

OOD
PM 19-11

Effective: May 1, 2019

To:       All of EOIR
From:     James R. McHenry III, Director
Date:     March 29, 2019

## "NO DARK COURTROOMS"

| | |
|---|---|
| PURPOSE: | Memorialize policies to reduce and minimize the impact of unused courtrooms and docket time |
| OWNER: | Office of the Director |
| AUTHORITY: | 8 C.F.R. § 1003.0(b) |
| CANCELLATION: | None |

A "dark," *i.e.* unused, immigration courtroom represents a lost opportunity for both respondents and the government to resolve immigration cases in a timely manner consistent with due process. The current pending immigration court caseload exceeds 850,000, and some cases are scheduled two to three years in the future. Consequently, dark courtrooms not only exacerbate the size of the pending caseload, but also significantly hinder the agency's ability to reduce the backlog.

A combination of sluggish immigration judge hiring between FY 2010 and FY 2016 and the prevalence of overlapping alternate work schedules contributed to a proliferation of dark courtrooms. For instance, as of June 2017, there were more than 100 immigration courtrooms not being used nationwide each Friday of every week.

Beginning in 2017, however, EOIR has actively sought to minimize the presence and effects of dark courtrooms by implementing practices designed to ensure that all available courtrooms are used for hearing cases every day during normal court operating hours. Although EOIR has discussed these practices previously in different fora and its Office of the Chief Immigration Judge (OCIJ) has been working on them for some time, this PM formally codifies EOIR's policy of "no dark courtrooms" and reaffirms its commitment to reducing unused docket time in order to adjudicate cases in a timely and impartial manner.

Increased hiring of immigration judges, increased availability of video teleconferencing (VTC), and improved scheduling and docketing practices since 2017 have made it easier to identify and address dark courtrooms and unused docket time. As most immigration judges maintain relatively consistent dockets over time, EOIR is also aware of gaps in immigration court scheduling that need to be covered, and it can take appropriate steps far enough in advance to address those gaps.

EOIR now also has a robust corps of supervisory immigration judges who can more easily coordinate scheduling across courts as necessary to ensure that as many dark courtrooms as possible are covered.

Accordingly, it is appropriate for EOIR to adopt a formal policy of "no dark courtrooms" and to direct OCIJ managers to ensure, to the maximum extent practicable, that all blocks of available immigration court time are being utilized for scheduling cases. In short, there should not be a dark courtroom during a court's normal operating hours unless there is absolutely no immigration judge available, including by VTC.

In implementing this policy, OCIJ managers should be mindful that immigration courts that presently have excess capacity due to small numbers of cases on their home dockets may hear cases from other courts, either in-person at a nearby court or by VTC. Similarly, immigration judges with small dockets may be re-assigned cases from those with heavier dockets to ensure consistent and timely scheduling of cases overall. Further, OCIJ managers should ensure that each individual immigration judge is assigned a sufficient number of cases to allow that judge the ability to meet any applicable performance measures. Additionally, consistent with OPPM 17-01, if an immigration judge grants a continuance of an individual merits hearing more than 30 days prior to the scheduled hearing date, the court administrator should endeavor to schedule another case in that slot as soon as possible.

To assist in addressing dark courtrooms, OCIJ managers should also be mindful of the availability of rehired retired immigration judges and of the ability of immigration judges at EOIR's immigration adjudication centers to hear cases by VTC.

It is important for supervisory immigration judges to maintain familiarity with adjudicatory conditions and case issues encountered by non-supervisory immigration judges. Although many supervisory immigration judges do hear cases on a regular basis, it is vital for all supervisory immigration judges to do so in order to better understand and assess the working conditions of the immigration judges and court staff whom they supervise. Accordingly, each Assistant Chief Immigration Judge should hear cases at least four times per month while covering a dark courtroom. Each Deputy Chief Immigration Judge, the Principal Deputy Chief Immigration Judge, and the Chief Immigration Judge should also hear cases at least once per month, again while covering a dark courtroom. Supervisory immigration judges on leave, on detail, or otherwise unavailable in circumstances approved by the Office of the Director are exempt from this requirement.

Finally, nothing in this policy is intended to eliminate or restrict the use of administrative time by immigration judges, and the agency understands that some courtrooms may not be used while immigration judges are utilizing administrative time. Rather, OCIJ management should ensure that the use of administrative time does not leave courtrooms dark any more than is necessary, and it should consider utilizing VTC or supervisory immigration judges to cover cases during that time.

This PM is effective May 1, 2019.

This PM is not intended to, does not, and may not be relied upon to create, any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

Please contact your supervisor if you have any questions.

———————————



OOD
PM 20-07

Effective:    January 31, 2020

To:        All of EOIR
From:      Sirce E. Owen, Acting Deputy Director *SEO*
Date:      January 31, 2020

## CASE MANAGEMENT AND DOCKETING PRACTICES

| | |
|---|---|
| PURPOSE: | Implementation of Efficient Docketing Practices |
| OWNER: | Office of the Director |
| AUTHORITY: | Pub. L. 103-62 and 111-352; 8 U.S.C. § 1225(b)(1)(B)(iii)(III); 8 C.F.R. §§ 1003.0(b) and (d), 1003.19(e), and 1208.31(g) |
| CANCELLATION: | None |

The primary mission of the Executive Office for Immigration Review (EOIR) is to adjudicate immigration cases by fairly, expeditiously, and uniformly interpreting and administering the Nation's immigration laws. "In all cases, immigration judges shall seek to resolve the questions before them in a timely and impartial manner consistent with the Act and regulations." 8 C.F.R. § 1003.10(b). Through its corps of dedicated, impartial, and professional immigration judges and immigration court support staff, EOIR has made marked improvements in the past three years in ensuring that cases are completed fairly and expeditiously consistent with due process. In Fiscal Year (FY) 2019, EOIR completed the largest number of cases at the immigration court level in its history. Moreover, though there have been significant increases in the past three years in the number of immigration judges adjudicating cases, the number of hearings held, and the number of cases completed, the number of complaints against immigration judges fell in FY 2019 for the second consecutive fiscal year. These results are a testament to the integrity and competence of our immigration judges and our immigration court staff, and their combined ability to fulfill EOIR's mission.

As EOIR moves forward, however, it is important to consolidate and institutionalize the progress made in the past three years. In particular, it is important for our immigration court leaders in the field, the Assistant Chief Immigration Judges (ACIJs) and the Court Administrators (CAs), to ensure that inefficient case management and docketing practices do not undermine EOIR's ability to complete cases in a timely and impartial manner or otherwise delay justice and impede due process, especially for aliens who are detained. Efficient docketing practices ensure the prompt review of all claims by an immigration judge to provide resolution to all parties, and good governance requires an efficient immigration court case processing system. Unnecessary delays benefit no one—not the alien, not the Department of Homeland Security (DHS), and not EOIR. Accordingly, this Policy Memorandum (PM) reiterates and

1

clarifies EOIR policy regarding certain case management and docketing practices in support of its mission.

I.     Detained Cases

EOIR continues to maintain its longstanding policy of prioritizing the timely completion of cases involving detained aliens. That policy, which was first memorialized in 1984, predates EOIR's creation in 1983:

> As previously established by INS policy before the establishment of EOIR and by continuation of that policy during the past year, detained cases and detained bond redetermination hearings should be calendared at the earliest possible date consistent with the uniform Docketing System and all efforts shall be made to complete these cases expeditiously. The calendaring of detained cases and detained bond redetermination hearings shall be of the <u>highest priority</u> relative to the calendaring of all other types of cases.

Operating Policies and Procedures Memorandum (OPPM) 84-1, *Case Priorities and Processing* (Feb. 6, 1984) at 1 (emphasis in original).

EOIR has repeatedly reiterated this policy, and it remains clear and unequivocal EOIR policy that, regardless of custodian, all detained cases should be prioritized for docketing and adjudication. Accordingly, employees who fail to ensure that detained cases are docketed and processed in a timely manner may be subject to corrective action.

   A.   Removal Cases

ACIJs and CAs should remain cognizant of prior guidance that detained removal cases should be input into the case management system within three days[1] of the filing of the Notice to Appear (NTA) and that—for cases not scheduled by DHS through the interactive scheduling portal—the initial master calendar hearing in a detained removal case should occur no later than ten days after the filing of the NTA.

   B.   Custody Redetermination Hearings[2]

EOIR maintains a goal of completing ninety percent of custody redetermination hearings within fourteen days of receipt of the request. Appendix A, *Case Priorities and Immigration Court Performance Measures* (Jan. 17, 2018). To meet this goal, custody redetermination hearings should occur no later than three to five days after the date the custody redetermination request was received. All immigration judges possess the professional competence to adjudicate

---

[1] All references to days in this PM refer to calendar days; however, for any deadline that falls on a Saturday, Sunday, federal holiday, or other government closure, the deadline is extended to the next business day.

[2] Although most custody redetermination hearings involve detained aliens, aliens who have been released from custody may request amelioration of the terms of release through a custody redetermination request filed within 7 days of release. 8 C.F.R. § 1236.1(d)(1); *Matter of Aguilar-Aquino*, 24 I&N Dec. 747 (BIA 2009). Such cases remain subject to EOIR's established goals for custody redetermination hearings.

AR.07413

custody redetermination cases, *Ethics and Professionalism Guide for Immigration Judges*, §
IV, and such cases may be placed on any immigration judge's docket, including an ACIJ's
docket, to ensure they are heard in a timely manner.

Once an immigration judge has issued a decision on an initial custody redetermination request,
subsequent requests must be in writing and must demonstrate that "the alien's circumstances
have changed materially since the prior bond redetermination." 8 C.F.R. § 1003.19(e). Before
scheduling a second or subsequent request for custody redetermination, the request should be
routed to an immigration judge for review within 24 hours of receipt. If the request does not
allege a material change in circumstances since the prior redetermination, then the immigration
judge may adjudicate the request without a hearing. If the immigration judge determines that a
hearing is warranted, however, then the hearing should occur within three to five days of receipt
of the request.

      C.  Credible Fear Reviews/Reasonable Fear Reviews[3]

Credible fear reviews "shall be concluded as expeditiously as possible, to the maximum extent
practicable within 24 hours, but in no case later than seven days after the date of" DHS's
determination. 8 U.S.C. § 1225(b)(1)(B)(iii)(III). To ensure that this statutory directive is
followed, ACIJs and CAs should ensure that a hearing on each request for review of a negative
credible fear determination occurs within 24 hours of receipt of the request to the maximum
extent practicable. In no case should a credible fear review hearing occur later than seven days
after the DHS determination.[4]

In the absence of exceptional circumstances, reasonable fear reviews should be conducted
within ten days of the receipt of the request for review. 8 C.F.R. § 1208.31(g). Accordingly,
ACIJs and CAs should ensure that a hearing on each request for review of a negative reasonable
fear determination occurs within that time frame, absent exceptional circumstances.

II.    Non-detained Removal Cases

For many non-detained removal cases, DHS schedules the initial master calendar hearing
through an interactive scheduling portal. For cases that are not scheduled through the interactive
scheduling portal, however, the ACIJ and the CA should ensure that cases are docketed as
expeditiously as possible upon the filing of the NTA. To that end, ACIJs and CAs should ensure
that cases are input into the case management system within five days of the filing of the NTA
and that—for cases not scheduled by DHS through the interactive scheduling portal—the initial
master calendar hearing in a non-detained case occurs no later than between 30 and 90 days
after the filing of the NTA.

---

[3] Most credible fear review and reasonable fear review cases involve aliens who are detained. Nevertheless, the
statutory and regulatory time frames—and, thus, the guidance in this PM—apply regardless of detention status.
[4] In cases in which DHS files the charging document in a credible fear review case more than 7 days after its
determination, the hearing should occur within 24 hours to the maximum extent practicable and no later than 7 days
after the filing of the charging document.

AR.07414

III.    Unscheduled Immigration Judge Absences

EOIR continues to maintain its policy of "no dark courtrooms" to ensure that parties do not have to wait any longer than necessary for the resolution of their cases. *See* PM 19-11, *"No Dark Courtrooms"* (Mar. 29, 2019). Consistent with that policy, an immigration judge's unexpected or unscheduled absence should not automatically require the rescheduling of cases scheduled on that judge's docket.[5] Rather, such dockets should be re-assigned to the ACIJ located at the court where the immigration judge is absent—if there is one—and the ACIJ should hear the cases as scheduled.[6]

For a detained docket, if no ACIJ is located at the court of the absent judge, the cases should be transferred to the docket of another immigration judge at the court to the maximum extent practicable.[7] This practice is already common at many courts to ensure that detained cases are not delayed and is consistent with EOIR's longstanding prioritization of detained cases discussed above.

For a non-detained docket, if no ACIJ is located at the court of the absent judge, the CA should inquire if another immigration judge hearing a docket that day is willing and available to accommodate the docket of the absent judge. If another immigration judge agrees to do so, then the cases should be transferred to that judge to be heard as scheduled. If no other immigration judge agrees to take the cases, then the clerk assigned to the absent immigration judge should have respondents check in and provide reset hearing notices to those who do. The cases of respondents who fail to appear, however, should not be rescheduled. Rather, those cases should be heard as scheduled by any available immigration judge, including an ACIJ, to determine whether an *in absentia* order of removal should be entered pursuant to 8 U.S.C. § 1229a(b)(5).

IV.    Cases Rescheduled due to Immigration Court Closures or Immigration Judge Absences

Cases that must be rescheduled due to the closure of an immigration court (*e.g.*, a weather-related closure) or an immigration judge's absence should be rescheduled expeditiously. For detained cases, rescheduled individual merits hearings should be reset to a date within 14 days of the original scheduled hearing date and may be heard by an ACIJ or by any available immigration judge. Rescheduled master calendar hearings should be reset to a date within 21 days of the original scheduled hearing date and may be distributed among multiple dockets as needed. For non-detained cases, rescheduled merits hearings should be reset to a date within 30 days of the original scheduled hearing date and may be heard by an ACIJ or by any available immigration judge. Rescheduled master calendar hearings should be reset to a date within 60

---

[5] Consistent with PM 19-11, an immigration judge's planned or scheduled absence also should not require the rescheduling of cases, as there will generally be sufficient time to find coverage for that judge's docket. In such circumstances, it remains the ACIJ's responsibility to ensure coverage of the absent judge's docket, including for the ACIJ to hear the cases if necessary.

[6] Each ACIJ possess the professional competence to adjudicate any type of immigration proceeding, and each ACIJ is expected to complete at least 100 cases during a fiscal year.

[7] Although transferred cases may be heard by video teleconferencing (VTC) if feasible, nothing in this PM should be construed as requiring an immigration judge to appear in person at a court in another city to hear a docket, though nothing in this policy prohibits an immigration judge from doing so voluntarily.

AR.07415

days of the original scheduled hearing date and may be distributed among multiple dockets as needed. Unless the immigration court closure or immigration judge absence is prolonged, compliance with this policy should not require any additional rescheduling of cases and is not a reason to reschedule future cases.

V.    Additional Docketing and Case Processing Issues

A. Interpreters

In-person contract interpreter services are billed based on a minimum block of time even if the services are not utilized for the entire block. It is incumbent upon EOIR to ensure that its resources related to in-person contract interpreters are utilized in the most efficient manner possible. If the hearing(s) for which an in-person contract interpreter was ordered conclude(s) before the end of the minimum billed time period, the CA should be notified prior to releasing the interpreter. For the remainder of the minimum billed time period, the interpreter should assist with other hearings if practicable. *See* OPPM 04-08, Contract Interpreter Services (Oct. 20, 2004) at 8 (". . .after a contract interpreter's services are no longer required for one hearing they may be asked to interpret in another. . .It should be noted that a contract interpreter is not released from duty until their services are no longer needed, as determined by the judge, court administrator, or other court designee.").

Interpreter services, delivered in person, by telephone, or by VTC, are an integral part of most EOIR proceedings. Although occasional interpreter unavailability does occur, repeated unavailability by a particular interpreter or in a particular case suggests a broader issue that should be addressed immediately. Accordingly, an immigration judge should notify the relevant ACIJ regarding any case that has been rescheduled two or more times due to interpreter unavailability, and the ACIJ should expeditiously elevate the issue to the Office of the Chief Immigration Judge for resolution, including scheduling and confirming an interpreter, either in person, by telephone, or by VTC, for the next hearing.

B. Continuances

EOIR has no policy mandating or requiring immigration judges to grant a continuance for any reason in any particular case or circumstance, except where a continuance is required by binding law. *See, e.g.*, *Matter of L-A-B-R-*, 27 I&N Dec. 405 (A.G. 2018); PM 19-13, *Use of Status Dockets* (Aug. 16, 2019) at 3.

C. Juveniles

Wherever feasible, EOIR maintains separate dockets for juvenile respondents whose parents are not also presently in immigration proceedings. OPPM 17-03, *Guidelines for Immigration Court Cases Involving Juveniles, Including Unaccompanied Alien Children* (Dec. 20, 2017) at 5. Juvenile respondents are defined as those under the age of 18. 8 C.F.R. § 1236.3(a). Accordingly, ACIJs and CAs should ensure that no respondent over the age of 18 has his or her case scheduled on a juvenile docket, and all cases of aliens over the age of 18 currently on a juvenile docket should be transferred to a regular docket.

5

---------

As the steward of an effective, professional administrative court system, EOIR strives to ensure all parties receive due process, cases are handled efficiently and impartially, and justice is served through the rule of law. The guidance set forth in this PM will aid EOIR in achieving those goals.

This PM supersedes any prior guidance to the contrary issued by EOIR on an issue contained in the PM. Nothing in this PM requires the rescheduling of currently-docketed cases or should be interpreted to require such rescheduling, except for the transfer of cases of non-juveniles from a juvenile docket to a regular docket.

This PM is not intended to, does not, and may not be relied upon to create, any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person. Nothing herein should be construed as mandating a particular outcome in any specific case.

Please contact your supervisor if you have any questions.

AR.07417

My Workbench                                                                    Tyler.Pietruszka@usdoj.gov    Log out

 An official website of the United States government
Here's how you know

THE UNITED STATES
DEPARTMENT *of* JUSTICE

ABOUT        OUR AGENCY        PRIORITIES        NEWS        RESOURCES        CAREERS        CONTACT

Home » Executive Office for Immigration Review » Find Legal Representation » Revisions                    SHARE

EOIR Home

Meet the Director

About the Office

News and
Information

Statistics and
Reports

Virtual Law
Library

EOIR FOIA

Contact EOIR

## FIND LEGAL REPRESENTATION

Revision state: *Published*
Most recent revision: *No*

**Recognition and Accreditation Program**

**List of Pro Bono Legal Service Providers (formerly the List of Free
Legal Services Providers)**

**Office of Legal Access Programs**

**List of Attorneys and Representatives who are currently Ineligible
to Practice Immigration Law**

**Read This Before You Take Legal Advice** (PDF)

*Updated October 1, 2020*

Was this page helpful?
Yes        No

ACTION CENTER

Access                    Access
ECAS                      ICOR

Find Legal                Submit a
Representation            Complaint

Find Case                 Find an
Information               Immigration
                          Court

 OCIJ
Practice
Manual

 BIA
Practice
Manual

 Forms

 Virtual
Law
Library

↓ **Expand** ↓

Customize Executive Office for Immigration Review Sidebar        Change layout

AR.07418

**U.S. Department of Justice**
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

**Stay Connected with Justice:**

**Email Updates** 

en ESPAÑOL
Contact DOJ

Archive
Accessibility
Information Quality
Privacy Policy
Legal Policies & Disclaimers
Social Media

Budget & Performance
Office of the Inspector
General
No FEAR Act
For Employees
FOIA
USA.gov

AR.07419

# Immigration Court Practice Manual



*The Practice Manual has been assembled as a public service to parties appearing before the Immigration Courts. This manual is not intended, in any way, to substitute for a careful study of the pertinent laws and regulations. Readers are advised to review Chapter 1.1 before consulting any information contained herein.*

*The Practice Manual is updated periodically. The legend at the bottom of each page reflects the last revision date. Updates to the Practice Manual are available through the EOIR website at www.justice.gov/eoir.*

AR.07420

## The Office of the Chief Immigration Judge

Christopher Santoro, Chief Immigration Judge (Acting)
Mary Cheng, Deputy Chief Immigration Judge
Sheila McNulty, Deputy Chief Immigration Judge (Acting)

| | | |
|---|---|---|
| Rico J. Bartolomei | David M. Jones | Sirce E. Owen |
| Grady A. Crooks | Matthew W. Kaufman | Nancy J. Paul |
| Daniel J. Daugherty | Joy Lampley-Fortson | Rodin Rooyani |
| Eric L. Dillow | Scott D. Laurent | Jose A. Sanchez |
| John R. Doolittle II | Lisa Luis | Theresa M. Scala |
| Irene C. Feldman | H. Kevin Mart | Christopher R. Seppanen |
| James K. Grim | Clay Martin | Elisa M. Sukkar |
| Theresa Holmes-Simmons | Hugo R. Martinez | Jack H. Weil |
| Amy C. Hoogasian | James F. McCarthy III | Daniel H. Weiss |
| Carrie C. Johnson-Papillo | Philip J. Montante Jr. | Ryan R. Wood |

Assistant Chief Immigration Judges

The Office of the Chief Immigration Judge expresses its gratitude to the many Immigration Judges, Court Administrators, and other individuals who provided comments and suggestions during the preparation of the Immigration Court Practice Manual. The Office of the Chief Immigration Judge also expresses its appreciation to former Chief Immigration Judge David L. Neal for his leadership in creating the Practice Manual.  In addition, the Office of the Chief Immigration Judge recognizes the original members of the Practice Manual Committee for their dedication in creating this publication:

Judge John F. Gossart, Jr.                  Scott M. Rosen, Chief Counsel, OCIJ
Judge Stephen S. Griswold                Gary M. Somerville, Court Administrator
Jean C. King, Senior Legal Advisor, BIA    Emmett D. Soper, Attorney Advisor, OCIJ



**U.S. Department of Justice**

Executive Office for Immigration Review

*Office of the Chief Immigration Judge*

December 2016

*5107 Leesburg Pike, Suite 2500*
*Falls Church, Virginia 22041*

## Immigration Court Practice Manual

In 2006, the Attorney General instructed the Director of the Executive Office for Immigration Review, in consultation with the Immigration Judges, to issue a practice manual for the parties who appear before the Immigration Courts. This directive arose out of the public's desire for greater uniformity in Immigration Court procedures and a call for Immigration Courts to implement their "best practices" nationwide.

Accordingly, the Office of the Chief Immigration Judge published the Immigration Court Practice Manual in February 2008. The Practice Manual is a comprehensive guide that sets forth uniform procedures, recommendations, and requirements for practice before the Immigration Courts. The requirements set forth in this manual are binding on the parties who appear before the Immigration Courts, unless the Immigration Judge directs otherwise in a particular case. The Practice Manual does not limit the discretion of Immigration Judges to act in accordance with law and regulation.

The Practice Manual is intended to be a "living document," and the Office of the Chief Immigration Judge updates it in response to changes in law and policy, as well as in response to comments by the parties using it. We welcome suggestions and encourage the public to provide comments, to identify errors or ambiguities in the text, and to propose revisions. Information regarding where to send your correspondence is included in Chapter 13 of the Practice Manual.

The Office of the Chief Immigration Judge has made the Immigration Court Practice Manual available through the EOIR website at www.justice.gov/eoir. We encourage you to share the Practice Manual with any individuals or organizations that may benefit from it.

*MaryBeth Keller*

MaryBeth Keller
Chief Immigration Judge

AR.07422

This page has been intentionally left blank.

AR.07423

# TABLE OF CONTENTS

**Chapter 1**   **The Immigration Court**

**Chapter 2**   **Appearances before the Immigration Court**

**Chapter 3**   **Filing with the Immigration Court**

**Chapter 4**   **Hearings before Immigration Judges**

**Chapter 5**   **Motions before the Immigration Court**

**Chapter 6**   **Appeals of Immigration Judge Decisions**

**Chapter 7**   **Other Proceedings before Immigration Judges**

**Chapter 8**   **Stays**

**Chapter 9**   **Detention and Bond**

**Chapter 10**   **Discipline of Practitioners**

**Chapter 11**   **Forms**

**Chapter 12**   **Freedom of Information Act (FOIA)**

**Chapter 13**   **Other Information**

**Appendices**

**Glossary**

**Word Index**

**Citation Index**

**Table of Changes**

# TABLE OF CONTENTS

**Chapter 1  The Immigration Court** ................................................. **1**
  1.1   Scope of the Practice Manual ......................................... 1
  1.2   Function of the Office of the Chief Immigration Judge ............. 1
  1.3   Composition of the Office of the Chief Immigration Judge .......... 3
  1.4   Other EOIR Components ................................................ 5
  1.5   Jurisdiction and Authority .......................................... 7
  1.6   Public Access ...................................................... 10
  1.7   Inquiries .......................................................... 12

**Chapter 2  Appearances before the Immigration Court** ......................... **17**
  2.1   Representation Generally ........................................... 17
  2.2   Unrepresented Aliens ("Pro se" Appearances) ....................... 19
  2.3    Attorneys ......................................................... 20
  2.4   Accredited Representatives and Recognized Organizations ........... 26
  2.5   Law Students and Law Graduates ..................................... 28
  2.6   Paralegals ......................................................... 30
  2.7   Immigration Specialists ............................................ 30
  2.8   Family Members ..................................................... 30
  2.9   Others ............................................................. 31

**Chapter 3  Filing with the Immigration Court** ............................... **21**
  3.1   Delivery and Receipt ............................................... 21
  3.2   Service on the Opposing Party ...................................... 41
  3.3   Documents .......................................................... 43
  3.4   Filing Fees ........................................................ 53

**Chapter 4  Hearings before the Immigration Judges** .......................... **57**
  4.1   Types of Proceedings ............................................... 57
  4.2   Commencement of Removal Proceedings ................................ 57
  4.3   References to Parties and the Immigration Judge .................... 58
  4.4   Representation ..................................................... 59
  4.5   Hearing and Filing Location ........................................ 60
  4.6   Form of the Proceedings ............................................ 60
  4.7   Hearings by Video or Telephone Conference .......................... 60
  4.8   Attendance ......................................................... 61
  4.9   Public Access ...................................................... 62
  4.10  Record ............................................................. 63
  4.11  Interpreters ....................................................... 64
  4.12  Courtroom Decorum .................................................. 64
  4.13  Electronic Devices ................................................. 65
  4.14  Access to Court .................................................... 66

Immigration Court
Practice Manual                                                    Table of Contents

4.15  Master Calendar Hearing .................................................. 66
4.16  Individual Calendar Hearing ............................................ 79
4.17  In Absentia Hearing ...................................................... 82
4.18  Pre-Hearing Conferences and Statements ......................... 82
4.19  Pre-Hearing Briefs ....................................................... 84
4.20  Subpoenas ................................................................. 86
4.21  Combining and Separating Cases .................................... 87
4.22  Juveniles ................................................................... 88
**Chapter 5  Motions before the Immigration Court**........................ **79**
5.1   Who May File ............................................................. 79
5.2   Filing a Motion ........................................................... 79
5.3   Motion Limits ............................................................. 94
5.4   Multiple Motions .......................................................... 94
5.5   Motion Briefs .............................................................. 94
5.6   Transcript Requests ...................................................... 94
5.7   Motions to Reopen ....................................................... 95
5.8   Motions to Reconsider ................................................... 97
5.9   Motions to Reopen In Absentia Orders .............................. 99
5.10  Other Motions ........................................................... 101
5.11  Decisions ................................................................. 104
5.12  Response to Motion ..................................................... 105
**Chapter 6  Appeals of Immigration Judge Decisions**.................... **106**
6.1   Appeals Generally ....................................................... 106
6.2   Process .................................................................... 106
6.3   Jurisdiction ............................................................... 107
6.4   Waiver of Appeal ........................................................ 107
6.5   Certification .............................................................. 107
6.6   Additional Information .................................................. 108
**Chapter 7  Other Proceedings before Immigration Judges**............. **109**
7.1   Overview .................................................................. 109
7.2   Deportation Proceedings and Exclusion Proceedings ........... 109
7.3   Rescission Proceedings ................................................ 111
7.4   Limited Proceedings .................................................... 109
**Chapter 8  Stays**.................................................................... **123**
8.1   In General ................................................................ 123
8.2   Automatic Stays ......................................................... 123
8.3   Discretionary Stays ..................................................... 125
**Chapter 9  Detention and Bond**.............................................. **130**
9.1   Detention ................................................................. 130
9.2   Detained Juveniles ...................................................... 131
9.3   Bond Proceedings ....................................................... 131

9.4    Continued Detention Review ................................................................ 136
**Chapter 10  Discipline of Practitioners .............................................. 140**
10.1  Practitioner Discipline Generally ..................................................... 140
10.2  Definition of Practitioner and Recognized Organization ................. 140
10.3  Jurisdiction ........................................................................................ 140
10.4  Conduct ............................................................................................. 141
10.5  Filing a Complaint ............................................................................. 143
10.6  Duty to Report ................................................................................... 144
10.7  Disciplinary Proceedings .................................................................. 145
10.8  Notice to Public ................................................................................. 150
10.9  Effect on Practitioner's Pending Immigration Cases ....................... 150
10.10 Reinstatement ................................................................................... 151
**Chapter 11  Forms ............................................................................... 153**
11.1  Forms Generally ................................................................................ 151
11.2  Obtaining Blank Forms ...................................................................... 153
11.3  Submitting Completed Forms ............................................................ 155
11.4  Additional Information ........................................................................ 155
**Chapter 12  Freedom of Information Act (FOIA) ................................. 156**
12.1  Generally ........................................................................................... 156
12.2  Requests ............................................................................................ 156
12.3  Denials ............................................................................................... 158
**Chapter 13  Other Information ............................................................. 159**
13.1  Reproduction of the Practice Manual ................................................ 159
13.2  Online Access to the Practice Manual .............................................. 159
13.3  Updates to the Practice Manual ........................................................ 163
13.4  Public Input ........................................................................................ 163

## Appendices

| | | |
|---|---|---|
| A | Immigration Court Addresses | A-1 |
| B | EOIR Directory | B-1 |
| C | Practice Manual Organizational Chart | C-1 |
| D | Deadlines | D-1 |
| E | Forms | E-1 |
| F | Sample Cover Page | F-1 |
| G | Sample Proof of Service | G-1 |
| H | Sample Certificate of Translation | H-1 |
| I | Telephonic Information | I-1 |
| J | Citation Guidelines | J-1 |
| K | Where to File | K-1 |
| L | Sample Written Pleading | L-1 |
| M | Sample Oral Pleading | M-1 |
| N | Sample Subpoena | N-1 |
| O | Sample Criminal History Chart | O-1 |
| P | Sample Table of Contents | P-1 |
| Q | Sample Proposed Order | Q-1 |
| R | Standing Orders | R-1 |

AR.07428

This page intentionally left blank.

AR.07429

# Chapter 1  The Immigration Court

## 1.1    Scope of the Practice Manual

*(a) Authority.* **—** The Executive Office for Immigration Review (EOIR) is charged with administering the Immigration Courts nationwide.  The Attorney General has directed the Director of EOIR, in consultation with the Immigration Judges, to issue an Immigration Court Practice Manual.

*(b) Purpose.* **—** This manual is provided for the information and convenience of the general public and for parties that appear before the Immigration Courts.  The manual describes procedures, requirements, and recommendations for practice before the Immigration Courts.  The requirements set forth in this manual are binding on the parties who appear before the Immigration Courts, unless the Immigration Judge directs otherwise in a particular case.

*(c) Disclaimer.* **—** This manual is not intended, nor should it be construed in any way, as legal advice.  The manual does not extend or limit the jurisdiction of the Immigration Courts as established by law and regulation.  Nothing in this manual shall limit the discretion of Immigration Judges to act in accordance with law and regulation.

*(d) Revisions.* **—** The Office of the Chief Immigration Judge reserves the right to amend, suspend, or revoke the text of this manual at any time at its discretion.  For information on how to obtain the most current version of this manual, see Chapter 13.3 (Updates to the Practice Manual).  For information on how to provide comments regarding this manual, see Chapter 13.4 (Public Input).

## 1.2    Function of the Office of the Chief Immigration Judge

*(a) Role.* **—** The Office of the Chief Immigration Judge oversees the administration of the Immigration Courts nationwide and exercises administrative supervision over Immigration Judges.  Immigration Judges are responsible for conducting Immigration Court proceedings and act independently in deciding matters before them.  Immigration Judges are tasked with resolving cases in a manner that is timely, impartial, and consistent with the Immigration and Nationality Act, federal regulations, and precedent decisions of the Board of Immigration Appeals and federal appellate courts.

*(b) Location within the federal governmen*t. **—** The Office of the Chief Immigration Judge (OCIJ) is a component of the Executive Office for Immigration Review

AR.07430

(EOIR). Along with the Board of Immigration Appeals and the Office of the Chief Administrative Hearing Officer, OCIJ operates under the supervision of the Director of EOIR. See 8 C.F.R. § 1003.0(a). In turn, EOIR is a component of the Department of Justice and operates under the authority and supervision of the Attorney General. See Appendix C (Organizational Chart).

**(c) Relationship to the Board of Immigration Appeals. —** The Board of Immigration Appeals is the highest administrative tribunal adjudicating immigration and nationality matters. The Board is responsible for applying the immigration and nationality laws uniformly throughout the United States. Accordingly, the Board has been given nationwide jurisdiction to review decisions of Immigration Judges and certain decisions made by the Department of Homeland Security (DHS). The Board is tasked with resolving the questions before it in a manner that is timely, impartial, and consistent with the Immigration and Nationality Act (INA) and federal regulations. The Board is also tasked with providing clear and uniform guidance to Immigration Judges, DHS, and the general public on the proper interpretation and administration of the INA and the federal regulations. See 8 C.F.R. § 1003.1(d)(1). See also Appendix C (Organizational Chart)..Finally, the Board has authority over the disciplining and sanctioning of representatives appearing before the Immigration Courts, DHS, and the Board. See Chapter 10 (Discipline of Practitioners).

For detailed guidance on practice before the Board, parties should consult the Board of Immigration Appeals Practice Manual, which is available at www.justice.gov/eoir.

**(d) Relationship to the Department of Homeland Security.** — The Department of Homeland Security (DHS) was created in 2003 and assumed most of the functions of the now-abolished Immigration and Naturalization Service. DHS is responsible for enforcing immigration laws and administering immigration and naturalization benefits. By contrast, the Immigration Courts and the Board of Immigration Appeals are responsible for independently adjudicating cases under the immigration laws. Thus, DHS is entirely separate from the Department of Justice and the Executive Office for Immigration Review. In proceedings before the Immigration Court or the Board, DHS is deemed to be a party and is represented by its component, U.S. Immigration and Customs Enforcement (ICE). See Chapters 1.5(a) (Jurisdiction), 1.5(c) (Immigration Judge decisions), 1.5(e) (Department of Homeland Security).

**(e) Relationship to the Immigration and Naturalization Service.** — Prior to the creation of the Department of Homeland Security (DHS), the Immigration and Naturalization Service (INS) was responsible for enforcing immigration laws and administering immigration and naturalization benefits. INS was a component of the

AR.07431

Department of Justice.  INS has been abolished and its role has been assumed by DHS, which is entirely separate from the Department of Justice.  See subsection (d), above.

*(f) Relationship to the Office of the Chief Administrative Hearing Officer. —* The Office of the Chief Administrative Hearing Officer (OCAHO) is an independent entity within the Executive Office for Immigration Review.  OCAHO is responsible for hearings involving employer sanctions, anti-discrimination provisions, and document fraud under the Immigration and Nationality Act.  OCAHO's Administrative Law Judges are not affiliated with the Office of the Chief Immigration Judge.  The Board of Immigration Appeals does not review OCAHO decisions.  See Appendix C (Organizational Chart).

*(g) Relationship to the Administrative Appeals Office. —* The Administrative Appeals Office (AAO), sometimes referred to as the Administrative Appeals Unit (AAU), was a component of the former Immigration and Naturalization Service and is now a component of the Department of Homeland Security (DHS).  The AAO adjudicates appeals from DHS denials of certain kinds of applications and petitions, including employment-based immigrant petitions and most nonimmigrant visa petitions.  See 8 C.F.R. §§ 103.2, 103.3.  The AAO is not a component of the Department of Justice.  The AAO should not be confused with the Executive Office for Immigration Review, the Office of the Chief Immigration Judge, or the Board of Immigration Appeals.  See Appendix C (Organizational Chart).

*(h) Relationship to the Office of Immigration Litigation (OIL). —* The Office of Immigration Litigation (OIL) represents the United States government in immigration-related civil trial litigation and appellate litigation in the federal courts.  OIL is a component of the Department of Justice, located in the Civil Division.  OIL is separate and distinct from the Executive Office for Immigration Review (EOIR).  OIL should not be confused with EOIR, the Office of the Chief Immigration Judge, or the Board of Immigration Appeals.  See Appendix C (Organizational Chart).

## 1.3    Composition of the Office of the Chief Immigration Judge

*(a) General. —* The Office of the Chief Immigration Judge (OCIJ) supervises and directs the activities of the Immigration Courts.  OCIJ operates under the supervision of the Director of the Executive Office for Immigration Review (EOIR).  OCIJ develops operating policies for the Immigration Courts, oversees policy implementation, evaluates the performance of the Immigration Courts, and provides overall supervision of the Immigration Judges.

*(i) Chief Immigration Judge. —* The Chief Immigration Judge oversees the administration of the Immigration Courts nationwide.

AR.07432

**(ii) Deputy Chief Immigration Judges. —** The Deputy Chief Immigration Judges assist the Chief Immigration Judge in carrying out his or her responsibilities.

**(iii) Assistant Chief Immigration Judges. —** The Assistant Chief Immigration Judges oversee the operations of specific Immigration Courts. A listing of the Immigration Courts overseen by each Assistant Chief Immigration Judge is available on the Executive Office for Immigration Review website at www.justice.gov/eoir.

**(iv) Legal staff. —** OCIJ's legal staff supports the Chief Immigration Judge, Deputy Chief Immigration Judges, and Assistant Chief Immigration Judges, as well as the Immigration Judges and Immigration Court law clerks nationwide.

**(v) Language Services Unit. —** The Language Services Unit oversees staff interpreters and contract interpreters at the Immigration Courts. The Language Services Unit conducts quality assurance programs for all interpreters.

**(vi) Court Evaluation Team. —** The Court Evaluation Team coordinates periodic comprehensive evaluations of the operations of each Immigration Court and makes recommendations for improvements.

**(vii) Court Analysis Unit. —** The Court Analysis Unit monitors Immigration Court operations and assists the courts by analyzing caseloads and developing systems to collect caseload data.

**(b) Immigration Courts. —** There are more than 400 Immigration Judges in more than 60 Immigration Courts nationwide. As a general matter, Immigration Judges determine removability and adjudicate applications for relief from removal. For the specific duties of Immigration Judges, see Chapter 1.5 (Jurisdiction and Authority). The decisions of Immigration Judges are final unless timely appealed or certified to the Board of Immigration Appeals. See Chapter 6 (Appeals of Immigration Judge Decisions).

Court Administrators are assigned to the local office of each Immigration Court. Under the supervision of an Assistant Chief Immigration Judge, the Court Administrator manages the daily activities of the Immigration Court and supervises staff interpreters, legal assistants, and clerical and technical employees.

In each Immigration Court, the Court Administrator serves as the liaison with the local office of the Department of Homeland Security, the private bar, and non-profit

AR.07433

organizations that represent aliens.  In some Immigration Courts, a Liaison Judge also participates as a liaison with these groups.

A listing of the Immigration Courts is available on the Executive Office for Immigration Review website at www.justice.gov/eoir.

***(c) Immigration Judge conduct and professionalism.* —** Immigration Judges strive to act honorably, fairly, and in accordance with the highest ethical standards, thereby ensuring public confidence in the integrity and impartiality of Immigration Court proceedings.  Alleged misconduct by Immigration Judges is taken seriously by the Department of Justice and the Executive Office for Immigration Review (EOIR), especially if it impugns the integrity of the hearing process.

Usually, when a disagreement arises with an Immigration Judge's ruling, the disagreement is properly raised in a motion to the Immigration Judge or an appeal to the Board of Immigration Appeals.  When a party has an immediate concern regarding an Immigration Judge's conduct that is not appropriate for a motion or appeal, the concern may be raised with the Assistant Chief Immigration Judge (ACIJ) responsible for the court or the ACIJ for Conduct and Professionalism.  Contact information for ACIJs is available on the EOIR website at www.justice.gov/eoir.

In the alternative, parties may raise concerns regarding an Immigration Judge's conduct directly with the Office of the Chief Immigration (OCIJ) by following the procedures outlined on the EOIR website at www.justice.gov/eoir or by sending an e-mail to OCIJ at: EOIR.IJConduct@usdoj.gov.  Where appropriate, concerns may also be raised with the Department of Justice, Office of Professional Responsibility.  All concerns, and any actions taken, may be considered confidential and not subject to disclosure.

## 1.4    Other EOIR Components

***(a) Office of the General Counsel.* —** The Office of the General Counsel (OGC) provides legal advice to the Executive Office for Immigration Review.  OGC also functions as a resource and point of contact for the public in certain instances.  In particular, OGC responds to Freedom of Information Act requests related to immigration proceedings. See Chapter 12 (Freedom of Information Act).  OGC receives complaints of misconduct involving immigration practitioners, and initiates disciplinary proceedings where appropriate.  See Chapter 10 (Discipline of Practitioners).

***(b) EOIR Fraud and Abuse Prevention Program.* —** The Executive Office for Immigration Review (EOIR) Fraud and Abuse Prevention Program was created to protect the integrity of immigration proceedings by reducing immigration fraud and abuse.  The

AR.07434

EOIR Fraud and Abuse Prevention Program assists Immigration Judges and EOIR staff in identifying fraud.  In addition, the program shares information with law enforcement and investigative authorities.  The program is an initiative of the EOIR Office of the General Counsel, as directed by the Attorney General.

Immigration fraud and abuse can take many forms.  Fraud is sometimes committed during Immigration Court proceedings by individuals in proceedings and by their attorneys. In addition, aliens are often victimized by fraud committed by individuals not authorized to practice law, who are frequently referred to as "immigration specialists," "visa consultants," "travel agents," and "notarios."

Where a person suspects that immigration fraud has been committed, he or she may report this to the EOIR Fraud and Abuse Prevention Program.  Where appropriate, the EOIR Fraud and Abuse Prevention Program refers cases to other authorities for further investigation.

Individuals wishing to report immigration fraud or abuse, or other irregular activity, should contact the EOIR Fraud and Abuse Prevention Program.  For contact information, see Appendix B (EOIR Directory).

***(c) Office of Legal Access Programs (OLAP).* —** The Office of Legal Access Programs (OLAP) in the Office of Policy is responsible for improving access to legal information and to representation for persons appearing before the Immigration Courts and the Board.  The Assistant Director for Policy administers the Recognition and Accreditation Program, including the recognition of organizations and the accreditation of their representatives wishing to practice before the Immigration Courts, the Board, and DHS, through OLAP.  For contact information, see Appendix B (EOIR Directory).

***(i) Legal Orientation Program.* —** The Legal Orientation Program (LOP) was created to provide detained aliens with essential and easy-to-understand information regarding the Immigration Court process, including their rights, responsibilities, and options for relief from removal.  The LOP is a program of the Office of Legal Access Programs within the Office of Policy.

The LOP is carried out locally through subcontracts with nonprofit legal agencies in cooperation with a number of local Immigration Courts and detention facilities.

The LOP providers conduct "group orientations," which are general rights presentations given to detained aliens prior to their first Immigration Court hearing. "Individual orientations" and "self-help workshops" are then provided to

AR.07435

unrepresented detainees to assist them with understanding their cases and identifying potential claims for relief from removal. While the LOP does not pay for legal representation, all detained aliens at LOP sites are provided access to program services, which may also include assistance with either locating pro bono counsel or representing themselves before the court.

More information about the LOP is available on the EOIR website at www.justice.gov/eoir.

**(d) Communications and Legislative Affairs Division. —** The Communications and Legislative Affairs Division (CLAD) in the Office of Policy is responsible for the public relations of the Executive Office for Immigration Review (EOIR), including the Office of the Chief Immigration Judge.  Because the Department of Justice policy prohibits interviews with Immigration Judges, CLAD serves as EOIR's liaison with the press.

**(e) Law Library and Immigration Research Center. —** The Law Library and Immigration Research Center (LLIRC) is maintained by the Executive Office for Immigration Review (EOIR) for use by EOIR staff and the general public.  The LLIRC maintains a "Virtual Law Library" accessible on the EOIR website at www.justice.gov/eoir. See Chapter 1.6(b) (Library and online resources).

## 1.5    Jurisdiction and Authority

**(a) Jurisdiction. —** Immigration Judges generally have the authority to:

- o  make determinations of removability, deportability, and excludability

- o  adjudicate applications for relief from removal or deportation, including, but not limited to, asylum, withholding of removal ("restriction on removal"), protection under the Convention Against Torture, cancellation of removal, adjustment of status, registry, and certain waivers

- o  review credible fear and reasonable fear determinations made by the Department of Homeland Security (DHS)

- o  conduct claimed status review proceedings

- o  conduct custody hearings and bond redetermination proceedings

- o  make determinations in rescission of adjustment of status and departure control cases

AR.07436

> o  take any other action consistent with applicable law and regulation as may be appropriate, including such actions as ruling on motions, issuing subpoenas, and ordering pre-hearing conferences and statements

See 8 C.F.R. §§ 1240.1(a), 1240.31, 1240.41.

Immigration Judges also have the authority to:

> o  conduct disciplinary proceedings pertaining to attorneys and accredited representatives, as discussed in Chapter 10 (Discipline of Practitioners)

> o  administer the oath of citizenship in administrative naturalization ceremonies conducted by DHS

> o  conduct removal proceedings initiated by the Office of Special Investigations

**(b) No jurisdiction. —** Although Immigration Judges exercise broad authority over matters brought before the Immigration Courts, there are certain immigration-related matters over which Immigration Judges do not have authority, such as:

> o  visa petitions

> o  employment authorization

> o  certain waivers

> o  naturalization applications

> o  revocation of naturalization

> o  parole into the United States under INA § 212(d)(5)

> o  applications for advance parole

> o  employer sanctions

> o  administrative fines and penalties under 8 C.F.R. parts 280 and 1280

AR.07437

    o determinations by the Department of Homeland Security involving safe third country agreements

See 8 C.F.R. §§ 103.2, 1003.42(h), 28 C.F.R. § 68.26.

  *(c) Immigration Judge decisions. —* Immigration Judges render oral and written decisions at the end of Immigration Court proceedings.  See Chapter 4.16(g) (Decision).  A decision of an Immigration Judge is final unless a party timely appeals the decision to the Board of Immigration Appeals or the case is certified to the Board.  Parties should note that the certification of a case is separate from any appeal in the case.  See Chapter 6 (Appeals of Immigration Judge Decisions).

  *(d) Board of Immigration Appeals. —* The Board of Immigration Appeals has broad authority to review the decisions of Immigration Judges.  See 8 C.F.R. § 1003.1(b).  See also Chapter 6 (Appeals of Immigration Judge Decisions).  Although the Immigration Courts and the Board are both components of the Executive Office for Immigration Review, the two are separate and distinct entities.  Thus, administrative supervision of Board Members is vested in the Chairman of the Board, not the Office of the Chief Immigration Judge. See Chapter 1.2(c) (Relationship to the Board of Immigration Appeals).  See Appendix C (Organizational Chart).

  *(e) Department of Homeland Security. —* The Department of Homeland Security (DHS) enforces the immigration and nationality laws and represents the United States government's interests in immigration proceedings.  DHS also adjudicates visa petitions and applications for immigration benefits.  See, e.g., 8 C.F.R. § 1003.1(b)(4), (5).  DHS is entirely separate from the Department of Justice and the Executive Office for Immigration Review.  When appearing before an Immigration Court, DHS is deemed a party to the proceedings and is represented by its component, U.S. Immigration and Customs Enforcement (ICE).  See Chapter 1.2(d) (Relationship to the Department of Homeland Security (DHS)).

  *(f) Attorney General. —* Decisions of Immigration Judges are reviewable by the Board of Immigration Appeals.  The Board's decisions may be referred to the Attorney General for review.  Referral may occur at the Attorney General's request, or at the request of the Department of Homeland Security or the Board.  The Attorney General may vacate any decision of the Board and issue his or her own decision in its place.  See 8 C.F.R. § 1003.1(d)(1)(i), (h).  Decisions of the Attorney General may be published as precedent decisions.  The Attorney General's precedent decisions appear with the Board's precedent decisions in Administrative Decisions Under Immigration and Nationality Law of the United States ("I&N Decisions").

AR.07438

***(g) Federal courts. —*** Decisions of Immigration Judges are reviewable by the Board of Immigration Appeals.  In turn, decisions of the Board are reviewable in certain federal courts, depending on the nature of the appeal.  When a decision of the Board is reviewed by a federal court, the Board provides that court with a certified copy of the record before the Board.  This record includes the Record of Proceedings before the Immigration Judge.

## 1.6    Public Access

***(a) Court locations. —***

***(i) Office of the Chief Immigration Judge. —*** The Office of the Chief Immigration Judge, which oversees the administration of the Immigration Courts nationwide, is located at the Executive Office for Immigration Review headquarters in Falls Church, Virginia.  See Appendix B (EOIR Directory).

***(ii) Hearing locations. —*** There are more than 400 Immigration Judges in more than 60 Immigration Courts in the United States.  A list of Immigration Courts is available in Appendix A (Immigration Court Addresses), as well as on the Executive Office for Immigration Review website at www.justice.gov/eoir.

Immigration Judges sometimes hold hearings in alternate locations, such as designated detail cities where the caseload is significant but inadequate to warrant the establishment of a permanent Immigration Court.  Immigration Judges also conduct hearings in Department of Homeland Security detention centers nationwide, as well as many federal, state, and local correctional facilities.  Documents pertaining to hearings held in these locations are filed at the appropriate Administrative Control Court.  See Chapter 3.1(a)(i) (Administrative Control Court).

In addition, hearings before Immigration Judges are sometimes conducted by video conference or, under certain conditions, by telephone conference.  See Chapter 4.7 (Hearings by Video or Telephone Conference).

With certain exceptions, hearings before Immigration Judges are open to the public.  See Chapter 4.9 (Public Access).  The public's access to immigration hearings is discussed in Chapter 4.14 (Access to Court).  For additional information on the conduct of hearings, see Chapters 4.12 (Courtroom Decorum), 4.13 (Electronic Devices).

***(b) Library and online resources. —***

AR.07439

*(i) Law Library and Immigration Research Center. —* CLAD maintains a Law Library and Immigration Research Center (LLIRC) at 5107 Leesburg Pike, Suite 1824, Falls Church, Virginia.  The LLIRC maintains select sources of immigration law, including Board decisions, federal statutes and regulations, federal case reporters, immigration law treatises, and various secondary sources.  The LLIRC serves the Executive Office for Immigration Review (EOIR), including the Office of the Chief Immigration Judge and the Immigration Courts, as well as the general public.  For hours of operation, directions, and collection information, contact the LLIRC at (703) 605-1103 or visit the EOIR website at www.justice.gov/eoir.  See Appendix B (EOIR Directory).

The LLIRC is not a lending library, and all printed materials must be reviewed on the premises.  LLIRC staff may assist patrons in locating materials, but are not available for research assistance.  LLIRC staff do not provide legal advice or guidance regarding filing or procedures for matters before the Immigration Courts.  LLRC staff may, however, provide guidance in locating published decisions of the Board.

Limited self-service copying is available in the LLIRC.

*(ii) Virtual Law Library. —* The LLIRC maintains a "Virtual Law Library," accessible on the Executive Office for Immigration Review website at www.justice.gov/eoir.  The Virtual Law Library serves as a comprehensive repository of immigration-related law and information for use by the general public.

*(c) Records. —*

*(i) Inspection by parties. —* Parties to a proceeding, and their representatives, may inspect the official record, except for classified information, by prior arrangement with the Immigration Court having control over the record.  See Chapters 3.1(a)(i) (Administrative Control Court), 4.10(c) (Record of Proceedings).  Removal of records by parties or other unauthorized persons is prohibited.

*(ii) Inspection by non-parties. —* Persons or entities who are not a party to a proceeding must file a request for information pursuant to the Freedom of Information Act (FOIA) to inspect the Record of Proceedings. See Chapter 12 (Freedom of Information Act).

AR.07440

*(iii) Copies for parties.* — The Immigration Court has the discretion to provide parties or their legal representatives with a copy of the hearing recordings and up to 25 pages of the record without charge, subject to the availability of court resources. Self-service copying is not available. However, parties may be required to file a request under FOIA to obtain these items. See Chapter 12 (Freedom of Information Act).

*(A) Digital audio recordings.* — Immigration Court hearings are recorded digitally. If a party is requesting a copy of a hearing that was recorded digitally, the court will provide the compact disc.

*(B) Cassette recordings.* — Previously, Immigration Court hearings were recorded on cassette tapes. If a party is requesting a copy of a hearing that was recorded on cassette tapes, the party must provide a sufficient number of 90-minute cassette tapes.

*(iv) Copies for non-parties.* — The Immigration Court does not provide non-parties with copies of any official record, whether in whole or in part. To obtain an official record, non-parties must file a request for information under FOIA. See Chapter 12 (Freedom of Information Act).

*(v) Confidentiality.* — The Immigration Courts take special precautions to ensure the confidentiality of cases involving aliens in exclusion proceedings, asylum applicants, battered alien spouses and children, classified information, and information subject to a protective order. See Chapter 4.9 (Public Access).

## 1.7    Inquiries

*(a) Generally.* — All inquiries to an Immigration Court must contain or provide the following information for each alien:

- o    complete name (as it appears on the charging document)

- o    alien registration number ("A number")

- o    type of proceeding (removal, deportation, exclusion, bond, etc.)

- o    date of the upcoming master calendar or individual calendar hearing

- o    the completion date, if the court proceedings have been completed

AR.07441

See also Chapter 3.3(c)(vi) (Cover page and caption), Appendix F (Sample Cover Page).

*(b) Press inquiries. —*  All inquiries from the press should be directed to the Executive Office for Immigration Review, Office of Policy, Communications and Legislative Affairs Division.  For contact information, see Appendix B (EOIR Directory).

*(c) Automated Case Information Hotline. —*  The Automated Case Information Hotline provides information about the status of cases before an Immigration Court or the Board of Immigration Appeals.  See Appendix B (EOIR Directory), Appendix I (Telephonic Information).  The Automated Case Information Hotline contains a telephone menu (in English and Spanish) covering most kinds of cases.  The caller must enter the alien registration number ("A number") of the alien involved.  A numbers have nine digits (e.g., A 234 567 890).  Formerly, A numbers had eight digits (e.g., A 12 345 678).  In the case of an eight-digit A number, the caller should enter a "0" before the A number (e.g., A 012 345 678).

For cases before the Immigration Court, the Automated Case Information Hotline contains information regarding:

- o  the next hearing date, time, and location

- o  in asylum cases, the elapsed time and status of the asylum clock

- o  Immigration Judge decisions

The Automated Case Information Hotline does not contain information regarding:

- o  bond proceedings

- o  motions

Inquiries that cannot be answered by the Automated Case Information Hotline may be directed to the Immigration Court in which the proceedings are pending or to the appropriate Administrative Control Court.  See Chapter 3.1(a)(i) (Administrative Control Courts).  Callers must be aware that Court Administrators and other staff members are prohibited from providing any legal advice and that no information provided by Court Administrators or other staff members may be construed as legal advice.

*(d)    Inquiries to Immigration Court staff. —*  Most questions regarding Immigration Court proceedings can be answered through the automated telephone number, known as the Automated Case Information Hotline.  See subsection (c), above.

AR.07442

For other questions, telephone inquiries may be made to Immigration Court staff.  Collect calls are not accepted.

   If a telephone inquiry cannot be answered by Immigration Court staff, the caller may be advised to submit an inquiry in writing, with a copy served on the opposing party.  See Appendix A (Immigration Court Addresses).

   In addition, Court Administrators and other staff members cannot provide legal advice to parties.

   ***(e) Inquiries to specific Immigration Judges. —*** Callers must bear in mind that Immigration Judges cannot engage in ex parte communications.  A party cannot speak about a case with the Immigration Judge when the other party is not present, and all written communications about a case must be served on the opposing party.

   ***(f) Faxes. —*** Immigration Courts generally do not accept inquiries by fax.  See Chapter 3.1(a)(vii) (Faxes and e-mail).

   ***(g) Electronic communications. —***

      ***(i) Internet. —*** The Executive Office for Immigration Review (EOIR) maintains a website at www.justice.gov/eoir. See Appendix A (Directory).  The website contains information about the Immigration Courts, the Office of the Chief Immigration Judge, the Board of Immigration Appeals, and the other components of EOIR.  It also contains newly published regulations, the Board's precedent decisions, and a copy of this manual. See Chapters 1.4(e) (Law Library and Immigration Research Center), 1.6(b) (Library and online resources).

      ***(ii) E-mail. —*** Immigration Courts generally do not accept inquiries by e-mail.

      ***(iii) Internet Immigration Information (I³). —*** The Internet Immigration Information (I³, pronounced "I-cubed") is a suite of EOIR web-based products that includes eRegistry, eFiling, and eInfo.  Access to these online electronic products is available on EOIR's website at http://www.justice.gov/eoir/internet-immigration-info.

         ***(A) Electronic Registry (eRegistry). —*** Attorneys and fully accredited representatives who are accredited to appear before EOIR must electronically register with EOIR in order to practice before the Immigration

AR.07443

Courts. eRegistry is the online process that is used to electronically register with EOIR. See Chapter 2.3(b)(i) (eRegistry).

**(B) Electronic filing (eFiling).** — The Immigration Court accepts electronic submission of the Notice of Entry of Appearance as an Attorney or Representative Before the Immigration Court (Form EOIR-28) except in certain situations.  See Chapter 2.3(c) (Appearances).

**(C) Electronic Case Information (eInfo).** — The Electronic Case Information System or "eInfo" provides information about the status of cases before an Immigration Court or the Board of Immigration Appeals. The information provided by eInfo is similar to that which is available by telephone via the Automated Case Information Hotline.  See Chapter 1.7(c) (Automated Case Information Hotline). eInfo is available only to registered attorneys and fully accredited representatives who electronically register with EOIR.  See subsection (A), above.

**(h) Emergencies and requests to advance hearing dates.** — If circumstances require urgent action by an Immigration Judge, parties should follow the procedures set forth in Chapters 5.10(b) (Motion to advance) or 8 (Stays), as appropriate.

AR.07444

AR.07445

# Chapter 2  Appearances before the Immigration Court

## 2.1    Representation Generally

**(a) Types of representatives. —** The regulations specify who may represent parties in immigration proceedings.  See 8 C.F.R. § 1292.1.  As a practical matter, there are four categories of people who may present cases in Immigration Court: unrepresented aliens (Chapter 2.2), attorneys (Chapter 2.3), accredited representatives (Chapter 2.4), and certain categories of persons who are expressly recognized by the Immigration Court (Chapters 2.5, 2.8, and 2.9).

Attorneys and accredited representatives must register with EOIR in order to practice before the Immigration Court.  See 8 C.F.R. § 1292.1(a)(1), (a)(4), (f); Chapters 2.3(b)(i) (eRegistry), 2.4 (Accredited Representatives).

No one else is recognized to practice before the Immigration Court.  Non-lawyer immigration specialists, visa consultants, and "notarios," are *not* authorized to represent parties before an Immigration Court.

**(b) Entering an appearance. —** All representatives must file a Notice of Entry of Appearance as Attorney or Representative Before the Immigration Court (Form EOIR-28).  See 8 C.F.R. §§ 1003.17(a), 1003.23(b)(1)(ii).  A Form EOIR-28 may be filed in one of two ways: either as an electronic Form EOIR-28, or as a paper Form EOIR-28.

Persons appearing without an attorney or representative ("pro se") should not file a Form EOIR-28.

Note that different forms are used to enter an appearance before an Immigration Court, the Board of Immigration Appeals, and the Department of Homeland Security (DHS).  The forms used to enter an appearance before the Board and DHS are as follows:

- o  the Notice of Entry of Appearance as Attorney or Representative Before the Board of Immigration Appeals (Form EOIR-27) is used to enter an appearance before the Board

- o  the Notice of Entry of Appearance of Attorney or Representative (Form G-28) is used to enter an appearance before DHS

AR.07446

The Immigration Court will not recognize a representative using a Form EOIR-27 or a Form G-28.

**(i) Electronic entry of appearance. —** After registering with the EOIR eRegistry, attorneys and accredited representatives may file either an electronic or paper Form EOIR-28 in the following situations:

- o    the first appearance of the representative, either at a hearing or by filing a pleading, motion, application, or other document

- o    whenever a case is remanded to the Immigration Court

- o    any change of business address or telephone number for the attorney or representative

- o    upon reinstatement following an attorney's suspension or expulsion from practice

In order to file an electronic Notice of Entry of Appearance as Attorney or Representative Before the Immigration Court (Form EOIR-28), an attorney or accredited representative should refer to the instructions for the EOIR eRegistry, which can be found on the Executive Office for Immigration Review website at www.justice.gov/eoir.

Attorneys and accredited representatives who electronically file a Form EOIR-28 close to a hearing may be required to complete a paper Form EOIR-28 at the hearing.

**(ii) Paper entry of appearance. —** A paper, not an electronic, Form EOIR-28 must be filed in the following situations:

- o    A bond redetermination request made before the filing of a Notice to Appear with an Immigration Court

- o    A motion to reopen

- o    A motion to reconsider

- o    A  motion to recalendar proceedings that are administratively

AR.07447

    closed

     o  A motion to substitute counsel

     o  A case in which there is more than one open proceeding

     o  Disciplinary proceedings

  When filing a paper Form EOIR-28, representatives should be sure to use the most current version of the form, which can be found on the EOIR website at www.justice.gov/eoir.  See also Chapter 11 (Forms), Appendix E (Forms).

  **(c) Notice to opposing party. —** In all instances of representation, the Department of Homeland Security must be served with a copy of the Notice of Entry of Appearance as Attorney or Representative Before the Immigration Court (Form EOIR-28).  See Chapter 3.2 (Service on the Opposing Party).  Even when an attorney or accredited representative files a Form EOIR-28 electronically with the Immigration Court, a printed copy of the electronically filed Form EOIR-28 must be served on the Department of Homeland Security for each case. See Chapter 3.2(c) (Method of service).

  **(d) Who may file. —** Whenever a party is represented, the party should submit all filings and communications to the Immigration Court through the representative.  See 8 C.F.R. § 1292.5(a).  An individual who is not a party to a proceeding may not file documents with the court.  See Chapters 5.1(c) (Persons not party to the proceedings), 3.2 (Service on the Opposing Party).

## 2.2 Unrepresented Aliens ("Pro se" Appearances)

  **(a) Generally. —** An individual in proceedings may represent himself or herself before the Immigration Court.

  Many individuals choose to be represented by an attorney or accredited representative.  Due to the complexity of the immigration and nationality laws, the Office of the Chief Immigration Judge recommends that those who can obtain qualified professional representation do so.  See Chapters 2.3(b) (Qualifications), 2.4 (Accredited Representatives), 2.5 (Law Students and Law Graduates)

AR.07448

*(b) Legal service providers.* — The Immigration Courts cannot give advice regarding the selection of a representative.  However, aliens in proceedings before an Immigration Court are provided with a list of free or low cost legal service providers within the region in which the Immigration Court is located. See 8 C.F.R. §§ 1003.61(a), 1292.2(a). The list is maintained by the Office of the Chief Immigration Judge and contains information on attorneys, bar associations, and certain non-profit organizations willing to provide legal services to indigent individuals in Immigration Court proceedings at little or no cost.  The free or low cost legal service providers may not be able to represent every individual who requests assistance.

In addition, all of the lists of free legal service providers nationwide are available on the EOIR website at www.justice.gov/eoir.

*(c) Address obligations.* — Whether represented or not, aliens in proceedings before the Immigration Court must notify the Immigration Court within 5 days of any change in address or telephone number, using the Alien's Change of Address Form (Form EOIR-33/IC).  See 8 C.F.R. § 1003.15(d)(2).  In many instances, the Immigration Court will send notification as to the time, date, and place of hearing or other official correspondence to the alien's address.  If an alien fails to keep address information up to date, a hearing may be held in the alien's absence, and the alien may be ordered removed even though the alien is not present. This is known as an "in absentia" order of removal.

Parties should note that notification to the Department of Homeland Security of a change in address does not constitute notification to the Immigration Court.

*(i) Change of address or telephone number.* — Changes of address or telephone number must be in writing and *only* on the Alien's Change of Address Form (Form EOIR-33/IC). Unless the alien is detained, *no other means of notification are acceptable.*  Changes in address or telephone numbers communicated through pleadings, motion papers, correspondence, telephone calls, applications for relief, or other means will *not* be recognized, and the address information on record will not be changed.

*(ii) Form EOIR-33/IC.* — The alien should use only the most current version of the Aliens's Change of Address Form (Form EOIR-33/IC).  The Form EOIR-33/IC is available at the Immigration Court and on the Executive Office for Immigration Review website at www.justice.gov/eoir. See also Chapter 11 (Forms) and Appendix E (Forms).  Individuals in proceedings should observe the distinction between the Immigration Court's Change of Address Form (Form EOIR-33/IC) and

AR.07449

the Board of Immigration Appeal's Change of Address Form (Form EOIR-33/BIA). The Immigration Courts will not recognize changes in address or telephone numbers communicated on the Board of Immigration Appeal's Change of Address Form (Form EOIR-33/BIA), and the address information on record will not be changed.

   *(iii) Motions.* — An alien should file an Alien's Change of Address Form (Form EOIR-33/IC) when filing a motion to reopen, a motion to reconsider, or a motion to recalendar. This ensures that the Immigration Court has the alien's most current address when it adjudicates the motion.

   *(d) Address obligations of detained aliens.* — When an alien is detained, the Department of Homeland Security (DHS) is obligated to report the location of the alien's detention to the Immigration Court. DHS is also obligated to report when an alien is moved between detention locations and when he or she is released. See 8 C.F.R. § 1003.19(g).

   *(i) While detained.* — As noted in (d), above, DHS is obligated to notify the Immigration Court when an alien is moved between detention locations. See 8 C.F.R. § 1003.19(g).

   *(ii) When released.* — The Department of Homeland Security is responsible for notifying the Immigration Court when an alien is released from custody. 8 C.F.R. § 1003.19(g). Nonetheless, the alien should file an Alien's Change of Address Form (Form EOIR-33/IC) with the Immigration Court within 5 days of release from detention to ensure that Immigration Court records are current. See Chapter 2.2(c) (Address obligations).

## 2.3    Attorneys

   *(a) Right to counsel.* — An alien in immigration proceedings may be represented by an attorney of his or her choosing, at no cost to the government. As in most civil or administrative proceedings, the government does not provide legal counsel. The Immigration Court provides aliens with a list of attorneys who may be willing to represent aliens for little or no cost, and many of these attorneys handle cases on appeal as well. See Chapter 2.2(b) (Legal service providers). Bar associations and nonprofit agencies can also refer aliens to practicing attorneys.

   *(b) Qualifications.* — An attorney may practice before the Immigration Court only if he or she is a member in good standing of the bar of the highest court of any state, possession, territory, or Commonwealth of the United States, or the District of Columbia,

AR.07450

and is not under any order suspending, enjoining, restraining, disbarring, or otherwise restricting him or her in the practice of law. See 8 C.F.R. §§ 1001.1(f), 1292.1(a)(1). Any attorney practicing before the Immigration Court who is the subject of such discipline in any jurisdiction must promptly notify the Executive Office for Immigration Review, Office of the General Counsel. See Chapter 10.6 (Duty to Report). In addition, an attorney must be registered with EOIR in order to practice before the Immigration Court. See 8 C.F.R. § 1292.1(f), and Chapter 2.3(b)(i) (eRegistry), below.

>    *(i) eRegistry.* **—** An attorney must register with the EOIR eRegistry in order to practice before the Immigration Court. See 8 C.F.R. § 1292.1(f). Registration must be completed online on the EOIR website at www.justice.gov/eoir.

>    >    (**A**) *Administrative suspension.* **—** If an attorney fails to register, he or she may be administratively suspended from practice before the Immigration Court. See 8 C.F.R. § 1292.1(f). Multiple attempts by an unregistered attorney to appear before EOIR may result in disciplinary sanctions. See 8 C.F.R. § 1003.101(b).

>    >    (**B**) *Appearance by unregistered attorney.* **—** An Immigration Judge may, under extraordinary and rare circumstances, permit an unregistered attorney to appear at one hearing if the attorney files a Notice of Entry of Appearance as Attorney or Representative Before the Immigration Court (Form EOIR-28), and provides, on the record, the following registration information: name; date of birth; business address(es); business telephone number(s); e-mail address; and bar admission information (including bar number if applicable) for all the jurisdictions in which the attorney is licensed to practice, including those in which he or she is inactive. See 8 C.F.R. § 1292.1(f). An unregistered attorney who is permitted to appear at one hearing in such circumstances must complete the electronic registration process without delay after that hearing.

>    *(c) Appearances.* **—** Attorneys must enter an appearance before the Immigration Court by filing a Notice of Entry of Appearance as Attorney or Representative Before the Immigration Court (Form EOIR-28). See 8 C.F.R. §§ 1003.17(a), 1003.23(b)(1)(ii). A Form EOIR-28 may be filed in one of two ways: either as an electronic Form EOIR-28, or as a paper Form EOIR-28. See Chapter 2.1(b) (Entering an appearance). A Form EOIR-28 should always be filed in the situations described in Chapter 2.1(b) (Entering an appearance). If a paper Form EOIR-28 is submitted with other documents, the Form EOIR-28 should be at the front of the package. See Chapter 3.3(c) (Format). It should *not* be included as an exhibit, as part of an exhibit, or with other supporting materials. In

addition, whether filed electronically or on paper, the Form EOIR-28 must be served on the opposing party.  See Chapter 3.2 (Service on the Opposing Party).  If information is omitted from the Form EOIR-28 or it is not properly completed, the attorney's appearance may not be recognized, and the accompanying filing may be rejected.

    ***(i) Form EOIR-28. —*** When filing Form EOIR-28 on paper rather than electronically, attorneys should use the most current version of the Notice of Entry of Appearance as Attorney or Representative Before the Immigration Court (Form EOIR-28), which can be found on the Executive Office for Immigration Review (EOIR) website at www.justice.gov/eoir. See also Chapter 11 (Forms), Appendix E (Forms).  The use of green paper when filing a paper Form EOIR-28 is strongly encouraged.  See Chapter 11.2(f) (Form colors).

    Attorneys should observe the distinction between the Immigration Courts' Notice of Appearance (Form EOIR-28) and the Board of Immigration Appeal's Notice of Appearance (Form EOIR-27).  The Immigration Courts will not recognize an attorney based on a Form EOIR-27, whether filed with the Board or the Immigration Court.  Accordingly, when a case is remanded from the Board to the Immigration Court, the attorney must file a new Form EOIR-28.

    ***(ii) Attorney information. —*** The Notice of Entry of Appearance as Attorney or Representative Before the Immigration Court (Form EOIR-28) must bear an individual attorney's current address and the attorney's signature in compliance with the requirements of Chapter 3.3(b) (Signatures).  When filing a paper Form EOIR-28, all information required on the form, including the date, should be typed or printed clearly. Note that the EOIR ID number issued by EOIR through the eRegistry process must be provided on the Form EOIR-28.

    ***(iii) Bar information. —*** When an attorney is a member of a state bar which has a state bar number or corresponding court number, the attorney must provide that number on the Notice of Entry of Appearance as Attorney or Representative Before the Immigration Court (Form EOIR-28).  If the attorney has been admitted to more than one state bar, *each and every* state bar to which the attorney has ever been admitted–including states in which the attorney is no longer an active member or has been suspended, expelled, or disbarred–must be listed and the state bar number, if any, provided.

    ***(iv) Disciplinary information. —*** The box regarding attorney bar membership and disciplinary action on the Form EOIR-28 must only be checked if the attorney is not subject to any order disbarring, suspending, or otherwise

AR.07452

restricting him or her in the practice of law.  If the attorney is subject to discipline, then the attorney must provide information on the back of the form.  (Attorneys may attach an explanatory supplement or other documentation to the form.)  An attorney who fails to provide discipline information will not be recognized by the Immigration Court and may be subject to disciplinary action.

*(d) Scope of representation.* — When filing a Notice of Entry of Appearance as Attorney or Representative Before the Immigration Court (Form EOIR-28) an attorney must check the box indicating whether the entry of appearance is for all proceedings, custody and bond proceedings only, or all proceedings other than custody and bond proceedings. Once an attorney has made an appearance, that attorney has an obligation to continue representation until such time as a motion to withdraw or substitute counsel has been granted by the Immigration Court.   See Chapter 2.3(i) (Change in representation).  When an attorney wishes to change the scope of his or her appearance in a particular case, the attorney or representative must file a new Form EOIR-28 and, if necessary, a motion to withdraw or substitute counsel. For example:

o  If an attorney previously filed a Form EOIR-28 and checked the box indicating that the entry of appearance is for custody and bond proceedings only, and the attorney later wishes to represent the same alien in removal proceedings as well, the attorney must file a new Form EOIR-28 and check the box indicating that the entry of appearance is for all proceedings.

o  If an attorney previously filed a Form EOIR-28 and checked the box indicating that the entry of appearance is for all proceedings, and the attorney later no longer wishes to represent the alien in removal proceedings but does wish to continue representing the alien in custody and bond proceedings only, the attorney must file a motion to withdraw from the removal proceedings as well as a new Form EOIR-28 in which the attorney has checked the box indicating that the entry of appearance is for custody and bond proceedings only.

*(e) Multiple representatives.* — Sometimes, an alien may retain more than one attorney at a time.  In such cases, *all* of the attorneys are representatives of record, and will all be held responsible as attorneys for the respondent.  One of the attorneys is recognized as the primary attorney (notice attorney).  All of the attorneys must file Notices of Entry of Appearance as Attorney or Representative Before the Immigration Court (Form EOIR-28), checking the appropriate box to reflect whether the attorney is the primary attorney or a non-primary attorney.  All submissions to the Immigration Court must bear the name of one of the representatives of record and be signed by that attorney.  See subsection (c), above.  See also Chapter 3.3(b) (Signatures).

AR.07453

**(f) Law firms.** — Only individuals, not firms or offices, may represent parties before the Immigration Court. In every instance of representation, a named attorney must enter an appearance to act as an attorney of record. In addition, all filings must be signed by an attorney of record. See Chapter 3.3(b) (Signatures). Accordingly, the Immigration Court does not recognize appearances or accept pleadings, motions, briefs, or other filings submitted by a law firm, law office, or other entity if the name and signature of an attorney of record is not included. See subsection (e), above. See also Chapter 3.3(b)(ii) (Law firms). If, at any time, more than one attorney represents an alien, one of the attorneys must be designated as the primary attorney (notice attorney). See subsection (e), above.

**(i) Change in firm.** — In the event that an attorney departs a law firm but wishes to continue representing the alien, the attorney must promptly file a new Notice of Entry of Appearance of Attorney or Representative Before the Immigration Court (Form EOIR-28). The new Notice of Appearance must reflect any change of address and apprize the Immigration Court of his or her change in affiliation. The attorney should check the "new address" box in the address block of the new Form EOIR-28, which must be served on the opposing party. See Chapter 3.2 (Service on the Opposing Party).

**(ii) Change in attorney.** — If the attorney of record leaves a law firm but the law firm wishes to retain the case, another attorney in the firm must file a motion for substitution of counsel. Similarly, if a law firm wishes to reassign responsibility for a case from one attorney to another attorney in the firm, the new attorney must file a motion for substitution of counsel. Until such time as a motion for substitution of counsel is granted, the original attorney remains the alien's attorney and is responsible for the case. See subsection (i)(i), below.

**(g) Service upon counsel.** — Service of papers upon counsel of a represented party constitutes service on the represented party. See 8 C.F.R. § 1292.5(a), Chapter 3.2(f) (Representatives and service).

**(h) Address obligations of counsel.** — Attorneys who enter an appearance before the Immigration Court have an affirmative duty to keep the Immigration Court apprised of their current address and telephone number. See 8 C.F.R. § 1003.15(d)(2). Changes in counsel's address or telephone number should be made by updating the attorney's registration information in the EOIR eRegistry to include the new address and telephone number. See Chapter 2.3(b)(i) (eRegistry). In addition, once the new address is added to the attorney's registration information, the attorney must submit a new electronic or paper Notice of Entry of Appearance of Attorney or Representative Before the Immigration Court (Form EOIR-28) for each alien for which the attorney address is

AR.07454

being changed.  If an attorney has multiple addresses, the attorney should make sure that the appropriate attorney address is designated for each alien. See Chapter 2.3(c) (Appearances).  The attorney also should check the "New Address" box in the address block on the Form EOIR-28. The attorney should *not* submit an Alien's Change of Address Form (Form EOIRв33/IC) to notify the Immigration Court of a change in the attorney's address.

> ***(i) No compound changes of address. —*** An attorney may not simply submit a list of clients for whom his or her change of address should be entered. Attorneys must submit a new electronic or paper Notice of Entry of Appearance of Attorney or Representative Before the Immigration Court (Form EOIR-28) for each alien he or she represents.

> ***(ii) Address obligations of represented aliens. —*** Even when an alien is represented, the alien is still responsible for keeping the Immigration Court apprised of his or her address and telephone number. Changes of address or telephone number for the alien may not be made on the Notice of Entry of Appearance of Attorney or Representative Before the Immigration Court (Form EOIR-28) but must be made on the Alien's Change of Address Form (Form EOIR-33/IC).  See Chapter 2.2(c) (Address obligations).

> ***(i) Change in representation. —*** Changes in representation may be made as described in subsections (i) through (iii), below.

> ***(i) Substitution of counsel. —*** When an alien wishes to substitute a new attorney for a previous attorney, the new attorney must submit a written or oral motion for substitution of counsel, accompanied by a Notice of Entry of Appearance of Attorney or Representative Before the Immigration Court (Form EOIR-28).  The new attorney must file a paper Form EOIR-28, not an electronic Form EOIR-28. See 8 C.F.R.  § 1003.17(b), Chapter 2.1(b) (Entering an appearance).  If in writing, the motion should be filed with a cover page labeled "MOTION FOR SUBSTITUTION OF COUNSEL" and comply with the deadlines and requirements for filing.  See Chapter 3 (Filing with the Immigration Court), Appendix F (Sample Cover Page).  The motion should contain the following information:

> o  whether the motion to substitute counsel is for all proceedings, custody and bond proceedings only, or all proceedings other than custody and bond proceeding

    o   the reason(s) for the substitution of counsel, in conformance with applicable state bar and other ethical rules

    o   evidence that prior counsel has been notified about the motion for substitution of counsel

    o   evidence of the alien's consent to the substitution of counsel

If the motion is in writing, the new counsel should serve a copy of the motion and executed Form EOIR-28 on prior counsel as well as the Department of Homeland Security. A Proof of Service of the motion and Form EOIR-28 on prior counsel is sufficient to show that prior counsel has been notified about the motion to substitute counsel.

In adjudicating a motion for substitution of counsel, the time remaining before the next hearing and the reason(s) given for the substitution are taken into consideration. Extension requests based on substitution of counsel are not favored.

If a motion for substitution of counsel is granted, prior counsel need not file a motion to withdraw. However, until a motion for substitution of counsel is granted, the original counsel remains the alien's attorney of record and must appear at all scheduled hearings.

The granting of a motion for substitution of counsel does *not* constitute a continuance of a scheduled hearing. Accordingly, parties must be prepared to proceed at the next scheduled hearing.

***(ii) Withdrawal of counsel.*** **—** When an attorney wishes to withdraw from representing an alien, and the alien has not obtained a new attorney, the attorney must submit a written or oral motion to withdraw. See 8 C.F.R. § 1003.17(b). If in writing, the motion should be filed with a cover page labeled "MOTION TO WITHDRAW AS COUNSEL" and comply with the deadlines and requirements for filing. See Chapter 3 (Filing with the Immigration Court), Appendix F (Sample Cover Page). The motion should contain the following information:

    o   whether the motion to withdraw is for all proceedings, custody and bond proceedings only, or all proceedings other than custody and bond proceedings

AR.07456

o  the reason(s) for the withdrawal of counsel, in conformance with applicable state bar or other ethical rules

o  the last known address of the alien

o  a statement that the attorney has notified the alien of the request to withdraw as counsel or, if the alien could not be notified, an explanation of the efforts made to notify the alien of the request

o  evidence of the alien's consent to withdraw or a statement of why evidence of such consent is unobtainable

o  evidence that the attorney notified or attempted to notify the alien, with a recitation of specific efforts made, of (a) pending deadlines; (b) the date, time, and place of the next scheduled hearing; (c) the necessity of meeting deadlines and appearing at scheduled hearings; and (d) the consequences of failing to meet deadlines or appear at scheduled hearings

In adjudicating a motion to withdraw, the time remaining before the next hearing and the reason(s) given for the withdrawal are taken into consideration.

Until a motion to withdraw is granted, the attorney who filed the motion remains the alien's attorney of record and must attend all scheduled hearings.

**(iii) Release of counsel.** — When an alien elects to terminate representation by counsel, the counsel remains the attorney of record until the Immigration Judge has granted either a motion for substitution of counsel or a motion to withdraw, as appropriate.  See subsections (i) and (ii), above.

**(j) Appearances "on behalf of."** — Appearances "on behalf of" occur when a second attorney appears on behalf of the attorney of record at a specific hearing before the Immigration Court.  The attorney making the appearance need not work at the same firm as the attorney of record.  Appearances "on behalf of" are permitted as described below.

First, the attorney making the appearance must notify the Immigration Judge on the record that he or she is appearing on behalf of the attorney of record.

Second, the attorney making the appearance must file a Notice of Entry of Appearance of Attorney or Representative Before the Immigration Court (Form EOIR-28)

AR.07457

with the Immigration Court and serve it on the opposing party. The attorney must file a paper Form EOIR-28, not an electronic Form EOIR-28. See Chapter 2.1(b) (Entering an appearance). The attorney must check the box on the Form EOIR-28 indicating that he or she is making an appearance on behalf of the attorney of record and fill in the name of the attorney of record.

Third, the appearance on behalf of the attorney of record must be authorized by the Immigration Judge.

At the hearing, the attorney making the appearance may file documents on behalf of the alien. The attorney making the appearance cannot file documents on behalf of the alien at any other time. See Chapters 3.3(b) (Signatures), 3.2 (Service on the Opposing Party). The attorney of record need not file a new Form EOIR-28 after the hearing.

**(k) Attorney misconduct. —** The Executive Office for Immigration Review has the authority to impose disciplinary sanctions upon attorneys and representatives who violate rules of professional conduct before the Board of Immigration Appeals, the Immigration Courts, and the Department of Homeland Security. See Chapter 10 (Discipline of Practitioners). Where an attorney in a case has been suspended from practice before the Immigration Court and the alien has not retained new counsel, the Immigration Court treats the alien as unrepresented. In such a case, all mailings from the Immigration Court, including notices of hearing and orders, are mailed directly to the alien. Any filing from an attorney who has been suspended from practice before the Immigration Court is rejected. See Chapter 3.1(d) (Defective filings).

## 2.4    Accredited Representatives and Recognized Organizations

A fully accredited representative is an individual who is not an attorney and is approved by the Assistant Director for Policy or the Assistant Director's designee to represent aliens before the Board, the Immigration Courts, and the Department of Homeland Security (DHS). A partially accredited representative is authorized to practice solely before DHS. An accredited representative must, among other requirements, have the character and fitness to represent aliens and be employed by, or be a volunteer for, a non-profit religious, charitable, social service, or similar organization which has been recognized by the Assistant Director for Policy or the Assistant Director's designee to represent aliens. 8 C.F.R. §§ 1292.1(a)(4), 1292.11(a) , 1292.12(a)-(e). Accreditation of an individual is valid for a period of up to three years, and recognition of an organization is valid for a period of up to six years. 8 C.F.R. §§ 1292.11(f), 1292.12(d). Both may be renewed. 8 C.F.R. § 1292.16. Before representing an individual before the Immigration Court, a fully accredited representative must:

AR.07458

    o  register with the EOIR eRegistry, and

    o  file a Notice of Entry of Appearance as Attorney or Representative Before the Immigration Court (Form EOIR-28).

See Chapters 2.1(b) (Entering an appearance), 2.3(b) (Qualifications), 2.3(c) (Appearances), 2.4(e) (Applicability of attorney rules).

  ***(a) Recognized organizations.*** —The Assistant Director for Policy or the Assistant Director's designee, in the exercise of discretion, may recognize an eligible organization to provide representation through accredited representatives.  See 8 C.F.R. § 1292.11(a); Chapter 2.2(b) (Legal Service Providers).  To be recognized by EOIR, an organization must affirmatively apply for that recognition.  Such an organization must establish, among other requirements, that it is a non-profit religious, charitable, social service, or similar organization, and, if the organization charges fees, has a written policy for accommodating clients unable to pay fees for immigration legal services, is a Federal tax-exempt organization, and has at its disposal adequate knowledge, information, and experience in immigration law and procedure. The qualifications and procedures for organizations seeking recognition are set forth in the regulations.  8 C.F.R. §§ 1292.11, 1292.13.  A recognized organization also has reporting, recordkeeping, and posting requirements.  8 C.F.R. § 1292.14.  Questions regarding recognition may be directed to the Office of Legal Access Programs in the EOIR Office of Policy.  See Appendix B (EOIR Directory).

 (***b) Accredited representatives.*** — Recognized organizations, or organizations applying for recognition, may request accreditation of individuals who are employed by or volunteer for that organization.  The Assistant Director for Policy or the Assistant Director's designee, in the exercise of discretion, may approve accreditation of an eligible individual.  No individual may apply on his or her own behalf.  The qualifications and procedures for individuals seeking accreditation are set forth in the regulations.  8 C.F.R. §§ 1292.12, 1292.13.  In addition, an accredited representative must register with EOIR's eRegistry in order to practice before the Immigration Courts.  See Chapters 2.3(b)(i) (eRegistry), 2.4(e) (Applicability of attorney rules).

 Accreditation is not transferrable from one representative to another, and no individual retains accreditation upon his or her separation from the recognized organization.

 ***(c) Immigration specialists.*** — Accredited representatives should not be

AR.07459

confused with non-lawyer immigration specialists, visa consultants, and "notarios." See

Chapter 2.7 (Immigration Specialists). Accredited representatives must be expressly accredited by the Assistant Director for Policy or the Assistant Director's designee and must be employed by an institution specifically recognized by the Assistant Director for Policy or the Assistant Director's designee.

*(d) Verification*. — To verify that an individual has been accredited by EOIR, the public can either:

- o    consult the [Recognition and Accreditation Lists](https://www.justice.gov/eoir/) at https://www.justice.gov/eoir/, or

- o    contact the Recognition and Accreditation Coordinator (see Appendix B (Directory)).

*(e) Applicability of attorney rules*. — Except in those instances set forth in the regulations and this manual, accredited representatives are to observe the same rules and procedures as attorneys. See Chapter 2.3 (Attorneys).

*(f) Signatures*. — Only the accredited representative who is the representative of record may sign submissions to the Immigration Court. An accredited representative, even in the same organization, may not sign or file documents on behalf of another accredited representative. See Chapter 3.3(b) (Signatures).

*(g) Representative misconduct*. — Accredited representatives must comply with certain standards of professional conduct. See 8 C.F.R. §§ 1003.101 et seq., 1292.13.

*(h) Request to be removed from list of recognized organizations or accredited representatives*. — A recognized organization or an accredited representative who no longer wishes to be on the Recognized Organizations and Accredited Representatives Roster must submit a written request to the Recognition and Accreditation Coordinator. See Appendix B (EOIR Directory).

## 2.5    Law Students and Law Graduates

*(a) Generally.* **—** Law students and law graduates (law school graduates who are not yet admitted to practice law) may appear before the Immigration Court if certain conditions are met and the appearance is approved by the Immigration Judge.

*Version released on*
March 17, 2020

AR.07460

Recognition by the Immigration Court is not automatic and must be requested in writing. See 8 C.F.R. § 1292.1(a)(2).

### (b) Law students. —

**(i) Notice of Appearance.** — A law student does not register with the Executive Office for Immigration Review eRegistry and cannot electronically file a Notice of Entry of Appearance as Attorney or Representative Before the Immigration Court (Form EOIR-28). See Chapter 2.3(b) (Qualifications). A law student must file a paper Form EOIR-28. The law student should be careful to use the most current version of the Form EOIR-28, which is available on the EOIR website at www.justice.gov/eoir. He or she should check the box on the Form EOIR 28 indicating that he or she is a law student as defined in 8 C.F.R. § 1292.1(a)(2), and provide on the reverse side of the form both the name of the supervising attorney or accredited representative and that person's business address, if different from that of the law student. The supervising attorney or accredited representative must be registered to practice before EOIR and the Form EOIR-28 should also include the EOIR ID number of the supervising attorney or fully accredited representative.

**(ii) Representation statement.** — A law student wishing to appear before the Immigration Court must file a statement that he or she is participating in a legal aid program or clinic conducted by a law school or nonprofit organization and is under the direct supervision of a faculty member, licensed attorney, or accredited representative. The statement should also state that the law student is appearing without direct or indirect remuneration from the alien being represented. Such statement should be filed with the Notice of Entry of Appearance of Attorney or Representative Before the Immigration Court (Form EOIR-28). The law student's supervisor may be required to accompany the law student at any hearing. 8 C.F.R. § 1292.1(a)(2).

### (c) Law graduates. —

**(i) Notice of Appearance.** — A law graduate does not register with the Executive Office for Immigration Review eRegistry and cannot electronically file a Notice of Entry of Appearance as Attorney or Representative Before the Immigration Court (Form EOIR-28). See Chapter 2.3(b) (Qualifications). A law graduate must file a paper Form EOIR-28. The law graduate should be careful to use the most current version of the Form EOIR-28, which is available on the EOIR website at www.justice.gov/eoir. He or she should check the box on the Form EOIR 28 indicating that he or she is a law graduate as defined in 8 C.F.R. §

1292.1(a)(2), and provide on the reverse side of the form both the name of the supervising attorney or accredited representative and that person's business address, if different from that of the law graduate.  The supervising attorney or accredited representative must be registered to practice before EOIR and the Form

EOIR-28 should also include the EOIR ID number of the supervising attorney or fully accredited representative.

> ***(ii) Representation statement.*** **—** A law graduate wishing to appear before the Immigration Court must file a statement that he or she is under the direct supervision of a licensed attorney, or accredited representative.  The statement should also state that the law graduate is appearing without direct or indirect remuneration from the alien being represented.  Such statement should be filed with the Notice of Entry of Appearance of Attorney or Representative Before the Immigration Court (Form EOIR-28).  The law graduate's supervisor may be required to accompany the law graduate at any hearing.  8 C.F.R. § 1292.1(a)(2).

> ***(d) Representative misconduct.*** **—** Law students and law graduates must comply with standards of professional conduct.  See 8 C.F.R. § 1003.101 et seq.

## 2.6  Paralegals

Paralegals are professionals who assist attorneys in the practice of law.  They are not themselves licensed to practice law and therefore may not represent parties before the Immigration Court.

## 2.7  Immigration Specialists

Immigration specialists—who include visa consultants and "notarios"—are not authorized to practice law or appear before the Immigration Court.  These individuals may be violating the law by practicing law without a license.  As such, they do not qualify either as accredited representatives or "reputable individuals" under the regulations.  See Chapters 2.4 (Accredited Representatives), 2.9(a) (Reputable individuals).

Anyone, including members of the public, may report instances of suspected misconduct by immigration specialists to the Executive Office for Immigration Review, Fraud and Abuse Prevention Program.  See Chapter 1.4(b) (EOIR Fraud and Abuse Prevention Program).

## 2.8  Family Members

AR.07462

If a party is a child, then a parent or legal guardian may represent the child before the Immigration Court, provided the parent or legal guardian clearly informs the Immigration Court of their relationship.  If a party is an adult, a family member may represent the party *only* when the family member has been authorized by the Immigration Court to do so.  See Chapter 2.9(a) (Reputable individuals).

## 2.9    Others

**(a) Reputable individuals. —** Upon request, an Immigration Judge has the discretion to allow a reputable individual to appear on behalf of an alien, if the Immigration Judge is satisfied that the individual is capable of providing competent representation to the alien.  See 8 C.F.R. § 1292.1(a)(3).  To qualify as a reputable individual, an individual must meet all of the following criteria:

- o    be a person of good moral character

- o    appear on an individual basis, at the request of the alien

- o    receive no direct or indirect remuneration for his or her assistance

- o    file a declaration that he or she is not being remunerated for his or her assistance

- o    have a preexisting relationship with the alien (e.g., relative, neighbor, clergy), except in those situations where representation would otherwise not be available, and

- o    be officially recognized by the Immigration Court

Any individual who receives any sort of compensation or makes immigration appearances on a regular basis (such as a non-lawyer "immigration specialist," "visa consultant," or "notario") does not qualify as a "reputable individual" as defined in the regulations.

A reputable individual does not register with the Executive Office for Immigration Review eRegistry and cannot electronically file a Notice of Entry of Appearance as Attorney or Representative Before the Immigration Court (Form EOIR-28).  See Chapter 2.3(b) (Qualifications).  To appear before the Immigration Court, a reputable individual must file a paper Form EOIR-28.  The reputable individual should be careful to use the most current version of the Form EOIR-28, which is available on the EOIR website at www.justice.gov/eoir.  The reputable individual should check the box on the Form

AR.07463

EOIR-28 indicating that he or she is a reputable individual as defined in 8 C.F.R. § 1292.1(a)(3). Identification Numbers ("EOIR ID numbers") are not issued to reputable individuals, and therefore need not be provided on the Form EOIR-28. A person asking to be recognized as a reputable individual should file a statement attesting to each of the criteria set forth above.  This statement should accompany the Form EOIR-28.

*(b) Fellow inmates.* — The regulations do not provide for representation by fellow inmates or other detained persons.  Fellow inmates do not qualify under any of the categories of representatives enumerated in the regulations.

*(c) Accredited officials of foreign governments.* — An accredited official who is in the United States may appear before the Immigration Court in his or her official capacity with the alien's consent.  See 8 C.F.R. § 1292.1(a)(5).  An accredited official does not register with the Executive Office for Immigration Review eRegistry and cannot electronically file a Notice of Entry of Appearance as Attorney or Representative Before the Immigration Court (Form EOIR-28).  See Chapter 2.3(b) (Qualifications).  To appear before the Immigration Court, an accredited official must file a paper Form EOIR-28.  The accredited official should be careful to use the most current version of the Form EOIR-28, which is available on the Executive Office for Immigration Review website at www.justice.gov/eoir.  An accredited official should check the box on the Form EOIR-28 indicating that he or she is an accredited foreign government official as defined in 8 C.F.R. § 1292.1(a)(5). Identification Numbers ("EOIR ID numbers") are not issued to accredited officials, and therefore need not be provided on the Form EOIR-28. The individual must also submit evidence verifying his or her status as an accredited official of a foreign government.

*(d) Former employees of the Department of Justice.* — Former employees of the Department of Justice may be restricted in their ability to appear before the Immigration Court.  See 8 C.F.R. § 1292.1(c).

*(e) Foreign student advisors.* — Foreign student advisors, including "Designated School Officials," are not authorized to appear before the Immigration Court, unless the advisor is an accredited representative.  See Chapter 2.4 (Accredited Representatives).

AR.07464

AR.07465

# Chapter 3  Filing with the Immigration Court

## 3.1   Delivery and Receipt

*(a) Filing. —* Documents are filed either with the Immigration Judge during a hearing or with the Immigration Court outside of a hearing.  For documents filed outside of a hearing, the filing location is usually the same as the hearing location.  However, for some hearing locations, documents are filed at a separate "Administrative Control Court." See subsection (i), below, 8 C.F.R. §§ 1003.31, 1003.13.

*(i) Administrative Control Courts. —* "Administrative Control Courts" maintain the Records of Proceeding for hearings that take place at certain remote hearing locations.  A list of these locations, and of the Administrative Control Courts responsible for these locations, is available on the Executive Office for Immigration Review website at www.justice.gov/eoir.

*(ii) Shared administrative control. —* In some instances, two or more Immigration Courts share administrative control of cases.  Typically, these courts are located close to one another, and one of the courts is in a prison or other detention facility.  Where courts share administrative control of cases, documents are filed at the hearing location.  Cases are sometimes transferred between the courts without a motion to change venue.  However, if a party wishes for a case to be transferred between the courts, a motion to change venue is required.  See Chapter 5.10(c) (Motion to change venue).  A list of courts with shared administrative control is available on the Executive Office for Immigration Review website at www.justice.gov/eoir.

*(iii) Receipt rule. —* An application or document is not deemed "filed" until it is received by the Immigration Court.  All submissions received by the Immigration Court are date-stamped on the date of receipt.  Chapter 3.1(c) (Must be "timely").  The Immigration Court does not observe the "mailbox rule." Accordingly, a document is not considered filed merely because it has been received by the U.S. Postal Service, commercial courier, detention facility, or other outside entity.

*(iv) Postage problems. —* All required postage or shipping fees must be paid by the sender before an item will be accepted by the Immigration Court.  When using a courier or similar service, the sender must properly complete the packing slip, including the label and billing information.  The Immigration Court does not pay postage due or accept mailings without sufficient postage.  Further, the

AR.07466

Immigration Court does not accept items shipped by courier without correct label and billing information.

*(v) Filings.* — Filings sent through the U.S. Postal Service or by courier should be sent to the Immigration Court's street address.  Hand-delivered filings should be brought to the Immigration Court's public window during that court's filing hours.  Street addresses and hours of operation for the Immigration Courts are available in on the Executive Office for Immigration Review website at www.justice.gov/eoir.  Addresses are also available in Appendix A (Immigration Court Addresses).

Given the importance of timely filing, parties are encouraged to use courier or overnight delivery services, whenever appropriate, to ensure timely filing. However, the failure of any service to deliver a filing in a timely manner does not excuse an untimely filing.  See Chapter 3.1(c)(iii) (Delays in delivery).

*(vi) Separate envelopes.* — Filings pertaining to unrelated matters should not be enclosed in the same envelope. Rather, filings pertaining to unrelated matters should be sent separately or in separate envelopes within a package.

*(vii) Faxes and e-mail.* — The Immigration Court does not accept faxes or other electronic submissions unless the transmission has been specifically requested by the Immigration Court staff or the Immigration Judge. Unauthorized transmissions are not made part of the record and are discarded without consideration of the document or notice to the sender.

*(viii) E-filing.* — The Immigration Court accepts electronic submission of the Notice of Entry of Appearance as an Attorney or Representative Before the Immigration Court (Form EOIR-28) except in certain situations.  See Chapter 2.1(b) (Entering an Appearance).  All other filings must be submitted as paper submissions to the Immigration Court.

*(b) Timing of submissions.* — Filing deadlines depend on the stage of proceedings and whether the alien is detained.  Deadlines for filings submitted while proceedings are pending before the Immigration Court (for example, applications, motions, responses to motions, briefs, pre-trial statements, exhibits, and witness lists) are as specified in subsections (i), (ii), and (iii), below, unless otherwise specified by the Immigration Judge.  Deadlines for filings submitted after proceedings before the Immigration Court have been completed are as specified in subsections (iv) and (v), below.

AR.07467

Deadlines for filings submitted while proceedings are pending before the Immigration Court depend on whether the next hearing is a master calendar or an individual calendar hearing.

Untimely filings are treated as described in subsection (d)(ii), below. Failure to timely respond to a motion may result in the motion being deemed unopposed. See Chapter 5.12 (Response to Motion). Immigration Judges may deny a motion before the close of the response period without waiting for a response from the opposing party. See Chapter 5.12 (Response to Motion). "Day" is constructed as described in subsection (c), below.

### (i) Master calendar hearings. —

**(A) Non-detained aliens.** — For master calendar hearings involving non-detained aliens, filings must be submitted at least fifteen (15) days in advance of the hearing if requesting a ruling at or prior to the hearing. Otherwise, filings may be made either in advance of the hearing or in open court during the hearing.

When a filing is submitted at least fifteen days prior to a master calendar hearing, the response must be submitted within ten (10) days after the original filing with the Immigration Court. If a filing is submitted less than fifteen days prior to a master calendar hearing, the response may be presented at the master calendar hearing, either orally or in writing.

**(B) Detained aliens.** — For master calendar hearings involving detained aliens, filing deadlines are as specified by the Immigration Court.

### (ii) Individual calendar hearings. —

**(A) Non-detained aliens.** — For individual calendar hearings involving non-detained aliens, filings must be submitted at least fifteen (15) days in advance of the hearing. This provision does not apply to exhibits or witnesses offered solely to rebut and/or impeach. Responses to filings that were submitted in advance of an individual calendar hearing must be filed within ten (10) days after the original filing with the Immigration Court. Objections to evidence may be made at any time, including at the hearing.

**(B) Detained aliens.** — For individual calendar hearings involving detained aliens, filing deadlines are as specified by the Immigration Court.

AR.07468

*(iii) Asylum applications.* — Asylum applications are categorized as either "defensive" or "affirmative." A defensive asylum application is filed with the Immigration Court by an alien already in proceedings. An affirmative asylum application is filed with the Department of Homeland Security (DHS) Asylum Office by an alien not in removal proceedings. If the DHS Asylum Office declines to grant an affirmative asylum application, removal proceedings may be initiated. In that case, the asylum application is referred to an Immigration Judge, who may grant or deny the application. See 8 C.F.R. § 1208.4.

An alien filing an application for asylum should be mindful that the application must be filed within one year after the date of the alien's arrival in the United States, unless certain exceptions apply. INA § 208(a)(2)(B), 8 C.F.R. § 1208.4(a)(2).

*(A) Defensive applications.* — Defensive asylum applications are filed by mail, courier, in person at the court window, or in open court at a master calendar hearing. For information regarding lodging an application for purposes of employment authorization, see Chapter 4.15(l) (Asylum Clock).

*(B) Affirmative applications.* — Affirmative asylum applications referred to an Immigration Court by the DHS Asylum Office are contained in the Record of Proceedings. Therefore, there is no need for the alien to re-file the application with the Immigration Court. After being placed in Immigration Court proceedings, the alien may amend his or her asylum application. For example, the alien may submit amended pages of the application, as long as all changes are clearly reflected. Such amendments must be filed by the usual filing deadlines, provided in subsections (b)(i) and (b)(ii), above. The amendment should be accompanied by a cover page with an appropriate caption, such as "AMENDMENT TO PREVIOUSLY FILED ASYLUM APPLICATION." See Appendix F (Sample Cover Page).

*(iv) Reopening and reconsideration.* — Deadlines for filing motions to reopen and motions to reconsider with the Immigration Court are governed by statute and regulation. See Chapter 5 (Motions). Responses to such motions are due within ten (10) days after the motion was received by the Immigration Court, unless otherwise specified by the Immigration Judge. See Chapter 5.7 (Motions to Reopen), Chapter 5.8 (Motions to Reconsider). See also Chapter 5.12 (Response to Motion)

AR.07469

*(v) Appeals.* — Appeals must be received by the Board of Immigration Appeals no later than 30 calendar days after the Immigration Judge renders an oral decision or mails a written decision. See 8 C.F.R. § 1003.38, Chapter 6 (Appeals of Immigration Judge Decisions).

*(vi) Specific deadlines.* — The deadlines for specific types of filings are listed in Appendix D (Deadlines).

*(c) Must be "timely."* — The Immigration Court places a date stamp on all documents it receives. Absent persuasive evidence to the contrary, the Immigration Court's date stamp is controlling in determining whether a filing is "timely." Because filings are date-stamped upon arrival at the Immigration Court, parties should file documents as far in advance of deadlines as possible.

*(i) Construction of "day."* — All filing deadlines are calculated in calendar days. Thus, unless otherwise indicated, all references to "days" in this manual refer to calendar days rather than business days.

*(ii) Computation of time.* — Parties should use the following guidelines to calculate deadlines.

*(A) Deadlines on specific dates.* — A filing may be due by a specific date. For example, an Immigration Judge may require a party to file a brief by June 21, 2008. If such a deadline falls on a Saturday, Sunday, or legal holiday, the deadline is construed to fall on the next business day.

*(B) Deadlines prior to hearings.* — A filing may be due a specific period of time *prior to* a hearing. For example, if a filing is due 15 days prior to a hearing, the day of the hearing counts as "day 0" and the day before the hearing counts as "day 1." Because deadlines are calculated using calendar days, Saturdays, Sundays, and legal holidays are counted. If, however, such a deadline falls on a Saturday, Sunday, or legal holiday, the deadline is construed to fall on the next business day.

*(C) Deadlines following hearings.* — A filing may be due within a specific period of time *following* a hearing. For example, if a filing is due 15 days after a master calendar hearing, the day of the hearing counts as "day 0" and the day following the hearing counts as "day 1." In such cases, the day of the hearing counts as "day 0" and the day following the hearing counts as "day 1." Because deadlines are calculated using calendar days, Saturdays, Sundays, and legal holidays are counted. If, however, such a

AR.07470

deadline falls on a Saturday, Sunday, or legal holiday, the deadline is construed to fall on the next business day.

**(D) Deadlines following Immigration Judges' decisions. —** Pursuant to statute or regulation, a filing may be due within a specific period of time following an Immigration Judge's decision. For example, appeals, motions to reopen, and motions to reconsider must be filed within such deadlines. See 8 C.F.R. §§ 1003.38(b), 1003.23. In such cases, the day the Immigration Judge renders an oral decision or mails a written decision counts as "day 0." The following day counts as "day 1." Statutory and regulatory deadlines are calculated using calendar days. Therefore, Saturdays, Sundays, and legal holidays are counted. If, however, a statutory or regulatory deadline falls on a Saturday, Sunday, or legal holiday, the deadline is construed to fall on the next business day.

**(E) Deadlines for responses. —** A response to a filing may be due within a specific period of time following the original filing. For example, if a response to a motion is due within 10 days after the motion was filed with the Immigration Court, the day the original filing is received by the Immigration Court counts as "day 0." The following day counts as "day 1." Because deadlines are calculated using calendar days, Saturdays, Sundays, and legal holidays are counted. If, however, such a deadline falls on a Saturday, Sunday, or legal holiday, the deadline is construed to fall on the next business day.

**(iii) Delays in delivery. —** Postal or delivery delays do not affect existing deadlines. Parties should anticipate all postal or delivery delays, whether a filing is made by first class mail, priority mail, or overnight or guaranteed delivery service. The Immigration Court does not excuse untimeliness due to postal or delivery delays, except in rare circumstances. See Chapter 3.1(a)(iii) (Receipt rule).

**(iv) Motions for extensions of filing deadlines. —** Immigration Judges have the authority to grant motions for extensions of filing deadlines that are not set by regulation. A deadline is only extended upon the *granting* of a motion for an extension. Therefore, the mere filing of a motion for an extension does not excuse a party's failure to meet a deadline. Unopposed motions for extensions are not automatically granted.

**(A) Policy. —** Motions for extensions are not favored. In general, conscientious parties should be able to meet filing deadlines. In addition, every party has an ethical obligation to avoid delay.

AR.07471

**(B) Deadline. —** A motion for an extension should be filed as early as possible, and must be received by the original filing deadline.

**(C) Contents. —** A motion for an extension should be filed with a cover page labeled "MOTION FOR EXTENSION" and comply with the requirements for filing.  See Chapter 3 (Filing with the Immigration Court), Appendix F (Sample Cover Page).  A motion for an extension should clearly state:

- o   when the filing is due

- o   the reason(s) for requesting an extension

- o   that the party has exercised due diligence to meet the current filing deadline

- o   that the party will meet a revised deadline

- o   if the parties have communicated, whether the other party consents to the extension

**(d) Defective filings. —** Filings may be deemed defective due to improper filing, untimely filing, or both.

**(i) Improper filings. —** If an application, motion, brief, exhibit, or other submission is not properly filed, it is rejected by the Immigration Court with an explanation for the rejection.  Parties are expected to exercise due diligence.  Parties wishing to correct the defect and refile after a rejection must do so promptly.  See Chapters 3.1(b) (Timing of submissions), 3.1(c) (Must be "timely").  See also subsection (ii), below.  The term "rejected" means that the filing is returned to the filing party because it is defective and therefore will not be considered by the Immigration Judge.  It is not an adjudication of the filing or a decision regarding its content.   Examples of improper submissions include:

- o   if a fee is required, failure to submit a fee receipt or fee waiver request

- o   failure to include a proof of service upon the opposing party

- o   failure to comply with the language, signature, and format requirements

   o  illegibility of the filing

If a document is improperly filed but not rejected, the Immigration Judge retains the authority to take appropriate action.

**(ii) Untimely filings. —** The untimely submission of a filing may have serious consequences.  The Immigration Judge retains the authority to determine how to treat an untimely filing.  Accordingly, parties should be mindful of the requirements regarding timely filings.  See Chapters 3.1(b) (Timing of submissions), 3.1(c) (Must be "timely").

Untimely filings, if otherwise properly filed, are not rejected by Immigration Court staff.  However, parties should note that the consequences of untimely filing are sometimes as follows:

   o  if an application for relief is untimely, the alien's interest in that relief is deemed waived or abandoned

   o  if a motion is untimely, it is denied

   o  if a brief or pre-trial statement is untimely, the issues in question are deemed waived or conceded

   o  if an exhibit is untimely, it is not entered into evidence or it is given less weight

   o  if a witness list is untimely, the witnesses on the list are barred from testifying

   o  if a response to a motion is untimely, the motion is deemed unopposed

**(iii) Motions to accept untimely filings. —** If a party wishes the Immigration Judge to consider a filing despite its untimeliness, the party must make an oral or written motion to accept the untimely filing.  A motion to accept an untimely filing must explain the reasons for the late filing and show good cause for acceptance of the filing.  In addition, parties are strongly encouraged to support the motion with documentary evidence, such as affidavits and declarations under the penalty of perjury.  The Immigration Judge retains the authority to determine how to treat an untimely filing.

AR.07473

*(iv) Natural or manmade disasters. —* Natural or manmade disasters may occur that create unavoidable filing delays.  Parties wishing to file untimely documents after a disaster must comply with the requirements of subsection (iii), above.

*(e) Filing receipts. —* The Immigration Court does not issue receipts for filings. Parties are encouraged, however, to obtain and retain corroborative documentation of delivery, such as mail delivery receipts or courier tracking information.  As a precaution, parties should keep copies of all items sent to the Immigration Court.

*(f) Conformed copies. —* A time-and-date stamp is placed on each filing received by the Immigration Court.  If the filing party desires a "conformed copy" (i.e., a copy of the filing bearing the Immigration Court's time-and-date stamp), the original must be accompanied by an accurate copy of the filing, prominently marked "CONFORMED COPY; RETURN TO SENDER."  If the filing is voluminous, only a copy of the cover page and table of contents needs to be submitted for confirmation.  The filing must also contain a self-addressed stamped envelope or comparable return delivery packaging.  The Immigration Court does not return conformed copies without a prepaid return envelope or packaging.

## 3.2    Service on the Opposing Party

*(a) Service requirements. —* For all filings before the Immigration Court, a party must:

- o    provide, or "serve," an identical copy on the opposing party (or, if the party is represented, the party's representative), and

- o    except for filings served during a hearing or jointly-filed motions agreed upon by all parties, declare in writing that a copy has been served.

The written declaration is called a "Proof of Service," also referred to as a "Certificate of Service."  See subsection (e), below, Appendix G (Sample Proof of Service).  See also 8 C.F.R. §§ 1003.17(a), 1003.23(b)(1)(ii), 1003.32(a).

*(b) Whom to serve. —* For all filings before the Immigration Court, the opposing party must be served.  For an alien in proceedings, the opposing party is the Department of Homeland Security (DHS).  In most instances, a DHS Chief Counsel or a specific DHS Assistant Chief Counsel is the designated officer to receive service.  Parties may contact

AR.07474

the Immigration Court for the DHS address. The opposing party is never the Immigration Judge or Immigration Court.

**(c) Method of service.** — Service on the opposing party may be accomplished by hand-delivery, by U.S. Postal Service, or by commercial courier. Where service on the opposing party is accomplished by hand-delivery, service is complete when the filing is hand-delivered to a responsible person at the address of the individual being served.

Where service on the opposing party is accomplished by U.S. Postal Service or commercial courier, service is complete when the filing is deposited with the U.S. Postal Service or the commercial courier. Note that this rule differs from the rule for filings— filings with the Immigration Court are deemed complete when documents are received by the court, not when documents are mailed. See Chapter 3.1(a)(iii) (Receipt Rule).

**(i) Service of an electronically filed Form EOIR-28.** – The electronic filing of a Form EOIR-28 with the Immigration Court does not constitute service on the Department of Homeland Security. Attorneys and accredited representatives must serve the Department of Homeland Security with a printed copy of the Form EOIR-28 for each case. See Chapter 2.1(c) (Notice to Opposing Party).

**(d) Timing of service.** — The Proof of Service must bear the actual date of transmission and accurately reflect the means of transmission (e.g., hand delivery, regular mail, overnight mail, commercial courier, etc.). Service must be calculated to allow the other party sufficient opportunity to act upon or respond to served material.

**(e) Proof of Service.** — A Proof of Service is required for all filings, except filings served on the opposing party during a hearing or jointly-filed motions agreed upon by all parties. See 8 C.F.R. § 1003.17(a), 1003.23(b)(1)(ii), 1003.32(a). See also Appendix G (Sample Proof of Service). When documents are submitted as a package, the Proof of Service should be placed at the bottom of the package.

**(i) Contents of Proof of Service.** — A Proof of Service must state:

    o    the name or title of the party served

    o    the precise and complete address of the party served

    o    the date of service

    o    the means of service (e.g., hand delivery, regular mail, overnight mail, commercial courier, etc.)

AR.07475

　o　　the document or documents being served

A Proof of Service must contain the name and signature of the person serving the document.  A Proof of Service may be signed by an individual designated by the filing party, unlike the document(s) being served, which must be signed by the filing party.

***(ii) Certificates of Service on applications.*** — Certain forms, such as the Application for Cancellation of Removal for Certain Permanent Residents (Form EOIR-42A), contain a Certificate of Service, which functions as a Proof of Service.  Such a Certificate of Service only functions as a Proof of Service for the form on which it appears, not for any supporting documents filed with the form.  If supporting documents are filed with an application containing a Certificate of Service, a separate Proof of Service for the entire submission must be included.

***(f) Representatives and service.*** —

***(i) Service on a representative.*** — Service on a representative constitutes service on the person or entity represented.  If an alien is represented by an attorney, the Department of Homeland Security must serve the alien's attorney but need not serve the alien.  See 8 C.F.R. § 1292.5(a), Chapter 2 (Appearances before the Immigration Court).

***(ii) Service by a represented alien.*** — Whenever a party is represented, the party should submit all filings and communications to the Immigration Court through the representative.  See 8 C.F.R. § 1292.5(a), Chapter 2.1 (Representation Generally).

***(g) Proof of Service and Notice of Appearance.*** — All filings with the Immigration Court must include a Proof of Service that identifies the item being filed, unless served during a hearing.  Thus, a completed Proof of Service on a Notice of Entry of Appearance of Attorney or Representative Before the Immigration Court (Form EOIR-28) does not constitute Proof of Service of documents accompanying the Form EOIR-28.  See Chapters 3.2(c)(i) (Service of an electronically filed Form EOIR-28), 3.2(e)(ii) (Service by a represented alien).

## 3.3    Documents

***(a) Language and certified translations.*** — All documents filed with the Immigration Court must be in the English language or accompanied by a certified English

AR.07476

translation.  See 8 C.F.R. §§ 1003.33, 1003.23(b)(1)(i).  An affidavit or declaration in English by a person who does not understand English must include a certificate of interpretation stating that the affidavit or declaration has been read to the person in a language that the person understands and that he or she understood it before signing. The certificate must also state that the interpreter is competent to translate the language of the document, and that the interpretation was true and accurate to the best of the interpreter's abilities.

A certification of translation of a foreign-language document or declaration must be typed, signed by the translator, and attached to the foreign-language document.  A certification must include a statement that the translator is competent to translate the language of the document and that the translation is true and accurate to the best of the translator's abilities.  If the certification is used for multiple documents, the certification must specify the documents.  The translator's address and telephone number must be included.  See Appendix H (Sample Certificate of Translation).

**(b) Signatures.** — No forms, motions, briefs, or other submissions are properly filed without an original signature from either the alien, the alien's representative, or a representative of the Department of Homeland Security.  For purposes of filing a Form EOIR-28, the electronic acknowledgement and submission of an electronically filed Form EOIR-28 constitutes the signature of the alien's representative.  A Proof of Service also requires a signature but may be filed by someone designated by the filing party.  See Chapter 3.2(e) (Proof of Service).

A signature represents a certification by the signer that: he or she has read the document; to the best of his or her knowledge, information, and belief formed after reasonable inquiry, the document is grounded in fact; the document is submitted in good faith; and the document has not been filed for any improper purpose.  See 8 C.F.R. § 1003.102(j)(1).  A signature represents the signer's authorization, attestation, and accountability.  Every signature must be accompanied by the typed or printed name.

**(i) Simulated signatures.** — Signature stamps and computer-generated signatures are not acceptable on documents filed with the Immigration Court. These signatures do not convey the signer's personal authorization, attestation, and accountability for the filing.  See also Chapters 3.1(a) (Filing), 3.3(d) (Originals and reproductions).

**(ii) Law firms.** — Except as provided in Chapter 2.3(j) (Appearances "on behalf of"), only an attorney of record–not a law firm, law office, or other attorney– may sign a submission to the Immigration Court.   See Chapters 2.3(c) (Appearances), 2.3(e) (Multiple representatives), 2.3(f) (Law firms).

AR.07477

*(iii) Accredited representatives.* **—** Accredited representatives must sign their own submissions. See Chapter 2.4(f) (Signatures).

*(iv) Paralegals and other staff.* **—** Paralegals and other staff are not authorized to practice before the Immigration Court and may not sign a submission to the Immigration Court.  See Chapter 2.6 (Paralegals).  However, a paralegal may sign a Proof of Service when authorized by the filing party.  See Chapter 3.2(e) (Proof of Service).

*(v) Other representatives.* **—** Only those individuals who have been authorized by the Immigration Court to represent a party and have submitted a Notice of Entry of Appearance of Attorney or Representative Before the Immigration Court (Form EOIR-28) may sign submissions to the Immigration Court.  See Chapters 2.5 (Law students and Law Graduates), 2.9 (Others).

*(vi) Family members.* **—** A family member may sign submissions on behalf of a party only under certain circumstances.  See Chapter 2.8 (Family Members).

*(c) Format.* **—** The Immigration Court prefers all filings and supporting documents to be typed, but will accept handwritten filings that are legible.  Illegible filings will be rejected or excluded from evidence.  See Chapter 3.1(d) (Defective filings).  All filings must be signed by the filing party.  See Chapter 3.3(b) (Signatures).

*(i) Order of documents.* **—** Filings should be assembled as follows.  All forms should be filled out completely.  If a Notice of Entry of Appearance of Attorney or Representative Before the Immigration Court (Form EOIR-28) is required, it should be submitted at the front of the package.  If a Form EOIR-28 has been filed electronically, a printed copy of the Form EOIR-28 is generally not required.  See Chapter 2.1(b) (Entering an Appearance).

*(A) Applications for relief.* **—** An application package should comply with the instructions on the application.  The application package should contain (in order):

(1)     Form EOIR-28 (if required)
(2)     Cover page
(3)     If applicable, fee receipt (stapled to the application) or motion for a fee waiver
(4)     Application
(5)     Proposed exhibits (if any) with table of contents

AR.07478

(6)    Proof of Service

See Chapters 2.1(b) (Entering an appearance), 3.2(e) (Proof of Service), 3.3(c)(vi) (Cover page and caption), 3.3(e)(ii) (Publications as evidence), 3.4 (Filing Fees).

**(B) Proposed exhibits. —** If proposed exhibits are not included as part of an application package, the proposed exhibit package should contain (in order):

(1)    Form EOIR-28 (if required)
(2)    Cover page
(3)    Table of contents
(4)    Proposed exhibits
(5)    Proof of Service

See Chapters 2.1(b) (Entering an appearance), Chapters 3.2(e) (Proof of Service), 3.3(c)(vi) (Cover page and caption), 3.3(e)(ii) (Publications as evidence), 3.4 (Filing Fees).

**(C) Witness list. —** A witness list package should contain (in order):

(1)    Form EOIR-28 (if required)
(2)    Cover page
(3)    Witness list (in compliance with the requirements of Chapter 3.3(g) (Witness lists))
(4)    Proof of Service

See Chapters 2.1(b) (Entering an appearance), 3.2(e) (Proof of Service), 3.3(c)(vi) (Cover page and caption).

**(D) Motions to reopen. —** A motion package for a motion to reopen should contain (in order):

(1)    Form EOIR-28
(2)    Cover page
(3)    If applicable, fee receipt (stapled to the motion or application) or motion for a fee waiver
(4)    Motion to reopen
(5)    A copy of the Immigration Judge's decision

AR.07479

(6)    If applicable, a motion brief
(7)    If applicable, a copy of the application for relief
(8)    Supporting documentation (if any) with table of contents
(9)    Alien's Change of Address Form (Form EOIR-33/IC) (recommended even if the alien's address has not changed)
(10)   A proposed order for the Immigration Judge's signature
(11)   Proof of Service

See Chapters 2.1(b) (Entering an appearance), 2.2(c)(iii) (Motions), 3.2(e) (Proof of Service), 3.3(c)(vi) (Cover page and caption), 3.3(e)(ii) (Publications as evidence), 3.4 (Filing Fees), 5 (Motions before the Immigration Court).

   *(E) Motions to reconsider. —* A motion package for a motion to reconsider should contain (in order):

(1)    Form EOIR-28
(2)    Cover page
(3)    If applicable, fee receipt (stapled to the motion or application) or motion for a fee waiver
(4)    Motion to reconsider
(5)    A copy of the Immigration Judge's decision
(6)    If applicable, a motion brief
(7)    If applicable, a copy of the application for relief
(8)    Supporting documentation (if any) with table of contents
(9)    Alien's Change of Address Form (Form EOIR-33/IC) (recommended even if the alien's address has not changed)
(10)   A proposed order for the Immigration Judge's signature
(11)   Proof of Service

See Chapters 2.1(b) (Entering an appearance), 2.2(c)(iii) (Motions), 3.2(e) (Proof of Service), 3.3(c)(vi) (Cover page and caption), 3.3(e)(ii) (Publications as evidence), 3.4 (Filing Fees), 5 (Motions before the Immigration Court).

   *(F) Other filings. —* Other filing packages, including pre-decision motions and briefs, should contain (in order):

(1)    Form EOIR-28 (if required)
(2)    Cover page

AR.07480

(3)    If applicable, fee receipt (stapled to the filing) or motion for a fee waiver
(4)    The filing
(5)    Supporting documentation (if any) with table of contents
(6)    If a motion, a proposed order for the Immigration Judge's signature
(7)    Proof of service

See Chapters 2.1(b) (Entering an appearance), 3.2(e) (Proof of Service), 3.3(c)(vi) (Cover page and caption), 3.3(e)(ii) (Publications as evidence), 3.4 (Filing Fees).

*(ii) Number of copies.* — Except as provided in subsection (A) and (B), below, only the original of each application or other submission must be filed with the Immigration Court.  For all filings, a copy must be served on the opposing party. See Chapter 3.2 (Service on the Opposing Party).  Multiple copies of a filing (e.g., a brief, motion, proposed exhibit, or other supporting documentation) should not be filed unless otherwise instructed by the Immigration Judge.

*(A) Defensive asylum applications.* — For defensive asylum applications, parties must submit to the Immigration Court the original application.  See Chapter 3.1(b)(iii)(A) (Defensive applications).  In addition, a copy must be served on the opposing party.  See Chapter 3.2 (Service on the Opposing Party).

*(B) Consolidated cases.* — In consolidated cases, parties should submit a separate copy of each submission for placement in each individual Record of Proceedings.  However, a "master exhibit" may be filed in the lead individual's file for exhibits and supporting documentation applicable to more than one individual, with the approval of the Immigration Judge.

*(iii) Pagination and table of contents.* — All documents, including briefs, motions, and exhibits, should always be paginated by consecutive numbers placed at the bottom center or bottom right hand corner of each page.

Whenever proposed exhibits or supporting documents are submitted, the filing party should include a table of contents with page numbers identified.  See Appendix P (Sample Table of Contents).

AR.07481

Where a party is filing more than one application, the party is encouraged to submit a separate evidence package, with a separate table of contents, for each application.

*(iv) Tabs. —* Parties should use alphabetic tabs, commencing with the letter "A." The tabs should be affixed to the right side of the pages. In addition, parties should carefully follow the pagination and table of contents guidelines in subsection (iii), above.

*(v) Paper size and document quality. —* All documents should be submitted on standard 8½" x 11" paper, in order to fit into the Record of Proceedings. See 8 C.F.R. § 1003.32(b). The use of paper of other sizes, including legal-size paper (8½" x 14"), is discouraged. If a document is smaller than 8½" x 11", the document should be affixed to an 8½" x 11" sheet of paper or enlarged to 8½" x 11". If a document is larger than 8½" x 11", the document should be reduced in size by photocopying or other appropriate means, as authorized by the Immigration Judge. This provision does not apply to documents whose size cannot be altered without altering their authenticity. All documents must be legible. Copies that are so poor in quality as to be illegible may be rejected or excluded from evidence. See Chapter 3.1(d) (Defective filings).

Paper should be of standard stock white, opaque, and unglazed. Given its fragility and tendency to fade, photo-sensitive facsimile paper should never be used.

Ink should be dark, preferably black.

Briefs, motions, and supporting documentation should be single-sided.

*(vi) Cover page and caption. —* All filings should include a cover page. The cover page should include a caption and contain the following information:

- o     the name of the filing party

- o     the address of the filing party

- o     the title of the filing (such as "RESPONDENT's APPLICATION FOR CANCELLATION OF REMOVAL," "DHS WITNESS LIST," "RESPONDENT's MOTION TO REOPEN")

o    the full name for each alien covered by the filing (as it appears on the charging document)

o    the alien registration number ("A number") for each alien covered by the filing (if an alien has more than one A number, all the A numbers should appear on the cover page with a clear notation that the alien has multiple A numbers)

o    the type of proceeding involved (such as removal, deportation, exclusion, or bond)

o    the date and time of the hearing

See Appendix F (Sample Cover Page). If the filing involves special circumstances, that information should appear prominently on the cover page, preferably in the top right corner and highlighted (e.g., "DETAINED," "JOINT MOTION," "EMERGENCY MOTION").

*(vii) Fonts and spacing.* **—** Font and type size must be easily readable. "Times Roman 12 point" font is preferred. Double-spaced text and single-spaced footnotes are also preferred. Both proportionally spaced and monospaced fonts are acceptable.

*(viii) Binding.* **—** The Immigration Court and the Board of Immigration Appeals use a two-hole punch system to maintain files. All forms, motions, briefs, and other submissions should always be pre-punched with holes along the top (centered and 2 ¾" apart). Submissions may be stapled in the top left corner. If stapling is impracticable, the use of removable binder clips is encouraged. Submissions should neither be bound on the side nor commercially bound, as such items must be disassembled to fit into the record of proceedings and might be damaged in the process. The use of ACCO-type fasteners and paper clips is discouraged.

*(ix) Forms.* **—** Forms should be completed in full and must comply with certain requirements. See Chapter 11 (Forms). See also Appendix E (Forms).

*(d) Originals and reproductions.* **—**

*(i) Briefs and motions.* **—** The original of a brief or motion must always bear an original signature. See Chapter 3.3(b) (Signatures).

AR.07483

*(ii)    Forms.* — The original of a form must always bear an original signature.  See Chapters 3.3(b) (Signatures), 11.3 (Submitting completed forms).  In certain instances, forms must be signed in the presence of the Immigration Judge.

*(iii) Supporting documents.* — Photocopies of supporting documents, rather than the originals, should be filed with the Immigration Court and served on the Department of Homeland Security (DHS).  Examples of supporting documents include identity documents, photographs, and newspaper articles.

If supporting documents are filed at a master calendar hearing, the alien must make the originals available to DHS at the master calendar hearing for possible forensics examination at the Forensics Documents Laboratory.   In addition, the alien must bring the originals to all individual calendar hearings.

If supporting documents are filed after the master calendar hearing(s), the filing should note that originals are available for review.  In addition, the alien must bring the originals to all individual calendar hearings.

The Immigration Judge has discretion to retain original documents in the Record of Proceedings.  The Immigration Judge notes on the record when original documents are turned over to DHS or the Immigration Court.

*(iv) Photographs.* — If a party wishes to submit a photograph, the party should follow the guidelines in subsection (iii), above.  In addition, prior to bringing the photograph to the Immigration Court, the party should print identifying information, including the party's name and alien registration number (A number), on the back of the original photograph.

*(e) Source materials.* — Source materials should be provided to the Immigration Court and highlighted as follows.

*(i) Source of law.* — When a party relies on a source of law in any filing (e.g., a brief, motion, or pre-trial statement) that is not readily available, that source of law should be reproduced and provided to the Immigration Court and the other party, along with the filing.  Similarly, if a party relies on governmental memoranda, legal opinions, advisory opinions, communiques, or other ancillary legal authority or sources in any filing, copies of such items should be provided to the Immigration Court and the other party, along with the filing.

AR.07484

***(ii) Publications as evidence.*** — When a party submits published material as evidence, that material must be clearly marked with identifying information, including the precise title, date, and page numbers.  If the publication is difficult to locate, the submitting party should identify where the publication can be found and authenticated.

In all cases, the party should submit title pages containing identifying information for published material (e.g., author, year of publication).  Where a title page is not available, identifying information should appear on the first page of the document.  For example, when a newspaper article is submitted, the front page of the newspaper, including the name of the newspaper and date of publication, should be submitted where available, and the page on which the article appears should be identified.  If the front page is not available, the name of the newspaper and the publication date should be identified on the first page of the submission.

Copies of State Department Country Reports on Human Rights Practices, as well as the State Department Annual Report on International Religious Freedom, must indicate the year of the particular report.

***(iii) Internet publications.*** — When a party submits an internet publication as evidence, the party should follow the guidelines in subsection (ii), above, as well as provide the complete internet address for the material.

***(iv) Highlighting.*** — When a party submits secondary source material ("background documents"), that party should highlight or otherwise indicate the pertinent portions of that secondary source material.  Any specific reference to a party should always be highlighted.

***(f) Criminal conviction documents.*** — Documents regarding criminal convictions must comport with the requirements of 8 C.F.R. § 1003.41.  When submitting documents relating to a respondent's criminal arrests, prosecutions, or convictions, parties are encouraged to use a criminal history chart and attach all pertinent documentation, such as arrest and conviction records.  The criminal history chart should contain the following information for each arrest:

o     arrest date

o     court docket number

o     charges

AR.07485

o        disposition

o        immigration consequences, if any

The documentation should be paginated, with the corresponding pages indicated on the criminal history chart.  For a sample, see Appendix O (Sample Criminal History Chart).  Under "Immigration Consequences," parties should simply state their "bottom-line" position (for example: "not an aggravated felony").  Parties may supplement the criminal history chart with a pre-hearing brief.  See Chapter 4.19 (Pre-Hearing Briefs).

**(g) Witness lists. —** A witness list should include the following information for each witness, except the respondent:

o        the name of the witness

o        if applicable, the alien registration number ("A number")

o        a written summary of the testimony

o        the estimated length of the testimony

o        the language in which the witness will testify

o        a curriculum vitae or resume, if called as an expert

## 3.4     Filing Fees

**(a)  Where paid. —** Fees for the filing of motions and applications for relief with the Immigration Court, when required, are paid to the Department of Homeland Security as set forth in 8 C.F.R. § 1103.7. The Immigration Court does not collect fees.  See 8 C.F.R. §§ 1003.24, 1103.7.

**(b) Filing fees for motions. —**

**(i) When required. —**The following motions require a filing fee:

o        a motion to reopen (except a motion that is based exclusively on a claim for asylum)

o        a motion to reconsider (except a motion that is based on an underlying claim for asylum)

AR.07486

8 C.F.R. §§ 1003.23(b)(1), 1003.24, 1103.7.  For purposes of determining filing fee requirements, the term "asylum" here includes withholding of removal ("restriction on removal"), withholding of deportation, and claims under the Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment.

Where a filing fee is required, the filing fee must be paid in advance to the Department of Homeland Security and the fee receipt must be submitted with the motion.  If a filing party is unable to pay the fee, he or she should request that the fee be waived. See subsection (d), below.

**(ii) When not required. —** The following motions do not require a filing fee:

- o     a motion to reopen that is based exclusively on a claim for asylum

- o     a motion to reconsider that is based on an underlying a claim for asylum

- o     a motion filed while proceedings are pending before the Immigration Court

- o     a motion requesting only a stay of removal, deportation, or exclusion

- o     a motion to recalendar

- o     any motion filed by the Department of Homeland Security

- o     a motion that is agreed upon by all parties and is jointly filed ("joint motion")

- o     a motion to reopen a removal order entered in absentia if the motion is filed under INA § 240(b)(5)(C)(ii)

- o     a motion to reopen a deportation order entered in absentia if the motion is filed under INA § 242B(c)(3)(B), as it existed prior to April 1, 1997

- o     a motion filed under law, regulation, or directive that specifically does not require a filing fee

AR.07487

8 C.F.R. §§ 1003.23(b)(1), 1003.24, 1103.7.  For purposes of determining filing fee requirements, the term "asylum" here includes withholding of removal ("restriction on removal"), withholding of deportation, and claims under the Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment.

*(c) Application fees. —*

*(i) When required. —* When an application for relief that requires a fee is filed during the course of proceedings, the fee for that application must be paid in advance to the Department of Homeland Security (DHS).  Instructions for paying application fees can be found in the DHS biometrics instructions, which are available on the Executive Office for Immigration Review website at www.justice.gov/eoir.  A fee receipt must be submitted when the application is filed with the Immigration Court.

If a filing party is unable to pay the fee, the party should file a motion for a fee waiver. See subsection (d), below.

*(ii) When not required. —* When an application for relief that requires a fee is the underlying basis of a motion to reopen, the fee for the application need not be paid to the Department of Homeland Security (DHS) in advance of the motion to reopen.  Rather, only the fee for the motion to reopen must be paid in advance.  The fee receipt for the motion to reopen must be attached to that motion.  See subsection (b)(i), above.  If the motion to reopen is granted, the fee for the underlying application must then be paid to DHS and that fee receipt must be submitted to the Immigration Court.  See Chapter 3.1(c) (Must be "timely").

*(d) When waived. —* When a fee to file an application or motion is required, the Immigration Judge has the discretion to waive the fee upon a showing that the filing party is unable to pay the fee.  However, the Immigration Judge will not grant a fee waiver where the application for relief is a Department of Homeland Security (DHS) form and DHS regulations prohibit the waiving of such fee.  See 8 C.F.R. §§ 103.7, 1103.7.

Fee waivers are not automatic. The request for a fee waiver must be accompanied by a properly executed affidavit or unsworn declaration made pursuant to 28 U.S.C. § 1746, substantiating the filing party's inability to pay the fee.  If a filing is submitted without a required fee and the request for a fee waiver is denied, the filing will be deemed defectively filed and may be rejected or excluded from evidence.  See Chapter 3.1(d) (Defective filings).

Fees are not reimbursed merely because the application or motion is granted.

***(e) Amount of payment.* —**

    ***(i) Motions to reopen or reconsider.* —** When a filing fee is required, the fee for motions to reopen or reconsider is $110. 8 C.F.R. § 1103.7(b)(2). The fee is paid to the Department of Homeland Security in advance. The fee receipt and motion are then filed with the Immigration Court.

    ***(ii) Applications for relief.* —** Application fees are found in the application instructions and in the federal regulations. See 8 C.F.R. §§ 103.7, 1103.7(b)(1). See also Chapter 11 (Forms), Appendix E (Forms).

    ***(iii) Background and security checks.* —** The Department of Homeland Security (DHS) biometrics fee is found in the DHS biometrics instructions provided to the aliens in the Immigration Court. 8 C.F.R. § 1003.47(d). The Immigration Judge cannot waive the DHS biometrics fee.

***(f) Payments in consolidated proceedings.* —**

    ***(i) Motions to reopen and reconsider.* —** Only one motion fee should be paid in a consolidated proceeding. For example, if several aliens in a consolidated proceeding file simultaneous motions to reopen, only one motion fee should be paid.

    ***(ii) Applications for relief.* —** To determine the amount of the fee to be paid for applications filed in consolidated proceedings, the parties should follow the instructions on the application. In some cases, a fee is required for each application. For example, if each alien in a consolidated proceeding wishes to apply for cancellation of removal, a fee is required for each application.

    ***(g) Form of payment.* —** When a fee is required to file an application for relief or a motion to reopen or reconsider, the fee is paid to the Department of Homeland Security and the form of the payment is governed by federal regulations. See 8 C.F.R. § 103.7.

    ***(h) Defective or missing payment.* —** If a fee is required to file an application for relief or motion but a fee receipt is not submitted to the Immigration Court (for example, because the fee was not paid in advance to the Department of Homeland Security), the filing is defective and may be rejected or excluded from evidence. If a fee is not paid in the correct amount or is uncollectible, the filing is defective and may be rejected or excluded from evidence. See Chapter 3.1(d) (Defective filings).

AR.07489

# Chapter 4  Hearings before the Immigration Judges

## 4.1    Types of Proceedings

Immigration Judges preside over courtroom proceedings in removal, deportation, exclusion, and other kinds of proceedings.  See Chapter 1.5(a) (Jurisdiction).  This chapter describes the procedures in removal proceedings.

Other kinds of proceedings conducted by Immigration Judges are discussed in the following chapters:

|  |  |
|---|---|
| Chapter 7 | Other Proceedings before Immigration Judges |
| Chapter 9 | Detention and Bond |
| Chapter 10 | Discipline of Practitioners |

**Note:** Prior to the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), the two major types of courtroom proceedings conducted by Immigration Judges were deportation and exclusion proceedings.  In 1996, the IIRIRA replaced deportation proceedings and exclusion proceedings with removal proceedings.  The new removal provisions went into effect on April 1, 1997.  See INA § 240, as amended by IIRIRA  § 309(a).  The regulations governing removal proceedings are found at 8 C.F.R. §§ 1003.12-1003.41, 1240.1-1240.26.  For more information on deportation and exclusion proceedings, see Chapter 7 (Other Proceedings before Immigration Judges).

## 4.2    Commencement of Removal Proceedings

*(a) Notice to Appear.* — Removal proceedings begin when the Department of Homeland Security files a Notice to Appear (Form I-862) with the Immigration Court after it is served on the alien.  See 8 C.F.R. §§ 1003.13, 1003.14.  The Notice to Appear, or "NTA," is a written notice to the alien which includes the following information:

o   the nature of the proceedings

o   the legal authority under which the proceedings are conducted

o   the acts or conduct alleged to be in violation of the law

o       the charge(s) against the alien and the statutory provision(s) alleged to have been violated

AR.07490

   o  the opportunity to be represented by counsel at no expense to the government

   o  the consequences of failing to appear at scheduled hearings

   o  the requirement that the alien immediately provide the Attorney General with a written record of an address and telephone number

The Notice to Appear replaces the Order to Show Cause (Form I-221), which was the charging document used to commence deportation proceedings, and the Notice to Applicant for Admission Detained for Hearing before an Immigration Judge (Form I-122), which was the charging document used to commence exclusion proceedings.  See 8 C.F.R. § 1003.13.

   ***(b) Failure to prosecute.*** **—** On occasion, an initial hearing is scheduled before the Department of Homeland Security (DHS) has been able to file a Notice to Appear with the Immigration Court.  For example, DHS may serve a Notice to Appear, which contains a hearing date, on an alien, but not file the Notice to Appear with the court until some time later.  Where DHS has not filed the Notice to Appear with the court by the time of the first hearing, this is known as a "failure to prosecute."  If there is a failure to prosecute, the respondent and counsel may be excused until DHS files the Notice to Appear with the court, at which time a hearing is scheduled.  Alternatively, at the discretion of the Immigration Judge, the hearing may go forward if both parties are present in court and DHS files the Notice to Appear in court at the hearing.

## 4.3 References to Parties and the Immigration Judge

The parties in removal proceedings are the alien and the Department of Homeland Security (DHS).  See Chapter 1.2(d) (Relationship to the Department of Homeland Security).  To avoid confusion, the parties and the Immigration Judge should be referred to as follows:

   o the alien should be referred to as "the respondent"

   o the Department of Homeland Security should be referred to as "the Department of Homeland Security or "DHS"

   o the attorney for the Department of Homeland Security should be referred to as "the Assistant Chief Counsel," "the DHS attorney," or "the government attorney"

*updates: www.justice.gov/eoir*       *Version released on*
58  March 17, 2020

AR.07491

- o  the respondent's attorney should be referred to as "the respondent's counsel" or "the respondent's representative"

- o  the respondent's representative, if not an attorney, should be referred to as "the respondent's representative"

- o  the Immigration Judge should be referred to as "the Immigration Judge" and addressed as "Your Honor" or "Judge ___"

Care should be taken not to confuse the Department of Homeland Security with the Immigration Court or the Immigration Judge. See Chapter 1.5(e) (Department of Homeland Security).

## 4.4    Representation

*(a) Appearances.* — A respondent in removal proceedings may appear without representation ("pro se") or with representation. See Chapter 2 (Appearances before the Immigration Court). If a party wishes to be represented, he or she may be represented by an individual authorized to provide representation under federal regulations. See 8 C.F.R. § 1292.1. See also Chapter 2 (Appearances before the Immigration Court). Whenever a respondent is represented, the respondent should submit all filings, documents, and communications to the Immigration Court through his or her representative. See Chapter 2.1(d) (Who may file).

*(b) Notice of Appearance.* — Representatives before the Immigration Court must file a Notice of Entry of Appearance as Attorney or Representative Before the Immigration Court (Form EOIR-28). See Chapter 2.1(b) (Entering an appearance). If at any time after the commencement of proceedings there is a change in representation, the new representative must file a new Form EOIR-28, as well as complying with the other requirements for substitution of counsel, if applicable. See Chapters 2.1(b) (Entering an appearance), 2.3(c) (Appearances), 2.3(d) (Scope of Appearances), 2.3(i)(i) (Substitution of counsel).

*(c) Multiple representation.* — For guidance on the limited circumstances in which parties may be represented by more than one representative, see Chapters 2.3(d) (Scope of representation), 2.3(e) (Multiple representatives).

*(d) Withdrawal or substitution.* — Withdrawal of counsel can be requested by oral or written motion. See Chapter 2.3(i)(ii) (Withdrawal of counsel). Substitution of counsel also can be requested by oral or written motion. See Chapter 2.3(i)(i)(Substitution of counsel).

AR.07492

## 4.5    Hearing and Filing Location

There are more than 400 Immigration Judges in over 60 Immigration Courts nationwide.  The hearing location is identified on the Notice to Appear (Form I-862) or hearing notice.  See Chapter 4.15(c) (Notification).  Parties should note that documents are not necessarily filed at the location where the hearing is held.  For information on hearing and filing locations, see Chapter 3.1(a) (Filing).  If in doubt as to where to file documents, parties should contact the Immigration Court.

## 4.6    Form of the Proceedings

An Immigration Judge may conduct removal hearings:

o    in person

o    by video conference

o    by telephone conference, except that evidentiary hearings on the merits may only be held by telephone if the respondent consents after being notified of the right to proceed in person or by video conference

See INA § 240(b)(2), 8 C.F.R. § 1003.25(c).  See also Chapter 4.7 (Hearings by Video or Telephone Conference).

Upon the request of the respondent or the respondent's representative, the Immigration Judge has the authority to waive the appearance of the respondent and/or the respondent's representative at specific hearings in removal proceedings.  See 8 C.F.R. § 1003.25(a).  See also Chapter 4.15(m) (Waivers of appearances).

## 4.7    Hearings by Video or Telephone Conference

***(a) In general.* —** Immigration Judges are authorized by statute to hold hearings by video conference and telephone conference, except that evidentiary hearings on the merits may only be conducted by telephone conference if the respondent consents after being notified of the right to proceed in person or through video conference.  See INA § 240(b)(2), 8 C.F.R. § 1003.25(c).  See also Chapter 4.6 (Form of the Proceedings).

***(b) Location of parties.* —** Where hearings are conducted by video or telephone conference, the Immigration Judge, the respondent, the DHS attorney, and the witnesses need not necessarily be present together in the same location.

AR.07493

*(c) Procedure.* — Hearings held by video or telephone conference are conducted under the same rules as hearings held in person.

*(d) Filing.* — For hearings conducted by video or telephone conference, documents are filed at the Immigration Court having administrative control over the Record of Proceedings. See Chapter 3.1(a) (Filing). The locations from which the parties participate may be different from the location of the Immigration Court where the documents are filed. If in doubt as to where to file documents, parties should contact the Immigration Court.

In hearings held by video or telephone conference, Immigration Judges often allow documents to be faxed between the parties and the Immigration Judge. Accordingly, all documents should be single-sided. Parties should not attach staples to documents that may need to be faxed during the hearing.

*(e) More information.* — Parties should contact the Immigration Court with any questions concerning an upcoming hearing by video or telephone conference.

## 4.8    Attendance

Immigration Court hearings proceed promptly on the date and time that the hearing is scheduled. Any delay in the respondent's appearance at a master calendar or individual calendar hearing may result in the hearing being held "in absentia" (in the respondent's absence). See 8 C.F.R. § 1003.26. See also Chapters 4.15 (Master Calendar Hearing), 4.16 (Individual Calendar Hearing), 4.17 (In Absentia Hearing).

Any delay in the appearance of either party's representative without satisfactory notice and explanation to the Immigration Court may, in the discretion of the Immigration Judge, result in the hearing being held in the representative's absence.

Respondents, representatives, and witnesses should be mindful that they may encounter delays in going through the mandatory security screening at the Immigration Court, and should plan accordingly. See 4.14 (Access to Court). Regardless of such delays, all individuals must pass through the security screening and be present *in the courtroom* at the time the hearing is scheduled.

For hearings at detention facilities, parties should be mindful of any additional security restrictions at the facility. See 4.14 (Access to Court). Individuals attending such a hearing must always be present at the time the hearing is scheduled, regardless of any such additional security restrictions.

AR.07494

## 4.9   Public Access

**(a) General public. —**

**(i) Hearings. —** Hearings in removal proceedings are generally open to the public.  However, special rules apply in the following instances:

> o   Evidentiary hearings involving an application for asylum or withholding of removal ("restriction on removal"), or a claim brought under the Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, are open to the public unless the respondent expressly requests that the hearing be closed.   In cases involving these applications or claims, the Immigration Judge inquires whether the respondent requests such closure.

> o   Hearings involving an abused alien child are closed to the public.  Hearings involving an abused alien spouse are closed to the public unless the abused spouse agrees that the hearing and the Record of Proceedings will be open to the public.

> o   Proceedings are closed to the public if information may be considered which is subject to a protective order and was filed under seal.

See  8 C.F.R.  §§  1003.27,  1003.31(d),  1003.46,  1208.6,  1240.10(b), 1240.11(c)(3)(i).  Only parties, their representatives, employees of the Department of Justice, and persons authorized by the Immigration Judge may attend a closed hearing.

**(ii) Immigration Judges authorized to close hearings. —** The Immigration Judge may limit attendance or close a hearing to protect parties, witnesses, or the public interest, even if the hearing would normally be open to the public.  See 8 C.F.R. § 1003.27(b).

**(iii) Motions to close hearing. —** For hearings not subject to the special rules in subsection (i), above, parties may make an oral or written motion asking that the Immigration Judge close the hearing.  See 8 C.F.R. § 1003.27(b).  The motion should set forth in detail the reason(s) for requesting that the hearing be closed.  If in writing, the motion should include a cover page labeled "MOTION

AR.07495

FOR CLOSED HEARING" and comply with the deadlines and requirements for filing.  See Chapter 3 (Filing with the Immigration Court), Appendix F (Sample Cover Page).

*(b) News media.* **—** Representatives of the news media may attend hearings that are open to the public.  The news media are subject to the general prohibition on electronic devices in the courtroom. See Chapter 4.13 (Electronic Devices).  The news media are strongly encouraged to notify the Office of Communications and Legislative Affairs and the Court Administrator before attending a hearing.  See Appendix B (EOIR Directory).

## 4.10    Record

*(a) Hearings recorded.* **—** Immigration hearings are recorded electronically by the Immigration Judge.  See 8 C.F.R. § 1240.9.  Parties may listen to recordings of hearings by prior arrangement with Immigration Court staff.  See Chapters 1.6(c) (Records), 12.2 (Requests).

The entire hearing is recorded except for those occasions when the Immigration Judge authorizes an off-the-record discussion.  On those occasions, the results of the off-the-record discussion are summarized by the Immigration Judge on the record.  The Immigration Judge asks the parties if the summary is true and complete, and the parties are given the opportunity to add to or amend the summary, as appropriate.  Parties should request such a summary from the Immigration Judge, if the Immigration Judge does not offer one.

*(b) Transcriptions.* **—** If an Immigration Judge's decision is appealed to the Board of Immigration Appeals, the hearing is transcribed in appropriate cases and a transcript is sent to both parties.  For information on transcriptions, parties should consult the Board Practice Manual, which is available on the Executive Office for Immigration Review website at www.justice.gov/eoir.

*(c) Record of Proceedings.* **—** The official file containing the documents relating to an alien's case is the Record of Proceedings, which is created by the Immigration Court.  The contents of the Record of Proceedings vary from case to case.  However, at the conclusion of Immigration Court proceedings, the Record of Proceedings generally contains the Notice to Appear (Form I-862), hearing notice(s), the attorney's Notice of Appearance (Form EOIR-28), Alien's Change of Address Form(s) (Form EOIR-33/IC), application(s) for relief, exhibits, motion(s), brief(s), hearing tapes (if any), and all written orders and decisions of the Immigration Judge.

### 4.11  Interpreters

Interpreters are provided at government expense to individuals whose command of the English language is inadequate to fully understand and participate in removal proceedings.  In general, the Immigration Court endeavors to accommodate the language needs of all respondents and witnesses.  The Immigration Court will arrange for an interpreter both during the individual calendar hearing and, if necessary, the master calendar hearing.  See 8 C.F.R. § 1003.22, Chapter 4.15(o) (Other requests).

The Immigration Court uses staff interpreters employed by the Immigration Court, contract interpreters, and telephonic interpretation services.  Staff interpreters take an oath to interpret and translate accurately at the time they are employed by the Department of Justice.  Contract interpreters take an oath to interpret and translate accurately in court.  See 8 C.F.R. § 1003.22.

### 4.12  Courtroom Decorum

*(a) Addressing the Immigration Judge.* — The Immigration Judge should be addressed as either "Your Honor" or "Judge __."  See Chapter 4.3 (References to Parties and the Immigration Judge).  The parties should stand when the Immigration Judge enters and exits the courtroom.

*(b) Attire.* — All persons appearing in the Immigration Court should respect the decorum of the court.  Representatives should appear in business attire.  All others should appear in proper attire.

*(c) Conduct.* — All persons appearing in the Immigration Court should respect the dignity of the proceedings.  No food or drink may be brought into the courtroom, except as specifically permitted by the Immigration Judge.  Disruptive behavior in the courtroom or waiting area is not tolerated.

*(i) Communication between the parties.* — Except for questions directed at witnesses, parties should not converse, discuss, or debate with each other or another person during a hearing.  All oral argument and statements made during a hearing must be directed to the Immigration Judge.  Discussions that are not relevant to the proceedings should be conducted outside the courtroom.

*(ii) Representatives.* — Attorneys and other representatives should observe the professional conduct rules and regulations of their licensing authorities.  Attorneys and representatives should present a professional demeanor at all times.

AR.07497

*(iii) Minors.* — Children in removal proceedings must attend all scheduled hearings unless their appearance has been waived by the Immigration Judge. Unless participating in a hearing, children should not be brought to the Immigration Court.  If a child disrupts a hearing, the hearing may be postponed with the delay attributed to the party who brought the child.  Children are not allowed to stay in the waiting area without supervision.

For Immigration Courts in Department of Homeland Security detention facilities or federal, state, or local correctional facilities, the facility's rules regarding the admission of children, representatives, witnesses, and family members will apply in addition to this subsection.  See 4.14 (Access to Court).

## 4.13 Electronic Devices

*(a) Recording devices.* — Removal proceedings may only be recorded with the equipment used by the Immigration Judge.  No device of any kind, including cameras, video recorders, and cassette recorders, may be used by any person other than the Immigration Judge to record any part of a hearing.  See 8 C.F.R. § 1003.28.

*(b) Possession of electronic devices during hearings.* — Subject to subsection (c), below, all persons, including parties and members of the press, may keep in their possession laptop computers, cellular telephones, electronic calendars, and other electronic devices commonly used to conduct business activities, including electronic devices which have collateral recording capability.  All electronic devices must be turned off in courtrooms and during hearings, unless otherwise authorized under subsection (c) below.  Outside of courtrooms and hearings, electronic devices may be used in non-recording mode, but they must be made silent, and usage must be limited and non-disruptive.  No device may be used by any person other than the Immigration Judge to record any part of a hearing.  See subsection (a), above. For further discussion on the use of electronic devices, see EOIR PM 19-10, *EOIR Security Directive: Policy for Public Use of Electronic Devices in EOIR Space* (Mar. 20, 2019), available at https://www.justice.gov/eoir/file/1146191/download.

*(c) Use of electronic devices during hearings.* — In any hearing before an Immigration Judge, only attorneys or representatives of record and attorneys from DHS representing the government may use laptop computers, electronic calendars, and other electronic devices commonly used to conduct business activities, provided they are used to conduct immediately relevant court and business related activities.  Such devices may only be used in silent/vibrate mode.  The use of such devices must not disrupt the hearing, and the Immigration Judge has the discretion to prohibit the continued use of any electronic devices that pose a disruption to ongoing proceedings.  Cellular telephones

AR.07498

and other electronic devices must be turned off when not in use to conduct business activities in the courtroom.  No device may be used by any person other than the Immigration Judge to record any part of a hearing.  See subsection (a), above. For further discussion on the use of electronic devices, see EOIR PM 19-10, *EOIR Security Directive: Policy for Public Use of Electronic Devices in EOIR Space* (Mar. 20, 2019), available at https://www.justice.gov/eoir/file/1146191/download.

*(d) Courtrooms administered under agreement.* — In any Immigration Court or detention facility administered under agreement between the Executive Office for Immigration Review and federal, state, or local authorities, the facility's rules regarding the possession and use of electronic devices shall apply in addition to subsections (a) through (c), above.  In some facilities, individuals, including attorneys, are not allowed to bring cellular telephones, laptop computers, and other electronic devices into the facility.

## 4.14   Access to Court

*(a) Security screening.* —

*(i) All Immigration Courts.* — All Immigration Courts require individuals attending a hearing to pass through security screening prior to entering the court. All individuals attending a hearing should be mindful that they may encounter delays in passing through the security screening.

*(ii) Detention facilities.* — For hearings held in Department of Homeland Security detention facilities or federal, state, or local correctional facilities, compliance with additional security restrictions may be required.  For example, individuals may be required to obtain advance clearance to enter the facility.  In addition, cellular telephones, laptop computers, and other electronic devices are not allowed at some of these facilities.  All persons attending a hearing at such a facility should be aware of the security restrictions in advance.  Such individuals should contact the Immigration Court or the detention facility in advance if they have specific questions related to these restrictions.

*(iii) Timeliness required.* — Respondents, representatives, and witnesses must always be present in the courtroom at the time the hearing is scheduled.  This applies regardless of any delays encountered in complying with the mandatory security screening and, if the hearing is held at a detention facility, with any additional security restrictions.  See Chapter 4.8 (Attendance).

*(b) No access to administrative offices.* — Access to each Immigration Court's administrative offices is limited to Immigration Court staff and other authorized personnel.

AR.07499

Parties appearing in Immigration Court or conducting business with the Immigration Court are not allowed access to telephones, photocopying machines, or other equipment within the Immigration Court's administrative offices.

## 4.15 Master Calendar Hearing

*(a) Generally.* — A respondent's first appearance before an Immigration Judge in removal proceedings is at a master calendar hearing. Master calendar hearings are held for pleadings, scheduling, and other similar matters. See subsection (e), below.

*(b) Request for a prompt hearing.* — To allow the respondent an opportunity to obtain counsel and to prepare to respond, at least ten days must elapse between service of the Notice to Appear (Form I-862) on the respondent and the initial master calendar hearing. The respondent may waive this ten-day requirement by signing the "Request for Prompt Hearing" contained in the Notice to Appear. The respondent may then be scheduled for a master calendar hearing within the ten-day period. See INA § 239(b)(1).

*(c) Notification.* — The Notice to Appear (Form I-862) served on the respondent may contain notice of the date, time, and location of the initial master calendar hearing. If so, the respondent must appear at that date, time, and location. If the Notice to Appear does not contain notice of the date, time, and location of the initial master calendar hearing, the respondent will be mailed a notice of hearing containing this information. If there are any changes to the date, time, or location of a master calendar hearing, the respondent will be notified by mail at the address on record with the Immigration Court. See Chapter 2.2(c) (Address obligations).

*(d) Arrival.* — Parties should arrive at the Immigration Court prior to the time set for the master calendar hearing. Attorneys and representatives should check in with the Immigration Court staff and sign in, if a sign-in sheet is available. Parties should be mindful that they may encounter delays in passing through mandatory security screening prior to entering the court. See Chapters 4.8 (Attendance), 4.14 (Access to Court).

*(e) Scope of the master calendar hearing.* — As a general matter, the purpose of the master calendar hearing is to:

> o    advise the respondent of the right to an attorney or other representative at no expense to the government

> o    advise the respondent of the availability of free and low-cost legal service providers and provide the respondent with a list of such providers in the area where the hearing is being conducted

AR.07500

- o    advise the respondent of the right to present evidence

- o    advise the respondent of the right to examine and object to evidence and to cross-examine any witnesses presented by the Department of Homeland Security

- o    explain the charges and factual allegations contained in the Notice to Appear (Form I-862) to the respondent in non-technical language

- o    take pleadings

- o    identify and narrow the factual and legal issues

- o    set deadlines for filing applications for relief, briefs, motions, pre-hearing statements, exhibits, witness lists, and other documents

- o    provide certain warnings related to background and security investigations

- o    schedule hearings to adjudicate contested matters and applications for relief

- o    advise the respondent of the consequences of failing to appear at subsequent hearings

- o    advise the respondent of the right to appeal to the Board of Immigration Appeals

See INA §§ 240(b)(4), 240(b)(5), 8 C.F.R. §§ 1240.10, 1240.15.

**(f) Opening of a master calendar hearing. —** The Immigration Judge turns on the recording equipment at the beginning of the master calendar hearing. The hearing is recorded except for off-the-record discussions.  See Chapter 4.10 (Record).  On the record, the Immigration Judge identifies the type of proceeding being conducted (e.g., a removal proceeding); the respondent's name and alien registration number ("A number"); the date, time, and place of the proceeding; and the presence of the parties.  The Immigration Judge also verifies the respondent's name, address, and telephone number. If the respondent's address or telephone number have changed, the respondent must submit an Alien's Change of Address Form (Form EOIR-33/IC).

AR.07501

If necessary, an interpreter is provided to an alien whose command of the English language is inadequate to fully understand and participate in the hearing.  See Chapter 4.11 (Interpreters), subsection (o), below.  If necessary, the respondent is placed under oath.

***(g) Pro se respondent. —*** If the respondent is unrepresented ("pro se") at a master calendar hearing, the Immigration Judge advises the respondent of his or her hearing rights and obligations, including the right to be represented at no expense to the government.  In addition, the Immigration Judge ensures that the respondent has received a list of providers of free and low-cost legal services in the area where the hearing is being held.  The respondent may waive the right to be represented and choose to proceed pro se.  Alternatively, the respondent may request that the Immigration Judge continue the proceedings to another master calendar hearing to give the respondent an opportunity to obtain representation.

If the proceedings are continued but the respondent is not represented at the next master calendar hearing, the respondent will be expected to explain his or her efforts to obtain representation.  The Immigration Judge may decide to proceed with pleadings at that hearing or to continue the matter again to allow the respondent to obtain representation.  If the Immigration Judge decides to proceed with pleadings, he or she advises the respondent of any relief for which the respondent appears to be eligible.  Even if the respondent is required to enter pleadings without representation, the respondent still has the right to obtain representation before the next hearing.  See Chapter 4.4 (Representation).

***(h) Entry of appearance. —*** If a respondent is represented, the representative should file any routinely submitted documents at the beginning of the master calendar hearing.  The representative must also serve such documents on the opposing party.  See Chapter 3.2 (Service on the Opposing Party).  Routinely-submitted documents include the Notice of Appearance (Form EOIR-28) and the Alien's Change of Address Form (Form EOIR-33/IC).  See Chapters 2.1(b) (Entering an appearance), 2.2(c) (Address obligations), 2.3(h)(ii) (Address obligations of represented aliens).

***(i) Pleadings. —*** At the master calendar hearing, the parties should be prepared to plead as follows.

***(i) Respondent. —*** The respondent should be prepared:

   o   to concede or deny service of the Notice to Appear (Form I-862)

AR.07502

○    to request or waive a formal reading of the Notice to Appear (Form I-862)

○    to request or waive an explanation of the respondent's rights and obligations in removal proceedings

○    to admit or deny the charges and factual allegations in the Notice to Appear (Form I-862)

○    to designate or decline to designate a country of removal

○    to state what applications(s) for relief from removal, if any, the respondent intends to file

○    to identify and narrow the legal and factual issues

○    to estimate (in hours) the amount of time needed to present the case at the individual calendar hearing

○    to request a date on which to file the application(s) for relief, if any, with the Immigration Court

○    to request an interpreter for the respondent and witnesses, if needed

A sample oral pleading is included in Appendix M (Sample Oral Pleading).  To make the master calendar hearing process more expeditious and efficient, representatives are strongly encouraged to use this oral pleading format.

***(ii) Department of Homeland Security. —*** The DHS attorney should be prepared:

○    to state DHS's position on all legal and factual issues, including eligibility for relief

○    to designate a country of removal

> o    to file with the Immigration Court and serve on the opposing party all documents that support the charges and factual allegations in the Notice to Appear (Form I-862)

> o    to serve on the respondent the DHS biometrics instructions, if appropriate

*(j) Written pleadings. —* In lieu of oral pleadings, the Immigration Judge may permit represented parties to file written pleadings, if the party concedes proper service of the Notice to Appear (Form I-862).  See Appendix L (Sample Written Pleading).  The written pleadings must be signed by the respondent and the respondent's representative.

The written pleading should contain the following:

> o    a concession that the Notice to Appear (Form I-862) was properly served on the respondent

> o    a representation that the hearing rights set forth in 8 C.F.R. § 1240.10 have been explained to the respondent

> o    a representation that the consequences of failing to appear in Immigration Court have been explained to the respondent

> o    an admission or denial of the factual allegations in the Notice to Appear (Form I-862)

> o    a concession or denial of the charge(s) in the Notice to Appear (Form I-862)

> o    a designation of, or refusal to designate, a country of removal

> o    an identification of the application(s) for relief from removal, if any, the respondent intends to file

> o    a representation that any application(s) for relief (other than asylum) will be filed no later than fifteen (15) days before the individual calendar hearing, unless otherwise directed by the Immigration Judge

> o    an estimate of the number of hours required for the individual calendar hearing

*updates: www.justice.gov/eoir*

*Version released on*
March 17, 2020

AR.07504

  o  a request for an interpreter, if needed, that follows the guidelines in subsection (n), below

  o  if background and security investigations are required, a representation that:

    •  the respondent has been provided Department of Homeland Security (DHS) biometrics instructions

    •  the DHS biometrics instructions have been explained to the respondent

    •  the respondent will timely comply with the DHS biometrics instructions prior to the individual calendar hearing

    •  the consequences of failing to comply with the DHS biometrics instructions have been explained to the respondent

  o  a representation by the respondent that he or she:

    •  understands the rights set forth in 8 C.F.R. § 1240.10 and waives a further explanation of those rights by the Immigration Judge

    •  if applying for asylum, understands the consequences under INA § 208(d)(6) of knowingly filing or making a frivolous asylum application

    •  understands the consequences of failing to appear in Immigration Court or for a scheduled departure

    •  understands the consequences of failing to comply with the DHS biometrics instructions

    •  knowingly and voluntarily waives the oral notice required by INA § 240(b)(7) regarding limitations on discretionary relief following an in absentia removal order, or authorizes his or her representative to waive such notice

AR.07505

- understands the requirement in 8 C.F.R. § 1003.15(d) to file an Alien's Change of Address Form (Form EOIR-33/IC) with the Immigration Court within five (5) days of moving or changing a telephone number

Additional matters may be included in the written pleading when appropriate. For example, the party may need to provide more specific information in connection with a request for an interpreter. See subsection (p), below.

**(k) Background checks and security investigations. —** For certain applications for relief from removal, the Department of Homeland Security (DHS) is required to complete background and security investigations. See 8 C.F.R. § 1003.47. Questions regarding background checks and security investigations should be addressed to DHS.

**(i) Non-detained cases. —** If a non-detained respondent seeks relief requiring background and security investigations, the DHS attorney provides the respondent with the DHS biometrics instructions. The respondent is expected to promptly comply with the DHS biometrics instructions by the deadlines set by the Immigration Judge. Failure to timely comply with these instructions will result in the application for relief not being considered unless the applicant demonstrates that such failure was the result of good cause. 8 C.F.R. § 1003.47(d).

In all cases in which the respondent is represented, the representative should ensure that the respondent understands the DHS biometrics instructions and the consequences of failing to timely comply with the instructions.

**(ii) Detained cases. —** If background and security investigations are required for detained respondents, DHS is responsible for timely fingerprinting the respondent and obtaining all necessary information. See 8 C.F.R. § 1003.47(d).

**(l) Asylum Clock. —** The Immigration Court operates an asylum adjudications clock which measures the length of time an asylum application has been pending for each asylum applicant in removal proceedings. The asylum clock is an administrative function that tracks the number of days elapsed since the application was filed, not including any delays requested or caused by the applicant and ending with the final administrative adjudication of the application. This period also does not include administrative appeal or remand.

Where a respondent has applied for asylum, the Immigration Judge determines during the master calendar hearing whether the case is an expedited asylum case. If so, the Immigration Judge asks on the record whether the applicant wants an "expedited

AR.07506

asylum hearing date," meaning an asylum hearing scheduled for completion within 180 days of the filing.  If the case is being adjourned for an alien-related reason, the asylum clock will stop until the next hearing.

Certain asylum applicants are eligible to receive employment authorization from the Department of Homeland Security (DHS) 180 days after the application is filed, not including delays in the proceedings caused by the applicant.  To facilitate DHS's adjudication of employment authorization applications, the Executive Office for Immigration Review (EOIR) provides DHS with access to its asylum adjudications clock for cases pending before EOIR.  See INA §§ 208(d)(2), 208(d)(5)(A)(iii); 8 C.F.R. § 1208.7.

   *(i) Lodged Asylum Applications.* — For the purpose of employment authorization, DHS considers a defensive asylum application "filed" as of the date the application is filed with the Immigration Court, unless the application is first lodged with the court.  If the application is first lodged with the court, DHS considers the date on which the application is lodged for the purpose of determining eligibility for employment authorization.  An alien may lodge an asylum application at the Immigration Court's public window during that court's filing hours, or by sending it to the Immigration Court by mail or courier.

   The lodged date is <u>not</u> the filing date, and a lodged asylum application is not considered filed.  A respondent who lodges a defensive asylum application must still file the completed application by mail, courier, at the court window, or before an Immigration Judge at a master calendar hearing.  See Chapter 3.1(b)(III)(A) (Defensive applications).

   The Immigration Court places a date stamp and a "lodged not filed" stamp on the application, and returns the application to the alien. The court does not retain a copy of the lodged application, and it is not placed in the record of proceedings; however, the date that the application was lodged with the court is electronically transmitted to DHS.

   *(A) Requirements for lodging.* — Only a respondent who plans to file a defensive asylum application, but has not yet done so, may lodge an asylum application.  An asylum applicant may only lodge an asylum application once.  If an asylum application is lodged, it must be lodged before that application is filed before an Immigration Judge at a master calendar hearing.  An applicant who already has an asylum application pending with the court may not lodge an asylum application.  Accordingly, if a respondent files an application with DHS and DHS refers that application

AR.07507

to the court, the respondent may not lodge an asylum application.

If an alien lodges an asylum application by mail or courier, the application must be accompanied by a self-addressed stamped envelope or comparable return delivery packaging.  It must also be accompanied by a cover page or include a prominent annotation on the top of the front page of the form stating that it is being submitted for the purpose of lodging .

Note that a Proof of Service is not required to lodge an application.

*(B) Defective lodging.* — Under certain circumstances, an asylum application which is submitted for the purpose of lodging the application is rejected.  Examples of defective submissions include:

o        the Form I-589 does not have the applicant's name

o        the Form I-589 does not have the A-number

o        the Form I-589 is not signed by the applicant

o        the Form I-589 has already been lodged with the court

o        the Form I-589 has already been filed with the court

o        the Form I-589 was referred to the court from USCIS

o        the Form I-589 is being submitted for lodging at the incorrect court location

o        the case is pending before the Board of Immigration Appeals

o        the case is not pending before EOIR

An application that is submitted by mail or courier for the purpose of lodging is subject to rejection for the following additional defects:

o        the application is not accompanied by a self-addressed stamped envelope or comparable return delivery packaging; or

AR.07508

      ○     The application is not accompanied by a cover page or does not include a prominent annotation on the top of the front page of the form stating that it is being submitted for the purpose of lodging.

**(m) Waivers of appearances.** — Respondents and representatives must appear at all master calendar hearings unless the Immigration Judge has granted a waiver of appearance for that hearing. Waivers of appearances for master calendar hearings are described in subsections (i) and (ii), below. Respondents and representatives requesting waivers of appearances should note the limitations on waivers of appearances described in subsection (iii), below.

Representatives should note that a motion for a waiver of a representative's appearance is distinct from a representative's motion for a *telephonic appearance*. Motions for telephonic appearances are described in subsection (n), below.

**(i) Waiver of representative's appearance.** — A representative's appearance at a master calendar hearing may be waived only by written motion filed in conjunction with written pleadings. See subsection (j), above. The written motion should be filed with a cover page labeled "MOTION TO WAIVE REPRESENTATIVE's APPEARANCE" and comply with the deadlines and requirements for filing. See Chapter 3 (Filing with the Immigration Court), Appendix F (Sample Cover Page). The motion should state the date and time of the master calendar hearing and explain the reason(s) for requesting a waiver of the representative's appearance.

**(ii) Waiver of respondent's appearance.** — A respondent's appearance at a master calendar hearing may be waived by oral or written motion. See 8 C.F.R. § 1003.25(a). If in writing, the motion should be filed with a cover page labeled "MOTION TO WAIVE RESPONDENT's APPEARANCE" and comply with the deadlines and requirements for filing. See Chapter 3 (Filing with the Immigration Court), Appendix F (Sample Cover Page). The motion should state the date and time of the master calendar hearing and explain the reason(s) for requesting a waiver of the respondent's appearance.

**(iii) Limitations on waivers of appearances.** —

**(A) Waivers granted separately.** — A waiver of a representative's appearance at a master calendar hearing does not constitute a waiver of the respondent's appearance. A waiver of a respondent's appearance at a

master calendar hearing does not constitute a waiver of the representative's appearance.

**(B) Pending motion. —** The mere filing of a motion to waive the appearance of a representative or respondent at a master calendar hearing does not excuse the appearance of the representative or respondent at that hearing. Therefore, the representative or respondent must appear in person unless the motion has been granted.

**(C) Future hearings. —** A waiver of the appearance of a representative or respondent at a master calendar hearing does not constitute a waiver of the appearance of the representative or respondent at any future hearing.

**(n) Telephonic appearances. —** In certain instances, respondents and representatives may appear by telephone at some master calendar hearings at the Immigration Judge's discretion. For more information, parties should contact the Immigration Court.

An appearance by telephone may be requested by written or oral motion. If in writing, the motion should be filed with a cover page labeled "MOTION TO PERMIT TELEPHONIC APPEARANCE" and comply with the deadlines and requirements for filing. See Chapter 3 (Filing with the Immigration Court), Appendix F (Sample Cover Page). The motion should state the date and time of the master calendar hearing and explain the reason(s) for requesting a telephonic appearance. In addition, the motion should state the telephone number of the representative or respondent.

Parties requesting an appearance by telephone should note the guidelines in subsections (i) through (v), below.

**(i) Representative's telephonic appearance is not a waiver of respondent's appearance. —** Permission for a *representative* to appear by telephone at a master calendar hearing does not constitute a waiver of the *respondent's* appearance at that hearing. A request for a waiver of a respondent's appearance at a master calendar hearing must comply with the guidelines in subsection (m), above.

**(ii) Availability. —** A representative or respondent appearing by telephone must be available during the entire master calendar hearing.

AR.07510

*(iii) Cellular telephones.* — Unless expressly permitted by the Immigration Judge, cellular telephones should not be used for telephonic appearances.

*(iv) Pending motion.* — The mere filing of a motion to permit a representative or respondent to appear by telephone at a master calendar hearing does not excuse the appearance in person at that hearing by the representative or respondent. Therefore, the representative or respondent must appear in person unless the motion has been granted.

*(v) Future hearings.* — Permission for a representative or respondent to appear by telephone at a master calendar hearing does not constitute permission for the representative or respondent to appear by telephone at any future hearing.

*(o) Other requests.* — In preparation for an upcoming individual calendar hearing, the following requests may be made at the master calendar hearing or afterwards, as described below.

*(i) Interpreters.* — If a party anticipates that an interpreter will be needed at the individual calendar hearing, the party should request an interpreter, either by oral motion at a master calendar hearing, by written motion, or in a written pleading. Parties are strongly encouraged to submit requests for interpreters at the master calendar hearing rather than following the hearing. A written motion to request an interpreter should be filed with a cover page labeled "MOTION TO REQUEST AN INTERPRETER," and comply with the deadlines and requirements for filing. See Chapter 3 (Filing with the Immigration Court), Appendix F (Sample Cover Page).

A request for an interpreter, whether made by oral motion, by written motion, or in a written pleading, should contain the following information:

- o the name of the language requested, including any variations in spelling

- o the specific dialect of the language, if applicable

- o the geographical locations where such dialect is spoken, if applicable

- o the identification of any other languages in which the respondent or witness is fluent

AR.07511

> o    any other appropriate information necessary for the selection of an interpreter

**(ii) Video testimony. —** In certain instances, witnesses may testify by video at the individual calendar hearing, at the Immigration Judge's discretion.  Video testimony may be requested only by written motion.  For more information, parties should contact the Immigration Court.

A written motion to request video testimony should be filed with a cover page labeled "MOTION TO PRESENT VIDEO TESTIMONY," and comply with the deadlines and requirements for filing.  See Chapter 3 (Filing with the Immigration Court), Appendix F (Sample Cover Page).  A motion to present video testimony must include an explanation of why the witness cannot appear in person.  In addition, parties wishing to present video testimony must comply with the requirements for witness lists.  See Chapter 3.3(g) (Witness lists).

If video testimony is permitted, the Immigration Judge specifies the time and manner under which the testimony is taken.

**(iii) Telephonic testimony. —** In certain instances, witnesses may testify by telephone, at the Immigration Judge's discretion.  If a party wishes to have witnesses testify by telephone at the individual calendar hearing, this may be requested by oral motion at the master calendar hearing or by written motion. If telephonic testimony is permitted, the court specifies the time and manner under which the testimony is taken.  For more information, parties should contact the Immigration Court.

A written motion to request telephonic testimony should be filed with a cover page labeled "MOTION TO PRESENT TELEPHONIC TESTIMONY," and comply with the deadlines and requirements for filing.  See Chapter 3 (Filing with the Immigration Court), Appendix F (Sample Cover Page).  In addition, parties wishing to present telephonic testimony must comply with the requirements for witness lists.  See Chapter 3.3(g) (Witness lists).

**(A) Contents. —** An oral or written motion to permit telephonic testimony must include:

> o    an explanation of why the witness cannot appear in person

AR.07512

    ○ the witness's telephone number and the location from which the witness will testify

  *(B) Availability*. — A witness appearing by telephone must be available to testify at any time during the course of the individual calendar hearing.

  *(C) Cellular telephones*. — Unless permitted by the Immigration Judge, cellular telephones should not be used by witnesses testifying telephonically.

  *(D) International calls*. — If international telephonic testimony is permitted, the requesting party should bring a pre-paid telephone card to the Immigration Court to pay for the call.

## 4.16  Individual Calendar Hearing

 *(a) Generally*. — Evidentiary hearings on contested matters are referred to as individual calendar hearings or merits hearings.  Contested matters include challenges to removability and applications for relief.

 *(b) Filings*. — The following documents should be filed in preparation for the individual calendar hearing, as necessary.  Parties should note that, since Records of Proceedings in removal proceedings are kept separate from Records of Proceeding in bond redetermination proceedings, documents already filed in bond redetermination proceedings must be re-filed for removal proceedings.  See Chapter 9.3 (Bond Proceedings).

  *(i) Applications, exhibits, motions*. — Parties should file all applications for relief, proposed exhibits, and motions, as appropriate.  All submissions must comply with the deadlines and requirements for filing.  See Chapter 3 (Filing with the Immigration Court).

  *(ii) Witness list*. — If presenting witnesses other than the respondent, parties must file a witness list that complies with the requirements of Chapter 3.3(g) (Witness lists).  In addition, the witness list must comply with the deadlines and requirements for filing.  See Chapter 3 (Filing with the Immigration Court).

  *(iii) Criminal history chart*. — When submitting documents relating to a respondent's criminal arrests, prosecutions, or convictions, parties are encouraged to use a criminal history chart and attach all pertinent documentation, such as

arrest and conviction records.  For guidance on submitting a criminal history chart, see Chapter 3.3(f) (Criminal conviction documents).  For a sample, see Appendix O (Sample Criminal History Chart).  Parties submitting a criminal history chart should comply with the deadlines and requirements for filing.  See Chapter 3 (Filing with the Immigration Court).

**(c) Opening the individual calendar hearing. —** The Immigration Judge turns on the recording equipment at the beginning of the individual calendar hearing.  The hearing is recorded, except for off-the-record discussions.  See Chapter 4.10 (Record).

On the record, the Immigration Judge identifies the type of proceeding being conducted (e.g., a removal proceeding); the respondent's name and alien registration number ("A number"); the date, time and place of the proceeding; and the presence of the parties.  The Immigration Judge also verifies the respondent's name, address, and telephone number.  If the respondent's address or telephone number have changed, the respondent must submit an Alien's Change of Address Form (Form EOIR-33/IC).

**(d) Conduct of hearing. —** While the Immigration Judge decides how each hearing is conducted, parties should be prepared to:

- make an opening statement

- raise any objections to the other party's evidence

- present witnesses and evidence on all issues

- cross-examine opposing witnesses and object to testimony

- make a closing statement

**(e) Witnesses. —** All witnesses, including the respondent if he or she testifies, are placed under oath by the Immigration Judge before testifying.  If necessary, an interpreter is provided.  See Chapters 4.11 (Interpreters), 4.15(o) (Other requests).  The Immigration Judge may ask questions of the respondent and all witnesses at any time during the hearing.  See INA § 240(b)(1).

**(f) Pro se respondents. —** Unrepresented ("pro se") respondents have the same hearing rights and obligations as represented respondents.  For example, pro se respondents may testify, present witnesses, cross-examine any witnesses presented by the Department of Homeland Security (DHS), and object to evidence presented by DHS.  When a respondent appears pro se, the Immigration Judge generally participates in

AR.07514

questioning the respondent and the respondent's witnesses. As in all removal proceedings, DHS may object to evidence presented by a pro se respondent and may cross-examine the respondent and the respondent's witnesses.

*(g) Decision.* — After the parties have presented their cases, the Immigration Judge renders a decision. The Immigration Judge may render an oral decision at the hearing's conclusion, or he or she may render an oral or written decision on a later date. See Chapter 1.5(c) (Immigration Judge decisions). If the decision is rendered orally, the parties are given a signed summary order from the court.

*(h) Appeal.* — The respondent and the Department of Homeland Security have the right to appeal the Immigration Judge's decision to the Board of Immigration Appeals. See Chapter 6 (Appeals of Immigration Judge Decisions). A party may waive the right to appeal. At the conclusion of Immigration Court proceedings, the Immigration Judge informs the parties of the deadline for filing an appeal with the Board, unless the right to appeal is waived. See Chapter 6.4 (Waiver of Appeal).

Parties should note that the Immigration Judge may ask the Board to review his or her decision. This is known as "certifying" a case to the Board. The certification of a case is separate from any appeal in the case. Therefore, a party wishing to appeal must file an appeal *even if* the Immigration Judge has certified the case to the Board. See Chapter 6.5 (Certification).

If an appeal is not filed, the Immigration Judge's decision becomes the final administrative decision in the matter, unless the case has been certified to the Board.

*(i) Relief granted.* — If a respondent's application for relief from removal is granted, the respondent is provided the Department of Homeland Security (DHS) post-order instructions. These instructions describe the steps the respondent should follow to obtain documentation of his or her immigration status from U.S. Citizenship and Immigration Services, a component of DHS.

More information about these post-order instructions is available on the Executive Office for Immigration Review website at www.justice.gov/eoir.

For respondents who are granted asylum, information on asylees' benefits and responsibilities is available at the Immigration Court.

## 4.17   In Absentia Hearing

AR.07515

**(a) In general.** Any delay in the respondent's appearance at a master calendar or individual calendar hearing may result in the respondent being ordered removed "in absentia" (in the respondent's absence).  See 8 C.F.R. § 1003.26(c).  See also Chapter 4.8 (Attendance).  There is no appeal from a removal order issued in absentia.  However, parties may file a motion to reopen to rescind an in absentia removal order.  See Chapter 5.9 (Motions to Reopen In Absentia Orders).

**(b) Deportation and exclusion proceedings. —** Parties should note that in absentia orders in deportation and exclusion proceedings are governed by different standards than in absentia orders in removal proceedings.  For the provisions governing in absentia orders in deportation and exclusion proceedings, see 8 C.F.R. § 1003.26. See also Chapter 7 (Other Hearings before Immigration Judges).

## 4.18    Pre-Hearing Conferences and Statements

**(a) Pre-hearing conferences. —** Pre-hearing conferences are held between the parties and the Immigration Judge to narrow issues, obtain stipulations between the parties, exchange information voluntarily, and otherwise simplify and organize the proceeding.  See 8 C.F.R. § 1003.21(a).

Pre-hearing conferences may be requested by a party or initiated by the Immigration Judge.  A party's request for a pre-hearing conference may be made orally or by written motion.  If in writing, the motion should be filed with a cover page labeled "MOTION FOR A PRE-HEARING CONFERENCE," and comply with the deadlines and requirements for filing.  See Chapter 3 (Filing with the Immigration Court), Appendix F (Sample Cover Page).

Even if a pre-hearing conference is not held, the parties are strongly encouraged to confer prior to a hearing in order to narrow issues for litigation.  Parties are further encouraged to file pre-hearing statements following such discussions.  See subsection (b), below.

- o    33

- o    the estimated time required to present the case

- o    a statement of unresolved issues in the proceeding

See 8 C.F.R. § 1003.21(b).

AR.07516

*(b) Pre-hearing statements.* — An Immigration Judge may order the parties to file a pre-hearing statement  See 8 C.F.R. § 1003.21(b).  Parties are encouraged to file a pre-hearing statement even if not ordered to do so by the Immigration Judge.  Parties also are encouraged to file pre-hearing briefs addressing questions of law.  See Chapter 4.19 (Pre-Hearing Briefs).

*(i) Filing.* — A pre-hearing statement should be filed with a cover page with an appropriate label (e.g., "PARTIES' PRE-HEARING STATEMENT"), and comply with the deadlines and requirements for filing.  See Chapter 3 (Filing with the Immigration Court), Appendix F (Sample Cover Page).

*(ii) Contents of a pre-hearing statement.* — In general, the purpose of a pre-hearing statement is to narrow and reduce the factual and legal issues in advance of an individual calendar hearing.  For example, a pre-hearing statement may include the following items:

- a statement of facts to which both parties have stipulated, together with a statement that the parties have communicated in good faith to stipulate to the fullest extent possible

- a list of proposed witnesses and what they will establish

- a list of exhibits, copies of exhibits to be introduced, and a statement of the reason for their introduction

- the estimated time required to present the case

- a statement of unresolved issues in the proceeding

See 8 C.F.R. § 1003.21(b).

## 4.19  Pre-Hearing Briefs

*(a) Generally.* — An Immigration Judge may order the parties to file pre-hearing briefs.  Parties are encouraged to file pre-hearing briefs even if not ordered to do so by the Immigration Judge.  Parties are also encouraged to file pre-hearing statements to narrow and reduce the legal and factual issues in dispute.  See Chapter 4.18(b) (Pre-hearing statements).

*(b) Guidelines.* — Pre-hearing briefs advise the Immigration Judge of a party's positions and arguments on questions of law.  A well-written pre-hearing brief is in the

AR.07517

party's best interest and is of great importance to the Immigration Judge.  Pre-hearing briefs should be clear, concise, and well-organized.  They should cite the record, as appropriate.  Pre-hearing briefs should cite legal authorities fully, fairly, and accurately.

Pre-hearing briefs should always recite those facts that are appropriate and germane to the adjudication of the issue(s) at the individual calendar hearing.  They should cite proper legal authority, where such authority is available.  See subsection (f), below.  Pre-hearing briefs should not belabor facts or law that are not in dispute.  Parties are encouraged to expressly identify in their pre-hearing briefs those facts or law that are not in dispute.

Briefs and other submissions should always be paginated. Parties must limit the body of their briefs to 25 pages.  If a party believes it cannot adequately address the issues in the case within the page limit, the party may make a motion to increase the page limit.  Pre-hearing briefs should always be paginated.

*(c) Format. —*

*(i) Filing. —* Pre-hearing briefs should be filed with a cover page with an appropriate label (e.g., "RESPONDENT's PRE-HEARING BRIEF"), and comply with the deadlines and requirements for filing.  See Chapter 3 (Filing with the Immigration Court), Appendix F (Sample Cover Page).  Pre-hearing briefs must be signed by the respondent, the respondent's primary attorney (notice attorney) or representative, or the representative of the Department of Homeland Security.  See Chapter 3.3(b) (Signatures).  See also Chapter 2 (Appearances before the Immigration Court).

*(ii) Contents. —* Unless otherwise directed by the Immigration Judge, the following items should be included in a pre-hearing brief:

- o    a concise statement of facts

- o    a statement of issues

- o    a statement of the burden of proof

- o    a summary of the argument

- o    the argument

- o    a short conclusion stating the precise relief or remedy sought

AR.07518

      ***(iii) Statement of facts.*** **—** Statements of facts in pre-hearing briefs should be concise.  Facts should be set out clearly.  Points of contention and points of agreement should be expressly identified.

      Facts, like case law, require citation.  Parties should support factual assertions by citing to any supporting documentation or exhibits, whether in the record or accompanying the brief.  See subsection (f), below.

      Do not misstate or misrepresent the facts, or omit unfavorable facts that are relevant to the legal issue.  A brief's accuracy and integrity are paramount to the persuasiveness of the argument and the decision regarding the legal issue(s) addressed in the brief.

      ***(iv) Footnotes.*** **—** Substantive arguments should be restricted to the text of pre-hearing briefs.  The excessive use of footnotes is discouraged.

      ***(v) Headings and other markers.*** **—** Pre-hearing briefs should employ headings, sub-headings, and spacing to make the brief more readable.  Short paragraphs with topic sentences and proper headings facilitate the coherence and cohesiveness of arguments.

      ***(vi) Chronologies.*** **—** Pre-hearing briefs should contain a chronology of the facts, especially where the facts are complicated or involve several events.  Charts or similar graphic representations that chronicle events are welcome.  See Appendix O (Sample Criminal History Chart).

      ***(d) Consolidated pre-hearing briefs.*** **ᴄ** Where cases have been consolidated, one pre-hearing brief may be submitted on behalf of all respondents in the consolidated proceeding, provided that each respondent's full name and alien registration number ("A number") appear on the consolidated pre-hearing brief. See Chapter 4.21 (Combining and Separating Cases).

      ***(e) Responses to pre-hearing briefs.*** **—** When a party files a pre-hearing brief, the other party may file a response brief.  A response brief should be filed with a cover page with an appropriate label (e.g., "DHS RESPONSE TO PRE-HEARING BRIEF"), and comply with the deadlines and requirements for filing.  See Chapter 3 (Filing with the Immigration Court), Appendix F (Sample Cover Page).  Response briefs should comply with the guidelines for pre-hearing briefs set forth above.

**(f) Citation. —** Parties are expected to provide complete and clear citations to all factual and legal authorities.  Parties should comply with the citation guidelines in Appendix J (Citation Guidelines).


## 4.20  Subpoenas

**(a) Applying for a subpoena. —** A party may request that a subpoena be issued requiring that witnesses attend a hearing or that documents be produced.  See 8 C.F.R. §§ 1003.35, 1287.4(a)(2)(ii).  A request for a subpoena may be made by written motion or by oral motion.  If made in writing, the request should be filed with a cover page labeled "MOTION FOR SUBPOENA," and comply with the deadlines and requirements for filing. See Chapter 3 (Filing with the Immigration Court), Appendix F (Sample Cover Page). Whether made orally or in writing, a motion for a subpoena must:

- o   provide the court with a proposed subpoena

- o   state what the party expects to prove by such witnesses or documentary evidence

- o   show affirmatively that the party has made diligent effort, without success, to produce the witnesses or documentary evidence

If requesting a subpoena for telephonic testimony, the party should also comply with Chapter 4.15(o)(iii) (Telephonic testimony).

**(b) Contents. —** A proposed subpoena should contain:

- o   the respondent's name and alien registration number ("A number")

- o   the type of proceeding

- o   the name and address of the person to whom the subpoena is directed

- o   a command that the recipient of the subpoena:

  - • testify in court at a specified time,
  - • testify by telephone at a specified time, or

  - • produce specified books, papers, or other items

AR.07520

o a return on service of subpoena

See 8 C.F.R. § 1003.35(b)(3), Appendix N (Sample Subpoena).

*(c) Appearance of witness.* — If the witness whose testimony is required is more than 100 miles from the Immigration Court where the hearing is being conducted, the subpoena must provide for the witness's appearance at the Immigration Court nearest to the witness to respond to oral or written interrogatories, unless the party calling the witness has no objection to bringing the witness to the hearing.  See 8 C.F.R. § 1003.35(b)(4).

*(d) Service.* — A subpoena issued under the above provisions may be served by any person over 18 years of age not a party to the case.  See 8 C.F.R. § 1003.35(b)(5).

## 4.21   Combining and Separating Cases

*(a) Consolidated cases.* — Consolidation of cases is the administrative joining of separate cases into a single adjudication for all of the parties involved.  Consolidation is generally limited to cases involving immediate family members.  The Immigration Court may consolidate cases at its discretion or upon motion of one or both of the parties, where appropriate.  For example, the Immigration Court may grant consolidation when spouses or siblings have separate but overlapping circumstances or claims for relief. Consolidation must be sought through the filing of a written motion that states the reasons for requesting consolidation.  Such motion should include a cover page labeled "MOTION FOR CONSOLIDATION" and comply with the deadlines and requirements for filing.  See Chapter 3 (Filing with the Immigration Court), Appendix F (Sample Cover Page).  A copy of the motion should be filed for each case included in the request for consolidation.  The motion should be filed as far in advance of any filing deadline as possible. See Chapter 3.1(b) (Timing of submissions).

*(b) Severance of cases.* — Severance of cases is the division of a consolidated case into separate cases, relative to each individual. The Immigration Court may sever cases in its discretion or upon request of one or both of the parties.  Severance must be sought through the filing of a written motion that states the reasons for requesting severance.   Such motion should include a cover page labeled "MOTION FOR SEVERANCE" and comply with the deadlines and requirements for filing.  See Chapter 3 (Filing before the Immigration Court), Appendix F (Sample Cover Page).  A copy of the motion should be filed for each case included in the request for severance.  Parties are advised, however, that such motion should be filed as far in advance of any filing deadline as possible. See Chapter 3.1(b) (Timing of submissions).

AR.07521

## 4.22   Juveniles

*(a) Scheduling.* — Immigration Courts do their best to schedule cases involving unaccompanied juveniles on a separate docket or at a fixed time in the week or month, separate and apart from adult cases.

*(b) Representation.* — An Immigration Judge cannot appoint a legal representative or a guardian ad litem for unaccompanied juveniles.  However, the Executive Office for Immigration Review encourages the use of pro bono legal resources for unaccompanied juveniles.  For further information, see Chapter 2.2(b) (Legal service providers).

*(c) Courtroom orientation.* — Juveniles are encouraged, under the supervision of court personnel, to explore an empty courtroom, sit in all locations, and practice answering simple questions before the hearing.  The Department of Health and Human Services, Office of Refugee Resettlement, provides orientation for most juveniles in their native languages, explaining Immigration Court proceedings.

*(d) Courtroom modifications.* — Immigration Judges make reasonable modifications for juveniles.  These may include allowing juveniles to bring pillows, or toys, permitting juveniles to sit with an adult companion, and permitting juveniles to testify outside the witness stand next to a trusted adult or friend.

*(e) Detained juveniles.* — For additional provisions regarding detained juveniles, see Chapter 9.2 (Detained Juveniles).

AR.07522

AR.07523

# Chapter 5  Motions before the Immigration Court

## 5.1    Who May File

*(a) Parties. —* Only an alien who is in proceedings before the Immigration Court (or the alien's representative), or the Department of Homeland Security may file a motion. A motion must identify all parties covered by the motion and state clearly their full names and alien registration numbers ("A numbers"), including all family members in proceedings.  See Chapter 5.2(b) (Form), Appendix F (Sample Cover Page).  The Immigration Judge will *not* assume that the motion includes all family members (or group members in consolidated proceedings).  See Chapter 4.21 (Combining and Separating Cases).

*(b) Representatives. —* Whenever a party is represented, the party should submit all motions to the Court through the representative.  See Chapter 2.1(d) (Who may file).

*(i) Pre-decision motions. —* If a representative has already filed a Notice of Entry of Appearance as Attorney or Representative Before the Immigration Court (Form EOIR-28), and the Immigration Judge has not rendered a final order in the case, a motion need not be accompanied by a Form EOIR-28.  However, if a representative is appearing for the first time, the representative must file a Form EOIR-28 along with the motion.  See Chapter 2 (Appearances before the Immigration Court).

*(ii) Post-decision motions. —*  All motions to reopen, motions to reconsider, and motions to reopen to rescind an in absentia order filed by a representative must be accompanied by a Form EOIR-28, even if the representative is already the representative of record.  See Chapter 2 (Appearances before the Immigration Court).

*(c) Persons not party to the proceedings. —* Only a party to a proceeding, or a party's representative, may file a motion pertaining to that proceeding.  Family members, employers, and other third parties may not file a motion.  If a third party seeks Immigration Court action in a particular case, the request should be made through a party to the proceeding.

## 5.2    Filing a Motion

AR.07524

**(a) Where to file. —** The Immigration Court may entertain motions only in those cases in which it has jurisdiction. See subsections (i), (ii), (iii), below, Appendix K (Where to File). If the Immigration Court has jurisdiction, motions are filed with the Immigration Court having administrative control over the Record of Proceedings. See Chapter 3.1(a) (Filing).

**(i) Cases not yet filed with the Immigration Court. —** Except for requests for bond redetermination proceedings, the Immigration Court cannot entertain motions if a charging document (i.e., a Notice to Appear) has not been filed with the court. See Chapters 4.2 (Commencement of Removal Proceedings), 9.3(b) (Jurisdiction).

**(ii) Cases pending before the Immigration Court. —** If a charging document has been filed with the Immigration Court but the case has not yet been decided by the Immigration Judge, all motions must be filed with the court.

**(iii) Cases already decided by the Immigration Court. —**

**(A) No appeal filed. —** Where a case has been decided by the Immigration Judge, and no appeal has been filed with the Board of Immigration Appeals, motions to reopen and motions to reconsider are filed with the Immigration Court. Parties should be mindful of the strict time and number limits on motions to reopen and motions to reconsider. See Chapters 5.7 (Motions to Reopen), 5.8 (Motions to Reconsider), 5.9 (Motions to Reopen In Absentia Orders).

**(B) Appeal filed. —** Where a case has been decided by the Immigration Judge, and an appeal has been filed with the Board of Immigration Appeals, the parties should consult the Board Practice Manual for guidance on where to file motions. The Board Practice Manual is available on the Executive Office for Immigration Review website at www.justice.gov/eoir. See also Appendix K (Where to File).

**(b) Form. —** There is no official form for filing a motion before the Immigration Court. Motions must be filed with a cover page and comply with the requirements for filing. See Chapter 3 (Filing with the Immigration Court), Appendix F (Sample Cover Page). In addition, all motions must be accompanied by the appropriate proposed order for the Immigration Judge's signature. See Appendix Q (Sample Proposed Order). Motions and supporting documents should be assembled in the order described in Chapter 3.3(c)(i) (Order of documents).

AR.07525

A motion's cover page must accurately describe the motion.  See Chapter 3.3(c)(vi) (Cover page and caption).  Parties should note that the Immigration Court construes motions according to content rather than title.  Therefore, the court applies time and number limits according to the nature of the motion rather than the motion's title.  See Chapter 5.3 (Motion Limits).

Motions must state with particularity the grounds on which the motion is based.  In addition, motions must identify the relief or remedy sought by the filing party.

*(c) When to file. —* Pre-decision motions must comply with the deadlines for filing discussed in Chapter 3.1(b) (Timing of submissions).  Deadlines for filing motions to reopen, motions to reconsider, and motions to reopen in absentia orders are governed by statute or regulation.  See Chapters 5.7 (Motions to Reopen), 5.8 (Motions to Reconsider), 5.9 (Motions to Reopen In Absentia Orders).

*(d) Copy of underlying order. —* Motions to reopen and motions to reconsider should be accompanied by a copy of the Immigration Judge's decision, where available.

*(e) Evidence. —* Statements made in a motion are *not* evidence.  If a motion is based upon evidence that was not made part of the record by the Immigration Judge, that evidence should be submitted with the motion.  Such evidence may include sworn affidavits, declarations under the penalties of perjury, and documentary evidence.  The Immigration Court will not suspend or delay adjudication of a motion pending the receipt of supplemental evidence.

All evidence submitted with a motion must comply with the requirements of Chapter 3.3 (Documents).

*(f) Filing fee. —* Where the motion requires a filing fee, the motion must be accompanied by a fee receipt from the Department of Homeland Security (DHS) or a request that the Immigration Judge waive the fee.  Filing fees are paid to DHS.  See Chapter 3.4 (Filing Fees).

*(g) Application for relief. —* A motion based upon eligibility for relief must be accompanied by a copy of the application for that relief and all supporting documents, if an application is normally required.  See 8 C.F.R. § 1003.23(b)(3).  A grant of a motion based on eligibility for relief does not constitute a grant of the underlying application for relief.

The application for relief must be duly completed and executed, in accordance with the requirements for such relief.  The original application for relief should be held by the

AR.07526

filing party for submission to the Immigration Court, if appropriate, after the ruling on the motion. See Chapter 11.3 (Submitting Completed Forms). The copy that is submitted to the Immigration Court should be accompanied by a copy of the appropriate supporting documents.

If a certain form of relief requires an application, *prima facie eligibility for that relief cannot be shown without it.* For example, if a motion to reopen is based on adjustment of status, a copy of the completed Application to Adjust Status (Form I-485) should be filed *with* the motion, along with the necessary documents.

Application fees are *not* paid to the Immigration Court and should not accompany the motion. Fees for applications should be paid if and when the motion is granted in accordance with the filing procedures for that application. See Chapter 3.4(c) (Application fees).

*(h) Visa petitions.* — If a motion is based on an application for adjustment of status and there is an underlying visa petition that has been approved, a copy of the visa petition and the approval notice should accompany the motion. When a petition is subject to visa availability, evidence that a visa is immediately available should also accompany the motion (e.g., a copy of the State Department's Visa Bulletin reflecting that the priority date is "current").

If a motion is based on adjustment of status and the underlying visa petition has not yet been adjudicated, a copy of that visa petition, all supporting documents, and the filing receipt (Form I-797) should accompany the motion.

Parties should note that, in certain instances, an approved visa petition is required for motions based on adjustment of status. See, e.g., *Matter of H-A-*, 22 I&N Dec. 728 (BIA 1999), modified by *Matter of Velarde*, 23 I&N Dec. 253 (BIA 2002).

Filing fees for visa petitions are not paid to the Immigration Court and should not accompany the motion. The filing fee for a visa petition is submitted to DHS when the petition is filed with DHS.

*(i) Opposing party's position.* — The party filing a motion should make a good faith effort to ascertain the opposing party's position on the motion. The opposing party's position should be stated in the motion. If the filing party was unable to ascertain the opposing party's position, a description of the efforts made to contact the opposing party should be included.

AR.07527

*(j) Oral argument.* — The Immigration Court generally does not grant requests for oral argument on a motion.   If the Immigration Judge determines that oral argument is necessary, the parties are notified of the hearing date.

## 5.3    Motion Limits

Certain motions are limited in time (when the motions must be filed) and number (how many motions may be filed).  Pre-decision motions are limited in time.  See Chapter 3.1(b) (Timing of submissions).  Motions to reopen and motions to reconsider are limited in both time and number.   See Chapters 5.7 (Motions to Reopen), 5.8 (Motions to Reconsider), 5.9 (Motions to Reopen In Absentia Orders).  Time and number limits are strictly enforced.

## 5.4    Multiple Motions

When multiple motions are filed, the motions should be accompanied by a cover letter listing the separate motions.  In addition, each motion must include a cover page and comply with the deadlines and requirements for filing.  See Chapter 5.2(b) (Form), Appendix F (Sample Cover Page).

Parties are strongly discouraged from filing compound motions, which are motions that combine two separate requests.  Parties should note that time and number limits apply to motions even when submitted as part of a compound motion.  For example, if a motion seeks both reopening and reconsideration, and is filed more than 30 days after the Immigration Judge's decision (the deadline for reconsideration) but within 90 days of that decision (the deadline for reopening), the portion that seeks reconsideration is considered untimely.

## 5.5    Motion Briefs

A brief is not required in support of a motion.  However, if a brief is filed, it should accompany the motion.  See 8 C.F.R. § 1003.23(b)(1)(ii).  In general, motion briefs should comply with the requirements of Chapters 3.3 (Documents) and 4.19 (Pre-Hearing Briefs).

A brief filed in opposition to a motion must comply with the filing deadlines for responses. See Chapter 3.1(b) (Timing of submissions).

## 5.6    Transcript Requests

AR.07528

The Immigration Court does not prepare a transcript of proceedings. See Chapter 4.10 (Record). Parties are reminded that recordings of proceedings are generally available for review by prior arrangement with the Immigration Court. See Chapter 1.6(c) (Records).

## 5.7    Motions to Reopen

*(a) Purpose.* — A motion to reopen asks the Immigration Court to reopen proceedings after the Immigration Judge has rendered a decision, so that the Immigration Judge can consider new facts or evidence in the case.

*(b) Requirements.* —

*(i) Filing.* — The motion should be filed with a cover page labeled ʌMOTION TO REOPEN" and comply with the deadlines and requirements for filing. See subsection (c), below, Chapter 5.2 (Filing a Motion), Appendix F (Sample Cover Page). If the alien is represented, the attorney must file a paper, not an electronic, Notice of Entry of Appearance as Attorney or Representative Before the Immigration Court (Form EOIR-28). See Chapter 2.1(b) (Entering an appearance). To ensure that the Immigration Court has the alien's current address, an Alien's Change of Address Form (EOIR-33/IC) should be filed with the motion. Depending on the nature of the motion, a filing fee or fee waiver request may be required. See Chapter 3.4 (Filing Fees). If the motion is based on eligibility for relief, the motion must be accompanied by a copy of the application for that relief and all supporting documents, if an application is normally required. See Chapter 5.2(g) (Application for relief.)

*(ii) Content.* — A motion to reopen must state the new facts that will be proven at a reopened hearing if the motion is granted, and the motion must be supported by affidavits or other evidentiary material. 8 C.F.R. § 1003.23(b)(3).

A motion to reopen is not granted unless it appears to the Immigration Judge that the evidence offered is material and was not available and could not have been discovered or presented at an earlier stage in the proceedings. See 8 C.F.R. § 1003.23(b)(3).

A motion to reopen based on an application for relief will not be granted if it appears the alien's right to apply for that relief was fully explained and the alien had an opportunity to apply for that relief at an earlier stage in the proceedings (unless the relief is sought on the basis of circumstances that have arisen subsequent to that stage of the proceedings). 8 C.F.R. § 1003.23(b)(3).).

AR.07529

*(c) Time limits. —* As a general rule, a motion to reopen must be filed within 90 days of an Immigration Judge's final order. 8 C.F.R. § 1003.23(b)(1). (For cases decided by the Immigration Judge before July 1, 1996, the motion to reopen was due on or before September 30, 1996. 8 C.F.R. § 1003.23(b)(1)). There are few exceptions. See subsection (e), below.

Responses to motions to reopen are due within ten (10) days after the motion was received by the Immigration Court, unless otherwise specified by the Immigration Judge.

*(d) Number limits. —* A party is permitted only one motion to reopen. 8 C.F.R. § 1003.23(b)(1). There are few exceptions. See subsection (e), below.

*(e) Exceptions to the limits on motions to reopen. —* A motion to reopen may be filed outside the time and number limits only in specific circumstances. See 8 C.F.R. § 1003.23(b)(4).

*(i) Changed circumstances. —* When a motion to reopen is based on a request for asylum, withholding of removal ("restriction on removal"), or protection under the Convention Against Torture, and it is premised on new circumstances, the motion must contain a complete description of the new facts that comprise those circumstances and articulate how those circumstances affect the party's eligibility for relief. See 8 C.F.R. § 1003.23(b)(4)(i). Motions based on changed circumstances must also be accompanied by evidence of the changed circumstances alleged. See 8 C.F.R. § 1003.23(b)(3).

*(ii) In absentia proceedings. —* There are special rules pertaining to motions to reopen following an alien's failure to appear for a hearing. See Chapter 5.9 (Motions to Reopen In Absentia Orders).

*(iii) Joint motions. —* Motions to reopen that are agreed upon by all parties and are jointly filed are not limited in time or number. See 8 C.F.R. § 1003.23(b)(4)(iv).

*(iv) DHS motions. —* For cases in removal proceedings, the Department of Homeland Security (DHS) is not subject to time and number limits on motions to reopen. See 8 C.F.R. § 1003.23(b)(1). For cases brought in deportation or exclusion proceedings, DHS is subject to the time and number limits on motions to reopen, unless the basis of the motion is fraud in the original proceeding or a crime that would support termination of asylum. See 8 C.F.R. § 1003.23(b)(1).

AR.07530

*(v) Pre-9/30/96 motions.* — Motions filed before September 30, 1996 do not count toward the one-motion limit.

*(vi) Battered spouses, children, and parents.* — There are special rules for certain motions to reopen by battered spouses, children, and parents. INA § 240(c)(7)(C)(iv).

*(vii) Other.* — In addition to the regulatory exceptions for motions to reopen, exceptions may be created in accordance with special statutes, case law, directives, or other special legal circumstances.  The Immigration Judge may also reopen proceedings at any time on his or her own motion.  See 8 C. F. R. § 1003.23(b)(1).

*(f) Evidence.* — A motion to reopen must be supported by evidence.  See Chapter 5.2(e) (Evidence).

*(g) Motions filed prior to deadline for appeal.* — A motion to reopen filed prior to the deadline for filing an appeal does not stay or extend the deadline for filing the appeal.

*(h) Motions filed while an appeal is pending.* —  Once an appeal is filed with the Board of Immigration Appeals, the Immigration Judge no longer has jurisdiction over the case.  See Chapter 5.2(a) (Where to file).  Thus, motions to reopen should not be filed with the Immigration Court after an appeal is taken to the Board.

*(i) Administratively closed cases.* — When proceedings have been administratively closed, the proper motion is a motion to recalendar, *not* a motion to reopen.  See Chapter 5.10(t) (Motion to recalendar).

*(j) Automatic stays.* — A motion to reopen that is filed with the Immigration Court does not automatically stay an order of removal or deportation.  See Chapter 8 (Stays). For automatic stay provisions for motions to reopen to rescind in absentia orders, see Chapter 5.9(d)(iv) (Automatic stay).

*(k) Criminal convictions.* — A motion claiming that a criminal conviction has been overturned, vacated, modified, or disturbed in some way must be accompanied by clear evidence that the conviction has actually been disturbed.  Thus, neither an intention to seek post-conviction relief nor the mere eligibility for post-conviction relief, by itself, is sufficient to reopen proceedings.

## 5.8    Motions to Reconsider

*updates: www.justice.gov/eoir*                                        *Version released on*
                                                                                          *March 17, 2020*

*(a) Purpose.* **—** A motion to reconsider either identifies an error in law or fact in the Immigration Judge's prior decision or identifies a change in law that affects an Immigration Judge's prior decision and asks the Immigration Judge to reexamine his or her ruling. A motion to reconsider is based on the existing record and does not seek to introduce new facts or evidence.

*(b) Requirements.* **—** The motion should be filed with a cover page labeled "MOTION TO RECONSIDER" and comply with the deadlines and requirements for filing. See subsection (c), below, Chapter 5.2 (Filing a Motion), Appendix F (Sample Cover Page). If the alien is represented, the attorney must file a paper, not an electronic, Notice of Entry of Appearance as Attorney or Representative Before the Immigration Court (Form EOIR-28). See Chapter 2.1(b) (Entering an appearance). To ensure that the Immigration Court has the alien's current address, an Alien's Change of Address Form (EOIR-33/IC) should be filed with the motion. A filing fee or a fee waiver request may be required. See Chapter 3.4 (Filing Fees).

*(c) Time limits.* **—** A motion to reconsider must be filed within 30 days of the Immigration Judge's final administrative order. 8 C.F.R. § 1003.23(b)(1). (For cases decided by the Immigration Court before July 1, 1996, the motion to reconsider was due on or before July 31, 1996. 8 C.F.R. § 1003.23(b)(1)).

Responses to motions to reconsider are due within ten (10) days after the motion was received by the Immigration Court, unless otherwise specified by the Immigration Judge.

*(d) Number limits.* **—** As a general rule, a party may file only one motion to reconsider. See 8 C.F.R. § 1003.23(b)(1). Motions filed prior to July 31, 1996, do not count toward the one-motion limit. Although a party may file a motion to reconsider the denial of a motion to reopen, a party may not file a motion to reconsider the denial of a motion to reconsider. 8 C.F.R. § 1003.23(b)(1).

*(e) Exceptions to the limits on motions to reconsider.* **—**

*(i) Alien motions.* **—** There are no exceptions to the time and number limitations on motions to reconsider when filed by an alien.

*(ii) DHS motions.* **—** For cases in removal proceedings, the Department of Homeland Security (DHS) is not subject to time and number limits on motions to reconsider. See 8 C.F.R. § 1003.23(b)(1). For cases brought in deportation or exclusion proceedings, DHS is subject to the time and number limits on motions

to reconsider, unless the basis of the motion is fraud in the original proceeding or a crime that would support termination of asylum.  See 8 C.F.R. § 1003.23(b)(1).

(iii) *Other*. — In addition to the regulatory exceptions for motions to reconsider, exceptions may be created in accordance with special statutes, case law, directives, or other special legal circumstances.  The Immigration Judge may also reconsider proceedings at any time on its own motion.  8 C.F.R. § 1003.23(b)(1).

(f) *Identification of error*. — A motion to reconsider must state with particularity the errors of fact or law in the Immigration Judge's prior decision, with appropriate citation to authority and the record.  If a motion to reconsider is premised upon changes in the law, the motion should identify the changes and, where appropriate, provide copies of that law.  For citation guidelines, see Chapter 4.19(f) (Citation), Appendix J (Citation Guidelines).

(g) *Motions filed prior to deadline for appeal*. — A motion to reconsider filed prior to the deadline for filing an appeal does not stay or extend the deadline for filing the appeal.

(h) *Motions filed while an appeal is pending*. — Once an appeal is filed with the Board of Immigration Appeals, the Immigration Judge no longer has jurisdiction over the case.  See Chapter 5.2(a) (Where to file).  Thus, motions to reconsider should not be filed with an Immigration Judge after an appeal is taken to the Board.

(i) *Automatic stays*. — A motion to reconsider does not automatically stay an order of removal or deportation.  See Chapter 8 (Stays).

(j) *Criminal convictions*. — When a criminal conviction has been overturned, vacated, modified, or disturbed in some way, the proper motion is a motion to reopen, not a motion to reconsider.  See Chapter 5.7(k) (Criminal convictions).

## 5.9  Motions to Reopen In Absentia Orders

(a) *In general*. — A motion to reopen requesting that an in absentia order be rescinded asks the Immigration Judge to consider the reasons why the alien did not appear at the alien's scheduled hearing.  See Chapter 4.17 (In Absentia Hearing).

(b) *Filing*. — The motion should be filed with a cover page labeled "MOTION TO REOPEN AN IN ABSENTIA ORDER" and comply with the deadlines and requirements

AR.07533

for filing.  See subsection (d), below, Chapter 5.2 (Filing a Motion), Appendix F (Sample Cover Page).  If the alien is represented, the attorney must file a paper, not an electronic, Notice of Entry of Appearance as Attorney or Representative Before the Immigration Court (Form EOIR-28).  See Chapter 2.1(b) (Entering an appearance).  To ensure that the Immigration Court has the alien's current address, an Alien's Change of Address Form (EOIR-33/IC) should be filed with the motion.  A filing fee or fee waiver request may be required, depending on the nature of the motion.  See 8 C.F.R. § 1003.24(b)(2).

**(c) Deportation and exclusion proceedings. —** The standards for motions to reopen to rescind in absentia orders in deportation and exclusion proceedings differ from the standards in removal proceedings.  See Chapter 7 (Other Proceedings before Immigration Judges).  The provisions in subsection (d), below, apply to removal proceedings only.  Parties in deportation or exclusion proceedings should carefully review the controlling law and regulations.  See 8 C.F.R. § 1003.23(b)(4)(iii).

**(d) Removal proceedings. —** The following provisions apply to motions to reopen to rescind in absentia orders in removal proceedings only.  Parties should note that, in removal proceedings, an in absentia order may be rescinded *only* upon the granting of a motion to reopen.  The Board of Immigration Appeals does not have jurisdiction to consider direct appeals of in absentia orders in removal proceedings.

**(i) Content. —** A motion to reopen to rescind an in absentia order must demonstrate that:

- o   the failure to appear was because of exceptional circumstances;

- o   the failure to appear was because the alien did not receive proper notice; or

- o   the failure to appear was because the alien was in federal or state custody and the failure to appear was through no fault of the alien.

INA § 240(b)(5)(C), 8 C.F.R. § 1003.23(b)(4)(ii).  The term "exceptional circumstances" refers to exceptional circumstances beyond the control of the alien (such as battery or extreme cruelty to the alien or any child or parent of the alien, serious illness of the alien or serious illness or death of the spouse, child, or parent of the alien, but not including less compelling circumstances).  INA § 240(e)(1).

**(ii) Time limits. —**

AR.07534

**(A) Within 180 days. —** If the motion to reopen to rescind an in absentia order is based on an allegation that the failure to appear was because of exceptional circumstances, the motion must be filed within 180 days after the in absentia order. See INA § 240(b)(5)(C), 8 C.F.R. § 1003.23(b)(4)(ii).

**(B) At any time. —** If the motion to reopen to rescind an in absentia order is based on an allegation that the alien did not receive proper notice of the hearing, or that the alien was in federal or state custody and the failure to appear was through no fault of the alien, the motion may be filed at any time. See INA § 240(b)(5)(C), 8 C.F.R. § 1003.23(b)(4)(ii).

**(C) Responses. —** Responses to motions to reopen to rescind in absentia orders are due within ten (10) days after the motion was received by the Immigration Court, unless otherwise specified by the Immigration Judge.

**(iii) Number limits. —** The alien is permitted to file only one motion to reopen to rescind an in absentia order. 8 C.F.R. § 1003.23(b)(4)(ii).

**(iv) Automatic stay. —** The removal of the alien is automatically stayed pending disposition by the Immigration Judge of the motion to reopen to rescind an in absentia order in removal proceedings. See INA § 240(b)(5)(C), 8 C.F.R. § 1003.23(b)(4)(ii).

## 5.10    Other Motions

**(a) Motion to continue. —** A request for a continuance of any hearing should be made by written motion. Oral motions to continue are discouraged. The motion should set forth in detail the reasons for the request and, if appropriate, be supported by evidence. See Chapter 5.2(e) (Evidence). It should also include the date and time of the hearing, as well as preferred dates that the party is available to re-schedule the hearing. However, parties should be mindful that the Immigration Court retains discretion to schedule continued cases on dates that the court deems appropriate.

The motion should be filed with a cover page labeled "MOTION TO CONTINUE" and comply with the deadlines and requirements for filing. See Chapter 5.2 (Filing a Motion), Appendix F (Sample Cover Page).

AR.07535

The filing of a motion to continue does not excuse the appearance of an alien or representative at any scheduled hearing.  Therefore, until the motion is granted, parties must appear at all hearings as originally scheduled.

*(b) Motion to advance.* — A request to advance a hearing date (move the hearing to an earlier date) should be made by written motion.  A motion to advance should completely articulate the reasons for the request.  The motion should be filed with a cover page labeled "MOTION TO ADVANCE" and comply with the deadlines and requirements for filing.  See Chapter 5.2 (Filing a Motion), Appendix F (Sample Cover Page).

*(c) Motion to change venue.* — A request to change venue should be made by written motion.  The motion should be supported by documentary evidence.  See Chapter 5.2(e) (Evidence).  The motion should contain the following information:

- o    the date and time of the next scheduled hearing

- o    an admission or denial of the factual allegations and charge(s) in the Notice to Appear (Form I-862)

- o    a designation or refusal to designate a country of removal

- o    if the alien will be requesting relief from removal, a description of the basis for eligibility

- o    a fixed street address where the alien may be reached for further hearing notification

- o    if the address at which the alien is receiving mail has changed, a properly completed Alien's Change of Address Form (Form EOIR-33/IC)

- o    a detailed explanation of the reasons for the request

See generally *Matter of Rahman*, 20 I&N Dec. 480 (BIA 1992), 8 C.F.R. § 1003.20.

The motion should be filed with a cover page labeled "MOTION TO CHANGE VENUE," accompanied by a proposed order for change of venue, and comply with the deadlines and requirements for filing.  See Chapter 5.2 (Filing a Motion), Appendix F (Sample Cover Page).

AR.07536

The filing of a motion to change venue does not excuse the appearance of an alien or representative at any scheduled hearing.  Therefore, until the motion is granted, parties must appear at all hearings as originally scheduled.

**(d) Motion for substitution of counsel.** — See Chapter 2.3(i)(Change in representation).

**(e) Motion to withdraw as counsel.** — See Chapter 2.3(i) (Change in representation).

**(f) Motion for extension.** — See Chapter 3.1(c)(iv) (Motions for extensions of filing deadlines).

**(g) Motion to accept an untimely filing.** — See Chapter 3.1(d)(ii) (Untimely filings).

**(h) Motion for closed hearing.** — See Chapter 4.9 (Public Access).

**(i) Motion to waive representative's appearance.** — See Chapter 4.15 (Master Calendar Hearing).

**(j) Motion to waive respondent's appearance.** — See Chapter 4.15 (Master Calendar Hearing).

**(k) Motion to permit telephonic appearance.** — See Chapter 4.15 (Master Calendar Hearing).

**(l) Motion to request an interpreter.** — See Chapter 4.15 (Master Calendar Hearing).

**(m) Motion for video testimony.** — See Chapter 4.15 (Master Calendar Hearing).

**(n) Motion to present telephonic testimony.** — See Chapter 4.15 (Master Calendar Hearing).

**(o) Motion for subpoena.** — See Chapter 4.20 (Subpoenas).

**(p) Motion for consolidation.** — See Chapter 4.21 (Combining and Separating Cases).

AR.07537

*(q) Motion for severance.* — See Chapter 4.21 (Combining and Separating Cases).

*(r) Motion to stay removal or deportation.* — See Chapter 8 (Stays).

*(s) Motions in disciplinary proceedings.* — Motions in proceedings involving the discipline of an attorney or representative are discussed in Chapter 10 (Discipline of Practitioners).

*(t) Motion to recalendar.* — When proceedings have been administratively closed and a party wishes to reopen the proceedings, the proper motion is a motion to recalendar, not a motion to reopen. A motion to recalendar should provide the date and the reason the case was closed. If available, a copy of the closure order should be attached to the motion. The motion should be filed with a cover page labeled "MOTION TO RECALENDAR" and comply with the requirements for filing. See Chapter 5.2 (Filing a Motion), Appendix F (Sample Cover Page). To ensure that the Immigration Court has the alien's current address, an Alien's Change of Address Form (EOIR-33/IC) should be filed with the motion. Motions to recalendar are not subject to time and number restrictions.

*(u) Motion to amend.* — The Immigration Judge entertains motions to amend previous filings in limited situations (e.g., to correct a clerical error in a filing). The motion should clearly articulate what needs to be corrected in the previous filing. The filing of a motion to amend does not affect any existing motion deadlines.

The motion should be filed with a cover page labeled "MOTION TO AMEND" and comply with the requirements for filing. See Chapter 5.2 (Filing a Motion), Appendix F (Sample Cover Page).

*(v) Other types of motions.* — The Immigration Court entertains other types of motions as appropriate to the facts and law of each particular case, provided that the motion is timely, is properly filed, is clearly captioned, and complies with the general motion requirements. See Chapters 5.2 (Filing a Motion), Appendix F (Sample Cover Page).

## 5.11  Decisions

Immigration Judges decide motions either orally at a hearing or in writing. If the decision is in writing, it is generally served on the parties by regular mail.

AR.07538

**5.12   Response to Motion**

Responses to motions must comply with the deadlines and requirements for filing. See 8 C.F.R. § 1003.23(a), Chapter 3 (Filing with the Immigration Court).  A motion is deemed unopposed unless timely response is made.  Parties should note that unopposed motions are not necessarily granted.  Immigration Judges may deny a motion before the close of the response period without waiting for a response from the opposing party if the motion does not comply with the applicable legal requirements.  Examples include:

○       Denial of a motion to withdraw as counsel of record that does not contain a statement that the attorney has notified the respondent of the request to withdraw as counsel or, if the respondent could not be notified, an explanation of the efforts made to notify the respondent of the request. See Chapter 2.3(i)(ii) (Withdrawal of counsel).

○       Denial of a motion to change venue that does not identify the fixed address where the respondent may be reached for further hearing notification.  See Chapter 5.10(c) (Motion to change venue), 8 C.F.R. § 1003.20(b).

AR.07539

# Chapter 6  Appeals of Immigration Judge Decisions

## 6.1    Appeals Generally

The Board of Immigration Appeals has nationwide jurisdiction to review decisions of Immigration Judges.  See  8 C.F.R. § 1003.1, Chapter 1.2(c) (Relationship to the Board of Immigration Appeals).  Accordingly, appeals of Immigration Judges decisions should be made to the Board.  Appeals of Immigration Judges decisions are distinct from motions to reopen or motions to reconsider, which are filed with the Immigration Court following a decision ending proceedings.  See Chapter 5 (Motions before the Immigration Court).

This chapter is limited to appeals from the decisions of Immigration Judges in removal, deportation, and exclusion proceedings.  Other kinds of appeals are discussed in the following chapters:

Chapter 7     Other Proceedings before Immigration Judges
Chapter 9     Detention and Bond
Chapter 10   Discipline of Practitioners

For detailed guidance on appeals, parties should consult the Board of Immigration Appeals Practice Manual, which is available on the Executive Office for Immigration Review website at www.justice.gov/eoir.

## 6.2    Process

*(a) Who may appeal.* — An Immigration Judge's decision may be appealed only by the alien subject to the proceeding, the alien's legal representative, or the Department of Homeland Security.  See 8 C.F.R. § 1003.3.

*(b) How to appeal.* — To appeal an Immigration Judge's decision, a party must file a properly completed and executed Notice of Appeal (Form EOIR-26) with the Board of Immigration Appeals.  The Form EOIR-26 must be received by the Board no later than 30 calendar days after the Immigration Judge renders an oral decision or mails a written decision.  See 8 C.F.R. § 1003.38.  Parties must comply with all instructions on the Form EOIR-26.

Appeals are subject to strict requirements.  For detailed information on these requirements, parties should consult the Board of Immigration Appeals Practice Manual.

AR.07540

## 6.3    Jurisdiction

After an appeal has been filed, jurisdiction shifts between the Immigration Court and the Board of Immigration Appeals depending on the nature and status of the appeal. For detailed guidance on whether the Immigration Court or the Board has jurisdiction over a particular matter in which an appeal has been filed, parties should consult the Board of Immigration Appeals Practice Manual.  See Appendix K (Where to File).

## 6.4    Waiver of Appeal

*(a) Effect of appeal waiver.* — If the opportunity to appeal is knowingly and voluntarily waived, the decision of the Immigration Judge becomes final.  See 8 C.F.R. § 1003.39.  If a party waives appeal at the conclusion of proceedings before the Immigration Judge, that party generally may not file an appeal thereafter.  See 8 C.F.R. § 1003.3(a)(1), *Matter of Shih*, 20 I&N Dec. 697 (BIA 1993).  See also 8 C.F.R. § 1003.1(d)(2)(i)(G).

*(b) Challenging a waiver of appeal.* — Generally, a party who waives appeal cannot retract, withdraw, or otherwise undo that waiver.  If a party wishes to challenge the validity of his or her waiver of appeal, the party may do so in one of two ways: either in a timely motion filed with the Immigration Judge that explains why the appeal waiver was not valid *or* in an appeal filed directly with the Board of Immigration Appeals that explains why the appeal waiver was not valid.  *Matter of Patino*, 23 I&N Dec. 74 (BIA 2001).  Once an appeal is filed, jurisdiction vests with the Board, and the motion can no longer be ruled upon by the Immigration Judge.  For detailed guidance on whether the Immigration Court or the Board has jurisdiction over a particular matter in which an appeal has been filed, parties should consult the Board of Immigration Appeals Practice Manual.

## 6.5    Certification

An Immigration Judge may ask the Board of Immigration Appeals to review his or her decision.  See 8 C.F.R. §§ 1003.1(c), 1003.7.  This is known as "certifying" the case to the Board.  When a case is certified, an Immigration Court serves a notice of certification on the parties.  Generally, a briefing schedule is served on the parties following certification.

The certification of a case is separate from any appeal in the case.  Therefore, a party wishing to appeal must file an appeal *even if* the Immigration Judge has certified the case to the Board.  See 8 C.F.R. § 1003.3(d).

AR.07541

**6.6     Additional Information**

For detailed guidance on appeals, parties should consult the Board of Immigration Appeals Practice Manual, which is available on the Executive Office for Immigration Review website at www.justice.gov/eoir.

# Chapter 7  Other Proceedings before Immigration Judges

## 7.1  Overview

While the vast majority of proceedings conducted by Immigration Judges are removal proceedings, Immigration Judges have jurisdiction over other kinds of proceedings as well.  This chapter provides a brief overview of these other kinds of proceedings.  They include:

- o  deportation proceedings and exclusion proceedings

- o  rescission proceedings

- o  limited proceedings, including:

  - • credible fear proceedings

  - • reasonable fear proceedings

  - • claimed status review

  - • asylum-only proceedings

  - • withholding-only proceedings

Removal proceedings are discussed in Chapter 4 (Hearings before Immigration Judges).  Additional proceedings conducted by Immigration Judges are discussed in the following chapters:

|  |  |
|---|---|
| Chapter 9 | Detention and Bond |
| Chapter 10 | Discipline of Practitioners |

## 7.2  Deportation Proceedings and Exclusion Proceedings

### *(a) In general. —*

**(i) Replaced by removal proceedings.** — Beginning with proceedings commenced on April 1, 1997, deportation and exclusion proceedings have been

AR.07543

replaced by removal proceedings.  See generally INA §§ 239, 240, 8 C.F.R. §§ 1003.12 et seq., 1240.1 et seq.  However, Immigration Judges continue to conduct deportation and exclusion proceedings in certain cases that began before April 1, 1997.

**(ii) Compared with removal proceedings. —** The procedures in deportation and exclusion proceedings are generally similar to the procedures in removal proceedings.  See Chapters 2 (Appearances before the Immigration Court), 3 (Filing with the Immigration Court), 4 (Hearings before Immigration Judges), 5 (Motions before the Immigration Court), 6 (Appeals of Immigration Judge Decisions).  However, deportation and exclusion proceedings are significantly different from removal proceedings in areas such as burden of proof, forms of relief available, and custody.  Accordingly, parties in deportation and exclusion proceedings should carefully review the laws and regulations pertaining to those proceedings.  The information in this chapter is provided as a general guideline only.

**(b) Deportation proceedings. —**

**(i) Order to Show Cause. —** Deportation proceedings began when the former Immigration and Naturalization Service (INS) filed an Order to Show Cause (Form I-221) with the Immigration Court after serving it on the alien in person or by certified mail.  See former INA § 242B(a)(1), 8 C.F.R. § 1240.40 et seq.  See also Chapter 1.2 (Function of the Office of the Chief Immigration Judge).  Similar to a Notice to Appear (Form I-862), an Order to Show Cause (Form I-221) is a written notice containing factual allegations and charge(s) of deportability.

**(ii) Hearing notification. c** In deportation proceedings, hearing notices from the Immigration Court are served on the parties, personally or by certified mail, at least 14 days prior to the hearing.

**(iii) Grounds of deportability. —** The grounds for deportation that apply in deportation proceedings are listed in former INA § 241.  In some cases, those grounds are different from the grounds of deportability in removal proceedings. Compare former INA § 241 (prior to 1997) with current INA § 237.

**(iv) Forms of relief. —** For the most part, the same forms of relief are available in deportation proceedings as in removal proceedings.  However, there are important differences.  Parties in deportation proceedings should carefully review the relevant law and regulations.

AR.07544

*(v) Appeals.* **—** In most cases, an Immigration Judge's decision in a deportation proceeding can be appealed to the Board of Immigration Appeals.  See Chapter 6 (Appeals of Immigration Judge Decisions).

*(c) Exclusion proceedings.* **—**

*(i) Notice to Applicant Detained for Hearing.* **—** Exclusion proceedings began when the Immigration and Naturalization Service (INS) filed a Notice to Applicant for Admission Detained for Hearing before an Immigration Judge (Form I-122).  See former INA § 242(b), 8 C.F.R. § 1240.30 et seq.  The Form I-122 is a written notice containing the charge(s) of excludability. Unlike the Order to Show Cause, the Form I-122 *does not* contain factual allegations.

*(ii) Hearing notification.* **—** In exclusion proceedings, the alien must be given a reasonable opportunity to be present at the hearing.  Note that, in exclusion proceedings, notice to the alien is not governed by the same standards as in deportation proceedings.  See *Matter of Nafi*, 19 I&N Dec. 430 (BIA 1987).

*(iii) Closed to public.* **—** Exclusion hearings are closed to the public, unless the applicant requests that the public be allowed to attend.

*(iv) Grounds of excludability.* **—** The grounds for exclusion are listed in the former INA § 212.  In some cases, the grounds of excludability in exclusion proceedings are different from the grounds of inadmissibility in removal proceedings.  Compare former INA § 212 (prior to 1997) with current INA § 212.

*(v) Forms of relief.* **—** For the most part, the same forms of relief are available in exclusion proceedings as in removal proceedings.  However, there are important differences.  Parties in exclusion proceedings should carefully review the relevant law and regulations.

*(vi) Appeals.* **—** An Immigration Judge's decision in an exclusion proceeding can be appealed to the Board of Immigration Appeals.  See Chapter 6 (Appeals of Immigration Judge Decisions).

## 7.3   Rescission Proceedings

*(a) In general.* **—** In a rescission proceeding, an Immigration Judge determines whether an alien's status as a lawful permanent resident should be "rescinded," or taken

AR.07545

away, because alien was not entitled to become a lawful permanent resident.  See generally 8 C.F.R. § 1246.1 et seq.  An alien's lawful permanent resident status may not be rescinded if more than 5 years have passed since the alien became a lawful permanent resident.  See INA § 246(a).

**(b) Notice of Intent to Rescind. —** A rescission proceeding begins when the Department of Homeland Security personally serves an alien with a Notice of Intent to Rescind.  The alien has 30 days to submit a sworn answer in writing and/or request a hearing before an Immigration Judge.  A rescission hearing is held if the alien files a timely answer which contests or denies any allegation in the Notice of Intent to Rescind *or* the alien requests a hearing.

**(c) Conduct of hearing. —** Rescission proceedings are conducted in a manner similar to removal proceedings.  See Chapter 4 (Hearings Before Immigration Judges).

**(d) Appeal. —** An Immigration Judge's decision in a rescission proceeding can be appealed to the Board of Immigration Appeals.

## 7.4    Limited Proceedings

**(a) In general. —** Certain aliens can be removed from the United States without being placed into removal proceedings.  However, in some circumstances, these aliens may be afforded limited proceedings, including credible fear review, reasonable fear review, claimed status review, asylum-only proceedings, and withholding-only proceedings.

**(b) Classes of aliens. —** The following aliens can be removed from the United States without being placed into removal proceedings.  These aliens are afforded limited proceedings as described below.

**(i) Expedited removal under INA § 235(b)(1). —** The following aliens are subject to "expedited removal" under INA § 235(b)(1):

  o    aliens arriving at a port of entry without valid identity or travel documents, as required, or with fraudulent documents

  o    aliens interdicted at sea (in international or U.S. waters) and brought to the United States

AR.07546

- o    aliens who have not been admitted or paroled into the United States and who have not resided in the United States for two years or more

- o    individuals paroled into the United States after April 1, 1997, and whose parole has since been terminated

**(A) Exceptions. —** The following aliens are *not* subject to expedited removal under INA § 235(b)(1):

- o    lawful permanent residents

- o    aliens granted refugee or asylee status

- o    aliens seeking asylum while applying for admission under the visa waiver program

- o    minors, unless they have committed certain crimes

**(B) Limited proceedings afforded. —** As described below, aliens subject to expedited removal under INA § 235(b)(1) are afforded the following proceedings:

- o    if the alien expresses a fear of persecution or torture, the alien is placed into "credible fear proceedings," as described in  subsection (d), (below)

- o    if the alien claims to be a United States citizen or a lawful permanent resident, or that he or she has been granted refugee or asylee status, the alien is allowed a "claimed status review," as described in subsection (f), (below)

**(ii) Expedited removal under INA § 238(b). —** Aliens who are not lawful permanent residents and who have been convicted of aggravated felonies are subject to "expedited removal" under INA § 238(b).  If such an alien expresses a fear of persecution or torture, the alien is placed into "reasonable fear proceedings."  See subsection (e), below.

AR.07547

*(iii) Reinstatement of prior orders under INA § 241(a)(5).* — Under INA § 241(a)(5), aliens who are subject to reinstatement of prior orders of removal are not entitled to removal proceedings.  If such an alien expresses a fear of persecution or torture, the alien is placed into "reasonable fear proceedings."  See subsection (e), below.

*(iv) Stowaways.* — If a stowaway expresses a fear of persecution or torture, he or she is placed into credible fear proceedings.  See INA § 235(a)(2), subsection (d), below.

*(v) Others.* — In certain circumstances, the aliens listed below may be placed into asylum-only proceedings.  See subsection (g), below.

- o  crewmembers (D visa applicants)

- o  certain cooperating witnesses and informants (S visa applicants)

- o  visa waiver applicants and visa waiver overstays

- o  aliens subject to removal under INA § 235(c) on security grounds

*(c) Custody in limited proceedings.* — An alien subject to limited proceedings may be detained during the proceedings.  Immigration Judges have no jurisdiction over custody decisions for these aliens.

*(d) Credible fear proceedings.* — Credible fear proceedings involve stowaways and aliens subject to expedited removal under INA § 235(b)(1).  See subsections (b)(i), (b)(iii), above.  If such an alien expresses a fear of persecution or torture to the Department of Homeland Security (DHS) immigration officer upon being detained by DHS or applying to enter the United States, the alien is interviewed by a DHS asylum officer who evaluates whether the alien possesses a credible fear of persecution or torture.  See generally INA § 235(b)(1)(B).

*(i) Credible fear standard.* — "Credible fear of persecution" means that there is a significant possibility that the alien can establish eligibility for asylum under INA § 208 or withholding of removal ("restriction on removal") under INA § 241(b)(3).  The credibility of the alien's statements in support of the claim, and

AR.07548

other facts known to the reviewing official, are taken into account.  8 C.F.R. §§ 208.30(e)(2), 1003.42(d).

"Credible fear of torture" means there is a significant possibility that the alien is eligible for withholding of removal ("restriction on removal") or deferral of removal under the Convention Against Torture pursuant to 8 C.F.R. §§ 208.16 or 208.17. 8 C.F.R. §§ 208.30(e)(3), 1003.42(d).

### (ii) If the DHS asylum officer finds credible fear. —

**(A) Stowaways. —** If the DHS asylum officer finds that a stowaway has a credible fear of persecution or torture, the stowaway is placed in asylum-only proceedings before an Immigration Judge.  See 8 C.F.R. § 208.30(f).  In asylum-only proceedings, the stowaway can apply for asylum, withholding of removal ("restriction on removal") under INA § 241(b)(3), and protection under the Convention Against Torture.  See subsection (g), below.

**(B) Aliens subject to expedited removal under INA § 235(b)(1). —** If the DHS asylum officer finds that an alien subject to expedited removal under INA § 235(b)(1) has a credible fear of persecution or torture, the alien is placed in removal proceedings before an Immigration Judge.  See 8 C.F.R. § 208.30(f).  In removal proceedings, the alien has the same rights, obligations, and opportunities for relief as any other alien in removal proceedings.  See Chapter 4 (Hearings before Immigration Judges).

**(iii) If the DHS asylum officer does not find credible fear. —** If the DHS asylum officer finds that the alien does *not* have a credible fear of persecution or torture, the alien may request that an Immigration Judge review this finding.  See 8 C.F.R. § 208.30(g).

**(iv) Credible fear review by an Immigration Judge. —** The credible fear review is conducted according to the provisions in (A) through (E), below.  See generally INA § 235(b)(1)(B), 8 C.F.R. § 1003.42.

**(A) Timing. —** The credible fear review must be concluded no later than 7 days after the date of the DHS asylum officer's decision.  If possible, the credible fear review should be concluded 24 hours after the decision.

AR.07549

**(B) Location. —** If possible, the credible fear review is conducted in person.  However, because of the time constraints, the credible fear review may be conducted by video or telephone conference.  See Chapter 4.7 (Hearings by Video or Telephone Conference).

**(C) Representation. —** Prior to the credible fear review, the alien may consult with a person or persons of the alien's choosing.  In the discretion of the Immigration Judge, persons consulted may be present during the credible fear review.  However, the alien is not represented at the credible fear review.  Accordingly, persons acting on the alien's behalf are not entitled to make opening statements, call and question witnesses, conduct cross examinations, object to evidence, or make closing arguments.

**(D) Record of Proceedings. —** DHS must give the complete record of the DHS asylum officer's credible fear determination to the Immigration Court.  This record includes any notes taken by the DHS asylum officer. The Immigration Judge creates a record, which is kept separate from the Record of Proceedings in any subsequent Immigration Court proceeding involving the alien.

**(E) Conduct of hearing. —** A credible fear review is not as exhaustive or in-depth as an asylum hearing in removal proceedings. Rather, a credible fear review is simply a review of the DHS asylum officer's decision.  Either the alien or DHS may introduce oral or written statements, and the court provides an interpreter if necessary.  Evidence may be introduced at the discretion of the Immigration Judge.  The hearing is recorded.  Parties should be mindful that all requests for continuances are subject to the statutory time limits.  See (A), above.

**(v) If the Immigration Judge finds credible fear. —**

**(A) Stowaways. —** If the Immigration Judge finds that a stowaway has a credible fear of persecution or torture, the stowaway is placed in asylum-only proceedings.  See 8 C.F.R. § 1208.30(g)(2)(iv)(C).  In asylum-only proceedings, the stowaway can apply for asylum, withholding of removal (Ꭺrestriction on removal") under INA § 241(b)(3), and protection under the Convention Against Torture.  See subsection (g), below.

AR.07550

**(B)  Aliens subject to expedited removal under INA § 235(b)(1).** — If the Immigration Judge finds that an alien subject to expedited removal under INA § 235(b)(1) has a credible fear of persecution or torture, the alien is placed in removal proceedings.  See 8 C.F.R. §§ 1003.42(f), 1208.30(g)(2)(iv)(B).  In removal proceedings, the alien has the same rights, obligations, and opportunities for relief, including the opportunity to apply for asylum, as any other alien in removal proceedings. See Chapter 4 (Hearings before Immigration Judges).

**(vi) If the Immigration Judge does not find credible fear.** — If the Immigration Judge does not find credible fear of persecution or torture, the alien is returned to DHS for removal. Neither party may appeal an Immigration Judge's ruling in a credible fear review.  However, after providing notice to the Immigration Judge, DHS may reconsider its determination that an alien does not have a credible fear of persecution.  See 8 C.F.R. § 1208.30(g)(2)(iv)(A).

**(e)  Reasonable fear proceedings.** — Reasonable fear proceedings involve aliens subject to expedited removal under INA § 238(b) and aliens subject to reinstatement of prior orders of removal under INA § 241(a)(5).  See subsections (b)(ii), (b)(iii), above.  If such an alien expresses a fear of persecution or torture to the Department of Homeland Security (DHS) immigration officer, the alien is interviewed by a DHS asylum officer who evaluates whether the alien has a ʺreasonable fear of persecution or torture.ʺ  See generally 8 C.F.R. § 1208.31.

**(i) Reasonable fear standard.** — "Reasonable fear of persecution or torture" means a reasonable possibility that the alien would be persecuted on account of his or her race, religion, nationality, membership in a particular social group, or political opinion, or a reasonable possibility that the alien would be tortured if returned to the country of removal.  The bars to eligibility for withholding of removal ("restriction on removal") under INA § 241(b)(3)(B) are not considered. 8 C.F.R. § 1208.31(c).

**(ii) If the DHS asylum officer finds reasonable fear.** — If the DHS asylum officer finds that the alien has a reasonable fear of persecution or torture, the alien is placed in withholding-only proceedings before an Immigration Judge.  See 8 C.F.R. § 208.31(e).  In withholding-only proceedings, the alien can apply for withholding of removal ("restriction on removal") under INA § 241(b)(3) and protection under the Convention Against Torture.  See subsection (h), below.

AR.07551

*(iii) If the DHS asylum officer does not find reasonable fear.* **—** If the DHS asylum officer finds that the alien does not have a reasonable fear of persecution or torture, the alien may request that an Immigration Judge review this finding.  See 8 C.F.R. § 208.31(f).

*(iv) Reasonable fear review by an Immigration Judge.* **—** The reasonable fear review is conducted according to the provisions in (A) through (E), below.  See generally 8 C.F.R. § 1208.31.

*(A) Timing.* **—** In the absence of exceptional circumstances, the reasonable fear review is conducted within 10 days after the case is referred to the Immigration Court.

*(B) Location.* **—** If possible, the reasonable fear review is conducted in person.  However, because of the time constraints, the reasonable fear review may be conducted by video or telephone conference.  See Chapter 4.7 (Hearings by Video or Telephone Conference).

*(C) Representation.* **—** Subject to the Immigration Judge's discretion, the alien may be represented during the reasonable fear review at no expense to the government.

*(D) Record of Proceedings.* **—** DHS must file the complete record of the DHS asylum officer's reasonable fear determination with the Immigration Court.  This record includes any notes taken by the DHS asylum officer.  The Immigration Judge creates a record, which is kept separate from the Record of Proceedings in any subsequent Immigration Court proceeding involving the alien.

*(E) Conduct of hearing.* **—** A reasonable fear review hearing is not as comprehensive or in-depth as a withholding of removal hearing in removal proceedings.  Rather, it is a review of the DHS asylum officer's decision.  Either party may introduce oral or written statements, and the court provides an interpreter if necessary.  Evidence may be introduced at the discretion of the Immigration Judge.  The hearing is recorded.  Parties should be mindful that all requests for continuances are subject to the statutory time limits.  See (A), above.

*(v) If the Immigration Judge finds reasonable fear.* **—** If the Immigration Judge finds that the alien has a reasonable fear of persecution or torture, the alien

is placed in withholding-only proceedings.  See 8 C.F.R. § 1208.31(g)(2).  In withholding-only proceedings, the alien can apply for withholding of removal (ᴀrestriction on removal") under INA § 241(b)(3) and protection under the Convention Against Torture.  See subsection (h).

  *(vi) If the Immigration Judge does not find reasonable fear.* **—** If the Immigration Judge does not find a reasonable fear of persecution or torture, the alien is returned to DHS for removal.  There is no appeal from an Immigration Judge's ruling in a reasonable fear review.  See 8 C.F.R. § 1208.31(g)(1).

 *(f) Claimed status review.* **—** If an individual is found by a Department of Homeland Security (DHS) immigration officer to be subject to expedited removal under INA § 235(b)(1), but claims to be a United States citizen or lawful permanent resident, or to have been granted asylum or admitted to the United States as a refugee, the DHS immigration officer attempts to verify that claim.  If the claim cannot be verified, the individual is allowed to make a statement under oath.  The case is then reviewed by an Immigration Judge in a "claimed status review."  See generally 8 C.F.R. § 1235.3(b)(5).

  *(i) Timing.* **—** Claimed status reviews are scheduled as expeditiously as possible, preferably no later than 7 days after the case was referred to the Immigration Court and, if possible, within 24 hours.  Claims to United States citizenship may require more time to permit the alien to obtain relevant documentation.

  *(ii) Location.* **—** If possible, the claimed status review is conducted in person.  However, because of the time constraints, the claimed status review may be conducted by video or telephone conference.  See Chapter 4.7 (Hearings by Video or Telephone Conference).

  *(iii) Representation.* **—** Prior to the claimed status review, the individual subject to the review may consult with a person or persons of his or her choosing.  In the discretion of the Immigration Judge, persons consulted may be present during the claimed status review.  However, the individual subject to the review is not represented during the review.  Accordingly, persons acting on his or her behalf are not entitled to make opening statements, call and question witnesses, conduct cross examinations, object to evidence, or make closing arguments.

  *(iv) Record of Proceedings.* **—** The Immigration Judge creates a Record of Proceedings.  If an individual subject to a claimed status review is later placed

in removal proceedings, the Record of Proceedings for the claimed status review is merged with the Record of Proceedings for the removal proceedings.

*(v) Conduct of hearing.* — Either party may introduce oral or written statements, and an interpreter is provided if necessary.  Though the claimed status review is limited in nature, claims to status, particularly claims to United States citizenship, can be complicated and may require extensive evidence.  Therefore, the Immigration Judge has the discretion to continue proceedings to allow DHS and the person making the claim to collect and submit evidence.  The hearing is recorded.

*(vi) If the Immigration Judge verifies the claimed status.* — If the Immigration Judge determines that the individual subject to the review is a United States citizen or lawful permanent resident, or that he or she has been granted asylum or refugee status, the expedited removal order is vacated, or cancelled, and the proceedings are terminated.

Unless the Immigration Judge determines that the person in proceedings is a United States citizen, DHS may elect to place him or her in removal proceedings. In removal proceedings, he or she has the same rights, obligations, and opportunities for relief as any other alien in removal proceedings.  See Chapter 4 (Hearings before Immigration Judges).

*(vii) If the Immigration Judge cannot verify the claimed status.* — If the Immigration Judge determines that the subject of a claimed status review is not a United States citizen or lawful permanent resident, and that he or she has not been granted asylee or refugee status, the individual is returned to DHS for removal. There is no appeal from an Immigration Judge's ruling in a claimed status review.

*(g) Asylum-only proceedings.* — Asylum-only proceedings are limited proceedings in which the Immigration Judge considers applications for asylum, withholding of removal ("restriction on removal") under INA § 241(b)(3), and protection under the Convention Against Torture.

*(i) Beginning asylum-only proceedings.* — Asylum-only proceedings are commenced as follows, depending upon the status of the alien.

*(A) Stowaways with a credible fear of persecution or torture.* — When a Department of Homeland Security (DHS) asylum officer or an Immigration Judge finds that a stowaway has a credible fear of persecution

AR.07554

or torture, the stowaway's matter is referred to the Immigration Court for an asylum-only proceeding.  See 8 C.F.R. §§ 208.30(f), 1208.2(c)(1)(ii), 1208.30(g)(2)(iv)(C).

***(B)  Crewmembers  (D  visa  applicants).  —*** When an alien crewmember expresses a fear of persecution or torture to a DHS immigration officer, he or she is removed from the vessel and taken into DHS custody.  The crewmember is then provided an Application for Asylum and for Withholding of Removal (Form I-589), which must be completed and returned to DHS within 10 days unless DHS extends the deadline for good cause.  The application is then referred to the Immigration Court for an asylum-only proceeding.  See 8 C.F.R. §§ 1208.2(c)(1)(i), 1208.5(b)(1)(ii).

***(C)  Visa waiver applicants and overstays. —*** When an alien who has applied for admission, been admitted, or overstayed his or her admission under the visa waiver program expresses a fear of persecution or torture to a DHS immigration officer, or applies for asylum with DHS, the matter may be referred to the Immigration Court for an asylum-only proceeding.  See 8 C.F.R.  §§ 1208.2(c)(1)(iii), 1208.2(c)(1)(iv).

***(D)  Certain  cooperating  witnesses  and  informants  (S  visa applicants).  —*** When an alien who has applied for admission, or been admitted, with an S visa expresses a fear of persecution or torture to a DHS immigration officer, or applies for asylum with DHS, the matter is referred to the Immigration Court for an asylum-only proceeding.  See 8 C.F.R. § 1208.2(c)(1)(vi).

***(E)  Persons subject to removal under INA § 235(c) on security grounds. —*** When a DHS immigration officer or an Immigration Judge suspects that an arriving alien appears removable as described in INA § 235(c), the alien is ordered removed, and the matter is referred to a DHS district director.  A DHS regional director may then order the case referred to an Immigration Judge for an asylum-only proceeding.  See 8 C.F.R. §§ 1208.2(c)(1)(v), 1235.8.

***(ii) Scope of the proceedings. —*** Asylum-only proceedings are limited to applications for asylum, withholding of removal ("restriction on removal") under INA § 241(b)(3), and protection under the Convention Against Torture.  Neither the alien nor DHS may raise any other issues, including issues of admissibility,

AR.07555

deportability, eligibility for waivers, and eligibility for any other form of relief.  See 8 C.F.R. § 1208.2(c)(3)(i).

*(iii) Conduct of the proceedings.* **—** Asylum-only proceedings are conducted under the procedures governing removal proceedings.  See 8 C.F.R. § 1208.2(c)(3).  See also Chapter 4 (Hearings before Immigration Judges).

*(iv) Appeals.* **—** Decisions by Immigration Judges in asylum-only proceedings may be appealed to the Board of Immigration Appeals.

*(h) Withholding-only proceedings.* **—** Withholding-only proceedings are limited proceedings involving aliens subject to expedited removal under INA § 238(b) and aliens subject to reinstatement of prior orders of removal under INA § 241(a)(5), who have a reasonable fear of persecution or torture.  See 8 C.F.R. § 1208.2(c)(2).  In withholding-only proceedings, the Immigration Judge considers applications for withholding of removal ("restriction on removal") under the Immigration and Nationality Act and protection under the Convention Against Torture.

*(i) Beginning withholding-only proceedings.* **—** When a DHS asylum officer or Immigration Judge finds that an alien subject to expedited removal under INA § 238(b) or an alien subject to reinstatement of a prior order of removal under INA § 241(a)(5) has a reasonable fear of persecution or torture, the matter is referred to the Immigration Court for a withholding-only proceeding.  See 8 C.F.R. §§ 208.31(e), 1208.31(g)(2).

*(ii) Scope of the proceedings.* **—** Withholding-only proceedings are limited to applications for withholding of removal ("restriction on removal") under INA § 241(b)(3) and protection under the Convention Against Torture.  Neither the alien nor DHS may raise any other issues, including issues of admissibility, deportability, eligibility for waivers, and eligibility for any other form of relief.  8 C.F.R. § 1208.2(c)(3)(i).

*(iii) Conduct of the proceedings.* **—** Withholding-only proceedings are conducted under the procedures governing removal proceedings.  See 8 C.F.R. § 1208.2(c)(3).  See also Chapter 4 (Hearings before Immigration Judges).

*(iv) Appeals.* **—** Decisions by Immigration Judges in withholding-only proceedings may be appealed to the Board of Immigration Appeals.

AR.07556

# Chapter 8  Stays

## 8.1    In General

A stay prevents the Department of Homeland Security (DHS) from executing an order of removal, deportation, or exclusion. Stays are automatic in some instances and discretionary in others. This chapter provides general guidance regarding the procedures to follow when filing for a stay before the immigration court or the Board of Immigration Appeals (BIA). For particular cases, parties should note that the procedures are not the same before the immigration court and the BIA and should consult the controlling law and regulations. See INA §§ 240(b)(5)(C), 240(c)(7)(C)(iv); 8 C.F.R. §§ 1003.2(f), 1003.6, 1003.23(b)(1)(v), and 1003.23(b)(4)(ii),(iii)(C).

An alien under a final order of deportation or removal may seek a stay of deportation or removal from DHS. A denial of the stay by DHS does not preclude an immigration judge or the BIA from granting a stay in connection with a previously filed motion to reopen or motion to reconsider. DHS shall take all reasonable steps to comply with a stay granted by an immigration judge or the BIA, but such a stay shall cease to have effect if granted or communicated after the alien has been placed aboard an aircraft or other conveyance for removal and the normal boarding has been completed. 8 C.F.R. §§ 241.6, 1241.6.

In the context of bond proceedings, the BIA has the authority to grant a stay of the execution of an immigration judge's decision when DHS has appealed or provided notice of intent to appeal by filing the Notice of Service Intent to Appeal Custody Redetermination (Form EOIR-43) with the Immigration Court within one business day of the Immigration Judge's bond order, and file the appeal within 10 business days. The BIA may also entertain motions to reconsider discretionary stays it has granted. See 8 C.F.R. § 1003.19(i)(1)-(2); see also Chapter 9.3(f) (Appeals).

There are important differences between the automatic stay provisions in deportation and exclusion proceedings and the automatic stay provisions in removal proceedings. Other than a motion to reopen in absentia deportation proceedings, those differences are not covered in this Practice Manual. Accordingly, parties in deportation or exclusion proceedings should carefully review the controlling law and regulations.

## 8.2    Automatic Stays

There are certain circumstances when an immigration judge's order of removal is automatically stayed pending further action on an appeal or motion. When a stay is

AR.07557

automatic, the immigration courts and the BIA do not issue a written order on the stay.

**(a) During the Appeal Period. —**  After an immigration judge issues a final decision on the merits of a case (not including bond or custody, credible fear, claimed status review, or reasonable fear determinations), the order is automatically stayed for the 30-day period for filing an appeal with the BIA. However, the order is not stayed if the losing party waived the right to appeal. 8 C.F.R. § 1003.6(a).

**(b) During the Adjudication of an Appeal. —**  If a party appeals an immigration judge's decision on the merits of the case (not including bond and custody determinations) to the BIA during the appeal period, the order of removal is automatically stayed during the BIA's adjudication of the appeal. 8 C.F.R. § 1003.6(a). The stay remains in effect until the BIA renders a final decision in the case.

**(c) During the Adjudication of Case Certified to the BIA. —** A removal order is stayed while the BIA adjudicates a case that is before that appellate body by certification. 8 C.F.R. § 1003.6(a); see also Chapter 6.5 (Certification). The stay remains in effect until the BIA renders a final decision in the case or declines to accept certification of the case.

**(d) Motions to Reopen. —**

**(i)    Removal Proceedings. —** An immigration judge's removal order is stayed during the period between the filing of a motion to reopen removal proceedings conducted in absentia and the immigration judge's ruling on that motion. 8 C.F.R. § 1003.23(b)(4)(ii).

An immigration judge's removal order is automatically stayed during the BIA's adjudication of an appeal of the immigration judge's ruling in certain motions to reopen filed by battered spouses, children, and parents. INA § 240(c)(7)(C)(iv).

An immigration judge's order is not automatically stayed in appeals to the BIA from an immigration judge's denial of a motion to reopen removal proceedings conducted in absentia, and motions to reopen or reconsider a prior BIA decision are not automatically stayed.

**(ii)    Deportation Proceedings. —** An immigration judge's deportation order is stayed during the period between the filing of a motion to reopen deportation proceedings conducted in absentia under prior INA § 242B and the immigration judge's ruling on that motion, as well as during the adjudication by the BIA of any subsequent appeal of that motion. 8 C.F.R. § 1003.23(b)(4)(iii)(C).

AR.07558

Automatic stays only attach to the original appeal from an immigration judge's denial of a motion to reopen deportation proceedings conducted in absentia under prior INA § 242B. See 8 C.F.R. § 1003.23(b)(4)(iii)(C). Additionally, there is no automatic stay to a motion to reopen or reconsider the BIA's prior dismissal of an appeal from an immigration judge's denial of a motion to reopen deportation proceedings conducted in absentia under prior INA § 242B.

*(e) Federal Court Remands.* — A federal court remand to the BIA results in an automatic stay of an order of removal if:

1.    The BIA's decision before the federal court involved a direct appeal of an immigration judge's decision on the merits of the case (excluding bond and custody determinations); or

2.    The BIA's decision before the federal court involved an appeal of an immigration judge's denial of a motion to reopen deportation proceedings conducted in absentia under prior INA § 242B.

## 8.3    Discretionary Stays

*(a) Jurisdiction.* —   Both immigration judges and the BIA have authority to grant and reconsider stays as a matter of discretion but only for matters within the judges' or the BIA's respective jurisdiction. See Chapters 1.5 (Jurisdiction and Authority), 9.3(b) (Jurisdiction). Immigration judges consider requests for discretionary stays only when a motion to reopen or a motion to reconsider is pending before the immigration court.

In most cases, the BIA entertains stays only when there is an appeal from an immigration judge's denial of a motion to reopen removal proceedings or a motion to reopen or reconsider a prior BIA decision pending before the BIA. The BIA may also consider a stay of an immigration judge's bond decision while a bond appeal is pending in order to prevent the alien's release from detention. See Chapter 9.3(f) (Appeals).

*(b) Motion to Reopen to Apply for Asylum, Withholding of Removal under the Act, or Protection under the Convention Against Torture.* — Time and numerical limitations do not apply to motions to reopen to apply for asylum, withholding of removal under the Act, or protection under the Convention Against Torture if the motion is based on changed country conditions arising in the country of nationality or the country to which removal has been ordered, if such evidence is material and was not available and could not have been discovered or presented at the previous proceeding. The filing of a motion to reopen in such circumstances does not automatically stay an alien's removal. The alien may request a stay and if granted by the immigration court shall not be removed pending

disposition of the motion. If the original asylum application was denied based on a finding that it was frivolous, the alien is ineligible to file a motion to reopen or reconsider or for a stay of removal. 8 C.F.R. § 1003.23(b)(4)(i).

When filing a motion to reopen to apply for asylum, withholding of removal under the Act, or protection under the Convention Against Torture based on changed country conditions, the alien does not need to file a copy of his or her record of proceedings or A-file.

**(c) Motion Required. —** Parties should submit a request for a discretionary stay by filing a written motion. The motion should comply with all the requirements for filing, including formatting, inclusion of a proof of service, and submission of possible fees. See Chapter 3 (Filing with the Immigration Court), Appendix F: Sample Cover Page.

**(i) Contents. —** A party requesting a discretionary stay of removal before the immigration court should submit a motion stating the complete case history and all relevant facts. It should also include a copy of the order that the party wants stayed, if available. If the moving party does not have a copy of the order, that party should provide the date of the order and a detailed description of the immigration judge's ruling and reasoning, as articulated by the immigration judge. If the facts are in dispute, the moving party should provide appropriate evidence. See Chapter 5.2(e) (Evidence). A discretionary request to stay removal, deportation, or exclusion may be submitted at any time after an alien becomes subject to a final order of removal, deportation, or exclusion if a motion to reopen or reconsider is pending before the immigration court.

A party requesting a discretionary stay of removal, deportation, or exclusion before BIA should follow the procedures described below:

**(A) Who May Request. —** An alien (or an alien's representative) may request a discretionary stay of removal, deportation, or exclusion only if the alien's case is currently before the BIA and the alien is subject to a removal, deportation, or exclusion order.

**(B) Timing of Request. —** A request to stay removal, deportation, or exclusion may be submitted at any time during the pendency of a case before the BIA.

**(C) Form of Request. —** Requests to stay removal, deportation, or exclusion must be made in writing. The BIA prefers that stay requests be

AR.07560

submitted in the form of a "MOTION TO STAY REMOVAL." See Appendix F: Sample Cover Page.

**(D) Contents. —** The motion should contain a complete recitation of the relevant facts and case history and indicate the current status of the case. The motion must also contain a specific statement of the time exigencies involved. Motions containing vague or general statements of urgency are not persuasive.

A copy of the existing immigration judge or BIA order should be included, when available. When the moving party does not have a copy of the order, the moving party should provide the date of the immigration judge's decision and a detailed description of both the ruling and the basis of that ruling, as articulated by the immigration judge. If the facts are in dispute, the moving party should furnish evidence supporting the motion to stay.

**(E) Format. —** The motion should comply with the general rules for filing motions. See Chapter 5.2 (Filing a Motion). The motion must include a Proof of Service. See Chapter 3.2 (Service on the Opposing Party), Appendix G: Sample Proof of Service.

**(F) Fee. —** A motion to stay removal, deportation, or exclusion does not, by itself, require a filing fee. The underlying appeal or motion, however, may still require a fee. See Chapter 3:4 (Filing Fees).

**(ii) Emergency v. Non-Emergency. —** The immigration courts and the BIA categorize stay requests into two categories: emergency and non-emergency. When filing a stay request with the immigration court, the parties should submit their motion with a cover page either labeled "MOTION TO STAY REMOVAL" or "EMERGENCY MOTION TO STAY REMOVAL," as relevant.

**(A) Emergency. —** The immigration courts and the BIA may rule immediately on an "emergency" stay request. The immigration court and the BIA only consider a stay request to be an emergency when an alien is:

1. in DHS's physical custody and removal, deportation, or exclusion is imminent;
2. turning himself or herself in to DHS custody in order to be removed, deported, or excluded and removal, deportation, or

AR.07561

exclusion is expected to occur within the next 3 business days; or

3. scheduled to self-execute an order of removal, deportation, or exclusion within the next 3 business days.

The motion should contain a specific statement of the time exigencies involved.

If a party is seeking an emergency stay from the BIA, the party must contact the BIA's Emergency Stay Unit by calling 703-306-0093. If a party is seeking an emergency stay from an immigration court, he or she must call the immigration court from which the removal order was issued. EOIR otherwise will not be able to properly process the request as an emergency stay. The BIA's Emergency Stay Unit is closed on federal holidays. It will consider an emergency stay request only on non-holiday weekdays from 9:00 a.m. to 5:30 p.m. (Eastern Time). Immigration courts will consider stay requests during posted operating hours.

An alien may supplement a non-emergency stay request with an emergency stay request if qualifying circumstances, such as when an alien reports to DHS custody for imminent removal, arise.

Parties can obtain instructions for filing an emergency stay motion with the BIA by calling the same numbers. For a list of immigration court numbers, see Appendix A or visit EOIR's website at www.justice.gov/eoir/eoir-immigration-court-listing.

When circumstances require immediate attention from the BIA or immigration courts, EOIR may, at the adjudicator's discretion, entertain a telephonic stay request.

EOIR promptly notifies the parties of its decision.

**(B) Non-Emergency. —** The immigration courts and the BIA do not rule immediately on a "non-emergency" stay request. Instead, the request is considered during the normal course of adjudication. Non-emergency stay requests include those from aliens who are not facing removal within the next 3 business days, and who are either:

1. not in detention; or
2. in detention but not facing imminent removal, deportation, or exclusion.

AR.07562

**(d) Pending Motions. —** Neither the immigration judges nor the BIA automatically grant discretionary stays. The mere filing of a motion for a discretionary stay of an order does not prevent the execution of the order. Therefore, DHS may execute the underlying removal, deportation, or exclusion order unless and until the immigration judge or the BIA grants the motion for a stay.

**(e) Adjudication and Notice. —** When an immigration judge or the BIA grants a discretionary stay of removal, deportation, or exclusion, the immigration judge or the BIA issues a written order. When a discretionary stay is granted, the parties are promptly notified about the decision.

**(f) Duration. —** A discretionary stay of removal, deportation, or exclusion lasts until the immigration judge adjudicates the motion to reopen or motion to reconsider or until the BIA renders a final decision on the merits of the appeal, motion to reopen, or the motion to reconsider.

AR.07563

AR.07564

# Chapter 9  Detention and Bond

## 9.1  Detention

**(a) In general. —** The Department of Homeland Security (DHS) bears the responsibility for the apprehension and detention of aliens.  Immigrations Judges have jurisdiction over custody determinations under certain circumstances.  See generally 8 C.F.R. § 1003.19.  See also Chapter 9.3 (Bond Proceedings).

**(b) Place and conditions. —** Aliens may be detained in a Department of Homeland Security (DHS) Processing Facility, or in any public or private detention facility contracted by DHS to detain aliens.  See 8 C.F.R. § 235.3(e).  Immigration Judges have no jurisdiction over the location of detention and the conditions in the detention facility.

**(c) Appearance at hearings. —** The Department of Homeland Security is responsible for ensuring that detained aliens appear at all hearings.

**(d) Transfers and Release. —** The Department of Homeland Security (DHS) sometimes transfers detained aliens between detention facilities.

**(i) Notification. —** DHS is obligated to notify the Immigration Court when an alien is moved between detention locations.  See 8 C.F.R. § 1003.19(g).

In addition, DHS is responsible for notifying the Immigration Court when an alien is released from custody.  See 8 C.F.R. § 1003.19(g).  Nonetheless, the alien should file an Alien's Change of Address Form (Form EOIR-33/IC) with the Immigration Court to ensure that Immigration Court records are up-to-date.

**(ii) Venue. —** If an alien has been transferred while proceedings are pending, the Immigration Judge with original jurisdiction over the case retains jurisdiction until that Immigration Judge grants a motion to change venue.  Either DHS or the alien may file a motion to change venue.  See Chapter 5 (Motions before the Immigration Court).  If DHS brings the alien before an Immigration Judge in another Immigration Court and a motion to change venue has not been granted, the second Immigration Judge does not have jurisdiction over the case, except for bond redeterminations.

**(e) Conduct of hearing. —** Proceedings for detained aliens are expedited.  Hearings are held either at the detention facility or at the Immigration Court, either by video or telephone conference.  For more information on hearings conducted by video or telephone conference, see Chapter 4.7 (Hearings by Video or Telephone Conference).

AR.07565

*(i) Special considerations for hearings in detention facilities.* — For hearings in detention facilities, parties must comply with the facility's security restrictions.  See Chapter 4.14 (Access to Court).

*(ii) Orientation.* — In some detention facilities, detainees are provided with orientations or "rights presentations" by non-profit organizations.  The Executive Office for Immigration Review also funds orientation programs at a number of detention facilities, which are administered by the EOIR Legal Orientation Program. See Chapter 1.4(c) (Legal Orientation Program).

## 9.2   Detained Juveniles

*(a) In general.* — There are special procedures for juveniles in federal custody, whether they are accompanied or unaccompanied.  See generally 8 C.F.R. § 1236.3.  For purposes of this chapter, a juvenile is defined as an alien under 18 years of age.  An unaccompanied juvenile is defined as an alien under 18 years of age who does not have a parent or legal guardian in the United States to provide care and physical custody.

*(b) Place and conditions of detention.* — The Department of Homeland Security (DHS) bears the initial responsibility for apprehension and detention of juveniles.  When DHS determines that a juvenile is accompanied by a parent or legal guardian, DHS retains responsibility for the juvenile's detention and removal.  When DHS determines that a juvenile is unaccompanied and must be detained, he or she is transferred to the care of the Department of Health and Human Services, Office of Refugee Resettlement, which provides for the care and placement, where possible, of the unaccompanied juvenile.  See 6 U.S.C. § 279.

*(c) Representation and conduct of hearing.* — For provisions regarding the representation of juveniles, and the conduct of hearings involving juveniles, see Chapter 4.22 (Juveniles).

*(d) Release.* — Unaccompanied juveniles who are released from custody are released to a parent, a legal guardian, an adult relative who is not in Department of Homeland Security detention, or, in limited circumstances, to an adult who is not a family member.

## 9.3   Bond Proceedings

*(a) In general.* — In certain circumstances, an alien detained by the Department of Homeland Security (DHS) can be released from custody upon the payment of bond.

AR.07566

Initially, the bond is set by DHS.  Upon the alien's request, an Immigration Judge may conduct a "bond hearing," in which the Immigration Judge has the authority to redetermine the amount of bond set by DHS.

Bond proceedings are separate from removal proceedings.  For guidance on entering an appearance in bond proceedings, see Chapter 2.3(d) (Scope of representation); see also generally 8 C.F.R. §§ 1003.17(a) , 1003.19, 1236.1.

**(b) Jurisdiction. —** Except as provided in subsections (i) through (iii), below, an Immigration Judge generally has jurisdiction to conduct a bond hearing if the alien is in Department of Homeland Security (DHS) custody.  The Immigration Judge also has jurisdiction to conduct a bond hearing if the alien is released from DHS custody upon payment of a bond and, within 7 days of release, files a request for a bond redetermination with the Immigration Court.

An Immigration Judge has jurisdiction over such cases even if a charging document has not been filed.  In addition, an Immigration Judge has jurisdiction to rule on whether he or she has jurisdiction to conduct a bond hearing.

**(i) No jurisdiction by regulation. —** By regulation, an Immigration Judge does not have jurisdiction to conduct bond hearings involving:

- o    aliens in exclusion proceedings
- o    arriving aliens in removal proceedings

- o    aliens ineligible for release on security or related grounds

- o    aliens ineligible for release on certain criminal grounds

8 C.F.R. § 1003.19(h)(2)(i).

**(ii) No jurisdiction by mootness. —** A bond becomes moot, and the Immigration Judge loses jurisdiction to conduct a bond hearing, when an alien:

- o    departs from the United States, whether voluntarily or involuntarily

- o    is granted relief from removal by the Immigration Judge, and the Department of Homeland Security does not appeal

AR.07567

○    is granted relief from removal by the Board of Immigration Appeals

○    is denied relief from removal by the Immigration Judge, and the alien does not appeal

○    is denied relief from removal by the Board of Immigration Appeals

*(iii) Other.* — Immigration Judges do not have bond jurisdiction in certain limited proceedings.  See generally Chapter 7 (Other Proceedings before Immigration Judges).

*(c) Requesting a bond hearing.* — A request for a bond hearing may be made in writing.  In addition, except as provided in subsection (iii), below, a request for a bond hearing may be made orally in court or, at the discretion of the Immigration Judge, by telephone.  If available, a copy of the Notice to Appear (Form I-862) should be provided.   The telephone number of each Immigration Court is listed on the Executive Office for Immigration Review website at www.justice.gov/eoir.

*(i) Contents.* — A request for a bond hearing should state:

○    the full name and alien registration number ("A number") of the alien

○    the bond amount set by the Department of Homeland Security

○    if the alien is detained, the location of the detention facility

*(ii) No fee.* — There is no filing fee to request a bond hearing.

*(iii) Where to request.* — A request for a bond hearing is made, in order of preference, to:

○    if the alien is detained, the Immigration Court having jurisdiction over the alien's place of detention;

○    the Immigration Court with administrative control over the case; or

   o  the Office of the Chief Immigration Judge for designation of an appropriate Immigration Court

8 C.F.R. § 1003.19(c).  See Chapter 3.1(a)(i) (Administrative Control Courts).

  ***(iv) Multiple requests. —*** If an Immigration Judge or the Board of Immigration Appeals has previously ruled in bond proceedings involving an alien, a subsequent request for a bond hearing must be in writing, and the alien must show that his or her circumstances have changed materially since the last decision.  In addition, the request must comply with the requirements listed in subsection (c)(i), above.  8 C.F.R. § 1003.19(e).

  ***(d) Scheduling a hearing. —*** In general, after receiving a request for a bond hearing, the Immigration Court schedules the hearing for the earliest possible date and notifies the alien and the Department of Homeland Security.

  In limited circumstances, an Immigration Judge may rule on a bond redetermination request without holding a hearing.

  If an alien requests a bond hearing during another type of hearing (for example, during a master calendar hearing in removal proceedings), the Immigration Judge may:

   o  stop the other hearing and conduct a bond hearing on that date

   o  complete the other hearing and conduct a bond hearing on that date

   o  complete the other hearing and schedule a bond hearing for a later date

   o  stop the other hearing and schedule a bond hearing for a later date

  ***(e) Bond hearings. —*** In a bond hearing, the Immigration Judge determines whether the alien is eligible for bond.  If the alien is eligible for bond, the Immigration Judge considers whether the alien's release would pose a danger to property or persons, whether the alien is likely to appear for further immigration proceedings, and whether the alien is a threat to national security.  In general, bond hearings are less formal than hearings in removal proceedings.

  ***(i) Location. —*** Generally, a bond hearing is held at the Immigration Court where the request for bond redetermination is filed.

AR.07569

*(ii) Representation.* — In a bond hearing, the alien may be represented at no expense to the government.

*(iii) Generally not recorded.* — Bond hearings are generally not recorded.

*(iv) Record of Proceedings.* — The Immigration Judge creates a record, which is kept separate from the Records of Proceedings for other Immigration Court proceedings involving the alien.

*(v) Evidence.* — Documents for the Immigration Judge to consider are filed in open court or, if the request for a bond hearing was made in writing, together with the request. Since the Record of Proceedings in a bond proceeding is kept separate and apart from other Records of Proceedings, documents already filed in removal proceedings must be resubmitted if the filing party wishes them to be considered in the bond proceeding.

If documents are filed in advance of the hearing, the documents should be filed *together with* the request for a bond hearing. If a document is filed in advance of the hearing but separate from the request for a bond hearing, it should be filed with a cover page labeled "BOND PROCEEDINGS." See Appendix F (Sample Cover Page).

Unless otherwise directed by the Immigration Judge, the deadlines and requirements for filings in Chapter 3 (Filing with the Immigration Court) do not apply in bond proceedings.

*(vi) Conduct of hearing.* — While the Immigration Judge decides how each hearing is conducted, parties should submit relevant evidence and:

o    the Department of Homeland Security (DHS) should state whether a bond has been set and, if a bond has been set, the amount of the bond and the DHS justification for that amount

o    the alien or the alien's representative should make an oral statement (an "offer of proof" or "proffer") addressing whether the alien's release would pose a danger to property or persons, whether the alien is likely to appear for future immigration proceedings, and whether the alien poses a danger to national security

AR.07570

At the Immigration Judge's discretion, witnesses may be placed under oath and testimony taken. However, parties should be mindful that bond hearings are generally briefer and less formal than hearings in removal proceedings.

*(vii) Decision. —* The Immigration Judge's decision is based on any information that is available to the Immigration Judge or that is presented by the parties. See 8 C.F.R. § 1003.19(d).

Usually, the Immigration Judge's decision is rendered orally. Because bond hearings are generally not recorded, the decision is not transcribed. If either party appeals, the Immigration Judge prepares a written decision based on notes from the hearing.

*(f) Appeals. —* Either party may appeal the Immigration Judge's decision to the Board of Immigration Appeals. If the alien appeals, the Immigration Judge's bond decision remains in effect while the appeal is pending. If the Department of Homeland Security appeals, the Immigration Judge's bond decision remains in effect while the appeal is pending unless the Board issues an emergency stay or the decision is automatically stayed by regulation. See 8 C.F.R. §§ 1003.6(c), 1003.19(i).

For detailed guidance on when Immigration Judges' decisions in bond proceedings are stayed, parties should consult the Board of Immigration Appeals Practice Manual, which is available on the Executive Office for Immigration Review website at www.justice.gov/eoir.

## 9.4    Continued Detention Review

*(a) In general. —* Generally, the Department of Homeland Security (DHS) must remove or release detained aliens within 90 days of a final order of removal. However, DHS may continue to detain an alien whose removal from the United States is not "reasonably foreseeable," if the alien's release would pose a special danger to the public. See INA § 241(a)(6), 8 C.F.R. § 1241.14(f). Such a decision by DHS to continue to detain an alien is reviewed by an Immigration Judge in "continued detention review proceedings." The proceedings begin with a DHS determination that continued detention is required  and are divided into two phases: (1) reasonable cause hearings and (2) continued detention review merits hearings. See subsections (c), (d), below.

*(b) DHS determination. —* If an alien has been ordered removed but remains detained, he or she may request that the Department of Homeland Security (DHS) determine whether there is a significant likelihood of removal in the reasonably

AR.07571

foreseeable future.  See 8 C.F.R. § 1241.13.  If there is a significant likelihood of removal in the reasonably foreseeable future, DHS may continue to detain the alien.

If there is *not* a significant likelihood of removal in the reasonably foreseeable future, the alien is released unless DHS determines, based on a full medical and physical examination, that the alien should be subject to continued detention because the alien's release would pose a special danger to the public.  Following such a determination, the matter is referred to an Immigration Judge for a reasonable cause hearing.  See 8 C.F.R. § 1241.14(f).

**(c) Reasonable cause hearing.** — A reasonable cause hearing is a brief hearing to evaluate the evidence supporting the determination by the Department of Homeland Security (DHS) that the alien's release would pose a special danger to the public.  In the hearing, the Immigration Judge decides whether DHS's evidence is sufficient to establish reasonable cause to go forward with a continued detention review merits hearing, or whether the alien should be released.  See generally 8 C.F.R. § 1241.14.

**(i) Timing.** — The reasonable cause hearing begins no later than 10 business days after referral to the Immigration Court.

**(ii) Location.** — If possible, the reasonable cause hearing is conducted in person, but may be conducted by telephone conference or video conference, at the Immigration Judge's discretion.  See Chapter 4.7 (Hearings by Video or Telephone Conference).

**(iii) Representation.** — The alien is provided with a list of free or low-cost legal service providers and may be represented at no expense to the government.

**(iv) Conduct of hearing.** — DHS may offer any evidence that is material and relevant to the proceeding.  The alien has a reasonable opportunity to examine evidence against him or her, to present evidence and witnesses on his or her own behalf, and to cross-examine witnesses presented by DHS.

**(v) Record of Proceedings.** — The Immigration Judge creates a Record of Proceedings, and the hearing is recorded.  The Record of Proceedings is not combined with records of any other Immigration Court proceedings involving the same alien.

**(vi) Immigration Judge's decision.** — If the Immigration Judge finds that DHS has met its burden of showing reasonable cause to go forward with a

AR.07572

continued detention review merits hearing, the alien is notified, and the merits hearing is scheduled.

If the Immigration Judge finds that DHS has *not* met its burden, the Immigration Judge dismisses the proceedings, and the alien is released under conditions determined by DHS.

***(vii) Appeals.*** — If the Immigration Judge finds that DHS has not met its burden of showing reasonable cause to go forward with a continued detention review merits hearing, DHS may appeal to the Board of Immigration Appeals. The appeal must be filed within two business days after the Immigration Judge's order. The Immigration Judge's order dismissing the proceedings is stayed pending adjudication of an appeal, unless DHS waives the right to appeal.

If the Immigration Judge finds that DHS *has* met its burden, the decision is not appealable by the alien.

***(d) Continued detention review merits hearing.*** — In the continued detention review merits hearing, the Department of Homeland Security (DHS) has the burden of proving by clear and convincing evidence that the alien should remain in custody because the alien's release would pose a special danger to the public. See generally 8 C.F.R. § 1241.14.

***(i) Timing.*** — The continued detention review merits hearing is scheduled promptly. If the alien requests, the merits hearing is scheduled to commence within 30 days of the decision in the reasonable cause hearing.

***(ii) Representation.*** — The alien is provided with a list of free and low-cost legal service providers and may be represented at no expense to the government.

***(iii) Conduct of hearing.*** — The Immigration Judge may receive into evidence any oral or written statement that is material and relevant to the proceeding. The alien has a reasonable opportunity to examine evidence against him or her, to present evidence and witnesses on his or her own behalf, and to cross-examine witnesses presented by DHS. In addition, the alien has the right to cross-examine the author of any medical or mental health reports used as a basis for DHS's determination that the alien's release would pose a special danger to the public.

***(iv) Immigration Judge's decision.*** — If the Immigration Judge determines that DHS has met its burden of showing that the alien should remain

AR.07573

in custody as a special danger to the public, the Immigration Judge orders the continued detention of the alien.

If the Immigration Judge determines that DHS has *not* met its burden, the Immigration Judge dismisses the proceedings, and the alien is released under conditions determined by DHS.

***(v) Appeals.* —** Either party may appeal the Immigration Judge's decision to the Board of Immigration Appeals.  Appeals by DHS must be filed within 5 business days of the Immigration Judge's order.  Appeals by aliens are subject to the same deadlines as appeals in removal proceedings.  For detailed guidance on appeals, parties should consult the Board of Immigration Appeals Practice Manual, which is available on the Executive Office for Immigration Review website at www.justice.gov/eoir.

If the Immigration Judge dismisses the proceedings and orders the alien released, the order is stayed pending adjudication of any DHS appeal, unless DHS waives the right to appeal.

***(e) Periodic review.* —** Following proceedings in which the alien's continued detention has been ordered, the alien may periodically request that the Department of Homeland Security (DHS) review his or her continued detention.  The alien must show that, due to a material change in circumstances, the alien's release would no longer pose a special danger to the public.  Such requests may be made no earlier than 6 months after the most recent decision of the Immigration Judge or the Board of Immigration Appeals.

If DHS does not release the alien, the alien may file a motion with the Immigration Court to set aside its prior determination in the proceedings.  The alien must show that, due to a material change in circumstances, the alien's release would no longer pose a special danger to the public.  If the Immigration Judge grants the motion, a new continued detention review merits hearing is held.  If the motion is denied, the alien may appeal to the Board.

AR.07574

# Chapter 10  Discipline of Practitioners

## 10.1  Practitioner Discipline Generally

The Executive Office for Immigration Review has the authority to impose disciplinary sanctions on attorneys, recognized organizations, and accredited representatives who violate rules of professional conduct in practice before the Immigration Courts, the Board of Immigration Appeals, and the Department of Homeland Security.  See 8 C.F.R. §§ 1003.1(d)(2)(iii), 1003.1(d)(5),1003.101-111, 292.3.  See also *Matter of Gadda*, 23 I&N Dec. 645 (BIA 2003).

Generally, discipline of practitioners and recognized organizations is initiated by the filing of a complaint.  See Chapter 10.5 (Filing a Complaint).  Any individual, including Immigration Judges, may file a complaint about the conduct of a practitioner or recognized organization.

## 10.2  Definition of Practitioner and Recognized Organization

For purposes of this Chapter, "practitioner" refers to an alien's attorney or representative, as defined in 8 C.F.R. §§ 1001.1(f) and 1001.1(j), 1292.1(a)(4), respectively.  The term "representative" refers to non-attorneys authorized to practice before the Immigration Courts and the Board of Immigration Appeals, including law students and law graduates, reputable individuals, accredited representatives, accredited officials, and persons formerly authorized to practice.   See 8 C.F.R. §§ 1001.1(j), 1292.1(a)-(b).  See also Chapter 2 (Appearances Before the Immigration Court).

For purposes of this Chapter, the term "recognized organization" is defined as a non-profit, federal tax-exempt, religious, charitable, social service, or similar organization established in the United States that has been recognized by the Assistant Director for Policy or the Assistant Director's designee to represent aliens through accredited representatives before DHS only or before the Board, the Immigration Courts, and DHS.  See 8 C.F.R. § 1292.11.

## 10.3  Jurisdiction

*(a) Immigration Judges. —* Immigration Judges have the authority to file complaints concerning practitioners who appear before them.

AR.07575

The disciplinary procedures described in this chapter do not apply to Immigration Judges.  For information on Immigration Judge conduct, see Chapter 1.3(c) (Immigration Judge conduct and professionalism).

**(b) Practitioners. —** The disciplinary procedures described in this chapter apply to practitioners who practice before the Immigration Courts, the Board of Immigration Appeals, or the Department of Homeland Security.  See 8 C.F.R. § 1003.101.

**(c) Recognized organizations. —** .
EOIR is authorized to discipline a recognized organization if it finds it to be in the public interest to do so.  8 C.F.R. § 1003.110.  It is in the public interest to discipline a recognized organization that violates one or more of the grounds specified in 8 C.F.R. § 1003.110(b).  Specific grounds for discipline of recognized organizations are listed in Chapter 10.4(b) (Recognized Organizations).

**(d) DHS attorneys. —** The disciplinary procedures described in this chapter do not apply to attorneys who represent the Department of Homeland Security (DHS).  The conduct of DHS attorneys is governed by DHS rules and regulations.  Concerns or complaints about the conduct of DHS attorneys may be raised in writing with the DHS Office of the Chief Counsel where the Immigration Court is located.  A list of Offices of the Chief Counsel is available on the DHS website at www.ice.gov.

**(e) Unauthorized practice of law. —** The disciplinary procedures described in this chapter apply to *practitioners* who assist in the unauthorized practice of law.  See 8 C.F.R. § 1003.102(m).  Anyone may file a complaint against a practitioner who is assisting in the unauthorized practice of law.  See 10.5 (Filing a Complaint).

The disciplinary procedures described in this chapter do not apply to *non-practitioners* engaged in the unauthorized practice of law.  Anyone harmed by an individual practicing law without authorization should contact the appropriate law enforcement or consumer protection agency.  In addition, persons harmed by such conduct are encouraged to contact the Executive Office for Immigration Review Fraud and Abuse Prevention Program.  See Chapter 1.4(b) (EOIR Fraud and Abuse Prevention Program), Appendix B (EOIR Directory).

In general, the unauthorized practice of law includes certain instances where non-attorneys perform legal services, give legal advice, or represent themselves to be attorneys.  Individuals engaged in the unauthorized practice of law include some immigration specialists, visa consultants, and "notarios."

## 10.4  Conduct

**(a) Practitioners.** — Conduct by practitioners which may result in discipline includes the following:

- o    grossly excessive fees;

- o    bribery or coercion;

- o    offering false evidence, or making a false statement of material fact or law;

- o    improperly soliciting clients;

- o    disbarment or suspension, or resignation while a disciplinary investigation or proceeding is pending;

- o    misrepresenting qualifications or services offered;

- o    conduct that would constitute contempt of court in a judicial proceeding;

- o    a conviction for a serious crime;

- o    falsely certifying a copy of a document;

- o    frivolous behavior, as defined in 8 C.F.R. § 1003.102(j);

- o    ineffective assistance of counsel;

- o    repeated failure to appear;

- o    assisting in the unauthorized practice of law;

- o    engaging in conduct that is prejudicial to the administration of justice or undermines the integrity of the adjudicative process;

- o    failing to provide competent representation to a client;

- o    failing to abide by a client's decisions;

- o    failing to act with reasonable diligence and promptness;

AR.07577

- a practitioner's workload must be controlled and managed so that each matter can be handled competently;

- a practitioner has the duty to comply with all time and filing limitations; and

- a practitioner should carry through to conclusion all matters undertaken for a client, consistent with the scope of representation.

o  failing to maintain communication with the client;

o  failing to disclose adverse legal authority;

o  failing to submit a Notice of Entry of Appearance as Attorney or Representative Before the Immigration Court (Form EOIR-28); or

o  repeatedly filing boilerplate submission.

For a full explanation of each ground for discipline, consult the regulations at 8 C.F.R. § 1003.102.

**(b) Recognized organizations. —** Conduct by recognized organizations which may result in discipline includes the following:

o  knowingly or with reckless disregard providing a false statement or misleading information in applying for recognition or accreditation of its representative;

o  knowingly or with reckless disregard providing false statements or misleading information to clients or prospective clients regarding the scope of its authority or services;

o  failing to provide adequate supervision of accredited representatives;

o  employing, or receiving services from, or affiliating with, an individual who performs an activity that constitutes the unauthorized practice of law or immigration fraud; or

o  engaging in the practice of law through staff when the organization does not have an attorney or accredited representative.

AR.07578

For a full explanation of each ground for discipline, consult the regulations at 8 C.F.R. § 1003.110(b).

## 10.5    Filing a Complaint

*(a) Who may file.* — Anyone may file a complaint against a practitioner or recognized organization, including Immigration Judges, Board Members, the practitioner's clients, Department of Homeland Security personnel, and other practitioners.  8 C.F.R. §§ 1003.104(a)(1), 1292.19(a).

*(b) What to file.* — Complaints must be submitted in writing.  Persons filing complaints are encouraged to use the Immigration Practitioner Complaint Form, (Form EOIR-44).  See Chapter 11.2 (Obtaining Blank Forms), Appendix E (Forms).  The Form EOIR-44 provides important information about the complaint process, the confidentiality of complaints, and the types of misconduct that can result in discipline by the Executive Office for Immigration Review.  Complaints should be specific and as detailed as possible, and supporting documentation should be provided if available.

*(c) Where to file.* — Complaints alleging practitioner misconduct before the Immigration Courts or the Board of Immigration Appeals, or complaints against recognized organizations, should be filed with the Executive Office for Immigration Review disciplinary counsel.  8 C.F.R. §§ 1003.104(a)(1), 1292.19(a).  The completed Form EOIR-44 and supporting documents should be sent to:

United States Department of Justice
Executive Office for Immigration Review
Office of the General Counsel
5107 Leesburg Pike, Suite 2600
Falls Church, VA 22041
Attn: Disciplinary Counsel

See Appendix B (EOIR Directory).  After receiving a complaint, the EOIR disciplinary counsel decides whether to initiate disciplinary proceedings.  8 C.F.R. §§ 1003.104(b), 1292.19(b).  See Chapter 10.7 (Disciplinary Proceedings).

*(d) When to file.* — Complaints should be filed as soon as possible.  There are no time limits for filing most complaints.  However, complaints based on ineffective assistance of counsel must be filed within one year of a finding of ineffective assistance of counsel by an Immigration Judge, the Board of Immigration Appeals, or a federal court judge or panel.  8 C.F.R. § 1003.102(k).

AR.07579

## 10.6   Duty to Report

A practitioner who practices before the Immigration Courts, the Board of Immigration Appeals, the Department of Homeland Security, and, if applicable, the authorized officer of each recognized organization with which a practitioner is affiliated, has an affirmative duty to report whenever he or she:

  o  has been found guilty of, or pled guilty or *nolo contendere* to, a serious crime (as defined in 8 C.F.R. § 1003.102(h)); or

  o  has been disbarred or suspended from practicing law, or has resigned while a disciplinary investigation or proceeding is pending.

8 C.F.R. §§ 1003.103(c), 292.3(c)(4).  The practitioner and, if applicable, the authorized officer of each recognized organization, must report the misconduct, criminal conviction, or discipline to the Executive Office for Immigration Review disciplinary counsel within 30 days of the issuance of the relevant initial order.  This duty applies even if an appeal of the conviction or discipline is pending.

## 10.7   Disciplinary Proceedings

*(a) In general. —* Disciplinary proceedings take place in certain instances where a complaint against a practitioner or recognized organization is filed with the Executive Office for Immigration Review disciplinary counsel, or a practitioner or recognized organization self-reports.  See Chapters 10.5 (Filing a Complaint), 10.6 (Duty to Report).  See generally 8 C.F.R. §§ 1003.101-1003.109.

In some cases, practitioners are subject to summary disciplinary proceedings, which involve distinct procedures as described in subsection (g), below.

In general, disciplinary hearings are conducted in the same manner as Immigration Court proceedings, as appropriate.  8 C.F.R. § 1003.106(a)(1)(v).

*(b) Preliminary investigation. —* When a complaint against a practitioner or recognized organization is filed, or a practitioner or recognized organization self-reports, the Executive Office for Immigration Review disciplinary counsel conducts a preliminary investigation.  Upon concluding the investigation, the EOIR disciplinary counsel may elect to:

  o  take no further action;

o      issue a warning letter or informal admonition to the practitioner;

o      enter into an agreement in lieu of discipline; or

o      initiate disciplinary proceedings by filing a Notice of Intent to Discipline (NID) with the Board of Immigration Appeals and serving a copy on the practitioner or recognized organization.

**(c) Notice of Intent to Discipline. —** Except as described in subsection (g), below, the Notice of Intent to Discipline (NID) contains the charge(s), the preliminary inquiry report, proposed disciplinary sanctions, instructions for filing an answer and requesting a hearing, and the mailing address and telephone number of the Board of Immigration Appeals.

**(i) Petition for Immediate Suspension. —** In certain circumstances, the Executive Office for Immigration Review disciplinary counsel files a petition with the Board of Immigration Appeals to immediately suspend the practitioner from practicing before the Immigration Courts and the Board. These circumstances include a conviction of a serious crime, disbarment or suspension from practicing law, or resignation while disciplinary proceedings are pending. Practitioners subject to a petition for immediate suspension are placed in summary disciplinary proceedings, as described in subsection (g), below.

The Board may set aside such a suspension upon good cause shown, if doing so is in the interest of justice. The hardships that typically accompany suspension from practice, such as loss of income and inability to complete pending cases, are usually insufficient to set aside a suspension order.

**(ii) DHS motion to join in disciplinary proceedings. —** The Department of Homeland Security (DHS) may file a motion to join in the disciplinary proceedings. If the motion is granted, any suspension or expulsion from practice before the Immigration Courts and the Board of Immigration Appeals will also apply to practice before DHS.

**(iii) Petition for Interim Suspension. —** In certain circumstances, the Executive Office for Immigration Review Disciplinary Counsel may petition for an interim suspension from practice of an accredited representative before the Board and the Immigration Courts. 8 C.F.R. § 1003.111(a)(1). DHS may ask that the accredited representative be similarly suspended from practice before DHS. 8 C.F.R. § 1003.111(a)(2).

AR.07581

The petition must demonstrate by a preponderance of the evidence that the accredited representative poses a substantial threat of irreparable harm to clients or prospective clients.  See 8 C.F.R. § 1003.111(a)(3).

**(d) Answer. —** A practitioner or recognized organization subject to a Notice of Intent to Discipline (NID) has 30 days from the date of service to file a written answer with the Board of Immigration Appeals and serve a copy on the counsel for the government. See Chapter 3.2 (Service on the Opposing Party).  The answer is deemed filed when it is *received* by the Board.

**(i) Contents. —** In the answer, the practitioner, or, in cases involving recognized organizations, the organization, must admit or deny each allegation in the NID.  Each allegation not expressly denied is deemed admitted.  In addition, the answer must state whether the practitioner or recognized organization requests a hearing.  If a hearing is not requested, the opportunity to request a hearing is deemed waived.  8 C.F.R. § 1003.105(c)(2).

**(ii) Motion for Extension of Time to Answer. —** The deadline for filing an answer may be extended for good cause shown, pursuant to a written motion filed with the Board of Immigration Appeals no later than 3 working days before the deadline.  The motion should be filed with a cover page labeled "MOTION FOR EXTENSION OF TIME TO ANSWER" and comply with the requirements for filing. For information on the requirements for filing with the Board, parties should consult the Board of Immigration Appeals Practice Manual, which is available at the Executive Office for Immigration Review website at www.justice.gov/eoir.

**(iii) Default order. —** If the practitioner or, in cases involving recognized organizations, the organization, does not file a timely answer, the Board of Immigration Appeals issues a default order imposing the discipline proposed in the NID, unless special considerations are present.  8 C.F.R. § 1003.105(d)(2).

**(iv) Motion to set aside default order. —** A practitioner or, in cases involving recognized organizations, the organization, subject to a default order may file a written motion with the Board of Immigration Appeals to set aside a default order.  The motion to set aside a default order must be filed within 15 days of service of the default order.  8 C.F.R. § 1003.105(d)(2).  The motion should be filed with a cover page labeled "MOTION TO SET ASIDE DEFAULT ORDER" and comply with the requirements for filing.  For information on the requirements for filing with the Board, parties should consult the Board of Immigration Appeals Practice Manual.

The motion must show that the failure to file a timely answer was caused by exceptional circumstances beyond the control the practitioner or recognized organization, such as the serious illness or the death of an immediate relative, but not including less compelling circumstances.  8 C.F.R. § 1003.105(d)(2).

*(e) Adjudication.* — Except as described in subsection (g) below, if a practitioner, or, in cases involving recognized organizations, the organization, files a timely answer, the matter is referred to an Immigration Judge or Administrative Law Judge who will act as the adjudicating official in the disciplinary proceedings.  An Immigration Judge cannot adjudicate a matter in which he or she filed the complaint or which involves a practitioner who regularly appears in front of that Immigration Judge.

*(i) Adjudication without hearing.* — If the practitioner or recognized organization files a timely answer without a request for a hearing, the adjudicating official provides the parties with the opportunity to file briefs and evidence to support or refute any of the charges or affirmative defenses, and the matter is adjudicated without a hearing.

*(ii) Adjudication with hearing.* — If the practitioner or recognized organization files a timely answer with a request for a hearing, a hearing is conducted as described in subsections (A) through (E), below.

*(A) Timing and location.* — The time and place of the hearing is designated with due regard to all relevant factors, including the location of the practitioner's practice or residence or, in the case of a recognized organization, the location of the recognized organization, and the convenience of witnesses.  The practitioner or the recognized organization is afforded adequate time to prepare the case in advance of the hearing.

*(B) Representation.* — The practitioner or, in cases involving recognized organizations, the organization, may be represented by counsel at no expense to the government.

*(C) Pre-hearing conferences.* — Pre-hearing conferences may be held to narrow issues, obtain stipulations between the parties, exchange information voluntarily, or otherwise simplify and organize the proceeding.

*(D) Timing of submissions.* — Deadlines for filings in disciplinary proceedings are as follows, unless otherwise specified by the adjudicating official.  Filings must be submitted at least thirty (30) days in advance of the

AR.07583

hearing.  Responses to filings that were submitted in advance of a hearing must be filed within fifteen (15) days after the original filing.

*(E) Conduct of hearing.* — At the hearing, each party has a reasonable opportunity to present evidence and witnesses, to examine and object to the other party's evidence, and to cross-examine the other party's witnesses.

*(iii) Decision.* — In rendering a decision, the adjudicating official considers the complaint, the preliminary inquiry report, the Notice of Intent to Discipline, the practitioner's, or, in cases involving recognized organizations, the organization's, answer, pleadings, briefs, evidence, any supporting documents, and any other materials.

*(iv) Sanctions authorized.* — A broad range of sanctions are authorized, including disbarment from immigration practice, suspension from immigration practice, and public or private censure.  8 C.F.R. § 1003.101(a).

The Executive Office for Immigration Review is also authorized to impose sanctions against a recognized organization, including revocation, termination, and such other sanctions as deemed appropriate.  8 C.F.R. § 1003.110.

*(v) Appeal.* — The decision of the adjudicating official may be appealed to the Board of Immigration Appeals.  A party wishing to appeal must file a Notice of Appeal from a Decision of an Adjudicating Official in a Practitioner Disciplinary Case (Form EOIR-45).  See Chapter 11.2 (Obtaining Blank Forms), Appendix E (Forms).  The Form EOIR-45 is specific to disciplinary proceedings.  The Form EOIR-45 must be received by the Board no later than 30 calendar days after the adjudicating official renders an oral decision or mails a written decision.

Parties should note that, on appeal, the Board may increase the sanction imposed by the adjudicating official.  See *Matter of Gadda*, 23 I&N Dec. 645 (BIA 2003).

*(f) Where to file documents.* — Documents in disciplinary proceedings should be filed as described below.

*(i) Board of Immigration Appeals.* — When disciplinary proceedings are pending before the Board of Immigration Appeals, documents should be filed with the Board.  For the Board's mailing address, parties should consult the Board of Immigration Appeals Practice Manual, which is available on the Executive Office

AR.07584

for Immigration Review website at www.justice.gov/eoir.  Examples of when to file documents with the Board include:

> o    after the filing of a Notice of Intent to Discipline, but before an adjudicating official is appointed to the case

> o    after a default order has been entered

> o    after an appeal has been filed

*(ii) Adjudication.* — When disciplinary proceedings are pending before an adjudicating official, documents should be sent to:

> United States Department of Justice
> Executive Office for Immigration Review
> Office of the Chief Immigration Judge
> 5107 Leesburg Pike, Suite 2500
> Falls Church, VA 22041
> Attn: Chief Clerk of the Immigration Court

*(g) Summary disciplinary proceedings.* — Summary disciplinary proceedings are held in cases where a petition for immediate suspension has been filed.  See (c)(i), above.  A preliminary inquiry report is not required to be filed with the Notice of Intent to Discipline (NID) in summary disciplinary proceedings.

These proceedings are conducted as described above, except that for the case to be referred to an adjudicating official, the practitioner must demonstrate in the answer to the NID that there is a material issue of fact in dispute or that certain special considerations are present.   If the practitioner's answer meets this requirement, disciplinary proceedings are held as described in subsections (d) through (f), above.  If the practitioner fails to meet this requirement, the Board issues an order imposing discipline.  For additional information, see 8 C.F.R. §§ 1003.103(b), 1003.106(a).

## 10.8   Notice to Public

*(a) Disclosure generally authorized.* — In general, action taken on a Notice of Intent to Discipline may be disclosed to the public.  See 8 C.F.R. § 1003.108(c).

*(b) Lists of disciplined practitioners.* — Lists of practitioners who have been disbarred, suspended, or publicly censured are posted at the Immigration Courts, at the

AR.07585

Board of Immigration Appeals, and on the Executive Office for Immigration Review website at www.justice.gov/eoir.  These lists are updated periodically.

## 10.9    Effect on Practitioner's Pending Immigration Cases

*(a) Duty to advise clients.* — A practitioner or recognized organization that is disciplined is obligated to advise all clients whose cases are pending before the Immigration Courts, the Board of Immigration Appeals, or the Department of Homeland Security that the practitioner or recognized organization has been disciplined.

*(b) Pending cases deemed unrepresented.* — Once a practitioner has been expelled or suspended, the practitioner's pending cases are deemed unrepresented.  The Immigration Court rejects filings that are submitted by a practitioner after he or she has been expelled or suspended.  See Chapter 3.1(d) (Defective filings).

*(c) Ineffective assistance of counsel.* — The imposition of discipline on a practitioner does not, by itself, constitute evidence of ineffective assistance of counsel in the practitioner's former cases.

*(d) Filing deadlines.* — An order of practitioner or recognized organization discipline does not automatically excuse parties from meeting any applicable filing deadlines.

## 10.10   Reinstatement

*(a) Following suspension.* — Following a suspension, reinstatement is not automatic.  With exceptions for accredited representatives specified in subsection (d) below, to be reinstated following a suspension, a practitioner must:

o    file a motion with the Board of Immigration Appeals requesting to be reinstated;

o    show that he or she is an attorney or representative as defined in 8 C.F.R. §§ 1001.1(f) and 1001.1(j), respectively; and

o    serve a copy of the motion on the EOIR Disciplinary Counsel and the DHS Disciplinary Counsel.

8 C.F.R. § 1003.107(a)(1).

The Executive Office for Immigration Review Disciplinary Counsel or the DHS Disciplinary Counsel may file a written response, including supporting documents or evidence, objecting to reinstatement on the ground that the practitioner failed to comply with the terms of the suspension. 8 C.F.R. § 1003.107(a)(2). Failure to meet the definition of an attorney or accredited representative will result in the request for reinstatement being denied. 8 C.F.R. § 1003.107(b)(3). If the practitioner failed to comply with the terms of the suspension, the Board will deny the motion and indicate the circumstances under which reinstatement may be sought.

**(b) During suspension for more than one year. —** A practitioner suspended for more than one year may file a petition for reinstatement with the Board of Immigration Appeals after one year has passed or one-half of the suspension has elapsed, whichever is greater. The practitioner must serve a copy of the petition on the Executive Office for Immigration Review disciplinary counsel. In the petition, the practitioner must show that:

o    he or she is an attorney or representative as defined in 8 C.F.R. §§ 1001.1(f) and 1001.1(g), respectively;

o    he or she possesses the moral and professional qualifications required to appear before the Board, the Immigration Courts, or DHS; and

o    his or her reinstatement will not be detrimental to the administration of justice.

8 C.F.R. § 1003.107(b).

The Board has the discretion to hold a hearing to determine if the practitioner meets all of the requirements for reinstatement. If the Board denies a petition for reinstatement, the practitioner is barred from filing a subsequent petition for reinstatement for one year from the date of denial.

**(c) If disbarred. —** A practitioner who has been disbarred may file a petition for reinstatement with the Board of Immigration Appeals after one year has passed, under the provisions described in subsection (b), above.

**(d) Accredited representatives. —**

**(i) Suspended. —** When an accredited representative is suspended past the expiration of the period of accreditation, the representative may not seek reinstatement. After the representative's suspension period has expired, a new

AR.07587

request for accreditation may be submitted by the recognized organization pursuant to 8 C.F.R. §§ 1003.107(c)(1), 1292.13).

*(ii) Disbarred.* — An accredited representative who has been disbarred may not seek reinstatement.  8 C.F.R. § 1003.107(c)(2).

*(e) Cases pending at reinstatement.* — Suspension or disbarment terminates representation.  A practitioner reinstated to immigration practice who wishes to represent clients before the Immigration Court, the Board of Immigration Appeals, or the Department of Homeland Security must enter a new appearance in each case, even if he or she was the practitioner at the time that discipline was imposed.  See Chapter 2.3(c) (Appearances).

AR.07588

# Chapter 11  Forms

## 11.1   Forms Generally

There is an official form that must be used to:

| | | | |
|---|---|---|---|
| o | appear as a representative | — | see Chapter 2.1(b) (Entering an appearance) |
| o | report a change of address | — | see Chapter 2.2(c) (Address obligations) |
| o | request most kinds of reliefs | — | see 8 C.F.R. parts 299, 1299 |
| o | file an appeal | — | see Chapter 6 (Appeals of Immigration Judge Decisions) |
| o | request a fee waiver on appeal | — | see Chapter 3.4 (Filing Fees) |

There is an official form that should be used to:

| | | | |
|---|---|---|---|
| o | file a practitioner complaint | — | see Chapter 10.5 (Filing a Complaint) |

There is *no* official form to:

| | | | |
|---|---|---|---|
| o | file a motion | — | see Chapter 5.2(b) (Form) |
| o | file a FOIA request | — | see Chapter 12 (Freedom of Information Act) |

## 11.2   Obtaining Blank Forms

**(a) Identifying EOIR forms.  —** Many forms used by the Executive Office for Immigration Review (EOIR) do not appear in the regulations.  All of the EOIR forms most commonly used by the public are identified in this manual.  See Appendix E (Forms). Form names and numbers can be obtained from the Immigration Courts and the Clerk's Office of the Board of Immigration Appeals.  See Appendix A (Immigration Court Addresses), Appendix B (EOIR Directory).

**(b) Obtaining EOIR forms. —** Appendix E (Forms) contains a list of frequently requested forms and information on where to obtain them.  In general, EOIR forms are available from the following sources:

- o  the EOIR website at www.justice.gov/eoir

- o  the Immigration Courts

- o  the Clerk's Office of the Board of Immigration Appeals

- o  certain Government Printing Office Bookstores

Parties should be sure to use the most recent version of each form, which will be available from the sources listed here.

**(c) Obtaining DHS forms.—** In general, DHS forms are available at www.uscis.gov.

**(d) Photocopied forms. —** Photocopies of blank EOIR forms may be used, provided that they are an accurate duplication of the government-issued form and are printed on the correct size and stock of paper.  See 8 C.F.R. §§ 299.4(a), 1299.1.  The filing party is responsible for the accuracy and legibility of the form.  The paper used to photocopy the form should also comply with Chapter 3.3(c)(v) (Paper size and document quality).  The most recent version of the form *must be used* and is available from the sources listed in subsection (b), above.

For the forms listed in subsection (f), below, the use of colored paper is strongly encouraged, but not required.

**(e) Computer-generated forms. —** Computer-generated versions of EOIR forms may be used, provided that they are an accurate duplication of the government-issued form and are printed on the correct size and stock of paper.  See 8 C.F.R. §§ 299.4(a), 1299.1.  The filing party is responsible for the accuracy and legibility of the form.  The paper used to photocopy the form should also comply with Chapter 3.3(c)(v) (Paper size and document quality).  The most recent version of the form *must be used* and is available from the sources listed in subsection (b), above.

At this time, only the Notice of Entry of Appearance as Attorney or Representative before the Immigration Court (Form EOIR-28) can be filed electronically with the Immigration Court.  See Chapters 3.1(a)(viii) (E-filing), 2.1(b) (Entering an appearance).

AR.07590

For the forms listed in subsection (f), below, when filing a paper form, the use of colored paper is strongly encouraged, but not required.

**(f) Form colors. —** Forms are no longer required to be filed on paper of a specific color.  However, the use of colored paper for the forms listed below is strongly encouraged.  Any submission that is not a form must be on white paper.

| | | |
|---|---|---|
| blue | — | EOIR-26 (Notice of Appeal / Immigration Judge Decision) |
| tan | — | EOIR-26A (Appeal Fee Waiver Request) |
| yellow | — | EOIR-27 (Notice of Appearance before the Board of Immigration Appeals) |
| green | — | EOIR-28 (Notice of Appearance before the Immigration Court) |
| pink | — | EOIR-29 (Notice of Appeal / DHS decision) |
| pink | — | EOIR-33/BIA (Change of Address / Board of Immigration Appeals) |
| blue | — | EOIR-33/IC (Change of Address / Immigration Court) |

## 11.3   Submitting Completed Forms

Completed forms must comply with the signature requirements in Chapter 3.3(b) (Signatures).

## 11.4   Additional Information

For further information on filing requirements, see Chapter 3 (Filing with the Immigration Court).  See also Chapters 5 (Motions before the Immigration Court), 6 (Appeals of Immigration Judge Decisions), 8 (Stays), 9 (Detention and Bond), 10 (Discipline of Practitioners), 12 (Freedom of Information Act).

AR.07591

Case 3:20-cv-07721-SI     Document 58-7     Filed 11/10/20     Page 184 of 1305

# Chapter 12  Freedom of Information Act (FOIA)

## 12.1  Generally

The Freedom of Information Act (FOIA) provides the public with access to federal agency records, with certain exceptions.  See 5 U.S.C. § 552.  The Executive Office for Immigration Review, Office of the General Counsel, responds to FOIA requests for Immigration Court records.  See Appendix B (EOIR Directory).

## 12.2  Requests

For detailed guidance on how to file a FOIA request, individuals requesting information under the Freedom of Information Act should consult the Executive Office for Immigration Review (EOIR) website at www.justice.gov/eoir or contact the EOIR FOIA unit.  See Appendix B (EOIR Directory).  General guidelines are as follows.

*(a) Who may file. —*

*(i) Parties. —*

*(A) Inspecting the record. —* Parties to an Immigration Court proceeding, and their legal representatives, may inspect the official record of proceedings by prior arrangement with Immigration Court staff.  A FOIA request is not required.  See Chapter 1.6(c) (Records).

*(B) Obtaining copies of the record. —* As a general rule, parties may only obtain a copy of the record of proceedings by filing a FOIA request.  See subsection (b), below.  However, in limited instances, Immigration Court staff have the discretion to provide a party with a copy of the record or portion of the record, without a FOIA request.  See Chapter 1.6(c) (Records).

*(ii) Non-parties. —* Persons who are not a party to a proceeding before an Immigration Court must file a FOIA request with the EOIR Office of the General Counsel if they wish to see or obtain copies of the record of proceedings.  See subsection (b), below.

*(b) How to file. —*

AR.07592

***(i) Form.* —** FOIA requests must be made in writing.  See 28 C.F.R. § 16.1 et seq.  The Executive Office for Immigration Review (EOIR) does not have an official form for filing FOIA requests.  The Department of Homeland Security Freedom of Information /Privacy Act Request (Form G-639) should not be used to file such requests.  For information on where to file a FOIA request, see Appendix B (EOIR Directory).

***(ii) Information required.* —** Requests should thoroughly describe the records sought and include as much identifying information as possible regarding names, dates, subject matter, and location of proceedings.  For example, if a request pertains to an alien in removal proceedings, the request should contain the full name and alien registration number ("A number") of that alien.  The more precise and comprehensive the information provided in the FOIA request, the better and more expeditiously the request can be processed.

***(iii) Fee.* —** No fee is required to file a FOIA request, but fees may be charged to locate, review, and reproduce records.  See 28 C.F.R. § 16.3(c).

***(iv) Processing times.* —** Processing times for FOIA requests vary depending on the nature of the request and the location of the records.

***(c) When to file.* —**

***(i) Timing.* —** A FOIA request should be filed as soon as possible, especially when a party is facing a filing deadline.

***(ii) Effect on filing deadlines.* —** Parties should not delay the filing of an application, motion, brief, appeal, or other document while awaiting a response to a FOIA request.  Non-receipt of materials requested pursuant to FOIA does *not* excuse a party's failure to meet a filing deadline.

***(d) Limitations.* —**

***(i) Statutory exemptions.* —** Certain information in agency records, such as classified material and information that would cause a clearly unwarranted invasion of personal privacy, is exempted from release under FOIA.  See 5 U.S.C. § 552(b)(1)-(9).  Where appropriate, such information is redacted (i.e., removed or cut out), and a copy of the redacted record is provided to the requesting party.  If material is redacted, the reasons for the redaction are indicated.

*(ii) Agency's duty.* — The FOIA statute does not require the Executive Office for Immigration Review, its Office of the General Counsel, or the Immigration Courts to perform legal research, nor does it entitle the requesting person to copies of documents that are available for sale or on the internet.

*(iii) Subject's consent.* — When a FOIA request seeks information that is exempt from disclosure on the grounds of personal privacy, the subject of the record must consent in writing to the release of the information.

## 12.3   Denials

If a FOIA request is denied, either in whole or in part, the requesting party may appeal the decision to the Office of Information and Privacy, Department of Justice. Information on how to appeal a denial of a FOIA request is available on the Office of Information and Privacy website at www.justice.gov/oip.   The rules regarding FOIA appeals can be found at 28 C.F.R. § 16.9.

# Chapter 13  Other Information

## 13.1   Reproduction of the Practice Manual

The Practice Manual is a public document and may be reproduced without advance authorization from the Executive Office for Immigration Review.

## 13.2   Online Access to the Practice Manual

The most current version of the Practice Manual is available at the Executive Office for Immigration Review website at www.justice.gov/eoir.  Questions regarding online access to the Practice Manual should be addressed to the Law Library and Immigration Research Center.  See Appendix B (EOIR Directory).

## 13.3   Updates to the Practice Manual

The Practice Manual is updated periodically.  The date of the most recent update is indicated at the bottom of each page.  Parties should make sure to consult the most recent version of the Practice Manual, which is posted online at the Executive Office for Immigration Review website at www.justice.gov/eoir.

## 13.4   Public Input

*(a) Practice Manual.* — The Executive Office for Immigration Review welcomes and encourages the public to provide comments on the Practice Manual.  In particular, the public is encouraged to identify errors or ambiguities in the text and to propose revisions for future editions.

Correspondence regarding the Practice Manual should be addressed to:

United States Department of Justice
Executive Office for Immigration Review
Office of the Chief Immigration Judge
5107 Leesburg Pike, Suite 2500
Falls Church, VA 22041

The public is asked not to combine comments regarding the Immigration Court Practice Manual with other inquiries, including inquiries regarding specific matters pending before the Immigration Courts.

*updates: www.justice.gov/eoir*                                          *Version released on*
                                                                                    *March 17, 2020*

**(b) Regulations and Published Rules. —** Periodically, the Executive Office for Immigration Review issues new regulations.   New regulations are published in the *Federal Register*, which is available online at www.ofr.gov, in most law libraries, and in many public libraries.  The public is encouraged to submit comments on proposed regulations.  Comments may be submitted at www.regulations.gov or as directed in the *Federal Register*.

# APPENDIX A
# Immigration Court Addresses

| Arizona | | | |
|---|---|---|---|
| **Eloy** | 1705 E. Hanna Rd., Suite 366<br>Eloy, AZ 85131<br>(520) 466-3671 | **Phoenix** | 250 N. 7th Avenue #300<br>Phoenix, AZ 85007<br>(602) 640-2747 |
| **Florence** | 3260 N. Pinal Parkway Ave.<br>Florence, AZ 85132<br>(520) 868-3341 | **Tucson** | 300 West Congress, Suite 300<br>Tucson, AZ 85701<br>(520) 670-5212 |

| California | | | |
|---|---|---|---|
| **Adelanto** | Adelanto Detention Facility<br>10250 Rancho Road, Suite 201A<br>Adelanto, CA 92301<br>760-561-6500 | **Otay Mesa** | 7488 Calzada de la Fuente<br>San Diego, CA 92154<br>(619) 661-5600<br><br>Mailing address:<br>P.O. Box 438150<br>San Ysidro, CA 92143-8150 |
| **Imperial** | 2409 La Brucherie Rd.<br>Imperial, CA 92251<br>(760) 370-5200 | | |
| **Los Angeles - Olive Street** | 606 S. Olive St., 15th Floor<br>Los Angeles, CA 90014<br>(213) 894-2811 | **Sacramento** | John Moss Federal Building<br>650 Capitol Mall, Suite. 4-200<br>Sacramento, CA 95814<br>(916) 447-9301 |
| **Los Angeles - N. Los Angeles St** | 300 North Los Angeles Street<br>Room 4330<br>Los Angeles, CA 90012<br>(213) 576-4701 | **San Diego** | 401 West "A" St., Suite 800<br>San Diego, CA 92101<br>(619) 557-6052 |
| **Los Angeles - Van Nuys Boulevard** | 6230 Van Nuys Blvd.<br>3rd Floor, Suite 300<br>Los Angeles, CA 91401<br>(818) 904-5200 | **San Francisco** | 100 Montgomery St., Suite 800<br>San Francisco, CA 94104<br>(415) 705-4415<br><br>San Francisco (Detained)<br>630 Sansome Street<br>4th Floor, Room 475<br>San Francisco, CA 94111<br>(415) 705-1033 |

| Colorado | | | |
|---|---|---|---|
| **Aurora** | 3130 N. Oakland Street<br>Aurora, CO 80010<br>(303) 361-0488 | **Denver** | 1961 Stout Street, Suite 3103<br>Denver, CO 80294<br>(303) 844-5815 |

| Connecticut | |
|---|---|
| **Hartford** | AA Ribicoff Federal Bldg. & Courthouse<br>450 Main St., Room 628<br>Hartford, CT 06103-3015<br>(860) 240-3881 |

| Florida | | | |
|---|---|---|---|
| **Miami** | One Riverview Square<br>333 S. Miami Ave., Suite 700<br>Miami, FL 33130<br>(305) 789-4221 | **Orlando** | 3535 Lawton Road, Suite 200<br>Orlando, FL 32803<br>(407) 722-8900 |
| **Miami Krome<br>(Detained)** | Krome North Processing Center<br>18201 SW 12th St., Bldg. #1, Suite C<br>Miami, FL 33194<br>(786) 422-8700 | | |

| Georgia | | | |
|---|---|---|---|
| **Atlanta -<br>Ted Turner<br>Drive** | 180 Ted Turner Dr SW, Suite 241<br>Atlanta, GA 30303<br>(404) 331-0907 | **Stewart** | 146 CCA Road<br>PO Box 248<br>Lumpkin, GA 31815<br>(229) 838-1320 |
| **Atlanta -<br>W. Peachtree<br>Street** | Peachtree Summit Federal Building<br>401 W. Peachtree Street NW,<br>Ste. 2600<br>Atlanta, GA 30308<br>(404) 554-9400 | | |

AR.07598

| Hawaii | |
|---|---|
| **Honolulu** | PJKK Federal Bldg.<br>300 Ala Moana Blvd.<br>Room 8-112<br>Honolulu, HI 96850<br>(808) 541-1870 |

| Illinois | |
|---|---|
| **Chicago** | 525 West Van Buren Street<br>Suite 500<br>Chicago, IL 60607<br>(312) 697-5800<br><br>Chicago (Detained)<br>536 Clark St, Suite 340<br>Chicago, IL 60605<br>(312) 294-8400 |

| Kentucky | |
|---|---|
| **Louisville** | *Location is temporarily closed.*<br><br>Filings accepted at the Memphis Immigration Court:<br>Brinkley Plaza<br>80 Monroe Ave., Suite 501<br>Memphis, TN 38103<br>(901) 528-5883 |

| Louisiana | | | |
|---|---|---|---|
| **LaSalle** | 830 Pine Hill Road<br>PO Box 2179<br>Jena, LA 71342<br>(318) 335-6880 | **Oakdale** | 1900 E. Whatley Rd.<br>Oakdale, LA 71463<br>(318) 335-0365 |
| **New Orleans** | One Canal Place<br>365 Canal St., Suite 500<br>New Orleans, LA 70130<br>(504) 589-3992 | | |

*updates: www.justice.gov/eoir*                                                    *Version released on*
*March 17, 2020*

AR.07599

| **Maryland** |
|---|
| **Baltimore**   George Fallon Federal Bldg.<br>31 Hopkins Plaza, Room 440<br>Baltimore, MD 21201<br>(410) 962-3092 |

| **Massachusetts** |
|---|
| **Boston**   JFK Federal Bldg.<br>15 New Sudbury St., Room 320<br>Boston, MA 02203<br>(617) 565-3080 |

| **Michigan** |
|---|
| **Detroit**   P.V. McNamara Federal Bldg.<br>477 Michigan Ave., Suite 440<br>Detroit, MI 48226<br>(313) 226-2603 |

| **Minnesota** |
|---|
| **Bloomington**   Bishop Henry Whipple Federal Building<br>1 Federal Drive, Suite 1850<br>Fort Snelling, MN 55111<br>(612) 725-3765 |

| **Missouri** |
|---|
| **Kansas City**   2345 Grand Blvd., Suite 525<br>Kansas City, MO 64108<br>(816) 581-5000 |

Appendix A

| Nebraska | |
|---|---|
| **Omaha** | 1717 Avenue H, Suite 100<br>Omaha, NE 68110<br>(402) 348-0310 |

| Nevada | |
|---|---|
| **Las Vegas** | 110 North City Parkway, Suite 400<br>Las Vegas, NV 89106<br>(702) 458-0227 |

| New Jersey | | | |
|---|---|---|---|
| **Elizabeth** | 625 Evans St., Room 148A<br>Elizabeth, NJ 07201<br>(908) 787-1355 | **Newark** | 970 Broad St., Room 1200<br>Newark, NJ 07102<br>(973) 645-3524 |

| New Mexico | |
|---|---|
| **Otero** | 26 McGregor Range Rd.,<br>Door #1<br>Chaparral, NM 88081<br>(575) 824-8900 |

| New York | | | |
|---|---|---|---|
| **Batavia** | 4250 Federal Drive<br>Room F108<br>Batavia, NY 14020<br>(585) 345-4300 | **New York -<br>Federal Plaza** | 26 Federal Plaza<br>12th Floor, Room 1237<br>New York, NY 10278<br>(917) 454-1040 |
| **Buffalo** | 130 Delaware Ave., Suite 300<br>Buffalo, NY 14202<br>(716) 551-3442 | **Ulster** | Ulster Correctional Facility<br>Berme Road<br>P.O. Box 800<br>Napanoch, NY 12458<br>(845) 647-2223 |

Appendix A

| New York | | | |
|---|---|---|---|
| **Fishkill** | Downstate Correctional Facility<br>121 Red Schoolhouse Rd.<br>Fishkill, NY 12524<br>(845) 838-5700 | **New York -**<br>**Varick Street** | 201 Varick St.<br>5th Floor, Room 507<br>New York, NY 10014<br>(646) 638-5766 |
| **New York -**<br>**Broadway** | 290 Broadway, Suite 2900<br>New York, NY 10057<br>(212) 240-4900 | | |

| North Carolina | |
|---|---|
| **Charlotte** | 5701 Executive Center Dr., Suite 400<br>Charlotte, NC 28212<br>(704) 817-6140 |

| Northern Mariana Islands | |
|---|---|
| **Saipan** | Marina Heights II Building, Suite 301<br>Marina Heights Business Park<br>Saipan, MP 96950<br>(670) 322-0601 |

| Ohio | |
|---|---|
| **Cleveland** | 801 W. Superior Ave.<br>Suite 13 - 100<br>Cleveland, OH 44113<br>(216) 802-1100 |

| Oregon | |
|---|---|
| **Portland** | 1220 SW 3rd Ave., Suite 500<br>Portland, OR 97204<br>(503) 326-6341 |

*updates: www.justice.gov/eoir*                                    *Version released on*
*March 17, 2020*

AR.07602

| Pennsylvania | | | |
| --- | --- | --- | --- |
| **Philadelphia** | Robert Nix Federal Bldg & Courthouse 900 Market Street, Suite 504 Philadelphia, PA 19107 (215) 656-7000 | **York** | 3400 Concord Rd., Suite 2 York, PA 17402 (717) 755-7555 Mailing Address: P.O. Box 20370 York, PA 17402 |

| Puerto Rico | |
| --- | --- |
| **San Juan** | San Patricio Office Center #7 Tabonuco St., Room 401 Guaynabo, PR 00968-4605 (787) 749-4386 |

| Tennessee | |
| --- | --- |
| **Memphis** | Brinkley Plaza 80 Monroe Ave., Suite 501 Memphis, TN 38103 (901) 528-5883 |

| Texas | |
|---|---|
| **Conroe** 806 Hilbig Road<br>Conroe, TX 77301<br>(936) 520-5400 | **Houston -** 8701 S. Gessner Road<br>**S. Gessner Rd** 10th Floor<br>Houston, TX 77074<br>(713) 995-3900 |
| **Dallas** 1100 Commerce St., Suite 1060<br>Dallas, TX 75242<br>(214) 767-1814 | **Pearsall** 566 Veterans Drive<br>Pearsall, TX 78061<br>(210) 368-5700 |
| **El Paso** 700 E. San Antonio Ave., Suite 750<br>El Paso, TX 79901<br>(915) 534-6020 | **Port Isabel** Port Isabel Processing Center<br>27991 Buena Vista Blvd.<br>Los Fresnos, TX 78566 |
| **El Paso SPC** Service Processing Center<br>8915 Montana Ave., Suite 100<br>El Paso, TX 79925<br>(915) 771-1600 | (956) 254-5700<br><br>Mailing Address:<br>27991 Buena Vista Blvd.<br>Los Fresnos, TX 78566 |
| **Harlingen** 2009 West Jefferson Ave., Suite 300<br>Harlingen, TX 78550<br>(956) 427-8580 | **San Antonio** 800 Dolorosa St., Suite 300<br>San Antonio, TX 78207<br>(210) 472-6637 |
| **Houston** Continental Center II<br>1801 Smith Street, 9th Floor<br>Houston, TX 77002<br>(713) 718-3870 | San Antonio (Annex)<br>106 S. St. Mary's St<br>Suite 600<br>San Antonio, TX 78205<br>(210) 230-9507 |
| Houston (Annex)<br>1919 Smith Street<br>6th and 14th Floors<br>Houston, TX 77002<br>6th Floor: 713-751-1514<br>14th Floor: 713-751-1500 | |

| Utah |
|---|
| **Salt Lake City** 2975 South Decker Lake Drive, Suite 200<br>West Valley City, UT 84119<br>(801) 524-3000 |

AR.07604

| Virginia | | |
|---|---|---|
| **Arlington** | 1901 South Bell Street, Suite 200<br>Arlington, VA 22202<br>(703) 603-1300 | **Falls Church Immigration Adjudication Center**   5107 Leesburg Pike<br>Falls Church, VA 22041 |

| Washington | | |
|---|---|---|
| **Seattle** | 1000 Second Ave., Suite 2500<br>Seattle, WA 98104<br>(206) 553-5953 | **Tacoma**   1623 East J St., Suite 3<br>Tacoma, WA 98421<br>(253) 779-6020 |

AR.07605

# APPENDIX B
# EOIR Directory

**EOIR Website**
www.justice.gov/eoir

**EOIR eRegistry**
Technical Assistance
eRegistration.support@usdoj.gov

**Automated Case Information Hotline**
(800) 898-7180
(304) 625-2050
24 hours, 7 days a week

**Office of the Chief Immigration Judge**
United States Department of Justice
Executive Office for Immigration Review
Office of the Chief Immigration Judge
5107 Leesburg Pike, Suite 2400
Falls Church, VA 22041
(703) 305-1247
8:00 a.m. to 5:00 p.m., Monday - Friday, except holidays

**Practice Manual Comments**
United States Department of Justice
Executive Office for Immigration Review
Office of the Chief Immigration Judge
5107 Leesburg Pike, Suite 2400
Falls Church, VA 22041

**Concerns/Complaints about Immigration Judge Conduct** www.justice.gov/eoir
Judicial.conduct@usdoj.gov

**Board of Immigration Appeals**
For addresses, see the Board of Immigration Appeals Practice Manual

**Clerk's Office**
(703) 605-1007
8:00 a.m. to 4:30 p.m.
Monday - Friday, except holidays

**Oral Argument Coordinator**
(703) 605-1007
8:00 a.m. to 4:30 p.m.
Monday - Friday, except holidays

**Telephonic Instructions and Procedures System (BIA TIPS)**
(703) 605-1007
24 hours, 7 days a week

**Emergency Stay Information**
(703) 605-1007
24 hours, 7 days a week

**Emergency Stay Coordinator**
(703) 306-0093
9:00 a.m. to 5:30 p.m.
Monday – Friday, except holidays

*updates: www.justice.gov/eoir*

*Version released on*
March 17, 2020

AR.07606

**Office of the General Counsel**
United States Department of Justice
Executive Office for Immigration Review
Office of the General Counsel
5107 Leesburg Pike, Suite 2600
Falls Church, VA 22041 (703) 305-0470
8:00 a.m. to 5:00 p.m., Monday - Friday, except holidays

**EOIR Disciplinary Counsel**
United States Department of Justice
Executive Office for Immigration Review
Office of the General Counsel
5107 Leesburg Pike, Suite 2600
Falls Church, VA 22041
Attn: Disciplinary Counsel

**EOIR Fraud and Abuse Prevention Program**
United States Department of Justice
Executive Office for Immigration Review
Office of the General Counsel
5107 Leesburg Pike, Suite 2600
Falls Church, VA 22041
Attn: Fraud and Abuse Prevention Program
1-877-388-3840

**Freedom of Information Act Requests (FOIA)**
United States Department of Justice
Executive Office for Immigration Review
Office of the General Counsel–FOIA/Privacy Act Requests
5107 Leesburg Pike, Suite 2150
Falls Church, VA 22041
(703) 605-1297
EOIR.FOIARequests@usdoj.gov

**Office of Policy, Office of Legal Access Programs**
United States Department of Justice
Executive Office for Immigration Review
Office of Legal Access Programs
5107 Leesburg Pike, Suite 2500
Falls Church, VA 22041
For questions specific to recognized organizations and accredited representatives,
email R-A-Info@usdoj.gov

**Office of Policy, Communications and Legislative Affairs Division**
United States Department of Justice
Executive Office for Immigration Review
Office of Policy
Office of Communications and Legislative Affairs
5107 Leesburg Pike, Suite 1800
Falls Church, VA 22041
(703) 305-0289
9:00 a.m. to 5:00 p.m., Monday - Friday, except holidays

**Office of Policy, Law Library and Immigration Research Center**
United States Department of Justice

*updates: www.justice.gov/eoir*

*Version released on*
March 17, 2020

AR.07607

> Executive Office for Immigration Review
> Law Library and Immigration Research Center
> 5107 Leesburg Pike, Suite 1824
> Falls Church, VA 22041
> (703) 605-1103
> 9:00 a.m. to 4:00 p.m., Monday - Friday, except holidays
> Virtual Law Library: www.justice.gov/eoir

# APPENDIX C
## Practice Manual Organizational Chart



*This chart is a general illustration of the organizational relationship between certain components of the Department of Justice. The chart does not display all components of offices displayed, nor does it represent their relative authority. See Chapter 1 (The Immigration Court). These components were selected because of their practical importance to persons appearing before the Immigration Courts and the Board of gration Appeals.*

# APPENDIX D
# Deadlines

This table is provided for general guidance *only*. To determine the particular deadlines in a given case, parties *must* consult the pertinent regulations and the text of this manual. The Immigration Judge has discretion to set deadlines for pre-decision filings.

| Filing | | Deadline *(the construction of "day" is discussed in Practice Manual Chapter 3.1(c)(i))* | Practice Manual Chapter |
|---|---|---|---|
| *Changes of address or telephone number* | alien | 5 days after the alien's change of address or telephone number | 2.2(c) |
| | representative | promptly | 2.3(h) |
| *Filings in advance of master calendar hearing* | filings | 15 days before the hearing, if requesting a ruling<br><br>*(if alien is detained, deadline is determined by the Immigration Court)* | 3.1(b)(i) |
| | responses | 10 days after the filing is received by the Immigration Court<br><br>*(if alien is detained, deadline is determined by the Immigration Court)* | |
| *Filings in advance of individual calendar hearing* | filings | 15 days before the hearing<br><br>*(if alien is detained, deadline is determined by the Immigration Court)* | 3.1(b)(ii) |
| | responses | 10 days after the filing is received by the Immigration Court<br><br>*(if alien is detained, deadline is determined by the Immigration Court)* | |

AR.07610

| Filing | | Deadline *(the construction of "day" is discussed in Practice Manual Chapter 3.1(c)(i))* | Practice Manual Chapter |
|---|---|---|---|
| *Asylum applications* | defensive applications | within one year after arrival to the United States * | 3.1(b)(iii)(A) |
| | affirmative applications | filed with DHS within one year after arrival to the United States * | 3.1(b)(iii)(B) |
| *Post-decision motions* | motions to reopen | 90 days after a final administrative order by the Immigration Judge, with certain exceptions | 5.7(c) |
| | motions to reconsider | 30 days after a final administrative order by the Immigration Judge | 5.8(c) |
| | motions to reopen in absentia removal order | 180 days after in absentia order, if based on exceptional circumstances | 5.9(d)(ii)(A) |
| | | at any time, if based on lack of proper notice | 5.9(d)(ii)(B) |
| *Deadlines for appeals to BIA* | | 30 days after the decision was rendered orally or mailed | 6.2 |

*\* An alien filing an application for asylum should be mindful that the application must be filed within one year after the date of the alien's arrival in the United States, unless certain exceptions apply.  INA § 208(a)(2)(B), 8 C.F.R. § 1208.4(a)(2).*

AR.07611

# APPENDIX E
# Forms

This appendix contains a list of frequently requested immigration forms and the best sources for obtaining copies of those forms.

*Online copies of forms.*  Many forms can be downloaded or printed from the website of the agency responsible for that form. For example, forms beginning with "EOIR-," as well as certain forms beginning with "I-" that are filed with the Immigration Court, can be found at www.justice.gov/eoir under the link "EOIR Forms." Other forms, including forms beginning with "I-," can be found at www.uscis.gov under the link "Immigration Forms."

*Paper copies of forms.*  If an immigration form is not available online, the best source for obtaining one is the agency that is responsible for that form. The table below identifies those agencies. (Local offices often provide forms on a walk-in basis.)    Other sources for forms include voluntary agencies (VOLAGs), public service organizations, law offices, and certain Government Printing Office Bookstores.  See 8 C.F.R. §§ 299.2, 299.3.

*Reproducing forms.* Forms may be photocopied, computer-generated, or downloaded, but must comply with all requirements listed in Chapter 11.2 (Obtaining Blank Forms).

| Abbreviations | | |
|---|---|---|
| AAO | = | Administrative Appeals Office, DHS |
| BIA | = | Board of Immigration Appeals |
| CIS | = | Citizenship and Immigration Services, DHS |
| EOIR | = | Executive Office for Immigration Review |
| IC | = | Immigration Court |
| IJ | = | Immigration Judge |
| OGC | = | Office of the General Counsel, EOIR |
| OLAP | = | Office of Legal Access Programs, EOIR |

AR.07612

| PURPOSE | FORM | NAME | GET FROM |
|---|---|---|---|
| accredited representative application | Form EOIR-31A | Request by Organization for Accreditation or Renewal of Accreditation of Non-Attorney Representative | OLAP |
| adjustment of status | Form I-485 | Application to Register Permanent Residence or Adjust Status | CIS |
| appeal of attorney discipline decision | Form EOIR-45 | Notice of Appeal from a Decision of an Adjudicating Official in a Practitioner Disciplinary Case | IC BIA OGC |
| appeal of IJ decision | Form EOIR-26 | Notice of Appeal from a Decision of an Immigration Judge | IC BIA |
| appeal of CIS decision (AAO jurisdiction) | Form I-290B | Notice of Appeal or Motion | CIS |
| appeal of CIS decision (BIA jurisdiction) | Form EOIR-29 | Notice of Appeal to the Board of Immigration Appeals from a Decision of a USCIS Officer | CIS |
| appearance as representative (before the BIA) | Form EOIR-27 | Notice of Entry of Appearance as Attorney or Representative before the Board of Immigration Appeals | IC BIA |
| appearance as representative (before an IC) | Form EOIR-28 | Notice of Entry of Appearance as Attorney or Representative before the Immigration Court | IC |
| asylum, withholding of removal (restriction on removal), Convention Against Torture | Form I-589 | Application for Asylum and for Withholding of Removal | IC CIS |
| attorney / representative complaint form | Form EOIR-44 | Immigration Practitioner Complaint Form | IC BIA OGC |
| cancellation of removal (non-permanent residents) | Form EOIR-42B | Application for Cancellation of Removal and Adjustment of Status for Certain Nonpermanent Residents | IC |
| cancellation of removal (permanent residents) | Form EOIR-42A | Application for Cancellation of Removal for Certain Permanent Residents | IC |

AR.07613

| PURPOSE | FORM | NAME | GET FROM |
|---|---|---|---|
| change of address (cases pending before BIA) | Form EOIR-33 / BIA | Alien's Change of Address Form / Board of Immigration Appeals | IC BIA |
| change of address (cases pending before an IC) | Form EOIR-33 / IC | Alien's Change of Address Form / Immigration Court | IC |
| fee waiver (appeals or motions | Form EOIR-26A | Fee Waiver Request | IC BIA |
| motion (any kind) | none | There is no official form for motions filed with an IC or the BIA. Do not use the Notice of Appeal (Form EOIR-26) for motions. | n/a |
| NACARA suspension of deportation/special rule cancellation | Form I-881 | Application for Suspension of Deportation or Special Rule Cancellation of Removal | CIS |
| recognized organization application | Form EOIR-31 | Request for New Recognition, Renewal of Recognition, Extension of Recognition of a Non-Profit Religious, Charitable, Social Service, or Similar Organization | OLAP |
| return to unrelinquished domicile | Form I-191 | Application for Advance Permission to Return to Unrelinquished Domicile | CIS |
| suspension of deportation | Form EOIR-40 | Application for Suspension of Deportation | IC |
| temporary protected status | Form I-821 | Application for Temporary Protected Status | CIS |
| visa petition (employment-based) | Form I-140 | Immigrant Petition for Alien Worker | CIS |
| visa petition (family-based) | Form I-130 | Petition for Alien Relative | CIS |
| waiver of inadmissibility | Form I-601 | Application for Waiver of Grounds of Inadmissibility | CIS |

AR.07614

# APPENDIX F
## Sample Cover Page

**A. Tourney, Esquire**
**1234 Center Street**
**Anytown, ST 99999**

**DETAINED**

*Filing party.  If pro se, the alien should provide his or her own name and address in this location.  If a representative, the representative should provide his or her name and complete business address.*

*Detention status.  If the alien is detained, the word "DETAINED" should appear prominently in the top right corner, preferably highlighted.*

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**IMMIGRATION COURT**
**ANYTOWN, STATE**

*Court.  The Immigration Court location (city or town) and state should be provided.*

**In the Matters of:**            )
                                  )
                                  )

**Jane Smith**                    )       **File Nos.:  A 012 345 678**
**John Smith**                    )                    **A 012 345 679**
**Jill Smith**                    )                    **A 012 345 680**
                                  )
**In removal proceedings**        )

*A numbers.  The alien registration number of <u>every person</u> included in the submission should be listed.*

*Name and type of proceeding.  The full name of <u>every person</u> included in the submission should be listed.*

**Immigration Judge Susan Jones   Next Hearing: September 22, 2008 at 1:00 p.m.**

*Name of the Immigration Judge and the date and time of the next hearing.  This information should always be listed.*

## RESPONDENT'S PRE-HEARING BRIEF

*Filing title.  The title of the submission should be placed in the middle and bottom of the page.*

AR.07615

# APPENDIX G
# Sample Proof of Service

## Instructions:

By law, all submissions to the Immigration Court *must* be filed with a "Proof of Service" (or "Certificate of Service"). See Chapter 3.2 (Service on the Opposing Party). This Appendix provides guidelines on how to satisfy this requirement.

*What is required.*   To satisfy the law, you must do *both* of the following:

> 1. *Serve the opposing party.* Every time you file a submission with the Immigration Court, you must give, or "serve," a copy on the opposing party.  If you are an alien in proceedings, the opposing party is the Department of Homeland Security.

> 2.   *Give the Immigration Court a completed Proof of Service.*   You must submit a signed "Proof of Service" to the Immigration Court along with your document(s). The Proof of Service tells the Immigration Court that you have given a copy of the document(s) to the opposing party.

*Sample Proof of Service.*  You do not have to use the sample contained in this Appendix. You may write up your own Proof of Service if you like. However, if you use this sample, you will satisfy the Proof of Service requirement.

*Sending the Proof of Service.*  When you have to supply a Proof of Service, be sure to staple or otherwise attach it to the document(s) that you are serving.

*Forms that contain a Proof of Service.* Some forms, such as the Application for Cancellation of Removal for Certain Permanent Residents (Form EOIR-42A), contain a Certificate of Service, which functions as a Proof of Service for the form.  You must complete the Certificate of Service to satisfy the Proof of Service requirement *for that form*.  Such a Certificate of Service only functions as a Proof of Service for the form on which it appears, not for any supporting documents that you file with the form.  If you are filing supporting documents with a form that contains a Certificate of Service, you must file a separate Proof of Service for those documents.

*Forms that do not contain a Proof of Service.*  Forms that do not contain a Certificate of Service are treated like any other document.  Therefore, you must supply the Proof of Service for those forms.

AR.07616

# Sample Proof of Service

_____
(Name of alien or aliens)

_____
("A number" of alien or aliens)

## PROOF OF SERVICE

On _____, I, _____,
        (date)                (printed name of person signing below)

served a copy of this _____
                        (name of document)

and any attached pages to _____
                        (name of party served)

at the following address: _____
                        (address of party served)

_____
                        (address of party served)

by _____.
(method of service, for example overnight courier, hand-delivery, first class mail)

_____            _____
         (signature)                            (date)

AR.07617

# APPENDIX H
# Sample Certificate of Translation

All submissions to the Immigration Court, if not in the English language, must be accompanied by a translation and certificate of translation.  See Chapter 3.3(a) (Language).

---

# CERTIFICATE OF TRANSLATION

I, _____, am competent to translate from
      (name of translator)

_____ into English, and certify that the
translation of
      (language)

_____
      (names of documents)

is true and accurate to the best of my abilities.


_____          _____
(signature of translator)               (typed/printed name of translator)

_____
(address of translator)

_____
(address of translator)

_____
(telephone number of translator)

---

# APPENDIX I
## Telephonic Information

Do you want to know the
status of your case before an
Immigration Judge or the
Board of Immigration Appeals?

All you have to do is call the

# Automated Case
# Information Hotline

## (800) 898-7180
## (240) 314-1500

The Automated Case Information
Hotline contains information
regarding your case, including your
next hearing date, asylum
processing, the Immigration
Judge's decision, or your case
appeal.

This service is available 24 hours a
day, 7 days a week.

---

Need information on how to
file an appeal, motion, or
anything else with the
Board of Immigration Appeals?

Let us give you some

# BIA TIPS
## (703) 605-1007

Call the Board of Immigration
Appeals Telephonic Instructions and
Procedures System for recorded
information on how to file an appeal,
motion, brief, change of address, and
other documents with the Board.

This service is available 24 hours a
day, 7 days a week.

AR.07619

# APPENDIX J
# Citation Guidelines*

When filing papers with the Immigration Court, parties should keep in mind that accurate and complete legal citations strengthen the argument made in the submission. This Appendix provides guidelines for frequently cited sources of law.

The Immigration Court generally follows *A Uniform System of Citation* (also known as the "Blue Book"), but diverges from that convention in certain instances. The Immigration Court appreciates but does not require citations that follow the examples used in this Appendix.  The citation categories are:

|      |                                                          |
|------|----------------------------------------------------------|
| I.   | Cases                                                    |
| II.  | Regulations                                              |
| III. | Statutes/laws                                            |
| IV.  | Legislative history                                      |
| V.   | Treaties and international materials                      |
| VI.  | Publications and communications by governmental agencies, and |
| VII. | Commonly cited commercial publications                   |

Note that, for the convenience of filing parties, some of the citation formats in this Appendix are less formal than those used in the published cases of the Board of Immigration Appeals. Once a source has been cited in full, the objective is brevity without compromising clarity.

This Appendix concerns the citation of legal authority.  For guidance on citing to the record and other sources, see Chapter 3.3(e) (Source materials) and Chapter 4.18(d) (Citation).

As a practice, the Immigration Court prefers italics in case names and publication titles, but underlining is an acceptable alternative.

□ □ □ □ □

---

\* This appendix is substantially based on Appendix J (Citation Guidelines) in the Board of Immigration Appeals Practice Manual.  The Office of the Chief Immigration Judge wishes to acknowledge the efforts of all those involved in the preparation of that appendix.

AR.07620

# I.  *Decisions, Briefs, and Exhibits*

**General guidance:**  *Abbreviations in case names.*   As a general rule, well-known agency abbreviations (e.g., DHS, INS, FBI, Dep't of Justice) may be used in a case name, but without periods. If an agency name includes reference to the "United States," it is acceptable to abbreviate it to "U.S."  However, when the "United States" is named as a party in the case, do not abbreviate "United States."  For example:

| | | |
|---|---|---|
| *DHS v. Smith* | ..... | **not** *D.H.S. v. Smith* |
| *U.S. Dep't of Justice v. Smith* | ..... | **not** *United States Department of Justice v. Smith* |
| *United States v. Smith* | ..... | **not** *U.S. v. Smith* |

*Short form of case names.*  After a case has been cited in full, a shortened form of the name may be used thereafter.  For example:

full:  *INS v. Phinpathya*, 464 U.S. 183 (1984)

short:  *Phinpathya*, 464 U.S. at 185

full:  *Matter of Nolasco*, 22 I&N Dec. 632 (BIA 1999)

short:  *Nolasco*, 22 I&N Dec. at 635

*Citations to a specific point.* Citations to a specific point should include the precise page number(s) on which the point appears.  For example:

*Matter of Artigas*, 23 I&N Dec. 99, 100 (BIA 2001)

*Citations to a dissent or concurrence.* If citing to a dissent or concurrence, this should be indicated in a parenthetical notation.  For example:

*Matter of Artigas*, 23 I&N Dec. 99, 109-110 (BIA 2001) (dissent)

**Board decisions:**  *Published decisions.*  Precedent decisions by the Board of Immigration Appeals ("Board") are binding on the Immigration Court, unless modified or overruled by the Attorney General or a federal court.  All precedent Board decisions are available on the Executive Office for Immigration Review website at www.justice.gov/eoir.  Precedent decisions should be cited in the "I&N Dec." form illustrated below.  The citation must identify the adjudicator (BIA, A.G., etc.) and the year of the decision.  Note that there are no spaces in "I&N" and that only

AR.07621

"Dec." has a period.

For example:

> *Matter of Balsillie*, 20 I&N Dec. 486 (BIA 1992)

*Unpublished decisions.* Citation to unpublished decisions is discouraged because these decisions are not binding on the Immigration Court in other cases. When reference to an unpublished case is necessary, a copy of the decision should be provided, and the citation should include the alien's full name, the alien registration number, the adjudicator, and the precise date of the decision. Italics, underlining, and "*Matter of*" should not be used.  For example:

> Jane Smith, A 012 345 678 (BIA July 1, 1999)

*"Interim Decision."*  In the past, the Board issued precedent decisions in slip opinion or "Interim Decision" form.  Because all published cases are now available in final form (as "I&N Decisions"), citations to "Interim Decisions" are no longer appropriate and are disfavored.

*"Matter of,"* not *"In re."* All precedent decisions should be cited as *"Matter of*." The use of *"In re"* is disfavored. For example: *Matter of Yanez*, not *In re Yanez*.

For a detailed description of the Board's publication process, see Board Practice Manual, which is available on the Executive Office for Immigration Review website at www.justice.gov/eoir.

**IJ decisions:**    If referring to an earlier decision in the case by the Immigration Judge, the decision should be cited.  This applies whether the decision was issued orally or in writing.  Citations to decisions of Immigration Judges should state the nature of the proceedings, the page number, and the date. For example:

> IJ Bond Proceedings Decision at 5 (Dec. 12, 2008)

**AG decisions:**    Precedent decisions by the Attorney General are binding on the Immigration Court, and should be cited in accordance with the rules for precedent decisions by the Board of Immigration Appeals. All precedent decisions by the Attorney General are available on the Executive Office for Immigration Review website at www.justice.gov/eoir.

> *Matter of Y-L-*, 23 I&N Dec. 270 (AG 2002)

AR.07622

**DHS decisions:**   Precedent decisions by the Department of Homeland Security and the former Immigration and Naturalization Service should be cited in accordance with the rules for precedent decisions by the Board of Immigration Appeals.

**Federal & state courts:**   *Generally.*   Federal and state court decisions should generally be cited according to the standard legal convention, as set out in the latest edition of *A Uniform System of Citation* (also known as the "Blue Book"). For example:

> *INS v. Phinpathya*, 464 U.S. 183 (1984)

> *Saakian v. INS*, 252 F.3d 21 (1st Cir. 2001)

> *McDaniel v. United States*, 142 F. Supp. 2d 219 (D. Conn. 2001)

*U.S. Supreme Court.*  The Supreme Court Reporter citation ("S.Ct.") should be used only when the case has not yet been published in the United States Reports ("U.S.").

*Unpublished cases.* Citation to unpublished state and federal court cases is discouraged.  When citation to an unpublished decision is necessary, a copy of the decision should be provided, and the citation should include the docket number, court, and precise date. Parties are also encouraged to provide the LexisNexis or Westlaw number.  For example:

> *Bratco v. Mukasey,* No. 04-726367, 2007 WL 4201263 (9th Cir. Nov. 29, 2007) (unpublished)

*Precedent cases not yet published.*  When citing to recent precedent cases that have not yet been published in the Federal Reporter or other print format, parties should provide the docket number, court, and year. Parties are also encouraged to provide the LexisNexis or Westlaw number.  For example:

> *Grullon v. Mukasey*, __ F.3d __, No. 05-4622, 2007 U.S. App. LEXIS 27325 (2d Cir. 2007)

**Briefs & exhibits:**   *Text from briefs.* If referring to text from a brief, the brief should be cited.  The citation should state the filing party's identity, the nature of proceedings, the page number, and the date.  For example:

> Respondent's Bond Appeal Brief at 5 (Dec. 12, 2008)

AR.07623

*Exhibits.*  Exhibits designated during a hearing should be cited as they were designated by the Immigration Judge.  For example:

> Exh. 3

Exhibits accompanying a brief should be cited by alphabetic tab or page number. For example:

> Respondent's Pre-Hearing Brief, Tab A

□ □ □ □ □

AR.07624

# II.  *Regulations*

| | |
|---|---|
| **General guidance:** | *Regulations generally.*  There are two kinds of postings in the Federal Register: those that are simply informative in nature (such as "notices" of public meetings) and those that are regulatory in nature (referred to as "rules"). There are different types of "rules," including "proposed," "interim," and "final." The type of rule will determine whether or not (and for how long) the regulatory language contained in that rule will be in effect.  Generally speaking, proposed rules are not law and do not have any effect on any case, while interim and final rules do have the force of law and, depending on timing, may affect a given case. |
| | *Federal Register and Code of Federal Regulations.*  Regulations appear first in the Federal Register (Fed. Reg.) and then in the Code of Federal Regulations (C.F.R.). Once regulations appear in a volume of the C.F.R., do not cite to the Federal Register *unless* there is a specific reason to do so (discussed below). |
| **C.F.R.:** | For the Code of Federal Regulations, always identify the volume, the section number. The year need not be given after the first citation, unless a subsequent citation refers to a regulation published in a different year. Always use periods in the abbreviation "C.F.R."  For example: |

full:    8 C.F.R. § 1003.1 (2002)

short:   8 C.F.R. § 1003.1

| | |
|---|---|
| **Fed. Reg.:** | Citations to regulatory material in the Federal Register should be used only when: |

- o   the citation is to information that will never appear in the C.F.R., such as a public notice or announcement

- o   the rule contains regulatory language that will be, but is not yet, in the C.F.R.

- o   the citation is to information associated with the rule, but which will not appear in the C.F.R. (e.g., a preamble or introduction to a rule)

- o   the rule contains proposed or past language of a regulation that is pertinent in some way to the filing or argument

The first citation to the Federal Register should always include (i) the volume, (ii) the abbreviated form "Fed. Reg.", (iii) the page number, (iv) the date, and (v) important identifying information such as "proposed rule," "interim rule," "supplementary information," or the citation where the rule will appear. For example:

> full:     67 Fed. Reg. 52627 (Aug. 13, 2002) (proposed rule)
>
> full:     67 Fed. Reg. 38341 (June 4, 2002) (to be codified at 8 C.F.R.
>             §§ 100, 103, 236, 245a, 274a, and 299)
>
> short:   67 Fed. Reg. at 52627-28; 67 Fed. Reg. at 38343

Since the Federal Register does not use commas in its page numbers, do not use a comma in page numbers. Use abbreviations for the month.

When citing the preamble to a rule, identify it exactly as it is titled in the Federal Register, e.g., 67 Fed. Reg. 54878 (Aug. 26, 2002) (supplementary information).

□ □ □ □ □

AR.07626

# III.  *Statutes / Laws*

**General guidance:**  *Full citations.*  Whenever citing a statute for the first time, be certain to include all the pertinent information, including the name of the statute, its public law number, statutory cite, and a parenthetical identifying where the statute was codified (if applicable).  The only exception is the Immigration and Nationality Act, which is illustrated below.

*Short citations.*  The use of short citations is encouraged, but only after the full citation has been used.

*Special rule for U.S.C. and C.F.R.* There are two abbreviations that never need to be spelled out: "U.S.C." for the U.S. Code and the "C.F.R." for the Code of Federal Regulations.  Always use periods with these abbreviations.

*Special rule for the INA.*  Given the regularity with which the Immigration and Nationality Act is cited before the Immigration Court, there is generally no need to provide the Public Law Number, the Stat. citation, or U.S.C. citation. The Immigration Court will presume INA citations refer to the current language of the Act unless the year is provided.

*State statutes.*  State statutes should be cited as provided in *A Uniform System of Citation* (also known as the "Blue Book").

*Sections of law.*  Full citations are often lengthy, and filing parties are sometimes uncertain where to put the section number in the citation. For the sake of simplicity, use the word "section" and give the section number in front of the full citation to the statute.  Once a full citation has been given, use the short citation form with a section symbol "§." This practice applies whether the citation is used in a sentence or after it. For example:

> The definition of the term "alien" in section 101(a)(3) of the Immigration and Nationality Act applies to persons who are not citizens or nationals of the United States. The term "national of the United States" is expressly defined in INA § 101(a)(22), but the term "citizen" is more complex. *See* INA §§ 301-309, 316, 320.

AR.07627

**USC:**            Citations to the United States Code, always identify the volume, the section number, and the year.  The year need not be given after the first citation, unless a subsequent citation refers to a section published in a different year.  Always use periods in the abbreviation "U.S.C."  For example:

full:     18 U.S.C. § 16 (2006)

short:    18 U.S.C. § 16


**INA:**            full:     section xxx of Immigration and Nationality Act

short:    INA § xxx


**USA PATRIOT:**    full:     section xxx of Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. No. 107-56, 115 Stat. 272

short:     USA PATRIOT Act § xxx


**LIFE:**           full:     section xxx of Legal Immigration and Family Equity Act, Pub. L. No. 106-553, 114 Stat. 2762 (2000), *amended by* Pub. L. No. 106-554, 114 Stat. 2763 (2000)

short:    LIFE Act § xxx


**CCA:**            full:     section xxx of Child Citizenship Act of 2000, Pub. L. No. 106-395, 114 Stat. 1631

short:    CCA § xxx


**NACARA:**         full:   section xxx of Nicaraguan Adjustment and Central American Relief Act, Pub. L. No. 105-100, tit. II, 111 Stat. 2193 (1997), *amended by* Pub. L. No. 105-139, 111 Stat. 2644 (1997)

short:    NACARA § xxx

AR.07628

**IIRIRA:**        full:   section xxx of Illegal Immigration Reform and Immigrant Responsibility Act
                           of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546

                   short:  IIRIRA § xxx


**AEDPA:**         full:   section xxx of Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-
                           132, 110 Stat. 1214

                   short:  AEDPA § xxx


**INTCA:**         full:   section xxx of Immigration and Nationality Technical Corrections Act of 1994,
                           Pub. L. No. 103-416, 108 Stat. 4305, *amended by* Pub. L. No. 105-38, 11 Stat.
                           1115 (1997)

                   short:  INTCA § xxx


**MTINA:**         full:   section   xxx   of   Miscellaneous   and   Technical   Immigration   and
                           Naturalization Amendments of 1991, Pub. L. No. 102-232, 105 Stat. 1733

                   short:  MTINA § xxx


**IMMACT90:**      full:   section xxx of Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978

                   short:  IMMACT90 § xxx


**ADAA:**          full:   section xxx of Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, 102 Stat.
                           4181

                   short:  ADAA § xxx


**IMFA:**          full:   section xxx of Immigration Marriage Fraud Amendments of 1986, Pub. L.
                           No. 99-639, 100 Stat. 3537

                   short:  IMFA § xxx

AR.07629

**IRCA:**          full:     section xxx of Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359

                   short:    IRCA § xxx


**IRFA:**          full:     section xxx of International Religious Freedom Act of 1988, Pub. L. No. 105-292, 112 Stat. 2787

                   short:    IRFA § xxx

□ □ □ □ □

AR.07630

# IV.  *Legislative History*

**General guidance:**   *Difficult to locate.* Because sources of legislative history are often difficult to locate, err on the side of providing more information, rather than less. If a source is difficult to locate, include a copy of the source with your filing (or an Internet address for it) and make clear reference to that source in your filing.

*Sources.* To locate legislative history, try the Library of Congress website (www.thomas.loc.gov) or commercial services.   Citation to common electronic sources is encouraged.

**Bills:**   Provide the following information the first time a bill is cited:  (i) the bill number, (ii) the number of the Congress, (iii) the session of that Congress, (iv) the section number of the bill, if you are referring to a specific section, (v) the Congressional Record volume, (vi) the Congressional Record page or pages, (vii) the date of that Congressional Record, and (viii) the edition of the Congressional Record, if known. For example:

full:   S. 2104, 100th Cong., 2d Sess. § 102, 134 Cong. Rec. 2216 (daily ed. Mar. 15, 1988)

short:   134 Cong. Rec. at 2218

**Reports:**   Provide the following information the first time a report is cited: (i) whether it is a Senate or House report, (ii) the report number, (iii) the year, and (iv) where it is reprinted (a reference to where the document is available electronically is acceptable). The short form may refer either to the page numbers of the report or the page numbers where the report is reprinted.  For example*:*

full:   H.R. Conf. Rep. No. 104-828 (1996), *available in* 1996 WL 563320

short:   H.R. Conf. Rep. No. 104-828, at 5

full:   S. Rep. No. 98-225 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182

short:   1984 U.S.C.C.A.N. at 3183

Many committee reports are available on-line through the Library of Congress web site (www.thomas.loc.gov) or commercial services. Copies of the U.S. Code Congressional & Administrative News (U.S.C.C.A.N.), which compiles many legislative documents, are available in some public libraries.

AR.07631

**Hearings:**     Provide the following information the first time a hearing is cited: (i) name of the hearing, (ii) the committee or subcommittee that held it, (iii) the number of the Congress, (iv) the session of that Congress, (v) the page or pages of the hearing, (vi) the date or year of the hearing, and (vii) information about what is being cited (such as the identity of the person testifying and context for the testimony).  For example:

> Operations of the Executive Office for Immigration Review (EOIR): Hearing before the Subcomm. on Immigration and Claims of the House Comm. on the Judiciary, 107th Cong., 2d Sess. 19 (2002) (testimony of EOIR Director)

□ □ □ □ □

AR.07632

# V. *Treaties and International Materials*

**CAT:**                              full:        Article 3 of the United Nations Convention Against Torture and
                                               Other Cruel, Inhuman or Degrading Treatment or Punishment,
                                               Dec. 10, 1984, S. Treaty Doc. No. 100-20 (1988)

                                      short:       Convention Against Torture, art. 3

**UNHCR Handbook:**                   full:        Office of the United Nations High Commissioner for Refugees,
                                               *Handbook on Procedures and Criteria for Determining Refugee Status
                                               Under the 1951 Convention and the 1967 Protocol Relating to the Status
                                               of Refugees* (Geneva 1992)

                                      short:       UNHCR Handbook ¶ xxx
                                               [use paragraph symbol "¶" or abbreviation "para."]

**U.N. Protocol
on Refugees:**                        full:        Article xxx of the United Natio n s Protocol Relating to the Status
                                               of Refugees, Jan. 31, 1967, [1968] 19 U.S.T. 6223

                                      short:       U.N. Refugee Protocol, art. xxx

<div align="center">□ □ □ □ □</div>

AR.07633

# VI.  *Publications and Communications by Governmental Agencies*

**General guidance:**   *No universal citation form.*  In immigration proceedings, parties cite to a wide variety of administrative agency publications and communications, and there is no one format that fits all such documents. For that reason, use common sense when citing agency documents, and err on the side of more information, rather than less.

*Difficult to locate material.*  If the document may be difficult for the Immigration Court to locate, include a copy of the document with your filing.

*Internet material.*  If a document is posted on the Internet, identify the website where the document can be found or include a copy of the document with a legible Internet address.

**Practice Manual:**   The Immigration Court Practice Manual is not legal authority.  However, if there is reason to cite it, the preferred form is to identify the specific provision by chapter and section along with the date at the bottom of the page on which the cited section appears.  For example:

full:     Immigration Court Practice Manual, Chapter 8.5(a)(iii) (January xx, xxxx)

short:   Practice Manual, Chap. 8.5(a)(iii)

**Forms:**   Forms should first be cited according to their full name and number.  A short citation form may be used thereafter.  See Appendix E (Forms) for a list of common immigration forms.  For example:

full:     Notice of Appeal from a Decision of an Immigration Judge (Form EOIR-26)

short:   Notice of Appeal *or* Form EOIR-26

If a form does not have a name, use the form number as the citation.

**Country reports:**   State Department country reports appear both as compilations in Congressional committee prints and as separate reports and profiles. Citations to country reports should always contain the publication date and the specific page numbers (if available). Provide an Internet address when available. The first citation to any country report should contain all identifying

information, and a short citation form may be used thereafter. For example:

full:    Bureau of Democracy, Human Rights and Labor, U.S. Dep't of State, *Nigeria Country Reports on Human Rights Practices – 2001* (Mar. 2002), *available at* http://www.state.gov/g/drl/rls/hrrpt/2001/af/8397.htm

short:    *2001 Nigeria Country Reports*

full:    Committees on Foreign Relations and International Relations, 104th Cong., 1st Sess., *Country Reports on Human Rights Practices for 1994* xxx (Joint Comm Print 1995)

short:    *1994 Country Reports* at page xxx

full:    Bureau of Democracy, Human Rights and Labor, U.S. Dep't of State, *The Philippines – Profile of Asylum Claims and Country Conditions* xxx (June 1995)

short:    *1995 Philippines Profile* at page xxx

**Visa Bulletin:**    Citations to the State Department's Visa Bulletin should include the volume, number, month, and year of the specific issue being cited.  For example:

full:    U.S. Dep't of State Visa Bulletin, Vol. VIII, No. 55 (March 2003)

short:    Visa Bulletin (March 2003)

**Internal documents:**    A citation to an internal government document, such as a memo or cable, should contain as much identifying information as possible.  Be sure to include any identifying heading (e.g., the "re" line in a memo) and the precise date of the document being cited.  Include a copy of the document with the filing or indicate where it has been reprinted publicly. For example:

Dep't of State cable (no. 97-State-174342) (Sept. 17, 1997) (copy attached)

Office of the General Counsel, INS, U.S. Dep't of Justice, Compliance with Article 3 of the Convention Against Torture in cases of removable aliens (May 14, 1997), reprinted in 75 *Interpreter Releases* 375 (Mar. 16, 1998)

AR.07635

**Religious Freedom**    The International Religious Freedom Act of 1998 (IRFA) mandates that the
**Reports:**    Department of State issue an Annual Report on International Religious Freedom
(State Department Report).  IRFA further authorizes Immigration Judges to use
the State Department Report as a resource   in asylum adjudications.  The State
Department Report should be cited as follows:

    full:    Bureau of  Democracy, Human Rights, and  Labor, U.S. Dep't of
State, *Annual Report on International Religious Freedom* (Sept. 2007)

    short:    2007 *Religious Freedom Report* at page xxx

IRFA also mandates the issuance of an Annual Report by the United States
Commission on International Religious Freedom (USCIRF Report). The USCIRF
is a government body that is independent of the executive branch.  Citations to
the USCIRF Report should be distinguishable from citations to the Department
of State report:

    full:    United States Commission on International Religious Freedom,
*Annual Report of the United States Commission on International
Religious Freedom*, xxx (May 2007)

    short:    2007 USCIRF Annual Report at page xxx

□ □ □ □ □

AR.07636

# VII. *Commonly Cited Commercial Publications*

**General guidance:**    *No universal citation form.*  In immigration proceedings, parties cite to a wide variety of commercial texts and publications.  Use common sense when citing these documents. If a document is difficult to locate, include a copy of the document with your filing (or an Internet address for it) and make clear reference to that document in your filing.

*No endorsements or disparagements.* The following list contains citations to specific publications that are frequently cited in filings before the Immigration Court. Their inclusion in the list is not an endorsement of the publication, nor is omission from this list a disparagement of any other publication.

*Use of quotation marks, italics or underlining, and first initials.*  For all filings, parties should use a single format for all publications – quotation marks around any article title (whether in a book, law review, or periodical), italics or underlining for the name of any publication (whether a book, treatise, or periodical), and reference to authors' last names only (although use of first initials is appropriate where there are multiple authors with the same last name).

*Shortened names.* Many publications have long titles. It is acceptable to use a shortened form of the title *after* the full title has been used.  Be certain to use a short form that clearly refers back to the full citation. Page and/or section numbers should always be used, whether the publication is cited in full or in shortened form.

**Articles in Books:**    Articles in books should identify the author (by last name only), title of the article, and the publication that contains that article (including the editor and year).  For example:

full:    Massimino, "Relief from Deportation Under Article 3 of the United Nations Convention Against Torture," *in* 2 *1997-98 Immigration & Nationality Law Handbook* 467 (American Immigration Lawyers Association, ed., 1997)

short:    Massimino at 469

AR.07637

| | |
|---|---|
| **Bender's:** | Bender's Immigration Bulletin should be cited by author (last name only), article, volume, publication, month, and year.  For example: |

        full:        Sullivan, "When Representations Cross the Line," 1 *Bender's Immigration Bulletin* (Oct. 1996)

        short:     Sullivan at 3

| | |
|---|---|
| **Immigration Briefings:** | This publication should be cited by author (last name only), article, volume, publication, month, and year.  For example: |

        full:        Elliot, "Relief From Deportation: Part I," 88-8 *Immigration Briefings* (Aug. 1988)

        short:     Elliot at 18

| | |
|---|---|
| **Immigration Law and Procedure:** | Citations to treatises require  particular attention because their pagination is often complex.  The first citation to this treatise must be in full and contain the volume number, the section number, the page number, the edition, and year. For example: |

        full:        2 Gordon, Mailman & Yale-Loehr, *Immigration Law and Procedure* § 51.01(1)(a), at 51-3 (rev. ed. 1997)

        short:     2 *Immigration Law and Procedure* § 51.01(1)(a), at 51-3

| | |
|---|---|
| **Interpreter Releases:** | Citations should state the  volume,  t it l e,  page  num ber(s),  and precise date.  Provide a parenthetical explanation for the citation when appropriate. For example: |

        full:        75 *Interpreter Releases* 275-76 (Feb. 23, 1998) (regarding INS guidelines on when to consent to reopening of proceedings)

        short:     75 *Interpreter Releases* at 276

AR.07638

If an article has a title and named author, provide that information.  For example:

full:     Wettstein, "Lawful Domicile for Purposes of INA § 212(c): Can It Begin with Temporary Residence," in 71 *Interpreter Releases* 1273 (Sept. 26, 1994)

short:    Wettstein at 1274


**Law Reviews:**    Law review articles should identify the author (by last name) and the title of the article, followed by the volume, name, page number(s), and year of the publication.  For example:

full:     Hurwitz, "Motions Practice Before the Board of Immigration Appeals," 20 San Diego L. Rev. 79 (1982)

short:    Hurwitz, 20 San Diego L. Rev. at 80


**Sutherland:**    Citations to this treatise should include the volume number, author, name of the publication, section number, page number(s), and edition. For example:

full:     2A  Singer,  *Sutherland Statutory Construction* § 47.11,  at  144 (4th ed. 1984)

short:    2A *Sutherland* § 47.11, at 144

□ □ □ □ □

# APPENDIX K
## Where to File

This Appendix provides guidance on where to file documents in removal proceedings. Parties should still review the pertinent regulations and must be careful to observe the rules regarding filings, especially the time and number limits on motions. See Chapters 3 (Filing with the Immigration Court), 5.2 (Filing a Motion), 5.3 (Motion Limits). In cases in which the Immigration Court has jurisdiction, documents must be filed with the Immigration Court having administrative control over the Record of Proceedings. See Chapter 3.1 (Delivery and Receipt). For information on how to file documents with the Board of Immigration Appeals, parties should consult the Board of Immigration Appeals Practice Manual.



AR.07640

# APPENDIX L
## Sample Written Pleading

Prior to entering a pleading, parties are expected to have reviewed the pertinent regulations, as well as Chapter 4 of the Immigration Court Practice Manual (Hearings before Immigration Judges).

---

**[name and address of attorney or representative]**

**United States Department of Justice
Executive Office for Immigration
Review Immigration Court
[the court's location (city or town) and state]**

_____

In the Matter of:                    )
                                     )
                                     )          File No.: [the respondent's A
number] [the respondent's name]      )
                                     )
In removal proceedings               )
_____  )

**RESPONDENT'S WRITTEN PLEADING**

On behalf of my client, I make the following representations:

1.      The respondent concedes proper service of the Notice to Appear, dated _____.

2.      I have explained to the respondent (through an interpreter, if necessary):

   a.      the rights set forth in 8 C.F.R. § 1240.10(a);
   b.      the consequences of failing to appear in court as set forth in INA § 240(b)(5);
   c.      the limitation on discretionary relief for failure to appear set forth in INA § 240(b)(7);
   d.      the consequences of knowingly filing or making a frivolous application as set forth in INA § 208(d)(6);
   e.      the requirement to notify the court within five days of any change of address or telephone number, using Form EOIR-33/IC pursuant to 8 C.F.R. § 1003.15(d).

AR.07641

3.     The respondent concedes the following allegation(s) _____ , and denies
       the following allegation(s) _____ .

4.     The respondent concedes the following charge(s) of removability _____ ,
       and denies the following charge(s) of removability _____ .

5.     In the event of removal, the respondent;

       ☐     names _____ as the country to which removal should
       be directed;

                              OR

       ☐ declines to designate a country of removal.

6.     The respondent will be applying for the following forms of relief from removal:

       ☐     Termination of Proceedings
       ☐ Asylum
       ☐ Withholding of Removal (Restriction on Removal)
       ☐ Adjustment of Status
       ☐ Cancellation of Removal pursuant to INA § _____
       ☐ Waiver of Inadmissibility pursuant to INA § _____
       ☐ Voluntary Departure
       ☐ Other (specify) _____
       ☐ None

7.     If the relief from removal requires an application, the respondent will file the application
       (other than asylum), no later than fifteen (15) days before the date of the individual calendar
       hearing, unless otherwise directed by the court.  The respondent acknowledges that, if the
       application(s) are not timely filed, the application(s) will be deemed waived and abandoned
       under 8 C.F.R. § 1003.31(c).

       If the respondent is filing a defensive asylum application, the asylum application will be
       filed in open court at the next master calendar hearing.

8.     If background and security investigations are required, the respondent has received the
       DHS biometrics instructions and will timely comply with the instructions.  I have explained
       the instructions to the respondent (through an interpreter, if necessary).  In addition, I have
       explained to the respondent (through an interpreter, if necessary), that, under 8 C.F.R. §
       1003.47(d), failure to provide biometrics or other biographical information within the time
       allowed will constitute abandonment of the application unless the respondent demonstrates
       that such failure was the result of good cause.

AR.07642

9.      The  respondent estimates          hours will be required for the respondent to present the case.
that

10.      ☐    It is requested that the Immigration Court order an interpreter proficient in
the                          language,

dialect;

'                              OR

Date                                              Attorney or Representative for the Respondent

### RESPONDENT'S PLEADING DECLARATION

I, _____, have been advised of my rights in these proceedings by my
attorney or representative.  I understand those rights. I waive a further explanation of those
rights by this court.

I have been advised by my attorney or representative of the consequences of failing to appear for a
hearing.  I have also been advised by my attorney of the consequences of failing to appear for a
scheduled date of departure or deportation.  I understand those consequences.

I have been advised by my attorney or representative of the consequences of knowingly filing a
frivolous asylum application.  I understand those consequences.

I have been advised by my attorney or representative of the consequences of failing to follow the DHS
biometrics instructions  within the time allowed.  I understand those consequences.

I understand that if my mailing address changes I must notify the court within 5 days of such
change by completing an Alien's Change of Address Form (Form EOIR-33/IC) and filing it with
this court.

Finally, my attorney or representative has explained to me what this Written Pleading says.  I understand it, I
agree with it, and I request that the court accept it as my pleading.

Date                                              Respondent

AR.07643

## CERTIFICATE OF INTERPRETATION

I, _____, am competent to translate and interpret from
                (name of interpreter)

_____ into English, and I certify that I have read this entire document to the
        (name of language)

respondent in _____, and that the respondent stated that he or she understood
                    (name of language)

the document before he or she signed the Pleading Declaration above.

_____
(signature of interpreter)

_____
(typed/printed name of interpreter)

### OR

I, _____, certify that _____, a telephonic
(name of attorney or representative)   (name of interpreter)

interpreter who is competent to translate and interpret from _____into English,
read
                                                                    (name of language)

this entire document to the respondent in _____and that the respondent stated
                                                        (name of language)

that he or she understood the document before he or she signed the Pleading Declaration above.

_____
(signature of attorney or representative)

_____
(typed/printed name of attorney or representative)

*Version released on*
March 17, 2020

AR.07644

# APPENDIX M
# Sample Oral Pleading

Prior to entering a pleading, attorneys and representatives are expected to have thoroughly reviewed all pertinent laws, regulations, and cases, as well as the Immigration Court Practice Manual.

\*          \*          \*

I, [*state your name*], on behalf of [*state the name of your client*], do concede proper service of the Notice to Appear dated [*state date of the NTA*], and waive a formal reading thereof.

I represent to the court that I have discussed with my client the nature and purpose of these proceedings, discussed specifically the allegations of facts and the charge(s) of removability, and further advised my client of his or her legal rights in removal proceedings.

I further represent to the court that I have fully explained to my client the consequences of failing to appear for a removal hearing or a scheduled date of departure as well as the consequences under section 208(d)(6) of the Act of knowingly filing or making a frivolous asylum application. My client knowingly and voluntarily waives the oral notice required by section 240(b)(7) of the Act.

As to each of these points, I am satisfied my client understands fully. On behalf of my client, I enter the following plea before this court:

One, [*he or she*] admits allegation(s) #_____to _____.

## – And/Or –

[*he or she*] denies allegation(s) # _____to _____.

Two, [*he or she*] concedes the charge(s) of removability.

## – Or –

[*he or she*] denies the charge(s) of removability.

AR.07645

Three, [*he or she*] seeks the following applications for relief from removal: [*state all applications, including termination of proceedings, if applicable*].

My client acknowledges that, if any applications are not timely filed, the applications will be deemed waived and abandoned under 8 C.F.R. § 1003.31(c). [*He or she*] acknowledges receipt of the DHS biometrics instructions, and understands that, under 8 C.F.R. § 1003.47(d), failure to timely comply with the biometrics instructions will constitute abandonment of the applications.

I request until [*state date to be filed*] to submit such applications to the court with proper service on the Department of Homeland Security.

I represent to the court that my client is prima facie eligible for the relief stated herein.

I request [*time/hours*] to present my client's case in chief.

I request an interpreter proficient in the [*state name of language*] language, [*state name of any applicable dialect*] dialect.

*– Or –*

I represent that my client is proficient in English and will not require the services of an interpreter. If any witnesses require an interpreter, I will notify the court no later than fifteen days prior to the Individual Calendar hearing.

My client designates [*state name of country*] as his/her country of choice for removal if removal becomes necessary.

*– Or –*

My client declines to designate a country of removal.

\*        \*        \*

AR.07646

# APPENDIX N
# Sample Subpoena

Subpoenas are issued to require that witnesses attend a hearing or that documents be produced. Prior to requesting a subpoena, parties are expected to have reviewed the pertinent regulations, as well as Chapter 4 of the Immigration Court Practice Manual (Hearings before Immigration Judges).

---

**United States Department of Justice**
**Executive Office for Immigration Review**
**Immigration Court**
**[the court's location (city or town) and state]**

**SUBPOENA**

In the Matter of :[the respondent's name and A number]  Date: _____

To:      [the name and address of the individual being subpoenaed]

**[If testifying in court]**

Pursuant to 8 C.F.R. § 1003.35(b), you are hereby commanded to appear before Immigration Judge
[name] at [the court's address] on [the date and time of the hearing] to give testimony
in connection with the [removal, deportation, etc.] proceedings being conducted
under the authority of the Immigration and Nationality Act, relating to [the
respondent's name], concerning [the topic(s) of testimony].

**[If testifying by telephone]**

Pursuant to 8 C.F.R. § 1003.35(b), you are hereby commanded to give telephonic
testimony before Immigration Judge [name] on [the date and time of hearing] in
connection with the [removal, deportation, etc.] proceedings being conducted under the
authority of the Immigration and Nationality Act, relating to [the respondent's name],
concerning [the topic(s) of testimony].

**[If necessary]**

You are further commanded to bring with you the following items: [books, papers, documents,
etc.].

_____
[name]
Immigration Judge

Page 1 of 2

---

AR.07647

**RETURN ON SERVICE OF SUBPOENA**

I hereby certify that on the _____ day of _____, 20___, I served the above subpoena on

the witness named above by _____
                                                        (specify type of service)

_____.

_____
(Name)

_____
(Title)

Page 2 of 2

AR.07648

# APPENDIX O
## Sample Criminal History Chart

The following sample criminal history chart is provided for general guidance. A party submitting a criminal history chart should attach all pertinent documentation. Prior to submitting any filings, parties are expected to have reviewed the pertinent regulations, as well as Chapter 3 of the Immigration Court Practice Manual (Filing with the Immigration Court).

### RESPONDENT'S CRIMINAL HISTORY CHART

**Respondent's name: Jane Smith**
**Respondent's A number: A012 345 678**

| Tab A, pp. 1-5 | Rap Sheet | Federal Bureau of Investigation |
|---|---|---|
| Tab B, pp. 6-11 | Rap Sheet | California Department of Justice |

| Tab, Pages | Arrest Date & Court Docket No. | Charges | Disposition | Immigration Consequences |
|---|---|---|---|---|
| C, 12-14 | 01/22/89 CO901583A | HS 11350 Possession of a controlled substance. | Pleaded not guilty. Prosecution diverted. Dismissed | No conviction because diverted without entry of any plea. Diversion neither completed nor terminated because charge dismissed by DA. |
| D, 15-18 | 07/27/91 SCO42665A | PC 496.1 Misd: receipt of stolen property. PC 466 Possession | Pleaded guilty. 90 days in jail. Expunged in 2000. Dismissed. | CIMT. None. |
| E, 19-20 | 10/07/95 CO11475A | PC 490.5 Misd: petty theft. | Pleaded not guilty. Dismissed. | None. |

AR.07649

# APPENDIX P

# Sample Table of Contents

This sample table of contents is provided for general guidance regarding organization and layout.  The documents submitted in Immigration Court proceedings vary depending on the type of proceeding, the form of relief requested, if any, and the circumstances of the particular case. Prior to making any submissions, parties are expected to have reviewed the pertinent regulations, as well as Chapter 3 of the Immigration Court Practice Manual (Filing with the Immigration Court).

**TABLE OF CONTENTS**

**TAB**                                                                                                    **PAGES**

**A**      **Hardship**

Medical letter and file from Dr. Mathews re Jane Smith, Respondent's USC child . . . . . . . . . . 1-2
Allergy evaluation of Jane Smith by Dr. James . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
Letter from Jane Smith's teacher . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
Letter from social worker regarding Jane Smith . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**B**      **Physical Presence**

1996 . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
1997 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
1998 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
1999 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
2000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-12
2002 . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13-14
2003 . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
2006 . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18-20
2007 . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21-22

AR.07650

**TAB**                                                                                              **PAGES**

**C**        **Good Moral Character**

              Letter from Respondent's employer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . 23
              Letter from Respondent's pastor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

**D**        **Biographical Information**

              Respondent's Birth Certificate, and certified translation  . . . . . . .. . . . . . . . . .. . . . . . . . . . . 25-26
              Respondent's identity documents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . 27
              Jane Smith's Birth Certificate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
              Jane Smith's identity documents  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . .  29

**E**        **State and Federal Tax Returns**

              1996 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30-31
              1997 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . 32-34
              1998 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35-37
              1999 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38-40
              2000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41-43
              2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44-45
              2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46-48
              2003 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49-51
              2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52-54
              2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55-57
              2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58-60
              2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61-63

AR.07651

# APPENDIX Q

# Sample Proposed Order

A proposed order is submitted with every motion filed.  Prior to filing a motion, parties are expected to have reviewed the pertinent regulations, as well as Chapter 5 of the Immigration Court Practice Manual (Motions before the Immigration Court).

---

**United States Department of Justice**
**Executive Office for Immigration Review**
**Immigration Court**
**[the court's location (city or town) and state]**

In the Matter of: [the respondent's name]                    A Number: [the respondent's A number]

### ORDER OF THE IMMIGRATION JUDGE

Upon consideration of ["the respondent's" or "DHS's"] [title of motion], it is HEREBY ORDERED that the motion be ☐ **GRANTED** ☐ **DENIED** because:

☐  DHS does not oppose the motion.
☐  The respondent does not oppose the motion.
☐  A response to the motion has not been filed with the court.
☐  Good cause has been established for the motion.
☐  The court agrees with the reasons stated in the opposition to the motion.
☐  The motion is untimely per _____.
☐  Other:

Deadlines:

☐  The application(s) for relief must be filed by _____
☐  The respondent must comply with DHS biometrics instructions by            ..

_____                    _____
Date                                                               [name]
                                                                       Immigration Judge

---

Certificate of Service
This document was served by:     [  ]     Mail  [ ] Personal Service
To: [ ]   Alien   [ ]   Alien c/o Custodial Officer [ ]   Alien's Atty/Rep  [ ]   DHS
Date: _____

By: Court Staff_____

AR.07652

# APPENDIX R

# Standing Orders

The following immigration courts have implemented standing orders pursuant to the EOIR Director's Policy Memorandum 20-09, *The Immigration Court Practice Manual and Orders* (Feb. 13, 2020):

1) Baltimore: Immigration Judge Elizabeth Kessler

**Standing Order (March 16, 2020): Telephonic Appearances and Requests to Continue due to COVID-19 Concerns in Cases before Immigration Judge Elizabeth A. Kessler, Baltimore Immigration Court**

Effective immediately and for as long as the State of Maryland continues to operate under a State of Emergency, any attorney for any party may appear telephonically in cases before Judge Kessler without prior approval and without filing a motion in advance. Attorneys who would like to appear telephonically for a particular case should inform Judge Kessler's legal assistant, Alethea Mable, in advance of the hearing by e-mail at alethea.mable@usdoj.gov, and should provide the best phone number at which to be reached. Also during this time period, requests to continue cases due to COVID-19 concerns should be filed with as much notice as possible, but may on an emergency basis be made to the court by e-mail, again by e-mailing Judge Kessler's legal assistant, while copying opposing counsel.

Elizabeth A. Kessler
Immigration Judge

AR.07653

2) York: All immigration judges

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
YORK, PENNSYLVANIA

STANDING ORDER OF THE YORK IMMIGRATION COURT
RELATING TO TELEPHONIC APPEARANCES AT MASTER CALENDAR HEARINGS

**IT IS HEREBY ORDERED** that, for the thirty (30) day period following the signing of this order, parties scheduled to appear for a master calendar hearing before the York Immigration Court may appear telephonically, without the need to file a motion for telephonic appearance. This permission is subject to the following caveats:

1) Any individual who wishes to appear telephonically does so with the understanding that any paper or electronic filings to be considered by the Court must be in the official record of proceeding at the time the hearing is scheduled to be held. No additional filings will be accepted at the hearing if counsel does not appear in person, and the decision of the Court will be based on the documents in the record at the close of the hearing.

2) Any party appearing telephonically waives the right to object to admissibility of any document offered in Court on the sole basis that they are unable to examine the document.

3) If the Court is unable to reach counsel by telephone for the hearing, counsel will thereafter be required to appear in-person at any rescheduled hearing.

3-17-2020
Date

Jack H. Weil
Jack H. Weil
Assistant Chief Immigration Judge
York, Pennsylvania

AR.07654

# GLOSSARY

*The following are brief explanations of some words and abbreviations commonly used in Immigration Court proceedings.*

**Accredited Representative**

A person who is approved by the Director of the Office of Legal Access Programs to represent aliens before the Immigration Courts, the Board of Immigration Appeals, and the Department of Homeland Security, or the Department of Homeland Security only.  He or she must work for, or be a volunteer of, a recognized organization.

**AEDPA**

An abbreviation for the Antiterrorism and Effective Death Penalty Act.

**Affidavit**

A document in which a person states facts, swearing that the facts are true and accurate.  The person should sign the affidavit under oath and the signature should be witnessed by an official, such as a notary public.

**"A Number"**

The alien registration number, which the Department of Homeland Security assigns to each alien.  It is an "A" followed by eight numbers.  For example: A12 345 678.  Some recently-issued A numbers consist of an "A" followed by nine digits.  For example: A 200 345 678. Cases before the Immigration Courts and the Board of Immigration Appeals are tracked by A number.

**Administrative Closing**

An order by an Immigration Judge removing a case from the Immigration Court's calendar. Once a case has been administratively closed, the court will not take any action on the case until a request to recalendar is filed by one of the parties.

**Affirmative Asylum Application**

An asylum application filed with the Department of Homeland Security Asylum Office by an alien not in removal proceedings.  If the Department of Homeland Security Asylum Office declines to grant an affirmative asylum application, removal proceedings may be initiated. In that case, the asylum application is referred to an Immigration Court for a hearing.

AR.07655

**Alien**

 A person who is not a citizen or national of the United States.

**Applicant**

 A person in exclusion proceedings.

**Assistant Chief Counsel**

 The attorney representing the Department of Homeland Security in Immigration Court proceedings.  Though the "Assistant Chief Counsel" is the attorney's official title, he or she is sometimes referred to as the "DHS attorney," the "government attorney," or the "trial attorney."

**Asylum Clock**

 The number of days elapsed since the filing of an asylum application, not including any delays in the proceeding caused by the alien.  Certain asylum applicants are eligible to receive employment authorization from the Department of Homeland Security after the asylum clock reaches 180 days.

**Asylum-Only Proceedings**

 Immigration Court proceedings in which an alien is limited to applying for asylum, withholding of removal ("restriction on removal") under the INA and protection under  CAT.  Asylum-only proceedings involve aliens who are not entitled to be placed in removal proceedings.

**Attorney of Record**

 An attorney who has properly entered an appearance with the Immigration Court in a particular case and is held responsible as an attorney for the respondent.

**Beneficiary**

 An alien who is sponsored by a relative or a business, or otherwise benefits from a visa petition.

**BIA**

 An abbreviation for the Board of Immigration Appeals.

**Biometrics Instructions**

 The term often used to refer to the Department of Homeland Security "*Instructions for Submitting Certain Applications in Immigration Court and for Providing*

AR.07656

*Biometric and Biographic Information to U.S. Citizenship and Immigration Services*." The biometrics instructions inform aliens how to comply with the background and security investigation requirements for certain forms of relief from removal, such as asylum, adjustment of status, and cancellation of removal. The biometrics instructions also inform aliens how to pay the fees for those applications.

**Board**
An abbreviation for the Board of Immigration Appeals.

**Board of Immigration Appeals**
The part of the Executive Office for Immigration Review that is authorized to review most decisions of Immigration Judges and some types of decisions of Department of Homeland Security officers.

**Bond**
The amount of money set by the Department of Homeland Security or an Immigration Judge as a condition to release a person from detention for an Immigration Court hearing at a later date.

**Bond Proceedings**
An Immigration Court hearing on a request to redetermine a bond set by the Department of Homeland Security. Bond proceedings are separate from other Immigration Court proceedings.

**CA**
An abbreviation for Court Administrator.

**CAT**
An abbreviation for the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment.

**CBP**
An abbreviation for U.S. Customs and Border Protection, a part of the Department of Homeland Security.

**Certificate of Translation**
A formal statement in which a translator shows that he or she has accurately translated a foreign-language document into English.

**C.F.R.**

An abbreviation for the Code of Federal Regulations.

**Charging Document**

The document that orders an alien to appear before an Immigration Judge. Immigration Court proceedings begin when the Department of Homeland Security mails or delivers the charging document to the alien and files it with the Immigration Court. In general, the charging document states why the Department of Homeland Security believes the alien should be deported from the United States. The charging document in removal proceedings is called the Notice to Appear (Form I-862).

**Claimed Status Review**

Immigration Court proceedings involving aliens subject to expedited removal under INA § 235(b)(1) who claim to be United States citizens or lawful permanent residents, or to have been granted refugee or asylee status.

**Code of Federal Regulations**

The official interpretations of laws passed by Congress. These interpretations are known as "regulations." Regulations are first published in a government publication called the *Federal Register*. After publication in the *Federal Register*, regulations can be found in the Code of Federal Regulations. Most immigration regulations are in Title 8, Aliens and Nationality.

**Convention Against Torture**

An abbreviation for the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment.

**Credible Fear Proceedings**

Immigration Court proceedings in which an Immigration Judge reviews a finding by a Department of Homeland Security asylum officer that a stowaway or an alien subject to expedited removal under INA § 235(b)(1) does not have a credible fear of persecution or torture.

**DAR**

An abbreviation for digital audio recording.

**Declaration under Penalty of Perjury**

A statement by a person, in which the person states that the information is true, to support his or her request or application. For example, a declaration may list the facts and then state: "I declare under penalty of perjury (under the laws of the United States of America) that the foregoing is true and correct." This statement should be followed by the date, signature, and printed name of the person signing.

**Defensive Asylum Application**

An asylum application filed with an Immigration Judge by an alien already in removal proceedings.

**Deportation Proceedings**

An Immigration Court proceeding begun before April 1, 1997, against a person believed to be in the United States without legal status, to determine whether the person should be deported from the United States.

**DHS**

An abbreviation for the Department of Homeland Security.

**DHS Attorney**

A term sometimes used to refer to an Assistant Chief Counsel in Immigration Court.

**DOJ**

An abbreviation for the United States Department of Justice.

**EOIR**

An abbreviation for the Executive Office for Immigration Review.

**eRegistry**

An online registry of attorneys and fully accredited representatives. In order to practice before the Immigration Court or the Board, all attorneys and fully accredited representatives must register with EOIR's eRegistry. Registrants receive an EOIR UserID number.

**Ex Parte Communication**

Any communication about a case between a party and an Immigration Judge which does not include the other party. Ex parte communications are generally prohibited. A party cannot speak about a case with the Immigration Judge when the other party is not present. In addition, all written communications about a case must be served on the opposing party.

AR.07659

**Exclusion Proceedings**

An Immigration Court proceeding begun before April 1, 1997, to determine whether a person should be allowed to legally enter the United States.

**Executive Office for Immigration Review**

The part of the United States Department of Justice that is responsible for the Immigration Courts and the Board of Immigration Appeals.

**FOIA**

An abbreviation for the Freedom of Information Act.

**ICE**

An abbreviation for the U.S. Immigration and Customs Enforcement, a part of the Department of Homeland Security.

**Immigration Court**

Any of the more than 60 courts nationwide administered by the Executive Office for Immigration Review.  In general, proceedings in Immigration Court involve aliens charged as present in the United States in violation of the immigration laws.

**Immigration Court Proceedings**

In general, proceedings in Immigration Court involve aliens charged as present in the United States in violation of the immigration laws.  Several types of proceedings are held in Immigration Court, including removal proceedings (begun on or after April 1, 1997), deportation proceedings (begun prior to April 1, 1997), exclusion proceedings (begun prior to April 1, 1997), bond proceedings, rescission proceedings, credible fear proceedings, reasonable fear proceedings, claimed status review, asylum-only proceedings, and withholding-only proceedings.

**Immigration Judge**

The official who presides over proceedings in Immigration Court.  In general, Immigration Judges determine removability and adjudicate applications for relief from removal.

**INA**

An abbreviation for the Immigration and Nationality Act.

AR.07660

**INS**

An abbreviation for the Immigration and Naturalization Service. INS has been abolished and its functions have been transferred to the Department of Homeland Security.

**In Absentia Hearing**

A hearing conducted without the alien's presence after the alien failed to appear as required.

**Individual Calendar Hearing**

Hearings scheduled by the Immigration Court for testimony and evidence. These hearings are also known as "merits hearings."

**IJ**

An abbreviation for Immigration Judge.

**IRCA**

An abbreviation for the Immigration Reform and Control Act of 1986.

**IIRIRA**

An abbreviation for the Illegal Immigration Reform and Immigrant Responsibility Act of 1996.

**LIFE**

An abbreviation for Legal Immigration and Family Equity Act.

**Lodged Asylum Application**

A defensive asylum application that is submitted at the Immigration Court filing window outside of a hearing for the purpose of employment authorization. The lodged date is not the filing date and a lodged asylum application is not considered filed. A respondent who lodges an asylum application must still file an asylum application before an Immigration Judge at a master calendar hearing.

**LPR**

An abbreviation for lawful permanent resident.

**Master Calendar Hearing**

AR.07661

Hearings held for pleadings, scheduling, and other similar matters.  A respondent's first appearance before an Immigration Judge in removal proceedings is at a master calendar hearing.

**Merits Hearing**

A term sometimes used to refer to an individual calendar hearing.

**NACARA**

An abbreviation for the Nicaraguan Adjustment and Central American Relief Act.

**Notice Attorney**

A term sometimes used in Immigration Court to refer to the primary attorney.

**Notice to Appear**

The charging document (Form I-862) used by the Department of Homeland Security to begin removal proceedings.

**NTA**

An abbreviation for Notice to Appear.

**OCIJ**

An abbreviation for the Office of the Chief Immigration Judge.

**Office of the Chief Immigration Judge**

The part of the Executive Office for Immigration Review that oversees the Immigration Courts.

**OIL**

The abbreviation for the Office of Immigration Litigation, a part of the United States Department of Justice.

**Order to Show Cause**

The charging document (Form I-221) used by the Department of Homeland Security before April 1, 1997, to begin deportation proceedings.

**OSC**

An abbreviation for Order to Show Cause.

**Party**

The term used to refer to the alien or the Department of Homeland Security in Immigration Court.

AR.07662

**Petitioner**

A person who files a visa petition.

**Practitioner**

A person who is authorized to represent aliens before the Immigration Courts and the Board of Immigration Appeals.

**Pre-Decision Motion**

A motion filed before the conclusion of Immigration Court proceedings.

**Primary Attorney**

An attorney who has properly entered an appearance with the Immigration Court and is designated to receive mailings from the court, including notices of hearings. If more than one attorney represents an alien in a proceeding, one of the attorneys must be designated as the primary attorney for that proceeding. Only the primary attorney, also known as the "notice attorney," will receive mailings from the Immigration Court related to that proceeding.

**Pro Se**

A term used to refer to an alien who does not have an attorney or representative in Immigration Court.

**Proof of Service**

A formal statement in which a party shows that he or she has provided a copy of a document to the other party.

**REAL ID**

An abbreviation for the REAL ID Act of 2005.

**Reasonable Fear Proceedings**

Immigration Court proceedings in which an Immigration Judge reviews a finding by a Department of Homeland Security asylum officer that an alien subject to expedited removal under INA §§ 238(b) or 241(a)(5) does not have a reasonable fear of persecution or torture.

**Recognized Organization**

AR.07663

A non-profit, federal tax-exempt, religious, charitable, social service, or similar organization established in the United States that is recognized by the Director of the Office of Legal Access Programs to provide representation through accredited representatives who appear on behalf of clients before the Immigration Courts, the Board of Immigration Appeals, and the Department of Homeland Security, or the Department of Homeland Security alone.

**Record of Proceedings**

The official file containing documents relating to an alien's case.

**Removal Proceedings**

An Immigration Court proceeding begun on or after April 1, 1997, to determine whether a person can be admitted to the United States or removed from the United States.

**Reputable Individual**

An individual who possesses good moral character and meets certain other requirements.  In appropriate circumstances, an Immigration Judge may allow a reputable individual to represent an alien in Immigration Court proceedings.

**Respondent**

A person in removal or deportation proceedings.

**ROP**

An abbreviation for Record of Proceedings.

**Serve**

To give, deliver, or mail a document to the opposing party.  For an alien, the opposing party is the Department of Homeland Security.

**Stay**

An order by an Immigration Judge, or a rule of law, that stops the Department of Homeland Security from removing an alien.

**Transcript**

A printed copy of the recording of a hearing before an Immigration Judge.

**Trial Attorney**

AR.07664

A term sometimes used to refer to an Assistant Chief Counsel.

**USCIS**

An abbreviation for U.S. Citizenship and Immigration Services, a part of the Department of Homeland Security.

**Visa Petition**

A form asking the Department of Homeland Security to determine if an alien is qualified to become a lawful permanent resident. Filing the visa petition is the first step in obtaining lawful permanent resident status (a "green card").

**Withholding-Only Proceedings**

Immigration Court proceedings in which an alien is limited to applying for withholding of removal "restriction on removal") under the INA and protection under CAT. Withholding-only proceedings involve certain aliens who are not entitled to be placed in removal proceedings.

AR.07665

# WORD INDEX

A separate Citation Index – containing cases, statutes and regulations – follows this Index.

A numbers ..................... 12, 13, 38, 41, Glossary
accredited officials..........see foreign government officials
accredited representatives
    accreditation ...............................................20
    application process ......................................20
    attorneys, same rules as..............................20
    definition ......................................... Glossary
    discipline ................................... see discipline
    entry of appearance..see entry of appearance
    filing................................................ see filing
    full accreditation..........................................20
    immigration specialists, compared to ..........20
    list of............................................................20
    OP, accredited by .......................................20
    partial accreditation.....................................20
    registry requirement....................................20
    removal from list of .....................................20
    signatures ............................... see signatures
    verification...................................................20
ACIJs.... see Assistant Chief Immigration Judges
address obligations
    aliens..... 20, 59, 63, 72, 95, 98, 100, 102, 104
    aliens, detained....................................20, 127
    attorneys ....................................................20
    compound changes of address ...................20
    consolidated cases .....................................20
    Form EOIR-33/IC ................................20, 157
    motions generally.........................................20
    motions to reconsider .................................98
    motions to reopen .......................................95
    motions to reopen in absentia orders ........100
    representatives ...........................................20
addresses............ see EOIR, Immigration Courts
adjudicating officials ...................... see discipline
administrative closure .................... see motions
Administrative Control Courts ....see Immigration Courts

Administrative Law Judges ............ see discipline
adverse legal authority, failure to disclose..... see discipline
advisory opinions ..............................................40
AEDPA .................................................Glossary
affidavits
    definition ............................................Glossary
    English language, in ...................................32
    penalty of perjury, under.............................92
    translation of ..............................................32
affirmative asylum applications..........see asylum
agreement in lieu of discipline ....... see discipline
alien .....................................................Glossary
appeals
    asylum-only proceedings....... see asylum-only
    BIA jurisdiction ..........................2, 9, 105, 106
    bond proceedings ........ see bond proceedings
    certification, distinct from.....................73, 106
    continued detention ...see continued detention
    deadlines .............................................25, 105
    deportation......... see deportation proceedings
    disciplinary proceedings ........... see discipline
    exclusion.............. see exclusion proceedings
    forms, use of required ...............................155
    how to appeal ...........................................105
    motions, relationship to ............... see motions
    Notice of Appeal .......................................105
    rescission............. see rescission proceedings
    right to appeal .............................................73
    stays .................................................see stays
    waiver of appeal ..................................73, 106
    who may appeal .......................................105
    withholding-only ............. see withholding-only
recognized organizations ..................................20
Assistant Chief Immigration Judges (ACIJs) . 4, 5
asylum
    affirmative applications................24, Glossary
    asylum clock ................................64, Glossary

asylum-only proceedings .......see asylum-only
  benefits and responsibilities ........................73
  changed circumstances ...............................96
  deadlines ....................................................24
  defensive applications .......... 24, 36, Glossary
  employment authorization............................64
  frivolous applications ...................................63
  lodged applications .....................................64
  number of copies .........................................36
  withholding-only ............. see withholding-only
asylum clock.......................................see asylum
Asylum Office ....... see Department of Homeland
  Security
asylum-only proceedings
  appeals ....................................................119
  conduct of proceedings.............................119
  cooperating witnesses .......................111, 118
  crewmembers ....................................111, 118
  D visa applicants................................111, 118
  detention ............................................111, 130
  generally ......................... 111, 118, Glossary
  S visa applicants.................................111, 118
  scope .......................................................119
  security grounds, removable under ....111, 119
  stowaways ..........................................112, 118
  visa waiver applicants........................111, 118
  visa waiver overstays.........................111, 118
attendance at hearings see removal proceedings
attire .............................. see Immigration Courts
Attorney General ...........................................9
attorneys (see also representation, discipline)
  absence at hearing ....................................51
  administrative suspension ...........................20
  adverse legal authority, failure to disclose .see
    discipline
  attire .......................... see Immigration Courts
  attorney of record.............................. Glossary
  automatic stays ................................ see stays
  bar information.............................................20
  change of address .....see address obligations
  discipline ................................ see discipline
  entry of appearance..see entry of appearance
  EOIR ID number .........................................20
  free legal services..............see representation
  law firms................................................21, 33
  multiple representatives.....see representation
  notice attorney .................see representation
  primary attorney.................see representation
  pro bono............. see pro bono representation
  qualifications ..............................................20

references to................................................49
registration requirement ..............................20
release of counsel ............. see representation
representation, scope of.... see representation
substitution of counsel....... see representation
telephonic appearances . see master calendar
waivers of appearances ............... see waivers
withdrawal of counsel ........ see representation
Automated Case Information Hotline... 13, App. I
background and security investigations see DHS
beneficiary..............................................Glossary
biometrics instructions .......................... see DHS
Board of Immigration Appeals (BIA)
  appeals to .................................... see appeals
  disciplinary authority.................. see discipline
  generally ...............................................Glossary
  Immigration Courts, relationship to...........2, 9
  jurisdiction...............................................2, 9
  Practice Manual.......2, 53, 105, 106, 134, 146
boilerplate submissions, repeatedly filing ...... see
  discipline
bond proceedings
  appeals .................................................... 133
  decision ................................................... 133
  definition of bond ...............................Glossary
  evidence .................................................. 132
  hearings..............................................130–33
  jurisdiction........................................129, 130
  mootness ................................................. 130
  recorded, generally not.............................. 132
  removal proceedings, compared to .......... 132
  representation........................................... 132
  testimony ................................................. 133
  witnesses................................................. 133
bribery ........................................... see discipline
briefs ................................see pre-hearing briefs
CAT .......................................................Glossary
CBP.......................................................Glossary
cellular telephones ........... see electronic devices
Certificate of Service...........................see service
certification ........................................73, 106
certified translations ................... see documents
CFR...............................Glossary, Citation Index
change of venue .............................. see motions
charging document ...............................Glossary
Chief Immigration Judge...................................3
citation.........................................................App. J
claimed status review
  detention...................................................130
  expedited removal .............................110, 116

generally .................................. 116, Glossary
hearing .......................................................117
location.......................................................116
no appeal ...................................................117
representation.............................................117
timing ........................................................116
client's decisions, failure to abide by..............*see* discipline
closing statements ...... *see* removal proceedings
Code of Federal Regulations ............... Glossary
coercion.......................................... *see* discipline
communication with client, failure to maintain*see* discipline
competent representation, failure to provide..*see* discipline
complaints ...................................... *see* discipline
conferences............*see* pre-hearing conferences
conformed copies........................ *see* documents
consolidated cases
address obligations....*see* address obligations
fees .............................................................45
filing...........................................................37
pre-hearing briefs......... *see* pre-hearing briefs
requests .....................................................79
standards ...................................................79
contempt of court ........................... *see* discipline
continuance..................................................101
continued detention review
appeals .............................................135, 136
DHS determination ...................................134
merits hearing ...........................................136
periodic review ..........................................137
reasonable cause hearing ................134, 135
representation.....................................135, 136
Convention Against Torture (CAT)........ Glossary
cooperating witnesses...............*see* asylum-only proceedings
copies........................................ *see* photocopies
country of removal....... *see* removal proceedings
Country Reports .......... *see* Department of State
courier services
delays in delivery ...................................22, 26
encouraged.................................................22
mailbox rule not observed ...........................21
service by........................................ *see* service
Court Administrators ............................4, 14, 53
Court Analysis Unit......................................4
Court Evaluation Team ......................................4
cover page ................................. *see* documents
credible fear proceedings

detention...............................................111, 130
expedited removal ...............................109–12
generally ...........................................111, Glossary
location ...................................................... 113
no appeal ................................................... 114
redetermination by DHS ........................... 114
representation............................................ 113
review by DHS....................................111, 112
review by Immigration Judge.................... 113
stowaways ...........................................112–14
timing ......................................................... 113
crewmembers ....... *see* asylum-only proceedings
criminal history chart....................41, 71, App. O
cross-examination......................... *see* witnesses
D visa applicants... *see* asylum-only proceedings
date stamp ................................... *see* deadlines
deadlines
"day," construction of.............................23, 25
appeals ........................................ *see* appeals
asylum ....................................................... 24
date stamp ................................................. 25
delays in delivery ....................................... 26
detained aliens ......................................23, 24
discipline proceedings, in ......... *see* discipline
effect of discipline on................ *see* discipline
extensions .................................................. 26
filing receipts.............................................. 29
generally ...............................................App. D
Immigration Judges can specify ................ 22
individual calendar hearings....................... 23
master calendar hearings....................23, 58
motions ....................................... *see* motions
receipt, deemed "filed" at ........................... 21
responses ................................................... 23
time, computation of ............................25, 26
untimely filings ........................................... 28
declarations
English language, in .................................... 32
penalty of perjury, under..............92, Glossary
translation of ............................................... 32
defective filings ....................................*see* filing
defensive asylum applications ..........*see* asylum
Department of Homeland Security (DHS)
Administrative Appeals Office (AAO) ........... 3
Assistant Chief Counsel ...................Glossary
asylum clock ..............................*see* asylum
Asylum Office .............................................. 24
background and security investigations 61–64
biometrics instructions.............43, 45, 61–64, Glossary

continued detention .. *see* continued detention
credible fear review............... *see* credible fear
detention of aliens............ *see* detained aliens
DHS forms ....................................... *see* forms
discipline of DHS attorneys........ *see* discipline
employment authorization............. *see* asylum
EOIR, separate from............................2, 9, 49
fees paid to ........................ 42, 43, 44, 92, 93
Forensics Document Laboratory .................39
Immigration and Customs Enforcement (ICE)
    ................................................. 2, 9, Glossary
INS, replaced ..................................................3
motions filed by........................... *see* motions
party in proceedings ...................................48
post-order instructions .................................73
reasonable fear review ....*see* reasonable fear
Department of Justice (DOJ)
    Board of Immigration Appeals ............ *see* BIA
    Executive Office for Immigration Review...*see*
        EOIR
    Office of Immigration Litigation (OIL)..*see* OIL
Department of State (DOS)
    Country Reports..............................................40
    publications as evidence............. *see* evidence
    Report on International Religious Freedom.40
    Visa Bulletin .................................................93
deportation proceedings
    appeals .....................................................108
    charging document ..............................48, 107
    DHS motions to reconsider.........................98
    generally ................................... 107, Glossary
    grounds of deportability ............................107
    hearing notification....................................107
    in absentia hearings.....................................74
    motions to reopen in absentia orders .......100
    Order to Show Cause (OSC)..............48, 107,
        Glossary
    relief available............................................108
    removal proceedings, compared with107, 108
    stays of deportation ......................... *see* stays
Deputy Chief Immigration  Judges.....................4
detained aliens
    address obligations....*see* address obligations
    appearance at hearings.............................127
    background and security investigations.....*see*
        DHS
    bond............................. *see* bond proceedings
    continued detention .. *see* continued detention
    deadlines .................................. *see* deadlines

detained minors............................ *see* minors
hearings...................................................128
limited proceedings ...*see* limited proceedings
location .....................................................127
orientation.................................................128
release......................................................127
transfers....................................................127
venue........................................................127
detention facilities ...........*see* Immigration Courts
DHS ........*see* Department of Homeland Security
digital audio recordings....................................12
disbarment .................................... *see* discipline
disciplinary counsel....................... *see* discipline
discipline
    accredited representatives .................20, 139
    adjudicating officials .............................147–50
    Administrative Law Judges as adjudicating
        officials.................................................147
    adverse legal authority, failure to disclose 142
    agreement in lieu of discipline...................145
    answer ..............................................146, 147
    appeals ..............................................149, 150
    attorneys...................................................139
    authority to discipline...........................21, 139
    boilerplate submissions, repeatedly filing.. 142
    bribery.......................................................141
    client's decisions, failure to abide by ........142
    coercion ....................................................141
    communication with client, failure to maintain
        ..............................................................142
    competent representation, failure to provide
        ..............................................................141
    complaints .........................................143, 144
    contempt of court.......................................141
    deadlines in discipline proceedings...........148
    deadlines, effect of discipline on ..............151
    default order ......................................147, 149
    DHS attorneys...........................................140
    DHS motion to join ....................................146
    disbarment................................141, 144, 145
    disciplinary counsel ...................143–46, 152
    disciplinary proceedings .....................144–50
    disclosure to public...................................150
    duty to advise clients ................................150
    duty to report ............................................144
    evidence ...................................................148
    extension of time to answer, motion for ....146
    false certification.......................................141
    false evidence...........................................141
    false statements ................................141, 142

Form EOIR-28, failure to file.....................142
frivolous behavior.......................................141
grossly excessive fees...............................141
hearings, repeated failure to attend...........141
Immigration Judges as adjudicating officials
..................................................................147
Immigration Judges' authority to file
complaints.................................................139
Immigration Practitioner Complaint Form...143
immigration specialists...............................141
improperly soliciting clients........................141
ineffective assistance of counsel ......141, 144,
151
law graduates ..............................................20
law students.................................................20
list of disciplined practitioners............150, 151
misrepresentations .....................................141
non-practitioners ........................................140
notarios ......................................................140
Notice of Intent to Discipline (NID) ...145, 146,
147, 150
pending cases, effect on............150, 151, 152
Petition for Immediate Suspension............145
practitioners ...............................................139
pre-hearing conferences............................148
prejudicial conduct .....................................141
preliminary investigations ..........................145
reasonable diligence and promptness, failure
to act with.................................................142
recognized organizations............................140
reinstatement to practice ...................151, 152
representation in disciplinary proceedings .148
resignation from bar...................141, 144, 145
sanctions for misconduct ...........................148
self-reporting of misconduct ......................144
serious crimes............................141, 144, 145
set aside default order, motion to ..............147
summary, disciplinary proceedings ..144, 146,
150
supervision of accredited representatives,
failure to provide ......................................142
suspension from bar ..................141, 144, 145
unauthorized practice of law..............140, 143
visa consultants ..........................................141
warning letter .............................................145
where to file documents.....................149, 150
witnesses ...................................................148
discretionary stays .............................. see stays
documents
advisory opinions..........................................40

binding of ....................................................39
certificate of translation .....................Glossary
certified translations ... see translations, below
conformed copies .........................................29
consolidated cases.... see consolidated cases
cover page....................34–36, 38, 91, App. F
date stamp.................................see deadlines
Department of State publications ................40
filing locations .....................................see filing
font and spacing ..........................................38
foreign-language documents.......................32
format, generally..........................................33
forms..............................................see forms
government memoranda ..............................40
internet publications ....................................41
legal opinions...............................................40
legibility..................................................33, 37
newspaper articles ......................................40
number of copies .........................................36
order of documents .........................34–36, 91
original documents ......................................39
pagination ....................................................37
paper size and quality ................................37
photocopies .........36, 39, 92, 93, 95, 102, 104
photographs.................................................40
Proof of Service .............................see service
proposed exhibits .............................34, 36, 37
publications..................................................40
service of ........................................see service
source materials ..........................................40
supporting documents .................................39
table of contents ..........................2–1, App. P
tabs..............................................................37
translations ....................................32, App. H
witness list ................................ see witnesses
e-filing
Form EOIR-28, instructions.........................18
generally......................................................22
notice to opposing party .............................19
electronic devices
cellular telephones ...................55, 56, 68, 71
detention facilities, in ..............................56, 57
electronic calendars ..............................55, 56
Immigration Court, in ..............................55, 56
laptop computers...................................55, 56
possession of during hearings...............55, 56
recording devices, use of ............................55
e-mails ...........................................................22
employment authorization..................see asylum
entry of appearance

accredited representative ...........................20
appearances "on behalf of"........................21
bar information ..........................................20
change in address .....................................20
change in firm ...........................................21
change in representation ...........................49
change of address .....................................18
change of telephone number.....................18
disciplinary information ..............................20
first appearance ..................................18, 49
foreign government officials........................20
Form EOIR-28, electronic...........................17
Form EOIR-28, failure to file...... see discipline
Form EOIR-28, must file ..........18, 19, 20, 155
Form G-28 not accepted.............................18
forms ........................................17, 19, 155
general rules for....................................17, 20
law graduates ...........................................20
law students .............................................20
master calendar, at ...................................60
motions ....................................... see motions
multiple representatives..............................20
reinstatement ...........................................18
remand......................................................18
reputable individuals.................. 20, Glossary
scope of representation ..............................20
service.............................................19, 32, 60
substitution of counsel ..........................20, 49
EOIR.......... see Executive Office for Immigration
Review
eRegistry ................................................ Glossary
attorneys, registration of ............................20
EOIR ID number ........................................20
generally ..............................................15, 20
registration requirement.............................17
evidence
bond proceedings ........ see bond proceedings
criminal convictions..see criminal history chart
Department of State publications as............40
impeachment evidence...............................23
motions ....................................... see motions
newspaper articles......................................40
publications as evidence.............................40
rebuttal evidence ......................................23
right to examine ........................................58
right to object to ..................................58, 72
right to present ....................................58, 72
subpoenas ............................. see subpoenas
ex parte communication ................. 14, Glossary

exclusion proceedings
appeals ..................................................108
applicant .............................................Glossary
charging document.............................48, 108
DHS motions to reconsider .......................98
generally ...................................108, Glossary
grounds of excludability............................108
hearing notification ...................................108
in absentia hearings ...................................74
motions to reopen in absentia orders........100
Notice to Applicant for Admission Detained
for Hearing...........................................48, 108
public, closed to........................................108
relief available...........................................108
removal proceedings, compared with107, 108
stays of exclusion ............................ see stays
Executive Office for Immigration Review (EOIR)
addresses ............................................ App. B
Board of Immigration Appeals ............ see BIA
disciplinary authority ................. see discipline
EOIR forms................................... see forms
FOIA requests .... see Freedom of Information
Act
Fraud and Abuse Prevention Program... 5, 20,
140
generally ...................................1–7, Glossary
Law Library ......................................7, 11, 163
Legal Orientation Program ...................6, 128
Office of Communications and Legislative
Affairs ....................................................53
Office of Legal Access Programs (OLAP).....6
Office of the Chief Immigration Judge (OCIJ)
............................................................1–5, 10
Office of the General Counsel (OGC) ..5, 143,
144, 156
organizational chart .............................App. C
telephone numbers...............................App. B
Virtual Law Library.....................................7, 11
website ......................................................14
expedited removal under INA § 235(b)(1)
aliens subject to.......................................109
claimed status review ........ see claimed status
credible fear proceedings ..... see credible fear
exceptions ..............................................110
expedited removal under INA § 238(b).......... see
reasonable fear, withholding-only
failure to prosecute ......see removal proceedings
false certification ........................... see discipline
false evidence ................................ see discipline
false statements............................ see discipline

family members.........................................20, 33
faxes.................................................14, 22, 51
federal courts ...................................................10
Federal Register..........................................164
fees
    amount........................................................44
    application fees......................................44, 45
    biometrics fees............................................45
    consolidated cases .... *see consolidated cases*
    defective or missing......................................45
    DHS, paid to ............................42, 44, 92, 93
    FOIA..............*see Freedom of Information Act*
    form of payment...........................................45
    grossly excessive......................*see discipline*
    Immigration Court, not paid to ....................42
    motions ......................................*see motions'*
    paid in advance......................................42, 51
    receipts .......................................................44
    visa petitions...............................................93
    waivers..................................................44, 92
filing
    ACCO fastners..............................................39
    attorneys, by ..........................................31, 81
    conformed copies ........... *see documents*
    consolidated cases .... *see consolidated cases*
    courier services.............. *see courier services*
    date stamp ............................... *see deadlines*
    deadlines ................................. *see deadlines*
    defective filings...........................................27
    disciplinary proceedings, in ....... *see discipline*
    documents ............................. *see documents*
    e-filing ........................................................22
    eFiling ........................................................15
    e-mail .........................................................22
    fax ........................................................22, 51
    filing receipts..............................................29
    forms..............................................*see forms*
    hole-punched...............................................39
    improper filings ..........................................27
    locations.......................21, 50, 51, 91, App. K
    mailbox rule not observed ..........................21
    motions ......................................*see motions*
    number of copies ................... *see documents*
    paper clips ..................................................39
    postage problems ........................................21
    proposed exhibits................... *see documents*
    public window, delivered to.........................22
    receipt, deemed "filed" at............................21
    rejected filings................................27, 28, 37
    representatives, by .........................31, 49, 81

required filings .............................................71
separate envelopes ......................................22
signatures ................................. *see signatures*
stapling .......................................................39
street address, sent to.................................22
supporting documents ........... *see documents*
telephonic hearings, filing at.......................51
untimely filings.......................................28, 29
video hearings, filing at................................51
filing deadlines ..............................*see deadlines*
fonts and spacing...................... *see documents*
food and drink .................*see Immigration Courts*
foreign government officials............................20
foreign student advisors..................................20
foreign-language documents ...... *see documents*
Forensic Document Laboratory ........... *see DHS*
Form EOIR-
    26.......................................................... App. E
    26A ....................................................... App. E
    27.......................................................... App. E
    28.........................*see entry of appearance*
    33/IC .........................*see address obligations*
Form G-28....................*see entry of appearance*
Form I-862 .............. *see Notice to Appear (NTA)*
former DOJ employees....................................20
forms
    colors ....................................................... 157
    completed forms........................................ 157
    computer-generated .................................. 156
    obtaining forms.......................................... 156
    photocopies .........................................39, 156
    recommended....................................143, 155
    required ..................................................... 155
free legal services.................. *see representation*
Freedom of Information Act (FOIA)
    consent of subject ..................................... 158
    copies of the record ................................... 156
    deadlines, effect on ................................... 157
    denials ...................................................... 158
    exempt from release................................... 157
    fees ........................................................... 157
    inspecting the record ................................. 156
    limitations............................................157, 158
    Office of Information and Privacy ............. 158
    processing times ....................................... 157
    requests..............................................156–58
frivolous asylum applications .............*see asylum*
frivolous behavior...........................*see discipline*
Glossary" ............................................................ ,

AR.07672

grossly excessive fees ................... *see* discipline
hearings, repeated failure to attend*see* discipline
Homeland Security ................................ *see* DHS
ICE . *see* Immigration and Customs Enforcement
IIRIRA .................................................. Glossary
Immigration and Customs Enforcement (ICE)*see*
   DHS
Immigration and Naturalization Service (INS)....2
Immigration Courts
   addresses ........................................22, App. A
   Administrative Control Courts..........10, 11, 21
   administrative offices, no access to.............57
   arrival at court ................................................58
   attire in court ..................................................54
   decorum ..........................................................54
   designated detail cities ..................................10
   detention facilities, in ........ 10, 52, 55, 57, 128
   electronic devices ........ *see* electronic devices
   food and drink .................................................54
   generally .................................. 4, 10, Glossary
   hours of operation ..........................................22
   Liaison Judges ..................................................5
   locations........................ 5, 10, 50, *See* App. A
   public windows................................................22
   public, when closed to ..........................52, 108
   security screening............................51, 56, 58
   shared administrative control.......................21
   telephone numbers ...............................App. A
Immigration Judges
   conduct and professionalism .........................5
   deadlines, can specify ..................................22
   decisions ...........................................................9
   discretion ...........................................................1
   generally ............................... 4, 7, 8, Glossary
   inquiries to .....................................................14
   practitioner discipline proceedings ............*see*
      discipline
   references to...........................................49, 54
Immigration Practitioner Complaint Form ......*see*
   discipline
immigration specialists .........................6, 20, 141
improper filings...................................... *see* filing
improperly solicited clients ............ *see* discipline
in absentia hearings
   deportation proceedings .............................74
   exclusion proceedings ..................................74
   generally .........................................................51
   reopening.. *see* motions to reopen in absentia
INA ................................ Glossary, Citation Index
individual calendar hearings

conduct of hearing.......................................72
conferences ....... *see* pre-hearing conferences
deadlines ...............................*see* deadlines
in absentia hearings .*see* in absentia hearings
interpreters .............................*see* interpreters
objections to evidence...............*see* evidence
opening statements ......................................72
oral decisions................................................73
post-order instructions..................... *see* DHS
pre-hearing briefs .........*see* pre-hearing briefs
purpose of hearing .....................71, Glossary
recording................. *see* recording of hearings
required filings ..................................*see* filing
statements ........... *see* pre-hearing statements
stipulations........... *see* pre-hearing statements
telephonic hearings .*see* removal proceedings
telephonic testimony*see* removal proceedings
testimony .................................. *see* witnesses
video hearings .........*see* removal proceedings
video testimony........*see* removal proceedings
witnesses ................................... *see* witnesses
written decisions ...........................................73
ineffective assistance of counsel ... *see* discipline
inquiries
   eFiling .............................................................15
   e-mail...............................................................14
   emergencies...................................................15
   fax ....................................................................14
   FOIA ............. *see* Freedom of Information Act
   generally .........................................................12
   Immigration Courts staff, to ........................ 13
   Immigration Judges, to ................................14
   press ................................................................13
   telephone, by .................................... 13, App. I
INS ....... *see* Immigration and Nationality Service
Internet Immigration Information, I³ ..........14, 15
internet publications.................... *see* documents
interpreters
   contract interpreters ....................................54
   Language Services Unit ................................4
   requests for interpreters .................61, 62, 69
   staff interpreters ..........................................54
   telephonic ......................................................54
   when needed .....................................61, 62, 69
   when provided .......................................54, 59
IRCA ................................................Glossary
joint motions...................................... *see* motions
Justice Department.... *see* Department of Justice
juveniles .............................................. *see* minors
Language Services Unit....................................4

laptop computers.............. *see* electronic devices
law firms ....................................................21, 33
law graduates...........................................20, 139
Law Library............................................ *see* EOIR
law students ............................................20, 139
Legal Orientation Program (LOP) ........ *see* EOIR
Liaison Judges .............. *see* Immigration Judges
LIFE Act................................................. Glossary
limited proceedings
   asylum-only............................*see* asylum-only
   claimed status...................*see* claimed status
   credible fear ........................*see* credible fear
   detention ..............................................111, 130
   generally ..............................................109–11
   reasonable fear................*see* reasonable fear
   withholding-only .............. *see* withholding-only
lodged asylum applications . *see* asylum, Glossary
LPR ...................................................... Glossary
mailings
   courier services............... *see* courier services
   delays in delivery ......................................26
   mailbox rule not observed ..........................21
   postage problems .......................................21
   service by mailings ....................................30
   street address, mailed to .............................22
master calendar hearings
   arrival at court ..........................................58
   background and security investigations.....*see* DHS
   biometrics instructions ..................... *see* DHS
   briefs ........................... *see* pre-hearing briefs
   conferences .......*see* pre-hearing conferences
   deadlines ................................. *see* deadlines
   entry of appearance..*see* entry of appearance
   in absentia ............... *see* in absentia hearings
   interpreters.............................*see* interpreters
   objections to evidence .............. *see* evidence
   opening the hearing ....................................59
   pleadings ................................. *see* pleadings
   purpose of hearing.................................57, 58
   recording.................*see* recording of hearings
   request for a prompt hearing .......................57
   statements ...........*see* pre-hearing statements
   stipulations.........*see* pre-hearing statements
   telephonic appearances...............................68
   telephonic testimony*see* removal proceedings
   video hearings ........ *see* removal proceedings
   video testimony....... *see* removal proceedings
   waivers................. *see* waivers of appearance

merits hearingsGlossary, *see* individual calendar
   hearings
minors
   courtroom modifications .............................80
   courtroom orientation .................................80
   detention.............................................128, 129
   disruptions by ...........................................55
   must attend hearings...................................55
   must be supervised ....................................55
   unaccompanied .........................................80
misrepresentation ........................ *see* discipline
motions
   accept untimely filings ................................29
   address obligations ... *see* address obligations
   administrative closure..........97, 104, Glossary
   advance hearing date................................102
   amend filing .............................................104
   appeals, relationship to ...................91, 97, 99
   application for relief .......................92, 95, 102
   briefs............................*see* pre-hearing briefs
   change of venue...............................102, 127
   close hearing .............................................53
   compound motions .....................................94
   consolidation.............................................79
   copy of order.............................................92
   cover page...................................... 91, App. F
   criminal convictions .............................97, 99
   deadlines ...................25, 92, 98, 100, App. D
   decisions..................................................104
   DHS motions ..............................43, 96, 98
   disciplinary proceedings, in ....... *see* discipline
   entry of appearance ................81, 95, 98, 100
   evidence ....................................................92
   extension of deadline .................................26
   fees.......................42–45, 92, 93, 95, 98, 100
   joint motions .....................................30, 43, 96
   motion package ..........................................35
   number limits ................................94, 96, 101
   opposing party's position ............................93
   oral argument ............................................94
   order of documents ................ *see* documents
   post-decision motions.......... 81, 92, 94, App. D
   pre-decision motions .......81, 92, 94, Glossary
   proposed order ...............................91, App. Q
   recalendar......................................43, 97, 104
   reconsider...............*see* motions to reconsider
   reopen ....................... *see* motions to reopen
   reopen in absentia... *see* motions to reopen in
   absentia

AR.07674

request an interpreter ...................................69
responses ...................... 25, 96, 98, 101, 105
severance ....................................................79
signatures ............................... *see* signatures
stays.................................................43, 126
subpoena ....................................................78
substitution of counsel ...........................20, 50
telephonic appearance ...............................68
telephonic testimony ...................................70
transcriptions ...............................*see* records
video testimony.....................................69, 70
visa petitions .............................. 93, Glossary
waive appearance..................................66, 67
where to file ...............................................91
withdrawal of counsel ...........................20, 50
motions to reconsider
address obligations....*see* address obligations
appeals deadlines, prior to .........................99
appeals pending ..........................................99
copy of order...............................................92
criminal convictions....................................99
deadlines .......................... 24, 92, 94, 96, 98
DHS motions...............................................98
entry of appearance.......................17, 81, 98
fees .................................................42–45, 98
identification of error ...................................99
motions packages .......................................35
no automatic stays.......................................99
number limits .......................................94, 98
order of documents................ *see* documents
pre-7/1/1996 cases .....................................98
pre-7/1/1996 motions..................................98
responses................................................24, 98
where to file ...............................................91
motions to reopen
address obligations....*see* address obligations
appeal pending ...........................................97
appeals deadline, prior to ...........................97
applications for relief...................................95
battered spouses, children, and parents .....97
changed circumstances...............................96
content........................................................95
copy of order...............................................92
criminal convictions....................................97
deadlines ...................................24, 92, 94, 96
DHS motions...............................................96
entry of appearance...............................17, 81
evidence ...............................................95, 97
fees .................................................42–45, 95
in absentia  *see* motions to reopen in absentia

orders
joint motions ...............................................96
motions packages .......................................35
no automatic stays ......................................97
number limits .......................................94, 96
order of documents ................ *see* documents
pre-9/30/1996 motions ...............................97
responses................................................24, 96
where to file ...............................................91
motions to reopen in absentia orders
address obligations ...*see* address obligations
automatic stay ..........................................101
content ...............................................99, 100
copy of order...............................................92
deadlines ..........................24, 92, 94, 96, 100
deportation proceedings...........................100
entry of appearance .......................17, 81, 99
exclusion proceedings..............................100
fees...............................................42–45, 100
number limits .....................................94, 101
responses.............................................24, 101
where to file ...............................................91
multiple representation .......... *see* representation
NACARA .............................................Glossary
newspaper articles..................... *see* documents
notarios ..............................................6, 20, 141
Notice of Appeal............................... *see* appeals
Notice of Intent to Discipline (NID) . *see* discipline
Notice to Appear (NTA)*see* removal proceedings
Notice to Applicant Detained for Hearing ...... *see* exclusion proceedings
**Office of Communications and Legislative Affairs** ........................................ 7, *see* EOIR
Office of Immigration Litigation (OIL) ................3
Office of Information and Privacy..........*see* FOIA
Office of Legal Access Programs .....................6
Office of the Chief Administrative Hearing Officer
................................................. 3, *see* EOIR
Office of the Chief Immigration Judge . *see* EOIR
Office of the General Counsel ......... 5, *see* EOIR
opening statements .....*see* removal proceedings
oral pleadings................................*see* pleadings
order of documents.................... *see* documents
Order to Show Cause ................ *see* deportation proceedings
organizational chart ............................. *see* EOIR
overnight delivery services ..*see* courier services
paper size and quality................. *see* documents
paralegals ................................................20, 33
party ....................................................Glossary

Petition for Immediate Suspension *see* discipline
petitioner................................................. Glossary
photocopies................................. *see* documents
photographs ............................... *see* documents
pleadings
    contents of ............................................60–63
    master calendar, taken at ...............58, 59, 60
    oral pleadings ............................ 61, App. M
    written pleadings............................ 61, App. L
postage problems............................*see* mailings
post-decision motions .................... *see* motions
post-order instructions........................... *see* DHS
Practice Manual
    authority ......................................................1
    available online ...........................................163
    BIA Practice Manual ......................... *see* BIA
    public input.................................................163
    purpose ......................................................1
    reproduction of...........................................163
    revisions......................................................1
    updates .....................................................163
practitioners...........................*see* representation
pre-decision motions ...................... *see* motions
pre-hearing briefs
    citations in ........................... 76, 77, 78, App. J
    consolidated cases ......................................77
    contents ......................................................76
    encouraged.................................................75
    motions briefs .............................................94
    responses....................................................77
    signatures ............................... *see* signatures
pre-hearing conferences
    disciplinary proceedings, in ....... *see* discipline
    Immigration Judge, initiated by...................74
    purpose ......................................................74
    requests for.................................................74
pre-hearing statements
    contents ......................................................75
    purpose ......................................................74
    stipulations in .............................................75
prejudicial conduct ........................ *see* discipline
press.....................................................13, 53, 55
primary attorney (notice attorney) ..Glossary, *see*
    representation
pro bono representation
    Legal Orientation Program .............. *see* EOIR
    unaccompanied juveniles, for ....................80
pro se ................... Glossary, *see* representation
Proof of Service................................. *see* service
proposed exhibits ........................ *see* documents

proposed order................................ *see* motions
REAL ID Act............................................Glossary
reasonable cause hearings........... *see* continued
    detention
reasonable diligence and promptness, failure to
    act with ..................................... *see* discipline
reasonable fear proceedings
    conduct of hearing......................................115
    detention...........................................111, 130
    expedited removal ............................111, 114
    generally ......................................114, Glossary
    location ......................................................115
    no appeal....................................................116
    reinstatement of prior order ...............111, 114
    representation.............................................115
    review by DHS.............................................114
    review by Immigration Judge.............115, 116
    timing .........................................................115
recognized organizations
    definition ................................................Glossary
    discipline .................................. *see* discipline
    removal from list of ......................................20
Record of Proceedings (ROP) ......... *see* records
recording of hearings
    bond proceedings........ *see* bond proceedings
    digital audio recording ................................12
    off-the-record discussions ....................53, 72
    restrictions on .............................................55
    rules for................................................53, 72
records
    confidentiality..............................................12
    copies for parties ........................................12
    non-parties' access to............................11, 12
    parties' access to.........................................11
    Record of Proceeding (ROP) 54, 71, Glossary
    requests for... *see* Freedom of Information Act
    transcriptions ........................53, 94, Glossary
registration ................................... *see* eRegistry
regulations ............................164, Citation Index
reinstatement of prior order *see* reasonable fear,
    withholding-only
reinstatement to practice .............. *see* discipline
rejected filing...........................................*see* filing
release from detention .......... *see* detained aliens
release of counsel.................. *see* representation
removal proceedings
    absence of representative ...........................51
    aliens, references to ....................................48
    appeals ........................................ *see* appeals
    arrival at court............*see* Immigration Courts

asylum clock .................................. *see* asylum
attendance required.......................................51
background and security investigations.....*see* DHS
behavior in court ........ *see* Immigration Courts
biometrics instructions ...................... *see* DHS
briefs ............................ *see* pre-hearing briefs
charging document 47, 50, 57, 58, 60, 61, 102
closed hearings.............................................53
closing statements .......................................72
communication between parties ..................55
conferences .......*see* pre-hearing conferences
consolidated cases .... *see* consolidated cases
country of removal ...................60, 61, 62, 102
deadlines ................................... *see* deadlines
definition ............................................ Glossary
detained aliens................. *see* detained aliens
DHS attorneys, references to .....................49
electronic devices ........ *see* electronic devices
employment authorization............. *see* asylum
entry of appearance...*see* entry of appearance
failure to prosecute .....................................48
filing locations ................................... *see* filing
hearing locations....................................50, 51
in absentia ............... *see* in absentia hearings
interpreters.............................*see* interpreters
master calendar ............. *see* master calendar
minors ............................................ *see* minors
Notice to Appear (NTA) 47, 48, 50, 57, 58, 60, 61, 102, Glossary
objections to evidence .............. *see* evidence
opening statements .....................................72
parties, references to ...................................48
pleadings .................................. *see* pleadings
post-order instructions ........................ *see* DHS
Record of Proceedings (ROP)......*see* records
recording.................*see* recording of hearings
representation....................*see* representation
severance .................*see* severance of cases
statements ..........*see* pre-hearing statements
stays of removal............................... *see* stays
stipulations ..........*see* pre-hearing statements
subpoenas ............................... *see* subpoenas
telephonic appearances..*see* master calendar hearings
telephonic hearings................................50, 51
telephonic testimony ....................................70
timeliness...............................................51, 57
video hearings .....................................50, 51
video testimony......................................69, 70

waivers .................*see* waivers of appearance
witnesses................................... *see* witnesses
representation
absence of representative ...........................51
adverse legal authority, failure to disclose *see* discipline
appearances "on behalf of" .........................21
attire...........................*see* Immigration Courts
attorneys, references to...............................49
boilerplate submissions, repeatedly filing.. *see* discipline
bond proceedings........ *see* bond proceedings
bribery.........................................*see* discipline
changes of address ...*see* address obligations
claimed status review ........ *see* claimed status review
client's decisions, failure to abide by ......... *see* discipline
communication with client, failure to maintain .................................................... *see* discipline
competent representation, failure to provide .................................................... *see* discipline
contempt of court...................... *see* discipline
continued detention ...*see* continued detention
credible fear proceedings ..... *see* credible fear
disbarment................................. *see* discipline
disciplinary proceedings, in ....... *see* discipline
entry of appearance .*see* entry of appearance
eRegistry ....................................*see* eRegistry
false certification....................... *see* discipline
false evidence........................... *see* discipline
false statements ....................... *see* discipline
family members ....................................20, 33
foreign government officials ........................20
foreign student advisors ..............................20
Form EOIR-28, failure to file...... *see* discipline
former DOJ employees ...............................20
free legal services ................................20, 58
frivolous behavior ..................... *see* discipline
grossly excessive fees .............. *see* discipline
hearings, failure to attend........... *see* discipline
immigration specialists ...............................20
improperly soliciting clients........ *see* discipline
ineffective assistance of counsel*see* discipline
inmates ........................................................20
law firms ..............................................21, 33
law graduates .....................................20, 139
law students.........................................20, 139
misconduct ................................ *see* discipline
misrepresentations ................... *see* discipline

multiple representatives..........................20, 49
paralegals ...............................................20, 33
practitioners .............................. 139, Glossary
prejudicial conduct .................... see discipline
primary attorney.................... 21, 49, Glossary
pro bono............. see pro bono representation
pro se........................ 19, 49, 59, 72, Glossary
reasonable diligence and promptness, failure
to act with................................... see discipline
reasonable fear proceedings .. see reasonable
fear
registration ................................ see eRegistry
release of counsel..................................... 20
representatives, references to ................... 49
reputable individuals ........... 20, 139, Glossary
resignation from bar.................. see discipline
right to representation...............20, 49, 58, 59
scope of .................................................... 20
separate appearances............................... 20
serious crimes........................... see discipline
signatures ................................ see signatures
substitution of counsel ..........................20, 50
suspension from bar ................. see discipline
telephonic appearances.. see master calendar
types of representatives............................. 17
unauthorized practice of law ...... see discipline
withdrawal of counsel ................................ 50
reputable individuals .............. 20, 139, Glossary
request for a prompt hearing..............see master
calendar
rescission proceedings
appeal ...................................................109
hearing ...................................................109
Notice of Intent to Rescind ........................109
resignation from bar ...................... see discipline
respondent .............................................. Glossary
S visa applicants ...see asylum-only proceedings
sanctions for misconduct............... see discipline
security grounds, removable under.. see asylum-
only
see representation" ..............................................
self-reporting of misconduct........... see discipline
serious crimes ............................... see discipline
service
attorneys, by ................................................ 31
attorneys, on .........................................21, 31
Certificate of Service............................30, 31
courier, by ................................................... 30
definition .............................. 29, Glossary
hand delivery, by.......................................... 30

Notice of Entry of Appearance ............. 19, 60
Proof of Service....... 30–32, App. G, Glossary
representatives, by ................................31, 60
representatives, on................................21, 31
requirements.................................................29
signatures ............................... see signatures
subpoenas, service of ........... see subpoenas
when completed .........................................30
whom to serve ...........................................30
severance of cases ......................................79
signatures
accredited representatives ...................20, 33
computer generated ...................................33
electronic ...................................................32
family members ..........................................33
forms .........................................................39
generally ....................................................32
law firms ....................................................33
motions ......................................................39
paralegals ..................................................33
photocopies ...............................................39
pre-hearing briefs ................................39, 76
Proof of Service ....................................31, 33
signature stamps .......................................33
simulated signatures ..................................33
third parties...........................................31, 33
solicitation, improper..................... see discipline
source materials........................ see documents
State Department..........see Department of State
stays
automatic stays...........................................126
deportation proceedings............................126
discretionary stays......................................126
exclusion proceedings................................126
stipulations ............... see pre-hearing statements
stowaways ........... see credible fear, asylum-only
subpoenas
contents ...........................................78, App. N
service ........................................................79
witnesses, for.......................................78, 79
substitution of counsel ........... see representation
summary disciplinary proceedings. see discipline
supporting documents ................ see documents
suspension from bar ..................... see discipline
table of contents.......................... see documents
tabs ............................................. see documents
telephone numbers ......... see EOIR, Immigration
Courts
telephonic appearances...... see master calendar
telephonic hearings......see removal proceedings

telephonic testimony ... *see* removal proceedings
televideo hearings ................. *see* video hearings
televideo testimony .............. *see* video testimony
transcriptions ..................................... *see* records
translations ................................. *see* documents
Trial Attorney ......................................... Glossary
unauthorized practice of law .......... *see* discipline
untimely filings ....................................... *see* filing
USCIS .................................................. Glossary
venue, change of ............................. *see* motions
video hearings ............. *see* removal proceedings
video testimony .......... *see* removal proceedings
Virtual Law Library ........................ 11, *see* EOIR
Visa Bulletin ................. *see* Department of State
visa consultants .................................... 6, 20, 141
visa petitions ................................... *see* motions
visa waiver applicants ................ *see* asylum-only
    proceedings
visa waiver overstays ................ *see* asylum-only
    proceedings
waivers of appearances
    aliens ..................................................... 67, 68
    representatives ..................................... 67, 68

warning letter ................................. *see* discipline
withdrawal of counsel ............ *see* representation
withholding-only proceedings
    appeals .................................................... 120
    conduct of proceeding .............................. 120
    detention ............................................ 111, 130
    expedited removal ..................................... 119
    generally .................................. 119, Glossary
    reinstatement of prior order ...................... 119
witness lists ................................... *see* witnesses
witnesses
    bond proceedings, in ... *see* bond proceedings
    cross-examination of ............................ 58, 72
    disciplinary proceedings, in ....... *see* discipline
    interpreters ........................... *see* interpreters
    oath, placed under ...................................... 72
    right to present ............................................ 72
    subpoenas ............................. *see* subpoenas
    testimony, objections to .............................. 72
    witness list required ................................... 71
    witness list requirements ...................... 34, 41
written pleadings ........................... *see* pleadings

# CITATION INDEX

A separate Word Index precedes this Index.

## Statutes and Cases

### 8 U.S.C.

208(d)(2) ................................................ 61
208(d)(5)(A)(iii) ..................................... 61
208(d)(6) ............................................... 60
212 ...................................................... 108
212(d)(5) .................................................. 8
235(a)(2) ............................................. 111
235(b)(1) ............................ 109, 110, 112, 114, 116
235(b)(1)(B) ................................... 111, 112
235(c) ........................................... 111, 118
237 ...................................................... 107
238(b) .................................. 110, 114, 119
239 ...................................................... 107
239(b)(1) ............................................... 55
240 ............................................... 45, 107
240(b)(1) ............................................... 69

240(b)(2) ............................................... 48
240(b)(4) ............................................... 56
240(b)(5) ............................................... 56
240(b)(5)(C) ................................... 100, 101
240(b)(5)(C)(ii) ...................................... 42
240(b)(7) ............................................... 60
240(c)(7)(C)(iv) ...................................... 97
240(e)(1) ............................................. 100
241 (former) ........................................ 107
241(a)(5) ...................................... 111, 114, 119
241(a)(6) ............................................. 133
241(b)(3) ........ 111, 112, 113, 114, 116, 117, 118, 119
241(b)(3)(B) ......................................... 114
242(b) .................................................. 108
242B(a)(1) ........................................... 107
242B(c)(3)(B) ......................................... 42
246(a) .................................................. 109

### 5 U.S.C.

552 ...................................................... 156
552(b) .................................................. 157

### BIA DECISIONS

*Gadda*, 23 I&N Dec. 645 (BIA 2003) ................................................................ 137, 146
*H-A-*, 22 I&N Dec. 728 (BIA 1999) ........................................................................ 93
*Nafi*, 19 I&N Dec. 430 (BIA 1987) ........................................................................ 108
*Patino*, 23 I&N Dec. 74 (BIA 2001) ...................................................................... 105
*Rahman*, 20 I&N Dec. 480 (BIA 1992) ................................................................. 102
*Shih*, 20 I&N Dec. 697 (BIA 1993) ....................................................................... 105
*Velarde*, 23 I&N Dec. 253 (BIA 2002) .................................................................... 93

# Regulations

## 8 CFR §

1001.1(f) .......................................... 19, 137, 148, 149
1001.1(g)................................................................149
1001.1(j) ........................................................ 137, 148
1003.0(a)....................................................................2
1003.1.....................................................................105
1003.1(b)......................................................................9
1003.1(b)(4)................................................................9
1003.1(b)(5)................................................................9
1003.1(c)................................................................105
1003.1(d)(1) ............................................................2, 9
1003.1(d)(2)(i)(G)....................................................105
1003.1(d)(2)(iii) ......................................................137
1003.1(d)(5) ............................................................137
1003.101 ..............................................19, 137, 138
1003.101(a)..............................................................146
1003.102 ......................................................137, 140
1003.102(h)..............................................................142
1003.102(j)................................................................139
1003.102(j)(1).............................................................32
1003.102(k)..............................................................141
1003.102(m)..............................................................138
1003.103..................................................................137
1003.103(c)..............................................................142
1003.104..................................................................137
1003.104(a)(1)..........................................................141
1003.104(b)..............................................................141
1003.105..................................................................137
1003.105(c)(2)..........................................................144
1003.105(d)(2)..........................................................144
1003.106..................................................................137
1003.106(a)(1)(v)......................................................142
1003.107..................................................................137
1003.107(a)..............................................................148
1003.107(a)(2)..........................................................148
1003.107(b)..............................................................149
1003.107(b)(3)..........................................................148
1003.107(c)(1)..........................................................149
1003.107(c)(2)..........................................................149
1003.108..................................................................137
1003.108(c)..............................................................147
1003.109..................................................................137
1003.110......................................................137, 138, 146

1003.110(b) ......................................................138, 140
1003.111..................................................................137
1003.111(a)..............................................................143
1003.111(a)(1)..........................................................143
1003.111(a)(3)..........................................................143
1003.12....................................................................107
1003.13..........................................................21, 45, 46
1003.14......................................................................45
1003.15(d)..................................................................60
1003.15(d)(2)......................................................20, 19
1003.17....................................................................129
1003.17(a) ..........................................17, 19, 29, 30
1003.17(b) ......................................................19, 20
1003.19..........................................................127, 129
1003.19(c)................................................................131
1003.19(d)................................................................133
1003.19(e)................................................................131
1003.19(g)......................................................20, 127
1003.19(h)(2)(i)........................................................129
1003.19(i)................................................................133
1003.20....................................................................102
1003.20(b)................................................................105
1003.21(a)..................................................................71
1003.21(b) ..........................................................71, 72
1003.22......................................................................52
1003.23......................................................................26
1003.23(a)................................................................105
1003.23(b)(1) ..............................42, 43, 96, 97, 98
1003.23(b)(1)(i).........................................................32
1003.23(b)(1)(ii)..............................17, 19, 29, 30, 94
1003.23(b)(3) ..................................................92, 95, 96
1003.23(b)(4)..............................................................96
1003.23(b)(4)(i)..........................................................96
1003.23(b)(4)(ii)................................................100, 101
1003.23(b)(4)(iii)......................................................100
1003.23(b)(4)(iv)........................................................96
1003.24............................................................41, 42, 43
1003.24(b)(2)............................................................100
1003.25(a)..................................................................64
1003.25(c)..................................................................48
1003.26............................................................49, 70
1003.26(c)..................................................................70
1003.27......................................................................50
1003.27(b)..................................................................50
1003.28......................................................................53

1003.3 .................................................105
1003.3(a)(1) ........................................105
1003.3(d) ............................................105
1003.31 ................................................21
1003.31(d) ...........................................50
1003.32(b) ...........................................37
1003.33 ................................................32
1003.35 ................................................74
1003.35(b)(3) .......................................75
1003.35(b)(4) .......................................75
1003.35(b)(5) .......................................75
1003.38 ........................................25, 105
1003.38(b) ...........................................26
1003.41 ................................................40
1003.42(d) ..........................................112
1003.42(f) ...........................................114
1003.42(h) .............................................9
1003.46 ................................................50
1003.47 ................................................60
1003.47(d) .....................................44, 61
1003.6(c) .............................................133
1003.61(a) .............................................20
1003.7 .................................................105
103.7 .............................................43, 44
1103.7 .......................................41, 42, 43
1103.7(b)(1) ..........................................44
1103.7(b)(2) ..........................................44
1208.2(c)(1)(i) .....................................118
1208.2(c)(1)(ii) ....................................118
1208.2(c)(1)(iii) ...................................118
1208.2(c)(1)(iv) ...................................118
1208.2(c)(1)(v) ....................................118
1208.2(c)(1)(vi) ...................................118
1208.2(c)(2) ........................................119
1208.2(c)(3) ........................................119
1208.2(c)(3)(i) .....................................119
1208.30(g)(2)(iv)(A) .............................114
1208.30(g)(2)(iv)(B) .............................114
1208.30(g)(2)(iv)(C) ......................113, 118
1208.31 ........................................114, 115
1208.31(c) ...........................................114
1208.31(g)(1) .......................................116
1208.31(g)(2) ................................116, 119
1208.4 ..................................................24
1208.4(a)(2) ..........................................24
1208.5(b)(1)(ii) ....................................118
1208.6 ..................................................50

1208.7 ..................................................61
1235.3(b)(5) ........................................116
1235.8 ................................................118
1236.1 ................................................129
1236.3 ................................................128
1240.1 ................................................107
1240.1(a) ................................................8
1240.10 ..........................................56, 59
1240.10(b) ............................................50
1240.11(c)(3)(i) .....................................50
1240.15 ................................................56
1240.30 ..............................................108
1240.31 ..................................................8
1240.40 ..............................................107
1240.41 ..................................................8
1240.9 ..................................................51
1241.13 ..............................................134
1241.14 ........................................134, 135
1241.14(f) .....................................133, 134
1246.1 ................................................109
1287.4(a)(2)(ii) ......................................74
1292.1 ...........................................17, 47
1292.1(a) .............................................137
1292.1(a)(1) ..........................................19
1292.1(a)(2) ..........................................19
1292.1(a)(3) ..........................................19
1292.1(a)(4) ...................................19, 137
1292.1(a)(5) ..........................................19
1292.1(b) .............................................137
1292.1(c) ..............................................19
1292.1(f) .........................................17, 19
1292.11 ................................................19
1292.11(a) .............................................19
1292.11(f) .............................................19
1292.12 ................................................19
1292.12(a) .............................................19
1292.12(b) .............................................19
1292.12(c) .............................................19
1292.12(d) .............................................19
1292.12(e) .............................................19
1292.13 ..........................................19, 149
1292.14 ................................................19
1292.16 ................................................19
1292.19(a) ...........................................141
1292.2(a) ..............................................20
1292.5(a) .........................................19, 31
1299.1 ................................................152

208.16 ............................................................ 112
208.17 ............................................................ 112
208.30(e)(2) .................................................... 112
208.30(e)(3) .................................................... 112
208.30(f) ................................................. 112, 118
208.30(g) ....................................................... 112
208.31(e) ................................................. 114, 119
208.31(f) ........................................................ 115
235.3(e) ......................................................... 127
292.3 ............................................................. 137
292.3(c)(4) ..................................................... 142
299.4(a) ......................................................... 152

**28 CFR §**

16.1 .............................................................. 157
16.3(c) .......................................................... 157
16.9 .............................................................. 158
68.26 ............................................................... 9

AR.07683

# Table of Changes

This Practice Manual is updated periodically. The tables below are arranged by most recent date of change, and contain within each table the section amended and nature of the change made to the Practice Manual. Page numbers throughout the Practice Manual may have changed as the result of updates.

## March 17, 2020

| Section amended | Nature of change |
|---|---|
| Appendix R | Added new standing order for York Immigration Court |

## March 16, 2020

| Section amended | Nature of change |
|---|---|
| Appendix R | Added new Appendix R: Standing Orders |

## February 20, 2020

| Section amended | Nature of change |
|---|---|
| Introduction | Updated names and titles |
| Chapter 1:1.4(c), 2:2.4(a)-(c), 10:10.2, Appendix B | Updated information to reflect organization of OLAP and CLAD under the Office of Policy |

AR.07684

| Chapter 4: 4.13(b)-(c) | Updated information on electronic devices |
|---|---|
| Chapter 4: 4.19(b) | Updated guidance on pre-hearing briefs |
| Appendix A | Technical Change – corrected court contact addresses |
| Appendix B | Updated local contact number for Automated Case Information Hotline |

## September 26, 2019

| Section amended | Nature of change |
|---|---|
| Appendix A | Technical Change - updated the Louisville Immigration Court contact information |
| Appendix A | Technical Change - added the Sacramento Immigration Court and its contact information |

## August 9, 2019

| Section amended | Nature of change |
|---|---|
| 1.3(b), 1.6(a)(ii), 4.5 | Updated number of immigration judges and number of immigration courts |
| 2.3(a) | Amended description of right to counsel in immigration court proceedings. |

AR.07685

| | |
|---|---|
| Glossary – "Immigration Court" | Amended number of immigration courts. |

## July 30, 2019

| Section amended | Nature of change |
|---|---|
| Introduction | Updated names and titles |
| 1.4(d) | Updated description to Communications and Legislative Affairs Division |
| 1.6(b) | Updated description of Law Library and Information Resource Center |
| 1.7(b) | Updated description of Communications and Legislative Affairs Division |
| 5.10(b) | Updated language regarding motions to advance hearing date |
| Appendix A | Updated contact information |
| Appendix B | Updated contact information |

## July 9, 2018

| Section amended | Nature of change |
|---|---|

AR.07686

| Introduction | Updated names and titles |
|---|---|
| 4.18 | Technical change – replace omitted text. |
| Chapter 8 | Replaced with new chapter 8 |

## November 2, 2017

| Section amended | Nature of change |
|---|---|
| 3.1(b), 3.1(b)(iv), 5.12 | Updated information regarding rulings on motions before the close of the response period |
| 5.10(c) | Updated language regarding motions to change venue |

## October 20, 2017

| Section amended | Nature of change |
|---|---|
| Introduction | Updated names and titles |
| 3.1(b)(5), 5.7(c), 5.8(c), 5.9(d)(ii)(C) | Updated information regarding response period for post-decision motions |

## May 15, 2017

AR.07687

| Section amended | Nature of change |
|---|---|
| Introduction | Updated Deputy Chief Immigration Judge and Assistant Chief Immigration Judge names |
| 1.4(b) | Technical Change - changed the name of OGC's Fraud and Abuse Prevention Program |
| 1.4(c) | Updated information regarding EOIR's Office of Legal Access Programs (OLAP) |
| 2.4 | Updated information related to the recognition and accreditation program |
| 3.3(a) | Updated information related to certification of translations |
| 7.4(b)(i)(A) | Updated section on expedited removal to reflect changes to the policy for Cuban arrivals |
| Chapter 10 | Updated information related to the recognition and accreditation program. |
| App. A | Technical Change - changed the Las Vegas Immigration Court mailing address |
| App. B | Technical Change - changed the name of OGC's Fraud and Abuse Prevention Program |
| App. B | Technical Change - added the Office of Legal Access Programs |
| App. E | Technical change - added Office of Legal Access Programs (OLAP) and Forms 31 and 31A |

AR.07688

| Glossary | Updated information related to the recognition and accreditation program |
|----------|--------------------------------------------------------------------------|

## April 4, 2017

| Section amended | Nature of change |
|-----------------|------------------|
| 3.1(b)(iii)(A) | Updated defensive asylum application provision |
| 4.15(l)(i) | Updated lodged asylum applications provision |
| App. D | Updated guidelines for filing asylum applications |

## January 31, 2017

| Section amended | Nature of change |
|-----------------|------------------|
| App. A | Technical change – changed the Krome Immigration Court mailing address |
| A-2, A-3 | Technical change – corrected a pagination error |
| 1.6(b)(1) | Technical change – Removed a sentence referring to the prohibition on smoking in the library |

**1 Wharton's Criminal Law § 19 (15th ed.)**

Wharton's Criminal Law  |  August 2020 Update
Charles E. Torcia

Part I. General Principles

Chapter 2. Definition, Analysis, and Classification of Crime

II. Classification of Offenses

# § 19. Felony

References

At common law, an offense other than treason was a felony if it resulted in a forfeiture of the offender's lands and goods and was punishable by death. [22]

In the United States, the commission of a felony does not result in a forfeiture in the common-law sense; and only some, not all, felonies are punishable by death.

An offense which is punishable by death is of course a felony. An offense which is not punishable by death is a felony if it is punishable by imprisonment for more than one year [23] or by imprisonment in the state prison. [24] What is determinative is the punishment which is authorized, not the punishment which is actually imposed. [25]

A number of cases discuss the concept of a "violent felony." In one case, the defendant entered a guilty plea in District Court to possessing a firearm and ammunition after having been convicted of a felony. The defendant, who had three prior felony convictions, including a Florida conviction for robbery, was subject to a mandatory minimum 15–year sentence under the Armed Career Criminal Act (ACCA). Rather than applying the categorical approach, the District Court evaluated whether the facts of Stokeling's robbery conviction were serious enough to warrant an enhancement, and concluded that although Stokeling had grabbed the victim by the neck and tried to remove her necklaces as she held onto them, his actions did not constitute a "violent felony" and did not justify a sentence enhancement. The Government appealed. The Court of Appeals for the Eleventh Circuit held that the District Court erred in making its own factual determination about the level of violence involved in Stokeling's particular robbery offense, and vacated his sentence and remanded for resentencing. The Supreme Court granted certiorari to address whether the "force" required to commit robbery under Florida law qualifies as "physical force" for purposes of the ACCA's elements clause, 18 U.S.C.A. § 924(e)(2)(B)(i). In a divided opinion, the majority, after construing the language of the elements clause in light of the history of ACCA and the Court's prior opinion in Johnson v. U.S., 559 U.S. 133, 130 S. Ct. 1265, 176 L. Ed. 2d 1 (2010), concluded that the elements clause encompasses robbery offenses, like Florida's, that require the criminal to overcome the victim's resistance. [25.30]

In a second case, a federal prisoner who had been convicted of a firearms offense filed a motion to vacate, set aside, or correct his sentence. The District Court denied the motion, and the prisoner appealed. The Court of Appeals for the Fourth Circuit held that: (1) a South Carolina statute making it a felony to assault, beat, or wound a law enforcement officer while resisting arrest, under which the defendant was previously convicted, was indivisible; and (2) that conviction was not categorically a predicate "violent felony" such as could support a sentence enhancement under the Armed Career Criminal Act (ACCA). The Court of Appeals distinguished *Stokeling*, discussed above, by noting that an assault under South Carolina law can be committed without the use, attempted use, or threatened use of violent physical force, and finding a realistic probability that South Carolina would apply the ABWO statute, S.C. Code Ann. § 16-9-320(B), to an assault involving only an attempt to touch an officer in a rude or angry manner while resisting arrest, such as spitting at the officer. [25.50]

In a third case, the defendant was convicted of being a felon in possession of a firearm and ammunition. He appealed from the enhanced sentence that he received under the Armed Career Criminal Act (ACCA). The Court of Appeals held that the defendant's prior South Carolina convictions of criminal domestic violence (CDV), under a statute whose minimum requirement was a threat to cause physical harm or injury to a member of the defendant's household, were categorically "violent felonies." The court noted that the minimum or "most innocent" conduct that must be proven to obtain a CDV conviction under S.C. Code Ann. § 16-25-20(A)(2) involves an "offer … to cause physical harm or injury to [his or her] own household member with apparent present ability under circumstances reasonably creating fear of imminent peril," and said "[w]e have no trouble concluding that this minimum unlawful conduct satisfies the ACCA's requirement that the offense have, as an element, the threatened use of physical or violent force 'capable of causing physical pain or injury to another person.' " [25.70]

Westlaw. © 2020 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

## Footnotes

| | |
|---|---|
| 22 | 4 Blackstone's Commentaries 94, 96. |
| | See also Ex parte Wilson (1885) 114 US 417, 29 L Ed 89, 5 S Ct 935; Bannon v United States (1895) 156 US 464, 39 L Ed 494, 15 S Ct 467; Reagan v United States (1895) 157 US 301, 39 L Ed 709, 15 S Ct 610; People v Connors (1921) 301 Ill 112, 133 NE 639; Bowser v State (1920) 136 Md 342, 110 A 854; State v Murphy (1892) 17 RI 698, 24 A 473. |
| 23 | See e.g., Minn Stats Ann, § 609.02(2) (" 'Felony' means a crime for which a sentence of imprisonment for more than one year may be imposed."); NH Rev Stats Ann, § 625:9(III) ("A felony is murder or a crime so designated by statute within or outside this code or a crime defined by statute outside of this code where the maximum penalty provided is imprisonment in excess of one year. …"); NY Penal L, § 10.00(5) (" 'Felony' means an offense for which a sentence to a term of imprisonment in excess of one year may be imposed."); Gen Laws of RI, § 11-1-2 ("Unless otherwise provided, any criminal offense which at any given time may be punished by imprisonment for a term of more than one year, or by a fine of more than one thousand dollars ($1,000), is hereby declared to be a felony."); ALI, Model Penal Code, § 1.04(2) (1985). |
| 24 | See e.g., Ariz Rev Stats, § 13-105(13) (" 'Felony' means an offense for which a sentence to a term of imprisonment in the custody of the state department of corrections is authorized by any law of this state."); Cal Penal Code, § 17(a); Fla Stats Ann, § 775.08(1) ("The term 'felony' shall mean any criminal offense that is punishable under the laws of this state, or that would be punishable if committed in this state, by death or imprisonment in a state penitentiary. … A person shall be imprisoned in the state penitentiary for each sentence which … exceeds 1 year."); Idaho Code, § 18-111; Wis Stats Ann, § 939.60 ("A crime punishable by imprisonment in the Wisconsin state prisons is a felony."). |
| 25 | Re Stevens (1893) 52 Kan 56, 34 P 459. |
| | Makarewicz v Commonwealth (1963) 346 Mass 478, 194 NE2d 388. |
| | People v Hughes (1893) 137 NY 29, 32 NE 1105. |
| 25.30 | Stokeling v. U.S., 139 S. Ct. 544, 202 L. Ed. 2d 512 (2019). |
| 25.50 | United States v. Jones, 914 F.3d 893 (4th Cir. 2019). |
| 25.70 | United States v. Drummond, 925 F.3d 681 (4th Cir. 2019). |

End of Document                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:20-cv-07721-SI Document 58-7 Filed 11/10/20 Page 284 of 1305

3. IMPOSITION OF DEATH PENALTY BY JURY, 82 Harv. L. Rev. 156

**82 Harv. L. Rev. 156**

Harvard Law Review
November, 1968

The Supreme Court, 1967 Term

I. Constitutional Law

E. Jury Trial

Copyright (c) 1968 by the Harvard Law Review Association

# 3. IMPOSITION OF DEATH PENALTY BY JURY

In *United States v. Jackson,* [1] the Court held unconstitutional the trial jury's exclusive power to impose the death sentence under the Federal Kidnaping Act [2] as an unnecessary burden on defendants' fifth amendment right to plead not guilty and their sixth amendment right to a jury trial. Defendants had been indicted under the **\*157** Kidnaping Act, which provides that those found guilty "shall be punished (1) by death if the kidnaped person has not been liberated unharmed, and if the verdict of the jury shall so recommend, or (2) by imprisonment for any term of years or for life, if the death penalty is not imposed." [3] The district court construed the statute to mean that only a jury could impose capital punishment, and therefore a defendant could insulate himself from the death sentence by pleading guilty or by waiving his right to a jury trial. [4] Citing *Griffin v. California,* [5] the court held the statute unconstitutional and dismissed the indictment, stating that the death penalty power of the jury burdened the defendants' sixth amendment right to a jury trial to the same extent that prosecutorial comment on an accused's silence at trial burdened a defendant's fifth amendment right against self-incrimination.

On appeal, the Supreme Court reversed by a 6-2 vote the lower court's decision that the unconstitutionality of the death penalty provision rendered the entire statute unenforceable. Writing for the majority, Mr. Justice Stewart held that although the capital punishment provision impaired the free exercise of the fifth amendment right to plead not guilty and the sixth amendment right to a jury trial, these constitutional infirmities could be cured merely by prohibiting the imposition of the death penalty in all cases under the statute. The Court found that the possibility of the death sentence served to penalize the defendant who chose to contest his guilt before a jury. The threat of this penalty would encourage waivers of the constitutional rights to plead not guilty and to demand a jury trial, and it was thus irrelevant that the statute might be viewed as lessening the impact of the death sentence by limiting the instances in which it could be imposed. The Court noted, *obiter,* that the policy of allowing a jury to impose the death sentence could be achieved by alternative methods that would not chill the assertion of those rights, such as by allowing a jury to determine the sentence regardless of the method of determining guilt. Hence, the exclusive power of the jury to impose the death penalty could not be upheld as incidental to a valid legislative objective, for the Kidnaping Act "needlessly" penalized defendants who stood on their right to plead not guilty before a jury.

The Court rejected two arguments to save the death penalty provision. First, the Government contended that the statute permitted the trial judge to treat the jury's recommendation of death **\*158** as advisory and to call special sentencing juries in cases where guilt had been determined by plea or after a waiver of jury trial; [6] thus, the death penalty could be imposed in any case, but only where both the judge and a jury concurred. Mr. Justice Stewart rejected this interpretation. The jury's "recommendation" was binding on the judge, for Congress had intended that the onus of the decision should rest solely with the jury. Nor did the judge have authority to call sentencing juries, for the reference to "the jury" in the statute meant the traditional trial jury. The Court also thought it unwise for trial judges to call sentencing juries without explicit authorization since the procedural rules for such a hearing could better be formulated by Congress in a comprehensive fashion [7] than on a case-by-case method without prior notice to the defendant. Second, the Government urged that the Court should instruct the lower courts not to accept any guilty pleas or jury waivers in kidnaping cases. Mr. Justice Stewart declined so to rule on the ground that defendants who acknowledge their guilt and wish to avoid the ignominy of public trial traditionally have been allowed to plead guilty; in addition, a flexible and efficient judicial system requires the use of guilty pleas.

Case 3:20-cv-07721-SI   Document 58-7   Filed 11/10/20   Page 285 of 1305

3. IMPOSITION OF DEATH PENALTY BY JURY, 82 Harv. L. Rev. 156

Finally, the Court concluded that since the purpose of the entire statute was to proscribe interstate kidnaping [8] and not merely to execute kidnapers, the death penalty could properly be severed and the remainder of the statute left operable. The Court recognized that the death penalty applied only to those kidnapers who harmed their victims, the statutory purpose being to induce careful treatment of victims. However, since the same purpose could be accomplished by varying the length of the prison sentence to "reflect the kidnaper's treatment of his victim," [9] the Court concluded that this did not impede severability and that there would be a greater frustration of congressional purpose if all the penalties were invalidated.

In a dissent in which Mr. Justice Black joined, Mr. Justice White agreed that the death penalty provision might in some cases induce defendants to waive jury trial or plead guilty. However, he thought that this provision could be saved by "making **\*159** it clear that pleas of guilty and waivers of jury trial should be carefully examined before they are accepted, in order to make sure that they have been neither coerced nor encouraged by the death penalty power in the jury." [10]

The theory employed in *Jackson* is a familiar one and requires that the exercise of constitutional rights cannot be penalized unless there are no less burdensome means to secure a more important policy goal. [11] The Court has applied this theory to prohibit prosecutorial comment on the exercise of a defendant's fifth amendment right to remain silent at trial, [12] to disallow disbarment where an attorney refuses to open his files, [13] to prohibit the government from retrying a defendant on counts on which he was acquitted where the defendant has successfully appealed from a conviction of another offense, [14] and to prohibit the withdrawal of unemployment benefits where an individual implements a religious conviction not to work on Saturday. [15] The extension of this constitutional standard to the sixth amendment right to trial by jury and its reapplication to the fifth amendment right not to plead guilty seem fully justified, for the Court has often held the right to a jury trial, with its requirement of a unanimous judgment from a group representing the community, to be basic to the preservation of traditional freedoms. [16] And fear of the death penalty would surely tend to discourage jury trials. [17] Nor would this tendency have been eliminated if the Court had adopted the Government's interpretation permitting **\*160** the trial judge to convene a sentencing jury after a guilty plea or a jury waiver. In such a case, the defendant who pleaded guilty might be able to present character evidence that would otherwise be inadmissible and to argue for a light sentence, a dubious tactic at a trial on guilt; this would further induce a defendant with a good record to plead guilty. [18]

By severing the death penalty provision from the statute, rather than rendering the Act totally invalid as the lower court had done, the Court wisely preserved the operability of an important criminal statute. [19] This remedy seems clearly preferable to that proffered by Mr. Justice White in his dissent, that the trial judge should carefully examine all guilty pleas and jury waivers to determine whether such action was coerced by fear of the death penalty. Presumably, Mr. Justice White would reject such pleas and waivers and force the defendant to accept a jury trial. But this procedure would then leave the defendant open to the death sentence, precisely the risk he wished to avoid. Thus, it would seem quite unlikely that a defendant who did in fact plead guilty to avoid the death penalty would ever admit that he was coerced, because a showing of coercion would result in a jury trial with its accompanying threat of the death sentence.

This decision will have a variety of effects on the criminal system. First, it will directly render invalid the capital punishment provisions in several similar federal [20] and state statutes. [21] The Court also indicated that a statutory scheme which gives the trial judge discretion to call a penalty jury after guilt has been determined by plea or by the judge would be unconstitutional; such a bifurcated process would be less likely to end in capital punishment than would an ordinary jury trial since in the latter case the death penalty could be imposed without the **\*161** exercise of judicial discretion to call a penalty jury. [22] Therefore, if legislatures wish to leave the imposition of the death sentence to a group of representatives of the community and insulate their judiciaries from the onus of such a decision, *Jackson* leaves them with only three alternatives: to make the death penalty mandatory in all cases, to convene penalty juries in all cases, or to refuse all guilty pleas or jury waivers in capital cases. [23] But none of these possibilities may be very attractive. The first seems unduly harsh and unlikely to be instituted in light of the trend towards a narrowing of capital offenses. [24] The second involves the establishment of a new and relatively untested type of trial. And the automatic refusal of all guilty pleas and jury waivers in capital cases can only worsen the clogged conditions of many trial dockets. Hence, legislatures are likely to conclude that the policy of giving a jury the exclusive right to impose capital punishment is not worth reasserting, and the death penalty provisions struck down by *Jackson* probably will be resurrected, if at all, only by giving the judge the authority to set punishment in every case. But since the increasingly vocal opposition

Case 3:20-cv-07721-SI   Document 58-7   Filed 11/10/20   Page 286 of 1305

3. IMPOSITION OF DEATH PENALTY BY JURY, 82 Harv. L. Rev. 156

to the death sentence may make it politically difficult for Congress and state legislatures to reestablish capital punishment in statutes subject to the defects of the Federal Kidnaping Act, the ultimate result of the Court's decision is likely to be an end to the death penalty for such offenses. [25]

The decision in *Jackson* casts doubt on the constitutionality of other criminal procedures, [26] particularly plea bargaining for lower sentences. Empirical studies have amply demonstrated that, as a class, those who plead not guilty before a jury receive higher sentences than those who confess their guilt. [27] There would thus seem to be little difference between the *Jackson* situation and one where a defendant, at the urging of his own attorney, **\*162** the prosecutor, or the judge, decides to plead guilty to a lesser offense or for a lower sentence rather than go to trial on a more serious charge or at the risk of a higher sentence. [28] Just as in *Jackson,* fear of a higher sentence serves to induce defendants to forego their sixth amendment right to a jury trial and their fifth amendment right to plead not guilty.

Although the broad language and theory used by the Court would seem to make guilty pleas induced by promises of lighter treatment open to collateral attack, the practice of plea bargaining might be distinguishable on several grounds. [29] First, the threat of the death penalty in *Jackson* may be more likely to encourage guilty pleas and jury waivers than the threat of a longer prison term. *Jackson* could thus be viewed merely as an expression of a growing judicial distaste for capital punishment and limited to cases in which the defendant is faced with the extreme penalty. [30] Second, the impermissible choice forced on the defendants in *Jackson* is embodied in a statute; legislative coercion may be viewed as having a greater impact on a defendant's decision to plead guilty or not guilty than negotiations between defense counsel and prosecutor. Third, the *Jackson* Court struck down the use of the death penalty because it "needlessly" encouraged [31] guilty pleas and jury waivers, and although plea bargaining burdens constitutional rights, it arguably serves vital policy interests that are unattainable in other ways. Plea bargaining sharply reduces the number of trials, thereby saving the state considerable expense, conserving limited judicial resources, and easing congested trial calendars while providing defendants with a more expeditious criminal process. [32] However, since these distinctions do not alter the fact that those who select a jury trial are penalized for their choice, future courts might use the *Jackson* rationale as a foundation for reappraising the constitutionality of the plea bargaining process.

## Footnotes

1    390 U.S. 570 (1968).

2    18 U.S.C. § 1201(a) (1964).

3    *Id.*

4    United States v. Jackson, 262 F. Supp. 716, 717-18 (D. Conn. 1967).

5    380 U.S. 609 (1965) (comment on an accused's silence at trial held unconstitutional).

6    The Seventh Circuit had permitted the use of sentencing juries in kidnaping cases. *See* Seadlund v. United States, 97 F.2d 742 (7th Cir. 1938). *See also* Robinson v. United States, 264 F. Supp. 146 (W.D. Ky. 1967).

7    *See* Frady v. United States, 348 F.2d 84, 115-16 (D.C. Cir.) (Burger, J., concurring in part and dissenting in part), *cert. denied,* 382 U.S. 909 (1965). *See also* Note, *The California Penalty Trial,* 52 CALIF. L. REV. 386 (1964); Note, *The Two-Trial System in Capital Cases,* 39 N.Y.U.L. REV. 50 (1964).

8    *See* Finley, *The Lindbergh Law,* 28 GEO. L.J. 908, 913 (1940).

9    390 U.S. at 591.

10    390 U.S. at 592.

11  *See, e.g.,* Shelton v. Tucker, 364 U.S. 479, 488 (1960); *cf.* Note, *Unconstitutional Conditions,* 73 HARV. L. REV. 1595 (1960). The argument that since Congress possessed the power to make the death penalty mandatory, it necessarily possessed the power to provide the option of avoiding the death penalty by waiving a jury trial has surface syllogistic appeal, but proves too much. To acknowledge a legislative power to provide a penalty for the exercise of constitutional rights would be to provide the power to render those rights nugatory by so structuring the choices that the rights would rarely be exercised.

12  Griffin v. California, 380 U.S. 609 (1965).

13  Spevack v. Klein, 385 U.S. 511 (1967).

14  Green v. United States, 355 U.S. 184, 193 (1957).

15  Sherbert v. Verner, 374 U.S. 398 (1963). *See also* Garrity v. New Jersey, 385 U.S. 493 (1967); Thomas v. United States, 368 F.2d 941 (5th Cir. 1966); Hale, *Unconstitutional Conditions and Constitutional Rights,* 35 COLUM. L. REV. 321 (1935).

16  *See, e.g.,* Duncan v. Louisiana, 391 U.S. 145 (1968); Reid v. Covert, 354 U.S. 1, 9-10 (1957). *But see* Palko v. Connecticut, 302 U.S. 319, 324 (1937) (Cardozo, J.) (dictum).

17  *See* Laboy v. New Jersey, 266 F. Supp. 581, 583 (D.N.J. 1967):
[Petitioner stated that] "the only thing I understood was that declaring myself guilty I would be saving myself from the electric chair …." Petitioner says that what he wanted to do at that time was to go to trial…. When asked if he was afraid of going to the electric chair if he did not plead guilty, petitioner answered, "And who is not afraid of something like that?"

18  *See* Knowlton, *Problems of Jy Discretion in Capital Cases,* 101 U. PA. L. REV. 1099 (1953); Note, United States v. Jackson: *The Possible Consequences of Impairing the Right to Trial by Jury,* 22 RUTGERS L. REV. 167, 179-83 (1967).

19  *See* Finley, *The Lindbergh Law,* 28 GEO. L.J. 908 (1940).

20  *See* 21 U.S.C. § 176b (1964) (sales of narcotics to minors); 42 U.S.C. §§ 2274-76 (1964) (atomic secrets); D.C. CODE ANN. § 22-2801 (1961) (rape). A similar statute on bank robbery, 18 U.S.C. § 2113(e) (1964), was struck down later in the Term in Pope v. United States, 392 U.S. 651 (1968).

21  *E.g.,* N.H. REV. STAT. ANN. § 585:4 (1955); N.J. REV. STAT. §§ 2A:113-3 to -4 (1951); WYO. STAT. ANN. § 6-59 (1957). An equal protection argument has been used by state courts to strike down similar state laws. Defendants who have committed similar crimes will be faced with different statutory sentence maximums depending on whether or not they choose to contest their guilt before a jury. Allowing discriminations between individuals to rest on their election of their constitutional right to a jury trial seems clearly unwarranted. *See* Sturges & Burn Mfg. Co. v. Pastel, 301 Ill. 253, 133 N.E. 762 (1922); Spillers v. State, 436 P.2d 18 (Nev. 1968).

22  390 U.S. at 573 n.6.

23  *E.g.,* WASH. REV. CODE ANN. §§ 9.48.030, 10.01.060, 10.49.010 (1961).

24  *See* H. KALVEN & H. ZEISEL, THE AMERICAN JURY 435 (1966).

25  *Cf.* Note, *supra* note 18, at 196.

26  For instance, in a recent case involving the Federal Juvenile Delinquency Act, 18 U.S.C. § 5033 (1964), the defendant had the option of being tried as an adult with a jury with a maximum penalty of 20 years or as a juvenile without a jury for lesser penalties. This was held to be an impermissible choice and the defendant was tried as a juvenile and with

Case 3:20-cv-07721-SI   Document 58-7   Filed 11/10/20   Page 288 of 1305

3. IMPOSITION OF DEATH PENALTY BY JURY, 82 Harv. L. Rev. 156

a jury. 🚩 *Nieves v. United States, 280 F. Supp. 994 (S.D.N.Y. 1968)*. *Jackson* would seem to make this result legally unassailable.

*Jackson* also casts doubt on jury sentencing because a defendant can have the benefit of a presentence report only if he pleads guilty. In some states, this practice apparently serves to induce defendants with clean records to plead guilty. *See* Note, *Jury Sentencing in Virginia,* 53 VA. L. REV. 968, 976 (1967).

27    *See, e.g.,* Note, *The Influence of the Defendant's Plea on Judicial Determination of Sentence,* 66 YALE L.J. 204 (1956).

28    Such an analogy is made more compelling by the majority's rejection of the solution offered by the dissenting Justices to examine jury waivers and guilty pleas for coercion. This is the method currently used by the federal courts to prevent involuntary guilty pleas. *See* FED. R. CRIM. P. 11.

29    Appellee Jackson argued that reductions in charges are of two types: the result of a bargain, and the correction of prosecutorial error. Since the latter is obviously beneficial and since the two may be outwardly indistinguishable, he argued that plea bargaining should be retained. Brief for Appellee at 9-11.

30    *See* 🚩 *Fay v. Noia, 372 U.S. 391, 440 (1963);* 🚩 *Green v. United States, 355 U.S. 184, 193 (1957); In re Cicenia, 148 F. Supp. 98, 101-02 (D.N.J. 1956).*

31    🚩 *390 U.S. at 583.*

32    *See* Note, *supra* note 18, at 194-95.

82 HVLR 156

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

T.I.A.S. No. 6577 (U.S. Treaty), 19 U.S.T. 6223 (U.S. Treaty), 1968 WL 89568 (U.S. Treaty)

UNITED STATES OF AMERICA

Multilateral

Protocol Relating to the Status of Refugees
Done at New York January 31, 1967;

Accession advised by the Senate of the United States of America, subject to certain reservations, October 4, 1968;
Accession approved by the President of the United States
of America, subject to said reservations, October 15, 1968;
Accession of the United States of America deposited with the Secretary-
General of the United Nations, with the said reservations, November 1, 1968;
Proclaimed by the President of the United States of America November 6, 1968;
Entered into force with respect to the United States of America November 1, 1968.
November 1, 1968.

**And text of convention relating to the status of refugees**

Done at Geneva July 28, 1951.

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

A PROCLAMATION

**PROTOCOL RELATING TO THE STATUS OF REFUGEES**

*UNITED NATIONS 1967*

Article I

GENERAL PROVISION

Article II

CO-OPERATION OF THE NATIONAL AUTHORITIES WITH THE UNITED NATIONS

Article III

INFORMATION ON NATIONAL LEGISLATION

Article IV

SETTLEMENT OF DISPUTES

Article V

ACCESSION

Article VI

FEDERAL CLAUSE

Article VII

RESERVATIONS AND DECLARATIONS

Article VIII

ENTRY INTO FORCE

Article IX

DENUNCIATION

Article X

NOTIFICATIONS BY THE SECRETARY-GENERAL OF THE UNITED NATIONS

Article XI

DEPOSIT IN THE ARCHIVES OF THE SECRETARIAT OF THE UNITED NATIONS

CONVENTION RELATING TO THE STATUS OF REFUGEES

**CONVENTION RELATING TO THE STATUS OF REFUGEES** [3]

*Preamble*

**Chapter I**

GENERAL PROVISIONS

ARTICLE 1

*Definition of the Term "Refugee"*

ARTICLE 2

*General Obligations*

ARTICLE 3

*Non-discrimination*

ARTICLE 4

*Religion*

ARTICLE 5

*Rights granted apart from this Convention*

ARTICLE 6

*The Term "in the same circumstances"*

ARTICLE 7

*Exemption from Reciprocity*

ARTICLE 8

*Exemption from Exceptional Measures*

ARTICLE 9

*Provisional Measures*

ARTICLE 10

*Continuity of Residence*

ARTICLE 11

*Refugee Seamen*

**Chapter II**

JURIDICAL STATUS

ARTICLE 12

*Personal Status*

ARTICLE 13

*Movable and Immovable Property*

ARTICLE 14

*Artistic Rights and Industrial Property*

ARTICLE 15

*Right of Association*

ARTICLE 16

*Access to Courts*

**Chapter III**

GAINFUL EMPLOYMENT

ARTICLE 17

*Wage-carning Employment*

ARTICLE 18

*Self-employment*

ARTICLE 19

*Liberal Professions*

**Chapter IV**

WELFARE

ARTICLE 20

*Rationing*

ARTICLE 21

*Housing*

ARTICLE 22

*Public Education*

ARTICLE 23

*Public Relief*

ARTICLE 24

*Labour Legislation and Social Security*

**Chapter V**

ADMINISTRATIVE MEASURES

ARTICLE 25

*Administrative Assistance*

ARTICLE 26

*Freedom of Movement*

ARTICLE 27

*Identity Papers*

ARTICLE 28

*Travel Documents*

ARTICLE 29

*Fiscal Charges*

ARTICLE 30

*Transfer of Assels*

ARTICLE 31

*Refugees unlawfully in the Country of Refuge*

ARTICLE 32

*Expulsion*

ARTICLE 33

*Prohibition of Expulsion or Return ("Refoulement")*

ARTICLE 34

*Naturalization*

**Chapter VI**

EXECUTORY AND TRANSITORY PROVISIONS

ARTICLE 35

ARTICLE 36

*Information on National Legislation*

ARTICLE 37

*Relation to Previous Conventions*

**Chapter VII**

FINAL CLAUSES

ARTICLE 38

*Settlement of Disputes*

ARTICLE 39

*Signature, Ratification and Accession*

ARTICLE 40

*Territorial Application Clause*

ARTICLE 41

*Federal Clause*

ARTICLE 42

*Reservations*

ARTICLE 43

*Entry into force*

ARTICLE 44

*Denunciation*

ARTICLE 45

*Revision*

ARTICLE 46

*Notifications by the Secretary-General of the United Nations*

**SCHEDULE**

*Paragraph 1*

*Paragraph 2*

*Paragraph 3*

*Paragraph 4*

*Paragraph 5*

*Paragraph 6*

*Paragraph 7*

*Paragraph 8*

*Paragraph 9*

*Paragraph 10*

*Paragraph 11*

*Paragraph 12*

*Paragraph 13*

*Paragraph 14*

*Paragraph 15*

*Paragraph 16*

**ANNEX**

**Specimen Travel Document**

(Cover of booklet)

TRAVEL DOCUMENT

(Convention of 28 July 1951)

(1)

TRAVEL DOCUMENT

(Convention of 28 July 1951)

(2)

Description

Children accompanying holder

*Strike out whichever does not apply.

(3)

(4)

(5)

Extension or renewal of validity

_____

Extension or renewal of validity

(6)

Extension or renewal of validity

_____

Extension or renewal of validity

(7-32)

Visas

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

A PROCLAMATION

**\*1**  WHEREAS the Protocol Relating to the Status of Refugees was opened for accession at New York on January 31, 1967, the certified text of which in the English, French, Chinese, Russian, and Spanish languages is word for word as follows:

**PROTOCOL RELATING TO THE STATUS OF REFUGEES**

***UNITED NATIONS 1967***

The States Parties to the present Protocol,

Considering that the Convention relating to the Status of Refugees done at Geneva on 28 July 1951 [1] (hereinafter referred to as the Convention) covers only those persons who have become refugees as a result of events occurring before 1 January 1951,

Considering that new refugee situations have arisen since the Convention was adopted and that the refugees concerned may therefore not fall within the scope of the Convention,

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Considering that it is desirable that equal status should be enjoyed by all refugees covered by the definition in the Convention irrespective of the dateline 1 January 1951,

Have agreed as follows:

Article I

GENERAL PROVISION

1. The States Parties to the present Protocol undertake to apply articles 2 to 34 [2] inclusive of the Convention to refugees as hereinafter defined.

2. For the purpose of the present Protocol, the term "refugee" shall, except as regards the application of paragraph 3 of this article, mean any person within the definition of article 1 of the Convention as if the words "As a result of events occurring before 1 January 1951 and..." and the words "... as a result of such events", in article 1 A (2) were omitted.

3. The present Protocol shall be applied by the States Parties hereto without any geographic limitation, save that existing declarations made by States already Parties to the Convention in accordance with article 1 B (1) (a) of the Convention, shall, unless extended under article 1 B (2) thereof, apply also under the present Protocol.

Article II

CO-OPERATION OF THE NATIONAL AUTHORITIES WITH THE UNITED NATIONS

1. The States Parties to the present Protocol undertake to co-operate with the Office of the United Nations High Commissioner for Refugees, or any other agency of the United Nations which may succeed it, in the exercise of its functions, and shall in particular facilitate its duty of supervising the application of the provisions of the present Protocol.

2. In order to enable the Office of the High Commissioner, or any other agency of the United Nations which may succeed it, to make reports to the competent organs of the United Nations, the States Parties to the present Protocol undertake to provide them with the information and statistical data requested, in the appropriate form, concerning:

(a) The condition of refugees;

(b) The implementation of the present Protocol;

(c) Laws, regulations and decrees which are, or may hereafter be, in force relating to refugees.

Article III

INFORMATION ON NATIONAL LEGISLATION

The States Parties to the present Protocol shall communicate to the Secretary-General of the United Nations the laws and regulations which they may adopt to ensure the application of the present Protocol.

Article IV

SETTLEMENT OF DISPUTES

Any dispute between States Parties to the present Protocol which relates to its interpretation or application and which cannot be settled by other means shall be referred to the International Court of Justice at the request of any one of the parties to the dispute.

Article V

ACCESSION

The present Protocol shall be open for accession on behalf of all States Parties to the Convention and of any other State Member of the United Nations or member of any of the specialized agencies or to which an invitation to accede may have been addressed by the General Assembly of the United Nations. Accession shall be effected by the deposit of an instrument of accession with the Secretary-General of the United Nations.

Article VI

FEDERAL CLAUSE

In the case of a Federal or non-unitary State, the following provisions shall apply:

(a) With respect to those articles of the Convention to be applied in accordance with article I, paragraph 1, of the present Protocol that come within the legislative jurisdiction of the federal legislative authority, the obligations of the Federal Government shall to this extent be the same as those of States Parties which are not Federal States;

(b) With respect to those articles of the Convention to be applied in accordance with article I, paragraph 1, of the present Protocol that come within the legislative jurisdiction of constituent States, provinces or cantons which are not, under the constitutional system of the federation, bound to take legislative action, the Federal Government shall bring such articles with a favourable recommendation to the notice of the appropriate authorities of States, provinces or cantons at the earliest possible moment;

(c) A Federal State Party to the present Protocol shall, at the request of any other State Party hereto transmitted through the Secretary-General of the United Nations, supply a statement of the law and practice of the Federation and its constituent units in regard to any particular provision of the Convention to be applied in accordance with article I, paragraph 1, of the present Protocol, showing the extent to which effect has been given to that provision by legislative or other action.

Article VII

RESERVATIONS AND DECLARATIONS

1. At the time of accession, any State may make reservations in respect of article IV of the present Protocol and in respect of the application in accordance with article I of the present Protocol of any provisions of the Convention other than those contained in articles 1, 3, 4, 16 (1) and 33 thereof, provided that in the case of a State Party to the Convention reservations made under this article shall not extend to refugees in respect of whom the Convention applies.

2. Reservations made by States Parties to the Convention in accordance with article 42 thereof shall, unless withdrawn, be applicable in relation to their obligations under the present Protocol.

3. Any State making a reservation in accordance with paragraph 1 of this article may at any time withdraw such reservation by a communication to that effect addressed to the Secretary-General of the United Nations.

4. Declaration made under article 40, paragraphs 1 and 2, of the Convention by a State Party thereto which accedes to the present Protocol shall be deemed to apply in respect of the present Protocol, unless upon accession a notification to the contrary is

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

addressed by the State Party concerned to the Secretary-General of the United Nations. The provisions of article 40, paragraphs 2 and 3, and of article 44, paragraph 3, of the Convention shall be deemed to apply *mutatis mutandis* to the present Protocol.

<div align="center">Article VIII</div>

<div align="center">ENTRY INTO FORCE</div>

1. The present Protocol shall come into force on the day of deposit of the sixth instrument of accession.

2. For each State acceding to the Protocol after the deposit of the sixth instrument of accession, the Protocol shall come into force on the date of deposit by such State of its instrument of accession.

<div align="center">Article IX</div>

<div align="center">DENUNCIATION</div>

1. Any State Party hereto may denounce this Protocol at any time by a notification addressed to the Secretary-General of the United Nations.

2. Such denunciation shall take effect for the State Party concerned one year from the date on which it is received by the Secretary-General of the United Nations.

<div align="center">Article X</div>

<div align="center">NOTIFICATIONS BY THE SECRETARY-GENERAL OF THE UNITED NATIONS</div>

The Secretary-General of the United Nations shall inform the States referred to in article V above of the date of entry into force, accessions, reservations and withdrawals of reservations to and denunciations of the present Protocol, and of declarations and notifications relating hereto.

<div align="center">Article XI</div>

<div align="center">DEPOSIT IN THE ARCHIVES OF THE SECRETARIAT OF THE UNITED NATIONS</div>

A copy of the present Protocol, of which the Chinese, English, French, Russian and Spanish texts are equally authentic, signed by the President of the General Assembly and by the Secretary-General of the United Nations, shall be deposited in the archives of the Secretariat of the United Nations. The Secretary-General will transmit certified copies thereof to all States Members of the United Nations and to the other States referred to in article V above.

In accordance with article XI of the Protocol, we have appended our signatures this thirty-first day of January one thousand nine hundred and sixty-seven.

A. R. PAZHWAK
PRESIDENT OF THE GENERAL ASSEMBLY OF THE UNITED NATIONS
U THANT
SECRETARY-GENERAL OF THE UNITED NATIONS

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Done at New York January 31, 1967;, T.I.A.S. No. 6577 (1968)

I hereby certify that the foregoing text is a true copy of the Protocol relating to the Status of Refugees, done at New York, on 31 January 1967, in a single copy signed by the President of the General Assembly of the United Nations and the Secretary-General of the United Nations, the original of which is deposited with the Secretary-General of the United Nations.

*For the Secretary-General:*
C A STAVROPOULOS
*Under-Secretary Legal Counsel*
United Nations, New York 9 February 1967

WHEREAS the Senate of the United States of America by its resolution of October 4, 1968, two-thirds of the Senators present concurring therein, did advise and consent to accession to the Protocol with the following reservations:

"The United States of America construes Article 29 of the Convention as applying only to refugees who are resident in the United States and reserves the right to tax refugees who are not residents of the United States in accordance with its general rules relating to nonresident aliens."

"The United States of America accepts the obligation of paragraph 1(b) of Article 24 of the Convention except insofar as that paragraph may conflict in certain instances with any provision of title II (old age, survivors' and disability insurance) or title XVIII (hospital and medical insurance for the aged) of the Social Security Act. As to any such provision, the United States will accord to refugees lawfully staying in its territory treatment no less favorable than is accorded aliens generally in the same circumstances."

WHEREAS the President of the United States of America, in pursuance of the advice and consent of the Senate, duly approved on October 15, 1968 the accession of the United States of America to the Protocol with the aforesaid reservations;

WHEREAS it is provided in Article VIII that the Protocol shall come into force on the day of deposit of the sixth instrument of accession and shall come into force for each State acceding thereafter on the date of deposit of its instrument of accession;

AND WHEREAS, pursuant to the provisions of Article VIII, the Protocol first came into force on October 4, 1967, and came into force with respect to the United States of America, subject to the aforesaid reservations, on November 1, 1968, the date of deposit by the United States of America of its instrument of accession;

NOW, THEREFORE, be it known that I, Lyndon B. Johnson, President of the United States of America, do hereby proclaim and make public the Protocol Relating to the Status of Refugees, to the end that the same and every article and clause thereof shall be observed and fulfilled with good faith, on and after November 1, 1968, by the United States of America and by the citizens of the United States of America and all other persons subject to the jurisdiction thereof, subject to the aforesaid reservations.

IN TESTIMONY WHEREOF, I have hereunto set my hand and caused the Seal of the United States of America to be affixed.

DONE at the city of Washington this sixth day of November in the year of our Lord one thousand nine hundred sixty-eight and of the Independence of the United States of America the one hundred ninety-third.

LYNDON B. JOHNSON
[SEAL]

**By the President:**
DEAN RUSK
*Secretary of State*

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**UNITED NATIONS CONFERENCE OF PLENIPOTENTIARIES ON THE STATUS OF REFUGEES AND STATELESS PERSONS**

**CONVENTION RELATING TO THE STATUS OF REFUGEES**

**CONVENTION RELATING TO THE STATUS OF REFUGEES** [3]

*Preamble*

The HIGH CONTRACTING PARTIES,

CONSIDERING that the Charter of the United Nations [4] and the Universal Declaration of Human Rights approved on 10 December 1948 by the General Assembly have affirmed the principle that human beings shall enjoy fundamental rights and freedoms without discrimination,

CONSIDERING that the United Nations has, on various occasions, manifested its profound concern for refugees and endeavoured to assure refugees the widest possible exercise of these fundamental rights and freedoms,

CONSIDERING that it is desirable to revise and consolidate previous international agreements relating to the status of refugees and to extend the scope of and the protection accorded by such instruments by means of a new agreement,

CONSIDERING that the grant of asylum may place unduly heavy burdens on certain countries, and that a satisfactory solution of a problem of which the United Nations has recognized the international scope and nature cannot therefore be achieved without international co-operation,

EXPRESSING the wish that all States, recognizing the social and humanitarian nature of the problem of refugees, will do everything within their power to prevent this problem from becoming a cause of tension between States,

NOTING that the United Nations High Commissioner for Refugees is charged with the task of supervising international conventions providing for the protection of refugees, and recognizing that the effective co-ordination of measures taken to deal with this problem will depend upon the co-operation of States with the High Commissioner,

HAVE AGREED as follows:

## Chapter I

### GENERAL PROVISIONS

### ARTICLE 1

*Definition of the Term "Refugee"*

A. For the purposes of the present Convention, the term "refugee" shall apply to any person who:

(1) Has been considered a refugee under the Arrangements of 12 May 1926 [5] and 30 June 1928 [6] or under the Conventions of 28 October 1933 [7] and 10 February 1938, [8] the Protocol of 14 September 1939 [9] or the Constitution of the International Refugee Organization; [10]

Decisions of non-eligibility taken by the International Refugee Organization during the period of its activities shall not prevent the status of refugee being accorded to persons who fulfil the conditions of paragraph 2 of this section;

(2) As a result of events occurring before 1 January 1951 and owing to well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality and is unable or, owing to such fear, is unwilling to avail himself of the protection of that country; or who, not having a nationality and being outside the country of his former habitual residence as a result of such events, is unable or, owing to such fear, is unwilling to return to it.

In thé case of a person who has more than one nationality, the term "the country of his nationality" shall mean each of the countries of which he is a national, and a person shall not be deemed to be lacking the protection of the country of his nationality if, without any valid reason based on well-founded fear, he has not availed himself of the protection of one of the countries of which he is a national.

B. (1) For the purposes of this Convention, the words "events occurring before 1 January 1951" in article 1, section A, shall be understood to mean either
    (*a*) "events occurring in Europe before 1 January 1951"; or
    (*b*) "events occurring in Europe or elsewhere before 1 January 1951";
and each Contracting State shall make a declaration at the time of signature, ratification or accession, specifying which of these meanings it applies for the purpose of its obligations under this Convention.

(2) Any Contracting State which has adopted alternative (*a*) may at any time extend its obligations by adopting alternative (*b*) by means of a notification addressed to the Secretary-General of the United Nations.

C. This Convention shall cease to apply to any person falling under the terms of section A if:
(1) He has voluntarily re-availed himself of the protection of the country of his nationality; or
(2) Having lost his nationality, he has voluntarily reacquired it; or
(3) He has acquired a new nationality, and enjoys the protection of the country of his new nationality; or
(4) He has voluntarily re-established himself in the country which he left or outside which he remained owing to fear of persecution; or
(5) He can no longer, because the circumstances in connexion with which he has been recognized as a refugee have ceased to exist, continue to refuse to avail himself of the protection of the country of his nationality;
Provided that this paragraph shall not apply to a refugee falling under section A (1) of this article who is able to invoke compelling reasons arising out of previous persecution for refusing to avail himself of the protection of the country of nationality;
(6) Being a person who has no nationality he is, because the circumstances in connexion with which he has been recognized as a refugee have ceased to exist, able to return to the country of his former habitual residence;
Provided that this paragraph shall not apply to a refugee falling under section A (1) of this article who is able to invoke compelling reasons arising out of previous persecution for refusing to return to the country of his former habitual residence.

D. This Convention shall not apply to persons who are at present receiving from organs or agencies of the United Nations other than the United Nations High Commissioner for Refugees protection or assistance.

When such protection or assistance has ceased for any reason, without the position of such persons being definitively settled in accordance with the relevant resolutions adopted by the General Assembly of the United Nations, these persons shall *ipso facto* be entitled to the benefits of this Convention.

E. This Convention shall not apply to a person who is recognized by the competent authorities of the country in which he has taken residence as having the rights and obligations which are attached to the possession of the nationality of that country.

F. The provisions of this Convention shall not apply to any person with respect to whom there are serious reasons for considering that:

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(*a*) he has committed a crime against peace, a war crime, or a crime against humanity, as defined in the international instruments drawn up to make provision in respect of such crimes;

(*b*) he has committed a serious non-political crime outside the country of refuge prior to his admission to that country as a refugee;

(*c*) he has been guilty of acts contrary to the purposes and principles of the United Nations.

## ARTICLE 2

### *General Obligations*

Every refugee has duties to the country in which he finds himself, which require in particular that he conform to its laws and regulations as well as to measures taken for the maintenance of public order.

## ARTICLE 3

### *Non-discrimination*

The Contracting States shall apply the provisions of this Convention to refugees without discrimination as to race, religion or country of origin.

## ARTICLE 4

### *Religion*

The Contracting States shall accord to refugees within their territories treatment at least as favourable as that accorded to their nationals with respect to freedom to practice their religion and freedom as regards the religious education of their children.

## ARTICLE 5

### *Rights granted apart from this Convention*

Nothing in this Convention shall be deemed to impair any rights and benefits granted by a Contracting State to refugees apart from this Convention.

## ARTICLE 6

### *The Term "in the same circumstances"*

For the purpose of this Convention, the term "in the same circumstances" implies that any requirements (including requirements as to length and conditions of sojourn or residence) which the particular individual would have to fulfil for the enjoyment of the right in question, if he were not a refugee, must be fulfilled by him, with the exception of requirements which by their nature a refugee is incapable of fulfilling.

## ARTICLE 7

### *Exemption from Reciprocity*

1. Except where this Convention contains more favourable provisions, a Contracting State shall accord to refugees the same treatment as is accorded to aliens generally.

2. After a period of three years' residence, all refugees shall enjoy exemption from legislative reciprocity in the territory of the Contracting States.

3. Each Contracting State shall continue to accord to refugees the rights and benefits to which they were already entitled, in the absence of reciprocity, at the date of entry into force of this Convention for that State.

4. The Contracting States shall consider favourably the possibility of according to refugees, in the absence of reciprocity, rights and benefits beyond those to which they are entitled according to paragraphs 2 and 3, and to extending exemption from reciprocity to refugees who do not fulfil the conditions provided for in paragraphs 2 and 3.

5. The provisions of paragraphs 2 and 3 apply both to the rights and benefits referred to in articles 13, 18, 19, 21 and 22 of this Convention and to rights and benefits for which this Convention does not provide.


## ARTICLE 8

### *Exemption from Exceptional Measures*

With regard to exceptional measures which may be taken against the person, property or interests of nationals of a foreign State, the Contracting States shall not apply such measures to a refugee who is formally a national of the said State solely on account of such nationality. Contracting States which, under their legislation, are prevented from applying the general principle expressed in this article, shall, in appropriate cases, grant exemptions in favour of such refugees.


## ARTICLE 9

### *Provisional Measures*

Nothing in this Convention shall prevent a Contracting State, in time of war or other grave and exceptional circumstances, from taking provisionally measures which it considers to be essential to the national security in the case of a particular person, pending a determination by the Contracting State that that person is in fact a refugee and that the continuance of such measures is necessary in his case in the interests of national security.


## ARTICLE 10

### *Continuity of Residence*

1. Where a refugee has been forcibly displaced during the Second World War and removed to the territory of a Contracting State, and is resident there, the period of such enforced sojourn shall be considered to have been lawful residence within that territory.

2. Where a refugee has been forcibly displaced during the Second World War from the territory of a Contracting State and has, prior to the date of entry into force of this Convention, returned there for the purpose of taking up residence, the period of residence before and after such enforced displacement shall be regarded as one uninterrupted period for any purposes for which uninterrupted residence is required.


## ARTICLE 11

### *Refugee Seamen*

In the case of refugees regularly serving as crew members on board a ship flying the flag of a Contracting State, that State shall give sympathetic consideration to their establishment on its territory and the issue of travel documents to them or their temporary admission to its territory particularly with a view to facilitating their establishment in another country.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

## Chapter II

## JURIDICAL STATUS

## ARTICLE 12

### *Personal Status*

1. The personal status of a refugee shall be governed by the law of the country of his domicile or, if he has no domicile, by the law of the country of his residence.

2. Rights previously acquired by a refugee and dependent on personal status, more particularly rights attaching to marriage, shall be respected by a Contracting State, subject to compliance, if this be necessary, with the formalities required by the law of that State, provided that the right in question is one which would have been recognized by the law of that State had he not become a refugee.

## ARTICLE 13

### *Movable and Immovable Property*

The Contracting States shall accord to a refugee treatment as favourable as possible and, in any event, not less favourable than that accorded to aliens generally in the same circumstances, as regards the acquisition of movable and immovable property and other rights pertaining thereto, and to leases and other contracts relating to movable and immovable property.

## ARTICLE 14

### *Artistic Rights and Industrial Property*

In respect of the protection of industrial property, such as inventions, designs or models, trade marks, trade names, and of rights in literary, artistic and scientific works, a refugee shall be accorded in the country in which he has his habitual residence the same protection as is accorded to nationals of that country. In the territory of any other Contracting State, he shall be accorded the same protection as is accorded in that territory to nationals of the country in which he has his habitual residence.

## ARTICLE 15

### *Right of Association*

As regards non-political and non-profitmaking associations and trade unions the Contracting States shall accord to refugees lawfully staying in their territory the most favourable treatment accorded to nationals of a foreign country, in the same circumstances.

## ARTICLE 16

### *Access to Courts*

1. A refugee shall have free access to the courts of law on the territory of all Contracting States.

2. A refugee shall enjoy in the Contracting State in which he has his habitual residence the same treatment as a national in matters pertaining to access to the Courts, including legal assistance and exemption from *cautio judicatum solvi*.

3. A refugee shall be accorded in the matters referred to in paragraph 2 in countries other than that in which he has his habitual residence the treatment granted to a national of the country of his habitual residence.

## Chapter III

## GAINFUL EMPLOYMENT

### ARTICLE 17

#### *Wage-carning Employment*

1. The Contracting States shall accord to refugees lawfully staying in their territory the most favourable treatment accorded to nationals of a foreign country in the same circumstances, as regards the right to engage in wageearning employment.

2. In any case, restrictive measures imposed on aliens or the employment of aliens for the protection of the national labour market shall not be applied to a refugee who was already exempt from them at the date of entry into force of this Convention for the Contracting State concerned, or who fulfils one of the following conditions:

(*a*) He has completed three years' residence in the country;

(*b*) He has a spouse possessing the nationality of the country of residence. A refugee may not invoke the benefit of this provision if he has abandoned his spouse;

(*c*) He has one or more children possessing the nationality of the country of residence.

3. The Contracting States shall give sympathetic consideration to assimilating the rights of all refugees with regard to wage-earning employment to those of nationals, and in particular of those refugees who have entered their territory pursuant to programmes of labour recruitment or under immigration schemes.

### ARTICLE 18

#### *Self-employment*

The Contracting States shall accord to a refugee lawfully in their territory treatment as favourable as possible and, in any event, not less favourable than that accorded to aliens generally in the same circumstances, as regards the right to engage on his own account in agriculture, industry, handicrafts and commerce and to establish commercial and industrial companies.

### ARTICLE 19

#### *Liberal Professions*

1. Each Contracting State shall accord to refugees lawfully staying in their territory who hold diplomas recognized by the competent authorities of that State, and who are desirous of practising a liberal profession, treatment as favourable as possible and, in any event, not less favourable than that accorded to aliens generally in the same circumstances.

2. The Contracting States shall use their best endeavours consistently with their laws and constitutions to secure the settlement of such refugees in the territories, other than the metropolitan territory, for whose international relations they are responsible.

## Chapter IV

## WELFARE

### ARTICLE 20

#### *Rationing*

Where a rationing system exists, which applies to the population at large and regulates the general distribution of products in short supply, refugees shall be accorded the same treatment as nationals.

## ARTICLE 21

### *Housing*

As regards housing, the Contracting States, in so far as the matter is regulated by laws or regulations or is subject to the control of public authorities, shall accord to refugees lawfully staying in their territory treatment as favourable as possible and, in any event, not less favourable than that accorded to aliens generally in the same circumstances.

## ARTICLE 22

### *Public Education*

1. The Contracting States shall accord to refugees the same treatment as is accorded to nationals with respect to elementary education.

2. The Contracting States shall accord to refugees treatment as favourable as possible, and, in any event, not less favourable than that accorded to aliens generally in the same circumstances, with respect to education other than elementary education and, in particular, as regards access to studies, the recognition of foreign school certificates, diplomas and degrees, the remission of fees and charges and the award of scholarships.

## ARTICLE 23

### *Public Relief*

The Contracting States shall accord to refugees lawfully staying in their territory the same treatment with respect to public relief and assistance as is accorded to their nationals.

## ARTICLE 24

### *Labour Legislation and Social Security*

1. The Contracting States shall accord to refugees lawfully staying in their territory the same treatment as is accorded to nationals in respect of the following matters:

   (*a*) In so far as such matters are governed by laws or regulations or are subject to the control of administrative authorities: remuneration, including family allowances where these form part of remuneration, hours of work, overtime arrangements, holidays with pay, restrictions on home work, minimum age of employment, apprenticeship and training, women's work and the work of young persons, and the enjoyment of the benefits of collective bargaining;

   (*b*) Social security (legal provisions in respect of employment injury, occupational diseases, maternity, sickness, disability, old age, death, unemployment, family responsibilities and any other contingency which, according to national laws or regulations, is covered by a social security scheme), subject to the following limitations:

      (i) There may be appropriate arrangements for the maintenance of acquired rights and rights in course of acquisition;

      (ii) National laws or regulations of the country of residence may prescribe special arrangements concerning benefits or portions of benefits which are payable wholly out of public funds, and concerning allowances paid to persons who do not fulfil the contribution conditions prescribed for the award of a normal pension.

2. The right to compensation for the death of a refugee resulting from employment injury or from occupational disease shall not be affected by the fact that the residence of the beneficiary is outside the territory of the Contracting State.

3. The Contracting States shall extend to refugees the benefits of agreements concluded between them, or which may be concluded between them in the future, concerning the maintenance of acquired rights and rights in the process of acquisition

in regard to social security, subject only to the conditions which apply to nationals of the States signatory to the agreements in question.

4. The Contracting States will give sympathetic consideration to extending to refugees so far as possible the benefits of similar agreements which may at any time be in force between such Contracting States and non-contracting States.

## Chapter V

## ADMINISTRATIVE MEASURES

## ARTICLE 25

### *Administrative Assistance*

1. When the exercise of a right by a refugee would normally require the assistance of authorities of a foreign country to whom he cannot have recourse, the Contracting States in whose territory he is residing shall arrange that such assistance be afforded to him by their own authorities or by an international authority.

2. The authority or authorities mentioned in paragraph 1 shall deliver or cause to be delivered under their supervision to refugees such documents or certifications as would normally be delivered to aliens by or through their national authorities.

3. Documents or certifications so delivered shall stand in the stead of the official instruments delivered to aliens by or through their national authorities, and shall be given credence in the absence of proof to the contrary.

4. Subject to such exceptional treatment as may be granted to indigent persons, fees may be charged for the services mentioned herein, but such fees shall be moderate and commensurate with those charged to nationals for similar services.

5. The provisions of this article shall be without prejudice to articles 27 and 28.

## ARTICLE 26

### *Freedom of Movement*

Each Contracting State shall accord to refugees lawfully in its territory the right to choose their place of residence and to move freely within its territory, subject to any regulations applicable to aliens generally in the same circumstances.

## ARTICLE 27

### *Identity Papers*

The Contracting States shall issue identity papers to any refugee in their territory who does not possess a valid travel document.

## ARTICLE 28

### *Travel Documents*

1. The Contracting States shall issue to refugees lawfully staying in their territory travel documents for the purpose of travel outside their territory, unless compelling reasons of national security or public order otherwise require, and the provisions of the Schedule to this Convention shall apply with respect to such documents. The Contracting States may issue such a travel document to any other refugee in their territory; they shall in particular give sympathetic consideration to the issue of such a travel document to refugees in their territory who are unable to obtain a travel document from the country of their lawful residence.

2. Travel documents issued to refugees under previous international agreements by parties thereto shall be recognized and treated by the Contracting States in the same way as if they had been issued pursuant to this article.

## ARTICLE 29

### *Fiscal Charges*

1. The Contracting States shall not impose upon refugees duties, charges or taxes, of any description whatsoever, other or higher than those which are or may be levied on their nationals in similar situations.

2. Nothing in the above paragraph shall prevent the application to refugees of the laws and regulations concerning charges in respect of the issue to aliens of administrative documents including identity papers.

## ARTICLE 30

### *Transfer of Assets*

1. A Contracting State shall, in conformity with its laws and regulations, permit refugees to transfer asscts which they have brought into its territory, to another country where they have been admitted for the purposes of resettlement.

2. A Contracting State shall give sympathetic consideration to the application of refugees for permission to transfer assets wherever they may be and which are necessary for their resettlement in another country to which they have been admitted.

## ARTICLE 31

### *Refugees unlawfully in the Country of Refuge*

1. The Contracting States shall not impose penalties, on account of their illegal entry or presence, on refugees who, coming directly from a territory where their life or freedom was threatened in the sense of article 1, enter or are present in their territory without authorization, provided they present themselves without delay to the authorities and show good cause for their illegal entry or presence.

2. The Contracting States shall not apply to the movements of such refugees restrictions other than those which are necessary and such restrictions shall only be applied until their status in the country is regularized or they obtain admission into another country. The Contracting States shall allow such refugees a reasonable period and all the necessary facilities to obtain admission into another country.

## ARTICLE 32

### *Expulsion*

1. The Contracting States shall not expel a refugee lawfully in their territory save on grounds of national security or public order.

2. The expulsion of such a refugee shall be only in pursuance of a decision reached in accordance with due process of law. Except where compelling reasons of national security otherwise require, the refugee shall be allowed to submit evidence to clear himself, and to appeal to and be represented for the purpose before competent authority or a person or persons specially designated by the competent authority.

3. The Contracting States shall allow such a refugee a reasonable period within which to seek legal admission into another country. The Contracting States reserve the right to apply during that period such internal measures as they may deem necessary.

Done at New York January 31, 1967;, T.I.A.S. No. 6577 (1968)

## ARTICLE 33

### *Prohibition of Expulsion or Return ("Refoulement")*

1. No Contracting State shall expel or return ("refouler") a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion.

2. The benefit of the present provision may not, however, be claimed by a refugee whom there are reasonable grounds for regarding as a danger to the security of the country in which he is, or who, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of that country.

## ARTICLE 34

### *Naturalization*

The Contracting States shall as far as possible facilitate the assimilation and naturalization of refugees. They shall in particular make every effort to expedite naturalization proceedings and to reduce as far as possible the charges and costs of such proceedings.

## Chapter VI

## EXECUTORY AND TRANSITORY PROVISIONS

## ARTICLE 35

### *Co-operation of the National Authorities with the United Nations*

1. The Contracting States undertake to cooperate with the Office of the United Nations High Commissioner for Refugees, or any other agency of the United Nations which may succeed it, in the exercise of its functions, and shall in particular facilitate its duty of supervising the application of the provisions of this Convention.

2. In order to enable the Office of the High Commissioner or any other agency of the United Nations which may succeed it, to make reports to the competent organs of the United Nations, the Contracting States undertake to provide them in the appropriate form with information and statistical data requested concerning:

   (*a*) the condition of refugees,

   (*b*) the implementation of this Convention, and

   (*c*) laws, regulations and decrees which are, or may hereafter be, in force relating to refugees.

## ARTICLE 36

### *Information on National Legislation*

The Contracting States shall communicate to the Secretary-General of the United Nations the laws and regulations which they may adopt to ensure the application of this Convention.

## ARTICLE 37

### *Relation to Previous Conventions*

Without prejudice to article 28, paragraph 2, of this Convention, this Convention replaces, as between parties to it, the Arrangements of 5 July 1922, [11] 31 May 1924, 12 May 1926, 30 June 1928 and 30 July 1935, the Conventions of 28 October 1933 and 10 February 1938, the Protocol of 14 September 1930 and the Agreement of 15 October 1946. [12]

## Chapter VII

## FINAL CLAUSES

## ARTICLE 38

### *Settlement of Disputes*

Any dispute between parties to this Convention relating to its interpretation or application, which cannot be settled by other means, shall be referred to the International Court of Justice at the request of any one of the parties to the dispute.

## ARTICLE 39

### *Signature, Ratification and Accession*

1. This Convention shall be opened for signature at Geneva on 28 July 1951 and shall thereafter be deposited with the Secretary-General of the United Nations. It shall be open for signature at the European Office of the United Nations from 28 July to 31 August 1951 and shall be re-opened for signature at the Headquarters of the United Nations from 17 September 1951 to 31 December 1952.

2. This Convention shall be open for signature on behalf of all States Members of the United Nations, and also on behalf of any other State invited to attend the Conference of Plenipotentiaries on the Status of Refugees and Stateless Persons or to which an invitation to sign will have been addressed by the General Assembly. It shall be ratified and the instruments of ratification shall be deposited with the Secretary-General of the United Nations.

3. This Convention shall be open from 28 July 1951 for accession by the States referred to in paragraph 2 of this article. Accession shall be effected by the deposit of an instrument of accession with the Secretary-General of the United Nations.

## ARTICLE 40

### *Territorial Application Clause*

1. Any State may, at the time of signature, ratification or accession, declare that this Convention shall extend to all or any of the territories for the international relations of which it is responsible. Such a declaration shall take effect when the Convention enters into force for the State concerned.

2. At any time thereafter any such extension shall be made by notification addressed to the Secretary-General of the United Nations and shall take effect as from the ninetieth day after the day of receipt by the Secretary-General of the United Nations of this notification, or as from the date of entry into force of the Convention for the State concerned, whichever is the later.

3. With respect to those territories to which this Convention is not extended at the time of signature, ratification or accession, each State concerned shall consider the possibility of taking the necessary steps in order to extend the application of this Convention to such territories, subject, where necessary for constitutional reasons, to the consent of the Governments of such territories.

AR.07719

# ARTICLE 41

*Federal Clause*

In the case of a Federal or non-unitary State, the following provisions shall apply:

(*a*) With respect to those articles of this Convention that come within the legislative jurisdiction of the federal legislative authority, the obligations of the Federal Government shall to this extent be the same as those of Parties which are not Federal States;

(*b*) With respect to those articles of this Convention that come within the legislative jurisdiction of constituent States, provinces or cantons which are not, under the constitutional system of the federation, bound to take legislative action, the Federal Government shall bring such articles with a favourable recommendation to the notice of the appropriate authorities of states, provinces or cantons at the earliest possible moment.

(*c*) A Federal State Party to this Convention shall, at the request of any other Contracting State transmitted through the Secretary-General of the United Nations, supply a statement of the law and practice of the Federation and its constituent units in regard to any particular provision of the Convention showing the extent to which effect has been given to that provision by legislative or other action.

# ARTICLE 42

*Reservations*

1. At the time of signature, ratification or accession, any State may make reservations to articles of the Convention other than to articles 1, 3, 4, 16 (1), 33, 36-46 inclusive.

2. Any State making a reservation in accordance with paragraph 1 of this article may at any time withdraw the reservation by a communication to that effect addressed to the Secretary-General of the United Nations.

# ARTICLE 43

*Entry into force*

1. This Convention shall come into force on the ninetieth day following the day of deposit of the sixth instrument of ratification or accession.

2. For each State ratifying or acceding to the Convention after the deposit of the sixth instrument of ratification or accession, the Convention shall enter into force on the ninetieth day following the date of deposit by such State of its instrument of ratification or accession.

# ARTICLE 44

*Denunciation*

1. Any Contracting State may denounce this Convention at any time by a notification addressed to the Secretary-General of the United Nations.

2. Such denunciation shall take effect for the Contracting State concerned one year from the date upon which it is received by the Secretary-General of the United Nations.

Done at New York January 31, 1967;, T.I.A.S. No. 6577 (1968)

3. Any State which has made a declaration or notification under article 40 may, at any time thereafter, by a notification to the Secretary-General of the United Nations, declare that the Convention shall cease to extend to such territory one year after the date of receipt of the notification by the Secretary-General.

## ARTICLE 45

### *Revision*

1. Any Contracting State may request revision of this Convention at any time by a notification addressed to the Secretary-General of the United Nations.

2. The General Assembly of the United Nations shall recommend the steps, if any, to be taken in respect of such request.

## ARTICLE 46

### *Notifications by the Secretary-General of the United Nations*

The Secretary-General of the United Nations shall inform all Members of the United Nations and non-member States referred to in article 39:

(*a*) Of declarations and notifications in accordance with section B of article 1;

(*b*) Of signatures, ratifications and accessions in accordance with article 39;

(*c*) Of declarations and notifications in accordance with article 40;

(*d*) Of reservations and withdrawals in accordance with article 42;

(*e*) Of the date on which this Convention will come into force in accordance with article 43;

(*f*) Of denunciations and notifications in accordance with article 44;

(*g*) Of requests for revision in accordance with article 45.

IN FAITH WHEREOF the undersigned, duly authorized, have signed this Convention on behalf of their respective Governments,

DONE at Geneva, this twenty-eighth day of July, one thousand nine hundred and fifty-one, in a single copy, of which the English and French texts are equally authentic and which shall remain deposited in the archives of the United Nations, and certified true copies of which shall be delivered to all Members of the United Nations and to the non-member States referred to in article 39.

## SCHEDULE

### *Paragraph 1*

1. The travel document referred to in article 28 of this Convention shall be similar to the specimen annexed hereto.

2. The document shall be made out in at least two languages, one of which shall be English or French.

### *Paragraph 2*

Subject to the regulations obtaining in the country of issue, children may be included in the travel document of a parent or, in exceptional circumstances, of another adult refugee.

### *Paragraph 3*

The fees charged for issue of the document shall not exceed the lowest scale of charges for national passports.

*Paragraph 4*

Save in special or exceptional cases, the document shall be made valid for the largest possible number of countries.

*Paragraph 5*

The document shall have a validity of either one or two years, at the discretion of the issuing authority.

*Paragraph 6*

1. The renewal or extension of the validity of the document is a matter for the authority which issued it, so long as the holder has not established lawful residence in another territory and resides lawfully in the territory of the said authority. The issue of a new document is, under the same conditions, a matter for the authority which issued the former document.

2. Diplomatic or consular authorities, specially authorized for the purpose, shall be empowered to extend, for a period not exceeding six months, the validity of travel documents issued by their Governments.

3. The Contracting States shall give sympathetic consideration to renewing or extending the validity of travel documents or issuing new documents to refugees no longer lawfully resident in their territory who are unable to obtain a travel document from the country of their lawful residence.

*Paragraph 7*

The Contracting States shall recognize the validity of the documents issued in accordance with the provisions of article 28 of this Convention.

*Paragraph 8*

The competent authorities of the country to which the refugee desires to proceed shall, if they are prepared to admit him and if a visa is required, affix a visa on the document of which he is the holder.

*Paragraph 9*

1. The Contracting States undertake to issue transit visas to refugees who have obtained visas for a territory of final destination.

2. The issue of such visas may be refused on grounds which would justify refusal of a visa to any alien.

*Paragraph 10*

The fees for the issue of exit, entry or transit visas shall not exceed the lowest scale of charges for visas on foreign passports.

*Paragraph 11*

When a refugee has lawfully taken up residence in the territory of another Contracting State, the responsibility for the issue of a new document, under the terms and conditions of article 28, shall be that of the competent authority of that territory, to which the refugee shall be entitled to apply.

*Paragraph 12*

The authority issuing a new document shall withdraw the old document and shall return it to the country of issue if it is stated in the document that it should be so returned; otherwise it shall withdraw and cancel the document.

Done at New York January 31, 1967;, T.I.A.S. No. 6577 (1968)

### *Paragraph 13*

1. Each Contracting State undertakes that the holder of a travel document issued by it in accordance with article 28 of this Convention shall be readmitted to its territory at any time during the period of its validity.

2. Subject to the provisions of the preceding sub-paragraph, a Contracting State may require the holder of the document to comply with such formalities as may be prescribed in regard to exit from or return to its territory.

3. The Contracting States reserve the right, in exceptional cases, or in cases where the refugee's stay is authorized for a specific period, when issuing the document, to limit the period during which the refugee may return to a period of not less than three months.

### *Paragraph 14*

Subject only to the terms of paragraph 13, the provisions of this Schedule in no way affect the laws and regulations governing the conditions of admission to, transit through, residence and establishment in, and departure from, the territories of the Contracting States.

### *Paragraph 15*

Neither the issue of the document nor the entries made thereon determine or affect the status of the holder, particularly as regards nationality.

### *Paragraph 16*

The issue of the document does not in any way entitle the holder to the protection of the diplomatic or consular authorities of the country of issue, and does not confer on these authorities a right of protection.

### ANNEX

### Specimen Travel Document

The document will be in booklet form (approximately 15 x 10 centimetres).

It is recommended that it be so printed that any erasure or alteration by chemical or other means can be readily detected, and that the words "Convention of 28 July 1951" be printed in continuous repetition on each page, in the language of the issuing country.

.........................................................................................................................................................................................

### (Cover of booklet)

### TRAVEL DOCUMENT

### (Convention of 28 July 1951)

.........................................................................................................................................................................................

No. _____

Done at New York January 31, 1967;, T.I.A.S. No. 6577 (1968)

(1)

**TRAVEL DOCUMENT**

**(Convention of 28 July 1951)**

This document expires on _____ unless its validity is extended or renewed.

Name _____

Forename(s) _____

Accompanied by _____ child (children).

1. This document is issued solely with a view to providing the holder with a travel document which can serve in lieu of a national passport. It is without prejudice to and in no way affects the holder's nationality.

2. The holder is authorized to return to _____ [state here the country whose authorities are issuing the document] on or before _____ unless some later date is hereafter specified. [The period during which the holder is allowed to return must not be less than three months.]

3. Should the holder take up residence in a country other than that which issued the present document, he must, if he wishes to travel again, apply to the competent authorities of his country of residence for a new document. [The old travel document shall be withdrawn by the authority issuing the new document and returned to the authority which issued it.] [13]

(This document contains pages, exclusive of cover.)

.................................................................................................................................................................................

(2)

Place and date of birth _____

Occupation _____

Present residence _____

* Maiden name and forename(s) of wife _____

* Name and forename(s) of husband _____

**Description**

Height _____
Hair _____
Colour of eyes _____
Nose _____
Shape of face _____
Complexion _____
Special peculiarities _____

**Children accompanying holder**

| Name | Forename(s) | Place and date of birth | Sex |
|------|-------------|-------------------------|-----|

<sub></sub>

\* **Strike out whichever does not apply.**

(This document contains pages, exclusive of cover.)

.................................................................................................................................................................

**(3)**

**Photograph of holder and stamp of issuing authority Finger-prints of holder (if required)**

Signature of holder _____

(This document contains pages, exclusive of cover.)

.................................................................................................................................................................

**(4)**

1. This document is valid for the following countries:

.................................................................................................................................................................

2. Document or documents on the basis of which the present document is issued:

.................................................................................................................................................................

Issued at _____

Date _____

Signature and stamp of authority issuing the document:

Fee paid:

(This document contains pages, exclusive of cover.)

.................................................................................................................................................................

**(5)**

**Extension or renewal of validity**

Fee paid:                                    From _____

To _____

Done at _____    Date _____

Signature and stamp of authority extending or renewing the validity of the document:

_____

**Extension or renewal of validity**

Fee paid:                        From _____

                                 To _____

Done at _____    Date _____

Signature and stamp of authority extending or renewing the validity of the document:

(This document contains pages, exclusive of cover.)

....................................................................................................................................................

**(6)**

**Extension or renewal of validity**

Fee paid:                        From _____

                                 To _____

Done at _____    Date _____

Signature and stamp of authority extending or renewing the validity of the document:

_____

**Extension or renewal of validity**

Fee paid:                        From _____

                                 To _____

Done at _____    Date _____

Signature and stamp of authority extending or renewing the validity of the document:

(This document contains pages, exclusive of cover.)

....................................................................................................................................................

**(7-32)**

**Visas**

The name of the holder of the document must be repeated in each visa.

(This document contains pages, exclusive of cover.)

**Footnotes**

| | |
|---|---|
| 1 | 189 UNTS 150. |
| 2 | See p. 6264. |
| 3 | Texts as certified by the Secretary-General of the United Nations. |
| 4 | TS 993; 59 Stat. 1031. |
| 5 | 89 LNTS 47. |
| 6 | 89 LNTS 63. |
| 7 | 159 LNTS 199. |
| 8 | 192 LNTS 59. |
| 9 | 198 LNTS 141. |
| 10 | TIAS 1846; 62 Stat. (3) 3037. |
| 11 | 13 LNTS 237. |
| 12 | 11 UNTS 73. |
| 13 | The sentence in brackets to be inserted by Governments which so desire. |

T.I.A.S. No. 6577

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
    Title 18. Crimes and Criminal Procedure (Refs & Annos)
        Part I. Crimes (Refs & Annos)
            Chapter 26. Criminal Street Gangs

18 U.S.C.A. § 521

§ 521. Criminal street gangs

Effective: December 21, 2018

Currentness

**(a) Definitions.--**

"conviction" includes a finding, under State or Federal law, that a person has committed an act of juvenile delinquency involving a violent or controlled substances felony.

"criminal street gang" means an ongoing group, club, organization, or association of 5 or more persons--

**(A)** that has as 1 of its primary purposes the commission of 1 or more of the criminal offenses described in subsection (c);

**(B)** the members of which engage, or have engaged within the past 5 years, in a continuing series of offenses described in subsection (c); and

**(C)** the activities of which affect interstate or foreign commerce.

"State" means a State of the United States, the District of Columbia, and any commonwealth, territory, or possession of the United States.

**(b) Penalty.--**The sentence of a person convicted of an offense described in subsection (c) shall be increased by up to 10 years if the offense is committed under the circumstances described in subsection (d).

**(c) Offenses.--**The offenses described in this section are--

**(1)** a Federal felony involving a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)) for which the maximum penalty is not less than 5 years;

**(2)** a Federal felony crime of violence that has as an element the use or attempted use of physical force against the person of another;

**(3)** a Federal offense involving human trafficking, sexual abuse, sexual exploitation, or transportation for prostitution or any illegal sexual activity; and

**(4)** a conspiracy to commit an offense described in paragraph (1), (2), or (3).

**(d) Circumstances.**--The circumstances described in this section are that the offense described in subsection (c) was committed by a person who--

**(1)** participates in a criminal street gang with knowledge that its members engage in or have engaged in a continuing series of offenses described in subsection (c);

**(2)** intends to promote or further the felonious activities of the criminal street gang or maintain or increase his or her position in the gang; and

**(3)** has been convicted within the past 5 years for--

**(A)** an offense described in subsection (c);

**(B)** a State offense--

**(i)** involving a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)) for which the maximum penalty is not less than 5 years' imprisonment; or

**(ii)** that is a felony crime of violence that has as an element the use or attempted use of physical force against the person of another;

**(C)** any Federal or State felony offense that by its nature involves a substantial risk that physical force against the person of another may be used in the course of committing the offense; or

**(D)** a conspiracy to commit an offense described in subparagraph (A), (B), or (C).

## CREDIT(S)

(Added Pub.L. 103-322, Title XV, § 150001(a), Sept. 13, 1994, 108 Stat. 2034; amended Pub.L. 104-294, Title VI, § 607(q), Oct. 11, 1996, 110 Stat. 3513; Pub.L. 107-273, Div. B, Title IV, § 4002(b)(3), Nov. 2, 2002, 116 Stat. 1807; Pub.L. 115-392, § 12, Dec. 21, 2018, 132 Stat. 5255.)

Notes of Decisions (3)

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 322 of 1305

18 U.S.C.A. § 521, 18 USCA § 521

Current through P.L. 116-187. Some statute sections may be more current, see credits for details.

**End of Document**                                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.



# National Drug Control Strategy

*A Report by the*
**Office of National Drug Control Policy**

**FEBRUARY 2020**

AR.07731

# TABLE OF CONTENTS

Preface

Introduction.................................................................................................................................... 1

Strategic Outcome and Assumptions ........................................................................................ 4

Strategy Implementation ............................................................................................................. 5

Prevention ...................................................................................................................................... 6

Treatment and Recovery............................................................................................................. 11

Reducing the Availability of Illicit Drugs in the United States ............................................. 17

Goals and Budget Projections .................................................................................................... 24

Appendix 1: List of Supporting Planning Documents............................................................ 28

Appendix 2: ONDCP's Role in Facilitating the Achievement of the Strategic Goals and
the Existing Coordination Mechanisms Necessary for Achieving the Strategic Goals ........................... 29

Appendix 3: Mission Statement and List of National Drug Control Program Agencies
and Role in Achieving Strategic Goals ..................................................................................... 31

Appendix 4: Role of Key Stakeholders and Partners in the Strategy....................................... 33

Appendix 5: National Drug Control Strategy Research and Data Collection Plan .................................. 37



Despite the challenges communities continue to face related to the negative consequences of the trafficking and use of illicit drugs and the continued availability of illicit drugs across the Nation, over the past year we have seen significant progress in strengthening communities across the Nation to address this evolving crisis. The Trump Administration remains focused on making continued progress in its second *National Drug Control Strategy* dedicated to reversing the adverse impacts of addiction so we may continue to save American lives and set our Nation on a path to being stronger, healthier, and drug-free.

This Strategy focuses Federal government efforts along three complementary lines of effort. First, we must continue to prevent initiates to drug use through education and evidence-based prevention programs. Second, we must continue to reduce barriers to treatment services so that access to long-term recovery is available for those suffering from substance use disorder. And finally, we must continue our work to drastically reduce the availability of these drugs in the United States through law enforcement and cooperation with international partners to eliminate the negative effects that drug trafficking has on the safety of our communities and the well-being of our citizens.

Drug misuse and abuse continues to endanger too many communities, ruin too many families, and takes the lives of too many of our fellow Americans. Drug addiction is causing rises in the number of children in foster care, job insecurity, and transportation safety issues. While this Strategy reflects the President's top priority to address the current opioid crisis and reduce the number of Americans dying from these dangerous drugs, it also sets us on the path to develop further the capability, knowledge, and infrastructure to respond quickly to the evolving nature of our Nation's drug threats. It reflects our understanding of the complex interplay between the availability of drugs in the U.S. market and their use, anticipates changes in the drug environment in both the public health and law enforcement domains, and allows us to adapt our actions and make lasting progress against this historic national security, law enforcement, and public health challenge.

Most importantly, it demands our full effort and a relentless focus on delivering results. The American People should expect nothing less.

James W. Carroll
Director of National Drug Control Policy

*"Our Administration remains committed to protecting American families and communities from the dangers of substance use. Working together we will lead our Nation to become a stronger, healthier, and drug-free society."*

—PRESIDENT DONALD J. TRUMP

# INTRODUCTION

During the past year we have indeed made some progress in preventing drug use, reducing barriers to treatment leading to long-term recovery, and reducing the availability of drugs in our communities and our homes. The Trump Administration has made life-saving gains through the synchronized approach laid out in the final report of The *President's Commission on Combating Drug Addiction and Opioid Abuse* in 2017, President Trump's *Initiative to Stop Opioid Abuse and Reduce Drug Supply and Demand* in 2018, and the Administration's 2019 *National Drug Control Strategy*. Nevertheless, far too many Americans continue to lose their lives to drug use, and drugs remain all too available throughout our Nation. While some advances have been made in our daily work to address the country's unprecedented drug crisis, we remain far from achieving the President's vision of being a healthier and drug-free society.

We must continue the hard work of individuals and organizations at all levels of government and civil society in an effort to resolve the crisis and to save American lives. It is well-understood that the crisis has evolved over several decades and has steadily worsened with time. Every state and county, and every socioeconomic group in our country, continues to be affected by the negative consequences of illicit drug use. However, as in the past year, our long-term success can only be achieved by our collective commitment to save lives and establish lasting solutions to this historic problem. The partnership of our law enforcement and public health professionals, working side-by-side, and inspired by the strength and wisdom of families who have lost loved ones to the scourge of drug use, continue to make a significant difference. This *National Drug Control Strategy*, the Trump Administration's second, affirms the President's priorities for addressing the challenge of drug trafficking and use, now and in coming years. It also provides the strategic direction necessary for the Federal government to prevent initiates to drug use through education and evidence-based prevention, provide treatment for those suffering from the disease of addiction so they can reach long-term recovery, and reduce the availability of these dangerous drugs in every American community.

The President's top priority remains, as he articulated in his first strategy, to address, head on, the current opioid crisis and reduce the number of Americans dying from these dangerous drugs. In 2017, there were more than 70,200 drug overdose deaths in the United States.[1] More than 47,500 of these deaths involved an opioid, and more than half of these deaths involved a synthetic opioid such as illicit fentanyl or one of its analogues. From 2014 to 2017, the number of deaths attributed to synthetic

[1] These are the latest available statistics of annual mortality due to drug overdoses in the United States. The 2018 statistics are expected to be issued by the Center for Disease Control and Prevention (CDC) in early 2020.

AR.07734

opioids like fentanyl and its analogues increased 413 percent, and these synthetic opioids are now involved in more deaths than any other drug such as prescription opioids, heroin, or cocaine. The infectious disease consequences of the opioid epidemic is also of grave concern. Since 2010, the United States has seen hepatitis C infection increase more than three-fold. Progress made in HIV resulting from injection drug use has stalled. Moreover, methamphetamine availability and use shows signs of renewed growth. According to the most recent available data, 10,333 Americans died in 2017 from a drug overdose involving methamphetamine and other psychostimulants with abuse potential, and half of these deaths also involved a prescription or illicit opioid, with a quarter involving a synthetic opioid such as fentanyl.

As he has since the beginning of his Administration, the President has marshalled every available resource throughout the Federal government to address America's crisis of drug abuse and addiction[2], requesting over $34.6 billion in his Fiscal Year 2020 Drug Control Budget to help states, communities, and law enforcement respond to the drug crisis and curb drug trafficking through several existing and new initiatives. The Trump Administration's whole-of-government approach reflected in these resources and articulated in this *Strategy* is focused on achieving a singular and overarching purpose: to prevent Americans from dying of a drug overdose.

While confronting today's drug crisis to arrest its growth and reduce its effects, we must also redouble our efforts to develop the capability, knowledge, and infrastructure to respond to the evolving nature of the drug threat. Over the past year we have seen the drug crisis transform in every dimension. A much larger variety of new and highly potent synthetic opioids and other synthetic drugs are being rapidly developed and shipped into the United States at an increasing rate. New marketing and sales techniques are making their detection and interdiction more challenging than ever. The historically low price for some synthetic drugs like methamphetamine is putting them within the economic reach of even more potential users, leading to an increasing trend of polydrug use across America. We have even seen an evolution in the manner in which drugs are taken into the body, including a startling and dangerous increase in concentrated marijuana-type drugs being ingested through vaping devices.

We must also confront the increasing availability and use of cocaine in the United States. The cultivation of coca and production of cocaine in Colombia, the source of the vast majority of the cocaine in the U.S. market, remains at record highs even in light of a slight leveling in 2018. Cocaine use in the United States continues to rise again after many years of decline. The National Survey of Drug Use and Health (NSDUH) shows that in 2018 there were 1.9 million people aged 12 and above who were past-month users of cocaine and 874,000 new cocaine initiates, averaging approximately 2,400 individuals per day. Moreover, the suspension of aerial eradication programs in Colombia that began in 2015 led to even greater yield from coca plants, resulting in increased production and purity levels that continues to bring negative consequences. From 2016 to 2017, overdose deaths in which cocaine was the primary

[2]The Diagnostic and Statistical Manual of Mental Disorders (DSM-5) contains descriptions and symptoms of all medical disorders classified by the American Psychiatric Association, including substance use disorder. The *Strategy* and ONDCP uses the word "addiction" to describe compulsive drug seeking despite negative consequences. ONDCP's use of the term addiction is consistent with the DSM definition of substance use disorder but acknowledges that addiction is not a specific diagnosis in the DSM-5.

AR.07735

contributing drug increased 34 percent.

The fundamental motivation of drug traffickers remains unchanged. They continue to attempt to secure ever-greater profits by expanding their customer base through the introduction of novel substances that create new user experiences, reducing production overhead, and mitigating risks to their supply chains by continually finding new methods of concealment and routes into the United States. The exponential growth in the availability and use of synthetic drugs in the United States continues to show us the face of drug use and trafficking for the foreseeable future. Drug trafficking organizations can avoid the costly process of harvesting illicit crops and producing plant-based drugs by the much cheaper and faster process of chemical synthesis. Potent synthetic drugs are smuggled across our borders in small quantities that can be more easily concealed than bulkier plant-based drugs. They are also purchased cheaply on the dark web using cryptocurrencies that provide anonymity, and shipped into the United States through international mail or as express consignment shipments. The combination of low production cost, the anonymity of the dark web and cryptocurrencies, and drugs with higher potency than their plant-based counterparts creates a favorable risk-reward structure that drug traffickers are now embracing to an even greater degree than ever before.

Given the current drug crisis facing America, and the President's priorities, this *Strategy* continues its strong bias toward action. The three lines of effort and associated nine goals contained in the *Strategy* were determined by drawing upon the collective expertise at the Federal, State, local and Tribal levels by key stakeholders in the governmental, academic, civic, law enforcement, and public health communities. Their deep understanding of America's drug crisis was fundamental to determining the *Strategy's* nine goals and has allowed us to better understand the complex interplay between the availability of drugs in the U.S. market and their use, anticipating changes in the drug environment in both the public health and law enforcement domains, and adapting our actions to seize the initiative to make lasting progress against this historic challenge. Specifically, Goals 1, 2, 4, 5, and 6, which are associated with the line of effort to prevent initiates to drug use, were selected based on our consultations with public health experts whose research and clinical experience determined that addiction is a disease that must be prevented from the start, and prevention is most effective when it is carried out over the long-term with repeated evidenced-based interventions. Similarly, Goals 1 and 3, which relate to the treatment and recovery line of effort, were selected based on our consultations with public health experts who understand that addiction is a chronic disease that should be treated like any other medical condition. This evidence, based on research and clinical expertise of our stakeholders, informed our decision to establish these goals. Finally, those goals related to addressing the availability of illicit drugs, Goals 1, 7, 8, and 9 were the result of consultations with Federal, State and local and Tribal government and law enforcement organizations. These consultations clearly demonstrated that almost all illicit drugs are produced outside the United States and then trafficked across the borders or via international mail or express consignment carriers. This evidence informed our selection of the goals that will aggressively reduce the availability of illicit drugs in American communities.

The global drug trafficking environment is vast, dynamic, and adaptable, but it is not without

AR.07736

vulnerabilities. It is only through a unified effort in which the Federal government works with, and in support of, creative and resourceful individuals and organizations across the country and within the nations of our international partners, that we can address this complex national security, law enforcement, and public health problem.

# STRATEGIC OUTCOME AND ASSUMPTIONS

This *Strategy* focuses on achieving one overarching strategic outcome:

> *Building a stronger, healthier, drug-free society today and in the years to come by drastically reducing the number of Americans losing their lives to drug addiction in today's crisis, and preparing now to dominate the drug environment of the future. This will be done by preventing initiates to drug use, providing treatment services leading to long-term recovery for those suffering from addiction, and aggressively reducing the availability of illicit drugs in America's communities.*

This *Strategy* consists of three interconnected lines of effort designed to achieve the President's strategic outcome of building and fostering a stronger, healthier, and drug-free society: prevention; treatment and recovery; and reducing the availability of drugs in America. The single and most important criterion of success is saving American lives, and achieving that outcome requires the Federal government to work with partners at the State, local, and Tribal levels; the healthcare sector; industry; foreign partners; and every concerned American citizen to advance our Nation's efforts to promote and maintain healthy lifestyles, and help build and grow safe communities free from the scourge of drug use and addiction.

This *Strategy* makes several key assumptions:

- Deliberate, sustained, and well-coordinated evidence-based prevention and education efforts will, over time, reduce the number of Americans who initiate illicit drug use.

- Better prescribing practices and the promotion of alternatives to prescription drugs that hold a high potential for addiction and misuse will have a positive effect on reducing the number of initiates to illicit drug use.

- Increasing the availability, access, and quality of evidence-based treatment and recovery services for substance use disorder, particularly in rural, tribal and other underserved communities, will lead to a greater number of Americans achieving sustained recovery.

- Reducing the availability of illicit drugs in the United States by disrupting the illicit drug supply chain will relieve pressure on our public health efforts, allowing our historic effort to prevent drug use and increase the availability of treatment to take hold, and increasing the potential sustainable success over time.

- Aggressive and versatile drug trafficking organizations will respond to sustained pressure

AR.07737

placed upon them by disruption, dismantlement, interdiction efforts, and judicial/prosecutorial efforts, and will adapt their production and trafficking methods to minimize risk and maximize profit.

This *Strategy* acknowledges several key challenges:

- Drug trafficking and transnational criminal organizations are highly adaptable.

- The path to substance use disorder is multifaceted and extremely individualized. Consequently, prevention, treatment, and recovery support services must also be multifaceted and individualized to maximize effectiveness.

- Synthetic drugs are easily modified, and rapid modifications in synthetic drug types and structures make their early detection a challenge.

# *STRATEGY* IMPLEMENTATION

The three fundamental lines of effort that form the heart of this *Strategy*—prevention, treatment and recovery, and reducing availability—are complementary and mutually supporting. Reducing the size of the illicit drug using population involves **preventing** initiates to illicit drug use through education and evidence-based prevention programs. Providing effective **treatment services leading to long-term recovery** for those suffering from substance use disorder, often using medication-assisted treatment (MAT) combined with therapy, moves people out of the active user population and puts them on the path to recovery. By reducing the number of individuals who use illicit drugs through prevention and treatment, we can diminish the market forces pulling illicit drugs across our borders and into our communities. Simultaneously, we must drastically reduce the **availability** of these drugs in the United States. Increased availability expands the opportunity for individuals to initiate drug use, and the path from first use to chronic use can be brutally short, particularly for potent and highly addictive drugs like methamphetamine and opioids. By reducing availability we not only lessen the negative ancillary effects of drug trafficking that impact the safety of our communities and the well-being of our citizens, we also relieve the pressure on the public health domain in its prevention and treatment efforts.

This *Strategy* does not enumerate every activity that the Federal government and key stakeholders must execute in order to achieve the President's strategic outcome. Rather, it articulates the President's drug control priorities and sets the strategic direction for the Administration to prevent Americans, especially our future generations, from falling into the cycle of drug use and addiction; to provide Americans who suffer from substance use disorders with world class treatment and recovery services; and to protect America's citizens from the negative effects of drug trafficking and use. It also provides Federal drug control departments and agencies the strategic guidance they need to develop their own drug control plans and strategies and ensures programming and resource decisions about Federal drug control budget dollars are allocated in a manner consistent with the Administration's priorities.

AR.07738

# PREVENTION

Preventing drug use before it starts is a fundamental tenet of a comprehensive approach to drug control. The science of prevention has evolved and significantly improved, and decades of research show that prevention is most effective when it is carried out over the long-term with repeated evidence-based interventions. Early detection of those most at risk united with education programs and community support mechanisms can alter the trajectory of young people's lives by increasing protective factors while reducing risk factors. Studies show that addiction is a disease that can be prevented and treated through sound public health interventions.

Early recognition and addressing risky substance use can help interrupt the trajectory toward more chronic substance use disorders and opportunities to screen for risky behavior should be widespread. Many medical organizations have developed evidence-based screening tools and recommend screening for drug use and prescription drug misuse for adolescents, as well as adults. All health systems should be using screening tools as part of routine health care. Given the high prevalence of co-occurring mental and substance use disorders, we must ensure adoption of comprehensive screening and integrated treatment for both. There is a significant relationship between mental health and substance use disorders at all ages, and it is common for persons to use substances in an attempt to self-medicate the symptoms of mental illness. Substance use can mask or exacerbate symptoms of mental illness and both disorders share common risk and protective factors that should be assessed and addressed together where possible, and treated when indicated. Facilities and professionals serving persons with either disorder should have the skill and operational capacity to provide integrated treatment that addresses behavioral and physical health, family, and environmental problems in addition to substance use. Additionally, treatment providers should recognize the different prevention and treatment considerations for children and young adults, and provide age appropriate care. Because the developing brain continues growth until at least age 25, children and young adults are more susceptible to addiction. Children and young adults also require age appropriate and relevant substance use prevention which integrates elements of sociocultural environment, social norms, trauma informed approaches, and resiliency-building interventions to help them make healthy lifestyle choices.

Individuals who have experienced a high number of traumatic or challenging experiences in childhood are at a significantly elevated risk for developing substance use disorder, and therefore need increased access to prevention education and intervention. Adverse Childhood Experiences (ACEs) describes the exposure of a person under the age of 18 to trauma, abuse, household challenges and neglect. As the number of ACEs increases, the likelihood of engaging in risky health behaviors including alcohol and drug use also increases. Research from the National Center for Chronic Disease Prevention and Health Promotion has shown that there is a correlation between having a higher ACE score and the number of prescriptions or classes of illicit drugs used by an individual, even long after the initial exposure to the childhood trauma. While significant challenges early in life, and a high ACE score, do not determine that a child will have poor life outcomes, they nonetheless present an increased need for protective factors to prevent drug misuse. Young people who are identified as being particularly vulnerable to

6

addiction have an increased potential for positive outcomes if they have access to supportive adults, exposure to evaluated drug prevention education, opportunities for academic and extracurricular engagement, and clear boundaries related to conduct and drug use.

Evidence continues to demonstrate that combining multiple evidence-based approaches in a comprehensive prevention program is more effective than a single activity alone. Moreover, these early investments pay large dividends in substantially reducing treatment and criminal justice costs, saving taxpayer dollars while reducing the number of young people whose lives are tragically affected by early substance misuse.

Finally, while the opioid crisis in America has mobilized awareness, action, and resources to reduce overdose fatalities, we cannot ignore the larger landscape of substance use and substance use disorders. Poly-substance use has become much more common as individuals make economic decisions about the drugs they use. It is important that we take the opportunity to leverage the momentum of our national response to the opioid crisis, and apply it to preventing the first use of all drugs using the decades of scientific evidence on effective primary prevention to launch and fully support effective prevention in homes, schools, the workplace, and communities.

## Strengthening the Capacity of State, Local, and Tribal Communities to Identify and Prevent Substance Misuse

Family, friends, and local communities are the first line of defense in preventing substance use and misuse. In addition, positive adult involvement in children's lives reduces the likelihood of drug use. Given the strong relationship between excessive alcohol use and binge drinking, and the misuse of prescription opioids and other illicit drugs, this Strategy emphasizes the need to implement effective community-based strategies to reduce misuse of legal substances, along with those to reduce the initiation of illicit drug use. Parents and primary caregivers must understand that they can make the most significant difference in the child's attitudes and values regarding the use of drugs. Religious and faith-based organizations are also an integral part of the community response to substance misuse, and clergy and faith-based organizations have been critical allies at keeping youth away from drugs and providing successful support when youth have turned to drug use. This *Strategy* supports and reinforces the positive resources that family, friends, and the community can bring to bear on this crisis at both the prevention and the treatment and recovery levels. Parents and families are historically under-represented in prevention programs despite the fact that family-based programs play a vital role in delaying the onset and use of alcohol and other drugs. This is true for school outreach programs as well. Finally, to build effective grassroots solutions, local leaders need greater access to data about drug use and drug-related deaths in their communities, as well as information on the demographic factors that may be driving those trends. Our rural communities have a particular need for comprehensive information about the many Federal funding resources available to combat addiction and to build capacity to assist a community in responding to the crisis. Federal grant-making agencies should continue to assist these rural communities in knowing what to apply for and the process for applying for these resources.

AR.07740

## Enhancing Research and the Development of Evidence–Based Prevention Programs

The National Academies of Sciences, Engineering, and Medicine outline three categories of prevention intervention: universal, selective, and indicated. Advancing our ability to prevent drug use before it starts will require, among other things, more widespread adoption and use of evidence-based methods to identify at-risk individuals using strategies that allow for screening, brief intervention, and referral to treatment. This is especially important for adolescents and young adults, from the middle school years through college age. In addition, we must work with stakeholders to increase opportunities to educate and inform child welfare professionals and healthcare providers about the early signs of substance misuse and identify resources to support pregnant and parenting women, children of parents with substance use disorders or addiction, and children born with neonatal abstinence syndrome (NAS). We must engage the research sector and prevention community to build evidence on interventions that address the Nation's ever-changing addiction crisis in diverse communities and conditions.

## Continuing to Strengthen ONDCP's Drug Free Communities Support Program

The Office of National Drug Control Policy's (ONDCP's) Drug-Free Communities (DFC) Support Program, created by the Drug-Free Communities Act of 1997, undergirds the Administration's focus on preventing and reducing youth substance use at the community level. The DFC Program provides grants to community coalitions to strengthen the infrastructure among local partners to create and sustain a reduction in local youth substance use. Since the DFC Program's inception, findings from evaluations of the DFC Program demonstrate that DFC-funded community coalitions have reduced youth substance use. According to the DFC's 2018 National Cross-Site Evaluation Report, on average DFC-funded communities saw significant reductions in middle school and high school aged youth. For example, past 30-day alcohol use decreased by 19 percent, past 30-day tobacco use decreased by 31 percent, past 30-day marijuana use decreased by 7 percent, and past 30-day prescription drug use decreased by 24 percent among high school students in DFC-funded communities. The DFC Program, through the National Coalition Institute (NCI), will provide training to ensure DFC-funded community coalitions have the resources, tools and skillset they need to develop, strengthen, and sustain the prevention infrastructure within their communities and among their local partners to effectively prevent and reduce youth alcohol, tobacco, marijuana, vaping, and prescription drug misuse.

## Addressing Safe Prescribing Practices

Safe prescribing practices are essential in primary prevention by decreasing the risk of drug addiction in patients who take opioids and controlled medications. Safe prescribing is also important for patients using medications at high dosages or with central nervous system depressants that in combination can lead to drug interactions, including overdose. Finally, safe prescribing also includes prevention of using medications for non-medical purposes.

Significant effort has gone into the development of evidence-based guidelines for the use of

AR.07741

medications and non-pharmacological therapies for the treatment of acute or chronic pain. These guidelines include recommendations for the dosing and duration of use of opioid analgesics, the use of lower risk opioid and non-opioid medications, and the development of innovative pain therapies that avoid potentially addictive medications. Another key area of concern is the practice of co-prescribing opioids and benzodiazepines or other drugs that increase the risk of opioid overdose or fatal respiratory depression. Overdose data shows that more than 30 percent of overdoses involving opioids also involve benzodiazepines. While opioid and other controlled substance prescribing practices continue to improve, continued monitoring, evaluation, and improvement, along with the enhanced ability to track prescribing across providers and states through the integration of Prescription Drug Monitoring Programs (PDMPs) and Electronic Health Records (EHRs) are essential to promoting safe and responsible prescribing, while also assuring appropriate pain care.

Prescribing naloxone can be life saving for patients on high dose opioids, along with those who use illicit drugs or are otherwise at risk for an accidental overdose. In 2018, the CDC reported that only one naloxone prescription was dispensed for every 69 high-dose opioid prescriptions, despite the fact that the number of naloxone prescriptions has doubled from 2017 to 2018. In 2017, unintentional overdoses involving prescribed medications other than illicit fentanyl were more than twice as common as in 1999. The medical community has responded by limiting opioid prescriptions both in terms of the total number of pills prescribed and the total morphine milligram equivalent (MME) of the prescriptions dispensed.  The total year-to-date billions of MMEs dispensed as of September 2018 decreased 16 percent over the prior year.

While we have made significant gains in reducing cases of unsafe or inappropriate prescribing, we must remain aware that patients with acute and especially chronic pain and who rely upon opioid medications to live comfortable and productive lives legitimately require access to opioid medications. Moreover, providers who know and understand their patients are in the best position to administer opioid medications at the correct dosage in a safe and responsible manner. Some patients do require long term pain management that includes opioids and others may be able to work with their clinicians to appropriately taper or discontinue opioid medications. Patients may also require ongoing treatment for any co-occurring behavioral health conditions such as depression. In some cases, specialty referral to a pain management or substance use disorder specialist may be necessary. While treatment guidelines are important and beneficial, the doctor-patient relationship is the foundation of quality medical care and must be tailored to meet the individual patient's needs.

## Expanding the Use of Prescription Drug Monitoring Programs

A PDMP is a proven means to increase accountability in opioid prescribing practices by providing information that allows for the coordination of multiple medications, as well as to prevent adverse drug interactions. However, PDMP use faces challenges nationwide. In some states PDMP checking is optional, and many providers report difficulty using their PDMP because it is not integrated with EHRs which interrupts providers' workflow and creates practical barriers to their use. In those cases where states' integration services are available, the service can be costly. Providers also cite a lack

AR.07742

of interstate data-sharing and concerns about patient confidentiality as reasons not to fully use the PDMP. Currently, two PDMP data sharing hubs exist and many states share data freely across state lines. However, remaining technical, legal, and procedural barriers remain and have thus far prevented the full development and execution of a nationwide PDMP capability. Expanding the use of PDMPs is a fundamental element of the *President's Initiative to Stop Opioid Abuse*, our *Strategy*, and ensuring the safe, legal, and responsible prescribing of opioids for those who need them. Expanding the use of PDMPs across the country means each state is choosing the system(s) it wants based on cost, needs, or whatever else they determine are important factors; ensuring that all systems communicate with each other and are integrated within provider workflows so they can be useful to providers; and the creation of a federated group of state PDMPs all able to seamlessly share data needed to connect with one another across the country. We will continue to work with our key stakeholders to build on existing research regarding barriers to nation-wide PDMP implementation, and drive PDMP integration and data sharing, including efforts that address any legal and interoperability challenges. We will also pursue incentives for states to make checking PDMPs mandatory for all providers, such as the Centers for Medicare and Medicaid Services' new incentive that offers five bonus points to prescribers who query the PDMP under the Medicare Merit Based Incentive Payment System.

## Expanding Drug Take-Back across the Country

The Drug Enforcement Administration's (DEA) twice-yearly Take-Back Day serves as an opportunity for citizens to dispose of unused and unneeded prescription drugs and a chance to support community drug prevention efforts. This past year, amidst an outbreak of vaping-related lung illness, the DEA has included the Take-Back of vaping products in addition to unused prescriptions for the first time. Although year-round take-back programs are expanding, including some by retail drug stores, the DEA program remains an important element to raise public awareness about the need to reduce unused medications available for potential diversion and misuse. Expanding the number of registered collectors, including hospitals and law enforcement centers, would allow states and municipalities to reduce their reliance on the Federal government for collection, disposal, and transportation. It should be noted that the number of authorized collectors has climbed from almost 6,000 in January 2019 to over 8,850 in December 2019, an increase of 40 percent.  The DEA and other Federal partners should work to engage State, local, and Tribal governments to raise awareness of the importance of disposing unused medications, expand the number of permanent disposal sites across the country, and increase the opportunity for their citizens to do so safely and easily. In addition, at-home disposal options should be more widely available, particularly in rural and tribal communities where prescribing rates are historically high, take-back options are limited, and transportation may be a barrier to accessing existing disposal locations.

## Conclusion

Decades of research and data demonstrate addiction is a preventable disease. Today, we continue to face a compelling need to invest in a comprehensive approach to preventing drug misuse that emphasizes concrete and lasting policy change at the Federal, State, Tribal, and community levels.

AR.07743

The Administration will continue to focus its efforts and work across the government to empower communities, youth, parents, caregivers, and families to come together to create sustainable programs, policies, and practices to combat drug abuse. We know that every dollar we invest in evidence-based substance use prevention programs has the potential to save much more in health care and criminal justice system costs and enhance the overall quality of life for communities and their citizens.

# TREATMENT AND RECOVERY

Addiction is a chronic medical condition that affects the brain by causing distinct cognitive, behavioral, and physiological changes. There is a need to improve the availability of treatment while concurrently enhancing the quality of that treatment. Research shows that treatment is most effective when it addresses addiction as a chronic condition requiring continuing services and support structures over an extended period of time. This can include ongoing outpatient services including MAT programs, intensive initial services such as detoxification, hospitalizations, and residential treatment, followed by continued care and recovery support in the community. Expanding treatment availability also requires accessibility for older adults and people with disabilities, including ensuring treatment centers are physically accessible. Every individual needs an assessment and individualized treatment plan to address their needs as they relate to opioid and other substance use disorders.

Unfortunately, most people who need treatment do not seek it. According to the NSDUH, in 2018 an estimated 21.2 million Americans aged 12 or older needed treatment for a substance use disorder, but only 3.7 million received any kind of treatment and only 2.4 million received that treatment at a specialty facility—a disparity known as the "treatment gap." In some cases treatment capacity is simply not available, and in others people do not fully acknowledge their need for treatment. Therefore, in addition to expanding treatment capacity, we need to engage with those people who need treatment but, for whatever reason, are not seeking it. Furthermore, according to the 2018 NSDUH, 62 percent of the 7.4 million working age adults who had illicit substance use disorder were employed either full-time (45 percent) or part-time (17 percent). The perception that one must "hit rock bottom" to need treatment is not accurate, and we must work to raise awareness of early intervention.

As a Nation, we must encourage people who need treatment to seek it, create greater access to treatment, and ensure there is adequate capacity and quality to accommodate the need. The Administration prioritizes several distinct initiatives to achieve these goals. First, we must expand a proactive response to overdoses to ensure that the patient can enter into a treatment program designed to meet his or her individual needs. Second, we need to use evidence-based approaches to treatment and make MAT the standard of care for opioid addiction. This means increasing the number of physicians providing high-quality, evidence-based MAT for opioid use disorders and increasing the availability of MAT for incarcerated individuals and people living in rural and tribal communities. Expanding treatment infrastructure will enable us to increase the initial treatment for the vast majority of people who require treatment but are unable or unwilling to obtain it. Third, we need to ensure that health insurance plans provide substance use disorder benefits in parity with medical/surgical

AR.07744

benefits and implement the SUPPORT Act which reduces reimbursement barriers, to encourage people who need treatment to make the positive decision to pursue it. Finally, the use of drug courts and diversion programs will foster entrance into treatment programs, steering people away from the cycle of destructive and self-defeating behaviors that is the hallmark of the disease of addiction.

People in long-term recovery demonstrate that recovery is possible and share the message that addiction is a disease and not the result of a personal or family failing. In doing so, they help lift the stigma, misunderstanding, and shame that prevent too many Americans from seeking help for substance use disorders. Often, these factors can close off opportunities for those in recovery who seek to become healthy and fully rejoin and contribute to their communities. Implementation of recovery-supportive and drug-free workplace policies is another important component to improve both the health of individuals and communities, as well as economic outcomes for affected workers. The Administration recognizes the toll that misunderstandings and stigma can take on people, families, and communities struggling with addiction, and is taking steps to address them.

Addressing these and other challenges will require a comprehensive multi-year strategy to educate the public and policymakers, reduce stigma and misunderstanding of addiction, better integrate substance misuse screening and treatment into mainstream health care, build and stabilize the addiction treatment workforce, increase access to treatment, and foster more effective approaches to care for people with substance use disorders.

# PROVIDING TREATMENT

## Improving the Response to and Monitoring of Overdose

Naloxone is an opioid antagonist medication that can rapidly reverse an opioid overdose. However, access to naloxone varies throughout the country. Most states have protocols to expand access to naloxone, such as allowing pharmacists to dispense naloxone under a standing physician's order. The U.S. Food and Drug Administration (FDA) is working to facilitate the development of nonprescription naloxone by creating and testing appropriate consumer-friendly Drug Facts labels. However, even simple rescue breathing can keep a person alive until the naloxone arrives and can be administered. We will begin to increase public awareness of the importance of rescue breathing as a critical life-saving measure in the event of an opioid overdose when naloxone is not immediately available. Moreover, we must do more to ensure that the reversal of a potentially fatal overdose is not just another event in a long and protracted struggle with an addiction to dangerous drugs, but rather the first important step toward effective treatment and sustained recovery.

## Enhancing Evidence-Based Addiction Treatment

Treatment models that demonstrate the best outcomes incorporate behavioral, psychosocial, and pharmacological elements, and are tailored to the specific circumstance of the individual. The ability to provide evidence-based treatment for those who need it depends on skilled and well-trained providers who are appropriately credentialed and licensed. This must include a complete assessment

AR.07745

for substance use disorders by a qualified medical professional; access to addiction treatment such as MAT as a deliberate choice made by a qualified professional in consultation with the patient for a substance use disorder; access to relevant psychosocial treatments such as therapy and relapse prevention; and, the treatment of co-occurring medical and mental health disorders. We must help health providers reduce and treat incidents of NAS by promoting responsible drug prescribing for pregnant women, promoting uniform screening and diagnostic tools, and providing women and their babies with evidence-backed pre- and postnatal treatment. Health providers and other stakeholders should also promote effective gender-relevant models for substance use disorder treatment for pregnant and parenting women. Children and young adults have unique prevention and treatment considerations, and the treatment gap for youth and young adults ages 12-17 is greater than the general public. We need a concerted effort to engage clinicians, school staff, employers, families, caregivers, juvenile justice professionals, community leaders, and health plans and issuers to ensure youth receive treatment that is developmentally appropriate, readily available, and adequately covered by insurance plans.

## Eliminating Barriers to Treatment Availability

Individuals with substance use disorders, including opioid addiction, should have access to evidence-based treatment. According to the Bureau of Justice Statistics and the Substance Abuse and Mental Health Services Administration (SAMHSA), this is particularly true for people in the criminal justice system where nearly 60 percent of people in state prisons and two-thirds of people in jail met the criteria for drug dependence or misuse. Fewer than half of the privately funded substance use disorder treatment facilities offer MAT, and only a third of patients with opioid use disorders have access to those treatments. This is especially true in rural areas where the compelling need for access to treatment far exceeds its availability. The Administration will work across the Federal government to remove barriers to substance use disorder treatments, including those obstacles to FDA-approved MAT, counseling, certain inpatient/residential treatment, and other treatment modalities. All primary care providers employed by the Federal government should screen for alcohol and drug use disorders and, if the patient requests it, provide substance use treatment or a referral for such treatment.

## Leveraging Drug Courts and Diversion Programs

Providing individuals arrested for non-violent drug-related offenses the opportunity to participate in a drug court program or outpatient treatment while under supervision is increasingly becoming the practice throughout the country. From 2009 to 2014 the number of drug courts in the United States increased by 24 percent, reaching 3,057, and today there are more than 3,100 drug courts across the United States, half of which are adult treatment drug courts according to the Department of Justice. Recently, some pioneering police departments began diverting individuals addicted to drugs directly to treatment in lieu of arrest. Many communities are adopting pre-arrest diversion programs where individuals with a substance use disorder are offered treatment in lieu of arrest and deflection models, where those struggling with addiction can walk into a participating police station 24 hours a day for police-assisted rapid treatment entry. The Administration supports these innovative programs and will

AR.07746

continue support for State, Tribal, and local drug courts to provide offenders struggling with addiction access to evidence-based treatment as an alternative to or in conjunction with incarceration, or as a condition of supervised release.

## Building the Addiction Treatment Workforce

Additional efforts must be made to build an addiction medicine infrastructure and expand the addiction profession and peer recovery support services workforces. Medical providers and patients may not have access to a network of treatment and recovery providers and services, and the actual availability of services when needed continues to be a challenge. Federal partners, medical institutions and educational systems must improve recruitment efforts to build and broaden addiction medicine expertise. The entire medical community is encouraged to engage in expanding addiction medicine knowledge. The current climate requires expansion of addiction medicine specialists in psychiatry and general medicine. Beyond the addiction medicine experts, all medical specialists are encouraged to learn about the treatment of addiction. The addiction treatment workforce covers a broad spectrum of professionals from peer counselors and peer support specialists, to addiction counselors, social workers, nurses, nurse providers, physician assistants, psychiatrists, and physicians of all specialties. We will work to grow and enhance all levels of the professional, mid-level and paraprofessional addiction workforces.

## Improving Efficiency in Surveillance and Infrastructure

Current public health infrastructure and its monitoring systems must improve to enable real-time information and epidemiological surveillance. Efforts must be made to understand infrastructure and monitoring capabilities to improve existing systems. Modernizing public health data systems includes having a trained workforce that can manage modernized systems and develop and improve the criteria and indicators necessary for identifying new or evolving classes of illicit drugs. A part of this process is to examine the capabilities and capacities around local toxicology testing, including the recommended minimum detection levels for screening and confirmatory testing of drugs, the role of coroners and medical examiners, and how issues with infrastructure impact data collection. The Federal government, in collaboration with States and localities, should explore ways to better measure and track treatment services and recovery housing availability against demand and need on the local, state, and national levels.

# SUPPORTING RECOVERY

## Utilizing Recovery Support Organizations

The sense of community and the establishment of a safe place to live are essential ingredients for all people who are breaking the grip of addiction and making the journey of recovery. Healthcare professionals, substance use disorder treatment providers, and government agencies need to utilize persons in recovery as a resource. People with lived experience offer an intimate understanding of the nature of addiction, the negative feelings associated with this disease, challenges to be met, and

AR.07747

whose very presence exemplifies hope for a new life to those still suffering.

Recovery-oriented services include Peer Recovery Support Services (PRSS), Recovery Community Organizations (RCOs), Collegiate Recovery Programs (CRPs) and other supportive community-based organizations. In rural areas where distance to service is a challenge, these recovery support services can be provided through mobile or teleservices. Peer Recovery Support Services provide essential services including help with navigating difficult social and family relationships, and offering employment-related advice. These PRSSs often provide a bridge to other communal support systems (mutual aid, faith groups, alcohol and drug-free social and recreational activities) and to other more formal systems such as child welfare offices, healthcare providers, treatment professionals, housing assistance programs, and job training. Recovery Community Organizations provide recovery-oriented education, community outreach, and peer-based recovery services among other invaluable contributions.

To further increase the development of RCOs and enhance their valuable services, Federal agencies should consider uniform standards for recovery support services. These PRSS standards will seek to augment care similar to SAMHSA's Recovery House Guidelines, the National Association of Recovery Residence's (NARR) standards, the Association of Recovery Organizations (ARCO), the Council on Accreditation of Peer Recovery Support Services (CAPRSS), the Oxford House, and other professional organizations with a mission to improve the quality of recovery support services.

Furthermore, while the number of CRPs on the campuses of large public universities, private higher education institutions, and community colleges has increased rapidly over the past decade, they are still the exception rather than the rule. Every higher education campus in America could potentially benefit from some type of CRP. Adolescent recovery support services are especially scarce and of tremendous value to youth, given the importance of peer networks to their social development. Recovery high schools and alternative peer group models hold great promise for meeting the needs of youth, either in active recovery or in encouraging youth to seek it, and we must encourage their increased use across the Nation.

For many individuals seeking recovery, a safe, drug and alcohol-free living environment that encourages recovery is vital to their growth and development. Access to quality recovery housing helps people overcome the challenges associated with substance use disorders.

## Improving Opportunities for Employment for Those in Recovery

Americans in stable recovery from addiction deserve fair consideration for any job for which they are qualified. Today, millions of Americans from all walks of life are in recovery. Many of these individuals have barriers to employment, such as past misdemeanor or felony drug-related criminal convictions that can impede or prevent them from securing employment for which they are fully qualified. In addition to the obstacles created by a past criminal conviction, those in recovery can face additional hardship in finding employment as a result of laws that prohibit the hiring of individuals with a past conviction. These legal restrictions can create additional difficulties for those seeking to fully rejoin the

AR.07748

community and sustain a life in recovery. The Administration will work across the Federal government and the private sector to increase hiring opportunities for those in recovery, including for those with past criminal convictions. This will include providing the best information to employers on the overall benefits of bringing these individuals back into our workforce, developing best practices to increase their employment prospects, and increasing the availability of workforce training, transportation, and safe housing that enables those in recovery to take their place in the American workforce.

## Expanding the Scientific Understanding of Peer Recovery Support Services

While much is known about the process of addiction and about interventions to help address it, less is known about the recovery process and its various trajectories, components, and stages. A better understanding of the recovery process will help in the design and targeting of both clinical and recovery support service interventions that are stage- and trajectory-specific. Continued research is needed to design and target clinical and recovery support interventions and strategies for long-term recovery. However, while the positive anecdotal evidence of the near-term effectiveness of recovery support service models is strong, empirical and rigorous research is required on their long-term effectiveness, the characteristics of those who benefit most from them, and peer recovery support services' role within and impact on broader systems and communities.

Even though evidence suggests that recovery support service models are efficacious in lessening the consequences associated with active addiction, more rigorous research is required to develop a deeper and broader understanding of how these services can best be utilized to mitigate relapses, save lives, and reach a segment of the population who are in need of services. To date much is known about the process of addiction, including specific interventions and treatment models, but less is known about the recovery process and its various trajectories, components, and stages. A better understanding of the recovery process will help practitioners design interventions that can be more effective in meeting people in all stages of active use and recovery. In other words, more research is needed to design and target clinical and recovery support interventions to assist all people in achieving long-term recovery.

## Reducing Stigma and Making Recovery Possible

Americans in recovery are a vital part of every community in the United States, and they seek the same things other Americans want and need—a good job, a safe place to live, a strong social support network, such as a faith community, and the companionship of neighbors and friends. Many people who go through recovery lack a supportive network and the necessary resources to be successful such as safe housing, transportation, or childcare. These hurdles can impede employment and healing, which can lead to potential relapse. For long-term recovery to work we must create mutually-supportive communities where individuals improve their physical, mental, spiritual, and social well-being and gain skills and resources to sustain their recovery. The millions of Americans in long-term recovery from addiction demonstrate that recovery is possible, and they share the message that while addiction is a chronic disease, it can be effectively addressed with evidence-based treatment. By sharing their

AR.07749

stories, individuals in recovery help lift the stigma, misunderstanding, and shame that prevent too many Americans from seeking help for substance use disorders. While stigma knows no geographical boundaries, this can be a particular challenge in rural and tribal communities that are often closely knit. By promoting, supporting, and celebrating recovery, we can reduce stigma and offer hope and encouragement to those struggling with addiction. Many people in recovery have also dedicated their lives to helping others affected by substance misuse as recovery coaches and counselors, a critically important and growing component of the addiction service workforce. The Administration will continue in its efforts to better educate the public, healthcare professionals, and policymakers on the science of addiction and the promise of recovery, and how stigma, poor language choice, and misunderstanding can undermine efforts to reduce drug use and its consequences.

## Conclusion

Untreated substance use disorder can result in violence, crime, and risky behavior that jeopardizes the health and safety of individuals, families, and communities. The moment a person is ready and willing to enter treatment can be fleeting and infrequent. In addition to matching the individual with the most appropriate care model, efforts to expand treatment must include the capability to act quickly on the demand for treatment whenever and wherever the opportunity is presented. Anytime someone seeking help for addiction calls a treatment center, doctor's office, hospital, health clinic, or other medical facility, that person should immediately be referred to some level of assistance. Even if a treatment slot is not immediately available, recovery coaches, peer counseling groups, and families who have learned about addiction can provide help until the right treatment opportunity becomes available. It is in everyone's best interest—affected individuals, their families, and the Nation—for high-quality, evidence-based drug treatment to become more easily accessible. The current opioid crisis highlights the urgent need to encourage those who need treatment to seek it, rapidly increase treatment admissions for opioid addiction, improve treatment retention, and increase the number of individuals who successfully achieve sustained recovery. It is also essential to eliminate the stigma, misunderstanding, and legal and regulatory barriers that delay or prevent treatment access and impede recovery. In addition to saving lives and helping people in recovery achieve their full potential, these changes will help ensure that the significant public investment in treatment pays off in terms of long-term recovery.

# REDUCING THE AVAILABILITY OF ILLICIT DRUGS IN THE UNITED STATES

Almost all of the illicit drugs causing American deaths are produced outside the United States and trafficked across the Nation's borders and through the international mail and express consignment carriers. Large and established Drug Trafficking Organizations (DTOs), the Transnational Criminal Organizations (TCOs) responsible for producing and shipping the drugs into the United States, threaten the health and safety of our communities by exposing our citizens to substances such as illicit fentanyl, non-fentanyl synthetic opioids, heroin, cocaine, and methamphetamine, which kill tens of thousands

AR.07750

of Americans each year. The increased use of illicit drugs burdens the U.S. health care system and leads to lost productivity and civil engagement. Moreover, drug trafficking sustains a vast domestic and international criminal enterprise that enables corruption, undermines governance, has a destabilizing effect on our partner nations, and funds a range of illicit activities. Law enforcement agencies at all levels—Federal, state, local, and tribal—have achieved considerable success in combating drug trafficking and use, yet traffickers continue to refine their methods and adopt new techniques for delivering potent illicit drugs to our communities. Responding to the aggressive trafficking and distribution techniques of DTOs is an urgent national security and law enforcement priority.

The non-medical use of prescription drugs presents another dimension of the availability problem. Many active drug users report obtaining prescription drugs from friends, family members, and in some cases, healthcare providers. The overprescribing of prescription drugs, the diversion of prescription drugs for non-medical use, and the lack of accountability or oversight in prescribing practices increase the availability of prescription drugs in America's homes and workplaces, making it far too easy for them to fall into the wrong hands. Moreover, drug dealers exploit the demand for prescription medicines and traffic in counterfeit pills containing illicit fentanyl, or one of its analogues. These drugs are difficult to distinguish from legitimate prescription medicines, and because they are most often milled and pressed in variable formulations in clandestine locations, it increases the chance for accidental overdose.

## Disrupting, Dismantling, and Defeating Drug Traffickers and Their Supply Chains

While DTOs often are involved in poly-drug trafficking and other criminal activity, the unprecedented rise in deaths from the opioid crisis demands that we prioritize U.S. government efforts on the individuals and groups involved in the smuggling and sale of the most deadly drugs such as synthetic opioids and heroin. As these organizations continue to modify their techniques and operations in an attempt to reduce risk and maximize profit, we must anticipate and then respond to changes in the drug trafficking environment, identify and exploit vulnerabilities in the illicit drug supply chain, and seize the initiative from drug traffickers in order to disrupt their activities and dismantle the infrastructure they use to sustain their illicit enterprise. Along with aggressive actions to prevent the further expansion of these criminal enterprises in our country, we must also work with foreign partners to attack criminal networks, principally those in the Western Hemisphere, whose drug trafficking and associated criminality directly impact migration and border security issues affecting the United States.

## Working with International Partners

The U.S. Government will focus its diplomatic efforts to encourage partner nations to produce results that match the growing threat from illicit drugs. Consistent with the National Security Strategy, we will prioritize assistance with partners who are aligned with U.S. interests, are showing results, and building the capacity to address these threats independent of U.S. assistance programs. This will require partners' renewed commitment to disrupt the illicit supply chain through the interdiction and

AR.07751

seizure of the illicit drug supply, illicit funds, and weapons; eradicate poppy and coca plants; find and dismantle the labs used for all illicit drug processing; develop and sustain robust law enforcement and justice systems; maintain the rule of law and ferret out corruption; and arrest and prosecute drug traffickers operating within their own land borders, territorial waters, and airspace. These efforts are not only important in their own right but will complement, and be informed by, a strong domestic public health response to the crisis aimed at reducing the use of these drugs in the United States. We will continue to work bilaterally with the primary drug producing and trafficking countries most affecting the United States, emphasizing our shared responsibility for today's drug problems and the strong desire for tangible progress in the years to come. Regional relationships will be an important part of our international approach, allowing us to share information and harmonize our drug policies in the face of a constantly changing threat. Moreover, we will take full advantage of the strong multilateral framework that exists to address the global drug problem, particularly in terms of supporting the three international drug control conventions and providing leadership in the processes for internationally scheduling, controlling, and monitoring illicit drugs and their precursor chemicals.

## Combating Illicit Internet Drug Sales

Over the past three years, illicit drug sales on both the clear and the dark web have further expanded the illicit drug market, allowing individuals to purchase dangerous drugs directly from their manufacturers or individual intermediaries instead of through established trafficking organizations, and have them shipped directly to their homes. We must continue to disrupt the ability of drug traffickers to exploit the anonymity, distance, and financial transaction reliability provided through internet sales by degrading the implicit trust between buyer and seller required for illicit on-line transactions. We must use existing authorities to their maximum effect to target drug traffickers and their enablers by employing both passive and active measures to disrupt and exploit illicit drug related activities operating on both clear and dark webs. Contesting drug marketplaces in the cyber domain and disrupting the use of cryptocurrencies for illicit drug sales requires a coordinated and well-resourced framework of relationships, laws and regulations, procedures, and capabilities. This will allow us to identify and target the network of actors involved, and prosecute those who use the open or dark webs to market, sell, and purchase illicit drugs. Utilizing our full range of authorities and cyberspace capabilities in a sustained effort against the internet drug market, will erode this implicit trust and disrupt illicit operations on the clear and dark webs over time.

## Focusing Federal Government Effort against Illicit Drug Delivery through the Mail and Express Consignment Networks

We must complement our efforts against internet drug sales with a sustained effort to disrupt the flow of illicit drugs shipped through the international mail and express consignment environments. This requires maximizing the policy and regulations, international relationships, facility infrastructure, and technology required to aggressively target, detect, and intercept illicit drugs transported through the international mail and express consignment environments both internationally and domestically. We must work with our international partners to develop the ability to share Advance Electronic Data

AR.07752

for all international shipments, in accordance with the President's *Initiative to Stop Opioid Abuse*, and continuously refine targeting algorithms to identify and interdict international shipments before they depart the source country and at U.S. Ports of Entry. We must help critical partner countries develop the ability to detect and intercept illicit drugs in their domestic mail and express consignment systems before those drugs depart for the United States and enter the U.S. mail or commercial carrier system. We must continue our extensive work with private sector partners which is critical to disrupting the manufacturing, marketing, sale, and shipment of drugs through the nation's commercial infrastructure. Finally, we must develop next generation technology and screening capabilities to increase our ability to detect illicit drugs once they enter the mail and express consignment systems within the country, and improve testing capability to determine the precise type and source of illicit drugs seized. This investment in science, technology, resources, and international relationships is necessary to determine the type, source region, production location, and route traveled for all illicit drugs seized by the United States and its international partners.

## Interdicting the Flow of Drugs across the Physical Borders and into the United States

Along with the challenge of drug trafficking via internet sales and mail and express consignment delivery, drugs continue to flow across our land borders and through the maritime and air routes. Stopping these flows must continue to be a part of our comprehensive interdiction efforts. This work includes enhancing the border's physical security infrastructure, especially along our southern border. The historically high levels of cocaine production in Colombia, along with heroin, methamphetamine, and illicit fentanyl production in Mexico, combined with the vast number of routes and conveyances into the United States, make the challenge of combating drug trafficking across our physical borders no less daunting than it has been for the past several decades. Federal agencies should expand efforts in the detection and monitoring of the air and maritime approaches to the United States; the detection of illicit drugs and precursor chemicals shipped in commercial containers; and interdiction of plant-based drugs such as heroin, cocaine, and marijuana, as well as synthetic drugs and their precursor chemicals, along the Nation's land borders. Moreover, increasing cooperation and effort from foreign partners who can contribute vital information on trafficking patterns and assets to seize drugs bound for the United States, will complement U.S. efforts.

## Disrupting and Dismantling the Illicit Drug Production Infrastructure

The United States and Mexico have expanded cooperation to address the common threat of illicit opioids, and both governments agree that reducing the supply of heroin, methamphetamine, and illicit fentanyl is a shared responsibility. Mexico has increased its efforts to eradicate poppy fields more effectively, destroy clandestine laboratories, and interdict heroin and other drugs before they reach the U.S. border. The U.S. Government's partnership with Mexican law enforcement officers, analysts, chemists, and military personnel to identify and safely dismantle clandestine drug laboratories that produce heroin, methamphetamine, and illicit fentanyl has increased Mexico's capability in addressing the dangers synthetic drugs present to law enforcement.

AR.07753

We must work with partners to address expanding coca cultivation and cocaine production in Colombia and the broader Andean region in a comprehensive manner. Key elements of cooperation with proven partners such as Colombia and Peru include increasing all forms of illicit crop eradication, alternative development and economic opportunities, interdiction, investigation and prosecution, judicial support, and public health cooperation, all of which must be long-term and sustainable. Since coca fields differ in their level of productivity, this approach will be most successful if we focus in areas of high-yield coca cultivation. Unfortunately, these areas generally have limited government services and lingering security concerns, and will require concerted effort over several years to turn the rising tide of cocaine production.

Within the United States, marijuana cultivation on public lands, and within National Forest System lands in particular, is a significant issue. Cultivation activities not only sustain the illicit marijuana trade but also produce large volumes of hazardous materials that pose a significant risk to the public and the environment. Wildlife, soil, and vegetation are often contaminated by the various hazardous substances involved in the cultivation process. Personnel conducting enforcement, cleanup, and regulatory activities, as well as the public, are at considerable health risk from exposure to these chemicals. Continued firm action is required against the exploitation of the Nation's public lands through increased detection, disruption, reclamation, and prosecutions.

The majority of illicit synthetic drugs available in the United States are manufactured abroad. New illicit synthetic drugs and the precursor chemicals used to make them originate predominantly in China, although most of the methamphetamine available in the United States is manufactured in Mexico and the rising production of illicit fentanyl in Mexico has become an increasing concern. Increased collaboration with Mexico, China, and other partners on shared drug priorities can help disrupt drug trafficking networks, along with the corrupt or compromised systems that support them, and reduce the availability of dangerous synthetic drugs in the United States. The United States will continue bilateral exchanges with China, Mexico, Colombia, and other source and transit countries to reduce production and trafficking of synthetic drugs destined for markets in the United States and support collaboration with international partners impacted by drugs from the very same sources.

## Leveraging the Full Capabilities of Multi-Agency, Multi-Jurisdictional Task Force Programs

Transnational drug trafficking organizations, by definition, operate across national, state, and local boundaries to produce, transport, and distribute dangerous and addictive drugs. In order to protect their criminal enterprise, drug trafficking organizations also commit violent crimes, threaten and corrupt public officials, traffic weapons, and launder their criminal proceeds. Accordingly, no single government, or government organization, alone can defeat these threats. Our best strategy to dismantle and disrupt criminal organizations is to employ the coordinated efforts of multi-agency, multi-jurisdiction task forces. Such task forces are best organized to work with international partners and to take coordinated action on shared investigative information and intelligence.

21

ONDCP oversees the High Intensity Drug Trafficking Areas (HIDTA) Program which provides assistance to law enforcement agencies operating in areas determined to be critical drug-trafficking regions of the United States. HIDTAs provide an umbrella to coordinate Federal, state, local, and tribal drug law enforcement agencies' investigations, and act as neutral centers to manage, de-conflict, analyze, provide intelligence support to, and execute drug enforcement activities in their respective regions. With the last year's inclusion of Alaska, the first new HIDTA in 17 years, the 29 regional HIDTAs now include designated areas in all 50 states, Puerto Rico, the U.S. Virgin Islands, and the District of Columbia. The regional HIDTAs bring together more than 21,000 Federal, state, local, and tribal personnel from 500 agencies through 800 enforcement, intelligence, and training initiatives, all designed to disrupt illicit drug trafficking and dismantle criminal and drug trafficking organizations. The Administration will ensure strong support for counterdrug enforcement, including by supporting Federal participation in multi-jurisdictional task forces and enhancing support for information sharing at all levels. This will ensure that national data systems receive input from state, local, and tribal agencies, and that these agencies, in turn, have access to data compiled by Federal agencies that can prove vital to their own investigations.

## Interrupting the Financial Activities of Drug Traffickers

Illicit drugs enter the United States from global suppliers as the result of a long and complex process involving manufacture, concealment, movement, purchase, and delivery. The illicit drugs may change hands several times during the process, and this often necessitates the transfer of money, either as payment for services or for delivery of the final product. Traditionally, street-level sales of illegal drugs are conducted with cash, creating immediately liquid assets that are almost impossible to track. As technology and money laundering methods have adapted over the years to circumvent Anti-Money Laundering regulations, drug traffickers have initiated many new techniques to enable the traditional method of hard currency transactions. Although some of these methods create additional investigative evidence, emerging technologies continue to outpace banking regulations and consistently provide drug traffickers the means to launder large amounts of their illicit proceeds.

Most of the revenue generated from illegal drug sales in the United States is maintained at the retail level of drug distribution. However, illicit proceeds that flow back to international sources of drug supply are most often used to finance other illegal activities or the next cycle of illegal drugs flowing into our communities, posing a continual threat to the country. These funds also corrupt and weaken the government infrastructure of source and transit countries, limiting those governments' ability to combat TCOs, escalating violence, and threatening the stability of the governments we partner with to counter illicit activity. We will combat this threat and target the drug proceeds that motivate criminal activity by attacking TCOs' financial capital; preventing the circulation, transfer, and concealment of their illicit proceeds; and, ultimately decreasing their wealth and their incentive to function.

## Enhancing Law Enforcement Capacity

Success in reducing the availability of illicit drugs in our country requires continuing to strengthen

AR.07755

the capacity and tools to fully understand, and relentlessly respond to, the increased drug threat we face. As our National Security Strategy states, this capacity building includes national-level strategic intelligence and planning capabilities to improve the ability of departments and agencies to work together to combat TCOs, particularly those who traffic drugs at home and abroad. We must improve our capability to dismantle TCOs as a whole through greater coordination and focus, directly benefiting our counterdrug efforts. Improved strategic planning must be informed by better strategic intelligence on transnational organized crime and global criminal networks, fusing law enforcement and Intelligence Community information and intelligence to create the most complete picture available of criminal networks. We must use that information to identify and exploit vulnerabilities in drug trafficking networks, using the full range of law enforcement capabilities including criminal prosecutions, financial disruption tools such as asset forfeiture proceedings, and security operations to remove the profits from crime. Moreover, we must maintain pressure on these organizations over time and prevent them from regenerating their capabilities. We must also emphasize both actions that lead to prosecutions—to reduce networks' ability to operate, through the investigation, arrest, and prosecution of critical personnel —and those that lead to the long-term disruption of network operations such as the seizures of illicit drugs, precursor chemicals, illicit funds, and weapons.

Our conventional focus on targeting high-level individuals within the hierarchy of well-organized and sophisticated DTOs must evolve toward identifying and targeting vulnerable critical components of more fluid and dynamic organizations such as financial facilitators, corrupt officials, and key transporters, to affect a significant disruption of DTO activities, targeting key nodes to attack the entire network through its enablers. Degrading and defeating criminal networks that have become more resilient because they are decentralized, redundant in capabilities and capacities, and compartmentalized, requires identifying the key nodes enabling DTO operations and simultaneously targeting them for maximum effectiveness over time. Agile interagency and international coordination will allow for better detection of changes in the trafficking supply chain, which will support intelligence-driven operations against identified vulnerabilities, from drug production to delivery to the end user.

## Conclusion

The increased availability and use of illicit drugs is taking far too many American lives and destroying American families. It burdens the U.S. health care system and leads to lost productivity and civil engagement here at home, and global drug trafficking sustains a vast domestic and international criminal enterprise that enables corruption and destabilizes partner nations abroad. America's drug crisis has created a complex national security, law enforcement, and public health challenge for the Nation, and this challenge will remain with us for the foreseeable future. We must leverage the full capabilities of the U.S. intelligence and law enforcement communities, our military, domestic law enforcement and criminal justice capabilities, and sustained engagements with the governments of key partner nations and international organizations to stop the flow of these drugs across our borders and into our communities, and use that capability to posture ourselves for an ever-evolving drug trafficking environment. Our actions will continue disrupting the evolving illicit supply chain, decreasing the

AR.07756

volume of drugs being sold over the internet; decreasing the cultivation of illicit crops like poppy and coca as well as the volume of illicit drugs being produced for export to the United States; increasing the amount of illicit drugs seized before entering the United States; increasing the amount of forfeited assets; increasing the number of convictions for drug-related crimes; and increasing the pace of review of, and imposition of international controls on, emerging dangerous substances.

Achieving the President's outcome of reducing the number of Americans losing their lives to drug addiction in today's crisis, and preparing now to dominate the drug environment of the future, requires deliberate actions focused on clear priorities and tangible outcomes to reduce the availability of drugs in our Nation. However, lasting success requires those actions to complement, and be informed by, a strong domestic public health response to reduce the use of these drugs in the United States which makes possible enormous profits for drug traffickers and fuels the illicit drug market. Bold and decisive national security, law enforcement, and public health efforts are needed to lift the Nation from the shadow of drug use and move toward the President's goal of a stronger, healthier, and drug-free society today and in the years to come.

# GOALS AND BUDGET PROJECTIONS

While this *Strategy* focuses on aggregate progress toward a strategic outcome rather than enumerating all of the tasks and activities that organizations at the Federal, State, local and Tribal levels must undertake in order to stem the tide of America's drug crisis, it is nonetheless important to establish objectives that align to the *Strategy's* nine goals for achieving the overarching strategic outcome of saving American lives and building a healthier, drug-free society. This not only ensures the necessary policies, priorities, and objectives of drug control agencies and interagency partners are adequately aligned and resourced to advance the President's drug control priorities, but also serves to identify those areas where a refinement of the *Strategy* may be necessary to close an identified gap, or areas where a shift in specific agency focus or resources can attain greater effects in achieving the President's overarching strategic objective.

## Goals for Reducing Illicit Drug Use, Objectives, and Targets for Measuring Progress

This *Strategy's* three lines of effort: preventing drug use before it starts, providing treatment leading to long-term recovery for those suffering from substance use disorder, and reducing the availability of drugs in the United States, will be advanced by the accomplishment of the nine goals listed below. Each goal directly supports the three lines of effort and contains one or more quantifiable and measurable objectives. The *Strategy*, with its three lines of effort, describes in detail how the aggregate progress across the interagency directly contributes to the achievement of the nine goals. Assessing the sustained progress toward achieving those objectives, and realizing the related goals, is enabled by annual targets that will be continually assessed over a five year period.[3]

---

[3] The accompanying *Performance and Reporting System* contains each of the annual targets for each Objective and a detailed description of how each was determined.

AR.07757

A description of how each goal and its supporting objective(s) was determined, including the data, research, or other information used to inform the determination to establish them, is discussed in the *National Drug Control Strategy: Performance Reporting System*. The baseline for all objectives is 2017, the first year of the Administration, except for three objectives for which the earliest data is for either 2018 or 2019. Development of the goals and objectives was an iterative process conducted by review of the latest research and data and consultation with subject matter experts within ONDCP and from the relevant National Drug Control Program Agencies.

- Goal 1: The number of Americans dying from a drug overdose is significantly reduced within five years.

  - Objective 1: Overdose deaths are reduced by reaching annual targets in percentage reductions each year, and by a total of 15 percent by 2022.

- Goal 2: Educate the public, especially adolescents, about drug use, specifically opioids.

  - Objective 1: Reduce the rate of past year use of any illicit drug among youth each year, and by 15 percent by 2022.

  - Objective 2: Reduce the rate of past year use of opioids among youth each year, and by 15 percent by 2022.

- Goal 3: Evidence-based addiction treatment, including MAT for opioid addiction, is more accessible nationwide.

  - Objective 1: Increase the percentage of specialty treatment facilities providing Medication-Assisted Treatment for opioid use disorder every year, so that 100 percent do so by 2022.

  - Objective 2: Increase the percentage of Federal health care workers certified to administer, prescribe, and dispense buprenorphine for opioid use disorder every year, and to 10 percent by 2022.

- Goal 4: Increase mandatory prescriber education and continuing training on best practices and current clinical guidelines.

  - Objective 1: Increase the percentage of Federal prescribers that have completed continuing education on best practices and current clinical guidelines in prescribing opioid medications every year, and by 50 percent by 2022.

- Goal 5: Reduce nationwide opioid prescription fills.

  - Objective 1: By increasing education and adherence to proper prescribing practices for effective pain management, reduce nationwide opioid prescription fills every year, and by 33 percent by 2020 and maintain that reduction in 2021 and 2022.

AR.07758

- Goal 6: Increase Prescription Drug Monitoring Program interoperability and usage across the country.

  - Objective 1: Increase the number of states integrating electronic health records with their Prescription Drug Monitoring Programs every year, and to 30 by 2022.

- Goal 7: Significantly reduce the availability of illicit drugs in the United States by preventing their production outside the United States.

  - Objective 1: Reduce potential production of cocaine (pure metric tons) in Colombia every year, and by 42 percent by 2022.

  - Objective 2: Reduce potential production of heroin (pure metric tons) in Mexico every year, and by 25 percent by 2022.

- Goal 8: Significantly reduce the availability of illicit drugs in the United States by disrupting their sale on the internet, and stopping their flow into the country through the mail and express courier environments, and across our borders.

  - Objective 1: Increase the amount of cocaine removals (in metric tons) in the transit zone every year, and by 10 percent by 2022.

  - Objective 2: Increase the amount of seizures (in metric tons or kilograms) at the U.S. southern border every year, and by 10 percent by 2022 for each of the following drugs: cocaine, fentanyl, heroin, and methamphetamines.

  - Objective 3: Increase the number of online drug vendor investigations every year, and by 20 percent by 2022.

- Goal 9: Illicit drugs are less available in the United States as reflected in increased price and decreased purity as measured by price per pure gram.

  - Objective 1: Increase the average price per pure gram of cocaine every year, and reach $250 by 2022.

  - Objective 2: Increase the average price per pure gram of heroin every year, and reach $1,400 by 2022.

  - Objective 3: Increase the average price per pure gram of methamphetamine to $120 by 2022.

  - Objective 4: Increase the cost of illicit fentanyl (purity not known) charged by dealers per kilogram to customers every year, and by 10 percent to $3,300 by 2022.

AR.07759

## Projections for National Drug Control Program and Budget Priorities

The 2019 *Strategy* set policy goals and objectives for the Nation, along with associated performance measures and targets to achieve those goals and objectives. ONDCP considers the *Strategy's* projections for policy priorities to be the budget priorities because they indicate to the National Drug Control Program Agencies what the Administration's long-term priorities are, and those agencies are expected to provide resources for those priorities over the course of the Administration. ONDCP's funding guidance also establishes the budget priorities—for the current and future years—for National Drug Control Program agencies to meet the performance targets and achieve the policy goals and objectives of the *Strategy*.

## Budget and Performance Summary

The *FY2020 Budget and Performance Summary*, published in May 2019, can be found at:

https://www.whitehouse.gov/wp-content/uploads/2019/05/FY-2020-Budget-and-Performance.pdf

ONDCP will release the *National Drug Control Strategy: FY 2021 Budget and Performance Summary* (*Budget Summary*) after the President's proposed budget is released in early 2020. The *Budget Summary* contains information on the President's FY 2021 drug control budget, as well as the enacted and actual funding levels for FY 2020 and FY 2019, by National Drug Control Program Agency (NDCPA) and subordinate elements, as well as historical funding levels by function. Appendices contain information on the resources to support the National Drug Control Strategy Border Strategies and the National Treatment Plan. In addition, the *Budget Summary* provides a description of each agency's mission, program descriptions, and significant changes in the FY 2021 request compared to the FY 2020 enacted or continuing resolution amount. The *FY 2021 Budget Summary* also contains details of each agency's program performance metrics and a section on the assessment of the contribution of each NDCPA to achieving the goals and objectives of the *Strategy.*

AR.07760

# Appendix 1: List of Supporting Planning Documents

The *National Drug Control Strategy* has six supporting plans or documents that address specific requirements necessary for achieving the *Strategy's* overarching strategic outcome and the nine goals, objectives, and targets used to assess performance. Taken together, the base *Strategy* and its six supporting plans and documents compose the Administration's *National Drug Control Strategy*:

- *National Drug Control Strategy: National Treatment Plan*—articulates how the Federal Departments and Agencies and their key stakeholders at the State, local, Tribal, and private sectors of society will expand treatment for substance use disorders.

- *National Drug Control Strategy: Southwest Border Counternarcotic Strategy*—articulates the Government's strategy for preventing the illegal trafficking of drugs across the international border between the United States and Mexico, including through ports of entry and between ports of entry on the border.

- *National Drug Control Strategy: Northern Border Counternarcotic Strategy*—articulates the Government's strategy for preventing the illegal trafficking of drugs across the international border between the United States and Canada, including through ports of entry and between ports of entry on the border.

- *National Drug Control Strategy: Budget and Performance Summary Report*—presents the details of the President's resource requirements to implement the Strategy and to inform Congress and the public about the total amount proposed to be spent on all supply reduction, demand reduction, State, local, and tribal affairs, including any drug law enforcement, and other drug control activities by the Federal Government. There are 16 Federal Departments and Agencies that have been designated by the ONDCP Director as Drug Control Program Agencies. Budget detail is provided at the program, project, and activity levels (the level at which the Office of Management and Budget and the agencies request funding and Congress appropriates it). The report also provides detail on agency-level performance metrics to enable assessment of progress toward achieving programmatic objectives.

- *National Drug Control Strategy: Performance Reporting System*—describes the Strategy's goals, objectives, and annual targets established for reducing drug use, availability, and the consequences of drug use.

- *National Drug Control Strategy: Data Supplement*—provides the data that enables an assessment of current drug use and availability, impact of illicit drug use, and treatment availability. The more than 150 data tables provide national, state, local, and international data on drug use; attitudes and perceptions toward drug use; drug- induced morbidity and mortality; drug treatment; drug-related crime, including drugged driving; drug price and purity; cultivation and/or the production of drugs; and drug eradication and seizures.

AR.07761

# Appendix 2: ONDCP's Role in Facilitating the Achievement of the Strategic Goals and the Coordination Mechanisms Necessary for Achieving the Strategic Goals

**ONDCP's Role:** Established by the Anti-Drug Abuse Act of 1988, and reauthorized by the *SUPPORT for Patients and Communities Act* (Public Law 115-271), ONDCP leads, coordinates, and oversees the implementation of the national drug control policy, including this *Strategy*. There are numerous facilitation mechanisms that the Director of the National Drug Control Policy uses to achieve the nine goals and objectives of this *Strategy*, the most important of which are the two National Coordination Groups within ONDCP and the specific functional coordinators discussed below. In addition, the Director, in conjunction with ONDCP's Office of Performance and Budget, conducts a yearly evaluation of the effectiveness of this *Strategy* in light of the activities and accomplishments of the National Drug Control Program Agencies.

## Existing Coordination Mechanisms:

**National Cocaine Coordination Group (NCCG):** Responsible for guiding and synchronizing interagency efforts to reduce the availability of cocaine. The NCCG identifies gaps and redundancies in Federal government's efforts to address the cocaine problem set and works to solve them in order to achieve its goal of reducing the number of fatal overdoses. The NCCG works with the National Security Council (NSC), Domestic Policy Council (DPC), and other White House elements, as appropriate, on issues involving counternarcotics, Colombia, Peru, transnational organized crime, and the implementation of the 2019 *National Drug Control Strategy*.

**National Opioids and Synthetics Coordination Group (NOSCG):** The focal point for guiding and synchronizing interagency efforts to reduce the availability of all illicit or illegally trafficked opioids, plant-based and synthetic, as well as psychostimulants such as methamphetamine. To achieve its primary measure of effectiveness, reducing the number of fatal overdoses, the NOSCG identifies gaps and redundancies in the Federal government's efforts to address the opioid and synthetics problem set and works to close them.

To do so, the NOSCG coordinates widely across the interagency and with partners in the private sector and the state-level and below, starting with ten engagements per month in direct support of the implementation of its Heroin Availability Reduction Plan. These engagements include a weekly TS-SCI video teleconference (VTC) with all Intelligence Community partners; a monthly VTC with US Embassy Mexico to align and coordinate counternarcotics and security activities and issues; a monthly VTC with US Embassy Beijing to coordinate and align policy issues related to synthetic opioids; a monthly Federal law enforcement Secure VTC to share information on emerging trends; a monthly nationwide webinar with 20 partner states in all four US census regions that brings together law enforcement and public health officials to share trends, best practices, and lessons learned; and a monthly teleconference to allow forensic scientists, medical examiners, coroners, intelligence analysts, and members of the law enforcement community to share trend data and information on newly identified substances seized by

AR.07762

U.S. Customs and Border Protection (CBP).

The NOSCG also co-chairs or supports NSC-led sub-policy coordinating committees, policy coordinating committees, and deputies committee meetings as appropriate on issues involving counternarcotics, Mexico, China, illicit finance, transnational organized crime, and special interest topics such as the Community Response to Drug Overdose and the safe handling of illicit fentanyl for first responders. Along with the DPC, the NOSCG co-chairs meetings on public health-related topics such as prescription drug monitoring programs, safe prescribing, naloxone availability and use, and increasing the availability of MAT for opioid use disorder. The NOSCG also organizes, leads, or participates in White House stakeholder events on specific topics for private sector partners such as private sector cooperation on stemming the flow of synthetic opioids and counterfeit prescription drugs into the United States, and overdose response and Naloxone availability in colleges and universities. Finally, the NOSCG supports both the NSC and DPC to co-chair meetings on implementation of the 2019 *Strategy*, providing subject matter and policy expertise on those strategy objectives related to opioids, illicit opioids, synthetic drugs, dark web drug sales, and illicit finance.

**Demand Reduction Coordinator and Public Health, Education and Treatment Task Force (PHET):** The Demand Reduction Coordinator leads ONDCP's Public Health, Education, and Treatment Task Force which establishes the ONDCP response to the Nation's addiction crisis, and provides strategic guidance to lead the interagency effort to plan, coordinate, and manage the public health responsibilities of the President's *Strategy*. The task force portfolio includes primary drug prevention, public education on the consequences of drug use, removing barriers to access effective addiction treatment including medication assisted therapies, criminal justice diversion programs, and establishing recovery support programs. Collaboration and coordination with other Federal agencies, State, local and Tribal health officials, and health policy-related interest groups is key to the development and implementation of these demand reduction functions.

**United States Interdiction Coordinator (USIC):** Responsible for establishing the Federal government's interdiction strategy and assessing the sufficiency of assets committed to illicit drug interdiction. To accomplish this, the USIC staff works across four primary lines of effort: border strategy development, information sharing, interdiction capability and capacity development and support, and interagency coordination. The USIC publishes the Administration's *National Interdiction Command Control Plan* (NICCP) and multiple border strategies in support of the of the President's *Strategy*. To develop and implement these availability reduction functions, the USIC collaborates with White House peers, international partners, Federal, State, local, and Tribal law enforcement officials, and the HIDTAs.

**State, Local, and Tribal Affairs Coordinator (SLTAC):** Coordinates drug control efforts between Federal agencies and State, local, and Tribal governments. The SLTAC meets with State, local, and Tribal governments to hear their concerns and coordinate their drug control efforts with the drug control efforts of the Federal agencies. This helps to ensure cooperation and information sharing, and to avoid duplication between Federal efforts and State, local, and Tribal efforts. The SLTAC also ensures that State, local, and Tribal governments commit to and take steps to achieve the *Strategy's* goals.

AR.07763

**Emerging Drug Threats Coordinator:** Chairs the Emerging Threats Committee that is responsible for recommending to the Director the criteria for declaring or terminating an emerging or evolving drug threat in the United States, monitoring, discussing, and identifying an evolving and emerging drug threat in the United States, and recommending to the Director when such a declaration or termination needs to be made. In the case of a declaration, the Chairperson and the Committee are responsible for developing, coordinating, and overseeing the execution of a Response Plan to address the drug threat as outlined in 21 USC §1708: Emerging Threats Committee, plan, and media campaign.

**Performance Budget Coordinator:** Responsible for ensuring the Director has sufficient information necessary to analyze the performance of each National Drug Control program Agency, the impact Federal funding has had on the goals in the *Strategy*, and the likely contributions to the goals of the Strategy based on funding levels of each National Drug Control Program Agency, to make an independent assessment of the budget request of each agency; and advising the Director on agency budgets, performance measures and targets, and additional data and research needed to make informed policy decisions.

AR.07764

# Appendix 3: Mission Statement and List of National Drug Control Program Agencies and How They Help Achieve the Strategic Goals

The National Drug Control Program's mission is to develop policies and to coordinate, promote, and implement initiatives that result in a stronger, healthier, drug-free society today and in the years to come. This mission is implemented through a series of congressionally mandated activities set forth in the agency's authorizing legislation, as well as through strategic initiatives aimed at preventing the initiation of illicit drug use, providing treatment services leading to long-term recovery for those suffering from addiction, and aggressively reducing the availability of illicit drugs in American communities.

The National Drug Control Program Agencies are the Departments of Agriculture, Defense, Education, Health and Human Services, Homeland Security, Housing and Urban Development, Interior, Justice, Labor, State, Transportation, Treasury, and Veterans Affairs, the Federal Judiciary, the Office of National Drug Control Policy, the United States Postal Inspection Service, and the Court Services and Offender Supervision Agency for the District of Columbia.

ONDCP has a performance evaluation plan for the nine goals of the *Strategy* that includes performance measures for each National Drug Control Program Agency, to the extent practicable, sets performance targets for those measures, and presents an estimate of the Federal funding needed to achieve performance targets and objectives. The *Strategy* establishes the long-range goals for reducing illicit drug use and the consequences of illicit drug use. The performance measures and targets that support the policy objectives of the *Strategy* are described in the *National Drug Control Strategy: Performance Reporting System* (PRS). ONDCP collaborates with National Drug Control Program Agencies to align their activities that support implementing the *Strategy's* policy objectives to the PRS performance targets. ONDCP also collaborates with agencies to establish agency-specific performance measures and targets to assist ONDCP and the agencies in evaluating their contributions to achieving *Strategy* goals. This agency-specific performance data is presented in the Performance section of the *National Drug Control Strategy: Budget and Performance Summary (Budget Summary)*. The budget request for the agency, also presented in the *Budget Summary,* describes the resources needed to meet the agency's performance targets, and ensures their contribution to achieving the performance goals and objectives of the *Strategy*. ONDCP's construct for performance evaluation planning allows it to assess the government's effectiveness in achieving policy objectives by aligning agency funding and performance to the strategic goals and policy priorities of the *Strategy*.

For a more in-depth description of the role of each NDCPA, their related programs, assets and activities to achieve Strategy goals, please refer to the FY 2020 *Budget and Performance Summary* that was published in May 2019, and to the FY 2021 *Budget and Performance Summary* that will be published after the President's proposed Budget is released.

AR.07765

# Appendix 4: Role of Key Stakeholders and Partners in the *Strategy*

ONDCP, established by the Anti-Drug Abuse Act of 1988, and reauthorized by the *SUPPORT for Patients and Communities Act* (Public Law 115-271), is required to consult a wide array of experts, key stakeholders, and officials while developing the President's *National Drug Control Strategy*. It requires the ONDCP Director to work with the heads of the National Drug Control Program agencies; ONDCP's internal coordinators; the Interdiction Committee and the Emerging Threats Committee; appropriate Congressional Committees; State, local and Tribal officials; private citizens and organizations with experience and expertise in demand and supply reduction; and appropriate representatives of foreign governments. ONDCP met this requirement by soliciting the views of the following individuals and organizations during the development of the National Drug Control Strategy as detailed below.

*Consultation with National Drug-Control Program Agencies (21 USC § 1705(b)(4)(A)(i))*

ONDCP works closely with agencies that have been charged to oversee drug prevention, treatment and recovery, and availability reduction. Input was solicited from fifteen Federal Departments, Independent Agencies, and the Federal Judiciary. ONDCP works regularly throughout the interagency (including the NSC and the DPC) to ensure the effective coordination of drug programs. These agencies, based on their unique mission, roles, functions, will play key roles in achieving all nine goals contained in the strategy

*Consultation with ONDCP coordinators (21 USC § 1705(b)(4)(A)(ii))*

The various coordinators within ONDCP (the Performance Budget Coordinator, the Interdiction Coordinator, the Emerging and Continuing Threats Coordinator, the State, Local, and Tribal Affairs Coordinator, and the Demand Reduction Coordinator) are each an integral part of the development of the Administration's policy and budget priorities in the areas of prevention, treatment and recovery, and reducing the availability of illicit drugs. Each coordinator contributed to the development of the *Strategy* and will play key roles in achieving the nine goals.

*Consultation with Interdiction and Emerging Threats committees (21 USC § 1705(b)(4)(A)(iii))*

ONDCP serves a leadership role on both the Interdiction Committee (TIC) and the Emerging Threats Committee, and engaged both groups to gather their views on the *Strategy*. The TIC works to enhance and expand cooperation and coordination with all agencies engaged across the operational spectrum of supply reduction and interdiction. Similarly, the new Emerging Threats Committee has established the criteria for declaring or terminating an evolving or emerging drug threat, and it is monitoring the landscape to identify such threats in the United States. Both Committees' perspectives were essential when considering both the public health and public safety aspects of the *Strategy*. The Interdiction Committee will have a significant role in achieving Goals 1, 7, 8, and 9 of the *Strategy*. The Emerging Threats Committee has members from the Prevention, Treatment and Recovery, and the Interdiction (law enforcement) communities, they will play key roles across the three lines of effort and with each of the nine goals.

AR.07766

*Consultation with appropriate Congressional committees (21 USC § 1705(b)(4)(A)(iv))*

The Administration works closely with the Congress in the development, implementation, oversight, and funding of the *National Drug Control Strategy*. ONDCP requested input from over 250 members of the House and Senate who sit on the House Oversight and Reform, Judiciary, Energy and Commerce, and Appropriations Committees, as well as the Senate Drug Caucus, Judiciary, Health, Education, Labor and Pensions and Appropriations Committees. Their input, as well as the continued interaction between Administration and Congress, was critical to the development of this *Strategy*.

*Consultation with State, local, and Tribal officials (21 USC § 1705(b)(4)(A)(v))*

ONDCP meets, interacts and consults regularly with State, local and Tribal officials when implementing the *Strategy*. Governors from all states and territories, regional commissions, Tribal leaders, local prevention experts, and public health and public safety officials (including those at the HIDTAs) were asked to provide input in the areas of prevention, treatment, and availability reduction. These views are important because they offer insight into local drug policy issues as well as potential solutions. These communities draw from key stakeholders in the Prevention, Treatment and Recovery, and Reducing the Availability of Illicit Drugs arenas, so they will have an important role in achieving all nine goals.

*Consultation with private citizens and organizations (21 USC § 1705(b)(4)(A)(vi and vii))*

ONDCP solicited input from a comprehensive array of nonprofit organizations, governmental associations, medical associations, health plans and issuers, drug policy stakeholders, community anti-drug coalitions, professional associations, research and educational institutions, and faith-based organizations representing the interest of both the supply-side and demand reduction communities. These citizens and organizations span all three lines of effort and will, therefore, have significant responsibility for achieving all nine objectives.

*Consultation with foreign governments (21 USC § 1705(b)(4)(A)(viii))*

ONDCP and the interagency works regularly with the international community to confront transnational criminal organizations, reduce illicit production, and protect citizens and democratic institutions from corruption or subversion. ONDCP requested input from both a number of partner nations as well as global and regional organizations including the United Nations Office on Drugs and Crime and the International Narcotics Control Board. Foreign governments are involved in preventing initiates to drug use, providing treatment services to move people into long-term recovery, and for interdicting the flow of drug into their countries and around the globe. This strategy will rely on the expertise and capabilities of our foreign partners across the three lines of effort and the related nine goals.

*Review of Stakeholders' Drug Control Activities and Their Role in Achieving the Strategic Goals (21 USC § 1705(c)(1)(E) and (F)(ii))*

ONDCP routinely examines how international, state, local, tribal, and the private sectors' activities align with the strategy to facilitate a coordinated and effective drug control system at all levels of government.

AR.07767

NATIONAL DRUG CONTROL STRATEGY

We do that through the strategy consultation process, in the annual performance review of the strategy, and in ongoing community outreach. The *Strategy* is not intended to enumerate every activity the Federal government and key stakeholder must execute in order to achieve our common vision, but it articulates a common way forward for stakeholders in academic, civic, government, law enforcement, and public health communities at the Federal, state, local, and tribal level to take collective action to address the crisis challenging communities across America. It is only through a united and unified effort in which the Federal government works with, and in support of, creative and resourceful individuals and organizations across the country and with our international partners, that we can address this complex national security, law enforcement, and public health problem.

Regarding stakeholders' consultation, as noted in the introduction of the *Strategy*, ONDCP relied heavily on the expertise of the stakeholders discussed above during the consultation and development phases of the *Strategy*. Their input was decisive in determining the nine goals as well as the underlying activities we must accomplish in order to achieve the strategic outcome of building a stronger, healthier, drug-free society and reducing the number of Americans losing their lives to drug addiction. More information regarding how stakeholder input helped to inform the strategy's goals can be found in the *Performance Reporting System*.

Stakeholders and their activities are also important in implementing the goals of the *Strategy*. The following bullets outlines major groups of stakeholders and include a sampling of their current activities and their role in facilitating the achievement of the *Strategy's* goals:

- Prevention Organizations: Prevention organizations engage in a variety of activities and programs to prevent people, especially young people, from initiating drug use. Some focus on education in schools, while others are more broadly community-based. These prevention organizations will play an important role in implementing the prevention line of effort and *Strategy* Goals 1, 2, and 5. For example, the stakeholders can help achieve the strategic goals through early recognition and addressing risky substance use which can help interrupt the trajectory towards more chronic substance use disorders. They would also do so through increasing the quantity and quality of prevention education, and in particular by making such prevention programs evidence-based.

- Public Health, Treatment, and Recovery Organizations: Public health, treatment and recovery organizations provide drug treatment to those with addictions, ensure sustainable recovery for those in recovery from addictions, and address broader public health concerns such as conditions associated with drug use. These public health, treatment, and recovery organizations will play an important role in implementing the treatment and recovery line of effort and *Strategy* Goals 1, 3, 4, and 5. For example, they would do so through increasing the quantity and quality of addiction treatment and recovery programs, and in particular by making such treatment and recovery programs evidence-based. Once an individual is in recovery, stakeholders can help achieve the strategic goals by creating mutually-supportive communities where the individual can improve their physical, mental, spiritual, and social well-being and gains skills and resources

35

to sustain their recovery.

- Law Enforcement Organizations: Law enforcement organizations stop drug trafficking through targeting drug trafficking organizations and reducing availability of drugs, and can assist with public health efforts through the criminal justice system as well. These law enforcement organizations will play an important role in implementing the Availability Reduction line of effort and *Strategy* Goals 1, 8, and 9. For example, these are numerous activities conducted by National Drug Control Program Agencies that enhance and coordinate domestic law enforcement efforts leading to reduced drug-related violence and property crime as well as substance use and availability. Law enforcement action would result in the further disruption of the evolving illicit drug supply chain and increase the amount of drugs seized before entering the United States.

- State, Local and Tribal Governments: State, local, and tribal governments play roles on both the public health and law enforcement aspects of the Strategy, and they are key partners of ONDCP and Federal agencies in all aspects of drug control. They often organize and fund various public health, prevention, and treatment efforts for drugs. They also run state, local, and tribal law enforcement agencies, which is where the majority of national drug prosecutions occur. State, local and tribal governments will play an important role in implementing all of the *Strategy's* lines of effort and goals. It is only through a unified effort in which the Federal government works with, and in support of, the creative and resourceful individuals at the State, Local, and Tribal level of government that we can successfully address this complex national security, law enforcement, and public health problem.

- International Organizations and Foreign Governments: International organizations and foreign governments play a role in working with U.S. agencies and law enforcement in particular to reduce source country production of drugs and interdict traffickers. International organizations and foreign governments will play an important role in implementing primarily the Availability Reduction line of effort and *Strategy* Goals 1, 7, and 9. For example, National Drug Control Program agencies conduct activities to reduce illicit drug availability by assisting our international partners in managing the consequences of drug production; trafficking; consumption in their own societies, including training and equipping security forces; raising awareness of science-based practices and programs to prevent, treat and recover from substance use disorder; and supporting economic development programs primarily intended to reduce the production and trafficking of illicit drugs. By taking advantage of the strong multilateral framework that exists to address the global drug problem, particularly in terms of supporting the three drug control conventions and providing leadership in the processes for internationally scheduling, controlling, and monitoring illicit drugs and their precursor chemicals, we will continue to advance the strategic goals.

AR.07769

# Appendix 5: *National Drug Control Strategy* Research and Data Collection Plan

**Scope & Criteria for Policy Questions:** While there are a range of data collection and research activities germane to the implementation of the *National Drug Control Strategy*, this data research plan focuses its policy questions on the identification and analysis of emerging or increasing trends that may require significant shifts in strategy, approach, or resource allocation to identify if we are postured to deal with these drug trends. This initial plan does not provide programmatic details outlining our progress.

As per the requirements of 21 U.S.C. § 1705(c)(1)(M), this plan also:

- Identifies data required to answer each question;

- Explains how data will be collected, analyzed and applied;

- Describes data collection and analysis challenges, such as data availability, data timeliness and integrity, and data sharing constraints; and,

- Details the steps ONDCP and drug control agencies will take to implement the plan.

**Research Plan Policy Question (RPPQ) 1:**

- **Question:** What new or emerging drugs or significant shifts in U.S. illicit drug use patterns may require changes in law enforcement or public health strategies, resource allocation or national strategy or priorities?

  o Do these trends include significant shifts in primary drug of choice, prevalence, route of administration, forms of poly drug use, overdose, use-related co-morbidities and mortality, or other consequences?

  o Are there trends that require an emergency or alternative response at the national, regional, state, or local levels?

This information would give senior policymakers the latest illicit drug use patterns, including emerging drugs to enable early detection and a rapid public health and public safety response to, ultimately, reduce morbidity and mortality.

- **Data or Datasets:** Current data systems such as the National Survey on Drug Use and Health (NSDUH), the Healthcare Cost and Utilization Project (HCUP), and the National Emergency Medical Services Information System (NEMSIS) provide information on the latest illicit drug use trends for the most commonly used substances.

NSDUH surveys a statistical sample of Americans living in households about their **alcohol** and other drug use and their mental health status, but does not collect adequate information on the use of emerging drugs. Administrative hospital billing records from HCUP can provide data on inpatient stays and emergency department visits related to non-fatal drug overdoses, based on

AR.07770

physician diagnoses and International Classification of Diseases, 10 Revision, Clinical Modification (ICD-10-CM) codes, but may not be corroborated with toxicology testing. NEMSIS provides data from Emergency Medical Service patient records resulting from an emergency 911 call, including non-fatal drug overdoses, however a toxicological test result is usually not included in the record. Postmortem testing can currently measure new or changing patterns of drug use.

- **Methods or Analytical Approach:** The U.S. Government can monitor emerging drugs by testing individuals at high risk—such as probationers, emergency-room patients, and the drug treatment population—for their drug use to get a better warning of new drugs of abuse. To achieve this testing, the US Government should establish a sentinel warning system—a system that actively monitors high-risk drug using populations—that conducts urinalysis tests on a broad panel of substances beyond those most commonly encountered. For example, the Community Drug Early Warning System (CDEWS) study was a pilot for such a sentinel system. CDEWS retested previously collected urine samples from populations very likely to use drugs. Results revealed that these high-risk populations commonly used multiple drugs that would not be detected using a traditional toxicology panel. Finally, systematic monitoring of online drug fora like Bluelight, Reddit, and Erowid via an artificial intelligence data mining interface may shed light on the substances current drug users are seeking out and purchasing.

- **Challenges or Deficiencies:** Existing data systems, such as NSDUH, HCUP, or NEMSIS are constrained by their design to report on drugs that are already commonly used and provide little or no insight into emerging drugs or use patterns. While postmortem testing can currently measure new or changing patterns of drug use, variations in local toxicological forensic testing and delays in national standardization and reporting limit its use as an early detection capability. Enhanced frontline surveillance systems could be further developed to identify emerging national and local drugs and trends, subject to the availability of funding.

**RPPQ 2:**

- **Question:** Are significant shifts occurring in the domestic illicit production of synthetic drugs and other emerging substances?

  This information will provide senior policymakers an understanding of the latest domestic drug production threat.

- **Data or Datasets:** The National Seizure System (NSS) collects domestic data on illicit drug and laboratory seizures.

- **Methods or Analytical Approach:** The DEA's Signature Programs, which determines the likely source country of a small sample of heroin and cocaine seizures, could potentially help identify domestic production. CBP palynologists have successfully used pollen testing to identify the geographic origin of seized fentanyl and related substances. Analysis of pollen and other residual organic matter have enabled palynologists to identify provinces in China where fentanyl has been

AR.07771

packaged, and shows promise for better identifying the source country of synthetic drugs. This method could be further tested to determine if it could be applied to domestic pollen to determine if a drug was produced in the United States. The U.S. Government also monitors domestic laboratory seizures of illicit synthetic drugs as an indicator of domestic production. For example, estimated levels of domestic methamphetamine production are assumed to be low because numbers of domestic laboratory seizures are few. Forensic analysis—the collection, analysis, and reporting of information critical to investigations by law enforcement—can also provide insight into domestic production trends.

- **Challenges or Deficiencies:** While the U.S. Government has some domestic production statistics, real-time surveillance of domestic production is limited. Also, due to the United States' negligible drug production, it is not among the countries for whom a source signature has been established. Source country signature analysis is not possible for synthetic drugs in the same fashion as plant-based drugs, like heroin and cocaine. DEA's labs and signature programs could test a greater proportion of seized drug material for content, purity, and source country signature.  CBP's palynology department could be expanded to geo-locate the packaging source location of a greater proportion of seized synthetic drugs. In tandem, consistent law enforcement resources need to be applied toward regular monitoring for and detection of domestic clandestine drug labs.

## RPPQ 3:

- **Question:** Are criminal actors exploiting new vectors (e.g., transshipment locations, methods of smuggling) for U.S. bound illicit substances?

  Senior policymakers need this information to ensure activities are prioritized toward the greatest concealment threats.

- **Data or Datasets**: Existing law enforcement seizure databases can provide some insight into current vectors of illicit substances. However, information about drug trafficking trends and common concealment methods are typically derived from targeted and time-limited intelligence gathering and law enforcement operations. For example, the El Paso Intelligence Center (EPIC) provides tactical intelligence to Federal, state, and local law enforcement agencies on a national scale—at times identifying new concealment methods in its intelligence reports.

- **Methods or Analytical Approach:** Policymaker understanding of the drug trafficking and use environment is essentially based upon three things; an in-depth understanding of the environment as it is, valid and necessary assumptions about how it will change over time, and a collective understanding about how actions can be taken to shape that environment in order to achieve the strategy's long-term goal, in this case to reduce the number of Americans dying from drug use. To do this policymakers rely upon a large body of reporting and datasets that each have unique capabilities and limitations. Law enforcement seizure data provides insight into the types of drugs seized during law enforcement operations within the United States, their value, and their purity. Seizure data from ports of entry identify the volume and variety of drugs seized as traffickers attempt

AR.07772

to bring them into the United States. Chemical signature and profiling data tells us the geographic origin of plant-based drugs or the chemical composition of synthetic drugs, and crop estimate data provides the magnitude of plant-based drug production in other countries that produce drugs for the US market. Similarly, public health data provides us insight in the size, behaviors, preferences, and usage patterns among the drug using population, as well as longitudinal trends in drug us across the country over time. Moreover, public health information is used to identify many of the consequences of drug use for individuals, families, and communities.  Although each of these individual data sources have known limitations, taken together they can provide the most complete available understanding of drug availability and use in the United States. More importantly, they allow policymakers to identify changes in that environment to identify whether or not the strategy's assumptions remain valid, and to see if there are gaps in our Federal government capability that need to be filled through regulatory, legislative, or resource changes.

- **Challenges or Deficiencies:** Whether law enforcement agencies activities are normative, generalizable, or scalable is difficult to judge absent consolidated law enforcement databases establishing baseline trends. Policymakers also have difficulty judging what front-end resources (e.g., detection technologies, person-power, screening levels) are most impactful against these new event types. Considerable ongoing interagency collaboration would be required to establish incoming and outgoing vector baseline thresholds, the operational and process requirements and maintenance of a consolidated data system, and the most effective use of detection technologies. Significant and efforts in technology, law enforcement operational capacity, big database architecture, and randomized data collection and analysis would be required to improve detection capabilities for new and under-resourced vectors, develop a consolidated data system that is useful both operationally and for policymakers, and establish baselines for specific locations and concealment methods.

**RPPQ 4:**

- **Question:** How well does substance use disorder treatment capacity (e.g., opioid treatment programs, residential treatment facilities, office-based opioid treatment, and outpatient specialty treatment) respond to new or emerging shifts in drug use within the United States?

  o  Is a shift in resource allocation required to better respond to needs?

  Senior policymakers need this information to determine if there is sufficient treatment support and to ensure that resources are appropriately targeted as domestic drug use shifts.

- **Data or Datasets**: Current surveys such as the NSDUH and the Monitoring the Future (MTF) provide information on the latest illicit drug use trends for the most commonly used substances for adults and youth. The Treatment Episode Data Set (TEDS) provides demographic and substance use characteristics of admissions to treatment for abuse of alcohol or drugs, while the National Survey of Substance Abuse Treatment Services (N-SSATS) collects data on the location, scope, and characteristics of substance abuse treatment facilities throughout the United States.

AR.07773

- **Methods or Analytical Approach:** Compare use and treatment admission data at the state, regional, and local levels to available treatment capacity to identify potential discrepancies between treatment availability and need.

- **Challenges or Deficiencies:** There is no data source that provides real-time available treatment capacity that can be cross-referenced against drug trends in demand.

**Director's Next Steps:**

The Director will establish an Interagency Drug Research Group composed of individuals from the National Drug Control Program Agencies chaired by ONDCP to effectuate the data collection plan and help explore data needs from future policy questions related to the *National Drug Control Strategy*.

AR.07774

UNHCR
The UN Refugee Agency

## Advisory Opinion on the Extraterritorial Application of *Non-Refoulement* Obligations under the 1951 Convention relating to the Status of Refugees and its 1967 Protocol[*]

**Introduction**

1.　　In this advisory opinion, the Office of the United Nations High Commissioner for Refugees ("UNHCR") addresses the question of the extraterritorial application of the principle of *non-refoulement* under the 1951 Convention relating to the Status of Refugees[1] and its 1967 Protocol.[2]

2.　　Part I of the opinion provides an overview of States' *non-refoulement* obligations with regard to refugees and asylum-seekers under international refugee and human rights law. Part II focuses more specifically on the extraterritorial application of these obligations and sets out UNHCR's position with regard to the territorial scope of States' *non-refoulement* obligations under the 1951 Convention and its 1967 Protocol.

3.　　UNHCR has been charged by the United Nations General Assembly with the responsibility of providing international protection to refugees and other persons within its mandate and of seeking permanent solutions to the problem of refugees by assisting governments and private organizations.[3] As set forth in its Statute, UNHCR fulfils its international protection mandate by, *inter alia*, "[p]romoting the conclusion and ratification of international conventions for the protection of refugees, supervising their application and proposing amendments thereto."[4] UNHCR's supervisory responsibility under its Statute is mirrored in Article 35 of the 1951 Convention and Article II of the 1967 Protocol.

4.　　The views of UNHCR are informed by over 50 years of experience supervising international refugee instruments. UNHCR is represented in 116 countries. It provides guidance in connection with the establishment and implementation of national procedures for refugee status determinations and also conducts such determinations under its own mandate. UNHCR's interpretation of the provisions of the 1951

---

[*]　This Opinion was prepared in response to a request for UNHCR's position on the extraterritorial application of the *non-refoulement* obligations under the 1951 Convention Relating to the Status of Refugees and its 1967 Protocol. The Office's views as set out in the Advisory Opinion are offered in a broad perspective, given the relevance of the legal questions involved to a variety of situations outside a State's national territory.

[1]　The 1951 Convention relating to the Status of Refugees, 189 U.N.T.S. 137, *entered into force* 22 April 1954 [hereinafter "1951 Convention"].

[2]　The 1967 Protocol relating to the Status of Refugees, 606 U.N.T.S. 267, *entered into force* 4 October 1967 [hereinafter "1967 Protocol"].

[3]　See: *Statute of the Office of the United Nations High Commissioner for Refugees*, G.A. Res. 428(V), Annex, U.N. Doc. A/1775, para. 1 (1950).

[4]　*Id.*, para. 8(a).

AR.07775



Convention and 1967 Protocol is considered an authoritative view which should be taken into account when deciding on questions of refugee law.

## I. *Non-Refoulement* Obligations Under International Law

### A.     The Principle of *Non-Refoulement* Under International Refugee Law

### 1.     *Non-Refoulement* Obligations Under International Refugee Treaties

### (i)     The 1951 Convention Relating to the Status of Refugees and its 1967 Protocol

5.     The principle of *non-refoulement* constitutes the cornerstone of international refugee protection. It is enshrined in Article 33 of the 1951 Convention, which is also binding on States Party to the 1967 Protocol.[5] Article 33(1) of the 1951 Convention provides:

> "No Contracting State shall expel or return ("*refouler*") a refugee in any manner whatsoever to the frontiers of territories where his [or her] life or freedom would be threatened on account of his [or her] race, religion, nationality, membership of a particular social group or political opinion."

6.     The protection against *refoulement* under Article 33(1) applies to any person who is a refugee under the terms of the 1951 Convention, that is, anyone who meets the requirements of the refugee definition contained in Article 1A(2) of the 1951 Convention (the "inclusion" criteria)[6] and does not come within the scope of one of its exclusion provisions.[7] Given that a person is a refugee within the meaning of the 1951 Convention as soon as he or she fulfills the criteria contained in the refugee definition, refugee status determination is declaratory in nature: a person does not become a refugee because of recognition, but is recognized because he or she is a refugee.[8] It follows that the principle of *non-refoulement* applies not only to recognized refugees, but also to

---

[5]    Article I(1) of the 1967 Protocol provides that the States Party to the Protocol undertake to apply Articles 2–34 of the 1951 Convention.

[6]    Under this provision, which is also incorporated into Article 1 of the 1967 Protocol, the term "refugee" shall apply to any person who "owing to a well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his [or her] nationality and is unable or, owing to such fear, unwilling to avail him [or her]self of the protection of that country; or who, not having a nationality and being outside the country of his [or her] habitual residence is unable or, owing to such fear, unwilling to return to it".

[7]    Exclusion from international refugee protection means denial of refugee status to persons who come within the scope of Article 1A(2) of the 1951 Convention, but who are not eligible for protection under the Convention because
-    they are receiving protection or assistance from a UN agency other than UNHCR (first paragraph of Article 1D of the 1951 Convention); or because
-    they are not in need of international protection because they have been recognized by the authorities of another country in which they have taken residence as having the rights and obligations attached to the possession of its nationality (Article 1E of the 1951 Convention); or because
-    they are deemed undeserving of international protection on the grounds that there are serious reasons for considering that they have committed certain serious crimes or heinous acts (Article 1F of the 1951 Convention).

[8]    See: UNHCR, *Handbook on Procedures and Criteria for Determining Refugee Status*, 1979, Reedited Geneva 1992, para. 28.

those who have not had their status formally declared.[9] The principle of *non-refoulement* is of particular relevance to asylum-seekers. As such persons may be refugees, it is an established principle of international refugee law that they should not be returned or expelled pending a final determination of their status.

7.     The prohibition of *refoulement* to a danger of persecution under international refugee law is applicable to any form of forcible removal, including deportation, expulsion, extradition, informal transfer or "renditions", and non-admission at the border in the circumstances described below. This is evident from the wording of Article 33(1) of the 1951 Convention, which refers to expulsion or return (*refoulement*) "in any manner whatsoever".[10] It applies not only in respect of return to the country of origin or, in the case of a stateless person, the country of former habitual residence, but also to any other place where a person has reason to fear threats to his or her life or freedom related to one or more of the grounds set out in the 1951 Convention, or from where he or she risks being sent to such a risk.[11]

8.     The principle of *non-refoulement* as provided for in Article 33(1) of the 1951 Convention does not, as such, entail a right of the individual to be granted asylum in a particular State.[12] It does mean, however, that where States are not prepared to grant asylum to persons who are seeking international protection on their territory, they must adopt a course that does not result in their removal, directly or indirectly, to a place where their lives or freedom would be in danger on account of their race, religion, nationality, membership of a particular social group or political opinion.[13] As a general rule, in order to give effect to their obligations under the 1951 Convention and/or 1967 Protocol, States will be required to grant individuals seeking international protection access to the territory and to fair and efficient asylum procedures.[14]

---

[9]    This has been reaffirmed by the Executive Committee of UNHCR, for example, in its Conclusion No. 6 (XXVIII) "*Non-refoulement*" (1977), para. (c) (reaffirming "the fundamental importance of the principle of *non-refoulement* … of persons who may be subjected to persecution if returned to their country of origin irrespective of whether or not they have been formally recognized as refugees."). The UNHCR Executive Committee is an intergovernmental group currently consisting of 70 Member States of the United Nations (including the United States) and the Holy See that advises the UNHCR in the exercise of its protection mandate. While its Conclusions are not formally binding on States, they are relevant to the interpretation and application of the international refugee protection regime. Conclusions of the Executive Committee constitute expressions of opinion which are broadly representative of the views of the international community. The specialized knowledge of the Committee and the fact that its conclusions are reached by consensus adds further weight. UNHCR Executive Committee Conclusions are available at http://www.unhcr.org/cgi-bin/texis/vtx/doclist?page=excom&id=3bb1cd174 (last visited on 26 October 2006).

[10]    The meaning of the terms "expel or return ("*refouler*")" in Article 33(1) is also discussed *infra* at Part II.A.

[11]    See: UNHCR, *Note on Non-Refoulement* (EC/SCP/2), 1977, para. 4. See also P. Weis, *The Refugee Convention, 1951: The Travaux Préparatoires Analysed with a Commentary by Dr. Paul Weis*, Cambridge University Press, Cambridge (1995), at p. 341.

[12]    See: P. Weis, *supra* footnote 11, at p. 342.

[13]    This could include, for example, removal to a safe third country or some other solution such as temporary protection or refuge under certain circumstances. *See* E. Lauterpacht and D. Bethlehem, "The scope and content of the principle of *non-refoulement: Opinion*", in E. Feller, V. Türk and F. Nicholson (eds.), *Refugee Protection in International Law: UNHCR's Global Consultations on International Protection*, Cambridge University Press, Cambridge (2003), para. 76.

[14]    The 1951 Convention and the 1967 Protocol define those to whom international protection is to be conferred and establish key principles such as non-penalisation of entry (Article 31) and *non-refoulement* (Article 33). However, they do not set out procedures for the determination of refugee status as such. Yet it is generally recognised that fair and efficient procedures are an essential element

 UNHCR

9.      The *non-refoulement* obligation under Article 33 of the 1951 Convention is binding on all organs of a State party to the 1951 Convention and/or the 1967 Protocol[15] as well as any other person or entity acting on its behalf.[16] As discussed in more detail in Part II below, the obligation under Article 33(1) of the 1951 Convention not to send a refugee or asylum-seeker to a country where he or she may be at risk of persecution is not subject to territorial restrictions; it applies wherever the State in question exercises jurisdiction.

10.      Exceptions to the principle of *non-refoulement* under the 1951 Convention are permitted only in the circumstances expressly provided for in Article 33(2), which stipulates that:

> "The benefit of [Article 33(1)] may not, however, be claimed by a refugee whom there are reasonable grounds for regarding as a danger to the security of the country in which he [or she] is, or who, having been convicted by a final judgement of a particularly serious crime, constitutes a danger to the community of that country."

The application of this provision requires an individualized determination by the country in which the refugee is that he or she comes within one of the two categories provided for under Article 33(2) of the 1951 Convention.[17]

11.      The provisions of Article 33(2) of the 1951 Convention do not affect the host State's *non-refoulement* obligations under international human rights law, which permit no exceptions. Thus, the host State would be barred from removing a refugee if this

---

in the full and inclusive application of the 1951 Convention outside the context of mass influx situations. *See* UNHCR, Asylum Processes (Fair and Efficient Asylum Procedures), EC/GC/01/12, 31 May 2001, paras. 4–5. See also Executive Committee, Conclusion No. 81 (XLVIII) *"General"* (1997), para. (h); Conclusion No. 82 (XLVIII), *"Safeguarding Asylum"* (1997), para. (d)(iii); Conclusion No. 85 (XLIX), *"International Protection"* (1998), para. (q); Conclusion No. 99 (LV), *"General Conclusion on International Protection"* (2004), para. (l).

[15]   See *supra* footnote 5.

[16]   Under applicable rules of international law, this applies to the acts, or omissions, of all organs, sub-divisions and persons exercising governmental authority in legislative, judicial or executive functions, and acting in that capacity in the particular instance, as well as to the conduct of organs placed at the disposal of a State by another State, even if they exceed their authority or contravene instructions. Pursuant to Articles 4–8 of the Articles of State Responsibility, the conduct of a person or group of persons shall be considered an act of a State under international law if the person or group of persons is in fact acting on the instructions of, or under the direction or control of, that State in carrying out the conduct (*Articles on State Responsibility*, Articles 4–8). The Articles of State Responsibility were adopted by the International Law Commission without a vote and with consensus on virtually all points. The Articles and their commentaries were subsequently referred to the General Assembly with the recommendation that the General Assembly initially take note of and annex the text of the articles in a resolution, reserving to a later session the question whether the articles should be embodied in a convention on State responsibility. *See* J. Crawford, *The International Law Commission's Articles on State Responsibility: Introduction, Text and Commentary.* Cambridge University Press, UK: 2002. The General Assembly annexed the Articles on State Responsibility to its resolution 56/83 of 12 December 2001 on Responsibility of States for Internationally Wrongful Acts.

[17]   For a detailed discussion of the criteria which must be met for Article 33(2) of the 1951 Convention to apply, *see* E. Lauterpacht and D. Bethlehem, *supra* footnote 13, paras. 145–192. On the "danger to the security" exception, *see also* "*Factum of the Intervenor, UNHCR, Suresh v. the Minister of Citizenship and Immigration; the Attorney General of Canada, SCC No. 27790*" (hereinafter: "UNHCR, *Suresh Factum*"), in 14:1 International Journal of Refugee Law (2002).



would result in exposing him or her, for example, to a substantial risk of torture.[18] Similar considerations apply with regard to the prohibition of *refoulement* to other forms of irreparable harm.[19]

12.    Within the framework of the 1951 Convention/1967 Protocol, the principle of *non-refoulement* constitutes an essential and non-derogable component of international refugee protection. The central importance of the obligation not to return a refugee to a risk of persecution is reflected in Article 42(1) of the 1951 Convention and Article VII(1) of the 1967 Protocol, which list Article 33 as one of the provisions of the 1951 Convention to which no reservations are permitted. The fundamental and non-derogable character of the principle of *non-refoulement* has also been reaffirmed by the Executive Committee of UNHCR in numerous Conclusions since 1977.[20] Similarly, the General Assembly has called upon States "to respect the fundamental principle of *non-refoulement*, which is not subject to derogation."[21]

*(ii)    Other International Instruments*

13.    States' *non-refoulement* obligations with respect to refugees are also found in regional treaties, notably the 1969 OAU Convention Governing Specific Aspects of Refugee Problems in Africa[22] and the 1969 American Convention on Human Rights.[23]

---

[18]    See: UNHCR, *Suresh Factum, supra* footnote 17, paras. 18–50; E. Lauterpacht and D. Bethlehem, *supra* footnote 13, para. 159(ii), 166 and 179.

[19]    See the discussion of *non-refoulement* obligations under international human rights law *infra* at Part IB.

[20]    See, for example, Executive Committee, Conclusion No. 6 (XXVIII), *supra* footnote 9, para. (c) (reaffirming "the fundamental humanitarian principle of *non-refoulement* has found expression in various international instruments adopted at the universal and regional levels and is generally accepted by States." ); Conclusion No. 17 (XXXI) *"Problems of extradition affecting refugees"* (1980), at. para (b) (reaffirming "the fundamental character of the generally recognized principle of *non-refoulement.");* Conclusion No. 25 (XXXIII) *"General"* (1982), para. (b) (reaffirming "the importance of the basic principles of international protection and in particular the principle of *non-refoulement* which was progressively acquiring the character of a peremptory rule of international law."); Conclusion No. 65 (XLII) *"General"* (1981), para. (c) (emphasizing "the primary importance of *non-refoulement* and asylum as cardinal principles of refugee protection…"); Conclusion No. 68 (XLIII) *"General"* (1982), para. (f) (reaffirming "the primary importance of the principles of *non-refoulement* and asylum as basic to refugee protection); No. 79 (XLVIII) *"General"* (1996), para. (j) (reaffirming "the fundamental importance of the principle of *non-refoulement*); No. 81 (XLVIII), *supra* footnote 14, para. (i) (recognizing "the fundamental importance of the principle of *non-refoulement*"); No. 103 (LVI) *"Provision of International Protection Including Through Complementary Forms of Protection"* (2005), at (m) (calling upon States "to respect the fundamental principle of *non-refoulement*").

[21]    See, for example, A/RES/51/75, 12 February 1997, para. 3; A/RES/52/132, 12 December 1997, at preambular para. 12.

[22]    OAU Convention Governing Specific Aspects of Refugee Problems in Africa, 1969, 1001 U.N.T.S. 45, *entered into force* 20 June 1974 [hereinafter, "1969 OAU Convention"]. Article II(3) reads: "No person shall be subjected by a Member State to measures such as rejection at the frontier, return or expulsion, which would compel him to return to or remain in a territory where his life, physical integrity or liberty would be threatened for the reasons set out in Article I, paras. 1 and 2 *[concerning persecution for reasons of race, religion, nationality, membership of a particular social group or political opinion or who is compelled to leave his country of origin or place of habitual residence in order to seek refuge from external aggression, occupation, foreign domination or events seriously disturbing public order].*"

[23]    1969 American Convention on Human Rights "Pact of San José, Costa Rica", 1144 U.N.T.S. 123, *entered into force* 18 July 1978 [hereinafter, "ACHR"]. Article 22(8) reads: "In no case may an alien be deported or returned to a country, regardless of whether or not it is his country of origin, if in that



*Non-refoulement* provisions modelled on Article 33(1) of the 1951 Convention have also been incorporated into extradition treaties[24] as well as a number of anti-terrorism conventions both at the universal and regional level.[25] Moreover, the principle of *non-refoulement* has been re-affirmed in the 1984 Cartagena Declaration on Refugees[26] and other, important non-binding international texts, including, in particular, the Declaration on Territorial Asylum adopted by the United Nations General Assembly on 14 December 1967.[27]

---

country his right to life or personal freedom is in danger of being violated because of his race, nationality, religion, social status, or political opinions."

[24] In the context of extradition, these provisions are usually referred to as "discrimination clauses". *See*, for example, Article 3(2) of the 1957 European Convention on Extradition, ETS 024, 359 U.N.T.S. 273 *entered into force* 18 April 1960 ("[Extradition shall not be granted] if the requested Party has substantial grounds for believing that a request for extradition for an ordinary criminal offence has been made for the purpose of prosecuting or punishing a person on account of his race, religion, nationality or political opinion, or that that person's position may be prejudiced for any of these reasons."); Article 4(5) of the 1981 Inter-American Convention on Extradition, 20 I.L.M. 723 (1981), *entered into force* 28 March 1992 ("Extradition shall not be granted … when, from the circumstances of the case, it can be inferred that persecution for reasons of race, religion or nationality is involved, or that the position of the person sought may be prejudiced for any of these reasons.")

[25] See, for example, Article 9(1) of the 1979 International Convention against the Taking of Hostages, 1316 U.N.T.S. 205, *entered into force* 3 June 1983 ("A request for the extradition of an alleged offender, pursuant to this Convention, shall not be granted if the requested State Party has substantial grounds for believing: (a) that the request for extradition for an offence set forth in article 1 has been made for the purpose of prosecuting or punishing a person on account of his race, religion, nationality, ethnic origin or political opinion; or (b) that the person's position may be prejudiced: (i) for any of the reasons mentioned in subpara. (a) of this para. …"). *See also* Article 12 of the 1997 International Convention for the Suppression of Terrorist Bombings, 37 I.L.M. 249 (1998), *entered into force* 23 May 2001 ("Nothing in this Convention shall be interpreted as imposing an obligation to extradite or to afford mutual legal assistance, if the requested State Party has substantial grounds for believing that the request for extradition for offences set forth in article 2 or for mutual legal assistance with respect to such offences has been made for the purpose of prosecuting or punishing a person on account of that person's race, religion, nationality, ethnic origin or political opinion or that compliance with the request would cause prejudice to that person's position for any of these reasons."), and the almost identical provisions in Article 15 of the 1999 International Convention for the Suppression of the Financing of Terrorism, 39 I.L.M. 270 (2000), *entered into force* 10 April 2002; Article 5 of the 1977 European Convention on the Suppression of Terrorism, ETS 090, 1137 U.N.T.S. 93, *entered into force* 4 August 1978; Article 14 of the 2002 Inter-American Convention against Terrorism, 42 I.L.M. 19 (2003), *entered into force* 7 October 2003.

[26] Cartagena Declaration on Refugees, 22 November 1984, Annual Report of the Inter-American Commission on Human Rights, OAS Doc. OEA/Ser.L/V/II.66/doc.10, rev. 1, at 190-93 (1984-85) [hereinafter, "Cartagena Declaration"]. The Conclusion set out in section III(5) reads: "To reiterate the importance and meaning of the principle of *non-refoulement* (including the prohibition of rejection at the frontier) as a corner-stone of the international protection of refugees…" While not legally binding, the provisions of the Cartagena Declaration have been incorporated into the legislation of numerous States in Latin America.

[27] A/RES/2312 (XXII), 14 December 1967, at Article 3 ( "No person referred to in Article 1, para. 1, shall be subjected to measures such as rejection at the frontier or, if he has already entered the territory in which he seeks asylum, expulsion or compulsory return to any State where he may be subjected to persecution."). *See also* Resolution (67) 14 on Asylum to Persons in Danger of Persecution, adopted by the Committee of Ministers of the Council of Europe on 29 June 1967, para. 2 (recommending that Governments should "…ensure […] that no one shall be subjected to refusal of admission at the frontier, rejection, expulsion or any other measure which would have the result of compelling him to return to, or remain in, a territory where he would be in danger of persecution.").

UNHCR

## 2.    *Non-Refoulement* of Refugees Under Customary International Law

14.    Article 38(1)(b) of the Statute of the International Court of Justice lists "international custom, as evidence of a general practice accepted as law", as one of the sources of law which it applies when deciding disputes in accordance with international law.[28] For a rule to become part of customary international law, two elements are required: consistent State practice and *opinio juris*, that is, the understanding held by States that the practice at issue is obligatory due to the existence of a rule requiring it.[29]

15.    UNHCR is of the view that the prohibition of *refoulement* of refugees, as enshrined in Article 33 of the 1951 Convention and complemented by *non-refoulement* obligations under international human rights law, satisfies these criteria and constitutes a rule of customary international law.[30] As such, it is binding on all States, including those which have not yet become party to the 1951 Convention and/or its 1967 Protocol.[31] In this regard, UNHCR notes, *inter alia*, the practice of non-signatory States hosting large numbers of refugees, often in mass influx situations.[32] Moreover, exercising its supervisory function,[33] UNHCR has closely followed the practice of Governments in relation to the application of the principle of *non-refoulement*, both by States Party to the 1951 Convention and/or 1967 Protocol and by States which have not adhered to either instrument. In UNHCR's experience, States have overwhelmingly indicated that they accept the principle of *non-refoulement* as binding, as demonstrated, *inter alia*, in numerous instances where States have responded to UNHCR's representations by providing explanations or justifications of cases of actual or intended *refoulement*, thus implicitly confirming their acceptance of the principle.[34]

---

[28]    Article 38(1) of the Statute of the International Court of Justice, 59 Stat. 1031, 1060 (1945).

[29]    See: International Court of Justice, *North Sea Continental Shelf, Judgment,* 1969 ICJ Reports, page 3, para. 74. See also International Court of Justice, *Military and Paramilitary Activities in and against Nicaragua (Nicaragua v. United States of America)*, Jurisdiction and Admissibility, 1984 ICJ Reports, page 392, para. 77.

[30]    See: UNHCR, *The Principle of Non-Refoulement as a Norm of Customary International Law,* Response to the Questions posed to UNHCR by the Federal Constitutional Court of the Federal Republic of Germany in cases 2 BvR 1938/93, 2 BvR 1953/93, 2 BvR 1954/93 (available at: http://www.unhcr.org/home/RSDLEGAL/437b6db64.html, last accessed on 30 October 2006); UNHCR, *Note on the Principle of Non-Refoulement (EU Seminar on the Implementation of the 1995 EU Resolution on Minimum Guarantees for Asylum Procedures)*, 1 November 1997 (available at: http://www.unhcr.org/home/RSDLEGAL/438c6d972.html, last accessed on 30 October 2006). *See also* New Zealand Court of Appeal, *Zaoui v. Attorney General*, 30 September 2004, (No 2) [2005] 1 NZLR 690, para. 34 ("The prohibition on refoulement, contained in art 33.1 of the Refugee Convention, is generally thought to be part of customary international law, the (unwritten) rules of international law binding on all States, which arise when States follow certain practices generally and consistently out of a sense of legal obligation.") and para. 136 ("The Refugee Convention is designed to protect refugees from persecution and the non-refoulement obligation is central to this function. It is non-derogable in terms of art 42.1 and, as discussed above at para [34] has become part of customary international law."). *See also* E. Lauterpacht and D. Bethlehem, *supra* footnote 13, paras. 193–219; G. Goodwin-Gill, *The Refugee in International Law*, 2nd edition, Oxford University Press (1996), at pp. 167–171.

[31]    The prohibition of *refoulement* of refugees under customary international law also applies, with regard to non-European refugees, in States which are party to the 1951 Convention, but which maintain the geographical limitation provided for Article 1B(1) of the Convention.

[32]    This is the case, for example, in Bangladesh, India, Pakistan and Thailand.

[33]    Under Paragraph 8 of the Statute of UNHCR, Article 35 of the 1951 Convention and Article II of the 1967 Protocol (see also *supra* footnote 3).

[34]    As noted by the International Court of Justice in *Military and Paramilitary Activities in and against Nicaragua (Nicaragua v. U.S.)*, Merits, 1986 ICJ Reports, page 14, para. 186, "[i]n order to deduce the existence of customary rules, the Court deems it sufficient that the conduct of States should, in



16.     In a Declaration which was adopted at the Ministerial Meeting of States Parties of 12–13 December 2001 and subsequently endorsed by the General Assembly, the States party to the 1951 Convention and/or 1967 Protocol acknowledged "…the continuing relevance and resilience of this international regime of rights and principles, including at its core the principle of *non-refoulement*, whose applicability is embedded in customary international law."[35] At the regional level, the customary international law character of the principle of *non-refoulement* has also been re-affirmed in a Declaration adopted by Latin American States participating at a gathering to celebrate the twentieth anniversary of the 1984 Cartagena Declaration.[36]

## B.     *Non-Refoulement* Obligations Under International Human Rights Law

## 1.     International Human Rights Treaties

17.     *Non-refoulement* obligations complementing the obligations under the 1951 Convention, which preceded the major human rights treaties, have also been established under international human rights law. More specifically, States are bound not to transfer any individual to another country if this would result in exposing him or her to serious

---

general, be consistent which such rules, and that instances of State conduct inconsistent with a given rule should generally have been treated as breaches of that rule, not as indications of the recognition of a new rule. If a State acts in a way *prima facie* incompatible with a recognized rule, but defends its conduct by appealing to exceptions or justifications contained within the rule itself, then whether or not the State's conduct is in fact justifiable on that basis, the significance of that attitude is to confirm rather than to weaken the rule."

[35] Declaration of States Parties to the 1951 Convention and/or its 1967 Protocol adopted at the Ministerial Meeting of States Parties of 12–13 December 2001, HCR/MMSP/2001/09, 16 January 2002 (available at: http://www.unhcr.org/home/RSDLEGAL/3d60f5557.pdf, last accessed on 30 October 2006) at preambular para. 4. Earlier, the Executive Committee of UNHCR observed that "the principle of *non-refoulement* … was progressively acquiring the character of a *peremptory rule* of international law." *See* Executive Committee Conclusion No. 25 (XXXIII), *supra* footnote 20, para. (b). Pursuant to Article 53 of the 1969 Vienna Convention on the Law of Treaties, 1155 U.N.T.S. 331, *entered into force* 27 January 1980 [hereinafter: "1969 Vienna Convention"], peremptory norms of general international law, or *jus cogens*, are norms accepted and recognized by the international community of States as a whole as norms from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character. Article 64 of the 1969 Vienna Convention provides that peremptory norms of international law prevail over treaty provisions.

[36] Mexico Declaration and Plan of Action to Strengthen the International Protection of Refugees in Latin America of 16 November 2004 (available at: http://www.unhcr.org/home/RSDLEGAL/424bf6914.pdf, last accessed on 30 October 2006), at preliminary para. 7 ("*Recognizing* the *jus cogens* nature of the principle of *non-refoulement*, including non-rejection at the border, the cornerstone of international refugee law, which is contained in the 1951 Convention relating to the Status of Refugees and its Protocol of 1967, and also set out in Article 22 (8) of the American Convention on Human Rights and Article 3 of the 1984 Convention against Torture and other Cruel, Inhuman or Degrading Treatment or Punishment, …"). *See also* Section III(5) of the 1984 Cartagena Declaration on Refugees, *supra* footnote 26 ("…[The] principle [of *non-refoulement*] is imperative in regard to refugees and in the present state of international law should be acknowledged and observed as a rule of *jus cogens*.").



human rights violations, notably arbitrary deprivation of life[37], or torture or other cruel, inhuman or degrading treatment or punishment.[38]

18.    An explicit *non-refoulement* provision is contained in Article 3 of the 1984 Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment,[39] which prohibits the removal of a person to a country where there are substantial grounds for believing that he or she would be in danger of being subjected to torture.

19.    Obligations under the 1966 Covenant on Civil and Political Rights,[40] as interpreted by the Human Rights Committee, also encompass the obligation not to extradite, deport, expel or otherwise remove a person from their territory, where there are substantial grounds for believing that there is a real risk of irreparable harm, such as that contemplated by Articles 6 [right to life] and 7 [right to be free from torture or other cruel, inhuman or degrading treatment or punishment] of the Covenant, either in the country to which removal is to be effected or in any country to which the person may subsequently be removed.[41] The prohibition of *refoulement* to a risk of serious human rights violations, particularly torture and other forms of ill-treatment, is also firmly established under regional human rights treaties.[42]

---

[37]    The right to life is guaranteed under Article 6 of the ICCPR and, for example, Article 2 of the 1950 European Convention for the Protection of Human Rights and Fundamental Freedoms, ETS 005, 213 U.N.T.S. 222, *entered into force* 3 September 1953 [hereinafter: "ECHR"]; Article 4 ACHR; Article 4 of the African (Banjul) Charter on Human and People's Rights, 21 I.L.M. 58 (1982), *entered into force* 21 October 1986 [hereinafter: "Banjul Charter"].

[38]    The right to be free from torture is guaranteed under Article 1 of the 1984 Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment and Article 2 of the 1985 Inter-American Convention to Prevent and Punish Torture, 25 I.L.M. 519 (1992), *entered into force* 28 February 1987. Article 16 of the Convention Against Torture prohibits other cruel, inhuman or degrading treatment or punishment. A prohibition of torture and other cruel, inhuman or degrading treatment or punishment is guaranteed under Article 7 of the ICCPR and provisions in regional human rights treaties, such as, for example, Article 3 of the ECHR; Article 5(2) of the ACHR; or Article 5 of the Banjul Charter.

[39]    The 1984 United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, 1465 U.N.T.S. 85, *entered into force* 26 June 1987 [hereinafter: "Convention Against Torture"].

[40]    1966 International Covenant on Civil and Political Rights, 999 U.N.T.S. 171, *entered into force* 23 March 1976 [hereinafter: "ICCPR"].

[41]    With regard to the scope of the obligations under Article 7 of the ICCPR, *see* Human Rights Committee in its *General Comment No. 20: Article 7 (Prohibition of torture, or other cruel, inhuman or degrading treatment or punishment),* 10 March 1992, U.N. Doc. HRI/ GEN/1/Rev.7, para. 9 ("States parties must not expose individuals to the danger of torture or cruel, inhuman or degrading treatment or punishment upon return to another country by way of their extradition, expulsion or *refoulement"*)*;* and *General Comment No. 31 on the Nature of the General Legal Obligation on States Parties to the Covenant,* U.N. Doc. CCPR/C/21/Rev.1/Add.13, 26 May 2004, para. 12. Similarly, in its *General Comment No. 6 (2005) on the Treatment of unaccompanied and separated children outside their country of origin,* U.N. Doc. CRC/GC/2005/6, 1 September 2005, the Committee on the Rights of the Child stated that States party to the Convention on the Rights of the Child "[…] shall not return a child to a country where there are substantial grounds for believing that there is a real risk of irreparable harm to the child, such as, but by no means limited to, those contemplated under articles 6 [right to life] and 37 [right to be free from torture or other cruel, inhuman or degrading treatment or punishment and right not to be arbitrarily deprived of liberty] of the Convention." (para. 27).

[42]    See, for example, the jurisprudence of the European Court of Human Rights, which has held that *non-refoulement* is an inherent obligation under Article 3 of the ECHR in cases where there is a real risk of exposure to torture, inhuman or degrading treatment or punishment, including, in particular, the Court's decisions in *Soering v. United Kingdom,* Application No. 14038/88, 7 July 1989 and subsequent cases, including *Cruz Varas v.* Sweden, Application No. 15567/89, 20 March 1991;

UNHCR

20.      The prohibition of *refoulement* to a country where the person concerned would face a real risk of irreparable harm such as violations of the right to life or the right to be free from torture or cruel, inhuman or degrading treatment or punishment extends to all persons who may be within a State's territory or subject to its jurisdiction, including asylum seekers and refugees,[43] and applies with regard to the country to which removal is to be effected or any other country to which the person may subsequently be removed.[44] It is non-derogable and applies in all circumstances,[45] including in the context of measures to combat terrorism[46] and during times of armed conflict.[47]

---

*Vilvarajah et al. v. United Kingdom*, Application No. 13163/87 et al., 30 October 1991; *Chahal v. United Kingdom*, Application No. 22414/93, 15 November 1996; *Ahmed v. Austria*, Application No. 25964/94, 17 December 1996; *TI v. United Kingdom*, Application No. 43844/98 (Admissibility), 7 March 2000. In the Americas, see, for example, Article 22(8) of the 1969 ACHR ("In no case may an alien be deported or returned to a country, regardless of whether or not it is his country of origin, if in that country his right to life or personal freedom is in danger of being violated because of his race, nationality, religion, social status, or political opinions.") or Article 13(4) of the 1985 Inter-American Convention to Prevent and Punish Torture ("Extradition shall not be granted nor shall the person sought be returned when there are grounds to believe that his life is in danger, that he will be subjected to torture or to cruel, inhuman or degrading treatment, or that he will be tried by special or ad hoc courts in the requesting State.").

[43] For States Party to the ICCPR, this has been made explicit by the Human Rights Committee in its *General Comment No. 31, supra* footnote 41, para. 10 ("… [T]he enjoyment of Covenant rights is not limited to citizens of States Parties but must also be available to all individuals, regardless of nationality or statelessness, such as asylum seekers, refugees, migrant workers and other persons, who may find themselves in the territory or subject to the jurisdiction of the State Party. …"). *See also infra* at Part II.B.

[44] See: Human Rights Committee, *General Comment No. 31, supra* footnote 41, para. 12. *See also supra* footnote 41.

[45] See, for example, Human Rights Committee, *General Comment No. 29 on States of Emergency (Article 4),* U.N. Doc. CCPR/C/21/Rev.1/Add.11, 31 August 2001, para. 11; Human Rights Committee, *Concluding Observations/Comments* on Canada, U.N. Doc. CCPR/C/CAN/CO/5, 20 April 2006, para. 15; Committee Against Torture, *Gorki Ernesto Tapia Paez v. Sweden*, U.N. Doc. CAT/C/18/D/39/1996, 28 April 1997, para. 14.5. The absolute nature of the prohibition of *refoulement* to a risk of torture and other forms of ill-treatment under Article 3 of the ECHR has been affirmed by the European Court of Human Rights, for example, in *Chahal v. United Kingdom*, *supra* footnote 42.

[46] See, for example, Committee Against Torture, *Agiza v. Sweden*, U.N. Doc. CAT/C/34/D/233/2003, 20 May 2005; Human Rights Committee, *Alzery v. Sweden*, U.N. Doc. CCPR/C/88/D/1416/2005, 10 November 2006; Inter-American Commission on Human Rights, *Report on the Situation of Human Rights of Asylum-Seekers within the Canadian Refugee Determination System*, 28 February 2000, para. 154. *See also* United Nations Commission on Human Rights, Resolution 2005/80 of 21 April 2005 on Protection of human rights and fundamental freedoms while countering terrorism; Security Council resolutions 1456 (2003) of 20 January 2003, 1535 (2004) of 26 March 2004, 1624 (2004) of 14 September 2005, the Declaration on Measures to Eliminate International Terrorism (annex to General Assembly resolution 49/60 of 9 December 1994), the Declaration to Supplement the 1994 Declaration on Measures to Eliminate International Terrorism (annex to General Assembly resolution 51/210 of 17 December 1996), the 2005 World Summit Outcome (General Assembly resolution 60/1 of 16 September 2005) and the Plan of Action annexed to the United Nations Global Counter-Terrorism Strategy adopted by the General Assembly on 8 September 2006 (A/RES/60/288)**.**

[47] International human rights law does not cease to apply in case of armed conflict, except where a State has derogated from its obligations in accordance with the relevant provisions of the applicable international human rights treaty (for example, Article 4 ICCPR). In determining what constitutes a violation of human rights, regard must be had to international humanitarian law, which operates as *lex specialis* to international human rights in law during a time of armed conflict. This has been confirmed, *inter alia*, by the International Court of Justice in its *Advisory Opinion on the Legality of the Threat or Use of Nuclear Weapons*, 8 July 1996, para. 25; and the judgement of 19 December 2005 in *Case concerning Armed Activities on the Territory of the Congo (Democratic Republic of the Congo v. Uganda)*, paras. 215–219. *See also*, for example, Concluding Observations of the Human Rights Committee, United States of America, U.N. Doc. CCPR/C/USA/CO/3/Rev.1, 18 December 2006, para. 10; Human Rights Committee, *General Comment No. 31*, *supra* footnote 41, para. 11; *see*

 UNHCR

## 2.    Human Rights-Based *Non-Refoulement* Obligations Under Customary International Law

21.    The prohibition of torture is also part of customary international law, which has attained the rank of a peremptory norm of international law, or *jus cogens*.[48] It includes, as a fundamental and inherent component, the prohibition of *refoulement* to a risk of torture, and thus imposes an absolute ban on any form of forcible return to a danger of torture which is binding on all States, including those which have not become party to the relevant instruments. The prohibition of arbitrary deprivation of life, which also includes an inherent obligation not to send any person to a country where there is a real risk that he or she may be exposed to such treatment, also forms part of customary international law.[49] The prohibition of *refoulement* to a risk of cruel, inhuman or degrading treatment or punishment, as codified in universal as well as regional human rights treaties is in the process of becoming customary international law, at the very least at regional level.[50]

22.    Under the above-mentioned obligations, States have a duty to establish, prior to implementing any removal measure, that the person whom it intends to remove from their territory or jurisdiction would not be exposed to a danger of serious human rights violations such as those mentioned above. If such a risk exists, the State is precluded from forcibly removing the individual concerned.

## II. EXTRATERRITORIAL APPLICABILITY OF THE PRINCIPLE OF *NON-REFOULEMENT* UNDER THE 1951 CONVENTION AND/OR ITS 1967 PROTOCOL

23.    The Sections of this Advisory Opinion which follow examine the territorial scope of Article 33(1) of the 1951 Convention in light of the criteria provided for under international law for the interpretation of treaties. In accordance with the relevant rules,

---

*also* Conclusions and recommendations of the Committee against Torture concerning the second report of the United States of America, U.N. Doc. CAT/C/USA/CO/2, 25 July 2006 para. 14.

[48]    See, for example, Human Rights Committee, *General Comment No. 29: Article 4: Derogations during a State of Emergency,* U.N. Doc. CCPR/C/21/Rev.1/Add.11, 31 August 2001, para. 11 ("The proclamation of certain provisions of the Covenant as being of a non-derogable nature, in article 4, para. 2, is to be seen partly as recognition of the peremptory nature of some fundamental rights ensured in treaty form in the Covenant (e.g., articles 6 and 7). "); *see also* the decisions of the International Criminal Tribunal for the former Yugoslavia (ICTY) in *Prosecutor v Delalic and Others*, Trial Chamber, Judgement of 16 November 1998, para. 454; *Prosecutor v. Furundzija*, Trial Chamber, Judgement of 10 December 1998, paras. 134–164; *Prosecutor v. Kunarac and Others*, Trial Chamber, Judgement of 22 February 2001, para. 466. *See also* the judgement of the House of Lords in *Pinochet Ugarte, re.* [1999] 2 All ER 97, paras. 108–109. *See also*, for example, *Filartiga v. Pena Irala,* 630 F.2d 876 (2d. Cir. 1980).

[49]    See Human Rights Committee, *General Comment No. 24: Issues relating to reservations made upon ratification or accession to the Covenant or the Optional Protocols thereto, or in relation to declarations under Article 41 of the Covenant*, U.N. Doc. CCPR/C/21/Rev.1/Add.6, 4 November 1994, para. 8 ("… [P]rovisions in the Covenant that represent customary international law (and *a fortiori* when they have the character of peremptory norms) may not be the subject of reservations. Accordingly, a State may not reserve the right to engage in … torture, to subject persons to cruel, inhuman or degrading treatment or punishment, to arbitrarily deprive persons of their lives …").

[50]    See, for example, the jurisprudence of the European Court of Human Rights referred to *supra* footnote 42; *see also* Article 19(2) of the European Charter of Fundamental Rights, [2000] OJ C364; and preambular para. 13 of the Council Framework Decision of 13 June 2002 on the European arrest warrant and the surrender procedures between Member States, 2002/584/JHA, adopted by the Council of the European Union.



as stated in the 1969 Vienna Convention on the Law of Treaties,[51] the meaning of a provision in an international treaty must be established by examining the ordinary meaning of the terms employed, in light of their context and the object and purpose of the treaty.[52] Subsequent practice of States in applying the treaty as well as relevant rules of international law must also be taken into consideration in interpreting a treaty.[53]

24.     For the reasons set out below, UNHCR is of the view that the purpose, intent and meaning of Article 33(1) of the 1951 Convention are unambiguous and establish an obligation not to return a refugee or asylum-seeker to a country where he or she would be risk of persecution or other serious harm, which applies wherever a State exercises jurisdiction, including at the frontier, on the high seas or on the territory of another State.[54]

### A.     Scope *Ratione Loci* of Article 33(1) of the 1951 Convention: Ordinary Meaning, Context, Object and Purpose of the 1951 Convention

25.     As noted above, the focus of the present inquiry is the territorial scope of the *non-refoulement* provision under Article 33(1) of the 1951 Convention. In keeping with the primary rule of treaty interpretation stated in Article 31(1) of the 1969 Vienna Convention, it is necessary, first, to examine the ordinary meaning of the terms of Article 33(1) of the 1951 Convention, taking into account their context as well as the object and purpose of the treaty of which it forms part.

26.     The obligation set out in Article 33(1) of the 1951 Convention is subject to a geographic restriction only with regard to the country where a refugee may not be sent to, not the place where he or she is sent from. The extraterritorial applicability of the *non-refoulement* obligation under Article 33(1) is clear from the text of the provision itself, which states a simple prohibition: "No Contracting State shall expel or return *("refouler")* a refugee in any manner whatsoever to the frontiers of territories where his [or her] life or freedom would be threatened…".

---

[51]   *Supra* footnote 35 [hereinafter, "1969 Vienna Convention"]. The 1969 Vienna Convention is generally regarded as expressing rules which constitute customary international law.

[52]   Article 31(1) of the 1969 Vienna Convention provides: "A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose."

[53]   Article 31(3) of the 1969 Vienna Convention provides that, in interpreting a treaty: "… there shall be taken into account, together with the context, … (b) any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation; (c) any relevant rules of international law applicable in the relations between parties."

[54]   In a decision which addressed the applicability *inter alia* of Article 33(1) of the 1951 Convention to the return to Haiti of persons intercepted on the high seas by U.S. coast guard vessels, the United States Supreme Court determined that Article 33(1) of the 1951 Convention is applicable only to persons within the territory of the United States (*Sale, Acting Commissioner, Immigration and Naturalization Service, et al., Petitioners v. Haitian Centers Council, Inc., et. al.,* 509 U.S. 155 (1993)). For the reasons set out in this advisory opinion, UNHCR is of the view that the majority opinion of the Supreme Court in *Sale* does not accurately reflect the scope of Article 33(1) of the 1951 Convention. *See also* Inter-American Commission on Human Rights in *The Haitian Centre for Human Rights et al. v. United States*, *supra* footnote 42, para. 157 ("… The Commission shares the view advanced by the United Nations High Commissioner for Refugees in its <u>Amicus Curiae</u> brief in its argument before the Supreme Court, that Article 33 had no geographical limitations.").



27.      The ordinary meaning of "return" includes "to send back" or "to bring, send, or put back to a former or proper place".[55] The English translations of "*refouler*" "include words like 'repulse', 'repel', 'drive back'."[56] It is difficult to conceive that these words are limited to refugees who have already entered the territory of a Contracting State. The ordinary meaning of the terms "return" and "*refouler*" does not support an interpretation which would restrict its scope to conduct within the territory of the State concerned, nor is there any indication that these terms were understood by the drafters of the 1951 Convention to be limited in this way.[57]

28.      A contextual analysis of Article 33 of the 1951 Convention further supports the view that the scope *ratione loci* of the *non-refoulement* provision in Article 33(1) is not limited to a State's territory. The view has been advanced that Article 33(2) of the 1951 Convention, which permits exceptions to the principle of *non-refoulement* only with regard to a refugee who constitutes a danger to the security or the community of the country in which he is, implies that the scope of Article 33(1) is also limited to persons within the territory of the host country.[58] However, in UNHCR's opinion this view is contradicted by the clear wording of Article 33(1) and 33(2), respectively, which address different concerns,[59] as well as the fact that the territorial scope of a number of other provisions of the 1951 Convention is made explicit.[60] Thus, where the drafters of the 1951 Convention intended a particular clause of the 1951 Convention to apply only to

---

[55]  See: *Merriam-Webster Online Dictionary*, 10th edition, available at: http://www.m-w.com/cgi-bin/dictionary?book=Dictionary&va=return (last accessed on 15 October 2006).

[56]  This was also noted by the majority of the United States Supreme Court in *Sale, supra* footnote 54 (at 181) which, however, went on to state that "'return' means a defensive act of resistance or exclusion at a border rather than an act of transporting someone to a particular destination" (at 182), and that "… because the text of Article 33 cannot reasonably be read to say anything at all about a nation's actions toward aliens outside its own territory, it does not prohibit such actions." (at 183). As noted by Blackmun J in his dissenting opinion in *Sale, supra* footnote 54, "[t]he majority's puzzling progression ('*refouler*' means repel or drive back; therefore 'return' means only exclude at a border; therefore the treaty does not apply) hardly justifies a departure from the path of ordinary meaning. The text of Article 33(1) is clear, and whether the operative term is 'return' or '*refouler*', it prohibits the Government's actions." (at 192–193).

[57]  In support of its finding that Article 33(1) does not apply outside a State's territory, the majority of the United States Supreme Court in *Sale, supra* footnote 54, relied on statements by a number of delegates involved in the drafting of the 1951 Convention. However, these statements were expressions of concern related to a possible obligation to grant asylum to large numbers of arrivals in mass influx situations. In UNHCR's view, these portions of the negotiating history do not warrant the conclusion that the drafters of the 1951 Convention reached consensus about an implicit restriction of the territorial scope of the principle of *non-refoulement* as provided for in Article 33(1). *See also* UNHCR, *The Principle of Non-Refoulement as a Norm of Customary International Law*, *supra* footnote 30.

[58]  See: *Sale, supra* footnote 54, at 179–180.

[59]  See also the dissenting opinion of Blackmun J in *Sale, supra* footnote 54, at 194 ("Far from constituting 'an absurd anomaly […], the fact that a state is permitted to 'expel or return' a small class of refugees found within its territory but may not seize and return refugees who remain outside its frontiers expresses precisely the objectives and concerns of the Convention. Non return is the rule; the sole exception (neither applicable nor invoked here) is that a nation endangered by a refugee's very presence may 'expel or return' him to an unsafe country if it chooses. The tautological observation that only a refugee already in a country can pose a danger to the country 'in which he is' proves nothing.")

[60]  For example, Articles 2, 4 and 27 require simple presence of a refugee in the host country, while Articles 18, 26 and 32 require that he or she be "lawfully on the territory" of a Contracting State, and Articles 15, 17(1), 19, 21, 23, 24 and 28 apply to refugees who are "lawfully staying" in the country of refuge.



those within the territory of a State Party, they chose language which leaves no doubt as to their intention.

29.     Furthermore, any interpretation which construes the scope of Article 33(1) of the 1951 Convention as not extending to measures whereby a State, acting outside its territory, returns or otherwise transfers refugees to a country where they are at risk of persecution would be fundamentally inconsistent with the humanitarian object and purpose of the 1951 Convention and its 1967 Protocol. In this context, it is worth recalling the first two paragraphs of the Preamble to the 1951 Convention, which read:

"Considering that the Charter of the United Nations and the Universal Declaration of Human Rights approved on 10 December 1948 by the General Assembly have affirmed the principle that human beings shall enjoy fundamental rights and freedoms without discrimination,61

Considering that the United Nations has, on various occasions, manifested its profound concern for refugees and endeavoured to assure refugees the widest possible exercise of these fundamental rights and freedoms."

30.     A comprehensive review of the *travaux préparatoires*[62] confirms the overriding humanitarian object and purpose of the Convention and provides significant evidence that the *non-refoulement* provision in Article 33(1) was intended to prohibit any acts or omissions by a Contracting State which have the effect of returning a refugee to territories where he or she is likely to face persecution or danger to life or freedom. For example, when the 1951 Convention was in the course of preparation, the Secretary-General stated in a Memorandum dated 3 January 1950 to the *Ad Hoc* Committee on Statelessness and Related Problems that "turning a refugee back to the frontier of the country where his life or liberty is threatened… would be tantamount to delivering him into the hands of his persecutors."[63] During the discussions of the Committee, the representative of the United States vigorously argued that:

"[w]hether it was a question of closing the frontier to a refugee who asked admittance, or of turning him back after he had crossed the frontier, or even expelling him after he had been admitted to residence in the territory, the problem was more or less the same. Whatever the case might be, whether or not

---

[61]  One of the fundamental rights enshrined in the Universal Declaration of Human Rights, General Assembly resolution 217A (III), U.N. Doc. A/810 at 71 (1948), is the right of everyone "to seek and enjoy in other countries asylum from persecution" under Article 14.

[62]  Pursuant to Article 32 of the 1969 Vienna Convention, *supra* footnote 35, recourse to the preparatory work of the treaty is a supplementary means of treaty interpretation is permitted only where the meaning of the treaty language is ambiguous or obscure; or where interpretation pursuant to the general rules set out in Article 31 of the 1969 Vienna Convention leads to a result which is manifestly absurd or unreasonable. It is a well-established principle that when the meaning of the treaty is clear from its text when viewed in light of its context, object and purpose, supplementary sources are unnecessary and inapplicable, and recourse to such sources is discouraged. *See*, for example, International Court of Justice, *Interpretation of the Treaty of Lausanne*, P.C.I.J., Ser. B, No. 12 (1925), at 22; The *Lotus Case*, P.C.I.J., Ser. A, No. 10 (1927), at 16; *Admission to the United Nations Case*, 1950 ICJ Reports 8. Thus, while UNHCR is of the view that recourse to the drafting history of Article 33(1) of the 1951 Convention is not necessary given the unambiguous wording of this provision, the *travaux préparatoires* are nevertheless of interest in clarifying the background, content and scope of Article 33(1).

[63]  *Ad Hoc* Committee on Statelessness and Related Problems, Status of Refugees and Stateless Persons – Memorandum by the Secretary General, U.N. Document E/AC.32/2, 3 January 1950, Comments on Article 24 of the preliminary draft, para. 3.

the refugee was in a regular position, he must not be turned back to a country where his life or freedom could be threatened."[64]

31.     The same representative of the United States proposed that the words "undertakes not to expel or return (*refouler*)" should replace the words "not turn back" in order to settle any doubts that *non-refoulement* applied to refugees whether or not they had been regularly admitted to residence,[65] an amendment that ultimately formed the basis for the "expel or return" final wording of Article 33 of the 1951 Convention. It is also worth noting that at one point the Chairman of the *Ad Hoc* Committee suspended the discussion, observing that it had indicated agreement on the principle that refugees fleeing from persecution on account of their race, religion, nationality or political opinion should not be pushed back into the arms of their persecutors.[66]

## B.     Extraterritorial Applicability of Article 33(1) of the 1951 Convention: Subsequent State Practice and Relevant Rules of International Law

32.     Limiting the territorial scope of Article 33(1) of the 1951 Convention to conduct of a State within its national territory would also be at variance with subsequent State practice and relevant rules of international law applicable between the States party to the treaty in question. In accordance with Article 31(3) of the 1969 Vienna Convention,[67] these elements also need to be taken into account in interpreting a provision of an international treaty.

33.     Subsequent State practice is expressed, *inter alia*, through numerous Executive Committee Conclusions which attest to the overriding importance of the principle of *non-refoulement* irrespective of whether the refugee is in the national territory of the State concerned.[68] Subsequent State practice which is relevant to the interpretation of the *non-refoulement* obligation under the 1951 Convention and 1967 Protocol is also evidenced by other international refugee and human rights instruments drawn up since 1951, none of which places territorial restrictions on States' *non-refoulement* obligations.[69]

---

[64]   Statement of Mr. Henkin of the United States, U.N. Doc. E/AC.32/SR.20, Feb 1, 1950, paras. 54–55.

[65]   U.N. Doc. E/AC.32/SR.20, para. 56.

[66]   Statement of the Chairman, Mr. Chance of Canada, U.N. Doc. E/AC.32.SR.21, 2 February 1950, at page 7. The Chairman then invited the representatives of Belgium and the United States to confer with him to attempt the preparation of a suitable draft for later consideration.

[67]   *Supra* footnote 53.

[68]   See, for example, Executive Committee, Conclusion No. 6 (XXVIII), *supra* footnote 9, at para (c) (reaffirming "the fundamental importance of the observance of the principle of *non-refoulement* – both at the border and within the territory of a State …"); Conclusion No. 15 (XXX) *"Refugees without an Asylum Country"* (1979) paras. (b) and (c) (stating that "[a]ction whereby a refugee is obliged to return or is sent to a country where he has reason to fear persecution constitutes a grave violation of the principle of *non-refoulement*" and noting that "[i]t is the humanitarian obligation of all coastal States to allow vessels in distress to seek haven in their waters and to grant asylum, or at least temporary refuge, to persons on board wishing to seek asylum."); Conclusion No. 22 (XXXII) *"Protection of Asylum-Seekers in Situations of Large-Scale Influx"* (1981), at II.A.2. ("In all cases the fundamental principle of *non-refoulement* – including non-rejection at the frontier – must be scrupulously observed."); Conclusion No. 53 (XXXIX) *"Stowaway Asylum-Seekers"* (1988), para. (1) (providing *inter alia* that "[l]ike other asylum seekers, stowaway asylum-seekers must be protected against forcible return to their country of origin.").

[69]   These include, in particular, the 1969 OAU Convention (*supra* footnote 22); the 1969 ACHR (*supra* footnote 23); and the Convention Against Torture (*supra* footnote 39). See also the expressions of the principle of *non-refoulement* in non-binding texts such as, for example, the 1984 Cartagena



34.    In keeping with the above-mentioned rules of treaty interpretation, it is also necessary to have regard to developments in related areas of international law when interpreting the territorial scope of Article 33(1) of the 1951 Convention. International refugee law and international human rights law are complementary and mutually reinforcing legal regimes.[70] It follows that Article 33(1), which embodies the humanitarian essence of the 1951 Convention and safeguards fundamental rights of refugees, must be interpreted in a manner which is consistent with developments in international human rights law. An analysis of the scope *ratione loci* of States' *non-refoulement* obligations under international human rights law is particularly pertinent to the question of the extraterritorial applicability of the prohibition on returning a refugee to a danger of persecution under international refugee instruments.

35.    As discussed in more detail below, States are bound by their obligations not to return any person over whom they exercise jurisdiction to a risk of irreparable harm. In determining whether a State's human rights obligations with respect to a particular person are engaged, the decisive criterion is not whether that person is on the State's national territory, or within a territory which is *de jure* under the sovereign control of the State, but rather whether or not he or she is subject to that State's effective authority and control.

36.    In its General Comment No. 31 on the Nature of the General Legal Obligation Imposed on States Parties to the [ICCPR], the Human Rights Committee has stated that "States are required by Article 2(1) [of the ICCPR] to respect and to ensure the Covenant rights to all persons who may be within their territory and to all persons subject to their jurisdiction. This means that a State party must respect and ensure the rights laid down in the Covenant to anyone within the power or effective control of that State Party, even if not situated within the territory of the State Party."[71] The General Comment reaffirms consistent jurisprudence of the Human Rights Committee to the effect that States can "be held accountable for violations of rights under the ICCPR which its agents commit on the territory of another State, whether with the acquiescence of the Government of that State or in opposition to it"[72] and that in certain

---

Declaration (*supra* footnote 26); the 1967 Declaration of Territorial Asylum adopted by the General Assembly (*supra* footnote 27); and Resolution (67) 14 of the Committee of Ministers of the Council of Europe (*supra* footnote 27).

[70]    The complementarity between *non-refoulement* obligations under international refugee and human rights law has been highlighted, for example, in the Mexico Declaration and Plan of Action to Strengthen the International Protection of Refugees in Latin America of 16 November 2004 (available at: http://www.unhcr.org/home/RSDLEGAL/424bf6914.pdf, last accessed on 30 October 2006). This Declaration was adopted by Latin American States participating at a gathering to celebrate the twentieth anniversary of the 1984 Cartagena Declaration. *See also* Executive Committee, Conclusion No. 79 (XLVII), *supra* footnote 20; No. 81(XLVII) "*General*" (1997); Conclusion No. 82 (XLVIII) "*Safeguarding Asylum*" (1997), which specifically refer to the prohibition of return to torture, as set forth in the Convention against Torture, and Executive Committee Conclusion No. 95 (LIV) "*General Conclusion on International Protection*" (2003), para. (l) (noting the "complementary nature of international refugee and human rights law as well as the possible role of the United Nations human rights mechanisms in this area …").

[71]    General Comment No. 31, *supra* footnote 41, para. 10.

[72]    See the decisions of the Human Rights Committee in *Lopez Burgos v. Uruguay*, U.N. Doc. CCPR/C/13/D/52/1979, 29 July 1981, para. 12.3; and *Celiberti de Casariego v. Uruguay*, U.N. Doc. CCPR/C/13/D/56/1979, 29 July 1981, para. 10.3. In both decisions, the Human Rights Committee has also held that "it would be unconscionable to so interpret the responsibility under article 2 of the Covenant as to permit a State party to perpetrate violations of the Covenant on the territory of another State, which violations it could not perpetrate on its own territory." *See also* the decision of the



circumstances, "persons may fall under the subject-matter of a State Party [to the ICCPR] even when outside that State's territory."[73]

37.    The International Court of Justice has confirmed that the ICCPR is applicable in respect of acts done by a State in the exercise of its jurisdiction outside its own territory.[74] The Court observed that, "while the jurisdiction of States is primarily territorial, it may sometimes be exercised outside the national territory. Considering the object and purpose of the International Covenant on Civil and Political Rights, it would seem natural that, even when such is the case, States parties to the Covenant should be bound to comply with its provisions."[75]

38.    Similarly, the Committee against Torture has affirmed that the *non-refoulement* obligation contained in Article 3 of the Convention Against Torture applies in any territory under a State party's jurisdiction.[76] With regard to those provisions of the Convention Against Torture which "are expressed as applicable to 'territory under [the State party's] jurisdiction'", the Committee Against Torture reiterated "its previously expressed view that this includes all areas under the de facto effective control of the State party, by whichever military or civil authorities such control is exercised" and made it clear that these provisions "apply to, and are fully enjoyed, by all persons under the effective control of its authorities, of whichever type, wherever located in the world."[77]

39.    The extraterritorial applicability of human rights treaties is also firmly established at the regional level. The European Court of Human Rights has examined the concept of "jurisdiction" in a number of decisions and consistently held that the decisive criterion is not whether a person is within the territory of the State concerned, but whether or not, in respect of the conduct alleged, he or she is under the effective control

---

Human Rights Committee in *Pereira Montero v. Uruguay*, U.N. Doc. CCPR/C/18/D/106/1981, 31 March 1983, para. 5.

[73]    See, for example, Concluding Observations of the Human Rights Committee, United States of America, U.N. Doc. CCPR/C/79/Add.50, 3 October 1995, para. 284. In 2006, the Human Rights Committee also reaffirmed the applicability of the provisions of the ICCPR with reference to conduct of the United States at Guantánamo Bay. *See* Concluding Observations of the Human Rights Committee, United States of America, *supra* footnote 47, para. 10. See also Concluding Observations of the Human Rights Committee, Israel, U.N. Doc. CCPR/C/79/Add.93, 18 August 1998, para. 10 and U.N. Doc. CCPR/CO/78/ISR, 21 August 2003, para. 11.

[74]    See the Advisory Opinion of the International Court of Justice in *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory,* (2004) ICJ Gen. List No. 131, 9 July 2004, para. 111. See also the recent judgement of the International Court of Justice in *Case Concerning Armed Activities on the Territory of the Congo (DRC v. Uganda)*, (2005) ICJ Gen. List No. 116, 19 December 2005, para. 216.

[75]    *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory*, *supra* footnote 74, para. 109.

[76]    See, for example, Committee Against Torture, Conclusions and recommendations of the Committee against Torture concerning the second report of the United States of America, *supra* footnote 47. Having requested the State Party's views on the extraterritorial applicability of Article 3 of the Convention against Torture in the context of Guantánamo Bay, the Committee expressed its concern ("…that the State party considers that the non-refoulement obligation, under article 3 of the Convention, does not extend to a person detained outside its territory. … The State party should apply the *non-refoulement* guarantee to all detainees in its custody, …, in order to comply with its obligations under article 3 of the Convention. …") (para. 20).

[77]    *Id*., para. 15. This applies, *inter alia*, to Article 16 of the Convention Against Torture, which prohibits acts of cruel, inhuman or degrading treatment or punishment which do not amount to torture as defined in Article 1 of the Convention.

**UNHCR**

of, or is affected by those acting on behalf of, the State in question. Thus, in a decision in which it examined the circumstances in which the obligations under the European Convention apply extraterritorially, the European Court of Human Rights held that while, "from the standpoint of public international law, the jurisdictional competence of a state is primarily territorial",[78] it may extend extraterritorially if a State, "through the effective control of the relevant territory and its inhabitants abroad as a consequence of military occupation or through the consent, invitation or acquiescence of the government of that territory, exercises all or some of the public powers normally to be exercised by that government."[79] A situation in which a person is brought under the "effective control" of the authorities of a State if they are exercising their authority outside the State's territory may also give rise to the extraterritorial application of Convention obligations.[80]

40.    Also relevant in the present context is the judgement of the European Court of Human Rights in *Issa and Ors v. Turkey*, which confirmed that

> "a State may also be held accountable for violations of the Convention rights and freedoms of persons who are in the territory of another State but who are found to be under the former State's authority and control through its agents operating – whether lawfully or unlawfully – in the latter State […]. Accountability in such situations stems from the fact that Article 1 of the Convention cannot be interpreted so as to allow a State party to perpetrate violations of the Convention on the territory of another State, which it could not perpetrate on its own territory […]."[81]

41.    The Inter-American Commission on Human Rights held in its decision in *Coard et al. v. the United States* that "while the extraterritorial application of the American Declaration has not been placed at issue by the parties, the Commission finds it pertinent to note that, under certain circumstances, the exercise of its jurisdiction over acts with an extraterritorial locus will not only be consistent with, but required by the norms which pertain."[82]

---

[78]    *Bankovic et al. v. Belgium and 16 other contracting States (Admissibility)*, Application No. 52207/99, 12 December 2001, para. 59.

[79]    *Id.*, para. 71. See also *Loizidou v. Turkey (Preliminary Objections),* Application No. 15318/89, Judgement of 23 February 1995, Series A, No. 310, para. 62 ("In this respect the Court recalls that, although Article 1 (art. 1) sets limits on the reach of the Convention, the concept of 'jurisdiction' under this provision is not restricted to the national territory of the High Contracting Parties. […] [t]he responsibility of Contracting Parties can be involved because of acts of their authorities, whether performed within or outside national boundaries, which produce effects outside their own territory.").

[80]    *Öcalan v. Turkey (Preliminary Objections)*, Application No. 46221/99, Judgement of 12 March 2003, para. 93 (the former PKK leader had been arrested by Kenyan authorities and handed over to Turkish officials operating in Kenya). *See also Ilascu and Others v. Russia and Moldova*, Application No. 48787/99, Judgement of 8 July 2004, paras. 382-394 (finding that the complainants came within the "jurisdiction" of the Russian Federation, and that the responsibility of the Russian Federation for acts which occurred on the territory of Moldova was engaged by the conduct of its own soldiers there, as well as that of the Transdniestran authorities, on the basis of the support provided by Russia to the latter) on the basis of the actions of its own soldiers as well as their support to the Transdniestran authorities).

[81]    *Issa and Ors v. Turkey,* Application No. 3821/96, Judgement of 16 November 2004, para. 71, with references, *inter alia*, to decisions of the Human Rights Committee and the Inter-American Commission of Human Rights.

[82]    *Coard et al. v. the United States*, Case No. 10.951, Report No. 109/99, 29 September 1999, para. 37.



42.     In UNHCR's view, the reasoning adopted by courts and human rights treaty bodies in their authoritative interpretation of the relevant human rights provisions is relevant also to the prohibition of *refoulement* under international refugee law, given the similar nature of the obligations and the object and purpose of the treaties which form their legal basis.[83]

43.     Thus, an interpretation which would restrict the scope of application of Article 33(1) of the 1951 Convention to conduct within the territory of a State party to the 1951 Convention and/or its 1967 Protocol would not only be contrary to the terms of the provision as well as the object and purpose of the treaty under interpretation, but it would also be inconsistent with relevant rules of international human rights law. It is UNHCR's position, therefore, that a State is bound by its obligation under Article 33(1) of the 1951 Convention not to return refugees to a risk of persecution wherever it exercises effective jurisdiction. As with *non-refoulement* obligations under international human rights law, the decisive criterion is not whether such persons are on the State's territory, but rather, whether they come within the effective control and authority of that State.

UNHCR, Geneva
26 January 2007

---

[83]    As noted by the International Law Commission in its Report of the fifty-eighth session (1 May-9 June and 3 July-11 August 2006), U.N. Doc. A/61/10, at pp. 414–415, "Article 31(3)(c) [of the 1969 Vienna Convention, *supra* footnote 36] also requires the interpreter to consider other treaty-based rules so as to arrive at a consistent meaning. Such other rules are of particular relevance where parties to the treaty under interpretation are also parties to the other treaty, where the treaty rule has passed into or expresses customary international law or where they provide evidence of the common understanding of the parties as to the object and purpose of the treaty under interpretation or as to the meaning of a particular term."

PL 104–132, April 24, 1996, 110 Stat 1214

UNITED STATES PUBLIC LAWS

104th Congress - Second Session

Convening January 3, 1996

Additions and Deletions are not identified in this document.

8848

PL 104–132 (S 735)

April 24, 1996

ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT OF 1996

An Act to deter terrorism, provide justice for victims, provide for an effective death penalty, and for other purposes.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,

<< 18 USCA § 1 NOTE >>

SECTION 1. SHORT TITLE.

 This Act may be cited as the "Antiterrorism and Effective Death Penalty Act of 1996".

SEC. 2. TABLE OF CONTENTS.

 The table of contents of this Act is as follows:

Sec. 1. Short title.

Sec. 2. Table of contents.

### TITLE I—HABEAS CORPUS REFORM

Sec. 101. Filing deadlines.

Sec. 102. Appeal.

Sec. 103. Amendment of Federal Rules of Appellate Procedure.

Sec. 104. Section 2254 amendments.

Sec. 105. Section 2255 amendments.

Sec. 106. Limits on second or successive applications.

Sec. 107. Death penalty litigation procedures.

Sec. 108. Technical amendment.

### TITLE II—JUSTICE FOR VICTIMS

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 387 of 1305

Subtitle A—Mandatory Victim Restitution

Sec. 201. Short title.

Sec. 202. Order of restitution.

Sec. 203. Conditions of probation.

Sec. 204. Mandatory restitution.

Sec. 205. Order of restitution to victims of other crimes.

Sec. 206. Procedure for issuance of restitution order.

Sec. 207. Procedure for enforcement of fine or restitution order.

Sec. 208. Instruction to Sentencing Commission.

Sec. 209. Justice Department regulations.

Sec. 210. Special assessments on convicted persons.

Sec. 211. Effective date.

Subtitle B—Jurisdiction for Lawsuits Against Terrorist States

Sec. 221. Jurisdiction for lawsuits against terrorist states.

Subtitle C—Assistance to Victims of Terrorism

Sec. 231. Short title.

Sec. 232. Victims of Terrorism Act.

Sec. 233. Compensation of victims of terrorism.

Sec. 234. Crime victims fund.

Sec. 235. Closed circuit televised court proceedings for victims of crime.

Sec. 236. Technical correction.

TITLE III—INTERNATIONAL TERRORISM PROHIBITIONS

Subtitle A—Prohibition on International Terrorist Fundraising

Sec. 301. Findings and purpose.

Sec. 302. Designation of foreign terrorist organizations.

Sec. 303. Prohibition on terrorist fundraising.

Subtitle B—Prohibition on Assistance to Terrorist States

Sec. 321. Financial transactions with terrorists.

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 388 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

Sec. 322. Foreign air travel safety.

Sec. 323. Modification of material support provision.

Sec. 324. Findings.

Sec. 325. Prohibition on assistance to countries that aid terrorist states.

Sec. 326. Prohibition on assistance to countries that provide military equipment to terrorist states.

Sec. 327. Opposition to assistance by international financial institutions to terrorist states.

Sec. 328. Antiterrorism assistance.

Sec. 329. Definition of assistance.

Sec. 330. Prohibition on assistance under Arms Export Control Act for countries not cooperating fully with United States antiterrorism efforts.

TITLE IV—TERRORIST AND CRIMINAL ALIEN REMOVAL AND EXCLUSION

Subtitle A—Removal of Alien Terrorists

Sec. 401. Alien terrorist removal.

Subtitle B—Exclusion of Members and Representatives of Terrorist Organizations

Sec. 411. Exclusion of alien terrorists.

Sec. 412. Waiver authority concerning notice of denial of application for visas.

Sec. 413. Denial of other relief for alien terrorists.

Sec. 414. Exclusion of aliens who have not been inspected and admitted.

Subtitle C—Modification to Asylum Procedures

Sec. 421. Denial of asylum to alien terrorists.

Sec. 422. Inspection and exclusion by immigration officers.

Sec. 423. Judicial review.

Subtitle D—Criminal Alien Procedural Improvements

Sec. 431. Access to certain confidential immigration and naturalization files through court order.

Sec. 432. Criminal alien identification system.

Sec. 433. Establishing certain alien smuggling-related crimes as RICO-predicate offenses.

Sec. 434. Authority for alien smuggling investigations.

Sec. 435. Expansion of criteria for deportation for crimes of moral turpitude.

Sec. 436. Miscellaneous provisions.

AR.07796

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 389 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

Sec. 437. Interior repatriation program.

Sec. 438. Deportation of nonviolent offenders prior to completion of sentence of imprisonment.

Sec. 439. Authorizing State and local law enforcement officials to arrest and detain certain illegal aliens.

Sec. 440. Criminal alien removal.

Sec. 441. Limitation on collateral attacks on underlying deportation order.

Sec. 442. Deporation procedures for certain criminal aliens who are not permanent residents.
  Sec. 443. Extradition of aliens.

TITLE V—NUCLEAR, BIOLOGICAL, AND CHEMICAL WEAPONS RESTRICTIONS

Subtitle A—Nuclear Materials

Sec. 501. Findings and purpose.

Sec. 502. Expansion of scope and jurisdictional bases of nuclear materials prohibitions.

Sec. 503. Report to Congress on thefts of explosive materials from armories.

Subtitle B—Biological Weapons Restrictions

Sec. 511. Enhanced penalties and control of biological agents.

Subtitle C—Chemical Weapons Restrictions

Sec. 521. Chemical weapons of mass destruction; study of facility for training and evaluation of personnel who respond to use of chemical or biological weapons in urban and suburban areas.

TITLE VI—IMPLEMENTATION OF PLASTIC EXPLOSIVES CONVENTION

Sec. 601. Findings and purposes.

Sec. 602. Definitions.

Sec. 603. Requirement of detection agents for plastic explosives.

Sec. 604. Criminal sanctions.

Sec. 605. Exceptions.

Sec. 606. Seizure and forfeiture of plastic explosives.

Sec. 607. Effective date.

TITLE VII—CRIMINAL LAW MODIFICATIONS TO COUNTER TERRORISM

Subtitle A—Crimes and Penalties

Sec. 701. Increased penalty for conspiracies involving explosives.

Sec. 702. Acts of terrorism transcending national boundaries.

Case 3:20-cv-07721-SI   Document 58-7   Filed 11/10/20   Page 390 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

Sec. 703. Expansion of provision relating to destruction or injury of property within special maritime and territorial jurisdiction.

Sec. 704. Conspiracy to harm people and property overseas.

Sec. 705. Increased penalties for certain terrorism crimes.

Sec. 706. Mandatory penalty for transferring an explosive material knowing that it will be used to commit a crime of violence.

Sec. 707. Possession of stolen explosives prohibited.

Sec. 708. Enhanced penalties for use of explosives or arson crimes.

Sec. 709. Determination of constitutionality of restricting the dissemination of bomb-making instructional materials.

Subtitle B—Criminal Procedures

Sec. 721. Clarification and extension of criminal jurisdiction over certain terrorism offenses overseas.

Sec. 722. Clarification of maritime violence jurisdiction.

Sec. 723. Increased and alternate conspiracy penalties for terrorism offenses.

Sec. 724. Clarification of Federal jurisdiction over bomb threats.

Sec. 725. Expansion and modification of weapons of mass destruction statute.

Sec. 726. Addition of terrorism offenses to the money laundering statute.

Sec. 727. Protection of Federal employees; protection of current or former officials, officers, or employees of the United States.

Sec. 728. Death penalty aggravating factor.

Sec. 729. Detention hearing.

Sec. 730. Directions to Sentencing Commission.

Sec. 731. Exclusion of certain types of information from definitions.

Sec. 732. Marking, rendering inert, and licensing of explosive materials.

TITLE VIII—ASSISTANCE TO LAW ENFORCEMENT

Subtitle A—Resources and Security

Sec. 801. Overseas law enforcement training activities.

Sec. 802. Sense of Congress.

Sec. 803. Protection of Federal Government buildings in the District of Columbia.

Sec. 804. Requirement to preserve record evidence.

Sec. 805. Deterrent against terrorist activity damaging a Federal interest computer.

Sec. 806. Commission on the Advancement of Federal Law Enforcement.

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 391 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

Sec. 807. Combatting international counterfeiting of United States currency.

Sec. 808. Compilation of statistics relating to intimidation of Government employees.

Sec. 809. Assessing and reducing the threat to law enforcement officers from the criminal use of firearms and ammunition.

Sec. 810. Study and report on electronic surveillance.

Subtitle B—Funding Authorizations for Law Enforcement

Sec. 811. Federal Bureau of Investigation.

Sec. 812. United States Customs Service.

Sec. 813. Immigration and Naturalization Service.

Sec. 814. Drug Enforcement Administration.

Sec. 815. Department of Justice.

Sec. 816. Department of the Treasury.

Sec. 817. United States Park Police.

Sec. 818. The Judiciary.

Sec. 819. Local firefighter and emergency services training.

Sec. 820. Assistance to foreign countries to procure explosive detection devices and other counterterrorism technology.

Sec. 821. Research and development to support counterterrorism technologies.

Sec. 822. Grants to State and local law enforcement for training and equipment.

Sec. 823. Funding source.

TITLE IX—MISCELLANEOUS

Sec. 901. Expansion of territorial sea.

Sec. 902. Proof of citizenship.

Sec. 903. Representation fees in criminal cases.

Sec. 904. Severability.

TITLE I—HABEAS CORPUS REFORM

<< 28 USCA § 2244 >>

SEC. 101. FILING DEADLINES.

 Section 2244 of title 28, United States Code, is amended by adding at the end the following new subsection:

 "(d)(1) A 1–year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—

Case 3:20-cv-07721-SI   Document 58-7   Filed 11/10/20   Page 392 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

"(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

"(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

"(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

"(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

"(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.".

<< 28 USCA § 2253 >>

SEC. 102. APPEAL.

Section 2253 of title 28, United States Code, is amended to read as follows:

"§ 2253. Appeal

"(a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.

"(b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.

"(c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—

"(A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

"(B) the final order in a proceeding under section 2255.

"(2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

"(3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).".

<< 28 USCA FRAP Rule 22 >>

SEC. 103. AMENDMENT OF FEDERAL RULES OF APPELLATE PROCEDURE.

Rule 22 of the Federal Rules of Appellate Procedure is amended to read as follows:

"Rule 22. Habeas corpus and section 2255 proceedings

"(a) APPLICATION FOR THE ORIGINAL WRIT.—An application for a writ of habeas corpus shall be made to the appropriate district court. If application is made to a circuit judge, the application shall be transferred to the appropriate district court. If an application is made to or transferred to the district court and denied, renewal of the application before a circuit judge shall not be permitted. The applicant may, pursuant to section 2253 of title 28, United States Code, appeal to the appropriate court of appeals from the order of the district court denying the writ.

"(b) CERTIFICATE OF APPEALABILITY.—In a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court, an appeal by the applicant for the writ may not proceed unless a district or a circuit judge issues a certificate of appealability pursuant to section 2253(c) of title 28, United States Code. If an appeal is taken by the applicant, the district judge who rendered the judgment shall either issue a certificate of appealability or state the reasons why such a certificate should not issue. The certificate or the statement shall be forwarded to the court of appeals with the notice of

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 393 of 1305

appeal and the file of the proceedings in the district court. If the district judge has denied the certificate, the applicant for the writ may then request issuance of the certificate by a circuit judge. If such a request is addressed to the court of appeals, it shall be deemed addressed to the judges thereof and shall be considered by a circuit judge or judges as the court deems appropriate. If no express request for a certificate is filed, the notice of appeal shall be deemed to constitute a request addressed to the judges of the court of appeals. If an appeal is taken by a State or its representative, a certificate of appealability is not required.".

<< 28 USCA § 2254 >>

SEC. 104. SECTION 2254 AMENDMENTS.

Section 2254 of title 28, United States Code, is amended—

(1) by amending subsection (b) to read as follows:

"(b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—

"(A) the applicant has exhausted the remedies available in the courts of the State; or

"(B)(i) there is an absence of available State corrective process; or

"(ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

"(2) An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.

"(3) A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement.";

(2) by redesignating subsections (d), (e), and (f) as subsections (e), (f), and (g), respectively;

(3) by inserting after subsection (c) the following new subsection:

"(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

"(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

"(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.";

(4) by amending subsection (e), as redesignated by paragraph (2), to read as follows:

"(e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

"(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—

"(A) the claim relies on—

"(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

"(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

"(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."; and

(5) by adding at the end the following new subsections:

"(h) Except as provided in section 408 of the Controlled Substances Act, in all proceedings brought under this section, and any subsequent proceedings on review, the court may appoint counsel for an applicant who is or becomes financially unable to afford counsel, except as provided by a rule promulgated by the Supreme Court pursuant to statutory authority. Appointment of counsel under this section shall be governed by section 3006A of title 18.

"(i) The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254.".

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 394 of 1305

<< 28 USCA § 2255 >>

## SEC. 105. SECTION 2255 AMENDMENTS.

Section 2255 of title 28, United States Code, is amended—

(1) by striking the second and fifth undesignated paragraphs; and

(2) by adding at the end the following new undesignated paragraphs:

"A 1–year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of—

"(1) the date on which the judgment of conviction becomes final;

"(2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;

"(3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

"(4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

"Except as provided in section 408 of the Controlled Substances Act, in all proceedings brought under this section, and any subsequent proceedings on review, the court may appoint counsel, except as provided by a rule promulgated by the Supreme Court pursuant to statutory authority. Appointment of counsel under this section shall be governed by section 3006A of title 18.

"A second or successive motion must be certified as provided in section 2244 by a panel of the appropriate court of appeals to contain—

"(1) newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense; or

"(2) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable.".

<< 28 USCA § 2244 >>

## SEC. 106. LIMITS ON SECOND OR SUCCESSIVE APPLICATIONS.

(a) CONFORMING AMENDMENT TO SECTION 2244(a).—Section 2244(a) of title 28, United States Code, is amended by striking "and the petition" and all that follows through "by such inquiry." and inserting ", except as provided in section 2255.".

(b) LIMITS ON SECOND OR SUCCESSIVE APPLICATIONS.—Section 2244(b) of title 28, United States Code, is amended to read as follows:

"(b)(1) A claim presented in a second or successive habeas corpus application under section 2254 that was presented in a prior application shall be dismissed.

"(2) A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless—

"(A) the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

"(B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and

"(ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

"(3)(A) Before a second or successive application permitted by this section is filed in the district court, the applicant shall move in the appropriate court of appeals for an order authorizing the district court to consider the application.

"(B) A motion in the court of appeals for an order authorizing the district court to consider a second or successive application shall be determined by a three-judge panel of the court of appeals.

"(C) The court of appeals may authorize the filing of a second or successive application only if it determines that the application makes a prima facie showing that the application satisfies the requirements of this subsection.

Case 3:20-cv-07721-SI   Document 58-7   Filed 11/10/20   Page 395 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

"(D) The court of appeals shall grant or deny the authorization to file a second or successive application not later than 30 days after the filing of the motion.

"(E) The grant or denial of an authorization by a court of appeals to file a second or successive application shall not be appealable and shall not be the subject of a petition for rehearing or for a writ of certiorari.

"(4) A district court shall dismiss any claim presented in a second or successive application that the court of appeals has authorized to be filed unless the applicant shows that the claim satisfies the requirements of this section.".

SEC. 107. DEATH PENALTY LITIGATION PROCEDURES.

(a) ADDITION OF CHAPTER TO TITLE 28, UNITED STATES CODE.—Title 28, United States Code, is amended by inserting after chapter 153 the following new chapter:

<< 28 USCA Ch. 154 >>

"CHAPTER 154—SPECIAL HABEAS CORPUS PROCEDURES IN CAPITAL CASES

"Sec.

"2261. Prisoners in State custody subject to capital sentence; appointment of counsel; requirement of rule of court or statute; procedures for appointment.

"2262. Mandatory stay of execution; duration; limits on stays of execution; successive petitions.

"2263. Filing of habeas corpus application; time requirements; tolling rules.

"2264. Scope of Federal review; district court adjudications.

"2265. Application to State unitary review procedure.

"2266. Limitation periods for determining applications and motions.

<< 28 USCA § 2261 >>

"§ 2261. Prisoners in State custody subject to capital sentence; appointment of counsel; requirement of rule of court or statute;
  procedures for appointment

"(a) This chapter shall apply to cases arising under section 2254 brought by prisoners in State custody who are subject to a capital sentence. It shall apply only if the provisions of subsections (b) and (c) are satisfied.

"(b) This chapter is applicable if a State establishes by statute, rule of its court of last resort, or by another agency authorized by State law, a mechanism for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel in State post-conviction proceedings brought by indigent prisoners whose capital convictions and sentences have been upheld on direct appeal to the court of last resort in the State or have otherwise become final for State law purposes. The rule of court or statute must provide standards of competency for the appointment of such counsel.

"(c) Any mechanism for the appointment, compensation, and reimbursement of counsel as provided in subsection (b) must offer counsel to all State prisoners under capital sentence and must provide for the entry of an order by a court of record—

"(1) appointing one or more counsels to represent the prisoner upon a finding that the prisoner is indigent and accepted the offer or is unable competently to decide whether to accept or reject the offer;

"(2) finding, after a hearing if necessary, that the prisoner rejected the offer of counsel and made the decision with an understanding of its legal consequences; or

"(3) denying the appointment of counsel upon a finding that the prisoner is not indigent.

"(d) No counsel appointed pursuant to subsections (b) and (c) to represent a State prisoner under capital sentence shall have previously represented the prisoner at trial or on direct appeal in the case for which the appointment is made unless the prisoner and counsel expressly request continued representation.

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 396 of 1305

"(e) The ineffectiveness or incompetence of counsel during State or Federal post-conviction proceedings in a capital case shall not be a ground for relief in a proceeding arising under section 2254. This limitation shall not preclude the appointment of different counsel, on the court's own motion or at the request of the prisoner, at any phase of State or Federal post-conviction proceedings on the basis of the ineffectiveness or incompetence of counsel in such proceedings.

<< 28 USCA § 2262 >>

"§ 2262. Mandatory stay of execution; duration; limits on stays of execution; successive petitions

"(a) Upon the entry in the appropriate State court of record of an order under section 2261(c), a warrant or order setting an execution date for a State prisoner shall be stayed upon application to any court that would have jurisdiction over any proceedings filed under section 2254. The application shall recite that the State has invoked the post-conviction review procedures of this chapter and that the scheduled execution is subject to stay.

"(b) A stay of execution granted pursuant to subsection (a) shall expire if—

"(1) a State prisoner fails to file a habeas corpus application under section 2254 within the time required in section 2263;

"(2) before a court of competent jurisdiction, in the presence of counsel, unless the prisoner has competently and knowingly waived such counsel, and after having been advised of the consequences, a State prisoner under capital sentence waives the right to pursue habeas corpus review under section 2254; or

"(3) a State prisoner files a habeas corpus petition under section 2254 within the time required by section 2263 and fails to make a substantial showing of the denial of a Federal right or is denied relief in the district court or at any subsequent stage of review.

"(c) If one of the conditions in subsection (b) has occurred, no Federal court thereafter shall have the authority to enter a stay of execution in the case, unless the court of appeals approves the filing of a second or successive application under section 2244(b).

<< 28 USCA § 2263 >>

"§ 2263. Filing of habeas corpus application; time requirements; tolling rules

"(a) Any application under this chapter for habeas corpus relief under section 2254 must be filed in the appropriate district court not later than 180 days after final State court affirmance of the conviction and sentence on direct review or the expiration of the time for seeking such review.

"(b) The time requirements established by subsection (a) shall be tolled—

"(1) from the date that a petition for certiorari is filed in the Supreme Court until the date of final disposition of the petition if a State prisoner files the petition to secure review by the Supreme Court of the affirmance of a capital sentence on direct review by the court of last resort of the State or other final State court decision on direct review;

"(2) from the date on which the first petition for post-conviction review or other collateral relief is filed until the final State court disposition of such petition; and

"(3) during an additional period not to exceed 30 days, if—

"(A) a motion for an extension of time is filed in the Federal district court that would have jurisdiction over the case upon the filing of a habeas corpus application under section 2254; and

"(B) a showing of good cause is made for the failure to file the habeas corpus application within the time period established by this section.

<< 28 USCA § 2264 >>

"§ 2264. Scope of Federal review; district court adjudications

"(a) Whenever a State prisoner under capital sentence files a petition for habeas corpus relief to which this chapter applies, the district court shall only consider a claim or claims that have been raised and decided on the merits in the State courts, unless the failure to raise the claim properly is—

"(1) the result of State action in violation of the Constitution or laws of the United States;

"(2) the result of the Supreme Court's recognition of a new Federal right that is made retroactively applicable; or

Case 3:20-cv-07721-SI   Document 58-7   Filed 11/10/20   Page 397 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

"(3) based on a factual predicate that could not have been discovered through the exercise of due diligence in time to present the claim for State or Federal post-conviction review.

"(b) Following review subject to subsections (a), (d), and (e) of section 2254, the court shall rule on the claims properly before it.

<< 28 USCA § 2265 >>

"§ 2265. Application to State unitary review procedure

"(a) For purposes of this section, a 'unitary review' procedure means a State procedure that authorizes a person under sentence of death to raise, in the course of direct review of the judgment, such claims as could be raised on collateral attack. This chapter shall apply, as provided in this section, in relation to a State unitary review procedure if the State establishes by rule of its court of last resort or by statute a mechanism for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel in the unitary review proceedings, including expenses relating to the litigation of collateral claims in the proceedings. The rule of court or statute must provide standards of competency for the appointment of such counsel.

"(b) To qualify under this section, a unitary review procedure must include an offer of counsel following trial for the purpose of representation on unitary review, and entry of an order, as provided in section 2261(c), concerning appointment of counsel or waiver or denial of appointment of counsel for that purpose. No counsel appointed to represent the prisoner in the unitary review proceedings shall have previously represented the prisoner at trial in the case for which the appointment is made unless the prisoner and counsel expressly request continued representation.

"(c) Sections 2262, 2263, 2264, and 2266 shall apply in relation to cases involving a sentence of death from any State having a unitary review procedure that qualifies under this section. References to State 'post-conviction review' and 'direct review' in such sections shall be understood as referring to unitary review under the State procedure. The reference in section 2262(a) to 'an order under section 2261(c)' shall be understood as referring to the post-trial order under subsection (b) concerning representation in the unitary review proceedings, but if a transcript of the trial proceedings is unavailable at the time of the filing of such an order in the appropriate State court, then the start of the 180–day limitation period under section 2263 shall be deferred until a transcript is made available to the prisoner or counsel of the prisoner.

<< 28 USCA § 2266 >>

"§ 2266. Limitation periods for determining applications and motions

"(a) The adjudication of any application under section 2254 that is subject to this chapter, and the adjudication of any motion under section 2255 by a person under sentence of death, shall be given priority by the district court and by the court of appeals over all noncapital matters.

"(b)(1)(A) A district court shall render a final determination and enter a final judgment on any application for a writ of habeas corpus brought under this chapter in a capital case not later than 180 days after the date on which the application is filed.

"(B) A district court shall afford the parties at least 120 days in which to complete all actions, including the preparation of all pleadings and briefs, and if necessary, a hearing, prior to the submission of the case for decision.

"(C)(i) A district court may delay for not more than one additional 30–day period beyond the period specified in subparagraph (A), the rendering of a determination of an application for a writ of habeas corpus if the court issues a written order making a finding, and stating the reasons for the finding, that the ends of justice that would be served by allowing the delay outweigh the best interests of the public and the applicant in a speedy disposition of the application.

"(ii) The factors, among others, that a court shall consider in determining whether a delay in the disposition of an application is warranted are as follows:

"(I) Whether the failure to allow the delay would be likely to result in a miscarriage of justice.

"(II) Whether the case is so unusual or so complex, due to the number of defendants, the nature of the prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect adequate briefing within the time limitations established by subparagraph (A).

"(III) Whether the failure to allow a delay in a case that, taken as a whole, is not so unusual or so complex as described in subclause (II), but would otherwise deny the applicant reasonable time to obtain counsel, would unreasonably deny the

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 398 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

applicant or the government continuity of counsel, or would deny counsel for the applicant or the government the reasonable time necessary for effective preparation, taking into account the exercise of due diligence.

"(iii) No delay in disposition shall be permissible because of general congestion of the court's calendar.

"(iv) The court shall transmit a copy of any order issued under clause (i) to the Director of the Administrative Office of the United States Courts for inclusion in the report under paragraph (5).

"(2) The time limitations under paragraph (1) shall apply to—

"(A) an initial application for a writ of habeas corpus;

"(B) any second or successive application for a writ of habeas corpus; and

"(C) any redetermination of an application for a writ of habeas corpus following a remand by the court of appeals or the Supreme Court for further proceedings, in which case the limitation period shall run from the date the remand is ordered.

"(3)(A) The time limitations under this section shall not be construed to entitle an applicant to a stay of execution, to which the applicant would otherwise not be entitled, for the purpose of litigating any application or appeal.

"(B) No amendment to an application for a writ of habeas corpus under this chapter shall be permitted after the filing of the answer to the application, except on the grounds specified in section 2244(b).

"(4)(A) The failure of a court to meet or comply with a time limitation under this section shall not be a ground for granting relief from a judgment of conviction or sentence.

"(B) The State may enforce a time limitation under this section by petitioning for a writ of mandamus to the court of appeals. The court of appeals shall act on the petition for a writ of mandamus not later than 30 days after the filing of the petition.

"(5)(A) The Administrative Office of the United States Courts shall submit to Congress an annual report on the compliance by the district courts with the time limitations under this section.

"(B) The report described in subparagraph (A) shall include copies of the orders submitted by the district courts under paragraph (1)(B)(iv).

"(c)(1)(A) A court of appeals shall hear and render a final determination of any appeal of an order granting or denying, in whole or in part, an application brought under this chapter in a capital case not later than 120 days after the date on which the reply brief is filed, or if no reply brief is filed, not later than 120 days after the date on which the answering brief is filed.

"(B)(i) A court of appeals shall decide whether to grant a petition for rehearing or other request for rehearing en banc not later than 30 days after the date on which the petition for rehearing is filed unless a responsive pleading is required, in which case the court shall decide whether to grant the petition not later than 30 days after the date on which the responsive pleading is filed.

"(ii) If a petition for rehearing or rehearing en banc is granted, the court of appeals shall hear and render a final determination of the appeal not later than 120 days after the date on which the order granting rehearing or rehearing en banc is entered.

"(2) The time limitations under paragraph (1) shall apply to—

"(A) an initial application for a writ of habeas corpus;

"(B) any second or successive application for a writ of habeas corpus; and

"(C) any redetermination of an application for a writ of habeas corpus or related appeal following a remand by the court of appeals en banc or the Supreme Court for further proceedings, in which case the limitation period shall run from the date the remand is ordered.

"(3) The time limitations under this section shall not be construed to entitle an applicant to a stay of execution, to which the applicant would otherwise not be entitled, for the purpose of litigating any application or appeal.

"(4)(A) The failure of a court to meet or comply with a time limitation under this section shall not be a ground for granting relief from a judgment of conviction or sentence.

"(B) The State may enforce a time limitation under this section by applying for a writ of mandamus to the Supreme Court.

"(5) The Administrative Office of the United States Courts shall submit to Congress an annual report on the compliance by the courts of appeals with the time limitations under this section.".

<< 28 USCA Ch. 153 >>

(b) TECHNICAL AMENDMENT.—The part analysis for part IV of title 28, United States Code, is amended by adding after the item relating to chapter 153 the following new item:

"154. Special habeas corpus procedures in capital cases .......... 2261.".

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 399 of 1305

<< 28 USCA § 2261 NOTE >>

(c) EFFECTIVE DATE.—Chapter 154 of title 28, United States Code (as added by subsection (a)) shall apply to cases pending on or after the date of enactment of this Act.

<< 21 USCA § 848 >>

SEC. 108. TECHNICAL AMENDMENT.

Section 408(q) of the Controlled Substances Act (21 U.S.C. 848(q)) is amended by amending paragraph (9) to read as follows:
"(9) Upon a finding that investigative, expert, or other services are reasonably necessary for the representation of the defendant, whether in connection with issues relating to guilt or the sentence, the court may authorize the defendant's attorneys to obtain such services on behalf of the defendant and, if so authorized, shall order the payment of fees and expenses therefor under paragraph (10). No ex parte proceeding, communication, or request may be considered pursuant to this section unless a proper showing is made concerning the need for confidentiality. Any such proceeding, communication, or request shall be transcribed and made a part of the record available for appellate review.".

TITLE II—JUSTICE FOR VICTIMS

Subtitle A—Mandatory Victim Restitution

<< 18 USCA § 3551 NOTE >>

SEC. 201. SHORT TITLE.

This subtitle may be cited as the "Mandatory Victims Restitution Act of 1996".

<< 18 USCA § 3556 >>

SEC. 202. ORDER OF RESTITUTION.

Section 3556 of title 18, United States Code, is amended—
(1) by striking "may" and inserting "shall"; and
(2) by striking "sections 3663 and 3664." and inserting "section 3663A, and may order restitution in accordance with section 3663. The procedures under section 3664 shall apply to all orders of restitution under this section.".

<< 18 USCA § 3563 >>

SEC. 203. CONDITIONS OF PROBATION.

Section 3563 of title 18, United States Code, is amended—
(1) in subsection (a)—
  (A) in paragraph (3), by striking "and" at the end;
  (B) in the first paragraph (4) (relating to conditions of probation for a domestic crime of violence), by striking the period and inserting a semicolon;
  (C) by redesignating the second paragraph (4) (relating to conditions of probation concerning drug use and testing) as paragraph (5);
  (D) in paragraph (5), as redesignated, by striking the period at the end and inserting a semicolon; and
  (E) by inserting after paragraph (5), as redesignated, the following new paragraphs:
"(6) that the defendant—
  "(A) make restitution in accordance with sections 2248, 2259, 2264, 2327, 3663, 3663A, and 3664; and
  "(B) pay the assessment imposed in accordance with section 3013; and

AR.07807

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 400 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

"(7) that the defendant will notify the court of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay restitution, fines, or special assessments."; and

(2) in subsection (b)—

(A) by striking paragraph (2);

(B) by redesignating paragraphs (3) through (22) as paragraphs (2) through (21), respectively; and

(C) by amending paragraph (2), as redesignated, to read as follows:

"(2) make restitution to a victim of the offense under section 3556 (but not subject to the limitation of section 3663(a) or 3663A(c)(1)(A));".

SEC. 204. MANDATORY RESTITUTION.

<< 18 USCA § 3663A >>

(a) IN GENERAL.—Chapter 232 of title 18, United States Code, is amended by inserting immediately after section 3663 the following new section:

"§ 3663A. Mandatory restitution to victims of certain crimes

"(a)(1) Notwithstanding any other provision of law, when sentencing a defendant convicted of an offense described in subsection(c), the court shall order, in addition to, or in the case of a misdemeanor, in addition to or in lieu of, any other penalty authorized by law, that the defendant make restitution to the victim of the offense or, if the victim is deceased, to the victim's estate.

"(2) For the purposes of this section, the term 'victim' means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern. In the case of a victim who is under 18 years of age, incompetent, incapacitated, or deceased, the legal guardian of the victim or representative of the victim's estate, another family member, or any other person appointed as suitable by the court, may assume the victim's rights under this section, but in no event shall the defendant be named as such representative or guardian.

"(3) The court shall also order, if agreed to by the parties in a plea agreement, restitution to persons other than the victim of the offense.

"(b) The order of restitution shall require that such defendant—

"(1) in the case of an offense resulting in damage to or loss or destruction of property of a victim of the offense—

"(A) return the property to the owner of the property or someone designated by the owner; or

"(B) if return of the property under subparagraph (A) is impossible, impracticable, or inadequate, pay an amount equal to—

"(i) the greater of—

"(I) the value of the property on the date of the damage, loss, or destruction; or

"(II) the value of the property on the date of sentencing, less

"(ii) the value (as of the date the property is returned) of any part of the property that is returned;

"(2) in the case of an offense resulting in bodily injury to a victim—

"(A) pay an amount equal to the cost of necessary medical and related professional services and devices relating to physical, psychiatric, and psychological care, including nonmedical care and treatment rendered in accordance with a method of healing recognized by the law of the place of treatment;

"(B) pay an amount equal to the cost of necessary physical and occupational therapy and rehabilitation; and

"(C) reimburse the victim for income lost by such victim as a result of such offense;

"(3) in the case of an offense resulting in bodily injury that results in the death of the victim, pay an amount equal to the cost of necessary funeral and related services; and

"(4) in any case, reimburse the victim for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense.

"(c)(1) This section shall apply in all sentencing proceedings for convictions of, or plea agreements relating to charges for, any offense—

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 401 of 1305

"(A) that is—

"(i) a crime of violence, as defined in section 16;

"(ii) an offense against property under this title, including any offense committed by fraud or deceit; or

"(iii) an offense described in section 1365 (relating to tampering with consumer products); and

"(B) in which an identifiable victim or victims has suffered a physical injury or pecuniary loss.

"(2) In the case of a plea agreement that does not result in a conviction for an offense described in paragraph (1), this section shall apply only if the plea specifically states that an offense listed under such paragraph gave rise to the plea agreement.

"(3) This section shall not apply in the case of an offense described in paragraph (1)(A)(ii) if the court finds, from facts on the record, that—

"(A) the number of identifiable victims is so large as to make restitution impracticable; or

"(B) determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process.

"(d) An order of restitution under this section shall be issued and enforced in accordance with section 3664.".

<< 18 USCA Ch. 232 >>

(b) CLERICAL AMENDMENT.—The analysis for chapter 232 of title 18, United States Code, is amended by inserting immediately after the matter relating to section 3663 the following:

"3663A. Mandatory restitution to victims of certain crimes.".

SEC. 205. ORDER OF RESTITUTION TO VICTIMS OF OTHER CRIMES.

<< 18 USCA § 3663 >>

(a) IN GENERAL.—Section 3663 of title 18, United States Code, is amended—

(1) in subsection (a)(1)—

(A) by striking "(a)(1) The court" and inserting "(a)(1)(A) The court";

(B) by inserting ", section 401, 408(a), 409, 416, 420, or 422(a) of the Controlled Substances Act (21 U.S.C. 841, 848(a), 849, 856, 861, 863) (but in no case shall a participant in an offense under such sections be considered a victim of such offense under this section)," before "or section 46312,";

(C) by inserting "other than an offense described in section 3663A(c)," after "title 49,";

(D) by inserting before the period at the end the following: ", or if the victim is deceased, to the victim's estate";

(E) by adding at the end the following new subparagraph:

"(B)(i) The court, in determining whether to order restitution under this section, shall consider—

"(I) the amount of the loss sustained by each victim as a result of the offense; and

"(II) the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate.

"(ii) To the extent that the court determines that the complication and prolongation of the sentencing process resulting from the fashioning of an order of restitution under this section outweighs the need to provide restitution to any victims, the court may decline to make such an order."; and

(F) by amending paragraph (2) to read as follows:

"(2) For the purposes of this section, the term 'victim' means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern. In the case of a victim who is under 18 years of age, incompetent, incapacitated, or deceased, the legal guardian of the victim or representative of the victim's estate, another family member, or any other person appointed as suitable by the court, may assume the victim's rights under this section, but in no event shall the defendant be named as such representative or guardian.";

(2) by striking subsections (c) through (i); and

AR.07809

Case 3:20-cv-07721-SI   Document 58-7   Filed 11/10/20   Page 402 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

(3) by adding at the end the following new subsections:

"(c)(1) Notwithstanding any other provision of law (but subject to the provisions of subsections (a)(1)(B) (i)(II) and (ii), when sentencing a defendant convicted of an offense described in section 401, 408(a), 409, 416, 420, or 422(a) of the Controlled Substances Act (21 U.S.C. 841, 848(a), 849, 856, 861, 863), in which there is no identifiable victim, the court may order that the defendant make restitution in accordance with this subsection.

"(2)(A) An order of restitution under this subsection shall be based on the amount of public harm caused by the offense, as determined by the court in accordance with guidelines promulgated by the United States Sentencing Commission.

"(B) In no case shall the amount of restitution ordered under this subsection exceed the amount of the fine ordered for the offense charged in the case.

"(3) Restitution under this subsection shall be distributed as follows:

"(A) 65 percent of the total amount of restitution shall be paid to the State entity designated to administer crime victim assistance in the State in which the crime occurred.

"(B) 35 percent of the total amount of restitution shall be paid to the State entity designated to receive Federal substance abuse block grant funds.

"(4) The court shall not make an award under this subsection if it appears likely that such award would interfere with a forfeiture under chapter 46 of this title or under the Controlled Substances Act (21 U.S.C. 801 et seq.).

"(5) Notwithstanding section 3612(c) or any other provision of law, a penalty assessment under section 3013 or a fine under subchapter C of chapter 227 shall take precedence over an order of restitution under this subsection.

"(6) Requests for community restitution under this subsection may be considered in all plea agreements negotiated by the United States.

"(7)(A) The United States Sentencing Commission shall promulgate guidelines to assist courts in determining the amount of restitution that may be ordered under this subsection.

"(B) No restitution shall be ordered under this subsection until such time as the Sentencing Commission promulgates guidelines pursuant to this paragraph.

"(d) An order of restitution made pursuant to this section shall be issued and enforced in accordance with section 3664.".

<< 18 USCA § 2248 >>

(b) SEXUAL ABUSE.—Section 2248 of title 18, United States Code, is amended—

(1) in subsection (a), by inserting "or 3663A" after "3663";

(2) in subsection (b)—

 (A) by amending paragraph (1) to read as follows:

"(1) DIRECTIONS.—The order of restitution under this section shall direct the defendant to pay to the victim (through the appropriate court mechanism) the full amount of the victim's losses as determined by the court pursuant to paragraph (2).";

 (B) by amending paragraph (2) to read as follows:

"(2) ENFORCEMENT.—An order of restitution under this section shall be issued and enforced in accordance with section 3664 in the same manner as an order under section 3663A.";

 (C) in paragraph (4), by striking subparagraphs (C) and (D); and

 (D) by striking paragraphs (5) through (10);

(3) by striking subsections (c) through (e); and

(4) by redesignating subsection (f) as subsection (c).

<< 18 USCA § 2259 >>

(c) SEXUAL EXPLOITATION AND OTHER ABUSE OF CHILDREN.—Section 2259 of title 18, United States Code, is amended—

(1) in subsection (a), by inserting "or 3663A" after "3663";

(2) in subsection (b)—

 (A) by amending paragraph (1) to read as follows:

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 403 of 1305

"(1) DIRECTIONS.—The order of restitution under this section shall direct the defendant to pay the victim (through the appropriate court mechanism) the full amount of the victim's losses as determined by the court pursuant to paragraph (2).";

  (B) by amending paragraph (2) to read as follows:

"(2) ENFORCEMENT.—An order of restitution under this section shall be issued and enforced in accordance with section 3664 in the same manner as an order under section 3663A.";

  (C) in paragraph (4), by striking subparagraphs (C) and (D); and

  (D) by striking paragraphs (5) through (10);

 (3) by striking subsections (c) through (e); and

 (4) by redesignating subsection (f) as subsection (c).

<< 18 USCA § 2264 >>

 (d) DOMESTIC VIOLENCE.—Section 2264 of title 18, United States Code, is amended—

 (1) in subsection (a), by inserting "or 3663A" after "3663";

 (2) in subsection (b)—

  (A) by amending paragraph (1) to read as follows:

"(1) DIRECTIONS.—The order of restitution under this section shall direct the defendant to pay the victim (through the appropriate court mechanism) the full amount of the victim's losses as determined by the court pursuant to paragraph (2).";

  (B) by amending paragraph (2) to read as follows:

"(2) ENFORCEMENT.—An order of restitution under this section shall be issued and enforced in accordance with section 3664 in the same manner as an order under section 3663A.";

  (C) in paragraph (4), by striking subparagraphs (C) and (D); and

  (D) by striking paragraphs (5) through (10);

 (3) by striking subsections (c) through (g); and

 (4) by adding at the end the following new subsection (c):

 "(c) VICTIM DEFINED.—For purposes of this section, the term 'victim' means the individual harmed as a result of a commission of a crime under this chapter, including, in the case of a victim who is under 18 years of age, incompetent, incapacitated, or deceased, the legal guardian of the victim or representative of the victim's estate, another family member, or any other person appointed as suitable by the court, but in no event shall the defendant be named as such representative or guardian.".

<< 18 USCA § 2327 >>

 (e) TELEMARKETING FRAUD.—Section 2327 of title 18, United States Code, is amended—

 (1) in subsection (a), by inserting "or 3663A" after "3663";

 (2) in subsection (b)—

  (A) by amending paragraph (1) to read as follows:

"(1) DIRECTIONS.—The order of restitution under this section shall direct the defendant to pay to the victim (through the appropriate court mechanism) the full amount of the victim's losses as determined by the court pursuant to paragraph (2).";

  (B) by amending paragraph (2) to read as follows:

"(2) ENFORCEMENT.—An order of restitution under this section shall be issued and enforced in accordance with section 3664 in the same manner as an order under section 3663A.";

  (C) in paragraph (4), by striking subparagraphs (C) and (D); and

  (D) by striking paragraphs (5) through (10);

 (3) by striking subsections (c) through (e); and

 (4) by redesignating subsection (f) as subsection (c).

SEC. 206. PROCEDURE FOR ISSUANCE OF RESTITUTION ORDER.

<< 18 USCA § 3664 >>

 (a) IN GENERAL.—Section 3664 of title 18, United States Code, is amended to read as follows:

AR.07811

Case 3:20-cv-07721-SI   Document 58-7   Filed 11/10/20   Page 404 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

"§ 3664. Procedure for issuance and enforcement of order of restitution

"(a) For orders of restitution under this title, the court shall order the probation officer to obtain and include in its presentence report, or in a separate report, as the court may direct, information sufficient for the court to exercise its discretion in fashioning a restitution order. The report shall include, to the extent practicable, a complete accounting of the losses to each victim, any restitution owed pursuant to a plea agreement, and information relating to the economic circumstances of each defendant. If the number or identity of victims cannot be reasonably ascertained, or other circumstances exist that make this requirement clearly impracticable, the probation officer shall so inform the court.

"(b) The court shall disclose to both the defendant and the attorney for the Government all portions of the presentence or other report pertaining to the matters described in subsection (a) of this section.

"(c) The provisions of this chapter, chapter 227, and Rule 32(c) of the Federal Rules of Criminal Procedure shall be the only rules applicable to proceedings under this section.

"(d)(1) Upon the request of the probation officer, but not later than 60 days prior to the date initially set for sentencing, the attorney for the Government, after consulting, to the extent practicable, with all identified victims, shall promptly provide the probation officer with a listing of the amounts subject to restitution.

"(2) The probation officer shall, prior to submitting the presentence report under subsection (a), to the extent practicable—

"(A) provide notice to all identified victims of—

"(i) the offense or offenses of which the defendant was convicted;

"(ii) the amounts subject to restitution submitted to the probation officer;

"(iii) the opportunity of the victim to submit information to the probation officer concerning the amount of the victim's losses;

"(iv) the scheduled date, time, and place of the sentencing hearing;

"(v) the availability of a lien in favor of the victim pursuant to subsection (m)(1)(B); and

"(vi) the opportunity of the victim to file with the probation officer a separate affidavit relating to the amount of the victim's losses subject to restitution; and

"(B) provide the victim with an affidavit form to submit pursuant to subparagraph (A)(vi).

"(3) Each defendant shall prepare and file with the probation officer an affidavit fully describing the financial resources of the defendant, including a complete listing of all assets owned or controlled by the defendant as of the date on which the defendant was arrested, the financial needs and earning ability of the defendant and the defendant's dependents, and such other information that the court requires relating to such other factors as the court deems appropriate.

"(4) After reviewing the report of the probation officer, the court may require additional documentation or hear testimony. The privacy of any records filed, or testimony heard, pursuant to this section shall be maintained to the greatest extent possible, and such records may be filed or testimony heard in camera.

"(5) If the victim's losses are not ascertainable by the date that is 10 days prior to sentencing, the attorney for the Government or the probation officer shall so inform the court, and the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing. If the victim subsequently discovers further losses, the victim shall have 60 days after discovery of those losses in which to petition the court for an amended restitution order. Such order may be granted only upon a showing of good cause for the failure to include such losses in the initial claim for restitutionary relief.

"(6) The court may refer any issue arising in connection with a proposed order of restitution to a magistrate judge or special master for proposed findings of fact and recommendations as to disposition, subject to a de novo determination of the issue by the court.

"(e) Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence. The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government. The burden of demonstrating the financial resources of the defendant and the financial needs of the defendant's dependents, shall be on the defendant. The burden of demonstrating such other matters as the court deems appropriate shall be upon the party designated by the court as justice requires.

"(f)(1)(A) In each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant.

"(B) In no case shall the fact that a victim has received or is entitled to receive compensation with respect to a loss from insurance or any other source be considered in determining the amount of restitution.

Case 3:20-cv-07721-SI   Document 58-7   Filed 11/10/20   Page 405 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

"(2) Upon determination of the amount of restitution owed to each victim, the court shall, pursuant to section 3572, specify in the restitution order the manner in which, and the schedule according to which, the restitution is to be paid, in consideration of—

"(A) the financial resources and other assets of the defendant, including whether any of these assets are jointly controlled;

"(B) projected earnings and other income of the defendant; and

"(C) any financial obligations of the defendant; including obligations to dependents.

"(3)(A) A restitution order may direct the defendant to make a single, lump-sum payment, partial payments at specified intervals, in-kind payments, or a combination of payments at specified intervals and in-kind payments.

"(B) A restitution order may direct the defendant to make nominal periodic payments if the court finds from facts on the record that the economic circumstances of the defendant do not allow the payment of any amount of a restitution order, and do not allow for the payment of the full amount of a restitution order in the foreseeable future under any reasonable schedule of payments.

"(4) An in-kind payment described in paragraph (3) may be in the form of—

"(A) return of property;

"(B) replacement of property; or

"(C) if the victim agrees, services rendered to the victim or a person or organization other than the victim.

"(g)(1) No victim shall be required to participate in any phase of a restitution order.

"(2) A victim may at any time assign the victim's interest in restitution payments to the Crime Victims Fund in the Treasury without in any way impairing the obligation of the defendant to make such payments.

"(h) If the court finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.

"(i) If the court finds that more than 1 victim has sustained a loss requiring restitution by a defendant, the court may provide for a different payment schedule for each victim based on the type and amount of each victim's loss and accounting for the economic circumstances of each victim. In any case in which the United States is a victim, the court shall ensure that all other victims receive full restitution before the United States receives any restitution.

"(j)(1) If a victim has received compensation from insurance or any other source with respect to a loss, the court shall order that restitution be paid to the person who provided or is obligated to provide the compensation, but the restitution order shall provide that all restitution of victims required by the order be paid to the victims before any restitution is paid to such a provider of compensation.

"(2) Any amount paid to a victim under an order of restitution shall be reduced by any amount later recovered as compensatory damages for the same loss by the victim in—

"(A) any Federal civil proceeding; and

"(B) any State civil proceeding, to the extent provided by the law of the State.

"(k) A restitution order shall provide that the defendant shall notify the court and the Attorney General of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay restitution. The court may also accept notification of a material change in the defendant's economic circumstances from the United States or from the victim. The Attorney General shall certify to the court that the victim or victims owed restitution by the defendant have been notified of the change in circumstances. Upon receipt of the notification, the court may, on its own motion, or the motion of any party, including the victim, adjust the payment schedule, or require immediate payment in full, as the interests of justice require.

"(l) A conviction of a defendant for an offense involving the act giving rise to an order of restitution shall estop the defendant from denying the essential allegations of that offense in any subsequent Federal civil proceeding or State civil proceeding, to the extent consistent with State law, brought by the victim.

"(m)(1)(A)(i) An order of restitution may be enforced by the United States in the manner provided for in subchapter C of chapter 227 and subchapter B of chapter 229 of this title; or

"(ii) by all other available and reasonable means.

"(B) At the request of a victim named in a restitution order, the clerk of the court shall issue an abstract of judgment certifying that a judgment has been entered in favor of such victim in the amount specified in the restitution order. Upon registering, recording, docketing, or indexing such abstract in accordance with the rules and requirements relating to judgments of the court of the State where the district court is located, the abstract of judgment shall be a lien on the property of the defendant located

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 406 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

in such State in the same manner and to the same extent and under the same conditions as a judgment of a court of general jurisdiction in that State.

"(2) An order of in-kind restitution in the form of services shall be enforced by the probation officer.

"(n) If a person obligated to provide restitution, or pay a fine, receives substantial resources from any source, including inheritance, settlement, or other judgment, during a period of incarceration, such person shall be required to apply the value of such resources to any restitution or fine still owed.

"(o) A sentence that imposes an order of restitution is a final judgment notwithstanding the fact that—

"(1) such a sentence can subsequently be—

"(A) corrected under Rule 35 of the Federal Rules of Criminal Procedure and section 3742 of chapter 235 of this title;

"(B) appealed and modified under section 3742;

"(C) amended under section 3664(d)(3); or

"(D) adjusted under section 3664(k), 3572, or 3613A; or

"(2) the defendant may be resentenced under section 3565 or 3614.

"(p) Nothing in this section or sections 2248, 2259, 2264, 2327, 3663, and 3663A and arising out of the application of such sections, shall be construed to create a cause of action not otherwise authorized in favor of any person against the United States or any officer or employee of the United States.".

<< 18 USCA Ch. 232 >>

(b) TECHNICAL AMENDMENT.—The item relating to section 3664 in the analysis for chapter 232 of title 18, United States Code, is amended to read as follows:

"3664. Procedure for issuance and enforcement of order of restitution.".

SEC. 207. PROCEDURE FOR ENFORCEMENT OF FINE OR RESTITUTION ORDER.

<< 18 USCA FRCRP Rule 32 >>

(a) AMENDMENT OF FEDERAL RULES OF CRIMINAL PROCEDURE.—Rule 32(b) of the Federal Rules of Criminal Procedure is amended—

(1) in paragraph (1), by adding at the end the following: "Notwithstanding the preceding sentence, a presentence investigation and report, or other report containing information sufficient for the court to enter an order of restitution, as the court may direct, shall be required in any case in which restitution is required to be ordered."; and

(2) in paragraph (4)—

(A) by redesignating subparagraphs (F) and (G) as subparagraphs (G) and (H), respectively; and

(B) by inserting after subparagraph (E), the following new subparagraph:

"(F) in appropriate cases, information sufficient for the court to enter an order of restitution;".

<< 18 USCA § 3572 >>

(b) FINES.—Section 3572 of title 18, United States Code, is amended—

(1) in subsection (b) by inserting "other than the United States," after "offense,";

(2) in subsection (d)—

(A) in the first sentence, by striking "A person sentenced to pay a fine or other monetary penalty" and inserting "(1) A person sentenced to pay a fine or other monetary penalty, including restitution,";

(B) by striking the third sentence; and

(C) by adding at the end the following:

"(2) If the judgment, or, in the case of a restitution order, the order, permits other than immediate payment, the length of time over which scheduled payments will be made shall be set by the court, but shall be the shortest time in which full payment can reasonably be made.

"(3) A judgment for a fine which permits payments in installments shall include a requirement that the defendant will notify the court of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay the fine. Upon receipt of such notice the court may, on its own motion or the motion of any party, adjust the payment schedule, or require immediate payment in full, as the interests of justice require.";

(3) in subsection (f), by inserting "restitution" after "special assessment,";

(4) in subsection (h), by inserting "or payment of restitution" after "A fine"; and

(5) in subsection (i)—

(A) in the first sentence, by inserting "or payment of restitution" after "A fine"; and

(B) by amending the second sentence to read as follows: "Notwithstanding any installment schedule, when a fine or payment of restitution is in default, the entire amount of the fine or restitution is due within 30 days after notification of the default, subject to the provisions of section 3613A.".

(c) POSTSENTENCE ADMINISTRATION.—

<< 18 USCA § 3611 >>

(1) PAYMENT OF A FINE OR RESTITUTION.—Section 3611 of title 18, United States Code, is amended—

(A) by amending the heading to read as follows:

"§ 3611. Payment of a fine or restitution";

and

(B) by striking "or assessment shall pay the fine or assessment" and inserting ", assessment, or restitution, shall pay the fine, assessment, or restitution".

<< 18 USCA § 3612 >>

(2) COLLECTION.—Section 3612 of title 18, United States Code, is amended—

(A) by amending the heading to read as follows:

"§ 3612. Collection of unpaid fine or restitution";

(B) in subsection (b)(1)—

(i) in the matter preceding subparagraph (A), by inserting "or restitution order" after "fine";

(ii) in subparagraph (C), by inserting "or restitution order" after "fine";

(iii) in subparagraph (E), by striking "and";

(iv) in subparagraph (F)—

(I) by inserting "or restitution order" after "fine"; and

(II) by striking the period at the end and inserting "; and"; and

(v) by adding at the end the following new subparagraph:

"(G) in the case of a restitution order, information sufficient to identify each victim to whom restitution is owed. It shall be the responsibility of each victim to notify the Attorney General, or the appropriate entity of the court, by means of a form to be provided by the Attorney General or the court, of any change in the victim's mailing address while restitution is still owed the victim. The confidentiality of any information relating to a victim shall be maintained.";

(C) in subsection (c)—

(i) in the first sentence, by inserting "or restitution" after "fine"; and

(ii) by adding at the end the following: "Any money received from a defendant shall be disbursed so that each of the following obligations is paid in full in the following sequence:

"(1) A penalty assessment under section 3013 of title 18, United States Code.

"(2) Restitution of all victims.

"(3) All other fines, penalties, costs, and other payments required under the sentence.";

(D) in subsection (d)—

Case 3:20-cv-07721-SI Document 58-7 Filed 11/10/20 Page 408 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

(i) by inserting "or restitution" after "fine"; and

(ii) by striking "is delinquent, to inform him that the fine is delinquent" and inserting "or restitution is delinquent, to inform the person of the delinquency";

(E) in subsection (e)—

(i) by inserting "or restitution" after "fine"; and

(ii) by striking "him that the fine is in default" and inserting "the person that the fine or restitution is in default";

(F) in subsection (f)—

(i) in the heading, by inserting "and restitution" after "on fines"; and

(ii) in paragraph (1), by inserting "or restitution" after "any fine";

(G) in subsection (g), by inserting "or restitution" after "fine" each place it appears; and

(H) in subsection (i), by inserting "and restitution" after "fines".

<< 18 USCA § 3613 >>

(3) CIVIL REMEDIES.—Section 3613 of title 18, United States Code, is amended to read as follows:

"§ 3613. Civil remedies for satisfaction of an unpaid fine

"(a) ENFORCEMENT.—The United States may enforce a judgment imposing a fine in accordance with the practices and procedures for the enforcement of a civil judgment under Federal law or State law. Notwithstanding any other Federal law (including section 207 of the Social Security Act), a judgment imposing a fine may be enforced against all property or rights to property of the person fined, except that—

"(1) property exempt from levy for taxes pursuant to section 6334(a)(1), (2), (3), (4), (5), (6), (7), (8), (10), and (12) of the Internal Revenue Code of 1986 shall be exempt from enforcement of the judgment under Federal law;

"(2) section 3014 of chapter 176 of title 28 shall not apply to enforcement under Federal law; and

"(3) the provisions of section 303 of the Consumer Credit Protection Act (15 U.S.C. 1673) shall apply to enforcement of the judgment under Federal law or State law.

"(b) TERMINATION OF LIABILITY.—The liability to pay a fine shall terminate the later of 20 years from the entry of judgment or 20 years after the release from imprisonment of the person fined, or upon the death of the individual fined.

"(c) LIEN.—A fine imposed pursuant to the provisions of subchapter C of chapter 227 of this title, or an order of restitution made pursuant to sections 2248, 2259, 2264, 2327, 3663, 3663A, or 3664 of this title, is a lien in favor of the United States on all property and rights to property of the person fined as if the liability of the person fined were a liability for a tax assessed under the Internal Revenue Code of 1986. The lien arises on the entry of judgment and continues for 20 years or until the liability is satisfied, remitted, set aside, or is terminated under subsection (b).

"(d) EFFECT OF FILING NOTICE OF LIEN.—Upon filing of a notice of lien in the manner in which a notice of tax lien would be filed under section 6323(f)(1) and (2) of the Internal Revenue Code of 1986, the lien shall be valid against any purchaser, holder of a security interest, mechanic's lienor or judgment lien creditor, except with respect to properties or transactions specified in subsection (b), (c), or (d) of section 6323 of the Internal Revenue Code of 1986 for which a notice of tax lien properly filed on the same date would not be valid. The notice of lien shall be considered a notice of lien for taxes payable to the United States for the purpose of any State or local law providing for the filing of a notice of a tax lien. A notice of lien that is registered, recorded, docketed, or indexed in accordance with the rules and requirements relating to judgments of the courts of the State where the notice of lien is registered, recorded, docketed, or indexed shall be considered for all purposes as the filing prescribed by this section. The provisions of section 3201(e) of chapter 176 of title 28 shall apply to liens filed as prescribed by this section.

"(e) DISCHARGE OF DEBT INAPPLICABLE.—No discharge of debts in a proceeding pursuant to any chapter of title 11, United States Code, shall discharge liability to pay a fine pursuant to this section, and a lien filed as prescribed by this section shall not be voided in a bankruptcy proceeding.

"(f) APPLICABILITY TO ORDER OF RESTITUTION.—In accordance with section 3664(m)(1)(A) of this title, all provisions of this section are available to the United States for the enforcement of an order of restitution.".

Case 3:20-cv-07721-SI   Document 58-7   Filed 11/10/20   Page 409 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

<< 18 USCA § 3613A >>

(4) DEFAULT.—Chapter 229 of title 18, United States Code, is amended by inserting after section 3613 the following new section:

"§ 3613A. Effect of default

"(a)(1) Upon a finding that the defendant is in default on a payment of a fine or restitution, the court may, pursuant to section 3565, revoke probation or a term of supervised release, modify the terms or conditions of probation or a term of supervised release, resentence a defendant pursuant to section 3614, hold the defendant in contempt of court, enter a restraining order or injunction, order the sale of property of the defendant, accept a performance bond, enter or adjust a payment schedule, or take any other action necessary to obtain compliance with the order of a fine or restitution.

"(2) In determining what action to take, the court shall consider the defendant's employment status, earning ability, financial resources, the willfulness in failing to comply with the fine or restitution order, and any other circumstances that may have a bearing on the defendant's ability or failure to comply with the order of a fine or restitution.

"(b)(1) Any hearing held pursuant to this section may be conducted by a magistrate judge, subject to de novo review by the court.

"(2) To the extent practicable, in a hearing held pursuant to this section involving a defendant who is confined in any jail, prison, or other correctional facility, proceedings in which the prisoner's participation is required or permitted shall be conducted by telephone, video conference, or other communications technology without removing the prisoner from the facility in which the prisoner is confined.".

<< 18 USCA § 3614 >>

(5) RESENTENCING.—Section 3614 of title 18, United States Code, is amended—
  (A) in the heading, by inserting "or restitution" after "fine";
  (B) in subsection (a), by inserting "or restitution" after "fine"; and
  (C) by adding at the end the following new subsection:
"(c) EFFECT OF INDIGENCY.—In no event shall a defendant be incarcerated under this section solely on the basis of inability to make payments because the defendant is indigent.".

<< 18 USCA Ch. 229 >>

(d) CLERICAL AMENDMENT.—The table of sections at the beginning of subchapter B of chapter 229 of title 18, United States Code, is amended to read as follows:

"Sec.

"3611. Payment of a fine or restitution.

"3612. Collection of an unpaid fine or restitution.

"3613. Civil remedies for satisfaction of an unpaid fine.

"3613A. Effect of default.

"3614. Resentencing upon failure to pay a fine or restitution.

"3615. Criminal default.".

<< 28 USCA § 994 NOTE >>

## SEC. 208. INSTRUCTION TO SENTENCING COMMISSION.

Pursuant to section 994 of title 28, United States Code, the United States Sentencing Commission shall promulgate guidelines or amend existing guidelines to reflect this subtitle and the amendments made by this subtitle.

<< 18 USCA § 3551 NOTE >>

## SEC. 209. JUSTICE DEPARTMENT REGULATIONS.

Not later than 90 days after the date of enactment of this subtitle, the Attorney General shall promulgate guidelines, or amend existing guidelines, to carry out this subtitle and the amendments made by this subtitle and to ensure that—

(1) in all plea agreements negotiated by the United States, consideration is given to requesting that the defendant provide full restitution to all victims of all charges contained in the indictment or information, without regard to the counts to which the defendant actually pleaded; and

(2) orders of restitution made pursuant to the amendments made by this subtitle are enforced to the fullest extent of the law.

<< 18 USCA § 3013 >>

## SEC. 210. SPECIAL ASSESSMENTS ON CONVICTED PERSONS.

Section 3013(a)(2) of title 18, United States Code, is amended—

(1) in subparagraph (A), by striking "$50" and inserting "not less than $100"; and

(2) in subparagraph (B), by striking "$200" and inserting "not less than $400".

<< 18 USCA § 2248 NOTE >>

## SEC. 211. EFFECTIVE DATE.

The amendments made by this subtitle shall, to the extent constitutionally permissible, be effective for sentencing proceedings in cases in which the defendant is convicted on or after the date of enactment of this Act.

### Subtitle B—Jurisdiction for Lawsuits Against Terrorist States

## SEC. 221. JURISDICTION FOR LAWSUITS AGAINST TERRORIST STATES.

<< 28 USCA § 1605 >>

(a) EXCEPTION TO FOREIGN SOVEREIGN IMMUNITY FOR CERTAIN CASES.—Section 1605 of title 28, United States Code, is amended—

(1) in subsection (a)—

(A) by striking "or" at the end of paragraph (5);

(B) by striking the period at the end of paragraph (6) and inserting "; or"; and

(C) by adding at the end the following new paragraph:

"(7) not otherwise covered by paragraph (2), in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources (as defined in section 2339A of title 18) for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency, except that the court shall decline to hear a claim under this paragraph—

"(A) if the foreign state was not designated as a state sponsor of terrorism under section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)) or section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371) at the time the act occurred, unless later so designated as a result of such act; and

"(B) even if the foreign state is or was so designated, if—

Case 3:20-cv-07721-SI Document 58-7 Filed 11/10/20 Page 411 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

"(i) the act occurred in the foreign state against which the claim has been brought and the claimant has not afforded the foreign state a reasonable opportunity to arbitrate the claim in accordance with accepted international rules of arbitration; or

"(ii) the claimant or victim was not a national of the United States (as that term is defined in section 101(a)(22) of the Immigration and Nationality Act) when the act upon which the claim is based occurred."; and

(2) by adding at the end the following:

"(e) For purposes of paragraph (7) of subsection (a)—

"(1) the terms 'torture' and 'extrajudicial killing' have the meaning given those terms in section 3 of the Torture Victim Protection Act of 1991;

"(2) the term 'hostage taking' has the meaning given that term in Article 1 of the International Convention Against the Taking of Hostages; and

"(3) the term 'aircraft sabotage' has the meaning given that term in Article 1 of the Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation.

"(f) No action shall be maintained under subsection (a)(7) unless the action is commenced not later than 10 years after the date on which the cause of action arose. All principles of equitable tolling, including the period during which the foreign state was immune from suit, shall apply in calculating this limitation period.

"(g) LIMITATION ON DISCOVERY.—

"(1) IN GENERAL.—(A) Subject to paragraph (2), if an action is filed that would otherwise be barred by section 1604, but for subsection (a)(7), the court, upon request of the Attorney General, shall stay any request, demand, or order for discovery on the United States that the Attorney General certifies would significantly interfere with a criminal investigation or prosecution, or a national security operation, related to the incident that gave rise to the cause of action, until such time as the Attorney General advises the court that such request, demand, or order will no longer so interfere.

"(B) A stay under this paragraph shall be in effect during the 12–month period beginning on the date on which the court issues the order to stay discovery. The court shall renew the order to stay discovery for additional 12–month periods upon motion by the United States if the Attorney General certifies that discovery would significantly interfere with a criminal investigation or prosecution, or a national security operation, related to the incident that gave rise to the cause of action.

"(2) SUNSET.—(A) Subject to subparagraph (B), no stay shall be granted or continued in effect under paragraph (1) after the date that is 10 years after the date on which the incident that gave rise to the cause of action occurred.

"(B) After the period referred to in subparagraph (A), the court, upon request of the Attorney General, may stay any request, demand, or order for discovery on the United States that the court finds a substantial likelihood would—

"(i) create a serious threat of death or serious bodily injury to any person;

"(ii) adversely affect the ability of the United States to work in cooperation with foreign and international law enforcement agencies in investigating violations of United States law; or

"(iii) obstruct the criminal case related to the incident that gave rise to the cause of action or undermine the potential for a conviction in such case.

"(3) EVALUATION OF EVIDENCE.—The court's evaluation of any request for a stay under this subsection filed by the Attorney General shall be conducted ex parte and in camera.

"(4) BAR ON MOTIONS TO DISMISS.—A stay of discovery under this subsection shall constitute a bar to the granting of a motion to dismiss under rules 12(b)(6) and 56 of the Federal Rules of Civil Procedure.

"(5) CONSTRUCTION.—Nothing in this subsection shall prevent the United States from seeking protective orders or asserting privileges ordinarily available to the United States.".

<< 28 USCA § 1610 >>

(b) EXCEPTION TO IMMUNITY FROM ATTACHMENT.—

(1) FOREIGN STATE.—Section 1610(a) of title 28, United States Code, is amended—

(A) by striking the period at the end of paragraph (6) and inserting ", or"; and

(B) by adding at the end the following new paragraph:

"(7) the judgment relates to a claim for which the foreign state is not immune under section 1605(a)(7), regardless of whether the property is or was involved with the act upon which the claim is based.".

(2) AGENCY OR INSTRUMENTALITY.—Section 1610(b)(2) of title 28, United States Code, is amended—

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 412 of 1305

(A) by striking "or (5)" and inserting "(5), or (7)"; and

(B) by striking "used for the activity" and inserting "involved in the act".

<< 28 USCA § 1605 NOTE >>

(c) APPLICABILITY.—The amendments made by this subtitle shall apply to any cause of action arising before, on, or after the date of the enactment of this Act.

Subtitle C—Assistance to Victims of Terrorism

<< 42 USCA § 10601 NOTE >>

SEC. 231. SHORT TITLE.

This subtitle may be cited as the "Justice for Victims of Terrorism Act of 1996".

SEC. 232. VICTIMS OF TERRORISM ACT.

<< 42 USCA § 10603b >>

(a) AUTHORITY TO PROVIDE ASSISTANCE AND COMPENSATION TO VICTIMS OF TERRORISM.—The Victims of Crime Act of 1984 (42 U.S.C. 10601 et seq.) is amended by inserting after section 1404A the following new section:

"SEC. 1404B. COMPENSATION AND ASSISTANCE TO VICTIMS OF TERRORISM OR MASS VIOLENCE.

"(a) VICTIMS OF ACTS OF TERRORISM OUTSIDE THE UNITED STATES.—The Director may make supplemental grants as provided in section 1404(a) to States to provide compensation and assistance to the residents of such States who, while outside of the territorial boundaries of the United States, are victims of a terrorist act or mass violence and are not persons eligible for compensation under title VIII of the Omnibus Diplomatic Security and Antiterrorism Act of 1986.

"(b) VICTIMS OF TERRORISM WITHIN THE UNITED STATES.—The Director may make supplemental grants as provided in section 1404(d)(4)(B) to States for eligible crime victim compensation and assistance programs to provide emergency relief, including crisis response efforts, assistance, training, and technical assistance, for the benefit of victims of terrorist acts or mass violence occurring within the United States and may provide funding to United States Attorney's Offices for use in coordination with State victim compensation and assistance efforts in providing emergency relief.".

<< 42 USCA § 10601 >>

(b) FUNDING OF COMPENSATION AND ASSISTANCE TO VICTIMS OF TERRORISM, MASS VIOLENCE, AND CRIME.—Section 1402(d)(4) of the Victims of Crime Act of 1984 (42 U.S.C. 10601(d)(4)) is amended to read as follows:

"(4)(A) If the sums available in the Fund are sufficient to fully provide grants to the States pursuant to section 1403(a)(1), the Director may retain any portion of the Fund that was deposited during a fiscal year that was in excess of 110 percent of the total amount deposited in the Fund during the preceding fiscal year as an emergency reserve. Such reserve shall not exceed $50,000,000.

"(B) The emergency reserve referred to in subparagraph (A) may be used for supplemental grants under section 1404B and to supplement the funds available to provide grants to States for compensation and assistance in accordance with sections 1403 and 1404 in years in which supplemental grants are needed.".

(c) CRIME VICTIMS FUND AMENDMENTS.—

(1) UNOBLIGATED FUNDS.—Section 1402 of the Victims of Crime Act of 1984 (42 U.S.C. 10601) is amended—

(A) in subsection (c), by striking "subsection" and inserting "chapter"; and

(B) by amending subsection (e) to read as follows:

"(e) AMOUNTS AWARDED AND UNSPENT.—Any amount awarded as part of a grant under this chapter that remains unspent at the end of a fiscal year in which the grant is made may be expended for the purpose for which the grant is made at any

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 413 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

time during the 2 succeeding fiscal years, at the end of which period, any remaining unobligated sums in excess of $500,000 shall be returned to the Treasury. Any remaining unobligated sums in an amount less than $500,000 shall be returned to the Fund.".

<< 42 USCA § 10603 >>

(2) BASE AMOUNT.—Section 1404(a)(5) of the Victims of Crime Act of 1984 (42 U.S.C. 10603(a)(5)) is amended to read as follows:

"(5) As used in this subsection, the term 'base amount' means—

"(A) except as provided in subparagraph (B), $500,000; and

"(B) for the territories of the Northern Mariana Islands, Guam, American Samoa, and the Republic of Palau, $200,000, with the Republic of Palau's share governed by the Compact of Free Association between the United States and the Republic of Palau.".

SEC. 233. COMPENSATION OF VICTIMS OF TERRORISM.

<< 42 USCA § 10602 >>

(a) REQUIRING COMPENSATION FOR TERRORIST CRIMES.—Section 1403(d)(3) of the Victims of Crime Act of 1984 (42 U.S.C. 10602(d)(3)) is amended—

(1) by inserting "crimes involving terrorism," before "driving while intoxicated"; and

(2) by inserting a comma after "driving while intoxicated".

<< 42 USCA § 10602 >>

(b) FOREIGN TERRORISM.—Section 1403(b)(6)(B) of the Victims of Crime Act of 1984 (42 U.S.C. 10602(b)(6)(B)) is amended by inserting "are outside of the United States (if the compensable crime is terrorism, as defined in section 2331 of title 18, United States Code), or" before "are States not having".

(c) DESIGNATION OF CARTNEY McRAVEN CHILD DEVELOPMENT CENTER.—

(1) DESIGNATION.—

(A) IN GENERAL.—The Federal building at 1314 LeMay Boulevard, Ellsworth Air Force Base, South Dakota, shall be known as the "Cartney McRaven Child Development Center".

(B) REPLACEMENT BUILDING.—If, after the date of enactment of this Act, a new Federal building is built at the location described in subparagraph (A) to replace the building described in the paragraph, the new Federal building shall be known as the "Cartney McRaven Child Development Center".

(2) REFERENCES.—Any reference in a law, map, regulation, document, paper, or other record of the United States to a Federal building referred to in paragraph (1) shall be deemed to be a reference to the "Cartney McRaven Child Development Center".

<< 42 USCA § 10602 NOTE >>

(d) EFFECTIVE DATE.—This section and the amendments made by this section shall take effect 1 year after the date of enactment of this Act.

SEC. 234. CRIME VICTIMS FUND.

(a) PROHIBITION OF PAYMENTS TO DELINQUENT CRIMINAL DEBTORS BY STATE CRIME VICTIM COMPENSATION PROGRAMS.—

<< 42 USCA § 10602 >>

(1) IN GENERAL.—Section 1403(b) of the Victims of Crime Act of 1984 (42 U.S.C. 10602(b)) is amended—

(A) by striking "and" at the end of paragraph (7);

(B) by redesignating paragraph (8) as paragraph (9); and

Case 3:20-cv-07721-SI   Document 58-7   Filed 11/10/20   Page 414 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

(C) by inserting after paragraph (7) the following new paragraph:

"(8) such program does not provide compensation to any person who has been convicted of an offense under Federal law with respect to any time period during which the person is delinquent in paying a fine, other monetary penalty, or restitution imposed for the offense; and".

<< 42 USCA § 10602 NOTE >>

(2) APPLICATION OF AMENDMENT.—Section 1403(b)(8) of the Victims of Crime Act of 1984, as added by paragraph (1) of this section, shall not be applied to deny victims compensation to any person until the date on which the Attorney General, in consultation with the Director of the Administrative Office of the United States Courts, issues a written determination that a cost-effective, readily available criminal debt payment tracking system operated by the agency responsible for the collection of criminal debt has established cost-effective, readily available communications links with entities that administer Federal victim compensation programs that are sufficient to ensure that victim compensation is not denied to any person except as authorized by law.

<< 42 USCA § 10602 >>

(b) EXCLUSION FROM INCOME FOR PURPOSES OF MEANS TESTS.—Section 1403 of the Victims of Crime Act of 1984 (42 U.S.C. 10602) is amended by inserting after subsection (b) the following new subsection:

"(c) EXCLUSION FROM INCOME FOR PURPOSES OF MEANS TESTS.—Notwithstanding any other law, for the purpose of any maximum allowed income eligibility requirement in any Federal, State, or local government program using Federal funds that provides medical or other assistance (or payment or reimbursement of the cost of such assistance) that becomes necessary to an applicant for such assistance in full or in part because of the commission of a crime against the applicant, as determined by the Director, any amount of crime victim compensation that the applicant receives through a crime victim compensation program under this section shall not be included in the income of the applicant until the total amount of assistance that the applicant receives from all such programs is sufficient to fully compensate the applicant for losses suffered as a result of the crime.".

<< 42 USCA § 10608 >>

SEC. 235. CLOSED CIRCUIT TELEVISED COURT PROCEEDINGS FOR VICTIMS OF CRIME.

(a) IN GENERAL.—Notwithstanding any provision of the Federal Rules of Criminal Procedure to the contrary, in order to permit victims of crime to watch criminal trial proceedings in cases where the venue of the trial is changed—

(1) out of the State in which the case was initially brought; and

(2) more than 350 miles from the location in which those proceedings originally would have taken place;

the trial court shall order closed circuit televising of the proceedings to that location, for viewing by such persons the court determines have a compelling interest in doing so and are otherwise unable to do so by reason of the inconvenience and expense caused by the change of venue.

(b) LIMITED ACCESS.—

(1) GENERALLY.—No other person, other than official court and security personnel, or other persons specifically designated by the court, shall be permitted to view the closed circuit televising of the proceedings.

(2) EXCEPTION.—The court shall not designate a person under paragraph (1) if the presiding judge at the trial determines that testimony by that person would be materially affected if that person heard other testimony at the trial.

(c) RESTRICTIONS.—

(1) The signal transmitted pursuant to subsection (a) shall be under the control of the court at all times and shall only be transmitted subject to the terms and conditions imposed by the court.

(2) No public broadcast or dissemination shall be made of the signal transmitted pursuant to subsection (a). In the event any tapes are produced in carrying out subsection (a), such tapes shall be the property of the court and kept under seal.

(3) Any violations of this subsection, or any rule or order made pursuant to this section, shall be punishable as contempt of court as described in section 402 of title 18, United States Code.

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 415 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

(d) DONATIONS.—The Administrative Office of the United States Courts may accept donations to enable the courts to carry out subsection (a).

(e) CONSTRUCTION.—

  (1) Nothing in this section shall be construed—

    (i) to create in favor of any person a cause of action against the United States or any officer or employees thereof, or

    (ii) to provide any person with a defense in any action in which application of this section is made.

 (f) DEFINITION.—As used in this section, the term "State" means any State, the District of Columbia, or any possession or territory of the United States.

 (g) RULES.—The Judicial Conference of the United States, pursuant to its rule making authority under section 331 of title 28, United States Code, may promulgate and issue rules, or amend existing rules, to effectuate the policy addressed by this section. Upon the implementation of such rules, this section shall cease to be effective.

 (h) EFFECTIVE DATE.—This section shall only apply to cases filed after January 1, 1995.

<< 42 USCA § 10601 >>

SEC. 236. TECHNICAL CORRECTION.

 Section 1402(d)(3)(B) of the Victims of Crime Act of 1984 (42 U.S.C. 10601(d)(3)(B)) is amended by striking "1404A" and inserting "1404(a)".

TITLE III—INTERNATIONAL TERRORISM PROHIBITIONS

Subtitle A—Prohibition on International Terrorist Fundraising

<< 18 USCA § 2339B NOTE >>

SEC. 301. FINDINGS AND PURPOSE.

 (a) FINDINGS.—The Congress finds that—

  (1) international terrorism is a serious and deadly problem that threatens the vital interests of the United States;

  (2) the Constitution confers upon Congress the power to punish crimes against the law of nations and to carry out the treaty obligations of the United States, and therefore Congress may by law impose penalties relating to the provision of material support to foreign organizations engaged in terrorist activity;

  (3) the power of the United States over immigration and naturalization permits the exclusion from the United States of persons belonging to international terrorist organizations;

  (4) international terrorism affects the interstate and foreign commerce of the United States by harming international trade and market stability, and limiting international travel by United States citizens as well as foreign visitors to the United States;

  (5) international cooperation is required for an effective response to terrorism, as demonstrated by the numerous multilateral conventions in force providing universal prosecutive jurisdiction over persons involved in a variety of terrorist acts, including hostage taking, murder of an internationally protected person, and aircraft piracy and sabotage;

  (6) some foreign terrorist organizations, acting through affiliated groups or individuals, raise significant funds within the United States, or use the United States as a conduit for the receipt of funds raised in other nations; and

  (7) foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct.

 (b) PURPOSE.—The purpose of this subtitle is to provide the Federal Government the fullest possible basis, consistent with the Constitution, to prevent persons within the United States, or subject to the jurisdiction of the United States, from providing material support or resources to foreign organizations that engage in terrorist activities.

SEC. 302. DESIGNATION OF FOREIGN TERRORIST ORGANIZATIONS.

<< 8 USCA § 1189 >>

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 416 of 1305

(a) IN GENERAL.—Chapter 2 of title II of the Immigration and Nationality Act (8 U.S.C. 1181 et seq.) is amended by adding at the end the following:

"SEC. 219. DESIGNATION OF FOREIGN TERRORIST ORGANIZATIONS.

"(a) DESIGNATION.—

"(1) IN GENERAL.—The Secretary is authorized to designate an organization as a foreign terrorist organization in accordance with this subsection if the Secretary finds that—

"(A) the organization is a foreign organization;

"(B) the organization engages in terrorist activity (as defined in section 212(a)(3)(B)); and

"(C) the terrorist activity of the organization threatens the security of United States nationals or the national security of the United States.

"(2) PROCEDURE.—

"(A) NOTICE.—Seven days before making a designation under this subsection, the Secretary shall, by classified communication—

"(i) notify the Speaker and Minority Leader of the House of Representatives, the President pro tempore, Majority Leader, and Minority Leader of the Senate, and the members of the relevant committees, in writing, of the intent to designate a foreign organization under this subsection, together with the findings made under paragraph (1) with respect to that organization, and the factual basis therefor; and

"(ii) seven days after such notification, publish the designation in the Federal Register.

"(B) EFFECT OF DESIGNATION.—

"(i) For purposes of section 2339B of title 18, United States Code, a designation under this subsection shall take effect upon publication under subparagraph (A).

"(ii) Any designation under this subsection shall cease to have effect upon an Act of Congress disapproving such designation.

"(C) FREEZING OF ASSETS.—Upon notification under paragraph (2), the Secretary of the Treasury may require United States financial institutions possessing or controlling any assets of any foreign organization included in the notification to block all financial transactions involving those assets until further directive from either the Secretary of the Treasury, Act of Congress, or order of court.

"(3) RECORD.—

"(A) IN GENERAL.—In making a designation under this subsection, the Secretary shall create an administrative record.

"(B) CLASSIFIED INFORMATION.—The Secretary may consider classified information in making a designation under this subsection. Classified information shall not be subject to disclosure for such time as it remains classified, except that such information may be disclosed to a court ex parte and in camera for purposes of judicial review under subsection (c).

"(4) PERIOD OF DESIGNATION.—

"(A) IN GENERAL.—Subject to paragraphs (5) and (6), a designation under this subsection shall be effective for all purposes for a period of 2 years beginning on the effective date of the designation under paragraph (2)(B).

"(B) REDESIGNATION.—The Secretary may redesignate a foreign organization as a foreign terrorist organization for an additional 2–year period at the end of the 2–year period referred to in subparagraph (A) (but not sooner than 60 days prior to the termination of such period) upon a finding that the relevant circumstances described in paragraph (1) still exist. The procedural requirements of paragraphs (2) and (3) shall apply to a redesignation under this subparagraph.

"(5) REVOCATION BY ACT OF CONGRESS.—The Congress, by an Act of Congress, may block or revoke a designation made under paragraph (1).

"(6) REVOCATION BASED ON CHANGE IN CIRCUMSTANCES.—

"(A) IN GENERAL.—The Secretary may revoke a designation made under paragraph (1) if the Secretary finds that—

"(i) the circumstances that were the basis for the designation have changed in such a manner as to warrant revocation of the designation; or

"(ii) the national security of the United States warrants a revocation of the designation.

"(B) PROCEDURE.—The procedural requirements of paragraphs (2) through (4) shall apply to a revocation under this paragraph.

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

Case 3:20-cv-07721-SI   Document 58-7   Filed 11/10/20   Page 417 of 1305

"(7) EFFECT OF REVOCATION.—The revocation of a designation under paragraph (5) or (6) shall not affect any action or proceeding based on conduct committed prior to the effective date of such revocation.

"(8) USE OF DESIGNATION IN TRIAL OR HEARING.—If a designation under this subsection has become effective under paragraph (1)(B), a defendant in a criminal action shall not be permitted to raise any question concerning the validity of the issuance of such designation as a defense or an objection at any trial or hearing.

"(b) JUDICIAL REVIEW OF DESIGNATION.—

"(1) IN GENERAL.—Not later than 30 days after publication of the designation in the Federal Register, an organization designated as a foreign terrorist organization may seek judicial review of the designation in the United States Court of Appeals for the District of Columbia Circuit.

"(2) BASIS OF REVIEW.—Review under this subsection shall be based solely upon the administrative record, except that the Government may submit, for ex parte and in camera review, classified information used in making the designation.

"(3) SCOPE OF REVIEW.—The Court shall hold unlawful and set aside a designation the court finds to be—

"(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

"(B) contrary to constitutional right, power, privilege, or immunity; or

"(C) in excess of statutory jurisdiction, authority, or limitation, or short of statutory right.

"(4) JUDICIAL REVIEW INVOKED.—The pendency of an action for judicial review of a designation shall not affect the application of this section, unless the court issues a final order setting aside the designation.

"(c) DEFINITIONS.—As used in this section—

"(1) the term 'classified information' has the meaning given that term in section 1(a) of the Classified Information Procedures Act (18 U.S.C. App.);

"(2) the term 'national security' means the national defense, foreign relations, or economic interests of the United States;

"(3) the term 'relevant committees' means the Committees on the Judiciary, Intelligence, and Foreign Relations of the Senate and the Committees on the Judiciary, Intelligence, and International Relations of the House of Representatives; and

"(4) the term 'Secretary' means the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General.".

(b) CLERICAL AMENDMENT.—The table of contents for the Immigration and Nationality Act, relating to terrorism, is amended by inserting after the item relating to section 218 the following new item:

"Sec. 219. Designation of foreign terrorist organizations.".

SEC. 303. PROHIBITION ON TERRORIST FUNDRAISING.

<< 18 USCA § 2339B >>

(a) IN GENERAL.—Chapter 113B of title 18, United States Code, is amended by adding at the end the following new section:

"§ 2339B. Providing material support or resources to designated foreign terrorist organizations

"(a) PROHIBITED ACTIVITIES.—

"(1) UNLAWFUL CONDUCT.—Whoever, within the United States or subject to the jurisdiction of the United States, knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 10 years, or both.

"(2) FINANCIAL INSTITUTIONS.—Except as authorized by the Secretary, any financial institution that becomes aware that it has possession of, or control over, any funds in which a foreign terrorist organization, or its agent, has an interest, shall—

"(A) retain possession of, or maintain control over, such funds; and

"(B) report to the Secretary the existence of such funds in accordance with regulations issued by the Secretary.

"(b) CIVIL PENALTY.—Any financial institution that knowingly fails to comply with subsection (a)(2) shall be subject to a civil penalty in an amount that is the greater of—

"(A) $50,000 per violation; or

"(B) twice the amount of which the financial institution was required under subsection (a)(2) to retain possession or control.

Case 3:20-cv-07721-SI   Document 58-7   Filed 11/10/20   Page 418 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

"(c) INJUNCTION.—Whenever it appears to the Secretary or the Attorney General that any person is engaged in, or is about to engage in, any act that constitutes, or would constitute, a violation of this section, the Attorney General may initiate civil action in a district court of the United States to enjoin such violation.

"(d) EXTRATERRITORIAL JURISDICTION.—There is extraterritorial Federal jurisdiction over an offense under this section.

"(e) INVESTIGATIONS.—

"(1) IN GENERAL.—The Attorney General shall conduct any investigation of a possible violation of this section, or of any license, order, or regulation issued pursuant to this section.

"(2) COORDINATION WITH THE DEPARTMENT OF THE TREASURY.—The Attorney General shall work in coordination with the Secretary in investigations relating to—

"(A) the compliance or noncompliance by a financial institution with the requirements of subsection (a)(2); and

"(B) civil penalty proceedings authorized under subsection (b).

"(3) REFERRAL.—Any evidence of a criminal violation of this section arising in the course of an investigation by the Secretary or any other Federal agency shall be referred immediately to the Attorney General for further investigation. The Attorney General shall timely notify the Secretary of any action taken on referrals from the Secretary, and may refer investigations to the Secretary for remedial licensing or civil penalty action.

"(f) CLASSIFIED INFORMATION IN CIVIL PROCEEDINGS BROUGHT BY THE UNITED STATES.—

"(1) DISCOVERY OF CLASSIFIED INFORMATION BY DEFENDANTS.—

"(A) REQUEST BY UNITED STATES.—In any civil proceeding under this section, upon request made ex parte and in writing by the United States, a court, upon a sufficient showing, may authorize the United States to—

"(i) redact specified items of classified information from documents to be introduced into evidence or made available to the defendant through discovery under the Federal Rules of Civil Procedure;

"(ii) substitute a summary of the information for such classified documents; or

"(iii) substitute a statement admitting relevant facts that the classified information would tend to prove.

"(B) ORDER GRANTING REQUEST.—If the court enters an order granting a request under this paragraph, the entire text of the documents to which the request relates shall be sealed and preserved in the records of the court to be made available to the appellate court in the event of an appeal.

"(C) DENIAL OF REQUEST.—If the court enters an order denying a request of the United States under this paragraph, the United States may take an immediate, interlocutory appeal in accordance with paragraph (5). For purposes of such an appeal, the entire text of the documents to which the request relates, together with any transcripts of arguments made ex parte to the court in connection therewith, shall be maintained under seal and delivered to the appellate court.

"(2) INTRODUCTION OF CLASSIFIED INFORMATION; PRECAUTIONS BY COURT.—

"(A) EXHIBITS.—To prevent unnecessary or inadvertent disclosure of classified information in a civil proceeding brought by the United States under this section, the United States may petition the court ex parte to admit, in lieu of classified writings, recordings, or photographs, one or more of the following:

"(i) Copies of items from which classified information has been redacted.

"(ii) Stipulations admitting relevant facts that specific classified information would tend to prove.

"(iii) A declassified summary of the specific classified information.

"(B) DETERMINATION BY COURT.—The court shall grant a request under this paragraph if the court finds that the redacted item, stipulation, or summary is sufficient to allow the defendant to prepare a defense.

"(3) TAKING OF TRIAL TESTIMONY.—

"(A) OBJECTION.—During the examination of a witness in any civil proceeding brought by the United States under this subsection, the United States may object to any question or line of inquiry that may require the witness to disclose classified information not previously found to be admissible.

"(B) ACTION BY COURT.—In determining whether a response is admissible, the court shall take precautions to guard against the compromise of any classified information, including—

"(i) permitting the United States to provide the court, ex parte, with a proffer of the witness's response to the question or line of inquiry; and

"(ii) requiring the defendant to provide the court with a proffer of the nature of the information that the defendant seeks to elicit.

"(C) OBLIGATION OF DEFENDANT.—In any civil proceeding under this section, it shall be the defendant's obligation to establish the relevance and materiality of any classified information sought to be introduced.

"(4) APPEAL.—If the court enters an order denying a request of the United States under this subsection, the United States may take an immediate interlocutory appeal in accordance with paragraph (5).

"(5) INTERLOCUTORY APPEAL.—

"(A) SUBJECT OF APPEAL.—An interlocutory appeal by the United States shall lie to a court of appeals from a decision or order of a district court—

"(i) authorizing the disclosure of classified information;

"(ii) imposing sanctions for nondisclosure of classified information; or

"(iii) refusing a protective order sought by the United States to prevent the disclosure of classified information.

"(B) EXPEDITED CONSIDERATION.—

"(i) IN GENERAL.—An appeal taken pursuant to this paragraph, either before or during trial, shall be expedited by the court of appeals.

"(ii) APPEALS PRIOR TO TRIAL.—If an appeal is of an order made prior to trial, an appeal shall be taken not later than 10 days after the decision or order appealed from, and the trial shall not commence until the appeal is resolved.

"(iii) APPEALS DURING TRIAL.—If an appeal is taken during trial, the trial court shall adjourn the trial until the appeal is resolved, and the court of appeals—

"(I) shall hear argument on such appeal not later than 4 days after the adjournment of the trial;

"(II) may dispense with written briefs other than the supporting materials previously submitted to the trial court;

"(III) shall render its decision not later than 4 days after argument on appeal; and

"(IV) may dispense with the issuance of a written opinion in rendering its decision.

"(C) EFFECT OF RULING.—An interlocutory appeal and decision shall not affect the right of the defendant, in a subsequent appeal from a final judgment, to claim as error reversal by the trial court on remand of a ruling appealed from during trial.

"(6) CONSTRUCTION.—Nothing in this subsection shall prevent the United States from seeking protective orders or asserting privileges ordinarily available to the United States to protect against the disclosure of classified information, including the invocation of the military and State secrets privilege.

"(g) DEFINITIONS.—As used in this section—

"(1) the term 'classified information' has the meaning given that term in section 1(a) of the Classified Information Procedures Act (18 U.S.C. App.);

"(2) the term 'financial institution' has the same meaning as in section 5312(a)(2) of title 31, United States Code;

"(3) the term 'funds' includes coin or currency of the United States or any other country, traveler's checks, personal checks, bank checks, money orders, stocks, bonds, debentures, drafts, letters of credit, any other negotiable instrument, and any electronic representation of any of the foregoing;

"(4) the term 'material support or resources' has the same meaning as in section 2339A;

"(5) the term 'Secretary' means the Secretary of the Treasury; and

"(6) the term 'terrorist organization' means an organization designated as a terrorist organization under section 219 of the Immigration and Nationality Act.".

<< 18 USCA Ch. 113B >>

(b) CLERICAL AMENDMENT TO TABLE OF SECTIONS.—The table of sections at the beginning of chapter 113B of title 18, United States Code, is amended by adding at the end the following new item:

"2339B. Providing material support or resources to designated foreign terrorist organizations.".

(c) TECHNICAL AMENDMENT.—

<< 18 USCA Ch. 113B >>

(1) NEW ITEM.—Chapter 113B of title 18, United States Code, relating to torture, is redesignated as chapter 113C.

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 420 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

<< 18 USCA Ch. 1 >>

(2) TABLE OF CHAPTERS.—The table of chapters for part I of title 18, United States Code, is amended by striking "113B. Torture" and inserting "113C. Torture".

Subtitle B—Prohibition on Assistance to Terrorist States

SEC. 321. FINANCIAL TRANSACTIONS WITH TERRORISTS.

<< 18 USCA § 2332d >>

(a) IN GENERAL.—Chapter 113B of title 18, United States Code, relating to terrorism, is amended by inserting after the section 2332c added by section 521 of this Act the following new section:

"§ 2332d. Financial transactions

"(a) OFFENSE.—Except as provided in regulations issued by the Secretary of the Treasury, in consultation with the Secretary of State, whoever, being a United States person, knowing or having reasonable cause to know that a country is designated under section 6(j) of the Export Administration Act (50 U.S.C. App. 2405) as a country supporting international terrorism, engages in a financial transaction with the government of that country, shall be fined under this title, imprisoned for not more than 10 years, or both.

"(b) DEFINITIONS.—As used in this section—

"(1) the term 'financial transaction' has the same meaning as in section 1956(c)(4); and

"(2) the term 'United States person' means any—

"(A) United States citizen or national;

"(B) permanent resident alien;

"(C) juridical person organized under the laws of the United States; or

"(D) any person in the United States.".

<< 18 USCA Ch. 113B >>

(b) CLERICAL AMENDMENT.—The table of sections at the beginning of chapter 113B of title 18, United States Code, relating to terrorism, is amended by inserting after the item added by section 521 of this Act the following new item:

"2332d. Financial transactions.".

<< 18 USCA § 2332d NOTE >>

(c) EFFECTIVE DATE.—The amendments made by this section shall become effective 120 days after the date of enactment of this Act.

<< 49 USCA § 44906 >>

SEC. 322. FOREIGN AIR TRAVEL SAFETY.

Section 44906 of title 49, United States Code, is amended to read as follows:

"§ 44906. Foreign air carrier security programs

"The Administrator of the Federal Aviation Administration shall continue in effect the requirement of section 129.25 of title 14, Code of Federal Regulations, that a foreign air carrier must adopt and use a security program approved by the Administrator. The Administrator shall not approve a security program of a foreign air carrier under section 129.25, or any successor regulation, unless the security program requires the foreign air carrier in its operations to and from airports in the United States to adhere to

Case 3:20-cv-07721-SI   Document 58-7   Filed 11/10/20   Page 421 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

the identical security measures that the Administrator requires air carriers serving the same airports to adhere to. The foregoing requirement shall not be interpreted to limit the ability of the Administrator to impose additional security measures on a foreign air carrier or an air carrier when the Administrator determines that a specific threat warrants such additional measures. The Administrator shall prescribe regulations to carry out this section.".

<< 18 USCA § 2339A >>

SEC. 323. MODIFICATION OF MATERIAL SUPPORT PROVISION.

   Section 2339A of title 18, United States Code, is amended to read as follows:

"§ 2339A. Providing material support to terrorists

   "(a) OFFENSE.—Whoever, within the United States, provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of section 32, 37, 81, 175, 351, 831, 842(m) or (n), 844(f) or (i), 956, 1114, 1116, 1203, 1361, 1362, 1363, 1366, 1751, 2155, 2156, 2280, 2281, 2332, 2332a, 2332b, or 2340A of this title or section 46502 of title 49, or in preparation for, or in carrying out, the concealment from the commission of any such violation, shall be fined under this title, imprisoned not more than 10 years, or both.
   "(b) DEFINITION.—In this section, the term 'material support or resources' means currency or other financial securities, financial services, lodging, training, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical assets, except medicine or religious materials.".

<< 22 USCA § 2377 NOTE >>

SEC. 324. FINDINGS.

   The Congress finds that—
   (1) international terrorism is among the most serious transnational threats faced by the United States and its allies, far eclipsing the dangers posed by population growth or pollution;
   (2) the President should continue to make efforts to counter international terrorism a national security priority;
   (3) because the United Nations has been an inadequate forum for the discussion of cooperative, multilateral responses to the threat of international terrorism, the President should undertake immediate efforts to develop effective multilateral responses to international terrorism as a complement to national counter terrorist efforts;
   (4) the President should use all necessary means, including covert action and military force, to disrupt, dismantle, and destroy international infrastructure used by international terrorists, including overseas terrorist training facilities and safe havens;
   (5) the Congress deplores decisions to ease, evade, or end international sanctions on state sponsors of terrorism, including the recent decision by the United Nations Sanctions Committee to allow airline flights to and from Libya despite Libya's noncompliance with United Nations resolutions; and
   (6) the President should continue to undertake efforts to increase the international isolation of state sponsors of international terrorism, including efforts to strengthen international sanctions, and should oppose any future initiatives to ease sanctions on Libya or other state sponsors of terrorism.

<< 22 USCA § 2377 >>

SEC. 325. PROHIBITION ON ASSISTANCE TO COUNTRIES THAT AID TERRORIST STATES.

   The Foreign Assistance Act of 1961 (22 U.S.C. 151 et seq.) is amended by adding immediately after section 620F the following new section:

"SEC. 620G. PROHIBITION ON ASSISTANCE TO COUNTRIES THAT AID TERRORIST STATES.

Case 3:20-cv-07721-SI   Document 58-7   Filed 11/10/20   Page 422 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

"(a) WITHHOLDING OF ASSISTANCE.—The President shall withhold assistance under this Act to the government of any country that provides assistance to the government of any other country for which the Secretary of State has made a determination under section 620A.

"(b) WAIVER.—Assistance prohibited by this section may be furnished to a foreign government described in subsection (a) if the President determines that furnishing such assistance is important to the national interests of the United States and, not later than 15 days before obligating such assistance, furnishes a report to the appropriate committees of Congress including—

"(1) a statement of the determination;

"(2) a detailed explanation of the assistance to be provided;

"(3) the estimated dollar amount of the assistance; and

"(4) an explanation of how the assistance furthers United States national interests.".

<< 22 USCA § 2378 >>

SEC. 326. PROHIBITION ON ASSISTANCE TO COUNTRIES THAT PROVIDE MILITARY EQUIPMENT TO TERRORIST STATES.

The Foreign Assistance Act of 1961 (22 U.S.C. 151 et seq.) is amended by adding immediately after section 620G the following new section:

"SEC. 620H. PROHIBITION ON ASSISTANCE TO COUNTRIES THAT PROVIDE MILITARY EQUIPMENT TO TERRORIST STATES.

"(a) PROHIBITION.—

"(1) IN GENERAL.—The President shall withhold assistance under this Act to the government of any country that provides lethal military equipment to a country the government of which the Secretary of State has determined is a terrorist government for the purposes of section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)), or 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371).

"(2) APPLICABILITY.—The prohibition under this section with respect to a foreign government shall terminate 1 year after that government ceases to provide lethal military equipment. This section applies with respect to lethal military equipment provided under a contract entered into after the date of enactment of this Act.

"(b) WAIVER.—Notwithstanding any other provision of law, assistance may be furnished to a foreign government described in subsection (a) if the President determines that furnishing such assistance is important to the national interests of the United States and, not later than 15 days before obligating such assistance, furnishes a report to the appropriate committees of Congress including—

"(1) a statement of the determination;

"(2) a detailed explanation of the assistance to be provided;

"(3) the estimated dollar amount of the assistance; and

"(4) an explanation of how the assistance furthers United States national interests.".

<< 22 USCA § 262p–4q >>

SEC. 327. OPPOSITION TO ASSISTANCE BY INTERNATIONAL FINANCIAL INSTITUTIONS TO TERRORIST STATES.

The International Financial Institutions Act (22 U.S.C. 262c et seq.) is amended by inserting after section 1620 the following new section:

"SEC. 1621. OPPOSITION TO ASSISTANCE BY INTERNATIONAL FINANCIAL INSTITUTIONS TO TERRORIST STATES.

"(a) IN GENERAL.—The Secretary of the Treasury shall instruct the United States executive director of each international financial institution to use the voice and vote of the United States to oppose any loan or other use of the funds of the respective

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 423 of 1305

institution to or for a country for which the Secretary of State has made a determination under section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)) or section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371).

"(b) DEFINITION.—For purposes of this section, the term 'international financial institution' includes—

"(1) the International Bank for Reconstruction and Development, the International Development Association, and the International Monetary Fund;

"(2) wherever applicable, the Inter–American Bank, the Asian Development Bank, the European Bank for Reconstruction and Development, the African Development Bank, and the African Development Fund; and

"(3) any similar institution established after the date of enactment of this section.".

<< 22 USCA § 2349aa–2 >>

<< 22 USCA § 2349aa–10 >>

## SEC. 328. ANTITERRORISM ASSISTANCE.

(a) FOREIGN ASSISTANCE ACT.—Section 573 of the Foreign Assistance Act of 1961 (22 U.S.C. 2349aa–2) is amended—

(1) in subsection (c), by striking "development and implementation of the antiterrorism assistance program under this chapter, including";

(2) by amending subsection (d) to read as follows:

"(d)(1) Arms and ammunition may be provided under this chapter only if they are directly related to antiterrorism assistance.

"(2) The value (in terms of original acquisition cost) of all equipment and commodities provided under this chapter in any fiscal year shall not exceed 30 percent of the funds made available to carry out this chapter for that fiscal year."; and

(3) by striking subsection (f).

(b) ASSISTANCE TO FOREIGN COUNTRIES TO PROCURE EXPLOSIVES DETECTION DEVICES AND OTHER COUNTERTERRORISM TECHNOLOGY.—(1) Subject to section 575(b), up to $3,000,000 in any fiscal year may be made available—

(A) to procure explosives detection devices and other counterterrorism technology; and

(B) for joint counterterrorism research and development projects on such technology conducted with NATO and major non-NATO allies under the auspices of the Technical Support Working Group of the Department of State.

(2) As used in this subsection, the term "major non-NATO allies" means those countries designated as major non-NATO allies for purposes of section 2350a(i)(3) of title 10, United States Code.

(c) ASSISTANCE TO FOREIGN COUNTRIES.—Notwithstanding any other provision of law (except section 620A of the Foreign Assistance Act of 1961) up to $1,000,000 in assistance may be provided to a foreign country for counterterrorism efforts in any fiscal year if—

(1) such assistance is provided for the purpose of protecting the property of the United States Government or the life and property of any United States citizen, or furthering the apprehension of any individual involved in any act of terrorism against such property or persons; and

(2) the appropriate committees of Congress are notified not later than 15 days prior to the provision of such assistance.

<< 22 USCA § 2349aa–10 NOTE >>

## SEC. 329. DEFINITION OF ASSISTANCE.

For purposes of this title—

(1) the term "assistance" means assistance to or for the benefit of a government of any country that is provided by grant, concessional sale, guaranty, insurance, or by any other means on terms more favorable than generally available in the applicable market, whether in the form of a loan, lease, credit, debt relief, or otherwise, including subsidies for exports to such country and favorable tariff treatment of articles that are the growth, product, or manufacture of such country; and

(2) the term "assistance" does not include assistance of the type authorized under chapter 9 of part 1 of the Foreign Assistance Act of 1961 (relating to international disaster assistance).

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 424 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

<< 22 USCA § 2781 >>

SEC. 330. PROHIBITION ON ASSISTANCE UNDER ARMS EXPORT CONTROL ACT FOR COUNTRIES NOT COOPERATING FULLY WITH UNITED STATES ANTITERRORISM EFFORTS.

Chapter 3 of the Arms Export Control Act (22 U.S.C. 2771 et seq.) is amended by adding at the end the following:

"SEC. 40A. TRANSACTIONS WITH COUNTRIES NOT FULLY COOPERATING WITH UNITED STATES ANTITERRORISM EFFORTS.—

"(a) PROHIBITED TRANSACTIONS.—No defense article or defense service may be sold or licensed for export under this Act in a fiscal year to a foreign country that the President determines and certifies to Congress, by May 15 of the calendar year in which that fiscal year begins, is not cooperating fully with United States antiterrorism efforts.

"(b) WAIVER.—The President may waive the prohibition set forth in subsection (a) with respect to a specific transaction if the President determines that the transaction is important to the national interests of the United States.".

TITLE IV—TERRORIST AND CRIMINAL ALIEN REMOVAL AND EXCLUSION

Subtitle A—Removal of Alien Terrorists

SEC. 401. ALIEN TERRORIST REMOVAL.

(a) IN GENERAL.—The Immigration and Nationality Act is amended by adding at the end the following new title:

<< 8 USCA Ch.12 >>

"TITLE V—ALIEN TERRORIST REMOVAL PROCEDURES

<< 8 USCA § 1531 >>

"SEC. 501. DEFINITIONS.

"As used in this title—

"(1) the term 'alien terrorist' means any alien described in section 241(a)(4)(B);

"(2) the term 'classified information' has the same meaning as in section 1(a) of the Classified Information Procedures Act (18 U.S.C. App.);

"(3) the term 'national security' has the same meaning as in section 1(b) of the Classified Information Procedures Act (18 U.S.C. App.);

"(4) the term 'removal court' means the court described in section 502;

"(5) the term 'removal hearing' means the hearing described in section 504; and

"(6) the term 'removal proceeding' means a proceeding under this title.

<< 8 USCA § 1532 >>

"SEC. 502. ESTABLISHMENT OF REMOVAL COURT.

"(a) DESIGNATION OF JUDGES.—The Chief Justice of the United States shall publicly designate 5 district court judges from 5 of the United States judicial circuits who shall constitute a court that shall have jurisdiction to conduct all removal proceedings. The Chief Justice may, in the Chief Justice's discretion, designate the same judges under this section as are designated pursuant to section 103(a) of the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1803(a)).

"(b) TERMS.—Each judge designated under subsection (a) shall serve for a term of 5 years and shall be eligible for redesignation, except that of the members first designated—

"(1) 1 member shall serve for a term of 1 year;

"(2) 1 member shall serve for a term of 2 years;

Case 3:20-cv-07721-SI Document 58-7 Filed 11/10/20 Page 425 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

"(3) 1 member shall serve for a term of 3 years; and

"(4) 1 member shall serve for a term of 4 years.

"(c) CHIEF JUDGE.—

"(1) DESIGNATION.—The Chief Justice shall publicly designate one of the judges of the removal court to be the chief judge of the removal court.

"(2) RESPONSIBILITIES.—The chief judge shall—

"(A) promulgate rules to facilitate the functioning of the removal court; and

"(B) assign the consideration of cases to the various judges on the removal court.

"(d) EXPEDITIOUS AND CONFIDENTIAL NATURE OF PROCEEDINGS.—The provisions of section 103(c) of the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1803(c)) shall apply to removal proceedings in the same manner as they apply to proceedings under that Act.

<< 8 USCA § 1533 >>

"SEC. 503. REMOVAL COURT PROCEDURE.

"(a) APPLICATION.—

"(1) IN GENERAL.—In any case in which the Attorney General has classified information that an alien is an alien terrorist, the Attorney General may seek removal of the alien under this title by filing an application with the removal court that contains—

"(A) the identity of the attorney in the Department of Justice making the application;

"(B) a certification by the Attorney General or the Deputy Attorney General that the application satisfies the criteria and requirements of this section;

"(C) the identity of the alien for whom authorization for the removal proceeding is sought; and

"(D) a statement of the facts and circumstances relied on by the Department of Justice to establish probable cause that—

"(i) the alien is an alien terrorist;

"(ii) the alien is physically present in the United States; and

"(iii) with respect to such alien, removal under title II would pose a risk to the national security of the United States.

"(2) FILING.—An application under this section shall be submitted ex parte and in camera, and shall be filed under seal with the removal court.

"(b) RIGHT TO DISMISS.—The Attorney General may dismiss a removal action under this title at any stage of the proceeding.

"(c) CONSIDERATION OF APPLICATION.—

"(1) BASIS FOR DECISION.—In determining whether to grant an application under this section, a single judge of the removal court may consider, ex parte and in camera, in addition to the information contained in the application—

"(A) other information, including classified information, presented under oath or affirmation; and

"(B) testimony received in any hearing on the application, of which a verbatim record shall be kept.

"(2) APPROVAL OF ORDER.—The judge shall issue an order granting the application, if the judge finds that there is probable cause to believe that—

"(A) the alien who is the subject of the application has been correctly identified and is an alien terrorist present in the United States; and

"(B) removal under title II would pose a risk to the national security of the United States.

"(3) DENIAL OF ORDER.—If the judge denies the order requested in the application, the judge shall prepare a written statement of the reasons for the denial, taking all necessary precautions not to disclose any classified information contained in the Government's application.

"(d) EXCLUSIVE PROVISIONS.—If an order is issued under this section granting an application, the rights of the alien regarding removal and expulsion shall be governed solely by this title, and except as they are specifically referenced in this title, no other provisions of this Act shall be applicable.

<< 8 USCA § 1534 >>

"SEC. 504. REMOVAL HEARING.

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 426 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

"(a) IN GENERAL.—

  "(1) EXPEDITIOUS HEARING.—In any case in which an application for an order is approved under section 503(c)(2), a removal hearing shall be conducted under this section as expeditiously as practicable for the purpose of determining whether the alien to whom the order pertains should be removed from the United States on the grounds that the alien is an alien terrorist.

  "(2) PUBLIC HEARING.—The removal hearing shall be open to the public.

"(b) NOTICE.—An alien who is the subject of a removal hearing under this title shall be given reasonable notice of—

  "(1) the nature of the charges against the alien, including a general account of the basis for the charges; and

  "(2) the time and place at which the hearing will be held.

"(c) RIGHTS IN HEARING.—

  "(1) RIGHT OF COUNSEL.—The alien shall have a right to be present at such hearing and to be represented by counsel. Any alien financially unable to obtain counsel shall be entitled to have counsel assigned to represent the alien. Such counsel shall be appointed by the judge pursuant to the plan for furnishing representation for any person financially unable to obtain adequate representation for the district in which the hearing is conducted, as provided for in section 3006A of title 18, United States Code. All provisions of that section shall apply and, for purposes of determining the maximum amount of compensation, the matter shall be treated as if a felony was charged.

  "(2) INTRODUCTION OF EVIDENCE.—Subject to the limitations in subsection (e), the alien shall have a reasonable opportunity to introduce evidence on the alien's own behalf.

  "(3) EXAMINATION OF WITNESSES.—Subject to the limitations in subsection (e), the alien shall have a reasonable opportunity to examine the evidence against the alien and to cross-examine any witness.

  "(4) RECORD.—A verbatim record of the proceedings and of all testimony and evidence offered or produced at such a hearing shall be kept.

  "(5) REMOVAL DECISION BASED ON EVIDENCE AT HEARING.—The decision of the judge regarding removal shall be based only on that evidence introduced at the removal hearing.

"(d) SUBPOENAS.—

  "(1) REQUEST.—At any time prior to the conclusion of the removal hearing, either the alien or the Department of Justice may request the judge to issue a subpoena for the presence of a named witness (which subpoena may also command the person to whom it is directed to produce books, papers, documents, or other objects designated therein) upon a satisfactory showing that the presence of the witness is necessary for the determination of any material matter. Such a request may be made ex parte except that the judge shall inform the Department of Justice of any request for a subpoena by the alien for a witness or material if compliance with such a subpoena would reveal classified evidence or the source of that evidence. The Department of Justice shall be given a reasonable opportunity to oppose the issuance of such a subpoena.

  "(2) PAYMENT FOR ATTENDANCE.—If an application for a subpoena by the alien also makes a showing that the alien is financially unable to pay for the attendance of a witness so requested, the court may order the costs incurred by the process and the fees of the witness so subpoenaed to be paid from funds appropriated for the enforcement of title II.

  "(3) NATIONWIDE SERVICE.—A subpoena under this subsection may be served anywhere in the United States.

  "(4) WITNESS FEES.—A witness subpoenaed under this subsection shall receive the same fees and expenses as a witness subpoenaed in connection with a civil proceeding in a court of the United States.

  "(5) NO ACCESS TO CLASSIFIED INFORMATION.—Nothing in this subsection is intended to allow an alien to have access to classified information.

"(e) DISCOVERY.—

  "(1) IN GENERAL.—For purposes of this title—

  "(A) discovery of information derived pursuant to the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1801 et seq.), or otherwise collected for national security purposes, shall not be authorized if disclosure would present a risk to the national security of the United States;

  "(B) an alien subject to removal under this title shall not be entitled to suppress evidence that the alien alleges was unlawfully obtained; and

  "(C) section 3504 of title 18, United States Code, and section 1806(c) of title 50, United States Code, shall not apply if the Attorney General determines that public disclosure would pose a risk to the national security of the United States because it would disclose classified information or otherwise threaten the integrity of a pending investigation.

Case 3:20-cv-07721-SI   Document 58-7   Filed 11/10/20   Page 427 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

"(2) PROTECTIVE ORDERS.—Nothing in this title shall prevent the United States from seeking protective orders and from asserting privileges ordinarily available to the United States to protect against the disclosure of classified information, including the invocation of the military and State secrets privileges.

"(3) TREATMENT OF CLASSIFIED INFORMATION.—

"(A) USE.—The judge shall examine, ex parte and in camera, any evidence for which the Attorney General determines that public disclosure would pose a risk to the national security of the United States or to the security of any individual because it would disclose classified information.

"(B) SUBMISSION.—With respect to such information, the Government shall submit to the removal court an unclassified summary of the specific evidence that does not pose that risk.

"(C) APPROVAL.—Not later than 15 days after submission, the judge shall approve the summary if the judge finds that it is sufficient to enable the alien to prepare a defense. The Government shall deliver to the alien a copy of the unclassified summary approved under this subparagraph.

"(D) DISAPPROVAL.—

"(i) IN GENERAL.—If an unclassified summary is not approved by the removal court under subparagraph (C), the Government shall be afforded 15 days to correct the deficiencies identified by the court and submit a revised unclassified summary.

"(ii) REVISED SUMMARY.—If the revised unclassified summary is not approved by the court within 15 days of its submission pursuant to subparagraph (C), the removal hearing shall be terminated.

"(f) ARGUMENTS.—Following the receipt of evidence, the Government and the alien shall be given fair opportunity to present argument as to whether the evidence is sufficient to justify the removal of the alien. The Government shall open the argument. The alien shall be permitted to reply. The Government shall then be permitted to reply in rebuttal.

"(g) BURDEN OF PROOF.—In the hearing, it is the Government's burden to prove, by the preponderance of the evidence, that the alien is subject to removal because the alien is an alien terrorist.

"(h) RULES OF EVIDENCE.—The Federal Rules of Evidence shall not apply in a removal hearing.

"(i) DETERMINATION OF DEPORTATION.—If the judge, after considering the evidence on the record as a whole, finds that the Government has met its burden, the judge shall order the alien removed and detained pending removal from the United States. If the alien was released pending the removal hearing, the judge shall order the Attorney General to take the alien into custody.

"(j) WRITTEN ORDER.—At the time of issuing a decision as to whether the alien shall be removed, the judge shall prepare a written order containing a statement of facts found and conclusions of law.

"(k) NO RIGHT TO ANCILLARY RELIEF.—At no time shall the judge consider or provide for relief from removal based on—

"(1) asylum under section 208;

"(2) withholding of deportation under section 243(h);

"(3) suspension of deportation under subsection (a) or (e) of section 244;

"(4) adjustment of status under section 245; or

"(5) registry under section 249.

<< 8 USCA § 1535 >>

"SEC. 505. APPEALS.

"(a) APPEAL OF DENIAL OF APPLICATION FOR REMOVAL PROCEEDINGS.—

"(1) IN GENERAL.—The Attorney General may seek a review of the denial of an order sought in an application filed pursuant to section 503. The appeal shall be filed in the United States Court of Appeals for the District of Columbia Circuit by notice of appeal filed not later than 20 days after the date of such denial.

"(2) RECORD ON APPEAL.—The entire record of the proceeding shall be transmitted to the Court of Appeals under seal, and the Court of Appeals shall hear the matter ex parte.

"(3) STANDARD OF REVIEW.—The Court of Appeals shall—

"(A) review questions of law de novo; and

AR.07835

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 428 of 1305

"(B) set aside a finding of fact only if such finding was clearly erroneous.

"(b) APPEAL OF DETERMINATION REGARDING SUMMARY OF CLASSIFIED INFORMATION.—

"(1) IN GENERAL.—The United States may take an interlocutory appeal to the United States Court of Appeals for the District of Columbia Circuit of—

"(A) any determination by the judge pursuant to section 504(e)(3); or

"(B) the refusal of the court to make the findings permitted by section 504(e)(3).

"(2) RECORD.—In any interlocutory appeal taken pursuant to this subsection, the entire record, including any proposed order of the judge, any classified information and the summary of evidence, shall be transmitted to the Court of Appeals. The classified information shall be transmitted under seal. A verbatim record of such appeal shall be kept under seal in the event of any other judicial review.

"(c) APPEAL OF DECISION IN HEARING.—

"(1) IN GENERAL.—The decision of the judge after a removal hearing may be appealed by either the alien or the Attorney General to the United States Court of Appeals for the District of Columbia Circuit by notice of appeal filed not later than 20 days after the date on which the order is issued. The order shall not be enforced during the pendency of an appeal under this subsection.

"(2) TRANSMITTAL OF RECORD.—In an appeal or review to the Court of Appeals pursuant to this subsection—

"(A) the entire record shall be transmitted to the Court of Appeals; and

"(B) information received in camera and ex parte, and any portion of the order that would reveal the substance or source of such information, shall be transmitted under seal.

"(3) EXPEDITED APPELLATE PROCEEDING.—In an appeal or review to the Court of Appeals under this subsection—

"(A) the appeal or review shall be heard as expeditiously as practicable and the court may dispense with full briefing and hear the matter solely on the record of the judge of the removal court and on such briefs or motions as the court may require to be filed by the parties;

"(B) the Court of Appeals shall issue an opinion not later than 60 days after the date of the issuance of the final order of the district court;

"(C) the court shall review all questions of law de novo; and

"(D) a finding of fact shall be accorded deference by the reviewing court and shall not be set aside unless such finding was clearly erroneous.

"(d) CERTIORARI.—Following a decision by the Court of Appeals pursuant to subsection (c), the alien or the Attorney General may petition the Supreme Court for a writ of certiorari. In any such case, any information transmitted to the Court of Appeals under seal shall, if such information is also submitted to the Supreme Court, be transmitted under seal. Any order of removal shall not be stayed pending disposition of a writ of certiorari, except as provided by the Court of Appeals or a Justice of the Supreme Court.

"(e) APPEAL OF DETENTION ORDER.—

"(1) IN GENERAL.—Sections 3145 through 3148 of title 18, United States Code, pertaining to review and appeal of a release or detention order, penalties for failure to appear, penalties for an offense committed while on release, and sanctions for violation of a release condition shall apply to an alien to whom section 507(b)(1) applies. In applying the previous sentence—

"(A) for purposes of section 3145 of such title an appeal shall be taken to the United States Court of Appeals for the District of Columbia Circuit; and

"(B) for purposes of section 3146 of such title the alien shall be considered released in connection with a charge of an offense punishable by life imprisonment.

"(2) NO REVIEW OF CONTINUED DETENTION.—The determinations and actions of the Attorney General pursuant to section 507(b)(2)(C) shall not be subject to judicial review, including application for a writ of habeas corpus, except for a claim by the alien that continued detention violates the alien's rights under the Constitution. Jurisdiction over any such challenge shall lie exclusively in the United States Court of Appeals for the District of Columbia Circuit.

<< 8 USCA § 1536 >>

"SEC. 506. CUSTODY AND RELEASE PENDING REMOVAL HEARING.

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 429 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

"(a) UPON FILING APPLICATION.—

"(1) IN GENERAL.—Subject to paragraphs (2) and (3), the Attorney General may—

  "(A) take into custody any alien with respect to whom an application under section 503 has been filed; and

  "(B) retain such an alien in custody in accordance with the procedures authorized by this title.

"(2) SPECIAL RULES FOR PERMANENT RESIDENT ALIENS.—

  "(A) RELEASE HEARING.—An alien lawfully admitted for permanent residence shall be entitled to a release hearing before the judge assigned to hear the removal hearing. Such an alien shall be detained pending the removal hearing, unless the alien demonstrates to the court that the alien—

    "(i) is a person lawfully admitted for permanent residence in the United States;

    "(ii) if released upon such terms and conditions as the court may prescribe (including the posting of any monetary amount), is not likely to flee; and

    "(iii) will not endanger national security, or the safety of any person or the community, if released.

  "(B) INFORMATION CONSIDERED.—The judge may consider classified information submitted in camera and ex parte in making a determination whether to release an alien pending the removal hearing.

"(3) RELEASE IF ORDER DENIED AND NO REVIEW SOUGHT.—

  "(A) IN GENERAL.—Subject to subparagraph (B), if a judge of the removal court denies the order sought in an application filed pursuant to section 503, and the Attorney General does not seek review of such denial, the alien shall be released from custody.

  "(B) APPLICATION OF REGULAR PROCEDURES.—Subparagraph (A) shall not prevent the arrest and detention of the alien pursuant to title II.

"(b) CONDITIONAL RELEASE IF ORDER DENIED AND REVIEW SOUGHT.—

"(1) IN GENERAL.—If a judge of the removal court denies the order sought in an application filed pursuant to section 503 and the Attorney General seeks review of such denial, the judge shall release the alien from custody subject to the least restrictive condition, or combination of conditions, of release described in section 3142(b) and clauses (i) through (xiv) of section 3142(c)(1)(B) of title 18, United States Code, that—

  "(A) will reasonably assure the appearance of the alien at any future proceeding pursuant to this title; and

  "(B) will not endanger the safety of any other person or the community.

"(2) NO RELEASE FOR CERTAIN ALIENS.—If the judge finds no such condition or combination of conditions, as described in paragraph (1), the alien shall remain in custody until the completion of any appeal authorized by this title.

<< 8 USCA § 1537 >>

"SEC. 507. CUSTODY AND RELEASE AFTER REMOVAL HEARING.

"(a) RELEASE.—

"(1) IN GENERAL.—Subject to paragraph (2), if the judge decides that an alien should not be removed, the alien shall be released from custody.

"(2) CUSTODY PENDING APPEAL.—If the Attorney General takes an appeal from such decision, the alien shall remain in custody, subject to the provisions of section 3142 of title 18, United States Code.

"(b) CUSTODY AND REMOVAL.—

"(1) CUSTODY.—If the judge decides that an alien shall be removed, the alien shall be detained pending the outcome of any appeal. After the conclusion of any judicial review thereof which affirms the removal order, the Attorney General shall retain the alien in custody and remove the alien to a country specified under paragraph (2).

"(2) REMOVAL.—

  "(A) IN GENERAL.—The removal of an alien shall be to any country which the alien shall designate if such designation does not, in the judgment of the Attorney General, in consultation with the Secretary of State, impair the obligation of the United States under any treaty (including a treaty pertaining to extradition) or otherwise adversely affect the foreign policy of the United States.

  "(B) ALTERNATE COUNTRIES.—If the alien refuses to designate a country to which the alien wishes to be removed or if the Attorney General, in consultation with the Secretary of State, determines that removal of the alien to the country so

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

Case 3:20-cv-07721-SI   Document 58-7   Filed 11/10/20   Page 430 of 1305

designated would impair a treaty obligation or adversely affect United States foreign policy, the Attorney General shall cause the alien to be removed to any country willing to receive such alien.

"(C) CONTINUED DETENTION.—If no country is willing to receive such an alien, the Attorney General may, notwithstanding any other provision of law, retain the alien in custody. The Attorney General, in coordination with the Secretary of State, shall make periodic efforts to reach agreement with other countries to accept such an alien and at least every 6 months shall provide to the attorney representing the alien at the removal hearing a written report on the Attorney General's efforts. Any alien in custody pursuant to this subparagraph shall be released from custody solely at the discretion of the Attorney General and subject to such conditions as the Attorney General shall deem appropriate.

"(D) FINGERPRINTING.—Before an alien is removed from the United States pursuant to this subsection, or pursuant to an order of exclusion because such alien is excludable under section 212(a)(3)(B), the alien shall be photographed and fingerprinted, and shall be advised of the provisions of section 276(b).

"(c) CONTINUED DETENTION PENDING TRIAL.—

"(1) DELAY IN REMOVAL.—The Attorney General may hold in abeyance the removal of an alien who has been ordered removed, pursuant to this title, to allow the trial of such alien on any Federal or State criminal charge and the service of any sentence of confinement resulting from such a trial.

"(2) MAINTENANCE OF CUSTODY.—Pending the commencement of any service of a sentence of confinement by an alien described in paragraph (1), such an alien shall remain in the custody of the Attorney General, unless the Attorney General determines that temporary release of the alien to the custody of State authorities for confinement in a State facility is appropriate and would not endanger national security or public safety.

"(3) SUBSEQUENT REMOVAL.—Following the completion of a sentence of confinement by an alien described in paragraph (1), or following the completion of State criminal proceedings which do not result in a sentence of confinement of an alien released to the custody of State authorities pursuant to paragraph (2), such an alien shall be returned to the custody of the Attorney General who shall proceed to the removal of the alien under this title.

"(d) APPLICATION OF CERTAIN PROVISIONS RELATING TO ESCAPE OF PRISONERS.—For purposes of sections 751 and 752 of title 18, United States Code, an alien in the custody of the Attorney General pursuant to this title shall be subject to the penalties provided by those sections in relation to a person committed to the custody of the Attorney General by virtue of an arrest on a charge of a felony.

"(e) RIGHTS OF ALIENS IN CUSTODY.—

"(1) FAMILY AND ATTORNEY VISITS.—An alien in the custody of the Attorney General pursuant to this title shall be given reasonable opportunity, as determined by the Attorney General, to communicate with and receive visits from members of the alien's family, and to contact, retain, and communicate with an attorney.

"(2) DIPLOMATIC CONTACT.—An alien in the custody of the Attorney General pursuant to this title shall have the right to contact an appropriate diplomatic or consular official of the alien's country of citizenship or nationality or of any country providing representation services therefore. The Attorney General shall notify the appropriate embassy, mission, or consular office of the alien's detention.".

<< 8 USCA § 1105a >>

(b) JURISDICTION OVER EXCLUSION ORDERS FOR ALIEN TERRORISTS.—Section 106(b) of the Immigration and Nationality Act (8 U.S.C. 1105a(b)) is amended by adding at the end the following sentence: "Jurisdiction to review an order entered pursuant to the provisions of section 235(c) concerning an alien excludable under section 212(a)(3)(B) shall rest exclusively in the United States Court of Appeals for the District of Columbia Circuit.".

<< 8 USCA § 1326 >>

(c) CRIMINAL PENALTY FOR REENTRY OF ALIEN TERRORISTS.—Section 276(b) of such Act (8 U.S.C. 1326(b)) is amended—

(1) by striking "or" at the end of paragraph (1),

(2) by striking the period at the end of paragraph (2) and inserting "; or", and

(3) by inserting after paragraph (2) the following new paragraph:

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 431 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

"(3) who has been excluded from the United States pursuant to section 235(c) because the alien was excludable under section 212(a)(3)(B) or who has been removed from the United States pursuant to the provisions of title V, and who thereafter, without the permission of the Attorney General, enters the United States, or attempts to do so, shall be fined under title 18, United States Code, and imprisoned for a period of 10 years, which sentence shall not run concurrently with any other sentence.".

(d) TABLE OF CONTENTS.—The Immigration and Nationality Act is amended by adding at the end of the table of contents the following:

"TITLE V—ALIEN TERRORIST REMOVAL PROCEDURES

"Sec. 501. Definitions.

"Sec. 502. Establishment of removal court.

"Sec. 503. Removal court procedure.

"Sec. 504. Removal hearing.

"Sec. 505. Appeals.

"Sec. 506. Custody and release pending removal hearing.

"Sec. 507. Custody and release after removal hearing.".

<< 8 USCA § 1105a >>

(e) ELIMINATION OF CUSTODY REVIEW BY HABEAS CORPUS.—Section 106(a) of the Immigration and Nationality Act (8 U.S.C. 1105a(a)) is amended—
  (1) in paragraph (8), by adding "and" at the end;
  (2) in paragraph (9), by striking "; and" at the end and inserting a period; and
  (3) by striking paragraph (10).

<< 8 USCA §§ 1105a NOTE, 1326 nt >>

<< 8 USCA §§ 1531 nt, 1532 nt, 1533 nt, 1534 nt, 1535 nt, 1536 nt, 1537 nt >>

(f) EFFECTIVE DATE.—The amendments made by this section shall take effect on the date of enactment of this Act and shall apply to all aliens without regard to the date of entry or attempted entry into the United States.

Subtitle B—Exclusion of Members and Representatives of Terrorist Organizations

<< 8 USCA § 1182 >>

SEC. 411. EXCLUSION OF ALIEN TERRORISTS.

Section 212(a)(3)(B) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)(B)) is amended—
(1) in clause (i)—
  (A) in subclause (I), by striking "or" at the end;
  (B) in subclause (II), by inserting "is engaged in or" after "believe,"; and
  (C) by inserting after subclause (II) the following:
    "(III) is a representative (as defined in clause (iv)) of a foreign terrorist organization, as designated by the Secretary under section 219, or
    "(IV) is a member of a foreign terrorist organization, as designated by the Secretary under section 219,"; and
(2) by adding at the end the following:

Case 3:20-cv-07721-SI   Document 58-7   Filed 11/10/20   Page 432 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

"(iv) REPRESENTATIVE DEFINED.—As used in this paragraph, the term 'representative' includes an officer, official, or spokesman of an organization, and any person who directs, counsels, commands, or induces an organization or its members to engage in terrorist activity.".

<< 8 USCA § 1182 >>

## SEC. 412. WAIVER AUTHORITY CONCERNING NOTICE OF DENIAL OF APPLICATION FOR VISAS.

Section 212(b) of the Immigration and Nationality Act (8 U.S.C. 1182(b)) is amended—

(1) by redesignating paragraphs (1) and (2) as subparagraphs (A) and (B), respectively, and indenting each new subparagraph 2 ems to the right;

(2) by striking "If" and inserting "(1) Subject to paragraphs (2) and (3), if"; and

(3) by adding at the end the following new paragraphs:

"(2) The Secretary of State may waive the requirements of paragraph (1) with respect to a particular alien or any class or classes of excludable aliens.

"(3) Paragraph (1) does not apply to any alien excludable under paragraph (2) or (3) of subsection (a).".

## SEC. 413. DENIAL OF OTHER RELIEF FOR ALIEN TERRORISTS.

<< 8 USCA § 1253 >>

(a) WITHHOLDING OF DEPORTATION.—Section 243(h)(2) of the Immigration and Nationality Act (8 U.S.C. 1253(h)(2)) is amended by adding at the end the following new sentence: "For purposes of subparagraph (D), an alien who is described in section 241(a)(4)(B) shall be considered to be an alien for whom there are reasonable grounds for regarding as a danger to the security of the United States.".

<< 8 USCA § 1254 >>

(b) SUSPENSION OF DEPORTATION.—Section 244(a) of such Act (8 U.S.C. 1254(a)) is amended by striking "section 241(a)(4)(D)" and inserting "subparagraph (B) or (D) of section 241(a)(4)".

(c) VOLUNTARY DEPARTURE.—Section 244(e)(2) of such Act (8 U.S.C. 1254(e)(2)) is amended by inserting "under section 241(a)(4)(B) or" after "who is deportable".

<< 8 USCA § 1255 >>

(d) ADJUSTMENT OF STATUS.—Section 245(c) of such Act (8 U.S.C. 1255(c)) is amended—

(1) by striking "or" before "(5)", and

(2) by inserting before the period at the end the following:

", or (6) an alien who is deportable under section 241(a)(4)(B)".

<< 8 USCA § 1259 >>

(e) REGISTRY.—Section 249(d) of such Act (8 U.S.C. 1259(d)) is amended by inserting "and is not deportable under section 241(a)(4)(B)" after "ineligible to citizenship".

<< 8 USCA § 1253 >>

(f) WAIVER.—Section 243(h) of such Act (8 U.S.C. 1253(h)) is amended by adding at the end the following:

"(3) Notwithstanding any other provision of law, paragraph (1) shall apply to any alien if the Attorney General determines, in the discretion of the Attorney General, that—

"(A) such alien's life or freedom would be threatened, in the country to which such alien would be deported or returned, on account of race, religion, nationality, membership in a particular social group, or political opinion; and

AR.07840

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 433 of 1305

"(B) the application of paragraph (1) to such alien is necessary to ensure compliance with the 1967 United Nations Protocol Relating to the Status of Refugees.".

<< 8 USCA §§ 1253 NOTE, 1254 nt, 1255 nt, 1259 nt >>

 (g) EFFECTIVE DATE.—The amendments made by this section shall take effect on the date of the enactment of this Act and shall apply to applications filed before, on, or after such date if final action has not been taken on them before such date.

SEC. 414. EXCLUSION OF ALIENS WHO HAVE NOT BEEN INSPECTED AND ADMITTED.

<< 8 USCA § 1251 >>

  (a) IN GENERAL.—Section 241 of the Immigration and Nationality Act (8 U.S.C. 1251) is amended by adding at the end the following new subsection:

 "(d) Notwithstanding any other provision of this title, an alien found in the United States who has not been admitted to the United States after inspection in accordance with section 235 is deemed for purposes of this Act to be seeking entry and admission to the United States and shall be subject to examination and exclusion by the Attorney General under chapter 4. In the case of such an alien the Attorney General shall provide by regulation an opportunity for the alien to establish that the alien was so admitted.".

<< 8 USCA § 1251 NOTE >>

 (b) EFFECTIVE DATE.—The amendment made by subsection (a) shall take effect on the first day of the first month beginning more than 180 days after the date of the enactment of this Act.

Subtitle C—Modification to Asylum Procedures

SEC. 421. DENIAL OF ASYLUM TO ALIEN TERRORISTS.

<< 8 USCA § 1158 >>

 (a) IN GENERAL.—Section 208(a) of the Immigration and Nationality Act (8 U.S.C. 1158(a)) is amended by adding at the end the following: "The Attorney General may not grant an alien asylum if the Attorney General determines that the alien is excludable under subclause (I), (II), or (III) of section 212(a)(3)(B)(i) or deportable under section 241(a)(4)(B), unless the Attorney General determines, in the discretion of the Attorney General, that there are not reasonable grounds for regarding the alien as a danger to the security of the United States.".

<< 8 USCA § 1158 NOTE >>

 (b) EFFECTIVE DATE.—The amendment made by subsection (a) shall take effect on the date of the enactment of this Act and apply to asylum determinations made on or after such date.

SEC. 422. INSPECTION AND EXCLUSION BY IMMIGRATION OFFICERS.

<< 8 USCA § 1225 >>

  (a) IN GENERAL.—Subsection (b) of section 235 of the Immigration and Nationality Act (8 U.S.C. 1225) is amended to read as follows:
 "(b)(1)(A) If the examining immigration officer determines that an alien seeking entry—
  "(i) is excludable under section 212(a)(6)(C) or 212(a)(7), and
  "(ii) does not indicate either an intention to apply for asylum under section 208 or a fear of persecution,

the officer shall order the alien excluded from the United States without further hearing or review.

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 434 of 1305

"(B) The examining immigration officer shall refer for an interview by an asylum officer under subparagraph (C) any alien who is excludable under section 212(a)(6)(C) or 212(a)(7) and has indicated an intention to apply for asylum under section 208 or a fear of persecution.

"(C)(i) An asylum officer shall promptly conduct interviews of aliens referred under subparagraph (B).

"(ii) If the officer determines at the time of the interview that an alien has a credible fear of persecution (as defined in clause (v)), the alien shall be detained for an asylum hearing before an asylum officer under section 208.

"(iii)(I) Subject to subclause (II), if the officer determines that the alien does not have a credible fear of persecution, the officer shall order the alien excluded from the United States without further hearing or review.

"(II) The Attorney General shall promulgate regulations to provide for the immediate review by a supervisory asylum office at the port of entry of a determination under subclause (I).

"(iv) The Attorney General shall provide information concerning the asylum interview described in this subparagraph to aliens who may be eligible. An alien who is eligible for such interview may consult with a person or persons of the alien's choosing prior to the interview or any review thereof, according to regulations prescribed by the Attorney General. Such consultation shall be at no expense to the Government and shall not delay the process.

"(v) For purposes of this subparagraph, the term 'credible fear of persecution' means (I) that it is more probable than not that the statements made by the alien in support of the alien's claim are true, and (II) that there is a significant possibility, in light of such statements and of such other facts as are known to the officer, that the alien could establish eligibility for asylum under section 208.

"(D) As used in this paragraph, the term 'asylum officer' means an immigration officer who—

"(i) has had professional training in country conditions, asylum law, and interview techniques; and

"(ii) is supervised by an officer who meets the condition in clause (i).

"(E)(i) An exclusion order entered in accordance with subparagraph (A) is not subject to administrative appeal, except that the Attorney General shall provide by regulation for prompt review of such an order against an alien who claims under oath, or as permitted under penalty of perjury under section 1746 of title 28, United States Code, after having been warned of the penalties for falsely making such claim under such conditions, to have been lawfully admitted for permanent residence.

"(ii) In any action brought against an alien under section 275(a) or section 276, the court shall not have jurisdiction to hear any claim attacking the validity of an order of exclusion entered under subparagraph (A).

"(2)(A) Except as provided in subparagraph (B), if the examining immigration officer determines that an alien seeking entry is not clearly and beyond a doubt entitled to enter, the alien shall be detained for a hearing before a special inquiry officer.

"(B) The provisions of subparagraph (A) shall not apply—

"(i) to an alien crewman;

"(ii) to an alien described in paragraph (1)(A) or (1)(C)(iii)(I), or

"(iii) if the conditions described in section 273(d) exist.

"(3) The decision of the examining immigration officer, if favorable to the admission of any alien, shall be subject to challenge by any other immigration officer and such challenge shall operate to take the alien whose privilege to enter is so challenged, before a special inquiry officer for a hearing on exclusion of the alien.".

<< 8 USCA § 1227 >>

(b) CONFORMING AMENDMENT.—Section 237(a) of such Act (8 U.S.C. 1227(a)) is amended—

(1) in the second sentence of paragraph (1), by striking "Deportation" and inserting "Subject to section 235(b)(1), deportation", and

(2) in the first sentence of paragraph (2), by striking "If" and inserting "Subject to section 235(b)(1), if".

<< 8 USCA §§ 1225 NOTE, 1227 nt >>

(c) EFFECTIVE DATE.—The amendments made by this section shall take effect on the first day of the first month that begins more than 180 days after the date of the enactment of this Act.

SEC. 423. JUDICIAL REVIEW.

Case 3:20-cv-07721-SI   Document 58-7   Filed 11/10/20   Page 435 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

<< 8 USCA § 1105a >>

(a) PRECLUSION OF JUDICIAL REVIEW.—Section 106 of the Immigration and Nationality Act (8 U.S.C. 1105a) is amended—

(1) by amending the section heading to read as follows:

   "JUDICIAL REVIEW OF ORDERS OF DEPORTATION AND EXCLUSION, AND SPECIAL EXCLUSION"; and

(2) by adding at the end the following new subsection:

"(e)(1) Notwithstanding any other provision of law, and except as provided in this subsection, no court shall have jurisdiction to review any individual determination, or to entertain any other cause or claim, arising from or relating to the implementation or operation of section 235(b)(1). Regardless of the nature of the action or claim, or the party or parties bringing the action, no court shall have jurisdiction or authority to enter declaratory, injunctive, or other equitable relief not specifically authorized in this subsection nor to certify a class under Rule 23 of the Federal Rules of Civil Procedure.

"(2) Judicial review of any cause, claim, or individual determination covered under paragraph (1) shall only be available in habeas corpus proceedings, and shall be limited to determinations of—

   "(A) whether the petitioner is an alien, if the petitioner makes a showing that the petitioner's claim of United States nationality is not frivolous;

   "(B) whether the petitioner was ordered specially excluded under section 235(b)(1)(A); and

   "(C) whether the petitioner can prove by a preponderance of the evidence that the petitioner is an alien lawfully admitted for permanent residence and is entitled to such review as is provided by the Attorney General pursuant to section 235(b)(1)(E)(i).

"(3) In any case where the court determines that an alien was not ordered specially excluded, or was not properly subject to special exclusion under the regulations adopted by the Attorney General, the court may order no relief beyond requiring that the alien receive a hearing in accordance with section 236, or a determination in accordance with section 235(c) or 273(d).

"(4) In determining whether an alien has been ordered specially excluded, the court's inquiry shall be limited to whether such an order was in fact issued and whether it relates to the petitioner.".

<< 8 USCA § 1225 >>

(b) PRECLUSION OF COLLATERAL ATTACKS.—Section 235 of such Act (8 U.S.C. 1225) is amended by adding at the end the following new subsection:

"(d) In any action brought for the assessment of penalties for improper entry or re-entry of an alien under section 275 or section 276, no court shall have jurisdiction to hear claims collaterally attacking the validity of orders of exclusion, special exclusion, or deportation entered under this section or sections 236 and 242.".

(c) CLERICAL AMENDMENT.—The item relating to section 106 in the table of contents of such Act is amended to read as follows:

"Sec. 106. Judicial review of orders of deportation and exclusion, and special exclusion.".

Subtitle D—Criminal Alien Procedural Improvements

SEC. 431. ACCESS TO CERTAIN CONFIDENTIAL IMMIGRATION AND NATURALIZATION FILES THROUGH COURT ORDER.

<< 8 USCA § 1255a >>

(a) CONFIDENTIALITY OF INFORMATION.—Section 245A(c)(5) of the Immigration and Nationality Act (8 U.S.C. 1255a(c)(5)) is amended—

(1) by inserting "(i)" after "except the Attorney General"; and

(2) by inserting after "Title 13" the following: "and (ii) may authorize an application to a Federal court of competent jurisdiction for, and a judge of such court may grant, an order authorizing disclosure of information contained in the application of the alien to be used—

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

Case 3:20-cv-07721-SI   Document 58-7   Filed 11/10/20   Page 436 of 1305

"(I) for identification of the alien when there is reason to believe that the alien has been killed or severely incapacitated; or

"(II) for criminal law enforcement purposes against the alien whose application is to be disclosed.".

<< 8 USCA § 1160 >>

(b) APPLICATIONS FOR ADJUSTMENT OF STATUS.—Section 210(b) of the Immigration and Nationality Act (8 U.S.C. 1160(b)) is amended—

(1) in paragraph (5), by inserting ", except as allowed by a court order issued pursuant to paragraph (6) of this subsection" after "consent of the alien"; and

(2) in paragraph (6), by inserting the following sentence before "Anyone who uses": "Notwithstanding the preceding sentence, the Attorney General may authorize an application to a Federal court of competent jurisdiction for, and a judge of such court may grant an order authorizing, disclosure of information contained in the application of the alien to be used for identification of the alien when there is reason to believe that the alien has been killed or severely incapacitated, or for criminal law enforcement purposes against the alien whose application is to be disclosed or to discover information leading to the location or identity of the alien.".

<< 8 USCA § 1252 NOTE >>

SEC. 432. CRIMINAL ALIEN IDENTIFICATION SYSTEM.

Section 130002(a) of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322) is amended to read as follows:

"(a) OPERATION AND PURPOSE.—The Commissioner of Immigration and Naturalization shall, under the authority of section 242(a)(3)(A) of the Immigration and Nationality Act (8 U.S.C. 1252(a)(3)(A)), operate a criminal alien identification system. The criminal alien identification system shall be used to assist Federal, State, and local law enforcement agencies in identifying and locating aliens who may be subject to deportation by reason of their conviction of aggravated felonies.".

<< 18 USCA § 1961 >>

SEC. 433. ESTABLISHING CERTAIN ALIEN SMUGGLING–RELATED CRIMES AS RICO–PREDICATE OFFENSES.

Section 1961(1) of title 18, United States Code, is amended—

(1) by inserting "section 1028 (relating to fraud and related activity in connection with identification documents) if the act indictable under section 1028 was committed for the purpose of financial gain," before "section 1029";

(2) by inserting "section 1542 (relating to false statement in application and use of passport) if the act indictable under section 1542 was committed for the purpose of financial gain, section 1543 (relating to forgery or false use of passport) if the act indictable under section 1543 was committed for the purpose of financial gain, section 1544 (relating to misuse of passport) if the act indictable under section 1544 was committed for the purpose of financial gain, section 1546 (relating to fraud and misuse of visas, permits, and other documents) if the act indictable under section 1546 was committed for the purpose of financial gain, sections 1581–1588 (relating to peonage and slavery)," after "section 1513 (relating to retaliating against a witness, victim, or an informant),";

(3) by striking "or" before "(E)"; and

(4) by inserting before the period at the end the following: ", or (F) any act which is indictable under the Immigration and Nationality Act, section 274 (relating to bringing in and harboring certain aliens), section 277 (relating to aiding or assisting certain aliens to enter the United States), or section 278 (relating to importation of alien for immoral purpose) if the act indictable under such section of such Act was committed for the purpose of financial gain".

<< 18 USCA § 2516 >>

SEC. 434. AUTHORITY FOR ALIEN SMUGGLING INVESTIGATIONS.

Section 2516(1) of title 18, United States Code, is amended—

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 437 of 1305

(1) by striking "and" at the end of paragraph (n),

(2) by redesignating paragraph (o) as paragraph (p), and

(3) by inserting after paragraph (n) the following new paragraph:

"(o) a felony violation of section 1028 (relating to production of false identification documents), section 1542 (relating to false statements in passport applications), section 1546 (relating to fraud and misuse of visas, permits, and other documents) of this title or a violation of section 274, 277, or 278 of the Immigration and Nationality Act (relating to the smuggling of aliens); or".

## SEC. 435. EXPANSION OF CRITERIA FOR DEPORTATION FOR CRIMES OF MORAL TURPITUDE.

<< 8 USCA § 1251 >>

(a) IN GENERAL.—Section 241(a)(2)(A)(i)(II) of the Immigration and Nationality Act (8 U.S.C. 1251(a)(2)(A)(i)(II)) is amended to read as follows:

"(II) is convicted of a crime for which a sentence of one year or longer may be imposed,".

<< 8 USCA § 1251 NOTE >>

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply to aliens against whom deportation proceedings are initiated after the date of the enactment of this Act.

## SEC. 436. MISCELLANEOUS PROVISIONS.

<< 8 USCA § 1252 >>

(a) USE OF ELECTRONIC AND TELEPHONIC MEDIA IN DEPORTATION HEARINGS.—The second sentence of section 242(b) of the Immigration and Nationality Act (8 U.S.C. 1252(b)) is amended by inserting before the period the following: "; except that nothing in this subsection shall preclude the Attorney General from authorizing proceedings by electronic or telephonic media (with the consent of the alien) or, where waived or agreed to by the parties, in the absence of the alien".

(b) CODIFICATION.—

<< 8 USCA § 1252 >>

(1) Section 242(i) of such Act (8 U.S.C. 1252(i)) is amended by adding at the end the following: "Nothing in this subsection shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person.".

<< 8 USCA § 1101 NOTE >>

(2) Section 225 of the Immigration and Nationality Technical Corrections Act of 1994 (Public Law 103–416) is amended by striking "and nothing in" and all that follows through "1252(i))".

<< 8 USCA § 1252 NOTE >>

(3) The amendments made by this subsection shall take effect as if included in the enactment of the Immigration and Nationality Technical Corrections Act of 1994 (Public Law 103–416).

<< 8 USCA § 1253 NOTE >>

## SEC. 437. INTERIOR REPATRIATION PROGRAM.

Not later than 180 days after the date of enactment of this Act, the Attorney General and the Commissioner of Immigration and Naturalization shall develop and implement a program in which aliens who previously have illegally entered the United States not less than 3 times and are deported or returned to a country contiguous to the United States will be returned to locations not less than 500 kilometers from that country's border with the United States.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:20-cv-07721-SI   Document 58-7   Filed 11/10/20   Page 438 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

SEC. 438. DEPORTATION OF NONVIOLENT OFFENDERS PRIOR TO COMPLETION OF SENTENCE OF IMPRISONMENT.

<< 8 USCA § 1252 >>

(a) IN GENERAL.—Section 242(h) of the Immigration and Nationality Act (8 U.S.C. 1252(h)) is amended to read as follows:

"(h)(1) Except as provided in paragraph (2), an alien sentenced to imprisonment may not be deported until such imprisonment has been terminated by the release of the alien from confinement. Parole, supervised release, probation, or possibility of rearrest or further confinement in respect of the same offense shall not be a ground for deferral of deportation.

"(2) The Attorney General is authorized to deport an alien in accordance with applicable procedures under this Act prior to the completion of a sentence of imprisonment—

"(A) in the case of an alien in the custody of the Attorney General, if the Attorney General determines that (i) the alien is confined pursuant to a final conviction for a nonviolent offense (other than alien smuggling), and (ii) such deportation of the alien is appropriate and in the best interest of the United States; or

"(B) in the case of an alien in the custody of a State (or a political subdivision of a State), if the chief State official exercising authority with respect to the incarceration of the alien determines that (i) the alien is confined pursuant to a final conviction for a nonviolent offense (other than alien smuggling), (ii) such deportation is appropriate and in the best interest of the State, and (iii) submits a written request to the Attorney General that such alien be so deported.

"(3) Any alien deported pursuant to this subsection shall be notified of the penalties under the laws of the United States relating to the reentry of deported aliens, particularly the expanded penalties for aliens deported under paragraph (2).".

<< 8 USCA § 1326 >>

(b) REENTRY OF ALIEN DEPORTED PRIOR TO COMPLETION OF TERM OF IMPRISONMENT.—Section 276 of the Immigration and Nationality Act (8 U.S.C. 1326) is amended by adding at the end the following new subsection:

"(c) Any alien deported pursuant to section 242(h)(2) who enters, attempts to enter, or is at any time found in, the United States (unless the Attorney General has expressly consented to such alien's reentry) shall be incarcerated for the remainder of the sentence of imprisonment which was pending at the time of deportation without any reduction for parole or supervised release. Such alien shall be subject to such other penalties relating to the reentry of deported aliens as may be available under this section or any other provision of law.".

<< 8 USCA § 1252c >>

SEC. 439. AUTHORIZING STATE AND LOCAL LAW ENFORCEMENT OFFICIALS TO ARREST AND DETAIN CERTAIN ILLEGAL ALIENS.

(a) IN GENERAL.—Notwithstanding any other provision of law, to the extent permitted by relevant State and local law, State and local law enforcement officials are authorized to arrest and detain an individual who—

(1) is an alien illegally present in the United States; and

(2) has previously been convicted of a felony in the United States and deported or left the United States after such conviction,

but only after the State or local law enforcement officials obtain appropriate confirmation from the Immigration and Naturalization Service of the status of such individual and only for such period of time as may be required for the Service to take the individual into Federal custody for purposes of deporting or removing the alien from the United States.

(b) COOPERATION.—The Attorney General shall cooperate with the States to assure that information in the control of the Attorney General, including information in the National Crime Information Center, that would assist State and local law enforcement officials in carrying out duties under subsection (a) is made available to such officials.

SEC. 440. CRIMINAL ALIEN REMOVAL.

<< 8 USCA § 1105a >>

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 439 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

(a) JUDICIAL REVIEW.—Section 106 of the Immigration and Nationality Act (8 U.S.C. 1105a(a)(10)) is amended to read as follows:

"(10) Any final order of deportation against an alien who is deportable by reason of having committed a criminal offense covered in section 241(a)(2) (A)(iii), (B), (C), or (D), or any offense covered by section 241(a)(2)(A)(ii) for which both predicate offenses are covered by section 241(a)(2)(A)(i), shall not be subject to review by any court.".

<< 8 USCA § 1101 >>

(b) FINAL ORDER OF DEPORTATION DEFINED.—Section 101(a) of such Act (8 U.S.C. 1101(a)) is amended by adding at the end the following new paragraph:

"(47)(A) The term 'order of deportation' means the order of the special inquiry officer, or other such administrative officer to whom the Attorney General has delegated the responsibility for determining whether an alien is deportable, concluding that the alien is deportable or ordering deportation.

"(B) The order described under subparagraph (A) shall become final upon the earlier of—

"(i) a determination by the Board of Immigration Appeals affirming such order; or

"(ii) the expiration of the period in which the alien is permitted to seek review of such order by the Board of Immigration Appeals.".

<< 8 USCA § 1252 >>

(c) ARREST AND CUSTODY.—Section 242(a)(2) of such Act is amended—

(1) in subparagraph (A)—

(A) by striking "(2)(A) The Attorney" and inserting "(2) The Attorney";

(B) by striking "an aggravated felony upon" and all that follows through "of the same offense)" and inserting "any criminal offense covered in section 241(a)(2) (A)(iii), (B), (C), or (D), or any offense covered by section 241(a)(2)(A)(ii) for which both predicate offenses are covered by section 241(a)(2)(A)(i), upon release of the alien from incarceration, shall deport the alien as expeditiously as possible"; and

(C) by striking "but subject to subparagraph (B)"; and

(2) by striking subparagraph (B).

<< 8 USCA § 1182 >>

(d) CLASSES OF EXCLUDABLE ALIENS.—Section 212(c) of such Act (8 U.S.C. 1182(c)) is amended—

(1) by striking "The first sentence of this" and inserting "This"; and

(2) by striking "has been convicted of one or more aggravated felonies" and all that follows through the end and inserting "is deportable by reason of having committed any criminal offense covered in section 241(a)(2) (A)(iii), (B), (C), or (D), or any offense covered by section 241(a)(2)(A)(ii) for which both predicate offenses are covered by section 241(a)(2)(A)(i).".

<< 8 USCA § 1101 >>

(e) AGGRAVATED FELONY DEFINED.—Section 101(a)(43) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(43)), as amended by section 222 of the Immigration and Nationality Technical Corrections Act of 1994 (Public Law 103–416), is amended—

(1) in subparagraph (J), by inserting ", or an offense described in section 1084 (if it is a second or subsequent offense) or 1955 of that title (relating to gambling offenses)," after "corrupt organizations)";

(2) in subparagraph (K)—

(A) by striking "or" at the end of clause (i),

(B) by redesignating clause (ii) as clause (iii), and

(C) by inserting after clause (i) the following new clause:

"(ii) is described in section 2421, 2422, or 2423 of title 18, United States Code (relating to transportation for the purpose of prostitution) for commercial advantage; or";

AR.07847

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 440 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

(3) by amending subparagraph (N) to read as follows:

"(N) an offense described in paragraph (1)(A) or (2) of section 274(a) (relating to alien smuggling) for which the term of imprisonment imposed (regardless of any suspension of imprisonment) is at least 5 years;";

(4) by amending subparagraph (O) to read as follows:

"(O) an offense (i) which either is falsely making, forging, counterfeiting, mutilating, or altering a passport or instrument in violation of section 1543 of title 18, United States Code, or is described in section 1546(a) of such title (relating to document fraud) and (ii) for which the term of imprisonment imposed (regardless of any suspension of such imprisonment) is at least 18 months;";

(5) in subparagraph (P), by striking "15 years" and inserting "5 years", and by striking "and" at the end;

(6) by redesignating subparagraphs (O), (P), and (Q) as subparagraphs (P), (Q), and (U), respectively;

(7) by inserting after subparagraph (N) the following new subparagraph:

"(O) an offense described in section 275(a) or 276 committed by an alien who was previously deported on the basis of a conviction for an offense described in another subparagraph of this paragraph;"; and

(8) by inserting after subparagraph (Q), as so redesignated, the following new subparagraphs:

"(R) an offense relating to commercial bribery, counterfeiting, forgery, or trafficking in vehicles the identification numbers of which have been altered for which a sentence of 5 years' imprisonment or more may be imposed;

"(S) an offense relating to obstruction of justice, perjury or subornation of perjury, or bribery of a witness, for which a sentence of 5 years' imprisonment or more may be imposed;

"(T) an offense relating to a failure to appear before a court pursuant to a court order to answer to or dispose of a charge of a felony for which a sentence of 2 years' imprisonment or more may be imposed; and".

<< 8 USCA § 1101 NOTE >>

(f) EFFECTIVE DATE.—The amendments made by subsection (e) shall apply to convictions entered on or after the date of the enactment of this Act, except that the amendment made by subsection (e)(3) shall take effect as if included in the enactment of section 222 of the Immigration and Nationality Technical Corrections Act of 1994.

<< 8 USCA § 1252a >>

(g) DEPORTATION OF CRIMINAL ALIENS.—Section 242A(a) of such Act (8 U.S.C. 1252a) is amended—

(1) in paragraph (1)—

(A) by striking "aggravated felonies (as defined in section 101(a)(43) of this title)" and inserting "any criminal offense covered in section 241(a)(2) (A)(iii), (B), (C), or (D), or any offense covered by section 241(a)(2)(A)(ii) for which both predicate offenses are covered by section 241(a)(2)(A)(i)."; and

(B) by striking ", where warranted,";

(2) in paragraph (2), by striking "aggravated felony" and all that follows through "before any scheduled hearings." and inserting "any criminal offense covered in section 241(a)(2)(A)(iii), (B), (C), or (D), or any offense covered by section 241(a) (2)(A)(ii) for which both predicate offenses are covered by section 241(a)(2)(A)(i).".

<< 8 USCA § 1252 >>

(h) DEADLINES FOR DEPORTING ALIEN.—Section 242(c) of such Act (8 U.S.C. 1252(c)) is amended—

(1) by striking "(c) When a final order" and inserting "(c)(1) Subject to paragraph (2), when a final order"; and

(2) by inserting at the end the following new paragraph:

"(2) When a final order of deportation under administrative process is made against any alien who is deportable by reason of having committed a criminal offense covered in section 241(a)(2)(A)(iii), (B), (C), or (D) or any offense covered by section 241(a)(2)(A)(ii) for which both predicate offenses are covered by section 241(a)(2)(A)(i), the Attorney General shall have 30 days from the date of the order within which to effect the alien's departure from the United States. The Attorney General shall have sole and unreviewable discretion to waive the foregoing provision for aliens who are cooperating with law enforcement authorities or for purposes of national security.".

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

Case 3:20-cv-07721-SI   Document 58-7   Filed 11/10/20   Page 441 of 1305

## SEC. 441. LIMITATION ON COLLATERAL ATTACKS ON UNDERLYING DEPORTATION ORDER.

<< 8 USCA § 1326 >>

(a) IN GENERAL.—Section 276 of the Immigration and Nationality Act (8 U.S.C. 1326) is amended by adding at the end the following new subsection:

"(d) In a criminal proceeding under this section, an alien may not challenge the validity of the deportation order described in subsection (a)(1) or subsection (b) unless the alien demonstrates that—

"(1) the alien exhausted any administrative remedies that may have been available to seek relief against the order;

"(2) the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and

"(3) the entry of the order was fundamentally unfair.".

<< 8 USCA § 1326 NOTE >>

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply to criminal proceedings initiated after the date of enactment of this Act.

## SEC. 442. DEPORTATION PROCEDURES FOR CERTAIN CRIMINAL ALIENS WHO ARE NOT PERMANENT RESIDENTS.

<< 8 USCA § 1252a >>

(a) ADMINISTRATIVE HEARINGS.—Section 242A(b) of the Immigration and Nationality Act (8 U.S.C. 1252a(b)), as added by section 130004(a) of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322), is amended—

(1) in paragraph (2)—

(A) by striking "and" at the end of subparagraph (A) and inserting "or", and

(B) by amending subparagraph (B) to read as follows:

"(B) had permanent resident status on a conditional basis (as described in section 216) at the time that proceedings under this section commenced.";

(2) in paragraph (3), by striking "30 calendar days" and inserting "14 calendar days";

(3) in paragraph (4)(B), by striking "proccedings" and inserting "proceedings";

(4) in paragraph (4)—

(A) by redesignating subparagraphs (D) and (E) as subparagraphs (F) and (G), respectively; and

(B) by adding after subparagraph (C) the following new subparagraphs:

"(D) such proceedings are conducted in, or translated for the alien into, a language the alien understands;

"(E) a determination is made for the record at such proceedings that the individual who appears to respond in such a proceeding is an alien subject to such an expedited proceeding under this section and is, in fact, the alien named in the notice for such proceeding;".

(5) by adding at the end the following new paragraph:

"(5) No alien described in this section shall be eligible for any relief from deportation that the Attorney General may grant in the Attorney General's discretion.".

<< 8 USCA § 1105a >>

(b) LIMIT ON JUDICIAL REVIEW.—Subsection (d) of section 106 of the Immigration and Nationality Act (8 U.S.C. 1105a), as added by section 130004(b) of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322), is amended to read as follows:

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 442 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

"(d) Notwithstanding subsection (c), a petition for review or for habeas corpus on behalf of an alien described in section 242A(c) may only challenge whether the alien is in fact an alien described in such section, and no court shall have jurisdiction to review any other issue.".

<< 8 USCA § 1252a >>

(c) PRESUMPTION OF DEPORTABILITY.—Section 242A of the Immigration and Nationality Act (8 U.S.C. 1252a) is amended by inserting after subsection (b) the following new subsection:

"(c) PRESUMPTION OF DEPORTABILITY.—An alien convicted of an aggravated felony shall be conclusively presumed to be deportable from the United States.".

<< 8 USCA § 1105a NOTE >>

(d) EFFECTIVE DATE.—The amendments made by this section shall become effective no later than 60 days after the publication by the Attorney General of implementing regulations that shall be published on or before January 1, 1997.

SEC. 443. EXTRADITION OF ALIENS.

<< 18 USCA § 3181 >>

(a) SCOPE.—Section 3181 of title 18, United States Code, is amended—

(1) by inserting "(a)" before "The provisions of this chapter"; and

(2) by adding at the end the following new subsections:

"(b) The provisions of this chapter shall be construed to permit, in the exercise of comity, the surrender of persons, other than citizens, nationals, or permanent residents of the United States, who have committed crimes of violence against nationals of the United States in foreign countries without regard to the existence of any treaty of extradition with such foreign government if the Attorney General certifies, in writing, that—

"(1) evidence has been presented by the foreign government that indicates that had the offenses been committed in the United States, they would constitute crimes of violence as defined under section 16 of this title; and

"(2) the offenses charged are not of a political nature.

"(c) As used in this section, the term 'national of the United States' has the meaning given such term in section 101(a)(22) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(22)).".

<< 18 USCA § 3184 >>

(b) FUGITIVES.—Section 3184 of title 18, United States Code, is amended—

(1) in the first sentence by inserting after "United States and any foreign government," the following: "or in cases arising under section 3181(b),";

(2) in the first sentence by inserting after "treaty or convention," the following: "or provided for under section 3181(b),";

(3) in the third sentence by inserting after "treaty or convention," the following: "or under section 3181(b),".

TITLE V—NUCLEAR, BIOLOGICAL, AND CHEMICAL WEAPONS RESTRICTIONS

Subtitle A—Nuclear Materials

<< 18 USCA § 831 NOTE >>

SEC. 501. FINDINGS AND PURPOSE.

(a) FINDINGS.—The Congress finds that—

(1) nuclear materials, including byproduct materials, can be used to create radioactive dispersal devices that are capable of causing serious bodily injury as well as substantial damage to property and to the environment;

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 443 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

(2) the potential use of nuclear materials, including byproduct materials, enhances the threat posed by terrorist activities and thereby has a greater effect on the security interests of the United States;

(3) due to the widespread hazards presented by the threat of nuclear contamination, as well as nuclear bombs, the United States has a strong interest in ensuring that persons who are engaged in the illegal acquisition and use of nuclear materials, including byproduct materials, are prosecuted for their offenses;

(4) the threat that nuclear materials will be obtained and used by terrorist and other criminal organizations has increased substantially since the enactment in 1982 of the legislation that implemented the Convention on the Physical Protection of Nuclear Material, codified at section 831 of title 18, United States Code;

(5) the successful efforts to obtain agreements from other countries to dismantle nuclear weapons have resulted in increased packaging and transportation of nuclear materials, thereby decreasing the security of such materials by increasing the opportunity for unlawful diversion and theft;

(6) the trafficking in the relatively more common, commercially available, and usable nuclear and byproduct materials creates the potential for significant loss of life and environmental damage;

(7) report trafficking incidents in the early 1990's suggest that the individuals involved in trafficking in these materials from Eurasia and Eastern Europe frequently conducted their black market sales of these materials within the Federal Republic of Germany, the Baltic States, the former Soviet Union, Central Europe, and to a lesser extent in the Middle European countries;

(8) the international community has become increasingly concerned over the illegal possession of nuclear and nuclear byproduct materials;

(9) the potentially disastrous ramifications of increased access to nuclear and nuclear byproduct materials pose such a significant threat that the United States must use all lawful methods available to combat the illegal use of such materials;

(10) the United States has an interest in encouraging United States corporations to do business in the countries that comprised the former Soviet Union, and in other developing democracies;

(11) protection of such United States corporations from threats created by the unlawful use of nuclear materials is important to the success of the effort to encourage business ventures in these countries, and to further the foreign relations and commerce of the United States;

(12) the nature of nuclear contamination is such that it may affect the health, environment, and property of United States nationals even if the acts that constitute the illegal activity occur outside the territory of the United States, and are primarily directed toward foreign nationals; and

(13) there is presently no Federal criminal statute that provides adequate protection to United States interests from nonweapons grade, yet hazardous radioactive material, and from the illegal diversion of nuclear materials that are held for other than peaceful purposes.

(b) PURPOSE.—The purpose of this title is to provide Federal law enforcement agencies with the necessary means and the maximum authority permissible under the Constitution to combat the threat of nuclear contamination and proliferation that may result from the illegal possession and use of radioactive materials.

<< 18 USCA § 831 >>

SEC. 502. EXPANSION OF SCOPE AND JURISDICTIONAL BASES OF NUCLEAR MATERIALS PROHIBITIONS.

Section 831 of title 18, United States Code, is amended—

(1) in subsection (a)—

(A) by striking "nuclear material" each place it appears and inserting "nuclear material or nuclear byproduct material";

(B) in paragraph (1)—

(i) in subparagraph (A), by inserting "or to the environment" after "property"; and

(ii) so that subparagraph (B) reads as follows:

"(B) circumstances exist, or have been represented to the defendant to exist, that are likely to cause the death or serious bodily injury to any person, or substantial damage to property or to the environment;"; and

(C) in paragraph (6), by inserting "or to the environment" after "property";

(2) in subsection (c)—

(A) so that paragraph (2) reads as follows:

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 444 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

"(2) an offender or a victim is—

"(A) a national of the United States; or

"(B) a United States corporation or other legal entity;";

(B) in paragraph (3)—

(i) by striking "at the time of the offense the nuclear material is in use, storage, or transport, for peaceful purposes, and"; and

(ii) by striking "or" at the end of the paragraph;

(C) in paragraph (4)—

(i) by striking "nuclear material for peaceful purposes" and inserting "nuclear material or nuclear byproduct material"; and

(ii) by striking the period at the end of the paragraph and inserting "; or"; and

(D) by adding at the end the following new paragraph:

"(5) either—

"(A) the governmental entity under subsection (a)(5) is the United States; or

"(B) the threat under subsection (a)(6) is directed at the United States."; and

(3) in subsection (f)—

(A) in paragraph (1)—

(i) in subparagraph (A), by striking "with an isotopic concentration not in excess of 80 percent plutonium 238"; and

(ii) in subparagraph (C), by striking "uranium" and inserting "enriched uranium, defined as uranium";

(B) by redesignating paragraphs (2), (3), and (4) as paragraphs (3), (4), and (5), respectively;

(C) by inserting after paragraph (1) the following new paragraph:

"(2) the term 'nuclear byproduct material' means any material containing any radioactive isotope created through an irradiation process in the operation of a nuclear reactor or accelerator;";

(D) in paragraph (4), as redesignated, by striking "and" at the end;

(E) in paragraph (5), as redesignated, by striking the period at the end and inserting a semicolon; and

(F) by adding at the end the following new paragraphs:

"(6) the term 'national of the United States' has the same meaning as in section 101(a)(22) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(22)); and

"(7) the term 'United States corporation or other legal entity' means any corporation or other entity organized under the laws of the United States or any State, Commonwealth, territory, possession, or district of the United States.".

## SEC. 503. REPORT TO CONGRESS ON THEFTS OF EXPLOSIVE MATERIALS FROM ARMORIES.

(a) STUDY.—The Attorney General and the Secretary of Defense shall jointly conduct a study of the number and extent of thefts from military arsenals (including National Guard armories) of firearms, explosives, and other materials that are potentially useful to terrorists.

(b) REPORT TO THE CONGRESS.—Not later than 6 months after the date of enactment of this Act, the Attorney General and the Secretary of Defense shall jointly prepare and transmit to the Congress a report on the findings of the study conducted under subsection (a).

### Subtitle B—Biological Weapons Restrictions

<< 42 USCA § 262 NOTE >>

## SEC. 511. ENHANCED PENALTIES AND CONTROL OF BIOLOGICAL AGENTS.

(a) FINDINGS.—The Congress finds that—

(1) certain biological agents have the potential to pose a severe threat to public health and safety;

(2) such biological agents can be used as weapons by individuals or organizations for the purpose of domestic or international terrorism or for other criminal purposes;

(3) the transfer and possession of potentially hazardous biological agents should be regulated to protect public health and safety; and

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 445 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

(4) efforts to protect the public from exposure to such agents should ensure that individuals and groups with legitimate objectives continue to have access to such agents for clinical and research purposes.

(b) CRIMINAL ENFORCEMENT.—Chapter 10 of title 18, United States Code, is amended—

<< 18 USCA § 175 >>

<< 42 USCA § 262 NOTE >>

(1) in section 175(a), by inserting "or attempts, threatens, or conspires to do the same," after "to do so,";

<< 18 USCA § 177 >>

<< 42 USCA § 262 NOTE >>

(2) in section 177(a)(2), by inserting "threat," after "attempt,"; and

<< 18 USCA § 178 >>

<< 42 USCA § 262 NOTE >>

(3) in section 178—
 (A) in paragraph (1), by striking "or infectious substance" and inserting "infectious substance, or biological product that may be engineered as a result of biotechnology, or any naturally occurring or bioengineered component of any such microorganism, virus, infectious substance, or biological product";
 (B) in paragraph (2)—
  (i) by inserting "the toxic material of plants, animals, microorganisms, viruses, fungi, or infectious substances, or a recombinant molecule" after "means";
  (ii) by striking "production—" and inserting "production, including—";
  (iii) in subparagraph (A), by inserting "or biological product that may be engineered as a result of biotechnology" after "substance"; and
  (iv) in subparagraph (B), by inserting "or biological product" after "isomer"; and
 (C) in paragraph (4), by inserting ", or molecule, including a recombinant molecule, or biological product that may be engineered as a result of biotechnology," after "organism".

<< 18 USCA § 2332a >>

<< 42 USCA § 262 NOTE >>

 (c) TERRORISM.—Section 2332a(a) of title 18, United States Code, is amended by inserting ", including any biological agent, toxin, or vector (as those terms are defined in section 178)" after "destruction".

<< 42 USCA § 262 NOTE >>

 (d) REGULATORY CONTROL OF BIOLOGICAL AGENTS.—
 (1) LIST OF BIOLOGICAL AGENTS.—
  (A) IN GENERAL.—The Secretary shall, through regulations promulgated under subsection (f), establish and maintain a list of each biological agent that has the potential to pose a severe threat to public health and safety.
  (B) CRITERIA.—In determining whether to include an agent on the list under subparagraph (A), the Secretary shall—
   (i) consider—
    (I) the effect on human health of exposure to the agent;
    (II) the degree of contagiousness of the agent and the methods by which the agent is transferred to humans;
    (III) the availability and effectiveness of immunizations to prevent and treatments for any illness resulting from infection by the agent; and

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 446 of 1305

(IV) any other criteria that the Secretary considers appropriate; and

(ii) consult with scientific experts representing appropriate professional groups.

<< 42 USCA § 262 NOTE >>

(e) REGULATION OF TRANSFERS OF LISTED BIOLOGICAL AGENTS.—The Secretary shall, through regulations promulgated under subsection (f), provide for—

(1) the establishment and enforcement of safety procedures for the transfer of biological agents listed pursuant to subsection (d)(1), including measures to ensure—

(A) proper training and appropriate skills to handle such agents; and

(B) proper laboratory facilities to contain and dispose of such agents;

(2) safeguards to prevent access to such agents for use in domestic or international terrorism or for any other criminal purpose;

(3) the establishment of procedures to protect the public safety in the event of a transfer or potential transfer of a biological agent in violation of the safety procedures established under paragraph (1) or the safeguards established under paragraph (2); and

(4) appropriate availability of biological agents for research, education, and other legitimate purposes.

<< 42 USCA § 262 NOTE >>

(f) REGULATIONS.—The Secretary shall carry out this section by issuing—

(1) proposed rules not later than 60 days after the date of enactment of this Act; and

(2) final rules not later than 120 days after the date of enactment of this Act.

<< 42 USCA § 262 NOTE >>

(g) DEFINITIONS.—For purposes of this section—

(1) the term "biological agent" has the same meaning as in section 178 of title 18, United States Code; and

(2) the term "Secretary" means the Secretary of Health and Human Services.

Subtitle C—Chemical Weapons Restrictions

SEC. 521. CHEMICAL WEAPONS OF MASS DESTRUCTION; STUDY OF FACILITY FOR TRAINING AND EVALUATION OF PERSONNEL WHO RESPOND TO USE OF CHEMICAL OR BIOLOGICAL WEAPONS IN URBAN AND SUBURBAN AREAS.

<< 18 USCA § 2332c >>

(a) CHEMICAL WEAPONS OF MASS DESTRUCTION.—Chapter 113B of title 18, United States Code, relating to terrorism, is amended by inserting after section 2332b as added by section 702 of this Act the following new section:

"§ 2332c. Use of chemical weapons

"(a) PROHIBITED ACTS.—

"(1) OFFENSE.—A person shall be punished under paragraph (2) if that person, without lawful authority, uses, or attempts or conspires to use, a chemical weapon against—

"(A) a national of the United States while such national is outside of the United States;

"(B) any person within the United States; or

"(C) any property that is owned, leased, or used by the United States or by any department or agency of the United States, whether the property is within or outside of the United States.

"(2) PENALTIES.—A person who violates paragraph (1)—

"(A) shall be imprisoned for any term of years or for life; or

"(B) if death results from that violation, shall be punished by death or imprisoned for any term of years or for life.

"(b) DEFINITIONS.—As used in this section—

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 447 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

"(1) the term 'national of the United States' has the same meaning as in section 101(a)(22) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(22)); and

"(2) the term 'chemical weapon' means any weapon that is designed or intended to cause widespread death or serious bodily injury through the release, dissemination, or impact of toxic or poisonous chemicals or precursors of toxic or poisonous chemicals.

<< 50 USCA § 1522 NOTE >>

(b) STUDY OF FACILITY FOR TRAINING AND EVALUATION OF PERSONNEL WHO RESPOND TO USE OF CHEMICAL OR BIOLOGICAL WEAPONS IN URBAN AND SUBURBAN AREAS.—

(1) FINDINGS.—The Congress finds that—

(A) the threat of the use of chemical and biological weapons by Third World countries and by terrorist organizations has increased in recent years and is now a problem of worldwide significance;

(B) the military and law enforcement agencies in the United States that are responsible for responding to the use of such weapons require additional testing, training, and evaluation facilities to ensure that the personnel of such agencies discharge their responsibilities effectively; and

(C) a facility that recreates urban and suburban locations would provide an especially effective environment in which to test, train, and evaluate such personnel for that purpose.

(2) STUDY OF FACILITY.—

(A) IN GENERAL.—The President shall establish an interagency task force to determine the feasibility and advisability of establishing a facility that recreates both an urban environment and a suburban environment in such a way as to permit the effective testing, training, and evaluation in such environments of government personnel who are responsible for responding to the use of chemical and biological weapons in the United States.

(B) DESCRIPTION OF FACILITY.—The facility considered under subparagraph (A) shall include—

(i) facilities common to urban environments (including a multistory building and an underground rail transit system) and to suburban environments;

(ii) the capacity to produce controllable releases of chemical and biological agents from a variety of urban and suburban structures, including laboratories, small buildings, and dwellings;

(iii) the capacity to produce controllable releases of chemical and biological agents into sewage, water, and air management systems common to urban areas and suburban areas;

(iv) chemical and biocontaminant facilities at the P3 and P4 levels;

(v) the capacity to test and evaluate the effectiveness of a variety of protective clothing and facilities and survival techniques in urban areas and suburban areas; and

(vi) the capacity to test and evaluate the effectiveness of variable sensor arrays (including video, audio, meteorological, chemical, and biosensor arrays) in urban areas and suburban areas.

(C) SENSE OF CONGRESS.—It is the sense of Congress that the facility considered under subparagraph (A) shall, if established—

(i) be under the jurisdiction of the Secretary of Defense; and

(ii) be located at a principal facility of the Department of Defense for the testing and evaluation of the use of chemical and biological weapons during any period of armed conflict.

<< 18 USCA Ch. 113B >>

(c) CLERICAL AMENDMENT.—The table of sections at the beginning of chapter 113B of title 18, United States Code, relating to terrorism, is amended by inserting after the item added by section 702 of this Act that relates to section 2332b the following new item:

"2332c. Use of chemical weapons.".

TITLE VI—IMPLEMENTATION OF PLASTIC EXPLOSIVES CONVENTION

Case 3:20-cv-07721-SI   Document 58-7   Filed 11/10/20   Page 448 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

<< 18 USCA § 841 NOTE >>

## SEC. 601. FINDINGS AND PURPOSES.

(a) FINDINGS.—The Congress finds that—

(1) plastic explosives were used by terrorists in the bombings of Pan American Airlines flight number 103 in December 1988 and UTA flight number 722 in September 1989;

(2) plastic explosives can be used with little likelihood of detection for acts of unlawful interference with civil aviation, maritime navigation, and other modes of transportation;

(3) the criminal use of plastic explosives places innocent lives in jeopardy, endangers national security, affects domestic tranquility, and gravely affects interstate and foreign commerce;

(4) the marking of plastic explosives for the purpose of detection would contribute significantly to the prevention and punishment of such unlawful acts; and

(5) for the purpose of deterring and detecting such unlawful acts, the Convention on the Marking of Plastic Explosives for the Purpose of Detection, Done at Montreal on 1 March 1991, requires each contracting State to adopt appropriate measures to ensure that plastic explosives are duly marked and controlled.

(b) PURPOSE.—The purpose of this title is to fully implement the Convention on the Marking of Plastic Explosives for the Purpose of Detection, Done at Montreal on 1 March 1991.

<< 18 USCA § 841 >>

## SEC. 602. DEFINITIONS.

Section 841 of title 18, United States Code, is amended by adding at the end the following new subsections:

"(o) 'Convention on the Marking of Plastic Explosives' means the Convention on the Marking of Plastic Explosives for the Purpose of Detection, Done at Montreal on 1 March 1991.

"(p) 'Detection agent' means any one of the substances specified in this subsection when introduced into a plastic explosive or formulated in such explosive as a part of the manufacturing process in such a manner as to achieve homogeneous distribution in the finished explosive, including—

"(1) Ethylene glycol dinitrate (EGDN), C2H 4(NO 3) 2, molecular weight 152, when the minimum concentration in the finished explosive is 0.2 percent by mass;

"(2) 2,3–Dimethyl–2,3–dinitrobutane (DMNB), C 6H 12(NO 2) 2 , molecular weight 176, when the minimum concentration in the finished explosive is 0.1 percent by mass;

"(3) Para–Mononitrotoluene (p–MNT), C 7H 7NO 2, molecular weight 137, when the minimum concentration in the finished explosive is 0.5 percent by mass;

"(4) Ortho–Mononitrotoluene (o–MNT), C 7H 7NO 2, molecular weight 137, when the minimum concentration in the finished explosive is 0.5 percent by mass; and

"(5) any other substance in the concentration specified by the Secretary, after consultation with the Secretary of State and the Secretary of Defense, that has been added to the table in part 2 of the Technical Annex to the Convention on the Marking of Plastic Explosives.

"(q) 'Plastic explosive' means an explosive material in flexible or elastic sheet form formulated with one or more high explosives which in their pure form has a vapor pressure less than $10^{-4}$ Pa at a temperature of 25°C., is formulated with a binder material, and is as a mixture malleable or flexible at normal room temperature.".

<< 18 USCA § 842 >>

## SEC. 603. REQUIREMENT OF DETECTION AGENTS FOR PLASTIC EXPLOSIVES.

Section 842 of title 18, United States Code, is amended by adding at the end the following new subsections:

"(l) It shall be unlawful for any person to manufacture any plastic explosive that does not contain a detection agent.

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 449 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

"(m)(1) It shall be unlawful for any person to import or bring into the United States, or export from the United States, any plastic explosive that does not contain a detection agent.

"(2) This subsection does not apply to the importation or bringing into the United States, or the exportation from the United States, of any plastic explosive that was imported or brought into, or manufactured in the United States prior to the date of enactment of this subsection by or on behalf of any agency of the United States performing military or police functions (including any military reserve component) or by or on behalf of the National Guard of any State, not later than 15 years after the date of entry into force of the Convention on the Marking of Plastic Explosives, with respect to the United States.

"(n)(1) It shall be unlawful for any person to ship, transport, transfer, receive, or possess any plastic explosive that does not contain a detection agent.

"(2) This subsection does not apply to—

"(A) the shipment, transportation, transfer, receipt, or possession of any plastic explosive that was imported or brought into, or manufactured in the United States prior to the date of enactment of this subsection by any person during the period beginning on that date and ending 3 years after that date of enactment; or

"(B) the shipment, transportation, transfer, receipt, or possession of any plastic explosive that was imported or brought into, or manufactured in the United States prior to the date of enactment of this subsection by or on behalf of any agency of the United States performing a military or police function (including any military reserve component) or by or on behalf of the National Guard of any State, not later than 15 years after the date of entry into force of the Convention on the Marking of Plastic Explosives, with respect to the United States.

"(o) It shall be unlawful for any person, other than an agency of the United States (including any military reserve component) or the National Guard of any State, possessing any plastic explosive on the date of enactment of this subsection, to fail to report to the Secretary within 120 days after such date of enactment the quantity of such explosives possessed, the manufacturer or importer, any marks of identification on such explosives, and such other information as the Secretary may prescribe by regulation.".

<< 18 USCA § 844 >>

SEC. 604. CRIMINAL SANCTIONS.

Section 844(a) of title 18, United States Code, is amended to read as follows:

"(a) Any person who violates any of subsections (a) through (i) or (l) through (o) of section 842 shall be fined under this title, imprisoned for not more than 10 years, or both.".

<< 18 USCA § 845 >>

SEC. 605. EXCEPTIONS.

Section 845 of title 18, United States Code, is amended—

(1) in subsection (a)—

(A) by inserting "(l), (m), (n), or (o) of section 842 and subsections" after "subsections"; and

(B) in paragraph (1), by inserting before the semicolon ", and which pertain to safety"; and

(2) by adding at the end the following new subsection:

"(c) It is an affirmative defense against any proceeding involving subsections (l) through (o) of section 842 if the proponent proves by a preponderance of the evidence that the plastic explosive—

"(1) consisted of a small amount of plastic explosive intended for and utilized solely in lawful—

"(A) research, development, or testing of new or modified explosive materials;

"(B) training in explosives detection or development or testing of explosives detection equipment; or

"(C) forensic science purposes; or

"(2) was plastic explosive that, within 3 years after the date of enactment of the Antiterrorism and Effective Death Penalty Act of 1996, will be or is incorporated in a military device within the territory of the United States and remains an integral part of such military device, or is intended to be, or is incorporated in, and remains an integral part of a military device that is

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 450 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

intended to become, or has become, the property of any agency of the United States performing military or police functions (including any military reserve component) or the National Guard of any State, wherever such device is located.

"(3) For purposes of this subsection, the term 'military device' includes, but is not restricted to, shells, bombs, projectiles, mines, missiles, rockets, shaped charges, grenades, perforators, and similar devices lawfully manufactured exclusively for military or police purposes.".

<< 19 USCA § 1595 >>

SEC. 606. SEIZURE AND FORFEITURE OF PLASTIC EXPLOSIVES.

Section 596(c)(1) of the Tariff Act of 1930 (19 U.S.C. 1595a(c)(1)) is amended—
    (1) in subparagraph (B), by striking "or" at the end;
    (2) in subparagraph (C), by striking the period and inserting "; or"; and
    (3) by adding at the end the following new subparagraph:
    "(D) is a plastic explosive, as defined in section 841(q) of title 18, United States Code, which does not contain a detection agent, as defined in section 841(p) of such title.".

<< 18 USCA § 841 NOTE >>

SEC. 607. EFFECTIVE DATE.

Except as otherwise provided in this title, this title and the amendments made by this title shall take effect 1 year after the date of enactment of this Act.

TITLE VII—CRIMINAL LAW MODIFICATIONS TO COUNTER TERRORISM

Subtitle A—Crimes and Penalties

<< 18 USCA § 844 >>

SEC. 701. INCREASED PENALTY FOR CONSPIRACIES INVOLVING EXPLOSIVES.

Section 844 of title 18, United States Code, is amended by adding at the end the following new subsection:
"(n) Except as otherwise provided in this section, a person who conspires to commit any offense defined in this chapter shall be subject to the same penalties (other than the penalty of death) as the penalties prescribed for the offense the commission of which was the object of the conspiracy.".

SEC. 702. ACTS OF TERRORISM TRANSCENDING NATIONAL BOUNDARIES.

<< 18 USCA § 2332b >>

(a) OFFENSE.—Chapter 113B of title 18, United States Code, relating to terrorism, is amended by inserting after section 2332a the following new section:

"§ 2332b. Acts of terrorism transcending national boundaries

"(a) PROHIBITED ACTS.—
"(1) OFFENSES.—Whoever, involving conduct transcending national boundaries and in a circumstance described in subsection (b)—
    "(A) kills, kidnaps, maims, commits an assault resulting in serious bodily injury, or assaults with a dangerous weapon any person within the United States; or
    "(B) creates a substantial risk of serious bodily injury to any other person by destroying or damaging any structure, conveyance, or other real or personal property within the United States or by attempting or conspiring to destroy or damage any structure, conveyance, or other real or personal property within the United States;

Case 3:20-cv-07721-SI  Document 58-7  Filed 11/10/20  Page 451 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

in violation of the laws of any State, or the United States, shall be punished as prescribed in subsection (c).

"(2) TREATMENT OF THREATS, ATTEMPTS AND CONSPIRACIES.—Whoever threatens to commit an offense under paragraph (1), or attempts or conspires to do so, shall be punished under subsection (c).

"(b) JURISDICTIONAL BASES.—

"(1) CIRCUMSTANCES.—The circumstances referred to in subsection (a) are—

"(A) any of the offenders uses the mail or any facility of interstate or foreign commerce in furtherance of the offense;

"(B) the offense obstructs, delays, or affects interstate or foreign commerce, or would have so obstructed, delayed, or affected interstate or foreign commerce if the offense had been consummated;

"(C) the victim, or intended victim, is the United States Government, a member of the uniformed services, or any official, officer, employee, or agent of the legislative, executive, or judicial branches, or of any department or agency, of the United States;

"(D) the structure, conveyance, or other real or personal property is, in whole or in part, owned, possessed, or leased to the United States, or any department or agency of the United States;

"(E) the offense is committed in the territorial sea (including the airspace above and the seabed and subsoil below, and artificial islands and fixed structures erected thereon) of the United States; or

"(F) the offense is committed within the special maritime and territorial jurisdiction of the United States.

"(2) CO–CONSPIRATORS AND ACCESSORIES AFTER THE FACT.—Jurisdiction shall exist over all principals and co-conspirators of an offense under this section, and accessories after the fact to any offense under this section, if at least one of the circumstances described in subparagraphs (A) through (F) of paragraph (1) is applicable to at least one offender.

"(c) PENALTIES.—

"(1) PENALTIES.—Whoever violates this section shall be punished—

"(A) for a killing, or if death results to any person from any other conduct prohibited by this section, by death, or by imprisonment for any term of years or for life;

"(B) for kidnapping, by imprisonment for any term of years or for life;

"(C) for maiming, by imprisonment for not more than 35 years;

"(D) for assault with a dangerous weapon or assault resulting in serious bodily injury, by imprisonment for not more than 30 years;

"(E) for destroying or damaging any structure, conveyance, or other real or personal property, by imprisonment for not more than 25 years;

"(F) for attempting or conspiring to commit an offense, for any term of years up to the maximum punishment that would have applied had the offense been completed; and

"(G) for threatening to commit an offense under this section, by imprisonment for not more than 10 years.

"(2) CONSECUTIVE SENTENCE.—Notwithstanding any other provision of law, the court shall not place on probation any person convicted of a violation of this section; nor shall the term of imprisonment imposed under this section run concurrently with any other term of imprisonment.

"(d) PROOF REQUIREMENTS.—The following shall apply to prosecutions under this section:

"(1) KNOWLEDGE.—The prosecution is not required to prove knowledge by any defendant of a jurisdictional base alleged in the indictment.

"(2) STATE LAW.—In a prosecution under this section that is based upon the adoption of State law, only the elements of the offense under State law, and not any provisions pertaining to criminal procedure or evidence, are adopted.

"(e) EXTRATERRITORIAL JURISDICTION.—There is extraterritorial Federal jurisdiction—

"(1) over any offense under subsection (a), including any threat, attempt, or conspiracy to commit such offense; and

"(2) over conduct which, under section 3, renders any person an accessory after the fact to an offense under subsection (a).

"(f) INVESTIGATIVE AUTHORITY.—In addition to any other investigative authority with respect to violations of this title, the Attorney General shall have primary investigative responsibility for all Federal crimes of terrorism, and the Secretary of the Treasury shall assist the Attorney General at the request of the Attorney General. Nothing in this section shall be construed to interfere with the authority of the United States Secret Service under section 3056.

"(g) DEFINITIONS.—As used in this section—

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 452 of 1305

"(1) the term 'conduct transcending national boundaries' means conduct occurring outside of the United States in addition to the conduct occurring in the United States;

"(2) the term 'facility of interstate or foreign commerce' has the meaning given that term in section 1958(b)(2);

"(3) the term 'serious bodily injury' has the meaning given that term in section 1365(g)(3);

"(4) the term 'territorial sea of the United States' means all waters extending seaward to 12 nautical miles from the baselines of the United States, determined in accordance with international law; and

"(5) the term 'Federal crime of terrorism' means an offense that—

"(A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and

"(B) is a violation of—

"(i) section 32 (relating to destruction of aircraft or aircraft facilities), 37 (relating to violence at international airports), 81 (relating to arson within special maritime and territorial jurisdiction), 175 (relating to biological weapons), 351 (relating to congressional, cabinet, and Supreme Court assassination, kidnapping, and assault), 831 (relating to nuclear materials), 842(m) or (n) (relating to plastic explosives), 844(e) (relating to certain bombings), 844(f) or (i) (relating to arson and bombing of certain property), 956 (relating to conspiracy to injure property of a foreign government), 1114 (relating to protection of officers and employees of the United States), 1116 (relating to murder or manslaughter of foreign officials, official guests, or internationally protected persons), 1203 (relating to hostage taking), 1361 (relating to injury of Government property or contracts), 1362 (relating to destruction of communication lines, stations, or systems), 1363 (relating to injury to buildings or property within special maritime and territorial jurisdiction of the United States), 1366 (relating to destruction of an energy facility), 1751 (relating to Presidential and Presidential staff assassination, kidnapping, and assault), 2152 (relating to injury of fortifications, harbor defenses, or defensive sea areas), 2155 (relating to destruction of national defense materials, premises, or utilities), 2156 (relating to production of defective national defense materials, premises, or utilities), 2280 (relating to violence against maritime navigation), 2281 (relating to violence against maritime fixed platforms), 2332 (relating to certain homicides and other violence against United States nationals occurring outside of the United States), 2332a (relating to use of weapons of mass destruction), 2332b (relating to acts of terrorism transcending national boundaries), 2339A (relating to providing material support to terrorists), 2339B (relating to providing material support to terrorist organizations), or 2340A (relating to torture);

"(ii) section 236 (relating to sabotage of nuclear facilities or fuel) of the Atomic Energy Act of 1954 (42 U.S.C. 2284); or

"(iii) section 46502 (relating to aircraft piracy) or section 60123(b) (relating to destruction of interstate gas or hazardous liquid pipeline facility) of title 49.".

<< 18 USCA Ch. 113B >>

(b) CLERICAL AMENDMENT.—The table of sections at the beginning of chapter 113B of title 18, United States Code, relating to terrorism, is amended by inserting after the item relating to section 2332a the following new item:

"2332b. Acts of terrorism transcending national boundaries.".

<< 18 USCA § 3286 >>

(c) STATUTE OF LIMITATIONS AMENDMENT.—Section 3286 of title 18, United States Code, is amended—

(1) by striking "any offense" and inserting "any non-capital offense";

(2) by striking "36" and inserting "37";

(3) by striking "2331" and inserting "2332";

(4) by striking "2339" and inserting "2332a"; and

(5) by inserting "2332b (acts of terrorism transcending national boundaries)," after "(use of weapons of mass destruction),".

<< 18 USCA § 3142 >>

(d) PRESUMPTIVE DETENTION.—Section 3142(e) of title 18, United States Code, is amended by inserting ", 956(a), or 2332b" after "section 924(c)".

Case 3:20-cv-07721-SI   Document 58-7   Filed 11/10/20   Page 453 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

<< 18 USCA § 1363 >>

SEC. 703. EXPANSION OF PROVISION RELATING TO DESTRUCTION OR INJURY OF PROPERTY WITHIN SPECIAL MARITIME AND TERRITORIAL JURISDICTION.

 Section 1363 of title 18, United States Code, is amended by striking "any building," and all that follows through "shipping" and inserting "any structure, conveyance, or other real or personal property".

SEC. 704. CONSPIRACY TO HARM PEOPLE AND PROPERTY OVERSEAS.

<< 18 USCA § 956 >>

 (a) IN GENERAL.—Section 956 of chapter 45 of title 18, United States Code, is amended to read as follows:

"§ 956. Conspiracy to kill, kidnap, maim, or injure persons or damage property in a foreign country

 "(a)(1) Whoever, within the jurisdiction of the United States, conspires with one or more other persons, regardless of where such other person or persons are located, to commit at any place outside the United States an act that would constitute the offense of murder, kidnapping, or maiming if committed in the special maritime and territorial jurisdiction of the United States shall, if any of the conspirators commits an act within the jurisdiction of the United States to effect any object of the conspiracy, be punished as provided in subsection (a)(2).
 "(2) The punishment for an offense under subsection (a)(1) of this section is—
 "(A) imprisonment for any term of years or for life if the offense is conspiracy to murder or kidnap; and
 "(B) imprisonment for not more than 35 years if the offense is conspiracy to maim.
 "(b) Whoever, within the jurisdiction of the United States, conspires with one or more persons, regardless of where such other person or persons are located, to damage or destroy specific property situated within a foreign country and belonging to a foreign government or to any political subdivision thereof with which the United States is at peace, or any railroad, canal, bridge, airport, airfield, or other public utility, public conveyance, or public structure, or any religious, educational, or cultural property so situated, shall, if any of the conspirators commits an act within the jurisdiction of the United States to effect any object of the conspiracy, be imprisoned not more than 25 years.".

<< 18 USCA Ch. 45 >>

 (b) CLERICAL AMENDMENT.—The item relating to section 956 in the table of sections at the beginning of chapter 45 of title 18, United States Code, is amended to read as follows:

"956. Conspiracy to kill, kidnap, maim, or injure persons or damage property in a foreign country.".

SEC. 705. INCREASED PENALTIES FOR CERTAIN TERRORISM CRIMES.

 (a) IN GENERAL.—Title 18, United States Code, is amended—

<< 18 USCA § 114 >>

 (1) in section 114, by striking "maim or disfigure" and inserting "torture (as defined in section 2340), maim, or disfigure";

<< 18 USCA § 755 >>

 (2) in section 755, by striking "two years" and inserting "5 years";

<< 18 USCA § 756 >>

 (3) in section 756, by striking "one year" and inserting "five years";

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 454 of 1305

<< 18 USCA § 878 >>

(4) in section 878(a), by striking "by killing, kidnapping, or assaulting a foreign official, official guest, or internationally protected person";

<< 18 USCA § 1113 >>

(5) in section 1113, by striking "three years" and inserting "seven years"; and

<< 18 USCA § 2332 >>

(6) in section 2332(c), by striking "five" and inserting "ten".

<< 49 USCA § 46505 >>

(b) PENALTY FOR CARRYING WEAPONS OR EXPLOSIVES ON AN AIRCRAFT.—Section 46505 of title 49, United States Code, is amended—

(1) in subsection (b), by striking "one year" and inserting "10 years"; and

(2) in subsection (c), by striking "5" and inserting "15".

<< 18 USCA § 844 >>

## SEC. 706. MANDATORY PENALTY FOR TRANSFERRING AN EXPLOSIVE MATERIAL KNOWING THAT IT WILL BE USED TO COMMIT A CRIME OF VIOLENCE.

Section 844 of title 18, United States Code, is amended by adding at the end the following new subsection:

"(o) Whoever knowingly transfers any explosive materials, knowing or having reasonable cause to believe that such explosive materials will be used to commit a crime of violence (as defined in section 924(c)(3)) or drug trafficking crime (as defined in section 924(c)(2)) shall be subject to the same penalties as may be imposed under subsection (h) for a first conviction for the use or carrying of an explosive material.".

<< 18 USCA § 842 >>

## SEC. 707. POSSESSION OF STOLEN EXPLOSIVES PROHIBITED.

Section 842(h) of title 18, United States Code, is amended to read as follows:

"(h) It shall be unlawful for any person to receive, possess, transport, ship, conceal, store, barter, sell, dispose of, or pledge or accept as security for a loan, any stolen explosive materials which are moving as, which are part of, which constitute, or which have been shipped or transported in, interstate or foreign commerce, either before or after such materials were stolen, knowing or having reasonable cause to believe that the explosive materials were stolen.".

## SEC. 708. ENHANCED PENALTIES FOR USE OF EXPLOSIVES OR ARSON CRIMES.

<< 18 USCA § 844 >>

(a) IN GENERAL.—Section 844 of title 18, United States Code, is amended—

(1) in subsection (e), by striking "five" and inserting "10";

(2) by amending subsection (f) to read as follows:

"(f)(1) Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other personal or real property in whole or in part owned or possessed by, or leased to, the United States, or any department or agency thereof, shall be imprisoned for not less than 5 years and not more than 20 years, fined under this title, or both.

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 455 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

"(2) Whoever engages in conduct prohibited by this subsection, and as a result of such conduct, directly or proximately causes personal injury or creates a substantial risk of injury to any person, including any public safety officer performing duties, shall be imprisoned for not less than 7 years and not more than 40 years, fined under this title, or both.

"(3) Whoever engages in conduct prohibited by this subsection, and as a result of such conduct directly or proximately causes the death of any person, including any public safety officer performing duties, shall be subject to the death penalty, or imprisoned for not less than 20 years or for life, fined under this title, or both.";

(3) in subsection (h)—

(A) in the first sentence, by striking "5 years but not more than 15 years" and inserting "10 years"; and

(B) in the second sentence, by striking "10 years but not more than 25 years" and inserting "20 years"; and (4) in subsection (i)—

(A) by striking "not more than 20 years, fined the greater of the fine under this title or the cost of repairing or replacing any property that is damaged or destroyed," and inserting "not less than 5 years and not more than 20 years, fined under this title"; and

(B) by striking "not more than 40 years, fined the greater of a fine under this title or the cost of repairing or replacing any property that is damaged or destroyed," and inserting "not less than 7 years and not more than 40 years, fined under this title".

<< 18 USCA § 81 >>

(b) CONFORMING AMENDMENT.—Section 81 of title 18, United States Code, is amended by striking "fined under this title or imprisoned not more than five years, or both" and inserting "imprisoned for not more than 25 years, fined the greater of the fine under this title or the cost of repairing or replacing any property that is damaged or destroyed, or both".

(c) STATUTE OF LIMITATION FOR ARSON OFFENSES.—

<< 18 USCA § 3295 >>

(1) IN GENERAL.—Chapter 213 of title 18, United States Code, is amended by adding at the end the following new section:

"§ 3295. Arson offenses

"No person shall be prosecuted, tried, or punished for any non-capital offense under section 81 or subsection (f), (h), or (i) of section 844 unless the indictment is found or the information is instituted not later than 10 years after the date on which the offense was committed.".

<< 18 USCA Ch. 213 >>

(2) CLERICAL AMENDMENT.—The table of sections at the beginning of chapter 213 of title 18, United States Code, is amended by adding at the end the following new item:

"3295. Arson offenses.".

<< 18 USCA § 844 >>

(3) CONFORMING AMENDMENT.—Section 844(i) of title 18, United States Code, is amended by striking the last sentence.

SEC. 709. DETERMINATION OF CONSTITUTIONALITY OF RESTRICTING THE DISSEMINATION OF BOMB–MAKING INSTRUCTIONAL MATERIALS.

(a) STUDY.—The Attorney General, in consultation with such other officials and individuals as the Attorney General considers appropriate, shall conduct a study concerning—

(1) the extent to which there is available to the public material in any medium (including print, electronic, or film) that provides instruction on how to make bombs, destructive devices, or weapons of mass destruction;

(2) the extent to which information gained from such material has been used in incidents of domestic or international terrorism;

(3) the likelihood that such information may be used in future incidents of terrorism;

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 456 of 1305

(4) the application of Federal laws in effect on the date of enactment of this Act to such material;

(5) the need and utility, if any, for additional laws relating to such material; and

(6) an assessment of the extent to which the first amendment protects such material and its private and commercial distribution.

(b) REPORT.—

(1) REQUIREMENT.—Not later than 180 days after the date of enactment of this Act, the Attorney General shall submit to the Congress a report that contains the results of the study required by this section.

(2) AVAILABILITY.—The Attorney General shall make the report submitted under this subsection available to the public.

Subtitle B—Criminal Procedures

SEC. 721. CLARIFICATION AND EXTENSION OF CRIMINAL JURISDICTION OVER CERTAIN TERRORISM OFFENSES OVERSEAS.

<< 18 USCA § 46502 >>

(a) AIRCRAFT PIRACY.—Section 46502(b) of title 49, United States Code, is amended—

(1) in paragraph (1), by striking "and later found in the United States";

(2) so that paragraph (2) reads as follows:

"(2) There is jurisdiction over the offense in paragraph (1) if—

"(A) a national of the United States was aboard the aircraft;

"(B) an offender is a national of the United States; or

"(C) an offender is afterwards found in the United States."; and

(3) by inserting after paragraph (2) the following:

"(3) For purposes of this subsection, the term 'national of the United States' has the meaning prescribed in section 101(a)(22) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(22)).".

<< 18 USCA § 32 >>

(b) DESTRUCTION OF AIRCRAFT OR AIRCRAFT FACILITIES.—Section 32(b) of title 18, United States Code, is amended—

(1) by striking ", if the offender is later found in the United States,"; and

(2) by inserting at the end the following: "There is jurisdiction over an offense under this subsection if a national of the United States was on board, or would have been on board, the aircraft; an offender is a national of the United States; or an offender is afterwards found in the United States. For purposes of this subsection, the term 'national of the United States' has the meaning prescribed in section 101(a)(22) of the Immigration and Nationality Act.".

(c) MURDER OF FOREIGN OFFICIALS AND CERTAIN OTHER PERSONS.—Section 1116 of title 18, United States Code, is amended—

<< 18 USCA § 1116 >>

(1) in subsection (b), by adding at the end the following:

"(7) 'National of the United States' has the meaning prescribed in section 101(a)(22) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(22))."; and

(2) in subsection (c), by striking the first sentence and inserting the following: "If the victim of an offense under subsection (a) is an internationally protected person outside the United States, the United States may exercise jurisdiction over the offense if (1) the victim is a representative, officer, employee, or agent of the United States, (2) an offender is a national of the United States, or (3) an offender is afterwards found in the United States.".

<< 18 USCA § 112 >>

(d) PROTECTION OF FOREIGN OFFICIALS AND CERTAIN OTHER PERSONS.—Section 112 of title 18, United States Code, is amended—

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:20-cv-07721-SI   Document 58-7   Filed 11/10/20   Page 457 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

(1) in subsection (c), by inserting " 'national of the United States'," before "and"; and

(2) in subsection (e), by striking the first sentence and inserting the following: "If the victim of an offense under subsection (a) is an internationally protected person outside the United States, the United States may exercise jurisdiction over the offense if (1) the victim is a representative, officer, employee, or agent of the United States, (2) an offender is a national of the United States, or (3) an offender is afterwards found in the United States.".

<< 18 USCA § 878 >>

(e) THREATS AND EXTORTION AGAINST FOREIGN OFFICIALS AND CERTAIN OTHER PERSONS.—Section 878 of title 18, United States Code, is amended—

(1) in subsection (c), by inserting " 'national of the United States'," before "and"; and

(2) in subsection (d), by striking the first sentence and inserting the following: "If the victim of an offense under subsection (a) is an internationally protected person outside the United States, the United States may exercise jurisdiction over the offense if (1) the victim is a representative, officer, employee, or agent of the United States, (2) an offender is a national of the United States, or (3) an offender is afterwards found in the United States.".

<< 18 USCA § 1201 >>

(f) KIDNAPPING OF INTERNATIONALLY PROTECTED PERSONS.—Section 1201(e) of title 18, United States Code, is amended—

(1) by striking the first sentence and inserting the following: "If the victim of an offense under subsection (a) is an internationally protected person outside the United States, the United States may exercise jurisdiction over the offense if (1) the victim is a representative, officer, employee, or agent of the United States, (2) an offender is a national of the United States, or (3) an offender is afterwards found in the United States."; and

(2) by adding at the end the following: "For purposes of this subsection, the term 'national of the United States' has the meaning prescribed in section 101(a)(22) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(22)).".

<< 18 USCA § 37 >>

(g) VIOLENCE AT INTERNATIONAL AIRPORTS.—Section 37(b)(2) of title 18, United States Code, is amended—

(1) by inserting "(A)" before "the offender is later found in the United States"; and

(2) by inserting "; or (B) an offender or a victim is a national of the United States (as defined in section 101(a)(22) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(22)))" after "the offender is later found in the United States".

<< 18 USCA § 178 >>

(h) BIOLOGICAL WEAPONS.—Section 178 of title 18, United States Code, is amended—

(1) by striking "and" at the end of paragraph (3);

(2) by striking the period at the end of paragraph (4) and inserting "; and"; and

(3) by adding the following at the end:

"(5) the term 'national of the United States' has the meaning prescribed in section 101(a)(22) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(22)).".

<< 18 USCA § 2280 >>

SEC. 722. CLARIFICATION OF MARITIME VIOLENCE JURISDICTION.

Section 2280(b)(1)(A) of title 18, United States Code, is amended—

(1) in clause (ii), by striking "and the activity is not prohibited as a crime by the State in which the activity takes place"; and

(2) in clause (iii), by striking "the activity takes place on a ship flying the flag of a foreign country or outside the United States,".

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 458 of 1305

SEC. 723. INCREASED AND ALTERNATE CONSPIRACY PENALTIES FOR TERRORISM OFFENSES.

(a) TITLE 18 OFFENSES.—

<< 18 USCA §§ 32, 37, 115, 1203, 2280, 2281 >>

(1) Sections 32(a)(7), 32(b)(4), 37(a), 115(a)(1)(A), 115(a)(2), 1203(a), 2280(a)(1)(H), and 2281(a)(1)(F) of title 18, United States Code, are each amended by inserting "or conspires" after "attempts".

<< 18 USCA § 115 >>

(2) Section 115(b)(2) of title 18, United States Code, is amended by striking "or attempted kidnapping" both places it appears and inserting ", attempted kidnapping, or conspiracy to kidnap".

(3)(A) Section 115(b)(3) of title 18, United States Code, is amended by striking "or attempted murder" and inserting ", attempted murder, or conspiracy to murder".

(B) Section 115(b)(3) of title 18, United States Code, is amended by striking "and 1113" and inserting ", 1113, and 1117".

(b) AIRCRAFT PIRACY.—

<< 49 USCA § 46502 >>

(1) Section 46502(a)(2) of title 49, United States Code, is amended by inserting "or conspiring" after "attempting".

(2) Section 46502(b)(1) of title 49, United States Code, is amended by inserting "or conspiring to commit" after "committing".

<< 18 USCA § 844 >>

SEC. 724. CLARIFICATION OF FEDERAL JURISDICTION OVER BOMB THREATS.

Section 844(e) of title 18, United States Code, is amended by striking "commerce," and inserting "interstate or foreign commerce, or in or affecting interstate or foreign commerce,".

<< 18 USCA § 2332a >>

SEC. 725. EXPANSION AND MODIFICATION OF WEAPONS OF MASS DESTRUCTION STATUTE.

Section 2332a of title 18, United States Code, is amended—

(1) in subsection (a)—

(A) in the subsection heading, by inserting "AGAINST A NATIONAL OF THE UNITED STATES OR WITHIN THE UNITED STATES" after "OFFENSE";

(B) by striking "uses, or attempts" and inserting ", without lawful authority, uses, threatens, or attempts"; and

(C) in paragraph (2), by inserting ", and the results of such use affect interstate or foreign commerce or, in the case of a threat, attempt, or conspiracy, would have affected interstate or foreign commerce" before the semicolon at the end;

(2) in subsection (b), by striking subparagraph (B) and inserting the following:

"(B) any weapon that is designed or intended to cause death or serious bodily injury through the release, dissemination, or impact of toxic or poisonous chemicals, or their precursors;";

(3) by redesignating subsection (b) as subsection (c); and

(4) by inserting after subsection (a) the following new subsection:

"(b) OFFENSE BY NATIONAL OF THE UNITED STATES OUTSIDE OF THE UNITED STATES.—Any national of the United States who, without lawful authority, uses, or threatens, attempts, or conspires to use, a weapon of mass destruction outside of the United States shall be imprisoned for any term of years or for life, and if death results, shall be punished by death, or by imprisonment for any term of years or for life.".

<< 18 USCA § 1956 >>

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:20-cv-07721-SI   Document 58-7   Filed 11/10/20   Page 459 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

## SEC. 726. ADDITION OF TERRORISM OFFENSES TO THE MONEY LAUNDERING STATUTE.

Section 1956(c)(7) of title 18, United States Code, is amended—

(1) in subparagraph (B), by amending clause (ii) to read as follows:

  "(ii) murder, kidnapping, robbery, extortion, or destruction of property by means of explosive or fire;"; and

(2) in subparagraph (D)—

  (A) by inserting after "an offense under" the following: "section 32 (relating to the destruction of aircraft), section 37 (relating to violence at international airports), section 115 (relating to influencing, impeding, or retaliating against a Federal official by threatening or injuring a family member),";

  (B) by inserting after "section 215 (relating to commissions or gifts for procuring loans)," the following: "section 351 (relating to congressional or Cabinet officer assassination),";

  (C) by inserting after "section 798 (relating to espionage)," the following: "section 831 (relating to prohibited transactions involving nuclear materials), section 844(f) or (i) (relating to destruction by explosives or fire of Government property or property affecting interstate or foreign commerce),";

  (D) by inserting after "section 875 (relating to interstate communications)," the following: "section 956 (relating to conspiracy to kill, kidnap, maim, or injure certain property in a foreign country),";

  (E) by inserting after "section 1032 (relating to concealment of assets from conservator, receiver, or liquidating agent of financial institution)," the following: "section 1111 (relating to murder), section 1114 (relating to murder of United States law enforcement officials), section 1116 (relating to murder of foreign officials, official guests, or internationally protected persons),";

  (F) by inserting after "section 1203 (relating to hostage taking)," the following: "section 1361 (relating to willful injury of Government property), section 1363 (relating to destruction of property within the special maritime and territorial jurisdiction),";

  (G) by inserting after "section 1708 (relating to theft from the mail)," the following: "section 1751 (relating to Presidential assassination),";

  (H) by inserting after "2114 (relating to bank and postal robbery and theft)," the following: "section 2280 (relating to violence against maritime navigation), section 2281 (relating to violence against maritime fixed platforms),";

  (I) by striking "or section 2320" and inserting "section 2320;" and

  (J) by striking "of this title" and inserting the following: ", section 2332 (relating to terrorist acts abroad against United States nationals), section 2332a (relating to use of weapons of mass destruction), section 2332b (relating to international terrorist acts transcending national boundaries), or section 2339A (relating to providing material support to terrorists) of this title, section 46502 of title 49, United States Code,".

## SEC. 727. PROTECTION OF FEDERAL EMPLOYEES; PROTECTION OF CURRENT OR FORMER OFFICIALS, OFFICERS, OR EMPLOYEES OF THE UNITED STATES.

<< 18 USCA § 1114 >>

(a) HOMICIDE.—Section 1114 of title 18, United States Code, is amended to read as follows:

"§ 1114. Protection of officers and employees of the United States

  "Whoever kills or attempts to kill any officer or employee of the United States or of any agency in any branch of the United States Government (including any member of the uniformed services) while such officer or employee is engaged in or on account of the performance of official duties, or any person assisting such an officer or employee in the performance of such duties or on account of that assistance, shall be punished—

  "(1) in the case of murder, as provided under section 1111;

  "(2) in the case of manslaughter, as provided under section 1112; or

  "(3) in the case of attempted murder or manslaughter, as provided in section 1113.".

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 460 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

<< 18 USCA § 115 >>

(b) THREATS AGAINST FORMER OFFICERS AND EMPLOYEES.—

 (1) IN GENERAL.—Section 115(a)(2) of title 18, United States Code, is amended by inserting ", or threatens to assault, kidnap, or murder, any person who formerly served as a person designated in paragraph (1), or" after "assaults, kidnaps, or murders, or attempts to kidnap or murder".

 (2) LIMITATION.—Section 115 of title 18, United States Code, is amended by adding at the end the following:

 "(d) This section shall not interfere with the investigative authority of the United States Secret Service, as provided under sections 3056, 871, and 879 of this title.".

<< 18 USCA § 111 >>

 (c) AMENDMENT TO CLARIFY THE MEANING OF THE TERM DEADLY OR DANGEROUS WEAPON IN THE PROHIBITION ON ASSAULT ON FEDERAL OFFICERS OR EMPLOYEES.—Section 111(b) of title 18, United States Code, is amended by inserting "(including a weapon intended to cause death or danger but that fails to do so by reason of a defective component)" after "deadly or dangerous weapon".

<< 18 USCA § 3592 >>

SEC. 728. DEATH PENALTY AGGRAVATING FACTOR.

 Section 3592(c) of title 18, United States Code, is amended by inserting after paragraph (15) the following new paragraph:

 "(16) MULTIPLE KILLINGS OR ATTEMPTED KILLINGS.—The defendant intentionally killed or attempted to kill more than one person in a single criminal episode.".

<< 18 USCA § 3142 >>

SEC. 729. DETENTION HEARING.

 Section 3142(f) of title 18, United States Code, is amended by inserting "(not including any intermediate Saturday, Sunday, or legal holiday)" after "five days" and after "three days".

<< 28 USCA § 994 NOTE >>

SEC. 730. DIRECTIONS TO SENTENCING COMMISSION.

 The United States Sentencing Commission shall forthwith, in accordance with the procedures set forth in section 21(a) of the Sentencing Act of 1987, as though the authority under that section had not expired, amend the sentencing guidelines so that the chapter 3 adjustment relating to international terrorism only applies to Federal crimes of terrorism, as defined in section 2332b(g) of title 18, United States Code.

<< 18 USCA § 2510 >>

SEC. 731. EXCLUSION OF CERTAIN TYPES OF INFORMATION FROM DEFINITIONS.

 Section 2510 of title 18, United States Code, is amended—

 (1) in paragraph (12)—

   (A) by striking "or" at the end of subparagraph (B);

   (B) by adding "or" at the end of subparagraph (C); and

   (C) by adding at the end the following new subparagraph:

   "(D) electronic funds transfer information stored by a financial institution in a communications system used for the electronic storage and transfer of funds;"; and

 (2) in paragraph (16)—

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 461 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

(A) by adding "or" at the end of subparagraph (D);

(B) by striking "or" at the end of subparagraph (E); and

(C) by striking subparagraph (F).

<< 18 USCA § 841 NOTE >>

## SEC. 732. MARKING, RENDERING INERT, AND LICENSING OF EXPLOSIVE MATERIALS.

(a) STUDY.—

(1) IN GENERAL.—Not later than 12 months after the date of enactment of this Act, the Secretary of the Treasury (referred to in this section as the "Secretary") shall conduct a study of—

(A) the tagging of explosive materials for purposes of detection and identification;

(B) the feasibility and practicability of rendering common chemicals used to manufacture explosive materials inert;

(C) the feasibility and practicability of imposing controls on certain precursor chemicals used to manufacture explosive materials; and

(D) State licensing requirements for the purchase and use of commercial high explosives, including—

(i) detonators;

(ii) detonating cords;

(iii) dynamite;

(iv) water gel;

(v) emulsion;

(vi) blasting agents; and

(vii) boosters.

(2) EXCLUSION.—No study conducted under this subsection or regulation proposed under subsection (e) shall include black or smokeless powder among the explosive materials considered.

(b) CONSULTATION.—

(1) IN GENERAL.—In conducting the study under subsection (a), the Secretary shall consult with—

(A) Federal, State, and local officials with expertise in the area of chemicals used to manufacture explosive materials; and

(B) such other individuals as the Secretary determines are necessary.

(2) FERTILIZER RESEARCH CENTERS.—In conducting any portion of the study under subsection (a) relating to the regulation and use of fertilizer as a pre-explosive material, the Secretary of the Treasury shall consult with and receive input from non-profit fertilizer research centers.

(c) REPORT.—Not later than 30 days after the completion of the study conducted under subsection (a), the Secretary shall submit a report to the Congress, which shall be made public, that contains—

(1) the results of the study;

(2) any recommendations for legislation; and

(3) any opinions and findings of the fertilizer research centers.

(d) HEARINGS.—Congress shall have not less than 90 days after the submission of the report under subsection (c) to—

(1) review the results of the study; and

(2) hold hearings and receive testimony regarding the recommendations of the Secretary.

(e) REGULATIONS.—

(1) IN GENERAL.—Not later than 6 months after the submission of the report required by subsection (c), the Secretary may submit to Congress and publish in the Federal Register draft regulations for the addition of tracer elements to explosive materials manufactured in or imported into the United States, of such character and in such quantity as the Secretary may authorize or require, if the results of the study conducted under subsection (a) indicate that the tracer elements—

(A) will not pose a risk to human life or safety;

(B) will substantially assist law enforcement officers in their investigative efforts;

(C) will not substantially impair the quality of the explosive materials for their intended lawful use;

(D) will not have a substantially adverse effect on the environment; and

(E) the costs associated with the addition of the tracers will not outweigh benefits of their inclusion.

Case 3:20-cv-07721-SI Document 58-7 Filed 11/10/20 Page 462 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

(2) EFFECTIVE DATE.—The regulations under paragraph (1) shall take effect 270 days after the Secretary submits proposed regulations to Congress pursuant to paragraph (1), except to the extent that the effective date is revised or the regulation is otherwise modified or disapproved by an Act of Congress.

TITLE VIII—ASSISTANCE TO LAW ENFORCEMENT

Subtitle A—Resources and Security

<< 28 USCA § 509 NOTE >>

SEC. 801. OVERSEAS LAW ENFORCEMENT TRAINING ACTIVITIES.

The Attorney General and the Secretary of the Treasury are authorized to support law enforcement training activities in foreign countries, in consultation with the Secretary of State, for the purpose of improving the effectiveness of the United States in investigating and prosecuting transnational offenses.

SEC. 802. SENSE OF CONGRESS.

It is the sense of the Congress that, whenever practicable, each recipient of any sum authorized to be appropriated by this Act, should use the money to purchase American-made products.

<< 40 USCA § 137 >>

SEC. 803. PROTECTION OF FEDERAL GOVERNMENT BUILDINGS IN THE DISTRICT OF COLUMBIA.

The Attorney General and the Secretary of the Treasury may prohibit—
 (1) any vehicles from parking or standing on any street or roadway adjacent to any building in the District of Columbia used by law enforcement authorities subject to their jurisdiction, that is in whole or in part owned, possessed, or leased to the Federal Government; and
 (2) any person or entity from conducting business on any property immediately adjacent to any building described in paragraph (1).

<< 18 USCA § 2703 >>

SEC. 804. REQUIREMENT TO PRESERVE RECORD EVIDENCE.

 Section 2703 of title 18, United States Code, is amended by adding at the end the following new subsection:
"(f) REQUIREMENT TO PRESERVE EVIDENCE.—
 "(1) IN GENERAL.—A provider of wire or electronic communication services or a remote computing service, upon the request of a governmental entity, shall take all necessary steps to preserve records and other evidence in its possession pending the issuance of a court order or other process.
 "(2) PERIOD OF RETENTION.—Records referred to in paragraph (1) shall be retained for a period of 90 days, which shall be extended for an additional 90–day period upon a renewed request by the governmental entity.".

<< 28 USCA § 994 NOTE >>

SEC. 805. DETERRENT AGAINST TERRORIST ACTIVITY DAMAGING A FEDERAL INTEREST COMPUTER.

 (a) REVIEW.—Not later than 60 calendar days after the date of enactment of this Act, the United States Sentencing Commission shall review the deterrent effect of existing guideline levels as they apply to paragraphs (4) and (5) of section 1030(a) of title 18, United States Code.
 (b) REPORT.—The United States Sentencing Commission shall prepare and transmit a report to the Congress on the findings under the study conducted under subsection (a).

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 463 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

(c) AMENDMENT OF GUIDELINES.—Pursuant to its authority under section 994(p) of title 28, United States Code, the United States Sentencing Commission shall amend the sentencing guidelines to ensure any individual convicted of a violation of paragraph (4) or (5) of section 1030(a) of title 18, United States Code, is imprisoned for not less than 6 months.

<< 18 USCA Ch. 1 NOTE >>

SEC. 806. COMMISSION ON THE ADVANCEMENT OF FEDERAL LAW ENFORCEMENT.

(a) ESTABLISHMENT.—There is established a commission to be known as the "Commission on the Advancement of Federal Law Enforcement" (hereinafter in this section referred to as the "Commission").

(b) DUTIES.—The Commission shall review, ascertain, evaluate, report, and recommend action to the Congress on the following matters:

(1) The Federal law enforcement priorities for the 21st century, including Federal law enforcement capability to investigate and deter adequately the threat of terrorism facing the United States.

(2) In general, the manner in which significant Federal criminal law enforcement operations are conceived, planned, coordinated, and executed.

(3) The standards and procedures used by Federal law enforcement to carry out significant Federal criminal law enforcement operations, and their uniformity and compatibility on an interagency basis, including standards related to the use of deadly force.

(4) The investigation and handling of specific Federal criminal law enforcement cases by the United States Government and the Federal law enforcement agencies therewith, selected at the Commission's discretion.

(5) The necessity for the present number of Federal law enforcement agencies and units.

(6) The location and efficacy of the office or entity directly responsible, aside from the President of the United States, for the coordination on an interagency basis of the operations, programs, and activities of all of the Federal law enforcement agencies.

(7) The degree of assistance, training, education, and other human resource management assets devoted to increasing professionalism for Federal law enforcement officers.

(8) The independent accountability mechanisms that exist, if any, and their efficacy to investigate, address, and to correct Federal law enforcement abuses.

(9) The degree of coordination among law enforcement agencies in the area of international crime and the extent to which deployment of resources overseas diminishes domestic law enforcement.

(10) The extent to which Federal law enforcement agencies coordinate with State and local law enforcement agencies on Federal criminal enforcement operations and programs that directly affect a State or local law enforcement agency's geographical jurisdiction.

(11) Such other related matters as the Commission deems appropriate.

(c) MEMBERSHIP AND ADMINISTRATIVE PROVISIONS.—

(1) NUMBER AND APPOINTMENT.—The Commission shall be composed of 5 members appointed as follows:

(A) 1 member appointed by the President pro tempore of the Senate.

(B) 1 member appointed by the minority leader of the Senate.

(C) 1 member appointed by the Speaker of the House of Representatives.

(D) 1 member appointed by the minority leader of the House of Representatives.

(E) 1 member (who shall chair the Commission) appointed by the Chief Justice of the Supreme Court.

(2) DISQUALIFICATION.—A person who is an officer or employee of the United States shall not be appointed a member of the Commission.

(3) TERMS.—Each member shall be appointed for the life of the Commission.

(4) QUORUM.—3 members of the Commission shall constitute a quorum but a lesser number may hold hearings.

(5) MEETINGS.—The Commission shall meet at the call of the Chair of the Commission.

(6) COMPENSATION.—Each member of the Commission who is not an officer or employee of the Federal Government shall be compensated at a rate equal to the daily equivalent of the annual rate of basic pay prescribed for level IV of the Executive Schedule under section 5315 of title 5, United States Code, for each day, including travel time, during which the member is engaged in the performance of the duties of the Commission.

Case 3:20-cv-07721-SI   Document 58-7   Filed 11/10/20   Page 464 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

(d) STAFFING AND SUPPORT FUNCTIONS.—

 (1) DIRECTOR.—The Commission shall have a director who shall be appointed by the Chair of the Commission.

 (2) STAFF.—Subject to rules prescribed by the Commission, the Director may appoint additional personnel as the Commission considers appropriate.

 (3) APPLICABILITY OF CERTAIN CIVIL SERVICE LAWS.—The Director and staff of the Commission shall be appointed subject to the provisions of title 5, United States Code, governing appointments in the competitive service, and shall be paid in accordance with the provisions of chapter 51 and subchapter III of chapter 53 of that title relating to classification and General Schedule pay rates.

(e) POWERS.—

 (1) HEARINGS AND SESSIONS.—The Commission may, for the purposes of carrying out this Act, hold hearings, sit and act at times and places, take testimony, and receive evidence as the Commission considers appropriate. The Commission may administer oaths or affirmations to witnesses appearing before it. The Commission may establish rules for its proceedings.

 (2) POWERS OF MEMBERS AND AGENTS.—Any member or agent of the Commission may, if authorized by the Commission, take any action which the Commission is authorized to take by this section.

 (3) OBTAINING OFFICIAL DATA.—The Commission may secure directly from any department or agency of the United States information necessary to enable it to carry out this section. Upon request of the Chair of the Commission, the head of that department or agency shall furnish that information to the Commission, unless doing so would threaten the national security, the health or safety of any individual, or the integrity of an ongoing investigation.

 (4) ADMINISTRATIVE SUPPORT SERVICES.—Upon the request of the Commission, the Administrator of General Services shall provide to the Commission, on a reimbursable basis, the administrative support services necessary for the Commission to carry out its responsibilities under this title.

(f) REPORT.—The Commission shall transmit a report to the Congress and the public not later than 2 years after a quorum of the Commission has been appointed. The report shall contain a detailed statement of the findings and conclusions of the Commission, together with the Commission's recommendations for such actions as the Commission considers appropriate.

(g) TERMINATION.—The Commission shall terminate 30 days after submitting the report required by this section.

<< 18 USCA § 470 NOTE >>

SEC. 807. COMBATTING INTERNATIONAL COUNTERFEITING OF UNITED STATES CURRENCY.

 (a) IN GENERAL.—The Secretary of the Treasury (hereafter in this section referred to as the "Secretary"), in consultation with the advanced counterfeit deterrence steering committee, shall—

 (1) study the use and holding of United States currency in foreign countries; and

 (2) develop useful estimates of the amount of counterfeit United States currency that circulates outside the United States each year.

(b) EVALUATION AUDIT PLAN.—

 (1) IN GENERAL.—The Secretary shall develop an effective international evaluation audit plan that is designed to enable the Secretary to carry out the duties described in subsection (a) on a regular and thorough basis.

 (2) SUBMISSION OF DETAILED WRITTEN SUMMARY.—The Secretary shall submit a detailed written summary of the evaluation audit plan developed pursuant to paragraph (1) to the Congress before the end of the 6–month period beginning on the date of the enactment of this Act.

 (3) FIRST EVALUATION AUDIT UNDER PLAN.—The Secretary shall begin the first evaluation audit pursuant to the evaluation audit plan no later than the end of the 1–year period beginning on the date of the enactment of this Act.

 (4) SUBSEQUENT EVALUATION AUDITS.—At least 1 evaluation audit shall be performed pursuant to the evaluation audit plan during each 3–year period beginning after the date of the commencement of the evaluation audit referred to in paragraph (3).

(c) REPORTS.—

 (1) IN GENERAL.—The Secretary shall submit a written report to the Committee on Banking and Financial Services of the House of Representatives and the Committee on Banking, Housing, and Urban Affairs of the Senate on the results of each evaluation audit conducted pursuant to subsection (b) within 90 days after the completion of the evaluation audit.

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 465 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

(2) CONTENTS.—In addition to such other information as the Secretary may determine to be appropriate, each report submitted to the Congress pursuant to paragraph (1) shall include the following information:

(A) A detailed description of the evaluation audit process and the methods used to develop estimates of the amount of counterfeit United States currency in circulation outside the United States.

(B) The method used to determine the currency sample examined in connection with the evaluation audit and a statistical analysis of the sample examined.

(C) A list of the regions of the world, types of financial institutions, and other entities included.

(D) An estimate of the total amount of United States currency found in each region of the world.

(E) The total amount of counterfeit United States currency and the total quantity of each counterfeit denomination found in each region of the world.

(3) CLASSIFICATION OF INFORMATION.—

(A) IN GENERAL.—To the greatest extent possible, each report submitted to the Congress under this subsection shall be submitted in an unclassified form.

(B) CLASSIFIED AND UNCLASSIFIED FORMS.—If, in the interest of submitting a complete report under this subsection, the Secretary determines that it is necessary to include classified information in the report, the report shall be submitted in a classified and an unclassified form.

(d) SUNSET PROVISION.—This section shall cease to be effective as of the end of the 10–year period beginning on the date of the enactment of this Act.

(e) RULE OF CONSTRUCTION.—No provision of this section shall be construed as authorizing any entity to conduct investigations of counterfeit United States currency.

(f) FINDINGS.—The Congress hereby finds the following:

(1) United States currency is being counterfeited outside the United States.

(2) The One Hundred Third Congress enacted, with the approval of the President on September 13, 1994, section 470 of title 18, United States Code, making such activity a crime under the laws of the United States.

(3) The expeditious posting of agents of the United States Secret Service to overseas posts, which is necessary for the effective enforcement of section 470 and related criminal provisions, has been delayed.

(4) While section 470 of title 18, United States Code, provides for a maximum term of imprisonment of 20 years as opposed to a maximum term of 15 years for domestic counterfeiting, the United States Sentencing Commission has failed to provide, in its sentencing guidelines, for an appropriate enhancement of punishment for defendants convicted of counterfeiting United States currency outside the United States.

(g) TIMELY CONSIDERATION OF REQUESTS FOR CONCURRENCE IN CREATION OF OVERSEAS POSTS.—

(1) IN GENERAL.—The Secretary of State shall—

(A) consider in a timely manner the request by the Secretary of the Treasury for the placement of such number of agents of the United States Secret Service as the Secretary of the Treasury considers appropriate in posts in overseas embassies; and

(B) reach an agreement with the Secretary of the Treasury on such posts as soon as possible and, in any event, not later than December 31, 1996.

(2) COOPERATION OF TREASURY REQUIRED.—The Secretary of the Treasury shall promptly provide any information requested by the Secretary of State in connection with such requests.

(3) REPORTS REQUIRED.—The Secretary of the Treasury and the Secretary of State shall each submit, by February 1, 1997, a written report to the Committee on Banking and Financial Services of the House of Representatives and the Committee on Banking, Housing, and Urban Affairs of the Senate explaining the reasons for the rejection, if any, of any proposed post and the reasons for the failure, if any, to fill any approved post by such date.

(h) ENHANCED PENALTIES FOR INTERNATIONAL COUNTERFEITING OF UNITED STATES CURRENCY.—Pursuant to the authority of the United States Sentencing Commission under section 994 of title 28, United States Code, the Commission shall amend the sentencing guidelines prescribed by the Commission to provide an appropriate enhancement of the punishment for a defendant convicted under section 470 of title 18 of such Code.

<< 28 USCA § 534 NOTE >>

AR.07873

Case 3:20-cv-07721-SI   Document 58-7   Filed 11/10/20   Page 466 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

## SEC. 808. COMPILATION OF STATISTICS RELATING TO INTIMIDATION OF GOVERNMENT EMPLOYEES.

 (a) FINDINGS.—The Congress finds that—

  (1) threats of violence and acts of violence against Federal, State, and local government employees and their families are increasing as the result of attempts to stop public servants from performing their lawful duties;

  (2) these acts are a danger to the constitutional form of government of the United States; and

  (3) more information is needed relating to the extent and nature of the danger to these employees and their families so that actions can be taken to protect public servants at all levels of government in the performance of their duties.

 (b) STATISTICS.—The Attorney General shall collect data, for the calendar year 1990 and each succeeding calendar year thereafter, relating to crimes and incidents of threats of violence and acts of violence against Federal, State, and local government employees and their families in the performance of their lawful duties. Such data shall include—

  (1) in the case of crimes against such employees and their families, the nature of the crime; and

  (2) in the case of incidents of threats of violence and acts of violence, including verbal and implicit threats against such employees and their families, the deterrent effect on the performance of their jobs.

 (c) GUIDELINES.—The Attorney General shall establish guidelines for the collection of the data under subsection (b), including a definition of the sufficiency of evidence of noncriminal incidents required to be reported.

 (d) USE OF DATA.—

  (1) ANNUAL PUBLISHING.—The Attorney General shall publish an annual summary of the data collected under this section.

  (2) USE OF DATA.—Except with respect to the summary published under paragraph (1), data collected under this section shall be used only for research and statistical purposes.

 (e) EXEMPTION.—The Attorney General, the Secretary of State, and the United States Secret Service is not required to participate in any statistical reporting activity under this section with respect to any direct or indirect threat made against any individual for whom that official or Service is authorized to provide protection.

<< 42 USCA § 3721 NOTE >>

## SEC. 809. ASSESSING AND REDUCING THE THREAT TO LAW ENFORCEMENT OFFICERS FROM THE CRIMINAL USE OF FIREARMS AND AMMUNITION.

 (a) The Secretary of the Treasury, in conjunction with the Attorney General, shall conduct a study and make recommendations concerning—

  (1) the extent and nature of the deaths and serious injuries, in the line of duty during the last decade, for law enforcement officers, including—

   (A) those officers who were feloniously killed or seriously injured and those that died or were seriously injured as a result of accidents or other non-felonious causes;

   (B) those officers feloniously killed or seriously injured with firearms, those killed or seriously injured with, separately, handguns firing handgun caliber ammunition, handguns firing rifle caliber ammunition, rifles firing rifle caliber ammunition, rifles firing handgun caliber ammunition and shotguns;

   (C) those officers feloniously killed or seriously injured with firearms, and killings or serious injuries committed with firearms taken by officers' assailants from officers, and those committed with other officers' firearms; and

   (D) those killed or seriously injured because shots attributable to projectiles defined as "armor piercing ammunition" under section 921(a)(17)(B)(i) and (ii) of title 18, United States Code, pierced the protective material of bullet resistant vests and bullet resistant headgear;

  (2) whether current passive defensive strategies, such as body armor, are adequate to counter the criminal use of firearms against law officers; and

  (3) the calibers of ammunition that are—

   (A) sold in the greatest quantities;

   (B) their common uses, according to consultations with industry, sporting organizations and law enforcement;

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 467 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

(C) the calibers commonly used for civilian defensive or sporting uses that would be affected by any prohibition on non-law enforcement sales of such ammunition, if such ammunition is capable of penetrating minimum level bullet resistant vests; and

(D) recommendations for increase in body armor capabilities to further protect law enforcement from threat.

(b) In conducting the study, the Secretary shall consult with other Federal, State and local officials, non-governmental organizations, including all national police organizations, national sporting organizations and national industry associations with expertise in this area and such other individuals as shall be deemed necessary. Such study shall be presented to Congress twelve months after the enactment of this Act and made available to the public, including any data tapes or data used to form such recommendations.

(c) There are authorized to be appropriated for the study and recommendations such sums as may be necessary.

SEC. 810. STUDY AND REPORT ON ELECTRONIC SURVEILLANCE.

(a) STUDY.—The Attorney General and the Director of the Federal Bureau of Investigation shall study all applicable laws and guidelines relating to electronic surveillance and the use of pen registers and other trap and trace devices.

(b) REPORT.—Not later than 90 days after the date of enactment of this Act, the Attorney General shall submit a report to the Congress that includes—

(1) the findings of the study conducted pursuant to subsection (a);

(2) recommendations for the use of electronic devices in conducting surveillance of terrorist or other criminal organizations, and for any modifications in the law necessary to enable the Federal Government to fulfill its law enforcement responsibilities within appropriate constitutional parameters;

(3) a summary of instances in which Federal law enforcement authorities may have abused electronic surveillance powers and recommendations, if needed, for constitutional safeguards relating to the use of such powers; and

(4) a summary of efforts to use current wiretap authority, including detailed examples of situations in which expanded authority would have enabled law enforcement authorities to fulfill their responsibilities.

Subtitle B—Funding Authorizations for Law Enforcement

<< 28 USCA § 531 NOTE >>

SEC. 811. FEDERAL BUREAU OF INVESTIGATION.

(a) IN GENERAL.—With funds made available pursuant to subsection (c)—

(1) the Attorney General shall—

(A) provide support and enhance the technical support center and tactical operations of the Federal Bureau of Investigation;

(B) create a Federal Bureau of Investigation counterterrorism and counterintelligence fund for costs associated with the investigation of cases involving cases of terrorism;

(C) expand and improve the instructional, operational support, and construction of the Federal Bureau of Investigation Academy;

(D) construct a Federal Bureau of Investigation laboratory, provide laboratory examination support, and provide for a command center;

(E) make grants to States to carry out the activities described in subsection (b); and

(F) increase personnel to support counterterrorism activities; and

(2) the Director of the Federal Bureau of Investigation may expand the combined DNA Identification System (CODIS) to include Federal crimes and crimes committed in the District of Columbia.

(b) STATE GRANTS.—

(1) AUTHORIZATION.—The Attorney General, in consultation with the Director of the Federal Bureau of Investigation, may make grants to each State eligible under paragraph (2) to be used by the chief executive officer of the State, in conjunction with units of local government, other States, or any combination thereof, to carry out all or part of a program to establish, develop, update, or upgrade—

(A) computerized identification systems that are compatible and integrated with the databases of the National Crime Information Center of the Federal Bureau of Investigation;

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 468 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

(B) the capability to analyze deoxyribonucleic acid (DNA) in a forensic laboratory in ways that are compatible and integrated with the combined DNA Identification System (CODIS) of the Federal Bureau of Investigation; and

(C) automated fingerprint identification systems that are compatible and integrated with the Integrated Automated Fingerprint Identification System (IAFIS) of the Federal Bureau of Investigation.

(2) ELIGIBILITY.—To be eligible to receive a grant under this subsection, a State shall require that each person convicted of a felony of a sexual nature shall provide to appropriate State law enforcement officials, as designated by the chief executive officer of the State, a sample of blood, saliva, or other specimen necessary to conduct a DNA analysis consistent with the standards established for DNA testing by the Director of the Federal Bureau of Investigation.

(3) INTERSTATE COMPACTS.—A State may enter into a compact or compacts with another State or States to carry out this subsection.

(c) AUTHORIZATION OF APPROPRIATIONS.—

(1) IN GENERAL.—There are authorized to be appropriated for the activities of the Federal Bureau of Investigation, to help meet the increased demands for activities to combat terrorism—

(A) $114,000,000 for fiscal year 1997;

(B) $166,000,000 for fiscal year 1998;

(C) $96,000,000 for fiscal year 1999; and

(D) $92,000,000 for fiscal year 2000.

(2) AVAILABILITY OF FUNDS.—Funds made available pursuant to paragraph (1), in any fiscal year, shall remain available until expended

(3) ALLOCATION.—

(A) IN GENERAL.—Of the total amount appropriated to carry out subsection (b) in a fiscal year—

(i) the greater of 0.25 percent of such amount or $500,000 shall be allocated to each eligible State; and

(ii) of the total funds remaining after the allocation under clause (i), there shall be allocated to each State an amount which bears the same ratio to the amount of remaining funds described in this subparagraph as the population of such State bears to the population of all States.

(B) DEFINITION.—For purposes of this paragraph, the term "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, American Samoa, Guam, and the Commonwealth of the Northern Mariana Islands, except that for purposes of the allocation under this subparagraph, American Samoa and the Commonwealth of the Northern Mariana Islands shall be considered as one State and that for these purposes, 67 percent of the amounts allocated shall be allocated to American Samoa, and 33 percent to the Commonwealth of the Northern Mariana Islands.

## SEC. 812. UNITED STATES CUSTOMS SERVICE.

(a) IN GENERAL.—There are authorized to be appropriated for the activities of the United States Customs Service, to help meet the increased needs of the United States Customs Service—

(1) $8,000,000 for fiscal year 1997;

(2) $8,000,000 for fiscal year 1998;

(3) $8,000,000 for fiscal year 1999; and

(4) $7,000,000 for fiscal year 2000.

(b) AVAILABILITY OF FUNDS.—Funds made available pursuant to subsection (a), in any fiscal year, shall remain available until expended.

## SEC. 813. IMMIGRATION AND NATURALIZATION SERVICE.

(a) IN GENERAL.—There are authorized to be appropriated for the activities of the Immigration and Naturalization Service, to help meet the increased needs of the Immigration and Naturalization Service, including the detention and removal of alien terrorists, $5,000,000 for each of the fiscal years 1997, 1998, 1999, and 2000.

(b) AVAILABILITY OF FUNDS.—Funds made available pursuant to subsection (a), in any fiscal year, shall remain available until expended.

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 469 of 1305

SEC. 814. DRUG ENFORCEMENT ADMINISTRATION.

 (a) ACTIVITIES OF DRUG ENFORCEMENT ADMINISTRATION.—The Attorney General shall use funds made available pursuant to subsection (b) to—

   (1) fund antiviolence crime initiatives;

   (2) fund initiatives to address major violators of Federal antidrug statutes; and

   (3) enhance or replace infrastructure of the Drug Enforcement Administration.

 (b) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated to the Drug Enforcement Administration, to help meet the increased needs of the Drug Enforcement Administration—

   (1) $35,000,000 for fiscal year 1997;

   (2) $40,000,000 for fiscal year 1998;

   (3) $45,000,000 for fiscal year 1999; and

   (4) $52,000,000 for fiscal year 2000.

 (c) AVAILABILITY OF FUNDS.—Funds made available pursuant to this section, in any fiscal year, shall remain available until expended.

SEC. 815. DEPARTMENT OF JUSTICE.

 (a) IN GENERAL.—The Attorney General shall use funds made available pursuant to subsection (b) to—

   (1) hire additional Assistant United States Attorneys and attorneys within the Criminal Division of the Department of Justice; and

   (2) provide for increased security at courthouses and other facilities in which Federal workers are employed.

 (b) AUTHORIZATION OF ADDITIONAL APPROPRIATIONS.—There are authorized to be appropriated to carry out this section—

   (1) $10,000,000 for fiscal year 1997;

   (2) $10,000,000 for fiscal year 1998;

   (3) $10,000,000 for fiscal year 1999; and

   (4) $11,000,000 for fiscal year 2000.

 (c) AVAILABILITY OF FUNDS.—Funds made available pursuant to this section, in any fiscal year, shall remain available until expended.

<< 28 USCA § 533 NOTE >>

 (d) EXEMPTION AUTHORITY.—Notwithstanding any other provision of law, section 102(b) of the Department of Justice and Related Agencies Appropriations Act, 1993 (Public Law 102–395), shall remain in effect until specifically repealed, subject to any limitation on appropriations contained in any Department of Justice Appropriation Authorization Act.

<< 18 USCA § 3059B >>

 (e) GENERAL REWARD AUTHORITY OF THE ATTORNEY GENERAL.—

   (1) IN GENERAL.—Chapter 203 of title 18, United States Code, is amended by adding immediately after section 3059A the following section:

"§ 3059B. General reward authority

 "(a) Notwithstanding any other provision of law, the Attorney General may pay rewards and receive from any department or agency funds for the payment of rewards under this section to any individual who assists the Department of Justice in performing its functions.

 "(b) Not later than 30 days after authorizing a reward under this section that exceeds $100,000, the Attorney General shall give notice to the respective chairmen of the Committees on Appropriations and the Committees on the Judiciary of the Senate and the House of Representatives.

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 470 of 1305

"(c) A determination made by the Attorney General to authorize an award under this section and the amount of any reward authorized shall be final and conclusive, and not subject to judicial review.".

## SEC. 816. DEPARTMENT OF THE TREASURY.

(a) IN GENERAL.—There are authorized to be appropriated for Department of Treasury law enforcement agencies engaged in counterterrorism efforts to augment those efforts—

(1) $10,000,000 for fiscal year 1997;

(2) $10,000,000 for fiscal year 1998;

(3) $10,000,000 for fiscal year 1999; and

(4) $10,000,000 for fiscal year 2000.

(b) UNITED STATES SECRET SERVICE.—There are authorized to be appropriated for the activities of the United States Secret Service, to augment White House security and expand Presidential protection activities—

(1) $11,000,000 for fiscal year 1997;

(2) $11,000,000 for fiscal year 1998;

(3) $13,000,000 for fiscal year 1999; and

(4) $15,000,000 for fiscal year 2000.

## SEC. 817. UNITED STATES PARK POLICE.

(a) IN GENERAL.—There are authorized to be appropriated for the activities of the United States Park Police, to help meet the increased needs of the United States Park Police, $500,000 for each of the fiscal years 1997, 1998, 1999, and 2000.

(b) AVAILABILITY OF FUNDS.—Funds made available pursuant to this section, in any fiscal year, shall remain available until expended.

## SEC. 818. THE JUDICIARY.

(a) IN GENERAL.—There are authorized to be appropriated to the Federal judiciary, to help meet the increased demands for judicial branch activities, including supervised release, and pretrial and probation services, resulting from the enactment of this Act—

(1) $10,000,000 for fiscal year 1997;

(2) $10,000,000 for fiscal year 1998;

(3) $10,000,000 for fiscal year 1999; and

(4) $11,000,000 for fiscal year 2000.

(b) AVAILABILITY OF FUNDS.—Funds made available pursuant to this section, in any fiscal year, shall remain available until expended.

<< 15 USCA § 2201 NOTE >>

## SEC. 819. LOCAL FIREFIGHTER AND EMERGENCY SERVICES TRAINING.

(a) GRANT AUTHORIZATION.—The Attorney General, in consultation with the Director of the Federal Emergency Management Agency, may make grants to provide specialized training and equipment to enhance the capability of metropolitan fire and emergency service departments to respond to terrorist attacks.

(b) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated for fiscal year 1997, $5,000,000 to carry out this section.

## SEC. 820. ASSISTANCE TO FOREIGN COUNTRIES TO PROCURE EXPLOSIVE DETECTION DEVICES AND OTHER COUNTERTERRORISM TECHNOLOGY.

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 471 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

There are authorized to be appropriated to the National Institute of Justice Office of Science and Technology not more than $10,000,000 for each of the fiscal years 1997 and 1998 to provide assistance to foreign countries facing an imminent danger of terrorist attack that threatens the national interest of the United States, or puts United States nationals at risk, in—

(1) obtaining explosive detection devices and other counterterrorism technology;

(2) conducting research and development projects on such technology; and

(3) testing and evaluating counterterrorism technologies in those countries.

SEC. 821. RESEARCH AND DEVELOPMENT TO SUPPORT COUNTERTERRORISM TECHNOLOGIES.

There are authorized to be appropriated to the National Institute of Justice Office of Science and Technology not more than $10,000,000 for fiscal year 1997, to—

(1) develop technologies that can be used to combat terrorism, including technologies in the areas of—

(A) detection of weapons, explosives, chemicals, and persons;

(B) tracking;

(C) surveillance;

(D) vulnerability assessment; and

(E) information technologies;

(2) develop standards to ensure the adequacy of products produced and compatibility with relevant national systems; and

(3) identify and assess requirements for technologies to assist State and local law enforcement in the national program to combat terrorism.

SEC. 822. GRANTS TO STATE AND LOCAL LAW ENFORCEMENT FOR TRAINING AND EQUIPMENT.

<< 42 USCA § 3751 >>

(a) AMENDMENT OF BYRNE GRANT PROGRAM.—Section 501(b) of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3751(b)) is amended—

(1) by striking "and" at the end of paragraph (24);

(2) by striking the period at the end of paragraph (25) and inserting "; and"; and

(3) by adding at the end the following new paragraph:

"(26) to develop and implement antiterrorism training programs and to procure equipment for use by local law enforcement authorities.".

(b) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated $25,000,000 for each of fiscal years 1997 through 2000 for grants under section 501 of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3751(b)) to be used for the development and implementation of antiterrorism training programs and to procure equipment for use by local law enforcement authorities.

SEC. 823. FUNDING SOURCE.

Appropriations for activities authorized in this subtitle may be made from the Violent Crime Reduction Trust Fund.

TITLE IX—MISCELLANEOUS

SEC. 901. EXPANSION OF TERRITORIAL SEA.

<< 18 USCA § 7 NOTE >>

(a) TERRITORIAL SEA EXTENDING TO TWELVE MILES INCLUDED IN SPECIAL MARITIME AND TERRITORIAL JURISDICTION.—The Congress declares that all the territorial sea of the United States, as defined by Presidential Proclamation 5928 of December 27, 1988, for purposes of Federal criminal jurisdiction is part of the United States, subject to its sovereignty, and is within the special maritime and territorial jurisdiction of the United States for the purposes of title 18, United States Code.

Case 3:20-cv-07721-SI   Document 58-7   Filed 11/10/20   Page 472 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

<< 18 USCA § 13 >>

(b) ASSIMILATED CRIMES IN EXTENDED TERRITORIAL SEA.—Section 13 of title 18, United States Code, is amended—

  (1) in subsection (a), by inserting after "title," the following: "or on, above, or below any portion of the territorial sea of the United States not within the jurisdiction of any State, Commonwealth, territory, possession, or district"; and

  (2) by adding at the end the following new subsection:

  "(c) Whenever any waters of the territorial sea of the United States lie outside the territory of any State, Commonwealth, territory, possession, or district, such waters (including the airspace above and the seabed and subsoil below, and artificial islands and fixed structures erected thereon) shall be deemed, for purposes of subsection (a), to lie within the area of the State, Commonwealth, territory, possession, or district that it would lie within if the boundaries of such State, Commonwealth, territory, possession, or district were extended seaward to the outer limit of the territorial sea of the United States.".

<< 42 USCA § 1973gg NOTE >>

SEC. 902. PROOF OF CITIZENSHIP.

  Notwithstanding any other provision of law, a Federal, State, or local government agency may not use a voter registration card (or other related document) that evidences registration for an election for Federal office, as evidence to prove United States citizenship.

SEC. 903. REPRESENTATION FEES IN CRIMINAL CASES.

<< 18 USCA § 3006A >>

  (a) IN GENERAL.—Section 3006A of title 18, United States Code, is amended—

  (1) in subsection (d)—

   (A) by redesignating paragraphs (4), (5), and (6) as paragraphs (5), (6), and (7), respectively; and

   (B) by inserting after paragraph (3) the following:

  "(4) DISCLOSURE OF FEES.—The amounts paid under this subsection, for representation in any case, shall be made available to the public."; and

  (2) in subsection (e) by adding at the end the following:

  "(4) DISCLOSURE OF FEES.—The amounts paid under this subsection for services in any case shall be made available to the public.".

<< 21 USCA § 848 >>

  (b) FEES AND EXPENSES AND CAPITAL CASES.—Section 408(q)(10) of the Controlled Substances Act (21 U.S.C. 848(q)(10)) is amended to read as follows:

  "(10)(A) Compensation shall be paid to attorneys appointed under this subsection at a rate of not more than $125 per hour for in-court and out-of-court time. Not less than 3 years after the date of the enactment of the Antiterrorism and Effective Death Penalty Act of 1996, the Judicial Conference is authorized to raise the maximum for hourly payment specified in the paragraph up to the aggregate of the overall average percentages of the adjustments in the rates of pay for the General Schedule made pursuant to section 5305 of title 5 on or after such date. After the rates are raised under the preceding sentence, such hourly range may be raised at intervals of not less than one year, up to the aggregate of the overall average percentages of such adjustments made since the last raise under this paragraph.

  "(B) Fees and expenses paid for investigative, expert, and other reasonably necessary services authorized under paragraph (9) shall not exceed $7,500 in any case, unless payment in excess of that limit is certified by the court, or by the United States magistrate judge, if the services were rendered in connection with the case disposed of entirely before such magistrate judge, as necessary to provide fair compensation for services of an unusual character or duration, and the amount of the excess payment

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 473 of 1305

ANTITERRORISM AND EFFECTIVE DEATH PENALTY..., PL 104–132, April 24,...

is approved by the chief judge of the circuit. The chief judge of the circuit may delegate such approval authority to an active circuit judge.

  "(C) The amounts paid under this paragraph for services in any case shall be disclosed to the public, after the disposition of the petition.".

<< 18 USCA § 3006A NOTE >>

 (c) EFFECTIVE DATE.—The amendments made by this section apply to—
   (1) cases commenced on or after the date of the enactment of this Act; and
   (2) appellate proceedings, in which an appeal is perfected, on or after the date of the enactment of this Act.

<< 18 USCA § 1 NOTE >>

SEC. 904. SEVERABILITY.

  If any provision of this Act, an amendment made by this Act, or the application of such provision or amendment to any person or circumstance is held to be unconstitutional, the remainder of this Act, the amendments made by this Act, and the application of the provisions of such to any person or circumstance shall not be affected thereby.

Approved April 24, 1996.

PL 104–132, 1996 S 735

---

**End of Document**                                  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Black's Law Dictionary (11th ed. 2019)

BIBLIOGRAPHY OF BOOKS CITED

Bryan A. Garner, Editor in Chief

Preface | Guide | Legal Maxims

Abbott, Austin. *A Brief for the Trial of Civil Issues Before a Jury.* 2d ed. Rochester, N.Y.: Lawyers' Co-op, 1900.

Abbott, Austin. *Trial Evidence.* N.Y.: Baker Voorhis, 1880.

Abbott, Frederick M.; Thomas Cottier; and Francis Gurry. *International Intellectual Property in an Integrated World Economy.* N.Y.: Aspen, 2007.

Abbott, L.W. *Law Reporting in England.* London: Athlone, 1973.

Abraham, Kenneth S. *The Forms and Functions of Tort Law.* N.Y.: Foundation Press, 2002.

Ackerman, Bruce A. *Reconstructing American Law.* Cambridge, Mass.: Harvard Univ. Press, 1984.

Adams, Henry; et al. *Essays in Anglo-Saxon Law.* Boston: Little Brown, 1905.

Adams, Henry C. *A Juridical Glossary.* Albany, N.Y.: Weed Parsons, 1886. [Though several volumes were planned, only one appeared.]

Adams, James Truslow (ed.). *Dictionary of American History.* 5 vols. N.Y.: C. Scribner's Sons, 1940.

Alexander, Larry; and Emily Sherwin. *Demystifying Legal Reasoning.* N.Y.: Cambridge Univ. Press, 2008.

Alexy, Robert. *A Theory of Constitutional Rights.* Julian Rivers, trans. Oxford: Oxford Univ. Press, 2002.

Alix, Jay; and Elmer E. Heupel. *Financial Handbook for Bankruptcy Professionals.* St. Paul: West, 1991.

Allen, Carleton Kemp. *Aspects of Justice.* London: Stevens & Sons, 1958.

Allen, Carleton Kemp. *Democracy and the Individual.* London: Oxford Univ. Press, 1943.

Allen, Carleton Kemp. *Law and Orders: An Inquiry into the Nature and Scope of Delegated Legislation and Executive Powers in English Law.* 2d ed. London: Stevens, 1956.

Allen, Carleton Kemp. *Law in the Making.* 7th ed. Oxford: Clarendon Press, 1964.

Allen, Carleton Kemp. *Legal Duties and Other Essays in Jurisprudence.* Oxford: Clarendon Press, 1931.

Aman, Alfred C., Jr.; and William T. Mayton. *Administrative Law.* 2d ed. St. Paul: West, 2001.

*American and English Encyclopaedia of Law, The.* 32 vols. David. S. Garland & Charles Porterfield, eds. 2d ed. N.Y.: Edward Thompson, 1896-1905.

*American Jurisprudence 2d.* 83 vols. St. Paul.: West, 1962-present.

*American Law and Procedure.* 14 vols. James Parker Hall & James De Witt Andrews, eds. Chicago: La Salle Extension Univ., 1948.

*American Law of Mining.* 6 vols. 2d ed. N.Y.: Matthew Bender, 1984-present.

*American Law of Property.* 7 vols. Boston: Little Brown, 1952-1954.

American Psychiatric Ass'n. *Diagnostic and Statistical Manual of Mental Disorders.* 5th ed. Washington, D.C.: American Psychiatric Ass'n, 2013.

Anderson, Ronald A. *Uniform Commercial Code.* 8 vols. 3d ed. St. Paul: West, 1981-present.

Anderson, Roy Ryden. *Damages Under the Uniform Commercial Code.* 2 vols. Eagan, Minn.: Thomson Reuters, 2013-2014.

Anderson, William C. *A Dictionary of Law.* Chicago: T.H. Flood & Co., 1889.

Andrews, William. *Bygone Punishments.* London: William Andrews & Co., 1899.

Anenson, T. Leigh. *Judging Equity: The Fusion of Unclean Hands in U.S. Law.* N.Y.: Cambridge Univ. Press, 2019.

Anson, William R. *Principles of the Law of Contract.* Arthur L. Corbin, ed. 3d Am. ed. N.Y.: Oxford Univ. Press, 1919.

Appleman, John Alan; and Jean Appleman. *Insurance Law and Practice.* 61 vols. St. Paul: West, 1941-present.

Arant, Herschel W. *Handbook of the Law of Suretyship and Guaranty.* St. Paul: West, 1931.

Archer, Gleason L. *Law Office and Court Procedure.* Boston: Little Brown, 1910.

Areeda, Phillip; and Donald F. Turner. *Antitrust Law.* 5 vols. & supp. Boston: Little Brown, 1978-1980 & 1982 (supp.).

Aristotle. *Rhetoric and Poetics* [4c B.C.]. W. Rhys Roberts et al., eds. Franklin Center, Pa.: Franklin Library, 1981.

Arnesen, Eric (ed.). *Encyclopedia of U.S. Labor and Working-Class History.* 3 vols. N.Y.: Routledge, 2007.

Ashworth, Andrew. *Principles of Criminal Law.* Oxford: Clarendon Press, 1991.

Atiyah, P.S. *An Introduction to the Law of Contract.* 3d ed. Oxford: Clarendon Press, 1981.

Atiyah, P.S. *Promises, Morals, and Law.* Oxford: Clarendon Press, 1981.

Atiyah, P.S.; and Robert S. Summers. *Form and Substance in Anglo-American Law.* Oxford: Clarendon Press, 1987.

Atkinson, Thomas E. *Handbook of the Law of Wills.* 2d ed. St. Paul: West, 1953.

Austin, Erik W. *Political Facts of the United States Since 1789.* N.Y.: Columbia Univ. Press, 1986.

Austin, John. *Lectures on Jurisprudence.* 2 vols. Robert Campbell, ed. 5th ed. London: J. Murray, 1885.

Bacon, Matthew. *A New Abridgment of the Law.* 5 vols. 2d ed. London: E. Richardson & C. Lintot, 1759-1766.

Bainbridge, David I. *Intellectual Property.* 5th ed. N.Y.: Longman, 2002.

Baird, Douglas G. *Elements of Bankruptcy.* N.Y.: Foundation Press, 2001.

Baker, J.H. *An Introduction to English Legal History.* 3d ed. London: Butterworths, 1990.

Baker, J.H. *A Manual of Law French.* Amersham, U.K.: Avebury, 1979.

Baker, J.H. *The Order of Serjeants at Law.* London: Selden Society, 1984.

Banks, George. *A Treatise on the Law of Support for Land, Buildings, and Public Works.* London: Sweet & Maxwell, 1894.

Barbour, Oliver L. *A Summary of the Law of Parties to Actions at Law and Suits in Equity.* Albany, N.Y.: W.C. Little, 1864.

Barbour, Oliver L. *A Treatise on the Law of Set Off.* Albany, N.Y.: W. & A. Gould & Co., 1864.

Barclay, Hugh. *A Digest of the Law of Scotland.* 3d ed. Edinburgh: T. & T. Clark, 1865.

Barnes, Marian Quinn (ed.). *A Treatise on the Law of Crimes.* 7th ed. Mundelein, Ill.: Callaghan, 1967.

Barnouw, Erik (ed.). *International Encyclopedia of Communications.* 4 vols. N.Y.: Oxford Univ. Press, 1989.

Barrington, Daines. *Observations on the More Ancient Statutes from Magna Charta to the Twenty-First of James I. Cap. XXVI.* 5th ed. London: J. Nichols, 1796.

Barton, R.T. *The Practice in the Courts of Law in Civil Cases.* 2 vols. 2d ed. Richmond, Va.: J.W. Randolph & Co., 1891-1892.

Basedow Jürgen; et al. (eds.). *The Max Planck Encyclopedia of European Private Law.* 2 vols. Oxford: Oxford Univ. Press, 2012.

Basye, Paul E. *Clearing Land Titles.* St. Paul: West, 1953.

Beale, Joseph Henry. *A Treatise on Criminal Pleading and Practice.* Boston: Little Brown, 1899.

Beale, Joseph Henry. *A Treatise on the Conflict of Laws.* 3 vols. N.Y.: Baker Voorhis, 1935.

Bean, Philip (ed.). *Hate Crime: Critical Concepts in Criminology.* 4 vols. London: Routledge, 2017.

Beard, Charles A.; and William Beard. *The American Leviathan: The Republic in the Machine Age.* N.Y.: Macmillan, 1931.

Beardsley, Arthur Sydney. *Legal Bibliography and the Use of Law Books.* Chicago: Foundation Press, 1937.

Beccaria, Cesare. *An Essay on Crimes and Punishments* [1764]. Rev. ed. Philadelphia: William Young, 1793.

Bederman, David J. *International Law Frameworks.* N.Y.: Foundation Press, 2001.

Beeton, Samuel Orchart. *Beeton's Illustrated Dictionary of Religion, Philosophy, Politics, and Law.* London: Ward, Lock & Co., 1886.

Belknap, William Worth; et al. *Proceeding of the Senate Sitting for the Trial of William W. Belknap.* Washington, D.C.: GPO, 1876.

Bell, John. *Policy Arguments in Judicial Decisions.* Oxford: Clarendon Press, 1983.

Bell, Samuel D. *Justice and Sheriff: Practical Forms for the Use of Justices of the Peace, Sheriffs, Coroners, and Constables.* Concord, N.H.: G. Parker Lyon, 1843.

Bell, William. *Bell's Dictionary and Digest of the Law of Scotland.* George Watson, ed. 7th ed. Edinburgh: Bell & Bradfute, 1890.

Benedict, Joseph. *Benedict's Treatise: Containing a Summary of the Jurisdiction, Powers, and Duties of Justices of the Peace in the State of New York.* 2d ed. Auburn, N.Y.: J.C. Derby & Co., 1847.

Bennett, Stephen C. *Arbitration: Essential Concepts.* N.Y.: ALM, 2002.

Bennion, F.A.R. *Statutory Interpretation.* 3d ed. London: Butterworths, 1997.

Bentham, Jeremy. *Bentham's Theory of Legislation.* 2 vols. Étienne Dumont, ed. Charles Milner Atkinson, trans. Oxford: Oxford Univ. Press, 1914. [Published originally in French.]

Bentham, Jeremy. *An Introduction to the Principles of Morals and Legislation.* 2 vols. London: W. Pickering, 1823.

Bentham, Jeremy. *The Works of Jeremy Bentham.* 11 vols. John Bowring, ed. Edinburgh: William Tait, 1843.

Bently, Lionel; and Brad Sherman. *Intellectual Property Law.* Oxford: Oxford Univ. Press, 2001.

Berger, Adolf. *Encyclopedic Dictionary of Roman Law.* Philadelphia: American Philosophical Society, 1953.

Bergin, Thomas F.; and Paul G. Haskell. *Preface to Estates in Land and Future Interests.* 2d ed. Mineola, N.Y.: Foundation Press, 1984.

Besson, Samantha; and John Tasioulas. *The Philosophy of International Law.* Oxford: Oxford Univ. Press, 2012.

Beven, Thomas. *Negligence in Law.* 2 vols. 3d ed. London: Stevens & Haynes, 1908.

Bigelow, Melville M. *Elements of the Law of Torts.* 6th ed. Boston: Little Brown, 1896.

Bigelow, Melville M. *The Law of Bills, Notes, and Checks.* William Minor Lile, ed. 3d ed. Boston: Little Brown, 1928.

Birks, Peter (ed.). *English Private Law.* 2 vols. Oxford: Oxford Univ. Press, 2000.

Birrell, Augustine. *The Duties and Liabilities of Trustees.* London: Macmillan, 1920.

Bishop, Joel Prentiss. *Commentaries on the Law of Contracts.* Chicago: T.H. Flood & Co., 1887.

Bishop, Joel Prentiss. *Commentaries on the Written Laws and their Interpretation.* Boston: Little Brown, 1882.

Bispham, George T. *The Principles of Equity.* Joseph D. McCoy, ed. 11th ed. N.Y.: Baker Voorhis, 1931.

Bix, Brian H. (ed.). *Analyzing Law: New Essays in Legal Theory.* Oxford: Clarendon Press, 1998.

Bix, Brian H. *A Dictionary of Legal Theory.* Oxford: Oxford Univ. Press, 2004.

Black, Charles L., Jr.; and Philip Bobbitt. *Impeachment: A Handbook.* New ed. New Haven: Yale Univ. Press, 2018.

Black, Henry Campbell. *Handbook of American Constitutional Law.* 4th ed. St. Paul: West, 1927.

Black, Henry Campbell. *Handbook on the Construction and Interpretation of the Laws.* 2d ed. St. Paul: West, 1911.

Black, Henry Campbell. *Handbook on the Law of Judicial Precedents.* St. Paul: West, 1912.

Black, Henry Campbell. *A Treatise on the Law and Practice of Bankruptcy.* Kansas City, Mo.: Vernon, 1914.

Black, Henry Campbell. *A Treatise on the Law of Income Taxation Under Federal and State Laws.* Kansas City, Mo.: Vernon, 1913.

Black, Henry Campbell. *A Treatise on the Law of Judgments.* 2 vols. 2d ed. St. Paul: West, 1902.

Black, Henry Campbell. *A Treatise on the Laws Regulating the Manufacture and Sale of Intoxicating Liquors.* St. Paul: West, 1892.

Blackstone, William. *Commentaries on the Laws of England.* 4 vols. Oxford: Clarendon Press, 1765-1769.

Bliss, George. *The Law of Life Insurance.* 2d ed. N.Y.: Baker Voorhis, 1874.

Block, Dennis J.; et al. *The Business Judgment Rule.* 2 vols. 5th ed. N.Y.: Aspen, 1998.

Blom-Cooper, Louis; et al. (eds.). *The Judicial House of Lords, 1876-2009.* Oxford: Oxford Univ. Press, 2009.

Blount, Thomas. *Nomo-Lexicon: A Law-Dictionary.* London: John Martin & Henry Herringman, 1670.

Boberg, P.Q.R. *The Law of Delict.* Cape Town: Juta, 1984.

Bodenheimer, Edgar. *Jurisprudence: The Philosophy and Method of the Law.* Rev. ed. Cambridge, Mass.: Harvard Univ. Press, 1974.

Bodenheimer, Edgar. *Treatise on Justice.* N.Y.: Philosophical Library, 1967.

Bonner, Robert J. *Lawyers and Litigants in Ancient Athens.* N.Y.: Barnes & Noble, 1927.

Born, Gary B. *International Commercial Arbitration.* 2 vols. Austin, Tex.: Wolters Kluwer, 2009.

Bouvier, John. *A Law Dictionary.* Philadelphia: T. & J.W. Johnson, 1839. Also: *Bouvier's Law Dictionary.* 3 vols. Francis Rawle, ed. 8th ed. Kansas City, Mo.: Vernon, 1914.

Boyer, Ralph E.; et al. *The Law of Property.* 4th ed. St. Paul: West, 1991.

Brandt, George W. *The Law of Suretyship and Guaranty.* 2 vols. 3d ed. Chicago: Callaghan & Co., 1905.

Branham, Vernon C.; and Samuel B. Kutash (eds.). *Encyclopedia of Criminology.* N.Y.: Philosophical Library, 1949.

Brierly, J.L. *The Law of Nations.* 5th ed. Oxford: Clarendon Press, 1955. (See also Clapham.)

Brittin, Burdick H. *International Law for Seagoing Officers.* 4th ed. Annapolis: Naval Inst. Press, 1981.

Bromberg, Alan R.; and Larry E. Ribstein. *Bromberg and Ribstein on Partnership.* 4 vols. Boston: Little Brown, 1988-present.

Broom, Herbert. *Commentaries on the Common Law.* 1st Am. ed. fr. 4th London ed. Philadelphia: T. & J.W. Johnson & Co., 1873.

Brown, David Paul. *The Forum: Or Forty Years Full Practice at the Philadelphia Bar.* 2 vols. Philadelphia: Robert H. Small, 1856.

Brown, Harold. *Franchising: Realities and Remedies.* 2 vols. Rev. ed. N.Y.: Law Journals Seminars Press, 1993.

Brown, Ray Andrews. *The Law of Personal Property.* 2d ed. Chicago: Callaghan & Co., 1955.

Brownsword, Roger; Norma J. Hird; and Geraint Howells (eds.). *Good Faith in Contract: Concept and Context.* Brookfield, Mass.: Ashgate/Dartmouth, 1999.

Brumbaugh, Jesse Franklin. *Legal Reasoning and Briefing.* Indianapolis: Bobbs-Merrill, 1917.

Bryant, Edwin E. *The Law of Pleading Under the Codes of Civil Procedure.* 2d ed. Boston: Little Brown, 1899.

Bryce, James. *Studies in History and Jurisprudence.* 2 vols. N.Y.: Oxford Univ. Press, 1901.

Buckland, W.W. *Elementary Principles of the Roman Private Law.* Cambridge: Cambridge Univ. Press, 1912.

Buckland, W.W. *A Manual of Roman Private Law.* 2d ed. Cambridge: Cambridge Univ. Press, 1939.

Buckland, W.W. *Some Reflections on Jurisprudence.* Cambridge: Cambridge Univ. Press, 1945.

Buckland, W.W. *A Text-book of Roman Law from Augustus to Justinian.* Peter Stein, ed. 3d ed. Cambridge: Cambridge Univ. Press, 1963.

Buckland, W.W.; and Arnold D. McNair. *Roman Law and Common Law: A Comparison in Outline.* F.H. Lawson, ed. 2d ed. Cambridge: Cambridge Univ. Press, 1952.

Bullen, Edward; and Stephen Martin Leake. *Bullen and Leake's Precedents of Pleadings in Actions in the King's Bench Division of the High Court of Justice.* Alfred Thompson Denning [later Lord Denning] & Arthur Grattan-Bellew, eds. 9th ed. London: Stevens & Sons, 1935.

Bullingbrooke, Edward. *The Duty and Authority of Justices of the Peace and Parish Officers for Ireland.* Rev. ed. Dublin: G. Grierson, 1788.

Burdick, William L. *Handbook of the Law of Real Property.* St. Paul: West, 1914.

Burgess, John W. *Political Science and Comparative Constitutional Law.* 2 vols. Boston: Ginn & Co., 1890-1891.

*The Burgundian Code* [ca. a.d. 523]. Katherine Fischer, trans. Philadelphia: Univ. of Philadelphia Press, 1949.

Burlamaqui, Jean-Jacques. *The Principles of Natural and Politic Law.* 2 vols. Thomas Nugent, trans. 6th ed. Philadelphia: H.C. Carey & I. Lea, 1823.

Burn, Richard. *The Justice of the Peace and Parish Officer.* 3d ed. London: Henry Lintot, 1756.

Burn, Richard. *A New Law Dictionary.* 2 vols. London: T. Cadell, 1792.

Burnham, Scott J. *Contract Drafting Guidebook.* 2d ed. Charlottesville, Va.: Michie Co., 1992.

Burrill, Alexander M. *A Law Dictionary and Glossary.* 2 vols. 2d ed. N.Y.: Baker Voorhis, 1867.

Burrill, Alexander M. *A Treatise on the Law and Practice of Voluntary Assignments for the Benefit of Creditors.* James Avery Webb, ed. 6th ed. N.Y.: Baker Voorhis, 1894.

Burrill, Alexander M. *A Treatise on the Nature, Principles and Rules of Circumstantial Evidence.* N.Y.: J.S. Voorhies, 1868.

Burrill, Alexander M. *Treatise on the Practice of the Supreme Court of the State of New-York.* 2 vols. 2d ed. N.Y.: John S. Voorhies, 1846.

Burrows, Andrew; and Alan Rodger (eds.). *Mapping the Law: Essays in Memory of Peter Birks.* Oxford: Oxford Univ. Press, 2006.

Butt, Peter. *Land Law.* 2d ed. Sydney: Lawbook Co., 1988. Also: 3d ed. Sydney: LBC Info. Servs., 1996.

Byrne, Edward M. *Military Law.* 2d ed. Annapolis: Naval Inst. Press, 1976.

Cairns, Huntington. *The Theory of Legal Science.* Chapel Hill, N.C.: Univ. of North Carolina Press, 1941.

Calabresi, Guido. *A Common Law for the Age of Statutes.* Cambridge, Mass.: Harvard Univ. Press, 1982.

Calamandrei, Piero. *Eulogy of Judges.* John Clarke Adams & C. Abbott Phillips Jr., trans. Princeton, N.J.: Princeton Univ. Press, 1942.

Calamari, John D.; and Joseph M. Perillo. *The Law of Contracts.* 4th ed. St. Paul: West, 1998.

Callmann, Rudolf. *The Law of Unfair Competition, Trademarks and Monopolies.* 6 vols. 4th ed. St. Paul: Thomson/West, 1981-present.

Cane, Peter; and Joanne Conaghan (eds.). *The New Oxford Companion to Law.* Oxford: Oxford Univ. Press, 2008.

Caney, L.R. *A Treatise on the Law Relating to Novation.* Cape Town: Juta, 1938.

Cardozo, Benjamin N. *The Paradoxes of Legal Science.* N.Y.: Columbia Univ. Press, 1928.

Caringella, Susan. *Addressing Rape Reform in Law and Practice.* N.Y.: Columbia Univ. Press, 2009.

Carter, A.T. *A History of English Legal Institutions.* 4th ed. London: Butterworth & Co., 1910.

Castagnino, John-Peter. *Derivatives: The Key Principles.* 3d ed. Oxford: Oxford Univ. Press, 2009.

*Century Dictionary and Cyclopedia, The.* 10 vols. & 2-vol. supp. William Dwight Whitney, ed. N.Y.: Century Co., 1889-1897.

Chamberlayne, Charles Frederic. *A Treatise on the Modern Law of Evidence.* 5 vols. Albany, N.Y.: Matthew Bender, 1911-1916.

Chambers, Ephraim. *Cyclopaedia: Or, an Universal Dictionary of Arts and Sciences.* 2 vols. & 2 supps. 5th ed. London: D. Midwinter et al., 1747 (vol. 1), 1743 (vol. 2 & 2 supps.).

Chambers, Robert. *A Course of Lectures on the English Law: 1767-1773.* Thomas M. Curley, ed. Madison, Wis.: Univ. of Wisconsin Press, 1986.

Chance, E.W. *Principles of Mercantile Law.* Vol 1. P.W. French, ed. 13th ed. St. Albans: Donnington Press, 1950. Vol 2. P.W. French, ed. 10th ed. St. Albans: Donnington Press, 1951. [Volume 1 appears to have gone through more editions than volume 2.]

Chandler, Ralph C.; Richard A. Enslen; and Peter G. Renstrom. *The Constitutional Law Dictionary.* 2 vols. & 1-vol. supp. Santa Barbara: ABC-CLIO, 1985 (vol. 1), 1987 (vol. 2 & supp.).

Chapin, H. Gerald. *Handbook of the Law of Torts.* St. Paul: West, 1917.

Charpentier, Arthur A. (ed.). *Counsel on Appeal.* N.Y.: McGraw-Hill, 1968.

Cheshire, G.C. *Modern Law of Real Property.* 3d ed. London: Butterworth & Co., 1933.

Cheshire, G.C. *Private International Law.* 6th ed. Oxford: Clarendon Press, 1961.

Childs, Frank Hall. *Where and How to Find the Law.* Chicago: La Salle Extension Univ., 1923.

Chirelstein, Marvin A. *Concepts and Case Analysis in the Law of Contracts.* Westbury, N.Y.: Foundation Press, 1990.

Chisum, Donald S. *Patents.* 13 vols. N.Y.: Lexis, 1978-present.

Chitty, Joseph. *A Practical Treatise on Bills of Exchange, Promissory Notes, and Bankers' Checks.* Erastus Smith, ed. Springfield, Mass.: G. & C. Merriam, 1834.

Chitty, Joseph. *A Practical Treatise on the Criminal Law.* 4 vols. 2d ed. London: Samuel Brooke, 1826.

Chitty, Joseph. *A Practical Treatise on the Law of Contracts.* Boston: Wells & Lilly, 1827.

Chitty, Joseph. *A Treatise on the Parties to Actions, the Forms of Actions, and on Pleading.* 3 vols. John H. Dunlap & E.D. Ingraham, eds. 6th Am. ed. fr. 5th London ed. Springfield, Mass.: G. & C. Merriam, 1833.

Clapham, Andrew. *Brierly's Law of Nations: An Introduction to the Role of International Law in International Relations.* 7th ed. Oxford: Oxford Univ. Press, 2012. (See also Brierly.)

Clapp, James E.; et al. *Lawtalk: The Unknown Stories Behind Familiar Legal Expressions.* New Haven: Yale Univ. Press, 2011.

Clark, Barkley; and Christopher Smith. *The Law of Product Warranties.* Boston: Warren, Gorham & Lamont, 1984.

Clark, Charles E. *Handbook of the Law of Code Pleading.* 2d ed. St. Paul: West, 1947.

Clark, David G.; and Earl R. Hutchinson. *Mass Media and the Law.* N.Y.: Wiley-Interscience, 1970.

Clark, E.C. *History of Roman Private Law.* 3 vols. W.W. Buckland, ed. (vol. 3). Cambridge: Cambridge Univ. Press, 1914 (vols. 1 & 2), 1919 (vol. 3).

Clark, Elias; et al. *Gratuitous Transfers: Wills, Intestate Succession, Trusts, Gifts, Future Interests, and Estate and Gift Taxation Cases and Materials.* 4th ed. St. Paul: West, 1999.

Clark, Homer H., Jr. *The Law of Domestic Relations in the United States.* 2d ed. St. Paul: West, 1988.

Clark, Homer H., Jr.; and Ann Laquer Estin. *Domestic Relations: Cases and Problems.* 6th ed. St. Paul: West, 2000.

Clark, Lindley Daniel. *The Law of the Employment of Labor.* N.Y.: Macmillan, 1911.

Clark, William Lawrence. *Handbook of Criminal Law.* Francis B. Tiffany, ed. 2d ed. St. Paul: West, 1902.

Clark, William Lawrence. *Handbook of the Law of Contracts.* Archibald H. Throckmorton, ed. 3d ed. St. Paul: West, 1914.

Clark, William Lawrence. *A Treatise on the Law of Crimes.* Marian Quinn Barnes, ed. 7th ed. Mundelein, Ill.: Callaghan & Co., 1967.

Coates, David (ed.). *The Oxford Companion to American Politics.* 2 vols. N.Y.: Oxford Univ. Press, 2012.

Cobbey, J.E. *A Practical Treatise on the Law of Replevin.* 2d ed. Chicago: Callaghan & Co., 1900.

Cogan, Jacob Katz; Ian Hurd; and Ian Johnstone (eds.). *The Oxford Handbook of International Organizations.* Oxford: Oxford Univ. Press, 2016.

Coggins, George Cameron. *Public Natural Resources Law.* 3 vols. St. Paul: Thomson/West, 1990.

Coggins, George Cameron; et al. *Federal Public Land and Resources Law.* 3d ed. Westbury, N.Y.: Foundation Press, 1993.

Cohen, Morris R. *Law and the Social Order.* N.Y.: Harcourt Brace, 1933.

Cohen, Morris R. *Reason and Law.* N.Y.: Collier Macmillan, 1961.

Colebrooke, William. *A Treatise on the Law of Collateral Securities.* Chicago: Callaghan & Co., 1883.

Conte, Alba. *Attorney Fee Awards.* 2 vols. Colorado Springs: Shepard's, 1993.

Cooley, Roger W. *Handbook of the Law of Municipal Corporations.* St. Paul: West, 1914.

Cooley, Thomas M. *The Law of Taxation.* 4 vols. Clark A. Nichols, ed. 4th ed. Chicago: Callaghan & Co., 1924.

Cooley, Thomas M. *A Treatise on the Constitutional Limitations Which Rest upon the Legislative Power of the States of the American Union.* Boston: Little Brown, 1868.

Coquillette, Daniel R. *The Anglo-American Legal Heritage.* Durham, N.C.: Carolina Academic Press, 1999.

Corbin, Arthur Linton. *Corbin on Contracts.* One-vol. ed. St. Paul: West, 1952. (*See also* Anson.)

*Corpus Juris Secundum* (C.J.S.). 101 vols. St. Paul: West, 1936-present.

Cotterrell, Roger. *The Politics of Jurisprudence: A Critical Introduction to Legal Philosophy.* 2d ed. Oxford: Oxford Univ. Press, 2003.

Couch, George J. *Couch on Insurance.* 26 vols. 2d ed. St. Paul: West, 1959-1994.

Cowell, John. *The Interpreter.* Cambridge: John Legate, 1607.

Cowen, Zelman. *Essays on the Law of Evidence.* Oxford: Clarendon Press, 1956.

Crabb, George. *A History of English Law.* 1st Am. ed. Burlington: C. Goodrich, 1831.

Craies, William Feilden. *A Treatise on Statute Law.* 2d ed. London: Stevens & Haynes, 1911.

Craig, Laurence; et al. *International Chamber of Commerce Arbitration.* 3d ed. Dobbs Ferry, N.Y.: Oceana, 2000.

Crawford, James. *Brownlie's Principles of Public International Law.* 8th ed. Oxford: Oxford Univ. Press, 2012.

Cribbet, John E. *Principles of the Law of Property.* 2d ed. Mineola, N.Y.: Foundation Press, 1975.

Crompton, George. *Practice Common-Placed: Rules and Cases of Practice in the Courts of King's Bench and Common Pleas.* 2 vols. 3d ed. Dublin: Elizabeth Lynch, 1787.

Cross, Frank B. *The Theory and Practice of Statutory Interpretation.* Stanford, Calif.: Stanford Law Books, 2009.

Cross, Rupert. *Evidence.* 3d ed. London: Butterworths, 1967.

Cross, Rupert. *Precedent in English Law.* 1st ed. Oxford: Clarendon Press, 1961. Also: With J.W. Harris. 4th ed. Oxford: Clarendon Press, 1991.

Cross, Rupert. *Statutory Interpretation.* London: Butterworths, 1976.

Croswell, Simon Greenleaf. *Handbook on the Law of Executors and Administrators.* St. Paul: West, 1897.

Cunningham, Roger A.; et al. *The Law of Property.* 2d ed. St. Paul: West, 1993.

Curzon, L.B. *English Legal History.* 2d ed. Estover, U.K.: Macdonald & Evans, 1979.

*Cyclopedia of Law and Procedure.* 40 vols. & index. William Mack & H.P. Nash, eds. N.Y.: American Law Book Co., 1901-1913.

Dahl, Robert A. *A Preface to Democratic Theory.* Chicago: Chicago Univ. Press, 1956.

Dainow, Joseph (ed.). *Essays on the Civil Law of Obligations.* Baton Rouge: Louisiana State Univ. Press, 1969.

Dangel, Edward M. *Contempt.* Boston: Nat'l Lawyers' Manual Co., 1939.

Daniel, John W. *A Treatise on the Law of Negotiable Instruments.* 3 vols. Thomas H. Calvert, ed. 7th ed. N.Y.: Baker Voorhis, 1933.

Darlington, Joseph J. *A Treatise on the Law of Personal Property.* Philadelphia: T. & J.W. Johnson & Co., 1891.

Davis, George B. *The Elements of International Law.* Gordon E. Sherman, ed. 4th ed. N.Y.: Harper & Bros., 1915.

Davis, George B. *A Treatise on the Military Law of the United States.* 3d ed. N.Y.: John Wiley & Sons, 1915.

Decker, Kurt H.; and H. Thomas Felix II. *Drafting and Revising Employment Contracts.* N.Y.: Wiley Law Publications, 1991.

De Colange, L. *The American Dictionary of Commerce, Manufactures, Commercial Law, and Finance.* 2 vols. Boston: Estes & Lauriat, 1881.

De Colyar, Henry Anselm. *A Treatise on the Law of Guarantees and of Principal and Surety.* 3d ed. London: Butterworth & Co., 1897.

De Funiak, William Q. *Handbook of Modern Equity.* 2d ed. Boston: Little, Brown, 1956.

Del Vecchio, Giorgio. *The Formal Bases of Law.* John Lisle, trans. N.Y.: Macmillan, 1921.

Demeter, George. *Demeter's Manual of Parliamentary Law and Procedure.* Boston: Little, Brown, 1969.

Denis, Henry. *A Treatise on the Law of the Contract of Pledge as Governed by Both the Common Law and the Civil Law.* New Orleans: F.F. Hansell & Bro., 1898.

Denman, D.R. *Origins of Ownership: A Brief History of Land Ownership and Tenure in England from Earliest Times to the Modern Era.* London: George Allen & Unwin, 1958.

Deschler, Lewis. *Deschler's Rules of Order.* Englewood Cliffs, N.J.: Prentice-Hall, 1976.

De Tourtoulon, Pierre. *Philosophy in the Development of Law.* Martha McC. Read, trans. N.Y.: Macmillan, 1922.

De Vattel, E. *The Law of Nations or the Principles of Natural Law.* Charles G. Fenwick, trans. Washington, D.C.: Carnegie Inst. of Washington, 1916.

Devlin, Patrick [Lord Devlin]. *The Criminal Prosecution in England.* London: Oxford Univ. Press, 1960.

Devlin, Patrick [Lord Devlin]. *The Enforcement of Morals.* London: Oxford Univ. Press, 1968.

Devlin, Patrick [Lord Devlin]. *The Judge.* Oxford: Oxford Univ. Press, 1979.

De Zulueta, F. *The Roman Law of Sale.* Oxford: Clarendon Press, 1945.

Dhokalia, R.P. *The Codification of Public International Law.* Manchester: Univ. of Manchester, 1970.

Dias, R.W.M.; and B.S. Markesinis. *Tort Law.* 2d ed. Oxford: Clarendon Press, 1989.

Dicey, A.V. *Introduction to the Study of the Law of the Constitution.* E.C.S. Wade, ed. 10th ed. London: Macmillan, 1959.

Dicey, A.V.; and A. Berriedale Keith. *A Digest of the Law of England with Reference to the Conflict of Laws.* 3d ed. London: Stevens & Sons, 1922.

Dickerson, Reed. *The Interpretation and Application of Statutes.* Boston: Little, Brown, 1975.

Digby, Kenelm E. *An Introduction to the History of the Law of Real Property.* 5th ed. Oxford: Clarendon Press, 1897.

Dillon, John F. *Commentaries on the Law of Municipal Corporations.* 2 vols. 3d ed. Boston: Little, Brown & Co., 1881.

Dillon, John F. *The Laws and Jurisprudence in England and America.* N.Y.: Da Capo Press, 1970.

Dinstein, Yoram. *War, Aggression, and Self-Defence.* 6th ed. Cambridge: Cambridge Univ. Press, 2017.

Dobbs, Dan B. *Law of Remedies.* 3 vols. 2d ed. St. Paul: West, 1993.

Dobie, Armistead M. *Handbook on the Law of Bailments and Carriers.* St. Paul: West, 1914.

Dolan, John F. *The Law of Letters of Credit.* Boston: Warren, Gorham & Lamont, 1984.

Drake, Charles D. *A Treatise on the Law of Suits by Attachment in the United States.* 7th ed. Boston: Little, Brown, 1891.

Dratler, Jay, Jr. *Cyberlaw.* N.Y.: Law Journal Press, 2001.

Dray, William. *Laws and Explanation in History.* Oxford: Clarendon Press, 1957.

Dressler, Joshua (ed.). *Encyclopedia of Crime and Justice.* 4 vols. 2d ed. N.Y.: Macmillan, 2002.

Driedger, Elmer A. *The Composition of Legislation.* Ottawa: Edmond Cloutier, 1957.

Drinker, Henry S. *Legal Ethics.* N.Y.: Columbia Univ. Press, 1953.

Drone, Eaton S. *A Treatise on the Law of Property in Intellectual Productions.* Boston: Little, Brown, 1879.

Dubber, Markus D.; and Christopher Tomlins (eds.). *The Oxford Handbook of Legal History.* Oxford: Oxford Univ. Press, 2018.

Dudley, Robert J. *Think Like a Lawyer.* Chicago: Nelson-Hall, 1980.

Duhamel, Jean; and J. Dill Smith. *Some Pillars of English Law.* Reginald Hall, ed. & trans. 1st English ed. London: Sir Isaac Pitman & Sons, 1959.

Dumenil, Lynn (ed.). *The Oxford Encyclopedia of American Social History.* 2 vols. N.Y.: Oxford Univ. Press, 2012.

Dunn, William C. *Trusts for Business Purposes.* Chicago: Callaghan & Co., 1922.

Du Plessis, Paul. *Borkowski's Textbook on Roman Law.* 4th ed. Oxford: Oxford Univ. Press, 2010.

Duxbury, Neil. *Elements of Legislation.* Cambridge: Cambridge Univ. Press, 2013.

Dwight, Timothy. *Travels in New-England and New-York.* 4 vols. New Haven: For the author, 1821-1822.

Dworkin, Gerald. *Odgers' Construction of Deeds and Statutes.* 5th ed. London: Sweet & Maxwell, 1967.

Dworkin, Ronald. *Law's Empire.* Cambridge, Mass.: Belknap Press, 1986.

Easterbrook, Frank H.; and Daniel R. Fischel. *The Economic Structure of Corporate Law.* Cambridge, Mass.: Harvard Univ. Press, 1991.

Eaton, James W. *Handbook of Equity Jurisprudence.* 1st ed. St. Paul: West, 1901. Also: Archibald H. Throckmorton, ed. 2d ed. St. Paul: West, 1923.

Eddy, Jonathan A.; and Peter Winship. *Commercial Transactions.* Boston: Little Brown, 1985.

Eden, Robert Henley. *A Treatise on the Law of Injunctions.* 1st Am. ed. Albany, N.Y.: William Gould & Co., 1822.

Edwards, George J., Jr. *The Grand Jury.* Philadelphia: George T. Bisel, 1906.

Eggleston, Richard. *Evidence, Proof and Probability.* London: Weidenfeld & Nicolson, 1978.

Ehrich, Manfred W. *The Law of Promoters.* Albany, N.Y.: Matthew Bender & Co., 1916.

Ehrlich, Eugen. *Fundamental Principles of the Sociology of Law.* Walter L. Moll, trans. N.Y.: Russell & Russell, 1962.

Eldredge, Lawrence H. *The Law of Defamation.* Indianapolis: Bobbs-Merrill, 1978.

Elias, Stephen. *Patent, Copyright and Trademark.* Berkeley: Nolo Press, 1996.

Elliott, Byron K.; and William F. Elliott. *A Treatise on the Law of Railroads.* 6 vols. 3d ed. Indianapolis: Bobbs-Merrill, 1921.

Elliott, Byron K.; and William F. Elliott. *The Work of the Advocate.* 2d ed. Indianapolis; Bobbs-Merrill, 1911.

Ely, John Hart. *Democracy and Distrust.* Cambridge: Harvard Univ. Press, 1980.

*Encyclopaedia Britannica.* 24 vols. 9th ed. Akron, Ohio: Werner Co., 1907.

*Encyclopaedia Britannica.* 29 vols. 11th ed. N.Y.: Cambridge Univ. Press, 1910-1911.

*Encyclopedia of Public International Law.* 5 vols. N.Y.: North-Holland, 1992.

Endlich, G.A. *The Law of Building Associations.* Jersey City, N.J.: F.D. Linn, 1886.

Enever, F.A. *History of the Law of Distress.* London: G. Routledge & Sons, 1931.

Epstein, David G.; Steve H. Nickles; and James J. White. *Bankruptcy.* St. Paul: West, 1993.

Epstein, David M. (ed.). *Eckstrom's Licensing in Foreign and Domestic Operations.* 7 vols. 5th ed. Eagan, Minn.: Thomson/West, 2002-2011.

Erskine, John. *An Institute of the Law of Scotland.* 2 vols. 4th ed. Edinburgh: Bell & Bradfute, 1805. Also: 2 vols. James Badenach Nicolson, ed. Edinburgh: Bell & Bradfute, 1871.

Eskridge, William N., Jr.; Philip P. Frickey; and Elizabeth Garett. *Cases and Materials on Legislation.* 3d ed. St. Paul: West, 2001.

Estee, Morris M. *Estee's Pleadings, Practice, and Forms.* 3 vols. Carter P. Pomeroy, ed. 3d ed. San Francisco: L. Bancroft & Co., 1885.

Evans, Hugh D. *An Essay on Pleading.* Baltimore: Edward J. Coale, 1827.

Everest, Lancelot Feilding. *Everest and Strode's Law of Estoppel.* 3d ed. London: Stevens & Sons, 1923.

Ewart, John S. *An Exposition of the Principles of Estoppel by Misrepresentation.* Chicago: Callaghan & Co., 1900.

Faber, Robert C. *Landis on Mechanics of Patent Claim Drafting.* 3d ed. N.Y.: Practising Law Inst., 1990.

Farnsworth, E. Allan. *Changing Your Mind: The Law of Regretted Decision.* New Haven: Yale Univ. Press, 1998.

Farnsworth, E. Allan. *Contracts.* 2d ed. Boston: Little Brown, 1990. Also: *Farnsworth on Contracts.* 3d. ed. 3 vols. N.Y.: Aspen, 1999, 2004.

Farnsworth, Ward. *The Legal Analyst: A Toolkit for Thinking About the Law.* Chicago: Univ. of Chicago Press, 2007.

Fassbender, Bardo; and Anne Peters (eds.). *Oxford Handbook of the History of International Law.* Oxford: Oxford Univ. Press, 2012.

Fellmeth, Aaron X.; and Maurice Horwitz. *Guide to Latin in International Law.* Oxford: Oxford Univ. Press, 2009.

Fenwick, Charles G. *International Law.* N.Y.: Century Co., 1924.

Ferris, Forrest G.; and Forrest G. Ferris Jr. *The Law of Extraordinary Legal Remedies.* St. Louis: Thomas Law Book Co., 1926.

Fetter, Norman. *Handbook of Equity Jurisprudence.* St. Paul: West, 1895.

Fifoot, C.H.S. *English Law and Its Background.* London: G. Bell & Sons, 1932.

Fifoot, C.H.S. *History and Sources of the Common Law: Tort and Contract.* London: Stevens, 1949.

Finch, Henry. *Law, or a Discourse Thereof.* London: Henry Lintot, 1759.

Finlason, W.F. *Reeves' History of the English Law.* 3 vols. Rev. ed. London: Reeves & Turner, 1869.

Finnis, John. *Human Rights and Common Good.* Oxford: Oxford Univ. Press, 2011.

Finnis, John. *Intention and Identity.* Oxford: Oxford Univ. Press, 2011.

Finnis, John. *Philosophy of Law.* Oxford: Oxford Univ. Press, 2011.

Finnis, John. *Reason in Action.* Oxford: Oxford Univ. Press, 2011.

Fisch, Edith L. *The Cy Pres Doctrine in the United States.* Albany, N.Y.: Bander, 1950.

Fishback, William P. *A Manual of Elementary Law.* Arnold Bennett Hall, ed. Rev ed. Indianapolis: Bobbs-Merrill, 1896.

Fisher, Louis. *The Law of the Executive Branch: Presidential Power.* N.Y.: Oxford Univ. Press, 2014.

Flanders, Henry. *A Treatise on the Law of Shipping.* Philadelphia: T. & J.W. Johnson, 1853.

Fledman, David (ed.). *English Public Law.* Oxford: Oxford Univ. Press, 2004.

Fletcher, C. Edward. *Materials on the Law of Insider Trading.* Durham, N.C.: Carolina Academic Press, 1991.

Fletcher, George P. *Basic Concepts of Criminal Law.* N.Y.: Oxford Univ. Press, 1998.

Fletcher, George P. *Basic Concepts of Legal Thought.* N.Y.: Oxford Univ. Press, 1996.

Fletcher, George P. *The Grammar of Criminal Law: American, Comparative, and International.* Oxford: Oxford Univ. Press, 2007.

Fletcher, William Meade. *Fletcher Cyclopedia of the Law of Private Corporations.* 20 vols. St. Paul: Thomson/West, 1931-present.

Folsom, Ralph H.; and Michael W. Gordon. *International Business Transactions.* 2 vols. St. Paul: West, 1995.

Fordham, Edward Wilfrid (ed.). *Notable Cross-Examinations.* London: Constable & Co., 1951.

Forsythe, David P. (ed.). *Encyclopedia of Human Rights.* Oxford: Oxford Univ. Press, 2009.

Fox-Davies, Arthur Charles; and P.W.P. Carlyon-Britton. *A Treatise on the Law Concerning Names and Changes of Name.* London: E. Stock, 1906.

Frank, Jerome. *Courts on Trial.* Princeton, N.J.: Princeton Univ. Press, 1950.

Frank, Jerome. *Law and the Modern Mind.* N.Y.: Tudor Pub. Co., 1936.

Frederick, David C. *Supreme Court and Appellate Advocacy.* St. Paul: Thomson/West, 2003.

Freeman, A.C. *Cotenancy and Partition.* 2d ed. San Francisco: Bancroft-Whitney, 1886.

Freeman, A.C. *A Treatise of the Law of Judgments.* Edward W. Tuttle, ed. 5th ed. San Francisco: Bancroft-Whitney, 1925.

Freund, Ernst. *The Police Power.* Chicago: Callaghan & Co., 1904.

Freund, Ernst. *Standards of American Legislation.* Chicago: Univ. of Chicago Press, 1917.

Fricke, Charles W. *Planning and Trying Cases.* St. Paul: West, 1952.

Friedell, Steven F. *Benedict on Admiralty.* Vol. 1. 7th ed. N.Y.: Matthew Bender, 1996.

Friedenthal, Jack H.; et al. *Civil Procedure.* 2d ed. St. Paul: West, 1993.

Friedman, Lawrence M. *American Law in the 20th Century.* New Haven: Yale Univ. Press, 2002.

Friedman, Lawrence M. *Crime and Punishment in American History.* N.Y.: BasicBooks, 1993.

Friedman, Lawrence M. *A History of American Law.* 2d ed. N.Y.: Simon & Schuster, 1985.

Friedmann, W. *Legal Theory.* 5th ed. London: Stevens & Sons, 1967.

Frost, Thomas Gold. *A Treatise on Guaranty Insurance.* 2d ed. Boston: Little Brown, 1909.

Frost, Thomas Gold. *A Treatise on the Incorporation and Organization of Corporations.* 2d ed. Boston: Little Brown, 1906.

Froude, Thomas; and Eric V.E. White. *The Practice Relating to Debentures.* London: Pitman & Sons, 1935.

Fuller, Lon L. *Anatomy of the Law.* N.Y.: F.A. Praeger, 1968.

Fuller, Lon L. *The Morality of Law.* Rev. ed. New Haven: Yale Univ. Press, 1969.

Fullinwider, Robert K. *The Reverse Discrimination Controversy.* Totowa, N.J.: Rowman & Littlefield, 1980.

Furmston, Michael P. *Cheshire, Fifoot and Furmston's Law of Contract.* 16th ed. Oxford: Oxford Univ. Press, 2012.

Furrow, Barry R.; et al. *Health Law.* 2d ed. St. Paul: West, 2000.

Gahan, Frank. *The Law of Damages.* London: Sweet & Maxwell, 1936.

Gardiner, Richard K. *Treaty Interpretation.* Oxford: Oxford Univ. Press, 2008.

Gardner, Jane F. *Women in Roman Law and Society.* Bloomington.: Indiana Univ. Press, 1986.

Garner, Bryan A. *Garner's Dictionary of Legal Usage.* 3d ed. Oxford: Oxford Univ. Press, 2011.

Garner, Bryan A. *Garner's Modern English Usage.* 4th ed. N.Y.: Oxford Univ. Press, 2016.

Garner, Bryan A. *The Winning Brief.* 3d ed. N.Y.: Oxford Univ. Press, 2014.

Garner, Bryan A.; Carlos Bea; Rebecca White Berch; Neil M. Gorsuch; Harris L Hartz; Nathan L. Hecht; Brett M. Kavanaugh; Alex Kozinski; Sandra L. Lynch; William H. Pryor Jr.; Thomas M. Reavley; Jeffrey S. Sutton; and Diane P. Wood. *The Law of Judicial Precedent.* St. Paul: Thomson Reuters, 2016.

Garrie, Daniel B.; and Francis M. Allegra. *Plugged In: Guidebook to Software and the Law.* Rochester, N.Y.: Thomson Reuters, 2013-2014.

Geistfeld, Mark A. *Tort Law: The Essentials.* N.Y.: Aspen, 2008.

Geldart, William. *Introduction to English Law.* D.C.M. Yardley, ed. 9th ed. Oxford: Oxford Univ. Press, 1984.

George, William. *Handbook of the Law of Partnership.* St. Paul: West, 1897.

Gerber, Scott Douglas. *A Distinct Judicial Power: The Origins of an Independent Judiciary, 1606-1787.* Oxford: Oxford Univ. Press, 2011.

Gerhardt, Michael J. *The Power of Precedent.* Oxford: Oxford Univ. Press, 2008.

Gevurtz, Franklin A. *Corporation Law.* St. Paul: West, 2000.

Gibson, Albert; Arthur Weldon; and H. Gibson Rivington. *Gibson's Conveyancing.* 14th ed. London: Law Notes Pub. Offices, 1933.

Gifford, D.J.; and John Salter. *How to Understand an Act of Parliament.* London: Cavendish, 1996.

Gilbert, Jeffrey [Lord Chief Baron]. *A Treatise of Equity.* 3d ed. Dublin: Henry Watts, 1792.

Gillers, Stephen. *Regulation of Lawyers: Problems of Law and Ethics.* 7th ed. N.Y.: Aspen, 2005.

Gilmore, Eugene Allen. *Handbook on the Law of Partnership.* St. Paul: West, 1911.

Gilmore, Grant. *The Death of Contract.* Columbus, Ohio: Ohio State Univ. Press, 1974.

Gilmore, Grant; and Charles L. Black Jr. *The Law of Admiralty.* 2d ed. Mineola, N.Y.: Foundation Press, 1975.

Ginsburg, Jane C.; and Robert A. Gorman. *Copyright Law.* N.Y.: Foundation Press, 2012.

Glendon, Mary Ann. *The Transformation of Family Law.* Chicago: Univ. of Chicago Press, 1989.

Glendon, Mary Ann; et al. *Comparative Legal Traditions.* 2d ed. St. Paul: West, 1994.

Glenn, Garrard. *The Law of Fraudulent Conveyances.* N.Y.: Baker Voorhis, 1931.

Goff, Robert H. [Lord Goff]; and Gareth H. Jones. *The Law of Restitution.* 3d ed. London: Sweet & Maxwell, 1986.

Golding, Martin P. *Philosophy of Law.* Englewood Cliffs, N.J.: Prentice-Hall, 1975.

Goldstein, Paul. *Copyright's Highway.* N.Y.: Hill & Wang, 1994.

Goldstein, Paul. *International Copyright: Principles, Law, and Practice.* Oxford: Oxford Univ. Press, 2001.

Golub, I.M.; et al. *COBRA Handbook.* N.Y.: Aspen, 1994.

Goodhart, Arthur L. *Essays in Jurisprudence and the Common Law.* Cambridge: Cambridge Univ. Press, 1931.

Goodin, Robert E. (ed.). *The Oxford Handbook of Political Science.* Oxford: Oxford Univ. Press, 2009.

Goodrich, Herbert F.; and Eugene F. Scoles. *Handbook of the Conflict of Laws.* 4th ed. St. Paul: West, 1964.

Gorman, Robert A. *Basic Text on Labor Law: Unionization and Collective Bargaining.* St. Paul: West, 1976.

Grange, William J. *Real Estate.* N.Y.: Ronald Press Co., 1937.

Graveson, R.H. *Conflict of Laws.* 7th ed. London: Sweet & Maxwell, 1974.

Gray, John Chipman. *The Nature and Sources of the Law.* 1st ed. N.Y.: Columbia Univ. Press, 1909. Also: 2d ed. N.Y.: Macmillan, 1921.

Gray, John Chipman. *The Rule Against Perpetuities.* Boston: Little Brown, 1886.

Gray, Tom; Martin Hinton; and David Caruso (eds.). *Essays in Advocacy.* Adelaide, Aus.: Barr Smith Press, 2012.

Green, Sanford M. *A Treatise on Townships, and the Powers and Duties of Township Officers.* 2d ed. Columbus, Ohio: For the author, 1882.

Greene, Jack P. (ed.). *Encyclopedia of American Political History.* N.Y.: Scribner, 1984.

Greene, T. Whitcombe. *Outlines of Roman Law.* 3d ed. London: Stevens & Sons, 1875.

Gregory, William A. *The Law of Agency and Partnership.* 3d ed. St. Paul: West, 2001.

Grenig, Jay E.; and Jeffrey S. Kinsler. *Handbook of Federal Civil Discovery and Disclosure.* 2d ed. St. Paul: West, 2002.

Grimes, Allen. *The City Attorney: A Practice Manual.* Washington, D.C.: Nat'l Inst. of Mun. Law Officers, 1978.

Grismore, Grover C. *Principles of the Law of Contracts.* John Edward Murray Jr., ed. Indianapolis: Bobbs-Merrill, 1965. (See also Murray.)

Griswold, Erwin N. *Law and Lawyers in the United States.* Cambridge, Mass.: Harvard Univ. Press, 1964.

Griswold, Erwin N. *Spendthrift Trusts.* 2d ed. Albany, N.Y.: Matthew Bender & Co., 1947.

Grotius, Hugo. *The Rights of War and Peace* [1625]. A.C. Campbell, trans. N.Y.: M. Walter Dunne, 1901.

Grubb, Philip W. *Patents for Chemicals, Pharmaceuticals, and Biotechnology.* 3d ed. Oxford: Clarendon Press, 1999.

Guest, A.G. (ed.). *Oxford Essays in Jurisprudence.* London: Oxford Univ. Press, 1961.

Gutteridge, H.C. *Comparative Law: An Introduction to the Comparative Method of Legal Study and Research.* Cambridge: Cambridge Univ. Press, 1946.

Hadley, James. *Introduction to Roman Law.* N.Y.: D. Appleton & Co., 1881.

Hagman, Donald G.; and Julian Conrad Juergensmeyer. *Urban Planning and Land Development Control Law.* 2d ed. St. Paul: West, 1986.

Hahlo, H.R.; and Ellison Kahn. *The South African Legal System and its Background.* Cape Town: Juta, 1968.

Hale, William G. *The Law of the Press.* 3d ed. St. Paul: West Pub. Co., 1948.

Hall, Kermit L. (ed.). *Oxford Companion to the Supreme Court of the United States.* N.Y.: Oxford Univ. Press, 1992.

Hall, Kermit L.; and Kevin T. McGuire (eds.). *The Judicial Branch.* Oxford: Oxford Univ. Press, 2005.

Hamilton, Alexander; James Madison; and John Jay. *The Federalist* [1788]. Clinton Rossiter, ed. N.Y.: New American Library, 1961.

Hamilton, Robert W. *Fundamentals of Modern Business.* Boston: Little Brown, 1989.

Hammond, E. *A Practical Treatise; or, An Abridgment of the Law Appertaining to the Office of Justice of the Peace.* West Brookfield, Mass.: C.A. Mirick & Co., 1841.

Hanbury, Harold Greville. *English Courts of Law.* London: Oxford Univ. Press, 1944.

Hanbury, Harold Greville. *Modern Equity.* 3d ed. London: Stevens & Sons, 1943.

Handelman, Jeffery A. *Guide to TTAB Practice.* 2 vols. Frederick, Md.: Aspen, 2008.

Harding, Alan. *A Social History of English Law.* Baltimore: Penguin Books, 1966.

Harris, John. *Lexicon Technicum: Or, an Universal English Dictionary of Arts and Sciences.* London: Daniel Brown et al., 1704.

Hart, H.L.A. *Law, Liberty, and Morality.* Stanford: Stanford Univ. Press, 1963.

Hart, H.L.A. *Punishment and Responsibility.* Oxford: Clarendon Press, 1968.

Case 3:20-cv-07721-SI   Document 58-7   Filed 11/10/20   Page 483 of 1305

Hart, H.L.A.; and Tony Honoré. *Causation in the Law.* 2d ed. Oxford: Clarendon Press, 1985.

Hartley, T.C. *The Foundations of European Community Law.* Oxford: Clarendon Press, 1981.

Hawkland, William D. *Uniform Commercial Code Series.* 15 vols. St. Paul: West, 1982-present.

Hayek, Friedrich A. *Law, Legislation, and Liberty.* 3 vols. Chicago: Univ. of Chicago Press, 1973 [vol. 1], 1976 [vol. 2], 1979 [vol. 3].

Hazard, Geoffrey C., Jr. *Ethics in the Practice of Law.* New Haven: Yale Univ. Press, 1978.

Hazard, Geoffrey C., Jr.; and Michele Taruffo. *American Civil Procedure: An Introduction* New Haven: Yale Univ. Press, 1993.

Hazen, Thomas Lee. *Treatise on the Law of Securities Regulation.* 3 vols. 3d ed. St. Paul: West, 1995.

Heard, Franklin Fiske. *The Principles of Pleading in Civil Actions.* Boston: Little Brown, 1880.

Heath, James. *Torture and English Law.* Westport, Conn.: Greenwood Press, 1982.

Helmholz, R.H. *Marriage Litigation in Medieval England.* Cambridge: Cambridge Univ. Press, 1974.

Helmholz, R.H. *Roman Canon Law in Reformation England.* Cambridge: Cambridge Univ. Press, 1990.

Helmholz, R.H. *The Spirit of Classical Canon Law.* Athens, Ga.: Univ. of Georgia Press, 1996.

Helmholz, R.H.; et al. *The Oxford History of the Laws of England: The Canon Law and Ecclesiastical Jurisdiction from 597 to the 1640s.* Vol. 1. Oxford: Oxford Univ. Press, 2004.

Hemingway, Richard W. *The Law of Oil and Gas.* 3d ed. St. Paul: West, 1991.

Hening, William Waller. *The Virginia Justice.* 4th ed. Richmond, Va.: For the author, 1825.

Henn, Henry G.; and John R. Alexander. *Laws of Corporations.* 3d ed. St. Paul: West, 1983.

Henson, Ray D. *Handbook on Secured Transactions Under the Uniform Commercial Code.* 2d ed. St. Paul: West, 1979. Also: 3d ed. St. Paul: West, 1983.

Heuston, R.F.V. *Salmond on the Law of Torts.* 17th ed. London: Sweet & Maxwell, 1977.

High, James L. *A Treatise on Extraordinary Legal Remedies.* Chicago: Callaghan & Co., 1884.

Hill, Mark. *Ecclesiastical Law.* 2d ed. Oxford: Oxford Univ. Press, 2001.

Hilliard, Edward. *Sheppard's Touchstone of Common Assurances.* Richard Preston, ed. London: J.W.T. Clarke, 1820.

Hinch, Frederick M. *John's American Notary and Commissioner of Deeds Manual.* 3d ed. Chicago: Callaghan & Co., 1922.

Hoar, Roger Sherman. *Patent Tactics and Law.* 3d ed. N.Y.: Ronald Press Co., 1950.

Hochheimer, Lewis. *A Treatise on the Law Relating to the Custody of Infants.* 2d ed. Baltimore: Harold B. Scrimger, 1891.

Hoffman, Leo J. *Voluntary Pooling and Unitization: Oil and Gas.* Albany, N.Y.: Matthew Bender, 1954.

Hogue, Arthur R. *Origins of the Common Law.* Bloomington, Ind.: Indiana Univ. Press, 1966.

Holdsworth, William S. *An Historical Introduction to the Land Law.* Oxford: Clarendon Press, 1927.

Holdsworth, William S. *A History of English Law.* 17 vols. [1903-1966] London: Methuen & Co., 1972.

Holdsworth, William S. *Sources and Literature of English Law.* Oxford: Clarendon Press, 1925.

Holland, James A.; and Julian S. Webb. *Learning Legal Rules.* 3d ed. London: Blackstone Press, 1996.

Holland, Thomas E. *The Elements of Jurisprudence.* 13th ed. Oxford: Clarendon Press, 1924.

Holmes, Oliver Wendell. *Collected Legal Papers.* Harold J. Laski, ed. N.Y. Harcourt Brace, 1920.

Holmes, Oliver Wendell. *The Common Law.* Boston: Little Brown, 1881.

Holt, J.C. *Magna Carta.* Cambridge: Cambridge Univ. Press, 1965.

Holyoak, Keith J.; and Robert G. Morrison (eds.). *The Oxford Handbook of Thinking and Reasoning.* Oxford: Oxford Univ. Press, 2012.

Honderich, Ted (ed.). *The Oxford Companion to Philosophy.* 2d ed. Oxford: Oxford Univ. Press, 2005.

Honoré, Tony. *About Law.* Oxford: Clarendon Press, 1995.

Honoré, Tony. *Law in the Crisis of Empire 379-455* AD. Oxford: Clarendon Press, 1998.

Honoré, Tony. *Making Law Bind: Essays Legal and Philosophical.* Oxford: Clarendon Press, 1987.

Honoré, Tony. *Responsibility and Fault.* Oxford: Hart, 1999.

Honoré, Tony. *Sex Law.* London: Gerald Duckworth & Co., 1978.

Honoré, Tony. *The South African Law of Trusts.* 3d ed. Cape Town: Juta, 1985.

Hopkins, Earl P. *Handbook on the Law of Real Property.* St. Paul: West, 1896.

Horack, Frank E., Jr. *Cases and Materials on Legislation.* 2d ed. Chicago: Callaghan & Co., 1954.

Horwill, Herbert W. *The Usages of the American Constitution.* London: Oxford Univ. Press, 1925.

Horwitz, Morton J. *The Transformation of American Law, 1780-1860.* Cambridge, Mass.: Harvard Univ. Press, 1977.

Horwitz, Morton J. *The Transformation of American Law, 1870-1960.* N.Y.: Oxford Univ. Press, 1992.

Hoskins, Mark; and William Robinson (eds.). *A True European: Essays for Judge David Edward.* Oxford: Hart, 2003.

Hovenkamp, Herbert. *Economics and Federal Antitrust Law.* St. Paul: West, 1985.

Hovenkamp, Herbert. *Federal Antitrust Policy.* St. Paul: West, 1999.

Howard League for Penal Reform. *Counsel for the Defence: An Enquiry into the Question of Legal Aid for Poor Prisoners.* London: Howard League for Penal Reform, 1926.

Howe, William Wirt. *Studies in the Civil Law, and Its Relations to the Law of England and America.* Boston: Little Brown, 1896.

Huffcut, Ernest W. *The Law of Agency.* Boston: Little Brown, 1901.

Hughes, Charles Evans. *The Supreme Court of the United States.* Garden City, N.Y.: Garden City Pub. Co., 1936.

Hughes, T.W. *A Treatise on Criminal Law and Procedure.* Indianapolis: Bobbs-Merrill, 1919.

Hume, David. *Baron David Hume's Lectures: 1786-1822.* 4 vols. G. Campbell H. Paton, ed. Edinburgh: Stair Society, 1939 [vol. 1], 1949 [vol. 2], 1952 [vol. 3], 1955 [vol. 4].

Hunnisett, R.F. *The Medieval Coroner.* Cambridge: Cambridge Univ. Press, 1961.

Hunter, Robert. *The Preservation of Open Spaces, and of Footpaths, and Other Rights of Way.* London: Eyre & Spottiswoode, 1896.

Hunter, William A. *Introduction to Roman Law.* F.H. Lawson, ed. 9th ed. London: Sweet & Maxwell, 1934.

Hunter, William A. *A Systematic and Historical Exposition of Roman Law.* 4th ed. London: Sweet & Maxwell, 1903.

Hurst, James Willard. *Dealing with Statutes.* N.Y.: Columbia Univ. Press, 1982.

Hurst, James Willard. *The Growth of American Law: The Law Makers.* Boston: Little Brown, 1950.

Hutchinson, Robert. *A Treatise on the Law of Carriers.* Chicago: Callaghan & Co., 1882.

Ilbert, Courtenay P. *Legislative Methods and Forms.* Oxford: Clarendon Press, 1901.

Indermaur, John. *Principles of the Common Law.* Edmund H. Bennett, ed. 1st Am. ed. San Francisco: S. Whitney & Co., 1878.

Ingersoll, Henry H. *Handbook of the Law of Public Corporations.* St. Paul: West, 1904.

Isenbergh, Joseph. *International Taxation.* N.Y.: Foundation Press, 2000.

Jackson, R.M. *The Machinery of Justice in England.* 5th ed. Cambridge: Cambridge Univ. Press, 1967.

Jacob, Giles. *A Law Grammar.* London: Henry Lintot, 1744.

Jacob, Giles. *A New Law-Dictionary.* 8th ed. London: T. Osborne, 1762. Also: John Morgan, ed. 10th ed. London: W. Strahan et al., 1782.

Jacobstein, J. Myron; and Roy M. Mersky. *Fundamentals of Legal Research.* 5th ed. Westbury, N.Y.: Foundation Press, 1990.

James, Fleming; Geoffrey C. Hazard Jr.; and John Leubsdorf. *Civil Procedure.* 5th ed. N.Y.: Foundation Press, 2001.

James, Philip S. *Introduction to English Law.* 9th ed. London: Butterworths, 1976.

Janosik, Robert J. (ed.). *Encyclopedia of the American Judicial System.* 3 vols. N.Y.: Scribner, 1987.

Jefferson, Thomas. *A Manual of Parliamentary Practice.* Washington City: Samuel Harrison Smith, 1801.

Jenks, Edward. *The Book of English Law.* P.B. Fairest, ed. 6th ed. Athens, Ohio: Univ. Press, 1967.

Jenks, Edward. *Law and Politics in the Middle Ages.* N.Y.: Henry Holt, 1898.

Jensen, O.C. *The Nature of Legal Argument.* Oxford: Basil Blackwell, 1957.

Jeremy, Henry. *The Law of Carriers, Inn-Keepers, Warehousemen, and Other Depositaries of Goods for Hire.* London: W. Clarke & Sons, 1815.

Jespersen, Otto. *Growth and Structure of the English Language.* 9th ed. Garden City, N.Y.: Doubleday Anchor, 1938.

Jessup, Philip C. *A Modern Law of Nations.* N.Y.: Macmillan, 1948.

Jessup, Philip C. *The Use of International Law.* Ann Arbor: Univ. of Michigan Law School, 1959.

Jester, Michael H. *Patents and Trademarks Plain & Simple.* Wayne, N.J.: Career Press, 2004.

Johnson, James D., Jr. *Guide to Louisiana Real Actions: Ten Year and Thirty Year Prescriptions.* Baton Rouge: Claitor's Book Store, 1961.

Johnson, Samuel. *A Dictionary of the English Language.* 2 vols. London: J. &. P. Knapton, 1755.

Johnstone, Quintin; and Dan Hopson Jr. *Lawyers and Their Work.* Indianapolis: Bobbs-Merrill, 1967.

Jolowicz, H.F. *Historical Introduction to the Study of Roman Law.* Cambridge: Cambridge Univ. Press, 1952.

Jones, Eugene A. *Manual of Equity Pleading and Practice.* Washington, D.C.: J. Byrne, 1916.

Jones, Harry W. *The Efficacy of Law.* Evanston, Ill.: Northwestern Univ. Press, 1968.

Jones, Leonard A. *A Treatise on the Law of Collateral Securities and Pledges.* Edward M. White, ed. 3d ed. Indiana-polis: Bobbs-Merrill, 1912.

Jones, Leonard A. *A Treatise on the Law of Mortgages.* 5th ed. Indianapolis: Bobbs-Merrill, 1908.

Jones, W.J. *The Elizabethan Court of Chancery.* Oxford: Clarendon Press, 1967.

Jowitt, William A. *The Dictionary of English Law.* 2 vols. Clifford Walsh, ed. 1st ed. London: Sweet & Maxwell, 1959. Also: 2 vols. John Burke, ed. 2d ed. London: Sweet & Maxwell, 1977. Also: 2 vols. Daniel Greenberg, ed. 3d ed. London: Sweet & Maxwell, 2010.

Joyce, Howard C. *A Treatise on the Law Relating to Injunctions.* 3 vols. Albany, N.Y.: Matthew Bender & Co., 1909.

Joyce, Joseph A.; and Howard C. Joyce. *Treatise on the Law Governing Nuisances.* Albany, N.Y.: Matthew Bender & Co., 1906.

Juergensmeyer, Julian Conrad; and Thomas E. Roberts. *Land Use Planning and Development Regulation Law.* St. Paul: Thomson/West, 2003.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Justinian. *Digest of Justinian.* 4 vols. [A.D. 533] Theodor Mommsen et al., eds. Philadelphia: Univ. of Pennsylvania Press, 1985.

Justinian. *The Institutes of Justinian* [ca. A.D. 533]. Thomas Cooper, trans. 3d ed. N.Y.: John S. Voorhies, 1852.

Kadish, Sanford H. (ed.). *Encyclopedia of Crime and Justice.* 4 vols. N.Y.: Free Press, 1983.

Kafka, Gerald A.; and Rita A. Cavanagh. *Litigation of Federal Civil Tax Controversies.* Colorado Springs: Shepard's, 2012.

Karlen, Delmar. *Anglo-American Criminal Justice.* Oxford: Clarendon Press, 1967.

Kaveny, Cathleen. *Law's Virtues.* Washington, D.C.: Georgetown Univ. Press, 2012.

Keesey, Ray E. *Modern Parliamentary Procedure.* Rev. ed. Washington, D.C.: American Psychological Ass'n, 1994.

Keeton, G.W. *The Elementary Principles of Jurisprudence.* 2d ed. London: Pitman, 1949.

Keeton, G.W. *An Introduction to Equity.* 5th ed. London: Pitman, 1961.

Keeton, Robert E. *Judging.* St. Paul: West, 1990.

Keeton, Robert E. *Venturing to Do Justice: Reforming Private Law.* Cambridge, Mass.: Harvard Univ. Press, 1969.

Keeton, Robert E.; and Alan I. Widiss. *Insurance Law: A Guide to Fundamental Principles, Legal Doctrines, and Commercial Practices.* St. Paul: West, 1988.

Keeton, W. Page; et al. *Prosser and Keeton on the Law of Torts.* 5th ed. St. Paul: West, 1984. (See also Prosser.)

Kelly, Alfred H.; and Winfred A. Harbison. *The American Constitution.* 5th ed. N.Y. W.W. Norton & Co., 1976.

Kent, James. *Commentaries on American Law.* 4 vols. George Comstock, ed. 11th ed. Boston: Little Brown, 1866. Also: Charles M. Barnes, ed. 13th ed. Boston: Little Brown, 1884.

Kinnane, Charles Herman. *A First Book on Anglo-American Law.* 2d ed. Indianapolis: Bobbs-Merrill, 1952.

Kintner, Earl W.; and Jack L. Lahr. *An Intellectual Property Law Primer.* 2d ed. N.Y.: Clark Boardman, 1982.

Kiralfy, A.K.R. *Potter's Outlines of English Legal History.* 5th ed. London: Sweet & Maxwell, 1958. (See also Potter.)

Klein, William A.; and John C. Coffee Jr. *Business Organization and Finance.* N.Y.: Foundation Press, 2002.

Knibb, David G. *Federal Court of Appeals Manual.* 4th ed. St. Paul: West, 2000.

Koch, Charles H. *Administrative Law and Practice.* 3 vols. 2d ed. St. Paul: West, 1997.

Kocourek, Albert; and John H. Wigmore (eds.). *Formative Influences of Legal Development.* Boston: Little Brown, 1918.

Kopaczyk, Joanna. *The Legal Language of Scottish Burghs.* Oxford: Oxford Univ. Press, 2013.

Kraemer, Sandy F. *Solar Law.* Colorado Springs: Shepard's, 1978.

Kratovil, Robert. *Real Estate Law.* 6th ed. Englewood Cliffs, N.J.: Prentice-Hall, 1974.

Krause, Harry D. *Child Support in America.* Charlottesville, Va.: Michie Co., 1981.

Krieger, Joel (ed.). *The Oxford Companion to Comparative Politics.* 2 vols. N.Y.: Oxford Univ. Press, 2013.

Krieger, Joel (ed.). *The Oxford Companion to Politics of the World.* 2d ed. Oxford: Oxford Univ. Press, 2001.

Kuhn, Arthur. *Comparative Commentaries on Private International Law, or Conflict of Laws.* N.Y.: Macmillan, 1937.

Kurian, George Thomas (ed.). *A Historical Guide to the U.S. Government.* N.Y.: Oxford Univ. Press, 1998.

Kyd, Stewart. *A Treatise on the Law of Awards.* Dublin: J. Stockdale, 1791.

Kyd, Stewart. *A Treatise on the Law of Bills of Exchange and Promissory Notes.* 2d Am. ed. Albany, N.Y.: Loring Andrews, 1800.

Lacovara, Philip Allen (ed.). *Federal Appellate Practice.* Arlington, Va.: BNA Books, 2008.

LaFave, Wayne R.; and Austin W. Scott Jr. *Criminal Law.* 2d ed. St. Paul: West, 1986.

LaFave, Wayne R.; and Austin W. Scott Jr. *Substantive Criminal Law.* 2 vols. St. Paul: West, 1986-present.

LaFave, Wayne R.; and Jerold H. Israel. *Criminal Procedure.* 2d ed. St. Paul: West, 1992.

Laitos, Jan G. *Natural Resources Law.* St. Paul: West, 2002.

Lalor, John J. (ed.) *Cyclopaedia of Political Science, Political Economy, and of the Political History of the United States.* 3 vols. N.Y.: Charles E. Merrill & Co., 1893.

Larson, Lex K. *Unjust Dismissal.* 2 vols. N.Y.: Matthew Bender, 1985-present.

Laughlin, Stanley K., Jr. *The Law of United States Territories and Affiliated Jurisdictions.* Rochester, N.Y.: Lawyers Co-operative, 1995.

Lawes, Edward. *A Practical Treatise on Pleading in Assumpsit.* 1st Am. ed. Joseph Story, ed. Boston: James W. Burditt & Co., 1811.

*Law Grammar: Or, an Introduction to the Theory and Practice of English Jurisprudence.* Dublin: James Moore, 1791.

Lawrence, Robert C., III. *International Tax and Estate Planning.* N.Y.: Practising Law Inst., 1989.

Lawrence, T.J. *A Handbook of Public International Law.* 10th ed. London: Macmillan & Co., 1925.

*Laws of Honour: Or, A Compendious Account of the Ancient Derivation of All Titles, Dignities, Offices, Etc., The.* London: R. Gosling, 1714.

Lawson, John D. *The Law of Expert and Opinion Evidence Reduced to Rules.* 2d ed. Chicago: T.H. Flood & Co., 1900.

Lawson, John D. *The Law of Presumptive Evidence.* 2d ed. St. Louis: Central Law Journal Co., 1899.

Laycock, Douglas. *The Death of the Irreparable Injury Rule.* N.Y.: Oxford Univ. Press, 1991.

Laycock, Douglas. *Modern American Remedies.* 4th ed. N.Y.: Aspen, 2010.

Lazar, Seth. and Helen Frowe (eds.). *The Oxford Handbook of the Ethics of War.* Oxford: Oxford Univ. Press, 2018.

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 486 of 1305

Leaffer, Marshall A. *Understanding Copyright Law.* 3d ed. N.Y.: Matthew Bender, 1999.

Leage, R.W. *Roman Private Law.* C.H. Ziegler, ed. 2d ed. London: Macmillan & Co., 1930.

Lee, R.W. *The Elements of Roman Law.* 4th ed. London: Sweet & Maxwell, 1956.

Leflar, Robert A. *American Conflicts Law.* 3d ed. Indianapolis: Bobbs-Merrill, 1977.

Levinson, David; and Melvin Ember (eds.). *Encyclopedia of Cultural Anthropology.* 4 vols. N.Y.: Henry Holt & Co., 1996.

Levy, Leonard W. (ed.). *Encyclopedia of the American Constitution.* 4 vols. & supp. N.Y.: Macmillan, 1986 & 1992.

Lévy-Ullmann, Henri. *The English Legal Tradition: Its Sources and History.* London: Macmillan, 1935.

Lewis, Harold S., Jr.; and Elizabeth J. Norman. *Employment Discrimination Law and Practice.* St. Paul: West, 2001.

Lieber, Francis. *Legal and Political Hermeneutics.* William G. Hammond, ed. 3d ed. St. Louis: F.H. Thomas & Co., 1880. [This posthumous edition contains Lieber's final corrections.]

Lieber, Francis. *The Miscellaneous Writings of Francis Lieber.* 2 vols. Philadelphia: J.B. Lippincott, 1880.

Lieber, Francis. *On Civil Liberty and Self-Government.* Theodore D. Woolsey, ed. 3d ed. Philadelphia: J.B. Lippincott & Co., 1883.

Lieberman, Jethro K. *The Evolving Constitution.* N.Y.: Random House, 1992.

Lile, William M.; et al. *Brief Making and the Use of Law Books.* Roger W. Cooley & Charles Lesley Ames, eds. 3d ed. St. Paul: West, 1914.

Litvinoff, Saul. *The Law of Obligations.* Louisiana Civil Law Treatise 5. 2d ed. St. Paul: West, 2001.

Llewellyn, Karl N. *The Common Law Tradition: Deciding Appeals.* Boston: Little Brown, 1960.

Lloyd, Dennis. *Introduction to Jurisprudence.* Rev. ed. N.Y.: Frederick A. Praeger, 1965.

Long, Joseph R. *A Treatise on the Law of Domestic Relations.* St. Paul: Keefe-Davidson, 1905.

Longenecker, Rolla R. *Some Hints on the Trial of a Lawsuit.* Rochester, N.Y.: Lawyers Co-operative, 1927.

Loss, Louis; and Edward M. Cowett. *Blue Sky Law.* Boston: Little Brown, 1958.

Lovell, Colin Rhys. *English Constitutional and Legal History.* N.Y.: Oxford Univ. Press, 1962.

Luban, David. *Lawyers and Justice: An Ethical Study.* Princeton, N.J.: Princeton Univ. Press, 1988.

Lubé, D.G. *An Analysis of the Principles of Equity Pleading.* San Francisco: Sumner Whitney & Co., 1882.

Luce, Robert. *Legislative Problems.* Boston: Houghton Mifflin, 1935.

Lynch, Timothy J. (ed.) *The Oxford Encyclopedia of American Military and Diplomatic History.* 2 vols. Oxford: Oxford Univ. Press, 2013.

Lynn, Robert J. *The Modern Rule Against Perpetuities.* Indianapolis: Bobbs-Merrill, 1966.

Lyon, Bryce. *A Constitutional and Legal History of Medieval England.* N.Y.: Harper & Bros., 1960.

MacCormick, Neil. *Legal Reasoning and Legal Theory.* Oxford: Clarendon Press, 1978.

MacCormick, Neil. *Legal Right and Social Democracy.* Oxford: Clarendon Press, 1982.

MacCormick, Neil. *Practical Reason in Law and Morality.* Oxford: Oxford Univ. Press, 2008.

MacCormick, Neil. *Rhetoric and the Rule of Law: A Theory of Legal Reasoning.* Oxford: Oxford Univ. Press, 2005.

Mackenzie, Thomas [Lord Mackenzie]. *Studies in Roman Law.* John Kirkpatrick, ed. 7th ed. Edinburgh: William Blackwood & Sons, 1898.

Mackintosh, James. *Roman Law in Modern Practice.* Edinburgh: W. Green & Son, 1934.

Macneil, Ian R.; et al. *Federal Arbitration Law.* 5 vols. Boston: Little Brown, 1994.

Madden, Joseph W. *Handbook of the Law of Persons and Domestic Relations.* St. Paul: West, 1931.

Madden, M. Stuart. *Products Liability.* 2 vols. 2d ed. St. Paul: West, 1988.

Maine, Henry S. *Ancient Law.* 10th ed. London: John Murray, 1884. Also: 17th ed. London: John Murray, 1901.

Maitland, Frederic W. *The Collected Papers of Frederic William Maitland.* 3 vols. H.A.L. Fisher, ed. Cambridge: Cambridge Univ. Press, 1911.

Maitland, Frederic W. *The Constitutional History of England.* Cambridge: Cambridge Univ. Press, 1908; repr. 1955.

Maitland, Frederic W. *Domesday Book and Beyond.* Cambridge: Cambridge Univ. Press, 1921.

Maitland, Frederic W. *Equity.* A.H. Chaytor & W.J. Whittaker, eds. Cambridge: Cambridge Univ. Press, 1909.

Maitland, Frederic W.; and Francis C. Montague. *A Sketch of English Legal History.* James F. Colby, ed. N.Y.: G.P. Putnam's Sons, 1915.

Male, Arthur. *A Treatise on the Law and Practice of Elections.* London: J. Butterworth & Son, 1818.

Manchester, A.H. *Modern Legal History of England and Wales, 1750-1950.* London: Butterworths, 1980.

Marsden, Reginald G. *A Treatise on the Law of Collisions at Sea.* 3d ed. London: Stevens & Sons, 1891.

Marshall, Samuel. *A Treatise on the Law of Insurance.* 2 vols. J.W. Coody, ed. 2d Am. ed. Philadelphia: William P. Farrand & Co., 1810.

Martindale, W.B. *A Treatise on the Law of Conveyancing.* Lyne S. Metcalfe, ed. St. Louis: Central Law Journal Co., 1889.

Maupin, Chapman W. *Marketable Title to Real Estate.* 2d ed. N.Y.: Baker Voorhis, 1907.

May, John Wilder. *The Law of Crimes.* 3d ed. Harry Augustus Bigelow, ed. Boston: Little Brown, 1905.

McCarthy, J. Thomas. *McCarthy on Trademarks and Unfair Competition.* 5 vols. 3d ed. Deerfield, Ill.: Clark Boardman Callaghan, 1992-1996.

McCarthy, J. Thomas. *The Rights of Publicity and Privacy*. 2 vols. 2d ed. St. Paul: West, 2000.

McCormack, David R. *Racketeering Influenced Corrupt Organizations*. 2 vols. Fort Worth, Tex.: Knowles, 1988-present.

McCormick, Charles T. *Handbook on the Law of Damages*. St. Paul: West, 1935.

McCrady, Archie R. *Patent Office Practice*. 2d ed. Madison, Wis.: Pacot, 1946.

McCrary, George W. *A Treatise on the American Law of Elections*. Henry L. McCune, ed. 4th ed. Chicago: Callaghan & Co., 1897.

McCulloch, J.R. *A Dictionary, Practical, Theoretical, and Historical, of Commerce and Commercial Navigation*. 2 vols. 2d ed. London: Longman, Rees, Orme, Brown, Green & Longman, 1834.

McDonnell, Denis Lane; and John George Monroe. *Kerr on the Law of Fraud and Mistake*. 7th ed. London: Sweet & Maxwell, 1952.

McDonnell, Julian B.; and Elizabeth J. Coleman. *Commercial and Consumer Warranties*. 2 vols. N.Y.: Matthew Bender, 1991.

McIlwain, C.H. *Constitutionalism and the Changing World*. N.Y.: Macmillan, 1939.

McLaughlin, A.C.; and Albert Bushnell Hart (eds.). *Cyclopedia of American Government*. 3 vols. N.Y.: D. Appleton & Co., 1914.

McMeel, Gerard. *The Construction of Contracts*. 2d ed. Oxford: Oxford Univ. Press, 2007.

McNair, Arnold Duncan. *Legal Effects of War*. 2d ed. Cambridge: Cambridge Univ. Press, 1944.

McNair, William Lennox; Alan Abraham Mocatta; and Michael J. Mustill. *Scrutton on Charterparties and Bills of Lading*. 17th ed. London: Sweet & Maxwell, 1964.

McNeil, Bruce J. *Nonqualified Deferred Compensation Plans*. St. Paul: West, 1994.

McNeil, Kent. *Common Law Aboriginal Title*. Oxford: Clarendon Press, 1989.

McQuillin, Eugene. *A Treatise on the Law of Municipal Ordinances*. Chicago: Callaghan & Co., 1904.

Meador, Daniel John; and Jordana Simone Bernstein. *Appellate Courts in the United States*. St. Paul: West, 1994.

Mechem, Floyd R. *Elements of the Law of Partnership*. 2d ed. Chicago: Callaghan & Co., 1920.

Mechem, Floyd R. *Outlines of the Law of Agency*. Philip Mechem, ed. 4th ed. Chicago: Callaghan & Co., 1952.

Megarry, Robert E. *Lawyer and Litigant in England*. London: Stevens & Sons, 1962.

Megarry, Robert E. *Miscellany-at-Law*. London: Stevens & Sons, 1955.

Megarry, Robert E. *A Second Miscellany-at-Law*. London: Stevens, 1973.

Megarry, Robert E. *A New Miscellany-at-Law*. Bryan A. Garner, ed. Oxford: Hart, 2005.

Megarry, Robert E. (ed.). *Snell's Principles of Equity*. 23d ed. London: Sweet & Maxwell, 1947. Also: With P.V. Baker. 27th ed. London: Sweet & Maxwell, 1973.

Megarry, Robert E.; and H.W.R. Wade. *The Law of Real Property*. 5th ed. London: Stevens, 1984.

Megarry, Robert E.; and P.V. Baker. *A Manual of the Law of Real Property*. 4th ed. London: Sweet & Maxwell, 1969. Also: With M.P. Thompson. 6th ed. London: Sweet & Maxwell, 1993.

Mellows, Anthony R. *The Law of Succession*. 3d ed. London: Butterworths, 1977.

Merges, Robert P.; et al (eds.). *Intellectual Property in the New Technological Age*. N.Y.: Aspen, 1997.

Merrill, S.S. *Law of Mandamus*. Chicago: T.H. Flood & Co., 1892.

Merwin, Elias. *Principles of Equity and Equity Pleading*. H.C. Merwin, ed. Boston: Houghton Mifflin, 1895.

*Michie on Banks and Banking*. 14 vols. Charlottesville, Va.: Lexis, 1931-present.

Millar, J.H. *A Handbook of Prescription*. Edinburgh: W. Green & Sons, 1893.

Millard, Christopher (ed.). *Cloud Computing Law*. Oxford: Oxford Univ. Press, 2013.

Miller, Frank W.; et al. *Cases and Materials on Criminal Justice Administration*. 3d ed. Mineola, N.Y.: Foundation Press, 1986.

Miller, Fred H.; and Alvin C. Harrell. *The Law of Modern Payment Systems*. St. Paul: Thomson/West, 2003.

Miller, Justin. *Handbook of Criminal Law*. St. Paul: West, 1934.

Millon, Theodore; et al. *Personality Disorders in Modern Life*. 2d ed. Hoboken, N.J.: John Wiley & Sons, 2004.

Milsom, S.F.C. *Historical Foundations of the Common Law*. London: Butterworths, 1969.

Milsom, S.F.C. *Studies in the History of the Common Law*. London: Hambledon Press, 1985.

Minda, Gary. *Postmodern Legal Movements*. N.Y.: NYU Press, 1995.

Moliterno, James E.; and John M. Levy. *Ethics of the Lawyer's Work*. St. Paul: West, 1993.

Moore, E. Garth; and Timothy Briden. *Moore's Introduction to English Canon Law*. 2d ed. London: Mowbray, 1985.

Moore, John Bassett. *The Collected Papers of John Bassett Moore*. 7 vols. New Haven: Yale Univ. Press, 1944.

Morgan, Edmund M. *Introduction to the Study of Law*. Chicago: Callaghan & Co., 1926.

Morrall, John B. *Political Thought in Medieval Times*. London: Hutchinson, 1958.

Morton, David A., III. *Medical Proof of Social Security Disability*. St. Paul: West, 1983.

Morton, William K.; and Dale A. Whitman. *Manual of the Law of Scotland*. Edinburgh: W. Green, 1896.

Moynihan, Cornelius J. *Introduction to the Law of Real Property*. 2d ed. St. Paul: West, 1988.

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 488 of 1305

Muirhead, James. *Historical Introduction to the Private Law of Rome.* Henry Goudy, ed. 2d ed. London: A. & C. Black, 1899.

Munkman, John H. *The Technique of Advocacy.* London: Stevens & Sons, 1951.

Munn, Glenn G. *Encyclopedia of Banking and Finance.* N.Y.: Bankers Pub. Co., 1931.

Murray, John Edward, Jr. *Cases and Materials on Contracts.* 2d ed. Indianapolis: Bobbs-Merrill, 1976.

Murray, John Edward, Jr. *Murray on Contracts.* 2d ed. Indianapolis: Bobbs-Merrill, 1974. (See also Grismore.)

Natelson, Robert G. *Law of Property Owners Associations.* Boston: Little Brown, 1989.

Nat'l Acad. of Sciences. *Strengthening Forensic Science in the United States: A Path Forward.* Washington, D.C.: GPO, 2009.

Nat'l Conference of State Legislatures. *Mason's Manual of Legislative Procedure.* Denver: Nat'l Conference of State Legislatures, 2000.

Nelson, Caleb. *Statutory Interpretation.* N.Y.: Foundation Press, 2011.

Nelson, Grant S. *Real Estate Finance Law.* 3d ed. St. Paul: West, 1994.

Newell, Martin L. *The Law of Defamation, Libel and Slander in Civil and Criminal Cases.* Chicago: Callaghan & Co., 1890.

Newell, Martin L. *A Treatise on the Law of Malicious Prosecution, False Imprisonment, and the Abuse of Legal Process.* Chicago: Callaghan & Co., 1892.

Newman, Peter (ed.). *The New Palgrave Dictionary of Economics and the Law.* 3 vols. London: Macmillan, 1998.

New York Inst. of Finance. *How the Bond Market Works.* N.Y.: New York Inst. of Finance, 1988.

Nicholas, Barry. *An Introduction to Roman Law.* Oxford: Clarendon Press, 1962.

Nimmer, Melville B.; and David Nimmer. *Nimmer on Copyright.* 10 vols. N.Y.: Matthew Bender, 1978-1995.

Nims, Harry D. *The Law of Unfair Competition and Trade-Marks.* N.Y.: Baker Voorhis, 1929.

Noonan, John T., Jr. *Bribes.* N.Y: Macmillan, 1984.

Norris, Martin J. *The Law of Salvage.* Mount Kisco, N.Y.: Baker Voorhis, 1958.

Norton, Charles Phelps. *Handbook of the Law of Bills and Notes.* 4th ed. St. Paul: West, 1914.

Nowak, John E.; and Ronald D. Rotunda. *Constitutional Law.* 4th ed. St. Paul: West, 1991. (See also Rotunda.)

Noy, William. *A Treatise of the Principal Grounds and Maxims of the Laws of This Nation.* C. Sims, ed. 4th ed. London: T. Collins; et al., 1677.

Nussbaum, Arthur. *A Concise History of the Law of Nations.* Rev. ed. N.Y.: Macmillan, 1961.

Oakley, John Bilyeu; and Robert S. Thompson. *Law Clerks and the Judicial Process.* Berkeley: Univ. of California Press, 1980.

Odean, Kathleen. *High Steppers, Fallen Angels, and Lollipops: Wall Street Slang.* N.Y.: Dodd Mead, 1988.

O'Gallagher, Judith. *Municipal Ordinances.* 2d ed. St. Paul: West, 1998.

Oldroyd, Mark. *A Living Wage.* Leeds: McCorquodale & Co., 1894.

Oliver, David T.; and W. Nalder Williams. *Willis and Oliver's Roman Law Examination Guide.* 3d ed. London: Butterworth & Co., 1910.

Oliver, Peter; Patrick Macklem; and Nathalie des Rosiers (eds.). *The Oxford Handbook of the Canadian Constitution.* Oxford: Oxford Univ. Press, 2017.

O'Neill, P.T.; and J.W. Woloniecki. *The Law of Reinsurance in England and Bermuda.* London: Sweet & Maxwell, 1998.

Ostrower, Alexander. *Language, Law, and Diplomacy: A Study of Linguistic Diversity in Official Relations and International Law.* 2 vols. Philadelphia: Univ. of Pennsylvania Press, 1965.

Owen, David G. *Products Liability Law.* St. Paul: Thomson/West, 2005.

Owen, Richard B. *Patents, Trademarks, Copyrights, Departmental Practice.* Washington, D.C.: R.B. Owen, 1925.

*Oxford English Dictionary.* 20 vols. 2d ed. Oxford: Clarendon Press, 1989.

Page, William Herbert. *A Treatise on the Law of Wills.* 7 vols. 3d ed. Cincinnati: W.H. Anderson Co., 1941-1958.

Page, William Herbert; and Paul Jones. *A Treatise on the Law of Taxation by Local and Special Assessments.* 2 vols. Cincinnati: W.H. Anderson Co., 1909.

Pal, Radhabinod. *The History of the Law of Primogeniture.* Calcutta: Univ. of Calcutta, 1929.

Palgrave, R.H. Inglis. *Palgrave's Dictionary of Political Economy.* 3 vols. Henry Higgs, ed. 2d ed. London: Macmillan, 1925.

Palmer, Ben W. *Courtroom Strategies.* Englewood Cliffs, N.J.: Prentice-Hall, 1959.

Palmer, George E. *The Law of Restitution.* 4 vols. Boston: Little Brown, 1978.

Paton, George Whitecross. *Bailment in the Common Law.* London: Stevens, 1952.

Paton, George Whitecross. *A Textbook of Jurisprudence.* G.W. Paton & David P. Derham, eds. 4th ed. Oxford: Clarendon Press, 1972.

Patry, William F. *Copyright Law and Practice.* 3 vols. Washington, D.C.: Bureau of Nat'l Affairs, 1994.

Patton, Rufford G.; and Carroll G. Patton. *Land Titles.* Kansas City: Vernon Law Book Co., 1938.

PDM Task Force. *Psychodynamic Diagnostic Manual.* Silver Spring, Md.: Alliance of Psychoanalytic Organizations, 2006.

Perkins, Rollin M.; and Ronald N. Boyce. *Criminal Law.* 3d ed. Mineola, N.Y.: Foundation Press, 1982.

Perry, H.W. *Deciding to Decide: Agenda Setting in the United States Supreme Court.* Cambridge, Mass.: Harvard Univ. Press, 2009.

Philbrick, Frederick A. *Language and the Law.* N.Y.: Macmillan, 1949.

Phillimore, John George. *Private Law Among the Romans.* London: Macmillan, 1863.

Phillips, George L. *An Exposition of the Principles of Pleading Under the Codes of Civil Procedure.* Chicago: Callaghan & Co., 1896.

Phillips, Samuel L. *A Treatise on the Law of Mechanic's Liens on Real and Personal Property.* Boston: Little Brown, 1874.

Pierce, Richard J., Jr.; Sidney A. Shapiro; and Paul R. Verkuil. *Administrative Law and Process.* 3d ed. N.Y.: Foundation Press, 1999.

Pigeon, Louis-Philippe. *Drafting and Interpreting Legislation.* Toronto: Carswell, 1988.

Pigott, Charles. *A Political Dictionary.* N.Y.: Thomas Greenleaf, 1796.

Platt, Thomas. *A Practical Treatise on the Law of Covenants.* London: Saunders & Benning, 1829.

Player, Mack A. *Employment Discrimination Law.* St. Paul: West, 1988.

Plucknett, Theodore F.T. *A Concise History of the Common Law.* 5th ed. London: Butterworth, 1956.

Plucknett, Theodore F.T. *Edward I and Criminal Law.* Cambridge: Cambridge Univ. Press, 1960.

*Pocket Lawyer and Family Conveyancer.* 3d ed. Harrisburg, Pa.: G.S. Peters, 1833.

Pollock, Frederick. *Essays in Jurisprudence and Ethics.* London: Macmillan, 1882.

Pollock, Frederick. *A First Book of Jurisprudence.* London: Macmillan, 1896.

Pollock, Frederick. *An Introduction to the History of the Science of Politics.* London: Macmillan & Co., 1906.

Pollock, Frederick. *The Land Laws.* 3d ed. London: Macmillan, 1896.

Pollock, Frederick; and Frederic W. Maitland. *History of English Law Before the Time of Edward I.* 2 vols. 2d ed. Cambridge: Cambridge Univ. Press, 1898-1899.

Pollock, Frederick; and Robert Samuel Wright. *An Essay on Possession in the Common Law.* Oxford: Clarendon Press, 1888.

Polyviou, Polyvios G. *The Equal Protection of the Laws.* London: Duckworth, 1980.

Pomeroy, John Norton. *Code Remedies: Remedies and Remedial Rights by the Civil Action.* Thomas A. Bogle, ed. 4th ed. Boston: Little, Brown & Co., 1904.

Pomeroy, John Norton. *A Treatise on Equity Jurisprudence.* 6 vols. John Norton Pomeroy Jr., ed. 4th ed. San Francisco: Bancroft-Whitney, 1918-1919.

Poole, Reginald L. *The Exchequer in the Twelfth Century.* Oxford: Clarendon Press, 1912.

Pooley, James. *Trade Secrets.* N.Y.: Law Journal Seminars Press, 1997.

Posner, Richard A. *Antitrust Law.* 2d ed. Chicago: Univ. of Chicago Press, 2001.

Posner, Richard A. *Economic Analysis of Law.* 2d ed. Boston: Little Brown, 1977.

Posner, Richard A. *The Federal Courts: Crisis and Reform.* Cambridge, Mass.: Harvard Univ. Press, 1985.

Posner, Richard A. *Law and Legal Theory in England and America.* Oxford: Clarendon Press, 1996.

Posner, Richard A. *Law and Literature: A Misunderstood Relation.* Cambridge, Mass.: Harvard Univ. Press, 1988.

Posner, Richard A. *The Problems of Jurisprudence.* Cambridge, Mass.: Harvard Univ. Press, 1990.

Potter, Harold. *An Historical Introduction to English Law and Its Institutions.* 3d ed. London: Sweet & Maxwell, 1948. (See also Kiralfy.)

Potter, Harold. *The Principles and Practice of Conveyancing Under the Land Registration Act, 1925.* London: Sweet & Maxwell, 1934.

Poulantzas, Nicholas. *The Right of Hot Pursuit in International Law.* 2d ed. The Hague: Martinus Nijhoff, 2002.

Pound, Roscoe. *Appellate Procedure in Civil Cases.* Boston: Little Brown, 1941.

Pound, Roscoe. *Contemporary Juristic Theory.* Claremont, Calif.: Claremont Colleges, 1940.

Pound, Roscoe. *The Development of Constitutional Guarantees of Liberty.* New Haven: Yale Univ. Press, 1957.

Pound, Roscoe. *The Formative Era of American Law.* Boston: Little Brown, 1938.

Pound, Roscoe. *The Ideal Element in Law* [1958]. Indianapolis: Liberty Fund, 2002.

Pound, Roscoe. *An Introduction to the Philosophy of Law.* Rev. ed. New Haven: Yale Univ. Press, 1954.

Pound, Roscoe. *Jurisprudence.* 5 vols. St. Paul: West, 1959.

Pound, Roscoe. *The Lawyer from Antiquity to Modern Times.* St. Paul: West, 1953.

Pound, Roscoe. *The Spirit of the Common Law.* Boston: Marshall Jones Co., 1921.

Powell, Richard R. *Powell on Real Property.* 17 vols. Patrick J. Rohan, ed. N.Y.: Matthew Bender, 1949-present.

Price, Griffith. *The Law of Maritime Liens.* London: Sweet & Maxwell, 1940.

Proffatt, John. *A Treatise on the Law Relating to the Office and Duties of Notaries Public.* John F. Tyler & John J. Stephens, eds. 2d ed. San Francisco: Bancroft-Whitney, 1892.

Prosser, William. *The Law of Torts.* 4th ed. St. Paul: West, 1971. (See also Keeton, W. Page.)

Pufendorf, Samuel. *Of the Law of Nature and Nations.* Basil Kennett, trans. 4th ed. London: J. Walthoe et al., 1719.

Pulling, Alexander. *The Order of the Coif.* London: William Clowes & Sons, 1884.

Purver, Jonathan M.; and Lawrence E. Taylor. *Handling Criminal Appeals.* Rochester, N.Y.: Lawyers Co-operative, 1980.

Puterbaugh, Sabin D. *Puterbaugh's Common Law Pleading and Practice.* 3d ed. Peoria, Ill.: Leslie Puterbaugh, 1873.

Putnam, Carlton B. *How to Find the Law.* 4th ed. St. Paul: West, 1949.

Quindry, Silvester E. *Bonds and Bondholders: Rights and Remedies.* 2 vols. Chicago: Burdette Smith, 1934.

Rabin, Edward H. *Fundamentals of Modern Real Property Law.* Mineola, N.Y.: Foundation Press, 1974.

Radcliffe, Cyril John [Lord Radcliffe]. *The Law and Its Compass.* Evanston, Ill.: Northwestern Univ. Press, 1960.

Radcliffe, Geoffrey; and Geoffrey Cross. *The English Legal System.* G.J. Hand & D.J. Bentley, eds. 6th ed. London: Butterworths, 1977.

Radin, Max. *Handbook of Anglo-American Legal History.* St. Paul: West, 1936.

Radin, Max. *Handbook of Roman Law.* St. Paul: West, 1927.

Radin, Max. *The Law and You.* N.Y.: New American Library, 1948.

Radin, Max. *Law as Logic and Experience.* New Haven: Yale Univ. Press, 1940.

Radin, Max; and Alexander M. Kidd (eds.). *Legal Essays in Tribute to Orrin Kip McMurray.* Berkeley: Univ. of California Press, 1935.

Radzinowicz, Leon. *A History of English Criminal Law and its Administration from 1750: The Movement for Reform, 1750-1833.* N.Y.: Macmillan, 1948.

Radzinowicz, Leon; and Marvin E. Wolfgang. *Crime and Justice.* 3 vols. N.Y.: Basic Books, 1971.

[Raithby, John.] *The Study and Practice of the Law.* London: T. Cadell Jr. & W. Davies, 1798.

Ralston, Robert. *The Principles of the Law Relating to the Discharge of Contracts.* Philadelphia: T. & J.W. Johnson & Co., 1886.

Ramsay, William. *A Manual of Roman Antiquities.* Rodolfo Lanciani, ed. 15th ed. London: Charles Griffin & Co., 1894.

Randolph, Joseph F. *A Treatise on the Law of Commercial Paper.* 3 vols. 2d ed. St. Paul: West, 1899.

Rapalje, Stewart. *A Treatise on the Law of Witnesses.* N.Y.: Banks & Bros., 1887.

Rapalje, Stewart; and Robert L. Lawrence. *A Dictionary of American and English Law.* 2 vols. Jersey City, N.J.: F.D. Linn & Co., 1883.

Rastell, John. *Les Termes de la Ley.* 26th ed. London: R. Gosling, 1721. Also: *Termes de la Ley.* 1st. Am. ed. fr. last London ed. of 1721. Portland, Me.: J. Johnson, 1812.

Rawle, William Henry. *A Practical Treatise on the Law of Covenants for Title.* 5th ed. Boston: Little Brown, 1887.

Reed, John C. *Practical Suggestions for the Management of Law-suits.* N.Y.: James Cockroft & Co., 1876.

Reeve, Tapping. *The Law of Baron and Femme.* 3d ed. Albany, N.Y.: William Gould, 1862.

Reeves, Alfred G. *A Treatise on Special Subjects of the Law of Real Property.* Boston: Little Brown, 1904.

Reilly, John W. *The Language of Real Estate.* 2d ed. Chicago: Real Estate Education Co., 1982. Also: 4th ed. Chicago: Real Estate Education Co., 1993.

Reinsch, Paul S. *American Legislatures and Legislative Methods.* N.Y.: Century Co., 1907.

Renton, Alexander Wood; and George Grenville Phillimore. *The Comparative Law of Marriage and Divorce.* London: Sweet & Maxwell, 1910.

Renton, Alexander Wood; et al. (eds.). *Encyclopaedia of the Laws of England.* 15 vols. 2d ed. London: Sweet & Maxwell, 1906-1909.

Restatement (Second) of Agency. St. Paul: American Law Inst., 1958.

Restatement (Third) of Agency. St. Paul: American Law Inst., 2006.

Restatement (Second) of Conflict of Laws. St. Paul: American Law Inst., 1971.

Restatement (Second) of Contracts. 10 vols. St. Paul: American Law Inst., 1981.

Restatement (Second) of Foreign Relations Law of the United States. St. Paul: American Law Inst., 1965.

Restatement (Second) of Judgments. St. Paul: American Law Inst., 1980.

Restatement (Third) of Property: Wills and Other Donative Transfers. St. Paul: American Law Inst., 1999.

Restatement (Third) of Restitution and Unjust Enrichment. St. Paul: American Law Inst., 2011.

Restatement of the Law Governing Lawyers. St. Paul: American Law Inst., 1998.

Restatement of the Law of Restitution. St. Paul: West, 1937.

Restatement (Third) of the U.S. Law of International Commercial Arbitration (Tent. Draft No. 3, May 22, 2013). Philadelphia: American Law Inst., 2013.

Restatement (First) of Torts. St. Paul: American Law Inst., 1938.

Restatement (Second) of Torts. 4 vols. St. Paul: American Law Inst., 1965-1979.

Restatement (Third) of Torts. 4 vols. St. Paul: American Law Inst., 1998-2012.

Restatement (Second) of Trusts. 5 vols. St. Paul: American Law Inst., 1959.

Restatement (Third) of Trusts. St. Paul: American Law Inst., 2003.

Reuschlein, Harold Gill; and William A. Gregory. *The Law of Agency and Partnership.* 2d ed. St. Paul: West, 1990.

Rex, Benjamin F. *The Notaries' Manual.* J.H. McMillan, ed. 6th ed. Kansas City, Mo.: Vernon, 1913.

Reynolds, F.M.B. *Bowstead and Reynolds on Agency*. 18th ed. London: Sweet & Maxwell, 2006.

Reynolds, Osborne M., Jr. *Handbook of Local Government Law*. St. Paul: West, 1982.

Reynolds, William. *The Theory of the Law of Evidence*. 2d ed. Chicago: Callaghan & Co., 1890.

Rhode Deborah L.; and David Luban. *Legal Ethics*. Westbury, N.Y.: Foundation Press, 1992.

Rhode, Deborah L.; and Geoffrey C. Hazard. *Professional Responsibility*. N.Y.: Foundation Press, 2002.

Richardson, William P. *The Law of Evidence*. 3d ed. Brooklyn: By the author, 1928.

Richman, William M.; and William L. Reynolds. *Injustice on Appeal: The United States Courts of Appeals in Crisis*. N.Y.: Oxford Univ. Press, 2013.

Riddick, Floyd M.; and Miriam H. Butcher. *Riddick's Rules of Procedure*. N.Y.: Scribner, 1985.

Robert, Henry M. *Robert's Rules of Order Newly Revised*. 10th ed. Philadelphia: Perseus, 2000. Also: Sarah Corbin Robert et al., eds. 11th ed. Philadelphia: Da Capo, 2011.

Roberts, Jessica L.; and Elizabeth Weeks. *Healthism: Health-Status Discrimination and the Law*. N.Y.: Cambridge Univ. Press, 2018.

Robertson, David W.; Steven F. Friedell; and Michael F. Sturley. *Admiralty and Maritime Law in the United States*. Durham, N.C.: Carolina Academic Press, 2001.

Robinson, Edward Stevens. *Law and the Lawyers*. N.Y.: Macmillan, 1935.

Robinson, O.F. *The Criminal Law of Ancient Rome*. Baltimore: Johns Hopkins Univ. Press, 1995.

Robinson, Paul H. *Criminal Law Defenses*. 2 vols. St. Paul: West, 1984.

Robinson, Thomas. *Robinson on Gavelkind*. Charles I. Elton & Herbert J.H. Mackay, eds. 5th ed. London: Butterworth & Co., 1897.

Roby, Henry John. *Roman Private Law in the Times of Cicero and of the Antonines*. 2 vols. Cambridge: Cambridge Univ. Press, 1902.

Roper, R.S. Donnison. *A Treatise upon the Law of Legacies*. Dublin: John Exshaw, 1800.

Rose, Michael D.; and John C. Chommie. *Federal Income Taxation*. 3d ed. St. Paul: West, 1988.

Rosenberg, Morgan D. *The Essentials of Patent Claim Drafting*. Oxford: Oxford Univ. Press, 2012.

Rosenberg, Morgan D. *Patent Application Drafting: A Practical Guide*. Oxford: Oxford Univ. Press, 2012.

Rosenfeld, Michel; and András Sajó (eds.). *The Oxford Handbook of Comparative Constitutional Law*. Oxford: Oxford Univ. Press, 2012.

Ross, Stephen F. *Principles of Antitrust Law*. Westbury, N.Y.: Foundation Press, 1993.

Rothstein, Mark A. *Occupational Safety and Health Law*. St. Paul: West, 1990.

Rothstein, Mark A.; et al. *Employment Law*. St. Paul: West, 1994.

Rothstein, Paul F. *The Federal Rules of Evidence*. 3d ed. St. Paul: West, 2003.

Rottschaefer, Henry. *Handbook of American Constitutional Law*. St. Paul: West, 1939.

Rotunda, Ronald D.; and John E. Nowak. *Treatise on Constitutional Law*. 5 vols. 3d ed. St. Paul: West, 1999. (See also Nowak.)

Rounds, Charles E., Jr.; and Charles E. Rounds III (eds.). *Loring: A Trustee's Handbook*. Austin, Tex.: Wolters Kluwer, 2008.

Rutherglen, George. *Employment Discrimination Law*. N.Y.: Foundation Press, 2001.

Sack, Robert D.; and Sandra S. Baron. *Libel, Slander, and Related Problems*. 2d ed. N.Y.: Practising Law Inst., 1994.

Safire, William. *Safire's New Political Dictionary*. N.Y.: Random House, 1993.

Salmond, John W. *Essays in Jurisprudence and Legal History*. London: Stevens & Haynes, 1891.

Salmond, John. *Jurisprudence*. Glanville L. Williams, ed. 10th ed. London: Sweet & Maxwell, 1947.

Salsich, Peter W., Jr. *Land Use Regulation*. Colorado Springs: Shepard's, 1991.

Savary des Brûlons, Jacques. *The Universal Dictionary of Trade and Commerce*. 2 vols. Malachy Postlethwayt, ed. & trans. London: John & Paul Knapton, 1751 & 1755.

Sawer, Geoffrey. *Law in Society*. Oxford: Clarendon Press, 1965.

Scalia, Antonin. *A Matter of Interpretation*. Princeton, N.J.: Princeton Univ. Press, 1997.

Scalia, Antonin; and Bryan A. Garner. *Making Your Case: The Art of Persuading Judges*. St. Paul: Thomson/West, 2008.

Scalia, Antonin; and Bryan A. Garner. *Reading Law: The Interpretation of Legal Texts*. St. Paul: Thomson/West, 2012.

Scanlan, Charles M. *The Law of Church and Grave*. N.Y.: Benziger Bros., 1909.

Scarman, Leslie. *English Law — The New Dimension*. London: Stevens, 1974.

Schacher, Ayelet; Rainer Bauböck; Irene Bloemraad; and Maarten Vink (eds.). *The Oxford Handbook of Citizenship*. Oxford: Oxford Univ. Press, 2017.

Schacht, Joseph. *An Introduction to Islamic Law*. Oxford: Clarendon Press, 1982.

Schechter, Roger E.; and John R. Thomas. *Intellectual Property*. St. Paul: Thomson/West, 2003.

Schoenbaum, Thomas J. *Admiralty and Maritime Law*. St. Paul: West, 1987.

Schulz, Fritz. *History of Roman Legal Science*. Rev. ed. Oxford: Clarendon Press, 1967.

Schwartz, Mortimer D.; and Richard C. Wydick. *Problems in Legal Ethics*. 2d ed. St. Paul: West, 1988.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Schwarzenberger, Georg. *A Manual of International Law.* 5th ed. London: Stevens, 1967.

Schwarzenberger, Georg. *Power Politics: A Study of International Society.* 2d ed. N.Y.: F.A. Praeger, 1951.

Schweitzer, Sydney C. *Trial Guide.* 3 vols. N.Y.: Baker Voorhis, 1945-1948.

Schwing, Ann Taylor. *California Affirmative Defenses.* 2d ed. 5 vols. San Francisco: Bancroft-Whitney, 1995-1996.

Schwing, Ann Taylor. *Open Meeting Laws.* 2 vols. 3d ed. Anchorage: Fathom, 2011.

Scott, Austin W.; and William F. Fratcher. *The Law of Trusts.* 12 vols. 4th ed. Boston: Little Brown, 1987.

Scott, H.L. *Military Dictionary.* N.Y.: D. Van Nostrand, 1861.

Seagle, William. *The Quest for Law.* N.Y.: Alfred A. Knopf, 1941.

Sedgwick, Arthur George. *Elements of the Law of Damages.* 2d ed. Boston: Little Brown, 1909.

*Select Essays in Anglo-American Legal History.* 3 vols. Boston: Little Brown, 1907-1909.

Sender, Marta Pertegás. *Cross-Border Enforcement of Patent Rights.* Oxford: Oxford Univ. Press, 2002.

Shapiro, Scott J. *Legality.* Cambridge, Mass.: Harvard Univ. Press, 2011.

Shapo, Marshall S. *The Duty to Act.* Austin, Tex.: Univ. of Texas Press, 1977.

Shartel, Burke. *Our Legal System and How It Operates.* Ann Arbor: Univ. of Michigan Law School, 1951.

Shaw, Malcolm N. *International Law.* 4th ed. Cambridge: Cambridge Univ. Press, 1997.

Sheppard, Stephen Michael. *I Do Solemnly Swear.* Cambridge: Cambridge Univ. Press, 2009.

Shipman, Benjamin J. *Handbook of Common-Law Pleading.* Henry Winthrop Ballantine, ed. 3d ed. St. Paul: West, 1923.

Shklar, Judith N. *Legalism: Law, Morals, and Political Trials.* Cambridge, Mass.: Harvard Univ. Press, 1964.

Silbey, Joel H. (ed.) *Encyclopedia of the American Legislative System.* 3 vols. N.Y.: C. Scribner's Sons, 1994.

Simes, Lewis M.; and Allan F. Smith. *The Law of Future Interests.* 2d ed. St. Paul: West, 1956.

Simpson, A.W.B. *An Introduction to the History of the Land Law.* London: Oxford Univ. Press, 1961.

Simpson, A.W.B. *Invitation to Law.* Oxford: Blackwell Pub., 1988.

Simpson, A.W.B. *Legal Theory and Legal History.* London: Hambledon Press, 1987.

Simpson, Keith. *Forensic Medicine.* 2d ed. London: Edward Arnold & Co., 1952.

Simpson, Laurence P. *Handbook of the Law of Contracts.* St. Paul: West, 1954.

Simpson, Laurence P. *Handbook on the Law of Suretyship.* St. Paul: West, 1950.

Sims, Henry Upson. *Covenants Which Run with Land, Other Than Covenants for Title.* Chicago: Callaghan & Co., 1901.

Singer, Norman J. *Sutherland Statutes and Statutory Construction.* 8 vols. 4th ed. Chicago: Callaghan & Co., 1986.

Smith, Horace. *A Treatise on the Law of Negligence.* 1st Am. ed. fr. 2d English ed. Philadelphia: Blackstone, 1887.

Smith, Munroe. *The Development of European Law.* N.Y.: Columbia Univ. Press, 1928.

Smith, Munroe. *A General View of European Legal History and Other Papers.* N.Y.: Columbia Univ. Press, 1927.

Smith, Walter Denton. *A Manual of Elementary Law.* St. Paul: West, 1896.

Soderquist, Larry D.; and Theresa A. Gabaldon. *Securities Law.* N.Y.: Foundation Press, 1998.

Soffer, Stuart B.; and Robert C. Kahrl. *Thesaurus of Claim Construction.* 2 vols. 2d ed. Oxford: Oxford Univ. Press, 2013.

Sohm, Rudolph. *The Institutes: A Textbook of the History and System of Roman Private Law.* James Crawford Ledlie, trans. 3d ed. Oxford: Clarendon Press, 1907.

Soper, John P.H. *A Treatise on the Law and Practice of Arbitrations and Awards.* David M. Lawrence, ed. 5th ed. London: Estates Gazette, 1935.

Spaht, Katherine S.; and W. Lee Hargrave. *Louisiana Civil Law Treatise: Matrimonial Regimes.* 2d ed. St. Paul: West, 1997.

Spaulding, Joseph Whitman. *The Practice in Civil Actions and Proceedings at Law.* Portland, Me.: Dresser, McLellan & Co., 1881.

Speiser, Stuart M. *The Negligence Case: Res Ipsa Loquitur.* Rochester, N.Y.: Lawyers Co-operative, 1972.

Spelling, Thomas Carl. *A Treatise on New Trial and Appellate Practice.* 2 vols. San Francisco: Bancroft-Whitney, 1903.

Staab, James Brian. *The Political Thought of Justice Antonin Scalia: A Hamiltonian on the Supreme Court.* Lanham, Md.: Rowman & Littlefield, 2006.

*Standard Library Cyclopaedia of Political, Constitutional, Statistical and Forensic Knowledge, The.* 4 vols. London: Henry G. Bohn, 1853.

Starkie, Thomas. *A Practical Treatise on the Law of Evidence.* 3 vols. 2d Am. ed. Boston: Wells & Lilly, 1828.

Starkie, Thomas. *A Treatise on the Law of Slander, Libel, Scandalum Magnatum, and False Rumours.* Edward D. Ingraham, ed. 1st Am. ed. N.Y.: G. Lamson, 1826.

Stearns, Arthur Aldebert. *The Law of Suretyship.* Wells M. Cook, ed. 3d ed. Cincinnati: W.H. Anderson, 1922.

Stein, Robert A. *Forming a More Perfect Union: A History of the Uniform Law Commission.* Charlottesville, Va.: LexisNexis, 2013.

Steinberg, Marc I. *Developments in Business Law and Policy.* San Diego: Cognella Academic, 2012.

Steinberg, Marc I. *Lawyering and Ethics for the Business Attorney.* 3d ed. St. Paul: West, 2011.

Steinberg, Marc I. *Understanding Securities Law.* 2d ed. N.Y.: Matthew Bender, 1996.

Stephen, Henry John. *Stephen's Commentaries on the Laws of England.* 4 vols. L. Crispin Warmington, ed. 21st ed. London: Butterworth, 1950.

Stephen, Henry John. *A Treatise on the Principles of Pleading in Civil Actions.* Samuel Williston, ed. Repr. fr. 5th English ed. Cambridge, Mass.: Harvard L. Rev. Pub. Ass'n, 1895.

Stephen, James Fitzjames. *A Digest of the Criminal Law.* 5th ed. London: Macmillan, 1894.

Stephen, James Fitzjames. *A Digest of the Law of Evidence.* George Chase, ed. Am. ed. fr. 4th English ed. N.Y.: George Chase, 1892.

Stephen, James Fitzjames. *A General View of the Criminal Law of England.* 2d ed. London: Macmillan, 1890.

Stephen, James Fitzjames. *A History of the Criminal Law of England.* 3 vols. London: Macmillan, 1883.

Stephen, James Fitzjames. *Liberty, Equality, Fraternity.* 2d ed. London: Smith, Elder & Co., 1874.

Stephenson, Andrew. *A History of Roman Law.* Boston: Little Brown, 1912.

Stephenson, Gilbert Thomas. *Wills.* N.Y.: F.S. Crofts & Co., 1934.

Stern, Robert L.; et al. *Supreme Court Practice.* 8th ed. Washington, D.C.: Bureau of Nat'l Affairs, 2002.

Stessinger, John G. *The Might of Nations.* Rev. ed. N.Y.: Random House, 1965.

Stimson, Frederic Jesup. *The Law of the Federal and State Constitutions of the United States.* Boston: Boston Book Co., 1908.

Stimson, Frederic Jesup. *Popular Law-Making.* N.Y.: Charles Scribner's Sons, 1910.

Stoebuck, William B.; and Dale A. Whitman. *The Law of Property.* 3d ed. St. Paul: West, 2000.

Stone, Ferdinand F. *Handbook of Law Study.* N.Y.: Prentice-Hall, 1952.

Stone, Julius. *Human Law and Human Justice.* Stanford: Stanford Univ. Press, 1965.

Story, Joseph. *Commentaries on Equity Jurisprudence.* W.E. Grigsby, ed. 1st English ed. London: Stevens & Haynes, 1884.

Story, Joseph. *Commentaries on the Constitution of the United States.* 2 vols. 3d ed. Boston: Little Brown, 1858.

Story, Joseph. *Commentaries on the Law of Agency.* Isaac R. Redfield, ed. 7th ed. Boston: Little Brown, 1869.

Story, Joseph. *Commentaries on the Law of Bailments.* Edmund H. Bennett, ed. 8th ed. Boston: Little Brown, 1870.

Story, Joseph. *Commentaries on the Law of Bills of Exchange.* Edmund Hatch Bennett, ed. 4th ed. Boston: Little Brown, 1860.

Story, Joseph. *Commentaries on the Law of Partnership.* John Chipman Gray Jr., ed. 6th ed. Boston: Little Brown, 1868.

Story, Joseph. *Commentaries on the Law of Promissory Notes.* 6th ed. Boston: Little Brown, 1868.

Story, William W. *A Treatise on the Law of Contracts.* 2 vols. Boston: Little Brown, 1874.

Story, William W. *A Treatise on the Law of Sales of Personal Property.* Boston: Little Brown, 1853.

Strong, John W.; et al. *McCormick on Evidence.* 5th ed. St. Paul: West, 1999. (See also McCormick.)

Stowell, Ellery C. *International Law: A Restatement of Principles in Conformity with Actual Practice.* N.Y.: Henry Holt & Co., 1931.

Stumberg, George Wilfred. *Principles of Conflict of Laws.* 2d ed. Brooklyn: Foundation Press, 1951.

Sturgis, Alice. *The Standard Code of Parliamentary Procedure.* 4th ed. Wilmington, Del.: American Inst. of Parliamentarians, 2001.

Sullivan, Francis Stoughton. *An Historical Treatise on the Feudal Law, and the Constitution and Laws of England.* London: J. Johnson, 1772.

Sullivan, Lawrence A. *Handbook of the Law of Antitrust.* St. Paul: West, 1977.

Sullivan, Lawrence A.; and Warren S. Grimes. *The Law of Antitrust: An Integrated Handbook.* St. Paul: West, 2000.

Summers, Robert S. (ed.). *Essays in Legal Philosophy.* Berkeley: Univ. of California Press, 1968.

Summers, Robert S. (ed.). *More Essays in Legal Philosophy.* Berkeley: Univ. of California Press, 1971.

Sumner, W.G. *Folkways.* Boston: Ginn, 1907.

Sutherland, Donald W. *The Assize of Novel Disseisin.* Oxford: Clarendon Press, 1973.

Svarlien, Oscar. *An Introduction to the Law of Nations.* N.Y.: McGraw-Hill, 1955.

Swartz, Matt; and Daniel Lee. *The Corporate, Securities, and M&A Lawyer's Job: A Survival Guide.* Chicago: ABA, 2007.

Taft, William Howard. *Ethics in Service.* New Haven: Yale Univ. Press, 1915.

Tait, George. *A Summary of the Powers and Duties of a Justice of the Peace in Scotland.* 2d ed. Edinburgh: John Anderson & Co., 1816.

Taswell-Langmead, Thomas Pitt. *English Constitutional History: From the Teutonic Conquest to the Present Time.* Theodore F.T. Plucknett, ed. 11th ed. London: Sweet & Maxwell, 1960.

Taylor, Benjamin J.; and Fred Whitney. *Labor Relations Law.* Englewood Cliffs, N.J.: Prentice-Hall, 1971.

Taylor, Hannis. *The Science of Jurisprudence.* N.Y.: Macmillan, 1908.

Tellegen-Couperus, Olga. *A Short History of Roman Law.* London: Routledge, 1993.

Thayer, James B. *A Preliminary Treatise on Evidence at the Common Law.* Boston: Little Brown, 1898.

Thomas, Ann Van Wynen; and A.J. Thomas Jr. *The Concept of Aggression in International Law.* Dallas: Southern Methodist Univ. Press, 1972.

Thompson, Seymour D. *A Treatise on the Liability of Stockholders in Corporations.* St. Louis: F.H. Thomas & Co., 1879.

Thoreau, Henry David. *Journal of Henry D. Thoreau*. 2 vols. Bradford Torrey & Francis H. Allen, eds. N.Y.: Dover, 1962.

Thornton, G.C. *Legislative Drafting*. 4th ed. London: Butterworths, 1996.

Thornton, W.W. *A Treatise on the Law Relating to Gifts and Advancements*. Philadelphia: T. & J.W. Johnson & Co., 1893.

Thorpe, Francis Newton. *The Essentials of American Constitutional Law*. N.Y.: G.P. Putnam's Sons, 1917.

Tidmarsh, Jay; and Roger H. Transgrud. *Complex Litigation*. N.Y.: Foundation Press, 2002.

Tiersma, Peter M. *Parchment, Paper, Pixels: Law and the Technologies of Communication*. Chicago: Univ. of Chicago Press, 2010.

Tiersma, Peter M.; and Lawrence B. Solan (eds.). *The Oxford Handbook of Language and Law*. Oxford: Oxford Univ. Press, 2012.

Tiffany, Francis B. *Death by Wrongful Act*. St. Paul: West, 1893.

Tiffany, Francis B. *Handbook of the Law of Banks and Banking*. St. Paul: West, 1912.

Tiffany, Francis B. *Handbook on the Law of Principal and Agent*. Richard R.B. Powell, ed. 2d ed. St. Paul: West, 1924.

Tiffany, Herbert Thorndike. *A Treatise on the Modern Law of Real Property*. Carl Zollmann, ed. Abridged ed. Chicago: Callaghan & Co., 1940.

Tiffany, Joel. *A Treatise on Government and Constitutional Law*. Albany, N.Y.: W.C. Little, 1867.

Tigar, Michael E. *Federal Appeals: Jurisdiction and Practice*. 2d ed. Colorado Springs: Shepard's, 1993.

Torcia, Charles E. *Wharton's Criminal Law*. 4 vols. 15th ed. Deerfield, Ill.: Clark Boardman Callaghan & Co., 1993.

Townes, John C. *General Principles of the Law of Torts*. Austin, Tex.: Austin Printing Co., 1907.

Townes, John C. *Studies in American Elementary Law*. Chicago: T.H. Flood & Co., 1911.

Trayner, John. *Trayner's Latin Maxims*. 4th ed. Edinburgh: William Green, 1894.

Treitel, G.H. *The Law of Contract*. 8th ed. London: Sweet & Maxwell, 1991.

Tribe, Laurence H. *American Constitutional Law*. Mineola, N.Y.: Foundation Press, 1978. Also: Vol. 1. 3d ed. N.Y.: Foundation Press, 2000.

Tribe, Laurence H. *Constitutional Choices*. Cambridge, Mass.: Harvard Univ. Press, 1985.

Turner, J.W. Cecil. *Kenny's Outlines of Criminal Law*. 16th ed. Cambridge: Cambridge Univ. Press, 1952.

Tyler, Ransom H. *A Treatise on the Remedy by Ejectment and the Law of Adverse Enjoyment in the United States*. Albany, N.Y.: William Gould & Son, 1870.

Ullmann, Walter. *The Medieval Idea of Law*. N.Y.: Barnes & Noble, 1969.

Underhill, H.C. *A Treatise on the Law of Landlord and Tenant*. 2 vols. Chicago: T.H. Flood & Co., 1909.

Underhill, H.C. *A Treatise on the Law of Wills*. 2 vols. Chicago: T.H. Flood & Co., 1900.

U.S. Office of Personnel Management. *Alternative Dispute Resolution: A Resource Guide*. Washington, D.C.: U.S. Office of Pers. Mgmt., 2001.

U.S. War Dep't. *A Manual for Courts-Martial*. Washington, D.C.: GPO, 1920.

Veasey, E. Norman; and Christine T. Di Guglielmo. *Indispensable Counsel*. Oxford: Oxford Univ. Press, 2012.

Verplanck, Gulian C. *An Essay on the Doctrine of Contracts*. N.Y.: G. & C. Carvill, 1825.

Vining, Joseph. *Legal Identity*. New Haven: Yale, 1978.

Vinogradoff, Paul. *Common Sense in Law*. H.G. Hanbury, ed. 2d ed. London: Oxford Univ. Press, 1946.

Vinogradoff, Paul. *Roman Law in Medieval Europe* [1909]. Cambridge: Speculum Historiale, 1968.

Vinogradoff, Paul. *Villainage in England*. Oxford: Clarendon Press, 1892.

Von Clausewitz, Carl. *On War* [1818]. Michael Howard & Peter Paret, trans. N.Y.: Knopf, 1993.

Voorhees, Harvey Cortlandt. *The Law of Arrest in Civil and Criminal Actions*. 2d ed. Boston: Little Brown, 1915.

Waddams, S.M. *The Law of Damages*. 3d ed. Toronto: Canada Law Book, 1997.

Wade, John. *The Cabinet Lawyer*. 14th ed. London: Simpkin, Marshall & Co., 1847.

Wade, William P. *A Treatise on the Operation and Construction of Retroactive Laws*. St. Louis: F.H. Thomas & Co., 1880.

Wadlington, Walter; and Raymond C. O'Brien. *Family Law in Perspective*. N.Y.: Foundation Press, 2001.

Walker, David M. *A Legal History of Scotland*. 7 vols. Edinburgh: W. Green/T. & T. Clark/Butterworths/LexisNexis UK, 1988-2004.

Walker, David M. *The Oxford Companion to Law*. Oxford: Clarendon Press, 1980.

Walker, David M. *Principles of Scottish Private Law*. 4 vols. 4th ed. Oxford: Clarendon Press, 1988.

Walker, David M. *The Scottish Legal System*. 6th ed. Edinburgh: W. Green/Sweet & Maxwell, 1992.

Walker, Thomas Alfred. *The Science of International Law*. London: C.J. Clay & Sons, 1893.

Walker, Timothy. *Introduction to American Law*. Clement Bates, ed. 10th ed. Boston: Little Brown, 1895.

Walsh, William F. *Outlines of the History of English and American Law*. N.Y.: New York Univ. Press, 1924.

Walsh, William F. *A Treatise on Equity*. Chicago: Callaghan & Co., 1930.

Wambaugh, Eugene. *The Study of Cases*. 2d ed. Boston: Little Brown, 1894.

Ware, Stephen J. *Alternative Dispute Resolution*. St. Paul: West, 2001.

Warren, Edward H. *The Rights of Margin Customers Against Wrongdoing Stockbrokers*. Norwood, Mass.: Plimpton Press, 1941.

AR.07902

Warren, Samuel. *A Popular and Practical Introduction to Law Studies.* Isaac Grant Thompson, ed. Albany, N.Y.: John D. Parsons, 1870.

Warvelle, George W. *A Treatise on the Principles and Practice of the Action of Ejectment.* Chicago: T.H. Flood & Co., 1905.

Washburn, Emory. *Lectures on the Study and Practice of the Law.* Boston: Little Brown, 1874.

Washburn, Emory. *A Treatise on the American Law of Real Property.* 3 vols. 4th ed. Boston: Little Brown, 1876.

Waterman, Thomas W. *A Treatise on the Law of Set-Off, Recoupment, and Counter Claim.* 2d ed. N.Y.: Baker Voorhis, 1872.

Waters, D.W.M. *The Constructive Trust.* London: Univ. of London, 1964.

Watson, Alan. *Ancient Law and Modern Understanding.* Athens, Ga.: Univ. of Georgia Press, 1998.

Watson, Alan. *Legal Origins and Legal Change.* London: Hambledon Press, 1991.

Watson, George. *Bell's Dictionary and Digest of the Law of Scotland.* 3d ed. Edinburgh: Bell & Bradfute, 1882.

Webb, James Avery. *A Treatise on the Law of Usury.* St. Louis: F.H. Thomas Law Book Co., 1899.

Webster, Daniel. *The Papers of Daniel Webster.* 14 vols. Charles M Wiltse, ed. Hanover, N.H.: Univ. Press of New England, 1974-1989.

Weeks, Edward P. *A Treatise on the Law of Depositions.* San Francisco: Sumner Whitney & Co., 1880.

Weintraub, Russell J. *Commentary on the Conflict of Laws.* 4th ed. N.Y.: Foundation Press, 2001.

Weiss, Samuel. *How to Try a Case.* N.Y.: Baker Voorhis, 1930.

Weller, Marc (ed.). *The Oxford Handbook of the Use of Force in International Law.* Oxford: Oxford Univ. Press, 2015.

Wentworth, Thomas. *The Office and Duty of Executors.* Henry Jeremy & E.D. Ingraham, eds. 1st Am. ed. fr. 14th London ed. Philadelphia: P.H. Nicklin & T. Johnson, 1832.

Wharton, Francis. *A Treatise on the Law of Evidence in Criminal Issues.* 2 vols. O.N. Hilton, ed. 10th ed. Rochester, N.Y.: Lawyers Co-operative, 1912.

Wharton, J.J.S. *Wharton's Law Lexicon.* Ivan Horniman, ed. 13th ed. London: Sevens & Sons, 1925.

White, Alan R. *Grounds of Liability.* Oxford: Clarendon Press, 1985.

White, Edward J. *Legal Antiquities.* St. Louis: F.H. Thomas, 1913.

White, G. Edward. *Law in American History: From the Colonial Years Through the Civil War.* Oxford: Univ. Press, 2012. [Projected to be a three-volume set.]

White, James J.; and Robert S. Summers. *Uniform Commercial Code.* 4 vols. 4th ed. St. Paul: West, 1995.

Whitebread, Charles H. *Criminal Procedure.* Mineola, N.Y.: Foundation Press, 1980.

Wiener, Frederick Bernays. *A Practical Manual of Martial Law.* Harrisburg, Pa.: Military Service Pub. Co., 1940.

Wigmore, John Henry. *Evidence in Trials at Common Law.* 11 vols. James H. Chadbourn et al., eds. 4th rev. ed. Boston: Little Brown, 1961-present.

Wigmore, John Henry. *Problems of Law.* N.Y.: Charles Scribner's Sons, 1920.

Wigmore, John Henry. *The Science of Judicial Proof.* 3d ed. Boston: Little Brown, 1937.

Wigmore, John Henry. *A Students' Textbook of the Law of Evidence.* Brooklyn: Foundation Press, 1935.

Wilhelm, Thomas. *A Military Dictionary and Gazetteer.* Rev. ed. Philadelphia: L.R. Hamersly & Co., 1881.

Willard, John. *A Treatise on Equity Jurisprudence.* 2d ed. Platt Potter, ed. N.Y.: Banks & Bros., 1879.

Williams, Glanville L. *Criminal Law: The General Part.* 2d ed. London: Stevens, 1961.

Williams, Glanville L. *Joint Obligations.* London: Butterworth & Co., 1949.

Williams, Glanville L. *Learning the Law.* 11th ed. London: Wm. Grant & Sons, 1982.

Williams, Glanville L. *The Proof of Guilt.* 3d ed. London: Stevens & Sons, 1963.

Williams, Glanville L. *The Sanctity of Life and the Criminal Law.* N.Y.: Knopf, 1957.

Williams, Glanville L. *Textbook of Criminal Law.* London: Stevens, 1978.

Williams, Joshua. *Principles of the Law of Personal Property.* 11th ed. London: Sweet, 1881.

Williams, Vergil L. *Dictionary of American Penology.* Rev. ed. Westport, Conn.: Greenwood Press, 1996.

Williston, Samuel. *The Law Governing Sales of Goods.* 4 vols. 3d ed. N.Y.: Baker Voorhis, 1948.

Williston, Samuel. *A Treatise on the Law of Contracts.* 18 vols. Walter H.E. Jaeger, ed. 3d ed. Mount Kisco, N.Y.: Baker Voorhis, 1957. Also: 31 vols. Richard A. Lord, ed. 4th ed. St. Paul: West, 2012.

Wills, William. *An Essay on the Principles of Circumstantial Evidence.* 1st Am. ed. fr. 3d London ed. Philadelphia: T. & J.W. Johnson, 1852.

Wilson, James. *Collected Works of James Wilson.* 2 vols. Kermit L. Hall & Mark David Hall, eds. Indianapolis: Liberty Fund, 2007.

Wiltsie, Charles Hastings. *A Treatise on the Law and Practice of Foreclosing Mortgages on Real Property.* Rochester, N.Y.: Williamson Law Book Co., 1893.

Windeyer, W.J.V. *Lectures on Legal History.* 2d ed. Sydney: Law Book Co., 1949.

Winfield, Percy H. *The Chief Sources of English Legal History.* Cambridge, Mass.: Harvard Univ. Press, 1925.

Winfield, Percy H. *A Textbook of the Law of Tort.* 5th ed. London: Sweet & Maxwell, 1950.

Winternitz, Ingrid. *Electronic Publishing Agreements.* Oxford: Oxford Univ. Press, 2000.

Wise, Raymond L. *Legal Ethics.* San Francisco: Matthew Bender & Co., 1966.

Witt, Elder (ed.). *Congressional Quarterly's Guide to the U.S. Supreme Court.* Washington, D.C.: Congressional Quarterly Inc., 1979.

Wolfe, Christopher. *The Rise of Modern Judicial Review: From Constitutional Interpretation to Judge-Made Law.* N.Y.: Basic Books, 1986.

Wolff, Hans Julius. *Roman Law: An Historical Introduction.* Norman, Okla.: Univ. of Oklahoma Press, 1951.

Wolfrum, Rüdiger (ed.). *The Max Planck Encyclopedia of Public International Law.* 10 vols. Oxford: Oxford Univ. Press, 2012.

Wood, Gordon S. *The Creation of the American Republic, 1776-1787.* Chapel Hill: Univ. of North Carolina Press, 1969.

Wood, H.G. *A Treatise on the Law of Master and Servant.* 2d ed. Albany, N.Y.: J.D. Parsons Jr., 1886.

Woodward, Frederic Campbell. *The Law of Quasi Contracts.* Boston: Little Brown, 1913.

Woolsey, Theodore D. *Introduction to the Study of International Law.* 5th ed. N.Y.: Charles Scribner's Sons, 1878.

Wright, Charles Alan. *The Law of Federal Courts.* 5th ed. St. Paul: West, 1994.

Wright, Charles Alan; et al. *Federal Practice and Procedure.* 55 vols. St. Paul: West, 1978-present.

Wright, Martin. *Introduction to the Law of Tenures.* 4th ed. London: F. Wingrave, 1792.

Yale Law School Faculty. *Two Centuries' Growth of American Law: 1701-1901.* N.Y.: Charles Scribner's Sons, 1901.

Yiannopoulos, A.N. *Property: The Law of Things — Real Rights — Real Actions.* 4th ed. St. Paul: West, 2001.

Young, Nigel J. (ed.). *The Oxford International Encyclopedia of Peace.* 4 vols. Oxford: Oxford Univ. Press, 2010.

Youngner, Stuart J.; and Robert M. Arnold (eds.). *The Oxford Handbook of Ethics at the End of Life.* Oxford: Oxford Univ. Press, 2016.

Zander, Michael. *Lawyers and the Public Interest.* London: Weidenfeld & Nicolson, 1968.

Zelermyer, William. *Legal Reasoning.* Englewood Cliffs, N.J.: Prentice-Hall, 1960.

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Black's Law Dictionary (11th ed. 2019), discretion

DISCRETION

Bryan A. Garner, Editor in Chief

Preface | Guide | Legal Maxims | Bibliography

**discretion** (di-**skresh**-ən) (14c) **1.** Wise conduct and management exercised without constraint; the ability coupled with the tendency to act with prudence and propriety. **2.** Freedom in the exercise of judgment; the power of free decision-making.

- **sole discretion.** (17c) An individual's power to make decisions without anyone else's advice or consent.

**3.** *Criminal & tort law.* The capacity to distinguish between right and wrong, sufficient to make a person responsible for his or her own actions. **4.** A public official's power or right to act in certain circumstances according to personal judgment and conscience, often in an official or representative capacity. — Also termed *discretionary power.*

- **administrative discretion.** (17c) A public official's or agency's power to exercise judgment in the discharge of its duties.

- **judicial discretion.** (17c) The exercise of judgment by a judge or court based on what is fair under the circumstances and guided by the rules and principles of law; a court's power to act or not act when a litigant is not entitled to demand the act as a matter of right. — Also termed *legal discretion.*

- **prosecutorial discretion.** (1960) **1.** *Criminal law.* A prosecutor's power to choose from the options available in a criminal case, such as filing charges, prosecuting, not prosecuting, plea-bargaining, and recommending a sentence to the court. **2.** *Immigration law.* A federal authority's discretion not to immediately arrest or endeavor to remove an illegal immigrant because the immigrant does not meet the federal government's immigration-enforcement priorities.

Westlaw. © 2019 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

Black's Law Dictionary (11th ed. 2019), judicial discretion

JUDICIAL DISCRETION

Bryan A. Garner, Editor in Chief

Preface | Guide | Legal Maxims | Bibliography

**judicial discretion** See DISCRETION (4).

Westlaw. © 2019 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works. AR.07906 1

sons as well as the effective implementation of the World Programme of Action in the pursuance of their overall objectives in their respective areas of competence;

10. *Decides* that, pending completion of the elaboration and the adoption of the guidelines referred to in paragraph 5 above, the United Nations Trust Fund for the International Year of Disabled Persons should continue to support activities in accordance with paragraph 157 of the World Programme of Action[53] and paragraph 4 of General Assembly resolution 38/28;

11. *Calls upon* Member States and other donors to continue to contribute generously to the Trust Fund;

12. *Requests* the Secretary-General to promote the recruitment of more disabled persons within the United Nations system;

13. *Again requests* the Secretary-General to convene in 1987 a meeting of experts, consisting largely of disabled persons, to evaluate progress at the mid-point of the Decade and to prepare a report that would enable him to help the General Assembly at its forty-second session to evaluate the implementation of the World Programme of Action, as provided for in paragraph 3 of resolution 37/52;

14. *Requests* the Secretary-General to report on the implementation of the present resolution, including detailed information on the activities relating to the Trust Fund, to the General Assembly at its fortieth session and decides to include in the provisional agenda of that session an item entitled "Implementation of the World Programme of Action concerning Disabled Persons and the United Nations Decade of Disabled Persons".

*71st plenary meeting
23 November 1984*

### 39/46. Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment

*The General Assembly,*

*Recalling* the Declaration on the Protection of All Persons from Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, adopted by the General Assembly in its resolution 3452 (XXX) of 9 December 1975,

*Recalling also* its resolution 32/62 of 8 December 1977, in which it requested the Commission on Human Rights to draw up a draft convention against torture and other cruel, inhuman or degrading treatment or punishment, in the light of the principles embodied in the Declaration,

*Recalling further* that, in its resolution 38/119 of 16 December 1983, it requested the Commission on Human Rights to complete, at its fortieth session, as a matter of highest priority, the drafting of such a convention, with a view to submitting a draft, including provisions for the effective implementation of the future convention, to the General Assembly at its thirty-ninth session,

*Taking note with satisfaction* of Commission on Human Rights resolution 1984/21 of 6 March 1984,[54] by which the Commission decided to transmit the text of a draft convention against torture and other cruel, inhuman or degrading treatment or punishment, contained in the annex to the report of the Working Group,[57] to the General Assembly for its consideration,

*Desirous* of achieving a more effective implementation of the existing prohibition under international and national law of the practice of torture and other cruel, inhuman or degrading treatment or punishment,

1. *Expresses its appreciation* for the work achieved by the Commission on Human Rights in preparing the text of a draft convention against torture and other cruel, inhuman or degrading treatment or punishment;

2. *Adopts* and opens for signature, ratification and accession the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment contained in the annex to the present resolution;

3. *Calls upon* all Governments to consider signing and ratifying the Convention as a matter of priority.

*93rd plenary meeting
10 December 1984*

### ANNEX

#### Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment

*The States Parties to this Convention,*

*Considering* that, in accordance with the principles proclaimed in the Charter of the United Nations, recognition of the equal and inalienable rights of all members of the human family is the foundation of freedom, justice and peace in the world,

*Recognizing* that those rights derive from the inherent dignity of the human person,

*Considering* the obligation of States under the Charter, in particular Article 55, to promote universal respect for, and observance of, human rights and fundamental freedoms,

*Having regard* to article 5 of the Universal Declaration of Human Rights[58] and article 7 of the International Covenant on Civil and Political Rights,[59] both of which provide that no one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment,

*Having regard also* to the Declaration on the Protection of All Persons from Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, adopted by the General Assembly on 9 December 1975,[60]

*Desiring* to make more effective the struggle against torture and other cruel, inhuman or degrading treatment or punishment throughout the world,

*Have agreed* as follows:

#### PART I

*Article 1*

1. For the purposes of this Convention, the term "torture" means any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. It does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions.

2. This article is without prejudice to any international instrument or national legislation which does or may contain provisions of wider application.

*Article 2*

1. Each State Party shall take effective legislative, administrative, judicial or other measures to prevent acts of torture in any territory under its jurisdiction.

2. No exceptional circumstances whatsoever, whether a state of war or a threat of war, internal political instability or any other public emergency, may be invoked as a justification of torture.

3. An order from a superior officer or a public authority may not be invoked as a justification of torture.

---

57 E/CN.4/1984/72.
58 Resolution 217 A (III).

59 See resolution 2200 A (XXI), annex.
60 Resolution 3452 (XXX), annex.

AR.07907

*Article 3*

1. No State Party shall expel, return ("*refouler*") or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture.

2. For the purpose of determining whether there are such grounds, the competent authorities shall take into account all relevant considerations including, where applicable, the existence in the State concerned of a consistent pattern of gross, flagrant or mass violations of human rights.

*Article 4*

1. Each State Party shall ensure that all acts of torture are offences under its criminal law. The same shall apply to an attempt to commit torture and to an act by any person which constitutes complicity or participation in torture.

2. Each State Party shall make these offences punishable by appropriate penalties which take into account their grave nature.

*Article 5*

1. Each State Party shall take such measures as may be necessary to establish its jurisdiction over the offences referred to in article 4 in the following cases:

(*a*) When the offences are committed in any territory under its jurisdiction or on board a ship or aircraft registered in that State;

(*b*) When the alleged offender is a national of that State;

(*c*) When the victim is a national of that State if that State considers it appropriate.

2. Each State Party shall likewise take such measures as may be necessary to establish its jurisdiction over such offences in cases where the alleged offender is present in any territory under its jurisdiction and it does not extradite him pursuant to article 8 to any of the States mentioned in paragraph 1 of this article.

3. This Convention does not exclude any criminal jurisdiction exercised in accordance with internal law.

*Article 6*

1. Upon being satisfied, after an examination of information available to it, that the circumstances so warrant, any State Party in whose territory a person alleged to have committed any offence referred to in article 4 is present shall take him into custody or take other legal measures to ensure his presence. The custody and other legal measures shall be as provided in the law of that State but may be continued only for such time as is necessary to enable any criminal or extradition proceedings to be instituted.

2. Such State shall immediately make a preliminary inquiry into the facts.

3. Any person in custody pursuant to paragraph 1 of this article shall be assisted in communicating immediately with the nearest appropriate representative of the State of which he is a national, or, if he is a stateless person, with the representative of the State where he usually resides.

4. When a State, pursuant to this article, has taken a person into custody, it shall immediately notify the States referred to in article 5, paragraph 1, of the fact that such person is in custody and of the circumstances which warrant his detention. The State which makes the preliminary inquiry contemplated in paragraph 2 of this article shall promptly report its findings to the said States and shall indicate whether it intends to exercise jurisdiction.

*Article 7*

1. The State Party in the territory under whose jurisdiction a person alleged to have committed any offence referred to in article 4 is found shall in the cases contemplated in article 5, if it does not extradite him, submit the case to its competent authorities for the purpose of prosecution.

2. These authorities shall take their decision in the same manner as in the case of any ordinary offence of a serious nature under the law of that State. In the cases referred to in article 5, paragraph 2, the standards of evidence required for prosecution and conviction shall in no way be less stringent than those which apply in the cases referred to in article 5, paragraph 1.

3. Any person regarding whom proceedings are brought in connection with any of the offences referred to in article 4 shall be guaranteed fair treatment at all stages of the proceedings.

*Article 8*

1. The offences referred to in article 4 shall be deemed to be included as extraditable offences in any extradition treaty existing between States Parties. States Parties undertake to include such offences as extraditable offences in every extradition treaty to be concluded between them.

2. If a State Party which makes extradition conditional on the existence of a treaty receives a request for extradition from another State Party with which it has no extradition treaty, it may consider this Convention as the

legal basis for extradition in respect of such offences. Extradition shall be subject to the other conditions provided by the law of the requested State.

3. States Parties which do not make extradition conditional on the existence of a treaty shall recognize such offences as extraditable offences between themselves subject to the conditions provided by the law of the requested State.

4. Such offences shall be treated, for the purpose of extradition between States Parties, as if they had been committed not only in the place in which they occurred but also in the territories of the States required to establish their jurisdiction in accordance with article 5, paragraph 1.

*Article 9*

1. States Parties shall afford one another the greatest measure of assistance in connection with criminal proceedings brought in respect of any of the offences referred to in article 4, including the supply of all evidence at their disposal necessary for the proceedings.

2. States Parties shall carry out their obligations under paragraph 1 of this article in conformity with any treaties on mutual judicial assistance that may exist between them.

*Article 10*

1. Each State Party shall ensure that education and information regarding the prohibition against torture are fully included in the training of law enforcement personnel, civil or military, medical personnel, public officials and other persons who may be involved in the custody, interrogation or treatment of any individual subjected to any form of arrest, detention or imprisonment.

2. Each State Party shall include this prohibition in the rules or instructions issued in regard to the duties and functions of any such persons.

*Article 11*

Each State Party shall keep under systematic review interrogation rules, instructions, methods and practices as well as arrangements for the custody and treatment of persons subjected to any form of arrest, detention or imprisonment in any territory under its jurisdiction, with a view to preventing any cases of torture.

*Article 12*

Each State Party shall ensure that its competent authorities proceed to a prompt and impartial investigation, wherever there is reasonable ground to believe that an act of torture has been committed in any territory under its jurisdiction.

*Article 13*

Each State Party shall ensure that any individual who alleges he has been subjected to torture in any territory under its jurisdiction has the right to complain to, and to have his case promptly and impartially examined by, its competent authorities. Steps shall be taken to ensure that the complainant and witnesses are protected against all ill-treatment or intimidation as a consequence of his complaint or any evidence given.

*Article 14*

1. Each State Party shall ensure in its legal system that the victim of an act of torture obtains redress and has an enforceable right to fair and adequate compensation, including the means for as full rehabilitation as possible. In the event of the death of the victim as a result of an act of torture, his dependants shall be entitled to compensation.

2. Nothing in this article shall affect any right of the victim or other persons to compensation which may exist under national law.

*Article 15*

Each State Party shall ensure that any statement which is established to have been made as a result of torture shall not be invoked as evidence in any proceedings, except against a person accused of torture as evidence that the statement was made.

*Article 16*

1. Each State Party shall undertake to prevent in any territory under its jurisdiction other acts of cruel, inhuman or degrading treatment or punishment which do not amount to torture as defined in article 1, when such acts are committed by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. In particular, the obligations contained in articles 10, 11, 12 and 13 shall apply with the substitution for references to torture of references to other forms of cruel, inhuman or degrading treatment or punishment.

2. The provisions of this Convention are without prejudice to the provisions of any other international instrument or national law which prohibits cruel, inhuman or degrading treatment or punishment or which relates to extradition or expulsion.

PART II

*Article 17*

1.  There shall be established a Committee against Torture (hereinafter referred to as the Committee) which shall carry out the functions hereinafter provided. The Committee shall consist of ten experts of high moral standing and recognized competence in the field of human rights, who shall serve in their personal capacity. The experts shall be elected by the States Parties, consideration being given to equitable geographical distribution and to the usefulness of the participation of some persons having legal experience.

2.  The members of the Committee shall be elected by secret ballot from a list of persons nominated by States Parties. Each State Party may nominate one person from among its own nationals. States Parties shall bear in mind the usefulness of nominating persons who are also members of the Human Rights Committee established under the International Covenant on Civil and Political Rights and who are willing to serve on the Committee against Torture.

3.  Elections of the members of the Committee shall be held at biennial meetings of States Parties convened by the Secretary-General of the United Nations. At those meetings, for which two thirds of the States Parties shall constitute a quorum, the persons elected to the Committee shall be those who obtain the largest number of votes and an absolute majority of the votes of the representatives of States Parties present and voting.

4.  The initial election shall be held no later than six months after the date of the entry into force of this Convention. At least four months before the date of each election, the Secretary-General of the United Nations shall address a letter to the States Parties inviting them to submit their nominations within three months. The Secretary-General shall prepare a list in alphabetical order of all persons thus nominated, indicating the States Parties which have nominated them, and shall submit it to the States Parties.

5.  The members of the Committee shall be elected for a term of four years. They shall be eligible for re-election if renominated. However, the term of five of the members elected at the first election shall expire at the end of two years; immediately after the first election the names of these five members shall be chosen by lot by the chairman of the meeting referred to in paragraph 3 of this article.

6.  If a member of the Committee dies or resigns or for any other cause can no longer perform his Committee duties, the State Party which nominated him shall appoint another expert from among its nationals to serve for the remainder of his term, subject to the approval of the majority of the States Parties. The approval shall be considered given unless half or more of the States Parties respond negatively within six weeks after having been informed by the Secretary-General of the United Nations of the proposed appointment.

7.  States Parties shall be responsible for the expenses of the members of the Committee while they are in performance of Committee duties.

*Article 18*

1.  The Committee shall elect its officers for a term of two years. They may be re-elected.

2.  The Committee shall establish its own rules of procedure, but these rules shall provide, *inter alia*, that:

(*a*)  Six members shall constitute a quorum;

(*b*)  Decisions of the Committee shall be made by a majority vote of the members present.

3.  The Secretary-General of the United Nations shall provide the necessary staff and facilities for the effective performance of the functions of the Committee under this Convention.

4.  The Secretary-General of the United Nations shall convene the initial meeting of the Committee. After its initial meeting, the Committee shall meet at such times as shall be provided in its rules of procedure.

5.  The States Parties shall be responsible for expenses incurred in connection with the holding of meetings of the States Parties and of the Committee, including reimbursement to the United Nations for any expenses, such as the cost of staff and facilities, incurred by the United Nations pursuant to paragraph 3 of this article.

*Article 19*

1.  The States Parties shall submit to the Committee, through the Secretary-General of the United Nations, reports on the measures they have taken to give effect to their undertakings under this Convention, within one year after the entry into force of the Convention for the State Party concerned. Thereafter the States Parties shall submit supplementary reports every four years on any new measures taken and such other reports as the Committee may request.

2.  The Secretary-General of the United Nations shall transmit the reports to all States Parties.

3.  Each report shall be considered by the Committee which may make such general comments on the report as it may consider appropriate and shall forward these to the State Party concerned. That State Party may respond with any observations it chooses to the Committee.

4.  The Committee may, at its discretion, decide to include any comments made by it in accordance with paragraph 3 of this article, together with the observations thereon received from the State Party concerned, in its annual report made in accordance with article 24. If so requested by the State Party concerned, the Committee may also include a copy of the report submitted under paragraph 1 of this article.

*Article 20*

1.  If the Committee receives reliable information which appears to it to contain well-founded indications that torture is being systematically practised in the territory of a State Party, the Committee shall invite that State Party to co-operate in the examination of the information and to this end to submit observations with regard to the information concerned.

2.  Taking into account any observations which may have been submitted by the State Party concerned, as well as any other relevant information available to it, the Committee may, if it decides that this is warranted, designate one or more of its members to make a confidential inquiry and to report to the Committee urgently.

3.  If an inquiry is made in accordance with paragraph 2 of this article, the Committee shall seek the co-operation of the State Party concerned. In agreement with that State Party, such an inquiry may include a visit to its territory.

4.  After examining the findings of its member or members submitted in accordance with paragraph 2 of this article, the Committee shall transmit these findings to the State Party concerned together with any comments or suggestions which seem appropriate in view of the situation.

5.  All the proceedings of the Committee referred to in paragraphs 1 to 4 of this article shall be confidential, and at all stages of the proceedings the co-operation of the State Party shall be sought. After such proceedings have been completed with regard to an inquiry made in accordance with paragraph 2, the Committee may, after consultations with the State Party concerned, decide to include a summary account of the results of the proceedings in its annual report made in accordance with article 24.

*Article 21*

1.  A State Party to this Convention may at any time declare under this article that it recognizes the competence of the Committee to receive and consider communications to the effect that a State Party claims that another State Party is not fulfilling its obligations under this Convention. Such communications may be received and considered according to the procedures laid down in this article only if submitted by a State Party which has made a declaration recognizing in regard to itself the competence of the Committee. No communication shall be dealt with by the Committee under this article if it concerns a State Party which has not made such a declaration. Communications received under this article shall be dealt with in accordance with the following procedure:

(*a*)  If a State Party considers that another State Party is not giving effect to the provisions of this Convention, it may, by written communication, bring the matter to the attention of that State Party. Within three months after the receipt of the communication the receiving State shall afford the State which sent the communication an explanation or any other statement in writing clarifying the matter, which should include, to the extent possible and pertinent, reference to domestic procedures and remedies taken, pending or available in the matter;

(*b*)  If the matter is not adjusted to the satisfaction of both States Parties concerned within six months after the receipt by the receiving State of the initial communication, either State shall have the right to refer the matter to the Committee, by notice given to the Committee and to the other State;

(*c*)  The Committee shall deal with a matter referred to it under this article only after it has ascertained that all domestic remedies have been invoked and exhausted in the matter, in conformity with the generally recognized principles of international law. This shall not be the rule where the application of the remedies is unreasonably prolonged or is unlikely to bring effective relief to the person who is the victim of the violation of this Convention;

(*d*)  The Committee shall hold closed meetings when examining communications under this article;

(*e*)  Subject to the provisions of subparagraph (*c*), the Committee shall make available its good offices to the States Parties concerned with a view to a friendly solution of the matter on the basis of respect for the obliga-

tions provided for in this Convention. For this purpose, the Committee may, when appropriate, set up an *ad hoc* conciliation commission;

(*f*) In any matter referred to it under this article, the Committee may call upon the States Parties concerned, referred to in subparagraph (*b*), to supply any relevant information;

(*g*) The States Parties concerned, referred to in subparagraph (*b*), shall have the right to be represented when the matter is being considered by the Committee and to make submissions orally and/or in writing;

(*h*) The Committee shall, within twelve months after the date of receipt of notice under subparagraph (*b*), submit a report:

(i) If a solution within the terms of subparagraph (*e*) is reached, the Committee shall confine its report to a brief statement of the facts and of the solution reached;

(ii) If a solution within the terms of subparagraph (*e*) is not reached, the Committee shall confine its report to a brief statement of the facts; the written submissions and record of the oral submissions made by the States Parties concerned shall be attached to the report. In every matter, the report shall be communicated to the States Parties concerned.

2. The provisions of this article shall come into force when five States Parties to this Convention have made declarations under paragraph 1 of this article. Such declarations shall be deposited by the States Parties with the Secretary-General of the United Nations, who shall transmit copies thereof to the other States Parties. A declaration may be withdrawn at any time by notification to the Secretary-General. Such a withdrawal shall not prejudice the consideration of any matter which is the subject of a communication already transmitted under this article; no further communication by any State Party shall be received under this article after the notification of withdrawal of the declaration has been received by the Secretary-General, unless the State Party concerned has made a new declaration.

### Article 22

1. A State Party to this Convention may at any time declare under this article that it recognizes the competence of the Committee to receive and consider communications from or on behalf of individuals subject to its jurisdiction who claim to be victims of a violation by a State Party of the provisions of the Convention. No communication shall be received by the Committee if it concerns a State Party which has not made such a declaration.

2. The Committee shall consider inadmissible any communication under this article which is anonymous or which it considers to be an abuse of the right of submission of such communications or to be incompatible with the provisions of this Convention.

3. Subject to the provisions of paragraph 2, the Committee shall bring any communications submitted to it under this article to the attention of the State Party to this Convention which has made a declaration under paragraph 1 and is alleged to be violating any provisions of the Convention. Within six months, the receiving State shall submit to the Committee written explanations or statements clarifying the matter and the remedy, if any, that may have been taken by that State.

4. The Committee shall consider communications received under this article in the light of all information made available to it by or on behalf of the individual and by the State Party concerned.

5. The Committee shall not consider any communications from an individual under this article unless it has ascertained that:

(*a*) The same matter has not been, and is not being, examined under another procedure of international investigation or settlement;

(*b*) The individual has exhausted all available domestic remedies; this shall not be the rule where the application of the remedies is unreasonably prolonged or is unlikely to bring effective relief to the person who is the victim of the violation of this Convention.

6. The Committee shall hold closed meetings when examining communications under this article.

7. The Committee shall forward its views to the State Party concerned and to the individual.

8. The provisions of this article shall come into force when five States Parties to this Convention have made declarations under paragraph 1 of this article. Such declarations shall be deposited by the States Parties with the Secretary-General of the United Nations, who shall transmit copies thereof to the other States Parties. A declaration may be withdrawn at any time by notification to the Secretary-General. Such a withdrawal shall not prejudice the consideration of any matter which is the subject of a communication already transmitted under this article; no further communication

by or on behalf of an individual shall be received under this article after the notification of withdrawal of the declaration has been received by the Secretary-General, unless the State Party has made a new declaration.

### Article 23

The members of the Committee and of the *ad hoc* conciliation commissions which may be appointed under article 21, paragraph 1 (*e*), shall be entitled to the facilities, privileges and immunities of experts on mission for the United Nations as laid down in the relevant sections of the Convention on the Privileges and Immunities of the United Nations.[61]

### Article 24

The Committee shall submit an annual report on its activities under this Convention to the States Parties and to the General Assembly of the United Nations.

## PART III

### Article 25

1. This Convention is open for signature by all States.

2. This Convention is subject to ratification. Instruments of ratification shall be deposited with the Secretary-General of the United Nations.

### Article 26

This Convention is open to accession by all States. Accession shall be effected by the deposit of an instrument of accession with the Secretary-General of the United Nations.

### Article 27

1. This Convention shall enter into force on the thirtieth day after the date of the deposit with the Secretary-General of the United Nations of the twentieth instrument of ratification or accession.

2. For each State ratifying this Convention or acceding to it after the deposit of the twentieth instrument of ratification or accession, the Convention shall enter into force on the thirtieth day after the date of the deposit of its own instrument of ratification or accession.

### Article 28

1. Each State may, at the time of signature or ratification of this Convention or accession thereto, declare that it does not recognize the competence of the Committee provided for in article 20.

2. Any State Party having made a reservation in accordance with paragraph 1 of this article may, at any time, withdraw this reservation by notification to the Secretary-General of the United Nations.

### Article 29

1. Any State Party to this Convention may propose an amendment and file it with the Secretary-General of the United Nations. The Secretary-General shall thereupon communicate the proposed amendment to the States Parties with a request that they notify him whether they favour a conference of States Parties for the purpose of considering and voting upon the proposal. In the event that within four months from the date of such communication at least one third of the States Parties favours such a conference, the Secretary-General shall convene the conference under the auspices of the United Nations. Any amendment adopted by a majority of the States Parties present and voting at the conference shall be submitted by the Secretary-General to all the States Parties for acceptance.

2. An amendment adopted in accordance with paragraph 1 of this article shall enter into force when two thirds of the States Parties to this Convention have notified the Secretary-General of the United Nations that they have accepted it in accordance with their respective constitutional processes.

3. When amendments enter into force, they shall be binding on those States Parties which have accepted them, other States Parties still being bound by the provisions of this Convention and any earlier amendments which they have accepted.

### Article 30

1. Any dispute between two or more States Parties concerning the interpretation or application of this Convention which cannot be settled through negotiation shall, at the request of one of them, be submitted to arbitration. If within six months from the date of the request for arbitration the Parties are unable to agree on the organization of the arbitration, any one of those Parties may refer the dispute to the International Court of Justice by request in conformity with the Statute of the Court.

2. Each State may, at the time of signature or ratification of this Convention or accession thereto, declare that it does not consider itself bound

---

[61] Resolution 22 A (I).

AR.07910

by paragraph 1 of this article. The other States Parties shall not be bound by paragraph 1 of this article with respect to any State Party having made such a reservation.

3. Any State Party having made a reservation in accordance with paragraph 2 of this article may at any time withdraw this reservation by notification to the Secretary-General of the United Nations.

*Article 31*

1. A State Party may denounce this Convention by written notification to the Secretary-General of the United Nations. Denunciation becomes effective one year after the date of receipt of the notification by the Secretary-General.

2. Such a denunciation shall not have the effect of releasing the State Party from its obligations under this Convention in regard to any act or omission which occurs prior to the date at which the denunciation becomes effective, nor shall denunciation prejudice in any way the continued consideration of any matter which is already under consideration by the Committee prior to the date at which the denunciation becomes effective.

3. Following the date at which the denunciation of a State Party becomes effective, the Committee shall not commence consideration of any new matter regarding that State.

*Article 32*

The Secretary-General of the United Nations shall inform all States Members of the United Nations and all States which have signed this Convention or acceded to it of the following:

(a) Signatures, ratifications and accessions under articles 25 and 26;

(b) The date of entry into force of this Convention under article 27 and the date of the entry into force of any amendments under article 29;

(c) Denunciations under article 31.

*Article 33*

1. This Convention, of which the Arabic, Chinese, English, French, Russian and Spanish texts are equally authentic, shall be deposited with the Secretary-General of the United Nations.

2. The Secretary-General of the United Nations shall transmit certified copies of this Convention to all States.

## 39/102. Measures to improve the situation and ensure the human rights and dignity of all migrant workers

*The General Assembly,*

*Reaffirming once more* the permanent validity of the principles and standards embodied in the basic instruments regarding the international protection of human rights, in particular in the Universal Declaration of Human Rights,[62] the International Covenants on Human Rights,[63] the International Convention on the Elimination of All Forms of Racial Discrimination[64] and the Convention on the Elimination of All Forms of Discrimination against Women,[65]

*Bearing in mind* the principles and standards established within the framework of the International Labour Organisation and the United Nations Educational, Scientific and Cultural Organization, and the importance of the task carried out in connection with migrant workers and their families in other specialized agencies and in various organs of the United Nations,

*Reiterating* that, in spite of the existence of an already established body of principles and standards, there is a need to make further efforts to improve the situation and ensure the human rights and dignity of all migrant workers and their families,

*Recalling* its resolution 34/172 of 17 December 1979, by which it decided to establish a working group open to all Member States to elaborate an international conven-

tion on the protection of the rights of all migrant workers and their families,

*Recalling also* its resolutions 35/198 of 15 December 1980, 36/160 of 16 December 1981, 37/170 of 17 December 1982 and 38/86 of 16 December 1983, by which it renewed the mandate of the Working Group on the Drafting of an International Convention on the Protection of the Rights of All Migrant Workers and Their Families and requested it to continue its work,

*Having examined* the progress made by the Working Group during its fourth inter-sessional meeting,[66] held from 29 May to 8 June 1984, as well as the report of the Working Group during the current session of the General Assembly,[67] during which the Working Group concluded the first reading of the draft convention,

1. *Takes note with satisfaction* of the reports of the Working Group on the Drafting of an International Convention on the Protection of the Rights of All Migrant Workers and Their Families and commends it for concluding, in its first reading, the drafting of the preamble and articles, which will serve as the basis for the second reading of the draft convention;

2. *Decides* that, in order to enable it to complete its task as soon as possible, the Working Group shall again hold an inter-sessional meeting of two weeks' duration in New York, immediately after the first regular session of 1985 of the Economic and Social Council;

3. *Invites* the Secretary-General to transmit to Governments the reports of the Working Group so as to enable the members of the Group to undertake the second reading of the preamble and the articles during the inter-sessional meeting to be held in the spring of 1985, as well as to transmit the results obtained at that meeting to the General Assembly for consideration during its fortieth session;

4. *Also invites* the Secretary-General to transmit the above-mentioned documents to the competent organs of the United Nations and to international organizations concerned, for their information, so as to enable them to continue their co-operation with the Working Group;

5. *Decides* that the Working Group shall meet during the fortieth session of the General Assembly, preferably at the beginning of the session, to continue the second reading of the draft international convention on the protection of the rights of all migrant workers and their families.

*101st plenary meeting*
*14 December 1984*

## 39/103. Question of the international legal protection of the human rights of individuals who are not citizens of the country in which they live

*The General Assembly,*

*Bearing in mind* Economic and Social Council resolutions 1790 (LIV) of 18 May 1973 and 1871 (LVI) of 17 May 1974 concerning the question of the international legal protection of the human rights of individuals who are not citizens of the country in which they live,

*Recalling* Commission on Human Rights resolutions 8 (XXIX) of 21 March 1973,[68] 11 (XXX) of 6 March

---

[62] Resolution 217 A (III).
[63] Resolution 2200 A (XXI), annex.
[64] Resolution 2106 A (XX), annex.
[65] Resolution 34/180, annex.

[66] See A/C.3/39/1.
[67] A/C.3/39/4 and Corr.1.
[68] See *Official Records of the Economic and Social Council, Fifty-fourth Session, Supplement No. 6* (E/5265), chap. XX, sect. A.



# Errors and Fraud in the Supplemental Nutrition Assistance Program (SNAP)

**Randy Alison Aussenberg**
Specialist in Nutrition Assistance Policy

Updated September 28, 2018

**Congressional Research Service**
7-5700
www.crs.gov
R45147

**CRS REPORT**
Prepared for Members and
Committees of Congress

AR.07912

# Summary

The Supplemental Nutrition Assistance Program (SNAP) is the nation's largest domestic food assistance program, serving over 42.1 million recipients in an average month at a federal cost of over $68 billion in FY2017. SNAP is jointly administered by state agencies, which handle most recipient functions, and the federal government—specifically, the U.S. Department of Agriculture's Food and Nutrition Service (USDA-FNS)—which supports and oversees the states and handles most retailer functions. In a program with diverse stakeholders, detecting, preventing, and addressing errors and fraud is complex. SNAP has typically been reauthorized in a farm bill approximately every five years; this occurred most recently in 2014 (P.L. 113-79). Policymakers have long been interested in reducing fraud and improving payment accuracy in the program. Provisions related to these goals have been included in past farm bill reauthorizations and may be considered for the next farm bill, expected in 2018.

There are four main types of inaccuracy and misconduct in SNAP:

- *Trafficking SNAP benefits* is the illicit sale of SNAP benefits, which can involve both retailers and recipients.
- *Retailer application fraud* generally involves an illicit attempt by a store owner to participate in SNAP when the store or owner is not eligible.
- *Errors and fraud by households applying for SNAP benefits* can result in improper payments. Errors are unintentional, while fraud is the intentional violation of program rules.
- *Errors and fraud by state agencies*—agency errors can result in inadvertent improper payments; the discussion of agency fraud largely focuses on certain states' Quality Control (QC) misconduct.

Certain key ideas are fundamental to any discussion of SNAP errors and fraud:

- Errors are not the same as fraud. Fraud is intentional activity that breaks federal and/or state laws, while errors can be the result of unintentional mistakes. Certain acts, such as trafficking SNAP benefits, are always considered fraud; other acts, such as duplicate enrollment, may be the result of either error or fraud depending on the circumstances of the case.
- SNAP fraud is relatively rare, according to available data and reports.
- There is no single measure that reflects all the forms of fraud in SNAP. There are some frequently cited measures that capture some parts of the issue, and there are relevant data from federal and state agencies' enforcement efforts.

The most frequently cited measure of fraud is the national retailer trafficking rate, which estimated that 1.5% of SNAP benefits redeemed from FY2012-FY2014 were trafficked. While the national retailer trafficking rate (which is issued roughly every three years) estimates the extent of retailer trafficking, there is not a standard recipient trafficking rate, nor is there an overall recipient fraud rate.

USDA-FNS is responsible for identifying stores engaged in retailer trafficking—using transaction data analysis, undercover investigations, and other tools—and imposing penalties on store owners who commit violations. Retailers found to have trafficked may be subject to permanent disqualification from participation in SNAP, fines, and other penalties. USDA-FNS also works to identify fraud by retailers applying to accept SNAP benefits. Retailers found to have falsified their applications may be subject to denial, permanent disqualification, and other penalties.

While retailer trafficking and retailer application fraud are primarily pursued by a single federal entity (USDA-FNS), recipient violations (i.e., recipient trafficking and recipient application fraud) are pursued by 53 different state agencies. Recipients found to have trafficked may be required to repay the amount trafficked and may be subject to disqualification from receiving SNAP benefits and other penalties. State agencies' efforts to reduce and punish recipient fraud vary, which is evident, for instance, in state-submitted data on recipient disqualification activities.

The national payment error rate (NPER) is the most-cited measure of nationwide payment accuracy. Using USDA-FNS's Quality Control (QC) system, the NPER estimates states' accuracy in determining eligibility and benefit amounts. The NPER has limitations, though; for instance, it only reflects errors above a threshold amount ($38 in FY2017). After publishing a FY2014 NPER, USDA Office of the Inspector General (OIG ) and USDA-FNS identified data quality issues that prevented the publication of an NPER in FY2015 and FY2016, but USDA-FNS published a NPER for FY2017 in June 2018. For FY2017, it was estimated that 6.30% of SNAP benefit issuance was improper—including a 5.19% overpayment rate and a 1.11% underpayment rate. Regardless of the cause of an overpayment, SNAP agencies are required to work toward recovering excess benefits from households that were overpaid (this is referred to as "establishing a claim against a household"). Applying these rates to benefits issued in FY2017 (over $63.6 billion), an estimated $3.30 billion in benefits were overpaid, and about $710 million in benefits were underpaid.

Overpayments and underpayments to households can be the result of recipient errors, recipient fraud, or agency errors during the certification process. State agencies rely on household-provided information in applications, but also employ a range of data matches—some required by federal law, some optional that vary by state—to promote accuracy and double-check information. According to the USDA-FNS FY2016 State Activity Report, of states' established claims for overpayment, approximately 62% of overpayment claim dollars were for recipient errors, about 28% were for agency errors, and about 11% were due to recipient fraud.

In addition to inadvertent agency errors, state agencies and their agents have been involved in isolated instances of fraud. Beyond cases of fraud conducted by state agency employees for personal gain, in FY2017 the Department of Justice obtained False Claim Act settlements from three state agencies accused of falsifying their Quality Control data and unlawfully obtaining federal bonuses. Investigations into this matter, conducted by the USDA-OIG, are ongoing.

Across all types of fraud, oversight entities such as the Government Accountability Office and USDA-OIG have identified issues and strategies relevant to combating errors and fraud in SNAP. USDA-FNS has also proposed related regulatory changes that were not finalized. On the retailer side, issues identified focus on opportunities to prevent and more promptly punish trafficking. On the recipient side, issues identified include the nonexistence of a recipient fraud rate, states' varied levels of anti-fraud efforts (which may be better incentivized), and improvements to data matching in the application process. During the 115th Congress, Members voted on farm bill proposals that contained some changes to SNAP program integrity policy; these proposals are summarized in CRS Report R45275, *The House and Senate 2018 Farm Bills (H.R. 2): A Side-by-Side Comparison with Current Law*.

Changes that might strengthen payment accuracy and punishments against fraud can be in tension with other policy objectives such as preserving recipient access to the program, and may have unintended consequences such as incurring costs greater than their savings. Balancing program objectives such as these are considerations for policymakers in this area.

# Contents

Introduction ........................................................................................................................... 1

Types of Errors and Fraud ..................................................................................................... 2

    Trafficking: Retailer and Recipient ................................................................................ 3

    Retailer Application Fraud .............................................................................................. 3

    Errors and Fraud in Benefit Issuance to Households ..................................................... 4

        Recipient Errors ........................................................................................................ 4

        Recipient Application Fraud ..................................................................................... 4

        Agency Errors ........................................................................................................... 5

    Fraud Conducted by State Agencies or Their Agents ..................................................... 5

        State Agency Employee Fraud .................................................................................. 5

        State Agency Fraud ................................................................................................... 5

Extent of Errors and Fraud .................................................................................................... 5

    Extent of Retailer Trafficking ........................................................................................ 5

    Extent of Retailer Application Fraud .............................................................................. 7

    Extent of Errors and Fraud in Benefit Issuance to Households ...................................... 8

        National Payment Error Rate .................................................................................... 8

        Differentiating Between Recipient Fraud, Recipient Errors, and Agency Errors ............ 10

Detection and Correction of Errors and Fraud .................................................................... 13

    Retailer Fraud ............................................................................................................... 14

        Detection of Retailer Trafficking ........................................................................... 14

        Correction of Retailer Trafficking.......................................................................... 15

        Detection of Retailer Application Fraud ................................................................. 17

        Correction of Retailer Application Fraud ............................................................... 17

    Errors in Benefit Issuance to Households ..................................................................... 17

        Detection of Recipient Errors—Data Matching...................................................... 17

        Detection of Agency Errors .................................................................................... 21

        Correction of Recipient and Agency Errors—Claims............................................. 21

    Recipient Fraud ............................................................................................................ 22

        Detection of Recipient Fraud .................................................................................. 22

        Correction of Recipient Fraud ................................................................................ 23

    State Agency Employee Fraud Detection and Correction.............................................. 25

State Agency Fraud: SNAP Quality Control ....................................................................... 25

    Quality Control: Incentives and Penalties Overview .................................................... 25

    State Agency Misreporting and Falsification of Quality Control Data .......................... 27

Combating Errors and Fraud: Issues and Strategies............................................................ 29

    Retailer Trafficking ...................................................................................................... 29

        Certain Store Owners Remain Active in SNAP Despite Permanent

            Disqualification for Trafficking ...................................................................... 29

        Strengthening Monetary Penalties against Trafficking Retailers........................... 30

        Changes in EBT Transaction Processing since 2014 ............................................. 31

        Enhancing Retailer Stocking Standards ................................................................. 32

        Suspending "Flagrant" Retailer Traffickers ........................................................... 33

        Increasing Requirements for High-Risk Stores ..................................................... 33

    Recipient Trafficking.................................................................................................... 34

        Requiring Recipient Photographs on EBT Cards.................................................... 34

        State Agency Reporting on Recipient Fraud........................................................... 35

Enhancing Federal Financial Incentives for State Agencies to Fight Fraud ..................... 36
Federal Oversight of State Agencies—Management Evaluations (MEs) ........................ 36
Delayed State Agency Notification of Retailer Trafficking Cases .................................... 37
Difference in Burden of Proof for Retailer Trafficking versus
    Recipient Trafficking ...................................................................................................... 37
Best Practices for Fighting Recipient Fraud—the SNAP Fraud Framework ................... 38
Retailer Application Fraud .......................................................................................................... 38
Verification and Use of Retailer Submitted Social Security Numbers (SSNs) ................ 38
Other Verification of Retailer Submitted Information ...................................................... 39
Mandating Background Checks on High-Risk Retailer Applications ............................... 39
Additional Retailer Application Vulnerabilities Identified in 2012 and 2013
    USDA-FNS Proposed Rules ............................................................................................ 40
Recipient Application Errors and Fraud .................................................................................... 41
Establish Federal Incentives to Conduct Pre-certification Investigations ........................ 41
Difficulties in Collecting Amounts Overpaid to or Trafficked by Recipients .................. 41
Duplicate Enrollment and the National Accuracy Clearinghouse (NAC) ...................... 42
Considerations for Data Matching .................................................................................... 44
State Agency Errors and Fraud .................................................................................................. 45
Modifying State Involvement in the Quality Control System ........................................... 45

# Figures

Figure 1. Authorization and Trafficking at Convenience Stores, 2006-2014 ................................ 7
Figure 2. Claims Establishment by Type, FY2007-FY2016 ........................................................ 13
Figure 3. Data Matching in SNAP Certification ......................................................................... 18
Figure 4. Per Capita Recipient Disqualifications in States .......................................................... 24
Figure 5. Claims Established and Claims Collected as Shares of Estimated Dollars
    Overissued, FY2005-FY2014 ...................................................................................... 42

# Tables

Table 1. National Payment Error Rate, FY2011-FY2014, FY2017 ............................................. 10
Table 2. Bonuses Awarded to States for High Payment Accuracy, FY2014 ............................... 26
Table 3. Penalties Repaid by States for Low Payment Accuracy, FY2005-FY2014 ................... 27

Table B-1. Inactive USDA-FNS Rulemaking Actions Related to SNAP Integrity ..................... 48
Table D-1. Convenience Stores as a Percentage of All Stores in SNAP ..................................... 52
Table D-2. Trafficking Rates in Convenience Stores Compared to the
    National Trafficking Rates .......................................................................................... 52
Table D-3. Convenience Store Redemptions and Trafficking as a Percentage of
    All Redemptions and Trafficking ................................................................................ 53
Table E-1. State Payment Error Rates, FY2010 to FY2014 ........................................................ 54
Table E-2. State Bonuses and Liabilities, FY2010 to FY2014 .................................................... 56

# Appendixes

Appendix A. Glossary of Abbreviations........................................................................ 46

Appendix B. "Inactive" USDA-FNS Rules................................................................... 48

Appendix C. Optional Income Data Matches................................................................ 50

Appendix D. Trends in Retailer Trafficking and Convenience Store Participation in
    SNAP................................................................................................................... 52

Appendix E. Payment Error Rate Information .............................................................. 54

# Contacts

Author Contact Information ........................................................................................ 58

# Introduction

The Supplemental Nutrition Assistance Program (SNAP) is the nation's largest domestic food assistance program, serving about 42.2 million recipients in an average month at a federal cost of over $68 billion in FY2017.[1] It is jointly administered by the federal government and the states and provides means-tested benefits to recipients who are deemed eligible. These benefits may be used only for eligible foods at any of the approximately 260,000 authorized retailers, which range from independent corner stores to national chain supermarkets.[2] In a program that operates with so many different stakeholders, detecting, preventing, and addressing errors and fraud is a complex undertaking. Among the complexities are the monitoring of retailer acceptance and recipient use of benefits, the accuracy of information provided by applicant households, and states' performance administering the program. Many governmental entities—federal and state agencies, including both human services and law enforcement—play a role in efforts to detect, prevent, and punish fraudulent SNAP activities and to reduce inadvertent errors.

SNAP has typically been reauthorized in a farm bill approximately every five years; this occurred most recently in 2014 (P.L. 113-79).[3] Policymakers have long been interested in reducing fraud and improving accuracy in the program, and provisions related to these goals are frequently included in farm bills. In preparation for the next farm bill, up for reauthorization in September 2018, policymakers have again begun to discuss error and fraud in the program.[4] The Trump Administration has also announced related policy changes.[5] At the same time, some policymakers defend the program against criticism of its integrity.[6]

To help policymakers navigate this complex set of policy issues, this report seeks to define terms related to errors and fraud; identify problems and describe what is known of their extent; summarize current policy and practice; and share recommendations, proposals, and pilots that have come up in recent years. The report answers several questions around four main types of inaccuracy and misconduct: (1) trafficking SNAP benefits (by retailers and by recipients); (2) retailer application fraud; (3) errors and fraud in SNAP household applications; and (4) errors and fraud committed by state agencies (including a discussion of states' recent Quality Control (QC) misconduct). The report then discusses challenges to combating errors and fraud—across the four areas—and potential strategies for addressing those challenges.

---

[1] Average monthly participation data and total program cost for FY2017 are from the U.S. Department of Agriculture Food and Nutrition Service (USDA-FNS) administrative data.

[2] For basic information on SNAP eligibility rules, benefit calculation, and benefit redemption, see CRS Report R42505, *Supplemental Nutrition Assistance Program (SNAP): A Primer on Eligibility and Benefits*, by Randy Alison Aussenberg.

[3] For background, see CRS In Focus IF10663, *Farm Bill Primer: SNAP and Other Nutrition Title Programs*, by Randy Alison Aussenberg.

[4] See Chairman K. Michael Conaway, *Past, Present, and Future of SNAP: Hearing Series Findings: 114th Congress*, House Committee on Agriculture, December 7, 2016, pp. 38-48, https://agriculture.house.gov/UploadedFiles/SNAP_Report_2016.pdf.

[5] For information regarding these policy changes, see, for example: December 5, 2017, USDA press release, https://www.usda.gov/media/press-releases/2017/12/05/usda-promises-new-snap-flexibilities-promote-self-sufficiency; and December 8, 2017, USDA press release: https://www.usda.gov/media/press-releases/2017/12/08/usda-clears-arizona-test-snap-fraud-prevention-improvement.

[6] See, for example, Representative Jim McGovern, "U.S. Rep. McGovern's 18th End Hunger Now Speech: Fraud, Waste, Abuse," press release, July 17, 2013, https://mcgovern.house.gov/news/documentsingle.aspx?DocumentID=396547.

Certain key ideas that are fundamental to discussion of SNAP errors and fraud are explored further in the report:

- Errors are not the same as fraud. Fraud is intentional activity that breaks federal and/or state laws, but there are also ways that program stakeholders—particularly recipients and states—may inadvertently err, which could affect benefit amounts. Certain acts, such as trafficking, are always considered fraud, but other acts, such as duplicate enrollment, may be the result of either error or fraud depending on the circumstances of the case.

- SNAP fraud is relatively rare, according to available data and reports. While this report discusses illegal or inaccurate activities in SNAP, they represent a relatively small fraction of SNAP activity overall.

- There is no single data point that reflects all the forms of fraud in SNAP. The most frequently cited measure of fraud is a national estimate of retailer trafficking, which is a significant, but not the only, type of fraud in the program.

- While retailer trafficking and retailer application fraud are pursued primarily by a single federal entity, recipient violations are pursued by 53 different state agencies. This leads to disparate approaches and disparate reporting.[7]

- The national payment error rate (NPER) is the most-often cited measure of nationwide SNAP payment accuracy, but it has limitations. For example, it only reflects errors above an error tolerance threshold.

Policies to reduce fraud and increase accuracy can be in tension with other policy objectives, and may have unintended consequences. Policies that make retailer authorization more onerous, for instance, have the potential to decrease participants' access to SNAP-authorized stores. Making eligibility determinations more complex for recipients can impede recipients' access to the program and could strain states' eligibility determination operations. Implementing better data collection and accountability systems could require more staff and could incur more costs than it reduces.

This report provides a foundation for discussing error and fraud in SNAP and for evaluating policy proposals. It does not make independent CRS findings, but rather synthesizes the many available resources on error and fraud in SNAP. It relies, in particular, on reports and data from the United States Department of Agriculture's Food and Nutrition Service (USDA-FNS) as well as the published audits of the USDA's Office of the Inspector General (USDA-OIG) and the Government Accountability Office (GAO). For a list of abbreviations used in this report, see **Appendix A**.

# Types of Errors and Fraud

This section defines each of the types of intentional fraud and unintentional errors committed by recipients, retailers, and state agencies, including retailer trafficking (fraud), recipient trafficking (fraud), retailer application fraud, recipient application fraud, recipient errors, agency errors, state agency employee fraud, and state agency fraud.

---

[7] 50 states, the District of Columbia, Guam, and the U.S. Virgin Islands administer SNAP.

## Trafficking: Retailer and Recipient

USDA-FNS is responsible for administering the retailer side of SNAP and for pursuing retailer fraud; while states are responsible for administering the recipient side of SNAP (with federal oversight) and for pursuing recipient fraud.[8] "Trafficking" usually means the direct exchange of SNAP benefits (formerly known as food stamps) for cash, which is illegal, and both retailers and recipients can engage in this form of fraud.[9] Although SNAP benefits have a dollar value, they are not the same as cash because they can only be spent on eligible food for household consumption at authorized stores equipped with Electronic Benefit Transfer (EBT) point of sale (POS) machines.[10] Trafficking can also include the exchange of SNAP benefits for controlled substances, firearms, ammunition, or explosives.[11] Additionally, trafficking includes indirect exchanges, such as obtaining cash refunds for products purchased with SNAP benefits or reselling products purchased with SNAP benefits. Trafficking SNAP benefits includes recipient trafficking and retailer trafficking. Retailer trafficking of SNAP benefits usually occurs when a SNAP recipient sells their benefits for cash, often at a loss, to an owner or employee of a store participating in SNAP.[12] Recipient trafficking usually coincides with retailer trafficking, but it may take other forms (e.g., if a recipient were to sell their benefits, or food purchased with benefits, to another individual). Trafficking is one of the most serious forms of SNAP fraud, and although it does not increase costs to the federal government (as overpayments do), it does divert federal funds from their intended purpose.

## Retailer Application Fraud

Retailers misrepresenting themselves or circumventing disqualification in the application process can be a source of fraud. To obtain SNAP authorization, applicant retailers must meet certain requirements, including stocking[13] and business integrity standards.[14] When a retailer initially applies to receive authorization to participate in SNAP or applies for reauthorization to continue SNAP participation,[15] the store owner must submit personal and business information and documentation to USDA-FNS in order to verify eligibility for SNAP participation. If a retailer

---

[8] Sections 9, 12, and 15 of the Food and Nutrition Act of 2008 (FNA) outline the requirement that USDA-FNS administer SNAP on the retailer side; Section 11 outlines the requirement that states administer SNAP on the recipient side.

[9] For the full definition of trafficking, see 7 C.F.R. §271.2.

[10] Stores authorized to participate in SNAP are required to ensure that SNAP benefits are accepted as payment only for eligible food. Many, but not all, stores ensure compliance by programming their point of sale systems to recognize the SNAP eligibility of products at the checkout counter, thereby preventing the use of SNAP benefits to pay for ineligible products.

[11] Controlled substances as defined at 21 U.S.C. §802.

[12] For example, a recipient swipes their SNAP EBT card for a $20 purchase transaction, but rather than receiving $20 of eligible food, the recipient obtains $10 in cash from the store owner. The total amount of the transaction ($20) is deposited into the store owner's bank account. In this example, both the recipient and retailer are engaged in trafficking SNAP benefits.

[13] SNAP stocking standards may be met with either a range of different staple foods on hand or documentation reflecting more than 50% of store sales in staple foods. For more information, see CRS Report R42505, *Supplemental Nutrition Assistance Program (SNAP): A Primer on Eligibility and Benefits*, by Randy Alison Aussenberg.

[14] SNAP business integrity standards require that store owners do *not* have a history of certain convictions, civil judgments, and violations. Section 9(a)(1)(D) of the FNA (codified at 7 U.S.C. §2018(a)(1)(D) and implemented at 7 C.F.R §278.1(b)(3)).

[15] Stores participating in SNAP must apply for reauthorization on a regular basis. Depending on risk level and other factors, stores are reconsidered on reauthorization cycles that vary from one to five years.

deliberately submits false or misleading information of a substantive nature in order to receive SNAP authorization despite their ineligibility, then they have committed falsification—retailer application fraud.[16] Another kind of retailer application fraud involves a store owner attempting to circumvent disqualification from SNAP by engaging in a purported sale or transfer of ownership of their store to a spouse or relative; after which the new purported owner applies to participate in SNAP, claiming that the former disqualified owners are no longer associated with the store. This practice is often referred to as "straw ownership," and USDA-FNS does not consider such sales or transfers of ownership to be bona fide.[17] Such actions by the disqualified retailer are considered circumvention—retailer application fraud.[18] Retailer application fraud does not increase costs to the federal government (as overpayments can), but it does enable retailers who may be more likely to engage in trafficking to enter the program.

## Errors and Fraud in Benefit Issuance to Households

In addition to retailer trafficking and retailer application fraud, errors and fraud can arise in determining eligibility and benefit amounts for recipients.

### Recipient Errors

When a household initially applies to receive or recertifies to continue receiving SNAP benefits, the applicant household must submit personal information and documentation to their state agency for eligibility determination, and for benefit calculation if found to be eligible. During this application process, an applicant may misunderstand SNAP rules, make a miscalculation, otherwise unintentionally provide incorrect information, or accidentally omit certain information. If this error results in an overpayment to the household and there is no proof that this error was *intentional*, then this error is designated as an inadvertent household error (IHE).[19]

### Recipient Application Fraud

If an applicant is found to have intentionally submitted false or misleading information during the initial application or recertification process that leads to an incorrect eligibility or allotment determination (resulting in an overpayment), then that applicant has committed an intentional program violation (IPV)—recipient application fraud.[20]

---

[16] Examples of falsification include providing USDA-FNS with a fake Social Security Number (SSN) for a store owner, untruthfully attesting that a store owner had never been convicted of a crime, or providing forged records indicating an inventory of foodstuffs not stocked at the store.

[17] A "straw owner" is an individual who legally owns property, or has the legal appearance of owning property, on behalf of another individual, sometimes for a fee. Typically, such arrangements are conducted solely to hide the identity of the effective owner.

[18] U.S. Department of Agriculture, Office of the Inspector General, *FNS: Controls for Authorizing Supplemental Nutrition Assistance Program Retailers*, Audit Report 27601-0001-31, July 2013, pp. 3-4, https://www.usda.gov/oig/webdocs/27601-0001-31.pdf (hereinafter cited as "July 2013 USDA-OIG report").

[19] Inadvertent household errors are sometimes referred to as unintentional program violations (UPVs).

[20] This is also referred to as "eligibility fraud" although recipient application fraud can involve recipients falsifying information pertaining to eligibility as well as income. See Section 6(b) of the FNA (codified at 7 U.S.C. §2015(b) and implemented at 7 C.F.R. §273.16).

### Agency Errors

SNAP overpayments or underpayments that are *not* the result of recipient actions (i.e., not the result of recipient errors or recipient fraud) are generally the result of agency errors (AEs).[21] Agency errors include overpayments or underpayments caused by the action of, or failure to take action by, any representative of a state agency.

## Fraud Conducted by State Agencies or Their Agents

"State agency employee fraud" and "state agency fraud" are not terms defined in statute, regulation, or agency guidance. As used in this report, "state agency employee fraud" and "state agency fraud" include forms of fraud often referred to as "insider threats"—a threat to SNAP integrity that comes from within entities that administer SNAP (i.e., state agencies).

### State Agency Employee Fraud

State agency employee fraud is any intentional effort by state employees to illegally generate and benefit from SNAP overpayments. State agency employee fraud usually involves eligibility workers who abuse their positions and access to the SNAP certification process in order to unlawfully generate SNAP accounts that materially benefit individuals not entitled to such benefits.

### State Agency Fraud

State agency fraud is any intentional effort by state officials to mislead USDA-FNS or other federal authorities in order to illegally obtain federal funds or avoid federal monetary penalties. State agency fraud cases are very infrequent and generally center on a state's falsification of program-related data. Of interest to policymakers, the state agency fraud case examined in this report, first identified in 2017, deals with multiple states' falsification of Quality Control (QC) data in order to obtain monetary bonuses and avoid monetary penalties, with some actions dating back to 2008.[22] (For more information, see "State Agency Fraud: SNAP Quality Control.")

# Extent of Errors and Fraud

## Extent of Retailer Trafficking

USDA-FNS publishes an annual report that summarizes their annual administrative activities pertaining to retailers participating in SNAP,[23] including detailed retailer data on participation and redemptions, retailer applications and authorizations, investigations and sanctions, and administrative review. According to this Retailer Management Report, in FY2016 there were 260,115 retailers participating in SNAP, and USDA-FNS permanently disqualified 1,842 stores for retailer trafficking (less than 1% of all stores).[24]

Roughly every three years, USDA-FNS publishes a study estimating the extent of retailer trafficking in SNAP over about three years of SNAP redemption data. The retailer trafficking studies referenced in this report were issued in 2017 (covering 2012-2014), 2013

> **National Retailer Trafficking Rate[25]**
>
> The most recent trafficking study (analyzing 2012-2014 data) estimated that 1.50% of all SNAP benefits redeemed were trafficked (sold for cash or exchanged illegally) at stores. This is up from an estimated 1.34% in the 2009-2011 study. This only reflects one type of fraud—retailer trafficking.

(covering 2009-2011), and 2011 (covering 2006-2008).[26] By examining a representative sample, these studies determined two national rates that reflect the prevalence of retailer trafficking. The *national retailer trafficking rate* represents the proportion of SNAP redemptions at stores that were estimated to have been trafficked. The *national store violation rate* represents the proportion of authorized stores that were estimated to have engaged in trafficking.

The national retailer trafficking rate is the most-cited measure of fraud in SNAP, although it does not capture all types of fraud (i.e., it represents only retailer trafficking). According to the September 2017 USDA-FNS Retailer Trafficking Study, the national retailer trafficking rate for 2012-2014 was 1.50%, up from 1.34% in the 2009-2011 study.[27] This means that, during this period, USDA-FNS estimates that 1.50% of all SNAP benefits redeemed were trafficked at participating stores. This constitutes about $1.1 billion in estimated benefits trafficked each year at stores during this period.[28] Additionally, this study estimated that the national store violation rate for this period was 11.82%, up from 10.47% in the 2009-2011 study.[29] This means that, during this period, USDA-FNS estimates that 11.82% of all SNAP-authorized retailers engaged in retailer trafficking at least once.

The September 2017 USDA-FNS Retailer Trafficking Study found that the increase in retailer trafficking was due to increased program participation by smaller stores, which have a higher rate of retailer trafficking. While stores enter and leave the program from year to year, the overall growth in SNAP-authorized stores over the last 10 years (FY2007-FY2016) was about 93,000, and about 63% of this growth came from convenience stores in the program (see **Table D-1** in **Appendix D**).[30] As of FY2016, convenience stores constitute about 46% of all stores in the program, up from 36% in FY2007.[31] According to the September 2017 USDA-FNS Retailer Trafficking Study, covering 2012-2014, convenience stores account for about 5% of total SNAP redemptions, but about 57% of retailer trafficking (see **Table D-3** in **Appendix D**).[32] Also

---

[21] Agency errors are sometimes called "administrative errors."

[22] U.S. Department of Justice (DOJ), "Wisconsin Department of Health Services Agrees to Pay Nearly $7 Million to Resolve Alleged False Claims for SNAP Funds," press release, April 12, 2017, https://www.justice.gov/opa/pr/wisconsin-department-health-services-agrees-pay-nearly-7-million-resolve-alleged-false-claims.

[23] Retailer Management Reports are available at https://www.fns.usda.gov/snap-retailer-data.

[24] This comes to about 0.71% of total stores participating in the program in FY2016. This CRS calculation is based on data provided in an email from SNAP, USDA-FNS, October 25, 2017.

[25] Joseph Willey, Nicole B. Fettig, and Malcolm Hale, *The Extent of Trafficking in the Supplemental Nutrition Assistance Program: 2012–2014*, prepared by WRMA, Inc. for the U.S. Department of Agriculture, Food and Nutrition Service, September 2017, pp. ii-9, https://www.fns.usda.gov/snap/extent-trafficking-supplemental-nutrition-assistance-program-2012%E2%80%932014 (hereinafter cited as "September 2017 USDA-FNS Retailer Trafficking Study").

[26] These three studies can be found online at https://www.fns.usda.gov/report-finder.

[27] September 2017 USDA-FNS Retailer Trafficking Study, pp. ii-9.

[28] SNAP benefit redemptions in FY2012, FY2013, and FY2014 were about $75 billion, $76 billion, and $70 billion, respectively.

[29] September 2017 USDA-FNS Retailer Trafficking Study, p. 17.

[30] This CRS calculation is based on data provided in an email from SNAP, USDA-FNS, January 5, 2018. USDA-FNS categorizes retailers into "store types" (e.g., "convenience store") according to definitions in an internal agency document. Store types are largely defined by volumes of sales, size, and other business characteristics.

[31] This CRS calculation based on data provided in an email from SNAP, USDA-FNS, January 5, 2018, and from U.S. Department of Agriculture, Food and Nutrition Service, *2016 Retailer Management Year End Summary Report*, December 2016, p. 1, https://fns-prod.azureedge.net/sites/default/files/snap/2016-SNAP-Retailer-Management-Year-End-Summary.pdf (hereinafter cited as "December 2016 USDA-FNS Retailer Management Report").

[32] This CRS calculation based on data from September 2017 USDA-FNS Retailer Trafficking Study, p. 9.

according to this study, about 18% of all SNAP benefits used at authorized convenience stores are trafficked by these stores (i.e., the convenience store trafficking rate), and about 19% of all authorized convenience stores are engaged in trafficking (i.e., the convenience store violation rate).[33] These rates are significantly higher than the national rates for all stores (see **Table D-2** in **Appendix D**). The increase in SNAP participation by smaller stores appears to correlate to an overall increase in retailer trafficking, according to USDA-FNS.[34] **Figure 1** displays some of these data from the three most recent trafficking studies.

**Figure 1. Authorization and Trafficking at Convenience Stores, 2006-2014**



**Source:** The three USDA-FNS retailer trafficking studies referenced can be found online using https://www.fns.usda.gov/report-finder.

## Extent of Retailer Application Fraud

There is no standard measure of retailer application fraud. However, USDA-FNS does report annually on actions taken against business integrity violations, and a retailer engaged in application fraud (including falsification and circumvention) is generally considered to be in violation of business integrity standards.

In FY2016, USDA-FNS sanctioned 126 stores for business integrity violations. This number includes sanctions not related to retailer application fraud and amounts to less than 1 store sanctioned for every 2,064 stores participating in the program.[35] During the same period, USDA-FNS permanently disqualified about 15 times as many stores for retailer trafficking.[36]

---

[33] September 2017 USDA-FNS Retailer Trafficking Study, p. 9.

[34] September 2017 USDA-FNS Retailer Trafficking Study, pp. iii-14.

[35] This business integrity sanction total includes stores sanctioned for past convictions as well as retailer application fraud (i.e., circumvention and falsification). Total FY2016 business integrity sanctions include 25 time-limited denials, 5 time-limited withdrawals, 56 permanent denials, 37 permanent withdrawals, and 3 permanent disqualifications; December 2016 USDA-FNS Retailer Management Report, p. 5, and email from SNAP, USDA-FNS, October 25, 2017.

[36] Total FY2016 permanent disqualifications for retailer trafficking were 1,842. CRS calculations in this paragraph use data from the December 2016 USDA-FNS Retailer Management Report, pp. 1-8, and email from SNAP, USDA-FNS, October 25, 2017.

# Extent of Errors and Fraud in Benefit Issuance to Households

## National Payment Error Rate

The SNAP Quality Control (QC) system measures improper payments in SNAP. This system was first established by the Food Stamp Act of 1977.[37] Under the QC system, every state agency conducts a monthly review of a sample of its households, comparing the amounts of overpayments and underpayments to total issuance.[38] From this review, state agencies calculate their state payment error rate (SPER). USDA-FNS conducts annual reviews of a sample of each state's reviews to validate state findings and determine national rates—developing the national payment error rate (NPER).

The NPER is the most-often cited measure of payment accuracy in SNAP.[39] Unlike the national retailer trafficking rate, the NPER is *not* a measure of fraud. The NPER reflects improper payments, but not the *cause* of these overpayments and underpayments. The NPER estimates all overpayments and underpayments resulting from recipient errors, recipient application fraud, and agency error.[40] Per current federal law, only overpayments and underpayments of $38 or more (inflation-adjusted annually) in the sample month are counted when calculating the payment error rate—this is called the Quality Control threshold.[41] Additionally, the NPER combines both the overpayment rate and the underpayment rate, so it does not reflect only excess expenditures. For example, in FY2017, the NPER was 6.30%—which included a 5.19% overpayment rate and a 1.11% underpayment rate.[42]

In discussions regarding SNAP payment accuracy, the NPER is sometimes misunderstood to be a measure of the federal dollars lost to fraud and waste in the program. The NPER instead reflects the extent of inaccurate payments that exceed the Quality Control threshold in a given year. Regardless of the cause of an overpayment, SNAP agencies are required to work towards recovering excess benefits from households that were overpaid. Recovery of overpayments involves, first, the establishment (or determination) of a claim against a household, and, second, the actual collection of that claim. Applying the FY2017 NPER to total benefit issuance, in FY2017 an estimated $3.3 billion in benefits were overpaid, an estimated $710 million in benefits

---

[37] Section 16 of the 1977 FSA originally established the SNAP QC system; Section 4418-4420 of the Farm Security and Rural Investment Act of 2002 (the 2002 Farm Bill) and Sections 4019-4021 of the 2014 Farm Bill modified Section 16 of the FNA (codified at 7 U.S.C. §2025 and implemented at 7 C.F.R. §275).

[38] This statistical sample includes households receiving benefits, as well as households denied, suspended, or terminated from receiving benefits in the sample month.

[39] USDA uses the NPER to measure the payment accuracy of SNAP issuance per the requirements of the Improper Payments and Elimination and Recovery Act of 2010 (P.L. 111-204); see https://paymentaccuracy.gov/program/supplemental-nutrition-assistance-program/. Also see CRS Report R43694, *Improper Payments in High Priority Programs: In Brief*, by Garrett Hatch.

[40] For information regarding the determination of payment error rates, see 7 C.F.R. §275.23(b) & (c).

[41] When SNAP agencies detect overpayments and underpayments of less than $38 (inflation adjusted annually), they still must follow SNAP rules and correct these errors. The Quality Control threshold, also known as the error tolerance threshold, is only important in the calculation of the payment error rate. The current Quality Control threshold was most recently set by Section 4019 of the 2014 Farm Bill which modified Section 16(c)(1)(A) of the FNA (codified at 7 U.S.C. §2025(c)(1)(A) and implemented at 7 C.F.R. §275.12(f)(2)). This threshold has been adjusted by statute and regulation over the years (set at $5 in FY1980, $25 in FY2000, $50 in FY2009, $25 in FY2010, $50 in FY2012, $37 in FY2014, and most recently $38 in FY2015).

[42] The NPER is sometimes called the "combined payment error rate" or the "national performance measure", and the NPER is sometimes called the "national payment accuracy rate" when inverted (i.e., 93.70% in FY2017).

were underpaid.[43] In FY2016, the most recent year available, states established over $684 million in claims to recover overpayments.[44]

### Context for Comparing FY2017 NPER to Prior Years

Recent years' NPERs are listed in **Table 1**, showing rates from FY2011-FY2014 and then skipping to FY2017. SNAP national payment error rates were not released by USDA-FNS in FY2015 or FY2016, due to data quality concerns.

In 2014, USDA found data quality issues in 42 of 53 state agencies' Quality Control data reporting. These data quality issues are not, in and of themselves, proof of wrongdoing. In some cases, states had not followed protocol, while in other cases states had been found to have deliberately covered up errors (fraudulent actions). (A more detailed discussion of Quality Control as well as these audits and investigations can be found in "State Agency Fraud: SNAP Quality Control"). USDA-FNS suspended error reporting for FY2015 and FY2016, and also used this time to examine and improve state quality control procedures.[45]

In June 2018, USDA-FNS published FY2017 state and national error rates (NPER). USDA-FNS's accompanying materials describe that this NPER was determined "under new controls to prevent any recurrence of statistical bias in the QC system," which includes "a new management evaluation process to examine state quality control procedures on a regular basis."[46] The agency also described that the FY2017 rate stems from "a modernized review process, which includes updated guidance, revisions to [the relevant FNS handbook], extensive training for State and Federal staff, and modifications to State procedures to ensure consistency with Federal guidelines."[47]

As displayed (**Table 1**) and discussed earlier, the FY2017 NPER of 6.30% is a substantial increase from the FY2014 of 3.66%. USDA-FNS states the FY2017 rate "is higher than the previous rate ... but it is more accurate."[48] However, changes to data collection and related oversight since FY2014 make it difficult to reliably compare FY2017 rates to earlier years, as it is possible that earlier years include systemic under-reporting.

---

[43] CRS calculation using USDA-FNS SNAP summary data for FY2017. This data is typically published in USDA-FNS QC annual reports; the FY2017 report has not been published as of the date of this report.

[44] In FY2016, 884,301 claims were established with a total value of $684,187,891, and $402,007,206 in claims were collected. Claims are established only when an overpayment is detected by the state agency. Claims are not always established or collected in the year that the overpayment occurred, and there exists large variability between levels of state claim establishment and collection activity. FY2016 SAR, pp. 32, 34.

[45] See, e.g., U.S. Department of Agriculture, Food and Nutrition Service , *Fiscal Year (FY) 2016 Supplemental Nutrition Assistance Program (SNAP) Payment Error Rate*, June 29, 2017, https://fns-prod.azureedge.net/sites/default/files/snap/FY2016-Payment-Error-Rate-Memo.pdf.

[46] USDA-FNS, "Fact Sheet: SNAP Payment Error Rate," June 2018, https://www.fns.usda.gov/sites/default/files/snap/QC-FactSheet-2018.pdf.

[47] USDA-FNS, "Quality Control," https://www.fns.usda.gov/snap/quality-control, accessed September 24, 2018.

[48] USDA-FNS, "Fact Sheet: SNAP Payment Error Rate," June 2018, https://www.fns.usda.gov/sites/default/files/snap/QC-FactSheet-2018.pdf.

**Table 1. National Payment Error Rate, FY2011-FY2014, FY2017**

|  | FY2011 | FY2012 | FY2013 | FY2014 | FY2017[a] |
|---|---|---|---|---|---|
| Overpayment | 2.99% | 2.77% | 2.61% | 2.96% | 5.19% |
| Underpayment | 0.81% | 0.65% | 0.60% | 0.69% | 1.11% |
| *NPER* | *3.80%* | *3.42%* | *3.20%* | *3.66%* | *6.30%* |

**Source:** USDA-FNS QC Annual Reports from the respective fiscal years.

**Note:** Overpayment and underpayment rates may not total to listed NPER due to rounding.

a. Per USDA-FNS, the agency developed new controls for FY2017 data collection that were not in place in FY2014.

## Differentiating Between Recipient Fraud, Recipient Errors, and Agency Errors

The SNAP overpayment rate (component of the national payment error rate) estimates the extent of all SNAP overpayments, including overpayments resulting from recipient errors, recipient fraud, and agency errors (estimated to total about $3.3 billion overpaid in FY2017). The NPER does *not*, however, differentiate between the relative extents of each of these types of errors and fraud (i.e., the NPER cannot tell us what percentage of this $3.3 billion is due to, for example, agency errors). There is currently no single standard measurement that individually quantifies the extent of recipient errors, recipient fraud, or agency errors. State agencies are, however, responsible for administering the recipient side of SNAP, and every year states report data on these activities which USDA-FNS publishes in the SNAP State Activity Report (SAR).[49] This report includes detailed data on state-level program operations including benefit issuance, participation, administrative (i.e., non-benefits) costs, recipient disqualification, and claims.

When a recipient error, an act of recipient fraud, or an agency error results in an overpayment to a household (and that overpayment is detected by the state agency), the household is generally required by the state agency to repay the overpaid amount (i.e., a claim is established). Data on the establishment of claims resulting from recipient errors, recipient fraud, and agency errors is provided in the state report (subdivided by type). The extent of claims establishment, therefore, can serve as a proxy for the extent of these types of errors and fraud. In addition, when a recipient commits fraud (and that act of fraud is detected and proven by the state agency), that recipient is generally punished with disqualification from SNAP. The extent of recipient disqualifications, therefore, can serve as a proxy for the extent of recipient fraud.

Before examining these claims and disqualification data, however, it is important to understand the limitations of this approach. Claims are not established in all instances of overpayments resulting from recipient errors, recipient fraud, or agency errors. For example, claims may not be established when overpayment amounts fall below state agencies' claims thresholds[50] or when overpayments are not detected by state agencies. Likewise, not all acts of recipient fraud are detected, proven, and punished with disqualification. Also, these claims establishment and disqualifications data are not based on representative samples and, therefore, these data may not fully reflect the prevalence of recipient errors, recipient fraud, or agency errors in the SNAP

---

[49] State Activity Reports are available at https://www.fns.usda.gov/pd/snap-state-activity-reports.

[50] Per SNAP regulation at 7 C.F.R. §273.18(e)(2), the "claims threshold" is the minimum dollar value of overpayments that *must* be collected by states. States *may* establish claims on amounts below this threshold. The claims threshold applies to overpayments regardless of cause (i.e., recipient error, recipient fraud, or agency error). Since 2000 the claims threshold has been set at $125.

caseload. Despite these shortcomings, these claims and disqualification data are the only available measures which reflect, albeit imperfectly, the extent of recipient errors, recipient fraud, or agency errors in SNAP. The following calculations of the extent of these types of errors and fraud are based on SNAP State Activity Report FY2016 data including the following: total issuance of $66,539,351,219; average monthly participation of 21,777,938 households; an average monthly participation of 44,219,363 persons; total claims established of 884,301; and total claims dollars established of $684,197,891.[51]

### Recipient Fraud

Unlike retailer trafficking, which is handled by one federal entity (USDA-FNS), recipient fraud is detected and punished by 53 different SNAP agencies (50 states, DC, Guam and the U.S. Virgin Islands) and, as noted in the September 2012 USDA-OIG report, "FNS cannot estimate a recipient fraud rate because it has not established how States should compile, track, and report fraud in a uniform manner."[52] This lack of standardization is a reason why a national recipient fraud rate does not exist.[53] Both recipient trafficking and recipient application fraud are included in these figures.

According to the FY2016 SNAP State Activity Report

- for every 10,000 households participating in SNAP, about 14 contained a recipient who was investigated and determined to have committed fraud that resulted in an overpayment that the state agency required the household to repay (30,274 claims established);

- for every $10,000 in benefits issued to households participating in SNAP, about $11 were determined by state agencies to have been overpaid due to recipient fraud and were required to be repaid by the overpaid household ($73,403,758 in fraud claims established);

- about 3% of the total number of claims established were established due to recipient fraud;

- about 11% of the total claims dollars established were established due to recipient fraud;

- for every 10,000 recipients participating in SNAP, about 13 were disqualified from the program for violating SNAP rules (e.g., committing fraud; 55,930 disqualified);

---

[51] U.S. Department of Agriculture, Food and Nutrition Service, *State Activity Report Fiscal Year 2016*, September 2016, pp. 5-36, https://fns-prod.azureedge.net/sites/default/files/snap/FY16-State-Activity-Report.pdf (hereinafter cited as "FY2016 SAR")**.**

[52] U.S. Department of Agriculture, Office of the Inspector General, *Analysis of FNS' Supplemental Nutrition Assistance Program Fraud Prevention and Detection Efforts*, Audit Report 27002-001-13, September 2012, p. 2, https://www.usda.gov/oig/webdocs/27002-0011-13.pdf (hereinafter cited as "September 2012 USDA-OIG report").

[53] USDA-FNS has considered developing a level of standardization sufficient to calculate a recipient fraud rate, but in May 2014 the agency determined that it was not possible without significant investment and oversight. Email from SNAP, USDA-FNS, November 24, 2017.

- about 1.5% of disqualification entries made into the USDA-FNS electronic Disqualified Recipient System (eDRS)[54] in FY2016 were permanent disqualifications;[55] and

- for every $10,000 in benefits issued to households participating in SNAP, about $21 were determined by state agencies to have been lost (overpaid due to recipient application fraud or trafficked) to recipient fraud associated with disqualified recipients ($136,475,242 in program loss associated with disqualified recipients).[56]

## Recipient Errors

According to the FY2016 SNAP State Activity Report

- for every 10,000 households participating in SNAP, about 181 were overpaid due to a recipient error and the state agency required the household to repay the overpaid amount (394,883 recipient error claims established);

- for every $10,000 in benefits issued to households participating in SNAP, about $63 were determined by state agencies to have been overpaid due to recipient errors and were required to be repaid by the overpaid household ($421,934,288 in recipient error claims established);

- about 45% of the total number of claims established were established due to recipient errors;

- about 62% of the total claims dollars established were established due to recipient errors;

- about 65% of FY2016 claims were established by four states;[57]

- about 55% of FY2016 claims amounts were established by these four states; and

- these four states accounted for about 30% of SNAP participants.

## Agency Errors

According to the FY2016 SNAP State Activity Report

- for every 10,000 households participating in SNAP, about 47 were overpaid due to agency errors, and the state agency required the household to repay the overpaid amount (459,144 agency error claims established);

- for every $10,000 in benefits issued to households participating in SNAP, about $28 were determined by state agencies to have been overpaid due to agency errors and were required to be repaid by the overpaid household ($188,859,846 in agency error claims established);

---

[54] The USDA-FNS-eDRS compiles information regarding recipients disqualified by SNAP state agencies.

[55] Email from SNAP, USDA-FNS, January 3, 2018.

[56] Per the FY2016 SAR, p. 32, "Some states establish all non-agency error claims as household error claims initially and then transfer the claim from household error to fraud after the prosecution or [administrative disqualification hearing] ADH. Therefore, the sum of the fraud associated with disqualifications is a better measure of the ultimate amount of fraud claims than the newly established amount."

[57] These states are California, Illinois, Texas, and Florida.

- about 52% of the total number of claims established were established due to agency errors;
- about 28% of the total claims dollars established were established due to agency errors;
- about 80% of the total number of agency error claims established were established by California;[58]
- about 64% of the total agency error claims dollars established were established by California; and
- California accounted for about 10% of SNAP participants.

Although the total volume of claims established has increased over time, the majority of claims established have been the result of recipient errors, with agency errors being second most common, and recipient fraud claims being least common—as illustrated by **Figure 2**.

**Figure 2. Claims Establishment by Type, FY2007-FY2016**



**Source:** Created by CRS using data from SNAP State Activity Reports FY2007-FY2016.

# Detection and Correction of Errors and Fraud

State and federal efforts to detect and correct errors, as well as efforts to detect and deter fraud, are detailed in this section.

---

[58] The claim threshold for agency errors in California is $35 for current households and $125 for inactive households. See http://www.cdss.ca.gov/shd/res/htm/FoodStampIndex.htm.

# Retailer Fraud

USDA-FNS is responsible for administering the retailer side of SNAP and for pursuing retailer fraud.[59] USDA-OIG, in collaboration with the Federal Bureau of Investigations (FBI), U.S. Secret Service, and other federal, state, and local law enforcement entities, is responsible for pursuing criminal charges against retailers found to be engaging in retailer trafficking.

## Detection of Retailer Trafficking

Retailer trafficking can be detected through a variety of means, including the following:

**Analysis of EBT Transaction Data**—Whenever a SNAP EBT card is swiped, the transaction data is captured and analyzed by USDA-FNS for suspicious patterns. USDA-FNS use these data to develop a case against a retailer when the transactions indicate retailer trafficking is occurring at their store. In FY2016, USDA-FNS reviewed the transactions of nearly 9% of participating stores.[60] Over 80% of retailer trafficking detected by USDA-FNS are found primarily through EBT transaction analysis.[61]

**Undercover Investigations**—USDA-FNS performs undercover investigation of stores suspected of violating SNAP rules (e.g., trafficking), and in FY2016, USDA-FNS investigated over 1% of participating stores.[62]

**State Law Enforcement Bureau (SLEB) Agreements**—Some state agencies enter into state law enforcement bureau (SLEB) agreements with law enforcement entities in their jurisdictions in order to further their efforts to detect trafficking. These agreements are typically focused on recipient trafficking, but they can have implications for retailer trafficking.

**Tips and Referrals**—USDA-FNS receives tips, complaints, and referrals, which can lead to cases of retailer trafficking. These referrals come from SNAP retailers, SNAP recipients, members of the public, state agencies, SLEBs, USDA-OIG, or other law enforcement entities. USDA-OIG operates a website and hotline for members of the public to report instances of fraud.[63] In FY2016, USDA-OIG referred 4,320 complaints to USDA-FNS.[64]

---

[59] Sections 9, 12, and 15 of the FNA outline the requirement that USDA-FNS administer SNAP on the retailer side.

[60] This CRS calculation is based on data from the December 2016 USDA-FNS Retailer Management Report, p. 1.

[61] This CRS calculation is based on data from the December 2016 USDA-FNS Retailer Management Report, p. 8 and an email from SNAP, USDA-FNS, October 25, 2017. In FY2016 1,842 stores were permanently disqualified for trafficking SNAP benefits, and USDA-FNS undercover investigations identified retailer trafficking in 288 instances. The remaining stores were EBT cases, sometimes referred to as paper cases.

[62] About 20% of these investigations resulted in findings of trafficking. This CRS calculation is based on data from the December 2016 USDA-FNS Retailer Management Report, p. 8.

[63] USDA-OIG hotline information available at https://www.usda.gov/oig/hotline.php.

[64] U.S. Department of Agriculture, Office of the Inspector General, *Semiannual Report to Congress: Second Half, April 1, 2016-September 30, 2016*, Number 76, November 2016, p. 54, https://www.usda.gov/oig/webdocs/ sarc2016_2nd_half_508.pdf (hereinafter cited as "USDA-OIG SARC 2nd Half FY2016"); U.S. Department of Agriculture, Office of the Inspector General, *Semiannual Report to Congress: First Half, October 1, 2015-March 31, 2016*, Number 75, May 2016, p. 57, https://www.usda.gov/oig/webdocs/sarc2016_1st_half.pdf (hereinafter cited as "USDA-OIG SARC 1st Half FY2016").

## Correction of Retailer Trafficking

If a store is found to have committed trafficking, then all of the owners of the store may be subject to penalties.[65] Major penalties associated with retailer trafficking include the following:

**Disqualification**—If USDA-FNS finds that a SNAP-authorized retailer violated *any* SNAP rules, then that retailer may be subject to a period of disqualification from program participation.[66] Trafficking SNAP benefits is considered one of the most severe violations of SNAP rules, and a retailer found by USDA-FNS to have trafficked SNAP benefits (regardless of the amount) is generally subject to a permanent disqualification (PDQ) from program participation.[67]

**Reciprocal WIC Disqualification**—Stores that are disqualified for violations of the rules of SNAP are disqualified for an equal (but not necessarily concurrent) period of time from participation in the Special Supplemental Nutrition Program for Women, Infants, and Children (WIC).[68] Likewise, stores disqualified from WIC are disqualified from SNAP for an equal (but not necessarily concurrent) period of time. PDQs, such as PDQs for trafficking, are also reciprocal between the programs.

**Restitution of Benefits Trafficked (Claims)**—When a retailer accepts or redeems SNAP benefits in violation of the Food and Nutrition Act of 2008 (FNA), such as engaging in retailer trafficking of SNAP benefits, that retailer may be compelled to repay the amount that they illegally redeemed. This is called a claim and is considered a federal debt. USDA-FNS has the authority to collect such claims by offsetting against a store's SNAP redemptions as well as a store's bond or letter of credit (LOC),[69] where applicable.[70]

> ### Rights of Retailers Accused of Fraud
>
> Following a completed trafficking investigation, the agency sends a retailer a "charge letter" detailing the charges, and explaining the retailer's right to request administrative review. If requested, an independent subdivision of USDA-FNS considers the validity of the charges anew and issues a Final Agency Determination that sustains, reverses, or modifies the charges and explains the retailer's right to request judicial review. The retailer may choose to file a complaint against USDA-FNS in the court of jurisdiction after receiving a Final Agency Determination.

**Public Disclosure of Disqualified Retailers**—USDA-FNS has the authority to publicly disclose the store and owner name for disqualified retailers.[71] A December 2016 USDA-FNS Final Rule asserted USDA-FNS's intent to disclose this information in order to deter retailer trafficking.[72]

---

[65] In community property states, the spouses of owners are automatically considered owners themselves and are also subject to all applicable penalties. As of March 2018, Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Texas, Washington, and Wisconsin are community property states.

[66] Disqualifications can be for a term or permanent. Term disqualification can vary in length from 6 months to 10 years, depending on the nature of the violation. Disqualification for trafficking is generally permanent. Section 12 of the FNA (codified at 7 U.S.C. §2021 and implemented at 7 C.F.R. §278.6).

[67] Section 12(b)(3)(B) of the FNA (codified at 7 U.S.C. §2021(b)(3)(B) and implemented at 7 C.F.R. §278.6(e)(1)(i)).

[68] Section 12(g) of the FNA (codified at 7 U.S.C. §2021(g) and implemented at 7 C.F.R §278.6(e)(8)). For more information on WIC, see CRS Report R44115, *A Primer on WIC: The Special Supplemental Nutrition Program for Women, Infants, and Children*, by Randy Alison Aussenberg.

[69] In certain circumstances USDA-FNS may require a retailer to provide a form of financial collateral (i.e., a collateral bond or an irrevocable letter of credit) as a condition of SNAP authorization.

[70] Section 15(e) of the FNA (codified at 7 U.S.C. §2024(e) and clarified at 7 C.F.R. §278.7).

[71] Section 9(c) of the FNA (codified at 7 U.S.C. §2018(c) and implemented at 7 C.F.R. §278.1(q)(5).

[72] U.S. Department of Agriculture, Food and Nutrition Service, "Enhancing Retailer Standards in the Supplemental

**Transfer of Ownership Civil Money Penalty (TOCMP)**—If a retailer under a period of disqualification sells or transfers ownership of their store, then USDA-FNS is to assess that disqualified retailer a "transfer of ownership civil money penalty" (TOCMP).[73] This means that retailers permanently disqualified from SNAP for committing retailer trafficking are to be assessed this penalty *whenever* they sell or transfer ownership of their stores (regardless of how much time has passed since the disqualification occurred). In FY2016, USDA-FNS assessed 257 such penalties with a mean value of $29,284.[74]

**Exclusion from the General Service Administration's System for Award Management (GSA-SAM)**—This GSA system tracks individuals and entities that do business with the federal government. An individual or entity excluded from this system is prohibited from doing business with the federal government for the duration of the exclusion.[75] All of the owners of a store permanently disqualified from SNAP participation for trafficking benefits are permanently listed as exclusions in GSA-SAM. As of September 2017, 10,307 permanently disqualified retailers have been listed by USDA-FNS in GSA-SAM as exclusions due to SNAP and WIC violations.[76] This type of exclusion can have collateral consequences for the excluded party.[77]

**Criminal Charges and Penalties**—Retailers engaged in trafficking may be criminally charged and penalized with fines up to $250,000 and imprisonment up to 20 years.[78] In addition, other adverse monetary penalties (e.g., asset forfeitures, recoveries, collections, and restitutions) may be assessed against those convicted. USDA-OIG, in collaboration with federal, state, and local law enforcement entities, pursues charges against retailers who traffic SNAP benefits. USDA-OIG usually criminally pursues only retailers who traffic in high dollar amounts of benefits and/or retailers who also engaged in other criminal activity. In some cases, state law enforcement bureaus may pursue criminal charges against individuals engaged in retailer trafficking under state or local statutes. In FY2016, USDA-OIG opened 208 SNAP fraud investigations, and obtained 600 indictments, 510 convictions, and $95.3 million in monetary penalties.[79]

---

Nutrition Assistance Program (SNAP)," 81 *Federal Register* 90675, December 15, 2016 (hereinafter cited as "December 2016 Final Rule"). For more information about this final rule, see CRS Report R44650, *Updated Standards for SNAP-Authorized Retailers*, by Randy Alison Aussenberg.

[73] Section 12(e)(1) of the FNA (codified at 7 U.S.C. §2021(e) and implemented at 7 C.F.R. §278.6(f)(2)).

[74] Email from SNAP, USDA-FNS, October 17, 2017.

[75] For more information on GSA-SAM, see CRS Report RL34753, *Procurement Debarment and Suspension of Government Contractors: Legal Overview*, coordinated by Kathleen Ann Ruane (available to congressional clients upon request to CRS).

[76] U.S. Department of Agriculture, Office of the Inspector General, *Implementation of Suspension and Debarment Tools in the U.S. Department of Agriculture*, 50016-0001-23, September 2017, p. 5, https://www.usda.gov/oig/webdocs/50016-0001-23.pdf (hereinafter cited as "September 2017 USDA-OIG report").

[77] This GSA system is available to the public, and this system is frequently used by employers, banks, universities, professional associations, and other institutions when checking the background of candidates or applicants. A GSA-SAM exclusion is often regarded by such institutions as a derogatory mark and may result in a wide range of adverse actions against the individual subject to the exclusion (e.g., denial of a mortgage loan, revocation of professional credentials, or non-selection for employment).

[78] This penalty is applicable to any party that knowingly misuses SNAP benefits equal to or greater than $5,000 in value (a felony). For felony violations involving benefits valued equal to or greater than $100 and less than $5,000, the penalties are a fine up to $10,000 and imprisonment up to five years. For misdemeanor violations involving benefits valued at less than $100, the penalties are a fine up to $1,000 and imprisonment up to one year. Section 15(b) of the FNA (codified at 7 U.S.C. §2024(b)(1)).

[79] Email from USDA-OIG, January 11, 2018.

### Detection of Retailer Application Fraud

USDA-FNS reviews all information and materials submitted by applicant retailers in order to identify suspicious items and documentation that may indicate retailer application fraud. Where such suspicions arise, USDA-FNS may require additional supporting documentation from the applicant retailer and may contact other federal, state, or local government entities (e.g., entities that administer business licensure, taxation, or trade) to verify questionable items.[80]

### Correction of Retailer Application Fraud

**Denial of Application**—If USDA-FNS finds during the application process that a retailer fails to meet requirements such as stocking and business integrity standards, then the retailer's application is to be denied. If USDA-FNS determines that an applicant retailer has falsified the application, then that retailer's application is to be denied—the period of denial ranges from three years to permanent depending on the severity and nature of the falsification.[81] A retailer denied authorization to participate in SNAP is not generally subject to any penalties other than denial.[82]

**Permanent or Term Disqualification**—Retailers who knowingly engage in falsification of substantive matters (e.g., falsification of ownership or eligibility information) may be subject to a permanent disqualification from program participation. Retailers who engage in falsification of a lesser nature (e.g., falsification of store information such as store name or address) are generally subject to a term disqualification of three years. Retailers that are permanently disqualified for falsification may be subject to all of the penalties associated with permanent disqualification (as discussed previously in the context of retailer trafficking penalties), including reciprocal WIC disqualification, claims, public disclosure, TOCMP, GSA-SAM exclusion, and criminal charges and penalties where appropriate.[83]

## Errors in Benefit Issuance to Households

SNAP certification is the process of evaluating an application, determining if an applicant is eligible to receive SNAP benefits, and the appropriate size of the benefit allotment if the applicant is found to be eligible. This is one of the primary responsibilities of state agencies (with federal oversight). Errors (i.e., recipient errors and agency errors) that occur during this process can result in underissuance or overissuance of SNAP benefits.

### Detection of Recipient Errors—Data Matching

The primary sources for information needed to make certification determinations are generally the applicants themselves, but the eligibility worker may also utilize collateral contact with other entities when necessary.[84] In addition, an eligibility worker may perform additional checks using federal, state, local, or private data systems in order to verify information provided by

---

[80] Section 9(c) of the FNA (codified at 7 U.S.C. §2018(c) and implemented at 7 C.F.R. §278.1(b)).

[81] See 7 C.F.R. 278.1(k)(3)-(4), 278.6(e)(1),(3).

[82] According to 7 C.F.R. §278.1(o), a retailer applicant's submission of false information may subject the store and its owners to civil or criminal action, but no such penalties are currently pursued against retailers denied for falsification.

[83] Email from SNAP, USDA-FNS, January 5, 2018.

[84] For example, an eligibility worker may contact an applicant's landlord in order to confirm residency and shelter costs.

applicants.[85] A visual overview of data matching in the certification process is presented in **Figure 3**.

**Figure 3. Data Matching in SNAP Certification**



**Source:** Prepared by the Congressional Research Service (CRS).

**Notes:** Certification, as illustrated in this graphic, includes five main steps: (1) a household initially applies to receive or recertifies to continue receiving SNAP benefits; (2) a SNAP eligibility worker evaluates the household's application for completion and verifies submitted information (including through interviews with the applicant); (3) a range of data matching systems (both mandatory and optional) is used to confirm eligibility and income information reported by the applicant; (4) when needed, the SNAP staff follows up to verify data; and (5) SNAP staff ultimately makes a SNAP eligibility determination and, if appropriate, designates the benefit allotment amount.

In FY2016, about 62% of overpayment dollars identified through the claims establishment process (i.e., after overpayments have already occurred) were due to inadvertent household errors made by recipients when applying for benefits.[86] With a caseload of about 22 million households, recipient errors (sometimes stemming from simple misunderstanding of federal SNAP regulations) can add up quickly and create a serious payment accuracy problem for states. Although the upfront cost and effort required of a state agency to implement a data match as part of the SNAP certification process can be considerable, data matches using federal, state, local, or private systems can allow agencies to quickly identify recipient errors that could affect applicants' eligibility or benefit amount. Over the years, policymakers have been interested in data matching systems to reduce overpayments.

### *Mandatory Data Matches*

The following six data matches have been statutorily mandated as part of the SNAP certification process:

**U.S Department of Health and Human Services, Administration for Children and Families, National Directory of New Hires (HHS-ACF-NDNH) New Hire File**—This system is used to verify household employment information.[87] The 2014 Farm Bill mandated state use of the New

---

[85] For more information regarding verification requirements, see 7 C.F.R. §273.2(f)

[86] This is addressed more fully in the "Extent of Errors and Fraud in Benefit Issuance to Households" section of this report.

[87] Matches made from this file are not considered verified upon receipt, so additional steps are necessary to confirm

Hire File and this requirement was implemented in a January 2016 USDA-FNS Interim Final Rule.[88]

**Social Security Administration, Prisoner Verification System (SSA-PVS)**—This system is used to verify if household members are incarcerated.[89] The Balanced Budget Act of 1997 mandated that all SNAP agencies match against the SSA's Prisoner Verification System.[90]

**Social Security Administration, Death Master File (SSA-DMF)**—This system is used to verify if household members are deceased.[91] In 1998, P.L. 105-379 mandated that all SNAP agencies match against the SSA-DMF.[92]

**USDA-FNS Electronic Disqualified Recipient System (USDA-FNS-eDRS)**—This system is used to verify if household members are disqualified from SNAP.[93]

**U.S. Department of Homeland Security U.S. Citizenship and Immigration Services Systematic Alien Verification for Entitlements (DHS-USCIS-SAVE)**—This system is used to verify household members immigration status.[94] The 2014 Farm Bill mandated that SNAP agencies utilize an immigration status verification system[95] as a part of the certification process;[96] a December 2016 USDA-FNS notice of proposed rulemaking (NPRM) regarding the requirement to utilize this data match was published, but the rule has not yet been finalized.[97]

---

matches. According to USDA-FNS, as of September 2017, 47 SNAP agencies were utilizing NDNH (per telephone call, SNAP, USDA-FNS, January 5, 2018) and in a survey of SNAP agencies from an October 2016 GAO report, only 14 of the 39 agencies utilizing it at the time considered it moderately or extremely useful (U.S. Government Accountability Office, *Supplemental Nutrition Assistance Program: More Information on Promising Practices Could Enhance States' Use of Data Matching for Eligibility*, GAO-17-111, October 2016, p. 16, https://www.gao.gov/assets/690/680535.pdf (hereinafter cited as "October 2016 GAO report").

[88] Section 4013 of the 2014 Farm Bill modified Section 11(e)(24) of the FNA (codified at 7 U.S.C. §2020(e)(24) and implemented at 7 C.F.R. §272.16) and U.S. Department of Agriculture, Food and Nutrition Service, "SNAP Requirement for National Directory of New Hires Employment Verification and Annual Program Activity Reporting," 81 *Federal Register* 4519, January 26, 2016.

[89] Matches made from this system are not considered verified upon receipt, so additional steps are necessary to confirm matches.

[90] Section 1003 of P.L. 105-33 modified Section 11(r) of the FNA (codified at 7 U.S.C. §2020(q) and (e)(18) and implemented at 7 C.F.R. §272.13). This requirement was implemented initially in a USDA-FNS directive in February 2000 and finally in U.S. Department of Agriculture, Food and Nutrition Service, "Supplemental Nutrition Assistance Program: Disqualified Recipient Reporting and Computer Matching Requirements," 77 *Federal Register* 48045, August 13, 2012 (hereinafter cited as "August 2012 USDA-FNS Final Rule").

[91] This system is also referred to as the Deceased Matching System (DMS). Matches made from this system are not considered verified upon receipt, so additional steps are necessary to confirm matches.

[92] Section 1 of P.L. 105-379 modified Section 11(r) of the FNA (codified at U.S.C. §2020(r) and clarified at 7 C.F.R. §272.14). This requirement was implemented initially in a USDA-FNS directive in February 2000 and finally in the August 2012 USDA-FNS Final Rule.

[93] Matches made from this system are not considered verified upon receipt, so additional steps are necessary to confirm matches. The use of the USDA-FNS-eDRS is mandated by SNAP regulations at 7 C.F.R. §273.16(i).

[94] Matches made from this system are considered verified upon receipt. As of January 2018, every state is using this system (Email from SNAP, USDA-FNS, January 2, 2018).

[95] Section 4015 of the 2014 Farm Bill modified Section 11(p) of the FNA (codified at 7 U.S.C. §2020(p)) to specify that SNAP agencies must use the immigration status verification system established under §1137 of the Social Security Act (42 U.S.C. §1320b-7). This system is DHS-USCIS-SAVE.

[96] Section 4015 of the 2014 Farm Bill modified Section 11(p) of the FNA (codified at 7 U.S.C. §2020).

[97] U.S. Department of Agriculture, Food and Nutrition Service, "Supplemental Nutrition Assistance Program: Student Eligibility, Convicted Felons, Lottery and Gambling, and State Verification Provisions of the Agricultural Act of 2014," 81 *Federal Register* 86614, December 1, 2016 (hereinafter cited as "December 2016 Proposed Rule").

**Income and Eligibility Verification System (IEVS)**—SNAP agencies are required to verify the income and eligibility of all applicants during the SNAP certification process. They generally fulfill this requirement through the use of an income and eligibility verification system (IEVS). An IEVS is not a single data match, but rather a state system that may use multiple federal, state, and local data sources to confirm the accuracy of eligibility and income information provided by the applicant and to locate pertinent information that may have been omitted by the applicant.[98] The specific data matches used in an IEVS, however, will vary from state to state.[99] The 2014 Farm Bill made states' use of IEVS mandatory in accordance with standards set by the Secretary of Agriculture. This policy is pending implementation, as USDA-FNS published an NPRM in December 2016, but a final rule has not yet been published.[100]

## *Optional Data Matches*

States also use optional data matches and incorporate these into their processes. Several key eligibility data examples, such as income and program disqualifications, are discussed below:[101]

**Income matches**—A household's income and related SNAP deductions are basic determinants of eligibility and an applicant's benefit allotment. As a result, in addition to the mandatory matches discussed above, most states utilize several optional federal and state data matches to verify earned and unearned income. For examples of optional income matches, see **Appendix C**.

**SNAP disqualification matches**—In addition to the mandatory USDA-FNS-eDRS match, states maintain their own internal databases of recipients disqualified within the state, and a match from such state databases indicates that a member of an applicant household is ineligible.[102]

**Other data matches**—In addition, state agencies use data sources to assess a number of other aspects of a household's application or recertification. For instance, state criminal justice or correctional agency system matches and state department of health vital information system or burial assistance program matches can ensure that a household does not include incarcerated or deceased members. Likewise, state department of children's services or foster care matches can ensure that a household does not include children that have been removed. Such state matches to verify that household size is correct are generally considered verified upon receipt. Matches against state and federal crime databases can ensure that individuals subject to crime-related restrictions are correctly excluded in eligibility determination.[103] Data matches between SNAP and other public benefit programs can also help a state agency ensure that states are accurately implementing their comparable disqualification policies.[104] These data matches are discussed in more detail in the October 2016 GAO report.[105]

---

[98] See §1137 of the Social Security Act for IEVS federal requirements.

[99] The definition of IEVS can be found in 7 C.F.R. §§271.2 and 272.8.

[100] Section 2015 of the 2014 Farm Bill modified Section 11(p) of the FNA (codified at 7 U.S.C. §2020). December 2016 Proposed Rule.

[101] For more information regarding SNAP eligibility, see CRS Report R42505, *Supplemental Nutrition Assistance Program (SNAP): A Primer on Eligibility and Benefits*, by Randy Alison Aussenberg.

[102] Matches made from these systems are generally considered verified upon receipt.

[103] For more information, see CRS Report R42394, *Drug Testing and Crime-Related Restrictions in TANF, SNAP, and Housing Assistance*, by Maggie McCarty et al.

[104] Section 6(i) of the FNA (codified at 7 U.S.C. §2015(i) and implemented at 7 C.F.R. §273.11(k)).

[105] See https://www.gao.gov/assets/690/680535.pdf.

## Detection of Agency Errors

State agencies are responsible for preventing, detecting, and correcting agency errors.[106] Agency errors are generally the product of human error, so training and supervision of eligibility workers is the primary means of mitigating them (e.g., something as simple as an eligibility worker transposing two digits during data entry). Agency errors can be detected by ongoing, independent process improvements (e.g., quality control or quality assurance), supervisory case review, eligibility workers, and recipients. Agency errors may also result from state system technical glitches, so states may detect these errors through system audits and mitigate them through system improvements.

## Correction of Recipient and Agency Errors—Claims

If a household receives an overpayment, and that overpayment is detected by the state agency, then the agency generally establishes a claim against the household, requiring the adult members of the household to repay the amount that was overpaid. Claims are considered federal debt and must be repaid by the adult members of overpaid households regardless of the cause of the overpayment (i.e., recipient error, recipient fraud, or agency error) except in the case of a major systems failure.[107] Agencies must also correct underpayments that they identify. State agencies may elect *not* to establish claims on low dollar overpayments when such overpayments fall below the agency's claims threshold, explained below.

---

**Claims Threshold**

The "claims threshold" is the minimum dollar value of overpayments that *must* be collected by state agencies. Agencies *may* establish claims on amounts below this threshold.[108] This threshold applies to overpayments regardless of cause (i.e., recipient error, recipient fraud, or agency error). Since 1983, this threshold was set at $35, but in 2000 it was raised to $125.[109] This threshold does not apply to any overpayments discovered during the Quality Control (QC) process, and claims must be established on all such amounts (regardless of dollar value). Generally, this threshold does *not* apply to households currently participating in the program, as it is easier to collect claims from actively participating households using allotment reduction (i.e., a portion of the household's monthly SNAP benefits are withheld until the claim amount is repaid). States may, however, establish their own cost-effectiveness plans. Under such a plan, if approved by USDA-FNS, a state may modify this threshold for one or more types of overpayments and may create a threshold limit for claims on households currently participating in the program.

---

Claims are not always established in the year that the overpayment occurs and claims are not always collected in the year that they are established. State agencies are entitled to retain 35% of the amount they collect on recipient fraud claims and certain recipient error claims, 20% of the

---

[106] Section 13 of the FNA (codified at 7 U.S.C. §2022 and implemented at 7 C.F.R. §273.18).

[107] In the case of a state agency's major systemic error "overissued benefits to a substantial number of households," USDA "may prohibit the State agency from collecting these overissuances from some or all households" and "shall establish a claim against the State agency equal to the value of the overissuance caused by the systemic error." Section 13(b)(5) of the FNA (codified at 7 U.S.C. §2022(b)(5)). In 2011, USDA-FNS published a proposed rule to implement this statutory provision; as of the date of this report, this rulemaking action is inactive (see **Table B-1** in **Appendix B**). As an example of USDA applying this statutory authority, in 2012, USDA established a claim of nearly $5 million against Maine for certain overissuances. (Eric Russell, *Feds order Maine to pay for food-stamp error*, The Portland Press Herald, September 27, 2012, https://www.pressherald.com/2012/09/27/maine-food-stamp-overpayment-recipeints-usda-reimbursment-letter-mary-mayhew/).

[108] See 7 C.F.R. §273.18(e)(2).

[109] U.S. Department of Agriculture, Food and Nutrition Service, "Food Stamp Program: Recipient Claim Establishment and Collection Standards; Final Rule," 65 *Federal Register* 41751, July 6, 2000.

AR.07938

amount they collect on all other recipient error claims, and none of the amount they collect on agency error claims.

# Recipient Fraud

## Detection of Recipient Fraud

State agencies are responsible for administering the recipient side of SNAP (with federal oversight) and for pursuing recipient fraud.[110] State agencies must, furthermore, establish and operate a SNAP recipient fraud investigation unit.[111] These units detect and punish recipient trafficking, as well as other forms of recipient fraud. USDA-FNS supports state agencies in this capacity by providing technical assistance and setting policy. USDA-OIG, in collaboration with other federal and state law enforcement entities, sometimes criminally pursues recipients who traffic SNAP benefits when such recipients traffic in high dollar amounts of benefits and/or such recipients also engage in other criminal activity. Recipient fraud, like retailer fraud, can be detected through a variety of means, including the following:

**Analysis of EBT Transaction Data**—Once USDA-FNS has completed the process of administratively penalizing a *retailer* for retailer trafficking, and the retailer has exhausted their appeal rights,[112] then USDA-FNS provides the retailer trafficking case to the appropriate state agency including EBT card numbers which can be used to identify SNAP *recipients* who may be trafficking.

**Social Media**—State agencies use automated tools and manual monitoring to detect postings on social media and online commerce websites by individuals attempting to traffic SNAP benefits.

**Undercover Investigations**—As is done with retailer trafficking cases, state agencies perform undercover investigations to detect recipient trafficking and recipient application fraud.

**Multiple Card Replacement**—Recipients who frequently request replacement EBT cards are flagged for review as potentially involved in trafficking benefits, because they would request replacements after selling their cards.[113] This recipient trafficking detection mechanism was established by an April 2014 USDA-FNS Final Rule.[114] In December 2017 USDA-FNS granted a waiver for one state to contact recipients who request a replacement card more than two times in a 12-month period, as opposed to the current regulations' standard of four requests in a 12-month period.[115]

**State Law Enforcement Bureau (SLEB) Agreements**—Some state agencies enter into state law enforcement bureau (SLEB) agreements with law enforcement entities in their jurisdictions in order to further their efforts to detect recipient trafficking and recipient application fraud. There are advantages to such arrangements for state agencies; for example, under SLEB agreements, the agency could be notified whenever an individual is arrested in possession of multiple EBT cards,

---

[110] Section 11 of FNA outlines the requirement that states administer SNAP on the recipient side.

[111] Section 11(e)(20) of the FNA (codified at 7 U.S.C. §2020(e)(20)).

[112] Section 14 of the FNA (codified at 7 U.S.C. §2023).

[113] Section 7(h)(8) of the FNA (codified at 7 U.S.C. 2016(h)(8) and implemented at 7 C.F.R. §274.6(b)(6)).

[114] U.S. Department of Agriculture, Food and Nutrition Service, "Supplemental Nutrition Assistance Program: Trafficking Controls and Fraud Investigations," 79 *Federal Register* 22766, April 23, 2014 (hereinafter cited as "April 2014 USDA-FNS Final Rule").

[115] USDA Office of Communications, "USDA Clears Arizona to Test SNAP Fraud Prevention Improvement," press release, December 8, 2017, https://content.govdelivery.com/accounts/USDAOC/bulletins/1cad357.

allowing the agency to flag the recipients associated with those EBT cards for potential recipient trafficking.

**Tips and Referrals**—As is done in detecting retailer trafficking, agencies use tips and referrals to detect recipient trafficking and recipient application fraud.

**Data Matching and Other Verification**—As is done in detecting recipient errors when applying for SNAP benefits, the data matching and certification process may also provide information useful in detecting recipient application fraud.

## Correction of Recipient Fraud

Whenever a SNAP recipient is found to have committed fraud, that individual is subject to individual penalties, such as disqualification. The other members of the SNAP household will not automatically be subject to such penalties, but the adult members of the household will generally be obligated to repay the amount established by the state agency as a claim for overpayment or trafficking. Major penalties associated with recipient fraud include the following:

---

### Rights of Recipients Accused of Fraud

When a state agency determines that a recipient has committed fraud, the agency provides notice of adverse action to the recipient, which outlines the charges. This notice explains the recipient's right to request a fair hearing (fair hearings may be requested by any recipient aggrieved by a SNAP agency action, not just recipients accused of fraud).[116] After a hearing, the recipient is notified of the decision reached and of the recipient's right to request an appeal or rehearing with the state agency. After a rehearing or appeal, the recipient is notified of the decision reached and the recipient's right to request judicial review. Until this process has been exhausted, recipients continue to receive SNAP benefits. Advocates argue that some states' anti-fraud efforts are overly aggressive and deny recipients' access to SNAP when a recipient error, not fraud, may be to blame for an overpayment.[117]

---

**Disqualification**—Trafficking and recipient application fraud are types of intentional program violations, and a SNAP recipient found to have committed fraud is generally subject to a period of program disqualification varying from one year to permanent.[118] **Figure 4** below compares the number of FY2016 SNAP recipient disqualifications to the monthly average number of participating recipients in the state in FY2016. Performing investigations and proving that recipients have committed intentional program violations (in order to disqualify them from SNAP) can require a considerable amount of state agency resources. This chart illustrates the

---

[116] SAR data indicates significant variability between the number of fair hearings held and the percentage of state decisions upheld/reversed from state to state. One state, Pennsylvania, accounted for about 36% of the fair hearings held in FY2016 although this state had an average of only 4% of the monthly recipients participating in that year. CRS calculation based on data from the FY2016 SAR, pp. 5, 20, 50.

[117] Bill Lueders, "Wisconsin FoodShare fraud crackdown questioned," Wisconsin Center for Investigative Journalism, May 3, 2015, https://www.wisconsinwatch.org/2015/05/wisconsin-foodshare-fraud-crackdown-questioned/. When charging a recipient with an intentional program violation, state agencies often encourage recipients to sign administrative disqualification hearing waivers. Signing such a document waives a recipient's rights to a fair hearing. This type of waiver accounted for about 44% of SNAP disqualifications in FY2016. Many recipients, advocates posit, are also unaware of their appeal rights and that participants often win on appeal. According to the FY2016 State Activity Report (pp. 20-25), state decisions were reversed in about 63% of fair hearings (this includes fair hearings held as result of any adverse state action, not just hearings held as a result of disqualification actions).

[118] Penalties for fraud generally include a one-year disqualification for the recipient's first violation, a two-year disqualification for the recipient's second violation, and a permanent disqualification for the recipient's third violation; however, recipients that traffic $500 or more in benefits are permanently disqualified upon the first violation. Section 6(b) of the FNA (codified at 7 U.S.C. §2015(b)).

extent to which agencies have prioritized this aspect of SNAP administration relative to their SNAP caseload.

### Figure 4. Per Capita Recipient Disqualifications in States
Comparing levels of state agency disqualification action



**Source:** Prepared by the Congressional Research Service (CRS) using data from the FY2016 State Activity Report, pp. 29-37.

**Restitution of Benefits Defrauded (Claims)**—A SNAP household must generally repay benefits amounts that are overpaid due to recipient application fraud or are trafficked.[119]

**Comparable Disqualification**—If a SNAP recipient is disqualified from any federal, state, or local means-tested public assistance program, then the state agency *may* impose the same period of disqualification on the individual under SNAP.[120] This comparable disqualification is mandatory for the Food Distribution Program on Indian Reservations (FDPIR).

**Criminal Charges and Penalties**—Generally, if criminal charges are pursued against recipients who traffic benefits or commit recipient application fraud, it is the states that will pursue and prosecute. State fraud laws vary in their penalties for recipient fraud.[121] Additionally, as stated in a

---

[119] Section 13 of the FNA (codified at 7 U.S.C. §2022 and implemented at 7 C.F.R. §273.18).

[120] Section 4211 of the 2008 Farm Bill modified Section 6(i) of the FNA (codified at 7 U.S.C. §2018(i) and implemented at 7 C.F.R. §273.11(k)).

[121] These criminal penalties may include fines, imprisonment, probation, community service, etc. For example, under Oklahoma law, recipient trafficking is punishable by fines up to $5,000 and/or imprisonment up to two years (OK Statute Title 56 Chapter 7 §243); under Mississippi law, recipient trafficking is punishable by fines up to $10,000

GAO report from August 2014, each state exercises its discretion differently with respect to filing criminal charges in cases of recipient fraud.[122] As with retailer trafficking, USDA-OIG sometimes pursues criminal charges in collaboration with federal and state law enforcement entities against recipients engaged in SNAP fraud.

## State Agency Employee Fraud Detection and Correction

U.S. Department of Agriculture, Office of the Inspector General (USDA-OIG), in conjunction with local, state, and other federal law enforcement entities, investigates cases of state agency employee fraud and penalizes state agency employees engaged in it. Criminal penalties for state agency employee fraud vary from state to state, and individuals who commit state agency employee fraud may be prosecuted for other crimes (e.g., identity theft) that occurred during the commission of the state agency employee fraud. Penalties for this type of criminal fraud vary but may include imprisonment, probation, and/or monetary restitutions.

# State Agency Fraud: SNAP Quality Control

SNAP has long had policies and procedures in place for measuring improper payments—largely, the program's Quality Control (QC) system. QC is currently the basis for levying financial penalties from low-performing states and providing financial performance incentives for the higher-performing and most improved states. In June 2018, following concerns that there had been misreporting of errors, USDA-FNS released a FY2017 NPER under new quality control procedures. This section reviews QC and these developments.

## Quality Control: Incentives and Penalties Overview

This section discusses false claims by state agencies with regard to Quality Control (QC) data and state payment error rates (SPERs). As discussed earlier in this report, since 1977, the SNAP Quality Control system has measured improper payments in SNAP, comparing the amounts of overpayments and underpayments that exceed the error tolerance threshold ($38 adjusted annually for inflation)[123] to total benefits issuance. The Quality Control process starts with state agency analyses that determine state payment error rates, which are then reviewed by USDA-FNS to develop the SNAP national payment error rate (NPER). After conducting this annual Quality

---

and/or imprisonment up to three years (MS Code Title 97 Chapter 19 §71). Most of the state laws' penalties for recipients are more lenient than the penalties enumerated at Section 15(b) of the FNA (codified at 7 U.S.C. §2024(b)(1)).

[122] U.S. Government Accountability Office, Supplemental Nutrition Assistance Program: Enhanced Detection Tools and Reporting Could Improve Efforts to Combat Recipient Fraud, GAO-14-641, August 2014, pp. 15-16, https://www.gao.gov/products/GAO-14-641 (hereinafter cited as "August 2014 GAO report"). For example, this report stated that the minimum amount of recipient fraud that would result in the filing of criminal charges was $100 in Tennessee, while it was $5,000 in Texas. In addition, according to this report certain prosecutors and jurisdictions refused to prosecute recipient trafficking cases entirely due to limited resources and caseloads replete with more serious criminal cases.

[123] When agencies detect overpayments and underpayments under the threshold, they still must follow SNAP rules and correct these errors. This current Quality Control threshold was most recently set by Section 4019 of the 2014 Farm Bill which modified Section 16(c)(1)(A) of the FNA (codified at 7 U.S.C. §2025(c)(1)(A) and implemented at 7 C.F.R. §275.12(f)(2)).

Control review, USDA-FNS awards bonuses to high-performing state agencies and assigns penalties to low-performing state agencies.[124]

USDA-FNS annually awards high-performance bonuses to up to 10 states with the lowest or most improved state payment error rates. High-performance bonuses must be used by states to improve their administration of SNAP.[125] The total annual amount awarded for SPER high-performance bonuses is $24 million.[126] The bonuses awarded in FY2014 are summarized in **Table 2**. Awards for FY2017 have not yet been announced, as of the date of this report.

### Table 2. Bonuses Awarded to States for High Payment Accuracy, FY2014

Amount of bonuses in thousands

| State | AK | FL | KS | MS | RI | SC | TN | TX | VT | WA |
|-------|-----|------|------|--------|-------|--------|--------|--------|-------|--------|
| **Bonus** | $247 | $7,742 | $628 | $1,302 | $502* | $1,672 | $2,687 | $6,497 | $293* | $2,428 |

**Source:** USDA-FNS, https://fns-prod.azureedge.net/sites/default/files/snap/2014-chart-awards.pdf.

**Note:** Bonus amounts marked with an asterisk "*" are for the most-improved state payment error rates.

State sanctions—known as "liabilities"—are used to punish states that have comparatively high payment error rates. If there is a 95% probability that a state makes payment errors 5% more frequently than the national average, then that state has "exceeded the liability level". If a state exceeds the liability level for two years in a row, then it is assessed a penalty—known as a "liability amount".[127] Liability amounts are assessed for only that portion of the state payment error rate that is above 6% (e.g., a state that exceeds the liability level with a state payment error rate of 5.99% would be assessed a $0 liability amount).[128] Once assessed, states have the option to pay the liability amount in full or enter into a settlement agreement with USDA-FNS.[129]

From FY2005 to FY2014, 42 of 53 state agencies have exceeded the liability level at least once, but only 9 state agencies have ever been compelled to actually repay an at-risk penalty amount to

---

[124] See Section 16(d) of FNA (codified at 7 U.S.C. §2025(d) and implemented at 7 C.F.R. §275.24).

[125] Section 4021 of the 2014 Farm Bill modified Section 16(d) of the FNA (codified at 7 U.S.C. §2025(d) and implemented at 7 C.F.R. §275(a)(8)). Consistent with the 2014 statutory change, this regulation limits the use of high-performance bonuses to SNAP administration. In terms of related proposals, the House-passed farm bill in the 113th Congress would have eliminated the performance bonuses (H.R. 2642), and the FY2019 President's Budget (FY2019 USDA-FNS Budget Justification, http://www.obpa.usda.gov/32fns2019notes.pdf, p. "32-87") also proposed elimination (estimating a savings of $480 million over FY2019-2028).

[126] Section 4420(a) of the 2002 Farm Bill modified Section 16(d)(2)(B)(ii) of the FNA (codified at 7 U.S.C. §2025(d)(1)(ii) and implemented at 7 C.F.R. §275.24(b)(1)).

[127] USDA-FNS determinations of error rates must be within 95% statistical probability. As a result, sometimes smaller states report exceeding the liability level, but are not assessed a liability as such a statistical determination cannot be made. Email from SNAP, USDA-FNS, December 28, 2017.

[128] Section 16(c)(1)(C) of the FNA (codified at 7 U.S.C. §2025(c)(1)(C) and implemented at 7 C.F.R. §275.23(d)(2)). Once assessed, generally half of liability amounts must be invested by the state in improving SNAP administration (without a federal match) and the other half are designated as "at-risk" for repayment to USDA-FNS. At-risk funds must be repaid to USDA-FNS if the state exceeds the liability level again the following year. This means that states have three years in which to improve their program administration before they are ever required to pay a penalty to USDA-FNS. See also 7 C.F.R. §275.234(e).

[129] Under such a settlement, half of the liability amount must be invested by the state into improving SNAP administration (without federal match) and the other half are designated "at-risk" for repayment to USDA-FNS. At-risk funds must be repaid to USDA-FNS if the state exceeds a 6% error rate again the following year. This means that states have three years in which to improve their program administration before they are required to pay a penalty to USDA-FNS.

USDA-FNS.[130] This is because most states improve their state payment error rates within one or two years and avoid being required to make a payment to USDA-FNS. Over these 10 years, these 9 states repaid about $1.5 million to USDA-FNS (see **Table 3**).[131]

### Table 3. Penalties Repaid by States for Low Payment Accuracy, FY2005-FY2014

Liability amounts (penalty) are in thousands, and year is fiscal year liability amount was established

| State | DC | ME | AZ | MD | WV | VT | GU | NV | RI | VT | GU | **TOTAL** |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Penalty** | $189 | $387 | $220 | $212 | $77 | $171 | $76 | $3 | $152 | $68 | $38a | **$1,514** |
| **Year** | 2006 | 2007 | 2010 | 2010 | 2011 | 2011 | 2012 | 2012 | 2012 | 2012 | 2013 | **2005-2014** |

**Source:** Email from SNAP, USDA-FNS, January 19, 2018.

a.  Amount due for repayment has not yet been paid as of the date of this report.

## State Agency Misreporting and Falsification of Quality Control Data

State agencies perform Quality Control reviews to determine state payment error rates and then submit these rates to USDA-FNS for its annual review; and agencies may be awarded or sanctioned according to these rates. This combination of positive and negative reinforcement is intended to incentivize high payment accuracy among states. USDA-FNS oversees state agencies through the management evaluation process and the Quality Control system, in addition to other federal oversight mechanisms.[132]

USDA-OIG performs regular audits of and investigations into state agency compliance with a range of SNAP rules. Through this oversight, USDA-OIG and USDA-FNS identified concerns in state-reported Quality Control data. In order to examine this issue, USDA-OIG began a series of audits in March 2013, which culminated in a September 2015 USDA-OIG report.[133] USDA-OIG looked at eight states and determined that all eight state agencies had deliberately weakened the integrity of the Quality Control process with the aid of hired consultants.[134] USDA-FNS responded in the September 2015 USDA-OIG report that USDA-OIG drew its conclusions on the basis of unconfirmed information, misunderstandings of SNAP policy, and insufficient statistical analysis. As a result, USDA-FNS contends that the concerns identified over these eight states' QC efforts were largely the result of administrative issues rather than fraud.[135]

According to 2017 U.S. Department of Justice (DOJ) findings, at least three state agencies (Virginia, Wisconsin, and Alaska) engaged in state agency fraud related to Quality Control data falsification since at least 2008. These three state agencies, with the help of their third-party

---

[130] Email from SNAP, USDA-FNS, January 19, 2018.

[131] This is compared to about $17.6 billion in benefits overissued by states, based on USDA-FNS QC Reports, FY2005-FY2014.

[132] Management evaluations are periodic reviews of state agency operations by USDA-FNS focusing on specific areas of compliance with program rules. More information regarding SNAP management evaluations is available at https://www.fns.usda.gov/snap/snap-program-improvement.

[133] U.S. Department of Agriculture, Office of the Inspector General, *FNS Quality Control Process for SNAP Error Rate*, 27601-0002-41, September 2015, https://www.usda.gov/oig/webdocs/27601-0002-41.pdf (hereinafter cited as "September 2015 USDA-OIG report").

[134] Ibid., p. 4.

[135] Ibid., pp. 56-58.

consultants, were found to have mitigated errors,[136] fraudulently improving their state payment error rates.[137] USDA-FNS and USDA-OIG testified on this subject in two hearings, one before the Senate Committee on Agriculture, Nutrition, and Forestry in August 2017 and one before the House Committee on Agriculture in July 2016.[138] Entities, including state agencies, found to have defrauded federal programs are required to repay funds obtained through fraud, plus interest, under the False Claims Act (31 U.S.C. §3729). As of the date of this report, these three state agencies have admitted to the DOJ that they engaged in falsifying QC data and violating the False Claims Act in their administration of SNAP.[139] As part of their settlements with DOJ, the Virginia state agency agreed to pay $7,150,436,[140] the Wisconsin state agency agreed to pay $6,991,905,[141] and the Alaska state agency agreed to pay $2,489,999.[142] These $16.6 million in payments represent the share of the high-performance bonuses awarded to these states for low state payment error rates while they were engaged in fraudulent practices, plus interest.

For FY2015, USDA-FNS determined that data quality issues existed for 79% of state agencies; however, such issues are not in and of themselves proof of fraud.[143] All three states that settled with DOJ had hired the same Quality Control consultant firm. As of the date of this report, the USDA-OIG investigation into this state agency fraud is still ongoing and Mississippi is known to be under investigation for Quality Control fraud.[144] In her comments at the August 2017 Senate Agriculture Committee Hearing, Ann M. Coffey, Assistant Inspector General of Investigations at USDA-OIG, stated that a "significant number" of states were still under investigation and that the scale of this state fraud was "unique."[145]

---

[136] For example, if a household in the Quality Control sample was overpaid by $50 due to an agency error (AE), the state agency employee conducting the Quality Control review would look for ways to offset this error (e.g., by adding new household or medical expenses) in order to bring the total overpayment below the Quality Control threshold, rather than simply reporting the error as required. September 2015 USDA-OIG report, p. 5.

[137] Wisconsin, for example, reduced its state payment error rate from 7.38% in FY2008 to 2.02% in FY2011, a 73% decline, during the period it worked with consultants and committed state agency fraud.

[138] Senate Committee on Agriculture, Nutrition, and Forestry, *Nutrition Programs: Perspectives for the 2018 Farm Bill*, 115th Cong., 1st sess., August 13, 2017, https://www.agriculture.senate.gov/hearings/nutrition-programs-perspectives-for-the-2018-farm-bill (hereinafter cited as "August 2017 Senate Agriculture Committee Hearing"). House Committee on Agriculture, *Past, Present, and Future of SNAP: Evaluating Error Rates and Anti-Fraud Measures to Enhance Program Integrity*, 114th Cong., 1st sess., July 6, 2016. https://agriculture.house.gov/news/documentsingle.aspx?DocumentID=3472.

[139] For more information regarding the False Claims Act, see CRS Report R40785, *Qui Tam: The False Claims Act and Related Federal Statutes*, by Charles Doyle.

[140] U.S. Department of Justice, "Virginia Department of Social Services Agrees to Pay $7.1 Million to Resolve Alleged False Claims for SNAP Funds," press release, April 10, 2017, https://www.justice.gov/opa/pr/virginia-department-social-services-agrees-pay-71-million-resolve-alleged-false-claims-snap.

[141] U.S. Department of Justice (DOJ), "Wisconsin Department of Health Services Agrees to Pay Nearly $7 Million to Resolve Alleged False Claims for SNAP Funds," press release, April 12, 2017, https://www.justice.gov/opa/pr/wisconsin-department-health-services-agrees-pay-nearly-7-million-resolve-alleged-false-claims.

[142] U.S. Department of Justice, "Alaska Department of Health and Social Services to Pay Nearly $2.5 Million to Resolve Alleged False Claims for SNAP Funds," press release, August 18, 2017, https://www.justice.gov/opa/pr/alaska-department-health-and-social-services-pay-nearly-25-million-resolve-alleged-false.

[143] This CRS calculation is based on data provided by the USDA-FNS QC Statement; QC data for only 11 of the 53 state agencies could be validated for FY2015. The remaining 42 state agencies had serious data quality issues in their QC samples. See https://www.fns.usda.gov/snap/quality-control.

[144] See https://www.clarionledger.com/story/news/2017/11/29/doj-investigates-mississippi-department-human-services-over-food-stamps-consultant/901927001/.

[145] August 2017 Senate Agriculture Committee Hearing.

# Combating Errors and Fraud: Issues and Strategies

Over time, USDA-FNS, SNAP state agencies, USDA-OIG, GAO, and other stakeholders have identified issues that may complicate or impede the detection and correction of errors and fraud in SNAP. These kinds of issues can stem from shortcomings or gaps in existing regulation and law, as well as complexities in the fundamental design of the program itself. In addition, stakeholders have proposed strategies to address these kinds of issues and further curb errors and fraud in SNAP. These include, for example, proposed rulemaking actions, proposed statutory changes, and state pilots. Changes that strengthen payment accuracy and punishments against fraud can be in tension with other policy objectives, such as preserving recipient access to the program, and may have unintended consequences such as incurring costs greater than their savings. Balancing program objectives such as these is always a consideration for policymakers in this area.

---

**Recent Developments**

In the second session of the 115th Congress, Members voted on related policies in farm bill proposals considered in the House and Senate. See CRS Report R45275, *The House and Senate 2018 Farm Bills (H.R. 2): A Side-by-Side Comparison with Current Law* for a summary of the policies passed in versions of H.R. 2. The House and Senate each passed bills that contained policies related to errors and fraud, but the bills differ in their precise contents.

---

## Retailer Trafficking

### Certain Store Owners Remain Active in SNAP Despite Permanent Disqualification for Trafficking

According to SNAP rules, if a store is permanently disqualified from participating in SNAP and later that store's owner applies to participate in SNAP at a new store, then USDA-FNS will deny the new store's application. Due to a longstanding USDA-FNS policy, however, store owners who own multiple stores that participate in SNAP have been able to remain in the program with some of their stores despite a permanent disqualification at another of their stores.[146] This USDA-FNS policy, identified and examined in the July 2013 USDA-OIG report, was intended to prevent the elimination of whole chains of stores from the program as a result of violations at one store.[147] However, the policy has been applied beyond chain stores, and USDA-OIG identified it as a weakness in efforts to combat trafficking. In the July 2013 report, USDA-OIG identified 586 store owners who remained in SNAP due to this policy despite their association with a permanently disqualified store; 66 of these owners were found to have obtained SNAP authorization at new stores.[148]

In the July 2013 report, USDA-OIG proposed that USDA-FNS make a change to SNAP regulations and USDA-FNS policy to allow for the permanent disqualification or denial of *all*

---

[146] For example, an individual owns three stores (Store A, B, and C) that are authorized to participate in SNAP. Store B is permanently disqualified from participating in SNAP due to a USDA-FNS finding that the store engaged in retailer trafficking. Store A and Store C will continue to participate in SNAP irrespective of the permanent disqualification of Store B. Additionally, when the store owner applies for SNAP authorization for a new store location, Store D, USDA-FNS will generally process that new application irrespective of the past trafficking violations that took place at Store B.

[147] July 2013 USDA-OIG report, p. 9.

[148] Ibid., pp. 2-19.

current or future stores, respectively, associated with an owner of a store that is permanently disqualified for retailer trafficking unless the retailer can meet certain criteria.[149]

USDA-FNS responded to USDA-OIG with an alternative policy that would impose collateral requirements for these owners. (Under current law, collateral bonds or letters of credit are required as a condition of participation in SNAP for stores that have been subjected to a term disqualification.[150] These are held as collateral against the retailer committing future violations.) USDA-FNS suggested requiring a bond or letter of credit for all authorized stores associated with a permanently disqualified owner and for new stores when such stores have an owner associated with a store permanently disqualified for trafficking.[151] USDA-OIG indicated that it considered this USDA-FNS alternative to its disqualification recommendations inadequate, noting "[w]e believe that continuing to allow known traffickers to participate in SNAP will undermine program integrity."[152]

As of the date of this report, none of these proposed policy changes have been implemented.[153]

## Strengthening Monetary Penalties against Trafficking Retailers

An estimated $1.1 billion in SNAP benefits were trafficked annually at stores,[154] but in FY2016, USDA-FNS fined trafficking retailers only about $7.5 million.[155] Monetary penalties can discourage retailers from engaging in trafficking and also help recoup federal funds lost to fraud. For these reasons, changes to SNAP rules have been proposed to augment the monetary penalties assessed against trafficking retailers.

**Increasing Transfer of Ownership Civil Money Penalties**—The 2008 Farm Bill modified the FNA to increase civil monetary penalties against retailers that break SNAP rules to a maximum of $100,000 per violation.[156] If a retailer that has been permanently disqualified for trafficking SNAP benefits subsequently sells or transfers ownership of a store, then USDA-FNS assesses that retailer a "transfer of ownership civil money penalty" (TOCMP).[157] This is currently the primary financial penalty assessed by USDA-FNS against retailers found to have engaged in trafficking.

In August 2012, USDA-FNS published a notice of proposed rulemaking (NPRM) to implement the 2008 Farm Bill change.[158] This notice stated that existing limits used by USDA-FNS were

---

[149] Relevant criteria are outlined in SNAP regulations at 7 C.F.R. §278.6(i).

[150] The value of these bonds or letters of credit is equal to 10% of the SNAP business conducted by the store in the previous 12-month period. Section 12(d) of the FNA (codified 7 U.S.C. §2021(d) and implemented at 7 C.F.R. §278.1(b)(4)).

[151] Under this change, if a retailer owned three stores (Store A, B, and C) and Store B was permanently disqualified for trafficking, the retailer would be required to submit a bond or letter of credit for Store A and Store C, in addition to a bond or letter of credit for any future store applying for participation in SNAP.

[152] July 2013 USDA-OIG report, p. 21.

[153] July 2013 USDA-OIG report, pp. 20-22.

[154] This figure represents estimated retailer trafficking annually from 2012 to 2014 per the September 2017 USDA-FNS Retailer Trafficking Study, pp. ii-iii.

[155] This CRS calculation is based on information provided via email from SNAP, USDA-FNS, October 17, 2017.

[156] Section 4132 of the Food, Conservation, and Energy Act of 2008 (the 2008 Farm Bill, P.L. 110-246) modified Section 12(a)(1)(B) and (c)(1) of the FNA (codified at 7 U.S.C. §2021(a)(1)(B) and (c)(1) and implemented at 7 C.F.R. §3.91(b)(3)(i)).

[157] Section 12(e)(1) of the FNA (codified at 7 U.S.C. §2021(e) and implemented at 7 C.F.R. §278.6(f)(2)).

[158] U.S. Department of Agriculture, Food and Nutrition Service, "Supplemental Nutrition Assistance Program: Farm Bill of 2008 Retailer Sanctions," 77 *Federal Register* 4848461, August 14, 2012 (hereinafter cited as "August 2012

$11,000 per violation and $59,000 per investigation, and that this rulemaking action would increase these limits to up to $100,000 per violation per the intent of Congress expressed in the 2008 Farm Bill.[159] As of the date of this report, this rulemaking action is inactive (see **Table B-1** in **Appendix B**). Because this change in the limits on TOCMPs has not been implemented, USDA-FNS continues to assess TOCMPs according to the limits in place before the passage of the 2008 Farm Bill (i.e., $11,000 per violation and $59,000 per investigation). In FY2016, the mean value of TOCMPs assessed by USDA-FNS was $29,284, about half of the limit per investigation.[160] Implementation of these changes in the maximum limits on TOCMPs could represent a nearly tenfold increase in the penalty amounts for permanently disqualified retailers engaged in a high volume of SNAP business, potentially increasing the penalties' deterrent effect.[161]

**Creating Additional Civil Money Penalties**—Currently, USDA-FNS only fines a limited share of trafficking retailers. Firms permanently disqualified for trafficking are subject to a TOCMP when USDA-FNS becomes aware that the permanently disqualified store owner has sold a store, but USDA-FNS can only become aware of such a sale when, and if, the new store owner applies for SNAP authorization. For every retailer assessed a TOCMP in FY2016, more than seven retailers were permanently disqualified for trafficking.[162] Ultimately this means that the overwhelming majority of store owners found by USDA-FNS to have committed and materially benefited from retailer trafficking are subject to no monetary penalty at all.

USDA-FNS proposed to create a new kind of monetary penalty, the trafficking civil penalty (TCP), in the August 2012 USDA-FNS NPRM.[163] Under this proposal, a retailer permanently disqualified for trafficking would be subject to this new kind of fine, the size of which would be based on the retailer's volume of fraud, as it is for a TOCMP.[164] Establishing this new fine would provide an immediate monetary penalty at the time of permanent disqualification to further deter retailers from engaging in trafficking activity and recoup misappropriated federal funds. As of the date of this report, this rulemaking action is inactive (see **Table B-1** in **Appendix B**) and USDA-FNS is not assessing this new kind of fine.

## Changes in EBT Transaction Processing since 2014

Prior to September 2014, about half of all SNAP-authorized retailers (including many smaller independent retailers) used free EBT-only point of sale (POS) devices provided by their state's EBT host processors.[165] Transaction data for purchases made at these free EBT-only POS devices

---

USDA-FNS NPRM").

[159] Ibid., p. 48466.

[160] Email from SNAP, USDA-FNS, October 17, 2017.

[161] For example, if a store that redeemed an average of $4,000 in SNAP benefits per month is permanently disqualified for six retailer trafficking violations, then it would be assessed a TOCMP at the maximum of $59,000 under current regulations. Such a store would be assessed a TOCMP of $576,000 under this proposal. This CRS calculation is based on information provided in the August 2012 USDA-FNS NPRM and regulations at 7 C.F.R. §278.6(g).

[162] This CRS calculation is based on data from the December 2016 USDA-FNS Retailer Management Report, pp. 1-8.

[163] The Food Stamp Act of 1977 granted USDA-FNS the authority to either disqualify a firm for program violations or impose a civil money penalty, but not both. This authority was broadened by the 2008 FNA to allow USDA-FNS to simultaneously apply both kinds of penalties (i.e., disqualification *and* civil money penalty) to retailers in violation.

[164] For example, if a store that redeemed an average of $4,000 in SNAP benefits per month is permanently disqualified for six retailer trafficking violations, then it would be immediately assessed a fine in the amount of $288,000. This CRS calculation is based on information provided in the August 2012 USDA-FNS NPRM.

[165] EBT host processors are larger companies, such as Fidelity National Information Services (FIS), Solutran, and

went directly to EBT host processors and then to USDA-FNS. USDA-FNS uses this transaction data to detect retailer trafficking activity.

The 2014 Farm Bill modified the FNA to require that all nonexempt retailers pay for their own EBT equipment and services.[166] Since this change, most stores now work with third-party companies that provide POS equipment and services for a fee. The introduction of these unregulated intermediary entities has complicated USDA-FNS's efforts to detect retailer trafficking,[167] and has also facilitated new forms of fraud. For example, in 2017, an account executive for a third party processor was sentenced to prison, to be followed by supervised release, and was ordered to pay restitution for his role in illegally providing 50 unauthorized stores with active SNAP EBT point-of-sale devices which were used to redeem about $6.5 million in benefits (at least eight of these stores were found to engaged in retailer trafficking).[168]

### Enhancing Retailer Stocking Standards

Since 1994, retailers applying to participate in the program have been required to meet stocking standards which mandate a minimum of 12 food items.[169] In an October 2006 GAO report on trafficking, these minimal stocking requirements were identified as a factor potentially contributing to retailer trafficking, as the standards may make it easier for small, fraud-prone retailers that do not primarily sell food to enter the program.[170] In addition, the September 2017 USDA-FNS Retailer Trafficking Study identified a correlation between an increase in small stores (e.g., convenience stores) in the program and an increase in retailer trafficking (for more information, see **Appendix D**). As a result, increasing stocking standards has been proposed as a strategy to curb retailer trafficking. The 2014 Farm Bill modified the FNA to enhance retailer stocking standards for participating stores.[171] The December 2016 USDA-FNS Final Rule implemented these changes and included several other provisions that would have significantly increased stocking standards for retailers; however, Section 765 of the Consolidated

---

Conduent, that contract with individual states or groups of states to provide EBT services such as routing transactions and printing cards. These EBT host processors are subject to service contracts that reflect the statutory and regulatory requirements of the EBT system and are overseen by USDA-FNS.

[166] Section 4002(b)(1) of the Agricultural Act of 2014 (the 2014 Farm Bill, P.L. 113-79) modified Section 7(f)(2)(A) of the FNA (codified at 7 U.S.C. §2016(f)(2)(A)). A small number of SNAP-authorized retailers were exempt from this change, including military commissaries, nonprofit food purchasing cooperative ventures, group living arrangements, direct-marketing farmers, farmers' markets, and others. See also agency guidance, *Supplemental Nutrition Assistance Program Provisions of the Agricultural Act of 2014 - Implementing Memorandum*, U.S. Department of Agriculture, Food and Nutrition Service , March 21, 2014, pp. 1-3, https://fns-prod.azureedge.net/sites/default/files/SNAP%20Provisions%20of%20the%20Agricultural%20Act%20of%202014%20-%20Implementing%20Memo.pdf.

[167] These entities include independent sales organizations (ISOs) and third-party processors (TPPs). An ISO generally works directly with a retailer by providing EBT equipment and helping to set up the retailer's connection to a TPP. A TPP generally provides transaction services between a retailer and an EBT host processor. TPPs and ISOs have no contractual relationship with states and are not overseen by USDA-FNS.

[168] USDA-OIG SARC 1ˢᵗ Half FY2017, pp. 29-30.

[169] Section 201 of the Food Stamp Program Improvements Act of 1994 (P.L. 103-225) modified Section 3(o)(1) of the FNA (codified at 7 U.S.C. §2018(a)(1) and implemented in 7 C.F.R. §271.2 and §278.1(b)(1)). See also U.S. Department of Agriculture, Food and Nutrition Service, "Food Stamp Program: Revisions to the Retail Food Store Definition and Program Authorization Guidance," 66 *Federal Register* 2795, January 12, 2001.

[170] U.S. Government Accountability Office, Food Stamp Trafficking: FNS Could Enhance Program Integrity by Better Targeting Stores Likely to Traffic and Increasing Penalties, GAO-07-53, October 2006, p. 5, http://www.gao.gov/assets/260/252570.pdf.

[171] Section 4002(a)(1) and (2) of the 2014 Farm Bill P.L. 113-79 modified Section 3(o)(1)(A) of the FNA (codified at 7 U.S.C. §2012(o)(1)(A)).

Appropriations Act of 2017 (2017 Omnibus, P.L. 115-31) prevented full implementation of this rule.[172] On January 17, 2018, USDA-FNS began implementing the remaining provisions of the December 2016 USDA-FNS Final Rule. Current implementation requires a modest increase to the number of items stocked (from 12 to 36 food items) but not as much as would have been required by the final rule before the 2017 Omnibus (84 food items).

## Suspending "Flagrant" Retailer Traffickers

Some retailers have been found to have delayed the disqualification process for their stores, enabling them to continue trafficking. Between the USDA-FNS official notification of trafficking charges and the permanent disqualification for trafficking, there are a number of administrative steps.[173] Until final implementation of a permanent disqualification, the retailer may continue to participate in the program, accepting and redeeming SNAP benefits. According to USDA-FNS, some charged retailers exploit the delay created by these administrative steps in order to continue (or even accelerate) their trafficking of SNAP benefits, sometimes remaining in the program for months.[174] The 2008 Farm Bill modified the FNA to require USDA-FNS to utilize the EBT system to immediately suspend the payment of redeemed SNAP benefits to stores determined to be engaged in this "flagrant" retailer trafficking.[175] A February 2013 USDA-FNS NPRM included a provision to implement this 2008 Farm Bill requirement, but, as of the date of this report, this rulemaking action is inactive (see **Table B-1** in **Appendix B**).

## Increasing Requirements for High-Risk Stores

When a store applies for authorization to participate in SNAP, USDA-FNS internally assigns that store a risk status (i.e., high, medium, or low) based on retailer trafficking data for the location and area.[176] If a new store applies at a physical address associated with past retailer trafficking, that new store is more likely to be considered "high risk." In a July 2013 report, USDA-OIG noted that certain high-risk store locations evidence a pattern of retailer trafficking that continues under new ownership.[177] USDA-OIG recommended requiring a bond or letter of credit as a precondition of SNAP authorization at high-risk store locations, which would require statutory changes.

---

[172] For more information on this rulemaking, see CRS Report R44650, *Updated Standards for SNAP-Authorized Retailers*, by Randy Alison Aussenberg.

[173] These administrative steps include providing USDA-FNS with additional information, requesting agency administrative review, and filing Freedom of Information Act (FOIA) requests that must be fulfilled before final implementation of a permanent disqualification for trafficking may occur.

[174] U.S. Department of Agriculture, Food and Nutrition Service, "Supplemental Nutrition Assistance Program: Suspension of SNAP Benefit Payments of Retailers," 78 *Federal Register* 12245, February 22, 2013 (hereinafter cited as "February 2013 USDA-FNS NPRM").

[175] Section 4132 of the 2008 Farm Bill modified Section 12(h) of the FNA (codified at 7 U.S.C. §2021(h)).

[176] Stores with higher-risk statuses may be subjected by USDA-FNS to more rigorous authorization processes, including enhanced documentation requirements and more frequent inspections.

[177] July 2013 USDA-OIG report, p. 16.

# Recipient Trafficking

## Requiring Recipient Photographs on EBT Cards

While some have argued that placing recipient photographs on EBT cards would reduce trafficking, specifically the sale of cards between recipients and unauthorized use of cards at authorized stores, there are operational and access challenges to this strategy. Since 1996, state agencies have had the option to require photographs of one or more SNAP household members on the household's EBT card(s).[178] This state option is known as "photo EBT."

Like SNAP benefits, EBT cards are issued to households, not to individuals. Also, households may appoint authorized representatives (outside of the household) to use their EBT cards to shop on the households' behalf.[179] As a result, a photo EBT card might only bear the image of the head of a household despite the fact that all members of the household can use the card. Similarly, an authorized representative may use a card that does not have the representative's picture on it. Retailers therefore cannot legally deny a SNAP transaction just because the user does not match the photo on the card. Additionally, some advocates point out that photo EBT has shown some adverse effects on recipient access.[180]

A number of states have considered or implemented photo EBT since 1996. States' evaluations of photo EBT have generally concluded that the option has or would have little to no effect on recipient trafficking.[181] Though evidence of reduced trafficking is lacking, two states, Maine and Massachusetts, currently implement photo EBT. Maine contended that it "[strengthens] the integrity of our public assistance programs."[182]

The implementation of photo EBT in a state requires both upfront and ongoing costs to the state and federal government. Upfront costs generally exceed ongoing costs, and ongoing costs generally increase over time. State estimates and actual expenditures on the cost of photo EBT vary widely. As an example, in 2000, Missouri enacted a state law mandating photo EBT, and the Office of the Missouri State Auditor evaluated the option in August 2001.[183] This audit determined that in the first year of implementation, photo EBT effected no fraud reduction, cost $1,801,858 ($947,280 federal costs and $854,578 state costs), and should be discontinued.[184] In 2001, Missouri discontinued its use of photo EBT.

---

[178] Section 825(a)(9) of Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA) modified Section 7(h)(9) of the FNA (codified at 7 U.S.C. §2016(h)(9) and implemented at 7 C.F.R. §274.8(b)(5)).

[179] For example, a household containing homebound senior citizens may give their EBT card and PIN to a neighbor and authorize them to shop on the household's behalf.

[180] See, for example, a summary of Massachusetts client advocate experiences and concerns included in an Urban Institute issue brief published in March 2015, "Assessing the Merits of Photo EBT Cards in the Supplemental Nutrition Assistance Program."

[181] This includes state reports such as those conducted by Missouri in August 2001 (https://catalog.loc.gov/vwebv/search?searchCode=LCCN&searchArg=2002435093&searchType=1&permalink=y), Rhode Island in September 2013 (https://lisaopdycke.files.wordpress.com/2014/03/ebt-feasibility-in-ri1.pdf), Pennsylvania in November 2012 (http://lbfc.legis.state.pa.us/Resources/Documents/Reports/450.pdf), and Massachusetts in April 2012 (http://archives.lib.state.ma.us/bitstream/handle/2452/213365/ocn885253047.pdf?sequence=1&isAllowed=y).

[182] Maine Department of Health and Human Services Commissioner Mary Mayhew, Department of Health and Human Services, Maine, "DHHS to Begin Putting Photos on Maine EBT Cards," press release, April 17, 2014, http://www.maine.gov/dhhs/archivednews_autosearch.shtml?id=618847.

[183] See Section 208.182, RSMo 2000.

[184] Office of Missouri State Auditor, *Audit of Department of Social Services Electronic Benefit Security Card and Electronic Benefit Transfer Benefit Delivery System*, Report No. 2001-58, August 2001, p. 8, https://catalog.loc.gov/

In reviewing 14 states that have considered photo EBT implementation since 2001, upfront costs range from about $1.6 million in New Hampshire (2016) to about $25.1 million in North Carolina (2011).[185] Estimates of ongoing annual costs vary across an even wider range, from approximately $65,000 in Virginia (2017) to $8.4 million in Arizona (2016).[186]

## State Agency Reporting on Recipient Fraud

There is currently no single standard measurement of recipient fraud (neither recipient trafficking nor recipient application fraud). In the absence of a national recipient trafficking rate, it is difficult to observe trends and evaluate the effectiveness of enforcement strategies. Both GAO[187] and USDA-OIG[188] have commented on the significance of this shortcoming and recommended changes to allow for the creation of a national recipient trafficking rate akin to the national retailer trafficking rate. Based on USDA-FNS analysis, however, GAO found it is infeasible to create a uniform methodology for states to calculate a national recipient trafficking rate without statutory changes to require and enable USDA-FNS and state agencies to assign sufficient resources to this issue.[189] USDA-FNS echoed these feasibility concerns in a May 2014 evaluation.[190]

Additional authority and resources to develop a recipient trafficking rate might allow USDA-FNS to do some or all of the following:

- conduct and publish a study of recipient trafficking of SNAP benefits using currently existing data, including a national recipient trafficking rate;

- determine and document what changes must be made to current regulations, forms, policies, and practices to standardize state agency reporting and calculation of recipient trafficking, including at minimum the definition of

---

vwebv/search?searchCode=LCCN&searchArg=2002435093&searchType=1&permalink=y.

[185] The cost estimate for New Hampshire in 2016 estimated an upfront cost of $1,554,634 and ongoing costs of about $887,507 a year. The cost estimate for North Carolina in 2011 estimated an upfront cost of $25,050,000 and ongoing costs of $2,450,000 a year. Department of Health and Human Services, New Hampshire, Fiscal Note: Senate Bill 529, January 28, 2016, https://legiscan.com/NH/text/SB529/id/1318275; General Assembly of North Carolina, Legislative Fiscal Note: House Bill 734, July 1, 2012, pp. 2-3, https://www.ncleg.net/Sessions/2011/FiscalNotes/House/PDF/HFN0734v1.pdf.

[186] The cost estimate for Virginia in 2017 estimated ongoing costs at approximately $65,000 per year and an upfront cost of $1,836,935 (this estimate only included costs directly associated with card production and excluded other ongoing photo EBT implementation costs); Joint Legislative Audit and Review Commission, 2017 General Assembly Session, Fiscal Impact Review: House Bill 2208, February 6, 2017, p. 3, https://lis.virginia.gov/cgi-bin/legp604.exe?171+oth+HB2208J110+PDF. The cost estimate for Arizona in 2016 estimated ongoing costs of $8.4 million per year and an upfront cost of $12 million; Joint Legislative Budget Committee of Arizona, Fiscal Note: House Bill 2596, February 17, 2016, p. 1, https://www.azleg.gov/legtext/52leg/2r/fiscal/hb2596.docx.pdf.

[187] Government Accountability Office, *Supplemental Nutrition Assistance Program: Enhanced Detection Tools and Reporting to Combat Recipient Fraud Are in Development*, GAO-16-719T, May 2016, pp. 4-15, https://www.gao.gov/assets/680/677779.pdf (hereinafter cited as "June 2016 GAO report").

[188] September 2012 USDA-OIG report, p. 21.

[189] June 2016 GAO report, p. 4-5.

[190] As of May 2014, USDA-FNS evaluated the feasibility of calculating a national recipient trafficking rate and determined that it would be necessary for USDA-FNS to create a system similar in nature to the SNAP Quality Control system in order to calculate a recipient fraud rate. This system would, like the SNAP QC system, require statutory authority and extensive regulations to standardize terminology, definitions, timelines, methodologies, data reporting, and data formatting. The system would also require a significant investment of state and federal resources to establish and operate. As no such authority or resources currently exist, USDA-FNS found that establishing the rate was infeasible. Email from SNAP, USDA-FNS, November 24, 2017.

relevant terms (e.g., definition of "investigation"), the annual timeframes, and the data sources for compilation of recipient trafficking data; and

- implement the identified changes necessary to reliably and accurately document the national recipient trafficking rate.

## Enhancing Federal Financial Incentives for State Agencies to Fight Fraud

USDA-FNS provides financial incentives to state agencies to reward high performance.[191] These bonuses reward states with low error rates but do not reward states that effectively detect and penalize recipient trafficking. In April 2014, USDA-FNS published a Request for Information (RFI) soliciting comment on ways to modify performance bonuses for state agencies, including creating bonuses related to activities targeting recipient trafficking.[192] The July 2016 GAO report also found that USDA-FNS does not sufficiently incentivize state agencies to pursue recipient trafficking cases. The report stated, "to help address the increased caseloads and the resources needed to conduct investigations, we recommended that USDA explore ways that federal financial incentives could be used to better support cost-effective anti-fraud strategies. At this time, FNS has decided not to pursue bonus awards for anti-fraud and program integrity activities."[193] Establishing a standard to measure performance for these bonuses would likely require the establishment of a national recipient trafficking rate as discussed earlier in this section.

Additionally, as stated earlier, state agencies establish and collect claims against recipients who traffic SNAP benefits. If a state agency collects on a claim resulting from fraud, such as recipient trafficking, the state agency is entitled to retain 35% of the amount collected.[194] The August 2014 GAO report suggested that increasing this retention rate and restricting the use of retained funds to state agency anti-fraud activities could significantly enhance efforts to combat recipient trafficking, noting that the strategy "may result in a net savings for SNAP if increased collections in payment recoveries outweigh the increased amount states receive in retentions."[195] Implementation of this strategy may require statutory change.

## Federal Oversight of State Agencies—Management Evaluations (MEs)

USDA-FNS oversees state agency administration of SNAP, and one of the primary tools used in this federal oversight is the management evaluation (ME). USDA-FNS conducts annual management evaluations on high priority areas and triennial reviews on lower priority areas.[196] If a state agency is found to be out of compliance with SNAP rules, then a corrective action plan (CAP) will be developed and USDA-FNS will work with the state agency to improve

---

[191] Section 16(d) of the FNA (codified at 7 U.S.C. §2025(d) and implemented at 7 C.F.R. §275.24).

[192] U.S. Department of Agriculture, Food and Nutrition Service, "Request for Information: Supplemental Nutrition Assistance Program (SNAP) High Performance Bonuses," 79 *Federal Register* 22788, April 23, 2014.

[193] July 2016 GAO report, p. 29.

[194] Section 16(a) of the FNA (codified at 7 U.S.C. §2025(a) and implemented at 7 C.F.R. §273.18(k)(1)).

[195] August 2014 GAO report, pp. 15-34.

[196] See 7 C.F.R. §275.3(a). In FY2017, for example, management evaluations included the administration of policies and programs related to Able-bodied Adults without Dependents (ABAWD), SNAP Employment and Training (E&T), Program Access Review (PAR), and photo EBT. U.S. Department of Agriculture, Food and Nutrition Service, *Supplemental Nutrition Assistance Program - Fiscal Year 2017 National Target Areas for Management Evaluations*, June 2018, pp. 1-2, https://fns-prod.azureedge.net/sites/default/files/snap/ SNAP%20FY17%20National%20Target%20Areas%20for%20Management%20Evaluations%20%282%29.pdf.

compliance. A January 2012 USDA-OIG report noted that USDA-FNS did not utilize management evaluations to assess the effectiveness of state agencies' efforts to detect and penalize recipient trafficking.[197] In response, USDA-FNS created a "recipient integrity" management evaluation in FY2012 which it currently uses to evaluate state agencies every three years.[198]

## Delayed State Agency Notification of Retailer Trafficking Cases

State agencies are responsible for investigating recipient trafficking, and USDA-FNS is responsible for investigating retailer trafficking. A large share of trafficking, however, results from collusion between recipients and retailers. If a state agency is made aware that a store in its jurisdiction is engaged in retailer trafficking, it can place the store under surveillance and build cases against recipients engaged in trafficking at that location.[199] Usually, however, state agencies have no such opportunity. USDA-FNS provides retailer trafficking cases to state agencies only after completing the agency administrative and appeal process. By the time the state agency is made aware of a retailer trafficking case, the store has ceased accepting SNAP and has often closed. At that point, meaningful surveillance of the store cannot be performed and EBT transaction data cannot be corroborated with other forms of hard evidence. It is important to note, however, that providing state agencies with advance notification regarding ongoing USDA-FNS investigations of retailers may jeopardize these investigations.[200]

## Difference in Burden of Proof for Retailer Trafficking versus Recipient Trafficking

Retailer and recipient trafficking proceedings have different burdens of proof; therefore, governments will not necessarily prevail in both cases with the same evidence. Accepting SNAP benefits as a form of payment is not an entitlement for retailers. To disqualify a SNAP retailer for a violation of SNAP rules, USDA-FNS must only meet a lower-level burden of proof—the "preponderance of the evidence" standard.[201] Receiving SNAP benefits is an entitlement for eligible individuals. To disqualify a SNAP recipient for fraud, a state agency must meet a higher-level burden of proof—the "clear and convincing evidence" standard.[202] This means that evidence

---

[197] U.S. Department of Agriculture, Office of the Inspector General, *State Fraud Detection Efforts for the Supplement Nutrition Assistance Program*, Audit Report 27703-0002-HY, January 2012, p. 2, https://www.usda.gov/oig/webdocs/27703-0002-HY.pdf.

[198] For more information about these management evaluations, see https://www.fns.usda.gov/snap/snap-program-improvement.

[199] Surveillance helps identify the SNAP recipients who frequent the store and, paired with EBT transaction data, can provide evidence of recipient trafficking. If, for example, a SNAP recipient enters a trafficking store, swipes his/her EBT card for a large transaction amount, and then leaves the store without bags of groceries, it is extremely likely that the recipient is engaged in trafficking.

[200] Email from SNAP, USDA-FNS, January 5, 2018.

[201] Under the preponderance standard, if more than 50% of the evidence favors a party, then that party prevails. In the context of a retailer administratively sanctioned by USDA-FNS for trafficking, the retailer must satisfy the preponderance standard to prove that the USDA-FNS administrative sanction was invalid. If the retailer is unable to meet this burden of proof, then the court will sustain USDA-FNS's administrative sanction. See USDA-FNS Final Agency Decisions at https://www.fns.usda.gov/snap/retailer-sanctions-final-agency-decisions-fads.

[202] The clear and convincing standard is met if the plaintiff/prosecutor proves that their position is substantially more likely than not to be true (i.e., if more than 70-75% of the evidence favors the plaintiff/prosecutor, then the plaintiff/prosecutor will win the case). The applicability of this burden of proof for SNAP recipients is established in regulation at 7 C.F.R. §273.16(e)(6).

AR.07954

deemed sufficient to prove retailer trafficking may not be sufficient to prove recipient trafficking. Indeed, over 84% of the USDA-FNS retailer trafficking cases that resulted in a permanent disqualification in FY2016 relied primarily on an analysis of suspicious transaction patterns based on Anti-fraud Locator using EBT Retailer Transactions (ALERT) system data.[203] These EBT transaction data, on their own, are not generally considered sufficient grounds for the disqualification of SNAP recipients. For this reason, state agencies often have difficulty disqualifying recipients whose EBT cards were used in transactions flagged as trafficking by ALERT transaction data analysis, absent other evidence of recipient trafficking.

### Best Practices for Fighting Recipient Fraud—the SNAP Fraud Framework

Grants to states for integrity activities, established by Section 4029 of the 2014 Farm Bill, were awarded in FY2014 and FY2015 but not in FY2016 or FY2017.[204] USDA-FNS is currently developing a "SNAP Fraud Framework," which combines best practices for fraud prevention gathered by USDA-FNS over several years from federal, state, and private partners. USDA-FNS plans to launch the SNAP Fraud Framework in FY2018 and to offer states grant opportunities using this funding to implement the framework.[205]

## Retailer Application Fraud

USDA-FNS is responsible for reviewing the applications submitted by retailers and ensuring that retailers authorized to participate in SNAP meet all eligibility requirements. Included in these applications are store owners' personal information, including but not limited to owners' Social Security Numbers (SSNs), but USDA-FNS is statutorily limited in how it can use these SSNs.

---

**Restrictions on the Use of Retailers' Social Security Numbers (SSNs)**

When a retailer applies to participate in SNAP, they must provide to USDA-FNS the SSNs of all owners of the applicant store. Per the Social Security Act, USDA-FNS may only legally use these SSNs for one purpose: "the establishment and maintenance of a list of the names and social security account numbers of such individuals for use in determining those applicants who have been previously sanctioned or convicted under section 12 or 15 [of the FNA]."[206] Due to this restriction, USDA-FNS is unable to use these SSNs to perform background checks or match with federal databases.

---

### Verification and Use of Retailer Submitted Social Security Numbers (SSNs)

During the application process, retailers provide USDA-FNS with the SSNs of all store owners. USDA-OIG compared these retailer-submitted SSNs to the Social Security Administration's Death Master File to identify store owners using SSNs that matched the SSNs of deceased individuals. In a January 2017 USDA-OIG report, 3,394 stores were found to have at least one owner using an SSA-DMF matched SSN, and 346 of these stores were found to have all owners

---

[203] CRS calculation based on data from December 2016 USDA-FNS Retailer Management Report, p. 8.

[204] For state activities under this grant, see, for example, U.S. Department of Agriculture, Food and Nutrition Service, *FY 2015 SNAP Recipient Integrity Information Technology Grant Summaries*, October 2015. https://www.fns.usda.gov/snap/fy2015-snap-recipient-integrity-information-technology-grant-summaries.

[205] U.S. Department of Agriculture, Office of Budget and Program Analysis , *2019 USDA Budget Explanatory Notes: Food and Nutrition Service* , pp. 32-91, https://www.obpa.usda.gov/32fns2019notes.pdf.

[206] Section 205(c)(2)(C)(iii)(I) of the Social Security Act (codified at 42 U.S.C. §405(c)(2)(C)(iii)(I) and implemented at 7 C.F.R. §278.1(q)(3)).

using SSA-DMF matched SSNs.[207] USDA-OIG recommended that USDA-FNS follow up with these 3,394 retailers and implement a new workflow process to check retailer-submitted SSNs on an ongoing basis. In the agency response to the report, USDA-FNS addressed these 3,394 identified retailers, but also identified the statutory barrier to this proposed change, stating: "FNS recognizes the value in conducting a DMF match on an on-going basis. As such, should FNS be granted future authority to use SSN for matching purposes, FNS will match to the SSA DMF using SSN on an on-going basis."[208] As of the date of this report, USDA-FNS does not verify retailer-submitted SSNs or match against the SSA-DMF due to this statutory restriction.[209] Implementation of this change would require modification to the Social Security Act.

## Other Verification of Retailer Submitted Information

In the July 2013 report, USDA-OIG recommended that USDA-FNS use other methods to verify applicant retailer information such as memoranda of understanding (MOUs) with state licensing agencies. USDA-FNS proposed instead to test the use of data brokers to complement existing techniques used to verify retailer applicant information.[210] In 2014, USDA-FNS conducted four pilots testing the use of data brokers and determined that it had low return on investment, in part due to USDA-FNS's inability to utilize applicant retailers' SSNs in data matches.[211]

## Mandating Background Checks on High-Risk Retailer Applications

Store owners who have been convicted of certain crimes will be denied authorization to participate in SNAP for lack of business integrity if they declare the past conviction when applying. However, USDA-FNS is not currently able to verify the information provided by the retailer if he/she chooses to falsify the application and conceal past criminal convictions. A September 2008 USDA-OIG report[212] suggested that USDA-FNS utilize the Interstate Identification Index (III) of the National Crime Information Center (NCIC) to perform background checks on retailers applying to participate in SNAP.[213] The July 2013 USDA-OIG report repeated this recommendation, finding three owners who failed to disclose past criminal convictions on their application for SNAP authorization out of a sample of 212 owners (all three were later permanently disqualified for retailer trafficking).[214] In response, USDA-FNS agreed to

---

[207] U.S. Department of Agriculture, Office of the Inspector General, *Detecting Potential SNAP Trafficking Using Data Analysis*, Report 27901-0002-13, January 2017, https://www.usda.gov/oig/webdocs/27901-0002-13.pdf, pp. 3-8.

[208] January 2017 USDA-OIG report, p. 6.

[209] Section 205(c)(2)(C)(iii)(I) of the Social Security Act (codified at 42 U.S.C. §405(c)(2)(C)(iii)(I) and implemented at 7 C.F.R. §278.1(q)(3)).

[210] A data broker, or information broker, collects information on individuals from private and public records and provides access to this information to customers for a fee.

[211] Email from SNAP, USDA-FNS, January 5, 2017.

[212] U.S. Department of Agriculture, Office of the Inspector General, *Audit Report: Food Stamp Program Retailer Authorization and Store Visits*, Report No. 27601-15-AT, September 2008, pp. 6-8, https://www.usda.gov/oig/webdocs/27601-15-At.pdf.

[213] The III, or "triple-I", is a national database of individuals' criminal histories which can be used for individual criminal background checks. The III database is accessible through the system used to access the DOJ-FBI-NCIC and maintained by the FBI. The NCIC is the country's central repository for a range of criminal information, facilitating information flow between federal, state, and local law enforcement agencies. USDA-FNS, and other non-criminal justice agencies, do not have access to the NCIC, but can obtain NCIC data when authorized by statute and approved by the U.S. Department of Justice (DOJ). Although individuals may obtain their own NCIC records, agencies like USDA cannot compel individuals to submit their own NCIC records without statutory authority and DOJ approval.

[214] September 2008 USDA-OIG report, pp. 4-8.

initiate a proposed rulemaking action to require retailer applicants and currently authorized retailers deemed "high risk"[215] to provide USDA-FNS with a self-initiated background check.[216] However, USDA-FNS does not currently have the statutory authority to compel retailer applicants to submit background checks. As of the date of this report, this rulemaking action is "inactive" (see **Table B-1** in Appendix B).

## Additional Retailer Application Vulnerabilities Identified in 2012 and 2013 USDA-FNS Proposed Rules

The August 2012 and February 2013 USDA-FNS NPRMs contained four provisions addressing shortcomings in existing retailer application regulations. These proposed rules are currently "inactive" (see **Table B-1** in **Appendix B**). Proposed changes included the following:

**Retailers failing to report changes in ownership**—Currently, authorized retailers are required to report any changes in the ownership of their stores, but there is currently no penalty for noncompliance. To deter retailer noncompliance, USDA-FNS proposed to subject to a six-month disqualification any retailer that failed to report ownership changes to USDA-FNS within 10 days of the change.[217]

**Disqualified SNAP recipients applying to become SNAP-authorized retailers**—Under current SNAP rules, USDA-FNS may not deny the application of a retailer who was permanently disqualified from SNAP as a recipient for fraud on business integrity grounds. USDA-FNS proposed to add recipient fraud to the definition of business integrity standards, "because a person, who violates program rules as a recipient, lacks the necessary business integrity and responsibility expected of a store owner who must train employees and oversee operations to ensure that SNAP EBT transactions are conducted in accordance with Department rules."[218] Data matches with the USDA-FNS electronic Disqualified Recipient System (eDRS) are needed to determine whether individuals are disqualified from receiving SNAP benefits, and such matches rely on the use of individuals' SSNs; therefore, USDA-FNS would have difficulty implementing this provision due to statutory restrictions on allowable uses of applicant retailers' SSNs.[219]

**Illegal retailer-to-retailer transfers of SNAP authorization**—Authorized retailers are prohibited from transferring the SNAP authorization of their stores to a new owner in the event of a sale, and retailers are prohibited from accepting SNAP benefits without first applying for and obtaining SNAP authorization. Under current regulations, if a retailer sells the authorization and a retailer buyer uses it, USDA-FNS penalizes the buyer but not the seller.[220] To address illegal collusion on the part of the seller and curtail unauthorized SNAP redemptions, USDA-FNS

---

[215] When a store applies for authorization to participate in SNAP, USDA-FNS internally assigns that store a risk status (i.e., high, medium, or low) based on retailer trafficking data for the location and area. Stores with higher-risk statuses may be subjected by USDA-FNS to more rigorous authorization processes, including enhanced documentation requirements and more frequent inspections.

[216] July 2013 USDA-OIG report, pp. 10-14.

[217] February 2013 USDA-FNS NPRM, pp. 12249-12250.

[218] August 2012 USDA-FNS NPRM, p. 48464.

[219] Section 205(c)(2)(C)(iii)(I) of the Social Security Act (codified at 42 U.S.C. §405(c)(2)(C)(iii)(I) and implemented at 7 C.F.R. §278.1(q)(3)).

[220] The fine for unauthorized acceptance of SNAP benefits is $1,000 for each violation plus an amount equal to three times the face value of the illegally accepted SNAP benefits. Section 12(f) of the FNA (codified at 7 U.S.C. §2021(f) and clarified at 7 C.F.R. §278.6(m)).

proposed to subject the seller to two penalties: permanent SNAP retailer ineligibility (for all current and future stores) and a fine equal to that of the buyer (under current regulations).[221]

**Retailers' failure to pay fines, claims, or fiscal penalties**—Current SNAP regulations allow USDA-FNS, on the basis of business integrity, to deny or withdraw the authorization of retailers who fail to pay *certain* fiscal claims or fines.[222] USDA-FNS proposed to allow the agency to deny or withdraw the authorization of retailers who fail to pay *any* fine, claim, or fiscal penalty assessed against them under 7 C.F.R. §278 when such debts become delinquent.[223]

# Recipient Application Errors and Fraud

## Establish Federal Incentives to Conduct Pre-certification Investigations

In the June 2016 GAO report, GAO recommended that federal financial incentives should be restructured to encourage effective pre-certification investigations "because some investigative agencies were not rewarded for cost-effective, anti-fraud efforts that could prevent ineligible people from receiving benefits."[224] As this report noted, "when fraud by a recipient is discovered, the state may generally retain 35 percent of the recovered overpayment, but when a state detects potential fraud by an applicant and denies the application, there are no payments to recover."[225] According to FY2016 State Activity Report data,[226] about half of the state agencies dedicated minimal resources to pre-certification investigations.[227] The five state agencies that engaged in the most extensive pre-certification investigation activity represented 96% of these investigations despite serving only 32% of all SNAP participants in FY2016.[228] Together, the five states reported about $369 million in prevented improper federal expenditure through these efforts.[229] With incentives, it is possible that more states would dedicate resources to conducting pre-certification investigations to find error and fraud on a regular basis.

## Difficulties in Collecting Amounts Overpaid to or Trafficked by Recipients

As one might expect, it is challenging to recover overpayments from poor and near-poor households.[230] Establishing and collecting claims is the primary way that overpayments are recovered; and, while state agencies have improved the rate of claims establishment since

---

[221] February 2013 USDA-FNS NPRM.

[222] Section 9(a)(1)(D) of the FNA (codified at 7 U.S.C. §2018(a)(1)(D) and implemented 7 C.F.R. §278.1(k)(7)).

[223] February 2013 USDA-FNS NPRM.

[224] June 2016 GAO report, p. 9.

[225] Ibid., pp. 9-10.

[226] The following CRS calculations are based on state data from the FY2016 SAR, pp. 5-36. Calculations are based on total FY2016 issuance of $66,539,351,219 and average monthly participation of 44,219,363 persons.

[227] Of the 53 states that administer SNAP (including the District of Columbia, Guam, and the U.S. Virgin Islands), 19 states did not initiate pre-certification investigations in FY2016 (Alabama, Georgia, Guam, Hawaii, Idaho, Illinois, Louisiana, Maine, Massachusetts, Mississippi, Missouri, Montana, New Mexico, Oklahoma, Oregon, South Carolina, Tennessee, Texas, and Wyoming) and 7 states initiated fewer than 100 pre-certification investigations in FY2016 (Colorado, the District of Columbia, Maryland, Nebraska, North Dakota, South Dakota, and Vermont).

[228] These five states are California, Florida, Michigan, New York, and Pennsylvania.

[229] FY2016 SAR, pp. 23-37.

[230] About 41% of claims are collected through the Treasury Offset Program (TOP) and about 39% of claims are collected through recoupment (i.e., partial reduction of an active SNAP household's monthly benefit to gradually collect overpayments). The remaining collections are conducted through other methods. This CRS calculation is based on FY2016 SAR, p. 35.

FY2005, states' efforts to actually collect on these claims have not likewise improved. From FY2005 to FY2014:

- the total annual dollar value of claims established has increased from about 20% to about 28% of the total annual dollar value of estimated overpayments; this improvement indicates increased claims establishment activity by state agencies.

- the total annual dollar value of claims collected has remained around 16% of the total annual dollar value of estimated overpayments; this reflects persistent difficulties in claim collection.

**Figure 5** reflects these trends.

**Figure 5. Claims Established and Claims Collected as Shares of Estimated Dollars Overissued, FY2005-FY2014**



**Sources:** CRS graphic made using data from SNAP State Activity Reports and Annual Quality Control Reports.

**Notes:** Claims are not always established in the same year as the overpayment or trafficking occurs, and claims are not always collected in the same year that they were established. Totals for claims establishment and claims collection are actual amounts established and collected, while total overpayments are estimates calculated using the SNAP Quality Control review system.

This was a finding in the August 2014 GAO report and, furthermore, "[s]tates' difficulty collecting overpayments compounds their concerns about having adequate resources for investigations because some states use recovered overpayments for this purpose."[231] The GAO report did not provide strategies for how states might address this concern.

## Duplicate Enrollment and the National Accuracy Clearinghouse (NAC)

Individuals are not allowed to apply for or receive benefits from more than one state agency at a time. It is important to note, however, that duplicate enrollment may be indicative of either an

---

[231] August 2014 GAO report, p. 16.

error or fraud depending on the circumstances of the case. Duplicate enrollment (or "dual participation") results in a 10-year disqualification from SNAP if it is due to intentional fraud.[232]

Some state agencies detect duplicate enrollment through exchanging enrollment data with neighboring states. As of the October 2016 GAO report, Massachusetts and New York, for example, had such an arrangement.[233]

The National Accuracy Clearinghouse (NAC) is a significant effort to detect and prevent duplicate enrollment. The NAC was funded as a pilot by the U.S. Office of Management and Budget (OMB) Partnership for Program Integrity and Innovation from April 2013 until May 2015. The NAC gathers and analyzes SNAP state enrollment data from five participating states.[234] Since the conclusion of the pilot in May 2015, these five states have continued NAC operations. In practice, the NAC is another data match performed during certification. NAC matches are not considered verified upon receipt, so additional steps are necessary to confirm matches.[235]

An evaluation of NAC published in October 2015[236] documented several elements of NAC's performance, outcomes, and costs, including the following:[237]

- In May 2014, prior to implementation, 10,076 instances of duplicate enrollment across the five states were identified. One year later, in May 2015, duplicate enrollment in these five states had been reduced by almost 50% (5,464 instances identified).

- Using NAC is estimated to have prevented about $548,336 in monthly overpayments during the pilot year,[238] with monthly state agency work effort costs totaling $81,913 (resulting in about $6.69 in monthly overpayments prevented for every $1.00 spent monthly).[239]

- In the first year, using NAC produced an estimated annualized savings of $5,597,076 (less the $669,331 spent on one-time startup costs).

- Nationalizing NAC has been estimated to result in $114,072,753 in annual savings.

---

[232] Sections 6(j) and 11(e)(18) of the FNA (codified at 7 U.S.C. §2015(j) and §2020(e)(18)(A) and implemented at 7 C.F.R. §273.16(b)(5)).

[233] October 2016 GAO report, p. 22.

[234] These five states are Florida, Georgia, Alabama, Louisiana, and Mississippi.

[235] The most common outcome of this process is preventing *accidental* dual participation, a recipient error, when a household failed to report that it moved to a different state. For example, an applicant household resides in Mississippi and is deemed eligible for and receives SNAP in Mississippi. Halfway through the year, the household moves to Louisiana and applies for SNAP benefits there. When a match is detected through NAC, the ultimate result would be the closure of the household's SNAP case in Mississippi followed by certification in Louisiana.

[236] PCG Human Services, *National Accuracy Clearinghouse (NAC) Evaluation*, Final Report, October 2015, pp. 22-38, https://risk.lexisnexis.com/-/media/files/government/report/ b7de1d11976a4bdd82a039a8f272265busdareportonnac2016117614-pdf.pdf (hereinafter cited as "NAC October 2015 report"). PCG completed this evaluation under a contract with Mississippi Department of Human Resources. The following CRS calculations are based on data from this NAC October 2015 report.

[237] The following are CRS calculations based on data from the NAC October 2015 report.

[238] Total overpayments in FY2014 in these five states are estimated at about $200 million. This CRS calculation is based on data from the FY2014 QC report, p. 11.

[239] This estimate is based on a comparison of duplicate enrollment levels in these five states prior to implementation (September 2013 to May 2014) with levels in the last four months of the pilot (February 2015 to May 2015).

- Costs of setting up and utilizing NAC for the first year came to about $1,652,287 for all five participating states.[240] USDA-FNS provides federal matching funds for states' program administration costs, including costs of NAC participation.

During the 115th Congress, the House passed an emergency supplemental appropriations bill, which included a provision that would have required the expansion of NAC to all states (Section 3003 of H.R. 4667; however, this provision was not included in the emergency supplemental appropriations which became law (Bipartisan Budget Act of 2018, P.L. 115-123).[241]

## Considerations for Data Matching

As discussed earlier, states are required to conduct certain data matches to verify household application information, and many opt to include additional data sources. There are arguments for and against expanding states' use of additional data matches. While verifying household data to high-fidelity sources seems compelling, the use of matching to less authoritative data can require additional employee hours and might introduce the errors it seeks to prevent.

Implementing new data matches may require large upfront investments and ongoing costs to state agencies. Non-verified upon receipt data matches may necessitate additional manual follow-up, which can create even more cost and delay. As a result, state agencies prefer to use verified upon receipt data matches whenever possible. However, only one of the six federally required databases is considered verified upon receipt. In comments published in response to USDA-FNS rulemaking implementing the statutorily mandated data matches, some states pointed out that the implementation of these data matches is burdensome on state agencies while providing minimal cost avoidance due to the rarity of matches and the effort needed to verify them.[242] A range of anecdotal evidence also points to the limited return on investment for the non-verified upon receipt of federally mandated data matches.[243] In a 2017 series of USDA-OIG audits of five states' compliance with federal requirements for state agencies, USDA-OIG found that all five were improperly handling a mandatory SSA-PVS data match.[244] At least one state explicitly stated that it elected not to perform the mandatory match due to perceived low return on investment.[245]

---

[240] NAC October 2015 report, p. 22. Generally, USDA-FNS pays 50% of state agencies' costs for program administration.

[241] The FY2019 President's Budget also proposes to require all states to participate in NAC, estimating that this policy change would save $1.1 billion over 10 years (FY2019-FY2028). FY2019 USDA-FNS Budget Justification, http://www.obpa.usda.gov/32fns2019notes.pdf, p. "32-87."

[242] With respect to the mandating of the SSA-PVS for example, the New York state agency noted that it piloted use of the system prior to the December 2006 USDA-FNS NPRM and concluded that less than 1% of matches were useful, while the Iowa state agency noted that it implemented use of the system in June 2000 and, as of March 2007, had never had a single confirmed match through it.

[243] According to the October 2016 GAO report, p.19, 41 of the 51 state agencies surveyed (50 states plus D.C.) identified the work hours needed to verify data matches as moderately or extremely challenging, and 35 of the 51 surveyed identified the untimeliness of data matches as moderately or extremely challenging.

[244] This audit series focused on compliance with regulations at 7 C.F.R. §272. States audited include Washington, South Carolina, Pennsylvania, Nebraska, and Georgia.

[245] For Washington, USDA-OIG noted, "During our testing, WA DSHS [the state agency] acknowledged that the State agency does not perform matches against SSA's PVS at application and recertification. This occurred because WA DSHS believes the data from SSA's PVS is neither current nor reliable and instead uses data from the State's [Department of Corrections] DOC database to identify individuals who are incarcerated, which the State believes is more reliable." U.S. Department of Agriculture, Office of the Inspector General, *Washington's Compliance with SNAP Requirements for Participating State Agencies (7 CFR, Part 272)*, Audit Report 27601-0012-10, September 2017, p.

Some optional data matches are widely used and considered worthwhile by state agencies, while other verified upon receipt and useful non-verified upon receipt data matches are arguably underutilized. Although not federally mandated, SSA benefit program databases were utilized and considered useful by all state agencies surveyed in the October 2016 GAO report, because these data matches provide verified upon receipt data on unearned income. Matches with state systems that provide verified upon receipt data on eligibility and income were used by many, but not all, state agencies.[246] In some cases, statutory obstacles prevent using existing federal data sources, such as the Centers for Medicare and Medicaid Services (CMS) federal data services hub (the Hub), which consolidates various sources of earned and unearned income data matching.[247] Some state agencies were concerned that the same data match services are being paid for twice, once for SNAP and once for Medicaid, often for the same beneficiaries.[248] In 2017, certain states have piloted data sharing agreements to utilize these federal data services hubs for SNAP.[249]

Earned income may be especially difficult to verify through data matching, and the costs associated with these matches may be prohibitive.[250] Currently, state agencies contract individually with The Work Number, but USDA-FNS has proposed negotiating a single contract that would make the service available for all state agencies at a greatly reduced cost per match.[251] According to the October 2016 GAO report, USDA-FNS has not done enough to encourage state agencies to adopt best practices in data matching. This includes explaining technical improvements such as unifying data sources into a centralized portal (data brokering) and publicizing the methods and successes of pilot projects like NAC.

## State Agency Errors and Fraud

### Modifying State Involvement in the Quality Control System

The September 2015 USDA-OIG report stated that the primary vulnerability of the QC system was its "two-tier" structure.[252] USDA-OIG argued that because a state calculates its own SPER, it has the means to manipulate the outcome of the QC process, and because a state stands to benefit from a low SPER, it has the motive to commit this fraud. USDA-OIG recommended the adoption of a "one-tier" QC process conducted exclusively by USDA-FNS. USDA-FNS noted that a one-tier QC system could create additional federal cost.

---

11, https://www.usda.gov/oig/webdocs/27601-0012-10.pdf.

[246] This can include data matches of income (such as child support payments and unemployment insurance benefits) and eligibility (such as state department of corrections records of incarceration and state department of health records of death)—all of which are generally considered verified upon receipt. October 2016 GAO report, pp. 10-20.

[247] The Patient Protection and Affordable Care Act (ACA), the Privacy Act of 1974, the Fair Credit Reporting Act, and other statutes, as well as the current terms of certain CMS contracts with private databases, were all cited as preventing the full utilization of CMS's the Hub and other data sources for SNAP certification determinations. October 2016 GAO report, pp. 23-27.

[248] October 2016 GAO report, p. 24

[249] U.S. Government Accountability Office, *Federal Low-Income Programs: Eligibility and Benefits Differ for Selected Programs Due to Complex and Varied Rules*, GAO-17-558, June 2017, p. 38, https://www.gao.gov/assets/690/685551.pdf.

[250] According to the October 2016 GAO report, p. 27, costs associated with data matches, especially private data match services like The Work Number, limited state agency usage of systems that they considered effective in preventing overpayments, with 34 of the 42 respondents identifying upfront costs and 30 of the 42 respondents identifying ongoing costs as challenging.

[251] October 2016 GAO report, pp. 27-33.

[252] September 2015 USDA-OIG report, p. 10.

# Appendix A. Glossary of Abbreviations

| | |
|---|---|
| **ACF** | Administration for Children and Families (HHS) |
| **AE** | agency error |
| **ALERT** | Anti-Fraud Locator using EBT Retailer Transactions (USDA-FNS) |
| **APT** | Application Processing Timeliness (USDA-FNS-SNAP) |
| **AR** | administrative review |
| **CAP** | corrective action plan |
| **CAPER** | Case and Procedural Error Rate (USDA-FNS-SNAP) |
| **CMS** | Centers for Medicare & Medicaid Services (HHS) |
| **DHS** | U.S. Department of Homeland Security |
| **DMF** | Death Master File (see DMS) |
| **DMS** | Deceased Matching System (see DMF) |
| **DOJ** | U.S. Department of Justice |
| **EBT** | Electronic Benefit Transfer |
| **eDRS** | electronic Disqualified Recipient System (USDA-FNS-SNAP) |
| **FAD** | final agency determination |
| **FBI** | Federal Bureau of Investigations (DOJ) |
| **FDPIR** | Food Distribution Program on Indian Reservations (USDA-FNS) |
| **FNA** | Food and Nutrition Act of 2008 |
| **FNS** | Food and Nutrition Service (USDA) |
| **GAO** | Government Accountability Office |
| **GSA** | General Services Administration |
| **HHS** | U.S. Department of Health and Human Services |
| **IEVS** | Income and Eligibility Verification System |
| **IHE** | inadvertent household error |
| **III** | Interstate Identification Index (DOJ-FBI) |
| **IPV** | intentional program violation |
| **JR** | judicial review |
| **LOC** | letter of credit |
| **ME** | management evaluation |
| **NAC** | National Accuracy Clearinghouse (USDA-FNS-SNAP) |
| **NCIC** | National Crime Information Center (DOJ-FBI) |
| **NDNH** | National Directory of New Hires (HHS-ACF) |
| **NPER** | National Payment Error Rate (USDA-FNS-SNAP) |
| **NPRM** | notice of proposed rulemaking |
| **OASDI** | Old-Age, Survivors, and Disability Insurance (SSA) |
| **OIG** | Office of the Inspector General |
| **OMB** | Office of Management and Budget |
| **OPM** | Office of Personnel Management |
| **PARIS** | Public Assistance Reporting Information System (HHS-ACF) |
| **PDQ** | permanent disqualification |
| **POS** | point of sale |
| **PVS** | Prisoner Verification System (SSA) |
| **QC** | Quality Control |
| **RIN** | Regulatory Identification Number |

| | |
|---|---|
| **SA** | state agency |
| **SAM** | System for Award Management (GSA) |
| **SAR** | State Activity Report (USDA-FNS-SNAP) |
| **SARC** | Semiannual Report to Congress (USDA-OIG) |
| **SAVE** | Systematic Alien Verification for Entitlements (DHS-USCIS) |
| **SLEB** | state law enforcement bureau |
| **SNAP** | Supplemental Nutrition Assistance Program (USDA-FNS) |
| **SPER** | State Payment Error Rate (USDA-FNS-SNAP) |
| **SSA** | Social Security Administration |
| **SSI** | Supplemental Security Income (SSA) |
| **SSN** | Social Security Number (SSA) |
| **TANF** | Temporary Assistance for Needy Families (HHS) |
| **TCP** | Trafficking Civil Penalty |
| **TOCMP** | Transfer of Ownership Civil Money Penalty |
| **TPP** | third-party processor |
| **UA** | Unified Agenda |
| **UIB** | unemployment insurance benefits |
| **UPV** | unintentional program violation (see IHE) |
| **USCIS** | U.S. Citizenship and Immigration Services (DHS) |
| **USDA** | U.S. Department of Agriculture |
| **VA** | U.S. Department of Veteran Affairs |
| **VUR** | verified upon receipt |
| **WIC** | Special Supplemental Nutrition Program for Women, Infants, and Children |

# Appendix B. "Inactive" USDA-FNS Rules

In the last 10 years, the U.S. Department of Agriculture Food and Nutrition Service (USDA-FNS) had started to draft new rules in response to direction in federal law and USDA Office of the Inspector General (USDA-OIG) audit findings, and at their own initiative. Currently, none of the regulatory initiatives discussed in this appendix have been completed. Before USDA-FNS's actions were suspended, they were in various stages of the regulatory process, which occurs as follows:

In order to codify a federal regulation in the Code of Federal Regulations (C.F.R.), the following steps must generally be completed:

- a regulatory work plan must be submitted to the Office of Management and Budget (OMB) and OMB must assign the rulemaking action a Regulatory Identification Number (RIN), adding the RIN to OMB's Unified Agenda (UA);[253]

- a notice of proposed rulemaking (NPRM) generally must be published by the rulemaking agency in the *Federal Register* (FR) with a comment period open to the public; and

- the rulemaking agency must consider the comments, make necessary changes to the rulemaking action, and then publish the final rule in the FR.

Along with other rulemaking actions, USDA rules had been in a "pending" status and had not been made available to the public.[254] The Trump Administration made these rules public in July 2017 and termed them "inactive."[255]

### Table B-1. Inactive USDA-FNS Rulemaking Actions Related to SNAP Integrity

| RIN | Full Title | First in UA | Proposed | Cited in Report as |
|---|---|---|---|---|
| 0584-AE22[a] | Supplemental Nutrition Assistance Program: Suspension of SNAP Benefit Payments to Retailers | 2012 | 02/22/2013 78 FR 12245 | February 2013 USDA-FNS NPRM |
| 0584-AD88[b] | Supplemental Nutrition Assistance Program: Farm Bill of 2008 Retailer Sanctions | Spring 2009 | 08/14/2012 77 FR 48461 | August 2012 USDA-FNS NPRM |
| 0584-AE37[c] | Modernizing Supplemental Nutrition Assistance Program (SNAP) Benefit Redemption Systems | Spring 2015 | n/a | USDA-FNS Benefit Redemption Modernization Rule |
| 0584-AE46[c] | Supplemental Nutrition Assistance Program: Definition of "Benefit" as it Pertains to Retail Owners | Fall 2016 | n/a | USDA-FNS Definition of Benefit Rule |

---

[253] The UA is a government-wide publication of upcoming regulations and is generally published twice each year on https://www.reginfo.gov.

[254] The "pending" list included rules that were not actively being worked on by the agencies.

[255] See CRS Report R45032, *The Trump Administration and the Unified Agenda of Federal Regulatory and Deregulatory Actions*, by Maeve P. Carey and Kathryn A. Francis.

| RIN | Full Title | First in UA | Proposed | Cited in Report as |
|---|---|---|---|---|
| 0584-AE47[c] | Supplemental Nutrition Assistance Program: National Crime Information Center Background Check Requirement for Retailer Authorization and Reauthorization | Fall 2016 | n/a | USDA-FNS Background Check Rule |
| 0584-AD98 | Supplemental Nutrition Assistance Program: Major System Failures | Fall 2009 | 08/18/2011  76 FR 51274 | n/a |

**Source:** Follow the FR links to view the proposed rules. The full inactive list is available online at https://www.reginfo.gov/public/jsp/eAgenda/InactiveRINs_2017_Agenda_Update.pdf.

a.  See https://www.federalregister.gov/documents/2013/02/22/2013-04037/supplemental-nutrition-assistance-program-suspension-of-snap-benefit-payments-to-retailers. For the history of this RIN, see https://www.reginfo.gov/public/do/eAgendaViewRule?RIN=0584-AE22.

b.  For the history of this RIN, see https://www.reginfo.gov/public/do/eAgendaViewRule?RIN=0584-AD88; https://www.federalregister.gov/documents/2012/08/14/2012-19773/supplemental-nutrition-assistance-program-farm-bill-of-2008-retailer-sanctions.

c.  This RIN appears on the OMB inactive list; see https://www.reginfo.gov/public/jsp/eAgenda/InactiveRINs_2017_Agenda_Update.pdf.

# Appendix C. Optional Income Data Matches

Data matching is used during the SNAP certification process to help make SNAP eligibility determinations and, if appropriate, designate the benefit allotment amounts for applicant households. In addition to the mandatory data matches discussed earlier in this report, states have many additional federal, state, and local data sources that they might use to verify household income data. This appendix lists some additional data matches that are discussed in related audit reports and state-specific policy manuals. Their verified upon receipt status varies.

## Optional Federal Income Data Matches[256]

- Social Security Administration (SSA) Benefit Programs Databases[257]—State agencies can match with SSA databases to verify an applicant's unearned income from these SSA programs.[258] These are verified upon receipt data matches. They are conducted and considered moderately or extremely useful by 51 of the 51 state agencies surveyed (50 states plus D.C.) in October 2016.

- SSA Beneficiary Earnings Exchange Record (BEER)—State agencies can match with SSA-BEER to verify income based on Internal Revenue Service (IRS) earnings and tax data. This is a non-verified upon receipt data match. It is conducted by 24 of the 51 state agencies and considered moderately or extremely useful by only 10 of those using it.

- U.S. Department of Health and Human Services Administration for Children and Families (HHS-ACF) Public Assistance Reporting Information System (PARIS)[259]—State agencies can match with HHS-ACF-PARIS to verify an applicant's earned and unearned income from public assistance and federal employment or retirement. These are non-verified upon receipt data matches. The HHS-ACF-PARIS Interstate Match File is conducted by 40 of the 51 state agencies and considered moderately or extremely useful by 31 of those using it. The HHS-ACF-PARIS Federal/VA File matches are conducted by 31 of the 51 state agencies and considered moderately or extremely useful by 20 of those using them.

- The Work Number—State agencies can match with this commercial verification service operated by Equifax, Inc. (for a fee) to obtain payroll information from participating retailers (covering about 35%-40% of working population) to verify an applicant's earned income. This is a non-verified upon receipt data match. It is used by 45 of the 51 state agencies and considered moderately or extremely useful by 43 of those using it.

---

[256] All survey numbers are from the October 2016 GAO report, cited elsewhere in this report, https://www.gao.gov/assets/690/680535.pdf.

[257] SSA benefit programs covered include Old Age, Survivors, and Disability Insurance (OASDI), Retirement Survivors and Disability Insurance (RSDI), and Supplemental Security Income (SSI).

[258] SSA databases for these programs that are used include the State On-Line Query (SOLQ), State Verification and Exchange System (SVES), Beneficiary and Earnings Data Exchange (BENDEX), and State Data Exchange (SDX).

[259] The HHS-ACF-PARIS Interstate Match File compiles public assistance beneficiary information from states, HHS-ACF-PARIS Veterans Affairs (VA) File includes VA beneficiary information, and the HHS-ACF-PARIS Federal File includes military and federal employees' and retirees' wage and retirement information gathered from Department of Defense (DOD) and Office of Personnel Management (OPM).

- HHS-ACF National Directory of New Hires (NDNH) Unemployment Insurance and Quarterly Wage Files—These data matches are distinct from the mandatory HHS-ACF-NDNH New Hire File match. The Unemployment Insurance File compiles information from state workforce agencies regarding unearned income, and the Quarterly Wage File compiles information from state workforce agencies regarding earned income. These are non-verified upon receipt data matches. The former is used by 9 of the 51 state agencies and the latter by 4 of the 51.

## Optional State Income Data Matches[260]

- State Unemployment Insurance Benefits (UIB) Database—State agencies can match with state workforce agencies that administer UIB to verify applicants' unearned income. This is generally a verified upon receipt data match. It is conducted by 49 of the 51 state agencies surveyed in October 2016 and considered moderately or extremely useful by 48 of those using it.

- Child Support Payments Database—State agencies can match with state human or social services agencies that administer and enforce child support payments to verify applicants' unearned income. This is generally a verified upon receipt data match. It is conducted by 47 of the 51 state agencies and considered moderately or extremely useful by 46 of those using it.

- State Wage Information Collection Agency (SWICA) Database—State agencies can match with SWICAs that gather quarterly wage and new hire data from employers to verify applicants' earned income. This is the state equivalent of the HHS-ACF-NDNH. These are non-verified upon receipt data matches. The former is conducted by 45 of the 51 state agencies and considered moderately or extremely useful by 31 of those using it; the latter is conducted by 36 of the 51 state agencies and considered moderately or extremely useful by 23 of those using it.

- State Day Care License Database—State agencies can match with state human or social services agencies that license day care workers and facilities to verify applicants' earned income. This is generally a verified upon receipt data match. It is conducted by 11 of the 51 state agencies.

- State Taxpayer Database—State agencies can match with state taxation agencies to verify applicants' unearned and earned income. This is generally a verified upon receipt data match. It is conducted by 7 of the 51 state agencies.

- Database of Income Verified by Other State Programs—State agencies can match with state human or social services agencies that administer other means-tested programs[261] to verify applicants' unearned and earned income. This is generally a verified upon receipt data match. It is conducted by 42 of the 51 state agencies and considered moderately or extremely useful by 38 of those using it.

---

[260] All survey numbers are from the October 2016 GAO report.

[261] These include TANF, old age pensions, aid to the disabled, state SSI supplement, etc.

# Appendix D. Trends in Retailer Trafficking and Convenience Store Participation in SNAP

The following three tables include CRS calculations based on data from U.S. Department of Agriculture Food and Nutrition Service (USDA-FNS) Retailer Management Reports, the last three Retailer Trafficking Studies, and other agency sources. **Table D-1** compares the growth in total stores participating in SNAP with the growth of convenience stores ("c-stores") participating in the program. From FY2007 to FY2016, convenience stores have grown from about 36% of all stores in the program to about 46%.

#### Table D-1. Convenience Stores as a Percentage of All Stores in SNAP

| Year | C-Stores | Change in C-Stores | All Stores | Change in All Stores | C-Stores as a Percentage of All Stores |
|------|----------|--------------------|------------|----------------------|----------------------------------------|
| FY2007 | 58,669 | — | 162,672 | — | 36.07% |
| FY2008 | 61,968 | +5.62% | 172,094 | +5.79% | 36.01% |
| FY2009 | 66,809 | +7.81% | 190,334 | +10.60% | 35.10% |
| FY2010 | 78,754 | +17.88% | 212,834 | +11.82% | 37.00% |
| FY2011 | 87,857 | +11.56% | 227,190 | +6.75% | 38.67% |
| FY2012 | 96,769 | +10.14% | 242,325 | +6.66% | 39.93% |
| FY2013 | 101,059 | +4.43% | 248,666 | +2.62% | 40.64% |
| FY2014 | 105,742 | +4.63% | 256,670 | +3.22% | 41.20% |
| FY2015 | 106,531 | +0.75% | 254,593 | -0.81% | 41.84% |
| FY2016 | 117,591 | +10.38% | 255,931 | +0.53% | 45.95% |

**Source:** USDA-FNS data from annual Retailer Management Reports, https://www.fns.usda.gov/snap-retailer-data; and email from SNAP, USDA-FNS, January 5, 2018.

The *national retailer trafficking rate* represents the proportion of SNAP benefits redeemed that were trafficked at stores, and the *national store violation rate* represents the proportion of authorized stores that were estimated to have engaged in trafficking. **Table D-2** compares these two rates for all stores with these rates for convenience stores. Across the nine years examined in the three studies, the convenience store retailer trafficking rates have been more than 1000% of the national retailer trafficking rates, and the convenience store violation rates have been more than 150% of the national store violation rates.

#### Table D-2. Trafficking Rates in Convenience Stores Compared to the National Trafficking Rates

| Report Years | National Retailer Trafficking Rate | C-Store Retailer Trafficking Rate | National Store Violation Rate | C-Store Violation Rate |
|--------------|------------------------------------|-----------------------------------|-------------------------------|------------------------|
| 2006-2008 | 1.03% | 12.93% | 8.25% | 15.52% |
| 2009-2011 | 1.34% | 14.07% | 10.47% | 17.68% |
| 2012-2014 | 1.50% | 17.67% | 11.82% | 19.42% |

**Source:** USDA-FNS data from Retailer Trafficking Studies, https://www.fns.usda.gov/report-finder.

**Table D-3** displays data regarding the convenience store share of total redemptions and data regarding the estimated convenience store share of total trafficking. Across the nine years examined in these three studies, convenience stores' shares of redemptions have not exceeded 5% of total redemptions and convenience store shares of trafficking have averaged more than half of total trafficking.

### Table D-3. Convenience Store Redemptions and Trafficking as a Percentage of All Redemptions and Trafficking

| Report Years | C-Store Redemptions as % of Total Redemptions | C-Store Trafficking as % of Total Trafficking |
|---|---|---|
| 2006-2008 | 4.05% | 50.91% |
| 2009-2011 | 4.38% | 45.80% |
| 2012-2014 | 4.84% | 57.24% |

**Source:** USDA-FNS data from Retailer Trafficking Studies, https://www.fns.usda.gov/report-finder.

# Appendix E. Payment Error Rate Information

This appendix provides a state-by-state summary of payment-error related data from FY2010-FY2014, including state payment error rates (SPERs), high-performance bonuses, and liabilities for low performance. **Table E-1** shows the states' annual rates and whether the state received an award or a sanction, while **Table E-2** displays the amounts of awards and sanctions. Using Alabama as an example, according to the first table the state received a bonus in FY2012 based on a 1.85% SPER, and according to the second table that award amount was approximately $1.9 million.

### Table E-1. State Payment Error Rates, FY2010 to FY2014

| State | FY2010 | FY2011 | FY2012 | FY2013 | FY2014 |
|---|---|---|---|---|---|
| Alabama | 3.75% | 5.10% | 1.85% (+) | 1.70% | 2.03% |
| Alaska | **2.15% (+)** | **0.76% (+)** | **1.07% (+)** | **1.27% (+)** | 0.89% (+) |
| Arizona | *6.69% (-)‡* | *6.34% (-)‡* | *5.60% (-)* | *5.48% (-)* | *5.18% (-)* |
| Arkansas | *5.64%* | *5.79% (-)* | *4.76% (-)* | *4.34%* | *5.58%* |
| California | *4.81%* | *4.58%* | *3.98%* | *3.63%* | *5.13%* |
| Colorado | 3.18% | 4.45% | *4.55%* | *5.59% (-)* | 4.26% |
| Connecticut | 7.66% ‡ | *6.46% (-)‡* | *5.99% (-)* | *7.13% (-)‡* | *5.84% (-)* |
| District of Columbia | 4.47% | 3.03% | 3.91% | *6.87% (-)‡* | *7.38% (-)‡* |
| Delaware | 1.52% (+) | 2.53% (+) | 3.41% | 3.53% | 2.78% |
| Florida | 0.78% (+) | 0.87% (+) | 0.77% (+) | 0.81% (+) | 0.42% (+) |
| Georgia | 1.99% (+) | 2.71% | 3.18% | *5.11%* | <u>6.49%</u> (-) |
| Guam | *5.42%* | *6.25% (-)‡* | *7.33% (-)‡* | *6.65% (-)‡* | *7.08% (-)‡* |
| Hawaii | 3.04% | 3.37% | 4.84% | 4.39% | 4.13% |
| Idaho | 3.32% | 2.52% (+) | 2.49% | 1.86% | 2.74% |
| Illinois | 1.70% (+) | 3.15% | 1.74% (+) | 4.27% | 5.27% |
| Indiana | 2.60% (+)* | 3.29% | 3.02% | 3.72% | 4.76% |
| Iowa | 3.36% | 3.97% | 3.43% | 4.12% | 4.60% |
| Kansas | 4.79% | 5.00% | *5.45%* | 3.99% | 0.75% (+) |
| Kentucky | 4.09% | 4.50% | 4.93% | *5.78% (-)* | 6.00% (-) |
| Louisiana | *5.03%* | *3.97%* | *1.45% (+)* | *1.44% (+)* | *1.55%* |
| Maine | 3.49% | 3.28% | 2.16% | 2.48% | 2.52% |
| Maryland | 7.68% (-)‡ | *6.06% (-)‡* | 3.40% (+)* | 2.12% | 3.41% |
| Massachusetts | *5.90%* | 4.40% (+)* | 4.03% | 2.87% | 5.09% |
| Michigan | 3.31% | 3.12% | 3.55% | 2.70% | 2.99% |
| Minnesota | 4.76% | 5.02% | *5.07%* | 4.08% | 6.87% ‡ |
| Mississippi | 1.92% (+) | 2.83% | 2.10% | 1.48% (+) | 1.16% (+) |
| Missouri | *5.65% (-)* | *5.88% (-)* | *7.18% (-)‡* | *1.62% (+)** | *1.50%* |
| Montana | 4.12% | 3.10% | 2.71% | 6.00% | *7.25% (-)‡* |

| State | FY2010 | FY2011 | FY2012 | FY2013 | FY2014 |
|---|---|---|---|---|---|
| Nebraska | 3.52% | 4.50% | 3.19% | 2.87% | 2.98% |
| Nevada | 6.57% ‡ | 6.29% (-)‡ | 6.01% (-)‡ | 5.51% (-) | 7.61% (-)‡ |
| New Hampshire | 5.31% | 4.82% | 5.09% | 3.82% | 4.72% |
| New Jersey | 4.62% | 4.33% | 3.49% | 1.32% (+) | 1.43% |
| New Mexico | 4.50% | 4.35% | 3.73% | *4.55%* | 6.22% (-)‡ |
| New York | *5.51%* | 4.32% | 5.09% | 4.79% (-) | *5.23% (-)* |
| North Carolina | 2.70% | 2.65% (+) | 2.32% | 4.75% | 4.98% (-) |
| North Dakota | 4.38% | 4.34% | 2.94% | 2.30% | 1.73% |
| Ohio | 3.31% | 3.40% | 3.39% | 4.12% | 4.67% |
| Oklahoma | 4.22% | 3.94% | 4.94% | 3.99% | 5.58% |
| Oregon | 4.88% | 3.99% | 4.66% | 4.17% | 5.11% |
| Pennsylvania | 3.93% | 3.30% | 3.08% | 3.56% | 4.27% |
| Rhode Island | 5.98% | 7.89% (-)‡ | 7.36% (-)‡ | 8.25% (-)‡ | 5.97% (-/+)* |
| South Carolina | *5.14%* | 3.14% (+)* | 1.59% (+) | 1.75% | 1.09% (+) |
| South Dakota | 1.31% (+) | 1.59% (+) | 1.37% (+) | 0.99% (+) | 1.26% |
| Tennessee | 4.39% | *5.46%* | 3.25% | 1.32% (+) | 1.08% (+) |
| Texas | 2.13% (+) | 3.48% | 3.63% | 1.44% (+) | 0.63% (+) |
| Utah | 4.33% | 4.19% | 2.39% | 2.11% | 2.79% |
| Vermont | 6.59% ‡ | 8.53% (-)‡ | 6.96% (-)‡ | 9.66% (-)‡ | 2.76% (+)* |
| Virgin Islands | 3.10% | 4.77% | 4.20% | 3.58% | 3.18% |
| Virginia | *5.87%* | **3.41% (+)*** | **1.76% (+)** | **0.44% (+)** | 4.73% |
| Washington | 3.30% | 3.81% | 2.49% | 1.71% | 0.77% (+) |
| West Virginia | *7.14%‡* | 6.31% (-)‡ | 7.06% (-)‡ | 5.24% (-) | 4.90% |
| Wisconsin | **1.97% (+)** | **2.02% (+)** | 2.07% (+) | 2.40% | 2.55% |
| Wyoming | 4.76% | 9.63% ‡ | 7.18% (-)‡ | 4.99% (-/+)* | 5.19% |
| NPER | 3.81% | 3.80% | 3.42% | 3.20% | 3.66% |

**Source:** USDA-FNS data, https://www.fns.usda.gov/pd/snap-quality-control-annual-reports.

**Notes:**

(+) represents years in which states were awarded a high-performance bonus for the years' best state payment error rates (SPERs).

\* represents years in which states were awarded a high-performance bonus for the years' most improved SPERs.

(-) represents years in which states were assessed liabilities for SPERS that exceed Quality Control standards.

(+/-) represents years in which states were awarded a high-performance bonus for most improved payment error rate, but still incurred a liability.

‡ represents years in which states' SPERs exceeded the liability threshold of 6%.

Italicized figures represent years in which states' SPERs exceeded the liability level (105% of the national payment error rate).

Bold figures represent years in which states' SPERs were fraudulently misreported (according to U.S. Department of Justice (DOJ) settlement documents, as these SPERs are associated with DOJ False Claims Act cases).

## Table E-2. State Bonuses and Liabilities, FY2010 to FY2014

In thousands of dollars

| State | FY2010 | FY2011 | FY2012 | FY2013 | FY2014 |
|---|---|---|---|---|---|
| Alabama | – | – | +$1,898 | – | – |
| Alaska | **+$233** | **+$290** | **+$266** | **+$236** | +$247 |
| Arizona | -$1,096 | -$561 | -$0 | -$0 | -$0 |
| Arkansas | LLE | -$0 | -$0 | – | LLE |
| California | – | – | – | – | – |
| Colorado | – | – | LLE | -$0 | – |
| Connecticut | LLE | -$298 | -$0 | -$800 | -$0 |
| District of Columbia | – | – | – | LLE | -$307 |
| Delaware | +$321 | +$435 | – | – | – |
| Florida | +$6,084 | +$9,088 | +$8,072 | +$7,015 | +$7,742 |
| Georgia | +$3,077 | – | – | LLE | -$1,386 |
| Guam | LLE | -$26 | -$151 | -$77 | -$117 |
| Hawaii | – | – | – | LLE | – |
| Idaho | – | +$622 | – | – | – |
| Illinois | +$3,484 | – | +$4,092 | – | LLE |
| Indiana | +$1,619* | – | – | – | – |
| Iowa | – | – | – | – | – |
| Kansas | LLE | – | LLE | – | +$628 |
| Kentucky | – | – | LLE | -$0 | -$0 |
| Louisiana | LLE | – | +$1,946 | +$1,614 | – |
| Maine | – | – | – | – | – |
| Maryland | -$1,475 | -$62 | +$1,674* | – | – |
| Massachusetts | LLE | +$2,522* | – | – | LLE |
| Michigan | – | – | – | – | – |
| Minnesota | – | – | LLE | – | LLE |
| Mississippi | +$1,182 | – | – | +$1,185 | +$1,302 |
| Missouri | -$0 | -$0 | -$1,725 | +$1,656* | – |
| Montana | – | – | – | LLE | -$220 |
| Nebraska | – | – | – | – | – |
| Nevada | LLE | -$144 | -$5 | -$0 | -$870 |
| New Hampshire | – | – | LLE | – | – |
| New Jersey | – | – | – | +$1,638 | – |
| New Mexico | – | – | – | LLE | -$138 |
| New York | LLE | – | LLE | -$0 | -$0 |
| North Carolina | – | +$4,079 | – | LLE | -$0 |

| State | FY2010 | FY2011 | FY2012 | FY2013 | FY2014 |
|-------|--------|--------|--------|--------|--------|
| North Dakota | – | – | – | – | – |
| Ohio | – | – | – | – | – |
| Oklahoma | – | – | LLE | – | LLE |
| Oregon | – | – | LLE | – | – |
| Pennsylvania | – | – | – | – | – |
| Rhode Island | LLE | -$519 | -$394 | -$683 | -$0 / +$502* |
| South Carolina | LLE | +$2,218* | +$1,892 | – | +$1,672 |
| South Dakota | +$275 | +$336 | +$297 | +$261 | – |
| Tennessee | – | LLE | – | +$2,456 | +$2,687 |
| Texas | +$6,243 | – | – | +$6,056 | +$6,497 |
| Utah | – | – | – | – | – |
| Vermont | LLE | -$341 | -$136 | -$549 | +$293* |
| Virgin Islands | – | – | – | – | – |
| Virginia | LLE | **+$2,304*** | **+$2,021** | **+$1,724** | – |
| Washington | – | – | – | – | +$2,428 |
| West Virginia | LLE | -$154 | -$530 | -$0 | – |
| Wisconsin | **+$1,484** | **+$2,106** | +$1,842 | – | – |
| Wyoming | – | LLE | -$61 | -$0 / +$158* | – |

**Source:** SNAP Quality Control Annual Reports FY2010 to FY2014; https://www.fns.usda.gov/pd/snap-quality-control-annual-reports.

**Notes:**

+$ represents high-performance bonuses awarded to states for the years' best state payment error rates (SPERs).

* represents years in which states were awarded a high-performance bonus for the years' most improved SPERs.

-$ represents liability amounts assessed against states for SPERS that exceed QC standards; if a state exceeded the liability level for two consecutive years but did not exceed the liability threshold of 6%, they were assessed a $0 liability (value noted as "-$0").

-$/+$ represents years in which states were awarded a high-performance bonus for most improved payment error rate, but still incurred a liability.

LLE (liability level exceeded) represents the first year that the liability level was exceeded by a state.

Bold figures represent years in which states' SPERs were fraudulently misreported (according to U.S. Department of Justice (DOJ) settlement documents, as these SPERs are associated with DOJ False Claims Act cases).

# Author Contact Information

Randy Alison Aussenberg
Specialist in Nutrition Assistance Policy
raussenberg@crs.loc.gov, 7-8641

# Acknowledgments

Daniel R. Cline, formerly a Research Associate with CRS, researched and authored the original version of this report. Jameson A. Carter, a Research Assistant in CRS's Domestic Social Policy division, assisted with this report's data and figures.

**Imm. Jdg. Bnchbk 4.I.D.**

Immigration Judge Benchbook  |  Updated Through February 2001

United States Department of Justice

Executive Office of Immigration Review (EOIR)

PART I: SUBSTANTIVE LAW

Chapter 4: Exclusion Hearings

I. Introduction - Applicable to Proceedings Commenced Prior to April 1, 1997

D. Requirements for an Entry

Table of Contents

# D. REQUIREMENTS FOR AN ENTRY

The Board of Immigration Appeals (BIA) has determined that entry involves: (1) crossing into the territorial limits of the United States (i.e., physical presence); (2) the inspection and admission by an immigration official, or (b) actual and intentional evasion of inspection at the nearest inspection checkpoint; and (3) freedom from official restraint. See Matter of Z-, 20 I&N Dec. 707 (BIA 1993); Matter of Patel, 20 I&N Dec. 368 (BIA 1991).

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

*Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528



**Homeland
Security**

January 25, 2019

**ACTION**

MEMORANDUM FOR:    L. Francis Cissna
Director
U.S. Citizenship and Immigration Services

Kevin K. McAleenan
Commissioner
U.S. Customs and Border Protection

Ronald D. Vitiello
Deputy Director and Senior Official Performing the Duties of
Director
U.S. Immigration and Customs Enforcement

FROM:    Kirstjen M. Nielsen
Secretary

SUBJECT:    Policy Guidance for Implementation of the Migrant Protection
Protocols

On December 20, 2018, I announced that the Department of Homeland Security (DHS),
consistent with the Migrant Protection Protocols (MPP), will begin implementation of
Section 235(b)(2)(C) of the Immigration and Nationality Act (INA) on a large-scale basis to
address the migration crisis along our southern border. In 1996, Congress added Section
235(b)(2)(C) to the INA. This statutory authority allows the Secretary of Homeland Security to
return certain applicants for admission to the contiguous country from which they are arriving on
land (whether or not at a designated port of entry) pending removal proceedings under Section
240 of the INA. Consistent with the MPP, citizens and nationals of countries other than Mexico
("third-country nationals") arriving in the United States by land from Mexico—illegally or
without proper documentation—may be returned to Mexico pursuant to Section 235(b)(2)(C) for
the duration of their Section 240 removal proceedings.

## Section 235(b)(2)(C) and the MPP

The United States issued the following statement on December 20, 2018, regarding implementation of the Migrant Protection Protocols:

> [T]he United States will begin the process of implementing Section 235(b)(2)(C) . . . with respect to non-Mexican nationals who may be arriving on land (whether or not at a designated port of entry) seeking to enter the United States from Mexico illegally or without proper documentation. Such implementation will be done consistent with applicable domestic and international legal obligations. Individuals subject to this action may return to the United States as necessary and appropriate to attend their immigration court proceedings.
>
> The United States understands that, according to the Mexican law of migration, the Government of Mexico will afford such individuals all legal and procedural protection[s] provided for under applicable domestic and international law. That includes applicable international human rights law and obligations as a party to the 1951 Convention relating to the Status of Refugees (and its 1967 Protocol) and the Convention Against Torture.
>
> The United States further recognizes that Mexico is implementing its own, sovereign, migrant protection protocols providing humanitarian support for and humanitarian visas to migrants.
>
> The United States proposes a joint effort with the Government of Mexico to develop a comprehensive regional plan in consultation with foreign partners to address irregular migration, smuggling, and trafficking with the goal of promoting human rights, economic development, and security.[1]

The Government of Mexico, in response, issued a statement on December 20, 2018. That statement provides, in part, as follows:

1. For humanitarian reasons, [the Government of Mexico] will authorize the temporary entrance of certain foreign individuals coming from the United States who entered that country at a port of entry or who were detained between ports of entry, have been interviewed by U.S. immigration authorities, and have received a notice to appear before an immigration judge. This is based on current Mexican legislation and the international commitments Mexico has signed, such as the Convention Relating to the Status of Refugees, its Protocol, and the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, among others.

---

[1] Letter from Chargé d'Affaires John S. Creamer to Sr. Jesús Seade, Subsecretaría para América del Norte, Secretaría de Relaciones Exteriores (Dec. 20, 2018).

2

2. It will allow foreigners who have received a notice to appear to request admission into Mexican territory for humanitarian reasons at locations designated for the international transit of individuals and to remain in national territory. This would be a "stay for humanitarian reasons" and they would be able to enter and leave national territory multiple times.

3. It will ensure that foreigners who have received their notice to appear have all the rights and freedoms recognized in the Constitution, the international treaties to which Mexico is a party, and its Migration Law. They will be entitled to equal treatment with no discrimination whatsoever and due respect will be paid to their human rights. They will also have the opportunity to apply for a work permit for paid employment, which will allow them to meet their basic needs.

4. It will ensure that the measures taken by each government are coordinated at a technical and operational level in order to put mechanisms in place that allow migrants who have receive[d] a notice to appear before a U.S. immigration judge have access without interference to information and legal services, and to prevent fraud and abuse.[2]

**Prosecutorial Discretion and *Non-Refoulement* in the Context of the MPP**

In exercising their prosecutorial discretion regarding whether to place an alien arriving by land from Mexico in Section 240 removal proceedings (rather than another applicable proceeding pursuant to the INA), and, if doing so, whether to return the alien to the contiguous country from which he or she is arriving pursuant to Section 235(b)(2)(C), DHS officials should act consistent with the *non-refoulement* principles contained in Article 33 of the 1951 Convention Relating to the Status of Refugees[3] (1951 Convention) and Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT).[4] Specifically, a third-country national should not be involuntarily returned to Mexico pursuant to Section 235(b)(2)(C) of the INA if the alien would more likely than not be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion (unless such alien has engaged in criminal, persecutory, or terrorist activity described in Section 241(b)(3)(B) of the

---

[2] Secretaría de Relaciones Exteriores, *Position of Mexico on the Decision of the U.S. Government to Invoke Section 235(b)(2)(C) of its Immigration and Nationality Act* (Dec. 20, 2018).

[3] The United States is not a party to the 1951 Convention but is a party to the 1967 Protocol Relating to the Status of Refugees, which incorporates Articles 2 to 34 of the 1951 Convention. Article 33 of the 1951 Convention provides that: "[n]o Contracting State shall expel or return ('*refouler*') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion."

[4] Article 3 of the CAT states, "No State Party shall expel, return ('*refouler*') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." *See also* Foreign Affairs Reform and Restructuring Act of 1998 (FARRA), Pub. L. No. 105-277, Div. G, Title XXII, § 2242(a) (8 U.S.C. § 1231 note) ("It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States.").

3

INA), or would more likely than not be tortured, if so returned pending removal proceedings. The United States expects that the Government of Mexico will comply with the commitments articulated in its statement of December 20, 2018.

U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, and U.S. Immigration and Customs Enforcement will issue appropriate internal procedural guidance to carry out the policy set forth in this memorandum.[5]

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

---

[5] A DHS immigration officer, when processing an alien for Section 235(b)(2)(C), should refer to USCIS any alien who has expressed a fear of return to Mexico for a *non-refoulement* assessment by an asylum officer.

4



SINCE 1828

- [GAMES](#)
- [BROWSE THESAURUS](#)
- [WORD OF THE DAY](#)
- [WORDS AT PLAY](#)

- [LOG IN](#)
- [REGISTER](#)
- 
  ⌄

  [settings](#)
- [SAVED WORDS](#)

discretion
✕

🔍

dictionary thesaurus      [view recents](#)

[Login](#) or [Register](#)
Hello,

- [GAMES](#)
- [BROWSE THESAURUS](#)
- [WORD OF THE DAY](#)
- [WORDS AT PLAY](#)
- [SETTINGS](#)
- 

- [SAVED WORDS](#)      [view recents](#)

# discretion

AR.07981

[noun](#)

 Save Word

To save this word, you'll need to log in.

[Log In](#) ☐

dis·cre·tion | \ di-ˈskre-shən 🔊 \

## Definition of *discretion*

1a **:** individual choice or judgment *left the decision to his discretion*
b **:** power of free decision or [latitude](#) of choice within certain legal bounds *reached the age of discretion*
2 **:** the quality of having or showing [discernment](#) or good judgment **:** the quality of being [discreet](#) **:**
[circumspection](#) especially **:** cautious [reserve](#) in speech
3 **:** ability to make [responsible](#) decisions
4 **:** the result of separating or distinguishing

 [Synonyms & Antonyms](#)     [More Example Sentences](#)    [Learn More about *discretion*](#)

Keep scrolling for more

## Synonyms & Antonyms for *discretion*

Synonyms

- [common sense](#),
- [discreetness](#),
- [gumption](#),
- [chiefly dialect],
- [horse sense](#),
- [levelheadedness](#),
- [nous](#),
- [chiefly British],
- [policy](#),
- [prudence](#),
- [sense](#),
- [sensibleness](#),
- [wisdom](#),
- [wit](#)

Antonyms

- [imprudence](#),
- [indiscretion](#)

[Visit the Thesaurus for More](#) ⦾

## Examples of *discretion* in a Sentence

AR.07982

Though it is worth noting that to live in a place where other people come just for pleasure has the odd effect of making me feel transient, while the visitors seem more fixed and permanent in their lives, coming as they do from more conventional homes far away. It is as if I am always waiting for them and am here at their discretion. — Richard Ford, *Wall Street Journal*, 14-15 June 2008 In Texas "capital" murder doesn't necessarily mean a death-penalty case; it's the designation for any aggravated murder, and prosecutors have full discretion in deciding whether to seek death in such cases. — John Cloud, *Time*, 14 July 2003

See More 

Recent Examples on the Web The onboard dual-microphone system ensures excellent ambient sound rejection and focuses on voice during calls, and the noise-canceling feature operates at three different levels at your *discretion*. — Popsci Commerce Team, *Popular Science*, "Over-the-ear headphones that will be music to your ears," 27 Oct. 2020 The hope is that the legislation will spur people to use more *discretion* when calling 911 for a non-emergency. — Trisha Thadani, *SFChronicle.com*, "S.F.'s new 'CAREN Act' makes false, racially charged complaints illegal," 20 Oct. 2020

These example sentences are selected automatically from various online news sources to reflect current usage of the word 'discretion.' Views expressed in the examples do not represent the opinion of Merriam-Webster or its editors. Send us feedback.

See More 

## First Known Use of *discretion*

14th century, in the meaning defined at sense 2

## History and Etymology for *discretion*

Middle English *discrecioun* "rational perception, moral discernment, good judgment," borrowed from Anglo-French & Late Latin; Anglo-French *discreciun, descrecion,* borrowed from Late Latin *discrētiōn-, discrētiō* "separation, act or power of distinguishing, caution, prudence," going back to Latin, "division, discrimination," from *discrē-,* variant stem of *discernere* "to separate, distinguish" + *-tiōn-, -tiō,* suffix of verbal action — more at discern

Keep scrolling for more

## Learn More about *discretion*

Share *discretion*

 Post the Definition of discretion to Facebook  Share the Definition of discretion on Twitter

Time Traveler for *discretion*



## The first known use of *discretion* was in the 14th century

AR.07983

See more words from the same century

From the Editors at Merriam-Webster



A Drudge of Lexicographers Presents:...

**A Drudge of Lexicographers Presents: Collective Nouns**

What do you call a group of cats?

# Dictionary Entries near *discretion*

discrepant

discrepate

discrete

discretion

discretional

discretionarily

discretionary

See More Nearby Entries

# Phrases Related to *discretion*

at (someone's) discretion

discretion is the better part of valor

leave to the discretion of

parental discretion

the soul of discretion

AR.07984

# Statistics for *discretion*

Last Updated

3 Nov 2020

Look-up Popularity

Top 1% of words

Cite this Entry

"Discretion." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/discretion. Accessed 8 Nov. 2020.

| **Style:** MLA | ▼ |
|---|---|

Keep scrolling for more

More Definitions for *discretion*

discretion

*noun*


# English Language Learners Definition of *discretion*

: the right to choose what should be done in a particular situation
: the quality of being careful about what you do and say so that people will not be embarrassed or offended **:** the quality of being discreet

See the full definition for *discretion* in the English Language Learners Dictionary

discretion

noun
dis·cre·tion | \ di-ˈskre-shən  \

# Kids Definition of *discretion*

1 **:** care in not attracting attention or letting out private information Use *discretion* in dealing with the situation.
2 **:** the power to decide what to do I'll leave it to your *discretion*.

discretion

noun
dis·cre·tion | \ dis-ˈkre-shən  \

AR.07985

# Legal Definition of *discretion*

**:** power of free decision or latitude of choice within certain bounds imposed by law reached the age of discretion struck down death penalty provisions administered through unbridled jury discretion— L. H. Tribe

**:** as

a **:** the power of a judge to use his or her own judgment in making decisions guided by what is fair and equitable and by principles of law — see also abuse of discretion

b **:** the power of a public official or employee to act and make decisions based on his or her own judgment or conscience within the bounds of reason and the law

Keep scrolling for more

More from Merriam-Webster on *discretion*

Thesaurus: All synonyms and antonyms for *discretion*

Nglish: Translation of *discretion* for Spanish Speakers

Britannica English: Translation of *discretion* for Arabic Speakers

Comments on *discretion*

What made you want to look up *discretion*? Please tell us where you read or heard it (including the quote, if possible).

**SHOW COMMENTS** ⊕



AR.07986



## octothorpe 🔊

See Definitions and Examples »

Get Word of the Day daily email!

| Your email address | **SUBSCRIBE** |

**Test Your Vocabulary**

Where in the World? A Quiz



- What language does **pajama** come from?

-

| **Arabic** | **Nguni** |
| **Cherokee** | **Hindi & Urdu** |

AR.07987



SPELL IT

Can you spell these 10 commonly misspelled words?

TAKE THE QUIZ

Test Your Knowledge - and learn some interesting things along the way.

TAKE THE QUIZ

AR.07988



# Love words? Need even more definitions?

Subscribe to America's largest dictionary and get thousands more definitions and advanced search—ad free!

**MERRIAM-WEBSTER UNABRIDGED**

## WORDS AT PLAY



**_ Week -**     **'Internecine': A History**     **The 'Moat' Surrounding Entertainment**     **Is I**

A mistake that stuck

AR.07989

f 11/6/2020        The Medieval 'Moat' Comeback    ...    'B

## ASK THE EDITORS

  

**poses' or**     **'Nip it in the butt' or 'Nip it**     **Literally**     **Is Si**
**rposes'?**     **in the bud'?**

ring it up     We're gonna stop you right there     How to use a word that (literally)     The a

                                         drives some pe...     ...

## WORD GAMES

**Where in the World? A Quiz**     **Here Be Dragons: A Creature Identification Quiz**     **Spell It**     **Add Diction**

Do you know what languages these ...         Can you spell these 10 commonly ...     Build a chain of words by addin ...

**TAKE THE QUIZ ›**     Director's Cut!     **TAKE THE QUIZ ›**     **PLAY THE GAME ›**

                                       **TAKE THE QUIZ ›**

AR.07990

**Learn a new word every day.
Delivered to your inbox!**

Your email ad…    **SUBSCRI >**

OTHER MERRIAM-WEBSTER DICTIONARIES

- LEARNER'S ESL DICTIONARY
  - VISUAL DICTIONARY
  - SCRABBLE® WORD FINDER

- MERRIAM-WEBSTER'S UNABRIDGED DICTIONARY
  - BRITANNICA ENGLISH - ARABIC TRANSLATION
  - NGLISH - SPANISH-ENGLISH TRANSLATION

FOLLOW US

Browse the Dictionary:   A   B   C   D   E   F   G   H   I   J   K   L   M   N   O   P   Q   R   S   T   U   V   W   X   Y   Z   0-9

Home  |  Help  |  Apps  |  About Us  |  Shop  |  Advertising Info  |  Dictionary API  |
Contact Us  |  Join MWU  |  Video  |  Word of the Year  |  Puku  |
Vocabulary Resources  |  Law Dictionary  |  Medical Dictionary  |  Privacy Policy  |
Terms of Use  |  Do Not Sell My Info

Browse the Thesaurus  |  Browse the Medical Dictionary  |
Browse the Legal Dictionary

© 2020 Merriam-Webster, Incorporated

AR.07991

# Documents Detail ICE Campaign to Prosecute Migrant Parents as Smugglers

*Ryan Devereauxryan.devereaux@theintercept.com@rdevro*

<u>In the first months</u> of Donald Trump's presidency, senior administration and U.S. Immigration and Customs Enforcement officials embarked on an ambitious plan to deal with undocumented children crossing the border alone. Reasoning that most of the kids made their way into the U.S. only after their parents or family members paid a smuggler to facilitate the journey, the officials decided to cut the migration off at its source: by arresting the parents and family members.

By late April, top officials in the Trump government were <u>already hinting</u> at the emerging strategy in public appearances. Meanwhile, behind the scenes, ICE was drafting a detailed plan laying out how it would work. The end result was a document that, nearly two years later, offers new insight into an enforcement initiative that was the precursor to one of the darkest episodes of the Trump administration: the forced separation of thousands of migrant children from their parents on the U.S. border with Mexico.



<u>Read Our Complete CoverageThe War on Immigrants</u>

Included among hundreds of pages of documents produced by ICE's Homeland Security Investigations, or HSI, and shared with The Intercept, the release of ICE's six-page "<u>concept of operations</u>" was the result of litigation the American Immigration Council — in collaboration with the Florence Immigrant and Refugee Rights Project, the National Immigrant Justice Center, Kids in Need of Defense, Women's Refugee Commission, and Wilmer Cutler Pickering Hale and Dorr LLP — is engaged in to secure the release of materials detailing the creation, implementation, and fallout of family separation.

The now-released May 5, 2017 plan details the creation of a "90- to 120-day operation" targeting criminal organizations involved in the smuggling of unaccompanied children, "with an emphasis on the identification, investigation, and arrest of human smuggling facilitators, including, but not limited to, parents and family members." Noting that the number of unaccompanied children coming

AR.07992

into the country decreased from a high in 2014, the plan nonetheless justified itself on the assertion that smuggling organizations "have yet to be held accountable."

"Since parents and sponsors have not been held accountable for their role, there is no deterrent for complying with U.S. immigration laws," the plan said, adding that "approximately 90 percent" of unaccompanied minors "are eventually turned over to a family member."

The initiative would be a collaboration between HSI, ICE's powerful investigative wing, and Enforcement and Removal Operations, the side of ICE responsible for deportations. The plan additionally called for coordination with the Department of Justice and the Department of Health and Human Services, as well as multiphase strategies to deal with Congress and the press.

On the ground, the initiative involved interviewing unaccompanied children to determine whether their mothers or fathers, or other family members, could be arrested. Once arrest operations were set in motion, ICE would grant itself the authority to take into custody any deportable immigrants encountered along the way (what ICE refers to as "collateral arrests").

In theory, the entire process — from the moment the child was first encountered to the time their family members were identified, surveilled, interviewed, and arrested — would take no more than 72 hours. ICE would gather several "metrics" as it pressed forward with the initiative, including the number of criminal, administrative, and collateral arrests made, and the value of any assets seized in the operations. The number of cases the DOJ declined to prosecute would also be tracked, as would the number of "gang members/affiliates" taken into custody.

ICE put an additional emphasis on tracking the effect the initiative would have on deterring migrants from making the journey north by monitoring "intelligence and open-source reporting identifying the changes in the alien's perception of the ability to enter and remain in the United States illegally."

AR.07993



AR.07994

From left, U.S. Border Patrol Acting Chief Carla Provost, Immigration and Customs Enforcement Executive Associate Director of Enforcement and Removal Operations Matthew Albence, commander of the U.S. Public Health Service Commissioned Corps Commander Jonathan White, and U.S. Justice Department Executive Office for Immigration Review Director James McHenry are sworn in before testifying to the Senate Judiciary Committee on July 31, 2018.

Photo: Chip Somodevilla/Getty Images

## A "Surge Initiative"

By June 2017, the operation was underway. In a June 12 email, an HSI "Intelligence Research Specialist" described the initiative as a "high" priority coming from headquarters. The specialist noted that the initiative was unfolding in three phases.

During phase one, HSI investigators would determine the final destination of a migrant child in government custody, identify their parents or guardians, then "develop target folders of the parents/guardians." During phase two, HSI agents would perform so-called knock and talk visits to the family's home and "determine the identities of the parents/guardians." The parents or guardians would be interviewed during phase three of the initiative, and "[i]f determined that the parents/guardians did pay smugglers to smuggle their children through the border, then HSI agents will develop warrants of prosecution."

With the initiative designed to last no more than a few months, its eventual end came as a disappointment to some senior administration officials.

In a December 2017 memo later leaked to Sen. Jeff Merkley's office by a government whistleblower, a central architect of the Trump administration's most hard-line immigration policies named Gene Hamilton offered comments on a range of policy proposals to respond to the "surge of illegal immigration" at the border. Hamilton's first comment, included in the margins of the memo, referenced "one option that isn't listed here, but should be: prosecuting those in the United States who conspire or otherwise facilitate the illegal entry into the United States." He pointed to a "fairly good initiative over the summer" that "got close to zero press."

"Not enough cases were accepted for criminal prosecution," Hamilton wrote. "We need a concerted six-month campaign — involving coordination between DHS, DOJ, and HHS. The whole of government needs to take a zero tolerance policy to the smuggling of minors into the United States (all aliens, of course, but especially minors)."

While the campaign to hunt down the parents of children fleeing some the most violent countries in the world did not generate the positive coverage Hamilton hoped for, it did attract attention. The same month that Hamilton lamented the end of the initiative, a coalition of immigrant rights organizations sent a letter to the heads of the Department of Homeland Security's top oversight offices; they criticized a "surge initiative" in immigration enforcement targeting relatives of unaccompanied minors as an unconstitutional effort in which law enforcement was "using children as bait." By the end of the summer, NPR confirmed, the initiative had resulted in more than 400 arrests.

The Trump administration's efforts to deter undocumented families from coming to

AR.07995

the U.S. by criminally prosecuting them did not end with the summer 2017 initiative. In the memo Hamilton marked up in December 2017, the prospect of separating arriving families — by requiring that all parents be criminally processed — was addressed explicitly. "[T]he increase in prosecutions would be reported by the media and it would have a substantial deterrent effect," the memo said.

Five months later, in April 2018, the heads of three of the administration's top immigration enforcement agencies recommended a policy of "zero tolerance" to former DHS Secretary Kirstjen Nielsen, acknowledging that the policy would lead to the separation of families.

One of those officials, Kevin McAleenan, is now acting director of DHS and scheduled to testify before Congress this week. The recommendation McAleenan provided — co-signed by the heads of ICE and U.S. Citizenship and Immigration Services — was included in a memo later obtained by Open the Government and Project on Government Oversight through a freedom of information request. On the same day the memo was sent, newly released emails now show HSI officials scrambling to find cases that would justify family separation to provide Nielsen ahead of an appearance before lawmakers.

"In preparation for S1's hearing next week, I want to develop a good narrative (supported by facts and cases), on the separating issues," the secretary's chief of staff wrote at the time. "We need to think strategically of the arguments from the other side and position S1 accordingly."

A year after family separation dominated the headlines, a pattern is emerging of primary source documents obtained through hard-fought freedom of information litigation detailing just how deliberate the policy of family separation was in its creation. Emily Creighton, deputy legal director at the American Immigration Council, said there's a value in seeing actual government records that cannot be overstated. "I think primary source documents are increasingly important to the American public," Creighton told The Intercept. "We've become skeptics of public statements that are made by public officials, for good reason, particularly in this context."

Creighton explained that the documents her organization and its legal collaborators are now beginning to receive started with freedom of information requests filed before "zero tolerance" — the policy that required family separation — even became official. Immigrant rights stakeholders like AIC "have been unearthing documents that contradict the government's public position," Creighton said. "These government documents are what help tell the whole story."

ICE did not respond to a request for comment.

As The Intercept reported Monday, in a story detailing how a private intelligence company working with DHS monitored more than 600 protests against family separation, the government has identified hundreds of thousands of documents responsive to the requests AIC and its partners have made. Getting access to those materials, however, has not been easy. "Their search capacities are limited," Creighton said of the government agencies involved. "We have to work with them to find a way to get to a place where we're actually receiving documents, and it's been a real struggle in this case."

"We live in a time when we are really rightly skeptical about how the government is

AR.07996

messaging policies and lying to the public to explain appalling policies like family separation," Creighton went on to say. "We have to continually remind ourselves that we have laws like the Freedom of Information Act that allow access to government documents that protect our right to know."

**Update: Monday, April 29, 2019**

*After publication, ICE provided the following statement:*

> *ICE aims to disrupt and dismantle end-to-end the illicit pathways used by transnational criminal organizations and human smuggling facilitators. As such, ICE conducted a surge initiative focused on the identification and arrest of individuals involved in illicit human smuggling operations, to include sponsors who have paid criminal organizations to smuggle children into the United States. The risks associated with smuggling children into the U.S. present a constant humanitarian threat. The sponsors who have placed children directly into harm's way by entrusting them to violent criminal organizations will be held accountable for their role in these conspiracies.*

> *The numbers as of August 21, 2017 when the domestic enforcement phase of the initiative concluded:*

> - *443 administrative arrests*
> - *35 criminal arrests*
> - *38 prosecutions accepted on charges including alien smuggling and re-entry of removed aliens.*

> *After the domestic enforcement phase of the initiative, the focus moved internationally to disrupting the transnational criminal organizations involved in human smuggling.*

AR.07997



# Office of the Attorney General
## Washington, D. C. 20530
December 5, 2017

MEMORANDUM FOR THE EXECUTIVE OFFICE FOR IMMIGRATION REVIEW

FROM:            THE ATTORNEY GENERAL

SUBJECT:       Renewing Our Commitment to the Timely and Efficient Adjudication of
                 Immigration Cases to Serve the National Interest

      Our primary mission at the Department of Justice—as reflected in the first clause of our mission statement—is to "enforce the law and defend the interests of the United States according to the law." Under my delegated authority, you, the men and women of the Executive Office for Immigration Review (EOIR), accomplish this objective by adjudicating immigration cases and interpreting and administering the immigration laws. Together, we have made significant progress since the beginning of the Trump Administration, but we want to build on this success to enshrine what the law contemplates and what the people desire—an end to unlawfulness in our immigration system.

      We have brought on 50 new immigration judges since January 20, and expect to add over 60 more in the next six months. We surged resources to the border at the direction of the President—and completed approximately 2,800 more cases than we were projected to have otherwise completed. We are actively developing a long overdue e-filing system to pilot in mid-2018. Initial case completions rose in FY 2017 to the highest level since FY 2012. In accordance with the law, we are prioritizing the completion of cases and developing performance measures to ensure that EOIR's mission of fairly, expeditiously, and uniformly administering the immigration laws is fulfilled.

      But as you know, tremendous challenges lie before us. There are approximately 650,000 cases pending before the immigration courts. Although we showed signs of leveling off the increase in the non-detained portion of the backlog at the end of FY 2017, we nevertheless face a steady stream of criticism that we are overwhelmed and that the backlog is intractable. I strongly disagree—this challenge is not insurmountable, but it does require a concerted effort to address it.

      While we continue to hire additional immigration judges and support personnel to address these challenges, we must all work to identify and adopt—consistent with the law—additional procedures and techniques that will increase productivity, enhance efficiencies, and ensure the timely and proper administration of justice. Whether you are an immigration judge who has a unique way to better handle dockets, or an administrative assistant who has a better process for handling the distribution of files in the office, we can all contribute something to improve the system. I, too, anticipate clarifying certain legal matters in the near future that will remove recurring impediments to judicial economy and the timely administration of justice.

      It is imperative that we all recognize our extraordinary role in ensuring the faithful application of our duly enacted immigration laws while simultaneously ensuring the timely and

Memorandum from the Attorney General
Subject: Renewing Our Commitment to the Timely
and Efficient Adjudication of Immigration Cases to Serve the National Interest        Page  2

impartial administration of justice.  Indeed, the manner in which cases are adjudicated has a direct impact on the sovereign interests of our nation.  It not only affects the flow of illegal entries into the United States and the number of visa overstays, but also our national security, public safety, and the employment prospects and wages of the American people.  It also furthers the national interest by ensuring that meritorious cases receive timely consideration while baseless cases are concluded expeditiously.

To that end, I expect you to ensure that the adjudication of immigration cases serves the national interest by supporting and adhering to the following principles:

- The immigration courts, the Board of Immigration Appeals, and the Office of the Chief Administrative Hearing Officer within EOIR are responsible for adjudicating cases and administering the immigration laws.  We serve the national interest by applying those laws as enacted, irrespective of our personal policy preferences.

- The timely and efficient conclusion of cases serves the national interest.  Unwarranted delays and delayed decision making do not.  The ultimate disposition for each case in which an alien's removability has been established must be either a removal order or a grant of relief or protection from removal provided for under our immigration laws, as appropriate and consistent with applicable law.

- Meritless cases or motions pending before the immigration courts or the Board of Immigration Appeals should be promptly resolved consistent with applicable law.

- The efficient and timely completion of cases and motions before EOIR is aided by the use of performance measures to ensure that EOIR adjudicates cases fairly, expeditiously, and uniformly in accordance with its mission.

- The attempted perpetration of fraud upon the United States government in our immigration court system can lead to delays, inefficiencies, and the improper provision of immigration benefits.  Therefore, any and all suspected instances of fraud should be promptly documented and reported to EOIR management, and any other agency with an interest in the identification of and response to such fraud (including the appropriate state bar(s) in cases of attorney misconduct), consistent with applicable law.

I expect all of you will carry out these principles capably and professionally in performing your duties, including in the preparation, adjudication, and completion of pending cases.  Further, I am confident that, together, we will uphold the mission of the Department of Justice, we will maintain respect for the rule of law, and we will serve the national interest by ensuring the timely administration of justice in immigration proceedings.

This guidance is not intended to, does not, and may not be relied upon to create, any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person. The Deputy Attorney General or the Director of EOIR may issue further guidance, as appropriate, to ensure the achievement of the principles set forth in this memorandum.

Uniform Laws Annotated
    Model Penal Code (Refs & Annos)(Refs & Annos)
        Part I Part I. General Provisions
            Article 1 Article 1. Preliminary (Refs & Annos)(Refs & Annos)

Model Penal Code § 1.04

§ 1.04. Classes of Crimes; Violations.

Currentness

(1) An offense defined by this Code or by any other statute of this State, for which a sentence of [death or of] imprisonment is authorized, constitutes a crime. Crimes are classified as felonies, misdemeanors or petty misdemeanors.

(2) A crime is a felony if it is so designated in this Code or if persons convicted thereof may be sentenced [to death or] to imprisonment for a term that, apart from an extended term, is in excess of one year.

(3) A crime is a misdemeanor if it is so designated in this Code or in a statute other than this Code enacted subsequent thereto.

(4) A crime is a petty misdemeanor if it is so designated in this Code or in a statute other than this Code enacted subsequent thereto or if it is defined by a statute other than this Code that now provides that persons convicted thereof may be sentenced to imprisonment for a term of which the maximum is less than one year.

(5) An offense defined by this Code or by any other statute of this State constitutes a violation if it is so designated in this Code or in the law defining the offense or if no other sentence than a fine, or fine and forfeiture or other civil penalty is authorized upon conviction or if it is defined by a statute other than this Code that now provides that the offense shall not constitute a crime. A violation does not constitute a crime and conviction of a violation shall not give rise to any disability or legal disadvantage based on conviction of a criminal offense.

(6) Any offense declared by law to constitute a crime, without specification of the grade thereof or of the sentence authorized upon conviction, is a misdemeanor.

(7) An offense defined by any statute of this State other than this Code shall be classified as provided in this Section and the sentence that may be imposed upon conviction thereof shall hereafter be governed by this Code.

**Editors' Notes**

**EXPLANATORY NOTE**

This section sets forth several important principles of the Code. First, it provides that any offense for which a sentence of death or imprisonment is authorized constitutes a crime, and classifies crimes as felonies, misdemeanors, and petty misdemeanors, based on the length of incarceration that may be imposed. Section 6.01(1) further subdivides felonies into three classes. There are thus for sentencing purposes five categories of crime under the Code.

Second, it creates a noncriminal class of offenses, designated "violations," for which only a fine or other civil penalty is authorized. It is envisaged that this class will primarily include regulatory offenses based on strict liability and certain minor offenses such as traffic violations.

Third, the section performs the necessary rationalizing task of subjecting criminal enactments found in a jurisdiction's other statutes to the sentencing structure of the criminal code.

For detailed Comment, *see* MPC Part I Commentaries, vol. 1, at 67.

Notes of Decisions (6)

Copr. (C) Thomson Reuters 2020. All rights reserved. Model Penal Code official Text Reproduced with Permission of the American Law Institute. Current through 2019 Annual Meeting of American Law Institute.

Model Penal Code § 1.04, ULA PENAL CODE § 1.04

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Pres. Proc. No. 9928, 84 FR 49187, 2019 WL 4447793(Pres.)
Proclamation 9928

National Gang Violence Prevention Week, 2019

September 13, 2019

**\*49187  By the President of the United States of America**

**A Proclamation**

My Administration has successfully indicted, convicted, imprisoned, and removed from our country ruthless members of gangs and cartels who inflict horrendous acts of violence upon Americans. During National Gang Violence Prevention Week, my Administration renews its dedication to identifying and dismantling the criminal networks that seek to wreak havoc on our communities and to bringing the individuals who participate in them to justice. We also reaffirm our support for the heroes of law enforcement who have taken a sacred pledge to defend the Nation and its people.

Our Nation's law enforcement officers are the first line of defense against acts of evil perpetrated by gang members. My Administration has increased efforts and has devoted considerable resources to catching, prosecuting, and removing these criminals from our streets. We have made tremendous strides by partnering with State, local, and tribal law enforcement to implement new initiatives, such as Project Safe Neighborhoods, that have been successful in creating safer communities through targeted and sustained reductions in gang violence. Because of these efforts, the Department of Justice (DOJ) brought more cases against violent criminals in fiscal year 2018 than ever before. The record progress we have achieved is the result of our tough stance against crime as well as the bravery and hard work of law enforcement officials.

My Administration is also aggressively combating transnational criminal organizations that bring mayhem across our borders and into our country. On our southern border especially, gangs are heavily involved in murder, extortion, narcotics, and weapons trafficking, human smuggling and trafficking, and other nefarious activities. In the first few weeks of my Administration, I signed three executive orders to dismantle transnational criminal organizations and subsidiary organizations, to reduce crime and restore public safety, and to enhance the safety of law enforcement officers. The DOJ is also working with law enforcement in El Salvador, Guatemala, and Honduras to help coordinate the fight against MS-13, the 18th Street Gang, and other dangerous criminal organizations that try to enter the United States in an effort to ravage our communities. This partnership, called Operation Regional Shield, targets gangs at the source and works to ensure that these criminals never reach our borders. So far, the program has resulted in the indictment of more than 7,000 criminal gang members. In the first 2 years of my Administration, Immigration and Customs Enforcement officers made 266,000 arrests of aliens with criminal records, including those charged or convicted of 100,000 assaults, nearly 30,000 sex crimes, and 4,000 violent killings. My first duty is to care for our Nation's citizens, and my Administration remains committed to securing the border and stopping criminal gangs, drug smugglers, and human traffickers.

This week, we renew our pledge to defeat criminal gangs and protect our Nation's communities from violent crime so that all Americans have the opportunity to live in safety and peace. We express our deep gratitude to the selfless men and women of our law enforcement agencies who risk their lives protecting our communities. We also pay tribute to the innocent  **\*49188** victims of gang violence and pray for their families. Let us honor them by redoubling our efforts to root out and eliminate brutal gangs that threaten our society.

NOW, THEREFORE, I, DONALD J. TRUMP, President of the United States of America, by virtue of the authority vested in me by the Constitution and the laws of the United States, do hereby proclaim the week of September 15 through September 21, 2019, as "National Gang Violence Prevention Week." I call upon the people of the United States to observe this week with appropriate ceremonies and activities.

IN WITNESS WHEREOF, I have hereunto set my hand this thirteenth day of September, in the year of our Lord two thousand nineteen, and of the Independence of the United States of America the two hundred and forty-fourth.

Pres. Proc. No. 992884 FR 491872019 WL 4447793(Pres.)

**End of Document**                                   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# MS-13 Gang: 96 Charged in Sweeping Crackdown on Long Island

*By Alan Feuer*

The accusations included seven murder conspiracies, as well as gun running and drug trafficking.



AR.08004



Credit...Johnny Milano for The New York Times

Over the course of 150 pages, the indictment described a remarkably vast criminal enterprise. There were seven murder plots with guns, machetes and Molotov cocktails. There were assaults in bars, meetings in local bakeries and gang initiations with 13-second beatings.

Men with nicknames like Droop and Broccoli were said to have dealt in crack cocaine, fentanyl and oxycodone. Gang members had to adhere to a 20-point list of rules and regulations, including one that stated that to move up in the ranks, members had to commit at least four murders.

All of this was laid out in voluminous detail as the Suffolk County district attorney's office announced on Friday that it had brought a series of sweeping charges against 96 members and associates of the notorious transnational street gang known as MS-13, capping a two-year investigation with a team of local, state and federal partners.

Originally founded in Los Angeles by refugees from El Salvador, MS-13 has long had a base of operations in Suffolk County, on the East End of Long Island, which has been plagued by gang violence in recent years.

But officials said that the case revealed on Friday was the biggest crackdown ever on the group in New York, and had dealt its local cells, or cliques, a significant blow.

"The goal of this investigation was to deliver a major blow to the gang's leadership, operations and recruitment in the our region," Timothy D. Sini, the Suffolk County district attorney, told reporters at a news conference on Friday.

"As we know, MS-13 is a ruthless, savage gang," he added, "which commits acts of violence to recruit, retain, and control its members and exact revenge on its rivals,

AR.08005

as well as to extort innocent members of our community."

The gang's notoriety and bloody tactics have caught the attention of President Trump, who has often invoked its name and reputation as a way to justify his immigration policy. He has referred to the group as an "infestation" and to its members as "animals." In 2018, he invited the mother of one MS-13 murder victim to be his guest at the State of the Union address.

And on Friday, the president went on Twitter to use the arrests as an argument for his immigration policy, saying that the gang takedown was an example of how "we are getting MS-13 gang members, and many other people that shouldn't be here, out of our country."

According to the federal authorities, no less than 28 murders have been attributed to MS-13 on Long Island since 2016, some of them leading to enormous public outcry.

Image



Credit...Uli Seit for The New York Times

In 2017, several members of a Long Island clique were charged with using knives and machetes to execute four young men in the woods behind a soccer field in Central Islip, N.Y. The victims were killed because their attackers believed they were members of a rival gang, but relatives said that was not the case.

That same year, another group of MS-13 members was arrested in connection with the brutal murders in 2016 of Kayla Cuevas and Nisa Mickens, two teenage girls from Brentwood, N.Y.

Ms. Cuevas had been engaged in a feud with gang members in school and over social media, while Ms. Mickens was simply a friend of Ms. Cuevas's, who happened

AR.08006

to be in the wrong place at the wrong time when they were set upon.

The two-year investigation was based on a sprawling wiretap that monitored as many as 215 separate phones, officials said, and has now led to the arrests of a total of roughly 200 members of the group.

Among those charged on Friday were nine top leaders of the gang who were part of what was known as the New York Program, a strategic initiative that MS-13 launched from its home base in El Salvador to strengthen its foothold in the New York area and to spread the group's operations along the Eastern Seaboard, law enforcement officials said.

The officials said that the New York Program was likely responsible for an uptick in violence by the group in recent years. One central function of the New York Program, the officials said, was to collect money in the New York area and send it back to MS-13 leaders in El Salvador.

The arrests included MS-13 members from nine separate cliques in Suffolk County, ranging in age from 16 to 59. They came from more than 20 cities in New York as well as from Connecticut, Massachusetts, Maryland, even Holland.

Officials identified Noe Fuentes, also known as Ghost, as the leader of the HCLS clique, one of Long Island's largest cells, and as the head of the New York Program. Mr. Sini said that the HCLS clique, or Huntington Criminales Los Salvatrucha, and other cells on Long Island had been "decimated" by law enforcement efforts, but that the group not been entirely dismantled.

"MS-13 is an international gang," he said. "They will attempt to recalibrate, and send individuals to take up leadership roles in Suffolk County, and that's why we need to stay vigilant."

In connection with the investigation, the authorities seized more than 10 kilograms of cocaine, about 1,000 pills of fentanyl, large quantities of heroin and marijuana, nine handguns, two rifles, at least 500 rounds of ammunition and numerous machetes.

Ray Donovan, the special agent in charge of the Drug Enforcement Administration's New York office, which took part in the case, said that investigators had determined that MS-13 was attempting to establish what amounted to a stronghold in New York.

As part of the investigation, Mr. Donovan explained, the authorities used more than just their wiretaps. They also physically surveilled gang members and monitored their social media accounts.

MS-13 has over 50,000 members in Central America, Mr. Donovan said, adding that another 8,000 to 10,000 members are spread throughout the United States and Europe.

Working with the authorities in Suffolk County and other law enforcement agencies, Mr. Donovan said that several murders had been prevented and that investigators were able to solve three previously unsolved killings in New York and three more in Virginia, though he did not provide any details about the killings.

AR.08007

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 600 of 1305

"This investigation, when it's all said and done, sends a very clear message to the leadership of MS-13," Mr. Donovan said. "New York is not your home, and it never will be your home."

Arielle Dollinger and William K. Rashbaum contributed reporting.

AR.08008



EXECUTIVE OFFICE OF THE PRESIDENT
OFFICE OF MANAGEMENT AND BUDGET
WASHINGTON, D.C. 20503

April 5, 2017

M-17-21

MEMORANDUM FOR:    REGULATORY POLICY OFFICERS AT EXECUTIVE
DEPARTMENTS AND AGENCIES AND MANAGING
AND EXECUTIVE DIRECTORS OF CERTAIN AGENCIES
AND COMMISSIONS

FROM:    Dominic J. Mancini, Acting Administrator
Office of Information and Regulatory Affairs

SUBJECT:    Guidance Implementing Executive Order 13771, Titled "Reducing
Regulation and Controlling Regulatory Costs"

## I.    Introduction

This guidance, in the form of Questions and Answers (Q&As), addresses the requirements of
Executive Order (EO) 13771, titled "Reducing Regulation and Controlling Regulatory Costs." It
applies to Fiscal Years (FY) 2017 and beyond. This guidance supplements the Office of
Management and Budget (OMB) interim guidance issued on February 2, 2017, titled "Interim
Guidance Implementing Section 2 of the EO of January 30, 2017, Titled 'Reducing Regulation
and Controlling Regulatory Costs.'" While OMB's Office of Information and Regulatory Affairs
(OIRA) believes this guidance largely treats the subjects covered in the February 2, 2017 interim
guidance in a consistent manner, where these two memoranda are in conflict, this guidance
supersedes the previous guidance. It reflects OIRA's consideration of the comments received in
response to the February 2, 2017, interim guidance. Comments sent by members of the public are
available on Regulations.gov in docket ID OMB-2017-0002.

## II.    General Requirements

The guidance explains, for purposes of implementing Section 2, the following requirements:

- "Unless prohibited by law, whenever an executive department or agency . . . publicly
proposes for notice and comment or otherwise promulgates a new regulation, it shall
identify at least two existing regulations to be repealed." Sec. 2(a).
- "For fiscal year 2017 . . . the heads of all agencies are directed that the total incremental
cost of all new regulations, including repealed regulations, to be finalized this year shall be
no greater than zero, unless otherwise required by law or consistent with advice provided in
writing by the Director of the Office of Management and Budget . . . ." Sec. 2(b).
- "In furtherance of the requirement of subsection (a) of this section, any new incremental
costs associated with new regulations shall, to the extent permitted by law, be offset by the
elimination of existing costs associated with at least two prior regulations." Sec. 2(c).

In general, executive departments or agencies ("agencies") may comply with those requirements by issuing two EO 13771 deregulatory actions (described below) for each EO 13771 regulatory action (described below). The incremental costs associated with EO 13771 regulatory actions must be fully offset by the savings of EO 13771 deregulatory actions.

In addition, agencies planning to issue one or more EO 13771 regulatory actions on or before September 30, 2017, should for each such EO 13771 regulatory action:

- Identify two existing regulatory actions the agency plans to eliminate or propose for elimination on or before September 30, 2017 in a reasonable period of time before the agency issues the EO 13771 regulatory action; and
- Fully offset the total incremental cost of such EO 13771 regulatory action as of September 30, 2017.

Guidance on the requirements of Section 3(a) is forthcoming.

Beginning with FY 2018, Section 3(d) requires the Director of OMB to identify to agencies a total amount of incremental costs (or "regulatory cap" as stated in Section 2) for all EO 13771 deregulatory and EO 13771 regulatory actions finalized during the fiscal year. The total incremental cost imposed by each agency should not exceed the agency's allowance for that fiscal year, unless required by law or approved by the Director. The total incremental cost allowance may be an increase or reduction in total regulatory cost, and will be informed by agencies' draft submissions for the *Regulatory Plan*.

Please consult with OIRA if you have any particular questions regarding the applicability or interpretation of EO 13771 not addressed in these Q&As.

Agencies should continue to comply with all applicable laws and requirements. In addition, EO 12866 remains the primary governing EO regarding regulatory planning and review. Accordingly, among other requirements, except where prohibited by law, agencies must continue to assess and consider both the benefits and costs of regulatory actions, including deregulatory actions, when making regulatory decisions, and issue regulations only upon a reasoned determination that benefits justify costs.

## III.        Definitions

This section provides definitions for terms used in this guidance. The definitions should not necessarily be applied to other sections of EO 13771 that this guidance does not cover, and do not replace definitions used in other EOs or statutes.

AR.08010

*Q1.    What is an "agency"?*

A: An "agency," unless otherwise indicated, means any authority of the United States that is an "agency" under 44 U.S.C. 3502(1), other than those considered to be independent regulatory agencies, as defined in 44 U.S.C. 3502(5). A cabinet department is considered a single agency for purposes of EO 13771 compliance.

*Q2.    What is an "EO 13771 regulatory action"?*

A: An "EO 13771 regulatory action" is:

(i) A significant regulatory action as defined in Section 3(f) of EO 12866 that has been finalized and that imposes total costs greater than zero; or

(ii) A significant guidance document (*e.g.,* significant interpretive guidance) reviewed by OIRA under the procedures of EO 12866 that has been finalized and that imposes total costs greater than zero.

For example, EO 13771 regulatory actions include negotiated rulemakings that are significant as defined in Section 3(f) of EO 12866, that have been finalized, and that impose total costs greater than zero.

*Q3.    What is a "significant guidance document"?*

A: As defined in OMB's *Final Bulletin for Agency Good Guidance Practices*, a "significant guidance document" is a guidance document disseminated to regulated entities or the general public that may reasonably be anticipated to:

(i) Lead to an annual effect on the economy of $100 million or more or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or tribal governments or communities;

(ii) Create a serious inconsistency or otherwise interfere with an action taken or planned by another agency;

(iii) Materially alter the budgetary impact of entitlements, grants, user fees, or loan programs or the rights and obligations of recipients thereof; or

(iv) Raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in EO 12866, as further amended.

A significant guidance document does not include legal advisory opinions for internal Executive Branch use and not for release (such as Department of Justice Office of Legal Counsel opinions); briefs and other positions taken by agencies in investigations, pre-litigation, litigation, or other enforcement proceedings; speeches; editorials; media interviews; press materials; Congressional correspondence; guidance documents that pertain to a military or foreign affairs function of the United States (other than guidance on procurement or the import or export of non-defense articles and services); grant solicitations;

3

warning letters; case or investigatory letters responding to complaints involving fact-specific determinations; purely internal agency policies guidance documents that pertain to the use, operation or control of a government facility; internal guidance documents directed solely to other Federal agencies; and any other category of significant guidance documents exempted by an agency in consultation and concurrence with the OIRA Administrator. In the list above, "internal" policies and guidance documents do not include those that materially affect an agency's interactions with non-Federal entities, even if nominally directed only to agency personnel. For example, an internal directive to field staff on how to implement a regulatory requirement could be a significant guidance document if it satisfied any of (i) through (iv) above.

If they satisfy the definition above, modifications to existing guidance and interpretative documents would be considered significant guidance documents.

### Q4.    What is an "EO 13771 deregulatory action"?

A: An "EO 13771 deregulatory action" is an action that has been finalized and has total costs less than zero. An EO 13771 deregulatory action qualifies as both: (1) one of the actions used to satisfy the provision to repeal or revise at least two existing regulations for each regulation issued, and (2) a cost savings for purposes of the total incremental cost allowance. EO 13771 deregulatory actions are not limited to those defined as significant under EO 12866 or OMB's *Final Bulletin on Good Guidance Practices.*

An EO 13771 deregulatory action may be issued in the form of an action in a wide range of categories of actions, including, but not limited to:

- Informal, formal, and negotiated rulemaking;
- Guidance and interpretative documents;
- Some actions related to international regulatory cooperation; and
- Information collection requests that repeal or streamline recordkeeping, reporting, or disclosure requirements.

Significant proposed rules issued before noon on January 20, 2017, that are formally withdrawn by notice in the *Federal Register* and removed from the *Unified Agenda of Regulatory and Deregulatory Actions* may qualify as repeal actions, but do not qualify for cost savings.

Please consult with OIRA regarding other actions your agency believes should qualify as an EO 13771 deregulatory action.

### Q5.    What does "offset" mean?

A: The term "offset" means at least two EO 13771 deregulatory actions have been taken per EO 13771 regulatory action and that the incremental cost of the EO 13771 regulatory action has been appropriately counterbalanced by incremental cost savings from EO 13771 deregulatory actions, consistent with the agency's total incremental cost allowance.

AR.08012

***Q6.     What is a "statutorily or judicially required" rulemaking?***

A:  A statutorily required rulemaking is one for which Congress has provided by statute an explicit requirement and explicit timeframe for rulemaking. For example, a statute that states, an agency "shall issue nutrition labeling requirements within 10 years" of the statute's enactment date would be considered a statutorily required rule.

A judicially required rulemaking is one for which there is a judicially established binding deadline for rulemaking, including deadlines established by settlement agreement or consent decree.

Agencies should consult with OIRA to determine whether a rule falls within the definition of a statutorily or judicially required rulemaking.

***Q7.     What is a rule issued with respect to a "national security function" of the United States?***

A:  For the purposes of EO 13771, a regulation issued with respect to a national security function is a regulation that satisfies the two following requirements:

   (1) The benefit-cost analysis demonstrates that the regulation is anticipated to improve national security as its primary direct benefit; and
   (2) (A) For regulations the agency considers legislative rules: OIRA and the agency agree the regulation qualifies for a "good cause" exception under 5 U.S.C. 553(b)(3)(B); or (B) For other regulations (including significant guidance) the agency and OIRA agree that applying the requirements of EO 13771 to the regulation would be impracticable or contrary to public interest.

***Q8.     What is "total incremental cost"?***

A:  The term "total incremental cost" means the sum of all costs from EO 13771 regulatory actions minus the cost savings from EO 13771 deregulatory actions.

## IV.     Scope Questions

***Q9.     Which new regulations as defined in EO 13771 must be offset?***

A:  Agencies are required to offset EO 13771 regulatory actions issued after noon on January 20, 2017. This includes those EO 13771 regulatory actions that are rules finalizing a Notice of Proposed Rulemaking (or in certain instances an interim final rule; see Question 11 for a further discussion) issued before noon on January 20, 2017.

Agencies should use the existing significance determination process outlined in EO 12866 for determining whether an action is an EO 13771 regulatory action. Agencies should not assume that actions that appear, or have appeared, in the *Unified Agenda of Regulatory and*

AR.08013

*Deregulatory Actions* as nonsignificant have been determined by OIRA to be nonsignificant. Agencies should obtain an affirmative significance determination from OIRA before publishing regulatory actions.

### Q10.    How are interim and direct final rules treated?

A: In general, significant interim and direct final rules must be offset. However, a significant interim final rule or direct final rule may qualify for an exemption with respect to the timing for identifying and issuing the EO 13771 deregulatory actions.

### Q11.    How are significant rules that finalize interim final rules (IFR) treated?

A: If the final rule neither increases nor decreases the cost of the IFR, then the action does not need to be offset nor does it qualify as an EO 13771 deregulatory action. If the final rule includes changes that increase the cost of the IFR, then the final rule must be offset (however, if the final rule imposes only *de minimis* costs relative to the IFR, the final rule may qualify for an exemption). If the final rule reduces the cost of the IFR, then the rule and the cost savings relative to the IFR may qualify as an EO 13771 deregulatory action.

### Q12.    Must agencies identify EO 13771 deregulatory actions for significant advance notices of proposed rulemaking (ANPRM)?

A: No. With respect to rulemaking, the requirements of EO 13771 do not apply to pre-notice of proposed rulemaking activities such as ANPRMs.

### Q13.    How are regulatory actions that implement Federal spending programs or establish fees and penalties treated?

A: In general, Federal spending regulatory actions that cause only income transfers between taxpayers and program beneficiaries (*e.g.*, regulations associated with Pell grants and Medicare spending) are considered "transfer rules" and are not covered by EO 13771. Additionally, an action that establishes a new fee or changes the existing fee for a service, without imposing any new costs, does not need to be offset; nor does an action that establishes new penalties or fines or changes those already in existence.

However, in some cases, such regulatory actions may impose requirements apart from transfers, or transfers may distort markets causing inefficiencies. In those cases, the actions would need to be offset to the extent they impose more than *de minimis* costs. Examples of ancillary requirements that may require offsets include new reporting or recordkeeping requirements or new conditions, other than user fees, for receiving a grant, a loan, or a permit. Analogously, if an action reduces the stringency of requirements or conditions for transfer recipients or permit holders, the action may qualify as an EO 13771 deregulatory action. Also, an action that causes transfers that, for example, induce moral hazard or other inefficient behavior may need to be offset and an action that reduces such transfers may qualify as an EO 13771 deregulatory action.

6

Please consult with OIRA on these actions, especially with regards to potential distortionary costs due to transfers. See OMB Circular A-4 for a discussion of the distinction between transfers and costs generally.

**Q14.**  *How are activities treated that are associated with regulatory cooperation or international standards?*

A:  Regulatory activities associated with regulatory cooperation with foreign governments that reduce costs to entities or individuals within the United States, including at the border, or otherwise lower the cost of regulations on the United States economy, may qualify as EO 13771 deregulatory actions. Activities associated with standard-setting that reduce costs to entities or individuals within the United States may also qualify as EO 13771 deregulatory actions. However, agency actions to harmonize with the standards of an international body or foreign government that increase costs on United States entities or individuals may need to be offset. OIRA recognizes such harmonization could also lead to operating efficiencies for businesses that agencies may be able to capture in their analysis of the benefits and costs of EO 13771 actions.

Agencies should consult OIRA on how to treat specific regulatory activities related to regulatory cooperation or international standard-setting.

**Q15.**  *Do regulatory actions overturned by subsequently enacted laws qualify for savings?*

A:  Generally, yes. OIRA considers Acts of Congress that overturn final regulatory actions, such as disapprovals of rules under the Congressional Review Act, to operate in a similar manner as agency EO 13771 deregulatory actions.

**Q16.**  *Do regulatory actions that are vacated or remanded by a court qualify as EO 13771 deregulatory actions?*

A:  If a regulatory action issued before noon on January 20, 2017, is vacated by a judicial order for which all appeals have been resolved, OIRA will consider on a case-by-case basis whether the regulatory action being vacated qualifies as an EO 13771 deregulatory action.

If an EO 13771 regulatory action was issued on or after noon on January 20, 2017, any judicial order for which all appeals have been resolved vacating the regulatory action, and any related subsequent agency action (such as a withdrawal of a vacated regulation from the Code of Federal Regulations in order to comply with the order), will not qualify as an EO 13771 deregulatory action. Any EO 13771 deregulatory actions used to offset a vacated EO 13771 regulatory action, however, would be available to offset other EO 13771 regulatory actions (after accounting for any sunk costs incurred in complying with the vacated action).

If a court permits a regulatory action to remain in effect after a judicial remand for further agency proceedings, such as through remand without vacatur, the remanded action remains in effect. Therefore, there is no action at the time of remand that could qualify as an EO 13771

AR.08015

deregulatory action. In the same way that an agency complies with EO 12866 when issuing a subsequent agency action to revise a remanded regulatory action, an agency will similarly need to comply with EO 13771. A subsequent agency action may qualify as an EO 13771 deregulatory action if the subsequent agency action is deregulatory in nature, or may need to be offset if the action is a significant regulatory action that is final and that imposes costs (*i.e.,* an EO 13771 regulatory action).

Agencies should notify OIRA of any judicial decisions that affect regulatory actions subject to EO 13771.

## Q17.    What happens if an EO 13771 deregulatory action is remanded or vacated by a court?

A: As in the answer to the previous question, OIRA recognizes the inherent case-by-case nature of the issues raised by the potential remand or vacatur of an EO 13771 deregulatory action. For example, such decisions may happen years after a rule is finalized, and may affect compliance with both the cost allowances and the repeal provisions established pursuant to EO 13771. The agency should contact OIRA to determine how a remand or vacatur of an EO 13771 deregulatory action affects the agency's obligations under EO 13771.

## Q18.    Does EO 13771 apply to significant regulatory actions in which the law prohibits the consideration of costs in determining a statutorily required standard?

A: Because EO 13771 applies only to the extent permitted by law, agencies are still required to comply with their statutory obligations. Accordingly, if a statute prohibits consideration of cost in taking a particular regulatory action, EO 13771 does not change the agency's obligations under that statute. However, agencies will generally be required to offset the costs of such regulatory actions through other deregulatory actions taken pursuant to statutes that do not prohibit consideration of costs. Because each agency's obligations will differ depending on the particular statutory language at issue, these issues must be addressed on a case-by-case basis.

Please consult with OIRA regarding questions about particular statutory language and its relationship to EO 13771.

## Q19.    How do the requirements of EO 13771 apply to significant regulatory actions issued by one agency that do not have the force and effect of law until adopted, with or without change, by another agency?

A: Because the agency authorities that establish such sequential or otherwise overlapping regulatory responsibilities differ by program, these actions will need to be handled on a case-by-case basis. However, agencies in these circumstances should always work together to avoid double-counting costs and cost savings; they should also work together as closely as possible when developing regulatory approaches for such programs. In cases where one agency's action does not qualify as an EO 13771 regulatory action because it is not a significant regulatory action under EO 12866, associated actions by other agencies may still be covered by EO 13771.

AR.08016

*Q20.   Does EO 13771 apply to regulatory actions of independent regulatory agencies?*

A: No. EO 13771 applies only to those agencies that meet the definition of "agency" in this guidance. Nevertheless, independent regulatory agencies are encouraged to identify existing regulations that, if repealed or revised, would achieve cost savings that would fully offset the costs of significant regulatory actions while continuing to meet the agency's statutory obligations.

## V.      Accounting Questions

*Q21.   How should costs and cost savings be measured?*

A: Except where noted in other portions of this guidance, costs should be estimated using the methods and concepts appearing in OMB Circular A-4. There are several types of impacts that, under OMB Circular A-4, could be reasonably categorized as either benefits or costs, with the only difference being the sign (positive or negative) on the estimates. In most cases where there is ambiguity in the categorization of impacts, agencies should conform to the accounting conventions they have followed in past analyses. For example, if medical cost savings due to safety regulations have historically been categorized as benefits rather than reduced costs, they should continue to be categorized as benefits for EO 13771 regulatory actions. Identifying cost savings, such as fuel savings associated with energy efficiency investments, as benefits is a common accounting convention followed in OIRA's reports to Congress on the benefits and costs of Federal regulations.

Cost savings estimates for EO 13771 deregulatory actions should follow the same conventions, but in reverse. Only those impacts that have been traditionally estimated as costs when taking a regulatory action should be counted as cost savings when taking an EO 13771 deregulatory action. For example, the medical cost savings described above as historically being counted as benefits when regulating should not then be counted as "negative cost savings" when deregulating.

An agency that has used different accounting conventions across different past analyses should consult with OIRA regarding the categorization of ambiguous impacts. In general, when faced with ambiguity, OIRA will attempt to achieve greater consistency in the categorization of similar types of costs and benefits across different agencies.

OIRA notes that rules that cause an increase in the resources used by Federal agencies to accomplish their programmatic goals may need to be offset, and rules that reduce the real resources used by Federal agencies to accomplish their goals may qualify as EO 13771 deregulatory actions. These types of impacts have long been considered regulatory costs under OMB Circular A-4, and are a component of the costs OIRA includes in its reports to Congress on the benefits and costs of Federal regulations.

For EO 13771 deregulatory actions that revise or repeal recently issued rules, agencies generally should not estimate cost savings that exceed the costs previously projected for the

9

AR.08017

relevant requirements, unless credible new evidence show that costs were previously underestimated. On the other hand, a less recent regulatory impact analysis (RIA) may need revision to reflect, among other things, the fact that only costs occurring after the effective date of the regulatory repeal should be the basis for the cost savings estimate (*i.e.,* agencies should not count sunk costs). Where an agency believes it can significantly improve upon a prior cost estimate, especially a recent one, through methodological enhancements, the agency should first discuss those methodologies with OIRA.

**Q22.    *How should cost savings be determined for regulatory actions that expand consumption and/or production options?***

A: For regulatory actions that expand consumption and/or production options—sometimes referred to as "enabling" regulatory actions or regulations—cost savings should include the full opportunity costs of the previously forgone activities. Opportunity cost in this context would equal the sum of consumer and producer surplus, minus any fixed costs. See OMB Circular A-4 for a more detailed discussion of these concepts.

Generally, "one-time" regulatory actions (*i.e.,* those actions that are not periodic in nature) that expand consumption and/or production options would qualify as EO 13771 deregulatory actions.

There may be situations where this approach for determining the cost offsets generated by an enabling regulatory action is inappropriate. For instance, this approach may not be appropriate in certain circumstances where, if an agency were to fail to issue a regulatory action, a significant existing and ongoing economic activity would be prohibited. See Question 26. Cost offsets for such regulatory actions will be determined on a case-by-case basis.

Please consult with OIRA on all such non-routine regulations.

**Q23.    *How does Executive Order 13771 apply to routine hunting and fishing regulatory actions?***

A. Routine hunting and fishing regulatory actions that establish annual harvest limits are not required to be offset, and are not eligible to be used as cost savings. This includes migratory bird hunting frameworks under the Migratory Bird Treaty Act and fishery management plans and amendments under the Magnuson-Stevens Fishery Conservation and Management Act. This exemption does not apply to regulatory actions that affect hunting and fishing activity that are not routine regulatory actions.

**Q24.    *What base year should agencies use?***

A: Agencies should adjust all estimates to 2016 dollars using the GDP deflator, as released on March 30, 2017, until further guidance is provided by OIRA.

AR.08018

***Q25.    How should agencies calculate cost and cost savings for the purpose of EO 13771 accounting?***

A: Agencies should calculate the present value (as of 2016) of costs for EO 13771 regulatory actions and cost savings for EO 13771 deregulatory actions over the full duration of the expected effects of the actions using both 7 percent and 3 percent end-of-period discount rates.

***Q26.    In determining costs and cost savings under EO 13771, how should regulatory baselines be determined?***

A: For the most part, agencies should follow the guidance about regulatory baselines provided in OMB Circular A-4. However, there can be uncertainty, which is recognized in OMB Circular A-4, regarding how best to capture the directive to assess impacts against the state of the world in the absence of the regulation. Provided below are two cases in which this uncertainty, or other challenges arising in the context of OMB Circular A-4, have often been addressed by performing analyses with multiple baselines. In each of these cases, OIRA has also provided guidance about how to determine costs or cost savings for the purposes of EO 13771:

    (1) When a regulatory action finalizes an interim final rule (IFR), agencies are typically encouraged to present two sets of estimates: the overall regulatory impacts and the incremental impacts relative to the IFR. For purposes of determining costs or available cost savings under EO 13771, agencies finalizing an IFR should include only the incremental impacts of the final rule, relative to the IFR.

    (2) There are multiple Federal programs and policies—such as discharge general permitting under the Clean Water Act or Medicare quality performance tracking—that are updated or renewed at regular intervals via rulemaking. Because these updates reliably occur, an assessment of the incremental changes between the previous and updated programs is often much more informative than a comparison of the updated programs against hypothetical discontinuance. Although multiple-baseline analysis is likely to continue to be encouraged in such cases for analysis conducted under EO 12866, for purposes of EO 13771, costs or cost savings should be determined by the incremental changes between previous and updated programs. For example, if an agency is statutorily or judicially required to issue a regulation every five years to permit or prohibit an activity, and the agency previously issued a regulation to address the requirement, the appropriate baseline to use for estimating the costs or cost savings of the new regulation under EO 13771 is likely the existing regulation (or interim operating conditions if there is temporarily no regulation in effect).

Please consult with OIRA if you have questions regarding the appropriate baseline upon which to calculate costs or cost savings.

11

***Q27.   How should agencies treat unquantified costs and cost savings?***

A:   As stated in OMB Circular A-4, agencies should use their best efforts to monetize the effects of both regulatory actions and deregulatory actions and, in some cases, significant guidance documents. Depending on the likely magnitude of the effects, such efforts may include conducting or sponsoring studies to develop monetized estimates. In proposed/draft regulatory actions expected to lead to EO 13771 regulatory actions or EO 13771 deregulatory actions agencies should, at a minimum, clearly identify any non-monetized costs or cost savings, explain the key reason(s) why monetization is not possible, discuss any information the agency has that is relevant to estimating such costs, and request information from the public to monetize such costs at the final stage.

The weight assigned to unquantified effects will depend on their significance and degree of certainty, and will be handled on a case-by-case basis. See OMB Circular A-4 for more information on unquantified costs.

***Q28.   How should agencies treat EO 13771 regulatory actions and EO 13771 deregulatory actions published by multiple agencies?***

A:   These will be handled on a case-by-case basis. Agencies should consult OIRA as early as possible to determine the appropriate treatment of the action.

***Q29.   Can agencies "bank" cost savings and deregulatory actions?***

A:   Yes. Agencies may bank both EO 13771 deregulatory actions and the associated cost savings for use in the same or a subsequent fiscal year towards EO 13771's requirement to identify at least two existing regulations to be repealed (unless prohibited by law) and, separately, to comply with the total incremental cost allowance. Surplus EO 13771 deregulatory actions and cost savings do not expire at the end of a fiscal year and can be used in subsequent fiscal years.

For example, if an agency issues four EO 13771 deregulatory actions, the agency may apply them to up to two subsequent EO 13771 regulatory actions, including those occurring in a future fiscal year. Regardless, at the end of each fiscal year, an agency must be able to identify, and should have finalized, twice as many EO 13771 deregulatory actions as EO 13771 regulatory actions.

Similarly, if an agency issues two EO 13771 deregulatory actions with total cost savings of $200 million to offset the cost of an EO 13771 regulatory action with a cost of $150 million, the agency may bank the surplus cost savings of $50 million to offset the cost of another EO 13771 regulatory action, regardless of when the latter action is issued. See Questions 24 and 25 for accounting conventions that allow for appropriate comparison of costs and cost savings experienced at different time periods.

AR.08020

**Q30.    Can EO 13771 deregulatory actions (and associated cost savings) be transferred within an agency?**

A:  Yes. The requirements of EO 13771 apply agency-wide. An EO 13771 deregulatory action issued by a component in one agency can be used to offset an EO 13771 regulatory action issued by a different component in that same agency.

**Q31.    Can EO 13771 deregulatory actions (and associated cost savings) be transferred between agencies?**

A:  An agency that is not able to identify sufficient EO 13771 deregulatory actions for an EO 13771 regulatory action it intends to issue may submit a written request to the Director of OMB to assess whether the transfer of EO 13771 deregulatory action credits (after consultation with the supplying agency) would be appropriate before submitting the EO 13771 regulatory action to OMB for review under EO 12866. However, if the transfer is not appropriate, the agency must identify adequate offsets absent an exemption.

## VI.    Process Questions

**Q32.    How does EO 13771 affect the consideration of regulatory benefits or other requirements under EO 12866?**

A:  EO 13771 does not change the requirements of EO 12866, which remains the primary governing EO regarding regulatory review and planning. In particular, EO 13771 has no effect on the consideration of benefits in informing any regulatory decisions. For all EO 13771 regulatory actions and EO 13771 deregulatory actions, except where prohibited by law, agencies must continue to assess and consider both benefits and costs and comply with all existing requirements and guidance, including but not limited to those in EO 12866 and OMB Circular A-4.

**Q33.    Which EO 13771 regulatory actions might qualify for a full or partial exemption from EO 13771 requirements?**

A:  The following categories of EO 13771 regulatory actions may qualify for a full or partial exemption from EO 13771's requirements: 1) expressly exempt actions; 2) emergency actions; 3) statutorily or judicially required actions; and 4) *de minimis* actions. These categories are not exhaustive. For any EO 13771 regulatory action an agency believes qualifies for an exemption under any of the circumstances provided below, agencies should submit exemption requests to OIRA prior to submitting the action to OMB for review under EO 12866 or prior to publication of the EO 13771 regulatory action if it was not subject to EO 12866 review.

- Expressly exempt – EO 13771 expressly exempts regulations issued with respect to a military, national security (see Question 7 above), or foreign affairs function, and regulations related to agency organization, management, or personnel. These actions qualify for a full exemption. See 5 USC 553.

13

- <u>Emergencies</u> – EO 13771 regulatory actions addressing emergencies such as critical health, safety, financial, non-exempt national security matters, or for some other compelling reason, may qualify for an exemption. In most cases, exemptions for such rules will be granted with respect to the timing of required offsets, allowing the agency to address the emergency before identifying and issuing EO 13771 deregulatory actions. Agencies will generally still be required to offset such actions. If necessary, the costs of such actions, and the requirement to identify for repeal at least two existing regulations, will be moved to the subsequent fiscal year for purposes of determining EO 13771 compliance.

- <u>Statutorily or judicially required</u> – EO 13771 does not prevent agencies from issuing regulatory actions in order to comply with an imminent statutory or judicial deadline, even if they are not able to satisfy EO 13771's requirements by the time of issuance. However, agencies will be required to offset any such EO 13771 regulatory actions as soon as practicable thereafter. In addition, this flexibility may not apply to discretionary provisions attached to EO 13771 regulatory actions required to comply with statutory or judicial deadlines.

- *De minimis* – EO 13771 regulatory actions with *de minimis* costs may qualify for an exemption. For example, if OIRA designates a proposed rule as significant under EO 12866 because it raises novel legal or policy issues, and the agency estimates the action would have present value costs of $50,000 spread over a large number of persons and/or entities, OIRA may exempt the action from some or all of the requirements of EO 13771.

### Q34. Is a significant final regulatory action exempt from the requirements of EO 13771 if the action was designated not significant at a prior stage?

A: Generally, no. Any regulatory action that is identified as significant at the final rule stage that imposes total costs greater than zero would need to be offset to comply with EO 13771, regardless of the determination in an earlier phase. Therefore, the agency should consult OIRA as soon as possible if it believes an action that was not determined to be significant at the draft or proposed rule stage may now be determined to be significant, perhaps due to substantive issues identified through public comment or further agency analysis.

### Q35. How should agencies prioritize existing requirements to repeal or revise?

A: Agencies should follow the requirements in EO 13777 for prioritizing existing requirements to repeal or revise. EO 13777 establishes Regulatory Reform Task Forces in agencies, and directs those task forces to evaluate existing regulations and make recommendations to the agency head regarding their repeal, replacement, or modification, consistent with applicable law. EO 13777 directs each Regulatory Reform Task Force to identify regulations that:

- Eliminate jobs, or inhibit job creation;
- Are outdated, unnecessary, or ineffective;
- Impose costs that exceed benefits;
- Create a serious inconsistency or otherwise interfere with regulatory reform initiatives and policies;

14

AR.08022

- Are inconsistent with the requirements of section 515 of the Treasury and General Government Appropriations Act, 2001 (44 U.S.C. 3516 note), or the guidance issued pursuant to that provision, in particular those regulations that rely in whole or in part on data, information, or methods that are not publicly available or that are insufficiently transparent to meet the standard for reproducibility; or
- Derive from or implement EOs or other Presidential directives that have been subsequently rescinded or substantially modified.

EO 13777 further directs each Regulatory Reform Task Force to seek input and other assistance, as permitted by law, from entities significantly affected by Federal regulations, including State, local, and tribal governments, small businesses, consumers, non-governmental organizations, and trade associations. Input from such public engagement may be used to prioritize recommendations to repeal or revise.

Finally, where the costs of an EO 13771 regulatory action will be incurred entirely or to a large degree by a certain sector or geographic area, the agency should prioritize EO 13771 deregulatory actions that affect the same sector or geographic area, to the extent feasible and permitted by law.

### Q36.   Can regulatory and deregulatory actions be bundled in the same action?

A:  Yes, under certain circumstances. Many actions submitted to OIRA for review under EO 12866 consist of logically connected changes to multiple but related sections of the Code of Federal Regulations. For example, a rule exempting some categories of regulated entities from compliance with a previously issued regulation may also require eligible entities to submit additional documentation to demonstrate eligibility for the exemption. In these cases, it may be legitimate and appropriate to pursue such changes through a single "bundled" action, and this guidance is not meant to materially change agency decision making in this area. Where an agency combines such provisions, the cost impact (the difference between costs imposed and cost savings, per Question 21) of such rules will generally determine whether such actions are EO 13771 regulatory actions that need to be offset, or EO 13771 deregulatory actions. Agencies, however, should avoid artificially bundling provisions that are not logically connected in a single regulatory action. OIRA may determine that the regulatory and deregulatory portions of the rule should be considered separately for purposes of EO 13771 compliance.

Agencies should consult with OIRA when considering bundling regulatory and deregulatory actions.

### Q37.   When and how should agencies identify EO 13771 deregulatory actions?

A:  The agency's *Unified Agenda of Regulatory and Deregulatory Actions* should reflect compliance with the requirements of EO 13771, and should include, to the extent practicable, EO 13771 deregulatory actions that, when combined with EO 13771 deregulatory actions that are not regulations (such as Paperwork Reduction Act information collection reforms), are sufficient to offset those actions appearing in the Agenda that are or are expected to result

AR.08023

in EO 13771 regulatory actions. At a minimum, the agency should identify all EO 13771 deregulatory actions, along with cost savings estimates, by the time it submits to OMB for review under EO 12866 the corresponding EO 13771 regulatory action. In the rare event that an agency is unable to identify sufficient EO 13771 deregulatory actions, OIRA will address such a situation on a case-by-case basis.

While each *Federal Register* notice should identify whether the regulation is an EO 13771 regulatory action, there is no need to discuss specific offsetting EO 13771 deregulatory actions within the same *Federal Register* entry. Additionally, offsetting the costs of regulatory actions to comply with the requirements of EO 13771 should not serve as the basis or rationale, in whole or in part, for issuing an EO 13771 deregulatory action.

### Q38.   *When must identified EO 13771 deregulatory actions be finalized?*

A: To the extent practicable, agencies should issue EO 13771 deregulatory actions before or concurrently with the EO 13771 regulatory actions they are intended to offset. By the end of each fiscal year, including any carryover from previous fiscal years, agencies should have: (1) issued at least twice the number of EO 13771 deregulatory actions as EO 13771 regulatory actions; and (2) appropriately offset the cost of all final EO 13771 regulatory actions issued. The offset should be consistent with their respective total incremental cost allowance for future fiscal years, and agencies are expected to maintain compliance, to the extent practicable, throughout the year. These requirements exclude those EO 13771 regulatory actions issued during the year for which either law prohibits compliance with EO 13771 or the agency received an exemption from OIRA. When an agency receives a partial exemption from OIRA (*e.g.,* with respect to the timing of EO 13771 deregulatory actions), the requirements should be addressed as soon as practicable. Agencies should plan in advance and leave sufficient time, if necessary, for OIRA to complete its review under EO 12866 or the Paperwork Reduction Act, and for agencies to publish in the *Federal Register* any EO 13771 deregulatory actions needed to comply with EO 13771 before the end of each fiscal year.

### Q39.   *What happens if an agency is not in full compliance with the requirements of EO 13771 at the end of a fiscal year?*

A: If, by the end of a fiscal year, an agency does not finalize at least twice as many EO 13771 deregulatory actions as EO 13771 regulatory actions issued during the fiscal year, or has not met its total incremental cost allowance for that fiscal year, the agency must, within 30 days of the end of the fiscal year, submit for the OMB Director's approval, a plan for coming into full compliance with EO 13771 that addresses each of the following:

(1) The reasons for, and magnitude of, non-compliance;
(2) How and when the agency will come into full compliance; and
(3) Any other relevant information requested by the Director.

This excludes EO 13771 regulatory actions that are exempt or where compliance with EO 13771 is prohibited by law.

16

OMB may recommend that an agency take additional steps to achieve compliance, such as publishing a notice in the *Federal Register* requesting ideas from the public on EO 13771 deregulatory actions to pursue. OMB may also request that agencies post plans approved by the Director.

This guidance is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

AR.08025

**30 Loy. L.A. L. Rev. 69**

**Loyola of Los Angeles Law Review**
November, 1996

**Symposium: Responsibilities of the Criminal Defense Attorney**
Michael J. Lightfoot [a]

Copyright (c) 1996 Loyola Law School of Loyola Marymount University; Michael J. Lightfoot

# ON A LEVEL PLAYING FIELD

This has not been all that easy, thinking back over thirty-two years of criminal practice, trying to define the role of the criminal defense lawyer in our system of justice. My initial thoughts were very traditional ones, probably not too different than what I thought coming out of law school: that in our adversary system a defense lawyer must use all his [1] energies, talents, and intellect, within the bounds of ethics, to defend his client and that neither the nature of the accusation nor the popularity of the client or his cause matters one whit. But like most things in life, that answer is too simple. For, in reality, the defense lawyer's role today, particularly in representing federal defendants, is quite different than it was twenty or thirty years ago. That role change has taken place gradually, slowly shaped by strong forces at work in our society.

The average person-in-the-street is now fed up with crime and criminals. She is not interested in hearing the reasons behind the escalation in violence. Nor does she have any tolerance for dealing with criminals other than with swift, no-nonsense justice. She simply wants to lock up the criminals for as long as possible and keep them out of her neighborhood--a simple solution to a complex problem. The politicians have listened carefully and have passed laws in response that may be long on appeal to their constituents, but are short on perspective. In doing so, they have upset the checks and balances in the criminal justice system and materially altered the roles of the prosecutor, judge, and defense attorney. From where I sit, the changes have not been healthy.

I came out of law school during a period that one legal commentator aptly called the Due Process Revolution. It was the 1960s, a heady time when blockbuster constitutional cases were **\*70** being decided in rapid succession by the Warren Court. Law enforcement officers and prosecutors were being put to the test, facing obstacles never presented before. The Bill of Rights had come alive. Confessions could not be used unless the police gave a warning of constitutional rights and got a clear waiver of those rights from the defendant. [2] Lawyers were now required to be present at the defendant's shoulder rendering effective assistance at each critical stage. [3] Rigorous rules applied to search warrants and the obtaining of evidence. [4] Constitutional violations sometimes resulted in the loss of evidence. [5] Prosecutors had to disclose exculpatory evidence. [6]

In my view, this revolution introduced a much needed measure of equity and fairness to a process that is fundamentally weighted against a criminal defendant. For anyone without firsthand experience of the criminal justice system, it is hard to appreciate the full weight of governmental power and authority that is brought to bear on an individual who is charged with a crime. My first courtroom appearances were as a federal prosecutor. I remember being awestruck at the amount of power my colleagues and I, as young inexperienced lawyers, had been given. We could alter the course of a person's life in making the sometimes hair-thin decision whether to file or decline to file charges and were instrumental in deciding whether release on bail was appropriate. While the sentencing decision was obviously up to the judge, the prosecutor's input was often very influential.

I soon saw and understood the trepidations felt by a defendant on being brought into the criminal system. Appearances before many judges were as pleasant as could be expected under the circumstances; **\*71** clients were treated with respect. But that was not always the case. The trappings of some courtrooms, as well as the demeanor of the courtroom personnel, could be very off-putting; the tone was almost funereal--long faces, musty odors, dark purple wall hangings behind the judges. One elderly judge even kept the temperature at what seemed to be just above freezing; the story was that they hadn't had time to embalm him yet. It was all quite intimidating. The process itself did not lighten the experience. In fact, it did not take a whole lot--one turn around the criminal justice track was normally enough--for a defendant to appreciate how cold and one-sided the system could be.

I joined the Federal Public Defender's Office in Los Angeles when it first opened in 1971. For the first time federal prosecutors faced a steady diet of prepared adversaries who were paid for their services. Defense lawyers now had full-time investigators; it was not rare for a government witness to be impeached with a statement obtained by the defense investigator. Expert witnesses appeared more regularly for the defense as the courts held that the indigent accused was as entitled to the same help as the defendant who could hire a lawyer, whether it be a competent psychiatrist in whose selection the prosecution would have no influence, [7] a handwriting expert, an accountant, or a savvy investigator. [8] Prosecutors in turn were regularly having to face defense witnesses for the first time, getting the same opportunity to hone their cross-examination skills as defense lawyers always had. It was a healthy system that had matured to a point where there was vigorous advocacy on both sides. Defense lawyers were performing the function envisaged by the Sixth Amendment. [9]

I don't want to create the false impression here that defendants were being acquitted with regularity. That certainly wasn't the case. In fact, it was still true that as a defense lawyer you lost **\*72** most of the time. That had always been par for the course. But there was the exhilaration of having fought a hard, fair fight, knowing that you had forced the government to do things right.

Over the past twenty years, that hard, fair fight has changed dramatically. While it may be difficult to pinpoint specific causes for the change, the public mood I mentioned earlier has certainly played a major role. Across society, there has been a growing antipathy towards the poor and the disadvantaged. Recently, aliens and immigrants have become particularly disfavored, as evidenced by the passage of Proposition 187 in California and other similar attempts to keep the have-nots from entering the mainstream of American society. [10]

With respect to criminal cases, the public has increasingly perceived the system as unfairly favoring the defendant. It has become conventional wisdom in some circles that with all the rights accorded the accused by the Warren Court, defendant after defendant has been acquitted or otherwise escaped justice because of hypertechnicalities, sneaky defense lawyer tactics, or weak-kneed judges. That is a misconception. Those with experience in the system will tell you that that simply has not been the case and, if anything, the changes brought about have served to improve the system, from both defense and prosecutorial perspectives. Nevertheless, the misconception is still alive. It has, in turn, created a politics of punishment where elected officials have succumbed to the public demand for harsher laws in general, the enactment of broader criminal prohibitions, and more severe punishments.

Ironically, the clients I now represent who have found the system to be particularly one-sided are the conservative businessmen who, but for their brush with the law, would be the first to complain about how defense-oriented the courts have become. It is inconceivable to them that law enforcement officers can decide unilaterally whether an individual will be arrested and lose his liberty. Why, they ask, wasn't the defendant provided an opportunity to present exculpatory evidence to some neutral person before his freedom was taken away. They are incredulous that a single police officer is free to make an arrest and ruin a person's reputation. They conclude that law enforcement agents have become immune **\*73** over time to the devastation the charge itself can cause. And even in a grand jury system where your fellow citizens ostensibly stand between the accused and a criminal charge, the defendant is normally neither entitled to present any exculpatory evidence nor have a lawyer present simply to observe the proceedings, much less address the charging body and explain the defendant's side of things.

The sense of one-sidedness gets even worse after the client makes his first court appearance. He will learn fast enough that, although there are always exceptions, he will find few friends in the system. It was bad enough that the FBI agent, who had first acted like his best friend, turned out to be anything but. The jailers will treat him with cold inhumanity. And some court personnel will have become so jaded by the system that they will automatically assume that he, like most everyone else charged with a crime, is guilty. Worse, it is not infrequent that a judge will abandon the independence she vowed to exercise when she took office and take the path of least resistance, bowing without serious thought to the suggestions and importunings of the prosecutor. This is especially true of some elected judges who fully appreciate both the power of prosecutors' associations and how devastating one unpopular decision reported in the local news could be at election time. The suggestion that judging civil and criminal cases is much the same experience is not necessarily true. I recall a judge telling the story of moving to a civil calendar after many years of having exclusively handled criminal cases. She asked a colleague who had recently made the same transition what to expect. He replied that the civil cases are really no different than the criminal ones except that when the parties in the civil cases introduce themselves, you don't know which one is supposed to win.

This is the context in which that traditional definition of the defense lawyer's role--the one I learned in law school--is rooted. The accused's lawyer is the one person who stands between him and the cold reality, the full force and weight, of the system.

AR.08027

The overriding responsibility of the criminal defense attorney is to fight off the advances of those who would take advantage and to boldly assert and vigorously pursue the client's defenses.

Recently, legislatures have put significantly more power in the hands of prosecutors who, as a result, have taken on a much more prominent role than they ever have in the past. Judges, at the same time, have suffered a significant loss of power. These **\*74** changes have also drastically affected the role of the defense lawyer so that the assistance given a client today, particularly in federal court, is markedly different than when I started. Unless that imbalance is corrected, it is going to have a seriously detrimental effect on our criminal justice system well into the future.

California is a good example, both in the state and federal courts, of the extent of power now available to the prosecutor. Everyone knows about the state's new "three-strikes" law and the draconian mandatory sentences that can be imposed for relatively minor, nonviolent third strike convictions. [11] County prosecutors unilaterally decide when to pursue third strikes. The discretion exercised varies with the county. Federal prosecutors have been accorded similar discretion in deciding whether or not to lodge charges carrying mandatory sentences. That in itself is an extraordinary power when you consider that a teenager can be sentenced to a mandatory thirty year sentence in federal court for a drug offense that would have carried the possibility of a probationary sentence if it had been filed in state court. But the real power of the federal prosecutor today emanates from the federal sentencing process, which, since 1987, has been governed by the Sentencing Guidelines. [12] These Guidelines virtually rob the judge of the discretion that used to be the hallmark of the process. Some judges have protested by resigning. Many, probably most, of the rest decry the Guidelines, rightly pointing out that the critically important job of sentencing could be done as readily by a computer.

This is how the Guidelines work. Virtually every conceivable sentencing factor, negative and positive, has supposedly been contemplated, codified, and assigned a value. [13] A numerical tally then predetermines a narrow range within which the judge must pick a **\*75** specific sentence. [14] The result of all this is that the defense lawyer will determine very early in the representation what the Guideline range will be if his client is convicted. All you need do is take out the Guidelines grid and your calculator. You will end up with a time period, for example, thirty-seven to forty-six months, within which the judge must select a specific period of incarceration. [15] Because parole has been abolished in the federal system, the defendant will invariably serve at least 85% of the sentence.

There is only one way out of this strait jacket--by way of Guidelines section 5K1, which gives the prosecutor the unilateral power to seek a downward departure if she decides that the defendant has earned it by cooperation, i.e., "substantial assistance in the investigation or prosecution of another person." [16] Cooperation is the only basis upon which the motion can be made. Neither the defense lawyer nor the judge, acting sua sponte, can make the motion. It is solely within the discretion of the prosecutor. A client may do everything within his or her ability to assist the government in making cases against others. By any objective standard it may be substantial; yet, the prosecutor is free to determine that it is not enough. Where that happens the defendant's only recourse is to prove that the prosecutor's refusal was made in bad faith. In most courts that is an almost insurmountable burden.

These prosecutorial weapons achieve results that do not advance legitimate criminal justice goals. First, they seriously neutralize the sentencing function of the judge in fitting the punishment to the individual defendant. In the past we trusted the ultimate decision as to the defendant's fate to the hands of an objective arbiter after a full review of all the facts. While it was true that that system did produce disparate results at times, those were not nearly as draconian as what has been produced by the Sentencing Guidelines. Consistency is certainly a goal to be strived for, but a fair sentence must be tailored to the particular circumstances of each defendant.

Now the ultimate arbiter turns out to be the prosecutor, the one who selects the charges. In general, these are decent, bright young lawyers, but they are often times fairly recent law school graduates with a minimum of legal experience, rarely in my experience any criminal defense experience, and, more significantly, **\*76** seriously lacking in life experience. Many are very well-intentioned but even the most right-minded cannot help but be significantly affected by this awesome power. God help you if you're unlucky and you happen to draw a mean-spirited prosecutor who is not too bright. The checks and balances assumed to be inherent in the system soon fade because there is really little "check" on the prosecutor's wielding of power. In many cases, the prosecutor, more than the judge, can determine the defendant's fate.

AR.08028

The most insidious feature of the Guidelines is that they emasculate the legitimate function of the defense lawyer in engaging in the hard, fair fight that is the essence of the adversary system. In many situations where, in the past, the prosecutor and defense lawyer would have fought out factual disputes in the courtroom as two vigorous advocates, now the defense lawyer cannot take the risk. Let me give you recent examples where charges carried such potentially severe sentences that defense counsel were forced to abandon arguably meritorious defenses. One classic situation involved a woman charged in a drug case where conviction carried a mandatory minimum sentence of ten years. The most incriminating piece of evidence was her statement to undercover agents that she needed a "hand"--an ambiguous enough expression interpreted by the agents to be a reference to five kilos of drugs. Pre-Guidelines, the prosecutor and defense attorney would have litigated the defendant's state of mind in front of a jury. But that turned out not to be a realistic option. For despite her protestations of innocence, her lawyer counseled her to stipulate to a factual basis for a finding of guilt and to plead guilty to a count leaving open the possibility of probation. She decided to enter the plea because she could not risk conviction and the certain consequence of leaving her children for a guaranteed minimum period of incarceration of eight and a half years.

In another case a man was sentenced to twenty-four years after conviction of a drug offense. After the defendant had served over two years of the sentence, the conviction was reversed when the Ninth Circuit found that he had been denied a fair trial on several grounds including the trial court's refusal to let him testify with the aid of an interpreter as well as the introduction of improper "other crimes" evidence. On remand, the prosecutor, unable to introduce the "other crimes" evidence as proof of the original charges, added them as substantive counts, upping the **\*77** ante to the extent that conviction would now carry a mandatory life sentence. The defendant adamantly protested his innocence of any wrongdoing. His lawyer, notwithstanding his own belief in his client's innocence, was prepared to counsel the client to accept a government offer to plead guilty to a significantly reduced charge carrying a maximum sentence of three years--most of which he had already served--simply because of the risk of the mandatory life sentence upon conviction. Fortunately, and to the great credit of the United States Attorney's Office, that choice never had to be made because all the charges were dismissed after all the facts were presented to that office. But had that unusual presentation of evidence not been made to the prosecutor pre-trial, a grotesque miscarriage of justice could well have occurred.

The 5K1 "cooperation" safety valve puts another unhealthy spin on the Guidelines. In a multidefendant case, where the prosecution needs the assistance of others for a successful prosecution, or even where, in a single defendant case, the client has inculpatory information about others, the first decision the defense lawyer must make revolves around cooperation. No longer does the lawyer spend his initial efforts in carefully examining the indictment for infirmities and then exploring possible motions, defenses, and evidentiary shortcomings in the government's case. Now, the first concerns must be the ultimate Guidelines range and the risks of going to trial. If the risks are too great, the lawyer must make a beeline to the prosecutor's door to offer his client up as a cooperator. For in a multidefendant case, the prosecutor may only need one cooperator. If you are beaten to the prosecutor's door by other defense counsel, your client may lose the opportunity to win a 5K1 downward departure.

Here is an example. In a recent multimillion dollar fraud case, the defendant was faced with these options:

(a) Go to trial and face a minimum eighteen year sentence under the Guidelines upon conviction;

(b) Plead guilty to lesser offenses, stipulate to the application of relevant Guidelines factors, and face a minimum eight year sentence; or

(c) Plead guilty to the same charges as in (b) and, in addition, cooperate by testifying against other defendants, thereby creating the possibility, if the prosecutor concluded by the time of sentencing that the cooperation was "significant," of a sentence under the Guidelines range, **\*78** including straight probation.

One option not available to the defendant was to go to trial, pursue what might be meritorious defenses, and if convicted, argue as he would have before the Guidelines were enacted, that the circumstances peculiar to his case called for a sentence well below the Guidelines range.

In this context, the defense lawyer has become a facilitator for the prosecution rather than a zealous advocate for his client. It is not surprising then that young defense lawyers have become frustrated and demeaned. Many come into the system soon after law school with the spirit, resolve, and determination so necessary to insure that our government not be able to take away a person's liberty unless that person's lawyer has had the opportunity to put vigorously the prosecution to the test of proof beyond a reasonable doubt. But the young lawyers learn after a short while that, for many clients, there is little they can do to achieve results that seem to be objectively rational and fair. The sense of hopelessness can become overwhelming to the point that it compromises the lawyer's dignity. Becoming frustrated is one thing. It comes with the territory and can be dealt with. But a process which demeans is inexcusable and must be changed.

This is not a time to become dispirited, but rather a time to dig in with determination to get the system back on track. While it may be a slow process, it has been happening for years now. The lawyers leading the way are the public defenders and private defense attorneys who struggle daily with resolve, grit, and good humor. They hammer away at inequities by proselytizing judges, prosecutors, and probation officers, especially those who have recently come into the criminal justice system. The imagination and resourcefulness of these lawyers have slowly borne fruit, eventually creating the "hooks" on which courts have been able to maneuver around the rules that would otherwise prevent them from fairly resolving criminal cases.

I turn to the words of retired Supreme Court Justice William J. Brennan, Jr. He has consistently, and with great eloquence, argued against the imposition of the death penalty as a violation of basic human dignity.[17] He played a major role in 1972 in declaring it unconstitutional.[18] He wrote passionately in dissent just four  **79** years later as a newly composed Court found it constitutional.[19] He continued his fierce opposition, filing dissents in over 1500 capital cases, until his retirement in 1990.[20] In the face of the public and official fervor to broaden the scope and accelerate the pace of death row executions, he has never wavered in his belief that unltimately they will be declared unconstitutional. As recently as this past April, on the celebration of his ninetieth birthday, he focused again on the basic inhumanity of the death penalty, reminding us that the pendulum will surely swing back again and that ultimately reason will prevail.[21] I trust that, in due course, the same will also be said of the imbalance that now exists in our system of criminal justice.

This may be a rough period of time in which to be a criminal defense lawyer. More than ever there is a need for lawyers with a strong resolve to take on the challenge to fight to better the system. Justice Brennan said many years ago that there is nothing more honorable that a lawyer can do than take on the representation of a criminal accused too poor to hire his own lawyer. It may be more difficult these days to carry out that mission than it was in the past, but it is no less honorable an undertaking. It will simply take the collective commitment of criminal lawyers to continue to zealously represent those accused of crime and to struggle to win back a level playing field.

## Footnotes

[a]    Michael J. Lightfoot is a partner at Talcott, Lightfoot, Vandevelde & Sadowsky in Los Angeles.

[1]    In conjunction with Loyola of Los Angeles Law Review's gender neutrality policy, certain genders have been assigned in this Article. The average person-in-the-street will be female, the defense attorney male, the prosecutor female, the defendant male, and the judges female. Eds.

[2]    Miranda v. Arizona, 384 U.S. 436, 467-73 (1966) (holding that absent other effective measures to protect Fifth Amendment privilege against self-incrimination, a person in custody must be warned prior to interrogation that the person has certain rights, including the right to remain silent).

[3]    See e.g., United States v. Wade, 388 U.S. 218 (1967) (stating that pre-trial identification is a critical stage of the prosecution at which the accused is as much entitled to such aid of counsel as at the trial itself).

[4]    Katz v. United States, 389 U.S. 347 (1967).

[5]    Mapp v. Ohio, 367 U.S. 643 (1961); see also Katz, 389 U.S. 347 (1967) (holding that evidence of accused's conversations overheard by attaching an electronic listening device to the telephone booth in which accused placed

his calls was excluded because the search was conducted without a warrant); 🚩 Weeks v. United States, 232 U.S. 383 (1914) (holding inadmissable letters and private documents seized during a warrantless search).

6   🏴 Brady v. Maryland, 373 U.S. 83, 87 (1963).

7   United States v. Bass, 477 F.2d 723 (9th Cir. 1973).

8   See, e.g., Cal. Penal Code s 987.9 (West 1985 & Supp. 1996); see also 🏴 Gideon v. Wainwright, 372 U.S. 335 (1963) (holding that the right of an indigent defendant in a criminal trial to have the assistance of counsel is a fundamental right essential to a fair trial).

9   U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.").

10   See e.g., Faye Fiore, Welfare Reform Bolsters Prop. 187, Governor Says., L.A. Times, Sept. 11, 1996, at A3.

11   🏴 Cal. Penal Code s 1170.12(a) (West Supp. 1996); see also Gordon Dillow, Pizza Case Unlikely Focus of 'Three Strikes' Debate, L.A. Times, Sept. 18, 1994, at B1; Eric Slater, Man Guilty in Potential 'Three Strikes' Pizza Case, L.A. Times, Jan. 21, 1995, at B1.

12   Sentencing Guidelines Act of 1986, 18 U.S.C. ss 3551-59 (1994).

13   United States Sentencing Commission, Guidelines Manual, 1-10 (Nov. 1995). One particularly disturbing aspect of the process worked out by the Sentencing Commission is that the very factors, such as age, mental, emotional and physical problems, employment record, family ties and military, civic, charitable and public service, which had always been thought to be core considerations in fashioning a fair sentence, have now been declared "factors ... not ordinarily relevant to the determination of whether a sentence should be outside the applicable guideline range." Id. at 304.

14   Id. at 11.

15   Id.

16   Id. at 309.

17   See e.g., cases cited infra notes 19-20.

18   🏴 Furman v. Georgia, 408 U.S. 238, 257 (1972) (Brennan, J., concurring).

19   🏴 Gregg v. Georgia, 428 U.S. 153, 227 (1976) (Brennan, J. dissenting).

20   See e.g., Lowenfield v. Butler, 485 U.S. 995, 995 (1988) (Brennan, J. dissenting); 🏴 McClesky v. Kemp, 481 U.S. 279, 320 (1987) (Brennan, J. dissenting); Tison v. Arizona, 481 U.S. 137, 159 (1987) (Brennan, J. dissenting).

21   Lauren Neergaard, Brennan Slams Death Penalty at 90, Charleston Sunday Gazette Mail, Apr. 26, 1996, at 2C.

30 LYLALR 69

**End of Document**     © 2020 Thomson Reuters. No claim to original U.S. Government Works.



**FACT SHEETS**

# Protecting American Communities from the Violence of MS-13

**IMMIGRATION** | Issued on: **February 6, 2018**



> # Together, we're going to restore safety to our streets and peace to our communities, and we're going to destroy the vile criminal cartel, MS-13, and many other gangs"

*President Donald J. Trump*

**A THREAT TO AMERICAN COMMUNITIES: MS-13 has brought violence, fear, and suffering to communities across the country.**

- MS-13, short for Mara Salvatrucha, is a violent transnational gang primarily composed of immigrants or descendants of immigrants from El Salvador.

AR.08032

- MS-13's motto is "mata, viola, controla" which means "kill, rape, control."

  - They commit shocking acts of violence to instill fear, like machete attacks, execution-style murders, gang rape, and human trafficking

- MS-13 has more than 30,000 members worldwide, including more than 10,000 in the United States.

  - The violent gang recruits middle- and high-school students, primarily immigrants, and uses fear of retribution to keep their recruits from leaving

- The gang is known to regularly conduct activities in at least 40 states and the District of Columbia.

  - MS-13 primarily generates income through extortion, prostitution, membership dues, and illicit trafficking.

- As revealed by recent investigations, MS-13 gang leaders are known to send representatives across the United States border to take control of local MS-13 "cliques," local units, and connect the local members to gang leaders abroad.

  - MS-13 gang leaders have directed American MS-13 cliques to become more violent in order to control territory.

- In recent years, MS-13 has taken advantage of the large flow of foreign nationals from Central America and Mexico into the U.S. by hiding in these populations.

- MS-13 has preyed on American communities, committing horrendous acts of violence.

  - Approximately 38 percent of all murders in Suffolk County, New York, between January 2016 and June 2017, were linked to MS-13.

**COMBATING MS-13: President Trump's Administration has undertaken serious efforts to bring the violent criminals of MS-13 to justice.**

- President Trump spoke on the threat posed by MS-13 in his remarks on the State of

AR.08033

the Union and described the bravery of our Nation's law enforcement officers who continue to combat this violent gang.

- Attorney General Jeff Sessions designated MS-13 as a priority for the Department of Justice (DOJ)'s Organized Crime Drug Enforcement Task Forces in October 2017.

- Under President Trump, DOJ has worked with partners in Central America resulting in the filing of criminal charges against more than 4,000 members of MS-13.

- ICE Homeland Security Investigations (HSI) made 4,818 criminal arrests related to gang activity in FY 2017, as well as 892 administrative arrests that resulted from gang investigations.

  - HSI arrested 796 MS-13 gang members and associates in FY 2017, an 83 percent increase from FY 2016.

- In FY 2017, U.S. Border Patrol Agents arrested 536 gang-affiliated illegal aliens, of whom 228, more than 40 percent, were affiliated with MS-13.

**SECURING OUR BORDERS: President Donald J. Trump has released an immigration framework which includes border security measures vital to preventing the entry of criminal aliens like MS-13 members into the United States.**

- President Trump has proposed an immigration framework that includes the tools and resources required to secure our borders and close legal loopholes exploited by cartels and criminals.

- The President has made clear that, as a part of our efforts to curb illegal immigration, we must ensure criminal aliens, gang members, violent offenders, and aggravated felons are detained and quickly removed from the United States.

AR.08034

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 627 of 1305

THE COMPATIBILITY OF THE PRINCIPLE OF..., 1 UCLA J. Int'l L. &...

**1 UCLA J. Int'l L. & Foreign Aff. 221**

**UCLA Journal of International Law and Foreign Affairs**
Spring, 1996

Comment

Ravi Mahalingam [a1]

Copyright (c) 1996 by the Regents of the University of California; Ravi Mahalingam

# THE COMPATIBILITY OF THE PRINCIPLE OF NONINTERVENTION WITH THE RIGHT OF HUMANITARIAN INTERVENTION

## Introduction

The principle of nonintervention—that is, the duty of States to refrain from interfering in the affairs of other States—rests uneasily with international protection of human rights in general, and a right of humanitarian intervention in particular. [1] While the former is a **\*222** recognized principle of international law, the latter's international legitimacy is subject to much conjecture. [2]

According to the traditional positivist theory of international law, States are the primary subjects of international society. International law is principally the practice of States and is concerned with their rights and obligations. Human beings do not have direct representation in international law; their interests are represented by the State. States are sovereign in that they are independent legal entities free to conduct their own affairs. As the legal philosopher W.E. Hall wrote, "The right of independence is a right possessed by a state to exercise its will without interference on the part of foreign states in all matters and upon all occasions with reference to which it acts as an independent community." [3]

The principle of nonintervention, therefore, is a necessary corollary to the right of sovereignty. [4] If States are independent, there is a corresponding duty not to intervene in the affairs of others in order **\*223** to protect that right of independence and to preserve the basis of international society. For the positivist, a right of humanitarian intervention would have grave implications for sovereignty because it contemplates a legal justification for the strong to overrun the weak and violates the right of States to determine their own affairs without interference from foreign powers. [5]

In contrast, the principle of humanitarian intervention posits that human beings, not States, should be the true subjects of international law; State supremacy in international law can only be justified to the extent that States represent their populations. Proponents of humanitarian intervention charge that individual States are the worst violators of human rights and cannot be trusted to protect their own citizens. [6] Governments are distinct from society, and their relationships with their citizens are often coercive, in which the rights of human beings are habitually sacrificed. A right of humanitarian intervention is an effective check on state power, reaffirming the importance of human rights and the moral force of international law. Like the positivists, proponents of the principle of humanitarian intervention believe that it would fundamentally change international society because international law would directly represent the interests of human beings in derogation of the absolute right of sovereignty.

Both positivists and proponents of the principle of humanitarian intervention view nonintervention and humanitarian intervention as inherently conflicting. "To argue against intervention is to give sovereignty a value higher than any other. To argue for intervention is a direct challenge to the value of sovereignty." [7] International law has not resolved this dilemma. Although States retain a supreme position in the management of their internal relations, international concern over human rights issues has existed since the creation of modern international society with the Treaty of Westphalia in 1648. For example, if one

AR.08035

Case 3:20-cv-07721-SI   Document 58-7   Filed 11/10/20   Page 628 of 1305

THE COMPATIBILITY OF THE PRINCIPLE OF..., 1 UCLA J. Int'l L. &...

surveys the treatises and commentaries on  *224  international law, one can find nearly equal support and opposition to the existence of a right of humanitarian intervention.

International law does not readily recognize a formal right of humanitarian intervention, largely because States fear the consequences to their own survival should the focus of international law shift to individuals. Nevertheless, there have been a number of interventions in international history which either have, or plausibly could have been, justified on the basis of a desire to protect the human rights of citizens of a particular State. Although contentious, some examples include the French intervention in Ottoman controlled Lebanon (1860-1861), the Indian intervention in East Pakistan (1971), and the collective United Nations ("U.N.") authorized interventions in Northern Iraq (1991) and Haiti (1994).

This comment examines how contemporary international law, with its emphasis on sovereignty and nonintervention, recognizes humanitarian intervention and to what extent the practice of States has created a common law right of humanitarian intervention given that no formal right exists. I argue that a discrepancy exists between international law in theory and in reality, as it is carried out in the practice of States. Despite persistent support for the right of sovereignty, States have seen fit to criticize the behavior of other States, apply moral and diplomatic pressure, and even use military intervention in response to objectionable human rights practices. History reveals great ambivalence and tension with respect to the legitimacy of unilateral intervention, but general support for collective intervention.

Moreover, I believe fundamental change has taken place in the form of the internationalization of human rights at the level of the U.N., a collective body with deliberative organs that has attained a certain supranational legitimacy, though nothing approaching the level of world government. If there is such a thing as a global consensus or world public opinion, it is to be found after debate at the U.N. The U.N. has established competence to analyze human rights issues, pass resolutions and sanctions, apply moral and diplomatic pressure, as well as take military action under certain limited circumstances.

In practice, the U.N. has legitimized humanitarian intervention in a number of situations. In the area of non-military intervention, the  *225  U.N. has clearly rejected the notion of absolute sovereignty. A country's human rights practices are subject to scrutiny and can be the target of diplomatic, moral, and economic pressure aimed at influencing events within the State's borders. With respect to military intervention, U.N. supported interventions have occurred where there has been a breakdown of sovereign authority, and even where the U.N. has determined that a functioning sovereign has violated the rights of those within its boundaries to an intolerable extent.

In addressing the legal scope of humanitarian intervention, this comment argues that humanitarian intervention does not oblige States to intervene whenever events pass a certain threshold, but yields the international community that option. Furthermore, for humanitarian intervention to have international legitimacy, it must first have a political consensus of support. The difficulty of achieving consensus will mean that the results will be uneven—the U.N. and world community will fail to intervene in some cases even where the circumstances warrant it. In addition, an obligation to intervene as opposed to a right to intervene is not desirable in international law because it would effectively diminish the right of sovereignty in favor of the protection of human rights. International law should strive for balance between these competing goals, not favor one to the practical exclusion of the other.

Part I of this comment defines humanitarian intervention. Part II examines the philosophical underpinnings of the principle of nonintervention and the right of humanitarian intervention. It focuses on three traditions, including: the realist tradition, which supports a strong rule of nonintervention; the liberal tradition, which generally affirms the right of nonintervention but carves out certain exceptions for humanitarian intervention; and the cosmopolitan tradition, which strongly favors a right of humanitarian intervention.

Part III analyzes the history of humanitarian intervention. Subsection A examines humanitarian intervention in the nineteenth century and focuses on the French intervention in Ottoman controlled Lebanon in 1860-61 to protect the Maronite Christians. Subsection B moves to the Cold War era, examining first the unilateral intervention by India in East Pakistan in 1971. Next, it focuses on the U.N., its legal framework, and how it has attempted to reconcile two competing  *226  goals of its Charter: respect for sovereignty and protection of human rights. A detailed analysis of the U.N.'s relationship with South Africa follows to show how U.N. practice has expanded the scope of member States' human rights obligations and limited their sovereignty rights under the U.N. Charter. Subsection C discusses the post-Cold War era, where the humanitarian dimensions of internal crises have been central to U.N. decision making. The U.N. has established that the internal human rights practices of States may have international effects and qualify as a threat to peace and security, thus allowing the U.N. to undertake any "enforcement

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

THE COMPATIBILITY OF THE PRINCIPLE OF..., 1 UCLA J. Int'l L. &...

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 629 of 1305

measures" including direct military intervention. This section examines the U.N. intervention in Northern Iraq to protect Kurdish minorities and the U.N.-authorized, U.S.-led intervention in Haiti as examples. Part IV presents the argument for acknowledging a common law right of humanitarian intervention derived from the practice of States that coexists with the formal right of sovereignty. This section also discusses the extent of this right and whether it obliges States to intervene or simply yields the international community that option.

## I. What is Humanitarian Intervention?

Historically, humanitarian intervention has been associated with the use of force by a State or group of States against a target State in order to protect the citizens of the target State from inhumane or cruel treatment at the hands of the sovereign. [8]  In the nineteenth century, many writers referred to humanitarian intervention as "intervention undertaken in the cause of humanity," thus placing the emphasis on protecting human rights. [9]  The French legal philosopher Rougier, for  **\*227**  example, stated that "the theory of intervention on the ground of humanity is properly that which recognizes the right of one state to exercise an international control over the acts of another in regard to its internal sovereignty when contrary to the laws of humanity." [10]  Similarly, Ellery Stowell defined humanitarian intervention as "reliance upon force for the justifiable purpose of protecting the inhabitants of another state from treatment which is so arbitrarily and persistently abusive as to exceed the limits of that authority within which the sovereign is presumed to act with reason and justice." [11]

However, some have questioned the legal merit of humanitarian intervention, [12]  and proponents have limited its scope to mitigate potential deleterious effects on the right of sovereignty. [13]  One view stated that humanitarian intervention could be legitimate only where it could achieve a positive good; otherwise, the intrusion into sovereignty was not acceptable. [14]  Moreover, Oppenheim and Hershey argued that humanitarian intervention did exist as an international right, but that it was only justified where great evils existed, where great crimes were being perpetrated, where there was a danger of race extermination, or where there were several participants involved. [15]  In the twentieth century, the concept of humanitarian intervention was  **\*228**  expanded to include non-military means such as moral suasion, economic sanctions, and diplomatic isolation. [16]  In the Cold War and post-Cold War era, utilization of non-military means to address human rights issues have grown tremendously under the aegis of the U.N. In many ways, these non-military forms of humanitarian intervention have attained full legitimacy in international law. [17]

The scope of legitimate humanitarian intervention, nevertheless, remains at issue. Modern concerns include whether rescue should be the sole motive, whether the duration should be limited, and whether interventions which change the authority structure in a State should properly qualify as humanitarian intervention. [18]  In short, humanitarian intervention is generally understood to involve action by a State or group of States to protect the human rights of citizens of a different State; where the intervening parties determine that a sovereign has exceeded or violated its sovereign authority; involving a transgression into the sovereignty in respect of its internal affairs; and may involve military or non-military means.

## II. The Philosophical Underpinnings of the Principle of Nonintervention and the Right of Humanitarian Intervention

### A. The Realist Perspective

Realist thinking begins with several observations of international relations. First, States are the principal actors. Second, the international system is anarchical in nature because there is no higher authority, i.e., world government, which enforces a rule of law or code of conduct akin to that found in civil societies. [19]  Early realist writers  **\*229**  like Machiavelli argued that power was the sole determinant of order in international relations. [20]  Hobbes's description of international society as a state of nature, where the principal goal is survival through self-help aptly reflects this perspective. [21]  Kenneth Waltz, a modern realist, posits parsimonious models describing States as billiard balls wandering on a pool table to underscore the absence of organized, hierarchical world government, and the importance of power in shaping international hierarchy. [22]  International politics is a zero sum game, where power distributions among these various units are the most important, if not the sole determinant of order in international relations. [23]

AR.08037

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 630 of 1305

THE COMPATIBILITY OF THE PRINCIPLE OF..., 7 UCLA J. Int'l L. &...

Other modern realists, like E.H. Carr, Hans Morgenthau, Raymond Aron, and Martin Wight maintain realism's predominant emphasis on the dynamics of power, but describe international relations in less stark terms. [24] These writers concede the existence of a international society of States, but are dubious about the enforceability of international law given the lack of world government.

Modern realists have much to say on the legal principle of nonintervention. [25] In fact, they take their aforementioned descriptive statements on international relations and turn them into normative principles. First, they argue that States are equal in that they are sovereign entities with respect to conduct within their borders and conduct of their foreign relations. [26] Sovereignty is a right possessed  **230**  by a State in virtue of its presumed legitimacy from the people within its territorial realm. If sovereignty is a right, then intervention which infringes that right must be prima facie illegitimate. [27]

Second, realism emphasizes the importance of nonintervention for international order. International society is not an analog to civil society principally because there is no sovereign authority to enforce a code of law. Realists assert that this type of world government cannot be achieved and is not necessarily desirable, so international society should strive to prevent major breakdowns of order without the guidance of a sovereign. This is accomplished through the balance of power system. [28] The principle of nonintervention works to this effect, because it recognizes spheres where States are supreme and seeks to prevent major conflagrations such as those that swept across Europe during the French Revolution. [29]

 **231**  Realists such as Aron and Morgenthau believe that power struggles are an inherent feature of interstate and human conflict. [30] Therefore, the realist agenda suggests that States should try to mediate and contain conflict by acting prudently and rationally. If States behave rationally their behavior will be more predictable and diplomacy can substitute for major wars. [31] Morgenthau, for example, noted in the opening pages of Politics Among Nations that policymakers should adopt pragmatism and avoid excessively ideological interpretations of foreign policy aims. [32]

Therefore, realists posit both a philosophical and pragmatic argument against recognizing humanitarian intervention. First, States are the subjects of international society, not human beings. A right of humanitarian intervention necessarily infringes sovereignty and, hence, international legitimacy. If State A possesses a right to infringe on the sovereignty of State B on behalf of B's citizens or other people located within B's sovereign authority, then State A has limited sovereignty over State B as a constitutive principle of international law and international society.

Moreover, major wars or global conflagrations dictated by passion rather than rational self-interest are likely to result from an acceptance of humanitarian intervention, and history tells us that such conflicts are destructive to humankind. [33] Martin Wight, for example, argued that events like the Crusades, the French Revolution, the Cold War, and other forms of "doctrinal conflict" should be avoided because change is not necessarily good and implies a heavy price. [34] In contrast, the nation-states system, with its emphasis on preventing major breakdowns of international order, is preferable to the era of religious wars and other doctrinal struggles for the allegiance of  **232**  humankind.

Realists draw support from the fact that in the post-1945 era humanitarian interventions have not been defended on a right of humanitarian intervention but rather as threats to international peace and security, including celebrated interventions like those by India in East Pakistan in 1971 and by Tanzania in Uganda in 1979, as well as all U.N. military interventions and even the U.N.'s handling of Apartheid in South Africa. [35] The reason is that States will not concede their place in international law to individuals, since a shift in international legal focus to individuals would threaten state sovereignty. [36]

## B. The Liberal Perspective on Nonintervention

Liberals favor the principles of nonintervention and sovereignty, although their reasons differ from those of the realists. They agree with realists and positivists that States are legal persons and possess rights of independence. However, unlike the realists, liberals are less concerned with international order and instead focus their attention on the basis of legitimacy within a State and preserving the idea of self-determination—the right of people to determine their own affairs—from foreign interference. [37] State legitimacy cannot be assumed, as realists assert, but is conditioned on the sovereign's ability to provide collectively for the purposes and aspirations of individuals. Liberals emphasize that States, in a Lockean sense, must form an effective  **233**

Case 3:20-cv-07721-SI   Document 58-7   Filed 11/10/20   Page 631 of 1305

THE COMPATIBILITY OF THE PRINCIPLE OF..., 7 UCLA J. Int'l L. &...

social contract with the myriad of social interests, then defend and protect it. The "moral standing" of any State depends on how well it accomplishes this. [38]

Richard Cobden argued for an absolute principle of nonintervention as a necessary analog to the development of liberal capitalist States. For Cobden, who adopted the economic theory of harmony of interests to international relations, the pursuit of self-interest on the part of every State would lead to a collective interest being achieved. [39] If left to their own devices, States would allocate resources in an efficient manner to maximize wealth. This requires a duty of nonintervention in the affairs of other States so that they may all pursue their individual self-interest and realize a collective goal. Humanitarian intervention was completely illegitimate in Cobden's view. [40] Though not explicitly articulating the importance of self-determination, Cobden's argument implies that sovereignty is vital to the collective good.

John Stuart Mill refined Cobden's analysis, focusing more emphatically on self-determination and nonintervention as moral principles. [41] Mill believed that intervention by civilized nations against "barbarians" was perfectly legitimate, because the latter were not members of international society and did not have the rights attributed to States. With respect to relations among accepted members of international society, however, Mill adopted an absolute policy of nonintervention with two exceptions. [42] First, based on international custom, he acknowledged that intervention by a State in a protracted civil war with no apparent outcome or decisive winner was legitimate, but that intervention on behalf of people struggling for liberty was not. [43] Second, Mill argued that where a foreign power had intervened on behalf of one disputant in a civil conflict, counter-  **234** intervention to balance and cancel the impact of foreign interference was legitimate. [44] However, Mill argued that self-determination was primarily the right of people to become free by their own efforts, if possible. The principle of nonintervention protected the exercise of this right against foreign interference. [45] Foreign powers could not justifiably intervene because this would violate self-determination by definition, since it was not discovered by the people themselves but was given to them by a foreign power. Thus, humanitarian intervention was illegitimate because it was inconsistent with self-determination. [46]

Michael Walzer presents the modern version of this argument, building particularly on Mill. Walzer, like Mill and Cobden before him, believes that States are the subjects of international society and have rights of territorial integrity and political sovereignty. [47] This legitimacy is not presumed but is a product of a social contract between the sovereign and the people, and must derive from their own efforts. Thus, nonintervention is an important principle not only because it preserves the sanctity of a State's rights of political sovereignty and territorial integrity, but is necessary for the principle of self-determination to take root without the corrupting interference of foreign powers. Despite this restatement of Mill's argument, Walzer expands the legitimate grounds for humanitarian intervention. In addition to the grounds recognized my Mill, Walzer would allow such a right in the case of a stable sovereign which has committed severe humanitarian atrocities. Walzer argues that foreign States may in fact intervene where a government has acted in such a manner as to clearly violate the norm of sovereign legitimacy. [48]

Despite his largely conservative theoretical assessment of international society, Walzer argues that the Indian intervention in Bangladesh in 1971 was a legitimate instance of humanitarian intervention, a view seriously disputed by realists. [49] For Walzer, the  **235** gross atrocities of the West Pakistani Government violated any social contract and warranted action by foreign powers to restore the liberty of the East Pakistani people. [50] In instances of grave humanitarian repression, the sovereign has violated the social contract and subjugated its people to the extent where they are no longer capable of exerting self-determination without outside help, which takes the form of foreign intervention. [51]

In sum, liberals offer a theory which provides that state legitimacy is the basis for adhering to nonintervention as a general principle and reserving humanitarian intervention as the exception. States have both internal and international legitimacy. Moreover, the international legitimacy, exemplified by the right of sovereignty, is based on a Lockean social contract it forms with the people. Liberals are particularly conscious of the right of self-determination as the only basis of legitimacy in a civil society. Thus, a right of humanitarian intervention by foreign parties is very difficult to support on philosophical grounds because it weakens the principle of self-determination.

### C. The Cosmopolitan Perspective

AR.08039

The cosmopolitan tradition began with Immanuel Kant, who argued that people, not States, should be the subjects of international society. [52] States must be based on moral integrity, and Kant envisioned that a peaceful international society could exist only if all States had republican forms of government. [53] Kant's unique contribution to the nonintervention and humanitarian intervention debate is that he supported intervention in order to establish a republican State where one did not exist. Thus, like Mill, Kant argued **\*236** that intervention by one State in the affairs of another can be legitimate, though Kant would grant legitimacy only when the intervention occurs on the part of a State with a republican form of government and has the end of assisting in the formation of a republic. In contrast, Mill would accept intervention by non-republican States as long as the country in which the intervention occurs is 'uncivilized.' [54] Apart from this context, Kant favored a strict rule of nonintervention among States in international society. Accordingly, even for Kant States were autonomous entities possessing rights of sovereignty within legitimate international society.

The modern members of the cosmopolitan perspective, David Luban and Fernando Tesón, focus on Kant's theme that individuals, not States, should be the principal subjects of international law. However, they advocate a formal international legal right of humanitarian intervention which may be invoked by the international community or an individual State against any State that violates human rights. Although they might accept some form of limited sovereignty, they clearly wish to emphasize that human rights should take precedence over States' rights.

In the view of Luban and Tesón, the ultimate justification for a State's legitimacy is the "protection and enforcement of the natural rights of the citizens." [55] This is the basis of both a State's domestic and international legitimacy. The State is not an end in itself but a means to the end of protecting the natural rights of human beings. For example, Tesón observes that the right of self-defense is morally justified as "a governmental action to defend the rights of its subjects, that is, the rights of individuals as victims of foreign aggression." [56] When governments engage in substantial violations of human rights, they damage their international legitimacy, and the right of **\*237** sovereignty should not extend to shield their actions. Thus, foreign governments have the right to intervene on behalf of human beings, the true ends of international law. [57] Luban decries the idea of the State as keeper of the social contract: "States are not to be loved and seldom to be trusted." [58] States cannot be assumed to have legitimacy but must earn it by respecting the natural rights of the governed. Many States do not respect such rights, and international law does not intervene on their behalf because of this false sense of neutrality. A right of humanitarian intervention should exist because it is just and serves to establish true legitimacy. [59]

In short, the cosmopolitan writers frame their argument in favor of humanitarian intervention as criticisms of existing State-centric theories. While realists concede that their theory of international relations provides no limit on what a sovereign may do within its borders, cosmopolitan writers view this lack of accountability as the fundamental problem of international law. If States exist for any reason, according to cosmopolitans, it is to preserve, protect and advance the natural rights of human beings. A right of humanitarian intervention will allow international law to better achieve these ends.

### III. The History of Humanitarian Intervention

### A. Humanitarian Intervention in the Nineteenth Century

Intervention for the protection of human rights was an important political and legal concern in the nineteenth century. In most cases, protection of human rights centered on prevention of persecution of religious minorities. The nineteenth century witnessed military and **\*238** diplomatic interventions to protect Christian minorities, often in the Muslim dominated Ottoman Empire, which stretched from the Middle East to the Balkans. The French intervention in Lebanon (then part of the Ottoman Empire), between 1860-1861, is such an example and is an important case of humanitarian intervention. [60]

### 1. The French Intervention in Ottoman Lebanon to Protect the Maronite christians

Lebanon's history has been frequently marked by sectarian violence. Throughout the 1840's and 1850's tensions between the Druze and the Maronites under Ottoman rule in Lebanon rose due to social and economic changes, pitting the more populous, poorer, but upwardly-mobile Maronite Christians against the politically strong, aristocratic and feudal Druze Muslims. [61]

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

In June, 1860, Druze-Maronite tensions came to a head when Druze groups attacked and overwhelmed Maronite Christians all across Lebanon and later in Damascus. The French initially warned the Ottoman government to restore order. [62] Later, Druze militias attacked the Lebanese town Dair al-Qamar, massacring thousands of Maronites, with no response from Ottoman government to quell the violence. A similar incident followed in Damascus. It was this incident, with the apparent abdication of Ottoman will to end the uprising, that drove the French to action. [63]

The plight of the Maronites drew concern from many European countries, and the call for international action grew. [64] The humanitarian considerations lent more credibility and legitimacy to the French decision to intervene. "The offence to Christendom was self-evident; the suffering of Catholics most involved France. **\*239** Humanitarian considerations, as understood at the time, demanded that something be done, and Louis-Napoleon was in a position to demonstrate the necessary activity." [65] Thus, once the European powers accepted that the grave situation in Lebanon warranted European intervention, the remaining issue was its scope.

The British feared French designs on the region, and wanted to limit the scope of the French intervention to the humanitarian mission. Other powers agreed, and in August, 1860, the European powers and the Ottoman Government signed a protocol and later a convention commissioned a 12,000 person multinational force to go to Lebanon for six months "to contribute to the restoration of tranquillity." [66] The French contributed the largest contingent of troops and essentially directed the operation. [67] France wanted to extend the duration of the military intervention, but Britain refused, agreeing only to a two month extension. [68] The European forces left Lebanon by June, 1861, as order had been considerably restored. [69]

The French led intervention presents many challenges to the nonintervention principle. It was an example of collective intervention on the part of the European powers who negotiated an agreement with the sovereign, the Ottoman Empire, so as to set limits upon the erosion of Ottoman sovereignty. In addition, it suggests that humanitarian intervention and sovereignty are not necessarily in conflict and can be reconciled in some cases. More importantly, as Stowell notes, the States were "actuated by motives of humanity to prevent religious persecutions." [70] The presence of the British made sure that the motives remained limited to the humanitarian goals by curtailing France's ability to pursue imperialist goals. The European powers believed that by limiting the French, they were enhancing the mission's international legitimacy. In short, the European powers believed that humanitarian intervention in Lebanon was legitimate and deserving of European attention. Their behavior indicates that there **\*240** was no necessary contradiction between respecting Ottoman sovereignty and the humanitarian crisis. [71]

## B. Humanitarian Intervention in the Cold War Era.

Although some governments openly referred to humanitarian goals to justify intervention in the nineteenth century, during the Cold War States were reluctant to follow this path for fear of establishing a legal precedent in favor of a right of humanitarian intervention. This apparent change in behavior reflected substantial changes in international society. During the Cold War era, decolonization accelerated, increasing the number of States; but the legitimacy of these States was an ongoing struggle given the pressures for economic development coupled with the competing forces of ethnic nationalism. Furthermore, the ideological conflict between the superpowers often played itself out in the newer States, and ostensibly involved their internal makeup, allegiance, and ultimately their legitimacy.

With these pressures on States, a formal right of humanitarian intervention appeared to threaten the stability of the nation-states system. States feared that humanitarian intervention would be manipulated by the Superpowers or ideological regimes to intervene at will and threaten the independence of many States. Therefore, while the major powers of the nineteenth century who undertook the interventions were fairly secure in their own legitimacy and in the inter-national norms of sovereignty, the twentieth century reflected insecurity and uncertainty about the survival of the States system itself. [72]

Yet, despite the apprehension regarding the impact of a formal right of humanitarian intervention, the human rights issue appeared **\*241** and reappeared during the Cold War. The era introduced many important precedents regarding the scope of the nonintervention principle and the extent to which a State or the U.N. as a collective body could intervene where human rights issues were involved. This section begins first with a discussion of the Indian intervention in East Pakistan, which has been cited as strong precedent for a right of humanitarian intervention. Second, it examines the U.N.'s role in the debate between

AR.08041

the propriety of humanitarian intervention and the dimensions of sovereignty, focusing in particular on the U.N.'s relationship with South Africa.

### 1. The Indian Intervention in East Pakistan

East and West Pakistan, formed at the partition of India in 1948, was a union based on a common religion (Islam) and a common rival (India). Beyond this, the two nations were distinct in nearly every conceivable way: different languages, cultural history, geography and level of economic development.[73] After the first democratic elections in East Pakistan placed a party with pro-independence leanings in the Pakistani national assembly in early 1970, the West Pakistani government unleashed a brutal military crackdown on the people of East Pakistan, beginning in March 1971. Over the nine-month period before the Indian intervention, nearly three million people—many of them supporters of independence and Hindus—were killed by the West Pakistani army and security forces, and nearly ten million East Pakistani refugees fled across the border to the Indian state of Bengal.[74] India forcibly intervened in the conflict in December 1971. A two-week war ensued between India and Pakistan, in which India was the decisive victor and East Pakistan secured independence as Bangladesh and was immediately recognized by India and later by much of the world community.[75]

**\*242** The U.N. did very little to address the situation in Bangladesh during the crisis period of 1971. Yet, the Indian intervention created a huge firestorm at the U.N.; many member States questioned the legality of the Indian action, particularly with respect to its import as an example of humanitarian intervention. India justified its action on two grounds. First, India claimed self-defense based on Pakistani incursions into Indian territory. Second, India drew significant attention to the human rights situation in East Pakistan and its impact on the Indian State of Bengal. In addressing the U.N. Security Council, an Indian delegate stated, "We shall not be a party to any solution that will mean continuation of oppression of East Pakistan people, whatever the pretext on which this is brought about. So long as we have any light of civilized behavior left in us, we shall protect them."[76] The U.N. did not censure India, but it did not give approval to its action either. Nevertheless, the international community legitimized the Indian action as several countries recognized Bangladesh within a year of the 1971 intervention.

Advocates of humanitarian intervention argued that the scope of the humanitarian crisis in East Pakistan validated India's unilateral action.[77] Moreover, India waited nine months before intervening, and the evidence suggests that the humanitarian crisis played an important role in India's decision-making.[78] In addition, advocates point to the quick recognition of Bangladesh as tacit approval of India's action, given international law's traditional emphasis on a near absolute right of sovereignty in theory.[79]

Realists contend that India had self-interested motives as exemplified by the fact that Pakistan lost nearly half of its territory, and that India became an unquestioned regional power as a result of **\*243** the war.[80] In addition to critiquing India's assertion of human rights concerns as a justification, the more important aspect of the realist argument categorically denies the legitimacy of a unilateral intervention.[81] Realists suggest, in essence, that no matter the circumstances, there is no way to create an acceptable right of unilateral humanitarian intervention because it would allow States to take advantage of the vulnerabilities of other States in order to violate the right of sovereignty with impunity. Thus, regardless of evidence which points to India's humanitarian aims in protecting the West Pakistani and Bengali people, a unilateral intervention is prima facie illegitimate.[82]

In short, the Indian intervention is an example of unilateral intervention by one State into the affairs of another based in a discernible, but not exclusive way, on protecting human rights. Yet, the mixed justifications for the Indian intervention—self-defense and human rights—reflect both a general skepticism of the concept as well as a sensitivity to the precedent that would be set. For potentially India is vulnerable to its own crises of legitimacy, and would not welcome foreign intrusion if such a crisis arose.

The Indian intervention also presents substantial justifications for legitimizing unilateral interventions where the humanitarian tragedy is compelling, or as Walzer writes, "shocks the conscience of mankind."[83] Walzer's statement is an implicit recognition that the international community has shown some limits to their tolerance of human rights abuses. Notwithstanding that States may be reluctant to formally recognize or legitimize humanitarian intervention even under compelling circumstances, they have not displayed a willingness to censure the State which acts unilaterally.

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 635 of 1305

THE COMPATIBILITY OF THE PRINCIPLE OF..., 7 UCLA J. Int'l L. &...

**\*244  C. The U.N. and the Balance Between Sovereignty and Humanitarian Intervention**

The U.N. Charter's attempt to recognize both the principle of nonintervention and the international importance of human rights crystallizes the ambivalent nature of international law on striking a balance between respect for human rights and the right of sovereignty. Article 2(4) adopts the rule of nonintervention of the military sort by one member against another: "all members shall refrain in their international relations from the threat or use of force against the territorial integrity or political independence of any State, in any manner inconsistent with the purposes of the United Nations." [84]  On its face, Article 2(4) would preclude forcible intervention for humanitarian or other purposes by unilateral means. Article 2(7) has been more controversial, as it relates to the relationship between the U.N. as an organization and an individual member: "Nothing contained in the present Charter shall authorize the United Nations to intervene in matters which are essentially within the domestic jurisdiction of any State or shall require the members to submit such matters to settlement under the present Charter; but the principle shall not prejudice the application of enforcement measures under Chapter VII." [85]

Although Articles 2(4) and 2(7) are clear statements of the nonintervention principle, the Charter also makes ample strides to recognize the importance of human rights. Of particular importance are Article 55(c), which commits the U.N. to promote universal respect for and observance of human rights and fundamental freedoms, Article 68, which sets up the Commission on Human Rights, and Article 13, which assigns to the U.N. General Assembly the task of initiating studies and making recommendations for the realization of human rights and fundamental freedoms for all without distinction as to race, sex, and language. [86]

 **\*245**  These articles represent a recognition that human rights issues have international effects and belong within the international sphere of debate. The U.N. has since used these forums to legitimize its competence to review human rights practices around the world. [87]  Furthermore, since the U.N. is a source of world opinion and a deliberative body which formulates positions and policies on a level which is a product of political bargaining and consensus building, it represents a degree of international legitimacy which individual States do not possess. [88]

Some have asserted that the facial meaning of Article 2(7)'s clause "essentially within the domestic jurisdiction of States" precludes intervention on behalf of human rights or for any other purpose. [89]  Nonetheless, the U.N. has manifestly established its competence to review any State's human rights practices and to criticize those practices. Furthermore, the U.N. has passed resolutions, undertaken relief missions, approved and monitored sanctions, and designated  **\*246**  certain acts deemed to violate human rights an international crime. [90]  As Rosalyn Higgins observes, U.N. practice of active involvement in internal human rights issues has narrowed the literal scope of Article 2(7): "One is led very near to saying that most things short of actual action by the United Nations are in fact now permissible interventions." [91]

The U.N. has accomplished this transition through the application of its Charter's Chapter VII legal mechanism, which allows the U.N. to define either human rights concerns or crises based in significant measure on their human rights dimension as threats to peace and security. [92]  The terms "peace" and "security" have never been defined. Furthermore, the U.N. has undertaken a number of collective interventions where it has cited human rights as an important factor in contributing to the breach of peace and security.

**1. The U.N.'s Relationship with South Africa**

The precedents set by the U.N.'s relationship with South Africa are significant on two levels. First, it validates a long tradition in international relations of States criticizing and applying diplomatic and economic pressure against States with objectionable human rights practices. More importantly, it is in the case of South Africa that the U.N. established its competence to judge the human rights practices of States in the international community. This was no small feat given  **\*247**  the distinction articulated in the U.N. Charter between international conflict and internal conflict, the latter being literally reserved under Article 2(7) for the domestic jurisdiction of States.

**a. Treatment of People of Indian Origin in the Union of South Africa**

AR.08043

THE COMPATIBILITY OF THE PRINCIPLE OF..., 7 UCLA J. Int'l L. &...

Case 3:20-cv-07721-SI   Document 58-7   Filed 11/10/20   Page 636 of 1305

In 1946, the Government of India brought a formal complaint against the Union of South Africa for certain laws which discriminated against persons of Indian origin. The South African legislation froze Indian land transactions and created separate political rights for Indians, distinct from and inferior to those granted to White South Africans. [93] The Indian government claimed that the South African actions violated both the Cape Town Agreement of 1927 and 1932—which both parties signed —as well as the U.N. Charter's human rights provisions. Furthermore, India claimed that South Africa refused to settle the matter by amicable means, and therefore the situation was likely to impair friendly relations between the two countries. South Africa contended that Article 2(7) precluded the General Assembly from even discussing the matter because it was essentially an internal matter and did not pose a threat to peace and security. [94]

However, later in 1946 the General Assembly approved a resolution authorizing both parties to bring their dispute before the following Assembly session. As Goronwy Jones, a vocal critic of U.N. practice with respect to Article 2(7), observed, "It was thus implicit in the resolution that the General Assembly did not regard the principle of non-intervention under Article 2, paragraph 7, as a denial of its authority to discuss the substance of the case and to recommend a line of approach for its pacific settlement." [95]

 **\*248**  In a later session of the Ad Hoc Political Committee in 1950, the discussion centered on whether the nonintervention principle codified in Article 2(7) precluded the U.N. from hearing the issue. The Ad Hoc Committee declared itself competent to judge the matter and focused on South Africa's international obligations, the fact that the situation threatened to severely impair relations between the parties, that the obligations under the Charter was sufficient to establish U.N. competence, and that the Universal Declaration of Human Rights (1958) imposed negative moral obligations on members to refrain from adopting measures which violated human rights. [96] However, the Ad Hoc Committee's findings were not immediately binding on South Africa, and the U.N. Security Council took no further action on the matter. [97]

### b. The U.N. and Apartheid

U.N. involvement in the issue of apartheid dates back to 1950 and culminated successfully in 1993, when the Security Council voted to recommend the lifting of economic sanctions by member States. As R.J. Vincent wrote in 1973, the apartheid issue represented a potential erosion of the nonintervention principle because its focus on the legitimacy of humanitarian intervention was "uncluttered with argument about aggression across international frontiers and claims to national self-defense or counterintervention." [98]

During the 1950's, the U.N. appointed a commission to study the international impact of apartheid and passed several resolutions calling on South Africa to reform its practices. [99] The major western powers, **\*249** who were wary of interfering in South Africa's internal affairs, refused to impose sanctions, suggesting that sanctions would infringe upon South Africa's right of sovereignty. [100] The turning point in U.N. involvement came after the Sharpesville massacre in 1960, where South African police fired on unarmed demonstrators protesting South Africa's pass laws, killing and wounding over 200 people. [101] The South African government then pursued an active campaign to round up and imprison the leaders of the political opposition: the African National Congress, the Pan African Congress, the Liberal Party, and the Congress Alliance. [102]

Following the Sharpesville massacre, the U.N. Security Council passed a resolution stating that South Africa's policies might qualify as a threat to peace and security, allowing the U.N. to undertake Chapter VII enforcement measures to deal with the problem. In 1963, the U.N. imposed a voluntary arms embargo. [103] In the 1970's the U.N. went further than had been imaginable in the prior two decades. It declared apartheid an international crime, barred the South African delegation from participating in its work, established the Special Committee Against Apartheid to review apartheid and its international repercussions, and recognized the rival African National Congress and Pan Africanist Congress as observers to participate in debates. [104] Moreover, in 1977 the U.N. made mandatory the 1963 arms embargo as a Chapter VII action. This was perhaps the most significant achievement in the campaign against apartheid in the 1970's because it declared apartheid a threat to peace and security and represented the first time that the U.N. imposed a Chapter VII action against a member State. [105]

In the 1980's, the U.N. actively campaigned for the eradication of **\*250** apartheid and continued international isolation of South Africa through a comprehensive program of sanctions and boycotts. [106] After increasing racial unrest in South Africa

in 1985, the Security Council passed a resolution in 1986, calling for the immediate release of all political prisoners and the eradication of apartheid. The U.S., a longtime holdout against sanctions, also passed comprehensive economic sanctions against South Africa. U.N. member States then passed a number of sports and cultural boycotts in 1986, which the U.N. monitored. [107] By 1993, with the dismantling of apartheid, and the scheduling of the first all racial democratic elections, the U.N. declared victory and called for the lifting of sanctions and all remaining boycotts against South Africa. [108]

In short, since the 1950's, the U.N. clearly intervened in South Africa's internal affairs. By operating under the precept that apartheid was an international crime and a threat to international peace and security, the U.N. established that the internal treatment of human rights can have international effects. As some have observed, human rights are not within the sole purview of the nation-state but are part of international law and discourse. [109] As long as the U.N. has been able to establish that a humanitarian crisis is a threat to international peace and security, then the members have been allowed to intervene.

In fact, the peace and security hurdle has probably done more than anything else to strengthen the argument that a right of humanitarian intervention exists. Most declarations claiming that a particular practice is a threat to peace and security follow a long protracted **\*251** debate and the development of consensus among the member nations. Therefore, once the U.N. has made such a declaration, it has the force of world opinion and has the credibility of a collective intervention, which even realists concede may be a legitimate form of intervention.

In the case of South Africa, the debate took place over four decades and many members of the international community changed their position to one favoring an active diplomatic and economic effort to isolate South Africa. The change in U.S. policy was the most striking. Until the Reagan Administration's second term, the U.S. was a defender of South Africa and nonintervention. However, after the Democrat-controlled Congress pushed through sanctions over President Reagan's veto, the U.S. moved to the opposite position, and may have been a final decisive force in uniting international resolve behind the dismantling of apartheid in South Africa. [110]

In the nineteenth century, as Martin Wight suggested, the power and impetus to intervene resided solely with the most powerful nations; the relatively weaker States had very little input. [111] Since the beginning of the Cold War era, the U.N. has been a forum for all States. Although weaker countries have had more input than they had in the past, decisive power still resides with the Security Council. Nonetheless, under the aegis of the U.N., collective intervention has become increasingly legitimized because of this broader spectrum of participation by member States. South Africa represents a case in point, because the movement towards international isolation began among the relatively powerless States and progressively enlisted the support of the powerful States over three successive decades.

### D. Humanitarian Intervention in the Post-Cold War Era

The collapse of the Soviet Union and the victory of the capitalist model of development has had two impacts on the U.N. First, the absence of a major superpower conflict has left the U.N. with a greater voice than in previous years. During the Cold War, the superpower **\*252** conflict restrained the U.N. from taking meaningful action on the side of non-intervention or human rights in many cases. The U.N.'s political paralysis has since ended. However, in the aftermath of the superpower conflict, the post-Cold war era has witnessed tremendous turmoil internal to States caused by movements for ethnic self-determination that have resulted in tragic humanitarian consequences. [112]

As a result, the U.N. has been called upon to monitor, moderate, and directly intervene in every major conflict since the end of the Cold War. [113] These changing circumstances have led to an important shift in U.N. thinking. Whereas the Charter expressed a strong distinction between international conflict and matters of an essentially domestic nature, the U.N. of the 1990's has internationalized many internal conflicts on the rationale that they create potential international threats to peace and security. [114] Internal conflict, in the eyes of many political observers, is currently the most significant threat to the society of States. [115]

Hence, the U.N. now recognizes that economic development and ethnic self-determination are among the major challenges confronting the modern State, and has turned its sights on the prevention of conflict within States. For example, in An Agenda for Peace, the U.N. Secretary General offers many suggestions for adapting the U.N. to internal conflict prevention. It identifies

Case 3:20-cv-07721-SI   Document 58-7   Filed 11/10/20   Page 638 of 1305

THE COMPATIBILITY OF THE PRINCIPLE OF..., 1 UCLA J. Int'l L. &...

the dangers of ethnic nationalism for multi-ethnic States and emphasizes the importance of developing civic nationalism, with respect for democracy and human **\*253** rights as essential to the survival of modern multi-ethnic States. [116]

In addition, the U.N. now openly acknowledges that sovereignty is not absolute and that there must be some accommodation between States to address transnational problems. [117] In one sense, this is the natural consequence of the shift from the traditional interstate focus of international law to internal conflicts. The U.N. now recognizes that contrary to a traditional positivist view, protecting human rights may not only be consistent with sovereignty, but also may be necessary for the survival of many multi-ethnic States. The human rights consequences of internal conflict threaten to undermine the very foundation of the international society of nation-states should both the causes and consequences of internal conflict be left unaddressed. The U.N. authorized actions in Northern Iraq and Haiti reflect the new approach to human rights and internal conflict—in each case the humanitarian cost of internal conflict was held to constitute a threat to peace and security, and, hence the U.N. arrived at a justification for intervention.

### 1. The U.N. Authorized Intervention to Protect the Kurds of Northern Iraq

In February, 1991, both Kurdish groups in Northern Iraq and Shi'ite Muslim groups in Southern Iraq rebelled against the Hussein regime weakened by Iraq's recent defeat by a U.N. multinational force led by the U.S. However, Saddam Hussein was able to regroup and suppress the insurrections by March, 1991. The result was a massive refugee crisis, especially among the Kurds of the North, many of whom fled to Turkey and Iran. This humanitarian crisis led to U.N. Security Council Resolution 688, which condemned Iraq's treatment **\*254** of the Kurdish population and mandated that Iraq allow immediate access for international humanitarian relief efforts. [118]

Having determined that the region needed to be made safe for Kurdish refugees to return home, the U.S. dispatched 10,000 troops, along with British and French contingents in April, 1991, to Northern Iraq to organize and secure U.N. protected zones. [119] The U.S. defended the action based on Resolution 688, arguing that its military forces were better equipped to implement the emergency relief operation than standard relief organizations. By mid-June 1991, most Kurdish asylum seekers had returned to their homes in the U.N. protected enclaves, and in the short term the crisis was alleviated. [120]

However, in October 1991, the Iraqi Government undertook a new strategy to frustrate the Kurdish independence movement by imposing an internal embargo on the Northern region of the country. In their attempt to starve the rebels into submission, the Iraqis denied the Kurds basic necessities including food and medicine and caused electric power cut-offs which led to spoilage and breakdowns in hospital services. The U.N. responded by importing generators and other humanitarian supplies to maintain stability in the region. [121] Since 1991, the emergency situation in Northern Iraq has subsided but the mandates of Security Council Resolution 688 on the Iraqi Government have continued into the mid-1990's.

The basis for the U.N. intervention was in part that the conflict between the Iraqi State and its Kurdish population threatened the latter's survival and that deteriorating relations between them was a threat to international peace and security. [122] The Kurdish human rights crisis derived in large measure from the refugee crisis and the corresponding concern from the border countries of Iran and Turkey. Hence, the critical factor in the U.N. decision to intervene was **\*255** ostensibly a product of human rights concerns. Many have viewed the intervention in Northern Iraq as a watershed case of humanitarian intervention because the U.N. forcibly prevented a sovereign from attacking its own people. [123] Consensus was not readily achieved, as many opposed the infringement on Iraqi sovereignty; nevertheless, the pro-interventionist forces won the day and the U.N. established a new precedent of collective intervention. [124]

### 2. The U.N. Authorized Intervention in Haiti

In Haiti, Jean Bertrand Aristide was elected President by an overwhelming majority in 1990 under U.N. supervised elections. Less than one year later, in September 1991, he was deposed in a coup. The U.N. quickly condemned this turn of events, and passed resolutions declaring the seizure of power illegal, and called for the restoration of Aristide to office and full observance of human rights. [125] The U.N. later declared the situation in Haiti a threat to peace and security under Chapter VII and issued U.N. Security Council Resolution 841, imposing a mandatory oil- and petroleum-related products embargo in June 1993. [126]

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 639 of 1305

THE COMPATIBILITY OF THE PRINCIPLE OF..., 7 UCLA J. Int'l L. &...

For over three years, the de facto regime ruled and subjected the Haitian people to human rights abuses reminiscent of the Duvalier dictatorship. [127] Aristide supporters, in particular, were targets of the coup leaders. During the U.N. economic embargo, the coup leaders **\*256** hoarded essential goods for the military and as a result denied basic necessities to many Haitians. [128] Moreover, during this period there was a steady flow of refugees from Haiti to neighboring Caribbean countries and to the U.S.

In July 1993, Aristide and the coup leaders, led by General Raoul Cedras, met at Governors Island in New York City and signed the resultant Governors Island Accord. [129] The agreement called for Aristide to return to Haiti in exchange for a suspension of the U.N. sanctions adopted under Security Council Resolution 841, a general amnesty for coup participants, and U.N. mediation in reaching a political agreement between Aristide and the coup leaders. [130] However, the Haitian coup leaders subsequently refused to implement the Governor's Island accord and prevented a U.N. relief mission from entering the country in October 1993. [131] The U.N. quickly restored the sanctions (U.N. Security Council Resolution 873), and increased their severity (U.N. Security Council Resolution 875). [132]

After the Haitian coup leaders refused to honor the Governor's Island accord, the tension between the U.S. and Haiti grew. The Haitian situation was an important foreign policy issue for both the Bush and Clinton Administrations, and the overt snub of U.S. power frustrated U.S. policymakers. In 1994, the U.S. intensified its campaign to remove the coup leaders and restore Aristide to power. Under U.S. leadership, the U.N. passed Security Council Resolution 940 in July 1994, authorizing the U.S. to use "all necessary means" to restore Aristide. [133] Armed with U.N. approval, President Clinton presented several ultimatums to the coup leaders, demanding that they leave Haiti. With the use of a renowned group of personally-appointed U.S. negotiators, backed by a threat of imminent invasion, **\*257** the coup leaders were persuaded to relent at the very last moment and agreed to give up power and leave Haiti in late September 1994. [134] U.S. troops peacefully occupied Haiti on September 20, 1994, and by October 15, 1994 Aristide was reinstated as Haiti's President. [135] The U.N. hailed the action, clearly supporting the return of a democratically-elected leader and the departure of a military coup which it deemed to be illegitimate. [136]

Article 2(7) provided Haiti with little protection from U.N. action. The Security Council refused to recognize the coup leaders, and in essence did not accept the coup as merely the result of an internal power struggle. Moreover, the Security Council held that the conditions in Haiti were a threat to peace and security; however, when compared with situations like Somalia or Iraq, the criteria for Chapter VII treatment appear to have been loosely construed. [137]

In effect, the U.N. made a judgment that Aristide was Haiti's legitimate ruler and that the coup leaders were illegitimate. In addition, consistent violation of Council resolutions accompanied by gross human rights violations warranted a finding of a threat to peace and security. Thus, the Haiti intervention takes a step in the **\*258** cosmopolitan direction. The international community made a judgment that a democratically-elected government was more legitimate and preferable to a military junta, and granted the U.S. the right to restore that democratically-elected government to power.

### IV. Analysis: The Common Law Right of Humanitarian Intervention

The history of humanitarian intervention suggests at the very least a demonstrable gap between the theory of international society—where a formal right of sovereignty exists but no formal right of humanitarian intervention—and the practice of States. In contrast to the tenets of the realist and liberal traditions, which support most strongly the principle of nonintervention, States have seen humanitarian intervention as both a legitimate objective and largely compatible with sovereignty.

There is a consistent tradition of humanitarian intervention in international law which allows one to discern a common law right of humanitarian intervention. This common law right is premised on the notion that sovereignty is an important, but not absolute, principle of international law. Sovereignty entails both an internal and external legitimacy; States thus owe obligations to other States as well as their own citizens. Furthermore, how a sovereign treats its people can affect this legitimacy in both an international and national sense. If a sovereign treats its citizens, or allows them to be treated in such a way which "shocks the conscience of mankind," or in ways which violate basic conceptions of human rights, other States may intervene.

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 640 of 1305

THE COMPATIBILITY OF THE PRINCIPLE OF..., 7 UCLA J. Int'l L. &...

International law has never accepted a positivist norm of absolute sovereignty and nonintervention, nor has it accepted the Kantian norm of a free right of intervention to protect human rights despite concerns about sovereignty. Rather, it has strived for balance. During the nineteenth century, the positivist conception of absolute sovereignty began to erode. During the twentieth century, although States have been unwilling to declare a formal right of unilateral humanitarian intervention for fear of eroding the right of sovereignty, the concept has developed more fully within the existing rubric of international law.

While there is a limited right of humanitarian intervention within **\*259** this society based on sovereignty and self-help, unilateral and collective interventions must be distinguished. The precedent is much stronger with regard to the latter than to the former. Although this does not preclude a legitimate unilateral humanitarian intervention, such interventions have been the most contentious. At a minimum, international society has displayed a clear reluctance to accept without reservation the notion of unilateral humanitarian intervention because of fear of abuse by powerful or ideologically driven States.

Yet, collective intervention is another matter. Collective intervention has a substantial history dating back to the nineteenth century, and has gained even greater legitimacy under the auspices of the U.N. In the past, only the most powerful nations intervened. Today, the U.N. has been a forum where weaker States can have an effective voice, even though the most powerful nations retain great influence. The U.N.'s forty year struggle against South Africa's practice of apartheid is a case in point. The campaign against apartheid began amongst the weaker, newer members of the U.N., then after forty years of debate the powers in the Security Council moved to effectively isolate South Africa and hasten the fall of apartheid.

In the post-Cold War era, the historical trend suggests an expanding right of collective humanitarian intervention in the direction of goals first proffered by cosmopolitan thinkers. The problem confronting the international society of States is internal conflict, driven predominantly by ethnic self-determination. In the view of the U.N. and many member States, this problem must be confronted by promoting civic nationalism. Moreover, for civic nationalism to succeed in the large number of multi-ethnic States, respect for the democratic process and human rights are essential. Thus, international protection of human rights and promotion of the democratic process, rather than being anti-statist in character, are central to preserving the international society of States. The U.N. will continue to be called upon to intervene when human rights are being violated, but also to legitimize the democratic process in many countries by acting as an impartial arbiter and observer.

As the U.N.-authorized interventions in Northern Iraq and Haiti indicate, the threshold for a breach of peace and security and, hence, Chapter VII treatment, has been liberalized. The presence of an **\*260** humanitarian catastrophe itself can trigger Chapter VII treatment even where the actual threat to other States is not particularly strong. In Haiti, echoing the Kantian tradition, the U.N. essentially argued that it had competence to determine that a democratic form of government was more legitimate than a military dictatorship. There were many reasons for this, but respect for human rights was clearly at the root of this judgment. Sovereignty, therefore, provides little protection to non-democratic regimes that violate human rights. If the international political will exists to intervene in response to the human rights practices of non-democratic regimes, then Haiti ranks as strong precedent supporting the legality of such action in the future.

Given that human rights have been internationalized and can now serve as a basis for a Chapter VII action, international law must also confront the issue of when this action should be undertaken. In other words, is there an obligation to intervene when human rights have been violated, or do States simply have the option to intervene? An obligation connotes a duty; it is something that must be done. A right, in contrast, is a privilege that one may choose whether or not to exercise; a right is not lost if one fails to exercise it.

I do not believe that the international community currently has an obligation to intervene to protect human rights. One need only look at the number of instances in human history where the international community has failed to intervene. The intractable two decade old civil war in Sudan, [138] the U.N. toleration of Iraqi repression of Shi'ite Muslims in Southern Iraq while it actively intervened in the North, [139] and the Indonesian treatment of the people of East Timor [140] highlight this point. Although the U.N. has criticized these countries' human rights practices, it has not embarked on interventions. Given the bulk of historical precedent, the U.N. would clearly have been able to take a **\*261** more proactive, interventionist policy in these countries had the political will existed to do so.

One is next led to the question of whether humanitarian intervention should be an obligation. To refresh their view, cosmopolitan thinkers like Luban and Tesón argue in effect that it should, because international law should be first and foremost about human beings. Where a State has allowed human rights to be violated, its right to sovereignty should not be respected, and the international community should intervene.

AR.08048

I disagree with cosmopolitan thinkers on this question and believe that an optional right on the part of States to intervene in response to human rights violations is more appropriate than an obligation for two principle reasons. First, collective acts of humanitarian intervention are more legitimate to the international community than unilateral acts, but it is impracticable to achieve international political consensus in every instance where such intervention is justified. Collective action requires an international political consensus, which is only arrived at through political bargaining, a process which leads to inconsistent outcomes. The case of Iraq bears this out. In spite of great public support for the Kurds among the powerful States, this support did not extend to the Shi'ite Muslims in the South, who faced a similar struggle with the repressive Iraqi Government. The reasons were largely political and strategic; the U.S. and Europe did not want to lend support to a pro-Iranian, anti-Western movement for independence in the sensitive Persian Gulf region. In short, the political element in international law effectively prevents the right of humanitarian intervention from rising to the level of an obligation in the practice of States.

Second, the right of humanitarian intervention should not rise to the level of an obligation because this would cause the position of States in international society to be eroded to the extent that sovereignty would become meaningless. Even in Kant's conception of international society, republican States possess a near absolute right of sovereignty. States retain great value for people as guarantors of political and economic security. Their legitimacy is based on a consensus among members of a political community, with a common history, values and goals. The Liberal idea that States can represent **\*262** their populations and protect and advance human rights is not inherently flawed. The problem, as Kant suggests, is that a State's power vis à vis its population needs to be checked. In international practice, the common law right of humanitarian intervention has evolved to require a higher standard of behavior on the part of the State in relation to protection of human rights. Although Luban argues that States are seldom to be trusted, one must distinguish between democratic States, which by and large respect human rights, and non-democratic, totalitarian, or dictatorial regimes, where the potential for human rights abuse is well chronicled.

The issue can be boiled down to whether one believes that States retain any value in international relations for advancing the interests of human beings. Luban clearly believes that States do not, and must therefore be subservient to the needs of individuals. I believe that the problem is the type of State, not the nature of the State itself. Democratic States tend to have broad respect for human rights, and wealthy democratic States have been able to create both prosperity and respect for human rights, thus demonstrating the benefits that come with independence accorded by international law.

Humanitarian intervention, therefore, should not be an obligation of the international community because a right of sovereignty is necessary for States—which themselves are a legal fiction—to function in order to fulfill their obligations to their populations. The right of humanitarian intervention—as opposed to the obligation—allows the international community greater flexibility in dealing with States which violate human rights while respecting the sovereignty of those who abide by basic standards. If a country's human rights practices violate basic standards, then the international community is within its rights to consider intervention. The right does not mandate intervention but gives the international community legal authority that can be used to force States to change their behavior or risk international intervention. International law should strive for balance between sovereignty and protection of human rights, not seek to make one supreme over the other.

## \*263  V. Conclusion

This comment has analyzed both the philosophical and historical underpinnings of humanitarian intervention and its relationship to the right of sovereignty and the corresponding duty of nonintervention in international law. International law is replete with differing traditions, some favoring a hard and fast rule of nonintervention while others advocate a right of humanitarian intervention in limited circumstances. Contrary to traditional positivist theory, international law has striven to achieve balance between the positivist norm of absolute sovereignty and nonintervention and the cosmopolitan norm of a free right of intervention to protect human rights.

As this common law right of humanitarian intervention has evolved, it has moved away from the realist and positivist and towards cosmopolitan thinking. International law now recognizes with little reservation that human rights is an international issue and may be a legitimate basis for intervention. As the twentieth century has progressed, the duty of each State to observe a basic respect for human rights, and to refrain from violating them in a manner which "shocks the conscience of mankind" or poses a "threat to peace and security" has become a litmus test for the continued respect of sovereignty and the principle of nonintervention.

AR.08049

However, what has evolved is a common law right of humanitarian intervention rather than an obligation on the part of the international community to intervene whenever States violate human rights. Like any right, it can be exercised or ignored, but cannot be taken away. The evolving common law right of humanitarian intervention does not aim to overthrow the States system, but rather is predicated on working within the system to make it better and more responsive to the potential abuse of power by States with respect to the treatment of human beings.

## Footnotes

[a1] J.D. Candidate, UCLA School of Law, 1996; M.Sc., London School of Economics, 1993; B.A., State University of New York at Binghamton, 1992. I am indebted to Professor William J. Aceves for his guidance and thoughtful suggestions. I thank Andrew Gilmour, George Foster, John Blomgren, Josh Levenberg, and Andrea Talentino for their diligent editorial assistance. I also thank my parents.

[1] According to Von Glahn, many commentators on international law take the modern conception of intervention to mean, "dictatorial interference by one state in the affairs of another state for the purpose of either maintaining or changing the existing order of things…" Gerhard Von Glahn, Law Among Nations: an Introduction to Public International Law 152 (5th ed. 1986) (footnote omitted) (citing Lauterpacht, Oppenheim). This definition is attributed to the international legal scholar, Laza Oppenheim. The realist school places more emphasis on the use or threat of military force. For example, noted realist Martin Wight defined intervention as, "forcible interference, short of declaring war, by one or more powers in the affairs of another state." Martin Wight, Power Politics 191 (1978). See also Von Glahn, supra at 152-59. According to Von Glahn, important international legal scholars have considered the exceptions to the general duty of nonintervention with respect to armed intervention to include the following: (1) Intervention by Right, i.e., by invitation or treaty; (2) Self-Defense; (3) Abatement of an international nuisance. This refers to state breakdown, when a sovereign can no longer maintain order within its borders, creating spillover effects to other border states. The abatement theory holds that where conditions in a neighboring state border on anarchy with the concurrent inability of the authorities to restore order and to prevent spillover to other countries, then a state has a duty to intervene. One example, given by Von Glahn, is the United States intervention in Mexico to put a stop to the Villa raids, after Mexico, which was involved in a civil war, was unable to stop Villa's incursions into United States territory. Von Glahn, supra, at 161.

[2] See generally Ian Brownlie, International Law and the use of force by states 338-42 (1963). Brownlie, for example, is a vocal critic of recognizing a right of humanitarian intervention. The chapter in which Brownlie discusses humanitarian intervention is entitled, "Other Justifications for Resort to Force of Doubtful Validity." Id. at 338. Moreover, Brownlie cites the legal philosopher W.E. Hall, who also questioned the legal validity of humanitarian intervention. Id. at 339.

[3] P.H. Winfield, The History of Intervention in International Law, 3 British Yearbook of International Law 125, 130 (1923) (quoting W.E. Hall, International Law § 10 (7th ed. 1917)).

[4] See Charles R. Beitz, Political Theory and International Relations 71-92 (1979) (discussing the philosophical underpinnings of state-centric theories of international relations), Bartram S. Brown, International Law: The Protection of Human Rights in Disintegrating States, 68 Chi.-Kent L.Rev. 203, 206 (1992).

[5] See generally Mark w. Janis, An Introduction to International Law 227-35 (2nd ed. 1993) (discussing the positivist view of individuals in international law).

[6] See David Luban, Just War and Human Rights, 9 Phil. & Pub. Aff. 161, 173 (1980).

[7] Ian Forbes & Mark Hoffman, Introduction, in International Relations and the Ethics of Intervention 9 (Ian Forbes & Mark Hoffman eds., 1993).

[8] See Ellery Stowell, Intervention in International Law 51-149 (1921). Hugo Grotius was the first international legal writer to advocate the legitimacy of this type of action by one state against another in De Jure Belli et Pacis. Id. at 55-57. Stowell, Antoine Rougier and other writers who advocate a limited right of humanitarian intervention, trace its roots to Grotius. The principles of Grotian thinking are similar to the Liberal perspective, which is discussed in part II, section B.

[9] Henry g. Hodges, The Doctrine of Intervention 87, 88-96 (1915). See also Natalino Ronzitti, Rescuing Nationals Abroad Through Military Coercion and Intervention on Grounds of Humanity xiv-xv (1985) (Humanitarian intervention has

Case 3:20-cv-07721-SI   Document 58-7   Filed 11/10/20   Page 643 of 1305

THE COMPATIBILITY OF THE PRINCIPLE OF..., 7 UCLA J. Int'l L. &...

been traditionally distinct from protection of nationals abroad. Humanitarian intervention, in a classical or traditional sense, refers to armed force used by one state or group of states in order to protect the citizens of another state from cruel treatment.). Id. at xiv.

[10] Stowell, supra note 8, at 53 (footnote omitted) (quoting Antoine Rougier, Théorie de l'intervention d'humanité, 7 Revue Générale du Droit International 472 (1910)).

[11] Id. at 53.

[12] Brownlie, supra note 2, at 338-42.

[13] T.J. Lawrence, Principles Of International Law 132-33 (1895) (arguing that although the French intervention to protect the Maronite Christians in Lebanon was deserving of moral approval, it was not strictly within the bounds of international law). See also Brownlie, supra note 2.

[14] Hodges, supra note 9, at 87-88 ("It is generally agreed that should the offense be continued, and be of such a nature as to shock all national morality, then an intervention may be permissible if an occasion should arise that would make it possible for this intervention to accomplish positive good.").

[15] Id. at 91. See also Hedley Bull, Conclusion, in Intervention in World Politics 195 (Hedley Bull ed., 1984). Bull notes that Christian Wolff, a positivist philosopher who expounded an absolute right of nonintervention, suggested that collective intervention may be justified when authorized by the international community itself. Bull, a modern realist, also conceded that collective intervention may have legitimacy where unilateral intervention does not. Id. See also Evan Luard, Collective Intervention, in Bull, supra, at 157-59.

[16] Lloyd N. Cutler, The Internationalization of Human Rights, 1990 U. Ill. L.Rev. 575, 578 (discussing the growing legitimacy of non-military means to address human rights concerns).

[17] Id. at 577-79.

[18] Tom J. Farer, Humanitarian Intervention: The View from Charlottesville, in Humanitarian Intervention and the United Nations 150-51 (Richard B. Lillich ed., 1973).

[19] See Cornelia Navari, Intervention, Non-Intervention and the Construction of the State, in International Relations and the Ethics of Intervention, supra note 7, at 43-59; Leo McCarthy, International Anarchy, Realism, and Non-Intervention, in International Relations and the Ethics of Intervention, supra note 7, at 75-88; Kenneth N. Waltz, Man, the State and War: a theoretical analysis 159-86 (1959).

[20] See generally Niccolo Machiavelli, The Prince (Daniel Donno trans., 1966).

[21] Beitz, supra note 4, at 27-34.

[22] See generally Kenneth N. Waltz, Theory of International Politics (1979).

[23] Id. See generally Beitz, supra note 4, at 35-50.

[24] See generally Hans J. Morgenthau, Politics Among Nations (5th ed. 1973); Edward H. Carr, The Twenty Years' Crisis, 1919-1939 (1939); Raymond Aron, Peace and War (Richard Howard & Annette B. Fox trans. 1967); Ian Clark, The Hierarchy of States (1989); Hedley Bull, The Anarchical Society: A study of order in world politics (1977).

[25] Forbes & Hoffman, in International Relations and the Ethics of Intervention, supra note 7, at 1.

[26] Wight, supra note 1, at 191. With respect to sovereignty, Wight states, "In principle, every state is independent in the management of its own affairs (except in so far as it may be limited by treaty), and foreign interference is a violation of its rights." Id.

[27] See Hedley Bull, Introduction, in Intervention in World Politics, supra note 15, at 2. See also Richard Little, Recent Literature on Intervention and Non-Intervention, in International Relations and the Ethics of Intervention, supra note 7, at 22. Realists generally accept the argument of the eighteenth century philosopher, Vattel, who analogized States to individuals. Since individuals were free, so too were all States. States, as collective persons, were therefore moral

persons in international law and deserving of a right of independence. For a more detailed analysis of Vattel, see R.J. Vincent, Nonintervention and International Order 26-31 (1974).

28   See Herbert Butterfield, The Balance of Power, in Diplomatic Investigations 132, 132-148 (Herbert Butterfield & Martin Wight eds., 1966). Butterfield describes the balance of power system as a self-regulating mechanism for international society given the absence of an international sovereign authority. In essence, sovereign states seek to preserve their independence by preventing any single state or group of states from gaining too much power. One way this is accomplished is through the formation of shifting alliances, where relatively weaker states join together to limit the more powerful state or states. Id.

29   See generally Clark, supra note 24, at 112-13 (discussing the Concert of Europe as a possible example of the balance of power concept in practice). As Clark suggests, in one sense the Concert of Europe may be viewed as several sovereign European States uniting against France's hegemonic designs, and affirming the principles of state sovereignty and hence, nonintervention. But cf. Wight, supra note 1, at 199. Some realists assert that nonintervention is simply another form of intervention, i.e. a refusal to act which leads to certain consequences. Wight refers to the remark by the French Statesman Tallyrand that nonintervention and intervention signify almost the same thing. In addition, Wight points out that the Non-Intervention Agreement of 1936 among the Western powers was a "diplomatic fiction" which provided a convenient way for the allied powers to deny assistance to the Spanish Republic, which had the support of Communists, while the fascist powers the gave support to Franco, the eventual victor in the Spanish Civil War. Id.

30   Morgenthau, supra note 24, at 1-15, Aron, supra note 24, at 1-18.

31   Morgenthau, supra note 24, Aron, supra note 24.

32   Morgenthau, supra note 24, at 1-10.

33   Wight, supra note 1, at 81-94. Wight describes the French Revolution as a reintroduction of fanaticism into international relations because the French revolutionaries wanted to remodel France "according to ideals that had no national limitation." Id. at 83. Wight does not identify these ideals, but the French Revolution is known for its egalitarian principles and for fundamentally redefining the relationship of the state to the people. Id.

34   Id.

35   Caroline Thomas, The Pragmatic Case Against Intervention, in International Relations and the Ethics of Intervention, supra note 7, at 91-101. Many realist writers point to the unwillingness of the international society of states to acknowledge a formal right of humanitarian intervention, particularly since the end of World War II. See Michael Akehurst, Humanitarian Intervention, in Intervention in World Politics, supra note 15, at 95-112.

36   Clark, supra note 24, at 200-01. As Clark observes, States have seldom presented humanitarian intervention as the true or primary basis for their interventions. Furthermore, suggesting that States are fully aware of their own vulnerability should a right of humanitarian intervention formally exist, Clark writes, "Not surprisingly, state authorities are reluctant to allow this particular genie to escape the bottle." Id. at 201.

37   Vincent, supra note 27, at 45-56.

38   Michael Walzer, The Moral Standing of States: A Response to Four Critics, 9 Phil. & Pub. Aff. 209, 211 (1980).

39   Vincent, supra note 27, at 45-54.

40   Vincent, supra note 27, at 46-47.

41   Vincent, supra note 27, at 54-56. See also Michael Walzer, Just and Unjust Wars 87-95 (1977).

42   Vincent, supra note 27, at 55-56.

43   Id.

44   Id. at 56.

45    Walzer, supra note 41, at 88.

46    Id.

47    See generally Walzer, supra note 41.

48    Id.

49    Id. at 105-07.

50    Id.

51    Id.

52    Vincent, supra note 27, at 56-58. See generally R.J. Vincent, Human Rights and International Relations 113-22 (1986) (discussing the state-centric perspective—referred to as the "Morality of States" argument—and contrasting it with the cosmopolitan perspective).

53    Vincent, supra note 27, at 56-58.

54    Vincent, supra note 27, at 55, 56-58. For example, Kant would likely argue that intervention to create a republican state in nineteenth-century Russia, Austria, or Germany, three states that were acknowledged members of international society, would be legitimate. Mill, however, in his discussion of uncivilized nations, thought mainly of colonial peoples: Asian, non-European, and also non-white. Id. at 55.

55    Fernando R. Tesón, humanitarian intervention: An Inquiry into Law and Morality 15 (1988).

56    Id. at 113.

57    Id.

58    Luban, supra note 6, at 173.

59    Both Luban and Tesón have sharp criticisms for Michael Walzer, even though in practical terms all three would justify a number of humanitarian interventions. They are philosophically opposed to Walzer's acceptance of State supremacy and the traditional shield of sovereignty short of genocidal acts. See Tesón, supra note 55, at 15-17, 23-33; David Luban, The Romance of the Nation-State, 9 Phil. & Pub. Aff. 392-97 (1980); Gerald Doppeldt, Walzer's Theory of Morality in International Relations, 8 Phil & Pub. Aff. 3-26 (1978).

60    Stowell, supra note 8, at 63. See also John P. Spagnolo, France & Ottoman Lebanon: 1861-1914, 1-55 (1977), William Miller, The Ottoman Empire and its Successors: 1801-1913, 300-03 (1923).

61    Spagnolo, supra note 60, at 2-3.

62    Spagnolo, supra note 60, at 29-33, Miller, supra note 60, at 301.

63    Stowell, supra note 8, at 63-66.

64    Id., Spagnolo, supra note 60, at 33-34.

65    Spagnolo, supra note 60, at 33.

66    Miller, supra note 60, at 302.

67    Id., Spagnolo, supra note 60, at 34-37, Stowell, supra note 8, at 63-66.

68    Stowell, supra note 8, at 63-66.

69    Miller, supra note 60, at 302.

AR.08053

Case 3:20-cv-07721-SI   Document 58-7   Filed 11/10/20   Page 646 of 1305

70   Stowell, supra note 8, at 66.

71   See Brownlie, supra note 2, at 340. Although Brownlie criticizes Stowell is a sceptic of humanitarian intervention, he concedes that the French intervention to protect the Maronite Christians in 1860-61 might be a valid instance of humanitarian intervention.

72   But cf. Clark, supra note 24, at 131-33. The importance of the internal makeup of a state was not novel to the Cold War, but was recognized by many European powers, especially the Habsburg and Prussian Monarchies, who feared nationalism and political and economic liberalism.

73   Bangladesh, Microsoft Encarta (Microsoft 1993).

74   V.P. Nanda, A Critique of the United Nations Inaction in the Bangladesh Crisis, 49 Den L.J. 53, 55-56 (1972).

75   Ronziti, supra note 9, at 95; Tesón, supra note 55, at 182-83; Walzer, supra note 41.

76   Ronzitti, supra note 9, at 96.

77   Walzer, supra note 41, at 105-07. See also Anthony Day, When Evil Calls Out for Action: The Nation Is Urged to Intervene Around the World to Do 'God's Work' and to Avert a 'Second Holocaust.' How Do We Know When to Act on the Humanitarian Impulse?, L.A. Times, Feb. 9, 1993, at A1 (reporting that Walzer characterizes the Indian action as a rescue mission).

78   Ronzitti, supra note 9, at 95-97. Nanda, supra note 74, at 55-56.

79   Walzer, supra note 41, at 105-07.

80   Ronzitti, supra note 9, at 95-97.

81   Thomas Franck & Nigel Rodley, After Bangladesh: The Law of Humanitarian Intervention by Military Force, 67 Am. J. Int'l L. 275, 297-305 (1973). Franck and Rodley argue that beyond the Spanish American War, which itself is questionable precedent as a unilateral intervention, the Indian intervention in East Pakistan does not fall within the so-called tradition of humanitarian intervention. Id. at 285.

82   Id. at 304-05.

83   Walzer, supra note 41, at 107.

84   U.N. Charter art 2, ¶ 4; Leland Goodrich et al., Charter of the United Nations: Commentary and Documents 43 (3d ed. 1969).

85   U.N. Charter art 2, ¶ 7; Goodrich, supra note 84, at 60.

86   See generally Goodrich, supra note 84, at 133, 371, 435. The U.N. Commission on Human Rights has operated under the Economic and Social Council since 1946. It submitted for General Assembly approval the Universal Declaration on Human Rights in 1948. Other human rights related Charter articles include the Preamble, "WE THE PEOPLE OF THE UNITED NATIONS DETERMINED … to reaffirm faith in fundamental human rights, in the dignity and worth of the human person, in the equal rights of men and women … ", id. at 19, and Article 1(3), "The Purposes of the United Nations are … To achieve international cooperation in solving international problems of an economic, social, cultural, or humanitarian character, and in promoting and encouraging respect for human rights and for fundamental freedoms for all without distinction as to race, sex, language, or religion ...." Id. at 25. See also, Enforcing Human Rights: The U.N. Machinery, The U.N. Machinery, 30 U.N. Chron. 93, Mar. 1993 (listing key human rights agreements), John P. Humphrey, The U.N. Charter and the Universal Declaration of Human Rights, in The International Protection of Human Rights 39 (Evan Luard ed., 1967).

87   See Louis B. Sohn, The New International Law: Protection of the Rights of Individuals Rather Than States, 32 AM. U. L. Rev. 1 (1982). Sohn traces the growth of international human rights protections since the end of the Second World War. In his view, the evolution of international humanitarian law has been revolutionary. Id at 1. Moreover, the U.N.

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 647 of 1305

THE COMPATIBILITY OF THE PRINCIPLE OF..., 7 UCLA J. Int'l L. &...

Charter deserves great credit for advancing the principle that human rights is an international matter as evidenced by the Commission on Human Rights and its subsequent Declaration and Covenants. Id. at 13-17.

88    Id. at 13-17. See also Enforcing Human Rights, supra note 86; Von Glahn, supra note 1, at 180-96.

89    Goronwy Jones, The United Nations and the Domestic Jurisdiction of States 37-40 (1979) (criticizing U.N. practice which has, in Jones' view, undermined the meaning of Article 2(7)'s emphasis on nonintervention). See also Goodrich, supra note 84, at 60-72.

90    Von Glahn, supra note 1, at 180-94 (discussing the U.N. General Assembly's adoption, and member state's ratification, of the International Convention for the Suppression and Punishment of the Crime of Apartheid). Id. at 193-94.

91    Rosalyn Higgins, Intervention and International Law, in Intervention in World Politics, supra note 15, at 36. See also J.E.S. Fawcet, Human Rights and Domestic Jurisdiction, in The International Protection of Human Rights, supra note 87, at 292-93.

92    Goodrich, supra note 84, at 290-300. See also Jost Delbrück, A Fresh Look at Humanitarian Intervention Under the Authority of the United Nations, 67 Ind. L.J. 887, 897 (1992). The U.N. must first decide under Article 39 that a threat to, or a breach of, international peace and security has occurred before relying on Chapter VII. Chapter VII allows the Security Council to undertake binding enforcement measures to "maintain or restore international peace and security." Frederic L. Kirgis, Jr., The United Nations at Fifty: The Security Council's First Fifty Years, 89 Am. J. Int'l L. 506, 512 (1995).

93    Unesco, The United Nations and South Africa, Unesco Courier, Nov. 1983, at 17. The Pegging Act (1946) froze Indian land transactions in the state of Natal and Transvaal. The Asiatic Land Tenure and Representation Act (1946) extended Pegging Act provisions to all non-white persons and imposed the new system of separate communal, and political rights. See also R.B. Ballinger, U.N. Action on Human Rights in South Africa, in The International Protection of Human Rights, supra note 86, at 248.

94    Jones, supra note 89, at 39.

95    Id. at 40. Furthermore, Jones writes: "But though U.N. organs have recognised that states are not bound by legal obligations in respect of human rights unless they have voluntarily ratified international conventions or covenants on such matters, they have nevertheless interfered in human rights questions with regard to which states have not accepted such obligations." Id. at 37.

96    Id. at 42-43.

97    Id. at 44-45.

98    Vincent, supra note 27, at 262 n.111. See also Cutler, supra note 16, at 581; Lori Fisler Damrosch, Politics Across Borders: Nonintervention and Nonforcible Influence Over Domestic Affairs, 83 Am. J. Int'l L. 1 (1989).

99    Ballinger, in The International Protection of Human Rights, supra note 86, at 255-57.

100    Id.

101    Id. at 257-59.

102    Id.; The U.N.'s Long Campaign Against Apartheid, Unesco Courier, Feb. 1992, at 40.

103    Ballinger, in The International Protection of Human Rights, supra note 94, at 259.

104    The U.N.'s Long Campaign Against Apartheid, supra note 102, at 40. The International Convention on the Suppression and Punishment of the Crime of Apartheid was adopted by the General Assembly in 1973 and came into force in 1976.

105    Id. See also Von Glahn, supra note 1, at 193-94.

106    See generally Aid to Liberation Movements in South Africa Urged; United Nations General Assembly Urges Cooperation in Struggle Against Apartheid, 31 U.N. Chron. 74, Feb. 1984; John Morrison, Pretoria's Trade Partners

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 648 of 1305

THE COMPATIBILITY OF THE PRINCIPLE OF..., 7 UCLA J. Int'l L. &...

Urged to Impose Sanctions, Reuters, June 17, 1986; Michael Wise, Anti-Apartheid Groups Urge Tighter South African Arms Ban, Reuters, May 28, 1986; Security Council Votes Anti-Apartheid Measure, N.Y. Times, July 27, 1985, at A4.

107    International Convention Against Apartheid in Sports Signed on 16 May by 43 States, 23 U.N. Chron. 39, Aug. 1986.

108    Richard Bernstein, Mandela Thanks U.N. for Apartheid Fight, N.Y.Times, Oct. 4, 1994, at A3.

109    Rosalyn Higgins, Intervention and International Law, in Intervention in World Politics, supra note 15, at 36. See generally Louis Henkin, The Mythology of Sovereignty, Asil News'l, Mar. 1993, available in LEXIS, Intlaw Library, ASIL File.

110    Sanctions Veto Takes a Trouncing in Both Houses, N.Y. Times, Oct. 5, 1986, at Section IV., 1.

111    Wight, supra note 1, at 191-93.

112    See Karin Von Hippel, The Resurgence of Nationalism and Its International Implications, 17 Wash. Q. 185 (1994). Ethnic self-determination is at the root of most post-cold war civil conflicts. The main risk to the international system as viewed by the U.N. is not war between States, but rather the implosion of States through secessionist and irredentist movements fueled by ethnic self-determination.

113    See Thomas G. Weiss, Intervention: Whither the United Nations?, 17 Wash. Q. 109 (1994). (discussing the myriad regional and internal conflicts the U.N. has been involved in since the end of the Cold War. The article goes on to criticize the lack of consistency in applying U.N. intervention under Chapter VII.).

114    Ruth Gordon, United Nations Intervention in Internal Conflicts: Iraq, Somalia, and Beyond, 15 Mich. J. Int'l L. 519, 544-45 (1994); Gene M. Lyons, A New Collective Security: The United Nations and International Peace, 17 Wash. Q. 171, 178-79 (1994).

115    See generally Von Hippel, supra note 112, at 185.

116    John Stremlau, Antidote to Anarchy, 18 Wash. Q. 27 (1995), Thomas M. Franck, The Emerging Right to Democratic Governance, 86 Am. J. Int'l L. 46 (1992) (emphasizing the growing necessity of democratization for governments to maintain legitimacy and the important role played by the U.N. as impartial observer in bestowing international legitimacy upon States attempting to democratize. U.N. monitoring of elections is discussed as an example.).

117    Henkin, supra note 109.

118    Gordon, supra note 114, at 546-50; S.C. Res. 688, U.N. SCOR, 46th Sess., 2982d mtg., U.N. Doc. S/Res/688 (1991).

119    Neil Hicks, The Iraqi Kurdish Refugee Crisis of 1991, presented at the International Conference: The Kurds, Political Status and Human Rights, Mar. 17, 1993, at 4.

120    Id. at 5.

121    Id. at 4-6; U.S. Department of State, Iraq Human Rights Practices, 1994, Dep't of St. Dispatch, Mar. 1995, available in LEXIS, Intlaw Library, Dstate file.

122    Gordon, supra note 114, at 546-50.

123    Id.

124    Lincoln P. Bloomfield, The Premature Burial of Global Law and Order: Looking Beyond the Three Cases from Hell, 17 Wash. Q. 142, 146 (1994) (noting that, although humanitarian intervention in the 'Kurdistan' region of Northern Iraq was successful, during this same period the Iraqi government was left free to crush rebellions in Southern Iraq by Pro-Iranian and hence Anti-American or Anti-Western Shi'ite Muslims).

125    Franck, supra note 116; Gordon, supra note 114, at 557-60.

126    Gordon, supra note 114, at 557-60; S.C. Res. 841, U.N. SCOR, 48th Sess., 3238th mtg., U.N. Doc. S/Res/841 (1993). Frederic L. Kirgis, Jr., Armed Intervention in Haiti, Asil News'l, Sept. 1994, available in LEXIS, Nexis Library, Allwld File. Kirgis notes, "… when the Security Council first imposed limited economic sanctions on Haiti in June, 1993,

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 649 of 1305

THE COMPATIBILITY OF THE PRINCIPLE OF..., 1 UCLA J. Int'l L. &...

the discussion concerned the urgent need to relieve the humanitarian crisis within the country and to foster a return to democracy." Id.

[127]   Kirgis, supra note 126.

[128]   Id. See also Gordon, supra note 114, at 557-60.

[129]   Angel Lockward, Haiti: Cronologia De Una Crisis 119-23 (1993).

[130]   Id.

[131]   Reuters, Mission to Haiti: Chronology; A Recent History of Haiti, N.Y. Times, Oct. 16, 1994, at Section 1, 18.

[132]   Thomas L. Friedman, Leaders in Haiti Wrong to Think They Can Stall U.S., Clinton Says, N.Y. Times, Oct. 29, 1993, at A6; Howard W. French, U.N. Envoy Proposes Talks to End the Impasse in Haiti, N.Y. Times, Oct. 30, 1993, at Section I, 5.

[133]   Kirgis, supra note 126; U.N. Doc. S/Res/940 (1994).

[134]   Steven Greenhouse, Showdown in Haiti: Police Force, N.Y. Times, Sept. 19, 1994, at A1; Haiti's Military Leaders Agree to Resign; Clinton Halts Assault, Recalls 61 Planes: Restoring Order, N.Y. Times, Sept. 19, 1994, at A1; Larry Rohter, 3000 Troops Land Without Opposition and Take Over Ports and Airfields in Haiti, N.Y. Times, Sept. 20, 1994, at A1. The negotiators included U.S. Senator Sam Nunn, Former President Jimmy Carter, and Retired General Colin Powell.

[135]   Return of Aristide Hailed After Three-Year Exile, 32 U.N. Chron. 4, Mar. 1995. The U.N. lifted economic sanctions against Haiti through Security Council Resolution 944 on the day of Aristide's return to Haiti. U.N. Doc. S/Res/944 (1994). The coup leaders themselves were given asylum as arranged by Panama and the U.S.; Eric Schmitt, U.S. Ready to Declare Haiti 'Secure', N.Y. Times, Jan. 15, 1995, at A8.

[136]   Multinational Force Dispatched to Pave Way for Aristide's Return, 31 U.N. Chron. 20, Dec. 1994. The U.N. Secretary General's annual report on Haiti for 1994 emphasized the coup leaders' failure to honor the Governors Island Accord and noted that there had been a "grave deterioration of the human rights situation." Id.

[137]   Jose E. Alvarez, The Once and Future Security Council, 18 Wash. Q. 5 (1995). Alvarez openly criticizes the U.N. decision to authorize the U.S. to remove the Haitian coup leaders. Moreover, he questions the nature of the threat to the international peace and security posed by Haiti. He suggests that the relatively low threshold for a threat to "peace and security" greatly expands the Security Council's powers and is questionable precedent. Id. at 9-10.

[138]   See Judy Mayotte, Civil War in Sudan: The Paradox of Human Rights and National Sovereignty, 47 J. Int'l Aff. 496 (1994). Mayotte compares the U.N. reaction to the Kurdish refugee crisis with the U.N.'s inaction in the equally tragic Sudanese civil war, arguing that the U.N. should intervene just as it did in Iraq.

[139]   Bloomfield, supra note 124, at 146.

[140]   John G. Taylor, The Indonesian Occupation of East Timor 1974-1989, 63, 79, 100, 129 (1990) (listing figures for deaths in East Timor in the tens of thousands during the mid 1970s and 1980s).

1 UCLAJILFA 221

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# HANDBOOK ON PROCEDURES AND CRITERIA FOR DETERMINING REFUGEE STATUS
# and GUIDELINES ON INTERNATIONAL PROTECTION

## UNDER THE 1951 CONVENTION AND THE 1967 PROTOCOL RELATING TO THE STATUS OF REFUGEES

REISSUED
GENEVA, FEBRUARY 2019



**UNHCR**
The UN Refugee Agency

AR.08058

AR.08059

# HANDBOOK ON PROCEDURES AND CRITERIA FOR DETERMINING REFUGEE STATUS AND GUIDELINES ON INTERNATIONAL PROTECTION

**UNDER THE 1951 CONVENTION AND THE 1967 PROTOCOL RELATING TO THE STATUS OF REFUGEES**

REISSUED
GENEVA, FEBRUARY 2019



**UNHCR**
The UN Refugee Agency

AR.08060

HCR/1P/4/ENG/REV. 4

© 2019 UNHCR.
All rights reserved for all countries.
UNHCR 1979.

# CONTENTS

|  | Paragraphs | Page |
|---|---|---|
| Foreword ............................................................................................ |  | 9 |

## HANDBOOK ON PROCEDURES AND CRITERIA FOR DETERMINING REFUGEE STATUS

| | Paragraphs | Page |
|---|---|---|
| Introduction – International instruments defining the term "refugee" ........................... | 1-27 | 13 |
| A. Early instruments (1921-1946) ........................... | 1-4 | 13 |
| B. 1951 Convention relating to the Status of Refugees ........................... | 5 | 13 |
| C. Protocol relating to the Status of Refugees ........................... | 6-11 | 13 |
| D. Main provisions of the 1951 Convention and the 1967 Protocol ........................... | 12 | 14 |
| E. Statute of the Office of the United Nations High Commissioner for Refugees .......... | 13-19 | 14 |
| F. Regional instruments relating to refugees ........................... | 20-23 | 15 |
| G. Asylum and the treatment of refugees ........................... | 24-27 | 15 |

## PART ONE

| | Paragraphs | Page |
|---|---|---|
| Criteria for the Determination of Refugee Status ........................... | 28-188 | 17 |
| Chapter I – General Principles ........................... | 28-31 | 17 |
| Chapter II – Inclusion Clauses ........................... | 32-110 | 18 |
| A. Definitions ........................... | 32-34 | 18 |
| (1) Statutory Refugees ........................... | 32-33 | 18 |
| (2) General definition in the 1951 Convention ........................... | 34 | 18 |
| B. Interpretation of terms ........................... | 35-110 | 18 |
| (1) "Events occurring before 1 January 1951" ........................... | 35-36 | 18 |
| (2) "well founded fear of being persecuted" ........................... | 37-65 | 19 |
| (a) General analysis ........................... | 37-50 | 19 |
| (b) Persecution ........................... | 51-53 | 21 |
| (c) Discrimination ........................... | 54-55 | 21 |
| (d) Punishment ........................... | 56-60 | 21 |
| (e) Consequences of unlawful departure or unauthorized stay outside country of origin ........................... | 61 | 22 |
| (f) Economic migrants distinguished from refugees ........................... | 62-64 | 22 |
| (g) Agents of persecution ........................... | 65 | 22 |

|  | Paragraphs | Page |
|---|---|---|
| (3) "for reasons of race, religion, nationality, membership of a particular social group or political opinion" | 66-86 | 23 |
| (a) General analysis | 66-67 | 23 |
| (b) Race | 68-70 | 23 |
| (c) Religion | 71-73 | 23 |
| (d) Nationality | 74-76 | 24 |
| (e) Membership of a particular social group | 77-79 | 24 |
| (f) Political opinion | 80-86 | 24 |
| (4) "is outside the country of his nationality" | 87-96 | 25 |
| (a) General analysis | 87-93 | 25 |
| (b) Refugees *sur place* | 94-96 | *26* |
| (5) "and is unable or, owing to such fear, is unwilling to avail himself of the protection of that country" | 97-100 | 26 |
| (6) "or who, not having a nationality and being outside the country of his former habitual residence as a result of such events, is unable or, owing to such fear, is unwilling to return to it" | 101-105 | 27 |
| (7) Dual or multiple nationality | 106-107 | 27 |
| (8) Geographical scope | 108-110 | 28 |
| Chapter III – Cessation Clauses | 111-139 | 29 |
| A. General | 111-117 | 29 |
| B. Interpretation of terms | 118-139 | 30 |
| (1) Voluntary re-availment of national protection | 118-125 | 30 |
| (2) Voluntary re-acquisition of nationality | 126-128 | 31 |
| (3) Acquisition of a new nationality and protection | 129-132 | 31 |
| (4) Voluntary re-establishment in the country where persecution was feared | 133-134 | 32 |
| (5) Nationals whose reasons for becoming a refugee have ceased to exist | 135-136 | 32 |
| (6) Stateless persons whose reasons for becoming a refugee have ceased to exist | 137-139 | 33 |
| Chapter IV – Exclusion Clauses | 140-163 | 34 |
| A. General | 140-141 | 34 |
| B. Interpretation of terms | 142-163 | 34 |
| (1) Persons already receiving United Nations protection or assistance | 142-143 | 34 |
| (2) Persons not considered to be in need of international protection | 144-146 | 34 |
| (3) Persons considered not to be deserving of international protection | 147-163 | 35 |

AR.00663

|  | Paragraphs | Page |
|---|---|---|
| (a) War crimes, etc. | 150 | 35 |
| (b) Common crimes | 151-161 | 36 |
| (c) Acts contrary to the purposes and principles of the United Nations | 162-163 | 37 |
| Chapter V – Special Cases | 164-180 | 38 |
| A. War refugees | 164-166 | 38 |
| B. Deserters and persons avoiding military service | 167-174 | 38 |
| C. Persons having resorted to force or committed acts of violence | 175-180 | 39 |
| Chapter VI – The Principle Of Family Unity | 181-188 | 41 |

## PART TWO

| Procedures for the Determination of Refugee Status | 189-219 | 42 |
|---|---|---|
| A. General | 189-194 | 42 |
| B. Establishing the Facts | 195-205 | 43 |
| (1) Principles and methods | 195-202 | 43 |
| (2) Benefit of the doubt | 203-204 | 44 |
| (3) Summary | 205 | 44 |
| C. Cases Giving Rise to Special Problems in Establishing the Facts | 206-219 | 45 |
| (1) Mentally disturbed persons | 206-212 | 45 |
| (2) Unaccompanied minors | 213-219 | 46 |
| Conclusion | 220-223 | 47 |

## ANNEXES

| Annex I – Excerpt from the Final Act of the United Nations Conference of Plenipotentiaries on the Status of Refugees and Stateless Persons | 48 |
|---|---|
| Annex II – 1951 Convention Relating to the Status of Refugees | 50 |
| Annex III – 1967 Protocol Relating to the Status of Refugees | 66 |
| Annex IV – List of States Parties To The 1951 Convention Relating to the Status of Refugees and the 1967 Protocol | 70 |
| Annex V – Excerpt From the Charter of the International Military Tribunal | 74 |
| Annex VI – International Instruments Relating to Article 1 F(a) of the 1951 Convention | 75 |
| Annex VII – Statute of the Office of the United Nations High Commissioner for Refugees | 76 |

AR.08064

## GUIDELINES ON INTERNATIONAL PROTECTION

GUIDELINES ON INTERNATIONAL PROTECTION NO. 1: Gender-Related Persecution within the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol relating to the Status of Refugees ........................................................................................ 83

GUIDELINES ON INTERNATIONAL PROTECTION NO. 2: "Membership of a particular social group" within the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol relating to the Status of Refugees ........................................................... 93

GUIDELINES ON INTERNATIONAL PROTECTION NO. 3: Cessation of Refugee Status under Article 1C(5) and (6) of the 1951 Convention relating to the Status of Refugees (the "Ceased Circumstances" Clauses) ............................................................................................... 99

GUIDELINES ON INTERNATIONAL PROTECTION NO. 4: "Internal Flight or Relocation Alternative" within the Context of Article 1A(2) of the 1951 Convention and/or 1967 Protocol relating to the Status of Refugees ........................................................................ 107

GUIDELINES ON INTERNATIONAL PROTECTION NO. 5: Application of the Exclusion Clauses: Article 1F of the 1951 Convention relating to the Status of Refugees ................................ 115

GUIDELINES ON INTERNATIONAL PROTECTION NO. 6: Religion-Based Refugee Claims under Article 1A(2) of the 1951 Convention and/or the 1967 Protocol relating to the Status of Refugees .... 123

GUIDELINES ON INTERNATIONAL PROTECTION NO. 7: The application of Article 1A(2) of the 1951 Convention and/or 1967 Protocol relating to the Status of Refugees to victims of trafficking and persons at risk of being trafficked ................................................. 133

GUIDELINES ON INTERNATIONAL PROTECTION NO. 8: Child Asylum Claims under Articles 1(A)2 and 1(F) of the 1951 Convention and/or 1967 Protocol relating to the Status of Refugees ......... 145

GUIDELINES ON INTERNATIONAL PROTECTION NO. 9: Claims to Refugee Status based on Sexual Orientation and/or Gender Identity within the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol relating to the Status of Refugees ...................... 165

GUIDELINES ON INTERNATIONAL PROTECTION NO. 10: Claims to Refugee Status related to Military Service within the context of Article 1A (2) of the 1951 Convention and/or the 1967 Protocol relating to the Status of Refugees ................................................... 185

GUIDELINES ON INTERNATIONAL PROTECTION NO. 11: Prima Facie Recognition of Refugee Status ......................................................................................... 203

GUIDELINES ON INTERNATIONAL PROTECTION NO. 12: Claims for refugee status related to situations of armed conflict and violence under Article 1A(2) of the 1951 Convention and/or 1967 Protocol relating to the Status of Refugees and the regional refugee definitions ................... 215

GUIDELINES ON INTERNATIONAL PROTECTION No. 13: Applicability of Article 1D of the 1951 Convention relating to the Status of Refugees to Palestinian Refugees ........................ 239

INDEX ............................................................................................................. 253

# FOREWORD

For over 65 years, the 1951 Convention relating to the Status of Refugees (1951 Convention), complemented by its 1967 Protocol, has served as the foundation of the refugee protection regime. It provides a universal code for the treatment of refugees uprooted from their countries as a result of persecution, including serious human rights violations or other forms of serious harm, as well as in the context of violence or armed conflict. Its key elements include: a definition of the term refugee (with provisions for inclusion, exclusion and cessation); a guarantee of protection against *refoulement*; and a set of minimum civil, political, economic, social and cultural rights. Complemented by the General Assembly resolution which created UNHCR, and made it functionally responsible for providing international protection and seeking durable solutions for refugees, as well as regional instruments such as the 1969 OAU Convention governing Specific Aspects of Refugee Problems in Africa, the 1984 Cartagena Declaration on Refugees and the Common European Asylum System, the 1951 Convention and its 1967 Protocol have been lifesaving instruments for some of the world's most vulnerable people.

The centrality of the 1951 Convention and its 1967 Protocol to the refugee protection regime is reinforced in two seminal texts: the 2016 New York Declaration for Refugees and Migrants, and the Global Compact on Refugees, affirmed by the General Assembly in 2018. These offer a meaningful set of common undertakings that have the potential to make a real difference in the lives of refugees and their host communities; notably, in the case of the Compact, by building on and complementing the 1951 Convention and relevant regional instruments through the establishment of more predictable and equitable responsibility-sharing arrangements with countries hosting large numbers of refugees. Creating an architecture of support for the countries most affected is fundamental to improvements in refugee protection and assistance, and a stronger focus on solutions from the outset.

The "Handbook and Guidelines on Procedures and Criteria for Determining Refugee Status" (the Handbook) is issued in accordance with UNHCR's supervisory responsibility under its Statute, the 1951 Convention, its 1967 Protocol and regional instruments. It is intended to guide government officials, judges, practitioners, as well as UNHCR colleagues in applying the refugee definition. The Handbook was first issued in September 1979 at the request of Member States of the Executive Committee of the High Commissioner's Programme. A second edition was released in January 1992, which updated information concerning States Parties to the 1951 Convention and 1967 Protocol, and a third edition was issued in December 2011 on the occasion of the 60th anniversary of the 1951 Convention.

The 1951 Convention has proven to be a living and dynamic instrument, and its interpretation and application has continued to evolve through State practice, UNHCR Executive Committee conclusions, academic literature and judicial decisions at national, regional and international levels. To capture this evolution and in line with its mandate, UNHCR has issued a series of legal positions on specific questions of international refugee law entitled "Guidelines on International Protection".[1] Included in this edition are the thirteen Guidelines developed by the Office between 2002 and 2017. They complement and update the Handbook and should be read in combination with it. Amongst other issues, they illustrate the potential of the 1951 Convention, together with regional instruments, to ensure international protection for persons fleeing a wide range of socio-political events, including:

---

[1] See Goal 1, para 6, second point of the Agenda for Protection, endorsed by the Executive Committee of UNHCR's Programme and welcomed by the General Assembly: UN High Commissioner for Refugees (UNHCR), *Agenda for Protection*, October 2003, Third edition, available at: https://www.refworld.org/docid/4714a1bf2.htm

AR.08066

- armed conflict, which is often rooted in and/or conducted along lines of real or perceived racial, ethnic, religious, political, gender or social group divides (Guidelines on International Protection No. 12);

- persecution on the basis of sexual orientation or gender identity (Guidelines on International Protection No. 9); and

- violence perpetrated by organized gangs, traffickers, and other non-State actors, against which the State is unable or unwilling to protect (including Guidelines on International Protection No. 7 and No. 12).

I trust that this latest edition of the Handbook, together with the accompanying Guidelines, will continue to support the full and inclusive application of the 1951 Convention and regional refugee instruments, and ensure international protection for those who need it worldwide.

**Volker Türk**
Assistant High Commissioner for Refugees (Protection)
UNHCR
Geneva, January 2019

AR.08067

# HANDBOOK ON PROCEDURES AND CRITERIA FOR DETERMINING REFUGEE STATUS

**UNDER THE 1951 CONVENTION AND THE 1967 PROTOCOL RELATING TO THE STATUS OF REFUGEES**

AR.08068

AR.08069

# INTRODUCTION – INTERNATIONAL INSTRUMENTS DEFINING THE TERM "REFUGEE"

## A. EARLY INSTRUMENTS (1921-1946)

1. Early in the twentieth century, the refugee problem became the concern of the international community, which, for humanitarian reasons, began to assume responsibility for protecting and assisting refugees.

2. The pattern of international action on behalf of refugees was established by the League of Nations and led to the adoption of a number of international agreements for their benefit. These instruments are referred to in Article 1 A (1) of the 1951 Convention relating to the Status of Refugees (see paragraph 32 below).

3. The definitions in these instruments relate each category of refugees to their national origin, to the territory that they left and to the lack of diplomatic protection by their former home country. With this type of definition "by categories" interpretation was simple and caused no great difficulty in ascertaining who was a refugee.

4. Although few persons covered by the terms of the early instruments are likely to request a formal determination of refugee status at the present time, such cases could occasionally arise. They are dealt with below in Chapter II, A. Persons who meet the definitions of international instruments prior to the 1951 Convention are usually referred to as "statutory refugees".

## B. 1951 CONVENTION RELATING TO THE STATUS OF REFUGEES

5. Soon after the Second World War, as the refugee problem had not been solved, the need was felt for a new international instrument to define the legal status of refugees. Instead of ad hoc agreements adopted in relation to specific refugee situations, there was a call for an instrument containing a general definition of who was to be considered a refugee. The Convention relating to the Status of Refugees was adopted by a Conference of Plenipotentiaries of the United Nations on 28 July 1951, and entered into force on 21 April 1954. In the following paragraphs it is referred to as "the 1951 Convention". (The text of the 1951 Convention will be found in Annex II.)

## C. PROTOCOL RELATING TO THE STATUS OF REFUGEES

6. According to the general definition contained in the 1951 Convention, a refugee is a person who:

> As a result of events occurring before 1 January 1951 and owing to well-founded fear of being persecuted ... is outside his country of nationality ...

7. The 1951 dateline originated in the wish of Governments, at the time the Convention was adopted, to limit their obligations to refugee situations that were known to exist at that time, or to those which might subsequently arise from events that had already occurred.[1]

8. With the passage of time and the emergence of new refugee situations, the need was increasingly felt to make the provisions of the 1951 Convention applicable to such new refugees. As a result, a Protocol relating to the Status of Refugees was prepared. After consideration by the General Assembly of the United Nations, it was opened for accession on 31 January 1967 and entered into force on 4 October 1967.

---

[1] The 1951 Convention also provides for the possibility of introducing a geographic limitation (see paras. 108 to 110 below).

AR.08070

9. By accession to the 1967 Protocol, States undertake to apply the substantive provisions of the 1951 Convention to refugees as defined in the Convention, but without the 1951 dateline. Although related to the Convention in this way, the Protocol is an independent instrument, accession to which is not limited to States parties to the Convention.

10. In the following paragraphs, the 1967 Protocol relating to the Status of Refugees is referred to as "the 1967 Protocol". (The text of the Protocol will be found in Annex III.)

11. At the time of writing, 78 States are parties to the 1951 Convention or to the 1967 Protocol or to both instruments. (A list of the States parties will be found in Annex IV.)

## D. MAIN PROVISIONS OF THE 1951 CONVENTION AND THE 1967 PROTOCOL

12. The 1951 Convention and the 1967 Protocol contain three types of provisions:

(i) Provisions giving the *basic definition* of who is (and who is not) a refugee and who, having been a refugee, has ceased to be one. The discussion and interpretation of these provisions constitute the main body of the present Handbook, intended for the guidance of those whose task it is to determine refugee status.

(ii) Provisions that define the *legal status* of refugees and their rights and duties in their country of refuge. Although these provisions have no influence on the process of determination of refugee status, the authority entrusted with this process should be aware of them, for its decision may indeed have far-reaching effects for the individual or family concerned.

(iii) Other provisions dealing with the *implementation* of the instruments from the administrative and diplomatic standpoint. Article 35 of the 1951 Convention and Article 11 of the 1967 Protocol contain an undertaking by Contracting States to co-operate with the Office of the United Nations High Commissioner for Refugees in the exercise of its functions and, in particular, to facilitate its duty of supervising the application of the provisions of these instruments.

## E. STATUTE OF THE OFFICE OF THE UNITED NATIONS HIGH COMMISSIONER FOR REFUGEES

13. The instruments described above under A-C define the persons who are to be considered refugees and require the parties to accord a certain status to refugees in their respective territories.

14. Pursuant to a decision of the General Assembly, the Office of the United Nations High Commissioner for Refugees ("UNHCR") was established as of 1 January 1951. The Statute of the Office is annexed to Resolution 428 (V), adopted by the General Assembly on 14 December 1950. According to the Statute, the High Commissioner is called upon – *inter alia* – to provide international protection, under the auspices of the United Nations, to refugees falling within the competence of his Office.

15. The Statute contains definitions of those persons to whom the High Commissioner's competence extends, which are very close to, though not identical with, the definition contained in the 1951 Convention. By virtue of these definitions the High Commissioner is competent for refugees irrespective of any dateline[2] or geographic limitation.[3]

16. Thus, a person who meets the criteria of the UNHCR Statute qualifies for the protection of the United Nations provided by the High Commissioner, regardless of whether or not he is in a country that is a party to the 1951 Convention or the 1967 Protocol or whether or not he has been recognized

---

[2] See paras. 35 and 36 below.
[3] See paras. 108 and 110 below.

AR.08071

by his host country as a refugee under either of these instruments. Such refugees, being within the High Commissioner's mandate, are usually referred to as "mandate refugees".

17. From the foregoing, it will be seen that a person can simultaneously be both a mandate refugee *and* a refugee under the 1951 Convention or the 1967 Protocol. He may, however, be in a country that is not bound by either of these instruments, or he may be excluded from recognition as a Convention refugee by the application of the dateline or the geographic limitation. In such cases he would still qualify for protection by the High Commissioner under the terms of the Statute.

18. The above mentioned Resolution 428 (V) and the Statute of the High Commissioner's Office call for co-operation between Governments and the High Commissioner's Office in dealing with refugee problems. The High Commissioner is designated as the authority charged with providing inter-national protection to refugees, and is required *inter alia* to promote the conclusion and ratification of international conventions for the protection of refugees, and to supervise their application.

19. Such co-operation, combined with his supervisory function, forms the basis for the High Commissioner's fundamental interest in the process of determining refugee status under the 1951 Convention and the 1967 Protocol. The part played by the High Commissioner is reflected, to varying degrees, in the procedures for the determination of refugee status established by a number of Governments.

## F. REGIONAL INSTRUMENTS RELATING TO REFUGEES

20. In addition to the 1951 Convention and the 1967 Protocol, and the Statute of the Office of the United Nations High Commissioner for Refugees, there are a number of regional agreements, conventions and other instruments relating to refugees, particularly in Africa, the Americas and Europe. These regional instruments deal with such matters as the granting of asylum, travel documents and travel facilities, etc. Some also contain a definition of the term "refugee", or of persons entitled to asylum.

21. In Latin America, the problem of diplomatic and territorial asylum is dealt with in a number of regional instruments including the Treaty on International Penal Law, (Montevideo, 1889); the Agreement on Extradition, (Caracas, 1911); the Convention on Asylum, (Havana, 1928); the Convention on Political Asylum, (Montevideo, 1933); the Convention on Diplomatic Asylum, (Caracas, 1954); and the Convention on Territorial Asylum, (Caracas, 1954).

22. A more recent regional instrument is the Convention Governing the Specific Aspects of Refugee Problems in Africa, adopted by the Assembly of Heads of State and Government of the Organization of African Unity on 10 September 1969. This Convention contains a definition of the term "refugee", consisting of two parts: the first part is identical with the definition in the 1967 Protocol (i.e. the definition in the 1951 Convention without the dateline or geographic limitation). The second part applies the term "refugee" to:

> every person who, owing to external aggression, occupation, foreign domination or events seriously disturbing public order in either part or the whole of his country of origin or nationality, is compelled to leave his place of habitual residence in order to seek refuge in another place outside his country of origin or nationality.

23. The present Handbook deals only with the determination of refugee status under the two international instruments of universal scope: the 1951 Convention and the 1967 Protocol.

## G. ASYLUM AND THE TREATMENT OF REFUGEES

24. The Handbook does not deal with questions closely related to the determination of refugee status e.g. the granting of asylum to refugees or the legal treatment of refugees after they have been recognized as such.

AR.08072

25. Although there are references to asylum in the Final Act of the Conference of Plenipotentiaries as well as in the Preamble to the Convention, the granting of asylum is not dealt with in the 1951 Convention or the 1967 Protocol. The High Commissioner has always pleaded for a generous asylum policy in the spirit of the Universal Declaration of Human Rights and the Declaration on Territorial Asylum, adopted by the General Assembly of the United Nations on 10 December 1948 and on 14 December 1967 respectively.

26. With respect to the treatment within the territory of States, this is regulated as regards refugees by the main provisions of the 1951 Convention and 1967 Protocol (see paragraph 12(ii) above). Furthermore, attention should be drawn to Recommendation E contained in the Final Act of the Conference of Plenipotentiaries which adopted the 1951 Convention:

> The Conference
>
> Expresses the hope that the Convention relating to the Status of Refugees will have value as an example exceeding its contractual scope and that all nations will be guided by it in granting so far as possible to persons in their territory as refugees and who would not be covered by the terms of the Convention, the treatment for which it provides.

27. This recommendation enables States to solve such problems as may arise with regard to persons who are not regarded as fully satisfying the criteria of the definition of the term "refugee".

AR.08073

# PART ONE

**CRITERIA FOR THE DETERMINATION OF REFUGEE STATUS**

## CHAPTER I – GENERAL PRINCIPLES

28. A person is a refugee within the meaning of the 1951 Convention as soon as he fulfils the criteria contained in the definition. This would necessarily occur prior to the time at which his refugee status is formally determined. Recognition of his refugee status does not therefore make him a refugee but declares him to be one. He does not become a refugee because of recognition, but is recognized because he is a refugee.

29. Determination of refugee status is a process which takes place in two stages. Firstly, it is necessary to ascertain the relevant facts of the case. Secondly, the definitions in the 1951 Convention and the 1967 Protocol have to be applied to the facts thus ascertained.

30. The provisions of the 1951 Convention defining who is a refugee consist of three parts, which have been termed respectively "inclusion", "cessation" and "exclusion" clauses.

31. The inclusion clauses define the criteria that a person must satisfy in order to be a refugee. They form the positive basis upon which the determination of refugee status is made. The so-called cessation and exclusion clauses have a negative significance; the former indicate the conditions under which a refugee ceases to be a refugee and the latter enumerate the circumstances in which a person is excluded from the application of the 1951 Convention although meeting the positive criteria of the inclusion clauses.

AR.08074

# CHAPTER II – INCLUSION CLAUSES

## A. DEFINITIONS

### (1) Statutory Refugees

32. Article 1 A (1) of the 1951 Convention deals with statutory refugees, i.e. persons considered to be refugees under the provisions of international instruments preceding the Convention. This provision states that:

> For the purposes of the present Convention, the term 'refugee' shall apply to any person who:
>
> (1) Has been considered a refugee under the Arrangements of 12 May 1926 and 30 June 1928 or under the Conventions of 28 October 1933 and 10 February 1938, the Protocol of 14 September 1939 or the Constitution of the International Refugee Organization;
>
> Decisions of non-eligibility taken by the International Refugee Organization during the period of its activities shall not prevent the status of refugees being accorded to persons who fulfil the conditions of paragraph 2 of this section.

33. The above enumeration is given in order to provide a link with the past and to ensure the continuity of international protection of refugees who became the concern of the international community at various earlier periods. As already indicated (para. 4 above), these instruments have by now lost much of their significance, and a discussion of them here would be of little practical value. However, a person who has been considered a refugee under the terms of any of these instruments is automatically a refugee under the 1951 Convention. Thus, a holder of a so-called "Nansen Passport"[4] or a "Certificate of Eligibility" issued by the International Refugee Organization must be considered a refugee under the 1951 Convention unless one of the cessation clauses has become applicable to his case or he is excluded from the application of the Convention by one of the exclusion clauses. This also applies to a surviving child of a statutory refugee.

### (2) General definition in the 1951 Convention

34. According to Article 1 A (2) of the 1951 Convention the term "refugee" shall apply to any person who:

> As a result of events occurring before 1 January 1951 and owing to well founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality and is unable or, owing to such fear, is unwilling to avail himself of the protection of that country; or who, not having a nationality and being outside the country of his former habitual residence as a result of such events, is unable or, owing to such fear, is unwilling to return to it.

This general definition is discussed in detail below.

## B. INTERPRETATION OF TERMS

### (1) "Events occurring before 1 January 1951"

35. The origin of this 1951 dateline is explained in paragraph 7 of the Introduction. As a result of the 1967 Protocol this dateline has lost much of its practical significance. An interpretation of the word "events" is therefore of interest only in the small number of States parties to the 1951 Convention that are not also party to the 1967 Protocol.[5]

---

[4] "Nansen Passport": a certificate of identity for use as a travel document, issued to refugees under the provisions of prewar instruments.
[5] See Annex IV.

AR.08075

36. The word "events" is not defined in the 1951 Convention, but was understood to mean "happenings of major importance involving territorial or profound political changes as well as systematic programmes of persecution which are after-effects of earlier changes".[6] The dateline refers to "events" as a result of which, and not to the date on which, a person becomes a refugee, not does it apply to the date on which he left his country. A refugee may have left his country before or after the datelines, provided that his fear of persecution is due to "events" that occurred before the dateline or to after-effects occurring at a later date as a result of such events.[7]

## (2) "well founded fear of being persecuted"

### (a) General analysis

37. The phrase "well-founded fear of being persecuted" is the key phrase of the definition. It reflects the views of its authors as to the main elements of refugee character. It replaces the earlier method of defining refugees by categories (i.e. persons of a certain origin not enjoying the protection of their country) by the general concept of "fear" for a relevant motive. Since fear is subjective, the definition involves a subjective element in the person applying for recognition as a refugee. Determination of refugee status will therefore primarily require an evaluation of the applicant's statements rather than a judgement on the situation prevailing in his country of origin.

38. To the element of fear – a state of mind and a subjective condition – is added the qualification "well-founded". This implies that it is not only the frame of mind of the person concerned that determines his refugee status, but that this frame of mind must be supported by an objective situation. The term "well-founded fear" therefore contains a subjective and an objective element, and in determining whether well-founded fear exists, both elements must be taken into consideration.

39. It may be assumed that, unless he seeks adventure or just wishes to see the world, a person would not normally abandon his home and country without some compelling reason. There may be many reasons that are compelling and understandable, but only one motive has been singled out to denote a refugee. The expression "owing to well-founded fear of being persecuted" – for the reasons stated – by indicating a specific motive automatically makes all other reasons for escape irrelevant to the definition. It rules out such persons as victims of famine or natural disaster, unless they also have well-founded fear of persecution for one of the reasons stated. Such other motives may not, however, be altogether irrelevant to the process of determining refugee status, since all the circumstances need to be taken into account for a proper understanding of the applicant's case.

40. An evaluation of the *subjective element* is inseparable from an assessment of the personality of the applicant, since psychological reactions of different individuals may not be the same in identical conditions. One person may have strong political or religious convictions, the disregard of which would make his life intolerable; another may have no such strong convictions. One person may make an impulsive decision to escape; another may carefully plan his departure.

41. Due to the importance that the definition attaches to the subjective element, an assessment of credibility is indispensable where the case is not sufficiently clear from the facts on record. It will be necessary to take into account the personal and family background of the applicant, his membership of a particular racial, religious, national, social or political group, his own interpretation of his situation, and his personal experiences – in other words, everything that may serve to indicate that the predominant motive for his application is fear. Fear must be reasonable. Exaggerated fear, however, may be well-founded if, in all the circumstances of the case, such a state of mind can be regarded as justified.

42. As regards the objective clement, it is necessary to evaluate the statements made by the applicant. The competent authorities that are called upon to determine refugee status are not required to pass judgement on conditions in the applicant's country of origin. The applicant's statements cannot, however, be considered in the abstract, and must be viewed in the context of the relevant background

---

[6] UN Document E/1618 page 39.
[7] *Loc. cit.*

situation. A knowledge of conditions in the applicant's country of origin –while not a primary objective – is an important element in assessing the applicant's credibility. In general, the applicant's fear should be considered well-founded if he can establish, to a reasonable degree, that his continued stay in his country of origin has become intolerable to him for the reasons stated in the definition, or would for the same reasons be intolerable if he returned there.

43. These considerations need not necessarily be based on the applicant's own personal experience. What, for example, happened to his friends and relatives and other members of the same racial or social group may well show that his fear that sooner or later he also will become a victim of persecution is well-founded. The laws of the country of origin, and particularly the manner in which they are applied, will be relevant. The situation of each person must, however, be assessed on its own merits. In the case of a well-known personality, the possibility of persecution may be greater than in the case of a person in obscurity. All these factors, e.g. a person's character, his background, his influence, his wealth or his outspokenness, may lead to the conclusion that his fear of persecution is "well-founded".

44. While refugee status must normally be determined on an individual basis, situations have also arisen in which entire groups have been displaced under circumstances indicating that members of the group could be considered individually as refugees. In such situations the need to provide assistance is often extremely urgent and it may not be possible for purely practical reasons to carry out an individual determination of refugee status for each member of the group. Recourse has therefore been had to so-called "group determination" of refugee status, whereby each member of the group is regarded *prima facie* (i.e. in the absence of evidence to the contrary) as a refugee.

45. Apart from the situations of the type referred to in the preceding paragraph, an applicant for refugee status must normally show good reason why he individually fears persecution. It may be assumed that a person has well-founded fear of being persecuted if he has already been the victim of persecution for one of the reasons enumerated in the 1951 Convention. However, the word "fear" refers not only to persons who have actually been persecuted, but also to those who wish to avoid a situation entailing the risk of persecution.

46. The expressions "fear of persecution" or even "persecution" are usually foreign to a refugee's normal vocabulary. A refugee will indeed only rarely invoke "fear of persecution" in these terms, though it will often be implicit in his story. Again, while a refugee may have very definite opinions for which he has had to suffer, he may not, for psychological reasons, be able to describe his experiences and situation in political terms.

47. A typical test of the well-foundedness of fear will arise when an applicant is in possession of a valid national passport. It has sometimes been claimed that possession of a passport signifies that the issuing authorities do not intend to persecute the holder, for otherwise they would not have issued a passport to him. Though this may be true in some cases, many persons have used a legal exit from their country as the only means of escape without ever having revealed their political opinions, a knowledge of which might place them in a dangerous situation vis-à-vis the authorities.

48. Possession of a passport cannot therefore always be considered as evidence of loyalty on the part of the holder, or as an indication of the absence of fear. A passport may even be issued to a person who is undesired in his country of origin, with the sole purpose of securing his departure, and there may also be cases where a passport has been obtained surreptitiously. In conclusion, therefore, the mere possession of a valid national passport is no bar to refugee status.

49. If, on the other hand, an applicant, without good reason, insists on retaining a valid passport of a country of whose protection he is allegedly unwilling to avail himself, this may cast doubt on the validity of his claim to have "well-founded fear". Once recognized, a refugee should not normally retain his national passport.

50. There may, however, be exceptional situations in which a person fulfilling the criteria of refugee status may retain his national passport-or be issued with a new one by the authorities of his country of origin under special arrangements. Particularly where such arrangements do not imply that the

AR.08077

holder of the national passport is free to return to his country without prior permission, they may not be incompatible with refugee status.

## (b) Persecution

51. There is no universally accepted definition of "persecution", and various attempts to formulate such a definition have met with little success. From Article 33 of the 1951 Convention, it may be inferred that a threat to life or freedom on account of race, religion, nationality, political opinion or membership of a particular social group is always persecution. Other serious violations of human rights – for the same reasons – would also constitute persecution.

52. Whether other prejudicial actions or threats would amount to persecution will depend on the circumstances of each case, including the subjective element to which reference has been made in the preceding paragraphs. The subjective character of fear of persecution requires an evaluation of the opinions and feelings of the person concerned. It is also in the light of such opinions and feelings that any actual or anticipated measures against him must necessarily be viewed. Due to variations in the psychological make-up of individuals and in the circumstances of each case, interpretations of what amounts to persecution are bound to vary.

53. In addition, an applicant may have been subjected to various measures not in themselves amounting to persecution (e.g. discrimination in different forms), in some cases combined with other adverse factors (e.g. general atmosphere of insecurity in the country of origin). In such situations, the various elements involved may, if taken together, produce an effect on the mind of the applicant that can reasonably justify a claim to well-founded fear of persecution on "cumulative grounds". Needless to say, it is not possible to lay down a general rule as to what cumulative reasons can give rise to a valid claim to refugee status. This will necessarily depend on all the circumstances, including the particular geographical, historical and ethnological context.

## (c) Discrimination

54. Differences in the treatment of various groups do indeed exist to a greater or lesser extent in many societies. Persons who receive less favourable treatment as a result of such differences are not necessarily victims of persecution. It is only in certain circumstances that discrimination will amount to persecution. This would be so if measures of discrimination lead to consequences of a substantially prejudicial nature for the person concerned, e.g. serious restrictions on his right to earn his livelihood, his right to practise his religion, or his access to normally available educational facilities.

55. Where measures of discrimination are, in themselves, not of a serious character, they may nevertheless give rise to a reasonable fear of persecution if they produce, in the mind of the person concerned, a feeling of apprehension and insecurity as regards his future existence. Whether or not such measures of discrimination in themselves amount to persecution must be determined in the light of all the circumstances. A claim to fear of persecution will of course be stronger where a person has been the victim of a number of discriminatory measures of this type and where there is thus a cumulative element involved.[8]

## (d) Punishment

56. Persecution must be distinguished from punishment for a common law offence. Persons fleeing from prosecution or punishment for such an offence are not normally refugees. It should be recalled that a refugee is a victim – or potential victim – of injustice, not a fugitive from justice.

57. The above distinction may, however, occasionally be obscured. In the first place, a person guilty of a common law offence may be liable to excessive punishment, which may amount to persecution within the meaning of the definition. Moreover, penal prosecution for a reason mentioned in the definition (for example, in respect of "illegal" religious instruction given to a child) may in itself amount to persecution.

---

[8] See also para. 53.

58. Secondly, there may be cases in which a person, besides fearing prosecution or punishment for a common law crime, may also have "well founded fear of persecution". In such cases the person concerned is a refugee. It may, however, be necessary to consider whether the crime in question is not of such a serious character as to bring the applicant within the scope of one of the exclusion clauses.[9]

59. In order to determine whether prosecution amounts to persecution, it will also be necessary to refer to the laws of the country concerned, for it is possible for a law not to be in conformity with accepted human rights standards. More often, however, it may not be the law but its application that is discriminatory. Prosecution for an offence against "public order", e.g. for distribution of pamphlets, could for example be a vehicle for the persecution of the individual on the grounds of the political content of the publication.

60. In such cases, due to the obvious difficulty involved in evaluating the laws of another country, national authorities may frequently have to take decisions by using their own national legislation as a yardstick. Moreover, recourse may usefully be had to the principles set out in the various international instruments relating to human rights, in particular the International Covenants on Human Rights, which contain binding commitments for the States parties and are instruments to which many States parties to the 1951 Convention have acceded.

**(e) Consequences of unlawful departure or unauthorized stay outside country of origin**

61. The legislation of certain States imposes severe penalties on nationals who depart from the country in an unlawful manner or remain abroad without authorization. Where there is reason to believe that a person, due to his illegal departure or unauthorized stay abroad is liable to such severe penalties his recognition as a refugee will be justified if it can be shown that his motives for leaving or remaining outside the country are related to the reasons enumerated in Article 1 A (2) of the 1951 Convention (see paragraph 66 below).

**(f) Economic migrants distinguished from refugees**

62. A migrant is a person who, for reasons other than those contained in the definition, voluntarily leaves his country in order to take up residence elsewhere. He may be moved by the desire for change or adventure, or by family or other reasons of a personal nature. If he is moved exclusively by economic considerations, he is an economic migrant and not a refugee.

63. The distinction between an economic migrant and a refugee is, however, sometimes blurred in the same way as the distinction between economic and political measures in an applicant's country of origin is not always clear. Behind economic measures affecting a person's livelihood there may be racial, religious or political aims or intentions directed against a particular group. Where economic measures destroy the economic existence of a particular section of the population (e.g. withdrawal of trading rights from, or discriminatory or excessive taxation of, a specific ethnic or religious group), the victims may according to the circumstances become refugees on leaving the country.

64. Whether the same would apply to victims of general economic measures (i.e. those that are applied to the whole population without discrimination) would depend on the circumstances of the case. Objections to general economic measures are not by themselves good reasons for claiming refugee status. On the other hand, what appears at first sight to be primarily an economic motive for departure may in reality also involve a political element, and it may be the political opinions of the individual that expose him to serious consequences, rather than his objections to the economic measures themselves.

**(g) Agents of persecution**

65. Persecution is normally related to action by the authorities of a country. It may also emanate from sections of the population that do not respect the standards established by the laws of the country

---

[9] See para. 144 to 156.

concerned. A case in point may be religious intolerance, amounting to persecution, in a country otherwise secular, but where sizeable fractions of the population do not respect the religious beliefs of their neighbours. Where serious discriminatory or other offensive acts are committed by the local populace, they can be considered as persecution if they are knowingly tolerated by the authorities, or if the authorities refuse, or prove unable, to offer effective protection.

### (3) "for reasons of race, religion, nationality, membership of a particular social group or political opinion"

#### (a) General analysis

66. In order to be considered a refugee, a person must show well-founded fear of persecution for one of the reasons stated above. It is immaterial whether the persecution arises from any single one of these reasons or from a combination of two or more of them. Often the applicant himself may not be aware of the reasons for the persecution feared. It is not, however, his duty to analyze his case to such an extent as to identify the reasons in detail.

67. It is for the examiner, when investigating the facts of the case, to ascertain the reason or reasons for the persecution feared and to decide whether the definition in the 1951 Convention is met with in this respect. It is evident that the reasons for persecution under these various headings will frequently overlap. Usually there will be more than one clement combined in one person, e.g. a political opponent who belongs to a religious or national group, or both, and the combination of such reasons in his person may be relevant in evaluating his well-founded fear.

#### (b) Race

68. Race, in the present connexion, has to be understood in its widest sense to include all kinds of ethnic groups that are referred to as "races" in common usage. Frequently it will also entail membership of a specific social group of common descent forming a minority within a larger population. Discrimination for reasons of race has found world-wide condemnation as one of the most striking violations of human rights. Racial discrimination, therefore, represents an important element in determining the existence of persecution.

69. Discrimination on racial grounds will frequently amount to persecution in the sense of the 1951 Convention. This will be the case if, as a result of racial discrimination, a person's human dignity is affected to such an extent as to be incompatible with the most elementary and inalienable human rights, or where the disregard of racial barriers is subject to serious consequences.

70. The mere fact of belonging to a certain racial group will normally not be enough to substantiate a claim to refugee status. There may, however, be situations where, due to particular circumstances affecting the group, such membership will in itself be sufficient ground to fear persecution.

#### (c) Religion

71. The Universal Declaration of Human Rights and the Human Rights Covenant proclaim the right to freedom of thought, conscience and religion, which right includes the freedom of a person to change his religion and his freedom to manifest it in public or private, in teaching, practice, worship and observance.

72. Persecution for "reasons of religion" may assume various forms, e.g. prohibition of membership of a religious community, of worship in private or in public, of religious instruction, or serious measures of discrimination imposed on persons because they practise their religion or belong to a particular religious community.

73. Mere membership of a particular religious community will normally not be enough to substantiate a claim to refugee status. There may, however, be special circumstances where mere membership can be a sufficient ground.

AR.08080

23

**(d) Nationality**

74. The term "nationality" in this context is not to be understood only as "citizenship". It refers also to membership of an ethnic or linguistic group and may occasionally overlap with the term "race". Persecution for reasons of nationality may consist of adverse attitudes and measures directed against a national (ethnic, linguistic) minority and in certain circumstances the fact of belonging to such a minority may in itself give rise to well-founded fear of persecution.

75. The co-existence within the boundaries of a State of two or more national (ethnic, linguistic) groups may create situations of conflict and also situations of persecution or danger of persecution. It may not always be easy to distinguish between persecution for reasons of nationality and persecution for reasons of political opinion when a conflict between national groups is combined with political movements, particularly where a political movement is identified with a specific "nationality".

76. Whereas in most cases persecution for reason of nationality is feared by persons belonging to a national minority, there have been many cases in various continents where a person belonging to a majority group may fear persecution by a dominant minority.

**(e) Membership of a particular social group**

77. A "particular social group" normally comprises persons of similar background, habits or social status. A claim to fear of persecution under this heading may frequently overlap with a claim to fear of persecution on other grounds, i.e. race, religion or nationality.

78. Membership of such a particular social group may be at the root of persecution because there is no confidence in the group's loyalty to the Government or because the political outlook, antecedents or economic activity of its members, or the very existence of the social group as such, is held to be an obstacle to the Government's policies.

79. Mere membership of a particular social group will not normally be enough to substantiate a claim to refugee status. There may, however, be special circumstances where mere membership can be a sufficient ground to fear persecution.

**(f) Political opinion**

80. Holding political opinions different from those of the Government is not in itself a ground for claiming refugee status, and an applicant must show that he has a fear of persecution for holding such opinions. This presupposes that the applicant holds opinions not tolerated by the authorities, which are critical of their policies or methods. It also presupposes that such opinions have come to the notice of the authorities or are attributed by them to the applicant. The political opinions of a teacher or writer may be more manifest than those of a person in a less exposed position. The relative importance or tenacity of the applicant's opinions – in so far as this can be established from all the circumstances of the case – will also be relevant.

81. While the definition speaks of persecution "for reasons of political opinion" it may not always be possible to establish a causal link between the opinion expressed and the related measures suffered or feared by the applicant. Such measures have only rarely been based expressly on "opinion". More frequently, such measures take the form of sanctions for alleged criminal acts against the ruling power. It will, therefore, be necessary to establish the applicant's political opinion, which is at the root of his behaviour, and the fact that it has led or may lead to the persecution that he claims to fear.

82. As indicated above, persecution "for reasons of political opinion" implies that an applicant holds an opinion that either has been expressed or has come to the attention of the authorities. There may, however, also be situations in which the applicant has not given any expression to his opinions. Due to the strength of his convictions, however, it may be reasonable to assume that his opinions will sooner or later find expression and that the applicant will, as a result, come into conflict with the authorities. Where this can reasonably be assumed, the applicant can be considered to have fear of persecution for reasons of political opinion.

AR.08081

83. An applicant claiming fear of persecution because of political opinion need not show that the authorities of his country of origin knew of his opinions before he left the country. He may have concealed his political opinion and never have suffered any discrimination or persecution. However, the mere fact of refusing to avail himself of the protection of his Government, or a refusal to return, may disclose the applicant's true state of mind and give rise to fear of persecution. In such circumstances the test of well-founded fear would be based on an assessment of the consequences that an applicant having certain political dispositions would have to face if he returned. This applies particularly to the so-called refugee "sur place".[10]

84. Where a person is subject to prosecution or punishment for a political offence, a distinction may have to be drawn according to whether the prosecution is for political *opinion* or for politically-motivated *acts*. If the prosecution pertains to a punishable act committed out of political motives, and if the anticipated punishment is in conformity with the general law of the country concerned, fear of such prosecution will not in itself make the applicant a refugee.

85. Whether a political offender can also be considered a refugee will depend upon various other factors. Prosecution for an offence may, depending upon the circumstances, be a pretext for punishing the offender for his political opinions or the expression thereof. Again, there may be reason to believe that a political offender would be exposed to excessive or arbitrary punishment for the alleged offence. Such excessive or arbitrary punishment will amount to persecution.

86. In determining whether a political offender can be considered a refugee, regard should also be had to the following elements: personality of the applicant, his political opinion, the motive behind the act, the nature of the act committed, the nature of the prosecution and its motives; finally, also, the nature of the law on which the prosecution is based. These elements may go to show that the person concerned has a fear of persecution and not merely a fear of prosecution and punishment – within the law – for an act committed by him.

## (4) "is outside the country of his nationality"

### (a) General analysis

87. In this context, "nationality" refers to "citizenship". The phrase "is outside the country of his nationality" relates to persons who have a nationality, as distinct from stateless persons. In the majority of cases, refugees retain the nationality of their country of origin.

88. It is a general requirement for refugee status that an applicant who has a nationality be outside the country of his nationality. There are no exceptions to this rule. International protection cannot come into play as long as a person is within the territorial jurisdiction of his home country.[11]

89. Where, therefore, an applicant alleges fear of persecution in relation to the country of his nationality, it should be established that he does in fact possess the nationality of that country. There may, however, be uncertainty as to whether a person has a nationality. He may not know himself, or he may wrongly claim to have a particular nationality or to be stateless. Where his nationality cannot be clearly established, his refugee status should be determined in a similar manner to that of a stateless person, i.e. instead of the country of his nationality, the country of his former habitual residence will have to be taken into account. (See paragraphs 101 to 105 below.)

90. As mentioned above, an applicant's well-founded fear of persecution must be in relation to the country of his nationality. As long as he has no fear in relation to the country of his nationality, he can be expected to avail himself of that country's protection. He is not in need of international protection and is therefore not a refugee.

---

[10] See paras. 94 to 96.
[11] In certain countries, particularly in Latin America, there is a custom of "diplomatic asylum", i.e. granting refuge to political fugitives in foreign embassies. While a person thus sheltered may be considered to be outside his country's jurisdiction, he is not outside its territory and cannot therefore be considered under the terms of the 1951 Convention. The former notion of the "extraterritoriality" of embassies has lately been replaced by the term "inviolability" used in the 1961 Vienna Convention on Diplomatic Relations.

AR.08082

91. The fear of being persecuted need not always extend to the *whole* territory of the refugee's country of nationality. Thus in ethnic clashes or in cases of grave disturbances involving civil war conditions, persecution of a specific ethnic or national group may occur in only one part of the country. In such situations, a person will not be excluded from refugee status merely because he could have sought refuge in another part of the same country, if under all the circumstances it would not have been reasonable to expect him to do so.

92. The situation of persons having more than one nationality is dealt with in paragraphs 106 and 107 below.

93. Nationality may be proved by the possession of a national passport. Possession of such a passport creates a *prima facie* presumption that the holder is a national of the country of issue, unless the passport itself states otherwise. A person holding a passport showing him to be a national of the issuing country, but who claims that he does not possess that country's nationality, must substantiate his claim, for example, by showing that the passport is a so-called "passport of convenience" (an apparently regular national passport that is sometimes issued by a national authority to non-nationals). However, a mere assertion by the holder that the passport was issued to him as a matter of convenience for travel purposes only is not sufficient to rebut the presumption of nationality. In certain cases, it might be possible to obtain information from the authority that issued the passport. If such information cannot be obtained, or cannot be obtained within reasonable time, the examiner will have to decide on the credibility of the applicant's assertion in weighing all other elements of his story.

**(b) Refugees *"sur place"***

94. The requirement that a person must be outside his country to be a refugee does not mean that he must necessarily have left that country illegally, or even that he must have left it on account of well-founded fear. He may have decided to ask for recognition of his refugee status after having already been abroad for some time. A person who was not a refugee when he left his country, but who becomes a refugee at a later date, is called a refugee *"sur place"*.

95. A person becomes a refugee *"sur place"* due to circumstances arising in his country of origin during his absence. Diplomats and other officials serving abroad, prisoners of war, students, migrant workers and others have applied for refugee status during their residence abroad and have been recognized as refugees.

96. A person may become a refugee *"sur place"* as a result of his own actions, such as associating with refugees already recognized, or expressing his political views in his country of residence. Whether such actions are sufficient to justify a well-founded fear of persecution must be determined by a careful examination of the circumstances. Regard should be had in particular to whether such actions may have come to the notice of the authorities of the person's country of origin and how they are likely to be viewed by those authorities.

## (5) "and is unable or, owing to such fear, is unwilling to avail himself of the protection of that country"

97. Unlike the phrase dealt with under (6) below, the present phrase relates to persons who have a nationality. Whether unable or unwilling to avail himself of the protection of his Government, a refugee is always a person who does not enjoy such protection.

98. Being *unable* to avail himself of such protection implies circumstances that are beyond the will of the person concerned. There may, for example, be a state of war, civil war or other grave disturbance, which prevents the country of nationality from extending protection or makes such protection ineffective. Protection by the country of nationality may also have been denied to the applicant. Such denial of protection may confirm or strengthen the applicant's fear of persecution, and may indeed be an element of persecution.

AR.08083

99. What constitutes a refusal of protection must be determined according to the circumstances of the case. If it appears that the applicant has been denied services (e.g., refusal of a national passport or extension of its validity, or denial of admittance to the home territory) normally accorded to his co-nationals, this may constitute a refusal of protection within the definition.

100. The term *unwilling* refers to refugees who refuse to accept the protection of the Government of the country of their nationality.[12] It is qualified by the phrase "owing to such fear". Where a person is willing to avail himself of the protection of his home country, such willingness would normally be incompatible with a claim that he is outside that country "owing to well-founded fear of persecution". Whenever the protection of the country of nationality is available, and there is no ground based on well-founded fear for refusing it, the person concerned is not in need of international protection and is not a refugee.

## (6) "or who, not having a nationality and being outside the country of his former habitual residence as a result of such events, is unable or, owing to such fear, is unwilling to return to it"

101. This phrase, which relates to stateless refugees, is parallel to the preceding phrase, which concerns refugees who have a nationality. In the case of stateless refugees, the "country of nationality" is replaced by "the country of his former habitual residence", and the expression "unwilling to avail himself of the protection..." is replaced by the words "unwilling to return to it". In the case of a stateless refugee, the question of "availment of protection" of the country of his former habitual residence does not, of course, arise. Moreover, once a stateless person has abandoned the country of his former habitual residence for the reasons indicated in the definition, he is usually unable to return.

102. It will be noted that not all stateless persons are refugees. They must be outside the country of their former habitual residence for the reasons indicated in the definition. Where these reasons do not exist, the stateless person is not a refugee.

103. Such reasons must be examined in relation to the country of "former habitual residence" in regard to which fear is alleged. This was defined by the drafters of the 1951 Convention as "the country in which he had resided and where he had suffered or fears he would suffer persecution if he returned".[13]

104. A stateless person may have more than one country of former habitual residence, and he may have a fear of persecution in relation to more than one of them. The definition does not require that he satisfies the criteria in relation to all of them.

105. Once a stateless person has been determined a refugee in relation to "the country of his former habitual residence", any further change of country of habitual residence will not affect his refugee status.

## (7) Dual or multiple nationality

Article 1 A (2), paragraph 2, of the 1951 Convention:

> In the case of a person who has more than one nationality, the term "the country of his nationality" shall mean each of the countries of which he is a national, and a person shall not be deemed to be lacking the protection of the country of his nationality if, without any valid reason based on well-founded fear, he has not availed himself of the protection of one of the countries of which he is a national.

106. This clause, which is largely self-explanatory, is intended to exclude from refugee status all persons with dual or multiple nationality who can avail themselves of the protection of at least one of the countries of which they are nationals. Wherever available, national protection takes precedence over international protection.

---

[12] UN Document E/1618, p. 39.
[13] *Loc. cit.*

AR.08084

107. In examining the case of an applicant with dual or multiple nationality, it is necessary, however, to distinguish between the possession of a nationality in the legal sense and the availability of protection by the country concerned. There will be cases where the applicant has the nationality of a country in regard to which he alleges no fear, but such nationality may be deemed to be ineffective as it does not entail the protection normally granted to nationals. In such circumstances, the possession of the second nationality would not be inconsistent with refugee status. As a rule, there should have been a request for, and a refusal of, protection before it can be established that a given nationality is ineffective. If there is no explicit refusal of protection, absence of a reply within reasonable time may be considered a refusal.

## (8) Geographical scope

108. At the time when the 1951 Convention was drafted, there was a desire by a number of States not to assume obligations the extent of which could not be foreseen. This desire led to the inclusion of the 1951 dateline, to which reference has already been made (paragraphs 35 and 36 above). In response to the wish of certain Governments, the 1951 Convention also gave to Contracting States the possibility of limiting their obligations under the Convention to persons who had become refugees as a result of events occurring in Europe.

109. Accordingly, Article 1 B of the 1951 Convention states that:

> (1) For the purposes of this Convention, the words "events occurring before 1 January 1951" in Article 1, Section A, shall be understood to mean either
>
> (a) "events occurring in Europe before 1 January 1951"; or
>
> (b) "events occurring in Europe and elsewhere before 1 January 1951";
>
> and each Contracting State shall make a declaration at the time of signature, ratification or accession, specifying which of these meanings it applies for the purposes of its obligations under this Convention.
>
> (2) Any Contracting State which has adopted alternative (a) may at any time extend its obligations by adopting alternative (b) by means of a notification addressed to the Secretary-General of the United Nations.

110. Of the States parties to the 1951 Convention, at the time of writing 9 still adhere to alternative (a), "events occurring in Europe".[14] While refugees from other parts of the world frequently obtain asylum in some of these countries, they are not normally accorded refugee status under the 1951 Convention.

---

[14] See Annex IV.

# CHAPTER III – CESSATION CLAUSES

## A. GENERAL

111. The so-called "cessation clauses" (Article 1 C (1) to (6) of the 1951 Convention) spell out the conditions under which a refugee ceases to be a refugee. They are based on the consideration that international protection should not be granted where it is no longer necessary or justified.

112. Once a person's status as a refugee has been determined, it is maintained unless he comes within the terms of one of the cessation clauses.[15] This strict approach towards the determination of refugee status results from the need to provide refugees with the assurance that their status will not be subject to constant review in the light of temporary changes – not of a fundamental character – in the situation prevailing in their country of origin.

113. Article 1 C of the 1951 Convention provides that:

> This Convention shall cease to apply to any person falling under the terms of section A if:
>
> (1) He has voluntarily re-availed himself of the protection of the country of his nationality; or
>
> (2) Having lost his nationality, he has voluntarily re-acquired it; or
>
> (3) He has acquired a new nationality, and enjoys the protection of the country of his new nationality; or
>
> (4) He has voluntarily re-established himself in the country which he left or outside which he remained owing to fear of persecution; or
>
> (5) He can no longer, because the circumstances in connexion with which he has been recognized as a refugee have ceased to exist, continue to refuse to avail himself of the protection of the country of his nationality;
>
> Provided that this paragraph shall not apply to a refugee falling under Section A (1) of this Article who is able to invoke compelling reasons arising out of previous persecution for refusing to avail himself of the protection of the country of nationality;
>
> (6) Being a person who has no nationality he is, because the circumstances in connexion with which he has been recognized as a refugee have ceased to exist, able to return to the country of his former habitual residence;
>
> Provided that this paragraph shall not apply to a refugee falling under section A (1) of this Article who is able to invoke compelling reasons arising out of previous persecution for refusing to return to the country of his former habitual residence.

114. Of the six cessation clauses, the first four reflect a change in the situation of the refugee that has been brought about by himself, namely:

1. voluntary re-availment of national protection;

2. voluntary re-acquisition of nationality;

3. acquisition of a new nationality;

4. voluntary re-establishment in the country where persecution was feared.

115. The last two cessation clauses, (5) and (6), are based on the consideration that international protection is no longer justified on account of changes in the country where persecution was feared, because the reasons for a person becoming a refugee have ceased to exist.

116. The cessation clauses are negative in character and are exhaustively enumerated. They should therefore be interpreted restrictively, and no other reasons may be adduced by way of analogy to justify the withdrawal of refugee status. Needless to say, if a refugee, for whatever reasons, no longer

---

[15] In some cases refugee status may continue, even though the reasons for such status have evidently ceased to exist. Cf sub-sections (5) and (6) (paras. 135 to 139 below).

AR.08086

29

wishes to be considered a refugee, there will be no call for continuing to grant him refugee status and international protection.

117. Article 1 C does not deal with the cancellation of refugee status. Circumstances may, however, come to light that indicate that a person should never have been recognized as a refugee in the first place; e.g. if it subsequently appears that refugee status was obtained by a misrepresentation of material facts, or that the person concerned possesses another nationality, or that one of the exclusion clauses would have applied to him had all the relevant facts been known. In such cases, the decision by which he was determined to be a refugee will normally be cancelled.

## B. INTERPRETATION OF TERMS

### (1) Voluntary re-availment of national protection

Article 1 C (1) of the 1951 Convention:

> He has voluntarily re-availed himself of the protection of the country of his nationality;

118. This cessation clause refers to a refugee possessing a nationality who remains outside the country of his nationality. (The situation of a refugee who has actually returned to the country of his nationality is governed by the fourth cessation clause, which speaks of a person having "re-established" himself in that country.) A refugee who has voluntarily re-availed himself of national protection is no longer in need of international protection. He has demonstrated that he is no longer "unable or unwilling to avail himself of the protection of the country of his nationality".

119. This cessation clause implies three requirements:

(a) voluntariness: the refugee must act voluntarily;

(b) intention: the refugee must intend by his action to re-avail himself of the protection of the country of his nationality;

(c) re-availment: the refugee must actually obtain such protection.

120. If the refugee does not act voluntarily, he will not cease to be a refugee. If he is instructed by an authority, e.g. of his country of residence, to perform against his will an act that could be interpreted as a re-availment of the protection of the country of his nationality, such as applying to his Consulate for a national passport, he will not cease to be a refugee merely because he obeys such an instruction. He may also be constrained, by circumstances beyond his control, to have recourse to a measure of protection from his country of nationality. He may, for instance, need to apply for a divorce in his home country because no other divorce may have the necessary international recognition. Such an act cannot be considered to be a "voluntary re-availment of protection" and will not deprive a person of refugee status.

121. In determining whether refugee status is lost in these circumstances, a distinction should be drawn between actual re-availment of protection and occasional and incidental contacts with the national authorities. If a refugee applies for and obtains a national passport or its renewal, it will, in the absence of proof to the contrary, be presumed that he intends to avail himself of the protection of the country of his nationality. On the other hand, the acquisition of documents from the national authorities, for which non-nationals would likewise have to apply – such as a birth or marriage certificate – or similar services, cannot be regarded as a re-availment of protection.

122. A refugee requesting protection from the authorities of the country of his nationality has only "re-availed" himself of that protection when his request has actually been granted. The most frequent case of "re-availment of protection" will be where the refugee wishes to return to his country of nationality. He will not cease to be a refugee merely by applying for repatriation. On the other hand,

AR.08087

obtaining an entry permit or a national passport for the purposes of returning will, in the absence of proof to the contrary, be considered as terminating refugee status.[16] This does not, however, preclude assistance being given to the repatriant – also by UNHCR – in order to facilitate his return.

123. A refugee may have voluntarily obtained a national passport, intending either to avail himself of the protection of his country of origin while staying outside that country, or to return to that country. As stated above, with the receipt of such a document he normally ceases to be a refugee. If he subsequently renounces either intention, his refugee status will need to be determined afresh. He will need to explain why he changed his mind, and to show that there has been no basic change in the conditions that originally made him a refugee.

124. Obtaining a national passport or an extension of its validity may, under certain exceptional conditions, not involve termination of refugee status (see paragraph 120 above). This could for example be the case where the holder of a national passport is not permitted to return to the country of his nationality without specific permission.

125. Where a refugee visits his former home country not with a national passport but, for example, with a travel document issued by his country of residence, he has been considered by certain States to have re-availed himself of the protection of his former home country and to have lost his refugee status under the present cessation clause. Cases of this kind should, however, be judged on their individual merits. Visiting an old or sick parent will have a different bearing on the refugee's relation to his former home country than regular visits to that country spent on holidays or for the purpose of establishing business relations.

## (2) Voluntary re-acquisition of nationality

Article 1 C (2) of the 1951 Convention:

> Having lost his nationality, he has voluntarily re-acquired it;

126. This clause is similar to the preceding one. It applies to cases where a refugee, having lost the nationality of the country in respect of which he was recognized as having well-founded fear of persecution, voluntarily re-acquires such nationality.

127. While under the preceding clause (Article 1 C (1)) a person having a nationality ceases to be a refugee if he re-avails himself of the protection attaching to such nationality, under the present clause (Article 1 C (2)) he loses his refugee status by re-acquiring the nationality previously lost.[17]

128. The re-acquisition of nationality must be voluntary. The granting of nationality by operation of law or by decree does not imply voluntary reacquisition, unless the nationality has been expressly or impliedly accepted. A person does not cease to be a refugee merely because he could have reacquired his former nationality by option, unless this option has actually been exercised. If such former nationality is granted by operation of law, subject to an option to reject, it will be regarded as a voluntary re-acquisition if the refugee, with full knowledge, has not exercised this option; unless he is able to invoke special reasons showing that it was not in fact his intention to re-acquire his former nationality.

## (3) Acquisition of a new nationality and protection

Article 1 C (3) of the 1951 Convention:

> He has acquired a new nationality and enjoys the protection of the country of his new nationality;

---

[16] The above applies to a refugee who is still outside his country. It will be noted that the fourth cessation clause provides that any refugee will cease to be a refugee when he has voluntarily "re-established" himself in his country of nationality or former habitual residence.

[17] In the majority of cases a refugee maintains the nationality of his former home country. Such nationality may be lost by individual or collective measures of deprivation of nationality. Loss of nationality (statelessness) is therefore not necessarily implicit in refugee status.

AR.08088

129. As in the case of the re-acquisition of nationality, this third cessation clause derives from the principle that a person who enjoys national protection is not in need of international protection.

130. The nationality that the refugee acquires is usually that of the country of his residence. A refugee living in one country may, however, in certain cases, acquire the nationality of another country. If he does so, his refugee status will also cease, provided that the new nationality also carries the protection of the country concerned. This requirement results from the phrase "and enjoys the protection of the country of his new nationality".

131. If a person has ceased to be a refugee, having acquired a new nationality, and then claims well-founded fear in relation to the country of his new nationality, this creates a completely new situation and his status must be determined in relation to the country of his new nationality.

132. Where refugee status has terminated through the acquisition of a new nationality, and such new nationality has been lost, depending on the circumstances of such loss, refugee status may be revived.

## (4) Voluntary re-establishment in the country where persecution was feared

Article 1 C (4) of the 1951 Convention:

> He has voluntarily re-established himself in the country which he left or outside which he remained owing to fear of persecution;

133. This fourth cessation clause applies both to refugees who have a nationality and to stateless refugees. It relates to refugees who, having returned to their country of origin or previous residence, have not previously ceased to be refugees under the first or second cessation clauses while still in their country of refuge.

134. The clause refers to "voluntary re-establishment". This is to be understood as return to the country of nationality or former habitual residence with a view to permanently residing there. A temporary visit by a refugee to his former home country, not with a national passport but, for example, with a travel document issued by his country of residence, does not constitute "re-establishment" and will not involve loss of refugee status under the present clause.[18]

## (5) Nationals whose reasons for becoming a refugee have ceased to exist

Article 1 C (5) of the 1951 Convention:

> He can no longer, because the circumstances in connexion with which he has been recognized as a refugee have ceased to exist, continue to refuse to avail himself of the protection of the country of his nationality;
>
> Provided that this paragraph shall not apply to a refugee falling under section A (1) of this Article who is able to invoke compelling reasons arising out of previous persecution for refusing to avail himself of the protection of the country of nationality;

135. Circumstances" refer to fundamental changes in the country, which can be assumed to remove the basis of the fear of persecution. A mere – possibly transitory – change in the facts surrounding the individual refugee's fear, which does not entail such major changes of circumstances, is not sufficient to make this clause applicable. A refugee's status should not in principle be subject to frequent review to the detriment of his sense of security, which international protection is intended to provide.

136. The second paragraph of this clause contains an exception to the cessation provision contained in the first paragraph. It deals with the special situation where a person may have been subjected to very serious persecution in the past and will not therefore cease to be a refugee, even if fundamental changes have occurred in his country of origin. The reference to Article 1 A (1) indicates that the

---

[18] See para. 125 above.

AR.08089

32

exception applies to "statutory refugees". At the time when the 1951 Convention was elaborated, these 'formed the majority of refugees. The exception, however, reflects a more general humanitarian principle, which could also be applied to refugees other than statutory refugees. It is frequently recognized that a person who – or whose family – has suffered under atrocious forms of persecution should not be expected to repatriate. Even though there may have been a change of regime in his country, this may not always produce a complete change in the attitude of the population, nor, in view of his past experiences, in the mind of the refugee.

### (6) Stateless persons whose reasons for becoming a refugee have ceased to exist

Article 1 C (6) of the 1951 Convention:

> Being a person who has no nationality he is, because the circumstances in connexion with which he has been recognized as a refugee have ceased to exist, able to return to the country of his former habitual residence;
>
> Provided that this paragraph shall not apply to a refugee falling under section A (1) of this Article who is able to invoke compelling reasons arising out of previous persecution for refusing to return to the country of his former habitual residence.

137. This sixth and last cessation clause is parallel to the fifth cessation clause, which concerns persons who have a nationality. The present clause deals exclusively with stateless persons who are able to return to the country of their former habitual residence.

138. "Circumstances" should be interpreted in the same way as under the fifth cessation clause.

139. It should be stressed that, apart from the changed circumstances in his country of former habitual residence, the person concerned must be *able* to return there. This, in the case of a stateless person, may not always be possible.

AR.08090

# CHAPTER IV – EXCLUSION CLAUSES

## A. GENERAL

140. The 1951 Convention, in Sections D, E and F of Article 1, contains provisions whereby persons otherwise having the characteristics of refugees, as defined in Article 1, Section A, are excluded from refugee status. Such persons fall into three groups. The first group (Article 1 D) consists of persons already receiving United Nations protection or assistance; the second group (Article 1 E) deals with persons who are not considered to be in need of international protection; and the third group (Article 1 F) enumerates the categories of persons who are not considered to be deserving of international protection.

141. Normally it will be during the process of determining a person's refugee status that the facts leading to exclusion under these clauses will emerge. It may, however, also happen that facts justifying exclusion will become known only after a person has been recognized as a refugee. In such cases, the exclusion clause will call for a cancellation of the decision previously taken.

## B. INTERPRETATION OF TERMS

### (1) Persons already receiving United Nations protection or assistance

Article 1 D of the 1951 Convention:

> This Convention shall not apply to persons who are at present receiving from organs or agencies of the United Nations other than the United Nations High Commissioner for Refugees protection or assistance.
>
> When such protection or assistance has ceased for any reason, without the position of such persons being definitively settled in accordance with the relevant resolutions adopted by the General Assembly of the United Nations, these persons shall ipso facto be entitled to the benefits of this Convention.

142. Exclusion under this clause applies to any person who is in receipt of protection or assistance from organs or agencies of the United Nations, other than the United Nations High Commissioner for Refugees. Such protection or assistance was previously given by the former United Nations Korean Reconstruction Agency (UNKRA) and is currently given by the United Nations Relief and Works Agency for Palestine Refugees In the Near East (UNRWA). There could be other similar situations in the future.

143. With regard to refugees from Palestine, it will be noted that UNRWA operates only in certain areas of the Middle East, and it is only there that its protection or assistance are given. Thus, a refugee from Palestine who finds himself outside that area does not enjoy the assistance mentioned and may be considered for determination of his refugee status under the criteria of the 1951 Convention. It should normally be sufficient to establish that the circumstances which originally made him qualify for protection or assistance from UNRWA still persist and that he has neither ceased to be a refugee under one of the cessation clauses nor is excluded from the application of the Convention under one of the exclusion clauses.

### (2) Persons not considered to be in need of international protection

Article 1 E of the 1951 Convention:

> This Convention shall not apply to a person who is recognized by the competent authorities of the country in which he has taken residence as having the rights and obligations which are attached to the possession of the nationality of that country.

AR.08091

144. This provision relates to persons who might otherwise qualify for refugee status and who have been received in a country where they have been granted most of the rights normally enjoyed by nationals, but not formal citizenship. (They are frequently referred to as "national refugees".) The country that has received them is frequently one where the population is of the same ethnic origin as themselves.[19]

145. There is no precise definition of "rights and obligations" that would constitute a reason for exclusion under this clause. It may, however, be said that the exclusion operates if a person's status is largely assimilated to that of a national of the country. In particular he must, like a national, be fully protected against deportation or expulsion.

146. The clause refers to a person who has "taken residence" in the country concerned. This implies continued residence and not a mere visit. A person who resides outside the country and does not enjoy the diplomatic protection of that country is not affected by the exclusion clause.

### (3) Persons considered not to be deserving of international protection

Article 1 F of the 1951 Convention:

> The provisions of this Convention shall not apply to any person with respect to whom there are serious reasons for considering that:
>
> (a) he has committed a crime against peace, a war crime, or a crime against humanity, as defined in the international instruments drawn up to make provision in respect of such crimes;
>
> (b) he has committed a serious non-political crime outside the country of refuge prior to his admission to that country as a refugee;
>
> (c) he has been guilty of acts contrary to the purposes and principles of the United Nations.

147. The pre-war international instruments that defined various categories of refugees contained no provisions for the exclusion of criminals. It was immediately after the Second World War that for the first time special provisions were drawn up to exclude from the large group of then assisted refugees certain persons who were deemed unworthy of international protection.

148. At the time when the Convention was drafted, the memory of the trials of major war criminals was still very much alive, and there was agreement on the part of States that war criminals should not be protected. There was also a desire on the part of States to deny admission to their territories of criminals who would present a danger to security and public order.

149. The competence to decide whether any of these exclusion clauses are applicable is incumbent upon the Contracting State in whose territory the applicant seeks recognition of his refugee status. For these clauses to apply, it is sufficient to establish that there are "serious reasons for considering" that one of the acts described has been committed. Formal proof of previous penal prosecution is not required. Considering the serious consequences of exclusion for the person concerned, however, the interpretation of these exclusion clauses must be restrictive.

### (a) War crimes, etc.

> (a) he has committed a crime against peace, a war crime or a crime against humanity, as defined in the international instruments drawn up to make provision in respect of such crimes.

150. In mentioning crimes against peace, war crimes or crimes against humanity, the Convention refers generally to "international instruments drawn up to make provision in respect of such crimes". There are a considerable number of such instruments dating from the end of the Second World War up to the present time. All of them contain definitions of what constitute "crimes against peace, war

---

[19] In elaborating this exclusion clause, the drafters of the Convention had principally in mind refugees of German extraction having arrived in the Federal Republic of Germany who were recognized as possessing the rights and obligations attaching to German nationality.    AR.08092

crimes and crimes against humanity". The most comprehensive definition will be found in the 1945 London Agreement and Charter of the International Military tribunal. The definitions contained in the above-mentioned London Agreement and a list of other pertinent instruments are given in Annexes V and VI.

### (b) Common crimes

> (b) he has committed a serious non-political crime outside the country of refuge prior to his admission to that country as a refugee.

151. The aim of this exclusion clause is to protect the community of a receiving country from the danger of admitting a refugee who has committed a serious common crime. It also seeks to render due justice to a refugee who has committed a common crime (or crimes) of a less serious nature or has committed a political offence.

152. In determining whether an offence is "non-political" or is, on the contrary, a "political" crime, regard should be given in the first place to its nature and purpose i.e. whether it has been committed out of genuine political motives and not merely for personal reasons or gain. There should also be a close and direct causal link between the crime committed and its alleged political purpose and object. The political element of the offence should also outweigh its common-law character. This would not be the case if the acts committed are grossly out of proportion to the alleged objective. The political nature of the offence is also more difficult to accept if it involves acts of an atrocious nature.

153. Only a crime committed or presumed to have been committed by an applicant "outside the country of refuge prior to his admission to that country as a refugee" is a ground for exclusion. The country outside would normally be the country of origin, but it could also be another country, except the country of refuge where the applicant seeks recognition of his refugee status.

154. A refugee committing a serious crime in the country of refuge is subject to due process of law in that country. In extreme cases, Article 33 paragraph 2 of the Convention permits a refugee's expulsion or return to his former home country if, having been convicted by a final judgement of a "particularly serious" common crime, he constitutes a danger to the community of his country of refuge.

155. What constitutes a "serious" non-political crime for the purposes of this exclusion clause is difficult to define, especially since the term "crime" has different connotations in different legal systems. in some countries the word "crime" denotes only offences of a serious character. In other countries it may comprise anything from petty larceny to murder. In the present context, however, a "serious" crime must be a capital crime or a very grave punishable act. Minor offences punishable by moderate sentences are not grounds for exclusion under Article 1 F (b) even if technically referred to as "crimes" in the penal law of the country concerned.

156. In applying this exclusion clause, it is also necessary to strike a balance between the nature of the offence presumed to have been committed by the applicant and the degree of persecution feared. If a person has well-founded fear of very severe persecution, e.g. persecution endangering his life or freedom, a crime must be very grave in order to exclude him. If the persecution feared is less serious, it will be necessary to have regard to the nature of the crime or crimes presumed to have been committed in order to establish whether the applicant is not in reality a fugitive from justice or whether his criminal character does not outweigh his character as a *bona fide* refugee.

157. In evaluating the nature of the crime presumed to have been committed, all the relevant factors – including any mitigating circumstances – must be taken into account. It is also necessary to have regard to any aggravating circumstances as, for example, the fact that the applicant may already have a criminal record. The fact that an applicant convicted of a serious non-political crime has already served his sentence or has been granted a pardon or has benefited from an amnesty is also relevant. In the latter case, there is a presumption that the exclusion clause is no longer applicable, unless it can be shown that, despite the pardon or amnesty, the applicant's criminal character still predominates.

AR.08093

158. Considerations similar to those mentioned in the preceding paragraphs will apply when a crime – in the widest sense – has been committed as a means of, or concomitant with, escape from the country where persecution was feared. Such crimes may range from the theft of a means of locomotion to endangering or taking the lives of innocent people. While for the purposes of the present exclusion clause it may be possible to over-look the fact that a refugee, not finding any other means of escape, may have crashed the border in a stolen car, decisions will be more difficult where he has hijacked an aircraft, i.e. forced its crew, under threat of arms or with actual violence, to change destination in order to bring him to a country of refuge.

159. As regards hijacking, the question has arisen as to whether, if committed in order to escape from persecution, it constitutes a serious non-political crime within the meaning of the present exclusion clause. Governments have considered the unlawful seizure of aircraft on several occasions within the framework of the United Nations, and a number of international conventions have been adopted dealing with the subject. None of these instruments mentions refugees. However, one of the reports leading to the adoption of a resolution on the subject states that "the adoption of the draft Resolution cannot prejudice any international legal rights or duties of States under instruments relating to the status of refugees and stateless persons". Another report states that "the adoption of the draft Resolution cannot prejudice any international legal rights or duties of States with respect to asylum".[20]

160. The various conventions adopted in this connexion[21] deal mainly with the manner in which the perpetrators of such acts have to be treated. They invariably give Contracting States the alternative of extraditing such persons or instituting penal proceedings for the act on their own territory, which implies the right to grant asylum.

161. While there is thus a possibility of granting asylum, the gravity of the persecution of which the offender may have been in fear, and the extent to which such fear is well-founded, will have to be duly considered in determining his possible refugee status under the 1951 Convention. The question of the exclusion under Article 1 F (b) of an applicant who has committed an unlawful seizure of an aircraft will also have to be carefully examined in each individual case.

**(c) Acts contrary to the purposes and principles of the United Nations**

> (c) he has been guilty of acts contrary to the purposes and principles of the United Nations.

162. It will be seen that this very generally-worded exclusion clause overlaps with the exclusion clause in Article 1 F (a); for it is evident that a crime against peace, a war crime or a crime against humanity is also an act contrary to the purposes and principles of the United Nations. While Article 1 F (c) does not introduce any specific new element, it is intended to cover in a general way such acts against the purposes and principles of the United Nations that might not be fully covered by the two preceding exclusion clauses. Taken in conjunction with the latter, it has to be assumed, although this is not specifically stated, that the acts covered by the present clause must also be of a criminal nature.

163. The purposes and principles of the United Nations are set out in the Preamble and Articles 1 and 2 of the Charter of the United Nations. They enumerate fundamental principles that should govern the conduct of their members in relation to each other and in relation to the international community as a whole. From this it could be inferred that an individual, in order to have committed an act contrary to these principles, must have been in a position of power in a member State and instrumental to his State's infringing these principles. However, there are hardly any precedents on record for the application of this clause, which, due to its very general character, should be applied with caution.

---

[20] Reports of the Sixth Committee on General Assembly resolutions 2645 (XXV). United Nations document A/8716, and 2551 (XXIV), United Nations document A/7845.

[21] Convention on Offences and Certain Other Acts Committed on Board Aircraft, Tokyo, 14 September 1963. Convention for the Suppression of Unlawful Seizure of Aircraft, the Hague, 16 December 1970. Convention for the Suppression of Unlawful Acts against the Safety of Civil Aviation, Montreal, 23 September 1971.

AR.08094

# CHAPTER V – SPECIAL CASES

## A. WAR REFUGEES

164. Persons compelled to leave their country of origin as a result of international or national armed conflicts are not normally considered refugees under the 1951 Convention or 1967 Protocol.[22] They do, however, have the protection provided for in other international instruments, e.g. the Geneva Conventions of 1949 on the Protection of War Victims and the 1977 Protocol additional to the Geneva Conventions of 1949 relating to the protection of Victims of International Armed Conflicts.[23]

165. However, foreign invasion or occupation of all or part of a country can result – and occasionally has resulted – in persecution for one or more of the reasons enumerated in the 1951 Convention. In such cases, refugee status will depend upon whether the applicant is able to show that he has a "well-founded fear of being persecuted" in the occupied territory and, in addition, upon whether or not he is able to avail himself of the protection of his government, or of a protecting power whose duty it is to safeguard the interests of his country during the armed conflict, and whether such protection can be considered to be effective.

166. Protection may not be available if there are no diplomatic relations between the applicant's host country and his country of origin. If the applicant's government is itself in exile, the effectiveness of the protection that it is able to extend may be open to question. Thus, every case has to be judged on its merits, both in respect of well-founded fear of persecution and of the availability of effective protection on the part of the government of the country of origin.

## B. DESERTERS AND PERSONS AVOIDING MILITARY SERVICE

167. In countries where military service is compulsory, failure to perform this duty is frequently punishable by law. Moreover, whether military service is compulsory or not, desertion is invariably considered a criminal offence. The Penalties may vary from country to country, and are not normally regarded as persecution. Fear of prosecution and punishment for desertion or draft-evasion does not in itself constitute well-founded fear of persecution under the definition. Desertion or draft-evasion does not, on the other hand, exclude a person from being a refugee, and a person may be a refugee in addition to being a deserter or draft-evader.

168. A person is clearly not a refugee if his only reason for desertion or draft-evasion is his dislike of military service or fear of combat. He may, however, be a refugee if his desertion or evasion of military service is concomitant with other relevant motives for leaving or remaining outside his country, or if he otherwise has reasons, within the meaning of the definition, to fear persecution.

169. A deserter or draft-evader may also be considered a refugee if it can be shown that he would suffer disproportionately severe punishment for the military offence on account of his race, religion, nationality, membership of a particular social group or political opinion. The same would apply if it can be shown that he has well-founded fear of persecution on these grounds above and beyond the punishment for desertion.

170. There are, however, also cases where the necessity to perform military service may be the sole ground for a claim to refugee status, i.e. when a person can show that the performance of military service would have required his participation in military action contrary to his genuine political, religious or moral convictions, or to valid reasons of conscience.

171. Not every conviction, genuine though it may be, will constitute a sufficient reason for claiming refugee status after desertion or draft-evasion. It is not enough for a person to be in disagreement

---

[22] In respect of Africa, however, see the definition in Article 1 (2) of the OAU Convention concerning the Specific Aspects of Refugee Problems in Africa, quoted in para. 22 above.
[23] See Annex VI, items (6) and (7).

AR.08095

with his government regarding the political justification for a particular military action. Where, however, the type of military action, with which an individual does not wish to be associated, is condemned by the international community as contrary to basic rules of human conduct, punishment for desertion or draft-evasion could, in the light of all other requirements of the definition, in itself be regarded as persecution.

172. Refusal to perform military service may also be based on religious convictions. If an applicant is able to show that his religious convictions are genuine, and that such convictions are not taken into account by the authorities of his country in requiring him to perform military service, he may be able to establish a claim to refugee status. Such a claim would, of course, be supported by any additional indications that the applicant or his family may have encountered difficulties due to their religious convictions.

173. The question as to whether objection to performing military service for reasons of conscience can give rise to a valid claim to refugee status should also be considered in the light of more recent developments in this field. An increasing number of States have introduced legislation or administrative regulations whereby persons who can invoke genuine reasons of conscience are exempted from military service, either entirely or subject to their performing alternative (i.e. civilian) service. The introduction of such legislation or administrative regulations has also been the subject of recommendations by international agencies.[24] In the light of these developments, it would be open to Contracting States, to grant refugee status to persons who object to performing military service for genuine reasons of conscience.

174. The genuineness of a person's political, religious or moral convictions, or of his reasons of conscience for objecting to performing military service, will of course need to be established by a thorough investigation of his personality and background. The fact that he may have manifested his views prior to being called to arms, or that he may already have encountered difficulties with the authorities because of his convictions, are relevant considerations. Whether he has been drafted into compulsory service or joined the army as a volunteer may also be indicative of the genuineness of his convictions.

## C. PERSONS HAVING RESORTED TO FORCE OR COMMITTED ACTS OF VIOLENCE

175. Applications for refugee status are frequently made by persons who have used force or committed acts of violence. Such conduct is frequently associated with, or claimed to be associated with, political activities or political opinions. They may be the result of individual initiatives, or may have been committed within the framework of organized groups. The latter may either be clandestine groupings or political cum military organizations that are officially recognized or whose activities are widely acknowledged.[25] Account should also be taken of the fact that the use of force is an aspect of the maintenance of law and order and may – by definition – be lawfully resorted to by the police and armed forces in the exercise of their functions.

176. An application for refugee status by a person having (or presumed to have) used force, or to have committed acts of violence of whatever nature and within whatever context, must in the first place – like any other application – be examined from the standpoint of the inclusion clauses in the 1951 Convention (paragraphs 32-110 above).

177. Where it has been determined that an applicant fulfils the inclusion criteria, the question may arise as to whether, in view of the acts involving the use of force or violence committed by him, he may not be covered by the terms of one or more of the exclusion clauses. These exclusion clauses, which figure in Article 1 F (a) to (c) of the 1951 Convention, have already been examined (paragraphs 147 to 163 above).

---

[24] Cf Recommendation 816 (1977) on the Right of Conscientious Objection to Military Service, adopted at the Parliamentary Assembly of the Council of Europe at its Twenty-ninth Ordinary Session (5-13 October 1977).
[25] A number of liberation movements, which often include an armed wing, have been officially recognized by the General Assembly of the United Nations. Other liberation movements have only been recognized by a limited number of governments. Others again have no official status.

AR.08096

178. The exclusion clause in Article 1 F (a) was originally intended to exclude from refugee status any person in respect of whom there were serious reasons for considering that he has "committed a crime against peace, a war crime, or a crime against humanity" in an official capacity. This exclusion clause is, however, also applicable to persons who have committed such crimes within the framework of various non-governmental groupings, whether officially recognized, clandestine or self-styled.

179. The exclusion clause in Article 1 F (b), which refers to "a serious non-political crime", is normally not relevant to the use of force or to acts of violence committed in an official capacity. The interpretation of this exclusion clause has already been discussed. The exclusion clause in Article 1 F (c) has also been considered. As previously indicated, because of its vague character, it should be applied with caution.

180. It will also be recalled that, due to their nature and the serious consequences of their application to a person in fear of persecution, the exclusion clauses should be applied in a restrictive manner.

AR.08097

# CHAPTER VI – THE PRINCIPLE OF FAMILY UNITY

181. Beginning with the Universal Declaration of Human Rights, which states that "the family is the natural and fundamental group unit of society and is entitled to protection by society and the State", most international instruments dealing with human rights contain similar provisions for the protection of the unit of a family.

182. The Final Act of the Conference that adopted the 1951 Convention:

> Recommends Governments to take the necessary measures for the protection of the refugee's family, especially with a view to:
>
> (1) Ensuring that the unity of the refugee's family is maintained particularly in cases where the head of the family has fulfilled the necessary conditions for admission to a particular country.
>
> (2) The protection of refugees who are minors, in particular unaccompanied children and girls, with special reference to guardianship and adoption.[26]

183. The 1951 Convention does not incorporate the principle of family unity in the definition of the term refugee. The above-mentioned Recommendation in the Final Act of the Conference is, however, observed by the majority of States, whether or not parties to the 1951 Convention or to the 1967 Protocol.

184. If the head of a family meets the criteria of the definition, his dependants are normally granted refugee status according to the principle of family unity. It is obvious, however, that formal refugee status should not be granted to a dependant if this is incompatible with his personal legal status. Thus, a dependant member of a refugee family may be a national of the country of asylum or of another country, and may enjoy that country's protection. To grant him refugee status in such circumstances would not be called for.

185. As to which family members may benefit from the principle of family unity, the minimum requirement is the inclusion of the spouse and minor children. In practice, other dependants, such as aged parents of refugees, are normally considered if they are living in the same household. On the other hand, if the head of the family is not a refugee, there is nothing to prevent any one of his dependants, if they can invoke reasons on their own account, from applying for recognition as refugees under the 1951 Convention or the 1967 Protocol. In other words, the principle of family unity operates in favour of dependants, and not against them.

186. The principle of the unity of the family does not only operate where all family members become refugees at the same time. It applies equally to cases where a family unit has been temporarily disrupted through the flight of one or more of its members.

187. Where the unity of a refugee's family is destroyed by divorce, separation or death, dependants who have been granted refugee status on the basis of family unity will retain such refugee status unless they fall within the terms of a cessation clause; or if they do not have reasons other than those of personal convenience for wishing to retain refugee status; or if they themselves no longer wish to be considered as refugees.

188. If the dependant of a refugee falls within the terms of one of the exclusion clauses, refugee status should be denied to him.

---

[26] See Annex 1.

# PART TWO

**PROCEDURES FOR THE DETERMINATION OF REFUGEE STATUS**

## A. GENERAL

189. It has been seen that the 1951 Convention and the 1967 Protocol define who is a refugee for the purposes of these instruments. It is obvious that, to enable States parties to the Convention and to the Protocol to implement their provisions, refugees have to be identified. Such identification, i.e. the determination of refugee status, although mentioned in the 1951 Convention (cf. Article 9), is not specifically regulated. In particular, the Convention does not indicate what type of procedures are to be adopted for the determination of refugee status. It is therefore left to each Contracting State to establish the procedure that it considers most appropriate, having regard to its particular constitutional and administrative structure.

190. It should be recalled that an applicant for refugee status is normally in a particularly vulnerable situation. He finds himself in an alien environment and may experience serious difficulties, technical and psychological, in submitting his case to the authorities of a foreign country, often in a language not his own. His application should therefore be examined within the framework of specially established procedures by qualified personnel having the necessary knowledge and experience, and an understanding of an applicant's particular difficulties and needs.

191. Due to the fact that the matter is not specifically regulated by the 1951 Convention, procedures adopted by States parties to the 1951 Convention and to the 1967 Protocol vary considerably. In a number of countries, refugee status is determined under formal procedures specifically established for this purpose. In other countries, the question of refugee status is considered within the framework of general procedures for the admission of aliens. In yet other countries, refugee status is determined under informal arrangements, or *ad hoc* for specific purposes, such as the issuance of travel documents.

192. In view of this situation and of the unlikelihood that all States bound by the 1951 Convention and the 1967 Protocol could establish identical procedures, the Executive Committee of the High Commissioner's Programme, at its twenty-eighth session in October 1977, recommended that procedures should satisfy certain basic requirements. These basic requirements, which reflect the special situation of the applicant for refugee status, to which reference has been made above, and which would ensure that the applicant is provided with certain essential guarantees, are the following:

AR.08099

(i) The competent official (e.g., immigration officer or border police officer) to whom the applicant addresses himself at the border or in the territory of a Contracting State should have clear instructions for dealing with cases which might come within the purview of the relevant international instruments. He should be required to act in accordance with the principle of non-refoulement and to refer such cases to a higher authority.

(ii) The applicant should receive the necessary guidance as to the procedure to be followed.

(iii) There should be a clearly identified authority – wherever possible a single central authority – with responsibility for examining requests for refugee status and taking a decision in the first instance.

(iv) The applicant should be given the necessary facilities, including the services of a competent interpreter, for submitting his case to the authorities concerned. Applicants should also be given the opportunity, of which they should be duly informed, to contact a representative of UNHCR.

(v) If the applicant is recognized as a refugee, he should be informed accordingly and issued with documentation certifying his refugee status.

(vi) If the applicant is not recognized, he should be given a reasonable time to appeal for a formal reconsideration of the decision, either to the same or to a different authority, whether administrative or judicial, according to the prevailing system.

(vii) The applicant should be permitted to remain in the country pending a decision on his initial request by the competent authority referred to in paragraph (iii) above, unless it has been established by that authority that his request is clearly abusive. He should also be permitted to remain in the country while an appeal to a higher administrative authority or to the courts is pending.[27]

193. The Executive Committee also expressed the hope that all States parties to the 1951 Convention and the 1967 Protocol that had not yet done so would take appropriate steps to establish such procedures in the near future and give favourable consideration to UNHCR participation in such procedures in appropriate form.

194. Determination of refugee status, which is closely related to questions of asylum and admission, is of concern to the High Commissioner in the exercise of his function to provide international protection for refugees. In a number of countries, the Office of the High Commissioner participates in various forms, in procedures for the determination of refugee status. Such participation is based on Article 35 of the 1951 Convention and the corresponding Article 11 of the 1967 Protocol, which provide for co-operation by the Contracting States with the High Commissioner's Office.

## B. ESTABLISHING THE FACTS

### (1) Principles and methods

195. The relevant facts of the individual case will have to be furnished in the first place by the applicant himself. It will then be up to the person charged with determining his status (the examiner) to assess the validity of any evidence and the credibility of the applicant's statements.

196. It is a general legal principle that the burden of proof lies on the person submitting a claim. Often, however, an applicant may not be able to support his statements by documentary or other proof, and cases in which an applicant can provide evidence of all his statements will be the exception rather than the rule. In most cases a person fleeing from persecution will have arrived with the barest necessities and very frequently even without personal documents. Thus, while the burden of proof in principle rests on the applicant, the duty to ascertain and evaluate all the relevant facts is shared between the applicant and the examiner. Indeed, in some cases, it may be for the examiner to use all the means at his disposal to produce the necessary evidence in support of the application. Even such independent research may not, however, always be successful and there may also be statements that are not susceptible of proof. In such cases, if the applicant's account appears credible, he should, unless there are good reasons to the contrary, be given the benefit of the doubt.

---

[27] Official Records of the General Assembly, Thirty second Session, Supplement No. 12 (A/32/12/Add.1), para. 53 (6) (e). AR.08100

197. The requirement of evidence should thus not be too strictly applied in view of the difficulty of proof inherent in the special situation in which an applicant for refugee status finds himself. Allowance for such possible lack of evidence does not, however, mean that unsupported statements must necessarily be accepted as true if they are inconsistent with the general account put forward by the applicant.

198. A person who, because of his experiences, was in fear of the authorities in his own country may still feel apprehensive vis-à-vis any authority. He may therefore be afraid to speak freely and give a full and accurate account of his case.

199. While an initial interview should normally suffice to bring an applicant's story to light, it may be necessary for the examiner to clarify any apparent inconsistencies and to resolve any contradictions in a further interview, and to find an explanation for any misrepresentation or concealment of material facts. Untrue statements by themselves are not a reason for refusal of refugee status and it is the examiner's responsibility to evaluate such statements in the light of all the circumstances of the case.

200. An examination in depth of the different methods of fact-finding is outside the scope of the present Handbook. It may be mentioned, however, that basic information is frequently given, in the first instance, by completing a standard questionnaire. Such basic information will normally not be sufficient to enable the examiner to reach a decision, and one or more personal interviews will be required. It will be necessary for the examiner to gain the confidence of the applicant in order to assist the latter in putting forward his case and in fully explaining his opinions and feelings. In creating such a climate of confidence it is, of course, of the utmost importance that the applicant's statements will be treated as confidential and that he be so informed.

201. Very frequently the fact-finding process will not be complete until a wide range of circumstances has been ascertained. Taking isolated incidents out of context may be misleading. The cumulative effect of the applicant's experience must be taken into account. Where no single incident stands out above the others, sometimes a small incident may be "the last straw"; and although no single incident may be sufficient, all the incidents related by the applicant taken together, could make his fear "well-founded" (see paragraph 53 above).

202. Since the examiner's conclusion on the facts of the case and his personal impression of the applicant will lead to a decision that affects human lives, he must apply the criteria in a spirit of justice and understanding and his judgement should not, of course, be influenced by the personal consideration that the applicant may be an "undeserving case".

## (2) Benefit of the doubt

203. After the applicant has made a genuine effort to substantiate his story there may still be a lack of evidence for some of his statements. As explained above (paragraph 196), it is hardly possible for a refugee to "prove" every part of his case and, indeed, if this were a requirement the majority of refugees would not be recognized. It is therefore frequently necessary to give the applicant the benefit of the doubt.

204. The benefit of the doubt should, however, only be given when all available evidence has been obtained and checked and when the examiner is satisfied as to the applicant's general credibility. The applicant's statements must be coherent and plausible, and must not run counter to generally known facts.

## (3) Summary

205. The process of ascertaining and evaluating the facts can therefore be summarized as follows:

AR.08101

(a) The *applicant* should:

(i) Tell the truth and assist the examiner to the full in establishing the facts of his case.

(ii) Make an effort to support his statements by any available evidence and give a satisfactory explanation for any lack of evidence. If necessary he must make an effort to procure additional evidence.

(iii) Supply all pertinent information concerning himself and his past experience in as much detail as is necessary to enable the examiner to establish the relevant facts. He should be asked to give a coherent explanation of all the reasons invoked in support of his application for refugee status and he should answer any questions put to him.

(b) The *examiner* should:

(i) Ensure that the applicant presents his case as fully as possible and with all available evidence.

(ii) Assess the applicant's credibility and evaluate the evidence (if necessary giving the applicant the benefit of the doubt), in order to establish the objective and the subjective elements of the case.

(iii) Relate these elements to the relevant criteria of the 1951 Convention, in order to arrive at a correct conclusion as to the applicant's refugee status.

## C. CASES GIVING RISE TO SPECIAL PROBLEMS IN ESTABLISHING THE FACTS

### (1) Mentally disturbed persons

206. It has been seen that in determining refugee status the subjective element of fear and the objective element of its well-foundedness need to be established.

207. It frequently happens that an examiner is confronted with an applicant having mental or emotional disturbances that impede a normal examination of his case. A mentally disturbed person may, however, be a refugee, and while his claim cannot therefore be disregarded, it will call for different techniques of examination.

208. The examiner should, in such cases, whenever possible, obtain expert medical advice. The medical report should provide information on the nature and degree of mental illness and should assess the applicant's ability to fulfil the requirements normally expected of an applicant in presenting his case (see paragraph 205 (a) above). The conclusions of the medical report will determine the examiner's further approach.

209. This approach has to vary according to the degree of the applicant's affliction and no rigid rules can be laid down. The nature and degree of the applicant's "fear" must also be taken into consideration, since some degree of mental disturbance is frequently found in persons who have been exposed to severe persecution. Where there are indications that the fear expressed by the applicant may not be based on actual experience or may be an exaggerated fear, it may be necessary, in arriving at a decision, to lay greater emphasis on the objective circumstances, rather than on the statements made by the applicant.

210. It will, in any event, be necessary to lighten the burden of proof normally incumbent upon the applicant, and information that cannot easily be obtained from the applicant may have to be sought elsewhere, e.g. from friends, relatives and other persons closely acquainted with the applicant, or from his guardian, if one has been appointed. It may also be necessary to draw certain conclusions from the surrounding circumstances. If, for instance, the applicant belongs to and is in the company of a group of refugees, there is a presumption that he shares their fate and qualifies in the same manner as they do.

211. In examining his application, therefore, it may not be possible to attach the same importance as is normally attached to the subjective element of "fear", which may be less reliable, and it may be necessary to place greater emphasis on the objective situation.

AR.08102

212. In view of the above considerations, investigation into the refugee status of a mentally disturbed person will, as a rule, have to be more searching than in a "normal" case and will call for a close examination of the applicant's past history and background, using whatever outside sources of information may be available.

## (2) Unaccompanied minors

213. There is no special provision in the 1951 Convention regarding the refugee status of persons under age. The same definition of a refugee applies to all individuals, regardless of their age. When it is necessary to determine the refugee status of a minor, problems may arise due to the difficulty of applying the criteria of "well-founded fear" in his case. If a minor is accompanied by one (or both) of his parents, or another family member on whom he is dependent, who requests refugee status, the minor's own refugee status will be determined according to the principle of family unity (paragraphs 181 to 188 above).

214. The question of whether an unaccompanied minor may qualify for refugee status must be determined in the first instance according to the degree of his mental development and maturity. In the case of children, it will generally be necessary to enrol the services of experts conversant with child mentality. A child – and for that matter, an adolescent – not being legally independent should, if appropriate, have a guardian appointed whose task it would be to promote a decision that will be in the minor's best interests. In the absence of parents or of a legally appointed guardian, it is for the authorities to ensure that the interests of an applicant for refugee status who is a minor are fully safeguarded.

215. Where a minor is no longer a child but an adolescent, it will be easier to determine refugee status as in the case of an adult, although this again will depend upon the actual degree of the adolescent's maturity. It can be assumed that – in the absence of indications to the contrary – a person of 16 or over may be regarded as sufficiently mature to have a well-founded fear of persecution. Minors under 16 years of age may normally be assumed not to be sufficiently mature. They may have fear and a will of their own, but these may not have the same significance as in the case of an adult.

216. It should, however, be stressed that these are only general guidelines and that a minor's mental maturity must normally be determined in the light of his personal, family and cultural background.

217. Where the minor has not reached a sufficient degree of maturity to make it possible to establish well-founded fear in the same way as for an adult, it may be necessary to have greater regard to certain objective factors. Thus, if an unaccompanied minor finds himself in the company of a group of refugees, this may – depending on the circumstances – indicate that the minor is also a refugee.

218. The circumstances of the parents and other family members, including their situation in the minor's country of origin, will have to be taken into account. If there is reason to believe that the parents wish their child to be outside the country of origin on grounds of well-founded fear of persecution, the child himself may be presumed to have such fear.

219. If the will of the parents cannot be ascertained or if such will is in doubt or in conflict with the will of the child, then the examiner, in cooperation with the experts assisting him, will have to come to a decision as to the well-foundedness of the minor's fear on the basis of all the known circumstances, which may call for a liberal application of the benefit of the doubt.

# CONCLUSION

220. In the present Handbook an attempt has been made to define certain guidelines that, in the experience of UNHCR, have proved useful in determining refugee status for the purposes of the 1951 Convention and the 1967 Protocol relating to the Status of Refugees. In so doing, particular attention has been paid to the definitions of the term "refugee" in these two instruments, and to various problems of interpretation arising out of these definitions. It has also been sought to show how these definitions may be applied in concrete cases and to focus attention on various procedural problems arising in regard to the determination of refugee status.

221. The Office of the High Commissioner is fully aware of the shortcomings inherent in a Handbook of this nature, bearing in mind that it is not possible to encompass every situation in which a person may apply for refugee status. Such situations are manifold and depend upon the infinitely varied conditions prevailing in countries of origin and on the special personal factors relating to the individual applicant.

222. The explanations given have shown that the determination of refugee status is by no means a mechanical and routine process. On the contrary, it calls for specialized knowledge, training and experience and – what is more important – an understanding of the particular situation of the applicant and of the human factors involved.

223. Within the above limits it is hoped that the present Handbook may provide some guidance to those who in their daily work are called upon to determine refugee status.

AR.08104

# ANNEXES

## ANNEX I

**EXCERPT FROM THE FINAL ACT OF THE UNITED NATIONS CONFERENCE OF PLENIPOTENTIARIES ON THE STATUS OF REFUGEES AND STATELESS PERSONS**[28]

### IV

The Conference adopted unanimously the following recommendations:

**A.**

"THE CONFERENCE,

"*Considering* that the issue and recognition of travel documents is necessary to facilitate the movement of refugees, and in particular their resettlement,

"*Urges* Governments which are parties to the Inter-Governmental Agreement on Refugee Travel Documents signed in London 15 October 1946, or which recognize travel documents issued in accordance with the Agreement, to continue to issue or to recognize such travel documents, and to extend the issue of such documents to refugees as defined in article 1 of the Convention relating to the Status of Refugees or to recognize the travel documents so issued to such persons, until they shall have undertaken obligations under article 28 of the said Convention."

**B.**

"THE CONFERENCE,

"*Considering* that the unity of the family, the natural and fundamental group of society, is an essential right of the refugee, and that such unity is constantly threatened, and

"*Noting* with satisfaction that, according to the official commentary of the *ad hoc* Committee on Statelessness and Related Problems the rights granted to a refugee are extended to members of his family,

"*Recommends* Governments to take the necessary measure protection of the refugee's family, especially with a view to:

"(1) Ensuring that the unity of the refugee's family is maintained particularly in cases where the head of the family has fulfilled the necessary conditions for admission to a particular country,

"(2) The protection of refugees who are minors, in particular unaccompanied children and girls, with special reference to guardianship and adoption."

---

[28] United Nations Treaty Series, vol. 189, p. 37.

AR.08105

**C.**

"THE CONFERENCE,

"*Considering* that, in the moral, legal and material spheres, refugees need the help of suitable welfare services, especially that of appropriate non-governmental organizations,

"*Recommends* Governments and inter-governmental bodies to facilitate, encourage and sustain the efforts of properly qualified or organizations."

**D.**

"THE CONFERENCE,

"*Considering* that many persons still leave their country of origin for reasons of persecution and are entitled to special protection on account of their position,

"*Recommends* that Governments continue to receive refugees in their territories and that they act in concert in a true spirit of international co-operation in order that these refugees may find asylum and the possibility of resettlement."

**E.**

"THE CONFERENCE,

"*Expresses* the hope that the Convention relating to the Status of Refugees will have value as an example exceeding its contractual scope and that all nations will be guided by it in granting so far as possible to persons in their territory as refugees and who would not be covered by the terms of the Convention, the treatment for which it provides."

# ANNEX II

**1951 CONVENTION RELATING TO THE STATUS OF REFUGEES**[29]

## PREAMBLE

THE HIGH CONTRACTING PARTIES

*Considering* that the Charter of the United Nations and the Universal Declaration of Human Rights approved on 10 December 1948 by the General Assembly have affirmed the principle that human beings shall enjoy fundamental rights and freedoms without discrimination,

*Considering* that the United Nations has, on various occasions, manifested its profound concern for refugees and endeavored to assure refugees the widest possible exercise of these fundamental rights and freedoms,

*Considering* that it is desirable to revise and consolidate previous international agreements relating to the status of refugees and to extend the scope of and the protection accorded by such instruments by means of a new agreement,

*Considering* that the grant of asylum may place unduly heavy burdens on certain countries, and that a satisfactory solution of a problem of which the United Nations has recognized the international scope and nature the cannot therefore be achieved without international co-operation,

*Expressing* the wish that all States, recognizing the social and humanitarian nature of the problem of refugees, will do everything within their power to prevent this problem from becoming a cause of tension between States,

*Noting* that the United Nations High Commissioner for Refugees is charged with the task of supervising international conventions providing for the protection of Refugees, and recognizing that the effective co-ordination of measures taken to deal with this problem will depend upon the co-operation of States with the High Commissioner,

*Have agreed as follows:*

## CHAPTER I – GENERAL PROVISIONS

### Article 1

**Definition of the term "Refugee"**

**A.** For the purposes of the present Convention, the term "refugee" shall apply to any person who:

(1) Has been considered a refugee under the Arrangements of 12 May 1926 and 30 June 1928 or under the Conventions of 28 October 1933 and 10 February 1938, the Protocol of 14 September 1939 or the Constitution of the International Refugee Organization;

Decisions of non-eligibility taken by the International Refugee Organization during the period of its activities shall not prevent the status of refugee being accorded to persons who fulfil the conditions of paragraph 2 of this section;

---

[29] United Nations Treaty Series, vol. 189, p. 137.

(2) As a result of events occurring before 1 January 1951 and owing to well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality and is unable or, owing to such fear, is unwilling to avail himself of the protection of that country; or who, not having a nationality and being outside the country of his former habitual residence as a result of such events, is unable or, owing to such fear, is unwilling to return to it.

In the case of a person who has more than one nationality, the term "the country of his nationality" shall mean each of the countries of which he is a national, and a person shall not be deemed to be lacking the protection of the country of his nationality if, without any valid reason based on well-founded fear, he has not availed himself of the protection of one of the countries of which he is a national.

**B.** (1) For the purposes of this Convention, the words "events occurring before 1 January 1951" in Article 1, Section A, shall be understood to mean either:

(a) "events occurring in Europe before 1 January 1951" or

(b) "events occurring in Europe or elsewhere before 1 January 1951"

and each Contracting State shall make a declaration at the time of signature, ratification or accession, specifying which of these meanings it applies for the purpose of its obligations under this Convention.

(2) Any Contracting State which has adopted alternative (a) may at any time extend its obligations by adopting alternative (b) by means of a notification addressed to the Secretary-General of the United Nations.

**C.** This Convention shall cease to apply to any person falling under the terms of Section A if:

(1) He has voluntarily re-availed himself of the protection of the country of his nationality; or

(2) Having lost his nationality, he has voluntarily re-acquired it; or

(3) He has acquired a new nationality, and enjoys the protection of the country of his new nationality; or

(4) He has voluntarily re-established himself in the country which he left or outside which he remained owing to fear of persecution; or

(5) He can no longer, because the circumstances in connexion with which he has been recognized as a refugee have ceased to exist, continue to refuse to avail himself of the protection of the country of his nationality;

Provided that this paragraph shall not apply to a refugee falling under section A (1) of this Article who is able to invoke compelling reasons arising out of previous persecution for refusing to avail himself of the protection of the country of nationality.

(6) Being a person who has no nationality he is, because the circumstances in connexion with which he has been recognized as a refugee have ceased to exist, able to return to the country of his former habitual residence;

Provided that this paragraph shall not apply to a refugee falling under section A (1) of this Article who is able to invoke compelling reasons arising out of previous persecution for refusing to return to the country of his former habitual residence.

**D.** This Convention shall not apply to persons who are at present receiving from organs or agencies of the United Nations other than the United Nations High Commissioner for Refugees protection or assistance.

When such protection or assistance has ceased for any reason, without the position of such persons being definitively settled in accordance with the relevant resolutions adopted by the General Assembly of the United Nations, these persons shall *ipso facto* be entitled to the benefits of this Convention.

**E.** This Convention shall not apply to a person who is recognized by the competent authorities of the country in which he has taken residence as having the rights and obligations which are attached to the possession of the nationality of that country.

**F.** The provisions of this Convention shall not apply to any person with respect to whom there are serious reasons for considering that:

(a) he has committed a crime against peace, a war crime, or a crime against humanity, as defined in the international instruments drawn up to make provision in respect of such crimes;

(b) he has committed a serious non-political crime outside the country of refuge prior to his admission to that country as a refugee;

(c) he has been guilty of acts contrary to the purposes and principles of the United Nations.

## Article 2

**General obligations**

Every refugee has duties to the country in which he finds himself, which require in particular that he conform to its laws and regulations as well as to measures taken for the maintenance of public order.

## Article 3

**Non-Discrimination**

The Contracting States shall apply the provisions of this Convention to refugees without discrimination as to race, religion or country of origin.

## Article 4

**Religion**

The Contracting States shall accord to refugees within their territories treatment at least as favorable as that accorded to their nationals with respect to freedom to practice their religion and freedom as regards the religious education of their children.

## Article 5

**Rights granted apart from this Convention**

Nothing in this Convention shall be deemed to impair any rights and benefits granted by a Contracting State to refugees apart from this Convention.

AR.08109

**Article 6**

**The term "in the same circumstances"**

For the purpose of this Convention, the term "in the same circumstances" implies that any requirements (including requirements as to length and conditions of sojourn or residence) which the particular individual would have to fulfil for the enjoyment of the right in question, if he were not a refugee, must be fulfilled by him, with the exception of requirements which by their nature a refugee is incapable of fulfilling.

## Article 7

**Exemption from reciprocity**

1. Except where this Convention contains more favorable provisions, a Contracting State shall accord to refugees the same treatment as is accorded to aliens generally.

2. After a period of three years' residence, all refugees shall enjoy exemption from legislative reciprocity in the territory of the Contracting States.

3. Each Contracting State shall continue to accord to refugees the rights and benefits to which they were already entitled, in the absence of reciprocity, at the date of entry into force of this Convention for that State.

4. The Contracting States shall consider favorably the possibility of according to refugees, in the absence of reciprocity, rights and benefits beyond those to which they are entitled according to paragraphs 2 and 3, and to extending exemption from reciprocity to refugees who do not fulfil the conditions provided for in paragraphs 2 and 3.

5. The provisions of paragraphs 2 and 3 apply both to the rights and benefits referred to in articles 13, 18, 19, 21 and 22 of this Convention and to rights and benefits for which this Convention does not provide.

## Article 8

**Exemption from exceptional measures**

With regard to exceptional measures which may be taken against the person, property or interests of nationals of a foreign State, the Contracting States shall not apply such measures to a refugee who is formally a national of the said State solely on account of such nationality. Contracting States which, under their legislation, are prevented from applying the general principle expressed in this article, shall, in appropriate cases, grant exemptions in favor of such refugees.

## Article 9

**Provisional measures**

Nothing in this Convention shall prevent a Contracting State, in time of war or other grave and exceptional circumstances, from taking provisionally measures which it considers to be essential to the national security in the case of a particular person, pending a determination by the Contracting State that person is in fact a refugee and that the continuance of such measures is necessary in his case in the interests of national security.

**Article 10**

**Continuity of residence**

1. Where a refugee has been forcibly displaced during the Second World War and removed to the territory of a Contracting State, and is resident there, the period of such enforced sojourn shall be considered to have been lawful residence within that territory.

2. Where a refugee has been forcibly displaced during the Second World War from the territory of a Contracting State and has, prior to the date of entry into force of this Convention, returned there for the purpose taking up residence, the period of residence before and after such enforced displacement shall be regarded as one uninterrupted period for any purposes for which uninterrupted residence is required.

**Article 11**

**Refugee seamen**

In the case of refugees regularly serving as crew members on board a ship flying the flag of a Contracting State, that state shall give sympathetic consideration to their establishment on its territory and the issue of travel documents to them on their temporary admissions to its territory particularly with a view to facilitating their establishment in another country.

## CHAPTER II – JURIDICAL STATUS

### Article 12

**Personal status**

1. The personal status of a refugee shall be governed by the law of the country of his domicile or, if he has no domicile, by the law of the country of his residence.

2. Rights previously acquired by a refugee and dependent on personal status, more particularly rights attaching to marriage, shall be respected by a Contracting State, subject to compliance, if this be necessary, with the formalities required by the law of that State, provided that the right in question is one which would have been recognized by the law of that State had he not become a refugee.

### Article 13

**Movable and immovable property**

The Contracting States shall accord to a refugee treatment as favorable as possible and, in any event, not less favorable than that accorded to aliens generally in the same circumstances as regards the acquisition of movable and immovable property and other rights pertaining thereto, and to leases and other contracts relating to movable and immovable property.

### Article 14

**Artistic rights and industrial property**

In respect of the protection of industrial property, such as inventions, designs or models, trade marks, trade names, and of rights in literary, artistic and scientific works, a refugee shall be accorded in the

AR-08999

country in which he has his habitual residence the same protection as is accorded to nationals of that country. In the territory of any other Contracting State, he shall be accorded the same protection as is accorded in that territory to nationals of the country in which he has habitual residence.

## Article 15

**Right of association**

As regards non-political and non-profit-making associations and trade unions the Contracting States shall accord to refugees lawfully staying in their territory the most favorable treatment accorded to nationals of a foreign country, in the same circumstances.

## Article 16

**Access to courts**

1. A refugee shall have free access to the courts of law on the territory of all Contracting States.

2. A refugee shall enjoy in the Contracting State in which he has his habitual residence the same treatment as a national in matters pertaining to access to the Courts, including legal assistance and exemption from *cautio judicatum solvi*.

3. A refugee shall be accorded in the matters referred to in paragraph 2 in countries other than that in which he has his habitual residence the treatment granted to a national of the country of his habitual residence.

## CHAPTER III – GAINFUL EMPLOYMENT

## Article 17

**Wage-earning employment**

1. The Contracting State shall accord to refugees lawfully staying in their territory the most favorable treatment accorded to nationals of a foreign country in the same circumstances, as regards the right to engage in wage-earning employment.

2. In any case, restrictive measures imposed on aliens or the employment of aliens for the protection of the national labour market shall not be applied to a refugee who was already exempt from them at the date of entry into force of this Convention for the Contracting States concerned, or who fulfills one of the following conditions:

(a) He has completed three years residence in the country;

(b) He has a spouse possessing the nationality of the country of residence. A refugee may not invoke the benefits of this provision if he has abandoned his spouse;

(c) He has one or more children possessing the nationality of the country of residence.

3. The Contracting States shall give sympathetic consideration to assimilating the rights of all refugees with regard to wage-earning employment to those of nationals, and in particular of those refugees who have entered their territory pursuant to programmes of labour recruitment or under immigration schemes.

AR.08112

Article 18

**Self-employment**

The Contracting States shall accord to a refugee lawfully in their territory treatment as favorable as possible and, in any event, not less favorable than that accorded to aliens generally in the same circumstances, as regards the right to engage on his own account in agriculture, industry, handicrafts and commerce and to establish commercial and industrial companies.

## Article 19

**Liberal professions**

1. Each Contracting State shall accord to refugees lawfully staying in their territory who hold diplomas recognized by the competent authorities of that State, and who are desirous of practising a liberal profession, treatment as favorable as possible and, in any event, not less favorable than that accorded to aliens generally in the same circumstances.

2. The Contracting States shall use their best endeavours consistently with their laws and constitutions to secure the settlement of such refugees in the territories, other than the metropolitan territory, for whose international relations they are responsible.

## CHAPTER IV – WELFARE

## Article 20

**Rationing**

Where a rationing system exists, which applies to the population at large and regulates the general distribution of products in short supply, refugees shall be accorded the same treatment as nationals.

## Article 21

**Housing**

As regards housing, the Contracting States, in so far as the matter is regulated by laws or regulations or is subject to the control of public authorities, shall accord to refugees lawfully staying in their territory treatment as favorable as possible and, in any event, not less favorable than that accorded to aliens generally in the same circumstances.

## Article 22

**Public education**

1. The Contracting States shall accord to refugees the same treatment as is accorded to nationals with respect to elementary education.

2. The Contracting States shall accord to refugees treatment as favorable as possible, and, in any event, not less favorable than that accorded to aliens generally in the same circumstances, with respect to education other than elementary education and, in particular, as regards access to studies, the recognition of foreign school certificates, diplomas and degrees, the remission of fees and charges and the award of scholarships.

AR.08113

**Article 23**

**Public relief**

The Contracting States shall accord to refugees lawfully staying in their territory the same treatment with respect to public relief and assistance as is accorded to their nationals.

## Article 24

**Labour legislation and social security**

1. The Contracting States shall accord to refugees lawfully staying in their territory the same treatment as is accorded to nationals in respect of the following matters:

(a) In so far as such matters are governed by laws or regulations or are subject to the control of administrative authorities: remuneration, including family allowances where these form part of remuneration, hours of work, overtime arrangements, holidays with pay, restrictions on home work, minimum age of employment, apprenticeship and training, women's work and the work of young persons, and the enjoyment of the benefits of collective bargaining;

(b) Social security (legal provisions in respect of employment injury, occupational diseases, maternity, sickness, disability, old age, death, unemployment, family responsibilities and any other contingency which, according to national laws or regulations, is covered by a social security scheme), subject to the following limitations:

(i) There may be appropriate arrangements for the maintenance of acquired rights and rights in course of acquisition;

(ii) National laws or regulations of the country of residence may prescribe special arrangements concerning benefits or portions of benefits which are payable wholly out of public funds, and concerning allowances paid to persons who do not fulfil the contribution conditions prescribed for the award of a normal pension.

2. The right to compensation for the death of a refugee resulting from employment injury or from occupational disease shall not be affected by the fact that the residence of the beneficiary is outside the territory of the Contracting State.

3. The Contracting States shall extend to refugees the benefits of agreements concluded between them, or which may be concluded between them in the future, concerning the maintenance of acquired rights and rights in the process of acquisition in regard to social security, subject only to the conditions which apply to nationals of the States signatory to the agreements in question.

4. The Contracting States will give sympathetic consideration to extending to refugees so far as possible the benefits of similar agreements which may at any time be in force between such Contracting States and non-contracting States.

## CHAPTER V – ADMINISTRATIVE MEASURES

## Article 25

**Administrative assistance**

1. When the exercise of a right by a refugee would normally require the assistance of authorities of a foreign country to whom he cannot have recourse, the Contracting States in whose territory he is residing shall arrange that such assistance be afforded to him by their own authorities or by an international authority.

AR.08114

2. The authority or authorities mentioned in paragraph 1 shall deliver or cause to be delivered under their supervision to refugees such documents or certifications as would normally be delivered to aliens by or through their national authorities.

3. Documents or certifications so delivered shall stand in the stead of the official instruments delivered to aliens by or through their national authorities, and shall be given credence in the absence of proof to the contrary.

4. Subject to such exceptional treatment as may be granted to indigent persons, fees may be charged for the services mentioned herein, but such fees shall be moderate and commensurate with those charged to nationals for similar services.

5. The provisions of this article shall be without prejudice to articles 27 and 28.

## Article 26

### Freedom of movement

Each Contracting State shall accord to refugees lawfully in its territory the right to choose their place of residence and to move freely within its territory, subject to any regulations applicable to aliens generally in the same circumstances.

## Article 27

### Identity papers

The Contracting States shall issue identity papers to any refugee in their territory who does not possess a valid travel document.

## Article 28

### Travel documents

1. The Contracting States shall issue to refugees lawfully staying in their territory travel documents for the purpose of travel outside their territory unless compelling reasons of national security or public order otherwise require, and the provisions of the Schedule to this Convention shall apply with respect to such document. The Contracting States may issue such a travel document to any other refugee in their territory; they shall in particular give sympathetic consideration to the issue of such a travel document to refugees in their territory who are unable to obtain a travel document from the country of their lawful residence.

2. Travel documents issued to refugees under previous international agreements by parties thereto shall be recognized and treated by the Contracting States in the same way as if they had been issued pursuant to this article.

## Article 29

### Fiscal charges

1. The Contracting States shall not impose upon refugees duties, charges or taxes, of any description whatsoever, other or higher than those which are or may be levied on their nationals in similar situations.

AR.08115

2. Nothing in the above paragraph shall prevent the application to refugees of the laws and regulations concerning charges in respect of the issue to aliens of administrative documents including identity papers.

## Article 30

**Transfer of assets**

1. A Contracting State shall, in conformity with its laws and regulations permit refugees to transfer assets which they have brought into its territory, to another country where they have been admitted for the purposes of resettlement.

2. A Contracting State shall give sympathetic consideration to the application of refugees for permission to transfer assets wherever they may be and which are necessary for their resettlement in another country to which they have been admitted.

## Article 31

**Refugees unlawfully in the country of refuge**

1. The Contracting States shall not impose penalties, on account of their illegal entry or presence, on refugees who, coming directly from a territory where their life or freedom was threatened in the sense of Article 1, enter or are present in their territory without authorization, provided they present themselves without delay to the authorities and show good cause for their illegal entry or presence.

2. The Contracting States shall not apply to the movements of such refugees restrictions other than those which are necessary and such restrictions shall only be applied until their status in the country is regularized or they obtain admission into another country. The Contracting States shall allow such refugees a reasonable period and all the necessary facilities to obtain admission into another country.

## Article 32

**Expulsion**

1. The Contracting States shall not expel a refugee lawfully in their territory save on grounds of national security or public order.

2. The expulsion of such a refugee shall be only in pursuance of a decision reached in accordance with due process of law. Except where compelling reasons of national security otherwise require, the refugee shall be allowed to clear himself, and to appeal to and be represented for the purpose before competent authority or a person or persons specially designated by the competent authority.

3. The Contracting States shall allow such a refugee a reasonable period within which to seek legal admission into another country. The Contracting States reserve the right to apply during that period such internal measures as they may deem necessary.

## Article 33

**Prohibition of expulsion or return ("refoulement")**

1. No Contracting State shall expel or return (*"refouler"*) a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion.

AR.08116

59

2. The benefit of the present provision may not, however, be claimed by a refugee whom there are reasonable grounds for regarding as a danger to the security of the country in which he is, or who, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of that country.

## Article 34

**Naturalization**

The Contracting States shall as far as possible facilitate the assimilation and naturalization of refugees. They shall in particular make every effort to expedite naturalization proceedings and to reduce as far as possible the charges and cost of such proceedings.

## CHAPTER VI – EXECUTORY AND TRANSITORY PROVISIONS

## Article 35

**Co-operation of the national authorities with the United Nations**

1. The Contracting States undertake to co-operate with the Office of the United Nations High Commissioner for Refugees, or any other agency of the United Nations which may succeed it, in the exercise of its functions, and shall in particular facilitate its duty of supervising the application of the provisions of this Convention.

2. In order to enable the Office of the High Commissioner or any other agency of the United Nations which may succeed it, to make reports to the competent organs of the United Nations, the Contracting States undertake to provide them in the appropriate form with information and statistical data requested concerning:

(a) the condition of refugees,

(b) the implementation of this Convention, and

(c) laws, regulations and decrees which are, or may hereafter be, in force relating to refugees.

## Article 36

**Information on national legislation**

The Contracting States shall communicate to the Secretary-General of the United Nations the laws and regulations which they may adopt to ensure the application of this Convention.

## Article 37

**Relation to previous conventions**

Without prejudice to article 28, Paragraph 2, of this Convention, this Convention replaces, as between parties to it, the Arrangements of 5 July 1922, 31 May 1924, 12 May 1926, 30 June 1928 and 30 July 1935, the Conventions of 28 October 1933 and 10 February 1938, the Protocol of 14 September 1939 and the Agreement of 15 October 1946.

AR.08117

## CHAPTER VII – FINAL CLAUSES

## Article 38

**Settlement of disputes**

Any dispute between parties to this Convention relating to its interpretation or application, which cannot be settled by other means, shall be referred to the International Court of Justice at the request of any one of the parties to the dispute.

## Article 39

**Signature, ratification and accession**

1. This Convention shall be opened for signature at Geneva on 28 July 1951 shall thereafter be deposited with the Secretary-General of the United Nations. It shall be open for signature at the European office of the United Nations from 28 July to 31 August 1951 and shall be reopened for signature at the Headquarters of the United Nations from 17 September 1951 to 31 December 1952.

2. This Convention shall be open for signature on behalf of all States members of the United Nations and also on behalf of any other State invited to attend the Conference of Plenipotentiaries on the Status of Refugees and Stateless Persons or to which an invitation to sign will have been addressed by the General Assembly. It shall be ratified and the instruments of ratification shall be deposited with the Secretary-General of the United Nations.

3. This Convention shall be open from 28 July 1951 for accession by the States referred to in paragraph 2 of this Article. Accession shall be effected by the deposit of an instrument of accession with the Secretary-General of the United Nations.

## Article 40

**Territorial application clause**

1. Any State may, at the time of signature, ratification or accession, declare that this Convention shall extend to all or any of the territories for the international relations of which it is responsible. Such a declaration shall take effect when the Convention enters into force for the States concerned.

2. At any time thereafter any such extension shall be made by notification addressed to the Secretary-General of the United Nations and shall take effect as from the ninetieth day after the day of receipt by the Secretary-General of the United Nations of this notification, or as from the date of entry into force of the Convention for the State concerned, whichever is the later.

3. With respect to those territories to which this Convention is not extended at the time of signature, ratification or accession, each State concerned shall consider the possibility of taking the necessary steps in order to extend the application of this Convention to such territories, subject where necessary for constitutional reasons, to the consent of the governments of such territories.

## Article 41

**Federal clause**

In the case of a Federal or non-unitary State, the following provisions shall apply:

AR.08118

(a) With respect to those articles of this Convention that come within the legislative jurisdiction of the federal legislative authority, the obligations of the Federal Government shall to this extent be the same as those of Parties which are not Federal States,

(b) With respect to those articles of this Convention that come within the legislative jurisdiction of constituent States, provinces or cantons which are not, under the constitutional system of the federation, bound to take legislative action, the Federal Government shall bring such articles with a favourable recommendation, to the notice of the appropriate authorities of States, provinces or cantons at the earliest possible moment.

(c) A Federal State Party to this Convention shall, at the request of any other Contracting State transmitted through the Secretary-General of the United Nations, supply a statement of the law and practice of the Federation and its constituent units in regard to any particular provision of the Convention showing the extent to which effect has been given to that provision by legislative or other action.

## Article 42

**Reservations**

1. At the time of signature, ratification or accession, any State may make reservations to articles of the Convention other than to articles 1, 3, 4, 16 (1), 33, 36 to 46 inclusive.

2. Any State making a reservation in accordance with paragraph 1 of this article may at any time withdraw the reservation by a communication to that effect addressed to the Secretary-General of the United Nations.

## Article 43

**Entry into force**

1. This Convention shall come into force on the ninetieth day following the day of deposit of the sixth instrument of ratification or accession.

2. For each State ratifying or acceding to the Convention after the deposit of the sixth instrument of ratification or accession, the Convention shall enter into force on the ninetieth day following the day of deposit by such State of its instrument of ratification or accession.

## Article 44

**Denunciation**

1. Any Contracting State may denounce this Convention at any time by a notification addressed to the Secretary-General of the United Nations.

2. Such denunciation shall take effect for the Contracting State concerned one year from the date upon which it is received by the Secretary-General of the United Nations.

3. Any State which has made a declaration or notification under article 40 may, at any time thereafter, by a notification to the Secretary-General of the United Nations, declare that the Convention shall cease to extend to such territory one year after the date of receipt of the notification by the Secretary-General.

AR.08119

**Article 45**

**Revision**

1. Any Contracting State may request revision of this Convention at any time by a notification addressed to the Secretary-General of the United Nations.

2. The General Assembly of the United Nations shall recommend the steps, if any, to be taken in respect of such request.

## Article 46

**Notifications by the Secretary-General of the United Nations**

The Secretary-General of the United Nations shall inform all Members of the United Nations and non-member States referred to in article 39:

(a) of declarations and notifications in accordance with Section B of Article 1;

(b) of signatures, ratifications and accessions in accordance with article 39;

(c) of declarations and notifications in accordance with article 40;

(d) of reservations and withdrawals in accordance with article 42;

(e) of the date on which this Convention will come into force in accordance with article 43;

(f) of denunciations and notifications in accordance with article 44;

(g) of requests for revision in accordance with article 45.

*In faith whereof* the undersigned, duly authorized, have signed this Convention on behalf of their respective Governments,

*Done* at Geneva, this twenty-eighth day of July, one thousand nine hundred and fifty-one, in a single copy, of which the English and French texts are equally authentic and which shall remain deposited in the archives of the United Nations, and certified true copies of which shall be delivered to all Members of the United Nations and to the non-member States referred to in article 39.

## SCHEDULE

### Paragraph 1

1. The travel document referred to in article 28 of this Convention shall be similar to the specimen annexed hereto.

2. The document shall be made out in at least two languages, one of which shall be in English or French.

### Paragraph 2

Subject to the regulations obtaining in the country of issue, children may be included in the travel document of a parent or, in exceptional circumstances, of another adult refugee. AR.08120

**Paragraph 3**

The fees charged for issue of the document shall not exceed the lowest scale of charges for national passports.

**Paragraph 4**

Save in special or exceptional cases, the document shall be made valid for the largest possible number of countries.

**Paragraph 5**

The document shall have a validity of either one or two years, at the discretion of the issuing authority.

**Paragraph 6**

1. The renewal or extension of the validity of the document is a matter for the authority which issued it, so long as the holder has not established lawful residence in another territory and resides lawfully in the territory of the said authority. The issue of a new document is, under the same conditions, a matter for the authority which issued the former document.

2. Diplomatic or consular authorities, specially authorized for the purpose, shall be empowered to extend, for a period not exceeding six months, the validity of travel documents issued by the Governments.

3. The Contracting States shall give sympathetic consideration to renewing or extending the validity of travel documents or issuing new documents to refugees no longer lawfully resident in their territory who are unable to obtain a travel document from the country of their lawful residence.

**Paragraph 7**

The Contracting States shall recognize the validity of the documents issued in accordance with the provisions of article 28 of this Convention.

**Paragraph 8**

The competent authorities of the country to which the refugee desires to proceed shall, if they are prepared to admit him and if a visa is required, affix a visa on the document of which he is the holder.

**Paragraph 9**

1. The Contracting States undertake to issue transit visas to refugees who have obtained visas for a territory of final destination.

2. The issue of such visas may be refused on grounds which would justify refusal of a visa to any alien.

**Paragraph 10**

The fees for the issue of exit, entry or transit visas shall not exceed the lowest scale of charges for visas on foreign passports.

AR.08121

**Paragraph 11**

When a refugee has lawfully taken up residence in the territory of another Contracting State, the responsibility for the issue of a new document, under the terms and conditions of article 28, shall be that of the competent authority of that territory, to which the refugee shall be entitled to apply.

**Paragraph 12**

The authority issuing a new document shall withdraw the old document and shall return it to the country of issue, if it is stated in the document that it should be so returned; otherwise it shall withdraw and cancel the document.

**Paragraph 13**

1. Each Contracting State undertakes that the holder of a travel document issued by it in accordance with article 28 of this Convention shall be readmitted to its territory at any time during the period of its validity.

2. Subject to the provisions of the preceding sub-paragraph, a Contracting State may require the holder of the document to comply with such formalities as may be prescribed in regard to exit from or return to its territory.

3. The Contracting States reserve the right, in exceptional cases, or in cases where the refugee's stay is authorized for a specific period, when issuing the document, to limit the period during which the refugee may return to a period of not less than three months.

**Paragraph 14**

Subject only to the terms of paragraph 13, the provisions of this Schedule in no way affect the laws and regulations governing the conditions of admission to, transit through, residence and establishment in, and departure from, the territories of the Contracting States.

**Paragraph 15**

Neither the issue of the document nor the entries made thereon determine or affect the status of the holder, particularly as regards nationality.

**Paragraph 16**

The issue of the document does not in any way entitle the holder to the protection of the diplomatic or consular authorities of the country of issue, and does not confer on these authorities a right of protection.

## ANNEX – SPECIMEN TRAVEL DOCUMENT

[not reproduced here]

AR.08122

# ANNEX III

## 1967 PROTOCOL RELATING TO THE STATUS OF REFUGEES[30]

*The States Parties* to the present Protocol,

*Considering* that the Convention relating to the Status of Refugees done at Geneva on 28 July 1951 (hereinafter referred to as the Convention) covers only those persons who have become refugees as a result of events occurring before 1 January 1951,

*Considering* that new refugee situations have arisen since the Convention was adopted and that the refugees concerned may therefore not fall within the scope of the Convention,

*Considering* that it is desirable that equal status should be enjoyed by all refugees covered by the definition in the Convention irrespective of the dateline 1 January 1951,

*Have agreed* as follows:

## Article I

### General provision

1. The States Parties to the present Protocol undertake to apply articles 2 to 34 inclusive of the Convention to refugees as hereinafter defined.

2. For the purpose of the present Protocol, the term "refugee" shall, except as regards the application of paragraph 3 of this article, mean any person within the definition of article 1 of the Convention as if the words "As a result of events occurring before 1 January 1951 and…" and the words "… as a result of such events", in article 1 A (2) were omitted.

3. The present Protocol shall be applied by the States Parties hereto without any geographic limitation, save that existing declarations made by States already Parties to the Convention in accordance with article 1 B (1) (a) of the Convention, shall, unless extended under article 1 B (2) thereof, apply also under the present Protocol.

## Article II

### Co-operation of the national authorities with the United Nations

1. The States Parties to the present Protocol undertake to co-operate with the Office of the United Nations High Commissioner for Refugees, or any other agency of the United Nations which may succeed it, in the exercise of its functions, and shall in particular facilitate its duty of supervising the application of the provisions of the present Protocol.

2. In order to enable the Office of the High Commissioner, or any other agency of the United Nations which may succeed it, to make reports to the competent organs of the United Nations, the States Parties to the present Protocol undertake to provide them with the information and statistical data requested, in the appropriate form, concerning:

(a) The condition of refugees;

---

[30] United Nations, Treaty Series, vol 606, p. 267.

(b) The implementation of the present Protocol;

(c) Laws, regulations and decrees which are, or may hereafter be, in force relating to refugees.

## Article III

**Information on national legislation**

The States Parties to the present Protocol shall communicate to the Secretary-General of the United Nations the laws and regulations which they may adopt to ensure the application of the present Protocol.

## Article IV

**Settlement of disputes**

Any dispute between States Parties to the present Protocol which relates to its interpretation or application and which cannot be settled by other means shall be referred to the International Court of Justice at the request of any one of the parties to the dispute.

## Article V

**Accession**

The present Protocol shall be open for accession on behalf of all States Parties to the Convention and of any other State Member of the United Nations or member of any of the specialized agencies or to which an invitation to accede may have been addressed by the General Assembly of the United Nations. Accession shall be effected by the deposit of an instrument of accession with the Secretary-General of the United Nations.

## Article VI

**Federal clause**

In the case of a Federal or non-unitary State, the following provisions shall apply:

(a) With respect to those articles of the Convention to be applied in accordance with article I, paragraph 1, of the present Protocol that come within the legislative jurisdiction of the federal legislative authority, the obligations of the Federal Government shall to this extent be the same as those of States Parties which are not Federal States;

(b) With respect to those articles of the Convention to be applied in accordance with article I, paragraph 1, of the present Protocol that come within the legislative jurisdiction of constituent States, provinces or cantons which are not, under the constitutional system of the federation, bound to take legislative action, the Federal Government shall bring such articles with a favourable recommendation to the notice of the appropriate authorities of States, provinces or cantons at the earliest possible moment;

(c) A Federal State Party to the present Protocol shall, at the request of any other State Party hereto transmitted through the Secretary General of the United Nations, supply a statement of the law and practice of the Federation and its constituent units in regard to any particular provision of the Convention to be applied in accordance with article 1, paragraph 1, of the present Protocol, showing the extent to which effect has been given to that provision by legislative or other action.

AR.08124

## Article VII

### Reservations and Declarations

1. At the time of accession, any State may make reservations in respect of article IV of the present Protocol and in respect of the application in accordance with article I of the present Protocol of any provisions of the Convention other than those contained in articles 1, 3, 4, 16 (1) and 33 thereof, provided that in the case of a State Party to the Convention reservations made under this article shall not extend to refugees in respect of whom the Convention applies.

2. Reservations made by States Parties to the Convention in accordance with article 42 thereof shall, unless withdrawn, be applicable in relation to their obligations under the present Protocol.

3. Any State making a reservation in accordance with paragraph 1 of this article may at any time withdraw such reservation by a communication to that effect addressed to the Secretary-General of the United Nations.

4. Declarations made under article 40, paragraphs 1 and 2, of the Convention by a State Party thereto which accedes to the present Protocol shall be deemed to apply in respect of the present Protocol, unless upon accession a notification to the contrary is addressed by the State Party concerned to the Secretary-General of the United Nations. The provisions of article 40, paragraphs 2 and 3, and of article 44, paragraph 3, of the Convention shall be deemed to apply *mutatis mutandis* to the present Protocol.

## Article VIII

### Entry into force

1. The present Protocol shall come into force on the day of deposit of the sixth instrument of accession.

2. For each State acceding to the Protocol after the deposit of the sixth instrument of accession, the Protocol shall come into force on the date of deposit by such State of its instrument of accession.

## Article IX

### Denunciation

1. Any State Party hereto may denounce this Protocol at any time by a notification addressed to the Secretary-General of the United Nations.

2. Such denunciation shall take effect for the State Party concerned one year from the date on which it is received by the Secretary-General of the United Nations.

## Article X

### Notifications by the Secretary-General of the United Nations

The Secretary-General of the United Nations shall inform the States referred to in article V above of the date of entry into force, accessions, reservations and withdrawals of reservations to and denunciations of the present Protocol, and of declarations and notifications relating hereto.

AR.08125

**Article XI**

**Deposit in the Archives of the Secretariat of the United Nations**

A copy of the present Protocol, of which the Chinese, English, French, Russian and Spanish texts are equally authentic, signed by the President of the General Assembly and by the Secretary-General of the United Nations, shall be deposited in the archives of the Secretariat of the United Nations. The Secretary-General will transmit certified copies thereof to all States Members of the United Nations and to the other States referred to in article V above.

## ANNEX IV

**LIST OF STATES PARTIES TO THE 1951 CONVENTION RELATING TO THE STATUS OF REFUGEES AND THE 1967 PROTOCOL**

Date of entry into force:
22 April 1954 (Convention)
4 October 1967 (Protocol)

### As of 10 December 2018

Total number of States Parties to the 1951 Convention: 146
Total number of States Parties to the 1967 Protocol: 147
States Parties to both the Convention and Protocol: 144
States Parties to one or both of these instruments: 149

### States Parties to the 1951 Convention only:

Madagascar and Saint Kitts and Nevis

### States Parties to the 1967 Protocol only:

Cape Verde, United States of America, Venezuela

The dates indicated are the dates of deposit of the instrument of ratification or accession by the respective States Parties with the Secretary-General of the United Nations in New York. In accordance with article 43(2), the Convention enters into force on the ninetieth day after the date of deposit. The Protocol enters into force on the date of deposit (article VIII (2)). Exceptions are indicated below.

| Country[31] | Convention | Protocol |
|---|---|---|
| Afghanistan | 30 Aug 2005 a | 30 Aug 2005 a |
| Albania | 18 Aug 1992 a | 18 Aug 1992 a |
| Algeria | 21 Feb 1963 d | 08 Nov 1967 a |
| Angola | 23 Jun 1981 a | 23 Jun 1981 a |
| Antigua and Barbuda | 07 Sep 1995 a | 07 Sep 1995 a |
| Argentina | 15 Nov 1961 a | 06 Dec 1967 a |
| Armenia | 06 Jul 1993 a | 06 Jul 1993 a |
| Australia | 22 Jan 1954 a | 13 Dec 1973 a |
| Austria | 01 Nov 1954 r | 05 Sep 1973 a |
| Azerbaijan | 12 Feb 1993 a | 12 Feb 1993 a |
| Bahamas | 15 Sep 1993 a | 15 Sep 1993 a |
| Belarus | 23 Aug 2001 a | 23 Aug 2001 a |
| Belgium | 22 Jul 1953 r | 08 Apr 1969 a |
| Belize | 27 Jun 1990 a | 27 Jun 1990 a |
| Benin | 04 Apr 1962 d | 06 Jul 1970 a |
| Bolivia, Plurinational State of | 09 Feb 1982 a | 09 Feb 1982 a |
| Bosnia and Herzegovina | 01 Sep 1993 d | 01 Sep 1993 d |
| Botswana | 06 Jan 1969 a | 06 Jan 1969 a |
| Brazil | 16 Nov 1960 r | 07 Apr 1972 a |
| Bulgaria | 12 May 1993 a | 12 May 1993 a |

---

[31] Notes:
  * Ratification (r), Accession (a), Succession (d).
  ** (C) denotes States Parties to the 1951 Convention only; (P) denotes States Parties to the 1967 Protocol only.

AR.08127

| Country | Convention | Protocol |
|---|---|---|
| Burkina Faso | 18 Jun 1980 a | 18 Jun 1980 a |
| Burundi | 19 Jul 1963 a | 15 Mar 1971 a |
| Cambodia | 15 Oct 1992 a | 15 Oct 1992 a |
| Cameroon | 23 Oct 1961 d | 19 Sep 1967 a |
| Canada | 04 Jun 1969 a | 04 Jun 1969 a |
| Cape Verde (P) | | 09 Jul 1987 a |
| Central African Republic | 04 Sep 1962 d | 30 Aug 1967 a |
| Chad | 19 Aug 1981 a | 19 Aug 1981 a |
| Chile | 28 Jan 1972 a | 27 Apr 1972 a |
| China | 24 Sep 1982 a | 24 Sep 1982 a |
| Colombia | 10 Oct 1961 r | 04 Mar 1980 a |
| Congo | 15 Oct 1962 d | 10 Jul 1970 a |
| Congo, Democratic Republic of | 19 July 1965 a | 13 Jan 1975 a |
| Costa Rica | 28 Mar 1978 a | 28 Mar 1978 a |
| Côte d'Ivoire | 08 Dec 1961 d | 16 Feb 1970 a |
| Croatia | 12 Oct 1992 d | 12 Oct 1992 d |
| Cyprus | 16 May 1963 d | 09 Jul 1968 a |
| Czech Republic | 11 May 1993 d | 11 May 1993 d |
| Denmark | 04 Dec 1952 r | 29 Jan 1968 a |
| Djibouti | 09 Aug 1977 d | 09 Aug 1977 d |
| Dominica | 17 Feb 1994 a | 17 Feb 1994 a |
| Dominican Republic | 04 Jan 1978 a | 04 Jan 1978 a |
| Ecuador | 17 Aug 1955 a | 06 Mar 1969 a |
| Egypt | 22 May 1981 a | 22 May 1981 a |
| El Salvador | 28 Apr 1983 a | 28 Apr 1983 a |
| Equatorial Guinea | 07 Feb 1986 a | 07 Feb 1986 a |
| Estonia | 10 Apr 1997 a | 10 Apr 1997 a |
| Ethiopia | 10 Nov 1969 a | 10 Nov 1969 a |
| Fiji | 12 Jun 1972 d | 12 Jun 1972 d |
| Finland | 10 Oct 1968 a | 10 Oct 1968 a |
| France | 23 Jun 1954 r | 03 Feb 1971 a |
| Gabon | 27 Apr 1964 a | 28 Aug 1973 a |
| Gambia | 07 Sep 1966 d | 29 Sep 1967 a |
| Georgia | 09 Aug 1999 a | 09 Aug 1999 a |
| Germany | 01 Dec 1953 r | 05 Nov 1969 a |
| Ghana | 18 Mar 1963 a | 30 Aug 1968 a |
| Greece | 05 Apr 1960 r | 07 Aug 1968 a |
| Guatemala | 22 Sep 1983 a | 22 Sep 1983 a |
| Guinea | 28 Dec 1965 d | 16 May 1968 a |
| Guinea-Bissau | 11 Feb 1976 a | 11 Feb 1976 a |
| Haiti | 25 Sep 1984 a | 25 Sep 1984 a |
| Holy See | 15 Mar 1956 r | 08 Jun 1967 a |
| Honduras | 23 Mar 1992 a | 23 Mar 1992 a |
| Hungary | 14 Mar 1989 a | 14 Mar 1989 a |
| Iceland | 30 Nov 1955 a | 26 Apr 1968 a |
| Iran, Islamic Republic of | 28 Jul 1976 a | 28 Jul 1976 a |
| Ireland | 29 Nov 1956 a | 06 Nov 1968 a |
| Israel | 01 Oct 1954 r | 14 Jun 1968 a |
| Italy | 15 Nov 1954 r | 26 Jan 1972 a |
| Jamaica | 30 Jul 1964 d | 30 Oct 1980 a |
| Japan | 03 Oct 1981 a | 01 Jan 1982 a |
| Kazakhstan | 15 Jan 1999 a | 15 Jan 1999 a |
| Kenya | 16 May 1966 a | 13 Nov 1981 a |
| Kyrgyzstan | 08 Oct 1996 a | 08 Oct 1996 a |
| Korea, Republic of | 03 Dec 1992 a | 03 Dec 1992 a |
| Latvia | 31 Jul 1997 a | 31 Jul 1997 a |

AR.08128

| Country | Convention | Protocol |
|---|---|---|
| Lesotho | 14 May 1981 a | 14 May 1981 a |
| Liberia | 15 Oct 1964 a | 27 Feb 1980 a |
| Liechtenstein | 08 Mar 1957 r | 20 May 1968 a |
| Lithuania | 28 Apr 1997 a | 28 Apr 1997 a |
| Luxembourg | 23 Jul 1953 r | 22 Apr 1971 a |
| Macedonia, The Former Yugoslav Republic of | 18 Jan 1994 d | 18 Jan 1994 d |
| Madagascar (C) | 18 Dec 1967 a | |
| Malawi | 10 Dec 1987 a | 10 Dec 1987 a |
| Mali | 02 Feb 1973 d | 02 Feb 1973 a |
| Malta | 17 Jun 1971 a | 15 Sep 1971 a |
| Mauritania | 05 May 1987 a | 05 May 1987 a |
| Mexico | 07 June 2000 a | 07 June 2000 a |
| Moldova, Republic of | 31 Jan 2002 a | 31 Jan 2002 a |
| Monaco | 18 May 1954 a | 16 June 2010 a |
| Montenegro | 10 Oct 2006 d | 10 Oct 2006 d |
| Morocco | 07 Nov 1956 d | 20 Apr 1971 a |
| Mozambique | 16 Dec 1983 a | 01 May 1989 a |
| Namibia | 17 Feb 1995 a | 17 Feb 1995 a |
| Nauru | 28 June 2011 a | 28 June 2011 a |
| Netherlands | 03 May 1956 r | 29 Nov 1968 a |
| New Zealand | 30 Jun 1960 a | 06 Aug 1973 a |
| Nicaragua | 28 Mar 1980 a | 28 Mar 1980 a |
| Niger | 25 Aug 1961 d | 02 Feb 1970 a |
| Nigeria | 23 Oct 1967 a | 02 May 1968 a |
| Norway | 23 Mar 1953 r | 28 Nov 1967 a |
| Panama | 02 Aug 1978 a | 02 Aug 1978 a |
| Papua New Guinea | 17 Jul 1986 a | 17 Jul 1986 a |
| Paraguay | 01 Apr 1970 a | 01 Apr 1970 a |
| Peru | 21 Dec 1964 a | 15 Sep 1983 a |
| Philippines | 22 Jul 1981 a | 22 Jul 1981 a |
| Poland | 27 Sep 1991 a | 27 Sep 1991 a |
| Portugal | 22 Dec 1960 a | 13 Jul 1976 a |
| Romania | 07 Aug 1991 a | 07 Aug 1991 a |
| Russian Federation | 02 Feb 1993 a | 02 Feb 1993 a |
| Rwanda | 03 Jan 1980 a | 03 Jan 1980 a |
| Saint Kitts and Nevis (C) | 01 Feb 2002 a | |
| Saint Vincent and the Grenadines | 03 Nov 1993 a | 03 Nov 2003 a |
| Samoa | 21 Sep 1988 a | 29 Nov 1994 a |
| Sao Tome and Principe | 01 Feb 1978 a | 01 Feb 1978 a |
| Senegal | 02 May 1963 d | 03 Oct 1967 a |
| Serbia | 12 Mar 2001 d | 12 Mar 2001 d |
| Seychelles | 23 Apr 1980 a | 23 Apr 1980 a |
| Sierra Leone | 22 May 1981 a | 22 May 1981 a |
| Slovakia | 04 Feb 1993 d | 04 Feb 1993 d |
| Slovenia | 06 Jul 1992 d | 06 Jul 1992 d |
| Solomon Islands | 28 Feb 1995 a | 12 Apr 1995 a |
| Somalia | 10 Oct 1978 a | 10 Oct 1978 a |
| South Africa | 12 Jan 1996 a | 12 Jan 1996 a |
| South Sudan | 10 Dec 2018 a | 10 Dec 2018 a |
| Spain | 14 Aug 1978 a | 14 Aug 1978 a |
| Sudan | 22 Feb 1974 a | 23 May 1974 a |
| Suriname | 29 Nov 1978 d | 29 Nov 1978 d |
| Swaziland | 14 Feb 2000 a | 28 Jan 1969 a |
| Sweden | 26 Oct 1954 r | 04 Oct 1967 a |
| Switzerland | 21 Jan 1955 r | 20 May 1968 a |

AR.08129

| Country | Convention | Protocol |
|---|---|---|
| Tajikistan | 07 Dec 1993 a | 07 Dec 1993 a |
| Tanzania, United Republic of | 12 May 1964 a | 04 Sep 1968 a |
| Timor-Leste | 07 May 2003 a | 07 May 2003 a |
| Togo | 27 Feb 1962 d | 01 Dec 1969 a |
| Trinidad and Tobago | 10 Nov 2000 a | 10 Nov 2000 a |
| Tunisia | 24 Oct 1957 d | 16 Oct 1968 a |
| Turkey | 30 Mar 1962 r | 31 Jul 1968 a |
| Turkmenistan | 02 Mar 1998 a | 02 Mar 1998 a |
| Tuvalu | 07 Mar 1986 d | 07 Mar 1986 d |
| Uganda | 27 Sep 1976 a | 27 Sep 1976 a |
| Ukraine | 10 Jun 2002 a | 04 Apr 2002 a |
| United Kingdom of Great Britain and Northern Ireland | 11 Mar 1954 r | 04 Sep 1968 a |
| United States of America (P) | | 01 Nov 1968 a |
| Uruguay | 22 Sep 1970 a | 22 Sep 1970 a |
| Venezuela, Bolivarian Republic of (P) | | 19 Sep 1986 a |
| Yemen | 18 Jan 1980 a | 18 Jan 1980 a |
| Zambia | 24 Sep 1969 d | 24 Sep 1969 a |
| Zimbabwe | 25 Aug 1981 a | 25 Aug 1981 a |

**Limitations:**

Article 1 B(1) of the 1951 Convention provides: "For the purposes of this Convention, the words 'events occurring before 1 January 1951' in article 1, Section A, shall be understood to mean either (a) 'events occurring in Europe before 1 January 1951'; or (b) 'events occurring in Europe or elsewhere before 1 January 1951', and each Contracting State shall make a declaration at the time of signature, ratification or accession, specifying which of these meanings it applies for the purposes of its obligations under this Convention."

The following States adopted alternative (a), the geographical limitation: Congo, Madagascar, Monaco and Turkey. Turkey expressly maintained its declaration of geographical limitation upon acceding to the 1967 Protocol. Madagascar has not yet acceded to the Protocol.

All other States Parties ratified, acceded or succeeded to the Convention without a geographical limitation by selecting option (b), 'events occurring in Europe or elsewhere before 1 January 1951'.

AR.08130

# ANNEX V

**EXCERPT FROM THE CHARTER OF THE INTERNATIONAL MILITARY TRIBUNAL**[32]

### Article 6

"The Tribunal established by the Agreement referred to in Article 1 hereof for the trial and punishment of the major war criminals of the European Axis countries shall have the power to try and punish persons who, acting in the interests of the European Axis countries, whether as individuals or as members of organisations, committed any of the following crimes.

"The following acts, or any of them, are crimes coming within the jurisdiction of the Tribunal for which there shall be individual responsibility:

(a) *Crimes against peace*: namely, planning, preparation, initiation or waging of a war of aggression, or a war in violation of international treaties, agreements or assurances, or participation in a common plan or conspiracy for the accomplishment of any of the foregoing;

(b) *War crimes*: namely, violations of the laws or customs of war. Such violations shall include, but not be limited to, murder, ill-treatment or deportation to slave labour or for any other purpose, of civilian population of or in occupied territory, murder or ill-treatment of prisoners of war or persons on the seas, killing of hostages, plunder of public or private property, wanton destruction of cities, towns or villages, or devastation not justified by military necessity;

(c) *Crimes against humanity*: namely, murder, extermination, enslavement, deportation and other inhumane acts committed against any civilian population, before or during the war; or persecutions on political, racial or religious grounds in execution of or in connection with any crime within the jurisdiction of the Tribunal, whether or not in violation of the domestic law of the country where perpetrated.

"Leaders, organisers, instigators and accomplices participating in the formulation or execution of a common plan or conspiracy to commit any of the foregoing crimes are responsible for all acts performed by any persons in execution of such plan."

---

[32] See "*The Charter and Judgment of the Nürnberg Tribunal: History and Analysis*" Appendix II – United Nations General Assembly-International Law Commission 1949 (A/CN.4/5 of 3 March 1949).

AR.08131

# ANNEX VI

## INTERNATIONAL INSTRUMENTS RELATING TO ARTICLE 1 F(A) OF THE 1951 CONVENTION

The main international instruments which pertain to Article 1 F (a) of the 1951 Convention are as follows:

(1) The London Agreement of 8 August 1945 and Charter of the International Military Tribunal;

(2) Law No. 10 of the Control Council for Germany of 20 December 1945 for the Punishment of Persons Guilty of War Crimes, Crimes against Peace and Crimes against Humanity;

(3) United Nations General Assembly Resolution 3 (1) of 13 February 1946 and 95 (1) of 11 December 1946 which confirm war crimes and crimes against humanity as they are defined in the Charter of the International Military Tribunal of 8 August 1945;

(4) Convention on the Prevention and Punishment of the Crime of Genocide of 9 December 1948 (Article III); (entered into force 12 January 1951);

(5) Geneva Conventions for the protection of victims of war of 12 August 1949 (Convention I for the protection of the wounded, and sick, Articles 3 and 50; Convention II for the protection of wounded, sick and shipwrecked, Articles 3 and 51; Convention III relative to the treatment of prisoners of war, Articles 3 and 130; Convention IV relative to the protection of civilian persons, Articles 3 and 147);

(6) Convention of the Non-Applicability of Statutory Limitations of War Crimes and Crimes against Humanity of 26 November 1968 (entered into force 11 November 1970);

(7) International Convention on the Suppression and Punishment of the Crime of Apartheid of 30 November 1973 (entered into force 18 July 1976);

(8) Additional Protocol of 8 June 1977 to the Geneva Conventions of 12 August 1949 relating to the Protection of Victims of International Armed Conflicts (Article 85 on the repression of breaches of this Protocol);

(9) Additional Protocol of 8 June 1977 to the Geneva Conventions of 12 August 1949 relating to the Protection of Victims of Non-International Armed Conflicts (Additional Protocol II);

(10) Statute of the International Criminal Tribunal for the Former Yugoslavia (ICTY Statute) of 25 May 1993;

(11) Statute of the International Criminal Tribunal for Rwanda (ICTR Statute) of 8 November 1994;

(12) Rome Statute of the International Criminal Court (ICC) of 17 July 1998 (entered into force 1 July 2002).

AR.08132

# ANNEX VII

**STATUTE OF THE OFFICE OF THE UNITED NATIONS HIGH COMMISSIONER FOR REFUGEES**

## CHAPTER I

### General Provisions

1. The United Nations High Commissioner for Refugees, acting under the authority of the General Assembly, shall assume the function of providing international protection, under the auspices of the United Nations, to refugees who fall within the scope of the present Statute and of seeking permanent solutions for the problem of refugees by assisting governments and, subject to the approval of the governments concerned, private organizations to facilitate the voluntary repatriation of such refugees, or their assimilation within new national communities. In the exercise of his functions, more particularly when difficulties arise, and for instance with regard to any controversy concerning the international status of these persons, the High Commissioner shall request the opinion of an advisory committee on refugees if it is created.

2. The work of the High Commissioner shall be of an entirely non-political character; it shall be humanitarian and social and shall relate, as a rule, to groups and categories of refugees,

3. The High Commissioner shall follow policy directives given him by the General Assembly or the Economic and Social Council.

4. The Economic and Social Council may decide, after hearing the views of the High Commissioner on the subject, to establish an advisory committee on refugees, which shall consist of representatives of States Members and States non-members of the United Nations, to be selected by the Council on the basis of their demonstrated interest in and devotion to the solution of the refugee problem.

5. The General Assembly shall review, not later than at its eighth regular session, the arrangements for the Office of the High Commissioner with a view to determining whether the Office should be continued beyond 31 December 1953.

## CHAPTER II

### Functions of the High Commissioner

6. The competence of the High Commissioner shall extend to:

A. (i) Any person who has been considered a refugee under the Arrangements of 12 May 1926 and 30 June 1928 or under the Conventions of 28 October 1933 and 10 February 1938, the Protocol of 14 September 1939 or the Constitution of the International Refugee Organization;

(ii) Any person who, as a result of events occurring before 1 January 1951 and owing to well-founded fear of being persecuted for reasons of race, religion, nationality or political opinion, is outside the country of his nationality and is unable or, owing to such fear or for reasons other than personal convenience, is unwilling to avail himself of the protection of that country; or who, not having a nationality and being outside the country of his former habitual residence, is unable or, owing to such fear or for reasons other than personal convenience, is unwilling to return to it.

AR.08133

Decisions as to eligibility taken by the International Refugee Organization during the period of its activities shall not prevent the status of refugee being accorded to persons who fulfil the conditions of the present paragraph;

The competence of the High Commissioner shall cease to apply to any person defined in section A above if:

(a) He has voluntarily re-availed himself of the protection of the country of his nationality; or

(b) Having lost his nationality, he has voluntarily reacquired it; or

(c) He has acquired a new nationality, and enjoys the protection of the country of his new nationality; or

(d) He has voluntarily re-established himself in the country which he left or outside which he remained owing to fear of persecution; or

(e) He can no longer, because the circumstances in connexion with which he has been recognized as a refugee have ceased to exist, claim grounds other than those of personal convenience for continuing to refuse to avail himself of the protection of the country of his nationality. Reasons of a purely economic character may not be invoked; or

(f) Being a person who has no nationality, he can no longer, because the circumstances in connexion with which he has been recognized as a refugee have ceased to exist and he is able to return to the country of his former habitual residence, claim grounds other than those of personal convenience for continuing to refuse to return to that country;

B. Any other person who is outside the country of his nationality or, if he has no nationality, the country of his former habitual residence, because he has or had wellfounded fear of persecution by reason of his race, religion, nationality or political opinion and is unable or, because of such fear, is unwilling to avail himself of the protection of the government of the country of his nationality, or, if he has no nationality, to return to the country of his former habitual residence.

7. Provided that the competence of the High Commissioner as defined in paragraph 6 above shall not extend to a person:

(a) Who is a national of more than one country unless he satisfies the provisions of the preceding paragraph in relation to each of the countries of which he is a national; or

(b) Who is recognized by the competent authorities of the country in which he has taken residence as having the rights and obligations which are attached to the possession of the nationality of that country; or

(c) Who continues to receive from other organs or agencies of the United Nations protection or assistance; or

(d) In respect of whom there are serious reasons for considering that he has committed a crime covered by the provisions of treaties of extradition or a crime mentioned in article VI of the London Charter of the International Military Tribunal or by the provisions of article 14, paragraph 2, of the Universal Declaration of Human Rights.[33]

8. The High Commissioner shall provide for the protection of refugees falling under the competence of his Office by:

(a) Promoting the conclusion and ratification of international conventions for the protection of refugees, supervising their application and proposing amendments thereto;

---

[33] See resolution 217 A (III).

AR.08134

77

(b) Promoting through special agreements with governments the execution of any measures calculated to improve the situation of refugees and to reduce the number requiring protection;

(c) Assisting governmental and private efforts to promote voluntary repatriation or assimilation within new national communities;

(d) Promoting the admission of refugees, not excluding those in the most destitute categories, to the territories of States;

(e) Endeavouring to obtain permission for refugees to transfer their assets and especially those necessary for their resettlement;

(f) Obtaining from governments information concerning the number and conditions of refugees in their territories and the laws and regulations concerning them;

(g) Keeping in close touch with the governments and inter-governmental organizations concerned;

(h) Establishing contact in such manner as he may think best with private organizations dealing with refugee questions;

(i) Facilitating the co-ordination of the efforts of private organizations concerned with the welfare of refugees.

9. The High Commissioner shall engage in such additional activities, including repatriation and resettlement, as the General Assembly may determine, within the limits of the resources placed at his disposal.

10. The High Commissioner shall administer any funds, public or private, which he receives for assistance to refugees, and shall distribute them among the private and, as appropriate, public agencies which he deems best qualified to administer such assistance. The High Commissioner may reject any offers which he does not consider appropriate or which cannot be utilized. The High Commissioner shall not appeal to governments for funds or make a general appeal, without the prior approval of the General Assembly. The High Commissioner shall include in his annual report a statement of his activities in this field.

11. The High Commissioner shall be entitled to present his views before the General Assembly, the Economic and Social Council and their subsidiary bodies. The High Commissioner shall report annually to the General Assembly through the Economic and Social Council; his report shall be considered as a separate item on the agenda of the General Assembly.

12. The High Commissioner may invite the co-operation of the various specialized agencies.

# CHAPTER III

## Organization and Finances

13. The High Commissioner shall be elected by the General Assembly on the nomination of the Secretary-General. The terms of appointment of the High Commissioner shall be proposed by the Secretary-General and approved by the General Assembly. The High Commissioner shall be elected for a term of three years, from 1 January 1951.

14. The High Commissioner shall appoint, for the same term, a Deputy High Commissioner of a nationality other than his own.

15. (a) Within the limits of the budgetary appropriations provided, the staff of the Office of the High

AR.08135

Commissioner shall be appointed by the High Commissioner and shall be responsible to him in the exercise of their functions.

(b) Such staff shall be chosen from persons devoted to the purposes of the Office of the High Commissioner.

(c) Their conditions of employment shall be those provided under the staff regulations adopted by the General Assembly and the rules promulgated thereunder by the Secretary-General.

(d) Provision may also be made to permit the employment of personnel without compensation.

16. The High Commissioner shall consult the governments of the countries of residence of refugees as to the need for appointing representatives therein. In any country recognizing such need, there may be appointed a representative approved by the government of that country. Subject to the foregoing, the same representative may serve in more than one country.

17. The High Commissioner and the Secretary-General shall make appropriate arrangements for liaison and consultation on matters of mutual interest.

18. The Secretary-General shall provide the High Commissioner with all necessary facilities within budgetary limitations.

19. The Office of the High Commissioner shall be located in Geneva, Switzerland.

20. The Office of the High Commissioner shall be financed under the budget of the United Nations. Unless the General Assembly subsequently decides otherwise, no expenditure, other than administrative expenditures relating to the functioning of the Office of the High Commissioner, shall be borne on the budget of the United Nations, and all other expenditures relating to the activities of the High Commissioner shall be financed by voluntary contributions.

21. The administration of the Office of the High Commissioner shall be subject to the Financial Regulations of the United Nations and to the financial rules promulgated thereunder by the Secretary-General.

22. Transactions relating to the High Commissioner's funds shall be subject to audit by the United Nations Board of Auditors, provided that the Board may accept audited accounts from the agencies to which funds have been allocated. Administrative arrangements for the custody of such funds and their allocation shall be agreed between the High Commissioner and the Secretary-General in accordance with the Financial Regulations of the United Nations and rules promulgated thereunder by the Secretary-General.

AR.08137

# GUIDELINES ON INTERNATIONAL PROTECTION

AR.08138

AR.08139

**UNHCR**
United Nations High Commissioner for Refugees
Haut Commissariat des Nations Unies pour les réfugiés

| Distr. GENERAL | HCR/GIP/02/01 | 7 May 2002 | Original: ENGLISH |

# GUIDELINES ON INTERNATIONAL PROTECTION NO. 1:

## Gender-Related Persecution within the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol relating to the Status of Refugees

UNHCR issues these Guidelines pursuant to its mandate, as contained in the *Statute of the Office of the United Nations High Commissioner for Refugees*, in conjunction with Article 35 of the *1951 Convention relating to the Status of Refugees* and Article II of its *1967 Protocol*. These Guidelines complement the UNHCR *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees* (re-edited, Geneva, January 1992). They further replace UNHCR's Position Paper on Gender-Related Persecution (Geneva, January 2000) and result from the Second Track of the Global Consultations on International Protection process which examined this subject at its expert meeting in San Remo in September 2001.

These Guidelines are intended to provide legal interpretative guidance for governments, legal practitioners, decision-makers and the judiciary, as well as UNHCR staff carrying out refugee status determination in the field.

AR.08140

## I. INTRODUCTION

1. "Gender-related persecution" is a term that has no legal meaning *per se.* Rather, it is used to encompass the range of different claims in which gender is a relevant consideration in the determination of refugee status. These Guidelines specifically focus on the interpretation of the refugee definition contained in Article 1A(2) of the *1951 Convention relating to the Status of Refugees* (hereinafter "1951 Convention") from a gender perspective, as well as propose some procedural practices in order to ensure that proper consideration is given to women claimants in refugee status determination procedures and that the range of gender-related claims are recognised as such.

2. It is an established principle that the refugee definition as a whole should be interpreted with an awareness of possible gender dimensions in order to determine accurately claims to refugee status. This approach has been endorsed by the General Assembly, as well as the Executive Committee of UNHCR's Programme.[1]

3. In order to understand the nature of gender-related persecution, it is essential to define and distinguish between the terms "gender" and "sex". Gender refers to the relationship between women and men based on socially or culturally constructed and defined identities, status, roles and responsibilities that are assigned to one sex or another, while sex is a biological determination. Gender is not static or innate but acquires socially and culturally constructed meaning over time. Gender-related claims may be brought by either women or men, although due to particular types of persecution, they are more commonly brought by women. In some cases, the claimant's sex may bear on the claim in significant ways to which the decision-maker will need to be attentive. In other cases, however, the refugee claim of a female asylum-seeker will have nothing to do with her sex. Gender-related claims have typically encompassed, although are by no means limited to, acts of sexual violence, family/domestic violence, coerced family planning, female genital mutilation, punishment for transgression of social mores, and discrimination against homosexuals.

4. Adopting a gender-sensitive interpretation of the 1951 Convention does not mean that all women are automatically entitled to refugee status. The refugee claimant must establish that he or she has a well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion.

## II. SUBSTANTIVE ANALYSIS

### A. Background

5. Historically, the refugee definition has been interpreted through a framework of male experiences, which has meant that many claims of women and of homosexuals, have gone unrecognised. In the past decade, however, the analysis and understanding of sex and gender in the refugee context have advanced substantially in case law, in State practice generally and in academic writing. These developments have run parallel to, and have been assisted by, developments in international human rights law and standards,[2] as well as in related areas of international law, including through jurisprudence of the International Criminal Tribunals for the former Yugoslavia and Rwanda, and the Rome Statute of the International Criminal Court. In this regard, for instance, it should be noted that harmful practices

---

[1] In its Conclusions of October 1999, No. 87 (n), the Executive Committee "not[ed] with appreciation special efforts by States to incorporate gender perspectives into asylum policies, regulations and practices; encourage[d] States, UNHCR and other concerned actors to promote wider acceptance, and inclusion in their protection criteria of the notion that persecution may be gender-related or effected through sexual violence; further encourage[d] UNHCR and other concerned actors to develop, promote and implement guidelines, codes of conduct and training programmes on gender-related refugee issues, in order to support the mainstreaming of a gender perspective and enhance accountability for the implementation of gender policies." See also Executive Committee Conclusions: No. 39, Refugee Women and International Protection, 1985; No. 73, Refugee Protection and Sexual Violence, 1993; No. 77(g), General Conclusion on International Protection, 1995; No. 79(o), General Conclusion on International Protection, 1996; and No. 81(t), General Conclusion on International Protection, 1997.

[2] Useful texts include the Universal Declaration of Human Rights 1948, the International Covenant on Civil and Political Rights 1966, the International Covenant on Economic, Social and Cultural Rights 1966, the Convention on the Political Rights of Women 1953, the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment 1984, the Convention on the Rights of the Child 1989, and in particular, the Convention on the Elimination of All Forms of Discrimination Against Women 1979 and the Declaration on the Elimination of Violence against Women 1993. Relevant regional instruments include the European Convention on Human Rights and Fundamental Freedoms. 1950, the American Convention on Human Rights 1969, and the African Charter on Human and Peoples' Rights 1981.

AR.08141

in breach of international human rights law and standards cannot be justified on the basis of historical, traditional, religious or cultural grounds.

6. Even though gender is not specifically referenced in the refugee definition, it is widely accepted that it can influence, or dictate, the type of persecution or harm suffered and the reasons for this treatment. The refugee definition, properly interpreted, therefore covers gender-related claims. As such, there is no need to add an additional ground to the 1951 Convention definition.[3]

7. In attempting to apply the criteria of the refugee definition in the course of refugee status determination procedures, it is important to approach the assessment holistically, and have regard to all the relevant circumstances of the case. It is essential to have both a full picture of the asylum-seeker's personality, background and personal experiences, as well as an analysis and up-to-date knowledge of historically, geographically and culturally specific circumstances in the country of origin. Making generalisations about women or men is not helpful and in doing so, critical differences, which may be relevant to a particular case, can be overlooked.

8. The elements of the definition discussed below are those that require a gender-sensitive interpretation. Other criteria (e.g. being outside the country of origin) remain, of course, also directly relevant to the holistic assessment of any claim. Throughout this document, the use of the term "women" includes the girl-child.

## B. Well-founded fear of persecution

9. What amounts to a well-founded fear of persecution will depend on the particular circumstances of each individual case. While female and male applicants may be subjected to the same forms of harm, they may also face forms of persecution specific to their sex. International human rights law and international criminal law clearly identify certain acts as violations of these laws, such as sexual violence, and support their characterisation as serious abuses, amounting to persecution.[4] In this sense, international law can assist decision-makers to determine the persecutory nature of a particular act. There is no doubt that rape and other forms of gender-related violence, such as dowry-related violence, female genital mutilation, domestic violence, and trafficking,[5] are acts which inflict severe pain and suffering – both mental and physical – and which have been used as forms of persecution, whether perpetrated by State or private actors.

10. Assessing a law to be persecutory in and of itself has proven to be material to determining some gender-related claims. This is especially so given the fact that relevant laws may emanate from traditional or cultural norms and practices not necessarily in conformity with international human rights standards. However, as in all cases, a claimant must still establish that he or she has a well-founded fear of being persecuted as a result of that law. This would not be the case, for instance, where a persecutory law continues to exist but is no longer enforced.

11. Even though a particular State may have prohibited a persecutory practice (e.g. female genital mutilation), the State may nevertheless continue to condone or tolerate the practice, or may not be able to stop the practice effectively. In such cases, the practice would still amount to persecution. The fact that a law has been enacted to prohibit or denounce certain persecutory practices will therefore not in itself be sufficient to determine that the individual's claim to refugee status is not valid.

12. Where the penalty or punishment for non-compliance with, or breach of, a policy or law is disproportionately severe and has a gender dimension, it would amount to persecution.[6] Even if the law is one of general applicability, circumstances of punishment or treatment cannot be so severe

3 See Summary Conclusions – Gender-Related Persecution, Global Consultations on International Protection, San Remo Expert Roundtable, 6-8 September 2001, nos.1 and 3 ("Summary Conclusions – Gender-Related Persecution").
4 See UNHCR, *Handbook*, para. 51.
5 See below at para. 18.
6 Persons fleeing from prosecution or punishment for a common law offence are not normally refugees, however, the distinction may be obscured, in particular, in circumstances of excessive punishment for breach of a legitimate law. See UNHCR, *Handbook*, paras. 56 and 57.

AR.08142

as to be disproportionate to the objective of the law. Severe punishment for women who, by breaching a law, transgress social mores in a society could, therefore, amount to persecution.

13. Even where <u>laws or policies have justifiable objectives</u>, methods of implementation that lead to consequences of a substantially prejudicial nature for the persons concerned, would amount to persecution. For example, it is widely accepted that family planning constitutes an appropriate response to population pressures. However, implementation of such policies, through the use of forced abortions and sterilisations, would breach fundamental human rights law. Such practices, despite the fact that they may be implemented in the context of a legitimate law, are recognised as serious abuses and considered persecution.

**Discrimination amounting to persecution**

14. While it is generally agreed that 'mere' discrimination may not, in the normal course, amount to persecution in and of itself, a pattern of discrimination or less favourable treatment could, on cumulative grounds, amount to persecution and warrant international protection. It would, for instance, amount to persecution if measures of discrimination lead to consequences of a substantially prejudicial nature for the person concerned, e.g. serious restrictions on the right to earn one's livelihood, the right to practice one's religion, or access to available educational facilities.[7]

15. Significant to gender-related claims is also an analysis of forms of discrimination by the State in failing to extend protection to individuals against certain types of harm. If the State, as a matter of policy or practice, does not accord certain rights or protection from serious abuse, then the discrimination in extending protection, which results in serious harm inflicted with impunity, could amount to persecution. Particular cases of domestic violence, or of abuse for reasons of one's differing sexual orientation, could, for example, be analysed in this context.

**Persecution on account of one's sexual orientation**

16. Refugee claims based on differing sexual orientation contain a gender element. A claimant's sexuality or sexual practices may be relevant to a refugee claim where he or she has been subject to persecutory (including discriminatory) action on account of his or her sexuality or sexual practices. In many such cases, the claimant has refused to adhere to socially or culturally defined roles or expectations of behaviour attributed to his or her sex. The most common claims involve homosexuals, transsexuals or transvestites, who have faced extreme public hostility, violence, abuse, or severe or cumulative discrimination.

17. Where homosexuality is illegal in a particular society, the imposition of severe criminal penalties for homosexual conduct could amount to persecution, just as it would for refusing to wear the veil by women in some societies. Even where homosexual practices are not criminalised, a claimant could still establish a valid claim where the State condones or tolerates discriminatory practices or harm perpetrated against him or her, or where the State is unable to protect effectively the claimant against such harm.

**Trafficking for the purposes of forced prostitution or sexual exploitation as a form of persecution[8]**

18. Some trafficked women or minors may have valid claims to refugee status under the 1951 Convention. The forcible or deceptive recruitment of women or minors for the purposes of forced prostitution or sexual exploitation is a form of gender-related violence or abuse that can even lead to death. It can be considered a form of torture and cruel, inhuman or degrading treatment. It can also impose serious restrictions on a woman's freedom of movement, caused by abduction, incar-

---

[7] See UNHCR, *Handbook*, para. 54.
[8] For the purposes of these Guidelines, "trafficking" is defined as per article 3 of the United Nations Protocol to Prevent, Suppress and Punish Trafficking in Persons, especially Women and Children, supplementing the United Nations Convention against Transnational Organised Crime, 2000. Article 3(1) provides that trafficking in persons means "the recruitment, transportation, transfer, harbouring or receipt of persons, by means of the threat or use of force or other forms of coercion, of abduction, of fraud, of deception, of the abuse of power or of a position of vulnerability or of the giving or receiving of payments or benefits to achieve the consent of a person having control over another person, for the purpose of exploitation. Exploitation shall include, at a minimum, the exploitation of the prostitution of others or other forms of sexual exploitation, forced labour or services, slavery or practices similar to slavery, servitude or the removal of organs."

AR.08143

86

1

ceration, and/or confiscation of passports or other identify documents. In addition, trafficked women and minors may face serious repercussions after their escape and/or upon return, such as reprisals or retaliation from trafficking rings or individuals, real possibilities of being re-trafficked, severe community or family ostracism, or severe discrimination. In individual cases, being trafficked for the purposes of forced prostitution or sexual exploitation could therefore be the basis for a refugee claim where the State has been unable or unwilling to provide protection against such harm or threats of harm.[9]

### Agents of Persecution

19. There is scope within the refugee definition to recognise both State and non-State actors of persecution. While persecution is most often perpetrated by the authorities of a country, serious discriminatory or other offensive acts committed by the local populace, or by individuals, can also be considered persecution if such acts are knowingly tolerated by the authorities, or if the authorities refuse, or are unable, to offer effective protection.[10]

## C. The causal link ("for reasons of")

20. The well-founded fear of being persecuted must be related to one or more of the Convention grounds. That is, it must be "for reasons of" race, religion, nationality, membership of a particular social group, or political opinion. The Convention ground must be a relevant contributing factor, though it need not be shown to be the sole, or dominant, cause. In many jurisdictions the causal link ("for reasons of") must be explicitly established (e.g. some Common Law States) while in other States causation is not treated as a separate question for analysis, but is subsumed within the holistic analysis of the refugee definition. In many gender-related claims, the difficult issue for a decision-maker may not be deciding upon the applicable ground, so much as the causal link: that the well-founded fear of being persecuted was for reasons of that ground. Attribution of the Convention ground to the claimant by the State or non-State actor of persecution is sufficient to establish the required causal connection.

21. In cases where there is a risk of being persecuted at the hands of a non-State actor (e.g. husband, partner or other non-State actor) for reasons which are related to one of the Convention grounds, the causal link is established, whether or not the absence of State protection is Convention related. Alternatively, where the risk of being persecuted at the hands of a non-State actor is unrelated to a Convention ground, but the inability or unwillingness of the State to offer protection is for reasons of a Convention ground, the causal link is also established.[11]

## D. Convention grounds

22. Ensuring that a gender-sensitive interpretation is given to each of the Convention grounds is important in determining whether a particular claimant has fulfilled the criteria of the refugee definition. In many cases, claimants may face persecution because of a Convention ground which is attributed or imputed to them. In many societies a woman's political views, race, nationality, religion or social affiliations, for example, are often seen as aligned with relatives or associates or with those of her community.

23. It is also important to be aware that in many gender-related claims, the persecution feared could be for one, or more, of the Convention grounds. For example, a claim for refugee status based on transgression of social or religious norms may be analysed in terms of religion, political opinion or membership of a particular social group. The claimant is not required to identify accurately the reason why he or she has a well-founded fear of being persecuted.

---

[9] Trafficking for other purposes could also amount to persecution in a particular case, depending on the circumstances.
[10] See UNHCR, *Handbook*, para. 65.
[11] See Summary Conclusions – Gender-Related Persecution, no. 6.

AR.08144

### Race

24. Race for the purposes of the refugee definition has been defined to include all kinds of ethnic groups that are referred to as "races" in common usage.[12] Persecution for reasons of race may be expressed in different ways against men and women. For example, the persecutor may choose to destroy the ethnic identity and/or prosperity of a racial group by killing, maiming or incarcerating the men, while the women may be viewed as propagating the ethnic or racial identity and persecuted in a different way, such as through sexual violence or control of reproduction.

### Religion

25. In certain States, the religion assigns particular roles or behavioural codes to women and men respectively. Where a woman does not fulfil her assigned role or refuses to abide by the codes, and is punished as a consequence, she may have a well-founded fear of being persecuted for reasons of religion. Failure to abide by such codes may be perceived as evidence that a woman holds unacceptable religious opinions regardless of what she actually believes. A woman may face harm for her particular religious beliefs or practices, or those attributed to her, including her refusal to hold particular beliefs, to practise a prescribed religion or to conform her behaviour in accordance with the teachings of a prescribed religion.

26. There is some overlap between the grounds of religion and political opinion in gender-related claims, especially in the realm of imputed political opinion. While religious tenets require certain kinds of behaviour from a woman, contrary behaviour may be perceived as evidence of an unacceptable political opinion. For example, in certain societies, the role ascribed to women may be attributable to the requirements of the State or official religion. The authorities or other actors of persecution may perceive the failure of a woman to conform to this role as the failure to practice or to hold certain religious beliefs. At the same time, the failure to conform could be interpreted as holding an unacceptable political opinion that threatens the basic structure from which certain political power flows. This is particularly true in societies where there is little separation between religious and State institutions, laws and doctrines.

### Nationality

27. Nationality is not to be understood only as "citizenship". It also refers to membership of an ethnic or linguistic group and may occasionally overlap with the term "race".[13] Although persecution on the grounds of nationality (as with race) is not specific to women or men, in many instances the nature of the persecution takes a gender-specific form, most commonly that of sexual violence directed against women and girls.

### Membership of a Particular Social Group[14]

28. Gender-related claims have often been analysed within the parameters of this ground, making a proper understanding of this term of paramount importance. However, in some cases, the emphasis given to the social group ground has meant that other applicable grounds, such as religion or political opinion, have been over-looked. Therefore, the interpretation given to this ground cannot render the other four Convention grounds superfluous.

29. Thus, a particular social group is a group of persons who share a common characteristic other than their risk of being persecuted, or who are perceived as a group by society. The characteristic will often be one which is innate, unchangeable, or which is otherwise fundamental to identity, conscience or the exercise of one's human rights.

30. It follows that sex can properly be within the ambit of the social group category, with women being a clear example of a social subset defined by innate and immutable characteristics, and who

---

[12] See UNHCR, *Handbook*, para. 68.

[13] See UNHCR, *Handbook*, para. 74.

[14] For more information, see UNHCR's *Guidelines on International Protection: "Membership of a particular social group" within the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol relating to the Status of Refugees* (HCR/GIP/02/02, 7 May 2002).

AR.08145

1

are frequently treated differently than men.[15] Their characteristics also identify them as a group in society, subjecting them to different treatment and standards in some countries.[16] Equally, this definition would encompass homosexuals, transsexuals, or transvestites.

31. The size of the group has sometimes been used as a basis for refusing to recognize 'women' generally as a particular social group. This argument has no basis in fact or reason, as the other grounds are not bound by this question of size. There should equally be no requirement that the particular social group be cohesive or that members of it voluntarily associate,[17] or that every member of the group is at risk of persecution.[18] It is well-accepted that it should be possible to identify the group independently of the persecution, however, discrimination or persecution may be a relevant factor in determining the visibility of the group in a particular context.[19]

**Political Opinion**

32. Under this ground, a claimant must show that he or she has a well-founded fear of being persecuted for holding certain political opinions (usually different from those of the Government or parts of the society), or because the holding of such opinions has been attributed to him or her. Political opinion should be understood in the broad sense, to incorporate any opinion on any matter in which the machinery of State, government, society, or policy may be engaged. This may include an opinion as to gender roles. It would also include non-conformist behaviour which leads the persecutor to impute a political opinion to him or her. In this sense, there is not as such an inherently political or an inherently non-political activity, but the context of the case should determine its nature. A claim on the basis of political opinion does, however, presuppose that the claimant holds or is assumed to hold opinions not tolerated by the authorities or society, which are critical of their policies, traditions or methods. It also presupposes that such opinions have come or could come to the notice of the authorities or relevant parts of the society, or are attributed by them to the claimant. It is not always necessary to have expressed such an opinion, or to have already suffered any form of discrimination or persecution. In such cases the test of well-founded fear would be based on an assessment of the consequences that a claimant having certain dispositions would have to face if he or she returned.

33. The image of a political refugee as someone who is fleeing persecution for his or her direct involvement in political activity does not always correspond to the reality of the experiences of women in some societies. Women are less likely than their male counterparts to engage in high profile political activity and are more often involved in 'low level' political activities that reflect dominant gender roles. For example, a woman may work in nursing sick rebel soldiers, in the recruitment of sympathisers, or in the preparation and dissemination of leaflets. Women are also frequently attributed with political opinions of their family or male relatives, and subjected to persecution because of the activities of their male relatives. While this may be analysed in the context of an imputed political opinion, it may also be analysed as being persecution for reasons of her membership of a particular social group, being her "family". These factors need to be taken into account in gender-related claims.

34. Equally important for gender-related claims is to recognise that a woman may not wish to engage in certain activities, such as providing meals to government soldiers, which may be interpreted by the persecutor(s) as holding a contrary political opinion.

---

[15] See Summary Conclusions – Gender-Related Persecution, no. 5.
[16] See also Executive Committee Conclusion No. 39, Refugee Women and International Protection, 1985: "States … are free to adopt the interpretation that women asylum seekers who face harsh or inhuman treatment due to their having transgressed the social mores of the society in which they live may be considered as 'a particular social group' within the meaning of Article 1A(2) of the 1951 United Nations Refugee Convention".
[17] See Summary Conclusions – Membership of a Particular Social Group, Global Consultations on International Protection, San Remo Expert Round-table, 6-8 September 2001, no. 4 ("Summary Conclusions – Membership of a Particular Social Group").
[18] See Summary Conclusions – Membership of a Particular Social Group, *Ibid.*, no. 7.
[19] See Summary Conclusions – Membership of a Particular Social Group, *Ibid.*, no. 6.

AR.08146

## III. PROCEDURAL ISSUES[20]

35. Persons raising gender-related refugee claims, and survivors of torture or trauma in particular, require a supportive environment where they can be reassured of the confidentiality of their claim. Some claimants, because of the shame they feel over what has happened to them, or due to trauma, may be reluctant to identify the true extent of the persecution suffered or feared. They may continue to fear persons in authority, or they may fear rejection and/or reprisals from their family and/or community.[21]

36. Against this background, in order to ensure that gender-related claims, of women in particular, are properly considered in the refugee status determination process, the following measures should be borne in mind:

i.    Women asylum-seekers should be interviewed separately, without the presence of male family members, in order to ensure that they have an opportunity to present their case. It should be explained to them that they may have a valid claim in their own right.

ii.   It is essential that women are given information about the status determination process, access to it, as well as legal advice, in a manner and language that she understands.

iii.  Claimants should be informed of the choice to have interviewers and interpreters of the same sex as themselves,[22] and they should be provided automatically for women claimants. Interviewers and interpreters should also be aware of and responsive to any cultural or religious sensitivities or personal factors such as age and level of education.

iv.   An open and reassuring environment is often crucial to establishing trust between the interviewer and the claimant, and should help the full disclosure of sometimes sensitive and personal information. The interview room should be arranged in such a way as to encourage discussion, promote confidentiality and to lessen any possibility of perceived power imbalances.

v.    The interviewer should take the time to introduce him/herself and the interpreter to the claimant, explain clearly the roles of each person, and the exact purpose of the interview.[23] The claimant should be assured that his/her claim will be treated in the strictest confidence, and information provided by the claimant will not be provided to members of his/her family. Importantly, the interviewer should explain that he/she is not a trauma counselor.

vi.   The interviewer should remain neutral, compassionate and objective during the interview, and should avoid body language or gestures that may be perceived as intimidating or culturally insensitive or inappropriate. The interviewer should allow the claimant to present his/her claim with minimal interruption.

vii.  Both 'open-ended' and specific questions which may help to reveal gender issues relevant to a refugee claim should be incorporated into all asylum interviews. Women who have been involved in indirect political activity or to whom political opinion has been attributed, for example, often do not provide relevant information in interviews due to the male-oriented nature of the questioning. Female claimants may also fail to relate questions that are about 'torture' to the types of harm which they fear (such as rape, sexual abuse, female genital mutilation, 'honour killings', forced marriage, etc.).

---

[20] This Part has benefited from the valuable guidance provided by various States and other actors, including the following guidelines: *Considerations for Asylum Officers Adjudicating Asylum Claims from Women* (Immigration and Naturalization Service, United States, 26 May 1995); *Refugee and Humanitarian Visa Applicants: Guidelines on Gender Issues for Decision Makers* (Department of Immigration and Humanitarian Affairs, Australia, July 1996) (hereinafter "Australian Guidelines on Gender Issues for Decision Makers"); *Guideline 4 on Women Refugee Claimants Fearing Gender-Related Persecution: Update* (Immigration and Refugee Board, Canada, 13 November 1996); *Position on Asylum Seeking and Refugee Women*, (European Council on Refugees and Exiles, December 1997) (hereinafter "ECRE Position on Asylum Seeking and Refugee Women"); *Gender Guidelines for the Determination of Asylum Claims in the UK* (Refugee Women's Legal Group, July 1998) (hereinafter "Refugee Women's Group Gender Guidelines"); *Gender Guidelines for Asylum Determination* (National Consortium on Refugee Affairs, South Africa, 1999); *Asylum Gender Guidelines* (Immigration Appellate Authority, United Kingdom, November 2000); and *Gender-Based Persecution: Guidelines for the investigation and evaluation of the needs of women for protection* (Migration Board, Legal Practice Division, Sweden, 28 March 2001).

[21] See also *Sexual Violence Against Refugees: Guidelines on Prevention and Response* (UNHCR, Geneva, 1995) and *Prevention and Response to Sexual and Gender-Based Violence in Refugee Situations* (Report of Inter-Agency Lessons Learned Conference Proceedings, 27-29 March 2001, Geneva).

[22] See also Executive Committee Conclusion No. 64, Refugee Women and International Protection, 1990, (a) (iii): Provide, wherever necessary, skilled female interviewers in procedures for the determination of refugee status and ensure appropriate access by women asylum-seekers to such procedures, even when accompanied by male family members.

[23] *Ibid.*, para. 3.19.

AR.08147

1

viii. Particularly for victims of sexual violence or other forms of trauma, second and subsequent interviews may be needed in order to establish trust and to obtain all necessary information. In this regard, interviewers should be responsive to the trauma and emotion of claimants and should stop an interview where the claimant is becoming emotionally distressed.

ix. Where it is envisaged that a particular case may give rise to a gender-related claim, adequate preparation is needed, which will also allow a relationship of confidence and trust with the claimant to be developed, as well as allowing the interviewer to ask the right questions and deal with any problems that may arise during an interview.

x. Country of origin information should be collected that has relevance in women's claims, such as the position of women before the law, the political rights of women, the social and economic rights of women, the cultural and social mores of the country and consequences for non-adherence, the prevalence of such harmful traditional practices, the incidence and forms of reported violence against women, the protection available to them, any penalties imposed on those who perpetrate the violence, and the risks that a woman might face on her return to her country of origin after making a claim for refugee status.

xi. The type and level of emotion displayed during the recounting of her experiences should not affect a woman's credibility. Interviewers and decision-makers should understand that cultural differences and trauma play an important and complex role in determining behaviour. For some cases, it may be appropriate to seek objective psychological or medical evidence. It is unnecessary to establish the precise details of the act of rape or sexual assault itself, but events leading up to, and after, the act, the surrounding circumstances and details (such as, use of guns, any words or phrases spoken by the perpetrators, type of assault, where it occurred and how, details of the perpetrators (e.g. soldiers, civilians) etc.) as well as the motivation of the perpetrator may be required. In some circumstances it should be noted that a woman may not be aware of the reasons for her abuse.

xii. Mechanisms for referral to psycho-social counseling and other support services should be made available where necessary. Best practice recommends that trained psycho-social counselors be available to assist the claimant before and after the interview.

**Evidentiary Matters**

37. No documentary proof as such is required in order for the authorities to recognise a refugee claim, however, information on practices in the country of origin may support a particular case. It is important to recognise that in relation to gender-related claims, the usual types of evidence used in other refugee claims may not be as readily available. Statistical data or reports on the incidence of sexual violence may not be available, due to under-reporting of cases, or lack of prosecution. Alternative forms of information might assist, such as the testimonies of other women similarly situated in written reports or oral testimony, of non-governmental or international organisations or other independent research.

## IV. METHODS OF IMPLEMENTATION

38. Depending on the respective legal traditions, there have been two general approaches taken by States to ensure a gender-sensitive application of refugee law and in particular of the refugee definition. Some States have incorporated legal interpretative guidance and/ or procedural safeguards within legislation itself, while others have preferred to develop policy and legal guidelines on the same for decision-makers. UNHCR encourages States who have not already done so to ensure a gender-sensitive application of refugee law and procedures, and stands ready to assist States in this regard.

AR.08149

**UNHCR**
United Nations High Commissioner for Refugees
Haut Commissariat des Nations Unies pour les réfugiés

**2**

Distr. GENERAL          HCR/GIP/02/02          7 May 2002          Original: ENGLISH

# GUIDELINES ON INTERNATIONAL PROTECTION NO. 2:

## "Membership of a particular social group" within the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol relating to the Status of Refugees

UNHCR issues these Guidelines pursuant to its mandate, as contained in *the Statute of the Office of the United Nations High Commissioner for Refugees*, and Article 35 of the *1951 Convention relating to the Status of Refugees* and/or its *1967 Protocol*. These Guidelines complement the UNHCR *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees* (re-edited, Geneva, January 1992). They further supersede IOM/132/1989 – FOM/110/1989 Membership of a Particular Social Group (UNHCR, Geneva, 12 December 1989), and result from the Second Track of the Global Consultations on International Protection process which examined this subject at its expert meeting in San Remo in September 2001.

These Guidelines are intended to provide legal interpretative guidance for governments, legal practitioners, decision-makers and the judiciary, as well as UNHCR staff carrying out refugee status determinations in the field.

AR.08150

## I. INTRODUCTION

1. "Membership of a particular social group" is one of the five grounds enumerated in Article 1A(2) of the 1951 *Convention relating to the Status of Refugees* ("1951 Convention"). It is the ground with the least clarity and it is not defined by the 1951 Convention itself. It is being invoked with increasing frequency in refugee status determinations, with States having recognised women, families, tribes, occupational groups, and homosexuals, as constituting a particular social group for the purposes of the 1951 Convention. The evolution of this ground has advanced the understanding of the refugee definition as a whole. These Guidelines provide legal interpretative guidance on assessing claims which assert that a claimant has a well-founded fear of being persecuted for reasons of his or her membership of a particular social group.

2. While the ground needs delimiting – that is, it cannot be interpreted to render the other four Convention grounds superfluous – a proper interpretation must be consistent with the object and purpose of the Convention.[1] Consistent with the language of the Convention, this category cannot be interpreted as a "catch all" that applies to all persons fearing persecution. Thus, to preserve the structure and integrity of the Convention's definition of a refugee, a social group cannot be defined *exclusively* by the fact that it is targeted for persecution (although, as discussed below, persecution may be a relevant element in determining the visibility of a particular social group).

3. There is no "closed list" of what groups may constitute a "particular social group" within the meaning of Article 1A(2). The Convention includes no specific list of social groups, nor does the ratifying history reflect a view that there is a set of identified groups that might qualify under this ground. Rather, the term membership of a particular social group should be read in an evolutionary manner, open to the diverse and changing nature of groups in various societies and evolving international human rights norms.

4. The Convention grounds are not mutually exclusive. An applicant may be eligible for refugee status under more than one of the grounds identified in Article 1A(2).[2] For example, a claimant may allege that she is at risk of persecution because of her refusal to wear traditional clothing. Depending on the particular circumstances of the society, she may be able to establish a claim based on political opinion (if her conduct is viewed by the State as a political statement that it seeks to suppress), religion (if her conduct is based on a religious conviction opposed by the State) or membership in a particular social group.

## II. SUBSTANTIVE ANALYSIS

### A. Summary of State Practice

5. Judicial decisions, regulations, policies, and practices have utilized varying interpretations of what constitutes a social group within the meaning of the 1951 Convention. Two approaches have dominated decision-making in common law jurisdictions.

6. The first, the "protected characteristics" approach (sometimes referred to as an "immutability" approach), examines whether a group is united by an immutable characteristic or by a characteristic that is so fundamental to human dignity that a person should not be compelled to forsake it. An immutable characteristic may be innate (such as sex or ethnicity) or unalterable for other reasons (such as the historical fact of a past association, occupation or status). Human rights norms may help to identify characteristics deemed so fundamental to human dignity that one ought not to be compelled to forego them. A decision-maker adopting this approach would examine whether the asserted group is defined: (1) by an innate, unchangeable characteristic, (2) by a past temporary or voluntary status that

---

[1] See Summary Conclusions – Membership of a Particular Social Group, Global Consultations on International Protection, San Remo Expert Roundtable, 6-8 September 2001, no. 2 ("Summary Conclusions – Membership of a Particular Social Group").

[2] See UNHCR, *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees* (re-edited, Geneva, January 1992), paras. 66-67, 77; and see also Summary Conclusions – Membership of a Particular Social Group, no. 3.

AR.08154

is unchangeable because of its historical permanence, or (3) by a characteristic or association that is so fundamental to human dignity that group members should not be compelled to forsake it. Applying this approach, courts and administrative bodies in a number of jurisdictions have concluded that women, homosexuals, and families, for example, can constitute a particular social group within the meaning of Article 1A(2).

7. The second approach examines whether or not a group shares a common characteristic which makes them a cognizable group or sets them apart from society at large. This has been referred to as the "social perception" approach. Again, women, families and homosexuals have been recognized under this analysis as particular social groups, depending on the circumstances of the society in which they exist.

8. In civil law jurisdictions, the particular social group ground is generally less well developed. Most decision-makers place more emphasis on whether or not a risk of persecution exists than on the standard for defining a particular social group. Nonetheless, both the protected characteristics and the social perception approaches have received mention.

9. Analyses under the two approaches may frequently converge. This is so because groups whose members are targeted based on a common immutable or fundamental characteristic are also often perceived as a social group in their societies. But at times the approaches may reach different results. For example, the social perception standard might recognize as social groups associations based on a characteristic that is neither immutable nor fundamental to human dignity – such as, perhaps, occupation or social class.

## B. UNHCR's Definition

10. Given the varying approaches, and the protection gaps which can result, UNHCR believes that the two approaches ought to be reconciled.

11. The protected characteristics approach may be understood to identify a set of groups that constitute the core of the social perception analysis. Accordingly, it is appropriate to adopt a single standard that incorporates both dominant approaches:

> a particular social group is a group of persons who share a common characteristic other than their risk of being persecuted, or who are perceived as a group by society. The characteristic will often be one which is innate, unchangeable, or which is otherwise fundamental to identity, conscience or the exercise of one's human rights.

12. This definition includes characteristics which are historical and therefore cannot be changed, and those which, though it is possible to change them, ought not to be required to be changed because they are so closely linked to the identity of the person or are an expression of fundamental human rights. It follows that sex can properly be within the ambit of the social group category, with women being a clear example of a social subset defined by innate and immutable characteristics, and who are frequently treated differently to men.[3]

13. If a claimant alleges a social group that is based on a characteristic determined to be neither unalterable or fundamental, further analysis should be undertaken to determine whether the group is nonetheless perceived as a cognizable group in that society. So, for example, if it were determined that owning a shop or participating in a certain occupation in a particular society is neither unchangeable nor a fundamental aspect of human identity, a shopkeeper or members of a particular profession might nonetheless constitute a particular social group if in the society they are recognized as a group which sets them apart.

---

[3] For more information on gender-related claims, see UNHCR's *Guidelines on International Protection: Gender-Related Persecution within the Context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol relating to the Status of Refugees* (HCR/GIP/02/01, 10 May 2002), as well as Summary Conclusions of the Expert Roundtable on Gender-Related Persecution, San Remo, 6-8 September 2001, no. 5.

AR.08152

**The role of persecution**

14. As noted above, a particular social group cannot be defined exclusively by the persecution that members of the group suffer or by a common fear of being persecuted. Nonetheless, persecutory action toward a group may be a relevant factor in determining the visibility of a group in a particular society.[4] To use an example from a widely cited decision, "[W]hile persecutory conduct cannot define the social group, the actions of the persecutors may serve to identify or even cause the creation of a particular social group in society. Left-handed men are not a particular social group. But, if they were persecuted because they were left-handed, they would no doubt quickly become recognizable in their society as a particular social group. Their persecution for being left-handed would create a public perception that they were a particular social group. But it would be the attribute of being left-handed and not the persecutory acts that would identify them as a particular social group."[5]

**No requirement of cohesiveness**

15. It is widely accepted in State practice that an applicant need not show that the members of a particular group know each other or associate with each other as a group. That is, there is no requirement that the group be "cohesive."[6] The relevant inquiry is whether there is a common element that group members share. This is similar to the analysis adopted for the other Convention grounds, where there is no requirement that members of a religion or holders of a political opinion associate together, or belong to a "cohesive" group. Thus women may constitute a particular social group under certain circumstances based on the common characteristic of sex, whether or not they associate with one another based on that shared characteristic.

16. In addition, mere membership of a particular social group will not normally be enough to substantiate a claim to refugee status. There may, however, be special circumstances where mere membership can be a sufficient ground to fear persecution.[7]

**Not all members of the group must be at risk of being persecuted**

17. An applicant need not demonstrate that all members of a particular social group are at risk of persecution in order to establish the existence of a particular social group.[8] As with the other grounds, it is not necessary to establish that all persons in the political party or ethnic group have been singled out for persecution. Certain members of the group may not be at risk if, for example, they hide their shared characteristic, they are not known to the persecutors, or they cooperate with the persecutor.

**Relevance of size**

18. The size of the purported social group is not a relevant criterion in determining whether a particular social group exists within the meaning of Article 1A(2). This is true as well for cases arising under the other Convention grounds. For example, States may seek to suppress religious or political ideologies that are widely shared among members of a particular society – perhaps even by a majority of the population; the fact that large numbers of persons risk persecution cannot be a ground for refusing to extend international protection where it is otherwise appropriate.

19. Cases in a number of jurisdictions have recognized "women" as a particular social group. This does not mean that all women in the society qualify for refugee status. A claimant must still demonstrate a well-founded fear of being persecuted based on her membership in the particular social group, not be within one of the exclusion grounds, and meet other relevant criteria.

---

[4] See Summary Conclusions – Membership of a Particular Social Group, no. 6.
[5] McHugh, J., in *Applicant A v. Minister for Immigration and Ethnic Affairs*, (1997) 190 CLR 225, 264, 142 ALR 331.
[6] See Summary Conclusions – Membership of a Particular Social Group, no. 4.
[7] See UNHCR, *Handbook*, para. 79.
[8] See Summary Conclusions – Membership of a Particular Social Group, no. 7.

AR.08153

**Non-State actors and the causal link ("for reasons of")**

20. Cases asserting refugee status based on membership of a particular social group frequently involve claimants who face risks of harm at the hands of non-State actors, and which have involved an analysis of the causal link. For example, homosexuals may be victims of violence from private groups; women may risk abuse from their husbands or partners. Under the Convention a person must have a well-founded fear of being persecuted and that fear of being persecuted must be based on one (or more) of the Convention grounds. There is no requirement that the persecutor be a State actor. Where serious discriminatory or other offensive acts are committed by the local populace, they can be considered as persecution if they are knowingly tolerated by the authorities, or if the authorities refuse, or prove unable, to offer effective protection.[9]

21. Normally, an applicant will allege that the person inflicting or threatening the harm is acting for one of the reasons identified in the Convention. So, if a non-State actor inflicts or threatens persecution based on a Convention ground and the State is unwilling or unable to protect the claimant, then the causal link has been established. That is, the harm is being visited upon the victim for reasons of a Convention ground.

22. There may also arise situations where a claimant may be unable to show that the harm inflicted or threatened by the non-State actor is related to one of the five grounds. For example, in the situation of domestic abuse, a wife may not always be able to establish that her husband is abusing her based on her membership in a social group, political opinion or other Convention ground. Nonetheless, if the State is unwilling to extend protection based on one of the five grounds, then she may be able to establish a valid claim for refugee status: the harm visited upon her by her husband is based on the State's unwillingness to protect her for reasons of a Convention ground.

23. This reasoning may be summarized as follows. The causal link may be satisfied: (1) where there is a real risk of being persecuted at the hands of a non-State actor for reasons which are related to one of the Convention grounds, whether or not the failure of the State to protect the claimant is Convention related; or (2) where the risk of being persecuted at the hands of a non-State actor is unrelated to a Convention ground, but the inability or unwillingness of the State to offer protection is for a Convention reason.

---

[9] See UNHCR, *Handbook*, para. 65.

AR.08155



**UNHCR**
United Nations High Commissioner for Refugees
Haut Commissariat des Nations Unies pour les réfugiés

| Distr. GENERAL | HCR/GIP/03/03 | 10 February 2003 | Original: ENGLISH |
| --- | --- | --- | --- |

**3**

# GUIDELINES ON INTERNATIONAL PROTECTION NO. 3:

### Cessation of Refugee Status under Article 1C(5) and (6) of the 1951 Convention relating to the Status of Refugees (the "Ceased Circumstances" Clauses)

UNHCR issues these Guidelines pursuant to its mandate, as contained in the *Statute of the Office of the United Nations High Commissioner for Refugees*, in conjunction with Article 35 of the *1951 Convention relating to the Status of Refugees* and Article II of its *1967 Protocol*. These Guidelines complement the UNHCR *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees* (re-edited, Geneva, January 1992). They replace UNHCR's *The Cessation Clauses: Guidelines on their Application* (Geneva, April 1999) in so far as these concern the "ceased circumstances" clauses and result, *inter alia*, from the Second Track of the Global Consultations on International Protection which examined this subject at an expert meeting in Lisbon in May 2001.

These Guidelines are intended to provide legal interpretative guidance for governments, legal practitioners, decision-makers and the judiciary, as well as UNHCR staff carrying out refugee status determination in the field.

AR.08156

## I. INTRODUCTION

1. The *1951 Convention relating to the Status of Refugees* (hereinafter "1951 Convention") recognises that refugee status ends under certain clearly defined conditions. This means that once an individual is determined to be a refugee, their status is maintained unless they fall within the terms of the cessation clauses or their status is cancelled or revoked.[1] Under Article 1C of the 1951 Convention, refugee status may cease either through the actions of the refugee (contained in sub-paragraphs 1 to 4), such as by re-establishment in his or her country of origin,[2] or through fundamental changes in the objective circumstances in the country of origin upon which refugee status was based (sub-paragraphs 5 and 6). The latter are commonly referred to as the "ceased circumstances" or "general cessation" clauses. These Guidelines are concerned only with the latter provisions.

2. Article 1C(5) and (6) provides that the 1951 Convention shall cease to apply to any person falling under the terms of Article 1(A) if:

> (5) He can no longer, because the circumstances in connexion with which he has been recognized as a refugee have ceased to exist, continue to refuse to avail himself of the protection of the country of his nationality;
>
> Provided that this paragraph shall not apply to a refugee falling under section A(1) of this Article who is able to invoke compelling reasons arising out of previous persecution for refusing to avail himself of the protection of the country of nationality;
>
> (6) Being a person who has no nationality he is, because the circumstances in connexion with which he has been recognized as a refugee have ceased to exist, able to return to the country of his former habitual residence; 141,6
>
> Provided that this paragraph shall not apply to a refugee falling under section A(1) of this Article who is able to invoke compelling reasons arising out of previous persecution for refusing to return to the country of his former habitual residence.

3. UNHCR or States may issue formal declarations of general cessation of refugee status for a particular refugee caseload.[3] UNHCR has such competence under Article 6A of the Statute of the Office of the High Commissioner for Refugees in conjunction with Article 1C of the 1951 Convention. Due to the fact that large numbers of refugees voluntarily repatriate without an official declaration that conditions in their countries of origin no longer justify international protection, declarations are infrequent. Furthermore, many States Parties grant permanent residence status to refugees in their territories after several years, eventually leading to their integration and naturalisation. Similarly, cessation determinations on an individual basis as well as periodic reviews are rare, in recognition of the "need to respect a basic degree of stability for individual refugees".[4]

4. The grounds identified in the 1951 Convention are exhaustive; that is, no additional grounds would justify a conclusion that international protection is no longer required.[5] Operation of the cessation clauses should, in addition, be distinguished from other decisions that terminate refugee status. Cessation differs from cancellation of refugee status. Cancellation is based on a determination that an individual should not have been recognised as a refugee in the first place. This is, for instance, so where it is established that there was a misrepresentation of material facts essential to the outcome of the determination process or that one of the exclusion clauses would have been applicable had all the relevant facts been known. Cessation also differs from revocation, which may take place if a refugee subsequently engages in conduct coming within the scope of Article 1F(a) or 1F(c).

---

[1] See, UNHCR, *Handbook on Procedures and Criteria for Determining Refugee Status*, (hereinafter "UNHCR, *Handbook*") (1979, Geneva, re-edited Jan. 1992), para. 112. For distinction between cessation and cancellation/revocation see, para. 4 below.
[2] In these Guidelines, "country of origin" is understood to cover both the country of nationality and the country of former habitual residence, the latter in relation to refugees who are stateless. For more on Article 1C(1–4), see UNHCR, "The Cessation Clauses: Guidelines on their Application", April 1999.
[3] See, for example, UNHCR's formal declarations of general cessation: "Applicability of the Cessation Clauses to Refugees from Poland, Czechoslovakia and Hungary", 15 Nov. 1991, "Applicability of Cessation Clauses to Refugees from Chile", 28 March 1994, "Applicability of the Cessation Clauses to Refugees from the Republics of Malawi and Mozambique", 31 Dec. 1996, "Applicability of the Cessation Clauses to Refugees from Bulgaria and Romania", 1 Oct. 1997, "Applicability of the Ceased Circumstances; Cessation Clauses to pre-1991 refugees from Ethiopia", 23 Sept. 1999, and "Declaration of Cessation – Timor Leste", 20 December 2002.
[4] "Summary Conclusions on Cessation of Refugee Status, Global Consultations on International Protection, Lisbon Expert Roundtable", May 2001, no. B (17). See also, UNHCR, *Handbook*, para. 135.
[5] See, amongst others, UNHCR, *Handbook*, para. 116.

AR.08157

## II. SUBSTANTIVE ANALYSIS

5. The following framework for substantive analysis is drawn from the terms of Article 1C(5) and 1C(6) of the 1951 Convention and takes into account Executive Committee Conclusion No. 69, subsequent legal developments, and State practice.

**3**

### A. GENERAL CONSIDERATIONS

6. When interpreting the cessation clauses, it is important to bear in mind the broad durable solutions context of refugee protection informing the object and purpose of these clauses. Numerous Executive Committee Conclusions affirm that the 1951 Convention and principles of refugee protection look to durable solutions for refugees.[6] Accordingly, cessation practices should be developed in a manner consistent with the goal of durable solutions. Cessation should therefore not result in persons residing in a host State with an uncertain status. It should not result either in persons being compelled to return to a volatile situation, as this would undermine the likelihood of a durable solution and could also cause additional or renewed instability in an otherwise improving situation, thus risking future refugee flows. Acknowledging these considerations ensures refugees do not face involuntary return to situations that might again produce flight and a need for refugee status. It supports the principle that conditions within the country of origin must have changed in a profound and enduring manner before cessation can be applied.

7. Cessation under Article 1C(5) and 1C(6) does not require the consent of or a voluntary act by the refugee. Cessation of refugee status terminates rights that accompany that status. It may bring about the return of the person to the country of origin and may thus break ties to family, social networks and employment in the community in which the refugee has become established. As a result, a premature or insufficiently grounded application of the ceased circumstances clauses can have serious consequences. It is therefore appropriate to interpret the clauses strictly and to ensure that procedures for determining general cessation are fair, clear, and transparent.

### B. ASSESSMENT OF CHANGE OF CIRCUMSTANCES IN THE COUNTRY OF ORIGIN

8. Article 1C(5) and (6) provides for the cessation of a person's refugee status where "the circumstances in connexion with which he [or she] has been recognized as a refugee have ceased to exist". To assist assessment of how and to what extent conditions in the country of origin must have changed before these "ceased circumstances" clauses can be invoked, UNHCR's Executive Committee has developed guidance in the form of Executive Committee Conclusion No. 69 (XLIII) (1992), which reads in part:

> [I]n taking any decision on application of the cessation clauses based on "ceased circumstances", States must carefully assess the fundamental character of the changes in the country of nationality or origin, including the general human rights situation, as well as the particular cause of fear of persecution, in order to make sure in an objective and verifiable way that the situation which justified the granting of refugee status has ceased to exist.
>
> ... [A]n essential element in such assessment by States is the fundamental, stable and durable character of the changes, making use of appropriate information available in this respect, *inter alia*, from relevant specialized bodies, including particularly UNHCR.

9. Key elements relevant to assessment of the extent and durability of change required before it can be said that the circumstances in connection with which refugee status was recognised have ceased to exist are outlined below.

---

[6] See, e.g., Executive Committee Conclusions No. 29 (XXXIV) (1983), No. 50 (XXXIX) (1988), No. 58 (XL) (1989), No. 79 (XLVII) (1996), No. 81 (XLVIII) (1997), No. 85 (XLIX) (1998), No. 87 (L) (1999), No. 89 (L) (2000), and No. 90 (LII) (2001).

AR.08158

### The fundamental character of change

10. For cessation to apply, the changes need to be of a fundamental nature, such that the refugee "can no longer … continue to refuse to avail himself of the protection of the country of his nationality" (Article 1C(5)) or, if he has no nationality, is "able to return to the country of his former habitual residence" (Article 1C(6)). Cessation based on "ceased circumstances" therefore only comes into play when changes have taken place which address the causes of displacement which led to the recognition of refugee status.

11. Where indeed a "particular cause of fear of persecution"[7] has been identified, the elimination of that cause carries more weight than a change in other factors. Often, however, circumstances in a country are inter-linked, be these armed conflict, serious violations of human rights, severe discrimination against minorities, or the absence of good governance, with the result that resolution of the one will tend to lead to an improvement in others. All relevant factors must therefore be taken into consideration. An end to hostilities, a complete political change and return to a situation of peace and stability remain the most typical situation in which Article 1C(5) or (6) applies.

12. Large-scale spontaneous repatriation of refugees may be an indicator of changes that are occurring or have occurred in the country of origin. Where the return of former refugees would be likely to generate fresh tension in the country of origin, however, this itself could signal an absence of effective, fundamental change. Similarly, where the particular circumstances leading to flight or to non-return have changed, only to be replaced by different circumstances which may also give rise to refugee status, Article

1C(5) or (6) cannot be invoked.

### The enduring nature of change

13. Developments which would appear to evidence significant and profound changes should be given time to consolidate before any decision on cessation is made. Occasionally, an evaluation as to whether fundamental changes have taken place on a durable basis can be made after a relatively short time has elapsed. This is so in situations where, for example, the changes are peaceful and take place under a constitutional process, where there are free and fair elections with a real change of government committed to respecting fundamental human rights, and where there is relative political and economic stability in the country.

14. A longer period of time will need to have elapsed before the durability of change can be tested where the changes have taken place violently, for instance, through the overthrow of a regime. Under the latter circumstances, the human rights situation needs to be especially carefully assessed. The process of national reconstruction must be given sufficient time to take hold and any peace arrangements with opposing militant groups must be carefully monitored. This is particularly relevant after conflicts involving different ethnic groups, since progress towards genuine reconciliation has often proven difficult in such cases. Unless national reconciliation clearly starts to take root and real peace is restored, political changes which have occurred may not be firmly established.

### Restoration of protection

15. In determining whether circumstances have changed so as to justify cessation under Article 1C(5) or (6), another crucial question is whether the refugee can effectively re-avail him- or herself of the protection of his or her own country.[8] Such protection must therefore be effective and available. It requires more than mere physical security or safety. It needs to include the existence of a functioning government and basic administrative structures, as evidenced for instance through a functioning system of law and justice, as well as the existence of adequate infrastructure to enable residents to exercise their rights, including their right to a basic livelihood.

---

[7] See Executive Committee Conclusion No. 69 (XLIII) (1992), para. a.
[8] See Art. 12(4) of the 1966 International Covenant on Civil and Political Rights declaring: "No one shall be arbitrarily deprived of the right to enter his own country" and Human Rights Committee, General Comment No. 27, Article 12 (freedom of movement), 1999.                    AR.08159

16. An important indicator in this respect is the general human rights situation in the country. Factors which have special weight for its assessment are the level of democratic development in the country, including the holding of free and fair elections, adherence to international human rights instruments, and access for independent national or international organisations freely to verify respect for human rights. There is no requirement that the standards of human rights achieved must be exemplary. What matters is that significant improvements have been made, as illustrated at least by respect for the right to life and liberty and the prohibition of torture; marked progress in establishing an independent judiciary, fair trials and access to courts: as well as protection amongst others of the fundamental rights to freedom of expression, association and religion. Important, more specific indicators include declarations of amnesties, the repeal of oppressive laws, and the dismantling of former security services.

## C. PARTIAL CESSATION

17. The 1951 Convention does not preclude cessation declarations for distinct sub-groups of a general refugee population from a specific country, for instance, for refugees fleeing a particular regime but not for those fleeing after that regime was deposed.[9] In contrast, changes in the refugee's country of origin affecting only part of the territory should not, in principle, lead to cessation of refugee status. Refugee status can only come to an end if the basis for persecution is removed without the precondition that the refugee has to return to specific safe parts of the country in order to be free from persecution. Also, not being able to move or to establish oneself freely in the country of origin would indicate that the changes have not been fundamental.

## D. INDIVIDUAL CESSATION

18. A strict interpretation of Article 1C(5) and (6) would allow their application on an individual basis. It reads: "The Convention shall cease to apply to any person [if] ... [h]e can no longer, *because the circumstances in connexion with which he has been recognized as a refugee* have ceased to exist, continue to refuse to avail himself of the protection" of his country of origin (emphasis supplied). Yet Article 1C(5) and (6) have rarely been invoked in individual cases. States have not generally undertaken periodic reviews of individual cases on the basis of fundamental changes in the country of origin. These practices acknowledge that a refugee's sense of stability should be preserved as much as possible. They are also consistent with Article 34 of the 1951 Convention, which urges States "as far as possible [to] facilitate the assimilation and naturalization of refugees". Where the cessation clauses are applied on an individual basis, it should not be done for the purposes of a re-hearing *de novo*.

## E. EXCEPTIONS TO CESSATION

### Continued international protection needs

19. Even when circumstances have generally changed to such an extent that refugee status would no longer be necessary, there may always be the specific circumstances of individual cases that may warrant continued international protection. It has therefore been a general principle that all refugees affected by general cessation must have the possibility, upon request, to have such application in their cases reconsidered on international protection grounds relevant to their individual case.[10]

### "Compelling reasons"

20. Both Article 1C(5) and (6) contain an exception to the cessation provision, allowing a refugee to invoke "compelling reasons arising out of previous persecution" for refusing to re-avail

---

[9] This approach has been taken by UNHCR on one occasion.
[10] Executive Committee, Conclusion No. 69 (XLIII) (1992), para. d.

AR.08160

himself or herself of the protection of the country of origin. This exception is intended to cover cases where refugees, or their family members, have suffered atrocious forms of persecution and therefore cannot be expected to return to the country of origin or former habitual residence.[11] This might, for example, include "ex-camp or prison detainees, survivors or witnesses of violence against family members, including sexual violence, as well as severely traumatised persons. It is presumed that such persons have suffered grave persecution, including at the hands of elements of the local population, and cannot reasonably be expected to return."[12] Children should also be given special consideration in this regard, as they may often be able to invoke "compelling reasons" for refusing to return to their country of origin.

21. Application of the "compelling reasons" exception is interpreted to extend beyond the actual words of the provision to apply to Article 1A(2) refugees. This reflects a general humanitarian principle that is now well-grounded in State practice.[13]

**Long-term residents**

22. In addition, the Executive Committee, in Conclusion No. 69, recommends that States consider "appropriate arrangements" for persons "who cannot be expected to leave the country of asylum, due to a long stay in that country resulting in strong family, social and economic links". In such situations, countries of asylum are encouraged to provide, and often do provide, the individuals concerned with an alternative residence status, which retains previously acquired rights, though in some instances with refugee status being withdrawn. Adopting this approach for long-settled refugees is not required by the 1951 Convention per se, but it is consistent with the instrument's broad humanitarian purpose and with respect for previously acquired rights, as set out in the aforementioned Executive Committee Conclusion No. 69 and international human rights law standards.[14]

## F. CESSATION AND MASS INFLUX

**Prima facie group determinations under the 1951 Convention**

23. Situations of mass influx frequently involve groups of persons acknowledged as refugees on a group basis because of the readily apparent and objective reasons for flight and circumstances in the country of origin. The immediate impracticality of individual status determinations has led to use of a *prima facie* refugee designation or acceptance for the group.[15] For such groups, the general principles described for cessation are applicable.

**Temporary protection in mass influx situations that include persons covered by the 1951 Convention**

24. Some States have developed "temporary protection" schemes[16] under which assistance and protection against *refoulement* have been extended on a group basis, without either a determination of *prima facie* refugee status for the group or individual status determinations for members of the group. Even though the cessation doctrine does not formally come into play, this form of protection is built upon the 1951 Convention framework and members of the group may well be or include refugees under the Convention. Decisions by States to withdraw temporary protection should therefore be preceded by a thorough evaluation of the changes in the country of origin. Such decisions should also be accompanied by an opportunity for those unwilling to return and requesting international protection to have access to an asylum procedure. In this context, it is also appropriate for States to provide exceptions for individuals with "compelling reasons" arising out of prior persecution.

---

[11] See amongst others, UNHCR, *Handbook*, para. 136.
[12] See UNHCR and UNHCR Study, "Daunting Prospects Minority Women: Obstacles to their Return and Integration", Sarajevo, Bosnia and Herzegovina, April 2000.
[13] See generally, J. Fitzpatrick and R. Bonoan, "Cessation of Refugee Protection" in *Refugee Protection in International Law: UNHCR's Global Consultations on International Protection*, eds E. Feller, V. Türk and F. Nicholson, (Cambridge University Press, 2003 forthcoming).
[14] See e.g., above footnote 8.
[15] See "Protection of Refugees in Mass Influx Situations: Overall Protection Framework, Global Consultations on International Protection", EC/GC/01/4, 19 Feb. 2001.
[16] See, e.g., the European Union Directive on Temporary Protection, 2001/55/EC, 20 July 2001.

AR.08161

## III. PROCEDURAL ISSUES

25. As mentioned earlier, a declaration of general cessation has potentially serious consequences for recognised refugees. It acknowledges loss of refugee status and the rights that accompany that status, and it may contemplate the return of persons to their countries of origin. Thus, the following procedural aspects should be observed:

**General considerations**

i.   In making an assessment of the country of origin, States and UNHCR must "make sure in an objective and verifiable way that the situation which justified the granting of refugee status has ceased to exist".[17] As noted above, this assessment should include consideration of a range of factors, including the general human rights situation.

ii.  The burden rests on the country of asylum to demonstrate that there has been a fundamental, stable and durable change in the country of origin and that invocation of Article 1C(5) or (6) is appropriate. There may be instances where certain groups should be excluded from the application of general cessation because they remain at risk of persecution.

iii. It is important that both the declaration process and implementation plans be consultative and transparent, involving in particular UNHCR, given its supervisory role.[18] NGOs and refugees should also be included in this consultative process. "Go and see" visits to the country of origin could, where feasible, be facilitated to examine conditions there, as well as an examination of the situation of refugees who have already returned voluntarily.

iv.  General cessation declarations should be made public.

v.   Counselling of refugees, information sharing and, if necessary, the provision of assistance to returnees are critical to the successful implementation of general cessation.

vi.  Procedures operationalising a declaration of cessation need to be carried out in a flexible, phased manner, particularly in developing countries hosting large numbers of refugees. There needs to be a certain time lapse between the moment of declaration and implementation, allowing for preparations for return and arrangements for long-term residents with acquired rights.

vii. Noting the potential impact of a general cessation declaration on refugees and their families, they should be given an opportunity, upon request, to have their case reconsidered on grounds relevant to their individual case, in order to establish whether they come within the terms of the exceptions to cessation.[19] In such cases, however, no action should be taken to withdraw rights of the refugee until a final decision has been taken.

viii. UNHCR retains a role in assisting the return of persons affected by a declaration of cessation or the integration of those allowed to stay, since they remain under UNHCR's Mandate for a period of grace.

**Post–declaration applications for refugee status**

ix.  A declaration of general cessation cannot serve as an automatic bar to refugee claims, either at the time of a general declaration or subsequent to it. Even though general cessation may have been declared in respect of a particular country, this does not preclude individuals leaving this country from applying for refugee status. For example, even if fundamental changes have occurred in a State, members of identifiable sub-groups – such as those based on ethnicity, religion, race, or political opinion – may still face particular circumstances that

---

[17] This rigorous standard is reflected in Executive Committee Conclusion No. 69 (XLIII) (1992), para. a.

[18] See para. 8(a) of the UNHCR Statute, Article 35 of the 1951 Convention and Article II of the 1967 Protocol, as well as in particular, the second preambular paragraph of Executive Committee Conclusion No. 69 (XLIII) (1992).

[19] See paras. 19–22 of these Guidelines and Executive Committee Conclusion No. 69 (XLIII) (1992).

AR.08162

warrant refugee status. Alternatively, a person may have a well-founded fear of persecution by a private person or group that the government is unable or unwilling to control, persecution based on gender being one example.



**UNHCR**
United Nations High Commissioner for Refugees
Haut Commissariat des Nations Unies pour les réfugiés

| Distr. GENERAL | HCR/GIP/03/04 | 23 July 2003 | Original: ENGLISH |

**4**

# GUIDELINES ON INTERNATIONAL PROTECTION NO. 4:

## "Internal Flight or Relocation Alternative" within the Context of Article 1A(2) of the 1951 Convention and/or 1967 Protocol relating to the Status of Refugees

UNHCR issues these Guidelines pursuant to its mandate, as contained in the *Statute of the Office of the United Nations High Commissioner for Refugees*, and Article 35 of the *1951 Convention relating to the Status of Refugees* and/or its *1967 Protocol*. These Guidelines supplement the UNHCR *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees* (re-edited, Geneva, January 1992). They further supersede UNHCR's Position Paper, *Relocating Internally as a Reasonable Alternative to Seeking Asylum – (The So-Called "Internal Flight Alternative" or "Relocation Principle")* (Geneva, February 1999). They result, *inter alia*, from the Second Track of the Global Consultations on International Protection which examined this subject at its expert meeting in San Remo, Italy, in September 2001 and seek to consolidate appropriate standards and practice on this issue in light of recent developments in State practice.

These Guidelines are intended to provide interpretative legal guidance for governments, legal practitioners, decision-makers and the judiciary, as well as UNHCR staff carrying out refugee status determination in the field.

AR.08164

## I. INTRODUCTION

1. Internal flight or relocation alternative is a concept that is increasingly considered by decision-makers in refugee status determination. To date, there has been no consistent approach to this concept and consequently divergent practices have emerged both within and across jurisdictions. Given the differing approaches, these Guidelines are designed to offer decision-makers a more structured approach to analysis of this aspect of refugee status determination.

2. The concept of an internal flight or relocation alternative is not a stand-alone principle of refugee law, nor is it an independent test in the determination of refugee status. A Convention refugee is a person who meets the criteria set out in Article 1A(2) of the *1951 Convention and/or 1967 Protocol relating to the Status of Refugees* (hereinafter "1951 Convention"). These criteria are to be interpreted in a liberal and humanitarian spirit, in accordance with their ordinary meaning, and in light of the object and purpose of the 1951 Convention. The concept of an internal flight or relocation alternative is not explicitly referred to in these criteria. The question of whether the claimant has an internal flight or relocation alternative may, however, arise as part of the refugee status determination process.

3. Some have located the concept of internal flight or relocation alternative in the "well- founded fear of being persecuted" clause of the definition, and others in the "unwilling ... or unable ... to avail himself of the protection of that country" clause. These approaches are not necessarily contradictory, since the definition comprises one holistic test of interrelated elements. How these elements relate, and the importance to be accorded to one or another element, necessarily falls to be determined on the facts of each individual case.[1]

4. International law does not require threatened individuals to exhaust all options within their own country first before seeking asylum; that is, it does not consider asylum to be the last resort. The concept of internal flight or relocation alternative should therefore not be invoked in a manner that would undermine important human rights tenets underlying the international protection regime, namely the right to leave one's country, the right to seek asylum and protection against refoulement. Moreover, since the concept can only arise in the context of an assessment of the refugee claim on its merits, it cannot be used to deny access to refugee status determination procedures. A consideration of internal flight or relocation necessitates regard for the personal circumstances of the individual claimant and the conditions in the country for which the internal flight or relocation alternative is proposed.[2]

5. Consideration of possible internal relocation areas is not relevant for refugees coming under the purview of Article I(2) of the OAU Convention Governing the Specific Aspects of Refugee Problems in Africa 1969. Article I(2) specifically clarifies the definition of a refugee as follows: "every person who, owing to external aggression, occupation, foreign domination or events seriously disturbing public order in either part or the whole of his country of origin or nationality, is compelled to leave his place of habitual residence in order to seek refuge in another place outside his country of origin or nationality".[3]

## II. SUBSTANTIVE ANALYSIS

### A. Part of the holistic assessment of refugee status

6. The 1951 Convention does not require or even suggest that the fear of being persecuted need always extend to the whole territory of the refugee's country of origin.[4] The concept of an internal flight or relocation alternative therefore refers to a specific area of the country where there is no

---

[1] For further details, see UNHCR, "Interpreting Article 1 of the 1951 Convention Relating to the Status of Refugees", Geneva, April 2001, (hereafter UNHCR, "Interpreting Article 1"), para. 12.

[2] *Ibid.*, paras. 35–37.

[3] (Emphasis added.) The 1984 *Cartagena Declaration* also specifically refers to Article I(2) of the OAU Refugee Convention.

[4] See UNHCR, *Handbook on Procedures and Criteria for Determining Refugee Status* (1979, Geneva, re-edited 1992), (hereinafter "UNHCR, *Handbook*"), para. 91.

AR.08165

risk of a well-founded fear of persecution and where, given the particular circumstances of the case, the individual could reasonably be expected to establish him/herself and live a normal life.[5] Consequently, if internal flight or relocation is to be considered in the context of refugee status determination, a particular area must be identified and the claimant provided with an adequate opportunity to respond.

7. In the context of the holistic assessment of a claim to refugee status, in which a well-founded fear of persecution for a Convention reason has been established in some localised part of the country of origin, the assessment of whether or not there is a relocation possibility requires two main sets of analyses, undertaken on the basis of answers to the following sets of questions:

**I.  The Relevance Analysis**

a.  *Is the area of relocation practically, safely, and legally accessible to the individual*? If any of these conditions is not met, consideration of an alternative location within the country would not be relevant.

b.  *Is the agent of persecution the State*? National authorities are presumed to act throughout the country. If they are the feared persecutors, there is a presumption in principle that an internal flight or relocation alternative is not available.

c.  I*s the agent of persecution a non-State agent*? Where there is a risk that the non- State actor will persecute the claimant in the proposed area, then the area will not be an internal flight or relocation alternative. This finding will depend on a determination of whether the persecutor is likely to pursue the claimant to the area and whether State protection from the harm feared is available there.

d.  *Would the claimant be exposed to a risk of being persecuted or other serious harm upon relocation*? This would include the original or any new form of persecution or other serious harm in the area of relocation.

**II.  The Reasonableness Analysis**

a.  *Can the claimant, in the context of the country concerned, lead a relatively normal life without facing undue hardship*? If not, it would not be reasonable to expect the person to move there.

**Scope of assessment**

8. The determination of whether the proposed internal flight or relocation area is an appropriate alternative in the particular case requires an assessment over time, taking into account not only the circumstances that gave rise to the persecution feared, and that prompted flight from the original area, but also whether the proposed area provides a meaningful alternative in the future. The forward-looking assessment is all the more important since, although rejection of status does not automatically determine the course of action to be followed, forcible return may be a consequence.

## B. The relevance analysis

9. The questions outlined in paragraph 7 can be analysed further as follows:

**Is the area of relocation practically, safely, and legally accessible to the individual?**

10. An area is not an internal flight or relocation alternative if there are barriers to reaching the area which are not reasonably surmountable. For example, the claimant should not be required to encounter physical dangers en route to the area such as mine fields, factional fighting, shifting war fronts, banditry or other forms of harassment or exploitation.

---

[5] For issues concerning the burden of proof in establishing these issues see section III.A below.                    AR.08166

11. If the refugee claimant would have to pass through the original area of persecution in order to access the proposed area, that area cannot be considered an internal flight or relocation alternative. Similarly, passage through airports may render access unsafe, especially in cases where the State is the persecutor or where the persecutor is a non- State group in control of the airport.

12. The proposed area must also be legally accessible, that is, the individual must have the legal right to travel there, to enter, and to remain. Uncertain legal status can create pressure to move to unsafe areas, or to the area of original persecution. This issue may require particular attention in the case of stateless persons or those without documentation.

**Is the agent of persecution the State?**

13. The need for an analysis of internal relocation only arises where the fear of being persecuted is limited to a specific part of the country, outside of which the feared harm cannot materialise. In practical terms, this normally excludes cases where the feared persecution emanates from or is condoned or tolerated by State agents, including the official party in one-party States, as these are presumed to exercise authority in all parts of the country.[6] Under such circumstances the person is threatened with persecution countrywide unless exceptionally it is clearly established that the risk of persecution stems from an authority of the State whose power is clearly limited to a specific geographical area or where the State itself only has control over certain parts of the country.[7]

14. Where the risk of being persecuted emanates from local or regional bodies, organs or administrations within a State, it will rarely be necessary to consider potential relocation, as it can generally be presumed that such local or regional bodies derive their authority from the State. The possibility of relocating internally may be relevant only if there is clear evidence that the persecuting authority has no reach outside its own region and that there are particular circumstances to explain the national government's failure to counteract the localised harm.

**Is the agent of persecution a non-State agent?**

15. Where the claimant fears persecution by a non-State agent of persecution, the main inquiries should include an assessment of the motivation of the persecutor, the ability of the persecutor to pursue the claimant in the proposed area, and the protection available to the claimant in that area from State authorities. As with questions involving State protection generally, the latter involves an evaluation of the ability and willingness of the State to protect the claimant from the harm feared. A State may, for instance, have lost effective control over its territory and thus not be able to protect. Laws and mechanisms for the claimant to obtain protection from the State may reflect the State's willingness, but, unless they are given effect in practice, they are not of themselves indicative of the availability of protection. Evidence of the State's inability or unwillingness to protect the claimant in the original persecution area will be relevant. It can be presumed that if the State is unable or unwilling to protect the individual in one part of the country, it may also not be able or willing to extend protection in other areas. This may apply in particular to cases of gender-related persecution.

16. Not all sources of possible protection are tantamount to State protection. For example, if the area is under the control of an international organisation, refugee status should not be denied solely on the assumption that the threatened individual could be protected by that organisation. The facts of the individual case will be particularly important. The general rule is that it is inappropriate to equate the exercise of a certain administrative authority and control over territory by international organisations on a transitional or temporary basis with national protection provided by States. Under international law, international organisations do not have the attributes of a State.

17. Similarly, it is inappropriate to find that the claimant will be protected by a local clan or militia in an area where they are not the recognised authority in that territory and/or where their control over

---

[6] See Summary Conclusions – Internal Protection/Relocation/Flight Alternative, Global Consultations on International Protection, San Remo Expert Roundtable, 6–8 September 2001 (hereinafter "Summary Conclusions – Internal Protection/Relocation/Flight Alternative"), para. 2; UNHCR, "Interpreting Article 1", paras. 12–13.

[7] See also paras. 16, 17 and 27 of these Guidelines.

AR.08167

the area may only be temporary. Protection must be effective and of a durable nature: It must be provided by an organised and stable authority exercising full control over the territory and population in question.

**Would the claimant be exposed to a risk of being persecuted or other serious harm upon relocation?**

18. It is not sufficient simply to find that the original agent of persecution has not *yet* established a presence in the proposed area. Rather, there must be reason to believe that the reach of the agent of persecution is likely to remain localised and outside the designated place of internal relocation.

19. Claimants are not expected or required to suppress their political or religious views or other protected characteristics to avoid persecution in the internal flight or relocation area. The relocation alternative must be more than a "safe haven" away from the area of origin.

20. In addition, a person with an established fear of persecution for a 1951 Convention reason in one part of the country cannot be expected to relocate to another area of serious harm. If the claimant would be exposed to a new risk of serious harm, including a serious risk to life, safety, liberty or health, or one of serious discrimination,[8] an internal flight or relocation alternative does not arise, irrespective of whether or not there is a link to one of the Convention grounds.[9] The assessment of new risks would therefore also need to take into account serious harm generally covered under complementary forms of protection.[10]

21. The proposed area is also not an internal flight or relocation alternative if the conditions there are such that the claimant may be compelled to go back to the original area of persecution, or indeed to another part of the country where persecution or other forms of serious harm may be a possibility.

## C. The reasonableness analysis

22. In addition to there not being a fear of persecution in the internal flight or relocation alternative, it must be reasonable in all the circumstances for the claimant to relocate there. This test of "reasonableness" has been adopted by many jurisdictions. It is also referred to as a test of "undue hardship" or "meaningful protection".

23. The "reasonableness test" is a useful legal tool which, while not specifically derived from the language of the 1951 Convention, has proved sufficiently flexible to address the issue of whether or not, in all the circumstances, the particular claimant could reasonably be expected to move to the proposed area to overcome his or her well-founded fear of being persecuted. It is not an analysis based on what a hypothetical "reasonable person" should be expected to do. The question is what is reasonable, both subjectively and objectively, given the individual claimant and the conditions in the proposed internal flight or relocation alternative.

**Can the claimant, in the context of the country concerned, lead a relatively normal life without facing undue hardship?**

24. In answering this question, it is necessary to assess the applicant's personal circumstances, the existence of past persecution, safety and security, respect  for human rights, and possibility for economic survival.

---

[8] See UNHCR, *Handbook*, paras. 51–52.
[9] A more general right not to be returned to a country where there is a risk of torture or cruel or inhuman treatment is found, either explicitly or by interpretation, in international human rights instruments. The most prominent are Article 3 of the Convention against Torture 1984, Article 7 of the International Covenant on Civil and Political Rights 1966, and Article 3 of the European Convention for the Protection of Human Rights and Fundamental Freedoms 1950.
[10] See UN docs. EC/50/SC/CRP.18, 9 June 2000 and EC/GC/01/18, 4 September 2001.

AR.08168

**Personal circumstances**

25. The personal circumstances of an individual should always be given due weight in assessing whether it would be unduly harsh and therefore unreasonable for the person to relocate in the proposed area. Of relevance in making this assessment are factors such as age, sex, health, disability, family situation and relationships, social or other vulnerabilities, ethnic, cultural or religious considerations, political and social links and compatibility, language abilities, educational, professional and work background and opportunities, and any past persecution and its psychological effects. In particular, lack of ethnic or other cultural ties may result in isolation of the individual and even discrimination in communities where close ties of this kind are a dominant feature of daily life. Factors which may not on their own preclude relocation may do so when their cumulative effect is taken into account. Depending on individual circumstances, those factors capable of ensuring the material and psychological well-being of the person, such as the presence of family members or other close social links in the proposed area, may be more important than others.

**Past persecution**

26. Psychological trauma arising out of past persecution may be relevant in determining whether it is reasonable to expect the claimant to relocate in the proposed area. The provision of psychological assessments attesting to the likelihood of further psychological trauma upon return would militate against finding that relocation to the area is a reasonable alternative. In some jurisdictions, the very fact that the individual suffered persecution in the past is sufficient in itself to obviate any need to address the internal relocation issue.

**Safety and security**

27. The claimant must be able to find safety and security and be free from danger and risk of injury. This must be durable, not illusory or unpredictable. In most cases, countries in the grip of armed conflict would not be safe for relocation, especially in light of shifting armed fronts which could suddenly bring insecurity to an area hitherto considered safe. In situations where the proposed internal flight or relocation alternative is under the control of an armed group and/or State-like entity, careful examination must be made of the durability of the situation there and the ability of the controlling entity to provide protection and stability.

**Respect for human rights**

28. Where respect for basic human rights standards, including in particular non-derogable rights, is clearly problematic, the proposed area cannot be considered a reasonable alternative. This does not mean that the deprivation of any civil, political or socio-economic human right in the proposed area will disqualify it from being an internal flight or relocation alternative. Rather, it requires, from a practical perspective, an assessment of whether the rights that will not be respected or protected are fundamental to the individual, such that the deprivation of those rights would be sufficiently harmful to render the area an unreasonable alternative.

**Economic survival**

29. The socio-economic conditions in the proposed area will be relevant in this part of the analysis. If the situation is such that the claimant will be unable to earn a living or to access accommodation, or where medical care cannot be provided or is clearly inadequate, the area may not be a reasonable alternative. It would be unreasonable, including from a human rights perspective, to expect a person to relocate to face economic destitution or existence below at least an adequate level of subsistence. At the other end of the spectrum, a simple lowering of living standards or worsening of economic status may not be sufficient to reject a proposed area as unreasonable. Conditions in the area must be such that a relatively normal life can be led in the context of the country concerned. If, for instance, an individual would be without family links and unable to benefit from an informal social safety net, relocation may not be reasonable, unless the person would otherwise be able to sustain a relatively normal life at more than just a minimum subsistence level.

AR.08169

112

30. If the person would be denied access to land, resources and protection in the proposed area because he or she does not belong to the dominant clan, tribe, ethnic, religious and/or cultural group, relocation there would not be reasonable. For example, in many parts of Africa, Asia and elsewhere, common ethnic, tribal, religious and/or cultural factors enable access to land, resources and protection. In such situations, it would not be reasonable to expect someone who does not belong to the dominant group, to take up residence there. A person should also not be required to relocate to areas, such as the slums of an urban area, where they would be required to live in conditions of severe hardship.

**4**

### D. Relocation and internally displaced persons

31. The presence of internally displaced persons who are receiving international assistance in one part of the country is not in itself conclusive evidence that it is reasonable for the claimant to relocate there. For example, the standard and quality of life of the internally displaced are often insufficient to support a finding that living in the area would be a reasonable alternative to flight. Moreover, where internal displacement is a result of "ethnic cleansing" policies, denying refugee status on the basis of the internal flight or relocation concept could be interpreted as condoning the resulting situation on the ground and therefore raises additional concerns.

32. The reality is that many thousands of internally displaced persons do not enjoy basic rights and have no opportunity to exercise the right to seek asylum outside their country. Thus, although standards largely agreed by the international community now exist, their implementation is by no means assured in practice. Moreover, the *Guiding Principles on Internal Displacement* specifically affirm in Principle 2(2) that they are not to be interpreted as "restricting, modifying or impairing the provisions of any international human rights or international humanitarian law instrument or rights granted to persons under domestic law" and in particular, they are "without prejudice to the right to seek and enjoy asylum in other countries."[11]

## III. PROCEDURAL ISSUES

### A. Burden of proof

33. The use of the relocation concept should not lead to additional burdens on asylum- seekers. The usual rule must continue to apply, that is, the burden of proving an allegation rests on the one who asserts it. This is consistent with paragraph 196 of the *Handbook* which states that

> ... while the burden of proof in principle rests on the applicant, the duty to ascertain and evaluate all the relevant facts is shared between the applicant and the examiner. Indeed, in some cases, it may be for the examiner to use all the means at his [or her] disposal to produce the necessary evidence in support of the application.

34. On this basis, the decision-maker bears the burden of proof of establishing that an analysis of relocation is relevant to the particular case. If considered relevant, it is up to the party asserting this to identify the proposed area of relocation and provide evidence establishing that it is a reasonable alternative for the individual concerned.

35. Basic rules of procedural fairness require that the asylum-seeker be given clear and adequate notice that such a possibility is under consideration.[12] They also require that the person be given an opportunity to provide arguments why (a) the consideration of an alternative location is not relevant in the case, and (b) if deemed relevant, that the proposed area would be unreasonable.

---

[11] See also W. Kälin, *Guiding Principles on Internal Displacement: Annotations*, Studies in Transnational Legal Policy No. 32, 2000 (The American Society of International Law, The Brookings Institution, Project on Internal Displacement), pp. 8-10.
[12] See Summary Conclusions – Internal Protection/Relocation/Flight Alternative, para. 7.

AR.08170

**B. Accelerated or admissibility procedures**

36. Given the complex and substantive nature of the inquiry, the examination of an internal flight or relocation alternative is not appropriate in accelerated procedures, or in deciding on an individual's admissibility to a full status determination procedure.[13]

**C. Country of origin information**

37. While examination of the relevance and reasonableness of a potential internal relocation area always requires an assessment of the individual's own particular circumstances, well-documented, good quality and current information and research on conditions in the country of origin are important components for the purpose of such examination. The usefulness of such information may, however, be limited in cases where the situation in the country of origin is volatile and sudden changes may occur in areas hitherto considered safe. Such changes may not have been recorded by the time the claim is being heard.

## IV. CONCLUSION

38. The concept of internal flight or relocation alternative is not explicitly referred to in the criteria set out in Article 1A(2) of the 1951 Convention. The question of whether the claimant has an internal flight or relocation alternative may, however, arise as part of the holistic determination of refugee status. It is relevant only in certain cases, particularly when the source of persecution emanates from a non-State actor. Even when relevant, its applicability will depend on a full consideration of all the circumstances of the case and the reasonableness of relocation to another area in the country of origin.

---

[13] See Summary Conclusions – Internal Protection/Relocation/Flight Alternative, para. 6; Executive Committee Conclusion No. 87 (L), 1999, para. j; and Note on International Protection, 1999, para. 26 (UN doc. A/AC.96/914, 7 July 1999).

AR.08171

**UNHCR**
**United Nations High Commissioner for Refugees**
Haut Commissariat des Nations Unies pour les réfugiés

| Distr. GENERAL | HCR/GIP/03/05 | 4 September 2003 | Original: ENGLISH |

# GUIDELINES ON INTERNATIONAL PROTECTION NO. 5:

**5**

### Application of the Exclusion Clauses: Article 1F of the 1951 Convention relating to the Status of Refugees

UNHCR issues these Guidelines pursuant to its mandate, as contained in the 1950 *Statute of the Office of the United Nations High Commissioner for Refugees*, in conjunction with Article 35 of the *1951 Convention relating to the Status of Refugees* and Article II of its *1967 Protocol*. These Guidelines complement the UNHCR *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees* (re-edited, Geneva, January 1992). These Guidelines summarise the *Background Note on the Application of the Exclusion Clauses: Article 1F of the 1951 Convention relating to the Status of Refugees* (4 September 2003) which forms an integral part of UNHCR's position on this issue. They supersede *The Exclusion Clauses: Guidelines on their Application* (UNHCR, Geneva, 1 December 1996) and *Note on the Exclusion Clauses* (UNHCR, Geneva, 30 May 1997), and result, *inter alia*, from the Second Track of the Global Consultations on International Protection process which examined this subject at its expert meeting in Lisbon, Portugal, in May 2001. An update of these Guidelines was also deemed necessary in light of contemporary developments in international law.

These Guidelines are intended to provide interpretative legal guidance for governments, legal practitioners, decision-makers and the judiciary, as well as UNHCR staff carrying out refugee status determination in the field.

AR.08172

## I. INTRODUCTION

### A. Background

1. Paragraph 7(d) of the 1950 UNHCR Statute, Article 1F of the 1951 Convention relating to the Status of Refugees (hereinafter "1951 Convention") and Article I(5) of the 1969 Organisation of African Unity (OAU) Convention Governing the Specific Aspects of Refugee Problems in Africa (hereinafter "OAU Convention") all oblige States and UNHCR to deny the benefits of refugee status to certain persons who would otherwise qualify as refugees. These provisions are commonly referred to as "the exclusion clauses". These Guidelines provide a summary of the key issues relating to these provisions – further guidance can be found in UNHCR's Background Note on the Application of the Exclusion Clauses: Article 1F of the 1951 Convention relating to the Status of Refugees (hereinafter "the Background Note"), which forms an integral part of these Guidelines.

2. The rationale for the exclusion clauses, which should be borne in mind when considering their application, is that certain acts are so grave as to render their perpetrators undeserving of international protection as refugees. Their primary purpose is to deprive those guilty of heinous acts, and serious common crimes, of international refugee protection and to ensure that such persons do not abuse the institution of asylum in order to avoid being held legally accountable for their acts. The exclusion clauses must be applied "scrupulously" to protect the integrity of the institution of asylum, as is recognised by UNHCR's Executive Committee in Conclusion No. 82 (XLVIII), 1997. At the same time, given the possible serious consequences of exclusion, it is important to apply them with great caution and only after a full assessment of the individual circumstances of the case. The exclusion clauses should, therefore, always be interpreted in a restrictive manner.

3. The exclusion clauses in the 1951 Convention are exhaustive. This should be kept in mind when interpreting Article I(5) of the OAU Convention which contains almost identical language. Article 1F of the 1951 Convention states that the provisions of that Convention "shall not apply to any person with respect to whom there are serious reasons for considering" that:

(a)  he [or she] has committed a crime against peace, a war crime, or a crime against humanity, as defined in the international instruments drawn up to make provision in respect of such crimes;

(b)  he [or she] has committed a serious non-political crime outside the country of refuge prior to his [or her] admission to that country as a refugee; or

(c)  he [or she] has been guilty of acts contrary to the purposes and principles of the United Nations.

### B. Relationship with other provisions of the 1951 Convention

4. Article 1F of the 1951 Convention should be distinguished from **Article 1D** which applies to a specific category of persons receiving protection or assistance from organs and agencies of the United Nations other than UNHCR.[1] Article 1F should also be distinguished from **Article 1E** which deals with persons not in need (as opposed to undeserving) of international protection. Moreover the exclusion clauses are not to be confused with **Articles 32 and 33(2)** of the Convention which deal respectively with the expulsion of, and the withdrawal of protection from *refoulement* from, recognised refugees who pose a danger to the host State (for example, because of serious crimes they have committed there). Article 33(2) concerns the future risk that a recognised refugee may pose to the host State.

### C. Temporal scope

5. Articles 1F(a) and 1F(c) are concerned with crimes whenever and wherever they are committed. By contrast, the scope of Article 1F(b) is explicitly limited to crimes committed outside the country of refuge prior to admission to that country as a refugee.

---

[1] See, UNHCR, "Note on the Applicability of Article 1D of the 1951 Convention relating to the Status of Refugees to Palestinian Refugees", October 2002.

**D. Cancellation or revocation on the basis of exclusion**

6. Where facts which would have led to exclusion only come to light after the grant of refugee status, this would justify **cancellation** of refugee status on the grounds of exclusion. The reverse is that information casting doubt on the basis on which an individual has been excluded should lead to reconsideration of eligibility for refugee status. Where a refugee engages in conduct falling within Article 1F(a) or 1F(c), this would trigger the application of the exclusion clauses and the **revocation** of refugee status, provided all the criteria for the application of these clauses are met.

**E. Responsibility for determination of exclusion**

7. States parties to the 1951 Convention/1967 Protocol and/or OAU Convention and UNHCR need to consider whether the exclusion clauses apply in the context of the determination of refugee status. Paragraph 7(d) of UNHCR's Statute covers similar grounds to Article 1F of the 1951 Convention, although UNHCR officials should be guided by the language of Article 1F, as it represents the later and more specific formulation.

**F. Consequences of exclusion**

8. Although a State is precluded from granting refugee status pursuant to the 1951 Convention or the OAU Convention to an individual it has excluded, it is not otherwise obliged to take any particular course of action. The State concerned can choose to grant the excluded individual stay on other grounds, but obligations under international law may require that the person concerned be criminally prosecuted or extradited. A decision by UNHCR to exclude someone from refugee status means that that individual can no longer receive protection or assistance from the Office.

9. An excluded individual may still be protected against return to a country where he or she is at risk of ill-treatment by virtue of other international instruments. For example, the 1984 Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment absolutely prohibits the return of an individual to a country where there is a risk that he or she will be subjected to torture. Other international and regional human rights instruments contain similar provisions.[2]

## II. SUBSTANTIVE ANALYSIS

**A. Article 1F(a): Crimes against peace, war crimes and crimes against humanity**

10. Amongst the various international instruments which offer guidance on the scope of these international crimes are the 1948 Convention on the Prevention and Punishment of the Crime of Genocide, the four 1949 Geneva Conventions for the Protection of Victims of War and the two 1977 Additional Protocols, the Statutes of the International Criminal Tribunals for the former Yugoslavia and Rwanda, the 1945 Charter of the International Military Tribunal (the London Charter), and most recently the 1998 Statute of the International Criminal Court which entered into force on 1 July 2002.

11. According to the London Charter a **crime against peace** involves the "planning, preparation, initiation or waging of a war of aggression, or a war in violation of international treaties, agreements, or assurances, or participation in a common plan or conspiracy for the accomplishment of any of the foregoing". Given the nature of this crime, it can only be committed by those in a high position of authority representing a State or a State-like entity. In practice, this provision has rarely been invoked.

---

[2] For further details, see Annex A of the Background Note accompanying these Guidelines.

AR.08174

12. Certain breaches of international humanitarian law constitute **war crimes**.[3] Although such crimes can be committed in both international and non-international armed conflicts, the content of the crimes depends on the nature of the conflict. War crimes cover such acts as wilful killing and torture of civilians, launching indiscriminate attacks on civilians, and wilfully depriving a civilian or a prisoner of war of the rights of fair and regular trial.

13. The distinguishing feature of **crimes against humanity**,[4] which cover acts such as genocide, murder, rape and torture, is that they must be carried out as part of a widespread or systematic attack directed against the civilian population. An isolated act can, however, constitute a crime against humanity if it is part of a coherent system or a series of systematic and repeated acts. Since such crimes can take place in peacetime as well as armed conflict, this is the broadest category under Article 1F(a).

## B. Article 1F(b): Serious non-political crimes

14. This category does not cover minor crimes nor prohibitions on the legitimate exercise of human rights. In determining whether a particular offence is sufficiently serious, international rather than local standards are relevant. The following factors should be taken into account: the nature of the act, the actual harm inflicted, the form of procedure used to prosecute the crime, the nature of the penalty, and whether most jurisdictions would consider it a serious crime. Thus, for example, murder, rape and armed robbery would undoubtedly qualify as serious offences, whereas petty theft would obviously not.

15. A serious crime should be considered **non-political** when other motives (such as personal reasons or gain) are the predominant feature of the specific crime committed. Where no clear link exists between the crime and its alleged political objective or when the act in question is disproportionate to the alleged political objective, non-political motives are predominant.[5] The motivation, context, methods and proportionality of a crime to its objectives are important factors in evaluating its political nature. The fact that a particular crime is designated as non-political in an extradition treaty is of significance, but not conclusive in itself. Egregious acts of violence, such as acts those commonly considered to be of a "terrorist" nature, will almost certainly fail the predominance test, being wholly disproportionate to any political objective. Furthermore, for a crime to be regarded as political in nature, the political objectives should be consistent with human rights principles.

16. Article 1F(b) also requires the crime to have been committed "outside the country of refuge prior to [the individual's] admission to that country as a refugee". Individuals who commit "serious non-political crimes" within the country of refuge are subject to that country's criminal law process and, in the case of particularly grave crimes, to Articles 32 and 33(2) of the 1951 Convention.

## C. Article 1F(c): Acts contrary to the purposes and principles of the United Nations

17. Given the broad, general terms of the purposes and principles of the United Nations, the scope of this category is rather unclear and should therefore be read narrowly. Indeed, it is rarely applied and, in many cases, Article 1F(a) or 1F(b) are anyway likely to apply. Article 1F(c) is only triggered in extreme circumstances by activity which attacks the very basis of the international community's coexistence. Such activity must have an international dimension. Crimes capable of affecting international peace, security and peaceful relations between States, as well as serious and sustained violations of human rights, would fall under this category. Given that Articles 1 and 2 of the United Nations Charter essentially set out the fundamental principles States must uphold in their mutual relations, it would appear that in principle only persons who have been in positions of power in a State or State-like entity would appear capable of committing such acts. In cases involving a terrorist act, a correct application of Article 1F(c) involves an assessment as to the extent to which the act impinges on the international plane – in terms of its gravity, international impact, and implications for international peace and security.

---

[3] For instruments defining war crimes, see Annex B of the Background Note.
[4] For instruments defining crimes against humanity, see Annex C of the Background Note.
[5] See para 152 of the UNHCR *Handbook on Procedures and Criteria for Determining Refugee Status*, Geneva, re-edited 1992 AR.08175

## D. Individual responsibility

18. For exclusion to be justified, individual responsibility must be established in relation to a crime covered by Article 1F. Specific considerations in relation to crimes against peace and acts against the purposes and principles of the UN have been discussed above. In general, individual responsibility flows from the person having committed, or made a substantial contribution to the commission of the criminal act, in the knowledge that his or her act or omission would facilitate the criminal conduct. The individual need not physically have committed the criminal act in question. Instigating, aiding and abetting and participating in a joint criminal enterprise can suffice.

19. The fact that a person was at some point a senior member of a repressive government or a member of an organisation involved in unlawful violence does not in itself entail individual liability for excludable acts. A presumption of responsibility may, however, arise where the individual has remained a member of a government clearly engaged in activities that fall within the scope of Article 1F. Moreover, the purposes, activities and methods of some groups are of a particularly violent nature, with the result that voluntary membership thereof may also raise a presumption of individual responsibility. Caution must be exercised when such a presumption of responsibility arises, to consider issues including the actual activities of the group, its organisational structure, the individual's position in it, and his or her ability to influence significantly its activities, as well as the possible fragmentation of the group. Moreover, such presumptions in the context of asylum proceedings are rebuttable.

20. As for ex-combatants, they should not necessarily be considered excludable, unless of course serious violations of international human rights law and international humanitarian law are reported and indicated in the individual case.

## E. Grounds for rejecting individual responsibility

21. Criminal responsibility can normally only arise where the individual concerned committed the material elements of the offence with knowledge and intent. Where the **mental element** is not satisfied, for example, because of ignorance of a key fact, individual criminal responsibility is not established. In some cases, the individual may not have the mental capacity to be held responsible a crime, for example, because of insanity, mental handicap, involuntary intoxication or, in the case of children, immaturity.

22. Factors generally considered to constitute **defences** to criminal responsibility should be considered. For example, the defence of superior orders will only apply where the individual was legally obliged to obey the order, was unaware of its unlawfulness and the order itself was not manifestly unlawful. As for duress, this applies where the act in question results from the person concerned necessarily and reasonably avoiding a threat of imminent death, or of continuing or imminent serious bodily harm to him- or herself or another person, and the person does not intend to cause greater harm than the one sought to be avoided. Action in self-defence or in defence of others or of property must be both reasonable and proportionate in relation to the threat.

23. Where **expiation** of the crime is considered to have taken place, application of the exclusion clauses may no longer be justified. This may be the case where the individual has served a penal sentence for the crime in question, or perhaps where a significant period of time has elapsed since commission of the offence. Relevant factors would include the seriousness of the offence, the passage of time, and any expression of regret shown by the individual concerned. In considering the effect of any pardon or amnesty, consideration should be given to whether it reflects the democratic will of the relevant country and whether the individual has been held accountable in any other way. Some crimes are, however, so grave and heinous that the application of Article 1F is still considered justified despite the existence of a pardon or amnesty.

AR.08176

### F. Proportionality considerations

24. The incorporation of a proportionality test when considering exclusion and its consequences provides a useful analytical tool to ensure that the exclusion clauses are applied in a manner consistent with the overriding humanitarian object and purpose of the 1951 Convention. The concept has evolved in particular in relation to Article 1F(b) and represents a fundamental principle of many fields of international law. As with any exception to a human rights guarantee, the exclusion clauses must therefore be applied in a manner proportionate to their objective, so that the gravity of the offence in question is weighed against the consequences of exclusion. Such a proportionality analysis would, however, not normally be required in the case of crimes against peace, crimes against humanity, and acts falling under Article 1F(c), as the acts covered are so heinous. It remains relevant, however, to Article 1F(b) crimes and less serious war crimes under Article 1F(a).

### G. Particular acts and special cases

25. Despite the lack of an internationally agreed definition of **terrorism**,[6] acts commonly considered to be terrorist in nature are likely to fall within the exclusion clauses even though Article 1F is not to be equated with a simple anti-terrorism provision. Consideration of the exclusion clauses is, however, often unnecessary as suspected terrorists may not be eligible for refugee status in the first place, their fear being of legitimate prosecution as opposed to persecution for Convention reasons.

26. Of all the exclusion clauses, Article 1F(b) may be particularly relevant as acts of terrorist violence are likely to be disproportionate to any avowed political objective. Each case will require individual consideration. The fact that an individual is designated on a national or international list of terrorist suspects (or associated with a designated terrorist organisation) should trigger consideration of the exclusion clauses but will not in itself generally constitute sufficient evidence to justify exclusion. Exclusion should not be based on membership of a particular organisation alone, although a presumption of individual responsibility may arise where the organisation is commonly known as notoriously violent and membership is voluntary. In such cases, it is necessary to examine the individual's role and position in the organisation, his or her own activities, as well as related issues as outlined in paragraph 19 above.

27. As acts of **hijacking** will almost certainly qualify as a "serious crime" under Article 1F(b), only the most compelling of circumstances can justify non-exclusion. Acts of **torture** are prohibited under international law. Depending on the context, they will generally lead to exclusion under Article 1F.

28. The exclusion clauses apply in principle to **minors**, but only if they have reached the age of criminal responsibility and possess the mental capacity to be held responsible for the crime in question. Given the vulnerability of children, great care should be exercised in considering exclusion with respect to a minor and defences such as duress should in particular be examined carefully. Where UNHCR conducts refugee status determination under its mandate, all such cases should be referred to Headquarters before a final decision is made.

29. Where the main applicant is excluded from refugee status, the dependants will need to establish their own grounds for refugee status. If the latter are recognised as refugees, the excluded individual is not able to rely on the right to family unity in order to secure protection or assistance as a refugee.

30. The exclusion clauses can also apply in situations of **mass influx**, although in practice the individual screening required may cause operational and practical difficulties. Nevertheless, until such screening can take place, all persons should receive protection and assistance, subject of course to the separation of armed elements from the civilian refugee population.

---

[6] For instruments pertaining to terrorism, see Annex D of the Background Note.

AR.08177

## III. PROCEDURAL ISSUES

31. Given the grave consequences of exclusion, it is essential that rigorous procedural **safeguards** are built into the exclusion determination procedure. Exclusion decisions should in principle be dealt with in the context of the **regular refugee status determination procedure** and not in either admissibility or accelerated procedures, so that a full factual and legal assessment of the case can be made. The exceptional nature of Article 1F suggests that inclusion should generally be considered before exclusion, but there is no rigid formula. Exclusion may exceptionally be considered without particular reference to inclusion issues (i) where there is an indictment by an international criminal tribunal; (ii) in cases where there is apparent and readily available evidence pointing strongly towards the applicant's involvement in particularly serious crimes, notably in prominent Article 1F(c) cases, and (iii) at the appeal stage in cases where exclusion is the question at issue.

32. **Specialised exclusion units** within the institution responsible for refugee status determination could be set up to handle exclusion cases to ensure that they are dealt with in an expeditious manner. It may be prudent to defer decisions on exclusion until completion of any domestic criminal proceedings, as the latter may have significant implications for the asylum claim. In general, however, the refugee claim must be determined in a final decision before execution of any extradition order.

33. At all times the **confidentiality** of the asylum application should be respected. In exceptional circumstances, contact with the country of origin may be justified on national security grounds, but even then the existence of the asylum application should not be disclosed.

34. The burden of proof with regard to exclusion rests with the State (or UNHCR) and, as in all refugee status determination proceedings, the applicant should be given the benefit of the doubt. Where, however, the individual has been indicted by an international criminal tribunal, or where individual responsibility for actions which give rise to exclusion is presumed, as indicated in paragraph 19 of these Guidelines, the burden of proof is reversed, creating a rebuttable presumption of excludability.

35. In order to satisfy the **standard of proof** under Article 1F, clear and credible evidence is required. It is not necessary for an applicant to have been convicted of the criminal offence, nor does the criminal standard of proof need to be met. Confessions and testimony of witnesses, for example, may suffice if they are reliable. Lack of cooperation by the applicant does not in itself establish guilt for the excludable act in the absence of clear and convincing evidence. Consideration of exclusion may, however, be irrelevant if non-cooperation means that the basics of an asylum claim cannot be established.

36. Exclusion should not be based on **sensitive evidence** that cannot be challenged by the individual concerned. Exceptionally, anonymous evidence (where the source is concealed) may be relied upon but only where this is absolutely necessary to protect the safety of witnesses and the asylum-seeker's ability to challenge the substance of the evidence is not substantially prejudiced. Secret evidence or evidence considered in camera (where the substance is also concealed) should not be relied upon to exclude. Where national security interests are at stake, these may be protected by introducing procedural safeguards which also respect the asylum-seeker's due process rights.

AR.08178

AR.08179

**UNHCR**
United Nations High Commissioner for Refugees
Haut Commissariat des Nations Unies pour les réfugiés

| Distr. GENERAL | HCR/GIP/04/06 | 28 April 2004 | Original: ENGLISH |

# GUIDELINES ON INTERNATIONAL PROTECTION NO. 6:

### Religion-Based Refugee Claims under Article 1A(2) of the 1951 Convention and/or the 1967 Protocol relating to the Status of Refugees

**6**

UNHCR issues these Guidelines pursuant to its mandate, as contained in the 1950 *Statute of the Office of the United Nations High Commissioner for Refugees*, in conjunction with Article 35 of the *1951 Convention relating to the Status of Refugees* and Article II of its *1967 Protocol*. These Guidelines complement the UNHCR *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees* (re-edited, Geneva, January 1992). They are informed, *inter alia*, by a roundtable organised by UNHCR and the Church World Service in Baltimore, Maryland, United States, in October 2002, as well as by an analysis of relevant State practice and international law.

These Guidelines are intended to provide interpretative legal guidance for governments, legal practitioners, decision-makers and the judiciary, as well as UNHCR staff carrying out refugee status determination in the field.

AR.08180

## I. INTRODUCTION

1. Claims to refugee status based on religion can be among the most complex. Decision-makers have not always taken a consistent approach, especially when applying the term "religion" contained in the refugee definition of the 1951 Convention relating to the Status of Refugees and when determining what constitutes "persecution" in this context. Religion-based refugee claims may overlap with one or more of the other grounds in the refugee definition or, as can often happen, they may involve post-departure conversions, that is, *sur place* claims. While these Guidelines do not purport to offer a definitive definition of "religion", they provide decision-makers with guiding parameters to facilitate refugee status determination in such cases.

2. The right to freedom of thought, conscience and religion is one of the fundamental rights and freedoms in international human rights law. In determining religion-based claims, it is therefore useful, *inter alia*, to draw on Article 18 of the 1948 Universal Declaration of Human Rights (the "Universal Declaration") and Articles 18 and 27 of the 1966 International Covenant on Civil and Political Rights (the "International Covenant"). Also relevant are the General Comments issued by the Human Rights Committee,[1] the 1981 Declaration on the Elimination of All Forms of Intolerance and Discrimination based on Religion or Belief, the 1992 Declaration on the Rights of Persons belonging to National or Ethnic, Religious and Linguistic Minorities and the body of reports of the Special Rapporteur on Religious Intolerance.[2] These international human rights standards provide guidance in defining the term "religion" also in the context of international refugee law, against which action taken by States to restrict or prohibit certain practices can be examined.

## II. SUBSTANTIVE ANALYSIS

### A. Defining "religion"

3. The refugee definition contained in Article 1A(2) of the 1951 Convention states:

> A. For the purposes of the present Convention, the term "refugee" shall apply to any person who: ...
>
> (2) ... owing to well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality and is unable or, owing to such fear, is unwilling to avail himself of the protection of that country; or who, not having a nationality and being outside the country of his former habitual residence as a result of such events, is unable or, owing to such fear, is unwilling to return to it.

4. The *travaux préparatoires* of the 1951 Convention show that religion-based persecution formed an integral and accepted part of the refugee definition throughout the drafting process. There was, however, no attempt to define the term as such.[3] No universally accepted definition of "religion" exists, but the instruments mentioned in paragraph 2 above certainly inform the interpretation of the term "religion" in the international refugee law context. Its use in the 1951 Convention can therefore be taken to encompass freedom of thought, conscience or belief.[4] As the Human Rights Committee notes, "religion" is "not limited ... to traditional religions or to religions and beliefs with institutional characteristics or practices analogous to those of traditional religions".[5] It also broadly covers acts of failing or refusing to observe a religion or to hold any particular religious belief. The term is not, however, without limits and international human rights law foresees a number of legitimate boundaries on the exercise of religious freedom as outlined in greater detail in paragraphs 15–16 below.

---

[1] See, in particular, Human Rights Committee, General Comment No. 22, adopted 20 July 1993, UN doc. CCPR/C/21/Rev.1/ ADD.4, 27 September 1993.

[2] The latter can be found at http://www.unhchr.ch/huridocda/huridoca.nsf/FramePage/intolerance+En?OpenDocument. Relevant regional instruments include Article 9 of the 1950 European Convention on Human Rights; Article 12 of the 1969 American Convention on Human Rights; Article 8 of the 1981 African Charter on Human and Peoples' Rights.

[3] A key source in States' deliberations was the refugee definition set out in the 1946 Constitution of the International Refugee Organisation (IRO). This included those expressing valid objections to return because of a fear of persecution on grounds of "race, religion, nationality or political opinions". (A fifth ground, membership of a particular social group, was approved later in the negotiating process for the 1951 Convention.)

[4] See, also, UNHCR, *Handbook on Procedures and Criteria for Determining Refugee Status*, 1979, Geneva, re-edited 1992 (hereafter "UNHCR, *Handbook*"), para. 71.

[5] Human Rights Committee, General Comment No. 22, above note 1, para. 2.

AR.08181

5. Claims based on "religion" may involve one or more of the following elements:

a. religion as belief (including non-belief);

b. religion as identity;

c. religion as a way of life.

6. "Belief", in this context, should be interpreted so as to include theistic, nontheistic and atheistic beliefs. Beliefs may take the form of convictions or values about the divine or ultimate reality or the spiritual destiny of humankind. Claimants may also be considered heretics, apostates, schismatic, pagans or superstitious, even by other adherents of their religious tradition and be persecuted for that reason.

7. "Identity" is less a matter of theological beliefs than membership of a community that observes or is bound together by common beliefs, rituals, traditions, ethnicity, nationality, or ancestry. A claimant may identify with, or have a sense of belonging to, or be identified by others as belonging to, a particular group or community. In many cases, persecutors are likely to target religious groups that are different from their own because they see that religious identity as part of a threat to their own identity or legitimacy.

8. For some individuals, "religion" is a vital aspect of their "way of life" and how they relate, either completely or partially, to the world. Their religion may manifest itself in such activities as the wearing of distinctive clothing or observance of particular religious practices, including observing religious holidays or dietary requirements. Such practices may seem trivial to non-adherents, but may be at the core of the religion for the adherent concerned.

9. Establishing sincerity of belief, identity and/or a certain way of life may not necessarily be relevant in every case.[6] It may not be necessary, for instance, for an individual (or a group) to declare that he or she belongs to a religion, is of a particular religious faith, or adheres to religious practices, where the persecutor imputes or attributes this religion, faith or practice to the individual or group. As is discussed further below in paragraph 31, it may also not be necessary for the claimant to know or understand anything about the religion, if he or she has been identified by others as belonging to that group and fears persecution as a result. An individual (or group) may be persecuted on the basis of religion, even if the individual or other members of the group adamantly deny that their belief, identity and/or way of life constitute a "religion".

10. Similarly, birth into a particular religious community, or a close correlation between race and/or ethnicity on the one hand and religion on the other could preclude the need to enquire into the adherence of an individual to a particular faith or the bona fides of a claim to membership of that community, if adherence to that religion is attributed to the individual.

## B. Well-founded fear of persecution

### a) General

11. The right to freedom of religion includes the freedom to manifest one's religion or belief, either individually or in community with others and in public or private in worship, observance, practice and teaching.[7] The only circumstances under which this freedom may be restricted are set out in Article 18(3) of the International Covenant, as described in paragraphs 15–16 below.

12. Persecution for reasons of religion may therefore take various forms. Depending on the particular circumstances of the case, including the effect on the individual concerned, examples could include prohibition of membership of a religious community, of worship in community with others in public

---

[6] For further analysis of credibility issues, see paras. 28–33 below.
[7] See Universal Declaration, Article 18 and International Covenant, Article 18(1).

AR.08182

or in private, of religious instruction, or serious measures of discrimination imposed on individuals because they practise their religion, belong to or are identified with a particular religious community, or have changed their faith.[8] Equally, in communities in which a dominant religion exists or where there is a close correlation between the State and religious institutions, discrimination on account of one's failure to adopt the dominant religion or to adhere to its practices, could amount to persecution in a particular case.[9] Persecution may be inter-religious (directed against adherents or communities of different faiths), intra-religious (within the same religion, but between different sects, or among members of the same sect), or a combination of both.[10] The claimant may belong to a religious minority or majority. Religion-based claims may also be made by individuals in marriages of mixed religions.

13. Applying the same standard as for other Convention grounds, religious belief, identity, or way of life can be seen as so fundamental to human identity that one should not be compelled to hide, change or renounce this in order to avoid persecution.[11] Indeed, the Convention would give no protection from persecution for reasons of religion if it was a condition that the person affected must take steps – reasonable or otherwise – to avoid offending the wishes of the persecutors. Bearing witness in words and deeds is often bound up with the existence of religious convictions.[12]

14. Each claim requires examination on its merits on the basis of the individual's situation. Relevant areas of enquiry include the individual profile and personal experiences of the claimant, his or her religious belief, identity and/or way of life, how important this is for the claimant, what effect the restrictions have on the individual, the nature of his or her role and activities within the religion, whether these activities have been or could be brought to the attention of the persecutor and whether they could result in treatment rising to the level of persecution. In this context, the well-founded fear "need not necessarily be based on the applicant's own personal experience". What, for example, happened to the claimant's friends and relatives, other members of the same religious group, that is to say to other similarly situated individuals, "may well show that his [or her] fear that sooner or later he [or she] also will become a victim of persecution is well-founded".[13] Mere membership of a particular religious community will normally not be enough to substantiate a claim to refugee status. As the UNHCR Handbook notes, there may, however, be special circumstances where mere membership suffices, particularly when taking account of the overall political and religious situation in the country of origin, which may indicate a climate of genuine insecurity for the members of the religious community concerned.

### b) Restrictions or limitations on the exercise of religious freedom

15. Article 18(3) of the International Covenant permits restrictions on the "freedom to manifest one's religion or beliefs" if these limits "are prescribed by law and are necessary to protect public safety, order, health, or morals or the fundamental rights and freedoms of others". As the Human Rights Committee notes: "Limitations may be applied only for those purposes for which they were prescribed and must be directly related and proportionate to the specific need on which they are predicated. Restrictions may not be imposed for discriminatory purposes or applied in a discriminatory manner."[14] In assessing the legitimacy of the restriction or limitation at issue, it is therefore necessary to analyse carefully why and how it was imposed. Permissible restrictions or limitations could include measures to prevent criminal activities (for example, ritual killings), or harmful traditional practices and/or limitations on religious practices injurious to the best interests of the child, as judged by international law standards. Another justifiable, even necessary, restriction could involve the criminalisation of hate speech, including when committed in the name of religion. The

---

[8] UNHCR, *Handbook*, above note 4, para. 72.
[9] In this context, Article 27 of the International Covenant reads: "In those States in which ethnic, religious or linguistic minorities exist, persons belonging to such minorities shall not be denied the right, in community with the other members of their group, to enjoy their own culture, to profess and practise their own religion, or to use their own language."
[10] Interim Report of the Special Rapporteur on Religious Intolerance, "Implementation of the Declaration on the Elimination of All Forms of Intolerance and of Discrimination based on Religion or Belief", UN doc. A/53/279, 24 August 1998, para. 129.
[11] See also, UNHCR, "Guidelines on International Protection: 'Membership of a particular social group' within the Context of Article 1A(2) of the 1951 Convention and/or 1967 Protocol relating to the Status of Refugees", HCR/GIP/02/02, 7 May 2002, para. 6. Similarly, in internal flight or relocation cases, the claimant should not be expected or required to suppress his or her religious views to avoid persecution in the internal flight or relocation area. See UNHCR, "Guidelines on International Protection: 'Internal Flight or Relocation Alternative' within the Context of Article 1A(2) of the 1951 Convention and/or 1967 Protocol relating to the Status of Refugees", HCR/GIP/03/04, 23 July 2003, paras. 19, 25.
[12] UNHCR, *Handbook*, above note 4, para. 73.
[13] UNHCR, *Handbook*, above note 4, para. 43.
[14] See Human Rights Committee, General Comment No. 22, above note 1, para. 8.

AR.08183

fact that a restriction on the exercise of a religious freedom finds the support of the majority of the population in the claimant's country of origin and/or is limited to the manifestation of the religion in public is irrelevant.

16. In determining whether restrictions or limitations rise to the level of persecution, the decision-maker must not only take into account international human rights standards, including lawful limitations on the exercise of religious freedom, but also evaluate the breadth of the restriction and the severity of any punishment for noncompliance. The importance or centrality of the practice within the religion and/or to the individual personally is also relevant. The decision-maker should proceed cautiously with such inquiries, taking into account the fact that what may seem trivial to an outsider may be central to the claimant's beliefs. Where the restricted practice is not important to the individual, but important to the religion, then it is unlikely to rise to the level of persecution without additional factors. By contrast, the restricted religious practice may not be so significant to the religion, but may be particularly important to the individual, and could therefore still constitute persecution on the basis of his or her conscience or belief.

### c) Discrimination

17. Religion-based claims often involve discrimination.[15] Even though discrimination for reasons of religion is prohibited under international human rights law, all discrimination does not necessarily rise to the level required for recognition of refugee status. For the purposes of analysing an asylum claim, a distinction should be made between discrimination resulting merely in preferential treatment and discrimination amounting to persecution because, in aggregate or of itself, it seriously restricts the claimant's enjoyment of fundamental human rights. Examples of discrimination amounting to persecution would include, but are not limited to, discrimination with consequences of a substantially prejudicial nature for the person concerned, such as serious restrictions on the right to earn a livelihood, or to access normally available educational institutions and/or health services. This may also be so where economic measures imposed "destroy the economic existence" of a particular religious group.[16]

18. The existence of discriminatory laws will not normally in itself constitute persecution, although they can be an important, even indicative, factor which therefore needs to be taken into account. An assessment of the implementation of such laws and their effect is in any case crucial to establishing persecution. Similarly, the existence of legislation on religious freedom does not of itself mean individuals are protected. In many cases, such legislation may not be implemented in practice or custom or tradition may, for instance, in practice override this.

19. Discrimination may also take the form of restrictions or limitations on religious belief or practice. Restrictions have, for instance, included penalties for converting to a different faith (apostasy) or for proselytising, or for celebrating religious festivals particular to the religion concerned. The compulsory registration of religious groups and the imposition of specific regulations governing them to restrict the exercise of freedom of religion or belief can also have a discriminatory aim or results. Such actions are legitimate only if they are "specified by law, objective, reasonable and transparent and, consequently, if they do not have the aim or the result of creating discrimination".[17]

### d) Forced conversion

20. Forced conversion to a religion is a serious violation of the fundamental human right to freedom of thought, conscience and religion and would often satisfy the objective component of persecution. The claimant would still need to demonstrate a subjective fear that the conversion would be persecutory to him or her personally. Generally, this would be satisfied if the individual held convictions or faith or had a clear identity or way of life in relation to a different religion, or if he or she had chosen to be disassociated from any religious denomination or community. Where a claimant held no particular religious conviction (including one of atheism) nor a clear identification with

---

[15] See generally, UNHCR, *Handbook*, above note 4, paras. 54–55.
[16] UNHCR, *Handbook*, above note 4, paras. 54 and 63.
[17] Special Rapporteur on freedom of religion or belief, interim report annexed to Note by the Secretary-General, "Elimination of All Forms of Religious Intolerance", UN doc. A/58/296, 19 August 2003, paras. 134–35.

AR.08184

a particular religion or religious community before the conversion or threat of conversion, it would be necessary to assess the impact of such a conversion on the individual (for example, it may be an act without correlative personal effects).

### e) Forced compliance or conformity with religious practices

21. Forced compliance with religious practices might, for example, take the form of mandated religious education that is incompatible with the religious convictions, identity or way of life of the child or the child's parents.[18] It might also involve an obligation to attend religious ceremonies or swear an oath of allegiance to a particular religious symbol. In determining whether such forced compliance constitutes persecution, the policies or acts with which the person or group is required to comply, the extent to which they are contrary to the person's belief, identity or way of life and the punishment for non-compliance should be examined. Such forced compliance could rise to the level of persecution if it becomes an intolerable interference with the individual's own religious belief, identity or way of life and/or if non-compliance would result in disproportionate punishment.

22. Forced compliance may also involve the imposition of a particular criminal or civil legal code purported to be based on a religious doctrine to which non-observers might object. Where such a code contains discriminatory substantive or procedural safeguards and especially where it imposes different levels of punishment upon adherents and non-adherents, it could well be regarded as persecutory. Where the law imposes disproportionate punishment for breaches of the law (for example, imprisonment for blasphemy or practising an alternative religion, or death for adultery), whether or not for adherents of the same religion, it would constitute persecution. Such cases are more common where there is limited or no separation between the State and the religion.

23. A specific religious code may be persecutory not just when enforced against non- observers, but also when applied to dissidents within or members of the same faith. The enforcement of anti-blasphemy laws, for example, can often be used to stifle political debate among co-religionists and could constitute persecution on religious and/or political grounds even when enforced against members of the same religion.

## C. Special considerations

### a) Gender

24. Particular attention should be paid to the impact of gender on religion-based refugee claims, as women and men may fear or suffer persecution for reasons of religion in different ways to each other. Clothing requirements, restrictions on movement, harmful traditional practices, or unequal or discriminatory treatment, including subjection to discriminatory laws and/or punishment, may all be relevant.[19] In some countries, young girls are pledged in the name of religion to perform traditional slave duties or to provide sexual services to the clergy or other men. They may also be forced into underage marriages, punished for honour crimes in the name of religion, or subjected to forced genital mutilation for religious reasons. Others are offered to deities and subsequently bought by individuals believing that they will be granted certain wishes. Women are still identified as "witches" in some communities and burned or stoned to death.[20] These practices may be culturally condoned in the claimant's community of origin but still amount to persecution. In addition, individuals may be persecuted because of their marriage or relationship to someone of a different religion than their own.

---

[18] This would be likely also to interfere with the undertaking of States to respect the liberty of parents or legal guardians to ensure the religious and moral education of their children in conformity with their own convictions under Article 18(4) of the International Covenant.

[19] For more information, see UNHCR, "Guidelines on International Protection: Gender-Related Persecution within the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol relating to the Status of Refugees", HCR/GIP/02/01, 7 May 2002, especially paras. 25–26.

[20] For description of these practices, see "Integration of the Human Rights of Women and the Gender Perspective Violence against Women, Report of the Special Rapporteur on violence against women, its causes and consequences, Ms Radhika Coomaraswamy, submitted in accordance with Commission on Human Rights resolution 2001/49, Cultural practices in the family that are violent towards women", E/CN.4/2002/83, 31 January 2002, available at http://www.unhchr.ch/huridocda/huridoca.nsf/0/42E7191FAE543562C1256BA7004E963C/$ File/G0210428.doc?OpenElement; "Droits Civils et Politiques et, Notamment: Intolérance Religieuse", Rapport soumis par M. Abdelfattah Amor, Rapporteur spécial, conformément àla résolution 2001/42 de la Commission des droits de l'homme, Additif: "Étude sur la liberté de religion ou de conviction et la condition de la femme au regard de la religion et des traditions", E/CN.4/2002/73/Add.2, 5 avril 2002, available (only in French) at http://www.unhchr.ch/huridocda/huridoca.nsf/2848af408d01e-c0ac1256609004e770b/9fa99a4d3f9eade5c1256b9e00510d71?Open Document&Highlight=2,E%2FCN.4%2F2002%2F73%2FAdd.2.

AR: 08185

When, due to the claimant's gender, State actors are unwilling or unable to protect the claimant from such treatment, it should not be mistaken as a private conflict, but should be considered as valid grounds for refugee status.

**b) Conscientious objection**

25. A number of religions or sects within particular religions have abstention from military service as a central tenet and a significant number of religion-based claimants seek protection on the basis of refusal to serve in the military. In countries where military service is compulsory, failure to perform this duty is frequently punishable by law. Moreover, whether military service is compulsory or not, desertion is invariably a criminal offence.[21]

26. Where military service is compulsory, refugee status may be established if the refusal to serve is based on genuine political, religious, or moral convictions, or valid reasons of conscience.[22] Such claims raise the distinction between prosecution and persecution. Prosecution and punishment pursuant to a law of general application is not generally considered to constitute persecution,[23] although there are some notable exceptions. In conscientious objector cases, a law purporting to be of general application may, depending on the circumstances, nonetheless be persecutory where, for instance, it impacts differently on particular groups, where it is applied or enforced in a discriminatory manner, where the punishment itself is excessive or disproportionately severe, or where the military service cannot reasonably be expected to be performed by the individual because of his or her genuine beliefs or religious convictions. Where alternatives to military service, such as community service, are imposed there would not usually be a basis for a claim. Having said this, some forms of community service may be so excessively burdensome as to constitute a form of punishment, or the community service might require the carrying out of acts which clearly also defy the claimant's religious beliefs. In addition, the claimant may be able to establish a claim to refugee status where the refusal to serve in the military is not occasioned by any harsh penalties, but the individual has a well-founded fear of serious harassment, discrimination or violence by other individuals (for example, soldiers, local authorities, or neighbours) for his or her refusal to serve.

## III. PROCEDURAL ISSUES

**a) General**

27. The following are some general points of particular relevance to examining religion-based refugee claims:

a.   Religious practices, traditions or beliefs can be complex and may vary from one branch or sect of a religion to another or from one country or region to another. For this reason, there is a need for reliable, accurate, up-to-date, and country- or region- specific as well as branch- or sect-specific information.

b.   Refugee status determinations based on religion could also benefit from the assistance of independent experts with *particularised* knowledge of the country, region and context of the particular claim and/or the use of corroborating testimony from other adherents of the same faith.

c.   Decision-makers need to be objective and not arrive at conclusions based solely upon their own experiences, even where they may belong to the same religion as the claimant. General assumptions about a particular religion or its adherents should be avoided.

d.   In assessing religion-based claims, decision-makers need to appreciate the frequent interplay between religion and gender, race, ethnicity, cultural norms, identity, way of life and other factors.

---

[21] See generally, UNHCR, *Handbook*, above note 4, paras. 167–74.
[22] UNHCR, *Handbook*, above note 4, para. 170.
[23] UNHCR, *Handbook*, above note 4, para. 55–60.

AR.08186

e.  In the selection of interviewers and interpreters, there should be sensitivity regarding any cultural, religious or gender aspects that could hinder open communication.[24]

f.  Interviewers should also be aware of the potential for hostile biases toward the claimant by an interpreter, either because he or she shares the same religion or is not of the same religion, or of any potential fear of the same by the claimant, which could adversely affect his or her testimony. As with all refugee claims, it can be critical that interpreters are well-versed in the relevant terminology.

**b) Credibility**

28. Credibility is a central issue in religion-based refugee claims. While decision-makers will often find it helpful during research and preparation to list certain issues to cover during an interview, extensive examination or testing of the tenets or knowledge of the claimant's religion may not always be necessary or useful. In any case, knowledge tests need to take account of individual circumstances, particularly since knowledge of a religion may vary considerably depending on the individual's social, economic or educational background and/or his or her age or sex.

29. Experience has shown that it is useful to resort to a narrative form of questioning, including through open-ended questions allowing the claimant to explain the personal significance of the religion to him or her, the practices he or she has engaged in (or has avoided engaging in out of a fear of persecution), or any other factors relevant to the reasons for his or her fear of being persecuted. Information may be elicited about the individual's religious experiences, such as asking him or her to describe in detail how he or she adopted the religion, the place and manner of worship, or the rituals engaged in, the significance of the religion to the person, or the values he or she believes the religion espouses. For example, the individual may not be able to list the Ten Commandments or name the Twelve Imams, but may be able to indicate an understanding of the religion's basic tenets more generally. Eliciting information regarding the individual's religious identity or way of life will often be more appropriate and useful and may even be necessary. It should also be noted that a claimant's detailed knowledge of his or her religion does not necessarily correlate with sincerity of belief.

30. As indicated in paragraph 9 above, individuals may be persecuted on the basis of their religion even though they have little or no substantive knowledge of its tenets or practices. A lack of knowledge may be explained by further research into the particular practices of that religion in the area in question or by an understanding of the subjective and personal aspects of the claimant's case. For instance, the level of repression against a religious group in a society may severely restrict the ability of an individual to study or practise his or her religion. Even when the individual is able to receive religious education in a repressive environment, it may not be from qualified leaders. Women, in particular, are often denied access to religious education. Individuals in geographically remote communities may espouse adherence to a particular religion and face persecution as a result, yet have little knowledge of its formal practices. Over time, communities may adapt particular religious practices or faith to serve their own needs, or combine them with their more traditional practices and beliefs, especially where the religion has been introduced into a community with long-established traditions. For example, the claimant may not be able to distinguish between those practices which are Christian and those which are animist.

31. Less formal knowledge may also be required of someone who obtained a particular religion by birth and who has not widely practised it. No knowledge is required where a particular religious belief or adherence is imputed or attributed to a claimant.

32. Greater knowledge may be expected, however, of individuals asserting they are religious leaders or who have undergone substantial religious instruction. It is not necessary for such teaching or training to conform fully to objectively tested standards, as these may vary from region to region and country to country, but some clarification of their role and the significance of certain practices or rites to the religion would be relevant. Even claimants with a high level of education or schooling in their religion may not have knowledge of teachings and practices of a more complex, formal or obscure nature.

---

[24] See also, UNHCR, "Guidelines on Gender-Related Persecution", above note 19.

AR.08187

33. Subsequent and additional interviews may be required where certain statements or claims made by the claimant are incompatible with earlier statements or with general understandings of the religious practices of other members of that religion in the area or region in question. Claimants must be given an opportunity to explain any inconsistencies or discrepancies in their story.

### c) Conversion post departure

34. Where individuals convert after their departure from the country of origin, this may have the effect of creating a *sur place* claim.[25] In such situations, particular credibility concerns tend to arise and a rigorous and in depth examination of the circumstances and genuineness of the conversion will be necessary. Issues which the decision-maker will need to assess include the nature of and connection between any religious convictions held in the country of origin and those now held, any disaffection with the religion held in the country of origin, for instance, because of its position on gender issues or sexual orientation, how the claimant came to know about the new religion in the country of asylum, his or her experience of this religion, his or her mental state and the existence of corroborating evidence regarding involvement in and membership of the new religion.

35. Both the specific circumstances in the country of asylum and the individual case may justify additional probing into particular claims. Where, for example, systematic and organised conversions are carried out by local religious groups in the country of asylum for the purposes of accessing resettlement options, and/or where "coaching" or "mentoring" of claimants is commonplace, testing of knowledge is of limited value. Rather, the interviewer needs to ask open questions and try to elicit the motivations for conversion and what effect the conversion has had on the claimant's life. The test remains, however, whether he or she would have a well-founded fear of persecution on a Convention ground if returned. Regard should therefore be had as to whether the conversion may come to the notice of the authorities of the person's country of origin and how this is likely to be viewed by those authorities.[26] Detailed country of origin information is required to determine whether a fear of persecution is objectively well-founded.

36. So-called "self-serving" activities do not create a well-founded fear of persecution on a Convention ground in the claimant's country of origin, if the opportunistic nature of such activities will be apparent to all, including the authorities there, and serious adverse consequences would not result if the person were returned. Under all circumstances, however, consideration must be given as to the consequences of return to the country of origin and any potential harm that might justify refugee status or a complementary form of protection. In the event that the claim is found to be self-serving but the claimant nonetheless has a well-founded fear of persecution on return, international protection is required. Where the opportunistic nature of the action is clearly apparent, however, this could weigh heavily in the balance when considering potential durable solutions that may be available in such cases, as well as, for example, the type of residency status.

---

[25] Such a claim may also arise if a claimant marries someone of another religion in the country of asylum or educates his or her children in that other religion there and the country of origin would use this as the basis for persecution.
[26] See UNHCR, *Handbook*, above note 4, para. 96.

AR.08188

AR.08189

**UNHCR**
United Nations High Commissioner for Refugees
Haut Commissariat des Nations Unies pour les réfugiés

| Distr. GENERAL | HCR/GIP/06/07 | 7 April 2006 | Original: ENGLISH |

# GUIDELINES ON INTERNATIONAL PROTECTION NO. 7:

**The application of Article 1A(2) of the 1951 Convention and/or 1967 Protocol relating to the Status of Refugees to victims of trafficking and persons at risk of being trafficked**

7

UNHCR issues these Guidelines pursuant to its mandate, as contained in the 1950 *Statute of the Office of the United Nations High Commissioner for Refugees* in conjunction with Article 35 of the *1951 Convention relating to the Status of Refugees* and Article II of its *1967 Protocol*. These Guidelines complement the UNHCR *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees* (re-edited, Geneva, January 1992). They should additionally be read in conjunction with UNHCR's Guidelines on International Protection on gender-related persecution within the context of Article 1A(2) of the 1951 Convention and/or 1967 Protocol relating to the Status of Refugees (HCR/GIP/02/01) and on "membership of a particular social group" within the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol relating to the Status of Refugees (HCR/ GIP/02/02), both of 7 May 2002.

These Guidelines are intended to provide interpretative legal guidance for governments, legal practitioners, decision-makers and the judiciary, as well as for UNHCR staff carrying out refugee status determination in the field.

AR.08190

## I. INTRODUCTION

1. Trafficking in persons, the primary objective of which is to gain profit through the exploitation of human beings, is prohibited by international law and criminalized in the national legislation of a growing number of States. Although the range of acts falling within the definition of trafficking varies among national jurisdictions, States have a responsibility to combat trafficking and to protect and assist victims of trafficking.

2. The issue of trafficking has attracted substantial attention in recent years, but it is not a modern phenomenon. Numerous legal instruments dating from the late nineteenth century onwards have sought to address various forms and manifestations of trafficking.[1] These instruments remain in force and are relevant to the contemporary understanding of trafficking and how best to combat it. The 2000 Protocol to Prevent, Suppress and Punish Trafficking in Persons, especially Women and Children (hereinafter the "Trafficking Protocol")[2] supplementing the 2000 United Nations Convention against Transnational Organized Crime (hereinafter the "Convention against Transnational Crime")[3] provides an international definition of trafficking. This represents a crucial step forward in efforts to combat trafficking and ensure full respect for the rights of individuals affected by trafficking.

3. Trafficking in the context of the sex trade is well documented and primarily affects women and children who are forced into prostitution and other forms of sexual exploitation.[4] Trafficking is not, however, limited to the sex trade or to women. It also includes, at a minimum, forced labour or services, slavery or practices similar to slavery, servitude or the removal of organs.[5] Depending on the circumstances, trafficking may constitute a crime against humanity and, in armed conflict, a war crime.[6] A common characteristic of all forms of trafficking is that victims are treated as merchandise, "owned" by their traffickers, with scant regard for their human rights and dignity.

4. In some respects, trafficking in persons resembles the smuggling of migrants, which is the subject of another Protocol to the Convention against Transnational Crime.[7] As with trafficking, the smuggling of migrants often takes place in dangerous and/or degrading conditions involving human rights abuses. It is nevertheless essentially a voluntary act entailing the payment of a fee to the smuggler to provide a specific service. The relationship between the migrant and the smuggler normally ends either with the arrival at the migrant's destination or with the individual being abandoned en route. Victims of trafficking are distinguished from migrants who have been smuggled by the protracted nature of the exploitation they endure, which includes serious and ongoing abuses of their human rights at the hands of their traffickers. Smuggling rings and trafficking rings are nevertheless often closely related, with both preying on the vulnerabilities of people seeking international protection or access to labour markets abroad. Irregular migrants relying on the services of smugglers whom they have willingly contracted may also end up as victims of trafficking, if the services they originally sought metamorphose into abusive and exploitative trafficking scenarios.

5. UNHCR's involvement with the issue of trafficking is essentially twofold. Firstly, the Office has a responsibility to ensure that refugees, asylum-seekers, internally displaced persons (IDPs), stateless persons and other persons of concern do not fall victim to trafficking. Secondly, the Office has a responsibility to ensure that individuals who have been trafficked and who fear being subjected to persecution upon a return to their country of origin, or individuals who fear being trafficked, whose claim to international protection falls within the refugee definition contained in the 1951 Convention and/or its 1967 Protocol relating to the Status of Refugees (hereinafter "the 1951 Convention") are recognized as refugees and afforded the corresponding international protection.

---

[1] It has been estimated that between 1815 and 1957 some 300 international agreements were adopted to suppress slavery in its various forms, including for example the 1910 International Convention for the Suppression of the White Slave Traffic, the 1915 Declaration Relative to the Universal Abolition of the Slave Trade, the 1926 Slavery Convention, the 1949 Convention for the Suppression of the Traffick in Persons and of the Exploitation of the Prostitution of Others and the 1956 Supplementary Convention on the Abolition of Slavery, the Slave Trade and Institutions and Practices Similar to Slavery.

[2] Entered into force on 25 December 2003.

[3] Entered into force on 29 September 2003.

[4] Bearing in mind the prevalence of women and girls amongst the victims of trafficking, gender is a relevant factor in evaluating their claims for refugee status. See further, UNHCR, "Guidelines on International Protection: Gender-related persecution within the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol relating to the Status of Refugees" (hereinafter "UNHCR Guidelines on Gender-Related Persecution"), HCR/GIP/02/01, 7 May 2002, para. 2.

[5] See Article 3(a) of the Trafficking Protocol cited in para. 8 below.

[6] See, for instance, Articles 7(1)(c), 7(1)(g), 7(2)(c) and 8(2)(xxii) of the 1998 Statute of the International Criminal Court, A/ CONF.183/9, which specifically refer to "enslavement", "sexual slavery" and "enforced prostitution" as crimes against humanity and war crimes.

[7] The 2000 Protocol against the Smuggling of Migrants by Land, Sea and Air (entered into force on 28 January 2004).　　AR.08191

6. Not all victims or potential victims of trafficking fall within the scope of the refugee definition. To be recognized as a refugee, all elements of the refugee definition have to be satisfied. These Guidelines are intended to provide guidance on the application of Article 1A(2) of the 1951 Convention to victims or potential victims of trafficking. They also cover issues concerning victims of trafficking arising in the context of the 1954 Convention Relating to the Status of Stateless Persons and the 1961 Convention on the Reduction of Statelessness. The protection of victims or potential victims of trafficking as set out in these Guidelines is additional to and distinct from the protection contemplated by Part II of the Trafficking Protocol.[8]

## II. SUBSTANTIVE ANALYSIS

### a) Definitional issues

7

7. The primary function of the Convention against Transnational Crime and its supplementary Protocols against Trafficking and Smuggling is crime control. They seek to define criminal activities and guide States as to how best to combat them. In doing so, they nevertheless provide helpful guidance on some aspects of victim protection and therefore constitute a useful starting point for any analysis of international protection needs arising as a result of trafficking.

8. Article 3 of the Trafficking Protocol reads:

> For the purposes of this Protocol:
>
> (a) 'Trafficking in persons' shall mean the recruitment, transportation, transfer, harbouring or receipt of persons, by means of the threat or use of force or other forms of coercion, of abduction, of fraud, of deception, of the abuse of power or of a position of vulnerability, or of the giving or receiving of payments or benefits to achieve the consent of a person having control over another person, for the purpose of exploitation. Exploitation shall include, at a minimum, the exploitation of the prostitution of others or other forms of sexual exploitation, forced labour or services, slavery or practices similar to slavery, servitude or the removal of organs;
>
> (b) The consent of a victim of trafficking in persons to the intended exploitation set forth in subparagraph (a) of this article shall be irrelevant where any of the means set forth in subparagraph (a) have been used;
>
> (c) The recruitment, transportation, transfer, harbouring or receipt of a child for the purpose of exploitation shall be considered 'trafficking in persons' even if this does not involve any of the means set forth in subparagraph (a) of this article;
>
> (d) 'Child' shall mean any person under eighteen years of age.

9. The Trafficking Protocol thus defines trafficking by three essential and interlinked sets of elements:

<u>The act</u>: recruitment, transportation, transfer, harbouring or receipt of persons;

<u>The means</u>: by threat or use of force or other forms of coercion, abduction, fraud, deception, abuse of power, abuse of a position of vulnerability, or of giving or receiving of payments or benefits to achieve the consent of a person having control over the victim;

<u>The purpose</u>: exploitation of the victim, including, at a minimum, the exploitation of the prostitution of others or other forms of sexual exploitation, forced labour or services, slavery or practices similar to slavery, servitude or the removal of organs.[9]

---

[8] Part II of the Trafficking Protocol concerns the protection of victims of trafficking. It covers areas such as ensuring the protection of privacy and identity of the victims; providing victims with information on relevant court and administrative proceedings, as well as assistance to enable them to present their views and concerns at appropriate stages of criminal proceedings against offenders; providing victims with support for physical, psychological and social recovery; permitting victims to remain in the territory temporarily or permanently; repatriating victims with due regard for their safety; and other measures.

[9] For the purposes of these Guidelines, the Trafficking Protocol definition is used as it represents the current international consensus on the meaning of trafficking. In order to understand the legal meaning of terms used within the Protocol definition fully, it is nevertheless necessary to refer further to other legal instruments, for example, a number of International Labour Organization Conventions, including the 1930 Convention No. 29 on Forced or Compulsory Labour, the 1957 Convention No. 105 on the Abolition of Forced Labour, the 1975 Convention No. 143 on Migrant Workers (Supplementary Provisions) and the 1999 Convention No. 182 on the Worst Forms of Child Labour. These are referred to in the first report of the Special Rapporteur on trafficking in persons, especially women and children, Ms Sigma Huda, E/CN.4/2005/71, 22 December 2004, para. 22. Her second report entitled "Integration of the Human Rights of Women and a Gender Perspective", E/CN.4/2006/62, 20 February 2006, goes into this issue in further detail in paras. 31–45. The Special Rapporteur was appointed in 2004 pursuant to a new mandate created by the 60th Session of the Commission on Human Rights (E/CN.4/2004/110). AR-08192

10. An important aspect of this definition is an understanding of trafficking as a process comprising a number of interrelated actions rather than a single act at a given point in time. Once initial control is secured, victims are generally moved to a place where there is a market for their services, often where they lack language skills and other basic knowledge that would enable them to seek help. While these actions can all take place within one country's borders,[10] they can also take place across borders with the recruitment taking place in one country and the act of receiving the victim and the exploitation taking place in another. Whether or not an international border is crossed, the intention to exploit the individual concerned underpins the entire process.

11. Article 3 of the Trafficking Protocol states that where any of the means set forth in the definition are used, the consent of the victim to the intended exploitation is irrelevant.[11] Where the victim is a child,[12] the question of consent is all the more irrelevant as any recruitment, transportation, transfer, harbouring or receipt of children for the purpose of exploitation is a form of trafficking regardless of the means used.

12. Some victims or potential victims of trafficking may fall within the definition of a refugee contained in Article 1A(2) of the 1951 Convention and may therefore be entitled to international refugee protection. Such a possibility is not least implicit in the saving clause contained in Article 14 of the Trafficking Protocol, which states:

> 1. Nothing in this Protocol shall affect the rights, obligations and responsibilities of States and individuals under international law, including international humanitarian law and international human rights law and, in particular, where applicable, the 1951 Convention and the 1967 Protocol relating to the Status of Refugees and the principle of *non-refoulement* as contained therein.[13]
>
> 2. The measures set forth in this Protocol shall be interpreted and applied in a way that is not discriminatory to persons on the ground that they are victims of trafficking in persons. The interpretation and application of those measures shall be consistent with internationally recognized principles of non-discrimination.

13. A claim for international protection presented by a victim or potential victim of trafficking can arise in a number of distinct sets of circumstances. The victim may have been trafficked abroad, may have escaped her or his traffickers and may seek the protection of the State where she or he now is. The victim may have been trafficked within national territory, may have escaped from her or his traffickers and have fled abroad in search of international protection. The individual concerned may not have been trafficked but may fear becoming a victim of trafficking and may have fled abroad in search of international protection. In all these instances, the individual concerned must be found to have a "well- founded fear of persecution" linked to one or more of the Convention grounds in order to be recognized as a refugee.

## b) Well-founded fear of persecution

14. What amounts to a well-founded fear of persecution will depend on the particular circumstances of each individual case.[14] Persecution can be considered to involve serious human rights violations, including a threat to life or freedom, as well as other kinds of serious harm or intolerable predicament, as assessed in the light of the opinions, feelings and psychological make-up of the asylum applicant.

---

[10] The Council of Europe Convention on Action against Trafficking in Human Beings, opened for signature in May 2005, addresses the question of trafficking within national borders directly.

[11] Article 3(b) of the Trafficking Protocol. See also, the second report of the Special Rapporteur on trafficking in persons, cited above in footnote 9, paras. 37–43 on the "irrelevance of consent".

[12] Article 3(c) of the Trafficking Protocol follows the 1989 Convention on the Rights of the Child in defining a child as "any person under eighteen years of age".

[13] The Agenda for Protection, A/AC.96/965/Add.1, 2002, Goal 2, Objective 2, calls upon States to ensure that their asylum systems are open to receiving claims from individual victims of trafficking. This interpretation of the Article 14 saving clause as imposing an obligation on States to consider the international protection needs of victims of trafficking is strengthened by paragraph 377 of the Explanatory Report accompanying the Council of Europe Convention. This states in relation to Article 40 of that Convention:
The fact of being a victim of trafficking in human beings cannot preclude the right to seek and enjoy asylum and Parties shall ensure that victims of trafficking have appropriate access to fair and efficient asylum procedures. Parties shall also take whatever steps are necessary to ensure full respect for the principle of *non-refoulement*.
Additionally, the Office of the High Commissioner for Human Rights (OHCHR) "Recommended Principles and Guidelines on Human Rights and Human Trafficking" presented to the Economic and Social Council as an addendum to the report of the United Nations High Commissioner for Human Rights, E/2002/68/Add. 1, 20 May 2002, available at http:www.ohchr.org/about/ publications/docs/trafficking.doc, address in Guideline 2.7 the importance of ensuring that procedures and processes are in place for the consideration of asylum claims from trafficked persons (as well as from smuggled asylum-seekers) and that the principle of *non-refoulement* is respected and upheld at all times.

[14] UNHCR, *Handbook on Procedures and Criteria for Determining Refugee Status*, 1979, re-edited 1992, para. 51 (hereinafter "UNHCR, *Handbook*").

AR 08193

15. In this regard, the evolution of international law in criminalizing trafficking can help decision-makers determine the persecutory nature of the various acts associated with trafficking. Asylum claims lodged by victims of trafficking or potential victims of trafficking should thus be examined in detail to establish whether the harm feared as a result of the trafficking experience, or as a result of its anticipation, amounts to persecution in the individual case. Inherent in the trafficking experience are such forms of severe exploitation as abduction, incarceration, rape, sexual enslavement, enforced prostitution, forced labour, removal of organs, physical beatings, starvation, the deprivation of medical treatment. Such acts constitute serious violations of human rights which will generally amount to persecution.

16. In cases where the trafficking experience of the asylum applicant is determined to be a one-off past experience, which is not likely to be repeated, it may still be appropriate to recognize the individual concerned as a refugee if there are compelling reasons arising out of previous persecution, provided the other interrelated elements of the refugee definition are fulfilled. This would include situations where the persecution suffered during the trafficking experience, even if past, was particularly atrocious and the individual is experiencing ongoing traumatic psychological effects which would render return to the country of origin intolerable. In other words, the impact on the individual of the previous persecution continues. The nature of the harm previously suffered will also impact on the opinions, feelings and psychological make-up of the asylum applicant and thus influence the assessment of whether any future harm or predicament feared would amount to persecution in the particular case.

17. Apart from the persecution experienced by individuals in the course of being trafficked, they may face reprisals and/or possible re-trafficking should they be returned to the territory from which they have fled or from which they have been trafficked.[15] For example, the victim's cooperation with the authorities in the country of asylum or the country of origin in investigations may give rise to a risk of harm from the traffickers upon return, particularly if the trafficking has been perpetrated by international trafficking networks. Reprisals at the hands of traffickers could amount to persecution depending on whether the acts feared involve serious human rights violations or other serious harm or intolerable predicament and on an evaluation of their impact on the individual concerned. Reprisals by traffickers could also be inflicted on the victim's family members, which could render a fear of persecution on the part of the victim well-founded, even if she or he has not been subjected directly to such reprisals. In view of the serious human rights violations often involved, as described in paragraph 15 above, re-trafficking would usually amount to persecution.

18. In addition, the victim may also fear ostracism, discrimination or punishment by the family and/or the local community or, in some instances, by the authorities upon return. Such treatment is particularly relevant in the case of those trafficked into prostitution. In the individual case, severe ostracism, discrimination or punishment may rise to the level of persecution, in particular if aggravated by the trauma suffered during, and as a result of, the trafficking process. Where the individual fears such treatment, her or his fear of persecution is distinct from, but no less valid than, the fear of persecution resulting from the continued exposure to the violence involved in trafficking scenarios. Even if the ostracism from, or punishment by, family or community members does not rise to the level of persecution, such rejection by, and isolation from, social support networks may in fact heighten the risk of being re-trafficked or of being exposed to retaliation, which could then give rise to a well-founded fear of persecution.

## c) Women and children victims of trafficking

19. The forcible or deceptive recruitment of women and children for the purposes of forced prostitution or sexual exploitation is a form of gender-related violence, which may constitute persecu-

---

[15] See, "Report of the Working Group on Contemporary Forms of Slavery on its twenty-ninth session", E/CN.4/Sub.2/2004/36, 20 July 2004, Section VII Recommendations adopted at the twenty-ninth session, p. 16, para. 29. This "[c]alls upon all States to ensure that the protection and support of the victims are at the centre of any anti-trafficking policy, and specifically to ensure that: (a) No victim of trafficking is removed from the host country if there is a reasonable likelihood that she will be re-trafficked or subjected to other forms of serious harm, irrespective of whether she decides to cooperate in a prosecution".

AR.08194

tion.[16] Trafficked women and children can be particularly susceptible to serious reprisals by traffickers after their escape and/or upon return, as well as to a real possibility of being re-trafficked or of being subjected to severe family or community ostracism and/or severe discrimination.

20. In certain settings, unaccompanied or separated children,[17] are especially vulnerable to trafficking.[18] Such children may be trafficked for the purposes of irregular adoption. This can occur with or without the knowledge and assent of the child's parents. Traffickers may also choose to target orphans. In assessing the international protection needs of children who have been trafficked, it is essential that the best interest principle be scrupulously applied.[19] All cases involving trafficked children require a careful examination of the possible involvement of family members or caregivers in the actions that set the trafficking in motion.

### d) Agents of persecution

21. There is scope within the refugee definition to recognize both State and non-State agents of persecution. While persecution is often perpetrated by the authorities of a country, it can also be perpetrated by individuals if the persecutory acts are "knowingly tolerated by the authorities or if the authorities refuse, or prove unable to offer effective protection".[20] In most situations involving victims or potential victims of trafficking, the persecutory acts emanate from individuals, that is, traffickers or criminal enterprises or, in some situations, family or community members. Under these circumstances, it is also necessary to examine whether the authorities of the country of origin are able and willing to protect the victim or potential victim upon return.

22. Whether the authorities in the country of origin are able to protect victims or potential victims of trafficking will depend on whether legislative and administrative mechanisms have been put in place to prevent and combat trafficking, as well as to protect and assist the victims and on whether these mechanisms are effectively implemented in practice.[21] Part II of the Trafficking Protocol requires States to take certain steps with regard to the protection of victims of trafficking, which can be of guidance when assessing the adequacy of protection and assistance provided. Measures relate not only to protecting the privacy and identity of victims of trafficking, but also to their physical, psychological and social recovery.[22] Article 8 of the Trafficking Protocol also requires State Parties, which are facilitating the return of their nationals or permanent residents who have been trafficked, to give due regard to the safety of the individuals concerned when accepting them back. The protection measures set out in Part II of the Trafficking Protocol are not exhaustive and should be read in light of other relevant binding and non-binding human rights instruments and guidelines.[23]

23. Many States have not adopted or implemented sufficiently stringent measures to criminalize and prevent trafficking or to meet the needs of victims. Where a State fails to take such reasonable steps

---

[16] See UNHCR Guidelines on Gender-Related Persecution, above footnote 4, para. 18. The Commission on Human Rights also recognized that such violence may constitute persecution for the purposes of the refugee definition, when it urged States "to mainstream a gender perspective into all policies and programmes, including national immigration and asylum policies, regulations and practices, as appropriate, in order to promote and protect the rights of all women and girls, including the consideration of steps to recognize gender-related persecution and violence when assessing grounds for granting refugee status and asylum". See Resolution 2005/41, Elimination of violence against women, 57th meeting, 19 April 2005, operational para. 22.

[17] As indicated in the *Inter-agency Guiding Principles on Unaccompanied and Separated Children*, 2004, "separated children are those separated from both parents, or from their previous legal or customary primary care-giver, but not necessarily from other relatives", while unaccompanied children are "children who have been separated from both parents and other relatives and are not being cared for by an adult who, by law or custom, is responsible for doing so".

[18] There are a number of international instruments which offer specific guidance with respect to the needs and rights of children. These should be given due consideration in assessing the claims of child victims. See, for example, the 1989 Convention on the Rights of the Child, the 2000 Optional Protocol to that Convention, on the sale of children, child prostitution and child pornography, the 1980 Hague Convention No. 28 on the Civil Aspects of International Child Abduction, the 2000 Trafficking Protocol and the 1999 ILO Convention No. 182 on the Prohibition of the Worst Forms of Child Labour. See also, generally, Committee on the Rights of the Child, "General Comment No. 6 (2005) Treatment of Unaccompanied and Separated Children Outside their Country of Origin", CRC/CG/2005/6, 1 Sept. 2005.

[19] See, *UNHCR Guidelines on Formal Determination of the Best Interests of the Child*, provisional release April 2006; UN Children's Fund (UNICEF), "Guidelines for Protection of the Rights of Child Victims of Trafficking", May 2003 and in the process of being updated.

[20] See, UNHCR, *Handbook*, above footnote 14, para. 65; UNHCR, "Interpreting Article 1 of the 1951 Convention Relating to the Status of Refugees" (hereinafter "Interpreting Article 1"), April 2001, para. 19; UNHCR Guidelines on Gender-related Persecution, above footnote 4, para. 19.

[21] See Part II of the Trafficking Protocol outlined in footnote 8 above.

[22] *Ibid.*

[23] See, United Nations High Commissioner for Human Rights, "Recommended Principles and Guidelines on Human Rights and Human Trafficking", above footnote 13, which states in Principle No. 2: "States have a responsibility under international law to act with due diligence to prevent trafficking, to investigate and prosecute traffickers and to assist and protect trafficked persons". Numerous instruments of a binding and a non-binding nature highlight the obligation of States to uphold the human rights of victims of trafficking. See, for example, the Council of Europe Convention cited above at footnote 10, the 2002 South Asian Association for Regional Cooperation (SAARC) Convention on Preventing and Combating Trafficking in Women and Children for Prostitution and the 2003 Organization for Security and Cooperation in Europe (OSCE) Action Plan to Combat Trafficking in Human Beings.

AR.08195

as are within its competence to prevent trafficking and provide effective protection and assistance to victims, the fear of persecution of the individual is likely to be well-founded. The mere existence of a law prohibiting trafficking in persons will not of itself be sufficient to exclude the possibility of persecution. If the law exists but is not effectively implemented, or if administrative mechanisms are in place to provide protection and assistance to victims, but the individual concerned is unable to gain access to such mechanisms, the State may be deemed unable to extend protection to the victim, or potential victim, of trafficking.

24. There may also be situations where trafficking activities are *de facto* tolerated or condoned by the authorities or even actively facilitated by corrupt State officials. In these circumstances, the agent of persecution may well be the State itself, which becomes responsible, whether directly or as a result of inaction, for a failure to protect those within its jurisdiction. Whether this is so will depend on the role played by the officials concerned and on whether they are acting in their personal capacity outside the framework of governmental authority or on the basis of the position of authority they occupy within governmental structures supporting or condoning trafficking. In the latter case, the persecutory acts may be deemed to emanate from the State itself.

### e) Place of persecution

25. In order to come within the scope of Article 1A(2) of the 1951 Convention, the applicant must be outside her or his country of origin and, owing to a well-founded fear of persecution, be unable or unwilling to avail her- or himself of the protection of that country. The requirement of being outside one's country does not, however, mean that the individual must have left on account of a well-founded fear of persecution.[24] Where this fear arises after she or he has left the country of origin, she or he would be a refugee *sur place*, providing the other elements in the refugee definition were fulfilled. Thus, while victims of trafficking may not have left their country owing to a well-founded fear of persecution, such a fear may arise after leaving their country of origin. In such cases, it is on this basis that the claim to refugee status should be assessed.

26. Whether the fear of persecution arises before leaving the country of origin or after, the location where the persecution takes place is a crucial aspect in correctly assessing asylum claims made by individuals who have been trafficked. The 1951 Convention requires that the refugee demonstrate a well-founded fear of persecution with regard to her or his country of nationality or habitual residence. Where someone has been trafficked within her or his own country, or fears being trafficked, and escapes to another in search of international protection, the link between the fear of persecution, the motivation for flight and the unwillingness to return is evident and any international protection needs fall to be determined in terms of the threat posed to the individual should she or he be obliged to return to the country of nationality or habitual residence. If no such well-founded fear is established in relation to the country of origin, then it would be appropriate for the State from which asylum has been requested to reject the claim to refugee status.

27. The circumstances in the applicant's country of origin or habitual residence are the main point of reference against which to determine the existence of a well-founded fear of persecution. Nevertheless, even where the exploitation experienced by a victim of trafficking occurs mainly outside the country of origin, this does not preclude the existence of a well-founded fear of persecution in the individual's own country. The trafficking of individuals across international borders gives rise to a complex situation which requires a broad analysis taking into account the various forms of harm that have occurred at different points along the trafficking route. The continuous and interconnected nature of the range of persecutory acts involved in the context of transnational trafficking should be given due consideration. Furthermore, trafficking involves a chain of actors, starting with those responsible for recruitment in the country of origin, through to those who organize and facilitate the transport, transfer and/or sale of victims, through to the final "purchaser". Each of these actors has a vested interest in the trafficking enterprise and could pose a real threat to the victim. Depending on the sophistication of the trafficking rings involved, applicants may thus have experienced and continue to fear harm in a number of locations, including in countries through

---

[24] See UNHCR, *Handbook*, above footnote 14, para. 94.

which they have transited, the State in which the asylum application is submitted and the country of origin. In such circumstances, the existence of a well-founded fear of persecution is to be evaluated in relation to the country of origin of the applicant.

28. A victim of trafficking who has been determined to be a refugee may additionally fear reprisals, punishment or re-trafficking in the country of asylum. If a refugee is at risk in her or his country of refuge or has particular needs, which cannot be met in the country of asylum, she or he may need to be considered for resettlement to a third country.[25]

### f) The causal link ("for reasons of")

29. To qualify for refugee status, an individual's well-founded fear of persecution must be related to one or more of the Convention grounds, that is, it must be "for reasons of" race, religion, nationality, membership of a particular social group or political opinion. It is sufficient that the Convention ground be a relevant factor contributing to the persecution; it is not necessary that it be the sole, or even dominant, cause. In many jurisdictions, the causal link ("for reasons of") must be explicitly established, while in other States, causation is not treated as a separate question for analysis but is subsumed within the holistic analysis of the refugee definition.[26] In relation to asylum claims involving trafficking, the difficult issue for a decision-maker is likely to be linking the well-founded fear of persecution to a Convention ground. Where the persecutor attributes or imputes a Convention ground to the applicant, this is sufficient to satisfy the causal link.[27]

30. In cases where there is a risk of being persecuted at the hands of a non-State actor for reasons related to one of the Convention grounds, the causal link is established, whether or not the absence of State protection is Convention-related. Alternatively, where a risk of persecution at the hands of a non-State actor is unrelated to a Convention ground, but the inability or unwillingness of the State to offer protection is for reasons of a Convention ground, the causal link is also established.

31. Trafficking in persons is a commercial enterprise, the prime motivation of which is likely to be profit rather than persecution on a Convention ground. In other words, victims are likely to be targeted above all because of their perceived or potential commercial value to the traffickers. This overriding economic motive does not, however, exclude the possibility of Convention-related grounds in the targeting and selection of victims of trafficking. Scenarios in which trafficking can flourish frequently coincide with situations where potential victims may be vulnerable to trafficking precisely as a result of characteristics contained in the 1951 Convention refugee definition. For instance, States where there has been significant social upheaval and/or economic transition or which have been involved in armed conflict resulting in a breakdown in law and order are prone to increased poverty, deprivation and dislocation of the civilian population. Opportunities arise for organized crime to exploit the inability, or lack of will, of law enforcement agencies to maintain law and order, in particular the failure to ensure adequate security for specific or vulnerable groups.

32. Members of a certain race or ethnic group in a given country may be especially vulnerable to trafficking and/or less effectively protected by the authorities of the country of origin. Victims may be targeted on the basis of their ethnicity, nationality, religious or political views in a context where individuals with specific profiles are already more vulnerable to exploitation and abuse of varying forms. Individuals may also be targeted by reason of their belonging to a particular social group. As an example, among children or women generally in a particular society some subsets of children or women may be especially vulnerable to being trafficked and may constitute a social group within the terms of the refugee definition. Thus, even if an individual is not trafficked solely and exclusively for a Convention reason, one or more of these Convention grounds may have been relevant for the trafficker's selection of the particular victim.

---

[25] UNHCR, *Resettlement Handbook*, November 2004 edition, chapter 4.1.
[26] See UNHCR Guidelines on Gender-related Persecution, above footnote 4, para. 20.
[27] See UNHCR "Interpreting Article 1", above footnote 20, para. 25.

AR.08197

**g) Convention grounds**

33. The causal link may be established to any one single Convention ground or to a combination of these grounds. Although a successful claim to refugee status only needs to establish a causal link to one ground, a full analysis of trafficking cases may frequently reveal a number of inter-linked, cumulative grounds.

**Race**

34. For the purposes of the refugee definition, race has been defined as including "all kinds of ethnic groups that are referred to as 'races' in common usage".[28] In situations of armed conflict where there is a deliberate policy of exploitation or victimization of certain racial or ethnic groups, persecution may manifest itself by the trafficking of members of that group. This kind of targeting of victims may occur in conjunction with an economic motivation which above all seeks to obtain financial gain. In the absence of armed conflict, members of one racial group may still be particularly targeted for trafficking for varied ends, if the State is unable or unwilling to protect members of that group. Where trafficking serves the sex trade, women and girls may also be especially targeted as a result of market demands for a particular race (or nationality). As the Special Rapporteur on trafficking has noted, such demand "is often further grounded in social power disparities of race, nationality, caste and colour".[29]

**Religion**

35. Individuals may similarly be targeted by traffickers because they belong to a particular religious community, that is, they may be targeted because their faith or belief identifies them as a member of a vulnerable group in the particular circumstances, if, for instance, the authorities are known not to provide adequate protection to certain religious groups. Again the profit motive may be an overriding factor, but this does not obviate the relevance of religion as a factor in the profiling and selection of victims. Alternatively, trafficking may be the method chosen to persecute members of a particular faith.[30]

**Nationality**

36. Nationality has a wider meaning than citizenship. It can equally refer to membership of an ethnic or linguistic group and may overlap with the term "race".[31] Trafficking may be the method chosen to persecute members of a particular national group in a context where there is inter-ethnic conflict within a State and certain groups enjoy lesser guarantees of protection. Again, even where the primary motive of the trafficker is financial gain, someone's nationality may result in them being more vulnerable to trafficking.

**Membership of a particular social group[32]**

37. Victims and potential victims of trafficking may qualify as refugees where it can be demonstrated that they fear being persecuted for reasons of their membership of a particular social group. In establishing this ground it is not necessary that the members of a particular group know each other or associate with each other as a group. It is, however, necessary[33] that they either share a common characteristic other than their risk of being persecuted or are perceived as a group by society. The shared characteristic will often be one that is innate, unchangeable or otherwise fundamental to identity, conscience or the exercise of one's human rights.[34] Persecutory action against a group may be relevant in heightening the visibility of the group without being its defining characteristic.[35] As with the other Convention grounds, the size of the purported social group is not a relevant

---

[28] UNHCR, *Handbook*, para. 68.
[29] See, Report of the Special Rapporteur, "Integration of the Human Rights of Women and a Gender Perspective", above footnote 9, paras. 48 and 66.
[30] See generally, UNHCR, "Guidelines on International Protection: Religion-Based Refugee Claims under Article 1A(2) of the 1951 Convention and/or the 1967 Protocol relating to the Status of Refugees", HCR/GIP/04/06, 28 April 2004
[31] UNHCR, *Handbook*, para. 74.
[32] See generally, UNHCR, "Guidelines on International Protection: Membership of a Particular Social Group within the context of Article 1A(2) of the 1951 Convention and 1967 Protocol relating to the Status of Refugees", HCR/GIP/02/02, 7 May 2002.
[33] *Ibid.*, para. 15.
[34] *Ibid.*, para. 11.
[35] *Ibid.*, para. 14.

AR.08198

criterion in determining whether a social group exists within the meaning of Article 1A(2).[36] While a claimant must still demonstrate a well-founded fear of being persecuted based on her or his membership of the particular social group, she or he need not demonstrate that all members of the group are at risk of persecution in order to establish the existence of the group.[37]

38. Women are an example of a social subset of individuals who are defined by innate and immutable characteristics and are frequently treated differently to men. As such, they may constitute a particular social group.[38] Factors which may distinguish women as targets for traffickers are generally connected to their vulnerability in certain social settings; therefore certain social subsets of women may also constitute particular social groups. Men or children or certain social subsets of these groups may also be considered as particular social groups. Examples of social subsets of women or children could, depending on the context, be single women, widows, divorced women, illiterate women, separated or unaccompanied children, orphans or street children. The fact of belonging to such a particular social group may be one of the factors contributing to an individual's fear of being subjected to persecution, for example, to sexual exploitation, as a result of being, or fearing being, trafficked.

39. Former victims of trafficking may also be considered as constituting a social group based on the unchangeable, common and historic characteristic of having been trafficked. A society may also, depending on the context, view persons who have been trafficked as a cognizable group within that society. Particular social groups can nevertheless not be defined exclusively by the persecution that members of the group suffer or by a common fear of persecution.[39] It should therefore be noted that it is the past trafficking experience that would constitute one of the elements defining the group in such cases, rather than the future persecution now feared in the form of ostracism, punishment, reprisals or re-trafficking. In such situations, the group would therefore not be defined solely by its fear of future persecution.

**Political opinion**

40. Individuals may be targeted for trafficking because they hold a certain political opinion or are perceived as doing so. Similar considerations apply for the other Convention grounds, that is, individuals may, depending on the circumstances, be targeted because of their actual or perceived political views which make them vulnerable and less likely to enjoy the effective protection of the State.

## III. STATELESSNESS AND TRAFFICKING

41. The 1954 Convention relating to the Status of Stateless Persons and the 1961 Convention on the Reduction of Statelessness establish a legal framework setting out the rights of stateless persons, the obligations of States Parties to avoid actions that would result in statelessness and the steps to be taken to remedy situations of statelessness. The 1954 Convention applies to anyone who is "not considered as a national by any State under the operation of its law",[40] that is, it applies for the benefit of those who are denied citizenship under the laws of any State. The 1961 Convention generally requires States to avoid actions that would result in statelessness and explicitly forbids the deprivation of nationality if this would result in statelessness.[41] This constitutes a prohibition on actions that would cause statelessness, as well as an obligation to avoid situations where statelessness may arise by default or neglect. The only exception to this prohibition is when the nationality was acquired fraudulently.[42]

42. When seeking to assess and address the situation of someone who has been trafficked, it is important to recognize potential implications as regards statelessness. The mere fact of being a

---

[36] *Ibid.*, para. 18.
[37] *Ibid.*, para. 17.
[38] *Ibid.*, para. 12. See also UNHCR Guidelines on Gender-related Persecution, above footnote 4, para. 30.
[39] See UNHCR Guidelines on Membership of a Particular Social Group, above footnote 32, para. 14.
[40] See Article 1(1) of the 1954 Convention.
[41] See Article 8(1) of the 1961 Convention.
[42] In addition to the 1954 and 1961 Statelessness Conventions, other international or regional instruments set out similar principles. See, for instance, the 1965 Convention on the Elimination of All Forms of Racial Discrimination, the 1966 International Covenant on Civil and Political Rights, the 1979 Convention on the Elimination of All Forms of Discrimination Against Women, the 1997 European Convention on Nationality, the 1969 American Convention on Human Rights and the 1990 African Charter on the Rights and Welfare of the Child.

AR.08199

victim of trafficking will not *per se* render someone stateless. Victims of trafficking continue to possess the citizenship they had when they fell under the control of their traffickers. If, however, these traffickers have confiscated their identity documents, as commonly happens as a way of establishing and exerting control over their victims, they may be unable to prove citizenship. This lack of documentation and temporary inability to establish identity is not necessarily unique to victims of trafficking. It should be, and in many cases is, easily overcome with the assistance of the authorities of the State of origin.[43]

43. Everyone has the right to return to their own country.[44] States should extend diplomatic protection to their nationals abroad. This includes facilitating their re-entry into the country, including in the case of victims of trafficking who find themselves abroad. If, however, the State withholds such assistance and fails to supply documentation to enable the individual to return, one practical consequence may be to render the individual effectively stateless.[45] Even if the individuals were not previously considered stateless by their State of nationality, they may find themselves effectively treated as such if they attempt to avail themselves of that State's protection.[46] UNHCR's statelessness mandate may mean it needs to take action to assist individuals in such circumstances.[47]

44. There may also be situations where stateless individuals are trafficked out of their country of habitual residence. The lack of documentation coupled with lack of citizenship may render them unable to secure return to their country of habitual residence. While this alone does not make someone a refugee, the individual concerned may be eligible for refugee status where the refusal of the country of habitual residence to allow re-entry is related to a Convention ground and the inability to return to the country leads to serious harm or a serious violation, or violations, of human rights amounting to persecution.

## IV. PROCEDURAL ISSUES

45. Given the broad range of situations in which trafficking cases come to light and victims of trafficking can be identified, it is important that mechanisms be put in place at the national level to provide for the physical, psychological and social recovery of victims of trafficking. This includes the provision of housing, legal counselling and information, medical, psychological and material assistance, as well as employment, educational and training opportunities in a manner which takes into account the age, gender and special needs of victims of trafficking.[48] It is also necessary to ensure that victims of trafficking have access to fair and efficient asylum procedures as appropriate[49] and to proper legal counselling, if they are to be able to lodge an asylum claim effectively. In view of the complexities of asylum claims presented by victims or potential victims of trafficking, such claims normally require an examination on their merits in regular procedures.

46. In the reception of applicants who claim to have been victims of trafficking, and in interviewing such individuals, it is of utmost importance that a supportive environment be provided so that they can be reassured of the confidentiality of their claim. Providing interviewers of the same sex as the applicant can be particularly important in this respect. Interviewers should also take into consideration that victims who have escaped from their traffickers could be in fear of revealing the real extent of the persecution they have suffered. Some may be traumatized and in need of expert medical and/or psycho-social assistance, as well as expert counselling.

---

[43] In such circumstances, it is necessary to respect principles of confidentiality. These require amongst other things that any contact with the country of origin should not indicate either that the individual concerned has applied for asylum or that she or he has been trafficked.

[44] 1948 Universal Declaration of Human Rights, Article 13(2). See also, Article 12(4) of the International Covenant on Civil and Political Rights, which reads: "No one shall be arbitrarily deprived of the right to enter his own country."

[45] See, Executive Committee Conclusion No. 90 (LII), 2001, paragraph (s), in which the Executive Committee of UNHCR expresses its concern that many victims of trafficking are rendered effectively stateless due to an inability to establish their identity and nationality status.

[46] This is so, despite relevant State obligations contained in the 1961 Convention on the Reduction of Statelessness, in addition to Article 8 of the Trafficking Protocol.

[47] When the 1961 Convention on the Reduction of Statelessness came into force, the UN General Assembly designated UNHCR as the UN body entrusted to act on behalf of stateless persons. Since 1975, General Assembly Resolutions have further detailed UNHCR's responsibilities regarding the prevention of statelessness and the protection of stateless persons.

[48] See Article 6 in Part II of the Trafficking Protocol.

[49] See Agenda for Protection, Goal 2 Objective 2, and the OHCHR, "Recommended Principles and Guidelines on Human Rights and Human Trafficking", above footnote 13, Guideline 2.7, and the Council of Europe Convention, Explanatory Report, para. 377.

AR.08200

7

47. Such assistance should be provided to victims in an age and gender sensitive manner. Many instances of trafficking, in particular trafficking for the purposes of exploitation of the prostitution of others or other forms of sexual exploitation, are likely to have a disproportionately severe effect on women and children. Such individuals may rightly be considered as victims of gender-related persecution. They will have been subjected in many, if not most, cases to severe breaches of their basic human rights, including inhuman or degrading treatment, and in some instances, torture.

48. Women, in particular, may feel ashamed of what has happened to them or may suffer from trauma caused by sexual abuse and violence, as well as by the circumstances surrounding their escape from their traffickers. In such situations, the fear of their traffickers will be very real. Additionally, they may fear rejection and/or reprisals by their family and/or community which should be taken into account when considering their claims. Against this background and in order to ensure that claims by female victims of trafficking are properly considered in the refugee status determination process, a number of measures should be borne in mind. These have been set out in Part III of UNHCR's Guidelines on International Protection on gender-related persecution and are equally applicable in the context of trafficking-related claims.[50]

49. Children also require special attention in terms of their care, as well as of the assistance to be provided in the presentation of asylum claims. In this context, procedures for the rapid identification of child victims of trafficking need to be established, as do specialized programmes and policies to protect and support child victims, including through the appointment of a guardian, the provision of age-sensitive counselling and tracing efforts which bear in mind the need for confidentiality and a supportive environment. Additional information on the appropriate handling of claims by child victims of trafficking can be found in the UN Children Fund (UNICEF) "Guidelines for the Protection of the Rights of Child Victims of Trafficking",[51] in the "Recommended Principles and Guidelines on Human Rights and Human Trafficking" of the Office of the High Commissioner for Human Rights[52] and General Comment No. 6 of the of the Committee on the Rights of the Child.[53]

50. An additional and specific consideration relates to the importance of avoiding any linkage, whether overt or implied, between the evaluation of the merits of a claim to asylum and the willingness of a victim to give evidence in legal proceedings against her or his traffickers. Providing evidence to help identify and prosecute traffickers can raise specific protection concerns that need to be addressed through specially designed witness protection programmes. The fact that an individual has agreed to provide such evidence will nevertheless not necessarily make her or him a refugee, unless the repercussions feared upon a return to the country of origin rise to the level of persecution and can be linked to one or more of the Convention grounds. Conversely, the fact that a victim of trafficking refuses to provide evidence should not lead to any adverse conclusion with respect to her or his asylum claim.

---

[50] See UNHCR Guidelines on Gender-related Persecution, above footnote 4. Complementary information can be found in World Health Organization, London School of Hygiene and Tropical Medicine and Daphne Programme of the European Commission, *WHO Ethical and Safety Recommendations for Interviewing Trafficked Women*, 2003, available at http://www.who.int/gender/ documents/en/final%20recommendations%2023%20oct.pdf.

[51] See above footnote 19.

[52] See above footnote 13. Guideline 8 addresses special measures for the protection and support of child victims of trafficking.

[53] See above, footnote 18, especially paras. 64–78.

AR.08201

144

**UNHCR**
United Nations High Commissioner for Refugees
Haut Commissariat des Nations Unies pour les réfugiés

Distr. GENERAL    HCR/GIP/09/08    22 September 2009    Original: ENGLISH

# GUIDELINES ON INTERNATIONAL PROTECTION NO. 8:

## Child Asylum Claims under Articles 1(A)2 and 1(F) of the 1951 Convention and/or 1967 Protocol relating to the Status of Refugees

UNHCR issues these Guidelines pursuant to its mandate, as contained in the *Statute of the Office of the United Nations High Commissioner for Refugees*, in conjunction with Article 35 of the *1951 Convention relating to the Status of Refugees* and Article II of its *1967 Protocol*. These Guidelines complement the UNHCR *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees* (re-edited, Geneva, January 1992).

These Guidelines are intended to provide legal interpretative guidance for governments, legal practitioners, decision makers and the judiciary, as well as UNHCR staff carrying out refugee status determination in the field.

**8**

AR.08202

## I. INTRODUCTION

1. These Guidelines offer substantive and procedural guidance on carrying out refugee status determination in a child-sensitive manner. They highlight the specific rights and protection needs of children in asylum procedures. Although the definition of a refugee contained in Article 1(A)2 of the 1951 Convention relating to the Status of Refugees and its 1967 Protocol (hereafter "1951 Convention" and "1967 Protocol") applies to all individuals regardless of their age, it has traditionally been interpreted in light of adult experiences. This has meant that many refugee claims made by children have been assessed incorrectly or overlooked altogether.[1]

2. The specific circumstances facing child asylum-seekers as individuals with independent claims to refugee status are not generally well understood. Children may be perceived as part of a family unit rather than as individuals with their own rights and interests. This is explained partly by the subordinate roles, positions and status children still hold in many societies worldwide. The accounts of children are more likely to be examined individually when the children are unaccompanied than when they are accompanied by their families. Even so, their unique experiences of persecution, due to factors such as their age, their level of maturity and development and their dependency on adults have not always been taken into account. Children may not be able to articulate their claims to refugee status in the same way as adults and, therefore, may require special assistance to do so.

3. Global awareness about violence, abuse and discrimination experienced by children is growing,[2] as is reflected in the development of international and regional human rights standards. While these developments have yet to be fully incorporated into refugee status determination processes, many national asylum authorities are increasingly acknowledging that children may have refugee claims in their own right. In *Conclusion on Children at Risk* (2007), UNHCR's Executive Committee underlines the need for children to be recognized as "active subjects of rights" consistent with international law. The Executive Committee also recognized that children may experience child-specific forms and manifestations of persecution.[3]

4. Adopting a child-sensitive interpretation of the 1951 Convention does not mean, of course, that child asylum-seekers are automatically entitled to refugee status. The child applicant must establish that s/he has a well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion. As with gender, age is relevant to the entire refugee definition.[4] As noted by the UN Committee on the Rights of the Child, the refugee definition:

> … must be interpreted in an age and gender-sensitive manner, taking into account the particular motives for, and forms and manifestations of, persecution experienced by children. Persecution of kin; under-age recruitment; trafficking of children for prostitution; and sexual exploitation or subjection to female genital mutilation, are some of the child-specific forms and manifestations of persecution which may justify the granting of refugee status if such acts are related to one of the 1951 Refugee Convention grounds. States should, therefore, give utmost attention to such child-specific forms and manifestations of persecution as well as gender-based violence in national refugee status-determination procedures.[5]

Alongside age, factors such as rights specific to children, a child's stage of development, knowledge and/or memory of conditions in the country of origin, and vulnerability, also need to be considered to ensure an appropriate application of the eligibility criteria for refugee status.[6]

---

[1] UNHCR, *Guidelines on Policies and Procedures in Dealing with Unaccompanied Children Seeking Asylum*, Geneva, 1997 (hereafter "UNHCR, *Guidelines on Unaccompanied Children Seeking Asylum*"), http://www.unhcr.org/refworld/docid/3ae6b3360. html, in particular Part 8.

[2] See, for instance, UN General Assembly, Rights of the Child: Note by the Secretary-General, A/61/299, 29 Aug. 2006 (hereafter "UN study on violence against children") http://www.unhcr.org/refworld/docid/453780fe0.html; UN Commission on the Status of Women, The elimination of all forms of discrimination and violence against the girl child, E/CN.6/2007/2, 12 Dec. 2006, http://www. unhcr.org/refworld/docid/46c5b30c0.html; UN General Assembly, Impact of armed conflict on children: Note by the Secretary- General (the "Machel Study"), A/51/306, 26 Aug. 1996, http://www.unhcr. org/refworld/docid/3b00f2d30.html, and the strategic review marking the 10 year anniversary of the Machel Study, UN General Assembly, Report of the Special Representative of the Secretary-General for Children and Armed Conflict, A/62/228, 13 Aug. 2007, http://www.unhcr.org/refworld/docid/47316f602.html.

[3] ExCom, *Conclusion on Children at Risk*, 5 Oct. 2007, No. 107 (LVIII) – 2007, (hereafter "ExCom, Conclusion No. 107"), http://www.unhcr.org/refworld/docid/471897232.html, para. (b)(x)(viii).

[4] UNHCR, *Guidelines on International Protection No. 1: Gender-Related Persecution Within the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol Relating to the Status of Refugees*, 7 May 2002 (hereafter "UNHCR, Guidelines on Gender- Related Persecution"), http://www.unhcr.org/refworld/docid/3d36f1c64.html, paras. 2, 4.

[5] UN Committee on the Rights of the Child, *General Comment No. 6 (2005)-Treatment of Unaccompanied and Separated Children Outside Their Country of Origin*, CRC/GC/2005/6, Sep. 2005 (hereafter "CRC, *General Comment No. 6*"), http://www.unhcr.org/refworld/docid/42dd174b4.html, para. 74.

[6] UNHCR, *Guidelines on Unaccompanied Children Seeking Asylum, op cit.*, page 10.

AR.08203

5. A child-sensitive application of the refugee definition would be consistent with the 1989 Convention on the Rights of the Child (hereafter "the CRC").[7] The Committee on the Rights of the Child has identified the following four Articles of the CRC as general principles for its implementation:[8] *Article 2*: the obligation of States to respect and ensure the rights set forth in the Convention to each child within their jurisdiction without discrimination of any kind;[9] *Article 3 (1)*: the best interests of the child as a primary consideration in all actions concerning children;[10] *Article 6*: the child's inherent right to life and States parties' obligation to ensure to the maximum extent possible the survival and development of the child;[11] and *Article 12*: the child's right to express his/her views freely regarding "all matters affecting the child", and that those views be given due weight.[12] These principles inform both the substantive and the procedural aspects of the determination of a child's application for refugee status.

## II. DEFINITIONAL ISSUES

6. These guidelines cover all child asylum-seekers, including accompanied, unaccompanied and separated children, who may have individual claims to refugee status. Each child has the right to make an independent refugee claim, regardless of whether s/he is accompanied or unaccompanied. "Separated children" are children separated from both their parents or from their previous legal or customary primary caregivers but not necessarily from other relatives. In contrast, "unaccompanied children" are children who have been separated from both parents and other relatives and are not being cared for by an adult who, by law or custom, is responsible for doing so.[13]

7. For the purposes of these Guidelines, "children" are defined as all persons below the age of 18 years.[14] Every person under 18 years who is the principal asylum applicant is entitled to child-sensitive procedural safeguards. Lowering the age of childhood or applying restrictive age assessment approaches in order to treat children as adults in asylum procedures may result in violations of their rights under international human rights law. Being young and vulnerable may make a person especially susceptible to persecution. Thus, there may be exceptional cases for which these guidelines are relevant even if the applicant is 18 years of age or slightly older. This may be particularly the case where persecution has hindered the applicant's development and his/her psychological maturity remains comparable to that of a child.[15]

8. Even at a young age, a child may still be considered the principal asylum applicant.[16] The parent, caregiver or other person representing the child will have to assume a greater role in making sure

---

[7] With a near universal ratification, the CRC is the most widely ratified human rights treaty, available at http://www.unhcr.org/refworld/docid/3ae6b38f0.html. The rights contained therein apply to all children within the jurisdiction of the State. For a detailed analysis of the provisions of the CRC, see UNICEF, *Implementation Handbook for the Convention on the Rights of the Child*, fully revised third edition, Sep. 2007 (hereafter "UNICEF, *Implementation Handbook*"). It can be ordered at http://www.unicef.org/publications/index_43110.html.

[8] CRC, *General Comment No. 5 (2003): General Measures of Implementation for the Convention on the Rights of the Child* (Arts. 4, 42 and 44, Para. 6), CRC/GC/2003/5, 3 Oct. 2003 (hereafter "CRC, *General Comment No. 5*"), http://www.unhcr.org/refworld/docid/4538834f11.html, para. 12.

[9] CRC, *General Comment No. 6*, para. 18.

[10] *Ibid.*, paras. 19–22. See also ExCom *Conclusion No. 107*, para. (b)(5), and, on how to conduct "best interests" assessments and determinations, UNHCR, *Guidelines on Determining the Best Interests of the Child*, Geneva, May 2008, http://www.unhcr.org/refworld/docid/48480c342.html.

[11] CRC, *General Comment No. 6*, paras. 23–24.

[12] *Ibid.*, para. 25. See also CRC, *General Comment No. 12 (2009): The right of the child to be heard*, CRC/C/GC/12, 20 July 2009 (hereafter "CRC, *General Comment No. 12*"), http://www.unhcr.org/refworld/docid/4ae562c52.html.

[13] CRC, *General Comment No. 6*, paras. 7–8. See also, UNHCR, *Guidelines on Unaccompanied Children Seeking Asylum, op cit.*, p. 5, paras. 3.1-3.2. See also, UNHCR, UNICEF et al, *Inter-agency Guiding Principles on Unaccompanied and Separated Children*, Geneva, 2004 (hereafter "*Inter-Agency Guiding Principles*"), http://www.unhcr.org/refworld/docid/4113abc14.html, p. 13.

[14] CRC, Art. 1 provides that "a child means every human being below the age of eighteen years unless, under the law applicable to the child, majority is attained earlier." In addition, the EU Council Directive 2004/83/EC of 29 April 2004 on Minimum Standards for the Qualification and Status of Third Country Nationals or Stateless Persons as Refugees or as Persons Who Otherwise Need International Protection and the Content of the Protection Granted, 19 May 2004, 2004/83/EC, http://www.unhcr.org/refworld/docid/4157e75e4.html, provides that "'unaccompanied minors' means third-country nationals or stateless persons below the age of 18, who arrive on the territory of the Member States unaccompanied by an adult responsible for them whether by law or custom, and for as long as they are not effectively taken into the care of such a person; it includes minors who are left unaccompanied after they have entered the territory of the Member States", Art. 2 (i).

[15] The United Kingdom Immigration Appeals Tribunal (now the Asylum and Immigration Tribunal) has held that "[t]o adopt a rigidity however in this respect is in our view to fail to recognize that in many areas of the world even today exact ages and dates of birth are imprecise. It is better to err on the side of generosity"; *Sarjoy Jakitay v. Secretary of State for the Home Department*, Appeal No. 12658 (unreported), U.K. IAT, 15 Nov. 1995. See also, *Decision VA0-02635, VA0-02635*, Canada, Immigration and Refugee Board (hereafter "IRB"), 22 March 2001, http://www.unhcr.org/refworld/docid/4b18dec82.html.

[16] See, for instance, *Chen Shi Hai v. The Minister for Immigration and Multicultural Affairs*, [2000] HCA 19, Australia, High Court, 13 April 2000, http://www.unhcr.org/refworld/docid/3ae6b6df4.html. In this case, which concerned a 3 ½ year-old boy, it was found that "under Australian law, the child was entitled to have his own rights determined as that law provides. He is not for all purposes subsumed to the identity and legal rights of his parents", para. 78.

AR.08204

that all relevant aspects of the child's claim are presented.[17] However, the right of children to express their views in all matters affecting them, including to be heard in all judicial and administrative proceedings, also needs to be taken into account.[18] A child claimant, where accompanied by parents, members of an extended family or of the community who by law or custom are responsible for the child, is entitled to appropriate direction and guidance from them in the exercise of his/her rights, in a manner consistent with the evolving capacities of the child.[19] Where the child is the principal asylum-seeker, his/her age and, by implication, level of maturity, psychological development, and ability to articulate certain views or opinions will be an important factor in a decision maker's assessment.

9. Where the parents or the caregiver seek asylum based on a fear of persecution for their child, the child normally will be the principal applicant even when accompanied by his/her parents. In such cases, just as a child can derive refugee status from the recognition of a parent as a refugee, a parent can, *mutatis mutandis*, be granted derivative status based on his/her child's refugee status.[20] In situations where both the parent(s) and the child have their own claims to refugee status, it is preferable that each claim be assessed separately. The introduction of many of the procedural and evidentiary measures enumerated below in Part IV will enhance the visibility of children who perhaps ought to be the principal applicants within their families. Where the child's experiences, nevertheless, are considered part of the parent's claim rather than independently, it is important to consider the claim also from the child's point of view.[21]

# III. SUBSTANTIVE ANALYSIS

## a) Well-founded fear of persecution

10. The term "persecution", though not expressly defined in the 1951 Convention, can be considered to involve serious human rights violations, including a threat to life or freedom, as well as other kinds of serious harm or intolerable situations as assessed with regard to the age, opinions, feelings and psychological make-up of the applicant.[22] Discrimination may amount to persecution in certain situations where the treatment feared or suffered leads to consequences of a substantially prejudicial nature for the child concerned.[23] The principle of the best interests of the child requires that harm be assessed from the child's perspective. This may include an analysis as to how the child's rights or interests are, or will be, affected by the harm. Ill-treatment which may not rise to the level of persecution in the case of an adult may do so in the case of a child.[24]

11. Both objective and subjective factors are relevant to establish whether or not a child applicant has a well-founded fear of persecution.[25] An accurate assessment requires both an up-to-date analysis and knowledge of child-specific circumstances in the country of origin, including of existing child protection services. Dismissing a child's claim based on the assumption that perpetrators would not take a child's views seriously or consider them a real threat could be erroneous. It may be the case that a child is unable to express fear when this would be expected or, conversely, exaggerates the fear. In

---

[17] See also UNHCR, *Refugee Children: Guidelines on Protection and Care*, Geneva, 1994, http://www.unhcr.org/refworld/docid/3ae6b3470.html, pp. 97–103.

[18] CRC, Art. 12(2); CRC, *General Comment No. 12*, paras. 32, 67, 123.

[19] CRC, Art. 5.

[20] UNHCR, *Guidance Note on Refugee Claims relating to Female Genital Mutilation*, May 2009 (hereafter "UNHCR, *Guidance Note on FGM*"), http://www.unhcr.org/refworld/docid/4a0c28492.html, para. 11. See also UNHCR, ExCom Conclusion on the Protection of the Refugee's Family, No. 88 (L), 1999, http://www.unhcr.org/refworld/docid/3ae68c4340.html, para. (b)(iii).

[21] See, for instance, *EM (Lebanon) (FC) (Appellant) v. Secretary of State for the Home Department (Respondent)*, U.K. House of Lords, 22 Oct. 2008, http://www.unhcr.org/refworld/docid/490058699.html; *Refugee Appeal Nos. 76250 & 76251*, Nos. 76250 & 76251, New Zealand, Refugee Status Appeals Authority (hereafter "RSAA"), 1 Dec. 2008, http://www.unhcr.org/refworld/docid/494f64952.html.

[22] See UNHCR, *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees*, 1979, re-edited, Geneva, Jan. 1992 (hereafter "UNHCR, *Handbook*") http://www.unhcr. org/refworld/docid/3ae6b3314.html, paras. 51–52; UNHCR, *Guidelines on International Protection No. 7: The Application of Article 1A(2) of the 1951 Convention and/or 1967 Protocol Relating to the Status of Refugees to Victims of Trafficking and Persons at Risk of Being Trafficked*, 7 Apr. 2006 (hereafter "UNHCR, *Guidelines on Victims of Trafficking*"), http://www.unhcr.org/refworld/ docid/443679fa4.html, para. 14.

[23] UNHCR, *Handbook*, paras. 54–55.

[24] See, for instance, United States Bureau of Citizenship and Immigration Services, *Guidelines For Children's Asylum Claims*, 10 Dec. 1998 (hereafter the "U.S. Guidelines for Children's Asylum Claims"), http://www.unhcr.org/refworld/docid/3f8ec0574. html, noting that "the harm a child fears or has suffered, however, may be relatively less than that of an adult and still qualify as persecution." See also, *Chen Shi Hai, op. cit.*, where the Court found that "what may possibly be viewed as acceptable enforcement of laws and programmes of general application in the case of the parents may nonetheless be persecution in the case of the child", para. 79.

[25] UNHCR, *Handbook*, paras. 40–43.

AR.08205

such circumstances, decision makers must make an objective assessment of the risk that the child would face, regardless of that child's fear.[26] This would require consideration of evidence from a wide array of sources, including child-specific country of origin information. When the parent or caregiver of a child has a well-founded fear of persecution for their child, it may be assumed that the child has such a fear, even if s/he does not express or feel that fear.[27]

12. Alongside age, other identity-based, economic and social characteristics of the child, such as family background, class, caste, health, education and income level, may increase the risk of harm, influence the type of persecutory conduct inflicted on the child and exacerbate the effect of the harm on the child. For example, children who are homeless, abandoned or otherwise without parental care may be at increased risk of sexual abuse and exploitation or of being recruited or used by an armed force/ group or criminal gang. Street children, in particular, may be rounded up and detained in degrading conditions or be subjected to other forms of violence, including murder for the purpose of "social cleansing".[28] Children with disabilities may be denied specialist or routine medical treatment or be ostracized by their family or community. Children in what may be viewed as unconventional family situations including, for instance, those born out of wedlock, in violation of coercive family policies,[29] or through rape, may face abuse and severe discrimination. Pregnant girls may be rejected by their families and subject to harassment, violence, forced prostitution or other demeaning work.[30]

**Child-specific rights**

13. A contemporary and child-sensitive understanding of persecution encompasses many types of human rights violations, including violations of child-specific rights. In determining the persecutory character of an act inflicted against a child, it is essential to analyse the standards of the CRC and other relevant international human rights instruments applicable to children.[31] Children are entitled to a range of child-specific rights set forth in the CRC which recognize their young age and dependency and are fundamental to their protection, development and survival. These rights include, but are not limited to, the following: the right not to be separated from parents (Article 9); protection from all forms of physical and mental violence, abuse, neglect, and exploitation (Article 19); protection from traditional practices prejudicial to the health of children (Article 24); a standard of living adequate for the child's development (Article 27); the right not to be detained or imprisoned unless as a measure of last resort (Article 37); and protection from under- age recruitment (Article 38). The CRC also recognizes the right of refugee children and children seeking refugee status to appropriate protection and humanitarian assistance in the enjoyment of applicable rights set forth in the CRC and in other international human rights or humanitarian instruments (Article 22).

14. Children's socio-economic needs are often more compelling than those of adults, particularly due to their dependency on adults and unique developmental needs. Deprivation of economic, social and cultural rights, thus, may be as relevant to the assessment of a child's claim as that of civil and political rights. It is important not to automatically attribute greater significance to certain violations than to others but to assess the overall impact of the harm on the individual child. The violation of one right often may expose the child to other abuses; for example, a denial of the right to education or an adequate standard of living may lead to a heightened risk of other forms

---

[26] See UNHCR, *Handbook*, paras. 217–219. See also *Yusuf v. Canada (Minister of Employment and Immigration)*, [1992] 1 F.C. 629; F.C.J. 1049, Canada, Federal Court, 24 Oct. 1991, http://www.unhcr.org/refworld/docid/403e24e84.html. The Court concluded that "I am loath to believe that a refugee status claim could be dismissed solely on the ground that as the claimant is a young child or a person suffering from a mental disability, s/he was incapable of experiencing fear the reasons for which clearly exist in objective terms.", at 5.

[27] See, for instance, *Canada (Minister of Citizenship and Immigration) v. Patel*, 2008 FC 747, [2009] 2 F.C.R. 196, Canada, Federal Court, 17 June 2008, http://www.unhcr.org/refworld/docid/4a6438952.html, at 32–33.

[28] "Social cleansing" refers to the process of removing an undesirable group from an area and may involve murder, disappearances, violence and other ill-treatment. See, UNICEF, *Implementation Handbook*, pp. 89, 91, 287. See also *Case of the "Street Children" (Villagrán-Morales et al.) v. Guatemala*, Inter-American Court of Human Rights (hereafter "IACtHR"), Judgment of 19 Nov. 1999, http://www.unhcr.org/refworld/docid/4b17bc442.html, paras. 190–191. The Court found that there was a prevailing pattern of violence against street children in Guatemala. Relying on the CRC to interpret Art. 19 of the 1969 American Convention on Human Rights, "Pact of San Jose", Costa Rica (hereafter "ACHR"), http://www.unhcr.org/refworld/docid/3ae6b36510.html, the Court noted that the State had violated their physical, mental, and moral integrity as well as their right to life and also failed to take any measures to prevent them from living in misery, thereby denying them of the minimum conditions for a dignified life.

[29] See further, UNHCR, *Note on Refugee Claims Based on Coercive Family Planning Laws or Policies*, Aug. 2005, http://www.unhcr.org/refworld/docid/4301a9184.html.

[30] UNHCR, *Guidelines on Gender-Related Persecution, op cit.*, para. 18.

[31] In the context of Africa, the African Charter on the Rights and Welfare of the Child should also be considered (hereafter "African Charter"), http://www.unhcr.org/refworld/docid/3ae6b38c18.html.

AR.08206

of harm, including violence and abuse.[32] Moreover, there may be political, racial, gender or religious aims or intentions against a particular group of children or their parents underlying discriminatory measures in the access and enjoyment of ESC rights. As noted by the UN Committee on Economic, Social and Cultural Rights:

> The lack of educational opportunities for children often reinforces their subjection to various other human rights violations. For instance, children who may live in abject poverty and not lead healthy lives are particularly vulnerable to forced labour and other forms of exploitation. Moreover, there is a direct correlation between, for example, primary school enrolment levels for girls and major reductions in child marriages.[33]

### Child-related manifestations of persecution

15. While children may face similar or identical forms of harm as adults, they may experience them differently. Actions or threats that might not reach the threshold of persecution in the case of an adult may amount to persecution in the case of a child because of the mere fact that s/he is a child. Immaturity, vulnerability, undeveloped coping mechanisms and dependency as well as the differing stages of development and hindered capacities may be directly related to how a child experiences or fears harm.[34] Particularly in claims where the harm suffered or feared is more severe than mere harassment but less severe than a threat to life or freedom, the individual circumstances of the child, including his/her age, may be important factors in deciding whether the harm amounts to persecution. To assess accurately the severity of the acts and their impact on a child, it is necessary to examine the details of each case and to adapt the threshold for persecution to that particular child.

16. In the case of a child applicant, psychological harm may be a particularly relevant factor to consider. Children are more likely to be distressed by hostile situations, to believe improbable threats, or to be emotionally affected by unfamiliar circumstances. Memories of traumatic events may linger in a child and put him/her at heightened risk of future harm.

17. Children are also more sensitive to acts that target close relatives. Harm inflicted against members of the child's family can support a well-founded fear in the child. For example, a child who has witnessed violence against, or experienced the disappearance or killing of a parent or other person on whom the child depends, may have a well-founded fear of persecution even if the act was not targeted directly against him/her.[35] Under certain circumstances, for example, the forced separation of a child from his/her parents, due to discriminatory custody laws or the detention of the child's parent(s) could amount to persecution.[36]

### Child-specific forms of persecution

18. Children may also be subjected to specific forms of persecution that are influenced by their age, lack of maturity or vulnerability. The fact that the refugee claimant is a child may be a central factor in the harm inflicted or feared. This may be because the alleged persecution only applies to, or disproportionately affects, children or because specific child rights may be infringed. UNHCR's Executive Committee has recognized that child-specific forms of persecution may include under-age recruitment, child trafficking and female genital mutilation (hereafter "FGM").[37] Other examples include, but are not limited to, family and domestic violence, forced or underage marriage,[38] bonded or hazardous child labour, forced labour,[39]

---

[32] CRC, *General Comment No. 5, op cit.*, paras. 6–7. See further below at v. Violations of economic, social and cultural rights.

[33] UN Committee on Social and Cultural Rights (hereafter "CESCR"), *General Comment No. 11: Plans of Action for Primary Education (Art. 14 of the Covenant)*, E/1992/23, 10 May 1999, http://www.unhcr.org/refworld/docid/4538838c0.html, para. 4.

[34] See further Save the Children and UNICEF, *The evolving capacities of the child*, 2005, http://www.unicef-irc.org/publications/pdf/evolving-eng.pdf.

[35] See, for instance, *Cicek v. Turkey*, Application No. 67124/01, European Court of Human Rights (hereafter "ECtHR"), 18 Jan. 2005, http://www.unhcr.org/refworld/docid/42d3e7ea4.html, paras. 173–174; *Bazorkina v. Russia*, Application No. 69481/01, ECtHR, 27 July 2006, http://www.unhcr.org/refworld/docid/44cdf4ef4.html, paras. 140–141.

[36] See *EM (Lebanon) (FC) (Appellant) v. Secretary of State for the Home Department (Respondent), op. cit., Refugee Appeal Nos. 76226 and 76227*, Nos. 76226 and 76227, New Zealand, RSAA, 12 Jan. 2009, http://www.unhcr.org/refworld/docid/49a6ac0e2. html, paras. 112–113.

[37] ExCom, *Conclusion No. 107*, para. (g)(viii).

[38] CRC, Art. 24(3); International Convenant on Civil and Political Rights (hereafter "ICCPR"), http://www.unhcr.org/refworld/ docid/3ae6b3aa0.html, Art. 23; International Covenant on Economic, Social and Cultural Rights, http://www.unhcr.org/refworld/ docid/3ae6b36c0.html, Art. 10; Convention on the Elimination of All Forms of Discrimination Against Women, http://www.unhcr.org/refworld/docid/3ae6b3970.html, Art. 16.

[39] CRC, Arts. 32–36; International Labour Organization, Worst Forms of Child Labour Convention, C182 (hereafter "ILO Convention on the Worst Forms of Child Labour"), http://www.unhcr.org/refworld/docid/3ddb6e0c4.html; Minimum Age Convention, C138, (hereafter "ILO Minimum Age Convention"), http://www.unhcr.org/refworld/docid/421216a34.html, Arts. 2 (3), 2(4).

AR.08207

forced prostitution and child pornography.[40] Such forms of persecution also encompass violations of survival and development rights as well as severe discrimination of children born outside strict family planning rules[41] and of stateless children as a result of loss of nationality and attendant rights. Some of the most common forms of child-specific persecution arising in the context of asylum claims are outlined in greater detail below.

### i. Under-age recruitment

19. There is a growing consensus regarding the ban on the recruitment and use of children below 18 years in armed conflict.[42] International humanitarian law prohibits the recruitment and participation in the hostilities of children under the age of 15 years whether in international[43] or non-international armed conflict.[44] Article 38 of the CRC reiterates State Parties' obligations under international humanitarian law. The Rome Statute of the International Criminal Court classifies as war crimes the enlistment and use of children under the age of 15 years into the armed forces at a time of armed conflict.[45] The Special Court for Sierra Leone has concluded that the recruitment of children under the age of 15 years into the armed forces constitutes a crime under general international law.[46]

20. The Optional Protocol to the CRC on the Involvement of Children in Armed Conflict provides that States parties shall take all feasible measures to ensure that members of their armed forces under the age of 18 years do not take part in hostilities, and ensure that persons under the age of 18 years are not compulsorily recruited into their armed forces.[47] The Optional Protocol contains an absolute prohibition against the recruitment or use, under any circumstances, of children who are less than 18 years old by armed groups that are distinct from the armed forces of a State.[48] It also amends Article 38 of the CRC by raising the minimum age of voluntary recruitment.[49] States also commit to use all feasible measures to prohibit and criminalize under-age recruitment and use of child soldiers by non-State armed groups.[50] The Committee on the Rights of the Child emphasizes that

> … under-age recruitment (including of girls for sexual services or forced marriage with the military) and direct or indirect participation in hostilities constitutes a serious human rights violation and thereby persecution, and should lead to the granting of refugee status where the well-founded fear of such recruitment or participation in hostilities is based on "reasons of race, religion, nationality, membership of a particular social group or political opinion" (article 1A (2),
>
> 1951 Refugee Convention).[51]

21. In UNHCR's view, forced recruitment and recruitment for direct participation in hostilities of a child below the age of 18 years into the armed forces of the State would amount to persecution. The same would apply in situations where a child is at risk of forced re-recruitment or would be punished for having evaded forced recruitment or deserted the State's armed forces. Similarly, the recruitment by a non-State armed group of any child below the age of 18 years would be considered persecution.

---

[40] CRC, Art. 34; Optional Protocol to the Convention on the Rights of the Child on the Sale of Children, Child Prostitution and Child Pornography, http://www.unhcr.org/refworld/docid/3ae6b38bc.html.
[41] See, for instance, *Xue Yun Zhang v. Gonzales*, No. 01-71623, U.S. Court of Appeals for the 9th Circuit, 26 May 2005, http://www.unhcr.org/refworld/docid/4b17c7082.html; *Chen Shi Hai, op. cit.*
[42] See UNICEF, The Paris Principles and Guidelines on Children Associated With Armed Forces or Armed Groups, Feb. 2007 (hereafter "The Paris Principles"). While not binding, they reflect a strong trend for a complete ban on under-age recruitment. See also UN Security Council resolution 1612 (2005) (on children in armed conflict), 26 July 2005, S/RES/1612, http://www.unhcr.org/refworld/docid/43f308d6c.html, para. 1; 1539 on the protection of children affected by armed conflict, S/RES/1539, 22 Apr. 2004, http://www.unhcr.org/refworld/docid/411236fd4.html.
[43] Protocol Additional to the Geneva Conventions of 12 August 1949, and relating to the Protection of Victims of International Armed Conflicts (Protocol I), http://www.unhcr.org/refworld/docid/3ae6b36b4.html, Art. 77(2).
[44] Protocol Additional to the Geneva Conventions of 12 August 1949, and relating to the Protection of Victims of Non-International Armed Conflicts (Protocol II), http://www.unhcr.org/refworld/docid/3ae6b37f40.html, Art. 4(3).
[45] UN General Assembly, *Rome Statute of the International Criminal Court*, A/CONF. 183/9, 17 July 1998 (hereafter "ICC Statute"), http://www.unhcr.org/refworld/docid/3ae6b3a84.html, Art. 8 (2) (b) [xxvi] and (e)[vii].
[46] See *Prosecutor v. Sam Hinga Norman*, Case No. SCSL-2004-14-AR72(E), Decision on Preliminary Motion Based on Lack of Jurisdiction (Child Recruitment), 31 May 2004, paras. 52–53; UN Security Council, Report of the Secretary-General on the establishment of a Special Court for Sierra Leone, 4 Oct. 2000, S/2000/915, http://www.unhcr.org/refworld/docid/3ae6afbf4.html, para. 17, which recognized the customary character of the prohibition of child recruitment.
[47] The Optional Protocol to the Convention on the Rights of the Child on the Involvement of Children in Armed Conflict, http:// www.unhcr.org/refworld/docid/47fdfb180.html, Arts. 1–2. There are currently 127 States Parties to the Optional Protocol. See also the African Charter, which establishes 18 years as the minimum age for all compulsory recruitment, Arts. 2 and 22.2, and the ILO Convention on the Worst Forms of Child Labour, which includes the forced recruitment of children under the age of 18, Arts. 2 and 3(a) in its definition of worst forms of child labor.
[48] Optional Protocol to the CRC on the Involvement of Children in Armed Conflict, Art. 4.
[49] *Ibid.*, Art. 3.
[50] *Ibid.*, Art. 4.
[51] CRC, *General Comment, No. 6*, para. 59. See also para. 58.

AR.08208

22. Voluntary recruitment of children above the age of 16 years by States is permissible under the Optional Protocol to the CRC on the Involvement of Children in Armed Conflict.[52] However, the recruiting State authorities have to put in place safeguards to ensure that the recruitment is voluntary, that it is undertaken with the informed consent of the parents and that the children who are so recruited are requested to produce satisfactory proof of age prior to their recruitment. In such cases, it is important to assess whether the recruitment was genuinely voluntary, bearing in mind that children are particularly susceptible to abduction, manipulation and force and may be less likely to resist recruitment. They may enlist under duress, in self-defence, to avoid harm to their families, to seek protection against unwanted marriages or sexual abuse within their homes, or to access basic means of survival, such as food and shelter. The families of children may also encourage them to participate in armed conflict, despite the risks and dangers.

23. In addition, children may have a well-founded fear of persecution arising from the treatment they are subjected to, and/or conduct they are required to engage in, by the armed forces or armed group. Boys and girls associated with armed forces or armed groups may be required to serve as cooks, porters, messengers, spies as well as to take direct part in the hostilities. Girls, in particular, may be forced into sexual relations with members of the military.[53] It is also important to bear in mind that children who have been released from the armed forces or group and return to their countries and communities of origin may be in danger of harassment, re-recruitment or retribution, including imprisonment or extra-judicial execution.

### ii. Child trafficking and labour

24. As recognized by several jurisdictions, trafficked children or children who fear being trafficked may have valid claims to refugee status.[54] UNHCR's Guidelines on Victims of Trafficking and Persons at Risk of Being Trafficked are equally applicable to an asylum claim submitted by a child. The particular impact of a trafficking experience on a child and the violations of child-specific rights that may be entailed also need to be taken into account.[55]

25. The trafficking of children occurs for a variety of reasons but all with the same overarching aim to gain profit through the exploitation of human beings.[56] In this context, it is important to bear in mind that any recruitment, transportation, transfer, harbouring or receipt of children for the purpose of exploitation is a form of trafficking regardless of the means used. Whether the child consented to the act or not is, therefore, irrelevant.[57]

26. The trafficking of a child is a serious violation of a range of fundamental rights and, therefore, constitutes persecution. These rights include the right to life, survival and development, the right to protection from all forms of violence, including sexual exploitation and abuse, and the right to protection from child labour and abduction, sale and trafficking, as specifically provided for by Article 35 of the CRC.[58]

27. The impact of reprisals by members of the trafficking network, social exclusion, ostracism and/or discrimination[59] against a child victim of trafficking who is returned to his/her home country needs to be assessed in a child-sensitive manner. For example, a girl who has been trafficked for sexual ex-

---

[52] Optional Protocol to the CRC on the Involvement of Children in Armed Conflict, Art. 3. States Parties are required to raise in years the minimum age for the voluntary recruitment from the age set out in Art. 38, para. 3 of the CRC, hence, from 15 to 16 years.

[53] These children define children associated with an armed force or group as follows: "A child associated with an armed force or armed group refers to any person below 18 years of age who is or who has been recruited or used by an armed force or armed group in any capacity, including but not limited to children, boys and girls, used as fighters, cooks, porters, messengers, spies or for sexual purposes. It does not only refer to a child who is taking or has taken a direct part in hostilities." Art. 2.1.

[54] See, for instance, *Ogbeide v. Secretary of State for the Home Department*, No. HX/08391/2002, U.K. IAT, 10 May 2002 (unreported); *Li and Others v. Minister of Citizenship and Immigration*, IMM-932-00, Canada, Federal Court, 11 Dec. 2000, http:// www.unhcr.org/refworld/docid/4b18d3682.html.

[55] See UNHCR, *Guidelines on Victims of Trafficking*. See also UNICEF, *Guidelines on the Protection of Child Victims of Trafficking*, Oct. 2006, http://www. unicef.org/ceecis/0610-Unicef_Victims_Guidelines_en.pdf, which make reference to refugee status for children who have been trafficked.

[56] These reasons include, but are not limited to, bonded child labour, debt repayment, sexual exploitation, recruitment by armed forces and groups, and irregular adoption. Girls, in particular, may be trafficked for the purpose of sexual exploitation or arranged marriage while boys may be particularly at risk of being trafficked for various forms of forced labour.

[57] For a definition of the scope of "trafficking", see the following international and regional instruments: Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, Supplementing the UN Convention against Transnational Organized Crime, 15 Nov. 2000, http://www. unhcr.org/refworld/docid/4720706c0.html, in particular Art. 3; Council of Europe Convention on Action against Trafficking in Human Beings, CETS No. 197, 3 May 2005 http://www.unhcr.org/refworld/ docid/43fded544.html.

[58] For a detailed analysis of the human rights framework relating to the trafficking of children, see UNICEF, *Implementation Handbook, op cit.*, in particular pp. 531–542.

[59] UNHCR, *Guidelines on Victims of Trafficking, op cit.*, paras. 17–18.

AR.08209

152

ploitation may end up being rejected by her family and become a social outcast in her community if returned. A boy, who has been sent away by his parents in the hope and expectation that he will study, work abroad and send remittances back to his family likewise may become excluded from his family if they learn that he has been trafficked into forced labour. Such child victims of trafficking may have very limited possibilities of accessing and enjoying their human rights, including survival rights, if returned to their homes.

28. In asylum cases involving child victims of trafficking, decision makers will need to pay particular attention to indications of possible complicity of the child's parents, other family members or caregivers in arranging the trafficking or consenting to it. In such cases, the State's ability and willingness to protect the child must be assessed carefully. Children at risk of being (re-)trafficked or of serious reprisals should be considered as having a well- founded fear of persecution within the meaning of the refugee definition.

29. In addition to trafficking, other worst forms of labour, such as slavery, debt bondage and other forms of forced labour, as well as the use of children in prostitution, pornography and illicit activities (for example, the drug trade) are prohibited by international law.[60] Such practices represent serious human rights violations and, therefore, would be considered persecution, whether perpetrated independently or as part of a trafficking experience.

30. International law also proscribes labour likely to harm the health, safety or morals of a child, also known as "hazardous work".[61] In determining whether labour is hazardous, the following working conditions need to be considered: work that exposes children to physical or mental violence; work that takes place underground, under water, at dangerous heights or in confined spaces; work that involves dangerous equipment or manual handling of heavy loads; long working hours and unhealthy environments.[62] Labour performed by a child under the minimum age designated for the particular kind of work and deemed likely to inhibit the child's education and full development is also prohibited according to international standards.[63] Such forms of labour could amount to persecution, as assessed according to the particular child's experience, his/her age and other circumstances. Persecution, for example, may arise where a young child is compelled to perform harmful labour that jeopardizes his/her physical and/or mental health and development.

### iii. Female genital mutilation

31. All forms of FGM[64] are considered harmful and violate a range of human rights,[65] as affirmed by international and national jurisprudence and legal doctrine. Many jurisdictions have recognized that FGM involves the infliction of grave harm amounting to persecution.[66] As the practice disproportionately affects the girl child,[67] it can be considered a child-specific form of persecution. For further information about FGM in the context of refugee status determination, see UNHCR Guidance Note on Refugee Claims relating to Female Genital Mutilation.[68]

### iv. Domestic violence against children

32. All violence against children, including physical, psychological and sexual violence, while in the care of parents or others, is prohibited by the CRC.[69] Violence against children may be perpetrated

---

[60] ILO Convention on the Worst Forms of Child Labour, Art. 3 (a–c).
[61] *Ibid.*, Art. 3(d).
[62] *Ibid.*, Art. 3(d). Ibid., Art. 4 in conjunction with ILO Worst Forms of Child Labour Recommendation, 1999, R190, http://www.unhcr.org/refworld/docid/3ddb6ef34.html, at 3 and 4.
[63] ILO Minimum Age Convention, Art. 2.
[64] FGM comprises all procedures involving partial or total removal of the external female genitalia or other injury to the female genital organs for non-medical reasons. See further, OHCHR, UNAIDS et al., *Eliminating Female Genital Mutilation: An Interagency Statement*, Feb. 2008, http://www.unhcr.org/refworld/docid/47c6aa6e2.html.
[65] These include the right to life, to protection from torture, and cruel, inhuman or degrading treatment, to protection from physical and mental violence and the right to the highest attainable standard of health.
[66] See, for instance, *Mlle Diop Aminata*, 164078, Commission des Recours des Réfugiés (hereafter "CRR"), France, 17 July 1991, http://www.unhcr.org/refworld/docid/3ae6b7294.html; *Khadra Hassan Farah, Mahad Dahir Buraleh, Hodan Dahir Buraleh*, Canada, IRB, 10 May 1994, http://www.unhcr.org/refworld/docid/3ae6b70618.html; *In re Fauziya Kasinga*, 3278, U.S. Board of Immigration Appeals (hereafter "BIA"), 13 June 1996, http://www.unhcr.org/refworld/docid/47bb00782.html.
[67] FGM is mostly carried out on girls up to 15 years of age, although older girls and women may also be subjected to the practice.
[68] UNHCR, *Guidance Note on FGM, op cit*.
[69] CRC, Arts. 19, 37.

AR.08210

**8**

in the private sphere by those who are related to them through blood, intimacy or law.[70] Although it frequently takes place in the name of discipline, it is important to bear in mind that parenting and caring for children, which often demand physical actions and interventions to protect the child, is quite distinct from the deliberate and punitive use of force to cause pain or humiliation.[71] Certain forms of violence, in particular against very young children, may cause permanent harm and even death, although perpetrators may not aim to cause such harm.[72] Violence in the home may have a particularly significant impact on children because they often have no alternative means of support.[73]

33. Some jurisdictions have recognized that certain acts of physical, sexual and mental forms of domestic violence may be considered persecution.[74] Examples of such acts include battering, sexual abuse in the household, incest, harmful traditional practices, crimes committed in the name of honour, early and forced marriages, rape and violence related to commercial sexual exploitation.[75] In some cases, mental violence may be as detrimental to the victim as physical harm and could amount to persecution. Such violence may include serious forms of humiliation, harassment, abuse, the effects of isolation and other practices that cause or may result in psychological harm.[76] Domestic violence may also come within the scope of torture and other cruel, inhuman and degrading treatment or punishment.[77] A minimum level of severity is required for it to constitute persecution. When assessing the level of severity of the harm, a number of factors such as the frequency, patterns, duration and impact on the particular child need to be taken into account. The child's age and dependency on the perpetrator as well as the long-term effects on the physical and psychological development and well-being of the child also need to be considered.

### v. Violations of economic, social and cultural rights

34. The enjoyment of economic, social and cultural rights is central to the child's survival and development.[78] The UN Committee on the Rights of the Child has stated that

> ... the right to survival and development can only be implemented in a holistic manner, through the enforcement of all the other provisions of the Convention, including rights to health, adequate nutrition, social security, an adequate standard of living, a healthy and safe environment, education and play.[79]

While the CRC and the 1966 Covenant on Economic, Social and Cultural Rights contemplate the progressive realization of economic, social and cultural rights, these instruments impose various obligations on States Parties which are of immediate effect.[80] These obligations include avoiding taking retrogressive measures, satisfying minimum core elements of each right and ensuring non-discrimination in the enjoyment of these rights.[81]

35. A violation of an economic, social or cultural right may amount to persecution where minimum core elements of that right are not realized. For instance, the denial of a street child's right to an adequate standard of living (including access to food, water and housing) could lead to an intolerable

---

[70] Declaration on the Elimination of Violence Against Women, http://www.unhcr.org/refworld/docid/3b00f25d2c.html, Art. 2(a).
[71] See CRC, *General Comment No. 8 (2006): The Right of the Child to Protection from Corporal Punishment and Other Cruel or Degrading Forms of Punishment (Arts. 19; 28, Para. 2; and 37, inter alia)*, CRC/C/GC/8, 2 Mar. 2007 (hereafter "CRC, *General Comment No. 8*"), http://www.unhcr.org/refworld/docid/460bc7772.html, paras. 13–14, 26.
[72] UN study on violence against children, *op. cit*., para. 40.
[73] See further UNICEF, *Domestic Violence Against Women and Girls*, Innocenti Digest No. 6, 2000, http://www.unicef-irc.org/publications/pdf/digest6e.pdf.
[74] See UNHCR, *Handbook for the Protection of Women and Girls*, Feb. 2008, http://www.unhcr.org/refworld/docid/47cfc2962.html, pp. 142–144. See also, for instance, *Rosalba Aguirre-Cervantes a.k.a. Maria Esperanza Castillo v. Immigration and Naturalization Service*, U.S. Court of Appeals for the 9th Circuit, 21 Mar. 2001, http://www.unhcr.org/refworld/docid/3f37adc24.html.
[75] UN Commission on Human Rights, Human Rights Resolution 2005/41: Elimination of violence against women, E/CN.4/ RES/2005/41, 19 Apr. 2005, http://www.unhcr.org/refworld/docid/45377c59c.html, para. 5.
[76] CRC, *General Comment No. 8, op cit.*, para. 11. See also UN study on violence against children, *op. cit*., para. 42; UNICEF, *Domestic Violence Against Women and Girls, op cit*., pp. 2–4.
[77] CRC, *General Comment No. 8, op cit*., para. 12; Human Rights Council, Report of the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment, A/HRC/7/3, 15 Jan. 2008, http://www.unhcr.org/refworld/docid/47c2c5452. html, paras. 45–49.
[78] CRC, Art. 6.2.
[79] CRC, *General Comment No. 7: Implementing Child Rights in Early Childhood*, CRC/C/GC/7/Rev.1, 20 Sep. 2006 (hereafter "CRC, *General Comment No. 7*") http://www.unhcr.org/refworld/docid/460bc5a62.html, para. 10.
[80] See CESCR, *General Comment No. 3: The Nature of States Parties' Obligations* (Art. 2, Para. 1, of the Covenant), E/1991/23, 14 Dec. 1990, http://www.unhcr.org/refworld/docid/4538838e10.html, para. 1; CRC, *General Comment No. 5*, para. 6.
[81] See UN Commission on Human Rights, Note verbale dated 86/12/05 from the Permanent Mission of the Netherlands to the United Nations Office at Geneva addressed to the Centre for Human Rights ("Limburg Principles"), 8 Jan. 1987, E/CN.4/1987/17 at B.16, 21–22, http://www.unhcr.org/refworld/docid/48abd5790.html; International Commission of Jurists, Maastricht Guidelines on Violations of Economic, Social and Cultural Rights, 26 Jan. 1997, http://www.unhcr.org/refworld/docid/48abd5730.html, at II.9 and 11.

AR.08211

predicament which threatens the development and survival of that child. Similarly, a denial of medical treatment, particularly where the child concerned suffers from a life-threatening illness, may amount to persecution.[82] Persecution may also be established through an accumulation of a number of less serious violations.[83] This could, for instance, be the case where children with disabilities or stateless children lack access to birth registration and, as a result, are excluded from education, health care and other services.[84]

36. Measures of discrimination may amount to persecution when they lead to consequences of a substantially prejudicial nature for the child concerned.[85] Children who lack adult care and support, are orphaned, abandoned or rejected by their parents, and are escaping violence in their homes may be particularly affected by such forms of discrimination. While it is clear that not all discriminatory acts leading to the deprivation of economic, social and cultural rights necessarily equate to persecution, it is important to assess the consequences of such acts for each child concerned, now and in the future. For example, bearing in mind the fundamental importance of education and the significant impact a denial of this right may have for the future of a child, serious harm could arise if a child is denied access to education on a systematic basis.[86] Education for girls may not be tolerated by society,[87] or school attendance may become unbearable for the child due to harm experienced on racial or ethnic grounds.[88]

### b) Agents of persecution

37. In child asylum claims, the agent of persecution is frequently a non-State actor. This may include militarized groups, criminal gangs, parents and other caregivers, community and religious leaders. In such situations, the assessment of the well-foundedness of the fear has to include considerations as to whether or not the State is unable or unwilling to protect the victim.[89] Whether or not the State or its agents have taken sufficient action to protect the child will need to be assessed on a case-by-case basis.

38. The assessment will depend not only on the existence of a legal system that criminalizes and provides sanctions for the persecutory conduct. It also depends on whether or not the authorities ensure that such incidents are effectively investigated and that those responsible are identified and appropriately punished.[90] Hence, the enactment of legislation prohibiting or denouncing a particular persecutory practice against children, in itself, is not sufficient evidence to reject a child's claim to refugee status.[91]

---

[82] See, for instance, *RRT Case No. N94/04178*, N94/04178, Australia, Refugee Review Tribunal (hereafter "RRT"), 10 June 1994, http://www.unhcr.org/refworld/docid/3ae6b6300.html.
[83] UNHCR, *Handbook, para. 53. See also Canada (Citizenship and Immigration) v. Oh*, 2009 FC 506, Canada, Federal Court, 22 May 2009, http://www.unhcr.org/refworld/docid/4a897a1c2.html, at 10.
[84] See *Case of the Yean and Bosico Children v. The Dominican Republic*, IACtHR, 8 Sep. 2005, http://www.unhcr.org/refworld/ docid/44e497d94.html. Two girls of Haitian origin were denied the right to nationality and education because, among other matters, they did not have a birth certificate; *Case of the "Juvenile Reeducation Institute" v. Paraguay*, IACtHR, 2 Sep. 2004, http://www. unhcr.org/refworld/docid/4b17bab62.html. The Court found that failure to provide severely marginalized groups with access to basic health-care services constitutes a violation of the right to life of the ACHR. See also, CRC, General Comment No. 7, para. 25; CRC, *General Comment No. 9 (2006): The Rights of children with disabilities*, CRC/C/GC/9, 27 Feb. 2007 (hereafter "CRC, *General Comment No. 9*"), http://www.unhcr.org/refworld/docid/461b93f72.html, paras. 35–36.
[85] UNHCR, *Handbook*, para. 54.
[86] See *RRT Case No. V95/03256*, [1995] RRTA 2263, Australia, RRT, 9 Oct. 1995, http://www.unhcr.org/refworld/docid/4b17c13a2. html, where the Tribunal found that "discriminatory denial of access to primary education is such a denial of a fundamental human right that it amounts to persecution." at 47.
[87] See *Ali v. Minister of Citizenship and Immigration*, IMM-3404-95, Canada, IRB, 23 Sep. 1996, http://www.unhcr.org/refworld/ docid/4b18e21b2. html, which concerned a 9 year-old girl from Afghanistan. The Court concluded that "Education is a basic human right and I direct the Board to find that she should be found to be a Convention refugee."
[88] Decisions in both Canada and Australia have accepted that bullying and harassment of school children may amount to persecution. See, for instance, *Decision VA1-02828, VA1-02826, VA1-02827 and VA1-02829, VA1-02828, VA1-02826, VA1-02827 and VA1-02829*, Canada, IRB, 27 Feb. 2003, http://www.unhcr.org/refworld/docid/4b18e03d2.html, para. 36; *RRT Case No. N03/46534*, [2003] RRTA 670, Australia, RRT, 17 July 2003, http://www.unhcr.org/refworld/docid/4b17bfd62.html.
[89] See CRC, Art. 3, which imposes a duty on States Parties to ensure the protection and care of children in respect of actions by both State and private actors; ACHR, Arts. 17 and 19; African Charter, Arts. 1(3), 81. See also UNHCR, *Handbook*, para. 65; UNHCR, *Guidelines on Gender-Related Persecution*, para. 19; *Advisory Opinion on Juridical Condition and Human Rights of the Child*, No. OC-17/02, IACtHR, 28 Aug. 2002, http://www.unhcr.org/refworld/docid/4268c57c4.html.
[90] See, for instance, *Velásquez Rodríguez Case*, Series C, No. 4, IACtHR, 29 July 1988, para. 174 http://www.unhcr.org/refworld/docid/40279a9e4. html; M.C. v. Bulgaria, Application No. 39272/98, ECtHR, 3 Dec. 2003, http://www.unhcr.org/refworld/ docid/47b19f492.html. See also UN Committee on the Elimination of Discrimination Against Women, General Recommendations Nos. 19 and 20, adopted at the Eleventh Session, 1992 (contained in Document A/47/38), A/47/38, 1992, http://www.unhcr.org/refworld/docid/453882a422.html, para. 9; UN Commission on Human Rights, The due diligence standard as a tool for the elimination of violence against women: Report of the Special Rapporteur on Violence against Women, Its Causes and Consequences, Yakin Ertürk, E/CN.4/2006/61, 20 Jan. 2006, http://www.unhcr.org/refworld/docid/45377afb0.html.
[91] UNHCR, *Guidelines on Gender-Related Persecution*, para. 11.

AR.08212

**8**

39. The child's access to State protection also depends on the ability and willingness of the child's parents, other primary caregiver or guardian to exercise rights and obtain protection on behalf of the child. This may include filing a complaint with the police, administrative authorities or public service institutions. However, not all children will have an adult who can represent them as is the case, for example, where the child is unaccompanied or orphaned, or where a parent, other primary caregiver or guardian is the agent of persecution. It is important to remember that, due to their young age, children may not be able to approach law enforcement officials or articulate their fear or complaint in the same way as adults. Children may be more easily dismissed or not taken seriously by the officials concerned, and the officials themselves may lack the skills necessary to interview and listen to children.

### c) The 1951 Convention grounds

40. As with adult claims to refugee status, it is necessary to establish whether or not the child's well-founded fear of persecution is linked to one or more of the five grounds listed in Article 1A(2) of the 1951 Convention. It is sufficient that the Convention ground be a factor relevant to the persecution, but it is not necessary that it be the sole, or even dominant, cause.

#### Race and nationality or ethnicity

41. Race and nationality or ethnicity is at the source of child asylum claims in many contexts. Policies that deny children of a particular race or ethnicity the right to a nationality or to be registered at birth,[92] or that deny children from particular ethnic groups their right to education or to health services would fall into this category. This Convention ground would apply similarly to policies that aim to remove children from their parents on the basis of particular racial, ethnic or indigenous backgrounds. Systematic targeting of girls belonging to ethnic minorities for rape, trafficking, or recruitment into armed forces or groups also may be analysed within this Convention ground.

#### Religion

42. As with an adult, the religious beliefs of a child or refusal to hold such beliefs may put him/her at risk of persecution. For a Convention ground to be established, it is not necessary that the child be an active practitioner. It is sufficient that the child simply be perceived as holding a certain religious belief or belonging to a sect or religious group, for example, because of the religious beliefs of his/her parents.[93]

43. Children have limited, if any, influence over which religion they belong to or observe, and belonging to a religion can be virtually as innate as one's ethnicity or race. In some countries, religion assigns particular roles or behaviour to children. As a consequence, if a child does not fulfil his/her assigned role or refuses to abide by the religious code and is punished as a consequence, s/he may have a well-founded fear of persecution on the basis of religion.

44. The reasons for persecution related to a child's refusal to adhere to prescribed gender roles may also be analysed under this ground. Girls, in particular, may be affected by persecution on the basis of religion. Adolescent girls may be required to perform traditional slave duties or to provide sexual services. They also may be required to undergo FGM or to be punished for honour crimes in the name of religion.[94] In other contexts, children – both boys and girls – may be specifically targeted to join armed groups or the armed forces of a State in pursuit of religious or related ideologies.

#### Political opinion

45. The application of the Convention ground of "political opinion" is not limited to adult claims. A claim based on political opinion presupposes that the applicant holds, or is assumed to hold, opin-

---

[92] Universal Declaration of Human Rights, http://www.unhcr.org/refworld/docid/3ae6b3712c.html, Art. 15; ICCPR, Arts 24(2) and (3); CRC, Art. 7.

[93] UNHCR, *Guidelines on International Protection No. 6: Religion-Based Refugee Claims under Article 1A(2) of the 1951 Convention and/or the 1967 Protocol relating to the Status of Refugees*, HCR/GIP/04/06, 28 Apr. 2004 (hereafter, "UNHCR, *Guidelines on Religion-Based Persecution*"), http://www.unhcr.org/refworld/docid/4090f9794.html.

[94] *Ibid.*, para. 24.

AR.08213

ions not tolerated by the authorities or society and that are critical of generally accepted policies, traditions or methods. Whether or not a child is capable of holding a political opinion is a question of fact and is to be determined by assessing the child's level of maturity and development, level of education, and his/her ability to articulate those views. It is important to acknowledge that children can be politically active and hold particular political opinions independently of adults and for which they may fear being persecuted. Many national liberation or protest movements are driven by student activists, including schoolchildren. For example, children may be involved in distributing pamphlets, participating in demonstrations, acting as couriers or engaging in subversive activities.

46. In addition, the views or opinions of adults, such as the parents, may be imputed to their children by the authorities or by non-State actors.[95] This may be the case even if a child is unable to articulate the political views or activities of the parent, including where the parent deliberately withholds such information from the child to protect him/her. In such circumstances, these cases should be analysed not only according to the political opinion ground but also in terms of the ground pertaining to membership of a particular social group (in this case, the "family").

47. The grounds of (imputed) political opinion and religion may frequently overlap in child asylum claims. In certain societies, the role ascribed to women and girls may be attributable to the requirements of the State or official religion. The authorities or other agents of persecution may perceive the failure of a girl to conform to this role as a failure to practice or to hold certain religious beliefs. At the same time, failure to conform could be interpreted as holding an unacceptable political opinion that threatens fundamental power structures. This may be the case particularly in societies where there is little separation between religious and State institutions, laws and doctrines.[96]

**Membership of a particular social group**

48. Children's claims to refugee status most often have been analysed in the context of the Convention ground of "membership of a particular social group", although any of the Convention grounds may be applicable. As stated in UNHCR's Guidelines

> [a] particular social group is a group of persons who share a common characteristic other than their risk of being persecuted, or who are perceived as a group by society. The characteristic will often be one which is innate, unchangeable, or which is otherwise fundamental to identity, conscience or the exercise of one's human rights.[97]

49. Although age, in strict terms, is neither innate nor permanent as it changes continuously, being a child is in effect an immutable characteristic at any given point in time. A child is clearly unable to disassociate him/herself from his/her age in order to avoid the persecution feared.[98] The fact that the child will eventually will grow older is irrelevant to the identification of a particular social group, as this is based on the facts as presented in the asylum claim. Being a child is directly relevant to one's identity, both in the eyes of society and from the perspective of the individual child. Many government policies are age-driven or age-related, such as the age for military conscription, the age for sexual consent, the age of marriage, or the age for starting and leaving school. Children also share many general characteristics, such as innocence, relative immaturity, impressionability and evolving capacities. In most societies, children are set apart from adults as they are understood to require special attention or care, and they are referred to by a range of descriptors used to identify or label them, such as "young", "infant", "child", "boy", "girl" or "adolescent". The identification of

[95] See *Matter of Timnit Daniel and Simret Daniel*, A70 483 789 & A70 483 774, U.S. BIA, 31 Jan. 2002 (unpublished, non- precedent setting decision). The Court found that the notion "that the respondents were too young to have an actual political opinion is irrelevant; it is enough that the officials believed that they supported the EPLF."

[96] UNHCR, *Guidelines on Gender-Related Persecution, op. cit.* para. 26.

[97] UNHCR, *Guidelines on International Protection No. 2: 'Membership of a Particular Social Group' within the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol Relating to the Status of Refugees*, HCR/GIP/02/02, 7 May 2002, http://www.unhcr.org/refworld/docid/3d36f23f4. html, para. 11.

[98] See *Matter of S-E-G-, et al.*, 24 I&N Dec. 579 (BIA 2008), U.S. BIA, 30 July 2008, http://www.unhcr.org/refworld/ docid/4891da5b2.html, which noted that "we acknowledge that the mutability of age is not within one's control, and that if an individual has been persecuted in the past on account of an age-described particular social group, or faces such persecution at a time when that individual's age places him within the group, a claim for asylum may still be cognizable." (p. 583); *LQ (Age: Immutable Characteristic) Afghanistan v. Secretary of State for the Home Department*, [2008] U.K. AIT 00005, 15 Mar. 2007, http:// www.unhcr.org/refworld/docid/47a04ac32.html, finding that the applicant, "although, assuming he survives, he will in due course cease to be a child, he is immutably a child at the time of assessment" at 6; *Decision V99-02929, V99-02929*, Canada, IRB, 21 Feb. 2000, http://www.unhcr.org/refworld/docid/4b18e5592.html, which found that "[t]he child's vulnerability arises as a result of his status as a minor. His vulnerability as a minor is an innate and unchangeable characteristic, notwithstanding the child will grow into an adult.

AR.08214

social groups also may be assisted by the fact that the children share a common socially-constructed experience, such as being abused, abandoned, impoverished or internally displaced.

50. A range of child groupings, thus, can be the basis of a claim to refugee status under the "membership of a particular social group" ground. Just as "women" have been recognized as a particular social group in several jurisdictions, "children" or a smaller subset of children may also constitute a particular social group.[99] Age and other characteristics may give rise to groups such as "abandoned children",[100] "children with disabilities", "orphans", or children born outside coercive family planning policies or of unauthorized marriages, also referred to as "black children".[101] The applicant's family may also constitute a relevant social group.[102]

51. The applicant's membership in a child-based social group does not necessarily cease to exist merely because his/her childhood ends. The consequences of having previously belonged to such a social group might not end even if the key factor of that identity (that is, the applicant's young age) is no longer applicable. For instance, a past shared experience may be a characteristic that is unchangeable and historic and may support the identification of groups such as "former child soldiers"[103] or "trafficked children" for the purposes of a fear of future persecution.[104]

52. Some of the more prominent social groupings include the following:

i.   **Street children** may be considered a particular social group. Children living and/or working on the streets are among the most visible of all children, often identified by society as social outcasts. They share the common characteristics of their youth and having the street as their home and/or source of livelihood. Especially for children who have grown up in such situations, their way of life is fundamental to their identity and often difficult to change. Many of these children have embraced the term "street children" as it offers them a sense of identity and belonging while they may live and/ or work on the streets for a range of reasons. They also may share past experiences such as domestic violence, sexual abuse, and exploitation or being orphaned or abandoned.[105]

ii.  **Children affected by HIV/AIDS,** including both those who are HIV-positive and those with an HIV-positive parent or other relative, may also be considered a particular social group. The fact of being HIV-positive exists independently of the persecution they may suffer as a consequence of their HIV status. Their status or that of their family may set them apart and, while manageable and/or treatable, their status is by and large unchangeable.[106]

iii. Where children are singled out as a target group for **recruitment or use by an armed force or group,** they may form a particular social group due to the innate and unchangeable nature of their age as well as the fact that they are perceived as a group by the society in which they live. As with adults, a child who evades the draft, deserts or otherwise refuses to become associated with an armed force may be perceived as holding a political opinion in which case the link to the Convention ground of political opinion may also be established.[107]

---

[99] In *In re Fauziya Kasinga, op. cit.*, it was held that "young women" may constitute a particular social group.

[100] In *V97-03500*, Canada, Convention Refugee Determination Division, 31 May 1999, it was accepted that abandoned children in Mexico can be a particular social group. (A summary is available at http://www2.irb-cisr.gc.ca/en/decisions/reflex/index_e. htm?action=article.view&id=1749). See also RRT Case No. 0805331, [2009] RRTA 347, Australia, RRT, 30 April 2009, http://www.unhcr.org/refworld/docid/4a2681692.html, where the Tribunal held that the applicant's (a two-year old child) particular social group was "children of persecuted dissidents".

[101] This has been affirmed in several decisions in Australia. See, for instance, *Chen Shi Hai, op. cit.* and more recently in RRT Case No. 0901642, [2009] RRTA 502, Australia, RRT, 3 June 2009, http://www.unhcr.org/refworld/docid/4a76ddbf2.html.

[102] See *Aguirre-Cervantes, op. cit.*, where the Court found that "[f]amily membership is clearly an immutable characteristic, fundamental to one's identity", and noted that "[t]he undisputed evidence demonstrates that Mr. Aguirre's goal was to dominate and persecute members of his immediate family."

[103] In *Lukwago v. Ashcroft, Attorney General*, 02-1812, U.S. Court of Appeals for the 3rd Circuit, 14 May 2003, http://www.unhcr. org/refworld/docid/47a7078c3.html, the Court found that "membership in the group of former child soldiers who have escaped LRA captivity fits precisely within the BIA's own recognition that a shared past experience may be enough to link members of a 'particular social group'."

[104] UNHCR, *Guidelines on Victims of Trafficking*, para. 39. See also, RRT Case No. N02/42226, [2003] RRTA 615, Australia, RRT, 30 June 2003, http://www.unhcr.org/refworld/docid/4b17c2b02.html, which concerned a young woman from Uzbekistan. The identified group was "Uzbekistani women forced into prostitution abroad who are perceived to have transgressed social mores."

[105] See, for instance, *Matter of B-F-O-*, A78 677 043, U.S. BIA, 6 Nov. 2001 (unpublished, non-precedent decision). The Court found that the applicant, who was an abandoned street child, had a well-founded fear of persecution based on membership in a particular social group. See also, *LQ (Age: Immutable Characteristic) Afghanistan v. Secretary of State for the Home Department, op. cit.* The Tribunal found that the applicant's fear of harm as an orphan and street child "would be as a result of his membership in a part of a group sharing an immutable characteristic and constituting, for the purposes of the Refugee Convention, a particular social group", at 7.

[106] See further, CRC, *General Comment No. 3: HIV/AIDS and the Rights of the Child*, 17 Mar. 2003, http://www.unhcr.org/refworld/docid/4538834e15.html.

[107] UNHCR, *Handbook*, paras. 169–171; UNHCR, *Guidelines on Religion-Based Persecution*, paras. 25–26.

AR.08215

#### d) Internal "flight" or "relocation" alternative

53. An assessment of the issue of internal flight alternative contains two parts: the relevance of such an inquiry, and the reasonableness of any proposed area of internal relocation.[108] The child's best interests inform both the relevance and reasonableness assessments.

54. As in the case of adults, internal relocation is only **relevant** where the applicant can access practically, safely and legally the place of relocation.[109] In particular with regard to gender-based persecution, such as domestic violence and FGM which are typically perpetrated by private actors, the lack of effective State protection in one part of the country may be an indication that the State may also not be able or willing to protect the child in any other part of the country.[110] If the child were to relocate, for example, from a rural to an urban area, the protection risks in the place of re-location would also need to be examined carefully, taking into account the age and coping capacity of the child.

55. In cases where an internal flight or relocation alternative is deemed relevant, a proposed site of internal relocation that may be **reasonable** in the case of an adult may not be reasonable in the case of a child. The "reasonableness test" is one that is applicant-specific and, thus, not related to a hypothetical "reasonable person". Age and the best interests of the child are among the factors to be considered in assessing the viability of a proposed place of internal relocation.[111]

56. Where children are unaccompanied and, therefore, not returning to the country of origin with family members or other adult support, special attention needs to be paid as to whether or not such relocation is reasonable. Internal flight or relocation alternatives, for instance, would not be appropriate in cases where unaccompanied children have no known relatives living in the country of origin and willing to support or care for them and it is proposed that they relocate to live on their own without adequate State care and assistance. What is merely inconvenient for an adult might well constitute undue hardship for a child, particularly in the absence of any friend or relation.[112] Such relocation may violate the human right to life, survival and development, the principle of the best interests of the child, and the right not to be subjected to inhuman treatment.[113]

57. If the only available relocation option is to place the child in institutional care, a proper assessment needs to be conducted of the care, health and educational facilities that would be provided and with regard to the long-term life prospects of adults who were institutionalized as children.[114] The treatment as well as social and cultural perceptions of orphans and other children in institutionalized care needs to be evaluated carefully as such children may be the subject of societal disapproval, prejudice or abuse, thus rendering the proposed site for relocation unreasonable in particular circumstances.

#### e) The application of exclusion clauses to children

58. The exclusion clauses contained in Article 1F of the 1951 Convention provide that certain acts are so grave that they render their perpetrators undeserving of international protection as refu-

---

[108] UNHCR, *Guidelines on International Protection No. 4: "Internal Flight or Relocation Alternative" Within the Context of Article 1A(2) of the 1951 Convention and/or 1967 Protocol Relating to the Status of Refugees*, HCR/GIP/03/04, 23 July 2003, http://www. unhcr.org/refworld/docid/3f2791a44.html.

[109] *Ibid.*, para. 7.

[110] *Ibid.*, para. 15.

[111] *Ibid.*, para. 25. See further factors in the CRC, *General Comment No. 6*, para. 84, on Return to Country of Origin. Although drafted with a different context in mind, these factors are equally relevant to an assessment of an internal flight/relocation alternative.

[112] See, for instance, *Elmi v. Minister of Citizenship and Immigration*, Canada, Federal Court, No. IMM-580-98, 12 Mar. 1999, http://www.unhcr.org/refworld/docid/4b17c5932.html.

[113] CRC, Arts. 3, 6 and 37. See also *Mubilanzila Mayeka and Kaniki Mitunga v. Belgium*, Application No. 13178/03, ECtHR, 12 Oct. 2006, http://www.unhcr.org/refworld/docid/45d5cef72.html, which concerned the return (not internal relocation) of an unaccompanied five-year old girl. The Court was "struck by the failure to provide adequate preparation, supervision and safeguards for her deportation", noting further that such "conditions was bound to cause her extreme anxiety and demonstrated such a total lack of humanity towards someone of her age and in her situation as an unaccompanied minor as to amount to inhuman treatment [violation of article 3 of the European Convention on Human Rights]", paras. 66, 69.

[114] See CRC, *General Comment No. 6*, para. 85. See also *Inter-Agency Guiding Principles, op cit.*, which notes that institutional care needs to be considered a last resort, as "residential institutions can rarely offer the developmental care and support a child requires and often cannot even provide a reasonable standard of protection", p. 46.

AR.08216

8

gees.[115] Since Article 1F is intended to protect the integrity of asylum, it needs to be applied "scrupulously". As with any exception to human rights guarantees, a restrictive interpretation of the exclusion clauses is required in view of the serious possible consequences of exclusion for the individual.[116] The exclusion clauses are exhaustively enumerated in Article 1F, and no reservations are permitted.[117]

59. In view of the particular circumstances and vulnerabilities of children, the application of the exclusion clauses to children always needs to be exercised with great caution. In the case of young children, the exclusion clauses may not apply at all. Where children are alleged to have committed crimes while their own rights were being violated (for instance while being associated with armed forces or armed groups), it is important to bear in mind that they may be victims of offences against international law and not just perpetrators.[118]

60. Although the exclusion clauses of Article 1F do not distinguish between adults and children, Article 1F can be applied to a child only if s/he has reached the age of criminal responsibility as established by international and/or national law at the time of the commission of the excludable act.[119] Thus, a child below such minimum age cannot be considered responsible for an excludable act.[120] Article 40 of the CRC requires States to establish a minimum age for criminal responsibility, but there is no universally recognized age limit.[121] In different jurisdictions, the minimum age ranges from 7 years to higher ages, such as 16 or 18 years, while the Statutes of the Special Court for Sierra Leone[122] and the International Criminal Court[123] set the cut-off age at 15 years and 18 years respectively.

61. In view of the disparities in establishing a minimum age for criminal responsibility by States and in different jurisdictions, the emotional, mental and intellectual maturity of any child over the relevant national age limit for criminal responsibility would need to be evaluated to determine whether s/he had the mental capacity to be held responsible for a crime within the scope of Article 1F. Such considerations are particularly important where the age limit is lower on the scale but is also relevant if there is no proof of age and it cannot be established that the child is at, or above, the age for criminal responsibility. The younger the child, the greater the presumption that the requisite mental capacity did not exist at the relevant time.

62. As with any exclusion analysis, a three-step analysis needs to be undertaken if there are indications that the child has been involved in conduct which may give rise to exclusion.[124] Such an analysis requires that: (i) the acts in question be assessed against the exclusion grounds, taking into account the nature of the acts as well as the context and all individual circumstances in which they occurred; (ii) it be established in each case that the child committed a crime which is covered by one of the sub-clauses of Article 1F, or that the child participated in the commission of such a crime in a manner

---

[115] UNHCR's interpretative legal guidance on the substantive and procedural standards for the application of Art. 1F is set out in UNHCR, *Guidelines on International Protection No. 5: Application of the Exclusion Clauses: Article 1F of the 1951 Convention relating to the Status of Refugees*, HCR/GIP/03/05, 4 Sep. 2003, (hereafter: "UNHCR, *Guidelines on Exclusion*") http://www.unhcr. org/refworld/docid/3f5857684.html; UNHCR, *Background Note on the Application of the Exclusion Clauses: Article 1F of the 1951 Convention relating to the Status of Refugees*, 4 Sep. 2003, (hereafter "UNHCR, *Background Note on Exclusion*"), http://www. unhcr.org/refworld/docid/3f58572d24.html; UNHCR, *Statement on Article 1F of the 1951 Convention*, July 2009, (hereafter "UNHCR, Statement on Article 1F"), http://www.unhcr.org/refworld/docid/4a5de2992.html; and UNHCR, *Handbook*, paras. 140–163.

[116] UNHCR, *Guidelines on Exclusion*, para. 2; UNHCR *Background Note on Exclusion*, para. 4. UNHCR, *Handbook* para. 149. See also ExCom Conclusions No. 82 (XLVIII), *Safeguarding Asylum*, 17 Oct. 1997, http://www.unhcr.org/refworld/docid/3ae68c958.html, para. (v); No. 102 (LVI) 2005, *General Conclusion on International Protection*, 7 Oct. 2005, http://www.unhcr.org/refworld/ docid/43575ce3e.html, para. (i); No. 103 (LVI), *Conclusion on the Provision on International Protection Including Through Complementary Forms of Protection*, 7 Oct. 2005, http://www.unhcr.org/refworld/docid/43576e292.html, para. (d).

[117] UNHCR, *Guidelines on Exclusion*, para. 3; UNHCR, *Background Note on Exclusion*, para. 7.

[118] The Paris Principles state: "Children who are accused of crimes under international law allegedly committed while they were associated with armed forces or armed groups should be considered primarily as victims of offences against international law; not only as perpetrators. They must be treated in accordance with international law in a framework of restorative justice and social rehabilitation, consistent with international law which offers children special protection through numerous agreements and principles," para. 3.6. It should also be noted that the prosecutor for the SCSL chose not to prosecute children between the ages of 15 and 18 years given that they themselves were victims of international crimes.

[119] UNHCR, *Guidelines on Exclusion*, para. 28.

[120] UNHCR, *Background Note on Exclusion*, para. 91. If the age of criminal responsibly is higher in the country of origin than in the host country, this should be taken into account in the child's favour.

[121] The Committee on the Rights of the Child urged States not to lower the minimum age to 12 years and noted that a higher age, such as 14 or 16 years, "contributes to a juvenile justice system which [...] deals with children in conflict with the law without resorting to judicial proceedings"; see, CRC, *General Comment No. 10 (2007): Children's Rights in Juvenile Justice*, CRC/C/GC/10, 25 Apr. 2007, http://www.unhcr.org/refworld/docid/4670fca12.html, para. 33. See also UN General Assembly, United Nations Standard Minimum Rules for the Administration of Juvenile Justice ("The Beijing Rules"), A/RES/40/33, 29 Nov. 1985, http://www. unhcr.org/refworld/docid/3b00f2203c.html, which provides that the "beginning of that age should not be fixed at a too low an age level bearing in mind the facts of emotional, mental and intellectual maturity", Art. 4.1.

[122] UN Security Council, Statute of the Special Court for Sierra Leone, 16 Jan. 2002, Art. 7.

[123] ICC Statute, Art. 26.

[124] For further information on exclusion concerning child soldiers, see UNHCR, *Advisory Opinion From the Office of the United Nations High Commissioner for Refugees (UNHCR) Regarding the International Standards for Exclusion From Refugee Status as Applied to Child Soldiers*, 12 Sep. 2005 (hereafter "UNHCR, Advisory Opinion on the Application of Exclusion Clauses to Child Soldiers"), http://www.unhcr.org/refworld/docid/440eac0a2.html.

AR.08217

which gives rise to criminal liability in accordance with internationally applicable standards; and (iii) it be determined, in cases where individual responsibility is established, whether the consequences of exclusion from refugee status are proportional to the seriousness of the act committed.[125]

63. It is important to undertake a thorough and individualized analysis of all circumstances in each case. In the case of a child, the exclusion analysis needs to take into account not only general exclusion principles but also the rules and principles that address the special status, rights and protection afforded to children under international and national law at all stages of the asylum procedure. In particular, those principles related to the best interest of the child, the mental capacity of children and their ability to understand and consent to acts that they are requested or ordered to undertake need to be considered. A rigorous application of legal and procedural standards of exclusion is also critical.[126]

64. Based on the above, the following considerations are of central importance in the application of the exclusion clauses to acts committed by children:

i.  When determining individual responsibility for excludable acts, the issue of whether or not a child has the necessary **mental state** (or *mens rea*), that is, whether or not the child acted with the requisite intent and knowledge to be held individually responsible for an excludable act, is a central factor in the exclusion analysis. This assessment needs to consider elements such as the child's emotional, mental and intellectual development. It is important to determine whether the child was sufficiently mature to understand the nature and consequences of his/her conduct and, thus, to commit, or participate in, the commission of the crime. Grounds for the absence of the *mens rea* include, for example, severe mental disabilities, involuntary intoxication, or immaturity.

ii.  If mental capacity is established, other grounds for **rejecting individual responsibility** need to be examined, notably whether the child acted under duress, coercion, or in defence of self or others. Such factors are of particular relevance when assessing claims made by former child soldiers. Additional factors to consider may include: the age at which the child became involved in the armed forces or group; the reasons for which s/he joined and left the armed forces or group; the length of time s/he was a member; the consequences of refusal to join the group; any forced use of drugs, alcohol or medication; the level of education and understanding of the events in question; and the trauma, abuse or ill-treatment suffered.[127]

iii.  Finally, if individual responsibility is established, it needs to be determined whether or not the consequences of exclusion from refugee status are proportional to the seriousness of the act committed.[128] This generally involves a weighing of the gravity of the offence against the degree of persecution feared upon return. If the applicant is likely to face severe persecution, the crime in question needs to be very serious in order to exclude him/her from refugee status. Issues for consideration include any mitigating or aggravating factors relevant to the case. When assessing a child's claim, even if the circumstances do not give rise to a defence, factors such as the age, maturity and vulnerability of the child are important considerations. In the case of child soldiers, such factors include ill-treatment by military personnel and circumstances during service. The consequences and treatment that the child may face upon return (i.e. serious human rights violations as a consequence of having escaped the armed forces or group) also need to be considered.

---

[125] UNHCR, *Statement on Article 1F*, p. 7.

[126] For a detailed analysis on procedural issues regarding exclusion, see UNHCR, *Guidelines on Exclusion*, paras. 31–36 and UNHCR, *Background Note on Exclusion*, paras. 98–113.

[127] Decisions in France have recognized that children who committed offences, which should in principle lead to the application of the exclusion clauses, may be exonerated if they were in particularly vulnerable situations. See, for instance, *459358, M.V.; Exclusion*, CRR, 28 Apr. 2005, http://www.unhcr.org/refworld/docid/43abf5cf4.html; *448119, M.C*, CRR, 28 Jan. 2005, http://www. unhcr.org/refworld/docid/4b17b5d92.html. See also, *MH (Syria) v. Secretary of State for the Home Department; DS (Afghanistan) v. Secretary of State for the Home Department*, [2009] EWCA Civ 226, Court of Appeal (U.K.), 24 Mar. 2009, http://www.unhcr. org/refworld/docid/49ca60ae2.html, para. 3. For detailed guidance on grounds rejecting individual responsibility, see, UNHCR *Guidelines on Exclusion*, paras. 21–24. UNHCR, *Background Note on Exclusion*, paras. 91–93. UNHCR, *Advisory Opinion on the Application of Exclusion Clauses to Child Soldiers, op cit*. pp. 10–12.

[128] For detailed guidance on proportionality see UNHCR, *Guidelines on Exclusion*, para. 24; UNHCR, *Background Note on Exclusion*, paras. 76–78.

AR-08218

## IV. PROCEDURAL AND EVIDENTIARY ISSUES

65. Due to their young age, dependency and relative immaturity, children should enjoy specific procedural and evidentiary safeguards to ensure that fair refugee status determination decisions are reached with respect to their claims.[129] The general measures outlined below set out minimum standards for the treatment of children during the asylum procedure. They do not preclude the application of the detailed guidance provided, for example, in the Action for the Rights of Children Resources Pack,[130] the Inter-Agency Guiding Principles on Unaccompanied and Separated Children and in national guidelines.[131]

66. Claims made by child applicants, whether they are accompanied or not, should normally be processed on a priority basis, as they often will have special protection and assistance needs. Priority processing means reduced waiting periods at each stage of the asylum procedure, including as regards the issuance of a decision on the claim. However, before the start of the procedure, children require sufficient time in which to prepare for and reflect on rendering the account of their experiences. They will need time to build trusting relationships with their guardian and other professional staff and to feel safe and secure. Generally, where the claim of the child is directly related to the claims of accompanying family members or the child is applying for derivative status, it will not be necessary to prioritise the claim of the child unless other considerations suggest that priority processing is appropriate.[132]

67. There is no general rule prescribing in whose name a child's asylum claim ought to be made, especially where the child is particularly young or a claim is based on a parent's fear for their child's safety. This will depend on applicable national regulations. Sufficient flexibility is needed, nevertheless, to allow the name of the principal applicant to be amended during proceedings if, for instance, it emerges that the more appropriate principal applicant is the child rather than the child's parent. This flexibility ensures that administrative technicalities do not unnecessarily prolong the process.[133]

68. For unaccompanied and separated child applicants, efforts need to be made as soon as possible to initiate tracing and family reunification with parents or other family members. There will be exceptions, however, to these priorities where information becomes available suggesting that tracing or reunification could put the parents or other family members in danger, that the child has been subjected to abuse or neglect, and/ or where parents or family members may be implicated or have been involved in their persecution.[134]

69. An independent, qualified guardian needs to be appointed immediately, free of charge in the case of unaccompanied or separated children. Children who are the principal applicants in an asylum procedure are also entitled to a legal representative.[135] Such representatives should be properly trained and should support the child throughout the procedure.

70. The right of children to express their views and to participate in a meaningful way is also important in the context of asylum procedures.[136] A child's own account of his/her experience is often essential

---

[129] The relevant applicable age for children to benefit from the additional procedural safeguards elaborated in this section is the date the child seeks asylum and not the date a decision is reached. This is to be distinguished from the substantive assessment of their refugee claim in which the prospective nature of the inquiry requires that their age at the time of the decision may also be relevant.

[130] Action for the rights of children, *ARC Resource Pack, a capacity building tool for child protection in and after emergencies*, produced by Save the Children, UNHCR, UNICEF, OHCHR, International Rescue Committee and Terre des Hommes, 7 Dec. 2009, http://www.savethechildren.net/arc.

[131] See, for instance, U.K. Asylum Instruction, *Processing an Asylum Application from a Child*, 2 Nov. 2009, http://www.bia.homeoffice.gov.uk/sitecontent/documents/policyandlaw/asylumprocessguidance/specialcases/guidance/ processingasylumapplication1.pdf?view=Binary; U.K. Border Agency Code of Practice for Keeping Children Safe from Harm, Dec. 2008, http://www.unhcr.org/refworld/docid/4948f8662.html; Finland, Directorate of Immigration, *Guidelines for Interviewing (Separated) Minors*, Mar. 2002, http://www.unhcr.org/refworld/docid/430ae8d72.html; U.S. *Guidelines For Children's Asylum Claims, op cit.*; Canada, IRB, *Guidelines Issued by the Chairperson Pursuant to Section 65(4) of the Immigration Act: Guideline 3 – Child Refugee Claimants: Procedural and Evidentiary Issues*, 30 Sep. 1996, No. 3, http://www.unhcr.org/refworld/docid/3ae6b31d3b.html.

[132] UNHCR, *Procedural Standards for Refugee Status Determination Under UNHCR's Mandate*, 20 Nov. 2003, http://www.unhcr.org/refworld/docid/42d-66dd84.html, pages 3.25, 4.21–4.23.

[133] This is especially relevant in relation to claims, such as FGM or forced marriage, where parents flee with their child in fear for his/her life although the child may not fully comprehend the reason for flight.

[134] Family tracing and reunification have been addressed in a number of ExCom Conclusions, including most recently in ExCom, *Conclusion No. 107*, para. (h)(iii). See also UNHCR, *Guidelines on Determining the Best Interests of the Child, op cit.*; CRC, *General Comment No. 6*, para. 81.

[135] "Guardian" here refers to an independent person with specialized skills who looks after the child's best interests and general well-being. Procedures for the appointment of a guardian must not be less favourable than the existing national administrative or judicial procedures used for appointing guardians for children who are nationals in the country. "Legal representative" refers to a lawyer or other person qualified to provide legal assistance to, and inform, the child in the asylum proceedings and in relation to contacts with the authorities on legal matters. See ExCom, *Conclusion No. 107*, para. (g)(viii). For further details, see CRC, *General Comment No. 6*, paras. 33–38, 69. See also UNHCR, *Guidelines on Unaccompanied Children Seeking Asylum, op cit.*, p. 2 and paras. 4.2, 5.7, 8.3, 8.5.

[136] CRC, Art. 12. The CRC does not set any lower age limit on children's right to express their views freely as it is clear that children can and do form views from a very early age.

AR.08219

for the identification of his/her individual protection requirements and, in many cases, the child will be the only source of this information. Ensuring that the child has the opportunity to express these views and needs requires the development and integration of safe and child-appropriate procedures and environments that generate trust at all stages of the asylum process. It is important that children be provided with all necessary information in a language and manner they understand about the possible existing options and the consequences arising from them.[137] This includes information about their right to privacy and confidentiality enabling them to express their views without coercion, constraint or fear of retribution.[138]

71. Appropriate communication methods need to be selected for the different stages of the procedure, including the asylum interview, and need to take into account the age, gender, cultural background and maturity of the child as well as the circumstances of the flight and mode of arrival.[139] Useful, non-verbal communication methods for children might include playing, drawing, writing, role-playing, story-telling and singing. Children with disabilities require "whatever mode of communication they need to facilitate expressing their views".[140]

72. Children cannot be expected to provide adult-like accounts of their experiences. They may have difficulty articulating their fear for a range of reasons, including trauma, parental instructions, lack of education, fear of State authorities or persons in positions of power, use of ready-made testimony by smugglers, or fear of reprisals. They may be too young or immature to be able to evaluate what information is important or to interpret what they have witnessed or experienced in a manner that is easily understandable to an adult. Some children may omit or distort vital information or be unable to differentiate the imagined from reality. They also may experience difficulty relating to abstract notions, such as time or distance. Thus, what might constitute a lie in the case of an adult might not necessarily be a lie in the case of a child. It is, therefore, essential that examiners have the necessary training and skills to be able to evaluate accurately the reliability and significance of the child's account.[141] This may require involving experts in interviewing children outside a formal setting or observing children and communicating with them in an environment where they feel safe, for example, in a reception centre.

73. Although the burden of proof usually is shared between the examiner and the applicant in adult claims, it may be necessary for an examiner to assume a greater burden of proof in children's claims, especially if the child concerned is unaccompanied.[142] If the facts of the case cannot be ascertained and/or the child is incapable of fully articulating his/her claim, the examiner needs to make a decision on the basis of all known circumstances, which may call for a liberal application of the benefit of the doubt.[143] Similarly, the child should be given the benefit of the doubt should there be some concern regarding the credibility of parts of his/her claim.[144]

74. Just as country of origin information may be gender-biased to the extent that it is more likely to reflect male as opposed to female experiences, the experiences of children may also be ignored. In addition, children may have only limited knowledge of conditions in the country of origin or may be unable to explain the reasons for their persecution. For these reasons, asylum authorities need to make special efforts to gather relevant country of origin information and other supporting evidence.

75. Age assessments are conducted in cases when a child's age is in doubt and need to be part of a comprehensive assessment that takes into account both the physical appearance and the psychological maturity of the individual.[145] It is important that such assessments are conducted in a safe, child- and gender-sensitive manner with due respect for human dignity. The margin of appreciation inherent to all age-assessment methods needs to be applied in such a manner that,

---

[137] CRC, *General Comment No. 6*, para. 25; CRC, *General Comment No. 12*, paras. 123–124.
[138] CRC, Arts. 13, 17.
[139] Separated Children in Europe Programme, *SCEP Statement of Good Practice*, Third edition, 2004, http://www.unhcr.org/refworld/docid/415450694.html, para. 12.1.3.
[140] CRC, *General Comment No. 9*, para. 32.
[141] ExCom, *Conclusion No. 107*, para. (d).
[142] *Ibid.*, para. (g)(viii), which recommends that States develop adapted evidentiary requirements.
[143] UNHCR, *Handbook*, paras. 196, 219.
[144] *Inter-Agency Guiding Principles, op. cit.*, p. 61.
[145] ExCom, *Conclusion No. 107*, para. (g)(ix).

AR.08220

in case of uncertainty, the individual will be considered a child.[146] As age is not calculated in the same way universally or given the same degree of importance, caution needs to be exercised in making adverse inferences of credibility where cultural or country standards appear to lower or raise a child's age. Children need to be given clear information about the purpose and process of the age-assessment procedure in a language they understand. Before an age assessment procedure is carried out, it is important that a qualified independent guardian is appointed to advise the child.

76. In normal circumstances, DNA testing will only be done when authorized by law and with the consent of the individuals to be tested, and all individuals will be provided with a full explanation of the reasons for such testing. In some cases, however, children may not be able to consent due to their age, immaturity, inability to understand what this entails or for other reasons. In such situations, their appointed guardian (in the absence of a family member) will grant or deny consent on their behalf taking into account the views of the child. DNA tests should be used only where other means for verification have proven insufficient. They may prove particularly beneficial in the case of children who are suspected of having been trafficked by individuals claiming to be parents, siblings or other relatives.[147]

77. Decisions need to be communicated to children in a language and in a manner they understand. Children need to be informed of the decision in person, in the presence of their guardian, legal representative, and/or other support person, in a supportive and non-threatening environment. If the decision is negative, particular care will need to be taken in delivering the message to the child and explaining what next steps may be taken in order to avoid or reduce psychological stress or harm.

---

[146] *Ibid.*, para. (g)(ix); UNHCR, *Guidelines on Policies and Procedures in Dealing with Unaccompanied Children Seeking Asylum, op cit.*, paras. 5.11, 6.
[147] UNHCR, *Note on DNA Testing to Establish Family Relationships in the Refugee Context*, June 2008, http://www.unhcr.org/ref<span>AR_0822</span>48620c2d2.html.

**UNHCR**
United Nations High Commissioner for Refugees
Haut Commissariat des Nations Unies pour les réfugiés

| Distr. GENERAL | HCR/GIP/12/09 | 23 October 2012 | Original: ENGLISH |

# GUIDELINES ON INTERNATIONAL PROTECTION NO. 9:

**9**

## Claims to Refugee Status based on Sexual Orientation and/or Gender Identity within the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol relating to the Status of Refugees

UNHCR issues these Guidelines pursuant to its mandate, as contained in the *Statute of the Office of the United Nations High Commissioner for Refugees*, in conjunction with Article 35 of the *1951 Convention relating to the Status of Refugees* and Article II of its *1967 Protocol*. These Guidelines complement the *UNHCR Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention* (Reissued, Geneva, 2011). In particular, they should be read in conjunction with *UNHCR's Guidelines on International Protection No.1: Gender-Related Persecution within the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol relating to the Status of Refugees* (May 2002); *UNHCR's Guidelines on International Protection No. 2: "Membership of a Particular Social Group" Within the Context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol Relating to the Status of Refugees* (May 2002); and *UNHCR's Guidelines on International Protection No. 6: Religion-Based Refugee Claims under Article 1A(2) of the 1951 Convention and/or the 1967 Protocol relating to the Status of Refugees* (April 2004). They replace *UNHCR's Guidance Note on Refugee Claims relating to Sexual Orientation and Gender Identity* (November 2008).

These Guidelines are intended to provide legal interpretative guidance for governments, legal practitioners, decision makers and the judiciary, as well as UNHCR staff carrying out refugee status determination under its mandate.

The *UNHCR Handbook on Procedures and Criteria for Determining Refugee Status and the Guidelines on International Protection* are available as a compilation at: http://www.unhcr.org/refworld/docid/4f33c8d92.html.

AR.08222

## I. INTRODUCTION

1. In many parts of the world, individuals experience serious human rights abuses and other forms of persecution due to their actual or perceived sexual orientation and/or gender identity. While persecution of Lesbian, Gay, Bisexual, Transgender and Intersex (hereafter "LGBTI")[1] individuals and those perceived to be LGBTI is not a new phenomenon,[2] there is greater awareness in many countries of asylum that people fleeing persecution for reasons of their sexual orientation and/or gender identity can qualify as refugees under Article 1A(2) of the 1951 Convention relating to the Status of Refugees and/or its 1967 Protocol (hereafter the "1951 Convention").[3] Nevertheless, the application of the refugee definition remains inconsistent in this area.

2. It is widely documented that LGBTI individuals are the targets of killings, sexual and gender-based violence, physical attacks, torture, arbitrary detention, accusations of immoral or deviant behaviour, denial of the rights to assembly, expression and information, and discrimination in employment, health and education in all regions around the world.[4] Many countries maintain severe criminal laws for consensual same-sex relations, a number of which stipulate imprisonment, corporal punishment and/or the death penalty.[5] In these and other countries, the authorities may not be willing or able to protect individuals from abuse and persecution by non-State actors, resulting in impunity for perpetrators and implicit, if not explicit, tolerance of such abuse and persecution.

3. Intersecting factors that may contribute to and compound the effects of violence and discrimination include sex, age, nationality, ethnicity/race, social or economic status and HIV status. Due to these multiple layers of discrimination, LGBTI individuals are often highly marginalized in society and isolated from their communities and families. It is also not uncommon for some individuals to harbour feelings of shame and/or internalized homophobia. Because of these and other factors, they may be inhibited from informing asylum adjudicators that their real fear of persecution relates to their sexual orientation and/or gender identity.

4. The experiences of LGBTI persons vary greatly and are strongly influenced by their cultural, economic, family, political, religious and social environment. The applicant's background may impact the way he or she expresses his or her sexual orientation and/or gender identity, or may explain the reasons why he or she does not live openly as LGBTI. It is important that decisions on LGBTI refugee claims are not based on superficial understandings of the experiences of LGBTI persons, or on erroneous, culturally inappropriate or stereotypical assumptions. These Guidelines provide substantive and procedural guidance on the determination of refugee status of individuals on the basis of their sexual orientation and/or gender identity, with a view to ensuring a proper and harmonized interpretation of the refugee definition in the 1951 Convention.[6]

## II. INTERNATIONAL HUMAN RIGHTS LAW

5. Article 1 of the Universal Declaration of Human Rights provides that "all human beings are born free and equal in dignity and rights", and Article 2 declares that "everyone is entitled to all the rights and freedoms

---

[1] For a discussion of terms, see below at III. Terminology. For the purpose of these Guidelines, "gender identity" also incorporates "intersex".

[2] The 1951 Convention relating to the Status of Refugees was drafted not least as a response to the persecution during World War II, during which intolerance and violence cost the lives of thousands of people with a LGBTI background. See, UNHCR, "Summary Conclusions: Asylum-Seekers and Refugees Seeking Protection on Account of their Sexual Orientation and Gender Identity", November 2010, Expert Roundtable organized by UNHCR, Geneva, Switzerland, 30 September–1 October 2010 (hereafter "UNHCR, Summary Conclusions of Roundtable"), available at: http://www.unhcr.org/refworld/docid/4cff99a42.html, para. 3.

[3] UN General Assembly, Convention Relating to the Status of Refugees, 28 July 1951; Protocol Relating to the Status of Refugees, 31 January 1967.

[4] See, UN Human Rights Council, "Report of the United Nations High Commissioner for Human Rights on Discriminatory Laws and Practices and Acts of Violence against Individuals based on their Sexual Orientation and Gender Identity", 17 November 2011 (hereafter "OHCHR, Report on Sexual Orientation and Gender Identity"), available at: http://www.unhcr.org/refworld/docid/4ef092022.html. For an overview of jurisprudence and doctrine, see also International Commission of Jurists (hereafter "ICJ"), *Sexual Orientation and Gender Identity in Human Rights Law, References to Jurisprudence and Doctrine of the United Nations Human Rights System*, 2010, fourth updated edition, available at: http://www.unhcr.org/refworld/docid/4c627bd82.html; ICJ, *Sexual Orientation and Gender Identity in Human Rights Law, Jurisprudential, Legislative and Doctrinal References from the Council of Europe and the European Union*, October 2007, available at: http://www.unhcr.org/refworld/docid/4a54bbb5d.html; ICJ, *Sexual Orientation and Gender Identity in Human Rights Law: References to Jurisprudence and Doctrine of the Inter-American System*, July 2007, available at: http://www.unhcr.org/refworld/docid/4ad5b83a2.html.

[5] See, International Lesbian, Gay, Bisexual, Trans and Intersex Association, "State-sponsored Homophobia, A World Survey of Laws Prohibiting Same-Sex Activity between Consenting Adults", May 2012, available at: http://old.ilga.org/Statehomophobia/ILGA_State_Sponsored_Homophobia_2012.pdf.

[6] These Guidelines supplement the UNHCR "Guidelines on International Protection No. 1: Gender-Related Persecution Within the Context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol Relating to the Status of Refugees", 7 May 2002 (hereafter "UNHCR, Guidelines on Gender-Related Persecution"), available at: http://www.unhcr.org/refworld/docid/3d36f1c64.html

AR.08223

set forth in this Declaration".[7] All people, including LGBTI individuals, are entitled to enjoy the protection provided for by international human rights law on the basis of equality and non-discrimination.[8]

6. Although the main international human rights treaties do not explicitly recognize a right to equality on the basis of sexual orientation and/or gender identity,[9] discrimination on these grounds has been held to be prohibited by international human rights law.[10] For example, the proscribed grounds of "sex" and "other status" contained in the non-discrimination clauses of the main international human rights instruments have been accepted as encompassing sexual orientation and gender identity.[11] As respect for fundamental rights as well as the principle of non-discrimination are core aspects of the 1951 Convention and international refugee law,[12] the refugee definition must be interpreted and applied with due regard to them, including the prohibition on discrimination on the basis of sexual orientation and gender identity.

7. The Yogyakarta Principles on the Application of International Human Rights Law in relation to Sexual Orientation and Gender Identity were adopted in 2007 by a group of human rights experts and, although not binding, reflect well-established principles of international law.[13] They set out the human rights protection framework applicable in the context of sexual orientation and/or gender identity. Principle 23 outlines the right to seek and enjoy asylum from persecution related to sexual orientation and/or gender identity:

> Everyone has the right to seek and enjoy in other countries asylum from persecution, including persecution related to sexual orientation or gender identity. A State may not remove, expel or extradite a person to any State where that person may face a well-founded fear of torture, persecution, or any other form of cruel, inhuman or degrading treatment or punishment, on the basis of sexual orientation or gender identity.

## III. TERMINOLOGY

8. These Guidelines are intended to be inclusive of and relevant to the range of claims relating to sexual orientation and/or gender identity. The concepts of sexual orientation and gender identity are outlined in the Yogyakarta Principles and this terminology is also used for the purposes of these Guidelines. Sexual orientation refers to: "each person's capacity for profound emotional, affectional and sexual attraction to, and intimate relations with, individuals of a different gender or the same gender or more than one gender".[14] Gender identity refers to: "each person's deeply felt internal and individual experience of gender, which may or may not correspond with the sex assigned at birth, including the personal sense of the body and other expressions of gender, including dress, speech and mannerisms".[15]

9. Sexual orientation and gender identity are broad concepts which create space for self-identification. Research over several decades has demonstrated that sexual orientation can range along a continuum, including exclusive and non-exclusive attraction to the same or the opposite sex.[16] Gender identity and its expression also take many forms, with some individuals identifying neither as male nor female, or as both. Whether one's sexual orientation is determined

---

[7] UN General Assembly, Universal Declaration of Human Rights, 10 December 1948.
[8] OHCHR, Report on Sexual Orientation and Gender Identity, para. 5.
[9] However, some regional instruments expressly prohibit discrimination on grounds of sexual orientation. See, for example, Charter of Fundamental Rights of the European Union, Article 21, 18 December 2000, and Resolution of the Organization of American States, Human Rights, Sexual Orientation, and Gender Identity, AG/RES. 2721 (XLII-O/12), 4 June 2012.
[10] "[D]iscrimination' as used in the Covenant [on Civil and Political Rights] should be understood to imply any distinction, exclusion, restriction or preference which is based on any ground such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status, and which has the purpose or effect of nullifying or impairing the recognition, enjoyment or exercise by all persons, on an equal footing, of all rights and freedoms.", UN Human Rights Committee, CCPR General Comment No. 18: Non-Discrimination, 10 November 1989, available at: http://www.unhcr.org/refworld/docid/453883fa8.html, para. 7.
[11] The UN Human Rights Committee held in 1994 in the landmark decision *Toonen v. Australia* that the International Covenant on Civil and Political Rights (adopted by the UN General Assembly on 16 December 1966, hereafter "ICCPR") prohibits discrimination on the grounds of sexual orientation, see CCPR/C/50/D/488/1992, 4 April 1994, (hereafter "*Toonen v. Australia*") available at: http://www.unhcr.org/refworld/docid/48298b8d2.html. This has subsequently been affirmed by several other UN human rights treaty bodies, including also recognition that gender identity is among the prohibited grounds of discrimination. See further, OHCHR, Report on Sexual Orientation and Gender Identity, para. 7.
[12] 1951 Convention, Preambular para. 1, Article 3.
[13] ICJ, Yogyakarta Principles - Principles on the Application of International Human Rights Law in relation to Sexual Orientation and Gender Identity, (hereafter "Yogyakarta Principles"), March 2007, available at: http://www.unhcr.org/refworld/docid/48244e602.html.
[14] Yogyakarta Principles, Preamble.
[15] Ibid.
[16] American Psychological Association, "Sexual Orientation and Homosexuality" (hereafter "APA, Sexual Orientation and Homosexuality"), available at: http://www.apa.org/helpcenter/sexual-orientation.aspx.

AR.08224

by, *inter alia*, genetic, hormonal, developmental, social, and/or cultural influences (or a combination thereof), most people experience little or no sense of choice about their sexual orientation.[17] While for most people sexual orientation or gender identity are determined at an early age, for others they may continue to evolve across a person's lifetime. Different people realize at different points in their lives that they are LGBTI and their sexual and gender expressions may vary with age, and other social and cultural determinants.[18]

10. Refugee claims based on sexual orientation and/or gender identity often emanate from members of specific sub-groups, that is, lesbian, gay, bisexual, transgender, intersex and queer[19] individuals (usually abbreviated as "LGBT", "LGBTI" or "LGBTIQ"[20]). The experiences of members of these various groups will often be distinct from one another; and, as noted above at paragraph 4, *between* members. It is, therefore, essential that decision makers understand both the context of each refugee claim, as well as individual narratives that do not easily map onto common experiences or labels.[21]

### Lesbian

A *lesbian* is a woman whose enduring physical, romantic and/or emotional attraction is to other women. Lesbians often suffer multiple discrimination due to their gender, their often inferior social and/or economic status, coupled with their sexual orientation. Lesbians are commonly subjected to harm by non-State actors, including acts such as "corrective" rape, retaliatory violence by former partners or husbands, forced marriage, and crimes committed in the name of "honour" by family members. Some lesbian refugee applicants have not had any experiences of past persecution; for example, if they have had few or no lesbian relationships. Lesbians may have had heterosexual relationships, often, but not necessarily, because of social pressures to marry and bear children. They may only later in life enter into a lesbian relationship or identify as lesbian. As in all refugee claims, it is important to ensure that the assessment of her fear of persecution is future-looking and that decisions are not based on stereotypical notions of lesbians.

### Gay men

*Gay* is often used to describe a man whose enduring physical, romantic and/or emotional attraction is to other men, although gay can also be used to describe both gay men and women (lesbians). Gay men numerically dominate sexual orientation and gender identity refugee claims, yet their claims should not be taken as a "template" for other cases on sexual orientation and/or gender identity. Gay men are often more visible than other LGBTI groups in public life in many societies and can become the focus of negative political campaigns. It is important, however, to avoid assumptions that all gay men are public about their sexuality or that all gay men are effeminate. Having defied masculine privilege by adopting roles and characteristics viewed as "feminine", gay men may be viewed as "traitors", whether they are effeminate or not. They could be at particular risk of abuse in prisons, the military[22] and other traditionally male dominated environments and job sites. Some gay men may also have had heterosexual relationships because of societal pressures, including to marry and/or have children.

### Bisexual

*Bisexual* describes an individual who is physically, romantically and/or emotionally attracted to both men and women. The term bisexuality tends to be interpreted and applied inconsistently, often with a too narrow understanding. Bisexuality does not have to involve attraction to both sexes at the same time, nor does it have to involve equal attraction to or number of relationships with both sexes. Bisexuality is a unique identity, which requires an examination in its own right. In some countries persecution may be directed expressly at gay or lesbian conduct, but nevertheless encompass acts of individuals who identify as bisexual. Bisexuals often describe their sexual orientation as "fluid" or "flexible" (see further below at paragraph 47).

---

[17] There is no consensus among scientists about the exact reasons that an individual develops a particular sexual orientation. See, APA, Sexual Orientation and Homosexuality.

[18] *Application No. 76175*, New Zealand Appeals Authority, 30 April 2008, available at: http://www.unhcr.org/refworld/docid/482422f62.html, para. 92.

[19] *Queer* is traditionally a pejorative term, however, it has been appropriated by some LGBT people to describe themselves.

[20] UNHCR has opted to refer to "LGBTI" individuals, which is intended to be inclusive of a wide range of individuals who fear persecution for reasons of their sexual orientation and/or gender identity. See further, UNHCR, *Working with Lesbian, Gay, Bisexual, Transgender & Intersex Persons in Forced Displacement*, 2011, available at: http://www.unhcr.org/refworld/docid/4e6073972.html. For further information on terminology, see, for example, Gay & Lesbian Alliance Against Defamation, "Media Reference Guide: A Resource for Journalists", updated May 2010, available at: http://www.glaad.org/reference.

[21] Considerations relating to each group are also integrated elsewhere in these Guidelines.

[22] See, for example, *RRT Case No. 060931294*, [2006] RRTA 229, Australia, RRTA, 21 December 2006, available at: http://www.unhcr.org/refworld/docid/47a707ebd.html; *MS (Risk – Homosexuality – Military Service) Macedonia v. SSHD*, CG [2002] UKIAT 03308, UK Immigration and Asylum Tribunal, 30 July 2002, available at: http://www.unhcr.org/refworld/docid/46836aba0.html, which found that the "atrocious prison conditions" in the particular country would breach the appellant's rights under the European Convention for the Protection of Human Rights and Fundamental Freedoms (ECHR), Article 3. Lesbians may also be at risk in these environments. See, *Smith v. Minister of Citizenship and Immigration*, 2009 FC 1194, Canada, Federal Court, 20 November 2009, available at: http://www.unhcr.org/refworld/docid/4b3c7b8c2.html.

AR.08225

**Transgender**

*Transgender* describes people whose gender identity and/or gender expression differs from the biological sex they were assigned at birth.[23] Transgender is a gender identity, not a sexual orientation and a transgender individual may be heterosexual, gay, lesbian or bisexual.[24] Transgender individuals dress or act in ways that are often different from what is generally expected by society on the basis of their sex assigned at birth. Also, they may not appear or act in these ways at all times. For example, individuals may choose to express their chosen gender only at certain times in environments where they feel safe. Not fitting within accepted binary perceptions of being male and female, they may be perceived as threatening social norms and values. This non-conformity exposes them to risk of harm. Transgender individuals are often highly marginalized and their claims may reveal experiences of severe physical, psychological and/or sexual violence. When their self-identification and physical appearance do not match the legal sex on official documentation and identity documents, transgender people are at particular risk.[25] The transition to alter one's birth sex is not a one-step process and may involve a range of personal, legal and medical adjustments. Not all transgender individuals choose medical treatment or other steps to help their outward appearance match their internal identity. It is therefore important for decision makers to avoid overemphasis on sex-reassignment surgery.

**Intersex**

The term *intersex* or "disorders of sex development" (DSD)[26] refers to a condition in which an individual is born with reproductive or sexual anatomy and/or chromosome patterns that do not seem to fit typical biological notions of being male or female. These conditions may be apparent at birth, may appear at puberty, or may be discovered only during a medical examination. Individuals with these conditions were previously referred to as "hermaphrodites," however this term is considered outdated and should not be used unless the applicant uses it.[27] An intersex person may identify as male or female, while their sexual orientation may be lesbian, gay, bisexual, or heterosexual.[28] Intersex persons may be subjected to persecution in ways that relate to their atypical anatomy. They may face discrimination and abuse for having a physical disability or medical condition, or for non-conformity with expected bodily appearances of females and males. Some intersex children are not registered at birth by the authorities, which can result in a range of associated risks and denial of their human rights. In some countries, being intersex can be seen as something evil or part of witchcraft and can result in a whole family being targeted for abuse.[29] Similar to transgender individuals, they may risk being harmed during the transition to their chosen gender because, for example, their identification papers do not indicate their chosen gender. People who self-identify as intersex may be viewed by others as transgender, as there may simply be no understanding of the intersex condition in a given culture.

11. Not all applicants will self-identify with the LGBTI terminology and constructs as presented above or may be unaware of these labels. Some may only be able to draw upon (derogatory) terms used by the persecutor. Decision makers therefore need to be cautious about inflexibly applying such labels as this could lead to adverse credibility assessments or failure to recognize a valid claim. For example, bisexuals are often categorized in the adjudication of refugee claims as either gay, lesbian or heterosexual, intersex individuals may not identify as LGBTI at all (they may not see their condition as part of their identity, for example) and men who have sex with men do not always identify as gay. It is also important to be clear about the distinction between sexual orientation and gender identity. They are separate concepts and, as explained above at paragraph 8, they present different aspects of the identity of each person.

[23] The term may include, but is not limited to, transsexuals (an older term which originated in the medical and psychological communities), cross-dressers and other gender-variant people. See further, APA, "Answers to Your Questions about Transgender People, Gender Identity and Gender Expression", available at: http://www.apa.org/topics/sexuality/transgender.aspx.

[24] See also, *RRT Case No. 0903346*, [2010] RRTA 41, Australia, Refugee Review Tribunal, 5 February 2010, (hereafter "*RRT Case No. 0903346*") available at: http://www.unhcr.org/refworld/docid/4b8e783f2.html, which concerned a transgender applicant who feared persecution because of her gender identity.

[25] The European Court of Human Rights has established that authorities must legally recognize the altered gender. See, *Goodwin v. United Kingdom*, Application no. 28957/95, European Court of Human Rights, 11 July 2002, available at: http://www.unhcr.org/refworld/docid/4dad9f762.html, finding a violation of the applicant's right to privacy, noting that "the stress and alienation arising from a discordance between the position in society assumed by a post-operative transsexual and the status imposed by law which refuses to recognize the change of gender cannot, in the Court's view, be regarded as a minor inconvenience arising from a formality.", para. 77, and that "Under Article 8 of the Convention in particular, the notion of personal autonomy is an important principle underlying the interpretation of its guarantees, protection is given to the personal sphere of each individual, including the right to establish details of their identity as individual human beings", para. 90. See also Council of Europe Recommendation CM/Rec (2010)5 of the Committee of Ministers to Member States on measures to combat discrimination on grounds of sexual orientation or gender identity, recognizing that "Member states should take appropriate measures to guarantee the full legal recognition of a person's gender reassignment in all areas of life, in particular by making possible the change of name and gender in official documents in a quick, transparent and accessible way.", at 21.

[26] Note that some individuals (and/or their medical records) will just use the name of their particular condition, such as congenital adrenal hyperplasia or androgen insensitivity syndrome, rather than using the term intersex or DSD.

[27] US Citizenship and Immigration Services, "Guidance for Adjudicating Lesbian, Gay, Bisexual, Transgender and Intersex (LGBTI) Refugee and Asylum Claims", 27 December 2011 (hereafter "USCIS, Guidance for Adjudicating LGBTI Claims"), available at: http://www.unhcr.org/refworld/docid/4f269cd72.html, p. 13.

[28] See further, Advocates for Informed Choice website: http://aiclegal.org/faq/#whatisintersex.

[29] Jill Schnoebelen, *Witchcraft Allegations, Refugee Protection and Human Rights: A Review of the Evidence*, UNHCR, New Issues in Refugee Research, Research Paper No. 169, January 2009, available at: http://www.unhcr.org/4981ca712.pdf.

AR.08226

## IV. SUBSTANTIVE ANALYSIS

### A. Background

12. A proper analysis as to whether a LGBTI applicant is a refugee under the 1951 Convention needs to start from the premise that applicants are entitled to live in society as who they are and need not hide that.[30] As affirmed by the position adopted in a number of jurisdictions, sexual orientation and/or gender identity are fundamental aspects of human identity that are either innate or immutable, or that a person should not be required to give up or conceal.[31] While one's sexual orientation and/or gender identity may be revealed by sexual conduct or a sexual act, or by external appearance or dress, it may also be evidenced by a range of other factors, including how the applicant lives in society, or how he or she expresses (or wishes to express) his or her identity.[32]

13. An applicant's sexual orientation and/or gender identity can be relevant to a refugee claim where he or she fears persecutory harm on account of his or her actual or perceived sexual orientation and/or gender identity, which does not, or is seen not to, conform to prevailing political, cultural or social norms. The intersection of gender, sexual orientation and gender identity is an integral part in the assessment of claims raising questions of sexual orientation and/or gender identity. Harm as a result of not conforming to expected gender roles is often a central element in these claims. UNHCR's Guidelines on Gender-Related Persecution recognize that:

> Refugee claims based on differing sexual orientation contain a gender element. A claimant's sexuality or sexual practices may be relevant to a refugee claim where he or she has been subject to persecutory action on account of his or her sexuality or sexual practices. In many such cases, the claimant has refused to adhere to socially or culturally defined roles or expectations of behaviour attributed to his or her sex.[33]

14. The impact of gender is relevant to refugee claims made by both LGBTI men and women.[34] Decision makers need to be attentive to differences in their experiences based on sex/gender. For example, heterosexual or male gay norms or country information may not apply to the experiences of lesbians whose position may, in a given context, be similar to that of other women in her society. Full account needs to be taken of diverse and evolving identities and their expression, the actual circumstances of the individual, and the cultural, legal, political and social context.[35]

15. Societal disapproval of varied sexual identities or their expression is usually more than the simple disapproval of sexual practices. It is often underlined by a reaction to non-compliance with expected cultural, gender and/or social norms and values. The societal norms of who men and women are and how they are supposed to behave are commonly based on hetero-normative standards. Both men and women may be subject to violent acts to make them conform to society's gender roles and/or to intimidate others by setting "an example". Such harm can be "sexualized" as a means of further degrading, objectifying or punishing the victim for his/her sexual orientation and/or gender identity, but can also take other forms.[36]

---

[30] UNHCR, *HJ (Iran) and HT (Cameroon) v. Secretary of State for the Home Department – Case for the First Intervener (United Nations High Commissioner for Refugees)*, 19 April 2010, (hereafter "UNHCR, *HJ and HT*"), available at: http://www.unhcr.org/refworld/docid/4bd1abbc2.html, para. 1. For a comparison with other Convention grounds, see para. 29 of the submission. See also, *HJ (Iran) and HT (Cameroon) v. Secretary of State for the Home Department*, UK, [2010] UKSC 31, Supreme Court, 7 July 2010 (hereafter "*HJ and HT*"), available at: http://www.unhcr.org/refworld/docid/4c3456752.html.
[31] See, for example, *Canada (Attorney General) v. Ward*, [1993] 2 S.C.R. 689, Canada, Supreme Court, 30 June 1993 (hereafter "*Canada v. Ward*"), available at: http://www.unhcr.org/refworld/docid/3ae6b673c.html; *Geovanni Hernandez-Montiel v. Immigration and Naturalization Service*, US, 225 F.3d 1084, A72-994-275, (9th Cir. 2000), 24 August 2000, available at: http://www.unhcr.org/refworld/docid/3ba9c1119.html, later affirmed by *Morales v. Gonzales*, US, 478 F.3d 972, No. 05-70672, (9th Cir. 2007), 3 January 2007, available at: http://www.unhcr.org/refworld/docid/4829b1452.html; *Appellants S395/2002 and S396/2002 v. Minister for Immigration and Multicultural Affairs*, [2003] HCA 71, Australia, High Court, 9 December 2003 (hereafter "*S395/2002*"), available at: http://www.unhcr.org/refworld/docid/3fd9eca84.html; *Refugee Appeal No. 74665*, New Zealand, Refugee Status Appeals Authority, 7 July 2004 (hereafter "*Refugee Appeal No. 74665*"), available at: http://www.unhcr.org/refworld/docid/42234ca54.html; *HJ and HT*, above footnote 30, paras. 11, 14, 78.
[32] Yogyakarta Principles, Principle 3, affirms that each person's self-defined sexual orientation and gender identity is integral to their personality and is one of the most basic aspects of self-determination, dignity and freedom. See further, *S395/2002*, para. 81; *Matter of Toboso-Alfonso*, US Board of Immigration Appeals, 12 March 1990, (hereafter "*Matter of Toboso-Alfonso*"), available at: http://www.unhcr.org/refworld/docid/3ae6b6b84.html; *Nasser Mustapha Karouni v. Alberto Gonzales, Attorney General*, US, No. 02-72651, (9th Cir. 2005), 7 March 2005 (hereafter "*Karouni*") available at: http://www.unhcr.org/refworld/docid/4721b5c32.html, at III[6]; *Lawrence, et al. v. Texas*, US Supreme Court, 26 June 2003, available at: http://www.unhcr.org/refworld/docid/3f21381d4.html, which found that "When sexuality finds overt expression in intimate conduct with another person, the conduct can be but one element in a personal bond that is more enduring", p. 6.
[33] UNHCR, Guidelines on Gender-Related Persecution, para. 16.
[34] UNHCR, Guidelines on Gender-Related Persecution, para. 3.
[35] UNHCR, Summary Conclusions of Roundtable, para. 5.
[36] UNHCR, Summary Conclusions of Roundtable, paras. 6, 16.

AR.08227

## B. Well-founded fear of being persecuted

16. The term "persecution", though not expressly defined in the 1951 Convention, can be considered to involve serious human rights violations, including a threat to life or freedom as well as other kinds of serious harm. In addition, lesser forms of harm may cumulatively constitute persecution. What amounts to persecution will depend on the circumstances of the case, including the age, gender, opinions, feelings and psychological make-up of the applicant.[37]

17. Discrimination is a common element in the experiences of many LGBTI individuals. As in other refugee claims, discrimination will amount to persecution where measures of discrimination, individually or cumulatively, lead to consequences of a substantially prejudicial nature for the person concerned.[38] Assessing whether the cumulative effect of such discrimination rises to the level of persecution is to be made by reference to reliable, relevant and up-to-date country of origin information.[39]

18. Not all LGBTI applicants may have experienced persecution in the past (see further below at paragraphs 30-33 on concealment as persecution and at paragraph 57 on *sur place* claims). Past persecution is not a prerequisite to refugee status and in fact, the well-foundedness of the fear of persecution is to be based on the assessment of the predicament that the applicant would have to face if returned to the country of origin.[40] The applicant does not need to show that the authorities knew about his or her sexual orientation and/or gender identity before he or she left the country of origin.[41]

19. Behaviour and activities may relate to a person's orientation or identity in complex ways. It may be expressed or revealed in many subtle or obvious ways, through appearance, speech, behaviour, dress and mannerisms; or not revealed at all in these ways. While a certain activity expressing or revealing a person's sexual orientation and/or gender identity may sometimes be considered trivial, what is at issue is the consequences that would follow such behaviour. In other words, an activity associated with sexual orientation may merely reveal or expose the stigmatized identity, it does not cause or form the basis of the persecution. In UNHCR's view, the distinction between forms of expression that relate to a "core area" of sexual orientation and those that do not, is therefore irrelevant for the purposes of the assessment of the existence of a well-founded fear of persecution.[42]

### Persecution

20. Threats of serious abuse and violence are common in LGBTI claims. Physical, psychological and sexual violence, including rape,[43] would generally meet the threshold level required to establish persecution. Rape in particular has been recognized as a form of torture, leaving "deep psychological scars on the victim".[44] Rape has been identified as being used for such purposes as "intimida-

---

[37] UNHCR, *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees*, HCR/1P/4/ENG/REV. 3 (hereafter "UNHCR, *Handbook*"), paras. 51–53.
[38] *Ibid*, paras. 54–55.
[39] *Molnar v. Canada (Minister of Citizenship and Immigration)*, 2005 FC 98, Canada, Federal Court, 21 January 2005 (hereafter "*Molnar v. Canada*") available at: http://www.unhcr.org/refworld/docid/4fe81df72.html.
[40] See, for example, *Bromfield v. Mukasey*, US, 543 F.3d 1071, 1076-77 (9th Cir. 2008), 15 September 2008, available at: http://www.unhcr.org/ref-world/docid/498b08a12.html, *RRT Case No. 1102877*, [2012] RRTA 101, Australia, Refugee Review Tribunal, 23 February 2012, available at: http://www.unhcr.org/refworld/docid/4f8410a52.html, para. 91.
[41] UNHCR, *Handbook*, para. 83.
[42] *Bundesrepublik Deutschland v. Y (C-71/11)*, *Z (C-99/11)*, C-71/11 and C-99/11, CJEU, 5 September 2012, available at: http://www.unhcr.org/refworld/docid/505ace862.html, para. 62; *RT (Zimbabwe) and others v Secretary of State for the Home Department*, [2012] UKSC 38, UK Supreme Court, 25 July 2012, available at: http://www.unhcr.org/refworld/docid/500fdacb2.html, paras. 75–76 (Lord Kerr); UNHCR *Statement on Religious Persecution and the Interpretation of Article 9(1) of the EU Qualification Directive* and UNHCR, *Secretary of State for the Home Department (Appellant) v. RT (Zimbabwe), SM (Zimbabwe) and AM (Zimbabwe) (Respondents) and the United Nations High Commissioner for Refugees (Intervener) – Case for the Intervener*, 25 May 2012, Case No. 2011/0011, available at: http://www.unhcr.org/refworld/docid/4fc369022.html, para. 12(9).
[43] International criminal tribunals in their jurisprudence have broadened the scope of crimes of sexual violence that can be prosecuted as rape to include oral sex and vaginal or anal penetration through the use of objects or any part of the perpetrator's body. See, for instance, *Prosecutor v. Anto Furundzija (Trial Judgment)*, IT-95-17/1-T, International Criminal Tribunal for the Former Yugoslavia (ICTY), 10 December 1998, available at: http://www.unhcr.org/refworld/docid/40276a8a4.html, para. 185; *Prosecutor v. Dragoljub Kunarac, Radomir Kovac and Zoran Vukovic (Appeal Judgment)*, IT-96-23 & IT-96-23/1-A, ICTY, 12 June 2002, available at: http://www.unhcr.org/refworld/docid/3debaafe4.html, para. 128. See also, International Criminal Court, Elements of Crimes, 2011, available at: http://www.unhcr.org/refworld/docid/4ff5dd7d2.html, Articles 7 (1) (g)-1 and 8(2)(b)(xxii)-1. For refugee-related jurisprudence, see *Ayala v. US Attorney General*, US, No. 09-12113, (11th Cir. 2010), 7 May 2010 (hereafter "*Ayala v. US Attorney General*"), available at: http://www.unhcr.org/refworld/docid/4c6c04942.html, which found that oral rape constituted persecution.
[44] *Aydin v. Turkey*, 57/1996/676/866, Council of Europe, European Court of Human Rights, 25 September 1997, available at: http://www.unhcr.org/refworld/docid/3ae6b7228.html, para. 83. See also, *HS (Homosexuals: Minors, Risk on Return) Iran v. Secretary of State for the Home Department* [2005] UKAIT 00120, UK Asylum and Immigration Tribunal (AIT), 4 August 2005, available at: http://www.unhcr.org/refworld/docid/47fdfafe0.html, recognizing as torture the sexual assault the applicant had been subjected to while in detention, paras. 57, 134; *Arrêt n° 36 527*, Belgium: Conseil du Contentieux des Etrangers, 22 December 2009, available at: http://www.unhcr.org/refworld/docid/4dad94692.html, referring to torture and serious violations of the appellant's physical integrity while in prison as constituting persecution.

AR.08228

tion, degradation, humiliation, discrimination, punishment, control or destruction of the person. Like torture, rape is a violation of personal dignity."[45]

21. Many societies, for example, continue to view homosexuality, bisexuality, and/or transgender behaviour or persons, as variously reflecting a disease, a mental illness or moral failing, and they may thus deploy various measures to try to change or alter someone's sexual orientation and/or gender identity. Efforts to change an individual's sexual orientation or gender identity by force or coercion may constitute torture, or inhuman or degrading treatment, and implicate other serious human rights violations, including the rights to liberty and security of person. Examples at the extreme end and which on their face reach the threshold of persecution include forced institutionalization, forced sex-reassignment surgery, forced electroshock therapy and forced drug injection or hormonal therapy.[46] Non-consensual medical and scientific experimentation is also explicitly identified as a form of torture or inhuman or degrading treatment under the International Covenant on Civil and Political Rights.[47] Some intersex individuals may be forced to undergo surgery aimed at "normalcy" and, where it will be applied without their consent, this is likely to amount to persecution. It is also important to distinguish in these cases between surgery necessary to preserve life or health and surgery for cosmetic purposes or social conformity. The assessment needs to focus on whether the surgery or treatment was voluntary and took place with the informed consent of the individual.[48]

22. Detention, including in psychological or medical institutions, on the sole basis of sexual orientation and/or gender identity is considered in breach of the international prohibition against the arbitrary deprivation of liberty and would normally constitute persecution.[49] Moreover, as noted by the United Nations Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, there is usually a strict hierarchy in detention facilities and those at the bottom of this hierarchy, such as LGBTI detainees, suffer multiple discrimination. Male-to-female transgender prisoners are at particular risk of physical and sexual abuse if placed within the general male prison population.[50] Administrative segregation, or solitary confinement, solely because a person is LGBTI can also result in severe psychological harm.[51]

23. Social norms and values, including so-called family "honour", are usually closely intertwined in the refugee claims of LGBTI individuals. While "mere" disapproval from family or community will not amount to persecution, it may be an important factor in the overall context of the claim. Where family or community disapproval, for example, manifests itself in threats of serious physical violence or even murder by family members or the wider community, committed in the name of "honour", it would clearly be classed as persecution.[52] Other forms of persecution include forced or underage marriage,

[45] *The Prosecutor v. Jean-Paul Akayesu (Trial Judgment)*, ICTR-96-4-T, International Criminal Tribunal for Rwanda, 2 September 1998, available at: http://www.unhcr.org/refworld/docid/40278fbb4.html, para. 687.
[46] Yogyakarta Principles, Principle 18: "Notwithstanding any classifications to the contrary, a person's sexual orientation and gender identity are not, in and of themselves, medical conditions and are not to be treated, cured or suppressed". See also, *Alla Konstantinova Pitcherskaia v. Immigration and Naturalization Service*, US, 95-70887, (9th Cir. 1997), 24 June 1997 (hereafter "*Pitcherskaia v. INS*"), available at: http://www.unhcr.org/refworld/docid/4152e0fb26.html.
[47] ICCPR, Article 7, "*... In particular, no one shall be subjected without his free consent to medical or scientific experimentation". As affirmed, for example, by the UN Committee Against Torture and the UN Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, this includes subjecting men suspected of homosexual conduct to non-consensual anal examinations to prove their homosexuality. See further, OHCHR, Report on Sexual Orientation and Gender Identity, para. 37.*
[48] See, UN Committee on the Elimination of Discrimination against Women (CEDAW), *Communication No. 4/2004*, 29 August 2006, CEDAW/C/36/D/4/2004, available at: http://www.unhcr.org/refworld/docid/4fdb288e2.html, which considered non-consensual sterilization as a violation of women's rights to informed consent and dignity, para. 11.3. In respect of surgery at birth, the best interests of the child is a primary consideration, taking into account the rights and duties of his or her parents, legal guardians, or other individuals legally responsible for him or her (Convention on the Rights of the Child (CRC), Article 3). If sex re-assignment or reconstructive surgery is contemplated only later in childhood, "States Parties shall assure to the child who is capable of forming his or her own views the right to express those views freely in all matters affecting the child, the views of the child being given due weight in accordance with the age and maturity of the child" (CRC, Article 12(1)).
[49] See, UN Working Group on Arbitrary Detention, Opinions No. 22/2006 on Cameroon and No. 42/2008 on Egypt; A/HRC/16/47, annex, para. 8(e). See also, UNHCR, "Guidelines on the Applicable Criteria and Standards relating to the Detention of Asylum-Seekers and Alternatives to Detention", 2012, (hereafter "UNHCR, Guidelines on Detention"), available at: http://www.unhcr.org/refworld/docid/503489533b8.html.
[50] OHCHR, Report on Sexual Orientation and Gender Identity, para. 34.
[51] As noted in the UNHCR Guidelines on Detention, "solitary confinement is not an appropriate way to manage or ensure the protection of such individuals", para. 65.
[52] UN Human Rights Committee and the Inter-American Commission on Human Rights have concluded that the inaction of State vis-à-vis death threats constitutes a violation of the right to life. See also, *RRT Case No. 0902671*, [2009] RRTA 1053, Australia, Refugee Review Tribunal, 19 November 2009, available at: http://www.unhcr.org/refworld/docid/4b57016f2.html, which found that the "applicant's chance of facing serious harm, possibly death by honour killing, if he returned to [the country of origin] now or in the reasonably foreseeable future is real and amounts to serious harm...in that it is deliberate or intentional and involves persecution for a Convention reason". See also, *Muckette v. Minister of Citizenship and Immigration*, 2008 FC 1388, Canada, Federal Court, 17 December 2008, available at: http://www.unhcr.org/refworld/docid/4989a27e2.html. The case was remanded for reconsideration as the lower instance had "failed to address whether the death threats had a degree of reality to them and in effect dismissed them because no one had attempted to kill the Applicant."

AR.08229

forced pregnancy and/or marital rape (on rape, see above at paragraph 20). In the context of sexual orientation and/or gender identity cases, such forms of persecution are often used as a means of denial or "correcting" non-conformity. Lesbians, bisexual women and transgender persons are at particular risk of such harms owing to pervasive gender inequalities that restrict autonomy in decision-making about sexuality, reproduction and family life.[53]

24. LGBTI individuals may also be unable to enjoy fully their human rights in matters of private and family law, including inheritance, custody, visitation rights for children and pension rights.[54] Their rights to freedom of expression, association and assembly may be restricted.[55] They may also be denied a range of economic and social rights, including in relation to housing, education,[56] and health care.[57] Young LGBTI individuals may be prevented from going to school, subjected to harassment and bullying and/or expelled. Community ostracism can have a damaging impact on the mental health of those targeted, especially if such ostracism has lasted for an extended period of time and where it occurs with impunity or disregard. The cumulative effect of such restrictions on the exercise of human rights may constitute persecution in a given case.

25. LGBTI individuals may also experience discrimination in access to and maintenance of employment.[58] Their sexual orientation and/or gender identity may be exposed in the workplace with resulting harassment, demotion or dismissal. For transgender individuals in particular, deprivation of employment, often combined with lack of housing and family support, may frequently force them into sex work, subjecting them to a variety of physical dangers and health risks. While being dismissed from a job generally is not considered persecution, even if discriminatory or unfair, if an individual can demonstrate that his or her LGBTI identity would make it highly improbable to enjoy any kind of gainful employment in the country of origin, this may constitute persecution.[59]

**Laws criminalizing same-sex relations**

26. Many lesbian, gay or bisexual applicants come from countries of origin in which consensual same-sex relations are criminalized. It is well established that such criminal laws are discriminatory and violate international human rights norms.[60] Where persons are at risk of persecution or punishment such as by the death penalty, prison terms, or severe corporal punishment, including flogging, their persecutory character is particularly evident.[61]

27. Even if irregularly, rarely or ever enforced, criminal laws prohibiting same-sex relations could lead to an intolerable predicament for an LGB person rising to the level of persecution. Depending on the country context, the criminalization of same-sex relations can create or contribute to an oppressive atmosphere of intolerance and generate a threat of prosecution for having such relations. The existence of such laws can be used for blackmail and extortion purposes by the authorities or non-State actors. They can promote political rhetoric that can expose LGB individuals to risks of persecutory harm. They can also hinder LGB persons from seeking and obtaining State protection.

---

[53] OHCHR, Report on Sexual Orientation and Gender Identity, para. 66.
[54] *Ibid*, paras. 68–70.
[55] *Ibid*, paras. 62–65.
[56] *Ibid*, paras. 58–61.
[57] *Ibid*, paras. 54–57.
[58] *Ibid*, paras. 51–53.
[59] USCIS, Guidance for Adjudicating LGBTI Claims, p. 23. See also, *Kadri v. Mukasey*, US, Nos. 06-2599 & 07-1754, (1st Cir. 2008), 30 September 2008, available at: http://www.unhcr.org/refworld/docid/498b0a212.html. The case was remanded for consideration of the standard for economic persecution, referring to *In re T-Z-*, 24 I & N. Dec. 163 (US Board of Immigration Appeals, 2007), which had found that "'[nonphysical] harm or suffering . . . such as the deliberate imposition of severe economic disadvantage or the deprivation of liberty, food, housing, employment, or other essentials of life may rise to persecution".
[60] See, for example, *Toonen v. Australia*, above footnote 11, which found that the sodomy law of the territory concerned violated the rights to privacy and equality before the law.
[61] European Union, European Parliament, Directive 2011/95/EU of the European Parliament and of the Council of 13 December 2011 on standards for the qualification of third-country nationals or stateless persons as beneficiaries of international protection, for a uniform status for refugees or for persons eligible for subsidiary protection, and for the content of the protection granted (recast), (hereafter "EU Qualification Directive"), Article 9; COC and Vrije Universiteit Amsterdam, *Fleeing Homophobia, Asylum Claims Related to Sexual Orientation and Gender Identity in Europe*, September 2011 (hereafter "Fleeing Homophobia Report") available at: http://www.unhcr.org/refworld/docid/4ebba7852.html, pp. 22–24. See also *Arrêt n° 50 966*, Belgium, Conseil du Contentieux des Etrangers, 9 November 2010, available at: http://www.unhcr.org/refworld/docid/4dad967f2.html, concerning a lesbian, found that a prison term for homosexual conduct of 1–5 years and fines from 100 000 à 1 500 000 francs CFA and the fact that society was homophobic were sufficient grounds to constitute persecution in the circumstances of the case, para. 5.7.1. Similarly in *Arrêt n° 50 967*, Belgium, Conseil du Contentieux des Etrangers, 9 November 2010, available at: http://www.unhcr.org/refworld/docid/4dad97d92.html, concerning a gay man.

AR.08230

9

28. Assessing the "well-founded fear of being persecuted" in such cases needs to be fact-based, focusing on both the individual and the contextual circumstances of the case. The legal system in the country concerned, including any relevant legislation, its interpretation, application and actual impact on the applicant needs to be examined.[62] The "fear" element refers not only to persons to whom such laws have already been applied, but also to individuals who wish to avoid the risk of the application of such laws to them. Where the country of origin information does not establish whether or not, or the extent, that the laws are actually enforced, a pervading and generalized climate of homophobia in the country of origin could be evidence indicative that LGBTI persons are nevertheless being persecuted.

29. Even where consensual same-sex relations are not criminalized by specific provisions, laws of general application, for example, public morality or public order laws (loitering, for example) may be selectively applied and enforced against LGBTI individuals in a discriminatory manner, making life intolerable for the claimant, and thus amounting to persecution.[63]

**Concealment of sexual orientation and/or gender identity**

30. LGBTI individuals frequently keep aspects and sometimes large parts of their lives secret. Many will not have lived openly as LGBTI in their country of origin and some may not have had any intimate relationships. Many suppress their sexual orientation and/or gender identity to avoid the severe consequences of discovery, including the risk of incurring harsh criminal penalties, arbitrary house raids, discrimination, societal disapproval, or family exclusion.

31. That an applicant may be able to avoid persecution by concealing or by being "discreet" about his or her sexual orientation or gender identity, or has done so previously, is not a valid reason to deny refugee status. As affirmed by numerous decisions in multiple jurisdictions, a person cannot be denied refugee status based on a requirement that they change or conceal their identity, opinions or characteristics in order to avoid persecution.[64] LGBTI people are as much entitled to freedom of expression and association as others.[65]

32. With this general principle in mind, the question thus to be considered is what predicament the applicant would face if he or she were returned to the country of origin. This requires a fact-specific examination of what may happen if the applicant returns to the country of nationality or habitual residence and whether this amounts to persecution. The question is not, could the applicant, by being discreet, live in that country without attracting adverse consequences. It is important to note that even if applicants may so far have managed to avoid harm through concealment, their circumstances may change over time and secrecy may not be an option for the entirety of their lifetime. The risk of discovery may also not necessarily be confined to their own conduct. There is almost always the possibility of discovery against the person's will, for example, by accident, rumours or growing suspicion.[66] It is also important to recognize that even if LGBTI individuals conceal their sexual orientation or gender identity they may still be at risk of exposure and related harm for not following expected social norms (for example, getting married and having children, for example). The absence of certain expected activities and behaviour identifies a difference between them and other people and may place them at risk of harm.[67]

---

[62] UNHCR, *Handbook*, para. 45.

[63] *RRT Case No. 1102877*, [2012] RRTA 101, Australia, Refugee Review Tribunal, 23 February 2012, available at: http://www.unhcr.org/refworld/docid/4f8410a52.html, paras. 89, 96; *RRT Case No. 071862642*, [2008] RRTA 40, Australia: Refugee Review Tribunal, 19 February 2008, available at: http://www.unhcr.org/refworld/docid/4811a7192.html.

[64] For example, *HJ and HT*, above footnote 30; UNHCR, *HJ and HT*, above footnote 30, paras. 26–33; *S395/2002*, above footnote 31; *Refugee Appeal No. 74665*, above footnote 31; *Karouni*, above footnote 32; *KHO:2012:1*, Finland, Supreme Administrative Court, 13 January 2012, available at: http://www.unhcr.org/refworld/docid/4f3cdf7e2.html. See also, UNHCR, "Guidelines on International Protection No. 2: "Membership of a Particular Social Group" Within the Context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol Relating to the Status of Refugees", 7 May 2002, HCR/GIP/02/02 (hereafter "UNHCR, Guidelines on Social Group"), available at: http://www.unhcr.org/refworld/docid/3d36f23f4.html, paras. 6, 12; UNHCR, "Guidelines on International Protection No. 6: Religion-Based Refugee Claims under Article 1A(2) of the 1951 Convention and/or the 1967 Protocol relating to the Status of Refugees", 28 April 2004, HCR/GIP/04/06, (hereafter "UNHCR, Guidelines on Religion"), para. 13; UNHCR, *Secretary of State for the Home Department (Appellant) v. RT (Zimbabwe), SM (Zimbabwe) and AM (Zimbabwe) (Respondents) and the United Nations High Commissioner for Refugees (Intervener) - Case for the Intervener*, 25 May 2012, 2011/0011, available at: http://www.unhcr.org/refworld/docid/4fc369022.html, para. 9.

[65] As noted by the UK Supreme Court in *HJ and HT*, above footnote 30: "The underlying rationale of the Convention is ... that people should be able to live freely, without fearing that they may suffer harm of the requisite intensity or duration because they are, say, black, or the descendants of some former dictator, or gay. In the absence of any indication to the contrary, the implication is that they must be free to live openly in this way without fear of persecution. By allowing them to live openly and free from that fear, the receiving state affords them protection which is a surrogate for the protection which their home state should have afforded them", para. 53.

[66] *S395/2002*, above footnote 31, paras. 56–58.

[67] *SW (lesbians - HJ and HT applied) Jamaica v. Secretary of State for the Home Department*, UK, CG [2011] UKUT 00251(IAC), Upper Tribunal (Immigration and Asylum Chamber), 24 June 2011, available at: http://www.unhcr.org/refworld/docid/4e0c3fae2.html.

AR.08231

33. Being compelled to conceal one's sexual orientation and/or gender identity may also result in significant psychological and other harms. Discriminatory and disapproving attitudes, norms and values may have a serious effect on the mental and physical health of LGBTI individuals[68] and could in particular cases lead to an intolerable predicament amounting to persecution.[69] Feelings of self-denial, anguish, shame, isolation and even self-hatred which may accrue in response an inability to be open about one's sexuality or gender identity are factors to consider, including over the long-term.

**Agents of Persecution**

34. There is scope within the refugee definition to recognize persecution emanating from both State and non-State actors. State persecution may be perpetrated, for example, through the criminalization of consensual same-sex conduct and the enforcement of associated laws, or as a result of harm inflicted by officials of the State or those under the control of the State, such as the police or the military. Individual acts of "rogue" officers may still be considered as State persecution, especially where the officer is a member of the police and other agencies that purport to protect people.[70]

35. In situations where the threat of harm is from non-State actors, persecution is established where the State is unable or unwilling to provide protection against such harm. Non-State actors, including family members, neighbours, or the broader community, may be either directly or indirectly involved in persecutory acts, including intimidation, harassment, domestic violence, or other forms of physical, psychological or sexual violence. In some countries, armed or violent groups, such as paramilitary and rebel groups, as well as criminal gangs and vigilantes, may target LGBTI individuals specifically.[71]

36. In scenarios involving non-State agents of persecution, State protection from the claimed fear has to be available and effective.[72] State protection would normally neither be considered available nor effective, for instance, where the police fail to respond to requests for protection or the authorities refuse to investigate, prosecute or punish (non-State) perpetrators of violence against LGBTI individuals with due diligence.[73] Depending on the situation in the country of origin, laws criminalizing same-sex relations are normally a sign that protection of LGB individuals is not available. Where the country of origin maintains such laws, it would be unreasonable to expect that the applicant first seek State protection against harm based on what is, in the view of the law, a criminal act. In such situations, it should be presumed, in the absence of evidence to the contrary, that the country concerned is unable or unwilling to protect the applicant.[74] As in other types of claims, a claimant does not need to show that he or she approached the authorities for protection before flight. Rather he or she has to establish that the protection was not or unlikely to be available or effective upon return.

37. Where the legal and socio-economic situation of LGBTI people is improving in the country of origin, the availability and effectiveness of State protection needs to be carefully assessed based on reliable and up-to-date country of origin information. The reforms need to be more than merely transitional. Where laws criminalizing same-sex conduct have been repealed or other positive measures have been taken, such reforms may not impact in the immediate or foreseeable future as to how society generally regards people with differing sexual orientation and/or gender iden-

---

[68] Discrimination of LGBTI individuals has been associated with mental health problems. Studies have shown that internalized negative attitudes towards non-heterosexuality in LGB individuals was related to difficulties with self-esteem, depression, psychosocial and psychological distress, physical health, intimacy, social support, relationship quality, and career development. See further, APA, "Practice Guidelines for LGB Clients, Guidelines for Psychological Practice with Lesbian, Gay, and Bisexual Clients" (hereafter "APA, Practice Guidelines for LGB Clients"), available at: http://www.apa.org/pi/lgbt/resources/guidelines.aspx?item=3.

[69] *Pathmakanthan v. Holder*, US, 612 F.3d 618, 623 (7th Cir. 2010), available at: http://www.unhcr.org/refworld/docid/4d249efa2.html.

[70] See *Ayala v. US Attorney General*, above footnote 42. The treatment by a group of police officers (robbery and sexual assault) constituted persecution and was deemed to be on account of the applicant's sexual orientation.

[71] *P.S., a/k/a S.J.P., v. Holder, Attorney General*, US, No. 09-3291, Agency No. A99-473-409, (3rd Cir. 2010), 22 June 2010, available at: http://www.unhcr.org/refworld/docid/4fbf263f2.html, concerned a gay man who was targeted by a non-State armed group. See also, *RRT Case No. N98/22948*, [2000] RRTA 1055, Australia, Refugee Review Tribunal, 2 November 2000, available at: http://www.unhcr.org/refworld/docid/4b7a97fd2.html, which found that an applicant was at risk of persecution at the hands of vigilante groups. The identification of poor gay men as "disposables" put them at risk of "social clean up" operations.

[72] UNHCR, *Handbook*, paras. 97–101; UN Human Rights Committee, General Comment no. 31 [80], The nature of the general legal obligation imposed on States Parties to the Covenant, 26 May 2004, CCPR/C/21/Rev.1/Add.13, available at: http://www.unhcr.org/refworld/docid/478b26ae2.html, paras. 8, 15–16; CEDAW, General Recommendation No. 28 on the Core Obligations of States Parties under Article 2 of the Convention on the Elimination of All Forms of Discrimination against Women, 19 October 2010, CEDAW/C/2010/47/GC.2, available at: http://www.unhcr.org/refworld/docid/4d467ea72.html, para. 36.

[73] See, for example, UK Home Office, "Sexual Orientation Issues in the Asylum Claim", 6 October 2011, available at: http://www.unhcr.org/refworld/docid/4eb8f0982.html, p. 6.

[74] UNHCR, Summary Conclusions of Roundtable, para. 8.

AR.08232

tity.[75] The existence of certain elements, such as anti-discrimination laws or presence of LGBTI organizations and events, do not necessarily undermine the well-foundedness of the applicant's fear.[76] Societal attitudes may not be in line with the law and prejudice may be entrenched, with a continued risk where the authorities fail to enforce protective laws.[77] A *de facto*, not merely *de jure*, change is required and an analysis of the circumstances of each particular case is essential.

## C. The causal link ("for reasons of")

38. As with other types of refugee claims, the well-founded fear of persecution must be "for reasons of" one or more of the five grounds contained in the refugee definition in Article 1A(2) of the 1951 Convention. The Convention ground should be a contributing factor to the well-founded fear of persecution, though it need not be the sole, or even dominant, cause.

39. Perpetrators may rationalize the violence they inflict on LGBTI individuals by reference to the intention of "correcting", "curing" or "treating" the person.[78] The intent or motive of the persecutor can be a relevant factor to establishing the "causal link" but it is not a prerequisite.[79] There is no need for the persecutor to have a punitive intent to establish the causal link.[80] The focus is on the reasons for the applicant's feared predicament within the overall context of the case, and how he or she would experience the harm rather than on the mind-set of the perpetrator. Nonetheless, where it can be shown that the persecutor attributes or imputes a Convention ground to the applicant, this is sufficient to satisfy the causal link.[81] Where the persecutor is a non-State actor, the causal link may be established either where the non-State actor is likely to harm the LGBTI person for a Convention reason or the State is not likely to protect him or her for a Convention reason.[82]

## D. Convention grounds

40. The five Convention grounds, that is, race, religion, nationality, membership of a particular social group and political opinion, are not mutually exclusive and may overlap. More than one Convention ground may be relevant in a given case. Refugee claims based on sexual orientation and/or gender identity are most commonly recognized under the "membership of a particular social group" ground. Other grounds may though also be relevant depending on the political, religious and cultural context of the claim. For example, LGBTI activists and human rights defenders (or perceived activists/defenders) may have either or both claims based on political opinion or religion if, for example, their advocacy is seen as going against prevailing political or religious views and/or practices.

41. Individuals may be subject to persecution due to their actual or perceived sexual orientation or gender identity. The opinion, belief or membership may be attributed to the applicant by the State or the non-State agent of persecution, even if they are not in fact LGBTI, and based on this perception they may be persecuted as a consequence. For example, women and men who do not fit stereotyped appearances and roles may be perceived as LGBTI. It is not required that they actually be LGBTI.[83]

---

[75] *RRT Case No. 0905785*, [2010] RRTA 150, Australia, Refugee Review Tribunal, 7 March 2010, available at: http://www.unhcr.org/refworld/docid/4c220be62.html, found that the decriminalization of homosexual acts in the particular country was unlikely to have an immediate impact on how people viewed homosexuality, para. 88.

[76] USCIS, Guidance for Adjudicating LGBTI Claims, p. 25. See also *Guerrero v. Canada (Minister of Citizenship and Immigration)*, 2011 FC 860, Canada, Federal Court, 8 July 2011, available at: http://www.unhcr.org/refworld/docid/4fa952572.html, which noted that the presence of many non-governmental organizations that fight against discrimination based on sexual orientation is in itself a telling factor in considering the country conditions.

[77] See, *Judgment No. 616907*, K, France, Cour nationale du droit d'asile, 6 April 2009, summary available at *Contentieux des réfugiés: Jurisprudence du Conseil d'État et de la Cour nationale du droit d'asile – Année 2009*, 26 October 2010, available at: http://www.unhcr.org/refworld/docid/4dad9db02.html, pp. 61–62, which recognized as a refugee a gay man from a particular territory based on the fact that even though a 2004 law banned all discrimination on the basis of sexual orientation those showing their homosexuality in public were regularly subject to harassment and discrimination without being able to avail themselves of the protection of the authorities.

[78] Yogyakarta Principles, Principle 18.

[79] UNHCR, *Handbook*, para. 66.

[80] *Pitcherskaia v. INS*, above footnote 45, found that the requirement on the applicant to prove the punitive intent of the perpetrator was unwarranted.

[81] UNHCR, "Interpreting Article 1 of the 1951 Convention Relating to the Status of Refugees", April 2001, available at: http://www.unhcr.org/refworld/docid/3b20a3914.html, para. 19.

[82] UNHCR, Guidelines on Social Group, para. 23.

[83] UNHCR, Guidelines on Gender-Related Persecution, para. 32; UNHCR, *Advisory Opinion by UNHCR to the Tokyo Bar Association Regarding Refugee Claims Based on Sexual Orientation*, 3 September 2004, available at; http://www.unhcr.org/refworld/docid/4551c0d04.html, para. 5. See also, *Kwasi Amanfi v. John Ashcroft, Attorney General*, US, Nos. 01-4477 and 02-1541, (3rd Cir. 2003), 16 May 2003, available at: http://www.unhcr.org/refworld/docid/47fdfb2c1a.html, which concerned an applicant who claimed persecution on account of imputed homosexuality.

AR.08233

Transgender individuals often experience harm based on imputed sexual orientation. Partners of transgender individuals may be perceived as gay or lesbian or simply as not conforming to accepted gender roles and behaviour or associating themselves with transgender individuals.

**Religion**

38. Where an individual is viewed as not conforming to the teachings of a particular religion on account of his or her sexual orientation or gender identity, and is subjected to serious harm or punishment as a consequence, he or she may have a well-founded fear of persecution for reasons of religion.[84] The teachings of the world's major religions on sexual orientation and/or gender identity differ and some have also changed over time or in particular contexts, ranging from outright condemnation, including viewing homosexuality as an "abomination", "sin", "disorder" or apostasy, to complete acceptance of diverse sexual orientation and/or gender identity. Non-LGBTI persons may also be subject to persecution for reasons of religion, for example, where they are (wrongly) perceived as LGBTI or where they support or are seen to support them or their rights.

43. Negative attitudes held by religious groups and communities towards LGBTI individuals can be given expression in a range of ways, from discouraging same-sex activity, or transgender behaviour or expression of identity, among adherents to active opposition, including protests, beatings, naming/shaming and "excommunication", or even execution. The religion and political opinion grounds may overlap where religious and State institutions are not clearly separated.[85] Religious organizations may impute opposition to their teachings or governance by LGBTI individuals, whether or not this is the case. LGBTI applicants may continue to profess adherence to a faith in which they have been subject to harm or a threat of harm.

**Membership of a Particular Social Group**

44. The 1951 Convention includes no specific list of particular social groups. Rather, "the term membership of a particular social group should be read in an evolutionary manner, open to the diverse and changing nature of groups in various societies and evolving international human rights norms."[86] UNHCR defines a particular social group as:

> a group of persons who share a common characteristic other than their risk of being persecuted, *or* who are perceived as a group by society. The characteristic will often be one which is innate, unchangeable, or which is otherwise fundamental to identity, conscience or the exercise of one's human rights.[87]

45. The two approaches – "protected characteristics" and "social perception" - to identifying "particular social groups" reflected in this definition are *alternative*, not cumulative tests. The "protected characteristics" approach examines whether a group is united *either* by an innate or immutable characteristic *or* by a characteristic that is so fundamental to human dignity that a person should not be compelled to forsake it. The "social perception" approach, on the other hand, examines whether a particular social group shares a common characteristic which makes it cognizable or sets the group's members apart from society at large.

46. Whether applying the "protected characteristics" or "social perception" approach, there is broad acknowledgment that under a correct application of either of these approaches, lesbians,[88] gay men,[89] bisexuals[90] and transgender persons[91] are members of "particular social groups" within

---

[84] UNHCR, Guidelines on Gender-Related Persecution, para. 25. See by analogy, *In Re S-A*, Interim Decision No. 3433, US Board of Immigration Appeals, 27 June 2000, available at: http://www.unhcr.org/refworld/docid/3ae6b6f224.html.

[85] UNHCR, Guidelines on Gender-Related Persecution, para. 26.

[86] UNHCR, Guidelines on Social Group, para. 3.

[87] UNHCR, Guidelines on Social Group, para. 11. Emphasis added.

[88] See, for example, *Pitcherskaia v. INS*, above footnote 45; *Decisions VA0-01624 and VA0-01625 (In Camera)*, Canada, Immigration and Refugee Board, 14 May 2001, available at: http://www.unhcr.org/refworld/docid/48246f092.html; *Islam (A.P.) v. Secretary of State for the Home Department; R v. Immigration Appeal Tribunal and Another, Ex Parte Shah (A.P.)*, UK House of Lords (Judicial Committee), 25 March 1999, available at: http://www.unhcr.org/refworld/docid/3dec8abe4.html, pp. 8–10.

[89] See, for example. *Matter of Toboso-Alfonso*, above footnote 32; *Refugee Appeal No. 1312/93, Re GJ*, New Zealand, Refugee Status Appeals Authority, 30 August 1995, available at: http://www.unhcr.org/refworld/docid/3ae6b6938.html.

[90] See, for example, *VRAW v. Minister for Immigration and Multicultural and Indigenous Affairs*, [2004] FCA 1133, Australia, Federal Court, 3 September 2004, available at: http://www.unhcr.org/refworld/docid/4dada05c2.html; *Decision T98-04159*, Immigration and Refugee Board of Canada, 13 March 2000, available at: http://www.unhcr.org/refworld/docid/4dada1672.html.

[91] See, for example, *RRT Case No. 0903346*, above footnote 24; *CE, SSR, 23 juin 1997, 171858, Ourbih*, 171858, France, Conseil d'Etat, 23 June 1997, available at: http://www.unhcr.org/refworld/docid/3ae6b67c14.html.

AR.08234

the meaning of the refugee definition.[92] Relatively fewer claims have been made by intersex appli-cants, but they would also on their face qualify under either approach.

47. Sexual orientation and/or gender identity are considered as innate and immutable characteristics or as characteristics so fundamental to human dignity that the person should not be compelled to forsake them. Where the identity of the applicant is still evolving, they may describe their sexual orientation and/or gender identity as fluid or they may express confusion or uncertainty about their sexuality and/or identity. In both situations, these characteristics are in any event to be considered as fundamental to their evolving identity and rightly within the social group ground.

48. There is no requirement that members of the social group associate with one another, or that they are socially visible, for the purposes of the refugee definition. "Social perception" does not mean to suggest a sense of community or group identification as might exist for members of an organization or association. Thus, members of a social group may not be recognizable even to each other.[93]

49. Decision makers should avoid reliance on stereotypes or assumptions, including visible markers, or a lack thereof. This can be misleading in establishing an applicant's membership of a particular social group. Not all LGBTI individuals look or behave according to stereotypical notions. In addition, although an attribute or characteristic expressed visibly may reinforce a finding that an applicant belongs to an LGBTI social group, it is not a pre-condition for recognition of the group.[94] In fact, a group of individuals may seek to avoid manifesting their characteristics in society precisely to avoid persecution (see above paragraphs30-33).[95] The "social perception" approach requires neither that the common attribute be literally visible to the naked eye nor that the attribute be easily identifiable by the general public.[96] It is furthermore not necessary that particular members of the group or their common characteristics be publicly known in a society. The determination rests simply on whether a group is "cognizable" or "set apart from society" in a more general, abstract sense.

**Political Opinion**

50. The term political opinion should be broadly interpreted to incorporate any opinion on any matter in which the machinery of State, society, or policy may be engaged.[97] It may include an opinion as to gender roles expected in the family or as regards education, work or other aspects of life.[98] The expression of diverse sexual orientation and gender identity can be considered po-litical in certain circumstances, particularly in countries where such non-conformity is viewed as challenging government policy or where it is perceived as threatening prevailing social norms and values. Anti-LGBTI statements could be part of a State's official rhetoric, for example, denying the existence of homosexuality in the country or claiming that gay men and lesbians are not consid-ered part of the national identity.

# E. INTERNAL FLIGHT OR RELOCATION ALTERNATIVE

51. The concept of an internal flight or relocation alternative (IFA) refers to whether it is possible for an individual to be relocated to a specific area of the country where the risk of feared persecution would not be well-founded and where, given the particular circumstances of the case, the individual could reasonably be expected to establish him or herself and live a normal life.[99] Protection would

---

[92] Sexual orientation and/or gender identity has been explicitly included in the refugee definition in some regional and domestic legislation. For instance, the European Union has adopted a definition of particular social group, recognizing that "depending on the circumstances in the country of origin, a particular social group might include a group based on a common characteristic of sexual orientation", EU Qualification Directive, Article 10.

[93] UNHCR, Guidelines on Social Group, paras. 15–16.

[94] *Judgment No. 634565/08015025*, C, France, Cour nationale du droit d'asile, 7 July 2009, summary available at Contentieux des réfugiés: Jurisprudence du Conseil d'État et de la Cour nationale du droit d'asile - Année 2009, 26 October 2010, available at: http://www.unhcr.org/refworld/docid/4dad9db02.html, pp. 58–59, recognizing as a refugee a gay man who had neither claimed nor manifested his homosexuality openly.

[95] UNHCR, *HJ and HT*, above footnote 30, para. 26.

[96] See, for example, UNHCR, *Valdiviezo-Galdamez v. Holder, Attorney General. Brief of the United Nations High Commissioner for Refugees as Amicus Curiae in Support of the Petitioner*, 14 April 2009, available at: http://www.unhcr.org/refworld/docid/49ef25102.html; *Gatimi et al. v. Holder, Attorney General*, No. 08-3197, United States Court of Appeals for the Seventh Circuit, 20 August 2009, available at: http://www.unhcr.org/refworld/docid/4aba40332.html.

[97] *Canada v. Ward*, above footnote 31.

[98] UNHCR, Guidelines on Gender-Related Persecution, para. 32.

[99] See UNHCR, "Guidelines on International Protection No. 4: 'Internal Flight or Relocation Alternative' Within the Context of Article 1A(2) of the 1951 Convention and/or 1967 Protocol Relating to the Status of Refugees", 23 July 2003, HCR/GIP/03/04 (hereafter "UNHCR, Guidelines on Internal Flight Alternative"), para. 6.

AR.08235

need to be available in a genuine and meaningful way. United Nations agencies, non-governmental organizations, civil society and other non-State actors are not a substitute for State protection.

52. Within the context of the holistic assessment of a claim for refugee status, the assessment of whether or not there is an IFA requires two main analyses: (i) the relevance analysis[100] and (ii) the reasonableness analysis.[101] In considering the relevance and reasonableness of a proposed site of internal flight or relocation, gender considerations must be taken into account.

53. In respect of the relevance analysis, if the country in question criminalizes same-sex relations and enforces the relevant legislation, it will normally be assumed that such laws are applicable in the entire territory. Where the fear of persecution is related to these laws, a consideration of IFA would not be relevant. Laws which do not allow a transgender or intersex individual to access and receive appropriate medical treatment if sought, or to change the gender markers on his or her documents, would also normally be applicable nationwide and should be taken into account when considering the proposed place of relocation.

54. Furthermore, intolerance towards LGBTI individuals tends to exist countrywide in many situations, and therefore an internal flight alternative will often not be available. Relocation is not a relevant alternative if it were to expose the applicant to the original or any new forms of persecution. IFA should not be relied upon where relocation involves (re-)concealment of one's sexual orientation and/or gender identity to be safe (see paragraphs 30-33).[102]

55. Some countries have seen social and political progress which is sometimes localized in urban areas and these locations may in certain circumstances constitute a relocation alternative. In this context, it is important to recall that the decision maker bears the burden of proof of establishing that an analysis of relocation is relevant to the particular case, including identifying the proposed place of relocation and collecting country of origin information about it (see further below at paragraph 66).[103]

56. In determining whether internal flight is reasonable, the decision maker needs to assess whether return to the proposed place of relocation would cause undue hardship, including by examining the applicant's personal circumstances;[104] the existence of past persecution; safety and security; respect for human rights; and possibility for economic survival.[105] The applicant needs to be able to access a minimum level of political, civil and socio-economic rights. Women may have lesser economic opportunities than men, or may be unable to live separately from male family members, and this should be evaluated in the overall context of the case.[106]

## F. SUR PLACE CLAIMS

57. A *sur place* claim arises after arrival in the country of asylum, either as a result of the applicant's activities in the country of asylum or as a consequence of events, which have occurred or are occurring in the applicant's country of origin since their departure.[107] *Sur place* claims may also arise due to changes in the personal identity or gender expression of the applicant after his or her arrival in the country of asylum. It should be noted that some LGBTI applicants may not have identified themselves as LGBTI before the arrival to the country of asylum or may have consciously decided not to act on their sexual orientation or gender identity in their country of origin. Their fear of

---

[100] The elements to be examined under this analysis are the following: Is the area of relocation practically, safely and legally accessible to the individual? Is the agent of persecution a State or non-State agent? Would the claimant be exposed to a risk of being persecuted or other serious harm upon relocation?

[101] The criterion to be examined under this analysis is: Can the claimant lead a relatively normal life without facing undue hardship?

[102] See, for example, *Okoli v. Canada (Minister of Citizenship and Immigration)*, 2009 FC 332, Canada, Federal Court, 31 March 2009, available at: http://www.unhcr.org/refworld/docid/4a5b4bfa2.html, which found that the concealment of an immutable characteristic, that is, the applicant's sexual orientation, was an "impermissible requirement" for the assessment of internal flight alternative, paras. 36–37, 39; *HJ and HT*, above footnote 30. para. 21.

[103] UNHCR, Guidelines on Internal Flight Alternative, paras. 33–34.

[104] *Boer-Sedano v. Gonzales*, US, 418 F.3d 1082, (9th Cir. 2005), 12 August 2005, available at: http://www.unhcr.org/refworld/docid/4821a2ba2.html, found that the applicant's [HIV-positive] health status would make relocation unreasonable.

[105] UNHCR, Guidelines on Internal Flight Alternative, paras. 22–30.

[106] UNHCR, Guidelines on Gender-related Persecution.

[107] UNHCR, *Handbook*, paras. 94, 96.

AR.08236

persecution may thus arise or find expression whilst they are in the country of asylum, giving rise to a refugee claim *sur place*. Many such claims arise where an LGBTI individual engages in political activism or media work or their sexual orientation is exposed by someone else.

## V. PROCEDURAL ISSUES

**General**

58. LGBTI individuals require a supportive environment throughout the refugee status determination procedure, including pre-screening so that they can present their claims fully and without fear. A safe environment is equally important during consultations with legal representatives.

59. Discrimination, hatred and violence in all its forms can impact detrimentally on the applicant's capacity to present a claim. Some may be deeply affected by feelings of shame, internalized homophobia and trauma, and their capacity to present their case may be greatly diminished as a consequence. Where the applicant is in the process of coming to terms with his or her identity or fears openly expressing his or her sexual orientation and gender identity, he or she may be reluctant to identify the true extent of the persecution suffered or feared.[108] Adverse judgements should not generally be drawn from someone not having declared their sexual orientation or gender identity at the screening phase or in the early stages of the interview. Due to their often complex nature, claims based on sexual orientation and/or gender identity are generally unsuited to accelerated processing or the application of "safe country of origin" concepts.[109]

60. In order to ensure that refugee claims relating to sexual orientation and/or gender identity are properly considered during the refugee status determination process, the following measures should be borne in mind:

i.   An open and reassuring environment is often crucial to establishing trust between the interviewer and applicant and will assist the disclosure of personal and sensitive information. At the beginning of the interview, the interviewer needs to assure the applicant that all aspects of his or her claim will be treated in confidence.[110] Interpreters are also bound by confidentiality.

ii.  Interviewers and decision makers need to maintain an objective approach so that they do not reach conclusions based on stereotypical, inaccurate or inappropriate perceptions of LGBTI individuals. The presence or absence of certain stereotypical behaviours or appearances should not be relied upon to conclude that an applicant possesses or does not possess a given sexual orientation or gender identity.[111] There are no universal characteristics or qualities that typify LGBTI individuals any more than heterosexual individuals. Their life experiences can vary greatly even if they are from the same country.

iii. The interviewer and the interpreter must avoid expressing, whether verbally or through body language, any judgement about the applicant's sexual orientation, gender identity, sexual behaviour or relationship pattern. Interviewers and interpreters who are uncomfortable with diversity of sexual orientation and gender identity may inadvertently display distancing or demeaning body language. Self-awareness and specialized training (see iv.) are therefore critical aspects to a fair status determination.

iv.  Specialized training on the particular aspects of LGBTI refugee claims for decision makers, interviewers, interpreters, advocates and legal representatives is crucial.

---

[108] Some LGBTI applicants may, for instance, change their claims during the process by initially stating that their sexual orientation is imputed to them or making a claim on a ground unrelated to their sexual orientation or gender identity, to eventually expressing that they are LGBTI.

[109] UNHCR, "Statement on the right to an effective remedy in relation to accelerated asylum procedures", 21 May 2010, available at: http://www.unhcr.org/refworld/docid/4bf67fa12.html, paras. 11–12.

[110] UNHCR, Guidelines on Gender-Related Persecution, paras. 35, 36.iv.

[111] This issue has been addressed by a number of US Courts: *Shahinaj v. Gonzales*, 481 F.3d 1027, ( 8th Cir. 2007), 2 April 2007, available at: http://www.unhcr.org/refworld/docid/4821bd462.html; *Razkane v. Holder, Attorney General*, No. 08-9519, (10th Cir. 2009), 21 April 2009, available at: http://www.unhcr.org/refworld/docid/4a5c97042.html; *Todorovic v. US Attorney General*, No. 09-11652, (11th Cir. 2010), 27 September 2010, available at: http://www.unhcr.org/refworld/docid/4cd968902.html.

AR.08237

v.   The use of vocabulary that is non-offensive and shows positive disposition towards diversity of sexual orientation and gender identity, particularly in the applicant's own language, is essential.[112] Use of inappropriate terminology can hinder applicants from presenting the actual nature of their fear. The use of offensive terms may be part of the persecution, for example, in acts of bullying or harassment. Even seemingly neutral or scientific terms can have the same effect as pejorative terms. For instance, although widely used, "homosexual" is also considered a derogatory term in some countries.

vi.   Specific requests made by applicants in relation to the gender of interviewers or interpreters should be considered favourably. This may assist the applicant to testify as openly as possible about sensitive issues. If the interpreter is from the same country, religion or cultural background, this may heighten the applicant's sense of shame and hinder him or her from fully presenting all the relevant aspects of the claim.

vii.   Questioning about incidents of sexual violence needs to be conducted with the same sensitivity as in the case of any other sexual assault victims, whether victims are male or female.[113] Respect for the human dignity of the asylum-seeker should be a guiding principle at all times.[114]

viii.   For claims based on sexual orientation and/or gender identity by women, additional safeguards are presented in UNHCR's Guidelines on Gender-Related Persecution.[115] Women asylum-seekers should, for instance, be interviewed separately, without the presence of male family members in order to ensure they have an opportunity to present their case.

ix.   Specific procedural safeguards apply in the case of child applicants, including processing on a priority basis and the appointment of a qualified guardian as well as a legal representative.[116]

61. Where an individual seeks asylum in a country where same-sex relations are criminalized, these laws can impede his or her access to asylum procedures or deter the person from mentioning his or her sexual orientation or gender identity within status determination interviews. In such situations, it may be necessary for UNHCR to become directly involved in the case, including by conducting refugee status determination under its mandate.[117]

**Credibility and Establishing the Applicant's Sexual Orientation and/or Gender Identity**

62. Ascertaining the applicant's LGBTI background is essentially an issue of credibility. The assessment of credibility in such cases needs to be undertaken in an individualized and sensitive way. Exploring elements around the applicant's personal perceptions, feelings and experiences of difference, stigma and shame are usually more likely to help the decision maker ascertain the applicant's sexual orientation or gender identity, rather than a focus on sexual practices.[118]

63. Both open-ended and specific questions that are crafted in a non-judgemental manner may allow the applicant to explain his or her claim in a non-confrontational way. Developing a list of questions in preparation of the interview may be helpful, however, it is important to bear in mind that there is no magic formula of questions to ask and no set of "right" answers in response. Useful areas of questioning may include the following:

---

[112] For suggested appropriate terminology, see above at paras. 9–12.

[113] UNHCR, Guidelines on Gender-Related Persecution, para. 36 viii, xi.

[114] UNHCR, "Summary Report, Informal Meeting of Experts on Refugee Claims relating to Sexual Orientation and Gender Identity", 10 September 2011 (hereafter "UNHCR, Summary Report of Informal Meeting of Experts"), available at: http://www.unhcr.org/refworld/docid/4fa910f92.html, para. 34.

[115] UNHCR, Guidelines on Gender-Related Persecution paras. 35–37.

[116] UNHCR, "Guidelines on International Protection No. 8: Child Asylum Claims under Articles 1(A)2 and 1(F) of the 1951 Convention and/or 1967 Protocol relating to the Status of Refugees", 22 December 2009, HCR/GIP/09/08, available at: http://www.unhcr.org/refworld/docid/4b2f4f6d2.html, paras. 65–77.

[117] It is generally only where States have not yet acceded to the international refugee instruments, or if they have acceded but have not yet established national procedures, or these procedures are not fully functioning that UNHCR may be called upon to undertake individual refugee status determination and recognize refugees under its mandate. This function, therefore, can be exercised either in a State which is, or a State which is not, a signatory to the international refugee instruments. In these situations, UNHCR conducts refugee status determination for protection purposes (in order to protect refugees from *refoulement* and detention, for example) and/or to facilitate a durable solution. See, for example, UNHCR, *MM (Iran) v. Secretary of State for the Home Department - Written Submission on Behalf of the United Nations High Commissioner for Refugees*, 3 August 2010, C5/2009/2479, available at: http://www.unhcr.org/refworld/docid/4c6aa7db2.html, para. 11.

[118] UNHCR, Summary Report of Informal Meeting of Experts, para. 32.

AR.08238

i.  Self-identification: Self-identification as a LGBTI person should be taken as an indication of the applicant's sexual orientation and/or gender identity. The social and cultural background of the applicant may affect how the person self-identifies. Some LGB individuals, for example, may harbour deep shame and/or internalized homophobia, leading them to deny their sexual orientation and/or to adopt verbal and physical behaviours in line with heterosexual norms and roles. Applicants from highly intolerant countries may, for instance, not readily identify as LGBTI. This alone should not rule out that the applicant could have a claim based on sexual orientation or gender identity where other indicators are present.

ii.  Childhood: In some cases, before LGBTI individuals come to understand their own identity fully, they may feel "different" as children. When relevant, probing this experience of "difference" can be helpful to establishing the applicant's identity. The core attractions that form the basis for adult sexual orientation may emerge between middle childhood and early adolescence,[119] while some may not experience same-sex attraction until later in life. Likewise, persons may not be aware of their full gender identity until adolescence, early adulthood or later in life, as gender codes in many societies may be less prescriptive or strict during childhood than in (early) adulthood.

iii.  Self-Realization: The expression "coming out" can mean both an LGBTI person's coming to terms with his or her own LGBTI identity and/or the individual communicating his or her identity to others. Questions about both of these "coming out" or self-realization processes may be a useful way to get the applicant talking about his or her identity, including in the country of origin as well as in the country of asylum. Some people know that they are LGBTI for a long time before, for example, they actually pursue relationships with other people, and/or they express their identity openly. Some, for example, may engage in sexual activity (with same-sex and/or other-sex partners) before assigning a clear label to their sexual orientation. Prejudice and discrimination may make it difficult for people to come to terms with their sexual orientation and/or gender identity and it can, therefore, be a slow process.[120]

iv.  Gender identity: The fact that a transgender applicant has not undergone any medical treatment or other steps to help his or her outward appearance match the preferred identity should not be taken as evidence that the person is not transgender. Some transgender people identify with their chosen identity without medical treatment as part of their transition, while others do not have access to such treatment. It may be appropriate to ask questions about any steps that a transgender applicant has taken in his or her transition.

v.  Non-conformity: LGBTI applicants may have grown up in cultures where their sexuality and/or gender identity is shameful or taboo. As a result, they may struggle with their sexual orientation or gender identity at some point in their lives. This may move them away from, or place them in opposition to their families, friends, communities and society in general. Experiences of disapproval and of "being different" or the "other" may result in feelings of shame, stigmatization or isolation.

vi.  Family Relationships: Applicants may or may not have disclosed their sexual orientation and/or gender identity to close family members. Such disclosures may be fraught with difficulty and can lead to violent and abusive reactions by family members. As noted above, an applicant may be married, or divorced and/or have children. These factors by themselves do not mean that the applicant is not LGBTI. Should concerns of the credibility of an applicant who is married arise, it may be appropriate to ask the applicant a few questions surrounding the reasons for marriage. If the applicant is able to provide a consistent and reasonable explanation of why he or she is married and/or has children, the portion of the testimony should be found credible.[121]

vii.  Romantic and Sexual Relationships: The applicant's relationships with and attraction to partners, or their hope to have future relationships, will usually be part of their narrative of LGBTI individuals. Not everyone, however, especially young LGBTI people, will have had romantic or sexual relationships. The fact that an applicant has not had any relationship(s) in the country of origin does not

---

[119] APA, Sexual Orientation and Homosexuality.
[120] APA, Sexual Orientation and Homosexuality.
[121] USCIS, Guidance for Adjudicating LGBTI Claims, pp. 39–40.

AR.08239

necessarily mean that he or she is not LGBTI. It may rather be an indication that he or she has been seeking to avoid harm. Presuming that the applicant has been involved in a same-sex relationship, decision makers need to be sensitive with regard to questioning about past and current relationships since it involves personal information which the applicant may be reluctant to discuss in an interview setting. Detailed questions about the applicant's sex life should be avoided. It is not an effective method of ascertaining the well-foundedness of the applicant's fear of persecution on account of his or her sexual orientation and/or gender identity. Interviewers and decision makers need to bear in mind that sexual orientation and gender identity are about a person's identity, whether or not that identity is manifested through sexual acts.

viii. Community Relationship: Questions about the applicant's knowledge of LGBTI contacts, groups and activities in the country of origin and asylum may be useful. It is important to note, however, that applicants who were not open about their sexual orientation or gender identity in the country of origin may not have information about LGBTI venues or culture. For example, ignorance of commonly known meeting places and activities for LGBTI groups is not necessarily indicative of the applicant's lack of credibility. Lack of engagement with other members of the LGBTI community in the country of asylum or failure to join LGBTI groups there may be explained by economic factors, geographic location, language and/or cultural barriers, lack of such opportunities, personal choices or a fear of exposure.[122]

ix. Religion: Where the applicant's personal identity is connected with his/her faith, religion and/or belief, this may be helpful to examine as an additional narrative about their sexual orientation or gender identity. The influence of religion in the lives of LGBTI persons can be complex, dynamic, and a source of ambivalence.[123]

**Evidentiary Matters**

64. The applicant's own testimony is the primary and often the only source of evidence, especially where persecution is at the hands of family members or the community. Where there is a lack of country of origin information, the decision maker will have to rely on the applicant's statements alone. Normally, an interview should suffice to bring the applicant's story to light.[124] Applicants should never be expected or asked to bring in documentary or photographic evidence of intimate acts. It would also be inappropriate to expect a couple to be physically demonstrative at an interview as a way to establish their sexual orientation.

65. Medical "testing" of the applicant's sexual orientation is an infringement of basic human rights and must not be used.[125] On the other hand, medical evidence of transition-related surgery, hormonal treatment or biological characteristics (in the case of intersex individuals) may corroborate their personal narrative.

66. Relevant and specific country of origin information on the situation and treatment of LGBTI individuals is often lacking. This should not automatically lead to the conclusion that the applicant's claim is unfounded or that there is no persecution of LGBTI individuals in that country.[126] The extent to which international organizations and other groups are able to monitor and document abuses against LGBTI individuals remain limited in many countries. Increased activism has often been met with attacks on human rights defenders, which impede their ability to document violations. Stigma attached to issues surrounding sexual orientation and/or gender identity also contributes to incidents going unreported. Information can be especially scarce for certain groups, in particular bisexual, lesbian, transgender and intersex people. It is critical to avoid automatically drawing conclusions based on information about one group or another; however, it may serve as an indication of the applicant's situation in certain circumstances.

---

[122] *Essa v. Canada (Minister of Citizenship and Immigration)*, 2011 FC 1493, Canada, Federal Court, 20 December 2011, available at: http://www.unhcr.org/refworld/docid/4f901c392.html, paras. 30–31, found that the Board's insistence on the applicant going to or have knowledge about gay venues in the country of asylum in order to be gay was not reasonable.
[123] APA, Practice Guidelines for LGB Clients.
[124] UNHCR, *Handbook*, paras. 196, 203–204.
[125] See further, "UNHCR's Comments on the Practice of Phallometry in the Czech Republic to Determine the Credibility of Asylum Claims based on Persecution due to Sexual Orientation", April 2011, available at: http://www.unhcr.org/refworld/docid/4daeb07b2.html.
[126] See, for example, *Molnar v. Canada*, above footnote 39.

AR.08240

**9**

AR.08241

**UNHCR**
United Nations High Commissioner for Refugees
Haut Commissariat des Nations Unies pour les réfugiés

Distr. GENERAL       HCR/GIP/13/10/Corr. 1.       12 November 2014       Original: ENGLISH

# GUIDELINES ON INTERNATIONAL PROTECTION NO. 10:

**Claims to Refugee Status related to Military Service within the context of Article 1A (2) of the 1951 Convention and/or the 1967 Protocol relating to the Status of Refugees**

UNHCR issues these *Guidelines* pursuant to its mandate, as contained in the Office's Statute, in conjunction with Article 35 of the 1951 Convention relating to the Status of Refugees and Article II of its 1967 Protocol. These Guidelines complement the *UNHCR Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention* (reissued 2011) and, in particular, are to be read together with UNHCR's *Guidelines on International Protection No. 6: Religion-Based Refugee Claims* and *Guidelines on International Protection No. 8: Child Asylum Claims*. They replace *UNHCR's Position on Certain Types of Draft Evasion* (1991).

The *Guidelines*, the result of broad consultations, provide legal interpretative guidance for governments, legal practitioners, decision makers and the judiciary, as well as UNHCR staff carrying out mandate refugee status determination.

The UNHCR *Handbook on Procedures and Criteria for Determining Refugee Status* and *the Guidelines on International Protection* are available at: http://www.unhcr.org/refworld/docid/4f33c8d92.html.

**10**

AR.08242

## I. INTRODUCTION

1. The situation of "deserters and persons avoiding military service" is explicitly addressed in *UNHCR's Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees* ["*UNHCR Handbook*].[1] Since the publication of the *UNHCR Handbook* there have been considerable developments both in the practice of States and in the restrictions placed on military service by international law. Given these developments, as well as divergences in jurisprudence, UNHCR issues these *Guidelines* with the aim to facilitate a consistent and principled application of the refugee definition in Article 1A(2) of the 1951 Convention and/or 1967 Protocol relating to the Status of Refugees in such cases. These *Guidelines* examine the position of individuals who seek international protection to avoid recruitment by, and service in, State armed forces, as well as forced recruitment by non-State armed groups.

2. These Guidelines address the definition of key terms [Part II], followed by an overview of international legal developments relating to military service [Part III]. Part IV examines the refugee determination criteria as they apply to claims involving military service. Part V considers procedural and evidentiary issues. The *Guidelines* focus on the interpretation of the "inclusion" components of the refugee definition. Exclusion considerations are not addressed, although they may be at issue in such cases, and will need to be properly assessed.[2] Further, issues around maintaining the civilian and humanitarian character of asylum, while often relevant to such claims, are not dealt with in these Guidelines.[3]


## II. TERMINOLOGY

3. For the purpose of these *Guidelines*, these terms are defined as follows:

**Alternative service** refers to service in the public interest performed instead of compulsory military service in the State armed forces by individuals who have a conscientious objection to military service ["conscientious objectors"]. Alternative service may take the form of civilian service outside the armed forces or a non-combatant role in the military.[4] Civilian service can involve, for example, working in State-run health institutions, or voluntary work with charitable organisations either at home or abroad. Non-combatant service in the military would include positions such as cooks or administrative clerks.

**Conscientious objection** to military service refers to an objection to such service which "derives from principles and reasons of conscience, including profound convictions, arising from religious, moral, ethical, humanitarian or similar motives."[5] Such an objection is not confined to **absolute conscientious objectors** [pacifists], that is, those who object to all use of armed force or participation in all wars. It also encompasses those who believe that "the use of force is justified in some circumstances but not in others, and that therefore it is necessary to object in those other cases" [**partial** or **selective objection** to military service].[6] A conscientious objection may develop over time, and thus volunteers may at some stage also raise claims based on conscientious objection, whether absolute or partial.

**Desertion** involves abandoning one's duty or post without permission, or resisting the call up for military duties.[7] Depending on national laws, even someone of draft age who has completed his

---

[1] UNHCR, *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugee*, (reissued, Geneva, 2011), ("*UNHCR Handbook*"), available at: http://www.unhcr.org/refworld/pdfid/4f33c8d92.pdf, paras. 167-174.

[2] Reference is made instead to UNHCR, *Guidelines on International Protection No. 5: Application of the Exclusion Clauses: Article 1F of the 1951 Convention relating to the Status of Refugees*, HCR/GIP/03/05, 4 September 2003, ("*UNHCR Exclusion Guidelines*"), available at: http://www.unhcr.org/refworld/docid/3f5857684.html.

[3] See, Executive Committee ("ExCom") Conclusion No. 94 (LII), 2002, on the civilian and humanitarian character of asylum, para. (c)(vii).

[4] See, further, for example, UN Human Rights Council, *Analytical report on conscientious objection to military service: Report of the United Nations High Commissioner for Human Rights*, A/HRC/23/22, 3 June 2013, available at: http://www.refworld.org/docid/51b5c73c4.html.

[5] See, UN Commission on Human Rights, Resolution 1998/77, "*Conscientious Objection to Military Service*", E/CN.4/RES/1998/77, 22 April 1998, available at: http://www.refworld.org/docid/3b00f0be10.html. The Commission was replaced by the UN Human Rights Council in 2006.

[6] See, UN *Conscientious Objection to Military Service*, E/CN.4/Sub.2/1983/30/Rev.1, 1985 (the "*Eide and Mubanga-Chipoya report*"), available at: http://www.refworld.org/pdfid/5107cd132.pdf, para. 21. See also, paras. 128-135 regarding persecution in the context of conscientious objection to conflicts which violate basic rules of human conduct.

[7] See, European Court of Human Rights, *Feti Demirtaş c. Turquie*, Application no. 5260/07, 17 January 2012, available at: http://www.unhcr.org/refworld/docid/4ff5996d2.html.

AR.08243

or her national service and has been demobilized, but is still regarded as being subject to national service, may be regarded as a deserter under certain circumstances. Desertion can occur in relation to the police force, gendarmerie or equivalent security services, and is also the term used to apply to deserters from non-State armed groups. Desertion may be for reasons of conscience or for other reasons.

**Draft evasion** occurs when a person does not register for, or does not respond to, a call up or recruitment for compulsory military service. The evasive action may be as a result of the evader fleeing abroad, or may involve, inter alia, returning call up papers to the military authorities. In the latter case, the person may sometimes be described as a draft resister rather than a draft evader, although draft evader is used to cover both scenarios in these *Guidelines*. Draft evasion may also be pre-emptive in the sense that action may be taken in anticipation of the actual demand to register or report for duty. Draft evasion only arises where there is mandatory enrolment in military service ["the draft"]. Draft evasion may be for reasons of conscience or for other reasons.

**Forced recruitment** is the term used in these *Guidelines* to refer to the coerced, compulsory or involuntary recruitment into either a State's armed forces or a non-State armed group.

**Military service** primarily refers to service in a State's armed forces. This may occur in peacetime or during a period of armed conflict, and may be on a voluntary or compulsory basis. Compulsory military service by the State is also known as **conscription** or "**the draft**". Where an individual volunteers to join the State military, it is called **enlistment.**

**Reservists** are individuals who serve in the reserve forces of the State's armed forces. They are not considered to be on active duty, but are required to be available to respond to any call up in an emergency.

4. Where alternatives to compulsory military service are not available, an individual's conscientious objection may be expressed through draft evasion or desertion. However, draft evasion or desertion is not synonymous with conscientious objection as other motivations, such as fear of military service or the conditions of such service may be involved. Conscientious objection, draft evasion and desertion may all take place in peacetime as well as during armed conflict. Moreover, whilst conscientious objection and evasion/desertion tend to arise in relation to conscription, they can also take place where the original decision to join the armed forces was voluntary or the obligation to undertake compulsory military service was initially accepted.[8]


# III. INTERNATIONAL LAW ON MILITARY SERVICE

## A. The Right of States to Require Military Service

5. States have a right of self-defence under both the UN Charter and customary international law.[9] States are entitled to require citizens to perform military service for military purposes;[10] and this does not in itself violate an individual's rights.[11] This is recognized explicitly in human rights provisions concerned with forced labour, such as Article 8 of the 1966 International Covenant on Civil

---

[8] See, for example, UN Commission on Human Rights, Resolution 1998/77, preambular para. see note 5 above.
[9] Article 51, UN Charter. See also, International Court of Justice, *Case concerning the Military and Paramilitary Activities in and against Nicaragua (Nicaragua v. United States of America) (Merits)*, 27 June 1986, available at: http://www.refworld.org/docid/4023a44d2.html, paras. 187-201.
[10] This does not cover conscription of non-nationals in occupied territories in the context of international armed conflict: see Article 51 of the 1949 Geneva Convention Relative to the Protection of Civilian Persons in Time of War (Geneva Convention IV), which states that an "Occupying Power may not compel protected persons to serve in its armed or auxiliary forces." "Protected persons" refers in this context to civilians in the occupied territory who are not nationals of the Occupying Power.
[11] The UN Human Rights Committee ("HRC") has noted this in relation to a complaint of discrimination (Article 26 of the 1966 International Covenant on Civil and Political Rights ("ICCPR")). See, *M.J.G. (name deleted) v. Netherlands*, CCPR/C/32/D/267/1987, 24 March 1988, available at: http://www.unhcr.org/refworld/pdfid/50b8eca22.pdf para. 3.2; see, similarly, the earlier case of *R.T.Z. (name deleted) v. Netherlands*, CCPR/C/31/D/245/1987, 5 November 1987, available at: http://www.unhcr.org/refworld/pdfid/50b8ed122.pdf. That human rights law, in particular the ICCPR, applies to members of the military as well as to civilians was explicitly stated by the HRC in *Vuolanne v. Finland*, CCPR/C/35/D/265/1987, 2 May 1989, available at: http://www.unhcr.org/refworld/pdfid/50b8ee372.pdf.

AR.08244

and Political Rights ["ICCPR"].[12] States may also impose penalties on persons who desert or avoid military service where their desertion or avoidance is not based on valid reasons of conscience, provided such penalties and the associated procedures comply with international standards.[13]

6. The State's right to compel citizens to undertake military service is not subject to other requirements in international human rights law, as well as international humanitarian and international criminal law[ see Parts III.B. and III.C. below]. In general, for military recruitment and service to be justified it needs to fulfil certain criteria: prescribed by law, implemented in a way that is not arbitrary or discriminatory, the functions and discipline of the recruits must be based on military needs and plans, and be challengeable in a court of law.[14]

7. The position of non-State armed groups is different from that of States, in that only States can require military conscription. International law does not entitle non-State armed groups, whether or not they may be the *de facto* authority over a particular part of the territory, to recruit on a compulsory or forced basis.

## B. The Right to Conscientious Objection against Compulsory Military Service

8. The right to conscientious objection to State military service is a derivative right, based on an interpretation of the right to freedom of thought, conscience and religion contained in Article 18 of the Universal Declaration of Human Rights and Article 18 of the ICCPR. International jurisprudence on this right is evolving. The UN Human Rights Committee's [HRC] case law has shifted from characterizing the right as derived from the right "to manifest" one's religion or belief and thus subject to certain restrictions in Article 18(3),[15] to viewing it as one that "inheres in the right" to freedom of thought, conscience and religion in Article 18(1) itself.[16] This is a significant shift, and has been subject to individual concurring opinions.[17] According to the HRC, the right therefore "entitles the individual to an exemption from compulsory military service if this cannot be reconciled with the individual's religion or beliefs. The right must not be impaired by coercion."[18] The HRC has further clarified that "a State may, if it wishes, compel the objector to undertake a civilian alternative to military service, outside the military sphere and not under military command. The alternative service must not be of a punitive nature. It must be a real service to the community and compatible with respect for human rights."[19] Even in its earlier jurisprudence, where the HRC based its decisions on the right to *manifest* one's religion or belief [found in Article 18(3) read together with 18(1) ICCPR], the State had to demonstrate why such a restriction was "necessary", given that many other countries manage to reconcile the interests of the individual with the interests of the State through the provision of alternative service.[20]

---

[12] Article 8(3)(c)(ii) ICCPR exempts from the prohibition on forced or compulsory labour (found in Article 8(3)(a)), "Any service of a military character and, in countries where conscientious objection is recognized, any national service required by law of conscientious objectors." In addition, Article 2(2)(a) of the 1930 International Labour Organization ("ILO") Convention No. 29: Forced Labour Convention exempts from its prohibition on forced or compulsory labour (Article 1(1)), "any work or service exacted in virtue of compulsory military service laws for work of a purely military character." The reference to "military service laws" indicates that for the exemption to be valid, it must be set out in law. See also, the decisions of the HRC in *Venier and Nicholas v. France*, CCPR/C/69/D/690/1996, 1 August 2000, available at: http://www.unhcr.org/refworld/pdfid/50b8ec0c2.pdf and *Foin v. France*, CCPR/C/67/D/666/1995, 9 November 1999, where the HRC stated that under Article 8 of the ICCPR States may require service of a military character, available at: http://www.unhcr.org/refworld/docid/4a3a3aebf.html, para. 10.3.

[13] On procedures, in the European Court of Human Rights, see *Savda c. Turquie*, Application No. 42730/05,12 June 2012, available at: http://www.refworld.org/docid/4fe9a9bb2.html, see also, *Feti Demirtaş c. Turquie*, see note 7 above.

[14] Inter-American Commission on Human Rights ("IACHR"), "Fourth report on the situation of human rights in Guatemala", OEA/Ser.L/V/II.83, Doc. 16 rev., 1 June 1993, chap. V. See also, IACHR, *Piché Cuca v. Guatemala*, Report No. 36/93, case 10.975, decision on merits, 6 October 1993, indicating that the conscription process must be challengeable in a court of law, available at: http://www.refworld.org/docid/5020dd282.html.

[15] Article 18(3) ICCPR provides certain limitations on the right to manifest one's religion or belief, namely "prescribed by law and (...) necessary to protect public safety, order, health, or morals or the fundamental rights and freedoms of others." For further analysis, see UNHCR, *Guidelines on International Protection No. 6: Religion-Based Refugee Claims under Article 1A(2) of the 1951 Convention and/or the 1967 Protocol relating to the Status of Refugees*, HCR/GIP/04/06, 28 April 2004, *("UNHCR Guidelines on Religion-Based Claims")*, available at: http://www.unhcr.org/refworld/docid/4090f9794.html, para. 15. Moreover, unlike other rights in the Covenant, restrictions on the grounds of national security are not permitted at all. As noted by the HRC, "... such restrictions must not impair the very essence of the right in question." See HRC, *Yoon and Choi v. Republic of Korea*, CCPR/C/88/D/1321-1322/2004, 23 January 2007, available at: http://www.unhcr.org/refworld/docid/48abd57dd.html, para. 8.3, and *Eu-min Jung* and *Others v. Republic of Korea*, CCPR/C/98/D/1593-1603/2007, 30 April 2010, available at: http://www.unhcr.org/refworld/pdfid/4c19e0322.pdf, para. 7.4.

[16] See, HCR, *Min-Kyu Jeong at al v. Republic of Korea*, CCPR/C/101/D/1642-1741/2007, 27 April 2011, available at: http://www.unhcr.org/refworld/docid/4ff59b332.html paras. 7.3 - 7.4; *Atasoy and Sarkut v. Turkey*, CCPR/C/104/D/1853-1854/2008, 19 June 2012, available at: http://www.unhcr.org/refworld/docid/4ff5b14c2.html, paras.10.4 - 10.5; and *Jong-nam Kim et al v. Republic of Korea*, CCPR/C/106/D/1786/2008, 1 February 2013, available at: http://www.refworld.org/docid/532a9f1a4.html, paras. 7.4 – 7.5.

[17] See, Individual opinion of Committee member Mr. Gerald L. Neuman, jointly with members Mr. Yuji Iwasawa, Mr. Michael O'Flaherty and Mr. Walter Kaelin (concurring), *Atasoy and Sarkut v. Turkey, ibid.*

[18] *Min-Kyu Jeong at al v. Republic of Korea*, para.7.3; *Atasoy and Sarkut v. Turkey*, para. 10.4. and *Jong-nam Kim et al v. Republic of Korea*, para. 7.4, see note 16 above.

[19] *Ibid.*

[20] See, *Yoon and Choi v. Republic of Korea*, para. 8.4, and *Eu-min Jung and Others v. Republic of Korea*, para. 7.4, see both notes 15 above.

AR_08245

9. Thus a conscientious objector's rights under Article 18 ICCPR will be respected where he or she is (i) exempted from the obligation to undertake military service or (ii) appropriate alternative service is available. In assessing the appropriateness of alternative service, it is generally considered that it needs to be compatible with the reasons for the conscientious objection; of a non-combatant or civilian character; in the public interest; and not punitive.[21] For example, civilian service under civilian administration would be necessary in the cases of individuals who object outright to any association with the military.[22] However, where the objection is specifically to the personal carrying of arms the option of non-combatant service in the military may be appropriate. Many States avoid the difficulty of having to evaluate the sincerity of a claim to conscientious objection by allowing the person a free choice between military and alternative service.[23] In some States recognition of conscientious objection has been granted only to certain religious groups. However, as noted above, this would not be consistent with the scope of the right to freedom of thought, conscience and religion, nor with the prohibition on discrimination.[24]

10. The right to conscientious objection is also reaffirmed in regional instruments, either explicitly or by interpretation,[25] as well as in various international standard setting documents.[26]

11. The right to conscientious objection applies to absolute, partial, or selective objectors [see II.];[27] volunteers as well as conscripts before and after joining the armed forces; during peace time and during armed conflict.[28] It includes objection to military service based on moral, ethical, humanitarian or similar motives.[29]

**10**

---

[21] UN Commission on Human Rights resolution 1998/77, para. 4, see note 5 above. See also, note 18 above.

[22] See,, *Min-Kyu Jeong at al v. Republic of Korea*, para.7.3; *Atasoy and Sarkut v. Turkey*, para. 10.4; and *Jong-nam Kim et al v. Republic of Korea*, para. 7.4, note 16 above.

[23] For a general overview of State practice, see, *Analytical report on conscientious objection to military service: Report of the United Nations High Commissioner for Human Rights*, see note 4 above. See also, War Resisters' International, *World Survey of Conscription and Conscientious Objection to Military Service*, available at: http://www.wri-irg.org/co/rtba/index.html. With respect to European countries see also the judgment of the European Court of Human Rights in *Bayatyan v. Armenia*, Application No. 23459/03, 7 July 2011, available at: http://www.unhcr.org/refworld/docid/4e254eff2.html, para. 110.

[24] See, for example, HRC, *General Comment No. 22: The Right to Freedom of Thought, Conscience and Religion (Article 18)*, CCPR/C/21/Rev.1/Add.4, 30 July 1993, available at: http://www.unhcr.org/refworld/pdfid/453883fb22.pdf, stating that "...there shall be no differentiation among conscientious objectors on the basis of the nature of their particular beliefs...", para. 11. With regard to State practice recognizing conscientious objection even when it originates from views outside of those of certain formal religions, see, *Analytical report on conscientious objection to military service: Report of the United Nations High Commissioner for Human Rights*, para. 12, see note 4 above. See also, *Brinkhof v. Netherlands*, CCPR/C/48/D/402/1990, 29 July 1993, available at: http://www.unhcr.org/refworld/docid/4a3a3ae913.html.

[25] The right to conscientious objection is explicitly recognized in two regional treaties: 2000 Charter of Fundamental Rights of the European Union, Article 10(2); 2005 Ibero-American Convention on Young People's Rights, Article 12(3). The right is also derived from the right to freedom of thought, conscience and religion in regional human rights treaties, and has been recognized as such by the European Court of Human Rights (see *Bayatyan v. Armenia*, para. 110, note 28 above as affirmed by *Feti Demirtaş c. Turquie*, note 7 above; *Savda c. Turquie*, see note 13 above; and *Tarhan c. Turquie*, Application No. 9078/06, 17 July 2012, available at: http://www.refworld.org/docid/51262a732.html)) and by the IACHR (see *Cristián Daniel Sahli Vera et al. v. Chile*, Case 12.219, Report no. 43/05, 10 March 2005, available at: http://www.unhcr.org/refworld/pdfid/4ff59edc2.pdf; see also the friendly settlement in *Alfredo Díaz Bustos v. Bolivia*, Case 14/04, Report no. 97/05, 27 October 2005, available at: http://www.unhcr.org/refworld/pdfid/4ff59fbc2.pdf, para. 19). See also IACHR, Annual Report, 1997, Chapter VII: Recommendation 10, available at: http://www.unhcr.org/refworld/docid/50b8bd162.html; Council of Europe Parliamentary Assembly, Recommendation 1518 (2001) on the exercise of the right of conscientious objection to military service in Council of Europe Member States, 23 May 2001, available at: http://www.unhcr.org/refworld/docid/5107cf8f2.html; Council of Europe Committee of Ministers, Recommendation No. R (87) 8, 9 April 1987, available at: http://www.unhcr.org/refworld/docid/5069778e2.html; and Council of Europe Committee of Ministers, Recommendation CM/Rec (2010) 4 on human rights of members of the armed forces, 24 February 2010, available at: http://www.unhcr.org/refworld/docid/506979172.html.

[26] See, UN General Assembly resolution, 33/165, 1978 on Status of persons refusing service in military or police forces used to enforce apartheid, available at: http://www.refworld.org/docid/3b00f1ae28.html. See HRC, *General Comment No. 22: The Right to Freedom of Thought, Conscience and Religion (Article 18)*, para. 11, see note 24 above, as well as the HRC's Concluding Observations on Ukraine, CCPR/CO/73/UKR, 12 November 2001, available at: http://www.unhcr.org/refworld/docid/3cbbeb1c4.html para. 20, and those on Kyrgyzstan, CCPR/CO/69/KGZ, 24 July 2000, available at: http://www.unhcr.org/refworld/docid/507572ef2.html, para. 18. The former UN Commission on Human Rights also affirmed that a right to conscientious objection derives from the right to freedom of thought, conscience and religion (UN Commission on Human Rights Resolution, *Conscientious objection to military service*, E/CN.4/RES/1989/59, 8 March 1989, available at: http://www.unhcr.org/refworld/docid/3b00f0b24.html, reinforced and developed in resolutions E/CN.4/RES/1993/84, 10 March 1993, available at: http://www.unhcr.org/refworld/docid/3b00f1228c.html; E/CN.4/RES/1995/83, 8 March 1995, available at: http://www.unhcr.org/refworld/docid/3b00f0d220.html; and E/CN.4/RES/1998/77, see note 5 above, E/CN.4/RES/2000/34, 20 April 2000, available at: http://www.unhcr.org/refworld/docid/3b00efa128.html; E/CN.4/RES/2002/45, 23 April 2002, available at: http://www.unhcr.org/refworld/docid/5107c76c2.html; and E/CN.4/RES/2004/35, 19 April 2004, available at: http://www.unhcr.org/refworld/docid/415be85e4.html). Its successor, the UN Human Rights Council, has endorsed this position in its 2012 resolution on conscientious objection (A/HRC/RES/20/2, 16 July 2012, available at: http://www.unhcr.org/refworld/docid/501661d12.html) and latest in its 2013 resolution (A/HRC/24/L.23, 23 September 2013, available at: http://www.refworld.org/docid/526e3e114.html).

[27] Although the HRC has not discussed partial or selective conscientious objection either in *General Comment No. 22: The Right to Freedom of Thought, Conscience and Religion (Article 18)*, see note 29 above or in its recent decisions on individual complaints, a number of countries do make provision for selective or partial conscientious objection, see, for example, *Analytical report on conscientious objection to military service: Report of the United Nations High Commissioner for Human Rights*, para 47, see note 4 above.

[28] See, Part II on Terminology.

[29] See also *Savda c. Turquie*, para. 96, note 13 above.

AR.08246

**C. Prohibition on Underage Recruitment and Participation in Hostilities**

12. Explicit safeguards exist to prevent the exposure of children to military service.[30] All recruitment [both compulsory and voluntary] in State armed forces and the participation in hostilities[31] of those under 15 years of age is prohibited under international treaty law.[32] Such recruitment amounts to a war crime.[33] Whether conducted by governments or by non-State armed groups, compulsory recruitment of persons under 18 years of age is also prohibited pursuant to the 2000 Optional Protocol to the 1989 Convention on the Rights of the Child ["CRC"] on the involvement of children in armed conflict ["Optional Protocol to the CRC"].[34] A similar restriction is found in the 1999 International Labour Organization Convention on Worst Forms of Child Labour.[35] The 2000 Optional Protocol to the CRC requires States to "take all feasible measures" to prevent children under the age of 18 taking a "direct part in hostilities" whether as members of its armed forces or other armed groups and prohibits outright any voluntary recruitment of children under 18 years into non-State armed groups.[36] Whilst voluntary enlistment of children of 16 years and above is permitted for State armed forces, the State is obliged to put in place safeguards to ensure, *inter alia*, that any such recruitment is genuinely voluntary.[37] Despite the different age limits set by international law, it is UNHCR's view that forced recruitment and/or direct participation in hostilities of a child below the age of 18 years in the armed forces of the State or by a non-State armed group would amount to persecution.[38] Regional instruments also contain prohibitions on the recruitment and direct participation of children in hostilities.[39]

## IV. SUBSTANTIVE ANALYSIS

### A. Well-founded Fear of Being Persecuted

13. What amounts to a well-founded fear of being persecuted depends on the particular circumstances of the case, including the applicant's background, profile and experiences considered in light of up-to-date country of origin information.[40] It is important to take into account the personal experiences of the applicant, as well as the experiences of others similarly situated, since these may well show that there is a reasonable likelihood that the harm feared by the applicant will materialize sooner or later.[41] The first-tier question to ask is: *What would be the predicament [consequence(s)] for the applicant if returned?* The second-tier question is: *Does that predicament [or consequence(s)] meet the threshold of persecution?* The standard of proof to determine the risk is reasonable likelihood.[42]

---

[30] See, in this regard, UN Security Council, *Resolution 1882 (2009) on children and armed conflict*, S/RES/1882 (2009), 4 August 2009, available at: http://www.unhcr.org/refworld/docid/4a7bdb432.html.
[31] Technically, international humanitarian law distinguishes between non-international armed conflict and international armed conflict in this respect. In non-international armed conflict (Article 4(3)(c), Additional Protocol II to the 1949 Geneva Conventions, relating to the Protection of Victims of Non-International Armed Conflict ("Additional Protocol II")) the prohibition relates to use in hostilities. In international armed conflict (Article 77(2), Additional Protocol I to the 1949 Geneva Conventions, relating to the Protection of International Armed Conflict ("Additional Protocol I")), it is limited to taking direct part in hostilities. The Convention on the Rights of the Child ("CRC") adopts the narrower "direct part in hostilities" standard, see Article 38(2), CRC.
[32] Article 77(2), Additional Protocol I; Article 4(3)(c), Additional Protocol II; Article 38(2) CRC.
[33] See, Article 8(2)(b)(xxvi) and 8(2)(e)(vii) of the 1998 Statute of the International Criminal Court ("ICC Statute") which lists as war crimes "conscripting or enlisting children under the age of fifteen years into the national armed forces or using them to participate actively in hostilities." See also International Criminal Court ("ICC"), *Situation in the Democratic Republic of the Congo, in the case of the Prosecutor v. Thomas Lubanga Dyilo*, ICC-01/04-01/06, 14 March 2012, available at: http://www.unhcr.org/refworld/docid/4f69a2db2.html; Special Court for Sierra Leone ("SCSL"), *Prosecutor v. Issa Hassan Sesay, Morris Kallon and Augustine Gbao (the RUF accused) (Trial judgment)*, Case No. SCSL-04-15-T, 2 March 2009, available at: http://www.unhcr.org/refworld/docid/49b102762.html, at para. 184 (finding that the prohibition on such recruitment is customary international law). Further discussion of what constitutes the war crime of underage recruitment can be found in the SCSL, *Prosecutor v. Charles Ghankay Taylor*, SCSL-03-01-T, 18 May 2012, available at: http://www.unhcr.org/refworld/docid/50589aa92.html.
[34] Articles 2 and 4, 2000 Optional Protocol to the Convention on the Rights of the Child on the involvement of children in armed conflict.
[35] Article 3(a), 1999 ILO Convention No. 182 on Worst Forms of Child Labour.
[36] Articles 1 and 4, 2000 Optional Protocol to CRC.
[37] Article 3, 2000 Optional Protocol to CRC. See also, *UNHCR Guidelines on International Protection No. 8 Child Asylum Claims under Articles 1A(2) and 1(F) of the 1951 Convention and /or 1967 Protocol relating to the Status of Refugees*, HCR/GIP/09/08, 22 December 2009, ("UNHCR Guidelines on Child Asylum Claims"), available at: http://www.unhcr.org/refworld/docid/4b2f4f6d2.html, para. 22.
[38] *UNHCR Guidelines on Child Asylum Claims*, para. 21.
[39] See, Article 22(2), 1990 African Charter on the Rights and Welfare of the Child, and Article 12(3), 2005 Ibero-American Convention on Young People's Rights.
[40] *UNHCR Handbook*, paras. 51-53, see note 1 above.
[41] *UNHCR Handbook*, paras. 42-43, see note 1 above, and *UNHCR Guidelines on Religion-Based Claims*, para. 14, see note 15 above.
[42] See, UNHCR, *Note on the Burden and Standard of Proof*, 16 December 1998, ("Note on the Burden and Standard of Proof"), available at: http://www.refworld.org/docid/3ae6b3338.html, para. 10; UNHCR, *Interpreting Article 1 of the 1951 Convention relating to the Status of Refugees*, April 2001, ("UNHCR Interpreting Article 1"), available at: http://www.unhcr.org/refworld/docid/3b20a3914.html, paras. 16-17.

AR.08247

14. Persecution will be established if the individual is at risk of a threat to life or freedom,[43] other serious human rights violations, or other serious harm.[44] By way of example, disproportionate or arbitrary punishment for refusing to undertake State military service or engage in acts contrary to international law – such as excessive prison terms or corporal punishment – would be a form of persecution. Other human rights at stake in such claims include non-discrimination and the right to a fair trial right, as well as the prohibitions against torture or inhuman treatment, forced labour and enslavement/servitude.[45]

15. In assessing the risk of persecution, it is important to take into account not only the direct consequences of one's refusal to perform military service [for example, prosecution and punishment], but also any negative indirect consequences. Such indirect consequences may derive from non-military and non-State actors, for example, physical violence, severe discrimination and/or harassment by the community. Other forms of punitive retribution for draft evasion or desertion may also be evident in other situations, such as suspension of rights to own land, enrol in school or university, or access social services.[46] These types of harm may amount to persecution if they are sufficiently serious in and of themselves, or if they would cumulatively result in serious restrictions on the applicant's enjoyment of fundamental human rights, making their life intolerable.

16. Claims relating to military service may arise in various situations. This section outlines five common types of claims, albeit with some overlap.

### (i) Objection to State Military Service for Reasons of Conscience [absolute or partial conscientious objectors]

17. In assessing what kinds of treatment would amount to persecution in cases where the applicant is a conscientious objector [see V. A. below on issues relating to credibility and genuineness of the applicant's conviction(s)], the key issue is whether the national law on military service adequately provides for conscientious objectors, by either: (i) exempting them from military service, or (ii) providing appropriate alternative service. As mentioned in Part III above, States can legitimately require that citizens perform military or alternative service. However, where this is done in a manner that is inconsistent with international law standards, conscription may amount to persecution.

18. In countries where neither exemption nor alternative service is possible, a careful examination of the consequences for the applicant will be needed. For example, where the individual would be forced to undertake military service or participate in hostilities against their conscience, *or* risk being subjected to prosecution and disproportionate or arbitrary punishment for refusing to do so, persecution would arise. Moreover, the threat of such prosecution and punishment, which puts pressure on conscientious objectors to change their conviction, in violation of their right to freedom of thought, conscience or belief, would also meet the threshold of persecution.[47]

19. The persecution threshold would not be met in countries that do not make provision for alternative service, but where the only consequence is a theoretical risk of military service because in practice conscription is not enforced or can be avoided through the payment of an administrative fee.[48] Similarly, where a draft evader is exempted from military service, or where a deserter is offered an honourable discharge, the issue of persecution would not arise, unless other factors are present.

---

[43] Article 33(1), 1951 Convention.
[44] See, *UNHCR Handbook*, para. 51-53, see note 1 above. See also, UNHCR, *Guidelines on International Protection No. 7: The Application of Article 1A(2) of the 1951 Convention and/or 1967 Protocol Relating to the Status of Refugees to Victims of Trafficking and Persons At Risk of Being Trafficked*, HCR/GIP/06/07, 7 April 2006, available at: http://www.unhcr.org/refworld/docid/443679fa4.html, para. 14, and UNHCR Handbook, paras. 54-55, see note 1 above.
[45] See, for example, IACHR, "Fourth report on the situation of human rights in Guatemala", OEA/Ser.L/V/II.83, Doc. 16 rev., 1 June 1993, chap. V.
[46] Concerning the denial of enrolment into school or university see for example, UNHCR, *Eligibility Guidelines for Assessing the International Protection Needs of Asylum-Seekers from Eritrea*, April 2009, available at: http://www.refworld.org/docid/49de06122.html, page 13; regarding suspension of land ownership and denial of access to public services see for example, UNHCR, *Eligibility Guidelines for Assessing the International Protection Needs of Asylum-Seekers from Eritrea*, 20 April 2011, HCR/EG/ERT/11/01, available at: http://www.refworld.org/docid/4dafe0ec2.html, pages 10 and 25 respectively.
[47] See, UN Commission on Human Rights, *Civil and Political Rights, Including the Question of Torture and Detention: Report of the Working Group on Arbitrary Detention*, E/CN.4/2001/14, 20 December 2000, recommendation No. 2, available at: http://www.refworld.org/docid/3b00f54d18.html, paras. 91-94.
[48] Excessive administrative fees designed to deter genuine conscientious objectors from opting for alternative service or which are considered punitive would be considered discriminatory and may on a cumulative basis meet the threshold of persecution.

AR.08248

20. Where alternative service is available, but punitive in nature and implementation, because of the type of service involved or its disproportionate duration, the issue of persecution may nonetheless be at issue. A disparity in the length of alternative service will not, in itself, be sufficient to meet the threshold of persecution. If, for example, the duration of alternative service is based on objective and reasonable criteria, such as the nature of the specific service concerned, or the need for special training in order to accomplish that service, persecution would not arise.[49] However, where alternative service is merely theoretical, for instance, because the relevant legislative provision has never been implemented; the procedure for requesting alternative service is arbitrary and/or unregulated; or the procedure is open to some but not all, further inquiries need to be undertaken. In cases where the applicant has not availed him or herself of the existing procedures it would be important to understand their reasons for not doing so. If found that the reasons relate to a well-founded fear of being persecuted for publicly expressing his or her convictions, this would need to be factored into the overall analysis.

### (ii) Objection to Military Service in Conflict Contrary to the Basic Rules of Human Conduct

21. Refugee claims relating to military service may also be expressed as an objection to (i) a particular armed conflict or (ii) the means and methods of warfare [the conduct of a party to a conflict]. The first objection refers to the unlawful use of force [*jus ad bellum*], while the second refers to the means and methods of warfare as regulated by international humanitarian law [*jus in bello*], as well as international human rights and international criminal law.[50] Collectively such objections relate to being forced to participate in conflict activities that are considered by the applicant to be contrary to the basic rules of human conduct.[51] Such objections may be expressed as an objection on the basis of one's conscience, and as such can be dealt with as a case of "conscientious objection" [see (i) above]; however, this will not always be the case. Individuals may, for example, object to participating in military activities because they consider this is required to conform to their military code of conduct, or they may refuse to engage in activities which constitute violations of international humanitarian, criminal or human rights law.

22. Recognizing the right to object on such grounds and to be granted refugee status is consistent with the rationale underlying the exclusion clauses in the 1951 Convention. Articles 1F(a) and 1F(c) exclude from protection individuals in respect of whom there are serious reasons for considering that they have committed crimes against peace, war crimes or crimes against humanity or are guilty of acts contrary to the purposes and principles of the United Nations, and who are therefore considered undeserving of international protection as refugees. The obligation on individuals under international humanitarian law and international criminal law to refrain from certain acts during armed conflict would find reflection in international refugee law in the case of individuals who are at risk of being punished for exercising the restraint expected of them under international law [see paragraph 14]. In this regard, it is important to note the absence of a defence of superior orders which are manifestly unlawful.[52]

*Objection to Participating in an Unlawful Armed Conflict*

23. Where an armed conflict is considered to be unlawful as a matter of international law [in violation of *jus ad bellum*], it is not necessary that the applicant be at risk of incurring individual criminal responsibility if he or she were to participate in the conflict in question, rather the applicant would need to establish that his or her objection is genuine, and that because of his or her objection, there is a risk of persecution. Individual responsibility for a crime of aggression only arises under international law for

---

[49] See the HRC's approach in *Foin v. France*, see note 12 above. See similarly, Richard *Maille v. France*, CCPR/C/69/D/689/1996, 31 July 2000, available at: http://www.unhcr.org/refworld/docid/3f588efd3.html, and *Venier and Nicholas v. France*, see note 12 above.

[50] *Jus ad bellum* refers to the constraints under international law on the use of force, whereas *jus in bello* governs the conduct of the parties to an armed conflict. Traditionally, the latter refers to international humanitarian law but relevant standards are also found in applicable provisions of international human rights law and international criminal law.

[51] See, *UNHCR Handbook*, paras. 170-171, note 1 above. With regard to para. 171: "Where, however, the type of military action, with which an individual does not wish to be associated, is condemned by the international community as contrary to basic rules of human conduct, punishment for desertion or draft evasion could, in light of all other requirements of the definition, in itself be regarded as persecution." See also, at a regional level, Council of the European Union, "*Council Directive 2004/83/EC of 29 April 2004 on Minimum Standards for the Qualification and Status of Third Country Nationals or Stateless Persons as Refugees or as Persons who Otherwise Need International Protection and the Content of the Protection Granted*", OJ/L 304/12, 30 Sept. 2004, available at: http://www.unhcr.org/refworld/docid/4157e75e4.html. Article 9(2)(e) which includes as a form of persecution: "[p]rosecution or punishment for refusal to perform military service in a conflict, where performing military service would include crimes or acts falling under the exclusion clauses as set out in Article 12(2)."

[52] See, for example, Article 33, ICC Statute, see note 33 above.

AR.08249

persons who were in a position of authority in the State in question.[53] Soldiers who enlisted prior to or during the conflict in question may also object as their knowledge of or views concerning the illegality of the use of force evolve.

24. In determining the legality of the conflict in question condemnation by the international community is strong evidence, but not essential for finding that the use of force is in violation of international law. Such pronouncements are not always made, even where objectively an act of aggression has taken place. Thus, a determination of illegality with regard to the use of force needs to be made through the application of the governing rules under international law. The relevant norms are the obligation on States to refrain from the threat or use of force against other States; the right of individual or collective self-defence; and the authorization of the use of force in line with the UN Security Council's powers to maintain peace and security.[54]

25. If the conflict is objectively assessed not to be an unlawful armed conflict under international law, the refugee claim will ordinarily fail unless other factors are present. Likewise, where the legality of the armed conflict is not yet settled under international law, the application may be assessed pursuant to (i) above as a conscientious objector case.

*Objection to the Means and Methods of Warfare* [*Conduct of the Parties*]

26. Where the applicant's objection is to the methods and means employed in an armed conflict [that is, the conduct of the one or more of the parties to the conflict], it is necessary to make an assessment of the reasonable likelihood of the individual being forced to participate in acts that violate standards prescribed by international law. The relevant standards can be found in international humanitarian law [*jus in bello*], international criminal law, as well as international human rights law, as applicable.

27. War crimes and crimes against humanity are serious violations which entail individual responsibility directly under international law [treaty or custom]. Developments in the understanding of the elements of such crimes must be taken into account in determining what kinds of conduct or methods of warfare constitute such crimes.[55] Moreover, when assessing the kinds of acts an individual may be forced to commit in an armed conflict, other violations of international humanitarian law may also be relevant on a cumulative basis. The relevance of international human rights law in international or non-international armed conflict situations is also important to bear in mind.

28. Determining whether there is a reasonable likelihood that the individual would be forced to commit acts or to bear responsibility for such acts which violate the basic rules of human conduct will normally depend on an evaluation of the overall conduct of the conflict in question. Thus, the extent to which breaches of the basic rules of human conduct occur in the conflict will be relevant. However, it is the risk of being compelled to become involved in the act(s), rather than the conflict alone that is at issue, so the individual circumstances of the applicant must thus be examined, bearing in mind the role in which he or she will be engaged.

29. If the applicant is likely to be deployed in a role that excludes exposure to the risk of participating in the act(s) in question – for example, a non-combatant position such as a cook, or logistical or technical support roles only – then a claim of persecution is unlikely to arise without additional factors. Additional factors might include the link between the applicant's logistical or technical support role and the foreseeability of [or contribution to] the commission of crimes in violation of international humanitarian or international criminal law. Further, the applicant's reasons for object-

---

[53] See, for example, International Criminal Court, *Elements of Crimes*, ICC-ASP/1/3 at 108, U.N. Doc. PCNICC/2000/1/Add.2 (2000), Article 8 bis, available at: http://www.unhcr.org/refworld/pdfid/4ff5dd7d2.pdf.

[54] See respectively, Articles 2(4), 51 and 42 UN Charter. See also, UN General Assembly, *Declaration on the Inadmissibility of Intervention and Interference in the Internal Affairs of States*, 9 December 1981, A/RES/36/103, available at: http://www.refworld.org/docid/3b00f478f.html.

[55] For an overview, see UNHCR's *Background Note on Exclusion*, 4 September 2003, available at: http://www.unhcr.org/refworld/docid/3f5857d24.html, paras. 30-32. Examples of war crimes in the context of an international armed conflict are wilful killing of civilians, soldiers hors de combat or prisoners of war; torture; killing or wounding treacherously individuals belonging to the hostile army; intentionally directing attacks against the civilian population; rape; recruitment of children under the age of fifteen years into the armed forces or using them to participate actively in hostilities; and use of poisonous weapons. In a non-international armed conflict, war crimes include intentionally directing attacks against civilians; killing or wounding treacherously a combatant adversary; rape; recruitment of children under the age of fifteen years into armed forces or groups or using them to participate actively in hostilities.

AR.08250

ing – regardless of the foreseeability or remoteness of the commission of crimes linked to his or her activities – may be sufficient to qualify him or her as a conscientious objector [see (i) above].

30. By contrast, where there is a reasonable likelihood that an individual may not be able to avoid deployment in a combatant role that will expose him or her to the risk of committing illegal acts, his or her fear of being persecuted would be considered well-founded [see paragraph 14]. In some cases the conflict in question may be one that is not generally characterized by violations of international law. However, the individual in question may be a member of a unit whose particular duties mean that it is specifically, or more likely, to be implicated in violations of basic rules of human conduct. In such circumstances there may be a reasonable likelihood that the individual concerned will be forced to commit, for example, war crimes or crimes against humanity. Where options are available to be discharged, reassigned [including to alternative service] or to have an effective remedy against superiors or the military which will be fairly examined and without retribution, the issue of persecution will not arise, unless other factors are present.[56]

### (iii) Conditions of State Military Service

31. In cases involving conditions within the State armed forces, a person is clearly not a refugee if his or her only reason for desertion or draft evasion is a simple dislike of State military service or a fear of combat. However, where the conditions of State military service are so harsh as to amount to persecution the need for international protection would arise.[57] This would be the case, for instance, where the terms or conditions of military service amount to torture or other cruel or inhuman treatment,[58] violate the right to security[59] and integrity of person,[60] or involve forced or compulsory labour,[61] or forms of slavery or servitude [including sexual slavery].[62]

32. Such cases may in particular involve discrimination on the grounds of ethnicity, or gender. Where the ill-treatment feared is carried out within the State armed forces by military personnel, it is necessary to assess whether such practices are systemic and/or in practice authorized, tolerated or condoned by the military hierarchy. An assessment has to be made regarding the availability of redress against such ill-treatment.

33. Under international law the prohibition of "forced or compulsory labour"[63] does not encompass military or alternative service. Nevertheless, where it can be established that compulsory military service is being used to force conscripts to execute public works, and these works are not of a "purely military character" or not exacted in the case of an emergency, and do not constitute a necessity for national defence or a normal civic obligation, such work constitutes forced labour.[64] According to the International Labour Organization, the condition of a "purely military character" is aimed specifically

---

[56] See, for example, *Analytical report on conscientious objection to military service: Report of the United Nations High Commissioner for Human Rights*, see note 4 above, concerning the practice in some States of allowing enlisted soldiers to move to a different non-combatant unit if they develop a conscientious objection to a particular conflict or bearing arms altogether, paras. 26-27. Such an option may not be available though for an individual whose objection to a particular conflict is not based on conscientious objection.

[57] See, for example, Lord Justice Laws in obiter dictum "I should emphasise that it is plain (indeed uncontentious) that there are circumstances in which a conscientious objector may rightly claim that punishment for draft evasion would amount to persecution: where the military service to which he is called involves acts, with which he may be associated, which are contrary to basic rules of human conduct; where the conditions of military service are themselves so harsh as to amount to persecution on the facts; where the punishment in question is disproportionately harsh or severe. I am here addressing the case where none of these additional factors is present" in *Yasin Sepet, Erdem Bulbul v. Secretary of State for the Home Department*, C/2777; C/2000/2794, United Kingdom: Court of Appeal (England and Wales), 11 May 2001, available at: http://www.unhcr.org/refworld/docid/3ffbcb024.html, para. 61. See UN Working Group on Arbitrary Detention, Opinion No. 24/2003 (Israel), E/CN.4/2005/6/Add.1, 19 November 2004, available at: http://www.unhcr.org/refworld/pdfid/470fb77b10.pdf. Similarly, HRC, General Comment No. 32: Right to equality before courts and tribunals and to a fair trial (Article 14), 23 August 2007, available at: http://www.unhcr.org/refworld/docid/478b2b2f2.html, stating that, "Repeated punishment of conscientious objectors for not having obeyed a renewed order to serve in the military may amount to punishment for the same crime if such subsequent refusal is based on the same constant resolve grounded in reasons of conscience", para. 55; see also UN Commission on Human Rights, Resolution 98/77, para. 5, see note 5 above. Subsequent to the HRC's ruling on Article 18 and a right to conscientious objection in *Yoon and Choi v. Republic of Korea*, see note 15 above, the UN Working Group on Arbitrary Detention has stated that the imprisonment of a conscientious objector for refusing to take up military service constitutes arbitrary detention as it is a violation of the rights guaranteed in Article 18 ICCPR as well as Article 9 ICCPR: Opinion No. 16/2008 (Turkey), A/HRC/10/21/Add.1, 4 February 2009, available at: http://www.unhcr.org/refworld/pdfid/5062b12e2.pdf. See also the European Court of Human Rights that held that the cumulative effect of repeated prosecution and punishment of conscientious objectors for desertion was their "civil death" amounting to degrading treatment in violation of Article 3 of the ECHR. See *Ülke v. Turkey*, Application No. 39437/98, 24 January 2006, available at: http://www.unhcr.org/refworld/docid/4964bd752.html as well as *Savda c. Turquie*, note 13 above and *Tarhan c. Turquie*, note 21 above, and *Feti Demirtaş c. Turquie*, see note 7 above.

[58] See, Article 7 ICCPR.

[59] See, Article 9 ICCPR.

[60] See for an interpretation, Articles 7, 9 and 17 ICCPR.

[61] See, Article 8(3) ICCPR and Article 1(b) of the Abolition of Forced Labour Convention, 1957 (No. 105).

[62] See, Article 8(1) ICCPR and Article 6 of the 1979 Convention on the Elimination of All Forms of Discrimination against Women ("CEDAW").

[63] See, Article 8 ICCPR.

[64] 1930 ILO Convention No. 29 concerning Forced or Compulsory Labour. See also, IACHR, "Fourth report on the situation of human rights in Guatemala", OEA/Ser.L/V/II.83, Doc. 16 rev., 1 June 1993, chap. V.

AR.08251

at preventing the call up of conscripts for public works.[65] In situations of emergency, which would endanger the existence of the State or well-being of the whole or part of the population, conscripts may nevertheless be called upon to undertake non-military work. The duration and extent of compulsory service, as well as the purposes for which it is used, need to be confined to what is strictly required in the given situation.[66] Using a conscript to gain profit through his or her exploitation [e.g. slavery, sexual slavery, practices similar to slavery, and servitude] is prohibited by international law and criminalized in the national legislation of a growing number of States.

34. As with other refugee claims outlined above (i) - (ii), if the applicant has the possibility of discharge, reassignment [including appropriate alternative service] and/or an effective remedy, without retribution, the issue of persecution will not arise, unless other factors are present.

### (iv) Forced Recruitment and/or Conditions of Service in Non-State Armed Groups

35. As far as forced recruitment in non-State armed groups is concerned, it is recalled that non-State armed groups are not entitled to recruit by coercion or by force.[67] A person who seeks international protection abroad because of feared forced recruitment, or re-recruitment, by non-State armed groups, may be eligible for refugee status provided the other elements of the refugee definition are established; in particular that the State is unable or unwilling to protect the person against such recruitment [see paragraphs 42-44 and 60-61 below]. Likewise, forced recruitment by non-State groups to carry out non-military works could amount to, *inter alia*, forced labour, servitude and/or enslavement and constitute persecution.[68]

36. Where the applicant would be subjected to conditions of service that constitute serious violations of international humanitarian or international criminal law,[69] serious human rights violations or other serious harm, persecution would arise.[70]

### (v) Unlawful Child Recruitment

37. Special protection concerns arise where children are at risk of forced recruitment and service.[71] The same is true for children who may have "volunteered" for military activities with the State's armed forces or non-State armed groups. A child's vulnerability and immaturity make him or her particularly susceptible to coerced recruitment and obedience to the State's armed forces or a non-State armed group; this must be taken into account.

38. As outlined at III.C. above, there are important restrictions on the recruitment and participation in hostilities of children under international human rights law and international humanitarian law, whether related to an international or a non-international armed conflict, and relating to both State armed forces and non-State armed groups.[72] Children need to be protected from such violations; as such, a child evading forced recruitment or prosecution and/or punishment or other forms of serious retaliation for desertion would have a well-founded fear of persecution.

39. There may be cases where children "volunteer" under pressure, or are sent to fight by their parents or communities. Such cases can similarly give rise to refugee status. The key question is the likelihood of risk that the child will be recruited and/or forced to fight, and this needs to be assessed on the basis of up-to-date country of origin information, taking into account the child's

---

[65] It has its corollary in Article 1(b) of the Abolition of Forced Labour Convention, 1957 (No. 105), which prohibits the use of forced or compulsory labour "as a method of mobilizing and using labour for purposes of economic development."
[66] ILO, Committee of Experts on the Application of Conventions and Recommendations (CEACR), CEACR: Individual Direct Request concerning Forced Labour Convention, 1930 (No. 29) Eritrea (ratification: 2000), 2010.
[67] See, para 7 above.
[68] See, Article 8(3) ICCPR, Article 1(b) of the Abolition of Forced Labour Convention (No. 105), 1957; Article 8(1) ICCPR; and Article 6 CEDAW.
[69] See, Article 3 common to the four Geneva Conventions of 1949; Article 8, Rome Statute of the ICC (last amended 2010), 17 July 1998, available at: http://www.refworld.org/docid/3ae6b3a84.html.
[70] For example, torture or other cruel, inhuman or degrading treatment or punishment (see Article 7, ICCPR), violations of the right to security (see Article 9 ICCPR) and integrity of person (see for an interpretation Article 7, 9 and 17 ICCPR), forced or compulsory labour (see Article 8(3) ICCPR and Article 1(b) of the Abolition of Forced Labour Convention, 1957 (No. 105)) or forms of slavery (including sexual slavery, see Article 8(1) and Article 6 CEDAW).
[71] UNHCR Guidelines on Child Asylum Claims, see note 37 above.
[72] See generally, UN Committee on the Rights of the Child, CRC General Comment No. 6: *Treatment of Unaccompanied and Separated Children Outside their Country of Origin*, ("CRC General Comment No.6"), CRC/GC/2005/6, 1 September 2005, available at: http://www.unhcr.org/refworld/docid/42dd174b4.html, para. 59.

AR.08252

profile and past experiences, as well as the experiences of similarly situated children. Importantly, in refugee claims concerning violations of the restrictions on the recruitment and participation of children in hostilities, there is no additional requirement to consider the issue of conscientious objection.

40. Persecution may also arise from the nature of the treatment the child would be subjected to whilst in the military or armed group. In this respect, it is important to note that in addition to taking an active part in hostilities, children are also used as spies, messengers, porters, servants, slaves [including sex slaves], and/or to lay or clear landmines. Regardless of the function held by the child, they may be exposed to serious or multiple forms of harm, including being put in a position to witness heinous crimes.[73]

41. Persecution may also arise where there is a risk of ill-treatment on return to the country of origin, for example, because of the child's history of being involved with State armed forces or non-State armed groups, whether as a soldier/combatant/fighter or in another role. They may be considered as an "enemy" by respectively the State or the non-State armed group and as a result be at risk of retaliation, including physical attacks, or being ostracized by the community to such an extent that their life is intolerable. In all such cases, special consideration needs to be given to the particular vulnerabilities and best interest of child applicants.[74]

### Agents of Persecution

42. There is scope within the refugee definition to recognize both State and non-State agents of persecution. In countries undergoing civil war, generalized violence, situations of insurgency, or State fragmentation, the threat of forced recruitment often emanates from non-State armed groups. This may result from the State's loss of control over parts of its territory. Alternatively, the State may empower, direct, control or tolerate the activities of non-State armed groups [for example, paramilitary units or private security groups]. The congruity of interests between the State and a non-State armed group involved in forced recruitment may not always be clear. Other non-State actors may also be the perpetrators of persecution in forms other than forced recruitment, for example, through violence and discrimination by family members and neighbours against former child soldiers perceived as having aided the enemy.

43. In all cases involving harm by non-State armed groups and other non-State actors, it is necessary to review the extent to which the State is able and/or willing to provide protection against such harms.

44. Where the refugee claim is based on the risk of being forced to commit acts that violate basic rules of human conduct, it is necessary to examine the extent to which such violations are taking place, as well as the ability and/or willingness of the authorities, in particular the military authorities, to prevent future violations. Isolated breaches of *jus in bello* which are effectively investigated and dealt with by the military authorities will indicate the existence of available and effective State protection. State responses of this nature would involve action being taken against those responsible and measures being put in place to prevent repetition.

45. With respect to ill-treatment by other soldiers, such as serious bullying or hazing, it is necessary to determine whether such acts are condoned by the military authorities and whether effective methods of redress are available through the military system or elsewhere in the State structure.

### Amnesties

46. When a conflict ends, a State may offer amnesties to persons who evaded military service, in particular to conscientious objectors. Such initiatives may guarantee immunity from prosecution or offer official recognition of conscientious objector status, thereby removing the risk of harm associated with such prosecution or punishment. Nevertheless, the impact of an amnesty on an individual's fear of persecution requires careful assessment. Amnesties may not cover all deserters and draft evaders. Moreover, it is necessary to examine whether the protection is effective in practice; whether the individual may still face recruitment into the armed forces; whether he or she may be subjected

---

[73] See, note 70 above; see also *UNHCR Guidelines on Child Asylum Claims*, para. 23, see note 37 above.
[74] *UNHCR Guidelines on Child Asylum Claims*, paras. 4 and 5, see note 37 above, and the CRC General Comment No.6, see note 37 above. **AR.08253**

to other forms of persecution apart from any criminal liability quashed by the amnesty; and/or whether the person is at risk of being targeted by non-State actors – including community groups for being considered a traitor, for example – irrespective of the legislation adopted by the State. In particular, individuals who have witnessed the commission of war crimes or other serious acts, and have deserted as a result, may be able to establish a well-founded fear of persecution under certain circumstances if, for instance, they were required to act as witnesses in criminal proceedings upon return which would expose them to serious harm.

## B. The Convention Grounds

47. As with all claims to refugee status, the well-founded fear of persecution needs to be related to one or more of the grounds specified in the refugee definition in Article 1A (2) of the 1951 Convention; that is, it must be "for reasons of" race, religion, nationality, membership of a particular social group or political opinion. The Convention ground needs only to be a contributing factor to the well-founded fear of persecution; it need not be shown to be the dominant or even the sole cause. Further, one or more of the Convention grounds may be relevant; they are not mutually exclusive and may overlap.

48. The intent or motive of the persecutor can be a relevant factor in establishing the causal link between the fear of persecution and a Convention ground but it is not decisive, not least because it is often difficult to establish.[75] There is no need for the persecutor to have a punitive intent to establish the causal link; the focus is rather on the reasons for the applicant's predicament and how he or she is likely to experience the harm. Even where an individual is treated in the same way as a majority of the population this does not preclude persecution being for reasons of a Convention ground. Similarly, if the persecutor attributes or imputes a Convention ground to the applicant, this is sufficient to satisfy the causal link. Where the persecutor is a non-State armed actor, the causal link is established either where the persecutor harms the applicant for a Convention-related reason, *or* the State does not protect him or her for a Convention-related reason.[76]

### Religion

49. The religion ground is not limited to belief systems ["theistic, non-theistic and atheistic"],[77] but covers also notions of identity, or way of life.[78] It dovetails with Article 18 ICCPR and includes broader considerations of thought and conscience, including moral, ethical, humanitarian or similar views. The religion ground is thus particularly relevant in cases of conscientious objection, including those expressed through draft evasion or desertion, as explained at III.B. With respect to claims by conscientious objectors, the *UNHCR Handbook* states that:

> Refusal to perform military service may also be based on religious convictions. If an applicant is able to show that his religious convictions are genuine, and that such convictions are not taken into account by the authorities of his country in requiring him to perform military service, he may be able to establish a claim to refugee status. Such a claim would, of course, be supported by any additional indications that the applicant or his family may have encountered difficulties due to their religious convictions.[79]

50. The religion ground may also be relevant in cases based on military service other than in situations of conscientious objection. Recruits may be subject to detention, ill treatment [such as physical beatings or severe psychological pressure] and serious discrimination on account of their religious beliefs, identity or practices. They may also be pressured to renounce their beliefs and convert.

### Political Opinion

51. The political opinion ground is broader than affiliation with a particular political movement or ideology; it concerns "any opinion on any matter in which the machinery of the State, government,

---

[75] *UNHCR Handbook*, para. 66, see note 1 above.
[76] See, *UNHCR, Guidelines on International Protection No.2: "Membership of a particular social group" within the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol relating to the Status of Refugees, HCR/GIP/02/02, 7 May 2002, ("UNHCR Guidelines on Social Group")*, available at: http://www.unhcr.org/refworld/docid/3d36f23f4.html, para. 23.
[77] *UNHCR Guidelines on Religion-Based Claims*, para. 6, see note 15 above.
[78] *Ibid*, paras. 4 and 8.
[79] *UNHCR Handbook*, para. 172, see note 1 above.

AR.08254

society, or policy may be engaged."[80] Moreover, it covers both the holding of an actual political opinion and its expression, political neutrality as well as cases where a political opinion is imputed to the applicant even if he or she does not hold that view.[81] The latter can arise in cases where the State, or a non-State armed group, attributes to the individual a particular political view.

52. Cases involving objection to military service may be decided on the basis that there is a nexus with the political opinion ground in the 1951 Convention. Depending on the facts, an objection to military service - especially objections based on a view that the conflict violates basic rules of human conduct [see IV. A. (ii) above] – may be viewed through the prism of actual or imputed political opinion. In relation to the latter, the authorities may interpret the individual's opposition to participating in a conflict or in act(s) as a manifestation of political disagreement with its policies. The act of desertion or evasion may in itself be, or be perceived to be, an expression of political views.

53. The political opinion ground may be relevant in other circumstances. For instance, a refugee claim by a soldier who becomes aware of and objects to criminal activity being conducted or tolerated by military personnel in the context of a conflict, such as the illicit sale of weapons, extortion of civilians or trafficking of drugs or in persons, and who fears persecution as a result of his or her opposition to such activities, may be considered under the political opinion ground. Whether or not the soldier is a whistle-blower, attempts to flee military service may be perceived by the authorities as evidence of political opposition. Objection to recruitment by non-State armed groups may also be an expression of political opinion.

54. Political opinion may also be the applicable ground in relation to family members of a conscientious objector, draft evader or deserter who is identified by the State or non-State armed group as having an allegiance to a particular political cause. In such cases, persecution may be linked to imputed political opinion, on the basis that the family member is assumed to hold similar views as those ascribed to the conscientious objector, draft evader or deserter. The relevant ground in such cases may also be "family" as a social group [see below paragraph 58].

**Race or Nationality**

55. Race and nationality, in the sense of ethnicity, are often factors in cases connected with military service. The well-founded fear of persecution may be directly based on the applicant's race, for example where conscripts from a particular racial group face harsher conditions than other recruits, or are the only ones actually subject to the draft. Similarly, children may face forced recruitment because they belong to a targeted ethnic group. Cases based on the conditions of military service arising to persecution may also relate to discrimination on the basis of race and/or ethnicity, and could invoke this ground.

**Membership of a Particular Social Group**

56. The 1951 Convention does not include a specific list of particular social groups. Rather, "the term membership of a particular social group should be read in an evolutionary manner, open to the diverse and changing nature of groups in various societies and evolving international human rights norms."[82] UNHCR defines a "particular social group" as:

> A particular social group involves a group of persons who share a common characteristic other than their risk of being persecuted, or who are perceived as a group by society. The characteristic will often be one which is innate, unchangeable, or which is otherwise fundamental to identity, conscience or the exercise of one's human rights.[83]

---

[80] UNHCR, *Guidelines on International Protection No. 1: Guidelines on Gender-Related Persecution Within the Context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol Relating to the Status of Refugees*, HCR/GIP/02/01, 7 May 2002, ("*UNHCR Guidelines on Gender-Related Persecution*"), available at: http://www.unhcr.org/refworld/docid/3d36f1c64.html, para. 32, as adapted from G. Goodwin-Gill, The Refugee in International Law, Clarendon Press 1983, 1st ed., page 31, and latest 3rd ed., Oxford University Press 2007 with J. McAdam, page 87, as also cited in Canada (Attorney General) v. Ward, [1993] 2 S.C.R. 689, Canada: Supreme Court, 30 June 1993, available at: http://www.refworld.org/docid/3ae6b673c.html.
[81] See UNHCR, *Secretary of State for the Home Department (Appellant) v. RT (Zimbabwe), SM (Zimbabwe) and AM (Zimbabwe) (Respondents) and the United Nations High Commissioner for Refugees (Intervener) - Case for the Intervener*, 25 May 2012, available at: http://www.unhcr.org/refworld/docid/4fc369022.html, para. 8.
[82] *UNHCR Guidelines on Social Group*, para. 3, see note 81 above.
[83] *Ibid*, para. 11.

AR.08255

57. The two approaches – "protected characteristics" and "social perception" – to identifying "particular social groups" reflected in this definition are alternative, not cumulative, tests. The "protected characteristics" approach examines whether a group is connected either by an immutable characteristic, or by a characteristic that is so fundamental to human dignity that a person should not be compelled to forsake it. An immutable characteristic "may be innate [such as sex or ethnicity] or unalterable for other reasons [such as the historical fact of a past association, occupation or status]."[84] The "social perception" approach considers whether a particular social group shares a common characteristic which makes it cognizable or sets the group's members apart from society at large. The latter approach does not require that the common characteristic be easily identifiable by the general public, or visible to the naked eye. An applicant need not demonstrate that all members of a particular social group are at risk of persecution in order to establish the existence of a particular social group.[85] Moreover, irrespective of which approach is adopted, a particular social group can arise even where this covers a large number of people.[86] Nevertheless, everyone falling within a particular social group is not necessarily a refugee; a well-founded fear of persecution because of membership of that group is required.

58. Under either of these approaches, "conscientious objectors" are a particular social group given that they share a belief which is fundamental to their identity and that they may also be perceived as a particular group by society. Individuals with common past experience, such as child soldiers, may also constitute a particular social group. This may also be the case for draft evaders or deserters, as both types of applicants share a common characteristic which is unchangeable; a history of avoiding or having evaded military service. In some societies deserters may be perceived as a particular social group given the general attitude towards military service as a mark of loyalty to the country and/or due to the differential treatment of such persons [for example, discrimination in access to employment in the public sector] leading them to be set apart or distinguished as a group. The same may be true for draft evaders. Conscripts may form a social group characterized by their youth, forced insertion into the military corps or their inferior status due to lack of experience and low rank.

59. Women are a particular social group, defined by innate and immutable characteristics and frequently treated differently from men.[87] This may be the relevant ground in claims concerning sexual violence against female soldiers or women or girls forced to act as sex slaves; although this does not preclude the application of other grounds. Girls are a sub-set of this social group. Children are also a particular social group, and this will be a relevant ground in cases concerning fear of forced underage recruitment.[88]

## C. Internal Flight or Relocation Alternative

60. Where the feared persecution emanates from, or is condoned, or tolerated by the State and/or State agents, an internal flight or relocation alternative will generally not be available, as the State actors will be presumed to have control and reach throughout the country. In the case of conscientious objectors to State military service, where the State does not provide for exemption or alternative service, and where the fear of persecution is related to these laws and/or practices and their enforcement, a consideration of an internal flight or relocation alternative [IFA] would not be *relevant* as it can be assumed that the objector would face persecution across the country.[89]

61. Determining whether an IFA is available in cases where the risk of persecution emanates from non-State armed groups, it is necessary to evaluate the ability and/or willingness of the State to protect the applicant from the harm feared. The evaluation needs to take into account whether the State protection is effective and of a durable nature, provided by an organized and

---

[84] *Ibid*, para. 6.
[85] *Ibid*, para. 17.
[86] *Ibid*, paras. 18-19.
[87] *UNHCR Gender-Related Persecution Guidelines*, para. 30, see note 80 above.
[88] *UNHCR Guidelines on Child Asylum Claims*, para. 48 et seq., see note 37 above.
[89] *UNHCR Guidelines on International Protection No. 4: "Internal Flight or Relocation Alternative" within the Context of Article 1A (2) of the 1951 Convention relating to the Status of Refugees*, HCR/GIP/03/04, 23 July 2003, ("*UNHCR Internal Flight Guidelines*"), available at: http://www.refworld.org/docid/3f2791a44.html.

AR.08256

stable authority exercising full control over the territory and population in question. In the particular context of non-international armed conflict, special consideration would need to be given to the applicant's profile, and whether he or she was recruited into and/or participated in activities of a non-State armed group considered to be in opposition to the government, and any likely reprisals from the government. It would often be unreasonable to expect former non-State recruits to relocate into government-controlled territory in a situation of an ongoing conflict, especially if the conflict has religious or ethnic dimensions.

# V. PROCEDURAL AND EVIDENTIARY ISSUES

## A. Establishing the Relevant Facts

62. The credibility assessment refers to the process of determining whether, in light of all the information available to the decision maker, the statements of the applicant relating to material elements of the claim can, on balance, be accepted as having been truthfully given for the purpose of determining refugee status eligibility. Where, notwithstanding, an applicant's genuine efforts to provide evidence pertaining to the material facts, there remains some doubt regarding some of the facts alleged by him or her, the benefit of doubt should be given to the applicant in relation to the assertions for which evidentiary proof is lacking once the decision maker is satisfied with the general credibility of the claim.[90]

63. In claims related to military service, reliable and relevant country of origin information, including the extent to which exemption from military service or alternative service are available, the manner in which conscription is enforced, and the treatment of individuals or groups within the military forces of the country of origin, can assist in the evaluation of the truthfulness of the applicant's account and the determination of the forms of treatment and their likelihood he or she may face if returned.[91]

64. Establishing the genuineness and/or the personal significance of an applicant's beliefs, thoughts and/or ethics plays a key role in claims to refugee status based on objection to military service, in particular conscientious objection [see IV. A. (i)-(ii)].[92] The applicant needs to be given the opportunity during the individual interview to explain the personal significance of the reasons behind his or her objection, as well as how these reasons impact on his or her ability to undertake military service. Eliciting information regarding the nature of the reasons espoused, the circumstances in which the applicant has come to adopt them, the manner in which such beliefs conflict with undertaking military service, as well as the importance of the reasons to the applicant's religious or moral/ethical code are appropriate and assist in determining the credibility of the applicant's statements.

65. Where the objection to military service is derived from a formal religion, it may be relevant to elicit information about the individual's religious experiences, such as asking him or her to describe how they adopted the religion, the place and manner of worship, or the rituals engaged in, the significance of the religion to the person, or the values he or she believes the religion espouses, in particular, in relation to the bearing of arms. That said, extensive examination or testing of the tenets or knowledge of the individual's religion may not always be necessary or useful, particularly as such knowledge will vary considerably depending on his or her personal circumstances. A claimant's detailed knowledge of his or her religion does not necessarily correlate with sincerity of belief and vice-versa.

66. Cases involving mistaken beliefs as to a particular religion's views on the bearing of arms occur from time to time. Where mistaken beliefs are at issue, it would need to be established that the applicant, despite the mistaken beliefs, still faces a well-founded fear of persecution for one or more of the Convention grounds.[93]

---

[90] *UNHCR Handbook*, para. 204, see note 1 above.

[91] *UNHCR Handbook*, paras. 196 and 203-204, see note 1 above, and *UNHCR Interpreting Article 1*, para. 10, see note 42 above. Note the *World Survey of Conscription and Conscientious Objection to Military Service*, which provides a country-by-country analysis, see note 28 above.

[92] For a general discussion of credibility issues in claims based on freedom of thought, conscience and religion see *UNHCR Guidelines on Religion-based Claims*, paras. 28-29, see note 15 above.

[93] *Ibid*, para. 30.

AR.08257

67. If the claimant is mistaken about the nature of a particular conflict, such as whether the conflict abides by international law, this does not automatically undermine the credibility of the alleged reasons for objecting to military service. The credibility assessment in such situations needs to be conducted in light of the applicant's explanations regarding why involvement in the conflict would be inconsistent with his or her religious or moral beliefs, and the reality of the situation on the ground. Nonetheless, while they may be credible in their objection, where such an objection is based on a false premise, the risk of persecution would not arise unless they face other persecutory consequences for having deserted or evaded military service and a nexus to one of the Convention grounds is established.

68. For those objectors whose reasons for their objection is a matter of thought or conscience [rather than religion], they will not be able to refer to the practices of a religious community or teachings of a religious institution in order to substantiate their assertion. They should, however, be able to articulate the moral or ethical basis for their convictions. This may be based on social or community beliefs or practices, parental beliefs or on philosophical or human rights convictions. Past behaviour and experiences may shed light on their views.

69. In cases involving individuals who volunteered for military service or responded to a call up, and who subsequently desert, it is important to recognize that religious or other beliefs may develop or change over time, as may the circumstances of the military service in question. Thus, adverse judgements as to the credibility of the applicant should not generally be drawn based only on the fact that he or she initially joined the military service voluntarily; the full circumstances surrounding the individual's espoused beliefs and situation need to be carefully examined.

## B. Claims by Children

70. Given their young age, dependency and relative immaturity, special procedural and evidentiary safeguards are required for claims to refugee status by children.[94] In particular, children who spent time as soldiers/combatants/fighters or in a support role to armed groups may be suffering from severe trauma and be intimidated by authority figures. This can affect their ability to present a clearly understandable account of their experiences. Thus, appropriate interviewing techniques are essential during the refugee status determination procedure, as well as the creation of a non-threatening interview environment.

71. In cases concerning children, a greater burden of proof will fall on the decision makers than in other claims to refugee status, especially if the child is unaccompanied.[95] Given their immaturity, children cannot be expected to provide adult-like accounts of their experiences. If the facts of the case cannot be ascertained and/or the child is incapable of fully articulating his or her claim, a decision must be made on the basis of all known circumstances.

72. Age assessments may be particularly important in claims to refugee status based on military service where the age of the applicant is in doubt. This is the case not just with claims regarding conscription but also where a child considers him or herself to have "volunteered", given the limits on voluntary service set by international law [see III.B. above]. Age assessments, which may be part of a comprehensive assessment that takes into account both the physical appearance and the psychological maturity of the individual, are to be conducted in a safe, child- and gender-sensitive manner with due respect for human dignity.[96] Where the assessment is inconclusive, the applicant must be considered a child. Prior to the assessment, an independent guardian should be appointed to advise the child on the purpose and process of the assessment procedure, which needs to be explained clearly in a language that the child understands. DNA testing should, in normal circumstances, only be done if permitted by law and with the informed consent of the relevant individuals.

---

[94] For a full discussion of the minimum safeguards required see *UNHCR Guidelines on Child Asylum Claims*, paras. 65-77, see note 37 above. See also ExCom, *Conclusion on Children at Risk*, No. 107 (LVIII), 5 October 2007, available at: http://www.unhcr.org/refworld/docid/471897232.html, para. g(viii). Whether a claimant is a child for the purposes of such safeguards will depend on the age at the date the claim to refugee status is made.
[95] *UNHCR Guidelines on Child Asylum Claims*, para. 73, see note 37 above.
[96] See further, *UNHCR Guidelines on Child Asylum Claims*, paras. 75-76, see note 37 above.

AR.08258

AR.08259



**United Nations High Commissioner for Refugees**
Haut Commissariat des Nations Unies pour les réfugiés

---

**Distr. GENERAL**        **HCR/GIP/15/11**        **24 June 2015**        **Original: ENGLISH**

---

# GUIDELINES ON INTERNATIONAL PROTECTION NO. 11:

### Prima Facie Recognition of Refugee Status

UNHCR issues these Guidelines pursuant to its mandate, as contained in the Office's Statute, in conjunction with Article 35 of the 1951 Convention relating to the Status of Refugees and Article II of its 1967 Protocol. These Guidelines complement the *UNHCR Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees* (1979, reissued, Geneva, 2011) and the other Guidelines on International Protection.

These Guidelines, having benefited from broad consultation, are intended to provide legal interpretative guidance for governments, legal practitioners, decision-makers, as well as UNHCR staff carrying out refugee status determination under its mandate and/or advising governments on the application of a prima facie approach.

The UNHCR Handbook on Procedures and Criteria for Determining Refugee Status and the Guidelines on International Protection are available at: http://www.unhcr.org/refworld/docid/4f33c8d92.html.

Calls for public consultation on future guidelines will be posted at: http://www.unhcr.org/544f59896.html.

**11**

AR.08260

## I. INTRODUCTION

1. A prima facie approach means the recognition by a State or UNHCR of refugee status on the basis of readily apparent, objective circumstances in the country of origin or, in the case of stateless asylum-seekers, their country of former habitual residence.[1] A prima facie approach acknowledges that those fleeing these circumstances are at risk of harm that brings them within the applicable refugee definition.[2]

2. Although a prima facie approach may be applied within individual refugee status determination procedures (see Part III. D in these Guidelines), it is more often used in group situations, for example where individual status determination is impractical, impossible or unnecessary in large-scale situations. A prima facie approach may also be applied to other examples of group departure, for example, where the refugee character of a group of similarly situated persons is apparent.

3. Recognizing refugee status on a prima facie basis has been a common practice of both States and UNHCR for over 60 years. Despite its common use and the fact that the majority of the world's refugees are recognized on a prima facie basis,[3] there has been limited articulation of uniform standards to guide the practice. These Guidelines explain the legal basis as well as some procedural and evidentiary aspects of applying a prima facie approach. They outline standards of general application by States and by UNHCR, albeit some of those (e.g. legal decrees) are employable only by States. The Guidelines focus on group determination primarily, albeit they touch on how a prima facie approach may be applied in individual procedures at Part III. D.

### A. Definition and description

4. In general, "prima facie" means "at first appearance",[4] or "on the face of it."[5] UNHCR's *Handbook on Procedures and Criteria for Determining Refugee Status* describes group determination on a prima facie basis as follows:

> [s]ituations have [...] arisen in which entire groups have been displaced under circumstances indicating that members of the group could be considered individually as refugees. In such situations the need to provide assistance is often extremely urgent and it may not be possible for purely practical reasons to carry out an individual determination of refugee status for each member of the group. Recourse has therefore been had to so-called "group determination" of refugee status, whereby each member of the group is regarded *prima facie* (i.e. in the absence of evidence to the contrary) as a refugee.[6]

5. Refugee status may be recognized on a prima facie basis pursuant to any of the applicable refugee definitions, including:

- Article 1A(2) of the 1951 Convention and/or 1967 Protocol relating to the Status of Refugees (hereinafter "1951 Convention");[7]

- one of the definitions in the regional refugee instruments;[8]

---

[1] UNHCR, "Protection of Refugees in Mass Influx Situations: Overall Protection Framework", 19 February 2001, EC/GC/01/4, available at: http://www.unhcr.org/3ae68f3c2d.html, para. 6.
[2] Ivor C. Jackson, "The Refugee Concept in Group Situations" (Martinus Nijhoff, 1999), p. 3.
[3] UNHCR data indicates that in 2012, 1,121,952 refugees were recognized on a group basis and 239,864 were recognized individually. All refugees recognized on a group basis were recognized pursuant to a prima facie approach.
[4] Derived from Latin. "A case in which there is evidence which will suffice to support the allegation made in it, and which will stand unless there is evidence to rebut the allegation": *Osborn's Concise Law Dictionary* (10th edition, Thomson Sweet & Maxwell, 2005).
[5] The Oxford English Dictionary (1st edition 1933, reprinted 1978, online version, available at: http://www.oed.com/view/Entry/151264?redirected-From=prima+facie#eid).
[6] UNHCR, Handbook and Guidelines on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees, reissued December 2011, HCR/1P/4/ENG/REV.3 (hereafter "UNHCR, *Handbook*"), para. 44.
[7] Prima facie recognition may also apply to Palestinian refugees pursuant to Article 1D of the 1951 Convention, in circumstances where the protection or assistance of UNRWA has ceased.
[8] See, e.g., the extended regional refugee definitions in: Organization of African Unity (African Union), Convention Governing the Specific Aspects of Refugee Problems in Africa, 10 September 1969 (hereafter "OAU Convention"), Art. I(2); Cartagena Declaration on Refugees, adopted at the Colloquium on the International Protection of Refugees in Central America, Mexico and Panama, 22 November 1984 (hereafter "Cartagena Declaration"), Conclusion III(3).

AR.08261

- UNHCR's Statute and refugee mandate as further developed under the authority of the United Nations General Assembly.[9]

The regional refugee definitions were designed to respond, in part, to large-scale arrivals of people fleeing from objective circumstances in their countries of origin, such as conflict, occupation, massive human rights violations, generalised violence or events seriously disturbing public order, and are thus particularly suited to forms of group recognition. While commonly associated with the refugee definition under the 1969 Organization of African Unity (African Union) Convention Governing the Specific Aspects of Refugee Problems in Africa (hereinafter "OAU Convention"),[10] adopting a prima facie approach is not unique to Africa. Whichever instrument is applied, the assessment is based on the readily apparent, objective circumstances in the country of origin or former habitual residence relevant to the applicable refugee definition (II. A).

6. A prima facie approach operates only to recognize refugee status. Decisions to reject require an individual assessment.

## B. Refugee status and applicable rights

7. Each refugee recognized on a prima facie basis benefits from refugee status in the country where such recognition is made, and enjoys the rights contained in the applicable convention/instrument. Prima facie recognition of refugee status is not to be confused with an interim or provisional status, pending subsequent confirmation. Rather, once refugee status has been determined on a prima facie basis, it remains valid in that country unless the conditions for cessation[11] are met, or their status is otherwise cancelled[12] or revoked.[13]

8. Refugees recognized on a prima facie basis should be informed accordingly and issued with documentation certifying their status.[14]

## C. Settings for use and situations where a prima facie approach is appropriate

9. A prima facie approach is particularly suited to situations of large-scale arrivals of refugees. Large-scale situations are characterised by the arrival across an international border of persons in need of international protection in such numbers and at such a rate as to render individual determination of their claims impracticable.[15]

10. A prima facie approach may also be appropriate in relation to groups of similarly situated individuals whose arrival is not on a large-scale, but who share a readily apparent common risk of harm. The characteristics shared by the similarly situated individuals may be, for example, their ethnicity, place of former habitual residence, religion, gender, political background or age, or a combination thereof, which exposes them to risk.

---

[9] UNHCR, "Note on the Mandate of the High Commissioner for Refugees and his Office", October 2013, p. 3, which summarizes UNHCR's mandate for refugees as covering "all persons outside their country of origin for reasons of feared persecution, conflict, generalized violence, or other circumstances that have seriously disturbed public order and who, as a result, require international protection."

[10] OAU Convention, Art. 1.

[11] See UNHCR, "The Cessation Clauses: Guidelines on their Application", 26 April 1999, available at: http://www.refworld.org/cgi-bin/texis/vtx/rwmain?docid=3c06138c4, para. 2, and UNHCR, "Guidelines on International Protection No. 3: Cessation of Refugee Status under Article 1C (5) and (6)", 10 February 2003, HCR/GIP/03/03, available at: http://www.refworld.org/docid/3e50de6b4.html (hereafter "UNHCR, Cessation Guidelines"), para. 1.

[12] See UNHCR, "Note on the Cancellation of Refugee Status", 22 November 2004, available at: http://www.refworld.org/cgi-bin/texis/vtx/rwmain?docid=41a5dfd94 (hereafter "UNHCR, Note on Cancellation"), para. 1(i).

[13] See UNHCR, "Guidelines on International Protection No. 5: Application of the Exclusion Clauses: Article 1F of the 1951 Convention relating to the Status of Refugees", 4 September 2003, HCR/GIP/03/05, available at: http://www.unhcr.org/3f7d48514.html (hereafter "UNHCR, Article 1F Exclusion Guidelines"), para. 6.

[14] Executive Committee, (hereafter "ExCom") Conclusion No. 8 (XXVIII), 12 October 1977 on the Determination of Refugee Status, available at: http://www.unhcr.org/3ae68c6e4.html, para (v).

[15] UNHCR, "Guidelines on the Application in Mass Influx Situations of the Exclusion Clauses of Article 1F of the 1951 Convention relating to the Status of Refugees", 7 February 2006, available at: http://www.refworld.org/docid/43f48c0b4.html (hereafter "UNHCR, Mass Influx Exclusion Guidelines"), para. 1. "Large-scale movements" or "large-scale arrivals" are the preferred terms for these Guidelines, although it is noted that other terms are used in other Guidelines, such as "mass influx". There is no scientific number of persons for a situation to qualify as a "large-scale movement" or "large-scale arrival." Rather such a designation is at the discretion of the State of arrival, factoring in such matters as the capacity for registration, processing as well as assistance to respond, also related to the speed and daily or monthly rates of arrivals.

AR.08262

11. A prima facie approach may be employed in urban, rural as well as camp or out-of-camp settings.

12. A prima facie approach may not be appropriate in all of the aforementioned situations, taking into account security, legal or operational factors. Alternative protection responses may be more suited to the situation at hand, such as screening or other procedures (e.g. temporary protection) and, in some circumstances, individual status determination.[16]


## II. SUBSTANTIVE ANALYSIS

### A. Readily apparent, objective circumstances

13. Prima facie recognition is based on readily apparent, objective circumstances in the country of origin or former habitual residence assessed against the refugee definition being applied to that situation.

14. In determining the appropriate instrument pursuant to which to recognize refugee status on a prima facie basis, the 1951 Convention criteria should generally be considered first as the universal and primary legal instrument for refugees, unless there are good reasons for doing otherwise.[17]

15. In respect of the 1951 Convention definition, where there is evidence of persecution against an entire group on account of a 1951 Convention ground, refugee status should be recognized pursuant to the 1951 Convention. An individualized assessment of the element of fear would normally be rendered unnecessary in such circumstances, as being on its face self-evident from the event or situation which precipitated the flight.

16. As for the regional refugee definitions, persons may be alternatively or additionally recognized under the extended refugee definitions in the OAU Convention or the Cartagena Declaration.[18] In such instances, States regularly agree on the "refugee-producing" character of certain situations and apply a prima facie approach.

17. Country information will play an important role in identifying the readily apparent circumstances that underlie a decision to recognize refugee status on a prima facie basis.[19] Such information should be relevant, current and from reliable sources. At the same time, the complexity of events in the country of origin or former habitual residence may result, at least initially, in scant or conflicting information. Because of its international protection mandate, including its supervisory responsibility,[20] field presence and operational activities, UNHCR is often uniquely placed to obtain first-hand information on the causes and motivations of flight. UNHCR has a long established practice of recommending to governments the application of a prima facie approach to given situations. Where information is uncertain or the situation is fluid, other protection responses (such as temporary protection, see II. E. below) may be appropriate in these early stages before activating a prima facie approach

---

[16] Any alternative protection response is without prejudice to and should not undermine the protection regime established by the 1951 Convention or other legal instruments to which the State is a party. See II. E on temporary protection or stay arrangements.

[17] See UNHCR, "Summary Conclusions on International Protection of Persons Fleeing Armed Conflict and Other Situations of Violence; Roundtable 13 and 14 September 2012, Cape Town, South Africa", 20 December 2012, para. 6, available at: http://www.refworld.org/docid/50d32e5e2.html. In the Summary Conclusions, it was noted that some States have adopted different practices: some States have adopted the recommended sequential approach in which an assessment on the basis of the criteria of the 1951 Convention refugee definition precedes the application of one of the extended definitions; other States have adopted a "nature of flight" approach, in which the prevailing situation in the country of origin (for example, an armed conflict) would lead to an initial application of an extended definition, rather than the 1951 Convention refugee definition; and other situations have called for a pragmatic approach, in which an extended definition is applied for reasons of efficiency and ease (para. 31).

[18] See para. 5 of these Guidelines.

[19] See, generally, UNHCR, "Country of Origin Information: Towards Enhanced International Cooperation", February 2004, available at: http://www.refworld.org/docid/403b2522a.html, para 14.

[20] See UNHCR, "Note on the Mandate".

AR.08263

## B. Evidence to the contrary

18. A prima facie approach, once in place, applies to all persons belonging to the beneficiary class, *unless* there is evidence to the contrary in the individual case. Evidence to the contrary is information related to an individual that suggests that he or she should not be considered as a refugee – either because he or she is not a member of the designated group or, although being a member, should not be determined to be a refugee for other reasons (e.g. exclusion).

19. Examples of evidence to the contrary include, but are not limited to information, that the applicant:

i.    is not from the designated country of origin or former habitual residence or does not possess the shared characteristic underlying the designated group's constitution;

ii.   did not flee during the designated time period;

iii.  left for other, non-protection reasons unrelated to the situation/event in question and has no *sur place* claim;

iv.   has/had taken up residence in the country of asylum and is recognized by the competent authorities as having the rights and obligations attached to the possession of nationality of that country (Article 1E, 1951 Convention);[21]

v.    may fall within the exclusion clauses in Article 1F of the 1951 Convention or of the relevant regional instruments.[22]

20. For reasons of legal certainty, any evidence to the contrary ought to be recorded and assessed as soon as possible after arrival. Such information may come to light, for example, during registration (see III. B. below). Where contrary evidence comes to light during registration, various case management strategies may need to be instituted (see III. B. below). As noted above at paragraph 6, a prima facie approach operates only to recognize refugee status. Decisions to reject require an individual assessment.

21. Contrary evidence that already existed at the time of recognition may only emerge after the recognition of refugee status, in which case cancellation procedures would be initiated.[23]


## C. Dealing with combatants or armed elements

22. Owing to the civilian and humanitarian character of asylum, combatants and other armed elements are not eligible for international protection, until it has been established that they have genuinely and permanently renounced military or armed activities.[24] In the context of large-scale movements as a result of armed conflict, combatants and other armed elements should be identified early and separated from the civilian population through a careful screening mechanism.[25] Even if they have genuinely and permanently renounced their military or armed activities and thus become eligible to apply for refugee status, a full individual examination of their refugee claim is generally required (in particular because of the possible involvement in excludable acts).[26]

---

[21] UNHCR, "Note on the Interpretation of Article 1E of the 1951 Convention relating to the Status of Refugees", March 2009, available at: http://www.refworld.org/pdfid/49c3a3d12.pdf.
[22] UNHCR, "Article 1F Exclusion Guidelines".
[23] See UNHCR, "Note on Cancellation".
[24] ExCom, "Civilian and Humanitarian Character of Asylum", 8 October 2002, Conclusion No. 94 (LIII), available at: http://www.unhcr.org/3dafdd7c4.html, para. (c)(vii) (hereafter "ExCom Conclusion No. 94").
[25] Ibid. para. (c)(iii).
[26] UNHCR, "Article 1F Exclusion Guidelines", para. 15; restated in UNHCR, "Operational Guidelines on Maintaining the Civilian and Humanitarian Character of Asylum" September 2006, available at: http://www.refworld.org/docid/452b9bca2.html, p. 33 (hereafter "UNHCR, Operational Guidelines on Maintaining the Civilian and Humanitarian Character of Asylum").

AR.08264

**11**

23. Special procedures would need to be in place for children who formerly took part in armed activities.[27]

24. Civilian family members of combatants can benefit from refugee status on a prima facie basis unless there is evidence to the contrary in the individual case.[28]

## D. Sur place claims

25. Persons who departed their country of origin or former habitual residence prior to the situation/event giving rise to a prima facie approach may also benefit from a declaration of refugee status on a prima facie basis.[29] Should he or she have taken up residence in the country of asylum and be recognized by the competent authorities as having the rights and obligations attached to the possession of nationality of that country, Article 1E of the 1951 Convention may apply (see para. 19).

## E. Relationship with temporary protection or stay arrangements

26. Refugee status on a prima facie basis is to be distinguished from forms of temporary protection or stay arrangements. Such arrangements have a long history as an emergency response to large-scale movements of persons in need of international protection, providing protection from *refoulement* and appropriate treatment in accordance with international human rights standards.[30] They are not intended to substitute for existing protection mechanisms (such as prima facie recognition), and are more commonly applied in non-States parties or as regional approaches to particular crises in regions with few States parties to the relevant international and regional refugee instruments.[31]

27. In certain scenarios, it may be appropriate to apply a temporary protection or stay arrangement, as a prelude to a prima facie approach or at its end, even in States parties to the relevant instruments. In fluid or transitional contexts, such as at the beginning of a crisis where the exact cause and character of the movement is uncertain and hence a decision on prima facie recognition cannot be taken immediately, or at the end of a crisis, when the motivation for ongoing departures may need further assessment, a temporary protection or stay arrangement could be the appropriate response.[32]

## F. Cessation

28. While Articles 1C(1)-(4) apply based on an individual's own actions, the "ceased circumstances" clauses in Article 1C(5)-(6) of the 1951 Convention ("general cessation") are widely activated by States to apply to refugees recognized on a prima facie basis.[33] In respect of the latter, while all recognized refugees who fall within the terms of a declaration of general cessation lose their refugee status automatically once the cessation declaration comes into effect, they must be given the possibility prior to the effective date to apply for an exemption from cessation ("exemption procedures"). Even though the general circumstances may have ceased to exist, a certain number of refugees may continue to have a well-founded fear of persecution either in relation to past or new circumstances, or have compelling reasons arising out of past persecution justifying their continued need for international protection.[34]

---

[27] UNHCR, "Operational Guidelines on Maintaining the Civilian and Humanitarian Character of Asylum", Part 2J; UNHCR, "Guidelines on International Protection No. 8: Child Asylum Claims under Articles 1(A)2 and 1(F) of the 1951 Convention and/or 1967 Protocol relating to the Status of Refugees", 22 December 2009, HCR/GIP/09/08 , available at: http://www.refworld.org/docid/4b2f4f6d2.html para. 51; UNHCR, "Guidelines on International Protection No. 10: Claims to Refugee Status related to Military Service within the context of Article 1A (2) of the 1951 Convention and/or the 1967 Protocol relating to the Status of Refugees", 3 December 2013, HCR/GIP/13/10/Corr. 1, available at: http://www.refworld.org/docid/529ee33b4.html, paras. 12, 37–41.
[28] ExCom Conclusion No. 94, para. (c)(vi).
[29] UNHCR, *Handbook*, paras. 94–96.
[30] UNHCR, "Guidelines on Temporary Protection or Stay Arrangements", February 2014, available at: http://www.refworld.org/docid/52fba2404.html (hereafter "UNHCR, Guidelines on Temporary Protection or Stay Arrangements"). The Guidelines identify four situations in which temporary protection or stay arrangements may be appropriate, at para. 9: (i) large-scale arrivals of asylum-seekers or other similar humanitarian crises; (ii) complex or mixed cross-border population movements, including boat arrivals and rescue-at-sea scenarios; (iii) fluid or transitional contexts; or (iv) other exceptional and temporary conditions in the country of origin necessitating international protection and which prevent return in safety and dignity.
[31] UNHCR, "Guidelines on Temporary Protection or Stay Arrangements", paras. 3 and 8.
[32] Ibid., para. 9(iii).
[33] UNHCR, "Cessation Guidelines", para 23.
[34] UNHCR, "Guidelines on Exemption Procedures in respect of Cessation Declarations", December 2011, available at: http://www.refworld.org/docid/4eef5c3a2.html.

AR.08265

## III. EVIDENTIARY AND PROCEDURAL ASPECTS

29. The decision to adopt a prima facie approach rests on an assessment, by the relevant authority in the country of asylum or, acting under its mandate, by UNHCR, that the readily apparent, objective circumstances in the country of origin or former habitual residence causing persons to leave (or stay outside their country) satisfies the applicable refugee definition. It is standard practice to consult with UNHCR at the activation and ending of a prima facie approach and to strive for regional coherence.

### A. Formal decision regulated by law

30. The decision to adopt a prima facie approach is to be made in accordance with the national legal framework. Different States have adopted various ways to recognize refugee status on this basis, the most common being by decision of the executive, such as the relevant government ministry or by presidential or cabinet decision. It is also possible that such a decision is taken by the parliament or the administrative authority responsible for refugee affairs in the country of asylum carrying out regular refugee status determination. In each case, the entity needs to have the legal authority to do so. The decision may take the form of a published declaration, decree or order (for the purposes of these Guidelines, hereinafter "Decision").[35]

31. The Decision would generally specify the following:

i.   the applicable domestic law that provides the authority for declaring a prima facie approach;

ii.  the title of the 1951 Convention or regional instrument pursuant to which refugee status is recognized, along with the rights and duties accompanying this status;

iii. a description of the events/circumstances in the country of origin or former habitual residence underlying the Decision, or the characteristics of the class of beneficiaries to whom the approach applies;

iv.  periodic review and modalities of termination.

32. Sample Decisions covering the two distinct situations described in paragraphs 9–10 are attached as Annexes A and B to these Guidelines.

33. In accordance with its mandate, UNHCR has the authority to declare persons to be refugees, based on a prima facie determination. States are required to cooperate with UNHCR in the exercise of its functions to provide international protection and to find solutions, together with Governments and other relevant actors, for refugees.[36]

### B. Identification and registration

34. Registration procedures are key to the application of a prima facie approach and are the principal way in which individuals are identified within group-based processing.[37] Registration procedures aim both to ensure persons are appropriately identified so as to benefit from the prima facie approach as well as to channel those for whom further individualised inquiries may be required.

**11**

---

[35] Executive authorities have, at times, decided to recognize refugees on a prima facie basis without issuing a formal Decision and instead have informed UNHCR of such Decision by way of a letter. While UNHCR welcomes being formally notified of the Decision to recognize refugee status on a prima facie basis, this should be in addition to the more formal procedures described in the text at paras. 30–31.

[36] UNHCR, "Note on the Mandate", pp. 3–4. See 1951 Convention, Art. 35; 1967 Protocol, Art. II, as well as Cartagena Declaration, Conclusion II(2); OAU Convention, Art. VIII(1); and Treaty on the Functioning of the European Union, 13 December.

2007, OJ C 115/47 of 9.05.2008, Art. 78 (1) per general reference to 1951 Convention; Declaration 17 of the Treaty of Amsterdam, Declaration on Article 73k of the Treaty establishing the European Community, OJ C 340/134 of 10.11.1997; EU Council Directive 2005/85/EC on minimum standards on procedures in Member States for granting and withdrawing refugee status, OJ L 326/13 of 13.12.2005, Art. 21.

[37] See UNHCR ExCom, "Registration of Refugees and Asylum-Seekers", 5 October 2001, Conclusion No. 91 (LII), available at: http://www.unhcr.org/3bd3e1d44.html, para. (a).

AR.08266

While noting that the type and extent of data collected will vary depending on the situation,[38] the aim of registration as part of applying a prima facie approach would be to capture sufficient information on the individual and members of his/her family to determine their membership in the beneficiary class. Appropriate questions to identify any contrary evidence, including potentially excludable individuals, should also be included during the registration process.[39] Registration should ordinarily occur as soon as possible after arrival.[40]

35. Where there are indications of evidence to the contrary, persons need to be referred to a more enhanced registration process to gather more information. Where questions remain, the individual needs to be referred to regular refugee status determination procedures to assess adequately issues such as credibility and/or exclusion. In the event that regular status determination procedures are not operational, an assessment of the contrary evidence may need to be delayed, while making sure that the information is clearly recorded within the registration system. This will have the benefit of facilitating a review of eligibility for refugee status or possible cancellation at a later stage, when individual processing becomes feasible and/or operational.[41] In the meantime, such persons should benefit from an alternative form of stay.

## C. Decision to end the prima facie approach and to revert to regular individual status determination

36. A prima facie approach remains appropriate as long as the readily apparent circumstances prevailing in the country of origin or former habitual residence continue to justify a group-based approach to refugee status. The decision to adopt a prima facie approach, therefore, needs to be kept under periodic review, such that the on-going use of the practice is deliberative. Likewise, through registration, the profile of individuals and their reasons for flight can be monitored on a continual basis.

37. When circumstances change, careful consideration of ending the prima facie approach needs to be undertaken. Such reviews are guided by the situation in the country of origin, while recognizing the need for consistency and stability in refugee status approaches.[42]

38. As with the decision to recognize refugee status on a prima facie basis, the decision to end this approach rests with the relevant authority in the country of asylum. The decision to end the prima facie approach is to be communicated in the same manner (that is, via declaration, decree or order) as the initial decision to implement the prima facie approach, stating the end date. It should be made clear in such a decision, as well as through public communication and outreach, that the ending of the prima facie approach does not affect the refugee status of those who have already been recognized under this approach (their status would cease only in accordance with Article 1C of the 1951 Convention, see II. F). Equally, such a decision does not affect the right of asylum-seekers to apply for asylum through individual procedures. The ending of a prima facie approach signals that the asylum system is back to normal, with refugee claims being assessed through individual refugee status determination procedures.

39. A sample of a decision to end the prima facie approach is contained in Annex C.

## D. Prima facie approach within individual procedures

40. Although these Guidelines have focused on the group application of a prima facie approach, a number of States apply prima facie approaches within individual procedures. In the context of indi-

---

[38] UNHCR, "Handbook for Registration", September 2003, available at: http://www.refworld.org/docid/3f967dc14.html, p. 21, 30, 32, 41 and 53 (hereafter "UNHCR, Handbook for Registration"): Registration is a systematic method of identifying, recording, verifying, updating and managing the information on persons with the aim of protecting, documenting and assisting them (if and when necessary). Registration is also a starting and fundamental step for the search of durable solutions.
[39] See UNHCR, "Mass Influx Exclusion Guidelines", paras. 51–53. See II. B of these Guidelines.
[40] UNHCR, "Handbook for Registration", p. 7.
[41] See UNHCR, "Mass Influx Exclusion Guidelines", paras. 54–55.
[42] UNHCR ExCom Conclusion on the Extraterritorial Effect of Refugee Status, No. 12 (XXIX), 17 October 1978, available at: http://www.refworld.org/docid/3ae68c4447.html, para (b).

AR.08267

vidual procedures, a prima facie approach may also be part of simplified or accelerated processes based on the manifestly founded nature of a class of claims or on a presumption of inclusion.[43] Adopting a prima facie approach in individual procedures operates to provide an "evidentiary benefit"[44] to the applicant in the form of accepting certain objective facts. Refugee status would be provided to those who can establish that they belong to the pre-established "beneficiary class", unless there is evidence to the contrary.

41. Adopting a prima facie approach in individual procedures has many advantages, not least those of fairness and efficiency. In terms of fairness, it allows like cases to be treated alike as far as decision-makers are required to accept certain objective facts relating to the risks present in the country of origin or former habitual residence. In terms of efficiency, such an approach would generally reduce the time needed to hear cases because individuals are required to establish only that he or she (i) is a national of the country of origin or, in the case of stateless asylum-seekers, a former habitual resident, (ii) belongs to the identified group, and/or (iii) the specified time period of the event/situation in question.[45]

**11**

---

[43] It may also be known as "expedited positive" processing, or similar nomenclature.
[44] This evidentiary benefit was referred to as an "evidentiary shortcut" by J.-F. Durieux, "The Many Faces of "Prima Facie": Group-Based Evidence in Refugee Status Determination" (2008) 25(2) *Refuge* 151.
[45] UNHCR, "Note on Burden and Standard of Proof in Refugee Claims", 16 December 1998, available at: http://www.refworld.org/docid/3ae6b3338.html, para. 8.

AR.08268

**Annex A: Model Decision to adopt a prima facie approach for a large-scale arrival**

### Declaration of prima facie recognition

IN EXERCISE of the powers conferred by [*domestic law*], the [*relevant authority*] declares as follows:

1. Taking effect as at [*insert date*], any person who fled from [*country of origin*] arriving in [*country of asylum*] on or after [*date*] due to [*circumstances/event*] is recognized as a refugee, pursuant to a prima facie basis.

2. Any person who arrived in [*country of asylum*] from [*country of origin or, in case of stateless asylum-seekers, country of former habitual residence*] prior to [*date*] and is unable or unwilling to return to [*country of origin or former habitual residence*] due to [*circumstances/event*] will also benefit from prima facie recognition as a refugee (recognition *sur place*).

3. Any such persons recognized as refugees pursuant to [*Article 1A(2) of the 1951 Convention/1967 Protocol and/or regional refugee definition*] and [*relevant national law*] shall enjoy the rights and benefits as refugees pursuant to [*the 1951 Convention/regional refugee instrument, as applicable*], and have duties to conform to national laws and regulations.

4. This decision to recognize refugees pursuant to a prima facie approach will be kept under periodic review and remains valid until, after due consideration of country of origin information and consultation with UNHCR, it is terminated by [*formal decision by relevant authority*].

[signature]

[stamp]

[date]

AR.08269

**Annex B: Model Decision to adopt a prima facie approach for groups of similarly situated persons**

**Declaration on prima facie recognition for [description of the group]**

IN EXERCISE of the powers conferred by [*domestic law*], the [*relevant authority*] declares as follows:

1.  Taking effect as at [*insert date*], the following persons shall be recognized as refugees on a prima facie basis:

▪  [*insert description of the group*]

2.  Any such persons recognized as refugees pursuant to [*Article 1A(2) of the 1951 Convention/1967 Protocol and/or regional refugee definition*] and [*relevant national law*] shall enjoy the rights and benefits as refugees pursuant to [*the 1951 Convention/regional refugee instrument, as applicable*], and have duties to conform to national laws and regulations.

3.  Any decision to recognize refugees on a prima facie basis will be kept under periodic review and will remain valid until, after due consideration of country information and consultation with UNHCR, it is terminated by [*formal decision by relevant authority*].

[signature]

[stamp]

[date]

**11**

AR.08270

Annex C: Model decision to terminate a prima facie approach

**Decision to end the prima facie recognition for [description]**

IN EXERCISE of the powers conferred by [*domestic law*], the [*relevant authority*] declares as follows:

1. Decision *[insert decision number and date]* made by [*relevant authority*] to recognize refugees on a prima facie basis from [*name country of origin/circumstance/event*] is, after due consideration of the current situation in the country of origin and following consultation with UNHCR, terminated in accordance with [*applicable national law*], effective [*insert date*].

2. Nothing in this decision to terminate a prima facie approach removes the right of asylum-seekers to apply for asylum or other forms of international protection within the regular status determination procedures.

3. This decision does not in any way affect the refugee status of those who have been recognized under this approach [*date and number of decision declaring prima facie recognition*]. They continue to be recognized as refugees until their status is ceased in accordance with Article 1C of the 1951 Convention.

[signature]

[stamp]

[date]

AR.08271

**UNHCR**
United Nations High Commissioner for Refugees
Haut Commissariat des Nations Unies pour les réfugiés

Distr. GENERAL          HCR/GIP/16/12          02 December 2016          Original: ENGLISH

# GUIDELINES ON INTERNATIONAL PROTECTION NO. 12:

**Claims for refugee status related to situations of armed conflict and violence under Article 1A(2) of the 1951 Convention and/or 1967 Protocol relating to the Status of Refugees and the regional refugee definitions**

UNHCR issues these Guidelines on International Protection pursuant to its mandate, as contained in, inter alia, the *Statute of the Office of the United Nations High Commissioner for Refugees*, namely paragraph 8(a), in conjunction with Article 35 of the *1951 Convention relating to the Status of Refugees*, Article II of its *1967 Protocol*, Article VIII(1) of the *1969 OAU Convention Governing the Specific Aspects of Refugee Problems in Africa*, and Commitment II(e) of the *1984 Cartagena Declaration on Refugees*.

These Guidelines clarify paragraph 164 of the *UNHCR Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention* and otherwise complement the Handbook. They are to be read in conjunction with UNHCR's other Guidelines on International Protection.

**12**

These Guidelines, having benefited from broad consultations, are intended to provide legal interpretative guidance for governments, legal practitioners, decision-makers and the judiciary, as well as UNHCR staff carrying out refugee status determination.

UNHCR's *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention* and the *Guidelines on International Protection* are available at: http://www.refworld.org/docid/4f33c8d92.html.

Calls for public consultation on future Guidelines on International Protection will be posted online at: http://www.unhcr.org/544f59896.html.

AR.08272

## TABLE OF CONTENTS

**I. INTRODUCTION**..........................................................................................**218**

    A.  Scope and terminology.................................................................................218

    B.  The relationship between the 1951 Convention/1967 Protocol refugee definition and the regional definitions, and EU subsidiary protection ..................................219

        EU subsidiary protection.........................................................................220

**II. SUBSTANTIVE ANALYSIS OF ARTICLE 1A(2) OF THE 1951 CONVENTION.... 220**

    A.  A well-founded fear of being persecuted......................................................221

        Relevance of international humanitarian and criminal law..........................221

        Relevance of derogations under international human rights law....................222

        Individual and group-based risks..............................................................222

        Degree of risk .......................................................................................223

        No differential risk .................................................................................223

        Forward-looking assessment of risk .........................................................224

        Sexual and gender-related persecution .....................................................224

        Agents of persecution..............................................................................225

        Refugees sur place..................................................................................226

    B.  'For reasons of' one or more Convention grounds.........................................226

        'For reasons of' (causal link) ...................................................................226

        Convention grounds................................................................................226

    C.  Internal flight or relocation alternative ........................................................228

**III. SUBSTANTIVE ANALYSIS OF ARTICLE I(2) OF THE 1969 OAU CONVENTION ...................................................................................... 229**

    A.  Preliminary considerations to guide interpretation.......................................229

        Scope of the 1969 OAU Convention definition ..........................................230

    B.  Elements of the 1969 OAU Convention definition........................................230

        Compelled to leave one's place of habitual residence..................................230

        Refugees sur place..................................................................................230

        Situations compelling flight .....................................................................231

    C.  Internal flight or relocation alternative ........................................................232

AR.08273

**IV. SUBSTANTIVE ANALYSIS OF CONCLUSION III(3) OF THE 1984 CARTAGENA DECLARATION** ....................................................................................232

    A.   Preliminary considerations to guide interpretation...............................................232

        Scope of the Cartagena refugee definition ...............................................233

    B.   Elements of the Cartagena refugee definition .......................................................233

        Refugees sur place.................................................................................234

        Circumstances compelling flight.............................................................234

        Threat to life, security or freedom ..........................................................236

        Gang violence or violence from organized criminal groups...................236

    C.   Internal flight or relocation alternative .................................................................236


**V. PROCEDURAL AND EVIDENTIARY ISSUES**......................................................237

    A.   Approaches to applying the 1951 Convention/1967 Protocol definition and the regional definitions...............................................................................237

    B.   Establishing the facts ...........................................................................................237

        Country of origin information ..................................................................237

        Burden of proof .....................................................................................238

**12**

AR.08274

## I. INTRODUCTION

### A. Scope and terminology

1. Situations of armed conflict and violence are today the major causes of refugee movements. The majority of these situations engender political, religious, ethnic, social, or gender persecution. The 1951 Convention relating to the Status of Refugees[1] and/or its 1967 Protocol[2] (1951 Convention) is directly applicable to civilians displaced by situations of armed conflict and violence.

2. The purpose of these Guidelines is to provide substantive and procedural guidance for assessing claims for refugee status involving situations of armed conflict and violence, and to promote consistency in the application of the 1951 Convention and regional refugee definitions.[3]

3. These Guidelines provide guidance in relation to the inclusion aspects of the refugee definitions in:

- Article 1A(2) of the 1951 Convention and its 1967 Protocol (Part II of these Guidelines),

- Article I(2) of the 1969 OAU Convention Governing the Specific Aspects of Refugee Problems in Africa[4] (1969 OAU Convention) (Part III of these Guidelines), and

- Conclusion III(3) of the 1984 Cartagena Declaration on Refugees (Cartagena Declaration) (Part IV of these Guidelines).[5]

The inclusion of the regional refugee definitions in these Guidelines concern their application to claims for refugee status related to situations of armed conflict and violence and is without prejudice to the application of these definitions to other situations.

4. These Guidelines do not address exclusion[6] or cessation,[7] issues related to the civilian and humanitarian character of asylum,[8] or claims related to military service,[9] for which other guidance is available. These Guidelines also do not deal with prima facie recognition of refugee status, which is covered by Guidelines on International Protection No. 11.[10] However, they do deal with the relationship between the 1951 Convention refugee definition and the regional refugee definitions, including which approaches can be used in applying the various definitions (paragraphs 86 to 88 of these Guidelines). The Guidelines focus on refugee status and do not address specifically subsidiary or complementary forms of international protection.[11]

5. For the purpose of these Guidelines, the phrase "situations of armed conflict and violence" refers to situations that are marked by a material level or spread of violence that affects the civilian popula-

---

[1] *Convention Relating to the Status of Refugees* (28 July 1951) 189 UNTS 137 (1951 Convention), http://www.refworld.org/docid/3be01b964.html.

[2] *Protocol Relating to the Status of Refugees* (31 January 1967) 606 UNTS 267 (1967 Protocol), http://www.refworld.org/docid/3ae6b3ae4.html.

[3] For further information on the background to and reasons for developing these Guidelines, UNHCR, *Summary Conclusions on International Protection of Persons Fleeing Armed Conflict and Other Situations of Violence; Roundtable 13 and 14 September 2012, Cape Town, South Africa*, 20 December 2012, ("UNHCR Cape Town Summary Conclusions"), http://www.refworld.org/docid/50d32e5e2.html.

[4] *OAU Convention Governing the Specific Aspects of Refugee Problems in Africa* (10 September 1969) 1001 UNTS 45 (1969 OAU Convention),http://www.refworld.org/docid/3ae6b36018.html.

[5] *Cartagena Declaration on Refugees*, Colloquium on the International Protection of Refugees in Central America, Mexico and Panama, 22 November 1984, (Cartagena Declaration), http://www.refworld.org/docid/3ae6b36ec.html. The 1984 Cartagena Declaration is not a treaty within the meaning of Article 1(a) of the *1969 Vienna Convention on the Law of Treaties* (23 May 1969) 1155 UNTS 331.

[6] UNHCR, *Guidelines on International Protection No. 5: Application of the Exclusion Clauses: Article 1F of the 1951 Convention relating to the Status of Refugees*, 4 September 2003, HCR/GIP/03/05, http://www.refworld.org/docid/3f5857684.html. See also, UNHCR, *Guidelines on the Application in Mass Influx Situations of the Exclusion Clauses of Article 1F of the 1951 Convention relating to the Status of Refugees*, 7 February 2006, http://www.refworld.org/docid/43f48c0b4.html.

[7] UNHCR, *Guidelines on International Protection No. 3: Cessation of Refugee Status under Article 1C(5) and (6) of the 1951 Convention relating to the Status of Refugees (the "Ceased Circumstances" Clauses)*, 10 February 2003, HCR/GIP/03/03, http://www.refworld.org/docid/3e50de6b4.html.

[8] EXCOM Conclusion No. 94 (LIII), 2002, para. (c)(viii). UNHCR, *Operational Guidelines on Maintaining the Civilian and Humanitarian Character of Asylum*, September 2006, http://www.refworld.org/docid/452b9bca2.html.

[9] UNHCR, *Guidelines on International Protection No. 10: Claims to Refugee Status related to Military Service within the context of Article 1A (2) of the 1951 Convention and/or the 1967 Protocol relating to the Status of Refugees*, 3 December 2013, HCR/GIP/13/10/Corr. 1, ("UNHCR Military Service Guidelines"), http://www.refworld.org/docid/529ee33b4.html.

[10] UNHCR, *Guidelines on International Protection No. 11: Prima Facie Recognition of Refugee Status*, 24 June 2015, HCR/GIP/15/11, ("UNHCR Prima Facie Recognition Guidelines"), http://www.refworld.org/docid/555c335a4.html.

[11] Paragraph 9 of these Guidelines contains a reference to the relationship between the 1951 Convention and subsidiary protection status under European Union (EU) law.

AR.08275

tion. Such situations may involve violence between state and non-state actors, including organized gangs,[12] and violence between different groups in society. Further, such situations may include violence between two or more states, between states and non-state armed groups, or between various non-state armed groups. Any particular classification of an armed group, for example as criminal or political, is not necessary or determinative for the purpose of refugee status determination. Further, while in some circumstances situations of armed conflict and violence referred to in these Guidelines may be categorized as an international (IAC)[13] or a non-international (NIAC)[14] armed conflict within the meaning of international humanitarian law (IHL), such categorization is not required for the purpose of refugee status determination.[15] Many situations of armed conflict and violence are not designated as an armed conflict for IHL purposes, yet the means employed and their consequences may be just as violent or harmful. Other labels – such as a situation of generalized[16] or indiscriminate[17] violence – have also been used by decision-makers to describe situations of armed conflict and violence. Regardless of such characterizations, the method of assessing the claim to refugee status is the same – a full and inclusive application of the refugee definition to the situation at hand is required, as is set out in these Guidelines.

### B. The relationship between the 1951 Convention/1967 Protocol refugee definition and the regional definitions, and EU subsidiary protection

6. Regional refugee instruments, such as the 1969 OAU Convention and the Cartagena Declaration, complement the 1951 Convention/1967 Protocol, which remain the universal and primary legal protection instruments for refugees.[18] Each regional instrument incorporates the 1951 Convention definition of a refugee and also elaborates so-called broader refugee criteria (referred to as "regional definitions"). A principal purpose of both the 1969 OAU Convention and the Cartagena Declaration is to provide refugee protection in specific humanitarian situations, including large-scale arrivals of people fleeing specific situations or circumstances in their country of origin.[19]

7. Certain factual scenarios may suggest the relevance and applicability of both the 1951 Convention definition and one of the regional definitions to an individual claim for refugee status and raise questions concerning which definition to apply (see paragraphs 86 to 88 of these Guidelines). In other situations, an individual may be a refugee under one of the regional definitions but not under the 1951 Convention definition, including where no causal link can be established between her or his fear of being persecuted and a Convention ground. In such circumstances, the regional definitions expand the range of individuals eligible to benefit from refugee status.

8. While the two regional definitions differ slightly in wording, the types of situations or circumstances they refer to and are intended to cover can be largely assimilated. Further, although the re-

**12**

---

[12] UNHCR, *Guidance Note on Refugee Claims Relating to Victims of Organized Gangs*, 31 March 2010 ("UNHCR Gangs Guidance Note"), http://www.refworld.org/docid/4bb21fa02.html.

[13] Common Article 2(1) of the 1949 Geneva Conventions, including the *Geneva Convention Relative to the Protection of Civilian Persons in Time of War (Fourth Geneva Convention)*, 12 August 1949, 75 UNTS 287, http://www.refworld.org/docid/3ae6b36d2.html and Article 1(4) of *Protocol Additional to the Geneva Conventions of 12 August 1949, and relating to the Protection of Victims of International Armed Conflicts (Protocol I)*, 8 June 1977, 1125 UNTS 3, ("Protocol I to the Geneva Conventions"), http://www.refworld.org/docid/3ae6b36b4.html. See also, International Committee of the Red Cross (ICRC), *How is the Term "Armed Conflict" Defined in International Humanitarian Law?*, March 2008, pp 1 to 3, http://www.refworld.org/docid/47e24eda2.html and International Committee of the Red Cross (ICRC), *International humanitarian law and the challenges of contemporary armed conflicts*, October 2016, 32IC/15/11, http://www.refworld.org/docid/58047a764.html.

[14] Common Article 3 of the 1949 Geneva Conventions, including the Fourth Geneva Convention, note 13 above, and Article 1 of *Protocol Additional to the Geneva Conventions of 12 August 1949, and relating to the Protection of Victims of Non-International Armed Conflicts (Protocol II)*, 8 June 1977, 1125 UNTS 609, ("Protocol II to the Geneva Conventions"), http://www.refworld.org/docid/3ae6b37f40.html. See also, International Committee of the Red Cross (ICRC) 2008, note 13 above, pp 3 to 5 and International Committee of the Red Cross (ICRC) 2016, note 13 above.

[15] By analogy, this is the position taken by the Court of Justice of the European Union (CJEU) with regard to the meaning of internal armed conflict in the EU Qualification Directive, in *Aboubacar Diakité v. Commissaire général aux réfugiés et aux apatrides*, C-285/12, European Union: Court of Justice of the European Union, 30 January 2014, para. 23, http://www.refworld.org/docid/52ea51f54.html. The CJEU considered that 'while [IHL] is designed, inter alia, to provide protection for civilian populations in a conflict zone by restricting the effects of wars on persons and property, it does not ... provide for international protection to be granted to certain civilians who are outside both the conflict zone and the territory of the conflicting parties'.

[16] See paragraph 71 to 73 of these Guidelines.

[17] In the European Union, in the context of international protection, the term 'indiscriminate violence' is used in Article 15c of the EU Qualification Directive (recast). According to the CJEU indiscriminate violence 'implies that it may extend to people irrespective of their personal circumstances', in *Elgafaji v. Staatssecretaris van Justitie*, C-465/07, European Union: Court of Justice of the European Union, 17 February 2009, para. 34, http://www.refworld.org/docid/499aaee52.html.

[18] EXCOM Conclusion No. 87 (L) 1999, para. (f) and EXCOM Conclusion No. 89 (LI) 2000. See also, 1969 OAU Convention, note 4 above, ninth preambular paragraph, referring to the 1951 Convention and the 1967 Protocol as the basic and universal instrument for the protection of refugees.

[19] UNHCR Prima Facie Recognition Guidelines, note 10 above, para. 5.

AR.08276

gional definitions are detailed, neither of the regional instruments was intended to provide an all-encompassing definition for every situation in which persons are compelled to leave their countries of origin and cross an international border. As far as rights are concerned, the 1951 Convention and the regional instruments each recognize a person as a refugee and provide for 1951 Convention rights to be applied.[20] Therefore, in most cases, the particular definition pursuant to which the person is recognized as a refugee will not be of material consequence. For the purposes of legal certainty, however, a proper interpretation of each definition is necessary, with a sequential approach to adjudication being recommended (see paragraphs 86 to 88 of these Guidelines). Decision-makers also need to bear in mind that the regional protection systems are intended to be implemented in a manner that complements and strengthens the 1951 Convention regime.[21]

*EU subsidiary protection*

9. The EU Qualification Directive (recast) provides for subsidiary protection that is complementary to refugee protection envisaged by the 1951 Convention/1967 Protocol.[22] It applies to those who do not qualify as refugees but face a real risk of suffering serious harm, inter alia, when there is a 'serious and individual threat to a civilian's life or person by reason of indiscriminate violence in situations of international or internal armed conflict'.[23] Certain factual situations may give rise to an overlap between the criteria for refugee protection in accordance with the 1951 Convention and subsidiary protection. Because of the primacy of refugee protection and the limitation that subsidiary protection only applies to persons who do not qualify as refugees, claims related to situations of armed conflict and violence must first be assessed in accordance with the criteria for refugee protection. Only when the applicant does not qualify for refugee status, should the claim be assessed in accordance with the criteria for subsidiary protection.[24]

## II. SUBSTANTIVE ANALYSIS OF ARTICLE 1A(2) OF THE 1951 CONVENTION

10. In accordance with the ordinary meaning to be given to the terms and in light of the context as well as the object and purpose of the 1951 Convention,[25] Article 1A(2) applies to persons fleeing situations of armed conflict and violence. In fact, the 1951 Convention definition of a refugee makes no distinction between refugees fleeing peacetime or "wartime" persecution. The analysis required under Article 1A(2) focusses on a well-founded fear of being persecuted for one or more of the Convention grounds. The phrase, 'persons compelled to leave their country of origin as a result of international or national armed conflicts are not normally considered refugees under the 1951 Convention or 1967 Protocol', contained in paragraph 164 of the UNHCR Handbook needs to be understood as limited to situations where there is no causal link between a person's well-founded fear of being persecuted and a 1951 Convention ground.

---

[20] The 1969 OAU Convention accepts the rights in the 1951 Convention as applicable to refugees recognized under the 1969 OAU Convention, see 1969 OAU Convention, note 4 above, tenth preambular paragraph and Article VIII(2). See also, M Sharpe, "The 1969 African Refugee Convention: Innovations, Misconceptions, And Omissions", *McGill Law Journal* (2012) 58, p 126 to 145. The Cartagena Declaration also accepts the rights in the 1951 Convention as applicable to refugees recognized in accordance with Conclusion III(3) and also expressly calls upon countries in the region to apply the 1969 American Convention on Human Rights for the treatment of refugees and for countries to acknowledge that reunification of families constitutes a fundamental principle, see Cartagena Declaration, note 5 above, Conclusion III(1), III(8) and III(13).
[21] EXCOM Conclusion No. 89 (LI), 2000 and EXCOM Conclusion No. 103 (LVI), 2005, including para. (b).
[22] European Union: Council of the European Union, *Directive 2011/95/EU of the European Parliament and of the Council of 13 December 2011 on standards for the qualification of third-country nationals or stateless persons as beneficiaries of international protection, for a uniform status for refugees or for persons eligible for subsidiary protection, and for the content of the protection granted (recast)*, 20 December 2011, OJ L 337; December 2011, pp 9-26, preamble, recital 33, http://www.refworld.org/docid/4f197df02.html ("EU Qualification Directive (recast)"). The CJEU acknowledged the two distinct systems of protection in *Salahadin Abdulla and Others v. Bundesrepublik Deutschland*, C-175/08; C-176/08; C-178/08 & C-179/08, European Union: Court of Justice of the European Union, 2 March 2010, para. 78, http://www.refworld.org/docid/4b8e6ea22.html. See also, EXCOM Conclusion No. 103 (LVI), 2005, paras. (b), (i) and (k).
[23] EU Qualification Directive (recast), note 22 above, Article 2(f), according to which a "person eligible for subsidiary protection" means a third-country national or a stateless person who does not qualify as a refugee but in respect of whom substantial grounds have been shown for believing that the person concerned, if returned to his or her country of origin, or in the case of a stateless person, to his or her country of former habitual residence, would face a real risk of suffering serious harm as defined in Article 15, and to whom Article 17(1) and (2) does not apply, and is unable, or, owing to such risk, unwilling to avail himself or herself of the protection of that country'. Serious harm as defined in Article 15 of the EU Qualification Directive (recast) consists of: '(a) the death penalty or execution; or (b) torture or inhuman or degrading treatment or punishment of an applicant in the country of origin; or (c) serious and individual threat to a civilian's life or person by reason of indiscriminate violence in situations of international or internal armed conflict.'
[24] *H. N. v Minister for Justice, Equality and Law Reform, Ireland, Attorney General*, C-604/12, European Union: Court of Justice of the European Union, 8 May 2014, para. 35, http://www.refworld.org/docid/5375e84f4.html. It would be at variance with the Common European Asylum System, the Treaty of the European Union and the 1951 Convention when subsidiary protection criteria would be applied first, because, for example, of the comparatively or perceived easier task of establishing the existence of violence and conflict through generally-available country of origin information than a well-founded fear of being persecuted for one or more Convention grounds.
[25] EXCOM Conclusion No. 103 (LVI), 2005, para. (c).

AR.08277

## A. A well-founded fear of being persecuted

11. Threats to life or freedom and other serious human rights violations can constitute persecution for the purposes of the 1951 Convention refugee definition.[26] In addition, lesser forms of harm may cumulatively constitute persecution.[27] Discrimination will amount to persecution where the effect leads to a situation that is intolerable or substantially prejudicial to the person concerned.[28] Likewise, conduct amounting to serious violations of IHL can constitute persecution (see paragraphs 14 and 15 of these Guidelines).[29] What amounts to persecution will also depend on the circumstances of the individual, including the age, gender, opinions, health, feelings and psychological make-up of the applicant.[30]

12. The standards mentioned in paragraph 11 above should be applied no differently in the context of persons fleeing situations of armed conflict and violence. No higher level of severity or seriousness of the harm is required for the harm to amount to persecution in situations of armed conflict and violence compared to other situations, nor is it relevant or appropriate to assess whether applicants would be treated any worse than what may ordinarily be "expected" in situations of armed conflict and violence. The overall context of a situation of armed conflict and violence can compound the effect of harms on a person, giving rise in certain circumstances to harm that amounts to persecution. Protracted situations of armed conflict and violence, for example, can have serious deleterious effects on the physical and psychological health of applicants or their personal development, which would need to be evaluated, taking into account their character, background, position in society, age, gender, and other factors.[31]

13. Situations of armed conflict and violence frequently involve exposure to serious human rights violations or other serious harm amounting to persecution. Such persecution could include, but is not limited to, situations of genocide[32] and ethnic cleansing;[33] torture and other forms of inhuman or degrading treatment;[34] rape and other forms of sexual violence;[35] forced recruitment, including of children;[36] arbitrary arrest and detention; hostage taking and enforced or arbitrary disappearances; and a wide range of other forms of serious harm resulting from circumstances mentioned, for example, in paragraphs 18 and 19 of these Guidelines.

*Relevance of international humanitarian and criminal law*

14. Many of the aforementioned human rights violations and other serious harm may also constitute war crimes when committed in the context of and associated with an armed conflict within the meaning of IHL, and/or, crimes against humanity when part of a widespread or systematic attack against a civilian population.[37] Deportations and forcible transfer or displacement, sometimes in the form of ethnic cleansing or genocide, can also amount to war crimes when committed in the context of and associated with an armed conflict within the meaning of IHL, and, crimes against humanity when part of a widespread or systematic attack against a civilian population.[38]

---

[26] UNHCR, *Handbook and Guidelines on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees*, December 2011, HCR/1P/4/ENG/REV. 3, para. 51, http://www.refworld.org/docid/4f33c8d92.html ("UNHCR Handbook").

[27] *Ibid.*, para. 53.

[28] *Ibid.*, para. 54.

[29] UNHCR, *Expert Meeting on Complementarities between International Refugee Law, International Criminal Law and International Human Rights Law: Summary Conclusions*, July 2011, paras. 13-21, ("UNHCR Arusha Summary Conclusions"), http://www.refworld.org/docid/4e1729d52.html.

30 UNHCR Handbook, note 26 above, paras. 52 and 55.

[31] *Ibid.*, para. 43. UNHCR, *Guidelines on International Protection No. 8: Child Asylum Claims under Articles 1(A)2 and 1(F) of the 1951 Convention and/or 1967 Protocol relating to the Status of Refugees*, 22 December 2009, HCR/GIP/09/08, para. 10, http://www.refworld.org/docid/4b2f4f6d2.html.

[32] *Convention on the Prevention and Punishment of the Crime of Genocide* (9 December 1948) 78 UNTS 277, http://www.refworld.org/docid/3ae6b3ac0.html. Article 6, *Rome Statute of the International Criminal Court* (1 July 2002) 2187 UNTS 3, ("Rome Statute ICC"), http://www.refworld.org/docid/3ae6b3a84.html.

[33] Ethnic cleansing is defined as 'a purposeful policy designed by one ethnic or religious group to remove by violent and terror-inspiring means the civilian population of another ethnic or religious group from certain geographic areas', UN Security Council, *Report of the Commission of Experts Established Pursuant to United Nations Security Council Resolution 780 (1992)*, 27 May 1994, s/1994/674, http://www.refworld.org/docid/582060704.html.

[34] See, inter alia, Article 7, *International Covenant on Civil and Political Rights* (16 December 1966) 999 UNTS 171, (ICCPR), http://www.refworld.org/docid/3ae6b3aa0.html and *Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment* (10 December 1984) 1465 UNTS 85, http://www.refworld.org/docid/3ae6b3a94.html.

[35] See paragraphs 26 and 27 of these Guidelines.

[36] UNHCR Military Service Guidelines, note 9 above, paras. 35 and 37 to 41 ("unlawful child recruitment").

[37] Rome Statute ICC, note 32 above, Articles 7 and 8.

[38] UNHCR Arusha Summary Conclusions, note 29 above, paras. 9 and 10. Please note that in the context of an international armed conflict within the meaning of IHL, evacuations may take place for security or imperative military reasons in accordance with Article 49 of *Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field (First Geneva Convention)*, 12 August 1949, 75 UNTS 31, http://www.refworld.org/docid/3ae6b3694.html. In the context of a non-international armed conflict, see Article 17 of Protocol II to the Geneva Conventions, note 14 above.

AR.08278

15. For the purposes of determining refugee status, the existence of violations of IHL can be informative but not determinative of whether conduct amounts to persecution within the meaning of the 1951 Convention. An applicant cannot be expected to establish that there has been the commission of either an IHL violation or an international crime in order for a decision-maker to reach a finding that a particular kind of harm constitutes persecution.[39] Nor are the criteria for the crime against humanity of persecution, as defined in international criminal law,[40] applicable to refugee status determination. International criminal courts and tribunals are primarily concerned with harm committed in the past for the purposes of criminal prosecution; their mandate does not cover the broader humanitarian purpose of providing international protection to civilians. Relying on IHL or international criminal law in their strictest sense to determine refugee status could undermine the international protection objectives of the 1951 Convention, and leave outside its protection persons who face serious threats to their life or freedom.[41] Moreover, even if certain conduct is not prohibited under IHL or international criminal law, it does not change the fact that for international refugee law purposes, such conduct may constitute persecution.[42]

*Relevance of derogations under international human rights law*

16. States parties to relevant human rights treaties may derogate from a limited number of human rights in times of public emergency threatening the life of the nation.[43] Where a lawful state of emergency exists, non-securement of derogable rights may not necessarily constitute persecution if the adopted measures are strictly required by the exigencies of the situation.[44] However, to determine a claim to refugee status by an applicant who has fled such a situation, the overall circumstances of the case need to be assessed. A state of emergency may be unlawful or involve measures that are not strictly required by the exigencies of the situation or involve measures affecting non-derogable rights.

*Individual and group-based risks*

17. In situations of armed conflict and violence, an applicant may be at risk of being singled out or targeted for persecution. Equally, in such situations, entire groups or populations may be at risk of persecution, leaving each member of the group at risk.[45] The fact that many or all members of particular communities are at risk does not undermine the validity of any particular individual's claim.[46] The test is whether an individual's fear of being persecuted is well-founded. At times, the impact of a situation of armed conflict and violence on an entire community, or on civilians more generally, strengthens rather than weakens the well-founded nature of the fear of being persecuted of a particular individual.[47]

---

[39] For example, the requirements of discriminatory intent and that the crime be part of a widespread or systematic attack against a civilian population in international criminal law are not required by international refugee law, see UNHCR Arusha Summary Conclusions, note 29 above, para. 15.

[40] Rome Statute ICC, note 32 above, Article 7(1)(h).

[41] UNHCR Arusha Summary Conclusions, note 29 above, para. 15.

[42] Such conduct may, for example, amount to serious human rights violations. International human rights law does not cease to apply during situations of armed conflict, save in part through the effect of provisions for derogation of the kind to be found, for example, in Article 4 ICCPR, note 34 above. See, *Legality of the Threat or Use of Nuclear Weapons, Advisory Opinion*, I.C.J. Reports 1996, p. 226, International Court of Justice (ICJ), 8 July 1996, para. 15, http://www.refworld.org/docid/4b2913d62.html; *Advisory Opinion Concerning Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory*, International Court of Justice (ICJ), 9 July 2004, para. 106, http://www.refworld.org/docid/414ad9a719.html; and UN Human Rights Committee (HRC), *General comment no. 31 [80], The nature of the general legal obligation imposed on States Parties to the Covenant*, 26 May 2004, CCPR/C/21/Rev.1/Add.13, para. 11, http://www.refworld.org/docid/478b26ae2.html. See also, *AF (Syria)*, [2012] NZIPT 800388, New Zealand: Immigration and Protection Tribunal, 20 December 2012, paras. 45 to 49, http://www.refworld.org/docid/54c127434.html.

[43] ICCPR, note 34 above, Article 4. Also, UN Human Rights Committee (HRC), *CCPR General Comment No. 29: Article 4: Derogations during a State of Emergency*, 31 August 2001, CCPR/C/21/Rev.1/Add.11, ("HRC General Comment 29"), http://www.refworld.org/docid/453883fd1f.html, states may only derogate against specifically identified rights, and can only do so to the extent strictly required by the exigencies of the situation, must be consistent with other obligations under international law and may not be based on or result in discrimination. The measures adopted must be proportionate and of temporary duration, and the relevant human rights body needs to be notified of the derogation. At the regional level, derogation clauses are provided for in Council of Europe, *European Convention for the Protection of Human Rights and Fundamental Freedoms, as amended by Protocols Nos. 11 and 14*, 4 November 1950, ETS 5, Article 15, (ECHR), http://www.refworld.org/docid/3ae6b3b04.html and the Organization of American States (OAS), *American Convention on Human Rights, "Pact of San Jose", Costa Rica*, 22 November 1969, Article 27, (American Convention on Human Rights), http://www.refworld.org/docid/3ae6b36510.html.

[44] *MS (Coptic Christians) Egypt CG v Secretary of State for the Home Department*, [2013] UKUT 00611 (IAC), United Kingdom: Upper Tribunal (Immigration and Asylum Chamber), 3 December 2013, para. 120, http://www.refworld.org/docid/52a5b86e4.html.

[45] The risk of harm as a result of exceptionally high levels of violence to the general population was addressed by the European Court of Human Rights, in inter alia, *Sufi and Elmi v. United Kingdom*, Applications nos. 8319/07 and 11449/07, Council of Europe: European Court of Human Rights, 28 June 2011, http://www.refworld.org/docid/4e09d29d2.html and *L.M. and Others v. Russia*, Applications nos. 40081/14, 40088/14 and 40127/14, Council of Europe: European Court of Human Rights, 15 October 2015, http://www.refworld.org/docid/561f770f4.html.

[46] UNHCR, *Interpreting Article 1 of the 1951 Convention Relating to the Status of Refugees*, April 2001, para. 20, http://www.refworld.org/docid/3b20a3914.html.

[47] According to the European Court of Human Rights: 'in relation to asylum claims based on a well-known general risk, when information about such a risk is freely ascertainable from a wide number of sources, the obligations incumbent on the States under Articles 2 and 3 of the Convention in expulsion cases entail that the authorities carry out an assessment of that risk of their own motion', see: *F.G. v. Sweden*, Application no. 43611/11, Council of Europe: European Court of Human Rights, 23 March 2016, para. 126, http://www.refworld.org/docid/56fd485a4.html.  AR.08279

18. In situations of armed conflict and violence, whole communities may be affected by, and be at risk from, aerial bombardments, the use of cluster munitions, barrel bombs or chemical weapons, artillery or sniper fire, improvised explosive devices, landmines, car bombs or suicide bombers, or siege tactics, for example. The systematic denial of food and medical supplies, the cutting of water supplies and electricity, the destruction of property or the militarization or closure of hospitals and schools may also constitute serious human rights or IHL violations that affect whole communities.[48] Exposure to such actions can amount to persecution within the meaning of Article 1A(2) of the 1951 Convention, either independently or cumulatively.

19. Both the direct and indirect consequences of situations of armed conflict and violence may also constitute persecution, including long-term consequences of these situations, such as demolition of vital infrastructure, insecurity and abject poverty. More specifically, situations of armed conflict and violence may seriously affect the rule of law as well as state and societal structures and support systems. Situations of armed conflict and violence may lead to a full or partial collapse of government institutions and services, political institutions and the police and justice system. Vital services such as water, electricity and sanitation may be disrupted. Increased crime levels; looting and corruption; food insecurity, malnourishment or famine; constraints on access to education and health care; serious economic decline, destruction of livelihoods and poverty may also ensue. These consequences of situations of armed conflict and violence may be sufficiently serious, either independently or cumulatively, to constitute persecution and create a well-founded fear of being persecuted. This is also relevant where the risk of persecution emanates from non-state actors (see paragraphs 28 to 30 of these Guidelines).

20. Other factors to take into account include propaganda that may create or contribute to an oppressive atmosphere of intolerance vis-à-vis one or more groups, and promote or lead to a risk of persecution.[49]

*Degree of risk*

21. A person's fear of persecution is well-founded if it can be established, to a reasonable degree, that her or his continued stay in the country of origin has become, or would become, intolerable.[50] This does not require a probability calculus,[51] based, for example, on the number of people killed, injured or displaced, but requires an analysis of both quantitative and qualitative information assessed against the applicant's circumstances (see paragraphs 89 to 92 of these Guidelines on establishing the facts).

*No differential risk*

22. As mentioned in paragraph 17 of these Guidelines, a person may have a well-founded fear of persecution that is shared by many others, and of a similar or same degree.[52] An applicant fleeing a situation of armed conflict and violence is not required to establish a risk of harm over and above that of others similarly situated (sometimes called a "differential test").[53] No higher level of risk is

<div style="background:black;color:white">12</div>

---

[48] Relevant criteria to assess the intensity of a conflict were formulated by the United Kingdom, Asylum and Immigration Tribunal / Immigration Appellate Authority, in: *AM & AM (Armed Conflict: Risk Categories) Somalia v. Secretary of State for the Home Department*, [2008] UKAIT 00091, United Kingdom: Asylum and Immigration Tribunal / Immigration Appellate Authority, 27 January 2009, http://www.refworld.org/docid/4934f7542.html and repeated by the European Court of Human Rights in *Sufi and Elmi v. United Kingdom*, note 45 above, para. 241 and *L.M. and Others v. Russia*, note 45 above, para. 121.

[49] For example, in Rwanda in 1994, Tutsi women were portrayed in Hutu controlled media outlets as 'seductive agents of the enemy', thereby 'articulat[ing] a framework that made the sexual attack of Tutsi women a foreseeable consequence of the role attributed to them', see *The Prosecutor v. Ferdinand Nahimana, Jean-Bosco Barayagwiza, Hassan Ngeze (Judgement and Sentence)*, ICTR-99-52-T, International Criminal Tribunal for Rwanda (ICTR), 3 December 2003, para. 1079, http://www.refworld.org/docid/404468bc2.html.

[50] UNHCR Handbook, note 26 above, para. 42.

[51] *Immigration and Naturalization Service v. Cardoza-Fonseca*, 480 U.S. 421; 107 S. Ct. 1207; 94 L. Ed. 2d 434; 55 U.S.L.W. 4313, United States Supreme Court, 9 March 1987, http://www.refworld.org/docid/3ae6b68d10.html, in dismissing a calculus Stevens J. considered: 'The High Commissioner's analysis of the United Nations' standard is consistent with our own examination of the origins of the Protocol's definition, as well as the conclusions of many scholars who have studied the matter. There is simply no room in the United Nations' definition for concluding that because an applicant only has a 10% chance of being shot, tortured, or otherwise persecuted, that he or she has no "well-founded fear" of the event happening.'

[52] *Surajnarain and Others v. Minister of Citizenship and Immigration*, 2008 FC 1165, Canada: Federal Court, 16 October 2008, para. 17, http://www.refworld.org/docid/497f3bdc2.html.

[53] *Minister for Immigration and Multicultural Affairs v. Haji Ibrahim*, [2000] HCA 55, Australia: High Court, 26 October 2000, http://www.refworld.org/docid/3deb737f7.html, paras. 66 and 70. The 'differential test' test was considered by Lord Lloyd of Berwick in *R v. Secretary of State for the Home Department, Ex parte Adan*, CO/872/98, United Kingdom: House of Lords (Judicial Committee), 2 April 1998, http://www.refworld.org/docid/3ae6b6c914.html. See also *AM & AM (Armed Conflict: Risk Categories) Somalia v. Secretary of State for the Home Department*, note 48 above, para. 72.

AR.08280

required to establish a well-founded fear of persecution in situations of armed conflict and violence compared to other situations.

23. Further, some courts have referred to a "differential risk" in order to emphasize the requirement for a causal link between the risk (i.e. well-founded fear of persecution) and the reasons for persecution (i.e. one or more Convention grounds). However, such phrasing can lead to conflation of the risk element with the causal link requirement – addressed in paragraphs 32 and 33 of these Guidelines – and is not in keeping with a proper application of the 1951 Convention definition of a refugee.[54]

*Forward-looking assessment of risk*

24. The 1951 Convention protects those who – at the time of the decision – are at risk of persecution in their country of origin, regardless of whether they have already suffered persecution. A decision on whether a person has a well-founded fear of being persecuted requires a forward-looking assessment of all relevant facts of the case (see paragraphs 89 to 92 of these Guidelines). Absent a relevant change of circumstances, persons having suffered persecution in the past would be assumed to be at continued risk of persecution.[55]

25. When assessing the risk, it is important to take into account the fluctuating character of many contemporary situations of armed conflict and violence. Changing levels of violence or control over territories and populations are common in situations of armed conflict and violence. For example, even if the level of violence at the time of decision-making is relatively low, over time the situation of armed conflict and violence may change, increasing the degree of risk establishing a well-founded fear. There may be reasons for the lower level of violence at a particular moment in time, such as when the parties are regrouping or re-strategizing, or a temporary ceasefire has been agreed. Similarly, even if violence has not yet broken out in a particular part of the country, it may be foreseeable that the violence will spread there, taking into account the overall context and history of the situation of armed conflict and violence, the trajectory and mapping of the violence, the power dynamics at play and other conditions in the applicant's country of origin. The effects of past violence may also still rise to the level of persecution, despite a temporary suspension of hostilities, and need to be assessed carefully. In addition, the implementation of peace and demobilization agreements may lead to new armed actors filling vacuums of power, or to the consolidation of groups composed of former members who have not disarmed and reintegrated into society. This also requires a detailed analysis that constantly evolves in response to local developments in the country of origin.

*Sexual and gender-related persecution*

26. Sexual and gender-based violence, including rape, human trafficking, sexual slavery and conjugal slavery/forced marriage, are common forms of persecution in many situations of armed conflict and violence.[56] Sexual and gender-based violence may be used as an unlawful and criminal tactic, strategy or policy during situations of armed conflict and violence, in order to overwhelm and weaken the adversary directly or indirectly, by victimizing women and girls and/or men and boys.[57] Irrespective of the motivation of the individual perpetrator, sexual and gender-based violence may form part of a deliberate military or political strategy to debase, humiliate, terrorize or destroy civilian populations

[54] *Refugee Appeal No. 71462/99, Tamil and a Citizen of the Democratic Socialist Republic of Sri Lanka v. Refugee Status Branch of the New Zealand Immigration Service*, 71462/99, New Zealand: Refugee Status Appeals Authority, 27 September 1999, http://www.refworld.org/docid/3ae6b73cc.html.

[55] UNHCR Handbook, note 26 above, para. 45.

[56] UNHCR, *Guidelines on International Protection No. 1: Gender-Related Persecution Within the Context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol Relating to the Status of Refugees*, 7 May 2002, HCR/GIP/02/01, para. 9, ("UNHCR Gender-Persecution Guidelines"), http://www.refworld.org/docid/3d36f1c64.html. UNHCR, *Guidelines on International Protection No. 9: Claims to Refugee Status based on Sexual Orientation and/or Gender Identity within the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol relating to the Status of Refugees*, 23 October 2012, HCR/GIP/12/01, para. 20, ("UNHCR Sexual-Orientation and/or Gender Identity Guidelines"), http://www.refworld.org/docid/50348afc2.html. Rape, for example, was considered a serious human rights violation constituting persecution in: *SS (Adam – Sexual Violence – UNHCR Letter) Burundi v. Secretary of State for the Home Department*, CG [2004] UKIAT 00290, United Kingdom: Asylum and Immigration Tribunal / Immigration Appellate Authority, 29 October 2004, para. 16, http://www.refworld.org/docid/46836b180.html. UN Secretary-General (UNSG), *Sexual violence in conflict: report of the Secretary-General*, 14 March 2013, A/67/792-S/2013/149, ("UNSG Report sexual violence in conflict"), http://www.refworld.org/docid/5167bd0f4.html.

[57] See, for example, *Prosecutor v. Issa Hassan Sesay, Morris Kallon and Augustine Gbao (the RUF accused) (Trial judgment)*, Case No. SCSL-04-15-T, Special Court for Sierra Leone, 2 March 2009, para. 1347, http://www.refworld.org/docid/49b102762.html. *In re B (FC) (Appellant) (2002). Regina v. Special Adjudicator, Ex parte Hoxha (FC)*, [2005] UKHL 19, United Kingdom: House of Lords (Judicial Committee), 10 March 2005, para. 30, http://www.refworld.org/docid/423ec7784.html. Security Council, *Security Council resolution 2106 (2013) [on sexual violence in armed conflict]*, 24 June 2013, S/RES/2106 (2013), para. 1, http://www.refworld.org/docid/51d6b5e64.html.

AR.08281

in pursuit of broader goals, or rooted in gender-related and other forms of discrimination, thus linking it to one or more of the Convention grounds.[58]

27. For many victims of sexual and gender-based violence, torture and other acts of bodily harm and psychological trauma, the harm may continue long after the initial violent act was committed and the situation of armed conflict and violence has ended. They may be at risk of repeated harm[59] and/or the psychological consequences of their experiences may themselves amount to persecution,[60] in particular when people have suffered from particular egregious harm that makes return to the country of origin intolerable even if there is no future risk of further harm.[61]

*Agents of persecution*

28. In a situation of armed conflict and violence, persecution may emanate from state or non-state actors, and from one or more sides involved in the situation of armed conflict and violence.[62] Refugee status can be warranted in the case of persons at risk of harm from actors on both or all sides of these situations. Agents of persecution may include the state's armed forces, its law enforcement agents or security forces or other state organs or groups, and individuals for whom the state is responsible or whose conduct can be attributed to the state.[63] The state may empower, direct, control, support or tolerate the activities of so-called non-state actors, such that their actions can in some instances be attributable to the state.[64] Agents of persecution also include non-state actors such as paramilitary groups, militias, insurgents, bandits, pirates, criminal gangs or organizations,[65] terrorist organizations, private military or security companies, or other groups or individuals engaging in situations of armed conflict and violence. An analysis of these actors should take into account that their character may shift from one of these categories to another or defy categorization altogether. Non-state actors may also include neighbours, family members and other individuals.

**12**

29. In many situations of armed conflict and violence, the division between state and non-state actors is not always clear, especially as power shifts, situations overlap and alliances change, or where non-state actors penetrate or corrupt state institutions and/or law enforcement agencies or the state's armed forces.[66] The uncertainty during an attempted, ongoing or successful *coup d'état*, for example, can also blur such distinctions. However, it is not crucial to determine precisely from whom the feared harm may emanate; as long as a threat is established, it will be sufficient for determining a well-founded fear of persecution.

30. In cases involving non-state actors or unidentified actors, it is necessary to review the extent to which the state is able and/or willing to provide protection against persecution.[67] The particularities of the situation of armed conflict and violence will be relevant, since the state may be prevented from extending protection to affected populations, for example in cases where it has lost control over its territory and population or where such control is fluid or uncertain. In such situations, the state may also be unwilling to extend protection.

---

[58] UNHCR Cape Town Summary Conclusions, note 3 above, paras. 25 and 26. UNSG Report sexual violence in conflict, note 56 above, para. 5.

[59] *Matter of A-T-*, 25 I&N Dec. 4 (BIA 2009), United States Board of Immigration Appeals, 4 June 2009, http://www.refworld.org/docid/4a293b4a2.html. *Bah v. Y-, Diallo v. Department of Homeland Security, Diallo v. Department of Homeland Security*, 529 F.3d 99, 103 (2d Cir. 2008), United States Court of Appeals for the Second Circuit, 11 June 2008, http://www.refworld.org/docid/48d8a32c2.html.

[60] *In re B (FC) (Appellant) (2002). Regina v. Special Adjudicator, Ex parte Hoxha (FC)*, note 57 above, para. 36, in which Baroness Hale of Richmond considered: '[t]o suffer the insult and indignity of being regarded by one's own community as 'dirty like contaminated' because one has suffered the gross ill-treatment of a particularly brutal and dehumanising rape ... is the sort of cumulative denial of human dignity which ... is quite capable of amounting to persecution.'

[61] *In re Y-T-L-*, 23 I&N Dec. 601 (BIA 2003), United States Board of Immigration Appeals, 22 May 2003, p 607, http://www.refworld.org/docid/40449fa94.html. *Khadija Mohammed v. Alberto R. Gonzales, Attorney General; Khadija Ahmed Mohamed v. Alberto R. Gonzales, Attorney General*, A79-257-632; 03-72265; 03-70803, United States Court of Appeals for the Ninth Circuit, 10 March 2005, pp 3085 to 3086, http://www.refworld.org/docid/423811c04.html. UNHCR, *UNHCR intervention before the House of Lords in the case of Zainab Esther Fornah (Appellant) v. Secretary of State for the Home Department (Respondent)*, 14 June 2006, para. 24(2), http://www.refworld.org/docid/45631a0f4.html.

[62] UNHCR Handbook, note 26 above, para. 65.

[63] International Law Commission, Articles on the Responsibility of States for Internationally Wrongful Acts, *Yearbook of the International Law Commission*, 2001 Vol.II (Part Two), http://www.refworld.org/docid/3ddb8f804.html. See also: UNGA Res. 56/83, 12 December 2001; UNGA Res. 59/35, 2 December 2004; and UNGA Res. 71/133, 13 December 2016. In accordance with Article 10 of the aforementioned Articles, the conduct of an insurrectional movement or other movement shall be considered an act of state under international law, when the movement becomes the new government or when it succeeds in establishing a new state in part of the territory of a pre-existing state or in a territory under its administration.

[64] *Ibid.*, Articles 8 and 9. UNHCR Military Service Guidelines, note 9 above, para. 42.

[65] UNHCR Gangs Guidance Note, note 12 above, para. 4.

[66] See, for example, UNHCR, *Country of Origin Series: Guatemala: Background Paper*, October 2013, RBA/COI/GUA/13/01, p. 11, http://www.refworld.org/docid/53832fe84.html.

[67] UNHCR Military Service Guidelines, note 9 above, para. 43.

AR.08282

*Refugees sur place*

31. A well-founded fear of persecution may arise after an applicant has left her or his country of origin, owing to circumstances arising in the country of origin during the applicant's absence, and/or as a result of her or his own actions after s/he has left the country of origin, making the applicant a refugee *sur place*.[68] In the context of claims for refugee status related to situations of armed conflict and violence, a person may become a refugee *sur place* owing, for example, to the outbreak of a situation of armed conflict and violence, the intensification of a pre-existing but latent situation of armed conflict and violence in her or his country of origin,[69] or because she or he has expressed objections or taken a stance against the situation of armed conflict and violence.

## B. 'For reasons of' one or more Convention grounds

*'For reasons of' (causal link)*

32. The intent or motive of the persecutor can be a relevant factor in establishing the causal link between the fear of persecution and a 1951 Convention ground. However, the intent or motive of the persecutor is not necessary or decisive, not least because it is often difficult to establish,[70] in particular in situations of armed conflict and violence. A causal link may also be established by the strategies, tactics or means and methods of warfare of the persecutor, by the inability or unwillingness of the state to provide protection, or by the effect(s) of the situation of armed conflict and violence. The question to guide decision-makers is: do the reasons for the person's feared predicament, within the overall context of the country, relate to a Convention ground?[71]

33. Situations of armed conflict and violence may be rooted in, motivated or driven by, and/or conducted along lines of race, ethnicity, religion, politics, gender or social group divides, or may impact people based on these factors. In fact, what may appear to be indiscriminate conduct (i.e. conduct whereby the persecutor is not seeking to target particular individuals),[72] may in reality be aimed at whole communities or areas whose inhabitants are actual or perceived supporters of one of the sides in the situation of armed conflict and violence. Rarely are modern-day situations of armed conflict and violence characterised by violence that is not in one way or another aimed at particular populations, or which does not have a disproportionate effect on a particular population, establishing a causal link with one or more of the Convention grounds. Who belongs to or is considered or perceived to be affiliated with, a particular side in a situation of armed conflict and violence, is often interpreted broadly by actors during such situations – and may include a range of people, including family members of fighters as well as all those who belong to the same religious or ethnic groups or reside in particular neighbourhoods, villages or towns. A Convention ground is regularly imputed to groups of people based on their family, community, geographic or other links.[73]

*Convention grounds*

34. The reasons for fearing persecution may be multiple. One or more Convention grounds may be relevant. The grounds are not mutually exclusive and frequently overlap.[74] A Convention ground need only be a contributing factor; it need not be the dominant or the sole cause of the fear of persecution.

35. Situations of armed conflict and violence are regularly rooted in, or driven by, a variety of motives, or have consequences that affect various groups. Situations of armed conflict and violence regularly

---

[68] UNHCR Handbook, note 26 above, para. 94 to 96.

[69] For example, Mozambicans finding themselves in South Africa between 1980 and 1985 could be considered as refugees *sur place*, see *South Africa: Passport Control Instruction No. 20 of 1994 – Guidelines for Refugees Status Determination of Mozambicans in South Africa*, 1994, para. 5 [of the Guidelines] http://www.refworld.org/docid/3ae6b5082c.html.

[70] UNHCR Handbook, note 26 above, para. 66. UNHCR Military Service Guidelines, note 9 above, para. 48.

[71] *Refugee Appeal No. 72635/01*, 72635/01, New Zealand: Refugee Status Appeals Authority, 6 September 2002, para. 168, http://www.refworld.org/docid/402a6ae14.html. J C Hathaway and M Foster, *The Law of Refugee Status* (Cambridge University Press, 2014), p. 376 to 379.

[72] *Elgafaji v. Staatssecretaris van Justitie*, note 17 above, para. 34.

[73] UNHCR, *International Protection Considerations with regard to people fleeing the Syrian Arab Republic, Update IV*, November 2015, para. 17, http://www.refworld.org/docid/5641ef894.html. *Arrest nr. 122 129, 122 129, Belgium: Conseil du Contentieux des Etrangers*, 4 April 2014, (in Dutch; cover sheet in English available), http://www.refworld.org/docid/582068524.html.

[74] UNHCR Handbook, note 26 above, para. 67.

AR.08283

involve a mix of ethnic, religious, societal and political dimensions, with the parties involved operating along ethnic, religious or social lines and pursuing – or perceived to be pursuing – political and/or religious goals.

36. Even where the motives and drivers behind violent or otherwise harmful conduct resulting from, or prevalent in, situations of armed conflict and violence may, at first sight, appear to be criminal or profit-driven, they are regularly interconnected with Convention grounds.[75] For instance, armed groups may set up criminal enterprises to finance an ethnic, religious or political conflict, or the violence of gangs or other armed groups, including for example drug cartels, which is primarily profit-driven, may also have the aim of consolidating or expanding the group's powerbase in society, potentially characterizing the violence as politically motivated.[76] The targeting of individuals, as well as whole areas and populations, often has ethnic, religious and/or political purposes or links.

37. Expressing objections or taking a neutral or indifferent stance to the strategies, tactics or conduct of parties in situations of armed conflict and violence, or refusing to join, support, financially contribute to, take sides or otherwise conform to the norms and customs of the parties involved in the situation may – in the eyes of the persecutor – be considered critical of the political goals of the persecutor, or as deviating from the persecutor's religious or societal norms or practices.[77] Such objections, stances or behaviours may indicate or create the perception in the eyes of the persecutor that the person holds a political opinion or religious (or non-)belief, having an affiliation with or belonging to an ethnic or social group.

38. Persons pursuing certain trades, professions or occupations may be at risk for reasons of, for example, their real or perceived political opinion or religious (or non-)belief.[78] Their activities, role or status within society that follows from, or is associated with, their trade, profession or occupation, may be regarded as a real or perceived opinion on a matter in which the machinery of state, government, society or policy may be engaged,[79] in particular, in a country in conflict. For instance, journalists and other media professionals, and human rights and rule of law defenders, may report factually or critically on the conduct of certain actors, medical professionals treating opposition fighters may be seen as supporting the opposition, humanitarian workers continuing with their humanitarian work may be perceived as assisting the "enemy",[80] and religious leaders may side, or be seen to be siding, with one of the parties.

39. Claims involving gender-related persecution may be analysed under any of the Convention grounds, i.e. in relation to real or perceived political opinion, ethnicity[81] and/or religion or social group (gender).[82]

---

[75] *Refugee Appeal No. 76289*, No. 76289, New Zealand: Refugee Status Appeals Authority, 8 May 2009, para. 43, http://www.refworld.org/docid/4a2e2a5e2.html. *Emilia Del Socorro Gutierrez Gomez v. Secretary of State for the Home Department*, 00/TH/02257, United Kingdom: Asylum and Immigration Tribunal / Immigration Appellate Authority, 24 November 2000, paras. 43, 44, 50, 51 and 73(XI), http://www.refworld.org/docid/40487df64.html. *Osorio v. Immigration and Naturalization Service*, 18 F.3d 1017: 1994 U.S. App. LEXIS 4170, United States Court of Appeals for the Second Circuit, 7 March 1994, http://www.refworld.org/docid/3ae6b70e7.html.
[76] See, for example, *NS (Social Group – Women – Forced Marriage) Afghanistan v. Secretary of State for the Home Department*, CG [2004] UKIAT 00328, United Kingdom: Asylum and Immigration Tribunal / Immigration Appellate Authority, 30 December 2004, para. 69, http://www.refworld.org/docid/42c928984.html; and *Emilia Del Socorro Gutierrez Gomez v. Secretary of State for the Home Department*, note 75 above, para. 40.
[77] *RT (Zimbabwe) and others v Secretary of State for the Home Department*, [2012] UKSC 38, United Kingdom: Supreme Court, 25 July 2012, para. 42, http://www.refworld.org/docid/500fdacb2.html. UNHCR, *Secretary of State for the Home Department (Appellant) v. RT (Zimbabwe), SM (Zimbabwe) and AM (Zimbabwe) (Respondents) and the United Nations High Commissioner for Refugees (Intervener) - Case for the Intervener*, 25 May 2012, 2011/0011, para. 10, http://www.refworld.org/docid/4fc369022.html. *Souad Noune v Secretary of State for the Home Department*, C 2000/2669, United Kingdom: Court of Appeal (England and Wales), 6 December 2000, Schiemann LJ, paras. 8(5) and 28(5), http://www.refworld.org/docid/558bcbad4.html.
[78] M Foster, *The 'Ground with the Least Clarity': A Comparative Study of Jurisprudential Developments relating to 'Membership of a Particular Social Group'*, August 2012, UNHCR PPLA/2012/02, chapter 5.7.3, http://www.refworld.org/docid/4f7d94722.html. *Emilia Del Socorro Gutierrez Gomez v. Secretary of State for the Home Department*, note 75 above, para. 46.
[79] G S Goodwin-Gill and J McAdam, *The Refugee in International Law* (Oxford: Oxford University Press, 2007), p. 87. *Canada (Attorney General) v. Ward*, [1993] 2 S.C.R. 689, Canada: Supreme Court, 30 June 1993, http://www.refworld.org/docid/3ae6b673c.html.
[80] UNHCR, *UNHCR Eligibility Guidelines for Assessing the International Protection Needs of Asylum-Seekers from Iraq*, 31 May 2012, HCR/EG/IRQ/12/03, page 20 and 31, http://www.refworld.org/docid/4fc77d522.html.
[81] Real or perceived ethnicity is covered by the Convention grounds race and/or nationality, see, for example, UNHCR Handbook, note 26 above, paras. 68 and 74 and UNHCR Gender-Persecution Guidelines, note 56 above, paras. 24 (race) and 27 (nationality).
[82] UNHCR Gender-Persecution Guidelines, note 56 above, paras. 25 (religion), 28 to 31 (membership of a particular social group), and 32 to 34 (political opinion). UNHCR Sexual Orientation and/or Gender Identity Guidelines, note 56 above, paras. 42 and 43 (religion), 44 to 49 (membership of a particular social group), and 50 (political opinion).

AR.08284

## C. Internal flight or relocation alternative

40. The relevance of an internal flight or relocation alternative in situations of armed conflict and violence needs to be carefully assessed. Situations of armed conflict and violence are often characterized by widespread fighting, are frequently fluid, with changing frontlines and/or escalations in violence, and often involve a variety of state and non-state actors, who may not be easily identifiable, operating in diverse geographical areas. Further, such situations often seriously affect state and societal structures and support systems (see paragraph 19 of these Guidelines) creating hardships for the civilian population. The humanitarian situation of civilian populations living in areas affected by situations of armed conflict and violence is often dire, including as a result of blocking supply routes and restrictions on humanitarian aid and freedom of movement. Considering these factors, in many situations of armed conflict and violence, it may neither be relevant nor reasonable to apply an internal flight or relocation alternative.

41. Only when the situation of armed conflict and violence and its impact is geographically limited and confined to a specific part of the country would it be relevant to assess whether an internal flight or relocation alternative exists.[83] In such situations, a careful examination needs to be made of the practical, legal and safe accessibility of the identified alternative area, in particular for the person concerned, and the ability of the state or other entity to provide protection that is effective. Protection must be provided by an organized and stable authority exercising full control over the territory and population in question.[84] It would be inappropriate to equate the exercise of a certain administrative authority and control over territory by international organisations or non-state actors, with national protection provided by a state.[85] Such control is often transitional or temporary and without the range of functions required of a state, including the ability to readmit nationals to the territory or to exercise other basic functions of government. Specifically, non-state entities and bodies do not have the attributes of a state. Their ability to enforce the law is limited. Further, in determining whether the internal flight or relocation alternative is reasonable, a careful assessment needs to be made of the ability of the person to live in safety and security without undue hardship, and for her or his human rights to be protected. In addition, and in particular, the likely spread of the situation of armed conflict and violence into new areas needs to be taken into account (see paragraphs 25 and 40 of these Guidelines).[86] It is not reasonable to expect someone to relocate to a zone of active armed conflict and violence.

42. The presence of internally displaced persons, including those who are receiving international assistance, in one part of the country, is not necessarily evidence of the reasonableness of a proposed internal flight or relocation alternative in that part of the country.[87] Internally displaced persons often do not enjoy basic rights[88] and may face economic destitution or existence below an adequate level of subsistence, which would be evidence of the unreasonableness of the proposed internal flight or relocation alternative.[89] It is also necessary to consider the capacity of local authorities to provide protection against harm, as well as whether human rights, particularly non-derogable rights, are respected.[90] Further, in some situations, internal displacement may be the result of ethnic cleansing policies, or similar, in violation of the prohibitions on forcible transfer and arbitrary displacement under IHL in the context of an armed conflict. In such circumstances, an internal flight or relocation alternative should not be presumed to exist.[91]

43. Equally, "protected zones"[92] or "safe zones"[93] and other similar areas should not necessarily be considered a relevant or reasonable internal flight or relocation alternative. Under IHL, protected

---

[83] UNHCR Handbook, note 26 above, para. 91. For UNHCR guidance on a proper assessment of an internal flight or relocation alternative, see UNHCR, *Guidelines on International Protection No. 4: "Internal Flight or Relocation Alternative" Within the Context of Article 1A(2) of the 1951 Convention and/or 1967 Protocol Relating to the Status of Refugees*, 23 July 2003, HCR/GIP/03/04, ("UNHCR IFA Guidelines"), http://www.refworld.org/docid/3f2791a44.html.
[84] UNHCR IFA Guidelines, note 83 above, para. 17.
[85] *Ibid.*, paras. 16 and 17.
[86] *Ibid.*, paras. 17 and 27 to 30.
[87] *Ibid.*, para. 31.
[88] *Ibid.*, para. 32.
[89] *Ibid.*, para. 29. See also, *Sufi and Elmi v. United Kingdom*, note 45 above, para. 291.
[90] UNHCR IFA Guidelines, note 83 above, para. 28.
[91] *Ibid.*, para. 31.
[92] The term "protected zones" is the overarching term used by the International Committee of the Red Cross (ICRC) for all relevant zones stipulated in the 1949 Geneva Conventions and Additional Protocol I, and see Rules 35 to 37 of customary IHL, in: J –M Henkaerts and L Doswald-Beck (eds.), *Customary International Law, Volume I: Rules* (Cambridge University Press, 2005), pp. 119-126. The legal bases for establishing protected zones in the context of an armed conflict within the meaning of IHL can be found in Article 23 of the First Geneva Convention, note 38 above, Article 14 (hospital and safety zones and localities) and 15 (neutralized zones) of the Fourth Geneva Convention, note 13 above, and Article 59 (non-defended localities) and 60 (demilitarized zones) of Protocol I to the Geneva Convention, note 13 above.
[93] In a number of instances, the United Nations Security Council has called upon the creation of "safe zones", see, for example, UNSC Res. 787 (1992), 16 November 1992; UNSC Res. 819 (1993), 16 April 1993; UNSC Res. 824 (1993), 6 May 1993; UNSC Res. 918 (1994), 17 May 1994; and UNSC Res. 929 (1994), 22 June 1994.

AR.08285

zones agreed upon by the concerned belligerents are set up as measures to protect the civilian population and other categories of protected persons (for example, the wounded and sick, including wounded and sick combatants/fighters) from the effects of armed conflict. Similarly, "safe zones" and other similar areas established on the basis of United Nations Security Council resolutions, seek to prevent certain areas and persons from falling into enemy hands, even if their establishment and implementation differs from the "protected zones" within the meaning of IHL. Despite the overall objective of these zones and areas, the safety of the people living in such zones and areas may be compromised, as a result of sieges, or attacks against the zone or area and the population therein.

## III. SUBSTANTIVE ANALYSIS OF ARTICLE I(2) OF THE 1969 OAU CONVENTION

44. Article I(1) of the 1969 OAU Convention replicates the 1951 Convention refugee definition contained in Article 1A(2) of the 1951 Convention, as amended by the 1967 Protocol,[94] while Article I(2) offers refugee protection to:

> 'every person who, owing to external aggression, occupation, foreign domination or events seriously disturbing public order in either part or the whole of his country of origin or nationality, is compelled to leave his place of habitual residence in order to seek refuge in another place outside his country of origin or nationality.'

### Preliminary considerations to guide interpretation

45. In applying the 1969 OAU Convention definition, the primacy of the 1951 Convention needs to be borne in mind, given its status as the 'basic and universal instrument' for the protection of refugees.[95] Following the adoption of the 1967 Protocol, which made the 1951 Convention the global instrument for the protection of refugees, the 1969 OAU Convention sought in large part to address the specific challenges facing African countries in responding to refugee crises on the continent.

46. The 1969 OAU Convention is a widely ratified, legally binding instrument,[96] which is protection- and humanitarian-oriented[97] and reflects trans-African solidarity.[98] It specifically reaffirms the importance of the institution of asylum,[99] the principle of *non-refoulement*[100] and non-discrimination,[101] the duties of refugees,[102] and the search for durable solutions, including respect for the voluntary character of repatriation.[103] Cooperation with the African Union and UNHCR is also emphasized,[104] and it calls on all OAU (now African Union) Member States to accede to the 1951 Convention.[105]

---

[94] Contrary to Article 1A(2) of the 1951 Convention, Article I(1) of the 1969 OAU Convention does not include the temporal limitation of having a well-founded fear as a result of 'events occurring before 1 January 1951'; a limitation later removed with the adoption of the 1967 Protocol, Article I(2).

[95] 1969 OAU Convention, note 4 above, ninth preambular paragraph.

[96] To date, the 1969 OAU Convention has been ratified by 46 of the African Union's (AU) 54 Member States. Djibouti, Eritrea, Madagascar, Mauritius, Namibia, Sao Tomé & Principe and Somalia have signed but not ratified or acceded to the 1969 OAU Convention. Only the Saharawi Arab Democratic Republic (SADR) has neither signed nor ratified or acceded to the 1969 OAU Convention. Morocco is a party to the 1969 OAU Convention, but not a Member State of the African Union.

[97] 1969 OAU Convention, note 4 above, second preambular paragraph.

[98] *Ibid.*, eighth preambular paragraph.

[99] *Ibid.*, Article II. A right to seek and obtain asylum is recognized in Article 12(3) of the African Charter on Human and Peoples' Rights, Organization of African Unity (OAU), *African Charter on Human and Peoples' Rights ("Banjul Charter")*, 27 June 1981, CAB/LEG/67/3 rev. 5, 21 I.L.M. 58 (1982), http://www.refworld.org/docid/3ae6b3630.html.

[100] 1969 OAU Convention, note 4 above, Article II(3).

[101] *Ibid.*, Article IV.

[102] *Ibid.*, Article III.

[103] *Ibid.*, Article II(5), referring to a right to reside, to be granted temporary residence, and resettlement. The right to voluntary repatriation is regulated by Article V of the 1969 OAU Convention.

[104] *Ibid.*, eleventh preambular paragraph and Articles VII and VIII.

[105] To date, of the African Union's 54 Member States only the Comoros, Eritrea, Libya, Mauritius and South Sudan have neither signed nor ratified the 1951 Convention or its 1967 Protocol. Madagascar is a party to the 1951 Convention but not to the 1967 Protocol. Madagascar and the Republic of Congo continue to recognise the 1951 Convention's geographical limitation. Finally, Cabo Verde is party to the 1967 Protocol but not the 1951 Convention.

**12**

AR.08286

*Scope of the 1969 OAU Convention definition*

47. In accordance with the ordinary meaning of the terms, the 1969 OAU Convention definition applies to all persons within the jurisdiction of a State Party and is not limited to persons whose country of origin or nationality is in Africa.

48. Article I(2) of the 1969 OAU Convention is the first refugee definition of its kind to steer away from persecutory conduct towards more generalized or so-called "objectively" identifiable situations. The 1969 OAU definition acknowledges that the compulsion for persons to leave their country may occur not only as a result of the conduct by state or non-state actors in the refugee's country of origin, but also as a result of that government's loss of authority or control due to external aggression, occupation, foreign domination or events seriously disturbing public order.[106] The 1969 OAU definition focuses on situations that compel people to leave their countries in search of safety and sanctuary.

## B. Elements of the 1969 OAU Convention definition

49. Article I(2) of the 1969 OAU Convention protects as refugees persons who (i) are outside their country of origin,[107] (ii) having been compelled to leave their place of habitual residence, (iii) because one or more of the situations listed in the definition exists in their country of origin or nationality. These elements of the 1969 OAU Convention definition are explained below and need to be considered as part of a holistic assessment of a claim for refugee status.

*Compelled to leave one's place of habitual residence*

50. By including the language of "compulsion" in the definition, Article I(2) of the 1969 OAU Convention emphasizes the seriousness of the situation. The verb "to compel" is understood to mean 'to urge irresistibly, to constrain, oblige, force'.[108] Reference to one's 'place of habitual residence' must be understood as part of the compulsion to leave and seek refuge outside one's country of origin or nationality, i.e. the situation must have an impact on the person's place of habitual residence. The 'place of habitual residence' element has no other or separate legal effect. Thus, when the situation in question is sufficiently serious that it is objectively reasonable for a person to leave her or his place of habitual residence and seek refuge in another country, she or he needs to be protected.[109]

51. Article I(2) of the 1969 OAU Convention does not require a personalized or discriminatory threat or risk of harm.[110] Whole groups of persons or an entire population may be affected by the situation and be compelled to leave their places of habitual residence owing to the situation in question. As Article I(2) emphasizes the assessment of the seriousness of the situation in question more than motives for flight or the risk of harm, decision-makers should assess whether flight from the country of origin or nationality is objectively reasonable.

*Refugees sur place*

52. *Sur place* claims are accepted under the 1969 OAU Convention consistent with the interpretation of the 1951 Convention (see paragraph 31 of these Guidelines).

---

[106] J.C. Hathaway, *The Law of Refugee Status* (Butterworths, 1991), 17.
[107] The phrase 'country of origin or nationality' refers to the person's country of nationality, or in the case of stateless persons, the reference to 'country of origin' can be assimilated with 'country of former habitual residence' in Article 1A(2) of the 1951 Convention. To benefit from the 1969 OAU Convention, an applicant needs to be outside her or his country of origin or nationality.
[108] 'compel, v', *The Oxford English Dictionary* 2nd edition, OED online, 2015, Oxford University Press.
[109] *Radjabu v. The Chairperson of the Standing Committee for Refugee Affairs*, 8830/2010, South Africa: High Court, 4 September 2014, para. 6, http://www.refworld.org/docid/540874f94.html. The criterion of 'objectively reasonable to leave' speaks to the ordinary meaning of the word 'compulsion'. According to the Court, compulsion rather than volition is the predominant factor, whereby determining whether a person qualifies for refugee status under the regional definition requires an assessment of the existence of objectively ascertainable circumstances in the person's country of origin corresponding with any of those stipulated in the definition and whether their effect on the person concerned has been such as to force him or her to leave the place where s/he ordinarily resided.
[110] Article I(2) of the 1969 OAU Convention is not ignorant of a risk of harm as is evident from the phrase 'is compelled to leave' in the definition read in conjunction with the principle of *non-refoulement* laid down in Article II(3) of the 1969 OAU Convention, protecting people from being returned to a territory where their life, physical integrity or liberty would be threatened. However, a threat or risk of harm is not a necessary requirement to be granted protection under the regional definition.

AR.08287

*Situations compelling flight*

53. The situations mentioned in Article I(2) of the 1969 OAU Convention are to be given their ordinary meaning in their context and in light of their (protection-oriented) object and purpose.[111] They should also, wherever possible, be interpreted in such a way that they remain relevant and applicable to situations that were not foreseeable when the 1969 OAU Convention was drafted.

54. The situation may be the result of 'external aggression', i.e. aggression through the use of armed force by a state against the sovereignty, territorial integrity or political independence of another state, or in any other manner inconsistent with the Charter of the United Nations.[112] These situations may include armed conflicts fuelled by outside involvement or that have spilled over from neighbouring states, including because of the presence of (members of) the armed forces of another state or incursions by foreign armed groups.

55. Situations of armed conflict and violence may also accompany, or be the result of, 'occupation', i.e. a situation whereby the territory is actually placed under the authority or effective control of a hostile foreign state's armed forces.[113] This may also be the case for other situations not classified as 'occupation' within the meaning of IHL, where armed group(s) from either within or outside the country exercise control over territory.[114] Situations of armed conflict and violence could also accompany, or be the result of, 'foreign domination', i.e. the political, economic or cultural control of a state by (agents of) one or more other states, association of states, or state-governed international organizations.[115]

56. The phrase 'events seriously disturbing public order' should be construed, in line with the 1969 OAU Convention's humanitarian object and purpose, to include events that impact the maintenance of public order (*ordre public*) based on respect for the rule of law and human dignity to such an extent that the life, security and freedom of people are put in danger.[116] The threshold of "serious" refers to public disorder events likely to disrupt the normal functioning of the institutions of the state and affect internal and external security and stability of the state and society. Such events may be categorized as an IAC or NIAC within the meaning of IHL, but may also include events not categorized as an armed conflict within the meaning of IHL, involving violence by or between different groups in society or between the state and non-state actors.[117] The ground of 'events seriously disturbing public order' appears to be the primary element of Article I(2) of the 1969 OAU Convention under which refugee status is determined.[118]

57. A serious disturbance of public order may either be prompted by one-off acts or incidents, or a series of acts or incidents of a systematic or cumulative nature, in response to which the state is either unwilling or unable to provide protection. According to the ordinary meaning of the definition's terms, 'events seriously disturbing public order' may take place in either part or the whole of the country. Situations that have prompted the government to declare a state of emergency may be an important, albeit unnecessary indicator of the ground, although each situation should be assessed individually.[119]

---

[111] EXCOM Conclusion No. 103 (LVI), 2005, para. (c).

[112] United Nations, *Charter of the United Nations*, 24 October 1945, 1 UNTS XVI, Article 2(4) and Chapter VII, ("UN Charter"), http://www.refworld.org/docid/3ae6b3930.html. Article 1 of the UN General Assembly, *Definition of Aggression*, 14 December 1974, A/RES/3314, http://www.refworld.org/docid/3b00f1c57c.html, and Article 3, which includes a non-exhaustive list of acts that qualify as an act of aggression. See also, Article *8bis* of the Rome Statute ICC, note 32 above.

[113] *Hague Convention (IV) Respecting the Laws and Customs of War on Land and Its Annex: Regulations Concerning the Laws and Customs of War on Land*, 18 October 1907, Article 42, http://www.refworld.org/docid/4374cae64.html. See also, *Chiragov and Others v. Armenia*, Application no. 13216/05, Council of Europe: European Court of Human Rights, 16 June 2015, para. 96, http://www.refworld.org/docid/5582d29d4.html.

[114] African Commission on Human and Peoples' Rights, *Statement by the African Commission on the Present Human Rights Situation in Mali*, 18 January 2013, http://www.refworld.org/docid/5108d96a2.html.

[115] Banjul Charter, note above, Article 20(3): 'All peoples shall have the right to the assistance of the States parties to the present Charter in their liberation struggle against foreign domination, be it political, economic or cultural.'

[116] UNHCR, *Persons covered by the OAU Convention Governing the Specific Aspects of Refugee Problems in Africa and by the Cartagena Declaration on Refugees (Submitted by the African Group and the Latin American Group)*, 6 April 1992, EC/1992/SCP/CRP.6, http://www.refworld.org/docid/3ae-68cd214.html.

[117] See paragraph 5 of these Guidelines. See also, Article 1(2) Protocol II to the Geneva Conventions, note 14 above.

[118] M Sharpe, 'The 1969 OAU Refugee Convention in the Context of Individual Refugee Status Determination', in V Türk, A Edwards and C Wouters (eds.), *In Flight from Conflict and Violence. UNHCR's Consultations on Refugee Status and Other Forms of International Protection* (Cambridge University Press and UNHCR, forthcoming 2017), 133.

[119] ICCPR, note 34 above, Article 4. Also, HRC General Comment 29, note 43 above.

AR.08288

58. 'Events seriously disturbing public order' also include situations of generalized violence, i.e. violence that is widespread, affecting large groups of persons or entire populations, serious and/or massive human rights violations, or events characterized by the loss of government control and its inability or unwillingness to protect its population - including situations characterized by repressive and coercive social controls by non-state actors, often pursued through intimidation, harassment and violence.

59. Factual indicators of events seriously disturbing public order include: a declared state of emergency; violations of IHL including war crimes;[120] acts of terrorism; a significant number of people killed, injured or displaced; the closure of schools; a lack of food, medical services and supplies, and other vital services such as water, electricity and sanitation; a change in, or collapse of, government institutions and services, political systems or the police and justice system; the imposition of parallel or informal justice and administrative systems; and/or non-state actors controlling state territory.

## C. Internal flight or relocation alternative

60. The consideration of internal relocation is not generally relevant to the determination of refugee status under Article I(2) of the 1969 OAU Convention.[121] Article I(2) covers both situations that affect either 'part' or 'the whole' of the refugee's territory.[122] As the focus of Article I(2) is on situations that seriously disrupt state and societal structures, people cannot be required to relocate to other parts of the country, even if the situation in these parts may be less disrupted. The only exception would be where the situation is indisputably confined to a particular part of the country or to a particular region or city, and where the state is able and willing to protect its citizens in other areas. Consideration of the likely spread of the situation and the accompanying violence and disorder into other areas would need to be carefully assessed, with a forward-looking perspective.

# IV. SUBSTANTIVE ANALYSIS OF CONCLUSION III(3) OF THE 1984 CARTAGENA DECLARATION

## A. Preliminary considerations to guide interpretation

61. The Cartagena Declaration on Refugees is a regional protection instrument, adopted in 1984 by a group of experts from several Central and South American countries.[123] It resulted from a colloquium on International Protection for Refugees and Displaced Persons in Central America, Mexico and Panama held in Cartagena de Indias, Colombia. Its adoption represented a humanitarian and pragmatic response to the movements of people from conflict and other situations characterized by indiscriminate threats to life, security or freedom. The Cartagena Declaration reaffirms the peaceful, non-political and exclusively humanitarian nature of asylum and the principle of *non-refoulement*; the importance of searching actively for durable solutions; and the necessity of co-ordination and harmonization of universal and regional systems and national efforts.[124]

62. Conclusion III(3) of the Cartagena Declaration recommends to include among refugees:

'persons who have fled their country because their lives, security or freedom have been threatened by generalized violence, foreign aggression, internal conflicts, massive violation of human rights or other circumstances which have seriously disturbed public order.'[125]

---

[120] Rome Statute ICC, note 32 above, Article 8.

[121] UNHCR IFA Guidelines, note 83 above, para. 5.

[122] *Recueil des décisions (No 2 - 2008)*, Benin: Comité d'éligibilité au statut de réfugié, 2008, p. 97, http://www.refworld.org/docid/563cede14.html. See also, A. Edwards, 'Refugee Status Determination in Africa' (2006) 14 *Afr J Intl Comp L* 227.

[123] Belize, Colombia, Costa Rica, El Salvador, Guatemala, Honduras, Mexico, Nicaragua, Panama and Venezuela.

[124] See, respectively, Conclusion III(4) on the right to asylum; Conclusion III(5) on the principle of *non-refoulement*; Conclusion III(11) on integration and Conclusion III(12) on voluntary repatriation; and Conclusions III(14) to (17) on co-operation, coordination and harmonization.

[125] The original Spanish text of Conclusion III(3) of the Cartagena Declaration refers to '*seguridad*', which is properly translated into English as 'security' rather than 'safety', which is the word used in the Cartagena Declaration, note 5 above.

AR.08289

63. The Cartagena refugee definition has attained a particular standing in the region, not least through its incorporation into national laws and its application in practice.[126] The authority of the Cartagena refugee definition has been reaffirmed by the Inter-American Court of Human Rights (IACrtHR),[127] the San José Declaration on Refugees and Displaced Persons (1994),[128] the Mexico Declaration and Plan of Action to Strengthen International Protection of Refugees in Latin America (2004),[129] the Brasilia Declaration on the Protection of Refugees and Stateless Persons in the Americas (2011)[130] and the Brazil Declaration and Plan of Action (2014).[131]

64. As a protection instrument, the Cartagena Declaration has at its foundation the commitment to ensure the treatment provided by the 1951 Convention to all refugees.[132] It drew inspiration from the 1969 OAU Convention, as well as the doctrine of the Inter-American Commission on Human Rights (IACHR).[133] Its interpretation is to be informed by international and regional law, especially the norms and standards of the 1948 American Declaration of the Rights and Duties of Man,[134] the 1969 American Convention on Human Rights,[135] and the evolving case law of the Inter-American human rights bodies.

65. Furthermore, as a humanitarian- and protection-oriented instrument, the Cartagena Declaration calls for an inclusive, evolving and flexible interpretation of the refugee definition.[136] Where the ordinary meaning is not clear, the text should be given a purposive or teleological interpretation.

*Scope of the Cartagena refugee definition*

66. The Cartagena refugee definition provides international protection to people fleeing the threats resulting from "objectively" identifiable circumstances which have seriously disturbed public order. The circumstances referred to in the Cartagena refugee definition are characterized by the indiscriminate, unpredictable or collective nature of the threats they present to the lif(v)e(s), security or freedom of a person or group of persons, or even to populations at large. The focus of the Cartagena refugee definition is on the exposure of people to the threats inherent in the circumstances referred to.

67. As the Cartagena refugee definition focuses on indiscriminate threats, decision-makers are advised to adopt a consistent approach to persons fleeing similar circumstances in the same country. This contributes towards addressing protection gaps in the region, and to ensuring more consistent outcomes between cases.

## B. Elements of the Cartagena refugee definition

68. The Cartagena refugee definition protects as refugees persons who (i) are outside their country,[137] (ii) because their life, security or freedom has been threatened, (iii) as a result of

---

[126] To date, the Cartagena refugee definition has been incorporated into the national laws of 14 countries: Argentina, Belize, Bolivia, Brazil, Chile, Colombia, El Salvador, Guatemala, Honduras, Mexico, Nicaragua, Paraguay, Peru, and Uruguay. In addition, the Constitutional Court of Ecuador has ordered the regional definition to be reinstated in the national legal framework in September 2014: *Sentencia No 002-14-SIN-CC*, Ecuador: Corte Constitucional, 14 August 2014, http://www.refworld.org/docid/578f56084.html.

[127] *Advisory Opinion OC-21/14 of August 19, 2014 requested by the Argentine Republic, the Federative Republic of Brazil, the Republic of Paraguay and the Oriental Republic of Uruguay: Rights and Guarantees of Children in the Context of Migration and/or in Need of International Protection*, OC-21/14, Inter-American Court of Human Rights (IACrtHR), 19 August 2014, paras. 76, 77, 79 and 249, http://www.refworld.org/docid/54206c744.html.

[128] *San José Declaration on Refugees and Displaced Persons*, 7 December 1994, http://www.refworld.org/docid/4a54bc3fd.html.

[129] *Mexico Declaration and Plan of Action to Strengthen International Protection of Refugees in Latin America*, 16 November 2004, http://www.refworld.org/docid/424bf6914.html.

[130] *Brasilia Declaration on the Protection of Refugees and Stateless Persons in the Americas*, 11 November 2010, http://www.refworld.org/docid/4cdd44582.html.

[131] *Brazil Declaration and Plan of Action*, 3 December 2014, http://www.refworld.org/docid/5487065b4.html.

[132] Cartagena Declaration, note 5 above, Conclusion III(8). See also Recommendation E of the Final Act of the 1951 United Nations Conference of Plenipotentiaries on the Status of Refugees and Stateless Persons, United Nations Conference of Plenipotentiaries on the Status of Refugees and Stateless Persons, 25 July 1951, A/CONF.2/108/Rev.1, http://www.refworld.org/docid/40a8a7394.html.

[133] See the text of Cartagena Declaration, note 5 above, Conclusion III(3).

[134] Inter-American Commission on Human Rights (IACHR), *American Declaration of the Rights and Duties of Man*, 2 May 1948, http://www.refworld.org/docid/3ae6b3710.html.

[135] Cartagena Declaration, note 5 above, Conclusion III(8) and (10) make explicit reference to the 1969 American Convention on Human Rights, note 43 above.

[136] EXCOM Conclusion No. 103 (LVI), 2005, para. (c).

[137] For the purposes of the Cartagena definition, reference to 'their country', in the phrase 'persons who have fled their country', is to be interpreted in line with the 1951 Convention as a person's country of nationality, or, in the case of stateless persons, the country of former habitual residence.

AR-06290

circumstances referred to in the definition existing in their country. The particular elements of the Cartagena refugee definition are explained below. These elements need to be considered as part of a holistic assessment.

*Refugees sur place*

69. *Sur place* claims are accepted under the Cartagena refugee definition consistent with the interpretation of the 1951 Convention (see paragraph 31 of these Guidelines).

*Circumstances compelling flight*

70. These circumstances referred to in the Cartagena refugee definition include, but are not limited to, generalized violence, foreign aggression, internal conflicts, and massive violation of human rights. Further, other circumstances which have seriously disturbed public order in the country may also result in threats to persons' lives, security or freedom forcing them to flee their country. Guided by the protection purpose of the Cartagena Declaration, the circumstances referred to in the Cartagena refugee definition are to be given their ordinary meaning, wherever possible, and interpreted in an evolutionary way so that they remain relevant to situations not foreseeable when the Cartagena Declaration was drafted.

71. 'Generalized violence' is not a term of art, nor does it have a strict or closed meaning. Adopting a case-by-case approach, the term encompasses situations characterized by violence that is indiscriminate and/or sufficiently widespread to the point of affecting large groups of persons or entire populations. Drawing on international human rights law to determine whether a situation of generalized violence prevails, it would be appropriate to identify factual indicators relating to the number and type of security incidents, as well as the overall level of violence in the country of origin and its effect on civilian populations.[138] Situations of generalized violence include situations involving mass and/or serious violations of human rights or IHL. Generalized violence is established via the intensity or geographic spread of the violence, or through a combination of these.

72. Since 'generalized violence' is not a term found in IHL, it cannot be limited to situations of armed conflict within the meaning of IHL, although it can include these situations if the conditions for applicability of IHL are met. See also paragraph 5 of these Guidelines in relation to the limited relevance of categorizing a situation as an armed conflict under IHL in determining who is a refugee.

73. Situations of generalized violence encompass violence carried out by state or non-state actors. It is the situation on the ground, and the risks that the violence presents, that is at issue.

74. 'Foreign aggression' is understood to be the same as the terms 'aggression', 'war of aggression' and 'act of aggression' as defined under international law, as well as the term 'external aggression' included in the 1969 OAU Convention (see paragraph 54 of these Guidelines).[139] Consistent with the object and purpose of the Cartagena Declaration, foreign aggression can be equated to the crime leading to an IAC within the meaning of IHL,[140] as well as relating to situations not categorized as such under IHL. These situations may include conflicts fuelled by outside involvement or those that have spilled

[138] The IACrtHR has considered a situation of generalized and indiscriminate violence in El Salvador in the early 1980s to exist, referring to systematic violence indiscriminately affecting a large number of people over a prolonged period of time. See *The Massacres of El Mozote and nearby places v. El Salvador*, Inter-American Court of Human Rights (IACrtHR), 25 October 2012, paras. 70 and 193, http://www.refworld.org/docid/564ecfee4.html.The Inter-American Commission on Human Rights (IACHR) has referred to similar indicators when describing situations of "widespread violence". These include the following: a) the number of violent incidents as well as the number of victims of those incidents is very high; b) the prevailing violence inflicts heavy suffering among the population; c) violence manifests itself in most egregious forms, such as massacres, torture, mutilation, cruel, inhuman and degrading treatments, summary executions, kidnappings, disappearances of persons and gross breaches to IHL; d) the perpetration of acts of violence is often aimed at causing terror and, eventually, creating a situation such that individuals are left with no option other than flee the area affected; e) violence can emanate from state and non-state agents, and when it emanates from the first, or from others acting at the instigation or with the acquiescence of the state's authorities, the authors enjoy impunity; f) where violence emanates from non-state agents, authorities are unable to effectively control them; and g) the level and extent of violence is such that the normal functioning of society is seriously impaired. See, for example, Inter-American Commission on Human Rights (IACHR), *Report on the Situation of Human Rights in Jamaica*, 10 August 2012, OEA/Ser.L/V/II.144, pp. 5 and 27, http://www.refworld.org/docid/51ff65004.html.
[139] See supra note 112 and *Case Concerning Military and Paramilitary Activities In and Against Nicaragua (Nicaragua v. United States of America); Merits*, International Court of Justice (ICJ), 27 June 1986, http://www.refworld.org/docid/4023a44d2.html.
[140] See, Common Article 2(1) of the 1949 Geneva Conventions, note 13 above, which is applicable to IAC and refers to 'cases of declared war or of any other armed conflict which may arise between two or more of the High Contracting States', and see also Article 1(4) of Protocol I to the Geneva Conventions, note 13 above, which makes further reference to 'armed conflicts in which peoples are fighting against colonial domination and alien occupation and against racist regimes in the exercise of their right of self-determination'.

AR.08291

234

over from neighbouring states, including because of the presence of (members of) the armed forces of another state or incursions by foreign armed groups.

75. 'Internal conflicts' in the Cartagena refugee definition includes NIACs within the meaning of IHL.[141] However, keeping in mind the protection purpose of the Cartagena Declaration, the term 'internal conflicts' extends to internal armed conflicts that are not classified as NIACs within the meaning of IHL. IHL is considered to be informative, though not determinative of whether an internal conflict exists. Similarly, the qualifications made by the parties involved or affected by it are also considered to be informative rather than determinative (see paragraph 5 of these Guidelines).[142] For the purpose of the Cartagena refugee definition, situations that fall below the threshold of a NIAC within the meaning of IHL may be better captured under the ground of 'generalized violence' or 'massive violation of human rights'.

76. To determine whether a situation of 'massive violation of human rights' prevails, reference to the jurisprudence of the IACrtHR is particularly relevant. The term 'massive' refers to the scale or magnitude of the violation, irrespective of the duration, and as such, the violation may be the result of a single event.[143] Where the effects of human rights violations go beyond the actual/ direct victims to affect large segments of the population, or even the society as a whole, the situation may also be classified as 'massive violation of human rights'. The elements of planning and organization on the part of the perpetrator – whether a state or non-state actor – can also indicate a situation of 'massive violation of human rights', although they are not a requirement. In the case of non-state actors committing human rights abuses, a situation of 'massive violation of human rights' may exist when the state is either unable or unwilling to protect their citizens by failing to prevent, investigate, prosecute or sanction these violations.[144] In this context, displacement may be an indicator of 'massive violation of human rights' or lead to serious human rights violations. The Cartagena refugee definition makes no distinction between the types of rights that are threatened.

77. The existence of judgments or provisional measures by the IACrtHR[145] or precautionary measures by the IACHR[146] related to a given situation would be strong evidence that a situation of massive violation of human rights exists. The statements of human rights bodies or courts may also provide relevant indicators. However, such judgments or measures are not required to qualify a situation as one of 'massive violation of human rights'. This is a factual assessment, to be undertaken by the relevant asylum adjudication body, relying on relevant information and evidence, including the applicant's own testimony.

78. Of all the circumstances referred to in the Cartagena refugee definition, 'other circumstances which have seriously disturbed public order' is the least frequently applied by national adjudication bodies when determining refugee claims under the Cartagena refugee definition.[147] The notion of 'public order', while not having a universally accepted definition, can be interpreted in the context of the Cartagena refugee definition as referring to the peace, internal and external security as well

---

[141] See, Common Article 3 of the 1949 Geneva Conventions, note 38 above, Article 1 of Protocol II to the Geneva Convention, note 14 above, and *Prosecutor v. Dusko Tadic aka "Dule"* (Decision on the Defence Motion for Interlocutory Appeal on Jurisdiction), IT-94-1, International Criminal Tribunal for the former Yugoslavia (ICTY), 2 October 1995, para. 70, http://www.refworld.org/docid/47fdfb520.html.

[142] For example, while an UN Security Council designation of a situation as a NIAC within the meaning of IHL would be sufficient for the purposes of the Cartagena refugee definition, such a qualification cannot be a requirement. See also, UNHCR Arusha Summary Conclusion, note 29 above, para. 24.

[143] *Case of the "Las Dos Erres" Massacre v. Guatemala*, Inter-American Court of Human Rights (IACrtHR), 24 November 2009, paras. 73, 79 and 152, http://www.refworld.org/docid/564ed31a4.html; *Río Negro Massacres v. Guatemala*, Inter-American Court of Human Rights (IACrtHR), 4 September 2012, paras. 56, 58-60 and 63, http://www.refworld.org/docid/564ed2714.html.

[144] *González et al. ("Cotton Field") v. Mexico*, Inter-American Court of Human Rights (IACrtHR), 16 November 2009, para. 236, http://www.refworld.org/docid/564ed5234.html.

[145] Provisional measures are an instrument used by the IACrtHR to prevent irreparable harm to the rights and freedoms ensured under the American Convention on Human Rights of persons who are in a situation of extreme gravity and urgency. The measures are ordered ex officio or at the request of a party and result in a protection request to the respondent state of the alleged victim(s). See, American Convention on Human Rights, note 43 above, Article 63(2) and Organization of American States (OAS), *Rules of Procedure of the Inter-American Court of Human Rights*, 16-29 November 2009, Article 27, https://www.cidh.oas.org/Basicos/English/Basic20.Rules%20of%20Procedure%20of%20the%20Court.htm.

[146] Organization of American States (OAS), *Rules of Procedure of the Inter-American Commission on Human Rights*, 1 August 2013, http://www.oas.org/en/iachr/mandate/Basics/rulesiachr.asp, Article 25, establishes that, in serious and urgent situations, the Commission may, on its own initiative or at the request of a party, request that a State adopt precautionary measures to prevent irreparable harm to persons or to the subject matter of the proceedings in connection with a pending petition or case, as well as to persons under the jurisdiction of the State concerned, independently of any pending petition or case.

[147] UNHCR, *Summary Conclusions on the interpretation of the extended refugee definition in the 1984 Cartagena Declaration; roundtable 15 and 16 October 2013, Montevideo, Uruguay*, 7 July 2014, p. 7, http://www.refworld.org/docid/53c52e7d4.html.

12

AR.08292

as stability of the state and society, plus the normal functioning of the institutions of the state, based on respect for the rule of law and human dignity. Circumstances seriously disturbing public order can take place in times of armed conflict within the meaning of IHL as well as in peacetime. See also paragraphs 56 to 59 of these Guidelines.

79. In the jurisprudence of the IACrtHR, circumstances seriously disturbing public order have been defined by reference in part to the acts of states derogating from their human rights obligations in cases where a state of emergency has been declared.[148] However, a declaration of a state of emergency should not be seen as a prerequisite for the existence of a circumstance seriously disturbing public order, even though it would ordinarily be indicative of such a situation.

80. The inclusion of the adjective 'other' in 'other circumstances' in the Cartagena refugee definition allows states to grant protection in circumstances beyond those related to the four situations referred to in the Cartagena refugee definition.

*Threat to life, security or freedom*

81. The third element of the Cartagena definition is the link between the circumstance occurring in the country of origin and the threat it poses to the lives, security and freedom of persons residing in the country. The 'threat' or risk element in the definition connotes the possibility of harm being inflicted on a person, a group or a whole population; it does not imply that the harm has actually materialized. The link between the circumstance and the threat should not be interpreted in such a manner as to curtail or restrict unnecessarily the scope of international protection granted to persons fleeing their country, for example by requiring an individualized assessment of the risk to life, security or freedom. In fact, spatial/geographical proximity of the circumstance to the person would suffice to create a threat forcing the person to flee the country.

82. Since the Cartagena refugee definition is oriented towards circumstances that affect groups or whole populations, the focus is not on the personal circumstances of the individual fleeing a danger to her or his life, security or freedom, but rather on the objective circumstances in the country of origin.

83. Reference to persons' lives, security or freedom should be interpreted broadly, encompassing persons' physical and mental integrity, security, freedoms, human dignity and livelihoods, with reference to internationally and regionally recognized human rights.

*Gang violence or violence from organized criminal groups*

84. People fleeing gang violence or violence by organized criminal groups may meet the refugee criteria under the 1951 Convention.[149] People fleeing such violence may also fall under one or more of the circumstances mentioned in the Cartagena refugee definition.

## C. Internal flight or relocation alternative

85. The focus of the Cartagena refugee definition is on situations that seriously disrupt state and societal structures. Under such circumstances, people cannot be required to relocate to other parts of the country, even if the situation in these parts may be less disrupted. The only exception would be where the situation is isolated to a particular part of the country or to a particular region or city, and where the state is able and willing to protect its citizens in those other areas. Consideration of the likely spread of the situation and the accompanying violence and disorder into other areas would need to be carefully assessed, with a forward-looking perspective.

---

[148] American Convention on Human Rights, note 43 above, Article 27(1), allowing states to take derogating measures in time of war, public danger, or other emergency that threatens the independence or security of a State Party. See, *Habeas Corpus in Emergency Situations (Arts. 27(2), 25(1) and 7(6) American Convention on Human Rights)*, OC-8/87, Inter-American Court of Human Rights, 30 January 1987, paras. 19 and 20, http://www.refworld.org/docid/402795714.html.

[149] On the application of the 1951 Convention to such situations, see: UNHCR Gangs Guidance Note, note 12 above.     AR.08293

## V. PROCEDURAL AND EVIDENTIARY ISSUES

### A. Approaches to applying the 1951 Convention/1967 Protocol definition and the regional definitions

86. The various definitions of a refugee are not mutually exclusive. They each recognize a person as a refugee, thus triggering the standards of treatment foreseen by the 1951 Convention (see paragraph 8 of these Guidelines).

87. In applying the refugee definitions, a sequential approach is preferred, whereby refugee status is initially assessed under the 1951 Convention definition before an assessment is made under the regional definitions if the person is found not to be a refugee under the 1951 Convention. Such an approach underscores the universal character of the definition of a refugee in Article 1A(2) of the 1951 Convention, the primacy of that Convention,[150] and the explicitly complementary character of the regional definitions.[151]

88. However, applying the regional definitions would be more practical and efficient in group situations or in specific regional contexts,[152] as long as the 1951 Convention standards of treatment apply.

### B. Establishing the facts

89. Claims for refugee status related to situations of armed conflict and violence can raise complex factual issues, turning on the particular circumstances of the applicant viewed against the causes, character and impact of the situation of armed conflict and violence. Unless prima facie recognition of refugee status is applied, claims for refugee status should be considered on their individual merits, taking into account up-to-date and relevant country of origin information.

*Country of origin information*

90. Up-to-date, relevant country of origin information is important for understanding the situation of armed conflict and violence and whether the country of origin is experiencing one of the situations or circumstances referred to in the regional definitions.[153]

91. Relevant country of origin information includes both qualitative and quantitative information. Qualitative information is particularly relevant to avoid misunderstandings, stereotyping and generalizations and allows for a deeper understanding of the situation of armed conflict and violence, i.e. of the history and development of the situation, the actors involved, the means and methods of warfare, strategies and tactics used and the effects the situation has on the country and the people caught up in it.[154] Quantitative information related to situations of armed conflict and violence should be used with appropriate caution. Different sources may use diverse methodologies, often depending on their motivation for collecting data, resulting in substantial divergences between sources. While statistical data can provide an indication of the impact of the situation on the population, such data may be inconclusive or unreliable regarding the risk, harm, relevant 1951 Convention ground, and/or causal link between the risk of harm and ground, or situations mentioned in the regional definitions. Statistical information tends to focus on quantifiable features of the situation, such as the number of civilian casualties or the number of displaced persons, and may not capture other forms of harm – caused directly or indirectly by the armed conflict or violence – on persons, state structures or societies.

---

[150] EXCOM Conclusion No. 87 (L) 1999, para. (f); EXCOM Conclusion No. 89 (LI) 2000. See also, 1969 OAU Convention, note 4 above, ninth preambular paragraph, referring to the 1951 Convention/1967 Protocol as the basic and universal instrument for the protection of refugees.
[151] An additional argument for a sequential approach under the 1969 OAU Convention is the structure of Article I, where in paragraph 1 the 1951 Convention refugee definition is replicated before paragraph 2 provides the regional definition.
[152] UNHCR Prima Facie Recognition Guidelines, note 10 above, paras. 2 and 5.
[153] *Radjabu v. The Chairperson of the Standing Committee for Refugee Affairs*, note 107 above, para. 6, according to the Court, determining whether a person qualifies for refugee status under the extended definition requires an assessment of the existence of objectively ascertainable circumstances in the person's country of origin corresponding with any of the circumstances stipulated in the definition.
[154] *Sufi and Elmi v. United Kingdom*, note 45 above, para. 241.

AR.08294

92. In the assessment of claims for refugee status, country of origin information must be relevant to the particular circumstances of the applicant. Obtaining reliable and accurate country of origin information that is specific to the situation of particular groups of applicants, including children,[155] or persons of diverse gender identities and/or sexual orientations,[156] frequently poses significant challenges. Such challenges may be especially pronounced in situations of armed conflict and violence. Similarly, the available country of origin information about situations of armed conflict and violence may not reflect the specific circumstances of women or of men, including the prevalence of gender-specific forms of harm, or take into account the changing composition and conduct of the actors involved.[157] Decision-makers must take due cognizance of this fact. In situations of armed conflict and violence, an absence of country of origin information about the situation of particular groups should not be interpreted as implying that such groups do not face specific threats.

*Burden of proof*

93. While in general the burden of proof lies with the person submitting the claim, the obligation to gather and analyse all relevant facts and supporting evidence is shared between the applicant and the decision-maker.[158] This shared responsibility is particularly important when the country of origin is experiencing a situation of armed conflict and violence, since this makes obtaining information and documentation – in general, as well as in relation to the individual – more difficult.[159] People fleeing such situations are likely to encounter significant problems in giving a detailed account of events demonstrating a need for international protection, and/or in obtaining evidence to substantiate the claim. In these circumstances, it is therefore frequently necessary to give applicants the benefit of the doubt.[160]

---

[155] UNHCR, *Guidelines on International Protection No. 8: Child Asylum Claims under Articles 1(A)2 and 1(F) of the 1951 Convention and/or 1967 Protocol relating to the Status of Refugees*, 22 December 2009, HCR/GIP/09/08, para. 74, http://www.refworld.org/docid/4b2f4f6d2.html.

[156] UNHCR Gender-Related Persecution Guidelines, note 56 above, para. 37. UNHCR Sexual Orientation and/or Gender Identity Guidelines, note 56 above, para. 66.

[157] UNHCR Cape Town Summary Conclusions, note 3 above, para. 23.

[158] UNHCR Handbook, note 26 above, para. 196. See also, UNHCR, *Beyond Proof, Credibility Assessment in EU Asylum Systems: Full Report*, May 2013, pp. 86-88, http://www.refworld.org/docid/519b1fb54.html.

[159] *Refugee Appeal No. 71462/99, Tamil and a Citizen of the Democratic Socialist Republic of Sri Lanka v. Refugee Status Branch of the New Zealand Immigration Service*, 71462/99, note 54 above, para. 51.

[160] UNHCR Handbook, note 26 above, para. 203.

AR.08295

**UNHCR**
United Nations High Commissioner for Refugees
Haut Commissariat des Nations Unies pour les réfugiés

Distr. GENERAL          HCR/GIP/17/13          20 December 2017          Original: ENGLISH

# GUIDELINES ON INTERNATIONAL PROTECTION NO. 13:

### Applicability of Article 1D of the 1951 Convention relating to the Status of Refugees to Palestinian Refugees

UNHCR issues these Guidelines pursuant to its mandate, as contained in the Office's *Statute*, in conjunction with Article 35 of the 1951 *Convention relating to the Status of Refugees* and Article II of its 1967 Protocol, as well as relevant regional instruments. These Guidelines complement the UNHCR *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention* (Geneva: UNHCR, 1979; reissued 2011) and other Guidelines on International Protection. They replace the *Revised Note on the Applicability of Article 1D of the 1951 Convention relating to the Status of Refugees to Palestinian Refugees*, October 2009, and all prior relevant guidance. By contrast, the *Note on UNHCR's Interpretation of Article 1D of the 1951 Convention relating to the Status of Refugees and Article 12(1)(a) of the EU Qualification Directive in the context of Palestinian refugees seeking international protection*, May 2013, remains applicable.

These Guidelines, having benefited from broad public consultation, are intended to provide legal interpretative guidance for governments, legal practitioners, decision-makers and the judiciary, as well as UNHCR personnel carrying out mandate refugee status determination under its mandate.

These Guidelines have been prepared in close cooperation with the United Nations Relief and Works Agency for Palestine Refugees in the Near East ("UNRWA").

In light of UNHCR's equality and non-discrimination policies, wherever the original text of an international agreement was drafted in gender-specific language and gender was not in issue, the text needs to be read and understood today as if it applied equally to men and women; for that reason, texts quoted in UNHCR publications reflect this principle through the inclusion of appropriate wording in square brackets.

UNHCR's *Handbook on Procedures and Criteria for Determining Refugee Status* and *Guidelines on International Protection* are available at: http://www.refworld.org/docid/4f33c8d92.html.

Calls for public consultation on future guidelines will be posted at: http://www.unhcr.org/544f59896.html.

**13**

AR.08296

## I. INTRODUCTION

1. Article 1D of the 1951 Convention relating to the Status of Refugees ("1951 Convention")[1] acknowledges that certain categories of refugees may benefit from separate arrangements for their protection or assistance by organs or agencies of the United Nations other than the Office of the United Nations High Commissioner for Refugees ("UNHCR"). At present, Article 1D applies to Palestinian refugees, for whom the United Nations Relief and Works Agency for Palestine Refugees in the Near East ("UNRWA")[2] was established in order to respond to their situation.[3]

2. Article 1D of the 1951 Convention provides:[4]

> This Convention shall not apply to persons who are at present receiving from organs or agencies of the United Nations other than the United Nations High Commissioner for Refugees protection or assistance.
>
> When such protection or assistance has ceased for any reason, without the position of such persons being definitively settled in accordance with the relevant resolutions adopted by the General Assembly of the United Nations, these persons shall *ipso facto* be entitled to the benefits of this Convention.[4]

2. Article 1D of the 1951 Convention is often characterised as an "exclusion clause", whereas it has both exclusionary and inclusionary aspects[5] and its two paragraphs are to be read sequentially. In other words, one must first come within the scope of the first paragraph before coming within the second paragraph. Paragraph 1 generally excludes from the protection of the 1951 Convention those Palestinian refugees who are receiving protection or assistance from UNRWA, while paragraph 2 of Article 1D operates to include those very same Palestinian refugees when that protection or assistance has ceased. Once the protection or assistance has ceased (see section II E below), they are entitled *ipso facto* to the benefits of the 1951 Convention. As refugees already recognised by the international community,[6] no separate or additional assessment under Article 1A(2) is required for them to qualify for Convention protection. Claimants need only demonstrate that they fall within the terms of Article 1D.

3. All States parties to the 1951 Convention and/or 1967 Protocol need to ensure that Article 1D is fully incorporated in national law and practice. Fully incorporating this provision in national law and practice is a matter of States parties' obligations under the international refugee instruments.

4. These Guidelines address the interpretation of Article 1D of the 1951 Convention in respect of Palestinian refugees applying for protection under the 1951 Convention *outside* of UNRWA's areas of operation. They provide UNHCR's substantive interpretation of Article 1D (Part II), and also address

---

[1] 1951 *Convention relating to the Status of Refugees* (28 July 1951) 189 UNTS 137 (1951 Convention), http://www.refworld.org/docid/3be01b964.html, and its Protocol Relating to the Status of Refugees (31 January 1967) 606 UNTS 267 (1967 Protocol), http://www.refworld.org/docid/3ae6b3ae4.html.

[2] UN General Assembly Resolution 302 (IV), *Assistance to Palestine Refugees*, 8 December 1949, A/RES/302, created UNRWA, which has responsibilities to provide assistance and protection to Palestinian refugees. The role of UNRWA is also acknowledged by courts: see, for example, *Bolbol v. Bevándorlási és Állampolgársági Hivatal*, ("Bolbol"), C-31/09, Court of Justice of the European Union ("CJEU"), 17 June 2010, para. 44, http://www.refworld.org/docid/4c1f62d42.html: "It is not in dispute that UNRWA constitutes one of the organs or agencies of the United Nations other than UNHCR which are referred to in Article 12(1)(a) of the Directive and in Article 1D of the Geneva Convention ...". See also, *AD (Palestine)*, ("AD *Palestine*") [2015] NZIPT 800693-695, New Zealand: Immigration and Protection Tribunal, 23 December 2015, paras 101-116, http://www.refworld.org/docid/56b1bcc24.html.

[3] Prior to the establishment of UNRWA, the United Nations had also established the UN Conciliation Commission for Palestine ("UNCCP") to *inter alia* "facilitate the repatriation, resettlement and economic and social rehabilitation of the refugees and the payment of compensation, and to maintain close relations with the Director of the United Nations Relief for Palestine Refugees, and, through him [or her], with the appropriate organs and agencies of the United Nations." UNGA Resolution 194 (III), *Palestine - Progress Report of the United Nations Mediator*, 11 December 1948, A/RES/194, para. 11. By 1951, the UNCCP had informed the General Assembly, and began noting on an annual basis, that it was unable to find a means of achieving progress in the implementation of paragraph 11 of Resolution 194 (III). See, UNCCP, *Progress Report of the United Nations Conciliation Commission for Palestine*, UN Doc. A/1985, 20 November 1951 at paras 79 and 80 for first report, and more recently, Report of the UNCCP, 13 August 2015, A/70/319, Annex; UN General Assembly resolution 69/86.

[4] In these Guidelines, UNHCR refers to the first paragraph of Article 1D as 'Article 1D(1)' and the second paragraph as 'Article 1D(2)'.

[5] The French representative to the Conference of Plenipotentiaries, Mr. Rochefort, stated that "the clause in question was really one which provided for deferred inclusion". Conference of Plenipotentiaries on the Status of Refugees and Stateless Persons, Summary of the Third Meeting, 19 November 1951, UN doc. A/Conf.2/SR.3, p. 10. All UN documents are available through the UN Official Document System database at http://www.un.org/en/documents/index.html. See also, James Hathaway and Michelle Foster, *The Law of Refugee Status*, (Cambridge: Cambridge University Press, 2nd edn., 2014), 513; and Lex Takkenberg, *The Status of Palestinian Refugees in International Law*, (Oxford: Oxford University Press, 1998), p. 66. See also, Guy Goodwin-Gill and Jane McAdam, who state that Article 1D "should be seen not so much as an 'exclusion clause," but rather as a "contingent inclusion clause". *The Refugee in International Law*, (Oxford: Oxford University Press, 3rd edn., 2007), 153; and Atle Grahl-Madsen, who refers to it as a "suspensive clause", *The Status of Refugees in International Law*, Volume I Refugee Character, A.W. Sijthoff-Leyden, 1966, p. 263.

[6] "[P]alestinian refugees - and there is no doubt but that the displaced Palestinians were considered at all relevant stages to be *refugees* - were regarded, in and out of the United Nations, as belonging to a special category." *Amer Mohammed El-Ali v. The Secretary of State for the Home Department and Daraz v. The Secretary of State for the Home Department (The United Nations High Commissioner for Refugees, Intervener)*, ("El-Ali") United Kingdom: Court of Appeal (England and Wales), 26 July 2002, [2002] EWCA Civ 1103, http://www.refworld.org/cases/GBR_CA_CIV,3f278a3a4.html

AR.08297

a number of procedural and evidentiary matters (Part III), drawing on State practice, international and national jurisprudence, as well as the views of leading jurists and academic experts.

## II. ANALYSIS

### A. Object and purpose

5. In interpreting Article 1D, it is appropriate to have regard to its object and purpose and its context, including through recourse to the *travaux préparatoires* of the 1951 Convention and to other contemporaneous international instruments intended to address the questions of protection and institutional responsibility for Palestinian refugees. A broad interpretation is warranted, based on the intention of the parties as expressed in the ordinary meaning of the terms of the treaty, considered in context and in the light of its object and purpose.[7] By applying such, it is clear that Article 1D of the 1951 Convention has two related purposes which guide its interpretation and application. The first purpose is to ensure that Palestinian refugees continue to be recognized as a specific class,[8] and that they continue to receive protection and associated rights, until their position has been definitively settled in accordance with the relevant resolutions of the United Nations General Assembly.[9] This purpose is also reflected in the discussions regarding the drafting of the Statute of the Office of the United Nations High Commissioner for Refugees, in which it was emphasized that Palestinian refugees should continue to be granted special status.[10] It was also recognized as essential that the continuity of protection be ensured[11] for Palestinians as a *sui generis* class of refugees under the 1951 Convention.

6. The second purpose of Article 1D is to avoid duplicating and overlapping competencies between UNHCR and UNRWA. The responsibilities of the two agencies are intended to be complementary.[12] In this regard, it is noted that while UNHCR's mandate is global, its competence "shall not extend to a person ... who continues to receive from other organs or agencies of the United Nations protection or assistance."[13] In contrast, UNRWA has competence in five geographical areas or 'fields' of operation: Jordan, Lebanon, the Syrian Arab Republic, the West Bank (including East Jerusalem) and Gaza.[14] Taken together, these territories constitute UNRWA's areas of operation, in which it provides protection[15] or assistance to a population of over five million Palestinian refugees.[16]

**13**

---

[7] Article 31 of the *Vienna Convention on the Law of Treaties*, 23 May 1969, United Nations, Treaty Series, vol. 1155, p. 331, http://www.refworld.org/docid/3ae6b3a10.html. See also, Ian Brownlie, *Principles of Public International Law*, (Oxford: Oxford University Press, 7th edn., 2008), 631.

[8] "The Article aims, fundamentally, to ensure continued protection of Palestinians as persons whose *refugee character had already been established*". *AD (Palestine)*, para.159, note 2 above. Article 1D was "intended for an existing category of refugees in respect of which the General Assembly had already taken certain action." Takkenberg, note 5 above, 97.

[9] See also, *Mostafa Abed El Karem El Kott and Others v. Bevándorlási és Állampolgársági Hivatal*, C-364/11, European Union: Court of Justice of the European Union, 19 December 2012, ("*El Kott*"), http://www.refworld.org/cases,ECJ,50d2d7b42.html, para 62, where the CJEU affirmed that the objective of Article 1D was to "ensure that Palestinian refugees continue to receive protection, as Palestinian refugees, until their position has been definitely settled ...".

[10] General Assembly, Fifth Session, Official Records, Third Committee, 328th Meeting, 27 November 1950, paras 52, 55 (Mr. Baroody, Saudi Arabia), UN doc. A/C.3/SR.328, available through the UN Official Document System database at http://www.un.org/en/documents/index.html. Also cited in UNHCR's intervention before the Court of Appeal of England and Wales in the case of *El-Ali*, http://www.refworld.org/docid/3d1c73c04.html ("*UNHCR intervention in El-Ali*").

[11] General Assembly, Fifth Session, Official Records, Third Committee, 344th Meeting, 11 December 1950, paras 24-25 (Mr. Baroody, Saudi Arabia); para. 28 (Mr. Lesage, Canada); paras 29-30 (Mr. Davin, New Zealand); para. 39 (Mr. Noriega, Mexico); para. 42 (Mr. Raafat, Egypt), UN doc. A/C.3/SR.344, available through the UN Official Document System database at http://www.un.org/en/documents/index.html. Also cited in *UNHCR intervention in El-Ali*, note (10) above.

[12] See Goodwin Gill and McAdam, note 5 above, 152. The importance of this complementarity is reflected in the current practice of the two agencies. Since 2005, UNHCR and UNRWA have held annual high-level meetings in order to address issues of common concern; and since 2010, a joint working group has been established which remains in regular contact and meets twice per year.

[13] *Statute of the Office of the United Nations High Commissioner for Refugees*, ("Statute"), 14 December 1950, A/RES/428(V), http://www.refworld.org/docid/3ae6b3628.html, paragraphs 1 and 7(c). With regards to the differences between the language of the Statute ("continues to receive") and that of Article 1D ("at present receiving"), UNHCR interprets the phrases as having the same meaning. "For reasons which are not clear (but which may have been dictated by time constraints), the draft Convention refugee definition was not amended to bring it into line with the UNHCR Statute before being sent on to the Conference of Plenipotentiaries." Goodwin-Gill and McAdam, note 5 above, p. 154. See also on the issue of UNHCR's Mandate, UNHCR, *Note on the Mandate of the High Commissioner for Refugees and his Office*, October 2013, http://www.refworld.org/docid/5268c9474.html.

[14] See for example, General Assembly Resolution 58/95 of 17 December 2003 and, more recently, UNGA Resolution 71/91, *Assistance to Palestine refugees: Resolution adopted by the General Assembly*, 22 December 2016, A/RES/71/91: http://www.refworld.org/docid/586cbe334.html.

[15] It is important to note that UNRWA has had a protection mandate from its inception. Nevertheless, the protection function has grown over time and has increased since 2010 with the adoption of a protection policy and the development of protection tools and standards. See UNRWA, Protecting Palestine Refugees, 2015, http://www.refworld.org/docid/5703647f4.html and https://www.unrwa.org/what-we-do/protection. However, UNRWA "does not own, administer or police the camps, as this is the responsibility of the host authorities." https://www.unrwa.org/palestine-refugees. See also note 48 below.

[16] For latest UNRWA figures, see: http://www.unrwa.org/.

AR.08298

**B. Ratione personae: Personal scope of Article 1D**

7. The following groups of persons fall within the personal scope of Article 1D:

**Palestine refugees:** Persons who are "Palestine refugees"[17] within the sense of UN General Assembly Resolution 194 (III) of 11 December 1948[18] and subsequent UN General Assembly Resolutions and who, as a result of the 1948 Arab-Israeli conflict, were displaced from that part of Mandate Palestine which became Israel, and who have been unable to return there.

**Displaced persons:** Persons who are "displaced persons" within the sense of UN General Assembly Resolution 2252 (ES-V) of 4 July 1967 and subsequent UN General Assembly resolutions, and who, as a result of the 1967 conflict, have been displaced from the Palestinian territory occupied by Israel since 1967 and have been unable to return there.[19] It also includes those persons displaced by "subsequent hostilities".[20]

**Descendants:** "Descendants" refers to all persons born to Palestine refugees or displaced persons, as defined above.[21] Based on principles of gender equality and non-discrimination on the basis of sex, as well as the principle of family unity, these descendants, whether they are descended through the male or female line,[22] would be considered to fall within the purview of Article 1D.[23] This includes descendants who were born outside of and who have never resided in UNRWA's areas of operation, where the criteria for the application of Article 1D are met.

8. For the purposes of these Guidelines, the term "Palestinian refugees" is used to encompass "Palestine refugees", "displaced persons" and "descendants" or one or more of these groups, whose position has not been definitively settled in accordance with relevant resolutions of the UN General Assembly.

9. Not all Palestinians fall within the class of Palestinian refugees to whom Article 1D applies.[24] Such cases are to be assessed in the same manner as other claimants for refugee status, under Article 1A(2).

**C. Sequential reading**

10. The two paragraphs in Article 1D are to be read jointly and operate sequentially. This means that decision-makers need to assess (i) whether the applicant falls within the class of Palestinians to whom the protection of the 1951 Convention does not apply because he or she "is at present receiving" the protection or assistance of UNRWA; and if so, (ii) whether such an applicant is nonetheless included under the second paragraph owing to the cessation of that protection or assistance.

---

[17] The term "Palestine refugees" has never been expressly defined by the General Assembly. However, for early work on interpreting the term, see UN Doc. W/61/Add.1, *Addendum to Definition of a "Refugee" Under paragraph 11 of the General Assembly Resolution of 11 December 1948*, 29 May 1951 which is to be read with its Note by the Principal Secretary, UN Doc. A/AC.25/W/61, https://unispal.un.org/DPA/DPR/unispal.nsf/0/418E7BC6931616B-485256CAF00647CC7. UNRWA's operational definition of the term "Palestine refugee" for registration purposes has evolved over the years as it was initially a subcategory of persons who were 'in need'. Since 1984 it has been "*persons whose normal place of residence was Palestine during the period 1 June 1946 to 15 May 1948, and who lost both home and means of livelihood as a result of the 1948 conflict*."

[18] The UN General Assembly resolved in para. 11 of Resolution 194 (III) that "the refugees wishing to return to their homes and live at peace with their neighbours should be permitted to do so at the earliest practicable date" and that "compensation should be paid for the property of those choosing not to return and for loss of or damage to property".

[19] UN General Assembly Resolution 2452 (XXIII) A of 19 December 1968 called for the return of "displaced persons", as reiterated by subsequent UN General Assembly resolutions on an annual basis, https://unispal.un.org/DPA/DPR/unispal.nsf/0/0F32DC9EB80EE553852560DF004F1352. See, also, *Bolbol*, (note 2 above) para. 47: "[I]t cannot be maintained, as an argument against including persons displaced following the 1967 hostilities within the scope of Article 1D of the Geneva Convention, that only those Palestinians who became refugees as a result of the 1948 conflict who were receiving protection or assistance from UNRWA at the time when the original version of the Geneva Convention was concluded in 1951 are covered by Article 1D of that convention [...]."

[20] See UN General Assembly Resolution A/RES/37/120, 16 December 1982, which extended UNRWA's mandate to those displaced by subsequent hostilities; http://www.un.org/documents/ga/res/37/a37r120.htm.

[21] UNRWA's *Consolidated Eligibility and Registration Instructions*, 1 January 2009, ("UNRWA's CERI (2009)"), http://www.refworld.org/docid/520cc3634.html, at Part III(A)(1), p. 3, provide that "Palestine Refugees, and descendants of Palestine refugee males, including legally adopted children, are eligible to register for UNRWA services." Descendants of women who are Registered Refugees and are (or were) married to husbands who are not registered refugees are not considered to meet UNRWA's Palestine refugee criteria, but they (including legally adopted children) "are eligible to register to receive UNRWA services", Part II(A)(2).

[22] Including descendants of a Palestine refugee woman and a non-refugee male within the first paragraph of Article 1D of the 1951 Convention is compatible with the principle of non-discrimination on the basis of sex and avoids serious consequences for family unity. Further, the approach adopted in these Guidelines, which recognises descendants of Palestinian refugees, is consistent with UNHCR's general approach to protracted refugee situations in which children born to refugees in exile are registered as refugees until a durable solution has been found.

[23] Some of these descendants may have acquired the nationality of their non-refugee/non-Palestinian parent, hence an individual assessment will be required, which also considers the principle of family unity.

[24] For example, a Palestinian originally from the West Bank, who was never displaced.

AR.08299

## D. "Exclusion clause" of Article 1D(1): Palestinian refugees receiving or eligible to receive the protection or assistance of UNRWA

11. "Exclusion" from protection under the 1951 Convention pursuant to Article 1D(1) does not mean that persons within the scope of this provision are not to be considered refugees. Quite the contrary, the express intention of the drafters was to provide a separate regime for an entire class of persons already receiving specific benefits from UN organs or agencies. Thus, Article 1D is clearly intended to cover all Palestinian refugees "falling under the mandate of UNRWA, regardless of when, or whether, they are actually registered with that agency, or actually receiving assistance."[25] To interpret Article 1D(1) as an exclusion clause in that sense would be incorrect, as it would ignore the character of Article 1D as a "contingent inclusion clause."[26] It would also be inconsistent with the object and purpose of the 1951 Convention and, in particular, with the aim of Article 1D itself, which is to ensure continuity of protection for a class of persons who are already recognised as refugees by the international community.

12. Moreover, the object and purpose of the 1951 Convention and of its provisions relating to Palestinians require that the words "at present receiving" in the first paragraph of Article 1D are understood to mean (i) "persons who were and/or are now receiving" protection or assistance, or (ii) who are eligible for such protection or assistance. Those Palestinians who are eligible are described at paragraph 8. By capturing both those actually receiving, as well as those eligible to receive the protection or assistance of UNRWA within Article 1D(1), the continuing refugee character of Palestinian refugees is acknowledged, as is their entitlement to protection.

13. In UNHCR's view, it would be incompatible with the object and purpose of Article 1D to remove from its scope those Palestinian refugees who have not accessed UNRWA protection or assistance, despite being eligible, but are nonetheless in need of 1951 Convention protection under the second paragraph in Article 1D.[27] Such a narrow interpretation of the first paragraph of Article 1D would actually result in the denial of protection for many Palestinian refugees, *whose refugee character is already established*, creating gaps in the protection regime.[28]

14. Moreover, similarly situated persons who were displaced as a result of the same conflict would be subject to different treatment depending on whether they availed themselves of assistance or not and depending on where they fled. Some would be examined under Article 1D while others would be examined under Article 1A(2). An interpretation which differentiates these similarly situated persons is "clearly unreasonable and in conflict with the intentions of the drafters."[29]

15. In the same vein, interpreting Article 1D in a way that would not cover those Palestinian refugees who are eligible for UNRWA's protection or assistance would lead to the duplication of mandates in respect of the same refugee population between UNHCR and UNRWA *inside* UNRWA's areas of operation. In UNHCR's view, this same interpretation also guides the interpretation of the provision *outside* UNRWA's areas of operation. Thus, the provision ought to be interpreted in a way that reflects the complementary mandates of the two agencies, both within and outside UNRWA's areas of operation.[30]

16. It would also be incorrect to read Article 1D as applying only to those persons who were Palestinian refugees in 1951.[31] This would run contrary to the intentions of the Convention's drafters,

13

---

[25] Guy Goodwin Gill and Susan M. Akram, 'Brief Amicus Curiae', *Palestine Yearbook of International Law*, 2000/2001, Vol. XI, 185, at p. 236. See also, *AD (Palestine)*, note 2 above, where the scope of Article 1D was found to encompass persons "who have not in fact availed themselves of protection and assistance which they are otherwise eligible to receive." Para. 160 and see paragraphs 150-153 for a discussion of the difficulties of the "actually availed" approach.
[26] See footnote 5.
[27] This interpretation is distinct from the position taken by the CJEU in *Bolbol*, (note 2 above), where only those who had "actually availed" themselves of that protection or assistance were considered to fall within the first paragraph of Article 1D, based on a "clear reading" of Article 1D (para. 51). For the purposes of how this should be approached and reconciled as a matter of European law, UNHCR notes that Article 3 of the Qualification Directive provides that Member States may introduce or retain more favourable standards for determining who qualifies as a refugee. Member States are thus recommended to adopt the more favourable interpretation put forward by UNHCR, which is more in line with the object and purpose of Article 1D.
[28] See UNHCR, *Note on UNHCR's Interpretation of Article 1D of the 1951 Convention relating to the Status of Refugees and Article 12(1)(a) of the EU Qualification Directive in the context of Palestinian refugees seeking international protection*, May 2013, http://www.refworld.org/docid/518cb8c84.html.
[29] Brenda Goddard, 'UNHCR and the International Protection of Palestinian Refugees', (2009) 28 *Refugee Survey Quarterly*, 475 at 493.
[30] *AD (Palestine)*, note 2 above, para. 159.
[31] The "historical" argument that Article 1D is limited only to those persons who were Palestinian refugees in 1951, accepted by the United Kingdom Court of Appeal in *El-Ali* note 6 above, was rejected by the CJEU in *Bolbol*, note 2 above, paras 47-48. See also the rejection by Advocate General Sharpston, paras 62, 65-68, in her Opinion in *Bolbol*, http://eur-lex.europa.eu/legal-content/EN/TXT/?uri=CELEX%3A620 AR.08300

who sought to ensure continuity of protection for the specific class of persons addressed in Article 1D until their position was definitively settled, a need which continues not only for those who were Palestinian refugees in 1951, but also persons who were displaced by the 1967 conflict as well as their descendants. Moreover, it disregards the critical change effected by the 1967 Protocol, which removed the temporal limitation on the 1951 Convention, with the aim, as expressed in the Preamble, of ensuring "equal status" for "all refugees covered by the definition in the Convention irrespective of the dateline 1 January 1951."[32]

## E. "Inclusion clause" of Article 1D: the protection or assistance has ceased for any reason

17. Palestinian refugees (see paragraph 8) benefit from 1951 Convention protection under Article 1D(2) when the protection or assistance of UNRWA has ceased. Read in light of its ordinary meaning, considered in context and with due regard to the object and purpose of the 1951 Convention,[33] the phrase "ceased for any reason" is not to be construed restrictively. As noted in jurisprudence, exclusion from the 1951 Convention of Palestinian refugees by way of Article 1D "was intended to be conditional and temporary, not absolute and permanent."[34]

18. The application of the second paragraph of Article 1D is not, however, unlimited.[35] Protection under the 1951 Convention does not extend to those applicants who, being outside an UNRWA area of operation, refuse to (re-)avail themselves of the protection or assistance of UNRWA for reasons of personal convenience.[36] That said, the reasons why one has left an UNRWA area of operation (for example, for work or study purposes, or for protection reasons) is not of itself determinative. What is pivotal is whether the protection or assistance of UNRWA has ceased owing to one or more of the "objective reasons" for leaving or preventing them from (re)availing themselves of UNRWA's protection or assistance as set out in paragraph 22 below (see also paragraph 26ff on *sur place* claims). If a person has no objective reasons for not (re)availing themselves of UNRWA's protection or assistance, then such protection or assistance cannot be regarded or construed as having ceased within the meaning of the second paragraph of Article 1D when a Palestinian refugee can safely enter the UNRWA area of operation.

19. The inclusion assessment needs to be carried out not only having regard to UNRWA's mandate and operations, but also to the circumstances of the individual and to relevant and up-to-date country of origin information (COI).[37]

**Objective reasons bringing the applicant within the second paragraph of Article 1D**

20. While the drafters of the 1951 Convention envisaged primarily the application of the second paragraph in the event of the termination of UNRWA's mandate, the phrase "for any reason" is sufficiently broad to include circumstances other than the cessation of UNRWA's mandate. The *travaux préparatoires* of the 1951 Convention confirm this interpretation.[38] Importantly, where the drafters intended to limit the scope of provisions in other parts of the Convention, they did so explicitly and outlined the possible exceptions.[39]

---

[32] 1967 Protocol, preamble, third paragraph, note 1 above. See also, Goodwin-Gill and McAdam, note 5 above, p. 158, footnote 110.
[33] *Vienna Convention on the Law of Treaties*, article 31, note 7 above.
[34] *AD (Palestine)*, note 2 above, para. 99f.
[35] "Mere absence from such an area or a voluntary decision to leave it cannot be regarded as cessation of assistance.", *El Kott*, note 9 above, para. 59.
[36] See, *El Kott*, note 9 above, paras 49-51 and 59-63. See also by way of analogy regarding personal convenience, Statute of the Office of the United Nations High Commissioner for Refugees, paragraphs 6(ii)(e) and (f), note 13 above.
[37] "Country of Origin Information (COI) is information which is used in procedures that assess claims to refugee status or other forms of international protection. COI supports legal advisors and persons making decisions on international protection in their evaluation of: the human rights and security situation; the political situation and the legal framework; cultural aspects and societal attitudes; the humanitarian and economic situation; events and incidents; as well as the geography in claimants' countries of origin (or, in the case of stateless people, countries of former habitual residence) or countries of transit. To qualify as COI it is essential that the source of the information has no vested interest in the outcome of the individual claim for international protection." Austrian Centre for Country of Origin and Asylum Research and Documentation (ACCORD), *Researching Country of Origin Information: Training Manual*, October 2013, http://www.refworld.org/docid/5273a56b4.html.
[38] See for example the statement of the Egyptian delegate, Mr. Raafat, General Assembly, Fifth Session, Official Records, Third Committee, 344th Meeting, 11 December 1950, para. 13, UN doc. A/C.3/SR.344. See also the views of the French delegate, Mr. Rochefort, at the Conference of Plenipotentiaries, Summary of the Second Meeting, 20 July 1951, UN doc. A/CONF.2/SR.2, p. 27. Both documents are available through the UN Official Document System database at http://www.un.org/en/documents/index.html.
[39] For example, the drafters of the 1951 Convention set out, in a clearly limited fashion, the list of grounds on which refugee status may be considered to have ceased under Article 1C of the 1951 Convention. See, *El Kott*, note 9 above, para. 57.

AR.08301

244

21. Objective reasons,[40] which bring an applicant within the second paragraph of Article 1D, include:

### (i) Termination of the mandate of UNRWA[41]

a.   The termination of UNRWA's mandate would in principle require a resolution of the United Nations General Assembly. This element would consequently apply to the entire class of Palestinians, rather than particular individuals.

### (ii) Inability of UNRWA to fulfil its protection or assistance mandate

b.   The discontinuation of UNRWA's protection or assistance, which would apply to all Palestinians, would need to be determined to have occurred as a matter of fact, in an area of operations or on a country-wide basis. This might occur if, notwithstanding the continued existence of the agency, it were to become impossible for UNRWA to carry out its mission.[42] Evidence of this circumstance may be established, for example, by a resolution of the United Nations General Assembly, annual reports of UNRWA, statements by UNRWA that it has discontinued its activities, or other evidence brought forward by the applicant.[43]

c.   "Protection or assistance" are alternatives: an applicant is not required to establish that both the protection *and* the assistance of UNRWA have ceased. In relation to the discontinuation of assistance, however, the applicant would need to establish that the assistance pursuant to UNRWA's mandate has ceased.[44]

### (iii) Threat to the applicant's life, physical integrity, security or liberty or other serious protection-related reasons

d.   Palestinian refugees – as refugees already recognized by the international community via various UN General Assembly resolutions – are not required to establish individually that their treatment constitutes persecution within the meaning of Article 1A(2) of the 1951 Convention or that they meet the other requirements of the refugee definition in that paragraph, in order to benefit from Article 1D.[45] That said, a Palestinian refugee at risk of persecution in the sense of Article 1A(2) would clearly fall within the second paragraph of Article 1D.

e.   Beyond this, there is a range of threats that may compel a Palestinian to leave UNRWA's area of operation, with the result that UNRWA's protection and assistance would cease for him or her. In UNHCR's view, both group-based and individualised threats would qualify as circumstances beyond the applicant's control. Examples of group-based threats would include armed conflict or other situations of violence, such as civil unrest, widespread insecurity or events seriously disturbing public order.[46] Threats of a more individualised nature, which could also compel a Palestinian to leave an UNRWA area for reasons beyond his or her control, would include sexual or gender-based violence, torture, inhuman or

[40] In *El Kott*, the CJEU considered that "objective reasons" included "reasons beyond the person's control" (i.e. independent of their volition), note 9 above, para. 58. UNHCR considers that there is no significant difference between objective reasons and reasons beyond the person's control, except as noted in paragraphs 26-28 in relation to sur place claims, where the CJEU's judgment needs to be read with particular care as it did not apply to sur place claims.

[41] See note 2 and paragraph 7 above.

[42] *El Kott*, note 9 above, para. 56. The suspension of non-core services for a short period of time would not suffice.

[43] A comparison can be made with the UNCCP, which continues to exist but reports annually to the General Assembly that it is not able to carry out its mandate: see note 3 above.

[44] "Given the long-standing and continuing reality of funding deficits, should UNRWA continue to exist but in fact be unable to provide effective protection or assistance due to a lack of funding, there is no reason in principle why this should also not qualify as a cessation of activities under Article 1D, which expressly contemplates cessation 'for any reason' as activating the inclusion clause". *AD (Palestine)*, note 2 above, para. 172. See also, El Kott, note 9 above, paras 63, 65.

[45] See for example the Belgian Conseil du Contentieux des Étrangers, (Council of Alien Law Litigation) decision, which states that the recognition of the refugee status is not based on the existence of a real risk to personal safety, but is automatically granted based on Article 1D given that the person concerned is already a refugee and has demonstrated that he or she can no longer benefit from UNRWA assistance. *Arrêt No. 144 563*, Belgium: Conseil du Contentieux des Étrangers, 30 April 2015, http://www.refworld.org/cases/BEL_CCE,5963b1794.html.

[46] See, UNHCR, *Guidelines on International Protection No. 12: Claims for refugee status related to situations of armed conflict and violence under Article 1A(2) of the 1951 Convention and/or 1967 Protocol relating to the Status of Refugees and the regional refugee definitions*, 2 December 2016, HCR/GIP/16/12, http://www.refworld.org/docid/583595ff4.html.

**13**

AR.08302

degrading treatment or punishment, human trafficking and exploitation, forced recruitment, severe discrimination,[47] or arbitrary arrest or detention.

f.   Where any of these above-mentioned threats emanate from the authorities, protection under Article 1D would be required. Similarly, where the authorities are unable or unwilling to provide protection against threats emanating from non-State actors, protection under Article 1D(2) would also apply. A case-by-case assessment is necessary to determine the application of Article 1D in these cases.[48]

**(iv) Practical, legal and/or safety barriers preventing an applicant from (re)availing him/herself of the protection or assistance of UNRWA**

g.   Practical barriers include obstacles which prevent access the UNRWA area of operation, for example, because of border closures.

h.   Legal barriers would include absence of documentation allowing the individual to travel to, or transit through, or (re)enter and reside in the relevant UNRWA area of operation. Where the authorities refuse (re)admission or the renewal of travel or other requisite documents, the second paragraph of Article 1D would be satisfied. An applicant would not, however, benefit from protection under the 1951 Convention pursuant to Article 1D(2) if he or she were to seek to frustrate his or her (re)admission and stay by refusing to co-operate, for example, in acquiring documents.[49]

i.   Barriers relating to safety or personal security which prevent (re)availment could include dangers *en route* such as minefields, factional fighting, shifting battle fronts or the threat of other forms of harassment, violence or exploitation, preventing the applicant from being able to return safely. Up-to-date information on the realistic prospect of being able to re-avail oneself of the protection or assistance is required. The feasibility of (re)availment cannot be assessed in the abstract.

j.   Although Article 1D focuses on the cessation of the protection or assistance of UNRWA, the situation in the State in whose jurisdiction UNRWA is operating will not only be relevant, but may be determinative of the need for 1951 Convention protection. For example, the host State or authorities – not UNRWA – will control whether a Palestinian refugee will be permitted to (re)enter their territory and (re)establish him/herself there, including whether he or she is able to obtain the necessary legal documentation establishing a right to stay in the State or territory.[50] The risk facing the applicant may emanate, for example, from the authorities directly. These assessments are to be based on reliable and up-to-date information, and special care needs to be exercised where the situation is fluid or unclear.

k.   No State can safely assume that a Palestinian refugee will be able to access the protection or assistance of UNRWA in an area of operation where they have never resided, or other than that in which he or she was formerly residing. As such decision-makers should not assess the lawfulness of return in relation to an UNRWA area of operation to which the individual has no previous connection. That would impose unreasonable and insurmountable obstacles on applicants, and ignore the general workings of the State-based system of international relations and State sovereignty. Moreover, consistent with general principles of international refugee law, the assessment as to whether the protection or assistance of UNRWA has ceased for a person previously resident in an UNRWA area is to be made vis-à-vis the UNRWA area of operation where the applicant was

---

[47] This would often but not always include systematic or a pattern of consistent discrimination. See UNHCR, *Interpreting Article 1 of the 1951 Convention Relating to the Status of Refugees*, April 2001, http://www.refworld.org/docid/3b20a3914.html, at para. 17. It also includes measures of discrimination which "lead to consequences of a substantially prejudicial nature [... for example,] serious restrictions on the right to earn a livelihood, the right to practise religion, or access to normally available educational facilities." UNHCR, *Handbook and Guidelines on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees*, December 2011, HCR/1P/4/ENG/REV. 3, http://www.refworld.org/docid/4f33c8d92.html, ("UNHCR Handbook") para. 54.

[48] The provision of services by UNRWA is not relevant for this assessment. Non-state actors, including international organisations, do not have the attributes of a State, and are not in a position to provide protection and enforce the rule of law in the same fashion as a State.

[49] Article 2 of the 1951 Convention notes that every refugee has duties to the country in which he or she finds himself or herself, which require in particular that he or she conform to its laws and regulations as well as to measures taken for the maintenance of public order.

[50] For example, in relation to the West Bank, the position of the Israeli authorities will be determinative. Likewise, for passage across the border to Gaza from Egypt, permission from Egypt is likely to be required, noting that at some times, the border is closed.

AR.08303

previously residing.[51] The assessment is not to be made against each of UNRWA's areas of operation but to a single UNRWA area of operation.[52]

22. The circumstances listed above are alternative, not conjunctive, such that depending on the case at hand, one or more of the aforementioned circumstances may be present, bringing the applicant within the scope of Article 1D(2).[53] The evidentiary aspects of establishing the existence of the above-mentioned circumstances are dealt with in Part III.

### Personal circumstances of applicant

23. The personal circumstances of the applicant are relevant to the determination of whether one of the objective reasons exists to justify the application of the second paragraph of Article 1D. Thus, each claim must be determined on its individual merits, enabling consideration of factors that are specific to the applicant.[54] These personal circumstances may include age, sex, gender, sexual orientation and gender identity, health, disability, civil status, family situation and relationships, social or other vulnerabilities, ethnic, cultural or religious considerations, political and social links and compatibility, language abilities, and any past experiences of serious harm and its psychological effects.

### Internal relocation

24. The protection or assistance of UNRWA will not be considered to have ceased if an individual is able to access and receive protection or assistance from UNRWA elsewhere in the same UNRWA area of operation. For example, if a camp is destroyed by an armed attack and the protection or assistance of UNRWA is as a matter of fact available elsewhere within another part of that country or territory, and the individual has access to that protection or assistance, then the second paragraph of Article 1D would not be satisfied without additional factors. However, it cannot be expected that the applicant relocate (or be returned) to a different country or territory where he or she has no previous connection.[55]

### Sur place protection needs

25. A *sur place* claim arises after arrival in the country of asylum, either as a result of the applicant's activities in the country of asylum or as a consequence of events, which have occurred or are occurring in the applicant's country of origin since their departure.[56] The recognition of *sur place* claims of Palestinian refugees under Article 1D is in line with general principles of international refugee law applicable to Article 1 of the 1951 Convention that accept *sur place* refugee claims, recognizing that changes in the country of origin whilst abroad may make them a refugee.[57] For example, should the mandate or activities of UNRWA cease as described in paragraph 22 above while the individual is outside UNRWA's area of operation, she or he would qualify for 1951 Convention protection under Article 1D.

26. Although "ceased for any reason" does not generally include reasons of mere personal convenience for refusing to (re-)avail oneself of the protection or assistance of UNRWA, (as noted in paragraph 19 above),[58] it is not relevant whether the applicant departed in the first place on a

---

[51] See also, *El Kott*, note 9 above, para. 77: "... the person concerned ceases to be a refugee if he is able to return to the UNRWA area of operations in which he was formerly habitually resident because the circumstances which led to that person qualifying as a refugee no longer exist".

[52] This is supported by the language of the CJEU in *El Kott* which repeatedly uses the expression "area of operation" in the singular when referring to the scope of the assessment to be carried out. *El Kott*, note 9 above, paras 49, 50, 55, 58, 61, 62, 63, 64, 65.

[53] While the inclusionary aspects of Article 1D(2) will be established where an applicant has been forced to leave UNRWA's area of operation where his/her personal safety is at serious risk and if it is impossible for UNRWA to guarantee his/her living conditions in accordance with that organization's mission, the applicant is not required to establish both. In *El Kott*, (note 9 above), the CJEU accepted in the context of the facts before it, that such circumstances "will" fall within the second paragraph of Article 1D (para. 65). The CJEU did not however exhaust other circumstances in which such protection or assistance would be considered to have ceased, as this will depend on the case at hand. An interpretation that requires both would lead to perverse results. For example, if an applicant's personal safety is at serious risk, the assistance provided by UNRWA in the form of cash or food rations would be irrelevant to their need for protection.

[54] An exception would be in circumstances where UNRWA has ceased to operate as an agency (see paragraph 22(i) above).

[55] UNHCR, *Guidelines on International Protection No. 4: "Internal Flight or Relocation Alternative" Within the Context of Article 1A(2) of the 1951 Convention and/or 1967 Protocol Relating to the Status of Refugees*, 23 July 2003, HCR/GIP/03/04, http://www.refworld.org/docid/3f2791a44.html.

[56] UNHCR Handbook, note 47 above, paras 94-96.

[57] *Ibid.*. There is no reason to apply a different approach to Palestinian applicants under Article 1D.

[58] This interpretation is closely aligned with State practice which has not generally accepted automatic entitlement to Article 1D by reason simply of being outside an UNRWA area of operation.

AR.08304

voluntary basis from an UNRWA area of operation (for example, for study or work purposes). They are still eligible to benefit from the 1951 Convention pursuant to Article 1D should they meet its criteria.[59] A careful examination of the circumstances in each case would be required.

27. A person may become a refugee *sur place* in a country in which she or he claims asylum, as a result of his or her own actions, such as associating with refugees already recognized, or expressing political views in his or her country of residence.[60] Politically active Palestinian refugees who may attract attention because of their beliefs or activities, and who may even do so at great personal risk to themselves or their families, cannot be required to cease such activities as a precondition for protection under Article 1D; that would undermine the object and purpose of the 1951 Convention overall.[61]

## F. Automatic or "ipso facto" entitlement to the benefits of the 1951 Convention

28. When it is established that UNRWA's protection or assistance has ceased for any of the reasons mentioned in paragraph 22, the Palestinian refugee is automatically or "*ipso facto*" entitled to the benefits of the 1951 Convention,[62] provided Articles 1C, 1E or 1F of the 1951 Convention do not apply [see Parts G, H, and I below].[63] The term "*ipso facto*" would be entirely redundant if the provision merely meant that a Palestinian refugee could apply for international protection in accordance with the general rules and in the same way as all asylum-seekers via Article 1A(2) of the 1951 Convention.[64]

29. The phrase "benefits of this Convention" in the second paragraph of Article 1D refers to the substantive rights contained in Articles 2 to 34 of the 1951 Convention and which are attached to being a refugee, as defined in Article 1 of the 1951 Convention. The term "benefits" cannot mean simply access to asylum procedures for determining refugee status as Article 1 does not itself contain any benefits – it simply defines who *is* and who *is not* entitled to have access to those benefits.[65] This interpretation is also supported by the equally authentic French version of Article 1D, which uses the expression *"bénéficieront de plein droit du régime de cette convention."* They benefit by operation of law and "as of right" once they fulfil the criteria in Article 1D.[66]

30. Palestinian refugees protected under Article 1D are entitled to receive the same rights, benefits and standards of treatment as other refugees recognized under Articles 1A(1) or 1A(2), so there is no more favourable treatment provided to Article 1D refugees than other refugees. They each enjoy the benefits of the Refugee Convention set out in Articles 2 to 34.[67]

---

[59] *El Kott*, note 9 above, para. 59.

[60] UNHCR Handbook, note 47 above, para. 96.

[61] By analogy with the general position that one cannot be required to conceal or be discreet about a protected characteristic, see *X, Y, Z v Minister voor Immigratie en Asiel* , C-199/12 - C-201/12, European Union: Court of Justice of the European Union, 7 November 2013, http://www.refworld.org/docid/527b94b14.html; UNHCR *Observations in X, Y and Z*, 28 September 2012, http://www.refworld.org/docid/5065c0bd2.html; *Bundesrepublik Deutschland v Y and Z*, Judgment of the Court (Grand Chamber) of 5 September 2012 http://www.refworld.org/pdfid/505ace862.pdf; RT (Zimbabwe) and others v Secretary of State for the Home Department, [2012] UKSC 38, United Kingdom: Supreme Court, 25 July 2012, http://www.refworld.org/docid/500fdacb2.html.

[62] See UNHCR, *Written Intervention before the Court of Justice of the European Union in the case of El Kott*, 27 October 2011, para 4.3, C-364/11, http://www.refworld.org/docid/4eaa95d92.html and UNHCR, *Oral intervention before the Court of Justice of the European Union in the case of El Kott and Others v. Hungary*, 15 May 2012, C-364/11, http://www.refworld.org/docid/4fbd1e112.html, paras 10, 12-14. ("UNHCR Oral intervention in El Kott"). UNHCR's views were accepted by the Court in *El Kott*, note 9 above, paras 80-81.

[63] "There can be no doubt that the category of refugees considered in the present Paragraph is subject to the exclusion clauses contained in Article E and F, as well as to the cessation clauses enumerated in Article 1C of the Refugee Convention." Grahl-Madsen, note 5 above, 142.

[64] *UNHCR Oral intervention in El Kott*, note 63 above, para. 13. Although a common interpretation of this provision is that it only entitles the person to be considered under Article 1A(2) and that they must still meet the well-founded fear standard, "this is not the correct interpretation of Art. 1D as read in light of its history and protection purpose. The plain meaning of the term '*ipso facto*' holds that no other criteria need to be used for assessing the situation – they are by the fact of that precondition alone *de jure* refugees under the 1951 Convention and should thereby be entitled to refugee status in any State party to the 1951 Convention." Mutaz M. Qafisheh and Valentina Azarov, 'Article 1D', in A. Zimmermann (ed.), *The 1951 Convention relating to the Status of Refugees and its 1967 Protocol: A Commentary*, (Oxford University Press, 2011), 537-569, at 567.

[65] *Ibid.. UNHCR Oral intervention in El Kott*. This view is supported by the use of the term "benefits" elsewhere in the Refugee Convention, for example in Articles 5 and 7, in a context that can only mean the substantive rights conferred by the Refugee Convention. Nor can the term benefits merely refer to *non-refoulement*.

[66] *El Kott*, note 9 above, paras 70-71. See also, *AD (Palestine)*, note 2 above, para. 192.

[67] See, *UNHCR Oral intervention in El Kott*, para. 16, note 70 above. The discrimination argument was roundly rejected by the CJEU in *El Kott*, note 9 above, para 78.

AR.08305

## G. Applicability of Article 1C

31. The 1951 Convention will cease to apply under certain conditions, clearly defined in Article 1C.[68] Article 1C applies in principle to Palestinian refugees benefiting from the 1951 Convention on an individual basis. Although a literal interpretation of Article 1C, which explicitly references only refugees recognised under "Article 1A" of the 1951 Convention, would render it inapplicable to Article 1D Palestinian refugees, such an interpretation no longer corresponds to the reality that a number of Palestinian refugees have acquired the nationality and protection of other countries,[69] such that they no longer need the protection of the 1951 Convention. Notwithstanding the special situation of Palestinian refugees provided for by Article 1D, the provisions of Article 1C may be applied, account being taken of the considerable passage of time, changing circumstances, the practice of States, and the fact that many Palestinians have established themselves in other States, often acquiring a new nationality. This interpretation of the 1951 Convention is necessarily without prejudice to the meaning of 'the Palestinian people', as well as to the meaning of the terms 'refugees' and 'displaced persons' as used in various UN General Assembly and UN Security Council Resolutions.

32. Despite the decision by the UN General Assembly in 2012[70] to accord non-member observer State status in the United Nations to Palestine, Article 1D should continue to be interpreted and applied as outlined in these Guidelines and until the situation of Palestinians is definitively settled in accordance with General Assembly resolutions. It is premature to consider that the protection of the 1951 Convention should cease to apply to Palestinian refugees, merely by reason of Palestine having been accorded non-member observer status.

## H. Applicability of Article 1E

33. The fact that some Palestinian refugees have been living in countries where they exercise rights and obligations ordinarily attached to the possession of nationality may render Article 1E[71] applicable to their case. In the case of children and other descendants of Palestinian refugees who may be enjoying rights and obligations identical to those of nationals of another country, consideration of the application of Article 1E of the 1951 Convention would also be required.[72]

34. Historically, States party to the League of Arab States *Protocol for the Treatment of Palestinians in Arab States ("Casablanca Protocol")*[73] have pledged to provide a range of rights on par with their own citizens to Palestinian refugees, but many remain unimplemented in practice. Close scrutiny of the situation on the ground prior to applying Article 1E on the basis of the *Casablanca Protocol* would be required.

**13**

---

[68] UNHCR, "The Cessation Clauses: Guidelines on their Application", 26 April 1999, http://www.refworld.org/docid/3c06138c4.html and UNHCR, *Guidelines on International Protection No. 3: Cessation of Refugee Status under Article 1C(5) and (6) of the 1951 Convention relating to the Status of Refugees (the "Ceased Circumstances" Clauses)*, 10 February 2003, HCR/GIP/03/03, http://www.refworld.org/docid/3e50de6b4.html.
[69] "A great number of Palestinian refugee residing in Jordan have acquired Jordanian citizenship in accordance with the relevant provisions of the Nationality Law of 4 February 1954. Citizenship has also been obtained by a number of Palestinian refugees residing in Iraq, Kuwait, Lebanon, Saudi Arabia and other countries in the region. As a result of the acquisition of a new nationality such persons are no longer to be considered as refugees for the purpose of the 1951 Convention" [depending on whether the relevant criteria set out in Article 1C paragraph 3 are met]. Takkenberg, note 5 above, 127 (footnotes omitted).
[70] UN General Assembly Resolution 67/19, *Status of Palestine in the United Nations*, 29 November 2012, http://www.un.org/en/ga/search/view_doc.asp?symbol=A/RES/67/19.
[71] "The Convention shall not apply to a person who is recognized by the competent authorities of the country in which he has taken residence as having the rights and obligations which are attached to the possession of the nationality of that country." Article 1E, 1951 Convention, note 1 above.
[72] See UNHCR, *Note on the Interpretation of Article 1E of the 1951 Convention relating to the Status of Refugees*, March 2009, http://www.refworld.org/pdfid/49c3a3d12.pdf.
[73] League of Arab States, *Protocol for the Treatment of Palestinians in Arab States ("Casablanca Protocol")*, 11 September 1965, http://www.refworld.org/docid/460a2b252.html. The Casablanca Protocol provides for the right of employment on par with citizens, residency rights, travel documents, the right to leave and to return. However, it has not been consistently implemented and was weakened in 1991 with resolution 5093 that allows States to implement the Protocol "in accordance with the rules and laws in force in each state". See also, Goddard, note 27 above.

AR.08306

I. Applicability of Article 1F

35. Persons with respect to whom there are serious reasons for considering that they have committed acts within the scope of Article 1F of the 1951 Convention[74] are not entitled to international protection as refugees.[75]

## III. PROCEDURAL AND EVIDENTIARY ISSUES

### A. Individual assessment

36. Although Article 1D recognizes a specific class of refugees receiving the protection or assistance of a United Nations entity other than UNHCR, the application of Article 1D will normally be assessed on an individual basis.[76]

### B. Time of assessment

37. The assessment is whether, at the time the individual claim is considered, the protection or assistance of UNRWA has ceased such that the applicant is unable or unwilling to (re)avail him/herself of that protection or assistance for an objective reason beyond his/her control.

### C. Burden and standard of proof

38. In applications for refugee status or protection, including those under Article 1D, the burden generally rests on the applicant to produce evidence as far as possible to support his or her statements and to substantiate the claim. The applicant is required to give a truthful account of facts relevant to his or her claim so far as these are within his or her own knowledge, and insofar as there is information that is available to him or her and which s/he can reasonably be expected to provide to the decision-maker. A decision-maker shares the duty of ascertaining the facts relevant to the determination.[77]

39. Article 1D requires an examination of whether (i) the applicant falls within the category of Palestinian refugees who is receiving or eligible to receive the protection or assistance of UNRWA and (ii) the protection or assistance of UNRWA has ceased for any reason. These are questions of fact. The decision-maker has a duty to inquire into the matter and to take into account all of the available evidence.

40. The assessment must consider whether, at the time the individual's claim is considered, he or she is unable to or unwilling to (re)avail himself or herself of the protection or assistance of UNRWA for a reason beyond his or her control. Inquiries also need to be made in relation to the circumstances in the State or authority, as well as the applicant's individual circumstances (see paragraphs 22(j) and 25).[78] The burden of proof lies on the decision-making authorities where it is asserted by them that the applicant could relocate internally within the same UNRWA area of

---

[74] Article 1F states that the provisions of the 1951 Convention "shall not apply to any person with respect to whom there are serious reasons for considering that: a) he has committed a crime against peace, a war crime, or a crime against humanity, as defined in the international instruments drawn up to make provision in respect of such crimes; b) he has committed a serious non-political crime outside the country of refuge prior to his admission to that country as a refugee; c) he has been guilty of acts contrary to the purposes and principles of the United Nations."

[75] UNHCR, *Guidelines on International Protection No. 5: Application of the Exclusion Clauses: Article 1F of the 1951 Convention relating to the Status of Refugees*, 4 September 2003, HCR/GIP/03/05, http://www.refworld.org/docid/3f5857684.html. See also, *Background Note on the Application of the Exclusion Clauses: Article 1F of the 1951 Convention relating to the Status of Refugees*, 4 September 2003, http://www.refworld.org/docid/3f5857d24.html.

[76] A group-based approach, such as the prima facie recognition of refugee status, may be appropriate in certain circumstances: see UNHCR, *Guidelines on International Protection No. 11: Prima Facie Recognition of Refugee Status*, ("*Prima Facie Guidelines*"), 24 June 2015, HCR/GIP/15/11, http://www.refworld.org/docid/555c335a4.html.

[77] UNHCR Handbook, note 47 above, paras 196-205; UNHCR, *Note on the Burden and Standard of Proof in Refugee Claims*, 16 December 1998, http://www.refworld.org/docid/3ae6b3338.html.

[78] The ability of Palestinian refugees to move from one area of operation to another is contingent upon the recognition or granting of legal status by the host government of the receiving area, and the individual circumstances of the Palestinian refugee. This is also the case for a person who was never resident in an UNRWA area of operation.

AR.08307

operation, or absent other factors, be able to enter safely and with appropriate legal documentation per paragraph 22(iv) above.

### UNRWA registration

41. Being registered by UNRWA or possessing UNRWA documentation would serve as conclusive, albeit not necessary, proof of falling within the scope of Article 1D(1).[79] In the absence of such documentation or other relevant proof, adjudicators may rely on other evidence to this effect, including through, for example, the applicant's own statements, the affidavits of others or the production of other relevant documentation.[80] Evidence of registration with UNRWA should not, however, be considered as a necessary precondition to recognition.[81] "Displaced persons" for example, are not "registered" in UNRWA's registration system, however, UNRWA keeps "due records" of such persons.[82] Lastly, by definition, a person who, despite being eligible to receive UNRWA protection and assistance, has not received such, may not be registered nor have such proof. They may nevertheless still fall within Article 1D.

### Evidence of objective reasons bringing the applicant within the second paragraph of Article 1D

42. The evidence in relation to the inclusionary part of the assessment may come from a variety of sources. The applicant may provide evidence that is relevant in his or her own statements. A statement by UNRWA that it has discontinued activities in a given area of operation would be clear evidence that it had done so. Evidence from other sources that UNRWA had discontinued its activities could also be persuasive. It is important however that the applicant is not required to produce or point to any such possible statement.[83] If such a requirement were to be imposed, it would place an undue burden on UNRWA, one which it may not be able to satisfy in every case, owing to, for example, resources or logistical reasons or those of confidentiality.[84] Finally, the applicant should not be required to approach UNRWA directly, given the practical difficulties involved.[85] There may also be circumstances relevant to the particular applicant about which UNRWA would not know and could not provide relevant information.

## D. Individual Procedures

43. Fair and efficient procedures for the determination of refugee status under the 1951 Convention need to take particular account of claims relating to Article 1D, with clear identification of the issues relevant to Palestinians.

44. When requesting asylum, applicants must be given adequate time to exercise their rights, including, inter alia, the right to be informed, in a language which they understand, of the procedure to be followed, of their rights and obligations during the procedure, the possible consequences of not complying with their obligations and not cooperating with the authorities, the right to receive the services of an interpreter, to consult in an effective manner a legal adviser or other counsellor. Access to legal advice is paramount to a fair asylum procedure and often constitutes a prerequisite to ensure effective access to legal remedies.[86]

13

---

[79] UNRWA, *CERI*, 2009, Section III.A.1, page 3, note 21 above. The CJEU found that "[w]hile registration with UNRWA is sufficient proof of actually receiving assistance from it, it has been explained in paragraph 45 above that such assistance can be provided even in the absence of such registration, in which case the beneficiary must be permitted to adduce evidence of that assistance by other means." *Bolbol*, note 2 above, paras 46 and 52.

[80] Special consideration would need to be given to descendants of Palestinian refugee women married to persons other than Palestine refugees registered with UNRWA, since they are not under UNRWA's CERI, registered as Palestine refugees but may be otherwise recorded for the purpose of receiving services. See, note 21 above.

[81] "Registration with UNRWA is of a declaratory nature, confirming rather than establishing that an individual falls under UNRWA's mandate." Takkenberg, note 5 above, 100.

[82] UNRWA, *CERI*, 2009, Section III.B - "Persons eligible to receive services without being registered in UNRWA's registration system" at page 6, note 21 above.

[83] Whether protection or assistance has ceased is a matter of fact susceptible of proof in the normal way.

[84] Here an analogy can be made with UNHCR's position regarding information relating to mandate recognition, see submission in *I. A. v. Secretary of State for the Home Department: Case for the Intervener*, 27 October 2013, United Kingdom Supreme Court, UKSC2012/0157, http://www.refworld.org/docid/52a098e34.html.

[85] Although verification that a person is a registered "Palestine refugee", or is recorded as receiving UNRWA services, can be sought from UNRWA.

[86] UNHCR, *Public statement in relation to Brahim Samba Diouf v. Ministre du Travail, de l'Emploi et de l'Immigration pending before the Court of Justice of the European Union*, 21 May 2010, http://www.refworld.org/docid/4bf67fa12.html, paras 12-16.

AR.08308

45. For Palestinians who do not come within the personal scope of Article 1D, an assessment under Article 1A(2) would then normally proceed.

46. Even though protection pursuant to Article 1D is normally carried out in individual procedures, there may be situations in which a group of Palestinian refugees may be recognised on a prima facie basis. For example, where the mandate of UNRWA is terminated in one of UNRWA's areas of operation, or comes to an end for reasons beyond its control, such as an international or non-international armed conflict, they would be considered – as a group – not to be receiving the protection or assistance of UNRWA.[87]

47. Where an applicant raises both a refugee and a statelessness claim, the latter made pursuant to the 1954 *Convention relating to the Status of Stateless Persons*, it is important that each claim is assessed and that both types of status are explicitly recognized.[88]

48. Best State practice ensures that Palestinian refugees recognised under Article 1D are properly recorded and separately registered in national asylum statistics.


## E. Regional refugee instruments

49. Palestinian refugees are, like all other asylum applicants, entitled to apply for refugee status pursuant to any applicable regional refugee instruments, should they be in countries in which these apply.[89]


## F. Refugee status and subsidiary or complementary protection

50. Palestinians found not to fall within the scope of Article 1D could have their claims for protection considered under Article 1A(2). Should they not fall within either provision, they are entitled, like all other asylum applicants, for any national or regional forms of subsidiary or complementary protection; and also to benefit from protection under international human rights law.

---

[87] UNHCR, *Prima Facie Guidelines*, note 82 above.
[88] UNHCR, *Handbook on Protection of Stateless Persons*, 30 June 2014, http://www.refworld.org/docid/53b676aa4.html, para. 78.
[89] See, Organization of African Unity, *Convention Governing the Specific Aspects of Refugee Problems in Africa*, 10 September 1969, 1001 UNTS 45, http://www.refworld.org/docid/3ae6b36018.html; *Cartagena Declaration on Refugees, Colloquium on the International Protection of Refugees in Central America, Mexico and Panama*, 22 November 1984, http://www.refworld.org/docid/3ae6b36ec.html.

AR.08309

# INDEX

*The numbers refer to the paragraphs and the letters refer to the Handbook (H) and numbered Guidelines on International Protection (G1 to G13) respectively.*

abandoned, *see* children
abduction, G1:17-18, G7:8-9, 15, G8:22, 26
    child, G8:22
abortion, G1:13
abuse, G1:16, G8:13, 57, 64
    by husbands, G2:20
    child, G8:3, 12, 14, 68
    gender-related, G1:18
    of power, G1:17, G7:8-9
    protection from, G8:15
    reasons for, G1:36
    sexual, G8:26
    sexual orientation-related, G9:1-2, 20, 22
accelerated procedures
    exclusion, G5:31
    internal flight/relocation alternative, G4:36
acquired rights, G3:22
admission
    to territory, H:148, 153, G5:5, 16
    of aliens, H:191
    to refugee status determination procedures, H:194
adoption, H:182, G7:20, G8:25
adultery, disproportionate punishment for, G6:22
Africa
    OAU, *see* Organization of African Unity
    relocation, G4:30
age, G6:28, G8:7
assessment, G8:7, 75, G10:72
    criminal responsibility, *see* criminal responsibility
    factors, G1:36, G4:25, G6:28, G8:2, 8, 12, 15, 30, 33, 64, 71, 76 ,G9:3, G12:12, G10:58
    membership of a particular social group, G8:49-52
    persecution, G8:10, 15, 18, 30
    refugee definition, G8:4
    relocation, G8:54, 55
age-sensitive
    assistance, G7:47
    counselling and tracing, G7:49
    refugee status determination, G8:1, G8:7
agents of persecution, H:65, G1:19- 20, G7:21, G9:34-37, G10:42-45, G12:28-30
    non-State actors, G1:21, G2:20-23, G4:7, 15-17, 38, G7:21, 30, G8:37, G9:35-36, G10:43, G12:30
    State actors, G4:7, 13-14, G7:21, 24, G8:21, G9:34, G12:28
Americas, H: 20-21
amnesty, H:157, G3:16, G5:23, G10:46
armed conflict, H:164-165, G3:11, G4:27, G5:12-13, G7:3, 31, 34, G8:3, G10:61, G11:22, *see* G12, G13:21, 46
    and violence, *see* G12
    child participation in, G8:19-23, 52, 59, G10:12, 37-41, 70-72
armed forces, H:175, G8:12, 19-21, 23, 41, 59, 64, G12:28-29, 54-55
    recruitment by, G8:41G10:5-7, G12:13 *see also* children
armed group, G12:5, 36
Article 1A, *see* refugee definition

AR.08310

253

Article 1C, *see* cessation
Article 1D, H:140-141, G5:4, G11:5, G13
Article 1E, *see* exclusion
Article 1F, *see* exclusion
Asia, G4:30
assessment, H:40-41, 83, G1:7-8, 32, G3:8-9, 16, 25, G4:4, 6-8, 15, 20, 25-26, 28, 37, G5:2, 17, 31,
        G6:18, G7:16, G8:7-8, 11, 14, 37-38, 53, 57, 64, G9:13, 18-19, 21, G10:26, G11:5-6, 15, 87,
        G13:36
    age, *see* age assessment
    availability of redress G10:32
    Cartagena Declaration, under, G12:68, 77, 81
    credibility, G9: 62-63, G10: 67
    individual, need for in context of *prima facie* recognition, G11:6, 20, 35
    internal flight or relocation alternatives, G12:41
    OAU Convention, under, G12:49, 51
    *prima facie* recognition, G11:5, 29
    psychological, G4:26, G8:7-8
    risk, G12: 24-25
asylum, H:110, 159, 194,
    authorities, G8:3, 74 , G11:29
    civilian and humanitarian (character), G10:2, G11:22, G12:4, 61
    country of, H:184, G3:22, 25, G7:34-35, G7:28, G11:19, 25, 29, 30, 38
    diplomatic and territorial, H:21
    granting of, H:20, 24-25, 160-161
    institution of, G5:2, G12:46
    interviews, G1:36
    integrity of, G8:58
    persons entitled to, H:20
    procedure(s), G3:24, G5:19, G7:45, G8:63, 65, 66, 69-71, G9:61, G11:38
    right to, G4:32, G9:7
    seeking as a last resort, G4:4
    *sur place*, *see* sur place
asylum-seeker,
    additional burden, G4:33
    cessation of *prima facie* recognition, G11:38
    children, G8:2, 4, 6-9
    female, G1:3, G1:36
    personality, G1:7
    procedural fairness, G4:35, G5:36
    stateless, G11:1, 41
    victims of trafficking, *see* trafficking

belief, G6:6-7, 9, 16, 21, 29-30, 35, G9:41, 63, G10:8, 50, 58, 64-69, G12:37-38
    freedom of, G6:11, 15, G10:18
    *see also* religion
benefit of the doubt, H:196, 203-205, 219, G5:34, G8:73, G12:93
best interests of the child, G6:15, G8:5, 10, 53
burden of proof, H:196, 210, G3:25, G4:33-34, G5:34, G8:73, G9:55, G10:71, G12:93, G13:38-40

cancellation of refugee status, H:117, 141, G3:1, 4, G5:6, G11:21, 35
Caracas, H:21
Cartagena Declaration on Refugees (1984), G11:16, G12:3, 6, 61-85
caste, G7:34, G8:12
causal link
    Convention grounds, G10:48, G12:7, 10, 23, 32-33, 91
        gender-related persecution, G1:20-21, G9:38-39
        non-State actors, G2:20-23

AR.08311

      political opinion, H:81
      trafficking, G7:29-33
  crime, H:152
cessation, G3, H:30 , G11:7, G12:4, G13:31
    ceased circumstances, H:113, 115, 135, 138, G3, G3:1-2, 7-10, 18, G11:28
    clauses, H:31, 33, 111-116, 118-119, 125, 129, 133, 137-138, 143, 187, G3:1, 4, 8
    compelling reasons, H:113, 135, 137, G3:2, 20-21, 24, G7:16
    declaration of, G3:3, 17, 25
    exceptions, H:88, 136, G3:19-22, 24, G3:25
    fundamental changes/changed conditions, H:135-136, 141, G3:1, 10, 12-13, 15, 18
    general considerations, G3:6-7
    of refugee status, G3
    of UNRWA protection/assistance/mandate, G13:10, 20, 21
    individual, G3:18
    interpretation of, G3:18
    mass influx, G3:23-24
    new nationality, H:113, 129-132
    procedural issues, G3:25
    re-availment, H:118
    re-establishment, H:114, 133, 134, G3:1
    voluntary, H:113-134, G3:7
Charter of the International Military Tribunal (1945), H:150, G5:10-11
children, G8
    abandoned, G8:12, 36, 49-50, 52
    asylum-seekers, G8:2, 4, 6-9
    best interests, *see* best interests of the child
    child-sensitive, G8:1, 4-5, 7, 13, 27, 75
    claims by, G10:70-72
    convention grounds, G8:40-42, 45, 47-48
    country of origin regarding, G12:92
    criminal responsibility, *see* criminal responsibility
    discrimination, *see* discrimination
    exclusion clauses, G5:28, G8:58-64, *see also* exclusion
    family unity, H:182, 185, 213
    fear of persecution, H:213, 215, 218, G8:10-11, 21, 23, 28, 40
      child-related manifestations of persecution, G8:15-17
      child-specific forms of persecution, G8:3-4, 8, 13, 18-36
      sexual orientation and/or gender identity, G9:13
    female genital mutilation, G6:24, G8:31, 44, 54
    girl-child, G1:8, 31, 41, 44
    guidelines, national, G8:65
    identity, G8:12, 49
    intersex, G9:10
    labour, G8: 29-30
    of LGBTI parents, G9:10, 24,
    of Palestinian refugees, G13:33
    particular social group, *see* membership of a particular social group
    pornography, G7:20, G8:18, 29
    pregnant, G8:12
    recruitment, G10:12, 37-41
    religion, *see* religion
    relocation, G8:53-57
    rights, G7:20, G8:5, 13-14, 26, 34-36, 70, 77
    stateless, G8:18, 35
    street, G8:12, 52
    surviving, H:33
    trafficked, G7:2-3, 8, 11, 19-20, 32, 34, 38, 47, 49, G8:24-29, 41, 51, 76

AR.08312

      unaccompanied, *see* unaccompanied children

      under-age recruitment, G8:4, 13, 18-23, 41, 44, 52, G10:12, 37-41, 55, 59, G12:13

      violence against, G1:27, G8:3, 4, 12-14, 17-18, 23, 30, 32-33, 36, 52

          right to protection from, G8:26, 31-32

      will of the child, H:219

      with disabilities, G8:12, 35, 50, 71

      without parental care, G8:12

citizenship, H:74, 87, 144, G1:27, G7:36, 41-42, 44

civil and political rights, G1:36, G4:28, G6:2, G8:14

civilian population, G5:13, 30, G7:31, G11:22, G12:5, 14, 26, 40, 43, 71

civil law, G2:8

coercion, G7:8-9, G8:64, 70, G9:21, G10:8, 35

Committee on the Rights of the Child, G7:20, 49, G8:4-5, 20, 34, 60

common law offence, *see* crimes(s)

compliance, G6:21-22

      non-compliance G1:12, G6:16, 21

concealment, G9:18, 30-33, 54

Conference of Plenipotentiaries, H:5, 25-26

confidentiality, G1:35-6, G5:33, G7:42, 46, G7:49, G8:70, G9:60,

conscientious objection, H:170-174, G6:25-26, G10:3-4, 8-11, 21, 39, 49-50, 64, *see also* religious

      persecution

conscription, G8:49, G10:3-4, 7, 17, 19, 63, 72

Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment

      (1984), G1:5, G4:20, G5:9

Convention against Transnational Organized Crime (2000), G7:2, 4, 7, 25

Convention grounds, H: 66-67, G10:47-59, 66, 67, G12:10, 23, 26, 32-39

      contributing factor, G1:20, G7:29, G8:40, *see also* causal link

      cumulative, H:53, G1:14, 23, G7:33

      mutual, G2:4

      sexual orientation, G9:40-41

      *see* race; religion; nationality; membership of a particular group; political opinion

      *see also* children; gender-related persecution

Convention on Action against Trafficking in Human Beings (2005), G7:10

Convention on the Elimination of All Forms of Discrimination Against Women (1979), G1:5

Convention on the Political Rights of Women (1953), G1:5

Convention on the Prevention and Punishment of the Crime of Genocide (1948), G5:10

Convention on the Reduction of Statelessness (1961), G7:6, 41, 43

Convention on the Rights of the Child (1989), G1:5, G7:11, 20, G8:5-8, 12-13, 19-20, 22, 26, 32, 34,

      41, 52, 60, G10:12

Convention Relating to the Status of Stateless Persons (1951), G7:6, 41, G13:47

conversion, *see* religious persecution

counselling

      age-sensitive, G7:49

      legal, G7:45

      of refugees, G3:25

      psycho-social, G1:36, G7:46

country of origin, H:153, 164, 166, G1:8, G4:5-7, 38, G6:34, G7:25-26, G11:25, G12:10, 21, 47-51,

      81-82, G13:25

      assessment of, G3:8, 25, G4:7, G11:41, G12:24-25, G13:19

      authorities of, H:50, 83, 96, G6:35, G7:17, 21-22, 32

      circumstances / conditions / situation in, H:37, 42, 53, 63, 95, 112, 136, 218, G1:7, G3:1, 6,

          8, 17-18, 23-24, G4:37, G6:14-15, G7:27, G8:4, 11, G11:1, 5, 13, 17, 29, 31, 36-37, 41,

          G12:6, 31, 44, 81-82

      contact with, H:121, G5:33

      definition, G3:1

      information, G1:36, 37, G4:37, G6:35, G8:11, 74 , G9:64, 66, G10:13, 39, 63, G12:90-92

      laws, H:43

AR.08313

LGBTI persons in, G9:25, 28, 30, 32, 36-37, 57, 63,
nationality of, H:87
protection of, H:123, G3:18, 20
return to/re-establishment in, H:133, G3:1, 7, 12, 20, G6:36, G7:5, 16, 50, G8:56, G10:41,
    G12:27
"safe country of origin", G9:59
unlawful departure or unauthorized stay outside, H:61
country of refuge/asylum, H:12, 133, 146, 150, 153-154, 158, 184, G5:3, 5, 16, G7:28, G9:57,
    G11:19, 25, 29, G13:25
courts, H:192, G2:6, G3:16, G12:15, 23, 77
credibility, H:41-42, 93, 195, 204-205, G1:36, G6:28-33, 34, G8:73, 75, G9:11, 62-63, G10:17, 62,
    64, 67, 69, G11:35
crime(s), H:153, 156, 158, G5:5, 21, G7:7, G10:40, G12:19
against humanity, H:146, 149-150, 162, 178, G5:3, 10, 13, 24, G7:3, G10:22, 27, 29, G12:14-15
against peace, H:146, 149-150, 162, 178, G5:3, 10-11, 18, 24, G10:22
by children/minors, G8:59, 62, 64
common, H:56-58, 151-152, 154, G1:12, G5:2, G8:58
expiation of, G5:23
hijacking, H:158-159
honour, G1:36, G6:24, G8:33, 44
motivation, G5:15
nature of, H:156-158,
non-political, H:150, 155, 157, 159, 179, G5:3, 14-16
organized, G7:31
of aggression: G10:22
political, H:151-152, *see also* political opinion
serious, H:154-155, G5:2, 4, 17, 27, 31
terrorist/terrorism, G5:15, 17, 25-26
war, *see* war crimes
criminal responsibility, G5:21
age of, G5:21, 28, G8:60-61
defence/self-defence, G5:22, G8:22
individual, G5:18, 23, G8:62, 64, G10:23
cumulative
Convention grounds, *see* Convention grounds
discrimination, *see* discrimination
effect, H:201, G4:25
element, H:55
persecution: G9: 16-17, 24, G10: 15, G12: 11, 18-19

debt bondage, G8:29
deception, G1:17, G7:8-9
Declaration on Territorial Asylum (1967), H:25
Declaration on the Elimination of All Forms of Intolerance and Discrimination based on Religion or
    Belief (1981), G6:2, 12
Declaration on the Elimination of Violence against Women (1993), G1:5, G8:32
Declaration on the Rights of Persons belonging to National or Ethnic, Religious and Linguistic Minor-
    ities (1992), G6:2
deportation, H:145, G8:56, G12: 14
derivative status, G8:9, 66
deserter/desertion, H:167-169, 171, G6:25, G10:1, 3-4, 31, 46, 69
as expression of political opinion, G10:51-54
as "particular social group", G10: 58
punishment for, H:167, 169, 171, G6:26, G10:5, 14-15, 18, 38
detention, G8: 17, G9:2, 22, G10:50, G12:13, G13:21
diplomatic, H:12
asylum, H:21, 88

AR.08314

protection, H:3, 146, G7:43
    relations, H:166
disability/disabilities, G4:25, G13:23
    children with, G8:12, 35, 50, 71
    mental, G8:64
discretion, *see* concealment
discrimination
    children, G7:19, G8:3, 5, 10, 12, 14, 18, 27, 34, 36, G10:42
    cumulative, G1:16, G3:20, G4:35, G12:11
    forms of / measures, H:53-55, 72, G1:14-15, G6:12, G8:36
        political opinion, H:83, G1:32
        racial, H:68-69
        religious, H:72, G6:12, 17, 19, 26
        sexual orientation, G1:3, 16-17
    gender, G1:3, 15, G12:26
    minorities, G3:11
    military service, G10:11, 15, 32, 50, 55, 58
    non-discrimination, H:64, G8:34, G9:5, G10: 14, G12:46
    persecution, as, H:54-55, G1:14-15, 31-32, G2:20, G6:17, G8:10, 36, G9:17, 20, G10:15, G12:11
    sexual orientation, G9:2-3, 6, 10, 17, 20, 22, 25, 30, 37, 59
    trafficking victims, G1:18, G7:18, 19, G8:27
    women, G7:19
discriminatory
    acts/practices, H:65, G1:16, 17, 19, G2:20, G8:36
    application, H:59, G6:15, 16
    laws, G6:18, 24, G8:17, G9:26, 29
    measures, H:55, 63, G6:22, G8:14
    results, G6:19
    treatment, G6:24, G9:25, 33
divorce, H:120, 187, G8:17, G9:63
DNA testing, G8:76, G10:72
domestic abuse, G2:22
domestic violence, G1:3, 9, 15
    children, G8:18, 32, 33, 52, 54
    LGBTI individuals, G9:35
dowry-related violence, G1:9
draft-evader/evasion, *see* deserter/desertion
drugs, G8:64
drug trade, G8:29, G10:53
due process, G5:36
durable solutions, G3:6, G6: 36, G12:46, 61

economic migrants, H:62-64
economic motivation, G7:31, 34
economic, social and cultural rights, children, G8:14, 34, 36
economic survival, G4:24, G9:56
education, G8:30
    access to, G8:35-36
    girls, G8:36
    lack of, G8:72
    level of, G1:36, G6:32, G8:12, 45, 64
    religious, G6:21, 30
    right to, G8:14, 34, 41, G9:2, 24
educational
    background, G4:25, G6:28
    facilities, H:54, G1:14, G6:17, G8:57
    opportunities, G7:45, G8:14

AR.08315

elections, G3:13, 16
eligibility, certificate of, H:33
element
    armed, G5:30, G11:22
    common, G2:15, G9:17
    Cartagena refugee definition, G12:68, 76, 81
    core, G8:34, 35
    cumulative, H:53, 55
    fear, G9: 28, G11: 15, G12:21, 34
    harm, G9:13
    material, G5:21, G10: 62
    mental, G5:21
    OAU Convention, G12:49-50, 56
    objective, H:38, 42, 205, 206, 211, G8:11
    of refugee definition, H:37, G1:8, G7:6, 16, 25, G10:35
    political, H:64, 152
    risk, G12:23
    subjective, H:37, 38, 40, 41, 52, 206, 211, G8:11
entry permit, H:122
ethnic, G6:12
    clashes, H:91
    cleansing, G4:31, G12:13-14, 42
    considerations, G4:25, 30, G13:23
    conflict, G12:36
    dimensions, G10:61, G12:35
    grounds, G8:36
    group(s), H:63, 68, 74-75, 91, G1:24, 27, G2:17, G3:14, G4:30, G7:32, 34, 36, G8:41, G12:33, 37
        persecution of, H:91, G12:1
    identity, G1:24
    minorities, G6:2, G8:41
    origin, H:144
ethnicity, G2:6, G3:25, G6:7, 10, 27, G7:32, G8:41, 43, G9:3, G10:32, 55, 57, G11:10, G12:33, 39
Europe, H:20, 108
    events occurring in, H:109-110
European Convention on Human Rights and Fundamental Freedoms (1950), G1:5
evidence, H:44, 48, 195-197, 203-205, G1:25-26, 36-37, G3:13, 15, G4:14-15, 31, 33-34, G5:26, 31, 35-36, G6:34, G7:50, G8:11, 38, 74, G9:28, 36, 64-66, G10:24, 53, 62, G11:4, 15, 18-21, 24, 34-35, 40, G12:42, 77, 89-93, G13: 38-40, 42
exceptions, G6:26, G8:68, G13:21
    *see also* cessation
exclusion, G5,
    cancellation, H:117, G3:4, G5:6, G11:21
    clauses, H:31, 33, 117, 140-141, G5:1, 3, G10:22
        Article 1D, H:142-143, G5:4, G13: 11-16
        Article 1E, H:144-146, G5:4, G13:33-34
        Article 1F, H:147-163, 177-179, G3:4, G2:5, G5:1, 3, 4, 18, 23-26, 31, 35, G8:58-64,
           G11:18, G13:35
    children, *see* children
    consequences, G5:8-9
    crimes, *see* crimes
    criminals, H:147
    dependent(s), G5:29, H:188
    inclusion before exclusion, H:31, 177, G5:31
    interpretation of exclusion clauses, H:149, 179, G5:2
    mass influx, G5:30
    nature/rationale, H:180, G5:2, G8:58
    prima facie recognition, G11:18-19

AR.08316

    procedural issues, G5:31-36, G8:62-64
    proportionality, G5:15, 24, 26, G8:62, 64
    responsibility, *see* criminal responsibility
    revocation, G5:6
    status determination, H:30, G5:7
    United Nations, *see* United Nations
    women, G2:19
ex-combatants, G5:20
Executive Committee (of UNHCR)
    children, G8:3
    gender, G1:2
    procedure (status determination), H:192-193
Executive Committee Conclusions
    cessation, G3:5, 8, 22, 25
    children, G8:3, 18
    durable solutions, G3:6
    exclusion clauses, G5:2
    internal protection /flight/ relocation alternative, G4:36
    stateless, G7:43
    women, G1:2, 30, 36, G3:5
exploitation, G4:10, G13:21
    children, G7:47, G8:4, 12-14, 25-26, 33, 52
    consent, G7:11
    forms of, G7:15
    labour, G10:33
    sexual, *see* sexual exploitation
    trafficking, G7:1, 4, 8-11, 27, 32, 34, 38, 47, G8:25-26
    vulnerability to, G7:32, G8:12
expression, freedom of, G3:16, G9:24, 31
expulsion, H:145, 154, G5:4
external aggression, H:22, G4:5, G12:44, 48, 54, 74
extradition, H:21, G5:15, 32

fact-finding, H:200-201
family
    background, H:41, 216, 218, G4:25, G7:20, G8:12, 22, 28, 56, G9:4, G13:23
    cessation, H:187, G2:7, 20, 22, 25
    derivative status, H:184-187, G8:66
    descendants, G13:8
    exclusion, H:188, G9:30
    extended, G8:8
    gender roles, G9:50
    law, G9:24
    members, G11:24, 34, G12:33
    of applicant, H:172, G1:36, G2:20, G7:17, G8:8-9, 17
    ostracism / rejection, G1:18, 35, G7:18-19, 48, G8:12, 27
    particular social group, *see* membership of a particular social group
    persecution, H:136, G7:21, G8:18, G9:10, 23, 35, 64, G12:28
    planning, G1:3, 13, G8:18, 50
    political opinion, G10:54
    reasons, H:62
    religious convictions, G10:49
    reunification, G8:68
    support, G3:22, G4:29, G9:25
    tracing, G8:68
    violence, G1:3, G8:18, G9:63, G10:42
family unity

AR.08317

children, G8:2, H:182, 185
    principle of, H:181-188, 213, G13:7
    protection, H:181-182, G5:29
    right to, H:181
famine, H:39
fear, *see* well-founded fear
female genital mutilation (FGM), G1:3, 9, 11, 36, G6:24, G8:4, 18, 31, 44, 54, 67
force, use of, H:175-177, 179, G1:13, G7:8-9
forced labour, G7:3, 8-9, 15, G8:14, 18, 27, 29, G10:31, 33
forced marriage, G1:36, G8:20, 33, 67
forced recruitment, G8:20-21, G10:3, 12, 42, G13:21
foreign domination, H:22, 165, G4:5
fraud, G1:17, G7:8-9, 41

gender
    armed conflict, relation to, G12:12, 26-27, 33
    dimension, G1:12
    discrimination, G10:32
    element, G1:16, G9:13
    expression, G9:9, 57
    identity, G9:62-63, G12:92, G13:7, 23
    inequalities, G9:23
    guidelines, national, G1:35, 38
    of interviewers/interpreters, G9:60
    markers, G9:53
    related-claims, G1:1, 3, 10, 15, 20, 33, 35-36
    related/based violence, G1:2-3, 9, 16, 18, 36-37, G7:19, 48 G8:3-4, 31, 64, G9:2, G12:27, G13:21
    roles, G1:32-33, G8:44, G9:13, 15, 41, 50
    *see also* sex; women
gender sensitivity/sensitive
    assessments, G8:75, G10:72
    assistance, G7:45, 47
    country of origin information, G8:74
    confidentiality, G1:35
    implementation, G1:38
    interpretation, G1:1-2, 4-6, 8, G8:4
    interviews, G1:36, G6:27, G8:71
    procedural issues, G1:35-37, G3:25
gender-related persecution, G1, G9
    abortion, G1:13
    adultery, disproportionate punishment for, G6:22
    armed conflict, relation to, G12:1, 11, 26-27
    causal link, G1:20-21
    cessation, G3:25
    Convention grounds, G1:22-34, G12:39
    definition, G1:3, G12:11
    dress-codes, G1:17
    evidence, G1:37, G7:50
    failure of State protection, G4:15, G6:24, G8:37, G8:54
    female genital mutilation, *see* female genital mutilation
    harmful traditional practices, *see* harmful traditional practices
    men, G1:3
    nature of, G1:3
    refugee definition, G1:1, 6
    sexual exploitation, *see* sexual exploitation
    sexual orientation, *see* sexual orientation
    sexual violence, *see* sexual violence

AR.08318

trafficking, *see* trafficking
well-founded fear, *see* well-founded fear
women, G1:1, 3-5, 8, 12, 17-18, 25-27, 30-31, 33, 36, G6:24, 30, G7:3, 19, 32, 34, 38, 47-48,
    *see also*
    membership of a particular social group; trafficking
Geneva Conventions for the Protection of Victims of War (1949), H:164, G5:10
genocide, G5:10, 13, G12:13-14
geographic limitation, H:7, 15, 17, 22
girls, *see* children
grounds, *see* Convention grounds
group, *see* ethnic groups, membership of a particular group, vulnerable groups
guardian(ship)
    child, H:214, G7:49, G8:39, 66, 69, 75-77, G9:60, G10:72
    family unit, H:182
    mentally disturbed persons, H:210


Hague Convention, No. 28 on the Civil Aspects of International Child Abduction (1980), G7:20
harm, G1:6, 9, 15, 17, 18, 25, 36, G2:20, 22, G4:7, 13-20, 28, G5:14, 22, G6:36, G7:14-17, 27, 44,
    G8:10, 14-18, 22, 30, 32, 36, 77
    fear, *see* well-founded fear
    psychological, G8:16, 33
    risk of, G7:17, G8:12, G9:32, G10:46, G11:10, G12:22, 28, 51, 91
harmful traditional practices, G1:5, 36, G6:15, 24, G8:31, 33
hate speech, G6:15
hazardous work, G8:30
health
    access to, G6:17, G8:35, 41, G12:19
    child, G8:12, 13, 30, 57
    factors, G4:25, G8:12, G13:23
    protection of, G6:15
    right to, G8:34, 41, G9:2, 24
    risks to, G4:20, G9:25, 33, G12:12
    sex-reassignment surgery (forced), G9:21
hijacking, H:158-159, G5:27
HIV, G8:52, G9:3
homelessness, G8:12
homosexuality/homosexual, *see* sexual orientation
honour killings/crimes G1:36, G8:44, G9:10, 23
host country, H:16, 166, G7:17, G8:60
housing, G7:45, G8:35, G9:24-25
human dignity, H:69, G2:6, 9, G8:75, G9:45, 47, 60, G10:57, 72, G12:56, 78, 83
humanity, lack of, G8:56
human rights
    abuses of, G9:1
    assessment, G3:8, 13-14, 16, 25
    convictions, G10:68
    defenders G9:40, 66, G12:38
    definition of, G8:31
    denial of, G9:10, 24
    derogation from, G12:16, 79
    enjoyment of, G8:27
    exercise of, G5:14, G6:17, G8:48
    guarantee of, G4:24, G5:24, G8:58, G12:41
    instruments and guidelines, G3:16, G5:9, G7:22
    international law, G1:5, 9, G2:3, G4:20, 32, G6:2, G7:12, G8:7, G9:5-7, G10:5-7, 8, 21, 26-27,
        G12:16, 71, 83, G13:51
    norms, G1:13, G2:3, 6, G6:2, G9:44, G10:56, G11:27

AR.08319

respect for, G3:16, G4:24, 28, G9:56, G12:42
principles, H:60, G4:4, G5:15
restrictions on, G10:15
standards, H:59, G1:5, 10, G3:16, 22, G4:28, G6:2, 16, G8:3
treaty, G8:5
violations of, H:51, 68, G1:5, 13, G3:11, G5:17, 20, G7:3, 4, 14, 15, 17, 44, 47, 55, G8:7, 10,
    13-14, 20, 29, 31, 64, G9:16, 21, 26, 65, G10:14, 36, 38, G11:5, G12:11, 13-14, 18, 58, 62,
    70, 75-77
*see also* Universal Declaration of Human Rights
Human Rights Committee, G3:15, G6:2, 4, 15, G10:8
human rights law, G1:13, G3:22
    international, G1:5, G6:2, 4
    violations of, G5:20,
human trafficking, *see* trafficking

identity
    certificate of, H:33
    child of, *see* children
    documents, G7:42
    ethnic, G1:24
    national, G9:50
    religious, *see* religion
    sexual orientation, *see* sexual orientation
immigration officer, H:192
implementation of instruments/laws/standards, H:12, G4:32, G6:18, G8:5, G12:25
impunity, G1:15, G9:2, 24
incarceration, G1:18, G7:15
incest, G8:33
inclusion
    clauses, H:30-110, 176, G5:31
        Article 1D, G13: 17-19
    criteria, H:177
    family unit, H:185
    gender, G1:2
    presumption of, G11: 40,
    refugee definition aspects, G10:2, G12:3
individual procedures (refugee status determination), G11:40-41, G13:46
inhuman or degrading treatment, G1:18, G5:9, G7:47, G8:56, G9:7, 21-22, G10:14, 31, G12:13, G13:21
injustice, H:56
insanity, G5:21
institutional care, G8:57
intention, H:63, 119, 123, 128, G8:14, G9:39
    of the parties/drafters, G13:5, 11, 14, 16
    to exploit, G7:10
inter-ethnic conflict, G7:36
internal flight/relocation alternative, G4
    accessibility, G4:10-12
    armed conflict, application to, G12:40-43
    assessment, G4:6-8
    burden of proof, G4:33-35
    Cartagena refugee definition, G12:85
    children, G8:53-57
    concept, G4:1-4
    country of origin, G4:37
    hardship, G4:24
    LGBTI individuals, application to, G9:51-56
    non-State actors, G4:15-17, G10:60-61

AR.08320

    OAU Convention refugee definition, G12:60

    presumption, G4:14

    procedures, G4:36

    reasonableness, G4:22-32, G8:55, G13:24

    religious persecution, G6:13

    serious harm, G4:18-21

    state protection, G4:7, 15, 16, G8:54, 56

international agencies, H:173

international community, H:1, 33, 163, 171, G4:32, G5:17, G10:24, G13:2, 11, 21

internally displaced persons (IDPs)

    relocation, G4:31-32, G7:5, G12:42

International Covenant on Civil and Political Rights, H: 60, 71, G1:5, G3:15, G6:2, 11-12, 15, 21, G7:41, 43, G9:21, G10:5, 8, 9, 49

International Covenant on Economic, Social and Cultural Rights, H:60, G1:5, G8:34

International Criminal Court, G1:5, G5:10G8:19, 60

International Criminal Tribunals for the former Yugoslavia and Rwanda, G1:5, G5:10

international criminal law, G1:9, G10:6, 21-22, 26, 36, G12:15

international criminal tribunals, G1:5, G5:10, 31, 34

international human rights law, *see* human rights

international humanitarian law, G4:32, G5:12, 20, G7:12, G8:19, G10:21-22, 26-27, 38, G12:5

International Labour Organization Conventions, G7:9

international law, G1:5, 9, G4:4, 16, G5:8, 24, 27, G6:15, G7:1, 12, 15, 22, G8:3, 19, 29-30, 59, G9:7, G10:1, 5, 7, 12, 14, 17, 23-27, 30, 33, 67, 72

international protection

    Palestinian refugee, G13:2, 28-30

    Cartagena refugee definition, G12:66

    continuity, H:33

    discrimination, G1:14

    eligibility for, G11:22

    from forced recruitment, G10:35

    international courts/tribunals, G12:15

    needs, H:90, 100, G7:7, 20, 26, G11:28, G12:93

    prima facie approach/recognition of, G11:9, 26

    provision of, H:14, G6:36

    regime, G4:4

    scope of, G12:81

    undeserving of, G10:22

    UNHCR, G11:17, 33

    *vs.* national protection, H:106

International Refugee Organization (IRO), H:32-33

international standards, G8:30, G10:5

interpreter(s), H:192, G1:36, G6:27, G9:60, G13:45

interviewer(s), G1:36, G6:27, 35, G7:46, G9:60

invasion, foreign, H:165, *see* also foreign domination; occupation


jurisdiction

    civil law, G2:8

    common law, G1:20, G2:5

    territorial, H:88

jurisprudence, G1:5, G8:31, G10:1, 8, G12:76, 79, G13:4, 17


Latin America, H:21, 88

    *See also* Cartagena Declaration on Refugees (1984)

law and order, H:175, G7:31

League of Nations, H:2

legal representative, G8:69, 77, G9:58, 60

legal advice, G1:36, G13:44

AR.08321

liberation movements, H:175, G8:45

LGBTI individuals (concept), G9:10

London Agreement and Charter, *see* Charter of the International Military Tribunal

mandate
    country authorities, G11:29
    international criminal courts/tribunals, G12:15
    refugees, H:16-17, G11:33
    refugee status determination, G5:28, G9:61, G11:5
    UNRWA, G13:7, 12, 16, 20-21
        termination of, G13:22, 26, 47
marriage,
    arranged, G8:25
    certificate, H:121
    credibility determinations, G9:63
    child/underage marriage, G8:14, 49, G9:23
    forced, G6:24, G8:18, 33, G9:10, 23, G12:26
    of mixed religions, G6:12, 24
mass influx, G3:23-24, G5:30
medical
    advice, H:208
    assistance, G7:45-46
    care, G4:29
    condition, G9:10
    evidence, G1:36
    experimentation, G9:21
    institutions, G9:22
    professionals, G12:38
    report, H:208
    supplies, G12:18, 59
    testing, G9:65
    treatment, G7:15, G8:12, G9:10, 53, 63
        denial of, G8:35
membership of a particular social group, G2, H:77-79
    age, G8:49, 50, 51, 52
    armed conflict, relation to, G12:33, 37
    characteristics, G1:29, G2:11-13
    children, G7:32, 38, G8:4, 46, 48-52, G8:20, G10:59
    civil law, G2:8
    cohesiveness, no requirement of, G2:15
    contentious objectors, G10:58
    convention grounds, G10:47
    definition of, G2:10, G8:48, G10:56-57
    deserter /draft-evader, H:169
    family, G1:33, G2:1, 6-7, G8:46, 50, 52 , G10:54
    gender-related, G1:28-31, G7:38, G8:14, G10:59, G12:39
    homosexuals, G2:6, 7, 20
    human rights, G1:29, G2:11-12, G7:37, G8:48
    identity, G1:29, G2:11-13, G7:37, G8:48, 51-52
    immutable/unchangeable characteristics, G2:6, 9, 12, 13
    interpretation of, G2:2
    non-State actors, G2:20-23
    occupation, G2:1, 6, 9, 13
    sex, G1:30, G2:6,12, 15
    sexual orientation, G9:40, 44-49
    size, relevance of, G2:18-19
    social class, G2:9

AR.08322

social perception, G2:7, 8, 9, 13
tribes, G2:1
persecution, role of, G2:2, 14, 17
protected characteristics, G2:6, 8, 11, 12, 13
trafficking, G7:32, 37-39
women, G1:4, 20, 30-31, 33, G2:1, 6-7, 12, 15, 19-20, G7:32, 38, G8:50
mental
    capacity, G5:28, G8:61, 63, 64
    development, H:214, G8:30, 64
    disability, G8:11, 64
    domestic violence, G8:33
    element, G5:21
    harm, *see* harm
    health, G8:30, G9:24, 33
    illness, G9:21
    integrity, G12:83
    maturity, H:216, G8:61
    state, G7:34, G8:64
    suffering, G1:9
    violence, G8:13, 30, 33
mentality, H:214
mentally disturbed persons, H:206-212
Mexico, G8:50, G12:61
Mexico Declaration and Plan of Action to Strengthen International Protection of Refugees in Latin America (2004), G12:63
Middle East, H:143
migrant(s)
    economic, H:62-64
    smuggling of, G7:4
    workers, H:95
military service, H:167-168, 170, 172-174, G6:25-26, G10
    alternative service, G10:3, 8-9
    compulsory, G10:3, 4, 32
minority/minorities
    discrimination against, G3:11
    ethnic, H:74, G8:41
    national, H:74, 76
    race, H:68
    religious, G6:12
minors, *see* children
Montevideo, H:21
Montreal, H:160
motivation
    draft evasion/desertion, G10:4
    of flight: G11:17, 27
    of perpetrator/persecutor, G1:36, G4:15, G12:26
movement,
    freedom of, G1:18, G12:40
    of people/refugees (large-scale), G11:22, 26-27, G12:1, 61
multiple grounds, *see* Convention grounds
murder, H:155, G5:13-14, G8:12, G9:23


Nansen Passport, H:33
national law/legislation, H:60, G7:1, G8:60, 63, G13:3
    Cartagena refugee definition, G12:63
    military service, G10:3, 17, 33
national minority, *see* minority/minorities

AR.08323

nationality
> acquisition of, G13:31
> Convention ground, H:74-76, G9:3, 40, G10:47
>> children, G8:41
>> draft evaders, H:169, G10:58
>> gender, G1:4, 20, 22, 27
>> trafficking, G7:36
>> *vs.* membership of a particular social group, H:77
> country of, H:6, 22, 87-91, 98, 106-107, 113, 118-122, 124, 134, G3:2, 8, 10, G4:5, G7:26, 43, G8:4, G9:32, G11:19, 25
> deprivation of, G7:41
> dual or multiple, H:106, 107, 117
> loss of, G8:18
> military service, relation to, G10:55
> new, H:113-114, 129-132
> non-nationals, H:121
> no nationality, *see* stateless
> OAU Convention, G12:44, 47, 49-51
> passport, *see* passport
> re-acquisition of, H:113-114, 126 128
> rights and obligations of, G13: 34
natural disaster, H:39
naturalisation, G3:3
neglect, G7:41, G8:13, 68
nexus, *see* causal link
non-conformity, G9:10, 50, 63
non-derogable rights, G4:28, G12:16, 42
non-discrimination, G7:12, G8:34, G9:5-6, G10:14, G12:46, G13:7
non-governmental organizations (NGOs), G3:25, G9:51,
non-political crimes, *see* crimes, non-political
non-refoulement, *see* refoulement
non-State actor(s), *see* agents of persecution


OAU Convention Governing the Specific Aspects of Refugee Problems in Africa (1969), H:20, 22, 164, G4:5, G5:1, 3, 7-8, G8:13, G11:5, 16, G12:3, 6, 44-60, 64, 74
objective element, *see* element
occupation, *see also* invasion
> military H:22, 165, G4:5, G11: 5, G12:44, 48, 55
> professional G10:57, G12: 38
one-party States, G4:13
Organization of African Unity, H:22, G11:5
organs, removal of, G1:17, G7:3, 8-9, 15
orphans, G7:20, 38, G8:36, 39, 50, 52, 57
ostracism, G1:18, G7:19, 39, G8:27, G9:24
> fear of, G7:18


Palestine, H:142-143, G13:32
Palestinian refugees, G13:5, 7-9
particular social group, *see* membership of a particular social group
passport
> applying for, H:120-121
> confiscation of, G1:18
> issuing authority, H:93
> Nansen, H:33
> of convenience, H:93
> possession of, H:47-50, 93, 122-125, 134
> refusal of, H:99

AR.08324

peace, G10:24, G12:78
    arrangements, G3:14, G12:25
    crimes against, *see* crimes
    situation, G3:11
peacetime, G10:3-4, G12:10, 78
penal sentence, G5:23
penalties, H:61, 167, G1:17, 36, G6:19, 26, G9:30, G10:5
persecution
    agent(s) of, *see* agents of persecution
    area/place of, H:91, G4:11-12, 20, G7:25-28
    armed conflict, relation to, *see* G11, G12:12-13, 18
    atrocious forms of, H:136, G3:20, G7:16
    avoidance of, G4:19, G6:13, G9:49
    basis for, G9:19
    cumulative grounds for, *see* cumulative grounds
    definition of, H:51-53, G1:9, G7:14, G6:12, G8:10, G9:16
    emergency situations, in the context of, G12:16
    fear of, *see* well-founded fear
    ender-related, *see* gender-related persecution
    imputed political opinion, G10:54
    past/previous, H:113-115, 135-137, G4:24-26, G7:16, G9:10, 18, 56, G11:28, G12:25
    prima facie, G11: 15
    risk of, G10:15, 23, 67, G12:17, 24-25
    sexual orientation, G9*vs.* punishment, H:56-59
    *vs.* prosecution, G6:26
persecutory laws, G1:10-13
personal circumstances, G4:4, 24-25, G9:56, G10:65, G12:82, G13:23
police, H:17, G8:39, G9:34, 36, G10:3, G12:19, 59
political offence, *see* crime(s)
political opinion, H:80-86
    armed conflict, G12:37-39
    children, G8:4, 45-47
    Convention ground, G9:40, 43, G10:47
    gender, G1:4, 26, 28, 32-34, 36 , G9:50
    imputed, G1:26, 32
    military service, G10:51-54
    no-demonstration of, H:47
    punishment/prosecution for, H:84-86
    sexual orientation, G9:50
    trafficking, G7:40
    under-age recruitment, G8:20, 52
    *vs.* economic motive, H:64
    *vs.* nationality, H:75
political refugee, G1:33
political rights, *see* civil and political rights
pornography, *see* children
poverty, G7:31, G8:14, G12:19
prima facie, *see* G11
    presumption, H:93
    refugee, H:44, G3:23-24, G12:89, G13:46
privacy
    protection of, G7:6, 22
    right to, G8:70
profit motive, G7:1, 31, 35, G8:25
proportionality, *see* exclusion
prosecution
    criminal, G12:15

AR.08325

    fear of, H:58, 167
    for a common law offence, H:56-59, G1:12
    for desertion, *see* desertion
    for political offence, *see* crime(s)
    immunity from, G10:46
    lack of, G1:37
    legitimate, G5:25
    threat/risk of, G9:27, G10:18
    *see also* persecution
prostitution
    child, G7:20, G8:4, 12, 18, 29
    forced, G1:18, G7:3, 15, 19
    trauma, G7:18
    trafficking, G1:18, G7:3, 15, 19, 47
    *see also* sexual exploitation
protection
    absence of, G1:21, G7:30
    ability and/or willingness, G1:15, 17, G2:22-23, G6:24, G7:22, G8:28, 37, G9:35, G10:43,
        G12:30, 32, 41, 57
    access to, G13:24
    adequate, G7:35
    alternative responses, G11:12, 17
    child, *see also* children
        military service/recruitment, G10:37
        needs of, G8:1
        access to, G8:39
        services, G8:11, 66
    complementary forms of, G4:20, G6:36, G13:50
    continuity of, G13: 5, 11, 16
    diplomatic, H:3, 146, 166, G7:43
    effective, H:65, 166, G1:19, G2:20, G7:21, 23, 40
    exclusion from, G5
    family, *see* family; family unity
    guarantees of, G7:36
    internal flight/relocation, *see* internal flight/relocation alternative
    international, *see* international protection
    lack of, H:164
    meaningful, G4:22 national, H:49, 90, 97, 106, 113-114, 118-120, 129-130, G3:2, 10, G4:16
        denial of, H:98-100
        re-availment, *see* re-availment of national protection
        refusal of, H:83
    regional systems, G12:8,
        *see also*, OAU Convention Governing the Specific Aspects of Refugee Problems in Africa (1969)
        *see also*, Cartagena Declaration on Refugees (1984)
    restoration of, G3:15-16
    state, G9:27, 36-37, 51, G10:44, 61 stateless, H:101
    subsidiary, G12:9, G13:50
    temporary, G11:26-27
    United Nations, H:142-143
    witness programmes, G7:50
    *see also* agents of persecution
    Protocol relating to the Status of Refugees (1967), H:9-12, 16-17, 19-20, 22-23, 25-26, 29, 35,
        164, 183, 185, 189, 191-194, 220, G4:2, G5:7, G7:5, G8:1, G11: 5
    Protocol to Prevent, Suppress and Punish Trafficking in Persons (2000), G1:18, G7:2, 6-9, 11-12, 22
public order, H:22, 59, 148, G4:5, G9:29, G11:5, G12:44, 48, 56-59, 62, 66, 70, 78-79, G13:21
punishment, H:56-60
    disproportionate, G1:12, G10:18

AR.08326

degrading, G9: 7, G13: 21 children, of, G8:33
corporal, G9:2, 26 G10:14
for desertion, *see* desertion
for non-compliance with religious practices, G6:16, 21, 22, 24
for political offence, *see* crime(s)
for refusal to perform military service, G10:13-15
for sexual orientation, *see* sexual orientation
rape (as punishment), G9:20
*see also* prosecution

race, H:68-70
as a compounding factor, G9:3
armed conflict, relation to, G12:33
children, G8:4, 20, 41
draft evaders, H:169, G10:58
gender, G1:24
military service, connection to, G10:55
trafficking, G7:32, 34
religion, G6:10, 27, G8:43
*vs.* membership of a particular social group, H:77
*vs.* nationality, H:74, G1:27, G7:36
rape
armed conflict, G12:13
children born of, G8:12
crimes against humanity, G5:13
domestic violence, G8:33
gender-related violence, G1:9, G12:26
serious non-political crimes, G5:14
sexual orientation, relation to, G9:20
corrective rape, G9: 10,23
systematic targeting, G8:41
trafficking, G7:15,
torture, G1:36
reasonableness test/analysis, G4:7, 8, 22-30, G8:53, 55
of relocation area, G4:37-38, G9:52-54, G12:42 *see also* internal flight/relocation alternative
re-availment of national protection, H:114, 118-125, 127, G3:15
re-establishment in State of origin, H:114, 133-134, G3:1
reconciliation/reconstruction, G3:14
refoulement, H:192, G3:24, G4:4, G5:4, G11:26
refugee definition, H:32, 34, G6:3, G9:1, 6, 34, 38, 46, 48, G10:1-2, 35, 42, 47, G11:1, 5, 13, 29,
G12:2-5, 11, G13:21
by national origin, H:3
regional definitions, G11:5, 16, G12:6-9, 44, 48, 63, 65-70, 75-76, 78, 80, 82, 84-85, 87
refugee flows, G3:6
refugee law, G1:38, G4:2
international refugee law, G6:2, 4, G9:6, G10:22, G12:15, G13:21, 25
legal status of refugees, H:12
legal treatment of refugees, H:24
refugee 'sur place', *see* sur place refugees
regime change, H:136, G3:14, 17
religion
Convention ground, H:71-73
armed conflict, G12:33
conscientious objection/military service, G10:8, 49-50, 65-66,
gender, G1:25-26, G12:39
trafficking, G7:35
children, G8:42-44, 47

AR.08327

      sexual orientation, G9:42-43, 63
    definition of, G6:1, 4
    identity, G6:7-9, 13, *see* belief
    knowledge of, G6:9, 29-32
    prima facie approach, G11:10
    right to freedom of, H:71, G3:16, G6:2, 11, 20, G6:13
        restrictions on, G6:15-16
religious persecution, G6
    children, G6:16, 21
    conscientious objection, H:170-174, G6:25-26, G10:49-50
    conversion
        forced, G6:20
        motivation, G6:35
        post-departure, G6:1, 34-35
    discrimination, H:54, G2:4, G6:17-19
    forced compliance, G6:21–22
    forms of, H:65, 72, G1:14, G6:12
    gender, G1:22-23, G6:24, 27, 34
    procedural issues, G1:36, G3:25, G6:27-36
relocation alternative, *see* internal protection/flight/relocation alternative
removal of organs, *see* trafficking
repatriation, H:122, G12:46
    application for, H:122
    spontaneous, G3:12
reprisals, G1:18, 35, G7:17, 19, 28, 39, 48, G8:28, G10:61
    fear of, G1:35, G8:72
    *see also* trafficking impact of, G8:27
resettlement, G6:35, G7:28
responsibilities
    criminal, *see* criminal responsibilities
    supervisory, *see* UNHCR
retribution, fear of, G8:23, 70, G10:15, 30, 34
return
    ability to, G13:7, 21
    children, of, G8:23, 27
    consequences of, G1:32, G6:36, G8:64, G10:13, 46, 63
    country of original/nationality, G9:18, 32, G10:41, G12:27
    forcible, G4:8
    generation of tension, G3:12
    lawfulness of, G13:21
    place of relocation, G9:56
    prior permission to, H:50
    precondition of, G3:17
    protection against, G5:9
    refugee definition, H101-105
    right to, G7:43
    victims of trafficking, G7:22, 43
revocation, G3:4, G5:6, G11:7
Rome Statute of the International Criminal Court, G1:5, G8:19

safeguards
    discriminatory, G6:22
    procedural, G1:38, G5:31, 36
        for children, G8:7, 65, G10:12, 70
        for claims based on sexual orientation, G9:60
safety, *see* security
Second World War, H:5, 147, 150

AR.08328

security
    companies/forces/groups, G10:42, G12:28
    external, G12:56, 78
    failure to ensure, G7:31
    incidents, G12:71
    international, H:148, G5:17
    national, H:148, G5:33, 36
    physical, G3:15, G9:21
    prima facie approach, relation to, G11:12
    relocation, G4:27, 29
    safety and, G3:15, G4:24, 27, G5:36, G7:22, G8:67, G9:56, G10:31, G12:41, G13:21
    sense of, H:135
    services, G3:16, G10:3
    social, G8:34
    threats to, G12:61-62, 66, 68, 70, 81-83, G13:21
separated children, *see* unaccompanied/separated children
servitude, G7:3, 8-9, G10:14, 31, 33, 35
sex
    definition of, G1:3, 5
    factor, as, G4:25, G6:28
    interpreter, of, G1:35, G7:46
    non-discrimination, on the basis of, G13:7
    persecution specific to, G1:9, 16
    reassignment surgery, G9:10, 21
    same-sex, *see* sexual orientation
    slaves, G10:40, 59 *see also* slavery, sexual
    work, G9:25
    *vs.* gender, G1:3
    *see also* membership of a particular social group
sex trade, G7:3, 34
sexual assault, G1:36, G9:60
sexual enslavement, G7:15
sexual exploitation
    children, G8:4, 25-27, 33
    trafficking for the purpose of, G1:18, G7:3, 8, 9, 19, 38, 47
sexual orientation, *see* G9
    gender-related persecution, G1:15-17, G6:34
    homosexuality/homosexual, G1:3, 5, 16-17, 30, G2:1, 6–7, 20, G12:92, G13:23
    *see also* transgender/transsexual/transvestite
sexual services, G6:24, G8:20, 44
sexual violence/abuse, G1:2, 3, 9, 24, 27, 36-37, G3:20, G7:48, G8:12, 22, 33, 52, G9:10, 20, 35, 60,
    G10:59, G12:13, 26-27, G13:21
Sierra Leone, Special Court, G8:19, 60
slavery, G8:29
    sexual, G10:31, 33, G12:26
    trafficking, G7:2, 3, 9
smuggling, G7:4, 7
social cleansing, G8:12
social exclusion, G8:27
social group, *see* membership of particular social group
social mores, G1:3, 12, 30, 36, G8:51
standard of proof, G5:35, G10:13, G13:38-40
state obligations
    economic, social and cultural rights, G8:34
    exclusion, H:145, G5:8
    international humanitarian law, G8:19
    limitations, H:7, 108

AR.08329

statelessness, G7:41
state protection, *see* protection
statelessness,
    children, G8:18, 35
    country/countries of former habitual residence, H:104
    deprivation of nationality, G7:41
    lack of documentation, G4:12, G7:42-44
    loss of nationality, H:127
    no nationality, H:101, 137, 139, G3:2, 10
    refugees, H:101-102, 105, 133
        cessation, H:137-139
    relocation, G4:12
    trafficking, G7:41-44
    UNHCR mandate, G7:43-44
status, H:12-13, 77, 131, 145, 184, 195, G1:3, G2:6, G3:1, 3, 6, 22, 25, G4:12, 29, G6:36, G8:2, 52, 63
    conscientious objector, G10:46
    declaratory nature of, H:28
    derivative, *see* derivative status
    economic,G9:3, 10
    "equal status", G13:16
    non-member observer, G13:33
    of Palestinian refugees, G13:5
    provisional, G11:7
statutory refugees, H:4, 32-33, 136
stay arrangements, G11:26-27
sterilization, G1:13
street children, G8:12, 52
subjective element, *see* element
supervisory responsibility, *see* UNHCR
sur place refugees H:83, 94-96, G6:1, G7:25, G9:57, G11:25, G12:31, 52, 69, G13:25-27

temporary protection, G3:23-24, G11:12, 17, 26-27
terrorism/terrorist, *see* crime(s)
theft, H:158, G5:14
thought, conscience and religion, right to freedom of, H:71, G3:16, G6:2, 11, 20, G6:13, G10:8,
    *see* also religion
threat to life or freedom, H:51, G7:14, G8:10, 15, G9:16, G10:14
torture
    acts of, G5:12-13, 27, G8:33
    armed conflict, G12:13, 27
    gender, G1:35-36, G7:47
    forced prostitution or sexual exploitation, G1:18
    right not to be returned to, G4:20, G5:9
    sexual orientation, G9:2, 7, 20-23
    threats of, G13:21
    *see also* Convention Against Torture
    *see also* inhuman or degrading treatment
tracing, G7:49, G8:68
trafficking, G7, G10:53, G12:26, G13:21
    agents of persecution, G7:21-24
    children, G7:3, 19-20, 47, 49, G8:4, 18, 24-30
    consent of victim, G7:11
    convention grounds, G7:6, 29-31, 33-40
    definition of, G7:7-13
    drugs, G10:53
    evidence, provision of, G7:50
    force, use of, G7:8-9

AR.08330

forms of, G7:3, 15
gender-related violence, G1:19
legal instruments, G7:1-2
medical/psycho-social assistance, G7:46-47, 49
privacy and identity of victim, G7:22
procedural issues, G7:45-49
prostitution, *see* prostitution
Protocol, *see* Protocol to Prevent, Suppress and Punish Trafficking in Persons
removal of organs, G7:3, 8–9, 15
resettlement, G7:28
re-trafficking, G7:17-18, 28
rings, G7:4, 27, G8:27
servitude, G7:3, 8-9
sexual exploitation, *see* sexual exploitation
slavery, G7:2, 3, 9
smuggling, *see* smuggling
stateless, *see* statelessness
State protection, G7:22-24
UNHCR's involvement, G7:5
victims of, G7:5, 12-13, 15-17, 25-26, 49, 50, G8:24, 28
violence, G1:18, G7:18-19, 48
well-founded fear of persecution, *see* well-founded fear
within national borders, G7:10, 13
women, G7:3,19, 32, 34, 38, 47-48
transgender/transsexual/transvestite, G1:16, 30, *see* G9
trauma, G1:35-36, G4:26, G7:16, 18, 48, G8:64, 72, G9:59, G10:70, G12:27
travel documents, H:20, 33, 125, 134, 191
travel facilities, H:20
Treaty on International Penal Law, H:21
tribes, G2:1, G4:30

unaccompanied/separated children
adolescent, H:215
asylum-seekers, G8:6
burden of proof, G8:73, G10:71
guardian, G8:39, 69
refugee status, H:214
relocation, G8:56
victims of trafficking, G7:20
under-age, *see* children
undue hardship, G4:8, 22, 24, G8:56, G9:56, G12:41
United Nations
exclusion clauses, H:140, G5:3-4, G10:22, G11:19
purposes and principles, H:162-163, G5:17
protection or assistance, H:142-143, G5:3
United Nations Children's Fund (UNICEF), G7:20, 49
United Nations Committee on Economic, Social and Cultural Rights, G8:14
United Nations Committee on the Rights of the Child, G7:20, 49, G8:4-5, 20, 34, 60
United Nations High Commissioner for Refugees (UNHCR)
competence, G3:3, G13: 6
establishment, H:14
Executive Committee, *see* Executive Committee
mandate for statelessness, G7:43-44
mandate refugees, *see* mandate
obligations, G5:1
Statute of, H:13-19
supervisory responsibility, H:12, 19, G3:25

AR.08331

United Nations Korean Reconstruction Agency (UNKRA), H:142
United Nations Relief and Works Agency for Palestine Refugees In The Near East (UNRWA), H:142-143, *See* G13
Universal Declaration of Human Rights (1950)
    asylum, in the spirit of, H:25
    rights and freedoms, H:71, 181, G6:2 G7:43, G8:41, G9:5, G10:8

Vienna Convention on Diplomatic Relations (1961), H:88
victims
    child, G7:27-28, 49, G8:27-28, 33, 37, 59, *see* children
    of assault, G9:60
    of human rights violations, G12:76
    of persecution, H:39, 54, 63
    of sexual violence, G1:36, G12:27
    of trafficking, *see* trafficking
victimization, H:34
violence
    armed conflict and, *see* G12, G13:21
    children, against, *see* children
    domestic, *see* domestic violence
    egregious acts of, G5:15, *see also* crime(s)
    gang violence/violence, from organized criminal groups, G12:84
    gender-related, *see* violence
    generalised, G10:42, G11:5, G12:5, 58, 7-73, 75
    global awareness of, G8:3
    non-State actors, G2:20
    perpetrators of, H:175-179, G1:36, G8:32
    political, H:175
    sexual, *see* sexual violence
    threat of, G13:21
    trafficking, *see* trafficking
    unlawful, G5:19
    witness of, G3:20
voluntary
    *see* cessation
    departure from UNRWA protection, G13:26
    gender reassignment surgery, G9:21
    migration, H:62
    military service, *see* G10
    re-availment of national protection, H:119
vulnerable groups
    children, G8:7, 14
    trafficking, G7:20, 31-32, 35-36, 40

war
    civil, G10:42
    crimes, H:147, 150, 162, 178, G5:3,12, 24, G7:3, G10:12, 22, 30, 46, G12:14, 59
    criminals, H:148
    conscientious objection, *see* G10
    prisoners, H:95
    refugees, H:164-166
    state protection, H:98
warfare, G10:21, G12:32
    methods of, G10:21, 27, G12:91
    objection to means and methods of, G10:26-30
well-founded fear
    armed conflict and violence, G12:11, 17-19, 21-25, 29, 31

AR.08332

assessment, H:41, 43, 45-49, 52, 55, 58, 66, 96, 209, G4:7, 15, G6:14, 26, G6:29, G7:17, G8:11, 37, 40

burden of proof, H:67

cessation, H:113, 114, 115, 126, 131, 135, G3:8, 11, 25, G11:28

children, H:213, 215, 217, 218, 219, G8:4, 11, 17, 23-24, 28, 37, 43, 72

elements, H:37-38, 39, 42, 206, 211, G6:20, G7:11, G8:11, *see* also element

exaggerated, H:41, 209, G8:11

exclusion, H:156, 158, 161, 180, G5:25, G8:64

gender-related persecution, G1:4, 9, 10, 20, 23, 25, 32, 35, 36, G2:19, G6:24,
      *see also* gender-related persecution

habitual residence, H:103, G7:26, 27

internal protection/flight/relocation alternative, H:91, G4:3, 6, 7, 8, 13, 20, 22-23

membership of a particular social group, H:70, 77, 79, G2:1, 2, 14, 16, 19, 20,G7:37-39, G8:51

military service, G10:20
      child recruitment, G10:38
      desertion/draft-evasion, H:167, 168, 169, G10:46
      race/nationality, G10:55
      religion, G10 66

nationality, H:74, 76, 89, 90, 98, 100, 107, 126, 131, G7:26-27

political opinion, H:80, 82-84, 86, G1:32, G8:45

post-departure, G6:35-36

refugee definition, H:6, 34, G6:3, G8:4, G10:47-48, 57, G12:10-30

sexual orientation, G9:16-19, 28, 38-39, 42

stateless, H:104

sur place, H:94, 96, G7:25

trafficking, G7:5, 11, 17, 18, 23, 25-28, 37, 48, G8:24, 28

war refugees, H:165-166

women, G1
      as a particular social group, *see* membership of a particular social group
      asylum-seekers, *see* asylum-seeker
      gender, *see* gender; gender-related persecution
      roles/codes ascribed to, G1:25-26, G8:47
      sexual orientation, G9:10, 14-15, 23, 41, 56, 60
      social subset, as, G2:12, G7:38
      trafficked, *see* trafficking
      violence against, G10:59
      witches, G6:24

worship, H:71-72, G6:11-12, G10:65


Yogyakarta Principles, G9: 7

AR.08334



AR.08335

# Universal Declaration of Human Rights

---

*Adopted and proclaimed by General Assembly resolution 217 A (III) of 10 December 1948*

**On December 10, 1948 the General Assembly of the United Nations adopted and proclaimed the Universal Declaration of Human Rights the full text of which appears in the following pages. Following this historic act the Assembly called upon all Member countries to publicize the text of the Declaration and "to cause it to be disseminated, displayed, read and expounded principally in schools and other educational institutions, without distinction based on the political status of countries or territories."**

## *PREAMBLE*

Whereas recognition of the inherent dignity and of the equal and inalienable rights of all members of the human family is the foundation of freedom, justice and peace in the world,

Whereas disregard and contempt for human rights have resulted in barbarous acts which have outraged the conscience of mankind, and the advent of a world in which human beings shall enjoy freedom of speech and belief and freedom from fear and want has been proclaimed as the highest aspiration of the common people,

Whereas it is essential, if man is not to be compelled to have recourse, as a last resort, to rebellion against tyranny and oppression, that human rights should be protected by the rule of law,

Whereas it is essential to promote the development of friendly relations between nations,

Whereas the peoples of the United Nations have in the Charter reaffirmed their faith in fundamental human rights, in the dignity and worth of the human person and in the equal rights of men and women and have determined to promote social progress and better standards of life in larger freedom,

Whereas Member States have pledged themselves to achieve, in co-operation with the United Nations, the promotion of universal respect for and observance of human rights and fundamental freedoms,

Whereas a common understanding of these rights and freedoms is of the greatest importance for the full realization of this pledge,

AR.08336

**Now, Therefore THE GENERAL ASSEMBLY proclaims THIS UNIVERSAL DECLARATION OF HUMAN RIGHTS** as a common standard of achievement for all peoples and all nations, to the end that every individual and every organ of society, keeping this Declaration constantly in mind, shall strive by teaching and education to promote respect for these rights and freedoms and by progressive measures, national and international, to secure their universal and effective recognition and observance, both among the peoples of Member States themselves and among the peoples of territories under their jurisdiction.

### *Article 1.*

All human beings are born free and equal in dignity and rights. They are endowed with reason and conscience and should act towards one another in a spirit of brotherhood.

### *Article 2.*

Everyone is entitled to all the rights and freedoms set forth in this Declaration, without distinction of any kind, such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status. Furthermore, no distinction shall be made on the basis of the political, jurisdictional or international status of the country or territory to which a person belongs, whether it be independent, trust, non-self-governing or under any other limitation of sovereignty.

### *Article 3.*

Everyone has the right to life, liberty and security of person.

### *Article 4.*

No one shall be held in slavery or servitude; slavery and the slave trade shall be prohibited in all their forms.

### *Article 5.*

No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment.

### *Article 6.*

Everyone has the right to recognition everywhere as a person before the law.

### *Article 7.*

All are equal before the law and are entitled without any discrimination to equal protection of the law. All are entitled to equal protection against any discrimination in violation of this Declaration and against any incitement to such discrimination.

### *Article 8.*

Everyone has the right to an effective remedy by the competent national tribunals for acts violating the

AR.08337

fundamental rights granted him by the constitution or by law.

### Article 9.

No one shall be subjected to arbitrary arrest, detention or exile.

### Article 10.

Everyone is entitled in full equality to a fair and public hearing by an independent and impartial tribunal, in the determination of his rights and obligations and of any criminal charge against him.

### Article 11.

(1) Everyone charged with a penal offence has the right to be presumed innocent until proved guilty according to law in a public trial at which he has had all the guarantees necessary for his defence.

(2) No one shall be held guilty of any penal offence on account of any act or omission which did not constitute a penal offence, under national or international law, at the time when it was committed. Nor shall a heavier penalty be imposed than the one that was applicable at the time the penal offence was committed.

### Article 12.

No one shall be subjected to arbitrary interference with his privacy, family, home or correspondence, nor to attacks upon his honour and reputation. Everyone has the right to the protection of the law against such interference or attacks.

### Article 13.

(1) Everyone has the right to freedom of movement and residence within the borders of each state.

(2) Everyone has the right to leave any country, including his own, and to return to his country.

### Article 14.

(1) Everyone has the right to seek and to enjoy in other countries asylum from persecution.

(2) This right may not be invoked in the case of prosecutions genuinely arising from non-political crimes or from acts contrary to the purposes and principles of the United Nations.

### Article 15.

(1) Everyone has the right to a nationality.

(2) No one shall be arbitrarily deprived of his nationality nor denied the right to change his nationality.

### Article 16.

(1) Men and women of full age, without any limitation due to race, nationality or religion, have the right to marry and to found a family. They are entitled to equal rights as to marriage, during marriage and at its dissolution.

(2) Marriage shall be entered into only with the free and full consent of the intending spouses.

(3) The family is the natural and fundamental group unit of society and is entitled to protection by society and the State.

### Article 17.

(1) Everyone has the right to own property alone as well as in association with others.

(2) No one shall be arbitrarily deprived of his property.

### Article 18.

Everyone has the right to freedom of thought, conscience and religion; this right includes freedom to change his religion or belief, and freedom, either alone or in community with others and in public or private, to manifest his religion or belief in teaching, practice, worship and observance.

### Article 19.

Everyone has the right to freedom of opinion and expression; this right includes freedom to hold opinions without interference and to seek, receive and impart information and ideas through any media and regardless of frontiers.

### Article 20.

(1) Everyone has the right to freedom of peaceful assembly and association.

(2) No one may be compelled to belong to an association.

### Article 21.

(1) Everyone has the right to take part in the government of his country, directly or through freely chosen representatives.

(2) Everyone has the right of equal access to public service in his country.

(3) The will of the people shall be the basis of the authority of government; this will shall be expressed in periodic and genuine elections which shall be by universal and equal suffrage and shall be held by secret vote or by equivalent free voting procedures.

AR.08339

*Article 22.*

Everyone, as a member of society, has the right to social security and is entitled to realization, through national effort and international co-operation and in accordance with the organization and resources of each State, of the economic, social and cultural rights indispensable for his dignity and the free development of his personality.

*Article 23.*

(1) Everyone has the right to work, to free choice of employment, to just and favourable conditions of work and to protection against unemployment.

(2) Everyone, without any discrimination, has the right to equal pay for equal work.

(3) Everyone who works has the right to just and favourable remuneration ensuring for himself and his family an existence worthy of human dignity, and supplemented, if necessary, by other means of social protection.

(4) Everyone has the right to form and to join trade unions for the protection of his interests.

*Article 24.*

Everyone has the right to rest and leisure, including reasonable limitation of working hours and periodic holidays with pay.

*Article 25.*

(1) Everyone has the right to a standard of living adequate for the health and well-being of himself and of his family, including food, clothing, housing and medical care and necessary social services, and the right to security in the event of unemployment, sickness, disability, widowhood, old age or other lack of livelihood in circumstances beyond his control.

(2) Motherhood and childhood are entitled to special care and assistance. All children, whether born in or out of wedlock, shall enjoy the same social protection.

*Article 26.*

(1) Everyone has the right to education. Education shall be free, at least in the elementary and fundamental stages. Elementary education shall be compulsory. Technical and professional education shall be made generally available and higher education shall be equally accessible to all on the basis of merit.

(2) Education shall be directed to the full development of the human personality and to the strengthening of respect for human rights and fundamental freedoms. It shall promote understanding, tolerance and friendship among all nations, racial or religious groups, and shall further the activities of the United Nations for the maintenance of peace.

AR.08340

(3) Parents have a prior right to choose the kind of education that shall be given to their children.

## Article 27.

(1) Everyone has the right freely to participate in the cultural life of the community, to enjoy the arts and to share in scientific advancement and its benefits.

(2) Everyone has the right to the protection of the moral and material interests resulting from any scientific, literary or artistic production of which he is the author.

## Article 28.

Everyone is entitled to a social and international order in which the rights and freedoms set forth in this Declaration can be fully realized.

## Article 29.

(1) Everyone has duties to the community in which alone the free and full development of his personality is possible.

(2) In the exercise of his rights and freedoms, everyone shall be subject only to such limitations as are determined by law solely for the purpose of securing due recognition and respect for the rights and freedoms of others and of meeting the just requirements of morality, public order and the general welfare in a democratic society.

(3) These rights and freedoms may in no case be exercised contrary to the purposes and principles of the United Nations.

## Article 30.

Nothing in this Declaration may be interpreted as implying for any State, group or person any right to engage in any activity or to perform any act aimed at the destruction of any of the rights and freedoms set forth herein.

📒 KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted  Limited on Constitutional Grounds by  U.S. v. Booker,  U.S.,  Jan. 12, 2005

---

United States Code Annotated
  Federal Sentencing Guidelines (Refs & Annos)
    Chapter Two. Offense Conduct (Refs & Annos)
      Part L. Offenses Involving Immigration, Naturalization, and Passports
        1. Immigration

---

USSG, § 2L1.2, 18 U.S.C.A.

§ 2L1.2. Unlawfully Entering or Remaining in the United States

Currentness

**(a)** Base Offense Level: 8

**(b)** Specific Offense Characteristics

  **(1)** (Apply the Greater) If the defendant committed the instant offense after sustaining--

    **(A)** a conviction for a felony that is an illegal reentry offense, increase by 4 levels; or

    **(B)** two or more convictions for misdemeanors under 8 U.S.C. § 1325(a), increase by 2 levels.

  **(2)** (Apply the Greatest) If, before the defendant was ordered deported or ordered removed from the United States for the first time, the defendant engaged in criminal conduct that, at any time, resulted in--

    **(A)** a conviction for a felony offense (other than an illegal reentry offense) for which the sentence imposed was five years or more, increase by 10 levels;

    **(B)** a conviction for a felony offense (other than an illegal reentry offense) for which the sentence imposed was two years or more, increase by 8 levels;

    **(C)** a conviction for a felony offense (other than an illegal reentry offense) for which the sentence imposed exceeded one year and one month, increase by 6 levels;

    **(D)** a conviction for any other felony offense (other than an illegal reentry offense), increase by 4 levels; or

    **(E)** three or more convictions for misdemeanors that are crimes of violence or drug trafficking offenses, increase by 2 levels.

---

AR.08342

**(3)** (Apply the Greatest) If, after the defendant was ordered deported or ordered removed from the United States for the first time, the defendant engaged in criminal conduct that, at any time, resulted in--

**(A)** a conviction for a felony offense (other than an illegal reentry offense) for which the sentence imposed was five years or more, increase by 10 levels;

**(B)** a conviction for a felony offense (other than an illegal reentry offense) for which the sentence imposed was two years or more, increase by 8 levels;

**(C)** a conviction for a felony offense (other than an illegal reentry offense) for which the sentence imposed exceeded one year and one month, increase by 6 levels;

**(D)** a conviction for any other felony offense (other than an illegal reentry offense), increase by 4 levels; or

**(E)** three or more convictions for misdemeanors that are crimes of violence or drug trafficking offenses, increase by 2 levels.

## CREDIT(S)

(Effective November 1, 1987; amended effective January 15, 1988; November 1, 1989; November 1, 1991; November 1, 1995; November 1, 1997; November 1, 2001; November 1, 2002; November 1, 2003; November 1, 2007; November 1, 2008; November 1, 2010; November 1, 2011; November 1, 2012; November 1, 2014; November 1, 2015; November 1, 2016; November 1, 2018.)

## COMMENTARY

<**Statutory Provisions:** 8 U.S.C. § 1253, § 1325(a) (second or subsequent offense only), § 1326. For additional statutory provision(s), see Appendix A (Statutory Index).>

<**Application Notes**>

<**1. In General.**--><br>
<**(A) "Ordered Deported or Ordered Removed from the United States for the First Time".**--For purposes of this guideline, a defendant shall be considered "ordered deported or ordered removed from the United States" if the defendant was ordered deported or ordered removed from the United States based on a final order of exclusion, deportation, or removal, regardless of whether the order was in response to a conviction. "For the first time" refers to the first time the defendant was ever the subject of such an order.>

<**(B) Offenses Committed Prior to Age Eighteen.**--Subsections (b)(1), (b)(2), and (b)(3) do not apply to a conviction for an offense committed before the defendant was eighteen years of age unless such conviction is classified as an adult conviction under the laws of the jurisdiction in which the defendant was convicted.>

<**2. Definitions.**--For purposes of this guideline:>

<"Crime of violence" means any of the following offenses under federal, state, or local law: murder, voluntary manslaughter, kidnapping, aggravated assault, a forcible sex offense, robbery, arson, extortion, the use or unlawful possession of a firearm described in 26 U.S.C. § 5845(a) or explosive material as defined in 18 U.S.C. § 841(c), or any other offense under federal, state, or local law that has as an element the use, attempted use, or threatened use of physical force against the person of another. "Forcible sex offense" includes where consent to the conduct is not given or is not legally valid, such as where consent to the conduct is involuntary, incompetent, or coerced. The offenses of sexual abuse of a minor and statutory rape are included only if the sexual abuse of a minor or statutory rape was (A) an offense described in 18 U.S.C. § 2241(c) or (B) an offense under state law that would have been an offense under section 2241(c) if the offense had occurred within the special maritime and territorial jurisdiction of the United States. "Extortion" is obtaining something of value from another by the wrongful use of (A) force, (B) fear of physical injury, or (C) threat of physical injury.>

<"Drug trafficking offense" means an offense under federal, state, or local law that prohibits the manufacture, import, export, distribution, or dispensing of, or offer to sell a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense.>

<"Felony" means any federal, state, or local offense punishable by imprisonment for a term exceeding one year.>

<"Illegal reentry offense" means (A) an offense under 8 U.S.C. § 1253 or § 1326, or (B) a second or subsequent offense under 8 U.S.C. § 1325(a).>

<"Misdemeanor" means any federal, state, or local offense punishable by a term of imprisonment of one year or less.>

<"Sentence imposed" has the meaning given the term "sentence of imprisonment" in Application Note 2 and subsection (b) of § 4A1.2 (Definitions and Instructions for Computing Criminal History). The length of the sentence imposed includes any term of imprisonment given upon revocation of probation, parole, or supervised release, regardless of when the revocation occurred.>

<**3. Criminal History Points.--**For purposes of applying subsections (b)(1), (b)(2), and (b)(3), use only those convictions that receive criminal history points under § 4A1.1(a), (b), or (c). In addition, for purposes of subsections (b)(1)(B), (b)(2)(E), and (b)(3)(E), use only those convictions that are counted separately under § 4A1.2(a)(2).>

<A conviction taken into account under subsection (b)(1), (b)(2), or (b)(3) is not excluded from consideration of whether that conviction receives criminal history points pursuant to Chapter Four, Part A (Criminal History).>

<**4. Cases in Which Sentences for An Illegal Reentry Offense and Another Felony Offense were Imposed at the Same Time.--**There may be cases in which the sentences for an illegal reentry offense and another felony offense were imposed at the same time and treated as a single sentence for purposes of calculating the criminal history score under § 4A1.1(a), (b), and (c). In such a case, use the illegal reentry offense in determining the appropriate enhancement under subsection (b)(1), if it independently would have received criminal history points. In addition, use the prior sentence for the other felony offense in determining the appropriate enhancement under subsection (b)(2) or (b)(3), as appropriate, if it independently would have received criminal history points.>

<**5. Cases in Which the Criminal Conduct Underlying a Prior Conviction Occurred Both Before and After the Defendant Was First Ordered Deported or Ordered Removed.--**There may be cases in which the criminal conduct underlying a prior conviction occurred both before and after the defendant was ordered deported or ordered removed from the United States for the first time. For purposes of subsections (b)(2) and (b)(3), count such a conviction only under subsection (b)(2).>

<6. Departure Based on Seriousness of a Prior Offense.--There may be cases in which the offense level provided by an enhancement in subsection (b)(2) or (b)(3) substantially understates or overstates the seriousness of the conduct underlying the prior offense, because (A) the length of the sentence imposed does not reflect the seriousness of the prior offense; (B) the prior conviction is too remote to receive criminal history points (see § 4A1.2(e)); or (C) the time actually served was substantially less than the length of the sentence imposed for the prior offense. In such a case, a departure may be warranted.>

<7. Departure Based on Time Served in State Custody.--In a case in which the defendant is located by immigration authorities while the defendant is serving time in state custody, whether pre- or post-conviction, for a state offense, the time served is not covered by an adjustment under § 5G1.3(b) and, accordingly, is not covered by a departure under § 5K2.23 (Discharged Terms of Imprisonment). See § 5G1.3(a). In such a case, the court may consider whether a departure is appropriate to reflect all or part of the time served in state custody, from the time immigration authorities locate the defendant until the service of the federal sentence commences, that the court determines will not be credited to the federal sentence by the Bureau of Prisons. Any such departure should be fashioned to achieve a reasonable punishment for the instant offense.>

<Such a departure should be considered only in cases where the departure is not likely to increase the risk to the public from further crimes of the defendant. In determining whether such a departure is appropriate, the court should consider, among other things, (A) whether the defendant engaged in additional criminal activity after illegally reentering the United States; (B) the seriousness of any such additional criminal activity, including (1) whether the defendant used violence or credible threats of violence or possessed a firearm or other dangerous weapon (or induced another person to do so) in connection with the criminal activity, (2) whether the criminal activity resulted in death or serious bodily injury to any person, and (3) whether the defendant was an organizer, leader, manager, or supervisor of others in the criminal activity; and (C) the seriousness of the defendant's other criminal history.>

<8. Departure Based on Cultural Assimilation.--There may be cases in which a downward departure may be appropriate on the basis of cultural assimilation. Such a departure should be considered only in cases where (A) the defendant formed cultural ties primarily with the United States from having resided continuously in the United States from childhood, (B) those cultural ties provided the primary motivation for the defendant's illegal reentry or continued presence in the United States, and (C) such a departure is not likely to increase the risk to the public from further crimes of the defendant.>

<In determining whether such a departure is appropriate, the court should consider, among other things, (1) the age in childhood at which the defendant began residing continuously in the United States, (2) whether and for how long the defendant attended school in the United States, (3) the duration of the defendant's continued residence in the United States, (4) the duration of the defendant's presence outside the United States, (5) the nature and extent of the defendant's familial and cultural ties inside the United States, and the nature and extent of such ties outside the United States, (6) the seriousness of the defendant's criminal history, and (7) whether the defendant engaged in additional criminal activity after illegally reentering the United States.>

Notes of Decisions (544)

Federal Sentencing Guidelines, § 2L1.2, 18 U.S.C.A., FSG § 2L1.2
As amended to 10-14-20

---

**End of Document**                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted  Limited on Constitutional Grounds by   U.S. v. Booker,   U.S.,   Jan. 12, 2005

United States Code Annotated
   Federal Sentencing Guidelines (Refs & Annos)
     Chapter Four. Criminal History and Criminal Livelihood (Refs & Annos)
      Part A. Criminal History (Refs & Annos)

USSG, § 4A1.2, 18 U.S.C.A.

§ 4A1.2. Definitions and Instructions for Computing Criminal History

Currentness

**(a) Prior Sentence**

**(1)** The term "prior sentence" means any sentence previously imposed upon adjudication of guilt, whether by guilty plea, trial, or plea of nolo contendere, for conduct not part of the instant offense.

**(2)** If the defendant has multiple prior sentences, determine whether those sentences are counted separately or treated as a single sentence. Prior sentences always are counted separately if the sentences were imposed for offenses that were separated by an intervening arrest (i.e., the defendant is arrested for the first offense prior to committing the second offense). If there is no intervening arrest, prior sentences are counted separately unless (A) the sentences resulted from offenses contained in the same charging instrument; or (B) the sentences were imposed on the same day. Treat any prior sentence covered by (A) or (B) as a single sentence. See also § 4A1.1(e).

For purposes of applying § 4A1.1(a), (b), and (c), if prior sentences are treated as a single sentence, use the longest sentence of imprisonment if concurrent sentences were imposed. If consecutive sentences were imposed, use the aggregate sentence of imprisonment.

**(3)** A conviction for which the imposition or execution of sentence was totally suspended or stayed shall be counted as a prior sentence under § 4A1.1(c).

**(4)** Where a defendant has been convicted of an offense, but not yet sentenced, such conviction shall be counted as if it constituted a prior sentence under § 4A1.1(c) if a sentence resulting from that conviction otherwise would be countable. In the case of a conviction for an offense set forth in § 4A1.2(c)(1), apply this provision only where the sentence for such offense would be countable regardless of type or length.

"Convicted of an offense," for the purposes of this provision, means that the guilt of the defendant has been established, whether by guilty plea, trial, or plea of nolo contendere.

**(b) Sentence of Imprisonment Defined**

**(1)** The term "sentence of imprisonment" means a sentence of incarceration and refers to the maximum sentence imposed.

**(2)** If part of a sentence of imprisonment was suspended, "sentence of imprisonment" refers only to the portion that was not suspended.

**(c) Sentences Counted and Excluded**

Sentences for all felony offenses are counted. Sentences for misdemeanor and petty offenses are counted, except as follows:

**(1)** Sentences for the following prior offenses and offenses similar to them, by whatever name they are known, are counted only if (A) the sentence was a term of probation of more than one year or a term of imprisonment of at least thirty days, or (B) the prior offense was similar to an instant offense:

Careless or reckless driving

Contempt of court

Disorderly conduct or disturbing the peace

Driving without a license or with a revoked or suspended license

False information to a police officer

Gambling

Hindering or failure to obey a police officer

Insufficient funds check

Leaving the scene of an accident

Non-support

Prostitution

Resisting arrest

Trespassing.

**(2)** Sentences for the following prior offenses and offenses similar to them, by whatever name they are known, are never counted:

Fish and game violations

Hitchhiking

Juvenile status offenses and truancy

Local ordinance violations (except those violations that are also violations under state criminal law)

Loitering

Minor traffic infractions (e.g., speeding)

Public intoxication

Vagrancy.

**(d) Offenses Committed Prior to Age Eighteen**

**(1)** If the defendant was convicted as an adult and received a sentence of imprisonment exceeding one year and one month, add 3 points under § 4A1.1(a) for each such sentence.

**(2)** In any other case,

**(A)** add 2 points under § 4A1.1(b) for each adult or juvenile sentence to confinement of at least sixty days if the defendant was released from such confinement within five years of his commencement of the instant offense;

**(B)** add 1 point under § 4A1.1(c) for each adult or juvenile sentence imposed within five years of the defendant's commencement of the instant offense not covered in (A).

**(e) Applicable Time Period**

**(1)** Any prior sentence of imprisonment exceeding one year and one month that was imposed within fifteen years of the defendant's commencement of the instant offense is counted. Also count any prior sentence of imprisonment exceeding one year and one month, whenever imposed, that resulted in the defendant being incarcerated during any part of such fifteen-year period.

**(2)** Any other prior sentence that was imposed within ten years of the defendant's commencement of the instant offense is counted.

**(3)** Any prior sentence not within the time periods specified above is not counted.

**(4)** The applicable time period for certain sentences resulting from offenses committed prior to age eighteen is governed by § 4A1.2(d)(2).

**(f) Diversionary Dispositions**

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Diversion from the judicial process without a finding of guilt (e.g., deferred prosecution) is not counted. A diversionary disposition resulting from a finding or admission of guilt, or a plea of nolo contendere, in a judicial proceeding is counted as a sentence under § 4A1.1(c) even if a conviction is not formally entered, except that diversion from juvenile court is not counted.

**(g) Military Sentences**

Sentences resulting from military offenses are counted if imposed by a general or special court-martial. Sentences imposed by a summary court-martial or Article 15 proceeding are not counted.

**(h) Foreign Sentences**

Sentences resulting from foreign convictions are not counted, but may be considered under § 4A1.3 (Departures Based on Inadequacy of Criminal History Category (Policy Statement)).

**(i) Tribal Court Sentences**

Sentences resulting from tribal court convictions are not counted, but may be considered under § 4A1.3 (Departures Based on Inadequacy of Criminal History Category (Policy Statement)).

**(j) Expunged Convictions**

Sentences for expunged convictions are not counted, but may be considered under § 4A1.3 (Departures Based on Inadequacy of Criminal History Category (Policy Statement)).

**(k) Revocations of Probation, Parole, Mandatory Release, or Supervised Release**

**(1)** In the case of a prior revocation of probation, parole, supervised release, special parole, or mandatory release, add the original term of imprisonment to any term of imprisonment imposed upon revocation. The resulting total is used to compute the criminal history points for § 4A1.1(a), (b), or (c), as applicable.

**(2)** Revocation of probation, parole, supervised release, special parole, or mandatory release may affect the time period under which certain sentences are counted as provided in § 4A1.2(d)(2) and (e). For the purposes of determining the applicable time period, use the following: (A) in the case of an adult term of imprisonment totaling more than one year and one month, the date of last release from incarceration on such sentence (see § 4A1.2(e)(1)); (B) in the case of any other confinement sentence for an offense committed prior to the defendant's eighteenth birthday, the date of the defendant's last release from confinement on such sentence (see § 4A1.2(d)(2)(A)); and (C) in any other case, the date of the original sentence (see § 4A1.2(d)(2)(B) and (e)(2)).

**(l) Sentences on Appeal**

Prior sentences under appeal are counted except as expressly provided below. In the case of a prior sentence, the execution of which has been stayed pending appeal, § 4A1.1(a), (b), (c), (d), and (e) shall apply as if the execution of such sentence had not been stayed.

**(m) Effect of a Violation Warrant**

For the purposes of § 4A1.1(d), a defendant who commits the instant offense while a violation warrant from a prior sentence is outstanding (e.g., a probation, parole, or supervised release violation warrant) shall be deemed to be under a criminal justice sentence if that sentence is otherwise countable, even if that sentence would have expired absent such warrant.

**(n) Failure to Report for Service of Sentence of Imprisonment**

For the purposes of § 4A1.1(d), failure to report for service of a sentence of imprisonment shall be treated as an escape from such sentence.

**(o) Felony Offense**

For the purposes of § 4A1.2(c), a "felony offense" means any federal, state, or local offense punishable by death or a term of imprisonment exceeding one year, regardless of the actual sentence imposed.

**(p) Crime of Violence Defined**

For the purposes of § 4A1.1(e), the definition of "crime of violence" is that set forth in § 4B1.2(a).

### CREDIT(S)

(Effective November 1, 1987; amended effective November 1, 1989; November 1, 1990; November 1, 1991; November 1, 1992; November 1, 1993; November 1, 2007; November 1, 2010; November 1, 2011; November 1, 2012; November 1, 2013; November 1, 2015; November 1, 2018.)

### COMMENTARY

*<Application Notes:>*

<**1. Prior Sentence.** "Prior sentence" means a sentence imposed prior to sentencing on the instant offense, other than a sentence for conduct that is part of the instant offense. See § 4A1.2(a). A sentence imposed after the defendant's commencement of the instant offense, but prior to sentencing on the instant offense, is a prior sentence if it was for conduct other than conduct that was part of the instant offense. Conduct that is part of the instant offense means conduct that is relevant conduct to the instant offense under the provisions of § 1B1.3 (Relevant Conduct).>

<Under § 4A1.2(a)(4), a conviction for which the defendant has not yet been sentenced is treated as if it were a prior sentence under § 4A1.1(c) if a sentence resulting from such conviction otherwise would have been counted. In the case of an offense set forth in § 4A1.2(c)(1) (which lists certain misdemeanor and petty offenses), a conviction for which the defendant has not yet been sentenced is treated as if it were a prior sentence under § 4A1.2(a)(4) only where

the offense is similar to the instant offense (because sentences for other offenses set forth in § 4A1.2(c)(1) are counted only if they are of a specified type and length).>

<**2. Sentence of Imprisonment.** To qualify as a sentence of imprisonment, the defendant must have actually served a period of imprisonment on such sentence (or, if the defendant escaped, would have served time). See § 4A1.2(a)(3) and (b)(2). For the purposes of applying § 4A1.1(a), (b), or (c), the length of a sentence of imprisonment is the stated maximum (e.g., in the case of a determinate sentence of five years, the stated maximum is five years; in the case of an indeterminate sentence of one to five years, the stated maximum is five years; in the case of an indeterminate sentence for a term not to exceed five years, the stated maximum is five years; in the case of an indeterminate sentence for a term not to exceed the defendant's twenty-first birthday, the stated maximum is the amount of time in pre-trial detention plus the amount of time between the date of sentence and the defendant's twenty-first birthday). That is, criminal history points are based on the sentence pronounced, not the length of time actually served. See § 4A1.2(b)(1) and (2). A sentence of probation is to be treated as a sentence under § 4A1.1(c) unless a condition of probation requiring imprisonment of at least sixty days was imposed.>

<**3. Application of "Single Sentence" Rule (Subsection (a)(2)).--**>
  <**(A) Predicate Offenses.--**In some cases, multiple prior sentences are treated as a single sentence for purposes of calculating the criminal history score under § 4A1.1(a), (b), and (c). However, for purposes of determining predicate offenses, a prior sentence included in the single sentence should be treated as if it received criminal history points, if it independently would have received criminal history points. Therefore, an individual prior sentence may serve as a predicate under the career offender guideline (see § 4B1.2(c)) or other guidelines with predicate offenses, if it independently would have received criminal history points. However, because predicate offenses may be used only if they are counted "separately" from each other (see § 4B1.2(c)), no more than one prior sentence in a given single sentence may be used as a predicate offense.>

  <For example, a defendant's criminal history includes one robbery conviction and one theft conviction. The sentences for these offenses were imposed on the same day, eight years ago, and are treated as a single sentence under § 4A1.2(a)(2). If the defendant received a one-year sentence of imprisonment for the robbery and a two-year sentence of imprisonment for the theft, to be served concurrently, a total of 3 points is added under § 4A1.1(a). Because this particular robbery met the definition of a felony crime of violence and independently would have received 2 criminal history points under § 4A1.1(b), it may serve as a predicate under the career offender guideline.>

  <Note, however, that if the sentences in the example above were imposed thirteen years ago, the robbery independently would have received no criminal history points under § 4A1.1(b), because it was not imposed within ten years of the defendant's commencement of the instant offense. See § 4A1.2(e)(2). Accordingly, it may not serve as a predicate under the career offender guideline.>

  <**(B) Upward Departure Provision.--**Treating multiple prior sentences as a single sentence may result in a criminal history score that underrepresents the seriousness of the defendant's criminal history and the danger that the defendant presents to the public. In such a case, an upward departure may be warranted. For example, if a defendant was convicted of a number of serious non-violent offenses committed on different occasions, and the resulting sentences were treated as a single sentence because either the sentences resulted from offenses contained in the same charging instrument or the defendant was sentenced for these offenses on the same day, the assignment of a single set of points may not adequately reflect the seriousness of the defendant's criminal history or the frequency with which the defendant has committed crimes.>

<**4. Sentences Imposed in the Alternative.** A sentence which specifies a fine or other non-incarcerative disposition as an alternative to a term of imprisonment (e.g., $1,000 fine or ninety days' imprisonment) is treated as a non-imprisonment sentence.>

<**5. Sentences for Driving While Intoxicated or Under the Influence.** Convictions for driving while intoxicated or under the influence (and similar offenses by whatever name they are known) are always counted, without regard to how the offense is classified. Paragraphs (1) and (2) of § 4A1.2(c) do not apply.>

<**6. Reversed, Vacated, or Invalidated Convictions.** Sentences resulting from convictions that (A) have been reversed or vacated because of errors of law or because of subsequently discovered evidence exonerating the defendant, or (B) have been ruled constitutionally invalid in a prior case are not to be counted. With respect to the current sentencing proceeding, this guideline and commentary do not confer upon the defendant any right to attack collaterally a prior conviction or sentence beyond any such rights otherwise recognized in law (e.g., 21 U.S.C. § 851 expressly provides that a defendant may collaterally attack certain prior convictions).>

<Nonetheless, the criminal conduct underlying any conviction that is not counted in the criminal history score may be considered pursuant to § 4A1.3 (Departures Based on Inadequacy of Criminal History Category (Policy Statement)).>

<**7. Offenses Committed Prior to Age Eighteen.** Section 4A1.2(d) covers offenses committed prior to age eighteen. Attempting to count every juvenile adjudication would have the potential for creating large disparities due to the differential availability of records. Therefore, for offenses committed prior to age eighteen, only those that resulted in adult sentences of imprisonment exceeding one year and one month, or resulted in imposition of an adult or juvenile sentence or release from confinement on that sentence within five years of the defendant's commencement of the instant offense are counted. To avoid disparities from jurisdiction to jurisdiction in the age at which a defendant is considered a "juvenile," this provision applies to all offenses committed prior to age eighteen.>

<**8. Applicable Time Period.** Section 4A1.2(d)(2) and (e) establishes the time period within which prior sentences are counted. As used in § 4A1.2(d)(2) and (e), the term "commencement of the instant offense" includes any relevant conduct. See § 1B1.3 (Relevant Conduct). If the court finds that a sentence imposed outside this time period is evidence of similar, or serious dissimilar, criminal conduct, the court may consider this information in determining whether an upward departure is warranted under § 4A1.3 (Departures Based on Inadequacy of Criminal History Category (Policy Statement)).>

<**9. Diversionary Dispositions.** Section 4A1.2(f) requires counting prior adult diversionary dispositions if they involved a judicial determination of guilt or an admission of guilt in open court. This reflects a policy that defendants who receive the benefit of a rehabilitative sentence and continue to commit crimes should not be treated with further leniency.>

<**10. Convictions Set Aside or Defendant Pardoned.** A number of jurisdictions have various procedures pursuant to which previous convictions may be set aside or the defendant may be pardoned for reasons unrelated to innocence or errors of law, e.g., in order to restore civil rights or to remove the stigma associated with a criminal conviction. Sentences resulting from such convictions are to be counted. However, expunged convictions are not counted. § 4A1.2(j).>

<**11. Revocations to be Considered.** Section 4A1.2(k) covers revocations of probation and other conditional sentences where the original term of imprisonment imposed, if any, did not exceed one year and one month. Rather than count the original sentence and the resentence after revocation as separate sentences, the sentence given upon revocation should be added to the original sentence of imprisonment, if any, and the total should be counted as if it were one sentence. By this approach, no more than three points will be assessed for a single conviction, even if probation or conditional release was subsequently revoked. If the sentence originally imposed, the sentence imposed upon revocation, or the total of both sentences exceeded one year and one month, the maximum three points would

be assigned. If, however, at the time of revocation another sentence was imposed for a new criminal conviction, that conviction would be computed separately from the sentence imposed for the revocation.>

<Where a revocation applies to multiple sentences, and such sentences are counted separately under § 4A1.2(a)(2), add the term of imprisonment imposed upon revocation to the sentence that will result in the greatest increase in criminal history points. Example: A defendant was serving two probationary sentences, each counted separately under § 4A1.2(a)(2); probation was revoked on both sentences as a result of the same violation conduct; and the defendant was sentenced to a total of 45 days of imprisonment. If one sentence had been a "straight" probationary sentence and the other had been a probationary sentence that had required service of 15 days of imprisonment, the revocation term of imprisonment (45 days) would be added to the probationary sentence that had the 15-day term of imprisonment. This would result in a total of 2 criminal history points under § 4A1.1(b) (for the combined 60-day term of imprisonment) and 1 criminal history point under § 4A1.1(c) (for the other probationary sentence).>

**<12. Application of Subsection (c).-->**

<**(A) In General.**--In determining whether an unlisted offense is similar to an offense listed in subsection (c)(1) or (c)(2), the court should use a common sense approach that includes consideration of relevant factors such as (i) a comparison of punishments imposed for the listed and unlisted offenses; (ii) the perceived seriousness of the offense as indicated by the level of punishment; (iii) the elements of the offense; (iv) the level of culpability involved; and (v) the degree to which the commission of the offense indicates a likelihood of recurring criminal conduct.>

<**(B) Local Ordinance Violations.**-- A number of local jurisdictions have enacted ordinances covering certain offenses (e.g., larceny and assault misdemeanors) that are also violations of state criminal law. This enables a local court (e.g., a municipal court) to exercise jurisdiction over such offenses. Such offenses are excluded from the definition of local ordinance violations in § 4A1.2(c)(2) and, therefore, sentences for such offenses are to be treated as if the defendant had been convicted under state law.>

<**(C) Insufficient Funds Check.**-- "Insufficient funds check," as used in § 4A1.2(c)(1), does not include any conviction establishing that the defendant used a false name or non-existent account.>

<***Background:*** *Prior sentences, not otherwise excluded, are to be counted in the criminal history score, including uncounseled misdemeanor sentences where imprisonment was not imposed.*>

Notes of Decisions (595)

Federal Sentencing Guidelines, § 4A1.2, 18 U.S.C.A., FSG § 4A1.2
As amended to 10-14-20

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:20-cv-07721-SI    Document 58-7    Filed 11/10/20    Page 946 of 1305

§ 5G1.1.Sentencing on a Single Count of Conviction, FCJ Federal Sentencing...

**FCJ Federal Sentencing Guidelines Manual § 5G1.1 (11/1/18)**

**United States Sentencing Commission**  |  November 2018 Update

**Guidelines Manual**

Effective November 1, 1987, Including Amendments Effective January 15, 1988 through November 1, 2018 [*]

**Chapter Five. Determining the Sentence**

**Part G. Implementing the Total Sentence of Imprisonment**

# § 5G1.1. <u>Sentencing on a Single Count of Conviction</u>

(a) Where the statutorily authorized maximum sentence is less than the minimum of the applicable guideline range, the statutorily authorized maximum sentence shall be the guideline sentence.

(b) Where a statutorily required minimum sentence is greater than the maximum of the applicable guideline range, the statutorily required minimum sentence shall be the guideline sentence.

(c) In any other case, the sentence may be imposed at any point within the applicable guideline range, provided that the sentence

   (1) is not greater than the statutorily authorized maximum sentence, and

   (2) is not less than any statutorily required minimum sentence.

**<u>Commentary</u>**

This section describes how the statutorily authorized maximum sentence, or a statutorily required minimum sentence, may affect the determination of a sentence under the guidelines. For example, if the applicable guideline range is 51-63 months and the maximum sentence authorized by statute for the offense of conviction is 48 months, the sentence required by the guidelines under subsection (a) is 48 months; a sentence of less than 48 months would be a guideline departure. If the applicable guideline range is 41-51 months and there is a statutorily required minimum sentence of 60 months, the sentence required by the guidelines under subsection (b) is 60 months; a sentence of more than 60 months would be a guideline departure. If the applicable guideline range is 51-63 months and the maximum sentence authorized by statute for the offense of conviction is 60 months, the guideline range is restricted to 51-60 months under subsection (c).

 <u>Historical Note</u>: Effective November 1, 1987. Amended effective November 1, 1989 (<u>see</u> Appendix C, amendment 286).

Westlaw. © 2018 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

**Footnotes**

[*]         Incorporating amendments effective January 15, 1988; June 15, 1988; October 15, 1988; November 1, 1989; November 1, 1990; November 27, 1991; November 1, 1992; November 1, 1993; September 23, 1994; November 1, 1994; November 1, 1995; November 1, 1996; May 1, 1997; November 1, 1997; November 1, 1998; May 1, 2000; November 1, 2000; December 16, 2000; May 1, 2001; November 1, 2001; November 1, 2002; January 25, 2003; April 30, 2003; October 27, 2003;

Case 3:20-cv-07721-SI   Document 58-7   Filed 11/10/20   Page 947 of 1305

November 1, 2003; November 5, 2003; November 1, 2004; October 24, 2005; November 1, 2005; March 27, 2006; September 12, 2006; November 1, 2006; May 1, 2007; November 1, 2007; February 6, 2008; March 3, 2008; May 1, 2008; November 1, 2008; November 1, 2009; November 1, 2010; November 1, 2011; November 1, 2012; November 1, 2013; November 1, 2014; November 1, 2015; August 1, 2016; November 1, 2016; and November 1, 2018.

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# PUBLIC SUBMISSION

**As of:** 11/10/20 1:04 PM
**Received:** January 04, 2020
**Status:** Deferred
**Tracking No.** 1k4-9e9f-f8vx
**Comments Due:** January 21, 2020
**Submission Type:** API

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-DRAFT-0023
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Alegria Martinez
**Address:**
  4901 24th ave nw
  Rochester,  MN,  55901
**Email:** alvarez8092960575@gmail.com
**Phone:** 5073191213
**Organization:** Otra oportunidades para seguir con vida

---

## General Comment

El asilo no debe tener ninguna barrera ya que est figura del asilo busca proteger a las personas para que siga con con vida si ese derecho se restringe es como si condenaramos a muerte a los solicitantes de asilo que vienen huyendo a la muerte de pases que no valoran la vida ni tampoco respetan la dignidad de las personas sin el hecho de decir que ellos son ciudadanos de su pas de origen es decir se entiende que una persona debe poseer los mismos derechos que quienes los persiguen y lo quieren matar todo parece que nacer pobre es una condena de muerte

A los millonarios nadie lo persigue ni el estado ni grupos armados los millonarios viven su vida muy bien y hacen lo que le da la gana

Para que una persona que viene a Estados Unidos a pedir asilo esas personas si se le da la oportunidad de residir legalmente lo valorarn y harn todo por conservar su estatus como la nica oportunidad de vida que ellos tienen

Y como en todo puede aparecer alguien que solicite asilo y no se comporte como estados unidos quisiera entonce a esa personas es que se le debe aplicar todo peso de la ley y expulsarlo

Pero no apliquen una regla que afecte a todos y por favor busque la estadsticas de las personas que le han otorgado asilo y miren su historial tanto criminal como moral y su buen carcter y vern que esos aislados se comportan excentemente y agradecen infinitamente esta gran oportunidad

AR.08356

# PUBLIC SUBMISSION

**As of:** 11/10/20 1:11 PM
**Received:** January 11, 2020
**Status:** DoNotPost
**Tracking No.** 1k4-9edk-7f1f
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-DRAFT-0047
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Jay Martin Steinman
**Address:**
  1202 Hampshire Street
  Apt 13
  San Francisco, CA, 94110
**Email:** jaysteinman@hotmail.com

## General Comment

I wish to register my strong opposition to the proposed rule. It creates new limits to asylum which tread a path that Congress declined to take. The United States has a duty under treaty and domestic law to maintain a functioning asylum system; the proposed rule is just the latest in a series of measures to destroy that system from within. I have worked with asylum seekers for over ten years, and have known a good many with compelling asylum cases which would have been thrown out if the proposed rule were in effect. As it is, adjudicators are able to weigh any criminal history against other factors, and make a balanced determination whether asylum is warranted. The proposed rule would take away that discretion for a whole new class of cases, forcing them to be dismissed out of hand. I have seen the process up close, and know the importance of letting those claims be heard, argued, and considered. I urge the government to rescind the proposed rule.

Please see the attached letter for my full comments.

## Attachments

Regulations_comment_Proposed_rule_84 _FR_69640

# PUBLIC SUBMISSION

**As of:** 11/10/20 1:11 PM
**Received:** January 14, 2020
**Status:** Deferred
**Tracking No.** 1k4-9efw-ujuu
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-DRAFT-0074
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Guillermina Castellanos
**Address:**
    gcastellanos@dscs.org
    San Francisco, CA, 94110
**Phone:** 415 4107139

---

## General Comment

El president Trump no debe de jugar con la vida de las personas que piden asilo porque su vida esta en riesgo. El asilo es un derecho para salvar la vidas humanas.

# PUBLIC SUBMISSION

**As of:** 11/10/20 1:12 PM
**Received:** January 15, 2020
**Status:** DoNotPost
**Tracking No.** 1k4-9egk-1yet
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-DRAFT-0166
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Ravahn Samati

---

## General Comment

To Whom it May Concern:

I am writing n response to the above-referenced Proposed Rules to express my/our strong opposition to the Proposed Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019.

Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights. But the Trump administration is gutting asylum again with an unrelenting series of attacks.

For the reasons detailed in the comments that follow, the Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

Thank you for the opportunity to submit comments on the Proposed Rules. Please do not hesitate to contact Ravahn Samati, ravahn.samati@gmail.com to provide further information.

Sincerely,

Ravahn
Activist and Organizer
White men for Racial and Gender Justice, Educators for Democratic Schools

# PUBLIC SUBMISSION

**As of:** 11/10/20 1:12 PM
**Received:** January 17, 2020
**Status:** DoNotPost
**Tracking No.** 1k4-9ehz-vlqa
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-DRAFT-0295
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Samuel Warren

---

## General Comment

I am strongly opposed to this rule change. I am a seventh-generation American citizen who strongly believes that we must open our doors to those fleeing violence and persecution abroad. My community has been enriched immeasurably by immigrants and the families they have established here, and our country should do everything in its power to welcome asylees.

AR.08360

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** December 19, 2019
**Status:** Posted
**Posted:** December 23, 2019
**Tracking No.** 1k3-9dys-znks
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0002
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Ray Anonymous

## General Comment

I've smoked a lot of weed with Republicans and Democrats, all of them white people. We get our weed from Theory Wellness in Massachusetts and party in New York. Your laws mean nothing and criminalizing a plant is stupid and wasteful. Stop spending my American taxpayer money to fight a war on cannabis that I only want safe legal access to.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** December 20, 2019
**Status:** Posted
**Posted:** December 23, 2019
**Tracking No.** 1k3-9dz2-d0yp
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0003
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Ray Anonymous

---

## General Comment

From Michigan:
According to the ballot proposal approved by voters in 2018, the first $20 million in tax revenues in the first two years of recreational marijuana sales goes to research on the benefits of marijuana to treat ailments such as post-traumatic stress disorder REGARDLESS OF RACE OR NATIONALITY.

Cannabis use works for people with PTSD.

AR.08362

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** December 20, 2019
**Status:** Posted
**Posted:** December 23, 2019
**Tracking No.** 1k3-9dz1-3nv8
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0004
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Charles Lynch

---

## General Comment

More than half the entire nation including Celebrities, Politicians, Stock Brokers and State Officials all profiting off of a Schedule I Drug in Felonious violation of Federal Law (21 U.S.C. 812) Celebrities operating Continuing Criminal Enterprises branding distribution of marijuana (21 U.S.C. 848) #whoopigoldberg #willienelson #jimmybuffet #genesimmons #ziggymarley #jimbelushi #joemontana; Stock Brokers selling stocks of companies that conspire to distribute marijuana (21 U.S.C. 846) #etrade #nasdaq #tilray #nyse #aurora #canopygrowth; Politicians join the conspiracy as Executive Board members of Marijuana companies (21 U.S.C. 846) #johnboehner #howarddean #michaelsteele #antoniovillaraigosa #garyjohnson and State Officials collect taxes off the sales of a Schedule I Drug #gavinnewsom #jerrybrown #loriajax #jaredpolis #johnhickenlooper all in violation of Federal Drug Laws (21 U.S.C. 841 ) and the Patriot Act at RICO (18 U.S.C. 1961) and Death Penalty levels (18 U.S.C. 359(b)(1)) US Government employees should be required to disclose portfolios and held accountable for any schedule I holdings or dealings.
Meanwhile Millions of Americans continue to suffer the consequences of Schedule I Prohibition at the hands of law enforcement including defamation, prosecution, incarceration, disenfranchisement, forfeiture and the loss of basic civil liberties #scarmazzo #gloor #lynch #sandusky Additionally Free Federal Public Defenders say Federal Prosecutors are in Felonious Violation of Consolidated Appropriations Act 2019 Division C Section 537 by Continuing the 12 year 51 million Taxpayer dollar Federal Medical Marijuana Prosecution of Medical Cannabis Pioneer Charles Lynch for operating a Little ole Medical Marijuana Dispensary in California. Help end the 12 year Federal Medical Marijuana Prosecution of Charles Lynch Free Lance Gloor, Arron Sandusky and Luke Scarmazzo End World War Weed America Home of the Brave but fears a plant. Be Brave America Deschedulize #yourstruly
#usavslynch

#todayisday 4648

AR.08363

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** December 20, 2019
**Status:** Posted
**Posted:** December 23, 2019
**Tracking No.** 1k3-9dz9-z1p2
**Comments Due:** January 21, 2020
**Submission Type:** API

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0005
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

I absolutely oppose to this proposed rule.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** December 20, 2019
**Status:** Posted
**Posted:** December 23, 2019
**Tracking No.** 1k3-9dz9-2luh
**Comments Due:** January 21, 2020
**Submission Type:** API

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0006
Comment on FR Doc # 2019-27055

---

# Submitter Information

**Name:** Grace Kennedy
**Address:**
  1755 The Exchange, Suite 355
  Suite 355
  Marietta,  GA,  30068
**Email:** gkennedy@kennedyimmigrationfirm.com
**Phone:** 4049935358
**Organization:** 1978

---

# General Comment

Women fleeing extreme violence should not be barred from asylum because they save their children.

AR.08365

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** December 20, 2019
**Status:** Posted
**Posted:** December 23, 2019
**Tracking No.** 1k3-9dz4-gxwl
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0007
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Teresa Pedrizco

## General Comment

I oppose to this proposed rule.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** December 27, 2019
**Status:** Posted
**Posted:** December 30, 2019
**Tracking No.** 1k3-9e3l-pvkd
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0008
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Xuan Luo

---

## General Comment

I am concerned about the new bar to asylum for convictions of offenses for alien smuggling under INA 274(a)(1) (A). As described in section III.A.2 of the proposed rule, convictions under this section are mostly already a bar to asylum for being an aggravated felony, except for a first offense for the purpose of assisting the alien's spouse, child, or parent. As described in section III.A.2, the proposed rule makes the bar to asylum cover this exception too: "The proposed rule would broaden this bar so that first-time offenders who engage in illegal smuggling or harboring to aid certain family members, in violation of section 1324(a)(1)(A) or (2), are deemed to have committed particularly serious crimes." I am concerned about the expansion of the bar to asylum to cover this exception.

When a family group consisting of adults and children enter the US illegally together, the adults are generally considered to be guilty of having brought the children to the US illegally under INA 274(a)(1)(A)(i). The US government can prosecute and convict the adults for this offense, and that would make them ineligible for asylum under this proposed rule. Yet this ineligibility for asylum arguably arises primarily from the fact that they are adults in a family group including children entering together, and the manner of the group's entry being illegal. This seems contrary to the spirit of 8 USC 1158(a)(1) (part of the Refugee Act of 1980), which says an alien "who arrives in the United States (whether or not at a designated port of arrival [...])" may apply for asylum, as well as the spirit Article 31(1) of the 1951 Refugee Convention (as applied to the US through the 1967 Refugee Protocol), which says contracting states shall not impose penalties on refugees "on account of their illegal entry".

You could argue that, in this example, technically the adults are not being made ineligible for asylum due to their own illegal entry, but rather due to their assistance to the children in their family to enter the US illegally, but in my opinion that is a distinction without a practical difference, because adults are generally deemed to be assisting children when entering together. Asylum seekers often travel in family groups involving adults and children, and if the Refugee Act and the Refugee Convention envision that asylum seekers should be able to obtain asylum despite illegal entry, then I would argue that they also envision that when asylum seekers travel in a family group involving adults and children, all members of that group should be able to obtain asylum, if otherwise eligible,

despite their illegal entry together.

AR.08368

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** December 27, 2019
**Status:** Posted
**Posted:** December 30, 2019
**Tracking No.** 1k3-9e3l-7uea
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0009
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** louie dixon

---

## General Comment

deport them period

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** December 26, 2019
**Status:** Posted
**Posted:** December 30, 2019
**Tracking No.** 1k3-9e5p-g6wr
**Comments Due:** January 21, 2020
**Submission Type:** Paper

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0010
Comment on EOIR Docket 18-0002

## Submitter Information

**Name:** Linda S. Cornelius
**Address:**
  7505 New Hampshire Ave
  Suite 308
  Takoma Park,  MD,  20912
**Email:** Linda@Cornelius.legal
**Phone:** 301-439-0011

## General Comment

See Attached

## Attachments

Comment on EOIR Docket 18-0002

AR.08370

**LAW OFFICE OF LINDA CORNELIUS**

**7505 New Hampshire Avenue**

**Suite 308**

**Takoma Park MD 20912**

**301-439-0011**

Linda@Cornelius.legal

Attn: Lauren Alder Reid

 Assistant Director, Office of Policy

Executive Office for Immigration Review,

5107 Leesburg Pike, Suite 2616,

 Falls Church, VA 22041.

RE: EOIR Docket No. 18–0002                                    December 23, 2019

To Whom it May Concern;

This letter is a comment on portions of the rules proposed 12-19-2019 which would create several new bars to asylum. I am an attorney who has previously worked in Legal Services offices in several states, and I am now practicing immigration law.

Asylum under existing law is granted not only to individuals, but to their families. The existing law and regulations specifically permit those who are granted asylum to include in their claim their spouses and children.

We need to be mindful that any bar or restriction or limit imposed on the right to claim asylum not only prevents the claimant, (who by definition has been already found to have been the subject of past persecution or to be in danger of future persecution),  from finding safety, but also prevents their spouse and children from finding safety as derivative beneficiaries.

The recent decision of the Attorney General, that family members of a persecuted individual are generally no longer eligible for individual asylum claims based on their membership in the family of a persecuted individual, **Matter of L-E-A- 27 I&N Dec. 581 (A.G. 2019)**, makes it imperative that the rights of the derivative beneficiaries of asylum seekers be preserved intact and undiminished. Since that decision has reduced substantially the possibility of family members to qualify for asylum individually, it is important to preserve their rights to asylum as derivative beneficiaries

Many of the bars proposed on 12-19-2019 are based on what are essentially misdemeanors, or minor felonies. It was not the intention of the Congress when they passed the asylum law to limit the benefits to only those who had perfect records. And it was certainly not their intention to prevent derivative beneficiaries, the spouses and minor children of asylum seekers, from getting asylum because the family member who suffered persecution has made a single unwise mis-step or engaged in a single bad act in the United States.

The five current bars based in behavior, rather than firm resettlement in a third country, all focus on serious crimes creating serious danger. The proposed bars would ban from asylum entire family of a persecuted individual if that

individual had engaged in minor bad behavior. Behavior which could block asylum for an entire household includes: A single drunk driving conviction, even if the individual has taken remedial actions such as alcohol abuse treatment;

Loitering or trespassing together with a gang member; possessing marijuana, even if authorized by local law for medical or individual use purposes; possessing rolling papers for marijuana in certain jurisdictions; and similar misdemeanors that are not generally considered of extreme danger to society.

A sense of proportion is lacking if we bar otherwise eligible families from asylum, (which can be a matter of life or death), in order to reprimand a parent who has acted badly, but in a way that usually is punished with a brief jail term, or probation.

Particularly egregious is the proposed section 7. B. Public Benefit Offenses.

Anyone who has worked representing individuals who receive public benefits knows that many times people receive the wrong amounts or wrong kinds of public benefits, not only through greed or recklessness about following the laws, but because the programs are convoluted and so difficult to understand and apply correctly that the case workers administering them more often than not calculate the benefits incorrectly or enroll individuals in the wrong programs or enroll them under the wrong sections of programs. When I worked in Cook County, with a legal services program, we found that 100% of the food program benefits received by our clients were calculated incorrectly by the county.

In addition, we need also to recall that most of the persons applying for asylum are unfamiliar with our public benefit programs, unable to read the materials in English, and sometimes unable to read at all in any language, and therefor much more at risk than native born citizens of inadvertently receiving public benefits that they are not eligible for.

People can be convicted of fraud in the area of public benefits for minor errors. For example, for incorrectly reporting small amounts of income, which then results in their family receiving the wrong amount of benefits. I recall a young father who was hired to paint his grandmother's kitchen, and failed to report less than $100 in income, thereby receiving too much in food benefits for his twin infant children. He was convicted for that offense. His conviction, under this proposed set of rules, would bar his wife, his two children, and himself from asylum.

The proposed rules are setting up bars to asylum based on minor and petty offenses. There is no evident need to add additional bars to asylum. The asylum rules, as written and now existing, provide a fair and just framework for determining who will receive this life-saving benefit. The proposed changes will endanger countless innocent family members of people who may have made only a single, non-serious, mistake.

Sincerely,

Linda S. Cornelius

Attorney at law

Law Office of Linda Cornelius
7505 New Hampshire Ave. #308
Takoma Park, MD 20912



RECEIVED #3

DEC 26 2019

THIS PARCEL HAS BEEN X-RAYED

Attn: Lauren Alder Reid
 Assistant Director, Office of Policy
Executive Office for Immigration Review,
5107 Leesburg Pike, Suite 2616,
 Falls Church, VA 22041.

22041-326499

AR.08373

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** December 24, 2019
**Status:** Posted
**Posted:** December 30, 2019
**Tracking No.** 1k3-9e1p-nq1f
**Comments Due:** January 21, 2020
**Submission Type:** API

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0011
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Robert Lindstrom
**Address:**
    2017 Wisteria Road
    Rockford,  IL,  61107
**Email:** Rbrtlindstrom@gmail.com
**Phone:** 8155409843

---

## General Comment

This is easy, Cannabis should not be on Schedule 1 because it has known medical value.
Go to medicalcannabis.com Or go to Pubmed and search for cannabis research to find scores of studies to prove that this is true. Finally, www.cannabisinternational.org It starts with information on the US Governments patent on the medical use of cannabis as a neuroprotectant. Please, do the right thing!

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** December 28, 2019
**Status:** Posted
**Posted:** December 30, 2019
**Tracking No.** 1k3-9e4e-7c42
**Comments Due:** January 21, 2020
**Submission Type:** API

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0012
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

We need to change the laws with regards to Medical Marijuana and not ruin lives over a plant that help so many people have found beneficial for so many illnesses. This has to change

AR.08375

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** December 19, 2019
**Status:** Posted
**Posted:** December 30, 2019
**Tracking No.** 1k3-9dyq-b8y4
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0013
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Anonymous Anonymous
**Address:** United States,

---

## General Comment

Any increase in restrictions on asylum are a step in the right direction.

As a practicing attorney, I regularly see clients who have no basis for immigration, and who routinely ask to use political asylum as a last ditch effort to remain. Procedurally, this kind of nonsense fills up court dockets and delays the removal of aliens who have zero basis for immigration.

Many people argue that the asylum seeker just needs a safe haven, but they do not realize that asylum leads to LPR status. I have clients that have been granted asylum, granted permanent residency, naturalized, and then turn around and go right back to the country they claim they fled from. This is nothing short of stupidity on the part of the United States. It seems obvious that anyone who would return to the country they claim they had to leave should have their case re-examined for fraud; and the fraud should be prima facie where the asylee travels to the country their asylum case was based on.

Regarding the DUI, yes, absolutely this should be a bar. Allow me to explain why. On its face, DUI may not seem that bad, just a little too much to drink. But the reality is, most people convicted of a DUI are not first time offenders. My personal experience with many DUI offenders reveals a multitude of other behavioral problems coexisting with the drinking. Further, the DUI convictions often come after multiple alcohol incidents. In other words, by the time someone is finally convicted of DUI, they have committed many previous incidents of driving while intoxicated and just had not been caught. Or, put another way, they were just lucky that no one else was involved in the other incidents of drinking.

Regarding convictions, especially for border violations and family violence, of course they should be barred from asylum, and any other benefit that leads to LPR status.

Regarding reconsiderations, yes, end that practice. It consumes resources far beyond the value of the practice.

AR.08376

I have chosen not to provide contact information because doing so makes all my information public.

You should give serious consideration to protecting the identity of people who comment. There is much much more that I could tell you, but not if my name is exposed to existing clients.

AR.08377

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** December 22, 2019
**Status:** Posted
**Posted:** December 30, 2019
**Tracking No.** 1k3-9e05-xcoe
**Comments Due:** January 21, 2020
**Submission Type:** API

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0014
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

Dear people of the Executive Office for immigration review,
I stand in favor of making sure that the opioid epidemic that used marijuana as a gateway drug does not also continue to be ignored. My brothers untimely death may have been partially from the judgement impairment that comes with using marijuana (hairpin turns and 60 miles an hour and no seat belt in a Jeep.) The double incentive that combines sex/labor/child labor are alive and well in Ohio. At the Trillium egg farm in Marion Ohio it is PROVEN that Health and Human Services PLACED Guatemalan children into slavery. They were not allowed to go to school, they were physically abused. They were threatened. You can see the pictures in the Marion Star newspaper. You can see the hearings. What does this have to do with marijuana, this reduces the profitability of slave trading. In Franklin county Ohio Massage parlor women were never allowed to leave and slept on massage tables. This is a fact. Women and children are also used for the loopholes in immigration laws. Catch - release - ENSLAVE. I had a friend who had detectives staking out a massage parlor watching it from inside at her work. THE LIFE OF A SLAVE AVERAGES ONLY 17 years. THE DEMAND IS HIGH. A police chief APPROACHEDour womens church leader and told here to tell everyone to keep the children very close to them. ABC AND CBS do not care about exploited children-DO YOU!? Why do I care? Well, state route 23 goes right through Ohio. Stare route 23 goes from almost the Mexican border to Toledo Ohio-close to Canada. According to the B. R. A. V. E. Coalition Ohio is the number one human trafficking (slave) state in the Spring and Summer. Whether that is still the case, I do know that that NARCAN IS now available because it is often mixed with anesthesia drugs. We have dead people who thought marijuana and heroin were safe. JEFFERY EPSTEINS coworkers are NOT IN JAIL. Stop the guilty from exploiting the innocent. How can we convince the world WE ARE NOT A SLAVE NATION unless we take steps to make sure we do not allow those who would Traffick during/ children anesthesia drugs deadly in salt size portions into our nation. The we have those who will not protect the enslaved. Somehow, we forget what the consequences are for nations that do not uphold laws. We are enabling the bait and switch enslavement whether it is drug abuse or child slave/sex slave/labor slavery. The blind eye approach is killing people.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** December 30, 2019
**Status:** Posted
**Posted:** December 31, 2019
**Tracking No.** 1k3-9e5x-sej9
**Comments Due:** January 21, 2020
**Submission Type:** API

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0015
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Carolyn Anonymous

## General Comment

I am in favor of proposed changes to asylum procedures and eligibility.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** December 31, 2019
**Status:** Posted
**Posted:** January 02, 2020
**Tracking No.** 1k3-9e6i-gjn4
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0016
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Lauren Dikos-Roche
**Address:**
  120 w 1100 n #6
  Logan,  UT,
**Email:** L.a.dikos@aggiemail.usu.edu
**Phone:** 8158614896

## General Comment

The proposed bars to asylum eligibility are nothing but a way to eliminate persons from seeking asylum from dangerous places. By allowing these bars to eligibility ie; claiming that certain felonies prior to seeking asylum would promote more crime is nothing but a tactic to limit persons from entering the US. The list of "felonies" needs to be more clear and better thought out instead of implying that every asylum seeker is a criminal. Fleeing from violence and seeking asylum are legitimate reasons for people to want asylum in the first place. By adding these bars shows the discriminatory intent to sow fear among the American people and further claims of criminal intent are nothing but a way to deter people who are in danger in their home countries. Asylum seekers see the United States as a safe haven from the fears and violence from their original countries. Instead of demonizing and criminalizing these people we should welcome them with open arms and provide them with the security they need.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 01, 2020
**Status:** Posted
**Posted:** January 02, 2020
**Tracking No.** 1k4-9e72-xjph
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0017
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** W L Clark
**Address:**
    PO Box 2694
    La Mesa,  CA,  91943
**Email:** wleeclark8@gmail.com
**Phone:** 619-755-6048

## General Comment

After reading the proposed changes, I support this revised rule. Does the USA need more criminals? Obviously not! Kudos to Attorney General Barr for working to make America safer from foreign criminal street gang members and convicted felons.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 01, 2020
**Status:** Posted
**Posted:** January 02, 2020
**Tracking No.** 1k4-9e75-8h78
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0018
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Anonymous Anonymous
**Address:**
   MD,

---

## General Comment

I think these policy changes are sufficient in addressing the immigration issues facing this country

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 01, 2020
**Status:** Posted
**Posted:** January 02, 2020
**Tracking No.** 1k4-9e75-9k50
**Comments Due:** January 21, 2020
**Submission Type:** API

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0019
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Joel Watters

---

## General Comment

You're trying to include people who've gotten a D.U.I as a bar? On its face it's prejudiced against poor people. The obvious reasoning is a poor person will never get the same rights as someone who is not. That's reality, and so is the fact that a lot of these immigrants are in the poor person category by default.

You're lumping marijuana in there? I don't even do that and I find it hilarious that you would try to add that in.

You're also trying to include "engaged in acts of battery or extreme cruelty in a domestic context, even if no conviction resulted". That one is funny for two reasons:

First and foremost is your laughably ignorant "even if no conviction resulted".

Secondly, have any of you ever been involved in anything like that? I have, I(the man) was the abused for a long while, only to have it turned around on me by the system. I never got to say one word in court(I was told by a lawyer they'd not take me because it'd be an instant lose...no matter what proof I had had), never got to show MY proof that I still have years later(minus some videos I took of myself, she'd found those and trashed them). Screwed enough I ended up just leaving my home state and will never go back to a place that will do that to someone.

So, in closing: you and your corrupt system can go bleep yourselves.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 01, 2020
**Status:** Posted
**Posted:** January 02, 2020
**Tracking No.** 1k4-9e7d-b5ym
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0020
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

I 100% support this rule change. Criminals should not be able to get asylum in this great nation. This tightening of regulations is a direct result of state and local governments working to nullify undocumented criminal activity by dropping chargers, expunging records or pardoning. Including for serious crimes like armed robbery(Gov Colorado), sex assault, domestic abuse, wire fraud, identity theft etc. If you commit crimes in your home country and then commit crimes when you are in the United States or Criminally re-enter after you have gone through the immigration courts and have been removed YOU SHOULD NOT BE REWARDED with entry into this great nation. Adults who human smuggle children or adults should not only lose their right to entry but they should be imprisoned.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 01, 2020
**Status:** Posted
**Posted:** January 02, 2020
**Tracking No.** 1k4-9e7f-slf5
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0021
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

I totally support barring those who have abused the American citizen by committing crimes from being awarded asylum.
People who are domestic abusers, sexual abusers, drunk drivers, people who steal things or identities. People who human smuggle or criminally re-enter should in no way be REWARDED with the greatest gift anyone in the world can get THE OPPORTUNITY TO BE LEGALLY PRESENT IN THE USA.

This rule does nothing to the INNOCENT asylum seeker truly escaping political unrest or natural disaster.

I support the changes as written.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 04, 2020
**Status:** Posted
**Posted:** January 06, 2020
**Tracking No.** 1k4-9e96-a5l3
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0022
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

How can this proposal be even a question? Should be already in the books! Should have been a rule approved and enforced already!
I live many miles away from the border & seeing someone driving wreckedssly & drunk it's becoming the norm. Curiously though, it's always a non white, non African American, non Asian, non middle eastern, non Indian. Sadly, it's most of the time Hispanic. And before you get infuriated thinking this comment it's racist understand that I'M HISPANIC.
I'm in COMPLETELY AGREEMENT with a new rule requesting good moral character from ALL applicants. If we, legal residents and Naturalized US citizen must present ourselves as deserving & worthy, why an asylum applicant would get to walk free?
PLEASE enforce this proposal as rule like starting TODAY.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 04, 2020
**Status:** Posted
**Posted:** January 06, 2020
**Tracking No.** 1k4-9e9b-l05c
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0023
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Stpephen Gaertner
**Address:**
    3720 Sedona pl
    Apex,  NC,  27539
**Email:** gaertnersaw@hotmail.com
**Phone:** 9199246802

---

## General Comment

I approve of this regulation. I don't want people in the USA that have a complete disregard for our laws and norms...

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 05, 2020
**Status:** Posted
**Posted:** January 06, 2020
**Tracking No.** 1k4-9ea2-scz1
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0024
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Kate Gessert

## General Comment

I am strongly opposed to the categories of Alien Smuggling, Illegal Reentry, and Fraudulent Documents being included as grounds to deny asylum. In many cases, these actions cause harm to no one and are actions immigrants are forced into as a result of a broken immigration system. The U.S. needs to enact comprehensive, compassionate immigration reform, rather than persecuting individuals.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 06, 2020
**Status:** Posted
**Posted:** January 06, 2020
**Tracking No.** 1k4-9ea5-pm7y
**Comments Due:** January 21, 2020
**Submission Type:** API

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0025
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Frank J Lugo

---

## General Comment

A person pending asylum with minor crimes in his or her history should be able to enjoy a second chance to retract their behavior. could be sent to a court to defend the circumstances that led him to do so. Mention that our Lord Jesus Christ did not condemn the sinner but gave him the opportunity to redeem his actions and make them a better person. People can change if they give it a chance not to condemn them to be deported so that in their countries they are not victims of hatred and fear from which they fled

In the Bible it says that he who is forgiven much loves much. These people would be the most grateful to this wonderful country that they can give you that opportunity. Let's not be ordinary human beings and continue judging people by their past. God bless this great country and its rulers

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 06, 2020
**Status:** Posted
**Posted:** January 07, 2020
**Tracking No.** 1k4-9eag-uksf
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0026
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

I'm in SUPPORT of this regulation.
The US is a very generous country & many have been taking advantage of it.
We taxpayers are already seeing the disastrous consequences of foreigners who disregard the law. Enough already!
Even immigration lawyers are ill advising their clients. Everybody is taking advantage of the system!

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 07, 2020
**Status:** Posted
**Posted:** January 08, 2020
**Tracking No.** 1k4-9ebc-u465
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0027
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Naomi Metz

## General Comment

I oppose this! The processes/laws in place are sufficient (or already too restrictive) and the proposed rules would unfairly and unnecessarily restrict access to asylum for so many people. Plus, they do not comport with our international treaty obligations nor with our domestic laws.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 07, 2020
**Status:** Posted
**Posted:** January 08, 2020
**Tracking No.** 1k4-9ebb-4s20
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0028
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Aubra Fletcher

## General Comment

I oppose the Proposed Rules for the reasons stated in the attached letter. Asylum-seekers are already thoroughly vetted and must already navigate a complicated system of laws and procedures, including multiple legal bars to obtaining status. The Proposed Rules will wreak havoc on our legal system, on our credibility as a nation, and in the lives of people fleeing brutal persecution.

## Attachments

Comments re proposed new asylum bars - 1-7-20

AR.08392

# LAW OFFICE OF AUBRA FLETCHER

~ P.O. Box 189402, Sacramento, CA 95818 ~ 510-499-5264 ~ aubrafletcherlaw.com ~
aubra@aubrafletcherlaw.com

January 7, 2020

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

*Submitted via www.regulations.gov*

> **Re:    84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019;
> RIN 1125-AA87, 1615-AC41; Comments in Opposition to Proposed
> Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility**

To Whom it May Concern:

I am writing in response to the above-referenced Proposed Rules to express my strong
opposition to the Proposed Rules to amend regulations relating to eligibility for asylum
published in the Federal Register on December 19, 2019.

I am an immigration attorney who specializes in asylum law.  I have spent more than a
decade working with asylum-seekers from all over the world.

For the reasons detailed in the comments that follow, the Department of Homeland
Security ("DHS") and the Department of Justice ("DOJ") should immediately withdraw
their current proposal, and instead dedicate their efforts to ensuring that individuals
fleeing violence are granted full and fair access to asylum protections in the United
States.

Please see below, and please do not hesitate to contact me to provide further information.

Sincerely,

Aubra Fletcher

**DETAILED COMMENTS in opposition to the Proposed Rules re Procedures for Asylum and Bars to Asylum Eligibility, 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41**

Taken together, the proposed changes constitute an unnecessary, harsh, and unlawful gutting of the asylum protections enshrined in United States and international law. I submit these comments to express opposition to the entirety of the Proposed Rules and grave concerns with the administration's continued efforts to exclude refugees from obtaining the security and stability the United States asylum system has long promised. I urge that the Proposed Rules be rescinded in their entirety.

I.    **The Proposed Rules unnecessarily and cruelly exclude bona fide refugees from asylum eligibility**

*The barriers to asylum for those previously involved in the criminal legal system are already sweeping in scope; adding more barriers is cruel and unnecessary.*

The United States asylum system was first codified in statute through the Refugee Act of 1980. That Act—among other measures designed to bring the United States domestic legal code into compliance with the provisions of the United Nations Protocol Relating to the Status of Refugees—created a "broad class" of refugees eligible for a discretionary grant of asylum.

Asylum provides those fleeing horrors with physical safety, a path to citizenship and security, and the opportunity to reunite with immediate family members who may still remain abroad in danger. Many see the domestic asylum system as a symbol of the United States' commitment never to repeat its failure to save thousands of Jewish refugees and others fleeing the Holocaust. Others point to the critical role that domestic asylum policy plays in serving the United States' foreign policy interests abroad. For those individuals seeking asylum in the United States, the stakes could not be higher—a claim denied often means return to death or brutal persecution.

The laws, regulations, and process governing asylum adjudications are already exceedingly harsh. Asylum seekers bear the evidentiary burden of establishing their eligibility for asylum in the face of a complex web of laws and regulations, without the benefit of appointed counsel and often from a remote immigration jail. The obstacles to winning asylum are exceedingly high; indeed in some parts of the country and before certain immigration judges, almost no one succeeds. Today, newly imposed barriers to accessing asylum in the United States are breathtaking in scope, with those seeking safety at the southern border subject to return to dangerous conditions in Mexico and an overlapping web of policies that preclude asylum eligibility for countless migrants simply because of their national origin, manner of entry, or their flight path. There are consistent reports of the documented deaths and brutalities endured by those who sought but were denied asylum protections in the United States.

Specifically, the bars to asylum based on allegations of criminal conduct are *already* sweeping and over-broad in nature and scope. Any conviction for an offense determined to be an "aggravated felony" is considered a *per se* "particularly serious crime" and therefore a mandatory bar to asylum. "Aggravated felony" is a notoriously vague term, which exists only in immigration law. Originally limited to murder, weapons trafficking and drug trafficking, it has metastasized to encompass hundreds of offenses, many of them neither a felony nor aggravated, including petty offenses such as misdemeanor shoplifting, simple misdemeanor battery, or sale of counterfeit DVDs. The existing crime bars should be narrowed, not expanded. Even for those not categorically barred from relief, the immigration adjudicator maintains full discretion to deny asylum.

Immigration adjudicators already have vast discretion to deny asylum to those who meet the refugee definition but have been convicted of criminal conduct. Further categorical bars are not needed. The agencies' efforts to add *seven* new sweeping categories of barred conduct to the asylum eligibility criteria is unnecessary and cruel. The Proposed Rules drain the phrase "*particularly serious* crime," 8 U.S.C. § 1158, of any sensible meaning.

The Proposed Rules are also arbitrary and capricious. They would constitute a marked departure from past practice. And the agencies have proffered no evidence or data to support these changes.

One assumption fundamentally underlying the Proposed Rules, for example, is that every noncitizen convicted of any offense punishable by more than a year in prison necessarily constitutes a danger to the community. But no evidence is provided to support that assumption, and a criminal record, does not, in fact, reliably predict future dangerousness. The Proposed Rules are so capricious as to peremptorily postulate a noncitizen's supposed danger to the community even in circumstances when a federal, state, or local judge has concluded that no danger exists by, for example, imposing a noncustodial sentence. Conviction for a crime does not, without more, make one a present or future danger—which is why the Refugee Convention's particularly serious crime bar, made part of United States law through 8 U.S.C. § 1158, should only properly apply if both (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows that she is a present or future danger.

Similarly, the Proposed Rules fail to address or account for the fact that a significant number of people may agree to plead to a crime as to avoid the threat of a severe sentence; not only is a conviction an unreliable predictor of future danger, it can also be an unreliable indicator of past criminal conduct. In addition, the Proposed Rules do not address and make no exception for convictions for conduct influenced by mental illness or duress.

The Board of Immigration Appeals has cautioned that, "in light of the unusually harsh consequences which may befall a [noncitizen] who has established a well-founded fear of persecution; the danger of persecution should generally outweigh all but the most egregious of adverse factors." Yet because of the categorical nature of the seven news bars proposed here, asylum seekers will be precluded from obtaining protection on the

basis of a vast array of conduct, without any discretion left to the immigration adjudicator to determine whether the circumstances merit such a harsh penalty. Indeed, in the case of the domestic-violence related ground, the categorical bar will be imposed on the basis of *mere allegations* of conduct without any adjudication of guilt.

Those unjustly precluded from even seeking a discretionary grant of asylum by the Proposed Rules will include, for example: individuals struggling with addiction with one drug-related conviction, regardless of the circumstances of the offense; asylum seekers with two convictions for driving under the influence, regardless of whether the applicant has sought treatment for alcohol addiction or the circumstances of the convictions; community members seeking asylum defensively who have been convicted of a document fraud offense related to their immigration status; and asylum-seeking mothers convicted for bringing their own child across the southern border in an effort to find safety.

> *The Proposed Rules cruelly disregard the connections between trauma and involvement in the criminal legal system.*

The harsh nature of the Proposed Rules is especially evident when viewed through a trauma-informed lens. Asylum seekers are an inherently vulnerable population because of the trauma they have experienced in their countries of origin and, often, along the journey to find safety. Existing literature suggests that at least one out of every three asylum seekers struggles with depression, anxiety, and/or post-traumatic stress disorder (PTSD). One recent study found the mental health problems facing refugees and asylum seekers so acute that more than a third of the study's sample admitted having suicidal thoughts in the preceding two weeks. My own experience in working closely with asylum seekers mirrors these findings.

Studies also consistently reveal a high prevalence of comorbidity of PTSD and substance use disorders, with individuals with PTSD *up to 14 times more likely* to struggle with a substance use disorder. Asylum seekers in the United States are often unable to access affordable medical care and treatments for complex trauma; some turn to drugs and alcohol in an effort to self-medicate. The proposed new bars to asylum include *any* drug-related conviction (with one exception for a first minor marijuana possessory offense) and any second conviction for driving under the influence. This approach is not only cruel but also ignores the evidence. *Particularly* given the vulnerabilities of asylum seeking populations, prior struggles with addiction should be addressed with treatment and compassion, not a closed door and deportation order.

Immigration adjudicators already maintain the authority to deny asylum to individuals with drug-related criminal histories on the basis of discretion; denying asylum seekers even the opportunity to present the countervailing factors of their past trauma and potential recovery is simply cruel.

## II.    The Proposed Rules violate the letter and spirit of United States international treaty obligations

By acceding to the 1967 Protocol Relating to the Status of Refugees, which binds parties to the United Nations Convention Relating to the Status of Refugees, the United States obligated itself to develop and interpret United States refugee law in a manner that complies with the Protocol's principle of non-refoulement (the commitment not to return refugees to a country where they will face persecution on protected grounds), even where potential refugees have allegedly committed criminal offenses. As noted above, adjudicators already have over-broad authority to deny asylum based on allegations of criminal activity, which vastly exceeds the categories for exclusion and expulsion set out in the Convention. Instead of working towards greater congruence with the terms of the Convention, the Proposed Rules carve out categorical bars from protection that violate both the language and spirit of the treaty.

While the Convention allows states to exclude and/or expel potential refugees from protection, the circumstances in which this can occur are limited. In particular, the Convention allows states to exclude and/or expel individuals from refugee protection if the individual "having been convicted by a final judgement of a particularly serious crime, constitutes a danger to the community of that country." However, this clause is intended for "extreme cases," in which the particularly serious crime at issue is a "capital crime or a very grave punishable act." The United Nations High Commissioner for Refugees (UNHCR) has asserted that to constitute a "particularly serious crime," the crime "must belong to the gravest category" and be limited "to refugees who become an extremely serious threat to the country of asylum due to the severity of crimes perpetrated by them in the country of asylum." Moreover, the UNHCR has specifically noted that the particularly serious crime bar does not encompass less extreme crimes; "[c]rimes such as petty theft or the possession for personal use of illicit narcotic substances would not meet the threshold of seriousness." Finally, when determining whether an individual should be barred from protection for having been convicted of a particularly serious crime, the adjudicator must conduct an individualized analysis and consider any mitigating factors.

As noted above, legislation and agency interpretation of the Immigration and Nationality Act have already expanded the particularly serious crime bar far beyond what was contemplated in the Convention by creating categorical particularly serious crimes through the aggravated felony definition. The Proposed Rules would amplify the dissonance between U.S. refugee law and the Convention, as well as the violation of U.S. obligations under the Convention, by creating categorical bars within categorical bars. For example, at p. 69659, the Proposed Rules first exclude from protection anyone who was convicted of a felony and then at p. 69660, define "felony" as "any crime punishable by more than one year of imprisonment" without any reference to other factors, including dangerousness. The Proposed Rules described the increased categorization of the particularly serious crime bar as necessary because the case-by-case adjudication previously used for non-aggravated felony offenses was "inefficient," but an individualized analysis is exactly what the Convention requires to ensure only those individuals who have been convicted of crimes that are truly serious and therefore present a future danger are placed at risk of refoulement.

Additionally, outside of the aggravated felony context, it has generally been well understood by the Board of Immigration Appeals and the Courts of Appeals that low-level, "run-of-the-mill" offenses do not constitute particularly serious crimes. Under this long-standing interpretation of the particularly serious crime bar in the INA, there is simply no scenario in which low-level offenses like misdemeanor driving under the influence where no injury is caused to another or simple possession of a controlled substance or paraphernalia would constitute a particularly serious crime.

The reason for this is common sense. As Judge Reinhardt explained in a concurring opinion in *Delgado v. Holder*, a decision the Proposed Rules cite in support of the expanded bars, run-of-the-mill crimes like driving under the influence have "little in common" with other crimes the Board of Immigration Appeals has deemed particularly serious—e.g., felony menacing with a deadly weapon, armed robbery, and burglary of a dwelling in which the offender is armed or causes injury. Judge Reinhardt further noted that public opinion does not treat them similarly either: "American voters would be unlikely to elect a president or vice president who had committed a particularly serious crime, yet they had no difficulty in recently electing to each office a candidate with a DUI record." Barring individuals from asylum based on these relatively minor offenses renders the "particularly serious" part of the "particularly serious crime" bar meaningless.

The expansion of the asylum bar to include individuals who have been convicted of reentering the United States without inspection pursuant to INA § 276 is also unlike any of the other bars previously established or as interpreted by the Board of Immigration Appeals or Circuit Courts of Appeals. It is an offense with no element of danger or violence to others, and has no victim. Most significantly, and more so than other bars contained in the Proposed Rules, barring asylum based on the manner of entry directly violates the Convention's prohibition on imposing penalties based on a refugee's manner of entry or presence. This prohibition is a critical part of the Convention because it recognizes that refugees often have little control over the place and manner in which they enter the country where they are seeking refuge.

### III.     Those precluded from asylum eligibility will be gravely impacted even if granted withholding of removal or protection under the Convention Against Torture

Throughout the Proposed Rules, the agencies defend the harsh and broad nature of their proposal by pointing to the continued availability of alternative forms of relief for those precluded from asylum eligibility under the new rules. The availability of these alternatives forms of relief, however—known as withholding of removal and protection under the Convention Against Torture (CAT)—does not nullify the harm created by the Proposed Rule's new limits on asylum. The protections afforded by CAT and by statutory withholding of removal are limited in scope and duration, and they are harder to obtain. As a result, a Rule that limits *bona fide* refugees to withholding of removal and CAT protection would impose a very real harm on individuals who have come to the United States in search of protection.

First, the most serious harm that can befall an individual as a result of these Proposed Rules is removal to persecution and torture, and the existence of withholding of removal does not account for that risk. CAT and withholding protections demand a higher level of proof than asylum claims: a clear probability of persecution or torture. Thus, an individual could have a valid asylum claim but be unable to meet the standard under the other forms of relief and therefore would be removed to their country of origin, where they would face persecution or even death.

Even for those who meet the higher standard, withholding and CAT recipients are still subject to significant prejudice. For example, they have no ability to travel internationally. The United Nations Convention Relating to the Status of Refugees affords refugees the right to travel in mandatory terms. Article 28 states, "Contracting States shall issue to refugees lawfully staying in their territory travel documents for the purpose of travel outside their territory." Withholding and CAT recipients do not have access to a travel document as contemplated by Article 28. By regulation, refugee travel documents are available only to asylees. And the Board of Immigration Appeals requires that an individual granted withholding and CAT—unlike an individual granted asylum— must simultaneously be ordered removed, making any international travel a "self-deportation." Refugees granted only withholding of removal or CAT protection are thus effectively trapped within the United States in long-term limbo.

Withholding and CAT recipients also face permanent separation from their spouses and children. Because international travel is prohibited, these individuals cannot reconnect with their families in a third country. And they also cannot reunite with family in the United States because only asylees and refugees are eligible to petition for a spouse and children to join them as derivatives on that status. For many, this will mean that the Proposed Rules institute yet another formal policy of family separation. For example, a mother with two young children who flees to the United States and is subject to one of the expanded asylum bars will not be able to ensure that her children will be able to obtain protection in the United States with her if she is granted relief.  Rather, if her children are still in her home country, they would need to come to the United States and seek asylum on their own, likely as unaccompanied children. If her children fled to the United States with her, then they will need to establish their own eligibility for protection before an immigration judge, no matter their age.

Recently, this exact scenario played out with a mother who was subject to the so-called Migrant Protection Protocols (also known as Remain in Mexico) and the asylum "transit ban," which made the mother ineligible for asylum and thus required the children to establish their independent eligibility for withholding and CAT protection. An immigration judge granted the mother withholding of removal but denied protection to her young children, leaving the children with removal orders and immense uncertainty about their future. Under the expanded bars in the Proposed Rules, these situations will certainly increase, separating families and forcing parents to return to countries where it has been established they more likely than not will face persecution and torture, rather than leaving their children on their own.

Withholding recipients likewise face hurdles in access to employment. Article 17 of the Refugee Convention states that a contracting state "shall accord to refugees lawfully staying in their territory the most favorable treatment accorded to nationals of a foreign country in the same circumstances, as regards the right to wage-earning employment." Recipients of withholding enjoy no such right. They must apply for work authorization, and they face frequent delays in the adjudication of these applications, which often result in the loss of legal authorization to work.

And perhaps most fundamentally, there is continuing jeopardy for withholding and CAT recipients that does not exist for asylum recipients. When a noncitizen is granted asylum, the person receives a legal status. Asylum, once granted, protects an asylee against removal unless and until that status is revoked. None of these protections exists for withholding and CAT recipients. They have no access to permanent residency or citizenship. Instead, they are subject to a removal order and vulnerable to the permanent prospect of deportation to a third country and subject to potential check ins with immigration officials where they can be made to pursue removal to third countries to which they have no connection.

Finally, I write to highlight a different form of prejudice that will flow from the rule: one relating to judicial efficiency. Neither withholding of removal nor CAT protection allow family members who are in the United States together and pursuing protection on the same basis to apply as derivatives on a principal application. As a result, family claims for those rendered ineligible for asylum by the new rules will have to be adjudicated separately, and potentially before different adjudicators even when the claims are interrelated and even when minor children may not be in a position to explain the claim at all or as sufficiently as a parent. In addition to being unjust to the affected family members, this approach would result in gross inefficiencies, which should be avoided in a system that already contains a significant backlog of pending cases.

## IV.    The Proposed Rules will result in "mini-trials" in immigration court, undermine judicial efficiency and result in racially-biased decision-making

In two significant ways, the Proposed Rules require immigration adjudicators to engage in decision-making to determine whether an asylum applicant's conduct—considered independently of any criminal court adjudication—triggers a categorical bar to asylum eligibility. First, the agencies propose that immigration adjudicators be allowed to consider "all reliable evidence" to determine whether there is "reason to believe" an offense was "committed for or related to criminal gang evidence," or "in furtherance of gang-related activity, triggering ineligibility for asylum in either case. Second, the Proposed Rules permit immigration adjudicators to "assess all reliable evidence in order to determine whether [a] conviction amounts to a domestic violence offense;" and to go even further by considering whether non-adjudicated *conduct* "amounts to a covered act of battery or extreme cruelty."

Requiring adjudicators to make complex determinations regarding the nature and scope of a particular conviction or, in the case of the domestic violence bar, *conduct*, will

lead to massive judicial inefficiencies and slanted "mini-trials" within the asylum adjudication process. The scope of the "reliable evidence" available to adjudicators in asylum cases is potentially limitless; advocates on both sides would be obligated to present fulsome arguments to make their cases about gang connections to the underlying activity or the relationship of the asylum applicant to the alleged victim. Because of the lack of robust evidentiary rules in immigration proceedings, it will be difficult if not impossible for many applicants to rebut negative evidence marshaled against them, even if false; and in other cases, asylum applicants will struggle to find evidence connected to events that may have happened years prior (especially for those detained). Asylum trials, which are typically three or fewer hours under current policies, would provide insufficient time to fully present arguments on both sides of these unwieldy issues.

As the immigration courts contend with backlogs that now exceed one million cases, tasking adjudicators with a highly nuanced, resource-intensive assessment of the connection of a conviction to gang activity and/or the domestic nature of alleged criminal conduct—assessments far outside their areas of expertise—will prolong asylum proceedings and invariably lead to erroneous determinations that will give rise to an increase in appeals. The Proposed Rules repeatedly cite increased efficiency as justification for many of the proposed changes. Yet requiring adjudicators to engage in mini-trials to determine the applicability of categorical criminal bars, rather than relying on adjudications obtained through the criminal legal system, will dramatically *decrease* efficiency in the asylum adjudication process.

Indeed, the Supreme Court has "long deemed undesirable" exactly the type of "post hoc investigation into the facts of predicate offenses" proposed by the agencies here. Instead, for more than a century the federal courts have repeatedly embraced the "categorical approach" to determine the immigration consequence(s) of a criminal offense, wherein the immigration adjudicator relies on the statute of conviction as adjudicated by the criminal court system, without relitigating the nature or circumstances of the offense in immigration court. As the Supreme Court has explained, this approach "promotes judicial and administrative efficiency by precluding the relitigation of past convictions in minitrials conducted long after the fact." In *Moncrieffe v. Holder*, the Court forewarned of exactly the sort of harm that would arise from these Proposed Rules; in that case, the Court rejected the government's proposal that immigration adjudicators determine the nature and amount of remuneration involved in a marijuana-related conviction, noting that "our Nation's overburdened immigration courts" would end up weighing evidence "from, for example, the friend of a noncitizen" or the "local police officer who recalls to the contrary," with the end result a disparity of outcomes depending on the whims of the individual immigration judge and a further burdened court system.

Particularly in the context of the new proposed bar related to alleged gang affiliation, I am concerned that creating a blanket exclusion for anyone who is convicted of a crime – including a misdemeanor – that an immigration adjudicator deems linked to gang activity will erroneously prevent bona fide asylum seekers from receiving protection. This rule confers on immigration adjudicators—who generally are not criminologists, sociologists, or criminal law experts—the responsibility to determine if there is "reason to believe" any conviction flows from activity taken in furtherance of

gang activity. This rule will necessarily ensnare asylum seekers of color who have experienced racial profiling and a criminal legal system fraught with structural challenges and incentives to plead guilty to some crimes, particularly misdemeanors. These same individuals are vulnerable to being erroneously entered into gang databases. Such databases are notoriously inaccurate, outdated, and infected by racial bias.

Indeed, asylum applicants are *already* frequently subjected to wrongful denials of protection because of allegations of gang activity made by the Department of Homeland Security on the basis of information found in notoriously unreliable foreign databases and "fusion" intelligence-gathering centers outside the United States. Empowering immigration adjudicators to render asylum applicants *categorically* excluded from protection on the basis of such spurious allegations will inevitably result in the return of many refugees back to harm.

The Departments curiously argue that all gang-related offenses should be construed as "particularly serious crimes." They cite statistics from up to 16 years ago in an attempt to make the point that gang members commit violent crimes and drug crimes. They then make the illogical leap to the conclusion that *all crimes*—including misdemeanor property crimes—that may be construed as connected to gang activity are particularly serious. This simply does not follow; in fact, the Proposed Rules will inevitably result in the exclusion from protection of asylum seekers of color who live in economically distressed communities and have obtained a minor conviction such as a property crime. Relying on the definition of "particularly serious crime" to prevent asylum seekers convicted of even minor crimes construed as gang-related from accessing asylum protection is disingenuous at best, and tinged with racial animus at worst.

The Departments asks for comments on: (1) what should be considered a sufficient link between an asylum seeker's underlying conviction and the gang related activity in order to trigger the application of the proposed bar, and (2) any other regulatory approaches to defining the type of gang-related activities that should render individuals ineligible for asylum. The premise of these questions is wrong: a vague "gang related" bar should not be introduced at all. The Immigration and Nationality Act and existing regulations already provide overly broad bars to asylum where criminal behavior by an asylum seeker causes concern for an adjudicator. Adding this additional, superfluous layer of complication risks erroneously excluding bona fide asylum seekers from protection without adding any useful adjudicatory tool to the process.

## V.    The proposed definition of "conviction" and "sentence" for the purposes of the new bars further excludes those in need of protection

The section of the Proposed Rules that outlines a new set of criteria for determining whether a conviction or sentence is valid for the purpose of determining asylum eligibility is an ultra vires exercise of authority that is not authorized by the Immigration and Nationality Act. The Proposed Rules impose an unlawful presumption against asylum eligibility for applicants who seek post-conviction relief while in removal proceedings or longer than one year after their initial convictions. They also deny full

faith and credit to state court proceedings by attributing improper motives to state court actors.

> *The Proposed Rules undermine Sixth Amendment protections and harms immigrants unfamiliar with the complex criminal and immigration framework governing prior convictions.*

The Proposed Rules outline a new multi-factor process asylum adjudicators must use to determine whether a conviction or sentence remains valid for the purpose of determining asylum eligibility; the proposal includes a rebuttable presumption "against the effectiveness" of an order vacating, expunging, or modifying a conviction or sentence if the order was entered into after the asylum seeker was placed in removal proceedings or if the asylum seeker moved for the order more than one year after the date the original conviction or sentence was entered.

This newly created presumption unfairly penalizes asylum applicants, many of whom may not have the opportunity to seek review of their prior criminal proceedings until applying for asylum. In *Padilla v. Kentucky*, the Supreme Court recognized that the immigration consequences of a conviction are sufficiently serious for the Sixth Amendment to require a noncitizen defendant to be competently advised of them before agreeing to a guilty plea. By imposing a presumption against the validity of a withdrawal or vacatur of a plea, the Proposed Rules hold asylum seekers whose rights were violated under *Padilla* to a different standard; even though they too were denied effective assistance of counsel in the course of their underlying criminal proceedings, asylum seekers will be forced to rebut a presumption that their court-ordered withdrawal or vacatur is invalid. The Proposed Rules therefore compound the harm to immigrants who, in addition to facing persecution in their home countries, have been denied constitutionally compliant process in the United States criminal legal system.

Many asylum applicants, especially those in vulnerable populations isolated from resources and unfamiliar with the due process protections available to them in the United States, may not have discovered the defects in their underlying criminal proceedings until their consultation with an immigration attorney, or until they are placed into removal proceedings, which may happen several years after a conviction. Imposing a presumption *against* the validity of a plea withdrawal or vacatur in these cases will undoubtedly lead to the wrongful exclusion of countless immigrants from asylum simply because they were unable to adequately rebut the presumption, particularly in a complex immigration court setting without the benefit of appointed counsel.

> *The Proposed Rules violate the full faith, and credit to which state court decisions are entitled.*

The Proposed Rules further improperly authorize immigration adjudicators to second-guess the decision of a state court, even where the order on its face cites substantive and procedural defects in the underlying proceeding. The proffered justification for this presumption against the validity of post-conviction relief is to "ensure that aliens do not have their convictions vacated or modified for purported

rehabilitative purposes that are, in fact, for immigration purposes," "to codify the principle set forth in *Matter of Thomas and Thompson*," and to bring the analysis of post-conviction orders in line with *Matter of Pickering*. The agencies misread the applicable law, however, by authorizing adjudicators to disregard otherwise valid state orders. The immigration law only requires that to be effective for immigration purposes, orders vacating or modifying convictions must be based on substantive or procedural infirmities in the underlying proceedings. The Proposed Rule goes well beyond that requirement.

The Proposed Rules abandon the presumption of regularity that should accompany state court orders, thus upending settled principles of law. The Proposed Rules cite a misleading quote from *Matter of F-* in support of allowing asylum adjudicators to look beyond the face of a state court order; had the Rules' authors looked to the full case, they would have read the following: "Not only the full faith and credit clause of the Federal Constitution, but familiar principles of law require the acceptance at face value of a judgment regularly granted by a competent court, unless a fatal defect is evident upon the judgment's face. However, the presumption of regularity and of jurisdiction may be overcome by extrinsic evidence or by the record itself." In *Matter of F-*, the Board of Immigration Appeals offers support for the proposition that an adjudicator should presume the validity of a state court order unless there is a reason to doubt it, contrary to the *presumption of irregularity* put forward in the Proposed Rules.

The authority extended to adjudicators by the Proposed Rules also violates the law of multiple circuits, including *Pickering*, on which it relies. In *Pickering v. Gonzales*, the Sixth Circuit Court of Appeals held that despite the petitioner's stated motive of avoiding negative immigration consequences, the Board of Immigration Appeals was limited to reviewing the authority of the court issuing the order as to the basis for his vacatur. Similarly, in *Reyes-Torres* the Ninth Circuit Court of Appeals held that the motive of the respondent was not the relevant inquiry. Rather, "the inquiry must focus on the state court's rationale for vacating the conviction." In addition, the Third Circuit Court of Appeals in *Rodriguez v. U.S. Att'y Gen.*, which the Proposed Rules cite as "existing precedent," held that the adjudicator must look only to the "reasons explicitly stated in the record and may not impute an unexpressed motive for vacating a conviction." Moreover, the *Rodriguez* court stated that to determine the purpose of a vacatur, the adjudicator must first look to the face of the order vacating the conviction, and "if the order explains the courts reasons … the [adjudicator's] inquiry must end there." The Proposed Rules contain no such limiting language to guide the adjudicator's inquiry. Instead, the Rules grant adjudicators vague and indefinite authority to look beyond even a facially valid vacatur. Such breadth of authority undermines asylum seekers' rights to a full and fair proceeding.

> *The Proposed Rules wrongly extend* Matter of Thomas and Thompson *to all forms of post-conviction relief and impose an ultra vires and unnecessary burden on asylum seekers.*

Finally, the above-described presumption is ultra vires and unnecessary. As an initial matter, the Proposed Rules' reliance on *Matter of Thomas and Thompson* is flawed. The Attorney General's decision in *Matter of Thomas and Thompson* has no

justification in the text or history of the immigration statute. Nowhere does the plain text of the Immigration and Nationality Act support giving adjudicators the authority to give effect only to state court sentence modifications undertaken to rectify substantive or procedural defects in the underlying criminal proceedings. Nor does the legislative history support such a rule. The Board of Immigration Appeals recognized this in *Matter of Cota-Vargas*, where it concluded that the application of "the *Pickering* rationale to sentence modifications has no discernible basis in the language of the Act." Based on the text of the Immigration and Nationality Act and the well-documented legislative history behind Congress's definition of "conviction" and "sentence" in 8 U.S.C. § 1101(a)(48), the Board determined that Congress intended to ensure that, generally, proper admissions or findings of guilt were treated as convictions for immigration purposes, even if the conviction itself was later vacated. Neither the text of the INA nor the legislative history of the definitions reveal any attempt on Congress's part to change the longstanding practice of giving effect to state court sentencing modifications. For these reasons, *Matter of Thomas and Thompson* lacks Congressional support for its rule and should not be extended.

Moreover, as applicants for immigration benefits or relief from removal, asylum seekers already bear the burden of demonstrating their eligibility for asylum. The Proposed Rules do not alter or shift this burden, nor do they provide evidence supporting the need for this presumption. By introducing a presumption of bad faith into asylum adjudication, the Proposed Rules unfairly interfere with asylum seekers' efforts to establish their claims. Immigration law, and asylum law in particular, is already highly complex, and the process of seeking asylum is in many instances re-traumatizing, particularly for applicants who do not have counsel to represent them and who lacked effective counsel in their underlying criminal proceedings. The Proposed Rules as applied to asylum applicants who seek post-conviction relief transform an already difficult process into an adversarial inquiry, contrary to the intent of Congress.

## VI.   The Proposed Rules will disparately impact vulnerable populations already routinely criminalized, including LGBTQ immigrants, survivors of trafficking and domestic violence, and immigrant youth of color

The expanded criminal bars exclude from safety and a pathway to citizenship those convicted of offenses that are coincident to their flight from persecution, and do not accomplish the stated goal of making communities safer. They will disparately impact vulnerable populations, who comprise asylum seekers hailing primarily from Central America and the Global South, and those routinely criminalized because of their identities, racially disparate policing practices, or in connection with experiences of trafficking and domestic violence. For these populations especially, the discretion currently delegated to asylum adjudicators is crucial for them to become fully integrated in the larger community. The imposition of additional categorical bars to asylum will only further marginalize asylum seekers already struggling with trauma and discrimination.

The Proposed Rules turn asylum into a blunt instrument that would prevent the use of discretion where it is most needed and most effective. The existing framework for

determining if an offense falls within the particularly serious crime bar already provides the latitude for asylum adjudicators to deny relief to anyone found to pose a danger to the community. Furthermore, asylees with convictions that render them inadmissible must apply for a waiver at the time of their applications for permanent residence. These measures ensure that asylum applicants in vulnerable populations have access to supportive resources and have the opportunity to demonstrate their ongoing commitment to social and personal health. Moreover, the existence of provisions allowing the revocation of asylum status ensures that adjudicators may continue to enforce concerns related to the safety of the community even after asylum is granted.

> *Barring asylum for immigrants convicted of migration-related offenses punishes them for fleeing persecution and/or seeking safety for their children, and does not make communities safer.*

The expansion of the criminal bars to asylum to include offenses related to harboring, smuggling of noncitizens by parents and family members and those previously removed further criminalizes vulnerable populations fleeing persecution. The vast expansion of migrant prosecutions at the border during the current administration has created administrative chaos and separated families that do not pose a threat to the safety of communities in the United States. The Proposed Rules threaten to magnify the harm caused by these reckless policies by further compromising the ability of those seeking safety on the southern border to access the asylum system.

The Proposed Rules expand the asylum bar to parents or other caregivers who are convicted of smuggling or harboring offenses after taking steps to help minor children enter the United States in order to flee persecution. This proposed bar is particularly insidious in light of now-public documents revealing this administration's explicit efforts to utilize smuggling prosecutions against parents and caregivers as part of its strategy of deterring families from seeking asylum in the United States. The Proposed Rules seek to take this widely condemned strategy one step further, by additionally barring those parents *already prosecuted* from obtaining asylum protections for themselves and their children. The Proposed Rules multiply the harms parents and caregivers have experienced in their treacherous journeys to safety and callously penalize parents for doing what is only human—taking all necessary steps to protect their children.

The Proposed Rules also expand the asylum bar to those who have fled persecution multiple times and therefore been convicted of illegal reentry. Their inclusion is premised on conclusory statements regarding the dangerousness of recidivist offenders, without consideration of the seriousness of prior convictions. Rather, the Proposed Rules treat all immigration violations as similar in seriousness to those previously warranting inclusion in the particularly serious crime bar, without any independent evidence to justify the expansion. Such an approach renders meaningless the limiting language of "particularly serious" in the statute.

The Proposed Rules also conflate multiple entries by noncitizens having prior removal orders with those who have entered multiple times without ever having their asylum claims heard. Many immigrants who have previously attempted entry to the

United States to flee persecution could not have been aware of the complex statutory regime that governs asylum claims and would not have knowingly abandoned their right to apply for asylum. Some asylum seekers have also been wrongly assessed in prior credible fear interviews. And others yet may have previously entered or attempted to enter the United States before the onset of circumstances giving rise to their fear. Preserving discretion to grant asylum in these circumstances allows meritorious asylum seekers to be heard and corrects errors that might have previously occurred.

> *Extending the criminal bars to immigrants convicted of misdemeanor document fraud unfairly punishes low-wage immigrant workers and does not make communities safer.*

The Proposed Rules expand the asylum bar to include any asylum seeker who has been convicted of a misdemeanor offense for use of a fraudulent document. In so doing, the Rule entirely ignores the migration-related circumstances that often give rise to convictions involving document fraud. Migrants fleeing persecution often leave their home countries with nothing but the clothes on their backs and must rely on informal networks to navigate their new circumstances. Extension of a blanket bar to asylum seekers who are compelled to resort to fraudulent means to enter the United States, or to remain safely during their applications for asylum, upends decades of settled law directing that violations of law arising from an asylum applicant's manner of flight should constitute only one of many factors to be consulted in the exercise of discretion.

Moreover, migrants in vulnerable communities who are struggling to survive during the pendency of their asylum proceedings are often exploited by unscrupulous intermediaries who offer assurances and documentation that turn out to be fraudulent. Many noncitizens working in the low-wage economy face egregious workplace dangers and discrimination and suffer retaliation for asserting their rights. The continued availability of asylum to low-wage immigrant workers can encourage them to step out of the shadows. The expansion of criminal asylum bars to sweep in all document fraud offenses, on the other hand, would unfairly prejudice immigrants with meritorious asylum claims and force them deeper into the dangerous informal economy.

> *The Proposed Rules will harm communities with overlapping vulnerabilities, including LGBTQ asylum seekers, survivors of trafficking, and survivors of domestic violence.*

The Proposed Rules exclude from asylum protections countless members of vulnerable communities who have experienced trauma, abuse, coercion, and trafficking. Many of these individuals may only become aware of their ability to apply for asylum after law enforcement encounters that lead them to service providers who can educate them about their immigration options. Despite the unique difficulties they face, the Proposed Rules would compound their harm and prevent them from achieving family unification and a pathway to citizenship.

The Proposed Rules pose a unique threat to LGBTQ immigrant community members. LGBTQ immigrants in particular may have already experienced a high degree

of violence and disenfranchisement from economic and political life in their home countries. Hate violence towards undocumented LGBTQ immigrants in the United States is already disproportionately higher than for other members of the LGBTQ population. Members of these communities also experience isolation from their kinship and national networks following their migration. This isolation, compounded by the continuing discrimination towards the LGBTQ population at large, leave many in the LGBTQ immigrant community vulnerable to trafficking, domestic violence, and substance abuse, in addition to discriminatory policing practices. The expansion of criminal enforcement and prosecution of undocumented people also harms the LGBTQ immigrant community. The Proposed Rules will therefore have a disparate impact on LGBTQ individuals whose involvement in the criminal legal system is often connected to past trauma and/or the result of biased policing.  I have represented dozens of LGBTQ asylum applicants, nearly all of whom have been granted asylum because of the horrific abuse awaiting them in their home countries.

The expansion of asylum bars to include various misdemeanor offenses that were not previously considered particularly serious also unfairly sweeps trafficking survivors into its dragnet. It is becoming more widely recognized across state court systems that trafficking survivors frequently come into contact with intervention resources and service providers only after contact with law enforcement occurs. Innovative criminal justice reform efforts currently being adopted across the country include special trafficking courts that recognize the need for discretion in the determination of criminal culpability. The same approach should be employed in the determination of asylum eligibility, where the applicant's life and safety are on the line.

The Proposed Rules instead preclude asylum adjudicators from conducting a trauma-centered approach, categorically barring countless trafficking survivors convicted of misdemeanor and felony offenses without any opportunity to present the specific circumstances of their claim.

Survivors of domestic violence include trafficking survivors and LGBTQ community members, such that inclusion of offenses related to domestic violence in the expanded asylum bars affects populations with overlapping vulnerabilities. The Proposed Rules too broadly categorize domestic violence offenses as particularly serious and sweep both offenders and survivors into their dragnet. The immigration laws extend protections to domestic violence survivors outside of the asylum context, recognizing the complex dynamics surrounding intimate partner violence. Provisions in the Violence Against Women Act allow adjudicators evaluating claims for relief arising thereunder to exercise discretion based on a number of factors and circumstances.  The blunt approach adopted by the Proposed Rules is inconsistent with the approach taken towards survivors elsewhere in the federal immigration statute and does not rely on any evidence-based justification for treating asylum seekers differently.

Moreover, the domestic violence sections of the Proposed Rules include the only categorical bar to asylum for which a conviction is not required. Domestic violence incidents all too often involve the arrest of both the primary perpetrator of abuse and the survivor. These "cross-arrests" do not always yield clear determinations of victim and

perpetrator. Authorizing asylum adjudicators to determine the primary perpetrator of domestic assault, in the absence of a judicial determination, unfairly prejudices survivors who are wrongly arrested in the course of police intervention to domestic disturbances.

Finally, the exemption for asylum applicants who can demonstrate their eligibility for a waiver under section 237(a)(7)(A) of the Immigration and Nationality Act does not cure the harm to asylum seekers caused by imposition of a categorical domestic violence related bar. Rather, it converts a non-adversarial asylum proceeding into a multi-factor, highly specific inquiry into culpability based on circumstances that may be very difficult for an asylum seeker to prove—especially if proceeding without counsel and with limited English proficiency.

> *Barring asylum for immigrants convicted of "gang-related crimes" based on unreliable evidence and racially disparate policing practices is harmful to youth of color and does not make communities safer.*

In recent years, the expansion of gang databases for use in the apprehension and removal of foreign nationals—including children—has generated tremendous concern among advocates and the communities they serve. The use of gang databases by local law enforcement and Immigration and Customs Enforcement has been widely criticized as an overbroad, unreliable and often biased measure of gang membership and involvement. The Proposed Rules expand the criminal bars to asylum to those accused of gang involvement in the commission of minor criminal offenses, embracing an open-ended adjudicative process that will inevitably result in asylum adjudicators relying unfairly on these discredited methods of gang identification. This outcome would compound the disparate racial impact of inclusion in gang databases and bar asylum seekers who are themselves fleeing violence from gangs in their home countries.

Past legislative efforts to expand the grounds of removal and inadmissibility in the Immigration and Nationality Act to include gang membership have failed to pass both houses of Congress. In addition, immigration adjudicators already routinely premise discretionary denials of relief or release on bond on purported gang membership, and scores of alleged gang members have already been deported on grounds related to immigration violations or criminal convictions for which no relief is available. Creating a "gang-related crime" bar will only exacerbate the due process violations already occurring as the result of unsubstantiated information about supposed gang ties.

In addition, by focusing on "reason to believe" as the basis for the bar, rather than the seriousness of the crime, the proposed provision is ultra vires and unconscionably limits the eligibility for asylum of those most in need of protection. The effect of the Proposed Rules would be to expand the number and type of convictions for which an analysis of eligibility is required, sweeping in even petty offenses that would otherwise not trigger immigration consequences. Thus, an asylum applicant convicted of simple assault without use of a weapon, a non-violent property crime, or even possession of under 30 grams of marijuana for personal use (otherwise exempted from the reach of the Proposed Rule), could trigger a bar to asylum if the adjudicator concludes she has "reason to believe" the offense was committed in furtherance of gang activity. In making

these determinations, asylum adjudicators would be unable to rely on uncorroborated allegations contained in arrest reports, but could nevertheless shield their decisions by relying on discretion.

The Proposed Rules thus invite extended inquiry into the character of young men of color who otherwise have meritorious asylum claims, based on information gained through racially disparate policing practices. These rules multiply the harm to asylum seekers of color subject to racially disparate policing that results in racially disparate rates of guilty pleas to minor offenses. This same population is overrepresented in gang databases, which are notoriously inaccurate, outdated, and infected by racial bias.

### VII.    The Proposed Rules are ultra vires to the federal immigration statute to the extent they purport to bar eligibility through a categorical exercise of discretion

When Congress speaks clearly through a statute, the plain meaning of that statute governs. Congress by statute permits the Attorney General to designate certain categories of offenses as "particularly serious crimes." As such, Congress *explicitly* permitted the Attorney General to designate a non-aggravated felony to be a particularly serious crime and thus to disqualify a person from asylum. In the context of asylum, all aggravated felonies are *per se* particularly serious crimes and the Attorney General "may designate by regulation [other] offenses that will be considered to be" a particularly serious crime for purposes of asylum.

Here, however—seemingly in an attempt to insulate the Proposed Rules from review, the agencies attempt to designate new bars to asylum both by designating them as "particularly serious crimes" pursuant to 8 U.S.C. § 1158(b)(2)(B)(ii) and rendering them categorically exempt from a positive discretionary adjudication of asylum pursuant to 8 U.S.C. § 1158(b)(2)(C). This effort is unlawful. Section 1158(b)(2)(B)(ii) does permit the Attorney General to, if he wishes, attempt to designate some classes of offenses as particularly serious crimes; such designations are reviewable for legal error (and as explained above, the commenters believe these expansions are unlawful). However, if the offense is not a particularly serious crime, then a discretionary decision must be rendered on the application. It is true that the Attorney General may also provide for "additional limitations and conditions" on asylum applications so long as they are "consistent" with the with the asylum statute. In this case, however, the Proposed Rules add sweeping categories of offenses that automatically remove an applicant from the consideration of discretion—a regulatory proposal that is ultra vires to the plain text of the statute.

To the extent that the proposed rules would adopt a bar to asylum based on a categorical discretionary bar, rather than a particularly serious crime designation, they are similar to the rules struck down by numerous Circuit Courts of Appeal in the context of adjustment of status for those considered by law to be "arriving aliens." Purporting to exercise discretion categorically, then-Attorney General Reno putatively rendered that class of noncitizens ineligible for adjustment of status, a determination that is ordinarily discretionary, even though the statute seemed to allow eligibility. Multiple Circuit Courts of Appeal struck down the proposed regulations, finding them to reflect an impermissible

reading of the statute in light of the fact that Congress carefully defined in the statute the categories of people eligible to apply for adjustment of status.

The same logic applies here. In the asylum statute, Congress explicitly made the commission of a particularly serious crime a bar to asylum. The canon of interpretation known as *expressio unius est exclusio alterius* instructs that,"expressing one item of [an] associated group or series excludes another left unmentioned." The Proposed Rules attempt to create numerous categories of discretionary "pseudo-particularly serious crimes," barring asylum through a categorical exercise of discretion even if those offenses are ultimately found not to be particularly serious crimes. Such an effort violates this canon of interpretation, and places the Proposes Rules ultra vires to the statute.

## VIII.   Conclusion

In my many years of working with asylum-seekers and dealing with the Immigration Courts, USCIS, CBP, the BIA, and the Circuit Courts, I have seen our system deteriorate.  The backlogs are out of control at every level.  The law has become increasingly complicated and difficult for laypeople to navigate.  The practical effects of the newly proposed rules would wreak further havoc on our legal system, the lives of asylum-seekers and their families, and on the credibility of our nation in the eyes of the world.

Sincerely,

Aubra Fletcher

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 07, 2020
**Status:** Posted
**Posted:** January 08, 2020
**Tracking No.** 1k4-9eb9-db3w
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0029
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Eleanor Hoague
**Address:**
    3753 NE 188th St
    Seattle,  WA,  98155
**Email:** echoague@gmail.com
**Phone:** 2063652225

---

## General Comment

I am a retired immigration attorney with substantial experience in asylum applications. I am simply appalled by the proposed changes which in effect expand the reasons by which asylum may be denied. The idea that the crime of driving while under the influence is a serious crime, constituting a danger to the United States is beyond belief. At over 1,000,000 arrests per year, it is one of the most common reasons for arrest in the United States. In most states, it is judged to be a mere misdemeanor, barring extenuating circumstances. Using a misdemeanor as a basis for denying asylum is a major redrafting of the law of asylum as it was passed by Congress.

Further, the idea that a person who has been accused BUT NOT CONVICTED of an domestic violence offense, is deeply troubling and antithetical to the constitutional guarantee against double jeopardy. Although an asylum case is not a criminal case, it takes on every quality of a criminal case when an immigrant must defend against such an accusation not only in criminal court, but also in immigration court in order to be afforded the right to asylum. This does not pass the the sniff test.

It is extremely difficult to be granted asylum in the United States. Asylum laws were passed in order to provide a form of relief for those people fleeing persecution. It would be a travesty and overzealous application of asylum limitations if a DUI conviction or a mere accusation of domestic violence would preclude such relief.

DO NOT PASS THESE ANY OF THESE LIMITATIONS PROPOSED BARS TO ASYLUM ELIGIBILITY.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 07, 2020
**Status:** Posted
**Posted:** January 08, 2020
**Tracking No.** 1k4-9eb8-k7s7
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0030
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Juan Mendez

## General Comment

This proposed rules are a terrible idea that will harm asylum seekers. They seek to create a system of suspicion towards them and are especially harsh when viewed through a trauma-informed lens. Asylum seekers are an inherently vulnerable population because of the trauma they have experienced in their countries of origin and, often, along the journey to find safety. Existing literature suggests that at least one out of every three asylum seekers struggles with depression, anxiety, and/or post-traumatic stress disorder (PTSD). One recent study found the mental health problems facing refugees and asylum seekers so acute that more than a third of the study's sample admitted having suicidal thoughts in the preceding two weeks.

Studies also consistently reveal a high prevalence of comorbidity of PTSD and substance use disorders, with individuals with PTSD up to 14 times more likely to struggle with a substance use disorder. Asylum seekers in the United States are often unable to access affordable medical care and treatments for complex trauma; some turn to drugs and alcohol in an effort to self-medicate. The proposed new bars to asylum include any drug-related conviction (with one exception for a first minor marijuana possessory offense) and any second conviction for driving under the influence. This approach is not only cruel but also ignores the evidence. Particularly given the vulnerabilities of asylum seeking populations, prior struggles with addiction should be addressed with treatment and compassion, not a closed door and deportation order.

Immigration adjudicators already maintain the authority to deny asylum to individuals with drug-related criminal histories on the basis of discretion. Denying asylum seekers even the opportunity to present the countervailing factors of their past trauma and potential recovery is simply cruel. It rids them of the chance to actually tell their story.

AR.08413

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 07, 2020
**Status:** Posted
**Posted:** January 08, 2020
**Tracking No.** 1k4-9eb6-r4d4
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0031
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Sebastian Zavala

---

## General Comment

I oppose the new rules for the following reasons

-they do not comply with UN rules on the treatment of refugees and asylees
-they violate the human rights of asylees
-they are arbitrary and capricious and do not have a sufficient nexus to a government interest
-they violate the due process clause and equal protection clauses of the Constitution
-they are purposely aimed at harming vulnerable populations who are fleeing persecution in their home countries


I would be personally harmed by the law going into effect because I would be unable to effectively provide aid to asylums and refugees through my programs at the Immigration Advocates Network and immi.org.

Therefore I request that this rule not go into effect, now or ever.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 07, 2020
**Status:** Posted
**Posted:** January 08, 2020
**Tracking No.** 1k4-9eb5-s7qn
**Comments Due:** January 21, 2020
**Submission Type:** API

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0032
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Mary Durbin
**Address:**
  7425 La Vista Drive
  Apt. 611
  Dallas,  Texas,  75214
**Email:** mdurbin12@yahoo.com
**Phone:** 2149062822

---

## General Comment

As an attorney who practiced asylum law exclusively for over four years, I strongly oppose this proposed regulation.

On the surface, alien smuggling or harboring may appear to be an appropriate bar to asylum. However, the statutory language is extremely broad:

"Harboring" under 8 U.S.C. 1324(a)(1)(A)(iii) entails the following three elements:
(1) the noncitizen came, entered or remained in the United States in
violation of the law,
(2) the defendant knew or recklessly disregarded that the noncitizen
entered or remained in the United States in violation of the law,
(3) the defendant concealed, harbored or shielded from detection the
noncitizen in any place, including any building or any means of
transportation.

Under this statute, one could be convicted of "harboring" for allowing any undocumented person to reside with him/her or even giving an undocumented person a ride. This may include, for example, a live-in employee who provides babysitting or elder care, a friend, or even an immediate family member. I am aware of at least one case in which a woman was prosecuted under the statute for allowing her undocumented boyfriend to live with her. It would be unjust to prevent a sincere asylum seeker from obtaining asylum simply because s/he was trying to provide lodging to a similarly situated "alien."

AR.08415

I object to the bar for illegal reentry as overbroad. Many asylum seekers I have represented have re-entered the U.S. because of a new threat that arose in their home country subsequent to their departure from the U.S.

I further object to the bar for any crime "involving street gang activity." This could include nonviolent activity as minor as spraying graffiti on a building. Further, I have personally represented sincerely reformed gang members who have learned from their pasts and devoted their lives to preventing youth from becoming involved with gangs. Surely, this is the type of person we should want in our country--especially if they are seeking asylum and would not be safe in their home country due to their prior gang affiliation or other reasons.

In addition, I find it disturbing that the proposed regulation would bar folks who merely have been arrested, but not convicted, of domestic violence offenses. Immigration officers should not attempt to substitute their own judgment for the judgment of the trier of fact in the criminal case.

For these and other reasons, I strongly urge the rejection of these proposed regulations.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 08, 2020
**Status:** Posted
**Posted:** January 10, 2020
**Tracking No.** 1k4-9ebr-yijp
**Comments Due:** January 21, 2020
**Submission Type:** API

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0033
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

As the Director of a Refugee Women's Health Clinic in a large urban setting I am writing to voice my opposition to the proposed changes to baring asylum eligibility. Low level offenses are not dangerous, nor should they exclude anyone from being allowed to seek refuge within our country. As someone who personally was convicted of a low level offense as a teenager I can't imagine being barred from being allowed to live in a safe, prosperous country like the US due to a silly mistake I made many years ago. There is no basis for this change, and no data to support the value of the change, so I strongly oppose it.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 08, 2020
**Status:** Posted
**Posted:** January 10, 2020
**Tracking No.** 1k4-9ebs-q1za
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0034
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Whitney Leeds
**Address:**
   1601 Vine St.
   Denver,  CO,  80206

## General Comment

To Whom it May Concern:

I am writing in response to the above-referenced Proposed Rules to express my strong opposition to the Proposed Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019.

For the reasons detailed in the comments that follow, the Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

Thank you for the opportunity to submit comments on the Proposed Rules. You will find them attached.

Sincerely,
Whitney Leeds
Denver-based attorney, Colorado bar #47688

## Attachments

Comment to Proposed Rule, Jan 2020, 457452

AR.08418

Submitted via *[https://www.regulations.gov/document?D=EOIR-2019-0005-0001]*

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41; Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility

January 8, 2020

---

**DETAILED COMMENTS in opposition to the Proposed Rules re Procedures for Asylum and Bars to Asylum Eligibility, 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41**

**TABLE OF CONTENTS [with jump-links]**

I. Introduction
II. The Proposed Rules unnecessarily and cruelly exclude bona fide refugees from asylum eligibility
III. The Proposed Rules violate the letter and spirit of United States international treaty obligations
IV. Those precluded from asylum eligibility will be gravely impacted even if granted withholding or protection under the Convention Against Torture
V. The Proposed Rules will result in "mini-trials" in immigration court, undermine judicial efficiency and result in racially-biased decision-making
VI. The proposed definition of "conviction" and "sentence" for the purposes of the new bars further excludes those in need of protection
VII. The Proposed Rules will disparately impact vulnerable populations already routinely criminalized, including LGBTQ immigrants, survivors of trafficking and domestic violence, and immigrant youth of color
VIII. The Proposed Rules are ultra vires to the federal immigration statute to the extent they purport to bar eligibility through a categorical exercise of discretion

AR.08419

## I.    Introduction

On December 19th, the Department of Homeland Security (DHS) and the Department of Justice (DOJ) issued a joint set of Proposed Rules that would make three primary changes to the rules governing asylum adjudications.

The first proposed set of changes adds the following seven *categorical* bars to asylum eligibility: (1) any conviction of a felony offense; (2) any conviction for "smuggling or harboring" under 8 U.S.C. § 1324(a), even if the asylum seeker committed the offense for the purpose of bringing her own spouse, child or parent to safety; (3) any conviction for illegal reentry under 8 U.S.C. § 1326; (4) any conviction for an offense "involving criminal street gangs," with the adjudicator empowered to look to any evidence to determine applicability; (5) any second conviction for an offense involving driving while intoxicated or impaired; (6) any conviction *or accusation of conduct* for acts of battery involving a domestic relationship; (7) and any conviction for several newly defined categories of misdemeanor offenses, including *any* drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits.

The second section of the Proposed Rules provides a multi-factor test for immigration adjudicators to determine whether a criminal conviction or sentence is valid for the purpose of determining asylum eligibility. The third section rescinds a provision in the current rules regarding the reconsideration of discretionary asylum.

Taken together, these proposed changes constitute an unnecessary, harsh, and unlawful gutting of the asylum protections enshrined in United States and international law. I submit submits these comments to express opposition to the entirety of the Proposed Rules and grave concerns with the administration's continued efforts to exclude refugees from obtaining the security and stability the United States asylum system has long promised. We urge that the Proposed Rules be rescinded in their entirety.

## II.    The Proposed Rules unnecessarily and cruelly exclude bona fide refugees from asylum eligibility

*The barriers to asylum for those previously involved in the criminal legal system are already sweeping in scope; adding more barriers is cruel and unnecessary.*

The United States asylum system was first codified in statute through the Refugee Act of 1980, described by one prominent scholar as a bipartisan attempt to "reconcile our rhetoric with our law, our national immigration policy and our international treaty obligations so that we could

maintain a consistent posture towards the world as a nation with a strong humanitarian tradition and a unique historic role as a haven for persons fleeing oppression."[1] The Act—among other measures designed to bring the United States domestic legal code into compliance with the provisions of the United Nations Protocol Relating to the Status of Refugees—created a "broad class" of refugees eligible for a discretionary grant of asylum.[2]

The asylum protections provided by United States law are sacred. Asylum provides those fleeing horrors with physical safety, a path to citizenship and security, and the opportunity to reunite with immediate family members who may still remain abroad in danger.[3] Many see the domestic asylum system as a symbol of the United States' commitment never to repeat its failure to save thousands of Jewish refugees refused entry to the United States on the *St. Louis* and others fleeing the Holocaust.[4] Others point to the critical role that domestic asylum policy plays in serving the United States' foreign policy interests abroad.[5] For those individuals seeking asylum in the United States, the stakes could not be higher—a claim denied often means return to death or brutal persecution.[6]

The laws, regulations, and process governing asylum adjudications are already exceedingly harsh. Asylum seekers bear the evidentiary burden of establishing their eligibility for asylum[7] in the face of a complex web of laws and regulations, without the benefit of appointed counsel and often from a remote immigration jail.[8] The obstacles to winning asylum are exceedingly high; indeed in some parts of the country and before certain immigration judges, almost no one succeeds.[9] Today, newly imposed barriers to accessing asylum in the United

---

[1] Deborah Anker, "The Refugee Act of 1980: An Historical Perspective," *In Defense of the Alien* 5 (1982): 89-94, https://www.jstor.org/stable/23141008?read-now=1&refreqid=excelsior%3A1060953608aa0bdd30d5d506e1ff6318&seq=1#page_scan_tab_contents.

[2] *See I.N.S. v. Cardoza-Fonseca*, 40 U.S. 421, 423 (1987).

[3] The permanency and family reunification benefits that accompany asylum are not provided to those granted withholding of removal or protection under the Convention Against Torture, the alternative forms of relief described throughout the Proposed Rules as a justification for the breadth of the new proposed bars. For more details on the differences between the forms of protection, *see* section VI *infra*.

[4] Dara Lind, "How America's rejections of Jews fleeing Nazi Germany haunts our refugee policy today," *Vox*, January 27, 2017, https://www.vox.com/policy-and-politics/2017/1/27/14412082/refugees-history-holocaust.

[5] Council on Foreign Relations, *Independent Task Force Report No. 63: U.S. Immigration Policy* (2009), 117 (additional or dissenting view by Elisa Massimino) ("For better or worse, the United States sets the standard for reasonable and humane treatment of migrants around the world. If the United States endorses harsh treatment of immigrants, it erodes the norms designed to protect them, and other countries will have license to do the same.").

[6] *See, e.g.*, Sarah Stillman, "When deportation is a death sentence," *The New Yorker*, January 8, 2018, https://www.newyorker.com/magazine/2018/01/15/when-deportation-is-a-death-sentence.

[7] 8 USC § 1158(b)(1)(B); 8 CFR § 1240.8(d).

[8] *See* Daniel Connolly, Aaron Montes, and Lauren Villagran, "Asylum seekers in U.S. face years of waiting, little chance of winning their cases," *USA Today,* September 25, 2019, https://www.usatoday.com/in-depth/news/nation/2019/09/23/immigration-court-asylum-seekers-what-to-expect/2026541001/.

[9] Manuel Roig-Franzia, "Immigrants risk it all seeking asylum. The answer is almost always 'no,'" *Washington Post,* July 24, 2019, https://www.washingtonpost.com/lifestyle/style/migrants-risk-it-all-seeking-asylum-the-answer-in-court-is-almost-always-no/2019/07/23/9c161b2e-a3f7-11e9-b732-41a79c2551bf_story.html.

States are breathtaking in scope, with those seeking safety at the southern border subject to return to dangerous conditions in Mexico and an overlapping web of policies that preclude asylum eligibility for countless migrants simply because of their national origin, manner of entry, or their flight path.[10] There are consistent reports of the documented deaths and brutalities endured by those who sought but were denied asylum protections in the United States.[11]

Specifically, the bars to asylum based on allegations of criminal conduct are *already* sweeping and over-broad in nature and scope.[12] Any conviction for an offense determined to be an "aggravated felony" is considered a *per se* "particularly serious crime" and therefore a mandatory bar to asylum.[13] "Aggravated felony" is a notoriously vague term, which exists only in immigration law. Originally limited to murder, weapons trafficking and drug trafficking,[14] it has metastasized to encompass hundreds of offenses, many of them neither a felony nor aggravated, including petty offenses such as misdemeanor shoplifting, simple misdemeanor battery, or sale of counterfeit DVDs.[15] The existing crime bars should be narrowed, not expanded. Even for those not categorically barred from relief, the immigration adjudicator maintains full discretion to deny asylum.[16]

Immigration adjudicators already have vast discretion to deny asylum to those who meet the refugee definition but have been convicted of criminal conduct.[17] Further categorical bars are not needed. The agencies' efforts to add *seven* new sweeping categories of barred conduct to the asylum eligibility criteria is unnecessary and cruel. The Proposed Rules drain the phrase "*particularly serious* crime," 8 U.S.C. § 1158, of any sensible meaning.

---

[10] The National Immigrant Justice Center maintains a frequently updated timeline providing details of each of the asylum bans and other policies issued and implemented by the administration undermining asylum access at https://www.immigrantjustice.org/issues/asylum-seekers-refugees. For more information on the harms and rights abuses inherent in the Migrant Protection Protocols, or "Return-to-Mexico" program, *see* Human Rights First, *Delivered to Danger* (December 2019), https://www.humanrightsfirst.org/campaign/remain-mexico.

[11] *See, e.g.,* Stillman, "Death Sentence," *supra* (reporting on a database of more than sixty cases of individuals killed after deportation); *see also* Maria Sachetti, "'Death is waiting for him,'" *The Washington Post*, December 6, 2018, https://www.washingtonpost.com/graphics/2018/local/asylum-deported-ms-13-honduras/ (telling the story of Santos Chirino, denied asylum by a Virginia immigration judge, deported, and then murdered by those he told the immigration judge he feared); and Kevin Sieff, "When death awaits deported asylum seekers," *Washington Post*, December 26, 2018, https://www.washingtonpost.com/graphics/2018/world/when-death-awaits-deported-asylum-seekers/.

[12] The existing categorical bars to asylum eligibility are discussed in detail on p. 69641 of the Proposed Rules.

[13] 8 U.S.C. §§ 1158(b)(2)(A)(ii) and (B)(i).

[14] Pub. L. No. 100-690, § 7342, 102 Stat. 4181, 4469-70.

[15] 8 U.S.C. § 1101(a)(43). *See also* Nancy Morawetz, "Understanding the Impact of the 1996 Deportation Laws and the Limited Scope of Proposed Reforms," *Harvard Law Review* 113 (2000): 1939-40 (criticizing the "'Alice-in-Wonderland-like definition of the term 'aggravated felony'"); Melissa Cook, "Banished for Minor Crimes: The Aggravated Felony Provisions of the Immigration and Nationality Act as a Human Rights Violation," *Boston College Third World Law Journal* (2003): 293.

[16] *See Matter of Pula*, 19 I.&N. Dec. 467 (BIA 1987).

[17] *See id.*

The Proposed Rules are also arbitrary and capricious. They would constitute a marked departure from past practice. And the agencies have proffered no evidence or data to support these changes.

One assumption fundamentally underlying the Proposed Rules, for example, is that every noncitizen convicted of any offense punishable by more than a year in prison necessarily constitutes a danger to the community. But no evidence is provided to support that assumption, and a criminal record, does not, in fact, reliably predict future dangerousness.[18] The Proposed Rules are so capricious as to peremptorily postulate a noncitizen's supposed danger to the community even in circumstances when a federal, state, or local judge has concluded that no danger exists by, for example, imposing a noncustodial sentence. Conviction for a crime does not, without more, make one a present or future danger—which is why the Refugee Convention's particularly serious crime bar, made part of United States law through 8 U.S.C. § 1158, should only properly apply if both (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows that she is a present or future danger.[19]

Similarly, the Proposed Rules fail to address or account for the fact that a significant number of people may agree to plead to a crime as to avoid the threat of a severe sentence; not only is a conviction an unreliable predictor of future danger, it can also be an unreliable indicator of past criminal conduct.[20] In addition, the Proposed Rules do not address and make no exception for convictions for conduct influenced by mental illness or duress.

The Board of Immigration Appeals has cautioned that, "in light of the unusually harsh consequences which may befall a [noncitizen] who has established a well-founded fear of persecution; the danger of persecution should generally outweigh all but the most egregious of adverse factors."[21] Yet because of the categorical nature of the seven news bars proposed here, asylum seekers will be precluded from obtaining protection on the basis of a vast array of conduct, without any discretion left to the immigration adjudicator to determine whether the circumstances merit such a harsh penalty. Indeed, in the case of the domestic-violence related

---

[18] See U.S. Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders* (2017) (noting that recidivism rates fall substantially with age); U.S. Sentencing Commission, *Recidivism Among Federal Violent Offenders* (2019) (noting that non-violent offenders recidivate at significantly lower rates); J. Ramos and M. Wenger, "Immigration and recidivism: What is the Link?" *Justice Quarterly* (2019) (finding no correlation between recidivism rates and citizenship status among those formerly incarcerated for felonies in Florida prisons).

[19] See U.N. High Commissioner for Refugees, *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 11 (July 2007), http://www.unhcr.org/en-us/576d237f7.pdf (the Refugee Convention's particularly serious crime bar only applies if (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows she is a "present or future danger.").

[20] John H. Blume and Rebecca K. Helm, "The Unexonerated: Factually Innocent Defendants Who Plead Guilty," *Cornell Law Review* 100 (2014): 157, https://pdfs.semanticscholar.org/c00f/96d421adf1846d120bf802a8854b5e2c0ff2.pdf.

[21] *Pula*, 19 I.&N. Dec. at 474.

ground, the categorical bar will be imposed on the basis of *mere allegations* of conduct without any adjudication of guilt.[22]

Those unjustly precluded from even seeking a discretionary grant of asylum by the Proposed Rules will include, for example: individuals struggling with addiction with one drug-related conviction, regardless of the circumstances of the offense; asylum seekers with two convictions for driving under the influence, regardless of whether the applicant has sought treatment for alcohol addiction or the circumstances of the convictions; community members seeking asylum defensively who have been convicted of a document fraud offense related to their immigration status; and asylum-seeking mothers convicted for bringing their own child across the southern border in an effort to find safety.

> *The Proposed Rules cruelly disregard the connections between trauma and involvement in the criminal legal system.*

The harsh nature of the Proposed Rules is especially evident when viewed through a trauma-informed lens. Asylum seekers are an inherently vulnerable population because of the trauma they have experienced in their countries of origin and, often, along the journey to find safety. Existing literature suggests that at least one out of every three asylum seekers struggles with depression, anxiety, and/or post-traumatic stress disorder (PTSD).[23] One recent study found the mental health problems facing refugees and asylum seekers so acute that more than a third of the study's sample admitted having suicidal thoughts in the preceding two weeks.[24]

Studies also consistently reveal a high prevalence of comorbidity of PTSD and substance use disorders, with individuals with PTSD *up to 14 times more likely* to struggle with a substance use disorder.[25] Asylum seekers in the United States are often unable to access affordable medical care and treatments for complex trauma;[26] some turn to drugs and alcohol in an effort to self-medicate.[27] The proposed new bars to asylum include *any* drug-related conviction (with one

---

[22] The Proposed Rules at p. 69651 explain that the regulations will "render ineligible [non-citizens] who engaged in acts of battery and extreme cruelty in a domestic context in the United States, regardless of whether such conduct resulted in a criminal conviction."

[23] Giulia Turrini et al., "Common mental disorders in asylum seekers and refugees: umbrella review of prevalence and intervention studies," *International Journal of Mental Health Systems* 11 (August 2017): 51, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5571637/.

[24] Megan Brooks, "Refugees have high burden of mental health problems," *Psychiatry and Behavioral Health Learning Network*, June 2019, https://www.psychcongress.com/article/refugees-have-high-burden-mental-health-problems.

[25] Jenna L McCauley et al., "Posttraumatic Stress Disorder and Co-Occurring Substance Use Disorders: Advances in Assessment and Treatment," *Clinical Psychology Science and Practice* 19, 3 (October 2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3811127/.

[26] For more information on immigrant eligibility for federal benefits, *see* https://www.nilc.org/issues/health-care/.

[27] Carrier Clinic, *Trauma and Addiction* (2019), https://carrierclinic.org/2019/08/06/trauma-and-addiction/ ("...some people struggling to manage the effects of trauma in their lives may turn to drugs and alcohol to self-medicate. PTSD symptoms like agitation, hypersensitivity to loud noises or sudden movements, depression, social withdrawal

AR.08424

exception for a first minor marijuana possessory offense) and any second conviction for driving under the influence. This approach is not only cruel but also ignores the evidence. *Particularly* given the vulnerabilities of asylum seeking populations, prior struggles with addiction should be addressed with treatment and compassion, not a closed door and deportation order.

Immigration adjudicators already maintain the authority to deny asylum to individuals with drug-related criminal histories on the basis of discretion; denying asylum seekers even the opportunity to present the countervailing factors of their past trauma and potential recovery is simply cruel.

## III.    The Proposed Rules violate the letter and spirit of United States international treaty obligations

By acceding to the 1967 Protocol Relating to the Status of Refugees,[28] which binds parties to the United Nations Convention Relating to the Status of Refugees,[29] the United States obligated itself to develop and interpret United States refugee law in a manner that complies with the Protocol's principle of non-refoulement (the commitment not to return refugees to a country where they will face persecution on protected grounds), even where potential refugees have allegedly committed criminal offenses. As noted above, adjudicators already have over-broad authority to deny asylum based on allegations of criminal activity, which vastly exceeds the categories for exclusion and expulsion set out in the Convention. Instead of working towards greater congruence with the terms of the Convention, the Proposed Rules carve out categorical bars from protection that violate both the language and spirit of the treaty.

While the Convention allows states to exclude and/or expel potential refugees from protection, the circumstances in which this can occur are limited. In particular, the Convention allows states to exclude and/or expel individuals from refugee protection if the individual "having been convicted by a final judgement of a particularly serious crime, constitutes a danger to the community of that country."[30] However, this clause is intended for "extreme cases," in which the particularly serious crime at issue is a "capital crime or a very grave punishable act."[31] The United Nations High Commissioner for Refugees (UNHCR) has asserted that to constitute a

---

and insomnia may seem more manageable through the use of sedating or stimulating drugs depending on the symptom. However, addiction soon becomes yet another problem in the trauma survivor's life. Before long, the 'cure' no longer works and causes far more pain to an already suffering person.").

[28] United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268.

[29] Convention Relating to the Statute of Refugees, July 28, 1951, 140 U.N.T.S. 1954 (hereinafter "Refugee Convention").

[30] *Id*. at art. 33(2).

[31] U.N. High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees* 2, U.N. Doc. HCR/IP/Eng/REV. ¶ 154-55, (1979, reissued 2019).

AR.08425

"particularly serious crime," the crime "must belong to the gravest category" and be limited "to refugees who become an extremely serious threat to the country of asylum due to the severity of crimes perpetrated by them in the country of asylum."[32] Moreover, the UNHCR has specifically noted that the particularly serious crime bar does not encompass less extreme crimes; "[c]rimes such as petty theft or the possession for personal use of illicit narcotic substances would not meet the threshold of seriousness."[33] Finally, when determining whether an individual should be barred from protection for having been convicted of a particularly serious crime, the adjudicator must conduct an individualized analysis and consider any mitigating factors.[34]

As noted above, legislation and agency interpretation of the Immigration and Nationality Act have already expanded the particularly serious crime bar bar far beyond what was contemplated in the Convention by creating categorical particularly serious crimes through the aggravated felony definition. The Proposed Rules would amplify the dissonance between U.S. refugee law and the Convention, as well as the violation of U.S. obligations under the Convention, by creating categorical bars within categorical bars. For example, at p. 69659, the Proposed Rules first exclude from protection anyone who was convicted of a felony and then at p. 69660, define "felony" as "any crime punishable by more than one of imprisonment" without any reference to other factors, including dangerousness. The Proposed Rules described the increased categorization of the particularly serious crime bar as necessary because the case-by-case adjudication previously used for non-aggravated felony offenses was "inefficient,"[35] but an individualized analysis is exactly what the Convention requires to ensure only those individuals who have been convicted of crimes that are truly serious and therefore present a future danger are placed at risk of refoulement.

Additionally, outside of the aggravated felony context, it has generally been well understood by the Board of Immigration Appeals and the Courts of Appeals that low-level, "run-of-the-mill" offenses do not constitute particularly serious crimes.[36] Under this long-standing interpretation of the particularly serious crime bar in the INA, there is simply no scenario in which low-level offenses like misdemeanor driving under the influence where no injury is caused to another or simple possession of a controlled substance or paraphernalia would constitute a particularly serious crime.

---

[32] U.N. High Comm'r for Refugees (UNHCR), *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 7 (July 2007), http://www.unhcr.org/enus/576d237f7.pdf.

[33] *Id*. at ¶ 10.

[34] *Id*. at ¶ 10-11; U.N. High Commissioner for Refugees, *The Nationality, Immigration and Asylum Act 2002: UNHCR Comments on the Nationality, Immigration and Asylum Act 2002 (Specification of Particularly Serious Crimes) Order 2004*, 4 (2004).

[35] Proposed Rules at 69646.

[36] *Delgado v. Holder*, 648 F.3d 1095, 1110 (9th Cir. 2011) (en banc) (J. Reinhardt, concurring).

The reason for this is common sense. As Judge Reinhardt explained in a concurring opinion in *Delgado v. Holder*,[37] a decision the Proposed Rules cite in support of the expanded bars, run-of-the-mill crimes like driving under the influence have "little in common" with other crimes the Board of Immigration Appeals has deemed particularly serious—e.g., felony menacing with a deadly weapon, armed robbery, and burglary of a dwelling in which the offender is armed or causes injury.[38] Judge Reinhardt further noted that public opinion does not treat them similarly either: "American voters would be unlikely to elect a president or vice president who had committed a particularly serious crime, yet they had no difficulty in recently electing to each office a candidate with a DUI record."[39] Barring individuals from asylum based on these relatively minor offenses renders the "particularly serious" part of the "particularly serious crime" bar meaningless.

The expansion of the asylum bar to include individuals who have been convicted of reentering the United States without inspection pursuant to INA § 276[40] is also unlike any of the other bars previously established or as interpreted by the Board of Immigration Appeals or Circuit Courts of Appeals. It is an offense with no element of danger or violence to others, and has no victim. Most significantly, and more so than other bars contained in the Proposed Rules, barring asylum based on the manner of entry directly violates the Convention's prohibition on imposing penalties based on a refugee's manner of entry or presence.[41] This prohibition is a critical part of the Convention because it recognizes that refugees often have little control over the place and manner in which they enter the country where they are seeking refuge.

## IV.  Those precluded from asylum eligibility will be gravely impacted even if granted withholding of removal or protection under the Convention Against Torture

Throughout the Proposed Rules, the agencies defend the harsh and broad nature of their proposal by pointing to the continued availability of alternative forms of relief for those precluded from asylum eligibility under the new rules.[42] The availability of these alternatives forms of relief, however—known as withholding of removal and protection under the Convention Against Torture (CAT)—does not nullify the harm created by the Proposed Rule's new limits on asylum. The protections afforded by CAT and by statutory withholding of removal are limited in scope and duration, and they are harder to obtain. As a result, a Rule that limits *bona fide* refugees to withholding of removal and CAT protection would impose a very real harm on individuals who have come to the United States in search of protection.

---

[37]  648 F.3d at 1110 (J. Reinhardt, concurring).

[38] *Id*. at 1110.

[39] *Id*. at 1110.

[40] Proposed Rules at 69659, 69660.

[41] Refugee Convention, *supra*, at art 31.

[42] *See, e.g.,* Proposed Rules at 69644.

First, the most serious harm that can befall an individual as a result of these Proposed Rules is removal to persecution and torture, and the existence of withholding of removal does not account for that risk. CAT and withholding protections demand a higher level of proof than asylum claims: a clear probability of persecution or torture.[43] Thus, an individual could have a valid asylum claim but be unable to meet the standard under the other forms of relief and therefore would be removed to their country of origin, where they would face persecution or even death.

Even for those who meet the higher standard, withholding and CAT recipients are still subject to significant prejudice. For example, they have no ability to travel internationally. The United Nations Convention Relating to the Status of Refugees[44] affords refugees the right to travel in mandatory terms. Article 28 states, "Contracting States shall issue to refugees lawfully staying in their territory travel documents for the purpose of travel outside their territory." Withholding and CAT recipients do not have access to a travel document as contemplated by Article 28. By regulation, refugee travel documents are available only to asylees.[45] And the Board of Immigration Appeals requires that an individual granted withholding and CAT—unlike an individual granted asylum—must simultaneously be ordered removed, making any international travel a "self-deportation."[46] Refugees granted only withholding of removal or CAT protection are thus effectively trapped within the United States in long-term limbo.

Withholding and CAT recipients also face permanent separation from their spouses and children. Because international travel is prohibited, these individuals cannot reconnect with their families in a third country. And they also cannot reunite with family in the United States because only asylees and refugees are eligible to petition for a spouse and children to join them as derivatives on that status.[47] For many, this will mean that the Proposed Rules institute yet another formal policy of family separation. For example, a mother with two young children who flees to the United States and is subject to one of the expanded asylum bars will not be able to ensure that her children will be able to obtain protection in the United States with her if she is granted relief.  Rather, if her children are still in her home country, they would need to come to the United States and seek asylum on their own, likely as unaccompanied children. If her

---

[43] Withholding of removal requires the petitioner to demonstrate his or her "life or freedom would be threatened in that country because of the petitioner's race, religion, nationality, membership in a particular social group, or political opinion." *INS v. Stevic*, 467 U.S. 407, 411 (1984) (quoting 8 U.S.C. § 1231(b)(3)). Unlike asylum, however, the petitioner must show a "clear probability" of the threat to life or freedom if deported to his or her country of nationality. The clear probability standard is more stringent than the well-founded fear standard for asylum. *Id; see also Cardoza-Fonseca*, 480 U.S. at 431 (describing the difference between a well-founded fear of persecution and a clear probability of persecution). For CAT relief, an applicant must show it is more likely than not that he or she will be tortured or killed by or at the government's acquiescence if removed to the home country. 8 C.F.R. § 1208.16(c)(2).

[44] 19 U.S.T. 6223 T.I.A.S. No. 6577 (1968).

[45] 8 C.F.R. § 223.1.

[46] *See Matter of I-S- & C-S-*, 24 I.&N. Dec. 432, 434 n.3 (BIA 2008); 8 C.F.R. § 241.7.

[47] 8 C.F.R. § 208.21(a).

children fled to the United States with her, then they will need to establish their own eligibility for protection before an immigration judge, no matter their age.

Recently, this exact scenario played out with a mother who was subject to the so-called Migrant Protection Protocols (also known as Remain in Mexico) and the asylum "transit ban,"[48] which made the mother ineligible for asylum and thus required the children to establish their independent eligibility for withholding and CAT protection. An immigration judge granted the mother withholding of removal but denied protection to her young children, leaving the children with removal orders and immense uncertainty about their future.[49] Under the expanded bars in the Proposed Rules, these situations will certainly increase, separating families and forcing parents to return to countries where it has been established they more likely than not will face persecution and torture, rather than leaving their children on their own.

Withholding recipients likewise face hurdles in access to employment. Article 17 of the Refugee Convention states that a contracting state "shall accord to refugees lawfully staying in their territory the most favorable treatment accorded to nationals of a foreign country in the same circumstances, as regards the right to wage-earning employment." Recipients of withholding enjoy no such right. They must apply for work authorization, and they face frequent delays in the adjudication of these applications, which often result in the loss of legal authorization to work.[50]

And perhaps most fundamentally, there is continuing jeopardy for withholding and CAT recipients that does not exist for asylum recipients. When a noncitizen is granted asylum, the person receives a legal status.[51] Asylum, once granted, protects an asylee against removal unless and until that status is revoked.[52] None of these protections exists for withholding and CAT recipients. They have no access to permanent residency or citizenship.[53] Instead, they are subject to a removal order and vulnerable to the permanent prospect of deportation to a third country and subject to potential check ins with immigration officials where they can be made to pursue removal to third countries to which they have no connection.[54]

---

[48] 8 C.F.R. § 1208.13(c)(4).

[49] Adolfo Flores, "An Immigrant Woman Was Allowed To Stay In The US — But Her Three Children Have A Deportation Order," *Buzzfeed*, December 21, 2019, https://www.buzzfeednews.com/article/adolfoflores/an-immigrant-woman-was-allowed-to-stay-in-the-us-but-not.

[50] 8 C.F.R. § 274a.12(a)(10); *Northwest Immigrant Rights Project, et al. v. USCIS, et al.*, No. 2:15-cv-00813-JLR (W.D. Wash., filed May 22, 2015) (class action regarding delays in adjudication of work authorization).

[51] *See, e.g.*, 8 C.F.R. 245.1(d)(1) (defining "lawful immigration status" to include asylees).

[52] *See* 8 U.S.C. § 1158(c)(1)(A).

[53] *Matter of Lam*, 18 I.&N. Dec. 15, 18 (BIA 1981); 8 C.F.R. § 245.1(d)(1) (explaining that only those in "lawful immigration status" can seek permanent residency and excluding withholding recipients from such status); 8 C.F.R. § 209.2(a)(1) (authorizing adjustment of status to permanent residence for asylees); 8 C.F.R. § 316.2 (naturalization available only to permanent residents).

[54] *See R–S–C v. Sessions*, 869 F.3d 1176, 1180 (10th Cir. 2017).

AR.08429

Finally, I write to highlight a different form of prejudice that will flow from the rule: one relating to judicial efficiency. Neither withholding of removal nor CAT protection allow family members who are in the United States together and pursuing protection on the same basis to apply as derivatives on a principal application. As a result, family claims for those rendered ineligible for asylum by the new rules will have to be adjudicated separately, and potentially before different adjudicators even when the claims are interrelated and even when minor children may not be in a position to explain the claim at all or as sufficiently as a parent. In addition to being unjust to the affected family members, this approach would result in gross inefficiencies, which should be avoided in a system that already contains a significant backlog of pending cases.[55]

## V.    The Proposed Rules will result in "mini-trials" in immigration court, undermine judicial efficiency and result in racially-biased decision-making

In two significant ways, the Proposed Rules require immigration adjudicators to engage in decision-making to determine whether an asylum applicant's conduct—considered independently of any criminal court adjudication—triggers a categorical bar to asylum eligibility. First, the agencies propose that immigration adjudicators be allowed to consider "all reliable evidence" to determine whether there is "reason to believe" an offense was "committed for or related to criminal gang evidence," or "in furtherance of gang-related activity, triggering ineligibility for asylum in either case.[56] Second, the Proposed Rules permit immigration adjudicators to "assess all reliable evidence in order to determine whether [a] conviction amounts to a domestic violence offense;" and to go even further by considering whether non-adjudicated *conduct* "amounts to a covered act of battery or extreme cruelty."[57]

Requiring adjudicators to make complex determinations regarding the nature and scope of a particular conviction or, in the case of the domestic violence bar, *conduct*, will lead to massive judicial inefficiencies and slanted "mini-trials" within the asylum adjudication process. The scope of the "reliable evidence" available to adjudicators in asylum cases is potentially limitless; advocates on both sides would be obligated to present fulsome arguments to make their cases about gang connections to the underlying activity or the relationship of the asylum applicant to the alleged victim. Because of the lack of robust evidentiary rules in immigration proceedings, it will be difficult if not impossible for many applicants to rebut negative evidence marshaled against them, even if false; and in other cases, asylum applicants will struggle to find evidence connected to events that may have happened years prior (especially for those detained).

---

[55] See, e.g., Marissa Esthimer, "Crisis in the Courts: Is the Backlogged U.S. Immigration Court System at Its Breaking Point?," *Migration Policy Institute*, October 3, 2019, https://bit.ly/2sJuEWR.
[56] *See* Proposed Rules at 69649.
[57] *See* Proposed Rules at 69652.

Asylum trials, which are typically three or fewer hours under current policies, would provide insufficient time to fully present arguments on both sides of these unwieldy issues.

As the immigration courts contend with backlogs that now exceed one million cases,[58] tasking adjudicators with a highly nuanced, resource-intensive assessment of the connection of a conviction to gang activity and/or the domestic nature of alleged criminal conduct—assessments far outside their areas of expertise—will prolong asylum proceedings and invariably lead to erroneous determinations that will give rise to an increase in appeals. The Proposed Rules repeatedly cite increased efficiency as justification for many of the proposed changes.[59] Yet requiring adjudicators to engage in mini-trials to determine the applicability of categorical criminal bars, rather than relying on adjudications obtained through the criminal legal system, will dramatically *decrease* efficiency in the asylum adjudication process.

Indeed, the Supreme Court has "long deemed undesirable" exactly the type of "post hoc investigation into the facts of predicate offenses" proposed by the agencies here.[60] Instead, for more than a century the federal courts have repeatedly embraced the "categorical approach" to determine the immigration consequence(s) of a criminal offense, wherein the immigration adjudicator relies on the statute of conviction as adjudicated by the criminal court system, without relitigating the nature or circumstances of the offense in immigration court.[61] As the Supreme Court has explained, this approach "promotes judicial and administrative efficiency by precluding the relitigation of past convictions in minitrials conducted long after the fact."[62] In *Moncrieffe v. Holder*, the Court forewarned of exactly the sort of harm that would arise from these Proposed Rules; in that case, the Court rejected the government's proposal that immigration adjudicators determine the nature and amount of remuneration involved in a marijuana-related conviction, noting that "our Nation's overburdened immigration courts" would end up weighing evidence "from, for example, the friend of a noncitizen" or the "local police officer who recalls to the contrary," with the end result a disparity of outcomes depending on the whims of the individual immigration judge and a further burdened court system.[63]

---

[58] Marissa Esthimer, "Crisis in the Courts: Is the Backlogged U.S. Immigration Court System at Its Breaking Point?," *Migration Policy Institute*, October 3, 2019, https://www.migrationpolicy.org/article/backlogged-us-immigration-courts-breaking-point.

[59] *See* Proposed Rules at 69646, 69656-8.

[60] *Moncrieffe v. Holder*, 569 U.S. 184, 186 (2013).

[61] *See Moncrieffe*, 569 U.S. at 191 ("This categorical approach has a long pedigree in our Nation's immigration law."). For a more fulsome history of the development of the categorical approach in immigration court, *see* Alina Das, "The Immigration Penalties of Criminal Convictions: Resurrecting Categorical Analysis in Immigration Law," *New York University Law Review* 86, no. 6 (2011): 1689 - 1702, https://www.nyulawreview.org/wp-content/uploads/2018/08/NYULawReview-86-6-Das.pdf.

[62] *Moncrieffe*, 569 U.S. at 200-201.

[63] *Id.* at 201.

Particularly in the context of the new proposed bar related to alleged gang affiliation, I am concerned that creating a blanket exclusion for anyone who is convicted of a crime – including a misdemeanor – that an immigration adjudicator deems linked to gang activity will erroneously prevent bona fide asylum seekers from receiving protection. This rule confers on immigration adjudicators—who generally are not criminologists, sociologists, or criminal law experts—the responsibility to determine if there is "reason to believe" any conviction flows from activity taken in furtherance of gang activity. This rule will necessarily ensnare asylum seekers of color who have experienced racial profiling and a criminal legal system fraught with structural challenges and incentives to plead guilty to some crimes, particularly misdemeanors. These same individuals are vulnerable to being erroneously entered into gang databases. Such databases are notoriously inaccurate, outdated, and infected by racial bias.[64]

Indeed, asylum applicants are *already* frequently subjected to wrongful denials of protection because of allegations of gang activity made by the Department of Homeland Security on the basis of information found in notoriously unreliable foreign databases and "fusion" intelligence-gathering centers outside the United States. Empowering immigration adjudicators to render asylum applicants *categorically* excluded from protection on the basis of such spurious allegations will inevitably result in the return of many refugees back to harm.[65]

The Departments curiously argue that all gang-related offenses should be construed as "particularly serious crimes."[66] They cite statistics from up to 16 years ago in an attempt to make the point that gang members commit violent crimes and drug crimes. They then make the illogical leap to the conclusion that *all crimes*—including misdemeanor property crimes—that may be construed as connected to gang activity are particularly serious. This simply does not follow; in fact, the Proposed Rules will inevitably result in the exclusion from protection of asylum seekers of color who live in economically distressed communities and have obtained a minor conviction such as a property crime. Relying on the definition of "particularly serious crime" to prevent asylum seekers convicted of even minor crimes construed as gang-related from accessing asylum protection is disingenuous at best, and tinged with racial animus at worst.

The Departments asks for comments on: (1) what should be considered a sufficient link between an asylum seeker's underlying conviction and the gang related activity in order to

---

[64] Annie Sweeney and Madeline Buckley, "Chicago police gang data collection faulted by city's inspector general as unchecked and unreliable," *Chicago Tribune*, April 11, 2019, https://www.chicagotribune.com/news/breaking/ct-met-chicago-police-gang-data-04112019-story.html; Anita Chabria, "A routine police stop landed him on California's gang database. Is it racial profiling?," *Los Angeles Times*, May 9, 2019, https://www.latimes.com/politics/la-pol-ca-california-gang-database-calgang-criminal-justice-reform-20190509-story.html.

[65] Melissa del Bosque, "Immigration Officials Use Secretive Gang Databases to Deny Migrant Asylum Claims," *Pro Publica*, July 8, 2019, https://www.propublica.org/article/immigration-officials-use-secretive-gang-databases-to-deny-migrant-asylum-claims.

[66] Proposed Rules at p. 69650.

AR.08432

trigger the application of the proposed bar, and (2) any other regulatory approaches to defining the type of gang-related activities that should render individuals ineligible for asylum. The premise of these questions is wrong: a vague "gang related" bar should not be introduced at all. The Immigration and Nationality Act and existing regulations already provide overly broad bars to asylum where criminal behavior by an asylum seeker causes concern by an adjudicator. Adding this additional, superfluous layer of complication risks erroneously excluding bona fide asylum seekers from protection without adding any useful adjudicatory tool to the process.

## VI.    The proposed definition of "conviction" and "sentence" for the purposes of the new bars further excludes those in need of protection

The section of the Proposed Rules that outlines a new set of criteria for determining whether a conviction or sentence is valid for the purpose of determining asylum eligibility is an ultra vires exercise of authority that is not authorized by the Immigration and Nationality Act. The Proposed Rules impose an unlawful presumption against asylum eligibility for applicants who seek post-conviction relief while in removal proceedings or longer than one year after their initial convictions. They also deny full faith and credit to state court proceedings by attributing improper motives to state court actors.[67]

> *The Proposed Rules undermine Sixth Amendment protections and harms immigrants unfamiliar with the complex criminal and immigration framework governing prior convictions.*

The Proposed Rules outline a new multi-factor process asylum adjudicators must use to determine whether a conviction or sentence remains valid for the purpose of determining asylum eligibility; the proposal includes a rebuttable presumption "against the effectiveness" of an order vacating, expunging, or modifying a conviction or sentence if the order was entered into after the asylum seeker was placed in removal proceedings or if the asylum seeker moved for the order more than one year after the date the original conviction or sentence was entered.[68]

This newly created presumption unfairly penalizes asylum applicants, many of whom may not have the opportunity to seek review of their prior criminal proceedings until applying for asylum.[69] In *Padilla v. Kentucky*, the Supreme Court recognized that the immigration

---

[67] *See Saleh v. Gonzales*, 495 F.3d 17, 25-26 (2d Cir. 2007) (discussing 28 U.S.C. § 1738, requiring federal courts to give full faith and credit to state acts, records, and judicial proceedings and U.S. Const. art. IV, § 1, and finding that there was no violation where the Board of Immigration Appeals stopped short of "refusing to recognize or relitigating the validity of [Saleh's] state conviction.").

[68] Proposed Rules at 69655.

[69] On page 69656 of the Proposed Rules, the Department of Homeland Security and the Department of Justice urge that "[i]t is reasonable to conclude that an alien who has a meritorious challenge to a criminal conviction based on a procedural or substantive defect is more likely to seek post-conviction relief sooner than an alien who is seeking relief on rehabilitative grounds…"

AR.08433

consequences of a conviction are sufficiently serious for the Sixth Amendment to require a noncitizen defendant to be competently advised of them before agreeing to a guilty plea.[70] By imposing a presumption against the validity of a withdrawal or vacatur of a plea, the Proposed Rules hold asylum seekers whose rights were violated under *Padilla* to a different standard; even though they too were denied effective assistance of counsel in the course of their underlying criminal proceedings, asylum seekers will be forced to rebut a presumption that their court-ordered withdrawal or vacatur is invalid. The Proposed Rules therefore compound the harm to immigrants who, in addition to facing persecution in their home countries, have been denied constitutionally compliant process in the United States criminal legal system.

Many asylum applicants, especially those in vulnerable populations isolated from resources and unfamiliar with the due process protections available to them in the United States, may not have discovered the defects in their underlying criminal proceedings until their consultation with an immigration attorney, or until they are placed into removal proceedings, which may happen several years after a conviction. Imposing a presumption *against* the validity of a plea withdrawal or vacatur in these cases will undoubtedly lead to the wrongful exclusion of countless immigrants from asylum simply because they were unable to adequately rebut the presumption, particularly in a complex immigration court setting without the benefit of appointed counsel.

> *The Proposed Rules violate the full faith, and credit to which state court decisions are entitled.*

The Proposed Rules further improperly authorize immigration adjudicators to second-guess the decision of a state court, even where the order on its face cites substantive and procedural defects in the underlying proceeding. The proffered justification for this presumption against the validity of post-conviction relief is to "ensure that aliens do not have their convictions vacated or modified for purported rehabilitative purposes that are, in fact, for immigration purposes," "to codify the principle set forth in *Matter of Thomas and Thompson*," and to bring the analysis of post-conviction orders in line with *Matter of Pickering*.[71] The agencies misread the applicable law, however, by authorizing adjudicators to disregard otherwise valid state orders. The immigration law only requires that to be effective for immigration purposes, orders vacating or modifying convictions must be based on substantive or procedural infirmities in the underlying proceedings. The Proposed Rule goes well beyond that requirement.

---

[70] *Padilla v. Kentucky*, 559 U.S. 356 (2010).

[71] Proposed Rules at 69655-56 (*citing Matter of Thomas and Thompson*, 27 I.&N. Dec. 674 (A.G. 2019) and *Matter of Pickering*, 23 I.&N. Dec. 621 (BIA 2003), *rev'd on other grounds by Pickering v. Gonzales*, 465 F.3d 263, 267-70 (6th Cir. 2006)).

AR.08434

The Proposed Rules abandon the presumption of regularity that should accompany state court orders, thus upending settled principles of law. The Proposed Rules cite a misleading quote from *Matter of F-* in support of allowing asylum adjudicators to look beyond the face of a state court order; had the Rules' authors looked to the full case, they would have read the following: "Not only the full faith and credit clause of the Federal Constitution, but familiar principles of law require the acceptance at face value of a judgment regularly granted by a competent court, unless a fatal defect is evident upon the judgment's face. However, the presumption of regularity and of jurisdiction may be overcome by extrinsic evidence or by the record itself."[72] In *Matter of F-*, the Board of Immigration Appeals offers support for the proposition that an adjudicator should presume the validity of a state court order unless there is a reason to doubt it, contrary to the *presumption of irregularity* put forward in the Proposed Rules.

The authority extended to adjudicators by the Proposed Rules also violates the law of multiple circuits, including *Pickering*, on which it relies.[73] In *Pickering v. Gonzales*, the Sixth Circuit Court of Appeals held that despite the petitioner's stated motive of avoiding negative immigration consequences, the Board of Immigration Appeals was limited to reviewing the authority of the court issuing the order as to the basis for his vacatur.[74] Similarly, in *Reyes-Torres* the Ninth Circuit Court of Appeals held that the motive of the respondent was not the relevant inquiry.[75] Rather, "the inquiry must focus on the state court's rationale for vacating the conviction."[76] In addition, the Third Circuit Court of Appeals in *Rodriguez v. U.S. Att'y Gen.*, which the Proposed Rules cite as "existing precedent," held that the adjudicator must look only to the "reasons explicitly stated in the record and may not impute an unexpressed motive for vacating a conviction."[77] Moreover, the *Rodriguez* court stated that to determine the purpose of a vacatur, the adjudicator must first look to the face of the order vacating the conviction, and "if the order explains the courts reasons … the [adjudicator's] inquiry must end there."[78] The Proposed Rules contain no such limiting language to guide the adjudicator's inquiry. Instead, the Rules grant adjudicators vague and indefinite authority to look beyond even a facially valid vacatur. Such breadth of authority undermines asylum seekers' rights to a full and fair proceeding.

---

[72] *Matter of F-*, 8 I.&N. Dec. 251, 253 (BIA 1959).

[73] *See id.* (*citing Matter of Pickering*, 23 I.&N. Dec. 621).

[74] *Pickering v. Gonzales*, 465 F.3d 263, 267-70 (6th Cir. 2006).

[75] *Reyes-Torres v. Holder*, 645 F.3d 1073, 1077-78 (9th Cir. 2011) (*citing Cardoso-Tlaseca v, Gonzales*, 460 F.3d 1102, 1107 n.3 (9th Cir. 2006) and *Pickering v. Gonzales*, 454 F.3d 525 (6th Cir. 2006), *amended and superseded* by *Pickering*, 465 F.3d at 263.

[76] *Id.*

[77] *Rodriguez v. U.S. Att'y Gen.*, 844 F.3d 392, 397 (3d Cir. 2006) (noting that "[T]he IJ may rely only on reasons explicitly stated in the record and may not impute an unexpressed motive for vacating a conviction.").

[78] *Id.* ("Put simply, '[w]e will not . . . permit[ ] . . . speculation . . . about the secret motives of state judges and prosecutors,'" *quoting Pinho v. Gonzales*, 432 F.3d 193, 214-215 (3d Cir. 2005)).

AR.08435

*The Proposed Rules wrongly extend* Matter of Thomas and Thompson *to all forms of post-conviction relief and impose an ultra vires and unnecessary burden on asylum seekers.*

Finally, the above-described presumption is ultra vires and unnecessary. As an initial matter, the Proposed Rules' reliance on *Matter of Thomas and Thompson* is flawed. The Attorney General's decision in *Matter of Thomas and Thompson* has no justification in the text or history of the immigration statute. Nowhere does the plain text of the Immigration and Nationality Act support giving adjudicators the authority to give effect only to state court sentence modifications undertaken to rectify substantive or procedural defects in the underlying criminal proceedings. Nor does the legislative history support such a rule. The Board of Immigration Appeals recognized this in *Matter of Cota-Vargas*, where it concluded that the application of "the *Pickering* rationale to sentence modifications has no discernible basis in the language of the Act."[79] Based on the text of the Immigration and Nationality Act and the well-documented legislative history behind Congress's definition of "conviction" and "sentence" in 8 U.S.C. § 1101(a)(48), the Board determined that Congress intended to ensure that, generally, proper admissions or findings of guilt were treated as convictions for immigration purposes, even if the conviction itself was later vacated. Neither the text of the INA nor the legislative history of the definitions reveal any attempt on Congress's part to change the longstanding practice of giving effect to state court sentencing modifications. For these reasons, *Matter of Thomas and Thompson* lacks Congressional support for its rule and should not be extended.

Moreover, as applicants for immigration benefits or relief from removal, asylum seekers already bear the burden of demonstrating their eligibility for asylum.[80] The Proposed Rules do not alter or shift this burden, nor do they provide evidence supporting the need for this presumption. By introducing a presumption of bad faith into asylum adjudication, the Proposed Rules unfairly interfere with asylum seekers' efforts to establish their claims. Immigration law, and asylum law in particular, is already highly complex, and the process of seeking asylum is in many instances re-traumatizing, particularly for applicants who do not have counsel to represent them and who lacked effective counsel in their underlying criminal proceedings. The Proposed Rules as applied to asylum applicants who seek post-conviction relief transform an already difficult process into an adversarial inquiry, contrary to the intent of Congress.

VII.    **The Proposed Rules will disparately impact vulnerable populations already routinely criminalized, including LGBTQ immigrants, survivors of trafficking and domestic violence, and immigrant youth of color**

---

[79] *Matter of Cota-Vargas*, 23 I.&N. Dec. 849, 852 (BIA 2005).
[80] *Matter of S-K-*, 23 I.&N. Dec. 936, 939-40 (BIA 2006).

The expanded criminal bars exclude from safety and a pathway to citizenship those convicted of offenses that are coincident to their flight from persecution, and do not accomplish the stated goal of making communities safer. They will disparately impact vulnerable populations, who comprise asylum seekers hailing primarily from Central America and the Global South, and those routinely criminalized because of their identities, racially disparate policing practices, or in connection with experiences of trafficking and domestic violence.[81] For these populations especially, the discretion currently delegated to asylum adjudicators is crucial for them to become fully integrated in the larger community. The imposition of additional categorical bars to asylum will only further marginalize asylum seekers already struggling with trauma and discrimination.

The Proposed Rules turn asylum into a blunt instrument that would prevent the use of discretion where it is most needed and most effective. The existing framework for determining if an offense falls within the particularly serious crime bar already provides the latitude for asylum adjudicators to deny relief to anyone found to pose a danger to the community.[82] Furthermore, asylees with convictions that render them inadmissible must apply for a waiver at the time of their applications for permanent residence.[83] These measures ensure that asylum applicants in vulnerable populations have access to supportive resources and have the opportunity to demonstrate their ongoing commitment to social and personal health. Moreover, the existence of provisions allowing the revocation of asylum status ensures that adjudicators may continue to enforce concerns related to the safety of the community even after asylum is granted.[84]

> *Barring asylum for immigrants convicted of migration-related offenses punishes them for fleeing persecution and/or seeking safety for their children, and does not make communities safer.*

The expansion of the criminal bars to asylum to include offenses related to harboring, smuggling of noncitizens by parents and family members and those previously removed further

---

[81] D'Vera Cohn et al., "Rise in U.S. Immigrants from El Salvador, Guatemala and Honduras Outpaces Growth from Elsewhere," *Pew Research Center*, December 7, 2017, https://www.pewresearch.org/hispanic/wp-content/uploads/sites/5/2017/12/Pew-Research-Center_Central_American-migration-to-U.S._12.7.17.pdf.

[82] Apart from the statutory aggravated felony bar to asylum, the Board of Immigration Appeals and Attorney General have historically utilized a highly circumstantial approach to the particular serious crime determination that would bar an immigrant from receiving asylum. *See e.g., Matter of Juarez*, 19 I.&N. Dec. 664 (BIA 1988) (ordinarily a single misdemeanor that is not an aggravated felony will not be a particularly serious crime); *Matter of Frentescu*, 18 I.&N. Dec. 244 (BIA 1982), *modified* (setting forth several factors to be considered before imposing the particular serious crime bar, including: (i) the nature of the conviction, (ii) the circumstances and underlying facts for the conviction, (iii) the type of sentence imposed, and (iv) whether the type and circumstances of the crime indicate that the individual will be a danger to the community); *Matter of Y-L-, A-G-, R-S-R-,* 23 I.&N. Dec. 270 (A.G. 2002) (setting forth a multi-factor test to determine the dangerousness of a respondent convicted of a drug-trafficking offense who is otherwise barred from asylum as an aggravated felon, but seeking withholding of removal).

[83] 8 U.S.C. § 1159(c) (2012).

[84] 8 C.F.R. § 208.24(a) (2012).

criminalizes vulnerable populations fleeing persecution.[85] The vast expansion of migrant prosecutions at the border during the current administration has created administrative chaos and separated families that do not pose a threat to the safety of communities in the United States.[86] The Proposed Rules threaten to magnify the harm caused by these reckless policies by further compromising the ability of those seeking safety on the southern border to access the asylum system.

The Proposed Rules expand the asylum bar to parents or other caregivers who are convicted of smuggling or harboring offenses after taking steps to help minor children enter the United States in order to flee persecution. This proposed bar is particularly insidious in light of now-public documents revealing this administration's explicit efforts to utilize smuggling prosecutions against parents and caregivers as part of its strategy of deterring families from seeking asylum in the United States.[87] The Proposed Rules seek to take this widely condemned strategy one step further, by additionally barring those parents *already prosecuted* from obtaining asylum protections for themselves and their children. The Proposed Rules multiply the harms parents and caregivers have experienced in their treacherous journeys to safety and callously penalize parents for doing what is only human—taking all necessary steps to protect their children.

The Proposed Rules also expand the asylum bar to those who have fled persecution multiple times and therefore been convicted of illegal reentry. Their inclusion is premised on conclusory statements regarding the dangerousness of recidivist offenders, without consideration of the seriousness of prior convictions.[88] Rather, the Proposed Rules treat all immigration violations as similar in seriousness to those previously warranting inclusion in the particularly serious crime bar, without any independent evidence to justify the expansion. Such an approach renders meaningless the limiting language of "particularly serious" in the statute.

The Proposed Rules also conflate multiple entries by noncitizens having prior removal orders with those who have entered multiple times without ever having their asylum claims heard. Many immigrants who have previously attempted entry to the United States to flee persecution could not have been aware of the complex statutory regime that governs asylum

---

[85] On April 11, 2017, then-Attorney General Sessions instructed all federal prosecutors to increase their prioritization of immigration offenses for prosecution, including misdemeanor offenses committed by first time entrants. *See* Memorandum from the Attorney General: Renewed Commitment to Criminal Immigration Enforcement (April 11, 2017), https://www.justice.gov/opa/press-release/file/956841/download.

[86] *Id.*; Richard Marosi, "The aggressive prosecution of border crossers is straining the courts. Will zero tolerance make it worse?," *Los Angeles Times*, May 11, 2018, https://www.latimes.com/local/california/la-me-ln-immigrant-prosecutions-20180511-story.html.

[87] Ryan Devereaux, "Documents Detail ICE Campaign to Prosecute Migrant Parents as Smugglers," *The Intercept*, April 29, 2019, https://theintercept.com/2019/04/29/ice-documents-prosecute-migrant-parents-smugglers/ (describing how in May 2017, the Department of Homeland Security set out to target parents and family members of unaccompanied minors for prosecution).

[88] Proposed Rules at 69648.

claims and would not have knowingly abandoned their right to apply for asylum. Some asylum seekers have also been wrongly assessed in prior credible fear interviews. And others yet may have previously entered or attempted to enter the United States before the onset of circumstances giving rise to their fear. Preserving discretion to grant asylum in these circumstances allows meritorious asylum seekers to be heard and corrects errors that might have previously occurred.

> *Extending the criminal bars to immigrants convicted of misdemeanor document fraud unfairly punishes low-wage immigrant workers and does not make communities safer.*

The Proposed Rules expand the asylum bar to include any asylum seeker who has been convicted of a misdemeanor offense for use of a fraudulent document. In so doing, the Rule entirely ignores the migration-related circumstances that often give rise to convictions involving document fraud. Migrants fleeing persecution often leave their home countries with nothing but the clothes on their backs and must rely on informal networks to navigate their new circumstances.[89] Extension of a blanket bar to asylum seekers who are compelled to resort to fraudulent means to enter the United States, or to remain safely during their applications for asylum, upends decades of settled law directing that violations of law arising from an asylum applicant's manner of flight should constitute only one of many factors to be consulted in the exercise of discretion.[90]

Moreover, migrants in vulnerable communities who are struggling to survive during the pendency of their asylum proceedings are often exploited by unscrupulous intermediaries who offer assurances and documentation that turn out to be fraudulent.[91] Many noncitizens working in the low-wage economy face egregious workplace dangers and discrimination and suffer retaliation for asserting their rights.[92] The continued availability of asylum to low-wage immigrant workers can encourage them to step out of the shadows. The expansion of criminal asylum bars to sweep in all document fraud offenses, on the other hand, would unfairly prejudice immigrants with meritorious asylum claims and force them deeper into the dangerous informal economy.

> *The Proposed Rules will harm communities with overlapping vulnerabilities, including LGBTQ asylum seekers, survivors of trafficking, and survivors of domestic violence.*

---

[89] *See Pula*, 19 I.&N. Dec. at 474.

[90] *Id.*

[91] See American Bar Association, "About Notario Fraud," July 19, 2018, https://www.americanbar.org/groups/public_interest/immigration/projects_initiatives/fight-notario-fraud/about_notario_fraud/.

[92] Paul Harris, "Undocumented workers' grim reality: speak out on abuse and risk deportation," *The Guardian*, March 28, 2013, https://www.theguardian.com/world/2013/mar/28/undocumented-migrants-worker-abuse-deportation.

The Proposed Rules exclude from asylum protections countless members of vulnerable communities who have experienced trauma, abuse, coercion, and trafficking. Many of these individuals may only become aware of their ability to apply for asylum after law enforcement encounters that lead them to service providers who can educate them about their immigration options. Despite the unique difficulties they face, the Proposed Rules would compound their harm and prevent them from achieving family unification and a pathway to citizenship.

The Proposed Rules pose a unique threat to LGBTQ immigrant community members. LGBTQ immigrants in particular may have already experienced a high degree of violence and disenfranchisement from economic and political life in their home countries.[93] Hate violence towards undocumented LGBTQ immigrants in the United States is already disproportionately higher than for other members of the LGBTQ population.[94] Members of these communities also experience isolation from their kinship and national networks following their migration. This isolation, compounded by the continuing discrimination towards the LGBTQ population at large, leave many in the LGBTQ immigrant community vulnerable to trafficking, domestic violence, and substance abuse, in addition to discriminatory policing practices. The expansion of criminal enforcement and prosecution of undocumented people also harms the LGBTQ immigrant community.[95] The Proposed Rules will therefore have a disparate impact on LGBTQ individuals whose involvement in the criminal legal system is often connected to past trauma and/or the result of biased policing.

The expansion of asylum bars to include various misdemeanor offenses that were not previously considered particularly serious also unfairly sweeps trafficking survivors into its dragnet. It is becoming more widely recognized across state court systems that trafficking survivors frequently come into contact with intervention resources and service providers only after contact with law enforcement occurs. Innovative criminal justice reform efforts currently being adopted across the country include special trafficking courts that recognize the need for discretion in the determination of criminal culpability.[96] The same approach should be employed in the determination of asylum eligibility, where the applicant's life and safety are on the line.

---

[93] *See* Aengus Carroll and Lucas Ramon Mendos, *State Sponsored Homophobia: A World Survey of Sexual Orientation Laws: Criminalisation, Protection and Recognition* 12th Ed. (International Lesbian, Gay, Bisexual, Transgender, and Intersex Association (ILGA), 2017), https://ilga.org/downloads/2017/ILGA_State_Sponsored_Homophobia_2017_WEB.pdf.

[94] *See* Sharita Gruberg, "LGBTQ Undocumented Immigrants Face an Increased Risk of Hate Violence," *Center for American Progress*, June 10, 2014, https://www.americanprogress.org/issues/immigration/news/2014/06/10/91233/lgbt-undocumented-immigrants-face-an-increased-risk-of-hate-violence/.

[95] *See eg.,* Sharita Gruberg, "How Police Entanglement with Immigration Enforcement Puts LGBTQ Lives at Risk," *Center for American Progress*, April 12, 2017, https://www.americanprogress.org/issues/lgbtq-rights/reports/2017/04/12/430325/police-entanglement-immigration-enforcement-puts-lgbtq-lives-risk/.

[96] Elise White, et al., "Navigating Force and Choice: Experiences in the New York City Sex Trade and the Criminal Justice System's Response," *Center for Court Innovation*, December 2017 (noting that 78% of participants in the report's study had been arrested, mostly for non-violent, non-prostitution offenses such as *drug possession*).

The Proposed Rules instead preclude asylum adjudicators from conducting a trauma-centered approach, categorically barring countless trafficking survivors convicted of misdemeanor and felony offenses without any opportunity to present the specific circumstances of their claim.

Survivors of domestic violence include trafficking survivors and LGBTQ community members, such that inclusion of offenses related to domestic violence in the expanded asylum bars affects populations with overlapping vulnerabilities.[97] The Proposed Rules too broadly categorize domestic violence offenses as particularly serious and sweep both offenders and survivors into their dragnet. The immigration laws extend protections to domestic violence survivors outside of the asylum context, recognizing the complex dynamics surrounding intimate partner violence. Provisions in the Violence Against Women Act allow adjudicators evaluating claims for relief arising thereunder to exercise discretion based on a number of factors and circumstances.[98] The blunt approach adopted by the Proposed Rules is inconsistent with the approach taken towards survivors elsewhere in the federal immigration statute and does not rely on any evidence-based justification for treating asylum seekers differently.

Moreover, the domestic violence sections of the Proposed Rules include the only categorical bar to asylum for which a conviction is not required. Domestic violence incidents all too often involve the arrest of both the primary perpetrator of abuse and the survivor.[99] These "cross-arrests" do not always yield clear determinations of victim and perpetrator. Authorizing asylum adjudicators to determine the primary perpetrator of domestic assault, in the absence of a judicial determination, unfairly prejudices survivors who are wrongly arrested in the course of police intervention to domestic disturbances.

---

[97] Marty Schladen, "ICE Agents Detain Alleged Domestic Violence Victim," *El Paso Times*, February 16, 2017, https://www.elpasotimes.com/story/news/2017/02/15/ice-detains-domestic-violence-victim-court/97965624/ (noting that the immigrant detained, a transgender person previously deported following her conviction for crimes such as posession of stolen mail and assault, was then living at the Center Againts Sexual and Family Violence, a shelter for survivors of intimate partner violence).

[98] Nadine Shaanta Murshid and Elizabeth A. Bowen, "A Trauma-Informed Analysis of the Violence Against Women Act's Provisions for Undocumented Immigrant Women," *Violence Against Women* 24(13) (2018): 1540–1556, https://doi.org/10.1177/1077801217741991.

[99] David Hirschel, et al., "Domestic Violence and Mandatory Arrest Laws: To What Extent Do They Influence Police Arrest Decisions," *Journal of Criminal Law & Criminology* 98, no. 1 (2007-2008): 255, https://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?article=7284&context=jclc (noting that "[i]n some cases, dual arrests may be the result of legislation, department policies, or both failing to require officers to identify the primary aggressor. In addition, when such provisions are present, police may lack the training or information needed to identify the primary aggressor when responding to a domestic violence assault. This situation may be compounded by batterers who have become increasingly adept at manipulating the criminal justice system, and may make efforts to 'pre-empt' victims from notifying police in order to further control or retaliate against them.").

Finally, the exemption for asylum applicants who can demonstrate their eligibility for a waiver under section 237(a)(7)(A) of the Immigration and Nationality Act does not cure the harm to asylum seekers caused by imposition of a categorical domestic violence related bar.[100] Rather, it converts a non-adversarial asylum proceeding into a multi-factor, highly specific inquiry into culpability based on circumstances that may be very difficult for an asylum seeker to prove—especially if proceeding without counsel and with limited English proficiency.

*Barring asylum for immigrants convicted of "gang-related crimes" based on unreliable evidence and racially disparate policing practices is harmful to youth of color and does not make communities safer.*

In recent years, the expansion of gang databases for use in the apprehension and removal of foreign nationals—including children—has generated tremendous concern among advocates and the communities they serve.[101] The use of gang databases by local law enforcement and Immigration and Customs Enforcement has been widely criticized as an overbroad, unreliable and often biased measure of gang membership and involvement.[102] The Proposed Rules expand the criminal bars to asylum to those accused of gang involvement in the commission of minor criminal offenses, embracing an open-ended adjudicative process that will inevitably result in asylum adjudicators relying unfairly on these discredited methods of gang identification. This outcome would compound the disparate racial impact of inclusion in gang databases and bar asylum seekers who are themselves fleeing violence from gangs in their home countries.[103]

Past legislative efforts to expand the grounds of removal and inadmissibility in the Immigration and Nationality Act to include gang membership have failed to pass both houses of Congress.[104] In addition, immigration adjudicators already routinely premise discretionary denials of relief or release on bond on purported gang membership, and scores of alleged gang members have already been deported on grounds related to immigration violations or criminal

---

[100] 8 U.S.C. § 1227(a)(7)(A).

[101] *See* Nermeen Arastu, et al., "Swept Up In The Sweep: The Impact of Gang Allegations on Immigrant New Yorkers," *New York Immigration Coalition (NYIC) and CUNY School of Law's Immigrant and Non-citizen Rights Clinic*, May 2018, https://www.law.cuny.edu/wp-content/uploads/page-assets/academics/clinics/immigration/SweptUp_Report_Final-1.pdf.

[102] Ali Winston, "Marked for Life: U.S. Government Using Gang Databases to Deport Undocumented Immigrants," *The Intercept*, August 11, 2016, https://theintercept.com/2016/08/11/u-s-government-using-gang-databases-to-deport-undocumented-immigrants/.

[103] *See* Jonanthan Blitzer, "How Gang Victims Are Labeled As Gang Suspects," *The New Yorker*, January 23, 2018, https://www.newyorker.com/news/news-desk/how-gang-victims-are-labelled-as-gang-suspects.

[104] *See* Jessica Chacon, "Whose Community Shield?: Examining the Removal of the 'Criminal Street Gang Member,'" *University of Chicago Legal Forum* 317 (2007: 333-336) (reviewing legislative history of failed efforts to expand removability of those accused of gang related offenses and noting criticism that "[t]he only legal effect of the proposed legislation would be to increase the number of noncitizens lawfully present who would be subject to removal on the basis of their purported associations with individuals involved in group criminal activity.").

convictions for which no relief is available.[105] Creating a "gang-related crime" bar will only exacerbate the due process violations already occurring as the result of unsubstantiated information about supposed gang ties.[106]

In addition, by focusing on "reason to believe" as the basis for the bar, rather than the seriousness of the crime, the proposed provision is ultra vires and unconscionably limits the eligibility for asylum of those most in need of protection. The effect of the Proposed Rules would be to expand the number and type of convictions for which an analysis of eligibility is required, sweeping in even petty offenses that would otherwise not trigger immigration consequences. Thus, an asylum applicant convicted of simple assault without use of a weapon, a non-violent property crime, or even possession of under 30 grams of marijuana for personal use (otherwise exempted from the reach of the Proposed Rule), could trigger a bar to asylum if the adjudicator concludes she has "reason to believe" the offense was committed in furtherance of gang activity.[107] In making these determinations, asylum adjudicators would be unable to rely on uncorroborated allegations contained in arrest reports, but could nevertheless shield their decisions by relying on discretion.[108]

The Proposed Rules thus invite extended inquiry into the character of young men of color who otherwise have meritorious asylum claims, based on information gained through racially disparate policing practices.  These rules multiply the harm to asylum seekers of color subject to racially disparate policing that results in racially disparate rates of guilty pleas to minor offenses. This same population is overrepresented in gang databases, which are notoriously inaccurate, outdated, and infected by racial bias.[109]

---

[105] For an illustration of Immigration and Customs Enforcement's propensity to make gang allegations on the basis of questionable if not fabricated evidence, and the deference to which the evidence is often granted by immigration adjudicators, *see* Mark Joseph Stern, "Bad Liars," *Slate*, May 16, 2018, https://slate.com/news-and-politics/2018/05/federal-judge-accused-ice-of-making-up-evidence-to-prove-that-dreamer-was-gang-affiliated.html.

[106] See Yvette Cabrera, "New ICE Tactic Raises Questions About Due Process," *ThinkProgress*, October 6, 2017, https://thinkprogress.org/ice-targets-gangs-6775356473a8/; Rebecca Hufstader, "Immigration Reliance On Gang Databases: Unchecked Discretion And Undesirable Consequences," 90 *New York University Law Review* 90 (2015): 671.

[107] Page 69649 of the Proposed Rules notes that the applicable standard for determining when to apply the bar on asylum seekers convicted of a crime involving criminal street gangs is "reason to believe," as used in 8 U.S.C. § 1182(a)(2)(c), and that  the asylum adjudicator may consider "all reliable evidence" in making their decision.

[108] *See Garces v. U.S. A.G.*, 611 F.3d 1337, 1349-50 (11th Cir 2010) (reversing finding of "reason to believe" that the respondent was a participant in drug trafficking based on unsubstantiated arrest reports); *Matter of Rico*, 16 I.&N. Dec. 181, 185-86 (BIA 1977) (relying on pre-hearing admissions to uphold finding of inadmissibility).

[109] Annie Sweeney and Madeline Buckley, "Chicago police gang data collection faulted by city's inspector general as unchecked and unreliable," *Chicago Tribune*, April 11, 2019, https://www.chicagotribune.com/news/breaking/ct-met-chicago-police-gang-data-04112019-story.html; Anita Chabria, "A routine police stop landed him on California's gang database. Is it racial profiling?," *Los Angeles Times*, May 9, 2019, https://www.latimes.com/politics/la-pol-ca-california-gang-database-calgang-criminal-justice-reform-20190509-story.html.

VIII.    **The Proposed Rules are ultra vires to the federal immigration statute to the extent they purport to bar eligibility through a categorical exercise of discretion**

When Congress speaks clearly through a statute, the plain meaning of that statute governs.[110] Congress by statute permits the Attorney General to designate certain categories of offenses as "particularly serious crimes."[111] As such, Congress *explicitly* permitted the Attorney General to designate a non-aggravated felony to be a particularly serious crime and thus to disqualify a person from asylum. In the context of asylum, all aggravated felonies are *per se* particularly serious crimes and the Attorney General "may designate by regulation [other] offenses that will be considered to be" a particularly serious crime for purposes of asylum.[112]

Here, however—seemingly in an attempt to insulate the Proposed Rules from review, the agencies attempt to designate new bars to asylum both by designating them as "particularly serious crimes" pursuant to 8 U.S.C. § 1158(b)(2)(B)(ii) and rendering them categorically exempt from a positive discretionary adjudication of asylum pursuant to 8 U.S.C. § 1158(b)(2)(C). This effort is unlawful. Section 1158(b)(2)(B)(ii) does permit the Attorney General to, if he wishes, attempt to designate some classes of offenses as particularly serious crimes; such designations are reviewable for legal error (and as explained above, the commenters believe these expansions are unlawful).[113] However, if the offense is not a particularly serious crime, then a discretionary decision must be rendered on the application. It is true that the Attorney General may also provide for "additional limitations and conditions" on asylum applications so long as they are "consistent" with the with the asylum statute.[114] In this case, however, the Proposed Rules add sweeping categories of offenses that automatically remove an applicant from the consideration of discretion—a regulatory proposal that is ultra vires to the plain text of the statute.

To the extent that the proposed rules would adopt a bar to asylum based on a categorical discretionary bar, rather than a particularly serious crime designation, they are similar to the rules struck down by numerous Circuit Courts of Appeal in the context of adjustment of status for those considered by law to be "arriving aliens." Purporting to exercise discretion categorically, then-Attorney General Reno putatively rendered that class of noncitizens ineligible for adjustment of status, a determination that is ordinarily discretionary, even though the statute seemed to allow eligibility. Multiple Circuit Courts of Appeal struck down the proposed regulations, finding them to reflect an impermissible reading of the statute in light of the fact that

---

[110] See, *e.g.*, *Robinson* v. *Shell Oil Co.*, 519 U.S. 337, 340 (1997).

[111] 8 U.S.C. § 1158(b)(2)(B)(ii).

[112] *Id.* The Attorney General has not designated "substantial battery" to be a particularly serious crime for any purpose, including for purposes of ineligibility  to seek asylum.

[113] 8 U.S.C. § 1252(a)(2)(D).

[114] 8 U.S.C. § 1158(b)(2)(C); *see also* 8 U.S.C. § 1158(d)(5)(B).

Congress carefully defined in the statute the categories of people eligible to apply for adjustment of status.[115]

The same logic applies here. In the asylum statute, Congress explicitly made the commission of a particularly serious crime a bar to asylum. The canon of interpretation known as *expressio unius est exclusio alterius* instructs that,"expressing one item of [an] associated group or series excludes another left unmentioned."[116] The Proposed Rules attempt to create numerous categories of discretionary "pseudo-particularly serious crimes," barring asylum through a categorical exercise of discretion even if those offenses are ultimately found not to be particularly serious crimes. Such an effort violates this canon of interpretation, and places the Proposes Rules ultra vires to the statute.

---

[115] The First and Ninth Circuits found the regulations contrary to clear statutory command. *Succar v. Ashcroft*, 394 F.3d 8, 29 (1st Cir. 2005); *Bona v. Gonzales*, 425 F.3d 663, 668-71 (9th Cir. 2005). Other courts invalidated the adjustment regulations under "Step Two" of *Chevron*. Those courts found some ambiguity in the statute, but found a per se discretionary bar not based on a permissible construction of the eligibility standards set forth in the governing statute in light of the statutory scheme and congressional intent. *Zheng v. Gonzales*, 422 F.3d 98, 116-20 (3d Cir. 2005) (invalidating regulation precluding category of people from applying to adjust status "[g]iven Congress's intent as expressed in the language, structure, and legislative history of INA section 245 [8 U.S.C. § 1255]"); *Scheerer v. United States Attorney General*, 445 F.3d 1311, 1321-22 (11th Cir. 2006). This reasoning would likewise be applicable to the proposed rule. Where Congress went through the trouble to create a comprehensive statutory scheme to define asylum eligibility, the agency cannot preempt that in the guise of discretion by creating out of whole cloth a separate set of eligibility criteria.

[116] *United States* v. *Vonn*, 535 U.S. 55, 65 (2002).

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 08, 2020
**Status:** Posted
**Posted:** January 10, 2020
**Tracking No.** 1k4-9eby-6qx4
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0035
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Malena Mayorga

---

## General Comment

I write to express my strong opposition to this proposed rule change.

I am a concerned member of the public who believes strongly that this nation must welcome people fleeing violence, and who is strongly concerned about racial profiling in the criminal legal system. Immigrants are a vital part of my community, my neighborhood, and my state.

I am myself an immigrant from El Salvador who has lived in the U.S. for close to 40 years. My family fled extreme violence when i was a child and I am deeply concerned that this rule change would send other people who have fled violence back to danger and death.

I work with immigrant community members daily, and am concerned this rule would put many more people in life-threatening danger. I repeatedly hear stories of the extreme violence asylum seekers have survived and find it unbelievable that they must face more persecution when they arrive here. Everyone has a right to live free of violence, no matter their background.

I have also worked with incarcerated and formerly incarcerated people. I strongly think it's wrong to punish people a second time after they've completed their sentences. Deportation is often a matter of life and death. No one should be given a death sentence for crossing a border in order to survive.

The values this country professes demand it to be a place of refuge for people fleeing violence, starvation, poverty, or persecution. U.S. law enshrines the protections of the international Refugee Convention, drafted in the wake of the horrors of World War II. Under the Refugee Act of 1980, passed with bipartisan support, anyone present or arriving in the U.S. can apply for asylum.For asylum seekers, making it to the U.S. often means they have found safety from persecution, torture, and sometimes death. Yet asylum seekers face many unjust obstacles in the immigration system.

This proposed rule would inject racial profiling into the asylum process. This latest attack would put even more

AR.08446

people seeking asylum at risk of danger - and death. This would in turn eviscerate one of the most important defenses community members have against deportation.This proposed Trump rule would punish people who've already endured mistreatment and racial profiling in the criminal legal system a second time -- with deportation back to the very life-threatening situation they fled. This is profoundly immoral, makes a mockery of due process, and comes right out of Steven Miller's racist playbook.The criminal legal system in the U.S. is wracked with racial profiling and obstacles to equal justice. This country's harsh immigration laws exploit these obstacles to drive mass incarceration and mass deportation of people of color.

I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.

For these reasons, I call upon the Trump administration to withdraw this proposal immediately.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 09, 2020
**Status:** Posted
**Posted:** January 10, 2020
**Tracking No.** 1k4-9ec5-4d3q
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0036
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Martha J.
**Address:**
   936 Evert Ct.
   Paso Robles,  CA,  93446

---

## General Comment

I oppose the new rule change that would exclude many asylum seekers based on future contact with the U.S.'s flawed criminal legal system. The Trump administration and his adviser Stephen Miller have made a mockery of the Asylum laws. They are cruel and inhumane, cause trauma to families and involve racial profiling.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 09, 2020
**Status:** Posted
**Posted:** January 10, 2020
**Tracking No.** 1k4-9ecf-dkzg
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0037
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Judy Wright

## General Comment

I write to express my strong opposition to this proposed rule change. I am a concerned member of the public who believes strongly that our nation must welcome people fleeing violence, and who is strongly concerned about racial profiling in the criminal legal system. Immigrants are a vital part of my community, my neighborhood, and my state. I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them. For these reasons, I call upon the Trump administration to withdraw this proposal.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 09, 2020
**Status:** Posted
**Posted:** January 10, 2020
**Tracking No.** 1k4-9ech-rkh9
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0038
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Dana Chou

---

## General Comment

I strongly oppose the proposed rule change. As one who has worked for several organizations serving asylum seekers, other immigrants, and refugees I know that U.S. law enshrines the protections of the international Refugee Convention, drafted in the wake of the horrors of World War II. Under the Refugee Act of 1980, passed with bipartisan support, anyone present or arriving in the U.S. can apply for asylum.

Rather than honoring American ideals of compassion, fairness, and respect for human rights the proposed rule change would make many people with involvement in our flawed legal system totally ineligible for asylum. Both our criminal and immigration systems already routinely uses the 'criminal' label as a way of stripping people of their rights and humanity, and disproportionately target people of color. The proposed rule change would only make these injustices worse and inflict further harm on people who have already suffered greatly and bar their path to establishing legal presence.

Where is the logic in demonizing and persecuting people without immigration status while simultaneously making legal status impossible for them to achieve? The proposed rule offends against logic, against compassion, against human rights, and against international law to which the US has long subscribed.

Therefore I call upon the Trump administration to withdraw this proposal.

AR.08450

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 09, 2020
**Status:** Posted
**Posted:** January 10, 2020
**Tracking No.** 1k4-9ech-mabs
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0039
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Megan Hopkins
**Address:**
　5729 Engle Road
　Apt 8
　Carmichael,  CA,  95608
**Phone:** 3233462185

---

## General Comment

I am writing to express my grave concern over the proposed changes. These proposed changes constitute an unnecessary, harsh, and unlawful gutting of the asylum protections enshrined in United States and international law. I submit these comments to express opposition to the entirety of the Proposed Rules concerns with the administration's continued efforts to exclude refugees from obtaining the security and stability the United States asylum system has long promised. I urge that the Proposed Rules be rescinded in their entirety.

The proposed rules needlessly and cruelly exclude bona fide refugees from asylum eligibility.

The United States asylum system was first codified in statute through the Refugee Act of 1980, described by one prominent scholar as a bipartisan attempt to "reconcile our rhetoric with our law, our national immigration policy and our international treaty obligations so that we could maintain a consistent posture towards the world as a nation with a strong humanitarian tradition and a unique historic role as a haven for persons fleeing oppression." The Actamong other measures designed to bring the United States domestic legal code into compliance with the provisions of the United Nations Protocol Relating to the Status of Refugeescreated a "broad class" of refugees eligible for a discretionary grant of asylum.

The asylum protections provided by United States law are sacred. Asylum provides those fleeing horrors with physical safety, a path to citizenship and security, and the opportunity to reunite with immediate family members who may still remain abroad in danger. Many see the domestic asylum system as a symbol of the United States' commitment never to repeat its failure to save thousands of Jewish refugees refused entry to the United States on the St. Louis and others fleeing the Holocaust. Others point to the critical role that domestic asylum policy plays in serving the United States' foreign policy interests abroad. For those individuals seeking asylum in the United

AR.08451

States, the stakes could not be highera claim denied often means return to death or brutal persecution.

The laws, regulations, and process governing asylum adjudications are already exceedingly harsh. Asylum seekers bear the evidentiary burden of establishing their eligibility for asylum in the face of a complex web of laws and regulations, without the benefit of appointed counsel and often from a remote immigration jail. The obstacles to winning asylum are exceedingly high; indeed in some parts of the country and before certain immigration judges, almost no one succeeds. Today, newly imposed barriers to accessing asylum in the United States are breathtaking in scope, with those seeking safety at the southern border subject to return to dangerous conditions in Mexico and an overlapping web of policies that preclude asylum eligibility for countless migrants simply because of their national origin, manner of entry, or their flight path. There are consistent reports of the documented deaths and brutalities endured by those who sought but were denied asylum protections in the United States.

Specifically, the bars to asylum based on allegations of criminal conduct are already sweeping and over-broad in nature and scope. Any conviction for an offense determined to be an "aggravated felony" is considered a per se "particularly serious crime" and therefore a mandatory bar to asylum. "Aggravated felony" is a notoriously vague term, which exists only in immigration law. Originally limited to murder, weapons trafficking and drug trafficking, it has metastasized to encompass hundreds of offenses, many of them neither a felony nor aggravated, including petty offenses such as misdemeanor shoplifting, simple misdemeanor battery, or sale of counterfeit DVDs. The existing crime bars should be narrowed, not expanded. Even for those not categorically barred from relief, the immigration adjudicator maintains full discretion to deny asylum.

Immigration adjudicators already have vast discretion to deny asylum to those who meet the refugee definition but have been convicted of criminal conduct. Further categorical bars are not needed. The agencies' efforts to add seven new sweeping categories of barred conduct to the asylum eligibility criteria is unnecessary and cruel. The Proposed Rules drain the phrase "particularly serious crime," 8 U.S.C. 1158, of any sensible meaning.

The Proposed Rules are also arbitrary and capricious. They would constitute a marked departure from past practice. And the agencies have proffered no evidence or data to support these changes.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 09, 2020
**Status:** Posted
**Posted:** January 10, 2020
**Tracking No.** 1k4-9eci-txlc
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0040
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Carolina Martin Ramos, Esq.
**Organization:** Centro Legal de la Raza

---

## General Comment

As the Director of Programs and Advocacy at Centro Legal de la Raza and authorized to submit comment on behalf of Centro Legal de la Raza in Oakland, CA, I write to express our strong organizational opposition to this proposed rule change. We are members of the public and stakeholders working with asylum seekers. We believe strongly that our nation must comply with obligations mandated under international human rights laws and treaties. U.S. law enshrines the protections of the international Refugee Convention, drafted in the wake of the horrors of World War II. Under the Refugee Act of 1980, passed with bipartisan support, anyone present or arriving in the U.S. can apply for asylum. The United States must welcome and properly adjudicate the applications of asylum seekers fleeing persecution and torture outside of the U.S.

It is well documented by international refugee and human rights experts, the U.S. Citizenship & Immigration Services (USCIS) Refugee, Asylum and International Operations (RAIO) (see asylum officer and RAD officer training materials), and relative case law that asylum seekers and refugees are often charged with crimes or detained in their home countries precisely because they are being persecuted or tortured by government actors in their home countries. An asylum seeker's asylum claim may rest on extrajudicial and unjust criminalization and detention as their evidence of persecution and/or torture on account of a protected ground.

With this understanding, the U.S. congress determined that criminal conduct & convictions that do not rise to the level of: aggravated felonies; a "particularly serious crime" such that they are a danger to the U.S.; committed a "serious nonpolitical crime" outside the United States; or pose a danger to the security of the United States would not bar applicants from eligibility for asylum in the U.S. Besides these restrictions, we have bars to asylum that prohibit grants of asylum for applicants implicated in terrorism or persecution of others. The United States has entrusted specially trained asylum officers and immigration judges with discretion to make determinations about whether or not applicants are deserving of positive discretion. This proposed rule to further limit asylum seekers from gaining these humanitarian protections would undermine years of legal jurisprudence & violate our obligations under international laws and treaties. The multiple attacks against asylum seekers under this administration and the Trump administration's flagrant support of White supremacy combined with reprehensible

AR.08453

statements against Mexicans, Central Americans, and Africans and inhumane policies against migrants of color demonstrate that these proposed regulations & policies are motivated by pure malevolence and racism.

Racial profiling in the criminal justice system in the U.S. poses the threat of an unequal justice to migrants of color. We live and work in communities where we witness and experience racial profiling and disparate treatment in the criminal justice system. We have witnessed and experienced the increased criminalization of immigrant communities of color and in border states at the Mexico - U.S. border that are now, highly militarized. Racial disparities in arrests, convictions, and sentencing in the U.S. are widely known and documented. The U.S. criminal justice system has a long history of disenfranchising people of color through racist policies employed in policing, mass incarceration, & other methods widely employed and administered throughout the criminal justice system. Our harsh immigration laws exploit these obstacles to drive mass incarceration and mass deportation of people of color. Migrants of color in particular are much more likely to suffer racial profiling that violates fundamental rights under the Fourth and Fifth Amendments of the U.S. Constitution and leads to grave collateral consequences such as removal to a country where they may be persecuted, tortured, or killed. Therefore, any proposed policies or regulations that disqualify eligibility for the protections of asylum because of criminal convictions as proposed; would implicate an unequal justice that threatens the constitutional rights we hold dear and so many have died for. The proposed changes would cause dangerous regressions in any historical achievements made towards an more equal justice in the U.S. We implore you to reject these and any proposed regulations and policies that would undermine or contradict the rights based law and policy we have created through harmonization with international human rights laws and standards.

This proposed rule would punish people who've already endured mistreatment & racial profiling in the criminal legal system a second time -- with deportation back to the persecution & torture they fled. This is profoundly immoral and makes a mockery of due process. For these reasons, we call upon the Trump administration to withdraw this proposal.

# PUBLIC SUBMISSION

| |
|---|
| **As of:** January 22, 2020 |
| **Received:** January 09, 2020 |
| **Status:** Posted |
| **Posted:** January 10, 2020 |
| **Tracking No.** 1k4-9eci-62om |
| **Comments Due:** January 21, 2020 |
| **Submission Type:** Web |

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0041
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Steven Volk

---

## General Comment

I write to record, in the strongest possible manner, my opposition to this proposed rule change. Despite this administration's attempt to close our nation's doors to all immigrants, I and millions of my fellow citizens strongly believe that our nation must welcome the, particularly those fleeing violence in their home countries. U.S. law upholds the protections of the international Refugee Convention. Under the Refugee Act of 1980, passed with bipartisan support, anyone present or arriving in the U.S. can apply for asylum.

For asylum seekers, making it to the U.S. often means they have found safety from persecution, torture, and sometimes death. Yet asylum seekers face many unjust obstacles in the immigration system, and I am quite concerned about the way that this proposed rule would inject racial profiling into the asylum process. This latest attack would put even more people seeking asylum at risk of danger - and death. I believe we must recognize the humanity of every person, including immigrants, something that this proposed rules change doesn't do. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.

For the love of God, stop blaming immigrants for every ill that besets our country - treat them as humans and respect the law that requires their protection. Withdraw this proposal!

AR.08455

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 09, 2020
**Status:** Posted
**Posted:** January 10, 2020
**Tracking No.** 1k4-9ecj-88of
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0042
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Dominique Poirier
**Address:**
   7630 Little River Tpke
   #900
   Annandale,  22003
**Email:** dominique@justneighbors.org
**Phone:** 703-979-1240

---

## General Comment

As the Director of Legal Services at Just Neighbors, a Virginia-based non-profit immigration legal service provider, I am writing to register our strong opposition to the proposed changes to the asylum regulations posted in the FR of 12/19/2019. The proposed changes would adversely affect asylum seekers; most particularly, low-income asylum seekers, many of whom our non-profit serves. The following are our strongest concerns regarding the proposed changes:
1) Expansion of list of crimes which bar a refugee from applying for asylum.
a) This proposed expansion includes alien smuggling, including the "smuggling" of ones' children. However, many asylum-seekers are coming as family units and the addition of the alien smuggling category of "crimes" which bar one from applying for asylum is nothing less than a veiled attempt to exclude our mostly Central Americans clients from applying for asylum merely because they are escaping violence in Central America along with their children. It is at least arbitrary and capricious and seemingly racially motivated.
b) The proposed expanded list also includes an alien who is accused of acts of domestic battery. Again, this is a sweeping change and not based on any evidence which would support such a change. Moreover, the grant of asylum is already discretionary; therefore the addition of an exclusionary category based on an accusation of domestic battery, as opposed to a conviction, is unwarranted.
c) The proposed expanded list in it's entirety is unwarranted. The list of crimes which constitute a bar to asylum is already overbroad and should not be further broadened. There is no evidentiary basis to warrant such a broadening and, as noted above, asylum is already discretionary, therefore any convictions or arrests can be considered by an asylum officer/IJ when making a decision.
2) Applicants would need to wait 365 days to be eligible for an EAD: There is no evidentiary basis which warrants changing the wait time to apply for an EAD from 150 days to 365 days. The notion that applicants are

applying for asylum merely to acquire an EAD is not based on any evidence. Just Neighbors has assisted countless asylum seekers both here in Virginia as well as near the Southern border. Each individual we have worked with has a credible claim to asylum and has or will file for asylum based on the persecution suffered, not based on any alleged desire to acquire a work permit. Any notion claiming asylum seekers only wish to have a work permit is not based on reality and is arbitrary and capricious.

3) Applicants would not be eligible for an EAD if they did not enter legally through a POE: By law, asylum seekers can apply for asylum regardless of manner of entry. Any attempt to limit a work permit to those who enter legally through a POE is in contravention of the law and is unwarranted.

4) The issuance of an EAD would be discretionary: Presently, USCIS officers adjudicating EAD applications do not have to weigh any positive or negative equities when determining whether to issue an EAD. The addition of this proposed criteria would pose an undue burden on USCIS officers adjudicating applications and serve to do nothing but lengthen adjudication times and overburden adjudicating officers. Once again, the proposed change is not based on any rational explanation and is arbitrary and capricious.

As a non-profit which represents numerous asylum seekers, we submit that all the proposed changes, not merely those listed above, are unwarranted, not based on any real evidence, and are at least arbitrary and capricious and possibly motivated to exclude Central American asylum seekers in particular.

Thank you,
Dominique F. T. Poirier
Director of Legal Services
Just Neighbors
7630 Little River Tpke, Suite 900
Annandale, VA 22003

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 09, 2020
**Status:** Posted
**Posted:** January 10, 2020
**Tracking No.** 1k4-9ecj-wz7u
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0043
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Suchi Mathur

## General Comment

I strongly oppose this proposed rule change to asylum eligibility. As an attorney at the Bronx Defenders, I work with real people every day - some citizens and some noncitizens, and see how our criminal justice system can unfairly target low-income people of color. As a result, I am deeply concerned that this rule will endanger the lives of many people, harm our communities, and tear families apart, based on contact with the criminal legal system that is in no way probative of their danger or potential harm to the community.

The U.S. must serve as a refuge for people fleeing persecution, and our law enshrines the protections of the international Refugee Convention, drafted after the Holocaust and massive genocide during World War II. Under the Refugee Act of 1980, passed with bipartisan support, anyone present or arriving in the U.S. can apply for asylum. For asylum seekers, making it to the U.S. often means they have found safety from persecution, torture, and sometimes death. There are already innumerable barriers, legal and logistical, to people seeking and being granted asylum in the U.S.

This proposed rule would unlawfully make this process - meant to be a lifeline to people in need - even less accessible, and impermissibly inject racial profiling into the asylum process. This would in turn eviscerate one of the most important defenses people who have lives and families and often contribute in numerous different ways to their communities - have against deportation.

This proposed rule would punish people who've already endured mistreatment and racial profiling in the criminal legal system a second time -- with deportation back to the very life-threatening situation they fled. This is profoundly immoral, makes a mockery of due process, and comes right out of Steven Miller's racist playbook. The criminal legal system in the U.S. is wracked with racial profiling and obstacles to equal justice. For every Harvey Weinstein who is actually arrested, there are thousands of wealthy men who escape consequence for their illegal acts and crimes - while thousands of poor people of color are arrested on extremely minor charges every day. Our harsh immigration laws exploit these obstacles to drive mass incarceration and mass deportation of people of color.

AR.08458

In sum, this rule should not be implemented.

AR.08459

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 10, 2020
**Status:** Posted
**Posted:** January 12, 2020
**Tracking No.** 1k4-9ed5-k1ta
**Comments Due:** January 21, 2020
**Submission Type:** API

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0044
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Jay Martin Steinman
**Address:**
  1202 Hampshire Street
  Apt 13
  San Francisco,  CA,  94110
**Email:** jaysteinman@hotmail.com
**Phone:** 4156484882

---

## General Comment

I wish to register my strong opposition to the proposed rule. It creates new limits to asylum which tread a path that Congress declined to take. The United States has a duty under treaty and domestic law to maintain a functioning asylum system; the proposed rule is just the latest in a series of measures to destroy that system from within.

I have worked with asylum seekers for over ten years, and have known a good many with compelling asylum cases which would have been thrown out if the proposed rule were in effect. As it is, adjudicators are able to weigh any criminal history against other factors, and make a balanced determination whether asylum is warranted. The proposed rule would take away that discretion for a whole new class of cases, forcing them to be dismissed out of hand. I have seen the process up close, and know the importance of letting those claims be heard, argued, and considered. I urge the government to rescind the proposed rule.

Please see the attached letter for my full comments.

---

## Attachments

Regulations_comment_Proposed_rule_84 _FR_69640

 **CENTRAL AMERICAN RESOURCE CENTER**
**CENTRO DE RECURSOS CENTROAMERICANOS**

January 10, 2020

RE:   Proposed rule # 84 FR 69640
      EOIR Docket No. 18-0002

I am writing in my personal capacity, and not on behalf of any organization.

I want to register my opposition to the proposed rule that would introduce new mandatory criminal bars for asylum, in addition to getting rid of automatic reconsideration for discretionary asylum denials.

The proposed rule is just one of many regulations and policy changes aimed at dramatically reducing the number of people who may seek asylum and limiting the number of applications that are approved. Improving the regulatory framework for asylum is a legitimate purpose of government, but a wholesale attempt to destroy asylum as a pathway to legal status is not. Asylum is grounded in treaty obligations which are reflected in U.S. domestic law. The government has no authority to blow up the legal framework for asylum, whether by chopping it down in one blow or by tearing it apart piecemeal, as is being done here.

That said, I will address the content of the instant rule – specifically, the new criminal bars to asylum. I will start with legal objections, and then go on to my personal experience with the issue.

Up to now, Congress has approved a limited set of criminal bars for those seeking asylum – conviction for an aggravated felony or a particularly serious crime, as well as other security-based bars for things like terrorist activity and national security threats. In 1990, Congress ratified in law the particularly serious crime bar that had existed in previous regulation, and in 1996 it added the aggravated felony bar. It has had ample opportunity to go beyond those and provide a broader set of criminal bars; yet it declined to do so in 1996, and it has declined to do so in the two decades since then.

This statutory scheme reflects the nature of asylum as not merely a benefit, but an obligation of the United States to protect people at risk of persecution. Asylum has not been categorically denied for those with DUI's, or those who have showed a fake ID, or those who helped a relative get across the border, because the gravity of those offenses is outweighed by our country's obligation to provide a haven from persecution. This is not merely  my personal opinion. It is that of Congress, which expanded criminal bars in 1996 but chose to go no further: not then, and not since. The new regulation, which would deny asylum in all of the circumstances listed above, thus cuts against the will of Congress. The Immigration and Nationality Act allows for discretionary denials for people who are not subject to mandatory bars; that allows adjudicators to view the entire pattern of a person's conduct, their risk of persecution, and other factors in order to come to a balanced determination. Under current policy, people can be denied asylum for lesser crimes,

AR.08461

but their claims must be heard and put into the balance, in concordance with the interests of justice. The new rule would replace those scales with a wall.

I have spent over ten years working with people seeking asylum, in three different nonprofits that provide immigration legal services. Most of the people I have worked with would not be affected by these criminal bars, but a few would – and for many of those, their entire criminal history consisted of one mistake: One DUI, or one domestic dispute. I'm not apologizing for their behavior, and I haven't seen them apologize for it either. They have been punished by the criminal justice system, and most of them turned their life around after that experience, not wanting to be defined by their worst moment. I've known people with those convictions to be devoted parents, churchgoers, and providers for their families.

For these people, in their asylum proceedings, their history has been a hurdle to overcome; yet all of them knew that the judge (or the asylum officer) had the authority to see the full picture of their lives and rule accordingly. The mandatory bars in the propsed rule would throw away that important discretionary element. No matter how severe the threat of persecution, no matter how they live their lives or how long ago was the crime, they would be cast aside. If someone can show that they are in are threatened in their home country, and they pose no danger here, no public interest is served by not allowing them to make a case for asylum. I've known good people with horrific stories of persecution who would be denied that chance if the proposed rule goes into effect.

For all the reasons mentioned above, I respectfully request that the administration rescind its proposed rule.

Sincerely,

J. Martin Steinman
Paralegal

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 10, 2020
**Status:** Posted
**Posted:** January 12, 2020
**Tracking No.** 1k4-9ed3-n12f
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0045
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Gracia Valliant

---

## General Comment

I oppose these restrictions on asylum seekers. Anytime there is discretion left to a government official or agent leave the door open for an arbitrary decision not based on actual fact.
While someone who has committed a heinous crime might be excluded, it seems to me that these proposals leave the door open to excluding someone arbitrarily.
Fairness and justice should be the first rule when considering asylum for an individual coming from terror and inhumane treatment or fear for their life.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 10, 2020
**Status:** Posted
**Posted:** January 12, 2020
**Tracking No.** 1k4-9edd-gyfb
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0046
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Bonita Gutierrez
**Address:**
  436 14th Street
  801
  Oakland,  CA,  94612
**Email:** bonita.gutierrez.esq@gmail.com

---

## General Comment

I write to oppose these proposed additional restrictions on asylum status. The laws, regulations, and process governing asylum adjudications are already exceedingly harsh. Asylum seekers bear the evidentiary burden of establishing their eligibility for asylum in the face of a complex web of laws and regulations, without the benefit of appointed counsel and often from a remote immigration jail. The obstacles to winning asylum are exceedingly high; indeed in some parts of the country and before certain immigration judges, almost no one succeeds. Today, newly imposed barriers to accessing asylum in the United States are breathtaking in scope, with those seeking safety at the southern border subject to return to dangerous conditions in Mexico and an overlapping web of policies that preclude asylum eligibility for countless migrants simply because of their national origin, manner of entry, or their flight path. There are consistent reports of the documented deaths and brutalities endured by those who sought but were denied asylum protections in the United States.

Specifically, the bars to asylum based on allegations of criminal conduct are already sweeping and over-broad in nature and scope. Any conviction for an offense determined to be an "aggravated felony" is considered a per se "particularly serious crime" and therefore a mandatory bar to asylum. "Aggravated felony" is a notoriously vague term, which exists only in immigration law. Originally limited to murder, weapons trafficking and drug trafficking, it has metastasized to encompass hundreds of offenses, many of them neither a felony nor aggravated, including petty offenses such as misdemeanor shoplifting, simple misdemeanor battery, or sale of counterfeit DVDs. The existing crime bars should be narrowed, not expanded. Even for those not categorically barred from relief, the immigration adjudicator maintains full discretion to deny asylum.

Immigration adjudicators already have vast discretion to deny asylum to those who meet the refugee definition but have been convicted of criminal conduct. Further categorical bars are not needed. The agencies' efforts to add

AR.08464

seven new sweeping categories of barred conduct to the asylum eligibility criteria is unnecessary and cruel. The Proposed Rules drain the phrase "particularly serious crime," 8 U.S.C. 1158, of any sensible meaning.

The Proposed Rules are also arbitrary and capricious. They would constitute a marked departure from past practice. And the agencies have proffered no evidence or data to support these changes.

One assumption fundamentally underlying the Proposed Rules, for example, is that every noncitizen convicted of any offense punishable by more than a year in prison necessarily constitutes a danger to the community. But no evidence is provided to support that assumption, and a criminal record, does not, in fact, reliably predict future dangerousness. The Proposed Rules are so capricious as to peremptorily postulate a noncitizen's supposed danger to the community even in circumstances when a federal, state, or local judge has concluded that no danger exists by, for example, imposing a noncustodial sentence. Conviction for a crime does not, without more, make one a present or future dangerwhich is why the Refugee Convention's particularly serious crime bar, made part of United States law through 8 U.S.C. 1158, should only properly apply if both (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows that she is a present or future danger.

Similarly, the Proposed Rules fail to address or account for the fact that a significant number of people may agree to plead to a crime as to avoid the threat of a severe sentence; not only is a conviction an unreliable predictor of future danger, it can also be an unreliable indicator of past criminal conduct. In addition, the Proposed Rules do not address and make no exception for convictions for conduct influenced by mental illness or duress.

The Board of Immigration Appeals has cautioned that, "in light of the unusually harsh consequences which may befall a [noncitizen] who has established a well-founded fear of persecution; the danger of persecution should generally outweigh all but the most egregious of adverse factors." Yet because of the categorical nature of the seven news bars proposed here, asylum seekers will be precluded from obtaining protection on the basis of a vast array of conduct, without any discretion left to the immigration adjudicator to determine whether the circumstances merit such a harsh penalty. Indeed, in the case of the domestic-violence related ground, the categorical bar will be imposed on the basis of mere allegations of conduct without any adjudication of guilt.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 11, 2020
**Status:** Posted
**Posted:** January 12, 2020
**Tracking No.** 1k4-9edq-h3jv
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0047
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Mary Magdalene P

## General Comment

Interesting to read comments in opposition of a common sense proposal. Each & everyone of the ones in opposition get monetary compensation from the illegal immigrants. Mostly economic asylum seekers rather truly political asylum.
As far as I know as a regular citizen, almost all applicants get refusal even though 90% go to their hearings & have lawyers while in the US. So it is alarming to realize their request lack of legal merits because they aren't truly political assyles.
Question for the people opposing this proposal: are you okay with whites driving drunk? Or you just are okay with illegal immigrants driving drunk?
A proposal requesting the minimum good character and behavior in all applicants isn't evil isn't bigotry! Stop making money from your so called "non profit" organization. If you are a lawyer you are making tons of money from your clients. Stop pretending you are doing this only as charity.
I SUPPORT this proposal.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 11, 2020
**Status:** Posted
**Posted:** January 12, 2020
**Tracking No.** 1k4-9ee3-4df8
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0048
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Barbara Singer
**Address:**
    PO Box 2512
    Tijeras,  87059
**Email:** bsinger3000@gmail.com
**Phone:** 5053843160

---

## General Comment

I am writing to express strong opposition to the December 19, 2019 proposed rule that will further impede many people seeking asylum in our country. Having had person experience and knowledge of the brutal conditions people are fleeing, I only can be impressed by the courage of those I have met.

I am concerned that our nation must welcome people fleeing violence, and racial profiling can not be introduced into this process. Immigrants are a vital part of my community, my neighborhood, and my state.

Thank you for your consideration.

Respectfully,

Barbara Singer

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 12, 2020
**Status:** Posted
**Posted:** January 12, 2020
**Tracking No.** 1k4-9ee6-sj1h
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0049
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Sharad Jain

---

## General Comment

I am writing to urge the Department of Homeland Security and the Department of Justice to rescind the set of Proposed Rules issued on December 19, 2019 that would make it more difficult for individuals seeking asylum in the United States. These proposed changes constitute an unnecessary, harsh, and unlawful gutting of the asylum protections enshrined in United States and international law. I submit these comments to express my opposition to the entirety of the Proposed Rules and my grave concerns with the administration's continued efforts to exclude refugees from obtaining the security and stability the United States asylum system has long promised. I urge that the Proposed Rules be rescinded in their entirety.

The barriers to asylum for those previously involved in the criminal legal system are already sweeping in scope; adding more barriers is cruel and unnecessary. The laws, regulations, and process governing asylum adjudications are already exceedingly harsh. Asylum seekers bear the burden of establishing their eligibility for asylum in the face of a complex web of laws and regulations, without the benefit of appointed counsel and often from a remote immigration jail. Immigration adjudicators already have vast discretion to deny asylum to those who meet the refugee definition but have been convicted of criminal conduct. Further categorical bars are not needed. The agencies' efforts to add these new sweeping categories of barred conduct to the asylum eligibility criteria is unnecessary and cruel.

The Proposed Rules are also arbitrary and are not based on evidence. There is no evidence to support the assumption that every noncitizen convicted of any offense punishable by more than a year in prison necessarily constitutes a danger to the community. The Proposed Rules are so capricious as to peremptorily postulate a noncitizen's supposed danger to the community even in circumstances when a federal, state, or local judge has concluded that no danger exists by, for example, imposing a noncustodial sentence.

Furthermore, the Proposed Rules cruelly disregard the connections between trauma and involvement in the criminal legal system. The harsh nature of the Proposed Rules is especially evident when viewed through a trauma-informed lens. Asylum seekers are an inherently vulnerable population because of the trauma they have experienced in their countries of origin and, often, along the journey to find safety. Existing literature suggests

AR.08468

that at least one out of every three asylum seekers struggles with depression, anxiety, and/or post-traumatic stress disorder (PTSD). Asylum seekers in the United States are often unable to access affordable medical care and treatments for complex trauma; some turn to drugs and alcohol in an effort to self-medicate. The proposed new bars to asylum include any drug-related conviction (with one exception for a first minor marijuana offense) and any second conviction for driving under the influence. This approach is not only cruel but also ignores the evidence. Particularly given the vulnerabilities of asylum seeking populations, prior struggles with addiction should be addressed with treatment and compassion, not with deportation order.

Immigration adjudicators already maintain the authority to deny asylum to individuals with drug-related criminal histories on the basis of discretion; denying asylum seekers even the opportunity to present the countervailing factors of their past trauma and potential recovery is simply cruel. As a physician who works largely with immigrant populations, I know how difficult it is for individuals seeking asylum to be granted asylum, and I am appalled that this Administration is making the process more difficult without offering any evidence for why these changes are needed. I strongly urge that the new Proposal Rules be rescinded entirely.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 12, 2020
**Status:** Posted
**Posted:** January 12, 2020
**Tracking No.** 1k4-9eeb-p3t2
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0050
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Diana Rodriguez

## General Comment

This rule perpetuates the human rights violations this administration has championed over the last 2 years. There is enough argument against this rule that is based on the law and actual field data and yet this rule is based on feelings of xenophobia, pseudofacts and complete ignorance of basic human rights. It is unconceivable that an individual may be separated from his family due to an accusation without conviction. This rule promotes frivolous accusations against migrants and puts in danger their lives and their families. Those are the same migrants who already earn way below minimum wage and receive food donations to make it through the month. How much more does this country need to opress them? There are plenty of jobless hoodlums breaking the law that justice should go after, not the migrant hard workers, the studious pupils, the all-giving parents, innocent children and vulnerable elders.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 12, 2020
**Status:** Posted
**Posted:** January 12, 2020
**Tracking No.** 1k4-9eek-utn9
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0051
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Joyce Anderson
**Address:**
    2221 Country Lane
    Minnetonka,  55305-3113
**Email:** jgaanderson@excite.com
**Phone:** 9525460696

## General Comment

I am a concerned member of the public who believes strongly that our nation must welcome people fleeing violence, and who is strongly concerned about racial profiling in the criminal legal system. Immigrants are a vital part of my community, my neighborhood, and my state.
Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution.
This proposed rule would inject racial profiling into the asylum process. This latest attack would put even more people seeking asylum at risk of danger - and death. This would in turn remove the heart of one of the most important defenses community members have against deportation.
For these reasons, I call upon the Trump administration to withdraw this proposal.

AR.08471

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 12, 2020
**Status:** Posted
**Posted:** January 13, 2020
**Tracking No.** 1k4-9eep-4zs4
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0052
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Sara Koch

## General Comment

I write to express my strong opposition to this proposed rule change.

I am a concerned member of the public who believes strongly that our nation must welcome people fleeing violence, and who is strongly concerned about racial profiling in the criminal legal system. Immigrants are a vital part of my community, my neighborhood, and my state. This proposed rule would inject racial profiling into the asylum process. This latest attack would put even more people seeking asylum at risk of danger - and death. This would in turn eviscerate one of the most important defenses community members have against deportation.

For these reasons, I call upon the Trump administration to withdraw this proposal.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 12, 2020
**Status:** Posted
**Posted:** January 13, 2020
**Tracking No.** 1k4-9eep-5xhd
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0053
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Deborra Sanders

## General Comment

Please support a compassionate and flexible policy regarding migrants seeking asylum. I prefer that our country be a welcoming place for asylum seekers.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 12, 2020
**Status:** Posted
**Posted:** January 13, 2020
**Tracking No.** 1k4-9eeq-u5h6
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0054
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Laurie Gauer

## General Comment

I write to express not strong opposition to this time change. I believe in the inherent worth and dignity of every person, including immigrants, and that we must protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them. For these reasons, I call upon the Trump administration to withdraw this proposal.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 13, 2020
**Status:** Posted
**Posted:** January 13, 2020
**Tracking No.** 1k4-9ef2-bhro
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0055
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** mark voorhees
**Address:**
    18386 cattail ct
    Eden prairie,  55346
**Email:** Judyandmark4@comcast.net
**Phone:** 9523039531

---

## General Comment

We need to supportive of people leaving their place of home due to physical violence, fear for their lives, or climate destroyed habitat. These people are fleeing not because they want to but they need to in order to survive. We must be willing to accept.

AR.08475

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 13, 2020
**Status:** Posted
**Posted:** January 13, 2020
**Tracking No.** 1k4-9ef3-7ms5
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0056
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** georgia connelly

## General Comment

Refugees need our help. It would be unamerican to turn them away.

AR.08476

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 13, 2020
**Status:** Posted
**Posted:** January 13, 2020
**Tracking No.** 1k4-9ef7-nxon
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0057
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Migrant Justice
**Address:**
   179 S Winooski Ave
   Unit 202
   Burlington, VT, 05401
**Email:** info@migrantjustice.net
**Phone:** 8025408370

---

## General Comment

I write to express my strong opposition to this proposed rule change.

As a grassroots farmworker organization, at Migrant Justice we with immigrant community members daily, and are concerned this rule would put many people in danger. We support many people in asylum applications and understand what an incredibly difficult and painful process the asylum application process is.

Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution.
U.S. law enshrines the protections of the international Refugee Convention, drafted in the wake of the horrors of World War II. Under the Refugee Act of 1980, passed with bipartisan support, anyone present or arriving in the U.S. can apply for asylum.

For asylum seekers, making it to the U.S. often means they have found safety from persecution, torture, and sometimes death. Yet asylum seekers face many unjust obstacles in the immigration system.

This proposed rule would inject racial profiling into the asylum process. This latest attack would put even more people seeking asylum at risk of danger - and death. This would in turn eviscerate one of the most important defenses community members have against deportation.

This proposed Trump rule would punish people who've already endured mistreatment and racial profiling in the criminal legal system a second time -- with deportation back to the very life-threatening situation they fled. This

AR.08477

is profoundly immoral, makes a mockery of due process, and comes right out of Steven Miller's racist playbook. The criminal legal system in the U.S. is wracked with racial profiling and obstacles to equal justice. Our harsh immigration laws exploit these obstacles to drive mass incarceration and mass deportation of people of color.

I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them

For these reasons, we call upon the Trump administration to withdraw this proposal.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 13, 2020
**Status:** Posted
**Posted:** January 13, 2020
**Tracking No.** 1k4-9efa-jskm
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0058
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Stephen Fusselman

## General Comment

I write to express my strong opposition to this proposed rule change. I think Trump is immoral, anti-American, and anti-Christian.

I am a concerned member of the public who believes strongly that our nation must welcome people fleeing violence, and who is strongly concerned about racial profiling in the criminal legal system. Immigrants are a vital part of my community, my neighborhood, and my state.

My maternal grandfather was an immigrant from Europe who settled in Nebraska and became the civil engineer of a major Nebraska community.

Please, stop hating immigrants.

Steve Fusselman
Chaska, MN

AR.08479

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 13, 2020
**Status:** Posted
**Posted:** January 14, 2020
**Tracking No.** 1k4-9eff-4cp7
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0059
Comment on FR Doc # 2019-27055

---

# Submitter Information

**Name:** Mary Salit
**Address:**
    12407 12th Ave N
    Plymouth,  MN,  55441
**Email:** m-salit@u.northwestern.edu
**Phone:** 7634430874

---

# General Comment

Denying asylum to someone who is in danger could cost that person their life. For that reason such denials should only be issued when there is a compelling reason. The reasons listed in thrbpropksed rule change are trivial, and not worth the lives they will cost.

"(1) any conviction of a felony offense"

Very few felonies merit the death sentence, which is what asylum denial can often amount to.

"(2) any conviction for "smuggling or harboring" under 8 U.S.C. 1324(a)"

This shocks the conscience in cases where the asylum seeker committed the offense for the purpose of bringing her own spouse, child or parent to safety. For a parent to try to save their child is not only undeserving of a death sentence -- it should be rewarded and aided.

"(3) any conviction for illegal reentry under 8 U.S.C. 1326"

Asylum is meant for desperate people. Repeatedly attempting to flee to US territory is the action of a truly desperate person, and should be interpreted as evidence of that desperation.

;"(4) any conviction for an offense "involving criminal street gangs""

This is unworkable vague. In addition, it sentences people who may be fleeing gangs to possible death at the

AR.08480

hands of those gangs, precisely because of the involvement they are trying to flee.

No compelling American interest is served by this rule change, while asylum seekers are irreparably harmed I oppose this change.

Thank you.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 14, 2020
**Tracking No.** 1k4-9efp-l3yc
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0060
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Judith Blau
**Address:**
    75 Summit St
    Wellfleet,  MA,  02667
**Email:** judith_blau@unc.edu
**Phone:** 7747221223

---

## General Comment

What makes this country great is its diversity, and diversity is achieved when there is a continuous flow of refugees and migrants

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 14, 2020
**Tracking No.** 1k4-9efp-9dmy
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0061
Comment on FR Doc # 2019-27055

---

# Submitter Information

**Name:** nancy yeaw
**Address:**
  44 Harry Kemp Way
  25
  Provincetown,  02657
**Email:** nancymuir12@gmail.com
**Phone:** 5082460557

---

# General Comment

I am an 82 year old American citizen who views with horror the direction my country is heading. I strongly oppose this hateful, racially biased attempt to refuse even more people seeking refuge from violence and imminent danger in their country. This is not what our country stands for. Though we have certainly not been able to live up to the ideals we profess to stand for, the people of the United States do hope to try to do so. We need to help refuge seekers, not punish them. Please do not allow this .

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 14, 2020
**Tracking No.** 1k4-9efp-qrut
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0062
Comment on FR Doc # 2019-27055

---

# Submitter Information

**Name:** Evelyn Jackson
**Address:**
    Box 906
    South Wellfleet,
**Email:** Evelyn156@comcast.net
**Phone:** 508-349-5128

---

# General Comment

I am a concerned human being who is in opposition to the proposed immigration law change

My great grandparents were killed in the
Holocaust Asylum matters Refuges are counting on our country to be a place where the words of the Statue of Liberty are still true

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 14, 2020
**Tracking No.** 1k4-9efq-f84n
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0063
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Brigid Finucane
**Address:**
    3911 White Cloud Drive
    Skokie,  60076
**Email:** gardengoddess1@comcast.net
**Phone:** 8472130713

---

## General Comment

I am writing to express my strong opposition to this proposed rule change. I am a concerned member of the public who believes strongly that our nation must welcome people fleeing violence, and who is strongly concerned about racial profiling in the criminal legal system. Immigrants are a vital part of my community, my neighborhood, and my state.

Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution.
U.S. law enshrines the protections of the international Refugee Convention, drafted in the wake of the horrors of World War II. Under the Refugee Act of 1980, passed with bipartisan support, anyone present or arriving in the U.S. can apply for asylum.
For asylum seekers, making it to the U.S. often means they have found safety from persecution, torture, and sometimes death. Yet asylum seekers face many unjust obstacles in the immigration system.

I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.

For these reasons, I call upon the Trump administration to withdraw this proposal.

Brigid Finucane

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 14, 2020
**Tracking No.** 1k4-9efq-fqad
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0064
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Andrea Hanson

---

## General Comment

I am a concerned member of the public who believes strongly that our nation must welcome people fleeing violence, and who is strongly concerned about racial profiling in the criminal legal system. Immigrants are a vital part of my community, my neighborhood, and my state.
Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution.
U.S. law enshrines the protections of the international Refugee Convention, drafted in the wake of the horrors of World War II. Under the Refugee Act of 1980, passed with bipartisan support, anyone present or arriving in the U.S. can apply for asylum.
For asylum seekers, making it to the U.S. often means they have found safety from persecution, torture, and sometimes death. Yet asylum seekers face many unjust obstacles in the immigration system.

This proposed rule would inject racial profiling into the asylum process.
I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.
For these reasons, I call upon the Trump administration to withdraw this proposal.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 14, 2020
**Tracking No.** 1k4-9efr-qur1
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0065
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Anonymous Anonymous
**Address:**
   MA,  02648
**Email:** klharperuu@aol.com

---

## General Comment

I write to express my strong opposition to the proposed rule change. As a local Minister many of my members are immigrants or live in immigrant families. I believe that our country must protect and welcome those fleeing violence in their countries of origin. As a person of color I have intimate experience with racial profiling and our flawed criminal justice system and do not want to see nonviolent immigrants refused entry because of their race or ethnicity.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9efr-llkm
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0066
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** L Michael Hager
**Address:**
    115 Shady Lane
    Eastham,  MA,  02642
**Email:** l_michaelhager@hotmail.com
**Phone:** 774-207-0674

---

## General Comment

As a concerned citizen I oppose the proposed new procedures for asylum.

In further limiting the right to asylum, the new procedures would expose asylum-seekers to death threats and gang violence in their home countries. They would constrain the legal protections afforded asylum-seekers in U.S. law under the Refugee Act of 1980 and diminish American values that would afford refuge to people fleeing violence, starvation, poverty or persecution. The rules are patently racist and discriminatory because they are aimed at asylum-seekers, the majority of whom are poor and people of color.

The proposed rules would allow racial profiling in the asylum process. It would punish people who have already endured mistreatment and racial profiling in the criminal legal system a second time by deporting them back to the very life-threatening environment they fled.

In our racially-biased criminal justice system, the harsh immigration laws drive mass incarceration and mass deportation to people of color.

Instead of reducing asylum protections, let us restore American values and afford protection to those fleeing danger,

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9eft-b5b5
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0067
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Helen Lawrence
**Address:**
    436 14th Street
    Suite 801
    Oakland,  94612
**Email:** helen@oakimmigration.com
**Phone:** 5109220261

## General Comment

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41;
Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility

January 14, 2020

To Whom it May Concern:

I am writing on behalf of the Law Office of Helen Lawrence in response to the above-referenced Proposed Rules
to express our strong opposition to the Proposed Rules to amend regulations relating to eligibility for asylum

AR.08489

published in the Federal Register on December 19, 2019.

I graduated from Harvard Law School in 2009 and I have been representing asylum seekers ever since, for over 10 years. My office has represented thousands of asylum seekers. Each member of my office has traveled to many of the countries that today's asylum seekers are fleeing from and observed firsthand the imminent danger our clients face there. We have volunteered along the border and in southern detention centers, meeting with recently arrived asylum seekers and hearing their stories. Day in and day out, we meet with asylum seekers as they prepare for their adjudications and in the meantime support themselves and their children. We observe the contributions they are making to the United States, be that economically or culturally, truly enriching the fabric of this nation.

For the reasons detailed in the comments that follow, the Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

Thank you for the opportunity to submit comments on the Proposed Rules. Please do not hesitate to contact Helen Lawrence at (925) 788-6985 or helen@oakimmigration.com to provide further information.

Sincerely,
Helen Lawrence
Managing Attorney

---

# Attachments

LOHL Comment on Asylum Bars

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87,
1615-AC41; Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and
Bars to Asylum Eligibility

January 14, 2020

To Whom it May Concern:

I am writing on behalf of the Law Office of Helen Lawrence in response to the above-referenced
Proposed Rules to express our strong opposition to the Proposed Rules to amend regulations
relating to eligibility for asylum published in the Federal Register on December 19, 2019.

I graduated from Harvard Law School in 2009 and I have been representing asylum seekers ever
since, for over 10 years. My office has represented thousands of asylum seekers. Each member
of my office has traveled to many of the countries that today's asylum seekers are fleeing from
and observed firsthand the imminent danger our clients face there. We have volunteered along
the border and in southern detention centers, meeting with recently arrived asylum seekers and
hearing their stories. Day in and day out, we meet with asylum seekers as they prepare for their
adjudications and in the meantime support themselves and their children. We observe the
contributions they are making to the United States, be that economically or culturally, truly
enriching the fabric of this nation.

For the reasons detailed in the comments that follow, the Department of Homeland Security and
the Department of Justice should immediately withdraw their current proposal, and instead
dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access
to asylum protections in the United States.

Thank you for the opportunity to submit comments on the Proposed Rules. Please do not hesitate
to contact Helen Lawrence at (925) 788-6985 or helen@oakimmigration.com to provide further
information.

Sincerely,
Helen Lawrence
Managing Attorney

**DETAILED COMMENTS in opposition to the Proposed Rules re Procedures for Asylum and Bars to Asylum Eligibility, 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41**

**TABLE OF CONTENTS [with jump-links]**

I. Introduction

II. The Proposed Rules unnecessarily and cruelly exclude bona fide refugees from asylum eligibility

III. The Proposed Rules violate the letter and spirit of United States international treaty obligations

IV. Those precluded from asylum eligibility will be gravely impacted even if granted withholding or protection under the Convention Against Torture

V. The Proposed Rules will result in "mini-trials" in immigration court, undermine judicial efficiency and result in racially-biased decision-making

VI. The proposed definition of "conviction" and "sentence" for the purposes of the new bars further excludes those in need of protection

VII. The Proposed Rules will disparately impact vulnerable populations already routinely criminalized, including LGBTQ immigrants, survivors of trafficking and domestic violence, and immigrant youth of color

VIII. The Proposed Rules are ultra vires to the federal immigration statute to the extent they purport to bar eligibility through a categorical exercise of discretion

IX. Conclusion

**I. Introduction**

On December 19th, the Department of Homeland Security (DHS) and the Department of Justice (DOJ) issued a joint set of Proposed Rules that would make three primary changes to the rules governing asylum adjudications. ==*These rules are ultra vires going beyond what Congress specifically considered in terms of limiting asylum to refugees. Moreover, they create an enormous amount of additional work for a system that cannot handle its current adjudication framework and is limping along.*==

The first proposed set of changes adds the following seven *categorical* bars to asylum eligibility: (1) any conviction of a felony offense; (2) any conviction for "smuggling or harboring" under 8 U.S.C. § 1324(a), even if the asylum seeker committed the offense for the purpose of bringing her own spouse, child or parent to safety; (3) any conviction for illegal reentry under 8 U.S.C. § 1326; (4) any conviction for an offense "involving criminal street gangs," with the adjudicator empowered to look to any evidence to determine applicability; (5) any second conviction for an offense involving driving while intoxicated or impaired; (6) any conviction *or accusation of conduct* for acts of battery involving a domestic relationship; (7) and any conviction for several newly defined categories of misdemeanor offenses, including *any* drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits.

The second section of the Proposed Rules provides a multi-factor test for immigration adjudicators to determine whether a criminal conviction or sentence is valid for the purpose of determining asylum eligibility. The third section rescinds a provision in the current rules regarding the reconsideration of discretionary asylum.

Taken together, these proposed changes constitute an unnecessary, harsh, and unlawful gutting of the asylum protections enshrined in United States and international law. The Law Office of Helen Lawrence submits these comments to express opposition to the entirety of the Proposed Rules and grave concerns with the administration's continued efforts to exclude refugees from obtaining the security and stability the United States asylum system has long promised. We urge that the Proposed Rules be rescinded in their entirety.

## II.    The Proposed Rules unnecessarily and cruelly exclude bona fide refugees from asylum eligibility

*The barriers to asylum for those previously involved in the criminal legal system are already sweeping in scope; adding more barriers is cruel and unnecessary.*

The United States asylum system was first codified in statute through the Refugee Act of 1980, described by one prominent scholar as a bipartisan attempt to "reconcile our rhetoric with our law, our national immigration policy and our international treaty obligations so that we could maintain a consistent posture towards the world as a nation with a strong humanitarian tradition and a unique historic role as a haven for persons fleeing oppression." The Act—among other measures designed to bring the United States domestic legal code into compliance with the provisions of the United Nations Protocol Relating to the Status of Refugees—created a "broad class" of refugees eligible for a discretionary grant of asylum.

The asylum protections provided by United States law are sacred. Asylum provides those fleeing horrors with physical safety, a path to citizenship and security, and the opportunity to reunite with immediate family members who may still remain abroad in danger. Many see the domestic asylum system as a symbol of the United States' commitment never to repeat its failure to save thousands of Jewish refugees refused entry to the United States on the *St. Louis* and others fleeing the Holocaust. Others point to the critical role that domestic asylum policy plays in serving the United States' foreign policy interests abroad. For those individuals seeking asylum in the United States, the stakes could not be higher—a claim denied often means return to death or brutal persecution.

The laws, regulations, and process governing asylum adjudications are already exceedingly harsh. Asylum seekers bear the evidentiary burden of establishing their eligibility for asylum in the face of a complex web of laws and regulations, without the benefit of appointed counsel and often from a remote immigration jail. The obstacles to winning asylum are exceedingly high; indeed in some parts of the country and before certain immigration judges, almost no one succeeds. Today, newly imposed barriers to accessing asylum in the United States are breathtaking in scope, with those seeking safety at the southern border subject to return to dangerous conditions in Mexico and an overlapping web of policies that preclude asylum eligibility for countless migrants simply because of their national origin, manner of entry, or their

flight path. There are consistent reports of the documented deaths and brutalities endured by those who sought but were denied asylum protections in the United States.

Specifically, the bars to asylum based on allegations of criminal conduct are *already* sweeping and over-broad in nature and scope. Any conviction for an offense determined to be an "aggravated felony" is considered a *per se* "particularly serious crime" and therefore a mandatory bar to asylum. "Aggravated felony" is a notoriously vague term, which exists only in immigration law. Originally limited to murder, weapons trafficking and drug trafficking, it has metastasized to encompass hundreds of offenses, many of them neither a felony nor aggravated, including petty offenses such as misdemeanor shoplifting, simple misdemeanor battery, or sale of counterfeit DVDs. The existing crime bars should be narrowed, not expanded. Even for those not categorically barred from relief, the immigration adjudicator maintains full discretion to deny asylum.

Our office has represented clients, including children, who have been denied asylum based on discretion. Adjudicators are already armed with the power they need to deny asylum on a case-by-case basis. These regulations are not needed, irrespective of their *ultra vires* nature.

Immigration adjudicators already have vast discretion to deny asylum to those who meet the refugee definition but have been convicted of criminal conduct. Further categorical bars are not needed. The agencies' efforts to add *seven* new sweeping categories of barred conduct to the asylum eligibility criteria is unnecessary and cruel. The Proposed Rules drain the phrase "*particularly serious* crime," 8 U.S.C. § 1158, of any sensible meaning.

The Proposed Rules are also arbitrary and capricious. They would constitute a marked departure from past practice. And the agencies have proffered no evidence or data to support these changes.

One assumption fundamentally underlying the Proposed Rules, for example, is that every noncitizen convicted of any offense punishable by more than a year in prison necessarily constitutes a danger to the community. But no evidence is provided to support that assumption, and a criminal record, does not, in fact, reliably predict future dangerousness. The Proposed Rules are so capricious as to peremptorily postulate a noncitizen's supposed danger to the community even in circumstances when a federal, state, or local judge has concluded that no danger exists by, for example, imposing a noncustodial sentence. Conviction for a crime does not, without more, make one a present or future danger—which is why the Refugee Convention's particularly serious crime bar, made part of United States law through 8 U.S.C. § 1158, should only properly apply if both (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows that she is a present or future danger.

Similarly, the Proposed Rules fail to address or account for the fact that a significant number of people may agree to plead to a crime as to avoid the threat of a severe sentence; not only is a conviction an unreliable predictor of future danger, it can also be an unreliable indicator of past criminal conduct. In addition, the Proposed Rules do not address and make no exception for convictions for conduct influenced by mental illness or duress.

The Board of Immigration Appeals has cautioned that, "in light of the unusually harsh consequences which may befall a [noncitizen] who has established a well-founded fear of persecution; the danger of persecution should generally outweigh all but the most egregious of adverse factors." Yet because of the categorical nature of the seven news bars proposed here, asylum seekers will be precluded from obtaining protection on the basis of a vast array of conduct, without any discretion left to the immigration adjudicator to determine whether the circumstances merit such a harsh penalty. Indeed, in the case of the domestic-violence related ground, the categorical bar will be imposed on the basis of *mere allegations* of conduct without any adjudication of guilt.

Those unjustly precluded from even seeking a discretionary grant of asylum by the Proposed Rules will include, for example: individuals struggling with addiction with one drug-related conviction, regardless of the circumstances of the offense; asylum seekers with two convictions for driving under the influence, regardless of whether the applicant has sought treatment for alcohol addiction or the circumstances of the convictions; community members seeking asylum defensively who have been convicted of a document fraud offense related to their immigration status; and asylum-seeking mothers convicted for bringing their own child across the southern border in an effort to find safety.

> *The Proposed Rules cruelly disregard the connections between trauma and involvement in the criminal legal system.*

The harsh nature of the Proposed Rules is especially evident when viewed through a trauma-informed lens. Asylum seekers are an inherently vulnerable population because of the trauma they have experienced in their countries of origin and, often, along the journey to find safety. Existing literature suggests that at least one out of every three asylum seekers struggles with depression, anxiety, and/or post-traumatic stress disorder (PTSD). One recent study found the mental health problems facing refugees and asylum seekers so acute that more than a third of the study's sample admitted having suicidal thoughts in the preceding two weeks.

Studies also consistently reveal a high prevalence of comorbidity of PTSD and substance use disorders, with individuals with PTSD *up to 14 times more likely* to struggle with a substance use disorder. Asylum seekers in the United States are often unable to access affordable medical care and treatments for complex trauma; some turn to drugs and alcohol in an effort to self-medicate. The proposed new bars to asylum include *any* drug-related conviction (with one exception for a first minor marijuana possessory offense) and any second conviction for driving under the influence. This approach is not only cruel but also ignores the evidence. *Particularly* given the vulnerabilities of asylum seeking populations, prior struggles with addiction should be addressed with treatment and compassion, not a closed door and deportation order.

Immigration adjudicators already maintain the authority to deny asylum to individuals with drug-related criminal histories on the basis of discretion; denying asylum seekers even the opportunity to present the countervailing factors of their past trauma and potential recovery is simply cruel.

### III. The Proposed Rules violate the letter and spirit of United States international treaty obligations

By acceding to the 1967 Protocol Relating to the Status of Refugees, which binds parties to the United Nations Convention Relating to the Status of Refugees, the United States obligated itself to develop and interpret United States refugee law in a manner that complies with the Protocol's principle of non-refoulement (the commitment not to return refugees to a country where they will face persecution on protected grounds), even where potential refugees have allegedly committed criminal offenses. As noted above, adjudicators already have over-broad authority to deny asylum based on allegations of criminal activity, which vastly exceeds the categories for exclusion and expulsion set out in the Convention. Instead of working towards greater congruence with the terms of the Convention, the Proposed Rules carve out categorical bars from protection that violate both the language and spirit of the treaty.

While the Convention allows states to exclude and/or expel potential refugees from protection, the circumstances in which this can occur are limited. In particular, the Convention allows states to exclude and/or expel individuals from refugee protection if the individual "having been convicted by a final judgement of a particularly serious crime, constitutes a danger to the community of that country." However, this clause is intended for "extreme cases," in which the particularly serious crime at issue is a "capital crime or a very grave punishable act." The United Nations High Commissioner for Refugees (UNHCR) has asserted that to constitute a "particularly serious crime," the crime "must belong to the gravest category" and be limited "to refugees who become an extremely serious threat to the country of asylum due to the severity of crimes perpetrated by them in the country of asylum." Moreover, the UNHCR has specifically noted that the particularly serious crime bar does not encompass less extreme crimes; "[c]rimes such as petty theft or the possession for personal use of illicit narcotic substances would not meet the threshold of seriousness." Finally, when determining whether an individual should be barred from protection for having been convicted of a particularly serious crime, the adjudicator must conduct an individualized analysis and consider any mitigating factors.

As noted above, legislation and agency interpretation of the Immigration and Nationality Act have already expanded the particularly serious crime bar far beyond what was contemplated in the Convention by creating categorical particularly serious crimes through the aggravated felony definition. The Proposed Rules would amplify the dissonance between U.S. refugee law and the Convention, as well as the violation of U.S. obligations under the Convention, by creating categorical bars within categorical bars. For example, at p. 69659, the Proposed Rules first exclude from protection anyone who was convicted of a felony and then at p. 69660, define "felony" as "any crime punishable by more than one of imprisonment" without any reference to other factors, including dangerousness. The Proposed Rules described the increased categorization of the particularly serious crime bar as necessary because the case-by-case adjudication previously used for non-aggravated felony offenses was "inefficient," but an individualized analysis is exactly what the Convention requires to ensure only those individuals who have been convicted of crimes that are truly serious and therefore present a future danger are placed at risk of refoulement.

Additionally, outside of the aggravated felony context, it has generally been well understood by the Board of Immigration Appeals and the Courts of Appeals that low-level, "run-of-the-mill" offenses do not constitute particularly serious crimes. Under this long-standing interpretation of the particularly serious crime bar in the INA, there is simply no scenario in which low-level offenses like misdemeanor driving under the influence where no injury is caused to another or simple possession of a controlled substance or paraphernalia would constitute a particularly serious crime.

The reason for this is common sense. As Judge Reinhardt explained in a concurring opinion in *Delgado v. Holder*, a decision the Proposed Rules cite in support of the expanded bars, run-of-the-mill crimes like driving under the influence have "little in common" with other crimes the Board of Immigration Appeals has deemed particularly serious—e.g., felony menacing with a deadly weapon, armed robbery, and burglary of a dwelling in which the offender is armed or causes injury. Judge Reinhardt further noted that public opinion does not treat them similarly either: "American voters would be unlikely to elect a president or vice president who had committed a particularly serious crime, yet they had no difficulty in recently electing to each office a candidate with a DUI record." Barring individuals from asylum based on these relatively minor offenses renders the "particularly serious" part of the "particularly serious crime" bar meaningless.

The expansion of the asylum bar to include individuals who have been convicted of reentering the United States without inspection pursuant to INA § 276 is also unlike any of the other bars previously established or as interpreted by the Board of Immigration Appeals or Circuit Courts of Appeals. It is an offense with no element of danger or violence to others, and has no victim. Most significantly, and more so than other bars contained in the Proposed Rules, barring asylum based on the manner of entry directly violates the Convention's prohibition on imposing penalties based on a refugee's manner of entry or presence. This prohibition is a critical part of the Convention because it recognizes that refugees often have little control over the place and manner in which they enter the country where they are seeking refuge.

## IV.    Those precluded from asylum eligibility will be gravely impacted even if granted withholding of removal or protection under the Convention Against Torture

Throughout the Proposed Rules, the agencies defend the harsh and broad nature of their proposal by pointing to the continued availability of alternative forms of relief for those precluded from asylum eligibility under the new rules. The availability of these alternatives forms of relief, however—known as withholding of removal and protection under the Convention Against Torture (CAT)—does not nullify the harm created by the Proposed Rule's new limits on asylum. The protections afforded by CAT and by statutory withholding of removal are limited in scope and duration, and they are harder to obtain. As a result, a Rule that limits *bona fide* refugees to withholding of removal and CAT protection would impose a very real harm on individuals who have come to the United States in search of protection.

First, the most serious harm that can befall an individual as a result of these Proposed Rules is removal to persecution and torture, and the existence of withholding of removal does not account for that risk. CAT and withholding protections demand a higher level of proof than asylum claims: a clear probability of persecution or torture. Thus, an individual could have a valid asylum claim but be unable to meet the standard under the other forms of relief and therefore would be removed to their country of origin, where they would face persecution or even death.

Even for those who meet the higher standard, withholding and CAT recipients are still subject to significant prejudice. For example, they have no ability to travel internationally. The United Nations Convention Relating to the Status of Refugees affords refugees the right to travel in mandatory terms. Article 28 states, "Contracting States shall issue to refugees lawfully staying in their territory travel documents for the purpose of travel outside their territory." Withholding and CAT recipients do not have access to a travel document as contemplated by Article 28. By regulation, refugee travel documents are available only to asylees. And the Board of Immigration Appeals requires that an individual granted withholding and CAT—unlike an individual granted asylum—must simultaneously be ordered removed, making any international travel a "self-deportation." Refugees granted only withholding of removal or CAT protection are thus effectively trapped within the United States in long-term limbo.

Withholding and CAT recipients also face permanent separation from their spouses and children. Because international travel is prohibited, these individuals cannot reconnect with their families in a third country. And they also cannot reunite with family in the United States because only asylees and refugees are eligible to petition for a spouse and children to join them as derivatives on that status. For many, this will mean that the Proposed Rules institute yet another formal policy of family separation. For example, a mother with two young children who flees to the United States and is subject to one of the expanded asylum bars will not be able to ensure that her children will be able to obtain protection in the United States with her if she is granted relief. Rather, if her children are still in her home country, they would need to come to the United States and seek asylum on their own, likely as unaccompanied children. If her children fled to the United States with her, then they will need to establish their own eligibility for protection before an immigration judge, no matter their age.

Recently, this exact scenario played out with a mother who was subject to the so-called Migrant Protection Protocols (also known as Remain in Mexico) and the asylum "transit ban," which made the mother ineligible for asylum and thus required the children to establish their independent eligibility for withholding and CAT protection. An immigration judge granted the mother withholding of removal but denied protection to her young children, leaving the children with removal orders and immense uncertainty about their future. Under the expanded bars in the Proposed Rules, these situations will certainly increase, separating families and forcing parents to return to countries where it has been established they more likely than not will face persecution and torture, rather than leaving their children on their own.

Withholding recipients likewise face hurdles in access to employment. Article 17 of the Refugee Convention states that a contracting state "shall accord to refugees lawfully staying in their territory the most favorable treatment accorded to nationals of a foreign country in the same

circumstances, as regards the right to wage-earning employment." Recipients of withholding enjoy no such right. They must apply for work authorization, and they face frequent delays in the adjudication of these applications, which often result in the loss of legal authorization to work.

And perhaps most fundamentally, there is continuing jeopardy for withholding and CAT recipients that does not exist for asylum recipients. When a noncitizen is granted asylum, the person receives a legal status. Asylum, once granted, protects an asylee against removal unless and until that status is revoked. None of these protections exists for withholding and CAT recipients. They have no access to permanent residency or citizenship. Instead, they are subject to a removal order and vulnerable to the permanent prospect of deportation to a third country and subject to potential check ins with immigration officials where they can be made to pursue removal to third countries to which they have no connection.

Finally, the Law Office of Helen Lawrence writes to highlight a different form of prejudice that will flow from the rule: one relating to judicial efficiency. Neither withholding of removal nor CAT protection allow family members who are in the United States together and pursuing protection on the same basis to apply as derivatives on a principal application. As a result, family claims for those rendered ineligible for asylum by the new rules will have to be adjudicated separately, and potentially before different adjudicators even when the claims are interrelated and even when minor children may not be in a position to explain the claim at all or as sufficiently as a parent. In addition to being unjust to the affected family members, this approach would result in gross inefficiencies, which should be avoided in a system that already contains a significant backlog of pending cases.

## V. The Proposed Rules will result in "mini-trials" in immigration court, undermine judicial efficiency and result in racially-biased decision-making

In two significant ways, the Proposed Rules require immigration adjudicators to engage in decision-making to determine whether an asylum applicant's conduct—considered independently of any criminal court adjudication—triggers a categorical bar to asylum eligibility. First, the agencies propose that immigration adjudicators be allowed to consider "all reliable evidence" to determine whether there is "reason to believe" an offense was "committed for or related to criminal gang evidence," or "in furtherance of gang-related activity, triggering ineligibility for asylum in either case. Second, the Proposed Rules permit immigration adjudicators to "assess all reliable evidence in order to determine whether [a] conviction amounts to a domestic violence offense;" and to go even further by considering whether non-adjudicated *conduct* "amounts to a covered act of battery or extreme cruelty."

Requiring adjudicators to make complex determinations regarding the nature and scope of a particular conviction or, in the case of the domestic violence bar, *conduct*, will lead to massive judicial inefficiencies and slanted "mini-trials" within the asylum adjudication process. The scope of the "reliable evidence" available to adjudicators in asylum cases is potentially limitless; advocates on both sides would be obligated to present fulsome arguments to make their cases about gang connections to the underlying activity or the relationship of the asylum applicant to the alleged victim. Because of the lack of robust evidentiary rules in immigration proceedings, it will be difficult if not impossible for many applicants to rebut negative evidence

marshaled against them, even if false; and in other cases, asylum applicants will struggle to find evidence connected to events that may have happened years prior (especially for those detained). Asylum trials, which are typically three or fewer hours under current policies, would provide insufficient time to fully present arguments on both sides of these unwieldy issues.

As the immigration courts contend with backlogs that now exceed one million cases, tasking adjudicators with a highly nuanced, resource-intensive assessment of the connection of a conviction to gang activity and/or the domestic nature of alleged criminal conduct—assessments far outside their areas of expertise—will prolong asylum proceedings and invariably lead to erroneous determinations that will give rise to an increase in appeals. The Proposed Rules repeatedly cite increased efficiency as justification for many of the proposed changes. Yet requiring adjudicators to engage in mini-trials to determine the applicability of categorical criminal bars, rather than relying on adjudications obtained through the criminal legal system, will dramatically *decrease* efficiency in the asylum adjudication process.

Indeed, the Supreme Court has "long deemed undesirable" exactly the type of "post hoc investigation into the facts of predicate offenses" proposed by the agencies here. Instead, for more than a century the federal courts have repeatedly embraced the "categorical approach" to determine the immigration consequence(s) of a criminal offense, wherein the immigration adjudicator relies on the statute of conviction as adjudicated by the criminal court system, without relitigating the nature or circumstances of the offense in immigration court. As the Supreme Court has explained, this approach "promotes judicial and administrative efficiency by precluding the relitigation of past convictions in minitrials conducted long after the fact." In *Moncrieffe v. Holder*, the Court forewarned of exactly the sort of harm that would arise from these Proposed Rules; in that case, the Court rejected the government's proposal that immigration adjudicators determine the nature and amount of remuneration involved in a marijuana-related conviction, noting that "our Nation's overburdened immigration courts" would end up weighing evidence "from, for example, the friend of a noncitizen" or the "local police officer who recalls to the contrary," with the end result a disparity of outcomes depending on the whims of the individual immigration judge and a further burdened court system.

Particularly in the context of the new proposed bar related to alleged gang affiliation, the Law Office of Helen Lawrence is concerned that creating a blanket exclusion for anyone who is convicted of a crime – including a misdemeanor – that an immigration adjudicator deems linked to gang activity will erroneously prevent bona fide asylum seekers from receiving protection. This rule confers on immigration adjudicators—who generally are not criminologists, sociologists, or criminal law experts—the responsibility to determine if there is "reason to believe" any conviction flows from activity taken in furtherance of gang activity. This rule will necessarily ensnare asylum seekers of color who have experienced racial profiling and a criminal legal system fraught with structural challenges and incentives to plead guilty to some crimes, particularly misdemeanors. These same individuals are vulnerable to being erroneously entered into gang databases. Such databases are notoriously inaccurate, outdated, and infected by racial bias.

Indeed, asylum applicants are *already* frequently subjected to wrongful denials of protection because of allegations of gang activity made by the Department of Homeland Security

on the basis of information found in notoriously unreliable foreign databases and "fusion" intelligence-gathering centers outside the United States. Empowering immigration adjudicators to render asylum applicants *categorically* excluded from protection on the basis of such spurious allegations will inevitably result in the return of many refugees back to harm.

The Departments curiously argue that all gang-related offenses should be construed as "particularly serious crimes." They cite statistics from up to 16 years ago in an attempt to make the point that gang members commit violent crimes and drug crimes. They then make the illogical leap to the conclusion that *all crimes*—including misdemeanor property crimes—that may be construed as connected to gang activity are particularly serious. This simply does not follow; in fact, the Proposed Rules will inevitably result in the exclusion from protection of asylum seekers of color who live in economically distressed communities and have obtained a minor conviction such as a property crime. Relying on the definition of "particularly serious crime" to prevent asylum seekers convicted of even minor crimes construed as gang-related from accessing asylum protection is disingenuous at best, and tinged with racial animus at worst.

The Departments asks for comments on: (1) what should be considered a sufficient link between an asylum seeker's underlying conviction and the gang related activity in order to trigger the application of the proposed bar, and (2) any other regulatory approaches to defining the type of gang-related activities that should render individuals ineligible for asylum. The premise of these questions is wrong: a vague "gang related" bar should not be introduced at all. The Immigration and Nationality Act and existing regulations already provide overly broad bars to asylum where criminal behavior by an asylum seeker causes concern by an adjudicator. Adding this additional, superfluous layer of complication risks erroneously excluding bona fide asylum seekers from protection without adding any useful adjudicatory tool to the process.

## VI.    The proposed definition of "conviction" and "sentence" for the purposes of the new bars further excludes those in need of protection

The section of the Proposed Rules that outlines a new set of criteria for determining whether a conviction or sentence is valid for the purpose of determining asylum eligibility is an ultra vires exercise of authority that is not authorized by the Immigration and Nationality Act. The Proposed Rules impose an unlawful presumption against asylum eligibility for applicants who seek post-conviction relief while in removal proceedings or longer than one year after their initial convictions. They also deny full faith and credit to state court proceedings by attributing improper motives to state court actors.

*The Proposed Rules undermine Sixth Amendment protections and harms immigrants unfamiliar with the complex criminal and immigration framework governing prior convictions.*

The Proposed Rules outline a new multi-factor process asylum adjudicators must use to determine whether a conviction or sentence remains valid for the purpose of determining asylum eligibility; the proposal includes a rebuttable presumption "against the effectiveness" of an order vacating, expunging, or modifying a conviction or sentence if the order was entered into after the

asylum seeker was placed in removal proceedings or if the asylum seeker moved for the order more than one year after the date the original conviction or sentence was entered.

This newly created presumption unfairly penalizes asylum applicants, many of whom may not have the opportunity to seek review of their prior criminal proceedings until applying for asylum. In *Padilla v. Kentucky*, the Supreme Court recognized that the immigration consequences of a conviction are sufficiently serious for the Sixth Amendment to require a noncitizen defendant to be competently advised of them before agreeing to a guilty plea. By imposing a presumption against the validity of a withdrawal or vacatur of a plea, the Proposed Rules hold asylum seekers whose rights were violated under *Padilla* to a different standard; even though they too were denied effective assistance of counsel in the course of their underlying criminal proceedings, asylum seekers will be forced to rebut a presumption that their court-ordered withdrawal or vacatur is invalid. The Proposed Rules therefore compound the harm to immigrants who, in addition to facing persecution in their home countries, have been denied constitutionally compliant process in the United States criminal legal system.

Many asylum applicants, especially those in vulnerable populations isolated from resources and unfamiliar with the due process protections available to them in the United States, may not have discovered the defects in their underlying criminal proceedings until their consultation with an immigration attorney, or until they are placed into removal proceedings, which may happen several years after a conviction. Imposing a presumption *against* the validity of a plea withdrawal or vacatur in these cases will undoubtedly lead to the wrongful exclusion of countless immigrants from asylum simply because they were unable to adequately rebut the presumption, particularly in a complex immigration court setting without the benefit of appointed counsel.

We have represented many immigrant clients who have sought and obtained post conviction relief for convictions that were procedurally flawed.

*The Proposed Rules violate the full faith, and credit to which state court decisions are entitled.*

The Proposed Rules further improperly authorize immigration adjudicators to second-guess the decision of a state court, even where the order on its face cites substantive and procedural defects in the underlying proceeding. The proffered justification for this presumption against the validity of post-conviction relief is to "ensure that aliens do not have their convictions vacated or modified for purported rehabilitative purposes that are, in fact, for immigration purposes," "to codify the principle set forth in *Matter of Thomas and Thompson*," and to bring the analysis of post-conviction orders in line with *Matter of Pickering*. The agencies misread the applicable law, however, by authorizing adjudicators to disregard otherwise valid state orders. The immigration law only requires that to be effective for immigration purposes, orders vacating or modifying convictions must be based on substantive or procedural infirmities in the underlying proceedings. The Proposed Rule goes well beyond that requirement.

The Proposed Rules abandon the presumption of regularity that should accompany state court orders, thus upending settled principles of law. The Proposed Rules cite a misleading quote

from *Matter of F-* in support of allowing asylum adjudicators to look beyond the face of a state court order; had the Rules' authors looked to the full case, they would have read the following: "Not only the full faith and credit clause of the Federal Constitution, but familiar principles of law require the acceptance at face value of a judgment regularly granted by a competent court, unless a fatal defect is evident upon the judgment's face. However, the presumption of regularity and of jurisdiction may be overcome by extrinsic evidence or by the record itself." In *Matter of F-*, the Board of Immigration Appeals offers support for the proposition that an adjudicator should presume the validity of a state court order unless there is a reason to doubt it, contrary to the *presumption of irregularity* put forward in the Proposed Rules.

The authority extended to adjudicators by the Proposed Rules also violates the law of multiple circuits, including *Pickering*, on which it relies. In *Pickering v. Gonzales*, the Sixth Circuit Court of Appeals held that despite the petitioner's stated motive of avoiding negative immigration consequences, the Board of Immigration Appeals was limited to reviewing the authority of the court issuing the order as to the basis for his vacatur. Similarly, in *Reyes-Torres* the Ninth Circuit Court of Appeals held that the motive of the respondent was not the relevant inquiry. Rather, "the inquiry must focus on the state court's rationale for vacating the conviction." In addition, the Third Circuit Court of Appeals in *Rodriguez v. U.S. Att'y Gen.*, which the Proposed Rules cite as "existing precedent," held that the adjudicator must look only to the "reasons explicitly stated in the record and may not impute an unexpressed motive for vacating a conviction." Moreover, the *Rodriguez* court stated that to determine the purpose of a vacatur, the adjudicator must first look to the face of the order vacating the conviction, and "if the order explains the courts reasons … the [adjudicator's] inquiry must end there." The Proposed Rules contain no such limiting language to guide the adjudicator's inquiry. Instead, the Rules grant adjudicators vague and indefinite authority to look beyond even a facially valid vacatur. Such breadth of authority undermines asylum seekers' rights to a full and fair proceeding.

> *The Proposed Rules wrongly extend* Matter of Thomas and Thompson *to all forms of post-conviction relief and impose an ultra vires and unnecessary burden on asylum seekers.*

Finally, the above-described presumption is ultra vires and unnecessary. As an initial matter, the Proposed Rules' reliance on *Matter of Thomas and Thompson* is flawed. The Attorney General's decision in *Matter of Thomas and Thompson* has no justification in the text or history of the immigration statute. Nowhere does the plain text of the Immigration and Nationality Act support giving adjudicators the authority to give effect only to state court sentence modifications undertaken to rectify substantive or procedural defects in the underlying criminal proceedings. Nor does the legislative history support such a rule. The Board of Immigration Appeals recognized this in *Matter of Cota-Vargas*, where it concluded that the application of "the *Pickering* rationale to sentence modifications has no discernible basis in the language of the Act." Based on the text of the Immigration and Nationality Act and the well-documented legislative history behind Congress's definition of "conviction" and "sentence" in 8 U.S.C. § 1101(a)(48), the Board determined that Congress intended to ensure that, generally, proper admissions or findings of guilt were treated as convictions for immigration purposes, even if the conviction itself was later vacated. Neither the text of the INA nor the legislative history of

the definitions reveal any attempt on Congress's part to change the longstanding practice of giving effect to state court sentencing modifications. For these reasons, *Matter of Thomas and Thompson* lacks Congressional support for its rule and should not be extended.

Moreover, as applicants for immigration benefits or relief from removal, asylum seekers already bear the burden of demonstrating their eligibility for asylum. The Proposed Rules do not alter or shift this burden, nor do they provide evidence supporting the need for this presumption. By introducing a presumption of bad faith into asylum adjudication, the Proposed Rules unfairly interfere with asylum seekers' efforts to establish their claims. Immigration law, and asylum law in particular, is already highly complex, and the process of seeking asylum is in many instances re-traumatizing, particularly for applicants who do not have counsel to represent them and who lacked effective counsel in their underlying criminal proceedings. The Proposed Rules as applied to asylum applicants who seek post-conviction relief transform an already difficult process into an adversarial inquiry, contrary to the intent of Congress.

## VII.    The Proposed Rules will disparately impact vulnerable populations already routinely criminalized, including LGBTQ immigrants, survivors of trafficking and domestic violence, and immigrant youth of color

The expanded criminal bars exclude from safety and a pathway to citizenship those convicted of offenses that are coincident to their flight from persecution, and do not accomplish the stated goal of making communities safer. They will disparately impact vulnerable populations, who comprise asylum seekers hailing primarily from Central America and the Global South, and those routinely criminalized because of their identities, racially disparate policing practices, or in connection with experiences of trafficking and domestic violence. For these populations especially, the discretion currently delegated to asylum adjudicators is crucial for them to become fully integrated in the larger community. The imposition of additional categorical bars to asylum will only further marginalize asylum seekers already struggling with trauma and discrimination.

The Proposed Rules turn asylum into a blunt instrument that would prevent the use of discretion where it is most needed and most effective. The existing framework for determining if an offense falls within the particularly serious crime bar already provides the latitude for asylum adjudicators to deny relief to anyone found to pose a danger to the community. Furthermore, asylees with convictions that render them inadmissible must apply for a waiver at the time of their applications for permanent residence. These measures ensure that asylum applicants in vulnerable populations have access to supportive resources and have the opportunity to demonstrate their ongoing commitment to social and personal health. Moreover, the existence of provisions allowing the revocation of asylum status ensures that adjudicators may continue to enforce concerns related to the safety of the community even after asylum is granted.

*Barring asylum for immigrants convicted of migration-related offenses punishes them for fleeing persecution and/or seeking safety for their children, and does not make communities safer.*

The expansion of the criminal bars to asylum to include offenses related to harboring, smuggling of noncitizens by parents and family members and those previously removed further criminalizes vulnerable populations fleeing persecution. The vast expansion of migrant prosecutions at the border during the current administration has created administrative chaos and separated families that do not pose a threat to the safety of communities in the United States. The Proposed Rules threaten to magnify the harm caused by these reckless policies by further compromising the ability of those seeking safety on the southern border to access the asylum system.

The Proposed Rules expand the asylum bar to parents or other caregivers who are convicted of smuggling or harboring offenses after taking steps to help minor children enter the United States in order to flee persecution. This proposed bar is particularly insidious in light of now-public documents revealing this administration's explicit efforts to utilize smuggling prosecutions against parents and caregivers as part of its strategy of deterring families from seeking asylum in the United States. The Proposed Rules seek to take this widely condemned strategy one step further, by additionally barring those parents *already prosecuted* from obtaining asylum protections for themselves and their children. The Proposed Rules multiply the harms parents and caregivers have experienced in their treacherous journeys to safety and callously penalize parents for doing what is only human—taking all necessary steps to protect their children.

The Proposed Rules also expand the asylum bar to those who have fled persecution multiple times and therefore been convicted of illegal reentry. Their inclusion is premised on conclusory statements regarding the dangerousness of recidivist offenders, without consideration of the seriousness of prior convictions. Rather, the Proposed Rules treat all immigration violations as similar in seriousness to those previously warranting inclusion in the particularly serious crime bar, without any independent evidence to justify the expansion. Such an approach renders meaningless the limiting language of "particularly serious" in the statute.

The Proposed Rules also conflate multiple entries by noncitizens having prior removal orders with those who have entered multiple times without ever having their asylum claims heard. Many immigrants who have previously attempted entry to the United States to flee persecution could not have been aware of the complex statutory regime that governs asylum claims and would not have knowingly abandoned their right to apply for asylum. Some asylum seekers have also been wrongly assessed in prior credible fear interviews. And others yet may have previously entered or attempted to enter the United States before the onset of circumstances giving rise to their fear. Preserving discretion to grant asylum in these circumstances allows meritorious asylum seekers to be heard and corrects errors that might have previously occurred.

*Extending the criminal bars to immigrants convicted of misdemeanor document fraud unfairly punishes low-wage immigrant workers and does not make communities safer.*

The Proposed Rules expand the asylum bar to include any asylum seeker who has been convicted of a misdemeanor offense for use of a fraudulent document. In so doing, the Rule

entirely ignores the migration-related circumstances that often give rise to convictions involving document fraud. Migrants fleeing persecution often leave their home countries with nothing but the clothes on their backs and must rely on informal networks to navigate their new circumstances. Extension of a blanket bar to asylum seekers who are compelled to resort to fraudulent means to enter the United States, or to remain safely during their applications for asylum, upends decades of settled law directing that violations of law arising from an asylum applicant's manner of flight should constitute only one of many factors to be consulted in the exercise of discretion.

Moreover, migrants in vulnerable communities who are struggling to survive during the pendency of their asylum proceedings are often exploited by unscrupulous intermediaries who offer assurances and documentation that turn out to be fraudulent. Many noncitizens working in the low-wage economy face egregious workplace dangers and discrimination and suffer retaliation for asserting their rights. The continued availability of asylum to low-wage immigrant workers can encourage them to step out of the shadows. The expansion of criminal asylum bars to sweep in all document fraud offenses, on the other hand, would unfairly prejudice immigrants with meritorious asylum claims and force them deeper into the dangerous informal economy.

*The Proposed Rules will harm communities with overlapping vulnerabilities, including LGBTQ asylum seekers, survivors of trafficking, and survivors of domestic violence.*

The Proposed Rules exclude from asylum protections countless members of vulnerable communities who have experienced trauma, abuse, coercion, and trafficking. Many of these individuals may only become aware of their ability to apply for asylum after law enforcement encounters that lead them to service providers who can educate them about their immigration options. Despite the unique difficulties they face, the Proposed Rules would compound their harm and prevent them from achieving family unification and a pathway to citizenship.

The Proposed Rules pose a unique threat to LGBTQ immigrant community members. LGBTQ immigrants in particular may have already experienced a high degree of violence and disenfranchisement from economic and political life in their home countries. Hate violence towards undocumented LGBTQ immigrants in the United States is already disproportionately higher than for other members of the LGBTQ population. Members of these communities also experience isolation from their kinship and national networks following their migration. This isolation, compounded by the continuing discrimination towards the LGBTQ population at large, leave many in the LGBTQ immigrant community vulnerable to trafficking, domestic violence, and substance abuse, in addition to discriminatory policing practices. The expansion of criminal enforcement and prosecution of undocumented people also harms the LGBTQ immigrant community. The Proposed Rules will therefore have a disparate impact on LGBTQ individuals whose involvement in the criminal legal system is often connected to past trauma and/or the result of biased policing.

The expansion of asylum bars to include various misdemeanor offenses that were not previously considered particularly serious also unfairly sweeps trafficking survivors into its

dragnet. It is becoming more widely recognized across state court systems that trafficking survivors frequently come into contact with intervention resources and service providers only after contact with law enforcement occurs. Innovative criminal justice reform efforts currently being adopted across the country include special trafficking courts that recognize the need for discretion in the determination of criminal culpability. The same approach should be employed in the determination of asylum eligibility, where the applicant's life and safety are on the line.

The Proposed Rules instead preclude asylum adjudicators from conducting a trauma-centered approach, categorically barring countless trafficking survivors convicted of misdemeanor and felony offenses without any opportunity to present the specific circumstances of their claim.

Survivors of domestic violence include trafficking survivors and LGBTQ community members, such that inclusion of offenses related to domestic violence in the expanded asylum bars affects populations with overlapping vulnerabilities. The Proposed Rules too broadly categorize domestic violence offenses as particularly serious and sweep both offenders and survivors into their dragnet. The immigration laws extend protections to domestic violence survivors outside of the asylum context, recognizing the complex dynamics surrounding intimate partner violence. Provisions in the Violence Against Women Act allow adjudicators evaluating claims for relief arising thereunder to exercise discretion based on a number of factors and circumstances.  The blunt approach adopted by the Proposed Rules is inconsistent with the approach taken towards survivors elsewhere in the federal immigration statute and does not rely on any evidence-based justification for treating asylum seekers differently.

Moreover, the domestic violence sections of the Proposed Rules include the only categorical bar to asylum for which a conviction is not required. Domestic violence incidents all too often involve the arrest of both the primary perpetrator of abuse and the survivor. These "cross-arrests" do not always yield clear determinations of victim and perpetrator. Authorizing asylum adjudicators to determine the primary perpetrator of domestic assault, in the absence of a judicial determination, unfairly prejudices survivors who are wrongly arrested in the course of police intervention to domestic disturbances.

Finally, the exemption for asylum applicants who can demonstrate their eligibility for a waiver under section 237(a)(7)(A) of the Immigration and Nationality Act does not cure the harm to asylum seekers caused by imposition of a categorical domestic violence related bar. Rather, it converts a non-adversarial asylum proceeding into a multi-factor, highly specific inquiry into culpability based on circumstances that may be very difficult for an asylum seeker to prove—especially if proceeding without counsel and with limited English proficiency.

*Barring asylum for immigrants convicted of "gang-related crimes" based on unreliable evidence and racially disparate policing practices is harmful to youth of color and does not make communities safer.*

In recent years, the expansion of gang databases for use in the apprehension and removal of foreign nationals—including children—has generated tremendous concern among advocates

and the communities they serve. The use of gang databases by local law enforcement and Immigration and Customs Enforcement has been widely criticized as an overbroad, unreliable and often biased measure of gang membership and involvement. The Proposed Rules expand the criminal bars to asylum to those accused of gang involvement in the commission of minor criminal offenses, embracing an open-ended adjudicative process that will inevitably result in asylum adjudicators relying unfairly on these discredited methods of gang identification. This outcome would compound the disparate racial impact of inclusion in gang databases and bar asylum seekers who are themselves fleeing violence from gangs in their home countries.

Past legislative efforts to expand the grounds of removal and inadmissibility in the Immigration and Nationality Act to include gang membership have failed to pass both houses of Congress. In addition, immigration adjudicators already routinely premise discretionary denials of relief or release on bond on purported gang membership, and scores of alleged gang members have already been deported on grounds related to immigration violations or criminal convictions for which no relief is available. Creating a "gang-related crime" bar will only exacerbate the due process violations already occurring as the result of unsubstantiated information about supposed gang ties.

In addition, by focusing on "reason to believe" as the basis for the bar, rather than the seriousness of the crime, the proposed provision is ultra vires and unconscionably limits the eligibility for asylum of those most in need of protection. The effect of the Proposed Rules would be to expand the number and type of convictions for which an analysis of eligibility is required, sweeping in even petty offenses that would otherwise not trigger immigration consequences. Thus, an asylum applicant convicted of simple assault without use of a weapon, a non-violent property crime, or even possession of under 30 grams of marijuana for personal use (otherwise exempted from the reach of the Proposed Rule), could trigger a bar to asylum if the adjudicator concludes she has "reason to believe" the offense was committed in furtherance of gang activity. In making these determinations, asylum adjudicators would be unable to rely on uncorroborated allegations contained in arrest reports, but could nevertheless shield their decisions by relying on discretion.

The Proposed Rules thus invite extended inquiry into the character of young men of color who otherwise have meritorious asylum claims, based on information gained through racially disparate policing practices. These rules multiply the harm to asylum seekers of color subject to racially disparate policing that results in racially disparate rates of guilty pleas to minor offenses. This same population is overrepresented in gang databases, which are notoriously inaccurate, outdated, and infected by racial bias.

ICE and CBP are well known to include inaccurate and many times patently false information on their forms that under these proposed rules could be used to be found ineligible for asylum.

## VIII.    The Proposed Rules are ultra vires to the federal immigration statute to the extent they purport to bar eligibility through a categorical exercise of discretion

When Congress speaks clearly through a statute, the plain meaning of that statute governs. Congress by statute permits the Attorney General to designate certain categories of offenses as "particularly serious crimes." As such, Congress *explicitly* permitted the Attorney General to designate a non-aggravated felony to be a particularly serious crime and thus to disqualify a person from asylum. In the context of asylum, all aggravated felonies are *per se* particularly serious crimes and the Attorney General "may designate by regulation [other] offenses that will be considered to be" a particularly serious crime for purposes of asylum.

Here, however—seemingly in an attempt to insulate the Proposed Rules from review, the agencies attempt to designate new bars to asylum both by designating them as "particularly serious crimes" pursuant to 8 U.S.C. § 1158(b)(2)(B)(ii) and rendering them categorically exempt from a positive discretionary adjudication of asylum pursuant to 8 U.S.C. § 1158(b)(2)(C). This effort is unlawful. Section 1158(b)(2)(B)(ii) does permit the Attorney General to, if he wishes, attempt to designate some classes of offenses as particularly serious crimes; such designations are reviewable for legal error (and as explained above, the commenters believe these expansions are unlawful). However, if the offense is not a particularly serious crime, then a discretionary decision must be rendered on the application. It is true that the Attorney General may also provide for "additional limitations and conditions" on asylum applications so long as they are "consistent" with the with the asylum statute. In this case, however, the Proposed Rules add sweeping categories of offenses that automatically remove an applicant from the consideration of discretion—a regulatory proposal that is ultra vires to the plain text of the statute.

To the extent that the proposed rules would adopt a bar to asylum based on a categorical discretionary bar, rather than a particularly serious crime designation, they are similar to the rules struck down by numerous Circuit Courts of Appeal in the context of adjustment of status for those considered by law to be "arriving aliens." Purporting to exercise discretion categorically, then-Attorney General Reno putatively rendered that class of noncitizens ineligible for adjustment of status, a determination that is ordinarily discretionary, even though the statute seemed to allow eligibility. Multiple Circuit Courts of Appeal struck down the proposed regulations, finding them to reflect an impermissible reading of the statute in light of the fact that Congress carefully defined in the statute the categories of people eligible to apply for adjustment of status.

The same logic applies here. In the asylum statute, Congress explicitly made the commission of a particularly serious crime a bar to asylum. The canon of interpretation known as *expressio unius est exclusio alterius* instructs that,"expressing one item of [an] associated group or series excludes another left unmentioned." The Proposed Rules attempt to create numerous categories of discretionary "pseudo-particularly serious crimes," barring asylum through a categorical exercise of discretion even if those offenses are ultimately found not to be particularly serious crimes. Such an effort violates this canon of interpretation, and places the Proposes Rules ultra vires to the statute.

## IX.    Conclusion

For the reasons above, the Law Office of Helen Lawrence strongly urges the withdrawal of these proposed regulations. The current regulations more than sufficiently arm adjudicators with the power to deny asylum on a case-by-case basis. These regulations are ultra vires and should not be implemented.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9efu-uv09
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0068
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Itzel Nuno

## General Comment

I am writing to let my government know that I strongly oppose the proposed rule change. As an immigrant rights organizer in California, I see first hand the effects these racist and classist regulations have on our most vulnerable community members. I am the Bay Area Rapid Response Coordinator with the California Collaborative for Immigrant Justice. Every day our emergency hotlines, along with our dozens of volunteers, attorneys, dispatchers, and coordinators, work tirelessly to protect due process for all. We help people maneuver the insanely painful and unfair American Immigration process. The people we work with are just trying to survive, just that. Most miss their home country and wish they could go back and raise their families surrounded by the familiar sounds and smells they were raised around. However, they have decided to leave their homes because they had no other choice if they wanted to survive. People don't put their life and that of their children's at immense risk for no reason. Folks are fleeing violence they are not being protected from. They make the dangerous trek to the U.S and then are met here with only more hate and state sanctioned violence. Yet, they persist because going back home is not an option. It is our responsibility as a nation to stand by what we have claimed to stand by: "Give me your tired, your poor, Your huddled masses yearning to breathe free, The wretched refuse of your teeming shore." We cannot inject even more racial profiling into our judicial systems, we can't take anymore. For these reasons, I call on the Trump Administration to withdraw this racist and violent proposal.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9efu-t7vj
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0069
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Sandra Faiman-Silva, Ph.D.
**Address:**
    50 Davis Road
    Falmouth,  MA,  02540
**Email:** sfaiman@aol.com
**Phone:** 508-274-1131

---

## General Comment

These proposed rule changes are extreme and will further burden valid and worthy asylum-seekers from entering the United States. Ours is a nation of immigrants, and we welcome those who have come to our shores in desperate circumstances. To deny an asylum-seeker entry because of an auto infraction or other misdemeanor is punitive in the extreme. Also it should not be the privilege of the Attorney General and Director of Homeland Security to determine who can or cannot be deemed eligible for asylum. These two individuals have demonstrated a lack of objectivity in this area, and have unduly politicized the asylum-seeking process. That is not the intent of our immigration regulations. I strongly object to the proposed changes.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9efu-gjb7
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0070
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Ann Cotter

## General Comment

I am writing to express my abhorrence at this latest rule by the Trump administration to hurt asylum seekers. All based on future contact with the U.S.'s flawed criminal legal system. This administration continues to illegally detain lawful asylum seekers for limitless periods of time with no accountability and without fair legal representation. The treatment is a disgusting violation of the human rights of these asylum seekers.

Rather than a further dismantling of our already flawed asylum process with this rule, I urge the support of the New Way Forward Act (H.R. 6383), which rolls back harmful immigration laws as it proposes immigration reform measures that dismantle abuses of our system and our asylum seeking community. We are, after all, a nation of immigrants. And we know that immigrants are the backbone of our country and our democracy. We need to properly treat asylum seekers as potential contributors to our society.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9efv-l3mr
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0071
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

I strongly oppose this proposed rule because it endangers the lives of people who are legally claiming asylum.

AR.08514

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9efw-qi6s
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0072
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Lourdes Best

---

## General Comment

Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution.
U.S. law enshrines the protections of the international Refugee Convention, drafted in the wake of the horrors of World War II. Under the Refugee Act of 1980, passed with bipartisan support, anyone present or arriving in the U.S. can apply for asylum.
For asylum seekers, making it to the U.S. often means they have found safety from persecution, torture, and sometimes death. Yet asylum seekers face many unjust obstacles in the immigration system.

This proposed rule would inject racial profiling into the asylum process. This latest attack would put even more people seeking asylum at risk of danger - and death. This would in turn eviscerate one of the most important defenses community members have against deportation.
This proposed Trump rule would punish people who've already endured mistreatment and racial profiling in the criminal legal system a second time -- with deportation back to the very life-threatening situation they fled. This is profoundly immoral, makes a mockery of due process, and comes right out of Steven Miller's racist playbook. The criminal legal system in the U.S. is wracked with racial profiling and obstacles to equal justice. Our harsh immigration laws exploit these obstacles to drive mass incarceration and mass deportation of people of color.

I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.

It's important to our communities that the Trump administration withdraw this proposal.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9efx-7q4n
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0073
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

I want to express my strong opposition to the proposed changes to the regulations regarding asylum adjudication. As an immigration attorney at a nonprofit, these changes to the regulations concern me because of the violations of basic fundamental rights they will cause for clients. In my experience, deportation means life or death for many of my clients. The addition of seven categorical bars to asylum will severely impact those who have bona fide asylum claims and will exclude those that under international law should be granted protection. This rule would endanger the life of so many individuals who would be valuable members to our society and our country. This proposed rule would result in punishing people who already have endured mistreatment and racial profiling in the criminal legal system a second time -- with deportation back to life-threatening situations that they are attempting to escape. This is profoundly immoral and violates due process. Further, it unnecessarily places further restrictions on Immigration Judge's and Asylum Officer's ability to determine eligibility on a case by case basis. In matters of life and death, all factors should be considered and categorical bars undermine our nation's obligation to protect. U.S. law enshrines the protections of the international Refugee Convention, drafted in the wake of the horrors of World War II. Under the Refugee Act of 1980, passed with bipartisan support, anyone present or arriving in the U.S. can apply for asylum. These regulations would make a mockery of Congress's intent in enacting this statute and would create irreparable harm and damage not only to individuals but also to our country as a whole.
For the reasons above, I strongly urge the administration to withdraw these rules so that our country can be a world leader who values individuals rights as it once was, rather than a nation who fails to uphold its principles and obligations under international law.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9efx-h3wq
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0074
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Victoria Hartanto
**Address:**
    1121 Mission Street
    San Francisco, CA, 94103
**Email:** vhartanto@apilegaloutreach.org
**Phone:** 4155676255

---

## General Comment

I am writing to express my strong opposition to this proposed rule change to further unfairly attack asylum seekers. I am a staff attorney at the non-profit legal aid organization, Asian Pacific Islander Legal Outreach (API Legal Outreach). I work with immigrants and asylum seekers every day, representing them in their claims for asylum and other humanitarian relief. I am also an immigrant myself. This rule would harshly exclude many refugees, those with valid asylum claims, from seeking asylum in this country. This would be in direct violation of the United States' obligations under the Refugee Convention. Our country should be a leader in the world in protecting refugees and human rights, not one that attacks, derides and criminalizes asylum seekers. Excluding asylum seekers means returning them to a place where they face persecution and death. I have many clients in this very position. That is not what this country should stand for. The Trump Administration should withdraw this proposal immediately.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9efx-nkhi
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0075
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** F X Martn del Campo

## General Comment

We are Mexicans in the US who maintain our roots to Jalisco, Mxico for two generations.

We are deeply concerned that this rule change would send people who fled violence back to danger and death.

Los Martn del Campo,

Oakland, Ca

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9efx-ozhm
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0076
Comment on FR Doc # 2019-27055

---

# Submitter Information

**Name:** Sasha Feldstein

---

# General Comment

This proposal goes against everything that this country stands for. The U.S. has founded as being a place of refuge for people. U.S. law enshrines the protections of the international Refugee Convention, drafted in the wake of the horrors of World War II. Under the Refugee Act of 1980, passed with bipartisan support, anyone present or arriving in the U.S. can apply for asylum.

The Statue of Liberty does not say "Give me your tired, your poor, your huddled masses yearning to breathe free UNLESS you look a certain way." No. And this proposal, as well as all of the other proposal's I've seen relating to the asylum process under the Trump Administration, only punishes people who endure mistreatment and racial profiling in the criminal legal system -- with deportation back to the very life-threatening situation they fled. This is profoundly immoral, and makes a mockery of due process, but more important, it puts lives at danger and goes against our country's founding values.

AR.08519

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9efy-2bh9
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0077
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Judith Sockloff

## General Comment

We should be a country of compassion. Most of our ancestors fled oppression and these new asylum seekers are fleeing even worse, where their lives are at risk.

What is wrong with us?!!!!

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9efy-116k
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0078
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Lynda Pauling
**Address:**
    Stillwater,  MN,  55082
**Email:** lmp5812@comcast.net
**Phone:** 6513510000

---

## General Comment

The proposed rule change would hurt many asylum seekers. The rule change would bar many people from seeking asylum based on contact with the U.S.'s flawed criminal legal system. This proposed rule would inject racial profiling into the asylum process and put asylum seekers at risk of danger even death.

I oppose a Federal Register.

AR.08521

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9efz-3kwe
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0079
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Caryn Graves
**Address:**
    Berkeley,  CA,  94702
**Email:** caryn@lmi.net
**Phone:** 5105599047

---

## General Comment

I oppose the rule change. Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution. I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9efz-wicy
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0080
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Kathy Bernard
**Address:**
   7620 Ravenhill Dr
   St. Louis,  MO,  63123
**Email:** kathybernard.mktg@yahoo.com

## General Comment

Refugees bring intelligence, hard work, incredible spirit and new culture to America. Millions are in need and the United States should do our part to take in refugees!

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9efz-87l3
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0081
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Anonymous Anonymous

## General Comment

I strongly oppose this rule change. This proposed rule would inject racial profiling into the asylum process. This latest attack would put even more people seeking asylum at risk of danger - and death. This would in turn eviscerate one of the most important defenses community members have against deportation.

I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.

AR.08524

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9efz-8imw
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0082
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Tatiana Castro Pavich
**Address:**
   500 S. Claremont
   Chicago,  IL,  60612

---

## General Comment

The United States was built on the backs of immigrants from all over the world. We cannot turn our backs on those seeking asylum merely on the fact that they have been accused of gang activity. What would one define gang activity to begin with. Further many of those fleeing is due to the fact that they are trying to escape the gangs they were forced to join to begin with. What kind of country would we be if we turn our backs on them. The US is not what it was but we can change that by keeping our values and allowing others to contribute to this great nation. My family migrated here from El Salvador in the late 70's early 80's during the Civil War. My father obtained two Master's degree and worked for the State in the Dept. of Family Services. I am currently in Law School (John Marshall) obtaining my JD. We were once all illegal immigrants as well. Now we are all US citizens contributing to society. Where would my family be if we had been turned away when we were seeking political asylum. We must not turn our backs on those seeking a better life.

AR.08525

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9efz-saft
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0083
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

I am opposed to the rule change. This proposed rule would inject racial profiling into the asylum process. This latest attack would put even more people seeking asylum at risk of danger - and death. This would in turn eviscerate one of the most important defenses community members have against deportation.

AR.08526

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9efz-hi9p
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0084
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Susan Wald

---

## General Comment

I strongly oppose the proposed change to the rule governing procedures for asylum and bars to asylum eligibility. The United States has long been a place of refuge for people fleeing violence, starvation, poverty, or persecution. I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. The proposed rule would inject racial profiling into the asylum process, putting even more asylum seekers at risk of danger and even death. This would in turn eviscerate one of the most important defenses community members have against deportation. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights, not trample them.

AR.08527

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9efz-wl1j
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0085
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Claire Battle

---

## General Comment

I strongly oppose the proposed rule change.

Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution. In contrast, this proposed rule would inject racial profiling into the asylum process and put even more people seeking asylum at risk of danger - and death. This would in turn eviscerate one of the most important defenses community members have against deportation.

I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9efz-vjni
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0086
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Anonymous Anonymous

## General Comment

I request that the above regulation not be implemented at all I trust the judge The regulation would be too wide and blanketing
The important considerations with the trivial and superficial
And leaves the judge no room to judge

AR.08529

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9efz-oc8c
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0087
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Mari Barnes

---

## General Comment

I oppose the rule change to the Federal Register. This proposed rule would inject racial profiling into the asylum process. This latest attack would put even more people seeking asylum at risk of danger - and death. This would in turn eviscerate one of the most important defenses community members have against deportation.

I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.

We are diminishing our country with every hateful action condoned by rules like this.

AR.08530

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9efz-nicq
**Comments Due:** January 21, 2020
**Submission Type:** Web

# PUBLIC SUBMISSION

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0088
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Karen Jacques
**Address:**
    1209 T St
    Sacramento,  CA,  95811
**Email:** threegables1819@gmail.com

---

## General Comment

I am strongly opposed to your proposed rule change that would make any asylum seeker who has ever committed a crime, however minor, or ever been associated or alleged to be associated with a gang ineligible for asylum and lead to such persons immediately being sent back to the country from which they fled, regardless of their circumstances. This rule is arbitrary and capricious and doesn't allow for any review of individual cases or circumstances. It completely fails to recognize that people who come to the attention of the criminal justice center can, and often do, change for the better. It doesn't recognize that it is easy to falsely accuse someone of being associated with a gang or being a gang member and that, in some communities, being part of a gang or associating with gang members is a necessary condition of survival. It also doesn't recognize that racial profiling is rampant in our criminal justice system and that this rule while unfairly and disproportionately target immigrants of color.

During my career as a psychologist, I have worked in immigrant communities, worked with formerly incarcerated people and worked with gang members. I have seen many, many people who make mistakes when they were young (often small and stupid mistakes) that resulted in their entering the criminal justice system. I have seen many of them completely change their lives. One young man I worked with, spent time in juvenile hall and on probation turned his life around dramatically that he ended up graduating from college phi beta kappa. I hired a staff member who had served 23 years in prison because of a gang murder he had committed when he was 19. He totally turned around his life when In prison. I gave him his first job on the outside and he went on to establish a visual arts non-profit that provided art lessons to low income children, teenagers and seniors.

I see this proposal as yet another excuse for and means of turning away desperate people, even if doing so means sending them back to their deaths. It is profoundly unjust and morally wrong and it flies in the face of so many decent Americans who view asylum as life saving and want to welcome immigrants to our communities. I also

AR.08531

see this proposal as more evidence of this administration's hatred toward people of color and people who are not rich and, as an American, it makes me deeply ashamed.

AR.08532

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9efz-o443
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0089
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Bethany Hoffmann
**Address:**
    4206 River Hawk Drive
    Rockford,  IL,  61111
**Email:** beth@hil-llc.com
**Phone:** 8159758093

---

## General Comment

I have been practicing immigration and asylum law for almost 12 years. During this time, I have represented women, children, and men fleeing persecution in their home countries. This proposed rule would inject racial profiling into the asylum process and deny the most vulnerable populations in the world and relegate them to being sent back to a country where their lives are in serious danger. We should recognize the humanity of every person, and understand that asylum and immigration law are a cornerstone of human rights. The United States is a country that was founded by people fleeing persecution. We have ratified treaties agreeing to protect people from persecution. These regulations would eviscerate the core of what it means to be American--to respect and uphold human rights. I vehemently oppose these rules.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9efz-mk7b
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0090
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Aubra Fletcher

## General Comment

I oppose this change to the regulations. The proposed rule would inject racial profiling into the asylum process. This latest attack would put even more people seeking asylum at risk of danger - and death. This would in turn eviscerate one of the most important defenses community members have against deportation.

AR.08534

# PUBLIC SUBMISSION

| |
|---|
| **As of:** January 22, 2020 |
| **Received:** January 14, 2020 |
| **Status:** Posted |
| **Posted:** January 15, 2020 |
| **Tracking No.** 1k4-9efz-t2f2 |
| **Comments Due:** January 21, 2020 |
| **Submission Type:** Web |

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0091
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Nan Warshaw
**Address:**
　　4515 N Saint Louis Ave
　　Chicago,  IL,  60625
**Email:** nan62@narl.com

## General Comment

I oppose this rule. We must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our country's ideals of compassion, fairness, and respect for human rights - not trample them. I stand in opposition to this proposed rule.

# PUBLIC SUBMISSION

| |
|---|
| **As of:** January 22, 2020 |
| **Received:** January 14, 2020 |
| **Status:** Posted |
| **Posted:** January 15, 2020 |
| **Tracking No.** 1k4-9eg0-nbmh |
| **Comments Due:** January 21, 2020 |
| **Submission Type:** Web |

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0092
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Robert Brown
**Address:**
   1443 Edwards Avenue
   Fircrest,  WA,  98466
**Email:** larkbrown@comcast.net
**Phone:** 253-302-4480

---

## General Comment

I am for immigration. I think immigrants add color and variety and interest to our social structure. That being said, I am also for treating asylum seekers and all immigrants with respect by the current administration; something which is not happening now. No family members should be separated, no child (or adult, for that matter) should spend a minute in a cage. We should be following international laws which forbid having immigrants wait in the neighboring country while awaiting a trial/hearing for asylum. There are so many abuses of power by President Trump, and they must stop.

AR.08536

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9eg0-ka7b
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0093
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Robert Fingerman

---

## General Comment

I object to the proposed rule change as it would inject racial profiling into the asylum process and put asylum seekers at risk of danger even death. This would in turn eviscerate one of the most important defenses community members have against deportation.

Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution.

I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.

Sincerely,
Robert Fingerman

AR.08537

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9eg0-yly4
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0094
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Sheryl Munoz-Bergman

---

## General Comment

I am writing to express my opposition to these proposed changes to the procedures for asylum and bars to asylum eligibility. These proposed changes will make it harder for some legitimate asylum seekers to access the protections that they need and deserve, putting their wellbeing and even their lives at risk. My family, like most families in the United States, is a family of immigrants. Some have arrived here in recent years, and some members of my family can trace their immigration history back for decades. Many of my family members came to the United States seeking refuge from government persecution, police brutality, religious persecution, inability of state government to ensure the protection and well-being of the local populace, and dire economic situations in their home countries. These circumstances are just as true for family members who immigrated a century ago as it is for family members who have immigrated more recently.

These proposed restrictions would open the doors for racial profiling to limit who is able to seek refuge and protection in our country. I believe we must hold true to our nation's values as a place of refuge for those fleeing religious, political or social persecution, and these changes would limit our ability to do so. Every human being deserves to be safe, and protected from harm. We are a great nation, and the vibrancy of immigrant and refugee communities helps to keep us great.

I respectfully request that the Administration withdraw this proposal, and create welcoming policies for those in need.

AR.08538

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9eg0-3o74
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0095
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Carl Malischke
**Address:**
    2770 North 74th Street
    Milwaukee, WI, 53210
**Email:** cjsquirrel@mac.com
**Phone:** 4146872606

## General Comment

Everything we are doing with regard to asylum seekers and migrants and refugees goes against my Catholic values, principles and morals. In the words of Steve Schmidt, former GOP strategist, The "zero tolerance" policy, the family separations issue....What's at stake....."is a question of national honor. The United States of America should not separate mothers and children and lock the children into cages, into detention facilities. Should not. And it recalls the worst excesses in American history: the separation of African American mothers and children during slavery; the separation of mothers and children who were Native Americans. We have had great injustice in the country, but the greatness of the country is the ability to make great progress combating it. It's wrong. When you see a government official with an American flag on their shoulder committing that act, it's disgraceful, it's cruel, and it's inhumane. But we have become desensitized in this era of Trump to cruelty, to inhumanity, to indecency, to dishonesty, to all of our great detriment."

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9eg0-qy5x
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0096
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

The American police system relies on racial profiling, and is designed to escalate minor infractions, such as speeding, into situations that often lead to death or arrest, especially for black and other nonwhite populations. The list of "aggravated felonies" used to judge whether an asylum seeker is worthy continuing to stay in the US is ever-shifting and includes, for one, petty theft if theft is repeated. Stealing food to eat, stealing diapers for one's child, stealing practically anything is not equivalent to sending someone back to a dangerous situation in another country, where the conflict often stems from some US "intervention" many decades ago to begin with, and where the asylum seeker faces persecution or poverty and likely death. Another category that under this proposed rule that would guarantee deportation is "acts of violence." How specific! America jails women for fighting back against their abusers and exploiters, and it would send an asylum-seeking woman to her death for the same thing. How can we trust a judicial system that already does not treat its own people fairly, to make these life or death judgement calls for those whose circumstances are unfairly dire and are desperately petitioning the US for charity, only to be let in and then their new lives destroyed by a mercurial, racist application of American law. For humanity's sake, reconsider this proposal.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9eg0-655b
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0097
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Don Jantzi

---

## General Comment

I am writing in regards to to "Procedures for Asylum Eligibility and Bars to Asylum Eligibility." This cannot be allowed to pass! I believe our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights.

Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution.
This proposed rule would inject racial profiling into the asylum process. This latest attack would put even more people seeking asylum at risk of danger - and death. This would in turn eviscerate one of the most important defenses community members have against deportation.

Let's return to the ideals of Democracy and the values of followers of Christ!

# PUBLIC SUBMISSION

| | |
|---|---|
| **As of:** January 22, 2020 | |
| **Received:** January 14, 2020 | |
| **Status:** Posted | |
| **Posted:** January 15, 2020 | |
| **Tracking No.** 1k4-9eg1-gghp | |
| **Comments Due:** January 21, 2020 | |
| **Submission Type:** Web | |

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0098
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Matthew Genaze
**Address:**
   334 Harvard Street
   Cambridge,  MA,  02139
**Email:** aquarover@hotmail.com

---

## General Comment

Just before the holidays, the Trump administration quietly introduced a proposed rule change that would hurt many asylum seekers. I oppose this change.

Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution. This proposed rule would inject racial profiling into the asylum process. This latest attack would put even more people seeking asylum at risk of danger - and death. This would in turn eviscerate one of the most important defenses community members have against deportation.

I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them. I am only able to support legislators and the parties they are members of that oppose this type of legislation.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9eg1-s41w
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0099
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** JeVerna Haynes
**Address:**
    914 Northside Dr.
    Fredericksburg,  22405
**Email:** lynnhaynesaccess@yahoo.com
**Phone:** 5408999661

## General Comment

Donald Trump's rules regarding asylum seekers violates the very spirit of the Constitution of the United States of America. He has made a mockery of who and what we are. His vile bigoty should not be allowed to destroy the honor of our democratic republic and should continue to welcome and come to the aid of asylum seekers. Misdemeanors in this country are non-violent crimes. In countries these people are coming from, in protection of their lives, and in considering corrupt governments, they should not be a factor. Although, every step our government takes under this administration proves more corrupt every day too.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9eg1-ocxp
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0100
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Whitney Schmidt

---

## General Comment

I want to voice my strong opposition to this rule change. My understanding of US values is that the founders wanted our control to be a place of refuge for people fleeing violence, poverty, persecution and violence.

This proposed rule would add racial profiling into the asylum process which is wrong. Our immigration and asylum process must honor our US ideals of compassion, fairness and respect for all human rights and lives.

AR.08544

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9eg1-6h7i
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0101
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Deena Gottlieb

---

## General Comment

I am opposed to this rule change.

Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution.This proposed rule would inject racial profiling into the asylum process. This latest attack would put even more people seeking asylum at risk of danger - and death. This would in turn eviscerate one of the most important defenses community members have against deportation.
I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.

Again, I oppose this rule change.

Deena Gottlieb

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9eg1-mo16
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0102
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Lydia Hosek

## General Comment

I oppose this rule change. Do not make it more difficult for those fleeing violence to reach safety in our nation.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9eg1-dgg3
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0103
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Lorraine Johnson

## General Comment

I oppose the change in the Procedures for asylum that is being considered. We are a nation of immigrants and refugees from our history. We need the input of others to grow and develop.

AR.08547

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9eg1-oko8
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0104
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Anonymous Anonymous

## General Comment

This is poor rule making and legislates racial profiling

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9eg1-zanb
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0105
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Anonymous Anonymous

## General Comment

Stop making asylum harder. If you cared about legality, you would be clearing the legal path, not denying everyone their legal right to asylum.

Release the children you are torturing! Close the concentration camps!

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9eg2-hjxk
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0106
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Christine Austin
**Address:**
    606 N Saluki Dr
    Marion,  IL,  62959
**Email:** stine_310@yahoo.com
**Phone:** 6189931503

## General Comment

This proposed rule would inject racial profiling into the asylum process and put asylum seekers at risk of danger even death. It's no secret that racial profiling and obstacles to equal justice run rampant in the criminal legal system. Under this rule change, asylum seekers who have been convicted of almost any crime or accused of gang involvement could be punished a second time by being barred from asylum and deported back to the very life-threatening situation they fled. And judges would be powerless to help.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9eg2-v3ob
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0107
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Michael Lyon
**Address:**
    1536B Tyler St.
    Berkeley,  CA,  94703
**Email:** mlyon01@comcast.net
**Phone:** 415-215-7575

---

## General Comment

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41;
Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility

January 14, 2020

To Whom it May Concern:

I am writing on behalf of Gray Panthers of San Francisco in response to the above-referenced Proposed Rules to express our strong opposition to the Proposed Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019.

AR.08551

As an organization we strongly believe everyone should have the right to live in safety, without fear for their lives. For millions, their only immediate solution is seeking asylum in other countries. Our members have heard eye-witness accounts of seeing severed heads of young men who refused to join gangs in rural Latin America. Some members remember their parents talking about many hundreds of Jews in a ship off the US Atlantic coast being forced back to Nazi death camps because the US would not grant them asylum. Simple decency and international convention demand that asylum be denied only the most dire circumstances and after painstaking investigation into individual cases. Therefore, the proposed rule changes denoting entire categories of refugee applicants inadmissible is intolerable and must be rejected.

We cannot help observing that these proposed rule changes, like so many others proposed recently, are grievous threats to the lives of millions of immigrants and would-be immigrants, mostly people of color. Whether it is denying permanent residence to sick people who do not speak English, or ruling that documented and undocumented family members cannot live together in public housing, these rule changes are driven by racial animus rather than pubic policy.

For these reasons, the Department of Homeland Security and the Department of Justice must immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

Thank you for the opportunity to submit comments on the Proposed Rules. Please do not hesitate to contact [contact name and email address] to provide further information.

Sincerely,
Michael Lyon
Board Member, Gray Panthers of San Franacisco

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9eg2-rx2w
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0108
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Bernie Barrett

## General Comment

I oppose this new regulation regarding people seeking asylum in the U.S. People seeking asylum are under a lot of stress
coming from places of violence, war, and danger. They do not need to be treated with suspicion. There are already rules
in place regarding past criminal acts. We do not need to keep making asylum seekers look like gangsters. They are human
beings. The U.S. values the dignity of people and in the past treated people as children of God. The U.S. should be a place
where people can expect to be treated with dignity.

AR.08553

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9eg2-6vxh
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0109
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Patricia Copenhaver
**Address:**
    710 Union St.
    Iowa Falls,  IA,  50126
**Email:** patcope@ymail.com
**Phone:** 641-640-0754

---

## General Comment

Racial profiling is a discriminatory tactic used by xenophobic bigots to keep immigrants and refugees from applying for asylum, regardless of their circumstances. Discrimination is illegal, regardless of who it is leveled at, and certainly has no place in the immigration process. The majority of refugees, for example, are widows and orphans. All they want is a chance to rebuild their lives. Immigrants, such as migrant farm workers, come seeking work depending on the season. They do the work that most Americans don't want to do. Same goes for those who clean offices and homes, landscaping, and other manual labor. All they want is a chance at 'The American Dream.'

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9eg2-irhb
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0110
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Suzanne Hesh
**Address:**
  930 E. Foothills Dr.
  Tucson,  AZ,  85718
**Email:** textilz1@comcast.net

---

## General Comment

The U.S. must be a place of refuge for people fleeing violence, starvation, poverty, or persecution. This proposed rule would inject racial profiling into the asylum process. This latest attack would put even more people seeking asylum at risk of danger - and death. This would in turn eviscerate one of the most important defenses community members have against deportation."
We must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.
I am in extreme opposition to this change in rules of procedure.

AR.08555

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9eg2-he0h
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0111
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Lisa Merchant

---

## General Comment

Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution." "This proposed rule would inject racial profiling into the asylum process. This latest attack would put even more people seeking asylum at risk of danger - and death. This would in turn eviscerate one of the most important defenses community members have against deportation." "I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them."

AR.08556

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9eg3-1lsr
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0112
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Des Anonymous

---

## General Comment

I disagree with this racist policy and believe the US has an international responsibility to provide pathways to legal status that are accessible.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9eg3-bzrs
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0113
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Moira Birss
**Address:**
    1734 20TH AVE
    OAKLAND,  CA,  94606
**Email:** moira.birss@gmail.com
**Phone:** 6505200042

---

## General Comment

I am write today strongly communicate my total opposition to this proposed rule change.

I am a US citizen, and I believe wholeheartedly that this country can, should and MUST welcome people fleeing violence, and I am very concerned about racial profiling in the criminal legal system.

The values of the US state that it should be a place of refuge for people fleeing violence, starvation, poverty, or persecution. Not only that, but U.S. law enshrines the protections of the international Refugee Convention, drafted in the wake of the horrors of World War II. Under the Refugee Act of 198 and passed with bipartisan support, which states that anyone present or arriving in the U.S. can apply for asylum.

For asylum seekers, making it to the U.S. often means they have found safety from persecution, torture, and sometimes death. Yet asylum seekers face many unjust obstacles in the immigration system.

This proposed rule would inject racial profiling into the asylum process. This latest attack would put even more people seeking asylum at risk of danger - and death. This would in turn eviscerate one of the most important defenses community members have against deportation. The criminal legal system in the U.S. is wracked with racial profiling and obstacles to equal justice. Our harsh immigration laws exploit these obstacles to drive mass incarceration and mass deportation of people of color.

This proposed rule would also punish people who've already endured mistreatment and racial profiling in the criminal legal system a second time -- with deportation back to the very life-threatening situation they fled. This is profoundly immoral and makes a mockery of due process.

I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.

For these reasons, I call upon the Trump administration to withdraw this proposal.

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9eg3-lmub
**Comments Due:** January 21, 2020
**Submission Type:** Web

# PUBLIC SUBMISSION

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0114
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Cathy Baird

---

## General Comment

I oppose "Procedures for Asylum and Bars to Asylum Eligibility".

Asylum ideally provides those fleeing dangers in their native country with physical safety, a path to citizenship, and the opportunity to reunite with immediate family members who may remain abroad in danger. The United States committed to the domestic asylum system in an attempt to atone for for failing to save Jewish refugees who tried to flee the Holocaust.

When an asylum claim is denied, people often must return to death or persecution. Asylum seekers bear the burden of establishing their eligibility in the face of a complex web of laws and regulations, usually without the benefit of counsel and from a remote immigration jail. In some parts of the country, almost no one succeeds in winning asylum. This proposal would impose even more barriers to accessing asylum in the United States, so that even more people seeking safety would be returned to dangerous conditions.

"Aggravated felony" is a vague term that exists only in immigration law. It now encompasses hundreds of offenses, including misdemeanor shoplifting, misdemeanor battery, and sale of counterfeit DVDs. In addition, the proposed rules do not acknowledge that a significant number of people may plead to a crime to avoid the threat of a severe sentence, even though they may not have committed the offense. The proposed rules do not make exceptions for convictions influenced by mental illness or duress, even though people seeking asylum have a high rate of PTSD and other mental difficulties.

The proposed rules would bar parents and other caregivers who are convicted of smuggling or harboring after trying to help minor children to enter the United States in order to flee persecution. This is particularly insidious now that we know this administration has explicitly tried to use smuggling prosecutions against parents and caregivers to deter families from seeking asylum.

The proposed rules would disproportionately impact vulnerable people already routinely criminalized, including

AR.08560

LGBTQ immigrants, survivors of trafficking and domestic violence, and immigrant youth of color.

I ask you not to adopt the proposed rules.

AR.08561

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9eg4-oixs
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0115
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Rose Mendelsohn

---

## General Comment

To Whom it May Concern:

I write to express my strong opposition to this proposed rule change.

I am a concerned member of the public who believes strongly that our nation must welcome people fleeing violence, and who is strongly concerned about racial profiling in the criminal legal system. Immigrants are a vital part of my community, my neighborhood, and my state.

This proposed Trump rule would punish people who've already endured mistreatment and racial profiling in the criminal legal system a second time -- with deportation back to the very life-threatening situation they fled. This is profoundly immoral, makes a mockery of due process, and comes right out of Steven Miller's racist playbook.

For these reasons, I call upon the Trump administration to withdraw this proposal.

Sincerely,
Rose Mendelsohn

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9eg4-gckq
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0116
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Pete Woiwode
**Address:**
   5688 Telegraph Ave #4
   Oakland,  CA,  94609
**Email:** sweetfeetpete@gmail.com
**Phone:** 7347091789

---

## General Comment

I write to express my strong opposition to this proposed rule change.

I believe the soul of our country is about welcoming people in duress, and who is strongly concerned about racial profiling in the criminal legal system. My Immigrant neighbors are a vital part of my life and my community.

U.S. law enshrines the protections of the international Refugee Convention, drafted in the wake of the horrors of World War II. Under the Refugee Act of 1980, passed with bipartisan support, anyone present or arriving in the U.S. can apply for asylum.
For asylum seekers, making it to the U.S. often means they have found safety from persecution, torture, and sometimes death. Yet asylum seekers face many unjust obstacles in the immigration system.

This proposed rule would inject racial profiling into the asylum process. This latest attack would put even more people seeking asylum at risk of danger - and death. This would in turn eviscerate one of the most important defenses community members have against deportation.

This rule would punish those most vulnerable, and do so for a second time- and then send those people back to dangerous experiences that they've fled.

I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.

I demand that the Trump administration withdraw this proposal.

AR.08564

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9eg4-5mhz
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0117
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Daren Garshelis

## General Comment

I write to express my strong opposition to this proposed rule change. Immigrants and refugees are a vital part of the United States, and we should be welcoming people who are fleeing violence, not turning them away.

This proposed rule change would inject racial profiling into the asylum process and put people's lives in danger.

Please do the morally right thing and reject this reprehensible rule change.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9eg4-k6kw
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0118
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Meredith Wilkinson

---

## General Comment

To Whom it May Concern:

I am writing on behalf of NISGUA (Network in Solidarity with the People of Guatemala) in response to the above-referenced Proposed Rules to express our strong opposition to the Proposed Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019.

We work alongside human rights defenders, land rights activists, and survivors of trauma/genocide from Guatemala. Many of them are forced to leave their homelands and migrate to the US seeking asylum for fear or violence, discrimination, etc. This rule could impact our partners, their family members, and community members negatively.

For the reasons detailed in the comments that follow, the Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States. The barriers to asylum for those previously involved in the criminal legal system are already sweeping in scope; adding more barriers is cruel and unnecessary.


Thank you for the opportunity to submit comments on the Proposed Rules. Please do not hesitate to contact [contact name and email address] to provide further information.

Sincerely,
Meredith Wilkinson
US Operations and Programs Coordinator

AR.08566

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9eg4-iigc
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0119
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

I am writing to express my disagreement with this proposed rules change to asylum eligibility. I am a concerned member of the public who believes strongly that our nation have a responsibility to people fleeing violence. Immigrants made up my community, my neighborhood, and my state. As a naturalized U.S. citizen, I am deeply concerned that this rule change would force people in my community who fled violence back to danger and death. Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution. For asylum seekers, making it to the U.S. often means they have found safety from persecution, torture, and sometimes death. Yet asylum seekers face many unjust obstacles in the immigration system and will encounter more should this rules change come to pass.

I am strongly concerned about racial profiling in the criminal legal system. This proposed asylum rule change would inject racial profiling into the asylum process. This latest attack would put even more people seeking asylum at risk of danger - and death. This would in turn eviscerate one of the most important defenses my community have against deportation. The criminal legal system in the U.S. is wracked with racial profiling practices. This rule change will further enable our harsh immigration laws exploit these practices to drive mass incarceration and mass deportation of people of color.

I believe my government must recognize the humanity of immigrants and protect my neighbors from discrimination and abuse. Our immigration and asylum policies must honor ideals of compassion, fairness, and respect for human rights - not trample them. It is for these reasons I call upon the federal administration to withdraw this proposal to change asylum rules.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9eg4-1h9c
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0120
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Erin Burns
**Address:**
　1825 Pine Street
　Apt. 1
　San Francisco,  CA,  94109
**Email:** ahhitburns@gmail.com
**Phone:** 9047429139

---

## General Comment

I'm writing to strongly oppose the proposed rule. I previously worked with asylum-seekers and refugees at a refugee resettlement agency. The men, women, and children I worked with bore deep psychological scars from fleeing persecution, political violence, and gangs. The United States must remain a beacon of hope and opportunity, and grant refuge to our most vulnerable neighbors. To pass this rule would betray our fundamental values as Americans. I urge the Trump administration to withdraw this rule, which doubly punishes asylum-seekers in a flagrant violation of due process.

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9eg4-ppfm
**Comments Due:** January 21, 2020
**Submission Type:** Web

# PUBLIC SUBMISSION

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0121
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** James Deshotels
**Address:**
    161 Vondera Dr
    Robertsville,  MT,  63072
**Email:** jdesh@loyno.edu

---

## General Comment

This rule change is wrong and un-American.

"Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution."
"This proposed rule would inject racial profiling into the asylum process. This latest attack would put even more people seeking asylum at risk of danger - and death. This would in turn eviscerate one of the most important defenses community members have against deportation."
"I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them."

This rule change is wrong and un-American.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9eg4-elvu
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0122
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Thomas Brudenell
**Address:**
    5049 Smith Road
    Rohrersville,  MD,  21779
**Email:** lynntom@myactv.net
**Phone:** 3019914815

---

## General Comment

I believe our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights. But the Trump administration is gutting asylum with an unrelenting series of attacks.

In fact, just before the holidays, the Trump administration quietly introduced a proposed rule change that would hurt many asylum seekers. The rule change would bar many people from seeking asylum based on contact with the U.S.'s flawed criminal legal system.

This proposed rule would inject racial profiling into the asylum process and put asylum seekers at risk of danger even death

AR.08570

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9eg4-u8oi
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0123
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Kathy Bradley

---

## General Comment

I strongly oppose the proposed rule change. Our national values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution. This proposed rule would inject racial profiling into the asylum process. This latest attack would put even more people seeking asylum at risk of danger - and death. This would in turn eviscerate one of the most important defenses community members have against deportation.

I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9eg5-hmlg
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0124
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** anonymous anonymous
**Organization:** API Legal Outreach

## General Comment

I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9eg6-cm3d
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0125
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Rena Stoler

## General Comment

I am commenting to express my strong opposition to this rule change proposal. This proposed rule change is concerning to me as a member of the public who believes strongly that America is a country with a history of welcoming and protecting people who flee violence and dangerous situations across the world. I am very concerned that this proposal will increase racial profiling in the criminal legal system and go against American values. I believe our government must recognize everyone in our community's- including immigrants- unique contribution to society, and protect the vulnerable from discrimination and abuse. Our immigration and asylum policies need to honor our ideals of human rights, equality and fairness. For these reasons, I call upon the Trump administration to withdraw this proposal.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9eg6-2wkd
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0126
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Ellen Hage
**Address:**
    10 Buffalo Court
    Pacifica,  CA,

## General Comment

I strongly oppose the proposed rule change that will cause suffering and harm to immigrants fleeing their country and seeking refuge and asylum in our country. How is it possible to turn away people coming to our border for no other reason than to protect their lives and those if their families. I am a leader in my faith community. This is what we are called to do, to welcome the stranger, "to act justly, to love tenderly, and to walk humbly with your God". This proposed rule change is cruel and inhumane. Thank God my friend who sought asylum with her family is here now, healing from the trauma she experienced and contributing to our country. All the talk about Pro-Life, Protecting her life and the lives of other immigrants who come to our country seeking a chance to be safe and make a life, that is truly Pro-Life.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** k5e-xtlm-044l
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0127
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

I am a physician who works for and cares for the medically underserved, including undocumented immigrants, asylum seekers, and refugees. Our country was built on the backbone of immigrants and with the new proposed changes to asylum laws which will make it harder for individuals to make a new life for themselves and their families, is truly heartbreaking and cruel.

I am writing to urge the Department of Homeland Security and the Department of Justice to rescind the set of Proposed Rules issued on December 19, 2019 that would make it more difficult for individuals seeking asylum in the United States. These proposed changes constitute an unnecessary, harsh, and unlawful gutting of the asylum protections enshrined in United States and international law. I submit these comments to express my opposition to the entirety of the Proposed Rules and my grave concerns with the administration's continued efforts to exclude refugees from obtaining the security and stability the United States asylum system has long promised. I urge that the Proposed Rules be rescinded in their entirety.

The barriers to asylum for those previously involved in the criminal legal system are already sweeping in scope; adding more barriers is cruel and unnecessary. The laws, regulations, and process governing asylum adjudications are already exceedingly harsh. Asylum seekers bear the burden of establishing their eligibility for asylum in the face of a complex web of laws and regulations, without the benefit of appointed counsel and often from a remote immigration jail. Immigration adjudicators already have vast discretion to deny asylum to those who meet the refugee definition but have been convicted of criminal conduct. Further categorical bars are not needed. The agencies' efforts to add these new sweeping categories of barred conduct to the asylum eligibility criteria is unnecessary and cruel.

The Proposed Rules are also arbitrary and are not based on evidence. There is no evidence to support the assumption that every noncitizen convicted of any offense punishable by more than a year in prison necessarily constitutes a danger to the community. The Proposed Rules are so capricious as to peremptorily postulate a noncitizen's supposed danger to the community even in circumstances when a federal, state, or local judge has concluded that no danger exists by, for example, imposing a noncustodial sentence.

AR.08575

Furthermore, the Proposed Rules cruelly disregard the connections between trauma and involvement in the criminal legal system. The harsh nature of the Proposed Rules is especially evident when viewed through a trauma-informed lens. Asylum seekers are an inherently vulnerable population because of the trauma they have experienced in their countries of origin and, often, along the journey to find safety. Existing literature suggests that at least one out of every three asylum seekers struggles with depression, anxiety, and/or post-traumatic stress disorder (PTSD). Asylum seekers in the United States are often unable to access affordable medical care and treatments for complex trauma; some turn to drugs and alcohol in an effort to self-medicate. The proposed new bars to asylum include any drug-related conviction (with one exception for a first minor marijuana offense) and any second conviction for driving under the influence. This approach is not only cruel but also ignores the evidence. Particularly given the vulnerabilities of asylum seeking populations, prior struggles with addiction should be addressed with treatment and compassion, not with deportation order.

Immigration adjudicators already maintain the authority to deny asylum to individuals with drug-related criminal histories on the basis of discretion; denying asylum seekers even the opportunity to present the countervailing factors of their past trauma and potential recovery is simply cruel. As a physician who works largely with immigrant populations, I know how difficult it is for individuals seeking asylum to be granted asylum, and I am appalled that this Administration

is making the process more difficult without offering any evidence for why these changes are needed. I strongly urge that the new Proposal Rules be rescinded entirely.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9egb-4uan
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0128
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Susan Babbitt

---

## General Comment

This country is by tradition a place of refuge for people fleeing violence, starvation, poverty, or persecution. The proposed rule would inject racial profiling into the process and increase the number of people at risk of danger - and death. We should not expose more vulnerable people to deportation. I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. We must protect people and our values, and reject this rule.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9egc-h6ia
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0129
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Elissa Steglich

---

## General Comment

See attached file(s)

---

## Attachments

comments asylum expansion regs

**DETAILED COMMENTS in opposition to the Proposed Rules re Procedures for Asylum and Bars to Asylum Eligibility, 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41**

**TABLE OF CONTENTS**

I.     Introduction

II.    The Proposed Rules unnecessarily and cruelly exclude bona fide refugees from asylum eligibility

III.   The Proposed Rules violate the letter and spirit of United States international treaty obligations

IV.    Those precluded from asylum eligibility will be gravely impacted even if granted withholding or protection under the Convention Against Torture

V.     The Proposed Rules will result in "mini-trials" in immigration court, undermine judicial efficiency and result in racially-biased decision-making

VI.    The proposed definition of "conviction" and "sentence" for the purposes of the new bars further excludes those in need of protection

VII.   The Proposed Rules will disparately impact vulnerable populations already routinely criminalized, including LGBTQ immigrants, survivors of trafficking and domestic violence, and immigrant youth of color

VIII.  The Proposed Rules are ultra vires to the federal immigration statute to the extent they purport to bar eligibility through a categorical exercise of discretion

IX.    Conclusion

## I.     Introduction

On December 19th, the Department of Homeland Security (DHS) and the Department of Justice (DOJ) issued a joint set of Proposed Rules that would make three primary changes to the rules governing asylum adjudications.

The first proposed set of changes adds the following seven *categorical* bars to asylum eligibility: (1) any conviction of a felony offense; (2) any conviction for "smuggling or harboring" under 8 U.S.C. § 1324(a), even if the asylum seeker committed the offense for the purpose of bringing her own spouse, child or parent to safety; (3) any conviction for illegal reentry under 8 U.S.C. § 1326; (4) any conviction for an offense "involving criminal street gangs," with the adjudicator empowered to look to any evidence to determine applicability; (5) any second conviction for an offense involving driving while intoxicated or impaired; (6) any

conviction *or accusation of conduct* for acts of battery involving a domestic relationship; (7) and any conviction for several newly defined categories of misdemeanor offenses, including *any* drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits.

The second section of the Proposed Rules provides a multi-factor test for immigration adjudicators to determine whether a criminal conviction or sentence is valid for the purpose of determining asylum eligibility. The third section rescinds a provision in the current rules regarding the reconsideration of discretionary asylum.

Taken together, these proposed changes constitute an unnecessary, harsh, and unlawful gutting of the asylum protections enshrined in United States and international law.  As an immigration lawyer and US citizen, these comments to express my opposition to the entirety of the Proposed Rules and grave concerns with the administration's continued efforts to exclude refugees from obtaining the security and stability the United States asylum system has long promised. We urge that the Proposed Rules be rescinded in their entirety.

## II.    The Proposed Rules unnecessarily and cruelly exclude bona fide refugees from asylum eligibility

*The barriers to asylum for those previously involved in the criminal legal system are already sweeping in scope; adding more barriers is cruel and unnecessary.*

The United States asylum system was first codified in statute through the Refugee Act of 1980, described by one prominent scholar as a bipartisan attempt to "reconcile our rhetoric with our law, our national immigration policy and our international treaty obligations so that we could maintain a consistent posture towards the world as a nation with a strong humanitarian tradition and a unique historic role as a haven for persons fleeing oppression."[1] The Act—among other measures designed to bring the United States domestic legal code into compliance with the provisions of the United Nations Protocol Relating to the Status of Refugees—created a "broad class" of refugees eligible for a discretionary grant of asylum.[2]

The asylum protections provided by United States law are sacred. Asylum provides those fleeing horrors with physical safety, a path to citizenship and security, and the opportunity to reunite with immediate family members who may still remain abroad in danger.[3] Many see the

---

[1] Deborah Anker, "The Refugee Act of 1980: An Historical Perspective," *In Defense of the Alien* 5 (1982): 89-94, https://www.jstor.org/stable/23141008?read-now=1&refreqid=excelsior%3A1060953608aa0bdd30d5d506e1ff6318&seq=1#page_scan_tab_contents.

[2] *See I.N.S. v. Cardoza-Fonseca*, 40 U.S. 421, 423 (1987).

[3] The permanency and family reunification benefits that accompany asylum are not provided to those granted withholding of removal or protection under the Convention Against Torture, the alternative forms of relief described

domestic asylum system as a symbol of the United States' commitment never to repeat its failure to save thousands of Jewish refugees refused entry to the United States on the *St. Louis* and others fleeing the Holocaust.[4] Others point to the critical role that domestic asylum policy plays in serving the United States' foreign policy interests abroad.[5] For those individuals seeking asylum in the United States, the stakes could not be higher—a claim denied often means return to death or brutal persecution.[6]

The laws, regulations, and process governing asylum adjudications are already exceedingly harsh. Asylum seekers bear the evidentiary burden of establishing their eligibility for asylum[7] in the face of a complex web of laws and regulations, without the benefit of appointed counsel and often from a remote immigration jail.[8] The obstacles to winning asylum are exceedingly high; indeed in some parts of the country and before certain immigration judges, almost no one succeeds.[9] Today, newly imposed barriers to accessing asylum in the United States are breathtaking in scope, with those seeking safety at the southern border subject to return to dangerous conditions in Mexico and an overlapping web of policies that preclude asylum eligibility for countless migrants simply because of their national origin, manner of entry, or their flight path.[10] There are consistent reports of the documented deaths and brutalities endured by those who sought but were denied asylum protections in the United States.[11]

---

throughout the Proposed Rules as a justification for the breadth of the new proposed bars. For more details on the differences between the forms of protection, *see* section VI *infra*.

[4] Dara Lind, "How America's rejections of Jews fleeing Nazi Germany haunts our refugee policy today," *Vox*, January 27, 2017, https://www.vox.com/policy-and-politics/2017/1/27/14412082/refugees-history-holocaust.

[5] Council on Foreign Relations, *Independent Task Force Report No. 63: U.S. Immigration Policy* (2009), 117 (additional or dissenting view by Elisa Massimino) ("For better or worse, the United States sets the standard for reasonable and humane treatment of migrants around the world. If the United States endorses harsh treatment of immigrants, it erodes the norms designed to protect them, and other countries will have license to do the same.").

[6] *See, e.g.*, Sarah Stillman, "When deportation is a death sentence," *The New Yorker*, January 8, 2018, https://www.newyorker.com/magazine/2018/01/15/when-deportation-is-a-death-sentence.

[7] 8 USC § 1158(b)(1)(B); 8 CFR § 1240.8(d).

[8] *See* Daniel Connolly, Aaron Montes, and Lauren Villagran, "Asylum seekers in U.S. face years of waiting, little chance of winning their cases," *USA Today*, September 25, 2019, https://www.usatoday.com/in-depth/news/nation/2019/09/23/immigration-court-asylum-seekers-what-to-expect/2026541001/.

[9] Manuel Roig-Franzia, "Immigrants risk it all seeking asylum. The answer is almost always 'no,'" *Washington Post*, July 24, 2019, https://www.washingtonpost.com/lifestyle/style/migrants-risk-it-all-seeking-asylum-the-answer-in-court-is-almost-always-no/2019/07/23/9c161b2e-a3f7-11e9-b732-41a79c2551bf_story.html.

[10] The National Immigrant Justice Center maintains a frequently updated timeline providing details of each of the asylum bans and other policies issued and implemented by the administration undermining asylum access at https://www.immigrantjustice.org/issues/asylum-seekers-refugees. For more information on the harms and rights abuses inherent in the Migrant Protection Protocols, or "Return-to-Mexico" program, *see* Human Rights First, *Delivered to Danger* (December 2019), https://www.humanrightsfirst.org/campaign/remain-mexico.

[11] *See, e.g.*, Stillman, "Death Sentence," *supra* (reporting on a database of more than sixty cases of individuals killed after deportation); *see also* Maria Sachetti, "'Death is waiting for him,'" *The Washington Post*, December 6, 2018, https://www.washingtonpost.com/graphics/2018/local/asylum-deported-ms-13-honduras/ (telling the story of Santos Chirino, denied asylum by a Virginia immigration judge, deported, and then murdered by those he told the immigration judge he feared); and Kevin Sieff, "When death awaits deported asylum seekers," *Washington Post*, December 26, 2018, https://www.washingtonpost.com/graphics/2018/world/when-death-awaits-deported-asylum-seekers/.

AR.08581

Specifically, the bars to asylum based on allegations of criminal conduct are *already* sweeping and over-broad in nature and scope.[12] Any conviction for an offense determined to be an "aggravated felony" is considered a *per se* "particularly serious crime" and therefore a mandatory bar to asylum.[13] "Aggravated felony" is a notoriously vague term, which exists only in immigration law. Originally limited to murder, weapons trafficking and drug trafficking,[14] it has metastasized to encompass hundreds of offenses, many of them neither a felony nor aggravated, including petty offenses such as misdemeanor shoplifting, simple misdemeanor battery, or sale of counterfeit DVDs.[15] The existing crime bars should be narrowed, not expanded. Even for those not categorically barred from relief, the immigration adjudicator maintains full discretion to deny asylum.[16]

Immigration adjudicators already have vast discretion to deny asylum to those who meet the refugee definition but have been convicted of criminal conduct.[17] Further categorical bars are not needed. The agencies' efforts to add *seven* new sweeping categories of barred conduct to the asylum eligibility criteria is unnecessary and cruel. The Proposed Rules drain the phrase "*particularly serious* crime," 8 U.S.C. § 1158, of any sensible meaning.

The Proposed Rules are also arbitrary and capricious. They would constitute a marked departure from past practice. And the agencies have proffered no evidence or data to support these changes.

One assumption fundamentally underlying the Proposed Rules, for example, is that every noncitizen convicted of any offense punishable by more than a year in prison necessarily constitutes a danger to the community. But no evidence is provided to support that assumption, and a criminal record, does not, in fact, reliably predict future dangerousness.[18] The Proposed Rules are so capricious as to peremptorily postulate a noncitizen's supposed danger to the

---

[12] The existing categorical bars to asylum eligibility are discussed in detail on p. 69641 of the Proposed Rules.

[13] 8 U.S.C. §§ 1158(b)(2)(A)(ii) and (B)(i).

[14] Pub. L. No. 100-690, § 7342, 102 Stat. 4181, 4469-70.

[15] 8 U.S.C. § 1101(a)(43). *See also* Nancy Morawetz, "Understanding the Impact of the 1996 Deportation Laws and the Limited Scope of Proposed Reforms," *Harvard Law Review* 113 (2000): 1939-40 (criticizing the "'Alice-in-Wonderland-like definition of the term 'aggravated felony'"); Melissa Cook, "Banished for Minor Crimes: The Aggravated Felony Provisions of the Immigration and Nationality Act as a Human Rights Violation," *Boston College Third World Law Journal* (2003): 293.

[16] *See Matter of Pula*, 19 I.&N. Dec. 467 (BIA 1987).

[17] *See id.*

[18] See U.S. Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders* (2017) (noting that recidivism rates fall substantially with age); U.S. Sentencing Commission, *Recidivism Among Federal Violent Offenders* (2019) (noting that non-violent offenders recidivate at significantly lower rates); J. Ramos and M. Wenger, "Immigration and recidivism: What is the Link?" *Justice Quarterly* (2019) (finding no correlation between recidivism rates and citizenship status among those formerly incarcerated for felonies in Florida prisons).

AR.08582

community even in circumstances when a federal, state, or local judge has concluded that no danger exists by, for example, imposing a noncustodial sentence. Conviction for a crime does not, without more, make one a present or future danger—which is why the Refugee Convention's particularly serious crime bar, made part of United States law through 8 U.S.C. § 1158, should only properly apply if both (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows that she is a present or future danger.[19]

Similarly, the Proposed Rules fail to address or account for the fact that a significant number of people may agree to plead to a crime as to avoid the threat of a severe sentence; not only is a conviction an unreliable predictor of future danger, it can also be an unreliable indicator of past criminal conduct.[20] In addition, the Proposed Rules do not address and make no exception for convictions for conduct influenced by mental illness or duress.

The Board of Immigration Appeals has cautioned that, "in light of the unusually harsh consequences which may befall a [noncitizen] who has established a well-founded fear of persecution; the danger of persecution should generally outweigh all but the most egregious of adverse factors."[21] Yet because of the categorical nature of the seven news bars proposed here, asylum seekers will be precluded from obtaining protection on the basis of a vast array of conduct, without any discretion left to the immigration adjudicator to determine whether the circumstances merit such a harsh penalty. Indeed, in the case of the domestic-violence related ground, the categorical bar will be imposed on the basis of *mere allegations* of conduct without any adjudication of guilt.[22]

Those unjustly precluded from even seeking a discretionary grant of asylum by the Proposed Rules will include, for example: individuals struggling with addiction with one drug-related conviction, regardless of the circumstances of the offense; asylum seekers with two convictions for driving under the influence, regardless of whether the applicant has sought treatment for alcohol addiction or the circumstances of the convictions; community members seeking asylum defensively who have been convicted of a document fraud offense related to their immigration status; and asylum-seeking mothers convicted for bringing their own child across the southern border in an effort to find safety.

---

[19] See U.N. High Commissioner for Refugees, *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 11 (July 2007), http://www.unhcr.org/en-us/576d237f7.pdf (the Refugee Convention's particularly serious crime bar only applies if (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows she is a "present or future danger.").

[20] John H. Blume and Rebecca K. Helm, "The Unexonerated: Factually Innocent Defendants Who Plead Guilty," *Cornell Law Review* 100 (2014): 157, https://pdfs.semanticscholar.org/c00f/96d421adf1846d120bf802a8854b5e2c0ff2.pdf.

[21] *Pula*, 19 I.&N. Dec. at 474.

[22] The Proposed Rules at p. 69651 explain that the regulations will "render ineligible [non-citizens] who engaged in acts of battery and extreme cruelty in a domestic context in the United States, regardless of whether such conduct resulted in a criminal conviction."

*The Proposed Rules cruelly disregard the connections between trauma and involvement in the criminal legal system.*

The harsh nature of the Proposed Rules is especially evident when viewed through a trauma-informed lens. Asylum seekers are an inherently vulnerable population because of the trauma they have experienced in their countries of origin and, often, along the journey to find safety. Existing literature suggests that at least one out of every three asylum seekers struggles with depression, anxiety, and/or post-traumatic stress disorder (PTSD).[23] One recent study found the mental health problems facing refugees and asylum seekers so acute that more than a third of the study's sample admitted having suicidal thoughts in the preceding two weeks.[24]

Studies also consistently reveal a high prevalence of comorbidity of PTSD and substance use disorders, with individuals with PTSD *up to 14 times more likely* to struggle with a substance use disorder.[25] Asylum seekers in the United States are often unable to access affordable medical care and treatments for complex trauma;[26] some turn to drugs and alcohol in an effort to self-medicate.[27] The proposed new bars to asylum include *any* drug-related conviction (with one exception for a first minor marijuana possessory offense) and any second conviction for driving under the influence. This approach is not only cruel but also ignores the evidence. *Particularly* given the vulnerabilities of asylum seeking populations, prior struggles with addiction should be addressed with treatment and compassion, not a closed door and deportation order.

Immigration adjudicators already maintain the authority to deny asylum to individuals with drug-related criminal histories on the basis of discretion; denying asylum seekers even the opportunity to present the countervailing factors of their past trauma and potential recovery is simply cruel.

---

[23] Giulia Turrini et al., "Common mental disorders in asylum seekers and refugees: umbrella review of prevalence and intervention studies," *International Journal of Mental Health Systems* 11 (August 2017): 51, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5571637/.

[24] Megan Brooks, "Refugees have high burden of mental health problems," *Psychiatry and Behavioral Health Learning Network*, June 2019, https://www.psychcongress.com/article/refugees-have-high-burden-mental-health-problems.

[25] Jenna L McCauley et al., "Posttraumatic Stress Disorder and Co-Occurring Substance Use Disorders: Advances in Assessment and Treatment," *Clinical Psychology Science and Practice* 19, 3 (October 2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3811127/.

[26] For more information on immigrant eligibility for federal benefits, *see* https://www.nilc.org/issues/health-care/.

[27] Carrier Clinic, *Trauma and Addiction* (2019), https://carrierclinic.org/2019/08/06/trauma-and-addiction/ ("...some people struggling to manage the effects of trauma in their lives may turn to drugs and alcohol to self-medicate. PTSD symptoms like agitation, hypersensitivity to loud noises or sudden movements, depression, social withdrawal and insomnia may seem more manageable through the use of sedating or stimulating drugs depending on the symptom. However, addiction soon becomes yet another problem in the trauma survivor's life. Before long, the 'cure' no longer works and causes far more pain to an already suffering person.").

AR.08584

### III.  The Proposed Rules violate the letter and spirit of United States international treaty obligations

By acceding to the 1967 Protocol Relating to the Status of Refugees,[28] which binds parties to the United Nations Convention Relating to the Status of Refugees,[29] the United States obligated itself to develop and interpret United States refugee law in a manner that complies with the Protocol's principle of non-refoulement (the commitment not to return refugees to a country where they will face persecution on protected grounds), even where potential refugees have allegedly committed criminal offenses. As noted above, adjudicators already have over-broad authority to deny asylum based on allegations of criminal activity, which vastly exceeds the categories for exclusion and expulsion set out in the Convention. Instead of working towards greater congruence with the terms of the Convention, the Proposed Rules carve out categorical bars from protection that violate both the language and spirit of the treaty.

While the Convention allows states to exclude and/or expel potential refugees from protection, the circumstances in which this can occur are limited. In particular, the Convention allows states to exclude and/or expel individuals from refugee protection if the individual "having been convicted by a final judgement of a particularly serious crime, constitutes a danger to the community of that country."[30] However, this clause is intended for "extreme cases," in which the particularly serious crime at issue is a "capital crime or a very grave punishable act."[31] The United Nations High Commissioner for Refugees (UNHCR) has asserted that to constitute a "particularly serious crime," the crime "must belong to the gravest category" and be limited "to refugees who become an extremely serious threat to the country of asylum due to the severity of crimes perpetrated by them in the country of asylum."[32] Moreover, the UNHCR has specifically noted that the particularly serious crime bar does not encompass less extreme crimes; "[c]rimes such as petty theft or the possession for personal use of illicit narcotic substances would not meet the threshold of seriousness."[33] Finally, when determining whether an individual should be barred from protection for having been convicted of a particularly serious crime, the adjudicator must conduct an individualized analysis and consider any mitigating factors.[34]

---

[28] United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268.

[29] Convention Relating to the Statute of Refugees, July 28, 1951, 140 U.N.T.S. 1954 (hereinafter "Refugee Convention").

[30] *Id*. at art. 33(2).

[31] U.N. High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees* 2, U.N. Doc. HCR/IP/Eng/REV. ¶ 154-55, (1979, reissued 2019).

[32] U.N. High Comm'r for Refugees (UNHCR), *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 7 (July 2007), http://www.unhcr.org/enus/576d237f7.pdf.

[33] *Id*. at ¶ 10.

[34] *Id*. at ¶ 10-11; U.N. High Commissioner for Refugees, *The Nationality, Immigration and Asylum Act 2002: UNHCR Comments on the Nationality, Immigration and Asylum Act 2002 (Specification of Particularly Serious Crimes) Order 2004*, 4 (2004).

AR.08585

As noted above, legislation and agency interpretation of the Immigration and Nationality Act have already expanded the particularly serious crime bar far beyond what was contemplated in the Convention by creating categorical particularly serious crimes through the aggravated felony definition. The Proposed Rules would amplify the dissonance between U.S. refugee law and the Convention, as well as the violation of U.S. obligations under the Convention, by creating categorical bars within categorical bars. For example, at p. 69659, the Proposed Rules first exclude from protection anyone who was convicted of a felony and then at p. 69660, define "felony" as "any crime punishable by more than one of imprisonment" without any reference to other factors, including dangerousness. The Proposed Rules described the increased categorization of the particularly serious crime bar as necessary because the case-by-case adjudication previously used for non-aggravated felony offenses was "inefficient,"[35] but an individualized analysis is exactly what the Convention requires to ensure only those individuals who have been convicted of crimes that are truly serious and therefore present a future danger are placed at risk of refoulement.

Additionally, outside of the aggravated felony context, it has generally been well understood by the Board of Immigration Appeals and the Courts of Appeals that low-level, "run-of-the-mill" offenses do not constitute particularly serious crimes.[36] Under this long-standing interpretation of the particularly serious crime bar in the INA, there is simply no scenario in which low-level offenses like misdemeanor driving under the influence where no injury is caused to another or simple possession of a controlled substance or paraphernalia would constitute a particularly serious crime.

The reason for this is common sense. As Judge Reinhardt explained in a concurring opinion in *Delgado v. Holder*,[37] a decision the Proposed Rules cite in support of the expanded bars, run-of-the-mill crimes like driving under the influence have "little in common" with other crimes the Board of Immigration Appeals has deemed particularly serious—e.g., felony menacing with a deadly weapon, armed robbery, and burglary of a dwelling in which the offender is armed or causes injury.[38] Judge Reinhardt further noted that public opinion does not treat them similarly either: "American voters would be unlikely to elect a president or vice president who had committed a particularly serious crime, yet they had no difficulty in recently electing to each office a candidate with a DUI record."[39] Barring individuals from asylum based on these relatively minor offenses renders the "particularly serious" part of the "particularly serious crime" bar meaningless.

---

[35] Proposed Rules at 69646.
[36] *Delgado v. Holder*, 648 F.3d 1095, 1110 (9th Cir. 2011) (en banc) (J. Reinhardt, concurring).
[37] 648 F.3d at 1110 (J. Reinhardt, concurring).
[38] *Id*. at 1110.
[39] *Id*. at 1110.

The expansion of the asylum bar to include individuals who have been convicted of reentering the United States without inspection pursuant to INA § 276[40] is also unlike any of the other bars previously established or as interpreted by the Board of Immigration Appeals or Circuit Courts of Appeals. It is an offense with no element of danger or violence to others, and has no victim. Most significantly, and more so than other bars contained in the Proposed Rules, barring asylum based on the manner of entry directly violates the Convention's prohibition on imposing penalties based on a refugee's manner of entry or presence.[41] This prohibition is a critical part of the Convention because it recognizes that refugees often have little control over the place and manner in which they enter the country where they are seeking refuge.

## IV.    Those precluded from asylum eligibility will be gravely impacted even if granted withholding of removal or protection under the Convention Against Torture

Throughout the Proposed Rules, the agencies defend the harsh and broad nature of their proposal by pointing to the continued availability of alternative forms of relief for those precluded from asylum eligibility under the new rules.[42] The availability of these alternatives forms of relief, however—known as withholding of removal and protection under the Convention Against Torture (CAT)—does not nullify the harm created by the Proposed Rule's new limits on asylum. The protections afforded by CAT and by statutory withholding of removal are limited in scope and duration, and they are harder to obtain. As a result, a Rule that limits *bona fide* refugees to withholding of removal and CAT protection would impose a very real harm on individuals who have come to the United States in search of protection.

First, the most serious harm that can befall an individual as a result of these Proposed Rules is removal to persecution and torture, and the existence of withholding of removal does not account for that risk. CAT and withholding protections demand a higher level of proof than asylum claims: a clear probability of persecution or torture.[43] Thus, an individual could have a valid asylum claim but be unable to meet the standard under the other forms of relief and

---

[40] Proposed Rules at 69659, 69660.

[41] Refugee Convention, *supra*, at art 31.

[42] *See, e.g.,* Proposed Rules at 69644.

[43] Withholding of removal requires the petitioner to demonstrate his or her "life or freedom would be threatened in that country because of the petitioner's race, religion, nationality, membership in a particular social group, or political opinion." *INS v. Stevic*, 467 U.S. 407, 411 (1984) (quoting 8 U.S.C. § 1231(b)(3)). Unlike asylum, however, the petitioner must show a "clear probability" of the threat to life or freedom if deported to his or her country of nationality. The clear probability standard is more stringent than the well-founded fear standard for asylum. *Id; see also Cardoza-Fonseca*, 480 U.S. at 431 (describing the difference between a well-founded fear of persecution and a clear probability of persecution). For CAT relief, an applicant must show it is more likely than not that he or she will be tortured or killed by or at the government's acquiescence if removed to the home country. 8 C.F.R. § 1208.16(c)(2).

9

therefore would be removed to their country of origin, where they would face persecution or even death.

Even for those who meet the higher standard, withholding and CAT recipients are still subject to significant prejudice. For example, they have no ability to travel internationally. The United Nations Convention Relating to the Status of Refugees[44] affords refugees the right to travel in mandatory terms. Article 28 states, "Contracting States shall issue to refugees lawfully staying in their territory travel documents for the purpose of travel outside their territory." Withholding and CAT recipients do not have access to a travel document as contemplated by Article 28. By regulation, refugee travel documents are available only to asylees.[45] And the Board of Immigration Appeals requires that an individual granted withholding and CAT—unlike an individual granted asylum—must simultaneously be ordered removed, making any international travel a "self-deportation."[46] Refugees granted only withholding of removal or CAT protection are thus effectively trapped within the United States in long-term limbo.

Withholding and CAT recipients also face permanent separation from their spouses and children. Because international travel is prohibited, these individuals cannot reconnect with their families in a third country. And they also cannot reunite with family in the United States because only asylees and refugees are eligible to petition for a spouse and children to join them as derivatives on that status.[47] For many, this will mean that the Proposed Rules institute yet another formal policy of family separation. For example, a mother with two young children who flees to the United States and is subject to one of the expanded asylum bars will not be able to ensure that her children will be able to obtain protection in the United States with her if she is granted relief.  Rather, if her children are still in her home country, they would need to come to the United States and seek asylum on their own, likely as unaccompanied children. If her children fled to the United States with her, then they will need to establish their own eligibility for protection before an immigration judge, no matter their age.

Recently, this exact scenario played out with a mother who was subject to the so-called Migrant Protection Protocols (also known as Remain in Mexico) and the asylum "transit ban,"[48] which made the mother ineligible for asylum and thus required the children to establish their independent eligibility for withholding and CAT protection. An immigration judge granted the mother withholding of removal but denied protection to her young children, leaving the children

---

[44] 19 U.S.T. 6223 T.I.A.S. No. 6577 (1968).

[45] 8 C.F.R. § 223.1.

[46] *See Matter of I-S- & C-S-*, 24 I.&N. Dec. 432, 434 n.3 (BIA 2008); 8 C.F.R. § 241.7.

[47] 8 C.F.R. § 208.21(a).

[48] 8 C.F.R. § 1208.13(c)(4).

with removal orders and immense uncertainty about their future.[49] Under the expanded bars in the Proposed Rules, these situations will certainly increase, separating families and forcing parents to return to countries where it has been established they more likely than not will face persecution and torture, rather than leaving their children on their own.

Withholding recipients likewise face hurdles in access to employment. Article 17 of the Refugee Convention states that a contracting state "shall accord to refugees lawfully staying in their territory the most favorable treatment accorded to nationals of a foreign country in the same circumstances, as regards the right to wage-earning employment." Recipients of withholding enjoy no such right. They must apply for work authorization, and they face frequent delays in the adjudication of these applications, which often result in the loss of legal authorization to work.[50]

And perhaps most fundamentally, there is continuing jeopardy for withholding and CAT recipients that does not exist for asylum recipients. When a noncitizen is granted asylum, the person receives a legal status.[51] Asylum, once granted, protects an asylee against removal unless and until that status is revoked.[52] None of these protections exists for withholding and CAT recipients. They have no access to permanent residency or citizenship.[53] Instead, they are subject to a removal order and vulnerable to the permanent prospect of deportation to a third country and subject to potential check ins with immigration officials where they can be made to pursue removal to third countries to which they have no connection.[54]

Finally, I write to highlight a different form of prejudice that will flow from the rule: one relating to judicial efficiency. Neither withholding of removal nor CAT protection allow family members who are in the United States together and pursuing protection on the same basis to apply as derivatives on a principal application. As a result, family claims for those rendered ineligible for asylum by the new rules will have to be adjudicated separately, and potentially before different adjudicators even when the claims are interrelated and even when minor children may not be in a position to explain the claim at all or as sufficiently as a parent. In addition to being unjust to the affected family members, this approach would result in gross inefficiencies,

---

[49] Adolfo Flores, "An Immigrant Woman Was Allowed To Stay In The US — But Her Three Children Have A Deportation Order," *Buzzfeed*, December 21, 2019, https://www.buzzfeednews.com/article/adolfoflores/an-immigrant-woman-was-allowed-to-stay-in-the-us-but-not.
[50] 8 C.F.R. § 274a.12(a)(10); *Northwest Immigrant Rights Project, et al. v. USCIS, et al.*, No. 2:15-cv-00813-JLR (W.D. Wash., filed May 22, 2015) (class action regarding delays in adjudication of work authorization).
[51] *See, e.g.*, 8 C.F.R. 245.1(d)(1) (defining "lawful immigration status" to include asylees).
[52] *See* 8 U.S.C. § 1158(c)(1)(A).
[53] *Matter of Lam*, 18 I.&N. Dec. 15, 18 (BIA 1981); 8 C.F.R. § 245.1(d)(1) (explaining that only those in "lawful immigration status" can seek permanent residency and excluding withholding recipients from such status); 8 C.F.R. § 209.2(a)(1) (authorizing adjustment of status to permanent residence for asylees); 8 C.F.R. § 316.2 (naturalization available only to permanent residents).
[54] *See R–S–C v. Sessions*, 869 F.3d 1176, 1180 (10th Cir. 2017).

AR.08589

which should be avoided in a system that already contains a significant backlog of pending cases.[55]

## V.     The Proposed Rules will result in "mini-trials" in immigration court, undermine judicial efficiency and result in racially-biased decision-making

In two significant ways, the Proposed Rules require immigration adjudicators to engage in decision-making to determine whether an asylum applicant's conduct—considered independently of any criminal court adjudication—triggers a categorical bar to asylum eligibility. First, the agencies propose that immigration adjudicators be allowed to consider "all reliable evidence" to determine whether there is "reason to believe" an offense was "committed for or related to criminal gang evidence," or "in furtherance of gang-related activity, triggering ineligibility for asylum in either case.[56] Second, the Proposed Rules permit immigration adjudicators to "assess all reliable evidence in order to determine whether [a] conviction amounts to a domestic violence offense;" and to go even further by considering whether non-adjudicated *conduct* "amounts to a covered act of battery or extreme cruelty."[57]

Requiring adjudicators to make complex determinations regarding the nature and scope of a particular conviction or, in the case of the domestic violence bar, *conduct*, will lead to massive judicial inefficiencies and slanted "mini-trials" within the asylum adjudication process. The scope of the "reliable evidence" available to adjudicators in asylum cases is potentially limitless; advocates on both sides would be obligated to present fulsome arguments to make their cases about gang connections to the underlying activity or the relationship of the asylum applicant to the alleged victim. Because of the lack of robust evidentiary rules in immigration proceedings, it will be difficult if not impossible for many applicants to rebut negative evidence marshaled against them, even if false; and in other cases, asylum applicants will struggle to find evidence connected to events that may have happened years prior (especially for those detained). Asylum trials, which are typically three or fewer hours under current policies, would provide insufficient time to fully present arguments on both sides of these unwieldy issues.

As the immigration courts contend with backlogs that now exceed one million cases,[58] tasking adjudicators with a highly nuanced, resource-intensive assessment of the connection of a conviction to gang activity and/or the domestic nature of alleged criminal conduct—assessments far outside their areas of expertise—will prolong asylum proceedings and invariably lead to

---

[55] See, e.g., Marissa Esthimer, "Crisis in the Courts: Is the Backlogged U.S. Immigration Court System at Its Breaking Point?," *Migration Policy Institute*, October 3, 2019, https://bit.ly/2sJuEWR.
[56] *See* Proposed Rules at 69649.
[57] *See* Proposed Rules at 69652.
[58] Marissa Esthimer, "Crisis in the Courts: Is the Backlogged U.S. Immigration Court System at Its Breaking Point?," *Migration Policy Institute*, October 3, 2019, https://www.migrationpolicy.org/article/backlogged-us-immigration-courts-breaking-point.

AR.08590

erroneous determinations that will give rise to an increase in appeals. The Proposed Rules repeatedly cite increased efficiency as justification for many of the proposed changes.[59] Yet requiring adjudicators to engage in mini-trials to determine the applicability of categorical criminal bars, rather than relying on adjudications obtained through the criminal legal system, will dramatically *decrease* efficiency in the asylum adjudication process.

Indeed, the Supreme Court has "long deemed undesirable" exactly the type of "post hoc investigation into the facts of predicate offenses" proposed by the agencies here.[60] Instead, for more than a century the federal courts have repeatedly embraced the "categorical approach" to determine the immigration consequence(s) of a criminal offense, wherein the immigration adjudicator relies on the statute of conviction as adjudicated by the criminal court system, without relitigating the nature or circumstances of the offense in immigration court.[61] As the Supreme Court has explained, this approach "promotes judicial and administrative efficiency by precluding the relitigation of past convictions in minitrials conducted long after the fact."[62] In *Moncrieffe v. Holder*, the Court forewarned of exactly the sort of harm that would arise from these Proposed Rules; in that case, the Court rejected the government's proposal that immigration adjudicators determine the nature and amount of remuneration involved in a marijuana-related conviction, noting that "our Nation's overburdened immigration courts" would end up weighing evidence "from, for example, the friend of a noncitizen" or the "local police officer who recalls to the contrary," with the end result a disparity of outcomes depending on the whims of the individual immigration judge and a further burdened court system.[63]

Particularly in the context of the new proposed bar related to alleged gang affiliation, I am concerned that creating a blanket exclusion for anyone who is convicted of a crime – including a misdemeanor – that an immigration adjudicator deems linked to gang activity will erroneously prevent bona fide asylum seekers from receiving protection. This rule confers on immigration adjudicators—who generally are not criminologists, sociologists, or criminal law experts—the responsibility to determine if there is "reason to believe" any conviction flows from activity taken in furtherance of gang activity. This rule will necessarily ensnare asylum seekers of color who have experienced racial profiling and a criminal legal system fraught with structural challenges and incentives to plead guilty to some crimes, particularly misdemeanors. These same

---

[59] *See* Proposed Rules at 69646, 69656-8.

[60] *Moncrieffe v. Holder*, 569 U.S. 184, 186 (2013).

[61] *See Moncrieffe*, 569 U.S. at 191 ("This categorical approach has a long pedigree in our Nation's immigration law."). For a more fulsome history of the development of the categorical approach in immigration court, *see* Alina Das, "The Immigration Penalties of Criminal Convictions: Resurrecting Categorical Analysis in Immigration Law," *New York University Law Review* 86, no. 6 (2011): 1689 - 1702, https://www.nyulawreview.org/wp-content/uploads/2018/08/NYULawReview-86-6-Das.pdf.

[62] *Moncrieffe*, 569 U.S. at 200-201.

[63] *Id.* at 201.

AR.08591

individuals are vulnerable to being erroneously entered into gang databases. Such databases are notoriously inaccurate, outdated, and infected by racial bias.[64]

Indeed, asylum applicants are *already* frequently subjected to wrongful denials of protection because of allegations of gang activity made by the Department of Homeland Security on the basis of information found in notoriously unreliable foreign databases and "fusion" intelligence-gathering centers outside the United States. Empowering immigration adjudicators to render asylum applicants *categorically* excluded from protection on the basis of such spurious allegations will inevitably result in the return of many refugees back to harm.[65]

The Departments curiously argue that all gang-related offenses should be construed as "particularly serious crimes."[66] They cite statistics from up to 16 years ago in an attempt to make the point that gang members commit violent crimes and drug crimes. They then make the illogical leap to the conclusion that *all crimes*—including misdemeanor property crimes—that may be construed as connected to gang activity are particularly serious. This simply does not follow; in fact, the Proposed Rules will inevitably result in the exclusion from protection of asylum seekers of color who live in economically distressed communities and have obtained a minor conviction such as a property crime. Relying on the definition of "particularly serious crime" to prevent asylum seekers convicted of even minor crimes construed as gang-related from accessing asylum protection is disingenuous at best, and tinged with racial animus at worst.

The Departments asks for comments on: (1) what should be considered a sufficient link between an asylum seeker's underlying conviction and the gang related activity in order to trigger the application of the proposed bar, and (2) any other regulatory approaches to defining the type of gang-related activities that should render individuals ineligible for asylum. The premise of these questions is wrong: a vague "gang related" bar should not be introduced at all. The Immigration and Nationality Act and existing regulations already provide broad bars to asylum where criminal behavior by an asylum seeker causes concern by an adjudicator. Adding this additional, superfluous layer of complication risks erroneously excluding bona fide asylum seekers from protection without adding any useful adjudicatory tool to the process.

---

[64] Annie Sweeney and Madeline Buckley, "Chicago police gang data collection faulted by city's inspector general as unchecked and unreliable," *Chicago Tribune*, April 11, 2019, https://www.chicagotribune.com/news/breaking/ct-met-chicago-police-gang-data-04112019-story.html; Anita Chabria, "A routine police stop landed him on California's gang database. Is it racial profiling?," *Los Angeles Times*, May 9, 2019, https://www.latimes.com/politics/la-pol-ca-california-gang-database-calgang-criminal-justice-reform-20190509-story.html.

[65] Melissa del Bosque, "Immigration Officials Use Secretive Gang Databases to Deny Migrant Asylum Claims," *Pro Publica*, July 8, 2019, https://www.propublica.org/article/immigration-officials-use-secretive-gang-databases-to-deny-migrant-asylum-claims.

[66] Proposed Rules at p. 69650.

## VI.    The proposed definition of "conviction" and "sentence" for the purposes of the new bars further excludes those in need of protection

The section of the Proposed Rules that outlines a new set of criteria for determining whether a conviction or sentence is valid for the purpose of determining asylum eligibility is an ultra vires exercise of authority that is not authorized by the Immigration and Nationality Act. The Proposed Rules impose an unlawful presumption against asylum eligibility for applicants who seek post-conviction relief while in removal proceedings or longer than one year after their initial convictions. They also deny full faith and credit to state court proceedings by attributing improper motives to state court actors.[67]

> *The Proposed Rules undermine Sixth Amendment protections and harms immigrants unfamiliar with the complex criminal and immigration framework governing prior convictions.*

The Proposed Rules outline a new multi-factor process asylum adjudicators must use to determine whether a conviction or sentence remains valid for the purpose of determining asylum eligibility; the proposal includes a rebuttable presumption "against the effectiveness" of an order vacating, expunging, or modifying a conviction or sentence if the order was entered into after the asylum seeker was placed in removal proceedings or if the asylum seeker moved for the order more than one year after the date the original conviction or sentence was entered.[68]

This newly created presumption unfairly penalizes asylum applicants, many of whom may not have the opportunity to seek review of their prior criminal proceedings until applying for asylum.[69] In *Padilla v. Kentucky*, the Supreme Court recognized that the immigration consequences of a conviction are sufficiently serious for the Sixth Amendment to require a noncitizen defendant to be competently advised of them before agreeing to a guilty plea.[70] By imposing a presumption against the validity of a withdrawal or vacatur of a plea, the Proposed Rules hold asylum seekers whose rights were violated under *Padilla* to a different standard; even though they too were denied effective assistance of counsel in the course of their underlying criminal proceedings, asylum seekers will be forced to rebut a presumption that their court-ordered withdrawal or vacatur is invalid. The Proposed Rules therefore compound the harm to

---

[67] *See Saleh v. Gonzales*, 495 F.3d 17, 25-26 (2d Cir. 2007) (discussing 28 U.S.C. § 1738, requiring federal courts to give full faith and credit to state acts, records, and judicial proceedings and U.S. Const. art. IV, § 1, and finding that there was no violation where the Board of Immigration Appeals stopped short of "refusing to recognize or relitigating the validity of [Saleh's] state conviction.").

[68] Proposed Rules at 69655.

[69] On page 69656 of the Proposed Rules, the Department of Homeland Security and the Department of Justice urge that "[i]t is reasonable to conclude that an alien who has a meritorious challenge to a criminal conviction based on a procedural or substantive defect is more likely to seek post-conviction relief sooner than an alien who is seeking relief on rehabilitative grounds…"

[70] *Padilla v. Kentucky*, 559 U.S. 356 (2010).

AR.08593

immigrants who, in addition to facing persecution in their home countries, have been denied constitutionally compliant process in the United States criminal legal system.

Many asylum applicants, especially those in vulnerable populations isolated from resources and unfamiliar with the due process protections available to them in the United States, may not have discovered the defects in their underlying criminal proceedings until their consultation with an immigration attorney, or until they are placed into removal proceedings, which may happen several years after a conviction. Imposing a presumption *against* the validity of a plea withdrawal or vacatur in these cases will undoubtedly lead to the wrongful exclusion of countless immigrants from asylum simply because they were unable to adequately rebut the presumption, particularly in a complex immigration court setting without the benefit of appointed counsel.

> *The Proposed Rules violate the full faith, and credit to which state court decisions are entitled.*

The Proposed Rules further improperly authorize immigration adjudicators to second-guess the decision of a state court, even where the order on its face cites substantive and procedural defects in the underlying proceeding. The proffered justification for this presumption against the validity of post-conviction relief is to "ensure that aliens do not have their convictions vacated or modified for purported rehabilitative purposes that are, in fact, for immigration purposes," "to codify the principle set forth in *Matter of Thomas and Thompson*," and to bring the analysis of post-conviction orders in line with *Matter of Pickering.*[71] The agencies misread the applicable law, however, by authorizing adjudicators to disregard otherwise valid state orders. The immigration law only requires that to be effective for immigration purposes, orders vacating or modifying convictions must be based on substantive or procedural infirmities in the underlying proceedings. The Proposed Rule goes well beyond that requirement.

The Proposed Rules abandon the presumption of regularity that should accompany state court orders, thus upending settled principles of law. The Proposed Rules cite a misleading quote from *Matter of F-* in support of allowing asylum adjudicators to look beyond the face of a state court order; had the Rules' authors looked to the full case, they would have read the following: "Not only the full faith and credit clause of the Federal Constitution, but familiar principles of law require the acceptance at face value of a judgment regularly granted by a competent court, unless a fatal defect is evident upon the judgment's face. However, the presumption of regularity and of jurisdiction may be overcome by extrinsic evidence or by the record itself."[72] In *Matter of*

---

[71] Proposed Rules at 69655-56 (*citing Matter of Thomas and Thompson*, 27 I.&N. Dec. 674 (A.G. 2019) and *Matter of Pickering*, 23 I.&N. Dec. 621 (BIA 2003), *rev'd on other grounds by Pickering v. Gonzales*, 465 F.3d 263, 267-70 (6th Cir. 2006)).

[72] *Matter of F-*, 8 I.&N. Dec. 251, 253 (BIA 1959).

*F-*, the Board of Immigration Appeals offers support for the proposition that an adjudicator should presume the validity of a state court order unless there is a reason to doubt it, contrary to the *presumption of irregularity* put forward in the Proposed Rules.

The authority extended to adjudicators by the Proposed Rules also violates the law of multiple circuits, including *Pickering*, on which it relies.[73] In *Pickering v. Gonzales*, the Sixth Circuit Court of Appeals held that despite the petitioner's stated motive of avoiding negative immigration consequences, the Board of Immigration Appeals was limited to reviewing the authority of the court issuing the order as to the basis for his vacatur.[74] Similarly, in *Reyes-Torres* the Ninth Circuit Court of Appeals held that the motive of the respondent was not the relevant inquiry.[75] Rather, "the inquiry must focus on the state court's rationale for vacating the conviction."[76] In addition, the Third Circuit Court of Appeals in *Rodriguez v. U.S. Att'y Gen.*, which the Proposed Rules cite as "existing precedent," held that the adjudicator must look only to the "reasons explicitly stated in the record and may not impute an unexpressed motive for vacating a conviction."[77] Moreover, the *Rodriguez* court stated that to determine the purpose of a vacatur, the adjudicator must first look to the face of the order vacating the conviction, and "if the order explains the courts reasons … the [adjudicator's] inquiry must end there."[78] The Proposed Rules contain no such limiting language to guide the adjudicator's inquiry. Instead, the Rules grant adjudicators vague and indefinite authority to look beyond even a facially valid vacatur. Such breadth of authority undermines asylum seekers' rights to a full and fair proceeding.

> *The Proposed Rules wrongly extend* Matter of Thomas and Thompson *to all forms of post-conviction relief and impose an ultra vires and unnecessary burden on asylum seekers.*

Finally, the above-described presumption is ultra vires and unnecessary. As an initial matter, the Proposed Rules' reliance on *Matter of Thomas and Thompson* is flawed. The Attorney General's decision in *Matter of Thomas and Thompson* has no justification in the text or history of the immigration statute. Nowhere does the plain text of the Immigration and Nationality Act support giving adjudicators the authority to give effect only to state court sentence modifications undertaken to rectify substantive or procedural defects in the underlying

---

[73] *See id.* (*citing Matter of Pickering*, 23 I.&N. Dec. 621).

[74] *Pickering v. Gonzales*, 465 F.3d 263, 267-70 (6th Cir. 2006).

[75] *Reyes-Torres v. Holder*, 645 F.3d 1073, 1077-78 (9th Cir. 2011) (*citing Cardoso-Tlaseca v, Gonzales*, 460 F.3d 1102, 1107 n.3 (9th Cir. 2006) and *Pickering v. Gonzales*, 454 F.3d 525 (6th Cir. 2006), *amended and superseded* by *Pickering*, 465 F.3d at 263.

[76] *Id.*

[77] *Rodriguez v. U.S. Att'y Gen.*, 844 F.3d 392, 397 (3d Cir. 2006) (noting that "[T]he IJ may rely only on reasons explicitly stated in the record and may not impute an unexpressed motive for vacating a conviction.").

[78] *Id.* ("Put simply, '[w]e will not . . . permit[ ] . . . speculation . . . about the secret motives of state judges and prosecutors,'" *quoting Pinho v. Gonzales*, 432 F.3d 193, 214-215 (3d Cir. 2005)).

AR.08595

criminal proceedings. Nor does the legislative history support such a rule. The Board of Immigration Appeals recognized this in *Matter of Cota-Vargas*, where it concluded that the application of "the *Pickering* rationale to sentence modifications has no discernible basis in the language of the Act."[79] Based on the text of the Immigration and Nationality Act and the well-documented legislative history behind Congress's definition of "conviction" and "sentence" in 8 U.S.C. § 1101(a)(48), the Board determined that Congress intended to ensure that, generally, proper admissions or findings of guilt were treated as convictions for immigration purposes, even if the conviction itself was later vacated. Neither the text of the INA nor the legislative history of the definitions reveal any attempt on Congress's part to change the longstanding practice of giving effect to state court sentencing modifications. For these reasons, *Matter of Thomas and Thompson* lacks Congressional support for its rule and should not be extended.

Moreover, as applicants for immigration benefits or relief from removal, asylum seekers already bear the burden of demonstrating their eligibility for asylum.[80] The Proposed Rules do not alter or shift this burden, nor do they provide evidence supporting the need for this presumption. By introducing a presumption of bad faith into asylum adjudication, the Proposed Rules unfairly interfere with asylum seekers' efforts to establish their claims. Immigration law, and asylum law in particular, is already highly complex, and the process of seeking asylum is in many instances re-traumatizing, particularly for applicants who do not have counsel to represent them and who lacked effective counsel in their underlying criminal proceedings. The Proposed Rules as applied to asylum applicants who seek post-conviction relief transform an already difficult process into an adversarial inquiry, contrary to the intent of Congress.

## VII.  The Proposed Rules will disparately impact vulnerable populations already routinely criminalized, including LGBTQ immigrants, survivors of trafficking and domestic violence, and immigrant youth of color

The expanded criminal bars exclude from safety and a pathway to citizenship those convicted of offenses that are coincident to their flight from persecution, and do not accomplish the stated goal of making communities safer. They will disparately impact vulnerable populations, who comprise asylum seekers hailing primarily from Central America and the Global South, and those routinely criminalized because of their identities, racially disparate policing practices, or in connection with experiences of trafficking and domestic violence.[81] For these populations especially, the discretion currently delegated to asylum adjudicators is crucial for them to become fully integrated in the larger community. The imposition of additional

---

[79] *Matter of Cota-Vargas*, 23 I.&N. Dec. 849, 852 (BIA 2005).

[80] *Matter of S-K-*, 23 I.&N. Dec. 936, 939-40 (BIA 2006).

[81] D'Vera Cohn et al., "Rise in U.S. Immigrants from El Salvador, Guatemala and Honduras Outpaces Growth from Elsewhere," *Pew Research Center*, December 7, 2017,  https://www.pewresearch.org/hispanic/wp-content/uploads/sites/5/2017/12/Pew-Research-Center_Central_American-migration-to-U.S._12.7.17.pdf.

categorical bars to asylum will only further marginalize asylum seekers already struggling with trauma and discrimination.

The Proposed Rules turn asylum into a blunt instrument that would prevent the use of discretion where it is most needed and most effective. The existing framework for determining if an offense falls within the particularly serious crime bar already provides the latitude for asylum adjudicators to deny relief to anyone found to pose a danger to the community.[82] Furthermore, asylees with convictions that render them inadmissible must apply for a waiver at the time of their applications for permanent residence.[83] These measures ensure that asylum applicants in vulnerable populations have access to supportive resources and have the opportunity to demonstrate their ongoing commitment to social and personal health. Moreover, the existence of provisions allowing the revocation of asylum status ensures that adjudicators may continue to enforce concerns related to the safety of the community even after asylum is granted.[84]

> *Barring asylum for immigrants convicted of migration-related offenses punishes them for fleeing persecution and/or seeking safety for their children, and does not make communities safer.*

The expansion of the criminal bars to asylum to include offenses related to harboring, smuggling of noncitizens by parents and family members and those previously removed further criminalizes vulnerable populations fleeing persecution.[85] The vast expansion of migrant prosecutions at the border during the current administration has created administrative chaos and separated families that do not pose a threat to the safety of communities in the United States.[86] The Proposed Rules threaten to magnify the harm caused by these reckless policies by further

---

[82] Apart from the statutory aggravated felony bar to asylum, the Board of Immigration Appeals and Attorney General have historically utilized a highly circumstantial approach to the particular serious crime determination that would bar an immigrant from receiving asylum. *See e.g., Matter of Juarez*, 19 I.&N. Dec. 664 (BIA 1988) (ordinarily a single misdemeanor that is not an aggravated felony will not be a particularly serious crime); *Matter of Frentescu*, 18 I.&N. Dec. 244 (BIA 1982), *modified* (setting forth several factors to be considered before imposing the particular serious crime bar, including: (i) the nature of the conviction, (ii) the circumstances and underlying facts for the conviction, (iii) the type of sentence imposed, and (iv) whether the type and circumstances of the crime indicate that the individual will be a danger to the community); *Matter of Y-L-, A-G-, R-S-R-,* 23 I.&N. Dec. 270 (A.G. 2002) (setting forth a multi-factor test to determine the dangerousness of a respondent convicted of a drug-trafficking offense who is otherwise barred from asylum as an aggravated felon, but seeking withholding of removal).

[83] 8 U.S.C. § 1159(c) (2012).

[84] 8 C.F.R. § 208.24(a) (2012).

[85] On April 11, 2017, then-Attorney General Sessions instructed all federal prosecutors to increase their prioritization of immigration offenses for prosecution, including misdemeanor offenses committed by first time entrants. *See* Memorandum from the Attorney General: Renewed Commitment to Criminal Immigration Enforcement (April 11, 2017), https://www.justice.gov/opa/press-release/file/956841/download.

[86] *Id.*; Richard Marosi, "The aggressive prosecution of border crossers is straining the courts. Will zero tolerance make it worse?," *Los Angeles Times*, May 11, 2018, https://www.latimes.com/local/california/la-me-ln-immigrant-prosecutions-20180511-story.html.

AR.08597

compromising the ability of those seeking safety on the southern border to access the asylum system.

The Proposed Rules expand the asylum bar to parents or other caregivers who are convicted of smuggling or harboring offenses after taking steps to help minor children enter the United States in order to flee persecution. This proposed bar is particularly insidious in light of now-public documents revealing this administration's explicit efforts to utilize smuggling prosecutions against parents and caregivers as part of its strategy of deterring families from seeking asylum in the United States.[87] The Proposed Rules seek to take this widely condemned strategy one step further, by additionally barring those parents *already prosecuted* from obtaining asylum protections for themselves and their children. The Proposed Rules multiply the harms parents and caregivers have experienced in their treacherous journeys to safety and callously penalize parents for doing what is only human—taking all necessary steps to protect their children.

The Proposed Rules also expand the asylum bar to those who have fled persecution multiple times and therefore been convicted of illegal reentry. Their inclusion is premised on conclusory statements regarding the dangerousness of recidivist offenders, without consideration of the seriousness of prior convictions.[88] Rather, the Proposed Rules treat all immigration violations as similar in seriousness to those previously warranting inclusion in the particularly serious crime bar, without any independent evidence to justify the expansion. Such an approach renders meaningless the limiting language of "particularly serious" in the statute.

The Proposed Rules also conflate multiple entries by noncitizens having prior removal orders with those who have entered multiple times without ever having their asylum claims heard. Many immigrants who have previously attempted entry to the United States to flee persecution could not have been aware of the complex statutory regime that governs asylum claims and would not have knowingly abandoned their right to apply for asylum. Some asylum seekers have also been wrongly assessed in prior credible fear interviews. And others yet may have previously entered or attempted to enter the United States before the onset of circumstances giving rise to their fear. Preserving discretion to grant asylum in these circumstances allows meritorious asylum seekers to be heard and corrects errors that might have previously occurred.

> *Extending the criminal bars to immigrants convicted of misdemeanor document fraud unfairly punishes low-wage immigrant workers and does not make communities safer.*

---

[87] Ryan Devereaux, "Documents Detail ICE Campaign to Prosecute Migrant Parents as Smugglers," *The Intercept*, April 29, 2019, https://theintercept.com/2019/04/29/ice-documents-prosecute-migrant-parents-smugglers/ (describing how in May 2017, the Department of Homeland Security set out to target parents and family members of unaccompanied minors for prosecution).

[88] Proposed Rules at 69648.

The Proposed Rules expand the asylum bar to include any asylum seeker who has been convicted of a misdemeanor offense for use of a fraudulent document. In so doing, the Rule entirely ignores the migration-related circumstances that often give rise to convictions involving document fraud. Migrants fleeing persecution often leave their home countries with nothing but the clothes on their backs and must rely on informal networks to navigate their new circumstances.[89] Extension of a blanket bar to asylum seekers who are compelled to resort to fraudulent means to enter the United States, or to remain safely during their applications for asylum, upends decades of settled law directing that violations of law arising from an asylum applicant's manner of flight should constitute only one of many factors to be consulted in the exercise of discretion.[90]

Moreover, migrants in vulnerable communities who are struggling to survive during the pendency of their asylum proceedings are often exploited by unscrupulous intermediaries who offer assurances and documentation that turn out to be fraudulent.[91] Many noncitizens working in the low-wage economy face egregious workplace dangers and discrimination and suffer retaliation for asserting their rights.[92] The continued availability of asylum to low-wage immigrant workers can encourage them to step out of the shadows. The expansion of criminal asylum bars to sweep in all document fraud offenses, on the other hand, would unfairly prejudice immigrants with meritorious asylum claims and force them deeper into the dangerous informal economy.

> *The Proposed Rules will harm communities with overlapping vulnerabilities, including LGBTQ asylum seekers, survivors of trafficking, and survivors of domestic violence.*

The Proposed Rules exclude from asylum protections countless members of vulnerable communities who have experienced trauma, abuse, coercion, and trafficking. Many of these individuals may only become aware of their ability to apply for asylum after law enforcement encounters that lead them to service providers who can educate them about their immigration options. Despite the unique difficulties they face, the Proposed Rules would compound their harm and prevent them from achieving family unification and a pathway to citizenship.

The Proposed Rules pose a unique threat to LGBTQ immigrant community members. LGBTQ immigrants in particular may have already experienced a high degree of violence and

---

[89] *See Pula*, 19 I.&N. Dec. at 474.

[90] *Id.*

[91] See American Bar Association, "About Notario Fraud," July 19, 2018, https://www.americanbar.org/groups/public_interest/immigration/projects_initiatives/fight-notario-fraud/about_notario_fraud/.

[92] Paul Harris, "Undocumented workers' grim reality: speak out on abuse and risk deportation," *The Guardian*, March 28, 2013, https://www.theguardian.com/world/2013/mar/28/undocumented-migrants-worker-abuse-deportation.

disenfranchisement from economic and political life in their home countries.[93] Hate violence towards undocumented LGBTQ immigrants in the United States is already disproportionately higher than for other members of the LGBTQ population.[94] Members of these communities also experience isolation from their kinship and national networks following their migration. This isolation, compounded by the continuing discrimination towards the LGBTQ population at large, leave many in the LGBTQ immigrant community vulnerable to trafficking, domestic violence, and substance abuse, in addition to discriminatory policing practices. The expansion of criminal enforcement and prosecution of undocumented people also harms the LGBTQ immigrant community.[95] The Proposed Rules will therefore have a disparate impact on LGBTQ individuals whose involvement in the criminal legal system is often connected to past trauma and/or the result of biased policing.

The expansion of asylum bars to include various misdemeanor offenses that were not previously considered particularly serious also unfairly sweeps trafficking survivors into its dragnet. It is becoming more widely recognized across state court systems that trafficking survivors frequently come into contact with intervention resources and service providers only after contact with law enforcement occurs. Innovative criminal justice reform efforts currently being adopted across the country include special trafficking courts that recognize the need for discretion in the determination of criminal culpability.[96] The same approach should be employed in the determination of asylum eligibility, where the applicant's life and safety are on the line.

The Proposed Rules instead preclude asylum adjudicators from conducting a trauma-centered approach, categorically barring countless trafficking survivors convicted of misdemeanor and felony offenses without any opportunity to present the specific circumstances of their claim.

Survivors of domestic violence include trafficking survivors and LGBTQ community members, such that inclusion of offenses related to domestic violence in the expanded asylum

---

[93] See Aengus Carroll and Lucas Ramon Mendos, *State Sponsored Homophobia: A World Survey of Sexual Orientation Laws: Criminalisation, Protection and Recognition* 12th Ed. (International Lesbian, Gay, Bisexual, Transgender, and Intersex Association (ILGA), 2017), https://ilga.org/downloads/2017/ILGA_State_Sponsored_Homophobia_2017_WEB.pdf.

[94] See Sharita Gruberg, "LGBTQ Undocumented Immigrants Face an Increased Risk of Hate Violence," *Center for American Progress*, June 10, 2014, https://www.americanprogress.org/issues/immigration/news/2014/06/10/91233/lgbt-undocumented-immigrants-face-an-increased-risk-of-hate-violence/.

[95] See eg., Sharita Gruberg, "How Police Entanglement with Immigration Enforcement Puts LGBTQ Lives at Risk," *Center for American Progress*, April 12, 2017, https://www.americanprogress.org/issues/lgbtq-rights/reports/2017/04/12/430325/police-entanglement-immigration-enforcement-puts-lgbtq-lives-risk/.

[96] Elise White, et al., "Navigating Force and Choice: Experiences in the New York City Sex Trade and the Criminal Justice System's Response," *Center for Court Innovation*, December 2017 (noting that 78% of participants in the report's study had been arrested, mostly for non-violent, non-prostitution offenses such as *drug possession*).

bars affects populations with overlapping vulnerabilities.[97] The Proposed Rules too broadly categorize domestic violence offenses as particularly serious and sweep both offenders and survivors into their dragnet. The immigration laws extend protections to domestic violence survivors outside of the asylum context, recognizing the complex dynamics surrounding intimate partner violence. Provisions in the Violence Against Women Act allow adjudicators evaluating claims for relief arising thereunder to exercise discretion based on a number of factors and circumstances.[98]  The blunt approach adopted by the Proposed Rules is inconsistent with the approach taken towards survivors elsewhere in the federal immigration statute and does not rely on any evidence-based justification for treating asylum seekers differently.

Moreover, the domestic violence sections of the Proposed Rules include the only categorical bar to asylum for which a conviction is not required. Domestic violence incidents all too often involve the arrest of both the primary perpetrator of abuse and the survivor.[99] These "cross-arrests" do not always yield clear determinations of victim and perpetrator. Authorizing asylum adjudicators to determine the primary perpetrator of domestic assault, in the absence of a judicial determination, unfairly prejudices survivors who are wrongly arrested in the course of police intervention to domestic disturbances.

Finally, the exemption for asylum applicants who can demonstrate their eligibility for a waiver under section 237(a)(7)(A) of the Immigration and Nationality Act does not cure the harm to asylum seekers caused by imposition of a categorical domestic violence related bar.[100] Rather, it converts a non-adversarial asylum proceeding into a multi-factor, highly specific inquiry into culpability based on circumstances that may be very difficult for an asylum seeker to prove—especially if proceeding without counsel and with limited English proficiency.

---

[97] Marty Schladen, "ICE Agents Detain Alleged Domestic Violence Victim," *El Paso Times*, February 16, 2017, https://www.elpasotimes.com/story/news/2017/02/15/ice-detains-domestic-violence-victim-court/97965624/ (noting that the immigrant detained, a transgender person previously deported following her conviction for crimes such as posession of stolen mail and assault, was then living at the Center Againts Sexual and Family Violence, a shelter for survivors of intimate partner violence).

[98] Nadine Shaanta Murshid and Elizabeth A. Bowen, "A Trauma-Informed Analysis of the Violence Against Women Act's Provisions for Undocumented Immigrant Women," *Violence Against Women* 24(13) (2018): 1540–1556, https://doi.org/10.1177/1077801217741991.

[99] David Hirschel, et al., "Domestic Violence and Mandatory Arrest Laws: To What Extent Do They Influence Police Arrest Decisions," *Journal of Criminal Law & Criminology* 98, no. 1 (2007-2008): 255, https://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?article=7284&context=jclc (noting that "[i]n some cases, dual arrests may be the result of legislation, department policies, or both failing to require officers to identify the primary aggressor. In addition, when such provisions are present, police may lack the training or information needed to identify the primary aggressor when responding to a domestic violence assault. This situation may be compounded by batterers who have become increasingly adept at manipulating the criminal justice system, and may make efforts to 'pre-empt' victims from notifying police in order to further control or retaliate against them.").

[100] 8 U.S.C. § 1227(a)(7)(A).

AR.08601

*Barring asylum for immigrants convicted of "gang-related crimes" based on unreliable evidence and racially disparate policing practices is harmful to youth of color and does not make communities safer.*

In recent years, the expansion of gang databases for use in the apprehension and removal of foreign nationals—including children—has generated tremendous concern among advocates and the communities they serve.[101] The use of gang databases by local law enforcement and Immigration and Customs Enforcement has been widely criticized as an overbroad, unreliable and often biased measure of gang membership and involvement.[102] The Proposed Rules expand the criminal bars to asylum to those accused of gang involvement in the commission of minor criminal offenses, embracing an open-ended adjudicative process that will inevitably result in asylum adjudicators relying unfairly on these discredited methods of gang identification. This outcome would compound the disparate racial impact of inclusion in gang databases and bar asylum seekers who are themselves fleeing violence from gangs in their home countries.[103]

Past legislative efforts to expand the grounds of removal and inadmissibility in the Immigration and Nationality Act to include gang membership have failed to pass both houses of Congress.[104] In addition, immigration adjudicators already routinely premise discretionary denials of relief or release on bond on purported gang membership, and scores of alleged gang members have already been deported on grounds related to immigration violations or criminal convictions for which no relief is available.[105] Creating a "gang-related crime" bar will only exacerbate the due process violations already occurring as the result of unsubstantiated information about supposed gang ties.[106]

---

[101] *See* Nermeen Arastu, et al., "Swept Up In The Sweep: The Impact of Gang Allegations on Immigrant New Yorkers," *New York Immigration Coalition (NYIC) and CUNY School of Law's Immigrant and Non-citizen Rights Clinic*, May 2018, https://www.law.cuny.edu/wp-content/uploads/page-assets/academics/clinics/immigration/SweptUp_Report_Final-1.pdf.

[102] Ali Winston, "Marked for Life: U.S. Government Using Gang Databases to Deport Undocumented Immigrants," *The Intercept*, August 11, 2016, https://theintercept.com/2016/08/11/u-s-government-using-gang-databases-to-deport-undocumented-immigrants/.

[103] *See* Jonanthan Blitzer, "How Gang Victims Are Labeled As Gang Suspects," *The New Yorker*, January 23, 2018, https://www.newyorker.com/news/news-desk/how-gang-victims-are-labelled-as-gang-suspects.

[104] *See* Jessica Chacon, "Whose Community Shield?: Examining the Removal of the 'Criminal Street Gang Member,'" *University of Chicago Legal Forum* 317 (2007: 333-336) (reviewing legislative history of failed efforts to expand removability of those accused of gang related offenses and noting criticism that "[t]he only legal effect of the proposed legislation would be to increase the number of noncitizens lawfully present who would be subject to removal on the basis of their purported associations with individuals involved in group criminal activity.").

[105] For an illustration of Immigration and Customs Enforcement's propensity to make gang allegations on the basis of questionable if not fabricated evidence, and the deference to which the evidence is often granted by immigration adjudicators, *see* Mark Joseph Stern, "Bad Liars," *Slate*, May 16, 2018, https://slate.com/news-and-politics/2018/05/federal-judge-accused-ice-of-making-up-evidence-to-prove-that-dreamer-was-gang-affiliated.html.

[106] See Yvette Cabrera, "New ICE Tactic Raises Questions About Due Process," *ThinkProgress*, October 6, 2017, https://thinkprogress.org/ice-targets-gangs-6775356473a8/; Rebecca Hufstader, "Immigration Reliance On Gang Databases: Unchecked Discretion And Undesirable Consequences," 90 *New York University Law Review* 90 (2015): 671.

AR.08602

In addition, by focusing on "reason to believe" as the basis for the bar, rather than the seriousness of the crime, the proposed provision is ultra vires and unconscionably limits the eligibility for asylum of those most in need of protection. The effect of the Proposed Rules would be to expand the number and type of convictions for which an analysis of eligibility is required, sweeping in even petty offenses that would otherwise not trigger immigration consequences. Thus, an asylum applicant convicted of simple assault without use of a weapon, a non-violent property crime, or even possession of under 30 grams of marijuana for personal use (otherwise exempted from the reach of the Proposed Rule), could trigger a bar to asylum if the adjudicator concludes she has "reason to believe" the offense was committed in furtherance of gang activity.[107] In making these determinations, asylum adjudicators would be unable to rely on uncorroborated allegations contained in arrest reports, but could nevertheless shield their decisions by relying on discretion.[108]

The Proposed Rules thus invite extended inquiry into the character of young men of color who otherwise have meritorious asylum claims, based on information gained through racially disparate policing practices. These rules multiply the harm to asylum seekers of color subject to racially disparate policing that results in racially disparate rates of guilty pleas to minor offenses. This same population is overrepresented in gang databases, which are notoriously inaccurate, outdated, and infected by racial bias.[109]

## VIII.    The Proposed Rules are ultra vires to the federal immigration statute to the extent they purport to bar eligibility through a categorical exercise of discretion

When Congress speaks clearly through a statute, the plain meaning of that statute governs.[110] Congress by statute permits the Attorney General to designate certain categories of offenses as "particularly serious crimes."[111] As such, Congress *explicitly* permitted the Attorney General to designate a non-aggravated felony to be a particularly serious crime and thus disqualify a person from asylum. In the context of asylum, all aggravated felonies are *per se*

---

[107] Page 69649 of the Proposed Rules notes that the applicable standard for determining when to apply the bar on asylum seekers convicted of a crime involving criminal street gangs is "reason to believe," as used in 8 U.S.C. § 1182(a)(2)(c), and that the asylum adjudicator may consider "all reliable evidence" in making their decision.

[108] *See Garces v. U.S. A.G.*, 611 F.3d 1337, 1349-50 (11th Cir 2010) (reversing finding of "reason to believe" that the respondent was a participant in drug trafficking based on unsubstantiated arrest reports); *Matter of Rico*, 16 I.&N. Dec. 181, 185-86 (BIA 1977) (relying on pre-hearing admissions to uphold finding of inadmissibility).

[109] Annie Sweeney and Madeline Buckley, "Chicago police gang data collection faulted by city's inspector general as unchecked and unreliable," *Chicago Tribune*, April 11, 2019, https://www.chicagotribune.com/news/breaking/ct-met-chicago-police-gang-data-04112019-story.html; Anita Chabria, "A routine police stop landed him on California's gang database. Is it racial profiling?," *Los Angeles Times*, May 9, 2019, https://www.latimes.com/politics/la-pol-ca-california-gang-database-calgang-criminal-justice-reform-20190509-story.html.

[110] See, *e.g.*, *Robinson* v. *Shell Oil Co.*, 519 U.S. 337, 340 (1997).

[111] 8 U.S.C. § 1158(b)(2)(B)(ii).

particularly serious crimes and the Attorney General "may designate by regulation [other] offenses that will be considered to be" a particularly serious crime for purposes of asylum.[112]

Here, however—seemingly in an attempt to insulate the Proposed Rules from review, the agencies attempt to designate new bars to asylum both by designating them as "particularly serious crimes" pursuant to 8 U.S.C. § 1158(b)(2)(B)(ii) and rendering them categorically exempt from a positive discretionary adjudication of asylum pursuant to 8 U.S.C. § 1158(b)(2)(C). This effort is unlawful. Section 1158(b)(2)(B)(ii) does permit the Attorney General to, if he wishes, attempt to designate some classes of offenses as particularly serious crimes; such designations are reviewable for legal error (and as explained above, the commenters believe these expansions are unlawful).[113] However, if the offense is not a particularly serious crime, then a discretionary decision must be rendered on the application. It is true that the Attorney General may also provide for "additional limitations and conditions" on asylum applications so long as they are "consistent" with the with the asylum statute.[114] In this case, however, the Proposed Rules add sweeping categories of offenses that automatically remove an applicant from the consideration of discretion—a regulatory proposal that is ultra vires to the plain text of the statute.

To the extent that the proposed rules would adopt a bar to asylum based on a categorical discretionary bar, rather than a particularly serious crime designation, they are similar to the rules struck down by numerous Circuit Courts of Appeal in the context of adjustment of status for those considered by law to be "arriving aliens." Purporting to exercise discretion categorically, then-Attorney General Reno putatively rendered that class of noncitizens ineligible for adjustment of status, a determination that is ordinarily discretionary, even though the statute seemed to allow eligibility. Multiple Circuit Courts of Appeal struck down the proposed regulations, finding them to reflect an impermissible reading of the statute in light of the fact that Congress carefully defined in the statute the categories of people eligible to apply for adjustment of status.[115]

---

[112] *Id.* The Attorney General has not designated "substantial battery" to be a particularly serious crime for any purpose, including for purposes of ineligibility to seek asylum.

[113] 8 U.S.C. § 1252(a)(2)(D).

[114] 8 U.S.C. § 1158(b)(2)(C); *see also* 8 U.S.C. § 1158(d)(5)(B).

[115] The First and Ninth Circuits found the regulations contrary to clear statutory command. *Succar v. Ashcroft*, 394 F.3d 8, 29 (1st Cir. 2005); *Bona v. Gonzales*, 425 F.3d 663, 668-71 (9th Cir. 2005). Other courts invalidated the adjustment regulations under "Step Two" of *Chevron*. Those courts found some ambiguity in the statute, but found a per se discretionary bar not based on a permissible construction of the eligibility standards set forth in the governing statute in light of the statutory scheme and congressional intent. *Zheng v. Gonzales*, 422 F.3d 98, 116-20 (3d Cir. 2005) (invalidating regulation precluding category of people from applying to adjust status "[g]iven Congress's intent as expressed in the language, structure, and legislative history of INA section 245 [8 U.S.C. § 1255]"); *Scherer v. United States Attorney General*, 445 F.3d 1311, 1321-22 (11th Cir. 2006). This reasoning would likewise be applicable to the proposed rule. Where Congress went through the trouble to create a comprehensive statutory scheme to define asylum eligibility, the agency cannot preempt that in the guise of discretion by creating out of whole cloth a separate set of eligibility criteria.

AR.08604

The same logic applies here. In the asylum statute, Congress explicitly made the commission of a particularly serious crime a bar to asylum. The canon of interpretation known as *expressio unius est exclusio alterius* instructs that,"expressing one item of [an] associated group or series excludes another left unmentioned."[116] The Proposed Rules attempt to create numerous categories of discretionary "pseudo-particularly serious crimes," barring asylum through a categorical exercise of discretion even if those offenses are ultimately found not to be particularly serious crimes. Such an effort violates this canon of interpretation, and places the Proposes Rules ultra vires to the statute.

## IX.    Conclusion

Moving forwarding with these regulations will do a great disservice to our nation. Immigrants are the lifeblood of our country. We need to ensure that our borders remain open and our asylum system fair and accessible to all who need protection.

Sincerely,

Elissa Steglich, Esq.

---

[116] *United States* v. *Vonn*, 535 U.S. 55, 65 (2002).

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9egc-hgrm
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0130
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Anonymous Anonymous

## General Comment

This proposed rule would inject racial profiling into the asylum process and put asylum seekers at risk of danger even death.

AR.08606

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9egc-63ne
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0131
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Noam Brown

## General Comment

I would like to express my strong disapproval of this proposed new asylum rule which is aimed at broadening the scope of cases barred from getting their asylum cases heard. Barring asylum seekers who have been charged but not convicted of any crime, for example, is unjust and further breaks down the extremely important asylum laws already on the books meant to protect people escaping horrific and often life threatening conditions in their home countries.

AR.08607

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9egd-4mus
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0132
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Catherine Byrne

## General Comment

I object to the rule change proposed because it injects racial profiling.

AR.08608

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9ege-aqbo
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0133
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Carolyn Tacke
**Address:**
    Wellfleet, MA, 02667
**Email:** latack@comcast.net
**Phone:** 5083493668

## General Comment

I can't believe I am living in a first-world country that is rapidly becoming an elitist, white-supremacist nation.
To treat asylum-seekers as criminals is criminal. And to send them back to the situations that put them in crisis
is, in essence sentencing them to death.
Here in the "Land of the Free & the Home of the Brave", where everyone but Native American Indians has
descended from immigrants, we should not be screening for just the "cream", but taking the poor, the huddled
masses yearning to be free. Give them the chance to rise to their full potential. Look to Melanija Knavs, born in
Novo Mesto, Sloveniaour and married into citizenship to become our First Lady.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9ege-yj5s
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0134
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Bill Swartzendruber

---

## General Comment

I am opposed to the proposed rule making. We are a country built on the principles of equal rights for all. This rule change would introduce racial profiling into the asylum process and deny protection to the most vulnerable people when they need it the most. I have good friends who have minor noncriminal offenses who are denied documentation in spite of living an exemplary life of responsibility and family life,working hard to support themselves and paying taxes. I oppose making it more difficult for people to reach safety in our country.

AR.08610

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9ege-5ulg
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0135
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Elizabeth Corcoran

---

## General Comment

We need to preserve asylum as a way for people to escape harmful situations, even if they have or will have contact with the legal system.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9ege-e1q8
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0136
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Martha Schmitz
**Address:**
  14 Greentree Drive
  Phoenix,  MD,  21131
**Email:** mamasch@hotmail.com

---

## General Comment

I would like to express my passionate opposition to the proposed rule change laid out in EOIR Docket No. 18-0002 by the Executive Office for Immigration Review, Department of Justice; U.S. Citizenship and Immigration Services, Department of Homeland Security.

I am a U.S. citizen with years of experience working on human rights in Guatemala, a country from which many have been forced to flee, often as a direct consequence of U.S. policy that engenders poverty, corruption, genocide, criminalization and assassinations. I am deeply concerned that those fleeing violence continue to encounter further discrimination, racial profiling and criminalization at the hands of the above-named departments upon their entry into the U.S.

This proposed rule flies in the face of U.S. law, which commits to protecting refugees. It criminalizes, rather than welcomes those seeking asylum. It is part of a host of cruel policies imposed by the administration, which place those seeking refuge and safety into situations of further abuse and danger. Asylum seekers already face unjust obstacles and this further criminalizes them.

The U.S. justice and carceral system already suffer from deep problems with injustice and racial profiling. It is a travesty to subject immigrants to that system, then to deport them to their countries of origin, where they likely face threats to their life -- again, often thanks to U.S. government and business interests that have caused instability and propped up racist, violent, corrupt, narco-trafficking governments from which many are forced to flee.

This proposed rule change is deeply cruel and immoral and further drives a system of mass incarceration/deportation, wielded almost exclusively against communities of color. We must make changes to

AR.08612

create an immigration system that honors the humanity of each person.

AR.08613

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9ege-sw5k
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0137
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Nicole Morse

## General Comment

I am commenting to express my deep opposition to this proposed rule change. For people seeking asylum, a denial of asylum can be a death sentence, a punishment completely disproportionate to the crimes that this proposed rule would address. Additionally, people seeking asylum should have the right to be considered innocent until proven guilty, and should not be denied asylum based on an accusation. The United States should be a place of freedom, second chances, and justice with mercy. This proposed rule change violates the spirit of the constitution and would be a black mark upon our history.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9ege-dd7i
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0138
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Anna Cupito

## General Comment

I strongly urge EOIR to reconsider this rule. It will cause irreparable harm to families and the American communities in which they reside. The right to seek asylum is enshrined in both international law, and in the values that guide our countries. This proposal would put people in immediate danger of their lives, by deporting them to countries from which they fled. Over-policing and racial profiling of ethnic minorities is a well-documented fact, and further victimizing individuals seeking legal protections in this country based on past convictions is unhelpful. By and large, immigrant communities commit crimes at lower rates than native-born populations, and are an overall asset to the economies of the areas where they reside. Barring an individual from seeking asylum because of any sort of involvement in a deeply flawed, structurally racist criminal justice system will only cause more harm. It will not make our country, our communities, or our families safer.

AR.08615

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9ege-7rm3
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0139
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Lucy Duff
**Address:**
    9210 Fowler Ln
    Lanham,  MD,  20706-2454
**Email:** lucyduff@comcast.net
**Phone:** 3015772350

## General Comment

I would reject the proposed changes to the asylum eligibility rule.
The proposed rule would inject racial profiling into the asylum process, and so endanger even more people seeking asylum.
The United States should be a place of refuge from violence, starvation,poverty, or persecution.

AR.08616

# PUBLIC SUBMISSION

| |
|---|
| **As of:** January 22, 2020 |
| **Received:** January 15, 2020 |
| **Status:** Posted |
| **Posted:** January 15, 2020 |
| **Tracking No.** 1k4-9egf-eqsp |
| **Comments Due:** January 21, 2020 |
| **Submission Type:** Web |

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0140
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Kevin Dixler
**Address:**
   542 S. Dearborn St.
   Suite 590
   Chicago,  IL,  60605-1573
**Email:** kd@dixler.com
**Phone:** 3125880500

---

## General Comment

The proposed rule overlooks why asylum exists. The reason is corruption and the use of crime and immoral conduct to deter liberty and justice. Criminal cartels and gangs have significant control over politicians in too many nations. That means that those persecuted are often targeted for a variety of reasons. To impute alleged crime upon those who flee will allow their persecutors to summon them back to be used as an example.

I have practiced immigration law for over 25 years. I have taught other attorneys how to practice immigration law in National Conferences.

The proposed regulations are woefully vague and are fraught with vague and unclear language. In essence, they overlook how corrupt nations politicians and supporters criminalize their opponents in order to cause others to threaten beat, injure and kill them based upon their 'actual' and 'perceived' beliefs. This defeats the purpose of why asylum laws exist. That is, to protect those with a well founded fear of persecution on account of politics, race, religion, and/or particular social group.

The proposed regulations seem in direct conflict with the Immigration and Nationality Act, provided, regulators take a step back and consider how criminals through politicians, and corrupted law enforcement, persecute others.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9egf-n7ys
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0141
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

"Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution."
"This proposed rule would inject racial profiling into the asylum process. This latest attack would put even more people seeking asylum at risk of danger - and death. This would in turn eviscerate one of the most important defenses community members have against deportation."
"I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them."

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9egg-8321
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0142
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Haley Millner

---

## General Comment

See attached document.

---

## Attachments

2020-01-15 Haley Millner Comment on Asylum Criminal Bars Proposed Rule

AR.08619

*Submitted via https://www.regulations.gov/document?D=EOIR-2019-0005-0001*

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87,
1615-AC41; Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and
Bars to Asylum Eligibility

January 15, 2020

To Whom it May Concern:

I am writing in a personal capacity in response to the above-referenced Proposed Rules to
express my strong opposition to the Proposed Rules to amend regulations relating to eligibility
for asylum published in the Federal Register on December 19, 2019.

For the reasons detailed in the comments that follow, the Department of Homeland
Security and the Department of Justice should immediately withdraw their current proposal, and
instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair
access to asylum protections in the United States.

As an immigration attorney, I work with individuals daily who will be seriously
prejudiced by this rule. I represent many asylum-seekers with criminal records and have seen
how the legal system already unfairly holds minor arrests or convictions from many years ago
against them. The immigration laws and regulations do not need to be harsher when it comes to
criminal records; they need to be more forgiving.

One aspect of the proposed regulations that I find particularly troubling is the fact that
adjudicators will have to try to re-litigate criminal convictions to determine whether they involve
vague and amorphous qualities. In two significant ways, the Proposed Rules require immigration
adjudicators to engage in decision-making to determine whether an asylum applicant's
conduct—considered independently of any criminal court adjudication—triggers a categorical
bar to asylum eligibility. First, the agencies propose that immigration adjudicators be allowed to
consider "all reliable evidence" to determine whether there is "reason to believe" an offense was
"committed for or related to criminal gang evidence," or "in furtherance of gang-related activity,
triggering ineligibility for asylum in either case. Second, the Proposed Rules permit immigration

adjudicators to "assess all reliable evidence in order to determine whether [a] conviction amounts to a domestic violence offense;" and to go even further by considering whether non-adjudicated *conduct* "amounts to a covered act of battery or extreme cruelty."

Requiring adjudicators to make complex determinations regarding the nature and scope of a particular conviction or, in the case of the domestic violence bar, *conduct*, will lead to massive judicial inefficiencies and slanted "mini-trials" within the asylum adjudication process. The scope of the "reliable evidence" available to adjudicators in asylum cases is potentially limitless; advocates on both sides would be obligated to present fulsome arguments to make their cases about gang connections to the underlying activity or the relationship of the asylum applicant to the alleged victim. Because of the lack of robust evidentiary rules in immigration proceedings, it will be difficult if not impossible for many applicants to rebut negative evidence marshaled against them, even if false; and in other cases, asylum applicants will struggle to find evidence connected to events that may have happened years prior (especially for those detained). Asylum trials, which are typically three or fewer hours under current policies, would provide insufficient time to fully present arguments on both sides of these unwieldy issues.

These mini-trials would result in an egregious waste of judicial resources. Even as the laws and regulations stand today, judges have to expend significant time determining whether a respondent's crime meets the "particularly serious crime" bar to asylum. My law firm has been asked numerous times to brief the issue of whether the respondent committed a particularly serious crime, which added delays to the respondents' cases and required the judge to spend time reviewing the briefs submitted and evaluating this issue. As the immigration courts contend with backlogs that now exceed one million cases, tasking adjudicators with a highly nuanced, resource-intensive assessment of the connection of a conviction to gang activity and/or the domestic nature of alleged criminal conduct—assessments far outside their areas of expertise—will prolong asylum proceedings and invariably lead to erroneous determinations that will give rise to an increase in appeals. The Proposed Rules repeatedly cite increased efficiency as justification for many of the proposed changes. Yet requiring adjudicators to engage in mini-trials to determine the applicability of categorical criminal bars, rather than relying on adjudications obtained through the criminal legal system, will dramatically *decrease* efficiency in the asylum adjudication process.

Indeed, the Supreme Court has "long deemed undesirable" exactly the type of "post hoc investigation into the facts of predicate offenses" proposed by the agencies here. Instead, for more than a century the federal courts have repeatedly embraced the "categorical approach" to determine the immigration consequence(s) of a criminal offense, wherein the immigration adjudicator relies on the statute of conviction as adjudicated by the criminal court system, without relitigating the nature or circumstances of the offense in immigration court. As the Supreme Court has explained, this approach "promotes judicial and administrative efficiency by precluding the relitigation of past convictions in minitrials conducted long after the fact." In *Moncrieffe v. Holder*, the Court forewarned of exactly the sort of harm that would arise from these Proposed Rules; in that case, the Court rejected the government's proposal that immigration adjudicators determine the nature and amount of remuneration involved in a marijuana-related conviction, noting that "our Nation's overburdened immigration courts" would end up weighing evidence "from, for example, the friend of a noncitizen" or the "local police

officer who recalls to the contrary," with the end result a disparity of outcomes depending on the whims of the individual immigration judge and a further burdened court system.

Particularly in the context of the new proposed bar related to alleged gang affiliation, I am concerned that creating a blanket exclusion for anyone who is convicted of a crime – including a misdemeanor – that an immigration adjudicator deems linked to gang activity will erroneously prevent bona fide asylum seekers from receiving protection. This rule confers on immigration adjudicators—who generally are not criminologists, sociologists, or criminal law experts—the responsibility to determine if there is "reason to believe" any conviction flows from activity taken in furtherance of gang activity. This rule will necessarily ensnare asylum seekers of color who have experienced racial profiling and a criminal legal system fraught with structural challenges and incentives to plead guilty to some crimes, particularly misdemeanors. These same individuals are vulnerable to being erroneously entered into gang databases. Such databases are notoriously inaccurate, outdated, and infected by racial bias. I have heard of asylum-seekers being identified as having gang ties just because of the brand and style of shoes that they wore; I fear that the proposed regulation will encourage adjudicators to cast an even wider net when it comes to identifying alleged gang members.

Indeed, asylum applicants are *already* frequently subjected to wrongful denials of protection because of allegations of gang activity made by the Department of Homeland Security on the basis of information found in notoriously unreliable foreign databases and "fusion" intelligence-gathering centers outside the United States. Empowering immigration adjudicators to render asylum applicants *categorically* excluded from protection on the basis of such spurious allegations will inevitably result in the return of many refugees back to harm.

The Departments curiously argue that all gang-related offenses should be construed as "particularly serious crimes." They cite statistics from up to 16 years ago in an attempt to make the point that gang members commit violent crimes and drug crimes. They then make the illogical leap to the conclusion that *all crimes*—including misdemeanor property crimes—that may be construed as connected to gang activity are particularly serious. This simply does not follow; in fact, the Proposed Rules will inevitably result in the exclusion from protection of asylum seekers of color who live in economically distressed communities and have obtained a minor conviction such as a property crime. Relying on the definition of "particularly serious crime" to prevent asylum seekers convicted of even minor crimes construed as gang-related from accessing asylum protection is disingenuous at best, and tinged with racial animus at worst.

The Departments asks for comments on: (1) what should be considered a sufficient link between an asylum seeker's underlying conviction and the gang related activity in order to trigger the application of the proposed bar, and (2) any other regulatory approaches to defining the type of gang-related activities that should render individuals ineligible for asylum. The premise of these questions is wrong: a vague "gang related" bar should not be introduced at all. The Immigration and Nationality Act and existing regulations already provide overly broad bars to asylum where criminal behavior by an asylum seeker causes concern by an adjudicator. Adding this additional, superfluous layer of complication risks erroneously excluding bona fide asylum seekers from protection without adding any useful adjudicatory tool to the process.

I urge the Department to withdraw its current proposal, because it threatens to harm many immigrants with criminal histories who have already moved forward with their lives and rehabilitated themselves. I do not think that someone's minor past mistakes should be held against them for the rest of their lives. I ask that the Department show some compassion for these individuals, who have already suffered so much even before making it to the United States. They deserve the opportunity to seek asylum.

Please do not hesitate to contact me at haley@oakimmigration.com to provide further information.

Sincerely,

Haley Millner
Attorney at Law

Law Office of Helen Lawrence
Oakland, CA

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9egg-fl3p
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0143
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Bruce Hartford

## General Comment

I strongly oppose this blatant effort to prevent refugees and people under dire threat from seeking asylum in America. We have always been a haven for those fleeing persecution, systemic abuse, and threat of racial, gender, religious, or political violence -- and we have been richer for it. This rule is just one more instance of a racist, white-nationalist assault on and discrimination against people of color by Lord Trump and his Republican Party. We have always been a multi-racial nation and I oppose all their efforts to legally impose their white-supremacist agenda on my country. America was formed and built by immigrants from around the world and our society has greatly benefited from our mixture of cultures and races. I stand with the Statue of Liberty: "Give me your tired, your poor, Your huddled masses yearning to breathe free, The wretched refuse of your teeming shore. Send these, the homeless, tempest-tossed to me, I lift my lamp beside the golden door."

AR.08624

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9egg-chqk
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0144
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

I am opposed to the proposed rule change regarding asylum seekers.

I believe our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights.

However, a proposed rule change would hurt many asylum seekers. The rule change would bar many people from seeking asylum based on contact with the U.S.'s flawed criminal legal system.

This proposed rule would inject racial profiling into the asylum process and put asylum seekers at risk of danger even death. It's no secret that racial profiling and obstacles to equal justice run rampant in the criminal legal system. Under this rule change, asylum seekers who have been convicted of almost any crime or accused of gang involvement could be punished a second time by being barred from asylum and deported back to the very life-threatening situation they fled. And judges would be powerless to help.

Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution.
This proposed rule would inject racial profiling into the asylum process. This latest attack would put even more people seeking asylum at risk of danger - and death. This would in turn eviscerate one of the most important defenses community members have against deportation.

I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.

Again, I am opposed to this proposed rule change.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9egg-qjti
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0145
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Cristina Martinez

---

## General Comment

Lauren Alder Reid, Assitant Director
Office of Policy, EOIR
5107 Leesburg Pike, Suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
USCIS
DHS
20 Massachusetts Ave. NW
Washington, DC 20529-2140

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41;
Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility

January 15, 2020

To Whom It May Concern:

I am writing in response to the above-referenced Proposed Rules to express my strong opposition to the Proposed
Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19,
2019.

The proposed changes constitute an unnecessary, harsh, and unlawful gutting of the asylum protections enshrined
in the United States and International law. They are unnecessarily cruel and will serve as a barrier to safety for
many who feel hopeless and cannot find safety in their home country. So many have already been denied asylum
and sent back to their home countries where they inevitably face the same dangers that forced them to flee.

AR.08626

Adding a fee requirement will prevent those who did not have the opportunity to properly prepare before leaving from applying. Adding additional criminal statutes that prevent asylum seekers from applying only further deters people from finding safety. While the safety of our nation is important, the criminal statute barriers do not focus on safety but rather effects nonviolent offenders disproportionally.

Immigration adjudicators already have vast discretion to deny asylum to those who meet the refugee definition but have been convicted of criminal conduct. Further categorical bars are not needed. The agencies' efforts to add seven new sweeping categories of barred conduct to the asylum eligibility criteria are unnecessary and cruel. The Proposed Rules drain the phrase "particularly serious crime," 8 U.S.C. 1158, of any sensible meaning.

The Proposed Rules are also arbitrary and capricious. They would constitute a marked departure from past practice. And the agencies have proffered no evidence or support these changes.

One assumption fundamentally underlying the Proposed Rules, for example, is that every noncitizen convicted of any offense punishable by more than a year in prison necessarily constitutes a danger to the community. But no evidence is provided to support that assumption, and a criminal record, does not, in fact, reliably predict future dangerousness. The Proposed Rules are so capricious as to peremptorily postulate a noncitizen's supposed danger to the community even in circumstances when a federal, state or local judge has concluded that no danger exists by, for example, imposing a noncustodial sentence. A conviction for a crime does not, without more, make one a present or future danger--which is why the Refugee Convention's particularly serious crime bar, made part of United States law through 8 U.S.C. 1158, should only properly apply if both (a) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows that she is a present or future danger.

The asylum protections provided by Unites States law are sacred. Asylum provides those fleeing horrors with physical safety, a path to citizenship and security, and the opportunity to reunite with immediate family members who may still remain abroad in danger. Many see the domestic asylum system as a symbol of the United States' commitment never to repeat its failure to save thousands of Jewish refugees refused entry to the United States on the St. Louis ant. d others fleeing the s. Others' foreign policy interests abroad. point to the critical role that domestic asylum policy plays in serving the United States' foreign policy interests abroad. For those individuals seeking asylum in the United States, the stakes could not be higher--a claim denied often means a return to death or brutal persecution.

Adjudicators already have so much discretion that makes it nearly impossible for many who truly fear for their lives to be granted asylum. Adding these proposed rules will only keep countless more from safety and send the message that the United States is no longer a safe haven for those in need.

For the reasons detailed in the comments that follow, the Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal, and instead, dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

Thank you for the opportunity to submit comments on the Proposed Rules. Please do not hesitate to contact me at cmartinez@immigrantlc.org to provide further information.

Sincerely,
Cristina Martinez
Attorney

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9egg-4dwa
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0146
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Anonymous Anonymous

## General Comment

I am against this proposal. It will criminalize immigrants who have already been impacted by our criminal legal system. It harshly expands the number of convictions that would make asylum ineligible. Asylum seekers make our community better!

AR.08628

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9egg-66fp
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0147
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Julia Gittleman

---

## General Comment

I write to express my strong opposition to this proposed rule change. I am a concerned member of the public who believes strongly that our nation must welcome people fleeing violence, and who is strongly concerned about racial profiling in the criminal legal system.

Immigrants are a vital part of my community, my neighborhood, and my state. I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse.

Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.

For these reasons, I call upon the Trump administration to withdraw this proposal.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9egh-tcls
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0148
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Kim Tran

---

## General Comment

Hello, I'm a medical student and a United States citizen located in California writing to oppose the rules expanding asylum bars. I believe that this will further divide families for individuals who have worked really hard to get here and be a productive member of the American society. They have gone through a lot of trauma and as a result, they may have had some misdemeanors. However, they deserve a second chance to recover and stay with their families. We should not be punishing these people for all that they have gone through and endured in their home countries. It is just basic human rights and we need to stand up for them.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9egh-hsxw
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0149
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Milan Chang

## General Comment

Working in the immigration and criminal legal field, I am well aware that existing laws make it all too difficult for asylum seekers to receive the protections they need to ensure their safety and to honor the United States' commitment to refugees fleeing violence. Many of the vulnerable populations who face threats to their safety based on their identities are criminalized for those same qualities by our legal system; to deny asylum on this basis is not only illogical, it is a cruel application of our laws to persecute those most vulnerable among us. I strongly oppose any attempts to gut asylum protections as I believe the proposed changes will gravely endanger human lives and run counter to our country's purported values of justice and equality.

# PUBLIC SUBMISSION

| |
|---|
| **As of:** January 22, 2020<br>**Received:** January 15, 2020<br>**Status:** Posted<br>**Posted:** January 15, 2020<br>**Tracking No.** 1k4-9egh-a73y<br>**Comments Due:** January 21, 2020<br>**Submission Type:** Web |

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0150
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Nathan Mendelsohn

## General Comment

I am writing to express my strong opposition to this rule change. I am a concerned citizen with many loved ones from all over the world, who believes strongly that our nation must welcome people fleeing violence, and who is strongly concerned about racial profiling in the criminal legal system. Immigrants are a vital part of my community in Brooklyn, my social professional and creative lives, and my family.

Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution. Anything less is hypocrisy, short-sighted, and shameful.

U.S. law enshrines the protections of the international Refugee Convention, drafted in the wake of the horrors of World War II. Under the Refugee Act of 1980, passed with bipartisan support, anyone present or arriving in the U.S. can apply for asylum.
For asylum seekers, making it to the U.S. often means they have found safety from persecution, torture, and sometimes death. Yet asylum seekers face many unjust obstacles in the immigration system.

For these reasons, I call upon the Trump administration to withdraw this proposal.

AR.08632

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9egh-1y5m
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0151
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Rebecca Rojas
**Address:**
   2150 Old Orchard Dr
   Marietta,  30068
**Email:** rrojas621@gmail.com
**Phone:** 42305042038

## General Comment

I write to express my concern regarding this new proposed regulation. The rules for obtaining asylum in the United States are already very strict and adequately filter out merit less cases. It is exceedingly difficult to obtain asylum in the United States and most cases are in fact denied. Further, there is already a discretionary factor in all asylum cases that adequately covers these situations. This purpose of the many new regulations is clear: this administration wants to eliminate asylum in the United States. Time and again the administration has made it harder for the people in flight from life-threatening conditions in their homelands, to have meaningful access to seek relief. This regulation is completely unnecessary yet it purpose is clear - it is designed to purposely create an increasingly complex system which will effectively eliminate asylum.

# PUBLIC SUBMISSION

| |
|---|
| **As of:** January 22, 2020<br>**Received:** January 15, 2020<br>**Status:** Posted<br>**Posted:** January 15, 2020<br>**Tracking No.** 1k4-9egh-9gsg<br>**Comments Due:** January 21, 2020<br>**Submission Type:** Web |

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0152
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Patrick Bosold

---

## General Comment

I urge you to NOT move forward with this rule. I have a friend who is slowly making her way through the asylum process, with a claim that is fully justifiable. A rule like this would unjustly harm her and many others like her. Don't do it. Please think about how you would feel, and what you would want, if you were applying for asylum and the consequence of having it denied would be deportation back to a country where you would be facing arrest, imprisonment and possibly even execution due to your religious preferences or political beliefs.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9egh-9jc0
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0153
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Adria Orr

## General Comment

I am writing to raise a strong object to this proposed rule change. As an American who is the child of two immigrants, I believe that immigration is a wonderful benefit to our country and culture. I also believe that we have a responsibility to open our doors to people fleeing violence and persecution, sometimes caused by conflicts that we have caused or worsened through our political and economic machinations.

People who have been through the criminal justice system cannot be automatically sorted into the category of being a 'bad' person. The world doesn't work like that. It's not a binary black and white system. People may have been arrested, convicted, or incarcerated, but that doesn't mean they do not deserve a chance to be safe and seek opportunity in this country. Deportation is a second round of punishment on top of a sentence already served.

We have been on the wrong side of history before, turning away Jewish refugees who were seeking to escape certain death. It seems like we should have learned our lesson, and developed a conscience and values that tell us that those who are fleeing violence, starvation, desperate poverty, and persecution deserve our compassion and assistance. In fact, we acted on those values when we passed the Refugee Act of 1980, with BIPARTISAN support.

As Americans who are proud of our country, we should be proud that people think they can come here and be safe. We should honor the concept of fairness in the process of evaluating and identifying those who need our help. We should not allow discrimination and abuse to play outsize roles in the process of seeking asylum. I ask that the Trump administration withdraw this proposal.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9egi-810o
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0154
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Anna Kaplan

---

## General Comment

I am writing to oppose this rule change.

I believe the proposed changes stand in direct conflict with the founding principles of the United States. I am the great-grandchild of immigrants who fled government violence and unsafe homelands. Their story of immigration is deeply ingrained in my family's values, and these values are reflected in the laws of the United States that have allowed people seek refuge from persecution and torture.

There is no reason to inflict the racist profiling and discrimination of our criminal justice system on asylum seekers. Everyone deserves a chance at finding safety and building community, as my family did several generations ago. Instead of investing in broken institutions that disproportionately impact people of color and poor people, we should direct resources to creating a clear asylum process that recognizes the humanity of all people. I urge the administration to withdraw these proposed changes and consider the immense value that immigrants bring to our communities.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9egi-1s8n
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0155
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Regina Islas
**Address:**
   1369 Hyde St
   56A
   SAN FRANCISCO,  CA,  94109
**Email:** regina.islas@gmail.com
**Phone:** 6504847706

---

## General Comment

The proposed policy change is wrong, it must not pass. Period. Rather devious to rush it through during the holiday.

AR.08637

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9egi-6f71
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0156
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Nicole Joseph

## General Comment

I am writing to oppose the rule. I believe that the United States should be a place people in need can flee from violence or threats to their well being. The reason I was born in the United States and am an active citizen in because my parents had a pathway to citizenship after they immigrated to the US. Choosing to run from the place you know to and take so many risks is hard enough. Let us be a people that openly welcome people as Jesus would and has done. Again I strongly oppose this proposal and believe that it should not be passed in the USA

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9egi-z1rb
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0157
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Crawford MacCallum
**Address:**
    144 Sedillo Hill Rd
    Tijeras,  NM,  87059
**Email:** MCCALLUM@UNM.EDU
**Phone:** 5055739493

## General Comment

Procedures for Asylum and Bars to Asylum Eligibility should be made easier not harder. Asylum seekers should be shown compassion and also welcomed for economic reasons.

AR.08639

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9egj-whmq
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0158
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Catherine Brady

## General Comment

The right to asylum should not be taken away based on any contact at all with the criminal system. Someone who incurs a traffic ticket while awaiting a pending asylum case should not have to fear being detained by ICE. The government should not place these people in a position of being terrified to drive a car, for fear that they might be pulled over and detained for failure to make a complete stop at a stop sign. This constitutes cruel and unusual punishment.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9egj-4gmy
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0159
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Anonymous Anonymous
**Organization:** La Raza Centro Legal

---

## General Comment

I write to express my strong opposition to this proposed rule change. As an LGBT Asylum Seeker, I am writing to say this law can not be implemented because we have many immigrants seeking asylum in this country because our home countries are not good places to live, since we do not feel safe living with so much crime. We come here for fear of being victims. For these reasons, I call upon the Trump administration to withdraw this proposal.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9egj-dj6v
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0160
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Edwin Carmona-Cruz

---

## General Comment

As a co-director at a nonprofit organization, I find these proposed rules incredibly alarming. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights. Without any hesitation, I strongly oppose these rules. This proposed Trump rule would punish people who've already endured mistreatment and racial profiling in the criminal legal system a second time -- with deportation back to the very life-threatening situation they fled. This is profoundly immoral, makes a mockery of due process, and comes right out of Steven Miller's racist playbook. I firmly stand with our communities to pursue their right to a life of dignity and respect, and these proposed rules are the complete opposite of that.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9egk-gwye
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0161
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Devon Persing

## General Comment

Denying asylum to people in danger is a death sentence for many. By condoning this behavior, the administration is signing off on the murder of the most in need.

AR.08643

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9egk-kpx3
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0162
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Misha Seay

---

## General Comment

I write to express my strong opposition and concern about the implications of this proposed rule change.

As a managing attorney at a civil legal aid organization, I also work with immigrant community members daily, and am concerned this rule would put many people in danger.

The barriers to asylum for those previously involved in the criminal legal system are already sweeping in scope; adding more barriers is cruel and unnecessary.

Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution.
U.S. law enshrines the protections of the international Refugee Convention, drafted in the wake of the horrors of World War II. Under the Refugee Act of 1980, passed with bipartisan support, anyone present or arriving in the U.S. can apply for asylum. For asylum seekers, making it to the U.S. often means they have found safety from persecution, torture, and sometimes death. Yet asylum seekers face many unjust obstacles in the immigration system.

The Proposed Rules also cruelly disregards the connections between trauma and involvement in the criminal legal system. Immigration adjudicators already maintain the authority to deny asylum to individuals with drug-related criminal histories on the basis of discretion; denying asylum seekers even the opportunity to present the countervailing factors of their past trauma and potential recovery is simply cruel.

Requiring adjudicators to make complex determinations regarding the nature and scope of a particular conviction or, in the case of the domestic violence bar, conduct, will lead to massive judicial inefficiencies and slanted "mini-trials" within the asylum adjudication process. The scope of the "reliable evidence" available to adjudicators in asylum cases is potentially limitless; advocates on both sides would be obligated to present fulsome arguments to make their cases about gang connections to the underlying activity or the relationship of the asylum applicant to the alleged victim. Because of the lack of robust evidentiary rules in immigration

AR.08644

proceedings, it will be difficult if not impossible for many applicants to rebut negative evidence marshaled against them, even if false; and in other cases, asylum applicants will struggle to find evidence connected to events that may have happened years prior (especially for those detained). Asylum trials, which are typically three or fewer hours under current policies, would provide insufficient time to fully present arguments on both sides of these unwieldy issues.

As the immigration courts contend with backlogs that now exceed one million cases, tasking adjudicators with a highly nuanced, resource-intensive assessment of the connection of a conviction to gang activity and/or the domestic nature of alleged criminal conduct—assessments far outside their areas of expertise—will prolong asylum proceedings and invariably lead to erroneous determinations that will give rise to an increase in appeals. The Proposed Rules repeatedly cite increased efficiency as justification for many of the proposed changes. Yet requiring adjudicators to engage in mini-trials to determine the applicability of categorical criminal bars, rather than relying on adjudications obtained through the criminal legal system, will dramatically decrease efficiency in the asylum adjudication process.

Please do not adopt this awful proposed rule change that is contrary to the values of this nation.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9egk-yauj
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0163
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Ryan Pryor
**Address:**
   29 Williams Street
   Apt. 2
   Northampton,  01060
**Email:** ryanpryor4@gmail.com

---

## General Comment

I write to express my strong opposition to this proposed rule change and its implications for human rights and public health. I am a concerned Certified Nurse Midwife, Registered Nurse and Family Nurse Practitioner who believes strongly that our nation must welcome people fleeing violence, and who is strongly concerned about racial profiling in the criminal legal system. Immigrants are a vital part of my community, my neighborhood, and my state. As a healthcare provider I witness the negative impact of racism, criminalization of immigrants and deportation on clients and their families. This is wrong and preventable- this proposed rule will make things worse. U.S. law enshrines the protections of the international Refugee Convention, drafted in the wake of the horrors of World War II. Under the Refugee Act of 1980, passed with bipartisan support, anyone present or arriving in the U.S. can apply for asylum.
For asylum seekers, making it to the U.S. often means they have found safety from persecution, torture, and sometimes death. Yet asylum seekers face many unjust obstacles in the immigration system. I oppose this proposed rule and any like it. We need to remove barriers to legal paths to citizenship and increase protections for immigrants and this proposed rule would do the opposite, causing suffering, premature death, and increasing preventable health outcomes and health disparities. Thank you.

AR.08646

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9egk-53u7
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0164
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Anonymous Anonymous

## General Comment

I write to express my strong opposition to this proposed rule change.

I am a concerned member of the public who believes strongly that our nation must welcome people fleeing violence, and who is strongly concerned about racial profiling in the criminal legal system. Immigrants are a vital part of my community, my neighborhood, and my state.

U.S. law enshrines the protections of the international Refugee Convention, drafted in the wake of the horrors of World War II. Under the Refugee Act of 1980, passed with bipartisan support, anyone present or arriving in the U.S. can apply for asylum.
For asylum seekers, making it to the U.S. often means they have found safety from persecution, torture, and sometimes death. Yet asylum seekers face many unjust obstacles in the immigration system.

AR.08647

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9egk-jcmg
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0165
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Isobel White

## General Comment

I am strongly opposed to these proposed rules. People asking for asylum are fleeing death, torture, and persecution. You only leave home when home won't let you stay.
"You have to understand,
that no one puts their children in a boat
unless the water is safer than the land
no one burns their palms
under trains
beneath carriages
no one spends days and nights in the stomach of a truck
feeding on newspaper unless the miles travelled
means something more than journey." - by Warshan Shire.
This rule endangers people who may not have committed any crimes or may have committed crimes that harmed no one and simply reflected their determination to be with and protect their families.
Everyone deserves a second chance.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9egk-wyo1
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0166
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Ursula Murphy

## General Comment

I am strongly opposed to the whole of these proposed asylum rules. They restrict asylum protections for people in danger, who are the very people who need it!
The asylum rules have been intended to protect people fleeing from imminent danger, death, torture, and persecution. Our system is already limited and already includes harsh exclusions for past criminal activity.
The administration's proposed rules would make many people who've been victims of corrupt and flawed criminal legal system totally ineligible for asylum.
This rule also endangers people who may not have committed any crimes or may have committed crimes that harmed no one, did not involve moral turpitude, and simply reflected their determination to be with and protect their families.
Asylum is for protecting people from deportation to a place where they are in danger. No one should be abandoned to persecution or torture, regardless of their past mistakes.
When people who fear for their lives are denied asylum, it is the same as sending them to their deaths.

AR.08649

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9egl-ru3c
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0167
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Irina Faber

## General Comment

I strongly oppose to this proposed rule change. I am an Ivy League educated professional, who believes strongly that our nation must welcome people fleeing violence, and who is strongly concerned about racial profiling in the criminal legal system.
Immigrants are a vital part of my community, my neighborhood, and my state. I am an immigrant myself, and while I am a US citizen, I think it's atrocious the way we treat undocumented immigrants.

AR.08650

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9egl-arkb
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0168
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Jonathan Kleinman

---

## General Comment

I will take it as a given that our criminal justice system has a history of bias against black and brown people, just as our immigration system does. DHS already is barring asylum seekers from remaining in the United States if they crossed a third country to make here, which in reality means sending asylum seekers who pass through Mexico to return there while waiting an indeterminate time to have their cases heard. This, despite our State Department issuing travel warnings to those who might travel to Mexico and the fact that criminal gangs have made asylum seekers their victims, including by kidnapping them and demanding ransom from relatives already in the U.S.

The proposed rule change would impose a very low bar to asylum refusal by imposing these standards: "(5) certain federal, state, tribal, or local offenses concerning the operation of a motor vehicle while under the influence of an intoxicant" and (7)..."the possession or trafficking of a controlled substance or controlled-substance paraphernalia." While I agree that driving while under the influence of an intoxicant is dangerous, it should not be grounds for deportation. In the same vain, as long as marijuana is considered a controlled substance at the federal level, using possession of it as grounds for deportation is ridiculous, considering the number of states that have de-criminalized it's possession. This would put at risk a person in a state which prohibits marijuana possession, while not jeopardizing one in another state. This is unequal justice under the law. In addition, numerous studies have shown that black and brown people are disproportionately charged with drug offenses despite similar rates of use among white Americans.

Finally this statement: "Convictions for such misdemeanor offenses should be disqualifying because these offenses inherently undermine public safety or Government integrity" is ridiculous on it's face as there are many examples of such offenses that neither 'undermine public safety or Government integrity' - such as being found guilty of marijuana possession for smoking a joint while sitting at a sidewalk caf.

AR.08651

**PUBLIC SUBMISSION**

| |
|---|
| **As of:** January 22, 2020 |
| **Received:** January 15, 2020 |
| **Status:** Posted |
| **Posted:** January 15, 2020 |
| **Tracking No.** 1k4-9egl-1c2c |
| **Comments Due:** January 21, 2020 |
| **Submission Type:** Web |

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0169
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Juliana Morris
**Address:**
    3301 E 12th St
    Apt 316
    Oakland,  CA,  94601
**Email:** juliana.e.morris@gmail.com

---

## General Comment

I am a concerned citizen and primary care physician who opposes the proposed rule change. Many of my patients are immigrants, refugees, and asylees. Many have come to the U.S. fleeing violence and destruction and it would be incredibly harmful to their health, even fatal in some cases, if they are forced to return. Many of my patients have also had interactions with the criminal justice system, in many cases as a result of racial profiling in their communities, racism in the trial and sentencing process, economic deprivation, and/or the burden of unprocessed and untreated trauma. After serving their time, they must be given a chance at safety, rehabilitation, and health. They are members of our communities that have valuable contributions to offer. They must not be re-criminalized due to prior mistakes (either on their part or on the part of unjust criminal justice practices). Please stop this proposed rule change.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** k5f-tftu-bpfb
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0170
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Elaine Khoong
**Address:** United States,
**Email:** ekhoong@gmail.com

## General Comment

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41; Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility

I'm writing in response to the above-referenced Proposed Rules to express my strong opposition to the Proposed Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019.

As a child of immigrants and primary care clinician who provides care for many refugee and immigrant patients, these proposed rules do not align with the values that make America great a beacon of help or that have helped establish this land of immigrants to be the global leader that it is today. Populations that are fleeing violence to seek a better life are a great resource to our country, as evidenced by the large number that have gone on to build new companies, become healthcare professionals, and serve in many other needed roles within our country.

For the reasons detailed in the comments that follow, the Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

Thank you for the opportunity to submit comments on the Proposed Rules. Please do not hesitate to contact me to provide further information.

Sincerely,
Elaine Khoong, MD

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9egl-k1a4
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0171
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Leah Carnine

## General Comment

I am a concerned healthcare provider who believes strongly that our nation must welcome people fleeing violence, and who is strongly concerned about racial profiling in the criminal legal system. I see immigrants daily in my health clinic and they are so often trying to survive persecution, climate induced crisis in their home countries, and come here to survive and support their families. I am concerned about the way that immigrants are treated, and I daily see the way that it impacts their health in my clinic. It increases blood pressure, diabetes, and risks for acute crises like heart attacks which harm immigrant communities and negatively impact our healthcare system. This proposed rule would inject racial profiling into the asylum process. This attack would put even more people seeking asylum at risk of danger - and death. And it would in turn eviscerate one of the most important defenses community members have against deportation. This is very concerning to me as a community member, a friend of many immigrants, and a healthcare provider. I call upon the Trump administration to withdraw this proposal, in the name of health and wellness of our entire country.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9egm-g69n
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0172
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Anonymous Anonymous

## General Comment

I am writing to express my devout opposition to this proposed rule change. I am a concerned member of the public and a child of immigrants who strongly believes that our nation must welcome people fleeing violence. I am rigidly against racial profiling in the criminal legal system. I am an immigrant rights community organizer and immigrants are a vital part of my family, my neighborhood, my city and state. This country was founded by immigrants who stole this land and I believe it is imperative that the damage that was and continues to be inflicted is not furthered by racist rules like the one that is being proposed on asylum.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9egm-f956
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0173
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Lisa Bernstein
**Address:**
  2850 Pebble Creek
  Ann Arbor, MI, 48108
**Email:** zachary042812@gmail.com

---

## General Comment

I am strongly opposed to the Executive Office for Immigration Review proposed rule change regarding asylum eligibility. My cousin sought asylum in America in the early 1990's when she arrived from Russia. She was fleeing violence against Jews and found safety in the United States. She is now a doctor, giving back to her community. I am very concerned that others may not be given the same chance as her. Discrimination in immigration law is not what this country should be about. We must welcome people fleeing violence-- deportation can put people in mortal danger--literally. Our values and our history demand that the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution. Under the Refugee Act of 1980, passed with bipartisan support, anyone present or arriving in the U.S. can apply for asylum.

The proposed rule would allow for racial profiling during the asylum process. This would punish people who've already endured mistreatment and racial profiling in the criminal legal system a second time -- with deportation back to the very life-threatening situation they fled. This is profoundly immoral, makes a mockery of due process, and is clearly racist. We can protect our borders without separating families, without racial profiling, and without turning into an evil society. We can live up to the values of this country.

Do not allow this rule change to deport people who can become contributing members of our great country, like my cousin. Let justice and compassion be the values that determine our immigration policy.

For these reasons, I call upon the administration to withdraw this policy change.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9egm-xtau
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0174
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Isabel Ullmann

---

## General Comment

My name is Isabel Ullmann, I am a resident of San Francisco, California and I am a DOJ Accredited Representative, representing clients in their removal proceedings. I am writing to express my concern and opinion relating to the Department of Homeland Security's proposed rule change on "Procedures for Asylum and Bars to Asylum Eligibility."

I am a concerned member of the public who believes strongly that our nation must welcome people fleeing violence, and who is strongly concerned about racial profiling in the criminal legal system. Immigrants are a vital part of my community, my neighborhood, and my state. Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution. For asylum seekers, making it to the U.S. often means they have found safety from persecution, torture, and sometimes death. Yet asylum seekers face many unjust obstacles in the immigration system.

This proposed rule would inject racial profiling into the asylum process. This latest attack would put even more people seeking asylum at risk of danger - and death. This would in turn eviscerate one of the most important defenses community members have against deportation.

This proposed Trump rule would punish people who've already endured mistreatment and racial profiling in the criminal legal system a second time -- with deportation back to the very life-threatening situation they fled. This is profoundly immoral, makes a mockery of due process, and comes right out of Steven Miller's racist playbook.

The criminal legal system in the U.S. is wracked with racial profiling and obstacles to equal justice. Our harsh immigration laws exploit these obstacles to drive mass incarceration and mass deportation of people of color.

The clients that I work with are escaping rape, torture, child abuse, forced labor, homophobic persecution, political persecution, religious persecution, murder of family members, and so much more. They were the people that the asylum law was written for, people who would be harmed or persecuted in their home countries should they return. Due to racial profiling, my clients are sometimes cited and unfairly convicted of crimes. One youth

AR.08657

client of mine was convicted of "Street terrorism" when a kid pulled a knife on him at school. Our clients are charged with "smuggling" for bringing their babies with them as they escape abusive partners together. These people should not be barred for asylum. This policy only seeks to dismantle and gut the asylum system in a racist and discriminatory way, and would penalize people who are VICTIMS of crime and violence by preventing them from accessing the protection they are promised by the 1951 Refugee Convention to which the US is a signatory and our asylum laws here in the United States.

I urge the Administration to withdraw the proposed "Procedures for Asylum and Bars to Asylum Eligibility," which would drastically undermine our community and go against our values. I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.

Thank you for resolving this issue.

Sincerely,
Isabel Ullmann
La Raza Centro Legal

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9egm-vbmd
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0175
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Alessandra Stamper

## General Comment

I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.

AR.08659

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9egm-6th4
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0176
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Hoi-Fei Mok

## General Comment

I am a child of immigrants, born and raised in CA. Much of my community are immigrants or descendants of immigrants. We understand that refugees and asylum seekers are people who are fleeing from violence and it is absolutely the moral duty of the US government to accept them for shelter, no matter what. Racial profiling does not have a place in barring asylum seekers from entering the country. This latest attack would put even more people seeking asylum at risk of danger - and death. This would in turn eviscerate one of the most important defenses community members have against deportation. It is amoral to do this to people who have already been through so much and are merely looking to escape from the violence and trauma of places they have lived before. I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9egm-du3l
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0177
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Sara Zimmerman
**Address:**
   1425 Ward St
   Berkeley,  CA,  94702
**Email:** sarazi@gmail.com

---

## General Comment

I am submitting these comments because I am strongly opposed to the whole of the proposed rules. As a Jewish American, I deeply object to how these rules restrict asylum protections for people who are in danger. Inhumane, restrictive, and poorly structured and managed asylum and immigration systems condemned millions upon millions of Jews, people with disabilities, and people of different races, religions, sexual orientations, and political beliefs to death during WWII. Had many of those people committed some kind of crime? Yes, in part because desperate circumstances and the experience of extreme hardship and persecution can drive people to flout societal rules, out of necessity or damaged decision making. Should those actions be a death sentence? Absolutely not.

Our rules for granting asylum are intended to protect people who are fleeing from death, torture, and persecution. Our asylum system is already unfair and too limited, and already includes harsh and overbroad exclusions for past criminal activity. Combined with the fact that our criminal justice system is one that has been abundantly shown through studies and analyses to have racial bias that leads to more arrests, more criminal charges, harsher plea bargains, and harsher sentences for people of color and immigrants, and this proposal is layering injustice upon injustice. (Please include this report, Report to the United Nations on Racial Disparities in the U.S. Criminal Justice System, in the comment record for these proposed rules: https://www.sentencingproject.org/publications/un-report-on-racial-disparities/.)

Please abandon these proposed rules. They endanger people who may not have committed any crimes or may have committed crimes that harmed no one, did not involve moral turpitude, and simply reflected their determination to be with and protect their families. We must protect people from deportation to a place where they are in danger. No one should be abandoned to persecution or torture. We as a country are better than this - we can right the wrongs of the past and regain our international reputation as a contributor to a compassionate,

AR.08661

thriving, healthy world, but not with this kind of action.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 15, 2020
**Tracking No.** 1k4-9egn-uoxy
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0178
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Julie Starobin
**Address:**
    Pacifica,  CA,  94044
**Email:** juliestarobin@gmail.com

## General Comment

I am completely and totally opposed to the rule change that Trump proposed in December. It would hurt many asylum seekers because it would exclude people based on future contact with the U.S.'s flawed criminal legal system. This would allow racial profiling to affect the asylum process and put many at risk.

I am very concerned that this rule change is in contradiction to the values i always thought the u.s. represented in the world: a place for people who are escaping violence, poverty and persecution. The International Refugee Convention that was created in after WW II protects refugees and asylum seekers. The government of the u.s. should never let unjust obstacles stop people from trying to be safe.

Immigrants and refugees are our neighbors, we are all human beings in need of respect and compassion. Please do not allow the new rule change proposed by the president.

Thank you.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 16, 2020
**Tracking No.** 1k4-9egn-x6lu
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0179
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Danny Kay

## General Comment

I am a concerned physician who believes strongly that our nation must welcome people fleeing violence, and who is strongly concerned about racial profiling in the criminal legal system. Immigrants are a vital part of my community, my neighborhood, and my state. There is more than enough resources in this country to support asylum seekers (if we just re directed corporate tax cuts and bloated military budgets).

AR.08664

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 16, 2020
**Tracking No.** 1k4-9egn-xjix
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0180
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

I oppose this rule change. This proposed rule would inject racial profiling into the asylum process. This latest attack would put even more people seeking asylum at risk of danger - and death. This would in turn eviscerate one of the most important defenses community members have against deportation.

AR.08665

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 16, 2020
**Tracking No.** 1k4-9egn-9c44
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0181
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Cynthia Tuthill

## General Comment

I want to express my strong opposition to the Proposed Rules to amend regulations relating to eligibility for asylum. The Department of Homeland Security and the Department of Justice should immediately withdraw this proposal, and instead direct their efforts to ensure that individuals fleeing violence are granted full and fair access to asylum protections in the United States. This is what our country is all about! Adding more barriers to asylum seekers is not necessary, as we already have quite a strong set of rules in place. There is no need to block anyone who has been ACCUSED of domestic battery (without even a requirement for having been indicted or convicted), nor for misdemeanor offenses such as marijuana possession, fraudulent documents, or fraud in public benefits. What about the fact that in their home country, the danger of persecution could affect these kinds of offenses and accusations? These dangers to the person(s) seeking asylum should generally outweigh all but the most egregious (and proven) offenses. PLEASE do not allow this draconian increase in the difficulty for the United States to continue to be a safe haven.

AR.08666

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 16, 2020
**Tracking No.** 1k4-9egn-hk3y
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0182
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Anonymous Anonymous
**Organization:** La Raza Centro Legal

---

## General Comment

I am a resident of Daly City, California and I am an LGBT asylum seeker. I am writing to express my concern and opinion relating to the Department of Homeland Security's proposed rule change on "Procedures for Asylum and Bars to Asylum Eligibility."

I am a concerned member of the public who believes strongly that our nation must welcome people fleeing violence, and who is strongly concerned about racial profiling in the criminal legal system. Immigrants are a vital part of my community, my neighborhood, and my state.

Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution. For asylum seekers, like me, making it to the U.S. often means they have found safety from persecution, torture, and sometimes death. Yet we face many unjust obstacles in the immigration system.

This proposed rule would inject racial profiling into the asylum process. This latest attack would put even more people seeking asylum at risk of danger - and death. This would in turn eviscerate one of the most important defenses community members have against deportation.

I believe that we all have the right to an opportunity to feel safe. We have immigrated to this country with the goal of feeling complete and without any fear of anything. I think that if this law is approved, that we will no longer have the opportunity to start over, from all that we thought that we lost of which this country gave us hope. We want to feel safe without any fear of anything.

I urge the Administration to withdraw the proposed "Procedures for Asylum and Bars to Asylum Eligibility," which would drastically undermine our community and go against our values. I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.

Thank you for resolving this issue.

AR.08668

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 16, 2020
**Tracking No.** 1k4-9ego-pj75
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0183
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Kelli Livermore

---

## General Comment

As a concerned member of the public, I hereby express strong opposition to this proposed rule change. I strongly believe our nation must welcome people fleeing violence. I am also deeply concerned about racial profiling in the criminal legal system. Immigrants are a vital part of my community, my neighborhood, and my state. In fact, if we look at the history of our country, except for Native Americans, we are ALL immigrants or descendants of immigrants.

The United States has historically been a place of refuge for people fleeing violence, starvation, poverty, persecution, torture, and sometimes death. Yet asylum seekers face many unjust obstacles in our current immigration system. To add to that, this proposed rule would inject racial profiling into the asylum process. This would put even more people seeking asylum at risk of danger and death. It would in turn eviscerate one of the most important defenses community members have against deportation.

Lastly, this proposed rule would punish people a second time who've already endured mistreatment and racial profiling in the criminal legal system -- with deportation back to the very life-threatening situation they fled. This is profoundly immoral because it mocks due process. We must recognize the humanity of every person, including immigrants, and protect each other from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them For these reasons, I call upon the Trump administration to withdraw this proposal..

AR.08669

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 16, 2020
**Tracking No.** 1k4-9ego-6lyi
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0184
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Clara Guerrero
**Address:**
    Chicago,  IL,  60641
**Email:** clara_badillo@yahoo.com
**Phone:** 7734306914

## General Comment

I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 16, 2020
**Tracking No.** 1k4-9ego-lz07
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0185
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** D Gold

---

## General Comment

I am writing to express my opposition to the proposed change in the rule. I am particularly opposed to broadening the bars on eligibility for asylum.

I am a U.S. citizen of European Jewish descent. The failure of our country to provide asylum to people fleeing persecution and death in Europe under German occupation resulted in millions of deaths. It was this knowledge that led to the creation of the current asylum process in 1980.

As a resident of the San Francisco Bay Area, I became aware of the desperate need for asylum created by the human rights violations of various governments in Central and South America in the 1980s. This continual need for asylum has been exacerbated by the growth of organized criminal enterprises in the area, in some cases with the collusion of agencies of the U.S. government.

I am also a lesbian, and I am very aware of the persecution faced by many in the lesbian, gay, bisexual, and transgender communities particularly in Africa and Asia.

It is important to me that the U.S. live up to its international image, if not it's actual practice, as a haven for people fleeing persecution. Immigrants have enriched this country in every possible way.

It is therefore important that any potential consequences of considering asylum for an individual be sufficiently strong to outweigh the risk of death, torture, or incarceration that causes an individual to seek asylum, rather than be returned to the country that threatens their existence.

I further believe that while this rulemaking process should be revised to eliminate the additional proposed bars, rulemaking should be conducted to narrow existing bars, such as convictions in other countries. People who are at risk of death, torture or incarceration, or other serious consequences, are often people who may be at risk of persecution under the legal system in their country of origin. For example, it is not unusual to find homosexuals in countries in which homosexuality is outlawed to have been charged with a variety of "crimes" that consist

AR.08671

solely of private, consenting sexual or assumed sexual conduct among adults.

Specifically:
1. I am opposed creating a bar to any person who has been convicted of a felony in any domestic jurisdiction. A prior conviction of a felony does not indicate an existing threat, and certainly not one that should overwhelm the likelihood that a person will face death, torture or imprisonment if denied asylum. Studies have proven that people of color are considered for felony prosecution more frequently than white people are for the same alleged acts. People facing prosecution may choose to plead guilty in order to mitigate potential damages, or because they are incapable of sustaining lengthy legal defense. There are hundreds of potential acts that may be considered felonies here in California.

This proposed rule would eliminate any discretion for judges in determining whether a specific felony conviction is sufficient to overwhelm the probability of death, torture or imprisonment if the person is denied asylum.

I am further opposed to broadening the "felony" bar to include any crime for which incarceration of over 1 year is possible. Many people caught up in the criminal justice system will plead guilty to a "lesser charge". These people will be further punished, although denial of asylum was not a consideration when the person accepted the plea, and the person may well have not made the choice to plead to this charge if the consequence was known at the time.

2. I am opposed to creating a bar to any person who has been convicted of illegal entry or reentry. People often have to leave their home countries and seek safety somewhere, with little notice. Recently, the huge delay in processing asylum seekers at the border has created circumstances in which many people cross without permission, and in many cases with the intention of turning themselves in to border patrol authorities. And these people are often not provided with asylum proceedings, even if they are requested. There is simply no reason to create a new bar on asylum based on this.

3. I am opposed to creating a bar to any person who has been convicted of certain offences regarding identity or documentation. The unfair application of immigration regulations, delays in processing of work permits for asylum seekers, and force people into an untenable choice between starvation and working without appropriate documentation. Further, laws applying to identity and documentation are disparately enforced, and are often based on racial profiling.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 16, 2020
**Tracking No.** 1k4-9ego-je5g
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0186
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Christina Antonakos-Wallace

## General Comment

I write to express my strong opposition to this proposed rule change.

I am a concerned member of the public who believes strongly that our nation must welcome people fleeing violence, and who is strongly concerned about racial profiling in the criminal legal system.

Immigrants and refugees are a vital part of my community, my neighborhood, and my state.

Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution.
U.S. law enshrines the protections of the international Refugee Convention, drafted in the wake of the horrors of World War II.

Under the Refugee Act of 1980, passed with bipartisan support, anyone present or arriving in the U.S. can apply for asylum.
For asylum seekers, making it to the U.S. often means they have found safety from persecution, torture, and sometimes death. Yet asylum seekers face many unjust obstacles in the immigration system.

I call upon the Trump administration to withdraw this proposal immediately.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 16, 2020
**Tracking No.** 1k4-9ego-jg1s
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0187
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Quade Gallagher

---

## General Comment

I write to express my strong opposition to this proposed rule change.

I am a concerned member of the public who believes strongly that our nation must welcome people fleeing violence, and who is strongly concerned about racial profiling in the criminal legal system. Immigrants are a vital part of my community, my neighborhood, and my state.

Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution.
U.S. law enshrines the protection of the international Refugee Convention, drafted in the wake of the horrors of World War II. Under the Refugee Act of 1980, passed with bipartisan support, anyone present or arriving in the U.S. can apply for asylum.
For asylum seekers, making it to the U.S. often means they have found safety from persecution, torture, and sometimes death. Yet asylum seekers face many unjust obstacles in the immigration system.

This proposed rule would inject racial profiling into the asylum process. This latest attack would put even more people seeking asylum at risk of danger - and death. This would, in turn, eviscerate one of the most important defenses community members have against deportation.
This proposed Trump rule would punish people who've already endured mistreatment and racial profiling in the criminal legal system a second time -- with deportation back to the very life-threatening situation they fled. This is profoundly immoral, makes a mockery of due process, and comes right out of Steven Miller's racist playbook. The criminal legal system in the U.S. is wracked with racial profiling and obstacles to equal justice. Our harsh immigration laws exploit these obstacles to drive mass incarceration and mass deportation of people of color.

I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.

For these reasons, I call upon the Trump administration to withdraw this proposal.

AR.08675

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 16, 2020
**Tracking No.** 1k4-9ego-r6vz
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0188
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Anonymous Anonymous
**Organization:** La Raza Centro Legal

## General Comment

I am a resident of San Francisco, California and I am an immigrant. I am writing to express my concern and opinion relating to the Department of Homeland Security's proposed rule change on "Procedures for Asylum and Bars to Asylum Eligibility."

I am a concerned member of the public who believes strongly that our nation must welcome people fleeing violence, and who is strongly concerned about racial profiling in the criminal legal system. Immigrants are a vital part of my community, my neighborhood, and my state.

This proposed rule would inject racial profiling into the asylum process. This latest attack would put even more people seeking asylum at risk of danger - and death. This would in turn eviscerate one of the most important defenses community members have against deportation.

This proposed Trump rule would punish people who've already endured mistreatment and racial profiling in the criminal legal system a second time -- with deportation back to the very life-threatening situation they fled. This is profoundly immoral, makes a mockery of due process, and comes right out of Steven Miller's racist playbook.

Please help with all the refugee procedures to help them get political asylum, because if they are in this country they cannot return to their home countries, because they and their families are in danger and they want to help their families get ahead. It is their right to be helped by the president. Why doesn't the president want to help them? Please help them, do not change the law for worse, change it for the better of all asylum seekers.

I urge the Administration to withdraw the proposed "Procedures for Asylum and Bars to Asylum Eligibility," which would drastically undermine our community and go against our values. I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.

Thank you for resolving this issue.

AR.08677

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 16, 2020
**Tracking No.** 1k4-9ego-q3te
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0189
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Amanda Alvarado Ford

---

## General Comment

My name is Amanda Alvarado Ford, I am a resident of _____San Mateo_____, California and I am an immigrant/child of immigrants/descendant of immigrants/concerned individual (please circle one). I am writing to express my concern and opinion relating to the Department of Homeland Security's proposed rule change on "Procedures for Asylum and Bars to Asylum Eligibility."

I am a concerned member of the public who believes strongly that our nation must welcome people fleeing violence, and who is strongly concerned about racial profiling in the criminal legal system. Immigrants are a vital part of my community, my neighborhood, and my state.

Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution.
U.S. law enshrines the protections of the international Refugee Convention, drafted in the wake of the horrors of World War II. Under the Refugee Act of 1980, passed with bipartisan support, anyone present or arriving in the U.S. can apply for asylum.
For asylum seekers, making it to the U.S. often means they have found safety from persecution, torture, and sometimes death. Yet asylum seekers face many unjust obstacles in the immigration system.

This proposed rule would inject racial profiling into the asylum process. This latest attack would put even more people seeking asylum at risk of danger - and death. This would in turn eviscerate one of the most important defenses community members have against deportation.
This proposed Trump rule would punish people who've already endured mistreatment and racial profiling in the criminal legal system a second time -- with deportation back to the very life-threatening situation they fled. This is profoundly immoral, makes a mockery of due process, and comes right out of Steven Miller's racist playbook. The criminal legal system in the U.S. is wracked with racial profiling and obstacles to equal justice. Our harsh immigration laws exploit these obstacles to drive mass incarceration and mass deportation of people of color.

AR.08678

I am opposed to the proposed rule, please consider people are fleeing for their lives and many will face severe harm or death if deported, and this rule would have the net effect of criminalizing innocent people who were simply arrested and not convicted or convicted of minor offenses or convicted of offenses they did not commit.

Thank you

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 16, 2020
**Tracking No.** 1k4-9ego-jqfh
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0190
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Luis Vasquez Gomez

---

## General Comment

My name is Luis Vasquez, I am a resident of San Francisco, California and I am a concerned individual. I am writing to express my concern and opinion relating to the Department of Homeland Security's proposed rule change on "Procedures for Asylum and Bars to Asylum Eligibility."

I am a concerned member of the public who believes strongly that our nation must welcome people fleeing violence, and who is strongly concerned about racial profiling in the criminal legal system. Immigrants are a vital part of my community, my neighborhood, and my state.

Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution.

This new proposal will drastically penalize our communities in their search for asylum. It is a right for a person to apply for asylum and criminalization will not help obtain this right.

I urge the Administration to withdraw the proposed "Procedures for Asylum and Bars to Asylum Eligibility," which would drastically undermine our community and go against our values. I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.

Thank you for resolving this issue.

Sincerely,
Luis Vasquez Gomez

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 16, 2020
**Tracking No.** 1k4-9ego-90ck
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0191
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Anonymous Anonymous
**Organization:** La Raza Centro Legal

---

## General Comment

I am a resident of San Francisco, California and I am a descendant of immigrants. I am writing to express my concern and opinion relating to the Department of Homeland Security's proposed rule change on "Procedures for Asylum and Bars to Asylum Eligibility."

It is important, from my personal point of view, to advocate for people asking for asylum because many of them are fleeing violence, poverty, and corruption in their home countries. Please. Do. Not. Block. People. From. Seeking. Asylum.

I urge the Administration to withdraw the proposed "Procedures for Asylum and Bars to Asylum Eligibility," which would drastically undermine our community and go against our values. I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.
Thank you for resolving this issue.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 16, 2020
**Tracking No.** 1k4-9egp-xip7
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0192
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Shannon Jew

---

## General Comment

My name is Shannon Jew, I am a resident of San Francisco, California and I am a child of immigrants. I am writing to express my concern and opinion relating to the Department of Homeland Security's proposed rule change on "Procedures for Asylum and Bars to Asylum Eligibility."

Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution. U.S. law enshrines the protections of the international Refugee Convention, drafted in the wake of the horrors of World War II. Under the Refugee Act of 1980, passed with bipartisan support, anyone present or arriving in the U.S. can apply for asylum. For asylum seekers, making it to the U.S. often means they have found safety from persecution, torture, and sometimes death. Yet asylum seekers face many unjust obstacles in the immigration system.

The Trump Administration from the very beginning of his campaign, ran his campaign by demonizing and criminalizing the immigrant population of our community. They fail to empathize and have a lack of compassion for the people who flee from dangerous countries who are suffering violence and injustice. I urge this administration to withdraw this proposal and think about the type of message the United States wants to portray out to the world. We are a country of refuge. We are a country of immigrants.

AR.08682

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 16, 2020
**Tracking No.** k5g-1j63-q15r
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0193
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Kate Benham-Suk
**Address:**
   Oakland,  CA,  94611
**Email:** kbenham7@gmail.com
**Phone:** 4156520011

---

## General Comment

Asylum is about escaping persecution and we cannot call ourself America if we start making stipulations about that, such as only 'good' persecuted people are allowed in this country.

AR.08683

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 16, 2020
**Tracking No.** 1k4-9egp-vhyz
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0194
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Anonymous Anonymous
**Organization:** La Raza Centro Legal

---

## General Comment

I am a resident of San Francisco, California, I am an immigrant and I work at a food bank for low income immigrants. I am writing to express my concern and opinion relating to the Department of Homeland Security's proposed rule change on "Procedures for Asylum and Bars to Asylum Eligibility."

This proposed rule would inject racial profiling into the asylum process. This latest attack would put even more people seeking asylum at risk of danger - and death. This would in turn eviscerate one of the most important defenses community members have against deportation.

Times are always difficult, but now even more so with the person in charge of the presidency. Sometimes, in our countries, those of us who are not educated do not have any support for our lives. Life is very difficult and more than that, I think that like little animals we do things like immigrate for something better. This is the daily survival. We can't be quiet while we see immigrants suffering and not do anything for them.

I urge the Administration to withdraw the proposed "Procedures for Asylum and Bars to Asylum Eligibility," which would drastically undermine our community and go against our values. I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.

Thank you for resolving this issue.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 16, 2020
**Tracking No.** 1k4-9egp-dd4u
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0195
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Anonymous Anonymous
**Organization:** La Raza Centro Legal

---

## General Comment

I am a resident of San Mateo, California and I am a concerned individual. I am writing to express my concern and opinion relating to the Department of Homeland Security's proposed rule change on "Procedures for Asylum and Bars to Asylum Eligibility."

I am a concerned member of the public who believes strongly that our nation must welcome people fleeing violence, and who is strongly concerned about racial profiling in the criminal legal system. Immigrants are a vital part of my community, my neighborhood, and my state.

Please drop the proposal so that people can be eligible for asylum. I am sick and tired of the government separating families. No More Separation of Families!!!

Thank you for resolving this issue.

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 16, 2020
**Tracking No.** 1k4-9egp-nyoz
**Comments Due:** January 21, 2020
**Submission Type:** Web

# PUBLIC SUBMISSION

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0196
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Anonymous Anonymous
**Organization:** La Raza Centro Legal

---

## General Comment

I am a resident of San Francisco, California and I am an asylum seeker. I am writing to express my concern and opinion relating to the Department of Homeland Security's proposed rule change on "Procedures for Asylum and Bars to Asylum Eligibility."

I am a concerned member of the public who believes strongly that our nation must welcome people fleeing violence, and who is strongly concerned about racial profiling in the criminal legal system. Immigrants are a vital part of my community, my neighborhood, and my state.

Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution.

These deportations cannot continue. We have all come from our countries escaping violence and the governments in our countries do nothing to protect or support us. We have fled from our countries because our lives are at risk. Even the police put us in danger. We are threatened by them as well. There are people who have committed crimes, but they are also escaping from threats and dangers on their lives. We are people who comes to this country, not because we want to, but because we have to protect our lives and find the support we need. I don't think that people should keep being deported and separated from their families. It is not easy to live in this country, surviving through discrimination and racism every day, but we want to make our children's lives better. People are in danger. The pain is very great. More people would make comments like me, but it is very hard to find the time because our community works such long hours. Just because someone has a crime on their record, doesn't mean they should be sent to their death in their home country.

For these reasons, I am not in agreement of this rule.

AR.08686

AR.08687

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 16, 2020
**Tracking No.** 1k4-9egp-9mwf
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0197
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Chris Accomando

## General Comment

I am strongly opposed to the rule change on Procedures for Asylum and Bars to Asylum Eligibility. The current Administration is attempting to gut vital asylum protections by excluding many asylum seekers based on contact with a legal system that criminalizes vulnerable populations. This rule change would further reproduce injustices already deeply embedded in our criminal legal system.

AR.08688

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 16, 2020
**Tracking No.** 1k4-9egp-3nzi
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0198
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Maribel Sanchez

## General Comment

My name is Maribel Sanchez. I am a resident of San Francisco, California and I am a child of immigrants and a concerned individual. I am writing to express my concern and opinion relating to the Department of Homeland Security's proposed rule change on "Procedures for Asylum and Bars to Asylum Eligibility."

This is just one more discriminatory rule change that the Trump Administration is trying to implement. Ever since he came into office, he has spread nothing but hate and racism towards all people of color, including the immigrant population. This country was built by immigrants and whether or not the government wants to admit it, EVERYONE BUT THE NATIVE AMERICANS ARE IMMIGRANTS.

I am from San Francisco, where we have a huge undocumented and unhoused population. The biased racist policies that are currently in place make it so easy for someone to easily commit one of these crimes just for trying to survive and make a life for themselves. Everyone should have the right to seek asylum, regardless if they committed a crime or not. A DUI should not be the reason why someone should be deported and condemned to death.

I urge the Administration to withdraw the proposed "Procedures for Asylum and Bars to Asylum Eligibility," which would drastically undermine our community and go against our values. I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.

Thank you for resolving this issue.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 16, 2020
**Tracking No.** 1k4-9egr-s6de
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0199
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Penny Robinson
**Address:**
  1708 S Weimar St
  Appleton,  WI,  54915

---

## General Comment

I am strongly opposed to this proposed rule change. I am a concerned citizen who believes that we must continue to welcome people fleeing violence. I am also concerned about racial profiling in the criminal legal system. Immigrants are our neighbors and friends and a vital part of our community.

According to international as well as national law (Refugee Act of 1980) anyone present or arriving in the U.S. can apply for asylum. Making it here often means they have finally reached safety from violence, persecution, torture, and sometimes death. We cannot place even more unjust obstacles in the immigration system.

This proposed rule would add racial profiling into the asylum process and put even more individuals seeking asylum at risk by deporting them back to the very life-threatening situation they fled. This flies in the face of one of our most valued rights - due process.

We must not only follow the International and federal laws, but we must uphold the values long held by our citizens of fairness and respect for human rights.

For these reasons, I call upon the Trump administration to withdraw this proposal.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 16, 2020
**Tracking No.** 1k4-9egs-2qz0
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0200
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Alyssa Bell

## General Comment

This terrible rule would inject racial profiling into the asylum process and put asylum-seekers at risk of danger - even death. It's no secret that racial profiling and obstacles to equal justice run rampant in the criminal legal system. Under this rule change, people who have endured mistreatment and profiling would be punished a second time -- with deportation back to the very life-threatening situation they fled. And judges would be powerless to help. That is unthinkable and unacceptable in our society. I vehemently object.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 16, 2020
**Status:** Posted
**Posted:** January 16, 2020
**Tracking No.** 1k4-9egu-2eoc
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0201
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Kathryn Hedges

## General Comment

It is understandable to avoid sheltering people who have committed serious crimes.

However, the new rules won't distinguish between rapists, murderers, and people who get traffic tickets. If you have been careful enough to avoid getting traffic tickets, I'm sure someone in your family has had a burned-out taillight, been late on their registration, or even been caught speeding. Do you treat them the same way as you would if they were convicted of murder? If not, how do you justify treating asylum seekers with traffic tickets or other misdemeanors the same as a murderer?

We need to be compassionate to asylum seekers instead of making excuses to send them back to danger.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 16, 2020
**Status:** Posted
**Posted:** January 16, 2020
**Tracking No.** 1k4-9egv-8urc
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0202
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

I am writing to express my strong opposition to this proposed rule change. As an American Jew who does volunteer community organizing around issues of criminal justice reform, I believe deeply that we all have a moral obligation to honor the dignity and humanity of all people. These rules changes are the antithesis of my values. Instead of promoting racial profiling in the asylum process, we should be opening our doors to those fleeing violence and persecution to seek safety and a better life in the US. This rule change, seemingly proposed by those aligned with white nationalists, could put asylum seekers in further danger, punishing folks who have already endured mistreatment and racial profiling in the criminal legal system a second time -- with deportation back to the very life-threatening situation they fled. This is profoundly racist, immoral, and makes a mockery of due process. I implore you to immediately withdraw this proposal.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 16, 2020
**Status:** Posted
**Posted:** January 16, 2020
**Tracking No.** 1k4-9eh1-aqg6
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0203
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Rachel Ishikawa

---

## General Comment

I write to express my strong opposition to this proposed rule change.

I am a the child of an immigrant father, who has lived in this country for the 30 years. I fear that this rule change would send people who fled violence and death back into these dangerous situations.

U.S. law enshrines the protections of the international Refugee Convention, drafted in the wake of the horrors of World War II. Under the Refugee Act of 1980, passed with bipartisan support, anyone present or arriving in the U.S. can apply for asylum. These are values engrained into the U.S. Should we not protect them with all we have?

I believe we must recognize the humanity of every person. I call upon the Trump administration to withdraw this proposal.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 16, 2020
**Status:** Posted
**Posted:** January 16, 2020
**Tracking No.** 1k4-9eh1-b8xb
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0204
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Anonymous Anonymous

## General Comment

I write to express my strong opposition to this proposed rule change. I am a concerned member of the public who believes strongly that our nation must welcome people fleeing violence, and who is strongly concerned about racial profiling in the criminal legal system. Immigrants are a vital part of my community, my neighborhood, and my state. Our historical values require the United States to be a place of refuge for people fleeing violence, starvation, poverty, persecution, and other unjust treatment. Further, our criminal legal system is plagued daily by racial profiling and obstructs equal justice. Our cruel immigration laws continue to exploit these obstacles by driving the mass incarceration and mass deportation of people of color, specifically. Your proposed rule and your abetting of it would further inject racial profiling into our asylum process. This attack will sentence even more innocent people seeking asylum to the very danger and death they are coming to our nation to escape. This would in turn eviscerate one of the most important defenses community members have against deportation. It is our duty to recognize the humanity of every person, including immigrants seeking our help, and protect our neighbors from discrimination and abuse -- not discriminate and abuse them ourselves. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not disintegrate them. For these reasons, I call upon the Trump administration -- and upon you who are reading this to do your part -- to withdraw this proposal.

AR.08695

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 16, 2020
**Status:** Posted
**Posted:** January 16, 2020
**Tracking No.** 1k4-9eh1-e76t
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0205
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Molly McClure

## General Comment

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41;
Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility

January 16, 2020

To Whom it May Concern:

I am writing regarding with strong objection to the proposed amend in regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019.

I have worked with immigrants for the last 12 years in my community organization and have seen first-hand the challenges that individuals escaping violence experience. Rather than add more barriers to their efforts at securing safety, I urge you to see that they are granted full and fair access to asylum protections in the United States.

I appreciate your consideration, and please do not hesitate to contact me to provide further information.

Best,
Molly McClure
Causa Justa :: Just Cause

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 16, 2020
**Status:** Posted
**Posted:** January 16, 2020
**Tracking No.** 1k4-9eh2-u2hc
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0206
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Brian Smedley

---

## General Comment

I write to express my strong opposition to the proposed rule change that would make it harder for immigrants to seek asylum based on prior or future criminal justice contact.
I am a concerned member of the public who believes strongly that our nation must welcome people fleeing violence, and who is strongly concerned about racial profiling in the criminal legal system. Research shows that people of color are disproportionately targeted by law enforcement, which contributes to their overrepresentation in criminal justice systems. Many innocent asylum seekers could therefore be unfairly prohibited from seeking refuge in the United States, as required by U.S. and international law.
I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.

Immigrants are a vital part of my community, my neighborhood, and my state. For these reasons, I call upon the Trump administration to withdraw this proposal.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 16, 2020
**Status:** Posted
**Posted:** January 16, 2020
**Tracking No.** 1k4-9eh4-1zq7
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0207
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Haley Roe

---

## General Comment

To Whom It May Concern:

On behalf of the Wyoming Coalition Against Domestic Violence and Sexual Assault (WCADVSA), we are submitting comments in response to the DHS and DOJ's Joint Notice of Proposed Rulemaking Procedures for Asylum and Bars to Asylum Eligibility published in the Federal Register on December 19, 2019 to express our STRONG OPPOSITION to the proposed changes to the asylum process and asylum eligibility.

WCADVSA has grave concerns regarding the immense harm that these changes in the proposed rule will have on immigrant survivors of domestic violence, sexual assault, and other gender-based abuses. We urge DHS and DOJ to withdraw the proposed rule in its entirety.

At WCADVSA we strive to provide holistic legal services to all survivors in Wyoming, immigrant or not. While working with survivors and immigrants for the last 4 years I know from experience this new rule will put the safety of survivors at risk.

Immigrant survivors who flee to the U.S. to seek asylum have endured horrific domestic violence, sexual assault, rape, and other gender-based forms of abuse that have threatened their and their children's lives. The journey to the U.S. is a dangerous one. Still, survivors traverse the hundreds to thousands of miles because they strongly believe that it is safer to make the journey for the possibility of finding safety and protection in the U.S. than to stay in their home countries where their governments do little to protect them from their abusers and perpetrators.

The proposed rule would limit women who bring their children with them claiming they are "alien smuggling" and not that they are doing this to protect themselves and their families. Our immigration system claims to make families the top priority, but this rule change is directly contrary to that.

I understand the goals of this administration include limiting the amount of immigrants in the U.S., this however is not the way to do this. Limiting survivors access to safety is contrary to public policy, regardless of the side of

AR.08698

the aisle a person sits. It is vital that we, as the greatest country on Earth, do our part to help the many survivors of domestic violence, sexual assault, and rape. These survivors are coming to the US for help, turning our back on them would be reprehensible.

Thank you for the opportunity to submit comments on the Joint Notice of Proposed Rulemaking Procedures for Asylum and Bars to Asylum Eligibility. Please contact me if you have any questions or concerns relating to these comments. Thank you.
Respectfully submitted,

WCADVSA
Haley Roe
Program Attorney
307-259-4219

# PUBLIC SUBMISSION

| |
|---|
| **As of:** January 22, 2020 |
| **Received:** January 16, 2020 |
| **Status:** Posted |
| **Posted:** January 16, 2020 |
| **Tracking No.** 1k4-9eh5-kzai |
| **Comments Due:** January 21, 2020 |
| **Submission Type:** API |

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0208
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Tessa Pulaski
**Address:**
  3115 Mt. Pleasant St. NW
  Washington,  DC,  20010
**Email:** tpulaski@law.gwu.edu
**Phone:** 6175990048
**Organization:** IRAP GW Law

---

## General Comment

On behalf of the George Washington University Law School chapter of the International Refugee Assistance Project, we strongly oppose the proposed policy. As students interested in practicing asylum law, we believe this policy is too vague, has drastic consequences, and is not supported by a valid government interest.

First, the policy does not establish how these misdemeanors should preclude individuals from applying for asylum. People who have valid asylum claims and are fleeing violent contexts, should not be barred from receiving asylee status in the United States.

Second, committing misdemeanors does not speak to the character of these individuals. These people should still be eligible for asylum since the misdemeanors do not make them national security threats and they do not pose other risks to our country. There are other bars to receiving asylum and extensive screening mechanisms that already ensure that people who want to commit serious harm in the country are not able to receive relief.

Finally, asylum is fundamentally about providing a safe haven for individuals who are facing threats or violence on account of their race, nationality, social group, religion or political opinion. The United States should be a beacon of freedom for the world and accept individuals who have to flee their country. We should not prevent people from getting asylee status on this basis.

For the foregoing reasons, we ask that this policy not be implemented.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 16, 2020
**Status:** Posted
**Posted:** January 16, 2020
**Tracking No.** 1k4-9eh5-21qz
**Comments Due:** January 21, 2020
**Submission Type:** API

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0209
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Evan Monod
**Address:**
   DC,

---

## General Comment

I strongly oppose this proposed rule. As the son of an immigrant, I believe that immigration strengthens our country immeasurably. This is doubly true of the asylum seekers who have come to this country fleeing war, religious persecution, genocide, and the like. The United States remains a beacon of hope for millions around the globe in desperate situations. Given that asylum seekers are already subjected to a rigorous application process that can take several months, the addition of several low level misdemeanor offenses will only serve to make the process more onerous. It will not serve the public interest to bar someone who has been convicted of a low-level, nonviolent drug offense, simply because of that one mistake. For these reasons, I call upon this administration to withdraw this proposal.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 16, 2020
**Status:** Posted
**Posted:** January 16, 2020
**Tracking No.** 1k4-9eh5-nv37
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0210
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Javier Chavez

---

## General Comment

I am a concerned member of the public who believes strongly that our nation must welcome people fleeing violence, and who is strongly concerned about racial profiling in the criminal legal system. Immigrants are a vital part of my community, my neighborhood, and my state.

As an immigrant from Mexico who has lived in the U.S. for 30 years, I am deeply concerned that this rule change would send people who fled violence back to danger and death.

As a formerly incarcerated person, I think it's wrong to punish people a second time after they've completed their sentences. Deportation is often a matter of life and death.

As [Community Liasion] at Redwood Coast Medical Services], I work with immigrant community members daily, and am concerned this rule would put many people in danger

AR.08702

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 16, 2020
**Status:** Posted
**Posted:** January 16, 2020
**Tracking No.** 1k4-9eh5-dli4
**Comments Due:** January 21, 2020
**Submission Type:** API

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0211
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Anonymous Anonymous

## General Comment

I write to oppose this proposed rule change. I am a third-year law student who has researched and written about the most effective ways to help voluntary migrants and asylum seekers while maintaining sovereignty and national security. The proposed rule would extend bars to entry and protection based on misdemeanors to those seeking asylum.

By extending the entry bar based on certain misdemeanor offenses to asylum seekers, the rule creates another hurdle for extremely vulnerable populations to clear. Asylum seekers are already vetted and subject to intense scrutiny. Whatever the merits of barring voluntary migrants based on misdemeanor offenses, extending those to asylum seekers would only limit the amount of qualifying persons with no corresponding benefit to national security. The rule, along with prior restrictions on asylum-seeking, would have the purpose and effect of reducing the class of persons eligible for asylum.

Generalized appeals to "public safety" cannot and should not be used as a magic bullet to justify ever increasing restrictions on our liberty and the liberties of those fleeing war and dangerous circumstances abroad. Because this rule would serve no public purpose and would only discriminate against vulnerable populations, I urge the administration to withdraw this rule.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 16, 2020
**Status:** Posted
**Posted:** January 16, 2020
**Tracking No.** 1k4-9eh6-pg6s
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0212
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Ilyce Shugall
**Address:**
    Justice & Diversity Center of the Bar Association of San Francisco
    301 Battery Street, Third Floor
    San Francisco,  CA,  94111
**Email:** ishugall@sfbar.org
**Phone:** (415) 575-3123
**Fax:** (415) 688-4633

---

## General Comment

See attached file(s)

---

## Attachments

Comment on DoJ asylum bars 01.2020_Signed

AR.08704

# JUSTICE & DIVERSITY CENTER
OF THE BAR ASSOCIATION OF SAN FRANCISCO

**Board of Directors**

Doris Cheng
President

Stuart C. Plunkett
President-Elect

Marvin K. Anderson
Treasurer

Mary McNamara
Secretary

Khaldoun Baghdadi
A. Marisa Chun
Michelle Ferreira
Alicia Gámez
Lindsay M. Gehman
Matthew Gluck
Ari Hersher
Laura C. Hurtado
Jessica Jacob
Adam I. Kaplan
David Kelly
Anjali Kulkarni
Elinor Leary
David A. Lucero
Marie Ma
Gonzalo C. Martinez
Rob Meyerhoff
Catherine Ongiri
David Reidy
Charles O. Thompson
Demetria Vong-Spillan
Blair Walsh
Jee Young You

**Senior Staff**

Yolanda M. Jackson
Executive Director

Gloria Chun
Pro Bono Legal Services
Program Director

Teresa Lynn Friend
Homeless Advocacy
Project (HAP) Director

Carole Conn
Immigrant Legal Defense
Program Director

Samantha Akwei
Diversity & Pipeline
Programs Director

Shuwaski Young
Director of Donor &
Community Engagement

January 16, 2020

Submitted via www.regulations.gov

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

**Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41; Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility**

Dear Ms. Alder Reid and Ms. Dunn,

I am writing on behalf of the Justice & Diversity Center of the Bar Association of San Francisco to express our strong opposition to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility, 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41.

The Justice & Diversity Center (JDC) is a non-profit organization located in San Francisco, California which has been in existence since 1977. We are committed to providing free legal services to low-income residents of the Bay Area, enabling Bay Area residents to access the judicial system, and strengthening the community's personal, professional, and economic security.

One of JDC's programs, the Immigrant Legal Defense Program (ILDP), works to increase access to justice and protect the due process rights of low-income and unrepresented immigrants facing removal from the United States. ILDP builds legal capacity and resources throughout Northern and Central California to defend immigrants facing removal in the San Francisco Immigration Court. Most ILDP clients are asylum seekers. JDC opposes the proposed rule, which will significantly limit access to asylum for the most vulnerable non-citizens.

**JUSTICE & DIVERSITY CENTER**
Tel 415.982.1600    Fax 415.477.2390
301 Battery Street, Third Floor, San Francisco, CA 94111
www.sfbar.org/jdc

**HOMELESS ADVOCACY PROJECT** ☐
Tel 415.575.3130    Fax 415.575.3132
Tanya Neiman Building
125 Hyde Street, San Francisco, CA 94102
www.sfbar.org/hap

**JUSTICE & DIVERSITY CENTER**
OF THE BAR ASSOCIATION OF SAN FRANCISCO

**Introduction**

On December 19th, the Department of Homeland Security (DHS) and the Department of Justice (DOJ) issued a joint set of Proposed Rules that would make three primary changes to the rules governing asylum adjudications.

The first proposed set of changes adds the following seven *categorical* bars to asylum eligibility: (1) any conviction of a felony offense; (2) any conviction for "smuggling or harboring" under 8 U.S.C. § 1324(a), even if the asylum seeker committed the offense for the purpose of bringing her own spouse, child, or parent to safety; (3) any conviction for illegal reentry under 8 U.S.C. § 1326; (4) any conviction for an offense "involving criminal street gangs"; (5) any second conviction for an offense involving driving while intoxicated or impaired; (6) any conviction *or accusation of conduct* for acts of battery involving a domestic relationship; (7) and any conviction for several newly defined categories of misdemeanor offenses, including *any* drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits.

The second section of the Proposed Rules provides a multi-factor test for immigration adjudicators to determine whether a criminal conviction or sentence is valid for the purpose of determining asylum eligibility. The third section rescinds a provision in the current rules regarding the reconsideration of discretionary asylum.

Cumulatively, these proposed changes constitute an unnecessary and unlawful destruction of asylum protections under United States and international law. JDC submits these comments to express opposition to the entirety of the Proposed Rules and grave concerns with the administration's continued efforts to deny refugees the right to obtain the security and stability the United States asylum system has long promised. We urge that the Proposed Rules be rescinded in their entirety.

**The Proposed Rules Unnecessarily and Unlawfully Bar Legitimate Refugees from Asylum**

The laws, regulations, and process governing asylum adjudications are already extensive and harsh.[1] Asylum seekers bear the evidentiary burden of establishing their eligibility for asylum[2] under complex laws, regulations, and procedures without the benefit of appointed counsel and often from a remote immigration jail.[3] A large number of asylum

---

[1] 8 USC § 1158(b)(2)(A), (B); 8 CFR § 1240.14
[2] 8 USC § 1158(b)(1)(B); 8 CFR § 1240.8(d).
[3] *See* Daniel Connolly, Aaron Montes, and Lauren Villagran, "Asylum seekers in U.S. face years of waiting, little chance of winning their cases," *USA Today,* September 25, 2019,

AR.08706

**JUSTICE ❷ DIVERSITY CENTER**

OF THE BAR ASSOCIATION of SAN FRANCISCO

applicants present their cases without the benefit of representation.  According to data from the courts, as of 2017, 20.6% of asylum cases in the courts were decided without the benefit of counsel[4]  ILDP provides primarily limited scope assistance to non-citizens in removal proceedings, including asylum applicants.  This additional hurdle to establishing eligibility for asylum will make it significantly more difficult for organizations like JDC to provide limited scope assistance to unrepresented asylum seekers.

Furthermore, the current bars to asylum based on allegations of criminal conduct and convictions are *already* sweeping and over-broad.[5] Any conviction for an offense determined to be an "aggravated felony" is considered a *per se* "particularly serious crime" and therefore a mandatory bar to asylum.[6] "Aggravated felony" is a vague term, which exists only in immigration law. The definition encompasses hundreds of offenses, many of them neither a felony nor aggravated, including petty offenses such as misdemeanor shoplifting, simple misdemeanor battery, or sale of counterfeit DVDs.[7] For this reason, the existing crime bars should be narrowed, not expanded.

Asylum is a discretionary form of relief, such that adjudicators are tasked with exercising discretion in determining whether or not to grant relief.  Therefore, for those not categorically barred from asylum, the adjudicator maintains full discretion to deny asylum if a criminal offense is serious or if there are other adverse factors.[8] The Board of Immigration Appeals has cautioned that, "in light of the unusually harsh consequences which may befall a [noncitizen] who has established a well-founded fear of persecution; the danger of persecution should generally outweigh all but the most egregious of adverse factors."[9] However, the seven new bars proposed here preclude asylum seekers from obtaining protection on the basis of a vast array of conduct, without any discretion left to the immigration adjudicator to determine whether the circumstances merit such a harsh penalty. Indeed, in the case of the domestic-violence

---

https://www.usatoday.com/in-depth/news/nation/2019/09/23/immigration-court-asylum-seekers-what-to-expect/2026541001/.

[4] "Asylum Representation Rates Have Fallen Amid Rising Denial Rates," TRAC Immigration; available at: https://trac.syr.edu/immigration/reports/491/

[5] 8 USC 1158(b)(2)(A)(ii), (iii); (B); *see also* 84 FR 69641(setting forth existing categorical bars to asylum eligibility).

[6] 8 U.S.C. §§ 1158(b)(2)(A)(ii) and (B)(i).

[7] 8 U.S.C. § 1101(a)(43). *See also* Nancy Morawetz, "Understanding the Impact of the 1996 Deportation Laws and the Limited Scope of Proposed Reforms," *Harvard Law Review* 113 (2000): 1939-40 (criticizing the "'Alice-in-Wonderland-like definition of the term 'aggravated felony'"); Melissa Cook, "Banished for Minor Crimes: The Aggravated Felony Provisions of the Immigration and Nationality Act as a Human Rights Violation," *Boston College Third World Law Journal* (2003): 293.

[8] 8 USC § 1158(b)(1)(A); *See also Matter of Pula*, 19 I.&N. Dec. 467 (BIA 1987).

[9] *Pula*, 19 I.&N. Dec. at 474.

**JUSTICE & DIVERSITY CENTER**

OF THE BAR ASSOCIATION OF SAN FRANCISCO

related ground, the categorical bar will be imposed on the basis of *mere allegations* of conduct without any adjudication of guilt.[10]

Moreover, the Proposed Rules are ultra vires to the statute, as they render meaningless the phrase "*particularly serious* crime."[11]  If Congress intended to include all criminal convictions within the definition of particularly serious crime, it would have specifically indicated that anyone with a criminal conviction is barred from asylum.

**The Proposed Rules are In Violation of International Treaty Obligations**

In addition to violating the Immigration and Nationality Act, as discussed above, by acceding to the 1967 Protocol Relating to the Status of Refugees,[12] which binds parties to the United Nations Convention Relating to the Status of Refugees,[13] the United States obligated itself to develop and interpret United States refugee law in a manner that complies with the Protocol's principle of non-refoulement (the commitment not to return refugees to a country where they will face persecution on protected grounds), even where potential refugees have allegedly committed criminal offenses.

While the Convention allows states to exclude and/or expel potential refugees from protection, the circumstances in which this can occur are limited. In particular, the Convention allows states to exclude and/or expel individuals from refugee protection if the individual "having been convicted by a final judgement of a particularly serious crime, constitutes a danger to the community of that country."[14] However, this clause is intended for "extreme cases," in which the particularly serious crime at issue is a "capital crime or a very grave punishable act."[15] The United Nations High Commissioner for Refugees (UNHCR) has asserted that to constitute a "particularly serious crime," the crime "must belong to the gravest category" and be limited "to refugees who become an extremely serious threat to the country of asylum due to the severity of crimes

---

[10] The Proposed Rules at p. 69651 explain that the regulations will "render ineligible [noncitizens] who engaged in acts of battery and extreme cruelty in a domestic context in the United States, regardless of whether such conduct resulted in a criminal conviction."

[11] 8 U.S.C. § 1158(b)(2)(A)(ii)

[12] United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268.

[13] Convention Relating to the Statute of Refugees, July 28, 1951, 140 U.N.T.S. 1954 (hereinafter "Refugee Convention").

[14] *Id.* at art. 33(2).

[15] U.N. High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees* 2, U.N. Doc. HCR/IP/Eng/REV. ¶ 154-55, (1979, reissued 2019).

**JUSTICE & DIVERSITY CENTER**
OF THE BAR ASSOCIATION OF SAN FRANCISCO

perpetrated by them in the country of asylum."[16] Moreover, the UNHCR has specifically noted that the particularly serious crime bar does not encompass less extreme crimes; "[c]rimes such as petty theft or the possession for personal use of illicit narcotic substances would not meet the threshold of seriousness."[17] Finally, when determining whether an individual should be barred from protection for having been convicted of a particularly serious crime, the adjudicator must conduct an individualized analysis and consider any mitigating factors.[18]

As discussed above, legislation and agency interpretation of the Immigration and Nationality Act have already expanded the particularly serious crime bar beyond what was contemplated in the Convention by creating categorical particularly serious crimes through the aggravated felony definition. The Proposed Rules would pull the United States farther away from its treaty obligations, as they would render nearly all criminal convictions bars to asylum.

Additionally, outside of the aggravated felony context, the Board of Immigration Appeals and the Courts of Appeals have generally agreed that low-level, "run-of-the-mill" offenses do not constitute particularly serious crimes, which is consistent with our country's international treaty obligations.[19] Under this long-standing interpretation of the particularly serious crime bar in the INA, there is no scenario in which offenses like misdemeanor driving under the influence without injury or simple possession of a controlled substance or paraphernalia would constitute a particularly serious crime.

**Withholding of Removal and Protection Under the Convention Against Torture is an Insufficient Remedy for Refugees Who Are Eligible for and Deserving of Asylum**

Although individuals barred from asylum may nonetheless be eligible for withholding of removal and protection under the Convention Against Torture (CAT), refugees should not be required to settle for these lesser forms of relief. Withholding and CAT recipients face permanent separation from their spouses and children. By regulation, refugee travel documents are available only to asylees.[20] Further, the Board of Immigration Appeals requires that an individual granted withholding and CAT—unlike an individual

---

[16] U.N. High Comm'r for Refugees (UNHCR), *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 7 (July 2007), http://www.unhcr.org/enus/576d237f7.pdf.

[17] *Id.* at ¶ 10.

[18] *Id.* at ¶ 10-11; U.N. High Commissioner for Refugees, *The Nationality, Immigration and Asylum Act 2002: UNHCR Comments on the Nationality, Immigration and Asylum Act 2002 (Specification of Particularly Serious Crimes) Order 2004*, 4 (2004).

[19] *Delgado v. Holder*, 648 F.3d 1095, 1110 (9th Cir. 2011) (en banc) (J. Reinhardt, concurring).

[20] 8 C.F.R. § 223.1.

AR.08709

**JUSTICE ❷ DIVERSITY CENTER**

OF THE BAR ASSOCIATION OF SAN FRANCISCO

granted asylum—must simultaneously be ordered removed, making any international travel a "self-deportation."[21] Because international travel is prohibited, individuals granted withholding of removal and CAT cannot reconnect with their families in a third country. Likewise, they cannot reunite with family in the United States because only asylees and refugees are eligible to petition for a spouse and children as derivative beneficiaries.[22] For many, this will mean that the Proposed Rules institute yet another formal policy of family separation.

In the San Francisco Immigration Court, where JDC's clients are in removal proceedings, many asylum seekers are family units. In these family units, oftentimes, only the parent has an asylum claim, as the children are too young to have their own claims. In these scenarios, if the parents were only eligible for withholding of removal or CAT, the children would be ineligible for relief. Accordingly, the agencies cannot rely on the availability of such forms of relief as the way to meet the country's international treaty obligations.

**The Proposed Rules Will Result In "Mini-Trials" in Immigration Court, Rendering it Impossible for Pro Se Litigants to Effectively Present Their Cases**

In two significant ways, the Proposed Rules require immigration adjudicators to engage in decision-making to determine whether an asylum applicant's conduct—considered independently of any criminal court adjudication—triggers a categorical bar to asylum eligibility. First, the agencies propose that immigration adjudicators be allowed to consider "all reliable evidence" to determine whether there is "reason to believe" an offense was "committed for or related to criminal gang evidence," or "in furtherance of gang-related activity," triggering ineligibility for asylum in either case.[23] Second, the Proposed Rules permit immigration adjudicators to "assess all reliable evidence in order to determine whether [a] conviction amounts to a domestic violence offense;" and to further pry into the details in order to decide whether non-adjudicated *conduct* "amounts to a covered act of battery or extreme cruelty."[24]

Requiring adjudicators to make complex determinations regarding the nature and scope of a particular conviction or, in the case of the domestic violence bar, *conduct*, will lead to judicial inefficiencies and unfair "mini-trials" within the asylum adjudication process. The scope of the "reliable evidence" available to adjudicators in asylum cases is potentially limitless; advocates on both sides would be obligated to present fulsome arguments to make their cases about gang connections to the underlying activity or the

---

[21] *See Matter of I-S- & C-S-*, 24 I.&N. Dec. 432, 434 n.3 (BIA 2008); 8 C.F.R. § 241.7.

[22] 8 C.F.R. § 208.21(a).

[23] 84 Fed Reg 69649.

[24] 84 Fed. Reg. 69652.

**JUSTICE ⊕ DIVERSITY CENTER**

OF THE BAR ASSOCIATION OF SAN FRANCISCO

relationship of the asylum applicant to the alleged victim. Because of the lack of robust evidentiary rules in immigration proceedings, it will be difficult, if not impossible, for many applicants to rebut negative evidence marshaled against them, even if false. In other cases, asylum applicants will struggle to find evidence connected to events that may have happened years prior (especially detained applicants). Asylum trials, which are typically three or fewer hours under current policies, would provide insufficient time to fully present arguments on both sides of these unwieldy issues. Presenting such extensive evidence is particularly problematic for pro se litigants, who are already at a disadvantage, facing a trained prosecutor without representation. Pro se asylum applicants will be unable to effectively respond to endless hearsay evidence presented by government attorneys.

Furthermore, the immigration courts contend with backlogs that now exceed one million cases,[25] so tasking adjudicators with a highly nuanced, resource-intensive assessment of the connection of a conviction to gang activity and/or the domestic nature of alleged criminal conduct will prolong asylum proceedings and invariably lead to erroneous determinations, which will increase appeals. The Proposed Rules repeatedly cite increased efficiency as justification for many of the proposed changes.[26] However, requiring adjudicators to engage in mini-trials to determine the applicability of categorical criminal bars, rather than relying on adjudications obtained through the criminal legal system, will dramatically *decrease* efficiency in the asylum adjudication process.

The Supreme Court has "long deemed undesirable" exactly the type of "post hoc investigation into the facts of predicate offenses" proposed by the agencies here.[27] Instead, the federal courts have repeatedly embraced the "categorical approach" to determine the immigration consequence(s) of a criminal offense, wherein the immigration adjudicator relies on the statute of conviction as adjudicated by the criminal court system, without relitigating the nature or circumstances of the offense in immigration court.[28] As the Supreme Court has explained, this approach "promotes

---

[25] Marissa Esthimer, "Crisis in the Courts: Is the Backlogged U.S. Immigration Court System at Its Breaking Point?," *Migration Policy Institute*, October 3, 2019, https://www.migrationpolicy.org/article/backlogged-us-immigration-courts-breaking-point.

[26] *See* Proposed Rules at 69646, 69656-8.

[27] *Moncrieffe v. Holder*, 569 U.S. 184, 186 (2013).

[28] *See Moncrieffe*, 569 U.S. at 191 ("This categorical approach has a long pedigree in our Nation's immigration law."). For a more fulsome history of the development of the categorical approach in immigration court, *see* Alina Das, "The Immigration Penalties of Criminal Convictions: Resurrecting Categorical Analysis in Immigration Law," *New York University Law Review* 86, no. 6 (2011): 1689 - 1702, https://www.nyulawreview.org/wp-content/uploads/2018/08/NYULawReview-86-6-Das.pdf.

AR.08711

**JUSTICE & DIVERSITY CENTER**

OF THE BAR ASSOCIATION OF SAN FRANCISCO

judicial and administrative efficiency by precluding the relitigation of past convictions in minitrials conducted long after the fact."[29]

**The proposed definition of "conviction" and "sentence" for the purposes of the new bars further excludes those in need of protection and Imposes Greater Burdens on Pro Se Litigants**

The Proposed Rules impose an unlawful presumption against asylum eligibility for applicants who seek post-conviction relief while in removal proceedings or longer than one year after their initial convictions. They also deny full faith and credit to state court proceedings by attributing improper motives to state court adjudicators.[30]

The Proposed Rules outline a new multi-factor process asylum adjudicators must use to determine whether a conviction or sentence remains valid for the purpose of determining asylum eligibility; the proposal includes a rebuttable presumption "against the effectiveness" of an order vacating, expunging, or modifying a conviction or sentence if the order was entered into after the asylum seeker was placed in removal proceedings or if the asylum seeker moved for the order more than one year after the date the original conviction or sentence was entered.[31]

This newly created presumption unfairly penalizes asylum applicants, many of whom may not have the opportunity to seek review of their prior criminal proceedings until applying for asylum.[32] In *Padilla v. Kentucky*, the Supreme Court recognized that the immigration consequences of a conviction are sufficiently serious for the Sixth Amendment to require a noncitizen defendant to be competently advised of them before agreeing to a guilty plea.[33] By imposing a presumption against the validity of a withdrawal or vacatur of a plea, the Proposed Rules hold asylum seekers whose rights were violated under *Padilla* to a different standard. Even though they too were denied effective assistance of counsel in the course of their underlying criminal proceedings,

---

[29] *Moncrieffe*, 569 U.S. at 200-201.

[30] *See Saleh v. Gonzales*, 495 F.3d 17, 25-26 (2d Cir. 2007) (discussing 28 U.S.C. § 1738, requiring federal courts to give full faith and credit to state acts, records, and judicial proceedings and U.S. Const. art. IV, § 1, and finding that there was no violation where the Board of Immigration Appeals stopped short of "refusing to recognize or relitigating the validity of [Saleh's] state conviction.").

[31] Proposed Rules at 69655.

[32] On page 69656 of the Proposed Rules, the Department of Homeland Security and the Department of Justice urge that "[i]t is reasonable to conclude that an alien who has a meritorious challenge to a criminal conviction based on a procedural or substantive defect is more likely to seek post-conviction relief sooner than an alien who is seeking relief on rehabilitative grounds…"

[33] *Padilla v. Kentucky*, 559 U.S. 356 (2010).

**JUSTICE & DIVERSITY CENTER**
OF THE BAR ASSOCIATION OF SAN FRANCISCO

asylum seekers will be forced to rebut a presumption that their court-ordered withdrawal or vacatur is invalid. The Proposed Rules therefore compound the harm to immigrants who, in addition to facing persecution in their home countries, have been denied constitutionally compliant process in the United States criminal legal system.

Many of the asylum applicants, especially those in vulnerable populations isolated from resources and unfamiliar with the due process protections available to them in the United States, may not have not discovered the defects in their underlying criminal proceedings until their consultation with an immigration attorney, or until they are placed into removal proceedings, which may happen several years after a conviction. Imposing a presumption *against* the validity of a plea withdrawal or vacatur in these cases will undoubtedly lead to the wrongful exclusion of countless immigrants from asylum simply because they were unable to adequately rebut the presumption. It will place an undue burden on these applicants, particularly in a complex immigration court setting without the benefit of appointed counsel.

The Proposed Rules further improperly authorize immigration adjudicators to second-guess the order and jurisdiction of a state court, even where the order on its face cites substantive and procedural defects in the underlying proceeding. The proffered justification for this presumption against the validity of post-conviction relief is to "ensure that aliens do not have their convictions vacated or modified for purported rehabilitative purposes that are, in fact, for immigration purposes," "to codify the principle set forth in *Matter of Thomas and Thompson*," and to bring the analysis of post-conviction orders in line with *Matter of Pickering*.[34] The agencies misread the applicable law, however, by authorizing adjudicators to disregard otherwise valid state orders. The immigration law only requires that, to be effective for immigration purposes, orders vacating or modifying convictions must be based on substantive or procedural infirmities in the underlying proceedings. The Proposed Rule goes well beyond that requirement.

The Proposed Rules abandon the presumption of regularity that should accompany state court orders, thus upending settled principles of law. The Proposed Rules cite a misleading quote from *Matter of F-* in support of allowing asylum adjudicators to look beyond the face of a state court order. However, the case does not support the Proposed Rule. The Board held: "Not only the full faith and credit clause of the Federal Constitution, but familiar principles of law require the acceptance at face value of a judgment regularly granted by a competent court, unless a fatal defect is evident upon

---

[34] Proposed Rules at 69655-56 (*citing Matter of Thomas and Thompson*, 27 I.&N. Dec. 674 (A.G. 2019) and *Matter of Pickering*, 23 I.&N. Dec. 621 (BIA 2003), *rev'd on other grounds by Pickering v. Gonzales*, 465 F.3d 263, 267-70 (6th Cir. 2006)).