marshaled against them, even if false; and in other cases, asylum applicants will struggle to find evidence connected to events that may have happened years prior (especially for those detained). Asylum trials, which are typically three or fewer hours under current policies, would provide insufficient time to fully present arguments on both sides of these unwieldy issues, especially for those individuals who are appearing *pro se*.

As the immigration courts contend with backlogs that now exceed one million cases,[41] tasking adjudicators with a highly nuanced, resource-intensive assessment of the connection of a conviction to gang activity and/or the domestic nature of alleged criminal conduct, which would be far outside their areas of expertise, will prolong asylum proceedings and invariably lead to erroneous determinations that will give rise to an increase in appeals. The Proposed Rules repeatedly cite increased efficiency as justification for many of the proposed changes.[42] Yet requiring adjudicators to engage in mini-trials to determine the applicability of categorical criminal bars, rather than relying on adjudications obtained through the criminal legal system, will dramatically decrease efficiency in the asylum adjudication process.

Indeed, the Supreme Court has "long deemed undesirable" exactly the type of "post hoc investigation into the facts of predicate offenses" proposed by the agencies here.[43] Instead, for more than a century the federal courts have repeatedly embraced the "categorical approach" to determine the immigration consequence(s) of a criminal offense, wherein the immigration adjudicator relies on the statute of conviction as adjudicated by the criminal court system, without relitigating the nature or circumstances of the offense in immigration court.[44] As the Supreme Court has explained, this approach "promotes judicial and administrative efficiency by precluding the re-litigation of past convictions in minitrials conducted long after the fact."[45] In *Moncrieffe v. Holder*, the Court forewarned of exactly the sort of harm that would arise from these Proposed Rules; in that case, the Court rejected the government's proposal that immigration adjudicators determine the nature and amount of remuneration involved in a marijuana-related conviction, noting that "our Nation's overburdened immigration courts" would end up weighing evidence "from, for example, the friend of a noncitizen" or the "local police officer who recalls to the contrary," with the end result a disparity of outcomes depending on the whims of the individual immigration judge and a further burdened court system.[46]

Particularly in the context of the new proposed bar related to alleged gang affiliation, ABLE is concerned that creating a blanket exclusion for anyone who is convicted of a crime –

---

[41] Marissa Esthimer, "Crisis in the Courts: Is the Backlogged U.S. Immigration Court System at Its Breaking Point?," *Migration Policy Institute*, October 3, 2019, https://www.migrationpolicy.org/article/backlogged-us-immigration-courts-breaking-point.

[42] *See* Proposed Rules at 69646, 69656-8.

[43] *Moncrieffe v. Holder*, 569 U.S. 184, 186 (2013).

[44] *See Moncrieffe*, 569 U.S. at 191 ("This categorical approach has a long pedigree in our Nation's immigration law."). For a more fulsome history of the development of the categorical approach in immigration court, *see* Alina Das, "The Immigration Penalties of Criminal Convictions: Resurrecting Categorical Analysis in Immigration Law," *New York University Law Review* 86, no. 6 (2011): 1689 - 1702, https://www.nyulawreview.org/wp-content/uploads/2018/08/NYULawReview-86-6-Das.pdf.

[45] *Moncrieffe*, 569 U.S. at 200-201.

[46] *Id.* at 201.

AR.09306

including a misdemeanor – that an immigration adjudicator deems linked to gang activity will erroneously prevent bona fide asylum seekers from receiving protection. These rules confers on immigration adjudicators—who generally are not criminologists, sociologists, or criminal law experts—the responsibility to determine if there is "reason to believe" any conviction flows from activity taken in furtherance of gang activity. These rules will necessarily affect asylum seekers of color who have experienced racial profiling and a criminal legal system fraught with structural challenges and incentives to plead guilty to some crimes, particularly misdemeanors. These same individuals are vulnerable to being erroneously entered into gang databases. Such databases are notoriously inaccurate, outdated, and infected by racial bias.[47]

Indeed, asylum applicants are *already* frequently subjected to wrongful denials of protection because of allegations of gang activity made by the Department of Homeland Security on the basis of information found in notoriously unreliable foreign databases and "fusion" intelligence-gathering centers outside the United States. Empowering immigration adjudicators to render asylum applicants categorically excluded from protection on the basis of such spurious allegations will inevitably result in the return of many refugees back to harm.[48]

The Departments curiously argue that all gang-related offenses should be construed as "particularly serious crimes."[49] They cite statistics from up to 16 years ago in an attempt to make the point that gang members commit violent crimes and drug crimes. They then make the illogical leap to the conclusion that *all crimes*—including misdemeanor property crimes—that may be construed as connected to gang activity are particularly serious. This simply does not follow; in fact, the Proposed Rules will inevitably result in the exclusion from protection of asylum seekers of color who live in economically distressed communities and have obtained a minor conviction such as a property crime. Relying on the definition of "particularly serious crime" to prevent asylum seekers convicted of even minor crimes construed as gang-related from accessing asylum protection is disingenuous at best, and tinged with racial animus at worst.

The Departments asks for comments on: (1) what should be considered a sufficient link between an asylum seeker's underlying conviction and the gang related activity in order to trigger the application of the proposed bar, and (2) any other regulatory approaches to defining the type of gang-related activities that should render individuals ineligible for asylum. The premise of these questions is wrong: a vague "gang related" bar should not be introduced at all. The Immigration and Nationality Act and existing regulations already provide overly broad bars to asylum where criminal behavior by an asylum seeker causes concern by an adjudicator.

---

[47] Annie Sweeney and Madeline Buckley, "Chicago police gang data collection faulted by city's inspector general as unchecked and unreliable," *Chicago Tribune*, April 11, 2019, https://www.chicagotribune.com/news/breaking/ct-met-chicago-police-gang-data-04112019-story.html; Anita Chabria, "A routine police stop landed him on California's gang database. Is it racial profiling?," *Los Angeles Times*, May 9, 2019, https://www.latimes.com/politics/la-pol-ca-california-gang-database-calgang-criminal-justice-reform-20190509-story.html.

[48] Melissa del Bosque, "Immigration Officials Use Secretive Gang Databases to Deny Migrant Asylum Claims," *Pro Publica*, July 8, 2019, https://www.propublica.org/article/immigration-officials-use-secretive-gang-databases-to-deny-migrant-asylum-claims.

[49] Proposed Rules at p. 69650.

AR.09307

Adding this additional, superfluous layer of complication risks erroneously excluding bona fide asylum seekers from protection without adding any useful adjudicatory tool to the process.

## V.    The proposed definition of "conviction" and "sentence" for the purposes of the new bars further excludes those in need of protection

The section of the Proposed Rules that outlines a new set of criteria for determining whether a conviction or sentence is valid for the purpose of determining asylum eligibility is an ultra vires exercise of authority that is not authorized by the Immigration and Nationality Act. The Proposed Rules impose an unlawful presumption against asylum eligibility for applicants who seek post-conviction relief while in removal proceedings or longer than one year after their initial convictions. They also deny full faith and credit to state court proceedings by attributing improper motives to state court actors.[50]

The Proposed Rules undermine Sixth Amendment protections and harm immigrants unfamiliar with the complex criminal and immigration framework governing prior convictions. The Proposed Rules outline a new multi-factor process asylum adjudicators must use to determine whether a conviction or sentence remains valid for the purpose of determining asylum eligibility; the proposal includes a rebuttable presumption "against the effectiveness" of an order vacating, expunging, or modifying a conviction or sentence if the order was entered into after the asylum seeker was placed in removal proceedings or if the asylum seeker moved for the order more than one year after the date the original conviction or sentence was entered.[51]

This newly created presumption unfairly penalizes asylum applicants, many of whom may not have the opportunity to seek review of their prior criminal proceedings until applying for asylum.[52] In *Padilla v. Kentucky*, the Supreme Court recognized that the immigration consequences of a conviction are sufficiently serious for the Sixth Amendment to require a noncitizen defendant to be competently advised of them before agreeing to a guilty plea.[53] By imposing a presumption against the validity of a withdrawal or vacatur of a plea, the Proposed Rules hold asylum seekers whose rights were violated under *Padilla* to a different standard; even though they too were denied effective assistance of counsel in the course of their underlying criminal proceedings, asylum seekers will be forced to rebut a presumption that their court-ordered withdrawal or vacatur is invalid. The Proposed Rules therefore compound the harm to immigrants who, in addition to facing persecution in their home countries, have been denied constitutionally compliant process in the United States criminal legal system.

---

[50] *See Saleh v. Gonzales*, 495 F.3d 17, 25-26 (2d Cir. 2007) (discussing 28 U.S.C. § 1738, requiring federal courts to give full faith and credit to state acts, records, and judicial proceedings and U.S. Const. art. IV, § 1, and finding that there was no violation where the Board of Immigration Appeals stopped short of "refusing to recognize or relitigating the validity of [Saleh's] state conviction.").

[51] Proposed Rules at 69655.

[52] On page 69656 of the Proposed Rules, the Department of Homeland Security and the Department of Justice urge that "[i]t is reasonable to conclude that an alien who has a meritorious challenge to a criminal conviction based on a procedural or substantive defect is more likely to seek post-conviction relief sooner than an alien who is seeking relief on rehabilitative grounds…"

[53] *Padilla v. Kentucky*, 559 U.S. 356 (2010).

13

Many asylum applicants, especially those in vulnerable populations isolated from resources and unfamiliar with the due process protections available to them in the United States, may not have discovered the defects in their underlying criminal proceedings until their consultation with an immigration attorney, or until they are placed into removal proceedings, which may happen several years after a conviction. Imposing a presumption *against* the validity of a plea withdrawal or vacatur in these cases will undoubtedly lead to the wrongful exclusion of countless immigrants from asylum simply because they were unable to adequately rebut the presumption, particularly in a complex immigration court setting without the benefit of appointed counsel.

The Proposed Rules also violate the full faith and credit to which state court decisions are entitled. They improperly authorize immigration adjudicators to second-guess the decision of a state court, even where the order on its face cites substantive and procedural defects in the underlying proceeding. The proffered justification for this presumption against the validity of post-conviction relief is to "ensure that aliens do not have their convictions vacated or modified for purported rehabilitative purposes that are, in fact, for immigration purposes," "to codify the principle set forth in *Matter of Thomas and Thompson*," and to bring the analysis of post-conviction orders in line with *Matter of Pickering*.[54] The agencies misread the applicable law, however, by authorizing adjudicators to disregard otherwise valid state orders. The immigration law only requires that to be effective for immigration purposes, orders vacating or modifying convictions must be based on substantive or procedural infirmities in the underlying proceedings. The Proposed Rules goes well beyond that requirement.

The Proposed Rules abandon the presumption of regularity that should accompany state court orders, thus upending settled principles of law. The Proposed Rules cite a misleading quote from *Matter of F-* in support of allowing asylum adjudicators to look beyond the face of a state court order; had the Rules' authors looked to the full case, they would have read the following: "Not only the full faith and credit clause of the Federal Constitution, but familiar principles of law require the acceptance at face value of a judgment regularly granted by a competent court, unless a fatal defect is evident upon the judgment's face. However, the presumption of regularity and of jurisdiction may be overcome by extrinsic evidence or by the record itself."[55] In *Matter of F-*, the Board of Immigration Appeals offers support for the proposition that an adjudicator should presume the validity of a state court order unless there is a reason to doubt it, contrary to the *presumption of irregularity* put forward in the Proposed Rules.

The authority extended to adjudicators by the Proposed Rules also violates the law of multiple circuits, including *Pickering*, on which it relies.[56] In *Pickering v. Gonzales*, the Sixth Circuit Court of Appeals held that despite the petitioner's stated motive of avoiding negative immigration consequences, the Board of Immigration Appeals was limited to reviewing the

---

[54] Proposed Rules at 69655-56 (*citing Matter of Thomas and Thompson*, 27 I.&N. Dec. 674 (A.G. 2019) and *Matter of Pickering*, 23 I.&N. Dec. 621 (BIA 2003), *rev'd on other grounds by Pickering v. Gonzales*, 465 F.3d 263, 267-70 (6th Cir. 2006)).

[55] *Matter of F-*, 8 I.&N. Dec. 251, 253 (BIA 1959).

[56] *See id.* (*citing Matter of Pickering*, 23 I.&N. Dec. 621).

14

authority of the court issuing the order as to the basis for his vacatur.[57] Similarly, in *Reyes-Torres* the Ninth Circuit Court of Appeals held that the motive of the respondent was not the relevant inquiry.[58] Rather, "the inquiry must focus on the state court's rationale for vacating the conviction."[59] In addition, the Third Circuit Court of Appeals in *Rodriguez v. U.S. Att'y Gen.*, which the Proposed Rules cite as "existing precedent," held that the adjudicator must look only to the "reasons explicitly stated in the record and may not impute an unexpressed motive for vacating a conviction."[60] Moreover, the *Rodriguez* court stated that to determine the purpose of a vacatur, the adjudicator must first look to the face of the order vacating the conviction, and "if the order explains the courts reasons … the [adjudicator's] inquiry must end there."[61] The Proposed Rules contain no such limiting language to guide the adjudicator's inquiry. Instead, the Rules grant adjudicators vague and indefinite authority to look beyond even a facially valid vacatur. Such breadth of authority undermines asylum seekers' rights to a full and fair proceeding.

Finally, the Proposed Rules wrongly extend *Matter of Thomas and Thompson* to all forms of post-conviction relief and impose an ultra vires and unnecessary burden on asylum seekers. As an initial matter, the Proposed Rules' reliance on *Matter of Thomas and Thompson* is flawed. The Attorney General's decision in *Matter of Thomas and Thompson* has no justification in the text or history of the immigration statute. Nowhere does the plain text of the Immigration and Nationality Act support giving adjudicators the authority to give effect only to state court sentence modifications undertaken to rectify substantive or procedural defects in the underlying criminal proceedings. Nor does the legislative history support such a rule. The Board of Immigration Appeals recognized this in *Matter of Cota-Vargas*, where it concluded that the application of "the *Pickering* rationale to sentence modifications has no discernible basis in the language of the Act."[62] Based on the text of the Immigration and Nationality Act and the well-documented legislative history behind Congress's definition of "conviction" and "sentence" in 8 U.S.C. § 1101(a)(48), the Board determined that Congress intended to ensure that, generally, proper admissions or findings of guilt were treated as convictions for immigration purposes, even if the conviction itself was later vacated. Neither the text of the INA nor the legislative history of the definitions reveal any attempt on Congress's part to change the longstanding practice of giving effect to state court sentencing modifications. For these reasons, *Matter of Thomas and Thompson* lacks Congressional support for these rules and should not be extended.

Moreover, as applicants for immigration benefits or relief from removal, asylum seekers already bear the burden of demonstrating their eligibility for asylum.[63] The Proposed Rules do

---

[57] *Pickering v. Gonzales*, 465 F.3d 263, 267-70 (6th Cir. 2006).

[58] *Reyes-Torres v. Holder*, 645 F.3d 1073, 1077-78 (9th Cir. 2011) (*citing Cardoso-Tlaseca v, Gonzales*, 460 F.3d 1102, 1107 n.3 (9th Cir. 2006) and *Pickering v. Gonzales*, 454 F.3d 525 (6th Cir. 2006), *amended and superseded* by *Pickering*, 465 F.3d at 263.

[59] *Id.*

[60] *Rodriguez v. U.S. Att'y Gen.*, 844 F.3d 392, 397 (3d Cir. 2006) (noting that "[T]he IJ may rely only on reasons explicitly stated in the record and may not impute an unexpressed motive for vacating a conviction.").

[61] *Id.* ("Put simply, '[w]e will not . . . permit[ ] . . . speculation . . . about the secret motives of state judges and prosecutors,'" *quoting Pinho v. Gonzales*, 432 F.3d 193, 214-215 (3d Cir. 2005)).

[62] *Matter of Cota-Vargas*, 23 I.&N. Dec. 849, 852 (BIA 2005).

[63] *Matter of S-K-*, 23 I.&N. Dec. 936, 939-40 (BIA 2006).

not alter or shift this burden, nor do they provide evidence supporting the need for this presumption. By introducing a presumption of bad faith into asylum adjudication, the Proposed Rules unfairly interfere with asylum seekers' efforts to establish their claims. Immigration law, and asylum law in particular, is already highly complex, and the process of seeking asylum is in many instances re-traumatizing, particularly for applicants who do not have counsel to represent them and who lacked effective counsel in their underlying criminal proceedings. The Proposed Rules as applied to asylum applicants who seek post-conviction relief transform an already difficult process into an adversarial inquiry, contrary to the intent of Congress.

## VI. The Proposed Rules will disparately impact vulnerable populations already routinely criminalized, including LGBTQ+ immigrants, survivors of trafficking and domestic violence, and immigrant youth of color

The expanded criminal bars exclude from safety and a pathway to citizenship those convicted of offenses that are coincident to their flight from persecution, and do not accomplish the stated goal of making communities safer. They will disparately impact vulnerable populations, who comprise asylum seekers hailing primarily from Central America and the Global South, and those routinely criminalized because of their identities, racially disparate policing practices, or in connection with experiences of trafficking and domestic violence.[64] For these populations especially, the discretion currently delegated to asylum adjudicators is crucial for them to become fully integrated in the larger community. The imposition of additional categorical bars to asylum will only further marginalize asylum seekers already struggling with trauma and discrimination.

The Proposed Rules would prevent the use of discretion where it is most needed and most effective. The existing framework for determining if an offense falls within the particularly serious crime bar already provides the latitude for asylum adjudicators to deny relief.[65] Furthermore, asylees with convictions that render them inadmissible must apply for a waiver at the time of their applications for permanent residence.[66] These measures ensure that asylum applicants in vulnerable populations have access to supportive resources and have the opportunity to demonstrate their ongoing commitment to social and personal health. Moreover, the existence of provisions allowing the revocation of asylum status ensures that adjudicators

---

[64] D'Vera Cohn et al., "Rise in U.S. Immigrants from El Salvador, Guatemala and Honduras Outpaces Growth from Elsewhere," *Pew Research Center*, December 7, 2017, https://www.pewresearch.org/hispanic/wp-content/uploads/sites/5/2017/12/Pew-Research-Center_Central_American-migration-to-U.S._12.7.17.pdf.
[65] Apart from the statutory aggravated felony bar to asylum, the Board of Immigration Appeals and Attorney General have historically utilized a highly circumstantial approach to the particular serious crime determination that would bar an immigrant from receiving asylum. *See e.g., Matter of Juarez*, 19 I.&N. Dec. 664 (BIA 1988) (ordinarily a single misdemeanor that is not an aggravated felony will not be a particularly serious crime); *Matter of Frentescu,* 18 I.&N. Dec. 244 (BIA 1982), *modified* (setting forth several factors to be considered before imposing the particular serious crime bar, including: (i) the nature of the conviction, (ii) the circumstances and underlying facts for the conviction, (iii) the type of sentence imposed, and (iv) whether the type and circumstances of the crime indicate that the individual will be a danger to the community); *Matter of Y-L-, A-G-, R-S-R-,* 23 I.&N. Dec. 270 (A.G. 2002) (setting forth a multi-factor test to determine the dangerousness of a respondent convicted of a drug-trafficking offense who is otherwise barred from asylum as an aggravated felon, but seeking withholding of removal).
[66] 8 U.S.C. § 1159(c) (2012).

AR.09311

may continue to enforce concerns related to the safety of the community even after asylum is granted.[67]

Barring asylum for immigrants convicted of migration-related offenses punishes them for fleeing persecution and/or seeking safety for their children, and does not make communities safer. The expansion of the criminal bars to asylum to include offenses related to harboring, smuggling of noncitizens by parents and family members and those previously removed further criminalizes vulnerable populations fleeing persecution.[68] The vast expansion of migrant prosecutions at the border during the current administration has created administrative chaos and separated families that do not pose a threat to the safety of communities in the United States.[69] The Proposed Rules threaten to magnify the harm caused by these reckless policies by further compromising the ability of those seeking safety on the southern border to access the asylum system.

The Proposed Rules expand the asylum bar to parents or other caregivers who are convicted of smuggling or harboring offenses after taking steps to help minor children enter the United States in order to flee persecution. This proposed bar is particularly insidious in light of now-public documents revealing this administration's explicit efforts to utilize smuggling prosecutions against parents and caregivers as part of its strategy of deterring families from seeking asylum in the United States.[70] The Proposed Rules seek to take this widely condemned strategy one step further, by additionally barring those parents *already prosecuted* from obtaining asylum protections for themselves and their children. The Proposed Rules multiply the harms parents and caregivers have experienced in their treacherous journeys to safety and callously penalize parents for doing what is only human—taking all necessary steps to protect their children.

The Proposed Rules also expand the asylum bar to those who have fled persecution multiple times and therefore been convicted of illegal reentry. Their inclusion is premised on conclusory statements regarding the dangerousness of recidivist offenders, without consideration of the seriousness of prior convictions.[71] Rather, the Proposed Rules treat all immigration violations as similar in seriousness to those previously warranting inclusion in the particularly serious crime bar, without any independent evidence to justify the expansion. Such an approach renders meaningless the limiting language of "particularly serious" in the statute.

[67] 8 C.F.R. § 208.24(a) (2012).

[68] On April 11, 2017, then-Attorney General Sessions instructed all federal prosecutors to increase their prioritization of immigration offenses for prosecution, including misdemeanor offenses committed by first time entrants. *See* Memorandum from the Attorney General: Renewed Commitment to Criminal Immigration Enforcement (April 11, 2017), https://www.justice.gov/opa/press-release/file/956841/download.

[69] *Id.*; Richard Marosi, "The aggressive prosecution of border crossers is straining the courts. Will zero tolerance make it worse?," *Los Angeles Times*, May 11, 2018, https://www.latimes.com/local/california/la-me-ln-immigrant-prosecutions-20180511-story.html.

[70] Ryan Devereaux, "Documents Detail ICE Campaign to Prosecute Migrant Parents as Smugglers," *The Intercept*, April 29, 2019, https://theintercept.com/2019/04/29/ice-documents-prosecute-migrant-parents-smugglers/ (describing how in May 2017, the Department of Homeland Security set out to target parents and family members of unaccompanied minors for prosecution).

[71] Proposed Rules at 69648.

17

The Proposed Rules expand the asylum bar to include any asylum seeker who has been convicted of a misdemeanor offense for use of a fraudulent document. In so doing, the Rules entirely ignore the migration-related circumstances that often give rise to convictions involving document fraud, unfairly punishing low-wage immigrant workers and does not make communities safer. Migrants fleeing persecution often leave their home countries with nothing but the clothes on their backs and must rely on informal networks to navigate their new circumstances.[72] Extension of a blanket bar to asylum seekers who are compelled to resort to fraudulent means to enter the United States, or to remain safely during their applications for asylum, upends decades of settled law directing that violations of law arising from an asylum applicant's manner of flight should constitute only one of many factors to be consulted in the exercise of discretion.[73]

The Proposed Rules pose a unique threat to LGBTQ+ immigrant community members. LGBTQ+ immigrants in particular may have already experienced a high degree of violence and disenfranchisement from economic and political life in their home countries.[74] Hate violence towards undocumented LGBTQ+ immigrants in the United States is already disproportionately higher than for other members of the LGBTQ+ population.[75] Members of these communities also experience isolation from their kinship and national networks following their migration. This isolation, compounded by the continuing discrimination towards the LGBTQ+ population at large, leave many in the LGBTQ+ immigrant community vulnerable to trafficking, domestic violence, and substance abuse, in addition to discriminatory policing practices. The expansion of criminal enforcement and prosecution of undocumented people also harms the LGBTQ+ immigrant community.[76] The Proposed Rules will therefore have a disparate impact on LGBTQ+ individuals whose involvement in the criminal legal system is often connected to past trauma and/or the result of biased policing.

The expansion of asylum bars would also disproportionately affect trafficking survivors by precluding asylum adjudicators from conducting a trauma-centered approach, categorically barring countless trafficking survivors convicted of misdemeanor and felony offenses without any opportunity to present the specific circumstances of their claim. It is becoming more widely recognized across state court systems that trafficking survivors frequently come into contact with intervention resources and service providers only after contact with law enforcement occurs. Innovative criminal justice reform efforts currently being adopted across the country include

---

[72] *See Pula*, 19 I.&N. Dec. at 474.

[73] *Id.*

[74] *See* Aengus Carroll and Lucas Ramon Mendos, *State Sponsored Homophobia: A World Survey of Sexual Orientation Laws: Criminalisation, Protection and Recognition* 12th Ed. (International Lesbian, Gay, Bisexual, Transgender, and Intersex Association (ILGA), 2017),
https://ilga.org/downloads/2017/ILGA_State_Sponsored_Homophobia_2017_WEB.pdf.

[75] *See* Sharita Gruberg, "LGBTQ Undocumented Immigrants Face an Increased Risk of Hate Violence," *Center for American Progress*, June 10, 2014,
https://www.americanprogress.org/issues/immigration/news/2014/06/10/91233/lgbt-undocumented-immigrants-face-an-increased-risk-of-hate-violence/.

[76] *See eg.*, Sharita Gruberg, "How Police Entanglement with Immigration Enforcement Puts LGBTQ Lives at Risk," *Center for American Progress*, April 12, 2017, https://www.americanprogress.org/issues/lgbtq-rights/reports/2017/04/12/430325/police-entanglement-immigration-enforcement-puts-lgbtq-lives-risk/.

AR.09313

special trafficking courts that recognize the need for discretion in the determination of criminal culpability.[77] The same approach should be employed in the determination of asylum eligibility, where the applicant's life and safety are on the line.

Survivors of domestic violence include trafficking survivors and LGBTQ+ community members, such that inclusion of offenses related to domestic violence in the expanded asylum bars affects populations with overlapping vulnerabilities.[78] The Proposed Rules too broadly categorize domestic violence offenses as particularly serious, with consequences for both the victim and perpetrator. The immigration laws extend protections to domestic violence survivors outside of the asylum context, recognizing the complex dynamics surrounding intimate partner violence. Provisions in the Violence Against Women Act allow adjudicators evaluating claims for relief arising thereunder to exercise discretion based on a number of factors and circumstances.[79] The blunt approach adopted by the Proposed Rules is inconsistent with the approach taken towards survivors elsewhere in the federal immigration statute and does not rely on any evidence-based justification for treating asylum seekers differently.

Moreover, the domestic violence sections of the Proposed Rules include the only categorical bar to asylum for which a conviction is not required. Domestic violence incidents all too often involve the arrest of both the primary perpetrator of abuse and the survivor.[80] These "cross-arrests" do not always yield clear determinations of victim and perpetrator. Authorizing asylum adjudicators to determine the primary perpetrator of domestic assault, in the absence of a judicial determination, unfairly prejudices survivors who are wrongly arrested in the course of police intervention to domestic disturbances.

The exemption for asylum applicants who can demonstrate their eligibility for a waiver under section 237(a)(7)(A) of the Immigration and Nationality Act does not cure the harm to asylum seekers caused by imposition of a categorical domestic violence related bar.[81] Rather, it

---

[77] Elise White, et al., "Navigating Force and Choice: Experiences in the New York City Sex Trade and the Criminal Justice System's Response," *Center for Court Innovation*, December 2017 (noting that 78% of participants in the report's study had been arrested, mostly for non-violent, non-prostitution offenses such as *drug possession*).

[78] Marty Schladen, "ICE Agents Detain Alleged Domestic Violence Victim," *El Paso Times*, February 16, 2017, https://www.elpasotimes.com/story/news/2017/02/15/ice-detains-domestic-violence-victim-court/97965624/ (noting that the immigrant detained, a transgender person previously deported following her conviction for crimes such as posession of stolen mail and assault, was then living at the Center Againts Sexual and Family Violence, a shelter for survivors of intimate partner violence).

