# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 20, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ek3-mavj
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0413
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** annique boomsma

## General Comment

Already it is near impossible for people from countries with a lot of gang violence and poverty who arrive at our borders in desperation in hopes to get asylum to be granted that; the US immigration policies have become inhumane and cruel. These new rules seem to be nothing but yet more ways to prevent access to refugees who desperately need our help, and from the sound of it also another way to separate families by needing separate applications for children. Please do not pass these rules, instead open your heart and listen to your conscience: ALL people deserve a safe place to live, work and raise there children.

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ekk-jv51
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0414
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** New York City Bar Association

---

## General Comment

On behalf of the New York City Bar Association's Immigration & Nationality Law Committee, attached please find a letter in opposition to the Proposed Rules.

---

## Attachments

2020636-AsylumAdjudications_FINAL1.21.20

AR.09422



**COMMITTEE ON
IMMIGRATION & NATIONALITY LAW**

VICTORIA F. NEILSON
CHAIR
42 W. 44TH STREET
NEW YORK, NY 10036
Phone: (917) 499-8869
Vickie.neilson@gmail.com

January 21, 2020

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for
Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of
Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

Submitted via www.regulations.gov

**Re:     84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87,
1615-AC41; Comments in Opposition to Proposed Rulemaking: Procedures for
Asylum and Bars to Asylum Eligibility**

Dear Assistant Director Alder Reid and Chief Dunn,

On behalf of the Immigration and Nationality Law Committee of the New York City Bar
Association ("City Bar"), we respectfully submit this comment in response to the above-referenced
Proposed Rules to publish regulations relating to eligibility for asylum published in the Federal
Register on December 19, 2019. For the reasons detailed in the comments that follow, the City Bar
opposes the proposed changes to asylum eligibility and urges that the proposed rule be withdrawn
in its entirety.

With 24,000 members, the City Bar has a longstanding mission to equip and mobilize the
legal profession to practice with excellence, promote reform of the law, and advocate for access to
justice in support of a fair society. In doing so, the City Bar uses its voice to address a broad range
of policy issues, which includes civil rights, housing law, immigration and nationality law, social
welfare law, disability law, and laws affecting children and families.

The Proposed Rules would cause grave harm in shutting out asylum-seekers from safety
and refuge when there are already significant legal barriers to being recognized as an asylee in the
United States. A single wrongful asylum denial potentially carries fatal stakes. These Proposed
Rules represent a significant departure from existing domestic and international refugee laws and

THE ASSOCIATION OF THE BAR OF THE CITY OF NEW YORK
42 West 44th Street, New York, NY 10036
212.382.6600 | www.nycbar.org

AR.09423

further erode longstanding protections under our country's asylum system. Further, these Proposed Rules will have significant, harmful effects on the Constitutional rights of individuals in criminal proceedings, as well as undermine the full faith and credit due to state court decisions. The City Bar opposes these new rules in full and urges that the Departments of Justice and Homeland Security instead focus on how to include, rather than exclude, more people into the safety and freedom offered in the United States.

# I.    THE PROPOSED RULES IMPOSE UNNECESSARY ADDITIONAL EXCLUSIONS ON ASYLUM SEEKERS WHO ALREADY FACE SWEEPING LEGAL AND PRACTICAL BARRIERS TO RELIEF

For those individuals seeking asylum in the United States, the stakes are often a matter of life and death—the cruel persecution, extreme violence, and, often, death that await those whose claims have been denied are ongoing and well-documented. Asylum seekers must build their case for eligibility by decoding a byzantine universe of federal laws, state laws, agency regulations, and procedural requirements, often in a language they do not understand, without any appointed counsel, and often from a remote immigration jail. In some parts of the country and before certain immigration judges, almost no one succeeds in overcoming these hurdles to achieve safety.[1]

Under existing law, asylum seekers are already limited by broad, mandatory bars to asylum based on allegations of criminal conduct. The scope of disqualifying conduct includes conviction of an "aggravated felony," a term of art unique to immigration law that is deemed a "particularly serious crime" which, in turn, creates a statutory bar to asylum eligibility.[2] Originally limited to murder, weapons trafficking and drug trafficking,[3] "aggravated felonies" today include hundreds of offenses, many of them neither a felony nor aggravated, including petty offenses and misdemeanors such as shoplifting, simple battery, or sale of counterfeit DVDs. A single one of these past offenses eliminates an individual's eligibility for asylum, with no regard to the danger that person will face if sent back to their country.

Even if individuals overcome the practical and legal barriers to fully presenting their asylum claims, the immigration adjudicator maintains full discretion to deny asylum, including based on criminal conduct. Adjudicators may find that an individual has proven that they will face persecution if sent back and meets the definition of a refugee, but they can still deny asylum based on criminal conduct beyond the threshold criminal bars. The Proposed Rules would add seven new sweeping categories of barred conduct to the asylum eligibility criteria that are overbroad and unnecessary, especially in light of the existing broad categories of barred conduct and the

---

[1] *See generally* Manuel Roig-Franzia, *Migrants Risk It All Seeking Asylum. The Answer in Court is Almost Always 'No.'*, THE WASHINGTON POST, Jul. 24, 2019, https://www.washingtonpost.com/lifestyle/style/migrants-risk-it-all-seeking-asylum-the-answer-in-court-is-almost-always-no/2019/07/23/9c161b2e-a3f7-11e9-b732-41a79c2551bf_story.html; Gustavo Solis, *Remain in Mexico Has a 0.1 Percent Asylum Grant Rate*, THE SAN DIEGO UNION TRIBUNE, Dec. 15, 2019, https://www.sandiegouniontribune.com/news/border-baja-california/story/2019-12-15/remain-in-mexico-has-a-0-01-percent-asylum-grant-rate. (All links in this letter were last visited on January 21, 2020).

[2] 8 U.S.C. 1158(b)(2)(B)(i) (2020).

[3] 8 U.S.C. § 1101(a)(43) (1988).

2

additional discretion afforded to immigration adjudicators to deny asylum claims – indeed, if anything, the existing, overbroad criminal bars should be narrowed.

## II.   THE PROPOSED CATEGORICAL BARS GO BEYOND ANY COLORABLE DEFINITION OF A "PARTICULARLY SERIOUS CRIME" AND WILL NOT MAKE PEOPLE SAFER

The Proposed Rules would make three major changes that narrow asylum eligibility. Specifically, the first proposed set of changes adds the following seven bars to asylum eligibility: (1) conviction of a felony offense; (2) conviction for "smuggling or harboring,"[4] even if the asylum seeker committed the offense for the purpose of bringing her own spouse, child or parent to safety; (3) conviction for illegal reentry;[5] (4) conviction for an offense "involving criminal street gangs," with the adjudicator empowered to look to any evidence to determine applicability; (5) any second conviction for an offense involving driving while intoxicated or impaired; (6) conviction *or accusation of conduct* for acts of battery involving a domestic relationship; and (7) conviction for several newly defined categories of misdemeanor offenses, including any drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits.

There is no reason to believe that the Proposed Rules will identify individuals who "constitute a danger to the community of the United States."[6] The agencies have proffered no evidence or data to support these proposed changes, and in fact, the data supports an opposite conclusion—the fact of a past conviction is not a reliable predictor of an individual's future dangerousness.[7] In New York, the number of people who return to prison due to new offenses has declined. A 2017 report from the New York Department of Corrections and Community Supervision found that, of all individuals released from prison during 2012, only 9% were reincarcerated within three years for a new felony conviction.[8] Of those individuals who were newly convicted and returned to prison, the vast majority (78%) were reincarcerated for technical parole violations.[9] By implementing additional mandatory bars based on past offenses, the Proposed Rule would exclude even more individuals who are unlikely to commit new serious offenses, or any new offenses at all.

---

[4] 8 U.S.C. § 1324(a).

[5] 8 U.S.C. § 1326.

[6] 84 Fed. Reg. 69643 (Dec. 19, 2019).

[7] *See* U.S. Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders* (2017) https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf (noting that recidivism rates fall substantially with age); U.S. Sentencing Commission, Recidivism Among Federal Violent Offenders (2019) https://www.ussc.gov/research/research-reports/recidivism-among-federal-violent-offenders (noting that non-violent offenders recidivate at significantly lower rates); J. Ramos and M. Wenger, *Immigration and recidivism: What is the Link?* JUSTICE QUARTERLY (2019) https://www.tandfonline.com/doi/abs/10.1080/07418825.2019.1656763 (finding no correlation between recidivism rates and citizenship status among those formerly incarcerated for felonies in Florida prisons).

[8] Department of Corrections and Community Supervision, *Return Rate for Parolees Committing New Felony Crimes Hits Historic Low*, Nov. 24, 2014, http://www.nycourts.gov/reporter/webdocs/Recidivism_Rates_2010.pdf.

[9] *Id.*

3

In addition, a conviction may not accurately reflect a person's behavior or "dangerousness." The Proposed Rules fail to address or account for the reality of plea negotiations, in which a person may plead guilty to an offense for a variety of reasons, such as to avoid a severe sentence, to be released from pretrial detention, or to return to work and family obligations. In addition, research studies have found statistically significant racial disparities in the way white and black defendants have been charged and convicted. A study of misdemeanor marijuana cases in New York City found that black defendants were less likely than white defendants to be offered a charge reduction.[10] And a study of the plea bargaining process in Wisconsin found that white defendants are about 25% more likely than black defendants to have their principal initial charge dropped or reduced to a lesser crime, and that white defendants initially charged with misdemeanors were more likely than black defendants to be convicted for crimes carrying no possible incarceration, or not to be convicted at all.[11] Given these questions about the correlation between a person's alleged criminal conduct and the final conviction, additional mandatory bars based on the fact of a conviction alone are flawed gating mechanisms for naming who deserves safe passage. A conviction that results from the plea negotiation process cannot be taken at face value as a complete accounting of an individual's past action. It is even further attenuated from an indication of future dangerousness to others.

a. **The Seven Proposed Categorical Bars Are Overbroad And Will Sweep In Conduct Far Beyond The "Particularly Serious Crime" Standard**

Additionally, outside of the aggravated felony context, it has generally been well understood by the Board of Immigration Appeals (BIA) and the Courts of Appeals that low-level, "run-of-the-mill" offenses do not constitute "particularly serious crimes"[12] Under this long-standing interpretation of the particularly serious crime bar in the Immigration and Nationality Act (INA), there is no precedent for low-level offenses—like infraction or misdemeanor level driving under the influence convictions where no injury is caused to another, or simple possession of a controlled substance or paraphernalia—to constitute a "particularly serious crime."

The reason for this is common sense and a matter of interpreting the statutory language as it is written. As Judge Reinhardt observed in a concurring opinion in *Delgado v. Holder*,[13] a decision the Proposed Rules cite in support of these expanded bars, when the statute specifies "particularly serious" crimes, this distinction must be given the common sense, textual meaning it holds. "[R]un-of-the-mill" offenses like driving under the influence or petty theft have "little in common" with those offenses the BIA has deemed particularly serious—e.g., felony menacing with a deadly weapon, armed robbery, or burglary of a dwelling in which the offender is armed or causes injury.[14] As Judge Reinhardt further explained, public opinion vindicates such a common sense distinction: "American voters would be unlikely to elect a president or vice president who

---

[10] *See* Besiki Luka Kutateladze et al., *Opening Pandora's Box: How Does Defendant Race Influence Plea Bargaining?*, 33 JUST. Q. 398, 414 (2016) https://www.tandfonline.com/doi/abs/10.1080/07418825.2014.915340.

[11] *See* Carlos Berdejó, *Criminalizing Race: Racial Disparities in Plea Bargaining*, 59 BOST. COLL. L. REV. 1187, 1191 (2018) https://lawdigitalcommons.bc.edu/cgi/viewcontent.cgi?article=3659&context=bclr.

[12] *Delgado v. Holder*, 648 F.3d 1095, 1110 (9th Cir. 2011) (en banc) (J. Reinhardt, concurring).

[13] *Id.*

[14] *Id.*

4

had committed a particularly serious crime, yet they had no difficulty in recently electing to each office a candidate with a DUI record."[15] Barring individuals from asylum based on these relatively minor offenses renders the "particularly serious" part of the "particularly serious crime" bar meaningless.

The Board of Immigration Appeals has cautioned that, "in light of the unusually harsh consequences which may befall a [noncitizen] who has established a well-founded fear of persecution; the danger of persecution should generally outweigh all but the most egregious of adverse factors."[16] Yet because of the categorical nature of the seven new bars proposed here, asylum seekers will be precluded from obtaining protection on the basis of a vast array of conduct, without any discretion left to the immigration adjudicator to determine whether the circumstances merit such a harsh penalty. Indeed, in the case of the domestic-violence related ground, the categorical bar will be imposed based on mere allegations of conduct without any adjudication of guilt.

### i.    *The proposed controlled substance offense bar*

The proposal to create an eligibility bar based on a conviction for possession or trafficking of a controlled substance or controlled-substance paraphernalia, other than a single use offense involving possession for one's own use of 30 grams or less of marijuana,[17] is an overbroad exclusion that will not make anyone safer, but will put bona fide asylees back in danger. As discussed above, this proposed bar would go far beyond any common sense meaning or established legal definition of a "particularly serious crime." In New York, the proposed controlled substance offense eligibility bar would include misdemeanor drug offenses that have specifically been found not to be "particularly serious" by the BIA.[18] For example, an individual with a past conviction for misdemeanor simple possession of marijuana in the 4th degree[19] would be newly barred from asylum under the Proposed Rules, with no chance to present any mitigating circumstances. For drug-related offenses, the categorical bar is particularly concerning because it erases individual mitigating circumstances that are commonly associated with such conduct, like addiction, self-medication, and any subsequent treatment or rehabilitation.

### ii.    *The proposed felony and "punishable by more than one year" bars*

The Departments propose to implement a new eligibility bar for felony convictions, including felonies under federal, state, tribal, or local law, and crimes punishable by more than one year's imprisonment.[20] Reliance on the grade or potential sentences attached to offenses to define seriousness without examining the nature of the underlying conduct also erodes the common sense meaning of "particularly serious." There are several felonies in New York State that are not and

---

[15] *Id.*.

[16] *Matter of Pula*, 19 I.&N. Dec. 474 (BIA 1987).

[17] 84 Fed. Reg. 69654 (Dec. 19, 2019).

[18] *See Matter of Juarez*, 19 I&N Dec. 664 (BIA 1988) ("Without unusual circumstances, a single conviction of a misdemeanor offense is not a "particularly serious crime.")

[19] N.Y.P.L. 221.15

[20] 84 Fed. Reg. 69645 (Dec. 19, 2019).

5

should not categorically be considered "particularly serious crimes." For example, under these proposed rules, anyone who pleads guilty to causing $250 worth of property damage,[21] to having recorded a movie in a theater two times,[22] or to simple possession of a narcotic as little as 500 milligrams or half an ounce[23] would be categorically barred from asylum regardless of the severity of past persecution suffered or future persecution feared.

The Departments' purported goal of creating more uniformity cannot be achieved simply by incorporating a grade-based felony bar. In many cases, applying the "felony" designation as a categorical bar will lead to inconsistent results because offenses are categorized very differently across jurisdictions. For example, felony theft threshold amounts among the states range from $200 to $2,500 or more,[24] yet the Proposed Rules would consider all such felony convictions equivalent. Adding a felony bar that penalizes such a broad range of conduct does not address anomalous outcomes, but rather invites more incongruity and unequal treatment.[25] This overbroad exclusion fails to exercise the special caution called for in the asylum context, where the stakes are so high and the possible penalty so severe.

Further, the proposed bar based on any conviction "punishable by more than one year imprisonment" is also overbroad and unrelated to identifying threats to public safety. This exclusion would sweep in minor "felony" level conduct like the New York offenses described above, as well as misdemeanors from jurisdictions like New Jersey and Pennsylvania, without regard to the actual sentence imposed by the judge based on the particular factual record in the case. Especially in jurisdictions where sentencing judges explicitly weigh the specific facts and conduct at issue in the crime, the actual sentence is a more faithful and accurate measure of whether an individual's conduct was "particularly serious."

### iii.    The proposed illegal reentry and document fraud bars

The proposed bars for illegal reentry convictions under 8 U.S.C. 1326[26] and convictions for the possession or use, without lawful authority, of an identification document, authentication feature, or false identification document,[27] ignore and fundamentally mischaracterize the

---

[21] N.Y.P.L. 145.05.

[22] N.Y.P.L. 275.34.

[23] N.Y.P.L. 220.06.

[24] *See* Marella Gayla, The Marshall Project, *What's the Punishment for Theft? Depends on What State You're In*, Aug. 9, 2017, https://www.themarshallproject.org/2017/08/09/what-s-the-punishment-for-theft-depends-on-what-state-you-re-in.

[25] Categorical bars based on sentence length and nomenclature also creates dangerous incentives for lawmakers to amend criminal statutes to stack federal penalties against noncitizens. *See* Amit Jain and Phillip Dane Warren, *An Ode to the Categorical Approach*, 67 UCLA L. REV. DISC. 132, 149-50 (2019), https://poseidon01.ssrn.com/delivery.php?ID=624013110082095066006024017105093011052056061029027087091072065125102070125123068074053002099029105061121073066017065070072071039041082054021074083028123121079000100062032055071007072004096031125107076123095104066125126122111091076025102001090091111027&EXT=pdf.

[26] 84 Fed. Reg. 69648 (Dec. 19, 2019).
[27] 84 Fed. Reg. 69653 (Dec. 19, 2019).

6

circumstances that asylum seekers face in coming to the United States. The expansion of the asylum bar to include individuals who have been convicted of reentering the United States without inspection pursuant to INA § 276 is unlike any of the other bars previously established or interpreted by the BIA or Circuit Courts of Appeals. It is an offense with no element of danger or violence to others. Most significantly, and more so than other bars contained in the Proposed Rules, barring asylum based on the manner of entry directly violates the prohibition on imposing penalties based on a refugee's manner of entry or presence in the United Nations Convention Relating to the Status of Refuges ("the Convention"). This prohibition is a critical part of the Convention because it recognizes that refugees and asylum seekers often have little control over the place and way they enter the country where they are seeking refuge.

Likewise, many people who are fleeing persecution do not have the financial means to navigate the journey to safety, and may see no other choice than to use fraudulent means to enter the United States to remain here safely while their applications are pending. To suggest such conduct makes someone unfit to remain in the U.S., or renders them a serious threat to public safety, is arbitrary and irrational. It would also contradict decades of settled law directing that violations of law arising from an asylum applicant's manner of flight should constitute only one of many factors to be consulted in the exercise of discretion.[28] In addition, many such migrants are victims of unscrupulous individuals who offer false assurances and documentation that turns out to be fraudulent.

## III.    THE PROPOSED RULES VIOLATE THE LETTER AND SPIRIT OF UNITED STATES INTERNATIONAL TREATY OBLIGATIONS

As a signatory to the 1967 Protocol Relating to the Status of Refugees ("the Protocol"),[29] the United States is obligated to create and interpret domestic refugee law such that it upholds the Protocol's principle of non-refoulement, which is the commitment to not return refugees or asylum seekers to a country where they will face persecution on protected grounds. This core principle holds even when potential refugees have allegedly committed criminal offenses. The Proposed Rules further deviate from the United States' treaty obligations by expanding the type of alleged conduct that can lead to a refugee's expulsion, in violation of both the language and spirit of the treaty.

The United States' existing *per se* criminal bars and asylum denials based on mere allegations of criminal activity or minor offenses already vastly exceed the categories for exclusion and expulsion set out in the Convention. The Convention allows states to exclude and/or expel individuals from refugee protection if the individual "having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of that country."[30] However, this exception applies to "extreme cases," in which the particularly serious crime at issue is a

---

[28] *See Pula*, 19 I.&N. Dec. at 474.

[29] United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268.

[30] Convention Relating to the Statute of Refugees, July 28, 1951, 140 U.N.T.S. 1954 (hereinafter "the Convention"), at art. 33(2).

AR.09429

"capital crime or a very grave punishable act."[31] The United Nations High Commissioner for Refugees (UNHCR) has stated that a "particularly serious crime" bar should be limited "to refugees who become an extremely serious threat to the country of asylum due to the severity of crimes perpetrated by them in the country of asylum."[32]

Moreover, the UNHCR has specifically noted that the particularly serious crime bar does not encompass less serious crimes such as the proposed "felony" level offenses listed above: "[c]rimes such as petty theft or the possession for personal use of illicit narcotic substances would not meet the threshold of seriousness."[33] Finally, when determining whether a refugee should be barred from protection for a particularly serious crime conviction, the adjudicator must conduct an individualized inquiry and consider any mitigating factors. Current discretionary denials based on minimal or alleged conduct do not meet this "extremely serious threat to the country" standard of exclusion, and the *per se* bars are even more egregious in sweeping in minor offenses while ignoring mitigating evidence entirely. The Proposed Rules would push U.S. refugee law even further from its treaty obligations by slashing the number of people who will have their individual circumstances considered as required under the Convention and relying on the flawed and overbroad measures of dangerousness or threat level as discussed above.

## IV.    THOSE PRECLUDED FROM ASYLUM ELIGIBILITY WILL BE GRAVELY IMPACTED EVEN IF GRANTED WITHHOLDING OF REMOVAL OR PROTECTION UNDER THE CONVENTION AGAINST TORTURE

Throughout the Proposed Rules, the agencies defend their contravention of established U.S. and international refugee laws by pointing to the availability of alternative forms of relief for those categorically barred from asylum eligibility under the new rules.[34] However, the possible availability of these alternatives forms of relief—withholding of removal and protection under the Convention Against Torture ("CAT")—cannot justify the serious harm the Proposed Rule's overly harsh and broad limits on asylum will create. Critically, the relief provided under CAT and statutory withholding of removal is much narrower in scope and duration than under asylum, and these claims are adjudicated on a different, higher standard of proof—a clear probability, instead of a well-founded fear of, persecution or torture[35]—flowing from distinct international obligations. Therefore, an individual could simultaneously have a valid and strong asylum claim but be unable to meet the standard under withholding or removal or CAT and face removal to their country of origin, where persecution or even death await. Limiting bona fide asylum seekers to withholding

---

[31] U.N. High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees* 2, U.N. Doc. HCR/IP/Eng/REV. ¶ 154-55, (1979, reissued 2019).

[32] U.N. High Comm'r for Refugees (UNHCR), *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 7 (July 2007), http://www.unhcr.org/enus/576d237f7.pdf.

[33] U.N. High Comm'r for Refugees (UNHCR), *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 10 (July 2007), http://www.unhcr.org/enus/576d237f7.pdf.

[34] *See, e.g.,* 84 Fed. Reg. 69644 (Dec. 19, 2019).

[35] *Cardoza-Fonseca*, 480 U.S. at 431 (describing the difference between a well-founded fear of persecution and a clear probability of persecution). For CAT relief, an applicant must show it is more likely than not that he or she will be tortured or killed by or at the government's acquiescence if removed to the home country. 8 C.F.R. § 1208.16(c)(2).

8

AR.09430

of removal or CAT protection would unfairly strip them of the full extent of the protections and rights they are entitled to under our domestic and international commitments.

Even for those who meet the higher standard, withholding and CAT recipients are still subject to significant prejudice. For example, they have no ability to travel internationally. The United Nations Convention Relating to the Status of Refugees affords refugees the right to travel in mandatory terms. Article 28 states, "Contracting States shall issue to refugees lawfully staying in their territory travel documents for the purpose of travel outside their territory."[36] Unlike individuals granted asylum, withholding and CAT recipients do not have access to a travel document as contemplated by Article 28. And unlike individuals granted asylum, withholding and CAT recipients must legally be ordered removed, making any travel outside the U.S. a "self-deportation"[37] which prevents them from being able to return to the United States. Asylum seekers granted only withholding of removal or CAT protection are thus effectively trapped within the United States in long-term limbo.

Because international travel is prohibited, withholding and CAT recipients also face permanent separation from their spouses and children, as they cannot reconnect with their families in a third country. And they also cannot reunite with family in the United States because only asylees and refugees are eligible to petition for a spouse and children to join them as derivatives on that status. Thus, the Proposed Rules contribute to yet another policy of family separation. Under these new rules, even if a mother with young children flees to the United States for protection and is granted relief under withholding or CAT, her children will not be afforded the same protection and ability to stay in the United States with their mother. Instead, they will need to establish their own eligibility for protection before an immigration judge, no matter their age.

These foreseeable issues are already taking place at our southern border. Recently, a mother who had fled her home country with her young children was subject to the so-called Remain in Mexico policy and the asylum "transit ban," which made her ineligible for asylum. The immigration judge granted the mother withholding of removal and CAT protection but denied the same protection to her young children, ordering them removed, lurching the family into dangerous uncertainty.[38] Under the Proposed Rules, these types of dangerous and heart wrenching situations will increase, separating families and forcing parents to return to countries where it has been established they will more likely than not face persecution and torture, to prevent separation from their children.

Most fundamentally, there is continuing jeopardy for withholding and CAT recipients that does not exist for asylum recipients. When a noncitizen is granted asylum, the person receives a legal status that protects them against removal unless and until that status is terminated.[39] None of these protections exist for withholding and CAT recipients. They have no access to permanent

---

[36] 19 U.S.T. 6223 T.I.A.S. No. 6577 (1968).

[37] *See Matter of I-S- & C-S-*, 24 I.&N. Dec. 432, 434 n.3 (BIA 2008); 8 C.F.R. § 241.7.

[38] Adolfo Flores, "An Immigrant Woman Was Allowed To Stay In The US — But Her Three Children Have A Deportation Order," *Buzzfeed*, December 21, 2019, https://www.buzzfeednews.com/article/adolfoflores/an-immigrant-woman-was-allowed-to-stay-in-the-us-but-not.

[39] *See* 8 U.S.C. § 1158(c)(1)(A).

9

residency or citizenship. Instead, they are subject to a removal order and vulnerable to the permanent prospect of deportation to a third country and subject to potential check-ins with immigration officials where they can be made to pursue removal to third countries to which they have no connection.[40]

## V.    THE PROPOSED RULES WILL RESULT IN "PSEUDO-CRIMINAL TRIALS" IN IMMIGRATION COURT, UNDERMINE JUDICIAL EFFICIENCY, AND RESULT IN RACIALLY-BIASED DECISION-MAKING

The proposed criminal bars furthermore pose significant challenges to fair adjudication. In two significant ways, the Proposed Rules require immigration adjudicators to engage in decision-making to determine whether an asylum applicant's conduct—outside the context of any formal admissions or findings of guilt or criminal court adjudication—categorically bars asylum eligibility. First, under these new rules, immigration adjudicators would be allowed to consider "all reliable evidence" to determine whether there is "reason to believe" an offense was "committed for or related to criminal gang evidence," or "in furtherance of gang-related activity."[41] Second, the Proposed Rules would allow immigration adjudicators to "assess all reliable evidence in order to determine whether [a] conviction amounts to a domestic violence offense;" and to consider whether non-adjudicated conduct "amounts to a covered act of battery or extreme cruelty."[42]

These proposed requirements would require extensive fact-finding and result in "pseudo-criminal trials" within the asylum adjudication process. Because "reliable evidence" is not limited to formal records or court findings, both parties before the adjudicator will potentially be permitted to present an extremely large volume of "evidence" that may or may not be relevant. Asylum trials will be bloated with submissions from both sides because strict rules of evidence do not apply in immigration proceedings.[43] Asylum seekers would be denied constitutional rights that attach to criminal proceedings as the underlying basis of criminal convictions or charges are relitigated without traditional rules that specifically guard against unfair prejudice, confusion, and delay.[44]

These "pseudo-criminal trials"—or "post hoc investigation into the facts of predicate offenses"—have "long [been] deemed undesirable" by the federal courts, including the Supreme Court.[45] For more than a century, the federal courts have repeatedly upheld the "categorical approach" as the correct standard to determine the immigration consequences of a criminal offense, wherein the immigration adjudicator relies on the statute of conviction as adjudicated by the criminal court system, without relitigating the nature or circumstances of the offense in immigration court.[46] As the Supreme Court has explained, this approach "promotes judicial and

---

[40] *See R–S–C v. Sessions*, 869 F.3d 1176, 1180 (10th Cir. 2017).

[41]*See* 84 Fed. Reg. 69649 (Dec. 19, 2019).

[42]*See* 84 Fed. Reg. 69652 (Dec. 19, 2019).

[43]*Baliza v. INS*, 709 F.2d 1231 (9th Cir. 1983).

[44] *See*, *e.g.*, Fed. R. Evid. 403.

[45] *Moncrieffe v. Holder*, 569 U.S. 184, 186 (2013).

[46] *See Moncrieffe*, 569 U.S. at 191 ("This categorical approach has a long pedigree in our Nation's immigration law."). For a more fulsome history of the development of the categorical approach in immigration court, *see* Alina

AR.09432

administrative efficiency by precluding the relitigation of past convictions in minitrials conducted long after the fact."[47] In *Moncrieffe v. Holder*, the Court rejected the government's proposal that immigration adjudicators determine the nature and amount of remuneration involved in a marijuana-related conviction, noting that "our Nation's overburdened immigration courts" would end up weighing evidence "from, for example, the friend of a noncitizen" or the "local police officer who recalls to the contrary," with the end result a disparity of outcomes depending on the whims of the individual immigration judge and a further burdened court system.[48] This is exactly the kind of harm that would arise from these Proposed Rules.

The Proposed Rules repeatedly cite increased efficiency as justification for many of the proposed changes.[49] Yet the Departments propose to set aside final adjudications already available through the criminal system in favor of resource-intensive pseudo-criminal trials. The proposed rules thus will have the opposite effect of the rules' stated intention and will decrease efficiency in the asylum process.

The City Bar is especially concerned that creating a blanket exclusion for anyone who is convicted of a crime that an immigration adjudicator links to gang activity will erroneously prevent bona fide asylum seekers, in particular youth of color, from receiving protection. First, there have long been questions raised about the veracity of gang affiliation information used by immigration officials, such as local law enforcement gang databases that have been found to be inaccurate, outdated, and infected by racial bias.[50] Likewise, information about gang affiliations sourced from the fusion intelligence-gathering center in El Salvador has already been used against asylum seekers, even though it has been found to be inaccurate.[51] Empowering immigration adjudicators to render asylum applicants categorically excluded from protection because of such spurious allegations will inevitably result in the return of many asylum seekers back to harm and will compound the disparate racial impact of inclusion in gang databases. Creating a "gang-related crime" bar will only exacerbate the due process violations already occurring as the result of unsubstantiated information about supposed gang ties. The Immigration and Nationality Act and existing regulations already provide broad bars to asylum where criminal behavior by an asylum seeker causes concern by an adjudicator as to whether an asylum seeker merits asylum as a matter

---

Das, "The Immigration Penalties of Criminal Convictions: Resurrecting Categorical Analysis in Immigration Law," *New York University Law Review* 86, no. 6 (2011): 1689 - 1702, https://www.nyulawreview.org/wp-content/uploads/2018/08/NYULawReview-86-6-Das.pdf.

[47] *Moncrieffe*, 569 U.S. at 200-201.

[48] *Id.* at 201.

[49] *See* 84 Fed. Reg 69656-8 (Dec. 19, 2019).

[50] Annie Sweeney and Madeline Buckley, *Chicago Police Gang Data Collection Faulted by City's Inspector General as Unchecked and Unreliable*, CHICAGO TRIBUNE, Apr. 11, 2019, https://www.chicagotribune.com/news/breaking/ct-met-chicago-police-gang-data-04112019-story.html; Anita Chabria, *A Routine Police Stop Landed Him on California's Gang Database. Is It Racial Profiling?*, LOS ANGELES TIMES, May 9, 2019, https://www.latimes.com/politics/la-pol-ca-california-gang-database-calgang-criminal-justice-reform-20190509-story.html.

[51]*See* Melissa del Bosque, *Immigration Officials Use Secretive Gang Databases to Deny Migrant Asylum Claims,* PROPUBLICA, July 18. 2019, https://www.propublica.org/article/immigration-officials-use-secretive-gang-databases-to-deny-migrant-asylum-claims.

11

of discretion. Adding this additional, superfluous layer of complication risks erroneously excluding bona fide asylum seekers from protection without adding any useful adjudicatory tool to the process.

## VI.     THE PROPOSED DEFINITION OF "CONVICTION" AND "SENTENCE" FOR THE PURPOSES OF THE NEW BARS FURTHER EXCLUDES THOSE IN NEED OF PROTECTION

The Proposed Rules also impose an unlawful presumption against asylum eligibility for applicants who seek post-conviction relief while in removal proceedings or longer than one year after their initial convictions. In particular, the newly created rebuttable presumption "against the effectiveness" of an order vacating, expunging, or modifying a conviction or sentence if the order was entered into after the asylum seeker was placed in removal proceedings, or if the asylum seeker moved for the order more than one year after the date the original conviction or sentence was entered,[52] would unfairly penalize asylum applicants, many of whom may not have the opportunity to seek review of their prior criminal proceedings until applying for asylum.

In *Padilla v. Kentucky*, the Supreme Court recognized that the immigration consequences of a conviction are sufficiently serious for the Sixth Amendment to require a noncitizen defendant to be competently advised of them before agreeing to a guilty plea.[53] Many asylum applicants, especially those in vulnerable populations isolated from resources and unfamiliar with the due process protections available to them in the United States, may not have discovered the defects in their underlying criminal proceedings until their consultation with an immigration attorney, or until they are placed into removal proceedings, which may happen several years after a conviction. In addition, some individuals may have very old convictions that no longer impact their day to day life, and they may not have had any reason to think about past infirmities until the threat of persecution and death upon deportation arose. The proposed rebuttable presumption against the validity of a plea withdrawal or vacatur in these cases will undoubtedly lead to the wrongful exclusion of countless immigrants from asylum relief who have had their Constitutional rights violated. It is particularly difficult for an uncounseled individual to adequately prepare to make a sufficient distinction between a vacated, expunged, or modified sentence that involves a violation of their Constitutional rights to receive immigration advice under *Padilla*, from what the Departments consider to be a vacatur or modification "for immigration purposes." By imposing a presumption against the validity of a withdrawal or vacatur of a plea, the Proposed Rules compound the harm to immigrants who, in addition to facing persecution in their home countries, have been denied constitutionally compliant process in the United States criminal legal system.

Reliance on timing in particular is unfounded, as the adjudication of a vacatur or withdrawal motion can depend on many administrative or jurisdiction-specific factors beyond an individual's control. The timing criteria also prejudices individuals who may have simply taken longer to collect the necessary resources or receive a competent consultation to identify the

---

[52] On page 69656 of the Proposed Rules, the Department of Homeland Security and the Department of Justice urge that "[i]t is reasonable to conclude that an alien who has a meritorious challenge to a criminal conviction based on a procedural or substantive defect is more likely to seek post-conviction relief sooner than an alien who is seeking relief on rehabilitative grounds…" 84 Fed. Reg. 69656 (Dec. 19, 2019).

[53] *Padilla v. Kentucky*, 559 U.S. 356 (2010).

12

infirmities in their criminal proceedings. Regardless of whether immigration proceedings may or may not have prompted someone to examine the fairness of their case, the validity of a substantive or procedural defect in someone's criminal proceedings should in no way be tied to when a judge decides to enter that determination, something over which the individual has no control.

## VII.    THE PROPOSED RULES FAIL TO OFFER THE FULL FAITH AND CREDIT DUE TO STATE COURT DECISIONS

The Proposed Rules improperly authorize immigration adjudicators to second-guess state court decisions and make baseless assumptions about an applicant's motives to seek justice, even where a court order on its face cites substantive and procedural defects in the underlying proceeding. The proffered justification for this presumption against the validity of post-conviction relief is to "ensure that aliens do not have their convictions vacated or modified for purported rehabilitative purposes that are, in fact, for immigration purposes," "to codify the principle set forth in *Matter of Thomas and Thompson*," and to bring the analysis of post-conviction orders in line with *Matter of Pickering*.[54] However, the agencies misread the applicable law, which only requires that such orders are based on substantive or procedural defects in the criminal proceedings. The Proposed Rule goes well beyond that requirement.

The authority extended to adjudicators to impute motives to applicants violates the law of multiple circuits, including *Pickering*, on which it relies,[55] and grants adjudicators vague and indefinite authority to look beyond a facially valid vacatur. Such breadth of authority undermines asylum seekers' rights to a full and fair proceeding. As an initial matter, the Proposed Rules' reliance on *Matter of Thomas and Thompson*[56] is flawed. Neither the text nor the history of the immigration statute authorizes adjudicators to ignore state court sentence modifications unless they are based on substantive or procedural defects. The Board of Immigration Appeals recognized this in *Matter of Cota-Vargas*, where it concluded that the application of "the *Pickering* rationale to sentence modifications has no discernible basis in the language of the Act."[57]  Based on the text of the Immigration and Nationality Act and the well-documented legislative history behind Congress's definition of "conviction" and "sentence" in 8 U.S.C. § 1101(a)(48), the Board determined that Congress intended to ensure that, generally, proper admissions or findings of guilt

---

[54] 84 Fed. Reg. at 69655-56 (*citing Matter of Thomas and Thompson*, 27 I.&N. Dec. 674 (A.G. 2019) (holding that sentencing modifications must be based at least in part on a procedural or substantive defect) and *Matter of Pickering*, 23 I.&N. Dec. 621 (BIA 2003), *rev'd on other grounds* by *Pickering v. Gonzales*, 465 F.3d 263, 267-70 (6th Cir. 2006) (holding that convictions vacated on the basis of a procedural or substantive defect in the underlying proceedings are not valid for immigration purposes but vacaturs due to post-conviction events, such as rehabilitation or immigration hardships remain valid)).

[55] *See Matter of F-*, 8 I.&N. Dec. 251, 253 (BIA 1959) (citing *Matter of Pickering*, 23 I.&N. Dec. 621). *See also Pickering v. Gonzales*, 465 F.3d 263, 267-70 (6th Cir. 2006) (holding that the BIA was limited to reviewing the authority of the court issuing the order as to the basis for vacatur); *Reyes-Torres v. Holder*, 645 F.3d 1073, 1077-78 (9th Cir. 2011) (*citing Cardoso-Tlaseca v. Gonzales*, 460 F.3d 1102, 1107 (9th Cir. 2006) (finding that the state court's rationale, not the respondent's motive, was the relevant inquiry); *Rodriguez v. U.S. Att'y Gen.*, 844 F.3d 392, 397 (3d Cir. 2006) (noting that "[T]he IJ may rely only on reasons explicitly stated in the record and may not impute an unexpressed motive for vacating a conviction.").

[56] *Matter of Thomas and Thompson* 27 I&N Dec. 674 (A.G 2019).

[57] *Matter of Cota-Vargas*, 23 I.&N. Dec. 849, 852 (BIA 2005).

13

were treated as convictions for immigration purposes, even if the conviction itself was later vacated. Neither the text of the INA nor the legislative history of the definitions reveals any attempt on Congress's part to change the longstanding practice of giving effect to state court sentencing modifications. For these reasons, *Matter of Thomas and Thompson* lacks Congressional support for its rule and should not be extended.

## VIII.   CONCLUSION

For the above stated reasons, the City Bar respectfully opposes the Proposed Rules because they exclude refugees from protection in violation of international treaty agreements, and in a manner that invites racial bias and will further alienate vulnerable and marginalized individuals seeking safety. Thank you for the opportunity to submit these comments. We appreciate your consideration.

Respectfully,

Victoria F. Neilson, Chair
Immigration & Nationality Law Committee

14

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 20, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ek3-3tmd
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0415
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Mara Divis

## General Comment

I am a family physician in Chicago. I work with patients who are immigrants, many of whom have made the heart-wrenching decision to leave a home where they lived in fear for their and their childrens' lives and to make a new home here, who contribute to our community by working long, hard hours, by sending their children to local schools so that they may grow up to work and study and apply their skills and talent toward making our country a better place.
American immigration/asylum policies have to honor the compassion, justice, and respect for human rights that form the bedrock of our country's values. We have to stand up for our neighbors as the Trump administration guts asylum and tramples our highest ideals. I urge the administration to withdraw this proposal.

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 20, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ek2-y4k8
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0416
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Anonymous Anonymous

## General Comment

I write in opposition to the Department of Justice and Department of Homeland Security's proposed rule change, "Procedures for Asylum and Bars to Asylum Eligibility." People seeking asylum are often fleeing dangerous situations, and it is immoral and unethical to impose roadblocks to asylum for individuals with relatively minor criminal infractions. Furthermore, the proposed rule unfairly eliminates the possibility for individualized evaluation of asylum cases. The U.S. should continue its historic role as a refuge and support for people fleeing danger and violence, rather than create further barriers for people already in distress. I urge withdrawal of this proposed rule in its entirety, and strongly request that the government take the steps needed to enact more welcoming policies towards asylum seekers.

AR.09438

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 20, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ek1-1vhv
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0417
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Alice Levine
**Address:**
    79 Plain St.
    Easthampton,  ME,  01027-2509
**Email:** alicelevine12@gmail.com
**Phone:** 6179213512

---

## General Comment

I am very strongly opposed to the new bars for asylum eligibility. In particular, I am concerned about the provision requiring children to present asylum claims separately, even once their parent(s) have been deemed eligible for asylum. This could easily lead to more family separation, a practice that is opposed by doctors, mental health professionals, teachers, and others who support the healthy development of families.

I believe that the US government's current attempts to make it more and more difficult for people to be granted asylum (or even to file for it!) is an abuse of human rights that should not be tolerated. Many of our ancestors (in various generations) fled persecution and violence and found refuge in the US. We must not turn our backs now on those whose lives are in danger.

AR.09439

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 20, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ek1-2t99
**Comments Due:** January 21, 2020
**Submission Type:** API

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0418
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Jordan Cotleur
**Address:**
  1206 Broadway st
  Apt 3
  Cincinnati,  OH,  45202
**Email:** Cotleurj@aol.com
**Phone:** 3307300044

---

## General Comment

I do not support this modification to the Homeland Security Act. This does not comport with the standards outlined in the Refugee Act or the Immigration and Nationality Act. First, a conviction for a minor misdemeanor does not pose a national security risk to the United States. The current provisions already ban asylum seekers who have been convicted of a specifically well delineated set of misdemeanors that Congress has already deemed sufficient to serve national security. Broadening this exclusion to minor misdemeanor convictions is arbitrary and will only serve to bar admission to otherwise deserving asylum seekers who have committed petty offenses that do not pose any threat to national security. Second, an automatic bar on such individuals is especially ill advised because it revokes discretionary authority from the immigration judge to determine on an individual basis that one conviction for a minor misdemeanor is signficantly outweighed by an incredibly compelling asylum claim.

AR.09440

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 20, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ek1-5hun
**Comments Due:** January 21, 2020
**Submission Type:** API

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0419
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Anonymous Anonymous

## General Comment

It is no surprise that the Trump administration is continuing its assault on migrants and continuing to criminalize the natural phenomenon of migration. Adding crimes such as minor drug possession or driving under the influence to the list of crimes that bar migrants from claiming asylum does NOT make our country safer, it merely makes our country more racist.

I strongly oppose the proposed changes and implore lawmakers to consider the impacts of what our country has done over the years to create situations in places like Latin America which cause today's inhabitants to flee their homeland. The blood is on our hands and we are continuing to narrow the pathway which asylum seekers have in furtherance of a racist immigration agenda.

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 20, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ek1-5c8g
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0420
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Dina Friedman

## General Comment

I am extremely opposed to these regulations, which will increase the number of families being separated. If an individual is deemed eligible for asylum, their immediate family members should be granted asylum automatically, especially if they are minor children. They should not have to file individual applications. As a social worker, I am all too aware of the traumatic effects on children separated from their parents and the U.S. should not be participating in this trauma by establishing these rules.

AR.09442

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 20, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ek0-nqt1
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0421
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Kathleen Gribble

## General Comment

I am a concerned citizen that a proposal that would allow for racial profiling in making asylum decisions might further disgrace our great country.. We know that it is the greed of American corporations that often cause the violence in many countries south of our border. We must show compassion and respect the dignity of people who would come here seeking asylum. The people of my community are mostly very welcoming a people of other cultures. Diversity enriches us all!. We want to come passion and support for asylum seekers, not ways to further traumatize them.

AR.09443

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 20, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ejz-q6bg
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0422
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Pamela Richart
**Address:**
   919 West University Aveunue
   Champaign,  IL,  61821
**Email:** prichart@ecojusticecollaborative.org

---

## General Comment

I want to express my strong opposition to the Proposed Rules that the Department of Homeland Security (DHS) and the Department of Justice (DOJ) issued on December 19, 2019 that would make changes to the rules governing asylum adjudications.

I currently co-lead an immigration justice task force at the Unitarian Universalist Church of Urbana-Champaign. Immigrants are a vital part of my central Illinois community, and my state. My husband and I have assumed guardianship over a 14-year old unaccompanied minor from Guatemala, and have learned much about the violence that causes families and young adults to leave home. They are coming to the United States in search of safety and a better life, often fearing harm or even death.

The changes in the proposed rule are both unnecessary and harsh. I believe that they constitute a unlawful gutting of the asylum protections enshrined in United States law by excluding bona fide refugees from asylum eligibility. They add barriers to a process that already excludes refugees from obtaining the security and stability that U.S. asylum has promised for decades.

Under the Refugee Act of 1980, anyone present or arriving in the U.S. can apply for asylum. For asylum seekers, making it to the U.S. often means they have found safety from persecution, torture, and often, death.This latest attack by the Trump Administration would put more people seeking asylum at risk of danger - and death, and eviscerate one of the most important defenses community members have against deportation. Asylum seekers are vulnerable because of the trauma they have experienced both in their countries of origin and often along their journey to find safety. The Proposed Rules violate the spirit and intent of the Refugee Act and our nation's commitment to providing safe haven for those fleeing persecution.

I believe that our nation MUST welcome people fleeing violence. The Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

# PUBLIC SUBMISSION

| |
|---|
| **As of:** January 23, 2020 |
| **Received:** January 20, 2020 |
| **Status:** Posted |
| **Posted:** January 21, 2020 |
| **Tracking No.** 1k4-9ejz-mcun |
| **Comments Due:** January 21, 2020 |
| **Submission Type:** Web |

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0423
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Callie Tyner
**Address:**
    Newark,  DE,
**Phone:** 301-392-7787

---

## General Comment

To Whom It May Concern:

As a social scientist, licensed psychologist, and concerned citizen I strongly oppose the rule changes proposed in 84FR69640 and I urge the involved departments to halt these changes.

The rule changes are excessively restrictive and appear designed to virtually eliminate the ability of individuals to gain asylum in the United States. The asylum process as enforced historically includes many significant barriers that have resulted in a very low overall rate of admission of asylum applicants. The changes in discretionary enforcement that have unfolded over the past 3 years have drastically perverted the system to the point where there is much confusion about what circumstances render an individual eligible for asylum. It is reasonable to predict that if these proposed rules are adopted, the asylum system in this country would degrade even further.

The primary flaw in the proposed rule changes relates to the revised definition of what constitutes a "particularly serious crime" to include criminalization of activities that are commonplace for individuals seeking asylum. The purpose of this revised definition appears intended to prevent anyone from realistically being eligible for asylum. My primary concern relates to two specific actions that would fall under the new definition of "particularly serious crimes."

First, this revised definition would cause the act of crossing the border while attempting to seek asylum to become criminalized, and this so-called "criminal behavior" would render these individuals as ineligible for asylum. This concern is in reference to the changes outlined in section A.3. Federal Convictions for Illegal Reentry (p.70). Recent news reports have highlighted the extreme restrictions on access of asylum seekers to ports of entry, particularly related to the "Remain in Mexico" policy. Asylum seekers have been subjected to

AR.09446

violence, outbreaks of contagious illnesses, and other generally unsafe conditions in the areas around ports of entry (e.g., "Tents, stench, smoke: Health risks are gripping migrant camp" by N. Merchant, Associated Press, 14-Nov-2019). These conditions leave asylum seekers with the undesirable choice of either (a) remaining in Mexico without access to sanitary and safe living conditions or (b) crossing the border illegally to obtain safe housing while they await their asylum court date.

Second, this revised definition would also lead to the criminalization of the act of a parent bringing their child with them to seek asylum. This concern is in reference to the changes outlined in section A.2. Federal Convictions for Harboring Aliens (p.66). It is unreasonable to expect that parents at risk of torture, murder or abuse in their home countries would seek asylum alone and leave their children behind. Making parents travel alone as a requirement for a valid asylum application would be inhumane. The only conceivable purpose of these proposed definition changes is to subvert the very purpose of the asylum-seeking process.

To consider the counter argument, I can understand how, on the face of it, it seems important to limit the ability of of "known criminals" to gain access to the U.S. through the asylum system. However, I believe that this argument lacks an understanding of the practical implications of these rule changes. In many ways, these rule changes could be seen as tantamount to entrapment; these changes would mischaracterize the reasonable actions of asylum seekers as serious crimes. This type of policy, which would inaccurately criminalize the behaviors of many earnest asylum seekers, is reminiscent of other xenophobic policies that have been adopted throughout history with disastrous consequences. We must be careful as a society to protect those most vulnerable among us, and to not criminalize the legitimate participation of parents in the asylum-seeking process.

The review provided by the OMB as outlined p.136 indicates that these proposed rule changes are not necessary because there are already several standards that allow for consideration of an applicants criminal history as a part of their asylum application. It is also important to note that the OMB was unable to quantify the precise impact on the asylum-seeking population of this rule (p.142). This fact concerns me a great deal; when the anticipated outcomes of a major rule change are mostly unknown and unquantified, the likelihood for unintended negative consequences is great. Furthermore, it is worth noting that there was little doubt in the OMB report that these proposed rule changes would "likely result in fewer grants of asylum on the whole." I think that this result would be regrettable and would violate the founding principles of this country. Closing the doors to asylum seekers now would endanger the lives and welfare of thousands of vulnerable people who would otherwise be considered to have legitimate claims for asylum.

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 20, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ejz-xzcf
**Comments Due:** January 21, 2020
**Submission Type:** API

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0424
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Catherine Johnson
**Address:**
  300 W Timberdell Rd
  Norman,  OK,  73019
**Email:** cfajmib@yahoo.com
**Phone:** 7014022183

---

## General Comment

The proposed rules work to expand the exclusions barring individuals with criminal records from seeking asylum. Expansion is unnecessary given that the United States already bars individuals convicted of "aggravated felonies" from seeking asylum -- a bar that, counterintuitively, already works to exclude individuals convicted of conduct that is neither aggravated nor a felony.

By statute, only individuals convicted of a particularly serious crime, 8 U.S.C. 1158(b)(2)(ii), should be excluded from obtaining asylum. As mentioned, through the currently-existing "aggravated felony" bar, the United States already excludes individuals from seeking asylum who have committed crimes that are, in no sense, particularly serious. We certainly do not need to bar more individuals for committing even less-particularly-serious crimes.

Take the proposed rule to render ineligible asylum-seekers who are convicted of first-time smuggling of their family members, including their children. This expansion is nonsensical. If an individual is fleeing persecution within the meaning of 8 USC 1101(a)(42), they will want to save their children from the same persecution. Fear and desperation in the face of a threat of persecution may well drive an asylum-seeker to enter the U.S. unlawfully -- particularly given the well-documented "metering" that is going on at the Southern Border and which (intentionally) serves as a barrier against seeking asylum at lawful points of entry. Under the current federal prosecutorial priorities, it's not unlikely that such an adult would face a criminal charge of alien smuggling. And yet the smuggling would be the direct result of our failed asylum processes on the U.S. border!

Consider too the proposal to "render ineligible aliens who engaged in acts of battery and extreme cruelty in a domestic context in the United States, regardless of whether such conduct resulted in a criminal conviction." This, too, is nonsensical. How can we exclude individuals from seeking asylum on the basis of their "particularly

AR.09448

serious crime" if they have never been convicted of a crime! Moreover, such a change would task immigration courts with work they are wholly unsuited to do -- make factual findings about past conduct to determine if it is sufficiently criminal in nature. This is especially problematic where migrants do not have a right to counsel and are frequently pursuing their cases while in detention (or, worse, while in Mexico under the Migrant Protection Protocols). How can we expect such individuals to locate and bring witnesses to immigration court in order to address factual allegations about their past conduct?

The U.S. should be looking to narrow, not expand, the criminal grounds that bar migrants from seeking asylum.

# PUBLIC SUBMISSION

| |
|---|
| **As of:** January 23, 2020<br>**Received:** January 20, 2020<br>**Status:** Posted<br>**Posted:** January 21, 2020<br>**Tracking No.** 1k4-9ejz-47uq<br>**Comments Due:** January 21, 2020<br>**Submission Type:** Web |

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0425
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Edward Kleckner
**Address:**
    W6366 Firelane 8
    Menasha,  WI,  54952
**Email:** ekleckner@gmail.com
**Phone:** 9207380632

---

## General Comment

Dear public officials reviewing public comments...

When I read the following words in the proposed changes to the Asylum rules ( see below )... I immediately thought that these original protections were put into the rules to guard against abuse of "discretionary denials"... If you remove these protections ( as proposed in the quoted text below ) it will allow for mass abuses of the God Given rights of Asylum seekers provided by international law that all civilized countries have agreed to. To remove these protections is to make our commitments to international asylum laws worthless... and subject to mass abuses. If we want to be a GREAT COUNTRY we need to act with GREAT COMPASSION... not fear!

"remove their respective regulations governing the automatic reconsideration of discretionary denials of asylum applications."

I am OPPOSED to the proposed rules changes for these reasons:

1.) It opens the implementation of the process to discretionary denial abuse without a proper and just hearing.

2.) If we want our country to be "Blessed by God" we need to be acting with the compassion of Christianity... not looking for ways to easily dismiss legitimate asylum claims!

3.) Some of the earliest asylum seekers were the Puritans and the Pilgrims seeking safety from religious persecution in their native lands. Native Americans had compassion and fed them... we should give thanks for

AR.09450

that and respect this time honored tradition. I want to be proud of my Country... NOT ASHAMED of it!

4.) Most Americans today are descended from European immigrants, or from the slave trade ( bound in chains ) Many of these are people who were fleeing poverty, plagues, and unjust incarceration, and other threats... and in many cases had been jailed as indentured servants before boarding a ship to this land! They came here seeking refuge from economic persecution but they made a new start and had the strength to build this country into the nation that it is today.. All of our Revolutionary War heroes were perceived as law violators by the British Crown... but we called them Patriots for their courage to stand up for our principles of Equality and Justice. To approve these changes is to dishonor their courageous actions!

How can we expect God to bless our land if we do not show compassion for those who struggle greatly, and or fear for their lives. Our Nation will not be respected in the world if we do not show respect for international laws of common decency! A country that is not respected will have no friends in moments of crisis.

Sincerely,

Edward Kleckner / Elected County Supervisor

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 20, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ejx-a96n
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0426
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Emily Corbett
**Address:**
　1324 Edgewood Lane
　Northbrook,  IL,  60062
**Email:** callweiss@comcast.net
**Phone:** 847-559-8791

## General Comment

I believe this proposed rule would inject racial profiling into the asylum process. This would put even more people seeking asylum at risk of danger and death. Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution for any reason.

AR.09452

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 20, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ejx-msk8
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0427
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Clare Randolph

## General Comment

I am writing to express my strong opposition to Trump administration rule changes in regard to asylum seeking in the United States.

The Trump administration has demonstrated time and again the racism inherent in its decision making. We have seen recently that some of Trump's top policy advisers have been biased in their policy advise because of their racist and nationalistic beliefs (please read: https://www.washingtonpost.com/politics/2019/11/12/leaked-stephen-miller-emails-suggest-trumps-point-man-immigration-promoted-white-nationalism/ ). Racism and nationalism should have no place in policy and decision making in America, and show a lack of concern for real problems facing every-day American people.

America is great because of the diversity of people who live here, and because of our moral conscience. I have always been proud to be an American because of our country's willingness to accept asylum seekers and people of all backgrounds who are being persecuted by their former governments. If we begin to impose rules on asylum seekers, I believe this would increase racial profiling, hurt communities that have already been attacked by their government in their home countries, and in cases of deportation would often lead to a death sentence. It is immoral to knowingly send someone to their death simply because our flawed justice system has falsely accused someone, or racially profiled someone until they no longer meet the "asylum seeking criteria".

Because of the above reasons, I beg you to re-consider this rule change based on racism and fear-mongering. Policy should be based on study, need from real Americans, and informed decisions. Nationalism should have no part in American policy, otherwise, we will lose what truly makes America great: our differences. Thank you for your time and consideration.

# PUBLIC SUBMISSION

| |
|---|
| **As of:** January 23, 2020 |
| **Received:** January 20, 2020 |
| **Status:** Posted |
| **Posted:** January 21, 2020 |
| **Tracking No.** 1k4-9ejx-59d1 |
| **Comments Due:** January 21, 2020 |
| **Submission Type:** Web |

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0428
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Louise Mehler
**Address:**
    Sacramento,  CA,  95818-2423
**Email:** lmehler444@gmail.com

---

## General Comment

Thank you for allowing me to comment on 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41. I strongly oppose the proposed changes.

The Refugee Act of 1980, which brought US law into compliance with the provisions of the United Nations Protocol Relating to the Status of Refugees, has since been modified repeatedly to impose a variety of exceptions, restrictions, and burdensome procedures. It is already extremely challenging for traumatized people to negotiate the process, which they must manage without a right to counsel and often while detained in remote locations.

Asylum seekers are people fleeing for their lives. Numerous cases have been documented of unsuccessful applicants returning to their deaths. It does not really make sense for any element of a person's history to preclude asylum absolutely. There will always be extraordinary cases in which such rules exclude legitimate and desirable applicants. The proposed changes would make these desperate people hostage to the most biased and arbitrary elements of the US justice system. Rather than adding to the long list of disqualifying circumstances, I urge that discretion be extended to all cases.

Allowing discretion in all cases would at least approximate the intent of the 1967 Protocol Relating to the Status of Refugees, which binds its parties, including the United States, to the United Nations Convention Relating to the Status of Refugees. In particular, the Convention explicitly prohibits imposing penalties based on a refugee's manner of entry or presence.

I call on the Department of Justice and the Department of Homeland Security to think seriously about their obligations under the Convention Relating to the Status of Refugees and to design a procedure that reaffirms America's status as a haven for the persecuted.

AR.09454

AR.09455

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 20, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ejx-i5nj
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0429
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Martha Kransdorf
**Address:**
    1131 N. MAPLE RD. #107
    ANN ARBOR,  MI,  48103
**Email:** mkransdo@umich.edu
**Phone:** 7346637933

## General Comment

I absolutely oppose this proposed rule change. As a grandchild of immigrants, I believe that our country must continue to welcome people who are seeking a way out of a violent situation. The proposed rule will increase racial profiling, and that is just wrong. I have friends and neighbors who will be directly affected by the proposed rule change.. Please reconsider, and drop the proposed rule changes.

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 20, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ejx-s6a6
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0430
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** rosario cruz

---

## General Comment

I strongly oppose this proposed rule change. This criminalization of asylum seekers serves as a sick justification of the cruel and unusual punishment that is our manipulated legal, detention and deportation systems on behalf of the US. As the daughter of immigrants I learned at a young age that this country expects one to perform our trauma in order to receive 'permission to exist' by people who haven't lived through one's realities.

I work to develop the leadership inherent in immigrant women at Mujeres Unidas y Activas where survivors take charge of their own story and use their growth to assist other survivors. It is very clear that the profit margins of criminalization are steep. It is very clear that our government is unworthy of the power it wields in denying the reality of millions of people. I say millions because it is not just the asylum seekers that can see the situation for what it is.

U.S. law enshrines the protections of the international Refugee Convention, drafted in the wake of the horrors of World War II. Under the Refugee Act of 1980, passed with bipartisan support, anyone present or arriving in the U.S. can apply for asylum. This proposed Trump rule would punish people who've already endured mistreatment and racial profiling in the criminal legal system a second time -- with deportation back to the very life-threatening situation they fled. This is profoundly immoral, makes a mockery of due process, and comes right out of Steven Miller's racist playbook.
Our harsh immigration laws exploit these obstacles to drive mass incarceration and mass deportation of people of color.
Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution.
I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.
For these reasons, I call upon the Trump administration to withdraw this proposal.

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 20, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ejx-2ta3
**Comments Due:** January 21, 2020
**Submission Type:** API

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0431
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Kelly Ann Whelan
**Address:**
    2231 Crystal Drive
    Suite 350
    Arlington,  VA,  22202
**Email:** kwhelan@uscrimail.org
**Phone:** 7033101130x3056
**Organization:** U.S. Committee for Refugees and Immigrants (USCRI)

---

## General Comment

See attached file(s)

---

## Attachments

FR Comments Asylum Bars_USCRI

**U.S. COMMITTEE**
FOR REFUGEES AND IMMIGRANTS | EVERYONE. EVERYWHERE. EQUAL VALUE.

USCRI

21 January 2019                                        *Submitted electronically*

Lauren Alder Reid
Assistant Director
Office of Policy
Executive Office for Immigration Review
5107 Leesburg Pike
Suite 2616
Falls Church, VA 22041

**Officers**
Katharine Crost
*Chair*
Katharine Laud
*Vice Chair*
Gene DeFelice
*Secretary*
Scott Wu
*Treasurer*

Maureen Dunn
Chief, Division of Humanitarian Affairs
Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

**Board of Directors**
Kevin Bearden
Diann Dawson
Earl Johnson
Helen Kanovsky
Regis McDonald
Jeffrey Metzger
John Monahan
Linda Thomas-Greenfield
Sam Udani

**President and CEO**
Eskinder Negash

**Headquarters**
2231 Crystal Drive
Suite 350
Arlington, VA 22202
p/ 703-310-1130
f/ 703-769-4241

**Local Offices**
Albany, New York
Austin, Texas
Cleveland, Ohio
Colchester, Vermont
Des Moines, Iowa
Detroit, Michigan
Erie, Pennsylvania
Kansas City, Missouri
Nashville, Tennessee
Raleigh, North Carolina
"Rinconcito del Sol", Florida
Saint Louis, Missouri
San Salvador, El Salvador
Washington, DC

**refugees.org**

Re: EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41, Procedures for Asylum and Bars to Asylum Eligibility

Dear Ms. Alder Reid and Chief Dunn:

The U.S. Committee for Refugees and Immigrants (USCRI) respectfully submits these comments in response to the U.S. Citizenship and Immigration Services' (USCIS) and the Executive Office for Immigration Review's (EOIR) Notice of Proposed Rulemaking (NPRM) entitled "Procedures for Asylum and Bars to Asylum Eligibility" published on 19 December 2019. USCRI appreciates the opportunity to submit comments regarding the proposed rule.

USCRI expresses concern that the proposed rule would discriminate against many groups of asylum seekers fleeing violence and persecution for safety in the United States. As such, USCRI requests that USCIS and EOIR withdraw the proposed rule titled, "Procedures for Asylum and Bars to Asylum Eligibility."

USCRI, established in 1911, is a nongovernmental, not-for-profit international organization dedicated to addressing the needs and rights of refugees and immigrants. USCRI provides legal representation to asylum seekers at its four legal services offices.

The proposed rule regarding procedures for asylum and bars to asylum eligibility unfairly disadvantages many groups of asylum seekers otherwise eligible for asylum relief. The seven bars presented in the rule are disproportionately harsh and penalize those fleeing violence and the actions they must take to reach the United States to seek safety. Further, the rule would give asylum adjudicators an improper amount of discretion with unclear guidance in deciding if criminal convictions are valid in the context of deciding whether an individual is eligible for asylum. Such a requirement will increase the already large number of backlogs in the system. If implemented, the rule will exclude many fleeing violence and persecution on an unfair basis.

AR.09459

As such, USCRI opposes the proposed rule and requests that USCIS and EOIR withdraw it. Our specific comments are below.

<u>Opposition to the Seven Categorical Bars to Asylum</u>

The proposed rule would add seven sweeping bars to asylum. These bars include any conviction for smuggling or harboring under 8 U.S.C. 1324, even if the asylum seeker smuggled or harbored a family member to bring them to safety, any conviction for an offense involving criminal street gangs, and any conviction or accusation of acts of battery involving a domestic relationship.

While all seven bars are improper, these three bars in particular are highly discriminatory toward most asylum seekers' experience in fleeing to safety. First, many asylum seekers must smuggle or harbor family members, including their spouses and children, over the border into the United States because of the harsh and unforgiving regulations the U.S. government has placed to deter them from entering the country. Many times, those fleeing violence and persecution are apprehended at the border with their families and are charged with such a conviction.

Second, many asylum seekers flee violence due to the endemic and widespread presence of criminal street gangs. This is especially true of asylees from Central America, where, by the U.S. government's own account, gang activity has permeated every level of society. According to the Government Accountability Office,

> Northern Triangle countries have had weak security structures, high rates of crime and gang activity, and a lack of legitimate employment opportunities for youth susceptible to being drawn into criminal activity. While Northern Triangle countries experienced a decline in homicide rates from 2014 to 2017, the average homicide rate for El Salvador, Guatemala, and Honduras remains much higher than the averages for Latin America and the Caribbean for recent years and five to 12 times higher than the 10- year average for the United States.[1]

Therefore, while an asylum seeker may not be involved with a gang, due to the widespread nature of gang activity, they may be convicted with a related crime in error. Moreover, gangs in Central America generally act with impunity and often control a corrupt judiciary, which contributes to erroneous convictions to those who refuse to acquiesce to their commands.[2]

Third, the ban regarding a conviction or accusation of acts of battery involving a domestic relationship disproportionately penalizes innocent parties and victims who have been wrongly accused of violence against a partner. Survivors of domestic violence include trafficking survivors and LGBTQ community members, who often are wrongly accused of domestic violence in the context of receiving their own abuse. U.S. law already recognizes the complexity of domestic violence situations and makes provisions in the Violence Against Women Act (VAWA) to allow adjudicators to evaluate claims for relief arising thereunder to exercise discretion based on a number of factors and circumstances.[3] It is unclear why the approach taken by USCIS and EOIR on this front is so blunt, unforgiving, and inconsistent with the approach taken already by the U.S. government in terms of understanding survivors' experiences.

<u>Requiring adjudicators to decide whether criminal convictions are valid is an improper amount of discretion and will create inefficiency in processing</u>

---

[1] United States Government Accountability Office, *U.S. Assistance to Central America: Department of State Should Establish a Comprehensive Plan to Assess Progress toward Prosperity, Governance, and Security*, Report to Congressional Requesters, 9 September 2019 at 7.
[2] Douglas Farah, Central America's Gangs Are All Grown Up, Foreign Policy, 19 January 2016.
[3] Nadine Shaanta Murshid and Elizabeth A. Bowen, "A Trauma-Informed Analysis of the Violence Against Women Act's Provisions for Undocumented Immigrant Women," *Violence Against Women* 24(13) (2018): 1540–1556, https://doi.org/10.1177/1077801217741991.

Requiring adjudicators to make complex determinations regarding the nature and scope of a particular conviction or, in the case of the domestic violence bar, *conduct*, will lead to massive judicial inefficiencies and slanted "mini-trials" within the asylum adjudication process. The amount of discretion given to an adjudicator under this rule is improper given that there are no clear, established indicators to make such a determination.

The backlog of immigration court cases currently stands at more than one million cases.[4] Such a requirement would only increase this massive delay. The burden of evidence would increase exponentially, requiring advocates on both sides to make burdensome arguments about the validity of a conviction, connections to gang activity, etc. Such a requirement will unduly burden asylum seekers, advocates, and the government.

<u>There are already restrictive and overbroad bars to asylum, negating the need for further bars</u>

The current bars to asylum are already overbroad in nature and scope.[5] Any conviction for an offense determined to be an "aggravated felony" is considered a *per se* "particularly serious crime" and therefore a mandatory bar to asylum.[6] "Aggravated felony" is a notoriously vague term, which exists only in immigration law. Originally limited to murder, weapons trafficking, and drug trafficking,[7] it has metastasized to encompass hundreds of offenses, many of them neither a felony nor aggravated, including petty offenses such as misdemeanor shoplifting.[8] The existing crime bars should be narrowed, not expanded.

In consideration of the above comments regarding undue and discriminatory hardship to asylum seekers as well as concerns that the proposed rule would burden the U.S. government and the immigration system, USCRI respectfully requests that USCIS and EOIR withdraw the proposed rule, "Procedures for Asylum and Bars to Asylum Eligibility."

USCRI thanks USCIS and EOIR for the opportunity to submit comments regarding this proposed rule.


Sincerely,



Eskinder Negash, President and CEO


---

[4] Marissa Esthimer, "Crisis in the Courts: Is the Backlogged U.S. Immigration Court System at Its Breaking Point?," *Migration Policy Institute*, October 3, 2019, https://www.migrationpolicy.org/article/backlogged-us-immigration-courts-breaking-point.

[5] The existing categorical bars to asylum eligibility are discussed in detail on p. 69641 of the Proposed Rules.

[6] 8 U.S.C. §§ 1158(b)(2)(A)(ii) and (B)(i).

[7] Pub. L. No. 100-690, § 7342, 102 Stat. 4181, 4469-70.

[8] 8 U.S.C. § 1101(a)(43). *See also* Nancy Morawetz, "Understanding the Impact of the 1996 Deportation Laws and the Limited Scope of Proposed Reforms," *Harvard Law Review* 113 (2000): 1939-40 (criticizing the "'Alice-in-Wonderland-like definition of the term 'aggravated felony'"); Melissa Cook, "Banished for Minor Crimes: The Aggravated Felony Provisions of the Immigration and Nationality Act as a Human Rights Violation," *Boston College Third World Law Journal* (2003): 293.

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 20, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ejx-f16p
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0432
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Edna Yang
**Address:**
　314 E. Highland Mall Blvd.
　Suite 501
　Austin,  TX,  78752
**Email:** ednay@americangateways.org
**Phone:** 512-478-0546 ext. 202

## General Comment

See attached file(s)


January 20, 2020


Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

Submitted via [https://www.regulations.gov/document?D=EOIR-2019-0005-0001]

AR.09462

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41; Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility

To Whom it May Concern:

I write on behalf of American Gateways, in response to the above-referenced Proposed Rules to express our strong opposition to the Proposed Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019.

American Gateways provides much needed legal representation for indigent immigrants in Central Texas. Our mission is to champion the dignity and human rights of immigrants, refugees, survivors of persecution, torture, conflict, and human trafficking through exceptional legal services through low or no cost, education and advocacy. Our agency began in 1987 as the Political Asylum Project of Austin and was founded to provide much needed legal representation to central American immigrants fleeing persecution and seeking asylum in the US. Over the past 33 years, American Gateways has become an indispensable legal services provider for low-income asylum seekers and immigrants in Central Texas. One of our primary areas of practice remains representation in asylum cases, both before the Immigration Court and US Citizenship and Immigration Services (US CIS). These proposed regulations will have a direct and deep impact on our clients fleeing from persecution as they will deny many the opportunity to apply for asylum.

For the reasons detailed in the comments that are attached, the Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

Thank you for the opportunity to submit comments on the Proposed Rules. Please do not hesitate to contact me directly at EdnaY@americangateways.org to provide further information.

Sincerely,
Edna Yang, Esq.
American Gateways

# Attachments

asylum regs comment



January 7, 2020

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

*Submitted via [https://www.regulations.gov/document?D=EOIR-2019-0005-0001]*

**Re:    84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-
AA87, 1615-AC41; Comments in Opposition to Proposed Rulemaking: Procedures
for Asylum and Bars to Asylum Eligibility**

To Whom it May Concern:

I write on behalf of American Gateways, in response to the above-referenced Proposed Rules to express
our strong opposition to the Proposed Rules to amend regulations relating to eligibility for asylum
published in the Federal Register on December 19, 2019.

American Gateways provides much needed legal representation for indigent immigrants in Central
Texas. Our mission is to champion the dignity and human rights of immigrants, refugees, survivors of
persecution, torture, conflict, and human trafficking through exceptional legal services through low or
no cost, education and advocacy. Our agency began in 1987 as the Political Asylum Project of Austin
and was founded to provide much needed legal representation to central American immigrants fleeing
persecution and seeking asylum in the US. Over the past 33 years, American Gateways has become an
indispensable legal services provider for low-income asylum seekers and immigrants in Central Texas.
One of our primary areas of practice remains representation in asylum cases, both before the
Immigration Court and US Citizenship and Immigration Services (US CIS). These proposed regulations
will have a direct and deep impact on our clients fleeing from persecution as they will deny many the
opportunity to apply for asylum.

For the reasons detailed in the comments that follow, the Department of Homeland Security and the
Department of Justice should immediately withdraw their current proposal, and instead dedicate their
efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum
protections in the United States.

AR.09464

Thank you for the opportunity to submit comments on the Proposed Rules. Please do not hesitate to contact me directly at EdnaY@americangateways.org to provide further information.

Sincerely,


Edna Yang, Esq.
American Gateways

**DETAILED COMMENTS in opposition to the Proposed Rules re Procedures for Asylum and Bars to Asylum Eligibility, 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41**

**TABLE OF CONTENTS**

I.      Introduction

II.     The Proposed Rules unnecessarily and cruelly exclude bona fide refugees from asylum eligibility

III.    The Proposed Rules violate the letter and spirit of United States international treaty obligations

IV.     Those precluded from asylum eligibility will be gravely impacted even if granted withholding or protection under the Convention Against Torture

V.      The Proposed Rules will result in "mini-trials" in immigration court, undermine judicial efficiency and result in racially-biased decision-making

VI.     The Proposed Rules will disparately impact vulnerable populations already routinely criminalized, including LGBTQ immigrants, survivors of trafficking and domestic violence, and immigrant youth of color

VII.    The Proposed Rules are ultra vires to the federal immigration statute to the extent they purport to bar eligibility through a categorical exercise of discretion

VIII.   Conclusion

# I.    Introduction

On December 19, 2019, the Department of Homeland Security (DHS) and the Department of Justice (DOJ) issued a joint set of Proposed Rules that would make three primary changes to the rules governing asylum adjudications. These changes effectively strip the ability of an individual who has suffered persecution and harm from applying for asylum. The proposed changes do not take into account the trauma suffered by individuals fleeing harm and the impact that such trauma can have on the mental health of an individual. The proposed rules ignore the actual purpose of asylum protections by punishing individuals who attempt to flee to the US without documentation for safety and bring their loved ones to the US to keep them from imminent harm. These rules will effectively gut the ability of any individual fleeing harm to seek asylum in the US and are in violation of the US' commitments under international law to provide safe haven to those fleeing persecution.

The first proposed set of changes adds the following seven *categorical* bars to asylum eligibility: (1) any conviction of a felony offense; (2) any conviction for "smuggling or harboring" under 8 U.S.C. § 1324(a), even if the asylum seeker committed the offense for the purpose of bringing her own spouse, child or parent to safety; (3) any conviction for illegal reentry under 8 U.S.C. § 1326; (4) any conviction for an offense "involving criminal street gangs," with the adjudicator empowered to look to any evidence to determine applicability; (5) any second conviction for an offense involving driving while intoxicated or impaired; (6) any conviction *or accusation of conduct* for acts of battery involving a domestic relationship; (7) and any conviction for several newly defined categories of misdemeanor offenses, including *any* drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits.

The second section of the Proposed Rules provides a multi-factor test for immigration adjudicators to determine whether a criminal conviction or sentence is valid for the purpose of determining asylum eligibility.

AR.09466

The third section rescinds a provision in the current rules regarding the reconsideration of discretionary asylum.

Taken together, these proposed changes constitute an unnecessary, harsh, and unlawful gutting of the asylum protections enshrined in United States and international law. American Gateways submits these comments to express opposition to the entirety of the Proposed Rules. We have grave concerns with the administration's continued efforts to exclude refugees from obtaining the security and stability that the United States asylum system has long promised. We urge that the Proposed Rules be rescinded in their entirety.

## II.     The Proposed Rules unnecessarily and cruelly exclude bona fide refugees from asylum eligibility

*The barriers to asylum for those previously involved in the criminal legal system are already sweeping in scope; adding more barriers is cruel and unnecessary.*

The United States asylum system was first codified in statute through the Refugee Act of 1980, described by one prominent scholar as a bipartisan attempt to "reconcile our rhetoric with our law, our national immigration policy and our international treaty obligations so that we could maintain a consistent posture towards the world as a nation with a strong humanitarian tradition and a unique historic role as a haven for persons fleeing oppression." The Act—among other measures designed to bring the United States domestic legal code into compliance with the provisions of the United Nations Protocol Relating to the Status of Refugees—created a "broad class" of refugees eligible for a discretionary grant of asylum.

The asylum protections provided by United States law are sacred. Asylum provides those fleeing horrors with physical safety, a path to citizenship and security, and the opportunity to reunite with immediate family members who may still remain abroad in danger. Many see the domestic asylum system as a symbol of the United States' commitment never to repeat its failure to save thousands of Jewish refugees refused entry to the United States on the *St. Louis* and others fleeing the Holocaust. Others point to the critical role that domestic asylum policy plays in serving the United States' foreign policy interests abroad. For those individuals seeking asylum in the United States, the stakes could not be higher—a claim denied often means return to death, torture, or persecution.

The laws, regulations, and process governing asylum adjudications are already exceedingly harsh and place a high burden on applicants. Asylum seekers bear the evidentiary burden of establishing their eligibility for asylum in the face of a complex web of laws and regulations, without the benefit of appointed counsel and more often than not from a remote immigration jail. The obstacles to winning asylum are exceedingly high. Indeed, in some parts of the country and before certain immigration judges, almost no one succeeds. Today, newly imposed barriers to accessing asylum in the United States are breathtaking in scope, with those seeking safety at the southern border subject to return to dangerous conditions in Mexico and an overlapping web of policies that preclude asylum eligibility for countless migrants simply because of their national origin, manner of entry, or their flight path. There are consistent reports of the documented deaths and brutalities endured by those who sought but were denied asylum protections in the United States. In addition, the backlog of cases for both affirmative and defensive asylum cases is breathtaking, with asylum seekers waiting years for an interview with the Asylum Office or a hearing before the Immigration Judge. There are an estimated 1,071,036 asylum

cases pending adjudication as of fiscal year 2020.[1] Our agency has a large docket of affirmative and defensive asylum cases that have been waiting for an interview or a hearing before the Court since 2012.

Specifically, the already codified bars to asylum based on allegations of criminal conduct are *already* sweeping and over-broad in nature and scope. Any conviction for an offense determined to be an "aggravated felony" is considered a *per se* "particularly serious crime" and therefore a mandatory bar to asylum. "Aggravated felony" is a notoriously vague term, which exists only in immigration law. Originally limited to murder, weapons trafficking and drug trafficking, it has metastasized to encompass hundreds of offenses, many of them neither a felony nor aggravated, including petty offenses such as misdemeanor shoplifting, simple misdemeanor battery, or sale of counterfeit DVDs. The existing crime bars should be narrowed, not expanded. Even for those not categorically barred from relief, the immigration adjudicator maintains full discretion to deny asylum.

As an example, we have represented individuals who have been convicted of drug trafficking, and as such denied asylum by the Immigration Judge as they were barred from relief. In addition, a former client was convicted of assault on a public servant and was denied asylum based on discretion by the Immigration judge. The current criminal bars to asylum along with the discretion of the adjudicator to grant or deny claims are already overly exclusive and harsh to those with criminal convictions. Adding these categorical bars only serves to ensure that individuals with legitimate asylum claims are excluded from even applying for asylum protection. They also strip adjudicators of discretion to weigh the criminal conviction against the persecution and harm that an individual would suffer when rendering a decision. Immigration adjudicators already have vast discretion to deny asylum to those who meet the refugee definition but have been convicted of criminal conduct. Further categorical bars are not needed. The agencies' efforts to add *seven* new sweeping categories of barred conduct to the asylum eligibility criteria is unnecessary and cruel. The Proposed Rules drain the phrase "*particularly serious* crime," 8 U.S.C. § 1158, of any sensible meaning.  The Proposed Rules are also arbitrary and capricious. They would constitute a marked departure from past practice. And the agencies have proffered no evidence or data to support these changes.

One assumption fundamentally underlying the Proposed Rules, for example, is that every noncitizen convicted of any offense punishable by more than a year in prison necessarily constitutes a danger to the community. But no evidence is provided to support that assumption, and a criminal record, does not, in fact, reliably predict future dangerousness. The Proposed Rules are so capricious as to peremptorily postulate a noncitizen's supposed danger to the community even in circumstances when a federal, state, or local judge has concluded that no danger exists by, for example, imposing a noncustodial sentence. Conviction for a crime does not, without more, make one a present or future danger—which is why the Refugee Convention's particularly serious crime bar, made part of United States law through 8 U.S.C. § 1158, should only properly apply if both (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows that she is a present or future danger.

Similarly, the Proposed Rules fail to address or account for the fact that a significant number of people may agree to plead to a crime as to avoid the threat of a severe sentence; not only is a conviction an unreliable predictor of future danger, it can also be an unreliable indicator of past criminal conduct. In addition, the Proposed Rules do not address and make no exception for convictions for conduct influenced by mental illness or duress.

The Board of Immigration Appeals has cautioned that, "in light of the unusually harsh consequences which may befall a [noncitizen] who has established a well-founded fear of persecution; the danger of persecution should generally outweigh all but the most egregious of adverse factors." Yet because of the

---

[1] https://trac.syr.edu/phptools/immigration/court_backlog/

categorical nature of the seven news bars proposed here, asylum seekers will be precluded from obtaining protection on the basis of a vast array of conduct, without any discretion left to the immigration adjudicator to determine whether the circumstances merit such a harsh penalty. Indeed, in the case of the domestic-violence related ground, the categorical bar will be imposed on the basis of *mere allegations* of conduct without any adjudication of guilt.

Those unjustly precluded from even seeking a discretionary grant of asylum by the Proposed Rules will include, for example: individuals struggling with addiction with one drug-related conviction, regardless of the circumstances of the offense; asylum seekers with two convictions for driving under the influence, regardless of whether the applicant has sought treatment for alcohol addiction or the circumstances of the convictions; community members seeking asylum defensively who have been convicted of a document fraud offense related to their immigration status; and asylum-seeking mothers convicted for bringing their own child across the southern border in an effort to find safety.

The Proposed Rules would have barred Matilde and her daughter Sindy from being granted asylum. Matilde is a single mother who brought her seven-year-old daughter, Sindy, across the southern border. Sindy has cerebral palsy. Matilde made the decision to leave Honduras because Sindy had been denied access to health care and services as a person with a disability. The Proposed Rules would have also barred Sandra and her three young children from applying for and being granted asylum. Sandra fled El Salvador to escape years of horrific abuse and persecution form here spouse. She had initially fled to Nicaragua only to have her spouse find and locate her and force her back with him. She finally fled to the US leaving her three small children behind. She was later able to send for her children and applied for and was granted asylum with her children before the Immigration Judge. Both Matilde and Sandra were seeking safety for themselves and their children. The Proposed Rules would have precluded them from even applying for asylum because they brought their children over the border without documentation in order to protect them. They are overly harsh, unjust, and would bar many individuals who would otherwise qualify for asylum.

***The Proposed Rules cruelly disregard the connections between trauma and involvement in the criminal legal system.***

The harsh nature of the Proposed Rules is especially evident when viewed through a trauma-informed lens. Asylum seekers are an inherently vulnerable population because of the trauma they have experienced in their countries of origin and, often, along the journey to find safety. Existing literature suggests that at least one out of every three asylum seekers struggles with depression, anxiety, and/or post-traumatic stress disorder (PTSD). One recent study found the mental health problems facing refugees and asylum seekers so acute that more than a third of the study's sample admitted having suicidal thoughts in the preceding two weeks.

Studies also consistently reveal a high prevalence of comorbidity of PTSD and substance use disorders, with individuals with PTSD *up to 14 times more likely* to struggle with a substance use disorder. Asylum seekers in the United States are often unable to access affordable medical care and treatments for complex trauma; some turn to drugs and alcohol in an effort to self-medicate. The proposed new bars to asylum include *any* drug-related conviction (with one exception for a first minor marijuana possessory offense) and any second conviction for driving under the influence. This approach is not only cruel but also ignores the evidence. *Particularly* given the vulnerabilities of asylum-seeking populations, prior struggles with addiction should be addressed with treatment and compassion, not a closed door and deportation order.

Immigration adjudicators already maintain the authority to deny asylum to individuals with drug-related criminal histories on the basis of discretion; denying asylum seekers even the opportunity to present the countervailing factors of their past trauma and potential recovery is simply cruel.

Research done on the effects of trauma have found that exposure to traumatic experiences, especially those occurring in childhood has been linked to substance use disorders (SUDs), including abuse and dependence. *See* "Substance Use, Childhood Traumatic Experience, and Post Traumatic Stress Disorder in an Urban Civilian Population" Khoury L., Tang, Y., Bradley, B., *et.al.* Depression and Anxiety Journal 27:1077-1086 (2010) at 1077. In addition, studies have shown that self-medication is a common behavior among those who have suffered Posttraumatic Stress Disorder (PTSD). *See* "The use of alcohol and drugs to self-medicate symptoms of posttraumatic stress disorder" Leeies M., Pagura J., Sareen J., Bolton JM. Depression and Anxiety Journal, 2010 August, 27(8): 731-6. Moreover, early trauma exposure is well known to significantly increase the risk for a number of psychiatric disorders in adulthood. "Ample evidence has shown that childhood trauma compromises neural structure and function rendering an individual susceptible to later cognitive deficits and psychiatric illnesses, including schizophrenia, major depression, bipolar disorder, PTSD, and substance abuse." *Id.* at 1078. Those who have suffered persecution and trauma are at higher risk of self-medicating with drugs and alcohol in order to deal with the harm that they have suffered. This places them at greater risk for involvement in the criminal justice system and at greater risk of being returned to a country where they will only be further tortured and harmed.

## III.   The Proposed Rules violate the letter and spirit of United States international treaty obligations

By acceding to the 1967 Protocol Relating to the Status of Refugees, which binds parties to the United Nations Convention Relating to the Status of Refugees, the United States obligated itself to develop and interpret United States refugee law in a manner that complies with the Protocol's principle of non-refoulement (the commitment not to return refugees to a country where they will face persecution on protected grounds), even where potential refugees have allegedly committed criminal offenses. As noted above, adjudicators already have over-broad authority to deny asylum based on allegations of criminal activity, which vastly exceeds the categories for exclusion and expulsion set out in the Convention. Instead of working towards greater congruence with the terms of the Convention, the Proposed Rules carve out categorical bars from protection that violate both the language and spirit of the treaty.

The expansion of the asylum bar to include individuals who have been convicted of reentering the United States without inspection pursuant to INA § 276 is unlike any of the other bars previously established or as interpreted by the Board of Immigration Appeals or Circuit Courts of Appeals. It is an offense with no element of danger or violence to others and has no victim. Most significantly, and more so than other bars contained in the Proposed Rules, barring asylum based on the manner of entry directly violates the Convention's prohibition on imposing penalties based on a refugee's manner of entry or presence. This prohibition is a critical part of the Convention because it recognizes that refugees often have little control over the place and manner in which they enter the country where they are seeking refuge.

The vast majority of clients we serve who are detained by DHS and seeking asylum have entered the US without inspection. Julia and her spouse and son fled the Congo. They were tortured and harmed because of her husband's political activism. At the southern border she was separated from her spouse and young son. She entered the US without inspection and was subsequently detained at the Hutto Detention Center. She and her family had intended to come to the Port of Entry and ask for asylum, but they were unable to do so when they were separated. She entered the US without inspection and was then able to apply for asylum while in detention. Under the Proposed Rules, she would have been

barred from applying for asylum protection because she entered without inspection. In addition, individuals like Sara, who was detained at the Hutto Detention center after being convicted of illegal reentry to the US. She was fleeing harm from a gang member. Under the Proposed Rules she would not be able to present a claim for asylum. Each of these individuals were fleeing harm and had valid claims for protection in the US. Not allowing them to even present an asylum claim is contrary to the very purpose of asylum protections.

## IV.   Those precluded from asylum eligibility will be gravely impacted even if granted withholding of removal or protection under the Convention Against Torture

Throughout the Proposed Rules, the agencies defend the harsh and broad nature of their proposal by pointing to the continued availability of alternative forms of relief for those precluded from asylum eligibility under the new rules. The availability of these alternatives forms of relief, however—known as withholding of removal and protection under the Convention Against Torture (CAT)—does not nullify the harm created by the Proposed Rule's new limits on asylum. The protections afforded by CAT and by statutory withholding of removal are limited in scope and duration, and they are harder to obtain. As a result, a Rule that limits *bona fide* refugees to withholding of removal and CAT protection would impose a very real harm on individuals who have come to the United States in search of protection.

First, the most serious harm that can befall an individual as a result of these Proposed Rules is removal to persecution and torture, and the existence of withholding of removal does not account for that risk. CAT and withholding protections demand a higher level of proof than asylum claims: a clear probability of persecution or torture. Thus, an individual could have a valid asylum claim but be unable to meet the standard under the other forms of relief and therefore would be removed to their country of origin, where they would face persecution or even death.

Even for those who meet the higher standard, withholding and CAT recipients are still subject to significant prejudice. For example, they have no ability to travel internationally. The United Nations Convention Relating to the Status of Refugees affords refugees the right to travel in mandatory terms. Article 28 states, "Contracting States shall issue to refugees lawfully staying in their territory travel documents for the purpose of travel outside their territory." Withholding and CAT recipients do not have access to a travel document as contemplated by Article 28. By regulation, refugee travel documents are available only to asylees. And the Board of Immigration Appeals requires that an individual granted withholding and CAT—unlike an individual granted asylum—must simultaneously be ordered removed, making any international travel a "self-deportation." Refugees granted only withholding of removal or CAT protection are thus effectively trapped within the United States in long-term limbo.

Withholding and CAT recipients also face permanent separation from their spouses and children. Because international travel is prohibited, these individuals cannot reconnect with their families in a third country. And they also cannot reunite with family in the United States because only asylees and refugees are eligible to petition for a spouse and children to join them as derivatives on that status. For many, this will mean that the Proposed Rules institute yet another formal policy of family separation. For example, a mother with two young children who flees to the United States and is subject to one of the expanded asylum bars will not be able to ensure that her children will be able to obtain protection in the United States with her if she is granted relief.  Rather, if her children are still in her home country, they would need to come to the United States and seek asylum on their own, likely as unaccompanied children. If her children fled to the United States with her, then they will need to establish their own eligibility for protection before an immigration judge, no matter their age.

Recently, this exact scenario played out with a mother who was subject to the so-called Migrant Protection Protocols (also known as Remain in Mexico) and the asylum "transit ban," which made the mother ineligible for asylum and thus required the children to establish their independent eligibility for withholding and CAT protection. An immigration judge granted the mother withholding of removal but denied protection to her young children, leaving the children with removal orders and immense uncertainty about their future. Under the expanded bars in the Proposed Rules, these situations will certainly increase, separating families and forcing parents to return to countries where it has been established they more likely than not will face persecution and torture, rather than leaving their children on their own.

Withholding recipients likewise face hurdles in access to employment. Article 17 of the Refugee Convention states that a contracting state "shall accord to refugees lawfully staying in their territory the most favorable treatment accorded to nationals of a foreign country in the same circumstances, as regards the right to wage-earning employment." Recipients of withholding enjoy no such right. They must apply for work authorization, and they face frequent delays in the adjudication of these applications, which often result in the loss of legal authorization to work.

And perhaps most fundamentally, there is continuing jeopardy for withholding and CAT recipients that does not exist for asylum recipients. When a noncitizen is granted asylum, the person receives a legal status. Asylum, once granted, protects an asylee against removal unless and until that status is revoked. None of these protections exists for withholding and CAT recipients. They have no access to permanent residency or citizenship. Instead, they are subject to a removal order and vulnerable to the permanent prospect of deportation to a third country and subject to potential check ins with immigration officials where they can be made to pursue removal to third countries to which they have no connection.

Finally, American Gateways writes to highlight a different form of prejudice that will flow from the rule: one relating to judicial efficiency. Neither withholding of removal nor CAT protection allow family members who are in the United States together and pursuing protection on the same basis to apply as derivatives on a principal application. As a result, family claims for those rendered ineligible for asylum by the new rules will have to be adjudicated separately, and potentially before different adjudicators even when the claims are interrelated and even when minor children may not be in a position to explain the claim at all or as sufficiently as a parent. In addition to being unjust to the affected family members, this approach would result in gross inefficiencies, which should be avoided in a system that already contains a significant backlog of pending cases.

## V.     The Proposed Rules will result in "mini-trials" in immigration court, undermine judicial efficiency and result in racially biased decision-making

In two significant ways, the Proposed Rules require immigration adjudicators to engage in decision-making to determine whether an asylum applicant's conduct—considered independently of any criminal court adjudication—triggers a categorical bar to asylum eligibility. First, the agencies propose that immigration adjudicators be allowed to consider "all reliable evidence" to determine whether there is "reason to believe" an offense was "committed for or related to criminal gang evidence," or "in furtherance of gang-related activity, triggering ineligibility for asylum in either case. Second, the Proposed Rules permit immigration adjudicators to "assess all reliable evidence in order to determine whether [a] conviction amounts to a domestic violence offense;" and to go even further by considering whether non-adjudicated *conduct* "amounts to a covered act of battery or extreme cruelty."

Requiring adjudicators to make complex determinations regarding the nature and scope of a particular conviction or, in the case of the domestic violence bar, *conduct*, will lead to massive judicial inefficiencies and slanted "mini-trials" within the asylum adjudication process. The scope of the

"reliable evidence" available to adjudicators in asylum cases is potentially limitless; advocates on both sides would be obligated to present fulsome arguments to make their cases about gang connections to the underlying activity or the relationship of the asylum applicant to the alleged victim. Because of the lack of robust evidentiary rules in immigration proceedings, it will be difficult if not impossible for many applicants to rebut negative evidence marshaled against them, even if false; and in other cases, asylum applicants will struggle to find evidence connected to events that may have happened years prior (especially for those detained). Asylum trials, which are typically three or fewer hours under current policies, would provide insufficient time to fully present arguments on both sides of these unwieldy issues.

As the immigration courts contend with backlogs that now exceed one million cases, tasking adjudicators with a highly nuanced, resource-intensive assessment of the connection of a conviction to gang activity and/or the domestic nature of alleged criminal conduct—assessments far outside their areas of expertise—will prolong asylum proceedings and invariably lead to erroneous determinations that will give rise to an increase in appeals. The Proposed Rules repeatedly cite increased efficiency as justification for many of the proposed changes. Yet requiring adjudicators to engage in mini-trials to determine the applicability of categorical criminal bars, rather than relying on adjudications obtained through the criminal legal system, will dramatically *decrease* efficiency in the asylum adjudication process.

Indeed, the Supreme Court has "long deemed undesirable" exactly the type of "post hoc investigation into the facts of predicate offenses" proposed by the agencies here. Instead, for more than a century the federal courts have repeatedly embraced the "categorical approach" to determine the immigration consequence(s) of a criminal offense, wherein the immigration adjudicator relies on the statute of conviction as adjudicated by the criminal court system, without relitigating the nature or circumstances of the offense in immigration court. As the Supreme Court has explained, this approach "promotes judicial and administrative efficiency by precluding the re-litigation of past convictions in minitrials conducted long after the fact." In *Moncrieffe v. Holder*, the Court forewarned of exactly the sort of harm that would arise from these Proposed Rules; in that case, the Court rejected the government's proposal that immigration adjudicators determine the nature and amount of remuneration involved in a marijuana-related conviction, noting that "our Nation's overburdened immigration courts" would end up weighing evidence "from, for example, the friend of a noncitizen" or the "local police officer who recalls to the contrary," with the end result a disparity of outcomes depending on the whims of the individual immigration judge and a further burdened court system.

Particularly in the context of the new proposed bar related to alleged gang affiliation, American Gateways is concerned that creating a blanket exclusion for anyone who is convicted of a crime – including a misdemeanor – that an immigration adjudicator deems linked to gang activity will erroneously prevent bona fide asylum seekers from receiving protection. This rule confers on immigration adjudicators—who generally are not criminologists, sociologists, or criminal law experts— the responsibility to determine if there is "reason to believe" any conviction flows from activity taken in furtherance of gang activity. This rule will necessarily ensnare asylum seekers of color who have experienced racial profiling and a criminal legal system fraught with structural challenges and incentives to plead guilty to some crimes, particularly misdemeanors. These same individuals are vulnerable to being erroneously entered into gang databases. Such databases are notoriously inaccurate, outdated, and infected by racial bias.

Indeed, asylum applicants are *already* frequently subjected to wrongful denials of protection because of allegations of gang activity made by the Department of Homeland Security on the basis of information found in notoriously unreliable foreign databases and "fusion" intelligence-gathering centers outside the United States. Empowering immigration adjudicators to render asylum applicants *categorically*

excluded from protection on the basis of such spurious allegations will inevitably result in the return of many refugees back to harm.

The Departments curiously argue that all gang-related offenses should be construed as "particularly serious crimes." They cite statistics from up to 16 years ago in an attempt to make the point that gang members commit violent crimes and drug crimes. They then make the illogical leap to the conclusion that *all crimes*—including misdemeanor property crimes—that may be construed as connected to gang activity are particularly serious. This simply does not follow; in fact, the Proposed Rules will inevitably result in the exclusion from protection of asylum seekers of color who live in economically distressed communities and have obtained a minor conviction such as a property crime. Relying on the definition of "particularly serious crime" to prevent asylum seekers convicted of even minor crimes construed as gang-related from accessing asylum protection is disingenuous at best and tinged with racial animus at worst.

The Departments asks for comments on: (1) what should be considered a sufficient link between an asylum seeker's underlying conviction and the gang related activity in order to trigger the application of the proposed bar, and (2) any other regulatory approaches to defining the type of gang-related activities that should render individuals ineligible for asylum. The premise of these questions is wrong: a vague "gang related" bar should not be introduced at all. The Immigration and Nationality Act and existing regulations already provide overly broad bars to asylum where criminal behavior by an asylum seeker causes concern by an adjudicator. Adding this additional, superfluous layer of complication risks erroneously excluding bona fide asylum seekers from protection without adding any useful adjudicatory tool to the process.

## VI. The Proposed Rules will disparately impact vulnerable populations already routinely criminalized, including LGBTQ immigrants, survivors of trafficking and domestic violence, and immigrant youth of color

The expanded criminal bars exclude from safety and a pathway to citizenship those convicted of offenses that are coincident to their flight from persecution, and do not accomplish the stated goal of making communities safer. They will disparately impact vulnerable populations, who comprise asylum seekers hailing primarily from Central America and the Global South, and those routinely criminalized because of their identities, racially disparate policing practices, or in connection with experiences of trafficking and domestic violence. For these populations especially, the discretion currently delegated to asylum adjudicators is crucial for them to become fully integrated in the larger community. The imposition of additional categorical bars to asylum will only further marginalize asylum seekers already struggling with trauma and discrimination.

The Proposed Rules turn asylum into a blunt instrument that would prevent the use of discretion where it is most needed and most effective. The existing framework for determining if an offense falls within the particularly serious crime bar already provides the latitude for asylum adjudicators to deny relief to anyone found to pose a danger to the community. Furthermore, asylees with convictions that render them inadmissible must apply for a waiver at the time of their applications for permanent residence. These measures ensure that asylum applicants in vulnerable populations have access to supportive resources and have the opportunity to demonstrate their ongoing commitment to social and personal health. Moreover, the existence of provisions allowing the revocation of asylum status ensures that adjudicators may continue to enforce concerns related to the safety of the community even after asylum is granted.

*Barring asylum for immigrants convicted of migration-related offenses punishes them for fleeing persecution and/or seeking safety for their children and does not make communities safer.*

The expansion of the criminal bars to asylum to include offenses related to harboring, smuggling of noncitizens by parents and family members and those previously removed further criminalizes vulnerable populations fleeing persecution. The vast expansion of migrant prosecutions at the border during the current administration has created administrative chaos and separated families that do not pose a threat to the safety of communities in the United States. The Proposed Rules threaten to magnify the harm caused by these reckless policies by further compromising the ability of those seeking safety on the southern border to access the asylum system.

The Proposed Rules expand the asylum bar to parents or other caregivers who are convicted of smuggling or harboring offenses after taking steps to help minor children enter the United States in order to flee persecution. This proposed bar is particularly insidious in light of now-public documents revealing this administration's explicit efforts to utilize smuggling prosecutions against parents and caregivers as part of its strategy of deterring families from seeking asylum in the United States. The Proposed Rules seek to take this widely condemned strategy one step further, by additionally barring those parents *already prosecuted* from obtaining asylum protections for themselves and their children. The Proposed Rules multiply the harms parents and caregivers have experienced in their treacherous journeys to safety and callously penalize parents for doing what is only human—taking all necessary steps to protect their children.

The Proposed Rules also expand the asylum bar to those who have fled persecution multiple times and therefore been convicted of illegal reentry. Their inclusion is premised on conclusory statements regarding the dangerousness of recidivist offenders, without consideration of the seriousness of prior convictions. Rather, the Proposed Rules treat all immigration violations as similar in seriousness to those previously warranting inclusion in the particularly serious crime bar, without any independent evidence to justify the expansion. Such an approach renders meaningless the limiting language of "particularly serious" in the statute.

The Proposed Rules also conflate multiple entries by noncitizens having prior removal orders with those who have entered multiple times without ever having their asylum claims heard. Many immigrants who have previously attempted entry to the United States to flee persecution could not have been aware of the complex statutory regime that governs asylum claims and would not have knowingly abandoned their right to apply for asylum. Some asylum seekers have also been wrongly assessed in prior credible fear interviews. And others yet may have previously entered or attempted to enter the United States before the onset of circumstances giving rise to their fear. Preserving discretion to grant asylum in these circumstances allows meritorious asylum seekers to be heard and corrects errors that might have previously occurred.

***Extending the criminal bars to immigrants convicted of misdemeanor document fraud unfairly punishes low-wage immigrant workers and does not make communities safer.***

The Proposed Rules expand the asylum bar to include any asylum seeker who has been convicted of a misdemeanor offense for use of a fraudulent document. In so doing, the Rule entirely ignores the migration-related circumstances that often give rise to convictions involving document fraud. Migrants fleeing persecution often leave their home countries with nothing but the clothes on their backs and must rely on informal networks to navigate their new circumstances. Extension of a blanket bar to asylum seekers who are compelled to resort to fraudulent means to enter the United States, or to remain safely during their applications for asylum, upends decades of settled law directing that violations of law arising from an asylum applicant's manner of flight should constitute only one of many factors to be consulted in the exercise of discretion.

Moreover, migrants in vulnerable communities who are struggling to survive during the pendency of their asylum proceedings are often exploited by unscrupulous intermediaries who offer assurances and documentation that turn out to be fraudulent. Many noncitizens working in the low-wage economy face egregious workplace dangers and discrimination and suffer retaliation for asserting their rights. The continued availability of asylum to low-wage immigrant workers can encourage them to step out of the shadows. The expansion of criminal asylum bars to sweep in all document fraud offenses, on the other hand, would unfairly prejudice immigrants with meritorious asylum claims and force them deeper into the dangerous informal economy.

***The Proposed Rules will harm communities with overlapping vulnerabilities, including LGBTQ asylum seekers, survivors of trafficking, and survivors of domestic violence.***

The Proposed Rules exclude from asylum protections countless members of vulnerable communities who have experienced trauma, abuse, coercion, and trafficking. Many of these individuals may only become aware of their ability to apply for asylum after law enforcement encounters that lead them to service providers who can educate them about their immigration options. Despite the unique difficulties they face, the Proposed Rules would compound their harm and prevent them from achieving family unification and a pathway to citizenship.

The Proposed Rules pose a unique threat to LGBTQ immigrant community members. LGBTQ immigrants in particular may have already experienced a high degree of violence and disenfranchisement from economic and political life in their home countries. Hate violence towards undocumented LGBTQ immigrants in the United States is already disproportionately higher than for other members of the LGBTQ population. Members of these communities also experience isolation from their kinship and national networks following their migration. This isolation, compounded by the continuing discrimination towards the LGBTQ population at large, leave many in the LGBTQ immigrant community vulnerable to trafficking, domestic violence, and substance abuse, in addition to discriminatory policing practices. The expansion of criminal enforcement and prosecution of undocumented people also harms the LGBTQ immigrant community. The Proposed Rules will therefore have a disparate impact on LGBTQ individuals whose involvement in the criminal legal system is often connected to past trauma and/or the result of biased policing.

Linda is a transgendered woman who was granted asylum before the Immigration Judge. She is from El Salvador and suffered untold harm and abuse from family members, Salvadoran police officials, and the community at large since age 11. During the pendency of her asylum claim, Linda was arrested and convicted for possession of a controlled substance and Driving Under the Influence. She was able to enter a treatment program as a result of her convictions. Under these Proposed Rules, Linda would have been barred from an asylum grant, despite the fact that returning her to El Salvador would have been a death sentence.

The expansion of asylum bars to include various misdemeanor offenses that were not previously considered particularly serious also unfairly sweeps trafficking survivors into its dragnet. It is becoming more widely recognized across state court systems that trafficking survivors frequently come into contact with intervention resources and service providers only after contact with law enforcement occurs. Innovative criminal justice reform efforts currently being adopted across the country include special trafficking courts that recognize the need for discretion in the determination of criminal culpability. The same approach should be employed in the determination of asylum eligibility, where the applicant's life and safety are on the line.

The Proposed Rules instead preclude asylum adjudicators from conducting a trauma-centered approach, categorically barring countless trafficking survivors convicted of misdemeanor and felony offenses without any opportunity to present the specific circumstances of their claim.

Survivors of domestic violence include trafficking survivors and LGBTQ community members, such that inclusion of offenses related to domestic violence in the expanded asylum bars affects populations with overlapping vulnerabilities. The Proposed Rules too broadly categorize domestic violence offenses as particularly serious and sweep both offenders and survivors into their dragnet. The immigration laws extend protections to domestic violence survivors outside of the asylum context, recognizing the complex dynamics surrounding intimate partner violence. Provisions in the Violence Against Women Act allow adjudicators evaluating claims for relief arising thereunder to exercise discretion based on a number of factors and circumstances. The blunt approach adopted by the Proposed Rules is inconsistent with the approach taken towards survivors elsewhere in the federal immigration statute and does not rely on any evidence-based justification for treating asylum seekers differently.

Moreover, the domestic violence sections of the Proposed Rules include the only categorical bar to asylum for which a conviction is not required. Domestic violence incidents all too often involve the arrest of both the primary perpetrator of abuse and the survivor. These "cross-arrests" do not always yield clear determinations of victim and perpetrator. Authorizing asylum adjudicators to determine the primary perpetrator of domestic assault, in the absence of a judicial determination, unfairly prejudices survivors who are wrongly arrested in the course of police intervention to domestic disturbances.

Finally, the exemption for asylum applicants who can demonstrate their eligibility for a waiver under section 237(a)(7)(A) of the Immigration and Nationality Act does not cure the harm to asylum seekers caused by imposition of a categorical domestic violence related bar. Rather, it converts a non-adversarial asylum proceeding into a multi-factor, highly specific inquiry into culpability based on circumstances that may be very difficult for an asylum seeker to prove—especially if proceeding without counsel and with limited English proficiency.

Jose was arrested for assault family violence after a dispute with his domestic partner. They had an argument and his domestic partner, who spoke fluent English, called the police. He was arrested as a result, despite the fact that he had also been assaulted by his partner. Jose had experienced years sexual assaults, violence, and arrest and harassment in Honduras based on his sexual orientation. He had an innate fear of the police. That combined with his limited English proficiency, and the overall effect of years of abuse, ensured that he was not able to express fully his side of what had happened. Jose was not convicted of domestic violence and was eventually granted asylum. Under Proposed Rules individuals like Jose, would be affected negatively and barred from seeking the asylum protection that he desperately needed and deserved.

## VIII.    The Proposed Rules are ultra vires to the federal immigration statute to the extent they purport to bar eligibility through a categorical exercise of discretion

When Congress speaks clearly through a statute, the plain meaning of that statute governs. Congress by statute permits the Attorney General to designate certain categories of offenses as "particularly serious crimes." As such, Congress *explicitly* permitted the Attorney General to designate a non-aggravated felony to be a particularly serious crime and thus to disqualify a person from asylum. In the context of asylum, all aggravated felonies are *per se* particularly serious crimes and the Attorney General "may designate by regulation [other] offenses that will be considered to be" a particularly serious crime for purposes of asylum.

Here, however—seemingly in an attempt to insulate the Proposed Rules from review, the agencies attempt to designate new bars to asylum both by designating them as "particularly serious crimes" pursuant to 8 U.S.C. § 1158(b)(2)(B)(ii) and rendering them categorically exempt from a positive discretionary adjudication of asylum pursuant to 8 U.S.C. § 1158(b)(2)(C). This effort is unlawful. Section 1158(b)(2)(B)(ii) does permit the Attorney General to, if he wishes, attempt to designate some classes of offenses as particularly serious crimes; such designations are reviewable for legal error (and as explained above, the commenters believe these expansions are unlawful). However, if the offense is not a particularly serious crime, then a discretionary decision must be rendered on the application. It is true that the Attorney General may also provide for "additional limitations and conditions" on asylum applications so long as they are "consistent" with the with the asylum statute. In this case, however, the Proposed Rules add sweeping categories of offenses that automatically remove an applicant from the consideration of discretion—a regulatory proposal that is ultra vires to the plain text of the statute.

To the extent that the proposed rules would adopt a bar to asylum based on a categorical discretionary bar, rather than a particularly serious crime designation, they are similar to the rules struck down by numerous Circuit Courts of Appeal in the context of adjustment of status for those considered by law to be "arriving aliens." Purporting to exercise discretion categorically, then-Attorney General Reno putatively rendered that class of noncitizens ineligible for adjustment of status, a determination that is ordinarily discretionary, even though the statute seemed to allow eligibility. Multiple Circuit Courts of Appeal struck down the proposed regulations, finding them to reflect an impermissible reading of the statute in light of the fact that Congress carefully defined in the statute the categories of people eligible to apply for adjustment of status.

The same logic applies here. In the asylum statute, Congress explicitly made the commission of a particularly serious crime a bar to asylum. The canon of interpretation known as *expressio unius est exclusio alterius* instructs that, "expressing one item of [an] associated group or series excludes another left unmentioned." The Proposed Rules attempt to create numerous categories of discretionary "pseudo-particularly serious crimes," barring asylum through a categorical exercise of discretion even if those offenses are ultimately found not to be particularly serious crimes. Such an effort violates this canon of interpretation and places the Proposes Rules ultra vires to the statute.

## IX.    Conclusion

The Proposed Rules undermine the US' obligations to provide asylum protections to individuals fleeing persecution. They create harsh and unjust rules that will exclude many with viable asylum claims from applying for the relief that they deserve. These rules will also disproportionately impact the low income and detained immigrants that American Gateways serves. They create a complicated, burdensome, and unjust system that will be impossible for asylum seekers to navigate without legal representation and are contrary to the very nature of our asylum laws. For these reasons American Gateways strongly opposes the implementation of the Proposed Rules.

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 20, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ejw-3mwa
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0433
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Melinda Noack

---

## General Comment

I'm writing today to vehemently oppose the proposed changes on our procedures for asylum. I'm a citizen of the United States who lives and works in diverse communities in the Bay Area and has actively seen how race and perceived race influence whether or not someone is accused of criminal activity. In my time here, the SFPD has conducted sting operations and blatantly arrested drug dealers of color over others. It is one example of how racial profiling infiltrates our criminal system, causing long-term trauma and challenges to finding employment, housing, and so on for those affected. Not to mention the additional toll it takes their families. This propose rule enables a corrupt system to be used as a further case to harm people of color. Our country began with immigrants seeking freedom from political oppression. If we do not respect others looking for that same freedom, the basic right to live, then we are doing ourselves a disservice as a nation with power and privilege. More importantly, if we permit these propose changes, we are allowing lives to be lost by encouraging people to remain in a violent regime or to risk asylum at a high likelihood of entering our own prison system. I believe we are capable of being better, more compassionate, and just. This rule is the direct opposite of those ideals. I strongly urge you to withdraw this rule.

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ekk-cec7
**Comments Due:** January 21, 2020
**Submission Type:** API

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0434
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Sabrineh Ardalan
**Address:**
    HIRC, Harvard Law School
    6 Everett Street, Suite 3106
    Cambridge,  MA,  02138
**Email:** sardalan@law.harvard.edu
**Phone:** 6173847504
**Fax:** 6174958595
**Organization:** Harvard Immigration and Refugee Clinical Program

---

## General Comment

The Harvard Immigration & Refugee Clinical Program (HIRC) writes to express our strong opposition to the above-referenced Proposed Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019.

HIRC is one of the oldest clinical programs in the country that focuses on the advancement of immigrants rights while teaching students important lawyering skills. HIRC includes two distinct clinics that represent individuals seeking asylum and other humanitarian protections, some of whom have criminal convictions. The flagship clinic of the program, the Immigration & Refugee Advocacy Clinic, represents clients seeking humanitarian protections in a range of different fora, including administrative tribunals and federal appellate courts. HIRCs second clinic, the Crimmigration Clinic, is the first and only clinic of its kind that focuses on the growing intersection of criminal law and immigration law. HIRC faculty and staff also teach a range of courses concerning immigration policy, refugees and trauma, the intersection of immigration law and labor law, and the intersection of criminal law and immigration law. They also regularly publish scholarship concerning asylum adjudication, due process protections in removal proceedings, working with traumatized refugees, crimmigration, and immigration detention.

HIRC has worked with hundreds of immigrants and refugees since its founding in 1984. HIRCs advocacy includes representation of individual applicants for asylum and related relief and the development of theories and policy relating to asylum law, crimmigration, and immigrants rights. HIRC has an interest in the proper

AR.09480

application and development of U.S. asylum law to ensure that the claims of individuals seeking asylum and related relief receive fair and proper consideration under standards consisted with U.S. law and treaties.

HIRC regards the Proposed Rules as especially problematic, because, if implemented, they would severely undermine the protections of the United States domestic asylum and international treaty obligations and of fundamental criminal procedures. Stated plainly, the Proposed Rules could jeopardize the lives and safety of countless refugees.

For the reasons detailed in the comments that are attached, the Department of Homeland Security (DHS) and the Department of Justice ("DOJ") should immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

Thank you for the opportunity to submit comments on the Proposed Rules. Please do not hesitate to contact us via email (hirc@law.harvard.edu) to provide further information.

Sincerely,

Harvard Immigration & Refugee Clinical Program

---

# Attachments

HIRC Comment to Asylum Bars Final



**6 Everett St., Suite 3103**
**Cambridge, MA 02138**
**hirc@law.harvard.edu**
**(617) 384-8165**

January 21, 2020

*Submitted via [https://www.regulations.gov/document?D=EOIR-2019-0005-0001]*

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

> Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-
> AA87, 1615-AC41; Comments in Opposition to Proposed Rulemaking: Procedures
> for Asylum and Bars to Asylum Eligibility

To Whom It May Concern:

The Harvard Immigration & Refugee Clinical Program ("HIRC") writes to express our strong opposition to the above-referenced Proposed Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019.

HIRC is one of the oldest clinical programs in the country that focuses on the advancement of immigrants' rights while teaching students important lawyering skills. HIRC includes two distinct clinics that represent individuals seeking asylum and other humanitarian protections, some of whom have criminal convictions. The flagship clinic of the program, the Immigration & Refugee Advocacy Clinic, represents clients seeking humanitarian protections in a range of different fora, including administrative tribunals and federal appellate courts. HIRC's second clinic, the Crimmigration Clinic, is the first and only clinic of its kind that focuses on the growing intersection of criminal law and immigration law. HIRC faculty and staff also teach a range of courses concerning immigration policy, refugees and trauma, the intersection of immigration law and labor law, and the intersection of criminal law and immigration law. They also regularly publish scholarship concerning asylum adjudication, due process protections in removal proceedings, working with traumatized refugees, crimmigration, and immigration detention.

HIRC has worked with hundreds of immigrants and refugees since its founding in 1984. HIRC's advocacy includes representation of individual applicants for asylum and related relief and the development of theories and policy relating to asylum law, crimmigration, and immigrants' rights. HIRC has an interest in the proper application and development of United States asylum law to ensure that the claims of individuals seeking asylum and related relief receive fair and proper consideration under standards consisted with U.S. law and treaties.

HIRC regards the Proposed Rules as especially problematic, because, if implemented, they would severely undermine the protections of the United States' domestic asylum and international treaty obligations and of fundamental criminal procedures. Stated plainly, the Proposed Rules could jeopardize the lives and safety of countless refugees.

For the reasons detailed in the comments that follow, the Department of Homeland Security ("DHS") and the Department of Justice ("DOJ") should immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

Thank you for the opportunity to submit comments on the Proposed Rules. Please do not hesitate to contact us via email (hirc@law.harvard.edu) to provide further information.

Sincerely,

Harvard Immigration & Refugee Clinical Program

AR.09483

**DETAILED COMMENTS in opposition to the Proposed Rules re: Procedures for Asylum and Bars to Asylum Eligibility, 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41**

## INTRODUCTION

On December 19, 2019, DHS and DOJ issued a joint set of Proposed Rules that would make three primary changes to the rules governing asylum adjudications. The first proposed set of changes adds the following seven *categorical* bars to asylum eligibility: (1) any conviction of a felony offense; (2) any conviction for "smuggling or harboring" under 8 U.S.C. § 1324(a), even if the asylum seeker committed the offense for the purpose of bringing her own spouse, child or parent to safety; (3) any conviction for illegal reentry under 8 U.S.C. § 1326; (4) any conviction for an offense "involving criminal street gangs," with the adjudicator empowered to look to any evidence to determine applicability; (5) any second conviction for an offense involving driving while intoxicated or impaired; (6) any conviction or accusation of conduct for acts of battery involving a domestic relationship; (7) and any conviction for several newly defined categories of misdemeanor offenses, including any drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits.

The second section of the Proposed Rules provides a multi-factor test for immigration adjudicators to determine whether a criminal conviction or sentence is valid for the purpose of determining asylum eligibility. The third section would unlawfully permit the executive branch to deny asylum to otherwise-qualifying refugees based on the adjudicator's independent moral calculus in direct contravention of U.S. obligations under the 1951 Convention Relating to the Status of Refugees ("Refugee Convention" or "Convention") and the 1967 U.N. Protocol Relating the Status of Refugees ("1967 Protocol"), which the U.S. ratified and incorporated into U.S. law.

The Proposed Rules constitute an unnecessary, harsh, and unlawful gutting of the asylum system enshrined in both U.S. and international law. HIRC submits these comments to express its opposition to the entirety of the Proposed Rules and its grave concerns about the Administration's continued efforts to exclude refugees from obtaining the protection required under U.S. and international law. We urge that the Proposed Rules be rescinded in their entirety.

I.    **The Proposed Rules exacerbate the United States' ongoing violations of its international treaty obligations.**

By acceding to the 1967 Protocol,[1] the United States bound itself to the protection imperatives guaranteed by the Refugee Convention.[2] In *INS v. Cardoza-Fonseca*, the Supreme Court recognized that Congress enacted the Refugee Act of 1980 in order "to bring United States

---

[1] United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268.

[2] 1951 Convention Relating to the Statute of Refugees, July 28, 1951, 140 U.N.T.S. 1954.
.

AR.09484

refugee law into conformance with the 1967 Protocol" and therefore the Refugee Convention.[3] U.S. refugee law thus directly incorporates international treaty obligations.[4] When interpreting the Immigration & Nationality Act of 1952 ("INA"), DOJ has cited legislative history that demonstrates Congress aimed to "give statutory meaning to our national commitment to human rights and humanitarian concerns" precisely by "enacting the Refugee Act of 1980," which purposefully embraced the Convention and Protocol's definition of "refugee."[5] In passing the Refugee Act, Congress sought to excise the ideological maneuvering that had characterized U.S. refugee determinations to that point.[6] As such, inconsistencies between U.S. law and its international obligations must be avoided.

Under Article 33 of the Refugee Convention, when someone meets the Convention's definition of a refugee, a state party is forbidden from returning the person "in any manner whatsoever to the" country where she fears persecution. The Convention permits of extremely narrow "exclusions" to this non-refoulement guarantee, with "great caution and only after a full assessment of the individual circumstances of the case," and specifies that "inclusion should generally be considered before exclusion."[7] The U.S.'s already expansive *per se* criminal bars violate the Convention's requirements,[8] and the Proposed Rules threaten to make this problem even worse.

Specifically, the Refugee Convention allows states to exclude and/or expel individuals from refugee protection if the individual "having been convicted by a final judgement of a particularly serious crime, constitutes a danger to the community of that country."[9] However, this clause is intended for "extreme cases," in which the particularly serious crime at issue is a "capital crime or a very grave punishable act."[10] The United Nations High Commissioner for

---

[3] *INS v. Cardoza-Fonseca*, 480 U.S. 421, 436–37 (1987)

[4] Deborah E. Anker, LAW OF ASYLUM IN THE UNITED STATES 22–23 (2019 ed.)

[5] *Matter of S-P-*, 21 I.&N. Dec. 486, 492 (BIA 1996) (quoting S. Rep. No. 256, 96th Cong., 2d Sess. 1, 4, reprinted in 1980 U.S.C.C.A.N. 141, 144); *see also* H.R. Rep. No. 96-781, at 1 (1980) (Conf. Rep.) (noting that the Refugee Act aimed to "establish a more uniform basis for the provision of assistance to refugees"); S. Rep. No. 96-590, at 1 (1980) (Conf. Rep.) (same).

[6] *See* Deborah Anker, *The Refugee Act of 1980: An Historical Perspective*, 5 IN DEFENSE OF THE ALIEN 77–78 (1982); *see also American Baptist Churches v. Thornburgh*, 760 F. Supp. 796, 799 (N.D. Cal. 1991) (stipulating that "foreign policy and border enforcement considerations are not relevant to the determination of whether an applicant for asylum has a well-founded fear of persecution."); Jimmy Carter, "Refugee Act of 1980 Statement on Signing S. 643 into Law" (Mar. 18, 1980) (stating that the "new admissions policy . . . will permit fair and equitable treatment of refugees in the United States, regardless of their country of origin"), http://www.presidency.ucsb.edu/ws/?pid=33154 [https://perma.cc/ZY68- H7L7].

[7] UNHCR, *Guidelines On International Protection: Application of the Exclusion Clauses: Article 1F of the 1951 Convention relating to the Status of Refugees*, HCR/GIP/03/054 (Sept. 2003).

[8] *See* Harvard Immigration & Refugee Program, Crimmigration Clinic & Immigrant Defense Project, "'Particularly Serious Crime' Bars on Asylum and Withholding of Removal: Legal Standards and Sample Case Law Determinations" 1 (Sept. 2018), http://harvardimmigrationclinic.org/hirc/files/2018/09/IDP_Chart_v3_2-1.pdf.

[9] *See* United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] at art. 33(2).

[10] *See* Harvard Immigration & Refugee Program Crimmigration Clinic & Immigrant Defense Project, "'Particularly Serious Crime' Bars on Asylum and Withholding of Removal: Legal Standards and Sample Case Law Determinations" 1 (Sept. 2018), http://harvardimmigrationclinic.org/hirc/files/2018/09/IDP_Chart_v3_2-1.pdf; U.N. High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees* 2, U.N. Doc. HCR/IP/Eng/REV. ¶¶ 154–55 (1979, reissued 2019).

AR.09485

Refugees ("UNHCR") has explained that to constitute a "particularly serious crime," the crime "must belong to the gravest category" and be limited "to refugees who become an extremely serious threat to the country of asylum due to the severity of crimes perpetrated by them in the country of asylum."[11] Moreover, the UNHCR has emphasized that the particularly serious crime bar does not encompass less extreme crimes: "[c]rimes such as petty theft or the possession for personal use of illicit narcotic substances would not meet the threshold of seriousness."[12] Critically, when determining whether an individual should be barred from protection for having been convicted of a particularly serious crime, the adjudicator must conduct an individualized analysis and consider any mitigating factors.[13]

Thus, even under current statutes and regulations the bars to asylum based on allegations of criminal conduct are *already* overbroad in nature and scope.[14] Any conviction for an offense determined to be an "aggravated felony" is considered a *per se* "particularly serious crime" and therefore a mandatory bar to asylum.[15] "Aggravated felony" is a notoriously vague term, which exists only in immigration law. Originally limited to murder, weapons trafficking and drug trafficking,[16] it has metastasized to encompass thousands of offenses, many of them neither a felony nor aggravated, including petty offenses such as misdemeanor shoplifting, simple misdemeanor battery, or sale of counterfeit DVDs.[17]

The Proposed Rules represent an even greater departure from the Refugee Convention. Because of the categorical nature of the seven news bars proposed here, asylum seekers will be precluded from obtaining protection on the basis of a vast array of conduct. In the case of the domestic violence related ground, for example, the categorical bar will be imposed on the basis of *mere allegations* of conduct without any adjudication of guilt.[18]

Instead of working towards greater congruence with the terms of the Refugee Convention, in line with Congress's clear intention as recognized in *Cardoza-Fonseca*, the Proposed Rules violate both the language and spirit of the treaty. For example, at p. 69659, the Proposed Rules first exclude from protection anyone who was convicted of a felony and then at p. 69660, define "felony" as "any crime punishable by more than one of imprisonment" without any reference to other factors, including dangerousness. The Proposed Rules described the

---

[11] U.N. High Comm'r for Refugees (UNHCR), *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 7 (July 2007), http://www.unhcr.org/enus/576d237f7.pdf.

[12] *Id.* ¶ 10.

[13] *Id.* ¶¶10–11; U.N. High Commissioner for Refugees, *The Nationality, Immigration and Asylum Act 2002: UNHCR Comments on the Nationality, Immigration and Asylum Act 2002 (Specification of Particularly Serious Crimes) Order 2004*, 4 (2004).

[14] The existing categorical bars to asylum eligibility are discussed in detail on p. 69641 of the Proposed Rules.

[15] 8 U.S.C. §§ 1158(b)(2)(A)(ii) and (B)(i).

[16] Pub. L. No. 100-690, § 7342, 102 Stat. 4181, 4469–70.

[17] 8 U.S.C. § 1101(a)(43). *See also* Nancy Morawetz, *Understanding the Impact of the 1996 Deportation Laws and the Limited Scope of Proposed Reforms*, 113 HARVARD L. REV. 1939–40 (2000) (criticizing the "'Alice-in-Wonderland-like definition of the term 'aggravated felony'"); Melissa Cook, *Banished for Minor Crimes: The Aggravated Felony Provisions of the Immigration and Nationality Act as a Human Rights Violation*, BOSTON COLLEGE THIRD WORLD L. J. 293 (2003).

[18] The Proposed Rules at p. 69651 explain that the regulations will "render ineligible [non-citizens] who engaged in acts of battery and extreme cruelty in a domestic context in the United States, regardless of whether such conduct resulted in a criminal conviction."

AR.09486

increased categorization of the particularly serious crime bar as necessary because the case-by-case adjudication previously used for non-aggravated felony offenses was "inefficient."[19] But an individualized analysis is exactly what the Convention requires to ensure only those individuals who have been convicted of crimes that are truly serious and therefore present a future danger are placed at risk of refoulement.

Additionally, outside of the aggravated felony context, the Board of Immigration Appeals ("BIA" or "Board") and the Courts of Appeals have repeatedly found that low-level, "run-of-the-mill" offenses do not constitute particularly serious crimes.[20] Under this long-standing interpretation of the particularly serious crime bar in the INA, there is simply no scenario in which low-level offenses like misdemeanor driving under the influence where no injury is caused to another or simple possession of a controlled substance or paraphernalia would constitute a particularly serious crime. The reason for this is common sense. As Judge Reinhardt explained in his concurring opinion in *Delgado v. Holder*,[21] a decision the Proposed Rules cite in support of the expanded bars, run-of-the-mill crimes like driving under the influence have "little in common" with other crimes the BIA has deemed particularly serious—e.g., felony menacing with a deadly weapon, armed robbery, and burglary of a dwelling in which the offender is armed or causes injury.[22] The BIA has cautioned that, "in light of the unusually harsh consequences which may befall a [noncitizen] who has established a well-founded fear of persecution; the danger of persecution should generally outweigh all but the most egregious of adverse factors."[23]

The expansion of the asylum bar to include individuals who have been convicted of reentering the United States without inspection pursuant to INA § 276[24] is also unlike any of the other bars previously recognized by the BIA or the circuit courts. It is an offense with no element of danger or violence to others, and has no victim. Most significantly, and more so than other bars contained in the Proposed Rules, barring asylum based on the manner of entry directly violates the Convention's Article 31 prohibition on imposing penalties based on a refugee's manner of entry or presence in the country.[25] This prohibition is a critical part of the Convention because it recognizes that refugees often have little control over the place and manner in which they enter the country where they are seeking refuge.

The existing crime bars should thus be narrowed, not expanded. Further categorical bars are in direct contravention of U.S. obligations under both domestic and international law to safeguard refugees from return to persecution. The agencies' efforts to add *seven* new sweeping categories of barred conduct to the asylum eligibility criteria drains the phrase "*particularly serious* crime," 8 U.S.C. § 1158 (emphasis added), of any sensible meaning.

---

[19] Proposed Rules at 69646.
[20] *Delgado v. Holder*, 648 F.3d 1095, 1110 (9th Cir. 2011) (en banc) (J. Reinhardt, concurring).
[21] 648 F.3d at 1110 (J. Reinhardt, concurring).
[22] *Id*. at 1110.
[23] *Matter of Pula*, 19 I.&N. Dec. 467, 474 (BIA 1987).
[24] Proposed Rules at 69659, 69660.
[25] Refugee Convention, *supra*, art 31.

AR.09487

**II.    The Proposed Rules cruelly disregard the effects of trauma on asylum seekers and will have disparate impact on vulnerable asylum seekers.**

The harsh nature of the Proposed Rules is especially evident when viewed through a trauma-informed lens, as the categorical character of the Proposed Rules precludes asylum adjudicators from conducting a trauma-centered approach. Asylum seekers are an inherently vulnerable population because of the trauma they have often experienced in their countries of origin as well as along the journey to find safety.[26] Existing literature suggests that at least one out of every three asylum seekers struggles with depression, anxiety, and/or post-traumatic stress disorder ("PTSD").[27] One recent study found the mental health problems facing refugees and asylum seekers so acute that more than a third of the study's sample admitted having suicidal thoughts in the preceding two weeks.[28]

Studies also consistently reveal a high prevalence of comorbidity of PTSD and substance use disorders, with individuals with PTSD *up to 14 times more likely* to struggle with a substance use disorder.[29] Asylum seekers in the United States are often unable to access affordable medical care and treatments for complex trauma.[30] Some, like a HIRC attorney's prior client who had been kidnapped and forced to take cocaine and other addictive substances by a rebel group recruiting child soldiers or a HIRC client who was tortured for more than a year as a child, turn to drugs and alcohol in an effort to self-medicate.[31]

The proposed new bars to asylum include *any* drug-related conviction (with one exception for a first minor marijuana possessory offense) and any second conviction for driving under the influence. Particularly given the vulnerabilities of asylum seeking populations, prior struggles with addiction should be addressed with treatment and compassion, not a closed door and deportation order. To fairly decide asylum applications of this nature, an adjudicator has to take into account the applicant's history, the underlying cause of the criminal record, and the

---

[26] *See, e.g.*, Sabrineh Ardalan, *Access to Justice for Asylum Seekers: Developing an Effective Model of Holistic Asylum Representation*, 48 UNIV. MICH. J. OF LAW REF. 1001, 1020–23 (2015) (discussing examples of the challenges the asylum adjudication system foists upon trauma survivors); Sabrineh Ardalan, *Constructive or Counterproductive? Benefits and Challenges of Integrating Mental Health Professionals into Asylum Representation*, 30 GEORGETOWN IMMIGR. L.J. 1, 11–16 (2015) (same).

[27] Giulia Turrini et al., *Common mental disorders in asylum seekers and refugees: umbrella review of prevalence and intervention studies*, 11 INTERNATIONAL JOURNAL OF MENTAL HEALTH SYSTEMS 51 (August 2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5571637/.

[28] Megan Brooks, "Refugees have high burden of mental health problems," *Psychiatry and Behavioral Health Learning Network*, June 2019, https://www.psychcongress.com/article/refugees-have-high-burden-mental-health-problems.

[29] Jenna L. McCauley et al., "Posttraumatic Stress Disorder and Co-Occurring Substance Use Disorders: Advances in Assessment and Treatment," *Clinical Psychology Science and Practice* 19, 3 (October 2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3811127/.

[30] For more information on immigrant eligibility for federal benefits, *see* https://www.nilc.org/issues/health-care/.

[31] Carrier Clinic, *Trauma and Addiction* (2019), https://carrierclinic.org/2019/08/06/trauma-and-addiction/ ("[S]ome people struggling to manage the effects of trauma in their lives may turn to drugs and alcohol to self-medicate. PTSD symptoms like agitation, hypersensitivity to loud noises or sudden movements, depression, social withdrawal and insomnia may seem more manageable through the use of sedating or stimulating drugs depending on the symptom. However, addiction soon becomes yet another problem in the trauma survivor's life. Before long, the 'cure' no longer works and causes far more pain to an already suffering person.").

AR.09488

efforts towards rehabilitation. Unfortunately, the proposed rule eliminates all of these considerations by creating a de facto bar for the trauma survivor to be granted the precise protection needed to overcome the substance abuse disorder.

A case-by-case approach is not only justified but necessary to disentangle *possibly or even allegedly* criminal behavior from conduct fueled by trauma-related mental health disorders. When evaluating whether a criminal offense should bar a grant of asylum, it is critical for an adjudicator to take into account whether the criminal offense was related in some way to the past persecution suffered.

Take for example, Carl,[32] a young man and the son of a political dissident in a war-torn nation, who had been kidnapped and tortured by government security forces. This persecution caused him brain damage and further left him with significant depression and PTSD. Just a few years after his harrowing experience at the hands of state authorities, Carl was confronted and questioned by U.S. police officers following an argument at a waterpark. Carl misidentified himself and indicated that a friend's ID that he had been temporarily holding on to was his own. Carl was a prototypical refugee under the Refugee Act and Convention—but the Proposed Rules' categorical "documentation" bar, if then applied, could have jeopardized his protection without any consideration of the individualized harms he had suffered at the hands of his country's government.

Allowing adjudicators to consider even allegations of domestic violence in full context can be critical to protecting the wellbeing of entire refugee families. For example, HIRC represented a Central American woman named Isabel, who fled to the United States after suffering a decade of brutal violence, including rape and armed death threats by an abuser who after her flight continued to terrorize her young son and other close family members. In the United States, Isabel continued to suffer from severe clinical PTSD and depression and experienced suicidal ideations. She also slowly built a life with, and then married, another immigrant named Juan, who provided her and their children with emotional as well as financial support. Amidst an argument with Juan, Isabel began to have flashbacks to her abuser and called the police—who took Juan into custody. During his detention by the police and subsequently by ICE, Isabel—who had included Juan in her asylum application—did everything in her power to have him released. Indeed, Isabel's psychologist documented that Juan's detention caused her ongoing psychological harms to take a turn for the worse, and likewise the children's pediatrician testified his absence was damaging their wellbeing. Juan was ultimately granted derivative asylum through Isabel—but under the Proposed Rules, it may have been denied. His ineligibility (and their subsequent family separation) would have also greatly harmed Isabel and their young U.S. citizen children.

In addition, the Proposed Rules pose a unique threat to LGBTQ immigrants, many of whom are trauma survivors who have experienced a high degree of violence in their home countries.[33] LGBTQ immigrants often experience isolation following migration, and this

---

[32] The clients described throughout this comment are composites, based on the experiences of various HIRC clients, with names and identifying details altered to protect confidentiality.

[33] *See* Aengus Carroll and Lucas Ramon Mendos, *State Sponsored Homophobia: A World Survey of Sexual Orientation Laws: Criminalisation, Protection and Recognition* (International Lesbian, Gay, Bisexual, Transgender,

AR.09489

isolation frequently leaves them vulnerable to trafficking, domestic violence, and substance abuse. Discriminatory policing practices, along with the expansion of criminal enforcement and prosecution also disproportionately harm LGBTQ immigrants.[34] The Proposed Rules will therefore likely have a disparate impact on trauma survivors, including LGBTQ immigrants, whose involvement in the criminal legal system is often connected to their past trauma and/or the result of biased policing.

The expansion of the criminal bars to asylum to include offenses related to harboring and smuggling of noncitizens by parents and family members further criminalizes vulnerable populations fleeing persecution.[35] The Proposed Rules expand the asylum bar to parents or other caregivers who are convicted of smuggling or harboring offenses after taking steps to help minor children enter the United States in order to flee persecution. This proposed bar is particularly insidious in light of this administration's explicit efforts to utilize smuggling prosecutions against parents and caregivers as part of its strategy of deterring families from seeking asylum in the United States.[36] The Proposed Rules seek to take this widely condemned strategy one step further, by additionally barring those parents *already prosecuted* from obtaining asylum protections for themselves and their children.

The Proposed Rules also expand the asylum bar to those who have fled persecution multiple times and therefore been convicted of illegal reentry. It does so based on conclusory statements regarding the dangerousness of recidivist offenders, without consideration of the seriousness of prior convictions.[37] Rather, the Proposed Rules treat all immigration violations as similar in seriousness to those previously warranting inclusion in the particularly serious crime bar, without any independent evidence to justify the expansion of the bar. Such an approach renders meaningless the limiting language of "particularly serious" in the statute and places vulnerable refugees at risk.

## III.     Those precluded from asylum eligibility will be gravely harmed even if granted withholding of removal or protection under the Convention Against Torture.

Throughout the Proposed Rules, the agencies defend the harsh and broad nature of their proposal by pointing to the availability of alternative forms of relief for those precluded from

---

and Intersex Association, 12th ed. 2017),
https://ilga.org/downloads/2017/ILGA_State_Sponsored_Homophobia_2017_WEB.pdf.
[34] *See, e.g.*, Sharita Gruberg, "How Police Entanglement with Immigration Enforcement Puts LGBTQ Lives at Risk," *Center for American Progress*, Apr. 12, 2017, https://www.americanprogress.org/issues/lgbtq-rights/reports/2017/04/12/430325/police-entanglement-immigration-enforcement-puts-lgbtq-lives-risk/.
[35] On April 11, 2017, then-Attorney General Sessions instructed all federal prosecutors to increase their prioritization of immigration offenses for prosecution, including misdemeanor offenses committed by first time entrants. *See* Memorandum from the Attorney General: Renewed Commitment to Criminal Immigration Enforcement (Apr. 11, 2017), https://www.justice.gov/opa/press-release/file/956841/download.
[36] Ryan Devereaux, "Documents Detail ICE Campaign to Prosecute Migrant Parents as Smugglers," *The Intercept*, Apr. 29, 2019, https://theintercept.com/2019/04/29/ice-documents-prosecute-migrant-parents-smugglers/ (describing how in May 2017, the Department of Homeland Security set out to target parents and family members of unaccompanied minors for prosecution).
[37] Proposed Rules at 69648.

AR.09490

asylum.[38] The existence of these lesser forms of relief—known as withholding of removal and protection under the Convention Against Torture ("CAT")—do not nullify the harm created by the Proposed Rules' new limits on asylum. The protections afforded by CAT and by statutory withholding of removal are limited in scope and duration, and they are harder to obtain. As a result, a rule that limits *bona fide* refugees to withholding of removal and CAT protection would impose a very real harm on individuals who have come to the United States in search of protection.

First, the most serious harm that can befall an individual as a result of these Proposed Rules is removal to persecution and torture. CAT and withholding protections demand a higher level of proof than asylum claims: a clear probability of persecution or torture.[39] Thus, an individual could have a valid asylum claim but be unable to meet the standard for these other forms of relief and therefore be removed to a country in which she has a well-founded fear of persecution.

Even for those who meet the higher standard, withholding and CAT recipients are still subject to significant prejudice. For example, withholding and CAT recipients may face permanent separation from their spouses and children. These individuals have no recourse to reunite with their families. Only asylees and refugees are eligible to petition for a spouse and children to join them as derivatives.[40] For many, this will mean that the Proposed Rules institute yet another formal policy of family separation.

Withholding recipients likewise face hurdles in access to employment. Article 17 of the Refugee Convention states that a contracting state "shall accord to refugees lawfully staying in their territory the most favorable treatment accorded to nationals of a foreign country in the same circumstances, as regards the right to wage-earning employment." Yet recipients of withholding face frequent delays in and obstacles to the adjudication of their applications for work authorization.[41]

Most fundamentally, withholding and CAT recipients face ongoing risks of removal and live in a limbo that does not exist for asylum recipients. When a noncitizen is granted asylum, the person receives a legal status that provides a path to permanent residency and citizenship.[42] Asylum, once granted, protects an asylee against removal unless and until that status is

---

[38] *See, e.g.*, Proposed Rules at 69644.

[39] Withholding of removal requires the petitioner to demonstrate his or her "life or freedom would be threatened in that country because of the petitioner's race, religion, nationality, membership in a particular social group, or political opinion." *INS v. Stevic*, 467 U.S. 407, 411 (1984) (quoting 8 U.S.C. § 1231(b)(3)). Unlike asylum, however, the petitioner must show a "clear probability" of the threat to life or freedom if deported to his or her country of nationality. The clear probability standard is more stringent than the well-founded fear standard for asylum. *Id; see also Cardoza-Fonseca*, 480 U.S. at 431 (describing the difference between a well-founded fear of persecution and a clear probability of persecution). For CAT relief, an applicant must show it is more likely than not that he or she will be tortured or killed by or at the government's acquiescence if removed to the home country. 8 C.F.R. § 1208.16(c)(2).

[40] 8 C.F.R. § 208.21(a).

[41] 8 C.F.R. § 274a.12(a)(10); *Northwest Immigrant Rights Project, et al. v. USCIS, et al.*, No. 2:15-cv-00813-JLR (W.D. Wash., filed May 22, 2015) (class action regarding delays in adjudication of work authorization).

[42] *See, e.g.*, 8 C.F.R. 245.1(d)(1) (defining "lawful immigration status" to include asylees).

AR.09491

revoked.[43] None of these protections exists for withholding and CAT recipients. They have no access to permanent residency or citizenship.[44] Instead, they are subject to a removal order and vulnerable to the permanent prospect of deportation to a third country and subject to potential check ins with immigration officials, who can pursue removal to third countries to which the withholding and CAT recipients have no connection.[45]

## IV.     The Proposed Rules will undermine adjudications, violate due process, and result in racially-biased decision-making.

The Proposed Rules require immigration adjudicators to engage in decision-making to determine whether an asylum applicant's conduct—considered independently of any criminal court adjudication—triggers a categorical bar to asylum eligibility. First, the agencies propose that immigration adjudicators are allowed to consider "all reliable evidence" to determine whether there is "reason to believe" an offense was "committed for or related to criminal gang evidence," or "in furtherance of gang-related activity, triggering ineligibility for asylum in either case.[46] Second, the Proposed Rules permit immigration adjudicators to "assess all reliable evidence in order to determine whether [a] conviction amounts to a domestic violence offense;" and to go even further by considering whether non-adjudicated *conduct* "amounts to a covered act of battery or extreme cruelty."[47]

The Proposed Rules repeatedly cite increased efficiency as justification for many of the proposed changes.[48] Yet requiring adjudicators to engage in mini-trials into issues already adjudicated by the criminal law system based on evidence that may not have been properly tested for its veracity in the criminal process. Such mini-trials will dramatically *decrease* efficiency in the asylum adjudication process. Moreover, the Proposed Rules invite reliance on any type of evidence, including police reports with unsubstantiated or subsequently recanted hearsay statements. However, police reports are inherently unreliable in the absence of the protection of the Confrontation Clause of the Sixth Amendment and Federal Rules of Evidence, neither of which apply in immigration court.[49] For example, in the context of an alleged incident of domestic violence, neither police officers nor alleged victims are required to submit to cross examination in immigration proceedings. The Proposed Rules thus create a categorical bar ("*shall* be found ineligible for asylum") based on evidence, the reliability of which has not been tested, or which has been tested and has not been credited by a judicial court. In doing so, the proposed rule violates basic notions of fairness and due process.

---

[43] *See* 8 U.S.C. § 1158(c)(1)(A).

[44] *Matter of Lam*, 18 I.&N. Dec. 15, 18 (BIA 1981); 8 C.F.R. § 245.1(d)(1) (explaining that only those in "lawful immigration status" can seek permanent residency and excluding withholding recipients from such status); 8 C.F.R. § 209.2(a)(1) (authorizing adjustment of status to permanent residence for asylees); 8 C.F.R. § 316.2 (naturalization available only to permanent residents).

[45] *See R-S-C- v. Sessions*, 869 F.3d 1176, 1180 (10th Cir. 2017).

[46] *See* Proposed Rules at 69649.

[47] *See* Proposed Rules at 69652.

[48] *See* Proposed Rules at 69646, 69656-58.

[49] Mary Holper, *Confronting Cops in Immigration Court*, 23 Wm. & Mary Bill Rts. J. 675 (2015), https://scholarship.law.wm.edu/cgi/viewcontent.cgi?article=1730&context=wmborj.

AR.09492

Particularly in the context of the new proposed bar related to alleged gang affiliation, HIRC is concerned that creating a blanket exclusion for anyone who is convicted of a crime— including a misdemeanor—that an immigration adjudicator deems linked to gang activity will erroneously prevent bona fide asylum seekers from receiving protection. Past legislative efforts to expand the grounds of removal and inadmissibility in the INA to include gang membership have failed to pass both houses of Congress.[50] Scores of alleged gang members have already been deported on grounds related to immigration violations or criminal convictions for which no relief is available.[51] Creating a "gang-related crime" bar will only exacerbate the due process violations already occurring as the result of unsubstantiated information about supposed gang ties.[52] It would also result in the unfair targeting of young men of color because gang databases are notoriously infected by racial bias.[53]

The Proposed Rule confers on immigration adjudicators—who generally are not criminologists, sociologists, or criminal law experts—the responsibility to determine if there is "reason to believe" any conviction flows from activity taken in furtherance of gang activity. This rule will necessarily ensnare asylum seekers of color who have experienced racial profiling and a criminal legal system fraught with structural challenges and incentives to plead guilty to some crimes, particularly misdemeanors. These same individuals are vulnerable to being erroneously entered into gang databases. Such databases are notoriously inaccurate, outdated, and infected by racial bias.[54]

Empowering immigration adjudicators to render asylum applicants *categorically* excluded from protection on the basis of such spurious allegations will inevitably result in the

---

[50] *See* Jennifer Chacon, *Whose Community Shield?: Examining the Removal of the 'Criminal Street Gang Member*,' UNIV. OF CHICAGO LEGAL FORUM 317, 333-36 (2007) (reviewing legislative history of failed efforts to expand removability of those accused of gang related offenses and noting criticism that "[t]he only legal effect of the proposed legislation would be to increase the number of noncitizens lawfully present who would be subject to removal on the basis of their purported associations with individuals involved in group criminal activity.").

[51] For an illustration of Immigration and Customs Enforcement's propensity to make gang allegations on the basis of questionable if not fabricated evidence, and the deference to which the evidence is often granted by immigration adjudicators, *see* Mark Joseph Stern, "Bad Liars," *Slate*, May 16, 2018, https://slate.com/news-and-politics/2018/05/federal-judge-accused-ice-of-making-up-evidence-to-prove-that-dreamer-was-gang-affiliated.html.

[52] *See* Yvette Cabrera, "New ICE Tactic Raises Questions About Due Process," *ThinkProgress*, Oct. 6, 2017, https://thinkprogress.org/ice-targets-gangs-6775356473a8/; Rebecca Hufstader, *Immigration Reliance On Gang Databases: Unchecked Discretion And Undesirable Consequences*, 90 NEW YORK UNIVERSITY LAW REV. 671 (2015).

[53] Annie Sweeney and Madeline Buckley, "Chicago police gang data collection faulted by city's inspector general as unchecked and unreliable," *Chicago Tribune*, Apr. 11, 2019, https://www.chicagotribune.com/news/breaking/ct-met-chicago-police-gang-data-04112019-story.html; Anita Chabria, "A routine police stop landed him on California's gang database. Is it racial profiling?," *Los Angeles Times*, May 9, 2019, https://www.latimes.com/politics/la-pol-ca-california-gang-database-calgang-criminal-justice-reform-20190509-story.html.

[54] Annie Sweeney and Madeline Buckley, "Chicago police gang data collection faulted by city's inspector general as unchecked and unreliable," *Chicago Tribune*, Apr. 11, 2019, https://www.chicagotribune.com/news/breaking/ct-met-chicago-police-gang-data-04112019-story.html; Anita Chabria, "A routine police stop landed him on California's gang database. Is it racial profiling?," *Los Angeles Times*, May 9, 2019, https://www.latimes.com/politics/la-pol-ca-california-gang-database-calgang-criminal-justice-reform-20190509-story.html.

AR.09493

return of many refugees to persecution,[55] yet the Proposed Rule encourages immigration adjudicators to rely on evidence from fusion centers and "gang databases" that judicial courts have rejected wholesale as unreliable. For example, in *Commonwealth v. Wardsworth*, the Supreme Judicial Court of Massachusetts vacated convictions for first degree murder, armed assault with intent to murder, and firearm offenses, and remanded for a new trial in part due to the introduction of an expert opinion regarding gang-affiliation that was based on information from the Boston Regional Intelligence Center "gang database."[56] The Court concluded that, to the extent the database contains opinions about which individuals are gang members, these are hearsay, are not independently admissible, and raised serious Confrontation Clause concerns.[57] The Court went further to warn that the fact that "the defendant was observed in the presence of a suspected or actual gang member, even on more than one occasion, does not suffice to support the conclusion that the defendant was, himself, a member of a gang," and that no meaningful information could be gleaned from the fact that shootings had occurred in the defendant's neighborhood.[58]

Unsurprisingly, the expansion of gang databases for use in the apprehension and removal of foreign nationals—including children—has generated tremendous concern among advocates and the communities they serve.[59] The use of gang databases by local law enforcement and DHS has been widely criticized as an overbroad, unreliable and often biased measure of gang membership and involvement.[60] For example, HIRC represents a twenty-year-old young man who has been held in immigration custody for nearly two years on nothing more than unreliable gang affiliation allegations. The young man fled his home country as a child to seek refuge from targeted gang recruitment and persecution. He has no criminal record, yet he has been denied the ability to get out of detention.

## V.    The proposed definition of "conviction" and "sentence" for the purposes of the new bars further excludes those in need of protection.

The section of the Proposed Rules that outlines a new set of criteria for determining whether a conviction or sentence is valid for the purpose of determining asylum eligibility is an *ultra vires* exercise of authority that is not authorized by the INA or the Constitution. The Proposed Rules impose an unlawful presumption against asylum eligibility for applicants who

---

[55] Melissa del Bosque, "Immigration Officials Use Secretive Gang Databases to Deny Migrant Asylum Claims," *Pro Publica*, July 8, 2019, https://www.propublica.org/article/immigration-officials-use-secretive-gang-databases-to-deny-migrant-asylum-claims.

[56] 482 Mass. 454, 470 (2019).

[57] *Commonwealth v. Wardsworth*, 482 Mass. 454, 468 and n. 27 (2019).

[58] *Id.* at 469; *see also Commonwealth v. Wolcott*, 28 Mass. App. Ct. 200, 208 (1990) (opinion that defendant was member of gang constituted "unacceptable conjecture" where membership "was supported by little more than [the defendant's] use of a street name and his association with [a member of the gang]").

[59] *See* Nermeen Arastu, et al., "Swept Up In The Sweep: The Impact of Gang Allegations on Immigrant New Yorkers," *New York Immigration Coalition (NYIC) and CUNY School of Law's Immigrant and Non-citizen Rights Clinic*, May 2018, https://www.law.cuny.edu/wp-content/uploads/page-assets/academics/clinics/immigration/SweptUp_Report_Final-1.pdf.

[60] Ali Winston, "Marked for Life: U.S. Government Using Gang Databases to Deport Undocumented Immigrants," *The Intercept*, Aug. 11, 2016, https://theintercept.com/2016/08/11/u-s-government-using-gang-databases-to-deport-undocumented-immigrants/.

13

seek post-conviction relief while in removal proceedings or longer than one year after their initial convictions.

The Proposed Rules outline a new multi-factor process asylum adjudicators must use to determine whether a conviction or sentence remains valid for the purpose of determining asylum eligibility; the proposal includes a rebuttable presumption "against the effectiveness" of an order vacating, expunging, or modifying a conviction or sentence if the order was entered into after the asylum seeker was placed in removal proceedings or if the asylum seeker moved for the order more than one year after the date the original conviction or sentence was entered.[61]

This newly created presumption unfairly penalizes asylum applicants, many of whom may not have the opportunity to seek review of their prior criminal proceedings until applying for asylum.[62] In *Padilla v. Kentucky*, the Supreme Court recognized that the immigration consequences of a conviction are sufficiently serious for the Sixth Amendment to require a noncitizen defendant to be competently advised of them before agreeing to a guilty plea.[63] By imposing a presumption against the validity of a withdrawal or vacatur of a plea, the Proposed Rules hold asylum seekers whose rights were violated under *Padilla* to a different standard; even though they too were denied effective assistance of counsel in the course of their underlying criminal proceedings, asylum seekers will be forced to rebut a presumption that their court-ordered withdrawal or vacatur is invalid. The Proposed Rules therefore compound the harm to immigrants who, in addition to facing persecution in their home countries, have been denied constitutionally compliant process in the United States criminal legal system.

Many asylum applicants, especially those isolated from resources and unfamiliar with the due process protections available to them in the United States, may not have discovered the defects in their underlying criminal proceedings until their consultation with an immigration attorney, or until they are placed into removal proceedings, which may happen several years after a conviction. Imposing a presumption *against* the validity of a plea withdrawal or vacatur in these cases will undoubtedly lead to the wrongful exclusion of countless immigrants from asylum simply because they were unable to adequately rebut the presumption, particularly in a complex immigration court setting without the benefit of appointed counsel.

Furthermore, the Proposed Rule undermines the authority of a state or federal criminal tribunal to ensure that convictions are constitutionally sound. An immigration adjudicator cannot overlook a substantive or procedural constitutional deficiency that has been corrected by a post-conviction court. To do so would violate the principles of federalism upon which our system of dual sovereignty is based.[64]

---

[61] Proposed Rules at 69655.
[62] On page 69656 of the Proposed Rules, DHS and DOJ urge that "[i]t is reasonable to conclude that an alien who has a meritorious challenge to a criminal conviction based on a procedural or substantive defect is more likely to seek post-conviction relief sooner than an alien who is seeking relief on rehabilitative grounds…"
[63] *Padilla v. Kentucky*, 559 U.S. 356 (2010).
[64] *See* Philip L. Torrey, *Principles of Federalism and Convictions for Immigration Purposes*, 36 IMMIGR. & NAT'L L. REV. 3, 41–44 (2016).

14

**VI.    The Proposed Rules are *ultra vires* to the federal immigration statute to the extent they purport to bar eligibility through a categorical exercise of discretion.**

When Congress speaks clearly through a statute, the plain meaning of that statute governs.[65] Congress by statute permits the Attorney General to designate certain categories of offenses as "particularly serious crimes."[66] As such, Congress *explicitly* permitted the Attorney General to designate a non-aggravated felony to be a particularly serious crime and thus to disqualify a person from asylum. In the context of asylum, all aggravated felonies are *per se* particularly serious crimes and the Attorney General "may designate by regulation [other] offenses that will be considered to be" a particularly serious crime for purposes of asylum.[67]

Here, however—seemingly in an attempt to insulate the Proposed Rules from review, the agencies attempt to designate new bars to asylum both by designating them as "particularly serious crimes" pursuant to 8 U.S.C. § 1158(b)(2)(B)(ii) and rendering them categorically exempt from a positive discretionary adjudication of asylum pursuant to 8 U.S.C. § 1158(b)(2)(C). This effort is unlawful. Section 1158(b)(2)(B)(ii) does permit the Attorney General to, if he wishes, attempt to designate some classes of offenses as particularly serious crimes; such designations are reviewable for legal error (and as explained above, the commenters believe these expansions are unlawful).[68] But if the offense is not a particularly serious crime, then a discretionary decision must be rendered on the application. It is true that the Attorney General may also provide for "additional limitations and conditions" on asylum applications so long as they are "consistent" with the with the asylum statute.[69] However, the Proposed Rules add sweeping categories of offenses that automatically remove an applicant from the consideration of discretion—a regulatory proposal that is ultra vires to the plain text of the statute.

To the extent that the proposed rules would adopt a bar to asylum based on a categorical discretionary bar, rather than a particularly serious crime designation, they are similar to the rules struck down by numerous Circuit Courts of Appeal in the context of adjustment of status for those considered by law to be "arriving aliens." Purporting to exercise discretion categorically, then-Attorney General Reno putatively rendered that class of noncitizens ineligible for adjustment of status, a determination that is ordinarily discretionary, even though the statute seemed to allow eligibility. Multiple Circuit Courts of Appeal struck down the proposed regulations, finding them to reflect an impermissible reading of the statute in light of the fact that Congress carefully defined in the statute the categories of people eligible to apply for adjustment of status.[70]

---

[65] See, *e.g.*, *Robinson* v. *Shell Oil Co.*, 519 U.S. 337, 340 (1997).

[66] 8 U.S.C. § 1158(b)(2)(B)(ii).

[67] *Id.* The Attorney General has not designated "substantial battery" to be a particularly serious crime for any purpose, including for purposes of ineligibility to seek asylum.

[68] 8 U.S.C. § 1252(a)(2)(D).

[69] 8 U.S.C. § 1158(b)(2)(C); *see also* 8 U.S.C. § 1158(d)(5)(B).

[70] The First and Ninth Circuits found the regulations contrary to clear statutory command. *Succar v. Ashcroft*, 394 F.3d 8, 29 (1st Cir. 2005); *Bona v. Gonzales*, 425 F.3d 663, 668–71 (9th Cir. 2005). Other courts invalidated the adjustment regulations under "Step Two" of *Chevron*. Those courts found some ambiguity in the statute, but found a per se discretionary bar not based on a permissible construction of the eligibility standards set forth in the governing statute in light of the statutory scheme and congressional intent. *Zheng v. Gonzales*, 422 F.3d 98, 116–20 (3d Cir.

AR.09496

The same logic applies here. In the asylum statute, Congress explicitly made the commission of a particularly serious crime a bar to asylum. The canon of interpretation known as *expressio unius est exclusio alterius* instructs that, "expressing one item of [an] associated group or series excludes another left unmentioned."[71] The Proposed Rules attempt to create numerous categories of discretionary "pseudo-particularly serious crimes," barring asylum through a categorical exercise of discretion even if those offenses are ultimately found not to be particularly serious crimes. Such an effort violates this canon of interpretation, and makes the Proposed Rules ultra vires to the statute.

**CONCLUSION**

The Proposed Rules present copious legal and practical problems that threaten the integrity of the U.S. asylum system in critical ways. Chief among these issues, the Proposed Rules would violate Congress's express aim of bringing the United States into compliance with its international obligations with the Refugee Act of 1980 by enumerating new categorical exclusions to asylum that have no home in the Refugee Convention, or indeed, the INA. The Proposed Rules also encourage asylum adjudicators to engage with "evidence," that courts with competent criminal jurisdiction, such as the Massachusetts Supreme Judicial Court, have rejected as inherently unfair and unreliable. These new categorical exclusions would thus fly in the face of U.S. obligations under domestic and international law to provide protection to refugees and their families and would undermine U.S. commitments to refugees, putting countless bona fide refugees at risk of serious harm or even death.

---

2005) (invalidating regulation precluding category of people from applying to adjust status "[g]iven Congress's intent as expressed in the language, structure, and legislative history of INA section 245 [8 U.S.C. § 1255]"); *Scheerer v. United States Attorney General*, 445 F.3d 1311, 1321–22 (11th Cir. 2006). This reasoning would likewise be applicable to the proposed rule. Where Congress went through the trouble to create a comprehensive statutory scheme to define asylum eligibility, the agency cannot preempt that in the guise of discretion by creating out of whole cloth a separate set of eligibility criteria.

[71] *United States* v. *Vonn*, 535 U.S. 55, 65 (2002).

AR.09497

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 20, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ejt-w754
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0435
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Margaret N

---

## General Comment

I strongly oppose the proposed procedures for asylum, as this proposal further threatens justice throughout an already complex and arduous asylum process while harming the health of individuals and communities. People seeking asylum face undue difficulty in the United States, after already fleeing from life-threatening dangers. As a public health practitioner who has worked for years in refugee health, I have seen the many ways in which asylum-seekers face barriers in accessing services that they are eligible and entitled to, yet aren't made sufficiently accessible. I have seen the ways in which our criminal justice system threatens individual and community health in countless ways. Increasing incarceration threatens health. Deportation threatens health. Racial profiling threatens health. And these threats to health aren't just individual threats, they are threats to our community's health - threats to all of us. The U.S. prides itself on being a place of refuge, and yet with this proposal, we move even further away from living out our values that center compassion, fairness, and respect for human rights.

# PUBLIC SUBMISSION

| |
|---|
| **As of:** January 23, 2020 |
| **Received:** January 20, 2020 |
| **Status:** Posted |
| **Posted:** January 21, 2020 |
| **Tracking No.** 1k4-9ejt-eqf4 |
| **Comments Due:** January 21, 2020 |
| **Submission Type:** Web |

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0436
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Anonymous Anonymous

## General Comment

See attached file(s)

## Attachments

20200120122804217

9

Public Comment on Proposed Rule Change

Procedures for Asylum and Bars to Asylum Eligibility

RIN: 84 FR 69640

Agency:  Department of Justice and the Department of Homeland Security

Name (optional):

Comment:

I am writing to strongly oppose the Department of Justice and Department of Homeland Security's proposed rule change: "Procedures for Asylum and Bars to Asylum Eligibility.

The proposed rule does not take into account what is really happening on the ground when arrests occur, when convictions are made, and when adjudicators find a person's activity in the home "cruel," with not even a formal conviction required. The fact is that many asylum seekers are already being racially profiled. They are more often assumed to be trouble, and so they are investigated and charged more frequently, and often unfairly.

I implore you to protect each individual seeking asylum from blatantly unfair deportation.

AR.09500

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 20, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ejt-h6br
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0437
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

See attached file(s)

---

## Attachments

20200120122849909

Public Comment on Proposed Rule Change

Procedures for Asylum and Bars to Asylum Eligibility

RIN: 84 FR 69640

Agency: Department of Justice and the Department of Homeland Security - Proposed rule change "Procedures for Asylum and Bars to Asylum Eligibility"

Name (optional): ROSALIND T. KAPLAN

Comment: Traditionally and historically, the U.S. has been a leader in granting asylum to those throughout the world. The proposed rule change, "Procedure for Asylum and Bars to Asylum Eligibility." This proposed rule change creates further obstacles and barriers to those seeking asylum and disproportionately upsets people of color. Furthermore, the proposed rule change provides for barring asylum who may/cannot yet bless be subject to a jail sentence, simply the possibility. In addition, barring asylum based on an "adjudicators" process grounds, with no record or testimony under oath is unfair and prejudicial.

Please Reconsider do not pass this onerous procedure.

AR.09502

Public Comment on Proposed Rule Change

Procedures for Asylum and Bars to Asylum Eligibility

RIN: 84 FR 69640

Agency: Department of Justice and the Department of Homeland Security - *Proposed rule change "Procedures for Asylum and Bars to Asylum Eligibility"*

Name (optional): ROSALIND T. KAPLAN

Comment: Traditionally and historically, the U.S. has been a leader in granting asylum to those throughout the world. The proposed rule change, "Procedure for Asylum and Bars to Asylum Eligibility." This proposed rule change creates further obstacles and barriers to those seeking asylum and disproportionately affects people of color. Furthermore, the proposed rule change provides for barring asylum who may not yet bless be subject to a jail sentence, simply the "possibility." In addition, barring asylum based on an "adjudicators" opinion judges, with no record or testimony under oath is unfair and prejudicial.

Please consider do not pass this onerous procedure

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 20, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ejt-qfj0
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0438
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

See attached file(s)

---

## Attachments

20200120122910205

AR.09504

Public Comment on Proposed Rule Change

Procedures for Asylum and Bars to Asylum Eligibility

RIN: 84 FR 69640

Agency: Department of Justice and the Department of Homeland Security

Name (optional): Callie Kennedy

Comment:

I'm writing in opposition to the Department of Justice and Department of Homeland Security's proposed rule change "Procedures for Asylum and Bars to Asylum Eligibility."

The new bars to asylum are unjust and would exist simply to further prevent people seeking safety from obtaining it through the asylum process. Everyday people with minor criminal offenses still deserve human rights and a pathway to seeking safe haven in the U.S. when their home countries are unsafe for them. I believe the U.S. should be creating more accessible ~~avenues~~ opportunities for asylum-seekers to enter the U.S., not creating more excuses to keep deserving asylum-seekers from achieving safe haven.

I advocate for the withdrawal of this proposed rule and the enactment of more just and welcoming policies toward asylum seekers.

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 20, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ejt-ifkc
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0439
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

See attached file(s)

---

## Attachments

20200120122931912

Public Comment on Proposed Rule Change

Procedures for Asylum and Bars to Asylum Eligibility

RIN: 84 FR 69640

Agency:  Department of Justice and the Department of Homeland Security

Name (optional):  George Stern    geomstern@gmail.com

Comment:

I write in opposition to "Procedures for Asylum and Bars to Asylum Eligibility: Docket # 84 FR 69640"

Historically America has been a haven for the oppressed and persecuted, including immediate ancestors of current citizens and even leaders. Those whose lives are threatened must often resort to illegal activities simply to save themselves. American law must not be used to blame and punish victims.

Sadly, the current American justice system often treats people of color much more harshly than whites. The proposed rules would allow law enforcement people to adjudicate (without trial or appeal) the very people whom the system already exploits.

Study after study shows that many of the advances in American society have been initiated and carried out by immigrants. Regulations like these ultimately hurt us all.

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 20, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ejt-er4t
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0440
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

See attached file(s)

---

## Attachments

20200120122954302

Public Comment on Proposed Rule Change

Procedures for Asylum and Bars to Asylum Eligibility

RIN: 84 FR 69640

Agency: Department of Justice and the Department of Homeland Security

Name (optional): Deborah Stern    debstern502@msn.com

Comment: I'm writing to oppose the Dept. of Justice and Dept. of Homeland Security's proposed rule change: Proposed "Procedures for Asylum and Bars to Asylum Eligibility."

We are a nation of immigrants and the health of our county and its economy depends on welcoming and integrating new immigrants into other our nation, especially since our population is aging and is dependent on a young, vibrant group of young people supporting us ~~the~~ With all the many displacement in the world due to poverty, climate change, and wars, ~~we~~ the U.S. needs to be intelligently leading the world in ways to foster the movement and integration of peoples ~~that~~ from devastated areas to settled areas.

The new rules proposed don't further the above aim but rather unfairly put up further roadblocks to those seeking asylum and information into the U.S. ~~these~~ They give law enforcement and the judicial system too much leeway to reject asylum claims based on scant evidence and without regard to whether the migrants are actually dangerous or violent and so don't meet their stated goals of making the country safer.

I urge that this rule be withdrawn completely and that instead more welcoming policies be proposed for asylum seekers. Thank you!

AR09509

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 20, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9eju-rhi7
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0441
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Sarah-Hope Anonymous
**Address:**
    Watsonville,  CA,  95076
**Phone:** 8313190206

## General Comment

These new bars are unnecessary and designed to prevent legitimate asylum seekers from receiving the fair treatment they deserve under international and U.S. law.

AR.09510

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 20, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9eju-mtob
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0442
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Eleanor Liu

---

## General Comment

I am writing to express my strong opposition to this opposed rule change. My mother, my father's mother, and my father's grandfather all immigrated to this country seeking a better life and devoted to building productive, meaningful lives for themselves and their families. They were all fortunate enough to be able to entry the country with relatively simple documentation processes. They contributed deeply to their communities and beyond: my grandfather was an Army doctor; my grandmother taught English over the radio during WWII. My mother raised me to value the principles of democracy, individual liberties, and equality under the law that this country is meant to uphold.

Our immigration laws must reflect these principles. They must respect the dignity of asylum seekers, honor due process, and respect our country's moral commitment to the rights of refugees.

The people who will be affected by the proposed rule change are in desperate circumstances. My friend's niece is fleeing domestic violence in her home country. Her husband has pursued her to the border. She fears for her life and the life of her children. Her asylum process has been long, precarious, and tremendously grueling. She survived domestic abuse through incredible bravery, faith, and dedication to her own and her children's wellbeing. Now, she has to survive the violence, indignity and terror of an asylum process that does not value her safety.

The proposed rule change would unfairly impact people who have had run-ins with the law, even if they have served their time or only committed minor infractions. This rule change further aggravates the racial profiling at work in our asylum process, which must be free of this kind of injustice. Adding more obstacles to a process that is already dangerous and abusive is absolutely unconscionable. Deporting people back into life-threatening situations because they have already been racially profiled once is deeply immoral. Our immigration laws must stop driving mass incarceration and mass deportation of people of color. The proposed rule change would exacerbate the violence of policies that are already actually making this country less safe for all of us. We must support asylum seekers and recognize that when we do, they contribute hugely to the safety, health and thriving of our democracy.

AR.09511

I call upon the Trump administration to withdraw this proposal.

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 20, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ejv-o16q
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0443
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Elizabeth Schechter

---

## General Comment

I am writing to express my outrage at the proposed regulations that would make it even more difficult than it already is for immigrants to seek asylum in the United States. Why not just change the inscription on the Statue of Liberty to read: "DON'T give us your huddled masses yearning to breathe free. This is a country for rich, white, corrupt businessmen who play on people's prejudice and fear to become president. No place for you poor brown folks who come from south of the border!"

The Refugee Act of 1980, passed with bipartisan support, establishes fair and humane procedures for dealing with asylum seekers. It reflects us at our moral best, not our racist worst.

It is already very difficult to qualify for asylum. Most asylum seekers are fleeing violence that is related to drug cartels with which they have refused to cooperate. And who are the clients of these cartels? That would be American citizens. How hypocritical is it of us to act as if we have no responsibility for the tragedies that bring these people to our borders? Has anyone in your family ever purchased illegal drugs? If so, YOU bear some of the blame for the fact that so many must flee drug-related violence.

The criminal conduct restrictions in the new regulation are especially problematic, as "aggravated felony" is an otherwise non-legal term that can be stretched to include anything that is necessary to keep someone out. Some of those charged with such crimes incurred the charges, justly or often unjustly, in the countries they are trying to flee precisely because they refused to cooperate with crime or protested against corrupt governmental activity that supported it. And since when is an arrest that is not followed by a conviction a crime? Some of the details of the crime sections are laughable. Has any of you who are trying to implement these regulations ever been caught driving after having too much to drink? Ever smoke pot? Should Canada, England, Germany or France keep you out for such violations, if you would ever consider moving? But of course you would not consider moving to Germany or France because you wouldn't be able to communicate effectively there, English being the only language fit to exit anyone's mouth.

How many lives do you want on your hands as you refuse to let those who are desperately in need of refuge find

AR.09513

it here?

AR.09514

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 20, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ejv-c98s
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0444
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Maureen Sweeney
**Address:**
    500 W. Baltimore Street
    Baltimore,  21201
**Email:** msweeney@law.umaryland.edu
**Phone:** 4107063922

---

## General Comment

Maureen A. Sweeney
Law School Professor

Immigration Clinic
Clinical Law Program
500 W. Baltimore Street, Suite 360
Baltimore, MD 21201
(410) 706-3922
msweeney@law.umaryland.edu

Submitted electronically: https://www.regulations.gov/document?D=EOIR-2019-0005-0001

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security

AR.09515

20 Massachusetts Ave. NW
Washington, DC 20529-2140

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41;
Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility

January 20, 2020

To Whom it May Concern:

I am writing on behalf of the Immigration Clinic of the University of Maryland Carey School of Law in response to the above-referenced Proposed Rules to express in the strongest possible terms our opposition to the Proposed Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019. Every single one of these additional bars to asylum would punish vulnerable people who are deserving of and eligible for protection under United States asylum law.

The Maryland Carey Immigration Clinic has been representing asylum seekers for decades, with a specialty of complicated cases, including cases in which our clients accused of being subject to a bar to asylum eligibility. As the director of the Clinic for the last sixteen years, I have seen that it is often the very vulnerability of these asylum seekers that puts them in a position of potentially being barred and that requires us to view their situation in the totality of the circumstances. Viewed in the full human reality of the persecution they have suffered, these individuals are not only eligible for, but also fully deserving of the protection of asylum. Furthermore, once they achieve a position of safety in the United States, they go on to become valuable, contributing members of our communities.

For example, asylum seekers are extremely often the victims of trauma. It is well documented that trauma survivors may resort to coping mechanisms such as drinking alcohol to deal with the direct effects of their traumatic history. To create a bar or bars to asylum that are related to substance abuse serves to punish these vulnerable applicants for the harm they have suffered.

This targeting for exclusion violates the international obligations of the United States to protect vulnerable people. These obligations include limited exceptions for individuals who have engaged in serious criminal activity or activity that creates a genuine danger to the receiving society, but the proposed additional bars to asylum go far beyond the limited exceptions allowed by the terms of the treaties that create our national obligations. To the extent that they go beyond the limited exceptions allowed by international law, they are illegal under the Immigration and Nationality Act, which was amended by the Refugee Act of 1980 specifically to bring the United States into compliance with its international humanitarian obligations. INS v Cardoza-Fonseca, 480 US 421, 436-37 (1987).

For the reasons detailed in the comments that follow, the Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

Thank you for the opportunity to submit comments on the Proposed Rules. Please do not hesitate to contact Maureen A. Sweeney at msweeney@law.umaryland.edu to provide further information.

Sincerely,

Maureen A. Sweeney

# Attachments

MD Carey Immigration Clinic comments on proposed asylum ban expansion

AR.09517



**UNIVERSITY** *of* **MARYLAND**
**FRANCIS KING CAREY**
**SCHOOL OF LAW**

**Maureen A. Sweeney**
Law School Professor

*Immigration Clinic*
*Clinical Law Program*
500 W. Baltimore Street, Suite 360
Baltimore, MD 21201
(410) 706-3922
msweeney@law.umaryland.edu

*Submitted electronically:* https://www.regulations.gov/document?D=EOIR-2019-0005-0001

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87,
1615-AC41; Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and
Bars to Asylum Eligibility

January 20, 2020

To Whom it May Concern:

I am writing on behalf of the Immigration Clinic of the University of Maryland Carey School of
Law in response to the above-referenced Proposed Rules to express in the strongest possible
terms our opposition to the Proposed Rules to amend regulations relating to eligibility for asylum
published in the Federal Register on December 19, 2019.  Every single one of these additional
bars to asylum would punish vulnerable people who are deserving of eligible for protection
under United States asylum law.

1

The Maryland Carey Immigration Clinic has been representing asylum seekers for decades, with a specialty of complicated cases, including cases in which our clients accused of being subject to a bar to asylum eligibility. As the director of the Clinic for the last sixteen years, I have seen that it is often the very vulnerability of these asylum seekers that puts them in a position of potentially being barred and that requires us to view their situation in the totality of the circumstances. Viewed in the full human reality of the persecution they have suffered, these individuals are not only eligible for, but also fully deserving of the protection of asylum. Furthermore, once they achieve a position of safety in the United States, they go on to become valuable, contributing members of our communities.

For example, asylum seekers are extremely often the victims of trauma. It is well documented that trauma survivors may resort to coping mechanisms such as drinking alcohol to deal with the direct effects of their traumatic history. To create a bar or bars to asylum that are related to substance abuse serves to punish these vulnerable applicants for the harm they have suffered.

This targeting for exclusion violates the international obligations of the United States to protect vulnerable people. These obligations include limited exceptions for individuals who have engaged in serious criminal activity or activity that creates a genuine danger to the receiving society, but the proposed additional bars to asylum go far beyond the limited exceptions allowed by the terms of the treaties that create our national obligations. To the extent that they go beyond the limited exceptions allowed by international law, they are illegal under the Immigration and Nationality Act, which was amended by the Refugee Act of 1980 specifically to bring the United States into compliance with its international humanitarian obligations. INS v Cardoza-Fonseca, 480 US 421, 436–37 (1987).

For the reasons detailed in the comments that follow, the Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

Thank you for the opportunity to submit comments on the Proposed Rules. Please do not hesitate to contact Maureen A. Sweeney at msweeney@law.umaryland.edu to provide further information.

Sincerely,

Maureen A. Sweeney

**DETAILED COMMENTS in opposition to the Proposed Rules re Procedures for Asylum and Bars to Asylum Eligibility, 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41**

**TABLE OF CONTENTS [with jump-links]**

I.      Introduction

II.     The Proposed Rules unnecessarily and cruelly exclude bona fide refugees from asylum eligibility

III.    The Proposed Rules violate the letter and spirit of United States international treaty obligations

IV.     Those precluded from asylum eligibility will be gravely impacted even if granted withholding or protection under the Convention Against Torture

V.      The Proposed Rules will result in "mini-trials" in immigration court, undermine judicial efficiency and result in racially-biased decision-making

VI.     The proposed definition of "conviction" and "sentence" for the purposes of the new bars further excludes those in need of protection

VII.    The Proposed Rules will disparately impact vulnerable populations already routinely criminalized, including LGBTQ immigrants, survivors of trafficking and domestic violence, and immigrant youth of color

VIII.   The Proposed Rules are ultra vires to the federal immigration statute to the extent they purport to bar eligibility through a categorical exercise of discretion

IX.     Conclusion

**I.      Introduction**

On December 19th, the Department of Homeland Security (DHS) and the Department of Justice (DOJ) issued a joint set of Proposed Rules that would make three primary changes to the rules governing asylum adjudications. The Maryland Carey Immigration Clinic opposes these changes because they would senselessly exclude vulnerable people from protection, they exceed the very limited exceptions to protection provided for in the Immigration and Nationality Act (INA), and they would violate U.S. obligations under international law.

The Maryland Carey Immigration Clinic has been representing asylum seekers for decades, with a specialty of complicated cases, including cases in which our clients accused of being subject to a bar to asylum eligibility.  As the director of the Clinic for the last sixteen years, I have seen that it is often the very vulnerability of these asylum seekers that puts them in a position of potentially being barred and that requires us to view their situation in the totality of

the circumstances. Viewed in the full human reality of the persecution they have suffered, these individuals are not only eligible for, but also fully deserving of the protection of asylum. Furthermore, once they achieve a position of safety in the United States, they go on to become valuable, contributing members of our communities. The proposed changes would limit the protection of asylum in ways that are not permitted by the law and that would provide no concrete benefit to U.S. society.

The first proposed set of changes adds the following seven *categorical* bars to asylum eligibility: (1) any conviction of a felony offense; (2) any conviction for "smuggling or harboring" under 8 U.S.C. § 1324(a), even if the asylum seeker committed the offense for the purpose of bringing her own spouse, child or parent to safety; (3) any conviction for illegal reentry under 8 U.S.C. § 1326; (4) any conviction for an offense "involving criminal street gangs," with the adjudicator empowered to look to any evidence to determine applicability; (5) any second conviction for an offense involving driving while intoxicated or impaired; (6) any conviction *or accusation of conduct* for acts of battery involving a domestic relationship; (7) and any conviction for several newly defined categories of misdemeanor offenses, including *any* drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits.

The second section of the Proposed Rules provides a multi-factor test for immigration adjudicators to determine whether a criminal conviction or sentence is valid for the purpose of determining asylum eligibility. The third section rescinds a provision in the current rules regarding the reconsideration of discretionary asylum.

Taken together, these proposed changes constitute an unnecessary, harsh, and unlawful gutting of the asylum protections enshrined in United States and international law. The Maryland Carey Immigration Clinic submits these comments to express opposition to the entirety of the Proposed Rules and grave concerns with the administration's continued efforts to exclude refugees from obtaining the security and stability the United States asylum system has long promised. We urge that the Proposed Rules be rescinded in their entirety.

## II.    The Proposed Rules unnecessarily and cruelly exclude bona fide refugees from asylum eligibility

*The barriers to asylum for those previously involved in the criminal legal system are already sweeping in scope; adding more barriers is cruel and unnecessary.*

The United States asylum system was first codified in statute through the Refugee Act of 1980, described by one prominent scholar as a bipartisan attempt to "reconcile our rhetoric with our law, our national immigration policy and our international treaty obligations so that we could

maintain a consistent posture towards the world as a nation with a strong humanitarian tradition and a unique historic role as a haven for persons fleeing oppression."[1] The Act—among other measures designed to bring the United States domestic legal code into compliance with the provisions of the United Nations Protocol Relating to the Status of Refugees—created a "broad class" of refugees eligible for a discretionary grant of asylum.[2]

The asylum protections provided by United States law are sacred. Asylum provides those fleeing horrors with physical safety, a path to citizenship and security, and the opportunity to reunite with immediate family members who may still remain abroad in danger.[3] Many see the domestic asylum system as a symbol of the United States' commitment never to repeat its failure to save thousands of Jewish refugees refused entry to the United States on the *St. Louis* and others fleeing the Holocaust.[4] Others point to the critical role that domestic asylum policy plays in serving the United States' foreign policy interests abroad.[5] For those individuals seeking asylum in the United States, the stakes could not be higher—a claim denied often means return to death or brutal persecution.[6]

The laws, regulations, and process governing asylum adjudications are already exceedingly harsh. Asylum seekers bear the evidentiary burden of establishing their eligibility for asylum[7] in the face of a complex web of laws and regulations, without the benefit of appointed counsel and often from a remote immigration jail.[8] The obstacles to winning asylum are exceedingly high; indeed in some parts of the country and before certain immigration judges, almost no one succeeds.[9] Today, newly imposed barriers to accessing asylum in the United

---

[1] Deborah Anker, "The Refugee Act of 1980: An Historical Perspective," *In Defense of the Alien* 5 (1982): 89-94, https://www.jstor.org/stable/23141008?read-now=1&refreqid=excelsior%3A106095360820a0bdd30d5d506e1ff6318&seq=1#page_scan_tab_contents.

[2] *See I.N.S. v. Cardoza-Fonseca*, 40 U.S. 421, 423 (1987).

[3] The permanency and family reunification benefits that accompany asylum are not provided to those granted withholding of removal or protection under the Convention Against Torture, the alternative forms of relief described throughout the Proposed Rules as a justification for the breadth of the new proposed bars. For more details on the differences between the forms of protection, *see* section VI *infra*.

[4] Dara Lind, "How America's rejections of Jews fleeing Nazi Germany haunts our refugee policy today," *Vox*, January 27, 2017, https://www.vox.com/policy-and-politics/2017/1/27/14412082/refugees-history-holocaust.

[5] Council on Foreign Relations, *Independent Task Force Report No. 63: U.S. Immigration Policy* (2009), 117 (additional or dissenting view by Elisa Massimino) ("For better or worse, the United States sets the standard for reasonable and humane treatment of migrants around the world. If the United States endorses harsh treatment of immigrants, it erodes the norms designed to protect them, and other countries will have license to do the same.").

[6] *See*, *e.g.*, Sarah Stillman, "When deportation is a death sentence," *The New Yorker*, January 8, 2018, https://www.newyorker.com/magazine/2018/01/15/when-deportation-is-a-death-sentence.

[7] 8 USC § 1158(b)(1)(B); 8 CFR § 1240.8(d).

[8] *See* Daniel Connolly, Aaron Montes, and Lauren Villagran, "Asylum seekers in U.S. face years of waiting, little chance of winning their cases," *USA Today,* September 25, 2019, https://www.usatoday.com/in-depth/news/nation/2019/09/23/immigration-court-asylum-seekers-what-to-expect/2026541001/.

[9] Manuel Roig-Franzia, "Immigrants risk it all seeking asylum. The answer is almost always 'no,'" *Washington Post,* July 24, 2019, https://www.washingtonpost.com/lifestyle/style/migrants-risk-it-all-seeking-asylum-the-answer-in-court-is-almost-always-no/2019/07/23/9c161b2e-a3f7-11e9-b732-41a79c2551bf_story.html.

AR.09522

States are breathtaking in scope, with those seeking safety at the southern border subject to return to dangerous conditions in Mexico and an overlapping web of policies that preclude asylum eligibility for countless migrants simply because of their national origin, manner of entry, or their flight path.[10] There are consistent reports of the documented deaths and brutalities endured by those who sought but were denied asylum protections in the United States.[11]

Specifically, the bars to asylum based on allegations of criminal conduct are *already* sweeping and over-broad in nature and scope.[12] Any conviction for an offense determined to be an "aggravated felony" is considered a *per se* "particularly serious crime" and therefore a mandatory bar to asylum.[13] "Aggravated felony" is a notoriously vague term, which exists only in immigration law. Originally limited to murder, weapons trafficking and drug trafficking,[14] it has metastasized to encompass hundreds of offenses, many of them neither a felony nor aggravated, including petty offenses such as misdemeanor shoplifting, simple misdemeanor battery, or sale of counterfeit DVDs.[15]

In addition, the bar for a "serious nonpolitical crime" outside the U.S. includes no exception for conduct that was engaged in under direct coercion by the person's persecutors. The Maryland Carey Immigration Clinic has represented a young man from Central America who was targeted for persecution by local gangs and police alike because of his sexual orientation. In addition to rape and other physical abuse, his persecution by the gang included being coerced (on threat of death to himself and close family members) to transport drugs from city to city. The USCIS Asylum Office concluded that this conduct constituted a serious nonpolitical crime for which our client was barred from asylum. Though we are challenging this holding in court, it demonstrates the overbreadth of existing asylum bars.

---

[10] The National Immigrant Justice Center maintains a frequently updated timeline providing details of each of the asylum bans and other policies issued and implemented by the administration undermining asylum access at https://www.immigrantjustice.org/issues/asylum-seekers-refugees. For more information on the harms and rights abuses inherent in the Migrant Protection Protocols, or "Return-to-Mexico" program, *see* Human Rights First, *Delivered to Danger* (December 2019), https://www.humanrightsfirst.org/campaign/remain-mexico.

[11] *See, e.g.,* Stillman, "Death Sentence," *supra* (reporting on a database of more than sixty cases of individuals killed after deportation); *see also* Maria Sachetti, "'Death is waiting for him,'" *The Washington Post*, December 6, 2018, https://www.washingtonpost.com/graphics/2018/local/asylum-deported-ms-13-honduras/ (telling the story of Santos Chirino, denied asylum by a Virginia immigration judge, deported, and then murdered by those he told the immigration judge he feared); and Kevin Sieff, "When death awaits deported asylum seekers," *Washington Post*, December 26, 2018, https://www.washingtonpost.com/graphics/2018/world/when-death-awaits-deported-asylum-seekers/.

[12] The existing categorical bars to asylum eligibility are discussed in detail on p. 69641 of the Proposed Rules.

[13] 8 U.S.C. §§ 1158(b)(2)(A)(ii) and (B)(i).

[14] Pub. L. No. 100-690, § 7342, 102 Stat. 4181, 4469-70.

[15] 8 U.S.C. § 1101(a)(43). *See also* Nancy Morawetz, "Understanding the Impact of the 1996 Deportation Laws and the Limited Scope of Proposed Reforms," *Harvard Law Review* 113 (2000): 1939-40 (criticizing the "'Alice-in-Wonderland-like definition of the term 'aggravated felony'"); Melissa Cook, "Banished for Minor Crimes: The Aggravated Felony Provisions of the Immigration and Nationality Act as a Human Rights Violation," *Boston College Third World Law Journal* (2003): 293.

AR.09523

Immigration adjudicators already have vast discretion to deny asylum to those who meet the refugee definition but have been convicted of criminal conduct.[16] The existing crime bars should be narrowed, not expanded. Even for those not categorically barred from relief, the immigration adjudicator maintains full discretion to deny asylum.[17] Further categorical bars are not needed. The agencies' efforts to add *seven* new sweeping categories of barred conduct to the asylum eligibility criteria is unnecessary and cruel. The Proposed Rules drain the phrase "*particularly serious* crime," 8 U.S.C. § 1158, of any sensible meaning.

The Proposed Rules are also arbitrary and capricious. They would constitute a marked departure from past practice. And the agencies have proffered no evidence or data to support these changes.

One assumption fundamentally underlying the Proposed Rules, for example, is that every noncitizen convicted of any offense punishable by more than a year in prison necessarily constitutes a danger to the community. But no evidence is provided to support that assumption, and a criminal record, does not, in fact, reliably predict future dangerousness.[18] The Proposed Rules are so capricious as to peremptorily postulate a noncitizen's supposed danger to the community even in circumstances when a federal, state, or local judge has concluded that no danger exists by, for example, imposing a noncustodial sentence. Conviction for a crime does not, without more, make one a present or future danger—which is why the Refugee Convention's particularly serious crime bar, made part of United States law through 8 U.S.C. § 1158, should only properly apply if both (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows that she is a present or future danger.[19]

Similarly, the Proposed Rules fail to address or account for the fact that a significant number of people may agree to plead to a crime as to avoid the threat of a severe sentence; not only is a conviction an unreliable predictor of future danger, it can also be an unreliable indicator of past criminal conduct.[20] In addition, the Proposed Rules do not address and make no exception for convictions for conduct influenced by mental illness or duress.

---

[16] *See id.*

[17] *See Matter of Pula*, 19 I.&N. Dec. 467 (BIA 1987).

[18] See U.S. Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders* (2017) (noting that recidivism rates fall substantially with age); U.S. Sentencing Commission, *Recidivism Among Federal Violent Offenders* (2019) (noting that non-violent offenders recidivate at significantly lower rates); J. Ramos and M. Wenger, "Immigration and recidivism: What is the Link?" *Justice Quarterly* (2019) (finding no correlation between recidivism rates and citizenship status among those formerly incarcerated for felonies in Florida prisons).

[19] See U.N. High Commissioner for Refugees, *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 11 (July 2007), http://www.unhcr.org/en-us/576d237f7.pdf (the Refugee Convention's particularly serious crime bar only applies if (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows she is a "present or future danger.").

[20] John H. Blume and Rebecca K. Helm, "The Unexonerated: Factually Innocent Defendants Who Plead Guilty," *Cornell Law Review* 100 (2014): 157, https://pdfs.semanticscholar.org/c00f/96d421adf1846d120bf802a8854b5e2c0ff2.pdf.

AR.09524

The Board of Immigration Appeals has cautioned that, "in light of the unusually harsh consequences which may befall a [noncitizen] who has established a well-founded fear of persecution; the danger of persecution should generally outweigh all but the most egregious of adverse factors."[21] Yet because of the categorical nature of the seven news bars proposed here, asylum seekers will be precluded from obtaining protection on the basis of a vast array of conduct, without any discretion left to the immigration adjudicator to determine whether the circumstances merit such a harsh penalty. Indeed, in the case of the domestic-violence related ground, the categorical bar will be imposed on the basis of *mere allegations* of conduct without any adjudication of guilt.[22]

Those unjustly precluded from even seeking a discretionary grant of asylum by the Proposed Rules will include, for example: individuals struggling with addiction with one drug-related conviction, regardless of the circumstances of the offense; asylum seekers with two convictions for driving under the influence, regardless of whether the applicant has sought treatment for alcohol addiction or the circumstances of the convictions; community members seeking asylum defensively who have been convicted of a document fraud offense related to their immigration status; and asylum-seeking mothers convicted for bringing their own child across the southern border in an effort to find safety.

> *The Proposed Rules cruelly disregard the connections between trauma and involvement in the criminal legal system.*

The harsh nature of the Proposed Rules is especially evident when viewed through a trauma-informed lens. Asylum seekers are an inherently vulnerable population because of the trauma they have experienced in their countries of origin and, often, along the journey to find safety. Existing literature suggests that at least one out of every three asylum seekers struggles with depression, anxiety, and/or post-traumatic stress disorder (PTSD).[23] One recent study found the mental health problems facing refugees and asylum seekers so acute that more than a third of the study's sample admitted having suicidal thoughts in the preceding two weeks.[24]

---

[21] *Pula*, 19 I.&N. Dec. at 474.

[22] The Proposed Rules at p. 69651 explain that the regulations will "render ineligible [non-citizens] who engaged in acts of battery and extreme cruelty in a domestic context in the United States, regardless of whether such conduct resulted in a criminal conviction."

[23] Giulia Turrini et al., "Common mental disorders in asylum seekers and refugees: umbrella review of prevalence and intervention studies," *International Journal of Mental Health Systems* 11 (August 2017): 51, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5571637/.

[24] Megan Brooks, "Refugees have high burden of mental health problems," *Psychiatry and Behavioral Health Learning Network*, June 2019, https://www.psychcongress.com/article/refugees-have-high-burden-mental-health-problems.

AR.09525

Studies also consistently reveal a high prevalence of comorbidity of PTSD and substance use disorders, with individuals with PTSD *up to 14 times more likely* to struggle with a substance use disorder.[25] Asylum seekers in the United States are often unable to access affordable medical care and treatments for complex trauma;[26] some turn to drugs and alcohol in an effort to self-medicate.[27] The proposed new bars to asylum include *any* drug-related conviction (with one exception for a first minor marijuana possessory offense) and any second conviction for driving under the influence. This approach is not only cruel but also ignores the evidence. *Particularly* given the vulnerabilities of asylum seeking populations, prior struggles with addiction should be addressed with treatment and compassion, not a closed door and deportation order.

The Maryland Carey Immigration Clinic represented a young man who had fled his country after substantial abuse motivated by his sexual orientation. He was granted asylum despite a conviction for possession of a controlled substance. Like many young people who are struggling to come to terms with their sexuality in a hostile world, he sometimes self-medicated, but that fact did not make him any less deserving of or appreciative of asylum. He would be barred under the proposed changes, and the U.S. would have been deprived of the positive, contributing member of society that he has become, not to mention responsible for returning a young man back to a life of unmitigated danger and persecution because of his identity.

Immigration adjudicators already maintain the authority to deny asylum to individuals with drug-related criminal histories on the basis of discretion; denying asylum seekers even the opportunity to present the countervailing factors of their past trauma and potential recovery is simply cruel.

## III.    The Proposed Rules violate the letter and spirit of United States international treaty obligations

By acceding to the 1967 Protocol Relating to the Status of Refugees,[28] which binds parties to the United Nations Convention Relating to the Status of Refugees,[29] the United States

---

[25] Jenna L McCauley et al., "Posttraumatic Stress Disorder and Co-Occurring Substance Use Disorders: Advances in Assessment and Treatment," *Clinical Psychology Science and Practice* 19, 3 (October 2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3811127/.

[26] For more information on immigrant eligibility for federal benefits, *see* https://www.nilc.org/issues/health-care/.

[27] Carrier Clinic, *Trauma and Addiction* (2019), https://carrierclinic.org/2019/08/06/trauma-and-addiction/ ("...some people struggling to manage the effects of trauma in their lives may turn to drugs and alcohol to self-medicate. PTSD symptoms like agitation, hypersensitivity to loud noises or sudden movements, depression, social withdrawal and insomnia may seem more manageable through the use of sedating or stimulating drugs depending on the symptom. However, addiction soon becomes yet another problem in the trauma survivor's life. Before long, the 'cure' no longer works and causes far more pain to an already suffering person.").

[28] United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268.

[29] Convention Relating to the Statute of Refugees, July 28, 1951, 140 U.N.T.S. 1954 (hereinafter

AR.09526

obligated itself to develop and interpret United States refugee law in a manner that complies with the Protocol's principle of non-refoulement (the commitment not to return refugees to a country where they will face persecution on protected grounds), even where potential refugees have allegedly committed criminal offenses. As noted above, adjudicators already have over-broad authority to deny asylum based on allegations of criminal activity, which vastly exceeds the categories for exclusion and expulsion set out in the Convention. Instead of working towards greater congruence with the terms of the Convention, the Proposed Rules carve out categorical bars from protection that violate both the language and spirit of the treaty.

While the Convention allows states to exclude and/or expel potential refugees from protection, the circumstances in which this can occur are limited. In particular, the Convention allows states to exclude and/or expel individuals from refugee protection if the individual "having been convicted by a final judgement of a particularly serious crime, constitutes a danger to the community of that country."[30] However, this clause is intended for "extreme cases," in which the particularly serious crime at issue is a "capital crime or a very grave punishable act."[31] The United Nations High Commissioner for Refugees (UNHCR) has asserted that to constitute a "particularly serious crime," the crime "must belong to the gravest category" and be limited "to refugees who become an extremely serious threat to the country of asylum due to the severity of crimes perpetrated by them in the country of asylum."[32] Moreover, the UNHCR has specifically noted that the particularly serious crime bar does not encompass less extreme crimes; "[c]rimes such as petty theft or the possession for personal use of illicit narcotic substances would not meet the threshold of seriousness."[33] Finally, when determining whether an individual should be barred from protection for having been convicted of a particularly serious crime, the adjudicator must conduct an individualized analysis and consider any mitigating factors.[34]

As noted above, legislation and agency interpretation of the Immigration and Nationality Act have already expanded the particularly serious crime bar far beyond what was contemplated in the Convention by creating categorical particularly serious crimes through the aggravated felony definition. The Proposed Rules would amplify the dissonance between U.S. refugee law and the Convention, as well as the violation of U.S. obligations under the Convention, by creating categorical bars within categorical bars. For example, at p. 69659, the Proposed Rules

---

"Refugee Convention").

[30] *Id*. at art. 33(2).

[31] U.N. High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees* 2, U.N. Doc. HCR/IP/Eng/REV. ¶ 154-55, (1979, reissued 2019).

[32] U.N. High Comm'r for Refugees (UNHCR), *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 7 (July 2007), http://www.unhcr.org/enus/576d237f7.pdf.

[33] *Id*. at ¶ 10.

[34] *Id*. at ¶ 10-11; U.N. High Commissioner for Refugees, *The Nationality, Immigration and Asylum Act 2002: UNHCR Comments on the Nationality, Immigration and Asylum Act 2002 (Specification of Particularly Serious Crimes) Order 2004*, 4 (2004).

AR.09527

first exclude from protection anyone who was convicted of a felony and then at p. 69660, define "felony" as "any crime punishable by more than one of imprisonment" without any reference to other factors, including dangerousness. The Proposed Rules described the increased categorization of the particularly serious crime bar as necessary because the case-by-case adjudication previously used for non-aggravated felony offenses was "inefficient,"[35] but an individualized analysis is exactly what the Convention requires to ensure only those individuals who have been convicted of crimes that are truly serious and therefore present a future danger are placed at risk of refoulement.

Additionally, outside of the aggravated felony context, it has generally been well understood by the Board of Immigration Appeals and the Courts of Appeals that low-level, "run-of-the-mill" offenses do not constitute particularly serious crimes.[36] Under this long-standing interpretation of the particularly serious crime bar in the INA, there is simply no scenario in which low-level offenses like misdemeanor driving under the influence where no injury is caused to another or simple possession of a controlled substance or paraphernalia would constitute a particularly serious crime.

The reason for this is common sense. As Judge Reinhardt explained in a concurring opinion in *Delgado v. Holder*,[37] a decision the Proposed Rules cite in support of the expanded bars, run-of-the-mill crimes like driving under the influence have "little in common" with other crimes the Board of Immigration Appeals has deemed particularly serious—e.g., felony menacing with a deadly weapon, armed robbery, and burglary of a dwelling in which the offender is armed or causes injury.[38] Judge Reinhardt further noted that public opinion does not treat them similarly either: "American voters would be unlikely to elect a president or vice president who had committed a particularly serious crime, yet they had no difficulty in recently electing to each office a candidate with a DUI record."[39] Barring individuals from asylum based on these relatively minor offenses renders the "particularly serious" part of the "particularly serious crime" bar meaningless.

As already mentioned, our Clinic represented a young man recently who was granted asylum but would have been denied under the proposed changes for a controlled substance possession offense.

The expansion of the asylum bar to include individuals who have been convicted of reentering the United States without inspection pursuant to INA § 276[40] is also unlike any of the

---

[35] Proposed Rules at 69646.
[36] *Delgado v. Holder*, 648 F.3d 1095, 1110 (9th Cir. 2011) (en banc) (J. Reinhardt, concurring).
[37]  648 F.3d at 1110 (J. Reinhardt, concurring).
[38] *Id*. at 1110.
[39] *Id*. at 1110.
[40] Proposed Rules at 69659, 69660.

other bars previously established or as interpreted by the Board of Immigration Appeals or Circuit Courts of Appeals. It is an offense with no element of danger or violence to others, and has no victim. Most significantly, and more so than other bars contained in the Proposed Rules, barring asylum based on the manner of entry directly violates the Convention's prohibition on imposing penalties based on a refugee's manner of entry or presence.[41] This prohibition is a critical part of the Convention because it recognizes that refugees often have little control over the place and manner in which they enter the country where they are seeking refuge.

The Maryland Carey Immigration Clinic currently represents a young man whose family was granted asylum after being targeted because they refused to sacrifice their 15-year-old daughter's freedom to a local gang. Our client, because he had turned 18 years old by the time the family reached the U.S. border, was separated from his family members and detained in an adult men's detention center. Because he did not know all the details and could not articulate the reasons that the family was in danger, he was deported back to the home country. He fled again, because he was in danger of being killed at home, and reentered the U.S. again illegally, because he saw no other option that would keep him alive. The new proposed bar for those convicted of illegal reentry fails to account for situations such as his, that involve someone eligible for asylum who is forced to reenter the country outside normal channels because of the urgency of the threat against them.

## IV.    Those precluded from asylum eligibility will be gravely impacted even if granted withholding of removal or protection under the Convention Against Torture

Throughout the Proposed Rules, the agencies defend the harsh and broad nature of their proposal by pointing to the continued availability of alternative forms of relief for those precluded from asylum eligibility under the new rules.[42] The availability of these alternatives forms of relief, however—known as withholding of removal and protection under the Convention Against Torture (CAT)—does not nullify the harm created by the Proposed Rule's new limits on asylum. The protections afforded by CAT and by statutory withholding of removal are limited in scope and duration, and they are harder to obtain. As a result, a Rule that limits *bona fide* refugees to withholding of removal and CAT protection would impose a very real harm on individuals who have come to the United States in search of protection.

First, the most serious harm that can befall an individual as a result of these Proposed Rules is removal to persecution and torture, and the existence of withholding of removal does not account for that risk. CAT and withholding protections demand a higher level of proof than

---

[41] Refugee Convention, *supra*, at art 31.
[42] *See, e.g.*, Proposed Rules at 69644.

asylum claims: a clear probability of persecution or torture.[43] Thus, an individual could have a valid asylum claim but be unable to meet the standard under the other forms of relief and therefore would be removed to their country of origin, where they would face persecution or even death.

Even for those who meet the higher standard, withholding and CAT recipients are still subject to significant prejudice. For example, they have no ability to travel internationally. The United Nations Convention Relating to the Status of Refugees[44] affords refugees the right to travel in mandatory terms. Article 28 states, "Contracting States shall issue to refugees lawfully staying in their territory travel documents for the purpose of travel outside their territory." Withholding and CAT recipients do not have access to a travel document as contemplated by Article 28. By regulation, refugee travel documents are available only to asylees.[45] And the Board of Immigration Appeals requires that an individual granted withholding and CAT—unlike an individual granted asylum—must simultaneously be ordered removed, making any international travel a "self-deportation."[46] Refugees granted only withholding of removal or CAT protection are thus effectively trapped within the United States in long-term limbo.

Withholding and CAT recipients also face permanent separation from their spouses and children. Because international travel is prohibited, these individuals cannot reconnect with their families in a third country. And they also cannot reunite with family in the United States because only asylees and refugees are eligible to petition for a spouse and children to join them as derivatives on that status.[47] For many, this will mean that the Proposed Rules institute yet another formal policy of family separation. For example, a mother with two young children who flees to the United States and is subject to one of the expanded asylum bars will not be able to ensure that her children will be able to obtain protection in the United States with her if she is granted relief.  Rather, if her children are still in her home country, they would need to come to the United States and seek asylum on their own, likely as unaccompanied children. If her children fled to the United States with her, then they will need to establish their own eligibility for protection before an immigration judge, no matter their age.

---

[43] Withholding of removal requires the petitioner to demonstrate his or her "life or freedom would be threatened in that country because of the petitioner's race, religion, nationality, membership in a particular social group, or political opinion." *INS v. Stevic*, 467 U.S. 407, 411 (1984) (quoting 8 U.S.C. § 1231(b)(3)). Unlike asylum, however, the petitioner must show a "clear probability" of the threat to life or freedom if deported to his or her country of nationality. The clear probability standard is more stringent than the well-founded fear standard for asylum. *Id; see also Cardoza-Fonseca*, 480 U.S. at 431 (describing the difference between a well-founded fear of persecution and a clear probability of persecution). For CAT relief, an applicant must show it is more likely than not that he or she will be tortured or killed by or at the government's acquiescence if removed to the home country. 8 C.F.R. § 1208.16(c)(2).

[44] 19 U.S.T. 6223 T.I.A.S. No. 6577 (1968).

[45] 8 C.F.R. § 223.1.

[46] *See Matter of I-S- & C-S-*, 24 I.&N. Dec. 432, 434 n.3 (BIA 2008); 8 C.F.R. § 241.7.

[47] 8 C.F.R. § 208.21(a).

AR.09530

Recently, this exact scenario played out with a mother who was subject to the so-called Migrant Protection Protocols (also known as Remain in Mexico) and the asylum "transit ban,"[48] which made the mother ineligible for asylum and thus required the children to establish their independent eligibility for withholding and CAT protection. An immigration judge granted the mother withholding of removal but denied protection to her young children, leaving the children with removal orders and immense uncertainty about their future.[49] Under the expanded bars in the Proposed Rules, these situations will certainly increase, separating families and forcing parents to return to countries where it has been established they more likely than not will face persecution and torture, rather than leaving their children on their own.

Withholding recipients likewise face hurdles in access to employment. Article 17 of the Refugee Convention states that a contracting state "shall accord to refugees lawfully staying in their territory the most favorable treatment accorded to nationals of a foreign country in the same circumstances, as regards the right to wage-earning employment." Recipients of withholding enjoy no such right. They must apply for work authorization, and they face frequent delays in the adjudication of these applications, which often result in the loss of legal authorization to work.[50]

And perhaps most fundamentally, there is continuing jeopardy for withholding and CAT recipients that does not exist for asylum recipients. When a noncitizen is granted asylum, the person receives a legal status.[51] Asylum, once granted, protects an asylee against removal unless and until that status is revoked.[52] None of these protections exists for withholding and CAT recipients. They have no access to permanent residency or citizenship.[53] Instead, they are subject to a removal order and vulnerable to the permanent prospect of deportation to a third country and subject to potential check ins with immigration officials where they can be made to pursue removal to third countries to which they have no connection.[54]

Finally, The Maryland Carey Immigration Clinic writes to highlight a different form of prejudice that will flow from the rule: one relating to judicial efficiency. Neither withholding of removal nor CAT protection allow family members who are in the United States together and pursuing protection on the same basis to apply as derivatives on a principal application. As a

---

[48] 8 C.F.R. § 1208.13(c)(4).

[49] Adolfo Flores, "An Immigrant Woman Was Allowed To Stay In The US — But Her Three Children Have A Deportation Order," *Buzzfeed*, December 21, 2019, https://www.buzzfeednews.com/article/adolfoflores/an-immigrant-woman-was-allowed-to-stay-in-the-us-but-not.

[50] 8 C.F.R. § 274a.12(a)(10); *Northwest Immigrant Rights Project, et al. v. USCIS, et al.*, No. 2:15-cv-00813-JLR (W.D. Wash., filed May 22, 2015) (class action regarding delays in adjudication of work authorization).

[51] *See, e.g.*, 8 C.F.R. 245.1(d)(1) (defining "lawful immigration status" to include asylees).

[52] *See* 8 U.S.C. § 1158(c)(1)(A).

[53] *Matter of Lam*, 18 I.&N. Dec. 15, 18 (BIA 1981); 8 C.F.R. § 245.1(d)(1) (explaining that only those in "lawful immigration status" can seek permanent residency and excluding withholding recipients from such status); 8 C.F.R. § 209.2(a)(1) (authorizing adjustment of status to permanent residence for asylees); 8 C.F.R. § 316.2 (naturalization available only to permanent residents).

[54] *See R–S–C v. Sessions*, 869 F.3d 1176, 1180 (10th Cir. 2017).

AR.09531

result, family claims for those rendered ineligible for asylum by the new rules will have to be adjudicated separately, and potentially before different adjudicators even when the claims are interrelated and even when minor children may not be in a position to explain the claim at all or as sufficiently as a parent. In addition to being unjust to the affected family members, this approach would result in gross inefficiencies, which should be avoided in a system that already contains a significant backlog of pending cases.[55]

## V.    The Proposed Rules will result in "mini-trials" in immigration court, undermine judicial efficiency and result in racially-biased decision-making

In two significant ways, the Proposed Rules require immigration adjudicators to engage in decision-making to determine whether an asylum applicant's conduct—considered independently of any criminal court adjudication—triggers a categorical bar to asylum eligibility. First, the agencies propose that immigration adjudicators be allowed to consider "all reliable evidence" to determine whether there is "reason to believe" an offense was "committed for or related to criminal gang evidence," or "in furtherance of gang-related activity, triggering ineligibility for asylum in either case.[56] Second, the Proposed Rules permit immigration adjudicators to "assess all reliable evidence in order to determine whether [a] conviction amounts to a domestic violence offense;" and to go even further by considering whether non-adjudicated *conduct* "amounts to a covered act of battery or extreme cruelty."[57]

Requiring adjudicators to make complex determinations regarding the nature and scope of a particular conviction or, in the case of the domestic violence bar, *conduct*, will lead to massive judicial inefficiencies and slanted "mini-trials" within the asylum adjudication process. The scope of the "reliable evidence" available to adjudicators in asylum cases is potentially limitless; advocates on both sides would be obligated to present fulsome arguments to make their cases about gang connections to the underlying activity or the relationship of the asylum applicant to the alleged victim. Because of the lack of robust evidentiary rules in immigration proceedings, it will be difficult if not impossible for many applicants to rebut negative evidence marshaled against them, even if false; and in other cases, asylum applicants will struggle to find evidence connected to events that may have happened years prior (especially for those detained). Asylum trials, which are typically three or fewer hours under current policies, would provide insufficient time to fully present arguments on both sides of these unwieldy issues.

---

[55] See, e.g., Marissa Esthimer, "Crisis in the Courts: Is the Backlogged U.S. Immigration Court System at Its Breaking Point?," *Migration Policy Institute*, October 3, 2019, https://bit.ly/2sJuEWR.

[56] *See* Proposed Rules at 69649.

[57] *See* Proposed Rules at 69652.

AR.09532

As the immigration courts contend with backlogs that now exceed one million cases,[58] tasking adjudicators with a highly nuanced, resource-intensive assessment of the connection of a conviction to gang activity and/or the domestic nature of alleged criminal conduct—assessments far outside their areas of expertise—will prolong asylum proceedings and invariably lead to erroneous determinations that will give rise to an increase in appeals. The Proposed Rules repeatedly cite increased efficiency as justification for many of the proposed changes.[59] Yet requiring adjudicators to engage in mini-trials to determine the applicability of categorical criminal bars, rather than relying on adjudications obtained through the criminal legal system, will dramatically *decrease* efficiency in the asylum adjudication process.

Indeed, the Supreme Court has "long deemed undesirable" exactly the type of "post hoc investigation into the facts of predicate offenses" proposed by the agencies here.[60] Instead, for more than a century the federal courts have repeatedly embraced the "categorical approach" to determine the immigration consequence(s) of a criminal offense, wherein the immigration adjudicator relies on the statute of conviction as adjudicated by the criminal court system, without relitigating the nature or circumstances of the offense in immigration court.[61] As the Supreme Court has explained, this approach "promotes judicial and administrative efficiency by precluding the relitigation of past convictions in minitrials conducted long after the fact."[62] In *Moncrieffe v. Holder*, the Court forearmed of exactly the sort of harm that would arise from these Proposed Rules; in that case, the Court rejected the government's proposal that immigration adjudicators determine the nature and amount of remuneration involved in a marijuana-related conviction, noting that "our Nation's overburdened immigration courts" would end up weighing evidence "from, for example, the friend of a noncitizen" or the "local police officer who recalls to the contrary," with the end result a disparity of outcomes depending on the whims of the individual immigration judge and a further burdened court system.[63]

Particularly in the context of the new proposed bar related to alleged gang affiliation, The Maryland Carey Immigration Clinic is concerned that creating a blanket exclusion for anyone who is convicted of a crime – including a misdemeanor – that an immigration adjudicator deems linked to gang activity will erroneously prevent bona fide asylum seekers from receiving

---

[58] Marissa Esthimer, "Crisis in the Courts: Is the Backlogged U.S. Immigration Court System at Its Breaking Point?," *Migration Policy Institute*, October 3, 2019, https://www.migrationpolicy.org/article/backlogged-us-immigration-courts-breaking-point.

[59] *See* Proposed Rules at 69646, 69656-8.

[60] *Moncrieffe v. Holder*, 569 U.S. 184, 186 (2013).

[61] *See Moncrieffe*, 569 U.S. at 191 ("This categorical approach has a long pedigree in our Nation's immigration law."). For a more fulsome history of the development of the categorical approach in immigration court, *see* Alina Das, "The Immigration Penalties of Criminal Convictions: Resurrecting Categorical Analysis in Immigration Law," *New York University Law Review* 86, no. 6 (2011): 1689 - 1702, https://www.nyulawreview.org/wp-content/uploads/2018/08/NYULawReview-86-6-Das.pdf.

[62] *Moncrieffe*, 569 U.S. at 200-201.

[63] *Id.* at 201.

protection. This rule confers on immigration adjudicators—who generally are not criminologists, sociologists, or criminal law experts—the responsibility to determine if there is "reason to believe" any conviction flows from activity taken in furtherance of gang activity. This rule will necessarily ensnare asylum seekers of color who have experienced racial profiling and a criminal legal system fraught with structural challenges and incentives to plead guilty to some crimes, particularly misdemeanors. These same individuals are vulnerable to being erroneously entered into gang databases. Such databases are notoriously inaccurate, outdated, and infected by racial bias.[64]

Indeed, asylum applicants are *already* frequently subjected to wrongful denials of protection because of allegations of gang activity made by the Department of Homeland Security on the basis of information found in notoriously unreliable foreign databases and "fusion" intelligence-gathering centers outside the United States. Empowering immigration adjudicators to render asylum applicants *categorically* excluded from protection on the basis of such spurious allegations will inevitably result in the return of many refugees back to harm.[65]

The Departments curiously argue that all gang-related offenses should be construed as "particularly serious crimes."[66] They cite statistics from up to 16 years ago in an attempt to make the point that gang members commit violent crimes and drug crimes. They then make the illogical leap to the conclusion that *all crimes*—including misdemeanor property crimes—that may be construed as connected to gang activity are particularly serious. This simply does not follow; in fact, the Proposed Rules will inevitably result in the exclusion from protection of asylum seekers of color who live in economically distressed communities and have obtained a minor conviction such as a property crime. Relying on the definition of "particularly serious crime" to prevent asylum seekers convicted of even minor crimes construed as gang-related from accessing asylum protection is disingenuous at best, and tinged with racial animus at worst.

The Departments asks for comments on: (1) what should be considered a sufficient link between an asylum seeker's underlying conviction and the gang related activity in order to trigger the application of the proposed bar, and (2) any other regulatory approaches to defining the type of gang-related activities that should render individuals ineligible for asylum. The premise of these questions is wrong: a vague "gang related" bar should not be introduced at all.

---

[64] Annie Sweeney and Madeline Buckley, "Chicago police gang data collection faulted by city's inspector general as unchecked and unreliable," *Chicago Tribune*, April 11, 2019, https://www.chicagotribune.com/news/breaking/ct-met-chicago-police-gang-data-04112019-story.html; Anita Chabria, "A routine police stop landed him on California's gang database. Is it racial profiling?," *Los Angeles Times*, May 9, 2019, https://www.latimes.com/politics/la-pol-ca-california-gang-database-calgang-criminal-justice-reform-20190509-story.html.

[65] Melissa del Bosque, "Immigration Officials Use Secretive Gang Databases to Deny Migrant Asylum Claims," *Pro Publica*, July 8, 2019, https://www.propublica.org/article/immigration-officials-use-secretive-gang-databases-to-deny-migrant-asylum-claims.

[66] Proposed Rules at p. 69650.

The Immigration and Nationality Act and existing regulations already provide overly broad bars to asylum where criminal behavior by an asylum seeker causes concern by an adjudicator. Adding this additional, superfluous layer of complication risks erroneously excluding bona fide asylum seekers from protection without adding any useful adjudicatory tool to the process.

## VI. The proposed definition of "conviction" and "sentence" for the purposes of the new bars further excludes those in need of protection

The section of the Proposed Rules that outlines a new set of criteria for determining whether a conviction or sentence is valid for the purpose of determining asylum eligibility is an ultra vires exercise of authority that is not authorized by the Immigration and Nationality Act. The Proposed Rules impose an unlawful presumption against asylum eligibility for applicants who seek post-conviction relief while in removal proceedings or longer than one year after their initial convictions. They also deny full faith and credit to state court proceedings by attributing improper motives to state court actors.[67]

> *The Proposed Rules undermine Sixth Amendment protections and harms immigrants unfamiliar with the complex criminal and immigration framework governing prior convictions.*

The Proposed Rules outline a new multi-factor process asylum adjudicators must use to determine whether a conviction or sentence remains valid for the purpose of determining asylum eligibility; the proposal includes a rebuttable presumption "against the effectiveness" of an order vacating, expunging, or modifying a conviction or sentence if the order was entered into after the asylum seeker was placed in removal proceedings or if the asylum seeker moved for the order more than one year after the date the original conviction or sentence was entered.[68]

This newly created presumption unfairly penalizes asylum applicants, many of whom may not have the opportunity to seek review of their prior criminal proceedings until applying for asylum.[69] In *Padilla v. Kentucky*, the Supreme Court recognized that the immigration consequences of a conviction are sufficiently serious for the Sixth Amendment to require a noncitizen defendant to be competently advised of them before agreeing to a guilty plea.[70] By

---

[67] *See Saleh v. Gonzales*, 495 F.3d 17, 25-26 (2d Cir. 2007) (discussing 28 U.S.C. § 1738, requiring federal courts to give full faith and credit to state acts, records, and judicial proceedings and U.S. Const. art. IV, § 1, and finding that there was no violation where the Board of Immigration Appeals stopped short of "refusing to recognize or relitigating the validity of [Saleh's] state conviction.").

[68] Proposed Rules at 69655.

[69] On page 69656 of the Proposed Rules, the Department of Homeland Security and the Department of Justice urge that "[i]t is reasonable to conclude that an alien who has a meritorious challenge to a criminal conviction based on a procedural or substantive defect is more likely to seek post-conviction relief sooner than an alien who is seeking relief on rehabilitative grounds…"

[70] *Padilla v. Kentucky*, 559 U.S. 356 (2010).

imposing a presumption against the validity of a withdrawal or vacatur of a plea, the Proposed Rules hold asylum seekers whose rights were violated under *Padilla* to a different standard; even though they too were denied effective assistance of counsel in the course of their underlying criminal proceedings, asylum seekers will be forced to rebut a presumption that their court-ordered withdrawal or vacatur is invalid. The Proposed Rules therefore compound the harm to immigrants who, in addition to facing persecution in their home countries, have been denied constitutionally compliant process in the United States criminal legal system.

Many asylum applicants, especially those in vulnerable populations isolated from resources and unfamiliar with the due process protections available to them in the United States, may not have discovered the defects in their underlying criminal proceedings until their consultation with an immigration attorney, or until they are placed into removal proceedings, which may happen several years after a conviction. Imposing a presumption *against* the validity of a plea withdrawal or vacatur in these cases will undoubtedly lead to the wrongful exclusion of countless immigrants from asylum simply because they were unable to adequately rebut the presumption, particularly in a complex immigration court setting without the benefit of appointed counsel.

*The Proposed Rules violate the full faith, and credit to which state court decisions are entitled.*

The Proposed Rules further improperly authorize immigration adjudicators to second-guess the decision of a state court, even where the order on its face cites substantive and procedural defects in the underlying proceeding. The proffered justification for this presumption against the validity of post-conviction relief is to "ensure that aliens do not have their convictions vacated or modified for purported rehabilitative purposes that are, in fact, for immigration purposes," "to codify the principle set forth in *Matter of Thomas and Thompson*," and to bring the analysis of post-conviction orders in line with *Matter of Pickering*.[71] The agencies misread the applicable law, however, by authorizing adjudicators to disregard otherwise valid state orders. The immigration law only requires that to be effective for immigration purposes, orders vacating or modifying convictions must be based on substantive or procedural infirmities in the underlying proceedings. The Proposed Rule goes well beyond that requirement.

The Proposed Rules abandon the presumption of regularity that should accompany state court orders, thus upending settled principles of law. The Proposed Rules cite a misleading quote from *Matter of F-* in support of allowing asylum adjudicators to look beyond the face of a state court order; had the Rules' authors looked to the full case, they would have read the following:

---

[71] Proposed Rules at 69655-56 (*citing Matter of Thomas and Thompson*, 27 I.&N. Dec. 674 (A.G. 2019) and *Matter of Pickering*, 23 I.&N. Dec. 621 (BIA 2003), *rev'd on other grounds by Pickering v. Gonzales*, 465 F.3d 263, 267-70 (6th Cir. 2006)).

"Not only the full faith and credit clause of the Federal Constitution, but familiar principles of law require the acceptance at face value of a judgment regularly granted by a competent court, unless a fatal defect is evident upon the judgment's face. However, the presumption of regularity and of jurisdiction may be overcome by extrinsic evidence or by the record itself."[72] In *Matter of F-*, the Board of Immigration Appeals offers support for the proposition that an adjudicator should presume the validity of a state court order unless there is a reason to doubt it, contrary to the *presumption of irregularity* put forward in the Proposed Rules.

The authority extended to adjudicators by the Proposed Rules also violates the law of multiple circuits, including *Pickering*, on which it relies.[73] In *Pickering v. Gonzales*, the Sixth Circuit Court of Appeals held that despite the petitioner's stated motive of avoiding negative immigration consequences, the Board of Immigration Appeals was limited to reviewing the authority of the court issuing the order as to the basis for his vacatur.[74] Similarly, in *Reyes-Torres* the Ninth Circuit Court of Appeals held that the motive of the respondent was not the relevant inquiry.[75] Rather, "the inquiry must focus on the state court's rationale for vacating the conviction."[76] In addition, the Third Circuit Court of Appeals in *Rodriguez v. U.S. Att'y Gen.*, which the Proposed Rules cite as "existing precedent," held that the adjudicator must look only to the "reasons explicitly stated in the record and may not impute an unexpressed motive for vacating a conviction."[77] Moreover, the *Rodriguez* court stated that to determine the purpose of a vacatur, the adjudicator must first look to the face of the order vacating the conviction, and "if the order explains the courts reasons … the [adjudicator's] inquiry must end there."[78] The Proposed Rules contain no such limiting language to guide the adjudicator's inquiry. Instead, the Rules grant adjudicators vague and indefinite authority to look beyond even a facially valid vacatur. Such breadth of authority undermines asylum seekers' rights to a full and fair proceeding.

> *The Proposed Rules wrongly extend* Matter of Thomas and Thompson *to all forms of post-conviction relief and impose an ultra vires and unnecessary burden on asylum seekers.*

---

[72] *Matter of F-*, 8 I.&N. Dec. 251, 253 (BIA 1959).

[73] *See id.* (*citing Matter of Pickering*, 23 I.&N. Dec. 621).

[74] *Pickering v. Gonzales*, 465 F.3d 263, 267-70 (6th Cir. 2006).

[75] *Reyes-Torres v. Holder*, 645 F.3d 1073, 1077-78 (9th Cir. 2011) (*citing Cardoso-Tlaseca v, Gonzales*, 460 F.3d 1102, 1107 n.3 (9th Cir. 2006) and *Pickering v. Gonzales*, 454 F.3d 525 (6th Cir. 2006), *amended and superseded* by *Pickering*, 465 F.3d at 263.

[76] *Id.*

[77] *Rodriguez v. U.S. Att'y Gen.*, 844 F.3d 392, 397 (3d Cir. 2006) (noting that "[T]he IJ may rely only on reasons explicitly stated in the record and may not impute an unexpressed motive for vacating a conviction.").

[78] *Id.* ("Put simply, '[w]e will not . . . permit[ ] . . . speculation . . . about the secret motives of state judges and prosecutors,'" *quoting Pinho v. Gonzales*, 432 F.3d 193, 214-215 (3d Cir. 2005)).

AR.09537

Finally, the above-described presumption is ultra vires and unnecessary. As an initial matter, the Proposed Rules' reliance on *Matter of Thomas and Thompson* is flawed. The Attorney General's decision in *Matter of Thomas and Thompson* has no justification in the text or history of the immigration statute. Nowhere does the plain text of the Immigration and Nationality Act support giving adjudicators the authority to give effect only to state court sentence modifications undertaken to rectify substantive or procedural defects in the underlying criminal proceedings. Nor does the legislative history support such a rule. The Board of Immigration Appeals recognized this in *Matter of Cota-Vargas*, where it concluded that the application of "the *Pickering* rationale to sentence modifications has no discernible basis in the language of the Act."[79] Based on the text of the Immigration and Nationality Act and the well-documented legislative history behind Congress's definition of "conviction" and "sentence" in 8 U.S.C. § 1101(a)(48), the Board determined that Congress intended to ensure that, generally, proper admissions or findings of guilt were treated as convictions for immigration purposes, even if the conviction itself was later vacated. Neither the text of the INA nor the legislative history of the definitions reveal any attempt on Congress's part to change the longstanding practice of giving effect to state court sentencing modifications. For these reasons, *Matter of Thomas and Thompson* lacks Congressional support for its rule and should not be extended.

Moreover, as applicants for immigration benefits or relief from removal, asylum seekers already bear the burden of demonstrating their eligibility for asylum.[80] The Proposed Rules do not alter or shift this burden, nor do they provide evidence supporting the need for this presumption. By introducing a presumption of bad faith into asylum adjudication, the Proposed Rules unfairly interfere with asylum seekers' efforts to establish their claims. Immigration law, and asylum law in particular, is already highly complex, and the process of seeking asylum is in many instances re-traumatizing, particularly for applicants who do not have counsel to represent them and who lacked effective counsel in their underlying criminal proceedings. The Proposed Rules as applied to asylum applicants who seek post-conviction relief transform an already difficult process into an adversarial inquiry, contrary to the intent of Congress.

## VII.   The Proposed Rules will disparately impact vulnerable populations already routinely criminalized, including LGBTQ immigrants, survivors of trafficking and domestic violence, and immigrant youth of color

The expanded criminal bars exclude from safety and a pathway to citizenship those convicted of offenses that are coincident to their flight from persecution, and do not accomplish the stated goal of making communities safer. They will disparately impact vulnerable populations, who comprise asylum seekers hailing primarily from Central America and the Global South, and those routinely criminalized because of their identities, racially disparate

---

[79] *Matter of Cota-Vargas*, 23 I.&N. Dec. 849, 852 (BIA 2005).
[80] *Matter of S-K-*, 23 I.&N. Dec. 936, 939-40 (BIA 2006).

policing practices, or in connection with experiences of trafficking and domestic violence.[81] For these populations especially, the discretion currently delegated to asylum adjudicators is crucial for them to become fully integrated in the larger community. The imposition of additional categorical bars to asylum will only further marginalize asylum seekers already struggling with trauma and discrimination.

The Proposed Rules turn asylum into a blunt instrument that would prevent the use of discretion where it is most needed and most effective. The existing framework for determining if an offense falls within the particularly serious crime bar already provides the latitude for asylum adjudicators to deny relief to anyone found to pose a danger to the community.[82] Furthermore, asylees with convictions that render them inadmissible must apply for a waiver at the time of their applications for permanent residence.[83] These measures ensure that asylum applicants in vulnerable populations have access to supportive resources and have the opportunity to demonstrate their ongoing commitment to social and personal health. Moreover, the existence of provisions allowing the revocation of asylum status ensures that adjudicators may continue to enforce concerns related to the safety of the community even after asylum is granted.[84]

> *Barring asylum for immigrants convicted of migration-related offenses punishes them for fleeing persecution and/or seeking safety for their children, and does not make communities safer.*

The expansion of the criminal bars to asylum to include offenses related to harboring, smuggling of noncitizens by parents and family members and those previously removed further criminalizes vulnerable populations fleeing persecution.[85] The vast expansion of migrant prosecutions at the border during the current administration has created administrative chaos and

---

[81] D'Vera Cohn et al., "Rise in U.S. Immigrants from El Salvador, Guatemala and Honduras Outpaces Growth from Elsewhere," *Pew Research Center*, December 7, 2017, https://www.pewresearch.org/hispanic/wp-content/uploads/sites/5/2017/12/Pew-Research-Center_Central_American-migration-to-U.S._12.7.17.pdf.

[82] Apart from the statutory aggravated felony bar to asylum, the Board of Immigration Appeals and Attorney General have historically utilized a highly circumstantial approach to the particular serious crime determination that would bar an immigrant from receiving asylum. *See e.g., Matter of Juarez*, 19 I.&N. Dec. 664 (BIA 1988) (ordinarily a single misdemeanor that is not an aggravated felony will not be a particularly serious crime); *Matter of Frentescu*, 18 I.&N. Dec. 244 (BIA 1982), *modified* (setting forth several factors to be considered before imposing the particular serious crime bar, including: (i) the nature of the conviction, (ii) the circumstances and underlying facts for the conviction, (iii) the type of sentence imposed, and (iv) whether the type and circumstances of the crime indicate that the individual will be a danger to the community); *Matter of Y-L-, A-G-, R-S-R-,* 23 I.&N. Dec. 270 (A.G. 2002) (setting forth a multi-factor test to determine the dangerousness of a respondent convicted of a drug-trafficking offense who is otherwise barred from asylum as an aggravated felon, but seeking withholding of removal).

[83] 8 U.S.C. § 1159(c) (2012).

[84] 8 C.F.R. § 208.24(a) (2012).

[85] On April 11, 2017, then-Attorney General Sessions instructed all federal prosecutors to increase their prioritization of immigration offenses for prosecution, including misdemeanor offenses committed by first time entrants. *See* Memorandum from the Attorney General: Renewed Commitment to Criminal Immigration Enforcement (April 11, 2017), https://www.justice.gov/opa/press-release/file/956841/download.

AR.09539

separated families that do not pose a threat to the safety of communities in the United States.[86] The Proposed Rules threaten to magnify the harm caused by these reckless policies by further compromising the ability of those seeking safety on the southern border to access the asylum system.

The Proposed Rules expand the asylum bar to parents or other caregivers who are convicted of smuggling or harboring offenses after taking steps to help minor children enter the United States in order to flee persecution. This proposed bar is particularly insidious in light of now-public documents revealing this administration's explicit efforts to utilize smuggling prosecutions against parents and caregivers as part of its strategy of deterring families from seeking asylum in the United States.[87] The Proposed Rules seek to take this widely condemned strategy one step further, by additionally barring those parents *already prosecuted* from obtaining asylum protections for themselves and their children. The Proposed Rules multiply the harms parents and caregivers have experienced in their treacherous journeys to safety and callously penalize parents for doing what is only human—taking all necessary steps to protect their children.

The Proposed Rules also expand the asylum bar to those who have fled persecution multiple times and therefore been convicted of illegal reentry. Their inclusion is premised on conclusory statements regarding the dangerousness of recidivist offenders, without consideration of the seriousness of prior convictions.[88] Rather, the Proposed Rules treat all immigration violations as similar in seriousness to those previously warranting inclusion in the particularly serious crime bar, without any independent evidence to justify the expansion. Such an approach renders meaningless the limiting language of "particularly serious" in the statute.

The Proposed Rules also conflate multiple entries by noncitizens having prior removal orders with those who have entered multiple times without ever having their asylum claims heard. Many immigrants who have previously attempted entry to the United States to flee persecution could not have been aware of the complex statutory regime that governs asylum claims and would not have knowingly abandoned their right to apply for asylum. Some asylum seekers have also been wrongly assessed in prior credible fear interviews. And others yet may have previously entered or attempted to enter the United States before the onset of circumstances giving rise to their fear. Preserving discretion to grant asylum in these circumstances allows meritorious asylum seekers to be heard and corrects errors that might have previously occurred.

---

[86] *Id.*; Richard Marosi, "The aggressive prosecution of border crossers is straining the courts. Will zero tolerance make it worse?," *Los Angeles Times*, May 11, 2018, https://www.latimes.com/local/california/la-me-ln-immigrant-prosecutions-20180511-story.html.

[87] Ryan Devereaux, "Documents Detail ICE Campaign to Prosecute Migrant Parents as Smugglers," *The Intercept*, April 29, 2019, https://theintercept.com/2019/04/29/ice-documents-prosecute-migrant-parents-smugglers/ (describing how in May 2017, the Department of Homeland Security set out to target parents and family members of unaccompanied minors for prosecution).

[88] Proposed Rules at 69648.

*Extending the criminal bars to immigrants convicted of misdemeanor document fraud unfairly punishes low-wage immigrant workers and does not make communities safer.*

The Proposed Rules expand the asylum bar to include any asylum seeker who has been convicted of a misdemeanor offense for use of a fraudulent document. In so doing, the Rule entirely ignores the migration-related circumstances that often give rise to convictions involving document fraud. Migrants fleeing persecution often leave their home countries with nothing but the clothes on their backs and must rely on informal networks to navigate their new circumstances.[89] Extension of a blanket bar to asylum seekers who are compelled to resort to fraudulent means to enter the United States, or to remain safely during their applications for asylum, upends decades of settled law directing that violations of law arising from an asylum applicant's manner of flight should constitute only one of many factors to be consulted in the exercise of discretion.[90]

Moreover, migrants in vulnerable communities who are struggling to survive during the pendency of their asylum proceedings are often exploited by unscrupulous intermediaries who offer assurances and documentation that turn out to be fraudulent.[91] Many noncitizens working in the low-wage economy face egregious workplace dangers and discrimination and suffer retaliation for asserting their rights.[92] The continued availability of asylum to low-wage immigrant workers can encourage them to step out of the shadows. The expansion of criminal asylum bars to sweep in all document fraud offenses, on the other hand, would unfairly prejudice immigrants with meritorious asylum claims and force them deeper into the dangerous informal economy.

*The Proposed Rules will harm communities with overlapping vulnerabilities, including LGBTQ asylum seekers, survivors of trafficking, and survivors of domestic violence.*

The Proposed Rules exclude from asylum protections countless members of vulnerable communities who have experienced trauma, abuse, coercion, and trafficking. Many of these individuals may only become aware of their ability to apply for asylum after law enforcement encounters that lead them to service providers who can educate them about their immigration

---

[89] *See Pula*, 19 I.&N. Dec. at 474.
[90] *Id.*
[91] See American Bar Association, "About Notario Fraud," July 19, 2018, https://www.americanbar.org/groups/public_interest/immigration/projects_initiatives/fight-notario-fraud/about_notario_fraud/.
[92] Paul Harris, "Undocumented workers' grim reality: speak out on abuse and risk deportation," *The Guardian*, March 28, 2013, https://www.theguardian.com/world/2013/mar/28/undocumented-migrants-worker-abuse-deportation.

options. Despite the unique difficulties they face, the Proposed Rules would compound their harm and prevent them from achieving family unification and a pathway to citizenship.

The Proposed Rules pose a unique threat to LGBTQ immigrant community members. LGBTQ immigrants in particular may have already experienced a high degree of violence and disenfranchisement from economic and political life in their home countries.[93] Hate violence towards undocumented LGBTQ immigrants in the United States is already disproportionately higher than for other members of the LGBTQ population.[94] Members of these communities also experience isolation from their kinship and national networks following their migration. This isolation, compounded by the continuing discrimination towards the LGBTQ population at large, leave many in the LGBTQ immigrant community vulnerable to trafficking, domestic violence, and substance abuse, in addition to discriminatory policing practices. The expansion of criminal enforcement and prosecution of undocumented people also harms the LGBTQ immigrant community.[95] The Proposed Rules will therefore have a disparate impact on LGBTQ individuals whose involvement in the criminal legal system is often connected to past trauma and/or the result of biased policing.

The Maryland Carey Immigration Clinic has represented and continues to represent numerous members of the LGBTQ community, and nearly every single one of these proposed changes to the bars would adversely affect these clients.

The expansion of asylum bars to include various misdemeanor offenses that were not previously considered particularly serious also unfairly sweeps trafficking survivors into its dragnet. It is becoming more widely recognized across state court systems that trafficking survivors frequently come into contact with intervention resources and service providers only after contact with law enforcement occurs. Innovative criminal justice reform efforts currently being adopted across the country include special trafficking courts that recognize the need for discretion in the determination of criminal culpability.[96] The same approach should be employed in the determination of asylum eligibility, where the applicant's life and safety are on the line.

---

[93] *See* Aengus Carroll and Lucas Ramon Mendos, *State Sponsored Homophobia: A World Survey of Sexual Orientation Laws: Criminalisation, Protection and Recognition* 12th Ed. (International Lesbian, Gay, Bisexual, Transgender, and Intersex Association (ILGA), 2017), https://ilga.org/downloads/2017/ILGA_State_Sponsored_Homophobia_2017_WEB.pdf.

[94] *See* Sharita Gruberg, "LGBTQ Undocumented Immigrants Face an Increased Risk of Hate Violence," *Center for American Progress*, June 10, 2014, https://www.americanprogress.org/issues/immigration/news/2014/06/10/91233/lgbt-undocumented-immigrants-face-an-increased-risk-of-hate-violence/.

[95] *See eg.,* Sharita Gruberg, "How Police Entanglement with Immigration Enforcement Puts LGBTQ Lives at Risk," *Center for American Progress*, April 12, 2017, https://www.americanprogress.org/issues/lgbtq-rights/reports/2017/04/12/430325/police-entanglement-immigration-enforcement-puts-lgbtq-lives-risk/.

[96] Elise White, et al., "Navigating Force and Choice: Experiences in the New York City Sex Trade and the Criminal Justice System's Response," *Center for Court Innovation*, December 2017 (noting that 78% of participants in the report's study had been arrested, mostly for non-violent, non-prostitution offenses such as *drug possession*).

AR.09542

The Proposed Rules instead preclude asylum adjudicators from conducting a trauma-centered approach, categorically barring countless trafficking survivors convicted of misdemeanor and felony offenses without any opportunity to present the specific circumstances of their claim.

Survivors of domestic violence include trafficking survivors and LGBTQ community members, such that inclusion of offenses related to domestic violence in the expanded asylum bars affects populations with overlapping vulnerabilities.[97] The Proposed Rules too broadly categorize domestic violence offenses as particularly serious and sweep both offenders and survivors into their dragnet. The immigration laws extend protections to domestic violence survivors outside of the asylum context, recognizing the complex dynamics surrounding intimate partner violence. Provisions in the Violence Against Women Act allow adjudicators evaluating claims for relief arising thereunder to exercise discretion based on a number of factors and circumstances.[98]  The blunt approach adopted by the Proposed Rules is inconsistent with the approach taken towards survivors elsewhere in the federal immigration statute and does not rely on any evidence-based justification for treating asylum seekers differently.

Moreover, the domestic violence sections of the Proposed Rules include the only categorical bar to asylum for which a conviction is not required. Domestic violence incidents all too often involve the arrest of both the primary perpetrator of abuse and the survivor.[99] These "cross-arrests" do not always yield clear determinations of victim and perpetrator. Authorizing asylum adjudicators to determine the primary perpetrator of domestic assault, in the absence of a judicial determination, unfairly prejudices survivors who are wrongly arrested in the course of police intervention to domestic disturbances.

---

[97] Marty Schladen, "ICE Agents Detain Alleged Domestic Violence Victim," *El Paso Times*, February 16, 2017, https://www.elpasotimes.com/story/news/2017/02/15/ice-detains-domestic-violence-victim-court/97965624/ (noting that the immigrant detained, a transgender person previously deported following her conviction for crimes such as posession of stolen mail and assault, was then living at the Center Againts Sexual and Family Violence, a shelter for survivors of intimate partner violence).

[98] Nadine Shaanta Murshid and Elizabeth A. Bowen, "A Trauma-Informed Analysis of the Violence Against Women Act's Provisions for Undocumented Immigrant Women," *Violence Against Women* 24(13) (2018): 1540–1556, https://doi.org/10.1177/1077801217741991.

[99] David Hirschel, et al., "Domestic Violence and Mandatory Arrest Laws: To What Extent Do They Influence Police Arrest Decisions," *Journal of Criminal Law & Criminology* 98, no. 1 (2007-2008): 255, https://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?article=7284&context=jclc (noting that "[i]n some cases, dual arrests may be the result of legislation, department policies, or both failing to require officers to identify the primary aggressor. In addition, when such provisions are present, police may lack the training or information needed to identify the primary aggressor when responding to a domestic violence assault. This situation may be compounded by batterers who have become increasingly adept at manipulating the criminal justice system, and may make efforts to 'pre-empt' victims from notifying police in order to further control or retaliate against them.").

AR.09543

Finally, the exemption for asylum applicants who can demonstrate their eligibility for a waiver under section 237(a)(7)(A) of the Immigration and Nationality Act does not cure the harm to asylum seekers caused by imposition of a categorical domestic violence related bar.[100] Rather, it converts a non-adversarial asylum proceeding into a multi-factor, highly specific inquiry into culpability based on circumstances that may be very difficult for an asylum seeker to prove—especially if proceeding without counsel and with limited English proficiency.

> *Barring asylum for immigrants convicted of "gang-related crimes" based on unreliable evidence and racially disparate policing practices is harmful to youth of color and does not make communities safer.*

In recent years, the expansion of gang databases for use in the apprehension and removal of foreign nationals—including children—has generated tremendous concern among advocates and the communities they serve.[101] The use of gang databases by local law enforcement and Immigration and Customs Enforcement has been widely criticized as an overbroad, unreliable and often biased measure of gang membership and involvement.[102] The Proposed Rules expand the criminal bars to asylum to those accused of gang involvement in the commission of minor criminal offenses, embracing an open-ended adjudicative process that will inevitably result in asylum adjudicators relying unfairly on these discredited methods of gang identification. This outcome would compound the disparate racial impact of inclusion in gang databases and bar asylum seekers who are themselves fleeing violence from gangs in their home countries.[103]

Past legislative efforts to expand the grounds of removal and inadmissibility in the Immigration and Nationality Act to include gang membership have failed to pass both houses of Congress.[104] In addition, immigration adjudicators already routinely premise discretionary denials of relief or release on bond on purported gang membership, and scores of alleged gang members have already been deported on grounds related to immigration violations or criminal

---

[100] 8 U.S.C. § 1227(a)(7)(A).

[101] *See* Nermeen Arastu, et al., "Swept Up In The Sweep: The Impact of Gang Allegations on Immigrant New Yorkers," *New York Immigration Coalition (NYIC) and CUNY School of Law's Immigrant and Non-citizen Rights Clinic*, May 2018, https://www.law.cuny.edu/wp-content/uploads/page-assets/academics/clinics/immigration/SweptUp_Report_Final-1.pdf.

[102] Ali Winston, "Marked for Life: U.S. Government Using Gang Databases to Deport Undocumented Immigrants," *The Intercept*, August 11, 2016, https://theintercept.com/2016/08/11/u-s-government-using-gang-databases-to-deport-undocumented-immigrants/.

[103] *See* Jonanthan Blitzer, "How Gang Victims Are Labeled As Gang Suspects," *The New Yorker*, January 23, 2018, https://www.newyorker.com/news/news-desk/how-gang-victims-are-labelled-as-gang-suspects.

[104] *See* Jessica Chacon, "Whose Community Shield?: Examining the Removal of the 'Criminal Street Gang Member,'" *University of Chicago Legal Forum* 317 (2007: 333-336) (reviewing legislative history of failed efforts to expand removability of those accused of gang related offenses and noting criticism that "[t]he only legal effect of the proposed legislation would be to increase the number of noncitizens lawfully present who would be subject to removal on the basis of their purported associations with individuals involved in group criminal activity.").

AR.09544

convictions for which no relief is available.[105] Creating a "gang-related crime" bar will only exacerbate the due process violations already occurring as the result of unsubstantiated information about supposed gang ties.[106]

      In addition, by focusing on "reason to believe" as the basis for the bar, rather than the seriousness of the crime, the proposed provision is ultra vires and unconscionably limits the eligibility for asylum of those most in need of protection. The effect of the Proposed Rules would be to expand the number and type of convictions for which an analysis of eligibility is required, sweeping in even petty offenses that would otherwise not trigger immigration consequences. Thus, an asylum applicant convicted of simple assault without use of a weapon, a non-violent property crime, or even possession of under 30 grams of marijuana for personal use (otherwise exempted from the reach of the Proposed Rule), could trigger a bar to asylum if the adjudicator concludes she has "reason to believe" the offense was committed in furtherance of gang activity.[107] In making these determinations, asylum adjudicators would be unable to rely on uncorroborated allegations contained in arrest reports, but could nevertheless shield their decisions by relying on discretion.[108]

      The Proposed Rules thus invite extended inquiry into the character of young men of color who otherwise have meritorious asylum claims, based on information gained through racially disparate policing practices.  These rules multiply the harm to asylum seekers of color subject to racially disparate policing that results in racially disparate rates of guilty pleas to minor offenses. This same population is overrepresented in gang databases, which are notoriously inaccurate, outdated, and infected by racial bias.[109]

---

[105] For an illustration of Immigration and Customs Enforcement's propensity to make gang allegations on the basis of questionable if not fabricated evidence, and the deference to which the evidence is often granted by immigration adjudicators, *see* Mark Joseph Stern, "Bad Liars," *Slate*, May 16, 2018, https://slate.com/news-and-politics/2018/05/federal-judge-accused-ice-of-making-up-evidence-to-prove-that-dreamer-was-gang-affiliated.html.

[106] See Yvette Cabrera, "New ICE Tactic Raises Questions About Due Process," *ThinkProgress*, October 6, 2017, https://thinkprogress.org/ice-targets-gangs-6775356473a8/; Rebecca Hufstader, "Immigration Reliance On Gang Databases: Unchecked Discretion And Undesirable Consequences," 90 *New York University Law Review* 90 (2015): 671.

[107] Page 69649 of the Proposed Rules notes that the applicable standard for determining when to apply the bar on asylum seekers convicted of a crime involving criminal street gangs is "reason to believe," as used in 8 U.S.C. § 1182(a)(2)(c), and that  the asylum adjudicator may consider "all reliable evidence" in making their decision.

[108] *See Garces v. U.S. A.G.*, 611 F.3d 1337, 1349-50 (11th Cir 2010) (reversing finding of "reason to believe" that the respondent was a participant in drug trafficking based on unsubstantiated arrest reports); *Matter of Rico*, 16 I.&N. Dec. 181, 185-86 (BIA 1977) (relying on pre-hearing admissions to uphold finding of inadmissibility).

[109] Annie Sweeney and Madeline Buckley, "Chicago police gang data collection faulted by city's inspector general as unchecked and unreliable," *Chicago Tribune*, April 11, 2019, https://www.chicagotribune.com/news/breaking/ct-met-chicago-police-gang-data-04112019-story.html; Anita Chabria, "A routine police stop landed him on California's gang database. Is it racial profiling?," *Los Angeles Times*, May 9, 2019, https://www.latimes.com/politics/la-pol-ca-california-gang-database-calgang-criminal-justice-reform-20190509-story.html.

VIII.    **The Proposed Rules are ultra vires to the federal immigration statute to the extent they purport to bar eligibility through a categorical exercise of discretion**

When Congress speaks clearly through a statute, the plain meaning of that statute governs.[110] Congress by statute permits the Attorney General to designate certain categories of offenses as "particularly serious crimes."[111] As such, Congress *explicitly* permitted the Attorney General to designate a non-aggravated felony to be a particularly serious crime and thus to disqualify a person from asylum. In the context of asylum, all aggravated felonies are *per se* particularly serious crimes and the Attorney General "may designate by regulation [other] offenses that will be considered to be" a particularly serious crime for purposes of asylum.[112]

Here, however—seemingly in an attempt to insulate the Proposed Rules from review, the agencies attempt to designate new bars to asylum both by designating them as "particularly serious crimes" pursuant to 8 U.S.C. § 1158(b)(2)(B)(ii) and rendering them categorically exempt from a positive discretionary adjudication of asylum pursuant to 8 U.S.C. § 1158(b)(2)(C). This effort is unlawful. Section 1158(b)(2)(B)(ii) does permit the Attorney General to, if he wishes, attempt to designate some classes of offenses as particularly serious crimes; such designations are reviewable for legal error (and as explained above, the commenters believe these expansions are unlawful).[113] However, if the offense is not a particularly serious crime, then a discretionary decision must be rendered on the application. It is true that the Attorney General may also provide for "additional limitations and conditions" on asylum applications so long as they are "consistent" with the with the asylum statute.[114] In this case, however, the Proposed Rules add sweeping categories of offenses that automatically remove an applicant from the consideration of discretion—a regulatory proposal that is ultra vires to the plain text of the statute.

To the extent that the proposed rules would adopt a bar to asylum based on a categorical discretionary bar, rather than a particularly serious crime designation, they are similar to the rules struck down by numerous Circuit Courts of Appeal in the context of adjustment of status for those considered by law to be "arriving aliens." Purporting to exercise discretion categorically, then-Attorney General Reno putatively rendered that class of noncitizens ineligible for adjustment of status, a determination that is ordinarily discretionary, even though the statute seemed to allow eligibility. Multiple Circuit Courts of Appeal struck down the proposed regulations, finding them to reflect an impermissible reading of the statute in light of the fact that

---

[110] See, *e.g.*, *Robinson* v. *Shell Oil Co.*, 519 U.S. 337, 340 (1997).

[111] 8 U.S.C. § 1158(b)(2)(B)(ii).

[112] *Id.* The Attorney General has not designated "substantial battery" to be a particularly serious crime for any purpose, including for purposes of ineligibility to seek asylum.

[113] 8 U.S.C. § 1252(a)(2)(D).

[114] 8 U.S.C. § 1158(b)(2)(C); *see also* 8 U.S.C. § 1158(d)(5)(B).

AR.09546

Congress carefully defined in the statute the categories of people eligible to apply for adjustment of status.[115]

The same logic applies here. In the asylum statute, Congress explicitly made the commission of a particularly serious crime a bar to asylum. The canon of interpretation known as *expressio unius est exclusio alterius* instructs that,"expressing one item of [an] associated group or series excludes another left unmentioned."[116] The Proposed Rules attempt to create numerous categories of discretionary "pseudo-particularly serious crimes," barring asylum through a categorical exercise of discretion even if those offenses are ultimately found not to be particularly serious crimes. Such an effort violates this canon of interpretation, and places the Proposes Rules ultra vires to the statute.

## IX.    Conclusion

The Maryland Carey Immigration Clinic has been representing asylum seekers for decades, with a specialty of complicated cases, including cases in which our clients accused of being subject to a bar to asylum eligibility.  As the director of the Clinic for the last sixteen years, I have seen that it is often the very vulnerability of these asylum seekers that puts them in a position of potentially being barred and that requires us to view their situation in the totality of the circumstances.  Viewed in the full human reality of the persecution they have suffered, these individuals are not only eligible for, but also fully deserving of the protection of asylum.  Furthermore, once they achieve a position of safety in the United States, they go on to become valuable, contributing members of our communities.

This targeting for exclusion violates the international obligations of the United States to protect vulnerable people.  These obligations include limited exceptions for individuals who have engaged in serious criminal activity or activity that creates a genuine danger to the receiving society, but the proposed additional bars to asylum go far beyond the limited exceptions allowed by the terms of the treaties that create our national obligations.  To the extent that they go beyond the limited exceptions allowed by international law, they are illegal under the Immigration and Nationality Act, which was amended by the Refugee Act of 1980 specifically to bring the United

---

[115] The First and Ninth Circuits found the regulations contrary to clear statutory command. *Succar v. Ashcroft*, 394 F.3d 8, 29 (1st Cir. 2005); *Bona v. Gonzales*, 425 F.3d 663, 668-71 (9th Cir. 2005). Other courts invalidated the adjustment regulations under "Step Two" of *Chevron*. Those courts found some ambiguity in the statute, but found a per se discretionary bar not based on a permissible construction of the eligibility standards set forth in the governing statute in light of the statutory scheme and congressional intent. *Zheng v. Gonzales*, 422 F.3d 98, 116-20 (3d Cir. 2005) (invalidating regulation precluding category of people from applying to adjust status "[g]iven Congress's intent as expressed in the language, structure, and legislative history of INA section 245 [8 U.S.C. § 1255]"); *Scheerer v. United States Attorney General*, 445 F.3d 1311, 1321-22 (11th Cir. 2006). This reasoning would likewise be applicable to the proposed rule. Where Congress went through the trouble to create a comprehensive statutory scheme to define asylum eligibility, the agency cannot preempt that in the guise of discretion by creating out of whole cloth a separate set of eligibility criteria.

[116] *United States* v. *Vonn*, 535 U.S. 55, 65 (2002).

States into compliance with its international humanitarian obligations.  <u>INS v Cardoza-Fonseca</u>, 480 US 421, 436–37 (1987).

For these reasons, The Maryland Carey Immigration Clinic vehemently opposes the Proposed Rules.

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 20, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ejv-iglf
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0445
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Susan B.

---

## General Comment

I strongly oppose this proposed rule change.

I work for Causa Justa :: Just Cause (www.cjjc.org) in the Tenants' Rights Clinic in Oakland, California, and every week I help immigrants in the community defend themselves against illegal evictions, threats of harassment, and illegal rent increases after fleeing violence in their countries. These immigrants have gone on to be important members of the communities that they are now part of here. After arriving here, many of these immigrants have been unjustly singled out by our criminal justice system and this proposed rule change would put them at risk for deportation back to the violent areas that they fled.

I call upon the administration to withdraw this proposed rule change.

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 20, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ejv-64a1
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0446
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Jill Smith

---

## General Comment

Hello,

The procedures for Asylum and Bars to Asylum Eligibility amendments made on December 19, 2019 do not allow almost anyone coming to America to seek asylum. For example, the rules describe that a family member or members bringing his or her child/children to America to seek asylum actually would be committing a crime and thus would be unable to seek asylum because they would be considered criminals. It literally makes the act of seeking asylum in the traditional way a crime and this is preposterous and provides no due process to asylum seekers.

I do not see how anyone desperate to come to America would "get the memo" and know not to cross the border. These amendments make just about everyone seeking asylum criminals and therefore these desperate people would not be considered for asylum.

Bring these amendments to the American people before enacting them.

Please do not consider these amendments.

Thank you for your time that you took to read my concerns.

Sincerely, Jill Smith (Member of Esther of the Fox Valley)

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 20, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ejv-13pk
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0447
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Rebecca Hom

---

## General Comment

I am strongly opposed to this new proposed rule.
My own ancestors were once deemed unacceptable to this country through the Chinese Exclusion Act. While this rule change does not name a specific ethnicity/group, the intention in the same.
People and families that are seeking asylum are not coming to the United States to have an easy experience. They are coming to a country where they may not know the language and the government is letting them know they are seen as less than full human. This proposed law would add racial profiling to this system. This is not due process, and will push people towards deportation once they are allowed into the country.
Once again I want to re-iterate that I strongly oppose this new proposed rule.

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 20, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ejv-n4za
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0448
Comment on FR Doc # 2019-27055

---

# Submitter Information

**Name:** Jeffrey Harrison
**Address:**
   6835 Damsel Ct
   Greenbelt, MD, 20770
**Email:** Jeff6836@gmail.com
**Phone:** 240-604-4475

---

# General Comment

Re: Docket ID EOIR-2019-0005-0001, FR 2019-27055

For the reasons below, I strongly oppose the proposed U.S. rules barring asylum seekers.

-Our country's widely-held values require the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution.

-Asylum seekers already regularly experience injustice, human-rights abuses, inhumane conditions, assault, rape, murder, and kidnapping. The proposed rules would only intensify these ongoing atrocities.

-The proposed rules would exacerbate racial profiling in the asylum process. This unjust proposal would put even more people seeking asylum at risk of danger and death. This unjust proposal would remove one of the most important defenses against deportation.

-The proposed rules ignore ongoing injustice. In our country's criminal-justice systems and in those of other countries, innocent individuals regularly are accused of crimes they haven't committed. A criminal record should not disqualify an asylum seeker.

-The proposed rules ignore the power of redemption and contrition. A criminal record should not disqualify an asylum seeker.

-Our country is obligated to recognize the humanity of every person, including immigrants, and to protect our

AR.09552

neighbors from discrimination and abuse. Our country's immigration and asylum policies need to honor our country's ideals of compassion, fairness, and respect for human rights. Uphold these ideals ! Do not trample these ideals !

For those reasons, I strongly oppose the proposed U.S. rules barring asylum seekers. Please abandon the proposed rulemaking. Please honor human rights. Please stop abusing asylum seekers. Please provide more support for asylum seekers. Please give more asylum seekers their freedom in the U.S.

Jeffrey Harrison, Greenbelt, Md.

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 20, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ejw-qwfi
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0449
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Encian Pastel

---

## General Comment

To whom it may concern:

I am writing to express my opposition to the proposed rule, "Procedures for Asylum and Bars to Asylum Eligibility."

As a preschool teacher, I have witnessed the slow transformation of refugee children from quiet, worried, traumatized children to open, playful, expressive children. Having a safe place to live should be a right for everyone, not just those with light skin. The 3 year old children I work with understand the concept of fairness. The proposed rule change inserts the possibility of racial profiling into the asylum process. I don't know if the Trump administration misunderstands the concept of fairness, or understands it well, but doesn't care.

Either way, I call upon the Trump administration to withdraw this proposal.

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 20, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ejw-2gi4
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0450
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Andreana London
**Address:**
   316 Olive Avenue
   Piedmont,  CA,  94611
**Email:** annie.rose.london@gmail.com
**Phone:** 2014465931

---

## General Comment

I write to express my strong opposition to this proposed rule change. I am a concerned member of the public who believes strongly that our nation must welcome people fleeing violence, and who is strongly concerned about racial profiling in the criminal legal system. Immigrants are a vital part of my community, my neighborhood, and my state.
Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution.
U.S. law enshrines the protections of the international Refugee Convention, drafted in the wake of the horrors of World War II. Under the Refugee Act of 1980, passed with bipartisan support, anyone present or arriving in the U.S. can apply for asylum.
For asylum seekers, making it to the U.S. often means they have found safety from persecution, torture, and sometimes death. Yet asylum seekers face many unjust obstacles in the immigration system.

This proposed rule would inject racial profiling into the asylum process. This latest attack would put even more people seeking asylum at risk of danger - and death. This would in turn eviscerate one of the most important defenses community members have against deportation.
This proposed Trump rule would punish people who've already endured mistreatment and racial profiling in the criminal legal system a second time -- with deportation back to the very life-threatening situation they fled. This is profoundly immoral, makes a mockery of due process, and comes right out of Steven Miller's racist playbook. The criminal legal system in the U.S. is wracked with racial profiling and obstacles to equal justice. Our harsh immigration laws exploit these obstacles to drive mass incarceration and mass deportation of people of color.

I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.

For these reasons, I call upon the Trump administration to withdraw this proposal.

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 20, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ejw-m20x
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0451
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Suzanne Bender

## General Comment

As a child psychiatrist, I am appalled at how the government's approach to immigration has primarily become a vehicle to traumatize families and turn away those who have a legal right to asylum in this country. Our country was founded by immigrants and all those setting these rules are likely immigrants, unless they have Native American background. As an American, I am ashamed by the idea of increased regulations and restrictions for asylum seekers. I do not support this proposed rule.

AR.09557

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ekk-5yy3
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0452
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Kathryn Macaya

## General Comment

Migration is a human right! We all want a better life! We need to share this big world of ours! Love your neighbors!

# PUBLIC SUBMISSION

| |
|---|
| **As of:** January 23, 2020 |
| **Received:** January 21, 2020 |
| **Status:** Posted |
| **Posted:** January 21, 2020 |
| **Tracking No.** 1k4-9ekk-lyz4 |
| **Comments Due:** January 21, 2020 |
| **Submission Type:** API |

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0453
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Emma Winger
**Address:**
    1318 Beacon Street
    Suite 18
    Brookline,  Massachusetts,  02446
**Email:** ewinger@immcouncil.org
**Phone:** (617) 505-5375
**Organization:** American Immigration Council

## General Comment

The American Immigration Council writes in response to EOIR Docket No. 18-0002, the Executive Office for Immigration Review request for comments on the above-referenced Proposed Rules to amend regulations relating to eligibility for asylum, 84 Fed. Reg. 69,640 (Dec. 19, 2019). For the reasons detailed in the attached letter, the Department of Homeland Security and the Department of Justice should withdraw the Proposed Rules.

## Attachments

New Asylum Criminal Bars Comment.FINAL



Via Federal e-Rulemaking Portal

January 21, 2020

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, Suite 2616
Falls Church, VA 22041

Re:    Request for Comment on Procedures for Asylum and Bars to Asylum Eligibility, 84 Fed.
       Reg. 69,640 (Dec. 19, 2019)
       EOIR Docket No. 18-0002

Ms. Reid:

The American Immigration Council (the Council) writes in response to EOIR Docket No. 18-0002, the Executive Office for Immigration Review (EOIR) request for comments on the above-referenced Proposed Rules to amend regulations relating to eligibility for asylum, 84 Fed. Reg. 69,640 (Dec. 19, 2019) (hereinafter, Proposed Rules).

The Council is a nonprofit organization that strengthens America by shaping how America thinks about and acts towards immigrants and immigration. In addition, the Council works toward a more fair and just immigration system that opens its doors to those in need of protection and unleashes the energy and skills that immigrants bring. The Council envisions an America that values fairness and justice for immigrants and advances a prosperous future for all. If promulgated, the Proposed Rules would shut America's doors to many of those most in need of protection.

For the reasons detailed below, the Department of Homeland Security (DHS) and the Department of Justice (DOJ) should withdraw the Proposed Rules.

## I.    Introduction

On December 19, 2019, DHS and DOJ issued a joint set of Proposed Rules that would make three primary changes to the regulations governing asylum adjudications. The Council opposes all three changes as unlawful, unsound, and unjust policy.

The first section of the Proposed Rules adds the following seven *categorical* bars to asylum eligibility: (1) any conviction for an offense with a possible sentence of incarceration greater than one year; (2) any conviction for "smuggling or harboring" under 8 U.S.C. § 1324(a), even if the asylum seeker committed the offense for the purpose of bringing her own spouse, child or parent to safety; (3) any conviction for illegal reentry under 8 U.S.C. § 1326; (4) any conviction for an offense an adjudicator has "reason to believe . . . involv[ed] criminal street gangs," with the adjudicator empowered to look to any evidence to determine applicability; (5) any second

conviction for an offense involving driving while intoxicated or impaired; (6) any conviction *or accusation of conduct* for acts of battery involving a domestic relationship; and (7) any conviction for several newly defined categories of misdemeanor offenses, including *any* drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits.

The second section of the Proposed Rules provides a multi-factor test for immigration adjudicators to determine whether a criminal conviction or sentence is valid for the purpose of determining asylum eligibility. The third section rescinds a provision in the current regulations regarding the reconsideration of a discretionary denial of asylum.

Taken together, these proposed changes constitute an unnecessary, harsh, and unlawful gutting of the asylum protections enshrined in United States and international law. The Council opposes the entirety of the Proposed Rules and expresses grave concerns regarding the agency's continued efforts to exclude refugees from obtaining the security and stability the United States asylum system has long promised.

## II.    The Proposed Definitions of "Conviction" and "Sentence" Violate Binding Principles of Full Faith and Credit

The Proposed Rules improperly authorize immigration adjudicators to second-guess the decision of a state court vacating a conviction or sentence, even where the order on its face cites substantive and procedural defects in the underlying proceeding. The agencies misread the applicable law, however, by authorizing adjudicators to disregard otherwise valid state orders. Immigration case law only requires that to be effective for immigration purposes, orders vacating or modifying convictions must be based on substantive or procedural infirmities in the underlying proceedings.[1] Principles of full faith and credit, long a part of immigration law, forbid "look[ing] beyond the face" of a criminal court order.[2]

Since at least the post-World War II era, the Board of Immigration Appeals (Board) has recognized that state court judgments generally are not subject to collateral attack, even when the state court has erred. "Where a State court has jurisdiction of the subject matter and the person, the fact that an erroneous judgment is entered does not render the judgment void or subject to collateral attack in a Federal court."[3] In so holding, the Board has complied with Congress' command that "judicial proceedings . . . shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken."[4]

Even when the Board has compelling evidence that the state court lacked jurisdiction, the Board will generally accept a state court's assertion of jurisdiction.[5] The burden to undermine a state

---

[1] *Matter of Pickering*, 23 I. & N. Dec. 621 (BIA 2003), *rev'd on other grounds*, *Pickering v. Gonzales*, 465 F.3d 263 (6th Cir. 2006).
[2] 84 Fed. Reg. at 69,655.
[3] *Matter of J- & Y-*, 3 I. & N. Dec. 657, 659-60 (BIA 1949).
[4] 28 U.S.C. § 1738.
[5] *See Matter of F-*, 8 I. & N. Dec. 251, 253-54 (BIA 1959); *Matter of Kwan*, 11 I. & N. Dec. 205, 208-09 (BIA 1965).

court order "is a heavy one."[6] In *Matter of F-*, the beneficiary of a visa petition admitted to immigration authorities that he did not reside in Florida at the time of his divorce, a jurisdictional prerequisite to obtaining a divorce decree under Florida law.[7] The Board nevertheless gave full faith and credit to the decree, explaining that immigration officers "are not equipped to adjudicate troublesome legal questions" regarding state divorce law and so the judgment "should be accepted at face value."[8]

In a similar case, the Board accepted a state court order recognizing the petitioner and beneficiary's marriage and purporting to invalidate the beneficiary's prior marriage, even though the prior spouse was not a party to the action.[9] In rejecting a challenge to the marriage by the former Immigration and Naturalization Service (INS), the Board explained:

> Exploration of the ramifications of the legal questions presented would inevitably lead into labyrinths of jurisdiction, domicile, residence and status with no satisfactory goal and an involvement in complexities utterly foreign to the responsibilities of administrating the immigration laws. It would not appear to be sound administrative practice to expect immigration officers to pause in executing their exacting duties to embark upon the collateral inquiry as to whether state decrees were supported by proper jurisdiction and such inquiry would impede the expeditious administration of the immigration laws.[10]

"The wisest course," the Board explained, was to "accept at face value" the state court judgment.[11]

While the Attorney General has recently asserted that 28 U.S.C. § 1738 does not bind immigration agencies,[12] he did not overrule nearly half a century of Board precedent applying principles of full faith and credit to limit when adjudicators may look behind a state court judgment. Nor could he, for federal courts have refused to "endorse a test which requires speculation about, or scrutiny of, the reasons for judges' actions other than those reasons that appear on the record."[13] A state court judgment vacating a conviction or sentence must be accepted "at face value."[14] The Proposed Rules purport to authorize immigration adjudicators to "look beyond the face of the [state court] order," in contravention of this well-established case law.[15]

---

[6] *Matter of F-*, 8 I. & N. Dec. at 253.

[7] *Id.* at 252-53.

[8] *Id.* at 253-54.

[9] *Matter of Kwan*, 11 I. & N. Dec. at 208-09.

[10] *Id.* at 208.

[11] *Id.*; *see also Matter of San Juan*, 17 I. & N. Dec. 66, 68-69 (BIA 1979) (according divorce decree full faith and credit despite petitioner's admission that she did not meet any of the jurisdictional requirements for the divorce).

[12] *Matter of Thomas*, 27 I. & N. Dec. 674, 687 (AG 2019).

[13] *Pinho v. Gonzales*, 432 F.3d 193, 212 (3rd Cir. 2005); *see Rodriguez v. U.S. Att'y Gen.*, 844 F.3d 392, 397 (3d Cir. 2016) ("If the order explains the court's reasons for vacating the conviction, the [Immigration Judge]'s inquiry must end there.") (quotation omitted); *see also Reyes-Torres v. Holder*, 645 F.3d 1073, 1077–78 (9th Cir. 2011) (noncitizen's motives for seeking vacatur irrelevant when determining immigration effect of vacatur; instead, sole inquiry is the state court's rationale for vacating a conviction).

[14] *Matter of F-*, 8 I. & N. Dec. at 253-54.

[15] 84 Fed. Reg. at 69,655.

AR.09562

### III.    Asylum is an Essential Protection That Must Not Categorically Exclude People Accused or Convicted of Crimes Except in Extraordinary Circumstances

By acceding to the 1967 Protocol Relating to the Status of Refugees,[16] which binds parties to the United Nations Convention Relating to the Status of Refugees,[17] the United States is obligated to develop and interpret United States refugee law in a manner that complies with the Protocol's principle of non-refoulement (the commitment not to return refugees to a country where they will face persecution on protected grounds). The United States asylum system was first codified in statute through the Refugee Act of 1980, described by one prominent scholar as a bipartisan attempt to "reconcile our rhetoric with our law, our national immigration policy and our international treaty obligations so that we could maintain a consistent posture towards the world as a nation with a strong humanitarian tradition and a unique historic role as a haven for persons fleeing oppression."[18] The Act—among other measures designed to bring the United States domestic legal code into compliance with the provisions of the Protocol—created a "broad class" of refugees eligible for a discretionary grant of asylum.[19]

The asylum protections provided by United States and international law are sacred. Asylum provides those fleeing horrors with physical safety, a path to citizenship and security, and the opportunity to ultimately reunite with immediate family members abroad, including those who are in danger. Some see the domestic asylum system as a symbol of the United States' commitment never to repeat its failure to save thousands of Jewish refugees refused entry to the United States on the *St. Louis* and others fleeing the Holocaust.[20] Others point to the critical role that domestic asylum policy plays in serving the United States' foreign policy interests abroad.[21] For individuals seeking asylum in the United States, the stakes could not be higher—a claim denied can mean return to death or brutal persecution.[22]

The possibility of seeking alternative relief in the form of withholding of removal or protection under the Convention Against Torture (CAT) is of little comfort to asylum seekers. Even those who can meet the higher evidentiary burdens[23] to obtain withholding of removal or CAT

---

[16] United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 268.

[17] Convention Relating to the Statute of Refugees, July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 137, 150 [hereinafter Refugee Convention].

[18] Deborah Anker, *The Refugee Act of 1980: An Historical Perspective*, 5 In Defense of the Alien 89, 89-94 (1982), https://www.jstor.org/stable/23141008?read-now=1&refreqid=excelsior%3A1060953608aa0bdd30d5d506e1ff6318&seq=1#page_scan_tab_contents.

[19] *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 424 (1987).

[20] Dara Lind, *How America's Rejections of Jews Fleeing Nazi Germany Haunts Our Refugee Policy Today*, Vox (Jan. 27, 2017, 8:12 AM), https://www.vox.com/policy-and-politics/2017/1/27/14412082/refugees-history-holocaust.

[21] Council on Foreign Rel., *Independent Task Force Report No. 63: U.S. Immigration Policy* 116 (2009) (additional or dissenting view by Robert C. Bonner) ("For better or worse, the United States sets the standard for reasonable and humane treatment of migrants around the world. If the United States endorses harsh treatment of immigrants, it erodes the norms designed to protect them, and other countries will have license to do the same.").

[22] *See, e.g.*, Sarah Stillman, *When Deportation is a Death Sentence*, The New Yorker (Jan. 8, 2018), https://www.newyorker.com/magazine/2018/01/15/when-deportation-is-a-death-sentence.

[23] Withholding of removal requires the individual to demonstrate his or her "life or freedom would be threatened in that country because of her race, religion, nationality, membership in a particular social group, or political opinion." *INS v. Stevic*, 467 U.S. 407, 411 (1984) (quoting 8 U.S.C. § 1231(b)(3)). Unlike asylum, however, a person must show a "clear probability" of the threat to life or freedom if deported to his or her country of nationality. *Id.* at 413.

Comments on Proposed Rules, 84 Fed. Reg. 69,640 | **American Immigration Council** | January 2020

protection face, among other things, permanent separation from family members,[24] an inability to travel,[25] no pathway to become a permanent resident or citizen,[26] and the threat of removal to another country.[27]

Given the stakes, people accused or convicted of crimes should not be categorically barred from asylum protections. The Board has cautioned that, "in light of the unusually harsh consequences which may befall a [noncitizen] who has established a well-founded fear of persecution[,] the danger of persecution should generally outweigh all but the most egregious of adverse factors."[28]

Safeguarding asylum availability for bona fide asylum seekers is necessary to comply with the United States' obligations under international law. While the Convention allows states to exclude and/or expel potential refugees from protection in certain circumstances, those circumstances are extremely limited. The Convention authorizes states to deny refugee protection if the individual "having been convicted by a final judgement of a particularly serious crime, constitutes a danger to the community of that country."[29] However, this clause is intended for "extreme cases," in which the particularly serious crime at issue is a "capital crime or a very grave punishable act."[30] The United Nations High Commissioner for Refugees (UNHCR) has asserted that to constitute a "particularly serious crime," the crime "must belong to the gravest category" and be limited "to refugees who become an extremely serious threat to the country of asylum due to the severity of crimes perpetrated by them in the country of asylum."[31] Moreover, the UNHCR has specifically noted that the particularly serious crime bar does not encompass less extreme crimes; "[c]rimes such as petty theft or the possession for personal use of illicit narcotic substances would not meet the threshold of seriousness."[32] Finally, when determining whether an individual should be barred from protection for having been convicted of a particularly serious crime, the adjudicator must conduct an individualized analysis and consider any mitigating factors.[33]

---

The clear probability standard is more stringent than the well-founded fear standard for asylum. *Id; see also Cardoza-Fonseca*, 480 U.S. at 431 (describing the difference between a well-founded fear of persecution and a clear probability of persecution). For CAT protection, a person must show it is more likely than not that he or she will be tortured or killed by or at the government's acquiescence if removed to the country of origin. 8 C.F.R. § 1208.16(c)(2).

[24] Only asylees and refugees are eligible to petition for a spouse and children to join them as derivatives on that status. *See* 8 C.F.R. § 208.21(a).

[25] By regulation, refugee travel documents are available only to asylees. 8 C.F.R. § 223.1. And the Board requires that an individual granted withholding or CAT—unlike an individual granted asylum—simultaneously must have been ordered removed, making any international travel a "self-deportation." *See Matter of I-S- & C-S-*, 24 I. & N. Dec. 432, 434 n.3 (BIA 2008); 8 C.F.R. § 241.7.

[26] *Matter of Lam*, 18 I. & N. Dec. 15, 18 (BIA 1981); 8 C.F.R. § 245.1(d)(1) (explaining that only those in "lawful immigration status" can seek permanent residency and excluding withholding recipients from such status); 8 C.F.R. § 209.2(a)(1) (authorizing adjustment of status to permanent residence for asylees); 8 C.F.R. § 316.2 (naturalization available only to permanent residents).

[27] *See* 8 C.F.R. § 208.22; *R–S–C v. Sessions*, 869 F.3d 1176, 1180 (10th Cir. 2017).

[28] *Matter of Pula*, 19 I. & N. Dec. 467 (BIA 1987).

[29] Refugee Convention, *supra* note 17, at art. 33(2).

[30] UNHCR, *Handbook on Procedures and Criteria for Determining Refugee Status Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees*, ¶¶ 154-55, U.N. Doc. HCR/IP/Eng/REV.1 (Sept. 1979, reissued Jan. 2019).

[31] UNHCR, *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading*, ¶ 7 (July 2007), http://www.unhcr.org/enus/576d237f7.pdf.

[32] *Id*. at ¶ 10.

[33] *Id*. at ¶¶ 10-11.

AR.09564

Comments on Proposed Rules, 84 Fed. Reg. 69,640 | **American Immigration Council** | January 2020

The Proposed Rules are predicated on the assumption that, with the exception of only the most trivial criminal charges, *any* conviction (and in some cases, even a mere accusation) for a crime establishes either that a person constitutes a danger to the community or that she does not merit a favorable exercise of discretion. But there is no evidence to support that assumption, and a criminal record without more, does not, in fact, reliably predict future dangerousness.[34] It is arbitrary and capricious to presume a noncitizen's supposed danger to the community even in circumstances when a federal, state, or local judge has concluded that no danger exists by, for example, imposing a noncustodial sentence.

Similarly, the Proposed Rules fail to address or account for the fact that innocent people may agree to plead guilty to a crime to avoid the threat of a severe sentence; not only is a conviction an unreliable predictor of future danger, it can also be an unreliable indicator of past criminal conduct.[35]

The Proposed Rules unlawfully restrict an adjudicator's ability to consider the individual circumstances surrounding a conviction and fail to exempt conduct influenced by trauma, mental illness, addiction, or duress. Asylum seekers are an inherently vulnerable population because of the trauma they have experienced in their countries of origin and, often, along the journey to find safety.

In sum, the Proposed Rules violate the letter and the spirit of our international obligations and decimate the asylum system Congress put in place almost forty years ago. If promulgated, they will unlawfully deny essential asylum protections to people with well-founded fears of persecution.

## IV.    The Proposed Rules Are Unnecessary Because Current Law Already Includes Harsh Criminal Bars to Asylum and Allows for Consideration of All Criminal History

The laws, regulations, and process governing asylum adjudications already are exceedingly harsh. Asylum seekers bear the evidentiary burden of establishing their eligibility for asylum[36] in the face of a complex web of laws and regulations, without the benefit of appointed counsel and

---

[34] *See* U.S. Sent'g Comm'n, *The Effects of Aging on Recidivism Among Federal Offenders* (2017), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/2017/20171207_Recidivism-Age.pdf (noting that recidivism rates fall substantially with age); U.S. Sent'g Comm'n, *Recidivism Among Federal Violent Offenders* (2019), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/2019/20190124_Recidivism_Violence.pdf (noting that non-violent offenders recidivate at significantly lower rates); Javier Ramos & Marin Wenger, *Immigration and Recidivism: What is the Link?* Just. Q. (2019) (finding no correlation between recidivism rates and citizenship status among those formerly incarcerated for felonies in Florida prisons).

[35] John H. Blume & Rebecca K. Helm, *The Unexonerated: Factually Innocent Defendants Who Plead Guilty*, 100 Cornell L. Rev. 157 (2014), https://pdfs.semanticscholar.org/c00f/96d421adf1846d120bf802a8854b5e2c0ff2.pdf.

[36] 8 U.S.C. § 1158(b)(1)(B); 8 CFR § 1240.8(d).

AR.09565

often from a remote immigration jail.[37] The obstacles to winning asylum are exceedingly high; indeed in some parts of the country and before certain immigration judges, almost no one succeeds.[38] At present, many, if not most, individuals seeking safety at the southern border are subject to return to dangerous conditions in Mexico and an overlapping web of policies that preclude asylum eligibility for countless migrants simply because of their national origin, manner of entry, or their flight path.[39] There are consistent reports of the documented deaths and brutalities endured by those who sought, but were denied, asylum in the United States.[40]

Significantly, the bars to asylum based on allegations of criminal conduct are *already* sweeping and over-broad in nature and scope.[41] Any conviction for an offense determined to be an "aggravated felony" is considered a *per se* "particularly serious crime" and therefore a mandatory bar to asylum.[42] As the Council has reported, "aggravated felony" is a notoriously vague and broad term, which exists only in immigration law.[43] Originally limited to murder, weapons trafficking and drug trafficking,[44] it has metastasized to encompass hundreds of offenses, many of them neither a felony nor aggravated, including petty offenses such as misdemeanor shoplifting, simple misdemeanor battery, or sale of counterfeit DVDs.[45] The existing crime bars should be narrowed, not expanded. Even for those not categorically barred from relief, the immigration adjudicator maintains full discretion to deny asylum.[46]

Immigration adjudicators already have discretion to deny asylum to those who meet the refugee definition and have been convicted of criminal conduct, but must look to the specific circumstances of the offense as well as other mitigating evidence, when making that discretionary determination.[47] Further categorical bars are not needed. The agencies' efforts to

---

[37] *See* Daniel Connolly, *et al.*, *Asylum Seekers in U.S. Face Years of Waiting, Little Chance of Winning Their Cases*, USA Today (Sept. 25, 2019, 12:40 PM), https://www.usatoday.com/in-depth/news/nation/2019/09/23/immigration-court-asylum-seekers-what-to-expect/2026541001/.

[38] Manuel Roig-Franzia, *Immigrants Risk It All Seeking Asylum. The Answer is Almost Always 'No,'* Wash. Post (July 24, 2019, 6:00 AM), https://www.washingtonpost.com/lifestyle/style/migrants-risk-it-all-seeking-asylum-the-answer-in-court-is-almost-always-no/2019/07/23/9c161b2e-a3f7-11e9-b732-41a79c2551bf_story.html.

[39] American Immigration Council, *Policies Affecting Asylum Seekers at the Border: The Migrant Protection Protocols, the Asylum Transit, and Metering* (Jan. 2020), https://www.americanimmigrationcouncil.org/sites/default/files/research/policies_affecting_asylum_seekers_at_the_border.pdf.

[40] *See, e.g.,* Stillman, *Death Sentence*, *supra* note 22 (reporting on a database of more than sixty cases of individuals killed after deportation); *see also* Maria Sachetti, *'Death is Waiting for Him,'* Wash. Post (Dec. 6, 2018) https://www.washingtonpost.com/graphics/2018/local/asylum-deported-ms-13-honduras/ (telling the story of Santos Chirino, denied asylum by a Virginia immigration judge, deported, and then murdered by those he told the immigration judge he feared); Kevin Sieff, *When Death Awaits Deported Asylum Seekers*, Wash. Post (Dec. 26, 2018), https://www.washingtonpost.com/graphics/2018/world/when-death-awaits-deported-asylum-seekers/.

[41] *See* 84 Fed. Reg. at 69,641 (discussing the additional categorical bars to asylum).

[42] 8 U.S.C. § 1158(b)(2)(A)(ii), (B)(i).

[43] American Immigration Council, *Aggravated Felonies: An Overview* (Dec. 2016), https://www.americanimmigrationcouncil.org/research/aggravated-felonies-overview.

[44] Alcohol and Drug Safety Act of 1988, Pub. L. No. 100-690, § 7342, 102 Stat. 4181, 4469-70 (1988).

[45] 8 U.S.C. § 1101(a)(43); *see also* Nancy Morawetz, *Understanding the Impact of the 1996 Deportation Laws and the Limited Scope of Proposed Reforms*, 113 Harv. L. Rev. 1939, 1939-40 (2000) (criticizing the "Alice-in-Wonderland-like definition of the term 'aggravated felony'"); Melissa Cook, *Banished for Minor Crimes: The Aggravated Felony Provisions of the Immigration and Nationality Act as a Human Rights Violation*, 23 B.C. Third World L.J. 293 (2003).

[46] *See Pula*, 19 I. & N. Dec. 467.

[47] *See id.*

add *seven* new sweeping categories of barred conduct to the asylum eligibility criteria is unnecessary and unjustified.

The Proposed Rules are also arbitrary and capricious in that they would constitute a marked departure from past practice without any evidence or sound reasoning to justify the change. The agencies have proffered no evidence or data to support these changes.

## V.    The New Proposed Bars Are Extraordinarily and Unjustifiably Broad

The Proposed Rules include overbroad conviction and conduct bars that are contrary to the plain terms of the statute, which bars asylum only for those convicted of a "*particularly serious* crime."[48] The Proposed Rules suggest the increased categorization of the particularly serious crime bar is necessary because the case-by-case adjudication previously used for non-aggravated felony offenses was "inefficient."[49] However, as discussed *supra* at Part III, an individualized analysis is exactly what is required to ensure only those individuals who have been convicted of crimes that are truly serious and present a future danger are placed at risk of refoulement.

> *Any Conviction Punishable by More Than One Year's Imprisonment (84 Fed. Reg. at 69,645-69,647)*

The Proposed Rules create a categorical bar to asylum—not based on the sentence of incarceration a person actually receives—but instead on the *possibility* of a sentence over one year. Thus, even where a criminal court has determined that a person presents no danger and the offense was not serious enough to warrant any period of incarceration, the Proposed Rules would preclude asylum protection. The mere possibility of a sentence is insufficient to render an offense "particularly serious" or so repugnant as to require the denial of asylum in the exercise of discretion.

Moreover, though identified as a bar for those with felony convictions, in fact this provision would cover a wide range of misdemeanor convictions. In some states, an offense may remain a misdemeanor even if the potential penalty is greater than one year of incarceration.[50] As a result, misdemeanors such as simple theft,[51] simple assault without the use of a weapon,[52] a single offense of driving under the influence,[53] and borrowing a car without permission[54] would be included in this sweeping bar.

---

[48] 8 U.S.C. § 1158(b)(2)(A)(ii) (emphasis added).
[49] 84 Fed. Reg. at 69,646.
[50] *See, e.g.* Colo. Rev. Stat. § 18-1.3-501 (misdemeanor may carry maximum penalty of 18 months in jail); Mass. Gen. Laws ch. 274, § 1 (misdemeanor includes any offense not punishable in state prison).
[51] Colo. Rev. Stat. § 18-4-401(2)(e).
[52] Mass. Gen. Laws ch. 265, § 13A.
[53] Mass. Gen. Laws ch. 90, § 24(1)(a)(1).
[54] Mass. Gen. Laws ch. 90, §24(h)(2)(a).

AR.09567

*Convictions for Assisting Family Members Entering the United States (84 Fed. Reg. at 69,647-69,648)*

Under current law, with one exception, a person convicted of unlawfully aiding a noncitizen to enter or remain in the United States pursuant to 8 U.S.C. § 1324 is considered to have an aggravated felony conviction and, therefore, already is barred from asylum.[55] However, Congress has determined that those who commit the offense for the first time in order to assist a spouse, parent, or child have not committed an offense so serious that it should qualify as an aggravated felony.[56] Cruelly, and contrary to congressional intent as reflected in the aggravated felony definition, the Proposed Rules would eliminate this exception and categorically bar from asylum a mother convicted of assisting her child in fleeing to the United States and a husband helping to save his wife from violence.

*Convictions for Reentry After Removal (84 Fed. Reg. at 69,648-69,649)*

The Proposed Rules also deny asylum protection to those convicted of illegal reentry under 8 U.S.C. § 1326. Their inclusion is premised on conclusory statements regarding the dangerousness of recidivist offenders, without consideration of the seriousness of prior convictions.[57] Reentry after a removal order is an offense with no element of danger or violence to others and has no victim—a conviction for such an offense is no proof of dangerousness.

The Proposed Rules also fail to account for asylum seekers who have been prevented from seeking asylum during prior entries. U.S. Customs and Border Protection officers and agents are notorious for failing to properly screen for fear, coercing those who express a fear of return into abandoning their claims, and failing to refer those who express a fear for a credible fear interview.[58] And yet others may have previously entered or attempted to enter the United States before the onset of circumstances giving rise to their fear. Preserving discretion to grant asylum in these circumstances allows meritorious asylum seekers to be heard and corrects errors that might have previously occurred.

Most significantly, barring asylum based on the manner of entry directly violates the Convention's prohibition on imposing penalties based on a person's manner of entry or

---

[55] 8 U.S.C. § 1101(a)(43)(N).

[56] *See id.*

[57] 84 Fed. Reg. at 69,648.

[58] *See, e.g.*, John Washington, *Bad Information: Border Patrol Arrest Reports Are Full of Lies That Can Sabotage Asylum Claims*, The Intercept (Aug. 11, 2019, 12:20 PM), https://theintercept.com/2019/08/11/border-patrol-asylum-claim/; Human Rights First, *Fact Sheet: Allowing CBP to Conduct Credible Fear Interviews Undermines Safeguards to Protect* Refugees (Apr. 2019) https://www.humanrightsfirst.org/sites/default/files/CBP_Credible_Fear.pdf; Amnesty International, *Facing Walls: USA and Mexico's Violations of the Rights of Asylum-Seekers* (2017), https://www.amnestyusa.org/wp-content/uploads/2017/06/USA-Mexico-Facing-Walls-REPORT-ENG.pdf; Guillermo Cantor & Walter Ewing, American Immigration Council, *Still No Action Taken: Complaints Against Border Patrol Agents Continue to Go Unanswered* (Aug. 2017), https://www.americanimmigrationcouncil.org/sites/default/files/research/still_no_action_taken_complaints_against_border_patrol_agents_continue_to_go_unanswered.pdf; U.S. Comm'n on Int'l Religious Freedom, *Barriers to Protection: The Treatment of Asylum Seekers in Expedited Removal* (2016), https://www.uscirf.gov/sites/default/files/Barriers%20To%20Protection.pdf.

AR.09568

presence.[59] This prohibition is a critical part of the Convention because it recognizes that refugees often have little control over the place and manner in which they enter the country where they are seeking refuge.

> *Convictions an Adjudicator "Has Reason to Believe" Were Committed in Furtherance of Gang Activity (84 Fed. Reg. at 69,649-69,650)*

In a provision that is likely to disproportionally target young men of color, the Proposed Rules would permit adjudicators to look beyond a criminal conviction to determine if there is a "reason to believe" the person committed any offense to assist a "criminal street gang." Past legislative efforts to expand the grounds of removal and inadmissibility in the Immigration and Nationality Act to include gang membership have failed to pass both houses of Congress and for good reason.[60] In recent years, the expansion of gang databases for use in the apprehension and removal of foreign nationals—including children—has generated tremendous concern among advocates and the communities they serve.[61] The use of gang databases by local law enforcement and U.S. Immigration and Customs Enforcement has been widely criticized as an overbroad, unreliable and often biased measure of gang membership and involvement.[62] The Proposed Rules bar those accused of gang involvement in the commission of minor criminal offenses, embracing an open-ended adjudicative process that will inevitably result in asylum adjudicators relying unfairly on these discredited methods of gang identification. This would compound the disparate racial impact of inclusion in gang databases and bar asylum seekers who are themselves fleeing violence from gangs in their countries of origin.[63]

In addition, immigration adjudicators already routinely premise discretionary denials of relief or release on bond on purported gang membership, and scores of alleged gang members have already been deported on grounds related to immigration violations or criminal convictions for which no relief is available.[64] Creating a "gang-related crime" bar only will exacerbate the due

---

[59] Refugee Convention, *supra* note 17, at art 31.

[60] *See* Jessica Chacon, *Whose Community Shield?: Examining the Removal of the 'Criminal Street Gang Member,'* Univ. of Chicago Legal F. 317, 333-36 (2007) (reviewing legislative history of failed efforts to expand removability of those accused of gang related offenses and noting criticism that "[t]he only legal effect of the proposed legislation would be to increase the number of noncitizens lawfully present who would be subject to removal on the basis of their purported associations with individuals involved in group criminal activity").

[61] *See* Nermeen Arastu, *et al.*, *Swept Up In The Sweep: The Impact of Gang Allegations on Immigrant New Yorkers* (May 2018), https://www.law.cuny.edu/wp-content/uploads/page-assets/academics/clinics/immigration/SweptUp_Report_Final-1.pdf.

[62] Ali Winston, *Marked for Life: U.S. Government Using Gang Databases to Deport Undocumented Immigrants*, The Intercept (Aug. 11, 2016, 11:34 AM), https://theintercept.com/2016/08/11/u-s-government-using-gang-databases-to-deport-undocumented-immigrants/.

[63] *See* Jonathan Blitzer, *How Gang Victims Are Labeled As Gang Suspects*, The New Yorker (Jan. 23, 2018), https://www.newyorker.com/news/news-desk/how-gang-victims-are-labelled-as-gang-suspects.

[64] *See* Mark Joseph Stern, *Bad Liars*, Slate (May 16, 2018, 5:18 PM), https://slate.com/news-and-politics/2018/05/federal-judge-accused-ice-of-making-up-evidence-to-prove-that-dreamer-was-gang-affiliated.html (illustrating Immigration and Customs Enforcement's propensity to make gang allegations on the basis of questionable if not fabricated evidence, and the deference to which the evidence is often granted by immigration adjudicators).

Comments on Proposed Rules, 84 Fed. Reg. 69,640 | **American Immigration Council** | January 2020

process violations already occurring as the result of unsubstantiated information about supposed gang ties.[65]

Moreover, this provision dramatically would expand the number and type of convictions for which an analysis of eligibility is required, sweeping in even petty offenses that would otherwise not trigger immigration consequences. Thus, an asylum applicant convicted of simple assault without use of a weapon, a non-violent property crime, or even possession of under 30 grams of marijuana for personal use (otherwise exempted from the reach of the Proposed Rule), could trigger a bar to asylum if the adjudicator concludes she has "reason to believe" the offense was committed in furtherance of gang activity.[66] In making these determinations, asylum adjudicators would be able to rely on uncorroborated allegations contained in arrest reports and could nevertheless shield their decisions by relying on discretion.[67]

### Convictions for Driving Under the Influence (84 Fed. Reg. at 69,650-69,651)

The Proposed Rules wrongly expand the criminal bars to include a second conviction for driving under the influence—a conviction that can generally be obtained without proof of intentional misconduct.[68] A person's culpability is typically measured by the level of intent necessary to commit the crime.[69] It is thus arbitrary and capricious to make driving under the influence a *categorical* bar to asylum, rather than permitting an adjudicator to examine the facts of the case, including the age of the convictions and subsequent substance abuse treatment and recovery.

Moreover, as Judge Reinhardt explained in a concurring opinion in *Delgado v. Holder*,[70] a decision the Proposed Rules cite in support of the expanded bars, crimes like driving under the influence have "little in common" with other crimes the Board has deemed particularly serious— e.g., felony menacing with a deadly weapon, armed robbery, and burglary of a dwelling in which the offender is armed or causes injury.[71] Judge Reinhardt further noted that public opinion does not treat them similarly either: "American voters would be unlikely to elect a president or vice president who had committed a particularly serious crime, yet they had no difficulty in recently electing to each office a candidate with a DUI record."[72] Barring individuals from asylum based on these relatively minor offenses renders the "particularly serious" part of the "particularly serious crime" bar meaningless.

---

[65] *See* Yvette Cabrera, *New ICE Tactic Raises Questions About Due Process*, ThinkProgress (Oct. 6, 2017, 8:27 AM), https://thinkprogress.org/ice-targets-gangs-6775356473a8/; Rebecca Hufstader, *Immigration Reliance On Gang Databases: Unchecked Discretion And Undesirable Consequences*, 90 N.Y.U. L. Rev. 671 (2015).

[66] 84 Fed. Reg. at 69,649 (stating the applicable standard for determining when to apply the bar on asylum seekers convicted of a crime involving criminal street gangs is "reason to believe," as used in 8 U.S.C. § 1182(a)(2)(c), and that asylum adjudicator may consider "all reliable evidence" in making their decision).

[67] *See Garces v. U.S. Att'y Gen.*, 611 F.3d 1337, 1349-50 (11th Cir 2010) (reversing finding of "reason to believe" that the respondent was a participant in drug trafficking based on unsubstantiated arrest reports); *Matter of Rico*, 16 I. & N. Dec. 181, 185-86 (BIA 1977) (relying on pre-hearing admissions to uphold finding of inadmissibility).

[68] *See Leocal v. Ashcroft*, 543 U.S. 1, 8 (2004).

[69] *Cf. Matter of Tavdidishvili*, 27 I. & N. Dec. 142, 143 (BIA 2017) (holding that a "culpable" mental state for purposes of a crime involving moral turpitude is one which requires deliberation or consciousness, such as intent, knowledge, willfulness, or recklessness).

[70] 648 F.3d at 1110 (J. Reinhardt, concurring).

[71] *Id.* at 1110.

[72] *Id.*

AR.09570

*Convictions or Allegations of Domestic Offenses (84 Fed. Reg. at 69,651-69,653)*

The Proposed Rules too broadly categorize domestic violence offenses as particularly serious and sweep both offenders and survivors into their dragnet. The domestic violence sections of the Proposed Rules include the only categorical bar to asylum for which a conviction is not required. Domestic violence incidents all too often involve the arrest of both the primary perpetrator of abuse and the survivor.[73] These "cross-arrests" do not always yield clear determinations of victim and perpetrator. Authorizing asylum adjudicators to determine the primary perpetrator of domestic assault in the absence of a judicial determination—a task wholly beyond their expertise and training—unfairly prejudices survivors who are wrongly arrested in the course of police intervention in domestic disturbances.

Finally, the exemption for asylum applicants who can demonstrate their eligibility for a waiver under 8 U.S.C. § 1227(a)(7)(A) does not cure the harm to asylum seekers caused by imposition of a categorical domestic violence related bar. Rather, it converts a non-adversarial asylum proceeding into a multi-factor, highly specific inquiry into culpability based on circumstances that may be difficult for an asylum seeker to prove—especially those who must proceed without counsel or who have limited English proficiency.

*Convictions for Other Misdemeanors*

- Controlled Substance Offenses, Including Possession for Personal Use (84 Fed. Reg. at 69,654)

While courts and the law enforcement agencies across the country, as well as the general public, have come to recognize that addiction is a disease that must be treated with compassion, not penalties,[74] the Proposed Rules take a draconian and outdated approach to substance abuse-related convictions. Under current law, convictions for the sale and distribution of controlled substances already bar asylum.[75] The Proposed Rules would additionally exclude from asylum protections those convicted only of possession for personal use.

---

[73] David Hirschel, *et al.*, *Domestic Violence and Mandatory Arrest Laws: To What Extent Do They Influence Police Arrest Decisions*, 98 J. of Crim. L. & Criminology 255 (2007-2008), https://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?article=7284&context=jclc (noting that "[i]n some cases, dual arrests may be the result of legislation, department policies, or both failing to require officers to identify the primary aggressor. In addition, when such provisions are present, police may lack the training or information needed to identify the primary aggressor when responding to a domestic violence assault. This situation may be compounded by batterers who have become increasingly adept at manipulating the criminal justice system, and may make efforts to 'pre-empt' victims from notifying police in order to further control or retaliate against them.").

[74] Zachary Seigel, *Opioids, Pot and Criminal Justice Reform Helped Undermine This Decade's War on Drugs*, NBCNews.com (Dec. 29, 2019: 4:30 AM), https://www.nbcnews.com/think/opinion/opioids-pot-criminal-justice-reform-helped-undermine-decade-s-war-ncna1108231 ("With an extraordinary number of Americans suffering, the door has opened to understanding and treating the pain of drug use rather than apply brute force."); Pew Research Center, *America's New Drug Policy Landscape* (Apr. 2, 2014), https://www.people-press.org/2014/04/02/americas-new-drug-policy-landscape/ (reporting that two-thirds of Americans favor treatment, not jail, for use of illegal drugs).

[75] 8 U.S.C. § 1101(a)(43)(B).

AR.09571

The harsh nature of the Proposed Rules is especially evident when viewed through a trauma-informed lens. Studies also consistently reveal a high prevalence of comorbidity of post-traumatic stress disorder (PTSD) and substance use disorders, with individuals with PTSD up to 14 times more likely to struggle with a substance use disorder.[76] Asylum seekers in the United States are often unable to access affordable medical care and treatments for complex trauma,[77] making them vulnerable to substance abuse.[78] The proposed new bars to asylum include *any* drug-related conviction (with one exception for a first minor marijuana possessory offense). This approach is not only cruel but also ignores the evidence. Particularly given the vulnerabilities of asylum-seeking populations, prior struggles with addiction should be addressed with treatment and compassion, not a closed door and deportation order.

Immigration adjudicators already maintain the discretionary authority to deny asylum to individuals with drug-related criminal histories; denying asylum seekers even the opportunity to present the countervailing factors of their past trauma and potential recovery is simply cruel.

- Public Benefits and Document Fraud (84 Fed. Reg. at 69,653-69,654)

The Proposed Rules expand the asylum bar to include any asylum seeker who has been convicted of a misdemeanor offense for use of a fraudulent document or unlawfully obtaining public benefits. In so doing, the Rules entirely ignore the migration-related circumstances that often give rise to convictions involving document fraud. Individuals fleeing persecution often leave their countries of origin with nothing but the clothes on their backs and must rely on informal networks to navigate their new circumstances.[79] Extension of a blanket bar to asylum seekers who are compelled to resort to fraudulent means to enter the United States, or to remain safely during their applications for asylum, upends decades of settled law directing that violations of law arising from an asylum applicant's manner of flight should constitute only one of many factors to be consulted in the exercise of discretion.[80]

Moreover, migrants in vulnerable communities who are struggling to survive during the pendency of their asylum proceedings often are exploited by unscrupulous intermediaries who offer assurances and documentation that turn out to be fraudulent.[81] The expansion of criminal asylum bars to sweep in all document fraud offenses, on the other hand, would unfairly prejudice

---

[76] Jenna L McCauley *et al.*, *Posttraumatic Stress Disorder and Co-Occurring Substance Use Disorders: Advances in Assessment and Treatment*, 19 Clinical Psych. Sci. & Prac. 3 (Oct. 2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3811127/.

[77] For more information on immigrant eligibility for federal benefits, *see* https://www.nilc.org/issues/health-care/.

[78] Carrier Clinic, *Trauma and Addiction* (2019), https://carrierclinic.org/2019/08/06/trauma-and-addiction/ ("...some people struggling to manage the effects of trauma in their lives may turn to drugs and alcohol to self-medicate. PTSD symptoms like agitation, hypersensitivity to loud noises or sudden movements, depression, social withdrawal and insomnia may seem more manageable through the use of sedating or stimulating drugs depending on the symptom. However, addiction soon becomes yet another problem in the trauma survivor's life. Before long, the 'cure' no longer works and causes far more pain to an already suffering person.").

[79] *See Pula*, 19 I. & N. Dec. at 474.

[80] *Id.*

[81] See American Bar Ass'n, *About Notario Fraud* (July 19, 2018), https://www.americanbar.org/groups/public_interest/immigration/projects_initiatives/fight-notario-fraud/about_notario_fraud/.

AR.09572

immigrants with meritorious asylum claims and force them deeper into the dangerous informal economy.

In sum, the unduly harsh new criminal bars included in the Proposed Rules are contrary to United States and international law and must not be promulgated.

## VI.    Conclusion

For the foregoing reasons, DHS and DOJ should not implement the Proposed Rules. Please do not hesitate to contact us if you have questions regarding our comments.

Respectfully submitted,

Emma Winger
Staff Attorney
ewinger@immcouncil.org
(617) 505-5375

Trina Realmuto
Directing Attorney
trealmuto@immcouncil.org
(857) 305-3600

AMERICAN IMMIGRATION COUNCIL
1318 Beacon Street, Suite 18
Brookline, MA 02446

AR.09573

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9el1-inzm
**Comments Due:** January 21, 2020
**Submission Type:** Paper

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0454
Comment on RIN 1125-AA87

## Submitter Information

## General Comment

See Attached

## Attachments

Comment on RIN 1125-AA87

AR.09574



Ida Pache PORTLAND OR 972
POB 107
Joseph, OR    16 JAN 2020 PM 4 L
97846

Lauren Adler Reid
Asst Dir, Office
of Policy
Exe Office for
Immigration
Reform
5107 Leesburg Pike,
Ste 2616
Falls Church, VA
22041

AR.09575

Lauren Adler Reid,
Re: EOIR Docket No 18-002

The new proposed mandatory bars to asylum eligibility will do nothing to make the US safer and may exclude asylum-seekers who are complying with US and international law. It is important to continue to reconsider asylum denials as the situation may well be a matter of life and death for some individuals

AR.09576

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekk-pfyp
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0455
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Daniele Levy

---

## General Comment

I'm Dr. D. Levy, a licensed clinical psychologist working in public health in California.
The proposed legislation changes fail to take into account the chaotic environment of an asylum situation. While 99% of the worldwide population will never leave their countries, the 1% that does is driven by suffering so great that moving to an unknown, foreign environment is preferable to the inevitable distress and persecution that they are experiencing in their country of origin. Rarely, there is a well-thought out plan, with thorough documentation and flawless execution as they embark on this process. In real life, there are complex circumstances, unavoidable surprises, and less than perfect paths in search of a better life.
Our legal system must consider the human reality of the asylum process. If we exclude individuals with such a broad range of attributes as the new law proposes, we will be denying access to freedom and care to those who need it the most. And if we withhold the right to reconsideration to those who are denied, we risk perpetuating injustices. A country that is made up of immigrants, recent ones such as myself and ancient like those in the Mayflower, should have no tolerance for racism, xenophobia, and discrimination within its borders and across the globe.

AR.09577

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekl-w04i
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0456
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Danielle Alvarez
**Address:** United States,

## General Comment

I write to express my extremely strong opposition to this proposed rule change.

As the child and grandchild of immigrants, I celebrate the value and sacrifice my family members have made to afford me a life full of possibility. I spend my days as an adult raising money to support legal services for those fleeing violence, prosecution, and lack of opportunity. Immigrants are a vital part of my community, my neighborhood, and this country I call my home.

This proposed rule would punish people who've already endured mistreatment and racial profiling in the criminal legal system a second time--with deportation back to the very life-threatening situation they fled. This is profoundly immoral and makes an inexcusable mockery of due process. I believe it is essential that our immigration and asylum policies honor our Founder's ideals.

For these reasons, I call upon the Trump administration to withdraw this proposal.

# PUBLIC SUBMISSION

| |
|---|
| **As of:** January 23, 2020 |
| **Received:** January 21, 2020 |
| **Status:** Posted |
| **Posted:** January 22, 2020 |
| **Tracking No.** 1k4-9ekl-2uuh |
| **Comments Due:** January 21, 2020 |
| **Submission Type:** Web |

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0457
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Sandra Cardoza
**Address:**
  39 Stoneyford Ave
  San Francisco, CA, 94112
**Email:** sandra.cardoza@gmail.com

## General Comment

I write to express my strong opposition to this proposed rule change. I am a citizen of the United States of America who believes strongly that our nation must welcome people fleeing violence, and who is strongly concerned about racial profiling in the criminal legal system. Immigrants are a vital part of my community, my neighborhood, and my state.

This proposed rule would inject racial profiling into the asylum process. This latest attack would put even more people seeking asylum at risk of danger - and death. This would in turn eviscerate one of the most important defenses community members have against deportation.

I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.

For these reasons, I call upon the Trump administration to withdraw this proposal.

With Justice and Liberty for ALL,

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekl-f2ye
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0458
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Anonymous Anonymous

## General Comment

I write to express my strong opposition to this proposed rule change. I believe strongly that we must welcome people fleeing violence, as we would hope to be welcomed ourselves. Immigrants are a vital part of my community, my neighborhood, and my state. I'm worried that this rule change will send immigrants back to violent homes, where they face danger and death.

The proposed rule would inject racial profiling into the asylum process. The criminal legal system in the U.S. has been proven again and again to be filled with racial profiling and obstacles to equal justice. This proposed rule would punish people who have already endured mistreatment and racial profiling in the criminal legal system by deporting them back to the life-threatening situations they fled.

I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. I believe this will protect our own humanity, too. For these reasons, I call upon the Trump administration to withdraw this proposal.

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekl-hbm9
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0459
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

I write to express my strong opposition to this proposed rule change.

After spending a week at the Mexico-US border in Tijuana assisting asylum seekers navigate the complicated and often changing landscape of seeking asylum in the US, I am strongly concerned about this proposed rule change. In my professional life, I have worked with local governments in many states to improve their criminal justice systems. All these localities have extreme discrepancies in the demographics of their jails and prisons compared to the demographics of their jurisdiction. Racial profiling, institutional racism, and racist policies have created a US prison and jail system that is filled with mostly black and brown individuals.

I do not trust that this rule change will result in a fair and just process by which asylum seekers are reviewed and granted asylum. With an already hyper-racialized immigration system, this rule will further make the asylum process intractable for those fleeing violence and persecution in their own countries.

While in Tijuana, I saw women and children, who had fled wars and gang violence, made to jump through many hoops to reach safety. This rule change will make it even harder for these types of people to feel safe and included in our country, a country founded on diversity and immigrants. I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.

For these reasons, I call upon the Trump administration to withdraw this proposal.

AR.09581

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekl-gmup
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0460
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Lacy Panyard Holton

---

## General Comment

I am writing on behalf of myself, an Indiana constituent, as well as the community I represent in connection to the Proposed Rules. I strongly OPPOSE the proposed rules to amend the regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019. I have worked in the immigration field for close to ten years. I have been a practicing immigration attorney since 2013. I represent clients with their applications for asylum, withholding of removal, and protections under the convention against torture.

I have studied the evolution of asylum law in the United States, and how we arrived to where we are today: through decades of jurisprudence and understanding of culture and practices and how they might impact a victim's ability to seek help.

For the reasons detailed in my comments that follow, DHS and DOJ should immediately withdraw their current proposal and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

These proposed bars are an affront to our immigration law. They serve no public purpose. The only purpose I see is to limit those who are eligible for asylum even more than the Administration has already done. The Proposed Rules unnecessarily and cruelly exclude bona fide refugees from asylum eligibility. They will discourage the proper due process in asylum claims as certain immigration judges will likely try to pretermit applications for relief, and it could result in racially biased decision making.

The first proposed set of changes adds the following seven categorical bars to asylum eligibility: (1) any conviction of a felony offense; (2) any conviction for "smuggling or harboring" under 8 U.S.C. 1324(a), even if the asylum seeker committed the offense for the purpose of bringing her own spouse, child or parent to safety; (3) any conviction for illegal reentry under 8 U.S.C. 1326; (4) any conviction for an offense "involving criminal street gangs," with the adjudicator empowered to look to any evidence to determine applicability; (5) any second conviction for an offense involving driving while intoxicated or impaired; (6) any conviction or accusation of conduct for acts of battery involving a domestic relationship; (7) and any conviction for several newly defined

AR.09582

categories of misdemeanor offenses, including any drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits.

In Indiana, driving offenses can constitute felonies, on occasion. Before a few years ago, driving as a Habitual Traffic Violator (for example, three convictions of driving while suspended) was charged as a felony. It is ludacris to categorically exclude anyone with a felony conviction without considering whether the conviction would put the public at risk in any way. The immigration law allows a waiver for the conduct listed in (2) above: if a person brings his spouse or child to the United States unlawfully, he/she may request a waiver, but yet the Proposed Rule calls for a categorical denial? Absurd! As far as number (3), some of the strongest cases for asylum are for those people who have had to come back to the United States fleeing from their countries once they have returned. In regard to (6) above, are we going to ignore the science and studies behind Battered Spouse Syndrome? In the State of Indiana, you could commit "battery" while simply defending yourself from an abusive parent/ spouse/ partner/ child, yet this proposal aims to categorically deny cases on these grounds. I'm also aware of MULTIPLE cases where the person has been advised to plead guilty to avoid the uncertainty of trial, whether s/he maintains his innocence for the underlying conduct.

Taken together, these proposed changes constitute an unnecessary, harsh, and unlawful gutting of the asylum protections enshrined in United States and international law. I cannot emphasize enough that the Proposed Rules should be thrown in the garbage.

Here we are, the greatest country in the world, turning away our neighbors seeking our protection. I'm honestly disgusted. This seems to fly in the face of the golden rule: treat others as you want to be treated.

AR.09583

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekl-c0aw
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0461
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Janine deManda

---

## General Comment

I am a descendant of immigrants and concerned member of the public who believes strongly that our nation must welcome people fleeing violence, and who is strongly concerned about racial profiling in the criminal legal system. Immigrants are a vital part of my community, my neighborhood, and my state.

As a public librarian in the San Francisco Bay area, I work with immigrant community members daily, and am concerned this rule would put many people in danger.

Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution.

U.S. law enshrines the protections of the international Refugee Convention, drafted in the wake of the horrors of World War II. Under the Refugee Act of 1980, passed with bipartisan support, anyone present or arriving in the U.S. can apply for asylum.

For asylum seekers, making it to the U.S. often means they have found safety from persecution, torture, and sometimes death. Yet asylum seekers face many unjust obstacles in the immigration system.

This proposed rule would inject racial profiling into the asylum process. This latest attack would put even more people seeking asylum at risk of danger - and death. This would in turn eviscerate one of the most important defenses community members have against deportation.

This proposed Trump rule would punish people who've already endured mistreatment and racial profiling in the criminal legal system a second time -- with deportation back to the very life-threatening situation they fled. This is profoundly immoral, makes a mockery of due process, and comes right out of Steven Miller's racist playbook.

The criminal legal system in the U.S. is wracked with racial profiling and obstacles to equal justice. Our harsh immigration laws exploit these obstacles to drive mass incarceration and mass deportation of people of color.

AR.09584

I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.

For these reasons, I call upon the Trump administration to withdraw this proposal.

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekl-k57t
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0462
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** anonymous anonymous

## General Comment

I think the proposed rules are bad. Someone fleeing Domestic Violence and who had contact with the police while in a domestic violence situation should not be barred from asylum. It is clear they do not understand what happens in domestic violence situations and how the police is not always on the side of the victim. When someone is fleeing their country, they do not think about what legal resources they need or evidence to prove their case or why they were involved with the police. The only thing they are thinking about is their lives and fleeing. I am against these proposed rules.

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekl-flcd
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0463
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Manoj Govindaiah
**Organization:** Refugee and Immigrant Center for Education and Legal Services (RAICES)

## General Comment

Please see attached.

## Attachments

Comments on New Regs Additional Asylum Bars

AR.09587

**Before the**
**DEPARTMENT HOMELAND SECURITY**
**U.S. Citizenship and Immigration Services**
**Washington, D.C.**
**and**
**DEPARTMENT OF JUSTICE**
**Executive Office for Immigration Review**
**Falls Church, VA**

| | | |
|---|---|---|
| In Matter of | ) | |
| | ) | |
| Procedures for Asylum and Bars to | ) | EOIR Docket No. 18–0002 |
| Asylum Eligibility | ) | A.G. Order No. 4592-2019 |
| | ) | |
| | ) | |

## COMMENTS OF THE REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES

    The Refugee and Immigrant Center for Education and Legal Services ("RAICES") respectfully submits these comments to the proposed regulations by the U.S. Department of Homeland Security ("DHS") and the U.S. Department of Justice ("DOJ") (collectively the "Departments"), to create seven additional categorical bars to asylum, a multi-factor test for asylum adjudicators to determine whether a criminal conviction or sentence is valid for purposes of determining asylum eligibility, and rescind a provision in the current Rule regarding the reconsideration of discretionary asylum.[1] RAICES appreciates the efforts of the Departments to clarify concerns about the appropriateness of this Proposed Rule because of its inconsistency with the Constitution and laws of the United States as well as the international legal obligations of the United States. We look forward to working with the Departments to ensure the protection of the rights accorded immigrants by domestic and international law.

**I.    RAICES HAS EXTENSIVE EXPERIENCE REPRESENTING IMMIGRANTS WHO WILL BE SUBJECT TO THIS PROPOSED RULE AND IS PARTICULARLY QUALIFIED TO COMMENT ON THE PROPOSED RULE**

    RAICES envisions a compassionate society where all people have the right to migrate and human rights are guaranteed. RAICES defends the rights of immigrants and refugees, empowers individuals, families and communities, and advocates for liberty and justice. As a

---

[1] Procedures for Asylum and Bars to Asylum Eligibility, 84 FR 244 (proposed Dec. 19, 2019) [hereinafter Proposed Rule].

AR.09588

BIA-recognized, 501(c)(3) legal services agency based in San Antonio, Texas, RAICES serves tens of thousands of noncitizens per year in direct immigration legal services, social services, advocacy, community engagement, and refugee resettlement. In 2018, RAICES closed nearly 38,000 cases. With ten offices throughout Texas, more than 200 staff members, and thousands of active volunteers, RAICES is one of the largest legal service providers for low-income immigrants, asylum seekers, and refugees in the country.

For many years, RAICES has provided legal services to detained and released immigrant children, adults, and families applying for asylum either affirmatively before the U.S. Citizenship and Immigration Services ("USCIS") or defensively before the Executive Office of Immigration Review ("EOIR").  Additionally, since 2014, RAICES has coordinated the Karnes Pro Bono Project to provide legal services to families detained in Immigration and Customs Enforcement ("ICE") custody at the Karnes County Residential Center in Karnes City, Texas. The Karnes Pro Bono Project is a nationwide pro bono effort to provide universal legal services and representation to all men, women, and children detained at Karnes. Since 2014, RAICES staff, volunteers, and pro bono attorneys have provided free legal services to over 15,000 families detained at Karnes. Since 2008  RAICES has provided legal services to detained unaccompanied immigrant children under the care and custody of the Office of Refugee Resettlement. Since 2008 RAICES staff, volunteers, and pro bono attorneys have provided free legal services to over 50,000 unaccompanied immigrant children. Amongst some of our most vulnerable clients, we have represented survivors of domestic violence, human trafficking victims, and members of the LGBTQ community.

## II.     THE PROPOSED RULE

The Proposed Rule creates three changes to the asylum eligibility. First, it creates seven categorical bars to asylum: it bars any asylum applicant with (1) any conviction of a felony offense; (2) any conviction for "smuggling or harboring" under INA §§ 274(a)(1)(A) & (a)(2), even if the asylum seeker committed the offense for the purpose of bringing her own spouse, child or parent to safety; (3) any conviction for illegal reentry under INA § 276; (4) any conviction for an offense "involving criminal street gangs," with the adjudicator empowered to look to any evidence to determine applicability; (5) any second conviction for an offense involving driving while intoxicated or impaired; (6) any conviction *or accusation of conduct* for acts of battery involving a domestic relationship; (7) and any conviction for several newly defined categories of misdemeanor offenses, including *any* drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits. *See generally*, Proposed Rule.

The Proposed Rule additionally requires asylum adjudicators to apply a multi-factor test when determining whether a criminal conviction or sentence is valid for the purposes of determining if qualifies as a bar to asylum under the new Rule. Lastly, the Proposed Rule strikes 8 C.F.R. §§ 208.16(e), 1208.16(e), eliminating automatic review of a discretionary denial of asylum.

The Proposed Rule unnecessarily and unlawfully broadens the definition of a "particularly serious crime" in a way that is inconsistent with the Immigration and Nationality

AR.09589

Act ("INA" or "the Act"), the U.S. Constitution, and contrary to the United States obligations under the 1967 Protocol Relating to the Status of Refugees.

## III.    THE PROPOSED RULE IS INCONSISTENT WITH THE IMMIGRATION AND NATIONALITY ACT AND UNNECESSARILY BARS BONA FIDE REFUGEES FROM ASYLUM ELIGIBILITY

Although the INA provides the Attorney General authority to designate additional conditions or limitations on asylum, such limitations must still be consistent with the Act. Additionally, an agency may not promulgate a rule or regulation that renders Congress's words a nullity.[2] The Proposed Rule is inconsistent with the INA as it purports to bar asylum eligibility through a categorical exercise of discretion and thereby will unnecessarily bar bona fide refugees from asylum eligibility.[3] The Rule also seeks to categorically bar asylum by qualifying certain offenses and allegations as particularly serious crimes--thereby rendering the limiting word "serious" meaningless. As the agencies fail to show how such offenses and allegations are necessary for the safety of the community, these categorical bars are inconsistent with the Act.

When Congress speaks clearly through a statute, the plain meaning of that statute governs.[4] As such, Congress *explicitly* permitted the Attorney General to designate a non-aggravated felony to be a particularly serious crime and thus to disqualify a person from asylum. In the context of asylum, all aggravated felonies are *per se* particularly serious crimes and the Attorney General "may designate by regulation [other] offenses that will be considered to be" a particularly serious crime for purposes of asylum.[5]

In an attempt to insulate the Proposed Rule from review, the agencies attempt to designate new bars to asylum both by designating them as "particularly serious crimes" pursuant to 8 U.S.C. § 1158(b)(2)(B)(ii) and rendering them categorically exempt from a positive discretionary adjudication of asylum pursuant to 8 U.S.C. § 1158(b)(2)(C). This effort is unlawful[6] as the Rule will render meaningless Congress' specificity in the use of "particularly serious" in its application of particularly serious crime bars and unnecessarily bar bonafide refugees from asylum eligibility, contrary to the Act.

In the asylum process, if the offense is not a particularly serious crime, then asylum adjudicator's evaluate the criminal offense to determine if it warrants a grant of discretion.[7] However, by eliminating the discretionary component of the Act through sweeping categories of offenses, the Proposed rule is ultra vires and inconsistent with the statute.

---

[2] *Mohasco Corp. v. Silver*, 447 U.S. 807, 825 (1980) ("As we have held on prior occasions, [an agency's] 'interpretation' of the statute cannot supersede the language chosen by Congress.").
[3] 8 U.S.C. § 1158(b)(2)(B)(ii); U.S.C. § 1158(b)(2)(C); *see also* 8 U.S.C. § 1158(d)(5)(B).
[4] *See*, *e.g.*, *Robinson* v. *Shell Oil Co.*, 519 U.S. 337, 340 (1997).
[5] *Id.* The Attorney General has not designated "substantial battery" to be a particularly serious crime for any purpose, including for purposes of ineligibility to seek asylum.
[6] 8 U.S.C. § 1252(a)(2)(D).
[7] *Matter of Pula*, 19 I.&N. Dec. 467 (BIA 1987).

3

## A. Eroding Adjudicators' Discretion is Inconsistent with the Act

Eroding the adjudicator's discretion by creating these per se categorical bars is inconsistent with the Act, irrational, and arbitrary and capricious under the standard set out in section 706(2)(A) of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). When an applicant meets the definition of a refugee, absent any adverse factors, asylum should be granted as a matter of discretion.[8] No further inquiry is required because "in light of the unusually harsh consequences which may befall a [noncitizen] who has established a well-founded fear of persecution; the danger of persecution should generally outweigh all but the most egregious of adverse factors."[9] The *actual experience* of past persecution should also weigh in favor of a grant of asylum.[10] The discretionary determination is often treated as a balancing test, with adjudicators weighing the positive factors against any negative factors. Discretion under the statute required "some level of individualized determination."[11]  The act of Congress to make asylum discretionary underlines the need to provide adjudicators the ability by reviewing evidence to make hard individualized decisions in complex cases involving trauma survivors, individuals of different cultural backgrounds,  and vulnerable people with language barriers.

Because of the categorical nature of the seven new bars proposed, asylum seekers will be precluded from obtaining protection on the basis of a vast array of conduct, without any discretion left to the asylum adjudicator to determine whether the circumstances merit such a harsh penalty. To this extent, the Proposed Rule is similar to the Rule struck down by numerous Circuit Courts of Appeal in the context of adjustment of status for those considered by law to be "arriving aliens." Purporting to exercise discretion categorically, then-Attorney General Reno putatively rendered that class of noncitizens ineligible for adjustment of status, a determination that is ordinarily discretionary, even though the statute seemed to allow eligibility. Multiple Circuit Courts of Appeal struck down the proposed regulations, finding them to reflect an impermissible reading of the statute in light of the fact that Congress carefully defined in the statute the categories of people eligible to apply for adjustment of status.[12]  Accordingly, the Rule diminishing of adjudicators discretion is inconsistent with the Act.

---

[8] *Matter of Pula,* 19 I.&N. Dec. 467 (BIA 1987); *see also In re Kasinga,* 21 I.&N. Dec. 357, 367 (BIA 1996)

[9] *Pula,* 19 I.&N. Dec. at 474.

[10] *Matter of Chen,* 20 I.&N. Dec. 16, 19 (BIA 1989)..

[11] *Reno v. Flores,* 507 U.S. 292, 312 (1993).

[12] The First and Ninth Circuits found the regulations contrary to clear statutory command. *Succar v. Ashcroft,* 394 F.3d 8, 29 (1st Cir. 2005); *Bona v. Gonzales,* 425 F.3d 663, 668-71 (9th Cir. 2005). Other courts invalidated the adjustment regulations under "Step Two" of *Chevron*. Those courts found some ambiguity in the statute, but found a per se discretionary bar not based on a permissible construction of the eligibility standards set forth in the governing statute in light of the statutory scheme and congressional intent. *Zheng v. Gonzales*, 422 F.3d 98, 116-20 (3d Cir. 2005) (invalidating regulation precluding category of people from applying to adjust status "[g]iven Congress's intent as expressed in the language, structure, and legislative history of INA section 245 [8 U.S.C. § 1255]"); *Scheerer v. United States Attorney General*, 445 F.3d 1311, 1321-22 (11th Cir. 2006). This reasoning would likewise be applicable to the proposed rule. Where Congress went through the trouble to create a comprehensive statutory scheme to define asylum eligibility, the agency cannot preempt that in the guise of discretion by creating out of whole cloth a separate set of eligibility criteria.

AR.09591

**B.   Broadening What Constitutes a Particularly Serious Crime Bar is Inconsistent with the INA**

The Proposed Rule drains the phrase "*particularly serious* crime," 8 U.S.C. § 1158, of any sensible meaning, thereby making it arbitrary and capricious.  It is a departure from past practice and the agencies have proffered no evidence to demonstrate that asylum seekers with criminal histories necessarily constitute a danger to the community thereby demonstrating such a swooping change as the Proposed Rule is needed to protect the community.

Congress' specific language in the passing the Refugee Act of 1980, reflects Congress's intention to bring U.S. asylum law into conformity with humanitarian principles embodied in the United Nations Protocol Relating to the Status of Refugees. The legislative history shows that Congress intended the Act to be interpreted and "construed consistent with the Protocol."[13] In the passage of the Protocol, UNHCR issues the UNHCR Handbook instructing the particularly serious crime bar be only reserved for the most extreme cases.[14]

In the asylum statute, Congress explicitly made the commission of a particularly serious crime a bar to asylum. The canon of interpretation known as *expressio unius est exclusio alterius* instructs that, "expressing one item of [an] associated group or series excludes another left unmentioned."[15] Congress instructed the bar be considered more serious than the nonpolitical crime bar and requiring a different definition than a crime involving moral turpitude.[16] Therefore, in order for the bar to be consistent with the Act, it must be serious, be more severe than the serious nonpolitical crime bar, and independent from a crime involving moral turpitude.

The Proposed Rule attempts to create numerous categories of discretionary "pseudo-particularly serious crimes," barring asylum through a categorical limitation on exercise of discretion even if the offenses are ultimately found not to be particularly serious crimes. These additional bars instead demonstrate an effort to violate the *expressio unius est exclusion alterius* canon of interpretation, and cause the Proposed Rule to be ultra vires to the statute.

The agencies attempt to justify this expansion of the particularly serious crime bar by stating, without support, that the asylum applicants subject to these additional bars are a danger to the community. Contrary to the Departments' contentions, empirical evidence shows that immigrants are typically less dangerous than other populations[17] and that there is no correlation

---

[13] *See*  H.R.Conf.Rep. No. 781, 96th Cong., 2d Sess. 19, 20 (1980), reprinted in 1980 U.S.Code Cong. & Ad.News 160, 161.

[14] *See Matter of Frentescu*, 18 I.&N. Dec. 244, 246 (BIA 1982)(citing H.R.Rep. No. 96–781, 96th Cong., 2d Sess. 20.

[15] *United States* v. *Vonn*, 535 U.S. 55, 65 (2002).

[16]  *See Matter of Frentescu*, 18 I.&N. Dec. at 245.

[17]  Alex Nowrasteh, CATO Institute, *Immigration Research and Policy Brief No. 4*, "Criminal Immigrants in Texas: Illegal Immigrant Conviction and Arrest Rates for Homicide, Sex Crimes, Larceny, and Other Crimes," Feb. 26, 2018, available at https://www.cato.org/publications/immigration-research-policy-brief/criminal-immigrants-texas-illegal-immigrant (last accessed Nov. 7, 2019) AT 2 ("[T]here were 50 percent fewer criminal convictions of illegal immigrants than of native-born Americans in Texas in 2015."; Michael T. Light & Ty Miller, "Undocumented Immigration and Violent Crime," 56(2) *Criminology* 370 (2018).

AR.09592

between immigration status and recidivism.[18] Additionally, the evidence shows that nonviolent offender recidivists' rates are significantly lower.[19]

For these reasons the particularly serious crime bar, should only properly apply if both (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows that he is a present or future danger.[20] Contrary to Congress' intent, the rule peremptorily postulates a noncitizen's supposed danger to the community.

   1. *Expanding "particularly serious" crimes to include families travelling together is inconsistent with the Act*

The Proposed Rule penalizes asylums seekers for fleeing persecution with their spouses and/or children to ensure their family's life, wellbeing, and unity.[21] This proposed bar is particularly insidious in light of now-public documents revealing this administration's explicit efforts to utilize smuggling prosecutions against parents and caregivers as part of its strategy of deterring families from seeking asylum in the United States.[22] The Departments cite to no evidence to demonstrate that families travelling together are a threat to the safety of communities in the United States.[23] To the contrary, the Board of Immigration Appeals has recognized family ties are among the general humanitarian concerns courts should consider when adjudicating asylum cases[24]—the proposed rule however seeks to punish asylum applicants for travelling with their family members.

The Proposed Rule will create bars to asylum that will directly cause family separation. Asylum protects family unity in that when a parent or spouse meets the definition of a refugee, the spouse and/or child may derive asylee status.[25] This family unit protection does not exist for

---

[18] J. Ramos and M. Wenger, "Immigration and recidivism: What is the Link?" *Justice Quarterly* (2019) (finding no correlation between recidivism rates and citizenship status among those formerly incarcerated for felonies in Florida prisons).

[19] U.S. Sentencing Commission, *Recidivism Among Federal Violent Offenders* (2019) (noting that non-violent offenders recidivate at significantly lower rates).

[20] *See* U.N. High Commissioner for Refugees, *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 11 (July 2007), http://www.unhcr.org/en-us/576d237f7.pdf (the Refugee Convention's particularly serious crime bar only applies if (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows she is a "present or future danger.").

[21] On April 11, 2017, then-Attorney General Sessions instructed all federal prosecutors to increase their prioritization of immigration offenses for prosecution, including misdemeanor offenses committed by first time entrants. *See* Memorandum from the Attorney General: Renewed Commitment to Criminal Immigration Enforcement (April 11, 2017), https://www.justice.gov/opa/press-release/file/956841/download.

[22] Ryan Devereaux, "Documents Detail ICE Campaign to Prosecute Migrant Parents as Smugglers," *The Intercept*, April 29, 2019, https://theintercept.com/2019/04/29/ice-documents-prosecute-migrant-parents-smugglers/ (describing how in May 2017, the Department of Homeland Security set out to target parents and family members of unaccompanied minors for prosecution).

[23] *See* Memorandum from the Attorney General: Renewed Commitment to Criminal Immigration Enforcement (April 11, 2017), https://www.justice.gov/opa/press-release/file/956841/download; Richard Marosi, "The aggressive prosecution of border crossers is straining the courts. Will zero tolerance make it worse?," *Los Angeles Times*, May 11, 2018, https://www.latimes.com/local/california/la-me-ln-immigrant-prosecutions-20180511-story.html.

[24] *In re H-,* 21 I.&N. Dec. 337, 347-48 (BIA 1996).

[25] 8 C.F.R. § 208.21(a).

AR.09593

those granted Withholding of Removal or protection under the Convention Against Torture. The derivative asylee protection is tantamount in that there are cases where a child and/or spouse does not independently meet the definition of a refugee. Considering the heightened vulnerability of tender age children who may not have been persecuted before arriving with their parent to the United States, the Proposed Rule cuts away at the intent of Congress to protect vulnerable populations and protect family unity. By limiting such protection, the agencies charged with protecting asylees will, under the Proposed Rule, violate the spirit of the Act by 1) punishing families by raising the evidentiary burden but for traveling together; 2) forcing families to either be separated from their immediate family; or 3) be returned to a country where the immigration court has found it is more likely than not they will face persecution or be tortured.[26] The clear intent of this Rule is instead to continue to exploit the immigration system to separate families.

Recently, this exact scenario played out with a mother who was subject to the so-called Migrant Protection Protocols (also known as Remain in Mexico) and the asylum "transit ban,"[27] which made the mother ineligible for asylum and thus required the children to establish their independent eligibility for withholding and CAT protection. An immigration judge granted the mother withholding of removal but denied protection to her young children, leaving the children with removal orders and immense uncertainty about their future.[28] Under the expanded bars in the Proposed Rule, these situations will certainly increase, separating families and forcing parents to return to countries where it has been established that they more likely than not will face persecution and torture, rather than leaving their children on their own.

   2.  *Barring asylum applicants convicted of illegal reentry is inconsistent with the Act*

When an asylum applicant fears persecution in their country and reenters the United States to safeguard their life, their manner of reentry does not detract from, but instead supports, an applicant's persecution claim. Additionally, illegal reentry is an offense with no element of danger or violence to others, and has no victim. The Proposed Rule therefore will render meaningless the limiting language of "particularly serious" in the statute and therefore such an expansion is inconsistent with the Act.  Instead, the BIA has explicitly cautioned that manner of entry cannot, as a matter of law, suffice as a basis for a discretionary denial of asylum in the absence of other adverse factors.[29]  Circuit courts have similarly found that barring asylum to an immigrant due to their manner of entry would virtually bar almost all refugees.[30]

---

[26] *See INS v. Stevic*, 467 U.S. 407, 413, 429-30 (1984).

[27] 8 C.F.R. § 1208.13(c)(4).

[28] Adolfo Flores, "An Immigrant Woman Was Allowed To Stay In The US — But Her Three Children Have A Deportation Order," *Buzzfeed*, December 21, 2019, https://www.buzzfeednews.com/article/adolfoflores/an-immigrant-woman-was-allowed-to-stay-in-the-us-but-not.

[29] *Matter of Pula*, 19 I.&N. Dec. at 473-74.

[30] *See, e.g., Hussam F. v. Sessions*, 897 F.3d 707, 718 (6th Cir. 2018) (did not follow proper immigration procedures.); *Zuh v. Mukasey*, 547 F.3d 504, 511 n.4 (4th Cir. 2008); *Huang v. I.N.S.*, 436 F.3d 89, 100 (2d Cir. 2006) ("As with peripheral embellishments, if illegal manner of flight and entry were enough independently to support a denial of asylum, we can readily take notice, from the facts in numerous asylum cases that come before us, that virtually no persecuted refugee would obtain asylum. It follows that Wu's manner of entry, on the facts in this record, could not bear the weight given to it by the IJ."); *Mamouzian v. Ashcroft*, 390 F.3d 1129, 1138 (9th Cir. 2004) (quoting Akinmade v. I.N.S., 196 F.3d 951, 955 (9th Cir. 1999)).

AR.09594

The Departments rely on studies related to recidivism rates of individuals released from state prison for unrelated crimes to the population it now seeks to bar from asylum.[31] For example, in the same study, one in four state prisoners was in prison for violent crimes.[32] The study does not consider misdemeanors, individuals who were detained for a year or less, non-violent offenders, or individuals detained for illegal reentry.

The Proposed Rule also conflates multiple entries by noncitizens having prior removal orders with those who have entered multiple times without ever having their asylum claims heard. Many immigrants who have previously attempted entry to the United States to flee persecution could not have been aware of the complex statutory regime that governs asylum claims and would not have knowingly abandoned their right to apply for asylum. Some asylum seekers have also been wrongly assessed in prior credible fear interviews. And others yet may have previously entered or attempted to enter the United States before the onset of circumstances giving rise to their fear. Preserving discretion to grant asylum in these circumstances allows meritorious asylum seekers to be heard and corrects errors that might have previously occurred, consistent with the Act.

   3.  *Barring those convicted of a crime involving criminal street gangs is inconsistent with the INA*

The Proposed Rule creates a blanket exclusion for anyone who is convicted of a crime – including a misdemeanor – that an asylum adjudicator deems linked to gang activity. Such a categorical bar is inconsistent with the Act as it will include minor crimes construed as gang-related without a propensity to show such an individual is a danger to the community rendering "particularly serious crime" meaningless. It also unnecessarily bars bonafide refugees as the Proposed Rule removes the ability of asylum seekers to submit evidence they were wrongfully accused of being a gang member or arbitrarily included in a gang database.

This rule will confer on asylum adjudicators—who generally are not criminologists, sociologists, or criminal law experts—the responsibility to determine if there is "reason to believe" any conviction flows from activity taken in furtherance of gang activity. Asylum applicants are *already* frequently subjected to wrongful denials of protection because of allegations of gang activity made by the DHS on the basis of information found in notoriously unreliable foreign and national databases infected by racial bias[33] and "fusion" intelligence-gathering centers outside the United States. These asylum seekers are also subject to disparate racial impact of inclusion in gang databases and bar asylum seekers who are themselves fleeing

---

[31] Proposed Rule at 69648.

[32] Update on Prisoner Recidivism: A 9-Year Follow-up Period (2005–2014) 17 (2018) at 2.

[33] Annie Sweeney and Madeline Buckley, "Chicago police gang data collection faulted by city's inspector general as unchecked and unreliable," *Chicago Tribune*, April 11, 2019, https://www.chicagotribune.com/news/breaking/ct-met-chicago-police-gang-data-04112019-story.html; Anita Chabria, "A routine police stop landed him on California's gang database. Is it racial profiling?," *Los Angeles Times*, May 9, 2019, https://www.latimes.com/politics/la-pol-ca-california-gang-database-calgang-criminal-justice-reform-20190509-story.html; Ali Winston, "Marked for Life: U.S. Government Using Gang Databases to Deport Undocumented Immigrants," *The Intercept*, August 11, 2016, https://theintercept.com/2016/08/11/u-s-government-using-gang-databases-to-deport-undocumented-immigrants/.

AR.09595

violence from gangs in their home countries.[34]

Ignoring documentation of the inaccuracy of gang affiliation, the Departments argue all gang-related offenses should be construed as "particularly serious crimes."[35] They cite statistics from up to 16 years ago in an attempt to make the point that gang members commit violent crimes and drug crimes. They then make the illogical leap to the conclusion that *all crimes*— including misdemeanor property crimes—that may be construed as connected to gang activity are particularly serious. Simply put, these constructs are false. Instead, the Proposed Rule will inevitably result in the exclusion from protection of asylum seekers of color who live in economically distressed communities and have obtained a minor conviction such as a property crime, who have experienced racial profiling, and who have plead guilty to some crimes, particularly misdemeanors due to their limitations in financial resources.

Past legislative efforts to expand the grounds of removal and inadmissibility in the INA to include gang membership have failed to pass both houses of Congress.[36] In addition, immigration adjudicators already routinely premise discretionary denials of relief or release on bond on purported gang membership, and scores of alleged gang members have already been deported on grounds related to immigration violations or criminal convictions for which no relief is available.[37] Creating a "gang-related crime" bar will only exacerbate the due process violations already occurring as the result of unsubstantiated information about supposed gang ties.[38]

In addition, by focusing on "reason to believe" as the basis for the bar, rather than the seriousness of the crime, the proposed provision is ultra vires and unconscionably limits the eligibility for asylum of those most in need of protection. The effect of the Proposed Rule would be to expand the number and type of convictions for which an analysis of eligibility is required, sweeping in even petty offenses that would otherwise not trigger immigration consequences. Thus, an asylum applicant convicted of simple assault without use of a weapon, a non-violent property crime, or even possession of under 30 grams of marijuana for personal use (otherwise exempted from the reach of the Proposed Rule), could trigger a bar to asylum if the adjudicator concludes she has "reason to believe" the offense was committed in furtherance of gang

---

[34] *See* Jonanthan Blitzer, "How Gang Victims Are Labeled As Gang Suspects," *The New Yorker*, January 23, 2018, https://www.newyorker.com/news/news-desk/how-gang-victims-are-labelled-as-gang-suspects.

[35] Proposed Rule at p. 69650.

[36] *See* Jessica Chacon, "Whose Community Shield?: Examining the Removal of the 'Criminal Street Gang Member,'" *University of Chicago Legal Forum* 317 (2007: 333-336) (reviewing legislative history of failed efforts to expand removability of those accused of gang related offenses and noting criticism that "[t]he only legal effect of the proposed legislation would be to increase the number of noncitizens lawfully present who would be subject to removal on the basis of their purported associations with individuals involved in group criminal activity.").

[37] For an illustration of Immigration and Customs Enforcement's propensity to make gang allegations on the basis of questionable if not fabricated evidence, and the deference to which the evidence is often granted by immigration adjudicators, *see* Mark Joseph Stern, "Bad Liars," *Slate*, May 16, 2018, https://slate.com/news-and-politics/2018/05/federal-judge-accused-ice-of-making-up-evidence-to-prove-that-dreamer-was-gang-affiliated.html.

[38] *See* Yvette Cabrera, "New ICE Tactic Raises Questions About Due Process," *ThinkProgress*, October 6, 2017, https://thinkprogress.org/ice-targets-gangs-6775356473a8/; Rebecca Hufstader, "Immigration Reliance On Gang Databases: Unchecked Discretion And Undesirable Consequences," 90 *New York University Law Review* 90 (2015): 671.

AR.09596

activity.[39] In making these determinations, asylum adjudicators would be unable to rely on uncorroborated allegations contained in arrest reports, but could nevertheless shield their decisions by relying on discretion.[40]

The Proposed Rule thus invites extended inquiry into the character of young men of color who otherwise have meritorious asylum claims, based on information gained through racially disparate policing practices. This Rule multiplies the harm to asylum seekers of color subject to racially disparate policing that results in racially disparate rates of guilty pleas to minor offenses. This same population is overrepresented in gang databases, which are notoriously inaccurate, outdated, and infected by racial bias.[41]

For example, one of the clients RAICES represented lived in an impoverished neighborhood due to his socio-economic status. Unfortunately, gangs were present in his community, including his school. Although our client is not, and has never been, a gang member, the county police department identified him as an MS-13 gang member. The police department based their finding on our client's involvement in an altercation at his high school with MS-13 gang members and the principal allegedly reporting him as an MS-13 gang member. Our client was not permitted to present evidence to the contrary to the police nor was he aware that they had misidentified him as an MS-13 gang member. Instead, the police stigmatized our client for his Latino race and oversimplified a complicated social-economic problem through which many individuals have to navigate.

The Departments asks for comments on: (1) what should be considered a sufficient link between an asylum seeker's underlying conviction and the gang related activity in order to trigger the application of the proposed bar, and (2) any other regulatory approaches to defining the type of gang-related activities that should render individuals ineligible for asylum. The premise of these questions is wrong: a vague "gang related" bar should not be introduced at all. The INA and existing regulations already provide overly broad bars to asylum where criminal behavior by an asylum seeker causes concern by an adjudicator. Adding this additional, superfluous layer of complication risks erroneously excluding bonafide asylum seekers from protection without adding any useful adjudicatory tool to the process.

### 4. The Rule Revictimizes Vulnerable Populations

The Proposed Rule will disparately impact vulnerable populations already routinely

---

[39] Page 69649 of the Proposed Rule notes that the applicable standard for determining when to apply the bar on asylum seekers convicted of a crime involving criminal street gangs is "reason to believe," as used in 8 U.S.C. § 1182(a)(2)(c), and that the asylum adjudicator may consider "all reliable evidence" in making their decision.

[40] *See Garces v. U.S. A.G.*, 611 F.3d 1337, 1349-50 (11th Cir 2010) (reversing finding of "reason to believe" that the respondent was a participant in drug trafficking based on unsubstantiated arrest reports); *Matter of Rico*, 16 I.&N. Dec. 181, 185-86 (BIA 1977) (relying on pre-hearing admissions to uphold finding of inadmissibility).

[41] Annie Sweeney and Madeline Buckley, "Chicago police gang data collection faulted by city's inspector general as unchecked and unreliable," *Chicago Tribune*, April 11, 2019, https://www.chicagotribune.com/news/breaking/ct-met-chicago-police-gang-data-04112019-story.html; Anita Chabria, "A routine police stop landed him on California's gang database. Is it racial profiling?," *Los Angeles Times*, May 9, 2019, https://www.latimes.com/politics/la-pol-ca-california-gang-database-calgang-criminal-justice-reform-20190509-story.html.

AR.09597

criminalized, including LGBTQ immigrants, survivors of trafficking and domestic violence, and immigrant youth of color.  The expanded criminal bars exclude from safety and a pathway to citizenship those convicted of offenses that are coincidental to their flight from persecution, and do not accomplish the stated goal of making communities safer. They will disparately impact vulnerable populations, who comprise asylum seekers hailing primarily from Central America and the Global South, and those routinely criminalized because of their identities, racially disparate policing practices, or in connection with experiences of trafficking and domestic violence.[42] For these populations especially, the discretion currently delegated to asylum adjudicators is crucial for them to become fully integrated in the larger community. The imposition of additional categorical bars to asylum will only further marginalize asylum seekers already struggling with trauma and discrimination.

Those unjustly precluded from even seeking a discretionary grant of asylum by the Proposed Rule will include, for example: individuals struggling with addiction with one drug-related conviction, regardless of the circumstances of the offense; asylum seekers with two convictions for driving under the influence, regardless of whether the applicant has sought treatment for alcohol addiction or the circumstances of the convictions; community members seeking asylum defensively who have been convicted of a document fraud offense related to their immigration status; and asylum-seeking mothers convicted for bringing their own child across the southern border in an effort to find safety.

The Proposed Rule poses a unique threat to LGBTQ immigrant community members. LGBTQ immigrants in particular may have already experienced a high degree of violence and disenfranchisement from economic and political life in their home countries.[43] Hate violence towards undocumented LGBTQ immigrants in the United States is already disproportionately higher than for other members of the LGBTQ population.[44] Members of these communities also experience isolation from their kinship and national networks following their migration. This isolation, compounded by the continuing discrimination towards the LGBTQ population at large, leave many in the LGBTQ immigrant community vulnerable to trafficking, domestic violence, and substance abuse, in addition to discriminatory policing practices. The expansion of criminal enforcement and prosecution of undocumented people also harms the LGBTQ immigrant community.[45] The Proposed Rule will therefore have a disparate impact on LGBTQ individuals whose involvement in the criminal legal system is often connected to past trauma and/or the

---

[42] D'Vera Cohn et al., "Rise in U.S. Immigrants from El Salvador, Guatemala and Honduras Outpaces Growth from Elsewhere," *Pew Research Center*, December 7, 2017,  https://www.pewresearch.org/hispanic/wp-content/uploads/sites/5/2017/12/Pew-Research-Center_Central_American-migration-to-U.S._12.7.17.pdf.

[43] *See* Aengus Carroll and Lucas Ramon Mendos, *State Sponsored Homophobia: A World Survey of Sexual Orientation Laws: Criminalisation, Protection and Recognition* 12th Ed. (International Lesbian, Gay, Bisexual, Transgender, and Intersex Association (ILGA), 2017), https://ilga.org/downloads/2017/ILGA_State_Sponsored_Homophobia_2017_WEB.pdf.

[44] *See* Sharita Gruberg, "LGBTQ Undocumented Immigrants Face an Increased Risk of Hate Violence," *Center for American Progress*, June 10, 2014, https://www.americanprogress.org/issues/immigration/news/2014/06/10/91233/lgbt-undocumented-immigrants-face-an-increased-risk-of-hate-violence/.

[45] *See, e.g.,* Sharita Gruberg, "How Police Entanglement with Immigration Enforcement Puts LGBTQ Lives at Risk," *Center for American Progress*, April 12, 2017, https://www.americanprogress.org/issues/lgbtq-rights/reports/2017/04/12/430325/police-entanglement-immigration-enforcement-puts-lgbtq-lives-risk/.

AR.09598

result of biased policing

The Proposed Rule is contrary to the Act in that it uses the Act as a blunt instrument that would prevent the use of discretion where such discretion is most needed and most effective. The existing framework for determining if an offense falls within the particularly serious crime bar already provides the latitude for asylum adjudicators to deny relief to anyone found to pose a danger to the community.[46] Furthermore, asylees with convictions that render them inadmissible must apply for a waiver at the time of their applications for permanent residence.[47] These measures ensure that asylum applicants in vulnerable populations have access to supportive resources and have the opportunity to demonstrate their ongoing commitment to social and personal health. Moreover, the existence of provisions allowing the revocation of asylum status ensures that adjudicators may continue to enforce concerns related to the safety of the community even after asylum is granted.

> a. *The Proposed Rule will re-victimize asylum seekers who have self-medicated due to their trauma*

The proposed new bars to asylum include *any* drug-related conviction (with one exception for a first minor marijuana possessory offense)[48] and any second conviction for driving under the influence.[49] This approach is not only cruel but also ignores the evidence. *Particularly* given the vulnerabilities of asylum seeking populations, prior struggles with addiction should be addressed with treatment and compassion, not a closed door and removal order.

Asylum seekers are an inherently vulnerable population because of the trauma they have experienced in their countries of origin and, often, along the journey to find safety. Existing literature suggests that at least one out of every three asylum seekers struggles with depression, anxiety, and/or post-traumatic stress disorder (PTSD).[50] One recent study found the mental health problems facing refugees and asylum seekers so acute that more than a third of the study's sample admitted having suicidal thoughts in the preceding two weeks.[51]

---

[46] Apart from the statutory aggravated felony bar to asylum, the Board of Immigration Appeals and Attorney General have historically utilized a highly circumstantial approach to the particular serious crime determination that would bar an immigrant from receiving asylum. *See e.g., Matter of Juarez*, 19 I.&N. Dec. 664 (BIA 1988) (ordinarily a single misdemeanor that is not an aggravated felony will not be a particularly serious crime); *Matter of Frentescu*, 18 I.&N. Dec. 244 (BIA 1982), *modified* (setting forth several factors to be considered before imposing the particular serious crime bar, including: (i) the nature of the conviction, (ii) the circumstances and underlying facts for the conviction, (iii) the type of sentence imposed, and (iv) whether the type and circumstances of the crime indicate that the individual will be a danger to the community); *Matter of Y-L-, A-G-, R-S-R-,* 23 I.&N. Dec. 270 (A.G. 2002) (setting forth a multi-factor test to determine the dangerousness of a respondent convicted of a drug-trafficking offense who is otherwise barred from asylum as an aggravated felon, but seeking withholding of removal).

[47] 8 U.S.C. § 1159(c) (2012).

[48] Proposed Rule at p. 69654.

[49] *Id.* at 69650-51.

[50] Giulia Turrini et al., "Common mental disorders in asylum seekers and refugees: umbrella review of prevalence and intervention studies," *International Journal of Mental Health Systems* 11 (August 2017): 51, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5571637/.

[51] Megan Brooks, "Refugees have high burden of mental health problems," *Psychiatry and Behavioral Health*

AR.09599

Studies also consistently reveal a high prevalence of comorbidity of PTSD and substance use disorders, with individuals with PTSD *up to 14 times more likely* to struggle with a substance use disorder.[52] Asylum seekers in the United States are often unable to access affordable medical care and treatments for complex trauma;[53] some turn to drugs and alcohol in an effort to self-medicate.[54]

RAICES has represented individuals in counseling who have used drugs and alcohol to self-medicate due to their past trauma. For example, one client included a child who was a victim of sex trafficking. He was forced to perform sex acts in the United States on an adult man on a regular basis. This child used drugs to self-medicate. Through counseling this client was able to process his past persecution and stop abusing drugs. Similarly, RAICES represented a gay child who self-medicated in order to escape his past persecution. RAICES referred him to counseling services where he obtained the support he needed in order to stop abusing drugs. Such vulnerable populations are the exact individuals the Act attempts to protect, not bar from asylum. The Proposed Rule, however, will prevent asylum seekers the opportunity to present the countervailing factors of their past trauma and potential recovery thereby rendering the rule contrary to the Act.

The Rule also disregards and categorically bars individuals from receiving asylum who were used as drug mules by criminal syndicates and cartels at the southern border. Categorically barring victims of human trafficking from asylum is inconsistent with the Act.

> b. *The categorical bar on domestic violence allegations re-victimizes domestic violence survivors*

The Proposed Rule creates a categorical bar on the basis of *mere allegations* of domestic violence without any adjudication of guilt.[55] The Proposed Rule too broadly categorizes domestic violence offenses as particularly serious and sweeps both offenders and survivors into their dragnet. Because such a bar would include refugees the Act seeks to protect, this Rule is contrary to the INA.

---

*Learning Network*, June 2019, https://www.psychcongress.com/article/refugees-have-high-burden-mental-health-problems.

[52] Jenna L McCauley et al., "Posttraumatic Stress Disorder and Co-Occurring Substance Use Disorders: Advances in Assessment and Treatment," *Clinical Psychology Science and Practice* 19, 3 (October 2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3811127/.

[53] For more information on immigrant eligibility for federal benefits, *see* https://www.nilc.org/issues/health-care/.

[54] Carrier Clinic, *Trauma and Addiction* (2019), https://carrierclinic.org/2019/08/06/trauma-and-addiction/ ("...some people struggling to manage the effects of trauma in their lives may turn to drugs and alcohol to self-medicate. PTSD symptoms like agitation, hypersensitivity to loud noises or sudden movements, depression, social withdrawal and insomnia may seem more manageable through the use of sedating or stimulating drugs depending on the symptom. However, addiction soon becomes yet another problem in the trauma survivor's life. Before long, the 'cure' no longer works and causes far more pain to an already suffering person.").

[55] Proposed Rule at p. 69651 explains that the regulations will "render ineligible [non-citizens] who engaged in acts of battery and extreme cruelty in a domestic context in the United States, regardless of whether such conduct resulted in a criminal conviction."

AR.09600

Domestic violence incidents all too often involve the arrest of both the primary perpetrator of abuse and the survivor, sometimes as a direct result of police department dual arrest policies rather than culpability.[56] These "cross-arrests" or "dual arrests" do not always yield clear determinations of victim and perpetrator. Authorizing asylum adjudicators to determine the primary perpetrator of domestic assault, in the absence of a judicial determination, unfairly prejudices survivors who are wrongly arrested in the course of police intervention to domestic disturbances.

The exemption for asylum applicants who can demonstrate their eligibility for a waiver under section 237(a)(7)(A) of the INA does not cure the harm to asylum seekers caused by imposition of a categorical domestic violence related bar.[57] Rather, it converts a non-adversarial asylum proceeding into a multi-factor, highly specific inquiry into culpability based on circumstances that may be very difficult for an asylum seeker to prove—especially if proceeding without counsel and with limited English proficiency.

    5.   *Expanding the "particularly serious" crime bar to include various misdemeanors is inconsistent with the Act*

The expansion of asylum bars to include various misdemeanor offenses that were not previously considered particularly serious renders the term "particularly serious" meaningless and is thereby contrary to the Act. The Rule seeks to bar from asylum designated offenses involving the use of fraudulent documents, the receipt of public benefits under false pretenses, or the possession or trafficking of drugs as disqualifying for purposes of asylum, even if such offenses are misdemeanors rather than felonies.[58] The Departments cite to no evidence of how such misdemeanors are demonstrative of an individual's propensity to be a danger to the community.

It has generally been well understood by the BIA and the Courts of Appeals that low-level, "run-of-the-mill" offenses do not constitute particularly serious crimes.[59] Under this long-standing interpretation of the particularly serious crime bar in the INA, there is simply no scenario in which low-level offenses like misdemeanor driving under the influence where no injury is caused to another or simple possession of a controlled substance or paraphernalia would

---

[56] David Hirschel, et al., "Domestic Violence and Mandatory Arrest Laws: To What Extent Do They Influence Police Arrest Decisions," *Journal of Criminal Law & Criminology* 98, no. 1 (2007-2008): 255, https://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?article=7284&context=jclc (noting that "[i]n some cases, dual arrests may be the result of legislation, department policies, or both failing to require officers to identify the primary aggressor. In addition, when such provisions are present, police may lack the training or information needed to identify the primary aggressor when responding to a domestic violence assault. This situation may be compounded by batterers who have become increasingly adept at manipulating the criminal justice system, and may make efforts to 'pre-empt' victims from notifying police in order to further control or retaliate against them."); Marty Schladen, "ICE Agents Detain Alleged Domestic Violence Victim," *El Paso Times*, February 16, 2017, https://www.elpasotimes.com/story/news/2017/02/15/ice-detains-domestic-violence-victim-court/97965624/ (noting that the immigrant detained, a transgender person previously deported following her conviction for crimes such as possession of stolen mail and assault, was then living at the Center Againts Sexual and Family Violence, a shelter for survivors of intimate partner violence).
[57] 8 U.S.C. § 1227(a)(7)(A).
[58]  Proposed Rule at p. 69653
[59] *Delgado v. Holder*, 648 F.3d 1095, 1110 (9th Cir. 2011) (en banc) (J. Reinhardt, concurring).

AR.09601

constitute a particularly serious crime. As Judge Reinhardt explained in a concurring opinion in *Delgado v. Holder*,[60] a decision the Proposed Rule cites in support of the expanded bars, run-of-the-mill crimes like driving under the influence have "little in common" with other crimes the BIA has deemed particularly serious—e.g., felony menacing with a deadly weapon, armed robbery, and burglary of a dwelling in which the offender is armed or causes injury.[61] Judge Reinhardt further noted that public opinion does not treat them similarly either: "American voters would be unlikely to elect a president or vice president who had committed a particularly serious crime, yet they had no difficulty in recently electing to each office a candidate with a DUI record."[62] Barring individuals from asylum based on these relatively minor offenses renders the "particularly serious" part of the "particularly serious crime" bar meaningless.

The Proposed Rule entirely ignores the migration-related circumstances that often give rise to convictions involving document fraud. Migrants fleeing persecution often leave their home countries with nothing but the clothes on their backs and must rely on informal networks to navigate their new circumstances.[63] Extension of a blanket bar to asylum seekers who are compelled to resort to fraudulent means to enter the United States, or to remain safely during their applications for asylum, upends decades of settled law directing that violations of law arising from an asylum applicant's manner of flight should constitute only one of many factors to be consulted in the exercise of discretion.[64]

Moreover, migrants in vulnerable communities who are struggling to survive during the pendency of their asylum proceedings are often exploited by unscrupulous intermediaries who offer assurances and documentation that turn out to be fraudulent.[65] Many noncitizens working in the low-wage economy face egregious workplace dangers and discrimination and suffer retaliation for asserting their rights.[66] The continued availability of asylum to low-wage immigrant workers can encourage them to step out of the shadows. The expansion of criminal asylum bars to sweep in all document fraud offenses, on the other hand, would unfairly prejudice immigrants with meritorious asylum claims and force them deeper into the dangerous informal economy.

Instead the BIA and Circuit courts have acknowledged that even when immigrants use fraudulent documents they still merit a grant of asylum.[67] To do otherwise is inconsistent with

---

[60]  648 F.3d at 1110 (J. Reinhardt, concurring).

[61] *Id*. at 1110.

[62] *Id*. at 1110.

[63] *See Pula*, 19 I.&N. Dec. at 474.

[64] *Id.*

[65] *See* American Bar Association, "About Notario Fraud," July 19, 2018, https://www.americanbar.org/groups/public_interest/immigration/projects_initiatives/fight-notario-fraud/about_notario_fraud/.

[66] Paul Harris, "Undocumented workers' grim reality: speak out on abuse and risk deportation," *The Guardian*, March 28, 2013, https://www.theguardian.com/world/2013/mar/28/undocumented-migrants-worker-abuse-deportation.

[67] *See, e.g., Pula*, 19 I.&N. Dec. 467 (BIA 1987) (finding applicant warranted favorable exercise of discretion, even though he attempted to enter the United States with fraudulent document); *Matter of Chen*, 20 I.&N. 16 (BIA 1989)(overstayed visa and remained in the US unlawfully); *In re Kasinga*, 21 I.&N. Dec. at 368 (reversing an immigratoin judge's discretionary denial of asylum where the applicant had purchased a fraudulent passport to enter

AR.09602

the Act as it punishes asylum seekers for the manner in which they flee persecution. In RAICES' experience, women and girls would be adversely affected as it is often women and girls who are much less likely to obtain or possess valid travel documents due to misogynistic patriarchal norms in their home country. This means the only means to escape persecution is often procuring fraudulent documents.  Additionally, in RAICES' experience, unaccompanied children and juveniles are provided documents by smugglers and Mexican cartels without knowing they are fraudulent documents. RAICES has represented individuals that were forced to carry identity documents by human smugglers against their will. These case stories demonstrate the Proposed Rule would not further the intention of the Act to protect bonafide asylum seekers but rather punishment for their method of escaping persecution.

The Departments claim the need to bar asylum seekers from asylum if they unlawfully receive public benefits is because they burden taxpayers and drain the public benefits system.[68] Such a statement is unfounded and unsupported. The rate at which non-citizens use public benefit programs is less than that of U.S.-born citizens.[69] According to the Institute on Taxation and Economic Policy, undocumented immigrants contribute an estimated $11.74 billion to state and local economies each year, often paying more in taxes than they receive in benefits.[70]

Aside from the arguments discussed *supra,* this bar unfairly sweeps trafficking survivors into its dragnet. It is becoming more widely recognized across state court systems that trafficking survivors frequently come into contact with intervention resources and service providers only after contact with law enforcement occurs. Innovative criminal justice reform efforts currently being adopted across the country include special trafficking courts that recognize the need for discretion in the determination of criminal culpability.[71] The same approach should be employed in the determination of asylum eligibility, where the applicant's life and safety are on the line.

The Proposed Rule instead precludes asylum adjudicators from incorporating a trauma-centered approach, categorically barring countless trafficking survivors convicted of misdemeanor and felony offenses without any opportunity to present the specific circumstances of their claim. Foreclosing the door to evidence an asylum seeker may submit to a court to determine if it rises to a particularly serious crime is therefore contrary to the Act.

---

the United States); *Zuh v. Mukasey,* 547 F.3d 504 (4th Cir. 2008)(Zuh entered the United States on a borrowed Passport).

[68] Proposed Rule at p. 69653.

[69] *See* Leighton Ku and Brian Bruen, "The Use of Public Assistance Benefits by Citizens and Non-Citizen Immigrants in the United States,"*CATO Working Paper,* Feb. 19, 2013, available at https://www.cato.org/sites/cato.org/files/pubs/pdf/workingpaper-13_1.pdf, last accessed Jan. 16, 2020.

[70] *See* ITEP, "Undocumented Immigrants' State and Local Tax Contributions," Mar. 2, 2017, available at https://itep.org/immigration/, last accessed Jan. 16, 2020; FIU Research Institute on Social and Economic Policy, "Immigrants in Florida: Characteristics and Contrabutions," May 2007, available at https://risep.fiu.edu/research-publications/immigration/immigration-in-florida/2007/immigrants-in-florida-characteristics-and-contributions/immigrants_spring_2007_reduced.pdf, last accessed Jan. 16, 2020.

[71] Elise White, et al., "Navigating Force and Choice: Experiences in the New York City Sex Trade and the Criminal Justice System's Response," *Center for Court Innovation*, December 2017 (noting that 78% of participants in the report's study had been arrested, mostly for non-violent, non-prostitution offenses such as *drug possession*).

AR.09603

**C.  Eliminating the Mandatory Review of Asylum when Withholding of Removal is Granted and Asylum is Only Denied as a Matter of Discretion Revokes a Necessary Protection and is Therefore Inconsistent with the Act.**

8 C.F.R. § 1208.16(e) makes "reconsideration" mandatory when an asylum seeker is denied asylum solely in the exercise of discretion but is subsequently granted withholding of removal. Although instances are rare, this regulation is needed to insure the integrity of the statute. This regulation expressly acknowledges Congress' concern of abuse of discretion in light of the hardship that will befall the asylum applicant  when an immigration judge finds the asylum seeker possess a well-founded fear of persecution in their home country but decides to only grant them withholding of removal.[72] The Proposed Rule eliminates this protection.[73] Doing away with this protection is inconsistent with the Act.

## IV.    THE PROPOSED RULE UNDERMINES THE CONSTITUTION AND THE PRINCIPLES OF FEDERALISM

The Proposed Rule undermines the Constitution and the principles of federalism by requiring adjudicators to engage in a multi-factor process when determining if a conviction or sentence is valid. The Proposed Rule also differentiates between citizens and noncitizens in a manner that is insidiously discriminatory and not related to any compelling interest nor narrowly tailored towards such interest.

The Proposed Rule outlines a new multi-factor process asylum adjudicators must use to determine whether a conviction or sentence remains valid for the purpose of determining asylum eligibility; the proposal includes a rebuttable presumption "against the effectiveness" of an order vacating, expunging, or modifying a conviction or sentence if the order was entered into after the asylum seeker was placed in removal proceedings or if the asylum seeker moved for the order more than one year after the date the original conviction or sentence was entered.[74]

This newly created presumption unfairly penalizes asylum applicants, many of whom may not have the opportunity to seek review of their prior criminal proceedings until applying for asylum.[75] In *Padilla v. Kentucky*, the Supreme Court recognized that the immigration consequences of a conviction are sufficiently serious for the Sixth Amendment to require a noncitizen defendant to be competently advised of them before agreeing to a guilty plea.[76] By imposing a presumption against the validity of a withdrawal or vacatur of a plea, the Proposed Rule hold asylum seekers whose rights were violated under *Padilla* to a different standard; even though they too were denied effective assistance of counsel in the course of their underlying criminal proceedings, asylum seekers will be forced to rebut a presumption that their court-

---

[72] *See Haung v. INS*, 436 F.3d 89, 94 (2nd Cir. 2006).

[73] Proposed Rule at p. 69656-7.

[74] Proposed Rule at p.  69655.

[75] On page 69656 of the Proposed Rule, the Department of Homeland Security and the Department of Justice urge that "[i]t is reasonable to conclude that an alien who has a meritorious challenge to a criminal conviction based on a procedural or substantive defect is more likely to seek post-conviction relief sooner than an alien who is seeking relief on rehabilitative grounds…"

[76] *Padilla v. Kentucky*, 559 U.S. 356 (2010).

17

ordered withdrawal or vacatur is invalid. The Proposed Rule therefore compounds the harm to immigrants who, in addition to facing persecution in their home countries, have been denied a constitutionally compliant process in the U.S. criminal legal system.

Many asylum applicants, especially those in vulnerable populations isolated from resources and unfamiliar with the due process protections available to them in the United States, may not have discovered the defects in their underlying criminal proceedings until their consultation with an immigration attorney, or until they are placed into removal proceedings, which may happen several years after a conviction. Imposing a presumption *against* the validity of a plea withdrawal or vacatur in these cases will undoubtedly lead to the wrongful exclusion of countless immigrants from asylum simply because they were unable to adequately rebut the presumption, particularly in a complex immigration court setting without the benefit of appointed counsel, contrary to the Act.

Additionally, the Proposed Rule violates the principles of federalism by contradicting prior federal, state, or local judge's findings that the asylum applicant is a non-violent offender, does not pose a danger to the community, and therefore imposes a noncustodial sentence and improperly authorizes asylum adjudicators to second-guess the decision of a state court, even where the order on its face cites substantive and procedural defects in the underlying proceeding. The proffered justification for this presumption against the validity of post-conviction relief is to "ensure that aliens do not have their convictions vacated or modified for purported rehabilitative purposes that are, in fact, for immigration purposes," "to codify the principle set forth in *Matter of Thomas and Thompson*," and to bring the analysis of post-conviction orders in line with *Matter of Pickering*.[77] The Departments misread the applicable law, however, by authorizing adjudicators to disregard otherwise valid state orders. Immigration law only requires that to be effective for immigration purposes, orders vacating or modifying convictions must be based on substantive or procedural infirmities in the underlying proceedings. The Proposed Rule goes well beyond that requirement.

The Proposed Rule abandons the presumption of regularity that should accompany state court orders, thus upending settled principles of law. The Proposed Rule cites a misleading quote from *Matter of F-* in support of allowing asylum adjudicators to look beyond the face of a state court order; had the Rule's authors looked to the full case, they would have read the following: "Not only the full faith and credit clause of the Federal Constitution, but familiar principles of law require the acceptance at face value of a judgment regularly granted by a competent court, unless a fatal defect is evident upon the judgment's face. However, the presumption of regularity and of jurisdiction may be overcome by extrinsic evidence or by the record itself."[78] In *Matter of F-*, the BIA offers support for the proposition that an adjudicator should presume the validity of a state court order unless there is a reason to doubt it, contrary to the *presumption of irregularity* put forward in the Proposed Rule.

The authority extended to adjudicators by the Proposed Rule also violates the law of

---

[77] Proposed Rule at p. 69655-56 (*citing Matter of Thomas and Thompson*, 27 I.&N. Dec. 674 (A.G. 2019) and *Matter of Pickering*, 23 I.&N. Dec. 621 (BIA 2003), *rev'd on other grounds by Pickering v. Gonzales*, 465 F.3d 263, 267-70 (6th Cir. 2006)).

[78] *Matter of F-*, 8 I.&N. Dec. 251, 253 (BIA 1959).

AR.09605

multiple circuits, including *Pickering*, on which it relies.[79] In *Pickering v. Gonzales*, the Sixth Circuit Court of Appeals held that despite the noncitizen's stated motive of avoiding negative immigration consequences, the Board of Immigration Appeals was limited to reviewing the authority of the court issuing the order as to the basis for his vacatur.[80] Similarly, in *Reyes-Torres* the Ninth Circuit Court of Appeals held that the motive of the noncitizen was not the relevant inquiry.[81] Rather, "the inquiry must focus on the state court's rationale for vacating the conviction."[82] In addition, the Third Circuit Court of Appeals in *Rodriguez v. U.S. Att'y Gen.*, which the Proposed Rule cites as "existing precedent," held that the adjudicator must look only to the "reasons explicitly stated in the record and may not impute an unexpressed motive for vacating a conviction."[83] Moreover, the *Rodriguez* court stated that to determine the purpose of a vacatur, the adjudicator must first look to the face of the order vacating the conviction, and "if the order explains the courts reasons … the [adjudicator's] inquiry must end there."[84] The Proposed Rule contains no such limiting language to guide the adjudicator's inquiry. Instead, the Proposed Rule grants adjudicators vague and indefinite authority to look beyond even a facially valid vacatur. Such breadth of authority undermines asylum seekers' rights to a full and fair proceeding.

Finally, the above-described presumption is ultra vires and unnecessary as it wrongly extends *Matter of Thomas and Thompson* to all forms of post-conviction relief. As an initial matter, the Proposed Rule's reliance on *Matter of Thomas and Thompson* is flawed. The Attorney General's decision in *Matter of Thomas and Thompson* has no justification in the text or history of the immigration statute. Nowhere does the plain text of the Act support giving adjudicators the authority to give effect only to state court sentence modifications undertaken to rectify substantive or procedural defects in the underlying criminal proceedings. Nor does the legislative history support such a rule. The BIA recognized this in *Matter of Cota-Vargas*, where it concluded that the application of "the *Pickering* rationale to sentence modifications has no discernible basis in the language of the Act."[85] Based on the text of the Immigration and Nationality Act and the well-documented legislative history behind Congress's definition of "conviction" and "sentence" in 8 U.S.C. § 1101(a)(48), the Board determined that Congress intended to ensure that, generally, proper admissions or findings of guilt were treated as convictions for immigration purposes, even if the conviction itself was later vacated. Neither the text of the INA nor the legislative history of the definitions reveal any attempt on Congress's part to change the longstanding practice of giving effect to state court sentencing modifications. For these reasons, the Proposed Rule's reliance on *Matter of Thomas and Thompson* lacks Congressional support for its rule and should not be extended.

---

[79] *See id.* (*citing Matter of Pickering*, 23 I.&N. Dec. 621).

[80] *Pickering v. Gonzales*, 465 F.3d 263, 267-70 (6th Cir. 2006).

[81] *Reyes-Torres v. Holder*, 645 F.3d 1073, 1077-78 (9th Cir. 2011) (*citing Cardoso-Tlaseca v, Gonzales*, 460 F.3d 1102, 1107 n.3 (9th Cir. 2006) and *Pickering v. Gonzales*, 454 F.3d 525 (6th Cir. 2006), *amended and superseded* by *Pickering*, 465 F.3d at 263.

[82] *Id.*

[83] *Rodriguez v. U.S. Att'y Gen.*, 844 F.3d 392, 397 (3d Cir. 2006) (noting that "[T]he IJ may rely only on reasons explicitly stated in the record and may not impute an unexpressed motive for vacating a conviction.").

[84] *Id.* ("Put simply, '[w]e will not . . . permit[ ] . . . speculation . . . about the secret motives of state judges and prosecutors,'" *quoting Pinho v. Gonzales*, 432 F.3d 193, 214-215 (3d Cir. 2005)).

[85] *Matter of Cota-Vargas*, 23 I.&N. Dec. 849, 852 (BIA 2005).

AR.09606

Moreover, as applicants for immigration benefits or relief from removal, asylum seekers already bear the burden of demonstrating their eligibility for asylum.[86] The Proposed Rule does not alter or shift this burden, nor do the Departments provide evidence supporting the need for this presumption. By introducing a presumption of bad faith into asylum adjudication, the Proposed Rule unfairly interferes with asylum seekers' efforts to establish their claims. Immigration law, and asylum law in particular, is already highly complex, and the process of seeking asylum is in many instances re-traumatizing, particularly for applicants who do not have counsel to represent them and who lacked effective counsel in their underlying criminal proceedings. The Proposed Rule as applied to asylum applicants who seek post-conviction relief transform an already difficult process into an adversarial inquiry, contrary to the intent of Congress.

## V.     THE PROPOSED RULE IS INCONSISTENT WITH INTERNATIONAL LEGAL OBLIGATIONS APPLICABLE TO THE UNITED STATES

Although there are sufficient grounds under national law to withdraw the Proposed Rule, the international legal obligations of the United States, which are part of international law, provide additional reason why the Proposed Rule should be withdrawn. The United States acceded to the 1967 Protocol Relating to the Status of Refugees in 1968,[87] binding it to the United Nations Convention Relating to the Status of Refugees[88] and obligating itself to develop and interpret United States refugee law in a manner that complies with the Protocol's principle of non-refoulement (the commitment not to return refugees to a country where they will face persecution on protected grounds), even where potential refugees have allegedly committed criminal offenses.

The United States is also bound by customary international law. According to Article III of the U.S. Constitution, customary international law must be applied as "Laws of the United States."[89] The Supreme Court of the United States has repeatedly and consistently recognized that customary international law is part of U.S. law. The Supreme Court has stated that "[f]or two centuries we have affirmed that the domestic law of the United States recognizes the law of nations [i.e. customary international law]."[90] Indeed, the first Chief Justice of the Supreme Court, Chief Justice John Jay, expressly charged Grand Juries "that the laws of nations make part of the laws of this and of every other civilized nation. They consist of those Rule for regulating the conduct of nations towards each other; which, resulting from right reason, receive their obligations from that principle and from general assent and practice."[91] Justice Gray, writing the

---

[86] *Matter of S-K-*, 23 I.&N. Dec. 936, 939-40 (BIA 2006).

[87] United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268.

[88] Convention Relating to the Statute of Refugees, July 28, 1951, 140 U.N.T.S. 1954 (hereinafter "Refugee Convention").

[89] U.S. Const. art. III, §2, cl. 1.

[90] *Sosa v. Alvarez-Machain*, 542 U.S. 692, 729 (2004).

[91] John Jay, C.J., "Charge to Grand Juries: The Charges of Chief Justice Jay to the Grand Junes on the Eastern circuit at the circuit Courts held in the Districts of New York on the 4th, of Connecticut on the 22d days of April, of Massachusetts on the 4th, and of New Hampshire on the 20th days of May, 1790" in *The Correspondence and*

AR.09607

opinion for the Supreme Court expressly agreed, stating "[t]he most certain guide . . . [to the applicable international law] is a treaty or a statute . . . when . . . there is no written law upon the subject, the duty still rests upon the judicial tribunals of ascertaining and declaring what the law is …."[92] In *The Paquete Habana* case, Justice Gray again writing the opinion for the Supreme Court states that "[i]nternational law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction as often as questions of right depending upon it are duly presented for their determination."[93] Justice Gray further clarified that "[t]his rule of international law is one which . . . [the Supreme Court] . . . administering the law of nations are bound to take judicial notice of, and to give effect to …."[94] The Supreme Court continues to recognize that customary international law is part of U.S. law that must be applied by the U.S. courts.[95] This view is shared by the *Restatement (Third) of the Foreign Relations Law of the United States*, which reads "[i]nternational law and international agreements of the United States are law of the United States   [c]ases arising under international law or international agreements of the United States are within the Judicial Power of the United States …."[96]

Moreover, customary international law cannot be derogated by later legislation. Unlike treaty law that is created at a fixed time—i.e. when the United States becomes a party to a treaty that it has ratified—and which courts have determined can be superseded by later in time legislation, customary international law remains in force at all times. As the Supreme Court stated, in its Opinion written by Justice William Strong:

> customary international law is of universal obligation, and no statute of one or two nations can create obligations for the world. Like all the laws of nations, it rests upon the common consent of civilized communities. It is of force not because it was prescribed by any superior power, but because it has been generally accepted as a rule of conduct.[97]

Customary international law exists with the full force of its creation at all times; that it remains a rule of customary international law. Even good faith efforts by States to change a rule, are violations of the rule of customary international law until that rule has been changed the consensus of States expressed through their opinion juris and practice.

As indicated by the foregoing, the Proposed Rule must be consistent with the international legal obligations of the United States; it is not. While the Convention allows states to exclude and/or expel potential refugees from protection, the circumstances in which this can occur are limited. In particular, the Convention allows states to exclude and/or expel individuals from refugee protection if the individual "having been convicted by a final judgement of a particularly serious crime, constitutes a danger to the community of that country."[98] However,

---

*Public Papers of John Jay*, Vol. III, 387, 393 (Henry P. Johnston, ed., 1891).

[92] *Hilton v. Guyot*, 159 U.S. 113, 163 (1895).

[93] *The Paquete Habana*, 175 U.S. 677, 700 (1900).

[94] *Id*. at 708.

[95] *Bolivarian Republic of Venezuela, et al., v. Helmerich & Payne International Drilling Co., et al.*, 581 U.S. (2017).

[96] Restatement (Third) of the Foreign Relations Law of the United States, § 111 (1987).

[97] *The Scotia*, 81 U.S. 170, 187 (1871).

[98]  Refugee Convention at art. 33(2).

AR.09608

this clause is intended for "extreme cases," in which the particularly serious crime at issue is a "capital crime or a very grave punishable act."[99] The United Nations High Commissioner for Refugees (UNHCR) has asserted that to constitute a "particularly serious crime," the crime "must belong to the gravest category" and be limited "to refugees who become an extremely serious threat to the country of asylum due to the severity of crimes perpetrated by them in the country of asylum."[100] Moreover, the UNHCR has specifically noted that the particularly serious crime bar does not encompass less extreme crimes; "[c]rimes such as petty theft or the possession for personal use of illicit narcotic substances would not meet the threshold of seriousness."[101] Finally, when determining whether an individual should be barred from protection for having been convicted of a particularly serious crime, the adjudicator must conduct an individualized analysis and consider any mitigating factors.[102] Barring asylum based on proposed bars discussed above, especially the manner of entry directly and with whom the asylum seeker, violates the Convention's prohibition on imposing penalties based on a refugee's manner of entry or presence.[103]

The Rule's categorical addition of the enumerated asylum bars and elimination of discretionary adjudications of asylum, amplifies the dissonance between U.S. refugee law and the Convention, as well as the violation of U.S. obligations under the Convention. For example, at p. 69659, the Proposed Rule first excludes from protection anyone who was convicted of a felony and then at p. 69660, defines "felony" as "any crime punishable by more than one of imprisonment" without any reference to other factors, including dangerousness. The Proposed Rule described the increased categorization of the particularly serious crime bar as necessary because the case-by-case adjudication previously used for non-aggravated felony offenses was "inefficient,"[104] but an individualized analysis is exactly what the Convention requires to ensure only those individuals who have been convicted of crimes that are truly serious and therefore present a future danger are placed at risk of refoulement.

Throughout the Proposed Rule, the Departments defend the harsh and broad nature of their proposal by pointing to the continued availability of alternative forms of relief for those precluded from asylum eligibility under the new Rule.[105] The availability of these alternatives forms of relief, however—known as withholding of removal and protection under the CAT— does not nullify the harm created by the Proposed Rule's new limits on asylum. The protections afforded by CAT and by statutory withholding of removal are limited in scope and duration, and they are harder to obtain. As a result, a Rule that limits *bonafide* refugees to withholding of removal and CAT protection would impose a very real harm on individuals who have come to

---

[99] U.N. High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees* 2, U.N. Doc. HCR/IP/Eng/REV. ¶ 154-55, (1979, reissued 2019).

[100] U.N. High Comm'r for Refugees (UNHCR), *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 7 (July 2007), http://www.unhcr.org/enus/576d237f7.pdf.

[101] *Id*. at ¶ 10.

[102] *Id*. at ¶ 10-11; U.N. High Commissioner for Refugees, *The Nationality, Immigration and Asylum Act 2002: UNHCR Comments on the Nationality, Immigration and Asylum Act 2002 (Specification of Particularly Serious Crimes) Order 2004*, 4 (2004).

[103] Refugee Convention at art. 31.

[104] Proposed Rule at p. 69646.

[105] *See, e.g.,* Proposed Rule at p. 69644.

AR.09609

the United States in search of protection.

First, the most serious harm that can befall an individual as a result of the Proposed Rule is removal to persecution and torture, and the existence of withholding of removal does not account for that risk. CAT and withholding protections require a higher level of proof than asylum claims: a clear probability of persecution or torture.[106] Thus, an individual could have a valid asylum claim but be unable to meet the standard under the other forms of relief and therefore would be removed to their country of origin, where they would face persecution or even death.

Even for those who meet the higher standard, withholding and CAT recipients are still subject to significant prejudice. For example, they have no ability to travel internationally. The United Nations Convention Relating to the Status of Refugees[107] affords refugees the right to travel in mandatory terms. Article 28 states, "Contracting States shall issue to refugees lawfully staying in their territory travel documents for the purpose of travel outside their territory." Withholding and CAT recipients do not have access to a travel document as contemplated by Article 28. By regulation, refugee travel documents are available only to asylees.[108] And the BIA requires that an individual granted withholding and CAT—unlike an individual granted asylum—must simultaneously be ordered removed, making any international travel a "self-deportation."[109] Refugees granted only withholding of removal or CAT protection are thus effectively trapped within the United States in long-term limbo.

Withholding recipients likewise face hurdles in access to employment. Article 17 of the Refugee Convention states that a contracting state "shall accord to refugees lawfully staying in their territory the most favorable treatment accorded to nationals of a foreign country in the same circumstances, as regards the right to wage-earning employment." Recipients of withholding enjoy no such right. They must apply for employment authorization, and they face frequent delays in the adjudication of these applications, which often result in the loss of legal authorization to be employed.[110]

And perhaps most fundamentally, there is continuing jeopardy for withholding and CAT recipients that does not exist for asylum recipients. When a noncitizen is granted asylum, the

---

[106] Withholding of removal requires the petitioner to demonstrate his or her "life or freedom would be threatened in that country because of the petitioner's race, religion, nationality, membership in a particular social group, or political opinion." *INS v. Stevic*, 467 U.S. 407, 411 (1984) (quoting 8 U.S.C. § 1231(b)(3)). Unlike asylum, however, the petitioner must show a "clear probability" of the threat to life or freedom if deported to his or her country of nationality. The clear probability standard is more stringent than the well-founded fear standard for asylum. *Id; see also Cardoza-Fonseca*, 480 U.S. at 431 (describing the difference between a well-founded fear of persecution and a clear probability of persecution). For CAT relief, an applicant must show it is more likely than not that he or she will be tortured or killed by or at the government's acquiescence if removed to the home country. 8 C.F.R. § 1208.16(c)(2).

[107] 19 U.S.T. 6223 T.I.A.S. No. 6577 (1968).

[108] 8 C.F.R. § 223.1.

[109] *See Matter of I-S- & C-S-*, 24 I&N. Dec. 432, 434 n.3 (BIA 2008); 8 C.F.R. § 241.7.

[110] 8 C.F.R. § 274a.12(a)(10); *Northwest Immigrant Rights Project, et al. v. USCIS, et al.*, No. 2:15-cv-00813-JLR (W.D. Wash., filed May 22, 2015) (class action regarding delays in adjudication of work authorization).

AR.09610

person receives a legal status.[111] Asylum, once granted, protects an asylee against removal unless and until that status is revoked.[112] None of these protections exists for withholding and CAT recipients. They have no access to permanent residency or U.S. citizenship.[113] Instead, they are subject to a removal order and vulnerable to the permanent prospect of removal to a third country and subject to potential check ins with immigration officials where they can be made to pursue removal to third countries to which they have no connection.[114]

The Proposed Rule is also inconsistent with international law related to family unity. Family has long been held as an international human right.[115] The right to family includes the right to maintain a family together.[116] The right to a shared family life is also drawn from the prohibition against arbitrary interference with the family[117] and from the special family rights accorded to children under international law.[118] The drafters of the 1951 Convention relating to the Status of Refugees urged governments to "take the necessary measures for the protection of the refugee's family", and declared that "the unity of the family... is an essential right of the refugee".[119] The United States, along with the other members of the Executive Committee of UNHCR repeatedly emphasized the importance of family unity.

The Proposed Rule however is inconsistent with international law and the Protocol as it seeks to violate asylum seekers right to family unity. The Rule seeks to bar from asylum eligibility anyone convicted of "smuggling or harboring" even when it involved family members

---

[111] *See, e.g.*, 8 C.F.R. 245.1(d)(1) (defining "lawful immigration status" to include asylees).

[112] *See* 8 U.S.C. § 1158(c)(1)(A).

[113] *Matter of Lam*, 18 I.&N. Dec. 15, 18 (BIA 1981); 8 C.F.R. § 245.1(d)(1) (explaining that only those in "lawful immigration status" can seek permanent residency and excluding withholding recipients from such status); 8 C.F.R. § 209.2(a)(1) (authorizing adjustment of status to permanent residence for asylees); 8 C.F.R. § 316.2 (naturalization available only to permanent residents).

[114] *See R–S–C v. Sessions*, 869 F.3d 1176, 1180 (10th Cir. 2017).

[115] *See* Universal Declaration of Human Rights, UNGA Resolution 217 A (III), 10 Dec. 1948 (hereinafter 'Universal Declaration'),  Art. 16(3), International Covenant on Civil and Political Rights, 1966, 999 UNTS 171 (hereinafter 'ICCPR'), Art. 23(1), and American Convention on Human Rights or 'Pact of San Jose, Costa Rica',´ 1969, Organization of American States (OAS) Treaty Series No. 35 (hereinafter 'ACHR'), Art. 17(1), each state: 'The family is the natural and fundamental group unit of society and is entitled to protection by society and the State.'African Charter on Human and Peoples'Rights, 1981, 21 ILM, 1982, p. 58, Art. 18(1), states: 'The family shall be the natural unit and basis of society. It shall be protected by the State which shall take care of its physical and moral health.'European Social Charter, 1996 (ETS 163, revising the 1961 European Social Charter), Art. 16, states: 'The family as a fundamental unit of society has the right to appropriate social, legal and economic protection to ensure its full development.'

[116] Human Rights Committee (hereinafter 'HRC'), 39th Session, 1990, General Comment No. 19 on Article 23(5) para. 5; *see also*, Caritas Europa-Migration Commission/Churches'Commission for Migrants in Europe/Commission of the Bishops'Conferences of the European Community/International Catholic Migration Commission/Jesuit Refugee Service Europe, 'Position on the Amended EU Commission Proposal for a Council Directive on the Right to Family Reunification', Nov. 2000, para. 2.3; and E. F. Abram, 'The Child's Right to Family Unity in International Immigration Law,' 17(4) Law and Policy, 1995, p. 407

[117] Universal Declaration, Art. 12; ECHR, Art. 8; ICCPR, Art. 17; ACHR, Art. 11(2); Convention on the Rights of the Child, 1989, UNGA Res. 44/25, 20 Dec. 1989 (hereinafter 'CRC'), Art. 16.

[118] CRC, Arts. 3, 9, and 10.

[119] Final Act of the 1951 U. N. Conference of Plenipotentiaries on the Status Of Refugees and Stateless Persons, Recommendation B.

AR.09611

travelling together.[120] Reports show families will travel together as a way to ensure their safety and the integrity of their family.[121] Immigrants rely on family networks for employment, housing, transportation, informal financial services, schooling, childcare, and old age care, and mental health. Accordingly, such a rule is inconsistent with the United States' international obligations.

## VI.    CONCLUSION

For the foregoing reasons, RAICES respectfully urges the Departments not to adopt the Proposed Rule as it is inconsistent with domestic and international law as outlined above. Respectfully submitted,

/s/ Manoj Govindaiah
Manoj Govindaiah
REFUGEE AND IMMIGRANT CENTER
FOR EDUCATION AND LEGAL SERVICES (RAICES)
802 Kentucky Avenue
San Antonio, Texas 78201

---

[120] Proposed Rule 69647.

[121] U.N. High Comm'r for Refugees, Refugee Children: Guidelines on Protection and Care, 1994, available at: http://www.unhcr.org/refworld/docid/3ae6b3470.html; A child's physical safety is also compromised by family separation. Eliahu Frank Abram, The Child's Right to Family Unity in International Immigration Law, 17 Law & Pol'y 397, 399 (1995).

AR.09612

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekl-rpbh
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0464
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** David Strauss

---

## General Comment

January 21, 2020

Submitted via www.regulations.gov
Lauren Alder Reid, Assistant Director Office of Policy, Executive Office for Immigration Review 5107 Leesburg Pike, suite 2616 Falls Church, VA 22041

Maureen Dunn, Chief Division of Humanitarian Affairs, Office of Policy and Strategy U.S. Citizenship and Immigration Services Department of Homeland Security 20 Massachusetts Ave. NW Washington, DC 20529-2140
Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41; Ms. Alder and Ms. Dunn:

I am writing in response to the above-referenced Proposed Rules to express my strong opposition to the Proposed Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019.
Firstly, the Proposed Rules unnecessarily and cruelly exclude bona fide refugees from asylum eligibility. Next, the Proposed Rules violate the letter and spirit of United States international treaty obligations. There are also other reasons, including that those precluded from asylum eligibility will be gravely impacted even if granted withholding or protection under the Convention Against Torture, the Proposed Rules will result in "mini-trials" in immigration court, will undermine judicial efficiency and result in racially-biased decision-making. The proposed definition of "conviction" and "sentence" for the purposes of the new bars further excludes those in need of protection. The Proposed Rules will also disparately impact vulnerable populations already routinely criminalized, including immigrants of minority sexual orientations, survivors of trafficking and domestic violence, and immigrant youth of color. The Proposed Rules are ultra vires to the federal immigration statute to the extent they purport to bar eligibility through a categorical exercise of discretion.
For these and many other reasons I vigorously oppose these proposed rules and request that they be immediately withdrawn.

Sincerely,

David A. Strauss
7306 Trescott Avenue
Takoma Park, MD 20912

---

# Attachments

Rules comment on asylum

January 21, 2020

Submitted via www.regulations.gov

Lauren Alder Reid, Assistant Director Office of Policy, Executive Office for Immigration Review 5107 Leesburg Pike, suite 2616 Falls Church, VA 22041

Maureen Dunn, Chief Division of Humanitarian Affairs, Office of Policy and Strategy U.S. Citizenship and Immigration Services Department of Homeland Security 20 Massachusetts Ave. NW Washington, DC 20529-2140

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41;

Ms. Alder and Ms. Dunn:

I am writing in response to the above-referenced Proposed Rules to express my strong opposition to the Proposed Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019.

Firstly, the Proposed Rules unnecessarily and cruelly exclude bona fide refugees from asylum eligibility. Next, the Proposed Rules violate the letter and spirit of United States international treaty obligations. There are also other reasons, including that those precluded from asylum eligibility will be gravely impacted even if granted withholding or protection under the Convention Against Torture,  the Proposed Rules will result in "mini-trials" in immigration court, will undermine judicial efficiency and result in racially-biased decision-making. The proposed definition of "conviction" and "sentence" for the purposes of the new bars further excludes those in need of protection. The Proposed Rules will also disparately impact vulnerable populations already routinely criminalized, including immigrants of minority sexual orientations,  survivors of trafficking and domestic violence, and immigrant youth of color. The Proposed Rules are ultra vires to the federal immigration statute to the extent they purport to bar eligibility through a categorical exercise of discretion.

**For these and many other reasons I vigorously oppose these proposed rules and request that they be immediately withdrawn.**

Sincerely,

David A. Strauss

7306 Trescott Avenue

Takoma Park, MD 20912

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekl-y3ni
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0465
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Jason Cade

---

## General Comment

From the perspective of a law professor who teaches immigration and asylum law, who has represented asylum seekers and former refugees, and who is also a U.S. citizen concerned about our obligations under international and domestic law, I submit that the all of the changes proposed by this rule are unnecessary, overly harsh, and very likely without sufficient legal basis. The Proposed Rules should be rescinded in their entirety.

The current statutory bars to asylum based on allegations of criminal conduct are already sweeping and extensive. Any conviction for an offense determined to be an "aggravated felony" is already considered a per se "particularly serious crime" and therefore a mandatory bar to asylum. "Aggravated felonies" in the immigration context include crimes that are neither felonies nor aggravated, including many petty offenses that the underlying state penal systems do not consider to be serious offenses. Even for those not categorically barred from relief, the immigration adjudicators maintains discretion to deny asylum for persons with criminal convictions. There is no evidence that the current statutory and discretionary bars to eligibility are insufficient to further the purposes and effectiveness of our immigration and asylum laws.

The Proposed Changes, which would unnecessarily expand and broaden the nature of offenses that can lead to denial of the critical protection of our asylum regime, as well as expand and complicate the kinds of adjudications that can be considered "convictions," will result in an asylum regime that is arbitrary and capricious, lacking in sufficient standards, and unduly harsh.

The effect of these changes will be to increase the burdens on already backlogged immigration courts and to lead to far more erroneous or unwarranted denials of protection to asylum seekers--especially those who cannot afford legal counsel.

Accordingly, the Proposed Changes should be rescinded in their entirety.

Respectfully,

Jason A. Cade, Esq.

AR.09617

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekl-wm2y
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0466
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

We all have a right to ask for asylum and to be safe. These proposed rules are prejudiced against the kind of people who come and ask for asylum. These rules discriminate against Central Americans and Africans specifically. It is not fair to stop someone from asking for asylum if they were in the United States before because situations change all the time. This rule may not impact me and my case but it impacts any human being who is looking for safety and wants to apply for asylum. I am against the proposed rules and I think they are unjust.

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekl-1mrg
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0467
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Kiersten Stewart
**Organization:** Futures Without Violence

## General Comment

See attached file(s)

## Attachments

Final Comments--Immigration Asylum Proposed Rule--1:21:2020

AR.09619



January 21, 2020

*Submitted via* https://www.regulations.gov/document?D=EOIR-2019-0005-0001

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41; Comments in Response to Proposed Rulemaking Procedures for Asylum and Bars to Asylum Eligibility

Dear Ms. Reid and Ms. Dunn:

I am writing on behalf of Futures Without Violence (FUTURES), in response to the Department of Homeland Security (DHS) and Department of Justice's (DOJ) Joint Notice of Proposed Rulemaking Procedures for Asylum and Bars to Asylum Eligibility published in the Federal Register on December 19, 2019.

FUTURES strongly opposes the proposed changes to the asylum process and asylum eligibility. The changes in the proposed rule would be extremely harmful to immigrant survivors of domestic violence, sexual assault, and other gender-based abuses, leading to more women and children being beaten, raped and killed. We urge DHS and DOJ to withdraw the proposed rule in its entirety.

FUTURES is a national nonprofit organization that has worked for more than 35 years to prevent and end violence against women and children in the United States (U.S.) and around the world. We educate about and work to eliminate domestic violence, sexual assault, child abuse, and human trafficking through education and prevention campaigns; training and technical assistance to state agencies, public and private entities, judges and court systems,

1

colleges and universities, and global organizations; and we advance promising policies and practices at the state and federal level that prevent violence and help survivors and their children heal and thrive.

FUTURES staff are experts on family violence prevention, sexual assault, child trauma and human trafficking  and the services and supports necessary for children and women to heal from violence and trauma. Based on that experience, we know that violence against women and children is a global pandemic, affecting one in three women in the world and up to ¾ of the world's children. Recent data from the World Health Organization reveals that up to 1 billion children **aged 2–17 years, have experienced physical, sexual, or emotional violence or neglect in the past year.**  A report co-authored by FUTURES in partnership with the Civil Society Working Group on Women, Peace and Security, shows that women and children in the Northern Triangle – the countries of origin for the overwhelming majority of those seeking asylum at our southern border --- experience rates of sexual assault and violence higher than global averages.  (cite:https://www.futureswithoutviolence.org/wp-content/uploads/5th-US-CSWG-Policy-Brief-December-312c-2017-v7.pdf)

I.      Asylum Provides Critical Safety and Protection for Immigrant Survivors Fleeing Violence and Persecution.

Immigrant survivors who flee to the U.S. to seek asylum do not make the choice lightly. They must leave everything they know, brace themselves for the tremendous danger and peril that awaits them and their children during their journey, and traverse thousands of miles with very few possessions of their own. They do this because they have no choice. They know that they will be killed or seriously injured if they stay in their home countries where their governments do little to protect them from their abusers. "Domestic violence is reportedly the leading form of abuse against women and girls in El Salvador and Honduras…In Guatemala, every 46 minutes a new case of sexual violence is reported, but the number of incidents is likely much higher as many go unreported."[1] Thus, for many immigrant survivors, asylum is their only pathway to safety and protection.

The DHS and DOJ proposed rule seeks to bar many of these vulnerable immigrant survivors of violence from qualifying for asylum. The proposed rule does this in at least three significant ways. First, it establishes *seven* (7) new bars that prevent individuals fleeing violence and persecution from being eligible for asylum. Second, it gives immigration adjudicators unprecedented authority to decide if a state criminal conviction related to domestic violence bars an individual from asylum consideration. Third, it removes the review of discretionary denials of asylum.

---

[1] U.S. CSWG POLICYBrief, "Violence and Insecurity in the Northern Triangle of Central America: Dangerous Choices for Women and Girls," December 31, 2016, https://www.futureswithoutviolence.org/wp-content/uploads/5th-US-CSWG-Policy-Brief-December-312c-2017-v7.pdf.

AR.09621

The proposed rule is completely unnecessary and constructs even more barriers for immigrant survivors seeking safety and protection. The laws, regulations, and process governing asylum adjudications are already exceedingly stringent and harsh. Asylum-seekers bear the evidentiary burden of establishing their eligibility for asylum in the face of complex laws and regulations, without the benefit of appointed counsel and often from a remote immigration jail or a tent erected at the border. New policies that mandate that asylum-seekers apply for asylum in a third country of transit and that they return to Mexico to wait for the adjudication of their cases have imposed additional and more imposing barriers. These new proposed changes create more impediments and prevent immigrant survivors from obtaining the asylum protections they desperately need. Rather than restricting access to protection, the Administration should expand opportunities for vulnerable immigrant survivors to access safety and protection.

II.    The Proposed Rule Violates U.S. Commitments Under the Refugee Convention and the Immigration and Nationality Act.

The U.S. has a long history of providing safety and protection for individuals and families forced to leave their home countries because of violence and persecution. As a party to the 1967 Protocol Relating to the Status of Refugees, which binds parties to the United Nations Convention Relating to the Status of Refugees (Refugee Convention), the U.S. developed section 208 of the Immigration and Nationality Act ("INA"), 8 U.S.C. 1158 to extend asylum protections to immigrants fleeing persecution. For over forty years, the United States has continued to uphold its commitment to helping and protecting those who are fleeing persecution, including gender-based persecution. However, the proposed rule, which creates new categorical bars from asylum protection and expands the serious crime bar beyond the Convention's definition of "capital crime or a very grave punishable act," violates U.S. obligations under the Refugee Convention and the INA to provide asylum-seekers with fair access to asylum protections. These increased and arbitrary barriers to protection are completely incongruent with the commitment the U.S. made in the Refugee Convention and the INA to protect vulnerable refugees fleeing persecution.

III.    The  New Bars to Asylum Will Unjustly Exclude Many Immigrant Survivors with Meritorious Applications from Gaining Asylum Protection.

The proposed rule adds seven new criminal bars to asylum eligibility.[2] These new bars are expansive and will preclude immigrant survivors with meritorious applications from gaining the protection and safety they need through the asylum process.

A.    The Expansion of the "Smuggling or Harboring" Bar to Parents, Who Help Their Children Flee Violence, Harms Families and Punishes Parents for Protecting Their Children.

---

[2] Individuals would be ineligible to seek asylum if they are convicted of a 1) felony offense; 2)"smuggling or harboring" under 8 U.S.C. Section 1324(a); 3) illegal entry under 8 U.S.C. Section 1326; 4) an offense involving "criminal street gangs"; (5) a second offense of driving while intoxicated or impaired; 6) conviction or *accusation of conduct* of acts of battery or extreme cruelty in the domestic context; 7) certain newly defined misdemeanor offenses.

AR.09622

The proposed rule expands the "smuggling and harboring" asylum eligibility bar to include immigrants who are convicted of assisting their spouse, children, or parents escaping persecution to come to the U.S. Under the proposed rule, parents' efforts to bring children to safety will be considered "particularly serious crimes" and classified as aggravated felonies. This new bar means that immigrant survivors who are convicted of helping their children escape from an abuser or perpetrator of sexual violence and enter the U.S. will be deemed felons and ineligible for asylum. Thus, survivors who are protecting their children by fleeing to the U.S. will essentially be punished for seeking to build a life free from violence for themselves and their children. The proposed rule callously penalizes parents for doing what is only human – taking all necessary steps to protect their children from harm.

     B.   The Illegal Reentry Bar Violates the Refugee Convention, Ignores Immigrant Survivors Circumstances, and Criminalizes Immigrant Survivors Desperate for Protection.

The proposed rule bars all applicants convicted of illegal reentry from being eligible for asylum. Baring asylum based on the manner of entry violates the United Nations Convention Relating to the Status of Refugees' prohibition on imposing penalties based on a refugee's manner of entry or presence.[3] This prohibition is critical because it recognizes that individuals fleeing persecution often have little control over the place and manner in which they enter the country where they are seeking protection.

Additionally, the proposed rule completely ignores the reality that immigrant survivors of violence face – once they are sent back to their countries of nationality they are at risk of violent retaliation from their abusers or perpetrators and may even face death.  Many survivors therefore make the perilous journey back to the U.S. after they are removed for the same exact reason they fled before – to escape horrific domestic and sexual violence, desperately hoping that this time, they will be granted asylum and finally be safe. By denying these immigrant survivors the opportunity to seek asylum, the proposed rule denies safety and protection to those with the greatest need.

     C.   The Bar for Conviction or an Accusation of Conduct of Battery or Extreme Cruelty Disregards the Complexity of Domestic Violence and Adversely Harms Survivors.

The proposed rule makes all applicants who have been convicted of domestic assault or battery, stalking, or child abuse in the domestic violence context ineligible for asylum. Additionally, it makes immigrants who are simply *accused of* engaging in battery and extreme cruelty ineligible for asylum.  This proposed rule creates the **only** crime-related bar for which a conviction is not required. DHS and DOJ suggest that the proposed rule protects survivors. However, DHS and DOJ are mistaken and misunderstand the complexity of domestic violence as the proposed rule will cause harm to immigrant survivors of violence.

There are many cases in which immigrant survivors, not their abusers, are arrested and prosecuted for domestic violence offenses. Immigrant survivors who have limited English

---

[3] Convention Relating to the Status of Refugees, July 28, 1951, 140 U.N.T.S. 1954.

AR.09623

proficiency (LEP) may not be able to fully describe the situation and the abuse they experienced to police officers. In many situations, police officers may then turn to the *abusers* or *perpetrators* to interpret.

FUTURES has been working on the front lines of domestic violence services and advocacy and we know from our work that many survivors are arrested in dual arrests because the police use perpetrators as interpreters. In other cases, survivors are arrested and face charges for domestic violence arising from acts of self-defense or because abusive partners or perpetrators manipulate the legal system by filing false claims of abuse. Indeed, it is common to see abusers make false allegations to police and the courts to have immigrant survivors arrested. Indeed, we know of multiple instances where victims who have been accused themselves of domestic violence by an abusive spouse will accept a conviction simply because it is the only way then can get home to children who may be left alone. The proposed rule lacks any understanding of how abusers and perpetrators manipulate the legal system to maintain their power and control. The proposed rule's reliance on an accusation rather than a conviction increases the likelihood that accusers and perpetrators will make false accusations to further harm immigrant survivors.

While there is a proposed waiver for survivors who are deemed to not be the primary aggressor, the waiver is insufficient to mitigate the harm that many survivors will experience. Not only will victim-defendants be swept in, but survivors and their families will be harmed in cases where the allegedly abusive family member has not engaged in a pattern of coercive, controlling behavior, or has demonstrated actual rehabilitation and accountability and is making a significant contribution to the health and well-being of the family.

D. The Misdemeanor Document Fraud Bar Ignores the Realities Faced by Immigrant Survivors of Domestic Violence.

Under the proposed rule, the use of fraudulent documents would prevent an immigrant from being eligible for asylum. This bar has the capacity to provide abusers with additional tools of control and coercion and unfairly penalizes immigrant survivors who have fallen victim to fraud. Abusers often hide or destroy survivors' documents in order to exert dominance and prevent survivors from being able to leave the relationship. As such, immigrant survivors who escape from violence must often search for other ways to obtain documentation. This reality leads survivors to be highly vulnerable to falling prey to fraud by individuals who falsely claim to have the ability to prepare legal documentation for them. Immigrant survivors who have fraudulent documents may therefore genuinely believe that they had taken the necessary steps to acquire legal documents.

Additionally, as FUTURES knows well, most survivors of violence have experienced financial abuse, where the abuser has limited their access to financial resources and forced survivors to depend on them for housing, food, health care, and other basic needs. Survivors who escape from abusive relationships therefore risk falling into poverty and homelessness. As such, survivors may be compelled to resort to any measure to obtain documentation so that they can work and sustain themselves and their children. Access to economic resources is absolutely

5

critical in supporting the safety of survivors who are fleeing domestic violence, sexual assault, and human trafficking. Barring immigrant survivors from asylum for taking measures to ensure that they could feed, clothe, and house themselves and their children is cruel and will only serve to render them even more vulnerable to exploitation.

IV.    The Proposed Rule Creates Inconsistent Adjudications and Gives Immigration Adjudicators Unprecedented Authority in Complex Domestic Violence Circumstances.

The proposed rule allows immigration adjudicators to determine whether a conviction or conduct related to domestic violence or battery and extreme cruelty would prohibit an immigrant from being eligible for asylum. The proposed rule is seriously flawed and will likely lead to inconsistent adjudications. The definition of battery and extreme cruelty differs from state to state. These differing state definitions will create inconsistent adjudications about who is barred from seeking asylum. While such language is appropriate in providing protection for those seeking it, it is highly inappropriate in the context of barring individuals seeking protection against persecution.

The proposed rule also gives immigration adjudicators an unprecedented amount of authority to make determinations that involve the complex dynamics surrounding domestic violence. In order to properly and accurately assess domestic violence, battery, or extreme cruelty, a decision-maker must have experience and in-depth knowledge of the intricacies of abuser-survivor relationships and dynamics; the nuances of the tactics abusers and perpetrators use to control, intimidate, and manipulate survivors; understanding of the ongoing pattern of behavior in abusive relationships; specific vulnerabilities of immigrants to being victimized; and many other important analyses of the domestic nature of abusive conduct. Immigration adjudicators, in all likelihood, lack this expertise and intimate understanding. Putting the responsibility on immigration adjudicators to make these complex decisions about whether conduct amounts to a covered act of battery or extreme cruelty without court findings, following presentations of evidence under oath by adverse parties, is inappropriate, and will likely result in erroneous determinations that will strip immigrant survivors of their right to seek asylum.

The proposed rule also seeks to provide immigration adjudicators with the authority to determine whether a vacated, expunged, or modified conviction or sentence should be recognized in determining whether an immigrant is eligible for asylum. This proposed change undermines the authority of state courts that have experience and expertise and allows immigration adjudicators to essentially question and disbelieve the decisions of court judges. Providing immigration adjudicators with this broad and overextending authority will compromise the ability for immigrant survivors to have a fair and full proceeding.

V.    Withholding of Removal and Protection Under the Convention Against Torture Fail to Adequately Protect Immigrant Survivors of Violence.

The proposed rule offers that immigrants who are ineligible for asylum under the seven new bars may still be able to qualify for Withholding of Removal or protection under the Convention

AR.09625

Against Torture (CAT). While immigrant survivors may not be categorically barred from applying, these forms of relief require a higher burden of proof than asylum. This means that many asylum-seekers excluded from eligibility under the proposed rule will face deportation back to harm if they cannot meet this higher burden. Moreover, the protections afforded by CAT and by statutory Withholding of Removal are limited in scope and duration. Withholding of Removal and CAT protection do not provide a path to lawful permanent residence and do not allow for freedom of travel or for family reunification. Limiting protections for immigrant survivors to Withholding of Removal and CAT will leave them in a continued state of limbo that precludes them from building a safe and secure life for themselves and their children.

VI.    Removing Reconsiderations of Discretionary Denials of Asylum Deprives Immigrant Survivors of the Opportunity to Seek Safety Despite Having Viable Claims of Asylum.

The proposed rule removes the automatic review of a discretionary denial of an asylum seeker's application in the event that the immigrant is denied asylum solely in the exercise of discretion. Rescinding the review of discretionary denials is unjust and severely harms immigrant survivors of violence who often have limited English proficiency and lack the financial resources to retain an attorney. Immigrant survivors are forced to navigate an ever-changing immigration legal system that is incredibly complex and challenging. Thus, maintaining reconsiderations of discretionary denials of asylum is critical to ensure that immigrant survivors who are eligible for asylum have another opportunity to defend and prove their right to obtain asylum protections and remain in the U.S.

VII.    Conclusion

For the reasons set forth above, Futures Without Violence strongly urges DOJ and DHS to rescind the proposed rule. It violates our nation's laws and moral obligations and cruelly prevents many survivors of domestic violence, sexual assault, and human trafficking who are fleeing persecution from obtaining the asylum protections they need and deserve. We instead urge DOJ and DHS to promote policies that account for the desperate reality that immigrant survivors face and seek to maximize their safety throughout the asylum process.

Thank you for the opportunity to submit comments on the Joint Notice of Proposed Rulemaking Procedures for Asylum and Bars to Asylum Eligibility. Please contact me if you have any questions or concerns relating to these comments

Respectfully submitted,


Kiersten Stewart
Director, Public Policy and Washington Office
Futures Without Violence
1320 19th Street, NW #401
Washington, DC. 20036
(202) 595-7383

AR.09626

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekl-zb82
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0468
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Mary Ellen Burns
**Address:**
   81 Saltonstall Avenue
   New Haven,  CT,  06513
**Email:** smeburns@yahoo.com
**Phone:** 2037529068
**Fax:** 2037529136

---

## General Comment

I am the Executive Director of Apostle Immigrant Services, a nonprofit providing immigration legal services in New Haven, Connecticut. I write to oppose the broad expansion of criminal convictions that would bar a grant of asylum. This expansion flies in the face of the purpose of asylum law.

The United States has long served as a beacon of hope for immigrant survivors of domestic and sexual violence and other gender-based abuses. As a party to the 1967 Protocol Relating to the Status of Refugees, which binds parties to the United Nations Convention Relating to the Status of Refugees, the U.S. developed section 208 of the Immigration and Nationality Act ("INA"), 8 U.S.C. 1158 to extend asylum protections to immigrants fleeing persecution. For over forty years, the United States has continued to uphold its commitment to helping and protecting those who are fleeing persecution.

However, by carving out categorical bars from asylum protection and grossly expanding the serious crime bar beyond the Convention's definition of "capital crime or a very grave punishable act," the proposed rule violates our obligations under the Refugee Convention and the INA to provide asylum seekers with fair access to asylum protections. These increased and arbitrary hurdles to protection are wholly incongruent with the letter and spirit of the commitment the United States made in the Refugee Convention and the INA to protect vulnerable refugees fleeing persecution.

The proposed regulation would make the criminal bars to asylum higher than those for employment- and family-based immigration, an anomalous and incomprehensible result. Making a single DUI conviction a bar to asylum, as well as a single conviction for misdemeanors including use of fraudulent documents - the latter with the

AR.09627

justification that this poses a risk to public safety - would be laughable were not the consequences for an asylum seeker so dire. To pose these restrictions for those who have, frequently, suffered trauma and are without resources, even as the administration proposes restrictions on employment authorization for asylum applicants, thus barring their obtaining legitimate documentation, is unjustified and cruel.

US asylum law is, ultimately, rooted in the desire of the nations of the world to avoid a repetition of the scandalous refusal to provide safe harbor to those fleeing Nazi persecution. Our asylum law already sets a high bar for those who must prove their well-founded fear of persecution in their home country. To place these additional obstacles in their way would result in returning persons to face arrest, torture, or death for de minimis offenses. The proposed changes are unjustified and disgraceful.

# PUBLIC SUBMISSION

| | |
|---|---|
| **As of:** January 23, 2020 | |
| **Received:** January 21, 2020 | |
| **Status:** Posted | |
| **Posted:** January 22, 2020 | |
| **Tracking No.** 1k4-9ekm-lym1 | |
| **Comments Due:** January 21, 2020 | |
| **Submission Type:** Web | |

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0469
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Hon. Doug Collins

## General Comment

Please see the attached comments.

## Attachments

Comments of Hon. Doug Collins, Ranking Member House Judiciary Committee- EOIR 18-0002

JERROLD NADLER, New York
CHAIRMAN

DOUG COLLINS, Georgia
RANKING MINORITY MEMBER

# U.S. House of Representatives
## Committee on the Judiciary
### Washington, DC 20515–6216
#### One Hundred Sixteenth Congress

January 21, 2020

Lauren Alder Reid
Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, Suite 2616
Falls Church, VA 22041

**RE: EOIR Docket No. 18-0002**

Assistant Director Reid:

I submit the following written comments in response to the Notice of Proposed Rulemaking ("NPRM") issued by the Departments of Justice and Homeland Security ("Departments") on December 19, 2019, entitled "Procedures for Asylum and Bars to Asylum Eligibility."[1] As Ranking Member of the U.S. House of Representatives Committee on the Judiciary, I write to express general support for the regulatory changes proposed by the NPRM, which constitute a lawful exercise of existing statutory authority that would prevent certain criminals from obtaining asylum. Such a regulation will strengthen the integrity of the asylum program for those who meet the legal requirements of asylum and merit that benefit in the exercise of discretion.

## I. Asylum is an Extraordinary Discretionary Benefit

Asylum is an immigration benefit that exemplifies the welcoming nature of our people and our collective belief that individuals persecuted by their own governments should have a place in which to seek safety. The United States' system is generous. The United States granted asylum to 38,687 individuals in fiscal year 2018,[2] the most recent year for which comprehensive data is available, and the highest number of asylum grants on record since fiscal year 2002.[3] Of those granted applications, 25,439 were affirmatively granted by the DHS, while 13,248 were granted as defensive applications by Immigration Judges.[4]

---

[1] 84 Fed. Reg. 69640 (Dec. 19, 2019).

[2] Mossaad, Nadwa: *Refugees and Asylees: 2018*, October 2019, Department of Homeland Security, Office of Immigration Statistics, Office of Strategy, Policy & Plans, available at
https://www.dhs.gov/sites/default/files/images/OIS/2018/refugees_asylees_2018.pdf.

[3] *2018 Yearbook of Immigration Statistics*, Table 16, Individuals Granted Asylum Affirmatively or Defensively: Fiscal Years 1990 to 2018, Jan. 6, 2020, Department of Homeland Security, Office of Immigration Statistics, available at https://www.dhs.gov/immigration-statistics/yearbook/2018/table16.

[4] *Id.*

1

AR.09630

Asylum is also an extraordinary benefit, in almost all cases leading to lawful permanent residence and U.S. citizenship. Those who are granted asylum are protected from removal to their home country, are permitted to engage in employment in the United States, may travel under certain circumstances, and the spouse or child of the primary applicant may also be granted the same status.[5] Once an asylee has lived in the United States for a year, that asylee applies to adjust status to lawful permanent residence,[6] putting them on a path to apply to become a naturalized U.S. citizen after five years.[7]

Because asylum is such an extraordinary benefit, it is appropriate that it is a discretionary one. In addition to meeting the legal requirements for asylum, an applicant must demonstrate to the satisfaction of the asylum officer or immigration court that they merit such relief in the exercise of discretion.[8] As the Board of Immigration Appeals has noted, "The ultimate consideration when balancing factors in the exercise of discretion is to determine whether a grant of relief, or in this case protection, appears to be in the best interest of the United States."[9]

The vast majority of aliens who meet their burden of proof to establish legal eligibility for asylum are law-abiding individuals who positively contribute to their communities and present with other favorable discretionary factors. If such an alien meets the legal requirements to establish a legitimate claim for asylum, where that alien merits a positive exercise of discretion, they should be granted that relief as their admission to the United States as an asylee would "appear[] to be in the best interest of the United States."

But criminal aliens – especially in cases described under the NPRM, should not be granted such an extraordinary benefit, as their admission would not be in the best interest of the United States. I support a final rule similar to that proposed in the NPRM to ensure that individuals who qualify for asylum are only granted that status where they merit it in the exercise of discretion, and to provide a uniform and fair standard to prevent criminal aliens from gaining a foothold in the United States.

It is important to note that the regulations proposed under the NPRM are only applicable to the discretionary benefit of asylum, which can put an individual on a path to citizenship. They do not foreclose all fear-based protections from removal for aliens who would be barred from asylum. Criminal aliens who are rendered ineligible for asylum under the regulations proposed by the NPRM and who fear being persecuted or tortured in their home country are not precluded by the proposed regulations from applying for protection from removal to that country in the

---

[5] INA §§ 208(b)(3) and (c)(1).

[6] 8 C.F.R. § 209.2(a).

[7] INA § 316(a).

[8] INA § 208(b)(1)(A) ("The Secretary of Homeland Security or the Attorney General *may* grant asylum...") (emphasis added); *Jama v. ICE*, 543 U.S. 335, 346 (2005) ("The word 'may' customarily connotes discretion.").

[9] *Matter of D-A-C-*, 27 I&N Dec. 575, 578 (BIA 2019) (citing *Matter of C-V-T-*, 22 I&N Dec. 7, 11 (BIA 1998) and *Matter of Mendez*, 21 I&N Dec. 296, 305 (BIA 1996).

2

AR.09631

form of withholding of removal under the INA[10] or protection in the form of withholding or deferral under the regulations implementing Article III of the U.N. Convention against Torture.[11]

Because the proposed rule will prevent criminals from obtaining the extraordinary benefit of asylum, and because it will increase the integrity of the program, I generally support promulgating the regulatory changes proposed by the NPRM.

## II.  Regulatory Bars are Appropriate Exercises of Statutory Authority

The asylum statute provides that asylum is a discretionary benefit.[12]  In addition to demonstrating that the applicant has a well-founded fear of persecution on account of the applicant's race, religion, nationality, political opinion, or particular social group,[13] an applicant for asylum must demonstrate to the satisfaction of the asylum officer or immigration court that they merit such relief in the exercise of discretion.[14]  Such adjudicators generally weigh both favorable and adverse factors when making such a determination, and adverse factors considered can include significant violations of the immigration laws, the existence of a criminal record and other evidence of bad character.[15]  Thus, criminal convictions are appropriately considered serious negative discretionary factors.

In my view, an alien's participation in certain criminal activity – including many of the activities described in the NPRM – should constitute a conclusive determination that an applicant does not merit asylum in the exercise of discretion.  Instead of a haphazard approach that could result in aliens with similar convictions receiving different outcomes depending on the adjudicator, a determination should be made by regulation that some offenses should categorically bar an alien from asylum eligibility.  This will ensure fair and uniform application of the immigration laws.

In addition to being a lawful exercise of discretionary authority, the regulations proposed by the NPRM are an appropriate exercise of existing statutory authority to impose additional conditions or limitations on asylum by regulation.  The statute clearly provides for regulations establishing additional conditions or limitations on asylum.[16]  Additional conditions or limitations based on criminality or public safety concerns are also consistent with the statute, as the statute already contains several provisions which seek to exclude individuals from obtaining asylum on the basis

---

[10] INA § 241(b)(3).

[11] 8 C.F.R. § 208.16(c).

[12] INA § 208(b)(1)(A) ("The Secretary of Homeland Security or the Attorney General *may* grant asylum…") (emphasis added); *Jama v. ICE*, 543 U.S. 335, 346 (2005) ("The word 'may' customarily connotes discretion.")

[13] INA §§ 208(b)(1)(B); 101(a)(42)(A)

[14] INA § 208(b)(1)(A) ("The Secretary of Homeland Security or the Attorney General *may* grant asylum…") (emphasis added); *Jama v. ICE*, 543 U.S. 335, 346 (2005) ("The word 'may' customarily connotes discretion.")

[15] *Matter of D-A-C-*, 27 I&N Dec. 575, 577-578 (BIA 2019) (explaining the various factors employed in analyzing various forms of discretionary relief and quoting *Matter of C-V-T-*, 22 I&N Dec. 7, 11 (BIA 1998) (citing *Matter of Marin*, 16 I&N Dec. 581 (BIA 1978)).

[16] INA § 208(b)(2)(C) ("The Attorney General may by regulation establish additional limitations and conditions, consistent with this section, under which an alien shall be ineligible for asylum under paragraph (1)"); *see also* INA § 208(d)(5)(B) ("The Attorney General may provide by regulation for any other conditions or limitations on the consideration of an application for asylum not inconsistent with this Act.").

3

of criminal conduct[17] or other conduct indicating that the applicant does not merit asylum.[18] Thus, the regulations proposed by the NPRM are an appropriate exercise of authority on the basis of discretion and explicit statutory language.

### III. Comments on Proposed Changes

The regulations proposed by the NPRM would add additional bars to asylum for certain aliens engaged in criminal activity or activity indicating that the alien committed domestic violence. The categories of criminal activities proposed by the NPRM that would subject an individual to a mandatory bar tend to indicate that granting asylum – and a pathway to citizenship – to an alien engaged in such activity is not "in the best interest of the United States." Furthermore, the NPRM makes technical amendments to the regulations with respect to the treatment of certain vacated, expunged, or modified convictions, and eliminates an unnecessary provision in current regulations.

#### A. Felony Convictions:

Aliens convicted of a felony should not be granted asylum. A felony is generally defined as a criminal offense where the maximum term of imprisonment authorized exceeds one year.[19] Felonies – as opposed to misdemeanors – are so categorized because they generally involve more serious criminal conduct, which has a higher social cost. Conviction for a felony is such an egregious negative factor that it should conclusively establish that an alien does not merit asylum in all cases. The final rule should remain that the categorization of the crime as a felony – as opposed to the actual sentence imposed – controls the question of whether this bar applies.[20] This is because of the variability of sentences that can be imposed on individuals who commit the same crime yet appear before different judges or are charged in different jurisdictions. Immigration consequences should not vary depending on the jurisdiction or individual personality of a judge, but should be standardized across jurisdictions in the interest of fairness, uniformity, and efficient adjudication.

#### B. Aliens involved in smuggling:

Aliens convicted of alien harboring in violation of 8 U.S.C. § 1324(a)(1)(A) should also be ineligible for asylum. Individuals who concealed, harbored, shielded from detection, or transported an alien, or attempted to do so[21] are guilty of participating in alien smuggling, a business where people are routinely treated not as human beings, but as chattel. The men and

---

[17] *See* INA §§ 208(b)(2)(A)(ii) (particularly serious crime); 208(b)(2)(A)(iii) (serious nonpolitical crime outside the U.S.); 208(b)(2)(B)(i) (conviction for aggravated felony); 208(b)(2)(B)(ii) (offenses designated as particularly serious crimes or serious nonpolitical crimes designated by regulation).

[18] *See* INA §§ 208(b)(2)(A)(i) (alien engaged in persecution of another person on account of a protected ground); 208(b)(2)(A)(iv) (reasonable grounds to regard alien as a danger to the United States); 208(b)(2)(A)(v) (alien presents national security concerns or engaged in terrorist activity).

[19] *See, e.g.*, 18 U.S.C. § 3156(a)(3); 18 U.S.C. § 3559.

[20] 84 Fed. Reg. 69640, 69659 at 208.13(c)(6)(vi)(A) and 69661 at 1208.13(c)(6)(vi)(A).

[21] 8 U.S.C. § 1324(a)(1)(A).

AR.09633

women of the U.S. Department of Homeland Security rescue hundreds of individuals in perilous circumstances every year who were abandoned to their fates by smugglers. Those who participate in such an industry, or who place others into the hands of smugglers, should not be granted asylum. At a minimum, the conduct required for such a conviction demonstrates contempt for U.S. immigration law and a disregard for the value of human life.

### C. Illegal Reentry:

Likewise, aliens convicted of felony illegal reentry in violation of 8 U.S.C. § 1326 have demonstrated contempt for U.S. immigration law and should not be granted asylum. Such aliens have repeatedly violated the immigration laws – as such a conviction requires that the alien have illegally reentered after a prior removal – and intentionally chose not to present themselves at a port of entry. Whether or not the final rule includes the felony bar to asylum, it should incorporate a mandatory bar for those convicted of illegal reentry.

### D. Criminal Street Gang Activity:

Aliens convicted of a crime involving criminal street gang activity are also appropriately excluded under the proposed rule and should remain so in the final rule. Committing criminal acts on behalf of or in furtherance of a criminal street gang is an indicator of ongoing danger to the community. Although widespread criminal activity is not a sufficient legal basis to seek asylum,[22] adjudicators routinely hear testimony about the harm suffered by people subjected to extortion threats, murders, kidnappings, and sexual assaults by organized criminal groups. The victims of gang crimes are not eligible for asylum on the basis of that criminal conduct. Even so, our immigration system should not reward a discretionary benefit to those who would destabilize communities at home and abroad through violence.

The range of crimes committed by street gangs is broad, and not all gang members are convicted of a gang participation offense even if they commit a crime on behalf of the gang. Recognizing this reality, I support the NPRM's approach, permitting an adjudicator to determine – on the basis of sufficient evidence – whether a particular criminal act was committed "in support, promotion, or furtherance of a criminal street gang…".[23] Such a determination would only occur where the adjudicator "knows or has reason to believe" that the crime was committed in furtherance of gang activity on the basis of competent evidence, and is not satisfied by a mere suspicion.[24] Gang violence is a scourge on our communities, and those who further the goals of criminal street gangs should not be put on a path to citizenship.

### E. Multiple DUI Offenses, and DUI Offenses Involving Injury or Death:

---

[22] See Matter of A-B-, 27 I&N Dec. 316, 320 (A.G. 2018) ("Generally, claims by aliens pertaining to domestic violence or gang violence perpetrated by non-governmental actors will not qualify for asylum.").

[23] 84 Fed. Reg. 69640, 69659 at 208.13(c)(6)(ii) and 69660 at 1208.13(c)(6)(ii).

[24] See Garces v. U.S. Att'y Gen., 611 F.3d 1337, 1346-1350 (11th Cir. 2010) (favorably citing the State Department's Foreign Affairs Manual which explains that "Reason to believe" means "more than a mere suspicion – there must exist a probability, supported by evidence…", and finding that the respondent in that case was not subject to inadmissibility pursuant to section 212(a)(2)(C) of the INA where the circumstances of that case merely gave rise to "some suspicion").

AR.09634

I also support the NPRM's proposal that a second offense for driving under the influence of alcohol or drugs, or a single offense resulting in death or serious bodily injury, should render an alien ineligible for asylum.[25] Drunk and impaired driving is a dangerous activity that kills more than 10,000 people in the United States each year and injures many more.[26] We should not reward those with a recidivist DUI record, or those who have already caused injury or death, with asylum.

### F. Domestic Violence, Child Abuse, Stalking, Extreme Cruelty:

Those who engage in domestic violence, child abuse, stalking, and extreme cruelty should not be granted asylum. Domestic violence, child abuse, and stalking is reprehensible conduct by those who prey upon the vulnerabilities of their victims, and it often leads to serious injury or death. Those who would so mistreat their family members or cohabitants do not deserve a path to citizenship. Recognizing that victims who fight back should not be disadvantaged, I support the exception in the NPRM for aliens who were battered or subjected to extreme cruelty and who were not the primary perpetrators of violence in their relationships.[27]

### G. Certain Misdemeanor Offenses:

With respect to the limited provisions making certain misdemeanors disqualifying, I would encourage the Departments to consider including misdemeanor offenses involving sexual abuse or offenses reflecting a danger to children. Such offenses are indicative of an ongoing danger to the community, and should disqualify an applicant so convicted from receiving a discretionary grant of asylum in all circumstances.

### H. Treatment of vacated, expunged, or modified convictions:

I support the NPRM's approach to treating vacated, expunged, or modified convictions and sentences, which is consistent with the Attorney General's decision in *Matter of Thomas and Thompson*, 27 I&N Dec. 674 (A.G. 2019). Such an approach is appropriate in the interests of uniform application of the law across jurisdictions, such that aliens convicted of the same or similar conduct receive the same consequence with respect to asylum eligibility.

### I. Removal of 8 C.F.R. 208.16(e) and 1208.16(e):

I also support removal of the current regulatory provision contained at 8 C.F.R. §§ 208.16(e) and 1208.16(e), as this provision is unnecessary. The regulations currently require an adjudicator who denies an asylum application in the exercise of discretion to revisit and reconsider that denial, again weighing factors – including family reunification[28] – that would already have been considered in the original discretionary analysis.[29] Such a regulation serves no purpose, as one

---

[25] 84 Fed. Reg. 69640, 69659 at 208.13(c)(6)(iii)-(iv) and 69660 at 1208.13(c)(6)(iii)-(iv).

[26] https://www.nhtsa.gov/risky-driving/drunk-driving.

[27] 84 Fed. Reg. 69640, 69660 at 208.13(c)(6)(v)(C) and 69661 at 1208.13(c)(6)(v)(C).

[28] 8 C.F.R. §§ 208.16(e) and 1208.16(e).

[29] *See Matter of D-A-C-*, 27 I&N Dec. 575, 577-578 (BIA 2019) (explaining the various factors employed in analyzing various forms of discretionary relief, including "hardship to the respondent and his family if deportation

should not presume that an adjudicator did not do their job correctly in weighing discretionary factors in the first instance. As noted by the NPRM, such a requirement is inefficient, requiring additional adjudicatory resources to re-evaluate a decision that was only just decided by the same adjudicator, where there are already opportunities to seek review of that discretionary decision through motions to reconsider or an appeal.[30]

## IV. Conclusion

Because asylum is an extraordinary discretionary benefit which places aliens granted it on a path to citizenship, it is paramount that certain criminal aliens be excluded from that benefit. As I indicated previously, the vast majority of aliens who meet the legal requirements for asylum are law-abiding and are likely to positively contribute to their communities. Those individuals with meritorious cases are unaffected by the regulatory changes proposed by this NPRM. Because excluding certain criminals from eligibility will strengthen the integrity of the asylum system and ensure uniform and fair application of the immigration law across the country, I support the Departments' efforts through this NPRM.

Signed,

Doug Collins
Ranking Member

---

occurs…") (quoting *Matter of C-V-T-*, 22 I&N Dec. 7, 11 (BIA 1998) (citing *Matter of Marin*, 16 I&N Dec. 581 (BIA 1978)).

AR.09636

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekm-l323
**Comments Due:** January 21, 2020
**Submission Type:** API

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0470
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Joaquin Castro
**Address:**
  2241 Rayburn House Office Building
  45 Independence Ave SW
  Washington,  DC,  20515
**Email:** kaitlyn.montan@mail.house.gov
**Phone:** 202-225-3236
**Organization:** Office of Congressman Joaquin Castro

---

## General Comment

See attached file(s)

---

## Attachments

1.21.20 Comment Letter on Proposed Changes to Asylum Bars

AR.09637

# Congress of the United States
## Washington, DC 20515

January 21, 2020

The Honorable Chad Wolf
Secretary of Homeland Security
U.S. Department of Homeland Security
Washington, D.C. 20520

The Honorable William P. Barr
Attorney General
U.S. Department of Justice
Washington, D.C. 20530

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41; Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility

Dear Acting Secretary Wolf and Attorney General Barr:

We write to express our strong opposition to the proposed rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019. The Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

On December 19th, the Department of Homeland Security (DHS) and the Department of Justice (DOJ) issued a joint set of proposed rules that would make three primary changes to the rules governing asylum adjudications. We are submitting these comments to express opposition to the entirety of the proposed rules and grave concerns with the administration's continued efforts to exclude refugees from obtaining the security and stability the United States asylum system has long promised.

The asylum protections provided by United States law are sacred. Asylum provides those fleeing horrors with physical safety, a path to citizenship and security, and the opportunity to reunite with immediate family members who may still remain abroad in danger.[1] Specifically, the bars to asylum based on allegations of criminal conduct are *already* sweeping and over-broad in nature and scope.[2] The existing crime bars should be narrowed, not expanded. The agencies' efforts to add *seven* new sweeping categories of barred conduct to the asylum eligibility criteria are unnecessary and cruel. The proposed rules drain the phrase "*particularly serious* crime," 8 U.S.C.

---

[1] The permanency and family reunification benefits that accompany asylum are not provided to those granted withholding of removal or protection under the Convention Against Torture, the alternative forms of relief described throughout the Proposed Rules as a justification for the breadth of the new proposed bars. For more details on the differences between the forms of protection, *see* section VI *infra*.

[2] The existing categorical bars to asylum eligibility are discussed in detail on p. 69641 of the Proposed Rules.

§ 1158, of any sensible meaning.  The proposed rules would constitute a marked departure from past practice. And the agencies have proffered no evidence or data to support these changes.

The proposed rules repeatedly cite increased efficiency as justification for many of the proposed changes.[3] Yet requiring adjudicators to engage in mini-trials to determine the applicability of categorical criminal bars, rather than relying on adjudications obtained through the criminal legal system, will dramatically *decrease* efficiency in the asylum adjudication process.

The section of the proposed rules that outlines a new set of criteria for determining whether a conviction or sentence is valid for the purpose of determining asylum eligibility is an excessive use of authority that is not authorized by the Immigration and Nationality Act. These proposed rules unfairly interfere with asylum seekers' efforts to establish their claims. Immigration and asylum laws are already highly complex, and the process of seeking asylum is in many instances re-traumatizing, particularly for applicants who do not have counsel to represent them and who lacked effective counsel in their underlying criminal proceedings. The proposed rules as applied to asylum applicants who seek post-conviction relief will transform an already difficult process into an adversarial inquiry, contrary to the intent of Congress.

The expanded criminal bars only serve to exclude asylum seekers from safety and a pathway to citizenship and do not accomplish the stated goal of making communities safer. It is already immensely difficult to navigate our asylum and immigration laws. Many individuals are not even aware of their right to apply for asylum until after encounters with immigration enforcement that leads them to service providers and community advocates who can educate them on navigating through their different options. The proposed rules are also serving to exclude vulnerable communities from protection, including LGBTQ immigrants, survivors of trafficking and domestic violence, and immigrant youth of color who have experienced trauma, abuse, coercion, and trafficking. These are communities our asylum laws were created to protect. Despite the unique difficulties they face, the proposed rules would compound their harm and prevent them from achieving family unification and a pathway to citizenship.

When Congress speaks clearly through a statute, the plain meaning of that statute governs.[4]  In the asylum statute, Congress explicitly made the commission of a particularly serious crime a bar to asylum. The canon of interpretation known as *expressio unius est exclusio alterius* instructs that, "expressing one item of [an] associated group or series excludes another left unmentioned."[5] The proposed rules attempt to create numerous categories of discretionary "pseudo-particularly serious crimes," barring asylum through a categorical exercise of discretion even if those offenses are

---

[3] *See* Proposed Rules at 69646, 69656-8.

[4] See, *e.g.*, *Robinson* v. *Shell Oil Co.*, 519 U.S. 337, 340 (1997).

[5] *United States* v. *Vonn*, 535 U.S. 55, 65 (2002).

ultimately found not to be particularly serious crimes. Such an effort violates this canon of interpretation and places the Proposes Rules above our nation's statute.

In conclusion, we denounce the efforts of the Department of Homeland Security and the Department of Justice to once again narrow the doors into the United States for asylum seekers. We ask that these departments consider the comments expressed above and rescind the proposed rules in their entirety.

Sincerely,

Joaquin Castro
Member of Congress

Richard Blumenthal
United States Senator

Juan Vargas
Member of Congress

Raul Grijalva
Member of Congress

Bonnie Watson Coleman
Member of Congress

Jan Schakowsky
Member of Congress

Ro Khanna
Member of Congress

Deb Haaland
Member of Congress

Adriano Espaillat
Member of Congress

Alexandria Ocasio-Cortez
Member of Congress

Linda T. Sánchez
Member of Congress

Grace F. Napolitano
Member of Congress

Tony Cárdenas
Member of Congress

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekm-a2x8
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0471
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

I think the proposed rules are wrong. It is already so hard to get to the point to ask for asylum and these proposed rules are put to make it even harder for people to ask for asylum. These rules prejudice those who were in domestic violence situations who may have to defend themselves and because of that were involved in the criminal justice system. This also prejudices people who crossed the U.S. and returned to their home country only to find out that they would be killed. If these people are sent back, they will likely be killed on the spot. These proposed rules are prejudiced and I am not in agreement with them.

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekm-rlet
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0472
Comment on FR Doc # 2019-27055

---

# Submitter Information

**Name:** Heidi Altman
**Address:**
   National Immigrant Justice Center
   1099 New York Ave. NW 9th floor
   Washington,  DC,  20001
**Email:** haltman@heartlandalliance.org
**Phone:** 312-718-5021

---

# General Comment

Please see the attached PDF for the full comment of the National Immigrant Justice Center (NIJC) in opposition to the proposed Rules.

At a time when the asylum system is under attack and asylum seekers are regularly returned by the United States to harm, these Proposed Rules represent yet one more obstacle to protection for those in need. The Rules entirely strip away access to the asylum system for those with even minor criminal legal involvement. Given the widely acknowledged injustices and racial disparities at play in the United States criminal legal system and the Department of Homeland Security's proven history of levying allegations of criminal conduct on flimsy and unreliable evidence, these Rules will do nothing more than layer harm upon harm.

NIJC urges the Department of Homeland Security and Department of Justice to withdraw the Rules in their entirety and, instead, to devote their resources and energies to ensuring that a full and fair asylum system is made accessible to all those who seek safety here.

---

# Attachments

NIJC Comments NPRM Asylum Bar Expansion 01.21.20 FINAL

AR.09643

# NATIONAL IMMIGRANT JUSTICE CENTER

A **HEARTLAND ALLIANCE** PROGRAM

*Submitted online via https://www.regulations.gov/document?D=EOIR-2019-0005-0001*

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41; Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility

January 21, 2020

To Whom it May Concern:

The National Immigrant Justice Center (NIJC) works to advance the rights of all immigrants, including asylum seekers. We believe the right to asylum to be sacrosanct, and write to express our strong opposition to the above-referenced Proposed Rules relating to eligibility for asylum published in the Federal Register on December 19, 2019.

At a time when the asylum system is under attack and asylum seekers are regularly returned by the United States to harm, these Proposed Rules represent yet one more obstacle to protection for those in need. The Rules entirely strip away access to the asylum system for those with even minor criminal legal involvement. Given the widely acknowledged injustices and racial disparities at play in the United States criminal legal system and the Department of Homeland Security's proven history of levying allegations of criminal conduct on flimsy and unreliable evidence, these Rules will do nothing more than layer harm upon harm. These Rules are cruel in spirit and threaten to result in the denial of safety to those who need it most.

NIJC is dedicated to ensuring human rights protections and access to justice for immigrants, refugees, and asylum seekers. NIJC provides direct legal services to and advocates for these populations through policy reform, impact litigation, and public education. Since its founding more than three decades again, NIJC has been unique in blending individual client advocacy with broad-based systemic change. Headquartered in Chicago, with additional offices elsewhere in the Midwest, San Diego, and Washington, D.C., NIJC provides legal services to more than 10,000 individuals each year, including individuals from across the globe who have come to the United States seeking safety and refuge. In 2018, NIJC provided legal services to more than 1,300 asylum seekers.

We submit this comment today as part of our commitment to our clients and their families and communities. This rule will take the possibility of achieving safety away from many of them.

> One such client is Saulo[1], who is seeking asylum in the United States today. Saulo is afraid to return to his home country in Central America because of a powerful gang waiting to do him and his family harm. Saulo's life in his home country was disrupted after he saved a man who had been victimized by a gang; the gang in turn targeted Saulo, brutally assaulting him and his wife and threatening their young son.

> Saulo and his wife and child escaped to the United States, but escaping the trauma they endured was impossible. Saulo sought to numb the memories of the attack through alcohol; late one night he was arrested on a deserted street for driving under the influence. His therapist observed that, "[p]ersistent traumatic memories related to events in [his home country] … left him very vulnerable to [seeking to] escape his reality through alcohol misuse."

> Saulo faces a conviction for driving under the influence as a result of this incident. Depending on the outcome of his case, should these Proposed Rules become final he could also be stripped of the ability to ever obtain asylum and the permanence it brings with it. For Saulo, the Proposed Rules would add another layer of harm and unnecessary punitive government actions to a lifetime of struggle. Saulo like so many NIJC clients is fighting to overcome unimaginable obstacles to find safety and security for himself and his family; the United States asylum policy should help with that struggle, not layer additional barriers to an already fraught journey.

NIJC urges the Department of Homeland Security and Department of Justice to withdraw the Rules in their entirety and, instead, to devote their resources and energies to ensuring that a full and fair asylum system is made accessible to all those who seek safety here.

---

[1] Pseudonyms are used throughout to protect the privacy of NIJC clients.

This comment will address the following arguments in specificity: 1) The Proposes Rules will exclude bona fide refugees from asylum eligibility; 2) The Proposed Rules violate the letter and spirit of United States international treaty obligations; 3) The Proposed Rules will gravely harm those impacted even if withholding or protection under the Convention Against Torture remain available; 4) the Proposed Rules will undermine judicial efficiency; 5) The proposed definition of "conviction" and "sentence" further exclude those in need of protection; 6) The Proposed Rules will disparately impact vulnerable populations already criminalized; and 7) The Proposed Rules are ultra vires to the federal immigration statute.

1. **The Proposed Rules unnecessarily and cruelly exclude bona fide refugees from asylum eligibility**

The first set of changes proposed by the new rules would add the following seven *categorical* bars to asylum eligibility: (1) any conviction of a felony offense; (2) any conviction for "smuggling or harboring" under 8 U.S.C. § 1324(a), even if the asylum seeker committed the offense for the purpose of bringing her own spouse, child or parent to safety; (3) any conviction for illegal reentry under 8 U.S.C. § 1326; (4) any conviction for an offense "involving criminal street gangs," with the adjudicator empowered to look to any evidence to determine applicability; (5) any second conviction for an offense involving driving while intoxicated or impaired; (6) any conviction *or accusation of conduct* for acts of battery involving a domestic relationship; (7) and any conviction for several newly defined categories of misdemeanor offenses, including *any* drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits.

This section addresses the myriad ways in which these new bars will inevitably result in the return to harm of bona fide refugees who merit asylum protections under international and domestic law. It is particularly shocking that the Department of Homeland Security and the Department of Justice propose these bars to *categorically* bar relief, meaning that asylum applicants deemed to fall within the new seven categories will not even have the opportunity to have their case heard by an asylum officer or immigration judge. These Rules deny even the chance of a day in court to those asking for protection from return to death—a breathtakingly harsh government action.

> *NIJC client Than was granted asylum by an immigration judge who weighed all the equities in Than's case and found him to merit protection. Than came to the United States as a refugee from Burma; when he was a teenager he fell into the wrong crowd and was ultimately convicted of felony possession of a firearm. Prior to coming into the custody of U.S. Immigration and Customs, Than had made numerous positive changes to his life, including working with his local police department to prevent further criminal activity in the area where he lived. Pursuant to current asylum law and policy, Than was able to*

*present his claim for asylum to an immigration judge and demonstrate the many positive equities in his life; the judge exercised his discretion in Than's favor. Had the Proposed Rules been in effect at the time of his hearing, Than would not have even had the chance to present his case and would have been denied protection.*

<u>The barriers to asylum for those previously involved in the criminal legal system are already sweeping in scope; adding more barriers is cruel and unnecessary.</u>

The United States asylum system was first codified in statute through the Refugee Act of 1980, described by one prominent scholar as a bipartisan attempt to "reconcile our rhetoric with our law, our national immigration policy and our international treaty obligations so that we could maintain a consistent posture towards the world as a nation with a strong humanitarian tradition and a unique historic role as a haven for persons fleeing oppression."[2] The Act—among other measures designed to bring the United States domestic legal code into compliance with the provisions of the United Nations Protocol Relating to the Status of Refugees—created a "broad class" of refugees eligible for a discretionary grant of asylum.[3]

The asylum protections provided by United States law are sacred. Asylum provides those fleeing horrors with physical safety, a path to citizenship and security, and the opportunity to reunite with immediate family members who may still remain abroad in danger.[4] Many see the domestic asylum system as a symbol of the United States' commitment never to repeat its failure to save thousands of Jewish refugees refused entry to the United States on the *St. Louis* and others fleeing the Holocaust.[5] Others point to the critical role that domestic asylum policy plays in serving the United States' foreign policy interests abroad.[6] For those individuals seeking asylum in the United States, the stakes could not be higher—a claim denied often means return to death or brutal persecution.[7]

---

[2] Deborah Anker, "The Refugee Act of 1980: An Historical Perspective," *In Defense of the Alien* 5 (1982): 89-94, https://www.jstor.org/stable/23141008?read-now=1&refreqid=excelsior%3A1060953608aa0bdd30d5d506e1ff6318&seq=1#page_scan_tab_contents.
[3] *See I.N.S. v. Cardoza-Fonseca*, 40 U.S. 421, 423 (1987).
[4] The permanency and family reunification benefits that accompany asylum are not provided to those granted withholding of removal or protection under the Convention Against Torture, the alternative forms of relief described throughout the Proposed Rules as a justification for the breadth of the new proposed bars. For more details on the differences between the forms of protection, *see* section VI *infra*.
[5] Dara Lind, "How America's rejections of Jews fleeing Nazi Germany haunts our refugee policy today," *Vox*, January 27, 2017, https://www.vox.com/policy-and-politics/2017/1/27/14412082/refugees-history-holocaust.
[6] Council on Foreign Relations, *Independent Task Force Report No. 63: U.S. Immigration Policy* (2009), 117 (additional or dissenting view by Elisa Massimino) ("For better or worse, the United States sets the standard for reasonable and humane treatment of migrants around the world. If the United States endorses harsh treatment of immigrants, it erodes the norms designed to protect them, and other countries will have license to do the same.").
[7] *See, e.g.*, Sarah Stillman, "When deportation is a death sentence," *The New Yorker*, January 8, 2018, https://www.newyorker.com/magazine/2018/01/15/when-deportation-is-a-death-sentence.

AR.09647

The laws, regulations, and process governing asylum adjudications are already exceedingly harsh. Asylum seekers bear the evidentiary burden of establishing their eligibility for asylum[8] in the face of a complex web of laws and regulations, without the benefit of appointed counsel and often from a remote immigration jail.[9] The obstacles to winning asylum are exceedingly high; indeed in some parts of the country and before certain immigration judges, almost no one succeeds.[10] Today, newly imposed barriers to accessing asylum in the United States are breathtaking in scope, with those seeking safety at the southern border subject to return to dangerous conditions in Mexico and an overlapping web of policies that preclude asylum eligibility for countless migrants simply because of their national origin, manner of entry, or their flight path.[11] There are consistent reports of the documented deaths and brutalities endured by those who sought but were denied asylum protections in the United States.[12]

Specifically, the bars to asylum based on allegations of criminal conduct are *already* sweeping and over-broad in nature and scope.[13] Any conviction for an offense determined to be an "aggravated felony" is considered a *per se* "particularly serious crime" and therefore a mandatory bar to asylum.[14] "Aggravated felony" is a notoriously vague term, which exists only in immigration law. Originally limited to murder, weapons trafficking and drug trafficking,[15] it has metastasized to encompass hundreds of offenses, many of them neither a felony nor aggravated, including petty offenses such as misdemeanor shoplifting, simple misdemeanor battery, or sale of counterfeit DVDs.[16] The existing crime bars should be narrowed, not

---

[8] 8 USC § 1158(b)(1)(B); 8 CFR § 1240.8(d).

[9] *See* Daniel Connolly, Aaron Montes, and Lauren Villagran, "Asylum seekers in U.S. face years of waiting, little chance of winning their cases," *USA Today,* September 25, 2019, https://www.usatoday.com/in-depth/news/nation/2019/09/23/immigration-court-asylum-seekers-what-to-expect/2026541001/.

[10] Manuel Roig-Franzia, "Immigrants risk it all seeking asylum. The answer is almost always 'no,'" *Washington Post,* July 24, 2019, https://www.washingtonpost.com/lifestyle/style/migrants-risk-it-all-seeking-asylum-the-answer-in-court-is-almost-always-no/2019/07/23/9c161b2e-a3f7-11e9-b732-41a79c2551bf_story.html.

[11] The National Immigrant Justice Center maintains a frequently updated timeline providing details of each of the asylum bans and other policies issued and implemented by the administration undermining asylum access at https://www.immigrantjustice.org/issues/asylum-seekers-refugees. For more information on the harms and rights abuses inherent in the Migrant Protection Protocols, or "Return-to-Mexico" program, *see* Human Rights First, *Delivered to Danger* (December 2019), https://www.humanrightsfirst.org/campaign/remain-mexico.

[12] *See, e.g.,* Stillman, "Death Sentence," *supra* (reporting on a database of more than sixty cases of individuals killed after deportation); *see also* Maria Sachetti, "'Death is waiting for him,'" *The Washington Post,* December 6, 2018, https://www.washingtonpost.com/graphics/2018/local/asylum-deported-ms-13-honduras/ (telling the story of Santos Chirino, denied asylum by a Virginia immigration judge, deported, and then murdered by those he told the immigration judge he feared); and Kevin Sieff, "When death awaits deported asylum seekers," *Washington Post,* December 26, 2018, https://www.washingtonpost.com/graphics/2018/world/when-death-awaits-deported-asylum-seekers/.

[13] The existing categorical bars to asylum eligibility are discussed in detail on p. 69641 of the Proposed Rules.

[14] 8 U.S.C. §§ 1158(b)(2)(A)(ii) and (B)(i).

[15] Pub. L. No. 100-690, § 7342, 102 Stat. 4181, 4469-70.

[16] 8 U.S.C. § 1101(a)(43). *See also* Nancy Morawetz, "Understanding the Impact of the 1996 Deportation Laws and the Limited Scope of Proposed Reforms," *Harvard Law Review* 113 (2000): 1939-40 (criticizing the "'Alice-in-Wonderland-like definition of the term 'aggravated felony'"); Melissa Cook, "Banished for Minor Crimes: The Aggravated Felony Provisions of the Immigration and Nationality Act as a Human Rights Violation," *Boston College Third World Law Journal* (2003): 293.

AR.09648

expanded. Even for those not categorically barred from relief, the immigration adjudicator maintains full discretion to deny asylum.[17]

Immigration adjudicators already have vast discretion to deny asylum to those who meet the refugee definition but have been convicted of criminal conduct.[18] Further categorical bars are not needed. The agencies' efforts to add *seven* new sweeping categories of barred conduct to the asylum eligibility criteria is unnecessary and cruel. The Proposed Rules drain the phrase "*particularly serious* crime," 8 U.S.C. § 1158, of any sensible meaning.

The Proposed Rules are also arbitrary and capricious. They would constitute a marked departure from past practice. And the agencies have proffered no evidence or data to support these changes.

One assumption underlying the Proposed Rules, for example, is that every noncitizen convicted of any offense punishable by more than a year in prison necessarily constitutes a danger to the community. But no evidence is provided to support that assumption, and a criminal record, does not, in fact, reliably predict future dangerousness.[19] The Proposed Rules are so capricious as to peremptorily postulate a noncitizen's supposed danger to the community even in circumstances when a federal, state, or local judge has concluded that no danger exists by, for example, imposing a noncustodial sentence. Conviction for a crime does not, without more, make one a present or future danger—which is why the Refugee Convention's particularly serious crime bar, made part of United States law through 8 U.S.C. § 1158, should only properly apply if both (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows that she is a present or future danger.[20]

Similarly, the Proposed Rules fail to address or account for the fact that a significant number of people may agree to plead to a crime as to avoid the threat of a severe sentence; not only is a conviction an unreliable predictor of future danger, it can also be an unreliable indicator of past

---

[17] *See Matter of Pula*, 19 I.&N. Dec. 467 (BIA 1987).

[18] *See id.*

[19] See U.S. Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders* (2017) (noting that recidivism rates fall substantially with age); U.S. Sentencing Commission, *Recidivism Among Federal Violent Offenders* (2019) (noting that non-violent offenders recidivate at significantly lower rates); J. Ramos and M. Wenger, "Immigration and recidivism: What is the Link?" *Justice Quarterly* (2019) (finding no correlation between recidivism rates and citizenship status among those formerly incarcerated for felonies in Florida prisons).

[20] See U.N. High Commissioner for Refugees, *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 11 (July 2007), http://www.unhcr.org/en-us/576d237f7.pdf (the Refugee Convention's particularly serious crime bar only applies if (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows she is a "present or future danger.").

AR.09649

criminal conduct.[21] In addition, the Proposed Rules do not address and make no exception for convictions for conduct influenced by mental illness or duress.

The Board of Immigration Appeals has cautioned that, "in light of the unusually harsh consequences which may befall a [noncitizen] who has established a well-founded fear of persecution; the danger of persecution should generally outweigh all but the most egregious of adverse factors."[22] Yet because of the categorical nature of the seven news bars proposed here, asylum seekers will be precluded from obtaining protection on the basis of a vast array of conduct, without any discretion left to the immigration adjudicator to determine whether the circumstances merit such a harsh penalty. Indeed, in the case of the domestic-violence related ground, the categorical bar will be imposed on the basis of *mere allegations* of conduct without any adjudication of guilt.[23]

Those unjustly precluded from even seeking a discretionary grant of asylum by the Proposed Rules will include, for example: individuals struggling with addiction with one drug-related conviction, regardless of the circumstances of the offense; asylum seekers with two convictions for driving under the influence, regardless of whether the applicant has sought treatment for alcohol addiction or the circumstances of the convictions; community members seeking asylum defensively who have been convicted of a document fraud offense related to their immigration status; and asylum-seeking mothers convicted for bringing their own child across the southern border in an effort to find safety.

> The Proposed Rules cruelly disregard the connections between trauma and involvement in the criminal legal system.

The harsh nature of the Proposed Rules is especially evident when viewed through a trauma-informed lens. Asylum seekers are an inherently vulnerable population because of the trauma they have experienced in their countries of origin and, often, along the journey to find safety. Existing literature suggests that at least one out of every three asylum seekers struggles with depression, anxiety, and/or post-traumatic stress disorder (PTSD).[24] One recent study found the

---

[21] John H. Blume and Rebecca K. Helm, "The Unexonerated: Factually Innocent Defendants Who Plead Guilty," *Cornell Law Review* 100 (2014): 157, https://pdfs.semanticscholar.org/c00f/96d421adf1846d120bf802a8854b5e2c0ff2.pdf.
[22] *Pula*, 19 I.&N. Dec. at 474.
[23] The Proposed Rules at p. 69651 explain that the regulations will "render ineligible [non-citizens] who engaged in acts of battery and extreme cruelty in a domestic context in the United States, regardless of whether such conduct resulted in a criminal conviction."
[24] Giulia Turrini et al., "Common mental disorders in asylum seekers and refugees: umbrella review of prevalence and intervention studies," *International Journal of Mental Health Systems* 11 (August 2017): 51, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5571637/.

AR.09650

mental health problems facing refugees and asylum seekers so acute that more than a third of the study's sample admitted having suicidal thoughts in the preceding two weeks.[25]

Studies also consistently reveal a high prevalence of comorbidity of PTSD and substance use disorders, with individuals with PTSD *up to 14 times more likely* to struggle with a substance use disorder.[26] Asylum seekers in the United States are often unable to access affordable medical care and treatments for complex trauma;[27] some turn to drugs and alcohol in an effort to self-medicate.[28] The proposed new bars to asylum include *any* drug-related conviction (with one exception for a first minor marijuana possessory offense) and any second conviction for driving under the influence. This approach is not only cruel but also ignores the evidence. *Particularly* given the vulnerabilities of asylum-seeking populations, prior struggles with addiction should be addressed with treatment and compassion, not a closed door and deportation order.

> *NIJC client Joshua is currently living safely as an asylee in the United States. Under the Proposed Rules, the very same vulnerability that would result in his harm or death in his home country of the Philippines would have excluded him from asylum. Joshua is a young man from the Philippines who became addicted to meth and was convicted of drug possession. Because of this conviction he faced deportation to the Philippines, where President Duterte has waged a war on drugs that has involved extrajudicial torture and killings. Despite his conviction, Joshua was able to pursue asylum before the immigration judge; in court he was able to demonstrate that despite his offense, he both qualified for and merited asylum in the exercise of discretion. For Joshua, the U.S. asylum system offered a second chance at a safe and whole live. The Proposed Rules threaten to take this second chance away from countless others like Joshua who desperately need it.*

Immigration adjudicators already maintain the authority to deny asylum to individuals with drug-related criminal histories on the basis of discretion; denying asylum seekers even the opportunity to present the countervailing factors of their past trauma and potential recovery is simply cruel.

---

[25] Megan Brooks, "Refugees have high burden of mental health problems," *Psychiatry and Behavioral Health Learning Network*, June 2019, https://www.psychcongress.com/article/refugees-have-high-burden-mental-health-problems.

[26] Jenna L McCauley et al., "Posttraumatic Stress Disorder and Co-Occurring Substance Use Disorders: Advances in Assessment and Treatment," *Clinical Psychology Science and Practice* 19, 3 (October 2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3811127/.

[27] For more information on immigrant eligibility for federal benefits, *see* https://www.nilc.org/issues/health-care/.

[28] Carrier Clinic, *Trauma and Addiction* (2019), https://carrierclinic.org/2019/08/06/trauma-and-addiction/ ("...some people struggling to manage the effects of trauma in their lives may turn to drugs and alcohol to self-medicate. PTSD symptoms like agitation, hypersensitivity to loud noises or sudden movements, depression, social withdrawal and insomnia may seem more manageable through the use of sedating or stimulating drugs depending on the symptom. However, addiction soon becomes yet another problem in the trauma survivor's life. Before long, the 'cure' no longer works and causes far more pain to an already suffering person.").

### 2. The Proposed Rules violate the letter and spirit of United States international treaty obligations

By acceding to the 1967 Protocol Relating to the Status of Refugees,[29] which binds parties to the United Nations Convention Relating to the Status of Refugees,[30] the United States obligated itself to develop and interpret United States refugee law in a manner that complies with the Protocol's principle of non-refoulement (the commitment not to return refugees to a country where they will face persecution on protected grounds), even where potential refugees have allegedly committed criminal offenses. As noted above, adjudicators already have over-broad authority to deny asylum based on allegations of criminal activity, which vastly exceeds the categories for exclusion and expulsion set out in the Convention. Instead of working towards greater congruence with the terms of the Convention, the Proposed Rules carve out categorical bars from protection that violate both the language and spirit of the treaty.

While the Convention allows states to exclude and/or expel potential refugees from protection, the circumstances in which this can occur are limited. In particular, the Convention allows states to exclude and/or expel individuals from refugee protection if the individual "having been convicted by a final judgement of a particularly serious crime, constitutes a danger to the community of that country."[31] However, this clause is intended for "extreme cases," in which the particularly serious crime at issue is a "capital crime or a very grave punishable act."[32] The United Nations High Commissioner for Refugees (UNHCR) has asserted that to constitute a "particularly serious crime," the crime "must belong to the gravest category" and be limited "to refugees who become an extremely serious threat to the country of asylum due to the severity of crimes perpetrated by them in the country of asylum."[33] Moreover, the UNHCR has specifically noted that the particularly serious crime bar does not encompass less extreme crimes; "[c]rimes such as petty theft or the possession for personal use of illicit narcotic substances would not meet the threshold of seriousness."[34] Finally, when determining whether an individual should be barred from protection for having been convicted of a particularly serious crime, the adjudicator must conduct an individualized analysis and consider any mitigating factors.[35]

---

[29] United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268.

[30] Convention Relating to the Statute of Refugees, July 28, 1951, 140 U.N.T.S. 1954 (hereinafter "Refugee Convention").

[31] *Id*. at art. 33(2).

[32] U.N. High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees* 2, U.N. Doc. HCR/IP/Eng/REV. ¶ 154-55, (1979, reissued 2019).

[33] U.N. High Comm'r for Refugees (UNHCR), *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 7 (July 2007), http://www.unhcr.org/enus/576d237f7.pdf.

[34] *Id*. at ¶ 10.

[35] *Id*. at ¶ 10-11; U.N. High Commissioner for Refugees, *The Nationality, Immigration and Asylum Act 2002: UNHCR Comments on the Nationality, Immigration and Asylum Act 2002 (Specification of Particularly Serious Crimes) Order 2004*, 4 (2004).

AR.09652

As noted above, legislation and agency interpretation of the Immigration and Nationality Act have already expanded the particularly serious crime bar far beyond what was contemplated in the Convention by creating categorical particularly serious crimes through the aggravated felony definition. The Proposed Rules would amplify the dissonance between U.S. refugee law and the Convention, as well as the violation of U.S. obligations under the Convention, by creating categorical bars within categorical bars. For example, at p. 69659, the Proposed Rules first exclude from protection anyone who was convicted of a felony and then at p. 69660, define "felony" as "any crime punishable by more than one of imprisonment" without any reference to other factors, including dangerousness. The Proposed Rules described the increased categorization of the particularly serious crime bar as necessary because the case-by-case adjudication previously used for non-aggravated felony offenses was "inefficient,"[36] but an individualized analysis is exactly what the Convention requires to ensure only those individuals who have been convicted of crimes that are truly serious and therefore present a future danger are placed at risk of refoulement.

Additionally, outside of the aggravated felony context, it has generally been well understood by the Board of Immigration Appeals and the Courts of Appeals that low-level, "run-of-the-mill" offenses do not constitute particularly serious crimes.[37] Under this long-standing interpretation of the particularly serious crime bar in the INA, there is simply no scenario in which low-level offenses like misdemeanor driving under the influence where no injury is caused to another or simple possession of a controlled substance or paraphernalia would constitute a particularly serious crime.

The reason for this is common sense. As Judge Reinhardt explained in a concurring opinion in *Delgado v. Holder*,[38] a decision the Proposed Rules cite in support of the expanded bars, run-of-the-mill crimes like driving under the influence have "little in common" with other crimes the Board of Immigration Appeals has deemed particularly serious—e.g., felony menacing with a deadly weapon, armed robbery, and burglary of a dwelling in which the offender is armed or causes injury.[39] Judge Reinhardt further noted that public opinion does not treat them similarly either: "American voters would be unlikely to elect a president or vice president who had committed a particularly serious crime, yet they had no difficulty in recently electing to each office a candidate with a DUI record."[40] Barring individuals from asylum based on these relatively minor offenses renders the "particularly serious" part of the "particularly serious crime" bar meaningless.

---

[36] Proposed Rules at 69646.
[37] *Delgado v. Holder*, 648 F.3d 1095, 1110 (9th Cir. 2011) (en banc) (J. Reinhardt, concurring).
[38]  648 F.3d at 1110 (J. Reinhardt, concurring).
[39] *Id*. at 1110.
[40] *Id*. at 1110.

The expansion of the asylum bar to include individuals who have been convicted of reentering the United States without inspection pursuant to INA § 276[41] is also unlike any of the other bars previously established or as interpreted by the Board of Immigration Appeals or Circuit Courts of Appeals. It is an offense with no element of danger or violence to others, and has no victim. Most significantly, and more so than other bars contained in the Proposed Rules, barring asylum based on the manner of entry directly violates the Convention's prohibition on imposing penalties based on a refugee's manner of entry or presence.[42] This prohibition is a critical part of the Convention because it recognizes that refugees often have little control over the place and manner in which they enter the country where they are seeking refuge.

### 3. Those precluded from asylum eligibility will be gravely impacted even if granted withholding of removal or protection under the Convention Against Torture

Throughout the Proposed Rules, the agencies defend the harsh and broad nature of their proposal by pointing to the continued availability of alternative forms of relief for those precluded from asylum eligibility under the new rules.[43] The availability of these alternatives forms of relief, however—known as withholding of removal and protection under the Convention Against Torture (CAT)—does not nullify the harm created by the Proposed Rule's new limits on asylum. The protections afforded by CAT and by statutory withholding of removal are limited in scope and duration, and they are harder to obtain. As a result, a Rule that limits *bona fide* refugees to withholding of removal and CAT protection would impose a very real harm on individuals who have come to the United States in search of protection.

First, the most serious harm that can befall an individual as a result of these Proposed Rules is removal to persecution and torture, and the existence of withholding of removal does not account for that risk. CAT and withholding protections demand a higher level of proof than asylum claims: a clear probability of persecution or torture.[44] Thus, an individual could have a valid asylum claim but be unable to meet the standard under the other forms of relief and therefore would be removed to their country of origin, where they would face persecution or even death.

---

[41] Proposed Rules at 69659, 69660.

[42] Refugee Convention, *supra*, at art 31.

[43] *See, e.g.,* Proposed Rules at 69644.

[44] Withholding of removal requires the petitioner to demonstrate his or her "life or freedom would be threatened in that country because of the petitioner's race, religion, nationality, membership in a particular social group, or political opinion." *INS v. Stevic*, 467 U.S. 407, 411 (1984) (quoting 8 U.S.C. § 1231(b)(3)). Unlike asylum, however, the petitioner must show a "clear probability" of the threat to life or freedom if deported to his or her country of nationality. The clear probability standard is more stringent than the well-founded fear standard for asylum. *Id; see also Cardoza-Fonseca*, 480 U.S. at 431 (describing the difference between a well-founded fear of persecution and a clear probability of persecution). For CAT relief, an applicant must show it is more likely than not that he or she will be tortured or killed by or at the government's acquiescence if removed to the home country. 8 C.F.R. § 1208.16(c)(2).

Even for those who meet the higher standard, withholding and CAT recipients are still subject to significant prejudice. For example, they have no ability to travel internationally. The United Nations Convention Relating to the Status of Refugees[45] affords refugees the right to travel in mandatory terms. Article 28 states, "Contracting States shall issue to refugees lawfully staying in their territory travel documents for the purpose of travel outside their territory." Withholding and CAT recipients do not have access to a travel document as contemplated by Article 28. By regulation, refugee travel documents are available only to asylees.[46] And the Board of Immigration Appeals requires that an individual granted withholding and CAT—unlike an individual granted asylum—must simultaneously be ordered removed, making any international travel a "self-deportation."[47] Refugees granted only withholding of removal or CAT protection are thus effectively trapped within the United States in long-term limbo.

Withholding and CAT recipients also face permanent separation from their spouses and children. Because international travel is prohibited, these individuals cannot reconnect with their families in a third country. And they also cannot reunite with family in the United States because only asylees and refugees are eligible to petition for a spouse and children to join them as derivatives on that status.[48] For many, this will mean that the Proposed Rules institute yet another formal policy of family separation. For example, a mother with two young children who flees to the United States and is subject to one of the expanded asylum bars will not be able to ensure that her children will be able to obtain protection in the United States with her if she is granted relief. Rather, if her children are still in her home country, they would need to come to the United States and seek asylum on their own, likely as unaccompanied children. If her children fled to the United States with her, then they will need to establish their own eligibility for protection before an immigration judge, no matter their age.

Recently, this exact scenario played out with a mother who was subject to the so-called Migrant Protection Protocols (also known as Remain in Mexico) and the asylum "transit ban,"[49] which made the mother ineligible for asylum and thus required the children to establish their independent eligibility for withholding and CAT protection. An immigration judge granted the mother withholding of removal but denied protection to her young children, leaving the children with removal orders and immense uncertainty about their future.[50] Under the expanded bars in the Proposed Rules, these situations will certainly increase, separating families and forcing parents to return to countries where it has been established they more likely than not will face persecution and torture, rather than leaving their children on their own.

---

[45] 19 U.S.T. 6223 T.I.A.S. No. 6577 (1968).
[46] 8 C.F.R. § 223.1.
[47] *See Matter of I-S- & C-S-*, 24 I.&N. Dec. 432, 434 n.3 (BIA 2008); 8 C.F.R. § 241.7.
[48] 8 C.F.R. § 208.21(a).
[49] 8 C.F.R. § 1208.13(c)(4).
[50] Adolfo Flores, "An Immigrant Woman Was Allowed To Stay In The US — But Her Three Children Have A Deportation Order," *Buzzfeed*, December 21, 2019, https://www.buzzfeednews.com/article/adolfoflores/an-immigrant-woman-was-allowed-to-stay-in-the-us-but-not.

Furthermore, neither withholding of removal nor CAT protection allow family members who are in the United States together and pursuing protection on the same basis to apply as derivatives on a principal application. As a result, family claims for those rendered ineligible for asylum by the new rules will have to be adjudicated separately, and potentially before different adjudicators even when the claims are interrelated and even when minor children may not be in a position to explain the claim at all or as sufficiently as a parent. In addition to being unjust to the affected family members, this approach would result in gross inefficiencies.[51]

Withholding recipients likewise face hurdles in access to employment. Article 17 of the Refugee Convention states that a contracting state "shall accord to refugees lawfully staying in their territory the most favorable treatment accorded to nationals of a foreign country in the same circumstances, as regards the right to wage-earning employment." Recipients of withholding enjoy no such right. They must apply for work authorization, and they face frequent delays in the adjudication of these applications, which often result in the loss of legal authorization to work.[52]

And perhaps most fundamentally, there is continuing jeopardy for withholding and CAT recipients that does not exist for asylum recipients. When a noncitizen is granted asylum, the person receives a legal status.[53] Asylum, once granted, protects an asylee against removal unless and until that status is revoked.[54] None of these protections exists for withholding and CAT recipients. They have no access to permanent residency or citizenship.[55] Instead, they are subject to a removal order and vulnerable to the permanent prospect of deportation to a third country and subject to potential check ins with immigration officials where they can be made to pursue removal to third countries to which they have no connection.[56]

### 4. The Proposed Rules will result in "mini-trials" in immigration court, undermine judicial efficiency and result in racially-biased decision-making

In two significant ways, the Proposed Rules require immigration adjudicators to engage in decision-making to determine whether an asylum applicant's conduct—considered independently of any criminal court adjudication—triggers a categorical bar to asylum eligibility. First, the agencies propose that immigration adjudicators be allowed to consider "all reliable

---

[51] See, e.g., Marissa Esthimer, "Crisis in the Courts: Is the Backlogged U.S. Immigration Court System at Its Breaking Point?," *Migration Policy Institute*, October 3, 2019, https://bit.ly/2sJuEWR.

[52] 8 C.F.R. § 274a.12(a)(10); *Northwest Immigrant Rights Project, et al. v. USCIS, et al.*, No. 2:15-cv-00813-JLR (W.D. Wash., filed May 22, 2015) (class action regarding delays in adjudication of work authorization).

[53] *See, e.g.*, 8 C.F.R. 245.1(d)(1) (defining "lawful immigration status" to include asylees).

[54] *See* 8 U.S.C. § 1158(c)(1)(A).

[55] *Matter of Lam*, 18 I.&N. Dec. 15, 18 (BIA 1981); 8 C.F.R. § 245.1(d)(1) (explaining that only those in "lawful immigration status" can seek permanent residency and excluding withholding recipients from such status); 8 C.F.R. § 209.2(a)(1) (authorizing adjustment of status to permanent residence for asylees); 8 C.F.R. § 316.2 (naturalization available only to permanent residents).

[56] *See R–S–C v. Sessions*, 869 F.3d 1176, 1180 (10th Cir. 2017).

evidence" to determine whether there is "reason to believe" an offense was "committed for or related to criminal gang evidence," or "in furtherance of gang-related activity, triggering ineligibility for asylum in either case.[57] Second, the Proposed Rules permit immigration adjudicators to "assess all reliable evidence in order to determine whether [a] conviction amounts to a domestic violence offense;" and to go even further by considering whether non-adjudicated *conduct* "amounts to a covered act of battery or extreme cruelty."[58]

Requiring adjudicators to make complex determinations regarding the nature and scope of a particular conviction or, in the case of the domestic violence bar, *conduct*, will lead to massive judicial inefficiencies and slanted "mini-trials" within the asylum adjudication process. The scope of the "reliable evidence" available to adjudicators in asylum cases is potentially limitless; advocates on both sides would be obligated to present fulsome arguments to make their cases about gang connections to the underlying activity or the relationship of the asylum applicant to the alleged victim. Because of the lack of robust evidentiary rules in immigration proceedings, it will be difficult if not impossible for many applicants to rebut negative evidence marshaled against them, even if false; and in other cases, asylum applicants will struggle to find evidence connected to events that may have happened years prior (especially for those detained). Asylum trials, which are typically three or fewer hours under current policies, would provide insufficient time to fully present arguments on both sides of these unwieldy issues.

As the immigration courts contend with backlogs that now exceed one million cases,[59] tasking adjudicators with a highly nuanced, resource-intensive assessment of the connection of a conviction to gang activity and/or the domestic nature of alleged criminal conduct—assessments far outside their areas of expertise—will prolong asylum proceedings and invariably lead to erroneous determinations that will give rise to an increase in appeals. The Proposed Rules repeatedly cite increased efficiency as justification for many of the proposed changes.[60] Yet requiring adjudicators to engage in mini-trials to determine the applicability of categorical criminal bars, rather than relying on adjudications obtained through the criminal legal system, will dramatically *decrease* efficiency in the asylum adjudication process.

Indeed, the Supreme Court has "long deemed undesirable" exactly the type of "post hoc investigation into the facts of predicate offenses" proposed by the agencies here.[61] Instead, for more than a century the federal courts have repeatedly embraced the "categorical approach" to determine the immigration consequence(s) of a criminal offense, wherein the immigration

---

[57] *See* Proposed Rules at 69649.
[58] *See* Proposed Rules at 69652.
[59] Marissa Esthimer, "Crisis in the Courts: Is the Backlogged U.S. Immigration Court System at Its Breaking Point?," *Migration Policy Institute*, October 3, 2019, https://www.migrationpolicy.org/article/backlogged-us-immigration-courts-breaking-point.
[60] *See* Proposed Rules at 69646, 69656-8.
[61] *Moncrieffe v. Holder*, 569 U.S. 184, 186 (2013).

adjudicator relies on the statute of conviction as adjudicated by the criminal court system, without relitigating the nature or circumstances of the offense in immigration court.[62] As the Supreme Court has explained, this approach "promotes judicial and administrative efficiency by precluding the relitigation of past convictions in minitrials conducted long after the fact."[63] In *Moncrieffe v. Holder*, the Court forewarned of exactly the sort of harm that would arise from these Proposed Rules; in that case, the Court rejected the government's proposal that immigration adjudicators determine the nature and amount of remuneration involved in a marijuana-related conviction, noting that "our Nation's overburdened immigration courts" would end up weighing evidence "from, for example, the friend of a noncitizen" or the "local police officer who recalls to the contrary," with the end result a disparity of outcomes depending on the whims of the individual immigration judge and a further burdened court system.[64]

Particularly in the context of the new proposed bar related to alleged gang affiliation, NIJC is concerned that creating a blanket exclusion for anyone who is convicted of a crime – including a misdemeanor – that an immigration adjudicator deems linked to gang activity will erroneously prevent bona fide asylum seekers from receiving protection. This rule confers on immigration adjudicators—who generally are not criminologists, sociologists, or criminal law experts—the responsibility to determine if there is "reason to believe" any conviction flows from activity taken in furtherance of gang activity. This rule will necessarily ensnare asylum seekers of color who have experienced racial profiling and a criminal legal system fraught with structural challenges and incentives to plead guilty to some crimes, particularly misdemeanors. These same individuals are vulnerable to being erroneously entered into gang databases. Such databases are notoriously inaccurate, outdated, and infected by racial bias.[65]

Indeed, asylum applicants are *already* frequently subjected to wrongful denials of protection because of allegations of gang activity made by the Department of Homeland Security on the basis of information found in notoriously unreliable foreign databases and "fusion" intelligence-gathering centers outside the United States. Empowering immigration adjudicators to render

---

[62] *See Moncrieffe*, 569 U.S. at 191 ("This categorical approach has a long pedigree in our Nation's immigration law."). For a more fulsome history of the development of the categorical approach in immigration court, *see* Alina Das, "The Immigration Penalties of Criminal Convictions: Resurrecting Categorical Analysis in Immigration Law," *New York University Law Review* 86, no. 6 (2011): 1689 - 1702, https://www.nyulawreview.org/wp-content/uploads/2018/08/NYULawReview-86-6-Das.pdf.

[63] *Moncrieffe*, 569 U.S. at 200-201.

[64] *Id.* at 201.

[65] Annie Sweeney and Madeline Buckley, "Chicago police gang data collection faulted by city's inspector general as unchecked and unreliable," *Chicago Tribune*, April 11, 2019, https://www.chicagotribune.com/news/breaking/ct-met-chicago-police-gang-data-04112019-story.html; Anita Chabria, "A routine police stop landed him on California's gang database. Is it racial profiling?," *Los Angeles Times*, May 9, 2019, https://www.latimes.com/politics/la-pol-ca-california-gang-database-calgang-criminal-justice-reform-20190509-story.html.

asylum applicants *categorically* excluded from protection on the basis of such spurious allegations will inevitably result in the return of many refugees back to harm.[66]

The Departments curiously argue that all gang-related offenses should be construed as "particularly serious crimes."[67] They cite statistics from up to 16 years ago in an attempt to make the point that gang members commit violent crimes and drug crimes. They then make the illogical leap to the conclusion that *all crimes*—including misdemeanor property crimes—that may be construed as connected to gang activity are particularly serious. This simply does not follow; in fact, the Proposed Rules will inevitably result in the exclusion from protection of asylum seekers of color who live in economically distressed communities and have obtained a minor conviction such as a property crime. Relying on the definition of "particularly serious crime" to prevent asylum seekers convicted of even minor crimes construed as gang-related from accessing asylum protection is disingenuous at best, and tinged with racial animus at worst.

The Departments asks for comments on: (1) what should be considered a sufficient link between an asylum seeker's underlying conviction and the gang related activity in order to trigger the application of the proposed bar, and (2) any other regulatory approaches to defining the type of gang-related activities that should render individuals ineligible for asylum. The premise of these questions is wrong: a vague "gang related" bar should not be introduced at all. The Immigration and Nationality Act and existing regulations already provide overly broad bars to asylum where criminal behavior by an asylum seeker causes concern by an adjudicator. Adding this additional, superfluous layer of complication risks erroneously excluding bona fide asylum seekers from protection without adding any useful adjudicatory tool to the process.

5. **The proposed definition of "conviction" and "sentence" for the purposes of the new bars further excludes those in need of protection**

The section of the Proposed Rules that outlines a new set of criteria for determining whether a conviction or sentence is valid for the purpose of determining asylum eligibility is an ultra vires exercise of authority that is not authorized by the Immigration and Nationality Act. The Proposed Rules impose an unlawful presumption against asylum eligibility for applicants who seek post-conviction relief while in removal proceedings or longer than one year after their initial convictions. They also deny full faith and credit to state court proceedings by attributing improper motives to state court actors.[68]

---

[66] Melissa del Bosque, "Immigration Officials Use Secretive Gang Databases to Deny Migrant Asylum Claims," *Pro Publica*, July 8, 2019, https://www.propublica.org/article/immigration-officials-use-secretive-gang-databases-to-deny-migrant-asylum-claims.
[67] Proposed Rules at p. 69650.
[68] *See Saleh v. Gonzales*, 495 F.3d 17, 25-26 (2d Cir. 2007) (discussing 28 U.S.C. § 1738, requiring federal courts to give full faith and credit to state acts, records, and judicial proceedings and U.S. Const. art. IV, § 1, and finding that there was no violation where the Board of Immigration Appeals stopped short of "refusing to recognize or relitigating the validity of [Saleh's] state conviction.").

<u>The Proposed Rules undermine Sixth Amendment protections and harms immigrants unfamiliar with the complex criminal and immigration framework governing prior convictions.</u>

The Proposed Rules outline a new multi-factor process asylum adjudicators must use to determine whether a conviction or sentence remains valid for the purpose of determining asylum eligibility; the proposal includes a rebuttable presumption "against the effectiveness" of an order vacating, expunging, or modifying a conviction or sentence if the order was entered into after the asylum seeker was placed in removal proceedings or if the asylum seeker moved for the order more than one year after the date the original conviction or sentence was entered.[69]

This newly created presumption unfairly penalizes asylum applicants, many of whom may not have the opportunity to seek review of their prior criminal proceedings until applying for asylum.[70] In *Padilla v. Kentucky*, the Supreme Court recognized that the immigration consequences of a conviction are sufficiently serious for the Sixth Amendment to require a noncitizen defendant to be competently advised of them before agreeing to a guilty plea.[71] By imposing a presumption against the validity of a withdrawal or vacatur of a plea, the Proposed Rules hold asylum seekers whose rights were violated under *Padilla* to a different standard; even though they too were denied effective assistance of counsel in the course of their underlying criminal proceedings, asylum seekers will be forced to rebut a presumption that their court-ordered withdrawal or vacatur is invalid. The Proposed Rules therefore compound the harm to immigrants who, in addition to facing persecution in their home countries, have been denied constitutionally compliant process in the United States criminal legal system.

Many asylum applicants, especially those in vulnerable populations isolated from resources and unfamiliar with the due process protections available to them in the United States, may not have discovered the defects in their underlying criminal proceedings until their consultation with an immigration attorney, or until they are placed into removal proceedings, which may happen several years after a conviction. Imposing a presumption *against* the validity of a plea withdrawal or vacatur in these cases will undoubtedly lead to the wrongful exclusion of countless immigrants from asylum simply because they were unable to adequately rebut the presumption, particularly in a complex immigration court setting without the benefit of appointed counsel.

---

[69] Proposed Rules at 69655.
[70] On page 69656 of the Proposed Rules, the Department of Homeland Security and the Department of Justice urge that "[i]t is reasonable to conclude that an alien who has a meritorious challenge to a criminal conviction based on a procedural or substantive defect is more likely to seek post-conviction relief sooner than an alien who is seeking relief on rehabilitative grounds…"
[71] *Padilla v. Kentucky*, 559 U.S. 356 (2010).

AR.09660

<u>The Proposed Rules violate the full faith, and credit to which state court decisions are entitled.</u>

The Proposed Rules further improperly authorize immigration adjudicators to second-guess the decision of a state court, even where the order on its face cites substantive and procedural defects in the underlying proceeding. The proffered justification for this presumption against the validity of post-conviction relief is to "ensure that aliens do not have their convictions vacated or modified for purported rehabilitative purposes that are, in fact, for immigration purposes," "to codify the principle set forth in *Matter of Thomas and Thompson*," and to bring the analysis of post-conviction orders in line with *Matter of Pickering*.[72] The agencies misread the applicable law, however, by authorizing adjudicators to disregard otherwise valid state orders. The immigration law only requires that to be effective for immigration purposes, orders vacating or modifying convictions must be based on substantive or procedural infirmities in the underlying proceedings. The Proposed Rule goes well beyond that requirement.

The Proposed Rules abandon the presumption of regularity that should accompany state court orders, thus upending settled principles of law. The Proposed Rules cite a misleading quote from *Matter of F-* in support of allowing asylum adjudicators to look beyond the face of a state court order; had the Rules' authors looked to the full case, they would have read the following: "Not only the full faith and credit clause of the Federal Constitution, but familiar principles of law require the acceptance at face value of a judgment regularly granted by a competent court, unless a fatal defect is evident upon the judgment's face. However, the presumption of regularity and of jurisdiction may be overcome by extrinsic evidence or by the record itself."[73] In *Matter of F-*, the Board of Immigration Appeals offers support for the proposition that an adjudicator should presume the validity of a state court order unless there is a reason to doubt it, contrary to the *presumption of irregularity* put forward in the Proposed Rules.

The authority extended to adjudicators by the Proposed Rules also violates the law of multiple circuits, including *Pickering*, on which it relies.[74] In *Pickering v. Gonzales*, the Sixth Circuit Court of Appeals held that despite the petitioner's stated motive of avoiding negative immigration consequences, the Board of Immigration Appeals was limited to reviewing the authority of the court issuing the order as to the basis for his vacatur.[75] Similarly, in *Reyes-Torres* the Ninth Circuit Court of Appeals held that the motive of the respondent was not the relevant

---

[72] Proposed Rules at 69655-56 (*citing Matter of Thomas and Thompson*, 27 I.&N. Dec. 674 (A.G. 2019) and *Matter of Pickering*, 23 I.&N. Dec. 621 (BIA 2003), *rev'd on other grounds by Pickering v. Gonzales*, 465 F.3d 263, 267-70 (6th Cir. 2006)).
[73] *Matter of F-*, 8 I.&N. Dec. 251, 253 (BIA 1959).
[74] *See id*. (*citing Matter of Pickering*, 23 I.&N. Dec. 621).
[75] *Pickering v. Gonzales*, 465 F.3d 263, 267-70 (6th Cir. 2006).

inquiry.[76] Rather, "the inquiry must focus on the state court's rationale for vacating the conviction."[77] In addition, the Third Circuit Court of Appeals in *Rodriguez v. U.S. Att'y Gen.*, which the Proposed Rules cite as "existing precedent," held that the adjudicator must look only to the "reasons explicitly stated in the record and may not impute an unexpressed motive for vacating a conviction."[78] Moreover, the *Rodriguez* court stated that to determine the purpose of a vacatur, the adjudicator must first look to the face of the order vacating the conviction, and "if the order explains the courts reasons … the [adjudicator's] inquiry must end there."[79] The Proposed Rules contain no such limiting language to guide the adjudicator's inquiry. Instead, the Rules grant adjudicators vague and indefinite authority to look beyond even a facially valid vacatur. Such breadth of authority undermines asylum seekers' rights to a full and fair proceeding.

> ### The Proposed Rules wrongly extend *Matter of Thomas and Thompson* to all forms of post-conviction relief and impose an ultra vires and unnecessary burden on asylum seekers.

Finally, the above-described presumption is ultra vires and unnecessary. As an initial matter, the Proposed Rules' reliance on *Matter of Thomas and Thompson* is flawed. The Attorney General's decision in *Matter of Thomas and Thompson* has no justification in the text or history of the immigration statute. Nowhere does the plain text of the Immigration and Nationality Act support giving adjudicators the authority to give effect only to state court sentence modifications undertaken to rectify substantive or procedural defects in the underlying criminal proceedings. Nor does the legislative history support such a rule. The Board of Immigration Appeals recognized this in *Matter of Cota-Vargas*, where it concluded that the application of "the *Pickering* rationale to sentence modifications has no discernible basis in the language of the Act."[80] Based on the text of the Immigration and Nationality Act and the well-documented legislative history behind Congress's definition of "conviction" and "sentence" in 8 U.S.C. § 1101(a)(48), the Board determined that Congress intended to ensure that, generally, proper admissions or findings of guilt were treated as convictions for immigration purposes, even if the conviction itself was later vacated. Neither the text of the INA nor the legislative history of the definitions reveal any attempt on Congress's part to change the longstanding practice of giving effect to state court sentencing modifications. For these reasons, *Matter of Thomas and Thompson* lacks Congressional support for its rule and should not be extended.

---

[76] *Reyes-Torres v. Holder*, 645 F.3d 1073, 1077-78 (9th Cir. 2011) (*citing Cardoso-Tlaseca v, Gonzales*, 460 F.3d 1102, 1107 n.3 (9th Cir. 2006) and *Pickering v. Gonzales*, 454 F.3d 525 (6th Cir. 2006), *amended and superseded* by *Pickering*, 465 F.3d at 263.
[77] *Id*.
[78] *Rodriguez v. U.S. Att'y Gen*., 844 F.3d 392, 397 (3d Cir. 2006) (noting that "[T]he IJ may rely only on reasons explicitly stated in the record and may not impute an unexpressed motive for vacating a conviction.").
[79] *Id*. ("Put simply, '[w]e will not . . . permit[ ] . . . speculation . . . about the secret motives of state judges and prosecutors,'" *quoting Pinho v. Gonzales*, 432 F.3d 193, 214-215 (3d Cir. 2005)).
[80] *Matter of Cota-Vargas*, 23 I.&N. Dec. 849, 852 (BIA 2005).

AR.09662

Moreover, as applicants for immigration benefits or relief from removal, asylum seekers already bear the burden of demonstrating their eligibility for asylum.[81] The Proposed Rules do not alter or shift this burden, nor do they provide evidence supporting the need for this presumption. By introducing a presumption of bad faith into asylum adjudication, the Proposed Rules unfairly interfere with asylum seekers' efforts to establish their claims. Immigration law, and asylum law in particular, is already highly complex, and the process of seeking asylum is in many instances re-traumatizing, particularly for applicants who do not have counsel to represent them and who lacked effective counsel in their underlying criminal proceedings. The Proposed Rules as applied to asylum applicants who seek post-conviction relief transform an already difficult process into an adversarial inquiry, contrary to the intent of Congress.

### 6. The Proposed Rules will disparately impact vulnerable populations already routinely criminalized, including LGBTQ immigrants, survivors of trafficking and domestic violence, and immigrant youth of color

The expanded criminal bars exclude from safety and a pathway to citizenship those convicted of offenses that are coincident to their flight from persecution, and do not accomplish the stated goal of making communities safer. They will disparately impact vulnerable populations, who comprise asylum seekers hailing primarily from Central America and the Global South, and those routinely criminalized because of their identities, racially disparate policing practices, or in connection with experiences of trafficking and domestic violence.[82] For these populations especially, the discretion currently delegated to asylum adjudicators is crucial for them to become fully integrated in the larger community. The imposition of additional categorical bars to asylum will only further marginalize asylum seekers already struggling with trauma and discrimination.

The Proposed Rules turn asylum into a blunt instrument that would prevent the use of discretion where it is most needed and most effective. The existing framework for determining if an offense falls within the particularly serious crime bar already provides the latitude for asylum adjudicators to deny relief to anyone found to pose a danger to the community.[83] Furthermore,

---

[81] *Matter of S-K-*, 23 I.&N. Dec. 936, 939-40 (BIA 2006).

[82] D'Vera Cohn et al., "Rise in U.S. Immigrants from El Salvador, Guatemala and Honduras Outpaces Growth from Elsewhere," *Pew Research Center*, December 7, 2017, https://www.pewresearch.org/hispanic/wp-content/uploads/sites/5/2017/12/Pew-Research-Center_Central_American-migration-to-U.S._12.7.17.pdf.

[83] Apart from the statutory aggravated felony bar to asylum, the Board of Immigration Appeals and Attorney General have historically utilized a highly circumstantial approach to the particular serious crime determination that would bar an immigrant from receiving asylum. *See e.g., Matter of Juarez*, 19 I.&N. Dec. 664 (BIA 1988) (ordinarily a single misdemeanor that is not an aggravated felony will not be a particularly serious crime); *Matter of Frentescu*, 18 I.&N. Dec. 244 (BIA 1982), *modified* (setting forth several factors to be considered before imposing the particular serious crime bar, including: (i) the nature of the conviction, (ii) the circumstances and underlying facts for the conviction, (iii) the type of sentence imposed, and (iv) whether the type and circumstances of the crime indicate that the individual will be a danger to the community); *Matter of Y-L-, A-G-, R-S-R-*, 23 I.&N. Dec. 270

AR.09663

asylees with convictions that render them inadmissible must apply for a waiver at the time of their applications for permanent residence.[84] These measures ensure that asylum applicants in vulnerable populations have access to supportive resources and have the opportunity to demonstrate their ongoing commitment to social and personal health. Moreover, the existence of provisions allowing the revocation of asylum status ensures that adjudicators may continue to enforce concerns related to the safety of the community even after asylum is granted.[85]

> Barring asylum for immigrants convicted of migration-related offenses punishes them for fleeing persecution and/or seeking safety for their children, and does not make communities safer.

The expansion of the criminal bars to asylum to include offenses related to harboring, smuggling of noncitizens by parents and family members and those previously removed further criminalizes vulnerable populations fleeing persecution.[86] The vast expansion of migrant prosecutions at the border during the current administration has created administrative chaos and separated families that do not pose a threat to the safety of communities in the United States.[87] The Proposed Rules threaten to magnify the harm caused by these reckless policies by further compromising the ability of those seeking safety on the southern border to access the asylum system.

The Proposed Rules expand the asylum bar to parents or other caregivers who are convicted of smuggling or harboring offenses after taking steps to help minor children enter the United States in order to flee persecution. This proposed bar is particularly insidious in light of now-public documents revealing this administration's explicit efforts to utilize smuggling prosecutions against parents and caregivers as part of its strategy of deterring families from seeking asylum in the United States.[88] The Proposed Rules seek to take this widely condemned strategy one step further, by additionally barring those parents *already prosecuted* from obtaining asylum protections for themselves and their children. The Proposed Rules multiply the harms parents

---

(A.G. 2002) (setting forth a multi-factor test to determine the dangerousness of a respondent convicted of a drug-trafficking offense who is otherwise barred from asylum as an aggravated felon, but seeking withholding of removal).

[84] 8 U.S.C. § 1159(c) (2012).

[85] 8 C.F.R. § 208.24(a) (2012).

[86] On April 11, 2017, then-Attorney General Sessions instructed all federal prosecutors to increase their prioritization of immigration offenses for prosecution, including misdemeanor offenses committed by first time entrants. *See* Memorandum from the Attorney General: Renewed Commitment to Criminal Immigration Enforcement (April 11, 2017), https://www.justice.gov/opa/press-release/file/956841/download.

[87] *Id.*; Richard Marosi, "The aggressive prosecution of border crossers is straining the courts. Will zero tolerance make it worse?," *Los Angeles Times*, May 11, 2018, https://www.latimes.com/local/california/la-me-ln-immigrant-prosecutions-20180511-story.html.

[88] Ryan Devereaux, "Documents Detail ICE Campaign to Prosecute Migrant Parents as Smugglers," *The Intercept*, April 29, 2019, https://theintercept.com/2019/04/29/ice-documents-prosecute-migrant-parents-smugglers/ (describing how in May 2017, the Department of Homeland Security set out to target parents and family members of unaccompanied minors for prosecution).

and caregivers have experienced in their treacherous journeys to safety and callously penalize parents for doing what is only human—taking all necessary steps to protect their children.

The Proposed Rules also expand the asylum bar to those who have fled persecution multiple times and therefore been convicted of illegal reentry. Their inclusion is premised on conclusory statements regarding the dangerousness of recidivist offenders, without consideration of the seriousness of prior convictions.[89] Rather, the Proposed Rules treat all immigration violations as similar in seriousness to those previously warranting inclusion in the particularly serious crime bar, without any independent evidence to justify the expansion. Such an approach renders meaningless the limiting language of "particularly serious" in the statute.

The Proposed Rules also conflate multiple entries by noncitizens having prior removal orders with those who have entered multiple times without ever having their asylum claims heard. Many immigrants who have previously attempted entry to the United States to flee persecution could not have been aware of the complex statutory regime that governs asylum claims and would not have knowingly abandoned their right to apply for asylum. Some asylum seekers have also been wrongly assessed in prior credible fear interviews. And others yet may have previously entered or attempted to enter the United States before the onset of circumstances giving rise to their fear. Preserving discretion to grant asylum in these circumstances allows meritorious asylum seekers to be heard and corrects errors that might have previously occurred.

> ### Extending the criminal bars to immigrants convicted of misdemeanor document fraud unfairly punishes low-wage immigrant workers and does not make communities safer.

The Proposed Rules expand the asylum bar to include any asylum seeker who has been convicted of a misdemeanor offense for use of a fraudulent document. In so doing, the Rule entirely ignores the migration-related circumstances that often give rise to convictions involving document fraud. Migrants fleeing persecution often leave their home countries with nothing but the clothes on their backs and must rely on informal networks to navigate their new circumstances.[90] Extension of a blanket bar to asylum seekers who are compelled to resort to fraudulent means to enter the United States, or to remain safely during their applications for asylum, upends decades of settled law directing that violations of law arising from an asylum applicant's manner of flight should constitute only one of many factors to be consulted in the exercise of discretion.[91]

Moreover, migrants in vulnerable communities who are struggling to survive during the pendency of their asylum proceedings are often exploited by unscrupulous intermediaries who

---

[89] Proposed Rules at 69648.
[90] *See Pula*, 19 I.&N. Dec. at 474.
[91] *Id.*

offer assurances and documentation that turn out to be fraudulent.[92] Many noncitizens working in the low-wage economy face egregious workplace dangers and discrimination and suffer retaliation for asserting their rights.[93] The continued availability of asylum to low-wage immigrant workers can encourage them to step out of the shadows. The expansion of criminal asylum bars to sweep in all document fraud offenses, on the other hand, would unfairly prejudice immigrants with meritorious asylum claims and force them deeper into the dangerous informal economy.

> The Proposed Rules will harm communities with overlapping vulnerabilities, including LGBTQ asylum seekers, survivors of trafficking, and survivors of domestic violence.

The Proposed Rules exclude from asylum protections countless members of vulnerable communities who have experienced trauma, abuse, coercion, and trafficking. Many of these individuals may only become aware of their ability to apply for asylum after law enforcement encounters that lead them to service providers who can educate them about their immigration options. Despite the unique difficulties they face, the Proposed Rules would compound their harm and prevent them from achieving family unification and a pathway to citizenship.

The Proposed Rules pose a unique threat to LGBTQ immigrant community members. LGBTQ immigrants in particular may have already experienced a high degree of violence and disenfranchisement from economic and political life in their home countries.[94] Hate violence towards undocumented LGBTQ immigrants in the United States is already disproportionately higher than for other members of the LGBTQ population.[95] Members of these communities also experience isolation from their kinship and national networks following their migration. This isolation, compounded by the continuing discrimination towards the LGBTQ population at large, leave many in the LGBTQ immigrant community vulnerable to trafficking, domestic violence, and substance abuse, in addition to discriminatory policing practices. The expansion of criminal enforcement and prosecution of undocumented people also harms the LGBTQ immigrant

---

[92] See American Bar Association, "About Notario Fraud," July 19, 2018, https://www.americanbar.org/groups/public_interest/immigration/projects_initiatives/fight-notario-fraud/about_notario_fraud/.

[93] Paul Harris, "Undocumented workers' grim reality: speak out on abuse and risk deportation," *The Guardian*, March 28, 2013, https://www.theguardian.com/world/2013/mar/28/undocumented-migrants-worker-abuse-deportation.

[94] *See* Aengus Carroll and Lucas Ramon Mendos, *State Sponsored Homophobia: A World Survey of Sexual Orientation Laws: Criminalisation, Protection and Recognition* 12th Ed. (International Lesbian, Gay, Bisexual, Transgender, and Intersex Association (ILGA), 2017), https://ilga.org/downloads/2017/ILGA_State_Sponsored_Homophobia_2017_WEB.pdf.

[95] *See* Sharita Gruberg, "LGBTQ Undocumented Immigrants Face an Increased Risk of Hate Violence," *Center for American Progress*, June 10, 2014, https://www.americanprogress.org/issues/immigration/news/2014/06/10/91233/lgbt-undocumented-immigrants-face-an-increased-risk-of-hate-violence/.

AR.09666

community.[96] The Proposed Rules will therefore have a disparate impact on LGBTQ individuals whose involvement in the criminal legal system is often connected to past trauma and/or the result of biased policing.

The expansion of asylum bars to include various misdemeanor offenses that were not previously considered particularly serious also unfairly sweeps trafficking survivors into its dragnet. It is becoming more widely recognized across state court systems that trafficking survivors frequently come into contact with intervention resources and service providers only after contact with law enforcement occurs. Innovative criminal justice reform efforts currently being adopted across the country include special trafficking courts that recognize the need for discretion in the determination of criminal culpability.[97] The same approach should be employed in the determination of asylum eligibility, where the applicant's life and safety are on the line.

The Proposed Rules instead preclude asylum adjudicators from conducting a trauma-centered approach, categorically barring countless trafficking survivors convicted of misdemeanor and felony offenses without any opportunity to present the specific circumstances of their claim.

Survivors of domestic violence include trafficking survivors and LGBTQ community members, such that inclusion of offenses related to domestic violence in the expanded asylum bars affects populations with overlapping vulnerabilities.[98] The Proposed Rules too broadly categorize domestic violence offenses as particularly serious and sweep both offenders and survivors into their dragnet. The immigration laws extend protections to domestic violence survivors outside of the asylum context, recognizing the complex dynamics surrounding intimate partner violence. Provisions in the Violence Against Women Act allow adjudicators evaluating claims for relief arising thereunder to exercise discretion based on a number of factors and circumstances.[99] The blunt approach adopted by the Proposed Rules is inconsistent with the approach taken towards survivors elsewhere in the federal immigration statute and does not rely on any evidence-based justification for treating asylum seekers differently.

---

[96] *See eg.,* Sharita Gruberg, "How Police Entanglement with Immigration Enforcement Puts LGBTQ Lives at Risk," *Center for American Progress*, April 12, 2017, https://www.americanprogress.org/issues/lgbtq-rights/reports/2017/04/12/430325/police-entanglement-immigration-enforcement-puts-lgbtq-lives-risk/.

[97] Elise White, et al., "Navigating Force and Choice: Experiences in the New York City Sex Trade and the Criminal Justice System's Response," *Center for Court Innovation*, December 2017 (noting that 78% of participants in the report's study had been arrested, mostly for non-violent, non-prostitution offenses such as *drug possession*).

[98] Marty Schladen, "ICE Agents Detain Alleged Domestic Violence Victim," *El Paso Times*, February 16, 2017, https://www.elpasotimes.com/story/news/2017/02/15/ice-detains-domestic-violence-victim-court/97965624/ (noting that the immigrant detained, a transgender person previously deported following her conviction for crimes such as posession of stolen mail and assault, was then living at the Center Againts Sexual and Family Violence, a shelter for survivors of intimate partner violence).

[99] Nadine Shaanta Murshid and Elizabeth A. Bowen, "A Trauma-Informed Analysis of the Violence Against Women Act's Provisions for Undocumented Immigrant Women," *Violence Against Women* 24(13) (2018): 1540–1556, https://doi.org/10.1177/1077801217741991.

Moreover, the domestic violence sections of the Proposed Rules include the only categorical bar to asylum for which a conviction is not required. Domestic violence incidents all too often involve the arrest of both the primary perpetrator of abuse and the survivor.[100] These "cross-arrests" do not always yield clear determinations of victim and perpetrator. Authorizing asylum adjudicators to determine the primary perpetrator of domestic assault, in the absence of a judicial determination, unfairly prejudices survivors who are wrongly arrested in the course of police intervention to domestic disturbances.

Finally, the exemption for asylum applicants who can demonstrate their eligibility for a waiver under section 237(a)(7)(A) of the Immigration and Nationality Act does not cure the harm to asylum seekers caused by imposition of a categorical domestic violence related bar.[101] Rather, it converts a non-adversarial asylum proceeding into a multi-factor, highly specific inquiry into culpability based on circumstances that may be very difficult for an asylum seeker to prove—especially if proceeding without counsel and with limited English proficiency.

> Barring asylum for immigrants convicted of "gang-related crimes" based on unreliable evidence and racially disparate policing practices is harmful to youth of color and does not make communities safer.

In recent years, the expansion of gang databases for use in the apprehension and removal of foreign nationals—including children—has generated tremendous concern among advocates and the communities they serve.[102] The use of gang databases by local law enforcement and Immigration and Customs Enforcement has been widely criticized as an overbroad, unreliable and often biased measure of gang membership and involvement.[103] The Proposed Rules expand the criminal bars to asylum to those accused of gang involvement in the commission of minor criminal offenses, embracing an open-ended adjudicative process that will inevitably result in asylum adjudicators relying unfairly on these discredited methods of gang identification. This

---

[100] David Hirschel, et al., "Domestic Violence and Mandatory Arrest Laws: To What Extent Do They Influence Police Arrest Decisions," *Journal of Criminal Law & Criminology* 98, no. 1 (2007-2008): 255, https://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?article=7284&context=jclc (noting that "[i]n some cases, dual arrests may be the result of legislation, department policies, or both failing to require officers to identify the primary aggressor. In addition, when such provisions are present, police may lack the training or information needed to identify the primary aggressor when responding to a domestic violence assault. This situation may be compounded by batterers who have become increasingly adept at manipulating the criminal justice system, and may make efforts to 'pre-empt' victims from notifying police in order to further control or retaliate against them.").

[101] 8 U.S.C. § 1227(a)(7)(A).

[102] *See* Nermeen Arastu, et al., "Swept Up In The Sweep: The Impact of Gang Allegations on Immigrant New Yorkers," *New York Immigration Coalition (NYIC) and CUNY School of Law's Immigrant and Non-citizen Rights Clinic*, May 2018, https://www.law.cuny.edu/wp-content/uploads/page-assets/academics/clinics/immigration/SweptUp_Report_Final-1.pdf.

[103] Ali Winston, "Marked for Life: U.S. Government Using Gang Databases to Deport Undocumented Immigrants," *The Intercept*, August 11, 2016, https://theintercept.com/2016/08/11/u-s-government-using-gang-databases-to-deport-undocumented-immigrants/.

AR.09668

outcome would compound the disparate racial impact of inclusion in gang databases and bar asylum seekers who are themselves fleeing violence from gangs in their home countries.[104]

Past legislative efforts to expand the grounds of removal and inadmissibility in the Immigration and Nationality Act to include gang membership have failed to pass both houses of Congress.[105] In addition, immigration adjudicators already routinely premise discretionary denials of relief or release on bond on purported gang membership, and scores of alleged gang members have already been deported on grounds related to immigration violations or criminal convictions for which no relief is available.[106] Creating a "gang-related crime" bar will only exacerbate the due process violations already occurring as the result of unsubstantiated information about supposed gang ties.[107]

There is no doubt that the Proposed Rules will result in asylum seekers being denied protection on the basis of unsubstantiated allegations pushed forward by Department of Homeland Security attorneys and officers focused on pursuing removal. In 2019, the New York Civil Liberties Union and the New York Immigration Coalition conducted a study of hundreds of pages relating to immigration cases in the state of New York, and found that:

> "The Department of Homeland Security, in cooperation with local and federal law enforcement, compiles vague and overbroad evidence to argue that individuals are gang members or associates. Subsequently, DHS uses that evidence to oppose bond in removal and custody proceedings. DHS even alleges an individual is a 'gang associate,' and is therefore presumed dangerous, based on nothing more than the person having some social interaction with a gang member, no matter the significance of the interaction."[108]

---

[104] *See* Jonanthan Blitzer, "How Gang Victims Are Labeled As Gang Suspects," *The New Yorker*, January 23, 2018, https://www.newyorker.com/news/news-desk/how-gang-victims-are-labelled-as-gang-suspects.

[105] *See* Jessica Chacon, "Whose Community Shield?: Examining the Removal of the 'Criminal Street Gang Member,'" *University of Chicago Legal Forum* 317 (2007: 333-336) (reviewing legislative history of failed efforts to expand removability of those accused of gang related offenses and noting criticism that "[t]he only legal effect of the proposed legislation would be to increase the number of noncitizens lawfully present who would be subject to removal on the basis of their purported associations with individuals involved in group criminal activity.").

[106] For an illustration of Immigration and Customs Enforcement's propensity to make gang allegations on the basis of questionable if not fabricated evidence, and the deference to which the evidence is often granted by immigration adjudicators, *see* Mark Joseph Stern, "Bad Liars," *Slate*, May 16, 2018, https://slate.com/news-and-politics/2018/05/federal-judge-accused-ice-of-making-up-evidence-to-prove-that-dreamer-was-gang-affiliated.html.

[107] See Yvette Cabrera, "New ICE Tactic Raises Questions About Due Process," *ThinkProgress*, October 6, 2017, https://thinkprogress.org/ice-targets-gangs-6775356473a8/; Rebecca Hufstader, "Immigration Reliance On Gang Databases: Unchecked Discretion And Undesirable Consequences," 90 *New York University Law Review* 90 (2015): 671.

[108] Paige Austin Et al., "How Vague Gang Allegations Impact Relief & Bond for Immigrant New Yorkers: Stuck With Suspicion, *New York Civil Liberties Union and New York Immigration Coalition*, 2019, https://thenyic.pi.bypronto.com/2/wp-content/uploads/sites/2/2019/02/020819-NYCLU-NYIC-Report.pdf.

The Department of Homeland Security also persists in levying erroneous allegations of criminality against asylum seekers arriving at the southern border, allegations that already routinely result in the abusive practice of family separation and will now further serve to unjustly preclude refugees from asylum.[109] Specifically, Customs and Border Protection often relies on data via a transnational intelligence-sharing program involving Mexico, El Salvador, Guatemala, and Honduras to make these determinations, yet these allegations are often unsubstantiated.[110]

> *NIJC client Juanita was separated from her teenage son in July 2018 after government agents accused her of gang affiliation in her home country. Despite repeated requests, Immigration and Customs Enforcement refused to present any evidence in support of its baseless accusations. Juanita was separated from her son for eight months before the government finally released her in March 2019 after NIJC advocated extensively and threatened to file litigation. Since their traumatic separation, Juanita has suffered from severe depression, trouble sleeping, and uncontrollable shaking. Should the Proposed Rules become final, asylum seekers like Julia will face the additional harm of being precluded from asylum protections.*

In addition, by focusing on "reason to believe" as the basis for the bar, rather than the seriousness of the crime, the proposed provision is ultra vires and unconscionably limits the eligibility for asylum of those most in need of protection. The effect of the Proposed Rules would be to expand the number and type of convictions for which an analysis of eligibility is required, sweeping in even petty offenses that would otherwise not trigger immigration consequences. Thus, an asylum applicant convicted of simple assault without use of a weapon, a non-violent property crime, or even possession of under 30 grams of marijuana for personal use (otherwise exempted from the reach of the Proposed Rule), could trigger a bar to asylum if the adjudicator concludes she has "reason to believe" the offense was committed in furtherance of gang activity.[111] In making these determinations, asylum adjudicators would be unable to rely on uncorroborated allegations contained in arrest reports, but could nevertheless shield their decisions by relying on discretion.[112]

The Proposed Rules thus invite extended inquiry into the character of young immigrants of color who otherwise have meritorious asylum claims, based on information gained through racially

---

[109] Jesse Franzblau, "Family Separation Policy Continues, New Documents Show," *National Immigrant Justice Center*, June 22, 2019, https://www.immigrantjustice.org/staff/blog/family-separation-policy-continues-new-documents-show.

[110] *Id.*

[111] Page 69649 of the Proposed Rules notes that the applicable standard for determining when to apply the bar on asylum seekers convicted of a crime involving criminal street gangs is "reason to believe," as used in 8 U.S.C. § 1182(a)(2)(c), and that  the asylum adjudicator may consider "all reliable evidence" in making their decision.

[112] *See Garces v. U.S. A.G.*, 611 F.3d 1337, 1349-50 (11th Cir 2010) (reversing finding of "reason to believe" that the respondent was a participant in drug trafficking based on unsubstantiated arrest reports); *Matter of Rico*, 16 I.&N. Dec. 181, 185-86 (BIA 1977) (relying on pre-hearing admissions to uphold finding of inadmissibility).

AR.09670

disparate policing practices.  These rules multiply the harm to asylum seekers of color subject to racially disparate policing that results in racially disparate rates of guilty pleas to minor offenses. This same population is overrepresented in gang databases, which are notoriously inaccurate, outdated, and infected by racial bias.[113]

### 7.  The Proposed Rules are ultra vires to the federal immigration statute to the extent they purport to bar eligibility through a categorical exercise of discretion

When Congress speaks clearly through a statute, the plain meaning of that statute governs.[114] Congress by statute permits the Attorney General to designate certain categories of offenses as "particularly serious crimes."[115] As such, Congress *explicitly* permitted the Attorney General to designate a non-aggravated felony to be a particularly serious crime and thus to disqualify a person from asylum. In the context of asylum, all aggravated felonies are *per se* particularly serious crimes and the Attorney General "may designate by regulation [other] offenses that will be considered to be" a particularly serious crime for purposes of asylum.[116]

Here, however—seemingly in an attempt to insulate the Proposed Rules from review, the agencies attempt to designate new bars to asylum both by designating them as "particularly serious crimes" pursuant to 8 U.S.C. § 1158(b)(2)(B)(ii) and rendering them categorically exempt from a positive discretionary adjudication of asylum pursuant to 8 U.S.C. § 1158(b)(2)(C). This effort is unlawful. Section 1158(b)(2)(B)(ii) does permit the Attorney General to, if he wishes, attempt to designate some classes of offenses as particularly serious crimes; such designations are reviewable for legal error (and as explained above, the commenters believe these expansions are unlawful).[117] However, if the offense is not a particularly serious crime, then a discretionary decision must be rendered on the application. It is true that the Attorney General may also provide for "additional limitations and conditions" on asylum applications so long as they are "consistent" with the with the asylum statute.[118] In this case, however, the Proposed Rules add sweeping categories of offenses that automatically remove an applicant from the consideration of discretion—a regulatory proposal that is ultra vires to the plain text of the statute.

---

[113] Annie Sweeney and Madeline Buckley, "Chicago police gang data collection faulted by city's inspector general as unchecked and unreliable," *Chicago Tribune*, April 11, 2019, https://www.chicagotribune.com/news/breaking/ct-met-chicago-police-gang-data-04112019-story.html; Anita Chabria, "A routine police stop landed him on California's gang database. Is it racial profiling?," *Los Angeles Times*, May 9, 2019, https://www.latimes.com/politics/la-pol-ca-california-gang-database-calgang-criminal-justice-reform-20190509-story.html.
[114] See, *e.g.*, *Robinson* v. *Shell Oil Co.*, 519 U.S. 337, 340 (1997).
[115] 8 U.S.C. § 1158(b)(2)(B)(ii).
[116] *Id.* The Attorney General has not designated "substantial battery" to be a particularly serious crime for any purpose, including for purposes of ineligibility  to seek asylum.
[117] 8 U.S.C. § 1252(a)(2)(D).
[118] 8 U.S.C. § 1158(b)(2)(C); *see also* 8 U.S.C. § 1158(d)(5)(B).

AR.09671

To the extent that the proposed rules would adopt a bar to asylum based on a categorical discretionary bar, rather than a particularly serious crime designation, they are similar to the rules struck down by numerous Circuit Courts of Appeal in the context of adjustment of status for those considered by law to be "arriving aliens." Purporting to exercise discretion categorically, then-Attorney General Reno putatively rendered that class of noncitizens ineligible for adjustment of status, a determination that is ordinarily discretionary, even though the statute seemed to allow eligibility. Multiple Circuit Courts of Appeal struck down the proposed regulations, finding them to reflect an impermissible reading of the statute in light of the fact that Congress carefully defined in the statute the categories of people eligible to apply for adjustment of status.[119]

The same logic applies here. In the asylum statute, Congress explicitly made the commission of a particularly serious crime a bar to asylum. The canon of interpretation known as *expressio unius est exclusio alterius* instructs that,"expressing one item of [an] associated group or series excludes another left unmentioned."[120] The Proposed Rules attempt to create numerous categories of discretionary "pseudo-particularly serious crimes," barring asylum through a categorical exercise of discretion even if those offenses are ultimately found not to be particularly serious crimes. Such an effort violates this canon of interpretation, and places the Proposes Rules ultra vires to the statute.

### 8. Conclusion

> *NIJC client Mario is a young man who suffers from schizophrenia and would face involuntary institutionalization were he to return to Mexico. Mario has a conviction in his past for possession of cocaine, stemming from efforts to self-medicate. With NIJC providing legal representation, Mario was able to defend against deportation and seek asylum; the immigration judge weighed the circumstances of his case and determined that he merited the exercise of asylum. Mario is now safely in the United States, and his asylum grant allows him to access the benefits he will need to stay healthy. Should the Proposed Rules go into effect, Mario and others like him would be shut out of safety and*

---

[119] The First and Ninth Circuits found the regulations contrary to clear statutory command. *Succar v. Ashcroft*, 394 F.3d 8, 29 (1st Cir. 2005); *Bona v. Gonzales*, 425 F.3d 663, 668-71 (9th Cir. 2005). Other courts invalidated the adjustment regulations under "Step Two" of *Chevron*. Those courts found some ambiguity in the statute, but found a per se discretionary bar not based on a permissible construction of the eligibility standards set forth in the governing statute in light of the statutory scheme and congressional intent. *Zheng v. Gonzales*, 422 F.3d 98, 116-20 (3d Cir. 2005) (invalidating regulation precluding category of people from applying to adjust status "[g]iven Congress's intent as expressed in the language, structure, and legislative history of INA section 245 [8 U.S.C. § 1255]"); *Scheerer v. United States Attorney General*, 445 F.3d 1311, 1321-22 (11th Cir. 2006). This reasoning would likewise be applicable to the proposed rule. Where Congress went through the trouble to create a comprehensive statutory scheme to define asylum eligibility, the agency cannot preempt that in the guise of discretion by creating out of whole cloth a separate set of eligibility criteria.

[120] *United States* v. *Vonn*, 535 U.S. 55, 65 (2002).

*precluded from sharing the individual circumstances of their lives with an immigration adjudicator.*

Immigrants seeking asylum in the United States have overcome unique obstacles. Many have endured trauma in their home country, over the course of their flight to safety, and here in the United States. Some have become involved in the criminal legal system or are the subject of allegations of criminal conduct; yet these facts render them no less deserving of the opportunity to seek safety and legal protection in the United States. The United States government is quickly and violently closing the door to those in need of protection; we urge the Department of Homeland Security and the Department of Justice to urgently reverse course and *rescind* these Proposed Rules rather than adding yet one more layer of shameful cruelty to our domestic immigration laws and policy.

Thank you for the opportunity to submit comments on the Proposed Rules. Please do not hesitate to contact Heidi Altman at haltman@heartlandalliance.org or 202-879-4311 to provide further information.

Sincerely,

Heidi Altman
Director of Policy

# PUBLIC SUBMISSION

| |
|---|
| **As of:** January 23, 2020 |
| **Received:** January 21, 2020 |
| **Status:** Posted |
| **Posted:** January 22, 2020 |
| **Tracking No.** 1k4-9ekm-6ytx |
| **Comments Due:** January 21, 2020 |
| **Submission Type:** Web |

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0473
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Miriam Abaya

---

## General Comment

The Young Center for Immigrant Children's Rights (Young Center) writes to object to the above referenced Proposed Rules published December 19, 2019 by the Departments of Justice (DOJ) and Homeland Security (DHS). The Proposed Rules will jeopardize the safety and well-being of immigrant children by increasing the barriers to their right to seek and win asylum, resulting in their return to persecution in violation of immigration laws enacted by Congress, contained in international treaties, and which reflect basic principles of child welfare and human decency. We therefore respectfully urge the Departments to withdraw the Proposed Rules in their entirety, as outlined in more detail in the attached document.

---

## Attachments

Young Center Comment Opposing NPRM on Procedures for Asylum and Bars to Asylum Eligibility

*Submitted via www.regulations.gov*

January 21, 2020

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for
Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of
Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

**Re:    84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41; Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility**

Dear Ms. Alder Reid and Ms. Dunn,

The Young Center for Immigrant Children's Rights (Young Center) writes to object to the above referenced Proposed Rules published December 19, 2019 by the Departments of Justice (DOJ) and Homeland Security (DHS).[1]

The Young Center serves as the federally-appointed best interests guardian *ad litem* (Child Advocate) for trafficking victims and other vulnerable unaccompanied children in government custody as authorized by the Trafficking Victims Protection Reauthorization Act (TVPRA).[2] The Young Center is the only organization authorized by the Department of Health and Human Services' Office of Refugee Resettlement (ORR) to serve in that capacity. The role of the Child Advocate is to be a champion for the best interests of the child. A child's best interests are determined by considering the child's safety, expressed wishes, right to family integrity, liberty, developmental needs, and identity. Since 2004, ORR has appointed Young Center Child Advocates for thousands of unaccompanied children in ORR custody, many of whom have filed legitimate claims for asylum.

The Proposed Rules would deny both children and adults the right to seek asylum by: 1) adding categorical bars to asylum and eliminating adjudicators' discretion for determining asylum eligibility, 2) violating the asylum statute enacted by Congress, including the existing framework for aggravated felonies, 3) breaching the United States' treaty obligations to bring U.S. law into greater congruence with the Refugee Protocols principle of non-refoulement, 4) undermining children's safety and wellbeing when parents and other family members are barred from receiving asylum, likely resulting in family separation and 5) barring certain children fleeing gang violence and childhood trauma from filing independent applications for asylum that could otherwise make them eligible for protection.

---

[1] *See* Federal Regulation No. 224, Vol. 84 at 69640-69661.
[2] William Wilberforce Trafficking Victims Protection Act of 2008, 8 U.S.C.A. § 1232(c)(6)(A) (Westlaw through Pub. L. No. 115-171).

AR.09675

At the Young Center, we understand the particular vulnerability of immigrant children who flee life-threatening persecution in their countries. We recognize the basic principle that children are different from adults. Children face threats to their safety that are particular to their status as children, and they react to harm and trauma differently from adults.

We believe the Proposed Rules will jeopardize the safety and well-being of immigrant children by increasing the barriers to their right to seek and win asylum, resulting in their return to persecution in violation of immigration laws enacted by Congress, contained in international treaties, and which reflect basic principles of child welfare and human decency. For the reasons that follow, DOJ and DHS should immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

I.      **The Proposed Rules Contradict United States and International Law**

a.      The Proposed Rules Contradict United States Law Regarding Children's Protections and Balancing Asylum-Seekers' Valid Claims for Protection with Legitimate Public Safety Concerns

i.      *United States Law Already Places a High Burden on Children to Prove their Eligibility for Asylum, Despite Specific Procedural Protections*

The United States asylum system was first codified in statute through the Refugee Act of 1980, which amended the Immigration and Nationality Act. The Act created a "broad class" of refugees eligible for a discretionary grant of asylum.[3] Children's right to seek asylum finds even greater protection in U.S. law. The William Wilberforce Trafficking Victims Protection Reauthorization Act (TVPRA) provides special protections for unaccompanied children who apply for asylum, to ensure they have a fair opportunity to present their claim for protection in a manner that reflects their status as children. The TVPRA directs that asylum officers, rather than immigration judges, first hear the cases of unaccompanied children so that they can recount the sensitive and often traumatic facts of their claims in a non-adversarial setting.[4] This recognition of children's particular circumstances echoes guidance from the United Nations High Commissioner on Refugees (UNHCR), which establishes that because of children's age, dependency and relative immaturity, they should have specific procedural safeguards to ensure their asylum determinations are fair.[5]

Despite this procedural accommodation for unaccompanied children, the laws, regulations, and process governing asylum adjudications are already exceedingly complicated, and winning asylum is difficult for all applicants, most especially for children. Asylum seekers bear the burden of establishing their eligibility for asylum[6] in the face of a complex web of laws and

---

[3] *See I.N.S. v. Cardoza-Fonseca*, 40 U.S. 421, 423 (1987).
[4] 8 U.S.C.A. § 1232 (d)(7)(B); 8 U.S.C. § 1158(b)(3)(C).
[5] *Id.* para. 65.
[6] 8 USC § 1158(b)(1)(B); 8 CFR § 1240.8(d).

AR.09676

regulations, without the benefit of appointed counsel and often from a remote immigration jail.[7] Despite their age and early stages of development, unaccompanied children also must show they have suffered persecution or will suffer persecution based on a protected ground—many without a lawyer to represent them and while still in government custody. The Proposed Rules add barriers and further complication to a vital protection for children that is already difficult to obtain.

As discussed above, the TVPRA requires that unaccompanied children's asylum claims be heard by asylum officers, rather than immigration judges. However, the Proposed Rules would categorically bar certain children from seeking asylum. Under the Rules, unaccompanied children barred from asylum, who now must seek other forms of protection such as CAT or withholding, would be forced into adversarial proceedings before an immigration judge in clear violation of their rights under the TVPRA[8] and in a manner that would subject them to all of the harms attendant to adversarial hearings where there is no guarantee of representation.

> ii. _United States Law Seeks to Appropriately Balance Asylum-Seekers' Valid Claims for Protection with Legitimate Public Safety Concerns_

Though U.S. law permits the Attorney General, subject to review, to designate certain categories of offenses as "particularly serious crimes"[9] that preclude a grant of asylum, other offenses create no such categorical bar to a grant of asylum. It is true that the Attorney General may also provide for "additional limitations and conditions" on asylum applications, but these must be "consistent" with the asylum statute enacted by Congress.[10] The Proposed Rules are anything _but_ consistent with the asylum statute and the existing framework for aggravated felonies. They add sweeping categories of offenses that have nothing to do with the factors that led to the development of the aggravated felony doctrine, and which automatically remove an applicant from the consideration of discretion for any felony whatsoever. As a result, the Proposed Rules are contrary to the plain text of the asylum statute.

Additionally, it is well understood by the Board of Immigration Appeals and the Courts of Appeals that low-level, "run-of-the-mill" offenses do not constitute particularly serious crimes.[11] Under this long-standing interpretation of the particularly serious crime bar in the Immigration and Nationality Act, there is no scenario in which low-level offenses, like misdemeanor driving under the influence where no injury is caused, or simple possession of a controlled substance would constitute a particularly serious crime. Barring individuals from asylum based on these relatively minor offenses renders the "particularly serious crime" bar meaningless, will return individuals to life-endangering situations that would otherwise merit a grant of protection, and could lead to permanent separation from family.

---

[7] _See_ Daniel Connolly, Aaron Montes, & Lauren Villagran, _Asylum Seekers in U.S. Face Years of Waiting, Little Chance of Winning Their Cases_, USA TODAY (September 25, 2019), https://www.usatoday.com/in-depth/news/nation/2019/09/23/immigration-court-asylum-seekers-what-to-expect/2026541001/.

[8] 84 FR 33839 n. 7.

[9] 8 U.S.C. § 1158(b)(2)(B)(ii).

[10] 8 U.S.C. § 1158(b)(2)(C); _see also_ 8 U.S.C. § 1158(d)(5)(B).

[11] _Delgado v. Holder_, 648 F.3d 1095, 1110 (9th Cir. 2011) (en banc) (J. Reinhardt, concurring) (calling driving under the influence a "run-of-the-mill" offense that is not a particularly serious crime).

AR.09677

b.  The Proposed Rules Contradict International Law, Which Provides Specific Allowances for Children Seeking Asylum

International law also provides special protections for children seeking asylum. By acceding to the 1967 Protocol Relating to the Status of Refugees,[12] which binds parties to the United Nations Convention Relating to the Status of Refugees,[13] the United States obligated itself to develop and interpret United States refugee law in a manner that complies with the Protocol's principle of non-refoulement (the commitment not to return refugees to a country where they will face persecution on protected grounds), even where potential refugees have allegedly committed criminal offenses.[14] The U.S. is also a signatory to the Convention on the Rights of the Child (CRC) and therefore is obligated not to "defeat the object and purpose of [the] treaty."[15] The CRC protects the rights of children seeking asylum.[16] Expounding on that right, the UN Committee on the Rights of the Child has stated that the Refugee Convention "must be interpreted in an age and gender-sensitive manner, taking into account the particular motives for, and forms and manifestations of, persecution experienced by children."[17] Instead of working towards greater congruence with the terms of the Convention and its obligations under the CRC, the Proposed Rules carve out categorical bars from protection that violate the language and spirit of both treaties.

The Refugee Convention only allows states to exclude and/or expel individuals from refugee protection if the individual "having been convicted by a final judgement of a particularly serious crime, constitutes a danger to the community of that country."[18] However, this clause is intended for "extreme cases," in which the particularly serious crime at issue is a "capital crime or a very grave punishable act."[19] UNHCR has asserted that to constitute a "particularly serious crime," the crime "must belong to the gravest category" and be limited "to refugees who become an

---

[12] United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268.

[13] Convention Relating to the Statute of Refugees, July 28, 1951, 140 U.N.T.S. 1954 (*hereinafter* Refugee Convention).

[14] Phillip L. Torrey et al., *Misapplication of the Particularly Serious Crime Bar to Deny Refugees Protection from Removal to Countries Where Their Life or Freedom is Threatened*, , IMM. DEFENSE PROJECT, HARVARD IMM. & REFUGEE CLINICAL PROGRAM 11 (Fall 2019), https://www.immigrantdefenseproject.org/wp-content/uploads/IDP_Harvard_Report_FINAL.pdf (arguing that the U.S. Constitution and Supreme Court case law make clear that federal law must be interpreted to follow the U.S.'s treaty obligations, including the Refugee Convention's non-refoulement mandate and its limited exception).

[15] Convention on the Rights of the Child, Nov. 20, 1989, 1577 U.N.T.S. 3 [hereinafter CRC]. Vienna Convention on the Law of Treaties art. 18, May 23, 1969, 1155 U.N.T.S. 331 [hereinafter Vienna Convention].

[16] CRC, *supra* note 14, art. 22.

[17] UN Committee on the Rights of the Child, General Comment No. 6 (2005): Treatment of Unaccompanied and Separated Children Outside Their Country of Origin, CRC/GC/2005/6, Sep. 2005 (hereafter "CRC, General Comment No. 6"), http://www.unhcr.org/refworld/docid/42dd174b4.html, para. 74.

[18] *Id*. at art. 33(2).

[19] U.N. High Comm'r for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees* 2, U.N. Doc. HCR/IP/Eng/REV. ¶ 154-55, (1979, reissued 2019).

4

AR.09678

extremely serious threat to the country of asylum due to the severity of crimes perpetrated by them in the country of asylum."[20]

Moreover, UNHCR has specifically noted that the particularly serious crime bar does not encompass other crimes; "[c]rimes such as petty theft or the possession for personal use of illicit narcotic substances would not meet the threshold of seriousness."[21] When determining whether an individual should be barred from protection for having been convicted of a particularly serious crime, the adjudicator must conduct an individualized analysis and consider any mitigating factors.[22] UNHCR guidance further limits the application of exclusion clauses to children's cases. The guidance specifically states that criminal bars cannot be applied to children unless he or she "has reached the age of criminal responsibility" as established by international or national law.[23] Because the age of criminal responsibility varies across jurisdictions, countries must take children's emotional, mental and intellectual maturity into account when determining children's criminal responsibility in relationship to an asylum bar.[24] Contrary to this guidance, however, the Proposed Rules eliminate adjudicators' discretion to consider case-by-case decision-making and fails to limit bars to only those who would pose a serious danger to the community, violating U.S. obligations as a State Party to the Refugee Convention and a signatory to the CRC.

## II.    The Proposed Rules Undermine Children's Safety and Well-Being (their Best Interests) by Imposing Barriers for Children and Their Family Members Seeking Protection

The "best interests of the child" principle has no single definition but encompasses consistently-accepted factors. One of the most significant of these is the child's health and safety.[25] Resettlement of a child or a child's parent and family through asylum, to the extent it will prevent serious risks to a child's safety, is generally in the best interest of the child.[26] Furthermore, international guidance states that considering asylum bars for children, principles related to the best interests of the child and a child's ability to understand and consent to criminal acts must be considered.[27] However, the Proposed Rules' categorical bars and limitations on adjudicators' discretion regarding the effect of a criminal history on asylum eligibility put unnecessary and cruel barriers on children seeking asylum. These Proposed Rules would add to the government's newly imposed barriers to asylum in the United States that are breathtaking in

---

[20] U.N. High Comm'r for Refugees (UNHCR), *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 7 (July 2007), http://www.unhcr.org/enus/576d237f7.pdf.

[21] *Id*. at ¶ 10.

[22] *Id*. at ¶ 10-11; U.N. High Comm'r for Refugees, *The Nationality, Immigration and Asylum Act 2002: UNHCR Comments on the Nationality, Immigration and Asylum Act 2002 (Specification of Particularly Serious Crimes) Order 2004*, 4 (2004).

[23] UNHCR, Guidelines on International Protection: Child Asylum Claims under Article 1(A)2 and 1(F) of the 1951 Convention and/or 1967 Protocol Relating to the Status of Refugees [hereinafter *UNHCR Guidelines*] para. 60, December 22, 2009, https://www.unhcr.org/50ae46309.pdf.

[24] *Id*. at para. 61.

[25] *See* e.g., CHILD WELFARE INFORMATION GATEWAY, DETERMINING THE BEST INTERESTS OF THE CHILD (2016) at p.2, available at https://www.childwelfare.gov/pubPDFs/best_interest.pdf (identifying the "health, safety and/or protection of the child" as a "guiding principle of best interests determinations").

[26] *See* UNHCR Guidelines on Determining the Best Interest of the Child 70, UNHCR (May 2008).

[27] UNHCR Guidelines, *supra* note 22, para. 63.

5

AR.09679

scope, such as returning those seeking safety to dangerous conditions in Mexico and an overlapping web of policies that preclude asylum eligibility for countless migrants simply because of their national origin, manner of entry, or their flight path.[28] Together these policies will make it nearly impossible for children to ask for and receive asylum, even though children have demonstrated that when they have a fair opportunity to seek asylum (including representation by counsel), they are clearly eligible for and deserving of the protection.[29]

a. The Proposed Rules Would Prevent Children's Family Members From Seeking Protection in the United States, Harming Children in the Process

i. *The Proposed Rules' Expansion of the Asylum Bars to Include Smuggling Convictions Would Lead to Family Separation*

The Young Center is particularly concerned about the expansion of the criminal bars to asylum including offenses related to the harboring or smuggling of noncitizens by parents and family members and those previously removed, as it further criminalizes vulnerable populations fleeing persecution, especially parents and family members trying to protect children from harm.[30] The vast expansion of migrant prosecutions at the border during the current administration has created administrative chaos and separated families that do not pose a threat to the safety of communities in the United States.[31] The Proposed Rules threaten to magnify the harm caused by these reckless policies by further compromising the ability of those seeking safety on the southern border to access the asylum system, which would put children in those families in harm's way.

The Proposed Rules expand the asylum bar to parents or other caregivers who are convicted of smuggling or harboring offenses in situations where they helped or are accused of helping children enter the United States in order to flee persecution or simply to be safe while awaiting an asylum hearing after the family was subjected to the "Migration Protection Protocols." This proposed bar is particularly harmful to children given the many policies that prevent families from seeking protection in the United States, such as metering and sending families back to some of the most dangerous parts of Mexico to wait for their asylum hearing.[32] The Proposed Rules

---

[28] The National Immigrant Justice Center maintains a frequently updated timeline providing details of each of the asylum bans and other policies issued and implemented by the administration undermining asylum access at https://www.immigrantjustice.org/issues/asylum-seekers-refugees. For more information on the harms and rights abuses inherent in the Migrant Protection Protocols, or "Return-to-Mexico" program, *see* Human Rights First, *Delivered to Danger* (December 2019), https://www.humanrightsfirst.org/campaign/remain-mexico.

[29] *Representation for Unaccompanied Children in Immigration Court*, TRAC REPORTS (Nov. 25, 2014), https://trac.syr.edu/immigration/reports/371/ (showing that in three out of four cases where children have representation, they receive some form of protection).

[30] On April 11, 2017, then-Attorney General Sessions instructed all federal prosecutors to increase their prioritization of immigration offenses for prosecution, including misdemeanor offenses committed by first time entrants. *See* Memorandum from the Attorney General: Renewed Commitment to Criminal Immigration Enforcement (April 11, 2017), https://www.justice.gov/opa/press-release/file/956841/download.

[31] *Id.*; Richard Marosi, *The aggressive prosecution of border crossers is straining the courts. Will zero tolerance make it worse?*, LOS ANGELES TIMES (May 11, 2018), https://www.latimes.com/local/california/la-me-ln-immigrant-prosecutions-20180511-story.html.

[32] *Migrant Protection Protocols*, U.S. DEP'T OF HOMELAND SEC. (Jan. 24, 2019), https://www.dhs.gov/news/2019/01/24/migrant-protection-protocols; *Barred At the Border: Wait "Lists" Leave*

AR.09680

callously penalize parents for doing what is only human—taking all necessary steps to protect their children, such as bringing them back to the border when they fear for their child's safety in Mexico or their home country. In doing so, the Proposed Rules would likely result in long-term if not permanent family separation for children as their parents—despite an otherwise valid asylum claim—would be forcibly returned to home country while the children remain in the U.S. to pursue protection claims.

> *The Young Center was appointed to a toddler who arrived at the border with his father. His father brought documents confirming his legal status as the child's father, but was separated after a rapid DNA test indicated he was not the biological father. The father was charged with smuggling. The smuggling charge was dropped after review of his documents confirmed his status as the child's parent, but he and other parents are still targets for criminal charges that could preclude their ability to seek protection if they plead guilty in order to win release. The result: many parents and families will be excluded from seeking protection in violation of U.S. law, despite having done nothing wrong.*

Family separation is a stressful and traumatizing experience for children, which can alter the architecture of a child's developing brain and have lifelong consequences.[33] The Young Center has been appointed to hundreds of cases in which children were separated from their families during and after the administration's Zero-Tolerance policy. Our staff witnessed first-hand the devastating effects that family separation has on children. Separations undermine family stability, and lead to toxic stress, trauma, and developmental regression in children.[34] Even a temporary separation can have a negative impact on the health and educational attainment of children later in life, and many parents struggle to restore the parent-child bond once it has been disrupted by a separation.[35] By prosecuting children's family members for seeking safety from persecution in the United States, the government would once again have a part in disrupting children's bonds with their families and harming their health and development.

> ii. *Withholding of Removal and Protection Under the Convention Against Torture Are Insufficient Alternative Forms of Relief and Would Lead to Family Separation and Separate Immigration Court Claims for Children with Family*

---

*Asylum Seekers in Peril at Texas Ports of Entry*, HUMAN RTS. FIRST (Apr. 2019), https://www.humanrightsfirst.org/sites/default/files/BARRED_AT_THE_BORDER.pdf.

[33] Shruti Simha, *The Impact of Family Separation on Immigrant and Refugee Families*, 80 N.C. MED J. 95, 96 (2019).

[34] Caitlin Dickerson & Manny Fernandez, *What's Behind the 'Tender Age' Shelters Opening for Young Migrants*, N.Y. TIMES (June 20, 2018), https://www.nytimes.com/2018/06/20/us/tender-age-shelters-family-separation-immigration.html (quoting Young Center Associate Director Elizabeth Frankel) ; *see also All Things Considered: How the Trump Administration's Family Separation Policy is Playing Out* (NPR radio broadcast, May 28, 2018) (interviewing Young Center Policy Director Jennifer Nagda).

[35] Laura C. N. Wood, *Impact of Punitive Immigration Policies, Parent-Child Separation and Child Detention on the Mental Health and Development of Children*, 2 BMJ PAEDIATRICS OPEN 1, 3 (2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6173255/.

AR.09681

Throughout the Proposed Rules, the agencies defend the harsh and broad nature of their proposal by pointing to the continued availability of alternative forms of relief for those precluded from asylum eligibility under the new rules.[36] The availability of these alternatives forms of relief, however—known as withholding of removal and protection under the Convention Against Torture (CAT)—does not nullify the harm created by the Proposed Rules' new limits on asylum. The protections afforded by CAT and by statutory withholding of removal are limited in scope and duration, and they are harder to obtain.[37] As a result, a Rule that limits *bona fide* refugees to withholding of removal and CAT protection would impose a very real harm on individuals who have come to the United States in search of protection.

Withholding and CAT recipients also face permanent separation from family. Because international travel is prohibited for withholding and CAT recipients, they cannot reconnect with family members in a third country, even in emergencies. They also cannot reunite with family in the United States. Only asylees and refugees are eligible to petition for a spouse and children to join them as derivatives on that status.[38] For many, this will mean that the Proposed Rules institute yet another formal policy of family separation.

Additionally, under the Proposed Rules, if children flee to the United States with their family members who are only eligible for withholding and CAT, then they will need to pursue their own immigration case, separate from that of their family, in an adversarial process before an immigration judge. As a result, family claims will have to be adjudicated separately and potentially before different adjudicators, even when the claims are interrelated and even when minor children may not be in a position to explain the claim at all or as sufficiently as a parent. Such a result would contradict guidance from UNHCR and the U.S. Citizenship and Immigration Service regarding child asylum claims, which notes that "[c]hildren may not be able to articulate their claims to refugee status in the same way as adults, and, therefore, may require special assistance to do so."[39] In addition to being unjust to the children and their affected family members, this approach would result in gross inefficiencies, which should be avoided in a system that already contains a significant backlog of pending cases.[40]

Recently, this exact scenario played out with a mother who was subject to the "Migrant Protection Protocols" and the asylum "transit ban,"[41] which made a family ineligible for asylum and thus required the children to establish their independent eligibility for withholding and CAT protection. An immigration judge granted the mother withholding of removal but denied CAT

---

[36] *See, e.g.,* 84 FR 69644.

[37] *See* INS v. Cardoza-Fonseca, 480 U.S. 421(1987) (stating that applicants for protection under CAT must prove that it is "more likely than not" that they will be tortured if removed to another country, while the burden of proof for asylum is lower and requires showing a "well-founded," or "reasonable," fear).

[38] 8 C.F.R. § 208.21(a).

[39] UNHCR, Guidelines on International Protection: Child Asylum Claims under Article 1(A)2 and 1(F) of the 1951 Convention and/or 1967 Protocol Relating to the Status of Refugees [hereinafter *UNHCR Guidelines*] para. 2, December 22, 2009. U.S. Dept of Justice, Immigration & Naturalization Serv., Guidelines for Children's Asylum Claims at 5 (Dec. 10, 1998), https://www.uscis.gov/sites/default/files/USCIS/Laws%20and%20Regulations/Memoranda/Ancient%20History/ChildrensGuidelines121098.pdf.

[40] *See, e.g.,* Marissa Esthimer, *Crisis in the Courts: Is the Backlogged U.S. Immigration Court System at Its Breaking Point?,* MIGRATION POL'Y INST. (October 3, 2019), https://bit.ly/2sJuEWR.

[41] 8 C.F.R. § 1208.13(c)(4).

8

AR.09682

protection to her young children, leaving the children with removal orders and immense uncertainty about their future.[42] Such uncertainty about permanency and the ability to remain with a parent are deeply harmful to children's health and well-being. Under the expanded bars in the Proposed Rules, these situations will certainly increase, separating families and forcing parents to return to danger though they have established they more likely than not will face persecution and torture, rather than leaving their children on their own.

> b. The Proposed Rules Would Negatively Impact Children Fleeing Gang Violence and Childhood Trauma by Barring Them from Filing Independent Applications for Asylum

In recent years, expanded reliance on unreliable gang databases in the apprehension and removal of foreign nationals—including children—has generated tremendous concern among advocates and the communities they serve.[43] The use of gang databases by local law enforcement and Immigration and Customs Enforcement has been widely criticized as an overbroad, unreliable and often biased measure of gang membership and involvement.[44] Yet the Proposed Rules expand the criminal bars to asylum to anyone accused of gang involvement in the commission of minor criminal offenses, which will inevitably result in asylum adjudicators relying unfairly on these discredited methods of gang identification.

Creating a "gang-related crime" bar will exacerbate the due process violations already occurring as the result of unsubstantiated information about supposed gang ties,[45] and bar child asylum seekers who are themselves fleeing violence from gangs in their home countries.[46] Creating a blanket exclusion for anyone who is convicted of a crime—including a misdemeanor—that an immigration adjudicator considers to be linked to gang activity will erroneously prevent *bona fide* child asylum seekers from receiving protection. This rule confers on immigration adjudicators—who generally are not criminologists, sociologists, or criminal law experts—the responsibility to determine if there is "reason to believe" any conviction flows from activity taken in furtherance of gang activity.

The Young Center has been appointed as the independent child advocate to many children fleeing gang violence in their home countries. Reports by the U.S. government and other reputable organizations confirm that children are often targets for gang recruitment and gang

---

[42] Adolfo Flores, *An Immigrant Woman Was Allowed To Stay In The US — But Her Three Children Have A Deportation Order*, BUZZFEED (December 21, 2019), https://www.buzzfeednews.com/article/adolfoflores/an-immigrant-woman-was-allowed-to-stay-in-the-us-but-not.

[43] *See* Nermeen Arastu, et al., *Swept Up In The Sweep: The Impact of Gang Allegations on Immigrant New Yorkers*, NEW YORK IMMIGRATION COALITION (NYIC) AND CUNY SCHOOL OF LAW'S IMMIGRANT & NON-CITIZEN RIGHTS CLINIC (May 2018), https://www.law.cuny.edu/wp-content/uploads/page-assets/academics/clinics/immigration/SweptUp_Report_Final-1.pdf.

[44] Ali Winston, *Marked for Life: U.S. Government Using Gang Databases to Deport Undocumented Immigrants*, THE INTERCEPT (August 11, 2016), https://theintercept.com/2016/08/11/u-s-government-using-gang-databases-to-deport-undocumented-immigrants/.

[45] See Yvette Cabrera, *New ICE Tactic Raises Questions About Due Process*, THINKPROGRESS (October 6, 2017), https://thinkprogress.org/ice-targets-gangs-6775356473a8/; Rebecca Hufstader, *Immigration Reliance On Gang Databases: Unchecked Discretion And Undesirable Consequences*, 90 NY UNIV. L. REV. 90 671 (2015).

[46] *See* Jonathan Blitzer, *How Gang Victims Are Labeled As Gang Suspects*, THE NEW YORKER (January 23, 2018), https://www.newyorker.com/news/news-desk/how-gang-victims-are-labelled-as-gang-suspects.

9

violence in their home countries. A 2015 report issued by the Jesuit Conference of Canada and the United States found: "The overarching strategy employed [by Central American gangs] involves threatening young and adolescent children with physical violence or death unless they join a local clique. Threats commonly extend from the targeted recruit to their loved ones, resulting in the killing of parents and siblings, as well as the rape of female family members."[47] The report concludes that: "At the most fundamental level, it must be acknowledged that children are coerced, sometimes through grooming and sometimes under threat of torture to join or collude with *maras*. They are victims not only of gang members but also of an absent, complicit or abusive state and should not be seen as willing participants in lives of criminality."[48]

> *Cristina\* is a child from Central America who was forced to be a lookout for a gang after death threats from a family member. She eventually fled to the United States after threats on her life from individuals who knew she was related to a gang member. Cristina was granted asylum because an immigration judge recognized that she was forced into gang activity and that she would face serious harm if she returned to her home country. However, under the Proposed Rules, an independent adjudicator would have been unable to consider the unique circumstances of Cristina's case, and she would have been sent back to danger.*

Fundamentally, the children conscripted by the drug cartels are not materially different from the children who fight on the front lines of conflicts in other parts of the world. More and more, children "recruited" by drug cartels are being seen for what they are: child soldiers.[49] In 2016, the spokesperson for the United Nations Secretary General on child soldiers provided crucial guidance on how we should regard child soldiers: "Children associated with armed groups are, above all, victims of these groups."[50] Many Central American children' paths resemble that of a child soldier—these children also have no option to refuse the cartel's instructions. As such, these children are conscripts, not willing volunteers in gang violence, and should be receiving protection for such violence against them rather than being barred from asylum.

In the same way, the expansion of asylum bars to include misdemeanor offenses that were not previously considered particularly serious also unfairly targets children who are victims of trafficking, sexual or domestic violence, or who identify as LGBTQ. Children who are victims of trafficking frequently come to the attention of service providers only after being picked up by the police for minor offenses. The isolation and persecution that LGBTQ children experience in their home countries leave many vulnerable to trafficking, violence in the home, and substance abuse, in addition to discriminatory policing practices. As a result, the Proposed Rules will have a disparate impact on trafficking victims and LGBTQ children whose involvement in the criminal

---

[47] Jesuit Conference of Canada and the United States, *Unwilling Participants: The Coercion of Youth into Violent Criminal Groups in Central America's Northern Triangle*, 7 (2015), http://jesuits.org/Assets/Publications/File/Report_UnwillingParticipants_v4.pdf.

[48] *Id*. at 11.

[49] Patrick Radden Keefe, *The Teen Killers of the Drug War: Child Soldiers in Foreign Conflicts are Treated As Victims; What about Adolescents on the U.S.-Mexico Border*, THE NEW YORKER (Sep. 12, 2016), http://www.newyorker.com/magazine/2016/09/12/wolf-boys-two-american-teenagers-and-mexicos-most-dangerous-drug-cartel; *see also*, Robert Beckhusen, *How Mexico's Drug Cartels Recruit Child Soldiers as Young as 11*, WIRED (Mar. 28, 2013), https://www.wired.com/2013/03/mexico-child-soldiers/.

[50] Keefe, *supra* note 40.

AR.09684

legal system is often connected to past trauma and/or racially-, ethnically-, or gender-biased policing.

Reform efforts in the criminal justice system have demonstrated that discretion in the determination of criminal culpability is essential to a trauma-informed approach, particularly for vulnerable groups.[51] The same approach should be employed in the determination of asylum eligibility, where the applicant's life and safety are on the line.

In those rare cases that immigrant children have a confirmed criminal history, they should not be unduly penalized for decisions they made when they were young. Research shows that given children's ages and development, they do not fully understand the consequences of decisions to engage in criminal activity.[52] The United States Supreme Court has cautioned that "children cannot be viewed simply as miniature adults."[53] As the Court has explained: "The law has historically reflected the assumption that children characteristically lack the capacity to exercise mature judgment and possess only an incomplete ability to understand the world around them."[54] The Supreme Court also has observed that children "often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them."[55]

Under our nation's jurisprudence, guided by firmly-established principles of child development, it would be illogical and contrary to public policy to have a rule assuming that all children knowingly and willingly participate in criminal activity and should therefore be barred from asylum without consideration for their maturity, vulnerability, and trauma. Rather than allowing adjudicators to look at children differently from adults, the Proposed Rules would inappropriately penalize children with criminal histories from receiving asylum—a result with life or death consequence for those sent back to violence and persecution.

## III.   Conclusion

The Young Center opposes the adoption of any rule that would add to the already burdensome barriers that children and their family members must overcome to seek protection in the United States. U.S. and international law codify the right to seek asylum and only allow limitations on the right based on particularly serious crimes where an individual would pose a serious danger to

---

[51] Trauma Training for Criminal Justice Professionals, SUBSTANCE ABUSE & MENTAL HEALTH SERV. ADMIN., U.S. DEP'T OF HEALTH & HUMAN SERV., https://www.samhsa.gov/gains-center/trauma-training-criminal-justice-professionals (last updated Aug. 19, 2015).
[52] *See, e.g.*, Elizabeth Cauffman & Laurence Steinberg, *(Im)maturity of Judgment in Adolescence: Why Adolescents May Be Less Culpable Than Adults*, 18 BEHAVIORAL SCIENCE & LAW 741, 742-43 (2000), http://www2.law.columbia.edu/fagan/courses/law_socialscience/juvenile_justice/documents/Cauffman_and_Steinberg.pdf. Barbara Kaban & Ann E. Tobey, *When Police Question Children: Are Protections Adequate?*, 1 JUVENILE CTR. CHILD & COURTS 151, 155 (1999) (concluding that "research supports the notion that adolescents' failure to consider long-term consequences may compromise youthful decision making. A failure to consider consequences may be due to a lack of understanding of the consequences as well as a failure to consider them."). THOMAS GRISSO, *What We Know About Youth's Capacities*, YOUTH ON TRIAL: A DEVELOPMENTAL PERSPECTIVE ON JUVENILE JUSTICE 267-269 (Thomas Grisso and Robert G. Schwartz, eds.) (2000) (reviewing literature on effects of emotion on children's cognitive capacities).
[53] JDB v. North Carolina, 564 U.S. 261, 274 (2011).
[54] *Id.* at 273.
[55] *Id.* at 272 (quoting Eddings v. Oklahoma, 455 U.S. 104, 115-16 (1982).

11

AR.09685

the community. The categorical bars in the Proposed Rules go far beyond those limitations, and therefore would undermine the rights of children and their families to seek asylum, in clear contravention of U.S. law. We therefore urge DOJ and DHS to rescind the interim rule.

Respectfully submitted,


Mary Miller Flowers              Miriam Abaya
Senior Policy Analyst            Policy Associate

12

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekm-jt0h
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0474
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** David Thompson

---

## General Comment

As a US citizen who works directly with immigrants and refugees in Concord, California, I am concerned about the ramifications of the proposed rule changes. Specifically, I am concerned about sections 2,3,4, 5, and 7. The United States was founded on the principle of creating new opportunities for those who sought them. We have a long and established history of protecting citizens of the world fleeing conflict and strife. The precedent that has been set with past orders has been sufficient in filtering who is allowed into the United States and receives asylum and these new rules would not make the United States safer. #s 2,3,5 & 7 are generally not serious threats to our society and therefore should not be used to bar asylum.
While in some cases #2 may address human trafficking, it could very easily impact someone who unknowingly housed an individual who overstayed their visa. Our current immigration and penal code has sufficient force to punish those convicted for human trafficking.

#4 does not outline specific criteria for how gang affiliation would be determined. Due to the vagueness of this rule and the possibility of subjective determination of gang affiliation, this amendment would create significant opportunity for enforcement based on racial prejudice.

There is insurmountable evidence that our criminal legal system suffers from racial bias, with people of color convicted with more serious offenses and at far greater rates than those of European descent. As a result, these proposed rule changes inherently increase racial bias in our asylum system. Furthermore, these bars would create double punishment for non-life threatening offenses. This seems reprehensible and unAmerican.

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekm-fsnj
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0475
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Samah Sisay
**Address:**
    429 West 127th Street
    New York, NY, 10027
**Email:** samahm@africanservices.org
**Phone:** 2122223882
**Fax:** 2122227067
**Organization:** African Services Committee

## General Comment

African Services Committee is in opposition to the Proposed Rules regarding procedures for asylum and bars to asylum eligibility which were introduced on December 19, 2020 by the Department of Homeland Security (DHS) and the Department of Justice (DOJ). Please see the attached document for our full comment.

## Attachments

2020-01-20-FINAL ASC Comment to Asylum Proposed Rules



429 West 127th Street
New York, New York 10027
T: 212-222-3882
F: 212-222-7067
www.africanservices.org

Submitted via [*https://www.regulations.gov/document?D=EOIR-2019-0005-0001*]

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

January 20, 2020

Re:    84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-
       AC41; Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and Bars to
       Asylum Eligibility

To Whom It May Concern:

I am writing on behalf of African Services Committee in response to the above-referenced Proposed Rules
to express our strong opposition to the Proposed Rules to amend regulations relating to eligibility for
asylum published in the Federal Register on December 19, 2019.

African Services Committee (ASC) is a New York based non-profit organization that was founded in 1981
by Ethiopian refugees and today is dedicated to assisting immigrants, refugees, and asylees from across the
African Diaspora. We provide health, housing, legal, educational, and social services to 10,000 people each
year in New York City and beyond.

For the reasons detailed in the comments that follow, the Department of Homeland Security and the
Department of Justice should immediately withdraw their current proposal, and instead dedicate their
efforts to ensuring that individuals fleeing violence, including LGBTQ people and person's fleeing
domestic violence, are granted full and fair access to asylum protections in the United States.

Thank you for the opportunity to submit comments on the Proposed Rules. Please do not hesitate to contact
me at samahm@africanservices.org or 212-222-3882 with any further questions.

Sincerely,

Samah Sisay

Staff Attorney

A Head to Know. A Heart to Feel. A Hand to Serve.
An NGO with special consultative status to the United Nations Economic and Social Council.

## I.    INTRODUCTION

African Services Committee is in opposition to the Proposed Rules regarding procedures for asylum and bars to asylum eligibility which were introduced on December 19, 2020 by the Department of Homeland Security (DHS) and the Department of Justice (DOJ). African Services Committee would be uniquely impacted by the Proposed Rules because we are an organization founded by refugees and committed to providing legal and social services to immigrants, many of whom apply for asylum. Our programs address the needs of newcomers affected by war, persecution, poverty, and global health inequalities. We provide health, housing, legal, educational, and social services to 10,000 people each year. Staff representing more than 20 countries and speaking over 25 languages provide culturally and linguistically relevant support to this diverse and growing community.

Asylum provides those fleeing violence with safety, a path to permanent residency and security, and the chance to reunite with immediate family members. Our asylum system is part of the United States' commitment never to repeat its failure to provide protection to thousands of Jewish refugees fleeing the Holocaust. For those seeking asylum in the United States, the stakes are extremely high because a denied claim often means death or a return to brutal persecution.

The Proposed Rules seek to add even more limitations to asylum eligibility in the United States. These proposed changes will unnecessarily destroy asylum protections that are integral to American values and codified in U.S. statutes and international law. African Services Committee submits these comments to express opposition to the entirety of the Proposed Rules and detail our grave concerns with the administration's continued efforts to exclude refugees from obtaining the security and stability the United States asylum system has long promised. We urge that the Proposed Rules be rescinded in their entirety.

## II.    THE PROPOSED RULES ARE BROAD AND COUNTER THE INTENT OF 8 U.S.C.A. § 1158

One of the most egregious aspects of the Proposed Rules, is the addition of criminal bars to asylum eligibility, including: (1) any conviction of a felony ; (2) any conviction for "smuggling or harboring" under 8 U.S.C. § 1324(a), even if the asylum seeker committed the offense for the purpose of bringing her own spouse, child or parent to safety; (3) any conviction for illegal reentry under 8 U.S.C. § 1326; (4) any conviction for an offense "involving criminal street gangs," with the adjudicator empowered to look to any evidence to determine applicability; (5) any second conviction for an offense involving driving while intoxicated or impaired; (6) any conviction *or accusation of conduct* for acts of battery involving a domestic relationship; (7) and any conviction for several newly defined categories of misdemeanor offenses, including *any* drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits.

2

The expansion of asylum bars to include various misdemeanor offenses that were not previously considered particularly serious counter the intent of 8 U.S.C. § 1158, which codifies the U.S. asylum process. The statute clearly intends the criminal bar to asylum to be a higher standard described as "particularly serious crimes."[1] The United Nations High Commissioner for Refugees (UNHCR) has asserted that to constitute a "particularly serious crime," the crime "must belong to the gravest category" and be limited "to refugees who become an extremely serious threat to the country of asylum due to the severity of crimes perpetrated by them in the country of asylum."[2] However the Proposed Rules include driving under the influence (DUI) offenses and other criminal violation which do not meet the particularly serious standard. The Proposed Rules treat all violations as similar in seriousness to those previously warranting inclusion in the particularly serious crime bar, without any independent evidence to justify the expansion.[3] Barring individuals from asylum based on these relatively minor offenses renders the "particularly serious" part of the "particularly serious crime" bar meaningless.

## III.    THE PROPOSED RULES IS UNNECESSARILY HARSH AND WILL FURTHER RACIAL PROFILING

The barriers to asylum for those previously involved in the criminal legal system are already sweeping in scope; adding more barriers is cruel and unnecessary. Any conviction for an offense determined to be an "aggravated felony" is considered a *per se* "particularly serious crime" and therefore a mandatory bar to asylum.[4] "Aggravated felony" was originally limited to murder, weapons trafficking, and drug trafficking, but has since been expanded to include hundreds of offenses.[5] This includes petty offenses that are neither aggravated or felonies. For example, a poor immigrant who takes public transportation without paying a fare may be charged and convicted of theft of services and be barred from being granted asylum in the U.S., despite their real fear of persecution if returned to their country of origin. The existing bars related to criminal convictions are already unnecessarily harsh and should be narrowed, not expanded.

As an organization that works with immigrants from the African Diaspora, we know that these Proposed Rules would exclude many asylum seekers based on future contact with the U.S.'s flawed and racist criminal legal system. This would infuse further racial profiling into the asylum process and put asylum seekers at risk of danger and even death. According to the Bureau of Justice of Statistics, Black and Latinx residents are more likely to be stopped by police than white residents, and despite making up only 7.2 percent of the noncitizen population in the

---

[1] 8 U.S.C. § 1158(b)(2).
[2] U.N. High Comm'r for Refugees (UNHCR), *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 7 (July 2007), http://www.unhcr.org/enus/576d237f7.pdf.
[3] Proposed Rules at 69646.
[4] 8 U.S.C. §§ 1158(b)(2)(A)(ii) and (B)(i).
[5] Pub. L. No. 100-690, § 7342, 102 Stat. 4181, 4469-70.

AR.09691

US, more than 20 percent of people facing deportation on criminal grounds are Black. According to the New York Civil Liberties Union, these statistics are even starker in New York City: Black and Latinx people were the targets of four out of every five reported stops between 2014 and 2017. The Proposed Rules will further diminish the asylum system by relying on a flawed and discriminatory criminal system to exclude immigrants with legitimate fears of persecution.

The Proposed Rules also fail to address or account for the fact that a significant number of people may agree to plead to a crime in order to avoid the threat of a severe sentence. Therefore, a conviction is an unreliable predictor of future danger and is usually also an unreliable indicator of past criminal conduct.

## IV.    THE PROPOSED RULES WILL DISPARATELY IMPACT VULNERABLE POPULATIONS, INCLUDING LGBTQ IMMIGRANTS AND SURVIVORS OF TRAFFICKING AND DOMESTIC VIOLENCE

The expanded criminal bars will disparately impact vulnerable populations, who comprise of asylum seekers routinely criminalized because of their identities. The imposition of additional categorical bars to asylum will only further marginalize asylum seekers already struggling with trauma and discrimination.

The Proposed Rules expand the asylum bar to parents or other caregivers who are convicted of smuggling or harboring offenses after taking steps to help minor children enter the U.S. in order to flee persecution. The Proposed Rules take drastic measures to bar those parents from obtaining asylum protections for themselves and their children. The rules essentially seek to penalize parents and caregivers for taking all necessary steps to protect their children. This change will be extremely detrimental to individuals fleeing domestic violence who bring their children across the border in an effort to protect them.

The Proposed Rules also expand the asylum bar to those who have fled persecution multiple times and therefore have been convicted of illegal reentry.[6] The Proposed Rules conflate multiple entries by noncitizens having prior removal orders with those who have entered multiple times without ever having their asylum claims heard. Many immigrants who have formerly attempted to enter the U.S. while fleeing persecution could not have been aware of the complex laws that govern asylum claims. Asylum seekers are also often wrongly assessed during credible fear interviews, leading to their removal. Others may have previously entered the U.S. prior to the circumstances giving rise to their fear of return. Preserving discretion to grant asylum in these instances allow asylum seekers to be heard and corrects errors that may have occurred in the past.

---

[6] Proposed Rules at 69648.

AR.09692

Many LGBTQ asylum seekers often do not have the language to talk about their sexuality or gender identity or are experiencing so much trauma that they cannot clearly speak about their experiences. For example, African Services Committee represented a lesbian from Guyana who originally entered the U.S. to reunite with her mother. During her first entry, the client was struggling with her sexuality and unable to fully describe her fear of returning to her home country. She was found to not have a credible fear and deported. However, when she returned to Guyana, the client was brutally raped when her community members learned of her sexuality. Fearing for her life, she crossed the border again and asked for asylum in the U.S. Under the proposed rule, she would be criminally barred from being granted asylum even though she has a legitimate claim and could be further brutalized or killed if she returned to her home country.

Inclusion of offenses related to domestic violence in the expanded asylum bars affects populations with overlapping vulnerabilities. The Proposed Rules too broadly categorize domestic violence offenses as particularly serious and do not take into account the complexity of domestic violence situations. Imposition of this rule would further harm survivors and discourage individuals experiencing domestic violence from seeking protection from law enforcement. The immigration laws extend protections to domestic violence survivors outside of the asylum context, recognizing the complex dynamics surrounding intimate partner violence. Provisions in the Violence Against Women Act allow an adjudicator to exercise discretion based on a number of factors and circumstances. The approach adopted by the Proposed Rules is inconsistent with the approach taken towards survivors elsewhere in the federal immigration statute and does not rely on any evidence-based justification for treating asylum seekers differently.

Moreover, the domestic violence sections of the Proposed Rules include the *only* categorical bar to asylum for which a conviction is not required.[7] Domestic violence incidents all too often involve the arrest of both the primary perpetrator of abuse and the survivor, especially in instances involving same-sex couples. These "cross-arrests" do not always yield clear determinations of victim and perpetrator. Authorizing asylum adjudicators to determine the primary perpetrator of domestic assault, in the absence of a judicial determination, unfairly prejudices survivors who are wrongly arrested in the course of police intervention to domestic disturbances.

For example, African Services Committee recently represented a woman in asylum proceedings who experienced severe domestic abuse here in the United States. One day, her husband came home intoxicated and began to physically and verbally assault her. Afraid for her life, the client tried to leave the home and pushed her husband because he was blocking the front

---

[7] The Proposed Rules at p. 69651 explain that the regulations will "render ineligible [non-citizens] who engaged in acts of battery and extreme cruelty in a domestic context in the United States, regardless of whether such conduct resulted in a criminal conviction."

AR.09693

door. This made the husband furious and he called the police and claimed the client had assaulted him. The client tried to explain to the police what happened but they arrested her and charged her with a domestic violence offense. When she was able to get an attorney, the charges were eventually dismissed. However, under the Proposed Rules, the simple fact that she was charged with an offense related to domestic violence, would bar her from being granted asylum. The Proposed Rules would punish her and treat her like the perpetrator instead of a victim who survived unimaginable harm.

## V.    CONCLUSION

African Services Committee is in opposition to the Proposed Rules for the reasons detailed above. We call on the Department of Homeland Security and the Department of Justice to immediately withdraw the Proposed Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019. This administration should be working to actively ensure that individuals fleeing violence are granted full and fair access to asylum protections in the United States, instead of limiting their eligibility.

6

AR.09694

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekm-30e4
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0476
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** John Flanagan
**Address:**
  1322 Webster Street
  Suite 300
  Oakland,  CA,  94612
**Phone:** 415-233-7001
**Fax:** 415-233-7016

---

## General Comment

To Whom it May Concern:

I am writing in response to the above-referenced Proposed Rules to express my strong opposition to the Proposed Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019.

I am an attorney licensed in the State of California. I am an associate attorney in the law office of Becker & Lee LLP, located in Oakland, California. My office sub-contracts with the Vera Institute of Justice to provide government-funded representation under the auspices of EOIR's National Qualified Representative Program ("NQRP") and the permanent injunction in Franco-Gonzalez v. Holder, 2014 WL 5475097 (C.D. Cal. October 29, 2014) (providing for mandatory appointment of counsel for certain mentally incompetent respondents). I have personally represented 11 Franco-Gonzalez class members in their removal proceedings, seven of whom have proceeded to an individual merits hearing.

I am specifically concerned at how this regulation, which adds seven new categorical bars to asylum, will impact individuals with mental illness, who are disproportionately criminalized. For example, individuals with mental illness often use illegal substances as a means of self-medication. See e.g. Harris, Katherine M, and Mark J Edlund. "Self-medication of mental health problems: new evidence from a national survey." Health services research vol. 40,1 (2005): 117-34. doi:10.1111/j.1475-6773.2005.00345 (finding that individuals with unmet mental health needs use illegal narcotic substances at 1.4 times the rate of the general population). Given these realities, the disparate impact of this regulation on individuals with mental illness must be considered. Alexander

AR.09695

v. Choate, 469 U.S. 287, 292-297 (1985) (acknowledging that the Rehabilitation Act of 1973, 29 U.S.C. 794 (2000), authorizes disparate impact discrimination claims in some circumstances).

This regulation also departs significantly from the treatment of other categorical criminal bars to asylum, which take into a non-citizen's mental illness. For example, the Ninth Circuit has held that a non-citizen's mental condition at the time of an offense is a relevant factor because it may relevant to whether criminal conduct "was 'inherently base, vile, or depraved'" such that it is a "particularly serious crime" that warrants denial of asylum. See Gomez-Sanchez v. Sessions, 892 F.3d 985, 996 (9th Cir. 2018). Indeed, a respondent's mental condition "might well provide no defense to criminal conviction, even while bearing substantially on an immigration judge's determination of whether that individual poses a danger to the community." Id. at 996 n. 10 (analogizing to a situation where a victim of intimate partner abuse suffers from PTSD and assaults her abuser). The Ninth Circuit also rejected the argument that an immigration judge could simply rely on a criminal court's competency finding or a respondent's choice not to pursue a mental health defense because competency "has nothing to do with [a respondent's] mental state at the time of the offense," and "a defendant may choose not to pursue an affirmative defense of not guilty ... in light of the research indicating that those defendants who raise insanity defenses get significantly longer sentences than those convicted without arguing insanity." Gomez-Sanchez, 892 F.3d at 994 n.8. The proposed regulation fails to acknowledge any of these realities.

Cutting of a non-citizen from relief based on non-aggravated felony offenses motivated by mental illness, which may have been triggered by or will be the cause of persecution, is disproportionately cruel and ultra vires of Congress's intent when it clearly outlined the humanitarian benefit of asylum and its exclusions. For example, this decision will destroy access to humanitarian asylum under 8 C.F.R. 1208.13(b)(1)(iii) for individuals who faced even atrocious past persecution and will suffer other serious harm on account of mental illness, but who, because of lack of access to mental health resources, sustained a single controlled substance offense, engaged in other anti-social conduct, or failed to raise a mental health defense simply so they could get out of criminal custody.

Finally, in addition to being substantively unconscionable, this regulation erects procedural barriers that uniquely prejudice individuals with mental illness. The Franco-Gonzalez class members I represent are my clients because they are unable to understand the nature of their proceedings or mount their own defenses. Even with counsel, many of my clients are unable to provide coherent personal and medical histories. In light of this, the conduct-based criminal bars (e.g. for so-called "gang activity") will be difficult if not impossible for many of my clients to defend against and allow adjudicators to operate based on already-existing societal prejudices against individuals with mental illness (e.g. that they are inherently "dangerous").

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekm-nwzo
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0477
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Jaya Ramji-Nogales

## General Comment

See attached file(s)

## Attachments

comment on fed reg

AR.09697

*Submitted via [https://www.regulations.gov/document?D=EOIR-2019-0005-0001]*
Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41; Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility

January 21, 2020

To Whom it May Concern:

I write to express my strong opposition to the Proposed Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019 and referenced above. These rules should be rescinded in their entirety.

I am the I. Herman Stern Research Professor at Temple University's Beasley School of Law, where I teach Refugee Law and Policy, a course I have taught since 2005. My focus as a scholar is on asylum law and the U.S. asylum process. I have published two co-authored books, both empirical studies of the U.S. asylum adjudication system, and over ten articles and book chapters on domestic and international refugee law.

For the reasons I explain further in the comments below, the Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal. These agencies should instead, consistent with our obligations under international refugee and human rights law, dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

Thank you for the opportunity to submit comments on the Proposed Rules. Please do not hesitate to contact me at jayarn@temple.edu to provide further information. Please note that the views expressed in the comment below are attributable solely to the author and not to Temple University or its law school.

Sincerely,
Jaya Ramji-Nogales
I. Herman Stern Research Professor
Temple University, Beasley School of Law

1

**DETAILED COMMENTS in opposition to the Proposed Rules re Procedures for Asylum and Bars to Asylum Eligibility, 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41**

## A.  Introduction

On December 19th, the Department of Homeland Security (DHS) and the Department of Justice (DOJ) issued a joint set of Proposed Rules that would make three primary changes to the rules governing asylum adjudications.  I am deeply concerned that these rules (1) violate our international treaty obligations and (2) will undermine fairness and consistency in the asylum adjudication system.

The first proposed change adds seven mandatory bars to asylum eligibility: (1) any conviction of a felony offense; (2) any conviction for "smuggling or harboring" under 8 U.S.C. § 1324(a), even if the asylum seeker committed the offense for the purpose of bringing her own spouse, child or parent to safety; (3) any conviction for illegal reentry under 8 U.S.C. § 1326; (4) any conviction for an offense "involving criminal street gangs," with the adjudicator empowered to look to any evidence to determine applicability; (5) any second conviction for an offense involving driving while intoxicated or impaired; (6) any conviction *or accusation of conduct* for acts of battery involving a domestic relationship; (7) and any conviction for several newly defined categories of misdemeanor offenses, including *any* drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits.

The second section of the Proposed Rules provides a multi-factor test for immigration adjudicators to determine whether a criminal conviction or sentence is valid for the purpose of determining asylum eligibility. The third section rescinds a provision in the current rules regarding the reconsideration of discretionary asylum.

Taken together, these proposed changes violate our international treaty obligations regarding the asylum process and the substance of asylum law, and threaten to undermine the U.S. asylum process.  I submit these comments to express opposition to the the Proposed Rules as drafted.  These rules are part of the administration's continued unlawful and immoral efforts to exclude refugees from obtaining the security and stability the United States asylum system has long promised. I urge that the Proposed Rules be rescinded in their entirety.

## B.  The Proposed Rules violate the obligations of the 1951 UN Convention Relating to the Status of Refugees, to which the United States has bound itself to comply, as well as the UN High Commissioner for Refugees' interpretation of that convention.

By acceding to the 1967 Protocol Relating to the Status of Refugees, which binds parties to the United Nations Convention Relating to the Status of Refugees, the United States obligated itself to develop and interpret United States refugee law in a manner that complies with the Protocol's principle of *non-refoulement* (the commitment not to return refugees to a country

2

where they will face persecution on protected grounds). Expanding the scope of mandatory bars to asylum beyond the exclusion and expulsion categories specifically denoted in the Refugee Convention is a violation of the letter and the spirit of the treaty.

The Refugee Convention authorizes states parties to exclude and/or expel potential refugees from protection only when carefully denoted conditions apply. The plain language of the treaty allows states to exclude from refugee protection and/or expel individuals who, "having been convicted by a final judgement of a particularly serious crime, constitute a danger to the community of that country." The United Nations High Commissioner for Refugees, the treaty executive body charged with interpreting the Refugee Convention, has clarified the meaning of this provision, which applies only to "extreme cases," in which the particularly serious crime at issue is a "capital crime or a very grave punishable act." In order to constitute a "particularly serious crime," the crime "must belong to the gravest category" and be limited "to refugees who become an extremely serious threat to the country of asylum due to the severity of crimes perpetrated by them in the country of asylum." As UNHCR has explained in detail, the particularly serious crime bar does not encompass less extreme crimes; "[c]rimes such as petty theft or the possession for personal use of illicit narcotic substances would not meet the threshold of seriousness." Finally, UNHCR explains that the asylum adjudication process must offer an individualized assessment as to whether an individual should be barred from protection for having been convicted of a particularly serious crime, and that assessment must include consideration of any mitigating factors.

The Proposed Rules fall afoul of this neatly delineated exception. In just one example, the Proposed Rules exclude from protection anyone who was convicted of a felony (p. 69659) and define "felony" as "any crime punishable by more than one year of imprisonment" (p. 69660) without consideration of any other factors, including dangerousness. As UNHCR has explained, the Refugee Convention requires an individualized assessment of the seriousness of the conviction before applying this exclusion clause. To do otherwise is to place asylum seekers at risk of *refoulement* in violation of our international legal obligations.

The expansion of the asylum bar to include individuals who have been convicted of reentering the United States without inspection pursuant to INA § 276 also runs afoul of our obligations under the Refugee Convention. As recognized most recently by the 9th Circuit Court of Appeals in East Bay Sanctuary Covenant v. Trump, Case No. 3:18-cv-06810-JST, Order (9th Cir. Dec. 7, 2018), Article 31(1) of the Refugee Convention prohibits the imposition of penalties based on a refugee's manner of entry or presence. In the words of Judge Bybee, the author of that opinion, "This provision reflects our understanding of our treaty obligation to not 'impose penalties [on refugees] on account of their illegal entry or presence.'" In that same litigation, the UNHCR authored an amicus brief that explained that emphasized that the term "penalties" in Article 31(1) includes procedural restrictions on asylum; that Article 33(1) protects "all refugees, including those who have not been formally recognized"; and that "neither withholding of removal nor protection under CAT provides an adequate substitute for the asylum" process because they are not available to all refugees."

On this latter point, the Proposed Rules violate our international treaty obligations. The agencies point to the continued availability of alternative forms of relief for those precluded from

3

AR.09700

asylum eligibility as a reason why the harsh new rules are valid.  This is a misreading of international law as explained clearly by UNHCR.  The protections afforded by CAT and by statutory withholding of removal are limited in scope and duration, and they are harder to obtain than asylum. As UNHCR noted, a Rule that limits *bona fide* refugees to withholding of removal and CAT protection risks the *refoulement* of genuine refugees in violation of our international obligations.

Even for those who are able meet the higher standards of withholding and CAT relief, they are not accorded the benefits required by the Refugee Convention.  For example, they have no ability to travel internationally. Article 28 of the Refugee Convention states in no uncertain terms, "Contracting States shall issue to refugees lawfully staying in their territory travel documents for the purpose of travel outside their territory." Withholding and CAT recipients do not have access to a travel document as contemplated by Article 28. By regulation, refugee travel documents are available only to asylees. And the Board of Immigration Appeals requires that an individual granted withholding and CAT—unlike an individual granted asylum—must simultaneously be ordered removed, making any international travel a "self-deportation." Refugees granted only withholding of removal or CAT protection are thus effectively trapped within the United States in long-term limbo.

Withholding recipients likewise face hurdles in access to employment. Article 17 of the Refugee Convention states that a contracting state "shall accord to refugees lawfully staying in their territory the most favorable treatment accorded to nationals of a foreign country in the same circumstances, as regards the right to wage-earning employment." Recipients of withholding enjoy no such right. They must apply for work authorization, and they face frequent delays in the adjudication of these applications, which often result in the loss of legal authorization to work.

C. **The Proposed Rules will overburden an already struggling immigration court, undermining judicial efficiency and resulting in biased decision-making**

The Proposed Rules add two challenging components to immigration adjudicators' determinations of whether the applicant's actions constitute a crime that results in a mandatory bar to asylum.  First, the agencies propose that immigration adjudicators be allowed to consider "all reliable evidence" to determine whether there is "reason to believe" an offense was "committed for or related to criminal gang evidence," or "in furtherance of gang-related activity, triggering ineligibility for asylum in either case. Second, the Proposed Rules permit immigration adjudicators to "assess all reliable evidence in order to determine whether [a] conviction amounts to a domestic violence offense;" and to go even further by considering whether non-adjudicated *conduct* "amounts to a covered act of battery or extreme cruelty."

Requiring adjudicators to make complex determinations regarding the nature and scope of a particular conviction or, in the case of the domestic violence bar, *conduct*, will lead to massive judicial inefficiencies and slanted "mini-trials" within the asylum adjudication process. The scope of the "reliable evidence" available to adjudicators in asylum cases is potentially limitless; advocates on both sides would be obligated to present fulsome arguments to make their cases about gang connections to the underlying activity or the relationship of the asylum applicant to the alleged victim. Because of the lack of robust evidentiary rules in immigration

4

proceedings, it will be difficult if not impossible for many applicants to rebut negative evidence marshaled against them, even if false; and in other cases, asylum applicants will struggle to find evidence connected to events that may have happened years prior (especially for those detained). Asylum trials, which are typically three or fewer hours under current policies, would provide insufficient time to fully present arguments on both sides of these unwieldy issues.

As the immigration courts contend with backlogs that now exceed one million cases, tasking adjudicators with a highly nuanced, resource-intensive assessment of the connection of a conviction to gang activity and/or the domestic nature of alleged criminal conduct—assessments far outside their areas of expertise—will prolong asylum proceedings and invariably lead to erroneous determinations that will give rise to an increase in appeals. The Proposed Rules repeatedly cite increased efficiency as justification for many of the proposed changes. Yet requiring adjudicators to engage in mini-trials to determine the applicability of categorical criminal bars, rather than relying on adjudications obtained through the criminal legal system, will dramatically *decrease* efficiency in the asylum adjudication process.  As further analyzed in the seminal work, *Blinking on the Bench* (Chris Guthrie, Jeffrey J. Rachlinski, and Andrew J. Wistrich*, Blinking on the Bench: How Judges Decide Cases,* 93 CORNELL L. REV. 1 (2007)), highly time-pressured decisions are far more likely to be inaccurate and based on bias rather than a careful review of the record.

## D.  Conclusion

Because of the profound and unresolvable problems with these Proposed Rules, in particular their violations of our international treaty obligations and their likely impact on the asylum adjudication system, I oppose the Proposed Rules and propose that they be rescinded in their entirety.

5

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekm-3a3g
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0478
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Henry Baer-Benson

---

## General Comment

I write to express my strong opposition to this proposed rule change. I am a concerned member of the public who believes strongly that our nation must welcome people fleeing violence, and who is strongly concerned about racial profiling in the criminal legal system. Immigrants are a vital part of my community, my neighborhood, and my state. I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them. For these reasons, I call upon the Trump administration to withdraw this proposal.

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekm-7uc3
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0479
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Nazgol Ghandnoosh
**Address:**
    1705 DeSales St. NW 8th floor
    Washington,  DC,  20036
**Email:** nghandnoosh@sentencingproject.org
**Phone:** 2026289871

---

## General Comment

See attached file(s)

---

## Attachments

Nazgol Ghandnoosh on Proposed Asylum Restrictions Based on Criminal Histories

AR.09704



THE SENTENCING PROJECT

RESEARCH AND ADVOCACY FOR REFORM

# Comments of Nazgol Ghandnoosh

**Senior Research Analyst**
**The Sentencing Project**

**On Proposed Rules to Expand Bars to Eligibility for Asylum Based on Criminal Histories**

**Before the Department of Homeland Security and the Department of Justice**

**January 21, 2020**

AR.09705

*Submitted via https://www.regulations.gov/document?D=EOIR-2019-0005-0001*

Nazgol Ghandnoosh, Ph.D., Senior Research Analyst
The Sentencing Project
1705 DeSales St. NW, 8th floor
Washington, DC 20036


Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41; Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility

January 21, 2020

To Whom It May Concern:

I am writing on behalf of The Sentencing Project in response to the above-referenced Proposed Rules to express our strong opposition to the Proposed Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019.

Founded in 1986, The Sentencing Project engages in research and advocacy to achieve a fair and effective U.S. criminal justice system. As a Senior Research Analyst, I conduct and synthesize research on criminal justice policies on topics ranging from the opioid crisis to racial disparities in the justice system. I am a co-author of our report "Immigration and Public Safety," and have authored an analysis of the federal prison population titled "Federal Prisons at a Crossroads," both published in 2017 (see enclosed CV).

For the reasons detailed in the comments that follow, the Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

Thank you for the opportunity to submit comments on the Proposed Rules. The enclosed comments include hyperlinks to relevant sources which I request that you please review. Please do not hesitate to contact me, Nazgol Ghandnoosh (nghandnoosh@sentencingproject.org), to provide further information.

Sincerely,
Nazgol Ghandnoosh, Ph.D.
Senior Research Analyst


Enclosed: CV

1

**DETAILED COMMENTS submitted by The Sentencing Project in opposition to the Proposed Rules re Procedures for Asylum and Bars to Asylum Eligibility, 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41**

## I.    INTRODUCTION

On December 19th, the Department of Homeland Security (DHS) and the Department of Justice (DOJ) issued a joint set of Proposed Rules that would add seven *categorical* bars related to criminal history to asylum eligibility. This proposal runs counter to the growing understanding in domestic policy of the evidence and research on criminal histories, namely that they: can accompany innocence, are disproportionately imposed on the poor and people of color, need not reflect an elevated public safety risk, and highlight the need for investments in prevention, drug treatment, and restorative justice. Rather than allowing customized assessments of asylum cases involving criminal histories, DHS and DOJ are suggesting a one-size-fits-all approach that would stifle considerations of innocence, bias, rehabilitation, and treatment.

The proposed set of changes adds the following seven *categorical* bars to asylum eligibility related to offenses committed in the United States: (1) any conviction of a felony offense; (2) any conviction for "smuggling or harboring" under 8 U.S.C. § 1324(a), even if the asylum seeker committed the offense for the purpose of bringing her own spouse, child or parent to safety; (3) any conviction for illegal reentry under 8 U.S.C. § 1326; (4) any conviction for an offense "involving criminal street gangs," with the adjudicator empowered to look to any evidence to determine applicability; (5) any second conviction for an offense involving driving while intoxicated or impaired; (6) any conviction *or accusation of conduct* for acts of battery involving a domestic relationship; (7) and any conviction for several newly defined categories of misdemeanor offenses, including *any* drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits.

DHS and DOJ already impose a mandatory asylum bar on those convicted of "serious nonpolitical crime outside the United States" or a "particularly serious crime" in the United States. **The Sentencing Project strongly urges DHS and DOJ to reject expanding these mandatory restrictions because they do not serve the interest of public safety while unnecessarily gutting the asylum protections enshrined in United States and international law.**

## II.    A NON-TRIVIAL NUMBER OF PEOPLE WITH CRIMINAL RECORDS ARE INNOCENT AND WILL BE UNJUSTLY EXCLUDED FROM ASYLUM PROTECTION

Legal cases and media coverage have established that a non-trivial number of innocent people become entangled with the criminal justice system, ranging from an accusation of a gang affiliation to a murder conviction. Wrongful convictions are the result of many factors, including the failure of criminal justice practitioners to uphold the legal standards of their work, to false admissions of guilt in plea negotiations in order to avoid the most punitive consequences. For example:

2

- **Gang affiliation**

A growing number of recent cases and investigations have demonstrated the overly broad net that law enforcement agents have cast in identifying gang members. For example, Chief U.S. District Judge Virginia A. Phillips barred the city of Los Angeles from enforcing nearly all of its gang injunctions in 2018, anticipating that most of those affected by the injunctions suffered due process violations. These injunctions are civil court orders that bar suspected gang members from associating with friends or family members in areas where the gang is known to exist. Following an audit from the Los Angeles City Attorney's Office and the Los Angeles Police Department, the city had already reduced the number of people subject to such injunctions from 8,900 to 1,450. In January 2020, the *Los Angeles Times* reported that over a dozen of the city's officers were being investigated on suspicion of falsifying information they gathered during stops, incorrectly portraying people as affiliated with gangs to boost their stop statistics.

- **Homicide**

The Innocence Project reports that in the past three decades, "367 people in the United States have been exonerated by DNA testing, including 21 who served time on death row." 130 of these exonerees were wrongfully convicted of murders, many as a result of false confessions and eyewitness misidentifications. In *Corley v. United States (2009)*, the Supreme Court referenced the history of 20th-century dictatorships and recent research to argue that the pressures and isolation of custodial police interrogation "can induce a frighteningly high percentage of people to confess to crimes they never committed." Youth and people with learning disabilities are especially susceptible to these psychological pressures.

- **Guilty Pleas**

People plead guilty to crimes they did not commit in the United States sometimes to avoid the "trial penalty," the draconian sentence they would face if found guilty at trial, resulting from the dramatic increase in prison terms since the 1970s. Nearly all (98%) of guilty convictions in U.S. federal courts were the result of guilty pleas in 2018, as were 94% of felony convictions in U.S. state courts in 2006—a dramatic increase in recent decades. Jed S. Rakoff, U.S. District Judge for the Southern District of New York, notes that the infrequence of jury trials runs counter to the intentions of the Founding Fathers because these trials serve "not only as a truth-seeking mechanism and a means of achieving fairness, but also as a shield against tyranny." Among 354 individuals exonerated by DNA analysis, the National Association of Criminal Defense Lawyers writes, "11% had pled guilty to crimes they did not commit, and the National Registry of Exonerations has identified 359 exonerees who pled guilty."

Concerns about barring innocent people with criminal histories from seeking asylum should be sufficient cause for rejecting these Proposed Rules. But there are several reasons to reject this proposal even for people who are not factually innocent, as described next.

3

III.    PEOPLE IMPACTED BY UNWARRANTED RACIAL DISPARITIES IN THE
        CRIMINAL JUSTICE SYSTEM WILL BE DISPROPORTIONATELY
        BARRED FROM ASYLUM PROTECTION

Innocent or guilty in the United States, people of color are disproportionately impacted by the
criminal justice system. In 2015, The Sentencing Project reported that blacks and Latinos comprised
56% of the incarcerated population, yet only 30% of the U.S. population. The roots of this disparity
precede criminal justice contact: conditions of socioeconomic inequality contribute to higher rates of
some violent and property crimes among people of color. The disparities in the criminal justice
system resulting from differential patterns of criminal offending are considered "warranted"
disparities. But four features of the justice system exacerbate this underlying inequality and produce
unwarranted disparities: 1. Many ostensibly race-neutral policies and laws have a disparate racial
impact; 2. Criminal justice practitioners' use of discretion is—often unintentionally—influenced by
racial bias; 3. Key segments of the criminal justice system are underfunded, putting blacks and
Latinos—who are disproportionately low-income—at a disadvantage; 4. Criminal justice policies
exacerbate socioeconomic inequalities by imposing collateral consequences on those with criminal
records and by diverting public spending from more effective crime-reduction policies.

Researchers have found the greatest disparities between criminal activities and enforcement in lower
level offenses. For example:

- **Drug Crimes**

An ACLU report found that blacks were 3.7 times as likely to be arrested for marijuana
possession than whites in the United States in 2010. This disparity expands at later stages of the
criminal justice system so that 57% of people in state prisons for drug offenses are people of
color, even though whites comprise over two-thirds of drug users, and are likely a similar
proportion of sellers.

- **Gang Affiliation**

People of color, particularly African Americans, are especially likely to be identified as gang
members. For example, from 2010 through 2017, everyone arrested under Mississippi's gang law
was black, reports the *Jackson Free Press*, even though the Mississippi Association of Gang
Investigators found that 53% of verified gang members in the state were white. In Chicago, 95%
of the 65,000 individuals in the police department's gang database are black or Latino. In New
York City, only 1% of the 18,000 people in the police department's gang database are non-
Hispanic white.

Barring people with certain criminal records from seeking asylum would ossify these disparities,
rather than allow for an opportunity to stem further harm.

4

## IV.    PEOPLE WHO ARE NO LONGER A PUBLIC SAFETY RISK WILL BE EXCLUDED FROM ASYLUM PROTECTION

Setting aside concerns about innocence and biased enforcement, additional categorical asylum bars against people with criminal histories flies in the face of growing understanding domestically that a criminal conviction is a poor metric for assessing current public safety risk. Criminal offending peaks during the late teenage years and declines in the early 20s, as illustrated by criminological research on the age-crime curve (Figure 1). The National Institute of Justice explains that while specific versions of this curve vary for different populations, "This bell-shaped age trend, called the age-crime curve, is universal in Western populations."

**Figure 1: An Age-Crime Curve**



Source: Loeber, R., and R. Stallings. 2011. "Modeling the Impact of Interventions on Local Indicators of Offending, Victimization, and Incarceration," in Young Homicide Offenders and Victims: Risk Factors, Prediction, and Prevention from Childhood, eds. Rolf Loeber and David P. Farrington, New York: Springer: 137-152.

Criminologists Alfred Blumstein, of Carnegie Mellon University, and Kiminori Nakamura, of University of Maryland, have demonstrated that after the passage of time, even people convicted of violent crimes pose the same public safety risk as the general public.

In recent years, domestic U.S. policies have become increasingly aligned with criminal justice research by moving away from lifelong extra-legal punishment for criminal convictions and by encouraging successful community reintegration. In particular:

- **Re-entry**

In 2008, President George W. Bush signed into law the Second Chance Act—recently reauthorized by the First Step Act—making substantial investments to help the 650,000 people

5

released annually from prisons nationwide to re-enter society as "self-sustaining and law-abiding" members of society. Support for re-entry has also grown among states, such as with California's previously-named Department of Corrections adding "and Rehabilitation" to its name in 2005, after having disavowed the goal in the 1970s. President Barack Obama inaugurated a "National Reentry Week" in the final week of April 2016, to "reform the federal approach to reentry by addressing barriers to reentry, supporting state and local efforts to do the same, and engaging the private sector to provide individuals who have earned a second chance the opportunity to participate in the American economy." For the past two years, President Donald Trump has proclaimed April as Second Chance Month, to celebrate those who have successfully re-entered society after prison and expand opportunities for those working towards this goal, emphasizing "our belief in second chances for all who are willing to work hard to turn their lives around."

- **Ban the Box**

In December 2019, President Donald Trump signed into law the Fair Chance Act, legislation to "ban the box" on job applications for federal agencies and contractors, requiring these employers to make a conditional job offer before subjecting a prospective employee to a criminal background check. This change would improve hiring prospects at the country's largest employer, the federal government, for the over 70 million people in the United States who have an arrest or conviction record. This builds on the "ban the box" policies at a number of businesses including Walmart, Koch Industries, JP Morgan Case, Target, Home Depot, and Bed, Bath & Beyond. This reform also complements state and local reforms: According to the National Employment Law Project, 35 states and more than 150 cities have adopted "ban the box" policies. Thirteen states have extended these hiring requirements to private employers as well.

Domestically, public-sector and private-sector reforms increasingly reflect the understanding that criminal histories should not be equated with public safety risk given that many people with such histories do not pose any greater risk to society than those without records. The Proposed Rules run counter to this evidence-based understanding.

## V.    PEOPLE WHOSE CONVICTION IS THE RESULT OF PAST RELOCATION EFFORTS, TRAUMA, OR LIMITED OPPORTUNITIES WILL BE EXCLUDED FROM ASYLUM PROTECTION

The mandatory asylum bars of the Proposed Rules would preclude at least two additional considerations.

**First, for some individuals, a criminal history reflects an immigration law violation, which until recent decades, the United States treated as a civil rather than criminal offense.** It is unclear how public safety would be advanced by denying asylum to individuals whose most serious crime is an immigration law violation. If not for the redirection of immigration law violators into the

6

criminal system, individuals who previously illegally sough entry into or resided in the United States would not be barred from applying for asylum under the Proposed Rules.

Non-citizens are currently under-represented in the total U.S. prison population, making up 6% of the U.S. prison population while comprising 7% of the total U.S. population, according to research from The Sentencing Project. This reflects the fact that foreign-born residents of the United States, including those who are undocumented, commit crime less often than native-born citizens. Yet non-citizens are increasingly over-represented in federal prisons. In 2017, 22% of the federal prison population were non-citizens. The increased use of imprisonment for immigration law violations is a major driver of the over-representation of non-citizens in federal prisons. Among non-U.S. citizens who received a federal prison sentence in 2015, 66% were convicted of an immigration law violation as their most serious offense. This high proportion is the result of the dramatic increase in immigration case filings in U.S. District Court and in federal prison sentences for immigration law violations. Between 1994 and 2010, while the undocumented population in the United States roughly doubled, the number of defendants against whom immigration cases were filed in U.S. district court grew by 889% (Figure 2). Between 2000 and 2015, during a period in which the undocumented population grew by roughly 24%, the number of federal prison sentences for immigration law violations doubled, from 11,403 to 20,757. In its analysis of federal criminal cases in 2015, the Unites States Sentencing Commission noted that 82% of sentenced immigration cases involved "unlawful reentry into the United States or unlawfully remaining in the United States without authority" and another 12% involved transporting undocumented people across the border.

**Figure 2: Immigration Cases Filed in U.S. District Court, 1994-2010**



Source: Motivans, M. 2012. "Immigration Offenders in the Federal Justice System, 2010." U.S. Department of Justice, Bureau of Justice Statistics. Retrieved from: https://www.bjs.gov/content/pub/pdf/iofjs10.pdf

7

**Second, lack of access to education and opportunities, trauma, and lack of access to drug treatment, are all important drivers of crime and drug use. Many people commit crimes while under the influence of drugs and sell drugs in order to purchase their own.** The Bureau of Justice Statistics reports that 58% of people in state prisons and 63% of those serving jail sentences between 2007 and 2009 reported having a drug use disorder in the year prior to their admission. These facts indicate that better economic and social opportunities, and improved access to drug treatment, would prevent many of the crimes for which people are incarcerated. The Proposed Rules would bar people who failed to overcome these underlying criminogenic factors in our society from asylum protection.

## VI.    CONCLUSION

The bars to asylum based on allegations of criminal conduct are *already* sweeping and over-broad in nature and scope. Any conviction for an offense determined to be an "aggravated felony" is considered a *per se* "particularly serious crime" and therefore a mandatory bar to asylum. "Aggravated felony" is a notoriously vague term, which exists only in immigration law. Originally limited to murder, weapons trafficking, and drug trafficking, it has metastasized to encompass hundreds of offenses, many of them neither a felony nor aggravated, including petty offenses such as misdemeanor shoplifting, simple misdemeanor battery, or sale of counterfeit DVDs. In *Sessions v. Dimaya (2018)*, the Supreme Court struck down a provision of the Immigration and Nationality Act that led to the deportation of immigrants convicted of an "aggravated felony," including "a crime of violence," for being unconstitutionally vague.

The existing crime bars should be narrowed, not expanded. Even for those not categorically barred from relief, the immigration adjudicator maintains full discretion to deny asylum. As DHS states, "Asylum is a discretionary immigration benefit"— DHS and DOJ should preserve this discretionary authority by rejecting the creation of additional mandatory bars to asylum eligibility.

8

# Nazgol Ghandnoosh, Ph.D.

1705 DeSales Street Northwest, 8th floor Washington, DC 20036

nghandnoosh@sentencingproject.org | 202-628-0871

---

## EDUCATION

**Ph.D. Sociology**  University of California, Los Angeles, 2013
    *Dissertation*  "Challenging Mass Incarceration: A California Group's Advocacy for the Parole Release of Term-to-Life Prisoners"

**M.A. Sociology**  University of California, Los Angeles, 2007

**B.S. Economics**  University of Pennsylvania, 2001 (*magna cum laude*)

---

## PROFESSIONAL EXPERIENCE

2018 – present  *Senior Research Analyst*, The Sentencing Project

2013 – 2018  *Research Analyst*, The Sentencing Project

2006 – 2013  *Instructor, Teaching Assistant*, University of California Department of Sociology

2004 – 2005  *Researcher*, Service Employees International Union, Local 1199

2003  *Research Assistant*, National Center for Children in Poverty, Columbia University

2001 – 2003  *Consultant*, Monitor Group

---

## PUBLICATIONS

2019  "U.S. Prison Population Trends: Massive Buildup and Modest Decline." Washington, DC: The Sentencing Project.

2019  "The Next Step: Ending Excessive Punishment for Violent Crimes." Washington, DC: The Sentencing Project.

2018  "Cell Phones and 'Excessive Contact': The Contradictory Imperatives Facing California's Parole-Eligible Lifers." Forthcoming, *Criminal Justice Policy Review.*

2018  "Can we Wait 75 Years to Cut the Prison Population in Half?" Washington, DC: The Sentencing Project.

2017  "Opioids: Treating an Illness, Ending a War" (with Casey Anderson). Washington, DC: The Sentencing Project.

    Related Op-Ed: "Trump's Opioid Crisis Failures Mean States Must Lead the Way." *Newsweek,* December 14.

AR.09714

2017    "Minimizing the Maximum: The Case for Shortening All Prison Sentences." In *Smart Decarceration: Achieving Criminal Justice Transformation in the 21st Century* (Edited by C. Pettus-Davis & M. Epperson). New York: Oxford University Press.

2017    "Federal Prisons at a Crossroads." Washington, DC: The Sentencing Project.

2017    "U.S. Prison Population Trends 1999-2015: Modest Reductions with Significant Variation." Washington, DC: The Sentencing Project.

2017    "Immigration and Public Safety" (with Josh Rovner). Washington, DC: The Sentencing Project.

        Related Op-Ed: "Stiffening Immigration Enforcement is not the Answer to Reducing Crime" (with Alex Nowrasteh). *The Hill,* April 7.

2017    "Delaying a Second Chance: The Declining Prospects for Parole on Life Sentences." Washington, DC: The Sentencing Project.

        "Delaying a Second Chance: Thirty-Two Jurisdiction Profiles." Washington, DC: The Sentencing Project.

        Related Op-Ed: "Maryland Should Make Parole a Meaningful Part of Sentencing Again." *The Washington Post*, February 13.

2015    "Becoming Smart on Crime." *The News-Gazette.* April 26.

2015    "Black Lives Matter: Eliminating Racial Inequity in the Criminal Justice System." Washington, DC: The Sentencing Project.

2014    "Support Grows to End Excessive Punishment." *The Daily Journal.*

2014    "Life, with a Possibility of Blocked Parole." *The Daily Journal.*

2014    "Race and Punishment: Racial Perceptions of Crime and Support for Punitive Policies." Washington, DC: The Sentencing Project.

2014    "Fewer Prisoners, Less Crime: A Tale of Three States" (with Marc Mauer). Washington, DC: The Sentencing Project.

2013    "Can We Wait 88 Years to End Mass Incarceration?" (with Marc Mauer). *The Huffington Post*. December 20.

2011    Review of *Thug Life: Race, Gender, and the Meaning of Hip-Hop* by Michael Jeffries. *Ethnic and Racial Studies* 34(11): 1998 - 1999.

2010    "'Cross-Cultural' Practices: Interpreting Non-African-American Participation in Hip-Hop Dance." *Ethnic and Racial Studies* 33(9): 1580 - 1599.

2010  "Organizing Workers Along Ethnic Lines: The Pilipino Workers' Center." Pp. 49 - 70 in R. Milkman, J. Bloom, and V. Narro (eds.) *Working for Justice: The L.A. Model of Organizing and Advocacy*. Cornell University Press.

2006  "Strangeness at the Gates: The Peculiar Politics of American Immigration" (with Roger Waldinger). *International Migration Review* 40(3): 719 - 734.

---

## GRANTS AND FELLOWSHIPS

Ralph J. Bunche Center for African American Studies Grant, UCLA, 2012

Chicano Studies Research Center Grant, UCLA, 2012

Haynes Foundation Doctoral Dissertation Fellowship, 2011

Graduate Fellowship, Sociology, UCLA, 2005, 2010

Elena and Gregg Davis Foundation Grant, 2010

Quality of Graduate Education Summer Stipend, UCLA, 2009, 2008

Graduate Summer Research Mentorship Fellowship, UCLA, 2007, 2006

Labor and Employment Research Fund Mini-Grant, UCLA, 2007

---

## CONFERENCE PAPERS

"Redefining Life Sentences: How Legislators, Governors, and Parole Boards Have Increased the Wait for Parole in U.S. Prisons." Law and Society Association Annual Meeting, Mexico City, June 21, 2017.

"Life in America: The Growing Wait for Parole in U.S. Prisons" (with Ashley Nellis). American Society of Criminology Annual Meeting, New Orleans, November 16, 2016.

"Minimizing the Maximum: The Case for Reducing Lengths of Stay for All Prisoners." Washington University in St. Louis Smart Decarceration Initiative Inaugural Conference, St. Louis, September 25, 2015.

"Seeing Like an Advocate: Perceiving Success Amidst Ambiguous or Negative Outcomes." American Sociological Association Annual Meeting, San Francisco, August 19, 2014.

"Ties that Double Bind: Conflicting Effects of Intimate Relationships on the Parole Prospects of California's Term-to-Life Prisoners." Law and Society Association Annual Meeting, Minneapolis, May 31, 2014.

"Ties That Bind: Conflicting Effects of Intimacy for California Prisoners." American Sociological Association Annual Meeting, New York, August 10, 2013.

AR.09716

## INVITED PRESENTATIONS

"Can We Wait 75 Years to End Mass Incarceration?"
University of Rochester, Rochester Decarceration Research Initiative. March 27, 2019
Washington Adventist University. April 12, 2018

"Progress and Persistence in the Incarceration of Women and Girls"
The National Council for Incarcerated and Formerly Incarcerated Women and Girls, Free Her
National Conference. September 29, 2018

"Opioids: Treating an Illness, Ending a War"
Central Connecticut State University. March 1, 2018

"Want to End Mass Incarceration? Reform Life Sentences"
Eastern State Penitentiary, Searchlight Series. April 4, 2017

"Eliminating Racial Inequality in the Criminal Justice System"
American Humanist Association, Secular Social Justice. Aril 7, 2018
Federal Defender Training. August 6, 2015 and April 6, 2017
University of Utah Department of Political Science. October 17, 2016
Princeton's Students for Prison Education and Reform Conference. April 16, 2016
Ball State University's Center for Peace and Conflict Studies. April 2, 2016
Boston University School of Public Health. February 3, 2016
International Drug Policy Reform Conference. November 20, 2015
Pennsylvania State University Black Law Students Association. October 15, 2015
Bowie State University. October 1, 2015
Ecumenical Advocacy Days National Gathering. March 18, 2015
Connecticut African-American Affairs Commission. March 13, 2015

"Risk Assessment, Not Race Assessment"
Council of State Governments' Second Chance Act Conference. December 18, 2015

"Racial Perceptions of Crime and Support for Punitive Policies"
Riverside Church in New York City. October 24, 2015
American Bar Association Criminal Justice Section Conference. October 23, 2015

"American Justice: The Impact of Incarceration"
The Village Square (now American Public Square) at University of Missouri-Kansas City. April
29, 2015

"The States of Criminal Justice Reform"
Vermont Law School Law Review Symposium. October 3, 2014

## TEACHING EXPERIENCE

<u>Instructor</u>, UCLA
2011          Race, Drugs, and Social Control: Mass Incarceration in America
2010          Race and Ethnicity in American Life

AR.09717

<u>Teaching Assistant</u>, UCLA

| 2009 | Latin American Societies. Prof. Robert Jansen |
|------|-----------------------------------------------|
| 2009 | Death, Suicide, and Trauma. Prof. Stefan Timmermans |
| 2008, 2007 | A Global Perspective on Race and Ethnicity. Prof. Andreas Wimmer |
| 2008, 2007 | Contemporary Sociological Theory. Prof. Rogers Brubaker, Prof. Scott Washington |
| 2006 | Sociology of Mental Illness. Prof. Mel Pollner |

## PROFESSIONAL SERVICE AND AFFILIATIONS

2016            "Prisons Today" Exhibit at Eastern State Penitentiary, *Advisor*

2015 – present      Scholars Strategy Network, *Member*

2014 – present      Law and Society Association's Punishment and Society Collaborative Research Network, *Member*

AR.09718



1705 DeSales St. NW, 8th Floor
Washington, D.C. 20036
Tel: 202.628.0871 • Fax: 202.628.1091
sentencingproject.org

AR.09719

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekm-73wt
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0480
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

As an immigration attorney who works with survivors of gender-based violence, I am appalled by the proposed rules to expand the bars to asylum. Asylum is a form of safety available to the most vulnerable. Many people who apply for asylum are poor and often targeted by the U.S. criminal system. I very often see survivors who are arrested by police in domestic violence incidents where they call the police for protection. Their stories are often ignored because they don't speak English and then once in criminal court, they are forced to take a plea because they simply want to get home to their children. Many of the transgender clients I walk with are regularly profiled by the police and assumed to be engaged in prostitution work merely because they have the audacity to walk on the street while trans. These proposed rules work to exclude the most vulnerable and traumatized under the pretense of safety. A single felony, a DUI, or coming across the border with your child does not make someone inherently dangerous. These things speak to the difficulties poor immigrants of color face in the United States. This administration is unjustly trying to dismantle the asylum process that has existed in the United States for years without any authority to do so. These proposed rules are over broad, inhumane, and illegal.

AR.09720

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekm-3e4n
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0481
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Anonymous Anonymous

## General Comment

Immigrants are an important part of our communities and country. This land was built off of immigrants and we must protect them as they are citizens since they reside here. I oppose Trump's proposal.

AR.09721

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekm-uhp8
**Comments Due:** January 21, 2020
**Submission Type:** API

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0482
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Avatara Smith-Carrington
**Address:**
   3500 Oak Lawn Avenue
   Suite 500
   Dallas,  TX,  75219
**Email:** asmithcarrington@lambdalegal.org
**Phone:** 214-219-8585 ext. 245
**Fax:** 214-219-4455
**Organization:** Lambda Legal Defense and Education Fund, Inc.

## General Comment

See attached file(s)

## Attachments

2020-1-21_Lambda Legal Comment re DHS re Asylum Eligibility

AR.09722



January 21, 2020

***VIA Electronic Submission***

Lauren Alder Reid
Assistant Director, Office of Policy
Department of Justice
Executive Office for Immigration Review
5107 Leesburg Pike, Suite 2616
Attention: RIN 1125-AA87, 1615-AC41
Falls Church, VA 22041

**Re:    Procedures for Asylum and Bars to Asylum Eligibility, A Proposed Rule by the U.S.
Citizenship and Immigration Services and the Executive Office for Immigration Review; RIN
1125-AA87, 1615-AC41 – <u>Lambda Legal Opposition</u>**

Dear Secretary Alex Azar:

Lambda Legal Defense & Education Fund, Inc. ("Lambda Legal") submits these comments in response
to the U.S. Department of Health and Human Services ("HHS") Notice of Proposed Rulemaking
("Proposed Rule" or "NPRM") to express our opposition to the proposed rule published in the Federal
Register on December 19, 2019.

Founded in 1973, Lambda Legal is the oldest and largest national legal organization dedicated to
achieving full recognition of the civil rights of lesbian, gay, bisexual, transgender and queer ("LGBT")
people and everyone living with HIV through impact litigation, education, and policy advocacy. The
matters addressed in the Proposed Rule are of great concern to Lambda Legal. LGBT people and people
living with HIV routinely face high rates of discrimination and violence in their countries of origin or
nationality.[1] The ability to apply for and be granted asylum, a vital form of protection from persecution
for people seeking refuge within the United States, helps ensure the safety and well-being of LGBT
people and those living with HIV worldwide. The Proposed Rule would make it more difficult for
persecuted people fleeing violence to be granted full and fair access to asylum protections in the United
States.[2] Lambda Legal opposes the Proposed Rule for the reasons explained in these comments, and we
urge the Department to rescind the rule.


# Table of Contents

Introduction ..................................................................................................................................I

**The persecution of LGBT people and everyone living with HIV presents an ongoing humanitarian
crisis–both abroad and domestically.** ................................................................................... II

---

[1] *See infra* Part II.
[2] *See infra* Part III-V.



Lambda Legal Comments to the Executive Office for Immigration Review
NPRM re Procedures for Asylum and Bars to Asylum Eligibility
RIN 1125-AA87/1615-AC41
January 21, 2020
Page **2** of 11

**The expansion of categorical asylum bars for a wide array of convictions disproportionately impacts already marginalized LGBT applicants and applicants living with HIV.** .........................III

**The NPRM's proposed criminal ineligibility bars unnecessarily excludes bona fide asylum seekers from asylum eligibility. Existing crime bars should be narrowed, not expanded.** ..........................IV

**Asylum–unlike withholding of removal and protection under the Convention against Torture–is the only form of relief that provides asylees with a path towards permanent residence and ensures that they will not be removed to a third country.** ..............................................................................V

**Conclusion** ....................................................................................................................................VI

## I.    Introduction

On December 19th, the Department of Homeland Security (DHS) and the Department of Justice (DOJ) issued a joint set of Proposed Rules that would make three primary changes to the rules governing asylum adjudications. Lambda Legal vigorously opposes the NPRM because a grant of asylum provides LGBT asylum seekers and asylum seekers living with HIV the opportunity to attain stability, opportunity, and most importantly—freedom from current and future persecution. The barriers to asylum for those who have been entangled in the criminal legal system are already sweeping in scope; imposing further barriers is not only cruel and unnecessary but it will also disproportionately impact LGBT people, people living with HIV, and other vulnerable communities who are subjected to over-policing due to layered forms of discrimination.

The first proposed set of changes puts up additional barriers for asylum seekers by adding the following seven categorical bars to asylum eligibility: (1) any conviction of a felony offense; (2) any conviction for "smuggling or harboring" under 8 U.S.C. § 1324(a), even if the asylum seeker committed the offense for the purpose of bringing her own spouse, child or parent to safety; (3) any conviction for illegal reentry under 8 U.S.C. § 1326; (4) any conviction for an offense "involving criminal street gangs," with the adjudicator empowered to look to any evidence to determine applicability; (5) any second conviction for an offense involving driving while intoxicated or impaired; (6) any conviction or accusation of conduct for acts of battery involving a domestic relationship; (7) and any conviction for several newly defined categories of misdemeanor offenses, including any drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits.

The second section of the Proposed Rules imposes a multi-factor test for immigration adjudicators to determine whether a criminal conviction or sentence is valid for the purpose of determining asylum eligibility. The third section rescinds a provision in the current rules allowing immigration judges to reconsider denials of discretionary asylum.

Taken together, these proposed changes constitute an unnecessary, harsh, and unlawful gutting of the asylum protections enshrined in United States and international law. Lambda Legal submits these comments to express opposition to the entirety of the proposed rule and to express our grave concerns with the administration's continued efforts to exclude refugees from obtaining the security and stability

AR.09724



Lambda Legal Comments to the Executive Office for Immigration Review
NPRM re Procedures for Asylum and Bars to Asylum Eligibility
RIN 1125-AA87/1615-AC41
January 21, 2020
Page **3** of **11**

the United States asylum system has long promised. We urge the Department(s) to rescind the proposed rule in its entirety.

## II.    The persecution of LGBT people and everyone living with HIV presents an ongoing humanitarian crisis–both abroad and domestically.

For many LGBT people living within countries that criminalize their sexual orientation or gender identity or HIV status, just the act of existing can expose them to wide-spread systemic violence.[3] At least 68 countries still have laws criminalizing same-sex intimacy[4] and at least nine countries have laws criminalizing gender identity and expression.[5] Although some countries do not criminalize same-sex intimacy or gender identity and expression, they do condemn and prohibit "so-called 'propaganda' in support of LGBT rights, in an effort to silence" and therefore erase LGBT people.[6] Some of the laws criminalizing same-sex intimacy and gender identity and expression carry criminal sentences that may include fines, life imprisonment, and even the death penalty.[7] Worldwide, the persecution of LGBT people is not limited to explicit laws that criminalize their humanity. LGBT people, and even those who are perceived to be LGBT, are subjected to the denial of basic rights, sexual violence, physical violence, discrimination, and even targeted for killings by both private and state-actors around the world.[8]

---

[3] *See* HUMAN RIGHTS WATCH, WORLD REPORT 2019, HUMAN RIGHTS WATCH COUNTRY PROFILES: SEXUAL ORIENTATION AND GENDER IDENTITY (2019), https://www.hrw.org/video-photos/interactive/2019/09/23/sexual-orientation-gender-identity-country-profiles (providing a non-comprehensive report of countries that criminalize consensual same-sex relationships and gender expression. The report also highlights the language of such laws and the populations targeted to provide a comparative analysis of the legal and social environments facing LGBT people around the world"); Katalina Hadfield, *LGBTQ Asylum Seekers and Refugees Must Be Welcome Here*, HUMAN RIGHTS CAMPAIGN (Jan. 28, 2019), https://www.hrc.org/blog/lgbtq-asylum-seekers-and-refugees-must-be-welcome-here (noting that many LGBTQ asylum seekers are among the growing number of people seeking safety and shelter within the United States).
[4] HUMAN RIGHTS WATCH, LGBT RIGHT, #OUTLAWED: "THE LOVE THAT DARE NOT SPEAK ITS NAME" (2019), https://features.hrw.org/features/features/lgbt_laws/ (stating that the following countries criminalize same-sex conduct: Algeria, Antigua & Barbuda, Bangladesh, Barbados, Bhutan, Brunei, Burundi, Cameroon, Chad, Comoros, Cook Islands, Dominica, Egypt, Eritrea, Eswatini, Ethiopia, Gambia, Ghana, Grenada, Guinea, Guyana, Iran, Jamaica, Kenya, Kiribati, Kuwait, Lebanon, Liberia, Libya, Malawi, Malaysia, Maldives, Mauritania, Mauritius, Morocco, Myanmar, Namibia, Nigeria, Occupied Palestinian Territory, Gaza Strip, Oman, Pakistan, Papua New Guinea, Qatar, Saint Kitts and Nevis, Saint Lucia, Saint Vincent and The Grenadines, Samoa, Saudi Arabia, Senegal, Sierra Leone, Singapore, Solomon Islands, Somalia, South Sudan, Sri Lanka, Sudan, Syria, Tanzania, Tonga, Tunisia, Turkmenistan, Tuvalu, Uganda, Uzbekistan, Yemen, Zambia, Zimbabwe).
[5] *Id*. (stating that the following countries criminalize forms of gender identity and expression: Brunei, Kuwait, Malawi, Malaysia, Oman, Saudi Arabia, South Sudan, Tonga, United Arab Emirates).
[6] Russia and Lithuania prohibit so-called "propaganda" and other countries erect barriers to freedom of association and assembly for LGBT people. *Id*.
[7] *Id*. (noting that the following countries maintain the death penalty as punishment for same-sex conduct: Brunei, Iran, Mauritania, Qatar, Saudi Arabia, Sudan, Yemen).
[8] SHARITA GRUBERG & RACHEL WEST, CENTER FOR AMERICAN PROGRESS, HUMANITARIAN DIPLOMACY: THE U.S. ASYLUM SYSTEM'S ROLE IN PROTECTING GLOBAL LGBT RIGHTS 8 (2015), https://cdn.americanprogress.org/wp-content/uploads/2015/06/LGBTAsylum-final.pdf.

AR.09725



Lambda Legal Comments to the Executive Office for Immigration Review
NPRM re Procedures for Asylum and Bars to Asylum Eligibility
RIN 1125-AA87/1615-AC41
January 21, 2020
Page 4 of 11

In 2010, when the United States *finally* lifted the HIV travel ban,[9] people living with HIV suffering persecution due to their HIV-positive status were no longer barred entry into the United States for immigration purposes. Around the world, people living with HIV continue to face human rights violations due to intersecting forms of discrimination, violence, and inequality. More than 80 countries criminalize HIV nondisclosure, exposure, and transmission,[10] and some are particularly known for persecuting people living with HIV.[11] For example, Ana Batiz, an HIV-positive Honduran immigrant applying for asylum, was persecuted for living with HIV.[12] Ms. Batiz is part of the Garifuna community, descendants of enslaved Africans and indigenous Central Americans, who not only suffer economic disenfranchisement but also have the highest rate of HIV transmissions in Honduras.[13] As a Black woman living with HIV in Honduras, her family was routinely subjected to vicious attacks and openly discriminated against.[14] Because of the persecution and violence she experienced, Ms. Batiz, like other HIV positive asylum seekers, fled the violence she experienced in Honduras to seek asylum and sanctuary in the United States.[15]

**III.    The expansion of categorical asylum bars for a wide array of convictions disproportionately impacts already marginalized LGBT applicants and applicants living with HIV—especially, asylum seekers who are also people of color—due to compounded forms of discrimination.**

The proposed rule will exacerbate the already low numbers of LGBT people and people living with HIV who are granted asylum. The NPRM's proposed expansion of criminal ineligibility bars will disproportionately impact marginalized LGBT asylum seekers. **This is especially true for LGBT people of color—and chiefly transgender women of color—who already experience compounding discrimination due to race, sexuality, gender, and immigration status.**

The LGBT community experiences disparate levels of hyper-policing and over-criminalization. There are nearly twice the number of LGBT people incarcerated in state and federal prisons than non-LGBT

---

[9] Prior to 2010, federal immigration law prohibited people living with HIV from entering the United States. On January 4, 2010, HIV was no longer recognized as a bar to entry into the United States. *See* THE CENTER FOR HIV LAW & POLICY, IMMIGRATION, https://www.hivlawandpolicy.org/issues/immigration (last visited Jan. 2, 2020); Press Release, UNAIDS, UNAIDS Salutes Country Leadership to Eliminate HIV-Related Restrictions on Entry, Stay and Residence (Jul. 20, 2010), https://www.unaids.org/en/resources/presscentre/pressreleaseandstatementarchive/2010/july/20100720prtravelrestrictions; Julia Preston, *Obama Lifts a Ban on Entry Into U.S. by HIV-Positive People*, N.Y. TIMES (Oct. 30, 2009), https://www.nytimes.com/2009/10/31/us/politics/31travel.html.
[10] Twenty-nine states in the U.S. have laws HIV-specific criminal laws. THE CENTER FOR HIV LAW & POLICY, HIV CRIMINALIZATION IN THE UNITED STATES (2019), http://www.hivlawandpolicy.org/sites/default/files/CHLP%20HIV%20Crim%20Map%20030119.pdf.
[11] Specifically, countries within Central America, Africa, and Eastern Europe. David, Artavia, What's It Like for LGBTQ Asylum Seekers?, HIV PLUS MAGAZINE (Sept. 9, 2019), https://www.hivplusmag.com/print-issue/2019/9/09/whats-it-be-asylum-seeker-hiv.
[12] Beth Fertig, *A Mother and Daughter Both Have H.I.V. The U.S. Lets in Only One*, N.Y. TIMES (Mar. 6, 2019), https://www.nytimes.com/2019/03/06/nyregion/family-separation-hiv.html.
[13] *Id.*
[14] *Id.*
[15] *Id.*

AR.09726



Lambda Legal Comments to the Executive Office for Immigration Review
NPRM re Procedures for Asylum and Bars to Asylum Eligibility
RIN 1125-AA87/1615-AC41
January 21, 2020
Page 5 of 11

people.[16] Expanding the scope of ineligibility for asylum by including a wide array of convictions for non-violent offenses will further limit the already small numbers of LGBT people who are granted asylum and force LGBT asylum seekers to suffer further persecution and violence.[17] As a result of the high rates of discrimination LGBT people experience in schools, the workplace, in health care settings, when searching for safe and affordable housing, many LGBT people turn to "survival economies" that leave them vulnerable to encounters with law enforcement and ultimately criminalization.[18] These non-violent attempts to obtain basic necessities often entangle LGBT people within the criminal justice system, and any convictions they receive could render their asylum status ineligible under the proposed rule.

LGBT people also have a substantially higher rate of involvement with various justice systems like law enforcement and immigration and customs enforcement ("ICE"). Racism, homophobia and anti-transgender bias remain rampant in most law enforcement agencies.[19] The uptick in collaboration between local law enforcement and ICE creates an environment for the use of tactics that raise legal questions about racial profiling and unlawful arrest.[20] For example, in a 2012 report of interactions between transgender Latina women and law enforcement in Los Angeles County, two-thirds of the women reported verbal harassment by law enforcement.[21] The Proposed Rules will therefore have a disparate impact on LGBT individuals whose involvement in the criminal legal system is often connected to past trauma and/or the result of biased policing.

Additionally, survivors of domestic violence include trafficking survivors and LGBT community members, such that inclusion of offenses related to domestic violence in the expanded asylum bars affects populations with overlapping vulnerabilities.[22] The Proposed Rules too broadly categorize

---

[16] *See*, *Release: Broken Criminal Justice System Disproportionately Targets and Harms LGBT People*, CENTER FOR AMERICAN PROGRESS (Feb. 23, 2016), *available at* https://www.americanprogress.org/press/release/2016/02/23/131547/release-broken-criminal-justice-system-disproportionately-targets-and-harms-lgbt-people/.

[17] In general, the LGBT community faces disparate levels of policing in the United States. Across the country, gay, lesbian, and bisexual youth are more likely to be stopped by the police and experience greater criminal justice sanctions not explained by greater involvement in violating the law or engaging in transgressive behavior. A national survey of LGBT people found that 73% of LGBT people and people living with HIV reported face-to-face contact with law enforcement in the past five years. *Id.* at 1.

[18] Movement Advancement Project et al, *Unjust: How the Broken Criminal Justice System Fails LGBT People* (Feb. 2016), *available at* http://www.lgbtmap.org/file/lgbt-criminal-justice.pdf.

[19] LAMBDA LEGAL & NATIONAL CENTER FOR TRANSGENDER EQUALITY, POLICING AND THE LGBTQ COMMUNITY 2 (2019), https://docs.house.gov/meetings/JU/JU00/20190919/109952/HHRG-116-JU00-20190919-SD042.pdf [hereinafter POLICING AND THE LGBTQ COMMUNITY].

[20] *See generally* NATIONAL IMMIGRATION LAW CENTER, HOW ICE USES LOCAL CRIMINAL JUSTICE SYSTEMS TO FUNNEL PEOPLE INTO THE DETENTION AND DEPORTATION SYSTEM, https://www.nilc.org/issues/immigration-enforcement/localjusticeandice/ (last visited Jan. 6, 2020); Dale Russakoff & Deborah Sontag, *For Cops Who Want to Help ICE Crack Down on Illegal Immigration, Pennsylvania Is a Free-for-All*, PROPUBLICA (Apr. 12, 2018), https://www.propublica.org/article/pennsylvania-immigration-ice-crackdown-cops-free-for-all.

[21] POLICING AND THE LGBTQ COMMUNITY, *supra* note 20, at 2.

[22] Marty Schladen, *ICE Agents Detain Alleged Domestic Violence Victim*, EL PASO TIMES (Feb. 16, 2017), https://www.elpasotimes.com/story/news/2017/02/15/ice-detains-domestic-violence-victim-court/97965624/ (noting that the immigrant detained, a transgender person previously deported following her conviction for crimes such as possession of

AR.09727



Lambda Legal Comments to the Executive Office for Immigration Review
NPRM re Procedures for Asylum and Bars to Asylum Eligibility
RIN 1125-AA87/1615-AC41
January 21, 2020
Page **6** of **11**

domestic violence offenses as particularly serious and sweep both offenders and survivors into their dragnet. The immigration laws extend protections to domestic violence survivors outside of the asylum context, recognizing the complex dynamics surrounding intimate partner violence. Provisions in the Violence Against Women Act allow adjudicators evaluating claims for relief arising thereunder to exercise discretion based on a number of factors and circumstances.[23]  The blunt approach adopted by the Proposed Rules is inconsistent with the approach taken towards survivors elsewhere in the federal immigration statute and does not rely on any evidence-based justification for treating asylum seekers differently.

## IV.   The NPRM's proposed criminal ineligibility bars unnecessarily exclude bona fide asylum seekers from asylum eligibility. Existing crime bars should be narrowed, not expanded.

The asylum system in the United States was first codified in statute through the Refugee Act of 1980, described by one prominent scholar as a bipartisan attempt to "reconcile our rhetoric with our law, our national immigration policy and our international treaty obligations so that we could maintain a consistent posture towards the world as a nation with a strong humanitarian tradition and a unique historic role as a haven for persons fleeing oppression."[24] The Act—among other measures designed to bring the United States domestic legal code into compliance with the provisions of the United Nations Protocol Relating to the Status of Refugees—created a "broad class" of refugees eligible for a discretionary grant of asylum.[25]

The asylum protections provided by United States law are sacred. For certain people who are forced to flee their country of origin or nationality due to persecution or fear persecution a grant of asylum provides an asylee with the ability to remain in the United States lawfully–for an indefinite period of time. Asylees may obtain work authorization, immediately apply for a Social Security card, request derivative asylum status for immediate family members, and after one year apply for permanent residence. For those individuals seeking asylum in the United States, the stakes could not be higher—a claim denied often means return to death or brutal persecution.[26]

The laws, regulations, and process governing asylum adjudications are already exceedingly harsh and oftentimes insurmountable. Asylum seekers bear the evidentiary burden of establishing their eligibility for asylum[27] in the face of a complex web of laws and regulations, without the benefit of appointed

---

stolen mail and assault, was then living at the Center Against Sexual and Family Violence, a shelter for survivors of intimate partner violence).

[23] Nadine Shaanta Murshid and Elizabeth A. Bowen, *A Trauma-Informed Analysis of the Violence Against Women Act's Provisions for Undocumented Immigrant Women*, *Violence Against Women* 24(13) (2018): 1540–1556, https://doi.org/10.1177/1077801217741991.

[24] Deborah Anker, "The Refugee Act of 1980: An Historical Perspective," *In Defense of the Alien* 5 (1982): 89-94, https://www.jstor.org/stable/23141008?read-now=1&refreqid=excelsior%3A1060953608aa0bdd30d5d506e1ff6318&seq=1#page_scan_tab_contents.

[25] *See I.N.S. v. Cardoza-Fonseca*, 40 U.S. 421, 423 (1987).

[26] *See, e.g.*, Sarah Stillman, *When Deportation is a Death Sentence*, THE NEW YORKER (Jan. 8, 2018), https://www.newyorker.com/magazine/2018/01/15/when-deportation-is-a-death-sentence.

[27] 8 USC § 1158(b)(1)(B); 8 CFR § 1240.8(d).

AR.09728



Lambda Legal Comments to the Executive Office for Immigration Review
NPRM re Procedures for Asylum and Bars to Asylum Eligibility
RIN 1125-AA87/1615-AC41
January 21, 2020
Page **7** of **11**

counsel and often from a remote immigration jail.[28] The obstacles to winning asylum are exceedingly high; indeed in some parts of the country and before certain immigration judges, almost no one succeeds.[29] Today, newly imposed barriers to accessing asylum in the United States are breathtaking in scope, with those seeking safety at the southern border subject to return to dangerous conditions in Mexico and an overlapping web of policies that preclude asylum eligibility for countless migrants simply because of their national origin, manner of entry, or their flight path.[30] For example, for LGBT people fleeing countries in the Northern Triangle of Central America (El Salvador, Guatemala, and Honduras) the United States has returned people who are fleeing violence to their countries of origin without being able to request asylum, which is in violation of the principle of non-return and places LGBT people in serious danger.[31] There are consistent reports of the documented deaths and brutalities endured by those who sought but were denied asylum protections in the United States:

> "In Matamoros, six LGBTQ individuals – including a transgender Salvadoran woman who had been kidnapped in Mexico at gunpoint and raped – were again expelled to Matamoros under MPP after requesting and failing to pass MPP fear screening interviews at the Brownsville port of entry in early September. A young gay Honduran asylum seeker was returned to Nuevo Laredo after the interviewing DHS officer decided that he did not meet the high screening standard despite the documented harms suffered by gay men in Mexico."[32]

Criminal ineligibility bars to asylum are already sweeping and over-broad in nature and scope. Any conviction for an offense determined to be an "aggravated felony" is considered a per se "particularly serious crime" and therefore a mandatory bar to asylum.[33] "Aggravated felony" is a notoriously vague term, which exists only in immigration law. Originally limited to murder, weapons trafficking and drug trafficking,[34] it has metastasized to encompass hundreds of offenses, many of them neither a felony nor

---

[28] *See* Daniel Connolly, Aaron Montes, and Lauren Villagran, *Asylum seekers in U.S. face years of waiting, little chance of winning their cases*, USA TODAY (Sept. 25, 2019), https://www.usatoday.com/in-depth/news/nation/2019/09/23/immigration-court-asylum-seekers-what-to-expect/2026541001/.

[29] Manuel Roig-Franzia, *Immigrants risk it all seeking asylum. The answer is almost always 'no'*, WASHINGTON POST (Jul. 24, 2019), https://www.washingtonpost.com/lifestyle/style/migrants-risk-it-all-seeking-asylum-the-answer-in-court-is-almost-always-no/2019/07/23/9c161b2e-a3f7-11e9-b732-41a79c2551bf_story.html.

[30] The National Immigrant Justice Center maintains a frequently updated timeline providing details of each of the asylum bans and other policies issued and implemented by the administration undermining asylum access at https://www.immigrantjustice.org/issues/asylum-seekers-refugees. For more information on the harms and rights abuses inherent in the Migrant Protection Protocols, or "Return-to-Mexico" program, see HUMAN RIGHTS FIRST, DELIVERED TO DANGER (December 2019), https://www.humanrightsfirst.org/campaign/remain-mexico.

[31] AMNESTY INTERNATIONAL, NO SAFE PLACE: SALVADORANS, GUATEMALANS, AND HONDURANS SEEKING ASYLUM IN MEXICO BASED ON THEIR SEXUAL ORIENTATION AND/OR GENDER IDENTITY 27 (2017), https://www.unhcr.org/en-us/5a2ee5a14.pdf.

[32] HUMAN RIGHTS FIRST, ORDERS FROM ABOVE: MASSIVE HUMAN RIGHTS ABUSES UNDER TRUMP ADMINISTRATION RETURN TO MEXICO POLICY 10 (2019), https://www.humanrightsfirst.org/sites/default/files/hrfordersfromabove.pdf.

[33] 8 U.S.C. §§ 1158(b)(2)(A)(ii) and (B)(i).

[34] Pub. L. No. 100-690, § 7342, 102 Stat. 4181, 4469-70.

AR.09729



Lambda Legal Comments to the Executive Office for Immigration Review
NPRM re Procedures for Asylum and Bars to Asylum Eligibility
RIN 1125-AA87/1615-AC41
January 21, 2020
Page **8** of **11**

aggravated, including petty offenses such as misdemeanor shoplifting, simple misdemeanor battery, or sale of counterfeit DVDs.[35]

The Proposed Rules drain the phrase "particularly serious crime," 8 U.S.C. § 1158, of any sensible meaning. Bars to asylum eligibility for "particularly serious crimes" have typically been reserved for violent acts–by reason of which the offender "constitutes a danger to the community of the United States."[36] The NPRM, however, seeks to unnecessarily and cruelly expand existing criminal bars to eligibility for asylum through the inclusion of minor crimes. Such minor crimes include driving under the influence, possession of fake identification, illegal reentry and drug possession, including having marijuana. Yet because of the categorical nature of the seven new bars proposed here, asylum seekers will be precluded from obtaining protection on the basis of a vast array of conduct, without any discretion left to the immigration adjudicator to determine whether the circumstances merit such a harsh penalty. Indeed, in the case of the domestic-violence related ground, the categorical bar will be imposed on the basis of *mere allegations* of conduct without any adjudication of guilt.[37]

Those unjustly precluded from even seeking a discretionary grant of asylum by the Proposed Rules will include, for example: individuals struggling with addiction with one drug-related conviction, regardless of the circumstances of the offense; asylum seekers with two convictions for driving under the influence, regardless of whether the applicant has sought treatment for alcohol addiction or the circumstances of the convictions; community members seeking asylum defensively who have been convicted of a document fraud offense related to their immigration status; and asylum-seeking mothers convicted for bringing their own child across the southern border in an effort to find safety.

The NPRM's proposed criminal ineligibility bars are not only inconsistent with other aspects of the asylum statute but are also discordant with existing mandatory criminal ineligibility bars. And the agencies have proffered no evidence or data to support these changes. The Board of Immigration Appeals has cautioned that, "in light of the unusually harsh consequences which may befall a [noncitizen] who has established a well-founded fear of persecution; the danger of persecution should generally outweigh all but the most egregious of adverse factors."[38]

**V.    Asylum–unlike withholding of removal and protection under the Convention against Torture–is the only form of relief that provides asylees with a path towards permanent residence and ensures that they will not be removed to a third country.[39]**

---

[35] 8 U.S.C. § 1101(a)(43). *See also* Nancy Morawetz, *Understanding the Impact of the 1996 Deportation Laws and the Limited Scope of Proposed Reforms*, 113 HARV. L. REV. 1939-40 (2000) (criticizing the "'Alice-in-Wonderland-like definition of the term 'aggravated felony'"); Melissa Cook, *Banished for Minor Crimes: The Aggravated Felony Provisions of the Immigration and Nationality Act as a Human Rights Violation*, Boston College Third World Law Journal (2003): 293.
[36] INA § 208(b)(2)(A)(ii), (B)(ii), 8 U.S.C. § 1158(b)(2)(A)(iii), (B)(ii) (emphasis added).
[37] The Proposed Rules at p. 69651 explain that the regulations will "render ineligible [non-citizens] who engaged in acts of battery and extreme cruelty in a domestic context in the United States, regardless of whether such conduct resulted in a criminal conviction."
[38] *See Matter of Pula*, 19 I.&N. Dec. 467, 474 (BIA 1987).
[39] Both Withholding of Removal and CAT are special types of relief that protect a person from being deported to a country where they have experienced persecution or fear persecution. However, both provide very limited forms of relief. For

AR.09730



Case 3:20-cv-07721-SI     Document 58-10     Filed 11/10/20     Page 311 of 461

Lambda Legal Comments to the Executive Office for Immigration Review
NPRM re Procedures for Asylum and Bars to Asylum Eligibility
RIN 1125-AA87/1615-AC41
January 21, 2020
Page 9 of 11

Throughout the Proposed Rules, the agencies defend the harsh and broad nature of their proposal by pointing to the availability of alternative forms of relief for those excluded from asylum eligibility under the new rules.[40] The availability of these alternatives forms of relief, however—known as withholding of removal and protection under the Convention Against Torture (CAT)—does not nullify the harm created by the NPRM's new and unnecessary limits on asylum. The protections afforded by CAT and by statutory withholding of removal are limited in scope and duration, and they are harder to obtain. As a result, a Rule that limits bona fide refugees to withholding of removal and CAT protection would impose a very real harm on individuals who have come to the United States in search of protection.

If a recipient of withholding and CAT is able to meet the higher standard for these forms of limited protection,[41] recipients are subject to limited freedom and significant prejudice. For example, they have no ability to travel internationally because withholding and CAT recipients do not have access to travel documents made available only to asylees.[42] Additionally, withholding and CAT recipients also face permanent separation from immediate family members: (1) international travel is prohibited, these individuals cannot reconnect with their families in a third country and (2) they also cannot reunite with family in the United States because only asylees and refugees are eligible to petition for a spouse and children to join them as derivatives on that status.[43]

---

example, an individual who is successful under a CAT claim cannot be removed from the United States to the country from which they fled persecution, but they can be removed to a third country. Additionally, an individual granted CAT cannot adjust their status to legal permanent resident. An individual who wins Withholding of Removal can never travel internationally and does not have the ability to petition for derivative status. *See generally* IMMIGRATION EQUALITY, IMMIGRATION EQUALITY ASYLUM MANUAL, IMMIGRATION BASICS: RELIEF UNDER CAT, https://www.immigrationequality.org/get-legal-help/our-legal-resources/immigration-equality-asylum-manual/immigration-basics-relief-under-cat/#.Xg_MyEdKiUk (last visited Jan. 3, 2020); see also IMMIGRATION EQUALITY, IMMIGRATION EQUALITY ASYLUM MANUAL, IMMIGRATION BASICS: WITHHOLDING OF REMOVAL, https://www.immigrationequality.org/get-legal-help/our-legal-resources/immigration-equality-asylum-manual/immigration-basics-withholding-of-removal/#.Xg_NC0dKiUk (last visited Jan. 3, 2020).

[40] *See, e.g.,* Proposed Rules at 69644.

[41] CAT and withholding protections demand a higher level of proof than asylum claims: a clear probability of persecution or torture. Thus, an individual could have a valid asylum claim but be unable to meet the standard under the other forms of relief and therefore would be removed to their country of origin, where they would face persecution or even death. Withholding of removal requires the petitioner to demonstrate his or her "life or freedom would be threatened in that country because of the petitioner's race, religion, nationality, membership in a particular social group, or political opinion." *INS v. Stevic*, 467 U.S. 407, 411 (1984) (quoting 8 U.S.C. § 1231(b)(3)). Unlike asylum, however, the petitioner must show a "clear probability" of the threat to life or freedom if deported to his or her country of nationality. The clear probability standard is more stringent than the well-founded fear standard for asylum. *Id; see also Cardoza-Fonseca*, 480 U.S. at 431 (describing the difference between a well-founded fear of persecution and a clear probability of persecution). For CAT relief, an applicant must show it is more likely than not that he or she will be tortured or killed by or at the government's acquiescence if removed to the home country. 8 C.F.R. § 1208.16(c)(2).

[42] The United Nations Convention Relating to the Status of Refugees affords refugees the right to travel in mandatory terms. Article 28 states, "Contracting States shall issue to refugees lawfully staying in their territory travel documents for the purpose of travel outside their territory." Withholding and CAT recipients do not have access to a travel document as contemplated by Article 28. By regulation, refugee travel documents are available only to asylees. *See generally* 19 U.S.T. 6223 T.I.A.S. No. 6577 (1968); 8 C.F.R. § 223.1.

[43] 8 C.F.R. § 208.21(a).

AR.09731



Lambda Legal Comments to the Executive Office for Immigration Review
NPRM re Procedures for Asylum and Bars to Asylum Eligibility
RIN 1125-AA87/1615-AC41
January 21, 2020
Page **10** of 11

Withholding recipients likewise face hurdles in access to employment. Article 17 of the Refugee Convention states that a contracting state "shall accord to refugees lawfully staying in their territory the most favorable treatment accorded to nationals of a foreign country in the same circumstances, as regards the right to wage-earning employment." Recipients of withholding enjoy no such right. They must apply for work authorization, and they face frequent delays in the adjudication of these applications, which often result in the loss of legal authorization to work.[44] For LGBT withholding recipients, the harshness of immigration policies curtailing access to continued employment coupled with a lack of nondiscrimination protections on the basis of sexual orientation and/or gender identity in the workplace increases risk for discrimination and exploitation. Ultimately, unfamiliarity with the U.S. job market, paired with employers' lack of cultural competency and countless legal requirements to maintain employment authorization, can make it difficult for LGBT immigrants to not only find employment but also remain employed. Below is a first-hand example of the challenges immigrants experience when having only a "withholding of removal" status:

> "Even though Bamby was not deported and was allowed to remain in the United States, her 'withholding of removal' status leaves her in a state of legal limbo. Those who are granted this status cannot travel outside the U.S., can never apply for lawful permanent residence or citizenship, must renew their Employment Authorization Document annually, and can be required to have regular check-ins with a deportation officer in perpetuity."[45]

And perhaps most fundamentally, there is continuing jeopardy for withholding and CAT recipients that does not exist for asylum recipients. When a noncitizen is granted asylum, the person receives a legal status.[46] Asylum, once granted, protects an asylee against removal unless and until that status is revoked.[47] None of these protections exists for withholding and CAT recipients. They have no access to permanent residency or citizenship.[48] Instead, they are subject to a removal order and vulnerable to the permanent prospect of deportation to a third country and subject to potential check ins with immigration officials where they can be made to pursue removal to third countries to which they have no connection.[49]

## VI.    Conclusion

---

[44]  8 C.F.R. § 274a.12(a)(10); *Northwest Immigrant Rights Project, et al. v. USCIS, et al.*, No. 2:15-cv-00813-JLR (W.D. Wash., filed May 22, 2015) (class action regarding delays in adjudication of work authorization).

[45] NATIONAL CENTER FOR TRANSGENDER EQUALITY, OUR MOMENT FOR REFORM: IMMIGRATION AND TRANSGENDER PEOPLE 14 (2013), https://transequality.org/sites/default/files/docs/resources/OurMoment_CIR_en.pdf.

[46] *See, e.g.*, 8 C.F.R. 245.1(d)(1) (defining "lawful immigration status" to include asylees).

[47] *See* 8 U.S.C. § 1158(c)(1)(A).

[48] *Matter of Lam*, 18 I.&N. Dec. 15, 18 (BIA 1981); 8 C.F.R. § 245.1(d)(1) (explaining that only those in "lawful immigration status" can seek permanent residency and excluding withholding recipients from such status); 8 C.F.R. § 209.2(a)(1) (authorizing adjustment of status to permanent residence for asylees); 8 C.F.R. § 316.2 (naturalization available only to permanent residents).

[49] *See R–S–C v. Sessions*, 869 F.3d 1176, 1180 (10th Cir. 2017).

AR.09732



Lambda Legal Comments to the Executive Office for Immigration Review
NPRM re Procedures for Asylum and Bars to Asylum Eligibility
RIN 1125-AA87/1615-AC41
January 21, 2020
Page **11** of 11

For all the reasons stated above, Lambda Legal vigorously opposes the Proposed Rule. The NPRM adds to a growing list of policies determining asylum eligibility.[50]

Lambda Legal urges the Department not to finalize the NPRM and instead immediately to withdraw it.

Thank you for the opportunity to submit comments on the Proposed Rule. Please do not hesitate to contact Avatara Smith-Carrington at asmithcarrington@lambdalegal.org and Sasha Buchert at sbuchert@lambdalegal.org if further information would be of assistance.

Most respectfully,

LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.

Avatara Smith-Carrington, Tyron Garner Memorial Law Fellow
asmithcarrington@lambdalegal.org
3500 Oak Lawn Ave, Ste. 500
Dallas, TX 75219

Sasha Buchert, Senior Attorney
sbuchert@lambdalegal.org
1776 K Street, N.W., 8th Floor
Washington, DC 20006

---

[50] *See generally* Zolan Kanno-Youngs, *Trump Administration Proposes Adding Minor Crimes to List of Offenses That Bar Asylum*, N.Y. TIMES (Dec. 18, 2019), https://www.nytimes.com/2019/12/18/us/politics/trump-asylum-misdemeanors.html (noting the growing list of policies enacted by this administration to restrict who is eligible for asylum. Including, an unsuccessful attempt to bar any migrant who crossed the southern border between the ports of entry from obtaining asylum, deporting asylum seekers to Guatemala if they failed to apply for asylum there prior to applying in the United States, and a proposal to charge asylum seekers for their applications).

AR.09733

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekm-luup
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0483
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Lydia Sinkus

---

## General Comment

I write to express my strong opposition to the proposed rule changes. I am an attorney practicing immigration and criminal law. I work with clients of all non-citizen statuses who have had prior interaction with the criminal legal system. I also do pro bono work supporting refugees and asylum seekers. I believe strongly that our nation must do its utmost to welcome the most vulnerable migrants fleeing violence and persecution. Immigrants are a vital part of our nation, and our country should uphold its values as a welcoming nation.

This administration has already put in place a number of rules that bar access to asylum at the US border, including metering, the "Migrant Protection Protocols" and "Safe Third Country" rule. These policies leave families fleeing persecution and violence stranded in dangerous situations without access to resources necessary to pursue an asylum claim. They are a blatant attack on the US asylum system in an attempt to limit legal pathways safety in the US. This new proposed changes are part of this same systematic plan to gut our asylum system without congressional approval. The proposed rules reference safety and efficiency as a justification, but do nothing to make our communities safer or our immigration system more efficient. Instead, the proposed rules bar access to asylum for those who are pursuing claims from inside the country. Further restriction of our asylum system means arbitrarily placing more people in danger: more women returned to men who rape and abuse them, more political dissidents returned to governments who torture them, more members of the LGBTQ communities returned to police who murder them, and more families torn apart and children left without parents.

I am concerned that the proposed rule changes disparately impact immigrants of color, due to racial profiling and bias rampant in our criminal legal system. Almost all of my clients are people of color; their stories about profiling, false or enhanced charges, and pleas without effective assistance of counsel, reflect statistics showing people of color are charged and sentenced at more punitive rates than similarly situated white people. Instead of making our communities safer, the proposed rules build off of a racially inequitable criminal legal system to import racialized disadvantages into our immigration system.

Two classes of proposed bars are particularly abhorrent and cruel. The first is the mandatory bar for individuals convicted of a smuggling or illegal re-entry offense. These are convictions that are a byproduct of migration

itself, effectively criminalizing the act of fleeing. A parent fleeing persecution with their child could be categorically banned from asylum for simply doing all they can to keep their child safe by bringing them across the border. Similarly, illegal re-entry often results from a desperateness to find safety for oneself and family. These acts in no way in-and-of themselves indicate dangerousness or a desire to break the law. Under current law, an immigration judge who finds a person with a smuggling or illegal re-entry conviction poses a larger issue has the discretion to deny their asylum petition. The additional categorical bans are unnecessary and cruel. They are dehumanizing and will exacerbate trauma and danger for the most vulnerable migrants.

The proposed bars for DUIs or drug convictions are also particularly problematic. They ignore the impact of trauma on substance abuse and will repeatedly punish individuals trying to deal with and overcome their trauma experiences. I work with many individuals who have a history of drug charges or DUIs who were able to get clean after an arrest and conviction and lead a healthy life with their families and communities. They would be barred from asylum under the proposed rules due to a lack of discretion in the process. Individuals who are eligible for asylum by definition have experienced trauma; immigration adjudicators should be allowed to consider these experiences and their impacts when ruling on an asylum claim.

Finally, the proposed rules' "clarification" of what counts as a conviction for immigration purposes is legally invalid: it does not follow current case law and improperly subverts the power of a state court to determine what is or is not an invalid state criminal conviction. This has been well outlined in other public comments, and I agree with those points.

The administration must withdraw these racist and cruel proposed rule changes. It is wrong to punish people a second time after they've completed their sentences, particularly for people for whom deportation is often a matter of life and death. The criminal legal system in the US is wracked with racial profiling and obstacles to equal justice. Our harsh immigration laws exploit these obstacles to drive mass incarceration and mass deportation of people of color. The proposed rule changes are profoundly immoral and I oppose them in their entirety.

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekm-teg1
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0484
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Michele Garnett McKenzie
**Organization:** The Advocates for Human Rights

---

## General Comment

We write on behalf of The Advocates for Human Rights in response to the above-referenced Proposed Rules to express our strong opposition to the Proposed Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019. We note that the 30-day comment period, published to coincide with three federal holidays, provides an insufficient time to comment on these Proposed Rules

The Advocates for Human Rights is a nonprofit, nongovernmental organization headquartered in Minneapolis, Minnesota. Founded in 1983, The Advocates for Human Rights' mission is to implement international human rights standards to promote civil society and reinforce the rule of law. Holding Special Consultative Status at the United Nations, The Advocates regularly engages UN human rights mechanisms. The Advocates for Human Rights has provided free legal representation to asylum seekers for more than three decades, working with more than 10,000 cases to assess, advise, and represent in asylum proceedings. The Advocates for Human Rights is a global expert in women's human rights, particularly in the area of domestic violence. We have worked in Central and Eastern Europe, the former Soviet Union, the Caucasus, Central Asia, Mongolia, Morocco, Nepal, Mexico, Haiti, and the United States. At the request of government officials, embassies, and NGOs, we help draft laws that promote the safety of women. We have provided commentary on new and proposed domestic violence laws in nearly 30 countries. We have worked with host country partners to document violations of women's human rights, including domestic violence. We train police, prosecutors, lawyers, and judges to implement both new and existing laws on domestic violence. In addition, our Stop Violence Against Women website serves as a forum for information, advocacy, and change and, working with the UN, we developed the Legislation and Justice sections of the UN Women's Virtual Knowledge Center to End Violence Against Women.

The Proposed Rules are unnecessary and illegal. The Proposed Rules further draw the United States out of compliance with international human rights law obligations that protect people from refoulement to countries where they face irreparable harm and to ensure that the best interest of the child is taken into account during protection determinations. The Agencies seek to effectively eviscerate the asylum laws clearly adopted by Congress in the 1980 Refugee Act. While some people may view U.S. asylum law as an "end run" around other

immigration laws, the fact remains that Congress specifically enacted the Refugee Act to bring U.S. law into compliance with international refugee law. Because the Proposed Rules leave most vulnerable to due process violations those fleeing domestic violence or gang violence without any plausible justification or evidence supporting the proposed changes, the conclusion can clearly be drawn that the Proposed Rules are yet another attempt to limit Central American asylum claims. In so doing, the Proposed Rules pose serious risk to the life and safety of domestic violence victims. Similarly, the creation of a minitrial process without an infusion of adjudication resources leads to the conclusion that the Agencies are using the Proposed Rule to further clog the Asylum Office and Immigration Court systems.

For the reasons detailed in the attached comments, the Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

# Attachments

2020 Jan - Asylum Ban Reg Comments



*Submitted via* https://www.regulations.gov/

January 21, 2020

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41; Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility

To Whom it May Concern:

We write on behalf of The Advocates for Human Rights in response to the above-referenced Proposed Rules to express our strong opposition to the Proposed Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019. We note that the 30-day comment period, published to coincide with three federal holidays, provides an insufficient time to comment on these Proposed Rules

The Advocates for Human Rights is a nonprofit, nongovernmental organization headquartered in Minneapolis, Minnesota. Founded in 1983, The Advocates for Human Rights' mission is to implement international human rights standards to promote civil society and reinforce the rule of law. Holding Special Consultative Status at the United Nations, The Advocates regularly engages UN human rights mechanisms. The Advocates for Human Rights has provided free legal representation to asylum seekers for more than three decades, working with more than 10,000 cases to assess, advise, and represent in asylum proceedings. The Advocates for Human Rights is a global expert in women's human rights, particularly in the area of domestic violence. We have worked in Central and Eastern Europe, the former Soviet Union, the Caucasus, Central Asia, Mongolia, Morocco, Nepal, Mexico, Haiti, and the United States. At the request of government officials, embassies, and NGOs, we help draft laws that promote the safety of women. We have provided commentary on new and proposed domestic violence laws in nearly 30 countries. We have worked with host country partners to document violations of women's human rights,

including domestic violence. We train police, prosecutors, lawyers, and judges to implement both new and existing laws on domestic violence. In addition, our Stop Violence Against Women website serves as a forum for information, advocacy, and change and, working with the UN, we developed the Legislation and Justice sections of the UN Women's Virtual Knowledge Center to End Violence Against Women.

For the reasons detailed in the comments that follow, the Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

Thank you for the opportunity to submit comments on the Proposed Rules. Please do not hesitate to contact Michele Garnett McKenzie, mmckenzie@advrights.org or 612-746-4685 to provide further information.

Sincerely,

Michele Garnett McKenzie
Deputy Director
The Advocates for Human Rights

AR.09739

330 Second Avenue South  •  Suite 800  •  Minneapolis, MN  55401  •  USA
Tel:  612.341.3302  •  Fax:  612.341.2971  •  Email:  hrights@advrights.org  •  www.theadvocatesforhumanrights.org

**DETAILED COMMENTS in opposition to the Proposed Rules re Procedures for Asylum and Bars to Asylum Eligibility, 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41**

I.    **Introduction**

On December 19th, the Department of Homeland Security (DHS) and the Department of Justice (DOJ) issued a joint set of Proposed Rules that would make three primary changes to the rules governing asylum adjudications.

First, the Proposed Rule proposes adding seven *categorical* bars to asylum eligibility: (1) any conviction of a felony offense; (2) any conviction for "smuggling or harboring" under 8 U.S.C. § 1324(a), even if the asylum seeker committed the offense for the purpose of bringing her own spouse, child or parent to safety; (3) any conviction for illegal reentry under 8 U.S.C. § 1326; (4) any conviction for an offense "involving criminal street gangs," with the adjudicator empowered to look to any evidence to determine applicability; (5) any second conviction for an offense involving driving while intoxicated or impaired; (6) any conviction *or accusation of conduct* for acts of battery involving a domestic relationship; (7) and any conviction for several newly defined categories of misdemeanor offenses, including *any* drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits. Second, the Proposed Rule creates a multi-factor test for immigration adjudicators to determine whether a criminal conviction or sentence is valid for the purpose of determining asylum eligibility. Third, the Proposed Rule rescinds a provision in the current rules regarding the reconsideration of discretionary asylum.

The Proposed Rules violate the United States' obligations under international human rights law and international refugee law, including the 1951 Refugee Convention. Of particular concern is the proposed categorical bar for accusations of conduct for acts of battery involving a domestic relationship. The Proposed Rules are arbitrary and capricious, offered without any justification for the proposed categorical bars or any evidence that the existing discretionary framework has failed to adequately give effect to Congress's intent as articulated in the 1980 Refugee Act. The proposed multi-factor test would further complicate asylum adjudications, making proceedings more time-consuming and resource-intensive. Offered without justification, the Agencies' Proposed Rules can be read only as an attempt to eviscerate the congressionally mandated asylum system.

The Advocates for Human Rights submits these comments to express opposition to the entirety of the Proposed Rules and grave concerns with the administration's continued efforts to exclude refugees from obtaining the security and stability the United States asylum system has long promised. We urge that the Proposed Rules be rescinded in their entirety.

II.    **The Proposed Rules unnecessarily, cruelly, and illegally exclude bona fide refugees from asylum eligibility**

*The barriers to asylum for those previously involved in the criminal legal system are already sweeping in scope; adding more barriers is cruel, unnecessary, and illegal.*

330 Second Avenue South • Suite 800 • Minneapolis, MN 55401 • USA
Tel: 612.341.3302 • Fax: 612.341.2971 • Email: hrights@advrights.org • www.theadvocatesforhumanrights.org

The United States' asylum system was first codified in statute through the Refugee Act of 1980, described by one prominent scholar as a bipartisan attempt to "reconcile our rhetoric with our law, our national immigration policy and our international treaty obligations so that we could maintain a consistent posture towards the world as a nation with a strong humanitarian tradition and a unique historic role as a haven for persons fleeing oppression."[1] The Act—among other measures designed to bring the United States domestic legal code into compliance with the provisions of the United Nations Protocol Relating to the Status of Refugees—created a "broad class" of refugees eligible for a discretionary grant of asylum.[2]

The asylum protections provided by United States law are valuable both to those protected and to the United States. Asylum provides those fleeing persecution with physical safety, a path to citizenship and security, and the opportunity to reunite with immediate family members who remain abroad in danger.[3] Many see the domestic asylum system as a symbol of the United States' commitment never to repeat its failure to save thousands of Jewish refugees refused entry to the United States on the *St. Louis* and others fleeing the Holocaust.[4] Others point to the critical role that domestic asylum policy plays in serving the United States' foreign policy interests abroad.[5] For those individuals seeking asylum in the United States, the stakes could not be higher—a claim denied often means return to death or brutal persecution.[6] Importantly, asylum provides refugees with a means of integrating permanently into the community.

Despite Congress's clear intent to codify the Refugee Convention's obligations into federal law, some have viewed the asylum process as an "end run" around immigration laws. As a result, today the laws, regulations, and process governing asylum adjudications have become exceedingly harsh and increasingly out of step with international obligations. Asylum seekers bear the evidentiary burden of establishing their eligibility for asylum[7] in the face of a complex web of laws and regulations, without the benefit of appointed counsel and often from a remote immigration jail.[8] The obstacles to winning asylum are exceedingly high; indeed in some parts of the country and before certain immigration judges, almost no one succeeds.[9] Today, newly imposed barriers to accessing asylum in the United States are breathtaking in scope, with those seeking safety at the southern border subject to return to dangerous conditions in Mexico and an overlapping web of policies that preclude asylum eligibility for countless migrants simply because of their national origin, manner of entry, or their flight path.[10] There are consistent reports of the documented deaths and brutalities endured by those who sought but were denied asylum protections in the United States.[11]

Specifically, the bars to asylum based on allegations of criminal conduct are *already* sweeping and over-broad in nature and scope.[12] Any conviction for an offense determined to be an "aggravated felony" is considered a *per se* "particularly serious crime" and therefore a mandatory bar to asylum.[13] "Aggravated felony" is a notoriously vague term, which exists only in immigration law. Originally limited to murder, weapons trafficking and drug trafficking,[14] it has metastasized to encompass hundreds of offenses, many of them neither a felony nor aggravated, including petty offenses such as misdemeanor shoplifting, simple misdemeanor battery, or sale of counterfeit DVDs.[15] The existing crime bars should be narrowed, not expanded. Even for those not categorically barred from relief, the immigration adjudicator maintains full discretion to deny asylum.[16]

330 Second Avenue South  •  Suite 800  •  Minneapolis, MN  55401  •  USA
Tel: 612.341.3302  •  Fax: 612.341.2971  •  Email: hrights@advrights.org  •  www.theadvocatesforhumanrights.org

Immigration adjudicators already have vast discretion to deny asylum to those who meet the refugee definition but have been convicted of criminal conduct.[17] Further categorical bars are not needed. The agencies' efforts to add *seven* new sweeping categories of barred conduct to the asylum eligibility criteria is unnecessary and cruel. The Proposed Rules drain the phrase "*particularly serious* crime," 8 U.S.C. § 1158, of any sensible meaning.

One assumption fundamentally underlying the Proposed Rules, for example, is that every noncitizen convicted of any offense punishable by more than a year in prison necessarily constitutes a danger to the community. But no evidence is provided to support that assumption, and a criminal record, does not, in fact, reliably predict future dangerousness.[18] The Proposed Rules are so capricious as to peremptorily postulate a noncitizen's supposed danger to the community even in circumstances when a federal, state, or local judge has concluded that no danger exists by, for example, imposing a noncustodial sentence. Conviction for a crime does not, without more, make one a present or future danger—which is why the Refugee Convention's particularly serious crime bar, made part of United States law through 8 U.S.C. § 1158, should only properly apply if both (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows that she is a present or future danger.[19]

Similarly, the Proposed Rules fail to address or account for the fact that a significant number of people may agree to plead to a crime as to avoid the threat of a severe sentence; not only is a conviction an unreliable predictor of future danger, it can also be an unreliable indicator of past criminal conduct.[20] In addition, the Proposed Rules do not address and make no exception for convictions for conduct influenced by mental illness or duress.

The Board of Immigration Appeals has cautioned that, "in light of the unusually harsh consequences which may befall a [noncitizen] who has established a well-founded fear of persecution; the danger of persecution should generally outweigh all but the most egregious of adverse factors."[21] Yet because of the categorical nature of the seven news bars proposed here, asylum seekers will be precluded from obtaining protection on the basis of a vast array of conduct, without any discretion left to the immigration adjudicator to determine whether the circumstances merit such a harsh penalty. Indeed, in the case of the domestic-violence related ground, the categorical bar will be imposed on the basis of *mere allegations* of conduct without any adjudication of guilt.[22]

Those unjustly precluded from even seeking a discretionary grant of asylum by the Proposed Rules will include, for example: individuals struggling with addiction with one drug-related conviction, regardless of the circumstances of the offense; asylum seekers with two convictions for driving under the influence, regardless of whether the applicant has sought treatment for alcohol addiction or the circumstances of the convictions; community members seeking asylum defensively who have been convicted of a document fraud offense related to their immigration status; and asylum-seeking mothers convicted for bringing their own child across the southern border in an effort to find safety.

The Proposed Rules are also arbitrary and capricious. They would constitute a marked departure from past practice. The agencies have proffered no evidence or data to support these changes. Absent any evidence or data, it is fair to conclude that the Agencies have proposed this

330 Second Avenue South  •  Suite 800  •  Minneapolis, MN  55401  •  USA
Tel:  612.341.3302  •  Fax:  612.341.2971  •  Email:  hrights@advrights.org  •  www.theadvocatesforhumanrights.org

rule out of animus to asylum seekers and a desire to undermine the asylum system through an end-run around Congress.

*The Proposed Rules cruelly disregard the connections between trauma and involvement in the criminal legal system.*

The harsh nature of the Proposed Rules is especially evident when viewed through a trauma-informed lens. Asylum seekers are an inherently vulnerable population because of the trauma they have experienced in their countries of origin and, often, along the journey to find safety. Existing literature suggests that at least one out of every three asylum seekers struggles with depression, anxiety, and/or post-traumatic stress disorder (PTSD).[23] One recent study found the mental health problems facing refugees and asylum seekers so acute that more than a third of the study's sample admitted having suicidal thoughts in the preceding two weeks.[24]

Studies also consistently reveal a high prevalence of comorbidity of PTSD and substance use disorders, with individuals with PTSD *up to 14 times more likely* to struggle with a substance use disorder.[25] Asylum seekers in the United States are often unable to access affordable medical care and treatments for complex trauma;[26] some turn to drugs and alcohol in an effort to self-medicate.[27] The proposed new bars to asylum include *any* drug-related conviction (with one exception for a first minor marijuana possessory offense) and any second conviction for driving under the influence. This approach is not only cruel but also ignores the evidence. *Particularly* given the vulnerabilities of asylum seeking populations, prior struggles with addiction should be addressed with treatment and compassion, not a closed door and deportation order.

Immigration adjudicators already maintain the authority to deny asylum to individuals with drug-related criminal histories on the basis of discretion; denying asylum seekers even the opportunity to present the countervailing factors of their past trauma and potential recovery is simply cruel.

III.    **The Proposed Rules violate the United States' international human rights law and international treaty obligations**

*The Proposed Rules Violate the United States' Non-Derogable Obligations under International Human Rights Law*

The United States has a non-derogable legal obligation under international human rights law to ensure the protection of migrants. Grounded in the Universal Declaration of Human rights and the nine core international human rights instruments, **this principle applies to all migrants, at all times, irrespective of migration status.**[28] To ensure compliance with these protection obligations, the United States has a legal obligation under international human rights law to respond to the protection needs of migrants, including a particular duty of care to migrants in vulnerable situations.[29] To comply with its international human rights law obligations, the United States should (1) put in place and allocate resources to the identification and assessment of protection needs; and (2) establish mechanisms for entry and stay of migrants who are considered to have protection needs prohibiting their return under international human rights

AR.09743

law, including *non-refoulement,* as well as the rights to health, family life, best interests of the child, and torture rehabilitation.

Among these non-derogable obligations is the principle of *non-refoulement*. The principle of *non-refoulement* guarantees that no one should be returned to a country where they would face torture, cruel, inhuman or degrading treatment or punishment and other irreparable harm. The principle of *non-refoulement* under international human rights law applies to any form of removal or transfer of persons, regardless of their status, where there are substantial grounds for believing that the person would be at risk of irreparable harm on account of torture, ill-treatment, and other serious breaches of international human rights obligations.

The prohibition against *refoulement* applies to a range of serious human rights violations, including torture, other cruel, inhuman or degrading treatment, flagrant denial of the right to a fair trial,[30] risks of violations to the right to life,[31] integrity or freedom of the person,[32] serious forms of sexual and gender-based violence,[33] death penalty,[34][35] female genital mutilation,[36] and prolonged solitary confinement.[37]

The United States is obligated to ensure heightened consideration to children in the context of *non*-refoulement and must act in accordance with the best interests of the child. International human rights law is clear: a child should not be returned if such return would result in the violation of their fundamental human rights, including if there is a risk of insufficient provision of food or health services.[38]

*The Proposed Rules Violate the United States' Obligations under International Refugee Law*

The principle of *non-refoulement* is the cornerstone of international refugee protection. It is enshrined in Article 33 of the 1951 Convention Relating to the Status of Refugees[39] and is binding on parties to the 1967 Protocol Relating to the Status of Refugees.[40] As a party to the Protocol, the United States affirmatively obligated itself to develop and interpret United States refugee law in a manner that complies with the Protocol's principle of *non-refoulement* (the commitment not to return refugees to a country where they will face persecution on protected grounds). The United Nations High Commissioner for Refugees (UNHCR) makes clear that "Given that a person is a refugee within the meaning of the 1951 Convention as soon as he or she fulfills the criteria contained in the refugee definition, refugee status determination is declaratory in nature: a person does not become a refugee because of recognition, but is recognized because he or she is a refugee." The principle of non-refoulement applies to recognized refugees and asylum-seekers alike.

While the Convention allows states to exclude and/or expel certain migrants from refugee protection, the circumstances in which this can occur are limited. In particular, Article 33(2) of the Convention allows states to exclude and/or expel individuals from refugee protection if the individual "having been convicted by a final judgement of a particularly serious crime, constitutes a danger to the community of that country."[41] However, this clause is intended for "extreme cases," in which the particularly serious crime at issue is a "capital crime or a very grave punishable act."[42] The UNHCR makes clear that to constitute a "particularly serious crime," the crime "must belong to the gravest category" and be limited "to refugees who

330 Second Avenue South  •  Suite 800  •  Minneapolis, MN  55401  •  USA
Tel:  612.341.3302  •  Fax:  612.341.2971  •  Email:  hrights@advrights.org  •  www.theadvocatesforhumanrights.org

become an extremely serious threat to the country of asylum due to the severity of crimes perpetrated by them in the country of asylum."[43] Moreover, the UNHCR has specifically noted that the particularly serious crime bar does not encompass less extreme crimes; "[c]rimes such as petty theft or the possession for personal use of illicit narcotic substances would not meet the threshold of seriousness."[44] Finally, when determining whether an individual should be barred from protection for having been convicted of a particularly serious crime, the adjudicator must conduct an individualized analysis and consider any mitigating factors.[45]

Most importantly, the exceptions to refugee protection contained in Article 33(2) of the 1951 Convention *do not affect the United States' non-refoulement obligations under international human rights obligations, which permit no exceptions.* Thus the United States is barred from removing a refugee if this would result in exposing him or her to a substantial risk of torture or other forms of irreparable harm.

As noted above, legislation and agency interpretation of the Immigration and Nationality Act have already expanded the particularly serious crime bar far beyond what was contemplated in the Convention by creating categorical particularly serious crimes through the aggravated felony definition. The Proposed Rules would amplify the dissonance between U.S. refugee law and the Convention, as well as the violation of U.S. obligations under the Convention, by creating categorical bars within categorical bars. For example, at p. 69659, the Proposed Rules first exclude from protection anyone who was convicted of a felony and then at p. 69660, define "felony" as "any crime punishable by more than one of imprisonment" without any reference to other factors, including dangerousness. The Proposed Rules described the increased categorization of the particularly serious crime bar as necessary because the case-by-case adjudication previously used for non-aggravated felony offenses was "inefficient,"[46] but an individualized analysis is exactly what the Convention requires to ensure only those individuals who have been convicted of crimes that are truly serious and therefore present a future danger are placed at risk of refoulement.

Additionally, outside of the aggravated felony context, it has generally been well understood by the Board of Immigration Appeals and the Courts of Appeals that low-level, "run-of-the-mill" offenses do not constitute particularly serious crimes.[47] Under this long-standing interpretation of the particularly serious crime bar in the INA, there is simply no scenario in which low-level offenses like misdemeanor driving under the influence where no injury is caused to another or simple possession of a controlled substance or paraphernalia would constitute a particularly serious crime.

The reason for this is common sense. As Judge Reinhardt explained in a concurring opinion in *Delgado v. Holder*,[48] a decision the Proposed Rules cite in support of the expanded bars, run-of-the-mill crimes like driving under the influence have "little in common" with other crimes the Board of Immigration Appeals has deemed particularly serious—e.g., felony menacing with a deadly weapon, armed robbery, and burglary of a dwelling in which the offender is armed or causes injury.[49] Judge Reinhardt further noted that public opinion does not treat them similarly either: "American voters would be unlikely to elect a president or vice president who had committed a particularly serious crime, yet they had no difficulty in recently electing to each office a candidate with a DUI record."[50] Barring individuals from asylum based

AR.09745

330 Second Avenue South  •  Suite 800  •  Minneapolis, MN  55401  •  USA
Tel:  612.341.3302  •  Fax:  612.341.2971  •  Email:  hrights@advrights.org  •  www.theadvocatesforhumanrights.org

on these relatively minor offenses renders the "particularly serious" part of the "particularly serious crime" bar meaningless.

The expansion of the asylum bar to include individuals who have been convicted of reentering the United States without inspection pursuant to INA § 276[51] is also unlike any of the other bars previously established or as interpreted by the Board of Immigration Appeals or Circuit Courts of Appeals. It is an offense with no element of danger or violence to others, and has no victim. Most significantly, and more so than other bars contained in the Proposed Rules, barring asylum based on the manner of entry directly violates the Convention's prohibition on imposing penalties based on a refugee's manner of entry or presence.[52] This prohibition is a critical part of the Convention because it recognizes that refugees often have little control over the place and manner in which they enter the country where they are seeking refuge.

The Advocates has had several clients who were victims of trafficking forced to enter the U.S. as part of the trafficking scheme perpetrated against them. In three cases, those victims were intercepted by ICE, detained and either given voluntary departure, deported or faced expedited removal. At least one of these victims would not be eligible for a T visa as a victim of trafficking under present regulations due to the regulation barring a T visa where the person has been removed after the trafficking episode. Yet, they also face retaliation from their trafficker or other harms. As a result, these vulnerable trafficking victims need protections offered by asylum, but would be barred under the proposed regulation.

IV.    **Those precluded from asylum eligibility will be gravely impacted even if granted withholding of removal or protection under the Convention Against Torture**

Throughout the Proposed Rules, the agencies defend the harsh and broad nature of their proposal by pointing to the continued availability of alternative forms of relief for those precluded from asylum eligibility under the new rules.[53] The availability of these alternatives forms of relief, however—known as withholding of removal and protection under the Convention Against Torture (CAT)—does not nullify the harm created by the Proposed Rule's new limits on asylum. The protections afforded by CAT and by statutory withholding of removal are limited in scope and duration, and they are harder to obtain. As a result, a Rule that limits *bona fide* refugees to withholding of removal and CAT protection would impose a very real harm on individuals who have come to the United States in search of protection.

First, the most serious harm that can befall an individual as a result of these Proposed Rules is removal to persecution and torture, and the existence of withholding of removal does not account for that risk. CAT and withholding protections demand a higher level of proof than asylum claims: a clear probability of persecution or torture.[54] Thus, an individual could have a valid asylum claim but be unable to meet the standard under the other forms of relief and therefore would be removed to their country of origin, where they would face persecution or even death.

Even for those who meet the higher standard, withholding and CAT recipients are still subject to significant prejudice. For example, they have no ability to travel internationally. The United Nations Convention Relating to the Status of Refugees[55] affords refugees the right to

330 Second Avenue South  •  Suite 800  •  Minneapolis, MN  55401  •  USA
Tel: 612.341.3302  •  Fax: 612.341.2971  •  Email: hrights@advrights.org  •  www.theadvocatesforhumanrights.org

travel in mandatory terms. Article 28 states, "Contracting States shall issue to refugees lawfully staying in their territory travel documents for the purpose of travel outside their territory." Withholding and CAT recipients do not have access to a travel document as contemplated by Article 28. By regulation, refugee travel documents are available only to asylees.[56] And the Board of Immigration Appeals requires that an individual granted withholding and CAT—unlike an individual granted asylum—must simultaneously be ordered removed, making any international travel a "self-deportation."[57] Refugees granted only withholding of removal or CAT protection are thus effectively trapped within the United States in long-term limbo.

Withholding and CAT recipients also face permanent separation from their spouses and children. Because international travel is prohibited, these individuals cannot reconnect with their families in a third country. And they also cannot reunite with family in the United States because only asylees and refugees are eligible to petition for a spouse and children to join them as derivatives on that status.[58] For many, this will mean that the Proposed Rules institute yet another formal policy of family separation. For example, a mother with two young children who flees to the United States and is subject to one of the expanded asylum bars will not be able to ensure that her children will be able to obtain protection in the United States with her if she is granted relief.  Rather, if her children are still in her home country, they would need to come to the United States and seek asylum on their own, likely as unaccompanied children. If her children fled to the United States with her, then they will need to establish their own eligibility for protection before an immigration judge, no matter their age.

Recently, this exact scenario played out with a mother who was subject to the so-called Migrant Protection Protocols (also known as Remain in Mexico) and the asylum "transit ban,"[59] which made the mother ineligible for asylum and thus required the children to establish their independent eligibility for withholding and CAT protection. An immigration judge granted the mother withholding of removal but denied protection to her young children, leaving the children with removal orders and immense uncertainty about their future.[60] Under the expanded bars in the Proposed Rules, these situations will certainly increase, separating families and forcing parents to return to countries where it has been established they more likely than not will face persecution and torture, rather than leaving their children on their own.

Withholding recipients likewise face hurdles in access to employment. Article 17 of the Refugee Convention states that a contracting state "shall accord to refugees lawfully staying in their territory the most favorable treatment accorded to nationals of a foreign country in the same circumstances, as regards the right to wage-earning employment." Recipients of withholding enjoy no such right. They must apply for work authorization, and they face frequent delays in the adjudication of these applications, which often result in the loss of legal authorization to work.[61]  Moreover, they must pay a fee for employment authorization each time they re-apply. As the Administration also proposes increased fees, and has made fee waivers harder to obtain, imposing this additional hurdle on bona fide asylees is contrary to our treaty obligations as well as Congressional intent in the Refugee Act.

And perhaps most fundamentally, there is continuing jeopardy for withholding and CAT recipients that does not exist for asylum recipients. When a noncitizen is granted asylum, the person receives a legal status.[62] Asylum, once granted, protects an asylee against removal unless

330 Second Avenue South  •  Suite 800  •  Minneapolis, MN  55401  •  USA
Tel:  612.341.3302  •  Fax:  612.341.2971  •  Email:  hrights@advrights.org  •  www.theadvocatesforhumanrights.org

and until that status is revoked.[63] None of these protections exists for withholding and CAT recipients. They have no access to permanent residency or citizenship.[64] Instead, they are subject to a removal order and vulnerable to the permanent prospect of deportation to a third country and subject to potential check ins with immigration officials where they can be made to pursue removal to third countries to which they have no connection.[65] This uncertainty is incredibly harmful to asylum seekers who have experienced severe human rights abuses and been forced to flee their homes. Providing certainty of a safe place to live forever is one of the most important aspects of the treaties. Instead, the proposed rule seeks to give lesser protections and force trauma-affected individuals to forever live in limbo, with the threat that protections could be removed at any time.

In addition, the limbo of withholding of removal discourages connections to the U.S. and threatens to create a cohort of individuals who may later need a legislative fix to adjust their status and give full rights as citizens. This is not what Congress intended in passing implementing legislation to the Refugee convention in the form of the Refugee Act.

Moreover, creating a class of residents in limbo generates community instability. Where systems discourage strong community connections, there is less incentive for community members to invest in the community or keep the community safe. This, in turn, will increase the exact type of criminal activity this rule allegedly seeks to discourage. In addition, many asylees and immigrants invest in their communities through opening businesses, hiring others, paying taxes and more. However, if their status can be revoked— as the case in withholding and CAT cases— what is there to encourage these folks to make the investment in starting businesses or otherwise invest in the community? Since the U.S. is required to provide protection to these categories of persons, it should take all possible steps to encourage their inclusion and assimilation into the community lest our communities face destabilization.

Finally, The Advocates for Human Rights writes to highlight a different form of prejudice that will flow from the rule: one relating to judicial efficiency. The Advocates currently represents one family, comprised of a husband, wife, and seven children. Under the Proposed Rules, this single family unit will require nine separate removal proceedings. Neither withholding of removal nor CAT protection allow family members who are in the United States together and pursuing protection on the same basis to apply as derivatives on a principal application. As a result, family claims for those rendered ineligible for asylum by the new rules will have to be adjudicated separately, and potentially before different adjudicators even when the claims are interrelated and even when minor children may not be in a position to explain the claim at all or as sufficiently as a parent. In addition to being unjust to the affected family members, this approach would result in gross inefficiencies, which should be avoided in a system that already contains a significant backlog of pending cases.[66]

V.    **The Proposed Rules will result in "mini-trials" in immigration court, undermine judicial efficiency and result in racially-biased and gender-biased decision-making**

In two significant ways, the Proposed Rules require immigration adjudicators to engage in decision-making to determine whether an asylum applicant's conduct—considered independently of any criminal court adjudication—triggers a categorical bar to asylum eligibility. First, the agencies propose that immigration adjudicators be allowed to consider "all reliable

330 Second Avenue South  •  Suite 800  •  Minneapolis, MN  55401  •  USA
Tel: 612.341.3302  •  Fax: 612.341.2971  •  Email: hrights@advrights.org  •  www.theadvocatesforhumanrights.org

evidence" to determine whether there is "reason to believe" an offense was "committed for or related to criminal gang evidence," or "in furtherance of gang-related activity, triggering ineligibility for asylum in either case.[67] Second, the Proposed Rules permit immigration adjudicators to "assess all reliable evidence in order to determine whether [a] conviction amounts to a domestic violence offense;" and to go even further by considering whether non-adjudicated *conduct* "amounts to a covered act of battery or extreme cruelty."[68]

### Mini-trials Undermine Judicial Efficiency and Threaten Due Process

Requiring adjudicators to make complex determinations regarding the nature and scope of a particular conviction or, in the case of the domestic violence bar, *conduct*, will lead to massive judicial inefficiencies and slanted "mini-trials" within the asylum adjudication process. The scope of the "reliable evidence" available to adjudicators in asylum cases is potentially limitless; advocates on both sides would be obligated to present fulsome arguments to make their cases about gang connections to the underlying activity or the relationship of the asylum applicant to the alleged victim. Because of the lack of robust evidentiary rules in immigration proceedings, it will be difficult if not impossible for many applicants to rebut negative evidence marshaled against them, even if false; and in other cases, asylum applicants, particularly those in ICE detention, will struggle to find evidence connected to events that may have happened years prior. Asylum trials, which are typically three or fewer hours under current policies, would provide insufficient time to fully present arguments on both sides of these unwieldy issues.

As the immigration courts contend with backlogs that now exceed one million cases,[69] tasking adjudicators with a highly nuanced, resource-intensive assessment of the connection of a conviction to gang activity and/or the domestic nature of alleged criminal conduct—assessments far outside their areas of expertise—will prolong asylum proceedings and invariably lead to erroneous determinations that will give rise to an increase in appeals. The Proposed Rules repeatedly cite increased efficiency as justification for many of the proposed changes.[70] Yet requiring adjudicators to engage in mini-trials to determine the applicability of categorical criminal bars, rather than relying on adjudications obtained through the criminal legal system, will dramatically *decrease* efficiency in the asylum adjudication process.

Indeed, the Supreme Court has "long deemed undesirable" exactly the type of "post hoc investigation into the facts of predicate offenses" proposed by the agencies here.[71] Instead, for more than a century the federal courts have repeatedly embraced the "categorical approach" to determine the immigration consequence(s) of a criminal offense, wherein the immigration adjudicator relies on the statute of conviction as adjudicated by the criminal court system, without relitigating the nature or circumstances of the offense in immigration court.[72] As the Supreme Court has explained, this approach "promotes judicial and administrative efficiency by precluding the relitigation of past convictions in minitrials conducted long after the fact."[73] In *Moncrieffe v. Holder*, the Court forewarned of exactly the sort of harm that would arise from these Proposed Rules; in that case, the Court rejected the government's proposal that immigration adjudicators determine the nature and amount of remuneration involved in a marijuana-related conviction, noting that "our Nation's overburdened immigration courts" would end up weighing evidence "from, for example, the friend of a noncitizen" or the "local police officer who recalls to the contrary," with the end result a disparity of outcomes depending on the whims of the individual immigration judge and a further burdened court system.[74]

330 Second Avenue South • Suite 800 • Minneapolis, MN 55401 • USA
Tel: 612.341.3302 • Fax: 612.341.2971 • Email: hrights@advrights.org • www.theadvocatesforhumanrights.org

*Proposed Rules Threaten Protection for Domestic Violence Victims*

**Fears of deportation already inhibit women victims of domestic violence from reporting the violence; the proposed regulations will only heighten their fears and discourage reporting**. A report by The Advocates for Human Rights on domestic violence against immigrant women found that the risk of deportation exacerbated victims' existing fears of removal of both the abuser and themselves. This, in turn, can affect their willingness to report violence to authorities and ultimately stay safe.[1] According to USCIS:

> Immigrants are particularly vulnerable because many may not speak English, are often separated from family and friends, and may not understand the laws of the United States. For these reasons, immigrants are often afraid to report acts of domestic violence to the police or to seek other forms of assistance. Such fear causes many immigrants to remain in abusive relationships.[2]

**The justice system does not always accurately identify the correct offender in domestic violence cases, creating the real risk that a victim will be removed from the United States**. Although the proposed regulation exempts those who "have been battered...and who were not the primary perpetrators of violence in their relationships," identifying the primary aggressor is not always consistently nor correctly conducted. A report by The Advocates for Human Rights on immigrant women found that victims who used self-defense or pre-emptive violence against their abuser have nevertheless been deported: "[a]round the country, [the law] has resulted in the removal (deportation) of abusers (whether charged with domestic violence or disorderly conduct) *as well as some domestic violence victims* who committed assault in response to abuse"[3] [emphasis added].

The exemption to the domestic-violence bar for the person who was not the "primary perpetrator"[4] is a hollow promise. **The process of identifying the primary aggressor among competing versions and complex motives to lie or be truthful takes skill.** Whether the asylee has a domestic violence conviction or was merely arrested or charged, the information about who is the "primary perpetrator" will rarely be readily available. This requires an assessment of, inter alia, the overall relationship dynamics, the form that previous acts of violence took, control over resources and family relationships, access to weapons: a litany of factors that the asylee may be unable to accurately portray.[5] This is particularly concerning for asylees who are not represented by counsel and those for whom English is not their primary language.

Barring domestic violence victims unless they make this showing will put many of them in an impossible situation. It is well-documented that domestic violence victims often recant earlier truthful statements implicating their abusers in an act of violence. They may make a statement to police describing violence, and later try to recant the statement for a myriad of reasons that are grounded in the complexities of intimate-partner violence. Yet, if they need to demonstrate that the partner is the primary aggressor to overcome the proposed asylum bar, the victim will need to implicate the partner, contrary to their recantation. Despite platitudes about "especially vulnerable victim[s]" in the comments to the proposed rule, placing this burden on the victim actually endangers these non-citizen victims.[6] They will often have to choose between staying with the abuser and being sent back to the home-country persecution they are attempting to flee.

AR.09750

One expert from the Domestic Abuse Intervention Project provided an example that demonstrates how a victim would have been deported back to Russia, had the proposed legislation been in place at the time of her arrest. The night the victim was arrested, her abusive husband called the police and showed them a scratch on his thigh that she inflicted in self-defense. The victim did not give any information to the police out of fear of being deported and losing her children, and the scratch mark gave the police probable cause to arrest the victim. Ultimately, the prosecutor dismissed the case against her, and she was granted an order for protection, divorce, and child custody.[7] Under these proposed amendments, however, such a victim would be barred from asylum and removed.

**State laws, such as mandatory arrest policies, place victims at risk of being misidentified as a perpetrator of domestic abuse and thus removed.** As of 2015, 22 U.S. states retained mandatory arrest policies, which requires police officers to make an arrest when they are called to the scene of domestic violence.[8] Such mandatory arrest policies place victims at greater risk of being arrested and therefore wrongfully accused of domestic violence, instead of or alongside their abuser, when police fail to identify the correct predominant aggressor.[9] Research indicates "while the number of victim arrests has increased, the use of violence by victims has remained constant, suggesting greater manipulation of the justice system by defendants and lack of police training in the intricacies of domestic violence dynamics."[10] Victims who face this heightened risk of wrongful accusation of domestic violence in almost half of the U.S. states with mandatory arrest policies, could face removal under the proposed amendments. This context makes the Proposed Rules' creation of a categorical bar regardless of a conviction particularly harmful.

**Blanket inclusion of child abuse in the domestic context also places victims of domestic violence at risk of removal.** An early report by WATCH, a court monitoring program, on Minnesota's Child Protection system, found that "The prevailing societal attitude about domestic abuse more often questions why a victim remains in an abusive relationship and focuses on her actions instead of asking why the batterer batters. This attitude, which shifts responsibility for the abusive relationship to the victim, can also be present in the justice system....Victims also are often held responsible for changing the conditions, namely their abuser's behavior, that led to court intervention."[11] When child protection systems actors persist in holding such harmful attitudes, they risk assigning responsibility for child abuse to the non-violent parent, i.e. the victim, for not leaving an abusive relationship when they have many legitimate reasons for being unable to do so.

**The proposed bar to asylum for people who are merely charged with engaging in acts of domestic violence raises numerous concerns about due process and fairness.** It is a lower standard than the conviction required for removal of someone in resident status.[12] This would create inconsistency in the treatment of similarly-situated persons. This proposal would bar what might be a legitimate asylum claim (based upon a horrific past or fear of future persecution) for the unsubstantiated claim of domestic violence. Yet, someone seeking admission via other mechanisms may be deported only upon a domestic-violence conviction or factual admission.[13]

AR.09751

The rationale that requires a previous assessment of legitimacy for other removal proceedings based on domestic violence should apply equally to asylum proceedings. Immigration court is not competent to litigate criminal proceedings such as a decision to arrest or charge for domestic violence. Barring individuals from asylum without requiring a separate court determination turns the asylum hearing into the first fact-finding court in a domestic violence criminal case. This is a role it is ill-suited to serve.

There is a reason that many jurisdictions around the nation have specialized domestic violence police units, specialized domestic violence prosecutors, and specialized domestic violence courts. It is a complex issue with nuance that is gained only from training, experience, and guidance from more experienced practitioners. The proposal would place enormous significance upon on-the-spot arrest or charging decisions by potentially inexperienced police and prosecutors.

Under the best of circumstances, domestic violence criminal cases require assessing multiple factors and often competing versions of events. The asylum officer or judge tasked with applying the bar likely will not have such specialized knowledge, nor the time nor resources to gain it. Add to that implicit biases of the police or prosecutors based on race, language, and gender, and a bar for mere allegations of domestic violence should be denied as obviously flawed and ineffectual.

**It is not useful to note that domestic-violence victims who seek U-Visas or VAWA green-card procedures also need not await a conviction.**[14] Such benefits generally apply only with an acknowledgement from a local authority such as a prosecutor – thereby negating the need for a fact-finding hearing. Further, granting those benefits is not analogous to placing the burden upon a person to overcome a bar to application for asylum. The right to seek asylum is a human right and a statutory right in the U.S. Placing this bar before the otherwise-qualified asylee who may be unable to demonstrate to an under-qualified asylum judge that they are actually the victim in the relationship does not comport with international or historical U.S. standards.

Finally, the exemption for asylum applicants who can demonstrate their eligibility for a waiver under section 237(a)(7)(A) of the Immigration and Nationality Act does not cure the harm to asylum seekers caused by imposition of a categorical domestic violence related bar.[75] Rather, it converts a non-adversarial asylum proceeding into a multi-factor, highly specific inquiry into culpability based on circumstances that may be very difficult for an asylum seeker to prove—especially if proceeding without counsel and with limited English proficiency.

In one of The Advocates' cases, a young child was arrested and abused in his home country due to his parents' political activities and his own participation in the party. After escaping the torture, he arrived in the U.S. as a sixteen-year-old and sought asylum. Young and vulnerable, he entered a relationship with a woman he met here. As the relationship broke down, however, she became manipulative and psychologically abusive. As a result, this woman conducted an elaborate scheme and brought false charges of domestic abuse and stalking. The prosecutor's office declined to prosecute, noting specifically that the client appeared to be the victim of domestic violence and that the charges brought by the girlfriend were clearly false. Nonetheless, under this new rule, that vulnerable boy could be swept into the overly broad categorical bar.

AR.09752

*Proposed Gang Affiliation Bar Compounds Due Process Failures of Gang Databases*

In the context of the new proposed bar related to alleged gang affiliation, The Advocates for Human Rights is concerned that creating a blanket exclusion for anyone who is convicted of a crime – including a misdemeanor – that an immigration adjudicator deems *linked* to gang activity will erroneously prevent bona fide asylum seekers from receiving protection. This rule confers on immigration adjudicators—who generally are not criminologists, sociologists, or criminal law experts—the responsibility to determine if there is "reason to believe" any conviction flows from activity taken in furtherance of gang activity. This rule will necessarily ensnare asylum seekers of color who have experienced racial profiling and a criminal legal system fraught with structural challenges and incentives to plead guilty to some crimes, particularly misdemeanors. These same individuals are vulnerable to being erroneously entered into gang databases. Such databases are notoriously inaccurate, outdated, and infected by racial bias.[76]

Indeed, asylum applicants are *already* frequently subjected to wrongful denials of protection because of allegations of gang activity made by the Department of Homeland Security on the basis of information found in notoriously unreliable foreign databases and "fusion" intelligence-gathering centers outside the United States. Empowering immigration adjudicators to render asylum applicants *categorically* excluded from protection on the basis of such spurious allegations will inevitably result in the return of many refugees back to harm.[77]

The Departments curiously argue that all gang-related offenses should be construed as "particularly serious crimes."[78] They cite statistics from up to 16 years ago in an attempt to make the point that gang members commit violent crimes and drug crimes. They then make the illogical leap to the conclusion that *all crimes*—including misdemeanor property crimes— that may be construed as connected to gang activity are particularly serious. This simply does not follow; in fact, the Proposed Rules will inevitably result in the exclusion from protection of asylum seekers of color who live in economically distressed communities and have obtained a minor conviction such as a property crime. Relying on the definition of "particularly serious crime" to prevent asylum seekers convicted of even minor crimes construed as gang-related from accessing asylum protection is disingenuous at best, and tinged with racial animus at worst.

The Departments asks for comments on: (1) what should be considered a sufficient link between an asylum seeker's underlying conviction and the gang related activity in order to trigger the application of the proposed bar, and (2) any other regulatory approaches to defining the type of gang-related activities that should render individuals ineligible for asylum. The premise of these questions is wrong: a vague "gang related" bar should not be introduced at all. The Immigration and Nationality Act and existing regulations already provide overly broad bars to asylum where criminal behavior by an asylum seeker causes concern by an adjudicator. Adding this additional, superfluous layer of complication risks erroneously excluding bona fide asylum seekers from protection without adding any useful adjudicatory tool to the process.

In recent years, the expansion of gang databases for use in the apprehension and removal of foreign nationals—including children—has generated tremendous concern among advocates and the communities they serve.[79] The use of gang databases by local law enforcement and

330 Second Avenue South  •  Suite 800  •  Minneapolis, MN  55401  •  USA
Tel:  612.341.3302  •  Fax:  612.341.2971  •  Email:  hrights@advrights.org  •  www.theadvocatesforhumanrights.org

Immigration and Customs Enforcement has been widely criticized as an overbroad, unreliable and often biased measure of gang membership and involvement.[80] The Proposed Rules expand the criminal bars to asylum to those accused of gang involvement in the commission of minor criminal offenses, embracing an open-ended adjudicative process that will inevitably result in asylum adjudicators relying unfairly on these discredited methods of gang identification. This outcome would compound the disparate racial impact of inclusion in gang databases and bar asylum seekers who are themselves fleeing violence from gangs in their home countries.[81]

Past legislative efforts to expand the grounds of removal and inadmissibility in the Immigration and Nationality Act to include gang membership have failed to pass both houses of Congress.[82] In addition, immigration adjudicators already routinely premise discretionary denials of relief or release on bond on purported gang membership, and scores of alleged gang members have already been deported on grounds related to immigration violations or criminal convictions for which no relief is available.[83] Creating a "gang-related crime" bar will only exacerbate the due process violations already occurring as the result of unsubstantiated information about supposed gang ties.[84]

In addition, by focusing on "reason to believe" as the basis for the bar, rather than the seriousness of the crime, the proposed provision is ultra vires and unconscionably limits the eligibility for asylum of those most in need of protection. The effect of the Proposed Rules would be to expand the number and type of convictions for which an analysis of eligibility is required, sweeping in even petty offenses that would otherwise not trigger immigration consequences. Thus, an asylum applicant convicted of simple assault without use of a weapon, a non-violent property crime, or even possession of under 30 grams of marijuana for personal use (otherwise exempted from the reach of the Proposed Rule), could trigger a bar to asylum if the adjudicator concludes she has "reason to believe" the offense was committed in furtherance of gang activity.[85] In making these determinations, asylum adjudicators would be unable to rely on uncorroborated allegations contained in arrest reports, but could nevertheless shield their decisions by relying on discretion.[86]

The Proposed Rules thus invite extended inquiry into the character of young men of color who otherwise have meritorious asylum claims, based on information gained through racially suspect policing practices. These rules multiply the harm to asylum seekers of color subject to racially disparate policing that results in racially disparate rates of guilty pleas to minor offenses. This same population is overrepresented in gang databases, which are notoriously inaccurate, outdated, and infected by racial bias.[87]

## VI.    The proposed definition of "conviction" and "sentence" for the purposes of the new bars further excludes those in need of protection

The section of the Proposed Rules that outlines a new set of criteria for determining whether a conviction or sentence is valid for the purpose of determining asylum eligibility is an ultra vires exercise of authority that is not authorized by the Immigration and Nationality Act. The Proposed Rules impose an unlawful presumption against asylum eligibility for applicants who seek post-conviction relief while in removal proceedings or longer than one year after their initial convictions. They also deny full faith and credit to state court proceedings by attributing improper motives to state court actors.[88]

330 Second Avenue South  •  Suite 800  •  Minneapolis, MN  55401  •  USA
Tel:  612.341.3302  •  Fax:  612.341.2971  •  Email:  hrights@advrights.org  •  www.theadvocatesforhumanrights.org

*The Proposed Rules undermine Sixth Amendment protections and harms immigrants unfamiliar with the complex criminal and immigration framework governing prior convictions.*

The Proposed Rules outline a new multi-factor process asylum adjudicators must use to determine whether a conviction or sentence remains valid for the purpose of determining asylum eligibility; the proposal includes a rebuttable presumption "against the effectiveness" of an order vacating, expunging, or modifying a conviction or sentence if the order was entered into after the asylum seeker was placed in removal proceedings or if the asylum seeker moved for the order more than one year after the date the original conviction or sentence was entered.[89]

This newly created presumption unfairly penalizes asylum applicants, many of whom may not have the opportunity to seek review of their prior criminal proceedings until applying for asylum.[90] In *Padilla v. Kentucky*, the Supreme Court recognized that the immigration consequences of a conviction are sufficiently serious for the Sixth Amendment to require a noncitizen defendant to be competently advised of them before agreeing to a guilty plea.[91] By imposing a presumption against the validity of a withdrawal or vacatur of a plea, the Proposed Rules hold asylum seekers whose rights were violated under *Padilla* to a different standard; even though they too were denied effective assistance of counsel in the course of their underlying criminal proceedings, asylum seekers will be forced to rebut a presumption that their court-ordered withdrawal or vacatur is invalid. The Proposed Rules therefore compound the harm to immigrants who, in addition to facing persecution in their home countries, have been denied constitutionally compliant process in the United States criminal legal system.

Many asylum applicants, especially those in vulnerable populations isolated from resources and unfamiliar with the due process protections available to them in the United States, may not have discovered the defects in their underlying criminal proceedings until their consultation with an immigration attorney, or until they are placed into removal proceedings, which may happen several years after a conviction. Imposing a presumption *against* the validity of a plea withdrawal or vacatur in these cases will undoubtedly lead to the wrongful exclusion of countless immigrants from asylum simply because they were unable to adequately rebut the presumption, particularly in a complex immigration court setting without the benefit of appointed counsel.

*The Proposed Rules violate the full faith, and credit to which state court decisions are entitled.*

The Proposed Rules further improperly authorize immigration adjudicators to second-guess the decision of a state court, even where the order on its face cites substantive and procedural defects in the underlying proceeding. The proffered justification for this presumption against the validity of post-conviction relief is to "ensure that aliens do not have their convictions vacated or modified for purported rehabilitative purposes that are, in fact, for immigration purposes," "to codify the principle set forth in *Matter of Thomas and Thompson*," and to bring the analysis of post-conviction orders in line with *Matter of Pickering*.[92] The agencies misread the applicable law, however, by authorizing adjudicators to disregard otherwise valid state orders. The immigration law only requires that to be effective for immigration purposes, orders

330 Second Avenue South • Suite 800 • Minneapolis, MN 55401 • USA
Tel: 612.341.3302 • Fax: 612.341.2971 • Email: hrights@advrights.org • www.theadvocatesforhumanrights.org

vacating or modifying convictions must be based on substantive or procedural infirmities in the underlying proceedings. The Proposed Rule goes well beyond that requirement.

The Proposed Rules abandon the presumption of regularity that should accompany state court orders, thus upending settled principles of law. The Proposed Rules cite a misleading quote from *Matter of F-* in support of allowing asylum adjudicators to look beyond the face of a state court order; had the Rules' authors looked to the full case, they would have read the following: "Not only the full faith and credit clause of the Federal Constitution, but familiar principles of law require the acceptance at face value of a judgment regularly granted by a competent court, unless a fatal defect is evident upon the judgment's face. However, the presumption of regularity and of jurisdiction may be overcome by extrinsic evidence or by the record itself."[93] In *Matter of F-*, the Board of Immigration Appeals offers support for the proposition that an adjudicator should presume the validity of a state court order unless there is a reason to doubt it, contrary to the *presumption of irregularity* put forward in the Proposed Rules.

The authority extended to adjudicators by the Proposed Rules also violates the law of multiple circuits, including *Pickering*, on which it relies.[94] In *Pickering v. Gonzales*, the Sixth Circuit Court of Appeals held that despite the petitioner's stated motive of avoiding negative immigration consequences, the Board of Immigration Appeals was limited to reviewing the authority of the court issuing the order as to the basis for his vacatur.[95] Similarly, in *Reyes-Torres* the Ninth Circuit Court of Appeals held that the motive of the respondent was not the relevant inquiry.[96] Rather, "the inquiry must focus on the state court's rationale for vacating the conviction."[97] In addition, the Third Circuit Court of Appeals in *Rodriguez v. U.S. Att'y Gen.*, which the Proposed Rules cite as "existing precedent," held that the adjudicator must look only to the "reasons explicitly stated in the record and may not impute an unexpressed motive for vacating a conviction."[98] Moreover, the *Rodriguez* court stated that to determine the purpose of a vacatur, the adjudicator must first look to the face of the order vacating the conviction, and "if the order explains the courts reasons … the [adjudicator's] inquiry must end there."[99] The Proposed Rules contain no such limiting language to guide the adjudicator's inquiry. Instead, the Rules grant adjudicators vague and indefinite authority to look beyond even a facially valid vacatur. Such breadth of authority undermines asylum seekers' rights to a full and fair proceeding.

> *The Proposed Rules wrongly extend* Matter of Thomas and Thompson *to all forms of post-conviction relief and impose an ultra vires and unnecessary burden on asylum seekers.*

Finally, the above-described presumption is ultra vires and unnecessary. As an initial matter, the Proposed Rules' reliance on *Matter of Thomas and Thompson* is flawed. The Attorney General's decision in *Matter of Thomas and Thompson* has no justification in the text or history of the immigration statute. Nowhere does the plain text of the Immigration and Nationality Act support giving adjudicators the authority to give effect only to state court sentence modifications undertaken to rectify substantive or procedural defects in the underlying criminal proceedings. Nor does the legislative history support such a rule. The Board of Immigration Appeals recognized this in *Matter of Cota-Vargas*, where it concluded that the application of "the *Pickering* rationale to sentence modifications has no discernible basis in the

330 Second Avenue South  •  Suite 800  •  Minneapolis, MN  55401  •  USA
Tel: 612.341.3302  •  Fax: 612.341.2971  •  Email: hrights@advrights.org  •  www.theadvocatesforhumanrights.org

language of the Act."[100] Based on the text of the Immigration and Nationality Act and the well-documented legislative history behind Congress's definition of "conviction" and "sentence" in 8 U.S.C. § 1101(a)(48), the Board determined that Congress intended to ensure that, generally, proper admissions or findings of guilt were treated as convictions for immigration purposes, even if the conviction itself was later vacated. Neither the text of the INA nor the legislative history of the definitions reveal any attempt on Congress's part to change the longstanding practice of giving effect to state court sentencing modifications. For these reasons, *Matter of Thomas and Thompson* lacks Congressional support for its rule and should not be extended.

Moreover, as applicants for immigration benefits or relief from removal, asylum seekers already bear the burden of demonstrating their eligibility for asylum.[101] The Proposed Rules do not alter or shift this burden, nor do they provide evidence supporting the need for this presumption. By introducing a presumption of bad faith into asylum adjudication, the Proposed Rules unfairly interfere with asylum seekers' efforts to establish their claims. Immigration law, and asylum law in particular, is already highly complex, and the process of seeking asylum is in many instances re-traumatizing, particularly for applicants who do not have counsel to represent them and who lacked effective counsel in their underlying criminal proceedings. The Proposed Rules as applied to asylum applicants who seek post-conviction relief transform an already difficult process into an adversarial inquiry, contrary to the intent of Congress.

## VII.     The Proposed Rules will disparately impact vulnerable populations already routinely criminalized, including LGBTQ immigrants, survivors of trafficking and domestic violence, and immigrant youth of color

The expanded criminal bars exclude from safety and a pathway to citizenship those convicted of offenses that are coincident to their flight from persecution, and do not accomplish the stated goal of making communities safer. They will disparately impact vulnerable populations, who comprise asylum seekers hailing primarily from Central America and the Global South, and those routinely criminalized because of their identities, racially disparate policing practices, or in connection with experiences of trafficking and domestic violence.[102] For these populations especially, the discretion currently delegated to asylum adjudicators is crucial for them to become fully integrated in the larger community. The imposition of additional categorical bars to asylum will only further marginalize asylum seekers already struggling with trauma and discrimination.

The Proposed Rules turn asylum into a blunt instrument that would prevent the use of discretion where it is most needed and most effective. The existing framework for determining if an offense falls within the particularly serious crime bar already provides the latitude for asylum adjudicators to deny relief to anyone found to pose a danger to the community.[103] Furthermore, asylees with convictions that render them inadmissible must apply for a waiver at the time of their applications for permanent residence.[104] These measures ensure that asylum applicants in vulnerable populations have access to supportive resources and have the opportunity to demonstrate their ongoing commitment to social and personal health. Moreover, the existence of provisions allowing the revocation of asylum status ensures that adjudicators may continue to enforce concerns related to the safety of the community even after asylum is granted.[105]

330 Second Avenue South  •  Suite 800  •  Minneapolis, MN  55401  •  USA
Tel: 612.341.3302  •  Fax: 612.341.2971  •  Email: hrights@advrights.org  •  www.theadvocatesforhumanrights.org

*Barring asylum for immigrants convicted of migration-related offenses punishes them for fleeing persecution and/or seeking safety for their children, and does not make communities safer.*

The expansion of the criminal bars to asylum to include offenses related to harboring, smuggling of noncitizens by parents and family members and those previously removed further criminalizes vulnerable populations fleeing persecution.[106] The vast expansion of migrant prosecutions at the border during the current administration has created administrative chaos and separated families that do not pose a threat to the safety of communities in the United States.[107] The Proposed Rules threaten to magnify the harm caused by these reckless policies by further compromising the ability of those seeking safety on the southern border to access the asylum system.

The Proposed Rules expand the asylum bar to parents or other caregivers who are convicted of smuggling or harboring offenses after taking steps to help minor children enter the United States in order to flee persecution. This proposed bar is particularly insidious in light of now-public documents revealing this administration's explicit efforts to utilize smuggling prosecutions against parents and caregivers as part of its strategy of deterring families from seeking asylum in the United States.[108] The Proposed Rules seek to take this widely condemned strategy one step further, by additionally barring those parents *already prosecuted* from obtaining asylum protections for themselves and their children. The Proposed Rules multiply the harms parents and caregivers have experienced in their treacherous journeys to safety and callously penalize parents for doing what is only human—taking all necessary steps to protect their children.

The Advocates has had several clients who are victims of a severe form of trafficking, but who smuggled others into the U.S. In one case, the smuggling was at the direction of the trafficker and the victim was an unaccompanied minor. However, since the victim could be barred from a T visa if he had been removed after the trafficking incident, asylum may be the only way to get protection from the trafficker. Yet, with the new proposal, this victim would not be protected because he would be barred due to smuggling.

In another case, the trafficking victim had escaped the trafficking situation and was subsequently removed. However, due to threats in his home country to his daughter, he returned to the U.S. with his daughter. If this new regulation is adopted, this man would be barred for protections because of his attempts to bring his daughter to safety in the United States.

The Proposed Rules also expand the asylum bar to those who have fled persecution multiple times and therefore been convicted of illegal reentry. Their inclusion is premised on conclusory statements regarding the dangerousness of recidivist offenders, without consideration of the seriousness of prior convictions.[109] Rather, the Proposed Rules treat all immigration violations as similar in seriousness to those previously warranting inclusion in the particularly serious crime bar, without any independent evidence to justify the expansion. Such an approach renders meaningless the limiting language of "particularly serious" in the statute.

The Proposed Rules also conflate multiple entries by noncitizens having prior removal orders with those who have entered multiple times without ever having their asylum claims

330 Second Avenue South  •  Suite 800  •  Minneapolis, MN  55401  •  USA
Tel:  612.341.3302  •  Fax:  612.341.2971  •  Email:  hrights@advrights.org  •  www.theadvocatesforhumanrights.org

heard. Many immigrants who have previously attempted entry to the United States to flee
persecution could not have been aware of the complex statutory regime that governs asylum
claims and would not have knowingly abandoned their right to apply for asylum. Some asylum
seekers have also been wrongly assessed in prior credible fear interviews. And others yet may
have previously entered or attempted to enter the United States before the onset of circumstances
giving rise to their fear. Preserving discretion to grant asylum in these circumstances allows
meritorious asylum seekers to be heard and corrects errors that might have previously
occurred.

> *Extending the criminal bars to immigrants convicted of misdemeanor document fraud
> unfairly punishes low-wage immigrant workers and does not make communities safer.*

The Proposed Rules expand the asylum bar to include any asylum seeker who has been
convicted of a misdemeanor offense for use of a fraudulent document. In so doing, the Rule
entirely ignores the migration-related circumstances that often give rise to convictions involving
document fraud. Migrants fleeing persecution often leave their home countries with nothing but
the clothes on their backs and must rely on informal networks to navigate their new
circumstances.[110] Extension of a blanket bar to asylum seekers who are compelled to resort to
fraudulent means to enter the United States, or to remain safely during their applications for
asylum, upends decades of settled law directing that violations of law arising from an asylum
applicant's manner of flight should constitute only one of many factors to be consulted in the
exercise of discretion.[111]

Moreover, migrants in vulnerable communities who are struggling to survive during the
pendency of their asylum proceedings are often exploited by unscrupulous intermediaries who
offer assurances and documentation that turn out to be fraudulent.[112] Many noncitizens working
in the low-wage economy face egregious workplace dangers and discrimination and suffer
retaliation for asserting their rights.[113] The continued availability of asylum to low-wage
immigrant workers can encourage them to step out of the shadows. The expansion of criminal
asylum bars to sweep in all document fraud offenses, on the other hand, would unfairly prejudice
immigrants with meritorious asylum claims and force them deeper into the dangerous informal
economy.

> *The Proposed Rules will harm communities with overlapping vulnerabilities, including
> LGBTQ asylum seekers, survivors of trafficking, and survivors of domestic violence.*

The Proposed Rules exclude from asylum protections countless members of vulnerable
communities who have experienced trauma, abuse, coercion, and trafficking. Many of these
individuals may only become aware of their ability to apply for asylum after law enforcement
encounters that lead them to service providers who can educate them about their immigration
options. Despite the unique difficulties they face, the Proposed Rules would compound their
harm and prevent them from achieving family unification and a pathway to citizenship.

The Proposed Rules pose a unique threat to LGBTQ immigrant community members.
LGBTQ immigrants in particular may have already experienced a high degree of violence and
disenfranchisement from economic and political life in their home countries.[114] Hate violence
towards undocumented LGBTQ immigrants in the United States is already disproportionately

330 Second Avenue South  •  Suite 800  •  Minneapolis, MN  55401  •  USA
Tel:  612.341.3302  •  Fax:  612.341.2971  •  Email:  hrights@advrights.org  •  www.theadvocatesforhumanrights.org

higher than for other members of the LGBTQ population.[115] Members of these communities also experience isolation from their kinship and national networks following their migration. This isolation, compounded by the continuing discrimination towards the LGBTQ population at large, leave many in the LGBTQ immigrant community vulnerable to trafficking, domestic violence, and substance abuse, in addition to discriminatory policing practices. The expansion of criminal enforcement and prosecution of undocumented people also harms the LGBTQ immigrant community.[116] The Proposed Rules will therefore have a disparate impact on LGBTQ individuals whose involvement in the criminal legal system is often connected to past trauma and/or the result of biased policing.

The expansion of asylum bars to include various misdemeanor offenses that were not previously considered particularly serious also unfairly sweeps trafficking survivors into its dragnet. It is becoming more widely recognized across state court systems that trafficking survivors frequently come into contact with intervention resources and service providers only after contact with law enforcement occurs. Innovative criminal justice reform efforts currently being adopted across the country include special trafficking courts that recognize the need for discretion in the determination of criminal culpability.[117] The same approach should be employed in the determination of asylum eligibility, where the applicant's life and safety are on the line.

The Proposed Rules instead preclude asylum adjudicators from conducting a trauma-informed approach, categorically barring countless trafficking survivors convicted of misdemeanor and felony offenses without any opportunity to present the specific circumstances of their claim.

## VIII.  The Proposed Rules are ultra vires to the federal immigration statute to the extent they purport to bar eligibility through a categorical exercise of discretion

When Congress speaks clearly through a statute, the plain meaning of that statute governs.[118] Congress by statute permits the Attorney General to designate certain categories of offenses as "particularly serious crimes."[119] As such, Congress *explicitly* permitted the Attorney General to designate a non-aggravated felony to be a particularly serious crime and thus to disqualify a person from asylum. In the context of asylum, all aggravated felonies are *per se* particularly serious crimes and the Attorney General "may designate by regulation [other] offenses that will be considered to be" a particularly serious crime for purposes of asylum.[120]

Here, however—seemingly in an attempt to insulate the Proposed Rules from review, the agencies attempt to designate new bars to asylum both by designating them as "particularly serious crimes" pursuant to 8 U.S.C. § 1158(b)(2)(B)(ii) and rendering them categorically exempt from a positive discretionary adjudication of asylum pursuant to 8 U.S.C. § 1158(b)(2)(C). This effort is unlawful. Section 1158(b)(2)(B)(ii) does permit the Attorney General to, if he wishes, attempt to designate some classes of offenses as particularly serious crimes; such designations are reviewable for legal error (and as explained above, the commenters believe these expansions are unlawful).[121] However, if the offense is not a particularly serious crime, then a discretionary decision must be rendered on the application. It is true that the Attorney General may also provide for "additional limitations and conditions" on

330 Second Avenue South  •  Suite 800  •  Minneapolis, MN  55401  •  USA
Tel: 612.341.3302  •  Fax: 612.341.2971  •  Email: hrights@advrights.org  •  www.theadvocatesforhumanrights.org

asylum applications so long as they are "consistent" with the with the asylum statute.[122] In this case, however, the Proposed Rules add sweeping categories of offenses that automatically remove an applicant from the consideration of discretion—a regulatory proposal that is ultra vires to the plain text of the statute.

To the extent that the proposed rules would adopt a bar to asylum based on a categorical discretionary bar, rather than a particularly serious crime designation, they are similar to the rules struck down by numerous Circuit Courts of Appeal in the context of adjustment of status for those considered by law to be "arriving aliens." Purporting to exercise discretion categorically, then-Attorney General Reno putatively rendered that class of noncitizens ineligible for adjustment of status, a determination that is ordinarily discretionary, even though the statute seemed to allow eligibility. Multiple Circuit Courts of Appeal struck down the proposed regulations, finding them to reflect an impermissible reading of the statute in light of the fact that Congress carefully defined in the statute the categories of people eligible to apply for adjustment of status.[123]

The same logic applies here. In the asylum statute, Congress explicitly made the commission of a particularly serious crime a bar to asylum. The canon of interpretation known as *expressio unius est exclusio alterius* instructs that,"expressing one item of [an] associated group or series excludes another left unmentioned."[124] The Proposed Rules attempt to create numerous categories of discretionary "pseudo-particularly serious crimes," barring asylum through a categorical exercise of discretion even if those offenses are ultimately found not to be particularly serious crimes. Such an effort violates this canon of interpretation, and places the Proposes Rules ultra vires to the statute.

IX.    **Conclusion**

The Proposed Rules are unnecessary and illegal. The Proposed Rules further draw the United States out of compliance with international human rights law obligations that protect people from *refoulement* to countries where they face irreparable harm and to ensure that the best interest of the child is taken into account during protection determinations. The Agencies seek to effectively eviscerate the asylum laws clearly adopted by Congress in the 1980 Refugee Act. While some people may view U.S. asylum law as an "end run" around other immigration laws, the fact remains that Congress specifically enacted the Refugee Act to bring U.S. law into compliance with international refugee law. Because the Proposed Rules leave most vulnerable to due process violations those fleeing domestic violence or gang violence without any plausible justification or evidence supporting the proposed changes, the conclusion can clearly be drawn that the Proposed Rules are yet another attempt to limit Central American asylum claims. In so doing, the Proposed Rules pose serious risk to the life and safety of domestic violence victims. Similarly, the creation of a minitrial process without an infusion of adjudication resources leads to the conclusion that the Agencies are using the Proposed Rule to further clog the Asylum Office and Immigration Court systems.

Sincerely,

Amy Bergquist
International Justice Senior Staff Attorney

330 Second Avenue South  •  Suite 800  •  Minneapolis, MN  55401  •  USA
Tel:  612.341.3302  •  Fax:  612.341.2971  •  Email:  hrights@advrights.org  •  www.theadvocatesforhumanrights.org

Sarah Brenes
Refugee and Immigrant Program Director

Lindsey Greising
Human Trafficking Staff Attorney

Alison Griffith
Refugee and Immigrant Program Staff Attorney

Kaarin Long
Women's Human Rights Staff Attorney

Michele Garnett McKenzie
Deputy Director

Rosalyn Park
Women's Human Rights Director

Jennifer Prestholdt
Deputy Director

## Contributor Biographies

**Amy Bergquist** coordinates The Advocates for Human Rights' advocacy at the United Nations and regional human rights bodies. Her substantive areas of focus include LGBTI rights and discrimination based on sexual orientation or gender identity, rights of minorities and non-citizens, and the death penalty. In addition, she collaborates with diaspora communities seeking to be more effective advocates for human rights in their country of origin or ancestry. She also coordinates *pro bono* legal assistance to support non-governmental organizations based in Africa that work on human rights and rule of law issues. She represents The Advocates on the Steering Committee of the World Coalition Against the Death Penalty. Bergquist is a commissioner on the Minneapolis Commission on Civil Rights. She is also member of the Minnesota Judicial Branch's Committee for Equality and Justice. She serves on of the University of Minnesota Law School's board of advisors. Bergquist clerked for the Honorable Ruth Bader Ginsburg, Associate Justice of the U.S. Supreme Court, the Honorable William A. Fletcher of the U.S. Court of Appeals for the Ninth Circuit, and the Honorable John R. Tunheim, District Judge of the District of Minnesota. She was an associate at Faegre & Benson, LLP. Before attending law school, Amy worked for 11 years at Minneapolis South High School, where she taught social studies and Russian and coached debate and speech. Bergquist received her law degree *summa cum laude* from the University of Minnesota Law School in 2007. She graduated magna cum laude from Amherst College with a degree in political science. She is admitted to practice before Minnesota state and federal courts and before the U.S. Supreme Court and the Ninth Circuit Court of Appeals.

**Sarah Brenes** represents refugees seeking asylum, detainees, and people with various immigration issues. She leads efforts to recruit attorneys to volunteer for The Advocates for Human Rights' to represent refugees and immigrants. She also leads training and support for the volunteer attorneys. Prior to joining The Advocates, Brenes was a clinical law fellow at the University of St. Thomas School of Law. She taught and supervised students in the Immigration Law Practice Group, representing clients seeking asylum, family reunification benefits, and visas of victims of trafficking and violent crimes. She supervised students representing clients detained in immigration custody during their initial hearings before the immigration judge as part of the Minnesota Detention Project. Brenes has worked with non-profit organizations and private immigration firms serving immigrant clients. She worked with the Migrant Unit of Southern Minnesota Regional Legal Services in North Dakota and Minnesota and with the Immigrant Law Center of Minnesota through a clerkship sponsored by the Minnesota Justice Foundation (MJF). In addition, she clerked at Centro Legal, Inc. as an Equal Justice

AR.09762

Works Summer Corps Program Fellow. Brenes is admitted to practice before Minnesota state and federal courts and before the Eighth Circuit Court of Appeals. She has served on the Immigration Council and the Legal Assistance for the Disadvantaged Committee of the Minnesota State Bar Association. She currently co-chairs the 5th Grade Essay Contest Committee of the American Immigration Lawyers Association. Brenes received her J.D. from the University of St. Thomas School of Law where was awarded the John R. Roach Fellowship for pursuit of a career in public interest. Sarah has a master's degree in human rights and peace education from the National University in Costa Rica. She graduated with honors and earned her bachelor's degree in international affairs from the George Washington University.

Before joining The Advocates, **Lindsey Greising** practiced immigration law in private practice where she provided representation on a range of immigration cases including humanitarian, family-based, and employment-based matters as well as naturalization and citizenship. Lindsey has spent many years working internationally on human rights programs, including: work with the International Organization for Migration (IOM) on human trafficking research; the International Labour Organization (ILO) on labor rights and gender equity; and the US Department of State on conflict prevention programming and research. In addition, she worked on Internally Displaced Persons reintegration as well as access to justice projects with local NGOs in East Timor (Timor-Leste). Lindsey graduated magna cum laude from the University of Minnesota Law School with a concentration in human rights law and received her Bachelor of Arts in international studies from the University of Denver with magna cum laude honors. While in law school, Lindsey served in the Immigration & Human Rights Clinic, where she worked on asylum cases and helped to start a working group on pro bono representation for detained migrants. She also worked as a teaching assistant for an undergraduate International Human Rights Law course, interned for the judges at the International Criminal Tribunal for Rwanda (ICTR), and assisted Amnesty International USA on human rights research and advocacy. Lindsey has served as an adjunct professor of immigration law at the University of St Thomas School of Law in Minneapolis and is a member of the American Immigration Lawyers Association (AILA).

**Alison Griffith** is a Staff Attorney for The Advocates for Human Rights' Refugee & Immigrant Program. In that capacity, she mentors and supports pro bono attorneys handling asylum cases before the asylum office and the Immigration Court, as well as other humanitarian immigration matters. Alison also handles a caseload of asylum cases and other matters for The Advocates. Before joining The Advocates, she represented unaccompanied minors at Kids In Need of Defense (KIND), where she represented unaccompanied children seeking asylum, Special Immigrant Juvenile Status, U Visas, and other forms of humanitarian relief from deportation. Prior to her work with KIND, she represented asylum seekers with complex claims during law school at the University of St. Thomas Legal Clinic. Alison gained experience on humanitarian immigration cases as an intern at Catholic Charities of Washington, D.C., and during law school at several Twin Cities organizations, including the Immigrant Law Center of Minnesota and Mid Minnesota Legal Aid Society. She is a member of the American Immigration Lawyers Association and the Minnesota State Bar Association Immigration Law Section. Alison has presented on issues of immigration law at numerous CLE's, including the Upper Midwest AILA conference.

**Kaarin Long** is a staff attorney in the Women's Human Rights program.  Before joining The Advocates, Kaarin worked as a prosecutor in Minnesota for many years, focusing on cases involving violence against women. She is a former assistant Ramsey County Attorney, and former staff attorney at The Minnesota Coalition Against Sexual Assault.  She brings to The Advocates her experience investigating and prosecuting sexual-and domestic-violence cases.

**Michele Garnett McKenzie** serves on the senior leadership team at The Advocates for Human Rights and is responsible for research, education and advocacy on the organization's domestic priority issues, including migration and human trafficking. She joined the staff of The Advocates in 1999 as an attorney representing asylum seekers and detained immigrants and later managed the organization's immigration legal services program. Today McKenzie works to document and report on human rights issues and is the author of publications on human trafficking and immigrant rights. McKenzie also leads the organization's domestic policy advocacy, successfully working to create transformative policy change in the areas of trafficking and immigration. In addition, McKenzie heads The Advocates' universal representation team to ensure access to justice for detained immigrants. McKenzie serves on the national leadership team of the Immigration Advocates Network and on the Minnesota Coalition Against Sexual Assault public policy committee and previously chaired Detention Watch Network. A member of the American Immigration Lawyers Association, she is admitted to

AR.09763

practice in the State of Minnesota. She has served as an adjunct clinical faculty member of William Mitchell College of Law and the University of Minnesota Law School.

Prior to being appointed director of The Advocates' Women's Human Rights Program, **Rosalyn Park** was a staff attorney in the Women's Human Rights Program and on special projects addressing transitional justice and the death penalty. She is an internationally recognized expert on violence against women issues. Rosalyn has served as an expert for multiple NGOs, the UN, OSCE, and the Inter-Parliamentary Union on women's human rights and was selected to join the UN Special Rapporteur on Violence against Women's 2017 Expert Group Meeting on domestic violence best practice standards. She is a core member of the international UN Gender Network, a coalition established to examine gender equality policies within the UN and their impact on the UN's approach to the Sustainable Development Goals. She has led fact-finding missions in several countries, including Bosnia and Herzegovina, Bulgaria, Tajikistan, Croatia, Mongolia, Sierra Leone, Montenegro, and Serbia, as well as published reports with recommendations based on international legal standards. She frequently develops and conducts trainings for lawyers, human rights defenders, and systems actors locally and internationally. In addition, Park is an expert on the death penalty, having represented The Advocates on the World Coalition Against the Death Penalty's steering committee. She chaired the World Coalition's working group for World Day Against the Death Penalty for several years. She has co-authored several publications and is a frequent guest lecturer in the community. Rosalyn is admitted to practice in Minnesota. She received her J.D. cum laude from the University of Minnesota Law School and her B.S. from the University of Wisconsin-Madison. She is a member of the Minnesota Asian Pacific American Bar Association.

As The Advocates for Human Rights' deputy director, **Jennifer Prestholdt** assists in fundraising for and directing organizational operations. As the director of the organization's International Justice Program, she supervises the program's development and programming. Prior to becoming deputy director of The Advocates for Human Rights, Prestholdt practiced asylum law for five years as the organization's director of the Refugee and Immigrant Program. Prestholdt has also taught International Human Rights Law as an adjunct faculty member at the University of St. Thomas School of Law. She has worked on refugee and asylum issues for the United Nations High Commissioner for Refugees in Geneva, Switzerland. She has also interned for the Reebok Human Rights Program and the United Nations Sub-Commission on Prevention of Discrimination Against and Protection of Minorities. Prestholdt has a B.A. in political science from Yale and a M.A.L.D. from the Fletcher School of Law and Diplomacy, where she studied international human rights law and international refugee policy. She graduated *cum laude* from the University of Minnesota Law School in 1996.

AR.09764

330 Second Avenue South  •  Suite 800  •  Minneapolis, MN  55401  •  USA
Tel:  612.341.3302  •  Fax:  612.341.2971  •  Email:  hrights@advrights.org  •  www.theadvocatesforhumanrights.org

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekm-39m5
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0485
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Shira Levine
**Address:**
    1531 Everett Ave
    Oakland,  CA,  94602
**Email:** levine.shira@gmail.com
**Phone:** 7342621930

---

## General Comment

Asylum was created to protect individuals who face persecution in their home countries. Often, past traumas lead to substance abuse problems or other crimes. Individuals fight to recover from these past traumas and overcome their addictions. Asylum always has a discretionary aspect, but barring such individuals from seeking asylum undermines the purpose of asylum law and is contrary to the statute.

AR.09765

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekn-gs8l
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0486
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Rebecca Cassler
**Organization:** The Southern Poverty Law Center

## General Comment

Please see attached comments.

## Attachments

SPLC comment - Asylum Ban Expansion NPRM

AR.09766



Fighting Hate
Teaching Tolerance
Seeking Justice

Southern Poverty Law Center
PO Box 1287
Decatur, GA 30031-1287
404.521.6700
www.splcenter.org

January 21, 2020

Submitted via https://www.regulations.gov/document?D=EOIR-2019-0005-0001

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41;
Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility

To Whom it May Concern:

We are writing on behalf of the Southern Poverty Law Center to express our strong opposition to the above-referenced Proposed Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019.

As a civil rights organization that represents detained immigrants, including many asylum seekers, in the Southeast through the Southeast Immigrant Freedom Initiative (SIFI), litigates to promote and protect the rights of asylum seekers at our southern border, and advocates for racial and economic justice for all, the Southern Poverty Law Center opposes the Proposed Rules because they will harm our clients and the communities with whom we work.

For the reasons detailed in the comments that follow, the Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing persecution in their home countries are granted full and fair access to asylum protections in the United States.

Thank you for the opportunity to submit comments on the Proposed Rules. Please do not hesitate to contact Kelli Garcia, kelli.garcia@splcenter.org, if you need further information.

Sincerely,

Kelli Garcia                                    Melissa Crow
Federal Policy Counsel                          Senior Supervising Attorney
Immigrant Justice Project                       Immigrant Justice Project

AR.09767

**DETAILED COMMENTS in opposition to the Proposed Rules re Procedures for Asylum and Bars to Asylum Eligibility, 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41**

**TABLE OF CONTENTS [with jump-links]**

I.  Introduction
II.  The Proposed Rules unnecessarily and cruelly exclude bona fide refugees from asylum eligibility
III.  The Proposed Rules vastly expand categorial ineligibility based solely on the fact of a past conviction or a category of past alleged conduct, in violation of the letter and spirit of United States international treaty obligations and longstanding agency and federal court interpretation
IV.  Those precluded from asylum eligibility will be gravely impacted even if granted withholding of removal or protection under the Convention Against Torture
V.  The Proposed Rules will result in "mini-trials" in immigration court, further undermine judicial efficiency and result in racially biased decision-making
VI.  The Proposed Rules will disparately impact vulnerable populations already routinely criminalized
VII.  Conclusion

**I.    Introduction**

The Department of Homeland Security (DHS) and the Department of Justice (DOJ) issued a joint set of Proposed Rules on December 19, 2019, that would make three major changes to asylum adjudication rules. As a civil rights organization that represents detained immigrants in the Southeast through the Southeast Immigrant Freedom Initiative (SIFI), litigates to promote and protect the rights of asylum seekers at our southern border, and advocates for racial and economic justice for all, the Southern Poverty Law Center (SPLC) opposes the Proposed Rules because they will harm our clients and the communities with whom we work.

First, the Proposed Rules contain the following seven new *categorical* bars to asylum eligibility: (1) any conviction for a felony offense; (2) any conviction for "smuggling or harboring" (8 U.S.C. § 1324(a)), even if an asylum seeker committed this offense in order to bring his or her own spouse, child or parent to safety; (3) any conviction for illegal reentry (8 U.S.C. § 1326); (4) any conviction for an offense "involving criminal street gangs," with the adjudicator directed to examine any evidence to determine applicability; (5) any second conviction for an offense involving driving while intoxicated or impaired; (6) any conviction *or accusation of conduct* for acts of battery involving a domestic relationship; (7) and any conviction for several newly defined categories of misdemeanors, including *any* drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits.

Second, the Proposed Rules provide a multi-factor test for adjudicators to decide if a criminal conviction or sentence is valid for the purpose of determining asylum eligibility. Third, the Proposed Rules rescind a part of the current rules relating to the reconsideration of whether a favorable exercise of discretion is warranted.

AR.09768

These proposed changes amount to an unnecessary, harsh, and unlawful gutting of asylum as set out in United States and international law. The Southern Poverty Law Center submits these comments to express opposition to the Proposed Rules and serious concerns with the administration's ongoing efforts to exclude refugees from obtaining the security and stability the United States asylum system has long promised. We urge that the Proposed Rules be rescinded in their entirety.

## II.  The Proposed Rules unnecessarily and cruelly exclude bona fide refugees from asylum eligibility

*The barriers to asylum for those who have had previous encounters with the criminal justice system are already sweeping in scope; adding more barriers is cruel and unnecessary.*

Congress codified the U.S. asylum system through the Refugee Act of 1980, which one prominent scholar has described as a bipartisan attempt to "reconcile our rhetoric with our law, our national immigration policy and our international treaty obligations so that we could maintain a consistent posture towards the world as a nation with a strong humanitarian tradition and a unique historic role as a haven for persons fleeing oppression."[1] Among other measures meant to bring our country's domestic laws into compliance with the provisions of the United Nations Protocol Relating to the Status of Refugees, the Refugee Act created a "broad class" of refugees eligible for a discretionary grant of asylum.[2]

The asylum protections available under U.S. law are at the core of our country's commitment to human rights. Asylum provides those fleeing horrors with physical safety, a path to citizenship and security, and the opportunity to reunite with immediate family members who may still remain abroad in danger.[3] Many see the domestic asylum system as a manifestation of the United States' promise never to repeat its failure to save thousands of Jewish refugees refused entry to the United States on the *St. Louis* and others fleeing the Holocaust.[4] Others point to the critical role that domestic asylum policy plays in serving the United States' foreign policy interests abroad.[5] For those individuals seeking asylum in the United States, the stakes could not be higher—a claim denied often means return to death or brutal persecution.[6]

---

[1] Deborah Anker, "The Refugee Act of 1980: An Historical Perspective," *In Defense of the Alien* 5 (1982): 89-94, https://www.jstor.org/stable/23141008?read-now=1&refreqid=excelsior%3A1060953608aa0bdd30d5d506e1ff6318&seq=1#page_scan_tab_contents.

[2] *See I.N.S. v. Cardoza-Fonseca*, 40 U.S. 421, 423 (1987).

[3] The permanency and family reunification benefits that accompany asylum are not provided to those granted withholding of removal or protection under the Convention Against Torture, the alternative forms of relief described throughout the Proposed Rules as a justification for the breadth of the new proposed bars. For more details on the differences between these forms of protection, *see* section IV *infra*.

[4] Dara Lind, "How America's rejections of Jews fleeing Nazi Germany haunts our refugee policy today," *Vox*, January 27, 2017, https://www.vox.com/policy-and-politics/2017/1/27/14412082/refugees-history-holocaust.

[5] Council on Foreign Relations, *Independent Task Force Report No. 63: U.S. Immigration Policy* (2009), 117 (additional or dissenting view by Elisa Massimino) ("For better or worse, the United States sets the standard for reasonable and humane treatment of migrants around the world. If the United States endorses harsh treatment of immigrants, it erodes the norms designed to protect them, and other countries will have license to do the same.").

[6] *See, e.g.*, Sarah Stillman, "When deportation is a death sentence," *The New Yorker*, January 8, 2018, https://www.newyorker.com/magazine/2018/01/15/when-deportation-is-a-death-sentence.

AR.09769

The existing laws, regulations, and process governing asylum adjudications are exceedingly harsh. Asylum seekers bear the evidentiary burden of establishing their eligibility for asylum[7] in the face of a complex web of laws and regulations, without the benefit of appointed counsel and often from remote immigration jails.[8] The obstacles to winning asylum are very high; in some parts of the country ("asylum-free zones") and before certain immigration judges, almost no one succeeds.[9] Today, newly imposed barriers to accessing asylum in the United States are breathtaking in scope, with those seeking safety at the southern border rejected at ports of entry and, after finally being permitted to cross the border, returned to dangerous conditions in Mexico to await their hearings. An overlapping web of policies preclude asylum eligibility for countless migrants simply because of their national origin, manner of entry, or their flight path.[10] There are consistent reports of the documented deaths and brutalities endured by those who sought but were denied asylum protections in the United States.[11]

The bars to asylum based on allegations of criminal conduct are *already* over-broad in nature and scope.[12] A conviction for an offense determined to be an "aggravated felony" is considered a *per se* "particularly serious crime"—a mandatory bar to asylum.[13] "Aggravated felony" is a notoriously vague term, which exists only in immigration law. Originally limited to murder, weapons trafficking and drug trafficking,[14] it has ballooned to encompass hundreds of truly minor offenses such as misdemeanor shoplifting, simple misdemeanor battery, and sale of counterfeit DVDs.[15] The existing crime bars should be narrowed, not expanded, particularly given that the immigration adjudicator maintains full discretion to deny asylum even if

---

[7] 8 USC § 1158(b)(1)(B); 8 CFR § 1240.8(d).

[8] *See* Daniel Connolly, Aaron Montes, and Lauren Villagran, "Asylum seekers in U.S. face years of waiting, little chance of winning their cases," *USA Today,* September 25, 2019, https://www.usatoday.com/in-depth/news/nation/2019/09/23/immigration-court-asylum-seekers-what-to-expect/2026541001/; *see also* Innovation Law Lab & The Southern Poverty Law Center, *The Attorney General's Judges: How the U.S. Immigration Courts Became a Deportation Tool* at 10 (2019), https://www.splcenter.org/sites/default/files/com_policyreport_the_attorney_generals_judges_final.pdf.

[9] Manuel Roig-Franzia, "Immigrants risk it all seeking asylum. The answer is almost always 'no,'" *Washington Post,* July 24, 2019, https://www.washingtonpost.com/lifestyle/style/migrants-risk-it-all-seeking-asylum-the-answer-in-court-is-almost-always-no/2019/07/23/9c161b2e-a3f7-11e9-b732-41a79c2551bf_story.html; TRAC Immigration, "Asylum Decisions Vary Widely Across Judges and Courts – Latest Results," https://trac.syr.edu/immigration/reports/590/ (Jan. 13, 2020).

[10] The National Immigrant Justice Center maintains a frequently updated timeline providing details of each of the asylum bans and other policies issued and implemented by the administration undermining asylum access at https://www.immigrantjustice.org/issues/asylum-seekers-refugees. For more information on the harms and rights abuses inherent in the Migrant Protection Protocols, or "Remain in Mexico" program, *see* Human Rights First, *Delivered to Danger* (December 2019), https://www.humanrightsfirst.org/campaign/remain-mexico.

[11] *See, e.g.,* Stillman, "Death Sentence," *supra* (reporting on a database of more than sixty cases of individuals killed after deportation); *see also* Maria Sachetti, "Death is waiting for him,'" *The Washington Post,* December 6, 2018, https://www.washingtonpost.com/graphics/2018/local/asylum-deported-ms-13-honduras/ (telling the story of Santos Chirino, denied asylum by a Virginia immigration judge, deported, and then murdered by those he told the immigration judge he feared); and Kevin Sieff, "When death awaits deported asylum seekers," *Washington Post,* December 26, 2018, https://www.washingtonpost.com/graphics/2018/world/when-death-awaits-deported-asylum-seekers/.

[12] The existing categorical bars to asylum eligibility are discussed in detail on p. 69641 of the Proposed Rules.

[13] 8 U.S.C. §§ 1158(b)(2)(A)(ii) and (B)(i).

[14] Pub. L. No. 100-690, § 7342, 102 Stat. 4181, 4469-70.

[15] 8 U.S.C. § 1101(a)(43). *See also* Nancy Morawetz, "Understanding the Impact of the 1996 Deportation Laws and the Limited Scope of Proposed Reforms," *Harvard Law Review* 113 (2000): 1939-40 (criticizing the "'Alice-in-Wonderland-like definition of the term 'aggravated felony'"); Melissa Cook, "Banished for Minor Crimes: The Aggravated Felony Provisions of the Immigration and Nationality Act as a Human Rights Violation," *Boston College Third World Law Journal* (2003): 293.

AR.09770

a person is not categorically barred, which allows for consideration of the individualized circumstances of an applicant's past and whether he or she presents a danger to the community.[16]

The existing bars to asylum already give adjudicators alarming latitude to deny life-saving relief to people in desperate situations. These categorical bars compound the punishment meted out by a criminal justice system riddled with bias. Consider the irony of the United States visiting this double punishment of criminalization upon people who have already endured persecution in their home countries. They are people like S-T-, a SIFI client who survived rape as a child in the Democratic Republic of Congo (DRC). She came to the United States as a refugee through overseas processing and became a permanent resident. As a young Black woman in the United States, she experienced domestic violence and was trafficked into sex work. Instead of offering her protection as a victim of trafficking, federal prosecutors criminalized her, a decision the immigration judge later seized upon to justify revoking her status as a lawful permanent resident. The reason was that her victimization was an aggravated felony. S.T. now seeks protection through asylum and withholding of removal because she fears returning to the DRC as a lesbian deportee with diminished mental capacity. Further compounding the injustices to which S-T- has been subjected, her eligibility for such protection is at grave risk based on the existing categorical criminal bar to asylum for people with a "particularly serious crime" conviction. S-T-'s case is not the exception; it is the rule. The Proposed Rule at issue would only further entrench the injustices against asylum seekers like S-T.

The agencies' efforts to add *seven* new sweeping categories of barred conduct to the asylum eligibility criteria is unnecessary and cruel. The Proposed Rules drain the phrase "*particularly serious* crime," 8 U.S.C. § 1158, of any sensible meaning.

The Proposed Rules are also arbitrary and capricious. They would constitute a marked departure from past practice, and the agencies have proffered no evidence or data to support these changes.

For example, one fundamental assumption underlying the Proposed Rules is that every noncitizen convicted of any offense punishable by more than a year in prison necessarily poses a danger to the community. But no evidence is provided to support that assumption, and a criminal record does not, in fact, reliably predict future dangerousness.[17] The Proposed Rules are so capricious as to peremptorily postulate a noncitizen's supposed danger to the community even in circumstances when a federal, state, or local judge has concluded that no danger exists by, for example, imposing a noncustodial sentence. Conviction for a crime does not, without more, make one a present or future danger—which is why the Refugee Convention's particularly serious crime bar, made part of United States law through 8 U.S.C. § 1158, should only properly apply if both (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows that she is a present or future danger.[18]

---

[16] *See Matter of Pula*, 19 I.&N. Dec. 467 (BIA 1987).

[17] See U.S. Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders* (2017) (noting that recidivism rates fall substantially with age); U.S. Sentencing Commission, *Recidivism Among Federal Violent Offenders* (2019) (noting that non-violent offenders recidivate at significantly lower rates); J. Ramos and M. Wenger, "Immigration and recidivism: What is the Link?" *Justice Quarterly* (2019) (finding no correlation between recidivism rates and citizenship status among those formerly incarcerated for felonies in Florida prisons).

[18] See U.N. High Commissioner for Refugees, *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 11 (July 2007), http://www.unhcr.org/en-us/576d237f7.pdf (the Refugee Convention's particularly serious

AR.09771

Similarly, the Proposed Rules fail to address or account for the fact that a significant number of people may agree to plead to a crime to avoid the threat of a severe sentence or to put an end to their time in pre-trial detention if they cannot afford bail; not only is a conviction an unreliable predictor of future danger, it can also be an unreliable indicator of past criminal conduct.[19] In addition, the Proposed Rules do not address and make no exception for convictions for conduct influenced by mental illness or duress.

The BIA has cautioned that "the discretionary factors should be carefully evaluated in light of the unusually harsh consequences which may befall a [noncitizen] who has established a well-founded fear of persecution; the danger of persecution should generally outweigh all but the most egregious of adverse factors."[20] But under the seven new categorical bars proposed here, asylum seekers will be precluded from obtaining protection on the basis of a vast array of conduct, without any discretion left to the immigration adjudicator to determine whether the circumstances merit this harsh penalty.

*The Proposed Rules cruelly disregard the connections between trauma and prior encounters with the criminal justice system.*

The senselessness of the Proposed Rules is evident when viewed through a trauma-informed lens. Like most other asylum seekers, the vast majority of SPLC's asylum-seeking clients have experienced past trauma, which makes them an inherently vulnerable population. At least one out of every three asylum seekers struggles with depression, anxiety, and/or post-traumatic stress disorder (PTSD).[21] One recent study found the mental health problems refugees and asylum seekers face are so acute that more than a third of the study's sample admitted having suicidal thoughts in the preceding two weeks.[22]

Studies also consistently reveal a high prevalence of comorbidity of PTSD and substance use disorders, with individuals with PTSD *up to 14 times more likely* to struggle with a substance use disorder.[23] Asylum seekers in the U.S. are regularly unable to access affordable medical care and treatments for complex trauma;[24] some self-medicate with drugs and alcohol.[25] The Proposed Rules would bar from asylum a person

---

crime bar only applies if (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows she is a "present or future danger.").

[19] John H. Blume and Rebecca K. Helm, "The Unexonerated: Factually Innocent Defendants Who Plead Guilty," *Cornell Law Review* 100 (2014): 157, https://pdfs.semanticscholar.org/c00f/96d421adf1846d120bf802a8854b5e2c0ff2.pdf; Megan Stevenson, "Distortion of Justice: How the Inability to Pay Bail Affects Case Outcomes" (2016), https://www.econ.pitt.edu/sites/default/files/Stevenson.jmp2016.pdf.

[20] *Pula*, 19 I.&N. Dec. at 474.

[21] Giulia Turrini et al., "Common mental disorders in asylum seekers and refugees: umbrella review of prevalence and intervention studies," *International Journal of Mental Health Systems* 11 (August 2017): 51, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5571637/.

[22] Megan Brooks, "Refugees have high burden of mental health problems," *Psychiatry and Behavioral Health Learning Network*, June 2019, https://www.psychcongress.com/article/refugees-have-high-burden-mental-health-problems.

[23] Jenna L McCauley et al., "Posttraumatic Stress Disorder and Co-Occurring Substance Use Disorders: Advances in Assessment and Treatment," *Clinical Psychology Science and Practice* 19, 3 (October 2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3811127/.

[24] For more information on immigrant eligibility for federal benefits, *see* https://www.nilc.org/issues/health-care/.

[25] Carrier Clinic, *Trauma and Addiction* (2019), https://carrierclinic.org/2019/08/06/trauma-and-addiction/ ("...some people struggling to manage the effects of trauma in their lives may turn to drugs and alcohol to self-medicate. PTSD symptoms like agitation, hypersensitivity to loud noises or sudden movements, depression, social withdrawal and

AR.09772

with *any* drug-related conviction (except a first minor marijuana possessory offense) and any second DUI conviction. This approach ignores the evidence. Given the vulnerabilities of asylum-seeking populations, prior struggles with addiction should be addressed with treatment and compassion, not a closed door and a deportation order.

Immigration adjudicators already maintain the authority to deny asylum to individuals with drug-related criminal histories based on discretion. Denying asylum seekers even the opportunity to present the countervailing factors of their past trauma and potential recovery will exclude from asylum scores of bona fide asylum seekers who present no danger to the community and fall squarely within the group of individuals intended to be eligible for asylum under U.S. and binding international law.

### III.    The Proposed Rules vastly expand categorial ineligibility based solely on the fact of a past conviction or a category of past alleged conduct, in violation of the letter and spirit of United States international treaty obligations and longstanding agency and federal court interpretation

By acceding to the 1967 Protocol Relating to the Status of Refugees,[26] which binds parties to the United Nations Convention Relating to the Status of Refugees,[27] the United States obligated itself to develop and interpret United States refugee law in a manner that complies with the Protocol's and the Convention's principle of non-refoulement, even where potential refugees have allegedly committed criminal offenses, as well as Article 34 of the Convention which states that "Contracting States shall as far as possible facilitate the assimilation and naturalization of refugees." The asylum statute, 8 U.S.C. § 1158, is Congress's implementation of Article 34, which is binding on the United States. *See INS v. Cardoza-Fonseca.*[28] As noted above, U.S. adjudicators already have over-broad authority to deny asylum based on allegations of criminal activity, which vastly exceeds the categories for exclusion and expulsion set out in the Convention. Instead of working towards greater congruence with the terms of the Convention, the Proposed Rules carve out categorial bars from protection in violation of both the language and spirit of the treaty.

The Convention does allow states to exclude and/or expel potential refugees from protection, but this can only occur in limited circumstances. In particular, the Convention allows states to exclude and/or expel individuals from refugee protection if the individual "having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of that country."[29] This clause is only intended for "extreme cases," in which the particularly serious crime at issue is a "capital crime or a very

---

insomnia may seem more manageable through the use of sedating or stimulating drugs depending on the symptom. However, addiction soon becomes yet another problem in the trauma survivor's life. Before long, the 'cure' no longer works and causes far more pain to an already suffering person.").

[26] United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268 (hereinafter "Refugee Protocol").

[27] Convention Relating to the Statute of Refugees, July 28, 1951, 140 U.N.T.S. 1954 (hereinafter "Refugee Convention"). The Protocol incorporates the substantive protections found in the Convention, but without the temporal or geographic limitations found in the Article 1 of the Convention. Refugee Protocol, art. 1.

[28] 480 U.S. 421, 441 (1987) (explaining that Article 34 is binding on the United States, "provides for a precatory, or discretionary, benefit for the *entire class* of persons who qualify as "refugees," and was implemented by Congress in 8 U.S.C. § 1158(a), INA § 208(a)).

[29] *Id.* at art. 33(2).

AR.09773

grave punishable act."[30] To constitute a "particularly serious crime," the crime "must belong to the gravest category" and be limited "to refugees who become an extremely serious threat to the country of asylum due to the severity of crimes perpetrated by them in the country of asylum."[31] The particularly serious crime bar does not encompass less extreme crimes; "[c]rimes such as petty theft or the possession for personal use of illicit narcotic substances would not meet the threshold of seriousness."[32] When determining whether an individual should be barred from protection for having been convicted of a particularly serious crime, the adjudicator must conduct an individualized analysis and consider any mitigating factors.[33]

As explained above, legislation and agency interpretation of the Immigration and Nationality Act (INA) already contain an expanded particularly serious crime bar that goes far beyond what was contemplated in the Convention because they have created *categorical* particularly serious crimes through the aggravated felony definition. The Proposed Rules would amplify the dissonance between U.S. refugee law and the Convention and would exacerbate the existing violations of U.S. obligations under the Convention, by creating categorical bars within categorical bars. For example, at pp. 69659-60, the Proposed Rules exclude from protection anyone who was convicted of a felony, defined as "any crime punishable by more than one year of imprisonment," without any reference to other factors, including dangerousness. The Proposed Rules described this change as necessary because the individualized, case-by-case adjudication previously used for non-aggravated felony offenses was "inefficient,"[34] but individualized analysis is exactly what the Convention requires to ensure that only those people who have been convicted of crimes that are truly serious and therefore present a future danger are placed at risk of refoulement.

Furthermore, Board of Immigration Appeals (BIA) and Courts of Appeals decisions demonstrate the longstanding view that outside of the aggravated felony context, low-level, "run-of-the-mill" offenses are not particularly serious crimes.[35] Under this interpretation of the particularly serious crime bar in the INA, which has been consistent over time, there is simply no scenario in which low-level offenses like misdemeanor driving under the influence where no injury is caused to another, or simple possession of a controlled substance or paraphernalia would constitute a particularly serious crime.

This understanding is based on common sense. As Judge Reinhardt explained in a concurring opinion in *Delgado v. Holder*[36] (a decision the Proposed Rules cite in support of the expanded bars), run-of-the-mill crimes like DUI have "little in common" with other crimes the BIA has deemed particularly serious—e.g., felony menacing with a deadly weapon, armed robbery, and burglary of a dwelling in which the offender is armed or causes injury.[37] Judge Reinhardt noted that public opinion also does not view them as similar: "American voters would be unlikely to elect a president or vice president who had committed a particularly

---

[30] U.N. High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees* 2, U.N. Doc. HCR/IP/Eng/REV. ¶ 154-55, (1979, reissued 2019).

[31] U.N. High Comm'r for Refugees (UNHCR), *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 7 (July 2007), http://www.unhcr.org/enus/576d237f7.pdf.

[32] *Id.* at ¶ 10.

[33] *Id.* at ¶ 10-11; U.N. High Commissioner for Refugees, *The Nationality, Immigration and Asylum Act 2002: UNHCR Comments on the Nationality, Immigration and Asylum Act 2002 (Specification of Particularly Serious Crimes) Order 2004*, 4 (2004).

[34] Proposed Rules at 69646.

[35] *See, e.g., Delgado v. Holder*, 648 F.3d 1095, 1110 (9th Cir. 2011) (en banc) (J. Reinhardt, concurring).

[36] *Id.* at 1110.

[37] *Id.* at 1110.

AR.09774

serious crime, yet they had no difficulty in recently electing to each office a candidate with a DUI record."[38] Barring individuals from asylum based on these relatively minor offenses, as the Proposed Rule seeks to do, renders the "particularly serious" part of the "particularly serious crime" bar meaningless.

The expansion of the asylum bar to include individuals who have been convicted of reentering the United States without inspection pursuant to INA § 276[39] is also unlike any of the other bars previously established or as interpreted by the BIA or Courts of Appeals. This offense includes no element of danger or violence to others and has no victim. Most significantly, barring asylum based on the manner of entry directly violates the Convention's prohibition on imposing penalties based on a refugee's manner of entry or presence.[40] This is a critical part of the Convention because it recognizes that refugees—fleeing danger and in a vulnerable and precarious position as a result—often have little control over how and where they enter the country where they are seeking refuge.

This is particularly true under the current Administration, which has been engaged in a long-term and systematic assault against asylum seekers seeking to enter the United States through a port of entry on the southern border. The Proposed Rules casually assert that "[a]n alien seeking protection, even one who has previously been removed from the United States, may present himself or herself at a port of entry, without illegally reentering the United States."[41] This is absolutely incorrect. In fact, for nearly two years the Administration has been "metering," or artificially capping, the number of asylum seekers who may present themselves at ports of entry, despite the fact that the INA gives them no discretion to do so and there are no caps on the number of people who can seek asylum in a given year.[42] Faced with a months-long wait in a dangerous Mexican border town, some asylum seekers decide that the safest option is to cross the border without authorization, between ports of entry, and request asylum when they encounter CBP agents, whom they often seek out for this express purpose.[43]

If these Proposed Rules go into effect, they will bar from asylum the many migrants who, too poor to arrange travel through safer routes, take dangerous paths on foot across remote regions along the U.S.-Mexico border. Consider SPLC client A-P-F-, an asylum seeker with a prior removal order. He and his son were apprehended after losing their way in the darkness of the Sonoran Desert, a place that has claimed the lives of hundreds of migrants. That they were willing to brave such an odyssey should be a testament to their fear of persecution in Guatemala, not a ground to deny them the opportunity to seek asylum in the United States.

## IV.    Those precluded from asylum eligibility will be gravely impacted even if granted withholding of removal or protection under the Convention Against Torture

---

[38] *Id.* at 1110.
[39] Proposed Rules at 69659, 69660.
[40] Refugee Convention, *supra*, at art 31.
[41] Proposed Rules at 69648.
[42] *See Al Otro Lado v. Wolf*, Case No. 3:17-cv-02366-BAS-KSC (S.D. Cal.); *see also Al Otro Lado v. McAleenan*, 394 F. Supp. 3d 1168, 1194-96, 1209-11, 1214 (S.D. Cal. 2019); James Frederick, "'Metering' At The Border," National Public Radio (June 29, 2019), https://www.npr.org/2019/06/29/737268856/metering-at-the-border.
[43] *See, e.g.*, Declaration of B.B., Dkt. 390-83, *Al Otro Lado v. Wolf*, Case No. 3:17-cv-02366-BAS-KSC (S.D. Cal.) (Jan. 14, 2020).

AR.09775

The agencies defend the Proposed Rules by pointing to the continued availability of alternative forms of relief for those who would be precluded from asylum eligibility.[44] However, the availability of these alternatives forms of relief—known as withholding of removal and protection under the Convention Against Torture (CAT)—does not nullify the harm created by the Proposed Rule's new limits on asylum. The protections afforded by CAT and by statutory withholding of removal are limited in scope and duration, and they are much more difficult to obtain. As a result, a Rule that limits *bona fide* refugees to withholding of removal and CAT protection would impose a very real harm on individuals who have come to the United States in search of protection.

First, the most serious harm that can befall an individual as a result of these Proposed Rules is removal to persecution or torture. The existence of withholding of removal and relief under CAT does not account for that risk. Both those forms of relief require a much higher quantum of proof than asylum and offer significantly fewer protections.[45] Thus, an individual could have a valid asylum claim based on a real risk of persecution or torture in the home country but be unable to meet the standard for CAT or withholding. Under the Proposed Rules, such an individual would be removed to face persecution or even death in his or her home country.

Furthermore, unlike asylees, individuals granted withholding or CAT relief lack any pathway to permanent residency or citizenship and cannot petition for immediate family members to join them in the United States.[46] For example, a mother with two young children who flees to the United States and is subject to one of the expanded asylum bars will be unable to ensure that her children can obtain protection in the United States with her if she is granted relief. Rather, if her children are still in her home country, they would need to come to the United States and seek asylum on their own, likely as unaccompanied children. If her children fled to the United States with her, then they would need to establish their own eligibility for protection before an immigration judge, no matter their age. Under the expanded bars in the Proposed Rules, such situations will certainly increase, separating families and forcing parents to return to countries where it has been established they more likely than not will face persecution and torture, rather than leaving their children on their own.

In addition, although individuals granted withholding or CAT relief cannot be deported to the country where they fear persecution, they can be deported to another country.[47] They also may not travel outside the United States,[48] may be detained, and must pay a yearly renewal fee for an employment authorization document in order to maintain the right to work in the United States.[49] In essence, even those

---

[44] *See, e.g.,* Proposed Rules at 69644.

[45] To obtain withholding of removal, a person must show a "reasonable possibility" of persecution, *INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987), or a "clear probability of persecution." *INS v. Stevic*, 467 U.S. 407 (1984). For CAT relief, an applicant must show it is more likely than not that he or she will be tortured or killed by or at the government's acquiescence if removed to the home country. 8 C.F.R. § 1208.16(c)(2).

[46] *Cazun v. Attorney Gen. United States*, 856 F.3d 249, 252 n.3 (3d Cir. 2017) (citing *INS v. Cardoza-Fonseca*, 480 U.S. 421, 428 n.6 (1987)).

[47] *See* 8 U.S.C. § 1231(b); 8 C.F.R. § 1240.10(f).

[48] The BIA requires that an individual granted withholding or CAT—unlike an individual granted asylum—must simultaneously be ordered removed, making any international travel a "self-deportation" from the United States. *See Matter of I-S- & C-S-*, 24 I&N. Dec. 432, 434 n.3 (BIA 2008); 8 C.F.R. § 241.7.

[49] *See* 8 C.F.R. § 274a.12(a)(10); Lindsay M. Harris, *Withholding Protection*, 50 Colum. Hum. Rts. L. Rev. 1, 77 n.147 (2019).

AR.09776

individuals who succeed in meeting the higher burden of proof for withholding of removal and CAT relief are subject to substantial restrictions not applicable to asylees.

Withholding and CAT recipients remain in a precarious category under immigration law, unlike asylees. When a noncitizen is granted asylum, the person receives a legal status.[50] Asylum, once granted, protects an asylee against removal unless and until that status is revoked.[51] Asylees also become eligible to apply for lawful permanent residence, and eventually, U.S. citizenship. Such protections do not exist for withholding and CAT recipients, who have no access to permanent residency or citizenship.[52] They are instead subject to removal orders and vulnerable to deportation to a third country, and they may be required to attend regular check-ins with immigration.[53]

Finally, the limits on asylum in the Proposed Rules will undermine judicial efficiency by forcing claims from members of the same family (including small children) based on the same set of facts to proceed in separate cases and before different adjudicators. Neither withholding of removal nor CAT allows family members in the United States to be included as derivatives on a principal's application. The resulting inefficiencies would only exacerbate the existing backlog of pending cases in the immigration court system.[54]

## V.    The Proposed Rules will result in "mini-trials" in immigration court, further undermine judicial efficiency, and result in racially biased decision-making

The Proposed Rules require immigration adjudicators (including immigration judges in the Executive Office for Immigration Review and asylum officers in U.S. Citizenship and Immigration Services) to determine whether an asylum applicant's conduct triggers a categorical asylum bar. First, immigration adjudicators are allowed to consider "all reliable evidence" to determine whether there is "reason to believe" an offense was "committed for or related to criminal gang evidence," or "in furtherance of gang-related activity," triggering ineligibility for asylum in either case.[55] Second, the Proposed Rules permit immigration adjudicators to "assess all reliable evidence in order to determine whether [a] conviction amounts to a domestic violence offense," and to go even further by considering whether non-adjudicated *conduct* "amounts to a covered act of battery or extreme cruelty."[56]

Requiring adjudicators to make these complex determinations regarding the nature and scope of a particular conviction or particular conduct not resulting in a conviction will lead to massive judicial inefficiencies and biased "mini-trials" within the asylum adjudication process. The scope of the "reliable evidence" available to adjudicators in asylum cases is potentially limitless, particularly given that the rules of evidence applicable in federal court do not apply in immigration court.  It will be difficult, if not impossible,

---

[50] *See, e.g.*, 8 C.F.R. 245.1(d)(1) (defining "lawful immigration status" to include asylees).

[51] *See* 8 U.S.C. § 1158(c)(1)(A).

[52] *Matter of Lam*, 18 I.&N. Dec. 15, 18 (BIA 1981); 8 C.F.R. § 245.1(d)(1) (explaining that only those in "lawful immigration status" can seek permanent residency and excluding withholding recipients from such status); 8 C.F.R. § 209.2(a)(1) (authorizing adjustment of status to permanent residence for asylees); 8 C.F.R. § 316.2 (naturalization available only to permanent residents).

[53] *See R–S–C v. Sessions*, 869 F.3d 1176, 1180 (10th Cir. 2017).

[54] See, e.g., Marissa Esthimer, "Crisis in the Courts: Is the Backlogged U.S. Immigration Court System at Its Breaking Point?," *Migration Policy Institute*, October 3, 2019, https://bit.ly/2sJuEWR.

[55] *See* Proposed Rules at 69649.

[56] *See* Proposed Rules at 69652.

AR.09777

for many applicants to rebut negative evidence marshaled against them, even if that evidence is false, given the difficulty of affirmatively proving a negative. In other cases, asylum applicants will struggle to find evidence connected to events that may have happened years prior. Asylum trials, which typically take three or fewer hours under current policies, provide insufficient time to fully present arguments on both sides of these unwieldy issues.

As the immigration courts contend with backlogs that now exceed one million cases,[57] tasking immigration judges with this nuanced, resource-intensive assessment of the connection between a conviction and gang activity and/or the domestic nature of alleged criminal conduct—assessments far outside their areas of expertise—will prolong asylum proceedings, increase the immigration court backlog, and lead to erroneous determinations that will likely increase the number of appeals. The Proposed Rules repeatedly cite increased efficiency as justification for many of the proposed changes.[58] Yet requiring mini-trials related to past alleged conduct will decrease efficiency.

Furthermore, immigration courts are not a fair forum for evaluating the details or import of alleged criminal conduct. Immigration judges, who are not independent adjudicators but rather employees of the Department of Justice, face multiple pressures from the administration to toe the line and deny asylum, based on the current administration's virulent bias against asylum seekers.[59] Immigration judges face adverse employment consequences if they do not complete cases as quickly as required under a new EOIR case quota system.[60] If a judge is able to identify a categorical asylum bar that applies, she could avoid the time-consuming determinations regarding asylum eligibility that are required in the absence of such a bar, allowing her to complete cases more quickly, satisfy her quotas, and thereby avoid adverse employment consequences. Thus, the Proposed Rules, especially when combined with the existing institutional pressures on immigration judges, incentivize rapid, perfunctory decision making devoid of due process. In addition, EOIR has long failed to police racism, anti-asylum bias, and misconduct among individual immigration judges. Allowing fact-finding based on past alleged criminal conduct under the Proposed Rule would open up a new area of fact-finding with life-or-death consequences in a system where EOIR cannot be trusted to ensure that immigration judges treat asylum seekers fairly or rationally.

The Supreme Court has "long deemed undesirable" exactly the type of "post hoc investigation into the facts of predicate offenses" proposed by the agencies here.[61] For more than a century the federal courts have embraced the "categorical approach" to determine the immigration consequences of a conviction, based on the statute of conviction as adjudicated by the criminal court system rather than a re-litigation of the

---

[57] Marissa Esthimer, "Crisis in the Courts: Is the Backlogged U.S. Immigration Court System at Its Breaking Point?," *Migration Policy Institute*, October 3, 2019, https://www.migrationpolicy.org/article/backlogged-us-immigration-courts-breaking-point.

[58] *See* Proposed Rules at 69646, 69656-8.

[59] *See generally* Innovation Law Lab & The Southern Poverty Law Center, *The Attorney General's Judges: How the U.S. Immigration Courts Became a Deportation Tool* (2019), https://www.splcenter.org/sites/default/files/com_policyreport_the_attorney_generals_judges_final.pdf.

[60] EOIR, Policy Memorandum: Case Priorities and Immigration Court Performance Measures (Jan. 17, 2018), https://www.justice.gov/eoir/page/file/1026721/download; Tal Kopan, CNN, "Justice Department Rolls Out Case Quotas for Immigration Judges" (Apr. 2, 2018), https://www.cnn.com/2018/04/02/politics/immigration-judges-quota/index.html.

[61] *Moncrieffe v. Holder*, 569 U.S. 184, 186 (2013).

AR.09778

offense in immigration court.[62] This approach "promotes judicial and administrative efficiency by precluding the relitigation of past convictions in minitrials conducted long after the fact."[63]

Particularly in the context of the proposed bar related to alleged gang affiliation, the Southern Poverty Law Center is concerned that creating a blanket exclusion for anyone convicted of any crime—misdemeanors included—that an immigration adjudicator deems linked to gang activity will erroneously bar bona fide asylum seekers from obtaining protection. This Proposed Rule allows an adjudicator to bar asylum if there is a "reason to believe" any conviction flows from activity taken in furtherance of gang activity. Because the "reason to believe" standard does not require a finding of any actual link between a conviction and a gang, SPLC worries that an arbitrary agency argument that such a connection exists could lead an adjudicator to deem an applicant ineligible for asylum.[64] This Proposed Rule penalizes asylum seekers of color who have experienced racial profiling and a criminal legal system fraught with structural challenges and incentives to plead guilty. These same individuals are vulnerable to being erroneously entered into gang databases. Such databases are notoriously inaccurate, outdated, and infected by racial bias.[65]

Indeed, asylum applicants are *already* frequently subject to wrongful denials of protection because of allegations of gang activity made by the Department of Homeland Security based on information found in notoriously unreliable foreign databases and "fusion" intelligence-gathering centers outside the United States. Empowering immigration adjudicators to render asylum applicants *categorically* excluded from protection based on such spurious allegations will inevitably result in the return of many refugees to harm.[66]

For example, SIFI client Y-R- was arbitrarily misclassified by ICE as a member of the Central American gang MS-13 after an immigration judge had granted him asylum. ICE sought reconsideration of the asylum grant based on a declaration signed by an ICE officer whom Y-R- had never met, who stated that his tattoos were evidence of MS-13 involvement. But Y-R-, who is a former tattoo artist from Cameroon, barely speaks any Spanish. A tattoo expert and prior FBI employee testified that Y-R's tattoos, which include a treble clef demonstrating Y-R-'s passion for music, have absolutely no link to MS-13.[67] Ultimately, the

---

[62] *See Moncrieffe*, 569 U.S. at 191 ("This categorical approach has a long pedigree in our Nation's immigration law."). For a more fulsome history of the development of the categorical approach in immigration court, *see* Alina Das, "The Immigration Penalties of Criminal Convictions: Resurrecting Categorical Analysis in Immigration Law," *New York University Law Review* 86, no. 6 (2011): 1689 - 1702, https://www.nyulawreview.org/wp-content/uploads/2018/08/NYULawReview-86-6-Das.pdf.

[63] *Moncrieffe*, 569 U.S. at 200-201.

[64] *See, e.g.*, Caitlin Dickson, "He grew up in West Africa. He never heard of MS-13. Then he fled to the U.S. — and ICE accused him of being a gang member," Yahoo! News (Jan. 21, 2019), https://news.yahoo.com/grew-west-africa-never-heard-ms-13-fled-u-s-ice-accused-gang-member-100051192.html.

[65] Annie Sweeney and Madeline Buckley, "Chicago police gang data collection faulted by city's inspector general as unchecked and unreliable," *Chicago Tribune*, April 11, 2019, https://www.chicagotribune.com/news/breaking/ct-met-chicago-police-gang-data-04112019-story.html; Anita Chabria, "A routine police stop landed him on California's gang database. Is it racial profiling?," *Los Angeles Times*, May 9, 2019, https://www.latimes.com/politics/la-pol-ca-california-gang-database-calgang-criminal-justice-reform-20190509-story.html.

[66] Melissa del Bosque, "Immigration Officials Use Secretive Gang Databases to Deny Migrant Asylum Claims," *Pro Publica*, July 8, 2019, https://www.propublica.org/article/immigration-officials-use-secretive-gang-databases-to-deny-migrant-asylum-claims.

[67] Caitlin Dickson, "He grew up in West Africa. He never heard of MS-13. Then he fled to the U.S. — and ICE accused him of being a gang member," Yahoo! News (Jan. 21, 2019), https://news.yahoo.com/grew-west-africa-never-heard-ms-13-fled-u-s-ice-accused-gang-member-100051192.html.

AR.09779

immigration judge refused to reconsider Y-R-'s asylum grant. Y-R-'s case is just one example of the arbitrary and baseless claims of gang affiliation that ICE will make in order to prevent vulnerable individuals from obtaining asylum.

The Departments make the baseless argument that all gang-related offenses should be construed as "particularly serious crimes."[68] It is simply not logical to argue, as the Departments do, that because gang members may (based on 16-year-old statistics) commit some violent crimes and drug crimes, that all crimes committed by anyone remotely connected with a gang, including misdemeanor property crimes, are "particularly serious."  However, the Proposed Rules will exclude from protection bona fide asylum seekers of color who live in economically distressed communities and have minor convictions.

The Departments asks for comments on: (1) what should be considered a sufficient link between an asylum seeker's underlying conviction and the gang related activity in order to trigger the application of the proposed bar, and (2) any other regulatory approaches to defining the type of gang-related activities that should render individuals ineligible for asylum. The premise of these questions is wrong: a vague "gang related" bar should not be introduced at all.

## VI.   The Proposed Rules will disparately impact vulnerable populations already routinely criminalized

The imposition of additional categorical bars to asylum will only further marginalize asylum seekers already struggling with trauma and discrimination. It is particularly destructive to further punish individuals who are likely to be over-policed, over-prosecuted, and over-sentenced. These proposed asylum bars will disparately impact vulnerable populations--asylum seekers hailing primarily from Central America and the global South, and those routinely criminalized because of their identities, racially disparate policing practices, or in connection with experiences of trafficking and domestic violence.[69] The discretion currently delegated to asylum adjudicators is particularly crucial for these populations to become get the protection they deserve.

The expanded criminal bars under the Proposed Rules do not accomplish the stated goal of making communities safer. The existing framework for determining if an offense falls within the particularly serious crime bar already gives asylum adjudicators discretion to deny relief to anyone found to pose a danger to the community.[70] Furthermore, asylees with convictions that render them inadmissible must apply for a waiver at the time of their applications for permanent residence.[71] Moreover, the existence of provisions allowing the

---

[68] Proposed Rules at p. 69650.

[69] D'Vera Cohn et al., "Rise in U.S. Immigrants from El Salvador, Guatemala and Honduras Outpaces Growth from Elsewhere," *Pew Research Center*, December 7, 2017, https://www.pewresearch.org/hispanic/wp-content/uploads/sites/5/2017/12/Pew-Research-Center_Central_American-migration-to-U.S._12.7.17.pdf.

[70] Apart from the statutory aggravated felony bar to asylum, the Board of Immigration Appeals and Attorney General have historically utilized a highly circumstantial approach to the particularly serious crime determination that bars an immigrant from receiving asylum. *See e.g., Matter of Juarez,* 19 I.&N. Dec. 664 (BIA 1988) (ordinarily a single misdemeanor that is not an aggravated felony will not be a particularly serious crime); *Matter of Frentescu,* 18 I.&N. Dec. 244 (BIA 1982), *modified* (setting forth several factors to be considered before imposing the particularly serious crime bar, including: (i) the nature of the conviction, (ii) the circumstances and underlying facts of the conviction, (iii) the type of sentence imposed, and (iv) whether the type and circumstances of the crime indicate that the individual will be a danger to the community).

[71] 8 U.S.C. § 1159(c) (2012).

AR.09780

revocation of asylum status ensures that adjudicators may continue to enforce concerns related to the safety of the community even after asylum is granted.[72]

*Asylum seekers of color are over-policed, over-prosecuted, and over-sentenced – and thus disproportionately likely to have criminal records.*

Asylum seekers of color, like all communities of color in the United States, are already disproportionately targeted and punished by the criminal justice system.[73]  According to one study, "[t]he overpolicing of low-income neighborhoods has meant a sharp increase in the number of immigrants of color encountering the criminal justice—and thus the deportation—systems. In particular, more and more Black and brown immigrants, both undocumented and authorized, were arrested and convicted of drug crimes, received longer sentences than their white counterparts, and then were deported."[74] The disproportionate criminalization of non-white and immigrant communities thus feeds into the deportation system. Deportees who fear persecution may then re-enter the U.S. without authorization to seek safety or re-unite with family, risking another conviction for illegal reentry—an additional bar to asylum, per the Departments' Proposed Rules.

As local and state law enforcement agencies around the country increasingly choose to work with the federal government to enforce immigration law, the likelihood of profiling and over-policing will only increase.  Local police who view the enforcement of immigration laws as their role sometimes use racial profiling to decide whom to target and how to treat those individuals.[75]  For instance, local law enforcement officials may stop Latinos for purported traffic violations as a pretext for investigating their immigration paperwork or status.  A study of arrest data in Davidson County, Tennessee shows that the arrest rates for Latino defendants driving without a license more than doubled in the year after the county entered a formal agreement with Immigration and Customs Enforcement (ICE) to enforce immigration law.[76]  After the Irving, Texas police department agreed to partner with ICE, arrest data revealed an "immediate" and "dramatic" increase in "discretionary arrests" of Latinos for petty offenses—particularly minor traffic offenses" consistent with "racial profiling of Latinos in order to filter them through the [federal immigration enforcement program's] screening system."[77]  Similar conclusions resulted from analysis of data on individuals arrested nationwide under Secure Communities, showing that Latinos comprised 93% of

---

[72] 8 C.F.R. § 208.24(a) (2012).

[73] *See, e.g.*, Alexi Jones, Prison Policy Initiative, "Police Stops Are Still Marred by Racial Discrimination, New Data Shows" (Oct. 12, 2018), https://www.prisonpolicy.org/blog/2018/10/12/policing/; The Sentencing Project, "Report to the United Nations on Racial Disparities in the U.S. Criminal Justice System" (Apr. 19, 2018), https://www.sentencingproject.org/publications/un-report-on-racial-disparities/.

[74] Alan A. Aja and Alexandra Marchevsky, "How Immigrants Became Criminals," BOSTON REVIEW (Mar. 17, 2017), *available at* https://bostonreview.net/politics/alan-aja-alejandra-marchevsky-how-immigrants-became-criminals.

[75]     Racial profiling is obviously unconstitutional, *see, e.g.*, *Whren v. United States*, 517 U.S. 806, 813 (1996) ("[T]he Constitution prohibits selective enforcement of the law based on considerations such as race."), and violates Title VI of the Civil Rights Act of 1964 if the entity receives federal funding.

[76]     TENNESSEE IMMIGRANT AND REFUGEE RIGHTS COALITION & CRIMINAL JUSTICE PLANNING, CITATIONS/WARRANTS FOR NO DRIVER'S LICENSE BY ETHNICITY AND RACE:  COMPARING THE YEAR PRIOR TO 287(G) AND THE YEAR FOLLOWING 287(G) (2007), *available at* http://static1.1.sqspcdn.com/static/f/ 373699/7070512/1274810470237/No_Drivers_ License_1_year_overview+6-2008.pdf?token=CjxGyjZITqFgFmsjkDf0vECPSk0%3D.

[77]     TREVOR GARDNER II AND AARTI KOHLI, THE C.A.P. EFFECT: RACIAL PROFILING IN THE ICE CRIMINAL ALIEN PROGRAM (Sept. 2009), *available at* https://www.law.berkeley.edu/files/policybrief_irving_0909_v9.pdf.

AR.09781

individuals arrested through Secure Communities although they comprise only 77% of the undocumented population.[78]

SPLC sees these patterns play out every day in the lives of our detained clients, who become trapped in immigration detention after interactions with the criminal justice system that cannot be disentangled from racial profiling and bias. Take, for example, the case of a Central American man who was followed for miles by the police before being pretextually pulled over and charged with Driving Under the Influence (despite claiming to have been completely sober at the time of the incident), or a teenager from Honduras who was wrongly arrested for theft after being misidentified in security camera footage based solely on his race. Individuals such as these are moved seamlessly from criminal incarceration to immigration detention, where they must fight deportation from behind bars. They already face formidable obstacles to obtaining relief, including biased adjudicators and a lack of available legal representation. For those who fear return to their countries of origin, the Proposed Rules will add yet another roadblock to an already painful and unjust process. Ineligible for asylum, they will be forced to prove that they meet the much more stringent requirements for withholding of removal or protection under the Convention Against Torture. This adversely affects their chances of being granted a bond, because the availability of immigration relief plays an important role in an immigration judge's calculation of flight risk. The Proposed Rules will harm Black and brown immigrants, who are disproportionately likely to be affected due to racist policing and sentencing practices, by narrowing their paths to freedom from immigration detention and placing them at heightened risk of deportation to persecution, torture, or death.

> *Barring asylum for immigrants convicted of migration-related offenses punishes them for fleeing persecution and/or seeking safety for their children and does not make communities safer.*

The expansion of the criminal bars to asylum to include offenses related to the harboring or smuggling of noncitizens by parents and family members, as well as those previously removed, further criminalizes vulnerable populations fleeing persecution.[79] The vast expansion of migrant prosecutions at the border during the current administration has created administrative chaos and separated families that do not pose a threat to the safety of communities in the United States.[80] The Proposed Rules threaten to magnify the harm caused by these reckless policies by further compromising the ability of those seeking safety on the southern border to access the asylum system.

The Proposed Rules expand the asylum bar to parents or other caregivers who are convicted of smuggling or harboring offenses after taking steps to help minor children enter the United States in order to flee persecution. This proposed bar is particularly insidious in light of now-public documents revealing this

---

[78]     AARTI KOHLI, PETER L. MARKOWITZ & LISA CHAVEZ, SECURE COMMUNITIES BY THE NUMBERS: AN ANALYSIS OF DEMOGRAPHICS AND DUE PROCESS 5 (Oct. 2011), *available at* https://www.law.berkeley.edu/files/Secure_Communities_by_the_Numbers.pdf.

[79] On April 11, 2017, then-Attorney General Sessions instructed all federal prosecutors to increase their prioritization of immigration offenses for prosecution, including misdemeanor offenses committed by first time entrants. *See* Memorandum from the Attorney General: Renewed Commitment to Criminal Immigration Enforcement (April 11, 2017), https://www.justice.gov/opa/press-release/file/956841/download.

[80] *Id.*; Richard Marosi, "The aggressive prosecution of border crossers is straining the courts. Will zero tolerance make it worse?," *Los Angeles Times*, May 11, 2018, https://www.latimes.com/local/california/la-me-ln-immigrant-prosecutions-20180511-story.html.

AR.09782

administration's explicit efforts to utilize smuggling prosecutions against parents and caregivers as part of its strategy of deterring families from seeking asylum in the United States.[81] The Proposed Rules multiply the harms parents and caregivers have experienced in their treacherous journeys to safety and callously penalize parents for doing what is only human—taking all necessary steps to protect their children.

The Proposed Rules also bar asylum for those who have fled persecution multiple times and therefore been convicted of illegal reentry. Their inclusion is premised on conclusory statements regarding the dangerousness of recidivist offenders, without consideration of the nature or seriousness of prior convictions.[82] Rather, the Proposed Rules treat all immigration violations as analogous to those previously warranting inclusion in the particularly serious crime bar, without any independent evidence to justify this expansion. Such an approach renders meaningless the limiting language of "particularly serious" in the statute.

In addition, the Proposed Rules unnecessarily bar from asylum individuals who either were ordered removed long before the onset of the conditions giving rise to their *bona fide* fear of persecution. Take, for example, SPLC's client F-, who fled his home country after participating in anti-government protests and receiving repeated death threats from pro-government militia members as a result of his political activity. F- was deported from the United States years ago, well before the threats giving rise to his asylum claim occurred. But after receiving death threats, he fled home under cover of darkness and made his way to the U.S.-Mexico border to seek asylum in the United States. He first tried to present himself at a port of entry to seek asylum but was turned away by Customs and Border Protection (CBP) under the administration's unlawful metering policy. Turned back to one of the most dangerous cities on the U.S.-Mexico border in the state of Tamaulipas, he went to a migrant shelter where cartel members regularly threatened violence in order to access migrants waiting inside to extort, kidnap, and in some cases, murder them. Given the extreme dangers involved in waiting in Tamaulipas after being turned away by CBP at a port of entry, the best option available was to cross the river and enter the United States without inspection in order to seek asylum. Doing so would make him vulnerable to an illegal reentry conviction, despite his bona fide asylum claim and his attempt to first seek asylum by entering the United States lawfully at a port of entry, which CBP prevented. The Proposed Rules would make a person in this situation categorically ineligible for asylum if convicted of illegal reentry, even though the reentry was the result of a life-or-death choice and a prior unlawful rejection by CBP officers.

*Extending the criminal bars to immigrants convicted of misdemeanor document fraud unfairly punishes low-wage immigrant workers and does not make communities safer.*

The Proposed Rules would bar from asylum any asylum seeker convicted of a misdemeanor offense for use of a fraudulent document. This portion of the Proposed Rules entirely ignores the migration-related circumstances that regularly give rise to convictions involving document fraud. Migrants fleeing persecution often leave home with nothing but the clothes on their backs and rely on informal networks to survive in new

---

[81] Ryan Devereaux, "Documents Detail ICE Campaign to Prosecute Migrant Parents as Smugglers," *The Intercept*, April 29, 2019, https://theintercept.com/2019/04/29/ice-documents-prosecute-migrant-parents-smugglers/ (describing how in May 2017, the Department of Homeland Security set out to target parents and family members of unaccompanied minors for prosecution).

[82] Proposed Rules at 69648.

17

circumstances.[83] Extending a categorical asylum bar to those who were compelled to resort to fraudulent means to enter the country, or to support themselves while their applications are pending, upends decades of settled law that legal violations arising from an asylum applicant's manner of flight should be just one factor considered in the discretionary decision whether or not to grant asylum.[84]

Moreover, vulnerable migrants who are struggling to survive during the pendency of their asylum proceedings are often exploited by unscrupulous intermediaries who offer assurances and documentation that turn out to be fraudulent, unbeknownst to the asylum seekers.[85] Many noncitizens working in the low-wage economy face egregious workplace dangers and discrimination, and are vulnerable to retaliation for asserting their rights.[86]

This Proposed Rules create an incentive for unscrupulous employers to hire and exploit undocumented workers by eliminating an otherwise potentially available avenue of immigration relief—asylum—for such workers. Making people categorically ineligible for asylum based on past document fraud will increase the precarious nature of their work, given that "[e]mployers and their agents have far too frequently shown that they will use immigration status as a tool against labor organizing campaigns and worker claims."[87]  According to the National Employment Law Project, "in many cases, employers have improperly conducted I-9 self-audits just after employees have filed workplace-based complaints, or in the midst of labor disputes or collective bargaining, creating a climate of fear."[88] Undocumented workers are already vulnerable to deportation threats from employers who, after discovering their lack of immigration status, are able to commit workplace crimes or violations of workplace laws against the workers without consequences due to the workers' fear of retaliation and of interaction with the government due to their lack of immigration status.[89] The Proposed Rules increase the risk of immigration consequences for workers who might otherwise be eligible for asylum, but for the use of false documents in order to get a job, who try to hold their employers accountable for workplace violations.

The continued availability of asylum to low-wage immigrant workers can encourage them to step out of the shadows. The expansion of asylum bars under the Proposed Rules to sweep in all document fraud offenses would unfairly prejudice immigrants with meritorious asylum claims and force them deeper into the informal economy.

---

[83] *See Pula*, 19 I.&N. Dec. at 474.

[84] *Id.*

[85] See American Bar Association, "About Notario Fraud," July 19, 2018, https://www.americanbar.org/groups/public_interest/immigration/projects_initiatives/fight-notario-fraud/about_notario_fraud/.

[86] Paul Harris, "Undocumented workers' grim reality: speak out on abuse and risk deportation," *The Guardian*, March 28, 2013, https://www.theguardian.com/world/2013/mar/28/undocumented-migrants-worker-abuse-deportation.

[87] Eunice Hyunhye Cho & Rebecca Smith, *Workers' Rights on ICE: How Immigration Reform Can Stop Retaliation and Advance Labor Rights | California Report* (Feb. 2013), at 1, National Employment Law Project, https://ww.nelp.org/wp-content/uploads/2015/03/Workers-Rights-on-ICERetaliation-Report-California.pdf.

[88] *Id.* at 4.

[89] *See, e.g., Cazorla v. Koch Foods of Miss., L.L.C.*, 838 F.3d 540, 53 (5th Cir. 2016) ("Considerable evidence suggests that immigrants are disproportionately vulnerable to workplace abuse and, not coincidentally, highly reluctant to report it for fear of discovery and retaliation. And threats of deportation are among the most familiar and dreaded means by which unscrupulous employers retaliate against immigrant employees."); *Elizabeth* Fussell, *The Deportation Thread Dynamic & Victimization of Latino Migrants: Wage Theft & Robbery*, 52 Soc. Q. 593, 604, 610 (2011); Jacob Bucher, et al., *Undocumented Victims: An Examination of Crimes Against Undocumented Male Migrant Workers*, 7 Sw. J. Crim. Just. 159, 164 (2010); Southern Poverty Law Ctr., *Under Siege: Life for Low-Income Latinos in the South*, at 6 (Apr. 2009), http://www.splcenter.org/sites/ default/files/downloads/UnderSiege.pdf.

AR.09784

*The Proposed Rules will harm communities with overlapping vulnerabilities, including LGBTQ asylum seekers, survivors of trafficking, and survivors of domestic violence.*

The Proposed Rules improperly exclude from asylum protections countless members of vulnerable communities with bona fide asylum claims who have experienced trauma, abuse, coercion, or trafficking. Many of these individuals become aware of their ability to apply for asylum after law enforcement encounters that lead them to service providers who educate them about possible avenues for immigration relief. The Proposed Rules would compound their harm and prevent them from achieving family unification and a pathway to citizenship.

The Proposed Rules pose a unique threat to LGBTQ immigrant community members, including many SPLC clients. LGBTQ immigrants may have already experienced a high degree of violence and disenfranchisement from economic and political life in their home countries.[90] Hate violence towards undocumented LGBTQ immigrants in the United States is disproportionately higher than for other members of the LGBTQ population.[91] Members of these communities are also often isolated from their kinship and national networks following their migration. As a result of such discrimination and isolation, many in the LGBTQ immigrant community are vulnerable to trafficking, domestic violence, and substance abuse, in addition to discriminatory policing practices. The Proposed Rules will therefore have a disparate impact on LGBTQ asylum seekers whose involvement in the criminal justice system is often connected to past trauma and/or the result of biased policing.

The expansion of asylum bars to include various misdemeanor offenses that were not previously considered "particularly serious" also unfairly includes trafficking survivors. Trafficking survivors frequently come into contact with intervention resources and service providers only after contact with law enforcement. Innovative criminal justice reform efforts currently being adopted across the country include special trafficking courts that recognize the need for discretion in the determination of criminal culpability.[92] The same approach should be employed in the determination of asylum eligibility, where the applicant's life and safety are on the line.

The Proposed Rules instead preclude asylum adjudicators from conducting a trauma-centered approach, categorically barring countless trafficking survivors convicted of misdemeanor and felony offenses.

Survivors of domestic violence include trafficking survivors and LGBTQ community members, such that inclusion of offenses related to domestic violence in the expanded asylum bars affects populations with

---

[90] *See* Aengus Carroll and Lucas Ramon Mendos, *State Sponsored Homophobia: A World Survey of Sexual Orientation Laws: Criminalisation, Protection and Recognition* 12th Ed. (International Lesbian, Gay, Bisexual, Transgender, and Intersex Association (ILGA), 2017), https://ilga.org/downloads/2017/ILGA_State_Sponsored_Homophobia_2017_WEB.pdf.
[91] *See* Sharita Gruberg, "LGBTQ Undocumented Immigrants Face an Increased Risk of Hate Violence," *Center for American Progress*, June 10, 2014, https://www.americanprogress.org/issues/immigration/news/2014/06/10/91233/lgbt-undocumented-immigrants-face-an-increased-risk-of-hate-violence/.
[92] Elise White, et al., "Navigating Force and Choice: Experiences in the New York City Sex Trade and the Criminal Justice System's Response," *Center for Court Innovation*, December 2017 (noting that 78% of participants in the report's study had been arrested, mostly for non-violent, non-prostitution offenses such as *drug possession*).

AR.09785

overlapping vulnerabilities.[93] The Proposed Rules too broadly categorize domestic violence offenses as particularly serious and sweep both offenders and survivors into their dragnet. By contrast, the immigration laws extend protections to domestic violence survivors outside of the asylum context, recognizing the complex dynamics surrounding intimate partner violence. For example, provisions of the Violence Against Women Act allow adjudicators evaluating claims for relief arising thereunder to exercise discretion based on a number of factors and circumstances.[94]  The blunt approach adopted by the Proposed Rules is inconsistent with the approach taken towards survivors elsewhere in the federal immigration statute and does not rely on any evidence-based justification for treating asylum seekers differently.

Moreover, the domestic violence sections of the Proposed Rules include the only categorical bar to asylum for which a conviction is not required. Domestic violence incidents all too often involve the arrest of both the primary perpetrator of abuse and the survivor.[95] These "cross-arrests" do not always yield clear determinations of victim and perpetrator. Authorizing asylum adjudicators to determine the primary perpetrator of domestic assault, in the absence of a judicial determination, unfairly prejudices survivors who are wrongly arrested in the course of police intervention in domestic disturbances.

Finally, the exemption for asylum applicants who can demonstrate their eligibility for a waiver under section 237(a)(7)(A) of the INA does not cure the harm to asylum seekers caused by imposition of a categorical domestic violence related bar.[96] Rather, it converts a non-adversarial asylum proceeding into a multi-factor, highly specific inquiry into culpability based on circumstances that may be very difficult for an asylum seeker to prove—especially if proceeding without counsel and with limited English proficiency.

*Barring asylum for immigrants convicted of "gang-related crimes" based on unreliable evidence and racially disparate policing practices is harmful to youth of color and does not make communities safer.*

The recent expansion of gang databases for use in the apprehension and removal of foreign nationals—including children—has generated tremendous concern among advocates and the communities they serve.[97] The use of gang databases by local law enforcement and ICE is an overbroad, unreliable and

---

[93] Marty Schladen, "ICE Agents Detain Alleged Domestic Violence Victim," *El Paso Times*, February 16, 2017, https://www.elpasotimes.com/story/news/2017/02/15/ice-detains-domestic-violence-victim-court/97965624/ (noting that the immigrant detained, a transgender person previously deported following her conviction for crimes such as possession of stolen mail and assault, was then living at the Center Against Sexual and Family Violence, a shelter for survivors of intimate partner violence).

[94] Nadine Shaanta Murshid and Elizabeth A. Bowen, "A Trauma-Informed Analysis of the Violence Against Women Act's Provisions for Undocumented Immigrant Women," *Violence Against Women* 24(13) (2018): 1540–1556, https://doi.org/10.1177/1077801217741991.

[95] David Hirschel, et al., "Domestic Violence and Mandatory Arrest Laws: To What Extent Do They Influence Police Arrest Decisions," *Journal of Criminal Law & Criminology* 98, no. 1 (2007-2008): 255, https://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?article=7284&context=jclc (noting that "[i]n some cases, dual arrests may be the result of legislation, department policies, or both failing to require officers to identify the primary aggressor. In addition, when such provisions are present, police may lack the training or information needed to identify the primary aggressor when responding to a domestic violence assault. This situation may be compounded by batterers who have become increasingly adept at manipulating the criminal justice system, and may make efforts to 'pre-empt' victims from notifying police in order to further control or retaliate against them.").

[96] 8 U.S.C. § 1227(a)(7)(A).

[97] *See* Nermeen Arastu, et al., "Swept Up In The Sweep: The Impact of Gang Allegations on Immigrant New Yorkers," *New York Immigration Coalition (NYIC) and CUNY School of Law's Immigrant and Non-citizen Rights Clinic*, May 2018,

AR.09786

often biased measure of gang involvement.[98] The Proposed Rules expand the asylum bars to those accused of gang involvement in the commission of minor offenses, creating an open-ended adjudicative process that will lead adjudicators to unfairly rely on these discredited methods of gang identification. This outcome would further the disparate racial impact of inclusion in gang databases and will bar asylum seekers who are themselves fleeing violence from gangs in their home countries.[99]

Prior attempts to expand the statutory grounds of removal and inadmissibility in the INA to include gang membership have failed to pass both houses of Congress.[100] And immigration adjudicators already routinely premise discretionary denials of relief or release on purported gang membership; scores of alleged gang members have already been deported due to immigration violations or criminal convictions for which no relief is available.[101] Creating a "gang-related crime" bar will exacerbate the due process violations already occurring as the result of unsubstantiated information about supposed gang ties.[102]

In addition, by focusing on "reason to believe" as the basis for the bar, rather than the seriousness of the crime, the proposed provision is ultra vires and unconscionably limits eligibility for asylum for people with bona fide claims. The Proposed Rules would expand the number and type of convictions for which an analysis of eligibility is required, sweeping in even petty offenses that would otherwise not trigger immigration consequences. Thus, an asylum applicant convicted of simple assault without use of a weapon, a non-violent property crime, or even possession of under 30 grams of marijuana for personal use (otherwise exempted from the reach of the Proposed Rule), could be barred from asylum if the adjudicator concludes she has "reason to believe" the offense was committed in furtherance of gang activity.[103]

The Proposed Rules thus invite extended inquiry into the character of youth of color who otherwise have meritorious asylum claims, based on information gained through racially disparate policing practices. These rules multiply the harm to asylum seekers of color subject to racially disparate policing, which results in

---

https://www.law.cuny.edu/wp-content/uploads/page-assets/academics/clinics/immigration/SweptUp_Report_Final-1.pdf.
[98] Ali Winston, "Marked for Life: U.S. Government Using Gang Databases to Deport Undocumented Immigrants," *The Intercept*, August 11, 2016, https://theintercept.com/2016/08/11/u-s-government-using-gang-databases-to-deport-undocumented-immigrants/.
[99] *See* Jonathan Blitzer, "How Gang Victims Are Labeled As Gang Suspects," *The New Yorker*, January 23, 2018, https://www.newyorker.com/news/news-desk/how-gang-victims-are-labelled-as-gang-suspects.
[100] *See* Jessica Chacon, "Whose Community Shield?: Examining the Removal of the 'Criminal Street Gang Member,'" *University of Chicago Legal Forum* 317 (2007: 333-336) (reviewing legislative history of failed efforts to expand removability of those accused of gang related offenses and noting criticism that "[t]he only legal effect of the proposed legislation would be to increase the number of noncitizens lawfully present who would be subject to removal on the basis of their purported associations with individuals involved in group criminal activity.").
[101] For an illustration of Immigration and Customs Enforcement's propensity to make gang allegations on the basis of questionable if not fabricated evidence, and the deference to such evidence often granted by immigration adjudicators, *see* Mark Joseph Stern, "Bad Liars," *Slate*, May 16, 2018, https://slate.com/news-and-politics/2018/05/federal-judge-accused-ice-of-making-up-evidence-to-prove-that-dreamer-was-gang-affiliated.html.
[102] See Yvette Cabrera, "New ICE Tactic Raises Questions About Due Process," *ThinkProgress*, October 6, 2017, https://thinkprogress.org/ice-targets-gangs-6775356473a8/; Rebecca Hufstader, "Immigration Reliance On Gang Databases: Unchecked Discretion And Undesirable Consequences," 90 *New York University Law Review* 90 (2015): 671.
[103] Page 69649 of the Proposed Rules notes that the applicable standard for determining when to apply the bar to asylum seekers convicted of a crime involving criminal street gangs is "reason to believe," as used in 8 U.S.C. § 1182(a)(2)(c), and that the asylum adjudicator may consider "all reliable evidence" in making this determination.

AR.09787

racially disparate rates of guilty pleas to minor offenses. This same population is overrepresented in gang databases, which are notoriously inaccurate, outdated, and infected by racial bias.[104]

## VII.    Conclusion

For all the reasons explained above, and because the Southern Poverty Law Center believes a robust asylum system is essential to our humanity and dignity as a nation, we adamantly oppose the Proposed Rules.

Sincerely,

Kelli Garcia                                             Melissa Crow
Federal Policy Counsel                                   Senior Supervising Attorney
Immigrant Justice Project                                Immigrant Justice Project
Southern Poverty Law Center                              Southern Poverty Law Center

---

[104] Annie Sweeney and Madeline Buckley, "Chicago police gang data collection faulted by city's inspector general as unchecked and unreliable," *Chicago Tribune*, April 11, 2019, https://www.chicagotribune.com/news/breaking/ct-met-chicago-police-gang-data-04112019-story.html; Anita Chabria, "A routine police stop landed him on California's gang database. Is it racial profiling?," *Los Angeles Times*, May 9, 2019, https://www.latimes.com/politics/la-pol-ca-california-gang-database-calgang-criminal-justice-reform-20190509-story.html.

AR.09788

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekn-y1bc
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0487
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Judy Perry Martinez
**Organization:** American Bar Association

## General Comment

Please see attached comments on behalf of the American Bar Association.

## Attachments

ABA Comments re Procedures for Asylum and Bars to Asylum Eligibility 1-21-20

AR.09789



Judy Perry Martinez
President
321 N. Clark Street, Chicago, IL 60654-7598
T 312.988.5109 • F 312.988.5100
abapresident@americanbar.org
americanbar.org

January 21, 2020

Ms. Lauren Alder Reid
Assistant Director, Office of Policy
Executive Office for Immigration Review
5107 Leesburg Pike, Suite 2616
Falls Church, VA  22041

Ms. Maureen Dunn
Chief, Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship & Immigration Services
20 Massachusetts Ave., NW, Suite 1100
Washington, DC  20529-2140

RE:     Procedures for Asylum and Bars to Asylum Eligibility, 84 Fed. Reg. 69640 (Dec. 19, 2019); EOIR Docket No. 18-0002

Dear Assistant Director Alder Reid and Chief Dunn:

On behalf of the American Bar Association (ABA), I submit the following comments in response to EOIR Docket No. 18-0002, the joint notice of proposed rulemaking on Procedures for Asylum and Bars to Asylum Eligibility, 84 Fed. Reg. 69640 (Dec. 19, 2019) (hereinafter the Proposed Rule). The ABA urges the Department of Homeland Security (DHS) and the Department of Justice (DOJ) to rescind the Proposed Rule, for the reasons described in further detail below.

The ABA is the largest voluntary association of lawyers and legal professionals in the world.  The ABA works to improve the administration of justice, promotes programs that assist lawyers and judges in their work, accredits law schools, and works to build public understanding around the world of the importance of the rule of law.  The ABA's Commission on Immigration provides continuing education to the legal community, judges, and the public, and develops and assists in the operation of pro bono legal representation and information programs.

The ABA has long supported the establishment of laws, policies, and practices that ensure optimum access to legal protection for refugees, asylum seekers, torture victims, and others deserving of humanitarian refuge.  We also have voiced our concern about the already expansive immigration consequences of criminal convictions, and the lack of due process protections governing these determinations.  Therefore, we have significant concerns about the Proposed Rule, which would create additional barriers to asylum eligibility based on criminal history.  These additional bars are inconsistent with the United States' international law obligations and unnecessary.  Non-citizens who are convicted of an aggravated felony already are ineligible for

asylum, and immigration judges already have the discretion to deny requests for asylum from applicants with criminal histories that do not rise to the level of aggravated felonies.

The ABA also opposes the Proposed Rule because it would create additional obstacles for federal and state courts to provide relief from the immigration consequences of criminal convictions through vacated, expunged, or modified convictions or sentences. Due to the often severe and disproportionate immigration consequences of criminal convictions, the ABA has supported the restoration of authority to state and federal sentencing courts to reduce or eliminate these consequences.

The Proposed Rule should not be adopted for the following specific reasons.

**<u>Non-Citizens Who Have Been Convicted of an Aggravated Felony Covering a Broad Array of Criminal Conduct Are Already Ineligible for Asylum</u>**

Current law already provides that non-citizens convicted of an aggravated felony are considered to have been convicted of a particularly serious crime, and thus are not eligible for asylum.[1] The ABA has expressed concern about the expansion of what is considered to be an "aggravated felony" to include an additional large number of offenses, some of them minor.[2] For this reason, the ABA has recommended that Congress amend the definition of "aggravated felony" in the Immigration and Nationality Act (INA) to include only a felony for which a sentence of more than one year was imposed. Such an amendment would avoid serious immigration consequences for non-citizens who receive suspended sentences or for whom no jail term is ordered.

The Proposed Rule would go further inappropriately limiting those who are eligible for asylum by making non-citizens ineligible for asylum if they have been convicted of several additional categories of criminal offenses. These offenses would include: a misdemeanor offense under federal, state, tribal, or local law involving the possession or use of an identification document or false identification document without lawful authority; the receipt of federal public benefits, or similar public benefits, without lawful authority; and possession or trafficking of a controlled substance or controlled-substance paraphernalia, other than a single offense involving possession for one's own use of 30 grams or less of marijuana.[3] While the ABA is mindful of the Departments' legitimate public safety concerns, the definition of an "aggravated felony" already encompasses a broad array of conduct, making it unnecessary to exclude additional individuals from asylum eligibility based on criminal history.

In certain circumstances, the Proposed Rule remarkably would make a non-citizen ineligible for asylum if "[t]here are serious reasons for believing" that he has engaged "in acts of battery or extreme cruelty," even if he has not been convicted of such conduct.[4] The ABA strongly opposes any effort to exclude individuals from the asylum system based only on allegations of criminal conduct. That notion goes against the foundational beliefs of our U.S. Constitutional system that individuals have a right to defend themselves against criminal charges and are

---

[1] 8 U.S.C. § 1158(b)(2)(A)(ii), (B)(i).

[2] *Id.* § 1101(a)(43).

[3] 84 Fed. Reg. at 69653-54; *id.* at 69659-61 (proposed 8 C.F.R. §§ 208.13(c)(6)(vi)(B), 1208.13(c)(6)(vi)(B)).

[4] *Id*. at 69651-53, 69660-61 (proposed 8 C.F.R. §§ 208.13(c)(6)(vii), 1208.13(c)(6)(vii)).

AR.09791

presumed innocent until proven guilty. Individuals should not be excluded from asylum eligibility based on allegations of criminal misconduct that have not been proven in a court of law.

## Immigration Judges Already Have Discretion to Deny Asylum Based on Additional Criminal Conduct

The changes in the Proposed Rule are unnecessary and punitive because immigration judges already have the discretion to deny applications for asylum based on convictions for crimes that are not aggravated felonies (as well as the presence of other adverse factors in the record).[5] The ABA has long been concerned about provisions in the immigration laws that strip immigration judges of discretion by mandating removal and detention, or precluding eligibility for certain forms of relief. For this reason, we have urged the restoration of discretion to immigration judges when deciding on the availability of certain forms of relief from removal, such as asylum. The ABA therefore opposes the Proposed Rule because it would prevent immigration judges from exercising their discretion to weigh the equities in individual cases and grant asylum when non-citizens have been convicted of the criminal offenses outlined in the Proposed Rule.

## The Proposed Bars Are Inconsistent with International Law Obligations

The ABA also is concerned about the proposed expansion of the bars to asylum eligibility based on criminal history because they are inconsistent with the United States' obligations under international law. The United States is a party to the 1967 Protocol Relating to the Status of Refugees, which incorporates Articles 2-34 of the 1951 Convention Relating to the Status of Refugees. Article 33(1) of the Convention sets forth the principle of *non-refoulement,* which provides that "[n]o contracting state shall expel or return ("*refouler*") a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." Article 33(2) provides that refugees may not benefit from this protection if "there are reasonable grounds" for regarding the refugee "as a danger to the security" of the receiving country or if the refugee has "been convicted by a final judgment of a particularly serious crime" and "constitutes a danger to the community" of the receiving country.[6] Article 1F of the Convention also excludes from the Convention's provisions any person where "there are serious reasons for considering that" he has engaged in certain conduct, including that "he has committed a serious non-political crime outside the country of refuge prior to his admission to that country as a refugee." Congress has codified these exclusions in the INA.[7]

DHS and DOJ seek to justify the Proposed Rule by pointing to the serious non-political crime bar and citing to the United Nations High Commissioner for Refugees (UNHCR) *Handbook on Procedures and Criteria for Determining Refugee Status and Guidelines on International Protection Under the 1951 Convention and the 1967 Protocol Relating to the Status of*

---

[5] *E.g., Moncrieffe v. Holder*, 569 U.S. 184, 204 (2013) (noting that, if a non-citizen is convicted of an offense that is determined not to be an aggravated felony, she may seek relief from removal such as asylum, but the Attorney General may still deny relief because asylum is a discretionary remedy).

[6] Protocol Relating to the Status of Refugees, art. I, Jan. 31, 1967, 19 U.S.T. 6223.

[7] *See* 8 U.S.C. § 1158(b)(2)(A)(ii)-(iv).

3

*Refugees.*[8]  But their reliance is misplaced.  First, the serious non-political crime bar applies to conduct that occurred outside of the United States, which the Proposed Rule does not address.[9] Second, DHS and DOJ ignore Paragraph 154 of the *Handbook*, which states that:

> A refugee committing a serious crime in the country of refuge is subject to due process of law in that country.  In extreme cases, Article 33 paragraph 2 of the Convention permits a refugee's expulsion or return to his former country if, having been convicted by a final judgment of a "particularly serious" common crime, he constitutes a danger to the community of his country of refuge.[10]

UNHCR has elaborated on what constitutes a particularly serious crime for purposes of Article 33.  UNHCR noted that a "serious crime" is a "capital or a very grave crime normally punished with long imprisonment," meaning that a "particularly serious crime" "must belong to the gravest category."[11]  "Article 33(2) therefore applies to refugees who become an extremely serious threat to the country of asylum due to the severity of crimes perpetrated by them in the country of asylum" and "hinges on the assessment that the refugee in question poses a major actual or future threat."  Because "the Article 33(2) mechanism has always been considered as a measure of last resort" the threat must be "exceptional . . . a threat such that it can only be countered by removing the person from the country of asylum."[12]  "[T]he gravity of the crimes should be judged against international standards" and Article 33(2) "should not be applied solely by reason of the existence of a past crime but on an assessment of the present or future danger posed by the wrong-doer."[13]  The burden is on the State to prove that the conviction means that the refugee presents a danger to the community.[14]

DHS and DOJ fail to take into consideration UNHCR's opinion that only "extreme" cases should qualify as a "particularly serious crime," and do not even attempt to argue that convictions for some of the crimes included in the Proposed Rule demonstrate that an individual poses an actual or future threat to the safety of the community.[15]  Because DHS and DOJ have not properly

---

[8] *See* 84 Fed. Reg. at 69644 (citing UNHCR, *Handbook on Procedures and Criteria for Determining Refugee Status and Guidelines on International Protection Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees* ¶¶ 148, 151 (reissued Feb. 2019), https://www.unhcr.org/en-us/publications/legal/5ddfcdc47/handbook-procedures-criteria-determining-refugee-status-under-1951-convention.html) ("UNHCR *Handbook*")).

[9] *See* 84 Fed. Reg. at 69645 (the Proposed Rule does not cover foreign convictions).

[10] UNHCR *Handbook* ¶ 154.

[11] UNHCR, *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 7 (July 2007), https://www.unhcr.org/uk/576d237f7.pdf ("*UNHCR Briefing for the House of Commons*").  Paragraph 155 of the Handbook similarly states that a "serious" non-political crime in the context of Article 1F "must be a capital crime or a very grave punishable act.  Minor offences punishable by moderate sentences are not grounds for exclusion under Article 1F(b) even if technically referred to as 'crimes' in the penal law of the country concerned."

[12] *UNHCR Briefing for the House of Commons* ¶ 7.

[13] *Id*. ¶¶ 10, 11.

[14] *Id*. ¶ 12.

[15] *See* 84 Fed. Reg. at 69647-48, 69653 (not saying that, *inter alia*, convictions for first-time alien smuggling offenses involving immediate family members, use of fraudulent document offenses, or unlawful receipt of public benefits offenses indicate that the offender poses an actual or future threat to the community); *UNHCR Briefing for the House of Commons* ¶ 10 (noting that "[c]rimes such as petty theft or the possession for personal use of illicit narcotic substances would not meet the threshold of seriousness").

AR.09793

considered the United States' obligations under international law, they should reevaluate the Proposed Rule.

## The Availability of Additional Relief Is Not a Sufficient Safeguard

DHS and DOJ claim that the Proposed Rule is consistent with international obligations because it affects only an individual's eligibility for asylum, and not for withholding of removal or protection under the Convention Against Torture (CAT).[16]  However, the standard for demonstrating eligibility for withholding of removal under INA §241(b)(3) and CAT protection is more onerous than the standard that applies to asylum,[17] and those forms of relief confer fewer benefits on their recipients.[18]  Therefore, the availability of withholding of removal and CAT relief do not justify the restrictions in the Proposed Rule.

## The Executive Branch Should Not Further Constrain Efforts to Reduce the Immigration Consequences of Criminal Convictions

The ABA also opposes the Proposed Rule because it creates very strict criteria for when an order vacating, expunging, or modifying a conviction or sentence will be recognized for purposes of determining whether a non-citizen is eligible for asylum.  Under the Proposed Rule, in order for a non-citizen to be eligible for asylum despite a potentially disqualifying conviction, courts could not enter an order vacating, expunging, or modifying a conviction or sentence for rehabilitative or immigration purposes. In making this determination, adjudicators may look to evidence other than the order itself to determine whether it was issued for rehabilitative or immigration purposes and the non-citizen bears the burden of showing that the vacatur, expungement, or sentence modification was not for rehabilitative or immigration purposes. In addition, there is a rebuttable presumption that an order vacating, expunging, or modifying a conviction or sentence is not effective for immigration purposes if the order was entered after the initiation of a removal proceeding, or the non-citizen moved for the order more than one year after the date of the original order of conviction or sentencing.[19]

The ABA believes that state and federal sentencing courts should have more discretion to ameliorate the consequences of criminal convictions for a non-citizen's immigration proceedings.  Collateral sanctions imposed on persons convicted of crimes – such as ineligibility to apply for relief from removal and other immigration consequences – should be subject to

---

[16] 84 Fed. Reg. at 69644.

[17] *Moncrieffe*, 569 U.S. at 187 n.1.

[18] A person with asylum status may not be removed to her country of origin, can petition for his or her spouse and children, may apply for a refugee travel document, is eligible for work authorization, and can apply to become a lawful permanent resident after one year. 8 U.S.C. §§ 1158(b)(3)(A), (c)(1), 1159(b).  A person who is granted withholding of removal is eligible to apply for an employment authorization document, but may not travel outside of the United States, adjust status to that of a lawful permanent resident, or confer status on his or her family members. Protection under CAT can take the form of withholding of removal or deferral of removal. Deferral of removal under CAT is for those individuals who are not eligible for withholding of removal (generally because of past criminal convictions) and means that the individual does not receive any lawful or permanent immigrant status in the United States, and may continue to be detained.  Deferral of removal status also is subject to review and termination. 8 C.F.R. § 208.17(a), (b).

[19] 84 Fed. Reg. at 69654-55; *id*. at 69660, 69661 (proposed 8 C.F.R. §§ 208.13(c)(7)(v), (c)(8), 1208.13(c)(7)(v), (c)(8)).

AR.09794

waiver, modification, or another form of relief if the sanctions are inappropriate or unfair in a particular case. The ABA previously has raised concerns about the extension of the interpretation of the term "aggravated felony" to reach not only low-level offenses, but also state dispositions – such as convictions that are set-aside or expunged – that are not considered convictions under state law. This Proposed Rule would exacerbate the current situation by making it impermissible for state and federal sentencing courts to issue orders for the purpose of ameliorating the collateral consequences of criminal convictions for an individual's eligibility for asylum, and placing the burden on the non-citizen to show the order was for other than a rehabilitative or immigration purpose.

## **The Proposed Rule Would Lead to Mini-Trials that Lack Fundamental Due Process Protections**

Moreover, the ABA is opposed to several aspects of the Proposed Rule because they would require the adjudicator (the immigration judge or the asylum officer) to conduct a separate factual inquiry into the basis for a criminal conviction or allegations of criminal conduct to determine whether the individual is eligible for asylum. Such mini-trials will likely become necessary to determine whether, for example: an individual has been convicted of a crime where the adjudicator "knows or has reason to believe" that the crime "was committed in support, promotion, or furtherance of the activity of a criminal street gang";[20] whether an individual has been convicted of a crime "that involves conduct amounting to a crime of stalking; or a crime of child abuse, child neglect, or child abandonment; or that involves conduct amounting to a domestic assault or battery offense"[21] or "[t]here are serious reasons for believing the [non-citizen] has engaged on or after such date in acts of battery or extreme cruelty" even if the acts did not result in a conviction.[22]

The ABA has long believed that U.S. immigration authorities should interpret immigration laws in accordance with the categorical approach, whereby the adjudicator relies on the criminal statute and record of conviction only to determine the immigration consequences of criminal convictions. The ABA, as well as the U.S. Supreme Court, support the categorical approach because it promotes fairness and due process.[23] Immigration proceedings may occur long after a criminal conviction and lack the procedural due process protections available in criminal cases. Evidence may be old and witnesses unavailable. In immigration court, the Federal Rules of Evidence do not apply, non-citizens are not entitled to appointed counsel, and there is no right to

---

[20] *Id.* at 69659, 69660 (proposed 8 C.F.R. §§ 208.13(c)(6)(ii), 1208.13(c)(6)(ii)). To make this determination, the adjudicator could consider "all reliable evidence." *Id.* at 69649. To demonstrate that this determination would require a fact-intensive inquiry, DHS and DOJ themselves seek public comment on "[w]hat should be considered a sufficient link between a [non-citizen's] underlying conviction and the gang-related activity in order to trigger the application of the proposed bar[.]" *Id.* at 69650.

[21] *Id.* at 69659, 69661 (proposed 8 C.F.R. §§ 208.13(c)(6)(v)(A), 1208.13(c)(6)(v)(A)). To make this determination, the adjudicator could consider "the underlying conduct of the crime" and the adjudicator "is not limited to facts found by the criminal court or provided in the underlying record of conviction[.]" *Id.* (proposed 8 C.F.R. §§ 208.13(c)(6)(v)(B), 1208.13(c)(6)(v)(B)).

[22] *Id.* at 69660, 69661 (proposed 8 C.F.R. §§ 208.13(c)(6)(vii), 1208.13(c)(6)(vii)).

[23] *Moncrieffe*, 569 U.S. at 200-01 (noting that the Supreme Court has deemed "post hoc investigation into the facts of predicate offenses" in immigration proceedings "undesirable" and that the categorical approach promotes "judicial and administrative efficiency by precluding the relitigation of past convictions in minitrials conducted long after the fact" and reduces "potential unfairness").

AR.09795

a jury trial.  This makes it very difficult for a non-citizen to defend against challenges to his eligibility for discretionary relief based on prior criminal history.[24]  Inquiring into the factual basis for past convictions also disrupts the expectations of non-citizen defendants, prosecutors, judges, and defense lawyers as to the immigration consequences of a plea in a criminal case.[25]

Such mini-trials also are likely to make the adjudication of asylum applications less efficient, at a time when both the immigration court system and the USCIS asylum adjudication system are confronting substantial backlogs.[26]

## DOJ Should Exercise Discretion in Prosecuting Asylum Seekers for Illegal Entry

Finally, the ABA has urged the Attorney General to exercise prosecutorial discretion and refrain from prosecuting asylum seekers for the offense of illegal entry into the United States.  Section 208(1) of the INA provides that any non-citizen who is physically present in the United States, or arrives in the United States (whether or not at a designated port of arrival) may apply for asylum, irrespective of such person's status.  Prosecuting asylum seekers based on their manner of entry arguably is also inconsistent with Article 31 of the Refugee Convention, which prohibits a contracting state from imposing penalties on asylum seekers on account of their illegal entry, as long as asylum seekers present themselves to authorities without delay and show good cause for their illegal entry.  The INA and the Refugee Convention recognize the reality for many asylum seekers fleeing persecution: they frequently cannot obtain documentation that enables them to enter the protection country lawfully, because they fear persecution from the government that would need to issue such documents.  It is therefore concerning that DHS and DOJ propose to bar from asylum eligibility non-citizens who are convicted of illegal re-entry.  Immigration judges should not be prevented from considering the circumstances surrounding an applicant's illegal entry when deciding whether to exercise their discretion and grant a request for asylum.[27]

## Conclusion

The ABA repeatedly has emphasized that our government must address the immigration challenges facing the United States by means that are humane, fair, and effective – and that uphold the principles of due process.  Inflexible restrictions on asylum eligibility based on a broad array of past criminal conduct do not further these goals.  Therefore, the ABA respectfully urges DHS and DOJ to rescind the Proposed Rule.

---

[24] *Id*. at 201 ("[T]he minitrials the Government proposes would be possible only if the noncitizen could locate witnesses years after the fact, notwithstanding that during removal proceedings noncitizens are not guaranteed legal representation and are often subject to mandatory detention, § 1226(c)(1)(B), where they have little ability to collect evidence.  A noncitizen in removal proceedings is not at all similarly situated to a defendant in a federal criminal prosecution.") (internal citations omitted).
[25] *See Padilla v. Kentucky*, 559 U.S. 356 (2010) (holding that the Sixth Amendment requires that defense counsel must inform her non-citizen client whether his plea carries a risk of deportation).
[26] *Moncrieffe*, 569 U.S. at 201 (noting that *post hoc* investigation into the facts of predicate offenses would require overburdened immigration courts to conduct minitrials).
[27] *E.g.*, *Matter of Pula*, 19 I&N Dec. 467, 473 (BIA 1987) ("Instead of focusing only on the circumvention of orderly refugee procedures, the totality of the circumstances and actions of an alien in his flight from the country where he fears persecution should be examined in determining whether a favorable exercise of discretion is warranted.").

7

Thank you for considering our views. If you have any questions or need additional information, please contact Kristi Gaines in our Governmental Affairs Office at 202-662-1763 or kristi.gaines@americanbar.org.

Sincerely,

Judy Perry Martinez
President

8

AR.09797

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekn-skyi
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0488
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Melani Baker

---

## General Comment

Submitted via [https://www.regulations.gov/document?D=EOIR-2019-0005-0001]

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41;
Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility

January 21, 2020

To Whom it May Concern:

I am writing to express my strong opposition to the above-referenced Proposed Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019.

I am concerned that the Proposed Rules will deny the opportunity of asylum to those who need it, in particular that these proposed changes will unfairly and harmfully impact vulnerable populations, including survivors of domestic violence, LGBTQ immigrants, and immigrant youth of color. The Department of Homeland Security

AR.09798

and the Department of Justice should immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

Thank you for the opportunity to submit comments on the Proposed Rules.

Sincerely,
Melani Baker

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekn-6xbf
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0489
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Benjamin Brooks
**Organization:** Whitman-Walker Health

## General Comment

Whitman-Walker Health (WWH or Whitman-Walker) submits these comments in response to the joint notice of proposed rulemaking (Notice or Proposed Rule) "Procedures for Asylum and Bars to Asylum Eligibility" published by the Department of Homeland Security, (DHS) U.S. Citizenship and Immigration Services, (USCIS) Department Of Justice, (DOJ) and the Executive Office for Immigration Review (EOIR), on December 19, 2019. (84 Fed. Reg. 69640.)
WWH strongly opposes the proposed rule. The proposed rule contradicts the language of the INA and runs counter to the goals of our immigration system. The changes to asylum eligibility are likely to create fear and uncertainty for aliens when contacting law enforcement and exacerbate structural vulnerabilities in communities of marginalized aliens, many of whom are disproportionately profiled by law enforcement agencies and subjected to plea-bargained convictions without adequate understanding of the immigration consequences. See attached for complete comments.

## Attachments

Comments Opposing Restrictions on EAD for Asylum Applicants

## UNITED STATES DEPARTMENT OF HOMELAND SECURITY

Asylum Application, Interview and      : [CIS No. 2648-19; DHS Docket No.
Employment Authorization for Applicants    : USCIS-2019-0011]
                                           : RIN: 1615-AC27

*Submitted via Federal eRulemaking Portal: http:// www.regulations.gov*

## COMMENTS OF WHITMAN-WALKER HEALTH

Whitman-Walker Health (WWH or Whitman-Walker) submits these comments in response to the Department of Homeland Security's (DHS) notice of proposed rulemaking, "Asylum Application, Interview, and Employment Authorization for Applicants" published in the Federal Register on November 14, 2019 (hereinafter NPRM or Notice). (84 Fed. Reg. at 62374.)  WWH strongly opposes the changes in the NPRM because it stringently narrows eligibility for employment authorization documents (EADs) for asylum applicants and will result in substantial financial hardship for immigrants with asylum claims and the organizations that serve them.  The NPRM would also undermine national immigration policy by making the asylum process more uncertain, opaque, and difficult to access.

### EXPERTISE AND INTEREST OF WHITMAN-WALKER HEALTH

Whitman-Walker Health is a community-based, Federally Qualified Health Center offering primary medical care and HIV specialty care, community health services and legal services to residents of the greater Washington, DC metropolitan area.  WWH has a special mission to the lesbian, gay, bisexual and transgender (LGBT) members of our community, as well as to all Washington-area residents of every gender and sexual orientation who are living with or otherwise affected by HIV.  In calendar year 2018, more than 20,700 individuals received health services from Whitman-Walker.  In that year, 58% percent of our health care patients and clients who provided their sexual orientation identified as lesbian, gay, bisexual, or

AR.09801

otherwise non-heterosexual, and 9% of our patients and clients—more than 1,800 individuals—identified as transgender or gender queer.

Since the mid-1980s, Whitman-Walker has had an in-house Legal Services Department. Our attorneys and legal assistants provide information, counseling, and representation to Whitman-Walker patients, and to others in the community who are LGBT or living with or affected by HIV, on a wide range of civil legal matters that relate directly or indirectly to health and wellness – including immigration and asylum cases.  Our Legal Services Department, with the assistance of hundreds of volunteer attorneys throughout the area, has provided a wide range of immigration-related services to foreign-born LGBT individuals and families.  Many come to the U.S. fleeing persecution in their countries of birth because of their sexual orientation or gender identity.  In 2018, 52% of our legal services clients who provided their sexual orientation identified as lesbian, gay, bisexual or otherwise non-heterosexual; 20% identified as transgender or gender queer.  Although our patients and clients come from every income level, substantial numbers are lower-income.  Because of the difficult circumstances in which they have come to the U.S. – for instance, fleeing persecution in their countries of birth – many if not most of our immigration clients and foreign-born health care patients have limited means, particularly until their employment authorization documents are received and they are able to make new lives for themselves and becoming fully integrated members of our community.

2

AR.09802

COMMENTS ON THE PROPOSED RULE

**THE NPRM WILL CREATE CHAOS AND UNCERTAINTY IN THE ASYLUM PROCESS**

This far ranging NPRM substantially narrows access to EAD for asylum seekers by:  :

- Implementing a 365-day EAD filing wait period and removing the "Asylum Clock",
- Creating additional biometrics requirements for EAD applications and renewals,
- Eliminating asylum officer discretion to recommend approval of asylum applications,
- Reducing EAD validity periods,
- Introducing a 14-day supplementary evidence filing deadline,
- Removing the requirement for DHS to return incomplete I-589 filings in 30 days,
- Proposing a heightened criminal activity bar for EADs for asylum seekers,
- Heightening restrictions on one-year filing deadline, and
- Adjudicating pending (c)(8) applications under the new heightened restrictions.

Based on the Notice, these changes are intended to "reduce incentives for fraudulent, frivolous, and unmeritorious claims." (84 Fed. Reg. at 62375.)  However, the Notice does not demonstrate how these changes will reduce the incentives for unmeritorious asylum claims by applicants seeking employment authorizations.  The Notice fails to include any relevant discussion of drivers of unmeritorious asylum claims.  The Notice identifies that approximately 20% of asylum claims are successful as evidence of the widespread practice of filing unmeritorious claims.  DHS has not conducted an analysis on why asylum claims are unsuccessful.  The asylum application process if complex and fraught.  Our experience is that access to legal counsel can be determinative of a successful asylum application.

The Notice's discussion of "pull factors," primarily higher wages and stable economic conditions, is insufficiently analyzed to justify the sweeping changes included in the NPRM. The Notice provides no information or research to form the basis of why DHS believes the NPRM will improve the functioning of the asylum system.  On the contrary, the NPRM's changes are likely to increase the time and expense of processing asylum applications and dramatically decrease the ability of asylum applicants to access housing, food, and healthcare.

3

U. S. Citizenship and Immigration Services, (USCIS) a branch of DHS, does not collect adequate information on outcomes for applicants, for example on the outcomes for unrepresented applicants, or erroneous denials later granted on appeal, which limits their ability to implement evidence-based immigration policies and procedures.

The Notice's account of the historical reforms of the asylum system notes that the number of asylum applicants has increased since the reforms in the Immigration Reform and Control Act of 1986, despite Congressional limitations on employment for asylum seekers. (*Id.* at 62385.) DHS' reasoning narrowly analyzes the regulatory environment, without considering other contextual factors that contribute to asylum trends. Confounding factors, like more accessible transcontinental travel, partisan violence in Colombia, and political unrest in Venezuela, must be analyzed to understand how they contribute to trends in asylum applications. For example, DHS notes that they received increasing numbers of asylum applications since 2016. (*Id.* at 62385.) A more expansive analysis would reveal that an increase in asylum applications during this time is expected, as the global number of refugees and asylum seekers has been increasing since 2009 and reached unprecedented levels in 2018.[1]

### THE NPRM WILL STRAIN THE RESOURCES OF NON-PROFIT IMMIGRATION ORGANIZATIONS

The NPRM substantially changes the requirements for both filing deadlines and amending applications. The provisions, which institute 14-day filing deadline for supplementary evidence, and treat amending applications as an applicant-caused delay, purport to incentivize completeness when filing asylum applications. When implementing deadlines, USCIS must be

---

[1] *Global Trends Forced Displacement In 2018,* UNHCR, available at  https://www.unhcr.org/en-us/statistics/unhcrstats/5d08d7ee7/unhcr-global-trends-2018.html. "Over the past decade, the global population of forcibly displaced people grew substantially from 43.3 million in 2009 to 70.8 million in 2018."

AR.09804

mindful of the impact of USCIS delays and backlogs on applicants.  USCIS's profound asylum backlog means that many applicants are waiting several years before an Officer adjudicates their claim.  We have clients with asylum claims who, under the "Last In, First Out" (LIFO) system have been pending for more than 5 years.  Practitioners have had to adapt to this extremely unfortunate reality.  Supplementing the filing within closer proximity to the actual interview ensures that the Officer has more accurate, up-to-date, and complete evidence to consider. USCIS schedules interview notices 3 weeks before the interview.  The 14-day filing deadline does not allow sufficient time for applicants to prepare and submit evidence after receiving the interview notice.  Due to mail processing times, applicants have less than 7 days between receiving the interview notice and the 14-day filing deadline for supplementary evidence.  Less than 7 days is insufficient notice for due process purposes.  The filing deadline restricts an applicant's ability to provide supplementary evidence, likely requiring applicants to request a rescheduled interview, further delaying processing and adjudication.

It is common practice in non-profit legal immigration practice for LGBT clients to file the initial asylum application with the Form I-589 and additional evidence available at that time, which is supplemented at a date closer to the actual interview.  This practice is beneficial to practitioners and their clients because it enables asylum applicants to begin the lengthy USCIS process of obtaining protection from persecution and torture, meet the one-year filing deadline or file within a reasonable time after a material changed circumstance, and continue to gather evidence and documentation required to demonstrate a meritorious claim.  Providing supplementary evidence of material changes is beneficial to USCIS.  Filing supplemental evidence closer to asylum interviews also preserves the resources of non-profit immigration

AR.09805

practices, which are routinely required to prioritize emergent crises with limited resources. We recommend that USCIS eliminate the 14-day filing deadline for supplementary evidence.

### THE NPRM WILL HAVE A DISPROPORTIONATE EFFECT ON LGBT ASYLUM APPLICANTS

The NPRM doubles the time period an applicant is required to wait in order to apply for an EAD attendant to asylum, remove access to EADs for applicants who miss the One-Year Filing Deadline (1YFD), and proposes to restrict access to asylum derivative EADs for people with a range of unresolved criminal charges.  These restrictions will disproportionately impact LGBT asylum seekers.  LGBT asylum seekers are more likely to be poor, more likely to be criminalized in their home countries, and more likely to not file their asylum applicants by the 1YFD due to the process of coming out.[2]

LGBT people will be disproportionately impacted by limitations on access to employment because many are unable to rely on traditional safety nets, such as family, for housing and other basic needs due to widespread family and societal rejection.  LGBT people are more likely to be without financial resources necessary to hire a private attorney or to provide food, housing, and clothing for the pendency of their applications.  Restricting access to employment for asylum applicants while their application is processing severely detracts from the applicant's ability to provide for themselves and to participate in and integrate into their host communities.  Inability to work is particularly harmful for LGBT asylum applicants, many of

---

[2] *RAIO Guidance for Adjudicating Lesbian, Gay, Bisexual, Transgender, and Intersex (LGBTI) Refugee and Asylum Claims*, 52 (Nov. 16, 2015) "In many instances an individual does not "come out" as lesbian, gay, bisexual, or transgender until he or she is in the country where he or she sees that it is possible to live an open life as an LGBTI person. If an individual has recently "come out," this may qualify as an exception to the one-year filing deadline based on changed circumstances. […] LGBTI individuals who suffer from internalized homophobia and transphobia or who may have been subjected to coercive mental health treatment to "cure" them in their home countries may find it especially difficult to seek the mental health treatment they may need to proceed with their applications. Also, many LGBTI asylum-seekers in the United States live with extended family members or with members of the very community they fear."

AR.09806

whom experience family rejection and social marginalization and are extraordinarily vulnerable to labor and sex trafficking in the United States.

We are concerned with DHS' proposal to consider unresolved domestic charges or arrests that involve domestic violence when granting EADs. This proposal could allow for malicious parties to impede applications for victims of domestic violence by filing baseless domestic temporary restraining orders or protective orders. These short-term court orders have lower evidentiary burdens and allowing them to influence USCIS adjudications removes due process protections for applicants.

Given USCIS's tremendous backlogs in adjudicating asylum claims, applicants are often waiting for several years before receiving a decision in their case and it is essential that they have access to authorized employment in order to care for their basic needs during these extended periods. Access to a valid EAD that reflects a transgender applicant's name and gender identity is a critical lifeline to these individuals, providing protective effects against violence and discrimination. Restrictions like the ones proposed will result in further exploitation of already vulnerable populations. Consequently, we expect the NPRM, if enacted, to exacerbate the inequities of housing insecurity, food insecurity, and lack of access to healthcare for LGBT immigrants.

### THE NPRM REMOVES ACCOUNTABILITY MECHANISMS FROM USCIS

We are concerned that the NPRM removes the asylum clock and the 30-day notice requirement for incomplete applications without adequate replacements. Under the NPRM, instead of a 180-day EAD clock, there's a 365-day waiting period before asylum applicants can file an EAD. Additionally, the NPRM filed September 9, 2019 "Removal of 30-Day Processing Provision for Asylum Applicant-Related Form I-765 Employment Authorization Applications,"

7

(84 Fed. Reg. 47148), removed the 30-day EAD adjudication requirement.  With the removal of the asylum EAD clock and no replacement process, there is no mechanism for applicants to hold USCIS accountable to a timeline for adjudicating their applications.  The Asylum Clock and the 30-day notice requirement for incomplete applications are two sources of certainty for asylum seekers.  By removing these steps, USCIS provides no certainty or accountability mechanisms for asylum applicants and places the burden of USCIS' delays onto applicants.  These changes undermine the asylum system by removing USCIS' incentives to reduce delays and reduces public trust in the fair and regular adjudication of asylum applications.

We are concerned that the NPRM removes recommended approvals and adds biometric collection and fees to the asylum derivative EAD applications and renewals.  Removing recommended approvals increases the wait time for asylum applicants to receive EADs with no demonstrable benefit to the efficiency of the asylum process.  We are opposed to implementing biometric collection for EAD renewals because requiring more frequent and costlier filings presents additional barriers for applicants, who likely have difficulty paying the fees and accessing transportation to and from USCIS processing facilities.

We are very concerned that USCIS will apply the changes retroactively to pending asylum claims.  The NPRM's changes which bar EADs for applicants that miss the 1YFD would terminate pending applicant's EADs until the exception is adjudicated by an immigration judge or asylum officer.  The officer or judge determines if an exception applies at the final determination of the asylum claim.  Under the LIFO system, our clients with applications pending for years are unlikely to get their asylum claims approved for many more years.  The inevitable result is pending applicants are unlikely to access EADs until asylum is granted, leaving them unable to work and reliant on charity or vulnerable to exploitation.

AR.09808

## CONCLUSION

WWH finds that these changes will create chaos and uncertainty for asylum applicants and strain the resources of non-profits who serve them. The NPRM will have severely adverse consequences on pending asylum applicants, in particular LGBT applicants who experience widespread discrimination and family rejection. The Notice's restrictions on legal employment will create economic conditions of desperation for vulnerable populations of applicants. For these reasons, Whitman-Walker Health opposes the NPRM and recommends that the Administration promptly rescind it.

Respectfully submitted,

Benjamin Brooks, Assistant Director of Policy
Daniel Bruner, Senior Director of Policy
Denise Hunter, Staff Attorney
Connor Cory, Staff Attorney

WHITMAN-WALKER HEALTH
1377 R Street NW Suite 200
Washington, DC  20009

January 13, 2020

9

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekn-1plm
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0490
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Rachel Mendoza-Newton
**Address:**
  1019 S 4th St
  Louisville,  KY,  40203
**Email:** rnewton@russellimlaw.com
**Phone:** 5025877797

## General Comment

I am writing to express my INTENSE OPPOSITION to the Proposed Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019.

Though I am an immigration attorney, I have no financial motive in this. I make money defending clients from unjust laws, too. My statements are based on a lifetime of experience. I am also a board member of a local nonprofit that promotes education and learning English to help immigrants and refugees assimilate and break the cycle of poverty and ignorance. Most importantly, I am the wife of an immigrant and the mother to 3 beautiful bilingual children. These attacks on immigrants and refugees impact me and the people I love.

The proposed rules might sound good in the abstract, but in reality they are terrible. ALL of the new bars are problematic.

Any Felony: A lot of extremely minor offenses (factually speaking) are technically felonies. In New Mexico, a $25 cold check is a felony. In Kentucky, misdemeanors have a maximum sentence of 12 months instead of 364 days. Since they are punishable by a year, they can be classified as felonies in immigration law. Calling something a felony makes it sound really bad, but in reality a lot of very minor offenses, under this rule, would make someone ineligible for asylum no matter how otherwise deserving they may be.

Smuggling: If someone wants to really hurt you or force you to do things, the 1st thing they do is threaten your loved ones. If you are fleeing for your life, the one thing you CANNOT do is leave your closest loved ones behind to be kidnapped and tortured/raped/killed/etc. It is crazy to punish people for protecting their families. Plus, AZ used to charge people with smuggling THEMSELVES into the US, which would make everyone

AR.09810

ineligible for asylum.

Illegal Reentry: If someone wants to kill you, reentering a country from which you were deported might be necessary to save your life. You should not be punished so harshly for that desperate act of self-preservation.

Gangs: Many police officers see gangs behind every shadow & accuse young people of belonging to gangs when it isn't true. If a teenager is wearing baggy clothes, socializing with a suspected gang member, etc., officers add them to the gang database. If the person later gets detained for some minor crime, a gang affiliation flag gets added. A paranoid cop should not be allowed to destroy a young person's life with an unjustified gang label.

DUIs & Drugs: People who are forced to flee for their lives are already suffering from a lot of trauma, making it difficult for them to seek the help they need & to apply for asylum because telling their story in detail (necessary for asylum) is like reliving their trauma. Self-medication is common, just as it is for US citizens, whether with alcohol or drugs. When people make mistakes, we need to help them instead of kicking them while they are down.

Fraudulent documents: People need to eat and have a place to sleep. These are basic necessities for survival. If using a fake document with a made up Social Security number allows someone to work hard and earn money to support themselves and their children, taking away their ability to apply for asylum is much too harsh of a punishment. We should give them work permits instead, so that the fraud is unnecessary.

There are already so many barriers (both just and unjust) to asylum, it is nearly impossible for anyone's asylum claim to be granted. These are human beings, who don't deserve to be tossed into the garbage because they have human flaws and make mistakes. They came here searching for protection and safety, and to throw them out is to send them to their deaths. WE ARE SUPPOSED TO BE BETTER THAN THAT!!!

Not only are these proposed changes unnecessary and cruel, they constitute an unlawful gutting of the asylum protections enshrined in United States and international law. Current law already allows adjudicators discretion to deny asylum for criminal conduct. We have a legal and moral obligation to welcome asylum seekers and provide them with REAL due process - not this farce I have been seeing lately.

I understand that people are tired of hearing terrible stories about immigrants who do bad things, but that is simply the news media focusing on those stories for ratings. I see no media coverage of the vast majority of immigrants working hard, contributing to their communities, raising strong families and NOT getting in trouble.

The DHS and the DOJ should immediately withdraw this horrendous proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted FULL and FAIR access to asylum protections in the United States.

Thank you for the opportunity to submit comments on the Proposed Rules. Please do not hesitate to contact me to provide further information.

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekn-fjoj
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0491
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Virginia Goggin
**Address:**
  116 Nassau St.
  3rd Floor
  New York,  10038
**Email:** vgoggin@avp.org
**Phone:** 2127141184

## General Comment

See attached file(s)

## Attachments

Comment_on_ Proposed_Rulemaking_Procedures_ Asylum_and_Bars_to_ Asylum_Eligibility



Anti-Violence Project
116 Nassau Street, 3rd Floor
New York, New York 10038
212.714.1184 *voice* | 212.714.2627 *fax*
212.714.1141 *24-hour hotline*

January 21, 2020

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

*Submitted via* https://www.regulations.gov/document?D=EOIR-2019-0005-0001

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87,
1615-AC41; Comments in Response to *Proposed Rulemaking Procedures for Asylum and Bars
to Asylum Eligibility*

To Whom It May Concern:

On behalf of the New York City Gay and Lesbian Anti-Violence Project (AVP), please find this
comment in response to the Department of Homeland Security (DHS) and Department of
Justice's (DOJ) Joint Notice of *Proposed Rulemaking Procedures for Asylum and Bars to
Asylum Eligibility* published in the Federal Register on December 19, 2019, to express our strong
opposition to the proposed changes to the asylum process and asylum eligibility.

AVP, founded 40 years ago, empowers lesbian, gay, bisexual, transgender, queer (LGBTQ) and
HIV affected communities and allies to end all forms of violence through organizing and
education, and supports survivors through counseling, legal services and advocacy. We provide
counseling as well as legal and economic empowerment services to survivors, and engage in
community organizing and policy work in connection with and on behalf of members of the
LGBTQ and HIV affected communities. Under the current administration, our provision of
immigration-related legal services has increased exponentially, with the vast majority of our
work related to asylum requests. The need for asylum is particularly acute among the LGBTQ
and HIV-affected communities due to the severe oppression and marginalization that members of
these communities face globally.

**Serving New York's Lesbian, Gay, Bisexual, Transgender, Queer and HIV-Affected Communities**
www.avp.org
AR.09813

AVP has grave concerns regarding the immense harm that these changes in the proposed rule will have on immigrant survivors of domestic and intimate violence, sexual assault, human trafficking, anti-LGBTQ violence and other gender-based abuses, particularly those within LGBTQ and HIV affected communities. We urge DHS and DOJ to withdraw the proposed rule in its entirety.

The proposed changes would have a particularly detrimental effect on the communities that AVP represents. As a result of ostracization and rejection by their families, many LGBTQ and HIV-affected people turn to sex work, substance use, or other criminalized economies in order to survive. Many in these communities experience further discrimination in education, employment, and housing, making it even more likely that they will experience poverty and thus have contact with the criminal justice system. As a direct result of the systemic oppression they experience, members of the LGBTQ and HIV-affected communities are disproportionately policed in comparison to members of other identity groups. When LGBTQ and HIV-affected people are arrested or otherwise justice system-involved, they are likely to experience violence at the hands of police. For example, in AVP's National Report on LGBTQ & HIV-Affected Violence in 2017, 13% of the survivors of hate violence surveyed reported experiences of police misconduct. 44% reported that the police had used excessive force. Of the survivors of intimate-partner violence who were interviewed, 5% reported experiencing police misconduct, and in one out of every five interactions, excessive force was reported.

The proposed change that would allow a denial of asylum based on allegations of domestic violence for which an asylum seeker has not been convicted are particularly problematic considering the legacy of stereotypes about and inaction in response to domestic/intimate partner violence in the LGBTQ community. Abusers often use the legal system as a tool of abuse, filing police reports and counter-complaints against their partners in an attempt to further control them and prevent them from seeking help. An adjudicator who is not well-versed in the dynamics of domestic/intimate partner violence may mistake this as a reason to deny asylum, rather than understand it as a reason to grant it. Furthermore, law enforcement has traditionally been either unresponsive to violence in queer relationships or has used harmful assumptions as the basis of their investigative work. It is not uncommon, for instance, that the more masculine-appearing partner in a LGBTQ relationship be arrested on the assumption that they must be the abusive partner, even if they are in fact the survivor. This proposed change will not be successful in preventing abusers from claiming asylum. This change has a far greater chance of harming LGBTQ survivors of violence who are seeking asylum than it does of helping them.

The proposed changes would thus add insult to injury for LGBTQ and HIV-affected people seeking asylum. If these changes are enacted, the very reason that they are seeking asylum, their identities, will be the reason that they are denied it. What makes them highly deserving of this discretionary benefit is what will prevent them from ever being able to have their day in court.

I.    **Immigrant Survivors Flee to the U.S. to Seek Asylum as a Last Resort in Desperate Hope of Finding Safety and Protection.**

2

AR.09814

Immigrant survivors who flee to the U.S. to seek asylum have endured horrific domestic/intimate violence, sexual assault, rape, anti-LGBTQ violence[1] and other gender-based forms of abuse that have threatened their and their children's lives. The journey to the U.S. is a dangerous one. Still, survivors traverse the hundreds to thousands of miles because they strongly believe that it is safer to make the journey for the possibility of finding safety and protection in the U.S. than to stay in their home countries where their governments do little to protect them from their abusers and perpetrators, or are in effect *are* the perpetrators of harm-including death[2].

Many survivors and their children of domestic violence have endured years of abuse, terror, fear, and powerlessness before they finally take the steps to escape from their abusers to come to the U.S. Many immigrant survivors of sexual assault and rape are subjected to multiple attacks, stalked, or at risk of being murdered by their perpetrators. They are compelled to flee to the U.S. because they recognize that they will never be able to feel safe again if they remain in their home countries. Therefore, for many immigrant survivors, asylum is their only chance of finally obtaining safety and being to live as their authentic selves. Immigrant survivors of violence do not make the choice to seek asylum in the U.S. lightly. They must leave everything they know, brace themselves for the tremendous peril that awaits them during their journey, and traverse the many miles with very few possessions of their own – often with nothing but the clothing on their backs.

The proposed rule released by DHS and DOJ proposes to bar many of these vulnerable and traumatized immigrant survivors of violence from qualifying for asylum. Specifically, the proposed rule seeks to 1) establish seven new bars to eligibility for asylum, 2) authorize immigration adjudicators to determine whether a criminal conviction or sentence is valid for the purpose of determining eligibility for asylum, and 3) rescind a provision in the current regulation regarding reconsideration of discretionary denials of asylum. Immigrant survivors of violence already face numerous barriers to applying for asylum, and these proposed changes will only serve to create more barriers and prevent immigrant survivors from obtaining the asylum protections they desperately need. Rather than restricting access to protection, the administration should continue to expand opportunities for vulnerable immigrant survivors to access safety and protection.

In 2018, immigrants from Venezuela and the Northern Triangle countries – Guatemala, El Salvador, and Honduras – made up one half of the asylum seekers who filed for affirmative asylum – meaning individuals seeking asylum who are present in the U.S. and are not in removal proceedings. Immigrants from these same countries also made up the majority of the asylum seekers in the defensive asylum process – meaning asylum seekers who are in removal proceedings. Venezuela, the Northern Triangle countries, Caribbean countries, many African counties and countries throughout the Middle East are notorious for being places where it is extremely dangerous to be LGBTQ or HIV positive. Many immigrant LGBTQ people who flee from these countries to seek asylum in the U.S. have survived horrendous violence and trauma.

---

[1] Seventy-five countries criminalize sexual relationships between same-sex consenting adults, 12 of which impose the death penalty. Twelve countries criminalize the gender identity/expression of transgender people. See, https://www.humandignitytrust.org/lgbt-the-law/map-of-criminalisation/.
[2] *Id.*

3

In Venezuela, women and girls become victims of homicide by a rate of 24.5 per every 100,000 women, putting Venezuela as the country with the second highest femicide rate in 2016 when looking at countries that are not currently in an armed conflict. Furthermore, among 357 cases brought before the International Criminal Court regarding violence, abuse, and torture perpetrated by security forces against political prisoners, 190 were about rape and sexual abuse. Domestic and family violence are also pervasive in all three countries. According to one local NGO in El Salvador, approximately 70 percent of sexual assault perpetrators know the victim and 20 percent are family members.*

## II.     The Proposed Rule Violates U.S. Obligations Under Both Domestic and International Law.

The United States has long served as a beacon of hope for immigrant survivors of domestic and sexual violence and other gender-based abuses. As a party to the 1967 Protocol Relating to the Status of Refugees, which binds parties to the United Nations Convention Relating to the Status of Refugees, the U.S. developed section 208 of the Immigration and Nationality Act ("INA"), 8 U.S.C. 1158 to extend asylum protections to immigrants fleeing persecution. For over forty years, the United States has continued to uphold its commitment to helping and protecting those who are fleeing persecution, including gender-based persecution. However, by carving out categorical bars from asylum protection and grossly expanding the serious crime bar beyond the Convention's definition of "capital crime or a very grave punishable act," the proposed rule violates our obligations under the Refugee Convention and the INA to provide asylum seekers with fair access to asylum protections. These increased and arbitrary hurdles to protection are wholly incongruent with the letter and spirit of the commitment the United States made in the Refugee Convention and the INA to protect vulnerable refugees fleeing persecution.

## III.    The Proposed Rule Will Unfairly Prevent Many Vulnerable Immigrant Survivors from Obtaining Asylum.

The proposed rule seeks to add seven new criminal bars to asylum eligibility. These new bars are sweeping in scope, and several will render ineligible many vulnerable LGBTQ immigrant survivors who are in desperate need of protection and who would otherwise be eligible for asylum protections.

### A.    The Categorical Bar for an Offense of "Smuggling or Harboring" Will Harm and Fracture Immigrant Survivors and Their Families.

The proposed rule seeks to expand the "smuggling and harboring" asylum eligibility bar to include immigrants who are convicted of assisting their spouse, children, or parents escaping persecution to come to the U.S. Under this proposal, efforts to bring children to safety will disturbingly be considered "particularly serious crimes" and classified as aggravated felonies. Immigrant survivors who are convicted of helping their children escape from an abuser or perpetrator of sexual violence and enter the U.S. will therefore be branded as felons and ineligible for asylum. Survivors who have seized their last possible chance of protecting their children by fleeing to the U.S. will essentially be punished for seeking to build a life free from violence for themselves and their children. By depriving traumatized immigrant survivors and their children of the ability to obtain asylum protections, the proposed rule will only serve to re-

4

traumatize survivors and their children and cause them to remain vulnerable to experiencing even more violence and abuse.

### B. The Bar for Illegal Reentry Lacks Credible Justification and Criminalizes Immigrant Survivors Desperately Fleeing Violence.

The proposed rule seeks to bar all applicants convicted of illegal reentry from being eligible for asylum. This proposal wholly ignores the reality that immigrant survivors of violence who are sent back to their countries of nationality are at risk of violent retaliation from their abusers or perpetrators, and may even face death. Survivors therefore make the treacherous journey to the U.S. again after they are removed for the same exact reason they fled the time(s) before – to escape horrific domestic and sexual violence, desperately hoping that this time, they will be granted asylum and finally be safe.

Restricting asylum eligibility to exclude immigrant survivors who are convicted of illegal reentry for fleeing from violence multiple times is antithetical to the mission of the U.S. to protect the most vulnerable. The reason immigrant survivors repeatedly enter the U.S. in search of asylum is because they are subjected or at risk of being subjected to domestic or sexual violence when they are sent back to their country of nationality. By denying these survivors the ability to seek asylum, the proposed rule will be denying protection to among those who need it most.

### C. The Bar for Conviction or an Accusation of Conduct of Battery or Extreme Cruelty Harms Survivors.

The proposed rule seeks to make ineligible for asylum all applicants who have been convicted of domestic assault or battery, stalking, or child abuse in the domestic context. The proposed rule alarmingly takes this one step further so that immigrants who are simply *accused* of engaging in battery and extreme cruelty. This proposed rule creates the only crime-related bar for which a conviction is not required. DHS and DOJ paint this proposal as a way to protect survivors; however, it will cause immense harm to immigrant survivors of violence.

There are many cases in which immigrant survivors (and especially LGBTQ survivors), not their abusers, are arrested and prosecuted for domestic violence offenses. Immigrant survivors who have limited English proficiency (LEP) may not be able to fully describe the situation and the abuse they experienced to police officers. In many situations, police officers may then turn to the perpetrators to interpret. In fact, many LGBTQ survivors are arrested in dual arrests because the police use perpetrators as interpreters or do not conduct a primary aggressor analysis. In other cases, survivors are arrested and face charges for domestic violence arising from acts of self-defense or because abusive partners or perpetrators manipulate the legal system by filing false claims of abuse. Service providers report that it is common to see abusers make false allegations to police and the courts to have immigrant survivors arrested. The proposed rule's lack of requirement of a conviction increases that likelihood, given the lack of completion of a fact-finding.

Although there is a proposed waiver for survivors who are deemed to not be the primary aggressor, the waiver is insufficient to mitigate the harm that many survivors will experience. Not only will victim-defendants be swept in, but survivors and their families will be harmed in

5

cases where the allegedly abusive family member has not engaged in a pattern of coercive, controlling behavior, or has demonstrated actual rehabilitation and accountability and plays an important contribution to the health and well-being to the family.

### D. The Eligibility Bar for Misdemeanor Document Fraud Ignores Migration-related Circumstances.

One of the misdemeanor offenses that would render an immigrant ineligible for asylum is the use of fraudulent documents. This bar will sharpen the tools of control and coercion used by abusers, and punish immigrant survivors who have themselves fallen victim to fraud. Abusers often hide or destroy survivors' documents in order to exert dominance and prevent survivors from being able to leave the relationship. As such, immigrant survivors who escape from violence must often search for other ways to obtain documentation. This leads survivors to be highly vulnerable to falling prey to fraud by individuals who falsely claim to have the ability to prepare legal documentation for them. Immigrant survivors who have fraudulent documents may therefore genuinely believe that they had taken the necessary steps to acquire legal documents.

Most survivors of violence have experienced financial abuse, where the abuser has limited their access to financial resources and forced survivors to depend on them for housing, food, health care, and other basic needs. Survivors who escape from abusive relationships therefore risk falling into poverty and homelessness. As such, survivors may be compelled to resort to any measure to obtain documentation so that they can work and sustain themselves and their children. Access to economic resources is absolutely critical in supporting the safety of survivors who are fleeing domestic violence, sexual assault, and human trafficking. Barring immigrant survivors from asylum for taking measures to ensure that they could feed, clothe, and house themselves is cruel and will only serve to render them even more vulnerable to exploitation.

### E. The Proposed Rule Creates Inconsistency in Adjudications and Provides Immigration Adjudicators with an Unprecedented Amount of Authority.

The proposed rule aims to permit immigration adjudicators to determine whether a conviction or conduct related to domestic violence or battery and extreme cruelty would render an immigrant ineligible for asylum. First, the definition of battery and extreme cruelty in particular differs from state-law domestic violence criminal definitions, creating inconsistency in determining who is covered by the asylum bar. While such language is appropriate in providing protection for those seeking it, it is highly inappropriate in the context of barring individuals seeking protection against persecution. In addition, in order to properly and accurately assess domestic violence, battery, or extreme cruelty, one must have experience and in-depth knowledge of the intricacies of abuser-survivor relationships and dynamics; the nuances of the tactics abusers and perpetrators use to control, intimidate, and manipulate survivors; understanding of the ongoing pattern of behavior in abusive relationships; specific vulnerabilities of immigrants to being victimized; and many other important analyses of the domestic nature of abusive conduct. Immigration adjudicators, in all likelihood, lack this expertise and intimate understanding. As such, putting the responsibility on immigration adjudicators to make these complex decisions about whether conduct amounts to a covered act of battery or extreme cruelty without court findings, following presentations of evidence under oath by adverse parties, is wholly

6

inappropriate, and will likely result in erroneous determinations that will cruelly strip immigrant survivors of their right to seek asylum.

The proposed rule also seeks to provide immigration adjudicators with the authority to determine whether a vacated, expunged, or modified conviction or sentence should be recognized in determining whether an immigrant is eligible for asylum. This proposed change undermines the authority of state courts that have experience and expertise and allows immigration adjudicators to essentially question and disbelieve the decisions of court judges. Providing immigration adjudicators with this broad and overextending authority will compromise the ability for immigrant survivors to have a fair and full proceeding.

### F. Alternative Forms of Relief Are Insufficient to Protecting Immigrant Survivors of Violence

The proposed rule offers that immigrants who become ineligible for asylum under the seven new bars of asylum ineligibility could still qualify for other forms of protection, namely withholding of removal or protection under the Torture Convention (CAT). However, these forms of relief require a higher burden of proof than asylum, meaning that many asylum seekers excluded from eligibility under the proposed rule will face deportation back to harm if they cannot meet this higher burden. Furthermore, the protections afforded by CAT and by statutory withholding of removal are limited in scope and duration. Withholding of removal and CAT protection do not provide a path to lawful permanent residence and do not allow for freedom of travel or for family reunification, with detrimental consequences for other family members fleeing domestic and sexual violence and trafficking. Limiting protections for immigrant survivors to withholding of removal and CAT will leave them in a continued state of limbo and unable to truly build a safe and secure life for themselves.

### G. Removing Reconsiderations of Discretionary Denials of Asylum Will Deprive Immigrant Survivors of the Opportunity to Seek Safety Despite Having Viable Claims of Asylum.

The proposed rule seeks to remove automatic review of a discretionary denial of an asylum seeker's application in the event that the immigrant is denied asylum solely in the exercise of discretion. Rescinding the review of discretionary denials will be extremely harmful to immigrant survivors of violence. Many immigrant survivors are LEP or lack the financial resources to retain an attorney. The immigration legal system is incredibly complex and difficult to navigate, and many immigrant survivors with viable claims for asylum find their cases denied due to these barriers. Even if the survivor is granted withholding of removal or protection under CAT, as detailed in the section above, these alternative forms of protection do not allow for the same level of relief and benefits as asylum protection. Maintaining reconsiderations of discretionary denials of asylum is therefore absolutely critical to ensuring that immigrant survivors who are eligible for asylum have another opportunity to defend and prove their right to obtain asylum protections and remain in the U.S.

### H. Conclusion

AR.09819

For the foregoing reasons, the New York City Gay and Lesbian Anti-Violence Project urges DOJ and DHS to rescind the proposed rule, which violates our nation's laws and moral obligations and cruelly prevents many survivors of domestic/intimate violence, sexual assault, human trafficking and anti-LGBTQ violence who are fleeing persecution from obtaining the asylum protections they need and deserve. We instead urge DOJ and DHS to promote policies that account for the dire reality that traumatized refugees face and seek to maximize their safety throughout the asylum process.

Thank you for the opportunity to submit comments on the Joint Notice of Proposed Rulemaking Procedures for Asylum and Bars to Asylum Eligibility. Please contact me if you have any questions or concerns relating to these comments. Thank you.

Respectfully submitted,

New York City Gay and Lesbian Anti-Violence Project

Virginia M. Goggin
Legal Director
vgoggin@avp.org

8






## Policing and the LGBTQ community

Law enforcement's treatment of the LGBTQ community has historically been marked by bias and discrimination, often sanctioned by the state.[1] Today, homophobia and transphobia remain rampant in most, if not all, law enforcement agencies. LGBTQ people of color, transgender women of color, and non-binary people face compounding discrimination due to race, gender, and gender identity. Below is an overview of common issues faced by members of the LGBTQ community in interactions with law enforcement.

**Over-policing:** The LGBTQ community faces disparate levels of policing. Across the country, gay, lesbian, and bisexual youth are more likely to be stopped by the police and experience greater criminal justice sanctions not explained by greater involvement in violating the law or engaging in transgressive behavior.[2] A national survey of LGBT people found that 73% of LGBT people and people living with HIV reported face-to-face contact with law enforcement in the past five years.[3] In a 2012 report of LGBTQ communities of color in Jackson Heights, Queens, New York, 54% of LGBQ respondents reported having experienced a police stop and 59% of transgender respondents reported that they had been stopped by police.[4]

Studies show this may be, at least in part, attributable to "broken windows" policing tactics and the criminalization of poverty. Members of the LGBTQ community are more likely to live in poverty and experience higher unemployment and homelessness than non-LGBT people due to systemic discrimination in education, employment, and housing.[5] And in turn, "[i]ndividuals living in poverty have a substantially higher rate of involvement with the juvenile and criminal justice systems."[6]

**Homophobia and Transphobia:** Few police departments have policies governing their interactions with people who are LGBTQ or non-binary, and homophobia and transphobia are rampant within police departments. Officers frequently misgender or make offensive comments to LGBTQ people in

---

[1] In 2003, when the Supreme Court ruled that laws criminalizing sodomy were unconstitutional in *Lawrence v. Texas*, 539 U.S. 558 (2003), many states were enforcing anti-sodomy laws. A decade later, more than a dozen states still had not repealed the laws, refusing to do so to express continued moral disapproval of same-sex relationships.

[2] Kathryn E. W. Himmelstein & Hannah Brückner, Criminal-Justice and School Sanctions Against Nonheterosexual Youth: A National Longitudinal Study, 127 Pediatrics (no. 1) 49-57 (2011).

[3] Lambda Legal, Protected and Served? Survey of LGBT/HIV Contact with Police, Courts, Prisons, and Security," Preliminary Findings (2012), *available at* https://www.lambdalegal.org/protected-and-served

[4] Make the Road New York, Transgressive Policing: Police Abuse of LGBTQ Communities of Color in Jackson Heights, 4 (2012), *available at* https://maketheroadny.org/pix_reports/MRNY_Transgressive_Policing_Full_Report_10.23.12B.pdf

[5] Jamie M. Grant et al., Injustice at Every Turn: A Report of the National Transgender Discrimination Survey (2011), *available at* http://endtransdiscrimination.org/PDFs/BlackTransFactsheetFINAL_090811.pdf.

[6] Brenda Smith et al., Policy Review and Development Guide: Lesbian, Gay Bisexual, Transgender, and Intersex People in Custodial Settings, Nat'l Inst. Of Corrs. (2015), *available at* https://info.nicic.gov/sites/info.nicic.gov.lgbti/files/lgbti-policy-review-guide-2_0.pdf

AR.09821





interactions. And even in departments that have policies for interactions with LGBTQ people, ongoing training and accountability are needed.

Rampant homophobia and transphobia within agencies leads to LGBTQ people of color, transgender people, and youth experiencing particularly high rates of harassment and discrimination by law enforcement.[7] In a 2012 report of interactions between transgender Latina women and law enforcement in Los Angeles County, two-thirds of the women reported verbal harassment by law enforcement.[8] In a 2015 survey of transgender people throughout the United States, of respondents who interacted with police in the prior year and believed the officer thought or knew they were transgender, 58% reported some form of mistreatment; 49% involved officers consistently using the wrong gender pronouns, 20% involved other verbal harassment, and 19% involved officers asking questions about gender transition.[9] In a survey of sex workers in Baltimore, more than two-thirds (70%) of trans sex workers reported being verbally or emotionally harassed by police and over half (56%) reported police had made transphobic remarks to them.[10]

Even in cases in which transgender people are victims of crime, law enforcement agencies misgender them in internal and news reports, alienating the victim's friends and family, increasing distrust with the very community whose cooperation they need, and hampering their own ability to successfully resolve the investigation. In 2018 in Orange County, Florida, sheriff's deputies investigating the murder of Sasha Garden, a black trans woman, misgendered her in initial police reports, after being informed of her gender identity and refused to correct their initial report after pleas from Ms. Garden's friends to do so.[11]

Similarly, after the murders of three black transgender women, and the non-fatal shooting of a fourth transgender woman, in Jacksonville, Florida, the police department repeatedly refused to use their correct pronouns in reports to the media.[12] These intentional refusals to accurately use the correct

---

[7] Christina Mallory, Amira Hasenbush & Brad Sears, Discrimination and Harassment by Law Enforcement Officers in the LGBT Community, Williams Institute (2015), *available at* http://williamsinstitute.law.ucla.edu/wp-content/uploads/Mallory-Sears-Govt-Contractors-Non-Discrim-Feb-2012.pdf

[8] Frank Galvan & Mosen Bazargan, Interactions of Latina Transgender Women with Law Enforcement (2012), *available at* https://williamsinstitute.law.ucla.edu/wp-content/uploads/Galvan-Bazargan-Interactions-April-2012.pdf

[9] Sandy E. James et al., The Report of the 2015 U.S. Transgender Survey, Nat'l Center for Transgender Equality, 186 (2016), *available at* https://www.transequality.org/sites/default/files/docs/USTS-Full-Report-FINAL.PDF

[10] Katherine Footer et al., Police-Related Correlates of Client-Perpetrated Violence Among Female Sex Workers in Baltimore City, Maryland, 109 Am. J. Pub. (no. 2) 289-295 (2019).

[11] Colin Wolf and Monivette Cordeiro, A Transgender Woman Died Today and How It Was Reported Was Awful, Orlando Weekly (July 19, 2018), *available at* https://www.orlandoweekly.com/Blogs/archives/2018/07/19/a-transgender-woman-died-in-orlando-today-and-how-it-was-reported-was-awful.

[12] Lucas Waldron & Ken Schwencke, Deadnamed, ProPublica (Aug. 10, 2018), *available at* https://www.propublica.org/article/deadnamed-transgender-black-women-murders-jacksonville-police-investigation.

AR.09822



 

names and pronouns of victims of crime illustrate the transphobia within their department that impedes their ability to effectively serve the transgender members of their community.

**Profiling:** LGBTQ people, particularly transgender women of color and LGBTQ youth of color, are persistently profiled by law enforcement as being engaged in sex work. They are stopped and arrested for prostitution-related crimes, even when they are not engaged in sex work. A study by Human Rights Watch found that transgender women were subjected to constant harassment, verbal abuse, and stops for suspicion of prostitution.[13] For LGBTQ people, police stops "are often a result of profiling, targeting [people] for the way they look, what they are wearing, and where they are standing, rather than on the basis of any observed illegal activity."[14]

In a 2015 survey, of respondents who said they believed officers thought or knew they were transgender, 33% of Black transgender women and 30% of multiracial transgender women reported that an officer assumed they were sex workers.[15] Transgender women frequently report that police assume they are participating in sex work, simply because condoms are found during a frisk.[16] Transgender people report being stopped and searched for condoms "while walking home from school, going to the grocery store, and waiting for the bus."[17] Thus, every day activities become invitations for police stops and harassment, leading to disproportionate interactions with the criminal legal system and further abuse therein.

**Sexual Violence:** A survey of LGBTQ youth in New Orleans found that 59% of transgender youth surveyed had been asked for a sexual favor by the police in New Orleans, along with 12% of non-transgender LGBQ youth.[18] LGBT youth in a New York City survey were more than twice as likely to report negative sexual contact with police in the past six months, compared to non- LGBT youth.[19] Among Latina transgender women in Los Angeles County, 24% report being sexually assaulted by law enforcement.[20] In a recent study of sex workers in Baltimore whose results were released in early 2019, more than half (62%) of trans sex workers reported being sexually harassed or assaulted by police, and

---

[13] Human Rights Watch, Sex Workers at Risk: Condoms as Evidence of Prostitution in Four U.S. Cities, (2012) *available at* http://www.hrw.org/sites/default/files/reports/us0712ForUpload_1.pdf

[14] *Id.*

[15] James, supra n.9 at 14.

[16] Human Rights Watch, supra n. 11.

[17] *Id.* at 2.

[18] BreakOUT!, We Deserve Better: A Report on Policing in New Orleans By and For Queer and Trans Youth of Color, (2014) *available at* https://static1.squarespace.com/static/58ba8c479f7456dff8fb4e29/t/5ad61be22b6a2806771bb448/1523981349224/WE+DE SERVE+BETTER+REPORT.pdf

[19] Brett G. Stoudt, Michelle Fine & Madeline Fox, Growing Up Policed in the Age of Aggressive Policing Policies 56 N.Y.L. Sch. L. Rev. 1331 (2011) *available at* http://www.nylslawreview.com/wp-content/uploads/sites/16/2012/04/56-4.Growing-up-Policed-in-the-Age-of-Aggressive-Policing-Policies.Stoudt-Fine-Fox.pdf

[20] Galvan, supra n.8.

AR.09823






nearly half (43%) reported police had been their "clients" in the past three months.[21] The frequency of this egregious abuse of police authority is alarming.

**Failures to investigate or inadequate responses to reports of crime:** In the 2015 U.S. Transgender Survey, 57% of respondents said they would feel uncomfortable asking the police for help if they needed it.[22] Yet, even when they do report crimes to law enforcement, many LGBTQ people report receiving an inadequate response.

In a survey of LGBTQ and HIV+ individuals, HIV+ respondents and transfeminine respondents reported having experienced police neglect of physical assault at higher rates than other LGBTQ people: 73% of HIV+ personal assault victims and 70% of transfeminine respondents say they experienced police neglect of their physical assault complaint, compared to 59% of HIV-negative physical assault victims and 60% percent of cisgender (non-transgender or gender nonconforming (TGNC)) assault victims.[23] Similarly, TGNC and people of color reported indifference or a lack of proper response to property crime (58% of TGNC respondents, 59% of African-American respondents, 62% of Latina/o respondents, and 70% of Native American respondents).[24] This contributes to the distrust members of the LGBTQ community, particularly people of color, feel towards law enforcement.

**Conclusion:** The above issues are not exhaustive of the issues that LGBTQ people face in their interactions with law enforcement, but rather, are an overview of the most common issues faced because of a person's sexual orientation or gender identity. The order in which issues are presented is not intended to convey any hierarchy of significance. For additional information, please email Puneet Cheema, Staff Attorney, Lambda Legal at pcheema@lambdalegal.org, and Mateo de la Torre, Racial and Economic Justice Policy Advocate, National Center for Transgender Equality at mdelatorre@transequality.org.

---

[21] Footer, supra n.10.

[22] James, supra n.9 at 14.

[23] Lambda Legal, "Protected & Served," https://www.lambdalegal.org/protected-and-served/police#2a.

[24] *Id.*

AR.09824

Your privacy is important to us. We want to be sure you know how and why we use your data. View our Privacy Statement for more details. This also includes information on how we use cookies.



# Map of Countries that Criminalise LGBT People

The map below provides an overview of the countries across the world where lesbian, gay, bisexual and transgender people are criminalised.

AR.09825



# Countries

# Afghanistan

## · Criminalisation:

Criminalises LGBT
Criminalises sex between men
Criminalises sex between women
Death penalty

## · Maximum punishment:

Death penalty
· View country info

# Algeria

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men
  Criminalises sex between women

- ## Maximum punishment:

  Three years imprisonment and a fine of 10,000 Dinars
- View country info

# Antigua & Barbuda

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men
  Criminalises sex between women

- ## Maximum punishment:

  Fifteen years imprisonment
- View country info

# Bangladesh

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men

- ## Maximum punishment:

Life imprisonment
- View country info

# Barbados

### • Criminalisation:

Criminalises LGBT
Criminalises sex between men
Criminalises sex between women

### • Maximum punishment:

Life imprisonment
- View country info

# Bhutan

### • Criminalisation:

Criminalises LGBT
Criminalises sex between men
Criminalises sex between women

### • Maximum punishment:

One year imprisonment
- View country info

# Brunei

AR.09828

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men
  Criminalises sex between women
  Criminalises the gender identity/expression of trans people
  Death penalty

- ## Maximum punishment:

  Death by stoning
- View country info

# Burundi

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men
  Criminalises sex between women

- ## Maximum punishment:

  Two years imprisonment and a fine of 100,000 Burundian Francs
- View country info

# Cameroon

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men
  Criminalises sex between women

- ## Maximum punishment:

  Five years imprisonment and a fine of 200,000 West African CFA Francs
- View country info

# Chad

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men
  Criminalises sex between women

- ## Maximum punishment:

  Two years imprisonment and a fine of 500,000 West African CFA Francs
- View country info

# Comoros

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men
  Criminalises sex between women

- ## Maximum punishment:

  Five years imprisonment and a fine of 1,000,000 Comorian Francs
- View country info

AR.09830

# Cook Islands

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men

- ## Maximum punishment:

  Seven years imprisonment
- View country info

# Dominica

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men
  Criminalises sex between women

- ## Maximum punishment:

  Twelve years imprisonment
- View country info

# Egypt

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men

AR.09831

- ## Maximum punishment:

  Three years imprisonment and a fine of 3,000 Lira
- View country info

# Eritrea

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men
  Criminalises sex between women

- ## Maximum punishment:

  Three years imprisonment
- View country info

# eSwatini

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men

- ## Maximum punishment:

  Imprisonment
- View country info

# Ethiopia

AR.09832

- **Criminalisation:**

  Criminalises LGBT
  Criminalises sex between men
  Criminalises sex between women

- **Maximum punishment:**

  One year imprisonment
- View country info

## Gabon

- **Criminalisation:**

  Criminalises LGBT
  Criminalises sex between men
  Criminalises sex between women

- **Maximum punishment:**

  Six months' imprisonment & 5 million FCFA
- View country info

## Ghana

- **Criminalisation:**

  Criminalises LGBT
  Criminalises sex between men

- **Maximum punishment:**

Three years imprisonment
- View country info

# Grenada

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men

- ## Maximum punishment:

  Ten years imprisonment
- View country info

# Guinea

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men
  Criminalises sex between women

- ## Maximum punishment:

  Three years imprisonment and a fine of 1,000,000 Guinean Francs
- View country info

# Guyana

AR.09834

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men

- ## Maximum punishment:

  Life imprisonment
- View country info

# Indonesia

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men
  Criminalises sex between women
  Criminalises the gender identity/expression of trans people

- ## Maximum punishment:

  Eight years imprisonment and 100 lashes
- View country info

# Iran

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men
  Criminalises sex between women
  Death penalty

- ## Maximum punishment:

  Death penalty
- View country info

# Iraq

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men
  Criminalises sex between women

- ## Maximum punishment:

- View country info

# Jamaica

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men

- ## Maximum punishment:

  Ten years imprisonment with hard labour
- View country info

# Kenya

AR.09836

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men

- ## Maximum punishment:

  Fourteen years imprisonment
- View country info

# Kiribati

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men

- ## Maximum punishment:

  Fourteen years imprisonment
- View country info

# Kuwait

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men
  Criminalises the gender identity/expression of trans people

- ## Maximum punishment:

AR.09837

Seven years imprisonment
- View country info

# Lebanon

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men
  Criminalises sex between women
  Criminalises the gender identity/expression of trans people

- ## Maximum punishment:

  Six years imprisonment
- View country info

# Liberia

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men
  Criminalises sex between women

- ## Maximum punishment:

  One year imprisonment
- View country info

# Libya

AR.09838

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men
  Criminalises sex between women

- ## Maximum punishment:

  Five years imprisonment
- View country info

# Malawi

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men
  Criminalises sex between women
  Criminalises the gender identity/expression of trans people

- ## Maximum punishment:

  Fourteen years imprisonment with corporal punishment
- View country info

# Malaysia

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men
  Criminalises sex between women
  Criminalises the gender identity/expression of trans people

AR.09839

- ## Maximum punishment:

  Twenty years imprisonment and whipping
- View country info

# Maldives

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men
  Criminalises sex between women

- ## Maximum punishment:

  Eight years imprisonment and 100 lashes
- View country info

# Mauritania

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men
  Criminalises sex between women
  Death penalty

- ## Maximum punishment:

  Death by stoning
- View country info

AR.09840

# Mauritius

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men

- ## Maximum punishment:

  Five years imprisonment
- View country info

# Morocco

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men
  Criminalises sex between women

- ## Maximum punishment:

  Three years imprisonment and a fine of 1,000 Dirhams
- View country info

# Myanmar

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men

AR.09841

Criminalises the gender identity/expression of trans people

- ## Maximum punishment:

    Ten years imprisonment
- View country info

# Namibia

- ## Criminalisation:

    Criminalises LGBT
    Criminalises sex between men

- ## Maximum punishment:

    Unclear
- View country info

# Nigeria

- ## Criminalisation:

    Criminalises LGBT
    Criminalises sex between men
    Criminalises sex between women
    Criminalises the gender identity/expression of trans people
    Death penalty

- ## Maximum punishment:

    Death by stoning
- View country info

AR.09842

# Oman

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men
  Criminalises sex between women
  Criminalises the gender identity/expression of trans people

- ## Maximum punishment:

  Three years imprisonment
- View country info

# Pakistan

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men
  Death penalty

- ## Maximum punishment:

  Death by stoning
- View country info

# Palestine

- ## Criminalisation:

AR.09843

Criminalises LGBT
Criminalises sex between men

- ## Maximum punishment:

  Ten years imprisonment
- View country info

# Papua New Guinea

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men

- ## Maximum punishment:

  Fourteen years imprisonment
- View country info

# Qatar

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men
  Criminalises sex between women
  Death penalty

- ## Maximum punishment:

  Death by stoning
- View country info

AR.09844

# Saint Kitts and Nevis

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men

- ## Maximum punishment:

  Ten years imprisonment with hard labour
- View country info

# Saint Lucia

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men
  Criminalises sex between women

- ## Maximum punishment:

  Ten years imprisonment
- View country info

# Saint Vincent and the Grenadines

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men

AR.09845

Criminalises sex between women

- ## Maximum punishment:

  Ten years imprisonment
  - View country info

# Samoa

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men

- ## Maximum punishment:

  Five years imprisonment
  - View country info

# Saudi Arabia

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men
  Criminalises sex between women
  Criminalises the gender identity/expression of trans people
  Death penalty

- ## Maximum punishment:

  Death penalty
  - View country info

AR.09846

# Senegal

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men
  Criminalises sex between women

- ## Maximum punishment:

  Five years imprisonment and a fine of 1,500,000 West African CFA Francs
- View country info

# Sierra Leone

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men

- ## Maximum punishment:

  Life imprisonment
- View country info

# Singapore

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men

AR.09847

- ## Maximum punishment:

  Two years imprisonment
- View country info

# Solomon Islands

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men
  Criminalises sex between women

- ## Maximum punishment:

  Fourteen years imprisonment
- View country info

# Somalia

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men
  Criminalises sex between women
  Death penalty

- ## Maximum punishment:

  Death penalty
- View country info

AR.09848

## South Sudan

- ### Criminalisation:

  Criminalises LGBT
  Criminalises sex between men
  Criminalises sex between women
  Criminalises the gender identity/expression of trans people

- ### Maximum punishment:

  Fourteen years imprisonment and a fine
- View country info

## Sri Lanka

- ### Criminalisation:

  Criminalises LGBT
  Criminalises sex between men
  Criminalises sex between women
  Criminalises the gender identity/expression of trans people

- ### Maximum punishment:

  Ten years imprisonment and a fine
- View country info

## Sudan

- ### Criminalisation:

AR.09849

Criminalises LGBT
Criminalises sex between men
Criminalises sex between women
Death penalty

- ## Maximum punishment:

Death penalty
- View country info

# Syria

- ## Criminalisation:

Criminalises LGBT
Criminalises sex between men
Criminalises sex between women

- ## Maximum punishment:

Three years imprisonment
- View country info

# Tanzania

- ## Criminalisation:

Criminalises LGBT
Criminalises sex between men
Criminalises sex between women

- ## Maximum punishment:

Life imprisonment
- View country info

# The Gambia

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men
  Criminalises sex between women
  Criminalises the gender identity/expression of trans people

- ## Maximum punishment:

  Life imprisonment
- View country info

# Togo

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men
  Criminalises sex between women

- ## Maximum punishment:

  Three years imprisonment and a fine of 500,000 West African CFA Francs
- View country info

# Tonga

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men

- ## Maximum punishment:

  Ten years imprisonment
- View country info

# Tunisia

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men
  Criminalises sex between women

- ## Maximum punishment:

  Three years imprisonment
- View country info

# Turkmenistan

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men

- ## Maximum punishment:

Two years imprisonment
- View country info

# Tuvalu

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men

- ## Maximum punishment:

  Fourteen years imprisonment
- View country info

# Uganda

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men
  Criminalises sex between women

- ## Maximum punishment:

  Life imprisonment
- View country info

# United Arab Emirates

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men
  Criminalises sex between women
  Criminalises the gender identity/expression of trans people
  Death penalty

- ## Maximum punishment:

  Death penalty
- View country info

# Uzbekistan

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men

- ## Maximum punishment:

  Three years imprisonment
- View country info

# Yemen

- ## Criminalisation:

  Criminalises LGBT
  Criminalises sex between men
  Criminalises sex between women
  Death penalty

AR.09854

- **Maximum punishment:**

  Death penalty
- View country info

# Zambia

- **Criminalisation:**

  Criminalises LGBT
  Criminalises sex between men
  Criminalises sex between women

- **Maximum punishment:**

  Life imprisonment
- View country info

# Zimbabwe

- **Criminalisation:**

  Criminalises LGBT
  Criminalises sex between men

- **Maximum punishment:**

  One year imprisonment and a fine
- View country info

# Key Facts

AR.09855

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekn-8a9k
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0492
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Mark Gabriele

---

## General Comment

This rule should NOT be adopted as it is in violation of the Convention and Protocol relating to the Status of Refugees adopted in 1951 and still binding. These protocols clearly state "Prohibited penalties might include being charged with immigration or criminal offenses relating to the seeking of asylum, or being arbitrarily detained purely on the basis of seeking asylum." Illegal re-entry as a criminal ineligibility violates the protocol.
Article 31: REFUGEES UNLAWFULLY IN THE COUNTRY OF REFUGE
1.The Contracting States shall not impose penalties, on account of their illegal entry or presence, on refugees who, coming directly from a territory where their life or freedom was threatened in the sense of article 1, enter or are present in their territory without authorization, provided they present themselves without delay to the authorities and show good cause for their illegal entry or presence.
Please see full text attached of the Convention and Protocol.

---

## Attachments

Convention and Protocol

# CONVENTION

## AND

# PROTOCOL

### RELATING TO THE

## STATUS OF

## REFUGEES

_____



AR.0985

AR.09859

Text of the 1951 Convention
Relating to the Status of Refugees

———————————

Text of the 1967 Protocol
Relating to the Status of Refugees

———————————

Resolution 2198 (XXI) adopted by the
United Nations General Assembly

———————————

with an
Introductory Note
by the Office of the
United Nations High Commissioner for Refugees

AR.09860

**INTRODUCTORY NOTE**
by the Office of the
United Nations High Commissioner for Refugees
(UNHCR)

Grounded in Article 14 of the Universal Declaration of human rights 1948, which recognizes the right of persons to seek asylum from persecution in other countries, the United Nations Convention relating to the Status of Refugees, adopted in 1951, is the centrepiece of international refugee protection today.[1] The Convention entered into force on 22 April 1954, and it has been subject to only one amendment in the form of a 1967 Protocol, which removed the geographic and temporal limits of the 1951 Convention.[2] The 1951 Convention, as a post-Second World War instrument, was originally limited in scope to persons fleeing events occurring before 1 January 1951 and within Europe. The 1967 Protocol removed these limitations and thus gave the Convention universal coverage. It has since been supplemented by refugee and subsidiary protection regimes in several regions,[3] as well as via the progressive development of international human rights law.

---

(1)  United Nations General Assembly resolution 429(V) of 14 December 1950, available at http://www.unhcr.org/refworld/docid/3b00f08a27.html

(2)  The Convention enabled States to make a declaration when becoming party, according to which the words "events occurring before 1 January 1951" are understood to mean "events occurring in Europe" prior to that date. This geographical limitation has been maintained by a very limited number of States, and with the adoption of the 1967 Protocol, has lost much of its significance. The Protocol of 1967 is attached to United Nations General Assembly resolution 2198 (XXI) of 16 December 1967, available at http://www.unhcr.org/refworld/docid/3b00f1cc50.html.

(3)  See, for example, the Organization of African Unity (now African Union) Convention governing the Specific Aspects of Refugee Problems in Africa 1969, adopted in Addis Adaba, 10 September 1969; the European Union Council Directive 2004/83/EC of 29 April 2004 on minimum standards for the qualification and status of third country nationals or stateless persons as refugees or as persons who otherwise need international protection and the content of the protection granted, Official Journal L 304 , 30/09/2004 P. 0012 – 0023. The Cartagena Declaration on Refugees, adopted at a colloquium held at Cartagena, Colombia, 19-22 November 1984, while non-binding, also sets out regional standards for refugees in Central America, Mexico and Panama.

AR.09861

The 1951 Convention consolidates previous international instruments relating to refugees and provides the most comprehensive codification of the rights of refugees at the international level. In contrast to earlier international refugee instruments, which applied to specific groups of refugees, the 1951 Convention endorses a single definition of the term "refugee" in Article 1. The emphasis of this definition is on the protection of persons from political or other forms of persecution. A refugee, according to the Convention, is someone who is unable or unwilling to return to their country of origin owing to a well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group, or political opinion.

The Convention is both a status and rights-based instrument and is underpinned by a number of fundamental principles, most notably non-discrimination, non-penalization and *non-refoulement*. Convention provisions, for example, are to be applied without discrimination as to race, religion or country of origin. Developments in international human rights law also reinforce the principle that the Convention be applied without discrimination as to sex, age, disability, sexuality, or other prohibited grounds of discrimination. The Convention further stipulates that, subject to specific exceptions, refugees should not be penalized for their illegal entry or stay. This recognizes that the seeking of asylum can require refugees to breach immigration rules. Prohibited penalties might include being charged with immigration or criminal offences relating to the seeking of asylum, or being arbitrarily detained purely on the basis of seeking asylum. Importantly, the Convention contains various safeguards against the expulsion of refugees. The principle of *non-refoulement* is so fundamental that no reservations or derogations may be made to it. It provides that no one shall expel or return ("*refouler*") a refugee against his or her will, in any manner whatsoever, to a territory where he or she fears threats to life or freedom.

Finally, the Convention lays down basic minimum standards for the treatment of refugees, without prejudice to States granting more favourable treatment. Such rights include access to the courts, to primary education, to work, and the provision for documentation, including a refugee travel document in passport form. Most States parties to the Convention issue this document, which has become as widely accepted as the former "Nansen passport", an identity document for refugees devised by the first Commissioner for Refugees, Fridtjof Nansen, in 1922.

AR.09862

The Convention does not however apply to all persons who might otherwise satisfy the definition of a refugee in Article 1. In particular, the Convention does not apply to those for whom there are serious reasons for considering that they have committed war crimes or crimes against humanity, serious non-political crimes, or are guilty of acts contrary to the purposes and principles of the United Nations. The Convention also does not apply to those refugees who benefit from the protection or assistance of a United Nations agency other than UNHCR, such as refugees from Palestine who fall under the auspices of the United Nations Relief and Works Agency for Palestine Refugees in the Near East (UNRWA). Nor does the Convention apply to those refugees who have a status equivalent to nationals in their country of asylum.

Apart from expanding the definition of a refugee, the Protocol obliges States to comply with the substantive provisions of the 1951 Convention to all persons covered by the refugee definition in Article 1, without any limitation of date. Although related to the Convention in this way, the Protocol is an independent instrument, accession to which is not limited to States parties to the Convention.

Under the Convention and Protocol, there is a particular role for UNHCR. States undertake to cooperate with UNHCR in the exercise of its functions, which are set out in its Statute of 1950 along with a range of other General Assembly resolutions, and, in particular, to facilitate this specific duty of supervising the application of these instruments. By its Statute, UNHCR is tasked with, among others, promoting international instruments for the protection of refugees, and supervising their application.

The fundamental importance and enduring relevance of the Convention and the Protocol is widely recognized. In 2001, States parties issued a Declaration reaffirming their commitment to the 1951 Convention and the 1967 Protocol, and they recognized in particular that the core principle of *non-refoulement* is embedded in customary international law.[4] Moreover, the General Assembly has frequently called upon States to become parties to these instruments.

---

(4) Declaration of States parties to the 1951 Convention and/or its 1967 Protocol Relating to the Status of Refugees, Ministerial Meeting of States Parties, Geneva, Switzerland, 12-13 December 2001, UN Doc. HCR/MMSP/2001/09, 16 January 2002. The Declaration was welcomed by the UN General Assembly in resolution A/RES/57/187, para. 4, adopted on 18 December 2001.

AR.09863

Accession has also been recommended by various regional organizations, such as the Council of Europe, the African Union, and the Organization of American States. As UNHCR prepares to commemorate, in 2011, the 60th anniversary of the 1951 Convention, it is hoped that more States will accede to these instruments. Today, there are 147 States Parties to one or both of these instruments.

In view of the increasing recognition of the fundamental significance of the Convention and the Protocol for the protection of refugees and for the establishment of minimum standards for their treatment, it is important that their provisions be known as widely as possible, both by refugees and by all those concerned with refugee problems.

Additional information on the Convention and the Protocol, including accession details, may be obtained from UNHCR, or directly from the UNHCR website at www.unhcr.org.

Geneva, December 2010

## FINAL ACT

### of the United Nations Conference of Plenipotentiaries on the Status of Refugees and Stateless Persons

I.   The General Assembly of the United Nations, by Resolution 429 (V) of 14 December 1950, decided to convene in Geneva a Conference of Plenipotentiaries to complete the drafting of, and to sign, a Convention relating to the Status of Refugees and a Protocol relating to the Status of Stateless Persons.

The Conference met at the European Office of the United Nations in Geneva from 2 to 25 July 1951.

The Governments of the following twenty-six States were represented by delegates who all submitted satisfactory credentials or other communications of appointment authorizing them to participate in the Conference:

| | |
|---|---|
| Australia | Italy |
| Austria | Luxembourg |
| Belgium | Monaco |
| Brazil | Netherlands |
| Canada | Norway |
| Colombia | Sweden |
| Denmark | Switzerland (the Swiss delegation also represented Liechtenstein) |
| Egypt | |
| France | Turkey |
| Germany, Federal Republic of | United Kingdom of Great Britain and Northern Ireland |
| Greece | |
| Holy See | United States of America |
| Iraq | Venezuela |
| Israel | Yugoslavia |

The Governments of the following two States were represented by observers:

Cuba

Iran

Pursuant to the request of the General Assembly, the United Nations High Commissioner for Refugees participated, without the right to vote, in the deliberations of the Conference.

AR.09865

The International Labour Organisation and the International Refugee Organization were represented at the Conference without the right to vote.

The Conference invited a representative of the Council of Europe to be represented at the Conference without the right to vote.

Representatives of the following Non-Governmental Organizations in consultative relationship with the Economic and Social Council were also present as observers:

### CATEGORY A

International Confederation of Free Trade Unions
International Federation of Christian Trade Unions
Inter-Parliamentary Union

### CATEGORY B

Agudas Israel World Organization
Caritas Internationalis
Catholic International Union for Social Service
Commission of the Churches on International Affairs
Consultative Council of Jewish Organizations
Co-ordinating Board of Jewish Organizations
Friends' World Committee for Consultation
International Association of Penal Law
International Bureau for the Unification of Penal Law
International Committee of the Red Cross
International Council of Women
International Federation of Friends of Young Women
International League for the Rights of Man
International Social Service
International Union for Child Welfare
International Union of Catholic Women's Leagues
Pax Romana
Women's International League for Peace and Freedom
World Jewish Congress
World Union for Progressive Judaism
World Young Women's Christian Association

AR.09866

REGISTER

International Relief Committee for Intellectual Workers
League of Red Cross Societies
Standing Conference of Voluntary Agencies
World Association of Girl Guides and Girl Scouts
World University Service

Representatives of Non-Governmental Organizations which have been granted consultative status by the Economic and Social Council as well as those entered by the Secretary-General on the Register referred to in Resolution 288 B (X) of the Economic and Social Council, paragraph 17, had under the rules of procedure adopted by the Conference the right to submit written or oral statements to the Conference.

The Conference elected Mr. Knud Larsen, of Denmark, as President, and Mr. A. Herment, of Belgium, and Mr. Talat Miras, of Turkey, as Vice-Presidents.

At its second meeting, the Conference, acting on a proposal of the representative of Egypt, unanimously decided to address an invitation to the Holy See to designate a plenipotentiary representative to participate in its work. A representative of the Holy See took his place at the Conference on 10 July 1951.

The Conference adopted as its agenda the Provisional Agenda drawn up by the Secretary-General (A/CONF.2/2/Rev.1). It also adopted the Provisional Rules of Procedure drawn up by the Secretary-General, with the addition of a provision which authorized a representative of the Council of Europe to be present at the Conference without the right to vote and to submit proposals (A/CONF.2/3/Rev.1).

In accordance with the Rules of Procedure of the Conference, the President and Vice-Presidents examined the credentials of representatives and on 17 July 1951 reported to the Conference the results of such examination, the Conference adopting the report.

The Conference used as the basis of its discussions the draft Convention relating to the Status of Refugees and the draft Protocol relating to the Status of Stateless Persons prepared by the *ad hoc* Committee on Refugees and Stateless Persons at its second session held in Geneva from 14 to 25 August 1950, with the exception of the preamble and Article 1 (Definition of the term

AR.09867

"refugee") of the draft Convention. The text of the preamble before the Conference was that which was adopted by the Economic and Social Council on 11 August 1950 in Resolution 319 B II (XI). The text of Article 1 before the Conference was that recommended by the General Assembly on 14 December 1950 and contained in the Annex to Resolution 429 (V). The latter was a modification of the text as it had been adopted by the Economic and Social Council in Resolution 319 B II (XI).

The Conference adopted the Convention relating to the Status of Refugees in two readings. Prior to its second reading it established a Style Committee composed of the President and the representatives of Belgium, France, Israel, Italy, the United Kingdom of Great Britain and Northern Ireland and the United States of America, together with the High Commissioner for Refugees, which elected as its Chairman Mr. G. Warren, of the United States of America. The Style Committee re-drafted the text which had been adopted by the Conference on first reading, particularly from the point of view of language and of concordance between the English and French texts.

The Convention was adopted on 25 July by 24 votes to none with no abstentions and opened for signature at the European Office of the United Nations from 28 July to 31 August 1951. It will be re-opened for signature at the permanent headquarters of the United Nations in New York from 17 September 1951 to 31 December 1952.

The English and French texts of the Convention, which are equally authentic, are appended to this Final Act.

**II.** The Conference decided, by 17 votes to 3 with 3 abstentions, that the titles of the chapters and of the articles of the Convention are included for practical purposes and do not constitute an element of interpretation.

**III.** With respect to the draft Protocol relating to the Status of Stateless Persons, the Conference adopted the following resolution:

> THE CONFERENCE,
> **HAVING CONSIDERED** the draft Protocol relating to the Status of Stateless Persons,
> **CONSIDERING** that the subject still requires more detailed study,
> **DECIDES** not to take a decision on the subject at the present Conference and

AR.09868

refers the draft Protocol back to the appropriate organs of the United Nations for further study.

**IV.** The Conference adopted unanimously the following recommendations:

## A
### *(Facilitation of refugee travels)*[1]

THE CONFERENCE,

**CONSIDERING** that the issue and recognition of travel documents is necessary to facilitate the movement of refugees, and in particular their resettlement,

**URGES** Governments which are parties to the Inter-Governmental Agreement on Refugee Travel Documents signed in London on 15 October 1946, or which recognize travel documents issued in accordance with the Agreement, to continue to issue or to recognize such travel documents, and to extend the issue of such documents to refugees as defined in Article 1 of the Convention relating to the Status of Refugees or to recognize the travel documents so issued to such persons, until they shall have undertaken obligations under Article 28 of the said Convention.

## B
### *(Principle of unity of the family)*[1]

THE CONFERENCE,

**CONSIDERING** that the unity of the family, the natural and fundamental group unit of society, is an essential right of the refugee, and that such unity is constantly threatened, and

**NOTING** with satisfaction that, according to the official commentary of the *ad hoc* Committee on Statelessness and Related Problems (E/1618, p. 40), the rights granted to a refugee are extended to members of his family,

**RECOMMENDS** Governments to take the necessary measures for the protection of the refugee's family especially with a view to:

---

(1)  Headline added.

AR.09869

(1) Ensuring that the unity of the refugee's family is maintained particularly in cases where the head of the family has fulfilled the necessary conditions for admission to a particular country,

(2) The protection of refugees who are minors, in particular unaccompanied children and girls, with special reference to guardianship and adoption.

## C
### *(Welfare services)*[1]

THE CONFERENCE,

**CONSIDERING** that, in the moral, legal and material spheres, refugees need the help of suitable welfare services, especially that of appropriate non-governmental organizations,

**RECOMMENDS** Governments and inter-governmental bodies to facilitate, encourage and sustain the efforts of properly qualified organizations.

## D
### *(International co-operation in the field of asylum and resettlement)*[1]

THE CONFERENCE,

**CONSIDERING** that many persons still leave their country of origin for reasons of persecution and are entitled to special protection on account of their position,

**RECOMMENDS** that Governments continue to receive refugees in their territories and that they act in concert in a true spirit of international co-operation in order that these refugees may find asylum and the possibility of resettlement.

## E
### *(Extension of treatment provided by the Convention)*[1]

THE CONFERENCE,

**EXPRESSES** the hope that the Convention relating to the Status of Refugees will have value as an example exceeding its contractual scope and that

---

(1)  Headline added.

AR.09870

all nations will be guided by it in granting so far as possible to persons in their territory as refugees and who would not be covered by the terms of the Convention, the treatment for which it provides.

**IN WITNESS WHEREOF** the President, Vice-Presidents and the Executive Secretary of the Conference have signed this Final Act.

**DONE** at Geneva this twenty-eighth day of July one thousand nine hundred and fifty-one in a single copy in the English and French languages, each text being equally authentic. Translations of this Final Act into Chinese, Russian and Spanish will be prepared by the Secretary-General of the United Nations, who will, on request, send copies thereof to each of the Governments invited to attend the Conference.

| | |
|---|---|
| The President of the Conference: | Knud Larsen |
| The Vice-Presidents of the Conference: | A. Herment, Talat Miras |
| The Executive Secretary of the Conference: | John P. Humphrey |

AR.09871

## CONVENTION

Relating to the Status of Refugees

# Preamble

THE HIGH CONTRACTING PARTIES,

**CONSIDERING** that the Charter of the United Nations and the Universal Declaration of Human Rights approved on 10 December 1948 by the General Assembly have affirmed the principle that human beings shall enjoy fundamental rights and freedoms without discrimination,

**CONSIDERING** that the United Nations has, on various occasions, manifested its profound concern for refugees and endeavoured to assure refugees the widest possible exercise of these fundamental rights and freedoms,

**CONSIDERING** that it is desirable to revise and consolidate previous international agreements relating to the status of refugees and to extend the scope of and protection accorded by such instruments by means of a new agreement,

**CONSIDERING** that the grant of asylum may place unduly heavy burdens on certain countries, and that a satisfactory solution of a problem of which the United Nations has recognized the international scope and nature cannot therefore be achieved without international co-operation,

**EXPRESSING** the wish that all States, recognizing the social and humanitarian nature of the problem of refugees, will do everything within their power to prevent this problem from becoming a cause of tension between States,

**NOTING** that the United Nations High Commissioner for Refugees is charged with the task of supervising international conventions providing for the protection of refugees, and recognizing that the effective co-ordination of measures taken to deal with this problem will depend upon the co-operation of States with the High Commissioner,

**HAVE AGREED** as follows:

AR.09872

# CHAPTER I: General Provisions

*Article 1*

## DEFINITION OF THE TERM "REFUGEE"

**A.**  For the purposes of the present Convention, the term "refugee" shall apply to any person who:

(1) Has been considered a refugee under the Arrangements of 12 May 1926 and 30 June 1928 or under the Conventions of 28 October 1933 and 10 February 1938, the Protocol of 14 September 1939 or the Constitution of the International Refugee Organization;

Decisions of non-eligibility taken by the International Refugee Organization during the period of its activities shall not prevent the status of refugee being accorded to persons who fulfil the conditions of paragraph 2 of this section;

(2) As a result of events occurring before 1 January 1951 and owing to well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality and is unable or, owing to such fear, is unwilling to avail himself of the protection of that country; or who, not having a nationality and being outside the country of his former habitual residence as a result of such events, is unable or, owing to such fear, is unwilling to return to it.

In the case of a person who has more than one nationality, the term "the country of his nationality" shall mean each of the countries of which he is a national, and a person shall not be deemed to be lacking the protection of the country of his nationality if, without any valid reason based on well-founded fear, he has not availed himself of the protection of one of the countries of which he is a national.

**B.**(1) For the purposes of this Convention, the words "events occurring

AR.09873

before 1 January 1951" in article 1, section A, shall be understood to mean either:

    (a) "events occurring in Europe before 1 January 1951"; or

    (b) "events occurring in Europe or elsewhere before 1 January 1951", and each Contracting State shall make a declaration at the time of signature, ratification or accession, specifying which of these meanings it applies for the purpose of its obligations under this Convention.

(2) Any Contracting State which has adopted alternative (a) may at any time extend its obligations by adopting alternative (b) by means of a notification addressed to the Secretary-General of the United Nations.

**C.** This Convention shall cease to apply to any person falling under the terms of section A if:

(1) He has voluntarily re-availed himself of the protection of the country of his nationality; or

(2) Having lost his nationality, he has voluntarily re-acquired it; or

(3) He has acquired a new nationality, and enjoys the protection of the country of his new nationality; or

(4) He has voluntarily re-established himself in the country which he left or outside which he remained owing to fear of persecution; or

(5) He can no longer, because the circumstances in connexion with which he has been recognized as a refugee have ceased to exist, continue to refuse to avail himself of the protection of the country of his nationality;
Provided that this paragraph shall not apply to a refugee falling under section A(1) of this article who is able to invoke compelling reasons arising out of previous persecution for refusing to avail himself of the protection of the country of nationality;

(6) Being a person who has no nationality he is, because of the circumstances in connexion with which he has been recognized as a refugee have ceased to exist, able to return to the country of his former habitual residence;

AR.09874

Provided that this paragraph shall not apply to a refugee falling under section A (1) of this article who is able to invoke compelling reasons arising out of previous persecution for refusing to return to the country of his former habitual residence.

**D.** This Convention shall not apply to persons who are at present receiving from organs or agencies of the United Nations other than the United Nations High Commissioner for Refugees protection or assistance.

When such protection or assistance has ceased for any reason, without the position of such persons being definitively settled in accordance with the relevant resolutions adopted by the General Assembly of the United Nations, these persons shall *ipso facto* be entitled to the benefits of this Convention.

**E.** This Convention shall not apply to a person who is recognized by the competent authorities of the country in which he has taken residence as having the rights and obligations which are attached to the possession of the nationality of that country.

**F.** The provisions of this Convention shall not apply to any person with respect to whom there are serious reasons for considering that:

(a) he has committed a crime against peace, a war crime, or a crime against humanity, as defined in the international instruments drawn up to make provision in respect of such crimes;

(b) he has committed a serious non-political crime outside the country of refuge prior to his admission to that country as a refugee;

(c) he has been guilty of acts contrary to the purposes and principles of the United Nations.

*Article 2*

### GENERAL OBLIGATIONS

Every refugee has duties to the country in which he finds himself, which require in particular that he conform to its laws and regulations as well as to measures taken for the maintenance of public order.

AR.09875

### *Article 3*
#### NON-DISCRIMINATION

The Contracting States shall apply the provisions of this Convention to refugees without discrimination as to race, religion or country of origin.

### *Article 4*
#### RELIGION

The Contracting States shall accord to refugees within their territories treatment at least as favourable as that accorded to their nationals with respect to freedom to practice their religion and freedom as regards the religious education of their children.

### *Article 5*
#### RIGHTS GRANTED APART FROM THIS CONVENTION

Nothing in this Convention shall be deemed to impair any rights and benefits granted by a Contracting State to refugees apart from this Convention.

### *Article 6*
#### THE TERM "IN THE SAME CIRCUMSTANCES"

For the purposes of this Convention, the term "in the same circumstances" implies that any requirements (including requirements as to length and conditions of sojourn or residence) which the particular individual would have to fulfil for the enjoyment of the right in question, if he were not a refugee, must be fulfilled by him, with the exception of requirements which by their nature a refugee is incapable of fulfilling.

### *Article 7*
#### EXEMPTION FROM RECIPROCITY

**1.**  Except where this Convention contains more favourable provisions, a Contracting State shall accord to refugees the same treatment as is accorded to aliens generally.

**2.**  After a period of three years' residence, all refugees shall enjoy exemption from legislative reciprocity in the territory of the Contracting States.

AR.09876

**3.** Each Contracting State shall continue to accord to refugees the rights and benefits to which they were already entitled, in the absence of reciprocity, at the date of entry into force of this Convention for that State.

**4.** The Contracting States shall consider favourably the possibility of according to refugees, in the absence of reciprocity, rights and benefits beyond those to which they are entitled according to paragraphs 2 and 3, and to extending exemption from reciprocity to refugees who do not fulfil the conditions provided for in paragraphs 2 and 3.

**5.** The provisions of paragraphs 2 and 3 apply both to the rights and benefits referred to in articles 13, 18, 19, 21 and 22 of this Convention and to rights and benefits for which this Convention does not provide.

### *Article 8*
#### EXEMPTION FROM EXCEPTIONAL MEASURES

With regard to exceptional measures which may be taken against the person, property or interests of nationals of a foreign State, the Contracting States shall not apply such measures to a refugee who is formally a national of the said State solely on account of such nationality. Contracting States which, under their legislation, are prevented from applying the general principle expressed in this article, shall, in appropriate cases, grant exemptions in favour of such refugees.

### *Article 9*
#### PROVISIONAL MEASURES

Nothing in this Convention shall prevent a Contracting State, in time of war or other grave and exceptional circumstances, from taking provisionally measures which it considers to be essential to the national security in the case of a particular person, pending a determination by the Contracting State that that person is in fact a refugee and that the continuance of such measures is necessary in his case in the interests of national security.

### *Article 10*
#### CONTINUITY OF RESIDENCE

**1.** Where a refugee has been forcibly displaced during the Second World

AR.09877

War and removed to the territory of a Contracting State, and is resident there, the period of such enforced sojourn shall be considered to have been lawful residence within that territory.

**2.**  Where a refugee has been forcibly displaced during the Second World War from the territory of a Contracting State and has, prior to the date of entry into force of this Convention, returned there for the purpose of taking up residence, the period of residence before and after such enforced displacement shall be regarded as one uninterrupted period for any purposes for which uninterrupted residence is required.

### *Article 11*
#### REFUGEE SEAMEN

In the case of refugees regularly serving as crew members on board a ship flying the flag of a Contracting State, that State shall give sympathetic consideration to their establishment on its territory and the issue of travel documents to them or their temporary admission to its territory particularly with a view to facilitating their establishment in another country.

AR.09878

## CHAPTER II: Juridical Status

### *Article 12*
#### PERSONAL STATUS

1.  The personal status of a refugee shall be governed by the law of the country of his domicile or, if he has no domicile, by the law of the country of his residence.

2.  Rights previously acquired by a refugee and dependent on personal status, more particularly rights attaching to marriage, shall be respected by a Contracting State, subject to compliance, if this be necessary, with the formalities required by the law of that State, provided that the right in question is one which would have been recognized by the law of that State had he not become a refugee.

### *Article 13*
#### MOVABLE AND IMMOVABLE PROPERTY

The Contracting States shall accord to a refugee treatment as favourable as possible and, in any event, not less favourable than that accorded to aliens generally in the same circumstances, as regards the acquisition of movable and immovable property and other rights pertaining thereto, and to leases and other contracts relating to movable and immovable property.

### *Article 14*
#### ARTISTIC RIGHTS AND INDUSTRIAL PROPERTY

In respect of the protection of industrial property, such as inventions, designs or models, trade marks, trade names, and of rights in literary, artistic, and scientific works, a refugee shall be accorded in the country in which he has his habitual residence the same protection as is accorded to nationals of that

AR.09879

country. In the territory of any other Contracting State, he shall be accorded the same protection as is accorded in that territory to nationals of the country in which he has his habitual residence.

<em>Article 15</em>

## RIGHT OF ASSOCIATION

As regards non-political and non-profit-making associations and trade unions the Contracting States shall accord to refugees lawfully staying in their territory the most favourable treatment accorded to nationals of a foreign country, in the same circumstances.

<em>Article 16</em>

## ACCESS TO COURTS

**1.** A refugee shall have free access to the courts of law on the territory of all Contracting States.

**2.** A refugee shall enjoy in the Contracting State in which he has his habitual residence the same treatment as a national in matters pertaining to access to the Courts, including legal assistance and exemption from *cautio judicatum solvi.*

**3.** A refugee shall be accorded in the matters referred to in paragraph 2 in countries other than that in which he has his habitual residence the treatment granted to a national of the country of his habitual residence.

AR.09880

## CHAPTER III: Gainful Employment

### *Article 17*
#### WAGE-EARNING EMPLOYMENT

**1.**  The Contracting State shall accord to refugees lawfully staying in their territory the most favourable treatment accorded to nationals of a foreign country in the same circumstances, as regards the right to engage in wage-earning employment.

**2.**  In any case, restrictive measures imposed on aliens or the employment of aliens for the protection of the national labour market shall not be applied to a refugee who was already exempt from them at the date of entry into force of this Convention for the Contracting State concerned, or who fulfils one of the following conditions:

(a) He has completed three years' residence in the country;

(b) He has a spouse possessing the nationality of the country of residence. A refugee may not invoke the benefits of this provision if he has abandoned his spouse;

(c) He has one or more children possessing the nationality of the country of residence.

**3.**  The Contracting States shall give sympathetic consideration to assimilating the rights of all refugees with regard to wage-earning employment to those of nationals, and in particular of those refugees who have entered their territory pursuant to programmes of labour recruitment or under immigration schemes.

### *Article 18*
#### SELF-EMPLOYMENT

The Contracting States shall accord to a refugee lawfully in their territory

AR.09881