[79] Nadine Shaanta Murshid and Elizabeth A. Bowen, "A Trauma-Informed Analysis of the Violence Against Women Act's Provisions for Undocumented Immigrant Women," *Violence Against Women* 24(13) (2018): 1540–1556, https://doi.org/10.1177/1077801217741991.

[80] David Hirschel, et al., "Domestic Violence and Mandatory Arrest Laws: To What Extent Do They Influence Police Arrest Decisions," *Journal of Criminal Law & Criminology* 98, no. 1 (2007-2008): 255, https://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?article=7284&context=jclc (noting that "[i]n some cases, dual arrests may be the result of legislation, department policies, or both failing to require officers to identify the primary aggressor. In addition, when such provisions are present, police may lack the training or information needed to identify the primary aggressor when responding to a domestic violence assault. This situation may be compounded by batterers who have become increasingly adept at manipulating the criminal justice system, and may make efforts to 'pre-empt' victims from notifying police in order to further control or retaliate against them.").

[81] 8 U.S.C. § 1227(a)(7)(A).

AR.09314

converts a non-adversarial asylum proceeding into a multi-factor, highly specific inquiry into culpability based on circumstances that may be very difficult for an asylum seeker to prove—especially if proceeding without counsel and with limited English proficiency.

Barring asylum for immigrants convicted of "gang-related crimes" based on unreliable evidence and racially disparate policing practices is harmful to youth of color and does not make communities safer. In recent years, the expansion of gang databases for use in the apprehension and removal of foreign nationals—including children—has generated tremendous concern among advocates and the communities they serve.[82] The use of gang databases by local law enforcement and Immigration and Customs Enforcement has been widely criticized as an overbroad, unreliable and often biased measure of gang membership and involvement.[83] The Proposed Rules expand the criminal bars to asylum to those accused of gang involvement in the commission of minor criminal offenses, embracing an open-ended adjudicative process that will inevitably result in asylum adjudicators relying unfairly on these discredited methods of gang identification. This outcome would compound the disparate racial impact of inclusion in gang databases and bar asylum seekers who are themselves fleeing violence from gangs in their home countries.[84]

Past legislative efforts to expand the grounds of removal and inadmissibility in the Immigration and Nationality Act to include gang membership have failed to pass both houses of Congress.[85] In addition, immigration adjudicators already routinely premise discretionary denials of relief or release on bond on purported gang membership, and scores of alleged gang members have already been deported on grounds related to immigration violations or criminal convictions for which no relief is available.[86] Creating a "gang-related crime" bar will only exacerbate the due process violations already occurring as the result of unsubstantiated information about supposed gang ties.[87]

---

[82] *See* Nermeen Arastu, et al., "Swept Up In The Sweep: The Impact of Gang Allegations on Immigrant New Yorkers," *New York Immigration Coalition (NYIC) and CUNY School of Law's Immigrant and Non-citizen Rights Clinic*, May 2018, https://www.law.cuny.edu/wp-content/uploads/page-assets/academics/clinics/immigration/SweptUp_Report_Final-1.pdf.

[83] Ali Winston, "Marked for Life: U.S. Government Using Gang Databases to Deport Undocumented Immigrants," *The Intercept*, August 11, 2016, https://theintercept.com/2016/08/11/u-s-government-using-gang-databases-to-deport-undocumented-immigrants/.

[84] *See* Jonanthan Blitzer, "How Gang Victims Are Labeled As Gang Suspects," *The New Yorker*, January 23, 2018, https://www.newyorker.com/news/news-desk/how-gang-victims-are-labelled-as-gang-suspects.

[85] *See* Jessica Chacon, "Whose Community Shield?: Examining the Removal of the 'Criminal Street Gang Member,'" *University of Chicago Legal Forum* 317 (2007: 333-336) (reviewing legislative history of failed efforts to expand removability of those accused of gang related offenses and noting criticism that "[t]he only legal effect of the proposed legislation would be to increase the number of noncitizens lawfully present who would be subject to removal on the basis of their purported associations with individuals involved in group criminal activity.").

[86] For an illustration of Immigration and Customs Enforcement's propensity to make gang allegations on the basis of questionable if not fabricated evidence, and the deference to which the evidence is often granted by immigration adjudicators, *see* Mark Joseph Stern, "Bad Liars," *Slate*, May 16, 2018, https://slate.com/news-and-politics/2018/05/federal-judge-accused-ice-of-making-up-evidence-to-prove-that-dreamer-was-gang-affiliated.html.

[87] See Yvette Cabrera, "New ICE Tactic Raises Questions About Due Process," *ThinkProgress*, October 6, 2017, https://thinkprogress.org/ice-targets-gangs-6775356473a8/; Rebecca Hufstader, "Immigration Reliance On Gang Databases: Unchecked Discretion And Undesirable Consequences," 90 *New York University Law Review* 90 (2015): 671.

AR.09315

In addition, by focusing on "reason to believe" as the basis for the bar, rather than the seriousness of the crime, the proposed provision is ultra vires and unconscionably limits the eligibility for asylum of those most in need of protection. The effect of the Proposed Rules would be to expand the number and type of convictions for which an analysis of eligibility is required, sweeping in even petty offenses that would otherwise not trigger immigration consequences. Thus, an asylum applicant convicted of simple assault without use of a weapon, a non-violent property crime, or even possession of under 30 grams of marijuana for personal use (otherwise exempted from the reach of the Proposed Rules), could trigger a bar to asylum if the adjudicator concludes they have "reason to believe" the offense was committed in furtherance of gang activity.[88] In making these determinations, asylum adjudicators would be unable to rely on uncorroborated allegations contained in arrest reports, but could nevertheless shield their decisions by relying on discretion.[89]

The Proposed Rules thus invite extended inquiry into the character of young men of color who otherwise have meritorious asylum claims, based on information gained through racially disparate policing practices. These rules multiply the harm to asylum seekers of color subject to racially disparate policing that results in racially disparate rates of guilty pleas to minor offenses. This same population is overrepresented in gang databases, which are notoriously inaccurate, outdated, and infected by racial bias.[90]

## VII. The Proposed Rules are ultra vires to the federal immigration statute to the extent they purport to bar eligibility through a categorical exercise of discretion

When Congress speaks clearly through a statute, the plain meaning of that statute governs.[91] Congress by statute permits the Attorney General to designate certain categories of offenses as "particularly serious crimes."[92] As such, Congress *explicitly* permitted the Attorney General to designate a non-aggravated felony to be a particularly serious crime and thus to disqualify a person from asylum. In the context of asylum, all aggravated felonies are *per se* particularly serious crimes and the Attorney General "may designate by regulation [other] offenses that will be considered to be" a particularly serious crime for purposes of asylum.[93]

---

[88] Page 69649 of the Proposed Rules notes that the applicable standard for determining when to apply the bar on asylum seekers convicted of a crime involving criminal street gangs is "reason to believe," as used in 8 U.S.C. § 1182(a)(2)(c), and that the asylum adjudicator may consider "all reliable evidence" in making their decision.
[89] *See Garces v. U.S. A.G.*, 611 F.3d 1337, 1349-50 (11th Cir 2010) (reversing finding of "reason to believe" that the respondent was a participant in drug trafficking based on unsubstantiated arrest reports); *Matter of Rico*, 16 I.&N. Dec. 181, 185-86 (BIA 1977) (relying on pre-hearing admissions to uphold finding of inadmissibility).
[90] Annie Sweeney and Madeline Buckley, "Chicago police gang data collection faulted by city's inspector general as unchecked and unreliable," *Chicago Tribune*, April 11, 2019, https://www.chicagotribune.com/news/breaking/ct-met-chicago-police-gang-data-04112019-story.html; Anita Chabria, "A routine police stop landed him on California's gang database. Is it racial profiling?," *Los Angeles Times*, May 9, 2019, https://www.latimes.com/politics/la-pol-ca-california-gang-database-calgang-criminal-justice-reform-20190509-story.html.
[91] See, *e.g.*, *Robinson* v. *Shell Oil Co.*, 519 U.S. 337, 340 (1997).
[92] 8 U.S.C. § 1158(b)(2)(B)(ii).
[93] *Id.* The Attorney General has not designated "substantial battery" to be a particularly serious crime for any purpose, including for purposes of ineligibility to seek asylum.

AR.09316

Here, however—seemingly in an attempt to insulate the Proposed Rules from review, the agencies attempt to designate new bars to asylum both by designating them as "particularly serious crimes" pursuant to 8 U.S.C. § 1158(b)(2)(B)(ii) and rendering them categorically exempt from a positive discretionary adjudication of asylum pursuant to 8 U.S.C. § 1158(b)(2)(C). This effort is unlawful. Section 1158(b)(2)(B)(ii) does permit the Attorney General to, if he wishes, attempt to designate some classes of offenses as particularly serious crimes; such designations are reviewable for legal error (and as explained above, the commenters believe these expansions are unlawful).[94] However, if the offense is not a particularly serious crime, then a discretionary decision must be rendered on the application. It is true that the Attorney General may also provide for "additional limitations and conditions" on asylum applications so long as they are "consistent" with the with the asylum statute.[95] In this case, however, the Proposed Rules add sweeping categories of offenses that automatically remove an applicant from the consideration of discretion—a regulatory proposal that is ultra vires to the plain text of the statute.

To the extent that the proposed rules would adopt a bar to asylum based on a categorical discretionary bar, rather than a particularly serious crime designation, they are similar to the rules struck down by numerous Circuit Courts of Appeal in the context of adjustment of status for those considered by law to be "arriving aliens." Purporting to exercise discretion categorically, then-Attorney General Reno putatively rendered that class of noncitizens ineligible for adjustment of status, a determination that is ordinarily discretionary, even though the statute seemed to allow eligibility. Multiple Circuit Courts of Appeal struck down the proposed regulations, finding them to reflect an impermissible reading of the statute in light of the fact that Congress carefully defined in the statute the categories of people eligible to apply for adjustment of status.[96]

The same logic applies here. In the asylum statute, Congress explicitly made the commission of a particularly serious crime a bar to asylum. The Proposed Rules attempt to create numerous categories of discretionary "pseudo-particularly serious crimes," barring asylum through a categorical exercise of discretion even if those offenses are ultimately found not to be particularly serious crimes. Such an effort violates this canon of interpretation, and places the Proposed Rules ultra vires to the statute.

## VIII.   Conclusion

---

[94] 8 U.S.C. § 1252(a)(2)(D).

[95] 8 U.S.C. § 1158(b)(2)(C); *see also* 8 U.S.C. § 1158(d)(5)(B).

[96] The First and Ninth Circuits found the regulations contrary to clear statutory command. *Succar v. Ashcroft*, 394 F.3d 8, 29 (1st Cir. 2005); *Bona v. Gonzales*, 425 F.3d 663, 668-71 (9th Cir. 2005). Other courts invalidated the adjustment regulations under "Step Two" of *Chevron*. Those courts found some ambiguity in the statute, but found a per se discretionary bar not based on a permissible construction of the eligibility standards set forth in the governing statute in light of the statutory scheme and congressional intent. *Zheng v. Gonzales*, 422 F.3d 98, 116-20 (3d Cir. 2005) (invalidating regulation precluding category of people from applying to adjust status "[g]iven Congress's intent as expressed in the language, structure, and legislative history of INA section 245 [8 U.S.C. § 1255]"); *Scheerer v. United States Attorney General*, 445 F.3d 1311, 1321-22 (11th Cir. 2006). This reasoning would likewise be applicable to the proposed rules. Where Congress went through the trouble to create a comprehensive statutory scheme to define asylum eligibility, the agency cannot preempt that in the guise of discretion by creating out of whole cloth a separate set of eligibility criteria.

AR.09317

The Proposed Rules would create further hardships for our client community members seeking asylum protections and unfairly punish vulnerable populations for convictions and conduct. The bars to asylum are not only vague but would take away discretion from the adjudicator in cases where mitigating circumstances might exist. The Proposed Rules cruelly disregard the connections between trauma and involvement in the criminal legal system. The bars to asylum are already exceedingly harsh, and extending those bars would unlawfully make this process even less accessible, and impermissibly inject racial bias into the asylum process. As a legal services provider for low-income individuals, we see how racial disparities pervade the criminal justice system, harming low-income people of color disproportionately by design. As a result, contact with our criminal legal system is very often not reflective of a person's threat or danger to the community. We are deeply concerned that these rules will endanger the lives of many people, tear families apart, and harm our communities.

For these reasons, we again urge that the Proposed Rules be rescinded in their entirety.

Sincerely,


/s Maria Alejandra Otero
Maria Alejandra Otero
Attorney at Law

Registered E-mail: motero@ablelaw.org

AR.09318

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ekh-jz6g
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0383
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Nadine Wettstein
**Address:**
  191 E Jefferson Street
  Rockville,  MD,  20850
**Email:** nwettstein@opd.state.md.us
**Phone:** 301-563-8936
**Organization:** Maryland Office of the Public Defender

## General Comment

See attached comments on behalf of the Maryland Office of the Public Defender.

## Attachments

OPD comment on EOIR proposed rule 18-0002

STATE OF MARYLAND



LAWRENCE J. HOGAN, JR.
GOVERNOR

BOYD K. RUTHERFORD
LT. GOVERNOR

**OFFICE OF THE PUBLIC DEFENDER**
**ADMINISTRATION**
**WILLIAM DONALD SCHAEFER TOWER**
**6 SAINT PAUL STREET, SUITE 1400**
**BALTIMORE, MARYLAND 21202**
*Ph. (410) 767-8460*
*Fax (410) 333-8496*
*Toll Free: 1 (877) 430-5187*

PAUL B. DeWOLFE
PUBLIC DEFENDER

BECKY FELDMAN
DEPUTY PUBLIC DEFENDER

Lauren Adler Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, Suite 2616
Falls Church, Virginia 22041
Via Regulations.gov

**RE: Proposed Rule EOIR Docket No. 18-0002**

January 21, 2020

Dear Ms. Reid,

On behalf of the Maryland Office of the Public Defender (OPD), we write to urge the Department of Homeland Security and the Department of Justice to withdraw, in their entirety, the Proposed Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019.  84 FR 69640 (proposed Dec. 19, 2019). The Proposed Rules raise serious constitutional concerns and are arbitrary and capricious and ultra vires, and would not survive court challenge.

OPD is the state agency charged with representing indigent defendants accused of a crime in Maryland.  In accordance with *Padilla v. Kentucky*, 559 U.S. 356 (2010), and our commitment to client-centered superior representation, we counsel our noncitizen clients on the immigration consequences of their case and consider their status in plea negotiations and throughout representation. To meet this constitutional obligation, we have established in-house expertise on the immigration consequences of a criminal conviction and its impact on noncitizen Maryland residents. We regularly represent noncitizen residents throughout the state who will be disproportionately impacted by these Proposed Rules.

Asylum is a critically important remedy to provide those at grave risk of death or persecution in their native country with a path to U.S. citizenship and security.  The current asylum law, regulations, and processes already are extremely harsh, with sweeping categorical bars precluding many refugees from eligibility for asylum consideration and substantial barriers to relief even for those who are eligible for consideration.  Immigration adjudicators already have vast discretion to deny asylum to those who meet the refugee definition but have been convicted of criminal conduct, and the provisions authorizing revocation of asylum status allow for continued enforcement even after asylum is granted.   The provisions proposed here are unnecessary and preclude life-saving protections for some of the world's most vulnerable individuals.

Maryland Relay – 711 or 1-800-735-2258 for callers outside the State of Maryland

AR.09320

## I.    Additional Categorical Bars to Asylum Are Neither Needed Nor Appropriate

The Immigration and Nationality Act and implementing regulations bar an individual that "having been convicted by a final judgment of a particularly serious crime is a danger to the community of the United States" from receiving asylum status. 8 U.S.C. 1231(b)(3)(B); 8 CFR § 1208.13(c)(1). The Department of Justice and the Department of Homeland Security propose to designate seven new sweeping categories of offenses and conduct as "particularly serious crimes" that would trigger asylum ineligibility, including alleged conduct unaccompanied by any conviction. This proposal exceeds statutory authority, and thus would be *ultra vires*. It reverses decades of the Department of Justice's and federal courts' interpretation and construction of the term "particularly serious crime" without any rational justification.

Since the Attorney General's precedential case of *Matter of Frentescu* and its progeny, the Attorney General has always reiterated that "essential key to determining whether a crime is particularly serious, which is whether the nature of the crime is one which indicates that the alien poses a danger to the community." (*Matter of G-G-S-*, 26 I&N Dec. 339 (BIA 2014) (citing *Matter of Carballe*, 19 I&N Dec. 357, 360 (BIA 1986)). The Proposed Rules would arbitrarily re-categorize a large swath of offenses across the country, without any regard to "whether the nature of the crime is one which indicates that the alien poses a danger to the community." The Proposed Rules constitute a radical departure from the Departments' historical construction of the term that would drain it of any sensible meaning. The Proposed Rules would unreasonably exclude countless vulnerable immigrants to the United States from life-saving humanitarian protection.

### A. The Overly Broad Categories of a Felony, Including Any Conviction with a Potential Sentence of More than One Year, and Gang Affiliation Go Beyond "Particularly Serious Crimes."

The Proposed Rules propose to create a new category of per se particularly serious crime to include any offense punishable by more than a year in prison. This radical change relies on two unsupported assertions: first, that the legal scheme in place is "inefficient" and leads to inconsistent results because "case-by-case adjudication means that aliens convicted of the exact same offense can receive different asylum treatment." 84 Fed. Reg. 69646; second, that "convictions for which sentences are longer tend to be associated with crimes of a more consequential nature." 84 Fed. Reg. 69646. Both assertions ignore the reality of the criminal justice system in Maryland and around the country.

The maximum potential sentence for an offense is not a reliable indicator of the seriousness of the offense. In Maryland, many minor, nonviolent misdemeanor offenses that should never reasonably be considered "particularly serious" carry a potential sentence of one year. Examples include:

- MD. ALCO. BEV. §6-307, which criminalizes the sale of alcohol to a visibly intoxicated person with a sentence of up to two years

2

- MD. CRIM. LAW §3-804(a)(1), which criminalizes the use of a telephone to make a single anonymous phone call to annoy or embarrass another person with a sentence of up to three years
- MD. CRIM. LAW §4-101(c)(1), which criminalizes the simple possession of a "dangerous weapon," including a utility knife, on one's person, with a sentence of up to three years
- MD. CRIM. LAW §6-105(b), which criminalizes the burning of property under $1,000 with a sentence of up to 18 months
- MD. CRIM. LAW §6-205(a), which criminalizes the unauthorized entry into a dwelling with a sentence of up to 3 years
- MD. CRIM. LAW §7-203, which criminalizes the temporary use of another persons' vehicle without their consent (i.e. "joyriding") with a sentence of up to 4 years
- MD. CRIM. LAW § 13-1015, which criminalizes the import, sale or transportation of unstamped cigarettes within the State of Maryland with a sentence of up to 2 years

A potential sentence of one year is not an accurate or reliable indication of *any* seriousness, much less "crime[s] of a more consequential nature." When determining asylum eligibility, the Proposed Rules would result in irrational, arbitrary and fundamentally unfair scenarios where a person with a non-violent misdemeanor conviction, such as "joyriding," would be treated the same as a person with a violent felony conviction, such as homicide. In addition to the harsh inequities of such a framework, this Proposed Rules will create a clear disincentive for noncitizens fleeing persecution to plead guilty to misdemeanor charges that could face a one year sentence, even if the plea agreement would not include any incarceration. This in turn could have a host of unintended collateral consequences in the Maryland criminal justice system.

Furthermore, to justify this radical change under the guise of "consistency" ignores the fact that two people with convictions for the same offense could have engaged in significantly different conduct. Often, one statute will criminalize a range of conduct. For example, the Maryland offense of Indecent Exposure, MD. CRIM. LAW §11-107, which carries a potential sentence of 3 years, criminalizes conduct ranging from an individual intentionally exposing their genitals to another person in broad daylight, to a homeless individual urinating in a public park, outside of public view, after being unable to find an accessible public restroom. Despite the significantly different conduct and circumstances, under the Proposed Rules, both individuals would be barred from asylum.

The purported desire for consistency also ignores the federalist nature of the U.S. criminal justice system. As each state has its own criminal code, the same behavior may be criminalized differently across states. As highlighted above, Maryland's Indecent Exposure law covers a wide range of conduct under one offense with a wide sentencing range. Neighboring Delaware has first and second degree Indecent Exposure, Del. Code Ann., tit. 11, §§ 764-65 11-10, with the first degree charge authorizing a sentence of up to one year and the second degree charge having a maximum sentence of 30 days. If implemented, the Proposed Rules would classify all Indecent Exposure offenses in Maryland felonies, while some offenses based on identical conduct in Delaware would not. Thus, the change is in fact likely to result in *more* inconsistency than the current scheme in place, which authorizes immigration adjudicators to consider these significant distinctions.

Furthermore, the Proposed Rules make no exception for convictions based on conduct influenced by mental illness or duress, which is also very relevant to the "particularly serious" nature of a

3

AR.09322

particular conviction. For example, while experiencing a mental health crisis, OPD client EMD entered the home of another person. EMD was in a state of confusion and genuinely believed he was entering his own home. EMD did not hurt anyone, threaten anyone, nor attempt to take any property. EMD was arrested and charged with Fourth Degree Burglary pursuant to MD. CRIM. LAW §6-205(a), which carries a potential sentence of 3 years. If the Proposed Rules were implemented, a conviction would senselessly bar EMD from asylum, despite the fact that EMD's conduct resulted from a mental health crisis.

The Proposed Rules would place purported "consistency" over legitimate concerns of fairness and accurate assessments of dangerousness. Some applicants engaged in widely different conduct would be treated exactly the same; while other applicants engaged in the same conduct in different states would be treated differently. All would be barred from asylum protections. Making matters worse, the proposed provision creating a rebuttable presumption against the effectiveness of a state order vacating or modifying a conviction or sentence removes a critical safety net for these (and other) types of improper guilty pleas. *See infra* Section II.

OPD has represented asylee clients with horrific stories of violence and persecution who would have been barred from asylum under these new rules. CLB was a young man whose father was murdered by MS-13 for refusal to pay extortion. Afterward, MS-13 members continued to go after the family. They targeted CLB with escalating degrees of violence, ultimately shooting him at close range in an attempt to kill him. CLB narrowly escaped and made the perilous journey to the U.S. while still healing from the bullet wound. Shortly thereafter, MS-13 murdered CLB's step-brother. While living in Maryland, CLB was arrested for the first time and decided to plead guilty to simple assault—a misdemeanor offense. After reviewing the allegations and CLB's record, the judge issued a suspended sentence, a reflection that the situation did not call for active jail time. Following his conviction, CLB applied for and was granted asylum by an immigration judge, who considered the facts underlying the conviction and made the finding that the incident was not "particularly serious." Had these rules been in place, despite the clear danger CLB faces if deported and the absence of indicators that CLB poses a danger, he would have been barred from asylum because his Maryland misdemeanor conviction would be considered a felony.

## B. Several Proposed Bars to Eligibility Are for Offenses Due to Flight From Persecution

The expanded criminal bars would exclude from safety and a pathway to citizenship those convicted of offenses that are coincident to their flight from persecution, and do not accomplish the stated goal of making communities safer. For example, the Proposed Rules bars eligibility for any asylum seeker who has been convicted of a misdemeanor offense for use of a fraudulent document. Migrants fleeing persecution often lack documentation and are compelled to obtain fraudulent documentation to enter the United States, or to safely remain in the United States during the pendency of their immigration proceedings.

Likewise, parents or other caregivers can be convicted of smuggling or harboring offenses after taking steps to help minor children enter the United States in order to flee persecution. This proposed bar is particularly insidious in light of the Administration's strategic efforts to prosecute parents and family members of unaccompanied minors for smuggling offenses. Ryan Devereaux,

4

*Documents Detail ICE Campaign to Prosecute Migrant Parents as Smugglers*, *The Intercept*, April 29, 2019, https://theintercept.com/2019/04/29/ice-documents-prosecute-migrant-parents-smugglers.

Violations of law arising from an asylum applicant's manner or impact of flight are rightly considered one of many factors to be consulted in the exercise of discretion rather than serve as a decisive bar.    The discretion currently delegated to asylum adjudicators is crucial for contextualizing how the legitimate fear of persecution directly related to the activity underlying certain charges. Barring asylum for immigrants convicted of migration-related offenses punishes them for fleeing persecution and/or seeking safety for their children, and does not make communities safer.

### C. **The proposed additional bars ignore the impact of trauma, and its disproportionate impact on asylum seekers from vulnerable populations.**

The proposed new bars to asylum of *any* drug-related conviction (except a first minor marijuana possession offense) and any second conviction for driving under the influence (DUI) ignore the research and realities of the impact of trauma. Asylum seekers are an inherently vulnerable population with a high exposure to trauma and insufficient access to needed mental health care. As a result, asylum seekers are especially likely to self-medicate, placing them at high risk of obtaining a drug possession or DUI conviction.

OPD client JC is one of many asylees whose convictions derive directly from the trauma underlying his risk of persecution. JC was homeless and living out of his car. He was in a state of deep, deep depression and experiencing psychosis. His mental health issues were aggravated by a very serious head injury that resulted in significant cognitive impairments. JC began to self-medicate his mental health issues with alcohol. Twice in the span of a few months, JC was pulled over with empty beer bottles in his car. No accident occurred and there was no injury to any person or property. He was convicted of one DUI and charged with a second DUI. Following these two incidents, JC appeared before an immigration judge to apply for asylum, where he was able to explain that his life would be in danger if he were deported. The immigration judge granted asylum. JC has now been sober for more than a year and has stable housing and employment. Termination of his asylum and his deportation, based on the second DUI, would not address any of the purported bases for the proposed rule change.

The proposed categorical bar for domestic-violence related grounds also rejects a trauma-informed approach, making it inconsistent with the Violence Against Women Act and other immigration law provisions that allow adjudicators to exercise discretion in light of the complex dynamics surrounding intimate partner violence. Maryland, like many jurisdictions, often has cross-arrests in which both the perpetrator and the victim are swept into the criminal justice system. OPD client KPM is a longtime survivor of abuse and mother to two U.S. born children. KPM fled her home county to escape MS-13 gang members who had repeatedly gang-raped her with impunity. In the U.S., KPM continued to be victimized by a man who initially offered her protection, but saw her vulnerability and exploited it, ultimately transforming into her abuser. He completely isolated her from her family, regularly beat her, controlled her, and sexually abused her. When she defended herself from her abuser, police arrested her and charged her with a number of serious crimes, which were ultimately all dropped when KPM presented evidence of her ongoing abuse. Given the frequency of cross-arrest, this categorical bar is exceptionally likely to harm the very people who

5

should be protected. It would require that clients like KPM re-litigate their horrific experiences once again in immigration court, but this time without the assistance of an assigned legal representative.

The rejection of a trauma-informed approach will further have a disparate impact on populations with overlapping vulnerabilities. Trafficking survivors and LGBTQ individuals are especially at risk of criminal involvement tied to intimate partner victimization. In their home counties as well as in the U.S., LGBTQ immigrants experience higher rates of violence and are disproportionately vulnerable to trafficking, domestic violence, and substance abuse, in addition to discriminatory policing practices. Likewise, trafficking survivors often come into contact with intervention resources and service providers only after contact with law enforcement. By ignoring the realities of these highly vulnerable populations, the Proposed Rules preclude life-saving protections for those at greatest risk.

### D. Fact-Finding on criminality should not extend beyond the criminal court adjudication.

The Proposed Rules propose to bar applicants if the asylum adjudicator finds that a) an applicant engaged in *conduct* that amounts to "battery or extreme cruelty," regardless of whether or not the applicant was convicted of any offense, and b) conviction for *any crime* that the adjudicator "knows or has reason to believe...was committed in furtherance of criminal street gang activity." 84 FR at 69652, 69649. These provisions would require adjudicators to conduct mini-trials within the asylum adjudication process in order to make complex determinations regarding the nature and scope of particular convictions and conduct.

Tasking adjudicators with a highly nuanced, resource-intensive assessment of the connection of a conviction to gang activity and/or the domestic nature of alleged criminal conduct—assessments far outside their areas of expertise—will prolong asylum proceedings and invariably lead to erroneous determinations. The loosened evidentiary rules in immigration proceedings allow for potentially limitless evidence with varying degrees of reliability. In some cases, it will be nearly impossible for applicants to rebut the negative evidence marshaled against them, regardless of its veracity; while in other cases, asylum applicants (particularly if they are detained) will struggle to find evidence connected to events that may have happened years prior. Indeed, the Supreme Court has "long deemed undesirable" exactly the type of "post hoc investigation into the facts of predicate offenses" proposed here. *Moncrieffe v. Holder*, 569 U.S. 184, 186 (2013). The process would undermine the efficiency concerns that purport to justify other proposed rules, suggesting that the objective of these rules is not in fact to reduce inefficiency but to make the asylum process even more difficult and inaccessible.

The fact-finding required for the categorical bar where the immigration adjudicator has reason to believe that a conviction, no matter how minor, is linked to gang activity is especially problematic. Notably, Congress has considered, and rejected, efforts to expand the grounds of removal and inadmissibility to include gang membership. See Jessica Chacon, *Whose Community Shield?: Examining the Removal of the 'Criminal Street Gang Member*, U. CHI. LEGAL F. 317, 333-35 (2007) (reviewing legislative history of failed efforts to expand removability of those accused of gang related offenses).

6

Considering gang-related offenses to be "particularly serious crimes," 84 FR 69640, at best, conflates even the most petty of offenses with serious aggravated felonies. At worst, it codifies racial animus in asylum consideration. Gang databases have been widely criticized as an overbroad, unreliable and racially biased. *See, e.g.,* Annie Sweeney and Madeline Buckley, *Chicago Police Gang Data Collection Faulted by City's Inspector General as Unchecked and Unreliable,* CHI. TRIB., April 11, 2019, https://www.chicagotribune.com/news/breaking/ct-met-chicago-police-gang-data-04112019-story.html; Anita Chabria, *A Routine Police Stop Landed Him on California's Gang Database. Is it Racial Profiling?*, L.A. TIMES, May 9, 2019, https://www.latimes.com/politics/la-pol-ca-california-gang-database-calgang-criminal-justice-reform-20190509-story.html; Larry Smith, *Former Baltimore Police Officer Criticizes the Department's Gang Database,* THE APPEAL, July 23, 2018, https://theappeal.org/former-baltimore-police-officer-unloads-on-departments-gang-database/. This category will compound the disparate racial impact of inclusion in gang databases and bar asylum seekers who are themselves fleeing violence from gangs in their home countries. Individuals fleeing due to persecution by gangs are dangerously at risk of being inaccurately classified as a gang member themselves. Bona fide asylum seekers, particularly applicants of color who have experienced racial profiling and a criminal legal system fraught with structural challenges and incentives to plead guilty to misdemeanor offenses, will erroneously be denied consideration for relief. Given that immigration adjudicators already have the authority to rely on purported gang membership to justify discretionary denials of relief, the mandatory bar proposed here is particularly unnecessary.

## II. State Court Orders Should Be Presumed Effective

The Proposed Rules create a rebuttable presumption "against the effectiveness" of an order vacating, expunging, or modifying a conviction or sentence if the order was entered into after the asylum seeker was placed in removal proceedings or if the asylum seeker moved for the order more than one year after the date the original conviction or sentence was entered. This presumption goes well beyond the purposed intent to "ensure that aliens do not have their convictions vacated or modified for purported rehabilitative purposes that are, in fact, for immigration purposes," 84 Fed. Reg. 69655.

The Proposed Rules rest on an assumption that a motion to vacate filed more than a year after a judgment or during asylum proceedings was filed for immigration purposes. However, this assumption is unsupported. There are numerous reasons why a motion to vacate or modify a conviction or sentence may be filed more than one year after judgment. Particularly among underfunded and understaffed public defender offices, balancing the high volume of cases and the effort needed to prepare an effective post-conviction petition can require more than one year.[1] Even in plea cases, issues regarding the integrity of the proceeding may require more than one year to establish. Interviews with attorneys and analysis of relevant changes or clarifications in the law remain as important as transcript review, and may require time outside the defendant's control. Ignoring these time-intensive needs to presume that the timing of a filing is solely based on immigration purposes is inappropriate and will work injustices in individual asylum-seekers cases This newly created presumption also would raise serious constitutional concerns as it undermine the Sixth Amendment protections and principles established by *Padilla v. Kentucky,* 559 U.S. 356

---

[1] Anyone serving a sentence or on probation or parole due to a Maryland conviction, whether by plea or trial, has a statutory right to counsel for one post-conviction proceeding. Md. Crim. Proc. §7-101. Thus, even *pro se* petitioners are referred to our office for representation.

AR.09326

(2010). The Supreme Court recognized that a conviction cannot be valid without the effective assistance of counsel, and the defendant should not bear the consequences of a plea that violates basic constitutional principles. In many instances, the asylum seeker has neither the opportunity nor the knowledge to raise their ineffective assistance claim before applying for asylum. Many asylum applicants, especially those in vulnerable populations isolated from resources and unfamiliar with the due process protections available to them in the United States, may not have discovered the defects in their underlying criminal proceedings until their consultation with an immigration attorney, or until removal proceedings begin, which may happen several years after a conviction. By imposing a presumption against the validity of a withdrawal or vacatur of a plea, the Proposed Rules compound the harm to immigrants who, in addition to facing persecution in their home countries, have been denied constitutionally compliant process in the United States criminal legal system.

By requiring immigration adjudicators to second-guess the decision of a state court, even where the order on its face cites substantive and procedural defects in the underlying proceeding, the Proposed Rules violate full faith and credit and the presumption of regularity. *See Saleh v. Gonzales*, 495 F.3d 17, 25-26 (2d Cir. 2007) (discussing 28 U.S.C. § 1738, requiring federal courts to give full faith and credit to state acts, records, and judicial proceedings and U.S. Const. art. IV, § 1, and finding that there was no violation where the Board of Immigration Appeals stopped short of "refusing to recognize or relitigating the validity of [Saleh's] state conviction."). Moreover, without any limiting language to guide the adjudicator's inquiry, the Proposed Rules grant adjudicators vague and indefinite authority to look beyond a valid vacatur, in contravention to existing case law.

Imposing a presumption against the validity of a plea withdrawal or vacatur in these cases will undoubtedly lead to the wrongful exclusion of countless immigrants from asylum simply because they were unable to adequately rebut the presumption, particularly in a complex immigration court setting without the benefit of appointed counsel. Further, this proposed presumption would be arbitrary and capricious as it would contradict long-established federal, state, and agency law on the validity of vacated convictions. For example, the Fourth Circuit has said:

> In the context of removal proceedings, the BIA distinguishes between vacated convictions based on the reason for the vacatur to determine whether the noncitizen has been "convicted" of a qualifying offense. Where a conviction is vacated "based on a defect in the underlying criminal proceedings," the conviction is "no longer." *In re Pickering,* 23 I. & N. Dec. 621, 624 (BIA 2003) (*rev'd on other grounds sub nom., Pickering v. Gonzales,* 465 F.3d 263 (6th Cir.2006)). Where a conviction is "vacate[d] ... for reasons unrelated to the merits of the underlying criminal proceedings," however, the conviction "remains" for immigration purposes. *Id. See Pickering,* 465 F.3d at 266 ("A conviction vacated for rehabilitative or immigration reasons remains valid for immigration purposes, while one vacated because of procedural or substantive infirmities does not.").

*Dung Phan v. Holder,* 667 F.3d 448, 452 (4th Cir. 2012). See also *Duncan v. Maryland,* 236 Md. App. 510, 182 A.3d 268 (2018) (citing *Pickering* for this same principle); *Reyes-Torres v. Holder, 645 F.3d 1073, 1077-78 (9th Cir. 2011)* (holding that "the inquiry must focus on the state court's rationale for vacating the conviction"); *Rodriguez v. U.S. Att'y Gen.,* 844 F.3d 392, 397 (3d Cir. 2006) (noting that "[T]he IJ may rely only on reasons explicitly stated in the record and may not

8

impute an unexpressed motive for vacating a conviction."). As the court in *Rodriguez* stated: "if the order explains the courts reasons ... the [adjudicator's] inquiry must end there." *Rodriguez*, 844 F.3d at 397.

\*                               \*                               \*

The Board of Immigration Appeals has cautioned that, "in light of the unusually harsh consequences which may befall a [noncitizen] who has established a well-founded fear of persecution; the danger of persecution should generally outweigh all but the most egregious of adverse factors." *Matter of Pula*, 19 I.&N. Dec. 467, 474 (BIA 1987). Existing law provides more than sufficient measures to identify and address adverse factors, particularly adverse factors related to a criminal conviction. Beyond the automatic bars based on the aggravated felony provision, the current framework for determining if an offense falls within the particularly serious crime bar already provides the latitude for asylum adjudicators to deny relief to anyone found to pose a danger to the community. The various provisions in the Proposed Rules are inconsistent with existing law, ultra vires, and arbitrary and capricious. They raise serious constitutional concerns. The Department of Homeland Security and the Department of Justice should withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

Thank you for your consideration.

Sincerely,

Paul DeWolfe
Public Defender of Maryland

Nadine Wettstein
Director, Immigration Division

AR.09328

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ekh-qaph
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0384
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Rabbi Jonah Pesner
**Address:**
    2027 Massachusetts Ave NW
    Washington,  DC,  20036
**Email:** dcooper@rac.org
**Phone:** 202-387-2800
**Organization:** Religious Action Center of Reform Judaism

## General Comment

See attached file(s)

## Attachments

asylum rule changes public comment final

AR.09329



RABBI JONAH DOV PESNER, *Director*
ISABEL P. (LIZ) DUNST, *Chair, Commission on Social Action of Reform Judaism*

Arthur and Sara Jo Kobacker Building
*2027 Massachusetts Avenue, NW, at Kivie Kaplan Way, Washington, DC 20036*

(202) 387-2800        @theRAC        www.rac.org

January 21, 2020

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41; Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility

To Whom it May Concern:

I write on behalf of the Union for Reform Judaism, whose nearly 850 congregations across North America encompass 1.5 million Reform Jews, and the Central Conference of American Rabbis, whose membership includes more than 2,000 Reform rabbis, to express opposition to the proposed rule "Procedures for Asylum and Bars to Asylum Eligibility."

The changes to asylum policy included in the proposed rule would be devastating for people seeking asylum in the United States. By adding to the already-lengthy list of automatic bans on asylum access, the rule would undermine the ability of immigration adjudicators to look at a person's entire case and even further decimate the U.S. asylum system.

Currently, the administration uses an existing and expansive list of bars to asylum based on allegations of criminal conduct. Immigration judges also already have the authority to deny asylum relief to applicants who have committed offenses involving "moral turpitude or any violation of... any law or regulation relating to a controlled substance."[1] Despite this broad authority, the Department of Homeland Security and Department of Justice seek to add seven additional bars to eligibility, including for misdemeanor offenses such as those involving fraudulent documents or fraud in public benefits.

---

[1] https://www.uscis.gov/policy-manual/volume-12-part-f-chapter-2



*The Religious Action Center pursues social justice and religious liberty by mobilizing the Reform Jewish community and serving as its advocate in Washington, D.C. The Center is led by the Commission on Social Action of the Central Conference of American Rabbis and the Union for Reform Judaism (and its affiliates) and is supported by the congregations of the Union.*



AR.09330

These proposed changes rely on the assumption that even a non-violent criminal conviction serves as an indicator that an asylum seeker constitutes a "a danger to the community of the United States."[2] Given the grave circumstances from which many asylum seekers flee, to deny them asylum on such specious grounds is an abdication of moral duty. Among those who would be automatically barred from receiving asylum relief under the proposed rule are parents convicted of bringing their children across the border to seek safety and individuals struggling with addiction who have past drug-related convictions but who are seeking care. Discretion and compassion should be the norm when immigration adjudicators review cases such as these, particularly given the desperate circumstances from which asylum seekers are fleeing. Instead of individualized review, these asylum seekers would be blocked from consideration.

In the Torah, we are instructed to "love [the stranger] as yourself for you were strangers in the land of Egypt" (Leviticus 19:33). The value of welcoming the stranger drives our commitment to supporting those seeking refuge. The story of the Jewish people, deprived of refuge several painful times throughout our history, is reflected in the journeys of migrants today. Our Jewish tradition and our historical experiences alike lead us to support immigration policy that is compassionate and just.

This proposed rule is yet another instance of the administration's egregious campaign targeting the U.S. asylum system. The Migrant Protection Protocols (MPP) have forced tens of thousands of asylum seekers to return to dreadful conditions in Mexico as they await their case adjudication. Many migrants are forced to sleep outside, subject to exploitation and violence from cartels. MPP, metering, and safe third country agreements are counter to the international legal principle of *non-refoulement*, or not returning individuals to countries in which they will face persecution or danger. The restrictive admittance policies, fee changes, and, now, proposed new bars to asylum eligibility indicate a clear effort on the part of the administration to dismantle access to asylum in the United States.

Jewish tradition teaches the importance of protecting the most vulnerable. By contrast, the proposed rule would prevent marginalized individuals from accessing safety and security in the United States and would further undermine the ability of immigration adjudicators to offer asylum decisions based on a comprehensive, individualized understanding of a person's circumstances. We urge you to withdraw the proposed rule to avoid further impeding and imperiling asylum seekers seeking refuge in the United States.

Sincerely,

Rabbi Jonah Dov Pesner,

Director of the Religious Action Center of Reform Judaism

---

[2] https://www.govinfo.gov/content/pkg/USCODE-2018-title8/html/USCODE-2018-title8-chap12-subchapII-partI-sec1158.htm

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ekk-vfzh
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0385
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Nanya Thompson

## General Comment

I write to express my strong opposition to this proposed rule change. I am a concerned member of the public who believes strongly that our nation must welcome people fleeing violence, and who is strongly concerned about racial profiling in the criminal legal system. Immigrants are a vital part of my community, my neighborhood, and my state. Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution. U.S. law enshrines the protections of the international Refugee Convention, drafted in the wake of the horrors of World War II. Under the Refugee Act of 1980, passed with bipartisan support, anyone present or arriving in the U.S. can apply for asylum. For asylum seekers, making it to the U.S. often means they have found safety from persecution, torture, and sometimes death. Yet asylum seekers face many unjust obstacles in the immigration system. This proposed rule would inject racial profiling into the asylum process. This latest attack would put even more people seeking asylum at risk of danger - and death. This would in turn eviscerate one of the most important defenses community members have against deportation. This proposed Trump rule would punish people who've already endured mistreatment and racial profiling in the criminal legal system a second time -- with deportation back to the very life-threatening situation they fled. This is profoundly immoral, makes a mockery of due process, and comes right out of Steven Miller's racist playbook. We shouldn't let proven racists create immigration laws. The criminal legal system in the U.S. is wracked with racial profiling and obstacles to equal justice. Our harsh immigration laws exploit these obstacles to drive mass incarceration and mass deportation of people of color. I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.

AR.09332

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ekk-iv5p
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0386
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** k a

## General Comment

I write to express my strong opposition to this proposed rule change.

I am a concerned member of the public who believes strongly that our nation must welcome people fleeing violence, and who is strongly concerned about racial profiling in the criminal legal system. Immigrants are a vital part of my community, my neighborhood, and my state.

Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution.
U.S. law enshrines the protections of the international Refugee Convention, drafted in the wake of the horrors of World War II. Under the Refugee Act of 1980, passed with bipartisan support, anyone present or arriving in the U.S. can apply for asylum.

For asylum seekers, making it to the U.S. often means they have found safety from persecution, torture, and sometimes death. Yet asylum seekers face many unjust obstacles in the immigration system.

This proposed rule would inject racial profiling into the asylum process. This latest attack would put even more people seeking asylum at risk of danger - and death. This would in turn eviscerate one of the most important defenses community members have against deportation.

This proposed Trump rule would punish people who've already endured mistreatment and racial profiling in the criminal legal system a second time -- with deportation back to the very life-threatening situation they fled. This is profoundly immoral, makes a mockery of due process, and comes right out of Steven Miller's racist playbook.

The criminal legal system in the U.S. is wracked with racial profiling and obstacles to equal justice. Our harsh immigration laws exploit these obstacles to drive mass incarceration and mass deportation of people of color.

I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from

AR.09333

discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.

For these reasons, I call upon the Trump administration to withdraw this proposal NOW!

Thank you for your time and consideration.

Sincerely!

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ekh-8nn2
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0387
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Courtney Gamez

## General Comment

I strongly oppose all aspects of this proposed rule. The severity of the punishing that would be applied, barring protecting from persecution, does not align with the low level offenses that are being proposed as potential barring offenses. A DUI is a crime that should be punished, but does not equate to a reason someone should be sent back to a country where they will be tortured and killed. The proposed offenses are minor crimes that require a "slap on the wrist" punishment in courts, usually no more than a few days or weeks in jail. The current bars to asylum are major human rights abuses that are deserving of the severity assigned to them. We do not want to offer asylum to someone who has persecuted others for obvious reasons. These offenses are nowhere near that magnitude and are just another attempt by this administration to destroy all options for immigration relief even for those who have valid fears of persecution. I say it again because it cannot be stated more strongly, a DUI is not a reason someone should be denied protection from persecution or torture. These proposed bars are often crimes people make the unfortunate mistake of committing once and learn their lessons from. They are not the same as those committed by people who rape, torture, and murder others. They are nowhere near the same and should not be treated as such.

AR.09335

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ekg-ayt8
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0388
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Kathryn Nester
**Address:**
    Federal Defenders of San Diego, Inc.
    225 Broadway, Suite 900
    San Diego, CA, 92101
**Email:** Kathy_Nester@fd.org
**Phone:** 619-234-8467
**Fax:** 619-687-2666

---

## General Comment

Attached please find detailed comments from Federal Defenders of San Diego, Inc., expressing our strong opposition to the Proposed Rules. These Rules jeopardize our clients' statutory and treaty-based rights to seek safety from harm. Although Federal Defenders of San Diego, Inc., opposes these Proposed Rules in their entirety, our attached comments focus on four particular Rules that interfere with our core mission of representing individuals charged with federal crimes in the Southern District of California. We strongly urge the agency to withdraw these Proposed Rules and work to guarantee that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

---

## Attachments

Comment on asylum rule-FDSDI

AR.09336

# FEDERAL DEFENDERS OF SAN DIEGO, INC.

THE COMMUNITY DEFENDER ORGANIZATION FOR THE SOUTHERN DISTRICT OF CALIFORNIA

*Submitted via [https://www.regulations.gov/document?D=EOIR-2019-0005-0001]*

Lauren Alder Reid, Assistant Director
Office of Policy
Executive Office for Immigration Review
5107 Leesburg Pike, Suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs
Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

Re: 84 FR 69640; EOIR Docket No. 18-0002,
A.G. Order No. 4592-2019; RIN 1125-AA87,
1615-AC41; Comments in Opposition to
Proposed Rulemaking: Procedures for Asylum
and Bars to Asylum Eligibility

January 21, 2020

Dear Assistant Director Reid and Chief Dunn:

I am writing on behalf of Federal Defenders of San Diego, Inc., to express our strong opposition to above-referenced Proposed Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019.

Federal Defenders of San Diego, Inc., is the Federal Community Defender Organization for the Southern District of California. We are based in San Diego, with a branch office in El Centro, California, and are appointed to represent indigent persons accused of criminal offenses in federal court. We are independent from the local federal judiciary and funded by a sustaining grant awarded by Congress under the Criminal Justice Act. Our staff currently consists of over 60 trial attorneys and 70 support personnel.

Our organization's close proximity to the U.S.-Mexico border has a strong influence on our caseload. For decades, our most common type of case has been illegal reentry under 8 U.S.C. § 1326. Then two years ago, under the administration's new "zero-tolerance" policy, local prosecutors began aggressively charging thousands of people with misdemeanor illegal entry under 8 U.S.C. § 1325. Many of our clients are asylum seekers from Mexico, Central and South America, Asia, Africa, and other parts of the world who are fleeing threats, torture, persecution,

and certain death. We have seen firsthand how difficult it is for them to preserve their ability to apply for asylum when faced with criminal charges that may affect their eligibility for relief.

The Proposed Rules jeopardize our clients' statutory and international treaty-based rights to seek safety from harm. For the reasons detailed in the following comments, we strongly urge the Department of Homeland Security and the Department of Justice to immediately withdraw these Proposed Rules and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

Thank you for the opportunity to submit these comments. Please do not hesitate to contact me if I can provide any further information.

Respectfully,

KATHRYN N. NESTER
Executive Director

KNN:kh

AR.09338

**DETAILED COMMENTS in opposition to the Proposed Rules re Procedures for Asylum and Bars to Asylum Eligibility, 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41**

Federal Defenders of San Diego, Inc.
225 Broadway
Suite 900
San Diego, CA 92101

On December 19, 2019, the Department of Homeland Security (DHS) and the Department of Justice (DOJ) issued a joint set of Proposed Rules that would fundamentally transform the rules governing asylum adjudications. These proposed changes constitute an unnecessarily punitive and unlawful rollback of the asylum protections enshrined in federal and international law. Although Federal Defenders of San Diego, Inc., opposes these Proposed Rules in their entirety, the following comments focus on four particular Rules that interfere with our core mission of representing individuals charged with federal crimes in the Southern District of California.

## 1.     The categorical bar for conviction of any felony offense

The Proposed Rules expand the asylum bar to include any person who has been convicted of a felony. In so doing, the Rule ignores the migration-related circumstances that often give rise to common federal charges faced by traumatized asylum seekers, such as the use of fake documents; making false statements to federal officers out of fear, confusion, or ignorance; entering at a time or place other than as designated; or unlawful flight. Migrants fleeing persecution often leave their home countries with nothing but the clothes on their backs and must rely on informal networks to navigate their new circumstances. Extension of a blanket bar to asylum seekers who commit felonies in the course of entering the United States upends decades of settled law directing that offenses arising from an asylum applicant's manner of flight should constitute only one of many factors to be considered in the exercise of discretion.

For instance, the crime of illegal entry is a felony if the person has previously been convicted of the same offense. *See* 8 U.S.C. § 1325(a). But there are many reasons an asylum seeker's prior entry may not reflect a deliberate attempt to repeatedly violate the law. For instance, a significant number of our clients do not receive a credible fear interview the first time they enter the United States, even though they are legally entitled to one and even though they (and their lawyers) repeatedly request one. Instead they are convicted of illegal entry and deported without ever receiving the opportunity to apply for asylum. Upon deportation, they may again enter the United States in the hopes of receiving a credible fear interview but then face felony charges. Categorically barring such individuals from applying for asylum unjustly punishes them for the mistakes of the immigration authorities who ignored their pleas for asylum the first time around.

3

AR.09339

This Rule also ignores that the executive's own draconian policies towards asylum seekers force many people to enter illegally rather than seek protection at a designated port of entry. For instance, the policy of "metering" that permits only a handful of individuals to apply for asylum at a particular port-of-entry per day has created a backlog forcing thousands of our clients to live on the streets of Tijuana for months at a time. The same is true of the so-called "Migrant Protection Protocol," which requires non-Mexicans to wait in Mexico close to the border in order to attend their immigration hearings. These individuals must choose between being potentially kidnapped, extorted, raped, or even killed and the less-dangerous option of illegally entering the United States and being charged with a federal crime. But under the Proposed Rule, choosing the latter option will strip them of their ability to apply for asylum, forcing them into a no-win situation of foregoing their legal options in order to stay alive long enough to exercise them.

And once asylum seekers illegally cross and are charged with a federal crime, defending against the charges will almost certainly lead to more time in custody than the guilty plea that bars them from asylum. Most individuals who reenter and have no other criminal or immigration history will receive sentences of less than 30 days. But if a person tries to fight their case to avoid the harsh consequences of the Proposed Rule, they could easily spend three to four months in jail awaiting trial.

Not only does this extended trial schedule punish individuals for exercising their legal rights, it also overwhelms the jails and courts in the Southern District of California. Given the harsh consequences of this Proposed Rule, nearly every asylum seeker must go to trial to avoid a conviction that could jeopardize their ability to apply for asylum. This requires both federal courts and prosecutors to expend a tremendous amount of time and resources to secure an immigration-related conviction for conduct that posed no danger to the community and would otherwise receive a time-served sentence. These resources could be better spent prosecuting federal felonies that pose much greater risks to the safety of the community, such as terrorism, drug trafficking, weapons offenses, and human smuggling.

## 2.     The categorical bar for conviction of illegal reentry under 8 U.S.C. § 1326

The Proposed Rules also categorically bar individuals convicted of illegally reentering the United States under 8 U.S.C. § 1326 from seeking asylum. But as with felony § 1325, this proposed change denies asylum to people who sought a credible fear interview after their first entry but never received one. And even people who *did* receive a credible fear interview may have been denied asylum because their claims were wrongly assessed—a real risk given that the administration has begun using Border Patrol agents, rather than trained asylum officers, to conduct credible fear interviews. What's more, the events upon which many asylum seekers' claims are based arise only *after* their first deportation from the United States.

This is a particularly harsh consequence given that § 1326 lacks an element of any danger or violence to others, nor does it have a victim. The Proposed Rule thus treats § 1326 as the equivalent of other crimes traditionally considered to be "particularly serious" (such as murder,

AR.09340

rape, or drug trafficking) without any independent evidence to justify the expansion of this category. Most significantly, the 1951 United Nations Convention Relating to the Status of Refugees prohibits countries from imposing penalties based on the refugee's presence or manner of entry. This prohibition is a critical part of the Convention because it recognizes that refugees often have little control over the time, place, and manner of their entry. Furthermore, the Proposed Rules do not address and make no exception for convictions for conduct influenced by mental illness or duress.

3.      **The categorical bar for conviction of "smuggling or harboring" under 8 U.S.C. § 1324(a)**

The Proposed Rules also expand the criminal bars to asylum to include offenses relating to the harboring or smuggling of noncitizens under 8 U.S.C. § 1324. Although most § 1324 convictions already constitute an "aggravated felony" that automatically bars one from seeking asylum, the statute contains an exception for those who commit the offense "for the purpose of assisting, abetting, or aiding only the alien's spouse, child, or parent." *See* 8 U.S.C. § 1101(a)(43)(N). The Proposed Rule would remove this exception, expanding the asylum bar to parents or other caregivers convicted of smuggling or harboring immediate relatives fleeing persecution. This Rule multiplies the harms asylum seekers experience in their treacherous journeys to safety and callously penalizes parents for doing what is only human—taking all necessary steps to protect their children.

This proposed bar is particularly disturbing in light of now-public documents revealing the administration's explicit efforts to utilize smuggling prosecutions against parents and caregivers as part of its strategy of deterring families from seeking asylum in the United States. The Proposed Rules seek to take this widely condemned strategy one step further by barring those parents *already prosecuted* from obtaining asylum protections for themselves and their children. Barring asylum for immigrants convicted of migration-related offenses punishes them for fleeing persecution and seeking safety for their children and does not make communities safer.

4.      **The presumption against valid post-conviction relief**

Finally, the Proposed Rules impose an unlawful presumption against asylum eligibility for applicants seeking post-conviction relief. Specifically, the proposal includes a rebuttable presumption "against the effectiveness" of an order vacating, expunging, or modifying a conviction or sentence if the order was entered into after the asylum seeker was placed in removal proceedings or if the asylum seeker moved for the order more than one year after the date the original conviction or sentence was entered.

Attorneys in the Southern District of California routinely assist people seeking post-conviction relief under 28 U.S.C. § 2255. Many noncitizen clients, especially those in vulnerable populations isolated from resources and unfamiliar with the due process protections available to them in the United States, may not have discovered the defects in their underlying criminal

AR.09341

proceedings until their consultation with an immigration attorney, or until they are placed in removal proceedings years after a conviction. Imposing a presumption *against* the validity of a plea withdrawal or vacatur in these cases will lead to the wrongful exclusion of countless immigrants from asylum simply because they were unable to adequately rebut the presumption, particularly in a complex immigration court setting without the benefit of appointed counsel.

This Proposed Rule also unfairly penalizes asylum applicants, many of whom may not have the opportunity to seek review of their prior criminal proceedings until applying for asylum. In *Padilla v. Kentucky*, the Supreme Court recognized that the immigration consequences of a conviction are sufficiently serious for the Sixth Amendment to require defense attorneys to competently advise a noncitizen defendant prior to their guilty plea. By imposing a presumption against the validity of a withdrawal or vacatur of a plea, the Proposed Rules hold asylum seekers whose rights were violated under *Padilla* to a different standard: even though they were denied effective assistance of counsel in the course of their underlying criminal proceedings, asylum seekers will be forced to rebut a presumption that their court-ordered withdrawal or vacatur is invalid. The Proposed Rule therefore compounds the harm to immigrants who, in addition to facing persecution in their home countries, have been denied effective representation under the Sixth Amendment.

*   *   *

Because these and the remaining Proposed Rules unlawfully and unfairly jeopardize our clients' statutory and international treaty-based rights to seek safety from harm, Federal Defenders of San Diego, Inc., strongly urges the agency to withdraw them and work to ensure that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

Dated:  January 21, 2020

AR.09342

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ekg-9dmm
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0389
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Wendy Wayne

---

## General Comment

Please see attached file, a comment submitted on behalf of the Immigration Impact Unit of the Committee for Public Counsel Services (CPCS) of Massachusetts. Please also read all documents listed in the footnotes and provided through hyperlink.

---

## Attachments

IIU Comment_Proposed Asylum Rule_1.20.20

AR.09343

# The Commonwealth of Massachusetts
## Committee for Public Counsel Services
## Immigration Impact Unit
## 21 McGrath Highway, Somerville, MA 02143

TEL: 617-623-0591
FAX: 617-623-0936

**ANTHONY J. BENEDETTI**
CHIEF COUNSEL

**WENDY S. WAYNE**
DIRECTOR

January 20, 2020

*Submitted via www.regulations.gov*

Assistant Director Lauren Alder Reid
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, Suite 2616
Falls Church, VA 22041

      Re: Department of Justice Executive Office for Immigration Review (EOIR) Proposed Rule:
      Procedures for Asylum and Bars to Asylum Eligibility, EOIR Docket No. 18-0002.

Dear Ms. Reid,

      On behalf of the Immigration Impact Unit of the Committee for Public Counsel Services (CPCS), I submit the following comments on the interim rule entitled Procedures for Asylum and Bars to Asylum Eligibility, EOIR Docket No. 18-0002.

      CPCS is the Massachusetts state agency responsible for providing an attorney when the state or federal constitution or a state statute requires the appointment of an attorney for a person who cannot afford to retain one. We fight for equal justice and human dignity by supporting our clients in achieving their legal and life goals. We zealously advocate for the rights of individuals and promote just public policy to protect the rights of all. CPCS provides trial and appellate representation in four major practice areas: criminal defense, juvenile delinquency, child welfare, and mental health. The Immigration Impact Unit (IIU) provides specialized expertise regarding the immigration consequences of criminal matters and serves as in-house consultant to all appointed attorneys representing a noncitizen in the Commonwealth. In this role, the IIU regularly advises attorneys representing asylum seekers who have had contact with the criminal justice system.

      The CPCS Immigration Impact Unit writes to oppose the proposed regulation, which would effectively eliminate the protection of asylum for any noncitizen in Massachusetts who has had virtually any contact with the criminal justice system. The Executive Office of Immigration Review (EOIR) and United States Citizenship and Immigration Services (USCIS) have not offered any justification for so severely limiting eligibility for asylum, nor articulated the benefit gained from limiting the protection of asylum as proposed.

1

1. **The proposed rule will effectively eliminate the protection of asylum for noncitizens in MA with virtually any contact with the criminal justice system.**

Per the proposed rule, a noncitizen would be ineligible for asylum based on a conviction for "any felony under Federal, State, tribal, or local law," where the term "felony" is defined as "any crime defined as a felony by the relevant jurisdiction (Federal, State, tribal, or local) of conviction, or any crime punishable by more than one year of imprisonment." Proposed Rule 8 C.F.R. 208.13 (c)(6)(vi) and 8 C.F.R. 208.13 (c)(7) (i). The result of this rule in Massachusetts would be devastating to asylum seekers who are convicted of even very minor crimes. This is because the federal definition of a felony does not track in any way the definition of a felony or misdemeanor under state law in Massachusetts. The definition of a misdemeanor in Massachusetts is far broader and covers any offense for which there is no possibility of a sentence to state prison. M.G.L. c. 274 §1. Innumerable state offenses, classified as state misdemeanors, would nevertheless be classified as a federal felony because they are punishable by a maximum term of imprisonment of more than a year to a house of correction, rather than state prison. Examples include:

- M.G.L. c. 265 §13A(a), simple assault, which includes a mere offensive touching ("shall be punished by imprisonment for not more than 2 1/2 years in a house of correction or by a fine of not more than $1,000");
- M.G.L. c. 266 §30A, shoplifting over $250 ("shall be punished by a fine of not more than one thousand dollars or by imprisonment in the house of correction for not more than two and one-half years, or by both such fine and imprisonment");
- M.G.L. c. 266 §60, Misdemeanor Receiving Stolen Property, first offense, under $1200 ("by imprisonment in the house of correction for not more than 2 1/2 years or by a fine of not more than $3,000");
- M.G.L. c. 90 § 24(2)(a), Negligent Operation of a Motor Vehicle or Leaving the Scene of Property Damage ("shall be punished by a fine of not less than twenty dollars nor more than two hundred dollars or by imprisonment for not less than two weeks nor more than two years, or both");
- M.G.L. c. 268 §39, False report of a MV theft ("shall be punished by imprisonment for a first offense not less than five months, nor more than two years, or a fine of not less than two hundred and fifty dollars and not more than two thousand five hundred dollars, or both");
- M.G.L. c. 268 §32B, Resisting Arrest ("shall be punished by imprisonment in a jail or house of correction for not more than two and one-half years or a fine of not more than five hundred dollars, or both").

Due to the discrepancy between the federal and state definitions, the actual effect of the proposed rule in Massachusetts would be to bar asylum to all noncitizens with virtually any contact with the criminal justice system, including those with convictions for minor, non-violent offenses.

As justification for this broad expansion of the criminal bars, the proposing agencies have suggested that "convictions for which sentences are longer tend to be associated with crimes of a more consequential nature" and "crimes with the potential for longer sentences tend to indicate that the offenders who commit such crimes are greater dangers to the community." Proposed Rule at 69646. There is no support for these assumptions. As a single example among many, in Massachusetts, an individual charged with shoplifting over $250 faces a potential sentence of imprisonment in the house of correction of two and one-half years; but the actual sentence may be no more than a fine of $1,000. M.G.L. c. 266 §30A. The potential two and a half year sentence does not reflect what often is a very minor offense.

2

In addition, the severity of a crime is simply more complicated than the potential sentence and includes, among other factors, whether there is a prior criminal history, injury to person or property, and mitigating factors such as self-defense. Certain offenses cover a large range of conduct; as just one example, the Massachusetts Sentencing Commission has concluded in its sentencing guidelines that a single charge – Assault and Battery with a Dangerous Weapon, M.G.L. c. 265, § 15A (ABDW) – triggers many different levels of seriousness. The Commission has recognized ABDW with no or minor injury as offense seriousness level 3; resulting in moderate injury as level 4; resulting in significant injury as level 6; resulting in permanent injury as level 7.[1] Further, the Commission recommends that, when fashioning a sentence, state judges take into account the value of the property lost, the degree of injury to a victim, the display of a weapon, and the location of the offense. So while ABDW in Massachusetts is punished "by imprisonment in the state prison for not more than 10 years or in the house of correction for not more than 21/2 years, or by a fine of not more than $5,000, or by both such fine and imprisonment," the seriousness of the offense, and recommended sentence within the range, varies greatly. M.G.L. c. 265, § 15A. As a result, rather than enhance uniformity, the proposed bright line asylum rule is likely to lead to absurd results and inconsistencies across jurisdictions based on how state, tribal, and local jurisdictions have structured their sentencing schemes.

Indeed, it is clear that the proposed regulation goes far beyond the intent of Congress, and Congress could not have intended the extreme results this proposed rule will produce. If the rule goes into effect, a noncitizen in Massachusetts who pleads guilty to shoplifting over $250 and whose punishment is confined to paying a fine equivalent to the shoplifted item, will nevertheless be permanently barred from a grant of asylum. For the crime of shoplifting, the individual could be deported to a country where he or she faces a likelihood of severe harm and persecution.[2] When Congress adopted a mandatory criminal bar in 1996 for those convicted of "particularly serious crimes," Congress surely did not intend such minor offenses as simple assault and shoplifting to permanently bar eligibility for asylum.

## 2. Denying asylum to individuals as a result of mere allegations is a violation of due process.

Not only would the proposed rule require asylum adjudicators to deny asylum based on criminal convictions related to domestic violence, the proposed rule requires adjudicators to deny asylum to an individual, with an otherwise meritorious claim, due to alleged criminal conduct related to domestic violence, including facts not found by the criminal court or facts existing only in the underlying record of conviction. Proposed Rule 8 CFR 208.13(c)(6)(v)(B). The proposed rule also requires that asylum be denied when "there are serious reasons for believing the alien has engaged […] in acts of battery or extreme cruelty as defined in 8 CFR 204.2(c)(1)(vi)" by a person protected by family or domestic violence laws.  Finally, the agencies propose that immigration adjudicators be allowed to consider "all reliable evidence" to determine whether there is "reason to believe" an offense was "committed for or related to criminal gang

---

[1] Massachusetts Sentencing Commission, "Advisory Sentencing Guidelines" (November 2017), available at: https://www.mass.gov/doc/advisory-sentencing-guidelines/download

[2] While such an individual retains eligibility for withholding of removal and the Convention Against Torture (CAT), the protections afforded by CAT and by statutory withholding of removal are limited in scope and duration, and they are harder to obtain. CAT and withholding protections demand a higher level of proof than asylum claims: a clear probability of persecution or torture. *INS v. Stevic*, 467 U.S. 407, 411 (1984); 8 U.S.C. § 1231(b)(3); 8 C.F.R. § 1208.16(c)(2). Thus, an individual could have a valid asylum claim but be unable to meet the standard under the other forms of relief and therefore would be removed to their country of origin, where they would face persecution or even death. Even for those who meet the higher standard, withholding and CAT recipients are still subject to significant prejudice. For example, they have no ability to travel internationally. Withholding and CAT recipients also face permanent separation from their spouses and children. Because international travel is prohibited, these individuals cannot reconnect with their families in a third country. And they also cannot reunite with family in the United States because only asylees and refugees are eligible to petition for a spouse and children to join them as derivatives of that status. As a result, a rule that limits *bona fide* refugees to withholding of removal and CAT protection would impose a very real harm on individuals who have come to the United States in search of protection.

3

AR.09346

evidence," or "in furtherance of gang-related activity," triggering a mandatory bar to eligibility for asylum in either case. Proposed Rule at 69649.

Requiring adjudicators to deny a legal benefit, even a discretionary benefit, based on alleged and uncharged conduct is a clear violation of the presumption of innocence, one of the fundamental tenets of our democracy. The proposed rule invites reliance on any type of evidence, including police reports and unsubstantiated or subsequently recanted hearsay statements. However, police reports are inherently unreliable in the absence of the protection of the Confrontation Clause of the Sixth Amendment and Federal Rules of Evidence, neither of which apply in immigration court.[3] For example, in the context of an alleged incident of domestic violence, neither police officers nor alleged victims are required to submit to cross examination in immigration proceedings - without their appearance, an immigration adjudicator has no way to determine whether a victim had a motive to lie to the police, whether she later recanted her statements, or whether the police officer misunderstood some critical fact upon intervening in an emotionally-charged domestic dispute.

With regard to gang-related conduct, the proposed rule encourages immigration adjudicators to rely on evidence from fusion centers and "gang databases" that judicial courts have rejected wholesale as unreliable. In Commonwealth v. Wardsworth, 482 Mass. 454, 470 (2019), the Supreme Judicial Court of Massachusetts vacated convictions for first degree murder, armed assault with intent to murder, and firearm offenses, and remanded for a new trial in part due to the introduction of an expert opinion regarding gang-affiliation that was based on information from the Boston Regional Intelligence Center (BRIC) "gang database." The Court concluded that, to the extent the database contains opinions about which individuals are gang members, these are hearsay, are not independently admissible, and raised serious Confrontation Clause concerns. Id. at 468 and n. 27. The Court went further to warn that the fact that "the defendant was observed in the presence of a suspected or actual gang member, even on more than one occasion, does not suffice to support the conclusion that the defendant was, himself, a member of a gang," and that no meaningful information could be gleaned from the fact that shootings had occurred in the defendant's neighborhood. Id. at 469; see also Commonwealth v. Wolcott, 28 Mass. App. Ct. 200, 208 (1990) (opinion that defendant was member of gang constituted "unacceptable conjecture" where membership "was supported by little more than [the defendant's] use of a street name and his association with [a member of the gang]"). Despite the clear concern regarding the use of "gang-database" information expressed by the highest judicial court in Massachusetts, local immigration adjudicators in Massachusetts have regularly relied on BRIC reports in immigration proceedings and the proposed rule invites adjudicators to expand reliance on such reports to deny meritorious claims for asylum without addressing the concerns that their use is inherently unfair and unreliable.

Furthermore, requiring adjudicators to make complex determinations regarding the nature and scope of a particular conviction or, in the case of the domestic violence bar, *conduct*, will lead to massive judicial inefficiencies and slanted "mini-trials" within the asylum adjudication process. The scope of the "reliable evidence" available to adjudicators in asylum cases is potentially limitless; advocates on both sides would be obligated to present fulsome arguments to make their cases about gang connections to the underlying activity or the relationship of the asylum applicant to the alleged victim. Because of the lack of robust evidentiary rules in immigration proceedings, it will be difficult if not impossible for many applicants to rebut negative evidence marshaled against them, even if false; and in other cases, asylum applicants will struggle to find evidence connected to events that may have happened years prior (especially for those detained). The proposed pule repeatedly cites increased efficiency as justification for many of the proposed changes. *See* Proposed Rule at 69646, 69656-8. Yet requiring adjudicators to engage in mini-trials to

---

[3] Mary Holper, Confronting Cops in Immigration Court, 23 Wm. & Mary Bill Rts. J. 675 (2015), https://scholarship.law.wm.edu/cgi/viewcontent.cgi?article=1730&context=wmborj

4

determine the applicability of categorical criminal bars, rather than relying on adjudications obtained through the criminal legal system, will dramatically *decrease* efficiency in the asylum adjudication process.

Finally, the proposing agencies have drawn a false comparison between the above proposed rule and the existing rule at 8 U.S.C. 1229b(b)(2)(A). Proposed Rule at 69645 n. 4 ("conduct-specific inquiry is essentially identical to the inquiry already undertaken in situations in which an alien seeks to obtain immigration benefits based on domestic violence that does not necessarily result in conviction"). In the latter case, as well as when considering applications for special immigrant juvenile status based on child abuse, neglect, or abandonment, 8 U.S.C. §1101(a)(27)(J), adjudicators may consider the testimony of *a victim* when deciding whether to grant *the victim* a benefit for the purpose of facilitating the victim's ability to separate himself or herself from a violent relationship. In the proposed regulation, adjudicators are instructed to consider evidence introduced by the alleged victim as well as any other source when deciding whether to deny the *alleged perpetrator* a benefit and to do so without affording the alleged perpetrator an opportunity to present a defense or to meaningfully test the reliability of the evidence.

The proposed rule creates a categorical bar ("*shall* be found ineligible for asylum") based on evidence, the reliability of which has not been tested, or which has been tested and has not been credited by a judicial court. In doing so, the proposed rule violates basic notions of fairness and due process.

### 3.   The actual effect of the proposed rule is to eliminate the adjudicator's discretion.

In 1996, Congress amended the Immigration and Nationality Act to include six mandatory bars to asylum, including one for aliens convicted of a "particularly serious crime" in the United States and another for "aliens who are a danger to the security of the United States." 8 U.S.C. 1158(b)(2)(A)(ii) and 8 U.S.C. 1158(b)(2)(A)(iv). In doing so, Congress imposed criminal bars to an asylum grant for all the most serious and dangerous crimes. Indeed, in all of the categories that the current proposed rule addresses, convictions for the most serious and dangerous crimes already render an individual ineligible for asylum. So, for instance, the proposed rule recognizes that "some of the relevant criminal street gang-related offenses may already constitute aggravated felonies, such that aliens convicted of such offenses would already be ineligible for asylum" and even if they are not already designated as aggravated felonies, "criminal street gang-related offenses – whether felonies or misdemeanors – could reasonably be designated as 'particularly serious crimes' pursuant to 8 U.S.C. 1158(b)(2)(B)(ii)." Proposed Rule at 69650. Similarly, adjudicators may already deny asylum based on two or more OUIs in the exercise of discretion or by finding that a particular OUI conviction is a "particularly serious crime." Delgado v. Holder, 648 F.3d 1095, 1099 (9th Cir. 2011) (upholding IJ's determination that OUI is a "particularly serious crime" barring a grant of asylum under § 1158(b)(2)(A)(ii), withholding of removal under § 1231(b)(3)(B)(ii) and CAT withholding under 8 C.F.R. § 1208.16(d)(2)). Regarding the domestic violence category, the proposed rule acknowledges that many of the most serious crimes related to domestic violence are already designated aggravated felonies and "[t]he Board has routinely deemed some of the identified domestic violence offenses as particularly serious crimes, and many of those decisions have been upheld on appeal." Proposed Rules at 69652.

The real effect of the proposed rule, and seemingly the goal, is 1) to avoid the application of the categorical approach, and 2) to eliminate any remaining discretion adjudicators possess to evaluate on a case-by-case basis what is or is not a "particularly serious crime." The proposing agencies justify these goals by citing to the "significant interpretive difficulties and costs" as well as "unpredictable results" of the categorical approach and the case-by-case adjudication of "particularly serious crimes." Proposed Rule at 69645.

5

While it is true that courts have expressed frustration with the complexity of applying the categorical approach, the Supreme Court has repeatedly upheld the categorical approach and found that its virtues simply outweigh its shortcomings. E.g., Mathis v. United States, 136 S. Ct. 2243, 2252 (2016) (detailing "three basic reasons for adhering to the elements-only inquiry" including "serious Sixth Amendment concerns" and "unfairness to the defendants" created by alternatives). In any event, the concern the proposing agencies have expressed regarding the "unpredictable results" of the categorical approach is a red herring in the context of the adjudication of asylum applications because adjudicators may always undertake a facts-based analysis of an offense to determine whether it bars an asylum grant as a "particularly serious crime." E.g. Herrera-Davila v. Sessions, 725 F. App'x 589, 590 (9th Cir. 2018) (the BIA and IJ did not err in determining that an immigrant's conviction for drug possession constituted a particularly serious crime for both asylum and withholding of removal). Even when an offense does not rise to the level of a "particularly serious crime," and a person is statutorily eligible for asylum, an Immigration Judge may deny asylum as a matter of discretion. 8 U.S.C. § 1158(a); e.g. Kouljinski v. Keisler, 505 F.3d 534 (6th Cir. 2007)( upholding IJs discretionary denial of asylum based applicant's three drunk-driving convictions); United States v. Kantengwa, 781 F.3d 545, 555 (1st Cir. 2015) (even where an applicant otherwise satisfies the requirements for asylum, an immigration judge may deny relief based on a balancing of various "adverse factors," including fraudulently obtaining immigration benefits); Alsagladi v. Gonzales, 450 F.3d 700, 701 (7th Cir. 2006) (upholding discretionary denial of asylum where applicant from Yemen committed fraud by entering the U.S. as a tourist with intent to remain). Indeed, the proposed rule acknowledges that its argument regarding the categorical approach is no more than a red herring since "[t]he Board has rectified some anomalies by determining that certain crimes, though not aggravated felonies, are of a sufficiently pernicious nature that they should facially constitute particularly serious crimes that would disqualify aliens from eligibility for asylum or withholding of removal" and "[e]ven in the withholding context [...] courts have routinely concluded that crimes that are not aggravated felonies may be particularly serious crimes." Proposed Rule at 69646.

The remaining concern regarding the "significant interpretive difficulties and costs" and "inefficient means of identifying categories of offenses that should constitute 'particularly serious crimes'" overlooks the critical value of a case-by-case evaluation of criminal offenses in the context of asylum adjudications. As a single example among many, our unit has consulted with a court-appointed defense attorney representing a client on charges of Resisting Arrest under M.G.L. c. 268 §32B and Assault and Battery on a Police Officer under M.G.L c. 265 §13D. On its face, a conviction for resisting arrest sounds serious. However, in her representation of her client, the attorney learned that the client had witnessed police officers in his home country forcibly arrest his father based on his political affiliations. His father was tortured, beaten and died in police custody. When this client was caught allegedly shoplifting here in the U.S. many years later, his response to the police officer was disproportionate due to his traumatic history. His actions resulted in charges of assault and battery on a police officer and resisting arrest. Under the current regime, an adjudicator could take into account this individual's past experience when deciding whether a conviction for these charges constituted a "particularly serious crime." Under the proposed rule, an adjudicator would be left with no discretion; the individual would be barred from a grant of asylum because a conviction for resisting arrest under M.G.L. c. 268 §32B and assault and battery on a police officer under M.G.L c. 265 §13D are punishable by more than one year of imprisonment.

Empirical evidence demonstrates asylum seekers, by virtue of the persecution they have faced or fear in their countries of origin, suffer from higher than average rates of post-traumatic stress disorder (PTSD) and other trauma-related mental health disorders.[4] Existing literature suggests that at least one out

---

[4] Piwowarczyk, L., "Asylum Seekers Seeking Mental Health Services in the United States: Clinical and Legal Implications." The Journal of Nervous and Mental Disease. 195(9). 715-722. (2007) available at: http://www.ncbi.nlm.nih.gov/pubmed/17984770.

6

of every three asylum seekers struggles with depression, anxiety, and/or post-traumatic stress disorder (PTSD).[5] Individuals with PTSD have an elevated prevalence of risk factors that are associated with increased violence, such as substance misuse and comorbid psychiatric disorders.[6] The "inefficiency" and cost of the case-by-case approach is justified by the need to disentangle criminal behavior from conduct fueled by trauma-related mental health disorders that are frequently an issue in an asylum case. When evaluating whether a criminal offense should bar a grant of asylum, it is critical for an adjudicator to take into account whether the criminal offense was related in some way to the past persecution suffered and to weigh the severity of the offense against the harm the asylum seeker faces upon removal. The "inefficiencies" are also justified by the need to account for the high stakes at issue in the adjudication of an asylum claim and the often complex array of countervailing equities, including evidence of rehabilitation.

The expansion of the drug and alcohol-related criminal bars is particularly unjustified when the realities of asylum seekers are taken into account. The proposed new bars to asylum include *any* drug-related conviction (with one exception for a first minor marijuana possessory offense) and any second conviction for driving under the influence. But trauma survivors who are not provided with or do not have access to necessary social supports may turn to drugs and alcohol in an effort to self-medicate. Studies consistently reveal a high prevalence of comorbidity of PTSD and substance use disorders, with individuals with PTSD *up to 14 times more likely* to struggle with a substance use disorder. A trauma survivor who has developed a dependence on alcohol as a coping mechanism may as a result have multiple convictions for driving under the influence; this same trauma survivor may be able to overcome the substance misuse with appropriate social supports and medical interventions.[7] To fairly adjudicate this survivor's asylum application, an adjudicator has to take into account the applicant's history, the underlying cause of the criminal record, and the efforts towards rehabilitation. Unfortunately, the proposed rule eliminates all of these considerations by creating a de facto bar for the trauma survivor to be granted the precise protection needed to overcome the substance abuse disorder. *Particularly* given the vulnerabilities of asylum seeking populations, prior struggles with addiction should be addressed with treatment and compassion, not a closed door and deportation order.

The existing framework for determining if an offense falls within the particularly serious crime bar already provides the latitude for asylum adjudicators to deny relief to anyone found to pose a danger to the community but also latitude to account for the unique challenges asylum seekers face by virtue of the harm they have suffered.[8] Ignoring this careful balance and the realities asylum seekers face, the proposed rule prevents the use of discretion where it is most needed and most effective, instead callously introducing a

---

[5] Giulia Turrini et al., "Common mental disorders in asylum seekers and refugees: umbrella review of prevalence and intervention studies," *International Journal of Mental Health Systems* 11 (August 2017): 51, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5571637/

[6] Norman, Sonya, Elbogen, Eric B. and Schnurr, Paula P., "Research Findings on PTSD and Violence," U.S. Dept. of Veteran Affairs, available at: https://www.ptsd.va.gov/professional/treat/cooccurring/research_violence.asp.

[7] Norman, Sonya, Elbogen, Eric B. and Schnurr, Paula P., "Research Findings on PTSD and Violence," U.S. Dept. of Veteran Affairs, available at: https://www.ptsd.va.gov/professional/treat/cooccurring/research_violence.asp (Association between PTSD and violence diminishes when additional risk factors and protective factors are considered).

[8] Apart from the statutory aggravated felony bar to asylum, the Board of Immigration Appeals and Attorney General have historically utilized a highly circumstantial approach to the particular serious crime determination that would bar an immigrant from receiving asylum. *See e.g., Matter of Juarez*, 19 I.&N. Dec. 664 (BIA 1988) (ordinarily a single misdemeanor that is not an aggravated felony will not be a particularly serious crime); *Matter of Frentescu*, 18 I&N. Dec. 244 (BIA 1982), *modified* (setting forth several factors to be considered before imposing the particular serious crime bar, including: (i) the nature of the conviction, (ii) the circumstances and underlying facts for the conviction, (iii) the type of sentence imposed, and (iv) whether the type and circumstances of the crime indicate that the individual will be a danger to the community); *Matter of Y-L-, A-G-, R-S-R-*, 23 I.&N. Dec. 270 (A.G. 2002) (setting forth a multi-factor test to determine the dangerousness of a respondent convicted of a drug-trafficking offense who is otherwise barred from asylum as an aggravated felon, but seeking withholding of removal).

AR.09350

blunt tool that will force adjudicators to deny meritorious claims for asylum and send deserving asylum seekers back to their countries to face harm and persecution.

### 4. The proposed rule unfairly penalizes asylum seekers who have properly sought to vindicate legally valid rights in state courts.

The proposed rule also outlines a system for adjudicators to determine whether a conviction that has been vacated by a state court still disqualifies an individual from a grant of asylum. In particular, the proposed rule imposes a presumption against asylum eligibility for applicants who seek post-conviction relief for the first time while in removal proceedings or longer than one year after their initial conviction. Proposed Rule at 69655. These arbitrary limitations have no bearing on whether post-conviction relief is based on procedural or substantive defects in the conviction and unfairly penalize asylum applicants, many of whom may not have had any way to know that they needed to seek review of their prior convictions.

As justification for this proposed rule, the agencies have suggested that the initiation of post-conviction proceedings after removal proceedings have commenced "naturally raises an inference that the resulting order was issued for immigration or rehabilitative purposes." Proposed Rule at 69656. However, in many Massachusetts cases, the basis of the post-conviction motion is the failure of defense counsel to provide the constitutionally required advice regarding the immigration consequences of the criminal conviction, pursuant to *Padilla v. Kentucky*, 559 U.S. 356 (2010) and *Commonwealth v. Clarke*, 460 Mass. 30 (2011), or the failure of the state court judge to provide the immigration warnings, as required by M.G.L. c. 278, § 29D, during the plea colloquy, see *Commonwealth v. Grannum*, 457 Mass 128 (2010) and *Commonwealth v. Valdez*, 475 Mass. 178 (2017). Because such noncitizens have not received immigration advice, it is not until they are in removal proceedings or applying affirmatively for asylum that they become aware of the unwarned consequences.

In *Padilla v. Kentucky*, 559 U.S. 356 (2010), the Supreme Court recognized that the immigration consequences of a conviction are sufficiently serious for the Sixth Amendment to require a noncitizen defendant to be accurately advised of them before pleading guilty, and that failure to properly advise about immigration consequences constitutes ineffective assistance of counsel. Therefore, vacatur of a conviction based on the lack of accurate immigration advice is due to a substantive constitutional defect. It is important to note that even though the substantive defect was related to immigration, vacatur of the conviction is constitutionally required, not merely for immigration purposes. Therefore, vacaturs based on *Padilla* should not be treated differently than convictions that are vacated due to other constitutional violations. By imposing a presumption against the validity of vacatur of a conviction that occurred more than a year after imposition of the original conviction or during removal proceedings , the proposed rule compounds the harm to immigrants who, in addition to facing persecution in their home countries, have been denied constitutionally guaranteed rights in the United States criminal legal system.

In addition, filing for post-conviction relief more than a year after the conviction does not justify a presumption that the post-conviction motion is invalid. Often an individual is unaware of the procedural or substantive defect in their conviction until many years later. For example, in Massachusetts, a massive scandal involving the falsification of evidence in the state drug labs meant that convictions from 2003-2013, a ten year period, were tainted.[9]  Over 47,000 convictions were subsequently overturned on substantive defects. Because the tainting of the evidence was not discovered untilyears after the violations began, the majority of convictions were not able to be validly challenged until years after the initial convictions or sentencing. Imposing a presumption against the validity of a plea withdrawal or vacatur in cases such as

---

[9] *See* Shawn Musgrave, *The Chemists and the Cover Up*, REASON (Feb. 9, 2019), https://reason.com/2019/02/09/the-chemists-and-the-cover-up/

AR.09351

these will undoubtedly lead to the wrongful ineligibility of countless immigrants from asylum simply because they were unable to adequately rebut the presumption, particularly in a complex immigration court setting where many asylum seekers are unrepresented.

Furthermore, allowing asylum adjudicators to disregard state court decisions that are based on procedural or substantive defects misreads *Matter of Pickering* and *Matter of Thomas and Thompson*. These cases require only that the conviction be vacated for procedural and substantive reasons. The proposed rules go far beyond that by allowing an adjudicator to "look beyond the face of the order…notwithstanding the putative basis of the order." Proposed Rule at 69655. Such permission would create mini-trials in immigration court, without limitation as to the evidence permitted, as to the basis of a vacated conviction. The overburdened immigration system is not equipped for such work. Also, where the face of the criminal court documents clearly reflect vacatur based on substantive or procedural defects, such permission to look beyond the state court order undermines the authority of state court judges and violates the full, faith, and credit to which state court decisions are entitled.

For all of the reasons stated above, the CPCS Immigration Impact Unit strongly opposes the proposed regulation.

Sincerely,

Wendy S. Wayne
Director
CPCS Immigration Impact Unit

9

AR.09353

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ekg-idkq
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0390
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Anonymous Anonymous
**Organization:** NJCEDV

---

## General Comment

See attached file(s)

---

## Attachments

NJCEDV Comment on Asylum Rule

Washington, DC 20529-2140

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41; Comments in Response to Proposed Rulemaking Procedures for Asylum and Bars to Asylum Eligibility

To Whom It May Concern:

On behalf of The New Jersey Coalition to End Domestic Violence, we are submitting comments in response to the Department of Homeland Security (DHS) and Department of Justice's (DOJ) Joint Notice of Proposed Rulemaking Procedures for Asylum and Bars to Asylum Eligibility published in the Federal Register on December 19, 2019 to express our strong opposition to the proposed changes to the asylum process and asylum eligibility.

The New Jersey Coalition to End Domestic Violence has grave concerns regarding the immense harm that these changes in the proposed rule will have on immigrant survivors of domestic violence, sexual assault, and other gender-based abuses. We urge DHS and DOJ to withdraw the proposed rule in its entirety.

The New Jersey Coalition to End Domestic Violence is a statewide coalition whose purpose and mission is to end domestic violence in New Jersey. NJCEDV facilitates its mission through advocacy for survivors of domestic violence; collaboration with state agencies and its member programs, education and training; while also coordinating efforts to change societal attitudes and systemic barriers that impact domestic violence. NJCEDV recognizes the disproportionate impact marginalized communities face in the realm of domestic violence. Our social justice work promotes systemic change in attitudes and beliefs to support survivors of marginalized communities so they can get the support and resources needed to help them realize their full potential.

I.     The Trump Administration's Proposed Rule Change to Asylum Seekers upends longstanding practices regarding refugees who seek shelter from persecution.

Although the U.S. has long kept its doors open to refugees-and although the stakes for asylum seekers could not be higher-the Government implemented a drastic change in immigration law without first providing the public notice and inviting public input generally required by law. It is especially concerning that the rule attempts to topple decades of settled asylum practices and affects some of the most vulnerable people in the Western Hemisphere-without consulting Congressional lawmakers who in effect wrote the law. Second, the proposed rule change is inconsistent with the asylum statute 8 U.S.C. §1158(b) (2) (C) (requiring that any regulation like the rule be consistent with the statute). The statute provides that any noncitizen "physically present in the United

States or who arrives in the United States may apply for asylum. The only carved out exception Congress restricted asylum was based on the possibility that a person could safely resettle in a third country. The Administration's proposed rule does not consider whether refugees were safe or resettled, just whether they traveled through it.

II. Immigrant Survivors Flee to the U.S. to Seek Asylum as a Last Resort in Desperate Hope of Finding Safety and Protection.

Immigrant survivors who flee to the U.S. to seek asylum have endured horrific domestic violence, sexual assault, rape, and other gender-based forms of abuse that have threatened their and their children's lives. The journey to the U.S. is a dangerous one. Still, survivors traverse the hundreds to thousands of miles because they strongly believe that it is safer to make the journey for the possibility of finding safety and protection in the U.S. than to stay in their home countries where their governments do little to protect them from their abusers and perpetrators.

Many survivors and their children of domestic violence have endured years of abuse, terror, fear, and powerlessness before they finally take the steps to escape from their abusers to come to the U.S[1]. Many immigrant survivors of sexual assault and rape are subjected to multiple attacks, stalked, or at risk of being murdered by their perpetrators. They are compelled to flee to the U.S. because they recognize that they will never be able to feel safe again if they remain in their home countries[2]. Asylum is therefore for many immigrant survivors their only chance of finally obtaining safety and protection. Immigrant survivors of violence do not make the choice to seek asylum in the U.S. lightly. They must leave everything they know, brace themselves for the tremendous peril that awaits them and their children during their journey, and traverse the many miles with very few possessions of their own – often with nothing but the clothing on their backs.

The proposed rule released by DHS and DOJ proposes to bar many of these vulnerable and traumatized immigrant survivors of violence from qualifying for asylum. Specifically, the proposed rule seeks to 1) establish seven new bars to eligibility for asylum, 2) authorize immigration adjudicators to determine whether a criminal conviction or sentence is valid for the purpose of determining eligibility for asylum, and 3) rescind a provision in the current regulation regarding reconsideration of discretionary denials of asylum. Immigrant survivors of violence already face numerous barriers to applying for

---

[1] See for example, Dilawar, A. (August 10, 2018). How Anti-Immigration Policy Spurs Domestic Violence. Pacific Standard. Retrieved from https://psmag.com/social-justice/how-anti-immigration-policy-spurs-domestic-violence; Morrisey, K. (October 1, 2018). Refugee women struggle to confront domestic violence amid deportation fears. SanDiego Union Tribune. Retrieved from https://www.sandiegouniontribune.com/news/immigration/sd-me-refugees-dv-20181001-story.html ; Stillman, S. (January 8, 2018). When Deportation Is a Death Sentence. The New Yorker. Retrieved from https://www.newyorker.com/magazine/2018/01/15/when-deportation-is-a-death-sentence.

[2] Id.

AR.09356

asylum, and these proposed changes will only serve to create more barriers and prevent immigrant survivors from obtaining the asylum protections they desperately need. Rather than restricting access to protection, the administration should continue to expand opportunities for vulnerable immigrant survivors to access safety and protection.

Until 2017, the United States offered refuge each year to more people than all other nations combined. The Trump Administration has drastically reduced the number of refugees that can enter the United States that for the first time in modern history, the United States settled fewer refugees than the rest of the world. In 2017, children accounted for more than half of the refugee population globally. The new proposed rule would intensify family separations by increasing the standard a migrant would have to proof that their safety is in danger in order to attempt to stay in the United States. Their family members would not be eligible for family reunification. Instead each family member must go through the system independently, and because some cases are based on the claim of one person, the only person being granted a withhold of removal is that one person, leaving their family susceptive to being sent back to their homeland.

III. The Categorical Bar for an Offense of "Smuggling or Harboring" Will Harm and Fracture Immigrant Survivors and Their Families.

The proposed rule seeks to expand the "smuggling and harboring" asylum eligibility bar to include immigrants who are convicted of assisting their spouse, children, or parents escaping persecution to come to the U.S. Under this proposal, efforts to bring children to safety will disturbingly be considered "particularly serious crimes" and classified as aggravated felonies.

Immigrant survivors who are convicted of helping their children escape from an abuser or perpetrator of sexual violence and enter the U.S. will therefore be branded as felons and ineligible for asylum. Survivors who have seized their last possible chance of protecting their children by fleeing to the U.S. will essentially be punished for seeking to build a life free from violence for themselves and their children. By depriving traumatized immigrant survivors and their children of the ability to obtain asylum protections, the proposed rule will only serve to re-traumatize survivors and their children and cause them to remain vulnerable to experiencing even more violence and abuse.

IV. The Bar for Illegal Reentry Lacks Credible Justification and Criminalizes Immigrant Survivors Desperately Fleeing Violence.

The proposed rule seeks to bar all applicants convicted of illegal reentry from being eligible for asylum. This proposal wholly ignores the reality that immigrant survivors of violence who are sent back to their countries of nationality are at risk of violent retaliation from their abusers or perpetrators, and may even face death.  Survivors

therefore make the treacherous journey to the U.S. again after they are removed for the same exact reason they fled the time(s) before – to escape horrific domestic and sexual violence, desperately hoping that this time, they will be granted asylum and finally be safe.

Restricting asylum eligibility to exclude immigrant survivors who are convicted of illegal reentry for fleeing from violence multiple times is antithetical to the mission of the U.S. to protect the most vulnerable. The reason immigrant survivors repeatedly enter the U.S. in search of asylum is because they are subjected or at risk of being subjected to domestic or sexual violence when they are sent back to their country of nationality. By denying these survivors the ability to seek asylum, the proposed rule will be denying protection to those who need it most.


   V. The Bar for Conviction or an Accusation of Conduct of Battery or Extreme Cruelty Harms Survivors.

The proposed rule seeks to make ineligible for asylum all applicants who have been convicted of domestic assault or battery, stalking, or child abuse in the domestic context. The proposed rule alarmingly takes this one step further to include immigrants who are simply accused of engaging in battery and extreme cruelty.  This proposed rule creates the only crime-related bar for which a conviction is not required. DHS and DOJ paint this proposal as a way to protect survivors; however, it will cause immense harm to immigrant survivors of violence.

There are many cases in which immigrant survivors, not their abusers, are arrested and prosecuted for domestic violence offenses. Immigrant survivors who have limited English proficiency (LEP) may not be able to fully describe the situation and the abuse they experienced to police officers. In many situations, police officers may then turn to the perpetrators to interpret. In fact, a service provider explained that many survivors are arrested in dual arrests because the police use perpetrators as interpreters[3]. In other cases, survivors are arrested and face charges for domestic violence arising from acts of self-defense or because abusive partners or perpetrators manipulate the legal system by filing false claims of abuse. Service providers report that it is common to see abusers make false allegations to police and the courts to have immigrant survivors arrested. The proposed rule's lack of requirement of a conviction increases that likelihood, given the lack of completion of a fact-finding.

Although there is a proposed waiver for survivors who are deemed to not be the primary aggressor, the waiver is insufficient to mitigate the harm that many survivors will experience.   Not only will victim-defendants be swept in, but survivors and their families

---

[3] Casa de Esperanza: National Latin@ Network. Wrongful Arrests and Convictions of Immigrant Victims of Domestic Violence: Stories from the Field. Retrieved from
https://www.nationallatinonetwork.org/images/files/Quote_Sheet_for_Hill_Visits_-_Service_Providers.pdf.

will be harmed in cases where the allegedly abusive family member has not engaged in a pattern of coercive, controlling behavior, or has demonstrated actual rehabilitation and accountability and plays an important contribution to the health and well-being to the family.

## VI. The Eligibility Bar for Misdemeanor Document Fraud Ignores Migration-related Circumstances.

One of the misdemeanor offenses that would render an immigrant ineligible for asylum is the use of fraudulent documents. This bar will sharpen the tools of control and coercion used by abusers, and punish immigrant survivors who have themselves fallen victim to fraud. Abusers often hide or destroy survivors' documents in order to exert dominance and prevent survivors from being able to leave the relationship. As such, immigrant survivors who escape from violence must often search for other ways to obtain documentation. This leads survivors to be highly vulnerable to falling prey to fraud by individuals who falsely claim to have the ability to prepare legal documentation for them. Immigrant survivors who have fraudulent documents may therefore genuinely believe that they had taken the necessary steps to acquire legal documents.

Most survivors of violence have experienced financial abuse, where the abuser has limited their access to financial resources and forced survivors to depend on them for housing, food, health care, and other basic needs. Survivors who escape from abusive relationships therefore risk falling into poverty and homelessness. As such, survivors may be compelled to resort to any measure to obtain documentation so that they can work and sustain themselves and their children. Access to economic resources is absolutely critical in supporting the safety of survivors who are fleeing domestic violence, sexual assault, and human trafficking. Barring immigrant survivors from asylum for taking measures to ensure that they could feed, clothe, and house themselves and their children is cruel and will only serve to render them even more vulnerable to exploitation.

## VII. Conclusion

For the foregoing reasons, The New Jersey Coalition to End Domestic Violence urges DOJ and DHS to rescind the proposed rule, which violates our nation's laws and moral obligations and cruelly prevents many survivors of domestic violence, sexual assault, and human trafficking who are fleeing persecution from obtaining the asylum protections they need and deserve. We instead urge DOJ and DHS to promote policies that account for the dire reality that traumatized refugees face and seek to maximize their safety throughout the asylum process.

Thank you for the opportunity to submit comments on the Joint Notice of Proposed Rulemaking Procedures for Asylum and Bars to Asylum Eligibility. Please contact me if you have any questions or concerns relating to these comments. Thank you.

Respectfully submitted,

New Jersey Coalition to End Domestic Violence

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ekg-7hg2
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0391
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Karen Levine

---

## General Comment

Any rules regarding asylum seekers should in all cases process families together to make sure that children are never separated from their parents (or any relatives with whom they are in care or custody). The cases of child asylum seekers must never be processed separately which could risk a different disposition and result in separation of children. Al the experts agree on the long term damaging trauma that is caused by such family separation, and cannot be allowed to ever happen again in this process.

AR.09361

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ekg-g1kk
**Comments Due:** January 21, 2020
**Submission Type:** API

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0392
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Veena Iyer
**Address:**
    450 N. Syndicate Street, Suite 200
    St. Paul,  MN,  55104
**Email:** veena.iyer@ilcm.org
**Phone:** 651-641-1011
**Organization:** Immigrant Law Center of Minnesota

## General Comment

The Immigrant Law Center of Minnesota ("ILCM") files these comments in opposition to the regulations proposed in this docket by the Department of Homeland Security and the Department of Justice (together, "the Departments"). The proposed regulations are unsupported by substantial evidence that the existing regulatory approach is unworkable, rendering them arbitrary and capricious under section 706(2)(A) of the Administrative Procedure Act, 5 U.S.C. 706(2)(A). Further, the expansion of the proposed regulations will unjustifiably expand the bars to asylum and place vulnerable asylum seekers in life-threatening situations.

## Attachments

Attachment 1 - Asylum Comments ILCM 2020.01.21

**BEFORE THE**
**DEPARTMENT OF HOMELAND SECURITY**
**AND THE DEPARTMENT OF JUSTICE**

| | | |
|---|---|---|
| **Procedures for Asylum and** | ) | **Docket No. 18-0002** |
| **Bars to Asylum Eligibility** | ) | |

## <u>COMMENTS OF THE IMMIGRANT LAW CENTER OF MINNESOTA</u>

### I. **Introduction and Summary of Position**

The Immigrant Law Center of Minnesota ("ILCM") files these comments in opposition to the regulations proposed in this docket by the Department of Homeland Security and the Department of Justice (together, "the Departments"). ICLM is a non-profit public interest law firm, founded in 1976, and headquartered in St. Paul, Minnesota. ILCM is dedicated to enhancing opportunities for immigrants, refugees, and asylum seekers through legal representation for low-income individuals, and through education and advocacy with diverse communities. ILCM offers these comments in response to the Proposed Rule, Procedures for Asylum and Bars to Asylum Eligibility, EOIR Docket No. 18-0002, 84 FR 69640, pp. 69640-69661. The comments offered below are based not only our analysis of immigration law in the United States, but our daily work with refugees, asylees, and asylum seekers.

The proposed regulations are unsupported by substantial evidence that the existing regulatory approach is unworkable, rendering them arbitrary and capricious under section 706(2)(A) of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). Further, the expansion of the proposed regulations will unjustifiably expand the bars to asylum and place vulnerable asylum seekers in life-threatening situations. Section 208(d)(5)(B) of the INA directs that implementing regulations must be consistent with the statute, which the proposed regulations certainly are not.

1

AR.09363

To be blunt, these unnecessary, harsh, and unlawful bars to asylum will result in great bodily—and even death-- to innocent people and are contrary to the language and legislative intent of this country's asylum laws, as well as international law. ILCM routinely works with individual refugees, refugee communities, and individuals in the United States seeking asylum and **submits these comments to oppose the entirety of the Proposed Rules** and grave concerns with the administration's continued efforts to exclude refugees from obtaining the security and stability the United States asylum system has long promised. We urge that the Proposed Rules be rescinded in their entirety.

The asylum protections provided by United States law are sacred. Asylum provides those fleeing the horror of persecution with physical safety, a path to citizenship and security, and the opportunity to reunite with immediate family members who may still remain abroad in danger.[1] Many see the domestic asylum system as a symbol of the United States' commitment never to repeat its failure to save thousands of Jewish refugees refused entry to the United States on the *St. Louis* and others fleeing the Holocaust.[2] Others point to the critical role that domestic asylum policy plays in serving the United States' foreign policy interests abroad.[3] For those individuals seeking asylum in the United States, the stakes could not be higher—a claim denied often means return to death or brutal persecution.[4]

---

[1] The permanency and family reunification benefits that accompany asylum are not provided to those granted withholding of removal or protection under the Convention Against Torture, the alternative forms of relief described throughout the Proposed Rules as a justification for the breadth of the new proposed bars.

[2] Dara Lind, "How America's rejections of Jews fleeing Nazi Germany haunts our refugee policy today," *Vox*, January 27, 2017, https://www.vox.com/policy-and-politics/2017/1/27/14412082/refugees-history-holocaust.

[3] Council on Foreign Relations, *Independent Task Force Report No. 63: U.S. Immigration Policy* (2009), 117 (additional or dissenting view by Elisa Massimino) ("For better or worse, the United States sets the standard for reasonable and humane treatment of migrants around the world. If the United States endorses harsh treatment of immigrants, it erodes the norms designed to protect them, and other countries will have license to do the same.").

[4] *See, e.g.*, Sarah Stillman, "When deportation is a death sentence," *The New Yorker*, January 8, 2018, https://www.newyorker.com/magazine/2018/01/15/when-deportation-is-a-death-sentence.

2

AR.09364

The laws, regulations, and process governing asylum adjudications are already exceedingly harsh. Asylum seekers bear the evidentiary burden of establishing their eligibility for asylum[5] in the face of a complex web of laws and regulations, without the benefit of appointed counsel and often from a remote immigration jail.[6] The obstacles to winning asylum are exceedingly high; indeed in some parts of the country and before certain immigration judges, almost no one succeeds.[7] The high stakes of asylum adjudications are clear from the consistent reports of the documented deaths and brutalities endured by those who sought but were denied asylum protections in the United States.[8]

## II.    Argument

### A.    The Proposed Regulations are Inconsistent with the INA and Unsupported by Substantial Evidence

#### i. The Proposed Bars to Asylum Are Inconsistent with the INA In That They Unjustifiably Deny Applicants Who are at Risk of Harm or Persecution Based on Overstated Public Safety Concerns

The Department's proposed regulation drastically expanding the scope of "particularly serious crimes" barring asylum is inconsistent with the text and legislative intent of the Illegal

---

[5] 8 USC § 1158(b)(1)(B); 8 CFR § 1240.8(d).

[6] *See* Daniel Connolly, Aaron Montes, and Lauren Villagran, "Asylum seekers in U.S. face years of waiting, little chance of winning their cases," *USA Today,* September 25, 2019, https://www.usatoday.com/in-depth/news/nation/2019/09/23/immigration-court-asylum-seekers-what-to-expect/2026541001/.

[7] Manuel Roig-Franzia, "Immigrants risk it all seeking asylum. The answer is almost always 'no,'" *Washington Post,* July 24, 2019, https://www.washingtonpost.com/lifestyle/style/migrants-risk-it-all-seeking-asylum-the-answer-in-court-is-almost-always-no/2019/07/23/9c161b2e-a3f7-11e9-b732-41a79c2551bf_story.html.

[8] *See, e.g.,* Stillman, "Death Sentence," *supra* (reporting on a database of more than sixty cases of individuals killed after deportation); *see also* Maria Sachetti, "'Death is waiting for him,'" *The Washington Post*, December 6, 2018, https://www.washingtonpost.com/graphics/2018/local/asylum-deported-ms-13-honduras/ (telling the story of Santos Chirino, denied asylum by a Virginia immigration judge, deported, and then murdered by those he told the immigration judge he feared); and Kevin Sieff, "When death awaits deported asylum seekers," *Washington Post*, December 26, 2018, https://www.washingtonpost.com/graphics/2018/world/when-death-awaits-deported-asylum-seekers/.

CORE/2052922.0057/157266464.1

AR.09365

Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") and its antecedent legislation, the Refugee Act of 1980.[9]

As recently explained by the court in *R-S-C v. Sessions*, 869 F.3d 1176, 1178 (2017), the Refugee Act of 1980 amended the INA in order to shoulder the nation's commitment to the United Nation's Refuge Convention of 1951, as amended by the 1967 Protocol Relating to the Status of Refugees.   Article 33.1 of the Convention provides that "[n]o Contracting State shall expel or return ("refouler") a refugee…where his live or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion."   *Id.* Implementing this provision, the IILRA specifies that "the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion.   8 U.S.C. § 1231(b)(3)(A).  While Congress has itself cabined the Attorney General's authority under this provision by specifying particular circumstances in which an individual's presence in the United States would threaten public safety, the IILRA nonetheless requires the Attorney General to make individual determinations in the cases of each applicant for asylum whether an alien's life or freedom is threatened for proscribed reasons.   The proposed regulations reflect an effort, categorically, to eschew the exercise of that responsibility and are, accordingly "inconsistent with chapter [the INA"], as they must be under section 208(d)(5)(B) of the Act.

The "particularly serious crime" bar is the product of the United States' legal obligations under the 1967 Protocol related to the Status of Refugees ("Refugee Protocol") which incorporated

---

[9] Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 (codified in non-consecutive sections of 8 U.S.C.).

4

AR.09366

Articles 2 through 34 of the 1951 Convention relating to the Status of Refugees ("Refugee Convention"). It was in these treaties that the "particularly serious crime" concept was first articulated and understood by the signatories of those treaties.[10]  The Refugee Act of 1980 and later the IIRIRA codified the United States' legal obligation under the Refugee Protocol. Prior to the passage of the IIRIRA in 1996, the Attorneys General of the United States used their power under the Immigration and Naturalization Act (INA) to articulate the scope of the "particularly serious crime" bar to asylum.[11]

In 1996, Congress mandated in the IIRIRA an enumerated list of per se "particularly serious crimes" for which asylum was categorically denied.[12] Congress defined these "particularly serious crimes" as "aggravated felonies,"[13] which are defined as twenty-one enumerated categories of offenses under the INA.[14]  IIRIRA also vests the Attorney General with the authority to bar asylum "by regulation for any other conditions or limitations on the consideration of an application for asylum *not inconsistent* with this chapter."[15] (Emphasis added.).

The bars to asylum based on allegations of criminal conduct are *already* sweeping and over-broad in nature and scope. "Aggravated felony" is a notoriously vague term, which exists

---

[10] *See generally*, United States Failure to Comply with Refugee Convention: Misapplication of the Particularly Serious Crime Bar to Deny Refugees Protection from Removal to Countries Where Their Life or Freedom is Threatened, The Immigrant Defense Project & The Harvard Immigration and Refugee Clinical Program (Fall 2019). Available at https://www.immigrantdefenseproject.org/idp-report-misapplication-of-the-particularly-serious-crime-bar-to-deny-refugees-protection-from-removal-to-countries-where-their-life-or-freedom-is-threatened/
[11] 8 CFR 208.8(f) (1980); Aliens and Nationality; Refugee and Asylum Procedures, 45 FR 37392, 37392 (June 2, 1980).
[12] 8 U.S.C. 1158(b)(2), 8 U.S.C. 1101(a)(43).
[13] 8 U.S.C. 1158(b)(2)(B)(i).
[14] 8 U.S.C. 1101(a)(43).
[15] 8 U.S.C. 1158(d)(5)(B).

AR.09367

only in immigration law. Originally limited to murder, weapons trafficking and drug trafficking,[16] it has metastasized to encompass hundreds of offenses, many of them neither a felony nor aggravated, including petty offenses such as misdemeanor shoplifting, simple misdemeanor battery, or sale of counterfeit DVDs.[17] The existing crime bars should be narrowed, not expanded. Even for those not categorically barred from relief, the immigration adjudicator maintains full discretion to deny asylum.[18]

The Departments propose to expand the "particularly serious crimes" bar by limiting their own discretionary power through the promulgation of regulations that, among other items, add *seven categorical* bars to asylum for the following criminal offenses:

> (1) a felony under federal or state law;
> (2) an offense under 8 U.S.C. 1324(a)(1)(A) or 1324(a)(1)(2) (Alien Smuggling or Harboring);
> (3) an offense under 8 U.S.C. 1326 (Illegal Reentry);
> (4) a federal, state, tribal, or local crime involving criminal street gang activity;
> (5) certain federal, state, tribal, or local offenses concerning the operation of a motor vehicle while under the influence of an intoxicant;
> (6) a federal, state, tribal, or local domestic violence offense, or who are found by an adjudicator to have engaged in acts of battery or extreme cruelty in a domestic context, even if no conviction resulted; and
> (7) certain misdemeanors under federal or state law for offenses related to false identification; the unlawful receipt of public benefits from a federal, state, tribal, or local entity; or the possession or trafficking of a controlled substance or controlled-substance paraphernalia.

---

[16] Pub. L. No. 100-690, § 7342, 102 Stat. 4181, 4469-70.

[17] 8 U.S.C. § 1101(a)(43). *See also* Nancy Morawetz, "Understanding the Impact of the 1996 Deportation Laws and the Limited Scope of Proposed Reforms," *Harvard Law Review* 113 (2000): 1939-40 (criticizing the "'Alice-in-Wonderland-like definition of the term 'aggravated felony'"); Melissa Cook, "Banished for Minor Crimes: The Aggravated Felony Provisions of the Immigration and Nationality Act as a Human Rights Violation," *Boston College Third World Law Journal* (2003): 293.

[18] *See Matter of Pula*, 19 I.&N. Dec. 467 (BIA 1987).

CORE/2052922.0057/157266464.1

AR.09368

The Proposed Rules drain the phrase "*particularly serious* crime," 8 U.S.C. § 1158, of any sensible meaning and are arbitrary and capricious. They would constitute a marked departure from past practice. And the agencies have proffered no evidence or data to support these changes.

Historically, the Departments have determined on a case-by-case basis which criminal offenses lying outside of the enumerated crimes found in INA Section 1101(a)(43) are "particularly serious crimes." Now, the Departments lament their approach as imposing "significant interpretive difficulties and costs, while producing unpredictable results."[19] Difficulty and unpredictability are not justifications for imposing harsh regulatory bars that are not tied to the history and purpose of the statute in question and will lead to unjust and unlawful denials of asylum. The history of the Refugee Protocol and Refugee Convention and the legislative history of its codified progeny, the Refugee Act and IIRIRA, indicate that the words "particularly serious" should not be rendered superfluous with overly inclusive regulatory bars. Further, the Board of Immigration Appeals has cautioned that, "in light of the unusually harsh consequences which may befall a [noncitizen] who has established a well-founded fear of persecution; the danger of persecution should generally outweigh all but the most egregious of adverse factors."[20] Expanding the bars to asylum may reduce uncertainty about the outcome of certain asylum applications, but will inevitably deny asylum to those who need it, the agency has applying the law in a way antithetical to its core purpose. It is to Congress that the Department should look for relief if the statutory charge is overwhelming or insufficient, not the promulgation of regulations that would jeopardize the legislative intent of its enabling statute.

---

[19] Proposed Rule 69645.
[20] *Pula*, 19 I.&N. Dec. at 474.

CORE/2052922.0057/157266464.1

AR.09369

The Proposed Rules are so capricious as to peremptorily postulate a noncitizen's supposed danger to the community even in circumstances when a federal, state, or local judge has concluded that no danger exists by, for example, imposing a noncustodial sentence. Conviction for or an immigration judge's suspicion of a crime does not, without more, make one a present or future danger—which is why the Refugee Convention's particularly serious crime bar, made part of United States law through 8 U.S.C. § 1158, should only properly apply if both (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows that she is a present or future danger.[21]

### ii. The Proposed Regulations are Unsupported by Substantial Evidence and are Arbitrary and Capricious in Abandoning Existing Precedent Without Adequate Explanation

#### a. *All State and Federal Felonies*

The Departments propose to make all state and federal felonies bars to asylum.[22] The Departments ask for comments on questions that suggest recognition that such a vast expansion of predicate offenses would result in a significant over-inclusion of offenses for the purpose of barring asylum. For example, *"The Departments also seek public comment on whether (and, if so, how) to differentiate among crimes designated as felonies and among crimes punishable by more than one year of imprisonment. For example, are there crimes that are currently designated as felonies in one or more relevant jurisdictions in the United States that should not be categorical bars to asylum eligibility??"* The answer is clearly yes. There are felonies that should not be

---

[21] See U.N. High Commissioner for Refugees, *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 11 (July 2007), http://www.unhcr.org/en-us/576d237f7.pdf (the Refugee Convention's particularly serious crime bar only applies if (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows she is a "present or future danger.").

[22] Proposed Rule, P. 69646.

CORE/2052922.0057/157266464.1

AR.09370

categorical bars to asylum. But the solution is not to attempt to identify each such felony and then exclude that felony from the list of categorical bars to asylum.[23] Even if one wanted to engage in such a comprehensive analysis, states pass laws creating new felonies on an on-going basis. Whether all future felonies would rise to the level of "particularly serious" is unknowable, but unlikely. Using a categorical ban on all state felonies would effectively punt the determination of "particularly serious crimes" to individual state legislatures to determine in their state criminal code and would be over-inclusive. This is obviously not what Congress intended.

b. *Offense under 8 U.S.C. 1324(a)(1)(A) or 1324(a)(1)(2) (Alien Smuggling or Harboring)*

The Department's proposal "would broaden this bar so that first-time offenders who engage in illegal smuggling or harboring to aid certain family members, in violation of section 1324(a)(1)(A) or (2), are deemed to have committed particularly serious crimes."[24] Asylum seekers are desperate people fleeing persecution in their country of origin by virtue of their "race, religion, nationality, membership in a particular social group, or political opinion."[25] These categories of persecution are *familial* by nature, culture and law. In other words, asylum seekers often come to the United States in family units *by nature of the persecution* they are fleeing. This proposed expansion punishes desperate families for behaving like families in desperate situations. It is obviously not what Congress intended and a bar to asylum for the harboring or smuggling of family members will punish asylum seekers for caring for their children or their spouse. It is just wrong because it denies a fundamental reality of being an asylum seeker– the persecution is not isolated to the individual asylum seeker, but also targets one's family.

---

[23] ILCM invites the Department to google "weird felonies" in determining whether all felonies constitution "particularly serious felonies."
[24] Proposed Rule, P. 69647-48.
[25] INA 1101(a)(42)(A)

c. *An offense under 8 U.S.C. 1326 (Illegal Reentry)*

"The proposed rule would broaden this bar so that all aliens convicted of illegal reentry under section 1326 would be considered to have committed an offense that disqualifies them from asylum eligibility. It would also harmonize the treatment of most aliens who have illegally reentered the United State after being removed, as such aliens who have a prior order of removal reinstated are already precluded from asylum eligibility."[26] ILCM does not disagree that in certain circumstances a violation of 8 U.S.C. 1326 does constitute a "particularly serious crime." In fact, as noted by the Department[27], certain illegal reentry convictions already constitute an "aggravated felony" if the asylum seeker was deported because of a conviction of any one of the other enumerated "aggravated felonies" under INA Section 1101(a)(42). The proposed rule seeks to make illegal reentry an aggravated felony in and of itself without any other predicate crime. It requires little imagination to see how such a bar could be applied to an individual who poses no threat to the community, nor has committed a particularly serious crime.  For an unlucky few, the proposed rule will further penalize desperation.   A good example of this criminalization of desperation is an asylum seeking mother who has been separated from her child.  In order to be reunited with her child, she re-enters the United States and is arrested. Facing continued separation from her child, she accepts a plea for unlawful re-entry.  Under the proposed rule, that mother has pleaded to a "particularly serious crime" in attempting reunification with her child and is now barred from asylum.

Re-entering the United States without inspection is an offense with no element of danger or violence to others, and has no victim. Most significantly, and more so than other bars contained in the Proposed Rules, barring asylum based on the manner of entry directly violates the

---

[26] Proposed Rule, P. 69648
[27] Proposed Rule, P. 69648

CORE/2052922.0057/157266464.1

AR.09372

Convention's prohibition on imposing penalties based on a refugee's manner of entry or presence.[28]

### d. Street gang activity, DUI, Domestic Violence Offenses

The Department proposes additional categorical bars for crimes associated with street gang activity, driving under the influence and domestic violence offenses. Asylum seekers are an inherently vulnerable population because of the trauma they have experienced in their countries of origin and, often, along the journey to find safety. These proposed expansions ignore the particular needs of survivors of violence and dangerous journeys to the United States. Existing literature suggests that at least one out of every three asylum seekers struggles with depression, anxiety, and/or post-traumatic stress disorder (PTSD).[29] One recent study found the mental health problems facing refugees and asylum seekers so acute that more than a third of the study's sample admitted having suicidal thoughts in the preceding two weeks.[30]

"The Departments are proposing to bar from asylum all those who are convicted of a crime involving criminal street-gangs, regardless of whether that crime qualifies as a felony or as a misdemeanor…Specifically, the proposed rule would cover individuals convicted of federal, state, tribal, or local crimes in cases in which the adjudicator knows or has reason to believe the crime was committed in furtherance of criminal street gang activity."[31] "Finally, the Departments solicit public comments on: (1) What should be considered a sufficient link between an alien's underlying

---

[28] Refugee Convention, *supra*, at art 31.

[29] Giulia Turrini et al., "Common mental disorders in asylum seekers and refugees: umbrella review of prevalence and intervention studies," *International Journal of Mental Health Systems* 11 (August 2017): 51, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5571637/.

[30] Megan Brooks, "Refugees have high burden of mental health problems," *Psychiatry and Behavioral Health Learning Network*, June 2019, https://www.psychcongress.com/article/refugees-have-high-burden-mental-health-problems.

[31] Proposed Rules, 69649.

CORE/2052922.0057/157266464.1

AR.09373

conviction and the gang- related activity in order to trigger the application of the proposed bar; and (2) any other regulatory approaches to defining the type of gang-related activities that should render aliens ineligible for asylum."[32]  The answer to both of these questions is provided is found in 8 U.S.C. 1158(b)(2).  The sufficient link should be whether or not an alien's underlying conviction constitutes a "particularly serious crime." The Department should not look for clever heuristics in the form of categorical bans to replace the plain meaning of the words in the statute.

It is somewhat ironic that the Departments do not fear the "significant interpretive difficulties and costs" or "unpredictable results" of the adjudicator's role in determining (re-litigating) what crimes he has "reason to believe...was committed in furtherance of criminal street gang activity." The effect of the Proposed Rules would be to expand the number and type of convictions for which an analysis of eligibility is required, sweeping in even petty offenses that would otherwise not trigger immigration consequences. This rule confers on immigration adjudicators—who generally are not criminologists, sociologists, or criminal law experts—the responsibility to determine if there is "reason to believe" any conviction flows from activity taken in furtherance of gang activity. The adjudicator will be put in a position of trying to analyze past *misdemeanor* convictions to determine a link to street gang activities regardless of whether the offense included such a street gang charge.  This proposal truly will result in significant interpretive difficulties and costs and lead to unjust deportations of asylum seekers of color who have experienced racial profiling and a criminal legal system fraught with structural challenges and incentives to plead guilty to some crimes, particularly misdemeanors.[33]

---

[32] Proposed Rules, 69650.

[33] These same individuals are vulnerable to being erroneously entered into gang databases. Such databases are notoriously inaccurate, outdated, and infected by racial bias. Annie Sweeney and Madeline Buckley, "Chicago police gang data collection faulted by city's inspector general as unchecked and unreliable," *Chicago Tribune*, April 11, 2019, https://www.chicagotribune.com/news/breaking/ct-met-chicago-police-gang-data-04112019-story.html; Anita Chabria, "A routine police stop landed him on California's gang database. Is it racial profiling?," *Los Angeles Times*,

Further, ILCM is concerned that categorically barring asylum seekers based on alleged gang or domestic violence *conduct*, not convictions, will prevent eligible individuals from receiving the protection they need. Because of the lack of robust evidentiary rules in immigration proceedings, it will be difficult if not impossible for many applicants to rebut negative evidence marshaled against them, even if false; and in other cases, asylum applicants will struggle to find evidence connected to events that may have happened years prior (especially for those detained). Asylum hearings, which are typically three or fewer hours under current policies, would provide insufficient time to fully present arguments on both sides of these unwieldy issues.

These are crimes that cover a wide range of "seriousness." For example, a misdemeanor shoplifting or loitering offense could be deemed in furtherance of criminal street gang activities. This type of offense hardly rises to the level of a "particularly serious crime." Likewise, DUIs should not categorically be deemed a bar to asylum. A DUI conviction could follow from conduct that most would not consider dangerous. For example, in Missouri "if the key is in the ignition and the engine is running, a person 'operates' a vehicle, even if that person is sleeping or unconscious." *State v. Barac*, 558 S.W.3d 126, 129 (Ct. App. W. D. 2018). And even where a person is convicted of driving while under the influence of alcohol, that does not necessarily make the conduct itself serious. As Judge Reinhardt explained in a concurring opinion in *Delgado v. Holder*, a decision the Proposed Rules cite in support of the expanded bars, run-of-the-mill crimes like driving under the influence have "little in common" with other crimes the Board of Immigration Appeals has deemed particularly serious—e.g., felony menacing with a deadly weapon, armed robbery, and burglary of a dwelling in which the offender is armed or causes injury.[34] Judge Reinhardt further

---

May 9, 2019, https://www.latimes.com/politics/la-pol-ca-california-gang-database-calgang-criminal-justice-reform-20190509-story.html.

[34] *Delgado v. Holder*, 648 F.3d 1095, 1110 (9th Cir. 2011) (en banc) (J. Reinhardt, concurring).

CORE/2052922.0057/157266464.1

AR.09375

noted that public opinion does not treat them similarly either: "American voters would be unlikely to elect a president or vice president who had committed a particularly serious crime, yet they had no difficulty in recently electing to each office a candidate with a DUI record."[35] Barring individuals from asylum based on these relatively minor offenses renders the "particularly serious" part of the "particularly serious crime" bar meaningless.

Adjudicators currently have the authority to determine whether an otherwise-eligible asylum seeker merits an exercise of discretion. In this process, the adjudicator is able to consider whether an individual's criminal history warrants denial of asylum, even if that individual is not categorically barred from asylum. Given that existing authority, denying asylum seekers even the opportunity to present the countervailing factors of their past trauma and potential recovery is simply cruel.

*e. Misdemeanors false identification; the unlawful receipt of public benefits, the possession of a controlled substance*

Asylum seekers often obtain false identification in fleeing from persecution. Similar to the proposed rule on harboring illegal immigrants, the nature of becoming an asylum-seeker sometime requires unlawful conduct to simply survive. Asylum seekers are desperately escaping persecution and sometimes that entails obtaining false identification. The Departments should not impose categorical bans on activities, like false identification, that are sometimes required to escape persecution to begin with.

Similarly, unlawful receipt of public benefits is not a "particularly serious crime." Here again, asylum seekers are often in desperate situations and the Departments should differentiate

---

[35] *Id.*

CORE/2052922.0057/157266464.1

between dangerous offenses and those committed to help feed a starving family. Categorically, unlawful receipt of public benefits does not demonstrate that an asylum seekers poses a danger to the community of the United States.

Neither does possession of a controlled substance. In our experience, the vast majority of asylum seekers have endured traumatic experiences. Sometimes the effects of these traumatic experiences cause individuals to self-medicate when they are unable to access medical or psychological treatment.[36] The simple possession of a controlled substance should not exclude individuals who have a well-founded fear of persecution from the United States. Instead, those who need treatment for Post-traumatic Stress Disorder or other psychiatric ailments should be treated with compassion and assistance, not deportation.

IV. *Vacated, expunged, or modified conviction or sentence is recognized for immigration purposes*

"The proposed regulations governing ineligibility for asylum would also set forth criteria for determining whether a vacated, expunged, or modified conviction or sentence should be recognized for purposes of determining whether an alien is eligible for asylum."[37] It is telling that the Departments are only interested in utilizing criminal adjudications if they work against the interests of the asylum seekers. While the Department argues for a vast expansion of categorical bars based on an assortment of offenses because of "significant interpretive difficulties and costs, while producing unpredictable results," these same interpretive difficulties, costs and results are not a concern when applied to overriding a court's order. The Departments' position seems to be

---

[36] Carrier Clinic, *Trauma and Addiction* (2019), https://carrierclinic.org/2019/08/06/trauma-and-addiction/ ("...some people struggling to manage the effects of trauma in their lives may turn to drugs and alcohol to self-medicate. PTSD symptoms like agitation, hypersensitivity to loud noises or sudden movements, depression, social withdrawal and insomnia may seem more manageable through the use of sedating or stimulating drugs depending on the symptom. However, addiction soon becomes yet another problem in the trauma survivor's life. Before long, the 'cure' no longer works and causes far more pain to an already suffering person.").
[37] Proposed Rule, P. 69654-55

CORE/2052922.0057/157266464.1

AR.09377

that they dislike case-by-case adjudications on asylum, but also don't want courts to consider the asylum status of a defendant either. Heads we win, tails asylum seekers lose. **ILCM is of the opinion that the adjudicatory authority of the Departments over asylum are not well-served by promulgating regulations that cast automatic suspicion over judicial determinations simply because a court may have considered the immigration status of the defendant.**

V. *Conclusion*

As stated in the introduction to these comments, ICLM works with immigrants, refugees, and asylum seekers on a daily basis. We are uniquely positioned to hear and understand their stories of desperation as they flee, with their families, from the horrors of persecution. If the Proposed Regulations are implemented they will result in the physical harm and death of innocent people. Further, the Proposed Regulations are contrary to the plain language and legislative intent of 8 U.S.C. 1158(b)(2)(B)(i), as well as United States' treaty obligations. For these reasons, and all the reasons stated herein, ICLM asks that the Proposed Rules be rescinded in their entirety.

Respectfully submitted,

**IMMIGRANT LAW CENTER OF MINNESOTA**

By: /s/Veena Iyer
      Veena Iyer
      Executive Director
      450 N. Syndicate Street, Suite 200
      St. Paul, MN 55104
      Tel: 651-641-1011
      veena.iyer@ilcm.org

and

AR.09378

**STINSON LLP**

By: /s/Joshua K. Harden
      Joshua K. Harden, #57941
      1201 Walnut Street
      Kansas City, MO 64106
      Tel.: (816) 842-8600
      Fax: (816) 691-3495
      joshua.harden@stinson.com

17

AR.09379

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ekf-whdd
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0393
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** John Calhoun
**Address:**
   4545 Joseph Street
   Cincinnati,  OH,  45237
**Email:** hoon5306@gmail.com

---

## General Comment

I write to express my strong opposition to this proposed rule change. I am a concerned member of the public who believes strongly that our nation must welcome people fleeing violence, and who is strongly concerned about racial profiling in the criminal legal system. Immigrants are a vital part of my community, my neighborhood, and my state. Furthermore, Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution.

This proposed rule would inject racial profiling into the asylum process and put even more people seeking asylum at risk of danger and death. This proposed rule would punish people who've already endured mistreatment and racial profiling in the criminal legal system a second time -- with deportation back to the very life-threatening situation they fled. This is profoundly immoral, makes a mockery of due process, and comes right out of a racist playbook.

I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. My faith teaches me to love my neighbors and welcome the stranger. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.

AR.09380

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ekf-8l3j
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0394
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Rachel Graber
**Organization:** National Coalition Against Domestic Violence

## General Comment

See attached file(s)

## Attachments

Asylum and Bars to Asylum Eligbility Public Comment - real

January 17, 2020

*Submitted via* https://www.regulations.gov/document?D=EOIR-2019-0005-0001

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41; Comments in Response to Proposed Rulemaking Procedures for Asylum and Bars to Asylum Eligibility

To Whom It May Concern:

The National Coalition Against Domestic Violence (NCADV) has grave concerns about the immense harm that these changes in the proposed rule will have on immigrant survivors of domestic violence, sexual assault, and other gender-based abuses. We strongly oppose the proposed rule and urge DHS and DOJ to withdraw the proposed rule in its entirety.

The National Coalition Against Domestic Violence's mission is to lead, mobilize and raise our voices to support efforts that demand a change of conditions that lead to domestic violence such as patriarchy, privilege, racism, sexism, and classism. We are dedicated to supporting survivors and holding offenders accountable and supporting advocates. We envision a national culture in which we are all safe, empowered and free from domestic violence.

We prioritize the safety of *all* survivors, including immigrant survivors who seek refuge from violence in the United States. Survivors seeking asylum are escaping from dire peril; their very lives and the lives of their children are at risk.

   I.    Immigrant Survivors Flee to the U.S. to Seek Asylum as a Last Resort in Desperate Hope of Finding Safety and Protection.

Many survivors and their children of domestic violence have endured years of abuse, terror, and fear before they come to the U.S. to escape the abuse.[1] For many immigrant survivors, their only chance of finally obtaining safety and protection is to seek asylum. Immigrant survivors of violence do not make this choice lightly. They must leave their homes and communities, face

---

[1] See for example, Dilawar, A. (August 10, 2018). How Anti-Immigration Policy Spurs Domestic Violence. *Pacific Standard*. Retrieved from https://psmag.com/social-justice/how-anti-immigration-policy-spurs-domestic-violence; Morrisey, K. (October 1, 2018). Refugee women struggle to confront domestic violence amid deportation fears. *San Diego Union Tribune*. Retrieved from https://www.sandiegouniontribune.com/news/immigration/sd-me-refugees-dv-20181001-story.html ; Stillman, S. (January 8, 2018). When Deportation Is a Death Sentence. The New Yorker. Retrieved from https://www.newyorker.com/magazine/2018/01/15/when-deportation-is-a-death-sentence.

extreme danger during their journey, and travel hundreds or thousands of miles from everything they have ever known - often with nothing but the clothing on their backs.

The proposed rule released by DHS and DOJ proposes to bar many of these immigrant survivors of violence from qualifying for asylum by 1) establishing *seven* new bars to eligibility for asylum, 2) authorizing immigration adjudicators to determine whether a criminal conviction or sentence is valid for the purpose of determining eligibility for asylum, and 3) rescinding a provision in the current regulation regarding reconsideration of discretionary denials of asylum. Immigrant survivors already face many barriers to applying for asylum, and the proposed changes will create more barriers and prevent survivors from obtaining the asylum protections they desperately need. Instead of restricting access to asylum and safety, the administration ought to expand opportunities for vulnerable immigrant survivors to access safety and protection.

II.    The Proposed Rule Violates U.S. Obligations Under Both Domestic and International Law.

As a party to the 1967 Protocol Relating to the Status of Refugees, which binds parties to the United Nations Convention Relating to the Status of Refugees, the U.S. developed section 208 of the Immigration and Nationality Act ("INA"), 8 U.S.C. 1158 to extend asylum protections to immigrants fleeing persecution. Carving out categorical bars from asylum protection and grossly expanding the serious crime bar beyond the Convention's definition of "capital crime or a very grave punishable act," the proposed rule violates our obligations under the Refugee Convention and the INA to provide asylum seekers with fair access to asylum protections.

III.    The Proposed Rule Will Unfairly Prevent Many Vulnerable Immigrant Survivors from Obtaining Asylum.

The proposed rule seeks to add seven new criminal bars to asylum eligibility.[2] These new bars are sweeping in scope, and several will render ineligible many vulnerable immigrant survivors who are in desperate need of protection and who would otherwise be eligible for asylum protections.

A.    The Categorical Bar for an Offense of "Smuggling or Harboring" Will Harm and Fracture Immigrant Survivors and Their Families.

The proposed rule seeks to expand the "smuggling and harboring" asylum eligibility bar to include immigrants who are convicted of assisting their spouse, children, or parents escaping

---

[2] Individuals would be ineligible to seek asylum if they are convicted of 1) a felony offense; 2) "smuggling or harboring" under 8 U.S.C. § 1324(a); 3) illegal reentry under 8 U.S.C. § 1326; 4) an offense involving "criminal street gangs"; 5) a second offense of driving while intoxicated or impaired; 6) conviction or *accusation of conduct* of acts of battery or extreme cruelty in the domestic context; 7) certain newly defined misdemeanor offenses.

persecution to come to the U.S. Under this proposal, efforts to bring children to safety will disturbingly be considered "particularly serious crimes" and classified as aggravated felonies.

Immigrant survivors who are convicted of helping their children escape from an abuser or perpetrator of sexual violence and enter the U.S. will therefore be branded as felons and ineligible for asylum. Survivors who have seized their last possible chance of protecting their children by fleeing to the United States will essentially be punished for seeking to build a life free from violence for themselves and their children.

      B.   The Bar for Illegal Reentry Lacks Credible Justification and Criminalizes Immigrant Survivors Desperately Fleeing Violence.

The proposed rule seeks to bar all applicants convicted of illegal reentry from being eligible for asylum. This proposal wholly ignores the reality that immigrant survivors of violence who are sent back to their countries of nationality are at risk of violent retaliation from their abusers or perpetrators, and may even face death.  Survivors therefore make the treacherous journey to the U.S. again after they are removed for the same exact reason they fled the time(s) before – to escape horrific domestic and sexual violence, desperately hoping that this time, they will be granted asylum and finally be safe.

      C.   The Bar for Conviction or an Accusation of Conduct of Battery or Extreme Cruelty Harms Survivors.

The proposed rule would make everyone who has been convicted of domestic assault or battery, stalking, or child abuse in the domestic context ineligible for asylum. It takes this one step further so that immigrants who are accused, but have not been convicted, of engaging in battery and extreme cruelty ineligible for asylum.  This would be the the *only* crime-related bar for which a conviction is not required. DHS and DOJ claim this will protect survivors; in reality, it will harm them

In many cases, survivors, not the perpetrator, are arrested and charged with abuse. Immigrant survivors are particularly vulnerable to being wrongfully arrested, particularly those who have limited English proficiency (LEP) and may not be able to adequately describe their experience to law enforcement. In many situations, police officers actually ask the *perpetrators* to interpret. Many survivors are arrested in dual arrests because the police use perpetrators as interpreters.[3] Survivors are also often arrested charged with domestic violence when they defend themselves or when perpetrators use the legal system as a tool of power and control by filing false claims of abuse. The proposed rule's lack of requirement of a conviction increases the likelihood that the

---

[3] Casa de Esperanza: National Latin@ Network. Wrongful Arrests and Convictions of Immigrant Victims of Domestic Violence: Stories from the Field. Retrieved from
https://www.nationallatinonetwork.org/images/files/Quote_Sheet_for_Hill_Visits_-_Service_Providers.pdf.

survivor will be assumed to be the perpetrator, given the lack of completion of a fact-finding, and thus be ineligible for asylum.

Although there is a proposed waiver for survivors who are deemed to not be the primary aggressor, the waiver will not prevent or lessen the harm to survivors. Survivors will still be swept in to the system, and families torn apart.

        D.   The Eligibility Bar for Misdemeanor Document Fraud Ignores Migration-related Circumstances.

One of the misdemeanor offenses that would render an immigrant ineligible for asylum is the use of fraudulent documents. This bar add a new tool to abusers' arsenal of ways to control and coerce survivors. Abusers often hide or destroy survivors' documents in order to exert power and control and to keep survivors trapped in abusive relationships. Thus, immigrant survivors who escape from violence must obtain new documentation. Desperate survivors are then vulnerable to falling prey to fraud by individuals who falsely claim to have the ability to prepare legal documentation for them. Hence, immigrant survivors who have fraudulent documents may believe their documents are legal.

Almost all survivors of physical domestic violence also experience financial abuse. Abusers undermine their victims' employment, deny them access to household funds, and otherwise force them to be financially dependent on the abuser. In order to regain financial independence and to feed, house, and clothe themselves and their families, survivors may be forced to take whatever measures necessary to obtain documentation. Access to economic resources is vital to supporting the safety of survivors who are fleeing domestic violence.

IV.   The Proposed Rule Creates Inconsistency in Adjudications and Provides Immigration Adjudicators with an Unprecedented Amount of Authority.

The proposed rule would allow immigration adjudicators to decide whether a conviction for or conduct related to domestic violence or battery and extreme cruelty would make an immigrant ineligible for asylum. First, the definition of battery and extreme cruelty differs by state, creating inconsistency in determining who is covered by the asylum bar.  While such language is appropriate in providing protection for those seeking it, it is not appropriate for this purpose. Moreover, in order to properly and accurately assess domestic violence, battery, or extreme cruelty, the adjudicator must have extensive knowledge about the varied dynamics of abuse, including the forms of abusive related to the survivor's immigrant status.

Putting the responsibility on immigration adjudicators without a deep understanding of domestic violence to make decisions about whether conduct is a covered act of battery or extreme cruelty following presentations of evidence under oath by adverse parties, without court findings, is not

appropriate and will lead to survivors being stripped of their right to seek asylum based on erroneous determinations.

Moreover, the proposed rule would give immigration adjudicators the authority to determine if an expunged, vacated, or modified conviction or sentence ought to be recognized in determining whether an immigrant is eligible for asylum. This undermines the authority of state courts and allows immigration adjudicators to question the decisions of court judges. This will compromise the ability for immigrant survivors to have a fair and full proceeding.

V.    Alternative Forms of Relief Are Insufficient to Protecting Immigrant Survivors of Violence

The proposed rule notes that immigrant survivors who become ineligible for asylum under the seven new bars of asylum ineligibility could still qualify for other forms of protection such withholding of removal or protection under the Torture Convention (CAT). However, these forms of relief require a higher burden of proof than asylum. Moreover, the protections afforded by CAT and by statutory withholding of removal are limited in scope and duration. They do not provide a path to lawful permanent residence and do not allow for freedom of travel or for family reunification, harming other family members fleeing domestic and sexual violence and trafficking. Limiting protections for immigrant survivors to withholding of removal and CAT will leave them in limbo and make it impossible to rebuild their lives and provide stability for their families.

VI.    Removing Reconsiderations of Discretionary Denials of Asylum Will Deprive Immigrant Survivors of the Opportunity to Seek Safety Despite Having Viable Claims of Asylum.

The proposed rule would take away automatic review of a discretionary denial of an asylum seeker's application when the immigrant is denied asylum based on the adjudicator's discretion. This will significantly harm domestic violence survivors. Many immigrant survivors are LEP or do not have the resources to hire an attorney. Many survivors with viable claims are denied asylum, because they are unable to navigate the complex system without assistance. Even if the survivor is granted withholding of removal or protection under CAT, they will not receive the level of relief and benefits as asylum protection. Reconsiderations of discretionary denials of asylum is vital to ensuring survivors have another opportunity to prove their right to asylum protections and to remain in the United States.

VII.    Conclusion

In conclusion, the National Coalition Against Domestic Violence urges DOJ and DHS in the strongest terms to rescind this proposed rule, which puts survivors at risk and violates our laws and our moral obligations. Instead, DOJ and DHS ought to promote policies maximize survivors' safety and security throughout the asylum process.

Yours truly,

The National Coalition Against Domestic Violence
Rachel Graber
Director of Public Policy
rgraber@ncadv.org/202-714-7662

AR.09387

# PUBLIC SUBMISSION

| |
|---|
| **As of:** January 23, 2020<br>**Received:** January 21, 2020<br>**Status:** Posted<br>**Posted:** January 21, 2020<br>**Tracking No.** 1k4-9ekf-ys97<br>**Comments Due:** January 21, 2020<br>**Submission Type:** Web |

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0395
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Constance Kanitz
**Address:**
   516 Riverway
   Menasha,  WI,  54952
**Email:** connie.kanitz@gmail.com
**Phone:** 920-722-6438

---

## General Comment

I am writing to express my strong opposition to this proposed rule change.

I volunteer as a English tutor to immigrants in the city in which I live in Northeast WI. I understand that many immigrants are coming to the United States because of the danger of violence, persecution, torture and even threat of death that they face if they remain in their native country or if they face deportation . Under the Refugee Act of 1980, passed with bipartisan support, anyone present or arriving in the U.S. can apply for asylum.

Trump's proposed rule change would punish people who've already endured mistreatment and racial profiling in the criminal legal system a second time -- with deportation back to the very life-threatening situation they fled. This is profoundly immoral.
This proposed rule would inject racial profiling into the asylum process.

I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights.

AR.09388

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ekf-4t03
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0396
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Amanda Ufheil-Somers

## General Comment

I write to express my strong opposition to the proposed rule change. I am a concerned member of the public who believes that our country must welcome people fleeing violence, and who is very concerned about racial profiling and xenophobia in the criminal legal system. Immigrants are a vital part of my community, my neighborhood, and my state.

Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution, and U.S. law enshrines the protections of the international Refugee Convention, drafted in the wake of the horrors of World War II. Under the Refugee Act of 1980, passed with bipartisan support, anyone present or arriving in the U.S. can apply for asylum.

This proposed rule would punish people who've already endured mistreatment, discrimination, and racial profiling in the criminal legal system a second time, with deportation back to the very life-threatening situation they fled. This is profoundly immoral, and makes a mockery of due process.

For these reasons, I call upon the Trump administration to withdraw this proposal.

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ekf-zdau
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0397
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Michael Jose
**Address:**
  2 Tallwood Road
  Augusta,  ME,  04330
**Email:** mjjose@protonmail.com
**Phone:** 2074586997

---

## General Comment

I support the proposed regulation.

People who request asylum are guests in our country and they ought to appreciate what we have given them. People who flagrantly violate our laws and endanger U.S. citizens have no right to claim entry into our country. While I feel sorry for people who face persecution in their homeland, if they wish for us to protect them they need to respect our laws and avoid putting our citizens at risk.

Moreover, people who have previous immigration offenses are unlikely to be making the claim of asylum genuinely and are simply looking to loophole their way into the United States.

Anything else is allowing the safety and well-being of foreigners to be prioritized over that of Americans.

# PUBLIC SUBMISSION

| |
|---|
| **As of:** January 23, 2020 |
| **Received:** January 21, 2020 |
| **Status:** Posted |
| **Posted:** January 21, 2020 |
| **Tracking No.** 1k4-9eke-2bwt |
| **Comments Due:** January 21, 2020 |
| **Submission Type:** Web |

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0398
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Margaret Doyle

---

## General Comment

Docket number 84FR69640

I strongly oppose this proposed rule change. I accompany immigrants to immigration court and see the terror in their faces as they wait for the decision of one person who holds their future in his/her hands. These immigrants have already fled chaotic and violent home countries and been subject to our cruel asylum regulations. This proposed rule change is one more cruel way to treat vulnerable people. It is one more un American way of treating people coming to our country in search of a chance to live without fear, and I strongly oppose it.

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ek5-k1bm
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0399
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Audrey Hudgins

---

## General Comment

I strongly oppose the proposed joint set of rules issued on December 19, 2019 by the Department of Homeland Security (DHS) and the Department of Justice (DOJ) and wish to support earlier public comments made by many others.
The proposed changes would alter three aspects of the rules governing asylum adjudications, as outlined in the public comments made by by Elissa Steglich. First, the proposed changes would add seven bars to asylum eligibility: (1) any conviction of a felony offense; (2) any conviction for "smuggling or harboring" under 8 U.S.C. 1324(a), even if the asylum seeker committed the offense for the purpose of bringing her own spouse, child or parent to safety; (3) any conviction for illegal reentry under 8 U.S.C. 1326; (4) any conviction for an offense "involving criminal street gangs," with the adjudicator empowered to look to any evidence to determine applicability; (5) any second conviction for an offense involving driving while intoxicated or impaired; (6) any conviction or accusation of conduct for acts of battery involving a domestic relationship; (7) and any conviction for several newly defined categories of misdemeanor offenses, including any drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits. Second, the proposed rules provide a multi-factor test for immigration adjudicators to determine whether a criminal conviction or sentence is valid for the purpose of determining asylum eligibility. Third, the proposed rules rescind a provision in the current rules regarding the reconsideration of discretionary asylum.
The proposed changes gut the asylum protections enshrined in US and international law. As such, the proposed rules should be rescinded. They unnecessarily exclude bona fide refugees from asylum eligibility while also violating the letter and spirit of US international treaty obligations. Many who will be subject to exclusion will be harmed by the change, as will those who remain in a system that is increasingly characterized by racial bias and targeting of vulnerable populations such as LGBTQ immigrants, survivors of trafficking and domestic violence, and immigrant youth of color.
Thank you for considering this request for the proposed rules to be rescinded.

AR.09392

# PUBLIC SUBMISSION

| |
|---|
| **As of:** January 23, 2020<br>**Received:** January 21, 2020<br>**Status:** Posted<br>**Posted:** January 21, 2020<br>**Tracking No.** 1k4-9ekk-k79y<br>**Comments Due:** January 21, 2020<br>**Submission Type:** Web |

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0400
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Jamie Richardson

---

## General Comment

To Whom It May Concern,

I write to today express my STRONG opposition to this proposed rule change to asylum-seekers.

As an American citizen, member of the public, local government employee, voter, and supporter of civil and human rights, I am deeply troubled by the proposed rule change for asylum seekers. I strongly believe that our country was built on a foundation of welcoming the stranger, and more importantly, welcoming people who seek safety on our shores. We, the American people, welcome refugees, immigrants, asylum seekers, and everyone who must leave their homes to must flee violence, to protect themselves and their families from further injustice and further harm.

This proposed rule would inject racial profiling into the asylum process. This latest attack would put even more people seeking asylum at risk of danger - and death. This would in turn eviscerate one of the most important defenses community members have against deportation. The criminal legal system in the U.S. is wracked with racial profiling and obstacles to equal justice. Our harsh immigration laws exploit these obstacles to drive mass incarceration and mass deportation of people of color.

This new rule change is cruel and inhuman, and quite simply un-American. I am strongly concerned about the overtones of racial profiling in the criminal legal system that this proposed change insinuates and plants to execute. Immigrants of ALL backgrounds and nationality are an incredibly essential part of my life as an American. Immigrants make my neighborhood, my city, my work, my community events, and my state, GREAT. My great-grandparents fled their home country generations ago to seek safety and shelter on American soil. I am a great, proud, and accomplished member of American civil society because they were able to make a decision for their families and future generations to pursue the American dream.

This rule change cuts off that pursuit of life and liberty on American soil. It impedes the future of our country's growth by limiting individuals who want to live without fear and danger in order to express their talents,

AR.09393

contribute to American society, and to be fully human. I cannot support this rule change.

I think it's truly wrong to punish people a second time after they've completed their sentences. Deportation is often a matter of life and death. As someone who works with immigrant community members daily, and am concerned this rule would put many people in danger. For those that flee lgbtq+ based violence in their home countries, deporting these individuals is truly dangerous, and can lead to death. I lost a dear friend this way and it ripped his family apart, and I grieve the loss of this friend daily. His life was lost at the hands of immigration policies already in place, so I cannot bear to think what would happen if rules such as this one would happen. I am sick with this thought.

Let me reiterate. Our values as Americans call for the U.S. to be a place of refuge for ALL people fleeing violence, starvation, poverty, or persecution. U.S. law enshrines the protections of the international Refugee Convention, drafted in the wake of the horrors of World War II. Under the Refugee Act of 1980, passed with bipartisan support, anyone present or arriving in the U.S. can apply for asylum. For asylum seekers, making it to the U.S. often means they have found safety from persecution, torture, and sometimes death. Yet asylum seekers face many unjust obstacles in the immigration system.

This proposed Trump rule would punish people who've already endured mistreatment and racial profiling in the criminal legal system a second time -- with deportation back to the very life-threatening situation they fled. This is profoundly immoral, makes a mockery of due process, and comes right out of Steven Miller's racist playbook.

I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them. For these reasons, I call upon the Trump administration to withdraw this proposal.

I strongly oppose this rule. We, as Americans, know this is against our values. This is against our nation's values and our own values as humans of this planet. This proposed rule change will NOT be enacted.

Thank you.

# PUBLIC SUBMISSION

| | |
|---|---|
| **As of:** January 23, 2020 | |
| **Received:** January 21, 2020 | |
| **Status:** Posted | |
| **Posted:** January 21, 2020 | |
| **Tracking No.** 1k4-9ekk-ez40 | |
| **Comments Due:** January 21, 2020 | |
| **Submission Type:** Web | |

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0401
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Corrylee Drozda
**Address:**
   The Legal Aid Society of Cleveland
   1223 W 6th St
   Cleveland,  OH,  44113
**Email:** corrylee.drozda@lasclev.org
**Phone:** 2168615879

## General Comment

Please find attached the Legal Aid Society of Cleveland's comment in opposition to the Department of Homeland Security's and the Department of Justice's joint proposed rule to expand the bars to asylum eligibility. Thank you for the opportunity to submit a comment.

## Attachments

LASC Comment re DOJ-DHS Proposed Rule Expanding Bars to Asylum Eligibility final 01.21.20

AR.09395

*The*
# Legal Aid Society
## — *of Cleveland*
*Since 1905*

**Corrylee R. Drozda**
Phone:  216-861-5879
Fax:      216-861-3240
Corrylee.Drozda@lasclev.org

**New Clients Call:**

888.817.3777 (toll-free)
or
216.687.1900

**General Business:**

888.808.2800 (toll-free)
or
216.861.5500

**Cleveland
& Administrative Offices**

1223 West Sixth Street
Cleveland, OH  44113

General Business: 216.861.5500
Fax: 216.586.3220

**Elyria Office**

1530 West River Road North
Suite 301
Elyria, OH  44035

General Business: 440.324.1121
Fax: 440.324.1179

**Jefferson Office**

121 East Walnut Street
Jefferson, OH  44047

General Business: 440.576.8120
Fax: 440.576.3021

**Painesville Office**

8 North State Street
Suite 300
Painesville, OH  44077

General Business: 440.352.6200
Fax: 440.352.0015

**www.lasclev.org**

⊥LSC

January 21, 2020

*Submitted via  https://www.regulations.gov/document?D=EOIR-2019-0005-0001*

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN
1125-AA87, 1615-AC41; Comments in Opposition to Proposed Rulemaking:
Procedures for Asylum and Bars to Asylum Eligibility

To Whom it May Concern:

        We are writing on behalf of The Legal Aid Society of Cleveland ("Cleveland
Legal Aid") to express our strong opposition to the Proposed Rules to amend
regulations relating to eligibility for asylum published in the Federal Register on
December 19, 2019. We have grave concerns regarding the immense harm that the
changes in the proposed rule will have on immigrant survivors of crime, domestic
violence, sexual assault, and other gender-based abuses.

        Cleveland Legal Aid provides free legal services to vulnerable and low-
income clients who live in five counties in Northeast Ohio. Our mission is to secure
justice and resolve fundamental problems for those who are low-income and
vulnerable by providing high quality legal services and working for systemic
solutions. One of the specific client populations we serve are immigrants, particularly
immigrant victims and survivors of crime and domestic violence. In 2018, Cleveland
Legal Aid handled 190 cases where the client was an immigrant. Since October 2018,
we have represented approximately 50 immigrant clients who have been victims of
crime. Of those clients, many have fled severe violence in their home countries,
including El Salvador, Cuba, Guatemala, Honduras, Jamaica, Jordan, Mexico, and
Zimbabwe, and made courageous journeys to the United States to seek refuge from
the persecution they suffered. The Proposed Rules greatly undermine the asylum

AR.09396

protections our clients desperately need, placing them at even greater risk of further victimization, trauma, and imminent physical harm.

For the reasons detailed in the comments that follow, we urge the Department of Homeland Security ("DHS") and the Department of Justice ("DOJ") to immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

## I.    Introduction

Immigrant survivors who flee to the U.S. to seek asylum have endured horrific domestic violence, sexual assault, rape, and other gender-based forms of abuse that have threatened their and their children's lives. The journey to the United States is a dangerous one. Still, survivors traverse the hundreds to thousands of miles because they strongly believe that it is safer to make the journey for the possibility of finding safety and protection in the U.S. than to stay in their home countries where their governments do little to protect them from their abusers and perpetrators.

Many survivors of domestic violence and their children have endured years of abuse, terror, fear, and powerlessness before they finally take the steps to escape their abusers to come to the United States. Many immigrant survivors of sexual assault and rape are subjected to multiple attacks, stalked, or at risk of being murdered by their perpetrators. They are compelled to flee to the United States because they recognize that they will never feel safe again if they remain in their home countries. Asylum is therefore for many immigrant survivors their only chance of finally obtaining safety and protection. Immigrant survivors of violence do not make the choice to seek asylum in the Unites States lightly. They must leave everything they know, brace themselves for the tremendous peril that awaits them and their children during their journey, and traverse the many miles with very few possessions of their own—often with nothing but the clothing on their backs.

The Proposed Rules released by DHS and DOJ propose to bar many of these vulnerable and traumatized immigrant survivors of violence from qualifying for asylum. Specifically, the Proposed Rules add the following seven *categorical* bars to asylum eligibility: (1) any conviction of a felony offense; (2) any conviction for "smuggling or harboring" under 8 U.S.C. § 1324(a), even if the asylum seeker committed the offense for the purpose of bringing her own spouse, child or parent to safety; (3) any conviction for illegal reentry under 8 U.S.C. § 1326; (4) any conviction for an offense "involving criminal street gangs," with the adjudicator empowered to look to any evidence to determine applicability; (5) any second conviction for an offense involving driving while intoxicated or impaired; (6) any conviction *or accusation of conduct* for acts of battery involving a domestic relationship; (7) and any conviction for several newly defined categories of misdemeanor offenses, including *any* drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits.

These proposed changes constitute an unnecessary, harsh, and unlawful gutting of the asylum protections enshrined in U.S. and international law. Cleveland Legal Aid submits these comments to express opposition to the entirety of the Proposed Rules and grave concerns with the administration's continued efforts to exclude refugees from obtaining the security and stability the U.S. asylum system has long promised. We urge that the Proposed Rules be rescinded in their entirety.

2

## II.    The Proposed Rules Violate U.S. Obligations Under Domestic and International Law and Will Unnecessarily Exclude Bona Fide Refugees from Asylum Eligibility.

The U.S. asylum system was first codified in statute through the Refugee Act of 1980, described by one prominent scholar as a bipartisan attempt to "reconcile our rhetoric with our law, our national immigration policy and our international treaty obligations so that we could maintain a consistent posture towards the world as a nation with a strong humanitarian tradition and a unique historic role as a haven for persons fleeing oppression."[1] The Act—among other measures designed to bring the United States' domestic legal code into compliance with the provisions of the United Nations Protocol Relating to the Status of Refugees—created a "broad class" of refugees eligible for a discretionary grant of asylum.

The asylum protections provided by U.S. law are sacred. Asylum provides those fleeing horrors with physical safety, a path to citizenship and security, and the opportunity to reunite with immediate family members who may remain abroad in danger. For those seeking asylum in the United States, the stakes could not be higher—a claim denied often means return to death or brutal persecution.

The obstacles to winning asylum are high. Asylum seekers bear the evidentiary burden of establishing their eligibility for asylum in the face of a complex web of laws and regulations, without the benefit of appointed counsel and often from a remote immigration jail. Today, newly imposed barriers to accessing asylum in the U.S. are breathtaking in scope, with those seeking safety at the southern border subject to return to dangerous conditions in Mexico and an overlapping web of policies that preclude asylum eligibility for countless migrants simply because of their national origin, manner of entry, or their flight path.

Specifically, the bars to asylum based on allegations of criminal conduct are already sweeping in nature and scope. Any conviction for an offense determined to be an "aggravated felony" is considered a *per se* "particularly serious crime" and therefore a mandatory bar to asylum. Originally limited to murder, weapons trafficking and drug trafficking, "aggravated felony" has metastasized to encompass hundreds of offenses, many of them neither a felony nor aggravated, including petty offenses such as misdemeanor shoplifting, simple misdemeanor battery, or sale of counterfeit DVDs. The existing crime bars should not be expanded. Even for those not categorically barred from relief, the immigration adjudicator maintains full discretion to deny asylum.

In addition to being unnecessary, the Proposed Rules are also arbitrary and capricious. They would constitute a marked departure from past practice, and DOJ and DHS have proffered no evidence or data to support these changes. The Proposed Rules are so capricious as to peremptorily postulate a noncitizen's supposed danger to the community even in circumstances when a federal, state, or local judge has concluded that no danger exists by, for example, imposing a noncustodial sentence. Conviction for a crime does not, without more, make one a present or future danger. For this reason, the Refugee Convention's particularly serious crime bar, made part of U.S. law through 8 U.S.C. § 1158, should only apply if both (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows that she is a present or future danger.

---

[1] Deborah Anker, *The Refugee Act of 1980: An Historical Perspective*, 5 INT'L MIGRATION REV. 89, 89 (1982).

AR.09398

The Board of Immigration Appeals has cautioned that, "in light of the unusually harsh consequences which may befall a [noncitizen] who has established a well-founded fear of persecution; the danger of persecution should generally outweigh all but the most egregious of adverse factors."[2] Yet because of the categorical nature of the seven news bars proposed here, asylum seekers will be precluded from obtaining protection on the basis of a vast array of conduct, without any discretion left to the adjudicator to determine whether the circumstances merit such a harsh penalty. Immigration adjudicators already have vast discretion to deny asylum to those who meet the refugee definition but have been convicted of criminal conduct. Further categorical bars are not needed. The agencies' efforts to add *seven* new sweeping categories of barred conduct to the asylum eligibility criteria is unnecessary and cruel. The Proposed Rules drain the phrase "*particularly serious* crime," 8 U.S.C. § 1158, of any sensible meaning.

## III.    The Bar for Conviction or an Accusation of Conduct of Battery or Extreme Cruelty Harms Survivors.

The Proposed Rules exclude from asylum protections countless members of vulnerable communities who have experienced trauma, abuse, coercion, and trafficking. Many of these individuals may only become aware of their ability to apply for asylum after law enforcement encounters that lead them to service providers who can educate them about their immigration options. Despite the unique difficulties they face, the Proposed Rules would compound their harm and prevent them from achieving family unification and a pathway to citizenship.

In particular, the inclusion of offenses related to domestic violence on the basis of *mere allegations* of conduct in the expanded asylum bars unfairly affects survivors of domestic violence, one of Cleveland Legal Aid's most vulnerable client communities. Thirty-two percent of the immigration cases Cleveland Legal Aid handled in 2018 involved a victim of domestic violence. The domestic violence sections of the Proposed Rules include the only categorical bar to asylum for which a conviction is not required. Based on our experience representing survivors of domestic violence, we have observed that domestic violence incidents all too often involve the arrest of both the primary perpetrator of abuse and the survivor. These "cross-arrests" do not always yield clear determinations of victim and perpetrator, and we have seen that perpetrators make false accusations of abuse against their victims.

One Cleveland Legal Aid client, Julie,[3] suffered domestic violence at the hands of her abusive partner for many years. Although her partner was eventually convicted of domestic violence and sentenced to a term of imprisonment, Julie was arrested for a false accusation of domestic violence during the relationship. She called the police for protection against her partner, but when the police arrived at her partner's residence, the police ended up arresting her because her partner manipulated the situation in his favor.

The Proposed Rules' inclusion of a bar for a conviction or accusation of domestic violence would have prevented another Cleveland Legal Aid client from receiving the asylum grant he obtained in immigration court last year. Michael[4] suffered multiple years of threats, intimidation, and beatings in his home country because he supported an opposition political party. After a group of

---

[2] *Matter of Pula*, 19 I&N Dec. 467, 474 (BIA 1987).
[3] Name changed to protect identity/maintain confidentiality.
[4] Name changed to protect identity/maintain confidentiality.

AR.09399

men who supported the main political party beat him so badly that they broke his leg, Michael was forced to move to a neighboring country to flee further persecution. Michael then suffered another attack due to his opposition support in the neighboring country, which ultimately forced him to flee to the United States.

Michael affirmatively applied for asylum within the one-year filing deadline, but before U.S. Citizenship and Immigration Services issued a decision on his application, he was arrested on domestic violence charges and his immigration case was transferred to immigration court. The immigration judge was aware of Michael's arrest but still decided, in his discretion, that a pending criminal charge is not a reliable indication of criminality because Michael had yet to go through the criminal process, which ensures that those charged with a crime have the rights to counsel, to present witnesses, to confront one's accuser, and to prevent self-incrimination pursuant to the U.S. Constitution. Michael was ultimately convicted of disorderly conduct—a completely different offense that includes no element of domestic violence—and he is living happily and safely with his wife and infant son. However, under the Proposed Rules, Michael would have been barred from receiving asylum from the immigration judge due to mere accusations of domestic violence, even though he was not ultimately found guilty of domestic violence in criminal court

Based on Julie's and Michael's cases and the stories of other vulnerable Cleveland Legal Aid clients who face probable death if returned to their home countries, the Proposed Rules too broadly categorize domestic violence offenses as particularly serious and sweep both offenders and survivors into its dragnet. Authorizing asylum adjudicators to determine the primary perpetrator of domestic assault, in the absence of a judicial determination, unfairly prejudices survivors who are wrongly arrested in the course of police intervention to domestic disturbances. The immigration laws extend protections to domestic violence survivors outside of the asylum context, recognizing the complex dynamics surrounding intimate partner violence. The blunt approach adopted by the Proposed Rules is inconsistent with the approach taken towards survivors elsewhere in the federal immigration statute and does not rely on any evidence-based justification for treating asylum seekers differently.

IV.    **The Bar for Illegal Reentry Lacks Credible Justification, Criminalizes Immigrant Survivors Desperately Fleeing Violence, and Violates the Letter and Spirit of U.S. International Treaty Obligations.**

By acceding to the 1967 Protocol Relating to the Status of Refugees, the U.S. obligated itself to develop and interpret domestic refugee law in a manner that complies with the Protocol's principle of non-refoulement, even where potential refugees have allegedly committed criminal offenses. Instead of working towards greater congruence with the terms of the Convention, Cleveland Legal Aid is concerned that the Proposed Rules carve out categorical bars from protection that violate both the language and spirit of the treaty.

While the Convention allows states to exclude and/or expel potential refugees from protection, the circumstances in which this can occur are limited. By expanding the asylum bar to include individuals who have fled persecution multiple times and therefore been convicted of illegal reentry pursuant to INA § 276, the Proposed Rules would amplify the dissonance between U.S. refugee law and the Convention, as well as the violation of U.S. obligations under the Convention. Barring asylum based on the manner of entry directly violates the Convention's prohibition on imposing penalties based on a refugee's manner of entry or presence. It also ignores the reality that

AR.09400

immigrant survivors of violence who are sent back to their countries of nationality are at risk of violent retaliation from their abusers or perpetrators and may even face death. Survivors therefore make the treacherous journey to the U.S. again after they are removed for the same exact reason they fled the time(s) before—to escape horrific domestic and sexual violence, desperately hoping that this time, they will be granted asylum and finally be safe.

The Proposed Rules also conflate multiple entries by noncitizens having prior removal orders with those who have entered multiple times without ever having their asylum claims heard. Many immigrants who have previously attempted entry to the U.S. to flee persecution could not have been aware of the complex statutory regime that governs asylum claims and would not have knowingly abandoned their right to apply for asylum. Some asylum seekers have also been wrongly assessed in prior credible fear interviews, and others yet may have previously entered or attempted to enter the U.S. before the onset of circumstances giving rise to their fear. Preserving discretion to grant asylum in these circumstances allows meritorious asylum seekers to be heard and corrects errors that might have previously occurred.

One Cleveland Legal Aid client, Joey,[5] was brutally beaten in his home country for being gay. He fled to the U.S. to seek protection and was apprehended at the southern border. Although he came to the U.S. to save his life, Joey was not given a credible fear interview and was returned to his home country. No safer upon his return, Joey had no choice but to flee to the U.S. a second time; to stay would have been a death sentence because his persecutors had already perceived him as gay and were determined to punish him for something he could not change. Joey entered the U.S. without inspection and later applied for asylum. Had Joey been convicted of illegal reentry, he would have been barred from asylum under the Proposed Rules without regard to why he returned to the U.S. or whether immigration officials misunderstood him the first time he sought entry.

## V.     The Categorical Bar for an Offense of "Smuggling or Harboring" Will Harm and Fracture Immigrant Survivors and Their Families.

The expanded criminal bars exclude from safety those convicted of offenses that are coincident to their flight from persecution, and do not accomplish the stated goal of making communities safer. The vast expansion of migrant prosecutions at the border during the current administration has created administrative chaos and separated families that do not pose a threat to the safety of communities in the U.S. The Proposed Rules' inclusion of a bar to parents or other caregivers who are convicted of smuggling or harboring offenses threatens to magnify the harm caused by these reckless policies by further compromising the ability of those seeking safety on the southern border to access the asylum system. This bar will cruelly punish vulnerable asylum seekers for seizing their last possible chance of protecting their children by fleeing to the U.S. in order to build a life free from violence for themselves and for their children.

Indeed, Cleveland Legal Aid represents many families who are seeking asylum where one or both parents have suffered persecution in their home countries and have been forced to flee their homes with their children. We are currently helping a mother and her son apply for asylum based on the abuse they suffered at the hands of the son's father. The mother, Lily,[6] was brutally beaten, raped, and threatened with death for many years by her son's father. The father also beat her son

---

[5] Name changed to protect identity/maintain confidentiality.
[6] Name changed to protect identity/maintain confidentiality.

AR.09401

regularly and attempted to force the son to join his gang. Lily fled her home country to seek protection in the U.S. and, as any mother would do to protect her child, she brought her son with her because she knew that his father would continue to abuse him if she left him behind. Lily escaped a life-threatening situation and made the human choice to bring her son with her to the U.S., where she believed she and her son would be safe, not punished.

Cleveland Legal Aid represents another mother, Janet[7], and her daughter on their asylum applications. Janet's husband and the father of their daughter was murdered by gang members in their home country. When Janet started receiving death threats from the same gang, she escaped to the U.S. with her daughter. Had Janet come to the U.S. alone, she would have left her daughter in a dangerous situation without any parent or guardian to defend her. Like Lily, Janet had no option but to bring her daughter with her to the U.S. and she should not be barred from asylum for doing what was necessary to save her own life and the life of her daughter.

By depriving traumatized immigrant survivors like Lily and Janet of the ability to obtain asylum protections, the Proposed Rules will only serve to re-traumatize survivors and their children and cause them to remain vulnerable to experiencing even more violence and abuse.

## IX.    Conclusion

For the foregoing reasons, Cleveland Legal Aid urges DOJ and DHS to rescind the Proposed Rules, which violate our nation's laws and moral obligations and cruelly prevent many survivors of domestic violence, sexual assault, and human trafficking who are fleeing persecution from obtaining the asylum protections they desperately need and deserve. We instead urge DOJ and DHS to promote policies that account for the dire reality that traumatized refugees face and seek to maximize their safety throughout the asylum process.

Thank you for the opportunity to submit comments on the Joint Notice of Proposed Rulemaking Procedures for Asylum and Bars to Asylum Eligibility. Please contact me if you have any questions or concerns relating to these comments. Thank you.

Sincerely,

Corrylee Drozda
Attorney
216-861-5879
cdrozda@lasclev.org

Lisa Splawinski
Senior Attorney
216-861-5310
lsplawinski@lasclev.org

---

[7] Name changed to protect identity/maintain confidentiality.

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9eke-hyko
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0402
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Anonymous Anonymous

## General Comment

This proposed rule would inject racial profiling into the asylum process. This latest attack would put even more people seeking asylum at risk of danger - and death. This would in turn eviscerate one of the most important defenses community members have against deportation. As a concerned citizen I find this unecessary, unamerican, and mean spirited. Please revoke this rule change.

# PUBLIC SUBMISSION

| |
|---|
| **As of:** January 23, 2020 |
| **Received:** January 21, 2020 |
| **Status:** Posted |
| **Posted:** January 21, 2020 |
| **Tracking No.** 1k4-9eke-b6j6 |
| **Comments Due:** January 21, 2020 |
| **Submission Type:** Web |

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0403
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Rev. Vilius Rudra Dundzila
**Address:**
    615 W Wellington Ave
    Chicago,  IL,  60464
**Email:** interim@waucc.org
**Phone:** 773-935-0642

## General Comment

I write to express my strong opposition to this proposed rule change.
I know how hard it is currently to get asylum and these rules make it more difficult and unfair for asylum applicants.
I am a concerned member of the public who believes strongly that our nation must welcome people fleeing violence, and who is strongly concerned about racial profiling in the criminal legal system. Immigrants are a vital part of my community, my neighborhood, and my state.
As the interim Pastor at Wellington Ave United Church of Christ, I work with immigrant community members, and am concerned this rule would put many people in danger. We are an immigrant welcoming congregation that currently supports a refugee family with Refugee One. They have fled the civil war in the Congo and have lived in refugee camps for over a decade, before arriving in the United States last year. They are just ONE lucky example of the millions of asylum seekers world-wide who are fleeing war, civil insurrection and natural disasters in their home countries.


Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution.
U.S. law enshrines the protections of the international Refugee Convention, drafted in the wake of the horrors of World War II. Under the Refugee Act of 1980, passed with bipartisan support, anyone present or arriving in the U.S. can apply for asylum.
For asylum seekers, making it to the U.S. often means they have found safety from persecution, torture, and sometimes death. Yet asylum seekers face many unjust obstacles in the immigration system.

AR.09404

This proposed rule would inject racial profiling into the asylum process. This latest attack would put even more people seeking asylum at risk of danger - and death. This would in turn eviscerate one of the most important defenses community members have against deportation.

This proposed Trump rule would punish people who've already endured mistreatment and racial profiling in the criminal legal system a second time -- with deportation back to the very life-threatening situation they fled. This is profoundly immoral, makes a mockery of due process, and comes right out of Steven Miller's racist playbook. The criminal legal system in the U.S. is wracked with racial profiling and obstacles to equal justice. Our harsh immigration laws exploit these obstacles to drive mass incarceration and mass deportation of people of color.

I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.

For these reasons, I call upon the Trump administration to withdraw this proposal.

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9eke-q5yi
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0404
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Jordan Weiner
**Address:**
   570 Broad Street
   Suite 1001
   Newark,  07102
**Email:** jweiner@afsc.org
**Phone:** 9737057327

## General Comment

I am an immigration attorney with a non-profit organization that provides legal services to indigent asylum seekers. I talk to people almost everyday who have fled their countries due to violence and events beyond their control. These proposed barriers have no purpose except to weaken the US asylum program, and are inconsistent with Congress's intentions and US obligations under international law. In addition, in times of such crisis that are pushing so many people out of their countries, the US has a moral obligation to strengthen asylum protections, especially considering that US interventionist policies worldwide over decades have contributed to the mass displacement of refugees and asylum seekers.

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9eke-1y3r
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0405
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

As an advocate for survivors of domestic and sexual violence, I am submitting comments in response to the Department of Homeland Security (DHS) and Department of Justice's (DOJ) Joint Notice of Proposed Rule making Procedures for Asylum and Bars to Asylum Eligibility published in the Federal Register on December 19, 2019 to express our strong opposition to the proposed changes to the asylum process and asylum eligibility.

I have serious concerns about the harm these changes in the proposed rule will have on immigrant survivors of domestic violence, sexual assault, and other gender-based abuses. We urge DHS and DOJ to withdraw the proposed rule in its entirety.

As advocate, I have sworn to a code of ethics that does not discriminate against anyone regardless of race, religion, national origin, disability, language, and the list goes on. For many of us in this field, our code of ethics often reflects that language that is seen in the 1964 Civil Rights Act.

I have worked with immigrant survivors who braved dangerous conditions in order to find safety in the U.S. Additionally, I have worked with survivors who have re-entered the country seeking asylum because their homes are unsafe. The choice for survivors to leave the only homes may have have ever known is not an easy one.

For these reasons, I urge DOJ and DHS to rescind the proposed rule, which violates our nation's laws and moral obligations and cruelly prevents many survivors of domestic violence, sexual assault, and human trafficking who are fleeing persecution from obtaining the asylum protections they need and deserve. We instead urge DOJ and DHS to promote policies that account for the dire reality that traumatized refugees face and seek to maximize their safety throughout the asylum process.

Thank you for the opportunity to submit comments on the Joint Notice of Proposed Rulemaking Procedures for Asylum and Bars to Asylum Eligibility.

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ekd-bool
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0406
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Sara Wohlleb

---

## General Comment

I write to oppose the Proposed Rules that the Department of Homeland Security (DHS) and the Department of Justice (DOJ) issued on December 19, 2019 that would make three primary changes to the rules governing asylum adjudications. that the rules will preclude bona fide refugees from eligibility for asylum

I have worked with refugees and asylum seekers in various settings since 1995. I know first-hand about the struggles they face and the crucial, life-saving protections available through asylum. As an ordained minister in the United Church of Christ, I believe we are called to protect the "orphan, widow, and foreigner" as the Bible repeatedly reminds us. It is already quite difficult for immigrants to gain asylum- any further exclusion would be an abnegation of our duty and our values as a nation.

I ask that the Trump Administration withdraw its proposal. Thank you for your consideration.

AR.09408

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ekd-qeif
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0407
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Kent Newton

## General Comment

Creating additional barriers to immigrants, particular those who are at risk in their own countries, is short sighted, contrary to our values and unwise. We should understand that our country bears some responsibility for many of the problems and dangers that compel people to flee their home countries. Future generations will judge our conduct in this regard. They should not suffer the consequences of narrow minded and misguided policies that belie our best values.

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ekc-nfd5
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0408
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Tallia Corbett

## General Comment

To Whom It May Concern,

As a social scientist, teacher, Floridian, and natural-norm citizen of the United States, I oppose these changes. With a government founded on the basis of protecting individuals from tyranny, we cannot in good conscience stop helping those that uphold the same values. If not us, than who?

Love thy neighbor as thyself.

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ek8-ftk2
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0409
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Edward Clabaugh
**Address:**
   P.O. Box 333
   Vashon,  WA,  98070
**Email:** eclabaugh@comcast.net
**Phone:** 2064980761

---

## General Comment

See attached file(s)

---

## Attachments

Lttr to Gov from VIUF SJC re Proposed Rules R1

AR.09411

# VASHON ISLAND UNITARIAN FELLOWSHIP
## SOCIAL JUSTICE COMMITTEE
### 10217 SW BURTON DRIVE,
### VASHON ISLAND, WASHINGTON 98070
### (206) 498-0761
### WWW.VIUF.ORG.

*Submitted via https://www.regulations.gov/document?D-EOIR-2019-0005-0001*

January 21, 2020

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, Suite 2616
Falls Church, VA 22041

Maureen Dunn
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. Nw
Washington, DC 20529-2140

> Re:    84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87,
> 1615-AC41; Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and
> Bars to Asylum Eligibility

Dear Ms. Reid and Ms. Dunn and Your Respective Agencies:

I am writing on behalf of the Vashon Island Unitarian Fellowship Social Justice Committee in response to the above-referenced Proposed Rules to express our strong opposition to the Proposed Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019.

Our group is particularly focused on the proposed rules with respect to (1) any conviction of a felony offense; and (2) any conviction for "smuggling or harboring" under 8 U.S.C. Sec. 1324(a), even if the asylum seeker committed the offense for the purpose of bringing her own spouse, child or parent to safety.

The asylum protections provided by United States law are sacred. Asylum provides those fleeing from horrors in their homelands with physical safety, a path to citizenship and security, and the opportunity to reunite with immediate family members who may already be in the United States. If they have immediate family members still in danger abroad, asylum in the U.S. may give them the opportunity to help those family members in danger immigrate to the U.S. Many see the United States domestic asylum system as a symbol of the United States commitment never to repeat its failure to save thousands of Jewish refugees fleeing the Holocaust who were refused entry to the United States on the *St. Louis.* For those individuals seeking asylum in the United States a claim denied often means a return to brutal persecution or death.

The second section of the proposed rules provides a multi-factor test for immigration adjudicators to determine whether a criminal conviction or sentence is valid for the purpose of determining asylum eligibility. The third section of the proposed rules rescinds a provision in the current rules regarding the reconsideration of discretionary asylum.

Our group believes that these proposed changes constitute an unnecessary, harsh, and unlawful gutting of the asylum protection enshrined in United States and international law. Accordingly, the Vashon Island Unitarian Fellowship Social Justice Committee submits these comments to express opposition to certain of the proposed rules as explained below. We strongly believe that these proposed rules exclude refugees from obtaining the security and stability the United States asylum system has long promised and provided in the past. We urge that the Proposed Rules that we specifically object to be rescinded in their entirety.

The United States asylum system was first codified in statute through the Refugee Act of 1980 to enshrine our long-standing tradition as a haven for persons fleeing oppression, *Anything that detracts from our long-standing tradition as a haven for persons fleeing oppression is totally unacceptable in our nation of freedom and equal rights under the law – and to our citizens who originally came here from all over the world seeking freedom and equal rights under the law. They came here to a nation of laws – to escape systems that denied freedom and equal rights under the law.[i]*

Our group consists primarily of individuals who, on a monthly basis, go to the Northwest ICE Processing Center in Tacoma, Washington, (NWPC), formerly known as the Northwest Detention Center, to provide support to the families and friends of those detained in the NWPC. In that role we set up tables outside the NWPC entrance where visitors for the inmates enter. We provide them with refreshments such as coffee, tea, hot chocolate, cookies, home made brownies, candy as well as small packs of nutritional food for young children who want it who come to visit relatives. We also provide printed information concerning the rules and regulations of the NWPC for visitors in English and Spanish as well as lists of attorneys recommended by the Northwest Immigrant Rights Project. The information we provide also contains information concerning visiting hours for the different level of detainees, the level for which depends upon whether an inmate has been accused of a violent crime. We also provide information in English and Spanish concerning bonds, the dress code for visitors and the rights that undocumented persons have when confronted by United States Immigration and Customs Enforcement police or security personnel from Homeland Security. We also have clothing for visitors who do not meet the requirements of the dress code.

Since visitors cannot take food into the NWPC, many stop at our tables on the way out. While there we have a chance to talk with them. Some of our supporters who go with us speak Spanish. We hear some heart-rending stories from family members and friends concerning their loved ones in the Processing Center. Many have lived in the U.S. almost since birth and are going to school or are out of school and working and supporting families who have now been cut off from that means of support. We don't have names to provide you concerning those who have told us heart-rending stories nor do we claim any expertise in any fields. All we know is what we see and hear when we talk to these friends and families. As but one example, one woman who stopped at our table after visiting her husband. He had a good job and the two of them had bought a car. When he was rounded up by ICE and put in the Processing Center their income was cut off. She was destitute. She was living in the car at a shopping mall in Tacoma. She gladly took all the food we could provide her. She apparently was begging at the mall and on the streets in downtown Tacoma. Another one of the heart-wrenchers was told us by the mother of an 18 year old boy. He had dropped out of school when he was 16 to work to help support his family which consisted of his mother and four younger siblings. They were just scraping by. He had been picked up by ICE at his job. He had lived in the U.S. since the age of 2. He was going to be sent back to Guadalajara if he could not obtain asylum in the U.S. He had no family that his mother or he knew of in Guadalajara. She did not know what might happen to her son and she was heart-broken. The family could not afford an attorney and the *pro bono* attorneys already had all the cases they could handle. We could detail numerous other similar situations but will stop at these examples.

‗

We also have members who are "court-watchers" at the NWPC. The NWPC is one of the largest immigration prisons in the country with a capacity to hold up to 1575 inmates per day. Detainees/prisoners end up in the Processing Center after immigration raids, after being transferred from local law enforcement in our region, and after being transferred from the border regions, even some as far away as the border between El Paso and Juarez and other Texas border areas. Up to 200 undocumented persons, many of whom are seeking asylum, are transferred from the U.S.-Mexico border to the NWPC each month. Other undocumented persons held at the NWPC have lived in the U.S. for years, in some cases for the majority of their lives. We do not claim any expertise in this area. All we know is what we see and hear while watching cases in the administrative courts before administrative judges at the NWPC. We have been told at least a majority, if not all, of the administrative judges at the NWPC are former prosecutors of undocumented persons. As such former prosecutors, such administrative judges are subject to implicit bias against the undocumented persons they formerly prosecuted. Scientific studies show that all persons are subject to implicit bias based on their life experiences.[ii] In fact, one of our members was recently called to jury duty at the King County Superior Court. The head of the jury assembly room showed several videos concerning the duty of jurors and about how the system works. Then he showed a video about implicit bias that included interviews with a federal judge, a King County Superior Court Judge, a lawyer and a social worker. They spoke at length about implicit bias. The assembled potential jurors, numbering about 200, were told that all personnel in the King County Court system, including judges and prosecutors, are required to undergo bias training on a regular basis. *We strongly urge that such a requirement be added to your rules to require that all immigrant administrative judges and all immigrant prosecutors be provided bias training on a regular basis of not less than once a year.*

The laws regulations, and process governing asylum adjudications are already exceedingly harsh. Asylum seekers bear the evidentiary burden of establishing their eligibility for asylum in the face of a complex web of laws and regulations, without even the benefit of appointed counsel.

Additionally, the Form for Asylum, Form I-589, that must be filled out by asylum seekers is in English and the Instructions are in English. No provision is made for asylum seekers that do not speak English. Further, the detainee/asylum seeker must submit a passport-style photograph taken not more than 30 days before he/she files the application. How is that possible when the asylum seeker is detained in a prison-type facility? Further the detainee must submit "reasonably available corroborative evidence showing (1) the general conditions in the country from which you are seeking asylum, and (2) the specific facts on which you are relying to support your claim." Continuing, "Supporting evidence may include but is not limited to newspaper articles, affidavits of witnesses or experts, medical and/or psychological records, doctors' statements, periodicals, journals, books, photographs, official documents, or personal statements or live testimony from witnesses or experts. If you have difficulty discussing harm you have suffered in the past, you may wish to submit a health professional's report explaining this difficulty." For an individual detained in a prison type facility, it is practically impossible to obtain any of this information. The detainee has no way to obtain newspaper articles about his home country unless he has relatives or friends here who can obtain them. But that is rarely possible. There is no way the detainee can leave to obtain any of the other supporting evidence. Typically, the detainee's only supporting evidence is only his personal statement. Our understanding is that many immigration judges will not accept such a statement as sufficient in and of itself to grant asylum. **We strongly urge that the requirements as stated in this paragraph are already too difficult for detainees seeking asylum. Increasing such difficulty as proposed in the Proposed Rules is extremely and overly harsh.**

The existing bars to asylum based on allegations of criminal conduct are *already* sweeping and over-broad in nature and scope.[iii] Any conviction for an offense determined to be an "aggravated felony" is considered a *per se* "particularly serious crime" and therefore a mandatory bar to asylum.[iv] "Aggravated felony" is a notoriously vague term, which exists only in immigration law. Originally limited to murder, weapons trafficking and drug trafficking,[v] it has metastasized to encompass hundreds of offenses, many of them neither a felony nor

—

aggravated, including petty offenses such as misdemeanor shoplifting, simple misdemeanor battery, or sale of counterfeit DVDs.[vi] The existing crime bars should be narrowed not expanded.

One assumption fundamentally underlying the Proposed Rules, for example, is that every noncitizen convicted of any offense punishable by more that a year in prison necessarily constitutes a danger to the community. But no evidence is provided to support that assumption and a criminal record does not, in fact, reliably predict future dangerousness. The Proposed Rules are so capricious as to peremptorily postulate a noncitizen's supposed danger to the community even in circumstances when a federal, state, or local judge has concluded that no danger exists by, for example, imposing a noncustodial sentence. Conviction for a crime does not, without more, make one a present or future danger – which is why the Refugee Convention's particularly serious crime bar, made part of United States law through 8 U.S.C. sec. 1158, should only properly apply if both (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows that he or she is a present or future danger.

Similarly, the Proposed Rules fail to address or account for the fact that a significant number of people may agree to plead to a crime so as to avoid the threat of a severe sentence; not only is a conviction an unreliable predictor of future danger, it can also be an unreliable indicator of past criminal conduct. In addition, the Proposed Rules do not address and make no exception for convictions for conduct influenced by mental illness or duress.

The Board of Immigration Appeals has cautioned that, "in light of the unusually harsh consequences which may befall a [noncitizen] who has established a well-founded fear of persecution; the danger of persecution should generally outweigh all but the most egregious of adverse factors.[vii] Yet because of the categorical nature of the seven new bars proposed here, asylum seekers will be precluded from obtaining protection on the basis of a vast array of conduct, without any discretion left to the immigration adjudicator to determine whether the circumstances merit such a harsh penalty. Indeed, in the case of the domestic-violence related ground, the categorical bar will be imposed on the basis of *mere allegations* of conduct without any adjudication of guilt.[viii]

One of the most egregious examples of the proposed new bars as set forth in the Proposed Rules is that they would prevent a discretionary grant of asylum to asylum-seeking mothers convicted of bringing their own child across the southern border in an effort to find safety.

Further, concerning criminal convictions as bars to asylum seekers, in our state, Washington, the least serious class of felonies are Class C felonies which are punishable by up to 5 years in prison, In determining a sentence for such a conviction the courts refer to the Washington Adult Sentencing Guidelines Manual[ix] (the "Manual") for guidance. The Manual is designed to provide guidelines to "score" the offender's criminal history.

The offender's criminal history includes the defendant's prior adult convictions and juvenile court dispositions, whether in this state, in federal court, or elsewhere, and any issued certificates of restoration of opportunity. Although an offender's criminal history consists almost exclusively of felony convictions, in some instances, it also includes misdemeanors. The effect of criminal history also relates to the felony class of the crime (Class A, Class B or Class C), and the type of offense (i.e. serious violent, violent, nonviolent, sex, etc.).

A conviction is defined as a verdict of guilty, a finding of guilty, or an acceptance of a plea of guilty. RCW 9.94A.525(1) defines a prior conviction as one existing before the date of the sentencing for the offense for which the offender score is being computed. Convictions entered or sentenced on the same date as the conviction for which the offender score is being computed are deemed "other current offenses" within the meaning of RCW 9.94A.589. Prior adult convictions should be counted as criminal history unless:
• "Wash out" provisions apply; or
• A court has previously determined that they constituted "same criminal conduct" as defined by RCW 9.94A.589; or

• They were not previously deemed "same criminal conduct" but their sentences were served concurrently and a court now determines that they were committed at the same time, in the same place, and involved the same victim.

## "Wash Out" of Certain Prior Felonies

The rules governing which prior convictions are included in the offender score can be found in RCW 9.94A.525
• **Prior Class C (juvenile or adult) felony convictions,** other than sex offenses, **are not included in the offender score if, since the last date of release from confinement (including full-time residential treatment) pursuant to a felony conviction, if any, or since the entry of judgment and sentence, the offender had spent five consecutive years in the community without having been convicted of any crime.**
• **Prior (juvenile or adult) serious traffic convictions are not included in the offender score if, since the last date of release from confinement (including full-time residential treatment) pursuant to a felony conviction, if any, or since the entry of judgment and sentence, the offender had spent five years in the community without having been convicted of any crime.**
• **Prior convictions for repetitive domestic violence offense, as defined in RCW 9.94A.030(42), are not included in the offender score if the offender has spent ten consecutive years in the community without committing any crime resulting in a conviction since the last date of release.**

**Further, the Sentencing Reform Act permits vacating records of conviction under certain conditions and provides that vacated convictions "shall not be included in the offender's criminal history for purposes of determining a sentence in any subsequent conviction." RCW 9.94A.640. Vacation of the conviction record does not affect or prevent the use of an offender's prior conviction in a later criminal prosecution. The eligibility rules for vacation of conviction record are similar to the "wash-out" rules. Because the "wash-out" rules are automatic and do not require court action, an offense will "wash out" before formal record vacation occurs. (The main distinction between vacation of record of conviction and "wash-out" is that, after vacation, an offender may indicate on employment forms that he or she was not convicted of that crime.)**

To our experience and knowledge, many undocumented persons reside in the Puget Sound region. To our experience and knowledge, many, if not all of these undocumented persons are either fathers who own their own businesses and are providing for their families, or fathers who are working for others and providing for their families or husbands who are working to provide for themselves and their wives or individual men who are working and providing for themselves or mothers who are either working with their husbands or providing for themselves and, perhaps, a child or children. Additionally there are single women who are looking to establish themselves in our land of justice and opportunity. These people are productive members of our society who pay taxes and into our Social Security System.

**We strongly urge that the Proposed Rules be amended to provide for the same sentencing guidelines as provided in the Washington Adult Sentencing Guidelines Manual. Such Guidelines would provide a clear path for judges in determining requests for asylum.**

We, the Social Justice Committee of the Vashon Island Unitarian Fellowship, respectfully submit these comments in opposition to the proposed new harsh rules and in favor of our suggestions herein.

Respectfully yours,

Melvin Mackey          David Kearney          Tanya Roberts          Edward Clabaugh

AR.09416

i   *See, e.g. Plyler v. Doe* 475 U.S. 202 (1982).

ii  *See, e.g.,* 59 UCLA L. REV. 1124 (2012).

iii  The existing categorical bars to asylum eligibility are discussed in detail on p. 69641 of the Proposed Rules.

iv  8 U.S.C. Secs. 1158(b)(2)(A)(ii) and (B)(i).

v   Pub. L. No. 100-690, Sec. 7342, 102 Stat. 4181, 4469-70.

vi  8 U.S.C. Sec. 1101(a)(43).

vii  *Matter of Pula*, 19 I.&N. Dec. 467, 474 (BIA 1987)

viii  The Proposed Rules at p. 69651.

ix  2018 Washington State Adult Sentencing Guidelines Manual, ver 20181214

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ek6-ev14
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0410
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Cassidy Bennett
**Address:**
    2536 Clyde Ave
    Los Angeles,  CA,  90016
**Email:** cassidyjbennett@gmail.com

## General Comment

I am writing because I am opposed to this rules change. As a law student I have seen discrimination in effect all over the legal system and I am extremely concerned about racial profiling. Immigrants are a vital part of our country, my school community, and my state. Asylum seekers arrive in the United States after fleeing great pains to get here and we cannot layer further obstacles upon them as this proposed rule does. We have to recognize the humanity of every person we encounter, and this rule completely ignores that. For all of this I would like the Trump administration to withdraw this proposal.

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ek6-4h9k
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0411
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Katharine Walter

---

## General Comment

I am writing to express my strong opposition and deep concern about the proposed rule: Procedures for Asylum and Bars to Asylum Eligibility.

I am a concerned member of the public who believes strongly that our nation must provide a safe space for people fleeing violence. I am also an epidemiologist. Violence is a major public health problem. As a country committed to furthering the health of people around the world, the US must welcome those fleeing violence and provide them with a place to live, be healthy, and thrive.

This proposed rule would inject racial profiling into the asylum process. It would would put even more people seeking asylum at risk of danger - and death. This is a global health issue. It is critical that the government do everything it can to support and protect asylum seekers.

AR.09419

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 20, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ek4-i47z
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0412
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Monica Canfield-Lenfest

## General Comment

I strongly oppose this proposed rule change. I am very concerned that these changes will negatively impact targets of violence who are seeking asylum in the United States. It is critical that this country continues to provide opportunities for asylum seekers, rather than turning vulnerable people back to dangerous circumstances. This proposed Trump rule would punish people who've already endured mistreatment and racial profiling in the criminal legal system a second time -- with deportation back to the very life-threatening situation they fled. I think about immigrants in my community who escaped persecution and have been able to set up productive lives in the US, where they contribute to society every day. Therefore, I ask that the Trump Administration withdraw this proposal.