treatment as favourable as possible and, in any event, not less favourable than that accorded to aliens generally in the same circumstances, as regards the right to engage on his own account in agriculture, industry, handicrafts and commerce and to establish commercial and industrial companies.

<div align="center">

*Article 19*

**LIBERAL PROFESSIONS**

</div>

**1.**  Each Contracting State shall accord to refugees lawfully staying in their territory who hold diplomas recognized by the competent authorities of that State, and who are desirous of practicing a liberal profession, treatment as favourable as possible and, in any event, not less favourable than that accorded to aliens generally in the same circumstances.

**2.**  The Contracting States shall use their best endeavours consistently with their laws and constitutions to secure the settlement of such refugees in the territories, other than the metropolitan territory, for whose international relations they are responsible.

AR.09882

## CHAPTER IV: Welfare

### *Article 20*
#### RATIONING

Where a rationing system exists, which applies to the population at large and regulates the general distribution of products in short supply, refugees shall be accorded the same treatment as nationals.

### *Article 21*
#### HOUSING

As regards housing, the Contracting States, in so far as the matter is regulated by laws or regulations or is subject to the control of public authorities, shall accord to refugees lawfully staying in their territory treatment as favourable as possible and, in any event, not less favourable than that accorded to aliens generally in the same circumstances.

### *Article 22*
#### PUBLIC EDUCATION

1.   The Contracting States shall accord to refugees the same treatment as is accorded to nationals with respect to elementary education.

2.   The Contracting States shall accord to refugees treatment as favourable as possible, and, in any event, not less favourable than that accorded to aliens generally in the same circumstances, with respect to education other than elementary education and, in particular, as regards access to studies, the recognition of foreign school certificates, diplomas and degrees, the remission of fees and charges and the award of scholarships.

### *Article 23*
#### PUBLIC RELIEF

The Contracting States shall accord to refugees lawfully staying in their ter-

AR.09883

ritory the same treatment with respect to public relief and assistance as is accorded to their nationals.

## *Article 24*
### LABOUR LEGISLATION AND SOCIAL SECURITY

1.  The Contracting States shall accord to refugees lawfully staying in their territory the same treatment as is accorded to nationals in respect of the following matters:

(a)  In so far as such matters are governed by laws or regulations or are subject to the control of administrative authorities: remuneration, including family allowances where these form part of remuneration, hours of work, overtime arrangements, holidays with pay, restrictions on home work, minimum age of employment, apprenticeship and training, women's work and the work of young persons, and the enjoyment of the benefits of collective bargaining;

(b)  Social security (legal provisions in respect of employment injury, occupational diseases, maternity, sickness, disability, old age, death, unemployment, family responsibilities and any other contingency which, according to national laws or regulations, is covered by a social security scheme), subject to the following limitations:

(i)  There may be appropriate arrangements for the maintenance of acquired rights and rights in course of acquisition;

(ii) National laws or regulations of the country of residence may prescribe special arrangements concerning benefits or portions of benefits which are payable wholly out of public funds, and concerning allowances paid to persons who do not fulfil the contribution conditions prescribed for the award of a normal pension.

2.  The right to compensation for the death of a refugee resulting from employment injury or from occupational disease shall not be affected by the fact that the residence of the beneficiary is outside the territory of the Contracting State.

3.  The Contracting States shall extend to refugees the benefits of

AR.09884

agreements concluded between them, or which may be concluded between them in the future, concerning the maintenance of acquired rights and rights in the process of acquisition in regard to social security, subject only to the conditions which apply to nationals of the States signatory to the agreements in question.

**4.**  The Contracting States will give sympathetic consideration to extending to refugees so far as possible the benefits of similar agreements which may at any time be in force between such Contracting States and non-contracting States.

AR.09885

## CHAPTER V: Administrative Measures

### *Article 25*
### ADMINISTRATIVE ASSISTANCE

**1.** When the exercise of a right by a refugee would normally require the assistance of authorities of a foreign country to whom he cannot have recourse, the Contracting States in whose territory he is residing shall arrange that such assistance be afforded to him by their own authorities or by an international authority.

**2.** The authority or authorities mentioned in paragraph 1 shall deliver or cause to be delivered under their supervision to refugees such documents or certifications as would normally be delivered to aliens by or through their national authorities.

**3.** Documents or certifications so delivered shall stand in the stead of the official instruments delivered to aliens by or through their national authorities, and shall be given credence in the absence of proof to the contrary.

**4.** Subject to such exceptional treatment as may be granted to indigent persons, fees may be charged for the services mentioned herein, but such fees shall be moderate and commensurate with those charged to nationals for similar services.

**5.** The provisions of this article shall be without prejudice to articles 27 and 28.

### *Article 26*
### FREEDOM OF MOVEMENT

Each Contracting State shall accord to refugees lawfully in its territory the right to choose their place of residence to move freely within its territory, subject to any regulations applicable to aliens generally in the same circumstances.

AR.09886

### *Article 27*
#### IDENTITY PAPERS

The Contracting States shall issue identity papers to any refugee in their territory who does not possess a valid travel document.

### *Article 28*
#### TRAVEL DOCUMENTS

**1.** The Contracting States shall issue to refugees lawfully staying in their territory travel documents for the purpose of travel outside their territory, unless compelling reasons of national security or public order otherwise require, and the provisions of the Schedule to this Convention shall apply with respect to such documents. The Contracting States may issue such a travel document to any other refugee in their territory; they shall in particular give sympathetic consideration to the issue of such a travel document to refugees in their territory who are unable to obtain a travel document from the country of their lawful residence.

**2.** Travel documents issued to refugees under previous international agreements by parties thereto shall be recognized and treated by the Contracting States in the same way as if they had been issued pursuant to this article.

### *Article 29*
#### FISCAL CHARGES

**1.** The Contracting States shall not impose upon refugees duties, charges or taxes, of any description whatsoever, other or higher than those which are or may be levied on their nationals in similar situations.

**2.** Nothing in the above paragraph shall prevent the application to refugees of the laws and regulations concerning charges in respect of the issue to aliens of administrative documents including identity papers.

### *Article 30*
#### TRANSFER OF ASSETS

**1.** A Contracting State shall, in conformity with its laws and regulations, permit refugees to transfer assets which they have brought into its territory,

AR.09887

to another country where they have been admitted for the purposes of resettlement.

**2.** A Contracting State shall give sympathetic consideration to the application of refugees for permission to transfer assets wherever they may be and which are necessary for their resettlement in another country to which they have been admitted.

### *Article 31*
#### REFUGEES UNLAWFULLY IN THE COUNTRY OF REFUGE

**1.** The Contracting States shall not impose penalties, on account of their illegal entry or presence, on refugees who, coming directly from a territory where their life or freedom was threatened in the sense of article 1, enter or are present in their territory without authorization, provided they present themselves without delay to the authorities and show good cause for their illegal entry or presence.

**2.** The Contracting States shall not apply to the movements of such refugees restrictions other than those which are necessary and such restrictions shall only be applied until their status in the country is regularized or they obtain admission into another country. The Contracting States shall allow such refugees a reasonable period and all the necessary facilities to obtain admission into another country.

### *Article 32*
#### EXPULSION

**1.** The Contracting States shall not expel a refugee lawfully in their territory save on grounds of national security or public order.

**2.** The expulsion of such a refugee shall be only in pursuance of a decision reached in accordance with due process of law. Except where compelling reasons of national security otherwise require, the refugee shall be allowed to submit evidence to clear himself, and to appeal to and be represented for the purpose before competent authority or a person or persons specially designated by the competent authority.

**3.** The Contracting States shall allow such a refugee a reasonable period

AR.09888

within which to seek legal admission into another country. The Contracting States reserve the right to apply during that period such internal measures as they may deem necessary.

## *Article 33*
### PROHIBITION OF EXPULSION OR RETURN ("REFOULEMENT")

**1.**  No Contracting State shall expel or return ("refouler") a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion.

**2.**  The benefit of the present provision may not, however, be claimed by a refugee whom there are reasonable grounds for regarding as a danger to the security of the country in which he is, or who, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of that country.

## *Article 34*
### NATURALIZATION

The Contracting States shall as far as possible facilitate the assimilation and naturalization of refugees. They shall in particular make every effort to expedite naturalization proceedings and to reduce as far as possible the charges and costs of such proceedings.

AR.09889

## CHAPTER VI: Executory and Transitory Provisions

### *Article 35*

**CO-OPERATION OF THE NATIONAL AUTHORITIES WITH THE UNITED NATIONS**

**1.** The Contracting States undertake to co-operate with the Office of the United Nations High Commissioner for Refugees, or any other agency of the United Nations which may succeed it, in the exercise of its functions, and shall in particular facilitate its duty of supervising the application of the provisions of this Convention.

**2.** In order to enable the Office of the High Commissioner or any other agency of the United Nations which may succeed it, to make reports to the competent organs of the United Nations, the Contracting States undertake to provide them in the appropriate form with information and statistical data requested concerning:

(a) The condition of refugees,

(b) The implementation of this Convention, and;

(c) Laws, regulations and decrees which are, or may hereafter be, in force relating to refugees.

### *Article 36*

**INFORMATION ON NATIONAL LEGISLATION**

The Contracting States shall communicate to the Secretary-General of the United Nations the laws and regulations which they may adopt to ensure the application of this Convention.

### *Article 37*

**RELATION TO PREVIOUS CONVENTIONS**

Without prejudice to article 28, paragraph 2, of this Convention, this

AR.09890

Convention replaces, as between parties to it, the Arrangements of 5 July 1922, 31 May 1924, 12 May 1926, 30 June 1928 and 30 July 1935, the Conventions of 28 October 1933 and 10 February 1938, the Protocol of 14 September 1939 and the Agreement of 15 October 1946.

AR.09891

## CHAPTER VII: Final Clauses

### *Article 38*

#### SETTLEMENT OF DISPUTES

Any dispute between parties to this Convention relating to its interpretation or application, which cannot be settled by other means, shall be referred to the International Court of Justice at the request of any one of the parties to the dispute.

### *Article 39*

#### SIGNATURE, RATIFICATION AND ACCESSION

**1.**   This Convention shall be opened for signature at Geneva on 28 July 1951 and shall thereafter be deposited with the Secretary-General of the United Nations. It shall be open for signature at the European Office of the United Nations from 28 July to 31 August 1951 and shall be re-opened for signature at the Headquarters of the United Nations from 17 September 1951 to 31 December 1952.

**2.**   This Convention shall be open for signature on behalf of all States Members of the United Nations, and also on behalf of any other State invited to attend the Conference of Plenipotentiaries on the Status of Refugees and Stateless Persons or to which an invitation to sign will have been addressed by the General Assembly. It shall be ratified and the instruments of ratification shall be deposited with the Secretary-General of the United Nations.

**3.**   This Convention shall be open from 28 July 1951 for accession by the States referred to in paragraph 2 of this article. Accession shall be effected by the deposit of an instrument of accession with the Secretary-General of the United Nations.

AR.09892

## *Article 40*

### TERRITORIAL APPLICATION CLAUSE

**1.**  Any State may, at the time of signature, ratification or accession, declare that this Convention shall extend to all or any of the territories for the international relations of which it is responsible. Such a declaration shall take effect when the Convention enters into force for the State concerned.

**2.**  At any time thereafter any such extension shall be made by notification addressed to the Secretary-General of the United Nations and shall take effect as from the ninetieth day after the day of receipt by the Secretary-General of the United Nations of this notification, or as from the date of entry into force of the Convention for the State concerned, whichever is the later.

**3.**  With respect to those territories to which this Convention is not extended at the time of signature, ratification or accession, each State concerned shall consider the possibility of taking the necessary steps in order to extend the application of this Convention to such territories, subject, where necessary for constitutional reasons, to the consent of the Governments of such territories.

## *Article 41*

### FEDERAL CLAUSE

In the case of a Federal or non-unitary State, the following provisions shall apply:

(a)  With respect to those articles of this Convention that come within the legislative jurisdiction of the federal legislative authority, the obligations of the Federal Government shall to this extent be the same as those of Parties which are not Federal States;

(b)  With respect to those articles of this Convention that come within the legislative jurisdiction of constituent States, provinces or cantons which are not, under the constitutional system of the federation, bound to take legislative action, the Federal Government shall bring such articles with a favourable recommendation to the notice of the appropriate authorities of states, provinces or cantons at the earliest possible moment;

(c)  A Federal State Party to this Convention shall, at the request of any other Contracting State transmitted through the Secretary-General of

AR.09893

the United Nations, supply a statement of the law and practice of the Federation and its constituent units in regard to any particular provision of the Convention showing the extent to which effect has been given to that provision by legislative or other action.

### *Article 42*
#### RESERVATIONS

**1.**  At the time of signature, ratification or accession, any State may make reservations to articles of the Convention other than to articles 1, 3, 4, 16(1), 33, 36-46 inclusive.

**2.**  Any State making a reservation in accordance with paragraph 1 of this article may at any time withdraw the reservation by a communication to that effect addressed to the Secretary-General of the United Nations.

### *Article 43*
#### ENTRY INTO FORCE

**1.**  This Convention shall come into force on the ninetieth day following the day of deposit of the sixth instrument of ratification or accession.

**2.**  For each State ratifying or acceding to the Convention after the deposit of the sixth instrument of ratification or accession, the Convention shall enter into force on the ninetieth day following the date of deposit by such State of its instrument or ratification or accession.

### *Article 44*
#### DENUNCIATION

**1.**  Any Contracting State may denounce this Convention at any time by a notification addressed to the Secretary-General of the United Nations.

**2.**  Such denunciation shall take effect for the Contracting State concerned one year from the date upon which it is received by the Secretary-General of the United Nations.

**3.**  Any State which has made a declaration or notification under article 40

AR.09894

may, at any time thereafter, by a notification to the Secretary-General of the United Nations, declare that the Convention shall cease to extend to such territory one year after the date of receipt of the notification by the Secretary-General.

### *Article 45*

#### REVISION

**1.** Any Contracting State may request revision of this Convention at any time by a notification addressed to the Secretary-General of the United Nations.

**2.** The General Assembly of the United Nations shall recommend the steps, if any, to be taken in respect of such request.

### *Article 46*

#### NOTIFICATIONS BY
#### THE SECRETARY-GENERAL OF THE UNITED NATIONS

The Secretary-General of the United Nations shall inform all Members of the United Nations and non-member States referred to in article 39:

(a) Of declarations and notifications in accordance with section B of article 1;

(b) Of signatures, ratifications and accessions in accordance with article 39;

(c) Of declarations and notifications in accordance with article 40;

(d) Of reservations and withdrawals in accordance with article 42;

(e) Of the date on which this Convention will come into force in accordance with article 43;

(f) Of denunciations and notifications in accordance with article 44;

(g) Of requests for revision in accordance with article 45.

IN FAITH WHEREOF the undersigned, duly authorized, have signed this Convention on behalf of their respective Governments,

DONE at Geneva, this twenty-eighth day of July, one thousand nine hundred and fifty-one, in a single copy, of which the English and French texts are

AR.09895

equally authentic and which shall remain deposited in the archives of the United Nations, and certified true copies of which shall be delivered to all Members of the United Nations and to the non-member States referred to in article 39.

## SCHEDULE

### *Paragraph 1*

**1.**   The travel document referred to in article 28 of this Convention shall be similar to the specimen annexed hereto.

**2.**   The document shall be made out in at least two languages, one of which shall be English or French.

### *Paragraph 2*

Subject to the regulations obtaining in the country of issue, children may be included in the travel document of a parent or, in exceptional circumstances, of another adult refugee.

### *Paragraph 3*

The fees charged for issue of the document shall not exceed the lowest scale of charges for national passports.

### *Paragraph 4*

Save in special or exceptional cases, the document shall be made valid for the largest possible number of countries.

### *Paragraph 5*

The document shall have a validity of either one or two years, at the discretion of the issuing authority.

### *Paragraph 6*

**1.**   The renewal or extension of the validity of the document is a matter for the authority which issued it, so long as the holder has not established lawful residence in another territory and resides lawfully in the territory of the said

AR.09897

authority. The issue of a new document is, under the same conditions, a matter for the authority which issued the former document.

**2.** Diplomatic or consular authorities, specially authorized for the purpose, shall be empowered to extend, for a period not exceeding six months, the validity of travel documents issued by their Governments.

**3.** The Contracting States shall give sympathetic consideration to renewing or extending the validity of travel documents or issuing new documents to refugees no longer lawfully resident in their territory who are unable to obtain a travel document from the country of their lawful residence.

### *Paragraph 7*

The Contracting States shall recognize the validity of the documents issued in accordance with the provisions of article 28 of this Convention.

### *Paragraph 8*

The competent authorities of the country to which the refugee desires to proceed shall, if they are prepared to admit him and if a visa is required, affix a visa on the document of which he is the holder.

### *Paragraph 9*

**1.** The Contracting States undertake to issue transit visas to refugees who have obtained visas for a territory of final destination.

**2.** The issue of such visas may be refused on grounds which would justify refusal of a visa to any alien.

### *Paragraph 10*

The fees for the issue of exit, entry or transit visas shall not exceed the lowest scale of charges for visas on foreign passports.

### *Paragraph 11*

When a refugee has lawfully taken up residence in the territory of another

AR.09898

Contracting State, the responsibility for the issue of a new document, under the terms and conditions of article 28, shall be that of the competent authority of that territory, to which the refugee shall be entitled to apply.

### *Paragraph 12*

The authority issuing a new document shall withdraw the old document and shall return it to the country of issue if it is stated in the document that it should be so returned; otherwise it shall withdraw and cancel the document.

### *Paragraph 13*

**1.**   Each Contracting State undertakes that the holder of a travel document issued by it in accordance with article 28 of this Convention shall be readmitted to its territory at any time during the period of its validity.

**2.**   Subject to the provisions of the preceding sub-paragraph, a Contracting State may require the holder of the document to comply with such formalities as may be prescribed in regard to exit from or return to its territory.

**3.**   The Contracting States reserve the right, in exceptional cases, or in cases where the refugee's stay is authorized for a specific period, when issuing the document, to limit the period during which the refugee may return to a period of not less than three months.

### *Paragraph 14*

Subject only to the terms of paragraph 13, the provisions of this Schedule in no way affect the laws and regulations governing the conditions of admission to, transit through, residence and establishment in, and departure from, the territories of the Contracting States.

### *Paragraph 15*

Neither the issue of the document nor the entries made thereon determine or affect the status of the holder, particularly as regards nationality.

AR.09899

*Paragraph 16*

The issue of the document does not in any way entitle the holder to the protection of the diplomatic or consular authorities of the country of issue, and does not confer on these authorities a right of protection.

**ANNEX**

Specimen Travel Document

The document will be in booklet form (approximately 15 x 10 centimetres).

It is recommended that it be so printed that any erasure or alteration by chemical or other means can be readily detected, and that the words "Convention of 28 July 1951" be printed in continuous repetition on each page, in the language of the issuing country.

---

*(Cover of booklet)*
TRAVEL DOCUMENT
*(Convention of 28 July 1951)*

---

**No.**…………………….

**(1)**

TRAVEL DOCUMENT
*(Convention of 28 July 1951)*

This document expires on ……………………………………………………
unless its validity is extended or renewed.

Name …………………………………………………………………………

Forename(s) ………………………………………………………………… .

Accompanied by …………………………………………… child (children).

**1.**   This document is issued solely with a view to providing the holder with a travel document which can serve in lieu of a national passport. It is without prejudice to and in no way affects the holder's nationality.

**2.**   The holder is authorized to return to ……………………………………..
[state here the country whose authorities are issuing the document] on or before ……………………………………………………………………………

AR.09901

unless some later date is hereafter specified. [The period during which the holder is allowed to return must not be less than three months.]

**3.** Should the holder take up residence in a country other than that which issued the present document, he must, if he wishes to travel again, apply to the competent authorities of his country of residence for a new document. [The old travel document shall be withdrawn by the authority issuing the new document and returned to the authority which issued it.][1]

(This document contains……..pages, exclusive of cover.)

## (2)

Place and date of birth ………………………………………………………….
Occupation ………………………………………………………………………… .
Present residence …………………………………………………………………..
*Maiden name and forename(s) of wife ……………………………………………..
…………………………………………………………………………………………….
*Name and forename(s) of husband ………………………………………………… .
…………………………………………………………………………………………….

*Description*

Height…………………………………………………… .
Hair………………………………………………………… .
Colour of eyes …………………………………………….. .
Nose ……………………………………………………… .
Shape of face …………………………………………… .
Complexion………………………………………………… .
Special peculiarities……………………………………..

*Children accompanying holder*

| Name | Forename(s) | Place and date of birth | Sex |
|---|---|---|---|
| ………………… . | ………………… . | ………………………… | ………….. |
| ………………… . | ………………… . | ………………………… | ………….. |
| ………………… . | ………………… . | ………………………… | ………….. |

*Strike out whichever does not apply

(This document contains……..pages, exclusive of cover.)

---

(1)  The sentence in brackets to be inserted by Governments which so desire. AR.09902

## (3)

Photograph of holder and stamp of issuing authority

Finger-prints of holder (if required)

Signature of holder …………………………………………………………….

(This document contains……..pages, exclusive of cover.)

## (4)

1. This document is valid for the following countries:………………………
…………………………………………………………………………………
…………………………………………………………………………………
…………………………………………………………………………………

2. Document or documents on the basis of which the present document is
issued:………………………………………………………………………… .
…………………………………………………………………………………
…………………………………………………………………………………
…………………………………………………………………………………

Issued at……………………………
Date………………………………….

Signature and stamp of authority
issuing the document:

Fee paid:

(This document contains……..pages, exclusive of cover.)

## (5)

Extension or renewal of validity

Fee paid:                                    From………………………………….
                                                To…………………………………..
Done at…………………………………. Date…………………………………..
                                                Signature and stamp of authority
                                                extending or renewing the validity of
                                                the document:

AR.09903

Extension or renewal of validity

Fee paid:                                    From…………………………….

                                             To………………………………..

Done at ………………………….       Date …………………………….

                                             Signature and stamp of authority

                                             extending or renewing the validity of

                                             the document:

(This document contains……..pages, exclusive of cover.)

---

## (6)

Extension or renewal of validity

Fee paid:                                    From…………………………….

                                             To………………………………..

Done at ………………………….       Date …………………………….

                                             Signature and stamp of authority

                                             extending or renewing the validity of

                                             the document:

---

Extension or renewal of validity

Fee paid:                                    From…………………………….

                                             To………………………………..

Done at ………………………….       Date …………………………….

                                             Signature and stamp of authority

                                             extending or renewing the validity of

                                             the document:

(This document contains……..pages, exclusive of cover.)

---

## (7-32)

Visas

The name of the holder of the document must be repeated in each visa.

(This document contains……..pages, exclusive of cover.)

AR.09904

## PROTOCOL RELATING TO THE STATUS OF REFUGEES

THE STATES PARTIES TO THE PRESENT PROTOCOL,

**CONSIDERING** that the Convention relating to the Status of Refugees done at Geneva on 28 July 1951 (hereinafter referred to as the Convention) covers only those persons who have become refugees as a result of events occurring before 1 January 1951,

**CONSIDERING** that new refugee situations have arisen since the Convention was adopted and that the refugees concerned may therefore not fall within the scope of the Convention,

**CONSIDERING** that it is desirable that equal status should be enjoyed by all refugees covered by the definition in the Convention irrespective of the dateline 1 January 1951,

**HAVE AGREED** as follows:

### *Article I*
### GENERAL PROVISION

1.   The States Parties to the present Protocol undertake to apply articles 2 to 34 inclusive of the Convention to refugees as hereinafter defined.

2.   For the purpose of the present Protocol, the term "refugee" shall, except as regards the application of paragraph 3 of this article, mean any person within the definition of article 1 of the Convention as if the words "As a result of events occurring before 1 January 1951 and ..." "and the words"... "a result of such events", in article 1 A (2) were omitted.

3.   The present Protocol shall be applied by the States Parties hereto without any geographic limitation, save that existing declarations made by States already Parties to the Convention in accordance with article 1 B (1) (a) of the

AR.09905

Convention, shall, unless extended under article 1 B (2) thereof, apply also under the present Protocol.

## *Article II*

### CO-OPERATION OF THE NATIONAL AUTHORITIES WITH THE UNITED NATIONS

**1.**  The States Parties to the present Protocol undertake to co-operate with the Office of the United Nations High Commissioner for Refugees, or any other agency of the United Nations which may succeed it, in the exercise of its functions, and shall in particular facilitate its duty of supervising the application of the provisions of the present Protocol.

**2.**  In order to enable the Office of the High Commissioner, or any other agency of the United Nations which may succeed it, to make reports to the competent organs of the United Nations, the States Parties to the present Protocol undertake to provide them with the information and statistical data requested, in the appropriate form, concerning:

(a)  The condition of refugees;

(b)  The implementation of the present Protocol;

(c)  Laws, regulations and decrees which are, or may hereafter be, in force relating to refugees.

## *Article III*

### INFORMATION ON NATIONAL LEGISLATION

The States Parties to the present Protocol shall communicate to the Secretary-General of the United Nations the laws and regulations which they may adopt to ensure the application of the present Protocol.

## *Article IV*

### SETTLEMENT OF DISPUTES

Any dispute between States Parties to the present Protocol which relates to its interpretation or application and which cannot be settled by other means shall be referred to the International Court of Justice at the request of any one of the parties to the dispute.

AR.09906

*Article V*
## ACCESSION

The present Protocol shall be open for accession on behalf of all States Parties to the Convention and of any other State Member of the United Nations or member of any of the specialized agencies or to which an invitation to accede may have been addressed by the General Assembly of the United Nations. Accession shall be effected by the deposit of an instrument of accession with the Secretary-General of the United Nations.

*Article VI*
## FEDERAL CLAUSE

In the case of a Federal or non-unitary State, the following provisions shall apply:

(a) With respect to those articles of the Convention to be applied in accordance with article I, paragraph 1, of the present Protocol that come within the legislative jurisdiction of the federal legislative authority, the obligations of the Federal Government shall to this extent be the same as those of States Parties which are not Federal States;

(b) With respect to those articles of the Convention to be applied in accordance with article I, paragraph 1, of the present Protocol that come within the legislative jurisdiction of constituent States, provinces or cantons which are not, under the constitutional system of the federation, bound to take legislative action, the Federal Government shall bring such articles with a favourable recommendation to the notice of the appropriate authorities of States, provinces or cantons at the earliest possible moment;

(c) A Federal State Party to the present Protocol shall, at the request of any other State Party hereto transmitted through the Secretary-General of the United Nations, supply a statement of the law and practice of the Federation and its constituent units in regard to any particular provision of the Convention to be applied in accordance with article I, paragraph 1, of the present Protocol, showing the extent to which effect has been given to that provision by legislative or other action.

AR.09907

*Article VII*

## RESERVATIONS AND DECLARATIONS

**1.**  At the time of accession, any State may make reservations in respect of article IV of the present Protocol and in respect of the application in accordance with article I of the present Protocol of any provisions of the Convention other than those contained in articles 1, 3, 4, 16 (1) and 33 thereof, provided that in the case of a State Party to the Convention reservations made under this article shall not extend to refugees in respect of whom the Convention applies.

**2.**  Reservations made by States Parties to the Convention in accordance with article 42 thereof shall, unless withdrawn, be applicable in relation to their obligations under the present Protocol.

**3.**  Any State making a reservation in accordance with paragraph 1 of this article may at any time withdraw such reservation by a communication to that effect addressed to the Secretary-General of the United Nations.

**4.**  Declarations made under article 40, paragraphs 1 and 2, of the Convention by a State Party thereto which accedes to the present Protocol shall be deemed to apply in respect of the present Protocol, unless upon accession a notification to the contrary is addressed by the State Party concerned to the Secretary-General of the United Nations. The provisions of article 40, paragraphs 2 and 3, and of article 44, paragraph 3, of the Convention shall be deemed to apply *mutatis mutandis* to the present Protocol.

*Article VIII*

## ENTRY INTO FORCE

**1.**  The present Protocol shall come into force on the day of deposit of the sixth instrument of accession.

**2.**  For each State acceding to the Protocol after the deposit of the sixth instrument of accession, the Protocol shall come into force on the date of deposit by such State of its instrument of accession.

AR.09908

### *Article IX*
#### DENUNCIATION

1.  Any State Party hereto may denounce this Protocol at any time by a notification addressed to the Secretary-General of the United Nations.

2.  Such denunciation shall take effect for the State Party concerned one year from the date on which it is received by the Secretary-General of the United Nations.

### *Article X*
#### NOTIFICATIONS
#### BY THE SECRETARY-GENERAL OF THE UNITED NATIONS

The Secretary-General of the United Nations shall inform the States referred to in article V above of the date of entry into force, accessions, reservations and withdrawals of reservations to and denunciations of the present Protocol, and of declarations and notifications relating hereto.

### *Article XI*
#### DEPOSIT IN THE ARCHIVES
#### OF THE SECRETARIAT OF THE UNITED NATIONS

A copy of the present Protocol, of which the Chinese, English, French, Russian and Spanish texts are equally authentic, signed by the President of the General Assembly and by the Secretary-General of the United Nations, shall be deposited in the archives of the Secretariat of the United Nations. The Secretary-General will transmit certified copies thereof to all States Members of the United Nations and to the other States referred to in article V above.

AR.09909

**GENERAL ASSEMBLY RESOLUTION 2198 (XXI)**

# Protocol relating to the Status of Refugees

THE GENERAL ASSEMBLY,

**CONSIDERING** that the Convention relating to the Status of Refugees, signed at Geneva on 28 July 1951[1], covers only those persons who have become refugees as a result of events occurring before 1 January 1951,

**CONSIDERING** that new refugee situations have arisen since the Convention was adopted and that the refugees concerned may therefore not fall within the scope of the Convention,

**CONSIDERING** that it is desirable that equal status should be enjoyed by all refugees covered by the definition in the Convention, irrespective of the dateline of 1 January 1951,

**TAKING NOTE** of the recommendation of the Executive Committee of the Programme of the United Nations High Commissioner for Refugees[2] that the draft Protocol relating to the Status of Refugees should be submitted to the General Assembly after consideration by the Economic and Social Council, in order that the Secretary-General might be authorized to open the Protocol for accession by Governments within the shortest possible time,

---

(1)  United Nations, *Treaty Series*, vol. 189 (1954), No. 2545.

(2)  See A/6311/Rev.1/Add.1, part two, para. 38.

AR.09910

**CONSIDERING** that the Economic and Social Council, in its resolution 1186 (XLI) of 18 November 1966, took note with approval of the draft Protocol contained in the addendum to the report of the United Nations High Commissioner for Refugees and concerning measures to extend the personal scope of the Convention[3] and transmitted the addendum to the General Assembly,

1. **TAKES NOTE** of the Protocol relating to the Status of Refugees, the text of which[3] is contained in the addendum to the report of the United Nations High Commissioner for Refugees;

2. **REQUESTS** the Secretary-General to transmit the text of the Protocol to the States mentioned in article V thereof, with a view to enabling them to accede to the Protocol[4].

*1495th plenary meeting, 16 December 1966*

---

(3) Ibid., part one, para. 2.

(4) The Protocol was signed by the President of the General Assembly and by the Secretary-General on 31 January 1967.

AR.09911

UNHCR / COM&PI / C14·CONV&PRO / ENG / DECEMBER 2010



Published by:

**UNHCR**

Communications
and Public
Information Service

P.O. Box 2500
1211 Geneva 2
Switzerland

www.unhcr.org

For information
and inquiries,
please contact:

Communications
and Public
Information Service
hqpi00@unhcr.org

AR.09913

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekn-718o
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0493
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Emily Leung
**Address:**
    Justice Center of Southeast Massachusetts
    62 Main Street, Suite 302
    Brockton,  MA,  02301
**Email:** eleung@justicema.org
**Phone:** 5086380153

## General Comment

See attached file(s)

## Attachments

Justice Center of SEMA Public Comment - EOIR Docket 18-0002

# *JUSTICE CENTER OF SOUTHEAST MASSACHUSETTS LLC*

*Subsidiary of South Coastal Counties Legal Services, Inc.*
*Serving Southeastern Massachusetts, Cape Cod & Islands*

*Submitted via www.regulations.gov*

Lauren Alder Reid, Assistant Director
Office of Policy
Executive Office of Immigration Review
5107 Leesburg Pike, Suite 2616
Falls Church, VA 22041

**Re: U.S. Department of Homeland Security, Procedures for Asylum and Bars to Asylum Eligibility, EOIR Docket No. 18-0002; RIN 1125-AA87, 1615-AC41**

To Whom It May Concern:

We are writing on behalf of the Justice Center of Southeast Massachusetts in response to the Department of Homeland Security (DHS, or the Department) and Department of Justice's (DOJ, or the Department) Notice of Proposed Rulemaking (NPRM or proposed rule), to express our strong opposition to changes to the procedures for asylum and bars to asylum eligibility, published in the Federal Register on December 19, 2019.

The Justice Center of Southeast Massachusetts, a subsidiary of South Coastal Counties Legal Services, provides free civil legal services to indigent and elderly individuals in our service area. We serve communities in Plymouth, Bristol, Dukes, Nantucket, and Barnstable Counties, as well as residents of the towns of Avon and Stoughton. Our mission is to achieve equal justice for the poor and disadvantaged through community based legal advocacy. The Justice Center of Southeast Massachusetts provides civil legal services in the areas of housing, family law, education, immigration, and benefits. We are currently serving over 30 asylum seeking clients and their families, many of whom would be adversely affected by this rule.

The Justice Center of Southeast Massachusetts strongly opposes the changes being proposed to the asylum process as they will place an undue burden on our already very vulnerable clients.  The criminal bars being proposed do not make communities safer, ignore the trauma and vulnerability of this class of immigrants, and will ultimately contribute to the backlog by decreasing efficiency in immigration courts. The proposed rule will seriously jeopardize the asylum claims of domestic violence and intimate partner violence survivors and raises serious due process concerns in how it proposes to evaluate alleged criminal conduct that does not result in conviction. Generally, the proposed bars are overbroad, unclearly defined, with overly narrow exceptions, and insufficient guidance, which will result in meritorious asylum claims being denied. We strongly oppose the proposed rule and urge the Departments to rescind the rule.

**1. The proposed rule expands bars for an already difficult to acquire immigration benefit. The bars should be narrowed, not broadened.**

The proposed rule seeks to add  seven categorical bars to asylum eligibility:  (1) any conviction of a felony offense; (2) any conviction for "smuggling or harboring" under 8 U.S.C. § 1324(a), even if the asylum seeker committed the offense for the purpose of bringing her own spouse, child or parent to safety; (3) any conviction for illegal reentry under 8 U.S.C. § 1326; (4) any conviction for an offense "involving criminal street gangs," with the adjudicator empowered to look to any evidence to determine applicability; (5) any second conviction for an offense involving driving while intoxicated or impaired; (6) any conviction *or accusation of conduct* for acts of battery involving a domestic relationship; (7) and any conviction for several newly defined categories of misdemeanor offenses, including *any* drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits. These categorical bars are cruel and do not serve the purported goal of making communities safer and barring criminals from a discretionary benefit. Instead, it will be barring some asylum seekers with meritorious cases and complex circumstances from an immigration benefit they desperately need to stay *alive.* The burden on asylum seekers under current laws and regulations is already high. In the context of a complicated system of immigration laws and regulations, asylum seekers must bear the evidentiary burden of establishing their eligibility[1] often without legal counsel and often from within detention centers.[2] Additional regulations under the current administration have placed further bars on asylum eligibility based on asylum seekers' manner of entry, path to reaching the United States, and national origin.[3]

In regards to criminal bars, the current bars in place are already broad and somewhat vague. Any offense that falls under the category of an aggravated felony can be considered a "particularly serious crime" and preclude asylum eligibility. Over the past several decades, an aggravated felony went from only consisting of murder, weapons trafficking, and drug trafficking, to including over 30 offenses. Some of those offenses now include crimes such as failing to appear in court, filing a false tax return, and theft.[4] Further categorical bars are not needed when the current bars are already so broad. Even if an asylum seeker is not barred due to one of the current criminal bars, an asylum adjudicator still retains full discretion to deny asylum.[5] In order to justify these broad categorical bars, the proposed rule points to the availability of CAT and withholding of removal, however, this does not nullify the harm of this proposed rule. The protections afforded by CAT and by statutory withholding of removal are limited in scope and duration, and they are significantly harder to obtain.[6] The continue

---

[1] USC § 1158(b)(1)(B); 8 CFR § 1240.8(d).

[2] Daniel Connolly, Aaron Montes, and Lauren Villagran, "Asylum seekers in U.S. face years of waiting, little chance of winning their cases," *USA Today,* (September 25, 2019), available at  https://www.usatoday.com/indepth/news/nation/2019/09/23/immigration-court-asylum-seekers-what-to-expect/2026541001/.

[3] National Immigrant Justice Center "A Timeline of the Trump Administration's Efforts to End Asylum", (updated January 2020) available at  https://www.immigrantjustice.org/issues/asylum-seekers-refugees

[4] American immigration Council, "Aggravated Felonies: An Overview", (December 16, 2016), available at https://www.americanimmigrationcouncil.org/research/aggravated-felonies-overview

[5] *See Matter of Pula*, 19 I.&N. Dec. 467 (BIA 1987).

[6] Dagmar Myslinska,,"Which Should I Apply for: Asylum, Withholding of Removal, and/or Protection Under Convention Against Torture?", *NOLO*  (updated 2019), available at  https://www.nolo.com/legal-encyclopedia/differences-asylum-withholding-removal-protection-convention-against-torture.html

availability of CAT and withholding of removal does not justify the addition of numerous eligibility bars that have limited connection with public safety and security.

This proposed rule states, "Although Congress prescribed that all aggravated felonies constitute particularly serious crimes, Congress further provided that the Attorney General 'may designate by regulation offenses that will be considered' a 'particularly serious crime,' by reason of which the offender 'constitutes a danger to the community of the United States'". [7] In explaining their authority to implement these regulations the proposed rule further states that, "the additional limitations on eligibility must simply be established by regulation, and must be consistent with the rest of 8 U.S.C. §1158." These additional bars are arguably not consistent with 8 U.S.C. 1158. While 8 U.S.C. §1158 provides the authority to determine what counts as a particularly serious crime that could endanger others, it does not provide the authority to create arbitrary asylum bars that do not speak to the dangerousness of the asylum seeker.

Additionally, this proposed rule is at direct odds with the United States' international treaty obligations. The 1967 Protocol Relating to the Status of Refugees binds parties to the UN Convention Relating to the Status of Refugees.[8] The United States, in signing onto this, is essentially bound to create their refugee laws in a manner that complies with the Protocol. The Protocol's principle of non-refoulment, or returning refugees back to a place where they will be persecuted on protected grounds, is a key part of the agreement.[9] While the Convention allows states to exclude and/or expel potential refugees from protection, the circumstances in which this can occur are limited. The Convention allows states to exclude individuals from refugee protection if the individual "having been convicted by a final judgement of a particularly serious crime, constitutes a danger to the community of that country." However, this has generally been interpreted to encompass the most serious or extreme cases and the United Nations High Commissioner for Refugees (UNHCR) has asserted that to constitute a "particularly serious crime," the crime "must belong to the gravest category" and be limited "to refugees who become an extremely serious threat to the country of asylum due to the severity of crimes perpetrated by them in the country of asylum," and do not include lesser crimes such as theft or use of narcotic substances. This proposed rule is directly at odds with the nature of the protocol.

## 2. Creating an eligibility bar based on migration related offenses is inhumane and illogical.

Barring asylum eligibility for immigrants convicted of migration-related offenses punishes them for fleeing persecution and seeking safety for their children or other family members. More and more asylum seekers arrive to the United States in family units[10]- this does not suggest that their asylum claims are non-meritorious or that this "crime" of harboring a family member would make them a danger to US communities. The proposed rule states that "even first-time alien

---

[7] INA 208 (b)(2)(A)(ii), (B)(ii)., 8 U.S.C. 1158(b)(2)(A)(iii),(B)(ii).

[8] Convention Relating to the Statute of Refugees, July 28, 1951, 140 U.N.T.S. 1954 (hereinafter "Refugee Convention").

[9] United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268.

[10] Joel Rose and John Burnett, "Migrant Families Arrive in Busloads as Border Crossings Hit 10-year High), *NPR,* (March 5, 2019), available at https://www.npr.org/2019/03/05/700428069/migrant-families-arrive-in-busloads-as-border-crossings-hit-10-year-high

smuggling offenses involving immediate family members display a serious disregard for U.S. immigration law and pose a potential hazard to smuggled family members, which often include a vulnerable child or spouse." It is illogical to conclude that the hazard posed to a child or spouse being "smuggled" is a greater hazard than they would face in their native country from which they are fleeing *violence* and *persecution* because of their race, nationality, religion, political opinion or particular social group.

Additionally, it is illogical to assume that asylum seekers showing up at the US border after fleeing violence and persecution understand complicated portions of U.S. immigration law and/or have the resources to understand it. This proposed bar to asylum is direct violation with human nature itself. Parents fleeing unsafe circumstances are not going to leave behind their children. This proposed bar is particularly underhanded due to the recently released, now- public documents that reveal this administration's well thought out plan to utilize smuggling prosecutions to deport parents and caregivers that brought children to the United States.[11] The document, acquired through litigation, states that ICE sought "an interagency 90- to 120-day operation focusing on transnational criminal organizations (TCO) engaged in smuggling unaccompanied alien children (UAC) with an emphasis on the identification, investigation, and arrest of human smuggling facilitators, including, but not limited to, parents and family members."[12] This bar places families in a truly difficult position of choosing between leaving family members in danger or bringing them to the U.S. nullifying their ability to receive protection as a family. Importantly, cutting off asylum eligibility will eliminate family reunification options, which will result in permanent separation of families.

Additionally, this administration has put into place numerous impediments to legal entry into the United States, making it more difficult for immigrants to enter (or reenter) legally, and removing due process. It is unfair to bar asylum seekers from eligibility for not entering legally, when this administration has actively dismantled the pathways and processes to legal entry through regulation and policy. Chaos at the border has resulted in immigration proceedings being conducted in tent courts with video conferenced judges.[13] The policy of Migrant Protection Protocols (MPP), colloquially called "return to Mexico," sent asylum seekers to wait in camps on the Mexican side of the border while their asylum claims were being processed and adjudicated. This caused asylum seekers, who chose to follow the Trump Administration's rules and not enter unlawfully, to be disqualified from asylum eligibility based on additional Trump Administration rule. The administration limited the amount of asylum seekers they would allow through the legal ports of entry. Those asylum seekers waited on unofficial waiting lists in Mexico via MPP. Despite DHS' claim that "Mexico will provide them with all appropriate humanitarian protections for the duration of their stay,"[14] these camps were dangerous and unsanitary.[15] The

---

[11] USCIS "Concept of Operations: Unaccompanied Alien Children Human Smuggling Disruption Initiative" (May 15, 2017), available at https://www.documentcloud.org/documents/5980596-Smuggling-Initiative-ConOP.html
[12] USCIS "Concept of Operations: Unaccompanied Alien Children Human Smuggling Disruption Initiative" (May 15, 2017), available at https://www.documentcloud.org/documents/5980596-Smuggling-Initiative-ConOP.html
[13] Priscilla Alvarez, "Confusion and Frustration in Tent Courts Along the Texas Border", *CNN* (September 21, 2019) available at https://www.cnn.com/2019/09/21/politics/texas-tent-courts/index.html
[14] US Department of Homeland Security, "Migrant Protection Protocols", (January 24, 2019) available at https://www.dhs.gov/news/2019/01/24/migrant-protection-protocols

new rule, published as an interim final rule in July of 2019, bars asylum seekers from eligibility if they passed through a "third country" to get to the United States and did not apply for asylum there first.[16] So the asylum seekers who chose to follow the law and not enter illegally while waiting in Mexico, are now barred from asylum.[17]

Just this month, two programs were expanded that cut off asylum seekers from accessing counsel and rushed them through their credible fear interviews. The Prompt Asylum Claim Review (PACR), applying to individuals other than Mexican nationals, and the Humanitarian Asylum Review Process (HARP), applying to Mexican nationals, keeps those individuals at the border in Customs and Border Patrol Custody rather than transferring them to ICE.[18] The rates of credible fear interview passage are incredibly low, and most are sent back to the dangerous situations they came from. Legal counsel is essentially unavailable in CBP custody.[19] In instances like this, legitimate asylum seekers with meritorious cases may not have any other options than to unlawfully reenter the country in order to save their own lives. It is laughable and disingenuous that the administration purports that there are "alternative means to presenting a claim to persecution" aside from unlawfully entering the United States. The myriad policies rapidly issued and developed to prevent individuals from lawfully seeking asylum violate domestic and international laws and the proposed bars for unlawful entry and harboring are yet another example of the administration's abject hostility to asylum seekers.

Because this proposed rule bars any asylum seekers who have an illegal reentry conviction, this unfairly harms asylum seekers who have fled persecution multiple times. The proposed rule treats all illegal entry the same – whether it was multiple entries by immigrants having prior removal orders, asylum seekers who have entered multiple times without having their asylum claims heard, or even perhaps someone who was originally removed before the onset of the circumstances that caused fear of persecution and then returned. This is justified in the rule by stating that "Illegal reentry also reflects a willingness to repeatedly disregard the immigration laws despite alternative means of presenting a claim of persecution." But as previously discussed, chaos at the border has resulted in few alternative means of presenting a claim of persecution, and has muddied the pathway to legal entry. The rule further justifies this by loosely connecting the idea of criminal recidivism and dangerousness, without regard to the seriousness of the prior convictions. It provides no evidence to back up this claim that illegal reentry and dangerousness are related or correlated in any way. Discretion must be preserved to grant asylum on a case by case basis, otherwise meritorious asylum seekers will likely be deemed ineligible.

[15] Zacahry Mueller, "Immigration 101: What is 'Remain in Mexico', or the Migration Protection Protocols (MPP)?", *America's Voice,* (November 15, 2019) available at https://americasvoice.org/blog/remain-in-mexico-mpp/?gclid=EAIaIQobChMI1Zbd4PiK5wIVg5yzCh1TPgbuEAAYASAAEgIYrvD_BwE
[16] Human Rights First, "Trump Administration's Third-Country Transit Bar is An Asylum Ban that Will Return Refugees to Danger", (updated September 2019), available at https://www.humanrightsfirst.org/sites/default/files/Third-Country-Transit-Ban.pdf
[17] Dara Lind, "Asylum-Seekers Who Followed Trump Rule Now Don't Qualify Because of New Trump Rule", *ProPublica,* July 22, 2019 available at https://www.propublica.org/article/asylum-seekers-that-followed-trump-rule-now-dont-qualify-because-of-new-trump-rule
[18] National Immigrant Justice Center "Asylum Seekers and Refugees: A Timeline Of The Trump Administration's Efforts To End Asylum", (updated January 2020) available at https://www.immigrantjustice.org/issues/asylum-seekers-refugees
[19] US District Court for the District of Columbia, "PACR HARP Amended Complaint" (December 5, 2019) available at "https://www.aclutx.org/sites/default/files/aclu_complaint_expedited_removal_program_pacr_harp.pdf

Finally, this proposed rule is internally inconsistent. Under the section of the proposed rule that discusses the use of fraudulent documents, 7(a), there is an exception for aliens that "used the document to depart a country in which the alien has claimed a fear of persecution, and that the alien claimed a fear of persecution without delay upon presenting himself or herself to an immigration officer upon arrival at a US port of entry." The proposed rule itself, through this exception, acknowledges that when fleeing persecution and violence, an asylum seeker may need to enter the United States utilizing fraudulent documents, yet, it seeks to bar from eligibility individuals unlawfully enter the United States by crossing the border. This distinction penalizes asylum seekers who travel by land to the U.S., with no reasonable basis for this distinction. The bar for migration related crimes is wholly inconsistent with the plight of asylum seekers and seriously undermines the asylum process.

### 3. The bar on felonies is overbroad and no data is provided to support the idea that sentences over one year relate to rates of recidivism and dangerousness.

The proposed rule states that a noncitizen would be ineligible for asylum based on a conviction for "any felony under Federal, State, tribal, or local law," where the term "felony" is defined as "any crime defined as a felony by the relevant jurisdiction (Federal, State, tribal, or local) of conviction, or any crime punishable by more than one year of imprisonment."[20] Within the state of Massachusetts, this bar would remove eligibility for many asylum seekers who have committed even just minor crimes. In Massachusetts, the result of this rule would be incredibly far reaching. There are many misdemeanors in Massachusetts that would be classified as federal felonies. A misdemeanor by Massachusetts law is defined as an offense that cannot be punished by a *state* prison sentence.[21] Therefore there are misdemeanors, punishable by over a year in a house of correction, not a state prison, that would be defined as a federal felony and bar asylum eligibility. Many of these federal felonies are not a public safety threats, which is the justification provided by the Department for the expansion of the bar. The proposed rule states that it would "eliminate inefficiencies…by providing that all felonies would constitute particularly serious crimes." It goes on further and states that "crimes with the potential for longer sentences tend to indicate that the offenders who commit such crimes are greater dangers to the community." However, there is no basis in fact for this statement. The following crimes under Massachusetts law would be considered a federal felony and bar asylum seekers from eligibility:
- unauthorized recording of a live performance[22]
- unauthorized reproduction of a recording [23]
- larceny of a trade secret (no matter the value of the secret)[24]
- false report of a motor vehicle theft[25]
- negligent operation of a motor vehicle or leaving the scene of property damage[26]
- shoplifting over $250 [27]

---

[20] Proposed Rule 8 C.F.R. 208.13 (c)(6)(vi) and 8 C.F.R. 208.13 (c)(7) (i).
[21] M.G.L c. 274 s 1 available at  https://malegislature.gov/Laws/GeneralLaws/PartIV/TitleI/Chapter274/Section1
[22] M.G.L c. 266 s. 143B
[23] M.G.L c. 266 s. 143A
[24] M.G.L. c. 266 s. 30(4)
[25] M.G.L. c. 268 §39
[26] M.G.L. c. 90 § 24(2)(a),
[27] M.G.L. c. 266 §30A

- simple assault, which includes a mere offensive touching[28]

All of these abovementioned crimes are considered misdemeanors under Massachusetts law because they are not punishable by a state prison sentence. However, because they could result in a sentence of more than one, they would be categorized as federal felonies. Crimes with longer sentences do not necessarily indicate a greater danger to society, and using that as the justification for this overbroad bar, without backing it up with data is unreasonable. For example, unauthorized recording of a live performance (if between 7 and 65 audio video recordings) is punishable of up to 2 years in prison, a $100,000 fine, or both.  When Congress adopted a mandatory criminal bar in 1996 for those convicted of "particularly serious crimes," Congress did not intend an unauthorized recording of live performance to be "particularly serious crime" which would bar someone from asylum eligibility.

Convictions are not necessarily reflective of criminal conduct.[29] Firstly, this proposed rule ignores the possibility that some people will plead guilty to a crime to avoid a more severe sentence or to secure a more imminent release.[30] Additionally, this felony bar has no exceptions for survivors of abuse or trafficking. Many survivors of trafficking have felonies as a part of their victimization. In 2016, the National Survivor Network conducted a survey on criminal records related to trafficking. 91% of their respondents reported having been arrested at least once and over half of them believed all of their arrests were directly related to being trafficked. These arrests include things like prostitution, intent to solicit, drug sales, and drug possession, which in some states and circumstances can result in felony convictions.[31] Many survivors of domestic violence also have felony convictions as a result of their victimization. A 1999 study by the Department of Justice found that about half of women who had been imprisoned had been sexually or physically abused by a partner prior to their incarceration.[32] A 2007 study by the Department of Corrections in New York found that 2/3 of the women incarcerated for killing someone had been previously sexually or physically abused by that person.[33] Several states have introduced bills that advocate that victims of domestic violence and abuse should receive greater legal protections within the criminal justice system. For instance, in 2016 Illinois passed a law that requires judges to consider the role of abuse in sentencing. In 2012, California passed laws that allowed victims of abuse to challenge their incarceration if their original trial had limited testimony about abuse and it required the parole board to consider abuse during parole hearings.[34] Again, this proposed rule removes all discretion and context with an overbroad bar that does not take into account asylum seekers' circumstances.

---

[28] M.G.L. c. 265 §13A(a)

[29] John H. Blume and Rebecca K. Helm, "The Unexonerated: Factually Innocent Defendants Who Plead Guilty," *Cornell Law Review* 100 (2014): 157,

https://pdfs.semanticscholar.org/c00f/96d421adf1846d120bf802a8854b5e2c0ff2.pdf.

[30] *Id*

[31] National Survivor Network, "Impact of Criminal Arrest and Detention on Survivors of Human Trafficking", (August 2016)   https://nationalsurvivornetwork.org/wp-content/uploads/2017/12/VacateSurveyFinal.pdf

[32] US Department of Justice, "Prior Abuse Reported

by Inmates and Probationers", (April 1999) available at  https://www.bjs.gov/content/pub/pdf/parip.pdf

[33] New York County Lawyer's Association, "Women and Incarceration, (October 21, 2014) available at https://www.nycla.org/PDF/Women%20in%20Incarceration%20-%2010.21.14.pdf

[34] The Atlantic, "When Abuse Victims Commit Crimes", (May 21, 2019) available at https://www.theatlantic.com/politics/archive/2019/05/new-york-domestic-violence-sentencing/589507/

Finally, this proposed rule does not take into account the trauma that asylum seekers have experienced in their home countries and potentially on their journey to seek safety in the United States. Studies have found that at a minimum, one of every three asylum seekers suffers from depression, anxiety or PTSD.[35] PTSD has been highly linked with substance abuse disorders. Individuals with PTSD are 14 times more likely to struggle with drugs and alcohol.[36] Asylum seekers who have previously struggled with addiction and may have an offense related to that addiction and should not be automatically barred from eligibility, since the conviction is closely related to the persecution they suffered. Many asylum seekers do not have immediate access to social support systems or medical treatment upon arriving to the United States.[37] Under the current system, they would not have the opportunity to explain their past trauma and how that may have resulted in a drug related conviction or driving under the influence convictions. Under this proposed rule, asylum seekers would be cruelly barred from asylum eligibility with no discretion.

   4. **Barring asylum seekers from eligibility utilizing the standard that immigration judges "have reason to believe" they have been involved in crimes "in furtherance" of gang activity is essentially removing standards altogether. This proposed bar opens the door for racially biased adjudications based on inaccurate gang databases.**

   This proposed rule bars individuals who have been involved in crimes, felonies or misdemeanors, related to gang activity or in furtherance of gang activity. The proposed rule itself acknowledges that the criteria is unclear stating that, "The states…have enacted numerous laws that address gang-related crimes, but they have not enacted a uniform definition of what constitutes activity taken 'in furtherance' of a gang-related crime." This "reason to believe" standard allows for the consideration of all reliable evidence to determine whether a crime was committed to furtherance of criminal gang activities. "All reliable evidence" is an incredibly broad scope allowing advocates on both sides to present essentially limitless evidence about gang connections or lack thereof. Asylum hearings in which an adjudicator has to assess gang activity is going to greatly increase the amount of time asylum proceedings take and will likely result in an increase in appeals. Increased efficiency is frequently cited as a reason behind the proposed rule, yet this provision will decrease efficiency substantially by creating mini-trials in asylum adjudication. Immigration judges are not experts in criminal law. Giving them the authority and responsibility to determine if there is reason to believe any conviction is in furtherance of gang activity will effectively remove standards altogether.

---

[35] Giulia Turrini et al., "Common mental disorders in asylum seekers and refugees: umbrella review of prevalence and intervention studies," *International Journal of Mental Health Systems* 11 (August 2017): 51, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5571637/.

[36] Jenna L McCauley et al., "Posttraumatic Stress Disorder and Co-Occurring Substance Use Disorders: Advances in Assessment and Treatment," *Clinical Psychology Science and Practice* 19, 3 (October 2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3811127/.

[37] Journal of Health Care for the Poor and Underserved, "Barriers to Health Care Access among Refugee Asylum Seekers", (April 2011) available at https://www.researchgate.net/publication/51107234_Barriers_to_Health_Care_Access_among_Refugee_Asylum_Seekers

Additionally, because there is a lack of evidentiary rules in immigration proceedings, applicants will have a difficult task in rebutting negative evidence against them, even if the evidence is false. The likelihood that the evidence will be false is high. Gang databases are notoriously inaccurate. In <u>Commonwealth v. Wardsworth</u>, 482 Mass. 454, 470 (2019), the Supreme Judicial Court of Massachusetts vacated convictions for first degree murder, armed assault with intent to murder, and firearm offenses, and remanded for a new trial in part due to the introduction of an expert opinion regarding gang-affiliation that was based on information from the Boston Regional Intelligence Center (BRIC) gang database. The Court concluded that, to the extent the database contains opinions about which individuals are gang members, these are hearsay and are not independently admissible. Currently, the Massachusetts ACLU is suing the Boston Police Department to gain access to the Department's Gang Assessment Database, run by the Boston Regional Intelligence Center over concerns regarding how that information is being used in immigration court proceedings.[38] Immigration adjudicators have been relying on information from the database in immigration proceedings to make determinations about gang affiliation. The records request that led to the lawsuit demonstrated that the database primarily includes men of color and that youth are being labeled as gang members simply by the people they are seen with and the clothing they wear.[39] Gang databases are not isolated to Boston. Los Angeles and Chicago have also come under fire for racial profiling and the amount of unreliable information contained in gang databases.[40]

The Department asked for comments on what should be a "sufficient link" between a conviction and the gang related activity. A gang related bar should not be introduced at all due to complexity of the issue and frequency which individuals are mislabeled as being a part of a gang. The risk of erroneously barring legitimate asylum seekers from eligibility is too high.

5. **The proposed bar for domestic assault or battery, stalking, or child abuse is overly broad and will negatively impact victims of domestic and intimate partner violence.**

The proposed bar for domestic assault or battery, stalking, or child abuse would render individuals convicted of offenses *involving conduct amounting to* domestic assault or battery, stalking, or child abuse in the domestic context ineligible for asylum. Additionally, the rule proposes to bar individuals from asylum who have "engaged in acts" of battery and extreme cruelty in a domestic context "regardless of whether such conduct resulted in a criminal conviction." The proposed rule is overbroad, vague, and will require immigration officials and immigration judges to become experts in the domestic criminal laws of every jurisdiction in the

---

[38] *See* "ACLU Demands Records on Boston's 'Gang Database' Used in Deportations," November 15, 2018, available at https://www.aclum.org/en/news/aclu-demands-records-bostons-gang-database-used-deportations
[39] WBUR News, "Here's What We Know About Boston Police's Gang Database", (July 26, 2019) available at https://www.wbur.org/news/2019/07/26/boston-police-gang-database-immigration
[40] Annie Sweeney and Madeline Buckley, "Chicago police gang data collection faulted by city's inspector general as unchecked and unreliable," *Chicago Tribune*, April 11, 2019, https://www.chicagotribune.com/news/breaking/ctmet-chicago-police-gang-data-04112019-story.html; Anita Chabria, "A routine police stop landed him on California's gang database. Is it racial profiling?," *Los Angeles Times*, May 9, 2019, https://www.latimes.com/politics/la-pol-ca-california-gang-database-calgang-criminal-justice-reform-20190509-story.html.

U.S. The rule on its face is ambiguous and vague as it directs immigration officials and judges to evaluate whether conduct "amounts to" domestic assault or battery, stalking, or child abuse or whether an individual has "engaged in such acts" regardless of whether or not there is a conviction, regardless of whether or not the charged crime is a felony or misdemeanor, and regardless of what the actual criminal charges alleged. The language necessarily requires adjudicators to look beyond the criminal record and examine the acts of the underlying alleged crime and make the adjudicator a fact finder to try to determine whether or not the individual is barred from asylum eligibility.

First of all, this will severely impact judicial efficiency, as adjudicators will be required to undertake time consuming investigations to determine whether the new criminal bars apply. Certain proposed bars, such as the bar on domestic violence and child abuse related crimes, will be particularly time intensive as the standard is not well-defined and requires an examination not only of the criminal record, but of the underlying "acts" or "conduct," and of the relationships between the alleged victims and perpetrators to determine whether a "domestic context" exists. The proposed standard is very problematic as there is no guidance provided as to how adjudicators will determine whether the conduct or underlying relationships meet the unclear requirements. This standard also raises serious due process concerns, as the evidentiary standards in immigration court are significantly less robust than in a criminal proceeding. The administration claims that the proposed rule will *increase* efficiency, but requiring adjudicators to undertake intensive fact investigation will inevitably lead to longer hearings, further delaying a system that the administration claims is already overburdened.

The proposed rule will lead to dramatically different outcomes for individuals based on the assessment of their conduct by adjudicators who unlikely to be properly equipped to undertake this type of criminal investigation. As the agencies note, many of these offenses are already considered under the aggravated felony bar and the particularly serious crime bars for asylum, yet the administration takes issue with the categorical approach for evaluating the criminal offenses. The approach proposed in the rule contradicts Supreme Court precedent, which has long found against a "post hoc investigation into the facts of predicate offenses," as the administration proposes in this regulation.[41] Instead, for more than a century the federal courts have repeatedly embraced the "categorical approach" to determine the immigration consequence(s) of a criminal offense, wherein the immigration adjudicator relies on the statute of conviction as adjudicated by the criminal court system, without relitigating the nature or circumstances of the offense in immigration court. As the Supreme Court has explained, this approach "promotes judicial and administrative efficiency by precluding the relitigation of past convictions in minitrials conducted long after the fact." In Moncrieffe v. Holder, the Court forewarned of exactly the sort of harm that would arise from proposed rules such as this one, and the Court rejected the government's proposal that immigration adjudicators determine the nature

---

[41] *See Mathis v. United States*, 136 S.Ct. 2243 (2016); *Descamps v. United States*, 570 U.S. 254 (2013); *Moncrieffe v. Holder*, 569 U.S. 184 (2013)

and amount of remuneration involved in a marijuana-related conviction, noting that "our Nation's overburdened immigration courts" would end up weighing evidence "from, for example, the friend of a noncitizen" or the "local police officer who recalls to the contrary," with the end result a disparity of outcomes depending on the whims of the individual immigration judge and a further burdened court system.

Finally, the exception that the proposed rule provides for individuals who have been battered or subjected to extreme cruelty is insufficient, vague, and places a high burden on victims. The rule purports to except from the bar "aliens who have been battered or subjected to extreme cruelty and who were not the primary perpetrators of violence in their relationships." However, it fails to provide any guidance on how one would demonstrate that the exception applies, whether an individual would need to affirmatively raise this defense, or what type of evidence may be considered. The plain language of the exception is problematic since there is no clear definition of whether a person is a "primary perpetrator" of violence in their relationship. The lack of standard places a high burden on victims to prove their victimhood and also to demonstrate that they were not the "primary perpetrator" of violence in their relationship. The proposed rule fails to account for the complexities of domestic violence in relationships and may require individuals to provide evidence that may be impossible (or unsafe) for them to obtain. What standard do the agencies intend to apply to determine whether or not someone has been battered or subjected to extreme cruelty? What type of evidence will individuals be required to produce? Statistics demonstrate that many individuals, particularly females, who have been incarcerated, have suffered past abuse, and that the links between incarceration or criminal activity and abuse are very strong. However, the exception proposed by the agencies fails to encompass the complexities of the relationship between abuse and criminal activity. A 2016 study by the Vera Institute found that 86% of women in jail are survivors of sexual violence and 77% are survivors of intimate partner violence.[42] Other studies have shown that the criminal justice system insufficiently accounts for the impacts of intimate partner and sexual violence on criminal activity, an issue that will be further exacerbated by the proposed rule.[43]

6. **The proposed bars for certain misdemeanors is overly broad, penalizes conduct that is not related to public safety, and fails to provide exceptions for violations that arise directly as a result of the harm asylum seekers have fled.**

The rule also proposes to make certain offenses a bar to asylum eligibility including the use of fraudulent documents and the receipt of public benefits under false pretenses, even if such

---

[42] Vera Institute, Elizabeth Swavola, Kristine Riley, and Ram Subramanian, "Overlooked: Women and Jails in an Era of Reform," 2016, available at https://www.vera.org/downloads/publications/overlooked-women-and-jails-report-updated.pdf.

[43] *See* The Atlantic, Victoria Law, "When Abuse Victims Commit Crimes," (May 21, 2019), available at https://www.theatlantic.com/politics/archive/2019/05/new-york-domestic-violence-sentencing/589507/; The Highlight by Vox, Char Adams, "These women survived abuse and assault. Now they're behind bars. Should they be?" (Aug. 30, 2019), available at https://www.vox.com/the-highlight/2019/8/23/20828367/cyntoia-brown-sexual-domestic-abuse-prison-pipeline.

offenses are misdemeanors. The proposed bars for document and benefits offenses fail to recognize the vulnerable situation of asylum seekers and provide insufficient or no exceptions for individuals that may have unknowingly engaged in such conduct or needed to engage in such conduct to escape persecution and seek protection. The bars are overbroad and fail to provide necessary exceptions accounting for the life circumstances of asylum seekers.

First of all, the bar for document fraud includes a narrow exception for individuals who utilized fraudulent identification documents to enter the United States *and* claim a fear of persecution "without delay upon presenting himself or herself to an immigration officer upon arrival." This standard is unrealistic and fails to account for the distrust that many asylum seekers have of government officials upon arrival to the United States and the trauma that many of them have experienced. The proposed exception clearly recognizes that asylum seekers may be forced, due to the circumstances of their persecution, to undertake document fraud to escape persecution and seek protection. However, the exception is overly narrow and unclear as it requires expedient presentation to government officials, without defining the time period or recognizing the realities asylum seekers face. Many asylums seekers are fleeing harm perpetrated by government actors or by actors closely protected or associated with their governments. The distrust of government institutions and particularly of law enforcement entities is very common, and the current administration has also created an environment and rhetoric that could be characterized as hostile towards asylum seekers.[44] These factors would easily lead many asylum seekers to delay in making their claims for protection to government officials as they cope with their distrust, trauma, and learn the legal rights that they may have in the United States – cutting them off from critical protection that should account for these difficulties rather than punish them for their victimization. The document fraud bar is extremely overbroad and will foreclose eligibility for many qualified asylum seekers.

The administration further makes unsubstantiated claims regarding document fraud that is wholly unsupported. The agencies claim that "fraudulent document offenses pose such a significant affront to government integrity that even misdemeanor fraudulent document offenses should disqualify aliens from eligibility for asylum." Yet, the agencies have provided no evidence to support this claim and once again fail to recognize the uniquely difficult circumstances of asylum seekers, who often flee their countries to escape exigent danger leaving behind all identity and other documentation. The current bars to asylum are more closely linked to issues of public safety and danger, as well as some procedural measures meant to combat alleged fraud in the asylum system. However, the new proposed bars for benefits and document fraud go far beyond the scope of past practice without a demonstrated reasonable basis.

---

[44] Melissa Carlson, Laura Jakli, and Katerina Linos, "Refugees Misdirected: How Information, Misinformation, and Rumors Shape Refugees' Access to Fundamental Rights," Va. J. Int'l. L. Vol 57:3 (2018), available at https://scholarship.law.berkeley.edu/cgi/viewcontent.cgi?article=4039&context=facpubs; Amnesty International, "USA: 'You Don't Have Any Rights Here,'" (2018), available at https://www.amnesty.org/download/Documents/AMR5191012018ENGLISH.PDF.

In relation to public benefits offenses, the agencies have greatly overstated the perceived problem and have provided no information or date to support their claims of the "inherently pernicious nature" of public benefits offenses. On the contrary, data demonstrates that the incidents of these types of fraud crimes are minimal, for example, the incidents of fraud in the Supplemental Nutrition Assistance Program (SNAP) is estimated at 1.5% for *all incidents of fraud*, including individuals of all citizenship categories and including both fraud committed by agencies, retailers/shops, and individuals.[45] The report further details that many incidents of overpayment of SNAP benefits are the result of error, either by the agency or individual, that do not entail any intentional fraud.[46] The proposed bar for benefits fraud is overbroad and could sweep up individuals who accidentally collected benefits they were not eligible for. The provision of government benefits is extremely complex, for example, the oversight of SNAP is conducted by 53 different government agencies.[47] The sheer complexity could easily result in misdemeanor convictions of individuals who unintentionally enrolled in benefits they were not eligible for. Add another layer of complexity to account for the prevalence of mixed-status households and for the intervention of social service agencies and social workers in enrolling individuals into benefit programs, and individuals could easily unintentionally receive benefits. The definition that the agencies utilize leaves too much room for unintentional behavior since it defines the bar to include individuals who have been convicted of crimes relating to "unlawful receipt of benefits," but there is no provision that the unlawful receipt be connected to fraud or require intentionality.

### 7. The proposed rule provisions regarding the effect of post-conviction relief violates due process and fails to give full faith and credit to state courts.

The agencies propose to limit the recognition of modified or vacated criminal charges, which unfairly penalizes asylum seekers. The proposed rule creates many additional factors that an asylum seeker must demonstrate in order for their criminal modification or vacatur to be recognized, which violates due process. Additionally, the proposed rule would create a rebuttable presumption that any modification entered after initiation of removal proceedings or more than one year from the date of conviction or sentencing is not effective for immigration purposes.

The agencies suggest that the timing of initiating post-conviction relief is an indicator of the purpose behind the modification; however, this reasoning fails to consider that many individuals are unaware of the immigration consequences of their criminal proceedings until removal proceedings have commenced. The Supreme Court in *Padilla v. Kentucky*, 559 U.S. 356 (2010), explicitly recognized the substantive constitutional deficiencies of many criminal proceedings and many individuals pursued post-conviction relief, well outside one year of their original conviction, based upon this precedent. For example, in Massachusetts many cases of post-

---

[45] Congressional Research Service, Randy Alison Aussenberg, "Errors and Fraud in the Supplemental Nutrition Assistance Program (SNAP)," September 28, 2018, available at https://fas.org/sgp/crs/misc/R45147.pdf.
[46] *Id*.
[47] *Id*.

conviction relief are based on the failure of defense counsel to provide the constitutionally required advice regarding the immigration, pursuant to *Padilla v. Kentucky*, and *Commonwealth v. Clarke*, 460 Mass. 30 (2011), or the failure of the state court judge to provide the immigration warnings, as required by M.G.L. c. 278, § 29D. Though vacaturs upon these bases may appear to be related to immigration consequences, they are based upon substantive constitutional defects, and therefore should be considered effective modifications or vacaturs for immigration purposes. Imposing a presumption against the validity of a plea withdrawal or vacatur will inevitably result in many immigrants wrongly being denied asylum eligibility because they were unable to rebut the presumption. The proposed bar is unjust and violates due process.

Additionally, the proposed rule would allow adjudicators to explicitly look beyond the face of the criminal court orders to determine whether it will be effective for immigration purposes, "notwithstanding the putative basis of the order on its face." This is a clear violation of the full faith and credit due to state court judges and courts, and also makes immigration adjudicators act as fact finders that must go behind the clear record from the state court to make a determination of the "true" purpose of the modification, clarification, or vacatur. As other parts of this proposed rule, this would create mini-trials within the immigration court proceedings to review the basis of a vacated or modified conviction, a task that would further burden the court system.

## Conclusion

We strongly oppose the proposed rule regarding "Procedures for Asylum and Bars to Asylum Eligibility." The rule dramatically expands the bars to asylum eligibility in violation of international law and norms and our obligations under the 1967 Protocol Relating to the Status of Refugees. The proposed rule creates bars for minimal criminal activity that have little to no connection to public safety or that may be directly connected to the impacts of persecution. The proposed rule fails to protect victims of human trafficking and domestic violence in the broad and indiscriminate construction of the bars. The rule further undermines state court authority, by instructing immigration officials to "look behind" the findings and orders of state court judges, in violation of the full faith and credit owed to state courts. The rule will also create many different mini-trials within immigration proceedings to adjudicate the various bars, which have unclear and undefined standards, which will undoubtedly result in longer proceedings, larger court backlogs, and more appeals. The agencies have failed to provide sufficient reason for the expansion of the asylum bars, and claim that the continued availability of protection under the Convention Against Torture and withholding of removal affords them nearly limitless abilities to restrict asylum eligibility. However, the proposed rule clearly frustrates the fundamental purpose of asylum protection.

We request that the agencies and any other reviewing agency consider the contents of our citations (including any articles that are linked to in our footnotes) together with our comments. For all these reasons, we urge DHS and DOJ not to implement the proposed changes to asylum procedures and eligibility.

Sincerely yours,

Emily Leung, Supervising Attorney, Immigration Unit
The Justice Center of Southeast Massachusetts, LLC
Subsidiary of South Coastal Counties Legal Services, Inc.
62 Main Street, Suite 302, Brockton, MA 02301-4040
Direct Line: (508) 638-0153

Jill O'Bryan, AmeriCorps Legal Advocates of Massachusetts
Justice Center of Southeast Massachusetts, LLC
Subsidiary of South Coastal Counties Legal Services, Inc.
62 Main Street, Suite 302, Brockton, MA 02301-4040
Direct Line: 508-586-0570

# PUBLIC SUBMISSION

| |
|---|
| **As of:** January 23, 2020 |
| **Received:** January 21, 2020 |
| **Status:** Posted |
| **Posted:** January 22, 2020 |
| **Tracking No.** 1k4-9ekn-652e |
| **Comments Due:** January 21, 2020 |
| **Submission Type:** Web |

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0494
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Camilla Walter

## General Comment

To Whom it may concern,
I am writing to share that I oppose this rule change, and am very concerned. We must remain welcome as a noation to people fleeing vioelence, and immigrants are a valued and welcome part of my community. I worry that racial profiling would increase for people seeking asylum in our country, and punish individuals who have already been detained and served time.
Please withdraw this proposed change, for the sake of American neighborhoods like mine.
Thank you,
Camilla

AR.09930

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9eko-z650
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0495
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41;
Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility

Jan. 21, 2020

To Whom it May Concern:

I am writing in response to the above-referenced Proposed Rules to express my strong opposition to the Proposed
Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19,
2019.

The expanded criminal bars exclude from safety and a pathway to citizenship those convicted of offenses that are
coincident to their flight from persecution, and do not accomplish the stated goal of making communities safer.
They will disparately impact vulnerable populations, who comprise asylum seekers hailing primarily from
Central America and the Global South, and those routinely criminalized because of their identities, racially

AR.09931

disparate policing practices, or in connection with experiences of trafficking and domestic violence. For these populations especially, the discretion currently delegated to asylum adjudicators is crucial for them to become fully integrated in the larger community. The imposition of additional categorical bars to asylum will only further marginalize asylum seekers already struggling with trauma and discrimination.

The Proposed Rules turn asylum into a blunt instrument that would prevent the use of discretion where it is most needed and most effective. The existing framework for determining if an offense falls within the particularly serious crime bar already provides the latitude for asylum adjudicators to deny relief to anyone found to pose a danger to the community. Furthermore, asylees with convictions that render them inadmissible must apply for a waiver at the time of their applications for permanent residence. These measures ensure that asylum applicants in vulnerable populations have access to supportive resources and have the opportunity to demonstrate their ongoing commitment to social and personal health. Moreover, the existence of provisions allowing the revocation of asylum status ensures that adjudicators may continue to enforce concerns related to the safety of the community even after asylum is granted.

Barring asylum for immigrants convicted of migration-related offenses punishes them for fleeing persecution and/or seeking safety for their children, and does not make communities safer.

The expansion of the criminal bars to asylum to include offenses related to harboring, smuggling of noncitizens by parents and family members and those previously removed further criminalizes vulnerable populations fleeing persecution. The vast expansion of migrant prosecutions at the border during the current administration has created administrative chaos and separated families that do not pose a threat to the safety of communities in the United States. The Proposed Rules threaten to magnify the harm caused by these reckless policies by further compromising the ability of those seeking safety on the southern border to access the asylum system.

The Proposed Rules expand the asylum bar to parents or other caregivers who are convicted of smuggling or harboring offenses after taking steps to help minor children enter the United States in order to flee persecution. This proposed bar is particularly insidious in light of now-public documents revealing this administration's explicit efforts to utilize smuggling prosecutions against parents and caregivers as part of its strategy of deterring families from seeking asylum in the United States. The Proposed Rules seek to take this widely condemned strategy one step further, by additionally barring those parents already prosecuted from obtaining asylum protections for themselves and their children. The Proposed Rules multiply the harms parents and caregivers have experienced in their treacherous journeys to safety and callously penalize parents for doing what is only humantaking all necessary steps to protect their children.

Many of the people in my church with children would no longer be able to seek asylum under these proposed rules.

For the reasons detailed in the comments that follow, the Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.


Sincerely,
Elsa Kunz

_____

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9eko-uo2l
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0496
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Else Drooff
**Address:**
    PO Box 8009
    Santa Fe,  NM,  87504
**Email:** info@santafedreamersproject.org
**Phone:** 505-490-2789
**Organization:** Santa Fe Dreamers Project

---

## General Comment

To Whom it May Concern:

Santa Fe Dreamers Project is writing in response to the above-referenced Proposed Rules to express our strong opposition to the Proposed Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019.

Santa Fe Dreamers Project provides legal representation to hundreds of asylum-seekers in West Texas and New Mexico under the jurisdiction of the El Paso Immigration Court.Through our work, we regularly encounter clients with strong merits to their asylum claims for whom phony criminal charges are one of the ways in which they were persecuted in their countries of origin due to being a minority race, religion or particular social group such as LGBTQ. We also have represented many who have faced the ultimate decision on behalf of their children and family members - to flee their countries and come to the U.S. without prior authorization due to persecution, or the possibility of death and torture in their home countries. Many of these clients have prevailed in their asylum claims and gone on to be contributing members of our society in the U.S. with good character and no further criminal issues. We oppose the expansion of criminal bars outlined by the Proposed Rules because they unnecessarily and cruelly exclude bona fide refugees from asylum eligibility. We believe that bars to asylum based on offenses related to harboring, smuggling of non-citizens by parents and family members and those previously removed further criminalize vulnerable populations fleeing persecution.

The Proposed Rules expand the asylum bar to parents or other caregivers who are convicted of smuggling or harboring offenses after taking steps to help minor children enter the United States in order to flee persecution.

AR.09933

This proposed bar is particularly insidious in light of now-public documents revealing this administration's explicit efforts to utilize smuggling prosecutions against parents and caregivers as part of its strategy of deterring families from seeking asylum in the United States. For instance, a mother from Michoacan, Mexico fled to the United States with her young daughter due to ongoing persecution and extortion by the local police based on her family's well-known access to wealth. After surviving a kidnapping and receiving death threats toward her daughter's life, the mother decided to seek refuge in the United States to protect her daughter from danger she perceived in Mexico. Although she entered without inspection with her minor daughter, the client was ultimately granted asylum and her daughter derivative status based on the discretion of the Immigration Judge. However, because she was criminally prosecuted and convicted of unlawful entry, under the new Proposed Rules she would be ineligible for asylum. As stated in the Proposed Rules, "Even first-time alien smuggling offenses involving immediate family members display a serious disregard for U.S. immigration law and pose a potential hazard to smuggled family members, which often include a vulnerable child or spouse." Yet, in accordance with international asylum law, the mother appropriately sought asylum and did what she thought was best to keep her daughter out of harm's way. To deny her the ability to apply for asylum in the United States demonstrates a 'serious disregard' for the intensely vulnerable and precarious situations that many Mexican and Central American families find themselves in due to state-sponsored, or at the very least state-condoned violence. In fact, the Proposed Rules pose a real 'hazard' to credible asylum-seekers that have no other option than to cross the border in search of safety.

The Proposed Rules seek to take this widely condemned strategy one step further, by additionally barring those parents already prosecuted from obtaining asylum protections for themselves and their children. The Proposed Rules multiply the harms parents and caregivers have experienced in their treacherous journeys to safety and callously penalize parents for doing what is only humantaking all necessary steps to protect their children. Based on firsthand experience providing legal representation to family members impacted by family separation in the summer of 2018, SFDP Legal Director Emma O'Sullivan distinctly remembers that asylum-seekers were assured by U.S. immigration officials that their asylum cases would not be damaged if they plead guilty to smuggling or harboring offenses. So, for those asylum seekers that are still waiting for their cases to be processed nearly two years later, the Proposed Rules signify not only a broken promise, but a flagrant disregard for human decency.

Therefore, the Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

# Attachments

SFDP_Comment_OpposeBanExpansion

Submitted via *https://www.regulations.gov/document?D=EOIR-2019-0005-0001*

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, Suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87,
1615-AC41; Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and
Bars to Asylum Eligibility

January 21, 2020

To Whom it May Concern:

Santa Fe Dreamers Project is writing in response to the above-referenced Proposed Rules to
express our strong opposition to the Proposed Rules to amend regulations relating to eligibility
for asylum published in the Federal Register on December 19, 2019.

Santa Fe Dreamers Project provides legal representation to hundreds of asylum-seekers in West
Texas and New Mexico under the jurisdiction of the El Paso Immigration Court. Through our
work, we regularly encounter clients with strong merits to their asylum claims for whom phony
criminal charges are one of the ways in which they were persecuted in their countries of origin
due to being a minority race, religion or particular social group such as LGBTQ. We also have
represented many who have faced the ultimate decision on behalf of their children and family
members - to flee their countries and come to the U.S. without prior authorization due to
persecution, or the possibility of death and torture in their home countries. Many of these clients
have prevailed in their asylum claims and gone on to be contributing members of our society in
the U.S. with good character and no further criminal issues. We oppose the expansion of criminal
bars outlined by the Proposed Rules because they unnecessarily and cruelly exclude bona fide
refugees from asylum eligibility. We believe that bars to asylum based on offenses related to
harboring, smuggling of noncitizens by parents and family members and those previously
removed further criminalize vulnerable populations fleeing persecution.

Barring asylum for immigrants convicted of migration-related offenses punishes them for fleeing persecution and/or seeking safety for their children, and does not make communities safer. The expansion of the criminal bars to asylum to include offenses related to harboring, smuggling of noncitizens by parents and family members and those previously removed further criminalizes vulnerable populations fleeing persecution.[1] The vast expansion of migrant prosecutions at the border during the current administration has created administrative chaos and separated families that do not pose a threat to the safety of communities in the United States.[2] The Proposed Rules threaten to magnify the harm caused by these reckless policies by further compromising the ability of those seeking safety on the southern border to access the asylum system.

The Proposed Rules expand the asylum bar to parents or other caregivers who are convicted of smuggling or harboring offenses after taking steps to help minor children enter the United States in order to flee persecution. This proposed bar is particularly insidious in light of now-public documents revealing this administration's explicit efforts to utilize smuggling prosecutions against parents and caregivers as part of its strategy of deterring families from seeking asylum in the United States.[3] For instance, a mother from Michoacan, Mexico fled to the United States with her young daughter due to ongoing persecution and extortion by the local police based on her family's well-known access to wealth. After surviving a kidnapping and receiving death threats toward her daughter's life, the mother decided to seek refuge in the United States to protect her daughter from danger she perceived in Mexico. Although she entered without inspection with her minor daughter, the client was ultimately granted asylum and her daughter derivative status based on the discretion of the Immigration Judge. However, because she was criminally prosecuted and convicted of unlawful entry, under the new Proposed Rules she would be ineligible for asylum. As stated in the Proposed Rules, "Even first-time alien smuggling offenses involving immediate family members display a serious disregard for U.S. immigration law and pose a potential hazard to smuggled family members, which often include a vulnerable child or spouse." Yet, in accordance with international asylum law, the mother appropriately sought asylum and did what she thought was best to keep her daughter out of harm's way. To deny her the ability to apply for asylum in the United States demonstrates a 'serious disregard' for the intensely vulnerable and precarious situations that many Mexican and Central American families

---

[1] On April 11, 2017, then-Attorney General Sessions instructed all federal prosecutors to increase their prioritization of immigration offenses for prosecution, including misdemeanor offenses committed by first time entrants. *See* Memorandum from the Attorney General: Renewed Commitment to Criminal Immigration Enforcement (April 11, 2017), https://www.justice.gov/opa/press-release/file/956841/download.
[2] *Id.*; Richard Marosi, "The aggressive prosecution of border crossers is straining the courts. Will zero tolerance make it worse?," *Los Angeles Times*, May 11, 2018, https://www.latimes.com/local/california/la-me-ln-immigrant-prosecutions-20180511-story.html.
[3] Ryan Devereaux, "Documents Detail ICE Campaign to Prosecute Migrant Parents as Smugglers," *The Intercept*, April 29, 2019, https://theintercept.com/2019/04/29/ice-documents-prosecute-migrant-parents-smugglers/ (describing how in May 2017, the Department of Homeland Security set out to target parents and family members of unaccompanied minors for prosecution).

find themselves in due to state-sponsored, or at the very least state-condoned violence. In fact, the Proposed Rules pose a *real* 'hazard' to credible asylum-seekers that have no other option than to cross the border in search of safety.

The Proposed Rules seek to take this widely condemned strategy one step further, by additionally barring those parents *already prosecuted* from obtaining asylum protections for themselves and their children. The Proposed Rules multiply the harms parents and caregivers have experienced in their treacherous journeys to safety and callously penalize parents for doing what is only human—taking all necessary steps to protect their children. Based on firsthand experience providing legal representation to family members impacted by family separation in the summer of 2018, SFDP Legal Director Emma O'Sullivan distinctly remembers that asylum-seekers were assured by U.S. immigration officials that their asylum cases would *not* be damaged if they plead guilty to smuggling or harboring offenses. So, for those asylum seekers that are still waiting for their cases to be processed nearly two years later, the Proposed Rules signify not only a broken promise, but a flagrant disregard for human decency.

Additionally, the Proposed Rules pose a unique threat to LGBTQ immigrant community members. LGBTQ immigrants in particular may have already experienced a high degree of violence and disenfranchisement from economic and political life in their home countries.[4] Hate violence towards undocumented LGBTQ immigrants in the United States is already disproportionately higher than for other members of the LGBTQ population.[5] Members of these communities also experience isolation from their kinship and national networks following their migration. This isolation, compounded by the continuing discrimination towards the LGBTQ population at large, leave many in the LGBTQ immigrant community vulnerable to trafficking, domestic violence, and substance abuse, in addition to discriminatory policing practices. The expansion of criminal enforcement and prosecution of undocumented people also harms the LGBTQ immigrant community.[6] The Proposed Rules will therefore have a disparate impact on LGBTQ individuals whose involvement in the criminal legal system is often connected to past trauma and/or the result of biased policing.

---

[4] *See* Aengus Carroll and Lucas Ramon Mendos, *State Sponsored Homophobia: A World Survey of Sexual Orientation Laws: Criminalisation, Protection and Recognition* 12th Ed. (International Lesbian, Gay, Bisexual, Transgender, and Intersex Association (ILGA), 2017), https://ilga.org/downloads/2017/ILGA_State_Sponsored_Homophobia_2017_WEB.pdf.

[5] *See* Sharita Gruberg, "LGBTQ Undocumented Immigrants Face an Increased Risk of Hate Violence," *Center for American Progress*, June 10, 2014, https://www.americanprogress.org/issues/immigration/news/2014/06/10/91233/lgbt-undocumented-immigrants-face-an-increased-risk-of-hate-violence/.

[6] *See eg.,* Sharita Gruberg, "How Police Entanglement with Immigration Enforcement Puts LGBTQ Lives at Risk," *Center for American Progress*, April 12, 2017, https://www.americanprogress.org/issues/lgbtq-rights/reports/2017/04/12/430325/police-entanglement-immigration-enforcement-puts-lgbtq-lives-risk/.

AR.09937

The expanded criminal bars exclude from safety and a pathway to citizenship those convicted of offenses that are coincident to their flight from persecution, and do not accomplish the stated goal of making communities safer. They will disparately impact vulnerable populations, who comprise asylum seekers hailing primarily from Central America and the Global South, and those routinely criminalized because of their identities, racially disparate policing practices, or in connection with experiences of trafficking and domestic violence.[7] For these populations especially, the discretion currently delegated to asylum adjudicators is crucial for them to become fully integrated in the larger community. The imposition of additional categorical bars to asylum will only further marginalize asylum seekers already struggling with trauma and discrimination.

In sum, the Proposed Rules turn asylum into a blunt instrument that would prevent the use of discretion where it is most needed and most effective. The existing framework for determining if an offense falls within the particularly serious crime bar already provides the latitude for asylum adjudicators to deny relief to anyone found to pose a danger to the community.[8] Furthermore, asylees with convictions that render them inadmissible must apply for a waiver at the time of their applications for permanent residence.[9] These measures ensure that asylum applicants in vulnerable populations have access to supportive resources and have the opportunity to demonstrate their ongoing commitment to social and personal health. Moreover, the existence of provisions allowing the revocation of asylum status ensures that adjudicators may continue to enforce concerns related to the safety of the community even after asylum is granted.[10]

For the reasons detailed above, the Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal, and instead dedicate their efforts to

---

[7] D'Vera Cohn et al., "Rise in U.S. Immigrants from El Salvador, Guatemala and Honduras Outpaces Growth from Elsewhere," *Pew Research Center*, December 7, 2017, https://www.pewresearch.org/hispanic/wp-content/uploads/sites/5/2017/12/Pew-Research-Center_Central_American-migration-to-U.S._12.7.17.pdf.

[8] Apart from the statutory aggravated felony bar to asylum, the Board of Immigration Appeals and Attorney General have historically utilized a highly circumstantial approach to the particular serious crime determination that would bar an immigrant from receiving asylum. *See e.g., Matter of Juarez,* 19 I.&N. Dec. 664 (BIA 1988) (ordinarily a single misdemeanor that is not an aggravated felony will not be a particularly serious crime); *Matter of Frentescu,* 18 I.&N. Dec. 244 (BIA 1982), *modified* (setting forth several factors to be considered before imposing the particular serious crime bar, including: (i) the nature of the conviction, (ii) the circumstances and underlying facts for the conviction, (iii) the type of sentence imposed, and (iv) whether the type and circumstances of the crime indicate that the individual will be a danger to the community); *Matter of Y-L-, A-G-, R-S-R-,* 23 I.&N. Dec. 270 (A.G. 2002) (setting forth a multi-factor test to determine the dangerousness of a respondent convicted of a drug-trafficking offense who is otherwise barred from asylum as an aggravated felon, but seeking withholding of removal).

[9] 8 U.S.C. § 1159(c) (2012).

[10] 8 C.F.R. § 208.24(a) (2012).

ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

Thank you for the opportunity to submit comments on the Proposed Rules. Please do not hesitate to contact us at info@santafedreamersproject.org or 505-490-2789.

Sincerely,

Else Drooff on behalf of the Santa Fe Dreamers Project
PO Box 8009
Santa Fe, NM 87504

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9eko-uwbg
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0497
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Kate Jastram
**Organization:** Center for Gender & Refugee Studies

---

## General Comment

See attached file(s)

---

## Attachments

CGRS Asylum Bars FINAL 2020.1.21

AR.09940

# CENTER FOR
# Gender & Refugee
## STUDIES

*Protecting Refugees • Advancing Human Rights*

January 21, 2020
Via Federal e-Rulemaking Portal
http://www.regulations.gov

Lauren Alder Reid
Assistant Director, Office of Policy
Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn
Chief, Division of Humanitarian Affairs
Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

Re:     Request for Comments on *Procedures for Asylum and Bars to Asylum Eligibility* (December 19, 2019) EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41

Dear Ms. Reid and Ms. Dunn,

The Center for Gender & Refugee Studies (CGRS) writes in response to EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41, the Executive Office for Immigration Review (EOIR) and U.S. Citizenship and Immigration Services (USCIS) Request for Comments on *Procedures for Asylum and Bars to Asylum Eligibility* (December 19, 2019) (hereinafter, the Rule).

CGRS was founded in 1999 by Karen Musalo following her groundbreaking legal victory in *Matter of Kasinga[1]* to meet the needs of asylum seekers fleeing gender-based violence. CGRS protects the fundamental human rights of refugee women, children, LGBTQ individuals, and others who flee persecution and torture in their home countries. CGRS is an internationally respected resource for gender asylum, renowned for our knowledge of the law and ability to combine sophisticated legal strategies with policy advocacy and human rights interventions. We take the lead on emerging issues, participate as counsel or *amicus curiae* in impact litigation to advance the rights of asylum seekers,[2] produce an extensive library of litigation support materials, maintain an unsurpassed database of asylum records and decisions, and work in coalitions with immigrant, refugee, LGBTQ, children's, and

---

[1] 21 I&N Dec. 357 (BIA 1996).
[2] *See, e.g., Innovation Law Lab v. McAleenan,* 924 F.3d 503 (9th Cir. 2019); No.3:19-cv-00807-RS (D.N.Cal.) (pending); *Damus v. McAleenan*;  No. 1:18-cv-00578-JEB (D.D.C.) (pending); *see also Damus v. Nielsen*, No. 18-578, 313 F.Supp.3d 317 (D.D.C. Jul. 2, 2018); *Grace v. Barr,* 344 F.Supp.3d 96 (D.D.C. Dec. 18, 2018), *appeal docketed*, No. 195013 (D.C.Cir. Jan. 30, 2019)); and *Matter of A-B,* 27 I&N Dec. 316 (A.G. 2018).

women's rights networks. Since our founding, we have also engaged in international human rights work to address the underlying causes of forced migration that produce refugees—namely, violence and persecution committed with impunity when governments fail to protect their citizens.

As a critical part of our mission, CGRS serves as a resource to decision makers to promote laws and public policies that recognize the legitimate asylum claims of those fleeing persecution, with a special focus on women, children and LGBTQ refugees. Our goal is to create a U.S. framework of law and policy that responds to the rights of these groups and aligns with international law.

For the reasons set forth below, CGRS urges EOIR and USCIS to refrain from adding additional criminal bars to asylum eligibility. It is our expert opinion that these proposed changes are inconsistent with our treaty obligations and will be particularly harmful for women and LGBTQ people seeking asylum in the United States.[3]

<div align="center">**Outline of Comments**</div>

**I. THE PROPOSED CRIMINAL BAR FOR REENTRY WITHOUT INSPECTION VIOLATES THE REFUGEE CONVENTION AND PROTOCOL**
   A. **The Rule Violates Article 31 of the Refugee Convention**
   B. **The Rule is Inconsistent with Article 33 of the Refugee Convention**
   C. **The Rule Incorrectly Relies on Article 34 of the Refugee Convention**
   D. **The Rule is Contrary to U.S. Law in Denying the Right to Seek Asylum Because of Reentry Between Official Ports of Entry**

**II. THE PROPOSED CRIMINAL BAR RELATED TO PERPETRATORS OF DOMESTIC VIOLENCE VIOLATES THE REFUGEE CONVENTION AND PROTOCOL AND POSES A RISK TO SURVIVORS OF SUCH VIOLENCE**
   A. **The Rule Puts Survivors of Domestic Violence at Risk**
   B. **The Rule is Inconsistent with Article 33 of the Refugee Convention**

**III. THE REMAINING PROPOSED CRIMINAL BARS TO ASYLUM ARE ALSO OVERBROAD IN VIOLATION OF THE REFUGEE CONVENTION AND PROTOCOL**
   A. **The Proposed Categories of Crimes are Unreasonably Broad and Will Exclude From Refugee Protection, in Violation of International Law, Asylum Seekers Who Did Not Commit Particularly Serious Crimes**
   B. **The Rule's Categorical Approach Precludes the Use of a Balancing Test as Envisioned by the Refugee Convention in Order to Weigh Any Criminal Behavior Against the Fear of Harm Faced by an Asylum Seeker, as well as to Consider the Full Context of the Crime**

---

[3] CGRS has limited our comments to the proposed additional bars to asylum eligibility for certain criminal convictions. This should not be construed as CGRS's acceptance of the second section of the Rule providing a multi-factor test for immigration adjudicators to determine whether a criminal conviction or sentence is valid for the purpose of determining asylum eligibility or the third section which proposes to rescind a provision in the current regulations regarding the reconsideration of discretionary asylum.

## COMMENTS

CGRS is of the view that all seven of the new categorical grounds of ineligibility based on crimes violate our obligations under international law. We are particularly concerned about the bar for reentry without inspection, and the bar based on committing domestic violence, and begin our comments with an analysis of those elements of the Rule.

## I.    THE PROPOSED CRIMINAL BAR FOR REENTRY WITHOUT INSPECTION VIOLATES THE REFUGEE CONVENTION AND PROTOCOL

The Rule will bar asylum seekers from receiving asylum if they were convicted of illegal re-entry after previous deportation pursuant to 8 U.S.C. § 1326, without exception. Rule at 69648. The Administration justifies this proposed bar based on an erroneous interpretation of Article 34 of the 1951 Convention Relating to the Status of Refugees and without mention of U.S. obligations under Articles 31 and 32 of the Refugee Convention. In addition, the government wrongly asserts that entering without inspection reflects a disregard of U.S. immigration laws justifying a bar to asylum and reinforces this assertion by stating that asylum seekers could present themselves at a port of entry. Rule at 69648.

### A.    The Rule Violates Article 31 of the Refugee Convention

The Rule fails to address U.S. obligations under Article 31 of the Refugee Convention. This Article, which is binding on the U.S. through our ratification of the 1967 Protocol Relating to the Status of Refugees, specifically prohibits States from imposing penalties on refugees on account of their illegal entry or presence.[4] This prohibition does not include an exception for those who have been previously removed from a territory. Moreover, the United States, as a member of the United Nations High Commissioner for Refugees (UNHCR)'s Executive Committee, has joined an international consensus in agreeing that even in situations of large-scale influx, asylum seekers "should not be penalized or exposed to any unfavorable treatment solely on the ground that their presence in the country is considered unlawful."[5] Barring an asylum seeker from applying for asylum based solely on her reentry without inspection would be such a penalty. Accordingly, if implemented, this rule would be in direct violation of U.S. obligations under Article 31 of the Refugee Convention.

---

[4] 1951 Convention relating to the Status of Refugees, Art. 31(1). https://www.ohchr.org/EN/ProfessionalInterest/Pages/StatusOfRefugees.aspx. *See also Introductory note* by the Office of the United Nations High Commissioner for Refugees (UNHCR) to the Text of the 1951 Convention Relating to the Status of Refugees Text of the 1967 Protocol Relating to the Status of Refugees Resolution 2198 (XXI) adopted by the United Nations General Assembly, available at https://www.unhcr.org/en-us/protection/basic/3b66c2aa10/convention-protocol-relating-status-refugees.html.
[5] Protection of Asylum-Seekers in Situations of Large-Scale Influx, No. 22 (XXXII) II.B.2(a) - 1981 Executive Committee 32nd session. Contained in United Nations General Assembly Document No. 12A (A/36/12/Add.1). Conclusion endorsed by the Executive Committee of the High Commissioner's Programme upon the recommendation of the Sub-Committee of the Whole on International Protection of Refugees. https://www.unhcr.org/en-us/excom/exconc/3ae68c6e10/protection-asylum-seekers-situations-large-scale-influx.html.

**B.    The Rule is Inconsistent with Article 33 of the Refugee Convention**

The Refugee Convention does not require States to provide asylum to those who, having been convicted by a final judgment of a particularly serious crime, constitute a danger to the community of the asylum State. This limitation on the principle of *non-refoulement* is found in Article 33(2) of the Refugee Convention. However, under no reasonable interpretation of either criminal law or asylum law can the crime of reentry without inspection be considered a particularly serious crime.

Article 33(2) is intended for extreme cases. UNHCR has advised that a particularly serious crime "must belong to the gravest category" and be limited "to refugees who become an extremely serious threat to the country of asylum due to the severity of crimes perpetrated by them in the country of asylum."[6]

Leading scholars support this interpretation, explaining that:

> The text of Article 33(2) makes it clear that it is only convictions for crimes of a particularly serious nature that will come within the purview of the exception. This double qualification – *particularly* and *serious* – is consistent with the restrictive scope of the exception and emphasizes that *refoulement* may be contemplated pursuant to this provision only in the most exceptional of circumstances. Commentators have suggested that the kinds of crimes that will come within the purview of the exception will include crimes such as murder, rape, armed robbery, arson, etc.[7]

Moreover, UNHCR has specifically noted that the particularly serious crime bar does not encompass less extreme crimes; "[c]rimes such as petty theft or the possession for personal use of illicit narcotic substances would not meet the threshold of seriousness."[8]

Finally, when determining whether an individual should be barred from protection for having been convicted of a particularly serious crime, the adjudicator must conduct an individualized analysis and consider any mitigating factors. Again, leading experts are in agreement.

> In our view, and as a matter of international law, the interpretation and application of this concept in the context of an exception to *non-refoulement* ought necessarily to involve an assessment of all the circumstances, including the nature of the offense, the background to its commission, the behaviour of the individual, and the actual terms of any sentence imposed. … *[A] priori* determinations of seriousness by way of legislative labelling or other measures substituting executive determinations for judicial (and judicious) assessments are inconsistent with the *international* standard which is required to be applied, and with the humanitarian intent of the Convention.[9]

---

[6] UNHCR, *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 7 (July 2007), http://www.unhcr.org/enus/576d237f7.pdf.

[7] Sir Elihu Lauterpacht and Daniel Bethlehem, *The Scope and Content of the Principle of Non-Refoulement: Opinion*, in REFUGEE PROTECTION IN INTERNATIONAL LAW: UNHCR'S GLOBAL CONSULTATIONS ON INTERNATIONAL PROTECTION (edited by Erika Feller, Volker Türk and Frances Nicholson, Cambridge University Press, 2003) (emphases in original).

[8] UNHCR, *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 10 (July 2007), http://www.unhcr.org/enus/576d237f7.pdf.

[9] Guy S. Goodwin-Gill and Jane McAdam, *THE REFUGEE IN INTERNATIONAL LAW*, 3ʳᵈ ed. (Oxford University Press, 2007), pp. 239-240 (emphasis in original).

### C.   The Rule Incorrectly Relies on Article 34 of the Refugee Convention

With regard to U.S. obligations under the Refugee Convention, the Rule states that if the asylum seeker's grounds for persecution arose after the initial removal and subsequent reentry without inspection, the asylum seeker could still seek other forms of protection such as that found under the Convention Against Torture. Rule at 69649. The government asserts that the Rule is therefore consistent with U.S. obligations under the Refugee Convention, including its obligation of *non-refoulement*. Its reasoning is based on the implementation of Article 34 which the government notes concerns "assimilation of refugees, which is precatory and not mandatory." Rule at 69649.

Article 34 of the Refugee Convention is titled "Naturalization" and states:

> The Contracting States shall as far as possible facilitate the assimilation and naturalization of refugees. They shall in particular make every effort to expedite naturalization proceedings and to reduce as far as possible the charges and costs of such proceedings.[10]

While the Administration is correct that the language of Article 34 is not mandatory in that it requires States only to make every effort to naturalize refugees, it is simply not applicable to an asylum seeker's access to the asylum system. It is completely inapposite to suggest that Article 34 supports the Rule in making a person ineligible for asylum due to reentry without inspection. Although under U.S. law the granting of asylum is a discretionary act, it does not therefore follow that any and every whim of the government in creating grounds of ineligibility is consistent with our treaty obligations.

The intent of Congress in enacting the Refugee Act of 1980 was to bring the U.S into alignment with international law, specifically the Refugee Convention and Protocol. The intent of this Rule is to minimize the number of people who may be granted asylum by creating unwarranted and overly expansive grounds of ineligibility far beyond the structure set forth in the Convention. The Rule is a bad faith interpretation of our treaty obligations and the will of Congress. Accordingly, the government's conclusion that because Article 34 does not require the United States to naturalize all refugees, the Rule comports with its obligations under the Refugee Convention and Protocol is simply incorrect.

### D.   The Rule is Contrary to U.S. Law in Denying the Right to Seek Asylum Because of Reentry Between Official Ports of Entry

In addition to violating international law as described above, the government's bar of asylum for reentering without inspection is contrary to U.S. law given the provisions that Congress has specifically enacted for those seeking asylum. The Rule states with reference to reentering without inspection that it "reflects a willingness to repeatedly disregard the immigration laws despite alternative means of presenting a claim of persecution." The justification continues that an asylum seeker "seeking protection, even one who has previously been removed from the United States, may present himself or herself at a port of entry without illegally reentering the United States." Rule at 69648.

This argument is callously flawed. The government fully disregards that for those fleeing for their lives, reentering without inspection may be the only possible option, particularly given current U.S. violations of international and domestic law regarding access to territory. These include the practice of metering,

---

[10] https://www.unhcr.org/en-us/protection/basic/3b66c2aa10/convention-protocol-relating-status-refugees.html.

the Migrant Protection Protocols (MPP), the third country transit ban, and the asylum cooperative agreements established with Guatemala, Honduras and El Salvador.

This is particularly true for women and LGBTQ individuals approaching the U.S. border. Credible reports of rape, kidnappings and torture of those waiting in Mexico under the MPP highlight the need for many vulnerable individuals to find an immediate means to enter the U.S. in search of safety.[11] Given the extremely dangerous conditions and lack of social services including food, shelter, and medical care in northern Mexico, it is unreasonable to expect a woman or LGBTQ individual fleeing for their lives to wait for weeks or months in line to present themselves for entry.

Finally, it is unlawful to differentiate between asylum seekers who approach a port of entry and those who enter without inspection. In accordance with our international treaty obligations, Congress for almost 40 years has clearly supported the right to claim asylum *anywhere* on the U.S. border or at a land, sea or air port of entry. In the Refugee Act of 1980, Congress authorized asylum claims by any foreign national "physically present in the United States or **at a land border** or port of entry".[12] Later, Congress expressly reaffirmed the eligibility for asylum of "any" foreign national "who is physically present in the United States or who arrives in the United States (**whether or not at a designated port of arrival**)".[13] This inclusive provision reflected Congress's ongoing intent to comply with international law, as well as its recognition that allowing an applicant for refugee status to assert a claim for asylum at any point along a land border is a necessary component of essential refugee protections because asylum seekers often flee for their lives and cannot pick and choose where they will ask for protection.[14]

## II.    THE PROPOSED CRIMINAL BAR RELATED TO PERPETRATORS OF DOMESTIC VIOLENCE VIOLATES THE REFUGEE CONVENTION AND PROTOCOL AND POSES A RISK TO SURVIVORS OF SUCH VIOLENCE

The Rule will render asylum seekers convicted of conduct "amounting to domestic assault or battery, stalking, or child abuse in the domestic context ineligible for asylum, irrespective of whether those offenses qualify as felonies or misdemeanors." Rule at 69651. The Rule provides a limited exemption, discussed below. Rule at 69653.

### A.   The Rule Puts Survivors of Domestic Violence at Risk

As an organization with deep expertise in protecting asylum seekers fleeing gender-based violence, CGRS is especially concerned by this proposed new bar.

To begin with, the Rule may serve to empower abusers by giving them another means of controlling and punishing their victims. Of particular concern regarding this proposed bar is the phenomenon where abusers falsely accuse survivors of domestic violence as a means of terrorizing and controlling them. For example, in a case where CGRS assisted an asylum seeker, her abuser did precisely that.

---

[11] *See e.g.* Human Rights First: "Delivered to Danger: The Trump Administration Sending Asylum Seekers and Migrants to Danger," available at https://deliveredtodanger.org/**.**
[12] https://www.govinfo.gov/content/pkg/STATUTE-94/pdf/STATUTE-94-Pg102.pdf (emphasis added).
[13] https://casetext.com/statute/united-states-code/title-8-aliens-and-nationality/chapter-12-immigration-and-nationality/subchapter-ii-immigration/part-i-selection-system/section-1158-asylum (emphasis added).
[14] See https://www.humanrightsfirst.org/sites/default/files/US-Southern-Border-Fact-Sheet.pdf (providing a detailed explanation of why some asylum seekers cross the U.S. southern border between ports of entry).

AR.09946

Alejandra (a pseudonym) entered the United States after fleeing persecution she suffered in Mexico on account of her status as a transgender woman. After entering the U.S., Alejandra began a relationship with man who was a U.S. citizen. The man soon became verbally and physically abusive to Alejandra and often threatened to call immigration and have her deported. Alejandra feared contacting the police. When Alejandra finally gathered the strength to leave her partner, he wouldn't let her go and they began to argue. Her partner called the police, accused Alejandra of attacking him, and insisted that they arrest her. Alejandra was placed in the jail with the male population. She pleaded guilty to simple battery and completed probation. An immigration judge found that she was eligible for asylum and that based on her credible testimony about the facts and circumstances surrounding her arrest and conviction, she was deserving of asylum in the exercise of discretion.

Under the Rule, Alejandra would have been ineligible for asylum and would have faced the additional obstacle of showing that she qualified for the limited exemption provided.

Even if the abuser does not initiate a call to the police, as Alejandra's did, it is well-documented that there has been an increase in dual arrests, where responding officers will arrest both parties in a domestic incident.[15] Although many states require an officer to determine who is the primary aggressor, there are widespread variations in practice as to how this mandate is carried out.[16] Such variation does not provide a uniform basis for fulfilling our international obligations to protect refugees.

### B.  The Rule is Inconsistent with Article 33 of the Refugee Convention

The domestic violence bar specifically includes misdemeanor offenses. This alone reveals that it is impermissibly broad and will violate international law by barring eligible asylum seekers who have been convicted of minor offenses that cannot reasonably be considered particularly serious crimes. Please see section I.B above for an explanation of the problem with the overly broad reach of all of the proposed new bars, including this one.

An additional problem is that this new ground of ineligibility – unlike the other six new grounds of ineligibility – also bars asylum seekers who engage in acts of battery and extreme cruelty in a domestic context in the United States, regardless of whether such conduct resulted in a criminal conviction. Rule at 69651. Failing to require a criminal conviction leads the U.S. even further astray from our treaty obligations by dramatically expanding the potential for excluding people from being granted asylum. Nor is there any convincing explanation provided for why conduct that does not result in a conviction is included in the bar. The Rule states that not requiring a conviction "allow[s] the adjudicator to consider what conduct the [asylum seeker] engaged in to determine if the conduct amounts to a covered act of battery or extreme cruelty." Rule at 69652.

However, asylum officers in particular have neither the training nor the expertise in domestic violence law in the United States – particularly since the Rule references federal, state, tribal and local law – to make such a determination. This is why the Refugee Convention requires a conviction in order to consider exclusion from refugee status.

---

[15] Melissa E. Dichter (2013): "'They Arrested Me—And I Was the Victim': Women's Experiences With Getting Arrested in the Context of Domestic Violence," *Women & Criminal Justice*, 23:2, 81-98.
[16] David Hirschel, PhD, Philip D. McCormack, PhD, and Eve Buzawa, PhD, "A 10-Year Study of the Impact of Intimate Partner Violence Primary Aggressor Laws on Single and Dual Arrest," *Journal of Interpersonal Violence* 1-35 (2017).

Finally, the limited exemption proposed does not cure the defects of the bar. The Rule cross-references another, non-asylum, portion of the Immigration and Nationality Act, whose multiple elements would have to be met to fit within the exemption. The proposed bar is unlawful because a conviction is not required to trigger the bar. The limited exemption is insufficient and unworkable because the complex statutory scheme referenced in the Rule for determining if the exemption is available is completely outside the expertise of the Asylum Office. It is unrealistic in the extreme to expect – as the Rule asserts – that "[a]sylum officers or immigration judges could thus make factual determinations regarding whether an [asylum seeker] fit into this category, making the exception more administrable and uniform in the asylum context."

III.     **THE REMAINING PROPOSED CRIMINAL BARS TO ASYLUM ARE ALSO OVERBROAD IN VIOLATION OF THE REFUGEE CONVENTION AND PROTOCOL**

A.     **The Proposed Categories of Crimes are Unreasonably Broad and Will Exclude From Refugee Protection, in Violation of International Law, Asylum Seekers Who Did Not Commit Particularly Serious Crimes**

Each of the seven categories proposed by the Rule contains within it crimes that do not meet the criteria envisioned to be particularly serious crimes and will therefore exclude deserving asylum seekers from protection in violation of international law. This section discusses the remaining five proposed bars.

**The first new categorical bar,** "Aliens Convicted of a Felony Under Federal, State, Tribal or Local Law," will define a felony crime as "crimes designated as felonies by the relevant jurisdiction or crimes punishable by more than one year's imprisonment." Rule at 69645. The justification for this expansion is to systematize and streamline adjudicators' determinations of which convictions can bar asylum, as the current approach to the bar for aggravated felonies has resulted in inconsistent and time-consuming analyses.

However, this means that any crime punishable by over a year in prison will be deemed serious enough to bar a person from applying for asylum, even if it is a non-violent crime. For example, in Florida, if an asylum seeker stole $301 worth of groceries to feed her family, she could be charged with and convicted of a felony[17] and be rendered ineligible for asylum. If the government enacts its proposed restrictions on work authorization and imposes fees for asylum applications and work authorization, such survival crimes will likely increase.

**The second new categorical bar,** "Federal Convictions for Harboring Aliens" includes convictions for "smuggling or harboring" an individual under 8 U.S.C. § 1324(a). Although certain smuggling offenses already qualify as aggravated felonies that bar asylum seekers from receiving asylum, there is an exception for a first offense involving an immigrant's spouse, child or parent. Rule at 69647. The proposed rule changes this and would explicitly cover first time offenders, including those smuggling immediate family members. Rule at 69648. The stated rationale for this expansion is to preclude those who show a "serious disregard for U.S. immigration laws" from receiving asylum.

---

[17] https://www.miamiherald.com/news/politics-government/state-politics/article228723334.html

There is no consideration given for whether the act is predicated on bringing a family member to safety. Consider the case of a family separated by the Migrant Protection Protocols, where the father and son are now in the U.S. but the mother and daughter remain in danger in Mexico.[18]

> "Rosa" is a 23-year-old asylum seeker who fled Honduras with her husband, five-year-old daughter, Marisela, and seven-year-old son, Oscar, after receiving death threats due to Rosa's participation in the Partido Nacional de Honduras (National Party of Honduras), and the Honduran president's political campaign. In Mexico City, the family was kidnapped and extorted for money.
>
> Once the kidnappers released the family, they traveled to Juarez and crossed into the United States. CBP detained them under the International Bridge with thousands of other migrants. Rosa and their daughter Marisela were separated from Rosa's husband and their son Oscar when Marisela got very sick and went to the hospital. When Rosa and Marisela returned from the hospital, the other two were already released into the United States. Rosa and Marisela were returned to Mexico without ever being screened for fear of return there.
>
> Rosa was screened for fear of return to Mexico only following an initial court hearing in April 2019. She recounted the family's earlier kidnapping but was still returned to Juarez with Marisela. The shelter where they previously stayed was full, so they went to live in a crowded hotel room with a group of other mothers and young children.
>
> Rosa and Marisela were later kidnapped and held for ransom a second time, this time by a taxi driver and other armed men. Rosa knows they were targeted because they were migrants; the taxi driver told her that he knew she was not from Mexico and so she had to have family in the United States who could pay for her release. The kidnappers released Rosa and Marisela once Rosa's family paid a ransom. When Rosa tried to file a police report, the police told her "Nothing has happened, it was just a scare." Days later, a man armed with a knife tried to break into the hotel room they were sharing with other women and children. The women managed to block him by covering the door with furniture. They called the police but do not believe a report was filed.
>
> During her next hearing on May 17, 2019, Rosa recounted these two new instances to the immigration judge and later had a second fear screening. However, she was still returned to Mexico.

Under the Rule, if Rosa's husband tried to protect his wife and daughter and reunite their family by paying someone to help them enter the United States to escape the extreme danger they face in Mexico,[19] he would be barred from asylum protection. Yet such an action would not endanger the public and should not be considered a crime serious enough in nature to bar someone from asylum.

**The fourth new category,** "Federal, State, Tribal, or Local Convictions for Offenses Involving Criminal Street Gangs," proposes to bar from asylum all those who are convicted of a crime involving criminal

---

[18] https://www.splcenter.org/sites/default/files/documents/2019.06.26_-_049_-_brief_of_amicus_curiae_human_rights_first_iso_plfs-appellees.pdf
[19] *See e.g.* Human Rights First: "Delivered to Danger: The Trump Administration Sending Asylum Seekers and Migrants to Danger," available at https://deliveredtodanger.org/.

street gangs, regardless of whether that crime qualifies as a felony or as a misdemeanor. Rule at 69649. The fact that this category, even under U.S. law, includes misdemeanor offenses reflects that it is impermissibly broad and will violate international law by barring asylum seekers who have committed crimes which cannot be considered serious enough in nature to bar someone from asylum.

**The fifth new category**, "Convictions for Offenses Involving Driving While Intoxicated or Impaired," proposes to bar from asylum individuals who have been convicted of "certain offenses" involving driving while intoxicated or impaired. Rule at 69651. In describing which offenses would fall within this category, the government states "[e]ven if some of the proposed DUI-related bars could not be characterized as 'particularly serious crimes' for purposes of U.S. immigration law, the Attorney General and Secretary of Homeland Security could still legally bar asylum on this basis." Rule at 9651. The Rule justifies this by noting that courts have upheld discretionary denials of asylum for drunk driving convictions in cases where it was unclear if the conviction was for a crime that rose to the level of being particularly serious. This reasoning, however, ignores that creating blanket DUI-related bars takes away an adjudicator's opportunity to exercise discretion based on the facts before them. Thus, this overly broad category could violate international law if it impermissibly barred asylum seekers who have not committed a particularly serious crime.

**The seventh and final new categorical bar** is for "Convictions for Certain Misdemeanor Offenses." Misdemeanor is defined as "a lesser crime punishable by a fine and/or county jail time for up to one year."[20] Accordingly, this category, by definition, cannot contain offenses severe enough to be punished by death or considered "extremely grave" as intended under international refugee law. This category includes use of fraudulent documents, public benefits offenses and minor drug convictions. Rule at 69653. The Rule justifies disqualifying asylum seekers who have committed these misdemeanor offenses with the broad statement that "these offenses inherently undermine public safety or Government integrity." Rule at 69653. This disingenuous explanation does not reasonably justify categorizing these crimes as "particularly serious" – which even under U.S. law is the standard to bar asylum seekers from eligibility – given the consequences of such a designation.

If the government relies on these sweeping categories to bar asylum, it will be violating international law by impermissibly denying asylum to individuals who are eligible under international refugee law and should not be deemed ineligible for asylum based on a minor criminal conviction or behavior.

    **B.    The Rule's Categorical Approach Precludes the Use Of a Balancing Test as Envisioned by the Refugee Convention in Order to Weigh Any Criminal Behavior Against the Fear of Harm Faced by an Asylum Seeker, As Well As to Consider the Full Context of the Crime**

The UNHCR *Handbook on Procedures and Criteria for Determining Refugee Status* provides that in determining whether to exclude an asylum seeker or refugee who has been convicted of a crime, the crime must be weighed against the severity of the harm feared by the asylum-seeker if deported.[21] According to the *Handbook*,

---

[20] https://dictionary.law.com/Default.aspx?selected=1259.
[21] UN High Commissioner for Refugees (UNHCR), *Handbook and Guidelines on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees*, December 2011, HCR/1P/4/ENG/REV. 3, available at: https://www.refworld.org/docid/4f33c8d92.html , para. 156.

> In applying this exclusion clause, it is also necessary to strike a balance between the nature of the offence presumed to have been committed by the applicant and the degree of persecution feared. If a person has well-founded fear of very severe persecution, e.g. persecution endangering his life or freedom, a crime must be very grave in order to exclude him. If the persecution feared is less serious, it will be necessary to have regard to the nature of the crime or crimes presumed to have been committed in order to establish whether the applicant is not in reality a fugitive from justice or whether his criminal character does not outweigh his character as a bona fide refugee.[22]

Furthermore, the *Handbook* instructs that the adjudicator must include the nature of the crime as well as the circumstances of the crime and its punishment in his or her adjudication. According to the *Handbook*,[23]

> In evaluating the nature of the crime presumed to have been committed, all the relevant factors – including any mitigating circumstances – must be taken into account. It is also necessary to have regard to any aggravating circumstances as, for example, the fact that the applicant may already have a criminal record.

However, the Rule does not provide an opportunity for such an analysis, and instead imposes a complete bar to asylum based on the seven categories of convictions, with one limited exception. By removing the opportunity for an asylum officer or immigration judge to undertake this balancing analysis, the government is violating its international obligations to allow the adjudicator to determine whether the asylum seeker's character as an asylum seeker outweighs his or her criminal character.

In conclusion, the Rule's seven proposed bars will violate U.S. international obligations, flout Congressional intent, result in unnecessary suffering, and increase the vulnerability of an already traumatized population. We call upon USCIS and EOIR to refrain from implementing the proposed Rule and instead work to make criminal bars to asylum consistent with international law.

Thank you for the opportunity to submit comments on the Rule.

Sincerely,

*Kate Jastram*

Kate Jastram
Director of Policy & Advocacy
Center for Gender & Refugee Studies
jastramkate@uchastings.edu

---

[22] *Id.*
[23] *Handbook,* para. 157.

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9eko-e5to
**Comments Due:** January 21, 2020
**Submission Type:** API

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0498
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Julia Wilson
**Organization:** OneJustice

## General Comment

OneJustice submits the attached public comment in opposition to the proposed rule on Procedures for Asylum and Bars to Asylum Eligibility.

## Attachments

OneJustice Comment Draft on Asylum Eligibility Rule

January 21, 2020

*Submitted via [https://www.regulations.gov/document?D=EOIR-2019-0005-0001]*

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41; Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility

To Whom it May Concern,

OneJustice respectfully submits this comment on the above-referenced Proposed Rules to amend regulations relating to eligibility for asylum published on December 19, 2019. We are deeply concerned about the proposed changes and request that the Department of Homeland Security and the Department of Justice ("the Departments") withdraw all provisions that restrict access to eligibility for asylum.

Asylum is meant to be a protection for the most vulnerable populations in our global and domestic communities; it should therefore as accessible as possible. The proposed regulations significantly restrict access to this crucial protection for individuals with viable asylum claims, while failing to meaningfully contribute to the safety or well-being of our nation.

OneJustice is legal nonprofit organization in California that brings life-changing legal assistance to people in need by transforming the civil legal aid system. Our organization believes access to legal assistance is a basic human right.  OneJustice has dedicated years developing and implementing innovative solutions to expand access to legal aid programs for California residents. Through OneJustice's pro bono programs, we partner with law firms, law schools, corporations, stakeholders, community organizers, and legal services organizations and mobilize free legal clinics in rural and isolated communities throughout California.

OneJustice is committed to increasing access to justice for low-income and underrepresented immigrants. Since 2009, OneJustice's pro bono program has engaged over 2,000 pro bono volunteers, implemented over 190 immigration clinics and 100 record clearance clinics, and provided legal assistance to more than 3,500 immigrants. Our pro bono programs include legal

clinics providing asylum and post-conviction relief services, in addition to other types of legal services.

For the reasons detailed in the comments below, we urge the Departments to withdraw the proposed regulatory changes that will severely affect the lives of thousands fleeing from persecution, oppression, violence, and inevitable danger. The Departments should instead dedicate their efforts to ensuring individuals fleeing violence are granted full and equal access to asylum protection in the United States.

Thank you for the opportunity to submit comments on the Proposed Rules that will drastically amend regulations relating to asylum eligibility. Please do not hesitate to contact me at jwilson@one-justice.org with any questions or if we can provide any additional information.

Sincerely,

Julia R. Wilson
CEO

---

**DETAILED COMMENTS in opposition to the Proposed Rules re Procedures for Asylum and Bars to Asylum Eligibility, 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41**

I.    **Introduction**

On December 19th, the Department of Homeland Security ("DHS") and the Department of Justice ("DOJ") issued a joint set of Proposed Rules that would make three primary changes to the rules governing asylum adjudications. OneJustice strongly opposes each of these changes. The proposed changes serve only to increase the criminalization of migrants exercising their legal rights to seek asylum and to block access to crucial humanitarian protections provided for under United States and international law.

The first proposed set of changes adds the following seven *categorical* bars to asylum eligibility: (1) any conviction of a felony offense; (2) any conviction for "smuggling or harboring" under 8 U.S.C. § 1324(a), even if the asylum seeker committed the offense for the purpose of bringing her own spouse, child or parent to safety; (3) any conviction for illegal reentry under 8 U.S.C. § 1326; (4) any conviction for an offense "involving criminal street gangs," with the adjudicator empowered to look to any evidence to determine applicability; (5) any second conviction for an offense involving driving while intoxicated or impaired; (6) any

2

conviction *or accusation of conduct* for acts of battery involving a domestic relationship; (7) and any conviction for several newly defined categories of misdemeanor offenses, including *any* drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits.

The second section of the Proposed Rules provides a multi-factor test for immigration adjudicators to determine whether a criminal conviction or sentence is valid for the purpose of determining asylum eligibility. The third section rescinds a provision in the current rules regarding the reconsideration of discretionary asylum.

The proposed changes constitute a harsh and unlawful dismantling of the asylum protections enshrined in United States and international law. The United States has historically been a world leader in refugee protection and it is unconscionable that the administration continues to create barriers to prohibit migrants from exercising their legal right to seek asylum. OneJustice submits these comments to express opposition to the entirety of the Proposed Rules and grave concerns with the administration's increased efforts to exclude refugees from obtaining the protections the United States asylum system has long committed to. We urge that the Proposed Rules be rescinded in their entirety. OneJustice will focus on a few of the proposed changes in this public comment.

## II.    The Proposed Rules Unnecessarily and Cruelly Exclude Bona Fide Refugees from Asylum Eligibility

### A.    The Barriers to Asylum for Those Previously Involved in the Criminal Legal System are Already Sweeping in Scope; Adding More Barriers is Cruel and Unnecessary.

The Refugee Act of 1980 ("Act"), designed and approved by a bipartisan Congress, established the United States asylum system in order to protect the world's most vulnerable people from persecution. The Act—among other measures designed to bring the United States domestic legal code into compliance with the provisions of the United Nations Protocol Relating to the Status of Refugees—created a "broad class" of refugees eligible for a discretionary grant of asylum.[1] The United States is a signatory to the 1967 Protocol of the 1951 Convention Relating to the Status of Refugees and therefore has a legal obligation to accept asylum seekers who seek protection and safety. Asylum provides physical safety, a path to citizenship and security, and the opportunity to reunite with immediate family members who may still be in grave danger abroad.[2]

---

[1] *See I.N.S. v. Cardoza-Fonseca*, 40 U.S. 421, 423 (1987).
[2] The permanency and family reunification benefits that accompany asylum are not provided to those granted withholding of removal or protection under the Convention Against Torture, the alternative forms of relief described

The United States asylum system demonstrates the nation's commitment to never repeat its failure to save thousands of Jewish refugees that were refused entry to the United States and others fleeing the Holocaust.[3] For individuals seeking asylum in the United States, the stakes could not be higher—a claim denied often means return to death or brutal persecution.[4] It is imperative that the Proposed Rules not go into effect. The proposed changes would result in asylum seekers being denied protections they may be eligible for under federal law that has been in place for decades.

The current processes governing asylum adjudications are already exceedingly harsh and challenging for migrants who were forced to leave their home countries in search of safety. Asylum seekers experience immense trauma and are forced to navigate a new country without knowing the language or laws and without access to appointed counsel. Asylum seekers bear the evidentiary burden of establishing their eligibility for asylum[5] while navigating a complex web of laws and regulations, often without counsel and from a remote immigration jail.[6] The obstacles to winning asylum are exceedingly high; indeed in some parts of the country and before certain immigration judges, almost no one succeeds.[7] Today, newly imposed barriers to accessing asylum in the United States are extraordinarily cruel and unprecedented. Currently, asylum seekers fleeing persecution from countries all over the globe are seeking refuge at the southern border and are being forced to return to dangerous border cities in Mexico while navigating a web of policies that preclude asylum eligibility for countless migrants simply because of their national origin, manner of entry, or flight path.[8] There are consistent reports of the documented deaths and brutalities endured by those who sought, but were denied, asylum in

---

throughout the Proposed Rules as a justification for the breadth of the new proposed bars. For more details on the differences between the forms of protection, *see* section VI *infra*.

[3] Dara Lind, "How America's rejections of Jews fleeing Nazi Germany haunts our refugee policy today," *Vox*, January 27, 2017, https://www.vox.com/policy-and-politics/2017/1/27/14412082/refugees-history-holocaust.

[4] *See, e.g.*, Sarah Stillman, "When deportation is a death sentence," *The New Yorker*, January 8, 2018, https://www.newyorker.com/magazine/2018/01/15/when-deportation-is-a-death-sentence.

[5] 8 USC § 1158(b)(1)(B); 8 CFR § 1240.8(d).

[6] *See* Daniel Connolly, Aaron Montes, and Lauren Villagran, "Asylum seekers in U.S. face years of waiting, little chance of winning their cases," *USA Today*, September 25, 2019, https://www.usatoday.com/in-depth/news/nation/2019/09/23/immigration-court-asylum-seekers-what-to-expect/2026541001/.

[7] Manuel Roig-Franzia, "Immigrants risk it all seeking asylum. The answer is almost always 'no,'" *Washington Post*, July 24, 2019, https://www.washingtonpost.com/lifestyle/style/migrants-risk-it-all-seeking-asylum-the-answer-in-court-is-almost-always-no/2019/07/23/9c161b2e-a3f7-11e9-b732-41a79c2551bf_story.html.

[8] The National Immigrant Justice Center maintains a frequently updated timeline providing details of each of the asylum bans and other policies issued and implemented by the administration undermining asylum access at https://www.immigrantjustice.org/issues/asylum-seekers-refugees. For more information on the harms and rights abuses inherent in the Migrant Protection Protocols, or "Return-to-Mexico" program, *see* Human Rights First, *Delivered to Danger* (December 2019), https://www.humanrightsfirst.org/campaign/remain-mexico.

AR.09956

the United States.[9] The administration continues to create numerous barriers that exclude refugees from fairly accessing our asylum system.

Specifically, the bars to asylum based on allegations of criminal conduct are *already* sweeping and over-broad in nature and scope.[10] Any conviction for an offense determined to be an "aggravated felony" is considered a *per se* "particularly serious crime" and therefore a mandatory bar to asylum.[11] "Aggravated felony" is a notoriously vague term, which exists only in immigration law. Originally limited to murder, weapons trafficking and drug trafficking,[12] it has metastasized to encompass hundreds of offenses, many of them neither a felony nor aggravated, including petty offenses such as misdemeanor shoplifting, simple misdemeanor battery, or sale of counterfeit DVDs.[13] The existing crime bars should be narrowed, not expanded.

Immigration adjudicators already have vast discretion to deny asylum to those who meet the refugee definition but have been convicted of criminal conduct.[14] Further categorical bars are not needed and will have a devastating impact on asylum seekers who have valid asylum claims. The agencies' efforts to add *seven* new sweeping categories of barred conduct to the asylum eligibility criteria is unnecessary and cruel. The Proposed Rules drain the phrase "*particularly serious* crime," 8 U.S.C. § 1158, of any sensible meaning.  The Proposed Rules are also arbitrary and capricious. They would constitute a marked departure from past practice, and the agencies have proffered no evidence or data to support these changes.

---

[9] *See, e.g.,* Stillman, "Death Sentence," *supra* (reporting on a database of more than sixty cases of individuals killed after deportation); *see also* Maria Sachetti, "'Death is waiting for him,'" *The Washington Post*, December 6, 2018, https://www.washingtonpost.com/graphics/2018/local/asylum-deported-ms-13-honduras/ (telling the story of Santos Chirino, denied asylum by a Virginia immigration judge, deported, and then murdered by those he told the immigration judge he feared); and Kevin Sieff, "When death awaits deported asylum seekers," *Washington Post*, December 26, 2018, https://www.washingtonpost.com/graphics/2018/world/when-death-awaits-deported-asylum-seekers/.
[10] The existing categorical bars to asylum eligibility are discussed in detail on p. 69641 of the Proposed Rules.
[11] 8 U.S.C. §§ 1158(b)(2)(A)(ii) and (B)(i).
[12] Pub. L. No. 100-690, § 7342, 102 Stat. 4181, 4469-70.
[13] 8 U.S.C. § 1101(a)(43). *See also* Nancy Morawetz, "Understanding the Impact of the 1996 Deportation Laws and the Limited Scope of Proposed Reforms," *Harvard Law Review* 113 (2000): 1939-40 (criticizing the "'Alice-in-Wonderland-like definition of the term 'aggravated felony'"); Melissa Cook, "Banished for Minor Crimes: The Aggravated Felony Provisions of the Immigration and Nationality Act as a Human Rights Violation," *Boston College Third World Law Journal* (2003): 293.
[14] *See Matter of Pula*, 19 I.&N. Dec. 467 (BIA 1987).

AR.09957

Conviction for a crime does not, without more, make one a present or future danger[15] —which is why the Refugee Convention's particularly serious crime bar, made part of United States law through 8 U.S.C. § 1158, should only properly apply if both (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows that she is a present or future danger.[16]

The Proposed Rules abandon this rationale. First, they assume that every noncitizen convicted of any offense punishable by more than a year in prison necessarily constitutes a danger to the community. But no meaningful evidence is provided to support that assumption. The Proposed Rules are so capricious as to peremptorily postulate a noncitizen's supposed danger to the community even in circumstances when a federal, state, or local judge has concluded that no danger exists by, for example, imposing a noncustodial sentence. The Proposed Rules also fail to address or account for the fact that a significant number of people may agree to plead to a crime to avoid the threat of a severe sentence. Not only is a conviction an unreliable predictor of future danger, it can also be an unreliable indicator of past criminal conduct.[17] The Proposed Rules additionally fail to take into consideration convictions for conduct influenced by mental illness or duress. Finally, the Proposed Rules would have a racially disparate impact on asylum seekers of color who are subject to racially disparate policing, resulting in racial disparities in rates of guilty pleas to minor offenses.[18]

The Board of Immigration Appeals has cautioned that, "in light of the unusually harsh consequences which may befall a [noncitizen] who has established a well-founded fear of persecution; the danger of persecution should generally outweigh all but the most egregious of adverse factors."[19] Yet because of the categorical nature of the seven new bars proposed here,

---

[15] See U.S. Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders* (2017) (noting that recidivism rates fall substantially with age); U.S. Sentencing Commission, *Recidivism Among Federal Violent Offenders* (2019) (noting that non-violent offenders recidivate at significantly lower rates); J. Ramos and M. Wenger, "Immigration and recidivism: What is the Link?" *Justice Quarterly* (2019) (finding no correlation between recidivism rates and citizenship status among those formerly incarcerated for felonies in Florida prisons).

[16] See U.N. High Commissioner for Refugees, *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 11 (July 2007), http://www.unhcr.org/en-us/576d237f7.pdf (the Refugee Convention's particularly serious crime bar only applies if (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows she is a "present or future danger.").

[17] John H. Blume and Rebecca K. Helm, "The Unexonerated: Factually Innocent Defendants Who Plead Guilty," *Cornell Law Review* 100 (2014): 157,
https://pdfs.semanticscholar.org/c00f/96d421adf1846d120bf802a8854b5e2c0ff2.pdf.

[18] The Sentencing Project, "Report of The Sentencing Project to the United Nations Special Rapporteur on Contemporary Forms of Racism, Racial Discrimination, Xenophobia, and Related Intolerance: Regarding Racial Disparities in the United States Criminal Justice System" March 2018,
https://www.sentencingproject.org/publications/un-report-on-racial-disparities/, (describing racial disparities including imprisonment rates for black and Hispanic adults that are 5.9 and 3.1 times the rate for white adults)

[19] *Pula*, 19 I.&N. Dec. at 474.

asylum seekers will be precluded from obtaining protection on the basis of a vast array of conduct, without any discretion left to the immigration adjudicator to determine whether the circumstances merit such a harsh penalty.

Those unjustly precluded from even seeking a discretionary grant of asylum by the Proposed Rules will include, for example: individuals struggling with addiction with one drug-related conviction, regardless of the circumstances of the offense; asylum seekers with two convictions for driving under the influence, regardless of whether the applicant has sought treatment for alcohol addiction or the circumstances of the convictions; community members seeking asylum defensively who have been convicted of a document fraud offense related to their immigration status; and asylum-seeking mothers convicted for bringing their own child across the southern border in an effort to find safety.

B.  *The Proposed Rules Cruelly Disregard the Connections Between Trauma and Involvement in the Criminal Legal System.*

OneJustice firmly believes the harsh nature of the Proposed Rules is especially evident when viewed through a trauma-informed lens. The proposed additional mandatory bars to asylum eligibility fail to allow for consideration of how past trauma may lead to interaction with the criminal legal system or to provide space and support for a person to address such issues. The changes also threaten to compound trauma and punish individuals struggling with resulting mental health challenges.

Asylum seekers are an inherently vulnerable population because of the trauma they have experienced in their countries of origin and, often, along the dangerous journey to find safety. Existing literature suggests that at least one out of every three asylum seekers struggles with depression, anxiety, and/or post-traumatic stress disorder ("PTSD").[20] One recent study found the mental health problems facing refugees and asylum seekers are so acute that more than a third of the study's sample admitted having suicidal thoughts in the preceding two weeks.[21] Categorically barring asylum seekers with DUI or drug possession convictions ignores a common link between mental health and substance use, with the cruel result of punishing people for what are, in reality, health issues. A more punitive and complex asylum system will also exacerbate stress and trauma for a group who deserve support, empathy, and protection.

---

[20] Giulia Turrini et al., "Common mental disorders in asylum seekers and refugees: umbrella review of prevalence and intervention studies," *International Journal of Mental Health Systems* 11 (August 2017): 51, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5571637/.
[21] Megan Brooks, "Refugees have high burden of mental health problems," *Psychiatry and Behavioral Health Learning Network*, June 2019, https://www.psychcongress.com/article/refugees-have-high-burden-mental-health-problems.

In our legal clinics, OneJustice has often observed the trama associated with migration and compounded by inhumane immigration policies. OneJustice receives phone calls or text messages on a weekly basis from individuals who are in a state of high anxiety or depression due to challenges navigating our nation's immigration system.

- A 24 year-old DACA recipient called us a few months ago, pleading for help. On her boyfriend's birthday, he was picked up on the street by Immigration and Customs Enforcement, and his family did not know where he was taken. The caller began sobbing over the phone as she explained her search to locate her boyfriend. She was overwhelmed with frustration about how difficult the system is to navigate. Unfortunately, many clients we serve have similar experiences navigating the immigration system - experiences that are traumatic for the clients themselves and for their loved-ones.

At OneJustice's immigration legal clinics, it is common for us to have incredibly vulnerable, personal, and difficult conversations with our clients due to their prior experiences in their home countries.

- At a recent legal clinic in Monterey Bay, CA, a young client was uncomfortable throughout her appointment. She was reliving trauma. She was abused by her mother's partner at a young age and was fleeing violence in her home country. Through our clinic, she was able to find out she qualified for asylum. The fear from the violence she fled was visibly still present for her, even though she was safely in the United States.

OneJustice has provided legal assistance to many clients experiencing ongoing trauma and believes these individuals deserve a fair opportunity to present their asylum cases to be analyzed on an individual basis. This process allows for the decision maker to take into account the impact of past persecution and trauma on an asylum-seeker's record, and to determine if the conviction actually merits denial of safety and protection for that individual. Immigration adjudicators already have the authority to use their discretion to deny asylum to individuals with criminal convictions included in the proposed bars. To deny asylum seekers even the opportunity to present countervailing factors of their past trauma and potential recovery is cruel and neglectful of the difficult journey many people have to this country.

### III.     The Proposed Rules Criminalize Migrants and Migration and Fail to Distinguish Between Vastly Different Types of Criminal Records

The proposed additional criminal bars to asylum are overbroad and put unconscionable limits on asylum access. The Proposed Rules will disparately impact vulnerable populations, including asylum seekers hailing primarily from Central America and the Global South and those

AR.09960

routinely criminalized because of their identities, racially disparate policing practices, or in connection with experiences of trafficking and domestic violence.[22] For these populations, the discretion currently delegated to asylum adjudicators is especially crucial. The imposition of additional categorical bars to asylum will only further marginalize asylum seekers already struggling with trauma and discrimination.

   A.   *The Proposed Bars Based on Felony, DUI and Controlled Substance Convictions are Overbroad and Inconsistent with Principles of Asylum*

OneJustice is concerned about the overbroad scope of the proposed mandatory criminal bars to asylum and the categorical exclusion of individuals with valid asylum claims based on past convictions that do not involve particularly serious crimes.

According to the UNHCR, before barring an individual from asylum protection based on a particularly serious crime, an adjudicator must conduct an individualized analysis and consider any mitigating factors.[23] This requirement recognizes that a conviction in-an-of itself is not an indication of dangerousness and that asylum should be broadly accessible. The Proposed Rules run counter to this principle. For example, they exclude from protection anyone who was convicted of a felony and then define "felony" as "any crime punishable by more than one year of imprisonment" without any reference to other factors, including dangerousness. The Proposed Rules describe the increased categorization of the particularly serious crime bar as necessary because the case-by-case adjudication previously used for non-aggravated felony offenses was "inefficient."[24] However, an individualized analysis is exactly what the Convention requires to ensure only those individuals who have been convicted of crimes that are truly serious and therefore present a future danger, are placed at risk of refoulement.

Additionally, the Board of Immigration Appeals and the Courts of Appeals have generally held that, outside of the aggravated felony context, low-level, "run-of-the-mill" offenses do not constitute particularly serious crimes.[25] Under this long-standing interpretation of the particularly serious crime bar in the INA, there is simply no scenario in which low-level offenses like misdemeanor driving under the influence where no injury is caused, or simple

---

[22] D'Vera Cohn et al., "Rise in U.S. Immigrants from El Salvador, Guatemala and Honduras Outpaces Growth from Elsewhere," *Pew Research Center*, December 7, 2017, https://www.pewresearch.org/hispanic/wp-content/uploads/sites/5/2017/12/Pew-Research-Center_Central_America n-migration-to-U.S._12.7.17.pdf.
[23] *Id.* at ¶ 10-11; U.N. High Commissioner for Refugees, *The Nationality, Immigration and Asylum Act 2002: UNHCR Comments on the Nationality, Immigration and Asylum Act 2002 (Specification of Particularly Serious Crimes) Order 2004*, 4 (2004).
[24] Proposed Rules at 69646.
[25] *Delgado v. Holder*, 648 F.3d 1095, 1110 (9th Cir. 2011) (en banc) (J. Reinhardt, concurring).

possession of a controlled substance or paraphernalia, would constitute a particularly serious crime.

The reason for this is common sense. As Judge Reinhardt explained in a concurring opinion in *Delgado v. Holder*,[26] a decision the Proposed Rules cite in support of the expanded bars, run-of-the-mill crimes like driving under the influence have "little in common" with other crimes the Board of Immigration Appeals has deemed particularly serious—e.g., felony menacing with a deadly weapon, armed robbery, and burglary of a dwelling in which the offender is armed or causes injury.[27] Judge Reinhardt further noted that public opinion does not treat them similarly either: "American voters would be unlikely to elect a president or vice president who had committed a particularly serious crime, yet they had no difficulty in recently electing to each office a candidate with a DUI record."[28] Barring individuals from asylum based on these relatively minor offenses renders the "particularly serious" part of the "particularly serious crime" bar meaningless.

OneJustice strongly believes that a record alone is not an indication of future danger to the community. We often see clients in our Expungement and Immigrant Post-Conviction Relief Clinics with past DUI or low-level drug possession convictions who have moved past these mistakes and who are valued parents, employees, and community members.

In 2019, our Immigrant Post-Conviction Relief Clinic served 15 noncitizen clients with prior convictions. Three of these clients have two misdemeanor DUIs on their record, and one has a drug possession conviction. The Proposed Rules assert that these prior convictions show dangerousness and a disregard for the law, making these individuals undesirable as members of our community. This is an incorrect and damaging assumption. Each of these individuals has had a clean record for ten-plus years. Each has their own story about the difficult time in their lives that led to their convictions. One mother with two DUIs from her early 20's shared with us how an abusive relationship led to those incidents, how she is now sober and an active member of her church community. She is on her way to becoming a Lawful Permanent Resident. The client with a possession conviction spoke with us about his struggle with addiction, his path to getting clean, and the four children he and his wife are raising. He and the other two clients with multiple prior DUIs are all in the process of naturalizing and will have no trouble showing the good moral character required to become a citizen. The proposed rule would bar other individuals with similar stories from asylum protections and the same path to safety and a stable legal status.

---

[26]  648 F.3d at 1110 (J. Reinhardt, concurring).
[27]  *Id*. at 1110.
[28]  *Id*. at 1110.

OneJustice objects to the categorical exclusion of individuals from asylum protections based only on a minor conviction or potential sentence, without an individualized analysis, and believes that asylum should remain accessible.

### B.   The Proposed Illegal Re-Entry & Smuggling Bars Criminalize the Act of Migration and Constitute Unconscionable Limits on Asylum Access

The expanded criminal bars also exclude from safety and a pathway to citizenship those convicted of offenses that are coincident to their flight from persecution, punish them for fleeing persecution and/or seeking safety for their children, and do not accomplish the stated goal of making communities safer. OneJustice strongly opposes these limitations.

The expansion of the asylum bar to include individuals who have been convicted of reentering the United States without inspection pursuant to INA § 276[29] is unlike any of the other bars previously established or as interpreted by the Board of Immigration Appeals or Circuit Courts of Appeals. It is an offense with no element of danger or violence to others, and has no victim. Most significantly, and more so than other bars contained in the Proposed Rules, barring asylum based on the manner of entry directly violates the Convention's prohibition on imposing penalties based on a refugee's manner of entry or presence.[30] This prohibition is a critical part of the Convention because it recognizes that refugees often have little control over the place and manner in which they enter the country where they are seeking refuge.

An illegal reentry alone should not bar asylum seekers from protection who have a legitimate claim and are fleeing persecution. Illegal re-entry does not itself indicate a likelihood to commit future crimes, but is more likely a reflection of an individual's desperation to flee persecution. Regardless of the reason behind a previous entry, an asylum claim should be considered with the current set of facts that demonstrate the person's fear of persecution.

Since May 2019, OneJustice has partnered with law schools, law firms, and legal services organizations to pilot an Asylum Legal Clinic that provides free legal assistance to recently-arrived asylum seekers in Los Angeles. Through three legal clinics, we have provided legal assistance to over 80 families seeking asylum in the United States with cases pending before the Los Angeles Immigration Court. Several migrant families were forced to wait months in extremely dangerous border cities in Mexico because they were subject to the arbitrary "metering" policy that Customs and Border Protection ("CBP") has been implementing at the southern border. As a result, families have traveled through ports of entry with their children in order to seek asylum and obtain safety. The Migration Protection Protocols ("MPP"), metering

---

[29] Proposed Rules at 69659, 69660.
[30] Refugee Convention, *supra*, at art 31.

policies, and other policies have put migrants in grave danger simply for exercising their legal right to seek asylum. Migrants should not be criminalized for seeking safety and protection. The proposed criminal bars further put asylum seekers in grave danger and undermine federal and international law.

The Proposed Rules would also ban asylum for parents or other caregivers who are convicted of smuggling or harboring offenses after taking steps to help their minor children enter the United States to flee persecution. This expansion further criminalizes vulnerable refugee populations.[31] It is particularly insidious in light of now-public documents revealing this administration's explicit efforts to utilize smuggling prosecutions against parents and caregivers as part of a strategy to deter families from seeking asylum in the United States.[32] The vast expansion of migrant prosecutions at the border during the current administration has created administrative chaos and separated families that do not pose a threat to the safety of communities in the United States.[33] The Proposed Rules seek to take this widely condemned strategy one step further, by additionally barring those parents *already prosecuted* from obtaining asylum protections for themselves and their children.

The Proposed Rules suggest that refugees seeking protection should utilize "alternative means" of seeking protection by presenting themselves at a port of entry.[34] This is a disingenuous suggestion, given that this administration has made this option dangerous and impractical for many families and individuals fleeing persecution through the above-mentioned policies.[35] For many migrants facing kidnapping, violence, homelessness, illness, and hunger while waiting to present themselves at a port of entry, illegal re-entry or helping a child cross the border may be the only way to keep themselves and their family safe. Leaving children behind while fleeing is not an option for many parents. The Proposed Rules multiply the harms parents and caregivers

---

[31] On April 11, 2017, then-Attorney General Sessions instructed all federal prosecutors to increase their prioritization of immigration offenses for prosecution, including misdemeanor offenses committed by first time entrants. *See* Memorandum from the Attorney General: Renewed Commitment to Criminal Immigration Enforcement (April 11, 2017), https://www.justice.gov/opa/press-release/file/956841/download.

[32] Ryan Devereaux, "Documents Detail ICE Campaign to Prosecute Migrant Parents as Smugglers," *The Intercept*, April 29, 2019, https://theintercept.com/2019/04/29/ice-documents-prosecute-migrant-parents-smugglers/ (describing how in May 2017, the Department of Homeland Security set out to target parents and family members of unaccompanied minors for prosecution).

[33] *Id.*; Richard Marosi, "The aggressive prosecution of border crossers is straining the courts. Will zero tolerance make it worse?," *Los Angeles Times*, May 11, 2018,
https://www.latimes.com/local/california/la-me-ln-immigrant-prosecutions-20180511-story.html.

[34] Proposed Rules at 69648.

[35] Human Rights Watch, "Mexican Asylum Seekers Ordered to Wait:Mexicans Fleeing Violence Stuck in Dangerous Conditions at US Border," December 23, 2019,
https://www.hrw.org/news/2019/12/23/us-mexican-asylum-seekers-ordered-wait

have experienced in their treacherous journeys to safety and callously penalize parents for doing what is only human—taking all necessary steps to protect their children.

## IV.    The Proposed Definition of "Conviction" and "Sentence" for the Purposes of the New Bars Further Excludes Those in Need of Protection

The section of the Proposed Rules that outlines a new set of criteria for determining whether a conviction or sentence is valid for the purpose of determining asylum eligibility imposes an unlawful presumption against asylum eligibility for applicants who seek post-conviction relief while in removal proceedings or more than one year after a conviction. It also denies full faith and credit to state court proceedings by attributing improper motives to state court actors.[36]

OneJustice serves noncitizen clients with prior criminal records through our Immigrant Post-Conviction Relief Clinic; based on our knowledge and experience in this area, we strongly oppose this section of the Proposed Rules.

### A.    The Proposed Rules Undermine Sixth Amendment Protections and Harms Immigrants Unfamiliar with the Complex Criminal and Immigration Framework Governing Prior Convictions.

The Proposed Rules outline a new multi-factor process asylum adjudicators must use to determine whether a conviction or sentence remains valid for the purpose of determining asylum eligibility. The proposal includes a rebuttable presumption "against the effectiveness" of an order vacating, expunging, or modifying a conviction or sentence if the order was entered into after the asylum seeker was placed in removal proceedings or if the asylum seeker moved for the order more than one year after the date the original conviction or sentence was entered.[37] This newly-created presumption contravenes constitutional protections in criminal proceedings, ignores due process deficiencies that many noncitizen defendants face, and unfairly penalizes asylum applicants.

In *Padilla v. Kentucky*, the Supreme Court recognized that the immigration consequences of a conviction are sufficiently serious for the Sixth Amendment to require a noncitizen defendant to be competently advised of them before agreeing to a guilty plea.[38] In practice, many

---

[36] *See Saleh v. Gonzales*, 495 F.3d 17, 25-26 (2d Cir. 2007) (discussing 28 U.S.C. § 1738, requiring federal courts to give full faith and credit to state acts, records, and judicial proceedings and U.S. Const. art. IV, § 1, and finding that there was no violation where the Board of Immigration Appeals stopped short of "refusing to recognize or relitigating the validity of [Saleh's] state conviction.").
[37] Proposed Rules at 69655.
[38] *Padilla v. Kentucky*, 559 U.S. 356 (2010).

noncitizens in criminal proceedings are not advised of immigration consequences of a plea bargain presented to them. Many asylum seekers, especially those in vulnerable populations geographically and financially isolated from resources, may not become aware of constitutional defects in, or have the opportunity to seek review of their prior criminal proceedings, until applying for asylum.[39]

In our work providing immigration and post-conviction legal services in under-resourced areas of California, OneJustice has observed that many individuals learn of their right to effective assistance of counsel and of adverse immigration consequences of a conviction only when they are put in removal proceedings or when they seek legal advice about their immigration status, which may happen several years after a conviction.

Of the 15 clients screened through our Post-Conviction Relief Clinic in 2019, 10 had convictions impacting immigration eligibility; only one was aware of a potential issue. These convictions are all from non-urban counties, where access to quality, affordable legal services is limited. Two client stories demonstrate how the proposed presumption ignores this reality and would disproportionately harm vulnerable populations:

- M. is a long-time Lawful Permanent Resident and mother of four who came to our clinic to naturalize, only to find out that a 30-year old conviction made her deportable. The conviction suffers from multiple constitutional and statutory errors, of which she was not aware. She is currently seeking a vacatur.

- T. is a long-time Lawful Permanent Resident who learned that a prior conviction made him deportable only when he was put in removal proceedings upon returning from a funeral abroad. T. was shocked, as his criminal defense counsel had advised him that his plea was immigration safe. After six months of looking for appropriate and affordable legal counsel, he finally found OneJustice. We helped vacate the conviction based on due process and Sixth Amendment violations, and he was able to remain in his community with his US citizen partner, young child, siblings, and parents.

As these cases show, is unrealistic to expect a person who has not received accurate advice about a conviction to learn of the violation of their rights and to be able to legally challenge that violation within one year or before being placed in removal proceedings. The Proposed Rules' conflation of a court's reasons for vacating a conviction with the timing of a

---

[39] On page 69656 of the Proposed Rules, the Department of Homeland Security and the Department of Justice urge that "[i]t is reasonable to conclude that an alien who has a meritorious challenge to a criminal conviction based on a procedural or substantive defect is more likely to seek post-conviction relief sooner than an alien who is seeking relief on rehabilitative grounds…"

post-conviction relief motion is incredibly problematic given that many people learn of procedural or substantive defects underlying a conviction only when they learn of adverse immigration consequences.

The proposed presumption would hold asylum seekers whose rights were violated under *Padilla* to a different standard than noncitizens seeking different forms of immigration relief. Even though they too were denied effective assistance of counsel in the course of their underlying criminal proceedings, asylum seekers would be forced to rebut a presumption that their court-ordered withdrawal or vacatur is invalid.

The Proposed Rules therefore compound the harm to one of the most vulnerable groups of immigrants: those who, in addition to facing persecution in their home countries, have been denied constitutionally compliant process in the United States criminal legal system. Imposing a presumption *against* the validity of a plea withdrawal or vacatur in these cases will undoubtedly lead to the wrongful exclusion of countless immigrants from asylum simply because they were unable to adequately rebut the presumption, particularly in a complex immigration court setting without the benefit of appointed counsel.

B. *The Proposed Rules Violate the Full Faith, and Credit to Which State Court Decisions are Entitled.*

The Proposed Rules further improperly authorize immigration adjudicators to second-guess the decision of a state court, even where the order cites substantive and procedural defects in the underlying proceeding. The proffered justification for this presumption against the validity of post-conviction relief is to "ensure that aliens do not have their convictions vacated or modified for purported rehabilitative purposes that are, in fact, for immigration purposes," "to codify the principle set forth in *Matter of Thomas and Thompson*," and to bring the analysis of post-conviction orders in line with *Matter of Pickering*.[40] The agencies misread the applicable law, however, by authorizing adjudicators to disregard otherwise valid state orders. Immigration law only requires that to be effective for immigration purposes, orders vacating or modifying convictions must be based on substantive or procedural infirmities in the underlying proceedings. The Proposed Rules go well beyond that requirement.

The Proposed Rules abandon the presumption of regularity that should accompany state court orders, thus upending settled principles of law. They cite a misleading quote from *Matter of F-* in support of allowing asylum adjudicators to look beyond the face of a state court order.

---

[40] Proposed Rules at 69655-56 (*citing Matter of Thomas and Thompson*, 27 I.&N. Dec. 674 (A.G. 2019) and *Matter of Pickering*, 23 I.&N. Dec. 621 (BIA 2003), *rev'd on other grounds by Pickering v. Gonzales*, 465 F.3d 263, 267-70 (6th Cir. 2006)).

AR.09967

Had the Rules' authors looked to the full case, they would have read the following: "Not only the full faith and credit clause of the Federal Constitution, but familiar principles of law require the acceptance at face value of a judgment regularly granted by a competent court, unless a fatal defect is evident upon the judgment's face. However, the presumption of regularity and of jurisdiction may be overcome by extrinsic evidence or by the record itself."[41] In *Matter of F-*, the Board of Immigration Appeals offers support for the proposition that an adjudicator should presume the validity of a state court order unless there is a reason to doubt it, contrary to the *presumption of irregularity* put forward in the Proposed Rules.

The authority extended to adjudicators by the Proposed Rules also violates the law of multiple circuits, including *Pickering*, on which the Proposed Rules rely.[42] In *Pickering v. Gonzales*, the Sixth Circuit Court of Appeals held that despite the petitioner's stated motive of avoiding negative immigration consequences, the Board of Immigration Appeals was limited to reviewing the authority of the court issuing the order as to the basis for his vacatur.[43] Similarly, in *Reyes-Torres* the Ninth Circuit Court of Appeals held that the motive of the respondent was not the relevant inquiry.[44] Rather, "the inquiry must focus on the state court's rationale for vacating the conviction."[45] Moreover, the Third Circuit Court of Appeals in *Rodriguez v. U.S. Att'y Gen*. stated that to determine the purpose of a vacatur, the adjudicator must first look to the face of the order vacating the conviction, and "if the order explains the courts reasons … the [adjudicator's] inquiry must end there."[46] The Proposed Rules contain no such limiting language to guide the adjudicator's inquiry and grant adjudicators vague and indefinite authority to look beyond even a facially valid vacatur. Such breadth of authority undermines asylum seekers' rights to a full and fair proceeding.

By introducing a presumption of bad faith into asylum adjudication, the Proposed Rules unfairly interfere with asylum seekers' efforts to establish their claims. Immigration law, and asylum law in particular, is already highly complex, and the process of seeking asylum is in many instances re-traumatizing, particularly for applicants who do not have counsel to represent them and who lacked effective counsel in their underlying criminal proceedings. The Proposed Rules as applied to asylum applicants who seek post-conviction relief, transform an already difficult process into an adversarial inquiry, contrary to the intent of Congress.

---

[41] *Matter of F-*, 8 I.&N. Dec. 251, 253 (BIA 1959).

[42] *See id*. (*citing Matter of Pickering*, 23 I.&N. Dec. 621).

[43] *Pickering v. Gonzales*, 465 F.3d 263, 267-70 (6th Cir. 2006).

[44] *Reyes-Torres v. Holder*, 645 F.3d 1073, 1077-78 (9th Cir. 2011) (*citing Cardoso-Tlaseca v, Gonzales*, 460 F.3d 1102, 1107 n.3 (9th Cir. 2006) and *Pickering v. Gonzales*, 454 F.3d 525 (6th Cir. 2006), *amended and superseded* by *Pickering*, 465 F.3d at 263.

[45] *Id*.

[46] *Rodriguez v. U.S. Att'y Gen*., 844 F.3d 392, 397 (3d Cir. 2006) ("Put simply, '[w]e will not . . . permit[ ] . . . speculation . . . about the secret motives of state judges and prosecutors,'" *quoting Pinho v. Gonzales*, 432 F.3d 193, 214-215 (3d Cir. 2005)).

## V.    Conclusion

OneJustice believes that access to legal assistance is a basic human right. Our pro bono programs include legal clinics providing asylum and post-conviction relief services. In our clinics, interacting over the phone with the immigrant community, and partnering with on-the-ground community organizers and grassroot organizations, we have observed how the immigration and criminal system impacts the clients we serve.

The Proposed Rules contravene United States and International law and impose cruel and unnecessary limitations on access to asylum. For the reasons stated above, OneJustice opposes the Proposed Rules in their entirety. We urge the Departments to immediately withdraw the Proposed Rules, which would severely limit access to our nation's asylum system. Asylum should remain as accessible as possible given the life and death situations those eligible for this protection and their families face if denied a safe haven in the United States.

AR.09969

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9eko-56bz
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0499
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Pramila Jayapal
**Address:** United States,
**Email:** amy.fischer@mail.house.gov
**Phone:** 202-225-3235
**Organization:** U.S. House of Representatives

## General Comment

See attached file(s)

## Attachments

Asylum Rule Comments FINAL

AR.09970

January 21, 2020

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41; Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility

Dear Ms. Reid and Ms. Dunn:

    We the undersigned write to express our strong opposition to the Proposed Rules published by the Executive Office for Immigration Review (EOIR) and U.S. Citizenship and Immigration Services (USCIS) to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019.

    Asylum is a bedrock of the U.S. immigration system. Human lives depend on an asylum system that works and does not dangerously return people to the very harm they fled. The proposed rule creates new and overly broad categorical bars to asylum that undermine congressional intent behind the Refugee Act of 1980. The Department of Homeland Security and the Department of Justice should withdraw this notice of proposed rulemaking and instead ensure that individuals fleeing violence are granted full and fair access to asylum protections in the United States, in accordance with U.S. law and treaty obligations.[1]

    The proposed rule creates seven mandatory bars to asylum eligibility based on an individual's past criminal conduct.  These newly-created bars do not target asylum seekers who may pose a danger to the community; instead, they sweep broadly to cover a wide range of minor criminal conduct. For example, individuals who are convicted of unauthorized reentry under 8 U.S.C. § 1326 are categorically ineligible, as are individuals convicted of certain minor state misdemeanors.  The proposed rule also creates a multifactor test for immigration adjudicators to determine whether a criminal conviction or sentence is valid for purposes of determining asylum

---

[1] *United Nations Protocol Relating to the Status of Refugees*, Jan. 31, 1967, [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268.
Convention Relating to the Statute of Refugees, July 28, 1951, 140 U.N.T.S. 1954

eligibility and rescinds a preexisting provision regarding the reconsideration of discretionary asylum.

Congress enacted asylum laws that provide safety to those fleeing unimaginable persecution, a roadmap to citizenship, and the opportunity to rescue immediate family members who may still be facing danger in home country. Having a robust, functional, and inclusive asylum and refugee system is of high importance for the United States. It is a responsibility that serves U.S. foreign policy interests abroad, and a mutual duty we share with our peer nations, amidst the highest numbers of refugees and forcibly displaced people in history.

Congress first took action on asylum through the Refugee Act of 1980, described by legal scholars as a bipartisan attempt to "reconcile our rhetoric with our law, our national immigration policy and our international treaty obligations so that we could maintain a consistent posture towards the world as a nation with a strong humanitarian tradition and a unique historic role as a haven for persons fleeing oppression."[2] The Refugee Act of 1980 brought U.S. law into compliance with the provisions of the United Nations Protocol Relating to the Status of Refugee, creating a "broad class" of refugees eligible for a discretionary grant of asylum.[3] In the first section of the Act, Congress clearly stated its intent, "declar[ing] that it is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands[.]"[4]

For individuals seeking asylum, the stakes are incredibly high. Denial of asylum could literally mean death or persecution for the individual in question.[5] Just over 80 years ago, the *MS St. Louis* returned to Europe with 937 survivors fleeing the Holocaust after being denied safety by the United States, resulting in the death of 254 people at the hands of the Nazis.[6] Congress intended to create an asylum system which would prevent a similar tragedy from ever happening again.

Yet, current asylum law requires individuals fleeing persecution to navigate an extremely complex and demanding system. Asylum seekers bear the burden of establishing their eligibility for asylum, often without the benefit of an attorney, and while detained in a remote detention center.[7] Our asylum laws already contain broad criminal bars: any conviction for an offense determined to be an "aggravated felony" is considered a "particularly serious crime" and therefore a mandatory bar to asylum.[8] "Aggravated felony" is a notoriously vague term that

---

[2] Deborah Anker, *The Refugee Act of 1980: An Historical Perspective*, In Defense of the Alien Vol. 5 (1982) https://www.jstor.org/stable/23141008?read-now=1&refreqid=excelsior%3A1060953608aa0bdd30d5d506e1ff6318&seq=1#page_scan_tab_contents.
[3] *I.N.S. v. Cardoza-Fonseca*, 40 U.S. 421, 423 (1987).
[4] Refugee Act of 1980 § 101(a), Pub. L. No. 96-212 (Mar. 17, 1980).
[5] Kevin Sieff, *When death awaits deported asylum seekers*, Washington Post (Dec. 26, 2018) https://www.washingtonpost.com/graphics/2018/world/when-death-awaits-deported-asylum-seekers/.
[6] Candice Norwood, *A Twitter Tribute to Holocaust Victims,* The Atlantic (Jan. 27, 2017) https://www.theatlantic.com/politics/archive/2017/01/jewish-refugees-in-the-us/514742/
[7] 8 USC § 1158(b)(1)(B); 8 CFR § 1240.8(d)
Daniel Connolly, Aaron Montes, and Lauren Villagran, *Asylum seekers in U.S. face years of waiting, little chance of winning their cases*, USA Today, (Sep. 25, 2019) https://www.usatoday.com/in-depth/news/nation/2019/09/23/immigration-court-asylum-seekers-what-to-expect/2026541001/.
[8] 8 U.S.C. §§ 1158(b)(2)(A)(ii) and (B)(i).

AR.09972

exists only in immigration law. This term has evolved to encompass hundreds of offenses, many of them neither a felony nor aggravated, including petty offenses such as misdemeanor shoplifting, simple misdemeanor battery, or sale of counterfeit DVDs.[9]

New criminal bars, like those included in the proposed rulemaking, are entirely unnecessary. Immigration judges may already use their discretion to deny asylum to those who have a well-founded fear of persecution but have been convicted of a crime.[10] The proposed rule's new bars are an unnecessary, cruel, and transparent attempt to further limit asylum, denying refuge to nonviolent asylum seekers who pose no danger to our communities. A criminal conviction does not make one a present or future danger. This is precisely why the Refugee Convention's particularly serious crime bar, made part of U.S. law through the asylum code, should only apply if a migrant is both convicted of a particularly serious crime and a separate assessment shows that they are a present or future danger.[11]

By targeting offenses related to alcohol and drug use, the proposed rule also ignores overwhelming evidence that asylum seekers are a highly traumatized population, as at least one out of every three asylum seekers struggles with depression, anxiety, and/or post-traumatic stress disorder (PTSD).[12] Studies show a high correlation between PTSD and substance use disorders, with individuals with PTSD up to 14 times more likely to struggle with a substance use disorder.[13] Since asylum seekers in the United States are often disqualified for health insurance and unable to access affordable medical care, some turn to drugs and alcohol in an effort to self-medicate for their past trauma.[14] The proposed bars relating to drug and alcohol related offenses ignore the evidence of the particular vulnerabilities of asylum seekers, which should be addressed with treatment and care rather than categorical denial of asylum.

As Members of Congress, we are particularly concerned that the proposed rule attempts to rewrite immigration law, including by weaponizing the "particularly serious crime" bar to asylum in ways that Congress did not authorize.  Our asylum laws grant the Attorney General limited discretion to designate certain offenses as "particularly serious crime[s]," provided that an alien convicted of such a crime also "constitutes a danger to the community of the United

---

[9] 8 U.S.C. § 1101(a)(43).

Nancy Morawetz, *Understanding the Impact of the 1996 Deportation Laws and the Limited Scope of Proposed Reforms*, Harvard Law Review 113 (2000).

Melissa Cook, *Banished for Minor Crimes: The Aggravated Felony Provisions of the Immigration and Nationality Act as a Human Rights Violation*, Boston College Third World Law Journal (2003): 293.

[10] *Matter of Pula*, 19 I.&N. Dec. 467 (BIA 1987).

[11] U.N. High Commissioner for Refugees, *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* (July 2007) http://www.unhcr.org/en-us/576d237f7.pdf

[12] Giulia Turrini et al., *Common mental disorders in asylum seekers and refugees: umbrella review of prevalence and intervention studies*, International Journal of Mental Health Systems 11 (Aug. 2017): 51, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5571637/.

[13] Jenna L McCauley et al., *Posttraumatic Stress Disorder and Co-Occurring Substance Use Disorders: Advances in Assessment and Treatment*, Clinical Psychology Science and Practice 19, 3 (Oct. 2012) https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3811127/.

[14] Samantha Artiga and Maria Dias, *Health Coverage and Care of Undocumented Immigrants,* Kaiser Family Foundation (Jul. 15, 2019) https://www.kff.org/disparities-policy/issue-brief/health-coverage-and-care-of-undocumented-immigrants/

Carrier Clinic, *Trauma and Addiction* (2019), https://carrierclinic.org/2019/08/06/trauma-and-addiction/

AR.09973

States."[15]  Here, the proposed rule adopts a definition of "particularly serious crime" so expansive that it categorically denies asylum to individuals who pose no danger to our community.  This definition is inconsistent with our nation's asylum laws.[16]  The Department of Homeland Security and Department of Justice are therefore rewriting our asylum laws without congressional authorization.

We are also dismayed by the overly short comment period. The proposed rule puts forth substantive and complex changes to asylum eligibility in the United States and should be subject to the standard 60-day comment period. To demand that the public review, analyze, and provide meaningful comments on this proposal during the designated 30-day comment period is unreasonable.

Due to the potentially enormous impact on those seeking safety in the United States and the clear violation of congressional intent, we strongly encourage the Department of Homeland Security and the Department of Justice to withdraw the proposed rulemaking. It is the responsibility of the United States to have an asylum system that protects vulnerable communities, not categorically deny them the protection their lives depend on.

Sincerely,


PRAMILA JAYAPAL                            VERONICA ESCOBAR
Member of Congress                          Member of Congress


JERROLD NADLER                            ZOE LOFGREN
Member of Congress                          Member of Congress


ANNA G. ESHOO                              ADRIANO ESPAILLAT
Member of Congress                          Member of Congress


SYLVIA R. GARCIA                           RAÚL M. GRIJALVA
Member of Congress                          Member of Congress


DEB HAALAND                               HENRY C. "HANK" JOHNSON, JR.
Member of Congress                          Member of Congress

---

[15] *See* 8 U.S.C. § 208(b)(2)(A)(ii) (particularly serious crime bar); *id.* § 208(b)(2)(A)(ii) (grant of limited discretion to the Attorney General).

[16] 8 U.S.C. § 208(b)(2)(C) (allowing Attorney General to "establish additional limitations" on asylum eligibility insofar they are "consistent with this section")

AR.09974

JOSEPH P. KENNEDY, III
Member of Congress

JOHN LEWIS
Member of Congress

ALEXANDRIA OCASIO-CORTEZ
Member of Congress

MARK POCAN
Member of Congress

JAMIE RASKIN
Member of Congress

LINDA T. SÁNCHEZ
Member of Congress

JAN SCHAKOWSKY
Member of Congress

ADAM SMITH
Member of Congress

MIKE THOMPSON
Member of Congress

5

AR.09975

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9eko-xa1v
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0500
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Robert Shultz
**Address:**
    6926 N Upper Skyline Dr.
    Peoria, IL, 61614
**Email:** barneyshultz52@gmail.com
**Phone:** 618 560 9294

## General Comment

I write in opposition to the Proposed Rule: Procedures for Asylum and Bars to Asylum Eligibility. I recently retired from the active practice of law. I was in private practice for nearly 34 years before practicing with a large insurance organization for the past seven and one-half years.

In addition to the many substantive objections raised by others concerning the unfairness and illegality of the proposed rules as they would be applied, it is my legal judgment that the proposed rules are facially invalid. The discretion vested in the immigration adjudicator is ill-defined, as are the offenses for which asylum may be denied.

If I have learned anything in my 41 years of practicing law it is that the law must provide a sufficient degree of certainty so that others can understand and conform their conduct to the law's requirements. These rules will expand an already vague set of rules. As written, these proposed rules will aggravate, rather mitigate, the harshness faced by those who seek asylum in our country.

We should endeavor to be a nation based on laws, rather than men. The vast discretion these proposed rules will put into the hands of the adjudicators in inconsistent with that standard.

Respectfully submitted,
Robert H. Shultz, Jr.

AR.09976

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9eko-qrae
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0501
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Tim Lacy
**Address:**
   1444 W. Elmdale Ave., Apt. 3
   Chicago,  IL,  60660
**Email:** timothy.n.lacy@gmail.com
**Phone:** 773-632-6323

---

## General Comment

I am opposed to this rule change.

I work in higher education, particularly medical education. Asylum sekers are valuable students who bring unique experiences to the classroom. I also live in Chicago's Edgewater neighborhood. Its diversity is enhanced by asylum seekers and immigrants.

Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution.

This proposed rule would also inject racial profiling into the asylum process. This latest attack would put even more people seeking asylum at risk of danger - and death. This would in turn eviscerate one of the most important defenses community members have against deportation.

I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.

I am opposed to this rule change.

# PUBLIC SUBMISSION

| |
|---|
| **As of:** January 23, 2020 |
| **Received:** January 21, 2020 |
| **Status:** Posted |
| **Posted:** January 22, 2020 |
| **Tracking No.** 1k4-9eko-occb |
| **Comments Due:** January 21, 2020 |
| **Submission Type:** Web |

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0502
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Melissa Chan

---

## General Comment

I am a concerned member of the public and a child of immigrants who believes strongly that our nation must welcome people fleeing violence, and who is strongly concerned about racial profiling in the criminal legal system. Immigrants are a vital part of my community, my neighborhood, and my state. Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution. I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them. For these reasons, I call upon the Trump administration to withdraw this proposal.

AR.09978

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9eko-lefs
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0503
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Kevin Herrera
**Address:**
   3450 Wilshire Blvd
   Los Angeles,  CA,  90010
**Email:** herrera@nilc.org
**Phone:** 213-770-1325
**Organization:** National Immigration Law Center

---

## General Comment

See attached file(s)

---

## Attachments

NILC.Comments.84 FR 69640

AR.09979

*Submitted via regulations.gov*

January 21, 2019

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

  **Re: Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility, 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41**

Dear Ms. Alder Reid & Ms. Dunn,

We write on behalf of the National Immigration Law Center ("NILC") in strong opposition to the above-referenced Proposed Rules to amend regulations relating to eligibility for asylum. The Proposed rules were published in the Federal Register on December 19, 2019. We are filing these comments by the deadline of January 21, 2020.

As an organization exclusively dedicated to defending and advancing the rights of low-income immigrants, NILC is uniquely situated to identify the humanitarian, administrative, and legal harms that the Proposed Rules present. Founded in 1979, NILC focuses on issues that affect the well-being and economic security of low-income immigrants: health care and safety net programs; education and training; workers' rights; and federal and state policies affecting immigrants. NILC works to ensure that all low-income immigrants have the opportunity to achieve their full potential by protecting access to immigration relief that is established by statute and is reflective of our nation's inclusive values. When necessary, NILC has successfully defended low-income immigrants and their families in litigation against the government to protect their fundamental and constitutional rights, supporting its clients by using organizational expertise around policies affecting low-income immigrants.

**www.nilc.org**

**LOS ANGELES (Headquarters)**
3450 Wilshire Blvd. Box #108 – 62
Los Angeles, CA 90010
213 639-3900
213 639-3911 fax

**WASHINGTON, DC**
PO Box No. 34573
Washington, DC 20043
202 216-0261
202 216-0266 fax

AR.09980

At NILC, we believe that all people who live in the U.S. should have the opportunity to achieve their full potential.  As experts in the complex intersection between immigration law and the multifaceted political, social, and economic issues affecting low-income immigrant communities, NILC's staff helps to shape federal policy by meeting with and educating members of Congress. Our fact sheets and briefing papers have long been used by policymakers interested in ensuring the future prosperity of their constituents.

NILC's specifically dedicated interest in the wellbeing and just treatment of applicants for asylum is reflected in its ongoing efforts to assure consistent, evenhanded application of statutes governing eligibility for and adjudication of asylum applications. For example, NILC participates in ongoing monitoring and enforcement of the injunction originally ordered in *Orantes-Hernandez v. Smith*.[1] Through *Orantes* — a nation-wide, permanent injunction that requires the Department of Homeland Security ("DHS") to uphold certain rights of Salvadoran nationals in immigration detention — NILC staff has seen firsthand the myriad legal barriers, administrative challenges, and abuses that lax enforcement of asylum protections in immigration laws can expose vulnerable migrants to. NILC strongly opposes any changes that would create additional risks for asylum applicants.

In 1982, a U.S. district court issued a preliminary injunction based on evidence that the Immigration and Naturalization Service ("INS") had detained and removed Salvadoran nationals eligible for asylum by using coercive tactics, provided misleading information to Salvadoran detainees regarding their right to apply for political asylum, denied Salvadoran detainees adequate access to counsel and to information about their rights, and placed Salvadoran detainees into solitary confinement without a hearing.[2] After a lengthy trial, the court in 1988 entered a permanent nationwide injunction mandating that the INS provide Salvadorans placed in immigration custody with a written notice about their rights, ensure Salvadorans access to telephones, counsel, and legal materials in detention, and refrain from coercing Salvadorans into signing voluntary departure agreements.[3]

In 2007, the U.S. District Court for the Central District of California denied nearly all of the government's motion to dissolve the injunction, finding that the government had failed to show significantly changed conditions for Salvadoran detainees sufficient to warrant dissolving the injunction, and modifying the injunction only slightly.  The U.S. Court of Appeals for the Ninth Circuit upheld this decision in 2009,[4] and the government must abide by the terms of the modified permanent injunction nationwide.

The *Orantes* injunction applies to citizens and nationals of El Salvador who are eligible to apply for political asylum, and who have been, are, or will be taken into custody by agents of the Department of Homeland Security (DHS).[5] The detainee does not need to have applied for asylum in order for the injunction to apply. While enforcement of the *Orantes*

---

[1] *Orantes-Hernandez v. Smith*, 541 F. Supp. 351 (C.D. Cal. 1982).

[2] *Id.* at 354.

[3] *Orantes-Hernandez v. Meese*, 685 F. Supp. 1488, 1511-13 (C.D. Cal. 1988).

[4] *Orantes-Hernandez v. Holder*, 321 Fed. Appx. 625, 2009 WL 905454 (9th Cir. Apr. 6, 2009).

[5] *Orantes-Hernandez v. Meese*, 685 F. Supp. at 1491, *aff'd.*, 919 F.2d 549 (9th Cir. 1990).

AR.09981

injunction is intended to benefit Salvadoran individuals, many elements of the injunction effectively benefit all detainees in immigration detention, especially those seeking asylum under current protections.

NILC has additionally supported asylum seekers by, for example, advocating for legislation that would repeal a proclamation seeking to limit access to asylum for people entering the United States without inspection between ports of entry at the southern border.[6]

For the reasons detailed in the comments that follow, the Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

### A. Introduction

On December 19th, 2019, the Department of Homeland Security (DHS) and the Department of Justice (DOJ) issued a joint set of Proposed Rules concerning three sets of changes to the rules governing asylum adjudications. These changes, considered in their totality, frustrate the purpose of the comprehensive statutory scheme governing access to asylum in the United States. The changes also directly contravene NILC's mission as an organization dedicated to defending and advancing the rights of immigrants with low income and their ability to seek freedom from violence and persecution while fulfilling their potential in the United States. NILC's commitment to asylum access — as demonstrated by its work pursuing full enforcement of the *Orantes* injunction and by its related federal advocacy — is uniquely frustrated because of the ways in which the Proposed Rules will exacerbate the already persistent barriers to asylum access. The Proposed Rules will needlessly create additional obstacles to the United States in fulfilling its humanitarian obligations under statute, requiring hours of work by immigration advocates to ensure that the spirit and letter of laws guaranteeing the existence of asylum protections are not frustrated.

The first proposed set of changes adds the following seven <u>categorical</u> bars to asylum eligibility: (1) any conviction of a felony offense; (2) any conviction for "smuggling or harboring" under 8 U.S.C. § 1324(a), even if the asylum seeker committed the offense for the purpose of bringing her own spouse, child or parent to safety; (3) any conviction for illegal reentry under 8 U.S.C. § 1326; (4) any conviction for an offense "involving criminal street gangs," with the adjudicator empowered to look to any evidence to determine applicability; (5) any second conviction for an offense involving driving while intoxicated or impaired; (6) any conviction or <u>accusation</u> of conduct for acts of battery involving a domestic relationship; (7) and any conviction for several newly defined categories of misdemeanor offenses, including <u>any</u> drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits.

---

[6] https://www.whitehouse.gov/presidential-actions/presidential-proclamation-addressing-mass-migration-southern-border-united-states/

AR.09982

The second set of the Proposed Rules creates a multi-factor test for immigration adjudicators to determine whether a criminal conviction or sentence is valid for the purpose of determining asylum eligibility. The third set rescinds a provision in the current rules regarding the reconsideration of discretionary asylum.

Taken together, these proposed changes are an unnecessary, harsh, and unlawful gutting of the asylum laws of the United States. NILC submits these comments to express opposition to the entirety of the Proposed Rules and grave concerns with the administration's continued efforts to exclude vulnerable populations — especially people of color, LGBTQ, low-income, and other persecuted groups — from obtaining the security and stability the United States asylum system has long promised. We urge that the Proposed Rules be rescinded in their entirety.

### B. The Proposed Rules cruelly exclude bona fide refugees from asylum eligibility without rational support or justification

The United States asylum system was first codified in statute through the Refugee Act of 1980. The Act was designed to bring the United States domestic legal code into compliance with the provisions of the United Nations Protocol Relating to the Status of Refugees — creating a "broad class" of refugees eligible for a discretionary grant of asylum.[7] Asylum protections provided by United States law are sacred, providing those fleeing horrors with physical safety, a path to citizenship and security, and the opportunity to reunite with immediate family members who may still remain abroad in danger. For those individuals seeking asylum in the United States, the stakes could not be higher — a claim denied often means return to death or brutal persecution.[8]

The laws, regulations, and process governing asylum adjudications are already exceedingly harsh. Asylum seekers bear the evidentiary burden of establishing their eligibility for asylum[9] in the face of a complex web of laws and regulations, without the benefit of appointed counsel and often from a remote immigration jail.[10] The obstacles to winning asylum are very high; depending on the location of the application and the adjudicator, it can be nearly impossible to obtain relief, even in bona fide cases.[11] Newly imposed restrictions of seeking asylum subject thousands seeking safety at the southern border to return to dangerous conditions in Mexico and an overlapping web of policies preclude

---

[7] *See I.N.S. v. Cardoza-Fonseca*, 40 U.S. 421, 423 (1987).

[8] *See*, *e.g.*, Sarah Stillman, "When deportation is a death sentence," *The New Yorker*, January 8, 2018, https://www.newyorker.com/magazine/2018/01/15/when-deportation-is-a-death-sentence.

[9] 8 USC § 1158(b)(1)(B); 8 CFR § 1240.8(d).

[10] *See* Daniel Connolly, Aaron Montes, and Lauren Villagran, "Asylum seekers in U.S. face years of waiting, little chance of winning their cases," *USA Today,* September 25, 2019, https://www.usatoday.com/in-depth/news/nation/2019/09/23/immigration-court-asylum-seekers-what-to-expect/2026541001/.

[11] Manuel Roig-Franzia, "Immigrants risk it all seeking asylum. The answer is almost always 'no,'" *Washington Post,* July 24, 2019, https://www.washingtonpost.com/lifestyle/style/migrants-risk-it-all-seeking-asylum-the-answer-in-court-is-almost-always-no/2019/07/23/9c161b2e-a3f7-11e9-b732-41a79c2551bf_story.html.

AR.09983

asylum eligibility for countless migrants simply because of their national origin, manner of entry, or their flight path.[12] There are consistent reports of the documented deaths and brutalities endured by those who sought but were denied asylum protections in the United States.[13]

Immigration adjudicators already have vast discretion to deny asylum to those who meet the refugee definition but have been convicted of criminal conduct.[14] The agencies' efforts to add seven new sweeping categories of barred conduct to the asylum eligibility criteria is unnecessary and cruel. The proposed changes to implementing regulations render the phrase "particularly serious crime" in 8 U.S.C. § 1158 virtually meaningless.

The Proposed Rules are also arbitrary and capricious. They would constitute a marked departure from past practice and the agencies have proffered no evidence or data to support these changes. Because the Proposed Rules are divorced from the purposes animating their underlying statute and devoid of any discernable rationale beyond animus, they almost certainly run afoul laws governing federal rulemaking processes.

One assumption fundamentally underlying the Proposed Rules, for example, is that every noncitizen convicted of any offense punishable by more than a year in prison necessarily constitutes a danger to the community. But no evidence is provided to support that assumption, and a criminal record, does not, in fact, reliably predict future dangerousness.[15]  Conviction for a crime does not, without more, make one a present or future danger — which is why the particularly serious crime bar found in 8 U.S.C. § 1158

---

[12] The National Immigrant Justice Center maintains a frequently updated timeline providing details of each of the asylum bans and other policies issued and implemented by the administration undermining asylum access at https://www.immigrantjustice.org/issues/asylum-seekers-refugees. For more information on the harms and rights abuses inherent in the Migrant Protection Protocols, or "Return-to-Mexico" program, *see* Human Rights First, *Delivered to Danger* (December 2019), https://www.humanrightsfirst.org/campaign/remain-mexico.

[13] *See, e.g.,* Stillman, "Death Sentence," *supra* (reporting on a database of more than sixty cases of individuals killed after deportation); *see also* Maria Sachetti, "'Death is waiting for him,'" *The Washington Post*, December 6, 2018, https://www.washingtonpost.com/graphics/2018/local/asylum-deported-ms-13-honduras/ (telling the story of Santos Chirino, denied asylum by a Virginia immigration judge, deported, and then murdered by those he told the immigration judge he feared); and Kevin Sieff, "When death awaits deported asylum seekers," *Washington Post*, December 26, 2018, https://www.washingtonpost.com/graphics/2018/world/when-death-awaits-deported-asylum-seekers/.

[14] *See id.*

[15] See U.S. Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders* (2017) (noting that recidivism rates fall substantially with age); U.S. Sentencing Commission, *Recidivism Among Federal Violent Offenders* (2019) (noting that non-violent offenders recidivate at significantly lower rates); J. Ramos and M. Wenger, "Immigration and recidivism: What is the Link?" *Justice Quarterly* (2019) (finding no correlation between recidivism rates and citizenship status among those formerly incarcerated for felonies in Florida prisons).

AR.09984

should only properly apply if both (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows that she is a present or future danger.[16]

Similarly, the Proposed Rules fail to address or account for the fact that a significant number of people may agree to plead to a crime as to avoid the threat of a severe sentence; not only is a conviction an unreliable predictor of future danger, it can also be an unreliable indicator of past criminal conduct.[17] In addition, the Proposed Rules do not address and make no exception for convictions for conduct influenced by mental illness or duress.

The Board of Immigration Appeals has cautioned that, "in light of the unusually harsh consequences which may befall a [noncitizen] who has established a well-founded fear of persecution; the danger of persecution should generally outweigh all but the most egregious of adverse factors."[18] Yet because of the categorical nature of the seven news bars proposed here, asylum seekers will be precluded from obtaining protection on the basis of a vast array of conduct, without any discretion left to the immigration adjudicator to determine whether the circumstances merit such a harsh penalty. In the case of the domestic-violence related ground, the categorical bar will be imposed on the basis of mere allegations of conduct without any adjudication of guilt.[19]

### C. The Proposed Rules will undermine judicial efficiency by creating "mini-trials" in immigration court, while also encouraging racially biased decision-making by immigration adjudicators

The Proposed Rules require immigration adjudicators to engage in decision-making to determine whether an asylum applicant's conduct — untethered from a criminal court adjudication — triggers a categorical bar to asylum eligibility. First, the agencies propose that immigration adjudicators be allowed to consider "all reliable evidence" to determine whether there is "reason to believe" an offense was "committed for or related to criminal gang evidence," or "in furtherance of gang-related activity, triggering ineligibility for asylum in either case.[20] Second, the Proposed Rules permit immigration adjudicators to "assess all reliable evidence in order to determine whether [a] conviction amounts to a domestic violence offense;" and to go even further by considering whether non-adjudicated *conduct* "amounts to a covered act of battery or extreme cruelty."[21]

---

[16] See U.N. High Commissioner for Refugees, *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 11 (July 2007), http://www.unhcr.org/en-us/576d237f7.pdf (the Refugee Convention's particularly serious crime bar only applies if (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows she is a "present or future danger.").

[17] John H. Blume and Rebecca K. Helm, "The Unexonerated: Factually Innocent Defendants Who Plead Guilty," *Cornell Law Review* 100 (2014): 157, https://pdfs.semanticscholar.org/c00f/96d421adf1846d120bf802a8854b5e2c0ff2.pdf.

[18] *Pula*, 19 I.&N. Dec. at 474.

[19] The Proposed Rules at p. 69651 explain that the regulations will "render ineligible [non-citizens] who engaged in acts of battery and extreme cruelty in a domestic context in the United States, regardless of whether such conduct resulted in a criminal conviction."

[20] *See* Proposed Rules at 69649.

[21] *See* Proposed Rules at 69652.

AR.09985

Requiring adjudicators to make complex determinations regarding the nature and scope of a particular conviction or, in the case of the domestic violence bar, conduct, will lead to massive judicial inefficiencies and slanted "mini-trials" within the asylum adjudication process. The scope of the "reliable evidence" available to adjudicators in asylum cases is potentially limitless; advocates on both sides would be obligated to present fulsome arguments to make their cases about gang connections to the underlying activity or the relationship of the asylum applicant to the alleged victim. Because of the lack of robust evidentiary rules in immigration proceedings, it will be difficult if not impossible for many applicants to rebut negative evidence marshaled against them, even if false; and in other cases, asylum applicants will struggle to find evidence connected to events that may have happened years prior (especially for those detained). Asylum trials, which are typically three or fewer hours under current policies, would provide insufficient time to fully present arguments on both sides of these unwieldy issues.

As the immigration courts contend with backlogs that now exceed one million cases,[22] tasking adjudicators with a highly nuanced, resource-intensive assessment of the connection of a conviction to gang activity and/or the domestic nature of alleged criminal conduct — assessments far outside their areas of expertise—will prolong asylum proceedings and invariably lead to erroneous determinations that will give rise to an increase in appeals. The Proposed Rules repeatedly cite increased efficiency as justification for many of the proposed changes.[23] Yet requiring adjudicators to engage in mini-trials to determine the applicability of categorical criminal bars, rather than relying on adjudications obtained through the criminal legal system, will dramatically *decrease* efficiency in the asylum adjudication process.

The Supreme Court has "long deemed undesirable" exactly the type of "post hoc investigation into the facts of predicate offenses" proposed by the agencies here.[24] Instead, for more than a century the federal courts have repeatedly embraced the "categorical approach" to determine the immigration consequence(s) of a criminal offense, wherein the immigration adjudicator relies on the statute of conviction as adjudicated by the criminal court system, without relitigating the nature or circumstances of the offense in immigration court.[25] As the Supreme Court has explained, this approach "promotes judicial and administrative efficiency by precluding the relitigation of past convictions in minitrials conducted long after the fact."[26] In *Moncrieffe v. Holder*, the Court forewarned of exactly the

---

[22] Marissa Esthimer, "Crisis in the Courts: Is the Backlogged U.S. Immigration Court System at Its Breaking Point?," *Migration Policy Institute*, October 3, 2019, https://www.migrationpolicy.org/article/backlogged-us-immigration-courts-breaking-point.
[23] *See* Proposed Rules at 69646, 69656-8.
[24] *Moncrieffe v. Holder*, 569 U.S. 184, 186 (2013).
[25] *See Moncrieffe*, 569 U.S. at 191 ("This categorical approach has a long pedigree in our Nation's immigration law."). For a more fulsome history of the development of the categorical approach in immigration court, *see* Alina Das, "The Immigration Penalties of Criminal Convictions: Resurrecting Categorical Analysis in Immigration Law," *New York University Law Review* 86, no. 6 (2011): 1689 - 1702, https://www.nyulawreview.org/wp-content/uploads/2018/08/NYULawReview-86-6-Das.pdf.
[26] *Moncrieffe*, 569 U.S. at 200-201.

AR.09986

sort of harm that would arise from these Proposed Rules; in that case, the Court rejected the government's proposal that immigration adjudicators determine the nature and amount of remuneration involved in a marijuana-related conviction, noting that "our Nation's overburdened immigration courts" would end up weighing evidence "from, for example, the friend of a noncitizen" or the "local police officer who recalls to the contrary," with the end result a disparity of outcomes depending on the whims of the individual immigration judge and a further burdened court system.[27]

Particularly in the context of the new proposed bar related to alleged gang affiliation, NILC cautions that creating a blanket exclusion for anyone who is convicted of a crime — including a misdemeanor — that an immigration adjudicator deems linked to gang activity will erroneously prevent bona fide asylum seekers from receiving protection. This rule confers on immigration adjudicators—who generally are not criminologists, sociologists, or criminal law experts — the responsibility to determine if there is "reason to believe" any conviction flows from activity taken in furtherance of gang activity. This rule will necessarily ensnare asylum seekers of color who have experienced racial profiling and a criminal legal system fraught with structural challenges and incentives to plead guilty to some crimes, particularly misdemeanors. These same individuals are vulnerable to being erroneously entered into gang databases. Such databases are notoriously inaccurate, outdated, and infected by racial bias.[28]

The Proposed Rules' drafters curiously argue that all gang-related offenses should be construed as "particularly serious crimes."[29] They cite statistics from up to 16 years ago in an attempt to make the point that gang members commit violent crimes and drug crimes. They then make the illogical leap to the conclusion that *all crimes* — including misdemeanor property crimes — that may be construed as connected to gang activity are particularly serious. This simply does not follow; in fact, the Proposed Rules will inevitably result in the exclusion from protection of asylum seekers of color who live in economically distressed communities and have obtained a minor conviction such as a property crime. Relying on the definition of "particularly serious crime" to prevent asylum seekers convicted of even minor crimes construed as gang-related from accessing asylum protection is disingenuous at best and tinged with racial animus at worst.

The Departments seek comments on: (1) what should be considered a sufficient link between an asylum seeker's underlying conviction and the gang related activity in order to trigger the application of the proposed bar, and (2) any other regulatory approaches to defining the type of gang-related activities that should render individuals ineligible for

---

[27] *Id.* at 201.

[28] Annie Sweeney and Madeline Buckley, "Chicago police gang data collection faulted by city's inspector general as unchecked and unreliable," *Chicago Tribune*, April 11, 2019, https://www.chicagotribune.com/news/breaking/ct-met-chicago-police-gang-data-04112019-story.html; Anita Chabria, "A routine police stop landed him on California's gang database. Is it racial profiling?," *Los Angeles Times*, May 9, 2019, https://www.latimes.com/politics/la-pol-ca-california-gang-database-calgang-criminal-justice-reform-20190509-story.html.

[29] Proposed Rules at p. 69650.

AR.09987

asylum. The premise of these questions is wrong: a vague "gang related" bar should not be introduced at all. The Immigration and Nationality Act and existing regulations already provide overly broad bars to asylum where criminal behavior by an asylum seeker causes concern by an adjudicator. Adding this additional, superfluous layer of complication risks erroneously excluding bona fide asylum seekers from protection without adding any useful adjudicatory tool to the process.

### D.  The Proposed Rules will have especially devastating impacts among vulnerable populations, including LGBTQ immigrants, survivors of trafficking and domestic violence, and immigrant youth of color, who are already routinely criminalized

The expanded criminal bars exclude from safety and a pathway to citizenship those convicted of offenses that are coincident to their flight from persecution, and do not accomplish the stated goal of making communities safer. They will disparately impact vulnerable populations, who comprise asylum seekers hailing primarily from Central America and the Global South, and those routinely criminalized because of their identities, racially disparate policing practices, or in connection with experiences of trafficking and domestic violence.[30] For these populations especially, the discretion currently delegated to asylum adjudicators is crucial for them to become fully integrated in the larger community. The imposition of additional categorical bars to asylum will only further marginalize asylum seekers already struggling with trauma and discrimination.

The Proposed Rules turn asylum into a blunt instrument that would prevent the use of discretion where it is most needed and most effective. The existing framework for determining if an offense falls within the particularly serious crime bar already provides the latitude for asylum adjudicators to deny relief to anyone found to pose a danger to the community.[31] Furthermore, asylees with convictions that render them inadmissible must

---

[30] D'Vera Cohn et al., "Rise in U.S. Immigrants from El Salvador, Guatemala and Honduras Outpaces Growth from Elsewhere," *Pew Research Center*, December 7, 2017, https://www.pewresearch.org/hispanic/wp-content/uploads/sites/5/2017/12/Pew-Research-Center_Central_American-migration-to-U.S._12.7.17.pdf.

[31] Apart from the statutory aggravated felony bar to asylum, the Board of Immigration Appeals and Attorney General have historically utilized a highly circumstantial approach to the particular serious crime determination that would bar an immigrant from receiving asylum. *See e.g., Matter of Juarez*, 19 I.&N. Dec. 664 (BIA 1988) (ordinarily a single misdemeanor that is not an aggravated felony will not be a particularly serious crime); *Matter of Frentescu*, 18 I.&N. Dec. 244 (BIA 1982), *modified* (setting forth several factors to be considered before imposing the particular serious crime bar, including: (i) the nature of the conviction, (ii) the circumstances and underlying facts for the conviction, (iii) the type of sentence imposed, and (iv) whether the type and circumstances of the crime indicate that the individual will be a danger to the community); *Matter of Y-L-, A-G-, R-S-R-*, 23 I.&N. Dec. 270 (A.G. 2002) (setting forth a multi-factor test to determine the dangerousness of a respondent convicted of a drug-trafficking offense who is otherwise barred from asylum as an aggravated felon, but seeking withholding of removal).

AR.09988

apply for a waiver at the time of their applications for permanent residence.[32] These measures ensure that asylum applicants in vulnerable populations have access to supportive resources and have the opportunity to demonstrate their ongoing commitment to social and personal health. Moreover, the existence of provisions allowing the revocation of asylum status ensures that adjudicators may continue to enforce concerns related to the safety of the community even after asylum is granted.[33]

The expansion of the criminal bars to asylum to include offenses related to harboring, smuggling of noncitizens by parents and family members and those previously removed further criminalizes vulnerable populations fleeing persecution.[34] The vast expansion of migrant prosecutions at the border during the current administration has created administrative chaos and separated families that do not pose a threat to the safety of communities in the United States.[35] The Proposed Rules threaten to magnify the harm caused by these reckless policies by further compromising the ability of those seeking safety on the southern border to access the asylum system.

The Proposed Rules expand the asylum bar to parents or other caregivers who are convicted of smuggling or harboring offenses after taking steps to help minor children enter the United States in order to flee persecution. This proposed bar is particularly insidious in light of now-public documents revealing this administration's explicit efforts to utilize smuggling prosecutions against parents and caregivers as part of its strategy of deterring families from seeking asylum in the United States.[36] The Proposed Rules seek to take this widely condemned strategy one step further, by additionally barring those parents *already prosecuted* from obtaining asylum protections for themselves and their children. The Proposed Rules multiply the harms parents and caregivers have experienced in their treacherous journeys to safety and callously penalize parents for doing what is only human—taking all necessary steps to protect their children.

The Proposed Rules also expand the asylum bar to those who have fled persecution multiple times and therefore been convicted of illegal reentry. Their inclusion is premised on conclusory statements regarding the dangerousness of recidivist offenders, without

---

[32] 8 U.S.C. § 1159(c) (2012).

[33] 8 C.F.R. § 208.24(a) (2012).

[34] On April 11, 2017, then-Attorney General Sessions instructed all federal prosecutors to increase their prioritization of immigration offenses for prosecution, including misdemeanor offenses committed by first time entrants. *See* Memorandum from the Attorney General: Renewed Commitment to Criminal Immigration Enforcement (April 11, 2017), https://www.justice.gov/opa/press-release/file/956841/download.

[35] *Id.*; Richard Marosi, "The aggressive prosecution of border crossers is straining the courts. Will zero tolerance make it worse?," *Los Angeles Times*, May 11, 2018, https://www.latimes.com/local/california/la-me-ln-immigrant-prosecutions-20180511-story.html.

[36] Ryan Devereaux, "Documents Detail ICE Campaign to Prosecute Migrant Parents as Smugglers," *The Intercept*, April 29, 2019, https://theintercept.com/2019/04/29/ice-documents-prosecute-migrant-parents-smugglers/ (describing how in May 2017, the Department of Homeland Security set out to target parents and family members of unaccompanied minors for prosecution).

AR.09989

consideration of the seriousness of prior convictions.[37] Rather, the Proposed Rules treat all immigration violations as similar in seriousness to those previously warranting inclusion in the particularly serious crime bar, without any independent evidence to justify the expansion. Such an approach renders meaningless the limiting language of "particularly serious" in the statute.

The Proposed Rules also conflate multiple entries by noncitizens having prior removal orders with those who have entered multiple times without ever having their asylum claims heard. Many immigrants who have previously attempted entry to the United States to flee persecution could not have been aware of the complex statutory regime that governs asylum claims and would not have knowingly abandoned their right to apply for asylum. Some asylum seekers have also been wrongly assessed in prior credible fear interviews. And others yet may have previously entered or attempted to enter the United States before the onset of circumstances giving rise to their fear. Preserving discretion to grant asylum in these circumstances allows meritorious asylum seekers to be heard and corrects errors that might have previously occurred.

> *Extending the criminal bars to immigrants convicted of misdemeanor document fraud unfairly punishes low-wage immigrant workers and does not make communities safer.*

The Proposed Rules expand the asylum bar to include any asylum seeker who has been convicted of a misdemeanor offense for use of a fraudulent document. In so doing, the Rule entirely ignores the migration-related circumstances that often give rise to convictions involving document fraud. Migrants fleeing persecution often leave their home countries with nothing but the clothes on their backs and must rely on informal networks to navigate their new circumstances.[38] Extension of a blanket bar to asylum seekers who are compelled to resort to fraudulent means to enter the United States, or to remain safely during their applications for asylum, upends decades of settled law directing that violations of law arising from an asylum applicant's manner of flight should constitute only one of many factors to be consulted in the exercise of discretion.[39]

Moreover, migrants in vulnerable communities who are struggling to survive during the pendency of their asylum proceedings are often exploited by unscrupulous intermediaries who offer assurances and documentation that turn out to be fraudulent.[40] Many noncitizens working in the low-wage economy face egregious workplace dangers and discrimination and suffer retaliation for asserting their rights.[41] The continued availability of asylum to low-

---

[37] Proposed Rules at 69,648.

[38] *See Pula*, 19 I.&N. Dec. at 474.

[39] *Id.*

[40] See American Bar Association, "About Notario Fraud," July 19, 2018, https://www.americanbar.org/groups/public_interest/immigration/projects_initiatives/fight-notario-fraud/about_notario_fraud/.

[41] Paul Harris, "Undocumented workers' grim reality: speak out on abuse and risk deportation," *The Guardian*, March 28, 2013, https://www.theguardian.com/world/2013/mar/28/undocumented-migrants-worker-abuse-deportation.

AR.09990

wage immigrant workers can encourage them to step out of the shadows. The expansion of criminal asylum bars to sweep in all document fraud offenses, on the other hand, would unfairly prejudice immigrants with meritorious asylum claims and force them deeper into the dangerous informal economy.

> *The Proposed Rules will harm communities with overlapping vulnerabilities, including LGBTQ asylum seekers, survivors of trafficking, and survivors of domestic violence.*

The Proposed Rules exclude from asylum protections countless members of vulnerable communities who have experienced trauma, abuse, coercion, and trafficking. Many of these individuals may only become aware of their ability to apply for asylum after law enforcement encounters that lead them to service providers who can educate them about their immigration options. Despite the unique difficulties they face, the Proposed Rules would compound their harm and prevent them from achieving family unification and a pathway to citizenship.

The Proposed Rules pose a unique threat to LGBTQ immigrant community members. LGBTQ immigrants in particular may have already experienced a high degree of violence and disenfranchisement from economic and political life in their home countries.[42] Hate violence towards undocumented LGBTQ immigrants in the United States is already disproportionately higher than for other members of the LGBTQ population.[43] Members of these communities also experience isolation from their kinship and national networks following their migration. This isolation, compounded by the continuing discrimination towards the LGBTQ population at large, leave many in the LGBTQ immigrant community vulnerable to trafficking, domestic violence, and substance abuse, in addition to discriminatory policing practices. The expansion of criminal enforcement and prosecution of undocumented people also harms the LGBTQ immigrant community.[44] The Proposed Rules will therefore have a disparate impact on LGBTQ individuals whose involvement in the criminal legal system is often connected to past trauma and/or the result of biased policing.

As an organization concerned with the intersecting challenges immigrants confront as they navigate forced migration due to persecution and violence, NILC is highly concerned that the Proposed Rule will exacerbate the vulnerabilities of LGBTQ immigrants. Regulations

---

[42] *See* Aengus Carroll and Lucas Ramon Mendos, *State Sponsored Homophobia: A World Survey of Sexual Orientation Laws: Criminalisation, Protection and Recognition* 12th Ed. (International Lesbian, Gay, Bisexual, Transgender, and Intersex Association (ILGA), 2017), https://ilga.org/downloads/2017/ILGA_State_Sponsored_Homophobia_2017_WEB.pdf.

[43] *See* Sharita Gruberg, "LGBTQ Undocumented Immigrants Face an Increased Risk of Hate Violence," *Center for American Progress*, June 10, 2014, https://www.americanprogress.org/issues/immigration/news/2014/06/10/91233/lgbt-undocumented-immigrants-face-an-increased-risk-of-hate-violence/.

[44] *See eg.,* Sharita Gruberg, "How Police Entanglement with Immigration Enforcement Puts LGBTQ Lives at Risk," *Center for American Progress*, April 12, 2017, https://www.americanprogress.org/issues/lgbtq-rights/reports/2017/04/12/430325/police-entanglement-immigration-enforcement-puts-lgbtq-lives-risk/.

AR.09991

guiding asylum seekers should provide more support in addressing the unique challenges these individuals face, rather than creating a scheme that would be wrought with pitfalls likely to disqualify extremely compelling cases from asylum protections.

The expansion of asylum bars to include various misdemeanor offenses that were not previously considered particularly serious also unfairly sweeps trafficking survivors into its dragnet. It is becoming more widely recognized across state court systems that trafficking survivors frequently come into contact with intervention resources and service providers only after contact with law enforcement occurs. Innovative criminal justice reform efforts currently being adopted across the country include special trafficking courts that recognize the need for discretion in the determination of criminal culpability.[45] The same approach should be employed in the determination of asylum eligibility, where the applicant's life and safety are on the line.

Survivors of domestic violence include trafficking survivors and LGBTQ community members, such that inclusion of offenses related to domestic violence in the expanded asylum bars affects populations with overlapping vulnerabilities.[46] The Proposed Rules too broadly categorize domestic violence offenses as particularly serious and sweep both offenders and survivors into their dragnet. The immigration laws extend protections to domestic violence survivors outside of the asylum context, recognizing the complex dynamics surrounding intimate partner violence. Provisions in the Violence Against Women Act allow adjudicators evaluating claims for relief arising thereunder to exercise discretion based on a number of factors and circumstances.[47] The blunt approach adopted by the Proposed Rules is inconsistent with the approach taken towards survivors elsewhere in the federal immigration statute and does not rely on any evidence-based justification for treating asylum seekers differently.

Moreover, the domestic violence sections of the Proposed Rules include the only categorical bar to asylum for which a conviction is not required. Domestic violence incidents all too often involve the arrest of both the primary perpetrator of abuse and the survivor.[48] These

---

[45] Elise White, et al., "Navigating Force and Choice: Experiences in the New York City Sex Trade and the Criminal Justice System's Response," *Center for Court Innovation*, December 2017 (noting that 78% of participants in the report's study had been arrested, mostly for non-violent, non-prostitution offenses such as *drug possession*).

[46] Marty Schladen, "ICE Agents Detain Alleged Domestic Violence Victim," *El Paso Times*, February 16, 2017, https://www.elpasotimes.com/story/news/2017/02/15/ice-detains-domestic-violence-victim-court/97965624/ (noting that the immigrant detained, a transgender person previously deported following her conviction for crimes such as possession of stolen mail and assault, was then living at the Center Againts Sexual and Family Violence, a shelter for survivors of intimate partner violence).

[47] Nadine Shaanta Murshid and Elizabeth A. Bowen, "A Trauma-Informed Analysis of the Violence Against Women Act's Provisions for Undocumented Immigrant Women," *Violence Against Women* 24(13) (2018): 1540–1556, https://doi.org/10.1177/1077801217741991.

[48] David Hirschel, et al., "Domestic Violence and Mandatory Arrest Laws: To What Extent Do They Influence Police Arrest Decisions," *Journal of Criminal Law & Criminology* 98, no. 1 (2007-2008): 255, https://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?article=7284&context=jclc (noting that "[i]n some cases, dual arrests may be the result of legislation, department policies, or

AR.09992

"cross-arrests" do not always yield clear determinations of victim and perpetrator. Authorizing asylum adjudicators to determine the primary perpetrator of domestic assault, in the absence of a judicial determination, unfairly prejudices survivors who are wrongly arrested in the course of police intervention to domestic disturbances.

Finally, the exemption for asylum applicants who can demonstrate their eligibility for a waiver under section 237(a)(7)(A) of the Immigration and Nationality Act does not cure the harm to asylum seekers caused by imposition of a categorical domestic violence related bar.[49] Rather, it converts a non-adversarial asylum proceeding into a multi-factor, highly specific inquiry into culpability based on circumstances that may be very difficult for an asylum seeker to prove—especially if proceeding without counsel and with limited English proficiency.

> *Barring asylum for immigrants convicted of "gang-related crimes" is harmful to youth of color and does not make communities safer.*

In recent years, the expansion of gang databases for use in the apprehension and removal of foreign nationals — including children — has generated tremendous concern among advocates and the communities they serve.[50] The use of gang databases by local law enforcement and Immigration and Customs Enforcement has been widely criticized as an overbroad, unreliable and often biased measure of gang membership and involvement.[51] The Proposed Rules expand the criminal bars to asylum to those accused of gang involvement in the commission of minor criminal offenses, embracing an open-ended adjudicative process that will inevitably result in asylum adjudicators relying unfairly on these discredited methods of gang identification. This outcome would compound the disparate racial impact of inclusion in gang databases and bar asylum seekers who are themselves fleeing violence from gangs in their home countries.[52]

Past legislative efforts to expand the grounds of removal and inadmissibility in the Immigration and Nationality Act to include gang membership have failed to pass both

---

both failing to require officers to identify the primary aggressor. In addition, when such provisions are present, police may lack the training or information needed to identify the primary aggressor when responding to a domestic violence assault. This situation may be compounded by batterers who have become increasingly adept at manipulating the criminal justice system, and may make efforts to 'pre-empt' victims from notifying police in order to further control or retaliate against them.").

[49] 8 U.S.C. § 1227(a)(7)(A).

[50] *See* Nermeen Arastu, et al., "Swept Up In The Sweep: The Impact of Gang Allegations on Immigrant New Yorkers," *New York Immigration Coalition (NYIC) and CUNY School of Law's Immigrant and Non-citizen Rights Clinic*, May 2018, https://www.law.cuny.edu/wp-content/uploads/page-assets/academics/clinics/immigration/SweptUp_Report_Final-1.pdf.

[51] Ali Winston, "Marked for Life: U.S. Government Using Gang Databases to Deport Undocumented Immigrants," *The Intercept*, August 11, 2016, https://theintercept.com/2016/08/11/u-s-government-using-gang-databases-to-deport-undocumented-immigrants/.

[52] *See* Jonathan Blitzer, "How Gang Victims Are Labeled As Gang Suspects," *The New Yorker*, January 23, 2018, https://www.newyorker.com/news/news-desk/how-gang-victims-are-labelled-as-gang-suspects.

AR.09993

houses of Congress.[53] In addition, immigration adjudicators already routinely premise discretionary denials of relief or release on bond on purported gang membership, and scores of alleged gang members have already been deported on grounds related to immigration violations or criminal convictions for which no relief is available.[54] Creating a "gang-related crime" bar will only exacerbate the due process violations already occurring as the result of unsubstantiated information about supposed gang ties.[55]

In addition, by focusing on "reason to believe" as the basis for the bar, rather than the seriousness of the crime, the proposed provision is *ultra vires* and unconscionably limits the eligibility for asylum of those most in need of protection. The effect of the Proposed Rules would be to expand the number and type of convictions for which an analysis of eligibility is required, sweeping in even petty offenses that would otherwise not trigger immigration consequences. Thus, an asylum applicant convicted of simple assault without use of a weapon, a non-violent property crime, or even possession of under 30 grams of marijuana for personal use (otherwise exempted from the reach of the Proposed Rule), could trigger a bar to asylum if the adjudicator concludes she has "reason to believe" the offense was committed in furtherance of gang activity.[56] In making these determinations, asylum adjudicators would be unable to rely on uncorroborated allegations contained in arrest reports, but could nevertheless shield their decisions by relying on discretion.[57]

The Proposed Rules thus invite extended inquiry into the character of young men of color who otherwise have meritorious asylum claims, based on information gained through racially disparate policing practices.  These rules multiply the harm to asylum seekers of color subject to racially disparate policing that results in racially disparate rates of guilty

---

[53] *See* Jessica Chacon, "Whose Community Shield?: Examining the Removal of the 'Criminal Street Gang Member,'" *University of Chicago Legal Forum* 317 (2007: 333-336) (reviewing legislative history of failed efforts to expand removability of those accused of gang related offenses and noting criticism that "[t]he only legal effect of the proposed legislation would be to increase the number of noncitizens lawfully present who would be subject to removal on the basis of their purported associations with individuals involved in gang criminal activity.").

[54] For an illustration of Immigration and Customs Enforcement's propensity to make gang allegations on the basis of questionable if not fabricated evidence, and the deference to which the evidence is often granted by immigration adjudicators, *see* Mark Joseph Stern, "Bad Liars," *Slate*, May 16, 2018, https://slate.com/news-and-politics/2018/05/federal-judge-accused-ice-of-making-up-evidence-to-prove-that-dreamer-was-gang-affiliated.html.

[55] See Yvette Cabrera, "New ICE Tactic Raises Questions About Due Process," *ThinkProgress*, October 6, 2017, https://thinkprogress.org/ice-targets-gangs-6775356473a8/; Rebecca Hufstader, "Immigration Reliance On Gang Databases: Unchecked Discretion And Undesirable Consequences," 90 *New York University Law Review* 90 (2015): 671.

[56] Page 69649 of the Proposed Rules notes that the applicable standard for determining when to apply the bar on asylum seekers convicted of a crime involving criminal street gangs is "reason to believe," as used in 8 U.S.C. § 1182(a)(2)(c), and that  the asylum adjudicator may consider "all reliable evidence" in making their decision.

[57] *See Garces v. U.S. A.G.*, 611 F.3d 1337, 1349-50 (11th Cir 2010) (reversing finding of "reason to believe" that the respondent was a participant in drug trafficking based on unsubstantiated arrest reports); *Matter of Rico*, 16 I.&N. Dec. 181, 185-86 (BIA 1977) (relying on pre-hearing admissions to uphold finding of inadmissibility).

AR.09994

pleas to minor offenses. This same population is overrepresented in gang databases, which are notoriously inaccurate, outdated, and infected by racial bias.[58]

### E. The Proposed Rules are *ultra vires* to the federal immigration statute, as they purport to bar eligibility through a categorical exercise of discretion

When Congress speaks clearly through a statute, the plain meaning of that statute governs.[59] Congress by statute permits the Attorney General to designate certain categories of offenses as "particularly serious crimes."[60] As such, Congress *explicitly* permitted the Attorney General to designate a non-aggravated felony to be a particularly serious crime and thus to disqualify a person from asylum. In the context of asylum, all aggravated felonies are *per se* particularly serious crimes and the Attorney General "may designate by regulation [other] offenses that will be considered to be" a particularly serious crime for purposes of asylum.[61]

Here, however — seemingly in an attempt to insulate the Proposed Rules from review, the agencies attempt to designate new bars to asylum both by designating them as "particularly serious crimes" pursuant to 8 U.S.C. § 1158(b)(2)(B)(ii) and rendering them categorically exempt from a positive discretionary adjudication of asylum pursuant to 8 U.S.C. § 1158(b)(2)(C). This effort is unlawful. Section 1158(b)(2)(B)(ii) does permit the Attorney General to, if he wishes, attempt to designate some classes of offenses as particularly serious crimes; such designations are reviewable for legal error (and as explained above, the commenters believe these expansions are unlawful).[62] However, if the offense is not a particularly serious crime, then a discretionary decision must be rendered on the application. It is true that the Attorney General may also provide for "additional limitations and conditions" on asylum applications so long as they are "consistent" with the with the asylum statute.[63] In this case, however, the Proposed Rules add sweeping categories of offenses that automatically remove an applicant from the consideration of discretion—a regulatory proposal that is *ultra vires* to the plain text of the statute.

To the extent that the proposed rules would adopt a bar to asylum based on a categorical discretionary bar, rather than a particularly serious crime designation, they are similar to the rules struck down by numerous Circuit Courts of Appeal in the context of adjustment of

---

[58] Annie Sweeney and Madeline Buckley, "Chicago police gang data collection faulted by city's inspector general as unchecked and unreliable," *Chicago Tribune*, April 11, 2019, https://www.chicagotribune.com/news/breaking/ct-met-chicago-police-gang-data-04112019-story.html; Anita Chabria, "A routine police stop landed him on California's gang database. Is it racial profiling?," *Los Angeles Times*, May 9, 2019, https://www.latimes.com/politics/la-pol-ca-california-gang-database-calgang-criminal-justice-reform-20190509-story.html.

[59] See, *e.g.*, *Robinson* v. *Shell Oil Co.*, 519 U.S. 337, 340 (1997).

[60] 8 U.S.C. § 1158(b)(2)(B)(ii).

[61] *Id.* The Attorney General has not designated "substantial battery" to be a particularly serious crime for any purpose, including for purposes of ineligibility to seek asylum.

[62] 8 U.S.C. § 1252(a)(2)(D).

[63] 8 U.S.C. § 1158(b)(2)(C); *see also* 8 U.S.C. § 1158(d)(5)(B).

AR.09995

status for those considered by law to be "arriving aliens." Purporting to exercise discretion categorically, then-Attorney General Reno putatively rendered that class of noncitizens ineligible for adjustment of status, a determination that is ordinarily discretionary, even though the statute seemed to allow eligibility. Multiple Circuit Courts of Appeal struck down the proposed regulations, finding them to reflect an impermissible reading of the statute in light of the fact that Congress carefully defined in the statute the categories of people eligible to apply for adjustment of status.[64]

Congress's explicit definition of a particularly serious crime as a bar to asylum forecloses the expansion of disqualifying factors. Where Congress has created a list intended to create parameters around a given scheme, canons of statutory construction govern: "[E]xpressing one item of [an] associated group or series excludes another left unmentioned."[65] The Proposed Rules attempt to create numerous categories of discretionary "pseudo-particularly serious crimes," barring asylum through a categorical exercise of discretion even if those offenses are ultimately found not to be particularly serious crimes. Such an effort violates this canon of interpretation and places the Proposes Rules *ultra vires* to the statute.

**Conclusion**

The categorical bars to asylum and related policy changes raise grave concerns about continued access to asylum among eligible individuals who rightfully apply under the law. Full implementation of the Proposed Rules would undermine the spirit and the letter of immigration laws in the United States by, among other problems, enacting a system *ultra vires* categorical bars to asylum relief that were never anticipated under the INA. Such a broad, reflexive system of adjudication will inevitably subject individuals and families who have a colorable claim to asylum to severe harm and potentially death, contravening the purpose of asylum provisions dedicated to statute. Moreover, the Proposed Rules threaten to further ensnare applicants for asylum in an already voluminous backlog of cases by adding unnecessary layers of adjudication to the asylum application process.

Furthermore, DHS has provided virtually no governmental justification for the proposed changes to established asylum law. On their face, the Proposed Rules are a needless effort to undo protections for individuals fleeing persecution and violence and who reasonably

---

[64] The First and Ninth Circuits found the regulations contrary to clear statutory command. *Succar v. Ashcroft*, 394 F.3d 8, 29 (1st Cir. 2005); *Bona v. Gonzales*, 425 F.3d 663, 668-71 (9th Cir. 2005). Other courts invalidated the adjustment regulations under "Step Two" of *Chevron*. Those courts found some ambiguity in the statute, but found a per se discretionary bar not based on a permissible construction of the eligibility standards set forth in the governing statute in light of the statutory scheme and congressional intent. *Zheng v. Gonzales*, 422 F.3d 98, 116-20 (3d Cir. 2005) (invalidating regulation precluding category of people from applying to adjust status "[g]iven Congress's intent as expressed in the language, structure, and legislative history of INA section 245 [8 U.S.C. § 1255]"); *Scheerer v. United States Attorney General*, 445 F.3d 1311, 1321-22 (11th Cir. 2006). This reasoning would likewise be applicable to the proposed rule. Where Congress went through the trouble to create a comprehensive statutory scheme to define asylum eligibility, the agency cannot preempt that in the guise of discretion by creating out of whole cloth a separate set of eligibility criteria.
[65] *United States* v. *Vonn*, 535 U.S. 55, 65 (2002).

AR.09996

seek safe haven in the United States. These proposals will harm the interests of a broad swath of individuals and communities, including those of the United States and its longtime residents. For these reasons, the Department of Justice and the Department of Homeland Security should abandon the Proposed Rules.

**NILC urges USCIS against expanding categorical bars to asylum, noting the Proposed Rules' damage to eligible individuals and families, its clear hindrance to judicial efficiency, and is contrariness to law.** NILC is available and willing to discuss its opposition to the Proposed Rules and can be reached a herrera@nilc.org or moussavian@nilc.org.

Respectfully submitted,

Avideh Moussavian
Legislative Director, National Immigration Law Center

Kevin L. Herrera
Staff Attorney, National Immigration Law Center

AR.09997

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9eko-mzvq
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0504
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Stacy Suh

## General Comment

I write to express my strong opposition to this proposed rule change. I work with immigrant and refugee survivors of domestic violence, who have a criminal conviction due to experiencing gender based violence (self-defense, fleeing from abusive partner to seek safety, migration, etc). Unfortunately, the reality is that vast majority of people incarcerated in women's prisons have experienced gender based violence prior to their incarceration (up to 94% in some women's prisons). Many immigrant and refugee survivors are criminalized and punished for surviving abuse, including self-defense, fleeing from violence, and being blamed for the actions of their abusers. Furthermore, we know that women of color, queer, trans, and gender non-conforming people are disproportionately affected by the racist criminal legal system. The proposed rule change is cruel and will further punish survivors of gender based violence who are seeking asylum to find safety and to rebuild their lives. For these reasons, I urge the Trump administration to withdraw this proposal.

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9eko-r5ef
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0505
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Cristina Velez
**Address:**
    2201 Wisconsin Ave., NW
    Suite 200
    Washington,  DC,  20007
**Email:** cvelez@nipnlg.org
**Phone:** 617-227-9727 x6
**Fax:** 617-227-5495
**Organization:** Immigrant Justice Network

## General Comment

See attached file(s)

## Attachments

NIP-ILRC-IDP-JFL-IJN Comment re Procedures for Asylum and Bars to Asylum Eligibility FINAL

AR.09999



   

*Submitted via www.regulations.gov*

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87,
1615-AC41; Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and
Bars to Asylum Eligibility

January 21, 2020

To Whom it May Concern:

    We write on behalf of the Immigrant Justice Network (IJN) and its four organizational
members, Immigrant Legal Resource Center (ILRC), Immigrant Defense Project (IDP), Just
Futures Law (JFL), and the National Immigration Project of the National Lawyers Guild
(NIPNLG), in response to the above-referenced Proposed Rules published in the Federal
Register on December 19, 2019. We write to express our strong opposition to this proposal to
amend the asylum eligibility regulations.

    IJN is a leading voice against the criminalization of immigrants in the United States.
Grounded in racial justice values, we build power to defend the dignity of immigrants. We fight
for a world where our communities are thriving and free from policing, deportation, and
imprisonment. Since 2006, IJN has partnered with community groups and directly impacted
individuals who have navigated or survived the detention, deportation, and criminal legal
systems to achieve these goals. These partnerships help build long-lasting power for

1

AR.10000

transformational change of our criminal and immigration systems. A description of each of IJN's four organizational members follows.

- The NIPNLG is a national nonprofit organization that provides support, referrals, and legal and technical assistance to attorneys, community organizations, families, and advocates seeking to advance the rights of noncitizens. NIPNLG focuses especially on the immigration consequences of criminal convictions, and its mission is to fight for justice and fairness for noncitizens who have contact with the criminal legal system.

- The ILRC is a national non-profit that provides legal trainings, educational materials, and advocacy to advance immigrant rights. The ILRC's mission is to work with and educate immigrants, community organizations, and the legal sector to continue to build a democratic society that values diversity and the rights of all people. Since its inception in 1979, the ILRC has provided technical assistance on hundreds of thousands of immigration law issues, trained thousands of advocates and pro bono attorneys annually on immigration law, distributed thousands of practitioner guides, provided expertise to immigrant-led advocacy efforts across the country, and supported hundreds of immigration legal non-profits in building their capacity.

- IDP is a New York-based non-profit that conducts litigation and provides training, education, and advocacy in support of advancing the rights of immigrants who are subject to the criminal legal system. IDP's mission is to secure fairness and justice for immigrants in the United States. The organization provides technical assistance to hundreds of immigration attorneys, DOJ-accredited representatives, and criminal and family defense attorneys on issues related to immigration, criminal, and family law, particularly the immigration consequences of law enforcement interactions and criminal court adjudications.

- JFL is a transformational immigration legal shop rooted in movement lawyering. JFL defends and builds the power of immigrants' rights groups working to disrupt and dismantle our deportation and mass incarceration systems. We are legal workers and lawyers with decades of experience, grounded in the core value that lawyering should serve movement organizing. JFL staff have worked on many cases involving the intersection of immigration and criminal law, including recent high-impact decisions on behalf of individuals and amicus curiae, including *Saget v. Trump* (challenging termination of Haiti's Temporary Protected Status), *Catalan-Ramirez v. Wong* (Chicago Police Department's gang database and ICE's unlawful raid on Catalan-Ramirez), and *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018) (holding that immigration crime of violence definition is unconstitutionally vague).

For the reasons detailed in the comment that follows, the Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

2

## I.     Introduction

On December 19th, the Department of Homeland Security (DHS) and the Department of Justice (DOJ) issued a joint set of Proposed Rules that would substantially change the rules governing asylum adjudications.  For asylum seekers affected by these rules, the stakes could not be higher—a claim denied often means return to death or brutal persecution. Asylum provides those fleeing horrors with physical safety, a path to citizenship and security, and the opportunity to reunite with immediate family members who may still remain in danger abroad. This is why restrictions on asylum eligibility must be undertaken with the utmost care, adherence to the law and treaties that form the basis of asylum protection, and consideration of the impact on vulnerable populations meriting relief.  The Proposed Rules violate these principles and will have immediate and long-lasting effects on the equal protection, due process, and statutory rights of affected people.  For these reasons, we urge that the Proposed Rules be rescinded in their entirety.

The Proposed Rules would make three major changes that narrow asylum eligibility.  The first proposed set of changes adds the following seven *categorical* bars to asylum eligibility: (1) any conviction of a felony offense; (2) any conviction for "smuggling or harboring" under 8 U.S.C. § 1324(a), even if the asylum seeker committed the offense for the purpose of bringing her own spouse, child or parent to safety; (3) any conviction for illegal reentry under 8 U.S.C. § 1326; (4) any conviction for an offense "involving criminal street gangs," with the adjudicator empowered to look to any evidence to determine applicability; (5) any second conviction for an offense involving driving while intoxicated or impaired; (6) any conviction *or accusation of conduct* for acts of battery involving a domestic relationship; and (7) any conviction for several newly defined categories of misdemeanor offenses, including *any* drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits.

The second section of the Proposed Rules provides a multi-factor test for immigration adjudicators to determine whether a criminal conviction or sentence is valid for the purpose of determining asylum eligibility. The third section rescinds a provision in the current rules regarding the reconsideration of discretionary asylum.

Our comment focuses on the proposal to expand the criminal bars to asylum and the proposed framework for evaluating convictions or sentences. These proposed changes are arbitrary, capricious, and ultra vires. They would gut the asylum protections enshrined in United States and international law. We submit this comment to express grave concerns about the administration's continued efforts to undermine due process protections for noncitizens and to exclude refugees and their families from obtaining the security and stability the United States asylum system has long promised.

## II.     The Agencies Failed to Give the Public and Affected Parties Adequate Opportunity to Comment on the Proposed Rule

At the outset, we note that DOJ and DHS have not provided a meaningful opportunity for the public to comment on the Proposed Rules. The 30 day comment period provided by the

AR.10002

agencies, ending January 21, 2020, includes multiple federal and religious holidays, including the national workplace holidays of Christmas Eve, Christmas Day, and New Years Day when businesses and federal and state governments are closed. It also included other religious holidays, such as Hanukkah and Kwanzaa. Despite requests to extend the comment period, the agencies have taken no such steps to provide the public and affected parties adequate time to comment on such drastic and harmful proposed changes to asylum adjudications.

The complexity of the Proposed Rules requires a full 60 day comment period. The Proposed Rules propose seven categorical bars to asylum eligibility, create guidelines for the evidence that adjudicators may consider in determining whether any of these bars applies, provides a confusing and convoluted reasoning for eschewing the categorical analysis—the bedrock of analysis of criminal convictions in immigration adjudications, and attempts to establish a multi-factor legal test for determining when a state court order vacating a criminal conviction may be considered valid for immigration purposes. Assessing the merits of the agencies' position with respect to each of these proposed changes and their justifications requires a full comment period.

Moreover, the Proposed Rules provide no calculations of the time and cost burden on immigration judges, asylum officers, immigration attorneys, and criminal defense attorneys.[1] The public and affected parties cannot meaningfully comment without enough time to gather data or to conduct the analysis needed to rebut the agencies' supposition that the agencies "do not expect the proposed additional mandatory bars to increase the adjudication time for immigration court proceedings involving asylum applications"[2] or that "[t]o the extent there are any impacts of this rule, they would almost exclusively fall on" asylum applicants.[3] The public also cannot evaluate the agencies' information under the Information Quality Act or assess the agency's proposal against objective or publicly available information.[4] The comment period here does not permit sufficient time for completing these analyses. Nevertheless IJN attempts to address the many issues of concern to immigrant communities and their advocates, but strongly believes the Proposed Rules require an extended comment period.

III.    **The Categorical Expansion of the Particularly Serious Crime Bar to Asylum Is Ultra Vires to the Federal Immigration Statute and Violates International Treaty Obligations**

The United States asylum system was first codified in the Refugee Act of 1980, described by one prominent scholar as a bipartisan attempt to "reconcile our rhetoric with our law, our national immigration policy and our international treaty obligations so that we could maintain a consistent posture towards the world as a nation with a strong humanitarian tradition and a

---

[1] Proposed Rules at 69658 (explaining "there is no precise quantification available for the impact, if any, of this rule beyond the general notion that it will likely result in fewer grants of asylum on the whole").

[2] Proposed Rules at 69658.

[3] *Id.*

[4] 44 U.S.C. § 3516 note. *See Harkonen v. United States DOJ*, 800 F.3d 1143 (9th Cir. 2015) (discussing the Information Quality Act).

4

unique historic role as a haven for persons fleeing oppression."[5] The Refugee Act—among other measures designed to bring the United States domestic legal code into compliance with the provisions of the United Nations Protocol Relating to the Status of Refugees—created a "broad class" of refugees eligible for a discretionary grant of asylum.[6]

By acceding to the 1967 Protocol Relating to the Status of Refugees,[7] which binds parties to the United Nations Convention Relating to the Status of Refugees,[8] the United States obligated itself to develop and interpret United States refugee law in a manner that complies with the Protocol's principle of *nonrefoulement* (the commitment not to return refugees to a country where they will face persecution on protected grounds), even where potential refugees have allegedly committed criminal offenses. Specifically, the Convention allows states to exclude and/or expel individuals  who, "having been convicted by a final judgement of a particularly serious crime, constitute[] a danger to the community of that country."[9] This clause is intended for "extreme cases," in which the particularly serious crime at issue is a "capital crime or a very grave punishable act."[10]

The United Nations High Commissioner for Refugees (UNHCR) has asserted that to constitute a "particularly serious crime," the crime "must belong to the *gravest category*" and be limited "to refugees who become an extremely serious threat to the country of asylum due to the severity of crimes perpetrated by them in the country of asylum."[11] Ordinary or common crimes do not meet this "threshold of seriousness."[12] Moreover, the UNHCR has specifically noted that the particularly serious crime bar does not encompass less extreme crimes; "[c]rimes such as petty theft or *the possession for personal use of illicit narcotic substances would not meet the threshold of seriousness*."[13] Finally, the UNHCR has urged that when determining whether a

---

5 Deborah Anker, "The Refugee Act of 1980: An Historical Perspective," *In Defense of the Alien* 5 (1982): 89-94, https://www.jstor.org/stable/23141008?read-now=1&refreqid=excelsior%3A1060953608aa0bdd30d5d506e1ff6318&seq=1#page_scan_tab_contents.

6 *See I.N.S. v. Cardoza-Fonseca*, 40 U.S. 421, 423 (1987).

7 United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268.

8 Convention Relating to the Statute of Refugees, July 28, 1951, 140 U.N.T.S. 1954 (hereinafter "Refugee Convention").

9 *Id.* at art. 33(2).

10 U.N. High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees* 2, U.N. Doc. HCR/IP/Eng/REV. ¶ 154-55, (1979, reissued 2019).

11 U.N. High Comm'r for Refugees (UNHCR), *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 7 (July 2007), http://www.unhcr.org/enus/576d237f7.pdf [Emphasis added].

12 U.N. High Comm'r for Refugees (UNHCR), *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 7 (July 2007), http://www.unhcr.org/enus/576d237f7.pdf.  *See also Immigrant Defense Project & The Harvard Immigration and Refugee Clinical Program*, "United States Failure to Comply with the Refugee Convention: Misapplication of the Particularly Serious Crime Bar to Deny Refugee Protection From Removal to Countries Where Their Life or Freedom is Threatened," Fall 2018, https://blogs.harvard.edu/clinicalprobono/2018/09/21/hirc-idp-release-particularly-serious-crime-bars-report-and-chart/ (discussing the history of the particularly serious crime bar and its implementation throughout the signatory states.)

13 U.N. High Comm'r for Refugees (UNHCR), *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 10 (July 2007), http://www.unhcr.org/enus/576d237f7.pdf [Emphasis added].

AR.10004

person should be barred from protection for having been convicted of a particularly serious crime, the adjudicator must conduct an individualized analysis and consider any mitigating factors.[14]

Rather than taking steps to better adhere to the Convention, however, the Proposed Rules further diminish the protections for refugees by expanding the bar to ever more "common" offenses, like misdemeanors and non-violent felonies, and alleged activity.[15] Under the long-standing approach to the particularly serious crime bar, low-level offenses like misdemeanor driving under the influence where no injury is caused, or simple possession of a controlled substance or paraphernalia, that do not fall within the aggravated felony definition, simply cannot constitute a particularly serious crime.[16] The Proposed Rules defend the expansion of the particularly serious crime bar on the grounds that case-by-case adjudication is "inefficient."[17] However, the proposed framework still relies on case-by-case adjudication by creating fact-specific criteria for a number of the bars, meaning that the Proposed Rules do not even meet their stated purpose. Furthermore, the purported justification disregards the directive of the Convention to ensure that only people who have been convicted of crimes that are truly egregious and therefore present a future danger are placed at risk of *refoulement*.

Adjudicators have repeatedly recognized that crimes specifically contemplated for inclusion by the Proposed Rules are not "particularly serious crimes."[18] When declining to find that a fraudulent document offense was particularly serious, the Board of Immigration Appeals (BIA) cautioned that, "in light of the unusually harsh consequences which may befall a [noncitizen] who has established a well-founded fear of persecution[,] the danger of persecution should generally outweigh all but the most egregious of adverse factors."[19] The BIA has also observed that an alien smuggling offense could be "motivated by love, charity, kindness, or religious principles," and adjudicators should "exercise great caution in designating such an offense as a particularly serious crime" for the purpose of barring eligibility for withholding of removal.[20] As noted in the concurrence to *Delgado v. Holder*, a decision the Proposed Rules cite in support of the expanded bars, barring individuals from asylum based on these relatively minor offenses renders the "particularly serious" part of the "particularly serious crime" bar

---

14 *Id*. at ¶ 10-11; U.N. High Commissioner for Refugees, *The Nationality, Immigration and Asylum Act 2002: UNHCR Comments on the Nationality, Immigration and Asylum Act 2002 (Specification of Particularly Serious Crimes) Order 2004*, 4 (2004).

15 Note that the BIA has ruled that unless there are unusual circumstances, a single conviction of a misdemeanor offense is not a particularly serious crime. *See Matter of Juarez*, 19 I&N Dec. 664 (BIA 1988).

16 *See Immigrant Defense Project & The Harvard Immigration and Refugee Clinical Program*, "United States Failure to Comply with the Refugee Convention: Misapplication of the Particularly Serious Crime Bar to Deny Refugee Protection From Removal to Countries Where Their Life or Freedom is Threatened," Fall 2018, https://blogs.harvard.edu/clinicalprobono/2018/09/21/hirc-idp-release-particularly-serious-crime-bars-report-and-chart/

17 Proposed Rules at 69646.

18 For a thorough examination of the standards used to designate particularly serious crimes in caselaw *see* Fatma Marouf, "A Particularly Serious Exception to the Categorical Approach," *Boston Univ. Law Review* 97 (2017): 1427.

19 *Matter of Pula*, 19 I.&N. Dec. at 474.

20 *In re L-S-*, 22 I.&N. Dec. 645, 655 (BIA 1999) (citing *In re Tiwan*, 19 I.&N. Dec. 875 (BIA 1989)).

AR.10005

meaningless.[21] The Proposed Rules therefore represent a significant and baseless departure from past practice and the construction of the term "particularly serious crime."

For the same reasons, the Proposed Rules violate the plain meaning of the term "particularly serious crime."[22]  The Immigration and Nationality Act ("the INA") "does not define [this] phrase," so it carries "its ordinary meaning," and that common-sense understanding aligns with how the term originated and has been interpreted.[23] There is no ordinary, accepted use of the term "particularly serious crime" that would encompass all of the offenses the Proposed Rules would sweep in.  In no way can a misdemeanor document crime, simple drug possession, or even a DUI, be truly considered a "particularly serious crime."  The statutory phrase "constitutes a danger to the community of the United States" bolsters this conclusion.  Again, no ordinary usage of "danger to the community" would include (for example) simple drug possession.  And even if this language is at all ambiguous, the proposal is, for the reasons explained above, "'untethered to Congress's approach'" in implementing our treaty obligations, and therefore impermissible.[24]

### IV.    The Agencies Fail to Account for the Time and Cost Burden that the Proposed Rules will have on the Agencies as well as Criminal and Immigration Attorneys

The Proposed Rules impose a complex legal inquiry that may require analysis of statutes, review of case law and, in some cases, review of evidence beyond the record of conviction. In so doing, the agencies fail to calculate or consider the substantial burden of training costs and time that they must expend in order to train asylum officers and immigration judges on the criminal statutes of the fifty states as well as the District of Columbia and the U.S. territories in order to determine whether a criminal conviction meets one of the proposed bars.[25] The Proposed Rules would also impose an extraordinary burden of time and cost on the representatives of asylum seekers and asylum seekers proceeding *pro se*, who are the most prejudiced by the new scheme.

The Proposed Rules would supplant the current longstanding case-by-case framework by adding to the regulations seven categorical bars to asylum eligibility. However, the offenses included do not match any uniform label of such crimes (which does not currently exist). Indeed, multiple federal circuit courts of appeals have emphasized the substantial burden that such regulatory bars would have on the agencies, "considering the vast array of crimes defined by each of the fifty states' criminal codes."[26] Such research and legal analysis would need to be conducted by adjudicators who are not all attorneys, and who are already adjudicating a backlog

---

[21] *Delgado v. Holder*, 648 F.3d 1095, 1099-1110 (9 Cir. 2011) (Reinhardt, concurring)

[22] 8 U.S.C. §§ 1158(b)(2)(A)(ii) and (B)(i).

[23] *Burrage v. United States*, 571 U.S. 204, 210 (2014).

[24] *See NRDC v. EPA*, 777 F.3d 456, 469 (D.C. Cir. 2014).

[25] *See* Proposed Rules at 69658.

[26] *Ali v. Achim*, 468 F.3d 462, 469 (7th Cir. 2006) ("require[ing] the Attorney General and his agents to sift through each state's code and prospectively identify by regulation every single crime that would qualify as 'particularly serious' would impose an onerous burden"); *see also Gao v. Holder*, 595 F.3d 549, 557 (4th Cir. 2010) (explaining "the Attorney General would also face immense practical difficulties if he were required to act through rulemaking alone. It would be a Herculean task to "sift through each state's code and prospectively identify by regulation every single crime that would qualify as particularly serious." [internal quotes removed]).

AR.10006

of cases under immense time pressure.[27] The amount of training required to conduct such an analysis is substantial and has not been included in the costs enumerated in the proposed regulation.

Furthermore, the agencies have not considered the time or cost burden that the addition of such vague and broadly worded criminal bars to asylum will add to immigration attorneys, DOJ-accredited representatives, and *pro se* asylum applicants. The Proposed Rules will also undoubtedly increase the time and cost of providing technical assistance, as our organizations advise legal services providers on issues such as criminal bars to eligibility for asylum. Overall, the Proposed Rules will add many layers of confusion and uncertainty to the asylum application process, for both asylum seekers and their legal advocates, who will be unable to tell how they will determine whether countless criminal convictions will bar an applicant from asylum. This lack of predictability will create a substantial burden on immigration legal services providers, who will be unable to advise their clients as to their asylum eligibility, a long-term and stable form of protection from persecution. Thus, many people who are entitled to asylum will be too afraid to apply and will instead remain in the shadows.

Finally, this vague and unclear language presents constitutional problems. Due process prohibits laws and regulations that fail to "give ordinary people fair warning about what the law demands of them,"[28] and the Equal Protection Clause requires the government to treat similarly situated people the same way.[29] As written, the Proposed Rules fail to give affected people fair notice of which offenses will bar asylum and which will not. And for the reasons set forth above, they will very likely result in applicants, whose acts are materially indistinguishable, being treated differently.

## V.     Withholding of Removal and CAT are Not Sufficient to Meet Statutory and Treaty Obligations Violated By The Proposed Rules

Throughout the Proposed Rules, the agencies defend their harsh and broad proposal by pointing to the continued availability of alternative forms of relief for those precluded from asylum eligibility under the new rules.[30] The availability of these alternative forms of relief, however—known as withholding of removal and protection under the Convention Against Torture (CAT)—does not render the proposal lawful or nullify the harm created by the Proposed Rules' new limits on asylum. The protections afforded by CAT and by statutory withholding of removal are limited in scope and duration, and they are harder to obtain. As a result, a policy that limits *bona fide* refugees to withholding of removal and CAT protection continues to violate the international treaty obligations enshrined in US immigration law.

First and foremost, the most serious harm that can befall a person as a result of these Proposed Rules is removal to persecution and torture, a risk that is not mitigated by the

---

27 *See*, e.g., EOIR Memorandum, Case Priorities and Immigration Court Performance Measures, James R. McHenry III, Director (Jan. 17, 2018).

28 *U.S. v. Davis*, 139 S. Ct. 2319, 2323 (2019).

29 *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam).

30 *See, e.g.,* Proposed Rules at 69644.

8

availability of other forms of relief. CAT and withholding protections demand a higher level of proof than asylum claims: a clear probability of persecution or torture.[31] Thus, an applicant may have a valid asylum claim but be unable to meet the higher evidentiary standard for the other forms of relief and be removed to their country of origin, where they would face persecution or even death.  The asylum applicants most prejudiced by the Proposed Rules are those with meritorious claims.

Withholding and CAT recipients also face permanent separation from their families. Their spouses and children cannot reunite with them in the United States, because only immediate relatives of asylees and refugees are eligible to join them as derivatives.[32] For many, this will mean that the Proposed Rules institute yet another formal policy of family separation. For example, a mother with two young children who flees to the United States and is subject to one of the expanded asylum bars will not be able to ensure that her children will be able to obtain protection in the United States with her if she is granted relief.  Rather, if her children are still in her home country, they would need to come to the United States and seek asylum on their own, likely as unaccompanied children. If her children fled to the United States with her, then they will need to establish their own eligibility for protection before an immigration judge, no matter their age.[33]

Withholding and CAT recipients cannot travel internationally, which compounds their separation from family. The United States's treaty obligations under the United Nations Convention Relating to the Status of Refugees afford refugees the right to travel in mandatory terms. Article 28 states, "Contracting States shall issue to refugees lawfully staying in their territory travel documents for the purpose of travel outside their territory."[34] Withholding and CAT recipients do not have access to a travel document as contemplated by Article 28. By regulation, refugee travel documents are available only to asylees.[35] Moreover, the BIA requires

---

[31] Withholding of removal requires the petitioner to demonstrate his or her "life or freedom would be threatened in that country because of the petitioner's race, religion, nationality, membership in a particular social group, or political opinion." *INS v. Stevic*, 467 U.S. 407, 411 (1984) (quoting 8 U.S.C. § 1231(b)(3)). Unlike asylum, however, the petitioner must show a "clear probability" of the threat to life or freedom if deported to his or her country of nationality. *Id; see also Cardoza-Fonseca*, 480 U.S. at 431 (describing the difference between a well-founded fear of persecution and a clear probability of persecution). For CAT relief, an applicant must show it is more likely than not that he or she will be tortured or killed by or at the government's acquiescence if removed to the home country. 8 C.F.R. § 1208.16(c)(2).

[32] 8 C.F.R. § 208.21(a).

[33] Recently, this scenario played out with a mother who was subject to the so-called Migrant Protection Protocols (also known as Remain in Mexico) and the asylum "transit ban," which made the mother ineligible for asylum and thus required the children to establish their independent eligibility for withholding and CAT protection. An immigration judge granted the mother withholding of removal but denied protection to her young children, leaving the children with removal orders and immense uncertainty about their Under the expanded bars in the Proposed Rules, these situations will certainly increase, separating families and forcing parents to return to countries where it has been established they more likely than not will face persecution and torture, rather than leaving their children on their own. *See* Adolfo Flores, "An Immigrant Woman Was Allowed To Stay In The US — But Her Three Children Have A Deportation Order," *Buzzfeed*, December 21, 2019, https://www.buzzfeednews.com/article/adolfoflores/an-immigrant-woman-was-allowed-to-stay-in-the-us-but-not.

[34] 19 U.S.T. 6223 T.I.A.S. No. 6577 (1968).

[35] 8 C.F.R. § 223.1.

AR.10008

that an individual granted withholding or CAT—unlike an individual granted asylum—must simultaneously be ordered removed, making any international travel, regardless of what country they travel to, a "self-deportation."[36]

Perhaps the most pernicious result of these Proposed Rules is that withholding and CAT recipients are not eligible for adjustment of status to permanent residence, and subsequently citizenship.  Those with meritorious claims for relief from persecution or torture, who are barred from asylum as a result of the Proposed Rules, will be blocked from a pathway to citizenship and all of its attendant privileges, including the right to vote.

Finally, judicial and administrative efficiency are not served by expanded asylum bars that funnel more applicants into removal proceedings to seek withholding of removal and CAT relief.  Implementation of the Proposed Rules would further overload the immigration courts and cause applicants to wait years for a decision.  During these extended proceedings, bona fide asylum seekers would remain in limbo, facing permanent separation from their families in their home countries.  At the same time, their derivative family members in the United States would be required to seek separate forms of relief, further compounding administrative and judicial backlogs.

## VI.    Immigration Law Includes a Waiver of Inadmissibility for Asylees Broader than the Criminal Bars Proposed in These Rules

The Proposed Rules impose stricter limits on asylum eligibility than the immigration statute contemplates. Currently the INA provides that one year after being granted asylum, a successful applicant can apply to adjust their status to permanent residence. Asylees with a wide array of convictions that would otherwise make them inadmissible are entitled to apply for a waiver of inadmissibility that is broader than almost any other in the statute.  The waiver, found at section 209(c), is to be applied liberally to provide asylees with safe haven and a pathway to citizenship, serving the overall goals of the asylum law and our treaty obligations.[37]  The Proposed Rules directly conflict with these aims and would render the existence of this waiver superfluous.

Under section 209(c) of the INA, asylees seeking adjustment of status are completely exempt from certain grounds of inadmissibility, including 212(a)(4), which relates to the likelihood of becoming a public charge.[38] Section 209(c) also authorizes the waiver of almost any other ground of inadmissibility under section 212(a) for humanitarian, family unity, and public interest purposes, with two exceptions. The two exceptions to the waiver are broadly consistent with the existing law governing the determination of particularly serious crimes.  First, section 209(c) cannot be used to waive inadmissibility if the government has "reason to believe"

---

[36] *See Matter of I-S- & C-S-*, 24 I.&N. Dec. 432, 434 n.3 (BIA 2008); 8 C.F.R. § 241.7.

[37] 8 U.S.C. §1159(c).

[38] Under section 209(c) of the INA, eligible asylees and refugees seeking adjustment of status are exempt from the following grounds of inadmissibility: sections 212(a)(4) (relating to public charge), 212(a)(5) (relating to labor certification), and 212(a)(7)(A) (relating to presence in the United States without proper immigrant documentation) of the INA. 8 U.S.C. §§ 1159(c); 1182(a).

AR.10009

the applicant has engaged in drug trafficking.39 Second, the waiver cannot be granted to an asylee who has been convicted of a "violent or dangerous" crime, unless the person shows "exceptional and extremely unusual hardship" or foreign policy concerns justify issuance of the waiver.40 Apart from those two exceptions, the waiver can forgive any offense, including an inadmissible conviction that also is an aggravated felony, for example for theft or fraud, or a non-trafficking drug offense.

The proposal's dramatic expansion of criminal bars to asylum clashes with the breadth of the waiver available to asylee applicants for adjustment of status. Under the Proposed Rules, an applicant would be barred from eligibility for asylum, in the first instance, because of a criminal conviction that could be waived by section 209(c). The outcome of such a system is that otherwise eligible asylum applicants are blocked from the pathway to citizenship that the immigration statute clearly contemplates for them. This represents a significant conflict with the statute, for which the agencies offer no justification. And agencies may not adopt statutory interpretations that render statutory language superfluous or ineffective.41

## VII.    The Proposed Rules Improperly Authorize Asylum Adjudicators Applying the Particularly Serious Crime Bar to Conduct Criminal Factfinding Using Unreliable and Racially Biased Evidence

The Proposed Rules authorize immigration adjudicators to seek out unreliable evidence obtained in violation of due process to determine whether an asylum applicant's conduct— considered independently of a criminal court adjudication—triggers the particularly serious crime bar. This aspect of the proposal violates the statutory text and would produce burdensome and inefficient proceedings with arbitrary outcomes.

At the outset, we note that the statute allows the Attorney General to bar only those noncitizens who, "having been *convicted by a final judgment of a particularly serious crime*, constitutes a danger to the community of the United States." On its face, this language does not allow the government to decouple the seriousness determination from the conviction. That is, the statute prohibits applying the particularly serious crime bar based on unadjudicated facts. The bar may be applied only where the "final judgment" of "convict[ion]" itself establishes that the crime was particularly serious.42 That conclusion is bolstered by the Supreme Court's repeated recognition that "[s]imple references to a 'conviction,' . . . are 'read naturally' to denote the 'crime as *generally* committed,'" rather than the defendant's "actual conduct."43 Specifically, the

---

39 *See In re Y-L-*, 23 I.&N. Dec. 270 (BIA 2002) Although barred from asylum eligibility as an aggravated felon, a noncitizen convicted of a drug trafficking offense may still qualify for withholding of removal. As a withholding recipient, however, the immigrant would not be eligible to apply for adjustment of status to permanent residence, a result that is consistent with the terms of the 209(c) waiver.

40 *Matter of Jean*, 23 I.&N. Dec. 373 (AG 2002)

41 *E.g.*, *Corley v. United States*, 556 U.S. 303, 314 (2009).

42 See *Delgado v. Eric H. Holder Jr.*, 648 F.3d 1095, 1109 n.1 (9th Cir. 2011) (en banc) (Reinhardt, J., concurring) (the Attorney General's authority to designate particularly serious crimes "applies principally to the *categorical* classification of offenses as particularly serious, rather than to the classification of *individual* criminal acts as particularly serious").

43 *Sessions v. Dimaya*, 138 S. Ct. 1204, 1217 (2018).

AR.10010

Proposed Rules' extension of the asylum bar to *conduct* not requiring any conviction that the asylum adjudicator alone determines is related to domestic violence explicitly violates this textual directive.[44] Moreover, the inclusion of unadjudicated facts in the determination whether any minor offense was committed in furtherance of gang activity also runs afoul of this limitation in the statute to the extent that it sweeps in a vast array of convictions that would not otherwise even trigger an inquiry into whether the particularly serious crime bar applies.

The Proposed Rules repeatedly cite increased efficiency as justification for many of the proposed changes.[45] Yet requiring adjudicators to engage in minitrials to determine the applicability of categorical criminal bars, rather than relying on adjudications obtained through the criminal legal system, will dramatically *decrease* efficiency—and predictability—in the asylum adjudication process.  As the immigration courts contend with backlogs that now exceed one million cases,[46] tasking adjudicators with a highly nuanced, resource-intensive assessment of the connection of a conviction to gang activity or the domestic nature of alleged criminal conduct—assessments far outside their areas of expertise—will prolong asylum proceedings and invariably lead to erroneous determinations that will give rise to an increase in appeals.

Indeed, the Supreme Court has "long deemed undesirable" exactly the type of "post hoc investigation into the facts of predicate offenses" proposed by the agencies here.[47] Instead, for more than a century the federal courts have repeatedly embraced the "categorical approach" to determine the immigration consequences of a criminal offense, wherein the immigration adjudicator relies on the statute of conviction as adjudicated by the criminal court system, without relitigating the nature or circumstances of the offense in immigration court.[48] As the Supreme Court has explained, this approach "promotes judicial and administrative efficiency by precluding the relitigation of past convictions in minitrials conducted long after the fact."[49] In *Moncrieffe v. Holder*, the Court forewarned of exactly the sort of harm that would arise from these Proposed Rules; in that case, the Court rejected the government's proposal that immigration adjudicators determine the nature and amount of remuneration involved in a marijuana-related conviction, noting that "our Nation's overburdened immigration courts" would end up weighing evidence "from, for example, the friend of a noncitizen" or the "local police

---

[44] *See* Proposed Rules at 69652.

[45] *See* Proposed Rules at 69646, 69656-8.

[46] Marissa Esthimer, "Crisis in the Courts: Is the Backlogged U.S. Immigration Court System at Its Breaking Point?," *Migration Policy Institute*, October 3, 2019, https://www.migrationpolicy.org/article/backlogged-us-immigration-courts-breaking-point.

[47] *Moncrieffe v. Holder*, 569 U.S. 184, 186 (2013).

[48] *See Moncrieffe*, 569 U.S. at 191 ("This categorical approach has a long pedigree in our Nation's immigration law."); *United States ex rel. Guarino v. Uhl*, 107 F.2d 399, 400 (2d Cir. 1939) (L. Hand, J.) (holding that "deporting officials may not consider the particular conduct for which the alien has been convicted"). ."). For a more fulsome history of the development of the categorical approach in immigration court, *see* Alina Das, "The Immigration Penalties of Criminal Convictions: Resurrecting Categorical Analysis in Immigration Law," *New York University Law Review* 86, no. 6 (2011): 1689 - 1702, https://www.nyulawreview.org/wp-content/uploads/2018/08/NYULawReview-86-6-Das.pdf.

[49] *Moncrieffe*, 569 U.S. at 200-201.

AR.10011

officer who recalls to the contrary," with the end result being a disparity of outcomes depending on the whims of the individual immigration judge and a further burdened court system.[50]

Although it has not been decided that a categorical approach should apply to the particularly serious crime bar, these due process principles remain crucial to prevent governmental overreach.  Certainly, the statute's use of crime categories and the emphasis on the finality of a conviction militates against the fact-finding inquiry contained in the Proposed Rules. So too, is the use, for much of the last century, of some form of the categorical analysis to determine the immigration consequences of convictions.[51] The departure from that approach in these Proposed Rules, in violation of the statutory language and Congress's policy, makes them ultra vires and an unauthorized exercise of executive power.

A.  *The Proposed Rules Empower Adjudicators to Rely on Unreliable, Unproven, and Racially Biased Evidence of Gang Involvement*

The Proposed Rules also allow an adjudicator to apply the particularly serious crime bar to anyone who is convicted of a crime—including a misdemeanor—that the adjudicator deems linked to gang activity based on evidence that has no indicia of accuracy. This rule confers on immigration adjudicators—who generally are not criminologists, sociologists, or criminal law experts—the sole responsibility to determine if there is "reason to believe" that *any* conviction flows from activity taken in furtherance of gang activity. This rule will necessarily ensnare asylum seekers of color who have experienced racial profiling and a criminal legal system fraught with structural challenges and incentives to plead guilty to some crimes, particularly misdemeanors. These same individuals are vulnerable to being erroneously entered into gang databases. Such databases are notoriously inaccurate, outdated, and infected by racial bias.[52]

This aspect of the proposal is unlawful in two other ways. First, the agencies propose that immigration adjudicators be allowed to consider "all reliable evidence" to determine whether there is "reason to believe" an offense was "committed for or related to criminal gang activities," or "in furtherance of gang-related activity, triggering ineligibility for asylum in either case.[53] The rule's operative phrase—"in support, promotion, or furtherance of the activity of a criminal street gang"—fails to "give ordinary people fair warning about what the law demands of them,"[54] particularly in conjunction with the malleable "reliable evidence" and "reason to

---

[50] *Id.* at 201.

[51] *See* Alina Das, "The Immigration Penalties of Criminal Convictions: Resurrecting Categorical Analysis in Immigration Law," *New York University Law Review* 86, no. 6 (2011): 1689-1702, https://www.nyulawreview.org/wp-content/uploads/2018/08/NYULawReview-86-6-Das.pdf (providing a history of the development of the categorical approach in immigration law).

[52] *See* Annie Sweeney and Madeline Buckley, "Chicago police gang data collection faulted by city's inspector general as unchecked and unreliable," *Chicago Tribune*, April 11, 2019, https://www.chicagotribune.com/news/breaking/ct-met-chicago-police-gang-data-04112019-story.html; Anita Chabria, "A routine police stop landed him on California's gang database. Is it racial profiling?," *Los Angeles Times*, May 9, 2019, https://www.latimes.com/politics/la-pol-ca-california-gang-database-calgang-criminal-justice-reform-20190509-story.html.

[53] *See* Proposed Rules at 69649.

[54] *Davis v. United States*, 139 S. Ct. 2319, 2323 (2019).

AR.10012

believe" standards.  For example, while "a minor traffic infraction is not 'particularly serious'" by itself,[55] the proposal would allow an adjudicator to deem a traffic violation a particularly serious crime if, in the adjudicator's view, there is "reason to believe" the violation was somehow "in support, promotion, or furtherance" of gang activity.  This result not only contravenes the plain meaning of the phrase "particularly serious crime," as explained above, but also deprives people of fair notice.  The rule provides no indication of what degree of relation is required to establish "support" or "promotion," especially given that law enforcement agencies have sometimes deemed people to be promoting gang affiliations based merely on their tattoos or style of dress,[56] which have nothing to do with the nature of any particular offense.

The effect of these provisions of the Proposed Rules would be to expand the number and type of convictions for which an asylum seeker might be found ineligible for relief, sweeping in even petty offenses that would otherwise not trigger immigration consequences. Thus, an asylum applicant convicted of simple assault without use of a weapon, a non-violent property crime, or even possession of under 30 grams of marijuana for personal use (otherwise exempted from the reach of the Proposed Rules), could trigger a bar to asylum if the adjudicator concludes she has "reason to believe" the offense was committed in furtherance of gang activity.[57] In making these determinations, asylum adjudicators improperly relying on uncorroborated allegations contained in arrest reports, could nevertheless shield their decisions by relying on discretion.[58] The Proposed Rules contain no safeguards to ensure against such erroneous determinations.

In recent years, the expansion of gang databases for use in the apprehension and removal of foreign nationals—including children—has generated tremendous concern among advocates and the communities they serve.[59] The use of gang databases by local law enforcement and Immigration and Customs Enforcement has been widely criticized as an overbroad, unreliable and often biased measure of gang membership and involvement.[60] The Proposed Rules expand the criminal bars to asylum to those accused of gang involvement in the commission of minor criminal offenses, embracing an open-ended adjudicative process that will inevitably result in asylum adjudicators relying unfairly on these discredited methods of gang identification. This

---

[55] *Guerrero v. Whitaker*, 908 F.3d 541, 545 (9th Cir. 2018).

[56] LAPD, *How Are Gangs Identified*, http://www.lapdonline.org/get_informed/content_basic_view/23468.

[57] Page 69649 of the Proposed Rules notes that the applicable standard for determining when to apply the bar on asylum seekers convicted of a crime involving criminal street gangs is "reason to believe," as used in 8 U.S.C. § 1182(a)(2)(c), and that  the asylum adjudicator may consider "all reliable evidence" in making their decision.

[58] *See Garces v. U.S. A.G.*, 611 F.3d 1337, 1349-50 (11th Cir 2010) (reversing finding of "reason to believe" that the respondent was a participant in drug trafficking based on unsubstantiated arrest reports); *Matter of Rico*, 16 I.&N. Dec. 181, 185-86 (BIA 1977) (relying on pre-hearing admissions to uphold finding of inadmissibility).

[59] *See* Nermeen Arastu, et al., "Swept Up In The Sweep: The Impact of Gang Allegations on Immigrant New Yorkers," *New York Immigration Coalition (NYIC) and CUNY School of Law's Immigrant and Non-citizen Rights Clinic*, May 2018, https://www.law.cuny.edu/wp-content/uploads/page-assets/academics/clinics/immigration/SweptUp_Report_Final-1.pdf.

[60] Ali Winston, "Marked for Life: U.S. Government Using Gang Databases to Deport Undocumented Immigrants," *The Intercept*, August 11, 2016, https://theintercept.com/2016/08/11/u-s-government-using-gang-databases-to-deport-undocumented-immigrants/.

14

outcome would compound the disparate racial impact of inclusion in gang databases and bar asylum seekers who are themselves fleeing violence from gangs in their home countries.[61]

Indeed, asylum applicants are *already* frequently subjected to wrongful denials of protection because of allegations of gang activity made by the Department of Homeland Security based on information found in notoriously unreliable foreign databases and "fusion" intelligence-gathering centers. That is true even though past legislative efforts to expand the grounds of removal and inadmissibility in the INA to include gang membership have failed to pass both houses of Congress.[62] In addition, immigration adjudicators already routinely premise discretionary denials of relief or release on bond on purported gang membership, and scores of alleged gang members have already been deported on grounds related to immigration violations or criminal convictions for which no relief is available.[63] Creating a "gang-related crime" bar will only exacerbate the due process violations already occurring as a result of unsubstantiated information about supposed gang ties.[64] Empowering immigration adjudicators to render asylum applicants *categorically* excluded from protection on the basis of such spurious allegations presents serious due process concerns and will inevitably result in the return of many refugees back to harm.[65]

The Departments asks for comments on: (1) what should be considered a sufficient link between an asylum seeker's underlying conviction and the gang related activity in order to trigger the application of the proposed bar, and (2) any other regulatory approaches to defining the type of gang-related activities that should render individuals ineligible for asylum. The premise of these questions is wrong: a vague "gang related" bar should not be introduced at all. The INA and existing regulations already provide overly broad bars to asylum where criminal behavior by an asylum seeker causes concern to an adjudicator. Adding this additional, superfluous layer of complication risks erroneously excluding bona fide asylum seekers from protection without adding any useful adjudicatory tool to the process.

---

[61] *See* Jonathan Blitzer, "How Gang Victims Are Labeled As Gang Suspects," *The New Yorker*, January 23, 2018, https://www.newyorker.com/news/news-desk/how-gang-victims-are-labelled-as-gang-suspects.

[62] *See* Jessica Chacon, "Whose Community Shield?: Examining the Removal of the 'Criminal Street Gang Member,'" *University of Chicago Legal Forum* 317 (2007: 333-336) (reviewing legislative history of failed efforts to expand removability of those accused of gang related offenses and noting criticism that "[t]he only legal effect of the proposed legislation would be to increase the number of noncitizens lawfully present who would be subject to removal on the basis of their purported associations with individuals involved in group criminal activity.").

[63] For an illustration of Immigration and Customs Enforcement's propensity to make gang allegations on the basis of questionable if not fabricated evidence, and the deference to which the evidence is often granted by immigration adjudicators, *see* Mark Joseph Stern, "Bad Liars," *Slate*, May 16, 2018, https://slate.com/news-and-politics/2018/05/federal-judge-accused-ice-of-making-up-evidence-to-prove-that-dreamer-was-gang-affiliated.html.

[64] *See* Yvette Cabrera, "New ICE Tactic Raises Questions About Due Process," *ThinkProgress*, October 6, 2017, https://thinkprogress.org/ice-targets-gangs-6775356473a8/; Rebecca Hufstader, "Immigration Reliance On Gang Databases: Unchecked Discretion And Undesirable Consequences," 90 *New York University Law Review* 90 (2015): 671.

[65] Melissa del Bosque, "Immigration Officials Use Secretive Gang Databases to Deny Migrant Asylum Claims," *Pro Publica*, July 8, 2019, https://www.propublica.org/article/immigration-officials-use-secretive-gang-databases-to-deny-migrant-asylum-claims.

AR.10014

B.  *The Proposed Rules Empower Adjudicators to Rely on Unreliable, Unproven, and Biased Evidence of Domestic Violence in Direct Contravention of the Statute*

The Proposed Rules too broadly categorize domestic violence offenses as particularly serious and sweep both offenders and survivors into their dragnet. Survivors of domestic violence include trafficking survivors and LGBTQ community members, such that inclusion of offenses and conduct related to domestic violence in the expanded asylum bars affects populations with overlapping vulnerabilities.[66]

Moreover, the domestic violence sections of the Proposed Rules include the only categorical bar to asylum for which a conviction is *not required*. This provision of the Proposed Rules is undeniably an ultra vires exercise of authority, in conflict with the statute and treaty obligations, and has a disparate impact on vulnerable populations including survivors of domestic violence. The Proposed Rules permit immigration adjudicators to "assess all reliable evidence in order to determine whether [a] conviction amounts to a domestic violence offense," and to go even further by considering whether non-adjudicated *conduct* "amounts to a covered act of battery or extreme cruelty."[67]

Finally, the exemption for asylum applicants who can demonstrate their eligibility for a waiver under section 237(a)(7)(A) of the INA does not cure the harm to asylum seekers caused by imposition of a categorical domestic violence related bar based on unadjudicated facts.[68] Domestic violence incidents all too often involve the arrest of both the primary perpetrator of abuse and the survivor.[69] These "cross-arrests" do not always yield clear determinations of victim and perpetrator. Authorizing asylum adjudicators to determine the primary perpetrator of domestic assault, in the absence of a judicial determination, unfairly prejudices survivors who are wrongly arrested in the course of police intervention in domestic disturbances. Moreover, it exceeds the authority delegated to the Attorney General by the immigration statute.

## VIII.  The Proposed Rules Will Disparately Impact Vulnerable Populations Already Routinely Criminalized, Including LGBTQ Immigrants, Survivors of Trafficking and Domestic Violence, and Immigrant Youth of Color

---

[66] Marty Schladen, "ICE Agents Detain Alleged Domestic Violence Victim," *El Paso Times*, February 16, 2017, https://www.elpasotimes.com/story/news/2017/02/15/ice-detains-domestic-violence-victim-court/97965624/ (noting that the immigrant detained, a transgender person previously deported following her conviction for crimes such as posession of stolen mail and assault, was then living at the Center Againts Sexual and Family Violence, a shelter for survivors of intimate partner violence).

[67] *See* Proposed Rules at 69652.

[68] 8 U.S.C. § 1227(a)(7)(A).

[69] David Hirschel, et al., "Domestic Violence and Mandatory Arrest Laws: To What Extent Do They Influence Police Arrest Decisions," *Journal of Criminal Law & Criminology* 98, no. 1 (2007-2008): 255, https://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?article=7284&context=jclc (noting that "[i]n some cases, dual arrests may be the result of legislation, department policies, or both failing to require officers to identify the primary aggressor. In addition, when such provisions are present, police may lack the training or information needed to identify the primary aggressor when responding to a domestic violence assault. This situation may be compounded by batterers who have become increasingly adept at manipulating the criminal justice system, and may make efforts to 'pre-empt' victims from notifying police in order to further control or retaliate against them.").

AR.10015

The expanded criminal bars exclude from safety and a pathway to citizenship those convicted of offenses that are coincident to their flight from persecution, and do not accomplish the stated goal of making communities safer. They will disparately impact vulnerable populations, who comprise asylum seekers hailing primarily from Central America and the Global South, and those routinely criminalized because of their identities, racially disparate policing practices, or in connection with trafficking and domestic violence.[70] For these populations especially, the discretion currently delegated to asylum adjudicators is crucial for becoming fully integrated in the larger community. The imposition of additional categorical bars to asylum will only further marginalize asylum seekers already struggling with trauma and discrimination.

The Proposed Rules turn asylum into a blunt instrument that would prevent the use of discretion where it is most needed and most effective. The existing framework for determining if an offense falls within the particularly serious crime bar already provides latitude for asylum adjudicators to deny relief to anyone whose final criminal convictions show they are a danger to the community.[71] Furthermore, asylees with convictions that render them inadmissible must apply for a waiver at the time of their applications for permanent residence.[72] These measures ensure that asylum applicants in vulnerable populations have access to supportive resources and have the opportunity to demonstrate their ongoing commitment to social and personal health. Moreover, the existence of provisions allowing the revocation of asylum status ensures that adjudicators may continue to enforce concerns related to the safety of the community even after asylum is granted.[73]

A.    *Barring asylum for immigrants convicted of migration-related offenses punishes them for fleeing persecution and/or seeking safety for their children, and does not make communities safer.*

The expansion of the criminal bars to asylum to include offenses related to harboring and smuggling of noncitizens by parents and family members and those previously removed further

---

[70] *See* D'Vera Cohn et al., "Rise in U.S. Immigrants from El Salvador, Guatemala and Honduras Outpaces Growth from Elsewhere," *Pew Research Center*, December 7, 2017, https://www.pewresearch.org/hispanic/wp-content/uploads/sites/5/2017/12/Pew-Research-Center_Central_American-migration-to-U.S._12.7.17.pdf.

[71] Apart from the statutory aggravated felony bar to asylum, the BIA and Attorney General have historically utilized a highly circumstantial approach to the particular serious crime determination that would bar an immigrant from receiving asylum. *See e.g., Matter of Juarez,* 19 I.&N. Dec. 664 (BIA 1988) (ordinarily a single misdemeanor that is not an aggravated felony will not be a particularly serious crime); *Matter of Frentescu,* 18 I.&N. Dec. 244 (BIA 1982), *modified* (setting forth several factors to be considered before imposing the particular serious crime bar, including: (i) the nature of the conviction, (ii) the circumstances and underlying facts for the conviction, (iii) the type of sentence imposed, and (iv) whether the type and circumstances of the crime indicate that the individual will be a danger to the community); *Matter of Y-L-, A-G-, R-S-R-,* 23 I.&N. Dec. 270 (A.G. 2002) (setting forth a multi-factor test to determine the dangerousness of a respondent convicted of a drug-trafficking offense who is otherwise barred from asylum as an aggravated felon, but seeking withholding of removal).

[72] 8 U.S.C. § 1159(c).

[73] 8 C.F.R. § 208.24(a).

AR.10016

criminalizes vulnerable populations fleeing persecution.[74] The vast expansion of migrant prosecutions at the border during the current administration has created administrative chaos and separated families that do not pose a threat to the safety of communities in the United States.[75] The Proposed Rules threaten to magnify the harm caused by these reckless policies by further compromising the ability of those seeking safety on the southern border to access the asylum system.

The Proposed Rules expand the asylum bar to parents or other caregivers who are convicted of smuggling or harboring offenses after taking steps to help minor children enter the United States in order to flee persecution. This proposed bar is particularly grave in light of the administration's efforts to prosecute parents and caregivers as part of its strategy of deterring families from seeking asylum in the United States.[76] The Proposed Rules seek to take this strategy one step further, by additionally barring those parents *already prosecuted* from obtaining asylum protections for themselves and their children. The Proposed Rules multiply the harms parents and caregivers have experienced in their treacherous journeys to safety and callously penalize parents for doing what they must—taking all necessary steps to protect their children.

The Proposed Rules also expand the asylum bar to those who have fled persecution multiple times and therefore been convicted of illegal reentry. Their inclusion is premised on conclusory statements regarding the dangerousness of recidivist offenders, without consideration of the nature or seriousness of prior convictions.[77] Rather, the Proposed Rules treat all immigration violations as similar in seriousness without any independent evidence to justify the expansion. Such an approach renders meaningless the limiting language of "particularly serious" in the statute.

The Proposed Rules also conflate multiple entries by noncitizens having prior removal orders with those who have entered multiple times without ever having their asylum claims heard. Many immigrants who have previously attempted entry to the United States to flee persecution could not have been aware of the complex statutory regime that governs asylum claims and would not knowingly have abandoned their right to apply for asylum. Some asylum seekers have also wrongly been assessed in prior credible fear interviews. And others yet may have previously entered or attempted to enter the United States before the onset of circumstances

---

[74] On April 11, 2017, then-Attorney General Sessions instructed all federal prosecutors to increase their prioritization of immigration offenses for prosecution, including misdemeanor offenses committed by first time entrants. *See* Memorandum from the Attorney General: Renewed Commitment to Criminal Immigration Enforcement (April 11, 2017), https://www.justice.gov/opa/press-release/file/956841/download.

[75] *Id.*; Richard Marosi, "The aggressive prosecution of border crossers is straining the courts. Will zero tolerance make it worse?," *Los Angeles Times*, May 11, 2018, https://www.latimes.com/local/california/la-me-ln-immigrant-prosecutions-20180511-story.html.

[76] Ryan Devereaux, "Documents Detail ICE Campaign to Prosecute Migrant Parents as Smugglers," *The Intercept*, April 29, 2019, https://theintercept.com/2019/04/29/ice-documents-prosecute-migrant-parents-smugglers/ (describing how in May 2017, the Department of Homeland Security set out to target parents and family members of unaccompanied minors for prosecution).

[77] Proposed Rules at 69648.

AR.10017

giving rise to their fear. Preserving discretion to grant asylum in these circumstances allows meritorious asylum seekers to be heard and corrects errors that might previously have occurred.

B.  *Extending the criminal bars to immigrants convicted of misdemeanor document fraud unfairly punishes low-wage immigrant workers and does not make communities safer.*

The Proposed Rules expand the asylum bar to include any asylum seeker who has been convicted of a misdemeanor offense for use of a fraudulent document. Yet again, this expansion is flatly inconsistent with the plain statutory language. "As a matter of ordinary usage,"[78] no one would describe a misdemeanor document offense as a "particularly serious crime" that renders the offender "a danger to the community."

This expansion also ignores the migration-related circumstances that often give rise to convictions involving document fraud. Migrants fleeing persecution often leave their home countries with nothing but the clothes on their backs and must rely on informal networks to navigate their new circumstances.[79] Extension of a blanket bar to asylum seekers who are compelled to resort to fraudulent means to enter the United States, or to remain safely during their applications for asylum, upends decades of settled law directing that violations of law arising from an asylum applicant's manner of flight should constitute only one of many factors to be consulted in the exercise of discretion.[80]

Moreover, migrants in vulnerable communities who struggle to survive during the pendency of their asylum proceedings are often exploited by unscrupulous intermediaries who offer assurances and documentation that turn out to be fraudulent.[81] Many noncitizens working in the low-wage economy face egregious workplace dangers and discrimination and suffer retaliation for asserting their rights.[82] The continued availability of asylum to low-wage immigrant workers can encourage them to step out of the shadows. The expansion of criminal asylum bars to sweep in all document fraud offenses would unfairly prejudice immigrants with meritorious asylum claims and force them deeper into the dangerous informal economy.

C.  *The Proposed Rules will harm communities with overlapping vulnerabilities, including LGBTQ asylum seekers, survivors of trafficking, and survivors of domestic violence.*

The Proposed Rules exclude from asylum protections countless members of vulnerable communities who have experienced trauma, abuse, coercion, and trafficking. Many of these people may become aware of their ability to apply for asylum only after law enforcement

---

[78] *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1759 (2018).

[79] *See Matter of Pula*, 19 I.&N. Dec. at 474.

[80] *Id.*

[81] See American Bar Association, "About Notario Fraud," July 19, 2018, https://www.americanbar.org/groups/public_interest/immigration/projects_initiatives/fight-notario-fraud/about_notario_fraud/.

[82] Paul Harris, "Undocumented workers' grim reality: speak out on abuse and risk deportation," *The Guardian*, March 28, 2013, https://www.theguardian.com/world/2013/mar/28/undocumented-migrants-worker-abuse-deportation.

AR.10018

encounters that lead them to service providers who can educate them about their immigration options. Despite the unique difficulties they face, the Proposed Rules would compound their harm and prevent them from achieving family unification and a pathway to citizenship.

The Proposed Rules pose a unique threat to LGBTQ immigrant community members. LGBTQ immigrants in particular may already have experienced a high degree of violence and disenfranchisement from economic and political life in their home countries.[83] Hate violence towards undocumented LGBTQ immigrants in the United States is already disproportionately higher than for other members of the LGBTQ population.[84] Members of these communities also experience isolation from their kinship and national networks following their migration. This isolation, compounded by the continuing discrimination towards the LGBTQ population at large, leave many in the LGBTQ immigrant community vulnerable to trafficking, domestic violence, and substance abuse, in addition to discriminatory policing practices. The expansion of criminal enforcement and prosecution of undocumented people also harms the LGBTQ immigrant community.[85] The Proposed Rules will therefore have a disparate impact on LGBTQ individuals whose involvement in the criminal legal system is often connected to past trauma and/or the result of biased policing.

The expansion of asylum bars to include various misdemeanor offenses that were not previously considered particularly serious also unfairly sweeps trafficking survivors into its dragnet. Trafficking survivors frequently come into contact with intervention resources and service providers only after contact with law enforcement occurs. Innovative criminal justice reform efforts currently being adopted across the country include special trafficking courts that recognize the need for discretion in the determination of criminal culpability.[86] The same approach should be employed in the determination of asylum eligibility, where the applicant's life and safety are on the line.

The Proposed Rules instead preclude asylum adjudicators from using a trauma-centered approach, categorically barring countless trafficking survivors convicted of misdemeanor and felony offenses without any opportunity to present the specific circumstances of their claim.

---

83 *See* Aengus Carroll and Lucas Ramon Mendos, *State Sponsored Homophobia: A World Survey of Sexual Orientation Laws: Criminalisation, Protection and Recognition* 12th Ed. (International Lesbian, Gay, Bisexual, Transgender, and Intersex Association (ILGA), 2017), https://ilga.org/downloads/2017/ILGA_State_Sponsored_Homophobia_2017_WEB.pdf.

84 *See* Sharita Gruberg, "LGBTQ Undocumented Immigrants Face an Increased Risk of Hate Violence," *Center for American Progress*, June 10, 2014, https://www.americanprogress.org/issues/immigration/news/2014/06/10/91233/lgbt-undocumented-immigrants-face-an-increased-risk-of-hate-violence/.

85 *See eg.,* Sharita Gruberg, "How Police Entanglement with Immigration Enforcement Puts LGBTQ Lives at Risk," *Center for American Progress*, April 12, 2017, https://www.americanprogress.org/issues/lgbtq-rights/reports/2017/04/12/430325/police-entanglement-immigration-enforcement-puts-lgbtq-lives-risk/.

86 Elise White, et al., "Navigating Force and Choice: Experiences in the New York City Sex Trade and the Criminal Justice System's Response," *Center for Court Innovation*, December 2017 (noting that 78% of participants in the report's study had been arrested, mostly for non-violent, non-prostitution offenses such as *drug possession*).

AR.10019

## IX.    The Proposed Definition of "Conviction" and "Sentence" for the Purposes of the New Bars Further Excludes Those in Need of Protection

The section of the Proposed Rules that outlines a new set of criteria for determining whether a conviction or sentence is valid for the purpose of determining asylum eligibility violates the INA. The Proposed Rules impose an unlawful presumption against asylum eligibility for applicants who seek post-conviction relief while in removal proceedings for longer than one year after their initial convictions. They also deny full faith and credit to state court proceedings by attributing improper motives to state court actors.[87]

### A.    *The Proposed Rules undermine Sixth Amendment protections and harm immigrants unfamiliar with the complex criminal and immigration framework governing prior convictions.*

The Proposed Rules outline a new multi-factor process asylum adjudicators must use to determine whether a conviction or sentence remains valid for the purpose of determining asylum eligibility.  This proposal begins from the premise that "[n]o order vacating a conviction, modifying a sentence, clarifying a sentence, or otherwise altering a conviction or sentence, shall have any effect."[88]  This presumption is overcome only if the adjudicator finds that the court had authority to issue the order and the order "was not entered for rehabilitative [or immigration] purposes."  And an order presumptively fails this test if it was entered into after the asylum seeker was placed in removal proceedings or if the asylum seeker moved for the order more than one year after the date the original conviction or sentence was entered.[89]

This newly created presumption unfairly penalizes asylum applicants, many of whom may not have the opportunity to seek review of their prior criminal proceedings until applying for asylum.[90] In *Padilla v. Kentucky*, the Supreme Court recognized that the immigration consequences of a conviction are sufficiently serious for the Sixth Amendment to require a noncitizen defendant to be competently advised of them before agreeing to a guilty plea.[91] By imposing a presumption against the validity of a withdrawal or vacatur of a plea, the Proposed Rules hold asylum seekers whose rights were violated under *Padilla* to a different standard; even though they too were denied effective assistance of counsel in the course of their underlying criminal proceedings, asylum seekers will be forced to rebut a presumption that their court-ordered withdrawal or vacatur is invalid. The Proposed Rules therefore compound the harm to

---

[87] *See Saleh v. Gonzales*, 495 F.3d 17, 25-26 (2d Cir. 2007) (discussing 28 U.S.C. § 1738, requiring federal courts to give full faith and credit to state acts, records, and judicial proceedings and U.S. Const. art. IV, § 1, and finding that there was no violation where the BIA stopped short of "refusing to recognize or relitigating the validity of [Saleh's] state conviction.").

[88] Proposed Rules at 69660.

[89] Proposed Rules at 69655.

[90] On page 69656 of the Proposed Rules, the Department of Homeland Security and the Department of Justice urge that "[i]t is reasonable to conclude that an alien who has a meritorious challenge to a criminal conviction based on a procedural or substantive defect is more likely to seek post-conviction relief sooner than an alien who is seeking relief on rehabilitative grounds…"

[91] *Padilla v. Kentucky*, 559 U.S. 356 (2010).

AR.10020

immigrants who, in addition to facing persecution in their home countries, have been denied constitutionally compliant process in the United States criminal legal system.

Many asylum applicants, especially those in vulnerable populations isolated from resources and unfamiliar with the due process protections available to them in the United States, may not have discovered the defects in their underlying criminal proceedings until their consultation with an immigration attorney, or until they are placed into removal proceedings, which may happen several years after a conviction. Imposing a presumption *against* the validity of a plea withdrawal or vacatur in these cases will undoubtedly lead to the wrongful exclusion of countless immigrants from asylum simply because they were unable to adequately rebut the presumption, particularly in a complex immigration court setting without the benefit of appointed counsel.

> **B.** *The Proposed Rules violate the full faith and credit to which state court decisions are entitled.*

The Proposed Rules further improperly authorize immigration adjudicators to second-guess the decision of a state court, even where the order on its face cites substantive and procedural defects in the underlying proceeding. The proffered justification for this presumption against the validity of post-conviction relief is to "ensure that aliens do not have their convictions vacated or modified for purported rehabilitative purposes that are, in fact, for immigration purposes," "to codify the principle set forth in *Matter of Thomas and Thompson*," and to bring the analysis of post-conviction orders in line with *Matter of Pickering*.[92] The agencies misread the applicable law, however, by authorizing adjudicators to disregard otherwise valid state orders.

Apart from their textual infirmity, the Proposed Rules abandon the presumption of regularity that should accompany state court orders, thus upending settled principles of law. The Proposed Rules cite a misleading quote from *Matter of F-* in support of allowing asylum adjudicators to look beyond the face of a state court order; had the Rules' authors looked to the full case, they would have read the following: "Not only the full faith and credit clause of the Federal Constitution, but familiar principles of law require the acceptance at face value of a judgment regularly granted by a competent court, unless a fatal defect is evident upon the judgment's face. However, the presumption of regularity and of jurisdiction may be BIA offers support for the proposition that an adjudicator should presume the validity of a state court order unless there is a reason to doubt it, contrary to the *presumption of irregularity* put forward in the Proposed Rules.

The authority extended to adjudicators by the Proposed Rules also violates the law of multiple circuits, including *Pickering*, on which it relies.[93] In *Pickering v. Gonzales*, the Sixth Circuit Court of Appeals held that despite the petitioner's stated motive of avoiding negative

---

[92] Proposed Rules at 69655-56 (*citing Matter of Thomas and Thompson*, 27 I.&N. Dec. 674 (A.G. 2019) and *Matter of Pickering*, 23 I.&N. Dec. 621 (BIA 2003), *rev'd on other grounds by Pickering v. Gonzales*, 465 F.3d 263, 267-70 (6th Cir. 2006)).

[93] *See id.* (*citing Matter of Pickering*, 23 I.&N. Dec. 621).

AR.10021

immigration consequences, the BIA was limited to reviewing the authority of the court issuing the order as to the basis for his vacatur.[94] Similarly, in *Reyes-Torres v. Holder,* the Ninth Circuit Court of Appeals held that the motive of the respondent was not the relevant inquiry.[95] Rather, "the inquiry must focus on the state court's rationale for vacating the conviction."[96] In addition, the Third Circuit Court of Appeals in *Rodriguez v. U.S. Att'y Gen.*, which the Proposed Rules cite as "existing precedent," held that the adjudicator must look only to the "reasons explicitly stated in the record and may not impute an unexpressed motive for vacating a conviction."[97] Moreover, the *Rodriguez* court stated that to determine the purpose of a vacatur, the adjudicator must first look to the face of the order vacating the conviction, and "if the order explains the courts reasons … the [adjudicator's] inquiry must end there."[98] The Proposed Rules contain no such limiting language to guide the adjudicator's inquiry. Instead, the Rules grant adjudicators vague and indefinite authority to look beyond even a facially valid vacatur. Such breadth of authority undermines asylum seekers' rights to a full and fair proceeding.

    C. *The Proposed Rules wrongly extend* Matter of Thomas and Thompson *to all forms of post-conviction relief and impose an ultra vires and unnecessary burden on asylum seekers.*

Finally, the above-described presumption is ultra vires and unnecessary. As an initial matter, the Proposed Rules' reliance on *Matter of Thomas and Thompson* is flawed. The Attorney General's decision in *Matter of Thomas and Thompson* has no justification in the text or history of the immigration statute.

To start, nowhere does the plain text of the INA support giving adjudicators the authority to give effect only to state court sentence modifications undertaken to rectify substantive or procedural defects in the underlying criminal proceedings. On its face, the statute requires a "convict[ion] by a final judgment." A vacated judgment is neither "final" nor a "judgment"—it "has no effect" whatsoever.[99] Likewise, a vacated conviction is no conviction at all. Nothing in the statutory definition of "conviction" suggests a different approach here.[100]

---

[94] *Pickering v. Gonzales*, 465 F.3d 263, 267-70 (6th Cir. 2006).

[95] *Reyes-Torres v. Holder*, 645 F.3d 1073, 1077-78 (9th Cir. 2011) (*citing Cardoso-Tlaseca v, Gonzales*, 460 F.3d 1102, 1107 n.3 (9th Cir. 2006) and *Pickering v. Gonzales*, 454 F.3d 525 (6th Cir. 2006), *amended and superseded* by *Pickering*, 465 F.3d at 263.

[96] *Id.*

[97] *Rodriguez v. U.S. Att'y Gen.*, 844 F.3d 392, 397 (3d Cir. 2006) (noting that "[T]he IJ may rely only on reasons explicitly stated in the record and may not impute an unexpressed motive for vacating a conviction.").

[98] *Id.* ("Put simply, '[w]e will not . . . permit[ ] . . . speculation . . . about the secret motives of state judges and prosecutors,'" *quoting Pinho v. Gonzales*, 432 F.3d 193, 214-215 (3d Cir. 2005)).

[99] *E.g.*, *Fort Knox Music Inc. v. Baptiste*, 257 F.3d 108, 110 (2d Cir. 2001).

[100] 8 U.S.C. § 1101(48)(A) ("The term 'conviction' means, with respect to an alien, a formal judgment of guilt of the alien entered by a court or, if adjudication of guilt has been withheld, where—(i) a judge or jury has found the alien guilty or the alien has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilt, and (ii) the judge has ordered some form of punishment, penalty, or restraint on the alien's liberty to be imposed.").

23

Thus, nothing in the statute allows the government to treat a vacated judgment as valid and effective based on when, how, or why it was vacated. Put differently, the validity of a court order does not depend on the judge's apparent subjective reasons for entering it, or even whether the judge's legal reasoning was wrong,[101] and the statute leaves no room for the proposal's contrary presumption. The only even arguably permissible criterion in the proposal is whether the vacating court had jurisdiction to issue the order—but even then, the proposal errs by presuming that a vacatur order is invalid unless the adjudicator is shown otherwise. Court orders are presumptively valid, not the other way around.[102]

The same is true of orders modifying, clarifying, or altering a judgment or sentence. Again, nothing in the statute authorizes the government to ignore such an order based on the order's timing or the adjudicator's view of the reasons behind it. And there is no serious argument that Congress, in using the phrase "convicted by a final judgment," contemplated federal asylum adjudicators second-guessing state courts in this way. The statute's plain language flatly forecloses this aspect of the proposal. The BIA recognized this in *Matter of Cota-Vargas*, where it concluded that applying "the *Pickering* rationale to sentence modifications has no discernible basis in the language of the Act."[103]

Nor does the legislative history support such a rule. Based on the text of the INA and the well-documented legislative history behind Congress's definition of "conviction" and "sentence" in 8 U.S.C. § 1101(a)(48), the Board in *Matter of Cota-Vargas* determined that Congress intended to ensure that, generally, proper admissions or findings of guilt were treated as convictions for immigration purposes, even if the conviction itself was later vacated. Neither the text of the INA nor the legislative history of the definitions reveal any attempt on Congress's part to change the longstanding practice of giving effect to state court sentencing modifications. For these reasons, *Matter of Thomas and Thompson* lacks Congressional support for its rule and should not be extended.

Moreover, as applicants for immigration benefits or relief from removal, asylum seekers already bear the burden of demonstrating their eligibility for asylum.[104] The Proposed Rules do not alter or shift this burden, nor do they provide evidence supporting the need for this presumption. By introducing a presumption of bad faith into asylum adjudication, the Proposed Rules unfairly interfere with asylum seekers' efforts to establish their claims. Immigration law, and asylum law in particular, is already highly complex, and the process of seeking asylum is in many instances re-traumatizing, particularly for applicants who do not have counsel to represent them and who lacked effective counsel in their underlying criminal proceedings. The Proposed Rules as applied to asylum applicants who seek post-conviction relief transform an already difficult process into an adversarial inquiry, contrary to the intent of Congress.

---

101 *E.g.*, *Patton Boggs, LLP v. Chevron Corp.*, 825 F. Supp. 2d 35, 40 (D.D.C. 2011).

102 *E.g.*, *Lee v. Ali (In re Ali)*, No. 17-30413, at *5 (Bankr. S.D. Tex. Jan. 30, 2018) ("A court's orders are generally *presumed valid*; therefore, the burden of establishing that the Harris County Court's order was invalid rests with [the challenger].").

103 *Matter of Cota-Vargas*, 23 I.&N. Dec. 849, 852 (BIA 2005).

104 *Matter of S-K-*, 23 I.&N. Dec. 936, 939-40 (BIA 2006).

AR.10023

### X.     Conclusion

For the foregoing reasons, IJN and its four member organizations, ILRC, IDP, JFL, and NIPNLG, strongly oppose this rule.  In addition to the arguments made above, the Proposed Rules represent a sweeping and unauthorized change to asylum in the United States.  The Proposed Rules would endanger the lives of untold thousands by leaving them at greater risk of *refoulement* in violation of our nation's treaty obligations, and do not make communities safer. As organizations that work closely with immigrant communities, criminal defenders, and immigration attorneys, we encourage the agencies to rescind these harmful Proposed Rules in full.

We request that the agencies consider this comment on the Proposed Rules.  Please do not hesitate to contact Cristina Velez at cristina@nipnlg.org if you have any questions or need any further information. Thank you for your consideration.

Oliver Merino
Immigrant Justice Network Coordinator
Immigrant Justice Network
1015 15th Street NW, 6th Floor
Washington, DC 20005

Sirine Shebaya
Executive Director
National Immigration Project of the National Lawyers Guild
2201 Wisconsin Ave., NW, Suite 200
Washington, DC 20007

Sameera Hafiz, Esq.
Policy Director
Immigrant Legal Resource Center
1015 15th Street NW, 6th Floor
Washington, DC 20005

Alisa Wellek
Executive Director
Immigrant Defense Project
40 W. 39th Street, 5th Floor
New York, NY 10018

Paromita Shah
Executive Director
Just Futures Law
95 Washington Street, Suite 104-149
Canton, MA 02021

AR.10024

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9eko-7cr6
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0506
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Irena Sullivan
**Organization:** Tahirih Justice Center

## General Comment

Attached please find comments in pdf form from the Tahirih Justice Center in response to the EOIR proposed rule: Procedures for Asylum and Bars to Asylum Eligibility.

## Attachments

Tahirih Asylum bars NPRM comments Final

AR.10025



*Protecting Immigrant
Women and Girls
Fleeing Violence*

January 21, 2020

*Submitted via* www.regulations.gov

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
United States Department of Justice

**Re:    Comments in Response to Proposed Rule:** *Procedures for Asylum and Bars
to Asylum Eligibility*: EOIR Docket No. 18-0002; 84 F.R. 69640 / A.G. Order
No. 4592-2019

Dear Assistant Director Reid:

    The Tahirih Justice Center (Tahirih) is pleased to submit the following
comments in response to the Executive Office for Immigration Review's (EOIR) and
United States Citizenship and Immigration Services' (USCIS) Proposed Rule (NPRM)
and Request for Comment on *Procedures for Asylum and Bars to Asylum Eligibility;*
EOIR Docket No. 18-0002; 84 F.R. 69640 / A.G. Order No. 4592-2019 issued on
December 19, 2019.

## I.    Introduction

    Tahirih is a national, nonpartisan policy and direct services organization that
has assisted over 25,000 immigrant survivors of gender-based violence (GBV) over
the past twenty-two years.  Our clients endure horrific abuses such as human
trafficking, domestic violence, sexual assault, forced marriage, and honor crimes.
**As an organization that promotes safety and justice for survivors, we are strongly
opposed to this NPRM ("the proposed rule') and urge EOIR and USCIS to promptly
rescind it for reasons including the following.**

## II.    The Proposed Rule Will Cause Irreparable Harm to Survivors of GBV

    1.    <u>Barring Asylum for those who have Committed Domestic Violence
Acts and/or Offenses will Punish Survivors, Despite the Rule's
Exception for Non-Primary Perpetrators</u>

    The NPRM proposes to amend current regulations to render ineligible for
asylum any individuals who have been convicted of a crime involving domestic
violence, and those whom there are "serious reasons for believing" have engaged
in acts of domestic "battery or extreme cruelty."[i]  The rule provides a narrow
exception modeled after the waiver of the domestic violence ground of
deportability, for those who themselves have endured battery or extreme cruelty
and who are/were not the "primary perpetrator" of abuse.  For the exception to
apply, a finding must be made that the applicant "(1) … acted in self-defense; (2) …

**ATLANTA**
230 Peachtree Street NW
Atlanta, GA 30303
Tel: 470-481-4700
Fax: 470-481-7400
Atlanta@tahirih.org

**BALTIMORE**
211 E. Lombard Street
Suite 307
Baltimore, MD 21202
Tel: 410-999-1900
Fax: 410-630-7539
Baltimore@tahirih.org

**GREATER DC | NATIONAL**
6402 Arlington Boulevard
Suite 300
Tel: 571-282-6161
Fax: 571-282-6162
TTY: 711
Falls Church, VA 22042
GreaterDC@tahirih.org
Justice@tahirih.org

**HOUSTON**
1717 St. James Place
Suite 450
Houston, TX 77056
Tel: 713-496-0100
Fax: 713-481-1793
Houston@tahirih.org

**SAN FRANCISCO BAY AREA**
881 Sneath Lane
Suite 115
San Bruno, CA 94066
Tel: 650-270-2100
Fax: 650-466-0006
SFBayArea@tahirih.org

**tahirih.org**

AR.10026

was found to have violated a protection order intended to protect him or her; or (3) … committed, was arrested for, was convicted of, or pled guilty to committing a crime that did not result in serious bodily injury, and there was a connection between the crime and the applicant's having been battered or subjected to extreme cruelty."[ii]   For several reasons, this exception will prove inadequate in practice to shield survivors from its reach, and will result in grave injustices.

          *a.*    *It is Difficult to Determine the Primary Perpetrator of Domestic Violence in Dual Arrest Cases, Particularly when Immigrant Victims are Involved*

As recognized by the rule's proposed exception, dual arrests are well-known to arise in the domestic violence context.[iii]   Dual arrests are in fact often the product of jurisdictions' zealous response to domestic violence but can unwittingly function to the detriment of victims.  Such arrests typically occur when a victim acts in self-defense or when, to avoid accountability or retaliate, an abuser fabricates a cross-complaint for abuse against the victim.   In these cases, even trained law enforcement officers can be reluctant to determine which party is the primary aggressor when arriving at the scene of an incident.[iv]  Language and/or cultural barriers exacerbate the situation, which is frequently the case when the survivor is an immigrant.[v]  Well-aware of this reality, abusers are quick to exploit it and manipulate a victim's particular vulnerability in the abuser's favor.

In 2017, Tahirih conducted a nationwide survey of immigrant women and advocates working with them to determine the most urgent and prevalent challenges immigrant women face in the United States.  The responses to that survey indicate that language barriers faced by survivors allow many abusers to control the narrative in dual-arrest situations.  One advocate noted that an interpreter "is often someone the victim knows personally. I've even had cases where the only available interpreter was the accused perpetrator of the crime." Another stated: "We've had women arrested when they were abused by their spouse because they can't explain to the officer what happened, especially since they are under so much stress in that moment."   Other problematic scenarios arise when children are used as interpreters. Children who translate for their mothers regarding abuse are traumatized by that experience. Children might not have the vocabulary or cognitive ability to adequately express what they are seeing or hearing, while also being primary or secondary victims of abuse themselves.[vi] Faced with an impossible "choice," some intentionally mistranslate their mother's words for fear of sending their father to jail or causing his deportation.[vii]

Abusers are also known to retaliate against victims by framing them for crimes.  Tahirih is aware of a case in which an abuser planted drugs in his wife's car and then smashed her tail light to get her pulled over and arrested.  In another case, an abuser set fire to his home himself and called the fire department to report that his wife did it. She was arrested and jailed for weeks.  These examples show the insidious lengths to which perpetrators are willing to go to manipulate the legal system to silence and intimidate their victims.

As another tool of abuse, perpetrators notoriously try to thwart survivors' immigration cases by fabricating damaging information about the survivor and then reporting it to DHS.   In the marriage-based visa petitioning context, Congress expressly recognized and addressed this through the bipartisan Violence Against Women Act.[viii] There are no analogous protections in the asylum context to protect a survivor from the devastating effects of a vindictive abuser's unfounded

allegations. Furthermore, steps the Administration has recently taken to allow for anonymous tips to be submitted on an online form and establishing a dedicated office and phone line to receive complaints from supposed "victims" of immigrants has undoubtedly emboldened perpetrators more and newly lent more strength to otherwise weak accusations.[ix]

      b.     *The Proposed Rule's Evidentiary Standards are Unjustly Low and Allow DHS Unfettered, Unreviewable Discretion in Implementing them*

Under the proposed rule, asylum-seekers will be subject to the domestic violence bar where there are "serious reasons for believing" that they have engaged in acts of domestic "battery or extreme cruelty."[x]  Furthermore, the limited exception theoretically available to abused non-primary perpetrators will fall short of protecting those swept up in the bar because "all reliable evidence"[xi] can be considered in administering it:

(B) In making a determination under paragraph (c)(6)(v)(A) of this section, including in determining the existence of a domestic relationship between the alien and the victim, the underlying conduct of the crime may be considered and the asylum officer is not limited to facts found by the criminal court or provided in the underlying record of conviction.[xii]

The proposed rule leaves the door wide open for adjudicators to abuse discretion in deciding, subjectively, that there are "serious reasons for believing" that an applicant has engaged in acts of domestic battery or extreme cruelty.  It is unclear how "serious" will be defined, and whether and how detrimental and potentially false information provided by abusers will be considered in decision-making.  The risk of erroneous decisions at the expense of survivors is high.

In addition, this limited primary perpetrator exception will be extremely challenging for adjudicators to apply.  Law enforcement agents are themselves ill-equipped to make primary aggressor determinations for the reasons explained above.  Immigration adjudicators are even further removed from the immediate circumstances involved.  The dynamics of domestic violence are nuanced and complex, particularly when victims are immigrants, as even more tools can be employed to cruel advantage by abusers to isolate, control, and intimidate their victims.  It is essential for decisionmakers to have a deep understanding of these dynamics and the exploitative patters abusers engage in to manipulate their victims. It is likewise critical that evidence be deemed inherently "unreliable" when provided by an alleged abuser.  While the proposed exception to the asylum bar ostensibly aims to promote protection of individuals from domestic violence, we are deeply concerned that in practice, it will instead inflict harm on victims.

      i.     A high Standard of Proof is Appropriate When a Denial of Protection is at Stake

To bolster the validity of applying a liberal "conduct-specific" inquiry to trigger the bar, the rule notes that this same inquiry is used in the VAWA context when domestic violence victims seek lawful status based on the abuse they have suffered.[xiii]  In other words – DHS argues that because self-petitioners must only meet a low standard of proof to establish eligibility for protection, so, too

should DHS be entitled to a similarly low evidentiary burden to trigger a bar to asylum.  Yet, the equivalence drawn here is superficial. The vastly different interests at stake in these circumstances demand different burdens of proof.  A low burden is appropriate and necessary to protect victims in the VAWA self-petitioning context because 1) more harm is done by erroneously denying relief than erroneously granting it;[xiv] 2) a low standard maximizes the self-petitioner's confidentiality and therefore, safety;[xv] 3) certain forms of evidence can be inaccessible to a victim precisely because the abuser has blocked her access to doctors or courts, for example; and 4) no liberty interests are implicated for alleged perpetrators.  By contrast, a rigorous burden of proof is appropriate when potentially barring applicants from asylum.   The consequences of invoking the bar are dire, with the applicant's life and safety hanging in the balance.  Per the Supreme Court, asylum itself is granted to those who establish a well-founded fear of persecution – i.e., where the chance of persecution is "one in ten,"[xvi] for this very reason.

> c.    *The Domestic Violence Asylum Bar and Primary Perpetrator Exception Must Not be Implemented Arbitrarily*

Tahirih firmly opposes the proposed rule.  If finalized, however, we urge USCIS and EOIR to implement each of the following measures in their entirety to mitigate the harm the bar will inflict and maximize the utility of the primary persecutor exception for victims:

- Highly specialized relevant training in the dynamics of domestic violence and the unique vulnerabilities of immigrant victims should be required for all adjudicators, informed by meaningful input from all stakeholders, including advocates for survivors
- When an applicant is deemed not to meet the exception to the bar, the decision should be automatically subject to supervisory review
- Adjudicators should provide a detailed description as to how a decision that an applicant does not merit the exception was made; i.e., the adjudicator should indicate in writing what and how specific factual findings were made and how they were weighed against other evidence
- Adjudicators should also explain in detail, in writing, their initial decision to apply the bar, i.e., how they determined that "serious reasons" existed for believing that the applicant engaged in acts of domestic violence or extreme cruelty
- When an applicant doesn't meet the exception, adjudicators should identify what, if any, evidence was relied on that was provided by the alleged primary perpetrator, how it was weighed, and what the adjudicator did to determine whether it was false or fabricated
- Agencies should regularly engage with stakeholders to assess the impact of the bar/exception on survivors

2.    <u>Removing Automatic Review of Solely Discretionary Denials of Asylum is Arbitrary and Capricious and will Needlessly Harm Survivors of GBV</u>

The proposed rule rescinds the current regulation requiring automatic reconsideration of a solely discretionary denial of asylum.[xvii]  While an asylum applicant in this context is still granted withholding of removal, she 1) can no longer protect and/or reunite with her spouse or minor

children at home; 2) is susceptible to removal at any time; 3) cannot travel abroad; and 4) cannot regularize her status to secure lawful permanent residence and ultimately citizenship.

In revoking this provision, the NPRM claims confusion, inefficiency, and lack of necessity as the justification.  Among the sources of confusion are 1) who is to reconsider the denial of asylum; and 2) how the process for reconsideration should be initiated. The NPRM goes on to say that "continued litigation on these questions would be an ongoing burden for applicants, the immigration system, and courts."[xviii]  As to lack of necessity, the NPRM points to various other avenues for review of asylum denials.[xix]  However, in light of the dire interests at stake in the asylum context – the loss of life and freedom – it is arbitrary and capricious to attempt to cure this provision's alleged deficiencies by simply eliminating it entirely, without considering viable alternatives.  Put another way, it is USCIS' obligation to develop a clear process for reconsideration, and it cannot evade this responsibility by claiming before undertaking it that it would simply be too difficult.

Withholding of removal is an insufficient substitute for asylum, and those fleeing persecution should have every opportunity to pursue asylum.  This is particularly evident in cases where an individual has fled persecution, but they cannot protect their family through asylum and they are ultimately harmed in their home country.

In one Tahirih case, Sarah* from Nigeria, fled to the US after suffering severe domestic violence.  It was unsafe for Sarah's 14-year-old daughter to accompany her initially.  While Sarah's claim was pending, someone brutally attacked her daughter on her way home from school and she died the next day of her injuries.  Sarah's husband had been threatening her children for months. Sarah's other son is in hiding and her attorney is requesting humanitarian parole for him and an expedited asylum interview as a result.[xx]

Confusion and inconsistency within the current provision's implementation can be addressed through amending the rule and/or issuing guidance outlining a specific process to implement reconsiderations, as is done routinely in other contexts.  We urge EOIR and USCIS to do either or both, with meaningful input from stakeholders, including those serving asylum seekers, given the grave protection interests at issue.

### III.     The Proposed Rule Violates the Fourteenth Amendment as it Disproportionately Harms Non-White Immigrants

The proposed rule also raises serious equal protection concerns.  Asylum seekers are predominantly people of color.[xxi]  By targeting asylum seekers specifically for additional bars to relief, the NPRM seeks to operationalize the animus that high-ranking government officials, including the supposed Acting Director of USCIS, have repeatedly expressed about keeping non-white immigrants from places as disparate as Central America, Haiti, Mexico, the Middle East, and Nigeria out of the country.[xxii] A policy implemented on that basis violates the Equal Protection Clause of the Fourteenth Amendment.

### IV.     Conclusion

Excluding from asylum individuals deemed to have committed domestic violence offenses will ultimately punish those escaping life-threatening persecution at home and have a particularly harsh impact on survivors of domestic violence themselves.  This sweeping proposed rule is not necessary to serve any government interest.  While the NPRM purports to protect survivors and deter domestic abuse, in practice, the rule's potential to deepen trauma and double-down on injustice for survivors is very high.  **We therefore urge EOIR and USCIS to immediately abandon the proposed rule.  If the rule is finalized, we ask that our recommendations to ensure accountability in its application and to mitigate the harms that will result from its application are adopted and implemented.**

We look forward to your detailed feedback on these comments, and please contact me at irenas@tahirih.org or 571-282-6180 for additional information.

Respectfully,

Irena Sullivan
Senior Immigration Policy Counsel

---

[i] Proposed Rule §§208.13(c)(6)(v) and (vii).

[ii] Proposed Rule §208.13(c)(6)(vii)(F); *See also* INA §237(a)(7)(A) and (a)(2)(E)(i)-(ii).

[iii] https://permanent.access.gpo.gov/lps104035/usdoj/www.ojp.usdoj.gov/nij/publications/dv-dual-arrest-222679/dv-dual-arrest.pdf; https://www.tandfonline.com/doi/abs/10.1080/08974454.2013.759068; https://digitalcommons.law.yale.edu/cgi/viewcontent.cgi?referer=&httpsredir=1&article=1279&context=yjlf

[iv] *See* https://journals.sagepub.com/doi/abs/10.1177/0886260517739290?journalCode=jiva

[v] https://journals.sagepub.com/doi/abs/10.1177/0886260517739290?journalCode=jiva&; Finn, M. A., & Bettis, P. (2006). Punitive action or gentle persuasion: Exploring police officers' justifications for using dual arrest in domestic violence cases. Violence Against Women, 12, 268-287.

[vi] §208.13(c)(6)(v)(A) of the proposed rule also bars from asylum an individual who has been convicted of a crime involving child abuse, neglect, or abandonment.  Yet, many states have "failure-to-protect" statutes that have been used to prosecute battered mothers for not shielding their children from being abused by a spouse or partner, or even from being exposed to the abuse of the mother. Such statutes already penalize the victim who is often put in an impossible position, as she is likely to lose her children and exacerbate the violence if she attempts to leave and may have nowhere to go and no supports available to her. Women are more often prosecuted than men under such statutes. Exacerbating the immigration consequences that can flow from this kind of punitive use of such statutes (to justify the state's removal of children from the mother, or to coerce the mother to testify against the abuser) subjects the victim to further institutional violence and systemic injustice. *See, e.g.*, Sarah Rogerson, Special Issue: Immigration and the Family Court: Special Issue Article: Unintended and Unavoidable: the Failure to Protect Rule and its Consequences for Undocumented Parents and their Children, 50 fam. ct. rev. 580 (October 2012) and Margo Lindauer, Symposium: Theory and Praxis in Reducing Women's Poverty: Damned if you Do, Damned if you Don't: Why Multi-Court-Involved Battered Mothers Just Can't Win, 20 am. U.J. Gender Soc. Pol'y & l. 797 (2012).

[vii] http://www.tahirih.org/wp-content/uploads/2018/01/Tahirih-Justice-Center-Survey-Report-1.31.18-1.pdf;  *See also* Casa de Esperanza: National Latin@ Network. Wrongful Arrests and Convictions of Immigrant Victims of Domestic Violence:    Stories    from    the    Field.    Retrieved    from https://www.nationallatinonetwork.org/images/files/Quote_Sheet_for_Hill_Visits_-_Service_Providers.pdf.

[viii] *See* 8 U.S.C. §1367.

AR.10031

[ix] *See* https://www.federalregister.gov/documents/2019/08/08/2019-17022/agency-information-collection-activities-new-collection-uscis-tip-form#addresses and https://www.ice.gov/voice.

[x] Proposed rule §§208.13(c)(6)(v) and(vii).

[xi] Proposed rule at 69652.

[xii] Proposed rule §208.13(c)(6)(v)(B).

[xiii] *See* proposed rule FN 4: "…a conviction would not be required in certain situations involving battery or extreme cruelty. That conduct-specific inquiry is essentially identical to the inquiry already undertaken in situations in which an alien seeks to obtain immigration benefits based on domestic violence that does not necessarily result in a conviction. *See, e.g.,* INA 240A(b)(2)(A), 8 U.S.C. 1229b(b)(2)(A); 8 CFR 204.2(c)(1)(i)(E), (c)(1)(vi), (c)(2)(iv), (e)(1)(i)(E), (e)(1)(vi), and (e)(2)(iv)."

[xiv] And, in fact, historically very low rates of fraudulent filings have been found among VAWA self-petitions. According to USCIS data from 2012-2018, the rate of fraud among VAWA self-petitions was miniscule – a mere .142%. Data is available upon request. *See also* Congressional Research Service report, "Immigration Provisions of the Violence Against Women Act (VAWA)", by William Kandel, June 7, 2012 (hereafter CRS Report), 2nd page of summary: "While some suggest that VAWA provides opportunities for dishonest and enterprising foreign nationals to circumvent U.S. immigration laws, empirical evidence offers minimal support for these assertions."

[xv] Requiring further proof might involve seeking documents and statements directly from an abuser that would put him on notice that the victim was trying to escape, immediately exacerbating the risk to her safety.

[xvi] *INS v. Cardoza–Fonseca*, 480 U.S. 421, 1987.

[xvii] §208.16(e) would be rescinded; See proposed rule at 69660.

[xviii] *See* proposed rule at 69656-7; *See Shantu* v. *Lynch,* 654 F. App'x 608, 613-14 (4th Cir. 2016) (discussing these ambiguities); *see also* v. *INS,* 436 F.3d 89, 93 (2d Cir. 2006). These ambiguities have not been "definitively resolved," *Shantu,* 654 F. App'x at 614.

[xix] *See* proposed rule at 69657.

[xx] Sarah is applying for asylum, but the facts illustrate how dangerous it is for family unable to follow to join relatives who have fled to the US.

[xxi] *See* Transactional Records Access Clearinghouse, *Asylum Decisions*, https://trac.syr.edu/phptools/immigration/asylum (showing nationality of people seeking asylum in the United States).

[xxii] *See, e.g.,* Michael D. Shear & Julie Hirschfeld Davis, *Stoking Fears, Trump Defied Bureaucracy to Advance Immigration Agenda*, N.Y. Times (Dec. 23, 2017), https://perma.cc/F7LT-A8MC; President Donald Trump, Remarks on the Illegal Immigration Crisis and Border Security (Nov. 1, 2018), https://perma.cc/F4DX-RZ84; Jeff Sessions, U.S. Att'y Gen., Remarks on Immigration Enforcement, Las Cruces, NM (Apr. 11, 2018), https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-immigration-enforcement (Last accessed Dec. 12, 2019), https://perma.cc/DT3U-X4UG; Rebekah Entralgo, *Conservatives want a man who compared immigrants to rats to lead DHS* (Apr. 11, 2019), https://thinkprogress.org/conservatives-cuccinelli-dhs-immigrants-trump-7233d8f6f1ce/

AR.10032

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9eko-xu56
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0507
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Thng Phan

## General Comment

I oppose the cruel and harmful deportation of asylum seekers. The government should reform its asylum, refugee and immigration policies to create a more just world.

AR.10033

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9eko-y4t2
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0508
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Joshua Leach
**Address:**
  689 Massachusetts Ave.
  Cambridge,  MA,  02139
**Email:** jleach@uusc.org

---

## General Comment

See attached file(s)

---

## Attachments

UUSC_Public Comment_1.21.20

AR.10034

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for
Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of
Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41; Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility

January 21, 2020

To Whom It May Concern:

I write on behalf of the Unitarian Universalist Service Committee (UUSC) to express our strong opposition to the above-referenced proposed rules establishing seven new bars to eligibility for asylum. By categorically denying asylum on the basis of relatively minor criminal offenses—and, in some cases, mere *allegations* of criminal conduct—the proposed rules will almost certainly lead to the refoulement of people in desperate need of humanitarian protection.

Contrary to the proposed rules' assertions, these concerns are not adequately addressed by the fact that asylum-seekers subject to the new bars would have recourse to withholding of removal and Convention Against Torture (CAT) protections. Both alternative forms of protection mandate much higher burdens of proof, requiring an asylum-seeker to establish a greater than 50% likelihood of persecution in their home countries.

This is an extremely exacting standard that is very difficult to meet for people who have left homes and belongings behind. Such a high burden of proof should certainly never be applied in such a sweeping manner to cases where the consequence of a wrongful deportation may be torture or death.

Under the proposed rules, a person would be compelled to meet this high burden of proof merely on the basis of past low-level drug offenses, harmless immigration-related violations such as "illegal reentry," convictions for using false documents, allegations of certain acts of violence regardless of conviction, or smuggling or harboring offenses—even if they are asylum-seekers who were in fact "smuggling" their own child to safety.

Neither international law nor domestic practice has ever countenanced treating minor criminal offenses as grounds for categorically denying asylum. The right to life and security does not stop at the point at which a person has made mistakes. Categorical bars on the basis of real or alleged minor crimes also have a disproportionate impact on members of communities that are unjustly criminalized, overpoliced, and targeted by law enforcement, including Black and Trans communities.

For these reasons, we urge you to withdraw the proposed rules from consideration and focus on restoring the integrity of the right to seek asylum as enshrined in U.S. and international law.

Sincerely,
Joshua Leach
Policy Analyst
Unitarian Universalist Service Committee

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekp-im5a
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0509
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Daniel Kosten
**Organization:** National Immigration Forum

## General Comment

See attached file(s)

## Attachments

National Immigration Forum Comments on Additional Limitations on Eligibility for Asylum

AR.10036



**Practical Solutions for Immigrants and America**

January 21, 2020

Ms. Lauren Alder Reid
Assistant Director
Office of Policy
Executive Office for Immigration Review
5107 Leesburg Pike, Suite 2616
Falls Church, VA 22041

**Re: 8 CFR Part 1208 (EOIR Docket No. 18-0002)**

Dear Ms. Reid:

The National Immigration Forum (Forum) submits the following comments on the proposed rule titled 8 CFR Part 1208 (EOIR Docket No. 18-0002; AG Order No. 4592-2019), published in the Federal Register by the Department of Justice and the Department of Homeland Security (DHS) on December 19, 2019.

Founded in 1982, the Forum advocates for the value of immigrants and immigration to the nation. We play a leading role in the national debate about immigration, knitting together innovative alliances across diverse faith, law enforcement, veterans and business constituencies in communities across the country.

The Forum urges DOJ and DHS not to move forward with the proposed rule, as it is overbroad, departing from the existing clear statutory standard while undermining congressional intent. The proposed rule creates seven new bars to asylum that will dramatically scale back who can be eligible for asylum. These changes are in direct tension with both U.S. and international law. The proposed rule does not provide an adequate and comprehensive analysis of the potential impact of these seven bars, including whether the bars would prevent the United States from meeting its existing legal obligations, under statute and under treaties to which the United States is a party, including the Convention Against Torture.

This proposed rule would create even greater barriers to gaining asylum in a system that is already challenging to navigate, put asylum seekers with valid claims in danger, and undermine due process.

**The New Felony Bar is Overbroad and Inconsistent with Congressional Intent**

Congress currently bars asylum seekers convicted of aggravated felonies from obtaining asylum. While the Attorney General and DHS Secretary have authority to establish by regulation "any other conditions or limitations on the consideration of an application for asylum," the additional conditions cannot be "inconsistent with this chapter."

As DOJ and DHS acknowledge in the Notice of Proposed Rulemaking, the definition of felony in the proposed rule "might be over-inclusive." While the Forum appreciates that the agencies are seeking public comment on that point, we believe that the new bar is clearly overbroad and inconsistent with congressional intent. Creating a new, categorical bar to anyone with a felony conviction is plainly inconsistent with congressional intent, which explicitly differentiated between aggravated felonies and others felonies. Because aggravated felonies pose additional dangers to public safety, Congress defined (and over the years, expanded) that category, assigning additional adverse immigration consequences to it. By erasing the distinction between aggravated felonies and lesser felonies,

particularly those that lack a violent component, the proposed rule negates the careful work Congress has done in this area. While the Attorney General and the Secretary retain the ability to add additional categories of convictions to the list of barred offenses, the categorical natural of this new bar likely renders it invalid.

The new felony asylum bar will also be difficult to implement. Unlike the specific series of offenses set out by Congress to constitute aggravated felonies, jurisdictions vary in which offenses they define as felonies. The new felony bar will accordingly vary by jurisdiction and will not be uniform, leading to inconsistent outcomes.

The Forum believes that the felony bar is not consistent with congressional intent, over-expansive, and will lead to inconsistent outcomes. DOJ and DHS should reconsider it.

**New Bars Associated with Immigration Offenses Are Overbroad**

The proposed rule creates several new bars associated with immigration offenses – bars related to harboring, illegal reentry, and document offenses. While in certain circumstances, these offenses may justify denial of asylum, we believe that such decisions should be left to the discretion of immigration judges. These categorical bars are over-inclusive and will prevent asylum seekers with valid claims from obtaining relief, to which they are otherwise entitled.

The proposed rule's new bar against those with harboring offenses is not limited to human trafficking, having been broadened to cover first-time offenders who attempt to aid family members. Under the proposed rule, parents or spouses can be barred from obtaining asylum if they take steps to bring undocumented children or spouses into the United States. We believe that this bar is too harsh, preventing immigration judges from assessing the violations on a case-by-case basis, and threatening to undermine the sanctity of the family. We also have concerns that existing prohibitions against harboring, specifically the language about "transportation", could be applied to punish those who engage in routine conduct like driving someone to work or to a doctor's appointment. The Forum would favor the ability for immigration judges to make these assessments rather than creating a categorical bar for such offenses.

Similarly, the Forum is opposed to the creation of a new bar for illegal reentry. As the NPRM acknowledges this bar will commonly come into tension with U.S. treaty obligations, preventing valid asylum seekers fleeing danger from making their claims. While, as the NPRM explains, some asylum seekers may have alternative avenues for relief available to them, including statutory withholding of removal or protection, these alternatives are granted to only a handful of recipients, and are rare for those seeking relief without counsel. In most cases, it is likely that those with valid claims for asylum, falling under this bar, would be returned to danger, in violation of U.S. treaty obligations.

In addition, we note that entering the United States to seek asylum is permitted under federal law, making the use of the asylum processes for deterrent purposes particularly problematic.

A new bar for those with document offenses is over-inclusive. While persons convicted of preying upon innocent people to engage in identity theft should face criminal penalties and immigration consequences, some situations may not warrant such punishment such as when a spouse or child is unaware of the fraudulent nature of the documentation. Immigration judges should retain the discretion to evaluate the circumstances of the violation and be permitted to afford asylum relief where justified.

AR.10038

DOJ and DHS should not create new categories of asylum bars related to immigration offenses, but instead should allow immigration judges to continue to be able to use discretion to evaluate the claims of asylum seekers who otherwise would fall under the new bars.

**New Bars Related to Criminal Offenses Are Unnecessary and Overly Punitive**

The Forum has concerns about the proposed rule's new asylum bars relating to street gangs, domestic violence, drugs, and driving under the influence (DUI). Congress specifically defined the category of aggravated felonies to cover serious offenses that threaten the public safety. In addition, Congress and/or DOJ/DHS have added existing limitations for several additional offenses falling into these categories, such as those with multiple DUI offenses. The Forum agrees that certain gang, domestic violence, drug, and DUI offenses should be disqualifying for relief. However, as set out in the proposed rule, the bars may be over-expansive and prevent people with valid asylum claims from obtaining relief, even when they pose no danger to the public.

We are concerned that the standard for street gang-related offenses in the proposed rule may sweep in individuals who are not associated with street gangs. Because the proposed rule does not fully detail how an individual qualifies as a street gang member or how an activity is categorized as a gang related event, we have concerns about over-breadth. Will this be based on gang databases that commonly have been found to include significant numbers of non-gang members and lack due process protections? Will qualifying activities be determined by the location in which they occur? We have concerns that categorical bars to relief will be mistakenly applied to those who are not actually associated with gangs.

In addition, this particular expansion does not take into consideration the circumstances of the offense. In other words, did the asylum seeker voluntarily and freely engage in the offense or was coercion involved. Was the individual forced to engage in certain gang-related activity at the risk of losing their life or endangerment to a family member? We believe that immigration judges should be permitted to at least evaluate such circumstances prior to granting or denying relief.

We are similarly concerned that the new domestic violence bar to asylum relief will sweep in non-offenders. Because this bar does not require a criminal conviction, a categorical bar is troubling. We are particularly concerned about situations in which a domestic violence victim has been initially arrested along with her/his abuser, even when she/he is not the party at fault. Given existing bars against those with domestic violence convictions, as well as existing bars to those with aggravated felony convictions, we believe the expansion is unnecessary. Rather, we believe immigration judges should retain discretion in these situations and be permitted to grant relief in situations where the asylum seeker is not at fault.

We also have concerns about the expansion of the bar for those who have DUI convictions. While DUIs are serious offenses, immigration judges should retain discretion to determine whether they are disqualifying in the immigration context. Such review would be particularly important for first offenses where no one has been injured or killed or convictions in the distant past, including those who have pled guilty or no contest to prior offenses without understanding the immigration consequences. The bar for those convicted of drug offenses is also overbroad. Applying to those with possession offenses, not just drug traffickers, and failing to account for jurisdictions that have decriminalized certain drugs like cannabis, we again believe this bar is overbroad. With serious drug offenses already being considered to be aggravated felonies, we believe further bars to asylum for less serious offenses are unnecessary.

AR.10039

A majority of Americans (two-thirds) are united in believing that people who qualify for asylum should be allowed to come to the U.S. Eroding asylum through this proposed rule undermines our fundamental national values to provide protection to deserving asylum seekers. The proposed rule is in tension with federal law, including treaties to which the U.S. is a party. Because it is flawed and overbroad, we believe, DOJ and DHS should rescind the rule as currently proposed.

Thank you for considering these comments.

Sincerely,

Ali Noorani
Executive Director
National Immigration Forum

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekp-wxa0
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0510
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Rebecca Mitchell

---

## General Comment

This proposed rule would inject racial profiling into the asylum process. This latest attack would put even more people seeking asylum at risk of danger - and death. This would in turn eviscerate one of the most important defenses community members have against deportation.

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekp-f7h3
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0511
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Jorge Baron
**Address:**
   615 2nd Ave., Ste 400
   Seattle, WA, 98104
**Email:** jorge@nwirp.org
**Phone:** 206-587-4009
**Fax:** 206-587-4025

## General Comment

Northwest Immigrant Rights Project (NWIRP) strongly opposes the Proposed Rules and urges the Department of Homeland Security (DHS) and the Executive Office for Immigration Review (EOIR) to reject this proposal in full. Please find attached our full comment.

## Attachments

NWIRP Comments re Asylum Bars to Eligibility Final 01-21-20



Western Washington Office
615 Second Avenue
Suite 400
Seattle, Washington 98104

PHONE: 206-587-4009   TOLL-FREE: 800-445-5771   FAX: 206-587-4025   WEB: WWW.NWIRP.ORG

January 21, 2020

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41;
Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility

*Submitted VIA* www.regulations.gov

Dear Assistant Director Reid and Chief Dunn,

I am writing on behalf of Northwest Immigrant Rights Project (NWIRP) to submit this comment
regarding the Notice of Proposed Rule-Making (NPRM) and request for comment titled "Procedures for
Asylum and Bars to Asylum Eligibility," EOIR Docket No. 18-0002, A.G. Order No. 4592-2019, published
at 84 Fed. Reg. 69,640 (Dec. 19, 2019) ("Proposed Rules").  As outlined more fully below, NWIRP is
strongly opposed to this proposed rule and urges the Department of Homeland Security (DHS) and the
Executive Office for Immigration Review (EOIR) to abandon this proposal and maintain the current
regulatory framework.

**Interest in Proposed Rule**

Northwest Immigrant Rights Project (NWIRP) is a nationally-recognized legal services organization
founded in 1984. Each year, NWIRP provides direct legal assistance in immigration matters to over
15,000 low-income people from over 130 countries, speaking over 60 different languages and dialects.
NWIRP also strives to achieve systemic change to policies and practices affecting immigrants through
impact litigation, public policy work, and community education. NWIRP serves the community from four
offices in Washington State in Seattle, Granger, Tacoma, and Wenatchee.

Granger Office
121 Sunnyside Avenue
P.O. Box 270, Suite 146
Granger, Washington 98932

Tacoma Office
1119 Pacific Avenue
Suite 1400
Tacoma, Washington 98402

Wenatchee Office
620 North Emerson Avenue
Suite 201
Wenatchee, Washington 98801

NWIRP is a 501(c)(3) non-profit organization

AR.10043

NWIRP has particular expertise in the topic of the Proposed Rules. NWIRP has been providing immigration legal services for 35 years and is currently the largest nonprofit organization focused exclusively in providing immigration legal services in the Western United States. As explained below, NWIRP is deeply concerned about the impact the proposed rules will have on the client communities NWIRP serves as well as immigrant communities around the country. NWIRP was founded in 1984 as the Joint Legal Task Force for Central American Refugees, serving asylum seekers from Central America, and has provided legal assistance to asylum seekers throughout its existence. Each year, NWIRP provides legal assistance to hundreds of individuals seeking asylum protection in the United States.

**Opposition to the Proposed Regulatory Changes**

    **I.     Introduction**

On December 19th, the Department of Homeland Security (DHS) and the Department of Justice (DOJ) issued a joint set of Proposed Rules that would make three primary changes to the rules governing asylum adjudications.

The first proposed set of changes adds the following seven *categorical* bars to asylum eligibility: (1) any conviction of a felony offense; (2) any conviction for "smuggling or harboring" under 8 U.S.C. § 1324(a), even if the asylum seeker committed the offense for the purpose of bringing her own spouse, child or parent to safety; (3) any conviction for illegal reentry under 8 U.S.C. § 1326; (4) any conviction for an offense "involving criminal street gangs," with the adjudicator empowered to look to any evidence to determine applicability; (5) any second conviction for an offense involving driving while intoxicated or impaired; (6) any conviction *or accusation of conduct* for acts of battery involving a domestic relationship; (7) and any conviction for several newly defined categories of misdemeanor offenses, including *any* drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits.

The second section of the Proposed Rules provides a multi-factor test for immigration adjudicators to determine whether a criminal conviction or sentence is valid for the purpose of determining asylum eligibility. The third section rescinds a provision in the current rules regarding the reconsideration of discretionary asylum.

Taken together, these proposed changes constitute an unnecessary, harsh, and unlawful gutting of the asylum protections enshrined in United States and international law. NWIRP submits these comments to express opposition to the entirety of the Proposed Rules and grave concerns with the administration's continued efforts to exclude refugees from obtaining the security and stability the United States asylum system has long promised. We urge that the Proposed Rules be rescinded in their entirety.

    **II.    The Proposed Rules unnecessarily and cruelly exclude bona fide refugees from asylum eligibility**

*The barriers to asylum for those previously involved in the criminal legal system are already sweeping in scope; adding more barriers is cruel and unnecessary.*

AR.10044

The United States asylum system was first codified in statute through the Refugee Act of 1980, described by one prominent scholar as a bipartisan attempt to "reconcile our rhetoric with our law, our national immigration policy and our international treaty obligations so that we could maintain a consistent posture towards the world as a nation with a strong humanitarian tradition and a unique historic role as a haven for persons fleeing oppression."[1] The Act—among other measures designed to bring the United States domestic legal code into compliance with the provisions of the United Nations Protocol Relating to the Status of Refugees—created a "broad class" of refugees eligible for a discretionary grant of asylum.[2]

The asylum protections provided by United States law are essential. Asylum provides those fleeing horrors with physical safety, a path to citizenship and security, and the opportunity to reunite with immediate family members who may still remain abroad in danger.[3] Many see the domestic asylum system as a symbol of the United States' commitment never to repeat its failure to save thousands of Jewish refugees refused entry to the United States on the *St. Louis* and others fleeing the Holocaust.[4] Others point to the critical role that domestic asylum policy plays in serving the United States' foreign policy interests abroad.[5] For those individuals seeking asylum in the United States, the stakes could not be higher—a claim denied often means return to death or brutal persecution.[6]

The laws, regulations, and process governing asylum adjudications are already exceedingly harsh. Asylum seekers bear the evidentiary burden of establishing their eligibility for asylum[7] in the face of a complex web of laws and regulations, without the benefit of appointed counsel and often from a remote immigration jail.[8] The obstacles to winning asylum are exceedingly high; indeed in some parts of

---

[1] Deborah Anker, "The Refugee Act of 1980: An Historical Perspective," *In Defense of the Alien* 5 (1982): 89-94, https://www.jstor.org/stable/23141008?read-now=1&refreqid=excelsior%3A1060953608aa0bdd30d5d506e1ff6318&seq=1#page_scan_tab_contents.

[2] *See I.N.S. v. Cardoza-Fonseca*, 40 U.S. 421, 423 (1987).

[3] The permanency and family reunification benefits that accompany asylum are not provided to those granted withholding of removal or protection under the Convention Against Torture, the alternative forms of relief described throughout the Proposed Rules as a justification for the breadth of the new proposed bars. For more details on the differences between the forms of protection, *see* section VI *infra*.

[4] Dara Lind, "How America's rejections of Jews fleeing Nazi Germany haunts our refugee policy today," *Vox*, January 27, 2017, https://www.vox.com/policy-and-politics/2017/1/27/14412082/refugees-history-holocaust.

[5] Council on Foreign Relations, *Independent Task Force Report No. 63: U.S. Immigration Policy* (2009), 117 (additional or dissenting view by Elisa Massimino) ("For better or worse, the United States sets the standard for reasonable and humane treatment of migrants around the world. If the United States endorses harsh treatment of immigrants, it erodes the norms designed to protect them, and other countries will have license to do the same.").

[6] *See, e.g.*, Sarah Stillman, "When deportation is a death sentence," *The New Yorker*, January 8, 2018, https://www.newyorker.com/magazine/2018/01/15/when-deportation-is-a-death-sentence.

[7] 8 USC § 1158(b)(1)(B); 8 CFR § 1240.8(d).

[8] *See* Daniel Connolly, Aaron Montes, and Lauren Villagran, "Asylum seekers in U.S. face years of waiting, little chance of winning their cases," *USA Today,* September 25, 2019, https://www.usatoday.com/in-depth/news/nation/2019/09/23/immigration-court-asylum-seekers-what-to-expect/2026541001/.

AR.10045

the country and before certain immigration judges, almost no one succeeds.[9] Today, newly imposed barriers to accessing asylum in the United States are breathtaking in scope, with those seeking safety at the southern border subject to return to dangerous conditions in Mexico and an overlapping web of policies that preclude asylum eligibility for countless migrants simply because of their national origin, manner of entry, or their flight path.[10] There are consistent reports of the documented deaths and brutalities endured by those who sought but were denied asylum protections in the United States.[11]

Specifically, the bars to asylum based on allegations of criminal conduct are *already* sweeping and over-broad in nature and scope.[12] Any conviction for an offense determined to be an "aggravated felony" is considered a *per se* "particularly serious crime" and therefore a mandatory bar to asylum.[13] "Aggravated felony" is a notoriously vague term, which exists only in immigration law. Originally limited to murder, weapons trafficking and drug trafficking,[14] it has metastasized to encompass hundreds of offenses, many of them neither a felony nor aggravated, including petty offenses such as misdemeanor shoplifting, simple misdemeanor battery, or sale of counterfeit DVDs.[15] The existing crime bars should be narrowed, not expanded. Even for those not categorically barred from relief, the immigration adjudicator maintains full discretion to deny asylum.[16]

NWIRP's experience in serving asylum seekers informs our perspective that the proposed categorical bars are unnecessary and will prevent refugees from being able to obtain critical humanitarian protections.  For instance, one of our former clients (whom we'll refer to as "A.B.") sought asylum from Haiti where he would have been detained in a mental institution or prison, beaten, and tortured on account of his diagnosis with a severe mental illness. The conditions in Haitian mental institutions are

---

[9] Manuel Roig-Franzia, "Immigrants risk it all seeking asylum. The answer is almost always 'no,'" *Washington Post,* July 24, 2019, https://www.washingtonpost.com/lifestyle/style/migrants-risk-it-all-seeking-asylum-the-answer-in-court-is-almost-always-no/2019/07/23/9c161b2e-a3f7-11e9-b732-41a79c2551bf_story.html.

[10] The National Immigrant Justice Center maintains a frequently updated timeline providing details of each of the asylum bans and other policies issued and implemented by the administration undermining asylum access at https://www.immigrantjustice.org/issues/asylum-seekers-refugees. For more information on the harms and rights abuses inherent in the Migrant Protection Protocols, or "Return-to-Mexico" program, *see* Human Rights First, *Delivered to Danger* (December 2019), https://www.humanrightsfirst.org/campaign/remain-mexico.

[11] *See, e.g.,* Stillman, "Death Sentence," *supra* (reporting on a database of more than sixty cases of individuals killed after deportation); *see also* Maria Sachetti, "'Death is waiting for him,'" *The Washington Post*, December 6, 2018, https://www.washingtonpost.com/graphics/2018/local/asylum-deported-ms-13-honduras/ (telling the story of Santos Chirino, denied asylum by a Virginia immigration judge, deported, and then murdered by those he told the immigration judge he feared); and Kevin Sieff, "When death awaits deported asylum seekers," *Washington Post*, December 26, 2018, https://www.washingtonpost.com/graphics/2018/world/when-death-awaits-deported-asylum-seekers/.

[12] The existing categorical bars to asylum eligibility are discussed in detail on p. 69641 of the Proposed Rules.

[13] 8 U.S.C. §§ 1158(b)(2)(A)(ii) and (B)(i).

[14] Pub. L. No. 100-690, § 7342, 102 Stat. 4181, 4469-70.

[15] 8 U.S.C. § 1101(a)(43). *See also* Nancy Morawetz, "Understanding the Impact of the 1996 Deportation Laws and the Limited Scope of Proposed Reforms," *Harvard Law Review* 113 (2000): 1939-40 (criticizing the "'Alice-in-Wonderland-like definition of the term 'aggravated felony'"); Melissa Cook, "Banished for Minor Crimes: The Aggravated Felony Provisions of the Immigration and Nationality Act as a Human Rights Violation," *Boston College Third World Law Journal* (2003): 293.

[16] *See Matter of Pula*, 19 I.&N. Dec. 467 (BIA 1987).

AR.10046

notoriously dire - physical and sexual abuse of patients is rampant and patients are denied proper medical treatment and left to languish in filthy and unsanitary conditions. Like many people diagnosed with serious mental illness, A.B. lived homeless for extended periods of time and self-medicated with controlled substances, resulting in criminal justice system involvement. Under the current asylum regime, the Immigration Judge was provided with discretion to balance the seriousness of A.B.'s convictions with his mental state / mental health diagnoses at the time of conviction. However, under the proposed regulations, A.B. would be categorically barred from asylum.

Immigration adjudicators already have vast discretion to deny asylum to those who meet the refugee definition but have been convicted of criminal conduct.[17] Further categorical bars are not needed. The agencies' efforts to add *seven* new sweeping categories of barred conduct to the asylum eligibility criteria is unnecessary and cruel. The Proposed Rules drain the phrase "*particularly serious* crime," 8 U.S.C. § 1158, of any sensible meaning.

The Proposed Rules are also arbitrary and capricious. They would constitute a marked departure from past practice. And the agencies have proffered no evidence or data to support these changes.

One assumption fundamentally underlying the Proposed Rules, for example, is that every noncitizen convicted of any offense punishable by more than a year in prison necessarily constitutes a danger to the community. But no evidence is provided to support that assumption, and a criminal record, does not, in fact, reliably predict future dangerousness.[18] The Proposed Rules are so capricious as to peremptorily postulate a noncitizen's supposed danger to the community even in circumstances when a federal, state, or local judge has concluded that no danger exists by, for example, imposing a noncustodial sentence. Conviction for a crime does not, without more, make one a present or future danger—which is why the Refugee Convention's particularly serious crime bar, made part of United States law through 8 U.S.C. § 1158, should only properly apply if both (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows that they are a present or future danger.[19]

Similarly, the Proposed Rules fail to address or account for the fact that a significant number of people may agree to plead to a crime as to avoid the threat of a severe sentence; not only is a conviction an unreliable predictor of future danger, it can also be an unreliable indicator of past criminal conduct.[20] In

---

[17] *See id.*

[18] See U.S. Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders* (2017) (noting that recidivism rates fall substantially with age); U.S. Sentencing Commission, *Recidivism Among Federal Violent Offenders* (2019) (noting that non-violent offenders recidivate at significantly lower rates); J. Ramos and M. Wenger, "Immigration and recidivism: What is the Link?" *Justice Quarterly* (2019) (finding no correlation between recidivism rates and citizenship status among those formerly incarcerated for felonies in Florida prisons).

[19] See U.N. High Commissioner for Refugees, *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 11 (July 2007), http://www.unhcr.org/en-us/576d237f7.pdf (the Refugee Convention's particularly serious crime bar only applies if (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows she is a "present or future danger.").

[20] John H. Blume and Rebecca K. Helm, "The Unexonerated: Factually Innocent Defendants Who Plead Guilty," *Cornell Law Review* 100 (2014): 157, https://pdfs.semanticscholar.org/c00f/96d421adf1846d120bf802a8854b5e2c0ff2.pdf.

AR.10047

addition, the Proposed Rules do not address and make no exception for convictions for conduct influenced by mental illness or duress.

The Board of Immigration Appeals has cautioned that, "in light of the unusually harsh consequences which may befall a [noncitizen] who has established a well-founded fear of persecution; the danger of persecution should generally outweigh all but the most egregious of adverse factors."[21] Yet because of the categorical nature of the seven news bars proposed here, asylum seekers will be precluded from obtaining protection on the basis of a vast array of conduct, without any discretion left to the immigration adjudicator to determine whether the circumstances merit such a harsh penalty. Indeed, in the case of the domestic-violence related ground, the categorical bar will be imposed on the basis of *mere allegations* of conduct without any adjudication of guilt.[22]

Those unjustly precluded from even seeking a discretionary grant of asylum by the Proposed Rules will include, for example: individuals struggling with addiction with one drug-related conviction, regardless of the circumstances of the offense; asylum seekers with two convictions for driving under the influence, regardless of whether the applicant has sought treatment for alcohol addiction or the circumstances of the convictions; community members seeking asylum defensively who have been convicted of a document fraud offense related to their immigration status; and asylum-seeking mothers convicted for bringing their own child across the southern border in an effort to find safety.

> *The Proposed Rules cruelly disregard the connections between trauma and involvement in the criminal legal system.*

The harsh nature of the Proposed Rules is especially evident when viewed through a trauma-informed lens. Asylum seekers are an inherently vulnerable population because of the trauma they have experienced in their countries of origin and, often, along the journey to find safety. Existing literature suggests that at least one out of every three asylum seekers struggles with depression, anxiety, and/or post-traumatic stress disorder (PTSD).[23] One recent study found the mental health problems facing refugees and asylum seekers so acute that more than a third of the study's sample admitted having suicidal thoughts in the preceding two weeks.[24]

---

[21] *Pula*, 19 I.&N. Dec. at 474.

[22] The Proposed Rules at p. 69651 explain that the regulations will "render ineligible [non-citizens] who engaged in acts of battery and extreme cruelty in a domestic context in the United States, regardless of whether such conduct resulted in a criminal conviction."

[23] Giulia Turrini et al., "Common mental disorders in asylum seekers and refugees: umbrella review of prevalence and intervention studies," *International Journal of Mental Health Systems* 11 (August 2017): 51, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5571637/.

[24] Megan Brooks, "Refugees have high burden of mental health problems," *Psychiatry and Behavioral Health Learning Network*, June 2019, https://www.psychcongress.com/article/refugees-have-high-burden-mental-health-problems.

AR.10048

Studies also consistently reveal a high prevalence of comorbidity of PTSD and substance use disorders, with individuals with PTSD *up to 14 times more likely* to struggle with a substance use disorder.[25] Asylum seekers in the United States are often unable to access affordable medical care and treatments for complex trauma;[26] some turn to drugs and alcohol in an effort to self-medicate.[27] The proposed new bars to asylum include *any* drug-related conviction (with one exception for a first minor marijuana possessory offense) and any second conviction for driving under the influence. This approach is not only cruel but also ignores the evidence. *Particularly* given the vulnerabilities of asylum-seeking populations, prior struggles with addiction should be addressed with treatment and compassion, not a closed door and deportation order.

Immigration adjudicators already maintain the authority to deny asylum to individuals with drug-related criminal histories on the basis of discretion; denying asylum seekers even the opportunity to present the countervailing factors of their past trauma and potential recovery is simply cruel.

Here again our perspective about the negative impact of the Proposed Rules is informed by our experience serving asylum seekers who have been impacted by trauma.  One of our clients, whom we'll refer to as "C.D." is seeking asylum in the U.S. based on being trafficked for sex as a minor in Mexico. C.D. ran away from home after suffering sexual abuse in her family home, and quickly fell under the control of human traffickers, who forced her to dance for bar patrons - including military and police officers. C.D.'s traffickers plied her with illegal drugs to control her behavior and threatened to harm her if she tried to escape. C.D. eventually sought safety in the United States and had three U.S. citizen children. Unfortunately, the addiction to controlled substances encouraged by her traffickers plagued C.D.'s first few years in the U.S. and she was convicted of several minor drug-related offenses and illegal re-entry. Under the proposed rules, C.D. would be separated from her children and denied asylum due to offenses directly connected to her trauma.

Another example is that of a client we will refer to as "E.F."  E.F. grew up surviving extremely severe trauma and persecution as a child in Central America. When he reunited with relatives in the U.S., still a child seeking protection from the harm he experienced, he increasingly had difficulty managing his emotions around the past. E.F. turned to substances to medicate and was convicted of possession of a controlled substance - an anti-depressant for which he did not have a prescription. With therapy he has learned other tools to address his emotional struggles. However, the proposed regulation would bar him from asylum, even though he has lived much of his life now in the U.S.

---

[25] Jenna L McCauley et al., "Posttraumatic Stress Disorder and Co-Occurring Substance Use Disorders: Advances in Assessment and Treatment," *Clinical Psychology Science and Practice* 19, 3 (October 2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3811127/.

[26] For more information on immigrant eligibility for federal benefits, *see* https://www.nilc.org/issues/health-care/.

[27] Carrier Clinic, *Trauma and Addiction* (2019), https://carrierclinic.org/2019/08/06/trauma-and-addiction/ ("…some people struggling to manage the effects of trauma in their lives may turn to drugs and alcohol to self-medicate. PTSD symptoms like agitation, hypersensitivity to loud noises or sudden movements, depression, social withdrawal and insomnia may seem more manageable through the use of sedating or stimulating drugs depending on the symptom. However, addiction soon becomes yet another problem in the trauma survivor's life. Before long, the 'cure' no longer works and causes far more pain to an already suffering person.").

AR.10049

III.    **The Proposed Rules violate the letter and spirit of United States international treaty obligations**

By acceding to the 1967 Protocol Relating to the Status of Refugees,[28] which binds parties to the United Nations Convention Relating to the Status of Refugees,[29] the United States obligated itself to develop and interpret United States refugee law in a manner that complies with the Protocol's principle of non-refoulement (the commitment not to return refugees to a country where they will face persecution on protected grounds), even where potential refugees have allegedly committed criminal offenses. As noted above, adjudicators already have over-broad authority to deny asylum based on allegations of criminal activity, which vastly exceeds the categories for exclusion and expulsion set out in the Convention. Instead of working towards greater congruence with the terms of the Convention, the Proposed Rules carve out categorical bars from protection that violate both the language and spirit of the treaty.

While the Convention allows states to exclude and/or expel potential refugees from protection, the circumstances in which this can occur are limited. In particular, the Convention allows states to exclude and/or expel individuals from refugee protection if the individual "having been convicted by a final judgement of a particularly serious crime, constitutes a danger to the community of that country."[30] However, this clause is intended for "extreme cases," in which the particularly serious crime at issue is a "capital crime or a very grave punishable act."[31] The United Nations High Commissioner for Refugees (UNHCR) has asserted that to constitute a "particularly serious crime," the crime "must belong to the gravest category" and be limited "to refugees who become an extremely serious threat to the country of asylum due to the severity of crimes perpetrated by them in the country of asylum."[32] Moreover, the UNHCR has specifically noted that the particularly serious crime bar does not encompass less extreme crimes; "[c]rimes such as petty theft or the possession for personal use of illicit narcotic substances would not meet the threshold of seriousness."[33] Finally, when determining whether an individual should be barred from protection for having been convicted of a particularly serious crime, the adjudicator must conduct an individualized analysis and consider any mitigating factors.[34]

As noted above, legislation and agency interpretation of the Immigration and Nationality Act have already expanded the particularly serious crime bar far beyond what was contemplated in the

---

[28] United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268.

[29] Convention Relating to the Statute of Refugees, July 28, 1951, 140 U.N.T.S. 1954 (hereinafter "Refugee Convention").

[30] *Id.* at art. 33(2).

[31] U.N. High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees* 2, U.N. Doc. HCR/IP/Eng/REV. ¶ 154-55, (1979, reissued 2019).

[32] U.N. High Comm'r for Refugees (UNHCR), *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 7 (July 2007), http://www.unhcr.org/enus/576d237f7.pdf.

[33] *Id.* at ¶ 10.

[34] *Id.* at ¶ 10-11; U.N. High Commissioner for Refugees, *The Nationality, Immigration and Asylum Act 2002: UNHCR Comments on the Nationality, Immigration and Asylum Act 2002 (Specification of Particularly Serious Crimes) Order 2004*, 4 (2004).

AR.10050

Convention by creating categorical particularly serious crimes through the aggravated felony definition. The Proposed Rules would amplify the dissonance between U.S. refugee law and the Convention, as well as the violation of U.S. obligations under the Convention, by creating categorical bars within categorical bars. For example, at p. 69659, the Proposed Rules first exclude from protection anyone who was convicted of a felony and then at p. 69660, define "felony" as "any crime punishable by more than one of imprisonment" without any reference to other factors, including dangerousness. The Proposed Rules described the increased categorization of the particularly serious crime bar as necessary because the case-by-case adjudication previously used for non-aggravated felony offenses was "inefficient,"[35] but an individualized analysis is exactly what the Convention requires to ensure only those individuals who have been convicted of crimes that are truly serious and therefore present a future danger are placed at risk of refoulement.

Additionally, outside of the aggravated felony context, it has generally been well understood by the Board of Immigration Appeals and the Courts of Appeals that low-level, "run-of-the-mill" offenses do not constitute particularly serious crimes.[36] Under this long-standing interpretation of the particularly serious crime bar in the INA, there is simply no scenario in which low-level offenses like misdemeanor driving under the influence where no injury is caused to another or simple possession of a controlled substance or paraphernalia would constitute a particularly serious crime.

The reason for this is common sense. As Judge Reinhardt explained in a concurring opinion in *Delgado v. Holder*,[37] a decision the Proposed Rules cite in support of the expanded bars, run-of-the-mill crimes like driving under the influence have "little in common" with other crimes the Board of Immigration Appeals has deemed particularly serious—e.g., felony menacing with a deadly weapon, armed robbery, and burglary of a dwelling in which the offender is armed or causes injury.[38] Judge Reinhardt further noted that public opinion does not treat them similarly either: "American voters would be unlikely to elect a president or vice president who had committed a particularly serious crime, yet they had no difficulty in recently electing to each office a candidate with a DUI record."[39] Barring individuals from asylum based on these relatively minor offenses renders the "particularly serious" part of the "particularly serious crime" bar meaningless.

The expansion of the asylum bar to include individuals who have been convicted of reentering the United States without inspection pursuant to INA § 276[40] is also unlike any of the other bars previously established or as interpreted by the Board of Immigration Appeals or Circuit Courts of Appeals. It is an offense with no element of danger or violence to others, and has no victim. Most significantly, and more so than other bars contained in the Proposed Rules, barring asylum based on the manner of entry directly violates the Convention's prohibition on imposing penalties based on a refugee's manner of entry or presence.[41] This prohibition is a critical part of the Convention because it recognizes that

---

[35] Proposed Rules at 69646.

[36] *Delgado v. Holder*, 648 F.3d 1095, 1110 (9th Cir. 2011) (en banc) (J. Reinhardt, concurring).

[37] 648 F.3d at 1110 (J. Reinhardt, concurring).

[38] *Id*. at 1110.

[39] *Id*. at 1110.

[40] Proposed Rules at 69659, 69660.

[41] Refugee Convention, *supra*, at art 31.

AR.10051

refugees often have little control over the place and manner in which they enter the country where they are seeking refuge. The proposal also runs counter to the asylum statute (INA § 208) itself, which recognizes an individual's ability to seek asylum regardless of the manner of entry or the individual's immigration status.

Here again NWIRP has served individuals who were ultimately deemed as needing and being eligible for asylum protection but who would be denied under the Proposed Rules.  We would again highlight the case example of our client C.D. that is outlined on page 7 of the comments.  C.D. had been convicted of illegal re-entry but was able to obtain asylum protection despite that conviction.  The Proposed Rules would deny others like C.D. the opportunity to obtain asylum.

IV.    **Those precluded from asylum eligibility will be gravely impacted even if granted withholding of removal or protection under the Convention Against Torture**

Throughout the Proposed Rules, the agencies defend the harsh and broad nature of their proposal by pointing to the continued availability of alternative forms of relief for those precluded from asylum eligibility under the new rules.[42] The availability of these alternatives forms of relief, however—known as withholding of removal and protection under the Convention Against Torture (CAT)—does not nullify the harm created by the Proposed Rule's new limits on asylum. The protections afforded by CAT and by statutory withholding of removal are limited in scope and duration, and they are harder to obtain. As a result, a Rule that limits *bona fide* refugees to withholding of removal and CAT protection would impose a very real harm on individuals who have come to the United States in search of protection.

First, the most serious harm that can befall an individual as a result of these Proposed Rules is removal to persecution and torture, and the existence of withholding of removal does not account for that risk. CAT and withholding protections demand a higher level of proof than asylum claims: a clear probability of persecution or torture.[43] Thus, an individual could have a valid asylum claim but be unable to meet the standard under the other forms of relief and therefore would be removed to their country of origin, where they would face persecution or even death.

Even for those who meet the higher standard, withholding and CAT recipients are still subject to significant prejudice. For example, they have no ability to travel internationally. The United Nations Convention Relating to the Status of Refugees[44] affords refugees the right to travel in mandatory terms. Article 28 states, "Contracting States shall issue to refugees lawfully staying in their territory travel

---

[42] *See, e.g.,* Proposed Rules at 69644.

[43] Withholding of removal requires the petitioner to demonstrate his or her "life or freedom would be threatened in that country because of the petitioner's race, religion, nationality, membership in a particular social group, or political opinion." *INS v. Stevic*, 467 U.S. 407, 411 (1984) (quoting 8 U.S.C. § 1231(b)(3)). Unlike asylum, however, the petitioner must show a "clear probability" of the threat to life or freedom if deported to his or her country of nationality. The clear probability standard is more stringent than the well-founded fear standard for asylum. *Id; see also Cardoza-Fonseca*, 480 U.S. at 431 (describing the difference between a well-founded fear of persecution and a clear probability of persecution). For CAT relief, an applicant must show it is more likely than not that he or she will be tortured or killed by or at the government's acquiescence if removed to the home country. 8 C.F.R. § 1208.16(c)(2).

[44] 19 U.S.T. 6223 T.I.A.S. No. 6577 (1968).

AR.10052

documents for the purpose of travel outside their territory." Withholding and CAT recipients do not have access to a travel document as contemplated by Article 28. By regulation, refugee travel documents are available only to asylees.[45] And the Board of Immigration Appeals requires that an individual granted withholding and CAT—unlike an individual granted asylum—must simultaneously be ordered removed, making any international travel a "self-deportation."[46] Refugees granted only withholding of removal or CAT protection are thus effectively trapped within the United States in long-term limbo.

Withholding and CAT recipients also face permanent separation from their spouses and children. Because international travel is prohibited, these individuals cannot reconnect with their families in a third country. And they also cannot reunite with family in the United States because only asylees and refugees are eligible to petition for a spouse and children to join them as derivatives on that status.[47] For many, this will mean that the Proposed Rules institute yet another formal policy of family separation. For example, a mother with two young children who flees to the United States and is subject to one of the expanded asylum bars will not be able to ensure that her children will be able to obtain protection in the United States with her if she is granted relief.  Rather, if her children are still in her home country, they would need to come to the United States and seek asylum on their own, likely as unaccompanied children. If her children fled to the United States with her, then they will need to establish their own eligibility for protection before an immigration judge, no matter their age.

Recently, this exact scenario played out with a mother who was subject to the so-called Migrant Protection Protocols (also known as Remain in Mexico) and the asylum "transit ban,"[48] which made the mother ineligible for asylum and thus required the children to establish their independent eligibility for withholding and CAT protection. An immigration judge granted the mother withholding of removal but denied protection to her young children, leaving the children with removal orders and immense uncertainty about their future.[49] Under the expanded bars in the Proposed Rules, these situations will certainly increase, separating families and forcing parents to return to countries where it has been established they more likely than not will face persecution and torture, rather than leaving their children on their own.

Withholding recipients likewise face hurdles in access to employment. Article 17 of the Refugee Convention states that a contracting state "shall accord to refugees lawfully staying in their territory the most favorable treatment accorded to nationals of a foreign country in the same circumstances, as regards the right to wage-earning employment." Recipients of withholding enjoy no such right. They

---

[45] 8 C.F.R. § 223.1.

[46] *See Matter of I-S- & C-S-*, 24 I.&N. Dec. 432, 434 n.3 (BIA 2008); 8 C.F.R. § 241.7.

[47] 8 C.F.R. § 208.21(a).

[48] 8 C.F.R. § 1208.13(c)(4).

[49] Adolfo Flores, "An Immigrant Woman Was Allowed To Stay In The US — But Her Three Children Have A Deportation Order," *Buzzfeed*, December 21, 2019, https://www.buzzfeednews.com/article/adolfoflores/an-immigrant-woman-was-allowed-to-stay-in-the-us-but-not.

AR.10053

must apply for work authorization, and they face frequent delays in the adjudication of these applications, which often result in the loss of legal authorization to work.[50]

And perhaps most fundamentally, there is continuing jeopardy for withholding and CAT recipients that does not exist for asylum recipients. When a noncitizen is granted asylum, the person receives a legal status.[51] Asylum, once granted, protects an asylee against removal unless and until that status is revoked.[52] None of these protections exists for withholding and CAT recipients. They have no access to permanent residency or citizenship.[53] Instead, they are subject to a removal order and vulnerable to the permanent prospect of deportation to a third country and subject to potential check ins with immigration officials where they can be made to pursue removal to third countries to which they have no connection.[54]

Finally, NWIRP writes to highlight a different form of prejudice that will flow from the rule: one relating to judicial efficiency. Neither withholding of removal nor CAT protection allow family members who are in the United States together and pursuing protection on the same basis to apply as derivatives on a principal application. As a result, family claims for those rendered ineligible for asylum by the new rules will have to be adjudicated separately, and potentially before different adjudicators even when the claims are interrelated and even when minor children may not be in a position to explain the claim at all or as sufficiently as a parent. In addition to being unjust to the affected family members, this approach would result in gross inefficiencies, which should be avoided in a system that already contains a significant backlog of pending cases.[55]

### V.    The Proposed Rules will result in "mini-trials" in immigration court, undermine judicial efficiency and result in racially-biased decision-making

In two significant ways, the Proposed Rules require immigration adjudicators to engage in decision-making to determine whether an asylum applicant's conduct—considered independently of any criminal court adjudication—triggers a categorical bar to asylum eligibility. First, the agencies propose that immigration adjudicators be allowed to consider "all reliable evidence" to determine whether there is "reason to believe" an offense was "committed for or related to criminal gang activities," or "in furtherance of gang-related activity, triggering ineligibility for asylum in either case.[56] Second, the Proposed Rules permit immigration adjudicators to "assess all reliable evidence in order to determine

---

[50] 8 C.F.R. § 274a.12(a)(10); *Northwest Immigrant Rights Project, et al. v. USCIS, et al.*, No. 2:15-cv-00813-JLR (W.D. Wash., filed May 22, 2015) (class action regarding delays in adjudication of work authorization).

[51] *See, e.g.*, 8 C.F.R. 245.1(d)(1) (defining "lawful immigration status" to include asylees).

[52] *See* 8 U.S.C. § 1158(c)(1)(A).

[53] *Matter of Lam*, 18 I.&N. Dec. 15, 18 (BIA 1981); 8 C.F.R. § 245.1(d)(1) (explaining that only those in "lawful immigration status" can seek permanent residency and excluding withholding recipients from such status); 8 C.F.R. § 209.2(a)(1) (authorizing adjustment of status to permanent residence for asylees); 8 C.F.R. § 316.2 (naturalization available only to permanent residents).

[54] *See R–S–C v. Sessions*, 869 F.3d 1176, 1180 (10th Cir. 2017).

[55] See, e.g., Marissa Esthimer, "Crisis in the Courts: Is the Backlogged U.S. Immigration Court System at Its Breaking Point?," *Migration Policy Institute*, October 3, 2019, https://bit.ly/2sJuEWR.

[56] *See* Proposed Rules at 69649.

AR.10054

whether [a] conviction amounts to a domestic violence offense;" and to go even further by considering whether non-adjudicated *conduct* "amounts to a covered act of battery or extreme cruelty."[57]

Requiring adjudicators to make complex determinations regarding the nature and scope of a particular conviction or, in the case of the domestic violence bar, *conduct*, will lead to massive judicial inefficiencies and slanted "mini-trials" within the asylum adjudication process. The scope of the "reliable evidence" available to adjudicators in asylum cases is potentially limitless; advocates on both sides would be obligated to present fulsome arguments to make their cases about gang connections to the underlying activity or the relationship of the asylum applicant to the alleged victim. Because of the lack of robust evidentiary rules in immigration proceedings, it will be difficult if not impossible for many applicants to rebut negative evidence marshaled against them, even if false; and in other cases, asylum applicants will struggle to find evidence connected to events that may have happened years prior (especially for those detained). Asylum trials, which are typically three or fewer hours under current policies, would provide insufficient time to fully present arguments on both sides of these unwieldy issues.

As the immigration courts contend with backlogs that now exceed one million cases,[58] tasking adjudicators with a highly nuanced, resource-intensive assessment of the connection of a conviction to gang activity and/or the domestic nature of alleged criminal conduct—assessments far outside their areas of expertise—will prolong asylum proceedings and invariably lead to erroneous determinations that will give rise to an increase in appeals. The Proposed Rules repeatedly cite increased efficiency as justification for many of the proposed changes.[59] Yet requiring adjudicators to engage in mini-trials to determine the applicability of categorical criminal bars, rather than relying on adjudications obtained through the criminal legal system, will dramatically *decrease* efficiency in the asylum adjudication process.

Indeed, the Supreme Court has "long deemed undesirable" exactly the type of "post hoc investigation into the facts of predicate offenses" proposed by the agencies here.[60] Instead, for more than a century the federal courts have repeatedly embraced the "categorical approach" to determine the immigration consequence(s) of a criminal offense, wherein the immigration adjudicator relies on the statute of conviction as adjudicated by the criminal court system, without relitigating the nature or circumstances of the offense in immigration court.[61] As the Supreme Court has explained, this approach "promotes judicial and administrative efficiency by precluding the relitigation of past convictions in minitrials

---

[57] *See* Proposed Rules at 69652.

[58] Marissa Esthimer, "Crisis in the Courts: Is the Backlogged U.S. Immigration Court System at Its Breaking Point?," *Migration Policy Institute*, October 3, 2019, https://www.migrationpolicy.org/article/backlogged-us-immigration-courts-breaking-point.

[59] *See* Proposed Rules at 69646, 69656-8.

[60] *Moncrieffe v. Holder*, 569 U.S. 184, 186 (2013).

[61] *See Moncrieffe*, 569 U.S. at 191 ("This categorical approach has a long pedigree in our Nation's immigration law."). For a more fulsome history of the development of the categorical approach in immigration court, *see* Alina Das, "The Immigration Penalties of Criminal Convictions: Resurrecting Categorical Analysis in Immigration Law," *New York University Law Review* 86, no. 6 (2011): 1689 - 1702, https://www.nyulawreview.org/wp-content/uploads/2018/08/NYULawReview-86-6-Das.pdf.

AR.10055

conducted long after the fact."[62] In *Moncrieffe v. Holder*, the Court forewarned of exactly the sort of harm that would arise from these Proposed Rules; in that case, the Court rejected the government's proposal that immigration adjudicators determine the nature and amount of remuneration involved in a marijuana-related conviction, noting that "our Nation's overburdened immigration courts" would end up weighing evidence "from, for example, the friend of a noncitizen" or the "local police officer who recalls to the contrary," with the end result a disparity of outcomes depending on the whims of the individual immigration judge and a further burdened court system.[63]

Particularly in the context of the new proposed bar related to alleged gang affiliation, NWIRP is concerned that creating a blanket exclusion for anyone who is convicted of a crime – including a misdemeanor – that an immigration adjudicator deems linked to gang activity will erroneously prevent bona fide asylum seekers from receiving protection. This rule confers on immigration adjudicators—who generally are not criminologists, sociologists, or criminal law experts—the responsibility to determine if there is "reason to believe" any conviction flows from activity taken in furtherance of gang activity. This rule will necessarily ensnare asylum seekers of color who have experienced racial profiling and a criminal legal system fraught with structural challenges and incentives to plead guilty to some crimes, particularly misdemeanors. These same individuals are vulnerable to being erroneously entered into gang databases. Such databases are notoriously inaccurate, outdated, and infected by racial bias.[64]

Indeed, asylum applicants are *already* frequently subjected to wrongful denials of protection because of allegations of gang activity made by the Department of Homeland Security on the basis of information found in notoriously unreliable foreign databases and "fusion" intelligence-gathering centers outside the United States. Empowering immigration adjudicators to render asylum applicants *categorically* excluded from protection on the basis of such spurious allegations will inevitably result in the return of many refugees back to harm.[65]

The Departments curiously argue that all gang-related offenses should be construed as "particularly serious crimes."[66] They cite statistics from up to 16 years ago in an attempt to make the point that gang members commit violent crimes and drug crimes. They then make the illogical leap to the conclusion that *all crimes*—including misdemeanor property crimes—that may be construed as connected to gang activity are particularly serious. This simply does not follow; in fact, the Proposed Rules will inevitably result in the exclusion from protection of asylum seekers of color who live in economically distressed communities and have obtained a minor conviction such as a property crime. Relying on the definition

---

[62] *Moncrieffe*, 569 U.S. at 200-201.

[63] *Id.* at 201.

[64] Annie Sweeney and Madeline Buckley, "Chicago police gang data collection faulted by city's inspector general as unchecked and unreliable," *Chicago Tribune*, April 11, 2019, https://www.chicagotribune.com/news/breaking/ct-met-chicago-police-gang-data-04112019-story.html; Anita Chabria, "A routine police stop landed him on California's gang database. Is it racial profiling?," *Los Angeles Times*, May 9, 2019, https://www.latimes.com/politics/la-pol-ca-california-gang-database-calgang-criminal-justice-reform-20190509-story.html.

[65] Melissa del Bosque, "Immigration Officials Use Secretive Gang Databases to Deny Migrant Asylum Claims," *Pro Publica*, July 8, 2019, https://www.propublica.org/article/immigration-officials-use-secretive-gang-databases-to-deny-migrant-asylum-claims.

[66] Proposed Rules at p. 69650.

AR.10056

of "particularly serious crime" to prevent asylum seekers convicted of even minor crimes construed as gang-related from accessing asylum protection is disingenuous at best, and tinged with racial animus at worst.

The Departments asks for comments on: (1) what should be considered a sufficient link between an asylum seeker's underlying conviction and the gang related activity in order to trigger the application of the proposed bar, and (2) any other regulatory approaches to defining the type of gang-related activities that should render individuals ineligible for asylum. The premise of these questions is wrong: a vague "gang related" bar should not be introduced at all. The Immigration and Nationality Act and existing regulations already provide overly broad bars to asylum where criminal behavior by an asylum seeker causes concern by an adjudicator. Adding this additional, superfluous layer of complication risks erroneously excluding bona fide asylum seekers from protection without adding any useful adjudicatory tool to the process.

### VI. The proposed definition of "conviction" and "sentence" for the purposes of the new bars further excludes those in need of protection

The section of the Proposed Rules that outlines a new set of criteria for determining whether a conviction or sentence is valid for the purpose of determining asylum eligibility is an ultra vires exercise of authority that is not authorized by the Immigration and Nationality Act. The Proposed Rules impose an unlawful presumption against asylum eligibility for applicants who seek post-conviction relief while in removal proceedings or longer than one year after their initial convictions. They also deny full faith and credit to state court proceedings by attributing improper motives to state court actors.[67]

> *The Proposed Rules undermine Sixth Amendment protections and harms immigrants unfamiliar with the complex criminal and immigration framework governing prior convictions.*

The Proposed Rules outline a new multi-factor process asylum adjudicators must use to determine whether a conviction or sentence remains valid for the purpose of determining asylum eligibility; the proposal includes a rebuttable presumption "against the effectiveness" of an order vacating, expunging, or modifying a conviction or sentence if the order was entered into after the asylum seeker was placed in removal proceedings or if the asylum seeker moved for the order more than one year after the date the original conviction or sentence was entered.[68]

This newly created presumption unfairly penalizes asylum applicants, many of whom may not have the opportunity to seek review of their prior criminal proceedings until applying for asylum.[69] In *Padilla v.*

---

[67] *See Saleh v. Gonzales*, 495 F.3d 17, 25-26 (2d Cir. 2007) (discussing 28 U.S.C. § 1738, requiring federal courts to give full faith and credit to state acts, records, and judicial proceedings and U.S. Const. art. IV, § 1, and finding that there was no violation where the Board of Immigration Appeals stopped short of "refusing to recognize or relitigating the validity of [Saleh's] state conviction.").

[68] Proposed Rules at 69655.

[69] On page 69656 of the Proposed Rules, the Department of Homeland Security and the Department of Justice urge that "[i]t is reasonable to conclude that an alien who has a meritorious challenge to a criminal conviction

AR.10057

*Kentucky*, the Supreme Court recognized that the immigration consequences of a conviction are sufficiently serious for the Sixth Amendment to require a noncitizen defendant to be competently advised of them before agreeing to a guilty plea.[70] By imposing a presumption against the validity of a withdrawal or vacatur of a plea, the Proposed Rules hold asylum seekers whose rights were violated under *Padilla* to a different standard; even though they too were denied effective assistance of counsel in the course of their underlying criminal proceedings, asylum seekers will be forced to rebut a presumption that their court-ordered withdrawal or vacatur is invalid. The Proposed Rules therefore compound the harm to immigrants who, in addition to facing persecution in their home countries, have been denied constitutionally compliant process in the United States criminal legal system.

Many asylum applicants, especially those in vulnerable populations isolated from resources and unfamiliar with the due process protections available to them in the United States, may not have discovered the defects in their underlying criminal proceedings until their consultation with an immigration attorney, or until they are placed into removal proceedings, which may happen several years after a conviction. Imposing a presumption *against* the validity of a plea withdrawal or vacatur in these cases will undoubtedly lead to the wrongful exclusion of countless immigrants from asylum simply because they were unable to adequately rebut the presumption, particularly in a complex immigration court setting without the benefit of appointed counsel.

> *The Proposed Rules violate the full faith, and credit to which state court decisions are entitled.*

The Proposed Rules further improperly authorize immigration adjudicators to second-guess the decision of a state court, even where the order on its face cites substantive and procedural defects in the underlying proceeding. The proffered justification for this presumption against the validity of post-conviction relief is to "ensure that aliens do not have their convictions vacated or modified for purported rehabilitative purposes that are, in fact, for immigration purposes," "to codify the principle set forth in *Matter of Thomas and Thompson*," and to bring the analysis of post-conviction orders in line with *Matter of Pickering*.[71] The agencies misread the applicable law, however, by authorizing adjudicators to disregard otherwise valid state orders. The immigration law only requires that to be effective for immigration purposes, orders vacating or modifying convictions must be based on substantive or procedural infirmities in the underlying proceedings. The Proposed Rule goes well beyond that requirement.

The Proposed Rules abandon the presumption of regularity that should accompany state court orders, thus upending settled principles of law. The Proposed Rules cite a misleading quote from *Matter of F-* in support of allowing asylum adjudicators to look beyond the face of a state court order; had the Rules' authors looked to the full case, they would have read the following: "Not only the full faith and credit clause of the Federal Constitution, but familiar principles of law require the acceptance at face value of a

---

based on a procedural or substantive defect is more likely to seek post-conviction relief sooner than an alien who is seeking relief on rehabilitative grounds…"

[70] *Padilla v. Kentucky*, 559 U.S. 356 (2010).

[71] Proposed Rules at 69655-56 (*citing Matter of Thomas and Thompson*, 27 I.&N. Dec. 674 (A.G. 2019) and *Matter of Pickering*, 23 I.&N. Dec. 621 (BIA 2003), *rev'd on other grounds by Pickering v. Gonzales*, 465 F.3d 263, 267-70 (6th Cir. 2006)).

AR.10058

judgment regularly granted by a competent court, unless a fatal defect is evident upon the judgment's face. However, the presumption of regularity and of jurisdiction may be overcome by extrinsic evidence or by the record itself."[72] In *Matter of F-*, the Board of Immigration Appeals offers support for the proposition that an adjudicator should presume the validity of a state court order unless there is a reason to doubt it, contrary to the *presumption of irregularity* put forward in the Proposed Rules.

The authority extended to adjudicators by the Proposed Rules also violates the law of multiple circuits, including *Pickering*, on which it relies.[73] In *Pickering v. Gonzales*, the Sixth Circuit Court of Appeals held that despite the petitioner's stated motive of avoiding negative immigration consequences, the Board of Immigration Appeals was limited to reviewing the authority of the court issuing the order as to the basis for his vacatur.[74] Similarly, in *Reyes-Torres* the Ninth Circuit Court of Appeals held that the motive of the respondent was not the relevant inquiry.[75] Rather, "the inquiry must focus on the state court's rationale for vacating the conviction."[76] In addition, the Third Circuit Court of Appeals in *Rodriguez v. U.S. Att'y Gen.*, which the Proposed Rules cite as "existing precedent," held that the adjudicator must look only to the "reasons explicitly stated in the record and may not impute an unexpressed motive for vacating a conviction."[77] Moreover, the *Rodriguez* court stated that to determine the purpose of a vacatur, the adjudicator must first look to the face of the order vacating the conviction, and "if the order explains the courts reasons … the [adjudicator's] inquiry must end there."[78] The Proposed Rules contain no such limiting language to guide the adjudicator's inquiry. Instead, the Rules grant adjudicators vague and indefinite authority to look beyond even a facially valid vacatur. Such breadth of authority undermines asylum seekers' rights to a full and fair proceeding.

> *The Proposed Rules wrongly extend* Matter of Thomas and Thompson *to all forms of post-conviction relief and impose an ultra vires and unnecessary burden on asylum seekers.*

Finally, the above-described presumption is ultra vires and unnecessary. As an initial matter, the Proposed Rules' reliance on *Matter of Thomas and Thompson* is flawed. The Attorney General's decision in *Matter of Thomas and Thompson* has no justification in the text or history of the immigration statute. Nowhere does the plain text of the Immigration and Nationality Act support giving adjudicators the authority to give effect only to state court sentence modifications undertaken to rectify substantive or procedural defects in the underlying criminal proceedings. Nor does the legislative history support such a rule. The Board of Immigration Appeals recognized this in *Matter of Cota-Vargas*, where it concluded that the application of "the *Pickering* rationale to sentence modifications has no discernible basis in the

---

[72] *Matter of F-*, 8 I.&N. Dec. 251, 253 (BIA 1959).

[73] *See id*. (*citing Matter of Pickering*, 23 I.&N. Dec. 621).

[74] *Pickering v. Gonzales*, 465 F.3d 263, 267-70 (6th Cir. 2006).

[75] *Reyes-Torres v. Holder*, 645 F.3d 1073, 1077-78 (9th Cir. 2011) (*citing Cardoso-Tlaseca v, Gonzales*, 460 F.3d 1102, 1107 n.3 (9th Cir. 2006) and *Pickering v. Gonzales*, 454 F.3d 525 (6th Cir. 2006), *amended and superseded* by *Pickering*, 465 F.3d at 263).

[76] *Id*.

[77] *Rodriguez v. U.S. Att'y Gen.*, 844 F.3d 392, 397 (3d Cir. 2006) (noting that "[T]he IJ may rely only on reasons explicitly stated in the record and may not impute an unexpressed motive for vacating a conviction.").

[78] *Id*. ("Put simply, '[w]e will not . . . permit[ ] . . . speculation . . . about the secret motives of state judges and prosecutors,'" *quoting Pinho v. Gonzales*, 432 F.3d 193, 214-215 (3d Cir. 2005)).

AR.10059

language of the Act."[79] Based on the text of the Immigration and Nationality Act and the well-documented legislative history behind Congress's definition of "conviction" and "sentence" in 8 U.S.C. § 1101(a)(48), the Board determined that Congress intended to ensure that, generally, proper admissions or findings of guilt were treated as convictions for immigration purposes, even if the conviction itself was later vacated. Neither the text of the INA nor the legislative history of the definitions reveal any attempt on Congress's part to change the longstanding practice of giving effect to state court sentencing modifications. For these reasons, *Matter of Thomas and Thompson* lacks Congressional support for its rule and should not be extended.

Moreover, as applicants for immigration benefits or relief from removal, asylum seekers already bear the burden of demonstrating their eligibility for asylum.[80] The Proposed Rules do not alter or shift this burden, nor do they provide evidence supporting the need for this presumption. By introducing a presumption of bad faith into asylum adjudication, the Proposed Rules unfairly interfere with asylum seekers' efforts to establish their claims. Immigration law, and asylum law in particular, is already highly complex, and the process of seeking asylum is in many instances re-traumatizing, particularly for applicants who do not have counsel to represent them and who lacked effective counsel in their underlying criminal proceedings. The Proposed Rules as applied to asylum applicants who seek post-conviction relief transform an already difficult process into an adversarial inquiry, contrary to the intent of Congress.

### VII.    The Proposed Rules will disparately impact vulnerable populations already routinely criminalized, including LGBTQ immigrants, survivors of trafficking and domestic violence, and immigrant youth of color

The expanded criminal bars exclude from safety and a pathway to citizenship those convicted of offenses that are coincident to their flight from persecution, and do not accomplish the stated goal of making communities safer. They will disparately impact vulnerable populations, who comprise asylum seekers hailing primarily from Central America and the Global South, and those routinely criminalized because of their identities, racially disparate policing practices, or in connection with experiences of trafficking and domestic violence.[81] For these populations especially, the discretion currently delegated to asylum adjudicators is crucial for them to become fully integrated in the larger community. The imposition of additional categorical bars to asylum will only further marginalize asylum seekers already struggling with trauma and discrimination.

The Proposed Rules turn asylum into a blunt instrument that would prevent the use of discretion where it is most needed and most effective. The existing framework for determining if an offense falls within the particularly serious crime bar already provides the latitude for asylum adjudicators to deny relief to

---

[79] *Matter of Cota-Vargas*, 23 I.&N. Dec. 849, 852 (BIA 2005).

[80] *Matter of S-K-*, 23 I.&N. Dec. 936, 939-40 (BIA 2006).

[81] D'Vera Cohn et al., "Rise in U.S. Immigrants from El Salvador, Guatemala and Honduras Outpaces Growth from Elsewhere," *Pew Research Center*, December 7, 2017, https://www.pewresearch.org/hispanic/wp-content/uploads/sites/5/2017/12/Pew-Research-Center_Central_American-migration-to-U.S._12.7.17.pdf.

AR.10060

anyone found to pose a danger to the community.[82] Furthermore, asylees with convictions that render them inadmissible must apply for a waiver at the time of their applications for permanent residence.[83] These measures ensure that asylum applicants in vulnerable populations have access to supportive resources and have the opportunity to demonstrate their ongoing commitment to social and personal health. Moreover, the existence of provisions allowing the revocation of asylum status ensures that adjudicators may continue to enforce concerns related to the safety of the community even after asylum is granted.[84]

> *Barring asylum for immigrants convicted of migration-related offenses punishes them for fleeing persecution and/or seeking safety for their children, and does not make communities safer.*

The expansion of the criminal bars to asylum to include offenses related to harboring, smuggling of noncitizens by parents and family members and those previously removed further criminalizes vulnerable populations fleeing persecution.[85] The vast expansion of migrant prosecutions at the border during the current administration has created administrative chaos and separated families that do not pose a threat to the safety of communities in the United States.[86] The Proposed Rules threaten to magnify the harm caused by these reckless policies by further compromising the ability of those seeking safety on the southern border to access the asylum system.

The Proposed Rules expand the asylum bar to parents or other caregivers who are convicted of smuggling or harboring offenses after taking steps to help minor children enter the United States in order to flee persecution. This proposed bar is particularly insidious in light of now-public documents revealing this administration's explicit efforts to utilize smuggling prosecutions against parents and caregivers as part of its strategy of deterring families from seeking asylum in the United States.[87] The

---

[82] Apart from the statutory aggravated felony bar to asylum, the Board of Immigration Appeals and Attorney General have historically utilized a highly circumstantial approach to the particular serious crime determination that would bar an immigrant from receiving asylum. *See e.g., Matter of Juarez*, 19 I.&N. Dec. 664 (BIA 1988) (ordinarily a single misdemeanor that is not an aggravated felony will not be a particularly serious crime); *Matter of Frentescu*, 18 I.&N. Dec. 244 (BIA 1982), *modified* (setting forth several factors to be considered before imposing the particular serious crime bar, including: (i) the nature of the conviction, (ii) the circumstances and underlying facts for the conviction, (iii) the type of sentence imposed, and (iv) whether the type and circumstances of the crime indicate that the individual will be a danger to the community); *Matter of Y-L-, A-G-, R-S-R-*, 23 I.&N. Dec. 270 (A.G. 2002) (setting forth a multi-factor test to determine the dangerousness of a respondent convicted of a drug-trafficking offense who is otherwise barred from asylum as an aggravated felon, but seeking withholding of removal).

[83] 8 U.S.C. § 1159(c) (2012).

[84] 8 C.F.R. § 208.24(a) (2012).

[85] On April 11, 2017, then-Attorney General Sessions instructed all federal prosecutors to increase their prioritization of immigration offenses for prosecution, including misdemeanor offenses committed by first time entrants. *See* Memorandum from the Attorney General: Renewed Commitment to Criminal Immigration Enforcement (April 11, 2017), https://www.justice.gov/opa/press-release/file/956841/download.

[86] *Id.*; Richard Marosi, "The aggressive prosecution of border crossers is straining the courts. Will zero tolerance make it worse?," *Los Angeles Times*, May 11, 2018, https://www.latimes.com/local/california/la-me-ln-immigrant-prosecutions-20180511-story.html.

[87] Ryan Devereaux, "Documents Detail ICE Campaign to Prosecute Migrant Parents as Smugglers," *The Intercept*, April 29, 2019, https://theintercept.com/2019/04/29/ice-documents-prosecute-migrant-parents-smugglers/

19

AR.10061

Proposed Rules seek to take this widely condemned strategy one step further, by additionally barring those parents *already prosecuted* from obtaining asylum protections for themselves and their children. The Proposed Rules multiply the harms parents and caregivers have experienced in their treacherous journeys to safety and callously penalize parents for doing what is only human—taking all necessary steps to protect their children.

The Proposed Rules also expand the asylum bar to those who have fled persecution multiple times and therefore been convicted of illegal reentry. Their inclusion is premised on conclusory statements regarding the dangerousness of recidivist offenders, without consideration of the seriousness of prior convictions.[88] Rather, the Proposed Rules treat all immigration violations as similar in seriousness to those previously warranting inclusion in the particularly serious crime bar, without any independent evidence to justify the expansion. Such an approach renders meaningless the limiting language of "particularly serious" in the statute.

The Proposed Rules also conflate multiple entries by noncitizens having prior removal orders with those who have entered multiple times without ever having their asylum claims heard. Many immigrants who have previously attempted entry to the United States to flee persecution could not have been aware of the complex statutory regime that governs asylum claims and would not have knowingly abandoned their right to apply for asylum. Some asylum seekers have also been wrongly assessed in prior credible fear interviews. And others yet may have previously entered or attempted to enter the United States before the onset of circumstances giving rise to their fear. Preserving discretion to grant asylum in these circumstances allows meritorious asylum seekers to be heard and corrects errors that might have previously occurred.

> *Extending the criminal bars to immigrants convicted of misdemeanor document fraud unfairly punishes low-wage immigrant workers and does not make communities safer.*

The Proposed Rules expand the asylum bar to include any asylum seeker who has been convicted of a misdemeanor offense for use of a fraudulent document. In so doing, the Rule entirely ignores the migration-related circumstances that often give rise to convictions involving document fraud. Migrants fleeing persecution often leave their home countries with nothing but the clothes on their backs and must rely on informal networks to navigate their new circumstances.[89] Extension of a blanket bar to asylum seekers who are compelled to resort to fraudulent means to enter the United States, or to remain safely during their applications for asylum, upends decades of settled law directing that violations of law arising from an asylum applicant's manner of flight should constitute only one of many factors to be consulted in the exercise of discretion.[90]

Moreover, migrants in vulnerable communities who are struggling to survive during the pendency of their asylum proceedings are often exploited by unscrupulous intermediaries who offer assurances and

---

(describing how in May 2017, the Department of Homeland Security set out to target parents and family members of unaccompanied minors for prosecution).

[88] Proposed Rules at 69648.

[89] *See Pula*, 19 I.&N. Dec. at 474.

[90] *Id.*

AR.10062

documentation that turn out to be fraudulent.[91] Many noncitizens working in the low-wage economy face egregious workplace dangers and discrimination and suffer retaliation for asserting their rights.[92] The continued availability of asylum to low-wage immigrant workers can encourage them to step out of the shadows. The expansion of criminal asylum bars to sweep in all document fraud offenses, on the other hand, would unfairly prejudice immigrants with meritorious asylum claims and force them deeper into the dangerous informal economy.

Our perspective on this issue is informed by the experience of one of our clients, whom we'll refer to as "G.H." G.H. was an asylum-seeker from Sierra Leone, who survived the horrific civil war and fled to a neighboring country. In a precarious situation in a refugee camp, and without travel documents, he used a friend's passport to enter the U.S. Like many refugees and asylum seekers, he faced the choice of living in danger or using travel documents that were not his own or were not authentic. He disclosed the use of his friend's passport when he applied for asylum and other immigration benefits, and since being granted relief has been able to reunite with family in the U.S. Under the proposed regulation, he would be denied asylum and family reunification simply because he was a refugee who fled without travel documents.

> *The Proposed Rules will harm communities with overlapping vulnerabilities, including LGBTQ asylum seekers, survivors of trafficking, and survivors of domestic violence.*

The Proposed Rules exclude from asylum protections countless members of vulnerable communities who have experienced trauma, abuse, coercion, and trafficking. Many of these individuals may only become aware of their ability to apply for asylum after law enforcement encounters that lead them to service providers who can educate them about their immigration options. Despite the unique difficulties they face, the Proposed Rules would compound their harm and prevent them from achieving family unification and a pathway to citizenship.

The Proposed Rules pose a unique threat to LGBTQ immigrant community members. LGBTQ immigrants in particular may have already experienced a high degree of violence and disenfranchisement from economic and political life in their home countries.[93] Hate violence towards undocumented LGBTQ immigrants in the United States is already disproportionately higher than for other members of the LGBTQ population.[94] Members of these communities also experience isolation from their kinship and

---

[91] See American Bar Association, "About Notario Fraud," July 19, 2018, https://www.americanbar.org/groups/public_interest/immigration/projects_initiatives/fight-notario-fraud/about_notario_fraud/.

[92] Paul Harris, "Undocumented workers' grim reality: speak out on abuse and risk deportation," *The Guardian*, March 28, 2013, https://www.theguardian.com/world/2013/mar/28/undocumented-migrants-worker-abuse-deportation.

[93] *See* Aengus Carroll and Lucas Ramon Mendos, *State Sponsored Homophobia: A World Survey of Sexual Orientation Laws: Criminalisation, Protection and Recognition* 12th Ed. (International Lesbian, Gay, Bisexual, Transgender, and Intersex Association (ILGA), 2017), https://ilga.org/downloads/2017/ILGA_State_Sponsored_Homophobia_2017_WEB.pdf.

[94] *See* Sharita Gruberg, "LGBTQ Undocumented Immigrants Face an Increased Risk of Hate Violence," *Center for American Progress*, June 10, 2014,

AR.10063

national networks following their migration. This isolation, compounded by the continuing discrimination towards the LGBTQ population at large, leave many in the LGBTQ immigrant community vulnerable to trafficking, domestic violence, and substance abuse, in addition to discriminatory policing practices. The expansion of criminal enforcement and prosecution of undocumented people also harms the LGBTQ immigrant community.[95] The Proposed Rules will therefore have a disparate impact on LGBTQ individuals whose involvement in the criminal legal system is often connected to past trauma and/or the result of biased policing.

The expansion of asylum bars to include various misdemeanor offenses that were not previously considered particularly serious also unfairly sweeps trafficking survivors into its dragnet. It is becoming more widely recognized across state court systems that trafficking survivors frequently come into contact with intervention resources and service providers only after contact with law enforcement occurs. Innovative criminal justice reform efforts currently being adopted across the country include special trafficking courts that recognize the need for discretion in the determination of criminal culpability.[96] The same approach should be employed in the determination of asylum eligibility, where the applicant's life and safety are on the line.

The Proposed Rules instead preclude asylum adjudicators from conducting a trauma-centered approach, categorically barring countless trafficking survivors convicted of misdemeanor and felony offenses without any opportunity to present the specific circumstances of their claim.

Survivors of domestic violence include trafficking survivors and LGBTQ community members, such that inclusion of offenses related to domestic violence in the expanded asylum bars affects populations with overlapping vulnerabilities.[97] The Proposed Rules too broadly categorize domestic violence offenses as particularly serious and sweep both offenders and survivors into their dragnet. The immigration laws extend protections to domestic violence survivors outside of the asylum context, recognizing the complex dynamics surrounding intimate partner violence. Provisions in the Violence Against Women Act allow adjudicators evaluating claims for relief arising thereunder to exercise discretion based on a number of factors and circumstances.[98]  The blunt approach adopted by the Proposed Rules is

---

https://www.americanprogress.org/issues/immigration/news/2014/06/10/91233/lgbt-undocumented-immigrants-face-an-increased-risk-of-hate-violence/.

[95] *See eg.,* Sharita Gruberg, "How Police Entanglement with Immigration Enforcement Puts LGBTQ Lives at Risk," *Center for American Progress*, April 12, 2017, https://www.americanprogress.org/issues/lgbtq-rights/reports/2017/04/12/430325/police-entanglement-immigration-enforcement-puts-lgbtq-lives-risk/.

[96] Elise White, et al., "Navigating Force and Choice: Experiences in the New York City Sex Trade and the Criminal Justice System's Response," *Center for Court Innovation*, December 2017 (noting that 78% of participants in the report's study had been arrested, mostly for non-violent, non-prostitution offenses such as *drug possession*).

[97] Marty Schladen, "ICE Agents Detain Alleged Domestic Violence Victim," *El Paso Times*, February 16, 2017, https://www.elpasotimes.com/story/news/2017/02/15/ice-detains-domestic-violence-victim-court/97965624/ (noting that the immigrant detained, a transgender person previously deported following her conviction for crimes such as posession of stolen mail and assault, was then living at the Center Againts Sexual and Family Violence, a shelter for survivors of intimate partner violence).

[98] Nadine Shaanta Murshid and Elizabeth A. Bowen, "A Trauma-Informed Analysis of the Violence Against Women Act's Provisions for Undocumented Immigrant Women," *Violence Against Women* 24(13) (2018): 1540–1556, https://doi.org/10.1177/1077801217741991.

AR.10064

inconsistent with the approach taken towards survivors elsewhere in the federal immigration statute and does not rely on any evidence-based justification for treating asylum seekers differently.

Moreover, the domestic violence sections of the Proposed Rules include the only categorical bar to asylum for which a conviction is not required. Domestic violence incidents all too often involve the arrest of both the primary perpetrator of abuse and the survivor.[99] These "cross-arrests" do not always yield clear determinations of victim and perpetrator. Authorizing asylum adjudicators to determine the primary perpetrator of domestic assault, in the absence of a judicial determination, unfairly prejudices survivors who are wrongly arrested in the course of police intervention to domestic disturbances.

Finally, the exemption for asylum applicants who can demonstrate their eligibility for a waiver under section 237(a)(7)(A) of the Immigration and Nationality Act does not cure the harm to asylum seekers caused by imposition of a categorical domestic violence related bar.[100] Rather, it converts a non-adversarial asylum proceeding into a multi-factor, highly specific inquiry into culpability based on circumstances that may be very difficult for an asylum seeker to prove—especially if proceeding without counsel and with limited English proficiency.

> *Barring asylum for immigrants convicted of "gang-related crimes" based on unreliable evidence and racially disparate policing practices is harmful to youth of color and does not make communities safer.*

In recent years, the expansion of gang databases for use in the apprehension and removal of foreign nationals—including children—has generated tremendous concern among advocates and the communities they serve.[101] The use of gang databases by local law enforcement and Immigration and Customs Enforcement has been widely criticized as an overbroad, unreliable and often biased measure of gang membership and involvement.[102] The Proposed Rules expand the criminal bars to asylum to those accused of gang involvement in the commission of minor criminal offenses, embracing an open-ended adjudicative process that will inevitably result in asylum adjudicators relying unfairly on these discredited methods of gang identification. This outcome would compound the disparate racial impact

---

[99] David Hirschel, et al., "Domestic Violence and Mandatory Arrest Laws: To What Extent Do They Influence Police Arrest Decisions," *Journal of Criminal Law & Criminology* 98, no. 1 (2007-2008): 255, https://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?article=7284&context=jclc (noting that "[i]n some cases, dual arrests may be the result of legislation, department policies, or both failing to require officers to identify the primary aggressor. In addition, when such provisions are present, police may lack the training or information needed to identify the primary aggressor when responding to a domestic violence assault. This situation may be compounded by batterers who have become increasingly adept at manipulating the criminal justice system, and may make efforts to 'pre-empt' victims from notifying police in order to further control or retaliate against them.").

[100] 8 U.S.C. § 1227(a)(7)(A).

[101] *See* Nermeen Arastu, et al., "Swept Up In The Sweep: The Impact of Gang Allegations on Immigrant New Yorkers," *New York Immigration Coalition (NYIC) and CUNY School of Law's Immigrant and Non-citizen Rights Clinic*, May 2018, https://www.law.cuny.edu/wp-content/uploads/page-assets/academics/clinics/immigration/SweptUp_Report_Final-1.pdf.

[102] Ali Winston, "Marked for Life: U.S. Government Using Gang Databases to Deport Undocumented Immigrants," *The Intercept*, August 11, 2016, https://theintercept.com/2016/08/11/u-s-government-using-gang-databases-to-deport-undocumented-immigrants/.

AR.10065

of inclusion in gang databases and bar asylum seekers who are themselves fleeing violence from gangs in their home countries.[103]

Past legislative efforts to expand the grounds of removal and inadmissibility in the Immigration and Nationality Act to include gang membership have failed to pass both houses of Congress.[104] In addition, immigration adjudicators already routinely premise discretionary denials of relief or release on bond on purported gang membership, and scores of alleged gang members have already been deported on grounds related to immigration violations or criminal convictions for which no relief is available.[105] Creating a "gang-related crime" bar will only exacerbate the due process violations already occurring as the result of unsubstantiated information about supposed gang ties.[106]

In addition, by focusing on "reason to believe" as the basis for the bar, rather than the seriousness of the crime, the proposed provision is ultra vires and unconscionably limits the eligibility for asylum of those most in need of protection. The effect of the Proposed Rules would be to expand the number and type of convictions for which an analysis of eligibility is required, sweeping in even petty offenses that would otherwise not trigger immigration consequences. Thus, an asylum applicant convicted of simple assault without use of a weapon, a non-violent property crime, or even possession of under 30 grams of marijuana for personal use (otherwise exempted from the reach of the Proposed Rule), could trigger a bar to asylum if the adjudicator concludes she has "reason to believe" the offense was committed in furtherance of gang activity.[107] In making these determinations, asylum adjudicators would be unable to rely on uncorroborated allegations contained in arrest reports, but could nevertheless shield their decisions by relying on discretion.[108]

---

[103] *See* Jonanthan Blitzer, "How Gang Victims Are Labeled As Gang Suspects," *The New Yorker*, January 23, 2018, https://www.newyorker.com/news/news-desk/how-gang-victims-are-labelled-as-gang-suspects.

[104] *See* Jessica Chacon, "Whose Community Shield?: Examining the Removal of the 'Criminal Street Gang Member,'" *University of Chicago Legal Forum* 317 (2007: 333-336) (reviewing legislative history of failed efforts to expand removability of those accused of gang related offenses and noting criticism that "[t]he only legal effect of the proposed legislation would be to increase the number of noncitizens lawfully present who would be subject to removal on the basis of their purported associations with individuals involved in group criminal activity.").

[105] For an illustration of Immigration and Customs Enforcement's propensity to make gang allegations on the basis of questionable if not fabricated evidence, and the deference to which the evidence is often granted by immigration adjudicators, *see* Mark Joseph Stern, "Bad Liars," *Slate*, May 16, 2018, https://slate.com/news-and-politics/2018/05/federal-judge-accused-ice-of-making-up-evidence-to-prove-that-dreamer-was-gang-affiliated.html.

[106] See Yvette Cabrera, "New ICE Tactic Raises Questions About Due Process," *ThinkProgress*, October 6, 2017, https://thinkprogress.org/ice-targets-gangs-6775356473a8/; Rebecca Hufstader, "Immigration Reliance On Gang Databases: Unchecked Discretion And Undesirable Consequences," 90 *New York University Law Review* 90 (2015): 671.

[107] Page 69649 of the Proposed Rules notes that the applicable standard for determining when to apply the bar on asylum seekers convicted of a crime involving criminal street gangs is "reason to believe," as used in 8 U.S.C. § 1182(a)(2)(c), and that the asylum adjudicator may consider "all reliable evidence" in making their decision.

[108] *See Garces v. U.S. A.G.*, 611 F.3d 1337, 1349-50 (11th Cir 2010) (reversing finding of "reason to believe" that the respondent was a participant in drug trafficking based on unsubstantiated arrest reports); *Matter of Rico*, 16 I.&N. Dec. 181, 185-86 (BIA 1977) (relying on pre-hearing admissions to uphold finding of inadmissibility).

AR.10066

The Proposed Rules thus invite extended inquiry into the character of young men of color who otherwise have meritorious asylum claims, based on information gained through racially disparate policing practices. These rules multiply the harm to asylum seekers of color subject to racially disparate policing that results in racially disparate rates of guilty pleas to minor offenses. This same population is overrepresented in gang databases, which are notoriously inaccurate, outdated, and infected by racial bias.[109]

### VIII. The Proposed Rules are ultra vires to the federal immigration statute to the extent they purport to bar eligibility through a categorical exercise of discretion

When Congress speaks clearly through a statute, the plain meaning of that statute governs.[110] Congress by statute permits the Attorney General to designate certain categories of offenses as "particularly serious crimes."[111] As such, Congress *explicitly* permitted the Attorney General to designate a non-aggravated felony to be a particularly serious crime and thus to disqualify a person from asylum. In the context of asylum, all aggravated felonies are *per se* particularly serious crimes and the Attorney General "may designate by regulation [other] offenses that will be considered to be" a particularly serious crime for purposes of asylum.[112]

Here, however—seemingly in an attempt to insulate the Proposed Rules from review, the agencies attempt to designate new bars to asylum both by designating them as "particularly serious crimes" pursuant to 8 U.S.C. § 1158(b)(2)(B)(ii) and rendering them categorically exempt from a positive discretionary adjudication of asylum pursuant to 8 U.S.C. § 1158(b)(2)(C). This effort is unlawful. Section 1158(b)(2)(B)(ii) does permit the Attorney General to, if he wishes, attempt to designate some classes of offenses as particularly serious crimes; such designations are reviewable for legal error (and as explained above, the commenters believe these expansions are unlawful).[113] However, if the offense is not a particularly serious crime, then a discretionary decision must be rendered on the application. It is true that the Attorney General may also provide for "additional limitations and conditions" on asylum applications so long as they are "consistent" with the with the asylum statute.[114] In this case, however, the Proposed Rules add sweeping categories of offenses that automatically remove an applicant from the consideration of discretion—a regulatory proposal that is ultra vires to the plain text of the statute.

To the extent that the proposed rules would adopt a bar to asylum based on a categorical discretionary bar, rather than a particularly serious crime designation, they are similar to the rules struck down by

---

[109] Annie Sweeney and Madeline Buckley, "Chicago police gang data collection faulted by city's inspector general as unchecked and unreliable," *Chicago Tribune*, April 11, 2019, https://www.chicagotribune.com/news/breaking/ct-met-chicago-police-gang-data-04112019-story.html; Anita Chabria, "A routine police stop landed him on California's gang database. Is it racial profiling?," *Los Angeles Times*, May 9, 2019, https://www.latimes.com/politics/la-pol-ca-california-gang-database-calgang-criminal-justice-reform-20190509-story.html.

[110] See, *e.g.*, *Robinson* v. *Shell Oil Co.*, 519 U.S. 337, 340 (1997).

[111] 8 U.S.C. § 1158(b)(2)(B)(ii).

[112] *Id.* The Attorney General has not designated "substantial battery" to be a particularly serious crime for any purpose, including for purposes of ineligibility to seek asylum.

[113] 8 U.S.C. § 1252(a)(2)(D).

[114] 8 U.S.C. § 1158(b)(2)(C); *see also* 8 U.S.C. § 1158(d)(5)(B).

AR.10067

numerous Circuit Courts of Appeal in the context of adjustment of status for those considered by law to be "arriving aliens." Purporting to exercise discretion categorically, then-Attorney General Reno putatively rendered that class of noncitizens ineligible for adjustment of status, a determination that is ordinarily discretionary, even though the statute seemed to allow eligibility. Multiple Circuit Courts of Appeal struck down the proposed regulations, finding them to reflect an impermissible reading of the statute in light of the fact that Congress carefully defined in the statute the categories of people eligible to apply for adjustment of status.[115]

The same logic applies here. In the asylum statute, Congress explicitly made the commission of a particularly serious crime a bar to asylum. The canon of interpretation known as *expressio unius est exclusio alterius* instructs that, "expressing one item of [an] associated group or series excludes another left unmentioned."[116] The Proposed Rules attempt to create numerous categories of discretionary "pseudo-particularly serious crimes," barring asylum through a categorical exercise of discretion even if those offenses are ultimately found not to be particularly serious crimes. Such an effort violates this canon of interpretation, and places the Proposes Rules ultra vires to the statute.

*** 

For all of the reasons articulated above, NWIRP strongly objects to the Proposed Rules and urges DHS and EOIR to reject this proposal in full. While NWIRP outlined specific objections to certain aspects of the proposal, we wish to emphasize that we oppose the entirety of the Proposed Rules and urge DHS and EOIR to reject them.

Please do not hesitate to contact me if you have any questions. You may reach me at (206) 957-8609 or via email at jorge@nwirp.org.

Sincerely,

Jorge L. Barón
Executive Director

---

[115] The First and Ninth Circuits found the regulations contrary to clear statutory command. *Succar v. Ashcroft*, 394 F.3d 8, 29 (1st Cir. 2005); *Bona v. Gonzales*, 425 F.3d 663, 668-71 (9th Cir. 2005). Other courts invalidated the adjustment regulations under "Step Two" of *Chevron*. Those courts found some ambiguity in the statute, but found a per se discretionary bar not based on a permissible construction of the eligibility standards set forth in the governing statute in light of the statutory scheme and congressional intent. *Zheng v. Gonzales*, 422 F.3d 98, 116-20 (3d Cir. 2005) (invalidating regulation precluding category of people from applying to adjust status "[g]iven Congress's intent as expressed in the language, structure, and legislative history of INA section 245 [8 U.S.C. § 1255]"); *Scheerer v. United States Attorney General*, 445 F.3d 1311, 1321-22 (11th Cir. 2006). This reasoning would likewise be applicable to the proposed rule. Where Congress went through the trouble to create a comprehensive statutory scheme to define asylum eligibility, the agency cannot preempt that in the guise of discretion by creating out of whole cloth a separate set of eligibility criteria.

[116] *United States* v. *Vonn*, 535 U.S. 55, 65 (2002).

26

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekp-huk7
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0512
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** An Bui

---

## General Comment

I strongly oppose this proposed rule change that would unjustly criminalize asylum seekers. For asylum seekers, making it to the U.S. often means they have found safety from persecution, torture, and sometimes death. Yet asylum seekers face many unjust obstacles in the immigration system. This proposed Trump rule would punish people who endure mistreatment and racial profiling in the criminal legal system a second time -- with deportation back to the very life-threatening situation they fled. This is profoundly immoral, makes a mockery of due process, and comes right out of Steven Miller's racist playbook. I am speaking up for racial justice and standing against this proposed rule today!

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekp-j1dj
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0513
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Anna Krasner

---

## General Comment

The DHS should withdraw this proposal immediately.

he first proposed set of changes adds the following seven categorical bars to asylum eligibility: (1) any conviction of a felony offense; (2) any conviction for "smuggling or harboring" under 8 U.S.C. 1324(a), even if the asylum seeker committed the offense for the purpose of bringing her own spouse, child or parent to safety; (3) any conviction for illegal reentry under 8 U.S.C. 1326; (4) any conviction for an offense "involving criminal street gangs," with the adjudicator empowered to look to any evidence to determine applicability; (5) any second conviction for an offense involving driving while intoxicated or impaired; (6) any conviction or accusation of conduct for acts of battery involving a domestic relationship; (7) and any conviction for several newly defined categories of misdemeanor offenses, including any drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits.

Asylum eligibility should not be predicated on convictions for minor misdemeanors, and, in one case, the mere accusation of a crime. It violates the justice system's guiding principle of innocent until proven guilty, and subject asylum seekers to racial profiling. Also, asylum seekers cannot be accused of a crime when entering the United States illegally, as there is no illegal entry when reasonably seeking asylum. This criminalizes people for the very act of seeking asylum, thereby barring them from asylum. Essentially, this rule stands the risk of banning people from seeking asylum altogether.

This is un-American, undemocratic, and unjust. Please do not move forward with this proposal.

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekp-nsya
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0514
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Katherine Fite
**Organization:** Safe Passage Project

---

## General Comment

See attached file(s)

---

## Attachments

Safe Passage Project Comment

AR.10071



185 West Broadway

New York, NY 10013

t 212-324-6558 | f 347.368.2213

www.safepassageproject.org

*Via Federal e-Rulemaking Portal*
*https://www.regulations.gov/document?D=EOIR-2019-0005-0001*

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

**Re: Comment on Proposed Rule, "Procedures for Asylum and Bars to Asylum Eligibility,"
EOIR Docket No. 18–0002, A.G. Order No. 4592–2019**

January 21, 2020

To the Department of Justice and the Department of Homeland Security:

Safe Passage Project respectfully submits this comment to the Department of Justice and the
Department of Homeland Security Joint Notice of Proposed Rulemaking on Procedures for
Asylum and Bars to Asylum Eligibility, EOIR Docket No. 18–0002, A.G. Order No. 4592–2019,
Federal Register Vol. 84, No. 224, issued December 19, 2019 (the "Proposed Rules").

Safe Passage Project is a registered 501(c)(3) nonprofit corporation based in New York City. We
provide free lawyers to refugee and immigrant children in New York City and on Long Island
who face deportation back to life-threatening situations. Safe Passage Project was founded in
2006 at New York Law School and in 2013 fully incorporated as an independent nonprofit. Safe
Passage Project recruits, trains, and mentors volunteer attorneys to represent unaccompanied
minors in immigration court and before the U.S. Citizenship and Immigration Services
("USCIS") Asylum Office, and in New York Family Court. Without the legal services we
provide, many of these children would be unrepresented and unaware of the available options to
legalize their immigration status.

Our organization has a number of concerns about the Proposed Rules, including their legal
validity under international treaty obligations and the Full Faith and Credit clause of the
Constitution. However, in light of our organization's mission to provide legal services to
immigrant youth, we are focusing our comment upon the ways in which these Proposed Rules

harm children who have fled violence in their home countries to seek asylum in the United States and impacts the immigration court system.

## I.    Background

Safe Passage Project works with children from all over the world who are seeking asylum in the U.S. Many of our clients are fleeing record levels of violence in the Northern Triangle of Central America—El Salvador, Guatemala and Honduras. Children in these countries are often forcibly recruited by criminal syndicates commonly referred to as "gangs." They are forced to engage in criminal activities or engage in violent acts, or forced to provide sexual services to gang members. Children may also be targeted as members of families who are themselves targeted for persecution on account of their race, religion, nationality, membership in a particular social group, or political opinion. In many regions, the government is well aware of the criminal activity and does not protect the populace, and may in fact be benefitting from corrupt criminal payments. In many cases, children flee these conditions on their own, and arrive at the border unaccompanied by an adult family member. *See, generally, e.g.*, *Children on the Run: Unaccompanied Children Leaving Central America and Mexico and the Need for International Protection,* United Nations High Commissioner for Refugees, available at https://www.unhcr.org/about-us/background/56fc266f4/children-on-the-run-full-report.html.

In their searches for safety and security, many such children exercise their legal rights to apply for asylum in the U.S. On December 19, the Department of Homeland Security (DHS) and the Department of Justice (DOJ) issued a joint set of Proposed Rules that would make three primary changes to the rules governing asylum adjudications that would make the process much more difficult for such children.

First, the Proposed Rules add the following seven *categorical* bars to asylum eligibility: (1) any conviction of a felony offense; (2) any conviction for "smuggling or harboring" under 8 U.S.C. § 1324(a), even if the asylum seeker committed the offense for the purpose of bringing her own spouse, child or parent to safety; (3) any conviction for illegal reentry under 8 U.S.C. § 1326; (4) any conviction for an offense "involving criminal street gangs," with the adjudicator empowered to look to any evidence to determine applicability; (5) any second conviction for an offense involving driving while intoxicated or impaired; (6) any conviction *or accusation of conduct* for acts of battery involving a domestic relationship; (7) and any conviction for several newly defined categories of misdemeanor offenses, including *any* drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits. The second section of the Proposed Rules provides a multi-factor test for immigration adjudicators to determine whether a criminal conviction or sentence is valid for the purpose of determining asylum eligibility. The third section rescinds a provision in the current rules regarding the reconsideration of discretionary asylum.

Taken together, these proposed changes constitute an unnecessary, harsh, and unlawful gutting of the asylum protections enshrined in United States and international law. Safe Passage Project submits these comments to express opposition to the entirety of the Proposed Rules and grave concerns with the administration's continued efforts to exclude asylum-seeking children from obtaining the security and stability the United States asylum system has long promised. We urge that the Proposed Rules be rescinded in their entirety.

AR.10073

## II.     The Proposed Rules unnecessarily and cruelly exclude bona fide young refugees from asylum eligibility.

*The barriers to asylum for those previously involved in the criminal legal system are already sweeping in scope; adding more barriers is cruel and unnecessary.*

The United States asylum system was first codified in statute through the Refugee Act of 1980, described by one prominent scholar as a bipartisan attempt to "maintain a consistent posture towards the world as a nation with a strong humanitarian tradition and a unique historic role as a haven for persons fleeing oppression."[1] The Act created a "broad class" of refugees eligible for a discretionary grant of asylum.[2] Asylum provides people, including children, fleeing horrors in their home countries with physical safety, a path to citizenship and security, and the opportunity to reunite with immediate family members who may still remain abroad in danger.[3] For children seeking asylum in the United States, the stakes could not be higher—a claim denied often means return to death or brutal persecution.[4]

The laws, regulations, and processes governing asylum adjudications are already exceedingly harsh. Those seeking asylum bear the evidentiary burden of establishing their eligibility for asylum[5] in the face of a complex web of laws and regulations, with no right to free legal counsel; these hurdles are even more difficult for children, who are particularly ill equipped to navigate the labyrinthine legal system.[6] The obstacles to winning asylum are exceedingly high. Indeed, in some parts of the country and before certain immigration judges, almost no one succeeds.[7]

Even without the Proposed Rules, existing bars to asylum based on allegations of criminal conduct are *already* sweeping and over-broad.[8] Any conviction for an offense determined to be an "aggravated felony" is considered a *per se* "particularly serious crime" and therefore a mandatory bar to asylum.[9] "Aggravated felony" is a notoriously vague term that exists only in immigration law. Originally limited to murder, weapons trafficking and drug trafficking,[10] it has

---

[1] Deborah Anker, "The Refugee Act of 1980: An Historical Perspective," *In Defense of the Alien* 5 (1982): 89-94, https://www.jstor.org/stable/23141008?read-now=1&refreqid=excelsior%3A1060953608aa0bdd30d5d506e1ff6318&seq=1#page_scan_tab_contents.

[2] *See I.N.S. v. Cardoza-Fonseca*, 40 U.S. 421, 423 (1987).

[3] The permanency and family reunification benefits that accompany asylum are not provided to those granted withholding of removal or protection under the Convention Against Torture, the alternative forms of relief described throughout the Proposed Rules as a justification for the breadth of the new proposed bars. For more details on the differences between the forms of protection, *see* section VI *infra*.

[4] *See, e.g.*, Sarah Stillman, "When deportation is a death sentence," *The New Yorker*, January 8, 2018, https://www.newyorker.com/magazine/2018/01/15/when-deportation-is-a-death-sentence.

[5] 8 USC § 1158(b)(1)(B); 8 CFR § 1240.8(d).

[6] *See* Daniel Connolly, Aaron Montes, and Lauren Villagran, "Asylum seekers in U.S. face years of waiting, little chance of winning their cases," *USA Today*, September 25, 2019, https://www.usatoday.com/in-depth/news/nation/2019/09/23/immigration-court-asylum-seekers-what-to-expect/2026541001/.

[7] Manuel Roig-Franzia, "Immigrants risk it all seeking asylum. The answer is almost always 'no,'" *Washington Post*, July 24, 2019, https://www.washingtonpost.com/lifestyle/style/migrants-risk-it-all-seeking-asylum-the-answer-in-court-is-almost-always-no/2019/07/23/9c161b2e-a3f7-11e9-b732-41a79c2551bf_story.html.

[8] The existing categorical bars to asylum eligibility are discussed in detail on p. 69641 of the Proposed Rules.

[9] 8 U.S.C. §§ 1158(b)(2)(A)(ii) and (B)(i).

[10] Pub. L. No. 100-690, § 7342, 102 Stat. 4181, 4469-70.

AR.10074

metastasized to encompass hundreds of offenses, many of which are neither aggravated nor felonies, including petty offenses such as misdemeanor shoplifting, simple misdemeanor battery, or sale of counterfeit DVDs.[11] The existing crime bars should be narrowed, not expanded.

The Proposed Rules' bars are unnecessary not only because of the vast scope of existing criminal bars, but also because immigration adjudicators already have tremendous discretion to deny asylum to those who meet the refugee definition but have been convicted of criminal conduct.[12] Further categorical bars are not needed when adjudicators are already entitled to deny asylum claims on those grounds.

> *The Proposed Rules' application to children, especially children with overlapping vulnerabilities, is particularly cruel.*

The above arguments all apply to young asylum seekers as much as they do adults, but the Proposed Rules' application to children is especially harsh. Even our youngest clients, children who are too young to have faced criminal allegations themselves, will be harmed, because many rely on the support of asylum-seeking parents or guardians who will face the same eligibility bars. Children may also be derivative applicants in family member's now-excluded asylum claims. Realistically, for many young people, the deportation of their U.S. caregivers means their own deportation as well. Infants and other very young children should not be made to bear the burden of the immigration system's cruel attempts to exclude their parents from the country.

The harm to children is particularly great because the Proposed Rules expand the asylum bar to parents or other caregivers who are convicted of smuggling or harboring offenses after taking steps to help minor children enter the United States in order to flee persecution. The Proposed Rules multiply the harms parents and caregivers have experienced in their treacherous journeys to safety and callously penalize parents for doing what is only human—taking all necessary steps to protect their children. Because children are often derivatives on their parents' asylum applications, and in any case often have no one else to care from them in the U.S. should their parents be deported, it penalizes the children as well.

The Proposed Rules exclude from asylum protections countless members of vulnerable communities who have experienced trauma, abuse, coercion, and trafficking. Many of these individuals may only become aware of their ability to apply for asylum after law enforcement encounters that lead them to service providers who can educate them about their immigration options. Despite the unique difficulties they face, the Proposed Rules would compound their harm and prevent them from achieving family unification and a pathway to citizenship.

Further, the Proposed Rules pose a unique threat to immigrant youth with overlapping vulnerabilities. For example, young LGBTQ immigrants in particular may have already experienced a high degree of violence and disenfranchisement from economic and political life

---

[11] 8 U.S.C. § 1101(a)(43). *See also* Nancy Morawetz, "Understanding the Impact of the 1996 Deportation Laws and the Limited Scope of Proposed Reforms," *Harvard Law Review* 113 (2000): 1939-40 (criticizing the "'Alice-in-Wonderland-like definition of the term 'aggravated felony'"); Melissa Cook, "Banished for Minor Crimes: The Aggravated Felony Provisions of the Immigration and Nationality Act as a Human Rights Violation," *Boston College Third World Law Journal* (2003): 293.

[12] *See id.*

AR.10075

in their home countries.[13] Hate violence towards undocumented LGBTQ immigrants in the United States is already disproportionately higher than for other members of the LGBTQ population.[14] Members of these communities also experience isolation from their kinship and national networks following their migration. Together, these factors render many young LGBTQ immigrants vulnerable to trafficking, domestic violence, and substance abuse (in addition to discriminatory policing practices). The expansion of asylum bars to include various misdemeanor offenses that were not previously considered particularly serious also unfairly sweeps children who have survived trafficking into its dragnet. It is becoming more widely recognized across state court systems that trafficking survivors frequently come into contact with intervention resources and service providers only after contact with law enforcement occurs. Under the Proposed Rules, young people like these, whose cases should be met with empathy and understanding, would instead be barred from seeking asylum altogether.

The expansion of asylum bars to include various misdemeanor offenses that were not previously considered particularly serious also unfairly sweeps children who have survived trafficking into its dragnet. It is becoming more widely recognized across state court systems that trafficking survivors frequently come into contact with intervention resources and service providers only after contact with law enforcement occurs. Innovative criminal justice reform efforts currently being adopted across the country include special trafficking courts that recognize the need for discretion in the determination of criminal culpability.[15] The same approach should be employed in the determination of asylum eligibility, where the applicant's life and safety are on the line.

Additionally, young immigrants of color, especially boys and men, are especially vulnerable to false allegations of gang association. In recent years, the expansion of gang databases for use in the apprehension and removal of foreign nationals—including children—has generated tremendous concern among advocates and the communities they serve.[16] The use of gang databases by local law enforcement and Immigration and Customs Enforcement has been widely criticized as an overbroad, unreliable and often biased measure of gang membership and involvement.[17] The Proposed Rules expand the criminal bars to asylum to those accused of gang involvement in the commission of minor criminal offenses, embracing an open-ended

---

[13] *See* Aengus Carroll and Lucas Ramon Mendos, *State Sponsored Homophobia: A World Survey of Sexual Orientation Laws: Criminalisation, Protection and Recognition* 12th Ed. (International Lesbian, Gay, Bisexual, Transgender, and Intersex Association (ILGA), 2017), https://ilga.org/downloads/2017/ILGA_State_Sponsored_Homophobia_2017_WEB.pdf.

[14] *See* Sharita Gruberg, "LGBTQ Undocumented Immigrants Face an Increased Risk of Hate Violence," *Center for American Progress*, June 10, 2014, https://www.americanprogress.org/issues/immigration/news/2014/06/10/91233/lgbt-undocumented-immigrants-face-an-increased-risk-of-hate-violence/.

[15] Elise White, et al., "Navigating Force and Choice: Experiences in the New York City Sex Trade and the Criminal Justice System's Response," *Center for Court Innovation*, December 2017 (noting that 78% of participants in the report's study had been arrested, mostly for non-violent, non-prostitution offenses such as *drug possession*).

[16] *See* Nermeen Arastu, et al., "Swept Up In The Sweep: The Impact of Gang Allegations on Immigrant New Yorkers," *New York Immigration Coalition (NYIC) and CUNY School of Law's Immigrant and Non-citizen Rights Clinic*, May 2018, https://www.law.cuny.edu/wp-content/uploads/page-assets/academics/clinics/immigration/SweptUp_Report_Final-1.pdf.

[17] Ali Winston, "Marked for Life: U.S. Government Using Gang Databases to Deport Undocumented Immigrants," *The Intercept*, August 11, 2016, https://theintercept.com/2016/08/11/u-s-government-using-gang-databases-to-deport-undocumented-immigrants/.

AR.10076

adjudicative process that will inevitably result in asylum adjudicators relying unfairly on these discredited methods of gang identification. This outcome would compound the disparate racial impact of inclusion in gang databases and bar young people who are themselves fleeing violence from gangs in their home countries.[18]

Overall, the Proposed Rules turn asylum into a blunt instrument that would prevent the use of discretion where it is most needed and most effective: in cases of young people with past trauma overlapping vulnerabilities. The existing framework for determining if an offense falls within the particularly serious crime bar already provides the latitude for asylum adjudicators to deny relief to anyone found to pose a danger to the community.[19] Furthermore, asylees with convictions that render them inadmissible must apply for a waiver at the time of their applications for permanent residence.[20] These measures ensure that asylum applicants in vulnerable populations like those our organization represents have access to supportive resources. Moreover, the existence of provisions allowing the revocation of asylum status ensures that adjudicators may continue to enforce concerns related to the safety of the community even after asylum is granted.[21]

> *The Proposed Rules cruelly disregard the connections between trauma and involvement in the criminal legal system, especially for drug offenses.*

The harsh nature of the Proposed Rules is especially evident when viewed through a trauma-informed lens. Asylum seekers are an inherently vulnerable population because of the trauma they have experienced in their countries of origin and, often, along the journey to find safety. This is especially true for children and young people seeking asylum, whose ages make them even less equipped to process violence. Many asylum-seeking children traveled to the U.S. without a parent or guardian, a difficult journey that risks compounding their existing trauma, and are adjusting to life in a new country where they frequently do not yet speak the language.

Unsurprisingly, then, existing literature suggests that at least one out of every three asylum seekers struggles with depression, anxiety, and/or post-traumatic stress disorder (PTSD).[22] One recent study found the mental health problems facing refugees and asylum seekers so acute that

---

[18] *See* Jonanthan Blitzer, "How Gang Victims Are Labeled As Gang Suspects," *The New Yorker*, January 23, 2018, https://www.newyorker.com/news/news-desk/how-gang-victims-are-labelled-as-gang-suspects.

[19] Apart from the statutory aggravated felony bar to asylum, the Board of Immigration Appeals and Attorney General have historically utilized a highly circumstantial approach to the particular serious crime determination that would bar an immigrant from receiving asylum. *See e.g., Matter of Juarez*, 19 I.&N. Dec. 664 (BIA 1988) (ordinarily a single misdemeanor that is not an aggravated felony will not be a particularly serious crime); *Matter of Frentescu*, 18 I.&N. Dec. 244 (BIA 1982), *modified* (setting forth several factors to be considered before imposing the particular serious crime bar, including: (i) the nature of the conviction, (ii) the circumstances and underlying facts for the conviction, (iii) the type of sentence imposed, and (iv) whether the type and circumstances of the crime indicate that the individual will be a danger to the community); *Matter of Y-L-, A-G-, R-S-R-,* 23 I.&N. Dec. 270 (A.G. 2002) (setting forth a multi-factor test to determine the dangerousness of a respondent convicted of a drug-trafficking offense who is otherwise barred from asylum as an aggravated felon, but seeking withholding of removal).

[20] 8 U.S.C. § 1159(c) (2012).

[21] 8 C.F.R. § 208.24(a) (2012).

[22] Giulia Turrini et al., "Common mental disorders in asylum seekers and refugees: umbrella review of prevalence and intervention studies," *International Journal of Mental Health Systems* 11 (August 2017): 51, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5571637/.

AR.10077

more than a third of the study's sample admitted having suicidal thoughts in the preceding two weeks.[23]

Studies also consistently reveal a high prevalence of comorbidity of PTSD and substance use disorders, with individuals with PTSD *up to 14 times more likely* to struggle with a substance use disorder.[24] Asylum seekers in the United States are often unable to access affordable medical care and treatments for complex trauma;[25] some turn to drugs and alcohol in an effort to self-medicate.[26] The proposed new bars to asylum include *any* drug-related conviction (with one exception for a first minor marijuana possessory offense) and any second conviction for driving under the influence. This approach is not only cruel but also ignores the evidence. *Particularly* given the vulnerabilities of asylum seeking populations, prior struggles with addiction should be addressed with treatment and compassion, not a closed door and deportation order.

> *The agencies have not proven that the Proposed Rules will improve the safety of the American public.*

The Proposed Rules are also arbitrary and capricious. They would constitute a marked departure from past practice in the supposed name of public safety, but the agencies have proffered no evidence or data to suggest that the Proposed Rules will improve safety at all.

For example, one assumption fundamentally underlying the Proposed Rules is that every noncitizen convicted of any offense punishable by more than a year in prison necessarily constitutes a danger to the community. But no evidence is provided to support that assumption, and a criminal record, does not, in fact, reliably predict future dangerousness.[27] The Proposed Rules are so capricious as to peremptorily postulate a noncitizen's supposed danger to the community even in circumstances when a judge has actually concluded that no danger exists by, for example, imposing a noncustodial sentence. Conviction for a crime does not, without more, make one a present or future danger—which is why the Refugee Convention's particularly serious crime bar, made part of United States law through 8 U.S.C. § 1158, should only properly

---

[23] Megan Brooks, "Refugees have high burden of mental health problems," *Psychiatry and Behavioral Health Learning Network*, June 2019, https://www.psychcongress.com/article/refugees-have-high-burden-mental-health-problems.

[24] Jenna L McCauley et al., "Posttraumatic Stress Disorder and Co-Occurring Substance Use Disorders: Advances in Assessment and Treatment," *Clinical Psychology Science and Practice* 19, 3 (October 2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3811127/.

[25] For more information on immigrant eligibility for federal benefits, *see* https://www.nilc.org/issues/health-care/.

[26] Carrier Clinic, *Trauma and Addiction* (2019), https://carrierclinic.org/2019/08/06/trauma-and-addiction/ ("...some people struggling to manage the effects of trauma in their lives may turn to drugs and alcohol to self-medicate. PTSD symptoms like agitation, hypersensitivity to loud noises or sudden movements, depression, social withdrawal and insomnia may seem more manageable through the use of sedating or stimulating drugs depending on the symptom. However, addiction soon becomes yet another problem in the trauma survivor's life. Before long, the 'cure' no longer works and causes far more pain to an already suffering person.").

[27] See U.S. Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders* (2017) (noting that recidivism rates fall substantially with age); U.S. Sentencing Commission, *Recidivism Among Federal Violent Offenders* (2019) (noting that non-violent offenders recidivate at significantly lower rates); J. Ramos and M. Wenger, "Immigration and recidivism: What is the Link?" *Justice Quarterly* (2019) (finding no correlation between recidivism rates and citizenship status among those formerly incarcerated for felonies in Florida prisons).

AR.10078

apply if both (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows that she is a present or future danger.[28]

Similarly, the Proposed Rules fail to address or account for the fact that a significant number of people may agree to plead to a crime as to avoid the threat of a severe sentence; not only is a conviction an unreliable predictor of future danger, it can also be an unreliable indicator of past criminal conduct.[29] Even further, in the case of the domestic-violence-related ground, the categorical bar will be imposed on the basis of *mere allegations* of conduct without any adjudication of guilt.[30]

## III.    The Proposed Rules will result in "mini-trials" in immigration court, undermine judicial efficiency and result in racially biased decision-making.

In two significant ways, the Proposed Rules require immigration adjudicators to engage in decision-making to determine whether an asylum applicant's conduct—considered independently of any criminal court adjudication—triggers a categorical bar to asylum eligibility. First, the agencies propose that immigration adjudicators be allowed to consider "all reliable evidence" to determine whether there is "reason to believe" an offense was "committed for or related to criminal gang evidence," or "in furtherance of gang-related activity, triggering ineligibility for asylum in either case.[31] Second, the Proposed Rules permit immigration adjudicators to "assess all reliable evidence in order to determine whether [a] conviction amounts to a domestic violence offense;" and to go even further by considering whether non-adjudicated *conduct* "amounts to a covered act of battery or extreme cruelty."[32]

Requiring adjudicators to make complex determinations regarding the nature and scope of a particular conviction or, in the case of the domestic violence bar, *conduct*, will lead to massive judicial inefficiencies and slanted "mini-trials" within the asylum adjudication process. The scope of the "reliable evidence" available to adjudicators in asylum cases is potentially limitless; advocates on both sides would be obligated to present fulsome arguments to make their cases about gang connections to the underlying activity or the relationship of the asylum applicant to the alleged victim. Because of the lack of robust evidentiary rules in immigration proceedings, it will be difficult if not impossible for many applicants to rebut negative evidence marshaled against them, even if false; and in other cases, asylum applicants will struggle to find evidence connected to events that may have happened years prior (especially for those detained). Asylum

---

[28] See U.N. High Commissioner for Refugees, *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 11 (July 2007), http://www.unhcr.org/en-us/576d237f7.pdf (the Refugee Convention's particularly serious crime bar only applies if (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows she is a "present or future danger.").

[29] John H. Blume and Rebecca K. Helm, "The Unexonerated: Factually Innocent Defendants Who Plead Guilty," *Cornell Law Review* 100 (2014): 157, https://pdfs.semanticscholar.org/c00f/96d421adf1846d120bf802a8854b5e2c0ff2.pdf.

[30] The Proposed Rules at p. 69651 explain that the regulations will "render ineligible [non-citizens] who engaged in acts of battery and extreme cruelty in a domestic context in the United States, regardless of whether such conduct resulted in a criminal conviction."

[31] *See* Proposed Rules at 69649.

[32] *See* Proposed Rules at 69652.

AR.10079

trials, which are typically three or fewer hours under current policies, would provide insufficient time to fully present arguments on both sides of these unwieldy issues.

As the immigration courts contend with backlogs that now exceed one million cases,[33] tasking adjudicators with a highly nuanced, resource-intensive assessment of the connection of a conviction to gang activity and/or the domestic nature of alleged criminal conduct—assessments far outside their areas of expertise—will prolong asylum proceedings and invariably lead to erroneous determinations that will give rise to an increase in appeals. The Proposed Rules repeatedly cite increased efficiency as justification for many of the proposed changes.[34] Yet requiring adjudicators to engage in mini-trials to determine the applicability of categorical criminal bars, rather than relying on adjudications obtained through the criminal legal system, will dramatically *decrease* efficiency in the asylum adjudication process. Indeed, the Supreme Court has "long deemed undesirable" exactly the type of "post hoc investigation into the facts of predicate offenses" proposed by the agencies here.[35] Instead, for more than a century the federal courts have repeatedly embraced the "categorical approach" to determine the immigration consequence(s) of a criminal offense, wherein the immigration adjudicator relies on the statute of conviction as adjudicated by the criminal court system, without relitigating the nature or circumstances of the offense in immigration court.[36] As the Supreme Court has explained, this approach "promotes judicial and administrative efficiency by precluding the relitigation of past convictions in mini-trials conducted long after the fact."[37]

## IV.    The Proposed Rules undermine Sixth Amendment protections and harms immigrant youth unfamiliar with the complex criminal and immigration framework governing prior convictions.

The Proposed Rules outline a new multi-factor process asylum adjudicators must use to determine whether a conviction or sentence remains valid for the purpose of determining asylum eligibility; the proposal includes a rebuttable presumption "against the effectiveness" of an order vacating, expunging, or modifying a conviction or sentence if the order was entered into after the asylum seeker was placed in removal proceedings or if the asylum seeker moved for the order more than one year after the date the original conviction or sentence was entered.[38]

This newly created presumption unfairly penalizes asylum applicants, many of whom may not have the opportunity to seek review of their prior criminal proceedings until applying for

---

[33] Marissa Esthimer, "Crisis in the Courts: Is the Backlogged U.S. Immigration Court System at Its Breaking Point?," *Migration Policy Institute*, October 3, 2019, https://www.migrationpolicy.org/article/backlogged-us-immigration-courts-breaking-point.

[34] *See* Proposed Rules at 69646, 69656-8.

[35] *Moncrieffe v. Holder*, 569 U.S. 184, 186 (2013).

[36] *See Moncrieffe*, 569 U.S. at 191 ("This categorical approach has a long pedigree in our Nation's immigration law."). For a more fulsome history of the development of the categorical approach in immigration court, *see* Alina Das, "The Immigration Penalties of Criminal Convictions: Resurrecting Categorical Analysis in Immigration Law," *New York University Law Review* 86, no. 6 (2011): 1689 - 1702, https://www.nyulawreview.org/wp-content/uploads/2018/08/NYULawReview-86-6-Das.pdf.

[37] *Moncrieffe*, 569 U.S. at 200-201.

[38] Proposed Rules at 69655.

AR.10080

asylum.[39] In *Padilla v. Kentucky*, the Supreme Court recognized that the immigration consequences of a conviction are sufficiently serious for the Sixth Amendment to require a noncitizen defendant to be competently advised of them before agreeing to a guilty plea.[40] By imposing a presumption against the validity of a withdrawal or vacatur of a plea, the Proposed Rules hold asylum seekers whose rights were violated under *Padilla* to a different standard; even though they too were denied effective assistance of counsel in the course of their underlying criminal proceedings, asylum seekers will be forced to rebut a presumption that their court-ordered withdrawal or vacatur is invalid. The Proposed Rules therefore compound the harm to immigrants who, in addition to facing persecution in their home countries, have been denied constitutionally compliant process in the United States criminal legal system.

Many asylum applicants, especially the young people our organization represents, who are often isolated from resources and unfamiliar with the due process protections available to them in the United States, may not have discovered the defects in their underlying criminal proceedings until their consultation with an immigration attorney, or until they are placed into removal proceedings, which may happen several years after a conviction. Imposing a presumption *against* the validity of a plea withdrawal or vacatur in these cases will undoubtedly lead to the wrongful exclusion of countless immigrants from asylum simply because they were unable to adequately rebut the presumption, particularly in a complex immigration court setting without the benefit of appointed counsel.

## V.    Conclusion

The Proposed Rules cruelly and unnecessarily threaten the ability of young people with meritorious asylum claims to pursue their cases. Safe Passage Project affirms that the Proposed Rules as drafted would be harmful to our clients, vulnerable unaccompanied immigrant youth who have fled persecution and who risk harm and even death if removed from the U.S.


Yours truly,


Katherine Fite                    Alexandra Rizio                    Michelle Caldera-Kopf
Equal Justice Works Fellow        Managing Attorney                  Managing Attorney
Safe Passage Project              Safe Passage Project               Safe Passage Project,
                                                                     Long Island Office

---

[39] On page 69656 of the Proposed Rules, the Department of Homeland Security and the Department of Justice urge that "[i]t is reasonable to conclude that an alien who has a meritorious challenge to a criminal conviction based on a procedural or substantive defect is more likely to seek post-conviction relief sooner than an alien who is seeking relief on rehabilitative grounds…"
[40] *Padilla v. Kentucky*, 559 U.S. 356 (2010).

AR.10081

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekp-4jqy
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0515
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Charlie Sciammas

---

## General Comment

My name is Charlie Sciammas, I am a resident of San Francisco, California and I am an immigrant. I am writing to express my concern and opinion relating to the Department of Homeland Security's proposed rule change on "Procedures for Asylum and Bars to Asylum Eligibility."

I am a concerned member of the public who believes strongly that our nation must welcome people fleeing violence, and who is strongly concerned about racial profiling in the criminal legal system. Immigrants are a vital part of my community, my neighborhood, and my state.

Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution.

This proposed rule would inject racial profiling into the asylum process. This latest attack would put even more people seeking asylum at risk of danger - and death. This would in turn eviscerate one of the most important defenses community members have against deportation.

I do not agree with thew new proposed rules. I urge the administration to uphold the human and civil rights of our migrant communities.

I urge the Administration to withdraw the proposed "Procedures for Asylum and Bars to Asylum Eligibility," which would drastically undermine our community and go against our values. I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.

Thank you for resolving this issue.

Sincerely,

Charlie Sciammas

AR.10083

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekp-njnu
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0516
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Antonio Diaz

---

## General Comment

My name is Antonio Diaz, I am a resident of Oakland, California and I am a descendant of immigrants. I am writing to express my concern and opinion relating to the Department of Homeland Security's proposed rule change on "Procedures for Asylum and Bars to Asylum Eligibility."

I am a concerned member of the public who believes strongly that our nation must welcome people fleeing violence, and who is strongly concerned about racial profiling in the criminal legal system. Immigrants are a vital part of my community, my neighborhood, and my state.

Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution.

This proposed rule would inject racial profiling into the asylum process. This latest attack would put even more people seeking asylum at risk of danger - and death. This would in turn eviscerate one of the most important defenses community members have against deportation.

The Administration should not place further obstacles for people seeking asylum. The US should abide by its values adn policies to be a place of refuge and respect for human rights.

I urge the Administration to withdraw the proposed "Procedures for Asylum and Bars to Asylum Eligibility," which would drastically undermine our community and go against our values. I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.

Thank you for resolving this issue.

Sincerely,

Antonio Diaz

AR.10085

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekp-lkn0
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0517
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Laurie Almoslino
**Address:**
   2707 NE 95TH ST
   SEATTLE,  WA,  98115
**Email:** LAURIE@PCDATABASESOLUTIONS.COM
**Phone:** 206-735-8781

---

## General Comment

I urge you to reject these new bars to Asylum Eligibility. There is already a complex web of regulations and bars that make it extremely difficult to successfully apply for asylum. When you consider how desperate someone must be to leave their country, make their way here, and jump through all the necessary hoops - it is not an undertaking that is attempted lightly or for mere material advantage.

This being the case, adding even more complexity and giving the US even more reasons to reject someone does not serve any legitimate purpose. The fact that these new procedures are vague and can be interpreted in different ways is not conducive to a fair and just consideration of the right to asylum. Justice should be at the very foundation of our system. to quote the Bible:

"Judges and officers shall you appoint in all your gates, which the Lord your G-d gives you, throughout your tribes; and they shall judge the people with just judgment. You shall not pervert judgment; you shall not respect persons, nor take a bribe; for a bribe blinds the eyes of the wise, and perverts the words of the righteous. Justice, justice shall you pursue, that you may live, and inherit the land which the Lord your God gives you. (Deut. 16:18-20)"

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekp-jcwf
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0518
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Marilyn Duran

---

## General Comment

My name is Marilyn Duran, I am a resident of San Francisco, California and I am a child of immigrants. I am writing to express my concern and opinion relating to the Department of Homeland Security's proposed rule change on "Procedures for Asylum and Bars to Asylum Eligibility."

I am a concerned member of the public who believes strongly that our nation must welcome people fleeing violence, and who is strongly concerned about racial profiling in the criminal legal system. Immigrants are a vital part of my community, my neighborhood, and my state.

Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution.

This proposed rule would inject racial profiling into the asylum process. This latest attack would put even more people seeking asylum at risk of danger - and death. This would in turn eviscerate one of the most important defenses community members have against deportation.

The act of seeking protection under threats of violence for oneself and family members should not be criminalized, especially under a racist administration that seeks to regress our nation instead of progress it.

I urge the Administration to withdraw the proposed "Procedures for Asylum and Bars to Asylum Eligibility," which would drastically undermine our community and go against our values. I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.

Thank you for resolving this issue.

Sincerely,

AR.10087

Marilyn Duran

AR.10088

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekp-6hvf
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0519
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Jacqueline Gutierrez

## General Comment

My name is Jacqueline Gutierrrez, I am a resident of San Francisco, California and I am a child of immigrants. I am writing to express my concern and opinion relating to the Department of Homeland Security's proposed rule change on "Procedures for Asylum and Bars to Asylum Eligibility."

I am a concerned member of the public who believes strongly that our nation must welcome people fleeing violence, and who is strongly concerned about racial profiling in the criminal legal system. Immigrants are a vital part of my community, my neighborhood, and my state.

Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution.

This proposed rule would inject racial profiling into the asylum process. This latest attack would put even more people seeking asylum at risk of danger - and death. This would in turn eviscerate one of the most important defenses community members have against deportation.

Asylum seekers already are fleeing growing threats of violence, climate catastrophe and death. This process will only increase the risk of safety to asylum seekers and their families. No more deaths at the border, no more children in cages, we must protect human life.

I urge the Administration to withdraw the proposed "Procedures for Asylum and Bars to Asylum Eligibility," which would drastically undermine our community and go against our values. I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.

Thank you for resolving this issue.

Sincerely,
Jacqueline Gutierrez

AR.10090

# PUBLIC SUBMISSION

| |
|---|
| **As of:** January 23, 2020<br>**Received:** January 21, 2020<br>**Status:** Posted<br>**Posted:** January 22, 2020<br>**Tracking No.** 1k4-9ekp-nin2<br>**Comments Due:** January 21, 2020<br>**Submission Type:** Web |

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0520
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Amy Aguilera

## General Comment

My name is Amy Aguilera, I am a resident of San Francisco, California and I am a child of immigrants. I am writing to express my concern and opinion relating to the Department of Homeland Security's proposed rule change on "Procedures for Asylum and Bars to Asylum Eligibility."

I am a concerned member of the public who believes strongly that our nation must welcome people fleeing violence, and who is strongly concerned about racial profiling in the criminal legal system. Immigrants are a vital part of my community, my neighborhood, and my state.

Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution.

This proposed rule would inject racial profiling into the asylum process. This latest attack would put even more people seeking asylum at risk of danger - and death. This would in turn eviscerate one of the most important defenses community members have against deportation.

Our country must stand behind its values and continue to be a place of refuge for those fleeing violence and persecution. By agreeing with this proposal, the US is doing the opposite and turning its back on our migrant/immigrant communities. I ask that the administration not move forward with the proposed "Procedures for Asylum and Bars to Asylum Eligibility," which would drastically undermine our community and go against our values. I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.

Thank you for resolving this issue.

Sincerely,
Amy Aguilera

AR.10092

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekp-31c8
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0521
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Laura Melgarejo

---

## General Comment

My name is Laura Melgarejo, I am a resident of San Francisco, California and I am an immigrant. I am writing to express my concern and opinion relating to the Department of Homeland Security's proposed rule change on "Procedures for Asylum and Bars to Asylum Eligibility."

I am a concerned member of the public who believes strongly that our nation must welcome people fleeing violence, and who is strongly concerned about racial profiling in the criminal legal system. Immigrants are a vital part of my community, my neighborhood, and my state.

Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution.

This proposed rule would inject racial profiling into the asylum process. This latest attack would put even more people seeking asylum at risk of danger - and death. This would in turn eviscerate one of the most important defenses community members have against deportation.

Families fleeing violence should have the right to seek asylum and protect themselves from their predators, Their families deserve to live in peace, safety and with dignity. This proposed rule would only harm our communities by punishing them instead of protecting them. Thus, I write to express my strong opposition to this proposed rule change.

I urge the Administration to withdraw the proposed "Procedures for Asylum and Bars to Asylum Eligibility," which would drastically undermine our community and go against our values. I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.

Thank you for resolving this issue.

AR.10093

Sincerely,
Laura Melgarejo

AR.10094

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekp-s6mj
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0522
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Claudia Cubas
**Address:**
   1612 K Street NW
   Ste. 204
   Washington,  DC,  20006
**Email:** claudia.cubas@caircoalition.org
**Phone:** (202) 899-1416
**Fax:** (202) 379-9052
**Organization:** Capital Area Immigrants' Rights Coalition

---

## General Comment

See attached file(s)

---

## Attachments

Comments on Asylum Crim Bars FINAL PACKET

AR.10095



**CAPITAL AREA IMMIGRANTS' RIGHTS COALITION**

*Fighting for equal justice for all immigrants at risk of detention and deportation*

**www.caircoalition.org**

1612 K Street, NW  Suite 204   **T** 202 / 331.3320
Washington, DC 20006           **F** 202 / 331.3341

January 21, 2020

*Submitted via www.regulations.gov*

Lauren Alder Reid
Assistant Director, Office of Policy
Executive Office for Immigration Review
5107 Leesburg Pike
Suite 2616
Falls Church, VA 22041

> **Re:** **EOIR Docket No. 18-0002; A.G. Order No. 4592–2019, Comments in Response to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility**

Dear Ms. Reid:

The Capital Area Immigrants' Rights (CAIR) Coalition appreciates the opportunity to comment on the Department of Homeland Security (DHS) and the Department of Justice's (DOJ) Joint Notice of Proposed Rulemaking (Proposed Rules) "Procedures for Asylum and Bars to Asylum Eligibility" published in the Federal Register on December 19, 2019 (84 Fed. Reg. 69,640). The CAIR Coalition strongly opposes the Proposed Rules because they are inconsistent with statutory requirements enacted by Congress under the Immigration and Naturalization Act (INA), 8 U.S.C. §§ 1103(a)(1), (3), 1158, 1225, 1226, 1231, 1324(a). CAIR Coalition also opposes the Proposed Rules because they are arbitrary and capricious, violate constitutional due process, and fail to protect the vulnerable population we serve.

**CAIR Coalition's Expertise in Serving the Immigrant Community**

Established in 1999, CAIR Coalition strives to ensure equal justice for all immigrant adults and children at risk of detention and deportation in the D.C. metropolitan area and beyond through direct legal representation, know your rights presentations, impact and advocacy litigation, and the enlistment and training of attorneys to defend immigrants.

Our work with asylum seekers cuts across all our programs, most significantly in our Detained Adult and Detained Children's Programs. Our Detained Adult Program helps detained immigrants learn to understand the Immigration Court and deportation process so they can make better informed decisions about their cases. This program also helps people connect with pro bono attorneys if they are unable to pay for an attorney to represent them. We have represented numerous asylum seekers, with and without criminal convictions, in Immigration Court and before the Board of Immigration Appeals (BIA).

Our Detained Children's Program provides legal services to unaccompanied immigrant children detained by the Office of Refugee Resettlement (ORR) at juvenile facilities in Maryland and

CAIR COALITION IS A 501(c)(3) TAX-EXEMPT NON-PROFIT ORGANIZATION.

AR.10096

Virginia. The facilities include ORR long-term foster care programs, large shelter programs, and secure detention facilities. Our staff also routinely represents minors who have been reunified with a sponsor in the region and have pending asylum applications.

In our attached comments, we have addressed specific aspects in which these Proposed Rules contradict the INA, are arbitrary and capricious, and violate due process. In particular, we have highlighted six major issues with the Proposed Rules: (1) The Proposed Rules violate both the text and the spirit of the INA; (2) In forming the Proposed Rules, DHS and DOJ fail to provide sufficient reasons for departing from prior agency policy and fail to examine the relevant data; (3) The Proposed Rules unnecessarily and cruelly exclude bona fide refugees from asylum; (4) The Proposed Rules implicate serious due process concerns as they adversely affect people with mental health issues including addiction; (5) The Proposed Rules unfairly impact applicants regardless of whether they are granted withholding of removal or protection under the Convention Against Torture (CAT); and (6) the Proposed Rules undermine criminal judgments and violate due process by allowing DOJ and DHS to look outside of the criminal record to bar individuals from asylum.

For the reasons detailed in the attached comments, the CAIR Coalition strongly opposes the Proposed Rules. The Proposed Rules unfairly bar large swaths of individuals from asylum, depriving them of their right to an individualized analysis of their claims, based on the agencies' poorly reasoned and conclusory rationale. A court will surely view these rules as contradictory to the INA, arbitrary and capricious, and a violation of the due process protections of the Constitution. DOJ and DHS should withdraw the Proposed Rules, as only a thorough, case-by-case approach to asylum claims, in conformance with statutory and constitutional protections and international law, will properly protect asylum seekers.

Respectfully submitted,

Claudia Cubas, Esq.
Litigation Director
Capital Area Immigrants' Rights (CAIR) Coalition
1612 K Street NW, Suite 204
Washington, DC 20006
(202) 899-1416

2

**THE CAIR COALITION'S COMMENTS ON THE PROPOSED RULES**

**TABLE OF CONTENTS**

I.     INTRODUCTION....................................................................................... **2**

II.    THE PROPOSED RULES VIOLATE THE TEXT AND THE SPIRIT OF THE
       FEDERAL IMMIGRATION STATUTE......................................................... **3**

III.   THE PROPOSED RULES ARE ARBITRARY AND CAPRICIOUS BECAUSE
       THEY PROVIDE INSUFFICIENT REASON FOR DEPARTING FROM PRIOR
       AGENCY POLICY AND FAIL TO EXAMINE THE RELEVANT DATA. ............. **9**

IV.    THE PROPOSED RULES UNNECESSARILY AND CRUELLY EXCLUDE
       BONA FIDE REFUGEES FROM ASYLUM ELIGIBILITY AND WILL LEAD TO
       UNJUST AND IMBALANCED RESULTS THAT UNDERMINE ESTABLISHED
       CASE LAW.. ......................................................................................... **13**

V.     THE PROPOSED RULES RAISE DUE PROCESS CONCERNS BECAUSE THEY
       ADVERSELY AFFECT VULNERABLE POPULATIONS, SUCH AS ASYLUM
       SEEKERS WHO SUFFER FROM MENTAL HEALTH ISSUES AND THOSE
       WHO LACK LEGAL REPRESENTATION.................................................. **17**

VI.    APPLICANTS BARRED FROM ASYLUM WILL BE SIGNIFICANTLY
       IMPACTED, EVEN IF THEY ARE GRANTED WITHHOLDING OF REMOVAL
       OR PROTECTION UNDER THE CONVENTION AGAINST TORTURE ........... **21**

VII.   THE PROPOSED RULES UNDERMINE CRIMINAL JUDGMENTS AND
       VIOLATE DUE PROCESS BECAUSE THEY ALLOW DOJ AND DHS TO LOOK
       OUTSIDE OF THE CRIMINAL COURT RECORD IN BARRING INDIVIDUALS
       FROM ASYLUM. .................................................................................. **26**

       A.    The Proposed Rules disregard the established analysis for determining whether a
             conviction constitutes a bar to asylum and will encourage the use of unsubstantiated
             and weak evidence to categorically bar persecuted individuals from asylum. ............ 27

       B.    The Proposed Rules violate due process and undermine criminal court adjudications
             by expanding the inquiry of what constitutes a conviction or sentence for asylum
             purposes into the motives for a court's vacatur, modification, or correction of a
             conviction or sentence. ................................................................................. 34

       C.    The Proposed Rules are vague and overbroad, create inefficiencies, and adversely
             impact vulnerable populations....................................................................... 36

VIII.  CONCLUSION ................................................................................... **38**

1

AR.10098

## I.    INTRODUCTION

On December 19, 2019, the Department of Homeland Security (DHS) and the

Department of Justice (DOJ) published in the Federal Register a Notice of Proposed Rulemaking

titled "Procedures for Asylum and Bars to Asylum Eligibility" ("Proposed Rules").[1] The

Proposed Rules should be withdrawn because they run afoul of the Immigration and Nationality

Act (INA); lack evidentiary support; are not the product of reasoned decision making; undermine

the purpose of asylum; and violate the due process rights of asylum seekers.

The Proposed Rules would make three primary changes to the rules governing asylum

adjudications. The first proposed set of changes adds the following seven *categorical* bars to

asylum eligibility: (1) any conviction of a felony offense; (2) any conviction for "smuggling or

harboring" under 8 U.S.C. § 1324(a), even if the asylum seeker committed the offense for the

purpose of bringing her own spouse, child or parent to safety; (3) any conviction for illegal

reentry under 8 U.S.C. § 1326; (4) any conviction for an offense "involving criminal street

gangs," with the adjudicator empowered to look to any evidence to determine applicability; (5)

any second conviction for an offense involving driving while intoxicated or impaired; (6) any

conviction *or accusation of conduct* for acts of battery involving a domestic relationship; (7) and

any conviction for several newly defined categories of misdemeanor offenses, including *any*

drug-related offense except for a first-time marijuana possession offense, any offense involving a

fraudulent document, and fraud in public benefits. The second section of the Proposed Rules

provides a multi-factor test for immigration adjudicators to determine whether a criminal

conviction or sentence is valid for the purpose of determining asylum eligibility. The third

---

[1] 84 FR 69640.

AR.10099

section rescinds a provision in the current rules regarding the reconsideration of discretionary asylum.

Taken together, these proposed changes constitute an unnecessary, harsh, and unlawful gutting of the asylum protections enshrined in United States and international law. The Capital Area Immigrants' Rights (CAIR) Coalition submits these comments to express opposition to the entirety of the Proposed Rules and grave concerns with the administration's continued efforts to exclude refugees from obtaining the security and stability the United States asylum system has long promised. We urge that the Proposed Rules be rescinded in their entirety.

These comments highlight the following major flaws with the Proposed Rules: (1) The Proposed Rules violate both the text and the spirit of the INA; (2) In forming the Proposed Rules, DHS and DOJ fail to provide sufficient reasons for departing from prior agency policy and fail to examine the relevant data; (3) The Proposed Rules unnecessarily and cruelly exclude bona fide refugees from asylum; (4) The Proposed Rules implicate serious due process concerns as they adversely affect people with mental health issues including addiction; (5) The Proposed Rules unfairly impact applicants regardless of whether they are granted withholding of removal or protection under the Convention Against Torture (CAT); and (6) the Proposed Rules undermine criminal judgments and violate due process by allowing DOJ and DHS to look outside of the criminal record to bar individuals from asylum.

## II.     THE PROPOSED RULES VIOLATE THE TEXT AND THE SPIRIT OF THE FEDERAL IMMIGRATION STATUTE.

When DHS and DOJ promulgate regulations regarding asylum, they must act consistent with their statutory authority and Congressional intent in creating the asylum system. Asylum seekers have a statutory right to apply for asylum.[2] "The purpose of the Refugee Act was to

---

[2] 8 U.S.C. § 1158(a)(1).

AR.10100

protect refugees, i.e., individuals who are unable to protect themselves from persecution in their native country."[3] The Refugee Act of 1980 was passed "to align domestic refugee law with the United States' obligations" under the United Nations Protocol Relating to the Status of Refugees, "to give statutory meaning to 'our national commitment to human rights and humanitarian concerns,' and 'to afford a generous standard for protection in cases of doubt.'"[4]

When Congress speaks clearly through a statute, the plain meaning of that statute governs.[5] Congress by statute permits the Attorney General to designate certain categories of offenses as "particularly serious crimes."[6] As such, Congress *explicitly* permitted the Attorney General to designate a non-aggravated felony to be a particularly serious crime and to disqualify a person with such a conviction from asylum. In the context of asylum, all aggravated felonies are *per se* particularly serious crimes and the Attorney General "may designate by regulation [other] offenses that will be considered to be" a particularly serious crime for purposes of asylum.[7] However, simply because the Attorney General has some discretion in creating new bars to asylum does not mean that he can make a rule "that is contrary to the will of Congress."[8]

In an attempt to insulate the Proposed Rules from review, the Attorney General and Acting Secretary of Homeland Security ("Acting Secretary") delineate new bars to asylum both by designating offenses as "particularly serious crimes" pursuant to 8 U.S.C. § 1158(b)(2)(B)(ii) and by rendering aliens who have committed or been convicted of such offenses categorically exempt from a positive discretionary adjudication of asylum pursuant to 8 U.S.C.

---

[3] *Grace v. Whitaker*, 344 F. Supp. 3d 96, 123–24. (D.D.C. 2018).
[4] *Id.* at 106 (quoting *Matter of S-P-*, 21 I. & N. Dec. 486, 492 (B.I.A. 1998) (quoting S. REP. NO. 256, 96th Cong., 2d Sess. 1, 4, reprinted in 1980 U.S.C.C.A.N. 141, 144)).
[5] *See, e.g.*, *Robinson* v. *Shell Oil Co.*, 519 U.S. 337, 340 (1997).
[6] 8 U.S.C. § 1158(b)(2)(B)(ii).
[7] *Id.*
[8] *See Akram v. Holder*, 721 F.3d 853, 865 (7th Cir. 2013).

AR.10101

§ 1158(b)(2)(C). This effort is unlawful. Section 1158(b)(2)(B)(ii) does permit the Attorney

General to, if he wishes, designate some classes of offenses as particularly serious crimes; such

designations are reviewable for legal and constitutional error (and as explained below, the

commenters believe these expansions are unlawful).[9] However, if the offense is not a particularly

serious crime, then a discretionary decision must be rendered on the application. It is true that the

Attorney General may also provide for "additional limitations and conditions" on asylum

applications so long as they are "consistent" with the with the asylum statute.[10] In this case,

however, the Proposed Rules add sweeping categories of offenses that automatically remove an

applicant from the consideration of discretion—a regulatory proposal that is *ultra vires* to the

plain text of the INA.

To the extent that the Proposed Rules would adopt a bar to asylum based on a categorical

discretionary bar, rather than a particularly serious crime designation, they are similar to

former rules denying adjustment of status to non-citizens granted parole but placed in removal

proceedings, which were stuck down by multiple Courts of Appeals. Purporting to exercise

discretion categorically, then-Attorney General Reno rendered non-citizens granted parole status

who had been placed in removal proceedings ineligible for adjustment of status, even though the

statute defined persons who have parole status as eligible for adjustment of status and carved out

multiple exceptions. Multiple Circuit Courts of Appeals struck down the proposed regulations, in

light of the fact that the statute carefully defined the categories of people eligible to apply for

adjustment of status. In doing so, the Courts rejected the Attorney General's argument that the

regulation must be upheld as a permissible exercise of her ultimate discretion to deny adjustment

---

[9] 8 U.S.C. § 1252(a)(2)(D).

[10] 8 U.S.C. § 1158(b)(2)(C); *see also* 8 U.S.C. § 1158(d)(5)(B).

AR.10102

of status.[11] This reasoning is equally applicable to the Proposed Rules here. Where Congress specifically create a comprehensive statutory scheme to define asylum eligibility, the agencies cannot preempt that in the guise of discretion by creating out of whole cloth a separate set of eligibility criteria.

In the asylum statute, Congress explicitly made the commission of a particularly serious crime a bar to asylum. The canon of interpretation known as *expressio unius est exclusio alterius* instructs that, "expressing one item of [an] associated group or series excludes another left unmentioned."[12] The Proposed Rules attempt to create numerous categories of discretionary "pseudo-particularly serious crimes," barring asylum through a categorical exercise of discretion even if those offenses are ultimately found not to be particularly serious crimes. Such an effort violates this canon of interpretation, and places the Proposes Rules *ultra vires* to the statute.

The Proposed Rules further contravene Congressional intent by designating additional offenses as bars to asylum that were rejected by Congress in enacting the relevant portions of the INA. In creating the most recent statutory bars to asylum with the passage of the 1996 Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), Congress specifically omitted several types of offenses that appeared elsewhere in the INA from constituting *per se* bars to asylum. For example, the legislature specifically designated all controlled substance offenses

---

[11] The First and Ninth Circuits found the regulations contrary to clear statutory command. *Succar v. Ashcroft*, 394 F.3d 8, 29 (1st Cir. 2005); *Bona v. Gonzales*, 425 F.3d 663, 668-71 (9th Cir. 2005). Other courts invalidated the adjustment regulations under "Step Two" of *Chevron*. Those courts found some ambiguity in the statute, but found a per se discretionary bar not based on a permissible construction of the eligibility standards set forth in the governing statute in light of the statutory scheme and congressional intent. *Zheng v. Gonzales*, 422 F.3d 98, 116-20 (3d Cir. 2005) (invalidating regulation precluding category of people from applying to adjust status "[g]iven Congress's intent as expressed in the language, structure, and legislative history of INA section 245 [8 U.S.C. § 1255]"); *Scheerer v. United States Attorney General*, 445 F.3d 1311, 1321-22 (11th Cir. 2006).
[12] *United States* v. *Vonn*, 535 U.S. 55, 65 (2002).

AR.10103

(with the exception of "a single offense involving possession for one's own use of 30 grams or less of marijuana")[13] and domestic violence, stalking, and violation of protection order crimes[14] as grounds for deportability but not *per se* bars to asylum. This demonstrates that Congress was well-aware of these types of offenses, had considered the proper immigration consequences for them, and rejected them as *per se* bars to asylum. By attempting to add these types of offenses, and others that have been already assigned other immigration consequences in the INA, as automatic bars to asylum, the Proposed Rules run afoul of Congress' intent in enacting the INA and its amendments.

The Proposed Rules' attempt to expand the definition of the statutory term "particularly serious crime" is especially problematic, as it gives the term a new meaning that is incongruous with the INA. With regard to the grounds of inadmissibility, the INA defines the term "serious criminal offense" as: "(1) any felony; (2) any crime of violence, as defined in section 16 of title 18; or (3) any crime of reckless driving or of driving while intoxicated or under the influence of alcohol or of prohibited substances *if* such crime involves personal injury to another."[15] Under the plain meaning of the word "particularly," by definition, a "particularly serious crime" must apply to more egregious offenses than a "serious criminal offense." The Proposed Rules seek to designate numerous additional offenses as particularly serious crimes, many of which—such as crimes involving criminal street gangs, driving under the influence (without causing personal injury to another), and stalking—may constitute misdemeanors and not involve any physical injury at all.  In so doing, the Proposed Rules contradict the language of the INA by expanding

---

[13] 8 U.S.C. § 1227(a)(2)(B)(i).
[14] 8 U.S.C. § 1227(a)(2)(E).
[15] 8 U.S.C. § 1101(h) (emphasis added).

AR.10104

the definition of "particularly serious crime" to the point that it covers less culpable conduct than that for "serious criminal offense."

The Proposed Rules' extension of the term "particularly serious crime" as to felonies further violates the language of the INA. Under the statute, the term "aggravated felony" encompasses an enumerated list of generic offenses set forth in 8 U.S.C. § 1101(a)(43)(A)-(U). This list includes four categories of offenses designated as aggravated felonies, one of which is certain offenses that have a maximum sentence of one year or more, including crimes of violence, theft, burglary, bribery, forgery, obstruction of justice, and perjury.[16] Thus, in designating these offenses as aggravated felonies based on their maximum sentence, the INA relies on the federal definition of a felony.[17] Here, however, the Proposed Rules attempt to expand offenses that are *per se* "particularly serious crimes" from aggravated felonies, as designated by the INA, to all felonies, defined as all offenses that the relevant jurisdiction deems felonies, in addition to all offenses that have a maximum term of over a year.

By expanding the application of particularly serious crimes from certain offenses that are felonies based on their maximum sentence to all offenses that are felonies based on their maximum sentence or designation, the Proposed Rules impermissibly render the INA's definition of aggravated felony superfluous, thus violating Congressional intent. The Supreme Court has recognized that "one of the most basic interpretive canons, [is] that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or

---

[16] 8 U.S.C. § 1101(a)(43)(F) (crimes of violence); (G) (theft or burglary); (R) (bribery and forgery); (S) (obstruction of justice and perjury). The additional three categories are (1) Offenses defined solely by the nature of the crime, including murder, rape, sexual abuse of a minor, drug trafficking, firearm trafficking, and prostitution business offenses; (2) Offenses that involve fraud or deceit with loss to the victim of more than $10,000; and (3) Attempts or conspiracy to commit an aggravated felony. 8 U.S.C. § 1101(a)(43).
[17] *See* 18 U.S.C. § 3559.

8

superfluous, void or insignificant."[18] This canon also applies in the context of Administrative Procedure Act (APA) challenges to agency rules, barring rules that render superfluous the statute they are interpreting.[19] Thus, if enacted, the Proposed Rules that expand particularly serious crimes to all felonies would exceed the Attorney General's and Acting Secretary's authority by rendering portions of the INA superfluous. The fact that the Proposed Rules violate the word and the spirit of the INA is, in itself, sufficient reason to not promulgate them.

## III.   THE PROPOSED RULES ARE ARBITRARY AND CAPRICIOUS BECAUSE THEY PROVIDE INSUFFICIENT REASON FOR DEPARTING FROM PRIOR AGENCY POLICY AND FAIL TO EXAMINE THE RELEVANT DATA.

In issuing rules, DHS and DOJ must adhere to basic tenets of administrative law like any other federal agency. Action by DHS and DOJ "must be the product of reasoned decision-making."[20] To meet this standard, agencies must "examine the relevant data and articulate a satisfactory explanation for [their] action including a rational connection between the facts found and the choice made."[21]

Courts will not uphold arbitrary and capricious agency action. "[A]n agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[22]   Judicial review is generally confined to the administrative record, meaning that the rulemaking record

---

[18] *Corley v. United States*, 556 U.S. 303, 314 (2009) (brackets and internal quotation marks omitted).

[19] *See Abbott Radiology Associates v. Shalala*, 992 F. Supp. 212, 222 (W.D.N.Y. 1997) (rejecting "interpretation of the regulation would, in effect, render the [corresponding] statute superfluous").

[20] *Grace*, 344 F. Supp. 3d at 125.

[21] *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).

[22] *Id.*

9

must contain sufficient evidence to support the agency's action and courts "may not supply a reasoned basis for the agency's action that the agency itself has not given."[23] Additionally, an agency may not "proffer conclusory statements or unsubstantiated claims in defense of its decisions."[24]

The Proposed Rules are arbitrary and capricious because they depart from prior Board of Immigration Appeals (BIA) analysis on bars to asylum based on conclusory and insufficient reasoning. A rule change complies with the APA if the agency (1) displays "awareness that it is changing position," (2) shows that "the new policy is permissible under the statute," (3) "believes" the new policy is better, and (4) provides "good reasons" for the new policy, which, if the "new policy rests upon factual findings that contradict those which underlay its prior policy," must include "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy."[25] As discussed above, the Proposed Rules violate the second prong of this test by cutting against the language of the INA. The Attorney General and Acting Secretary further violate the fourth prong by failing to provide "good reasons" for the new policy, including "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy."[26]

Apart from the statutory aggravated felony bar to asylum, the BIA and Attorney General have historically utilized a highly circumstantial approach to the particularly serious crime

---

[23] *Id.* (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).
[24] *Nat'l Treasury Emp. Union v. Horner*, 654 F. Supp. 1159, 1163 (D.D.C. 1987); *see also Int'l Union, United Mine Workers v. Mine Safety and Health Admin.*, 626 F. 3d 84, 93 (D.C. Cir. 2010) (holding that provision in final rule was "arbitrary and capricious" because its only explanation was a "conclusory statement unsupported by the rulemaking record.").
[25] *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009) (emphasis omitted).
[26] *See id.*

AR.10107

determination that would bar an immigrant from receiving asylum.[27] The BIA has also directed

that, when denying asylum on a discretionary basis, adjudicators must analyze cases using a

case-by-case approach, adopting a "totality of the circumstances" test to determine whether

someone should be discretionarily denied.[28]

The Proposed Rules deem the increased categorization of the particularly serious crime

bar necessary because the case-by-case adjudication previously used for non-aggravated felony

offenses was "inefficient" and lead to "unpredictable results," where "aliens convicted of the

exact same offense can receive different asylum treatment."[29] But this result is the very nature

and purpose of considering the totality of the circumstances in determining whether a non-

aggravated felony offense is a particularly serious crime, rather than applying *per se* bars based

solely on the type of offense. The Acting Secretary and Attorney General cannot possibly argue

that they did not foresee this result when the prior agency policy was firmly rooted in applying a

case-by-case analysis. Nor can they now attempt to deprive asylum seekers of a thorough

consideration of their claims under the guise of administrative efficiency, knowing that a case-

by-case analysis has always encompassed a thorough analysis of each individual's claim.

Accordingly, the Attorney General and Acting Secretary fail to justify the Proposed Rules under

---

[27] *See e.g., Matter of Juarez*, 19 I.&N. Dec. 664 (BIA 1988) (ordinarily a single misdemeanor that is not an aggravated felony will not be a particularly serious crime); *Matter of Frentescu*, 18 I.&N. Dec. 244 (BIA 1982), *modified* (setting forth several factors to be considered before imposing the particular serious crime bar, including: (i) the nature of the conviction, (ii) the circumstances and underlying facts for the conviction, (iii) the type of sentence imposed, and (iv) whether the type and circumstances of the crime indicate that the individual will be a danger to the community); *Matter of Y-L-, A-G-, R-S-R-,* 23 I.&N. Dec. 270 (A.G. 2002) (setting forth a multi-factor test to determine the dangerousness of a respondent convicted of a drug-trafficking offense who is otherwise barred from asylum as an aggravated felon, but seeking withholding of removal).
[28] *Matter of Pula*, 19 I.&N. Dec. 467 (BIA 1987).
[29] 84 FR 69645-46

AR.10108

the standards of the APA by offering "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy."[30]

The Proposed Rules are also arbitrary and capricious because DHS and DOJ have failed to "examine the relevant data" in issuing them.[31] The agencies do not fully consider the effects of the Proposed Rules on asylum seekers, as they fail to give any kind of estimate of the additional number or percentage of asylum seekers who would be barred from asylum based on the proposed mandatory bars.[32] DHS and DOJ instead unhelpfully "note that the proposed expansion of the mandatory bars for asylum would likely result in fewer asylum grants annually" and allege that they are unable to provide any estimates of "the expected decrease" "because asylum applications are inherently fact-specific, and because there may be multiple bases for denying an asylum application."[33] The agencies further admit, "the full extent of the impacts [of the Proposed Rules] . . . is unclear."[34]

Not only do DHS and DOJ fail to provide any sort of estimate of the number of asylum applicants who would be affected, outside of citing general numbers regarding the total number of asylum cases and number of asylum grants, DHS and DOJ provide no statistics at all to substantiate their bases for the Proposed Rules. Their reliance on conclusory statements in the absence of any data is the precise opposite of reasoned and rational decision-making.[35] Moreover, recent reports that the Executive Office for Immigration Review (EOIR), the agency

---

[30] *See Fox Television Stations*, 556 U.S. at 515–16.
[31] *Genuine Parts Co. v. EPA*, 890 F.3d 304, 311–12 (D.C. Cir. 2018).
[32] *See* 84 FR 69658. DHS and DOJ provide an estimate of the number of cases that will be impacted by a section of the Proposed Rules that removes the provisions at 8 CFR §§ 208.16(e), 1208.16(e) regarding reconsideration of discretionary denials of asylum but do not provide any estimate for the number of cases affected by these other changes.
[33] 84 FR 69658.
[34] *Id.*
[35] *See Nat'l Treasury Emp. Union*, 654 F. Supp. at 1163; *Int'l Union, United Mine Workers*, 626 F.3d at 93.

12

overseeing the immigration court system, has been providing "garbled" and "inconsistent" data about immigration court cases and may have deleted 1 million immigration court records do little to foster any confidence in the veracity of the conclusory statements the agencies rely on in attempts to justify the Proposed Rules.[36]

## IV.    THE PROPOSED RULES UNNECESSARILY AND CRUELLY EXCLUDE BONA FIDE REFUGEES FROM ASYLUM ELIGIBILITY AND WILL LEAD TO UNJUST AND IMBALANCED RESULTS THAT UNDERMINE ESTABLISHED CASE LAW.

DHS and DOJ's justification for the Proposed Rules is insufficient to justify the unduly harsh and discriminatory effects the Proposed Rules will have on asylum seekers. In promulgating the Proposed Rules, DHS and DOJ allege that these changes are necessary because the current "mix of case-by-case adjudication and per se rules is an inefficient means of identifying categories of offenses that should constitute particularly serious crimes[]."[37] Apart from the reality that the agencies' desire for efficiency is not what the Proposed Rules would actually accomplish, as described in various sections of these comments, the Proposed Rules would also lead to unjust and imbalanced results.

The laws, regulations, and processes governing asylum adjudications are already exceedingly harsh. Asylum seekers bear the evidentiary burden of establishing their eligibility for asylum in the face of a complex web of laws and regulations, frequently without the benefit of appointed counsel and often from a remote immigration jail. The obstacles to winning asylum

---

[36] *See* Susan Monyak, "DOJ Accused of Wiping Nearly 1 Million Immigration Records," Law 360 (Nov. 1, 2019), available at: https://www.law360.com/articles/1215854/doj-accused-of-wiping-nearly-1-million-immigration-records.
[37] 84 FR 69646.

AR.10110

are exceedingly high; indeed, in some parts of the country and before certain Immigration

Judges, almost no one succeeds.[38]

Specifically, the bars to asylum based on allegations of criminal conduct are *already*

sweeping and overbroad in nature and scope. Any conviction for an offense determined to be an

"aggravated felony" is considered a *per se* "particularly serious crime" and therefore a

mandatory bar to asylum. "Aggravated felony" is a notoriously vague term, which exists only in

immigration law. Originally limited to murder, weapons trafficking and drug trafficking, this

definition has been expanded to encompass hundreds of offenses, many of them neither a felony

nor aggravated, including petty offenses such shoplifting,[39] simple misdemeanor battery, or sale

of counterfeit DVDs.[40]

Even for those not categorically barred from relief, the immigration adjudicator

maintains full discretion to deny asylum. For example in *Gao v. Holder*, the Fourth Circuit

determined that a conviction under 50 U.S.C. § 1702, for unlawful export of items on a

Commerce Control list, was a particularly serious crime.[41] The Court acknowledged that the

offense itself may seem innocuous and in some instances might not be particularly serious, but

ruled that the circumstances in that case warranted this finding because they implicated issues of

national security where the petitioner sold military technology information to Chinese quasi-

government entities.[42]

---

[38] See *Las Americas Immigrant Advocacy Center v. Trump*, 3:19-cv-02051-SB (D. Or.)
(Complaint filed on Dec. 18, 2019) (describing numerous courts as "asylum-free-zones" where
data shows immigration courts with denial rates at or beyond 85%; and one immigration court
had an asylum denial rate of 95.7%).
[39] *U.S. v. Christopher*, 239 F.3d 1191 (11th Cir. 2001).
[40] *Magasouba v. Mukasey,* 543 F.3d 13 (1st Cir. 2008).
[41] 595 F.3d 549 (4th Cir. 2010).
[42] *Id.* at 553.

AR.10111

This decision reiterates the concept that, as applied, the current bars and applicable analytical framework are sufficient to allow courts the flexibility to label circumstances "particularly serious" when they see them, in addition to denying asylum applications based on discretion. Indeed, the CAIR Coalition has had clients found ineligible for asylum as a matter of discretion where the offenses were neither aggravated felonies nor crimes involving moral turpitude. One case involved a young LGBTQI Central American man who had entered initially as an unaccompanied minor. The minor was originally in custody of the Office of Refugee Resettlement (ORR) but after reaching majority, he was transferred to civil adult immigration detention. It was during this time that the young man was involved in an altercation with a dorm officer. He ignored orders to return to his bunk, so officers sprayed him with mace. In response, the client punched the officer and threw a nearby plastic chair at him. While the officer was not injured, the Immigration Judge ultimately denied our client asylum, deeming his response to the detention disciplinary procedures as disproportionate and sending the wrong message to other detainees in removal proceedings applying for similar relief. Further categorical bars are not needed.

The agencies' efforts to add *seven* new sweeping categories of barred conduct to the asylum eligibility criteria also undermine past decisions by the Supreme Court. The Proposed Rules include a categorical bar against individuals convicted of misdemeanor offenses, such as driving while intoxicated, and possession of a controlled substance, including drug paraphernalia. These proposed bars track Supreme Court cases finding that these types of convictions are not aggravated felonies or offenses triggering removability.[43] If the

---

[43] *See Leocal v. Ashcroft,* 543 U.S. 1 (2004) (holding that a conviction for driving under the influence was not an aggravated felony crime of violence); *Carachuri-Rosendo v. Holder*, 560 U.S. 563 (2010) (ruling that a subsequent marijuana possession offense is not an aggravated

AR.10112

administration wishes to abrogate these rulings, it should do so by passing new legislation to supersede the Supreme Court's interpretation of this statute, not by proposing the unlawful Rules.[44] The Proposed Rules therefore effectively drain the phrase "*particularly serious* crime," 8 U.S.C. § 1158, of any sensible meaning.

The Proposed Rules are also arbitrary and capricious because they rely on faulty premises. One assumption fundamentally underlying the Proposed Rules, for example, is that every non-citizen convicted of any offense punishable by more than a year in prison necessarily constitutes a danger to the community. But no evidence is provided to support that assumption.

The Proposed Rules are further capricious, in that they peremptorily postulate a noncitizen's supposed danger to the community even in circumstances when a federal, state, or local judge has concluded that no danger exists by, for example, imposing a noncustodial sentence. Conviction for a crime does not, without more, make one a present or future danger—which is why the Refugee Convention's particularly serious crime bar, made part of United States law through 8 U.S.C. § 1158, should only properly apply if both (1) a non-citizen is convicted of a particularly serious crime and (2) a separate assessment shows that she is a present or future danger.

---

felony); *Mellouli v. Lynch*, 575 U.S. 798 (2015) (holding possession of paraphernalia was not a controlled substances offense).

[44] *Neal v. United States,* 516 U.S. 284, 295 (1996) ("Congress is free to change this Court's interpretation of its legislation." (quoting *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 736 (1977)).

AR.10113

## V.    THE PROPOSED RULES RAISE DUE PROCESS CONCERNS BECAUSE THEY ADVERSELY AFFECT VULNERABLE POPULATIONS, SUCH AS ASYLUM SEEKERS WHO SUFFER FROM MENTAL HEALTH ISSUES AND THOSE WHO LACK LEGAL REPRESENTATION.

The CAIR Coalition has been one of the leading legal experts in the area of representing immigrants with mental illness. We published one of the nation's first manuals on providing representation to clients with mental health disabilities in 2009, and a second edition of the manual in 2013.[45] We were also co-counsel in the precedent-setting case *Temu v. Holder*, 740 F.3d 887 (4th Cir. 2014), which established that a person's mental illness can be a protected ground for asylum. Indeed, every year, we represent a sizable number of immigrants with mental disabilities who have been deemed incompetent by Immigration Judges in various immigration courts.

The CAIR Coalition has represented individuals whose underlying mental health issues—including trauma and persecution-related mental health issues—have contributed to conduct that, under the Proposed Rules, could be considered in determining if an offense categorically bars someone from asylum. In *Gomez-Sanchez v. Sessions*, the Ninth Circuit held that all reliable, relevant information must be taken into consideration when making a particularly serious crime determination, "including the defendant's mental condition at the time of the crime, whether it was considered during the criminal proceedings or not."[46] Yet the Proposed Rules provide no such safeguards for the mentally ill and allow asylum adjudicators to consider non-adjudicated evidence to categorically bar them from asylum.

---

[45] The CAIR Coalition, Practice Manual for Pro Bono Attorneys: Representing Detainees with Mental Disabilities in the Immigration Detention and Removal System (2d ed. 2013), available at
https://www.caircoalition.org/sites/default/files/Cair%20Coalition%20Mental%20Health%20Practice%20Manual%202013.pdf.
[46] 892 F.3d 997 (9th Cir. 2018).

AR.10114

The CAIR Coalition also has particular concerns for the unrepresented, detained individuals with whom we work. Many of those individuals may not fully understand the purported evidence that DHS offers to disqualify post-conviction orders or to categorically bar them from asylum, especially when such evidence was not a basis for conviction or even presented in the criminal proceeding.[47] Moreover, the unlawful presumption against asylum eligibility for applicants who seek post-conviction relief while in removal proceedings or longer than one year after their initial convictions is particularly damaging to unrepresented, detained individuals, who may face severe challenges in obtaining the evidence they would need to rebut the presumption.[48]

Similarly, the Proposed Rules fail to address or account for the fact that many offenses related to possession or ingestion of controlled substances actually reflect bigger issues related to substance abuse and mental illness affecting our community at large, for which punitive methods are not the answer. The United States is in the midst of a growing opioid epidemic.[49] As a result, we are seeing growing incarceration rates for individuals struggling with addiction, who are the victims of this epidemic.[50] Despite these statistics, the National Institute on Drug Abuse reports that institutions in the criminal justice system have been reticent to treat opioid use disorder or to

---

[47] *See e.g. Moncrieffe*, 569 U.S. at 201 (noting that individuals in removal proceedings are not similarly situated to defendants in criminal proceedings and explaining that they face certain challenges such as limited ability to collect evidence).

[48] *Id.*

[49] Vedan Anthony-North, Leah G. Pope, Stephanie Pottinger, and Isaac Sederbaum, "Corrections-Based Responses to the Opioid Epidemic: Lessons from New York State's Overdose Education and Naloxone Distribution Program," Vera Institute of Justice (Mar. 2018), at 3, *available at* https://www.vera.org/downloads/publications/corrections-responses-to-opioid-epidemic-new-york-state.pdf.

[50] Tyler N.A. Winkelman, Virginia W. Chang, and Ingrid A. Binswanger, "Health, Polysubstance Use, and Criminal Justice Involvement Among Adults With Varying Levels of Opioid Use," JAMA Network (Jun. 15, 2018), *available at* https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2687053.

18

use methods that actually curb recidivism and overdose.[51] The Proposed Rules would further contribute to this failure to address the root cause of the problem. Instead, under the Proposed Rules, people who have become addicted and therefore convicted of even a single possession of a controlled substance or drug paraphernalia offense would be completely barred from asylum. In essence, people would be barred from asylum—relief from removal that could assist them in recovery—based on the very substance abuse problem that led to their conviction.

Offenses related to controlled substances are also a marker of attempts by people with mental illnesses to self-medicate. In a study reported by the National Institutes of Health, researchers found the use of illicit drugs increased with unmet need for mental health care, and that alcohol abuse was higher among people with no mental health care use.[52] Under the Proposed Rules, all people that may have a mental illness and, as a result, used controlled substances and were convicted of even a single offense (not marijuana) would be barred from asylum. The overbreadth of such a categorical bar would lead to the denial and unfair treatment of immigrants with untreated mental illnesses who are convicted due to behavior directly related to their illnesses. And while it stands that not all people with mental illnesses will use illicit controlled substances and be convicted for it, as applied, the Proposed Rules bar from asylum all mentally ill people who do. Additionally, the Proposed Rules do not address and make no exception for convictions for conduct influenced by mental illness or duress.

The BIA has cautioned that, "in light of the unusually harsh consequences which may befall a [noncitizen] who has established a well-founded fear of persecution; the danger of

---

[51] National Institute on Drug Abuse, "Medications to Treat Opioid Use Disorder" (Jun. 2018), available at https://www.drugabuse.gov/publications/medications-to-treat-opioid-addiction/how-opioid-use-disorder-treated-in-criminal-justice-system.

[52] Katherine M. Harris and Mark J. Edlund, "Self-Medication of Mental Health Problems: New Evidence from a National Survey," 40 Health Serv. Res. 1 (2005), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1361129/.

AR.10116

persecution should generally outweigh all but the most egregious of adverse factors."[53] Yet because of the categorical nature of the seven new bars proposed here, asylum seekers will be precluded from obtaining protection on the basis of a vast array of conduct, without any discretion left to the immigration adjudicator to determine whether the circumstances, particularly in light of the opioid epidemic or mental illness, merit such a harsh penalty.

Take for example the circumstances of a recent asylum client we represented in removal proceedings. This client was a man born in the Caribbean who had entered on a visitor visa and overstayed. He had one conviction for possession of marijuana and another for possession of another controlled substance. He had received treatment at a hospital after neighbors had caught him attempting to commit suicide in a neighborhood park. His family reported that, around this time, he became more secretive and paranoid, engaging in strange behavior such as staying up throughout the night and talking to himself. In an effort to calm himself down, the client often used marijuana, which was sometimes laced with other substances, which led to his second conviction on one instance.

After he was placed in removal proceedings, the Immigration Judge found our client incompetent based on his inability to answer basic questions and devolvement into fits of crying and ranting. The client was eventually diagnosed with several mental illnesses, including the possibility of schizophrenia. In fact, the client was in his late 20s, the average age of onset for schizophrenia. This man had no family back home; he had come to visit his step-siblings who were all settled in the United States. What awaited him in his home country was likely incarceration and torture by government officials and his community based on ill-conceived notions of his mental illness and behavior. Under the Proposed Rules, regardless of the fact that

---

[53] *Matter of Pula,* 19 I.&N. Dec. at 474.

AR.10117

he had little to no history of violent conduct or criminal history or that his convictions occurred during a series of events showing the onset of his mental health illness, our client would be barred from asylum.

The harsh nature of the Proposed Rules is especially evident when viewed through a trauma-informed lens. Asylum seekers are an inherently vulnerable population because of the trauma they have experienced in their countries of origin and, often, along the journey to find safety. Existing literature suggests that at least one out of every three asylum seekers struggles with depression, anxiety, and/or post-traumatic stress disorder (PTSD). One recent study found the mental health problems facing refugees and asylum seekers so acute that more than a third of the study's sample admitted having suicidal thoughts in the preceding two weeks.

Immigration adjudicators already maintain the authority to deny asylum to individuals with drug-related criminal histories on the basis of discretion; denying asylum seekers even the opportunity to present the countervailing factors of their past trauma and potential recovery is cruel and unjust.

## VI.    APPLICANTS BARRED FROM ASYLUM WILL BE SIGNIFICANTLY IMPACTED, EVEN IF THEY ARE GRANTED WITHHOLDING OF REMOVAL OR PROTECTION UNDER THE CONVENTION AGAINST TORTURE.

Throughout the Proposed Rules, the government defends the harsh and broad nature of the bars by pointing to the continued availability of alternative forms of relief for those precluded from asylum eligibility under the new rules, including withholding of removal under INA § 241(b)(3) and protection under the CAT. The availability of these alternative forms of relief, however—known as withholding of removal and CAT protection—does not nullify the harm created by the Proposed Rules' new limits on asylum. The protections afforded by CAT and by statutory withholding of removal are limited in scope and duration, and they are harder to obtain. As a result, a Rule that limits *bona fide* refugees to withholding of removal and CAT protection

AR.10118

would impose a very real harm on individuals who have come to the United States in search of protection.

First, the most serious harm that can befall an individual as a result of these Proposed Rules is removal to persecution and torture, and the existence of withholding of removal does not account for that risk. CAT and withholding protections demand a higher level of proof than asylum claims: a clear probability of persecution or torture. Thus, an individual could have a valid asylum claim but be unable to meet the standard under these other forms of relief and therefore would be removed to their country of origin, where they would face persecution or even death.

Second, for those who meet the higher standard, withholding and CAT recipients are still subject to significant prejudice. For example, they have no ability to travel internationally. The United Nations Convention Relating to the Status of Refugees affords refugees the right to travel in mandatory terms. Article 28 states, "Contracting States shall issue to refugees lawfully staying in their territory travel documents for the purpose of travel outside their territory." Withholding and CAT recipients do not have access to a travel document as contemplated by Article 28. By regulation, refugee travel documents are available only to asylees. And, unlike asylum, when a person is granted withholding or protection under CAT, an Immigration Judge issues two orders. One order withholds removal of that person to the country where they are likely to be persecuted or tortured and a simultaneous order orders that person removed.[54] This is because these forms of relief are country-specific, meaning that any international travel will act as "self-deportation."

---

[54] *See Calla Mejia v. Sessions*, 866 F.3d 573 (4th Cir. 2017) ("Moreover, while withholding of removal only prevents the removal of an alien to the specific country where she faces persecution—thereby leaving open the possibility of transfer to a third country.")

22

Refugees granted only withholding of removal or CAT protection are thus effectively trapped within the United States in long-term limbo.

Withholding and CAT recipients also face permanent separation from their spouses and children. Because international travel is prohibited, these individuals cannot reconnect with their families in a third country. And they also cannot reunite with family in the United States because only asylees and refugees are eligible to petition for a spouse and children to join them as derivatives on that status. For many, this will mean that the Proposed Rules institute yet another formal policy of family separation. For example, a mother with two young children who flees to the United States and is subject to one of the expanded asylum bars will not be able to ensure that her children will be able to obtain protection in the United States with her if she is granted alternative relief. Rather, if her children are still in her home country, they would need to come to the United States and seek asylum on their own, likely as unaccompanied children. If her children fled to the United States with her, then they will need to establish their own eligibility for protection before an Immigration Judge, no matter their age.

Recently, this exact scenario played out with a mother who was subject to the so-called Migrant Protection Protocols (also known as Remain in Mexico) and the asylum "transit ban," which made the mother ineligible for asylum and thus required the children to establish their independent eligibility for withholding and CAT protection. An Immigration Judge granted the mother withholding of removal but denied protection to her young children, leaving the children with removal orders and immense uncertainty about their future.[55] Under the expanded bars in the Proposed Rules, these situations will certainly increase, separating families and forcing

---

[55] Adolfo Flores, "An Immigrant Woman Was Allowed To Stay In The US — But Her Three Children Have A Deportation Order" (Dec. 21, 2019), *available at* https://www.buzzfeednews.com/article/adolfoflores/an-immigrant-woman-was-allowed-to-stay-in-the-us-but-not.

AR.10120

parents to return to countries where it has been established they more likely than not will face persecution and torture, rather than leaving their children on their own.

This is exactly the situation that the petitioner in *Calla Mejia v. Sessions*, 866 F.3d 573 (4th Cir. 2017), faced and why she challenged her statutory bar from asylum on appeal. Ms. Calla-Mejia was a mother of two children who was married to a police officer in her home country who repeatedly raped and hurt her. She entered the United States once but was summarily deported after an Immigration Judge did not explain her rights adequately, leading her to feel disillusioned and accept deportation. Following her return to her country, Ms. Calla-Mejia's husband found her and raped her, and so she fled to the United States again. This second time, however, because she was previously deported, she was placed in limited removal proceedings that reinstated her previous removal order and barred her from asylum. While Ms. Calla-Mejia was eventually granted withholding of removal, she worried about the safety of her children who remained in the care of her parents back in her home country. She was especially concerned about the welfare of her eldest daughter who was going through puberty and had already been the victim of inappropriate activity and desire by her police officer husband. Because Ms. Calla-Mejia had been granted withholding of removal, this protection did not extend to her children and so she was unable to petition for them as derivatives on her asylum application. Ms. Calla-Mejia appealed her bar from asylum based on her prior deportation and subsequent reinstatement but eventually lost because the Court found the Attorney General's interpretation of this statutory bar to asylum plausible. To this day, Ms. Calla-Mejia has been unable to see her children again.

Withholding recipients likewise face hurdles in access to employment. Article 17 of the Refugee Convention states that a contracting state "shall accord to refugees lawfully staying in

AR.10121

their territory the most favorable treatment accorded to nationals of a foreign country in the same circumstances, as regards to the right to wage-earning employment." Recipients of withholding enjoy no such right. They must apply for work authorization, and they face frequent delays in the adjudication of these applications, which often result in the loss of legal authorization to work. And perhaps most fundamentally, there is continuing jeopardy for withholding and CAT recipients that does not exist for asylum recipients. When a non-citizen is granted asylum, the person receives a legal status. Asylum, once granted, protects an asylee against removal unless and until that status is revoked. None of these protections exists for withholding and CAT recipients. They have no access to permanent residency or citizenship. Instead, they have a removal order, are vulnerable to the permanent prospect of deportation to a third country, and are subject to potential check-ins with immigration officials where they can be made to pursue removal to third countries to which they have no connection.

Returning to the example of Ms. Calla-Mejia, unlike the bars proposed in these Rules, the bar that applied to Ms. Calla-Mejia was based on explicit wording in the INA foreclosing her and others from discretionary relief, like asylum, based on her prior deportation and reinstatement of deportation order.[56] While the CAIR Coalition believes this outcome was unjust, the outcome did not rely on an implausible reading of the statute and so we understand why the Court upheld that bar. Nevertheless, through these Proposed Rules, the agencies seek the same desired unjust consequences of family separation, limited employment and travel, etc., based on statutory authority less explicit than in *Calla-Mejia*. This is cruel and unjust.

Finally, the CAIR Coalition writes to highlight a different form of prejudice that will flow from the Proposed Rules—one relating to judicial efficiency. Neither withholding of

---

[56] *Calla Mejia*, 866 F.3d at 580.

AR.10122

removal nor CAT protection allows family members who are in the United States together and pursuing protection on the same basis to apply as derivatives on a principal application. As a result, family claims for those rendered ineligible for asylum by the Proposed Rules will have to be adjudicated separately and potentially before different adjudicators even when the claims are interrelated or when minor children may not be in a position to explain their claim. In addition to being unjust to the affected family members, this approach would result in gross inefficiencies, which should be avoided in a system that already contains a significant backlog of pending cases.

## VII.  THE PROPOSED RULES UNDERMINE CRIMINAL JUDGMENTS AND VIOLATE DUE PROCESS BECAUSE THEY ALLOW DOJ AND DHS TO LOOK OUTSIDE OF THE CRIMINAL COURT RECORD IN BARRING INDIVIDUALS FROM ASYLUM.

The Proposed Rules pertaining to gang-related offenses, domestic violence offenses, and the effects of criminal convictions are deeply problematic in that they violate due process by undermining the criminal legal system and the criminal judgments issued by criminal courts, by requiring asylum adjudicators to look beyond the scope of criminal adjudications. The Proposed Rules' additional bars to asylum will further cause extreme hardship to the CAIR Coalition's clients, as discussed below.

The Proposed Rules violate due process because they require adjudicators to engage in decision-making to determine whether an asylum applicant's conduct—considered independently of any criminal court adjudication—triggers a categorical bar to asylum and whether a vacated or modified conviction or sentence still constitutes a conviction or sentence that implicates a bar to asylum. First, the agencies propose that immigration adjudicators be permitted to consider "all reliable evidence" to determine whether there is "reason to believe [a] crime was committed in furtherance of criminal street gang activity."[57] Second, the Proposed

---

[57] 84 FR 69649.

AR.10123

Rules permit immigration adjudicators to "assess all reliable evidence in order to determine whether [a] conviction amounts to a domestic violence offense," and to go even further by considering whether non-adjudicated *conduct* "amounts to a covered act of battery or extreme cruelty."[58] Third, the Proposed Rules permit an adjudicator to "look to evidence other than the order [vacating or expunging a conviction or modifying a sentence] to determine whether the order was issued for rehabilitative or immigration purposes."[59] The Proposed Rules also impose an unlawful presumption against asylum eligibility for applicants who seek post-conviction relief while in removal proceedings or longer than one year after their initial convictions.[60]

> A. <u>The Proposed Rules disregard the established analysis for determining whether a conviction constitutes a bar to asylum and will encourage the use of unsubstantiated and weak evidence to categorically bar persecuted individuals from asylum.</u>

For the purposes of asylum, a conviction for an aggravated felony constitutes a conviction for a particularly serious crime.[61] The legal framework for determining whether an asylum seeker has been convicted of an aggravated felony is known as the "categorical approach."[62] Under this approach, the court "must first determine the meaning of the offense listed in the INA and then compare that 'generic' definition to the elements of the crime under state law."[63] This analysis is more complex if the crime is divisible under state law. In that case, a "modified categorical" approach applies, under which the IJ may "consult a limited class of documents" to determine which alternative element of the crime formed the basis for the asylum

---

[58] 84 FR 69652, 69661.
[59] 84 FR 69660, 69654-55.
[60] 84 FR 69660, 69655.
[61] 8 U.S.C. § 1158(b)(2)(A)(ii), (B)(i).
[62] *Moncrieffe v. Holder*, 569 U.S. 184, 190 (2013).
[63] *Etienne v. Lynch*, 813 F.3d 135, 143 (4th Cir. 2015).

27

seeker's conviction.[64] Although the modified approach permits the review of certain reliable documents, it retains the categorical approach's emphasis on the elements, rather than the specific facts, of the crime.[65] The "INA's provisions ask what the noncitizen was 'convicted of,' not what he did, and the inquiry in immigration proceedings is limited accordingly.[66] For both the aggravated felony determination and the particularly serious crime determination, the relevant initial inquiry, and in many cases the only inquiry, is the conviction offense and its elements, not the specific conduct.

The Proposed Rules regarding gang-related and domestic violence offenses undermine criminal judgments and violate due process because they disregard the established framework for determining whether a conviction constitutes an aggravated felony and categorical bar to asylum. Instead of looking first to the elements of the conviction offense, the Proposed Rules require an asylum adjudicator to consider "gang-related" or "domestic violence" conduct that may not have been part of the required elements for conviction, and for that reason, may not have been objected to by an asylum applicant or their attorney during the criminal proceeding.[67] The categorical bars involving circumstance-specific particularly serious crimes proposed by these Rules vitiate from the clearly delineated aggravated felony grounds listed in the INA because

---

[64] *See Descamps v. United States*, 570 U.S. 254, 257 (2013).
[65] *Id.* at 263.
[66] *Moncrieffe*, 569 U.S. at 200 (internal quotation omitted); *see also* 8 U.S.C. § 1158(b)(2)(A)(ii) (providing that an individual is ineligible for asylum if he "having been convicted by a final judgment of a particularly serious, constitutes a danger to the Community of the United States.").
[67] *Descamps,* 570 U.S. at 270 (warning that "[a] defendant, after all, often has little incentive to contest facts that are not elements of the charged offense—and may have good reason not to. At trial, extraneous facts and arguments may confuse the jury. (Indeed, the court may prohibit them for that reason.) And during plea hearings, the defendant may not wish to irk the prosecutor or court by squabbling about superfluous factual allegations.").

28

they encompass convictions and even activity that the asylum seeker may not ultimately be convicted for at all.[68]

The Proposed Rules expand the group of individuals ineligible for asylum far beyond the scope of the INA's specific limitations—which only bar those who have been *convicted* of a *particularly serious* crime from receiving asylum.[69]  In *Moncrieffe v. Holder*, the Supreme Court forewarned of exactly the sort of harm that would arise from these Proposed Rules. In that case, the Court rejected the government's proposal that immigration adjudicators determine the nature and amount of remuneration involved in a marijuana-related conviction.[70]  The Court noted that, should this occur, "our Nation's overburdened immigration courts" would end up weighing evidence "from, for example, the friend of a noncitizen" or the "local police officer who recalls to the contrary," with the end result of a disparity of outcomes depending on the whims of the individual Immigration Judge and a further burdened immigration court system.[71] Moreover, the Court provided that a practical purpose of the categorical approach was to "promote judicial and administrative efficiency by precluding the relitigation of past convictions in minitrials conducted long after the fact."[72]

In contrast, the Proposed Rules' circumstance-specific approach undermines judicial efficiency and forces asylum seekers to try to disprove any allegations of gang-related activity or domestic violence that DHS has raised, which would result in relitigation of convictions or

---

[68] *See* 8 U.S.C. §§ 1101(a)(43), 1158(b)(2)(A)(ii).
[69] *See* 8 U.S.C. § 1158(b)(2)(A)(ii). The INA further defines a "conviction" as "a formal judgment of guilt of the alien entered by a court or, . . . where—(i) a judge or jury has found the alien guilty or the alien has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilt, and (ii) the judge has ordered some form of punishment, penalty, or restraint on the alien's liberty . . . ."  8 U.S.C. § 1101(48)(A).
[70] 569 U.S. 184, 200-01 (2013).
[71] *Id.*
[72] *Id.*

AR.10126

litigation of past conduct that fell outside of the conviction. The agencies have justified these Proposed Rules on the basis that the current application of the particularly serious crimes bar has led to "unpredictable results,"[73] yet by proposing a categorical bar based on circumstances described in unreliable documents, and not actual convictions, the government runs afoul of the same alleged problem it purports to address. These proposed changes are therefore arbitrary and capricious because they do not serve the stated purposes for these changes and are not adequately supported by relevant facts.[74]

This proposed approach is particularly troubling for many individuals that the CAIR Coalition encounters in detention facilities, because such individuals often lack representation and would be forced to disprove these circumstantial presumptions while detained, which greatly limits their ability to locate witnesses and evidence.[75] Additionally, the CAIR Coalition has grave due process concerns regarding the types of evidence DHS may use in an attempt to categorically bar asylum seekers from asylum under the Proposed Rules. As recognized by the Fourth Circuit in *Prudencio v. Holder*,[76] allegations or facts gleaned only from police reports where a police report is the basis for an allegation "often contain little more than unsworn witness statements and initial impressions" and "because these submissions are generated early in an investigation, they do not account for later events, such as witness recantations, amendments, or corrections."[77] Several Circuit Courts of Appeals have also spoken as to the

---

[73] 84 FR 69645-46.
[74] *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43 (an agency must supply reasoned basis for a decision).
[75] *Matter of S-K-*, 23 I.&N. Dec. 936, 939-40 (BIA 2006).
[76] 669 F.3d 472, 483-84 (4th Cir. 2012).
[77] *Id.*

AR.10127

unreliability of RAP sheets,[78] probation reports,[79] and investigation reports,[80] which under the Proposed Rules would be sufficient to categorically bar individuals from asylum. And when an I-213 Record of Deportable/Inadmissible Alien contains allegations that the non-citizen disputes, at least one circuit has ruled that the I-213 holds no independent value and is not entitled to evidentiary weight.[81] Despite these pronouncements of concern by the Circuit Courts of Appeals, now through this Proposed Rule, DHS and DOJ wish to allow the use of these unreliable documents to categorically bar people from asylum; this cannot be the product of reasoned decision-making.

For the proposed bar for gang-related offenses, the CAIR Coalition is further concerned that creating a blanket exclusion for anyone who is convicted of a crime—including a misdemeanor—that an immigration adjudicator deems linked to gang activity will prevent bona fide asylum seekers from receiving protection. The factual and due process concerns presented by the introduction of unsubstantiated gang allegations in immigration court have been well

---

[78] *Francis v. Gonzales*, 442 F.3d 131, 143 (2d Cir. 2006) (RAP sheets are products of "agencies whose jobs are to seek to detect and prosecute crimes" and thus "do not necessarily emanate from a neutral, reliable source")

[79] *Dickson v. Ashcroft*, 346 F.3d 44, 54 (2d Cir. 2003) (Because factual narratives in probation reports "are prepared by a probation officer on the basis of interviews with prosecuting attorneys, police officers, law enforcement agents, etc., they may well be inaccurate" and are "not a highly reliable basis for a decision of such importance as deportation.")

[80] *Banat v. Holder*, 557 F.3d 886, 891 (8th Cir. 2009) ("Reliance on reports of investigations that do not provide sufficient information about how the investigation was conducted are fundamentally unfair.").

[81] *Murphy v. INS*, 54 F.3d 605, 610 (9th Cir. 1995)

31

documented in scholarly articles,[82] lawsuits against local police departments and DHS,[83] and the

daily news.[84] Gang membership and gang association are not defined in the INA or the Proposed

Rules, and definitions of a "gang" differ among law enforcement and other state and federal

agencies.[85] State and local law enforcement agencies maintain gang databases for criminal

investigations and they enter into information sharing agreements that allow Immigration and

Customs Enforcement (ICE) to access this data for removal purposes.[86] Yet many states and

municipalities have found the errors in their gang databases so disturbing that they have either

---

[82] *See* Sean Garcia-Leys, Meigan Thompson, Christyn Richardson, *Mislabeled: Allegations of Gang Membership and their Immigration Consequences*, UCI School of Law Immigrant Rights Clinic (2016) [hereinafter *Mislabeled: Allegations of Gang Membership and their Immigration Consequences*]; *see generally,* Rebecca A. Hufstader, Note, Immigration Reliance on Gang Databases: Unchecked Discretion and Undesirable Consequences, 90 N.Y.U. L. REV. 671, 679 (2015) [hereinafter *Immigration Reliance on Gang Databases: Unchecked Discretion and Undesirable Consequences*]; Katherine Conway, Note, Fundamentally Unfair: Databases, Deportation, and the Crimmigrant Gang Member, 67 AM. U. L. REV. 269, 273–74 (2017) [hereinafter *Fundamentally Unfair: Databases, Deportation, and the Crimmigrant Gang Member*]; Michael Cannell, *Assumed Dangerous Until Proven Innocent: The Constitutional Defect in Alleging Gang Affiliation at Bail Hearings*, 63 DEPAUL L. REV. 1027 (2014); Jennifer M. Chacón, *Whose Community Shield?: Examining the Removal of the "Criminal Street Gang Member,"* 2007 U. CHI. LEGAL F. 317, 321 (2007) ) [hereinafter "Whose Community Shield?: Examining the Removal of the "Criminal Street Gang Member"].

[83] *See Saraviа v. Sessions*, 905 F.3d 1137 (9th Cir. 2018) (upholding the district court's preliminary injunction, requiring a prompt hearing before a neutral decision maker at which the minor plaintiffs could contest the gang allegations that led to their detention by ICE).

[84] *See* Hannah Dreier, *How a Crackdown on MS-13 Caught Up Innocent High School Students*, N.Y. Times (Dec. 27, 2018) [hereinafter, *How a Crackdown on MS-13 Caught Up Innocent High School Students*], https://www.nytimes.com/2018/12/27/magazine/ms13-deportation-ice.html; Christie Thompson, *How ICE Uses Secret Police Databases to Arrest Immigrants*, MARSHALL PROJECT (Aug. 28, 2017, 7:00 AM) https://www.themarshallproject.org/ 2017/08/28/how-ice-uses-secret-police-databases-to-arrest-immigrants#.c9orEGMWg; Ali Winston, *Vague Rules Let ICE Deport Undocumented Immigrants as Gang Members*, INTERCEPT (Feb. 17, 2017, 7:12 PM), https://theintercept.com/2017/02/17/ loose-classification-rules-give-ice-broad-authority-to-classify-immigrants-as-gangmembers; Nicole Narea, Immigrant *Teens Unjustly Jailed as Gang Members: ACLU*, LAW360 (Aug. 14, 2017, 3:29 PM), https://www.law360.com/articles/953705.

[85] *Fundamentally Unfair: Databases, Deportation, and the Crimmigrant Gang Member*, at 289; 84 FR 69649, 69659.

[86] *See Whose Community Shield?: Examining the Removal of the "Criminal Street Gang Member*, at 321.

AR.10129

ordered systemic investigations or overhauled the database procedures completely. The most notable entities to come under fire for error-ridden gang databases are Long Island, NY[87]; Portland, OR[88]; Chicago, IL[89]; and the entire state of California.[90]

Furthermore, the "evidence" of gang participation underlying a database entry, if presented at all, is often based on a check-list of generally innocuous behavior and traits, such as social media photos depicting youth wearing popular brands and sports paraphernalia (for example photos of Michael Jordan or the Chicago Bulls logo), wearing colors associated with gang membership, having a certain country of origin, or residence in a certain neighborhood "known for gang activity."[91] Even where the behavior is less innocuous, gang membership allegations can be raised by a single, unidentified witness and do not need to be substantiated.[92] Individuals entered into these databases are rarely notified of their designation and there is no

---

[87] Nicole Narea, *Immigrant Teens Unjutly Jailed as Gang Members*: ACLU, LAW360 (Aug. 14, 2017, 3:29 PM), https://www.law360.com/articles/953705

[88] *See* Carli Brosseau, *Who's on Portland's gang list?* The Oregonian, (Nov. 4, 2016, 2:29 pm), https://www.oregonlive.com/portland/2016/11/at_least_i_was_on_some_kind_of.html (the documents reviewed by the Oregonian showed that "[p]eople who challenge a gang designation are more likely than not to prevail; Police rarely cite a gang-related crime to justify designating someone a gang member; Almost every time police label someone a gang member, they say the person admitted it; Lies can land people on the list").

[89] Jacqueline Serrato, *Chicago Police admits gang database error that enabled ICE raid*, The Chicago Tribune (Dec. 6, 2017), https://www.chicagotribune.com/hoy/ct-chicago-police-admits-gang-database-error-20171206-story.html.

[90] *See* Ali Winston, *California's gang database gets less secretive, but problems linger*, Reveal (September 30, 2016), available at: https://www.revealnews.org/blog/californias-gang-database-gets-less-secretive-but-problems-linger/.

[91] *See Mislabeled: Allegations of Gang Membership and their Immigration Consequences; see also How a Crackdown on MS-13 Caught Up Innocent High School Students*; Nicole Narea, Immigrant Teens Unjustly Jailed as Gang Members: ACLU, LAW360 (Aug. 14, 2017, 3:29 PM), https://www.law360.com/articles/953705; *Reliance on Gang Databases: Unchecked Discretion and Undesirable Consequences*, 679–80 (listing differing criteria requirements per different state statutes, such as Texas's requirement that an individual meet two of eight criteria before entry into a local or regional gang database versus Minnesota's requirement that every individual have a criminal conviction before entry into its Gang Pointer File).

[92] *Id.*

33

meaningful mechanism to contest such a designation.[93] Where gang allegations arise from a criminal investigation, such allegations can continue to persist even where the suspect is cleared of any criminal wrongdoing, raising serious concerns about due process and fundamental fairness.[94] Accordingly, the Proposed Rules will only exacerbate the general due process and data accuracy problems presented by sharing unchecked gang allegations with federal immigration officials and will unfairly bar persecuted individuals from receiving asylum.

B.   The Proposed Rules violate due process and undermine criminal court adjudications by expanding the inquiry of what constitutes a conviction or sentence for asylum purposes into the motives for a court's vacatur, modification, or correction of a conviction or sentence.

The Proposed Rules also improperly authorize immigration adjudicators to second-guess both state and federal criminal court adjudications.[95] Current BIA precedent requires that, to be effective for immigration purposes, orders vacating or modifying convictions must be based on substantive or procedural infirmities in the underlying proceedings.[96] The Proposed Rules go far beyond that requirement, by examining the motives of the immigrant in challenging their conviction and sentence.[97] Many Circuit Courts of Appeals have already ruled that the inquiry

---

[93] *See Mislabeled: Allegations of Gang Membership and their Immigration Consequences*. To date, California is the only state that requires notice for individuals included in gang databases.

[94] *See Whose Community Shield?: Examining the Removal of the "Criminal Street Gang Member,"* at 321; *How a Crackdown on MS-13 Caught Up Innocent High School Students*; Nicole Narea, *Immigrant Teens Unjustly Jailed as Gang Members: ACLU*, LAW360 (Aug. 14, 2017, 3:29 PM), https://www.law360.com/articles/953705. *See generally, Fundamentally Unfair: Databases, Deportation, and the Crimmigrant Gang Member.*

[95] *Compare Saleh v. Gonzales*, 495 F.3d 17, 25-26 (2d Cir. 2007) (discussing 28 U.S.C. § 1738, requiring federal courts to give full faith and credit to state acts, records, and judicial proceedings and U.S. Const. art. IV, § 1, and finding that there was no violation where the Board of Immigration Appeals stopped short of "refusing to recognize or relitigating the validity of [Saleh's] state conviction.").

[96] *Matter of Thomas and Thompson*, 27 I.&N. Dec. 674, 684 (A.G. 2019)

[97] The proffered justification for this presumption against the validity of post-conviction relief is to "ensure that aliens do not have their convictions vacated or modified for purported rehabilitative purposes that are, in fact, for immigration purposes," "to codify the principle set

AR.10131

for determining the purpose of a vacatur or modification focuses on the criminal court order rather than any imputed motive of the immigrant.[98]

The Proposed Rules include a rebuttable presumption "against the effectiveness" of an order vacating, expunging, or modifying a conviction or sentence if the order was entered into after the asylum seeker was placed in removal proceedings or if the asylum seeker moved for the order more than one year after the date the original conviction or sentence was entered.[99] The Attorney General and Acting Secretary provide no support for the assertion that "[i]t is reasonable to conclude that an alien who has a meritorious challenge to a criminal conviction based on a procedural or substantive defect is more likely to seek post-conviction relief sooner than an alien who is seeking relief on rehabilitative grounds."[100] Common sense rejects such an assertion. After the Supreme Court invalidated the Armed Career Criminal Act's residual clause as void for vagueness in *Johnson v. United States*,[101] federal courts were inundated with post-conviction motions from individuals who had valid legal and constitutional challenges to their sometimes decades-old convictions.[102] The mere fact that some of these post-conviction motions

---

forth in *Matter of Thomas and Thompson*," and to bring the analysis of post-conviction orders in line with *Matter of Pickering*, 23 I.&N. Dec. 621 (BIA 2003), *rev'd on other grounds by Pickering v. Gonzales*, 465 F.3d 263, 267-70 (6th Cir. 2006).

[98] *See e.g Pickering,* 465 F.3d at 267-70 (holding that despite the petitioner's stated motive of avoiding negative immigration consequences, the Board of Immigration Appeals was limited to reviewing the authority of the court issuing the order as to the basis for his vacatur); *Reyes-Torres v. Holder*, 645 F.3d 1073, 1077-78 (9th Cir. 2011) (holding that the motive of the respondent was not the relevant inquiry and that, "the inquiry must focus on the state court's rationale for vacating the conviction"); *Rodriguez v. U.S. Att'y Gen.*, 844 F.3d 392, 397 (3d Cir. 2006) (noting that "the IJ may rely only on reasons explicitly stated in the record and may not impute an unexpressed motive for vacating a conviction" and the adjudicator must first look to the face of the order vacating the conviction, and "if the order explains the courts reasons … the [adjudicator's] inquiry must end there).

[99] 84 FR 96956.

[100] 84 FR 96956.

[101] 135 S. Ct. 2551 (2015).

[102] Thomas H. Gabay, *Using Johnson v. United States to Reframe Retroactivity for Second or Successive Collateral Challenges*, 84 Fordh. L. Rev. 4, 1615, n. 26 (2016) (noting several

AR.10132

were over a year old in no way diminished that the movants sought relief—and were granted relief—on substantive grounds.

Moreover, the presumption raises due process concerns because it ignores the realities of indigent people who have been convicted of crimes. Criminal defendants frequently lack legal representation in post-conviction proceedings.[103] Therefore, they may not have the knowledge, means, or the will to fight their conviction until they are advised to do so when they are in removal proceedings. By applying the presumption against the validity of an overturned or modified conviction or sentence, the Proposed Rules hold asylum seekers to a higher standard than those seeking other forms of relief in removal proceedings, by forcing only asylum seekers to rebut the presumption despite the existence of actual defects in their underlying criminal proceedings. The Proposed Rules therefore compound the harm to asylum seekers who, in addition to facing persecution in their home countries, have been denied constitutionally compliant process in the United States criminal legal system.

C.     The Proposed Rules are vague and overbroad, create inefficiencies, and adversely impact vulnerable populations.

The vagueness in the Proposed Rules also raises due process concerns.[104] The Proposed Rules are overbroad in that they do not explain what types of evidence or non-adjudicated conduct an Immigration Judge may rely on to categorically bar immigrants from asylum or to decide that a post-conviction order is for rehabilitative or immigration purposes. As discussed above, the types of evidence currently used to support gang allegations are suspect. Without clear

---

decisions from various courts of appeals vacating inmate sentences and remanding for resentencing in light of *Johnson*).

[103] *Pennsylvania v. Finley*, 481 U.S. 551 (1997) (providing that the right to appointed counsel extends only to the "first appeal of right," but not to further collateral attacks on a conviction).

[104] 84 FR 69649, 69652, 69659, 69661.

36

delineations as to what types of conduct are sufficient to implicate the gang or domestic violence bars and what evidence constitutes "reliable evidence" of gang allegations, domestic violence related conduct, or whether a post-conviction order is for rehabilitative or immigration purposes, the Proposed Rules "fail[] to give adequate notice to people of ordinary intelligence concerning the conduct [they] proscribe[]," and therefore violate due process.[105]

If these bars are insufficient to give people proper notice, they surely implicate further due process and constitutional rights in the criminal justice system. This is especially so as it relates to a criminal defendant's Sixth Amendment right to be accurately apprised by defense counsel of the immigration consequences of his guilty plea to criminal charges.[106] Despite this significant right at issue, the agencies have wholly failed to account or prioritize these real world consequences of the Proposed Rules. As is applicable here, "no deference is owed to an agency action that is based on an agency's purported expertise where the agency's explanation for its action lacks any coherence."[107]

The Proposed Rules repeatedly cite increased efficiency as justification for many of the proposed changes.[108] However, they create additional burdens for the already overwhelmed immigration court system by tasking adjudicators with highly nuanced, resource-intensive assessments of the connection of a conviction to gang activity, the domestic nature of alleged criminal conduct, and the motives of an immigrant in challenging a conviction—assessments far outside adjudicators' areas of expertise.[109] These in-depth assessments will prolong asylum

---

[105] *See United States v. Doremus*, 888 F.2d 630, 634 (10th Cir. 1989).
[106] *Padilla v. Kentucky,* 559 U.S. 356 (2010).
[107] *Grace*, 344 F. Supp. 3d at 125.
[108] *See* 84 FR 69646, 69656-8.
[109] Marissa Esthimer, "Crisis in the Courts: Is the Backlogged U.S. Immigration Court System at Its Breaking Point?," *Migration Policy Institute*, October 3, 2019, https://www.migrationpolicy.org/article/backlogged-us-immigration-courts-breaking-point (explaining that many immigration judges come from non-immigration related legal

AR.10134

proceedings and invariably lead to erroneous determinations that will give rise to an increase in appeals. Requiring adjudicators to engage in minitrials to determine the applicability of categorical criminal bars or the presumption that post-conviction relief for those who sought it while in removal proceedings or longer than one year after conviction, rather than relying on judgements arising out of the criminal legal system, will dramatically decrease efficiency in the asylum adjudication process and create more bases for appeals.

## VIII.   CONCLUSION

For the reasons detailed in the comments above, the CAIR Coalition strongly opposes DHS and DOJ's Proposed Rules. The Proposed Rules unfairly bar large swaths of individuals from asylum, depriving them of their right to an individualized analysis of their claims, based on the agencies' poorly reasoned and conclusory rationale. A court will surely view these rules as contradictory to the INA, arbitrary and capricious, and a violation of the due process protections of the Constitution. DHS and DOJ should withdraw the Proposed Rules, as only a thorough, circumstance-specific approach to asylum claims, in conformance with statutory and constitutional protections and international law will properly protect asylum seekers.

---

backgrounds, and stating that, as of August 2019, the number of pending cases in immigration court reached a "historic high of slightly more than 1 million.").

AR.10135

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekp-10on
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0523
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** TROY ELDER
**Address:**
   634 S Spring Street
   Los Angeles,  90014
**Email:** Troy@immdef.org
**Phone:** 2136347601
**Organization:** Immigrant Defenders Law Center

---

## General Comment

Please see attachments.

---

## Attachments

ImmDef Comment Asylum Bars Final Submitted

AR.10136



January 21, 2020

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, Suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

      Re:    84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019;
             RIN 1125-AA87, 1615-AC41; Comments in Opposition to Proposed
             Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility

To Whom it May Concern:

We are writing on behalf of Immigrant Defenders Law Center ("ImmDef") to express our strong opposition to the proposed amendment of certain regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019 ("Proposed Rules").

ImmDef is the largest provider of in-court asylum representation in the State of California.   Our clientele includes some of the most vulnerable individuals in, and at the borders of, the nation's most populous state.   The Proposed Rules would have grave and unnecessary consequences on our clients' ability to avail themselves of international protections which they urgently need.

For the reasons detailed in the comments that follow, the Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

Thank you for the opportunity to submit comments on the Proposed Rules. Please do not hesitate to contact the undersigned for further information.

Sincerely,

/s/Lindsay Toczylowski      /s/Munmeeth K. Soni      /s/ Troy Elder
Lindsay Toczylowski       Munmeeth K. Soni        Troy Elder
Executive Director          Director of Litigation and   Supervising Attorney for
                            Advocacy              Litigation and Advocacy

**DETAILED COMMENTS in opposition to the Proposed Rules re Procedures for Asylum and Bars to Asylum Eligibility, 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41**

## I.      Introduction

On December 19th, the Department of Homeland Security (DHS) and the Department of Justice (DOJ) issued a joint set of Proposed Rules that would make three primary changes to the rules governing asylum adjudications.  Taken together, these rules would bar significant numbers of ImmDef's clients from seeking asylum.

The first proposed set of changes adds the following seven *categorical* bars to asylum eligibility: (1) any conviction of a felony offense; (2) any conviction for "smuggling or harboring" under 8 U.S.C. § 1324(a), even if the asylum seeker committed the offense for the purpose of bringing her own spouse, child or parent to safety; (3) any conviction for illegal reentry under 8 U.S.C. § 1326; (4) any conviction for an offense "involving criminal street gangs," with the adjudicator empowered to look to any evidence to determine applicability; (5) any second conviction for an offense involving driving while intoxicated or impaired; (6) any conviction *or accusation of conduct* for acts of battery involving a domestic relationship; (7) and any conviction for several newly defined categories of misdemeanor offenses, including *any* drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits.

The second section of the Proposed Rules provides a multi-factor test for immigration adjudicators to determine whether a criminal conviction or sentence is valid for the purpose of determining asylum eligibility. The third section rescinds a provision in the current rules regarding the reconsideration of discretionary asylum.

Taken together, these proposed changes constitute an unnecessary, harsh, and unlawful gutting of the asylum protections enshrined in United States and international law.  ImmDef submits these comments to express opposition to the entirety of the Proposed Rules and grave concerns with the Administration's continued efforts to exclude refugees from obtaining the security and stability the United States asylum system has long promised. We urge that the Proposed Rules be rescinded in their entirety.

## II.      The Proposed Rules unnecessarily and cruelly exclude bona fide refugees from asylum eligibility

*The barriers to asylum for those previously involved in the criminal legal system are already sweeping in scope; adding more barriers is cruel and unnecessary.*



The asylum protections provided by United States law are sacred. Asylum provides those fleeing horrors with physical safety, opens a path to citizenship, and preserves family unity. The domestic asylum system is a symbol of the United States' commitment never to repeat its failure to save thousands of Jewish refugees refused entry to the United States on the *St. Louis* and others fleeing the Holocaust. Domestic asylum policy plays an important role in serving the United States' foreign policy interests abroad. For those individuals seeking asylum in the United States, the stakes could not be higher—a claim denied often means return to death or brutal persecution.

The laws, regulations, and process governing asylum adjudications are already exceedingly harsh. Asylum seekers bear the evidentiary burden of establishing their eligibility for asylum in the face of a complex web of laws and regulations, without the benefit of appointed counsel and often from a remote immigration jail. The obstacles to winning asylum are exceedingly high; indeed, in some parts of the country and before certain immigration judges, almost no one succeeds. Today, newly imposed barriers to accessing asylum in the United States are breathtaking in scope, with those seeking safety at the southern border subject to return to dangerous conditions in Mexico and an overlapping web of policies that preclude asylum eligibility for countless migrants simply because of their national origin, manner of entry, or their flight path. There are consistent reports of the documented deaths and brutalities endured by those who sought but were denied asylum protections in the United States.

Specifically, the bars to asylum based on allegations of criminal conduct are *already* sweeping and over-broad in nature and scope. Any conviction for an offense determined to be an "aggravated felony" is considered a *per se* "particularly serious crime" and therefore a mandatory bar to asylum. Originally limited to murder, weapons trafficking and drug trafficking, it has metastasized to encompass hundreds of offenses, many of them neither a felony nor aggravated, including petty offenses such as misdemeanor shoplifting, simple misdemeanor battery, or sale of counterfeit DVDs. If anything, the existing crime bars should be narrowed, not expanded. Even for those not categorically barred from relief, the immigration adjudicator maintains full discretion to deny asylum.

Immigration adjudicators already have vast discretion to deny asylum to those who meet the refugee definition but have been convicted of criminal conduct. Further categorical bars are not needed. The agencies' efforts to add *seven* new sweeping categories of barred conduct to the asylum eligibility criteria is unnecessary and cruel. The Proposed Rules drain the phrase "*particularly serious* crime," 8 U.S.C. § 1158, of any sensible meaning.

ImmDef's docket testifies to the potency of immigration judges' ability to make such discretionary denials.   For example, in November 2019, an immigration judge sitting in Los Angeles, upon reviewing a mentally ill Salvadoran asylum applicant's history of encounters with law enforcement, deemed him ineligible for asylum on



3
AR.10139

discretionary grounds, even though counsel for DHS had stipulated that none of the convictions met the "particularly serious" standard.

The Proposed Rules are also arbitrary and capricious. They would constitute a marked departure from past practice. And the agencies have proffered no evidence or data to support these changes.

One assumption fundamentally underlying the Proposed Rules, for example, is that every noncitizen convicted of any offense punishable by more than a year in prison necessarily constitutes a danger to the community. But no evidence is provided to support that assumption, and a criminal record, does not, in fact, reliably predict future dangerousness. The Proposed Rules are so capricious as to peremptorily postulate a noncitizen's supposed danger to the community even in circumstances when a federal, state, or local judge has concluded that no danger exists by, for example, imposing a noncustodial sentence. Conviction for a crime does not, without more, make one a present or future danger—which is why the Refugee Convention's particularly serious crime bar, made part of United States law through 8 U.S.C. § 1158, should only properly apply if both (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows that he or she is poses a future danger.

Similarly, the Proposed Rules fail to address or account for the fact that a significant number of people may agree to plead to a crime as to avoid the threat of a severe sentence; not only is a conviction an unreliable predictor of future danger, it can also be an unreliable indicator of past criminal conduct. In addition, the Proposed Rules do not address and make no exception for convictions for conduct influenced by mental illness or duress.

The Board of Immigration Appeals has cautioned that, "in light of the unusually harsh consequences which may befall a [noncitizen] who has established a well-founded fear of persecution; the danger of persecution should generally outweigh all but the most egregious of adverse factors." Yet because of the categorical nature of the seven new bars proposed here, asylum seekers will be precluded from obtaining protection on the basis of a vast array of conduct, without any discretion left to the immigration adjudicator to determine whether the circumstances merit such a harsh penalty. Indeed, in the case of the domestic-violence related ground, the categorical bar will be imposed on the basis of *mere allegations* of conduct without any adjudication of guilt.

Those unjustly precluded from even seeking a discretionary grant of asylum by the Proposed Rules will include, for example: individuals struggling with addiction with one drug-related conviction, regardless of the circumstances of the offense; asylum seekers with two convictions for driving under the influence, regardless of whether the applicant has sought treatment for alcohol addiction or the circumstances of the convictions; community members seeking asylum defensively who have been convicted of a document fraud offense related to their immigration status; and asylum-seeking



mothers convicted for bringing their own child across the southern border in an effort to find safety.

The proposed new criminal bars would unfairly prejudice large-numbers of ImmDef's asylum-seeking clients, particularly those with mental health disorders—often the very basis upon which they seek international protection from the barbaric methods employed by many countries to subdue, "treat," or "cure" them.   Given the high correlation between mental illness and adverse encounters with law enforcement, often due to extreme poverty, self-medication, and homelessness, the Proposed Rules would penalize ImmDef asylum clients such as:

- A 25-year old DACA-eligible Guatemalan man suffering from a traumatic brain injury and catatonia that led him to self-medicate with methamphetamines.   His single conviction in 2018 under Cal. H&S § 11364(a), for possession of unlawful drug paraphernalia, resulted in a two-*day* jail sentence.   An immigration judge in Adelanto, California found that this conviction was insufficiently severe to disqualify him from asylum, an outcome that would have been foreclosed under the Proposed Rules' bar on *any* drug-related offense (except for a first-time marijuana possession offense).

- A 38-year old Honduran man who had been gravely injured when riding a bicycle in 2015, resulting in severe brain injury, depression, and other mental health concerns.   His 2016 conviction for spousal injury under Cal. PC 273.5(A) resulted in a 3-year probation and was accompanied by evidence from his domestic partner, who had been his caregiver in the wake of his accident, that she had not wished to file charges.   In granting asylum, the immigration judge also noted that the sentence was minimal.   However, under the Proposed Rules' prohibition of asylum for any conviction *or accusation of conduct* for acts of battery involving a domestic relationship, our client would have been barred from asylum.

*The Proposed Rules cruelly disregard the connections between trauma and involvement in the criminal legal system.*

The harsh nature of the Proposed Rules is especially evident when viewed through a trauma-informed lens. Asylum seekers are an inherently vulnerable population because of the trauma they have experienced in their countries of origin and, often, along the journey to find safety. Existing literature suggests that at least one out of every three asylum seekers struggles with depression, anxiety, and/or post-traumatic stress disorder (PTSD). CITE? One recent study found the mental health problems facing refugees and asylum seekers so acute that more than a third of the study's sample admitted having suicidal thoughts in the preceding two weeks.

This is particularly true with a substantial portion of ImmDef's asylum caseload. As a provider under the National Qualified Representative Program ("NQRP"), ImmDef

serves as appointed counsel in cases for asylum-seekers who have been found to be incompetent to represent themselves in their immigration proceedings because of a serious mental disorder.  These clients suffer from serious mental or developmental disabilities and have often suffered persecution and torture in their home countries because of their mental disabilities.

Studies also consistently reveal a high prevalence of comorbidity of PTSD and substance use disorders, with individuals with PTSD *up to 14 times more likely* to struggle with a substance use disorder. Asylum seekers in the United States are often unable to access affordable medical care and treatments for complex trauma; some turn to drugs and alcohol in an effort to self-medicate.   Indeed, the Ninth Circuit Court of Appeals has recognized that an accused's mental health at the time of the crime may be taken into account by immigration judges when evaluating whether convictions meet the particularly serious crime standard.  Yet the proposed new bars to asylum include *any* drug-related conviction (with one exception for a first minor marijuana possessory offense) and any second conviction for driving under the influence. This approach is not only cruel but also ignores the evidence. *Particularly* given the vulnerabilities of asylum-seeking populations, prior struggles with addiction should be addressed with treatment and compassion, not a closed door and deportation order.

Immigration adjudicators already maintain the authority to deny asylum to individuals with drug-related criminal histories on the basis of discretion; denying asylum seekers even the opportunity to present the countervailing factors of their past trauma and potential recovery is simply cruel.

III.    **Those precluded from asylum eligibility will be gravely impacted even if granted withholding of removal or protection under the Convention Against Torture**

Throughout the Proposed Rules, the agencies defend the harsh and broad nature of their proposal by pointing to the continued availability of alternative forms of relief for those precluded from asylum eligibility under the new rules. The availability of these alternatives forms of relief, however—known as withholding of removal and protection under the Convention Against Torture (CAT)—does not nullify the harm created by the Proposed Rule's new limits on asylum. The protections afforded by CAT and by statutory withholding of removal are limited in scope and duration, and they are harder to obtain. As a result, a Rule that limits *bona fide* refugees to withholding of removal and CAT protection would impose a very real harm on individuals who have come to the United States in search of protection.

First, the most serious harm that can befall an individual as a result of these Proposed Rules is removal to persecution and torture, and the existence of withholding of removal does not account for that risk. CAT and withholding protections demand a higher level of proof than asylum claims: a clear probability of persecution or torture. Thus, an individual could have a valid asylum claim but be unable to meet the standard

under the other forms of relief and therefore would be removed to their country of origin, where they would face persecution or even death.

Even for those who meet the higher standard, withholding and CAT recipients are still subject to significant prejudice. For example, they have no ability to travel internationally. The United Nations Convention Relating to the Status of Refugees affords refugees the right to travel in mandatory terms. Article 28 states, "Contracting States shall issue to refugees lawfully staying in their territory travel documents for the purpose of travel outside their territory." Withholding and CAT recipients do not have access to a travel document as contemplated by Article 28. By regulation, refugee travel documents are available only to asylees. And the Board of Immigration Appeals requires that an individual granted withholding and CAT—unlike an individual granted asylum—must simultaneously be ordered removed, making any international travel a "self-deportation." Refugees granted only withholding of removal or CAT protection are thus effectively trapped within the United States in long-term limbo.

Withholding and CAT recipients also face permanent separation from their spouses and children. Because international travel is prohibited, these individuals cannot reconnect with their families in a third country. And they also cannot reunite with family in the United States because only asylees and refugees are eligible to petition for a spouse and children to join them as derivatives on that status. For many, this will mean that the Proposed Rules institute yet another formal policy of family separation. For example, a mother with two young children who flees to the United States and is subject to one of the expanded asylum bars will not be able to ensure that her children will be able to obtain protection in the United States with her if she is granted relief. Rather, if her children are still in her home country, they would need to come to the United States and seek asylum on their own, likely as unaccompanied children. If her children fled to the United States with her, then they will need to establish their own eligibility for protection before an immigration judge, no matter their age.

Recently, this exact scenario played out with a mother who was subject to the so-called Migrant Protection Protocols (also known as Remain in Mexico) and the asylum "transit ban," which made the mother ineligible for asylum and thus required the children to establish their independent eligibility for withholding and CAT protection. An immigration judge granted the mother withholding of removal but denied protection to her young children, leaving the children with removal orders and immense uncertainty about their future. Under the expanded bars in the Proposed Rules, these situations will certainly increase, separating families and forcing parents to return to countries where it has been established they more likely than not will face persecution and torture, rather than leaving their children on their own.

ImmDef has a strong and growing presence on the southern U.S. border, and with it a corresponding docket of families subjected to differing relief eligibility frameworks due to manner and/or date of entry and other factors. Accordingly, ImmDef clients subject to the transit ban, MPP, and other expanded asylum bars risk even more serious

harm if the ability to petition for a spouse and children to join them as derivatives is compromised.

Withholding of removal recipients likewise face hurdles in access to employment. Article 17 of the Refugee Convention states that a contracting state "shall accord to refugees lawfully staying in their territory the most favorable treatment accorded to nationals of a foreign country in the same circumstances, as regards the right to wage-earning employment." Recipients of withholding enjoy no such right. They must apply for work authorization, and they face frequent delays in the adjudication of these applications, which often result in the loss of legal authorization to work.

And perhaps most fundamentally, there is continuing jeopardy for withholding and CAT recipients that does not exist for asylum recipients. When a noncitizen is granted asylum, the person receives a legal status. Asylum, once granted, protects an asylee against removal unless and until that status is revoked. None of these protections exists for withholding and CAT recipients. They have no access to permanent residency or citizenship. Instead, they are subject to a removal order and vulnerable to the permanent prospect of deportation to a third country and subject to potential check ins with immigration officials where they can be made to pursue removal to third countries to which they have no connection.

Finally, ImmDef's clients suffering from mental and intellectual disabilities, already vulnerable, will lose opportunities for federal public benefits if limited to withholding of removal and CAT relief.   Federal means-tested public benefits such as supplemental security income, food stamps, Medicaid, and cash assistance are limited to "qualified aliens," a status conferred upon asylees and recipients of withholding of removal (but not CAT deferral) for a period of seven years, following which an asylee is presumed to have adjusted status to that of lawful permanent resident and naturalized. Because as explained above neither withholding of removal nor CAT provide a pathway to permanent residence and citizenship, disabled, elderly, and other categories of vulnerable immigrants who rely on federal means-tested public benefits, particularly for long-term medical conditions, would be further harmed by the Proposed Rules.

## IV.    The proposed definition of "conviction" and "sentence" for the purposes of the new bars further excludes those in need of protection

The section of the Proposed Rules that outlines a new set of criteria for determining whether a conviction or sentence is valid for the purpose of determining asylum eligibility is an ultra vires exercise of authority that is not authorized by the Immigration and Nationality Act. The Proposed Rules impose an unlawful presumption against asylum eligibility for applicants who seek post-conviction relief while in removal proceedings or longer than one year after their initial convictions. They also deny full faith and credit to state court proceedings by attributing improper motives to state court



8
AR.10144

actors.

> *The Proposed Rules undermine Sixth Amendment protections and harms immigrants unfamiliar with the complex criminal and immigration framework governing prior convictions.*

The Proposed Rules outline a new multi-factor process asylum adjudicators must use to determine whether a conviction or sentence remains valid for the purpose of determining asylum eligibility; the proposal includes a rebuttable presumption "against the effectiveness" of an order vacating, expunging, or modifying a conviction or sentence if the order was entered into after the asylum seeker was placed in removal proceedings or if the asylum seeker moved for the order more than one year after the date the original conviction or sentence was entered.

This newly created presumption unfairly penalizes asylum applicants, many of whom may not have the opportunity to seek review of their prior criminal proceedings until applying for asylum. In *Padilla v. Kentucky*, the Supreme Court recognized that the immigration consequences of a conviction are sufficiently serious for the Sixth Amendment to require a noncitizen defendant to be competently advised of them before agreeing to a guilty plea. By imposing a presumption against the validity of a withdrawal or vacatur of a plea, the Proposed Rules hold asylum seekers whose rights were violated under *Padilla* to a different standard; even though they too were denied effective assistance of counsel in the course of their underlying criminal proceedings, asylum seekers will be forced to rebut a presumption that their court-ordered withdrawal or vacatur is invalid. The Proposed Rules therefore compound the harm to immigrants who, in addition to facing persecution in their home countries, have been denied constitutionally compliant process in the United States criminal legal system.

Many asylum applicants, especially those in vulnerable populations isolated from resources and unfamiliar with the due process protections available to them in the United States, may not have discovered the defects in their underlying criminal proceedings until their consultation with an immigration attorney, or until they are placed into removal proceedings, which may happen several years after a conviction. Imposing a presumption *against* the validity of a plea withdrawal or vacatur in these cases will undoubtedly lead to the wrongful exclusion of countless immigrants from asylum simply because they were unable to adequately rebut the presumption, particularly in a complex immigration court setting without the benefit of appointed counsel.

In non-asylum contexts, ImmDef's clients have benefitted from these important constitutional safeguards and the opportunity to seek post-conviction relief.   Recent examples include:

- An NQRP client in his mid 50's had been an LPR since 2009. He had a minor criminal record (vandalism, with one drug possession dismissed through diversion). Due to untreated symptoms of schizophrenia, he was charged and pled

to a felony charge of criminal threats resulting from an altercation with his employer and was sentenced to 16 months in prison. Through habeas litigation showing ineffective assistance of counsel, the plea and conviction were vacated and he entered a plea to an immigration-safe charge for the same sentence, credit for time served. His immigration case, on appeal, was remanded and terminated, for want of sustainable grounds of removal.

- Another NQRP client, also an LPR, was an attorney who became symptomatic with schizophrenia and set a small fire of documents in his apartment. He was charged and convicted of arson--a categorical aggravated felony. ImmDef filed a motion to vacate based on failure to meaningfully understand and defend against the immigration consequences of his plea. The district attorney did not oppose and his arson conviction was vacated. He pled to a vandalism charge for probation and less than a year in custody, time served. His immigration case was terminated.

- A 20-year-old LPR, who was charged and convicted of assault and sentenced to prison. ImmDef litigated a motion to vacate and, over strenuous opposition from the district attorney, the court granted the motion and the charge was ultimately dismissed based on insufficiency of evidence of guilt. After the charge was dismissed, the client was released on bond, and DHS moved to terminate proceedings.

*The Proposed Rules violate the full faith, and credit to which state court decisions are entitled.*

The Proposed Rules further improperly authorize immigration adjudicators to second-guess the decision of a state court, even where the order on its face cites substantive and procedural defects in the underlying proceeding. The proffered justification for this presumption against the validity of post-conviction relief is to "ensure that aliens do not have their convictions vacated or modified for purported rehabilitative purposes that are, in fact, for immigration purposes," "to codify the principle set forth in *Matter of Thomas and Thompson*," and to bring the analysis of post-conviction orders in line with *Matter of Pickering*. The agencies misread the applicable law, however, by authorizing adjudicators to disregard otherwise valid state orders. The immigration law only requires that to be effective for immigration purposes, orders vacating or modifying convictions must be based on substantive or procedural infirmities in the underlying proceedings. The Proposed Rule goes well beyond that requirement.

The Proposed Rules abandon the presumption of regularity that should accompany state court orders, thus upending settled principles of law. The Proposed Rules cite a misleading quote from *Matter of F-* in support of allowing asylum adjudicators to look beyond the face of a state court order; had the Rules' authors looked to the full case, they would have read the following: "Not only the full faith and credit clause of the Federal Constitution, but familiar principles of law require the acceptance at face value of a judgment regularly granted by a competent court, unless a fatal defect is

evident upon the judgment's face. However, the presumption of regularity and of jurisdiction may be overcome by extrinsic evidence or by the record itself." In *Matter of F-*, the Board of Immigration Appeals offers support for the proposition that an adjudicator should presume the validity of a state court order unless there is a reason to doubt it, contrary to the *presumption of irregularity* put forward in the Proposed Rules.

The authority extended to adjudicators by the Proposed Rules also violates the law of multiple circuits, including *Pickering*, on which it relies. In *Pickering v. Gonzales*, the Sixth Circuit Court of Appeals held that despite the petitioner's stated motive of avoiding negative immigration consequences, the Board of Immigration Appeals was limited to reviewing the authority of the court issuing the order as to the basis for his vacatur. Similarly, in *Reyes-Torres* the Ninth Circuit Court of Appeals held that the motive of the respondent was not the relevant inquiry. Rather, "the inquiry must focus on the state court's rationale for vacating the conviction." In addition, the Third Circuit Court of Appeals in *Rodriguez v. U.S. Att'y Gen.*, which the Proposed Rules cite as "existing precedent," held that the adjudicator must look only to the "reasons explicitly stated in the record and may not impute an unexpressed motive for vacating a conviction." Moreover, the *Rodriguez* court stated that to determine the purpose of a vacatur, the adjudicator must first look to the face of the order vacating the conviction, and "if the order explains the courts reasons … the [adjudicator's] inquiry must end there." The Proposed Rules contain no such limiting language to guide the adjudicator's inquiry. Instead, the Rules grant adjudicators vague and indefinite authority to look beyond even a facially valid vacatur. Such breadth of authority undermines asylum seekers' rights to a full and fair proceeding.

> *The Proposed Rules wrongly extend* Matter of Thomas and Thompson *to all forms of post-conviction relief and impose an ultra vires and unnecessary burden on asylum seekers.*

Finally, the above-described presumption is ultra vires and unnecessary. As an initial matter, the Proposed Rules' reliance on *Matter of Thomas and Thompson* is flawed. The Attorney General's decision in *Matter of Thomas and Thompson* has no justification in the text or history of the immigration statute. Nowhere does the plain text of the Immigration and Nationality Act support giving adjudicators the authority to give effect only to state court sentence modifications undertaken to rectify substantive or procedural defects in the underlying criminal proceedings. Nor does the legislative history support such a rule. The Board of Immigration Appeals recognized this in *Matter of Cota-Vargas*, where it concluded that the application of "the *Pickering* rationale to sentence modifications has no discernible basis in the language of the Act." Based on the text of the Immigration and Nationality Act and the well-documented legislative history behind Congress's definition of "conviction" and "sentence" in 8 U.S.C. § 1101(a)(48), the Board determined that Congress intended to ensure that, generally, proper admissions or findings of guilt were treated as convictions for immigration purposes, even if the conviction itself was later vacated. Neither the text of the INA nor the legislative history of the definitions reveal any attempt on Congress's part to change the longstanding

practice of giving effect to state court sentencing modifications. For these reasons, *Matter of Thomas and Thompson* lacks Congressional support for its rule and should not be extended.

Moreover, as applicants for immigration benefits or relief from removal, asylum seekers already bear the burden of demonstrating their eligibility for asylum. The Proposed Rules do not alter or shift this burden, nor do they provide evidence supporting the need for this presumption. By introducing a presumption of bad faith into asylum adjudication, the Proposed Rules unfairly interfere with asylum seekers' efforts to establish their claims. Immigration law, and asylum law in particular, is already highly complex, and the process of seeking asylum is in many instances re-traumatizing, particularly for applicants who do not have counsel to represent them and who lacked effective counsel in their underlying criminal proceedings. The Proposed Rules as applied to asylum applicants who seek post-conviction relief transform an already difficult process into an adversarial inquiry, contrary to the intent of Congress.

\* \* \*

For these reasons, we urge that the Department of Homeland Security and the Department of Justice immediately withdraw their current proposal.



12
AR.10148

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekp-ilfi
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0524
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Harper Jean Tobin
**Organization:** National Center for Transgender Equality

---

## General Comment

See attached files:
(1) Comments of the National Center for Transgender Equality on the Proposed Rule; and,
(2) Report of the 2015 U.S. Transgender Survey (discussed in the above comments).

---

## Attachments

NCTE comment on DHS DOJ asylum eligibility NPRM 1 21 20

USTS Main Report

AR.10149

National Center for
**TRANSGENDER
EQUALITY**

Submitted via [https://www.regulations.gov/document?D=EOIR-2019-0005-0001]

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

January 21, 2020

**Re: Procedures for Asylum and Bars to Asylum Eligibility; Proposed Rule; 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41**

The National Center for Transgender Equality (NCTE) submits the following comments in opposition to the Departments' Proposed Rule to amend regulations relating to eligibility for asylum.

Founded 2003, NCTE works to improve the lives of the nearly two million transgender people in the United States and their families through sound public policy, public education, and groundbreaking research. NCTE has worked with countless employers as well as local, state, and federal agencies on equal employment opportunity (EEO) and other policies and enforcement efforts. In 2015, NCTE conducted the U.S. Transgender Survey, the largest survey to date of transgender people with nearly 28,000 respondents from all 50 states.

Existing asylum regulations and procedures are unduly harsh, requiring individuals fleeing life-altering and life-threatening violence to meet a heavy evidentiary burden, often without counsel and from remote detention facilities. In the current system, grants of asylum are exceedingly rare despite staggering conditions of persecution in many asylum-seekers' countries of origin. For many of these asylum-seekers, deportation is a death sentence.[1] The Departments proposed to add seven new categorical bars to asylum eligibility; adopt a multi-factor test for determining whether a criminal conviction is valid for the purpose of asylum eligibility; and to rescind provisions regarding reconsideration of discretionary grants of asylum. In combination, these

---

[1] *See, e.g.,* Sarah Stillman, "When deportation is a death sentence," *New Yorker*, Jan. 8, 2018, https://www.newyorker.com/magazine/2018/01/15/when-deportation-is-a-death-sentence; Maria Sachetti, "'Death is waiting for him,'" *Washington Post*, Dec. 6, 2018, https://www.washingtonpost.com/graphics/2018/local/asylum-deported-ms-13-honduras/; Kevin Sieff, "When death awaits deported asylum seekers," *Washington Post*, Dec. 26, 2018, https://www.washingtonpost.com/graphics/2018/world/when-death-awaits-deported-asylum-seekers.

proposals are arbitrary, contrary to law, create economic and non-economic costs that exceed any benefits, and are extraordinarily cruel. The proposed rule should therefore be withdrawn.

A very large number of transgender immigrants are asylum-seekers, fleeing often life-threatening violence in countries around the world. The extraordinary levels of violence and persecution toward transgender people in many nations around the world today are well-documented by the U.S. State Department, international bodies, and non-governmental organizations.[2] Many transgender people applying for asylum today have fled repeated sexual assault, gang-rape, brutal assaults, torture, and death threats, with government officials either openly tolerating or actively participating in this violence.[3]

In the 2015 U.S. Transgender Survey, 7% of non-U.S. citizen respondents had applied for asylum at some point.[4] Of non-citizens who did not apply for asylum, 51% said they did not do so because other forms of immigration status were available to them, 17% said they did not know how to apply, and only 12% said they did not need protection or were not eligible.[5] Of asylum-seeker respondents, 48% had already received asylum, while 32% received withholding of removal.[6]

NCTE regularly hears from asylum-seekers and immigration attorneys who are struggling to meet their basic needs without work authorization during the long pendency of their legal immigration claims. While NCTE is not a social service organization, we frequently hear from these individuals because they are not sure where to turn, especially given the social stigma that still faces transgender people. NCTE tries to connect individuals and their counsel whenever possible with information and resources concerning social and legal services in their areas. We also regularly communicate with service providers and attorneys looking for advice in serving asylum-seekers. NCTE anticipates that if the proposed rule were adopted, NCTE would have to

---

[2] *See, e.g.*, U.S. Dep't of State, 2018 Country Reports on Human Rights Practices (accessed Dec. 28, 2019), https://www.state.gov/reports/2018-country-reports-on-human-rights-practices/; Council for Global Equality, A Call on Secretary Pompeo to Respond to Rising Violence and Discrimination Against LGBTI People Globally (Apr. 26, 2018), available at: https://globalequality.wordpress.com/2018/04/26/a-call-on-secretary-pompeo-to-respond-torising-violence-and-discrimination-against-lgbti-people-globally (summarizing human rights abuses against LGBTI people around the world as described in U.S. Department of State 2017 country reports); Amnesty International, "No Safe Place": Salvadorans, Guatemalans and Hondurans Seeking Asylum in Mexico Based on their Sexual Orientation and/or Gender Identity (2017), https://www.amnestyusa.org/reports/no-safe-place-lgbti-salvadorans-guatemalansand-hondurans-seeking-asylum-in-mexico; United National High Commissioner for Refugees, *Protecting Persons with Diverse Sexual Orientations and Gender Identities: A Global Report on UNHCR's Efforts to Protect Lesbian, Gay, Bisexual, Transgender, and Intersex Asylum-Seekers and Refugees* (Dec. 2015), available at http://www.refworld.org/docid/566140454.html.

[3] *See, e.g.,* Molly Hennessy-Fiske, For transgender migrants fleeing death threats, asylum in the U.S. is a crapshoot, *Los Angeles Times*, Oct. 29, 2019, https://www.latimes.com/world-nation/story/2019-10-29/trump-administration-returns-vulnerable-lgbt-asylum-seekers-to-mexico; Tamaryn Nelson & Hajar Habbach, "If I went back, I would not survive." Asylum Seekers Fleeing Violence in Mexico and Central America, *Physicians foro Human Rights*, Oct. 9, 2019, https://phr.org/our-work/resources/asylum-seekers-fleeing-violence-in-mexico-and-central-america/; Elizabeth Trovall, Escaping Brutal Violence, Transgender Migrants Start Over In Texas, *Houston Public Media*, Sept. 10, 2019, https://www.houstonpublicmedia.org/articles/news/in-depth/2019/09/10/345466/escaping-brutal-violence-transgender-migrants-start-over-in-texas/.

[4] Sandy E. James et al., *The Report of the 2015 U.S. Transgender Survey* (National Center for Transgender Equality, 58 (2016).

[5] *Id.*

[6] *Id.*

expend resources in understanding and explaining the changes to members of the public and in handling an increase in contacts seeking information and referrals. The Departments must consider the burdens imposed on organizations such as NCTE, and the even greater burdens imposed by the proposed rule on organizations that provide direct assistance to individuals seeking asylum."

## The Departments have failed to follow settled rulemaking requirements

Supreme Court precedents make clear that an agency must "pay[] attention to the advantages *and* the disadvantages"[7] of adopting a regulation, and that an agency action may be arbitrary and capricious if it "failed to consider an important aspect of the problem.[8] Executive Orders 12866 and 13563 permit agencies to propose a rule only after conducting an accurate assessment of costs and benefits, and after reaching a reasoned determination that the benefits outweigh the costs and that the regulations are tailored "to impose the least burden on society."[9] Executive Order 12866 requires agencies to "assess *all* costs and benefits" and "should select those approaches that maximize *net* benefits."[10] Even those costs or benefits that are "difficult to quantify" are "nevertheless essential to consider."[11]

In addition, under the Administrative Procedure Act and binding Supreme Court precedent, when an agency seeks to change regulations in a manner that departs from prior policy, the agency must provide a "reasoned analysis for the change."[12] Since the Department previously chose to implement the asylum statutes through rulemaking, a reasoned analysis is required when amending or repealing such regulation. An agency change in regulation should not be based on solely a policy disagreement. Agencies have ample latitude to change existing policies; however, when agencies change course, the presumption is "*against* changes in current policy that are not justified by the rulemaking record."[13]

As Justice Kennedy wrote in *FCC v. Fox Television Stations, Inc.*:

> Where there is a policy change the record may be much more developed because the agency based its prior policy on factual findings. In that instance, an agency's decision to change course may be arbitrary and capricious if the agency ignores or countermands its earlier factual findings without reasoned explanation for doing so. An agency cannot simply disregard contrary or inconvenient factual determinations that it made in the past, any more than it can ignore inconvenient facts when it writes on a blank slate.[14]

---

[7] *Michigan v. EPA*, 135 S.Ct. 2699, 2707 (2015) (emphasis in original).

[8] *State Farm*, 463 U.S. at 43.

[9] Exec. Order 13563 § 1(b)(2), 76 Fed. Reg. 3821 (Jan. 21, 2011); Exec. Order 12866 § 1(b)(11), 58 Fed. Reg. 51735 (Oct. 4, 1993).

[10] Exec. Order 12866, Regulatory Planning and Review (Sept. 30, 1993) (emphasis added).

[11] Exec. Order 12866 § 1(a) (1993).

[12] *Motor Vehicles Mfrs. Ass'n v. State Farm Ins.*, 463 U.S. 29, 30 (1983).

[13] *Id.* at 42 (emphasis in original).

[14] 556 U.S. at 537 (Kennedy, J., concurring in part and in judgment).

The Proposed Rules clearly fail that standard. To the extent the Departments explain their departure from longstanding rules, they do so based on claims without evidence or contrary to evidence.

The proposal to add new categorical bars is premised on the assumption that all criminal convictions punishable by one year or more in prison reflect a danger to the community. This is plainly untrue.[15] The Departments fail to consider, for example, that in many cases sentencing judges impose noncustodial sentences for such convictions based precisely on the finding of no danger to the community.

The Departments also fail to consider obvious scenarios in which such a conviction is unlikely to be a clear indicator of danger, such as where an individual previously convicted of an offense related to alcohol or substance use has since sought successful treatment, or convictions related to being a victim of severe domestic violence.

The Departments fail to provide a reasoned explanation for why offenses that clearly reflect no danger to the community but may simply reflect the desperation of asylum-seekers—such as document fraud offenses related to immigration status, or parents' convictions for bringing their own children across the border—should be subject to a categorical bar.

The Department fails to explain how the proposed categorical bar for convictions of reentry without inspection under INA § 276 bears any relationship to community danger or public safety. It does not. This offense contains no element of violence, danger, or harm to any person. The Departments also fail to explain how this bar could possibly be consistent with the Refugee Convention's prohibition on imposing penalties based on a refugee's manner of entry or presence. It plainly is not.

Fundamentally, the Departments fail to explain how this is consistent with the text and history of 8 U.S.C. § 1158, which requires a separate finding of danger for the "particularly serious crime" bar applies. It is not.

Moreover, this proposal appears to bear no real relation to public safety and instead be geared to drive the number of those fleeing violence who can obtain asylum as close to zero as possible.

Existing rules are premised on both the statutory text and the recognition that, as the Board of Immigration Appeals has said, "in light of the unusually harsh consequences which may befall a [noncitizen] who has established a well-founded fear of persecution; the danger of persecution should generally outweigh all but the most egregious of adverse factors."[16] The Departments have recognized the importance of this principle in past rulemakings, but fail to do so here.

## **The Departments failed to consider important economic and non-economic costs, which would plainly exceed any speculative benefits**

---

[15] *See, e.g.,* U.S. Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders* (2017) (noting that recidivism rates fall substantially with age); U.S. Sentencing Commission, *Recidivism Among Federal Violent Offenders* (2019) (noting that non-violent offenders recidivate at significantly lower rates); J. Ramos and M. Wenger, "Immigration and recidivism: What is the Link?" *Justice Quarterly* (2019) (finding no correlation between recidivism rates and citizenship status among those formerly incarcerated for felonies in Florida prisons).

[16] *Matter of Pula*, 19 I.&N. Dec. 467, 474 (BIA 1987).

The Departments' primary stated reason for adopting new categorical bars is that the exercise of discretion has created inefficiency and inconsistency. The Departments point to examples of specific case outcomes, but presents no data or evidence to support a factual finding that any such benefits exceed the rules' potential costs, or why such concerns compel deviating from longstanding practice. Additionally, applying the proposed new categorical bars will often not be a simple mechanical exercise. As the very case law cited by the Departments in describing how the bars will be applied, applying terms such as "related to," "in support of," "in furtherance of," "criminal street gang," and others will itself raise numerous questions of law and fact that will create new judicial burdens and inconsistencies. The Departments' estimates of benefits in judicial economy fail to take account of these factors and are unreliable for that reason alone.

Moreover, the Departments make no attempt to estimate or consider numerous potential economic and noneconomic costs to this rule, including:

- Costs to individuals, families, and communities from the detention and deportation of individuals who would otherwise have meritorious asylum claims;
- Costs to individuals, families, and communities in the U.S. from the torture and killings of deported asylum-seekers;
- Economic and non-economic costs to asylum-seekers' families, including financial hardships and potential impacts on housing and food security, nutrition, physical and mental health, and family relationships;
- Costs to individuals, families, and communities from the dramatic differences in benefits for individuals who may only obtain lesser protection in the form of withholding of removal or Convention Against Torture (CAT) protection as a result of this rule, including:
  - The lack of any pathway to permanent residency or U.S. citizenship;
  - Inability to travel outside the United States;
  - Long-term separation from spouses, children, and family members;
  - Denial of eligibility for critical safety-net benefits available to asylees;
  - Additional delays and fees in applying for employment authorization (which DHS is proposing to dramatically increase);
  - Burdensome requirements for continuing ICE supervision; and,
  - The potential (although rare) to be deported to a third country.
- Costs to businesses that currently employ asylum-seekers;
- Costs to small businesses patronize by asylum-seekers who would lose earned income;
- Intangible costs to society and international relations from the diminution of respect for U.S. treaty obligations.
- Intangible costs to society from the diminution of respect for human life and the safety of asylum-seekers.

The Departments also fail to mention, let alone assess, the costs to judicial efficiency that would be caused by requiring family claims for those currently eligible for asylum to be converted into numerous separate adjudications for withholding or CAT relief.

The Departments state summarily that they cannot "quantify precisely the expected decrease" in asylum grants, but the Administrative Procedure Act and Executive Order 12866 require the Departments to use the best methods available to estimate regulatory costs and benefits, even if

those estimates cannot be precise. It is routine for agencies to provide a high and low estimate for potential regulatory impacts, but the Departments fail to even attempt that here.

The Departments similarly fail to consider the costs of the rule for asylum-seekers, families, and communities, because they lack "data at such a level of granularity" to estimate the "full extent of the impacts." Again, this is no excuse for giving no estimate at all. Comments on this and other recent asylum-related rulemakings have provided the Departments with ample data regarding the impacts of a denial of asylum. The Departments regularly adopt estimates of regulatory impacts based on such social, health, and economic data. It is the Departments', rather than the public's, responsibility to provide such estimates.

The Departments falsely suggest that any costs of the categorical bars are cured because "it is possible" that individuals would qualify for withholding of removal. There are two glaring flaws in this suggestion. First, as the Departments acknowledge in a footnote, there is a higher evidentiary bar for withholding of removal, and the Departments make no attempt whatsoever to assess how many individuals subject to the new categorical bars could meet this additional hurdle. Second, the Departments fail to acknowledge or address the obvious, numerous, and substantial differences between the protections of asylum and the sharply circumscribed parameters of withholding of removal. The same inadequacies apply to the Departments' suggestion that those barred could apply for CAT protection. Both the evidentiary standards and the economic and non-economic consequences of asylum and withholding are dramatically different, and any assessment of the rule's impact must account for those differences.

At bottom, the Departments are required to make a reasoned assessment of the rule's costs based on available data and methods that falls between the "precise quantification" they claim is impossible, and the "the general notion that it will likely result in fewer grants of asylum on the whole." Under Executive Order 12866, the Departments must take into account costs that are "difficult to quantify but nevertheless important to consider." The Departments present no data, estimates, nor any reasoning for the conclusion that "the expected costs of this proposed rule are likely to be *de minimis*."

**<u>For all these reasons, the Departments should withdraw the proposed rule.</u>**



**THE REPORT OF THE**

**2015**

**U.S.**

**TRANSGENDER**

**SURVEY**



National Center for
**TRANSGENDER**
**EQUALITY**

AR.10156

## About the National Center for Transgender Equality

The National Center for Transgender Equality (NCTE) is the nation's leading social justice policy advocacy organization devoted to ending discrimination and violence against transgender people. NCTE was founded in 2003 by transgender activists who recognized the urgent need for policy change to advance transgender equality. NCTE now has an extensive record winning life-saving changes for transgender people. NCTE works by educating the public and by influencing local, state, and federal policymakers to change policies and laws to improve the lives of transgender people. By empowering transgender people and our allies, NCTE creates a strong and clear voice for transgender equality in our nation's capital and around the country.

© 2016 The National Center for Transgender Equality. We encourage and grant permission for the reproduction and distribution of this publication in whole or in part, provided that it is done with attribution to the National Center for Transgender Equality. Further written permission is not required.

## RECOMMENDED CITATION

James, S. E., Herman, J. L., Rankin, S., Keisling, M., Mottet, L., & Anafi, M. (2016). *The Report of the 2015 U.S. Transgender Survey*. Washington, DC: National Center for Transgender Equality.

# The Report of the
# 2015 U.S. Transgender Survey

by:

Sandy E. James

Jody L. Herman

Susan Rankin

Mara Keisling

Lisa Mottet

Ma'ayan Anafi

**December 2016**

AR.10158

# Table of Contents

Acknowledgements ...................................................................................1

Executive Summary..................................................................................3

Chapter 1: Introduction ........................................................ 18

Chapter 2: Methodology........................................................ 21

Chapter 3: Guide to Report and Terminology ...................................39

Chapter 4: Portrait of USTS Respondents ......................................43

Chapter 5: Family Life and Faith Communities.................................64

Chapter 6: Identity Documents ........................................... 81

Chapter 7: Health ................................................................92

Chapter 8: Experiences at School...................................... 130

Chapter 9: Income and Employment Status....................................139

Chapter 10: Employment and the Workplace .................................. 147

Chapter 11: Sex Work and Other Underground Economy Work ..................... 157

Chapter 12: Military Service .................................................. 166

Chapter 13: Housing, Homelessness, and Shelter Access ................. 175

Chapter 14: Police, Prisons, and Immigration Detention.................................184

Chapter 15: Harassment and Violence ........................................ 197

Chapter 16: Places of Public Accommodation and Airport Security............................ 212

Chapter 17: Experiences in Restrooms ..........................................224

Chapter 18: Civic Participation and Policy Priorities ....................... 231

About the Authors.................................................................... 241

Appendix A: Characteristics of the Sample.....................................243

Appendix B: Survey Instrument (Questionnaire) ............................ 250

Appendix C: Detailed Methodology ............................................... 291

AR.10159

# Acknowledgements

The report authors extend our gratitude to all the members of the transgender community who participated in the 2015 U.S. Transgender Survey and the hundreds of individuals and organizations that made this survey report possible.

The following individuals in particular are recognized for their contributions during one or more stages of the process, including survey development, implementation, distribution, data preparation and analysis, and reporting:

Osman Ahmed

M. V. Lee Badgett

Kellan Baker

Genny Beemyn

Aaron Belkin

Walter Bockting

Kyler Broadus

David Chae

Cecilia Chung

Loree Cook Daniels

Kerith Conron

Ruby Corado

Andrew Cray

Kate D'Adamo

Laura Durso

Jake Eleazer

Gary J. Gates

Jaime Grant

Emily Greytak

Ann Haas

Jack Harrison-Quintana

Mark Hatzenbuehler

Darby Hickey

Lourdes Ashley Hunter

Chai Jindasurat

JoAnne Keatley

Elliot Kennedy

Paul Lillig

Emilia Lombardi

Jenifer McGuire

Ilan Meyer

Shannon Price Minter

Aaron Morris

Asaf Orr

Dylan Orr

Sari Reisner

Gabriel Rodenborn

Shelby Rowe

Brad Sears

Jama Shelton

Jillian Shipherd

Sharon Stapel

Michael Steinberger

Catalina Velasquez

Bianca Wilson

*The authors extend special gratitude to the following individuals for their contributions to the project:*

**Ignacio Rivera**, Survey Outreach Coordinator, for leading the survey outreach efforts and building a network of individuals and organizations that led to the unprecedented levels of participation in this survey.

**Andrew Flores** for assistance with questionnaire development and the weighting procedures to prepare the data for analysis.

**Daniel Merson** for continued work in cleaning the data set, re-coding the data, and providing population numbers for comparative purposes in the final report.

**Michael Rauch** for programming and implementation of the complex survey.

*Appreciation is also extended to **NCTE interns, law fellows, staff, and volunteers** who assisted with the project, including outreach across the country, development of outreach materials, and translation:*

Bre Kidman

Cyres Gibson

Mati Gonzalez Gil

Romeo Jackson

Kory Masen

Imari Moon

Cullen O'Keefe

Nowmee Shehab

*A special thanks is also extended to **USTS Interns, Fellows, and Assistants** for their work at various stages of the project:*

| | | | |
|---|---|---|---|
| Rodrigo Aguayo-Romero | Shabab Mirza | Jeymee Semiti | Venus Selenite |
| Willem Miller | Davida Schiffer | Danielle Stevens | |

*The authors also thank the **USTS Advisory Committee** (UAC) members, who devoted their time to the project by giving valuable recommendations around project development and community outreach:*

| | | | |
|---|---|---|---|
| Danni Askini | Brooke Cerda Guzman | Angelica Ross | Brynn Tannehill |
| Cherno Biko | Trudie Jackson | Nowmee Shehab | |
| Thomas Coughlin | Andrea Jenkins | Stephanie Skora | |

Additional acknowledgement goes to the **more than 300 transgender, LGBT, and allied organizations** that promoted and distributed the survey to its members throughout the country for completion.

*The authors also acknowledge current and former NCTE staff for their work on the project, particularly:*

**Theo George** and **Vincent Villano** for their pivotal work in survey project development and distribution through their respective roles in digital media and communication strategy.

**Arli Christian, Joanna Cifredo, K'ai Smith**, and **Harper Jean Tobin** for their contributions as report co-writers, including lending their subject-matter expertise and analysis to the findings included in this report.

*Various individuals and firms assisted in spreading the word about the survey, both prior to and during the data collection phase, and they also assisted with survey translation, design, and reporting. Thanks goes to:*

| | | |
|---|---|---|
| Sean Carlson | Anna Zuccaro | ThoughtWorks |
| Leah Furumo | Design Action Collective | TransTech Social Enterprises |
| Molly Haigh | Dewey Square Group | ZERN |

Additionally, NCTE would like to express special appreciation to **an anonymous donor** for providing the largest share of the funds needed to conduct and report on the U.S. Transgender Survey. Other important funders were the **Arcus Foundation**, the **Gill Foundation**, the **Human Rights Campaign Foundation**, and the **David Bohnett Foundation**. NCTE is also grateful to its other funders, many of which supported this project through general operating support, including the **Ford Foundation**, the **Evelyn & Walter Haas, Jr. Fund**, and the **Tides Foundation**.

Finally, NCTE would like to give special thanks to the **National LGBTQ Task Force**, for its previous partnership in conducting the National Transgender Discrimination Survey as a joint project from 2008 to 2011, as well as for its support of NCTE's re-development of it as the U.S. Transgender Survey.



# EXECUTIVE
# SUMMARY

EXECUTIVE SUMMARY

AR.10162

# USTS Executive Summary

The 2015 U.S. Transgender Survey (USTS) is the largest survey examining the experiences of transgender people in the United States, with 27,715 respondents from all fifty states, the District of Columbia, American Samoa, Guam, Puerto Rico, and U.S. military bases overseas. Conducted in the summer of 2015 by the National Center for Transgender Equality, the USTS was an anonymous, online survey for transgender adults (18 and older) in the United States, available in English and Spanish. The USTS serves as a follow-up to the groundbreaking 2008–09 National Transgender Discrimination Survey (NTDS), which helped to shift how the public and policymakers view the lives of transgender people and the challenges they face. The report of the 2015 USTS provides a detailed look at the experiences of transgender people across a wide range of categories, such as education, employment, family life, health, housing, and interactions with the criminal justice system.

The findings reveal disturbing patterns of mistreatment and discrimination and startling disparities between transgender people in the survey and the U.S. population when it comes to the most basic elements of life, such as finding a job, having a place to live, accessing medical care, and enjoying the support of family and community. Survey respondents also experienced harassment and violence at alarmingly high rates. Several themes emerge from the thousands of data points presented in the full survey report.

## Pervasive Mistreatment and Violence

Respondents reported high levels of mistreatment, harassment, and violence in every aspect of life. One in ten (10%) of those who were out to their immediate family reported that a family member was violent towards them because they were transgender, and 8% were kicked out of the house because they were transgender.

The majority of respondents who were out or perceived as transgender while in school (K–12) experienced some form of mistreatment, including being verbally harassed (54%), physically attacked (24%), and sexually assaulted (13%) because they were transgender. Further, 17% experienced such severe mistreatment that they left a school as a result.

In the year prior to completing the survey, 30% of respondents who had a job reported being fired, denied a promotion, or experiencing some other form of mistreatment in the workplace due to their gender identity or expression, such as being verbally harassed or physically or sexually assaulted at work.

AR.10163

In the year prior to completing the survey, 46% of respondents were verbally harassed and 9% were physically attacked because of being transgender. During that same time period, 10% of respondents were sexually assaulted, and nearly half (47%) were sexually assaulted at some point in their lifetime.

# Severe Economic Hardship and Instability

The findings show large economic disparities between transgender people in the survey and the U.S. population. Nearly one-third (29%) of respondents were living in poverty, compared to 12% in the U.S. population. A major contributor to the high rate of poverty is likely respondents' 15% unemployment rate—three times higher than the unemployment rate in the U.S. population at the time of the survey (5%).

Respondents were also far less likely to own a home, with only 16% of respondents reporting homeownership, compared to 63% of the U.S. population. Even more concerning, nearly one-third (30%) of respondents have experienced homelessness at some point in their lifetime, and 12% reported experiencing homelessness in the year prior to completing the survey because they were transgender.

# Harmful Effects on Physical and Mental Health

The findings paint a troubling picture of the impact of stigma and discrimination on the health of many transgender people. A staggering 39% of respondents experienced serious psychological distress in the month prior to completing the survey, compared with only 5% of the U.S. population. Among the starkest findings is that 40% of respondents have attempted suicide in their lifetime—nearly nine times the attempted suicide rate in the U.S. population (4.6%).

Respondents also encountered high levels of mistreatment when seeking health care. In the year prior to completing the survey, one-third (33%) of those who saw a health care provider had at least one negative experience related to being transgender, such as being verbally harassed or refused treatment because of their gender identity. Additionally, nearly one-quarter (23%) of respondents reported that they did not seek the health care they needed in the year prior to completing the survey due to fear of being mistreated as a transgender person, and 33% did not go to a health care provider when needed because they could not afford it.

# The Compounding Impact of Other Forms of Discrimination

When respondents' experiences are examined by race and ethnicity, a clear and disturbing pattern is revealed: transgender people of color experience deeper and broader patterns of discrimination than white respondents and the U.S. population. While respondents in the USTS sample overall were more than twice as likely as the U.S. population to be living in poverty, people of color, including Latino/a (43%), American Indian (41%), multiracial (40%), and Black (38%) respondents, were more than three times as likely as the U.S. population (12%) to be living in poverty. The unemployment rate among transgender people of color (20%) was four times higher than the U.S. unemployment rate (5%). People of color also experienced greater health disparities. While 1.4% of all respondents were living with HIV—nearly five times the rate in the U.S. population (0.3%)—the rate among Black respondents (6.7%) was substantially higher, and the rate for Black transgender women was a staggering 19%.

Undocumented respondents were also more likely to face severe economic hardship and violence than other respondents. In the year prior to completing the survey, nearly one-quarter (24%) of undocumented respondents were physically attacked. Additionally, one-half (50%) of undocumented respondents have experienced homelessness in their lifetime, and 68% have faced intimate partner violence.

Respondents with disabilities also faced higher rates of economic instability and mistreatment. Nearly one-quarter (24%) were unemployed, and 45% were living in poverty. Transgender people with disabilities were more likely to be currently experiencing serious psychological distress (59%) and more likely to have attempted suicide in their lifetime (54%). They also reported higher rates of mistreatment by health care providers (42%).

# Increased Visibility and Growing Acceptance

Despite the undeniable hardships faced by transgender people, respondents' experiences also show some of the positive impacts of growing visibility and acceptance of transgender people in the United States.

One such indication is that an unprecedented number of transgender people—nearly 28,000—completed the survey, more than four times the number of respondents in the 2008–09 NTDS. This number of transgender people who elevated their voices reflects the historic growth in visibility that the transgender community has seen in recent years. Additionally, this growing visibility has lifted up not only the voices of transgender men and women, but also people who are non-binary, which is a term that is often used to describe

people whose gender identity is not exclusively male or female, including those who identify as having no gender, a gender other than male or female, or more than one gender. With non-binary people making up over one-third of the sample, the need for advocacy that is inclusive of all identities in the transgender community is clearer than ever.

Respondents' experiences also suggest growing acceptance by family members, colleagues, classmates, and other people in their lives. More than half (60%) of respondents who were out to their immediate family reported that their family was supportive of them as a transgender person. More than two-thirds (68%) of those who were out to their coworkers reported that their coworkers were supportive. Of students who were out to their classmates, more than half (56%) reported that their classmates supported them as a transgender person.

O verall, the report provides evidence of hardships and barriers faced by transgender people on a day-to-day basis. It portrays the challenges that transgender people must overcome and the complex systems that they are often forced to navigate in multiple areas of their lives in order to survive and thrive. Given this evidence, governmental and private institutions throughout the United States should address these disparities and ensure that transgender people are able to live fulfilling lives in an inclusive society. This includes eliminating barriers to quality, affordable health care, putting an end to discrimination in schools, the workplace, and other areas of public life, and creating systems of support at the municipal, state, and federal levels that meet the needs of transgender people and reduce the hardships they face. As the national conversation about transgender people continues to evolve, public education efforts to improve understanding and acceptance of transgender people are crucial. The rates of suicide attempts, poverty, unemployment, and violence must serve as an immediate call to action, and their reduction must be a priority. Despite policy improvements over the last several years, it is clear that there is still much work ahead to ensure that transgender people can live without fear of discrimination and violence.

EXECUTIVE SUMMARY

# Overview of Key Findings

## Family Life and Faith Communities

- **A majority of respondents (60%) who were out to the immediate family they grew up with said that their family was generally supportive of their transgender identity**, while 18% said that their family was unsupportive, and 22% said that their family was neither supportive nor unsupportive.

- **Those who said that their immediate families were supportive were less likely to report a variety of negative experiences related to economic stability and health**, such as experiencing homelessness, attempting suicide, or experiencing serious psychological distress**.**



Negative experiences among those with supportive and unsupportive families

| | |
|---|---|
| Experienced homelessness | 27% / 45% |
| Attempted suicide | 37% / 54% |
| Currently experiencing serious psychological distress | 31% / 50% |

■ % of respondents whose families were supportive
■ % of respondents whose families were unsupportive

- **One in ten (10%)** respondents who were out to their immediate family reported that **a family member was violent towards them** because they were transgender.

- **One in twelve (8%)** respondents who were out to their immediate family **were kicked out of the house**, and one in ten (10%) ran away from home.

- **Nineteen percent (19%) of respondents who had ever been part of a spiritual or religious community left due to rejection**. Forty-two percent (42%) of those who left later found a welcoming spiritual or religious community.

AR.10167

# Identity Documents

- **Only 11% of respondents reported that *all* of their IDs had the name and gender they preferred, while more than two-thirds (68%) reported that *none* of their IDs had the name and gender they preferred.**



**Updated name or gender on ID**
OUT OF THOSE WHO HAD ID AND WANTED TO UPDATE IT (%)

| | Updated name | Updated gender |
|---|---|---|
| Driver's license/state-issued ID | 44% | 29% |
| Social Security records | 43% | 23% |
| Student records (current or last school attended) | 31% | 18% |
| Passport | 28% | 18% |
| Birth certificate | 18% | 9% |

- **The cost of changing ID documents was one of the main barriers respondents faced**, with 35% of those who have not changed their legal name and 32% of those who have not updated the gender on their IDs reporting that it was because they could not afford it.

- Nearly **one-third (32%)** of respondents **who have shown an ID with a name or gender that did not match their gender presentation were verbally harassed, denied benefits or service, asked to leave, or assaulted.**

# Health Insurance and Health Care

- **One in four (25%) respondents experienced a problem in the past year with their insurance related to being transgender**, such as being denied coverage for care related to gender transition or being denied coverage for routine care because they were transgender.

- **More than half (55%) of those who sought coverage for transition-related surgery in the past year were denied**, and 25% of those who sought coverage for hormones in the past year were denied.

- **One-third (33%) of those who saw a health care provider in the past year reported having at least one negative experience related to being transgender**, with higher rates for people of color and people with disabilities. This included being refused treatment, verbally harassed, or physically or sexually assaulted, or having to teach the provider about transgender people in order to get appropriate care.

- In the past year, **23% of respondents did not see a doctor when they needed to because of fear of being mistreated as a transgender person**, and 33% did not see a doctor when needed because they could not afford it.

# Psychological Distress and Attempted Suicide

- **Thirty-nine percent (39%) of respondents experienced serious psychological distress** in the month before completing the survey (based on the Kessler 6 Psychological Distress Scale), compared with only 5% of the U.S. population.

- **Forty percent (40%) have attempted suicide *in their lifetime***, nearly nine times the rate in the U.S. population (4.6%).

- **Seven percent (7%) attempted suicide *in the past year*—nearly twelve times the rate in the U.S. population (0.6%).**

# HIV

- Respondents were **living with HIV (1.4%) at nearly five times the rate in the U.S. population (0.3%).**

- **HIV rates were higher among transgender women (3.4%)**, especially transgender women of color. **Nearly one in five (19%) Black transgender women were living with HIV**, and American Indian (4.6%) and Latina (4.4%) women also reported higher rates.

AR.10169

# Experiences in Schools

- **More than three-quarters (77%)** of those who were out or perceived as transgender at some point between Kindergarten and Grade 12 (K–12) **experienced some form of mistreatment**, such as being verbally harassed, prohibited from dressing according to their gender identity, disciplined more harshly, or physically or sexually assaulted because people thought they were transgender.

- **Fifty-four percent (54%)** of those who were out or perceived as transgender in K–12 **were verbally harassed, nearly one-quarter (24%) were physically attacked, and 13% were sexually assaulted in K–12 because of being transgender.**

- **Seventeen percent (17%) faced such severe mistreatment as a transgender person that they left a K–12 school.**

- **Nearly one-quarter (24%)** of people who were out or perceived as transgender in college or vocational school **were verbally, physically, or sexually harassed.**

| Experiences of people who were out as transgender in K–12 or believed classmates, teachers, or school staff thought they were transgender | |
|---|---|
| **EXPERIENCES** | **% OF THOSE WHO WERE OUT OR PERCEIVED AS TRANSGENDER** |
| Verbally harassed because people thought they were transgender | 54% |
| Not allowed to dress in a way that fit their gender identity or expression | 52% |
| Disciplined for fighting back against bullies | 36% |
| Physically attacked because people thought they were transgender | 24% |
| Believe they were disciplined more harshly because teachers or staff thought they were transgender | 20% |
| Left a school because the mistreatment was so bad | 17% |
| Sexually assaulted because people thought they were transgender | 13% |
| Expelled from school | 6% |
| **One or more experiences listed** | **77%** |

# Income and Employment Status

- **The unemployment rate among respondents (15%) was three times higher than the unemployment rate in the U.S. population (5%),** with Middle Eastern, American Indian, multiracial, Latino/a, and Black respondents experiencing higher rates of unemployment.



**Unemployment rate**
**RACE/ETHNICITY (%)**

| | |
|---|---|
| Overall | 15% / 5% |
| American Indian | 23% / 12% |
| Asian | 10% / 4% |
| Black | 20% / 10% |
| Latino/a | 21% / 7% |
| Middle Eastern* | 35% |
| Multiracial | 22% / 9% |
| White | 12% / 4% |

■ % in USTS (supplemental survey weight applied)   ■ □ % in U.S. population (CPS)

*U.S. population data for Middle Eastern people alone is unavailable in the CPS.*

- **Nearly one-third (29%) were living in poverty, more than twice the rate in the U.S. population (12%).**

# Employment and the Workplace

- **One in six (16%)** respondents who have ever been employed—or 13% of all respondents in the sample—**reported losing a job because of their gender identity or expression** in their lifetime.

- **In the past year, 27%** of those who held or applied for a job during that year—19% of all respondents—**reported being fired, denied a promotion, or not being hired for a job they applied for because of their gender identity or expression.**

- **Fifteen percent (15%) of respondents who had a job in the past year were verbally harassed, physically attacked, and/or sexually assaulted** at work because of their gender identity or expression.

- **Nearly one-quarter (23%) of those who had a job in the past year reported other forms of mistreatment** based on their gender identity or expression during that year,

AR.10171

such as being forced to use a restroom that did not match their gender identity, being told to present in the wrong gender in order to keep their job, or having a boss or coworker share private information about their transgender status without their permission.

- **Overall, 30% of respondents who had a job in the past year reported being fired, denied a promotion, or experiencing some other form of mistreatment related to their gender identity or expression.**

- **More than three-quarters (77%)** of respondents who had a job in the past year **took steps to avoid mistreatment in the workplace**, such as hiding or delaying their gender transition or quitting their job.

# Housing, Homelessness, and Shelter Access

- **Nearly one-quarter (23%) of respondents experienced some form of housing discrimination in the past year**, such as being evicted from their home or denied a home or apartment because of being transgender.

- **Nearly one-third (30%) of respondents have experienced homelessness at some point in their lives.**

- **In the past year, one in eight (12%) respondents experienced homelessness** because of being transgender.

- **More than one-quarter (26%) of those who experienced homelessness in the past year avoided staying in a shelter because they feared being mistreated as a transgender person**. Those who did stay in a shelter reported high levels of mistreatment: **seven out of ten (70%)** respondents who stayed in a shelter in the past year reported some form of mistreatment, including being harassed, sexually or physically assaulted, or kicked out because of being transgender.

**Seven out of ten respondents who stayed in a shelter in the past year reported being mistreated because of being transgender.**



- Respondents were nearly **four times less likely to own a home (16%) compared to the U.S. population (63%)**.

# Sex Work and Other Underground Economy Work

- Respondents reported high rates of experience in the underground economy, including sex work, drug sales, and other work that is currently criminalized. **One in five (20%) have participated in the underground economy** for income at some point in their lives—including 12% who have done sex work in exchange for income—and 9% did so in the past year, with higher rates among women of color.

- Respondents who interacted with the police either while doing sex work or while the police mistakenly thought they were doing sex work reported high rates of police harassment, abuse, or mistreatment, with **nearly nine out of ten (86%) reporting being harassed, attacked, sexually assaulted, or mistreated in some other way by police**.

- **Those who have done income-based sex work were also more likely to have experienced violence.** More than three-quarters (77%) have experienced intimate partner violence and 72% have been sexually assaulted, a substantially higher rate than the overall sample. Out of those who were working in the underground economy at the time they took the survey, nearly half (41%) were physically attacked in the past year and over one-third (36%) were sexually assaulted during that year.

# Police Interactions and Prisons

- **Respondents experienced high levels of mistreatment and harassment by police.** In the past year, of respondents who interacted with police or law enforcement officers who thought or knew they were transgender, **more than half (58%) experienced some form of mistreatment.** This included being verbally harassed, repeatedly referred to as the wrong gender, physically assaulted, or sexually assaulted, including being forced by officers to engage in sexual activity to avoid arrest.

- **Police frequently assumed that respondents—particularly transgender women of color— were sex workers.** In the past year, of those who interacted with law enforcement officers who thought or knew they were transgender, one-third (33%) of Black transgender women and 30% of multiracial women said that an officer assumed they were sex workers.

- **More than half (57%)** of respondents said they would feel **uncomfortable asking the police for help** if they needed it**.**

- Of those who were arrested in the past year (2%), **nearly one-quarter (22%) believed they were arrested because they were transgender**.

AR.10173

**Transgender women reporting that police assumed they were sex workers in the past year (out of those who interacted with officers who thought they were transgender)**
RACE/ETHNICITY (%)

| | |
|---|---|
| Overall* | 11% |
| American Indian women | 23% |
| Asian women | 20% |
| Black women | 33% |
| Latina women | 25% |
| Middle Eastern women** | |
| Multiracial women | 30% |
| White women | 11% |

*Represents respondents of all genders who interacted with officers who thought they were transgender
**Sample size too low to report

- Respondents who were held in jail, prison, or juvenile detention in the past year faced **high rates of physical and sexual assault by facility staff and other inmates**. In the past year, nearly one-quarter (23%) were physically assaulted by staff or other inmates, and one in five (20%) were sexually assaulted. Respondents were over **five times more likely to be sexually assaulted by facility staff** than the U.S. population in jails and prisons, and over **nine times more likely to be sexually assaulted by other inmates**.

# Harassment and Violence

- **Nearly half (46%) of respondents were verbally harassed** in the past year because of being transgender.

- **Nearly one in ten (9%) respondents were physically attacked** in the past year because of being transgender.

- **Nearly half (47%) of respondents were sexually assaulted** at some point in their lifetime and **one in ten (10%) were sexually assaulted in the past year.** Respondents who have done sex work (72%), those who have experienced homelessness (65%), and people with disabilities (61%) were more likely to have been sexually assaulted in their lifetime.

- **More than half (54%) experienced some form of intimate partner violence**, including acts involving coercive control and physical harm.

- **Nearly one-quarter (24%) have experienced severe physical violence by an intimate partner, compared to 18% in the U.S. population.**

# Places of Public Accommodation

- Respondents reported being denied equal treatment or service, verbally harassed, or physically attacked at many places of public accommodation—places that provide services to the public, like retail stores, hotels, and government offices. Out of respondents who visited a place of public accommodation where staff or employees thought or knew they were transgender, **nearly one-third (31%) experienced at least one type of mistreatment in the past year in a place of public accommodation**. This included 14% who were denied equal treatment or service, 24% who were verbally harassed, and 2% who were physically attacked because of being transgender.

- **One in five (20%) respondents did not use at least one type of public accommodation** in the past year because they feared they would be mistreated as a transgender person.

| Denied equal treatment or service, verbally harassed, or physically attacked in public accommodations in the past year because of being transgender | |
|---|---|
| LOCATION VISITED | % OF THOSE WHO SAID STAFF KNEW OR THOUGHT THEY WERE TRANSGENDER |
| Public transportation | 34% |
| Retail store, restaurant, hotel, or theater | 31% |
| Drug or alcohol treatment program | 22% |
| Domestic violence shelter or program or rape crisis center | 22% |
| Gym or health club | 18% |
| Public assistance or government benefit office | 17% |
| Department of Motor Vehicles (DMV) | 14% |
| Nursing home or extended care facility | 14% |
| Court or courthouse | 13% |
| Social Security office | 11% |
| Legal services from an attorney, clinic, or legal professional | 6% |

# Experiences in Restrooms

The survey data was collected before transgender people's restroom use became the subject of increasingly intense and often harmful public scrutiny in the national media and legislatures around the country in 2016. Yet respondents reported facing frequent harassment and barriers when using restrooms at school, work, or in public places.

- **Nearly one in ten (9%) respondents reported that someone denied them access to a restroom in the past year.**

- In the past year, **respondents reported being verbally harassed (12%), physically attacked (1%), or sexually assaulted (1%)** when accessing a restroom.

AR.10175

- **More than half (59%)** of respondents **avoided using a public restroom** in the past year because they were afraid of confrontations or other problems they might experience.

- **Nearly one-third (32%)** of respondents **limited the amount that they ate and drank** to avoid using the restroom in the past year.

- **Eight percent (8%)** reported having a **urinary tract infection, kidney infection, or another kidney-related problem** in the past year as a result of avoiding restrooms.

**More than half (59%)** of respondents **avoided using a public restroom** in the past year because they were afraid of confrontations or other problems they might experience.

# Civic Participation and Party Affiliation

- **More than three-quarters (76%) of U.S. citizens of voting age in the sample reported that they were registered to vote in the November 2014 midterm election**, compared to 65% in the U.S. population.

- **More than half (54%)** of U.S. citizens of voting age **reported that they had voted in the midterm election,** compared to 42% in the U.S. population.

- **Half (50%) of respondents identified as Democrats, 48% identified as Independents, and 2% identified as Republicans**, compared to 27%, 43%, and 27% in the U.S. population, respectively.

| Political party affiliation | | |
| --- | --- | --- |
| POLITICAL PARTY | % IN USTS | % IN U.S. POPULATION (GALLUP) |
| Democrat | 50% | 27% |
| Independent | 48% | 43% |
| Republican | 2% | 27% |



# CHAPTER 1
# Introduction

**T**his report presents the findings of the 2015 U.S. Transgender Survey (USTS), a study conducted by the National Center for Transgender Equality (NCTE). With 27,715 respondents, it is the largest-ever survey examining the lives of transgender people in the United States. The USTS provides a detailed portrait of the experiences of transgender people across many areas, including health, family life, employment, and interactions with the criminal justice system.

The USTS serves as a follow-up to the National Transgender Discrimination Survey (NTDS), which was developed by NCTE and the National LGBTQ Task Force and conducted in 2008–09. The NTDS was the first comprehensive survey examining the lives and experiences of transgender and gender nonconforming people in the United States. With 6,456 respondents reporting on a range of experiences throughout their lives, the NTDS was a groundbreaking study. The results were published in the 2011 report, *Injustice at Every Turn*, and showed that discrimination against transgender people was pervasive in many areas of life, including education, employment, health care, and housing. The report also highlighted the resilience of transgender people in the face of such discrimination and found that family and peer support could have a substantially positive impact on a transgender person's quality of life. The report quickly became a vital source of information about transgender people and continues to serve as an important resource for advocates, policymakers, educators, service providers, media, and the general public.

AR.10177

Much has changed since the NTDS was conducted in 2008–09 and results were published in 2011, including increased visibility of transgender people in the media and in society in general. Despite making significant strides in the five years since the report was published, there is still a substantial amount of work to be done to address critical needs in transgender communities throughout the United States. Transgender people continue to experience discrimination and anti-transgender bias in virtually all areas of life.

The 2015 U.S. Transgender Survey was developed by the National Center for Transgender Equality to provide updated and more detailed data to inform a wide range of audiences about the experiences of transgender people, how things are changing, and what can be done to improve the lives of transgender individuals in the United States. It is the largest survey of transgender people conducted to date, far surpassing the previous survey, with 27,715 respondents. This study explores a wider range of topics than the previous survey and more deeply examines specific issue areas where transgender people are disparately impacted, such as health care, HIV/AIDS, housing, workplace discrimination, immigration, sex work, and police interactions. Additionally, by closely mirroring questions from federal and other existing surveys, this study seeks to fill in the gaps left by the lack of data collected about transgender people in national surveys. Since federal survey data is often used by government agencies to make key determinations about policies and programs that affect individuals in many areas of life, such as employment and health, it is important to provide specific data on the potential impact of such policies on transgender people. This report on the U.S. Transgender Survey data draws comparisons between transgender people and the U.S. population and examines disparities across multiple issue areas.

This report demonstrates that transgender people continue to face discrimination in numerous areas that significantly impact quality of life, financial stability, and emotional wellbeing, including employment, education, housing, and health care. Furthermore, many respondents experienced discrimination in multiple areas of their lives, the cumulative effect of which leads to severe economic and emotional hardship and can in turn have devastating effects on other outcome areas, such as health and safety.

Although issues impacting transgender people have become more visible in the years since the NTDS was published, the data overwhelmingly demonstrates that there is still a long way to go towards eliminating harmful discrimination and providing sustainable systems of support for transgender people throughout their lives. These findings are presented with the recognition that advocates, researchers, and transgender communities will greatly benefit from additional research conducted using this extensive data source. The authors encourage subsequent analyses to delve into areas of the data that this report is unable to address, and as before, will strive to make the dataset available for such analyses.

INTRODUCTION

# Report Roadmap

The next chapter of the report will give an overview of the study's methodology, which will be followed by a guide to this report, including information about terminology used throughout. These will be followed by chapters discussing respondents' experiences across a range of areas that impact transgender people's lives:

- Portrait of USTS Respondents

- Family Life and Faith Communities

- Identity Documents

- Health

- Experiences at School

- Income and Employment Status

- Employment and the Workplace

- Sex Work and Other Underground Economy Work

- Military Service

- Housing, Homelessness, and Shelter Access

- Police, Prisons, and Immigration Detention

- Harassment and Violence

- Places of Public Accommodation and Airport Security

- Experiences in Restrooms

- Civic Participation and Policy Priorities

The report also contains three appendices, which offer more detailed information related to the study:

Appendix A: Characteristics of the Sample

Appendix B: Survey Instrument (Questionnaire)

Appendix C: Detailed Methodology

AR.10179



# CHAPTER 2
# Methodology

The U.S. Transgender Survey is the largest survey ever conducted to examine the experiences of transgender people in the United States. The survey instrument was comprised of thirty-two sections reflecting 1,140 distinct variables that covered a broad array of topics, such as health and health care access, and experiences around employment, education, housing, law enforcement, and public accommodation.[1] The survey was developed by a team of researchers and advocates and administered online to transgender adults residing in the United States.[2] The survey was accessible via any web-enabled device (e.g., computer, tablet, netbook, smart phone), accessible for respondents with disabilities (e.g., through screen readers), and made available in English and Spanish. Rankin & Associates Consulting hosted the survey on several secure servers. The survey was accessed exclusively through a website created specifically for the promotion and distribution of the survey.[3] Data was collected over a 34-day period in the summer of 2015,[4] and the final sample included 27,715 respondents from all fifty states, the District of Columbia, American Samoa, Guam, Puerto Rico, and U.S. military bases overseas. The survey contained mainly closed-ended questions, but respondents were also offered the opportunity to provide write-in responses in fifty-three of the survey questions. Over 80,000 write-in responses were provided by respondents.

METHODOLOGY

AR.10180

# I. About the U.S. Transgender Survey

The U.S. Transgender Survey (USTS) was developed as the follow-up to the groundbreaking National Transgender Discrimination Survey (NTDS), which was the first study to comprehensively measure experiences and life outcomes of transgender people in the United States. Fielded in late 2008 to early 2009 by the National Center for Transgender Equality (NCTE) and the National LGBTQ Task Force ("the Task Force"), the NTDS provided data that has informed policymakers, advocates, and educators since its publication in 2011. However, the NTDS report acknowledged that the study had "just scratched the surface of this extensive data source" and encouraged advocates and researchers to conduct additional research to continue collecting data aimed at identifying and addressing the needs of transgender people.[5] The NTDS authors also examined the survey instrument and concluded that there were "imperfections" in the manner in which several questions had been posed.[6] The authors addressed areas for potential improvement with respect to both survey question design and substantive content in an "issues and analysis" section of the report.[7] These recommendations were considered in the development of the U.S. Transgender Survey.

In subsequent years, researchers have performed additional analyses using the NTDS public use dataset provided by NCTE and the Task Force. These analyses provided further insight into the experiences of transgender people, but also increased awareness of the questions that remained unanswered after the NTDS report was published. In some instances, there was insufficient information to draw nuanced comparisons between life outcomes of transgender people collected in the NTDS and the U.S. general population. In other cases,

the ability to form additional conclusions was limited due to a lack of follow-up questions. For example, the NTDS asked a single question about suicide attempts, which did not allow for a clear examination of suicidal thoughts and behaviors.[8] Additionally, given the deficiency of longitudinal data on outcomes specific to transgender people, there remained a need to collect data that could speak to the experiences of transgender people over time and how outcomes may have changed in the years since the NTDS was published. In these respects, the NTDS provided an important platform upon which to build the USTS to address identified areas for improvement and collect data that would enable new insights to be drawn about transgender people in the United States.

The study was renamed the U.S. Transgender Survey for several reasons. One was to clarify the geographical location of the intended study sample both during the data collection period and following report publication. The use of "U.S." signaled that this study was developed with the unique needs of transgender people in the United States and U.S. territories in mind, considering relevant policies, procedures, and practices applicable to residents of the United States at the time of the study in areas such as health care and insurance, income, employment, housing, and education. Recognizing the contextual differences between the experiences of transgender people in the U.S. and in other parts of the world, the research team sought to dispel any confusion arising from the use of "national" in the title. The new name was also intended to reflect the depth and breadth of the experiences of transgender people in the U.S. and elevate a variety of narratives beyond discrimination, including the resilience and resourcefulness of the transgender community in the face of hardship, as well as experiences of acceptance and affirmation. "Discrimination" was removed from the title to clarify that the survey was designed to capture all such experiences. Additionally, removing the word

reduced potential bias in respondents' answers or resulting from primarily attracting respondents who felt they had experienced discrimination.

# II. USTS Respondents

The study population included individuals who identified as transgender, trans, genderqueer, non-binary, and other identities on the transgender identity spectrum, in order to encompass a wide range of transgender identities, regardless of terminology used by the respondent. Although "transgender" was defined broadly for the purposes of this study as being inclusive of a wide range of identities—such as genderqueer, non-binary, and crossdresser—the research team recognized that many individuals for whom the study was intended may have used different terminology or definitions and might have assumed that the term "transgender" did not include them. To address this, promotional materials affirmed that the survey was inclusive of all transgender, trans, genderqueer, and non-binary people. Additionally, materials specified that the survey was for adults at any stage of their lives, journey, or transition to encourage participation among individuals with diverse experiences regarding their transgender identity. An in-depth description of survey respondents is available in the *Portrait of USTS Respondents* chapter.

The study included individuals aged 18 and older at the time of survey completion, as did the NTDS. The study was not offered to individuals under the age of 18 due to limitations created by specific risk factors and recommendations associated with research involving minors. These considerations, including requirements for parental/guardian consent, would have impacted the survey's scope and content and also reduced the literacy level at which the survey could be offered.[9] Furthermore, the current experiences and needs of transgender youth often differ from those of adults in a number of key areas, including experiences related to education, employment, accessing health care, and updating identity documents, and many of these experiences or needs could not be adequately captured in a survey that was not specifically tailored to transgender people under the age of 18.

The sample was limited to individuals currently residing in a U.S. state or territory, or on a U.S. military base overseas, since the study focused on the experiences of people who were subject to U.S. laws and policies at the time they completed the survey. Individuals residing outside of the U.S. may have vastly different experiences across a number of outcome measures based on each respective country's laws, policies, and culture, particularly in the areas of education, employment, housing, and health care. Additionally, many survey questions were taken from U.S. federal government surveys that also limit their sample population to individuals in the U.S., and the research team sought to examine a similar population with regard to geographical location to allow for comparisons to the U.S. general population.

# III. Developing the Survey Instrument

The USTS survey instrument was developed over the course of a year by a core team of researchers and advocates in collaboration with dozens of individuals with lived experience, advocacy and research experience, and subject-matter expertise. When developing the survey instrument, the research team focused on creating a questionnaire that could provide data to address both current and emerging needs of transgender people while gathering information about disparities

that often exist between transgender people and non-transgender people throughout the U.S. To achieve this, questions were included that would allow comparisons between the USTS sample and known benchmarks for the U.S. population as a whole or populations within the U.S. Consequently, questions were selected to best match those previously asked in federal government or other national surveys on a number of measures, such as measures related to income and health.[10] Changes were made to the language of comparable questions whenever it was required to more appropriately reflect issues pertaining to transgender people and language in common use in the transgender community while maintaining comparability to the best extent possible. However, in many cases, language was preserved to ensure that responses to a USTS question would maintain maximum comparability with surveys such as the U.S. Census Bureau's American Community Survey and Current Population Survey.

Several questions were also included in an attempt to provide comparability between the NTDS, where possible, to determine how certain outcomes may have changed since the NTDS data was collected in 2008–09. While the USTS provides crucial updated data, it is important to note that many of the questions asked in the NTDS were either not included in the USTS, or they were asked in a manner that reduced comparability with the NTDS. For example, many USTS questions asked about whether certain experiences occurred within the past year instead of asking whether those experiences occurred at any point during an individual's lifetime. These questions were included for both comparability with federal government or other national surveys and also to yield improved data regarding changing experiences in future iterations of the USTS. In such instances, the NTDS continues to provide the best available data regarding experiences that occurred over respondents' lifetime. The authors suggest referring to both the USTS and

the NTDS to gain a full picture of issues impacting transgender people.

The survey instrument was reviewed by researchers, members of the transgender community, and transgender advocates at multiple intervals throughout the development process. This included thorough reviews of sections that addressed specific subject matter and the entire questionnaire. The questionnaire was revised based on feedback from dozens of reviewers.

## a. Pilot Study

Prior to finalizing the survey instrument and launching the survey in field, a pilot study was conducted to evaluate the questionnaire. The pilot study was conducted among a small group of individuals with characteristics that were representative of the sample the study was intended to survey. The pilot study was administered through an online test site using the same platform and format in which the final survey later appeared. The purpose of the pilot study was to provide both a substantive and technical evaluation of the survey. Approximately 100 individuals were invited to complete and evaluate the survey online during a specified period of time. In order to receive access to the pilot study test site, invitees were required to confirm their participation by indicating that they met the following pilot study criteria: they were (1) 18 years or older, (2) transgender, (3) willing to provide feedback that would be used to make improvements to the survey, (4) available to take the survey online during specified dates, and (5) agreeing to not share the questions in the pilot study with anyone so as to not compromise the study. Forty (40) individuals confirmed their participation and received access to the pilot study test site. Thirty-two (32) people completed the study and submitted feedback on the questionnaire, including participants in fifteen states ranging in age from 19 to 78. Participants

reported identifying with a range of gender identities[11] and racial and ethnic identities, including 34% who identified as people of color.[12]

In addition to providing general feedback on individual questions and the entire questionnaire, pilot study participants were asked to address specific questions as part of their evaluation, including: (1) how long it took to complete the survey, (2) what they thought about the length of the survey, (3) whether any existing questions were confusing or difficult to answer, (4) whether they found any questions offensive or thought they should be removed or fixed, (5) whether they experienced technical or computer issues while taking the survey, and (6) what they thought about the statement explaining why the term "trans" was used throughout the survey.[13] All participant feedback was compiled, discussed, and used to further develop the questionnaire, such as through the revision of language and the addition of questions to more thoroughly examine an issue.

## b. Length

The final survey questionnaire contained a total of 324 possible questions in thirty-two discrete sections addressing a variety of subjects, such as experiences related to health and health care access, employment, education, housing, interactions with law enforcement, and places of public accommodation. The online survey platform allowed respondents to move seamlessly through the questionnaire and ensured they only received questions that were appropriate based on previous answers. This was accomplished using skip logic, which created unique pathways through the questionnaire, with each next step in a pathway being dependent on an individual respondent's answer choices. For example, respondents who reported that they had served in the U.S. Armed Forces, Reserves, or National Guard received a series of questions about their military service, but those who had not served

did not receive those questions. Due to the customized nature of the survey, the length varied greatly between respondents, and no respondent received all possible questions. Prior to the pilot study, estimates indicated a survey-completion time of 30–45 minutes. The completion-time estimate was extended to 60 minutes based on feedback from pilot study participants, and it was consistent with many reports during the fielding period.[14]

Despite observations about survey length discussed in the NTDS,[15] evolving data needs relating to issues affecting transgender people required an in-depth treatment of multiple issue areas. This often required multiple questions to thoroughly assess an issue—including in areas where the NTDS asked only one question—and resulted in a lengthier survey. Survey instrument length was assessed throughout its development to ensure it would be manageable for as many participants as possible. Furthermore, through multiple reviews and evaluations of the survey instrument—including the pilot study—survey takers reported that the length was appropriate for a survey addressing such a wide range of issues and the need for data outweighed concerns about the overall length of the survey.

# IV. Survey Distribution and Sample Limitations

The survey was produced and distributed in an online-only format after a determination that it would not be feasible to offer it in paper format due to the length and the complexity of the skip logic required to move through the questionnaire. With so many unique possibilities for a customized survey experience for each respondent, the intricate level of navigation through the survey

would have created an undue burden and confusion for many respondents. This could have led to questions being answered unnecessarily or being skipped completely, which could have increased the potential for missing data in the final dataset.[16] This made online programming the best option for ensuring that respondents received all of the questions that were appropriate based on their prior answers, decreasing the probability of missing data. However, the potential impact of internet survey bias on obtaining a diverse sample has been well documented in survey research,[17] with findings that online and paper surveys may reach transgender respondents with "vastly different health and life experiences."[18] With those considerations in mind, outreach efforts were focused on addressing potential demographic disparities in our final sample that could result from online bias and other issues relating to limited access. Although the intention was to recruit a sample that was as representative as possible of transgender people in the U.S., it is important to note that respondents in this study were not randomly sampled and the actual population characteristics of transgender people in the U.S. are not known. Therefore, it is not appropriate to generalize the findings in this study to all transgender people.

# V. Outreach

The main outreach objective was to provide opportunities to access the survey for as many transgender individuals as possible in different communities across the U.S. and its territories. Additionally, outreach efforts focused on reaching people who may have had limited access to the online platform and who were at increased risk of being underrepresented in such survey research. This included, but was not limited to, people of color, seniors, people residing in rural areas, and low-income individuals. The outreach strategy was a multi-pronged approach to reach transgender people through various connections and points-of-access, including transgender- or LGBTQ-specific organizations, support groups, health centers, and online communities.

Outreach efforts began approximately six months prior to the launch of the data-collection period with a variety of tactics designed to raise awareness of the survey, inform people when it would be available, and generate opportunities for community engagement, participation, and support. A full-time Outreach Coordinator worked for a period of six months to develop and implement the outreach strategy along with a team of paid and volunteer interns and fellows.[19]

An initial phase of outreach involved developing lists of active transgender, LGBTQ, and allied organizations who served transgender people and would eventually support the survey by spreading the word through multiple communication platforms and in some cases providing direct access to the survey at their offices or facilities. Establishing this network of "supporting organizations" was an essential component of reaching a wide, diverse sample of transgender people.

Over 800 organizations were contacted by email, phone, and social media, and they were asked if they would support the survey by sharing information about it with their members and contacts. Specifically, supporting organizations were asked to share information through email blasts and social media channels, and the research team provided language and graphics for organizations to use in an effort to recruit appropriate respondents into the study. Of the organizations contacted, approximately half responded to requests for support, resulting in direct recruitment correspondence with nearly 400 organizations at regular intervals during the pre-data-collection period and while the survey was in the field.[20,21] These organizations

AR.10185

performed outreach that contributed to the far reach of the survey and unprecedented number of respondents.[22] The organizations were also featured on the survey website so potential respondents could determine whether organizations they knew and trusted had pledged support for the survey.

Nearly 400 organizations responded to outreach and confirmed their support for the survey. The remaining organizations did not respond directly to invitations to learn more about the survey and become supporters. Consequently, these organizations did not receive correspondence aimed at directly recruiting respondents prior to the survey launch or during the data-collection period. It is possible, however, that survey respondents were still made aware of the survey through those organizations. Since there is no information regarding whether these organizations shared information about the survey through their channels, it is difficult to assess the full scope of the outreach efforts.

## a. Advisory Committee

A significant element of outreach involved convening a USTS Advisory Committee (UAC). The UAC was created to increase community engagement in the survey project and raise awareness by connecting with transgender people in communities across the country through a variety of networks. The UAC was comprised of eleven individuals with advocacy, research, and lived experience from a wide range of geographical locations.[23] Members were invited to join the committee as advisors on survey outreach to facilitate the collection of survey data that would best reflect the range of narratives and experiences of transgender people in the U.S. Each member brought unique skills and expertise to contribute to the committee's objectives. UAC members participated in five monthly calls with members of the USTS outreach team from May

to September 2015. UAC monthly calls focused on providing project updates and identifying pathways by which outreach could be conducted to increase the survey's reach and promote participation from a diverse sample. Members suggested organizations, individuals, and other avenues through which to conduct outreach, shared ideas and strategies for improving outreach to specific populations of transgender people, and spread the word about the survey through their professional and personal networks.

## b. Survey-Taking Events

In an effort to increase accessibility of the survey, the outreach team worked with organizations across the country to organize events or venues where people could complete the survey. *Survey-Taking Events*,[24] or "survey events," were spaces in which organizations offered resources to provide access to the survey, such as computers or other web-enabled devices. These organizations provided a location in which to take the survey at one particular time or over an extended period of time, such as during specified hours over the course of several days.[25] The events were created with the intention of providing access to individuals with limited or no computer or internet access, those who may have needed assistance when completing the survey, or those who needed a safe place to take the survey. Additionally, the population that had previously been identified as being more likely to take a paper survey than an online survey were considered,[26] and the events were developed to target those individuals.

Given the potential variety of these survey events—including the types of available resources and times at which they were conducted—guidelines were needed to maintain consistency across the events and preserve the integrity of the data-collection process. A protocol was developed outlining the rules for hosting a survey event to advise hosts on best practices for ensuring

METHODOLOGY

a successful data-collection process, including guidelines to prevent the introduction of bias into survey responses. The protocols described the steps for becoming a survey-event host and tips for how to conduct outreach about the event. The protocol also specified that hosts should inform NCTE of their event prior to hosting and report on how many people attended the event and how many people completed and submitted the survey. This was helpful information for evaluating the relative success and benefits of these events. All confirmed supporting organizations were invited to become survey event hosts, and those who accepted the invitation were sent the protocol. Seventy-one (71) organizations accepted the invitation and confirmed the date(s) and time(s) of their events.[27]

Survey events were promoted on the survey website and given a specific designation on the supporting organization map (described further in the "Survey Website" section), including information about where and when people could attend. Hosts were encouraged to promote their event through multiple channels and consider outreach methods beyond online avenues, such as direct mail or flyers, to better reach transgender people with limited or no internet access. Additionally, hosts were provided with flyer templates so they could promote the events in their facilities or through communications with their members or constituents. Of the organizations who confirmed their survey events, 46 reported information about attendance at the event. The hosts reported that 341 people attended their events, including transgender and non-transgender friends, family, and volunteers. Approximately 199 respondents completed the survey at these events.[28] However, survey responses indicate that additional unreported survey events or similar gatherings may have been held where participants had an opportunity to complete the survey.[29] Event-related information submitted by organizations following the fielding period was not comprehensive enough to make a thorough determination as to whether the events had achieved their previously stated objectives.[30]

### c. Incentives

As an incentive for completing the survey, participants were offered a cash-prize drawing. Incentives, such as cash prizes are widely accepted as a means by which to encourage and increase participation in survey research.[31] Studies have shown that such incentives may have a positive effect on survey response rate, which is the proportion of individuals in the population of interest that participates in the survey.[32] Research has also found that lottery-style cash drawings may be beneficial in online surveys,[33] since they offer a practical method for providing incentives in surveys with a large number of respondents by eliminating the potential high cost of both the cash incentive and prize distribution.[34]

USTS respondents were offered the opportunity to enter into a drawing for one of three cash prizes upon completion of the survey, including one $500 cash prize and two $250 cash prizes.[35] After completing and submitting their anonymous survey responses, USTS respondents were re-directed away from the survey hosting site[36] to a web page on the NCTE-hosted USTS website. In addition to being thanked for their participation on this page, respondents received a message confirming that their survey had been submitted and any further information they gave would not be connected to their survey responses. Only individuals who completed and submitted the survey were eligible for one of the cash prizes. To enter into the prize drawing, respondents were required to check a box giving their consent to be entered.[37] Respondents were also asked to provide their contact information in order to be notified if selected in the drawing. The final drawing contained 17,683 entrants. Each entrant was assigned a number, and six numbers were randomly chosen by a non-NCTE party: three

numbers for the prize winners and three for alternates if necessary. The three prize winners were contacted and awarded their prizes upon acceptance.

# VI. Communications

Communications for the survey required a multifaceted approach and a coordinated effort with the outreach strategy to most effectively reach a wide range of transgender people and ensure a robust sample size. The goals of survey communications were to: (1) inform people that NCTE would be conducting a survey to further the understanding of the experiences of transgender people in the U.S initially gleaned through the NTDS, (2) communicate when the survey would be available to complete and how it could be accessed, and (3) find creative ways of reaching diverse populations of potential respondents. This involved raising awareness of the survey through several communication methods, including email, social media, and print media, as well as through additional unique campaigns. Many survey promotional materials were produced in English and Spanish to increase the accessibility of the survey.[38]

## a. Survey Website

A website was created and designed specifically for the promotion and distribution of the survey.[39] This website served as a platform for providing information about the survey starting several months prior to its release in the field, such as a description of the survey, information about the team working on the survey, frequently asked questions, and sample language and graphics for individuals and organizations to use for email and social media communications, including sample Facebook and Twitter postings. The website also featured an interactive map, which included information about organizations that had pledged to support the survey. Additionally, the map distinctly indicated information about organizations that were hosting survey-taking events, including the date, time, and location of such events. The website later served as the only platform through which the survey could be accessed and provided English and Spanish links to enter the survey, since there was no direct link available to the off-site hosting platform.

## b. Survey Pledge

The survey pledge campaign was developed to raise awareness about the survey and generate investment in the project. The campaign engaged potential participants and allies by inviting them to pledge to take the survey and/or spread the word about the survey. The survey pledge was a critical method of both informing people that the survey would be launching and sustaining engagement with potential respondents in the months leading up to the fielding period. Pledges received reminders about the survey launch date and availability through email communications. Beginning in January 2015, pledge palm cards were distributed at a variety of events across the country, including conferences and speaking engagements. The cards contained information about the upcoming survey and asked people to sign up to help by committing to: (1) spread the word about the survey; and/or (2) take the survey. Transgender and non-transgender individuals were asked to complete the pledge information, either through a palm card or directly online through the survey website. Individuals who completed pledge information received email communications throughout the pre-data-collection phase. Pledge information was collected continuously for several months, and by the time of the survey launch, over 14,000 people had pledged to take the survey. Additionally, more than 500 people pledged to promote the survey among their transgender friends and family.[40] The pledge proved to be

an effective method of assessing how many people had learned about the survey and were interested in completing it, where potential survey respondents were distributed geographically, and how more potential respondents could be effectively engaged.

## c. Photo Booth Campaign

In January 2015, a photo booth campaign was launched as another method for engaging people and raising awareness about the survey. Individuals and groups were asked to take photos holding one of two signs with messages expressing support for the survey.[41] USTS photo booths were conducted at several conferences and events across the country. More than 300 photos were collected and shared directly through NCTE's Facebook page. Photos were also sent to most participants so they could conduct their own promotion using their photos.

## d. Social Media

With the increased use of social media in the years since the previous survey (the NTDS), it was important to engage via these outlets to further the reach of the survey. Facebook and Twitter[42] became the primary social media outlets used throughout the survey project, and their use significantly amplified awareness, increasing the number of people who were exposed to the survey. A series of postings provided the ability to rapidly and succinctly communicate with individuals and groups who had an interest in contributing to the survey's success by completing the survey and spreading the word about it. Although social media reach fluctuated during the months leading up to the survey launch, over 96,000 Facebook users were estimated to have received NCTE's post announcing that the survey was live and available for completion on August 19, 2015.

## e. USTS Awareness Week

Prior to launching the survey in the field, communication was maintained with thousands of individuals and organizations who fell into three categories: (1) people who had signed up to take or spread the word about the survey ("pledge list"), (2) organizations that had committed to support the survey through outreach efforts ("supporting organization list"), and (3) people who had signed up to be in communication with NCTE about the organization's work and projects ("NCTE list").

Communication with the individuals and groups on these lists through targeted messages occurred at various intervals; however, one of the most important methods for promoting the survey was through USTS Awareness Week. This campaign was designed to share a significant amount of information about the survey over a concentrated period of time in close proximity to the launch of the survey. Awareness Week occurred during the week of July 27, 2015 and highlighted different aspects of the survey focusing on a different medium each day, including social media, email, and blogs. Awareness Week was introduced to the communication lists on July 15, and recipients were invited to access and download a planning kit for the campaign, which was available on the survey website. The planning kit included language and graphics for email and social media communications. Communications were sent on each of the days devoted to social media,[43] email,[44] and blogs[45] with appeals for organizations to share the information with their membership and individuals to share the information through their personal networks. Awareness Week proved to be one of the most effective methods for increasing the number of individuals who pledged to take the survey and likely increased the number of eventual respondents.[46]

AR.10189

### f. Additional Communications Methods

The overall approach to survey communications was diverse and captured many media forms. In addition to the previously stated campaigns and projects, communications involved working with a variety of individuals such as bloggers, artists, advocates, and others to create print blogs and videos promoting the survey. Op-eds were another medium that contributed to survey promotion, and media consultants and traditional media sources aided in expanding the survey's reach even further. Approximately 50 articles, blogs, and op-eds focused on the survey were produced and distributed by organizations, including NCTE, and individuals prior to the launch of the survey and during the data-collection period. The wide variety of approaches contributed to the number of individuals who were reached through all communications and likely impacted the final number of respondents in the sample.

# VII. Language and Translation

Throughout the survey questionnaire, the use of accessible language was balanced with preserving the meaning of each question to the greatest extent possible. This was of particular importance in maintaining comparability with questions from existing surveys that allowed conclusions to be drawn about how the experiences of the USTS sample compares to the U.S. population. In order to make assessments about USTS survey respondents in relation to the U.S. population, it was important that USTS respondents had similar interpretations of questions taken from other surveys as non-transgender survey takers had to those questions in federal surveys. In many places, language was revised to use terminology that would most appropriately speak to individuals in the many communities for which the survey was intended. However, several areas required difficult choices about keeping language that may have caused discomfort for some respondents. Throughout the questionnaire, language was avoided that could be interpreted as stigmatizing or characterized as a value judgment wherever possible while maintaining objectivity in crafting sound research questions. For example, at times survey questions referred to work or activities that were "currently considered illegal." Such deliberate language was used in an attempt to separate the issue of criminalization from the activity in question while maintaining comparability with other surveys. This was a difficult balance to achieve throughout the survey. Eliminating technical language was also necessary, unless it was widely used and accepted in transgender communities, such as some medical terminology. Short descriptions or parenthetical explanations were provided whenever technical language was required for those who may not have been familiar with the language. Additionally, hyperlinked explanations of specific terms were included when those terms could be interpreted in several ways or if similar explanations were provided in the federal surveys from which the questions were taken. For example, explanations were provided for the terms "active duty" when asking about military service and "household" when asking about income.

The research team remained conscious of individual and collective identities throughout the survey instrument drafting process, and attempted to use language that acknowledged the breadth and significance of individual identities while also making the questions accessible to the widest range of transgender people possible across the U.S. and in the territories. The questionnaire was reviewed and revised for consistent readability at an eighth-grade literacy level where possible,[47] although several

terms used in the survey were at a considerably higher literacy level. This included places where language was preserved for comparability with other surveys and when language describing transgender-specific experiences or procedures was used. Additionally, community members and researchers reviewed the survey and suggested revised language throughout the development process. This collaborative process was beneficial in providing collective insight on the best language to use in each particular instance based on lived experience and research expertise. The research team acknowledges, however, a continuing need to work towards identifying suitably inclusive terminology within an evolving language and community for future iterations of the survey.

The questionnaire was translated into Spanish by a translation service, and several native-Spanish-speaking community members and NCTE staff and interns reviewed and revised the language to use terminology that was most prevalent in Spanish-speaking transgender communities in the U.S. In many instances, it was difficult to find language that accurately captured the meaning of a question or specific terms, but in each case language was selected to convey interpretations as close to the English-language question interpretations as possible.

# VIII. Institutional Review

The study was vetted through an Institutional Review Board (IRB) process, which is meant to ensure confidentiality and protect the rights and welfare of individuals participating in a research study. The USTS underwent a full board review by the University of California Los Angeles (UCLA) IRB. As a requirement of approval, the questionnaire began with a study information

sheet describing aspects of the study and rights of individuals as participants in the study.[48] To be included in the study, participants were required to indicate their consent at the end of the information sheet. This process established that participants were fully informed about the risks and benefits of participating in the study and that their participation was voluntary. IRB review also required the submission of all recruitment materials leading up to the launch of the survey and throughout the time the survey was in the field.[49] This required the production of a large volume of messaging for the many different types of media through which people were invited to participate in the survey in both English and Spanish. It also required anticipating how messaging might need to change while the survey was in the field and submitting this language for pre-approval for later use as needed.

# IX. Survey Hosting

The survey was hosted online by Rankin & Associates Consulting, under the supervision of USTS research team member, Dr. Susan Rankin. Access to the survey was provided exclusively through the USTS website. All programming of the questionnaire and online administration of the survey was handled through Rankin & Associates Consulting, which managed the process of collecting the survey data throughout the 34-day fielding period.

The survey was anonymous, and maintaining privacy and confidentiality in the collection and maintenance of survey data was an important component of preserving participants' anonymity. Furthermore, as a condition of IRB approval, the research team was required to ensure that confidentiality protections were in place for the study and demonstrate sufficiency of data security protocols. Accordingly, data from online

participants was submitted through seven secure firewalled servers with forced 256-bit SSL (Secure Sockets Layer) security and Security-Enhanced Linux (SELinux) security extensions to encrypt and protect the survey data.  Given the volume of traffic on the seven servers during the initial launch of the survey, an eighth server was added. The survey was stored in an SQL database that could only be accessed locally. The servers themselves were only accessible using encrypted SSH (Secure Shell) connections originating from the local network. The servers were also in RAID (Redundant Array of Inexpensive Disks), which is a data storage virtualization technology that combines multiple physical disk drive components into a single logical unit for the purposes of data redundancy, performance improvement, or both, to reduce the chance of any data loss due to hardware failure. The servers performed nightly security audits from data acquired via the system logs and notified the system administrators.

Despite a successful data-collection period evidenced by the large final sample size, it is important to note issues that occurred in the initial days of the survey data-collection period, given the potential impact on the data collection and the final sample. Prior to the survey launch, the online platform had been assessed and capacity was predicted for the seven dedicated servers based on reasonable estimated response rates. However, in the first days of the data-collection period, exceptionally high levels of traffic to the survey far exceeded the predicted response rates and overwhelmed the capacity of the servers, causing significant delays in accessing and completing the survey. The resulting server delays occurred within hours of the survey launch on August 19, 2015, producing unusually long page-loading times and may have served as a barrier to completing the survey.[50] The survey team notified potential respondents of the delays through email and social media communication and updated the first page of the online survey questionnaire with a note about the issues and information about the continued availability of the survey.[51] The hosting team added a server to process the high level of traffic and returned the survey to normal loading speeds within a couple days of the initial reports. Although high numbers of survey submissions were received throughout these days, it is likely that the server delays affected the completion and submission of some surveys or may have discouraged individuals from attempting to take the survey.

# X. Cleaning the Data

The dataset was cleaned following collection to remove survey responses that did not belong in the final sample.[52] Data cleaning is the process of detecting and removing some survey responses (e.g., duplicate responses, incomplete responses, illogical responses) in order to improve the quality of the sample. This dataset was "cleaned" using commonly accepted procedures.[53] The first step was to remove survey responses from individuals who did not consent to take the survey and those who did not meet the eligibility criteria, such as not being at least 18 years of age and not residing in the U.S. These survey respondents had been automatically sent to a disqualification page,[54] but their responses were included in the initial dataset. Incomplete responses were then removed from the sample based on a requirement that respondents minimally complete specific questions in Section 2 of the questionnaire to be included in the final dataset.[55] Duplicate survey responses were removed next, as were those with illogical responses, such as those with contradictory responses to related questions. Missing-data analyses were then conducted to determine the percentage of missing data.[56]

The next step of the process was recoding data, including re-categorization of answer choices

in several questions for improved analysis or to match existing categories for comparison to other surveys. Answers were evaluated for those questions that allowed a write-in response when the selected option was "not listed above." In some cases, these answers were recoded into existing answer choices where appropriate, and in other cases, new answer categories were created for write-in responses that were frequently repeated. The recoding process included two coding teams. The first coding team conducted initial data recoding, and the second team reviewed the recoding and flagged areas of disagreement.  A simple percent agreement score was calculated to determine inter-rater reliability.[57]

Several survey weights were developed for presentation of results in the report.[58] A race and ethnicity weight was developed based on the Census Bureau's 2014 American Community Survey (ACS).[59] Additionally, given the disproportionally large number of respondents who reported an age of 18 years old, a weight was created to balance the representation in the sample of those respondents in relation to the rest of the sample.[60] The race and ethnicity weight and the 18-year-old weight were both included in a "standard weight" applied to the dataset. All results presented in this report are weighted based on the standard weight unless otherwise noted. Additional survey weights were created for the purposes of comparability with federal government and national data sources, including weights for age and educational attainment.[61] These weights were applied in addition to the standard weight when comparing the USTS sample to the U.S. population for items that are sensitive to age and educational attainment, such as individual and household income, and are noted accordingly as the "supplemental weight."

# XI. Data Analysis and Presentation of Findings

The data was first analyzed to tabulate individual responses to each of the questions in the survey. The respondents included in each tabulation differed throughout the survey due to certain questions only being asked of a particular set of respondents and/or due to some respondents choosing not to answer a question. Analyses were performed to explore how survey responses differed based on demographic characteristics—such as race, gender, and income—and non-demographic factors—such as experience with sex work, HIV status, and experiences of family support or rejection.

All findings in the report are presented as weighted percentages of the entire sample or of the subgroups being examined. For example, educational attainment is presented as a percentage of the whole sample, while much of the data related to HIV care represent percentages of those respondents who are living with HIV. In limited instances, unweighted frequencies are included where the additional information could be informative and to provide context for the weighted percentages reported.

Percentages are rounded to whole numbers, except in cases where a more exact comparison to national data sources was desired or where more precision was needed due to the reported percentages being small. When rounding to whole numbers, the following convention was generally followed: findings containing decimals of 0.50 and above were rounded up, and findings with 0.49 and below were rounded down (e.g., 1.50% was rounded to 2% and 1.49% was rounded to 1%). Additionally, a finding of 0.49% and below was generally labeled "less than 1%" or "<1%." Throughout the report, results are presented in

various figures and tables. The percentages in these figures and tables do not always add up to 100% due to respondents being able to select more than one answer to a question ("mark all that apply") or due to rounding.

Throughout the report, U.S. population findings are provided for comparison to USTS findings or to provide context for USTS findings, where available and/or applicable. Where USTS data is compared to data from existing research, the data source is specified. When providing U.S. population comparisons, the research team made efforts to limit the comparisons to adults (18 years and older) to most appropriately match the USTS sample. Whenever that was not possible, notes as to age ranges or other limitations are provided. Additionally, calculations made by the research team when necessary to present U.S. population findings are noted. Data in this report is generally presented without information regarding statistical testing.[62]

**ENDNOTES**  |  CHAPTER 2: METHODOLOGY

1    The survey included questions related to the following topics (in alphabetical order): accessing restrooms; airport security; civic participation; counseling; education; employment; faith; family and peer support; health and health insurance; HIV; housing and homelessness; identity documents; immigration; income; intimate partner violence; military service; police and incarceration; policy priorities; public accommodations; sex work; sexual assault; substance use; suicidal thoughts and behaviors; unequal treatment, harassment, and physical attack; and voting.

2    Detailed information about survey methodology is available in *Appendix C (Detailed Methodology)*.

3    www.USTransSurvey.org

4    The survey was in the field between August 19 and September 21, 2015.

5    Grant, J. M., Mottet, L. A., Tanis, J., Harrison, J., Herman, J. L., & Keisling, M. (2011). *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey.* (p. 11). DC: National Center for Transgender Equality and National Gay and Lesbian Task Force.

6    Grant et al., p. 182.

7    Grant et al.

8    See Haas, A. P., Rodgers, P. L., & Herman, J. L. (2014). *Suicide Attempts Among Transgender and Gender Non-Conforming Adults.* New York, NY & Los Angeles, CA: American Foundation for Suicide Prevention & Williams Institute.

9    See e.g., The GenIUSS Group. (2014). In J. L. Herman (Ed.), *Best Practices for Asking Questions to Identify Transgender and Other Gender Minority Respondents on Population-Based Surveys* (p. vii). Los Angeles, CA: Williams Institute. ("Adolescents may have particular difficulties with complex vocabulary and sentences. Therefore, questions designed for adolescents should take extra care to use plain language and simple sentences. Terms used in measures of sex and gender should be defined since adolescents, and cisgender (non-transgender) adolescents in particular, conflate the terms sex and gender, and have varying understanding of the term *transgender*, *masculine*, and *feminine*."). Given the need to collect data about the unique experiences of transgender youth, it is important to design and conduct future studies focusing on the issue areas and needs most applicable to transgender youth.

10   Information about the source of survey questions used for comparison to the U.S. population can be found in *Appendix C (Detailed Methodology)*.

11   Forty-four (44%) of pilot participants identified as a woman or trans woman (MTF), 41% as a man or trans man (FTM), and 16% as non-binary or genderqueer.

12   These pilot participants identified as American Indian, Asian, multiracial, Black, Latino/a, and a racial/ethnic identity not listed above, in addition to 66% who identified as white.

13   The following statement was provided to explain why the word "trans" was used throughout the survey: We know that not everyone is comfortable with the word "transgender," but for this survey, we must use one word to refer to all trans and non-binary identities. Because of this we will use the word "trans" in this survey to refer to all trans and non-binary identities."

14  A notable exception to the 30–60 minute estimate for completing the survey occurred during the first days of the survey's availability, when a high volume of survey takers overwhelmed multiple servers, causing lengthy delays when completing the survey. This is discussed further in the "Survey Hosting" section.

15  Grant et al., p. 13.

16  Post-NTDS analysis of respondents who had completed that survey online or in paper format found that surveys completed online were less likely to have missing data, providing further support for the decision to only offer the survey online. See Reisner, et al. (2014). Comparing in-person and online survey respondents in the U.S. National Transgender Discrimination Survey: Implications for transgender health research. *LGBT Health, 1*(2), 98–106.

17  See Dillman, D. A., Smyth, J. D., & Christian, L. M. (2014). *Internet, Phone, Mail, and Mixed-Mode Surveys: The Tailored Design Method* (4th ed.). Hoboken, NJ: John Wiley & Sons.

18  Reisner et al., p. 98. See note 16. This analysis also found that "[a] higher proportion of in-person respondents were young, male-to-female, people of color, publicly insured, with lower incomes and lower educational attainment than online respondents (all $p$<0.05). In-person respondents also were more likely than online respondents to be current daily smokers, to endorse substance use to cope with mistreatment, and to self-report as HIV-positive (all $p$<0.05)."

19  Although outreach efforts were instrumental in obtaining the largest sample of transgender respondents ever collected, a longer outreach period may have resulted in reaching more individuals in communities that are often underrepresented in online surveys.

20  A total of 827 organizations received at least one outreach email, and organizations received additional outreach emails and/or phone calls if no response was received. Out of those organizations, 392 confirmed their support, and 435 did not respond to any communications.

21  Correspondence included almost one dozen emails with asks to spread the word about the survey and with various information about the availability of the survey.

22  The research team attempted to ascertain the level of outreach engagement of supporting organizations; however, the limited amount of information received about the outreach did not allow a calculation of a response rate. Of the 392 organizations that pledged their support, 58 (15%) reported information on their outreach activities and estimated reaching over 20,000 transgender people through their channels. In the future, researchers are encouraged to collect consistent outreach activity data from supporting organizations that will help to better assess the effectiveness of outreach and response rate estimates.

23  Information about UAC members can be found in the *Acknowledgements* section of the report.

24  These events were promoted as "Survey-Taking Events" on recruitment materials and described accordingly (see note 25). However, it is possible that the name did not appropriately capture the nature of these vastly differing events. A lack of clarity may have decreased the number of people who attempted to access the survey through organizations who offered space or computers to complete the survey online.

25  Survey-Taking Events were described as "a function in which an organization or group opens its doors and provides access to its facilities (such as community centers and office buildings) to allow trans survey participants use of its resources (including computers, tablets, and internet access) to complete the USTS. This will occur during specified periods of time or throughout the time the survey is available on a drop-in basis. For example, a community center might participate by setting aside one Saturday from 9am–6pm where some or all of its computers are available for survey takers to use, or it might host people on Monday–Friday from 5pm–9pm each evening for a week, or longer."

26  A total of 435 NTDS respondents completed the survey in paper format (7% of the sample) and were found to differ from online survey takers in sociodemographic characteristics, health outcomes, and life experiences. Reisner et al., p. 98, 103. See note 16.

27  Although only 71 organizations confirmed their events, based on information reported at various intervals throughout the data-collection period, it appeared that more organizations hosted survey events or similar gatherings to complete the survey without reporting them to the survey outreach team. Additionally, it is also possible that individuals and organizations held informal parties where groups of friends could gather to complete the survey at the same time. Data regarding this sort of activity was not collected or received.

28  This completion rate is a conservative estimate based on reports that some individuals started the survey at the event and then left to complete it on their own at a later time.

29  Four hundred and seventeen (417) respondents answered "yes" in response to the following survey question: "Are you taking this survey at a survey event or meeting, such as one hosted by an LGBTQ or Trans organization or meeting?"

30  In future iterations of the USTS and other research studies, the research team suggests a more robust approach towards organizing, conducting, and monitoring survey events to increase the reach and availability of such events in providing access to the survey. Researchers are also encouraged to conduct follow-up analyses to

determine the demographic characteristics of individuals who completed the survey at events and whether these events were successful in capturing a similar demographic to those who had completed paper surveys in the previous survey. See Reisner, et al. (discussing the demographics of online and paper respondents in the NTDS).

31  See e.g., Göritz, A. S. (2006). Incentives in web studies: Methodological issues and a review. *International Journal of Internet Science, 1*(1), 58–70. (finding that "material incentives increase the odds of a person responding by 19% over the odds without incentives").

32  Pedersen, M. J. & Nielsen, C. V. (2016). Improving survey response rates in online panels: Effects of low-cost incentives and cost-free text appeal interventions. *Social Science Computer Review, 34*(2), 229–243.

33  Pedersen et al., pp. 237–238.

34  Singer, E. & Ye, C. (2013). The use and effects of incentives in surveys. *The ANNALS of the American Academy of Political and Social Science, 645*(1), 123–124.

35  Participants were informed of the cash prize incentives in several ways. The study information sheet placed at the beginning of the survey prior to obtaining each respondent's consent to enter the survey contained the following information in response to the question of whether respondents would be paid for their participation: "You will receive no payment for your participation. You will have the option to voluntarily enter a drawing to win one of three cash prizes: one prize of $500 and two prizes of $250." The frequently asked questions section of the survey website also offered the following statement: "When you complete the survey, you will have the option to enter a drawing to win one of three cash prizes: one prize of $500 and two prizes of $250. Because thousands of trans people across the country will complete the survey, we cannot offer payment to each participant." Additionally, some recruitment materials mentioned the cash-prize drawing, including email blasts.

36  The survey was hosted by Rankin & Associates Consulting. Further details are described in the "Survey Hosting" section.

37  The check box stated: "Enter me in the drawing for one of three cash prizes: one prize of $500 and two prizes of $250!"

38  Due to limited funding, it was not possible to translate all survey materials, such as email communications. Translation of all promotional materials may positively impact the response rate amongst respondents with limited English proficiency in future iterations of the study.

39  www.USTransSurvey.org

40  Final pledge numbers were 14,005 and 561 for survey takers and promoters, respectively.

41  Photo booth participants could choose from one of two signs indicating that the survey was coming in the summer of 2015 and stating the following: (1) "My Voice Counts: I'm Taking the #USTransSurvey" or (2) "Every Voice Counts: Spread the Word About the #USTransSurvey."

42  The Twitter hashtag used to promote the survey was #USTransSurvey.

43  For social media day, recipients received one of the following requests, based on whether they were organizations or individuals: (1) "Use the hashtag #USTransSurvey on social media asking your social networks to join us" or (2) "Please join Social Media day. We have sample copy and a variety of photos and graphics."

44  For email day, recipients received one of the following requests, based on whether they were organizations or individuals: (1) "Email a friend explaining why this is so important to you" or (2) "Download the sample email and send it to your membership list today."

45  For blog day, recipients were invited to share a blog written by Outreach Coordinator, Ignacio Rivera, cross post the blog on an organization's blog site, or draft a blog about the importance of the survey.

46  The number of individuals who pledged to take the survey on the pledge list increased from approximately 7,700 when the initial Awareness Week email was sent on July 15 to over 14,000 at the time the survey launched in the field. The 82% increase in the numbers of survey pledges is likely due to the increased exposure generated by Awareness Week communications.

47  The initial literacy level review and revision was conducted by a certified copy editor proficient in reading levels, and the questionnaire was determined to be at an eighth grade reading level.

48  Due to IRB requirements, the language in the study information sheet was generally at a higher literacy level than the rest of the questionnaire.

49  This included all materials aimed at "recruiting" or getting people to participate in a research study, such as website pages, flyers, emails, and social media messages.

50  The research team received reports that it took some individuals up to several hours to complete the survey on the first day, and others reported that they were not able to complete or submit their survey at all due to the technical issues.

51  The following note was added to the first page of the survey (in English and Spanish) to notify respondents of the delay: "Our servers have been overwhelmed by the number of enthusiastic participants and some are experiencing unusual delays. We apologize for the inconvenience as we work to address this issue. You can complete the survey now but may experience delays. However, the survey will be available to complete through at least September 21st. If you experience delays, we encourage you to return to this site in the coming days. If the survey is slow to respond, you can leave the page open and return later. If the survey times out, you can hit the 'back' button. However, if you close your browser, you may have to restart the survey."

52  A detailed description of the cleaning process is included in *Appendix C (Detailed Methodology)*.

53  Rahm, E. & Do, H. H. (2000). Data cleaning: Problems and current approaches. *IEEE Data Engineering Bulletin, 23*(4), 3–13.

54  Ineligible respondents were sent to one of two disqualification pages notifying them of their ineligibility and providing either an opportunity to visit the survey website for more information or giving information about their gender identity or expression and experiences related to gender identity or expression.

55  See *Appendix C (Detailed Methodology)* for more information on the Section 2 questions that were required to remain in the sample.

56  Missing-data analyses determined that there was less than 5% missing data on all but two questions. Therefore, the research team did not impute the missing data. See *Appendix C (Detailed Methodology)* for more information.

57  A modified version of an inter-rater reliability metric was used by the two teams that conducted the review. Each team included a principal researcher and an outside researcher. One researcher on each team conducted the initial coding and the other researcher reviewed the coding for approval or revisions. See *Appendix C (Detailed Methodology)* for more information.

58  "Weighting" is a common statistical technique used to adjust data with disproportionate sample sizes to be more representative of the population from which the sample was drawn. For example, the proportion of respondents aged 18–24 and 25–44 in a survey sample taken in the U.S. may differ from the proportion of those age groups in the total U.S. population. Therefore, weights are applied to survey data in order to make comparisons between the collected survey data and the total population. See *Appendix C (Detailed Methodology)* for more detailed information about weights applied to the survey data.

59  Studies using representative samples of transgender adults have found that transgender adults differ from the general population in regard to race and ethnicity, with transgender people more likely to be people of color. See e.g., Flores, A. R., Brown, T. N. T., & Herman, J. L. (2016). *Race and Ethnicity of Adults who Identify as Transgender in the United States.* Los Angeles, CA: Williams Institute; Conron, K. J., Scott, G., Stowell, G. S., & Landers, S. J. (2012). Transgender health in Massachusetts: Results from a household probability sample of adults. *American Journal of Public Health, 102*(1), 118–122. However, the USTS sample has a higher percentage of white respondents than the U.S. general population. To help correct for this sampling bias, the research team applied U.S. population weights for race and ethnicity. While this may still over-represent white respondents, this weighting procedure brings the sample closer to what is estimated to be the true population distribution for race and ethnicity for transgender people.

60  The weight for 18-year-old respondents was created with propensity scores developed using a regression discontinuity model. For more information on this process and other weighting procedures, see *Appendix C (Detailed Methodology)*.

61  The age, race, and educational attainment weights were created based on the Census Bureau's 2014 American Community Survey (ACS).

62  Due to the large sample size, bivariate statistical tests largely result in statistically significant differences among the groups being compared. Small group differences often will be found to be statistically significant, even when the differences are small and, therefore, not particularly meaningful. In writing the findings to this report, the research team considered other measures when pointing out meaningful differences among groups, such as a particular cell's contribution to an overall chi-square test statistic and effect sizes. These tests are on file with the research team. Future researchers are encouraged to use additional bivariate and multivariate modeling to provide more nuanced understanding of group differences.



## CHAPTER 3

# Guide to Report and Terminology

**T**hroughout the report, the authors use a variety of terminology to refer to respondents in the sample or experiences that respondents reported. The authors also applied several conventions in the reporting of results. While explanations are often included in chapters to provide context and clarity, several terms and conventions that are used widely throughout the report are outlined in this chapter to make the report more accessible to a broad range of audiences.

GUIDE TO REPORT AND TERMINOLOGY

# I. Use of the Term "Transgender" in this Report

The term "transgender" is often used to describe people whose gender identity or expression differs from what is associated with the gender they were thought to be at birth. Although this term has often been described as an "umbrella term" that encompasses the spectrum of identities and captures the diversity of transgender people, the authors recognize that one term cannot reflect each individual's unique identity and some people prefer to use other terms to describe their gender identity. However, in order to make the report's findings clear and accessible, it was important to select a single term for consistent use throughout this report that could best represent the range of identities expressed in the USTS survey sample.

In promotional materials, the survey was described as being inclusive of all "transgender, trans, genderqueer, and non-binary" people, so that those who might have assumed that "transgender" did not include them would know their voice was welcomed. The survey also acknowledged the limitation of current language and used "trans"—a shorthand term that is widely accepted amongst transgender people—consistently throughout the questions. While respondents in this study identified with a wide range of terms—including more than 500 unique terms that were reported in response to survey questions—88% of respondents thought of themselves as transgender, and 86% expressed that they were "very comfortable," "somewhat comfortable," or "neutral" when asked how comfortable they were with the word "transgender" being used to describe them. This included 82% percent of non-binary respondents. This provides evidence of the term's continued broad usage and general acceptance. Based on this information, the term *transgender* is used for the purposes of this report to represent the diverse identities of the individuals who made their voices heard by completing the survey.

# II. Other Transgender-Specific Terminology

## Non-binary:

This term is used by some to describe people whose gender is not exclusively male or female, including those who identify as having no gender, a gender other than male or female, or more than one gender. In this report, "non-binary respondents" refers to respondents who said that the term "non-binary/genderqueer" best describes their current gender identity in response to Q. 2.3.

## Crossdresser:

While definitions of "crossdresser" vary, many use this term to describe a person who dresses in a way that is typically associated with a gender different from the one they were thought to be at birth, but who may not identify with that gender or intend to live full time as that gender. In this report, the term "crossdressers" refers to respondents who said that the term "cross-dresser" best described their current gender identity in response to Q. 2.3.

## Gender transition:

This is a process in which a person begins to live according to their gender identity, rather than the gender they were thought to be at birth. Not all transgender people have transitioned or intend to do so, but many do. Gender transition looks different for every person. Possible steps in a gender transition may or may not include changing one's clothing, appearance, name

and identity documents (for example, a driver's license), or undergoing medical procedures such as hormone therapy to change one's physical characteristics. This report refers to gender transition in several places when discussing steps that may be included in one's gender transition, such as updating the name and gender on identity documents. Additionally, the report includes a variety of terms to refer to therapy/counseling, hormone therapy, surgical treatments, and other health services transgender people may undergo as part of their transition, including "health care related to gender transition" or "transition-related care." In this report, the term "respondents who have transitioned" refers to respondents who reported that they are living full time in response to Q. 1.12 (see below).

## Living full time:

Respondents in the sample who were described in the report as "living full time" are those who reported that they lived full time in a gender different than the gender they were thought to be at birth in response to Q. 1.12. For many people, living full time may include changing one's name, clothing, and/or appearance, or taking other actions related to their gender transition.

## Gender identity or expression:

Several questions throughout the report asked whether respondents thought that an experience had occurred due to their "transgender status/ gender identity" and/or "gender expression/ appearance." Both answer choices were included so that respondents could select what they felt best represented their experience. Since there was a substantial overlap of respondents who selected both reasons, and because these terms are commonly used interchangeably or with very similar meanings, responses of those who selected one or both of these reasons were collapsed for reporting in one "gender identity/

expression" category. Additionally, several phrases are used interchangeably to describe experiences that respondents had as a result of biases due to being known or perceived to be transgender. These include, for example: "because they were transgender," "because of their transgender status," or "because of their gender identity or expression."

# III. Additional Terms and Conventions Used in the Report

## Sexual assault:

In this report, the term "sexual assault" refers to a variety of experiences of unwanted sexual contact. These may include, but are not limited to, oral, genital, or anal contact or penetration, forced fondling, and rape. Respondents were asked about their experiences with unwanted sexual contact or sexual assault in a number of different contexts. Definitions of these terms varied in some questions based on the context or, in some cases, on the national survey from which a question was adapted. Where applicable, the definition provided for "sexual assault" or "unwanted sexual contact" in each question is included in the report.

## Underground economy:

This terminology refers to fields of work that, in general, are currently criminalized in the United States. In this report, this term includes income-based sex work (including forms of work in the sex trade that are not criminalized, such as pornography), drug sales, and other income-based work that is currently criminalized. See *Sex Work and Other Underground Economy Income* chapter.

## Time period of reported experiences:

In the survey, respondents answered questions about experiences that occurred within a period of time prior to having taken the survey, such as in the past year or the past 30 days. The report refers to the time when these experiences occurred in comparison to the time when the respondent completed the survey. For example, respondents who had certain experiences within the 12 months prior to completing the survey were reported as having those experiences "in the past 12 months" or "in the past year." If a respondent had an experience that occurred within the 30 days prior to completing the survey, the experience was referred to as occurring "in the past month," "in the past 30 days," or "currently."

## Write-in responses:

At several places in the survey, respondents were given an opportunity to write in a response to a question. These write-in responses were reviewed for recoding to categorize the responses into existing answer choice categories or new categories when feasible. When it was possible to recode write-in answers into a new category, those answers were often listed in the report and labeled as a "write-in response." In many cases, it was not possible to recode the answers into existing or new categories, and these write-in-responses were included in categories such as "a reason not listed above." For more information about how write-in answers were recoded, refer to *Appendix C: Detailed Methodology.*

## U.S. population comparisons and other resources:

References to experiences of the U.S. population are included in the report for comparison and to provide context for findings where feasible. References to other research are also provided as resources in several places throughout the report. However, the list of references is not exhaustive, and should be not be treated as a comprehensive list of sources on any particular subject presented in this report.

## Stories included in the report:

Throughout the report, excerpts of stories are included in sections titled "In Our Own Voices." These stories, which were submitted by respondents after they completed the survey, are provided to support the findings of the report and offer important anecdotal evidence and context for respondents' reported experiences. These stories have been edited for length and clarity.

AR.10201



# CHAPTER 4

# Portrait of USTS Respondents

With 27,715 respondents, the U.S. Transgender Survey (USTS) is the largest survey ever conducted of transgender people in the United States, providing a rich understanding of numerous aspects of their lives and experiences. In this chapter, an overview of respondents' diverse gender identities and experiences with transitioning is presented. Additional characteristics of USTS respondents, such as race and ethnicity, age, educational attainment, and geographic location, are also presented. This information is discussed in the following sections:

I. Gender Identity and Expression
II. Experiences with Transitioning
III. Being Perceived as a Transgender Person by Others
IV. Outness
V. Race and Ethnicity
VI. Age
VII. Location
VIII. Primary Language Spoken in Home
IX. Religious or Spiritual Identity
X. Income and Employment Status
XI. Educational Attainment
XII. Disability
XIII. Citizenship and Immigration Status
XIV. Sexual Orientation
XV. Relationship Status

# I. Gender Identity and Expression

## a. Identity

The word *transgender* is often used as an "umbrella term" intended to encompass the spectrum of identities and capture the diversity of people whose gender differs from the one they were thought to be at birth. However, language describing identity continues to evolve, and it is difficult to describe all of those identities using just one term. Acknowledging this wide range of identities, the survey asked respondents if they thought of themselves as "transgender." Eighty-eight percent (88%) of respondents reported that they thought of themselves as transgender, while the remaining 12% used other terms to describe their gender and related experiences.[1]

Respondents were also asked how comfortable they were with the word "transgender" being used to describe them on a five-point scale from "very comfortable" to "very uncomfortable." Eighty-six percent (86%) expressed that they were comfortable or neutral using this term, including 82% percent of non-binary respondents. Forty-three percent (43%) were "very comfortable," and only 14% expressed discomfort with being described as transgender[2] (Figure 4.1).

**Figure 4.1: Respondent's level of comfort with the word "transgender" being used to describe them**



3%
Very uncomfortable

11%
Somewhat uncomfortable

16%
Neutral

% of respondents

43%
Very comfortable

27%
Somewhat comfortable

Respondents were also offered a list of identity terms from which they could check all terms that described their gender identity, and they were also given an opportunity write in a gender that was not listed (Table 4.1). In addition to the listed terms, respondents wrote in more than 500 unique gender terms with which they identified.

**Table 4.1: Gender identity terms**

| Gender identity terms | % of respondents |
|---|---|
| Transgender | 65% |
| Trans | 56% |
| Trans woman (MTF, male to female) | 32% |
| Trans man (FTM, female to male) | 31% |
| Non-binary | 31% |
| Genderqueer | 29% |
| Gender non-conforming or gender variant | 27% |
| Gender fluid/fluid | 20% |
| Androgynous | 18% |
| Transsexual | 18% |
| Agender | 14% |
| Two-spirit | 7% |
| Bi-gender | 6% |
| Butch | 5% |
| Crossdresser | 5% |
| Multi-gender | 4% |
| Third gender | 4% |
| Intersex | 3% |
| Drag performer (king/queen) | 2% |
| A.G. or aggressive | 1% |
| Stud | 1% |
| Travesti | 1% |
| Bulldagger | <1% |
| Fa'afafine | <1% |
| Mahu | <1% |
| A gender not listed above | 12% |

## b. Gender Identity Categories Used for Analysis

Respondents were also asked to choose only one term that best described their current gender identity out of six possible terms (*woman, man, trans woman (MTF)*, *trans man (FTM)*, *non-binary/genderqueer*, or *crossdresser*) to determine the gender identity categories used for primary analysis.[3] Respondents

AR.10203

were grouped into four gender identity categories based on their responses. These four categories are used throughout this report to discuss the experiences of those who completed the survey: *transgender women*, *transgender men*, *non-binary people*, and *crossdressers*.[4] Those who said that *woman* or *transgender woman* best described their gender identity were included in the transgender women analytical category (33%), and those who said that *man* or *transgender man* best described their gender identity were included in the transgender men analytical category (29%). Overall, 62% of respondents were included in the transgender men and women categories. Three percent (3%) said that *crossdresser* best described their gender identity. More than one-third (35%) of respondents indicated that their gender identity was best described as *non-binary* or *genderqueer*, a term often used to describe people whose gender is not exclusively male or female, including those who identify with a gender other than male or female, as more than one gender, or as no gender[5] (Figure 4.2). Throughout the report, these respondents are referred to as "non-binary."

**Figure 4.2: Gender identity**



## c. Gender Assignment at Birth

Respondents were asked about the sex they were "assigned at birth, on [their] original birth certificate."[6] In this report, the term "respondents with male on their original birth certificate" is used

to describe respondents who were thought to be male when they were born (such as transgender women), and "respondents with female on their original birth certificate" is used to describe respondents who were thought to be female when they were born (such as transgender men). More than half (57%) of respondents had female on their original birth certificate, and 43% had male on their original birth certificate. Of those who were non-binary, 80% had female on their original birth certificate, and 20% had male on their original birth certificate.

## d. Development of Transgender Identity and Interactions with Other Transgender People

Respondents received questions related to the development of their transgender identity throughout their lives. A majority of respondents (60%) reported that they began to feel "different" from the sex on their original birth certificate at age 10 or younger, including 32% who began to feel different at age 5 or younger, and 28% who began to feel different between the ages of 6 and 10. Six percent (6%) reported that they began to feel different at age 21 or older (Figure 4.3).

**Figure 4.3: Age they began to feel gender was different from the one on their original birth certificate**



Respondents were also asked how old they were when they started to think of themselves as transgender, even if they did not know that word. One in ten (10%) reported that they began thinking of themselves as transgender at age 5 or younger. Sixteen percent (16%) began to think of themselves as transgender between the ages of 6 and 10, and 28% between the ages of 11 and 15. Eight percent (8%) reported beginning to think of themselves as transgender at age 26 or older (Figure 4.4).

**Figure 4.4: Age they started to think they were transgender**



Respondents were also asked at what age they began to tell others that they were transgender. One in ten (10%) respondents reported that they began to tell others that they were transgender between the ages of 11 and 15, and more than one-third (37%) did so between the ages of 16 and 20. Another 30% began telling people that they were transgender between the ages of 21 and 30, and 14% began telling people that they were transgender at age 31 or older. Additionally, 5% reported that they had not told anyone else that they were transgender (Figure 4.5).

**Figure 4.5: Age they started to tell others that they were transgender**



## e. Gender Identity and Current Age

The age profile of respondents[7] differed widely by gender identity categories, with nearly half (47%) of transgender men and women being aged 25–44, compared to 35% of non-binary respondents, and 29% of crossdressers. Non-binary respondents were more likely to be younger, with nearly two-thirds (61%) being aged 18–24, in contrast to transgender men (43%), transgender women (24%), and crossdressers (8%). One in five (20%) crossdressers were aged 65 or older, compared to only 5% of transgender women, 1% of non-binary respondents, and less than 1% of transgender men (Figure 4.6).

**Figure 4.6: Gender identity by current age**



# II. Experiences with Transitioning

Transitioning is a process by which a person begins to live in a gender that is different than the one on their original birth certificate. Not all transgender people have transitioned or intend to do so, but many do. Gender transition can involve many different aspects, including changing one's clothing, appearance, name, and identity documents (such as driver's licenses or passports) and asking people to use different pronouns (such as he, she, or they) than the ones associated with the gender on one's original birth certificate. Transitioning may also include undergoing medical procedures, such as hormone therapy or surgeries, to change one's physical characteristics. Some people make many of these changes while others do not, depending on their needs and resources. Additionally, some transgender people may desire and make some of these changes even if they do not intend to live full time in a gender that is different than the one on their original birth certificate. However, many people who want to take these steps are not able to do so because of financial constraints, safety concerns, fear of discrimination and rejection, and other barriers.

## a. Full-Time Status and Transition

Nearly two-thirds (62%) of respondents were currently living full time in a gender that was different from the one on their original birth certificate. Throughout the report, the process of living full time in a gender that is different than that on one's original birth certificate is described as "transitioning." Twenty-two percent (22%) of respondents reported that they wanted to transition someday, 13% were unsure, and 3% did not want to transition (Figure 4.7). Three-quarters (75%) of transgender men and women had transitioned, and 43% of non-binary respondents had transitioned (Figure 4.8).[8]



**Figure 4.7: Transition status of respondents**



**Figure 4.8: Transition status of respondents**
GENDER IDENTITY (%)

Respondents were also asked what gender they were living in on a day-to-day basis. Thirty-five percent (35%) of respondents reported that they currently lived as a man on a daily basis, 30% lived as a woman, 21% lived as neither a man nor a woman, and 15% lived part time in one gender and part time in another.

## b. Age of Transition

Those who have transitioned reported the age at which they began transitioning, or living full-time in a gender other than that on their original birth certificate. Nearly half (43%) reported that they began transitioning between the ages of 18 and 24, and nearly one-quarter (24%) transitioned between ages 25 and 34. Fifteen percent (15%) transitioned under the age of 18, and 18% transitioned at age 35 or older. Non-binary respondents and transgender men were more likely to have transitioned at a younger age, with 24% of non-binary respondents and 17% of transgender men transitioning under the age of 18, compared to 7% of transgender women (Figure 4.9).[9]

**Figure 4.9: Age began transitioning**
**GENDER IDENTITY (%)**



- Under 18
- 18 to 24
- 25 to 34
- 35 and over

## c. Number of Years Since Transitioning

The number of years since a respondent had transitioned was determined in order to provide valuable information and context for some of the respondents' experiences.[10] Nearly one-third (31%) of those who had transitioned had done so within one year of taking the survey, 38% had transitioned 2 to 5 years prior, 13% transitioned 6 to 9 years prior, and 18% had transitioned 10 or more years prior (Figure 4.10).

**Figure 4.10: Number of years since transitioning**



## d. Additional Questions for Non-Binary Respondents

Non-binary respondents received questions about what they tell other people about their gender identity. They were asked about what gender they were perceived to be by people who did not know they were non-binary. A majority reported that people usually assumed they were non-transgender women (58%), including 72% of non-binary respondents with female on their original birth certificate, and 2% of non-binary respondents with male on their birth certificate. Seventeen percent (17%) reported that other people assumed they were non-transgender men, including 77% of non-binary respondents with male on their original birth certificate, and 3% of non-binary respondents with female on their birth certificate. Nearly one in five (19%) reported that assumptions about their gender varied (Figure 4.11).

**Figure 4.11: Gender that people who do not know they are non-binary usually assume they are**



2015 U.S. TRANSGENDER SURVEY

AR.10207

Non-binary respondents were asked how they responded when people in their life assumed their gender was something other than non-binary. Almost half (44%) reported that they usually let others assume they were a man or woman, and 53% sometimes corrected others and told them about their non-binary identity. Only 3% always told others that they were non-binary (Figure 4.12).

**Figure 4.12: Response when people assume that their gender is something other than non-binary**



**3%**
They always tell others they are non-binary

**53%** They some-times tell others they are non-binary

**44%** They usually let others assume they are a man or a woman

% of non-binary respondents

Non-binary respondents who reported that they usually let others assume they are a man or woman or only sometimes tell people they are non-binary were asked for the main reasons they do not tell others about their non-binary identity. Respondents could select multiple reasons for choosing not to tell people about their non-binary identity. A majority of non-binary respondents reported that people do not understand so they do not try to explain it (86%) or that it is easier not to say anything (82%). Approximately two-thirds reported that their non-binary identity is often dismissed as not being a real identity or just a phase (63%), and others feared they might face violence (43%) (Table 4.2).

**Table 4.2: Main reasons for not telling people they are non-binary**

| Main reasons for not telling others about non-binary identity | % of non-binary respondents |
| --- | --- |
| Most people do not understand so they do not try to explain it | 86% |
| It is easier not to say anything | 82% |
| Most people dismiss it as not being a real identity or a "phase" | 63% |
| They might face violence | 43% |
| They are not ready to tell people they identify as non-binary | 35% |
| They might lose their job or not be able to get a job | 35% |
| They might not get the medical care they need | 24% |
| They might be hurt financially | 23% |
| They might face mistreatment at school | 18% |
| Their friends might reject them | 18% |
| They might become homeless | 12% |
| Their church or faith community might reject them | 6% |
| A reason not listed above | 18% |

## e. Pronouns

Eighty-four percent (84%) of respondents reported that the pronouns they used were different from those associated with the sex on their original birth certificate. Respondents reported a wide range of pronouns that they asked people to use when referring to them and could select more than one pronoun. The most widely used pronouns were "he/his" (37%), "she/her" (37%), and "they/their" (29%). One in five (20%) reported that they did not ask people to use specific pronouns when referring to them, and another 4% indicated that they used pronouns other than those provided in the answer choices. This included more than a dozen additional pronouns provided through write-in responses (Figure 4.13).



Figure 4.13: Pronouns respondents ask people to use

could tell they were transgender without being told "most of the time," 32% said others could "sometimes" tell, and 24% said that others could never tell (Figure 4.14).[11] Respondents' experiences with others' perception of their transgender status varied by gender identity (Figure 4.15).

Figure 4.14: How often people could tell they were transgender without being told



# III. Being Perceived as a Transgender Person by Others

Some transgender people find that others can routinely tell that they are transgender without being told, while others are generally perceived as the gender they identify with, and still others are perceived as the gender they were thought to be at birth. Many interactions and experiences of transgender people may be influenced by others' perceptions of them as being a transgender person. Transgender people who are visually or otherwise perceived by others as transgender or gender non-conforming may be more vulnerable to negative interactions in public or other settings.

To assess whether respondents were perceived as transgender, they were asked whether others could tell that they were transgender even without being told on a five-point scale from "always" to "never." Nearly one in ten (9%) reported that others

Figure 4.15: How often people could tell they were transgender without being told
GENDER IDENTITY (%)



# IV. Outness

Respondents were asked whether they thought different groups of people in their lives knew that they were transgender to determine if they were "out"[12] about their transgender identity to family members, friends, supervisors and colleagues at work, classmates, and health care providers. Respondents were asked whether all, most, some, or none of the people in their lives knew they were transgender in each of the groups of people in their lives. Results reflect only those respondents who had people from each group in their lives. Overall, 8% reported that they were out to all of the people in their lives, across all groups of people, 48% were out to most, 43% were out to some, and only 2% were out to none of the people in their lives.

Nearly two-thirds (62%) were out to all or most of the immediate family that they grew up with, and 38% were out to all or most of their extended family.[13] Regarding workplace environments, nearly one-half reported that none of their current supervisors (49%) or coworkers (42%) knew that they were transgender.[14] In terms of health care providers, although 40% reported that all of their health care providers knew that they were transgender, almost one-third (31%) indicated that none of their health care providers knew that they were transgender (Figure 4.16).

Of all groups of people the survey asked about, respondents were most likely to be out to all of their LGBT friends (62%). Respondents were also asked about the methods by which they socialize with other transgender people. Sixty-four percent (64%) reported that they socialized with other transgender people in person, and 79% socialized online. Nearly one-third (32%) said they interacted with transgender people in political activism, and 10% reported that they did not socialize with other transgender people.

**Figure 4.16: Outness to people in respondents' lives**



- **All know that they are transgender**
- Most know that they are transgender
- Some know that they are transgender
- None know that they are transgender

# V. Race and Ethnicity

Respondents received a question on race and ethnicity and were asked to select only one of the following categories that most accurately described their racial or ethnic identity:

- Alaska Native (received a write-in option)[15]
- American Indian (received a write-in option)[16]
- Asian or Asian American
- Biracial or multiracial (received a follow-up question)[17]
- Black or African American
- Latino/a or Hispanic
- Middle Eastern or North African
- Native Hawaiian or Pacific Islander
- White or European American
- A racial or ethnic identity not listed above (received a follow-up question)[18]

Throughout the report, respondents who identified as biracial, multiracial, or more than one racial or ethnic category are included in the multiracial group. Additionally, due to small sample sizes and for purposes of analysis, certain racial and ethnic groups were combined into single categories. American Indian and Alaska Native respondents are combined in one category and reported as "American Indian." Similarly, the Asian/Asian American and Native Hawaiian/Pacific Islander groups are also combined in one category and reported as "Asian."[19]

The USTS sample had a percentage of white respondents that is notably higher than the U.S. general population, which is common among internet-based surveys.[20] Therefore, a race and ethnicity weight was developed to more closely represent what is estimated to be the actual racial and ethnic distribution for the transgender population in the U.S., based on the Census

Bureau's 2014 American Community Survey (ACS).[21] Racial and ethnic categories were weighted to reflect the ACS distribution for race and ethnicity as part of the standard survey weight that was applied to all results presented in the report (Figure 4.17).[22]

**Figure 4.17: Race and ethnicity of respondents**



- 0.7% American Indian
- 5.1% Asian
- 12.6% Black
- 16.6% Latino/a
- 0.4% Middle Eastern
- 2.5% Multiracial
- 62.2% White

% of respondents

# VI. Age

The age of respondents in the sample ranged from 18 to 87. The overall age of respondents in the sample was generally younger than that in the U.S population. In addition to having a younger age distribution, a disproportionally large number of respondents reported an age of 18 years old. Therefore a weight was created to balance the representation in the sample of those 18-year-old respondents in relation to the rest of the sample. This weight was part of the standard survey weight that was applied to all results presented in this report (Figure 4.18). Additionally, for certain findings in this report, a "supplemental weight" was applied to adjust the USTS sample to reflect the age distribution for the U.S. population based on the ACS.[23]

AR.10211

**Figure 4.18: Age of respondents**




# VII. Location

The sample included respondents from all 50 states, the District of Columbia, American Samoa, Guam, Puerto Rico, and several U.S. military bases overseas. The geographic distribution of the sample generally mirrors that of the U.S. general population (Figure 4.19).

The sample was divided into regions based on the Census Bureau regions, which included the Northeast, Midwest, South, and West (Figure 4.20). These regional categories did not include U.S. territories or U.S. military bases overseas.

**Figure 4.19**




*Each dot on the maps represents the number of people in a zip code. Every dot corresponds to at least one person, and the size of each dot increases in accordance with the number of people in each zip code.*

**Figure 4.20: Respondents' location by region**



% in USTS
- 20% Northeast
- 19% Midwest
- 29% South
- 31% West

% in U.S. population (Census)[24]
- 18% Northeast
- 21% Midwest
- 38% South
- 24% West

Northeast (CT, ME, MA, NH, NJ, NY, PA, RI, VT)

Midwest (IA, IN, IL, KS, MI, MN, MS, NE, ND, OH, SD, WI)

South (AL, AR, DE, DC, FL, GA, KY, LA, MD, MS, NC, OK, SC, TN, TX, VA, WV)

West (AK, AZ, CA, CO, HI, ID, MT, NM, NV, OR, UT, WA, WY)

# VIII. Primary Language Spoken in Home

Respondents were asked about the primary language spoken in their home. Eighty-four percent (84%) reported that English was the only language spoken in their home, compared to 79% in the U.S. general population, as reported in the

American Community Survey (ACS).[25] Fourteen percent (14%) reported that English and another language were mainly spoken in their home, and 2% reported that a language other than English was the primary language spoken in their home. In addition to spoken languages, 0.4% of respondents also reported that American Sign Language was either the main language or one of the main languages used in their home.

Spanish (including Spanish Creole) was reported as the most common language spoken in their home other than English, with 10% of respondents reporting Spanish was the main language spoken in their home, exclusively or along with English. This was slightly lower than the percentage of those who spoke Spanish in the home in the U.S. general population (13%).[26] Each of the other identified languages were spoken by less than 1% of respondents.

# IX. Religious or Spiritual Identity

Respondents were asked about their current religious or spiritual identity and could select one or more identities from a provided list, or they could select a religious affiliation or spiritual identity not listed.[27,28] Sixty-three percent (63%) of respondents reported that they had a spiritual or religious identity, and 37% of respondents reported that they did not have a spiritual or religious identity.[29] Respondents were most likely to identify as agnostic (23%), atheist (22%), or Christian (21%), followed by a smaller percentage who identified as Pagan (9%), Buddhist (6%), or Jewish (4%). One-quarter (25%) of respondents identified as spiritual, but with no religious affiliation. Thirteen percent (13%) had no religious or spiritual affiliation, and 7% identified with a religious affiliation or spiritual identity that was not listed (Table 4.3).

**Table 4.3: Current religious or spiritual identity**

| Current religious or spiritual identity | % of respondents |
|---|---|
| Spiritual, but no religious affiliation | 25% |
| Agnostic | 23% |
| Atheist | 22% |
| Christian | 21% |
| Pagan | 9% |
| Buddhist | 6% |
| Jewish | 4% |
| Secular Humanist | 4% |
| Wiccan | 4% |
| Druid | 1% |
| Hindu | 1% |
| Muslim | 1% |
| Native American Traditional Practitioner or Ceremonial | 1% |
| Polytheist (write-in response) | 1% |
| Taoist | 1% |
| Baha'i | <1% |
| Confucian | <1% |
| Jain | <1% |
| Jehovah's Witness | <1% |
| Rastafarian | <1% |
| Scientologist | <1% |
| Shinto | <1% |
| Sikh | <1% |
| Tenrikyo | <1% |
| A religious affiliation or spiritual identity not listed above | 7% |
| No affiliation | 13% |

# X. Income and Employment Status

Respondents were asked about various aspects of their income using a series of questions based on the Current Population Survey (CPS).[30] Results for income and employment status are presented

briefly in this section and discussed in greater detail in the *Income and Employment Status* chapter. In order to compare USTS respondents' income and employment data with data from the CPS and other national data sources, income and employment results are presented with the "supplement weight" applied.[31]

## a. Sources of Income

Nearly half (45%) of respondents received income from multiple sources, such as employment, Social Security income, or a pension. Thirty-six percent (36%) received income solely from their own employment or a partner or spouse's employment (not including underground economy work, such as sex work, drug sales, or other work that is currently criminalized). Nearly one in ten (9%) received income from Social Security, including disability, and 3% received income solely from a pension. Three percent (3%) reported that they were currently working in the underground economy, including 1% whose income came solely from underground economy work (Table 4.4).

**Table 4.4: Current sources of income by single and multiple sources**

| Sources of income | % of respondents (supplemental weight) |
|---|---|
| Employment only (from their own employer, partner/spouse's employer, or self-employment) | 36% |
| Social Security income/disability only | 9% |
| Pension/retirement only | 3% |
| Other sources of income only | 3% |
| No income | 2% |
| Sex work and other underground economy work only | 1% |
| Unemployment benefits/cash assistance only | 1% |
| Multiple sources | 45% |

## b. Individual and Household Income

Individual and household incomes for the USTS sample and the U.S. population were reported from 2014, the last full year prior to the survey for which annual income figures were available. Respondents reported lower incomes than the U.S. population (Figure 4.21 & Figure 4.22).[32]

**Figure 4.21: Individual income in 2014**



**Figure 4.22: Household income in 2014**



## c. Poverty

Nearly one-third (29%) of respondents were living in poverty,[33] more than twice the poverty rate among the general U.S. adult population (12%).[34]

## d. Employment Status

When asked about their current employment status, 35% of respondents reported that they currently had at least one full-time job, 15% had at least one part-time job, 15% were self-employed, and 11% were students. The unemployment rate for USTS respondents was 15%, three times the U.S. unemployment rate at the time of the survey (5%).[35]

# XI. Educational Attainment

Respondents were asked about the highest level of education or degree that they had completed. Thirteen percent (13%) of respondents had a high school diploma or GED, or did not complete high school. Forty percent (40%) had completed some college but had not obtained a degree, 9% had an associate's degree, and 38% had received a bachelor's degree or higher (Figure 4.23).

**Figure 4.23: Educational attainment (categories used in report)**



Throughout the report, educational attainment is reported according to the categories reflected in Figure 4.23. However, alternative categories are

also presented here for comparison to the U.S. population.[36] The USTS sample overall reflected higher educational attainment than the U.S. population, which is common among internet-based surveys.[37] To account for differences in educational attainment by age, USTS respondents are compared to the U.S. population for two age ranges: (1) ages 18 to 24 (Figure 4.24) and (2) ages 25 and older (Figure 4.25).[38]

**Figure 4.24: Educational attainment (ACS categories), ages 18 to 24**



# XII. Disability

Respondents received questions about their disability status based on questions from the American Community Survey (ACS) in order to compare those in the USTS sample to those with disabilities in the U.S. general population. Overall, 39% of respondents indicated that they had one or more disability as described in the ACS, compared to 15% of the general population.[39] Four percent (4%) of the sample reported that they were deaf or had serious difficulty hearing, similarly to the U.S. general population (4%).[40] Three percent (3%) reported that they were blind or had serious difficulty seeing even when wearing glasses, similarly to those in the U.S. population (3%).[41] USTS respondents were six times as likely to report having serious difficulty concentrating, remembering, or making decisions because of a physical, mental, or emotional condition (30%), in contrast to those in the U.S. population (5%).[42] Respondents were also almost four times as likely to report difficulty doing errands alone, such as visiting a doctor's office or shopping because of a physical, mental, or emotional condition (22%), compared to the U.S. population (6%) (Figure 4.26).[43]

**Figure 4.25: Educational attainment (ACS categories), age 25 and older**



**Figure 4.26: Disability status**



AR.10216

Respondents were also asked if they identified as a person with a disability to better capture disabilities that were not outlined in the ACS. Twenty-eight percent (28%) of the sample identified as a person with a disability.[44] Throughout the report, the experiences of "people with disabilities" reflect the experiences of these individuals.

# XIII. Citizenship and Immigration Status

Respondents were asked about their citizenship or immigration status. In addition to those who were citizens in the sample (97%), respondents reported a range of immigration statuses, including being permanent residents (1%), visa holders (1%), refugees (<1%), or undocumented residents (<1%) (Table 4.5).

**Table 4.5: Citizenship or immigration status**

| Citizenship or immigration status | % of respondents |
|---|---|
| U.S. citizen (by birth) | 94% |
| U.S. citizen (naturalized) | 3% |
| Permanent resident | 1% |
| A visa holder (such as F-1, J-1, H1-B, or U) | 1% |
| Undocumented resident | <1% |
| DACA (Deferred Action for Childhood Arrival) | <1% |
| Refugee status | <1% |
| Currently under a withholding of removal status | <1% |
| DAPA (Deferred Action for Parental Accountability) | <1% |
| Other documented status not listed | <1% |

Six percent (6%) of respondents were not citizens by birth, compared to 16% in the U.S. population.[45] This included approximately 3% who were naturalized citizens, 2% who were documented residents (such as permanent residents and visa holders), and <1% who were undocumented residents[46] (Table 4.6).

**Table 4.6: Citizenship or immigration status (collapsed)**

| Citizenship or immigration status | % in USTS | % in U.S. population (Census) |
|---|---|---|
| U.S. citizen (by birth) | 94% | 84% |
| U.S. citizen (naturalized) | 3% | 8% |
| Documented resident | 2% | 8% |
| Undocumented resident | <1% | |

Respondents who were not U.S. citizens by birth were asked if they had ever applied for asylum in the United States. Seven percent (7%) applied for asylum, including 3% who applied on the basis of their gender identity or sexual orientation. Of those who did not apply for asylum, 51% reported that they did not need asylum in order to stay in the United States because they had access to other avenues for becoming citizens, permanent residents, or visa holders.[47] Other respondents indicated that they did not know how to apply (17%) or did not apply for other reasons (Table 4.7).

**Table 4.7: Reasons for not applying for asylum**

| Reasons for not applying for asylum | % of those who did not apply for asylum |
|---|---|
| They had access to other legal statuses | 51% |
| They did not know how to apply | 17% |
| They did not want to apply | 16% |
| They did not need to or were not eligible | 12% |
| They were afraid to apply | 3% |
| They believed they were past the one-year deadline | 2% |
| A reason not listed above | 30% |

Nearly half (48%) of respondents who applied for asylum received it. Another 32% did not receive asylum but instead received a "withholding of removal" status, an alternative form of relief that allows someone to stay in the United States under certain conditions. One in five (20%) of these respondents were denied asylum (Figure 4.27). Of the respondents who were denied asylum (n=11, unweighted),[48] 31% reported that they were denied asylum because they were past the one-year deadline, 44% indicated that it was because the immigration official decided that they did not face danger in their country of origin, and 25% reported that it was because of a reason not listed.

**Figure 4.27: Outcome of asylum application**



- **20%** Denied asylum
- **32%** Denied asylum, but received a "with-holding of removal" status
- **48%** Received asylum

% of those who applied for asylum

# XIV. Sexual Orientation

Respondents were asked which terms best described their sexual orientation. Respondents were most likely to identify as queer (21%), and they also identified as pansexual (18%), gay, lesbian, or same-gender-loving (16%), straight (15%), bisexual (14%), and asexual (10%) (Figure 4.28).

**Figure 4.28: Sexual orientation**



Asexual: 10%, 4%, 6%, 7%, 17%
Bisexual: 14%, 29%, 10%, 20%, 12%
Gay, lesbian, or same-gender-loving: 16%, 13%, 8%, 27%, 12%
Pansexual: 18%, 6%, 21%, 16%, 17%
Queer: 21%, 3%, 34%, 6%, 24%
Straight or heterosexual: 15%, 41%, 2%, 19%, 23%
Sexual orientation not listed: 6%, 4%, 8%, 6%, 5%

Legend: Overall, Crossdressers, Non-binary, Trans women, Trans men

# XV. Relationship Status

Respondents were asked about their relationship status. Thirty-one percent (31%) were partnered and living together, 17% were partnered and not living together, 49% were single, 2% were in a polyamorous relationship, and 1% had a relationship status that was not listed. Respondents were also asked about their current legal marital status for the purpose of comparison to the U.S. adult population through the ACS. Eighteen percent (18%) of USTS respondents were currently married, in contrast to 52% in the U.S. adult population (Figure 4.29).[49] Almost three-quarters (72%) of respondents have never been married, which is more than twice as many as the U.S. adult population (30%).

**Figure 4.29: Currently married**
**CURRENT AGE (%)**



18 to 24: 3%, 8%
25 to 44: 23%, 53%
45 to 64: 42%, 66%
65 and over: 45%, 56%

Legend: % in USTS, % U.S. population (ACS)

PORTRAIT OF USTS RESPONDENTS

**ENDNOTES** | CHAPTER 4: PORTRAIT OF USTS RESPONDENTS

1    Respondents who were among the 12% who did not "think of [themselves] as transgender" in Q. 1.10 were eligible for the survey based on answers they provided to questions Q. 1.11–1.18. See *Appendix C (Detailed Methodology)* for a discussion of eligibility. Many of those individuals identified other terms that better described their gender and experiences.

2    Although only 12% of respondents reported that they did not think of themselves as transgender in response to Q. 1.10, a slightly larger number (14%) expressed discomfort with the word "transgender" being used to describe them in Q. 2.4. This may have been due to respondents' differentiation between identity and the terminology used to describe their identity. For example, while a respondent may have identified with the word transgender, they may not have been comfortable using the term "transgender" and would have instead preferred another term to describe their identity.

3    See Q. 2.3.

4    While most respondents were categorized for analysis by gender identity based on their selection of the term that best described them in Q. 2.3 and their selection in Q. 2.1 (sex assigned at birth on their original birth certificate) alone, a small number of respondents (n=439) required further analysis of their survey responses to determine if they met the eligibility criteria for the survey and, if so, what the most appropriate gender identity categories were for analysis. This included, for example, respondents who indicated in Q. 2.1 that the gender on their original birth certificate was female and that they identified as a woman in Q. 2.3, or who indicated that the gender on their original birth certificate was male and that they identified as a man. This recoding process is described in further detail in *Appendix C (Detailed Methodology).*

5    Respondents were also asked in an earlier question (Q. 1.11) if they identified "as more than one gender or as no gender (such as genderqueer or non-binary)," without asking them if that is the *best* term to describe their gender identity. Nearly half (47%) of respondents said that they identify as such. This means that some respondents who said that another term (such as transgender man, transgender woman, or crossdresser) best described their gender identity also identified as having more than one gender or as no gender.

6    Although the vast majority of people have either male or female on their original birth certificate, there are rare instances where the sex on a birth certificate is left blank or where a gender marker other than "male" or "female"

is listed at the time of birth. It is possible that some respondents had an original birth certificate that did not list them as "male" or "female" at the time of their birth. These respondents may not have been able to accurately answer this question. Respondents were required to select one response to the question about the sex listed on their original birth certificate in Q. 2.1—either "female" or "male"—in order to proceed, since this answer was used to determine subsequent questions that they would receive later in the survey.

7    The age of respondents in the sample is discussed in further detail in section VI of this chapter.

8    Note that Q. 1.12 asked whether respondents were currently living full time in a gender different from the one assigned to them at birth. Some non-binary respondents may have been living as a non-binary person full time (including people for whom living part time in one gender and part time in another gender is most consistent with their non-binary identity), but did not select "yes" because they assumed the survey was asking only about people who were living exclusively in a binary gender (male or female) that is different than the gender on their original birth certificate.

9    Although 6% of crossdressers reported that they had transitioned based on Q. 1.12, the sample size of crossdressers who had transitioned was too low to report on their experiences by age.

10    The number of years since transitioning was calculated based on respondents' current age as reported in Q. 2.13, and the age at which they began to transition, as reported in Q. 1.13.

11    Throughout this report, respondents' experiences with being perceived as transgender by others are reported according to three categories: those who said that people could tell they were transgender "always" or "most of time" (11%), those who said that others could "sometimes" tell (32%), and those who said that others could "rarely" or "never" tell (57%).

12    The term "out" is used here to describe a person who openly self-identifies as transgender in their private, public, and/or professional lives.

13    See the *Family Life and Faith Communities* chapter for a more detailed discussion of respondents' experiences with being out to the immediate family they grew up with and their extended family, as well as their experiences with being out to partners or spouses and children.

14    Respondents' experiences with being out in the workplace are further discussed in the *Employment and the Workplace* chapter.

15  Respondents who reported that "Alaska Native" most accurately described their racial or ethnic identity were asked to enter their enrolled or principal corporation.

16  Respondents who reported that "American Indian" most accurately described their racial or ethnic identity were asked to enter their enrolled or principal tribe.

17  Those who reported that "biracial/multiracial" best described their racial or ethnic identity received a follow-up question in which they could select one or more of the racial or ethnic identities listed above that best described them.

18  Those who selected "a racial/ethnic identity not listed above" were asked to specify their identity and then received a follow-up question asking them to select the racial/ethnic identity or identities that best described them from the list above, with the exception of the "identity not listed above" category.

19  Racial and ethnic categories are combined in a manner similar to that in the U.S. Census, which is important for the purposes of making racial and ethnic comparisons to the U.S. population. A notable exception to U.S. Census categorization is that Middle Eastern and white respondents are reported separately throughout the report. The U.S. Census also offers Asians and Native Hawaiians/Other Pacific Islanders as two separate racial categories. Additionally, this report includes a Latino/a category, and other racial and ethnic categories should be considered to be of "non-Hispanic" origin, based on U.S. Census categories.

20  The difference in racial and ethnic population distribution in the USTS sample and the U.S. general population may be due to sampling bias that is common in internet-based surveys and convenience samples. See e.g., Dillman, D. A., Smyth, J. D., & Christian, L. M. (2014). *Internet, Phone, Mail, and Mixed-Mode Surveys: The Tailored Design Method (4th ed.).* Hoboken, NJ: John Wiley & Sons. See also the *Methodology* chapter and *Appendix C (Detailed Methodology)* for more information about potential internet-based survey sampling bias. See *Appendix A (Characteristics of the Sample)* for unweighted frequencies and percentages for race and ethnicity in the USTS sample.

21  Prior research using representative samples of transgender adults have found that transgender adults differ from the general population in regard to race and ethnicity, with transgender people being more likely to be people of color. See e.g., Flores, A. R., Brown, T. N. T., & Herman, J. L. (2016). *Race and Ethnicity of Adults who Identify as Transgender in the United States.* Los Angeles, CA: Williams Institute; Conron, K. J., Scott, G., Stowell, G. S., & Landers, S. J. (2012). Transgender health in Massachusetts: Results from a household probability sample of adults. *American Journal of Public Health, 102*(1), 118–122. The USTS sample has a higher percentage of white respondents than the U.S. general population. To help correct for this sampling bias, weights for race and ethnicity were applied based on the racial and ethnic makeup of the U.S. population. While this may still over-represent white respondents relative to the makeup of the transgender adult population, this weighting procedure brings the sample closer to what is estimated to be the true population distribution for race and ethnicity for transgender people. See the *Methodology* chapter and *Appendix C (Detailed Methodology)* for more information on weighting procedures applied to the sample. See also *Appendix A (Characteristics of the Sample)* for unweighted frequencies and percentages for race and ethnicity in the USTS sample.

22  Although the ACS groups Middle Eastern and white people in one category, the experiences of Middle Eastern respondents are presented separately from white respondents throughout this report. Despite a low number of Middle Eastern respondents in the sample overall (<1%), it is important to report in a manner that best reflects the unique circumstances of transgender people who identify as Middle Eastern.

23  The weight for 18-year-old respondents was created with propensity scores developed using a regression discontinuity model. For more information on this process and other weighting procedures, such as the development and application of the "supplemental weight," see *Appendix C (Detailed Methodology).* See *Appendix A (Characteristics of the Sample)* for unweighted frequencies and percentages for age in the USTS sample.

24  U.S. Census Bureau. (2015). *Annual Estimates of the Resident Population: April 1, 2010 to July 1, 2015.* Available at: https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=PEP_2015_PEPANNRES&src=pt.

25  U.S. Census Bureau. (2015). *2015 American Community Survey 1-Year estimates: Language spoken at home by ability to speak English for the population 5 years and over.* Available at: https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_15_1YR_B16001&prodType=table. The percentages of people who reported on the primary language spoken in their home in the American Community Survey (ACS) were calculated by the research team. ACS findings include those in the U.S. population who are 5 years of age and older, in contrast to the USTS sample, which includes respondents who are 18 and older. Therefore, the comparison to the USTS sample should be interpreted with caution.

26  U.S. Census Bureau. (2015). *2015 American Community Survey 1-Year estimates: Language spoken at home by ability to speak English for the population 5 years and over.* See note 25.

27  Q. 2.12 asked about religious or spiritual identity only, rather than current involvement in a faith community. More information about respondents' experiences in faith communities (including religious and spiritual communities) can be found in the *Family and Faith Communities* chapter.

28   In addition to the main drop-down list of affiliations, those who identified as Christian, Jewish, or Muslim were able to provide additional specificity for their identity from a drop-down list of more specific religious affiliations in Q. 2.12. Although respondents were provided with numerous categories to specify for Christian, Jewish, and Muslim faiths, these lists were not exhaustive and likely did not capture all religious or spiritual identities represented in the sample. Furthermore, while those who identified as Christian were given an option to write in a Christian affiliation that was not listed, Jewish and Muslim respondents did not receive that option, which may have limited the manner in which they were able to identify their religious or spiritual identity.

29   Respondents who reported that they did not have a religious or spiritual identity included those who selected agnostic, atheist, or no affiliation without selecting another religious or spiritual identity.

30   The Current Population Survey is used by the Bureau of Labor Statistics to make determinations about the state of employment in the United States.

31   The "supplemental weight" includes the standard survey weight for 18-year-olds and race and ethnicity, as well as additional weights for age and educational attainment that were created based on the Census Bureau's 2014 American Community Survey (ACS). This weight was applied when comparing the USTS sample to the U.S. population for items that were sensitive to age and educational attainment, such as employment status and individual and household income.

32   USTS respondents seem to have similar household sizes to the U.S. population. For instance, according to the CPS, 2015 Annual Social and Economic Supplement, 28% of U.S. households have a household size of one, whereas 29% of USTS respondents have a household size of one (supplemental weight applied). However, USTS respondents are less likely to be living with family members, rather than with unrelated members of the household. Sixty-four percent (64%, supplemental weight applied) of USTS respondents reported a family size of one compared to 24% in U.S. population as reported in the CPS. Available at: https://www2.census.gov/programs-surveys/cps/techdocs/cpsmar15.pdf. Calculations were completed by the research team.

33   "Living in poverty" means living at or near the poverty line. The research team calculated the USTS poverty measure using the official poverty measure, as defined by the U.S. Census Bureau, which can be found at: https://www.census.gov/hhes/www/poverty/about/overview/measure.html. The income ranges in the USTS allowed for designation of respondents as living in or near poverty if their total family income fell under 125% of the official poverty line.

34   Proctor, B. D., Semega, J. L., & Kollar, M. A. (2016). *Income and Poverty in the United States: 2015.* (p. 13). DC: U.S. Census Bureau. Available at: https://www.census.gov/content/dam/Census/library/publications/2016/demo/p60-256.pdf. Calculations were completed by the research team.

35   Bureau of Labor Statistics. (2015). *The Employment Situation—August 2015.* Available at: http://www.bls.gov/news.release/archives/empsit_09042015.pdf; Bureau of Labor Statistics. (2015). *The Employment Situation—September 2015.* Available at: http://www.bls.gov/news.release/archives/empsit_10022015.pdf.

36   The educational attainment results reported for USTS respondents likely overestimates the number of transgender people with a level of education beyond high school and/or some college. This may be due to the method by which the survey was administered (online only) and the sampling technique (convenience sampling). Population-based surveys in several states have found lower educational attainment or no difference in educational attainment among transgender people when compared to non-transgender people. Conron, et al. See note 21; Meyer, I .H., Brown, T. N. T., Herman, J. L., Reisner, S. L., & Bockting, W. O. (in press). Demographic characteristics and health outcomes among transgender adults in select U.S. regions in the Behavioral Risk Factor Surveillance System. *American Journal of Public Health.*

37   See the *Methodology* chapter and the detailed methodology explanation in *Appendix C* (*Detailed Methodology*) for more information about potential internet-based survey sampling bias. See also note 20.

38   U.S. Census Bureau. (2015). *2015 American Community Survey 1-Year estimates: Educational Attainment.* Available at: https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_15_1YR_S1501&prodType=table.

39   U.S. Census Bureau. (2015). *2015 American Survey 1-Year estimates: Disability characteristics.* Available at: http://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_15_1YR_S1810&prodType=table. Calculations were completed by the research team.

40   U.S. Census Bureau. (2015). See note 39.

41   U.S. Census Bureau. (2015). See note 39.

42   U.S. Census Bureau. (2015). See note 39.

43   U.S. Census Bureau. (2015). See note 39.

44   The difference in the reported rate of those who had one or more listed ACS disabilities (39%) and those who identified as a person with a disability (28%) may be due to some individuals not being comfortable referring to themselves as a person with a disability. However, those who identified as people with a disability likely reflect a much wider range of disabilities.

45  U.S. Census Bureau. (2015). *2015 American Community Survey 1-Year estimates: Sex by age by nativity and citizenship status.* Available at; https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_15_1YR_B05003&prodType=table. Calculations were completed by the research team.

46  Documented and undocumented residents are often underrepresented in surveys for many reasons, including concerns about jeopardizing their residency by revealing information about their immigration status on a survey. When asking questions relating to citizenship and immigration status, the survey included statements reminding respondents that their answers were confidential and could not be used against them. However, it is likely that the number of documented and undocumented residents is underrepresented in this sample.

47  This percentage includes those who reported that they had access to other legal statuses and those who indicated that they were already citizens or permanent residents in Q. 9.8.

48  Due to the small sample size, the unweighted frequency is being presented alongside weighted percentages here to be clear that the percentages reflect the experiences of a small sample of respondents. While it is important to present these experiences in this report, the findings presented in this sentence should be interpreted with caution due to the small sample size.

49  U.S. Census Bureau. (2015). *2015 American Community Survey 1-Year Estimates: Sex by marital status by age for the population 15 years and over.* Available at: https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_15_1YR_B12002&prodType=table. These findings, as presented in the ACS, include adults who are currently married with both spouses who are present and not present based on the ACS definitions. Calculations were completed by the research team.



## CHAPTER 5

# Family Life and Faith Communities

<div style="writing-mode: vertical">2015 U.S. TRANSGENDER SURVEY</div>

**F**amily life and the state of relationships with family members, including immediate and extended family, spouses and partners, and children, have been shown to impact life outcomes in many areas, such as physical and mental health, economic status, and housing stability.[1] Experiences of support and rejection within the family environment can have a profound effect on these outcomes for transgender people. The survey explored aspects of family relationships for transgender people, particularly the impact of family acceptance and rejection.

Since spiritual and religious communities (such as within a church, synagogue, mosque, or other faith community) can play a significant role within families and throughout an individual's life, the survey also examined respondents' experiences with faith communities.

Notable differences in respondents' experiences based on demographic and other characteristics are reported throughout the chapter.

AR.10223

**KEY FINDINGS**

▶ Sixty percent (60%) of respondents who were out to the immediate family they grew up with reported that they had supportive families, and 40% had families that were neutral or not supportive.

- One in ten (10%) reported that an immediate family member had been violent towards them because they were transgender.

- Fifteen percent (15%) ran away from home and/or were kicked out of the house because they were transgender.

▶ More than one-quarter (27%) of respondents who have been out to any of their past or current spouses or partners reported that a spouse or partner ended their relationship solely or partly because they were transgender, including 10% who had a relationship end solely because they were transgender.

▶ Eighteen percent (18%) of respondents were parents.

▶ Twenty-one percent (21%) of respondents who were out to their children had a child who stopped speaking to them or spending time with them after coming out as transgender.

▶ One-half (50%) of respondents who were out to their family experienced at least one form of rejection from the immediate family they grew up with, their spouse or partner, and/or their children because they were transgender.

▶ Family support was associated with positive outcomes while family rejection was associated with negative outcomes. Respondents who were rejected were:

- Nearly twice as likely to have experienced homelessness (40%) as those who were not rejected (22%).

- Almost twice as likely to have engaged in sex work (16%) as those who were not rejected (9%).

- More likely to have attempted suicide (49%) than those who were not rejected (33%).

▶ Nearly one in five (19%) respondents who had ever been part of a spiritual or religious community left due to rejection. Forty-two percent (42%) of those who left found a welcoming spiritual or religious community.

FAMILY LIFE AND FAITH COMMUNITIES

AR.10224

# I. Outness to Family and Friends

Respondents received a series of questions to determine whether they were "out"[2] about their transgender identity to various family members and friends. Specifically, respondents were asked whether people in different groups knew they were transgender, including spouses and partners, children, immediate family they grew up with, extended family, LGBT[3] friends, and straight and non-transgender (non-LGBT) friends. Respondents then received questions regarding the impact that anti-transgender bias had on the relationships with most of the people in those groups.

Eighty-six percent (86%) of respondents reported having a current or former spouse or partner. Fifty-eight percent (58%) of those were out to their current spouse or partner and 53% had been out to at least one of their former spouses or partners. Overall, 88% of these respondents were or have been out to a current or former spouse or partner.

Of the 18% of respondents who had children, 69% reported being out to at least one child. This varied by race and ethnicity, with American Indian respondents (78%) reporting the highest level of outness, and Black (62%), Latino/a (62%), and Asian (55%) individuals being out to their children less often (Figure 5.1).

Respondents were asked whether they were currently out to all, most, some, or none of the people in several groups, including the immediate family they grew up with, extended family,[4] LGBT friends, and straight and non-transgender (non-LGBT) friends. Results for each group reflect only respondents who reported having people from that group in their lives.

More than half (53%) of respondents reported that they were out to all immediate family they grew up with. This number decreased to 49% when considering spouses or partners and children as part of the immediate family. Respondents were less likely to be out to extended family members, with 23% reporting that they were out to all extended family. Overall, less than one-quarter (22%) of respondents were out to all immediate family members—including spouses, partners and children—and extended family members.

Respondents were also asked whether their LGBT and non-LGBT friends knew that they were transgender. LGBT friends were the largest group of people among whom survey respondents were out, with 62% reporting that they were out to all of their LGBT friends. In contrast, less than one-third (32%) of respondents were out to all of their non-LGBT friends (Table 5.1).

**Figure 5.1: Out to children**
RACE/ETHNICITY (%)



*Sample size too low to report

**Table 5.1: Outness to family and friend groups**

| Family and friend groups | % of respondents who had people from the family or friend group in their lives | | |
|---|---|---|---|
| | All | Most or some | None |
| Lesbian, gay, bisexual, or transgender (LGBT) friends | 62% | 34% | 4% |
| Immediate family they grew up with (such as parents or siblings) | 53% | 25% | 22% |
| Immediate family they grew up with, spouses/partners, children | 49% | 43% | 8% |
| Straight, non-transgender (non-LGBT) friends | 32% | 56% | 12% |
| Extended family (such as aunts, uncles, and cousins) | 23% | 38% | 39% |
| Immediate family they grew up with, extended family, spouses/ partners, and children | 22% | 70% | 8% |

# II. Relationships with Spouses or Partners

Those who were out to a spouse or partner were asked whether a spouse or partner had ended their relationship because they were transgender. More than a quarter (27%) reported that a spouse or partner ended their relationship solely or partly because they were transgender, including 10% who had a relationship end solely because they were transgender.

Whether a relationship ended solely due to being transgender differed based on a respondents' current age, with those aged 45 and older being twice as likely to have this experience (Figure 5.2).

**Figure 5.2: Spouse/partner ended relationship solely because of transgender status**
CURRENT AGE (%)



The age at which a respondent transitioned also affected the likelihood of a relationship ending. Respondents who transitioned at age 35 or older were more than twice as likely to have their relationship end solely due to being transgender (24%) (Figure 5.3).

**Figure 5.3: Spouse/partner ended relationship solely because of transgender status**
AGE OF TRANSITION (%)



The likelihood of a relationship ending also differed by gender identity, with transgender women (18%) being more likely to have a relationship with a spouse or partner end solely because of being transgender than transgender men (9%), crossdressers (6%), and non-binary people (3%) (Figure 5.4).

**Figure 5.4: Spouse/partner ended relationship solely because of transgender status**
GENDER IDENTITY (%)



*More than one-quarter (27%) of respondents who were out to their spouse or partner reported that a spouse or partner ended their relationship solely or partly because they were transgender, including 10% who had a relationship end solely because they were transgender.*

Respondents were also asked whether a current or former romantic or sexual partner had ever been violent toward them. More than half (54%) reported that they had experienced some form of intimate partner violence. Experiences with intimate partner violence are discussed further in the *Harassment and Violence* chapter.

## III. Parental Status and Related Children in the Household

Eighteen percent (18%) of people in the sample were parents,[5] and of those individuals, more than two-thirds (69%) reported that they were out as transgender to at least one of their children.

In comparison to the U.S. adult population, USTS respondents were substantially less likely to have related children living in their home. According to the Current Population Survey, 34% of adults in the U.S. population had at least one related child under the age of 18 living in their household in 2015,[6] which was more than twice as many

## In Our Own Voices

"When I finally had the courage to come out, my parents, who I knew would freak out, did the unthinkable. They assured me I had their complete support to be who I am. I was never prouder than in that moment."

.................................................................

"My father physically assaulted me and kicked me out of the house. He screamed at me, calling me pathetic, a waste, worthless, and so on. I sat in silence."

.................................................................

"When I was 20, I slipped up and accidentally outed myself to my parents. It was the worst mistake of my life. They spoke with a pastor who convinced them that I was possessed by demon. A couple of days later, they told me to leave and not come back. I spent the next six months homeless."

.................................................................

"Within an hour of coming out to my parents, I was kicked out into the cold with very few items and my car taken away. I was soon informed by my college that my parents had withdrawn my tuition for the upcoming spring semester. I was devastated."

.................................................................

"It took my family a while to come around. At first they didn't accept me, but they eventually saw how much happier I am and are now my biggest supporters."

.................................................................

AR.10227

as USTS respondents (14%).[7] These differences persisted across all age groups, with USTS respondents aged 25 to 44 being more than four times less likely to have a related child under the age of 18 living in their household (12%) than the corresponding age group in the U.S. population (54%) (Figure 5.5).

**Figure 5.5: Respondents with related children under 18 living in household**
AGE (%)



USTS respondents with a related child under 18 in household

Adults in the U.S. population with a related child under 18 in household (CPS)

# IV. Relationships with Children

Respondents who reported that they were out to at least one of their children were asked a question to determine whether being transgender had ever negatively impacted a relationship with their child. Specifically, they were asked whether any of their children had ever stopped speaking to or spending time with them because they were transgender. More than one in five (21%) reported that at least one of their children stopped speaking

*More than one in five (21%) of those who were out to their children reported that at least one of their children stopped speaking or spending time with them, temporarily or permanently.*

or spending time with them, at least for a period of time.

The likelihood of this experience differed by gender identity, with transgender women (28%) being more than four times as likely to report that their child stopped speaking or spending time with them as transgender men (6%) and non-binary respondents (6%) (Figure 5.6).

**Figure 5.6: Children stopped speaking or spending time with respondent because of transgender status**
GENDER IDENTITY (%)



Overall, of respondents who have had a spouse or partner and/or who have children, 28% have had a relationship with their spouse or partner or child end, at least temporarily.

# V. Family Acceptance and Support

Respondents who reported that they were out to all, most, or some of the immediate family they grew up with were asked to assess how supportive their family was of them as a transgender person using a five-point scale from "very supportive" to "very unsupportive." The categories were collapsed to create a new variable reflecting a supportive, neutral, or unsupportive family.[8]

More than half (60%) reported that their family was supportive, 18% had unsupportive families, and 22% had families that were neither supportive nor unsupportive ("neutral").

*Experiences varied widely between those with family support and those with unsupportive families, with family support being associated with a reduced likelihood of negative experiences. Respondents with family support were:*

- *More likely to be employed (65%) than those with unsupportive families (52%).*

- *Less likely to have ever done sex work (11%) than those with unsupportive families (16%).*

- *Less likely to have experienced homelessness (27%) than those with unsupportive families (45%).*

- *Less likely to report currently experiencing serious psychological distress[9] (31%) in contrast to those with unsupportive families (50%).*

- *Less likely to have attempted suicide (37%) than those with unsupportive families (54%).*

*More than half (60%) of those who were out to their immediate family reported that their family was supportive, while 18% said that their family was unsupportive.*

# VI. Relationships with Immediate Family/ Family of Origin[10]

Nearly half (44%) of respondents who were out to all, most, or some of the immediate family they grew up with (such as parents and siblings) reported that they had experienced at least one form of family rejection outlined in the survey. This rejection included relationships ending, family violence, being kicked out of the house, not being allowed to wear clothes matching their gender identity, and being sent to a professional to stop them from being transgender.

## A. Ended Relationships

Among those who were out to their immediate family, more than one-quarter (26%) reported that an immediate family member stopped speaking to them for a long time or ended their relationship altogether because they were transgender. This was higher among American Indian (38%), Middle Eastern (37%), and Black (30%) respondents, and lower for Asian (22%) respondents (Figure 5.7). Undocumented residents (39%) were also more likely to face this form of family rejection than documented non-citizens (22%) and citizens (26%).

**Figure 5.7: Immediate family member stopped speaking or ended relationship**
RACE/ETHNICITY (%)



*More than one-quarter (26%) of respondents reported that an immediate family member stopped speaking to them for a long time or ended their relationship altogether because they were transgender.*

Whether a family member stopped speaking to or ended a relationship with a respondent differed by age, with 18 to 24 year olds experiencing the least amount of family rejection of this nature (18%) compared to those in other age groups, such as 45 to 64 year olds (37%) (Figure 5.8).

**Figure 5.8: Immediate family member stopped speaking or ended relationship**
CURRENT AGE (%)



Those who transitioned in the last year (24%) were less likely to have a family member stop speaking to them or end a relationship than those who transitioned 2 to 5 years ago (29%), 6 to 9 years

ago (37%), and 10 or more years ago (43%) (Figure 5.9).

**Figure 5.9: Immediate family member stopped speaking or ended relationship**
YEARS SINCE TRANSITIONING (%)



## B. Family Violence

Among those who were out to their immediate family, one out of every ten (10%) respondents reported that a family member was violent towards them because they were transgender. Prevalence of family violence differed greatly depending on the time period during which a respondent transitioned, with those transitioning 10 or more years ago (15%) experiencing almost twice as much violence as those who transitioned in the past year (8%) (Figure 5.10).

**Figure 5.10: Experienced violence by family member**
YEARS SINCE TRANSITIONING (%)



*Family violence was associated with increased likelihood of negative experiences. Those who experienced family violence were:*

- *More than twice as likely to have experienced homelessness (59%) than those who did not experience family violence (29%).*

- *More likely to be currently experiencing serious psychological distress (53%) than those who did not experience family violence (35%).*

- *More likely to have attempted suicide in their lifetime (65%) than those who did not experience family violence (39%).*

American Indian respondents (20%) were twice as likely to experience family violence, and other people of color, such as Asian (15%) and Middle Eastern (14%) respondents, also experienced higher rates of violence (Figure 5.11).

**Figure 5.11: Experienced violence by family member**
RACE/ETHNICITY (%)



Undocumented residents were more than twice as likely to have experienced family violence (25%) as their documented non-citizen (13%) and citizen (9%) counterparts.

## C. Kicked out of the House

Eight percent (8%) of respondents who were out to the immediate family they grew up with were kicked out of the house, which represents 6% of the whole sample. Those who transitioned 10 or more years ago were twice as likely to have been kicked out of the house (16%) as those who transitioned within the last year (7%) (Figure 5.12).

**Figure 5.12: Kicked out of the house by family**
YEARS SINCE TRANSITIONING (%)



People of color were kicked out of the house at higher rates, with Middle Eastern respondents (17%) being twice as likely, and American Indian (14%), Black (12%), Latino/a (11%), multiracial (11%), and Asian (9%) respondents experiencing this form of rejection more than white respondents (6%) (Figure 5.13).

AR.10231

**Figure 5.13: Kicked out of the house by family**
RACE/ETHNICITY (%)



*Fourteen percent (14%) of respondents who were out to their immediate family reported that their family sent them to a professional—such as a therapist, counselor, or religious advisor—to stop them from being transgender.*

*Being kicked out of the house was associated with an increased likelihood of a range of negative experiences related to economic stability, mental health, and physical health. Respondents who were kicked out of the house were:*

- *More likely to be living in poverty (43%) than those who were not kicked out of the house (28%), and had lower incomes overall.*

- *Three times more likely to have ever done sex work (33%) than those who were not kicked out of the house (11%).*

- *Almost three times as likely to have experienced homelessness (74%) as those who were not kicked out of the house (28%).*

- *More than twice as likely to be living with HIV (3.5%) than those who were not kicked out of the house (1.5%).*

- *Substantially more likely to have attempted suicide (66%) than those who were not kicked out of the house (39%).*

- *More likely to be currently experiencing serious psychological distress (50%) than those who were not kicked out of the house (36%).*

### D. Not Allowed To Wear Clothes Matching One's Gender Identity

More than one-quarter (27%) of respondents who were out to the immediate family they grew up with were not allowed to wear clothes that matched their gender.

### E. Sent to a Professional to Stop Them from Being Transgender

Fourteen percent (14%) of respondents who were out reported that their immediate family had sent them to a professional—such as a therapist, counselor, or religious advisor—to stop them from being transgender. This represents 11% of the whole sample. Those who transitioned 6 or more years ago (20%) were twice as likely to be sent to a professional as those who transitioned within the last year (11%) (Figure 5.14).

**Figure 5.14: Sent to a professional to stop them from being transgender**
YEARS SINCE TRANSITIONING (%)



Rates differed by race and ethnicity, with nearly one-third of Middle Eastern respondents (31%) and nearly one-quarter of American Indian respondents (24%) being sent to a professional (Figure 5.15).

**Figure 5.15: Sent to a professional to stop them from being transgender**
RACE/ETHNICITY (%)



Additional details on respondents' experiences with professionals who attempted to change their gender identity are discussed further in the "Conversion Therapy and Other Pressures to De-Transition" section of the *Health* chapter.

# VII. Ran Away From Home

One out of every ten (10%) respondents who were out to their immediate family ran away from home because they were transgender. Almost one-third (32%) of those individuals ran away at age 15 or younger.

Respondents were more than twice as likely to have run away from home if they transitioned 10 or more years ago (19%) as compared to those who had transitioned within the past year (8%) (Figure 5.16).

**Figure 5.16: Ran away from home**
YEARS SINCE TRANSITIONING (%)



People of color were more likely to have run away from home, with Middle Eastern (25%), American Indian (18%), Black (15%), multiracial (14%), Asian (12%), and Latino/a (12%) respondents all reporting that they had run away at higher rates than white respondents (8%) (Figure 5.17).

**Figure 5.17: Ran away from home**
RACE/ETHNICITY (%)



Rates also differed according to citizenship status, with undocumented residents (36%) running away from home more than three times as often as citizens (10%) and more than documented non-citizen residents (14%).

AR.10233

Overall, 15% of those who were out to their immediate family, or 11% of the whole sample, ran away from home and/or were kicked out of the house.

# VIII. Supportive Family Behaviors

Those who were out to their immediate family were asked whether any of the immediate family they grew up with demonstrated support of them as a transgender person through any specific acts listed in the question, such as using preferred names, using correct pronouns, and providing financial support for their transition. Eighty-two percent (82%) of respondents reported that at least one immediate family member supported them through at least one of these acts, while 18% did not experience any of the supportive acts (Table 5.2).

**Table 5.2: Family support**

| Supportive family behaviors | % of respondents |
|---|---|
| Told respondent they respect and/or support them | 65% |
| Used their preferred name | 58% |
| Used the correct pronouns | 55% |
| Stood up for them with family, friends, or others | 36% |
| Did research to learn how to best support them | 33% |
| Gave money to help with gender transition | 18% |
| Supported them in another way | 11% |
| Provided help with changing name and/or gender on an ID document | 10% |
| **One or more experiences listed** | **82%** |

# IX. Family Rejection Overall

A variable was created to combine all forms of family rejection examined in the survey. This included whether the respondent had a spouse, partner, or child end a relationship, reported that their family was unsupportive, or had any of the five specific rejecting experiences outlined in section VI of this chapter. One half (50%) of respondents who were out to family members reported that they experienced some form of family rejection, which represents 46% of the overall sample.[11]

Experience with family rejection differed by the age at which a respondent transitioned, with 68% of those who transitioned at age 35 or older experiencing rejection, compared to 56% of those who transitioned under the age of 18 (Figure 5.18). Among respondents who transitioned ten or more years ago, 68% reported family rejection compared to 48% of those who transitioned in the past year (Figure 5.19).

**Figure 5.18: Any family rejection**
AGE OF TRANSITION (%)



**Figure 5.19: Any family rejection**
YEARS SINCE TRANSITIONING (%)



Family rejection also differed by gender identity, with transgender women (63%) experiencing rejection more than transgender men (55%), and transgender men and women (59%) experiencing nearly twice as much rejection as non-binary respondents (32%) (Figure 5.20).

**Figure 5.20: Any family rejection**
GENDER IDENTITY (%)



Family rejection among respondents of different racial or ethnic identities varied little, although American Indian (66%) respondents experienced higher levels of rejection (Figure 5.21).

**Figure 5.21: Any family rejection**
RACE/ETHNICITY (%)



*Respondents who experienced family rejection were:*

* *Almost twice as likely to have experienced homelessness (40%) as those who were not rejected (22%).*

* *Nearly twice as likely to have done sex work (16%) as those who were not rejected (9%).*

* *More likely to have attempted suicide (49%) than those who were not rejected (33%).*

# X. Experiences with a Faith Community

The survey explored respondents' experiences with a spiritual or religious community ("faith community"), such as a church, synagogue, mosque, or other faith community. Two-thirds (66%) of the survey sample had been part of a faith community at some point in their life. Black (77%) and Middle Eastern (71%) respondents were more likely to have been part of a faith community than respondents of other races and ethnicities (Figure 5.22).

AR.10235

**Figure 5.22: Ever been part of a faith community**
RACE/ETHNICITY (%)



## B. Leaving a Faith Community Due to Rejection

Nearly one in five (19%) respondents who had been part of a faith community left because they were actually rejected (in contrast to feared rejection as reported in the last subsection), which represents 12% of all respondents. Experiences varied based on the amount of time since transition, with nearly one-third (32%) of those who transitioned 10 or more years ago leaving a faith community due to rejection (Figure 5.24).

**Figure 5.24: Ever left faith community due to rejection**
YEARS SINCE TRANSITIONING (%)



## A. Leaving a Faith Community Due to Fear of Rejection

More than one-third (39%) of respondents who have been part of a faith community left due to fear of being rejected because they were transgender. People of color, including Middle Eastern (54%), American Indian (51%), Black (49%), Latino/a (46%), Asian (43%), and multiracial (40%) respondents, were more likely to leave because they were afraid of rejection (Figure 5.23).

**Figure 5.23: Ever left faith community due to fear of rejection**
RACE/ETHNICITY (%)



People of color were rejected by their faith communities at higher rates, with one-third of American Indian respondents (33%) and almost one-quarter of Black (24%) and Middle Eastern (24%) individuals leaving for this reason (Figure 5.25).

*More than one-third (39%) of respondents who have been part of a faith community left because they feared rejection as a transgender person.*

**Figure 5.25: Ever left faith community due to rejection**
RACE/ETHNICITY (%)



## C. Welcoming Communities and Experiences Within the Past Year

Of the people who had been rejected by a faith community, 42% found a new community that welcomed them as a transgender person. This differed by respondents' race or ethnicity, with American Indian respondents (54%) being more likely to find a welcoming community, and Latino/a (37%) and Asian (34%) respondents being least likely (Figure 5.26).

**Figure 5.26: Found new welcoming faith community after rejection**
RACE/ETHNICITY (%)



*Sample size too low to report

Nearly one-third (30%) of those who had ever been part of a faith community reported that they had been part of such a community in the past year, which is 19% of the overall sample. Additionally, sixty percent (60%) of them were in a community where leaders or other members thought or knew they were transgender.

## D. Acceptance Within Faith Communities in the Past Year

Respondents whose faith community leaders or members thought or knew they were transgender were asked about a series of behaviors that signaled acceptance within the community in the past year. Ninety-four percent (94%) reported that community leaders and/or members accepted them for who they are as a transgender person, and more than three-quarters (80%) were told their religion or faith accepts them. Ninety-six percent (96%) of respondents who were in a faith community in the past year experienced at least one of the accepting behaviors (Table 5.3).

**Table 5.3: Acceptance within a faith community in the past year**

| Acceptance within faith community in past year | | | |
|---|---|---|---|
| | Many times | A few times | Once or twice |
| Community leaders and members accepted them for who they are as a transgender person | 75% | 11% | 8% |
| A leader or member of their faith community made them feel welcome as a transgender person | 72% | 12% | 9% |
| They were told that their religion or faith accepts them as a transgender person | 59% | 12% | 9% |
| **One or more experiences listed[12]** | **96%** | | |

## E. Rejection Within Faith Communities in the Past Year

Those with faith community leaders or members who thought or knew they were transgender were also asked about behaviors that signaled rejection in the past year. Among them, 6% were asked to meet with faith leaders to stop them from being transgender, and 5% were asked to stop coming to services or faith community functions (Table 5.4).

**Table 5.4: Rejection within a faith community in the past year**

| Rejection within faith community in past year | Many times | A few times | Once or twice |
|---|---|---|---|
| They were told that being transgender is a sin or that their religion does not approve of them | 5% | 5% | 7% |
| They were asked to meet with faith leaders to stop them from being transgender | 1% | 2% | 3% |
| Community leaders or members asked them to seek medical or psychological help to stop them from being transgender | 1% | 2% | 3% |
| They were asked to stop coming to services or faith community functions | 1% | 1% | 3% |
| **One or more experiences listed[13]** | | **18%** | |

Nearly one in five (18%) respondents who were in a faith community in the past year reported that they experienced at least one of the rejecting behaviors. Rejection was more likely among Asian (40%) and Black (25%) respondents (Figure 5.27).

***Nearly one in five (19%) respondents who had been part of a faith community left because they were rejected.***

**Figure 5.27: Any rejecting behavior by faith community in past year**
**RACE/ETHNICITY (%)**



*Sample size too low to report

# Conclusion

Results showed significant challenges in many areas of family life, including the retention of relationships with immediate and extended family, spouses and partners, and children. However, results also demonstrate that survey respondents were able to maintain relationships and successfully build family units despite those challenges. They further show the importance of family support in promoting positive experiences in many aspects of life. Results demonstrate that family rejection is strongly correlated with increased negative effects on a wide range of major life experiences, including income, homelessness, HIV infection, serious psychological distress, and suicidal behavior. Additionally, although many respondents experienced negative interactions within their faith communities, many others were able to find welcoming and supportive communities. While respondents' experiences varied overall, these findings reveal the substantial challenges facing many transgender people within their families and faith communities.

**ENDNOTES**  |  CHAPTER 5: FAMILY LIFE AND FAITH COMMUNITIES

1   Grant, J. M., Mottet, L. A., Tanis, J., Harrison, J., Herman, J. L., & Keisling, M. (2011). *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey*. (pp. 88–105). DC: National Center for Transgender Equality & National Gay and Lesbian Task Force; Huebner, D., Diaz, R. M., & Sanchez, J. (2010). Family acceptance in adolescence and the health of LGBT young adults. *Journal of Child and Adolescent Psychiatric Nursing, 23*(4), 205–213.

2   The term "out" is used here to describe a person who openly self-identifies as transgender in their private, public, and/or professional lives.

3   Lesbian, gay, bisexual, and transgender (LGBT).

4   See Q. 4.5 for descriptions of groups of family members.

5   A respondent's status as a parent was determined based on Q. 4.3, which asked if a respondent was out to any of their children. Eighty-two percent (82%) reported that they "do not have any children," and the remaining 18% answered "yes" or "no" to whether they were out to their children. This question established whether a respondent had at least one child, but did not determine the number of children, ages of children, or whether the children lived in the respondent's household.

6   U.S. Census Bureau. (2015). *Current Population Survey, Annual Social and Economic Supplement.*

7   The percentage of USTS respondents with related children under the age of 18 in the household is based on Q. 7.6.

8   "Very supportive" and "supportive" categories were collapsed into a single "supportive" category. "Very unsupportive" and "unsupportive" categories were collapsed into a single "unsupportive" category. See Q. 4.6.

9   The "serious psychological distress" measure was developed from the Kessler 6 scale. See Q. 12.2. See also *Health* chapter.

10  Section 4 asked about experiences with "immediate family [respondent] grew up with," and indicated that the definition included parents and siblings.

11  The figure of 50% of respondents experiencing family rejection is based on a variable created to reflect any family rejection among several questions, including: (1) Q. 4.2 (spouse/partner ended relationship), (2) Q. 4.4 (child stopped speaking or spending time with respondent), (3) Q. 4.6 (reported level of supportiveness of immediate family), and (4) acts listed in Q. 4.7.

12  The "any accepting behavior" variable was created based on respondents who had experienced an accepting behavior listed in Q. 5.7 once or twice, a few times, or many times.

13  The "any rejecting behavior" variable was created based on respondents who had experienced a rejecting behavior listed in Q. 5.7 once or twice, a few times, or many times.

# CHAPTER 6
# Identity Documents

**M**ost non-transgender people take their identity documents (IDs) for granted, but for transgender people, updating and using IDs may present substantial challenges. Transgender people often need to update their IDs to reflect their gender and name. Changing the name listed on most state or federal IDs and records typically involves obtaining a legal name change from a court.[1] Changing the gender marker listed on most IDs and records generally requires documentation of gender transition from a health provider, though the requirements of this documentation may vary greatly for each type of ID and from jurisdiction to jurisdiction.[2] Previous researchers have documented barriers preventing transgender people from updating the name and gender on their IDs.[3]

This chapter explores respondents' experiences with their IDs and records, including updating their name and/or gender, and interactions with others related to updating and presenting their IDs and records. Notable differences in respondents' experiences based on demographic and other characteristics are reported throughout the chapter.

IDENTITY DOCUMENTS

AR.10240

81

**KEY FINDINGS**

▶ Eleven percent (11%) of respondents had their preferred name and gender on all IDs and records, while 68% reported that none of their IDs had the name and gender they preferred.

▶ Forty-nine percent (49%) did not have an ID or record with the name they preferred, and 67% did not have an ID or record with the gender they preferred.

▶ Thirty percent (30%) of respondents completed a legal name change.

▶ Thirty-four percent (34%) of people who were granted a legal name change reported that they had spent over $250, and 11% spent over $500.

▶ Thirty-five percent (35%) of those who did not try to change their legal name did not try because they could not afford it.

▶ Of those who wanted to update their driver's license or state ID, an estimated 44% were able to change their name on the license and an estimated 29% were able to change their gender.

▶ Of those who wanted to change the gender on their birth certificate, only an estimated 9% were able to do so.

▶ As a result of showing an ID with a name or gender that did not match their gender presentation, 25% of people were verbally harassed, 16% were denied services or benefits, 9% were asked to leave a location or establishment, and 2% were assaulted or attacked.

# I. Access to Legal Name Changes

Changing a name is a step in the transition process for some, but not all, transgender people. A legal name change order is almost always required to update the name listed on many forms of official IDs and records, such as driver's licenses, passports, and Social Security cards.[4] Legal name changes typically happen through a court order, and the process for obtaining a court order varies in each state and territory. Respondents were asked a series of questions about factors in their decision to legally change their name and their access to a legal name change.

Approximately one-third (36%) of respondents have tried to obtain a legal name change, and 30% were able to do so. This rate varied greatly according to gender identity, where transgender men and women (51%) were almost five times as likely to have tried or completed the name change process as non-binary people (11%). A vast majority (96%) of respondents who underwent the process did so through a court order, less than 1%

# Thirty percent (30%) of respondents completed the legal name change process.

did so through the immigration or naturalization process, and 4% did so by other methods, including marriage, an informal or assumed name, or a process in another country. Eighty-eight percent (88%) of those who attempted to legally change their name were granted a name change. Those who attempted but did not complete the process reported a variety of reasons, such as being denied, running out of money, or giving up (Table 6.1).

**Table 6.1: Outcome of legal name change attempt**

| Outcome of legal name change attempt | % of those who attempted a legal name change |
|---|---|
| Court granted name change | 88% |
| Court denied name change | 1% |
| They are still in process of changing name | 6% |
| They stopped trying because they ran out of money | 2% |
| They gave up | 2% |
| Court initially denied, then later granted name change | <1% |
| Not listed above | <1% |

Forty-one percent (41%) of those who attempted a legal name change through a court did so at age 24 or younger, 45% between the ages of 25 and 44, 13% between the ages of 45 and 64, and less than 1% at age 65 or older.

Nearly two-thirds (64%) of respondents have never tried to change their legal name. These participants reported a variety of reasons for not engaging in the process, including 28% who felt that their name did not conflict with their gender identity (Table 6.2). This reason was more common among non-binary people (45%) and crossdressers (36%) than transgender men and women (10%).

**Table 6.2: Reasons for not attempting to change legal name**

| Reasons for not attempting to change legal name | % of those who had not attempted name change |
|---|---|
| They are not ready | 40% |
| They cannot afford it | 35% |
| Their name does not conflict with gender identity or expression | 28% |
| They do not know how | 24% |
| They were worried that changing their name would out them | 24% |
| They do not believe they are allowed | 3% |
| A reason not listed | 20% |

## a. Assistance with a Legal Name Change

The legal name change process can be complicated to navigate, and while many people undergo the process without help, some seek the assistance of others. Of people who tried or completed the name change process, 60% did so without help and 40% received help, including free help from a clinic or non-profit organization (17%), assistance from a friend (11%), or help from a paid attorney (9%) (Table 6.3).

**Table 6.3: Assistance for people who tried or completed the legal name change process**

| Type of assistance | % of those who attempted name change |
|---|---|
| None | 60% |
| Free help from a legal clinic or non-profit organization | 17% |
| Help from a friend | 11% |
| Legal help from a paid attorney | 9% |
| Help from another source | 7% |

## b. Interactions with Judges and Court Staff

Those who interacted with judges and court staff during the name change process reported widely varying experiences. Of the 84% who believed

*More than one-third (35%) of respondents who did not try to legally change their name said that it was because they could not afford it.*

that the judges and/or court staff thought or knew they were transgender during their interaction, three-quarters (75%) felt they were always treated with respect, almost one-quarter (22%) felt they were only sometimes treated with respect, and 2% felt they were never treated with respect. Reports of only sometimes or never being treated with respect were higher for certain groups of people, including people who were currently working in the underground economy, such as sex work, drug sales, or other work that is currently criminalized (41%), and people who had not had any hormonal or surgical treatment (35%).

Respondents who interacted with judges or court staff who thought or knew they were transgender were asked about specific experiences during their interactions. Twenty-three percent (23%) were referred to by the wrong gender pronouns (such as he, she, or they) or title (such as Mr. or Ms.) during their interactions. Almost one in five (19%) people who interacted with judges or court staff were asked questions about their gender transition, such as whether they take hormones or have had any surgery. Nearly one in ten (9%) reported that they received unequal treatment or service, and 3% were verbally harassed. Overall, more than one-third (36%) of those who interacted with judges or court staff during the name change process reported having at least one of these experiences.

### c. Cost Associated with a Legal Name Change

The process of obtaining a legal name change may include many different fees, such as the cost of legal help, court fees, and newspaper publication. The survey asked respondents to recall how much they spent on the name change process. Approximately one-quarter (27%) of those who were granted a legal name change reported that the process cost less than $100, more than half (55%) reported it costing $100–$499, and 10% reported the process costing $500–$2,000 (Figure 6.1).

**Figure 6.1: Reported cost of a legal name change**



The cost of obtaining a legal name change may make the process inaccessible for some people. Thirty-five percent (35%) of people who had not tried to legally change their name reported that they did not try because they could not afford it. Additionally, of people who had attempted the legal name change process, 2% did not complete the process because they ran out of money.

AR.10243

# II. Experiences with Updating Name and Gender on IDs

Transgender individuals may seek to update the name on their IDs and records, the gender marker (such as M or F), or both. Only 11% of respondents reported that *all* of their IDs and records listed both the name and gender they preferred, and rates were lower for certain populations, such as undocumented individuals (4%), people aged 18–24 (5%), and people with no income (6%). More than two-thirds (68%) reported that *none* of their IDs or records had both the name and gender they preferred. The following sections will first discuss respondents' experiences with updating the name on their IDs or records, and then their experiences with updating the gender marker.

## a. Updating Name on IDs and Records

In order to change the name on IDs and records, one often needs to first obtain a legal name change. Generally, a court order granting a name change must then be presented to update each ID or record separately. Respondents were asked whether all, some, or none of their IDs and records reflected the name they preferred. Thirty percent (30%) of respondents had the name they preferred on all IDs and records, and 22% had the name they preferred on some IDs and records. Nearly half (49%) of respondents did not have any ID or record with the name they preferred. Non-citizens, including undocumented residents (68%), were more likely to say that none of their IDs or records reflected the name they preferred. Respondents with lower incomes were also more likely to say that none of their IDs or records had the name they preferred.

# In Our Own Voices

"I was intentionally misgendered and continually verbally harassed by DMV employees. Even after paying for proper identification to be issued, they refused to send the identification because my female photo didn't match my 'M' gender marker."

.........................................................

"As a non-binary person, not being able to change my gender on any of my identification documents is really disheartening, dysphoria inducing, and kind of dehumanizing. I'm not allowed to be me."

.........................................................

"My legal name and gender are not yet changed on any documents due to the price. The process for that should be easier or cheaper because that is the main thing that stops me from doing things that require ID."

.........................................................

"Because my state won't update the gender markers on its birth certificates, the only way to update my driver's license is by changing my information on a federal level with my passport. The problem is that now my documents don't match."

.........................................................

IDENTITY DOCUMENTS

AR.10244

Respondents were also asked about their experiences with updating the name on specific kinds of IDs or records, like driver's licenses and birth certificates. Among those respondents who had a driver's license or state ID and wanted to update their name on it, less than half (44%) were estimated[5] to have done so. An estimated 44% have changed their name on a work ID, and 43% have changed their name with the Social Security Administration. In contrast, less than one-third (31%) have changed their name on student records, 28% on their passport, and 18% on their birth certificate.

Respondents who transitioned were more likely to have changed the name on their IDs.[6] For example, while 44% of the whole sample had updated their name on their driver's license, 56% of those who had transitioned had updated their name on their driver's license. Transgender men and women who had transitioned were more likely to have updated their name on various types of IDs than non-binary respondents who had transitioned. For example, (61%) of transgender men and women who had transitioned changed their name their driver's license, in contrast to non-binary respondents who had transitioned (39%) (Figure 6.2).

*More than two-thirds (68%) of respondents did not have any ID or record that reflected both the name and gender they preferred.*

Those who indicated that some or all of their IDs listed the name they prefer were asked specific questions about their experiences updating the name on different kinds of IDs and records. For each type of ID or record, those respondents were asked if (1) they had been able to change the name on that ID, (2) they were in process of doing so, (3) they tried to change the name on the ID but were denied, or (4) they had not tried to change the name on that ID but wanted to do it someday.[7] Respondents were most likely to have successfully changed the name on their driver's license (87%), work ID (88%), and Social Security records (84%), and they were most likely to be denied a name change on their birth certificate (6%) (Figure 6.3).



**Figure 6.2: Updated NAME on ID or record, by gender identity and transition status (estimated)**



**Figure 6.3: Experiences updating NAME on specific IDs (among those who updated some or all of their IDs/records)**



*The above chart reflects respondents who have been able to update some or all of their IDs only (omitting those who have not been able to update any IDs). It also does not include those who do not have the ID/record or do not want to update it. These numbers should not be reported without clearly stating that they represent only a subset of the respondents. For overall ability to change records, see Figure 6.2.*

## b. Updating Gender on IDs and Records

Updating the gender marker on any ID or record is typically a distinct process from updating the name, and may require documentation regarding gender transition from a healthcare provider, a court order of gender change, an updated birth certificate, or other documentation. Respondents were asked whether all, some, or none of their IDs and records listed the gender they preferred. More than two-thirds (67%) of respondents did not have any ID or record that listed the gender they preferred. Twelve percent (12%) of respondents had the gender they preferred on all IDs and records, and 21% of respondents had the gender they preferred on some IDs and records.

Respondents were also asked about their experiences with updating the gender on specific kinds of IDs or records, like driver's licenses and birth certificates. Among those respondents who had a driver's license or state ID and wanted

to update their gender on it, an estimated[8] less than one-third (29%) had done so, and only 9% were able to change their gender on their birth certificate. Twenty-three percent (23%) of those with a Social Security card who wanted to update their gender on it were estimated to have done so, and only 18% had updated their gender on their passport.

Respondents who had transitioned were more likely to have changed their gender on their IDs. For example, 29% of the overall sample have updated the gender on their driver's license, while 42% of those who have transitioned updated the gender marker on their driver's license. Transgender men and women who had transitioned (52%) were much more likely to have updated the gender on their driver's license, in contrast to non-binary respondents who had transitioned (9%) (Figure 6.4).

**Figure 6.4: Updated GENDER on ID or record, by gender identity and transition status (estimated)**



Those who indicated that some or all of their IDs listed the gender they preferred were asked specific questions about their experiences updating the gender on different kinds of IDs and records. For each type of ID or record, those respondents were asked if (1) they had been able to change the gender on that ID, (2) they were in process of doing so, (3) they tried to change the gender on the ID but were denied, or (4) they had not tried to change the gender on that ID but wanted to do it someday.[9] Respondents were most likely to change the gender on their driver's license (90%) and Social Security records (70%), and they were most likely to be denied a gender marker change on their birth certificate (15%) (Figure 6.5).

**Figure 6.5: Experiences updating GENDER on specific IDs (among those who updated some or all of their IDs/Records)**



*The above chart reflects respondents who have been able to update some or all of their IDs only (omitting those who have not been able to update any IDs). It also does not include those who do not have the ID/record or do not want to update it. These numbers should not be reported without clearly stating that they represent only a subset of the respondents. For overall ability to change records, see Figure 6.4.*

*Nearly one-third (32%) of respondents who did not have their preferred gender on any of their IDs or records reported that they could not afford to change them.*

Those who said that none of the IDs reflected the preferred gender were asked why that was the case. Twenty-five percent (25%) of these respondents believed they were not allowed to change the gender on their IDs or records, for reasons such as not having undergone medical treatment needed to change their gender on an ID or not having a doctor's letter. Nearly one-third (32%) of respondents indicated that none of their IDs or records had the gender they preferred because they could not afford it. Eighty-eight percent (88%) of non-binary individuals who indicated that none of their IDs or records had the gender they preferred reported that it was because the available gender options (male or female) did not fit their gender identity, in contrast to 4% of transgender men and women (Table 6.4).

**Table 6.4: Reasons for not changing gender on IDs or records**

| Reasons for not changing gender | % of those who reported having no IDs/records with the gender they preferred |
| --- | --- |
| They have not tried yet | 44% |
| The available gender options (male or female) do not fit their gender identity | 41% |
| They could not afford it | 32% |
| They were not ready | 30% |
| They did not know how | 26% |
| They believed they were not allowed | 25% |
| They worried that they might lose benefits or services | 25% |
| They worried that changing gender would out them | 25% |
| Their request was denied | 1% |
| A reason not listed | 10% |

# III. Experiences When Presenting Incongruent Identity Documents

Respondents were asked about their experiences when they have shown an ID with a name or gender that did not match the gender in which they present. Overall, nearly one-third (32%) of individuals who have shown IDs with a name or gender that did not match their presentation reported negative experiences, such as being harassed, denied services, and/or attacked.

One-quarter (25%) of these respondents reported being verbally harassed. Middle Eastern (44%) and American Indian (39%) respondents reported experiencing this more often than other racial or ethnic groups (Figure 6.6).

**Figure 6.6: Verbally harassed when using an ID with a name or gender that did not match their presentation RACE/ETHNICITY (%)**



Sixteen percent (16%) of people who showed IDs with a name or gender that did not match the gender they present in were denied services or benefits. Transgender men and women were more likely to have been denied services or benefits (20%) compared to non-binary respondents (10%).

*Nearly one-third (32%) of individuals who have shown IDs that did not match their presentation reported negative experiences, such as being harassed, denied services, and/or attacked.*

Nine percent (9%) of people who showed an incongruent ID were asked to leave. Transgender women were more likely to have been asked to leave after presenting incongruent IDs (13%), compared to transgender men (9%) and non-binary people (6%).

Two percent (2%) of people who showed IDs with a name and gender that did not match the gender they present in were assaulted or attacked. These experiences differed by race and ethnicity. Middle Eastern respondents were almost five times as likely (9%) to report experiencing this, American Indians were three times as likely (6%), and Black respondents were twice as likely (4%) (Figure 6.7). Undocumented residents were also substantially more likely to report being assaulted or attacked (15%), in contrast to documented residents (3%) and citizens (2%).

**Figure 6.7: Assaulted or attacked when using an ID with a name or gender that did not match their presentation**
**RACE/ETHNICITY (%)**



## Conclusion

Findings indicate that respondents encountered substantial issues related to obtaining IDs and records that reflect their gender identity, including financial, procedural, and eligibility barriers. The data suggests that the cost of a legal name change presents a considerable challenge to getting a preferred name on identity documents. Results also indicate that the cost of updating gender markers and procedural requirements (such as providing documentation of certain medical procedures) are among the main barriers preventing respondents from updating the gender on their IDs and records. Further, results suggest that respondents who presented IDs that did not correspond with the gender they presented in were put at risk of harassment, assault, and other forms of negative treatment. Overall, these findings illustrate a variety of difficulties that arise during the name and gender change process and emphasize the importance of access to accurate identity documentation for the safety and well-being of transgender people.

AR.10249

**ENDNOTES**  |  CHAPTER 6: IDENTITY DOCUMENTS

1    Forty-nine states and all five U.S. territories have a court order process for changing a legal name. Hawai'i is currently the only state with an administrative name change process. Additionally, a legal name change may be obtained through other processes, such as through naturalization or a common law name change. See NCTE's Identity Document Center for more information, available at: www.transequality.org/documents.

2    For more information on gender marker change requirements for state and federal IDs, see NCTE's Identity Document Center, available at www.transequality.org/documents.

3    Brown, T. N. T. & Herman, J. L. (2016). *Voter ID Laws and Their Added Costs for Transgender Voters*. Los Angeles, CA: Williams Institute. Available at: http://williamsinstitute.law.ucla.edu/wp-content/uploads/Voter-ID-Laws-and-Their-Added-Costs-for-Transgender-Voters-March-2016.pdf; Hussey, H. (2015). *Expanding ID Card Access for LGBT Homeless Youth*. DC: Center for American Progress. Available at: https://cdn.americanprogress.org/wp-content/uploads/2015/10/01071118/IDhomelessLGBT.pdf; Grant, J. M., Mottet, L. A., Tanis, J., Harrison, J., Herman, J. L., & Keisling, M. (2011). *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey*. (pp. 138–156). DC: National Center for Transgender Equality & National Gay and Lesbian Task Force.

4    See NCTE's Identity Document Center, available at: www.transequality.org/documents.

5    Due to an error in skip logic in this section of the survey, a portion of the respondents who should have seen questions about updating identity documents—specifically, respondents who said that none of their documents had the name or gender they preferred—did not receive them. To create a denominator that included those individuals, the research team used question answers from the respondents who *did* see the questions to estimate the number of respondents from the full sample who did have the ID in question and wanted to update it. This estimated denominator was used to calculate the percentages of those who updated these IDs out of respondents in the full sample who had the ID and wanted to update it.

6    For the purposes of this report, "transitioned" is defined as living full-time in a gender different than the one on a person's original birth certificate, as indicated by the answer to Q. 1.12.

7    Respondents could also select from the following additional answer choices about changing their name: (1) "I do not have this ID/record" and (2) "I do not want to change this ID/record." If a respondent selected one of those answers, they were removed from the calculation. Therefore, results only reflect the answers of those who had a particular ID/record and wanted to change the record. See Q. 10.14.

8    See note 5 regarding the estimated calculations in this section.

9    Respondents could also select from the following additional answer choices about changing their gender: (1) "I do not have this ID/record" and (2) "I do not want to change this ID/record." If a respondent selected one of those answers, they were removed from the calculation. Therefore, results only reflect the answers of those who had a particular ID/record and wanted to change the record. See Q. 10.16.



# CHAPTER 7
# Health

Disparities in health and health care among transgender people have been documented in prior research.[1] The survey explored several areas related to health care, including respondents' overall physical and mental health, and their experiences accessing health care services, both related to gender transition and routine health care.

Results related to health and health care are presented in six sections:

    A.   Routine and Transition-Related Health Care and Coverage

    B.   Overall Health and Psychological Distress

    C.   Conversion Therapy and Other Pressures to De-Transition

    D.   Suicidal Thoughts and Behaviors

    E.   Substance Use

    F.   HIV Testing and Care

Notable differences in respondents' experiences based on demographic and other characteristics are reported throughout the chapter.

AR.10251

# A. ROUTINE AND TRANSITION-RELATED HEALTH CARE AND COVERAGE

Previous studies indicate that transgender people face barriers to accessing quality, affordable health care. These barriers include lack of adequate insurance coverage, mistreatment by health providers, and health providers' discomfort or inexperience with treating transgender people.[2] Such barriers make it harder for transgender people to seek both routine health care that is unrelated to their transgender status, and health care related to gender transition ("transition-related care"). Transition-related care can include a variety of treatments, such as counseling, hormone therapy, and surgical procedures. While not every transgender person may need or want medical care related to gender transition, many do, and the specific treatments that they may undergo vary based on their individualized needs.

Respondents were asked about their experiences with health insurance coverage, including coverage for transition-related care. They were also asked about their experiences receiving general health care from doctors and other health providers, including how providers treated them as transgender people. Finally, respondents were asked about transition-related care they have had or wanted to have.

**KEY FINDINGS**

▷ One in four (25%) respondents experienced a problem with their insurance in the past year related to being transgender, such as being denied coverage for care related to gender transition.

  • One-quarter (25%) of those who sought coverage for hormones in the past year were denied, and 55% of those who sought coverage for transition-related surgery in the past year were denied.

▷ One-third (33%) of respondents who had seen a health care provider in the past year reported having at least one negative experience related to being transgender, such as verbal harassment, refusal of treatment, or having to teach the health care provider about transgender people to receive appropriate care.

▷ In the past year, 23% of respondents did not see a doctor when they needed to because of fear of being mistreated as a transgender person, and 33% did not see a doctor because of cost.

▷ While more than three-quarters (78%) of respondents wanted hormone therapy related to gender transition, only 49% had ever received it.

▷ One-quarter (25%) of respondents have undergone some form of transition-related surgery.

HEALTH

# I. Health Insurance

## a. Insurance Coverage and Source of Coverage

Respondents were asked a series of questions about health insurance coverage. Eighty-six percent (86%) reported that they were covered by a health insurance or health coverage plan, and 14% reported that they were uninsured. This compares to 89% of adults in the U.S. general population who were covered by a health insurance or health coverage plan in 2015, as reported in the American Community Survey (ACS).[3] Insurance coverage differed by region, with those in the South (20%) being more likely to be uninsured than those in the overall sample, compared to those in the Midwest (13%), West (11%), and Northeast (9%). Among people of color, Black (20%), American Indian (18%), and Latino/a (17%) respondents were more likely to be uninsured (Figure 7.1). Respondents who were not U.S. citizens were more likely to be uninsured, including nearly one-quarter (24%) of documented non-citizens and a majority (58%) of undocumented residents.

**Figure 7.1: Uninsured**
RACE/ETHNICITY (%)



### Fourteen percent (14%) of respondents were uninsured, compared to 11% of adults in the U.S. population.

The most common source of health insurance reported by respondents was an employer-sponsored insurance plan (either through the respondent's employer or someone else's employer) (53%). Fourteen percent (14%) of respondents had individual insurance plans that they or someone else purchased directly from an insurance company, through healthcare.gov, or from a health insurance marketplace, and 13% were insured through Medicaid (Table 7.1).

**Table 7.1: Type of health insurance or health coverage plan**

| Health insurance source | % in USTS | % in U.S. general population (ACS)[4] |
|---|---|---|
| Insurance through current or former employer or union (belonging to respondent or a family member) | 53% | 56% |
| Insurance they or someone else purchased directly from an insurance company or through a health insurance marketplace (such as healthcare.gov) | 14% | 16% |
| Medicaid | 13% | 15% |
| Medicare | 5% | 22% |
| TRICARE or other military health care | 2% | 3% |
| VA | 2% | 3% |
| Indian Health Service | <1% | 1%[5] |
| Another type of insurance | 6% | N/A |

More than one-quarter (26%) of respondents sought options for health insurance from a state or federal health insurance marketplace, such as through healthcare.gov, in the past year.[6] Of those who sought insurance through a marketplace, 42% purchased a plan. When acquiring health insurance through healthcare.gov or state marketplaces, most enrolled in a Medicaid plan (58%), 27% received a subsidy to buy a private plan, and 12% purchased a private plan without a subsidy.

AR.10253

## b. Negative Experiences with Insurance Coverage

One in four (25%) respondents reported having problems with their insurance in the past year related to being transgender, such as being denied coverage for care related to gender transition. Among those who were insured and made the relevant requests of their insurer,[7] several problems were reported. Seventeen percent (17%) of respondents had an insurer refuse to change their name and/or gender in their insurance record when requested. Thirteen percent (13%) reported that they were denied coverage for services often considered to be gender-specific, including routine sexual or reproductive health screenings (such as Pap smears, prostate exams, and mammograms). Seven percent (7%) reported that they were denied coverage for other routine health care. More than half (55%) of respondents who sought transition-related surgery coverage were denied, and one-quarter (25%) of those who sought coverage for hormones were denied (Table 7.2).

**Table 7.2: Negative action or policy by health insurer**

| Negative action or policy | % of respondents who made such a request of their insurer |
|---|---|
| Denied coverage for transition-related surgery | 55% |
| Covered only some of the surgical care needed for transition (respondent could not get coverage for treatment they needed) | 42% |
| Denied coverage for transition-related hormone therapy | 25% |
| Covered surgery for transition, but had no surgery providers in their network | 21% |
| Refused to change records to list current name or gender | 17% |
| Denied coverage for care often considered gender-specific because of transgender status | 13% |
| Denied other routine health care because of transgender status | 7% |

Denials for hormone coverage differed by gender, with transgender men (32%) and non-binary people who had female on their original birth certificate (36%) more likely to report being denied hormone coverage than transgender women (18%) and non-binary people who had male on their original birth certificate (16%). Respondents who were insured solely through Medicare were least likely to be denied coverage for hormones (14%) (Figure 7.2).[8]

**Figure 7.2: Denied coverage for hormone therapy in the past year**
**INSURANCE TYPE (%)**



Transgender men (57%) were more likely to be denied surgery coverage than transgender women (54%) and non-binary people, including non-binary people with female on their original birth certificate (49%) and non-binary people with male on their original birth certificate (35%). With the exception of those who were solely covered by Medicare (48%), the rate of denials for surgery was similar among the different types of insurance providers (Figure 7.3).

**Figure 7.3: Denied coverage for surgery in the past year**
**INSURANCE TYPE (%)**



HEALTH

## II. Experiences with Health Care Providers

### a. Outness to Health Care Providers

Respondents were asked whether their current health care providers knew they were transgender. Of respondents who currently had health care providers, 40% reported that all of their current health care providers knew they were transgender, 13% reported that most knew, and 17% reported that some knew that they were transgender. Nearly one-third (31%) of respondents reported that none of their health care providers knew they were transgender.

### b. Treatment by Health Care Providers as a Transgender Person

Eighty-seven percent (87%) of respondents had seen a health care provider in the year prior to taking the survey. Those respondents received questions about how their health care provider interacted with them as a transgender person. Of those who had seen a provider in the past year, 62% said that at least one provider they saw knew they were transgender and treated them with respect. However, one-third (33%) of respondents who had seen a provider in the past year reported having at least one negative experience with a doctor or other health care provider related to being transgender. This included having to teach the provider about transgender people in order to receive appropriate care (24%), being asked invasive or unnecessary questions about being transgender not related to the reason for the visit (15%), or being refused transition-related health care (8%) (Table 7.3).

## In Our Own Voices

"My state Medicaid does not cover hormones or surgeries. With my very limited income, it is difficult to afford the treatment I need and I will most likely never be able to have surgeries."

..............................................................

"I was consistently misnamed and misgendered throughout my hospital stay. I passed a kidney stone during that visit. On the standard 1–10 pain scale, that's somewhere around a 9. But not having my identity respected, that hurt far more."

..............................................................

"Multiple medical professionals have misgendered me, denied to me that I was transgender or tried to persuade me that my trans identity was just a misdiagnosis of something else, have made jokes at my expense in front of me and behind my back, and have made me feel physically unsafe. I often do not seek medical attention when it is needed, because I'm afraid of what harassment or discrimination I may experience in a hospital or clinic."

..............................................................

"When I was in college, I had my health insurance list me as male, and then they denied coverage for my routine pap smear and a gynecological prescription due to my gender."

..............................................................

AR.10255

**Table 7.3: Negative experiences when seeing a health care provider in the past year**

| Negative experience | % of those who had seen a provider in the past year |
|---|---|
| They had to teach their health care provider about transgender people to get appropriate care | 24% |
| A health care provider asked them unnecessary or invasive questions about their transgender status that were not related to the reason for their visit | 15% |
| A health care provider refused to give them transition-related care | 8% |
| They were verbally harassed in a health care setting (such as a hospital, office, or clinic) | 6% |
| A health care provider used harsh or abusive language when treating them | 5% |
| A health care provider refused to give them care not related to gender transition (such as physicals or care for the flu or diabetes) | 3% |
| A health care provider was physically rough or abusive when treating them | 2% |
| They were physically attacked by someone during their visit in a health care setting (such as a hospital, office, or clinic) | 1% |
| They were sexually assaulted[9] in a health care setting (such as a hospital, office, or clinic) | 1% |
| One or more experiences listed | 33% |

Negative experiences with doctors and other health care providers varied by race and ethnicity. American Indian respondents (50%) reported the highest level of negative experiences, and rates among Middle Eastern (40%) and multiracial (38%) respondents were also higher (Figure 7.4).

**Figure 7.4: One or more negative experiences with health provider in the past year**
RACE/ETHNICITY (%)



Negative experiences with health care providers also varied by gender identity. Transgender men (42%) were more likely to report negative experiences than transgender women (36%) and non-binary respondents (24%). People with disabilities[10] (42%) were also more likely to have at least one negative experience in the past year, compared with respondents who did not identify as having a disability (30%).

## c. Providers' Knowledge About Transgender People

Respondents were asked about the health providers they saw for transgender-related care and for routine health care needs and the providers' level of knowledge about transgender health care. More than half (56%) of respondents currently had a provider specifically for transition-related care, such as hormone therapy. Of those, 65% reported that this provider knew "almost everything" or "most things" about providing health care for transgender people. Seventeen percent (17%) of respondents reported that their provider for transition-related care knew only "some" things about the subject, 8% said this provider knew "almost nothing," and 10% said they were not sure.

Fifty-one percent (51%) of respondents reported that they saw the same provider for transition-related care and other routine health care. One-third (33%) indicated that they have a separate provider for routine care who is different from the provider they see for transition-related care. Fifteen percent (15%) of respondents reported that they have no transition-related or routine health care provider.

Respondents with a separate provider for routine care were asked about that provider's level of knowledge about caring for transgender people. More than half of (54%) of these respondents were unsure how much their provider knew about health care for transgender people, while others

indicated that their routine health care provider knew "some things" (16%) or "almost nothing" (24%). Only 6% of respondents reported that their routine care provider knew "almost everything" or "most things" about caring for transgender people.

### d. Barriers to Accessing Care

Respondents were asked about barriers to accessing health care, including cost of care, fear of being mistreated as a transgender person, and distance required to travel to see health providers for transition-related care.

Cost was a major factor in accessing health care, with one-third (33%) of respondents reporting that there was at least one time in the past year when they needed to see a doctor or other health care provider but did not because of cost. People of color, including multiracial (42%), American Indian (41%), Black (40%), and Latino/a (37%) respondents, were more likely to not have seen a doctor or other health care provider due to cost in the past year (Figure 7.5). People with disabilities (42%) were also more likely to not have seen a health provider when they needed to because of cost.

**Figure 7.5: Did not see health provider due to cost in the past year**
RACE/ETHNICITY (%)



*Nearly one-quarter (23%) of respondents reported that they avoided seeking health care they needed in the past year due to fear of being mistreated as a transgender person.*

Additionally, nearly one-quarter (23%) of respondents reported that at some point in the past year they needed health care but did not seek it due to fear of being disrespected or mistreated as a transgender person. American Indian (37%) and Middle Eastern (34%) respondents were more likely to not have gone to a doctor or other health care provider due to fear of being disrespected or mistreated as a transgender person (Figure 7.6).

**Figure 7.6: Did not see health provider due to fear of mistreatment in the past year**
RACE/ETHNICITY (%)



Fear of being disrespected or mistreated by a health care provider also differed by gender identity, with transgender men (31%) being more likely to avoid care out of fear of discrimination than transgender women (22%) and non-binary respondents (20%).

To examine the accessibility of respondents' health care providers, respondents were asked how far they had to travel to receive routine care and care

AR.10257

related to gender transition (transition-related care). Respondents reported having to travel further for transition-related care than routine care. While 63% indicated that they received routine care from providers within 10 miles of their home, less than half (45%) reported that they received transition-related health care within 10 miles of their home. Respondents were three times more likely to have to travel more than 50 miles for transgender-related care than for routine care (Figure 7.7).

**Figure 7.7: Distance to health care provider**



- ■ Transition-related health care
- ■ Routine health care

transgender men and women (81%) were only slightly more likely to have ever wanted gender-related counseling than non-binary respondents (70%), transgender men and women were more than twice as likely to have actually had counseling (73%) as compared to non-binary respondents (31%). Access to counseling varied greatly by income, with those who reported having no individual income (39%) and those who earned an income of $1 to $9,999 (48%) being much less likely to have received counseling than those who earned $50,000 or more (76%) (Figure 7.8).

**Figure 7.8: Counseling/therapy for gender identity or transition**
**INDIVIDUAL INCOME (%)**



# III. Transition-Related Health Care

Respondents received questions about whether they had ever had, or wanted to have, a range of potential health care services related to gender transition.

## a. Counseling

More than three-quarters (77%) of respondents said they wanted counseling or therapy for their gender identity or gender transition at some point in their life, but only 58% of respondents have ever received counseling or therapy. While

## b. Hormone Therapy

Seventy-eight percent (78%) of respondents wanted to receive hormone therapy at some point in their life, but only 49% of respondents have ever received it. Ninety-two percent (92%) of those who have ever received hormone therapy were currently still receiving it, representing 44% of all respondents. A large majority of transgender men and women (95%) have wanted hormone therapy, compared to 49% of non-binary respondents. Transgender men and women were about five times more likely to have ever had hormone therapy (71%) than non-binary respondents (13%).

**Seventy-eight percent (78%) of respondents wanted to receive hormone therapy at some point in their life, but only 49% of respondents have ever received it.**

There were also substantial differences in access to hormone therapy by income. Respondents who reported having no individual income (31%) or earning an income of $1 to $9,999 (37%) were about half as likely to have received hormone therapy as those who earned $25,000 or more (Figure 7.9).

Figure 7.9: Hormone therapy for gender transition
INDIVIDUAL INCOME (%)



Of respondents who have ever had hormone therapy, 4% started hormone therapy before the age of 18, 41% began between the ages of 18 and 24, 43% began between the ages of 25 and 44, and 13% began after age 45.

While the majority (91%) of respondents received their hormone medications only from licensed professionals, 6% received them from both licensed professionals and friends, and 2% reported receiving them only from friends, online sources, or other non-licensed sources.[11] Those who were uninsured were five times more likely to receive their hormones only from unlicensed sources (10%). Respondents who were currently working in the underground economy (such as sex work, drug sales, or other work that is currently criminalized) (8%), who have ever done sex work in their lifetime (5%), or who were living in poverty (4%), were more likely to receive their hormones only from unlicensed sources, as were transgender women (4%).

## c. Puberty-Blocking Hormones

Fifteen percent (15%) of respondents reported that at some point in their lives, they wanted puberty-blocking medications, which are hormone suppressors that are used to delay physical changes associated with puberty and were described as those usually being used by youth between the ages of 9 and 16. However, less than 1% of respondents reported ever having them.[12]

## d. Surgeries and Other Procedures

One in four (25%) reported having had some form of transition-related surgery.[13] Transgender men (42%) were more likely to have had any kind of surgery than transgender women (28%) or non-binary respondents (9%). Respondents who were living in poverty[14] (17%) were less likely to have had any surgery, as were those who had low incomes (Figure 7.10). Respondents who were uninsured (18%) were also less likely to have any surgery, while those who were insured through Medicare only were most likely (44%) (Figure 7.11).[15]

**One in four (25%) respondents reported having had some form of transition-related surgery.**

AR.10259

**Figure 7.10: Any surgery for gender transition**
**INDIVIDUAL INCOME (%)**



**Figure 7.11: Any surgery for gender transition**
**INSURANCE TYPE (%)**



Respondents were asked a series of questions about whether they had received or wanted to have specific surgical and other procedures. Respondents received different questions based on the sex that they reported was listed on their original birth certificate.[16]

## i. Experiences of Respondents With Female on Their Original Birth Certificate

Of respondents who had female on their original birth certificates, 21% had a chest reduction or reconstruction[17] and 8% had a hysterectomy.[18] Only 2% reported having any genital surgery, such as metoidioplasty[19] (1%) or phalloplasty[20] (1%) (Table 7.4). These experiences differed greatly by gender identity, with transgender men (Figure 7.12) being

more likely to have had any of the procedures than non-binary respondents who had female on their original birth certificate (Figure 7.13).

**Table 7.4: Procedures among respondents with female on their original birth certificate**

| Type of procedure | Have had it | Want it some day | Not sure if they want this | Do not want this |
|---|---|---|---|---|
| Chest surgery reduction or reconstruction | 21% | 52% | 17% | 10% |
| Hysterectomy | 8% | 44% | 28% | 19% |
| Metoidioplasty | 1% | 15% | 37% | 47% |
| Phalloplasty | 1% | 11% | 31% | 56% |
| Other procedure not listed | 3% | 7% | 13% | 77% |

**Figure 7.12: Procedures among transgender men**



- Have had it
- Want it some day
- Not sure if they want this
- Do not want this

**Figure 7.13: Procedures among non-binary respondents with female on their original birth certificate**



- Have had it
- Want it some day
- Not sure if they want this
- Do not want this

Among those who had female on their original birth certificate respondents and who had undergone any of these surgical procedures, 3% had their first procedure before the age of 18. More than one-third (35%) had their first procedure between the ages of 18 and 24, 40% between the ages of 25 and 34, and 22% after the age of 34.

In addition to transition-related care, respondents who had female on their original birth certificate were also asked whether they had received a Pap smear in the past year. Only 27% reported that they had a Pap smear in the past year, compared to 43% in the U.S. adult population.[21,22]

## ii. Experiences of Respondents With Male on Their Original Birth Certificate

Among respondents who had male on their original birth certificate, hair removal or electrolysis was both the most commonly reported and the most commonly desired procedure. Forty-one percent (41%) have had hair removal or electrolysis, and 11% had received voice therapy, the second most commonly reported procedure. Regarding surgical procedures, 10% of respondents had undergone vaginoplasty and/or labiaplasty,[23] 9% had an orchiectomy,[24] 6% had undergone facial feminization surgery,[25] 8% had augmentation mammoplasty (top surgery),[26] 4% had a tracheal shave,[27] and 1% had undergone voice surgery (Table 7.5). These experiences varied by gender identity, with transgender women (Figure 7.14) being more likely to have had the procedures than non-binary respondents who had male on their original birth certificate (Figure 7.15).

**Table 7.5: Procedures among respondents with male on their original birth certificate**

| Type of procedure | Have had it | Want it some day | Not sure if they want this | Do not want this |
|---|---|---|---|---|
| Hair removal or electrolysis | 41% | 49% | 5% | 5% |
| Voice therapy (non-surgical) | 11% | 46% | 19% | 24% |
| Vaginoplasty or labiaplasty | 10% | 45% | 23% | 22% |
| Augmentation mammoplasty | 8% | 36% | 31% | 24% |
| Orchiectomy | 9% | 40% | 24% | 27% |
| Facial feminization surgery | 6% | 39% | 30% | 25% |
| Tracheal shave | 4% | 29% | 29% | 38% |
| Silicone injections[28] | 2% | 9% | 27% | 61% |
| Voice surgery | 1% | 16% | 32% | 51% |
| Other procedure not listed | 5% | 13% | 15% | 67% |

**Figure 7.14: Procedures among transgender women**



| | Have had it |
| | Want it some day |
| | Not sure if they want this |
| | Do not want this |



**Figure 7.15: Procedures among non-binary respondents with male on their original birth certificate**

Two percent (2%) of respondents with male on their original birth certificate had their first transition-related procedure (not including hormone therapy) before the age of 18. Nearly one-quarter (23%) had their first procedure between the ages of 18 and 24, 32% had their first procedure between the ages 25 and 34, and 43% after the age of 34.

## e. Summary of Transition-Related Health Care

When examining the responses of all respondents, 91% reported that they had wanted counseling, hormones, and/or puberty blockers for their gender identity or gender transition at some point, but only 65% reported ever having any of them. Overall, 58% of respondents had received counseling. Approximately half (54%) had received hormone therapy and/or some form of surgery, including 49% who had hormone therapy and 25% who had undergone some form of transition-related surgery.

# B. OVERALL HEALTH AND PSYCHOLOGICAL DISTRESS

There is a well-documented link between experiences of discrimination and marginalization and poor physical and mental health outcomes. Populations that face widespread stigma and discrimination are more likely to report poor overall health and are more vulnerable to a variety of physical and mental health conditions.[29] Previous research has described substantial health disparities affecting transgender people and the impact that experiences of discrimination, rejection, and violence have on these disparities.[30]

**KEY FINDINGS**

▶ Twenty-two percent (22%) of respondents rated their health as "fair" or "poor," compared with 18% of the U.S. population.

▶ Thirty-nine percent (39%) of respondents were currently experiencing serious psychological distress, nearly eight times the rate in the U.S. population (5%).

# I. Current Health

Respondents were asked to rate their current overall health on a scale from "excellent" to "poor." Nearly half (45%) of respondents said their health was "excellent" or "very good" and one-third (33%) said it was "good." Twenty-two percent (22%) said it was "fair" or "poor" (Figure 7.16), compared with 18% of the U.S. general population (Figure 7.17).[31]

**Figure 7.16: General health rating**



**Figure 7.17: General health rating**



Respondents' self-reported health varied by gender identity, with non-binary respondents with female on their original birth certificate (35%) being less likely to report excellent or very good health compared to transgender men (47%), non-binary people with male on their original birth certificate (48%), transgender women (50%), and crossdressers (57%). Reporting also differed by age, with older respondents more likely to report excellent or very good health than younger respondents, such as those aged 65 and older (60%) and 45–64 (53%), compared with those aged 25–44 (48%) and 18–24 (39%) (Figure 7.18).

**Figure 7.18: Reported overall health**
**CURRENT AGE (%)**



Family support was associated with an increased likelihood of reporting excellent or very good health. Respondents who were out to their immediate family and described their family as supportive were more likely to report excellent or very good health (52%) than those whose families were neutral (42%) or unsupportive (38%) (Figure 7.19).

**Figure 7.19: Reported overall health**
**LEVEL OF FAMILY SUPPORT (%)**



*Thirty-nine percent (39%) of respondents reported currently experiencing serious psychological distress, a rate nearly eight times higher than in the U.S. population (5%).*

# II. Serious Psychological Distress

Respondents were asked questions to assess their level of psychological distress in the past 30 days, based on the Kessler Psychological Distress Scale (K6), a scale that is widely used when assessing mental health outcomes and is included in the National Health Interview Survey (NHIS).[32] The K6 includes mental health screening questions and is designed to identify people who are experiencing serious psychological distress. The K6 questions asked respondents to rate how often they experienced several feelings related to psychological distress—such as hopelessness or worthlessness—during the past month on a scale that included "none of the time," "a little of the time," "some of the time," "most of the time," and "all of the time."[33]

Respondents who reported experiencing feelings related to psychological distress at least "a little of the time" for one or more of the K6 questions were asked how much the feelings interfered with their life or activities. Among them, 27% reported that the psychological distress interfered with their life or activities a lot during the past 30 days, and 58% said it interfered some or a little. Only 10% of respondents reported that it did not interfere with their life or activities during the past 30 days (Figure 7.20), in contrast to the 35% in the U.S. general population who reported no interference with their lives (Figure 7.21).[34]

**Figure 7:20: Interference of psychological distress with life or activities among those who reported feelings of distress in the past 30 days**



**Figure 7:21: Interference of psychological distress with life or activities among those who reported feelings of distress in the past 30 days**



A variable was developed from the K6 questions to reflect respondents' current serious psychological distress (serious psychological distress experienced in the 30 days prior to participating in the survey).[35] Thirty-nine percent (39%) of respondents reported currently experiencing serious psychological distress, which is nearly eight times the rate reported in the U.S. population (5%).[36] Current serious psychological distress varied by gender identity. Non-binary respondents (49%) were more likely to report serious psychological distress than transgender men and women (35%) and crossdressers (18%).

HEALTH

While all age groups of USTS respondents reported substantially more distress than their counterparts in the U.S. population, younger survey respondents were more likely to report current serious psychological distress. Fifty-three percent (53%) of USTS respondents aged 18 to 25 reported experiencing current serious psychological distress, which was more than six times as high as the rate among respondents who were 65 and older (8%) (Figure 7.22).[37] A similar pattern emerged in reporting of current serious psychological distress in the U.S. population, with those aged 18 to 25 (10%) being five times as likely to report experiencing serious psychological distress as those aged 65 and older (2%).[38]

**Figure 7:22: Currently experiencing serious psychological distress**
**CURRENT AGE (%)**



■ % in USTS
□ % in U.S. population (NSDUH)

Experiences with current psychological distress differed according to educational attainment. Respondents who had not completed high school (58%), those who had completed high school or a GED only (54%), and those with some college education (48%) were more likely to report currently experiencing serious psychological distress than respondents who had completed an associate's degree (32%) or higher (Figure 7.23).

# In Our Own Voices

"I spent decades torturing myself into depression because I was certain that coming out would destroy my life. I did everything I could to get my transness to go away but it left me physically and psychologically weak, and on the verge of suicide."

..................................................................

"I had suffered from anxiety and depression as a direct result of gender dysphoria. This caused me to become more and more unable to function in society as time went on. Only when my state expanded Medicaid was I finally able to start dealing with all of these issues so I could become a productive member of society."

..................................................................

"I have struggled with depression and anxiety ever since puberty. I've failed classes, isolated myself, and considered suicide because of this. A year ago, I felt hopeless and had daily suicidal thoughts, and today I've got a plan for the future and haven't had a serious suicidal thought in months. I firmly believe this is because of my transition. I feel so much more comfortable and happy than I've ever been."

..................................................................

AR.10265

**Figure 7.23: Currently experiencing serious psychological distress**
**EDUCATIONAL ATTAINMENT (%)**



Respondents who were living in poverty were more likely to currently be experiencing serious psychological distress (52%). People with disabilities (59%) were nearly twice as likely to currently experience psychological distress compared to those who did not identify as having a disability (31%).

*Psychological distress was associated with a variety of experiences of rejection, discrimination, and violence:*

- *Respondents who were out to their immediate families and described them as supportive (31%) were less likely to report serious psychological distress than those whose families were neutral (42%) or unsupportive (50%).*

- *Respondents who were fired or forced to resign, denied a promotion, or not hired in the past year because they were transgender (51%) were more likely to report current serious psychological distress than those who did not have those experiences in the past year (36%).*

- *Respondents who were physically attacked in the past year (59%) were more likely to be currently experiencing serious psychological distress than those who were not physically attacked in the past year (36%).*

- *Respondents who were sexually assaulted in the past year[39] (60%) were more likely to be currently experiencing serious psychological distress than those who were not sexually assaulted in the past year (37%).*

Respondents who had transitioned ten or more years prior to participating in the survey (24%) were substantially less likely to be currently experiencing serious psychological distress, in contrast to those who had transitioned within the past year (41%) (Figure 7.24). While psychological distress was higher among those early in their transition, it was higher yet among those who have not transitioned but wanted to. Nearly half (49%) of those who have not transitioned but wanted to were currently experiencing serious psychological distress, compared with 36% of those who had transitioned at any time prior to taking the survey.

**Figure 7.24: Currently experiencing serious psychological distress**
**YEARS SINCE BEGAN TRANSITIONING (%)**



# C. CONVERSION THERAPY AND OTHER PRESSURES TO DE-TRANSITION

Many transgender people discuss their gender identity with professionals, such as health care providers or religious advisors. However, despite the medical consensus that efforts to change someone's gender identity or stop them from being transgender ("conversion therapy") are ineffective, harmful, and even abusive,[40] some professionals still attempt to do so. Additionally, some transgender people feel pressure to hide their gender identity or to go back to living according to the gender they were thought to be at birth ("de-transition") for a variety of other reasons. For example, some transgender people are pressured to avoid or put off their transition, or to de-transition after they have started their transition, by family members or employers, as well as religious advisors or health professionals. Others face significant discrimination when they begin transitioning, like losing their jobs or home or being rejected by their family or friends, and may decide to temporarily delay or even reverse their transition as a result.

The survey explored respondents' experiences discussing their gender identity with professionals, such as psychologists, counselors, and religious advisors, including pressure from those professionals to de-transition or stop being transgender. Experiences with de-transitioning were also examined. Respondents overall demonstrated high levels of resistance to such pressure and other forms of discrimination. Few respondents de-transitioned, and many of those who did de-transition did so only temporarily and were living according to their gender identity at the time of the survey.

**KEY FINDINGS**

▶ Thirteen percent (13%) of respondents reported that one or more professionals, such as a psychologist, counselor, or religious advisor, tried to stop them from being transgender.

▶ Eight percent (8%) of respondents had de-transitioned temporarily or permanently at some point, meaning that they went back to living as the gender they were thought to be at birth for a period of time.

▶ The majority of respondents who de-transitioned did so only temporarily, and 62% were currently living full time in a gender different than the one they were thought to be at birth.

▶ Respondents who de-transitioned cited a number of reasons for doing so, including facing too much harassment or discrimination after they began transitioning (31%), having trouble getting a job (29%), or pressure from a parent (36%), spouse (18%), or other family members (26%).

# I. Discussing Gender Identity with Professionals and Conversion Therapy

The survey examined a variety of experiences with professionals—such as psychologists, counselors, and religious advisors—with whom respondents had discussed their gender identity. Almost three-quarters of respondents (72%) reported that they had discussed their gender identity with such a professional.

Whether an individual discussed their gender identity with a professional differed by gender, with transgender men and women (84%) being more likely to do so than non-binary respondents (52%) and crossdressers (46%) (Figure 7.25).



**Figure 7.25: Ever discussed gender identity with a professional**
GENDER IDENTITY (%)

Overall: 72%
Crossdressers: 46%
Non-binary: 52%
Trans women: 83%
Trans men: 85%
Trans women and men: 84%

Of all respondents who discussed their gender identity with a professional, nearly one in five (18%) reported that the professional tried to stop them from being transgender, representing 13% of all respondents in the sample.[41] Four percent (4%) of all respondents saw a religious/spiritual counselor or advisor who tried to stop them

*Nearly one in five (18%) of those who discussed their gender identity with a professional—or 13% of all respondents—reported that the professional tried to stop them from being transgender.*

from being transgender, and nearly one in ten (9%) respondents saw a non-religious/spiritual professional (such as a therapist or a counselor) who tried to stop them from being transgender.

The likelihood that a professional tried to stop a respondent from being transgender differed by race and ethnicity. While Middle Eastern (32%) and American Indian (27%) respondents were most likely to have this experience, rates were lower for Black (16%) and Asian (14%) respondents (Figure 7.26).



**Figure 7.26: Professional tried to stop them from being transgender**
RACE/ETHNICITY (%)

Overall: 18%
American Indian: 27%
Asian: 14%
Black: 16%
Latino/a: 17%
Middle Eastern: 32%
Multiracial: 21%
White: 19%

More than three-quarters (78%) of respondents were under the age of 25 when they had this experience, 51% were 18 or younger, and 28% were 15 or younger.

AR.10268

Of the 4% who reported that a religious or spiritual counselor or advisor tried to stop them from being transgender, American Indian (9%) and Middle Eastern (7%) respondents were more likely to have such an experience with a religious or spiritual counselor or advisor (Figure 7.27).

**Figure 7.27: Religious counselor tried to stop them from being transgender**
RACE/ETHNICITY (%)



*Participants who had a professional try to stop them from being transgender were:*

- *Far more likely to currently be experiencing serious psychological distress (47%) than those who did not have the experience (34%).*

- *More likely to have attempted suicide (58%) than those who did not have the experience (39%).*

- *Nearly three times as likely to have run away from home (22%) than those who did not have the experience (8%).*

- *More likely to have ever experienced homelessness (46%) than those who did not have the experience (29%).*

- *More likely to have ever done sex work (18%) than those who did not have the experience (11%).*

# In Our Own Voices

"The doctor figured out I was trans and practiced conversion therapy without telling anyone, including my parents. I tried to tell my family that the doctor was not working, but nobody listened. I was sent there for over three years. I became so badly suicidal that I didn't go a minute without thinking of death."

......................................................

"When I was 18, I had to leave where I grew up after threats of physical violence and conversion therapy from my family. My parents were abusive before they knew I was trans, but when they found out, they used that to hurt and control me more."

......................................................

"[An] OB/GYN forced me onto birth control pills to 'fix' me into thinking I was a woman again. I ended up in the psychiatric ward of my local hospital on suicide watch after three days on birth control."

......................................................

"I was kicked out of my parents' home. I ran out of what little money I had, and I had nowhere to go. My family offered to let me return to their home on the condition that I de-transition and live as a man. I accepted because I had no choice."

......................................................

AR.10269

Sixty-nine percent (69%) of respondents discussed their sexual orientation with a professional. Of those, 14% reported that a professional tried to change their sexual orientation, representing 10% of the overall sample.

# II. De-Transitioning

Respondents were asked whether they had ever "de-transitioned," which was defined as having "gone back to living as [their] sex assigned at birth, at least for a while." Eight percent (8%) of respondents reported having de-transitioned at some point. Most of those who de-transitioned did so only temporarily: 62% of those who had de-transitioned reported that they were currently living full time in a gender different than the gender they were thought to be at birth.

Transgender women were more likely to report having de-transitioned (11%), in contrast to transgender men (4%). Rates of de-transitioning also differed by race and ethnicity, with American Indian (14%), Asian (10%), and multiracial (10%) respondents reporting the highest levels of de-transitioning (Figure 7.28).

Respondents who had de-transitioned cited a range of reasons, though only 5% of those who had de-transitioned reported that they had done so because they realized that gender transition was not for them, representing 0.4% of the overall sample.[42] The most common reason cited for de-transitioning was pressure from a parent (36%). Twenty-six percent (26%) reported that they de-transitioned due to pressure from other family members, and 18% reported that they de-transitioned because of pressure from their spouse or partner. Other common reasons included facing too much harassment or discrimination after they began transitioning (31%), and having trouble getting a job (29%) (Table 7.6).

**Table 7.6: Reasons why respondents de-transitioned, at least for a little while**

| Reasons for de-transitioning | % of those who had ever de-transitioned |
| --- | --- |
| Pressure from a parent | 36% |
| Transitioning was too hard for them | 33% |
| They faced too much harassment or discrimination as a transgender person | 31% |
| They had trouble getting a job | 29% |
| Pressure from other family members | 26% |
| Pressure from a spouse or partner | 18% |
| Pressure from an employer | 17% |
| Pressure from friends | 13% |
| Pressure from a mental health professional | 5% |
| Pressure from a religious counselor | 5% |
| They realized that gender transition was not for them | 5% |
| Initial transition did not reflect the complexity of their gender identity (write-in response) | 4% |
| Financial reasons (write-in response) | 3% |
| Medical reasons (write-in response) | 2% |
| A reason not listed above | 35% |

**Figure 7.28: Ever de-transitioned**
RACE/ETHNICITY (%)



# D. SUICIDAL THOUGHTS AND BEHAVIORS

The prevalence of suicide attempts among transgender people is reported in the literature as being substantially higher than that in the U.S. general population. Previous studies identify a variety of risk and protective factors that affect the rates of suicidal thoughts and behaviors among transgender people, including family support, experiences of anti-transgender discrimination and violence, and access to health care, employment, and housing.[43]

The survey explored suicidal thoughts and behaviors among respondents both over the course of their lifetime and in the year prior to completing the survey. Respondents were asked whether they had seriously thought about, made a plan, or tried to kill themselves at any time in their lives or in the past twelve months to assess a range of suicidal thoughts and behaviors. Questions were patterned on the National Survey on Drug Use and Health[44] and National Comorbidity Survey Replication[45] to allow for comparison to the U.S. population.

KEY FINDINGS

▶ Forty percent (40%) of respondents have attempted suicide at some point in their life, compared to 4.6% in the U.S. population.

▶ Forty-eight percent (48%) of respondents have seriously thought about killing themselves in the past year, compared to 4% of the U.S. population, and 82% have had serious thoughts about killing themselves at some point in their life.

▶ Nearly one-quarter (24%) of respondents made plans to kill themselves in the past year, compared to 1.1% of the U.S. population.

▶ Seven percent (7%) of respondents attempted suicide in the past year, compared to 0.6% in the U.S. population.

▶ More than two-thirds (71%) of respondents who have attempted suicide have done so more than once in their lifetime, with 46% of those who have attempted suicide reporting three or more attempts.

## I. Suicidal Thoughts and Behaviors in the Past Year

Nearly half (48%) of all respondents reported that they had seriously thought about killing themselves in the past twelve months, compared to 4% of the U.S. general population.[46] Nearly one-quarter (24%) of respondents reported making plans to kill themselves in the past year, compared to 1.1% in the U.S. population.[47]

Seven percent (7%) of all respondents attempted suicide in the past year, nearly twelve times the rate of attempted suicide in the U.S. population in the past year (0.6%).[48] The rate of attempted suicide in the past year was higher among people of color, including American Indian (10%), multiracial (10%), Black (9%), and Latino/a (9%) respondents (Figure 7.29). The rate of attempted suicide in the past year was also higher among people with disabilities (12%).

2015 U.S. TRANSGENDER SURVEY

**Figure 7.29: Attempted suicide in the past year
RACE/ETHNICITY (%)**



Respondents who did not complete high school (17%) were more than twice as likely as the overall sample to have attempted suicide in the past year, and those who completed high school or a GED only (13%) were almost twice as likely to have attempted suicide in that time period (Figure 7.30).

**Figure 7.30: Attempted suicide in the past year
EDUCATIONAL ATTAINMENT (%)**



*Seven percent (7%) of all respondents attempted suicide in the past year, nearly twelve times the rate of attempted suicide in the U.S. population (0.6%).*

Respondents whose current income came only from work in the underground economy, such as sex work, drug sales, or other criminalized work, had a higher rate of suicide attempts in the past year (27%). Additionally, respondents who described their families as unsupportive (13%) were more than twice as likely to have attempted suicide in the past year as those who described their families as supportive (6%).

The rate of suicide attempt in the past year varied by age, with younger respondents being more likely to have attempted suicide in the past year, a similar pattern to that found in the general U.S. population.[49] One in ten (10%) USTS respondents aged 18–25 have attempted suicide in the past year, ten times the rate among those aged 65 and older (1%) (Figure 7.31). Similarly, those aged 18–25 in the U.S. population (1.6%) were eight times more likely to report having attempted suicide in the past year than those aged 65 and older (0.2%).[50]

**Figure 7.31: Attempted suicide in the past year
CURRENT AGE (%)**



■ % in USTS
□ % in U.S. population (NSDUH)

AR.10272

Of those who attempted suicide in the past year, 45% received medical attention[51] as a result, compared to 60% who attempted suicide and received medical attention in the U.S. population.[52] Thirty percent (30%) of respondents who attempted suicide stayed in a hospital for at least one night, compared to 41% of those who attempted suicide in the U.S. population.[53]

# II. Lifetime Suicidal Thoughts and Behaviors

Eighty-two percent (82%) of all respondents had seriously thought about killing themselves at some point in their lives, and 40% of respondents in the sample reported having attempted suicide at some point in their life. This lifetime suicide attempt rate is nearly nine times as high as the prevalence in the U.S. population (4.6%).[54]

Lifetime suicide attempt rates were higher for transgender men (45%) than for transgender women (40%) and non-binary respondents (39%), and crossdressers had a substantially lower rate of attempted suicide in their lifetime (15%). Lifetime suicide attempts were also higher among people of color, with American Indian (57%) respondents reporting the highest rates, followed by multiracial (50%), Black (47%), Latino/a (45%), and Middle Eastern (44%) respondents, in contrast to white (37%) respondents (Figure 7.32).

**Figure 7.32: Ever attempted suicide**
RACE/ETHNICITY (%)



*Forty percent (40%) of respondents have attempted suicide in their lifetime, nearly nine times the rate reported in the U.S. population (4.6%).*

People with disabilities (54%) in the sample were more likely to report attempting suicide. Lifetime suicide attempts also varied by level of education, with the highest rates among those who did not complete high school (52%), and the lowest rates among those with a bachelor's degree (34%) or higher (30%) (Figure 7.33).

**Figure 7.33: Ever attempted suicide**
EDUCATIONAL ATTAINMENT (%)



Among respondents who were out to the immediate family they grew up with, lifetime suicide attempts varied significantly by family support. A majority (54%) of those who described their families as unsupportive had attempted suicide in their lifetime, in contrast to 37% of those with supportive families.[55]

Lifetime suicide attempts were also higher for respondents who were physically attacked in the past year (65%), or have ever experienced homelessness (59%), done sex work (57%), lost their job for being transgender (55%), or been sexually assaulted[56] (54%).

More than two-thirds (71%) of all respondents who had ever attempted suicide did so more than once, including 46% who reported three or more attempts, and 21% who reported five or more attempts.

# III. Age of Suicide Attempts

## a. Age of First Attempt

Respondents who have attempted suicide (once or multiple times) were asked about the age of their first suicide attempt. More than one-third (34%) reported that their first attempt was at age 13 or younger. Thirty-nine percent (39%) reported that their first attempt occurred between the ages of 14 and 17, 20% reported that it occurred between age 18 and 24, and 8% reported that their first attempt was at age 25 or older.

## b. Age of Most Recent Attempt

Among respondents who reported a suicide attempt,[57] 6% reported that their most recent attempt happened at age 13 or younger. More than one-quarter (26%) reported the most recent attempt occurred between the ages of 14 and 17, 41% reported that it happened between the ages of 18 and 24, and 27% reported that their most recent attempt was at age 25 or older.

# E. SUBSTANCE USE

Substance use is an important indicator of mental health as well as physical wellbeing, and it may reflect an individual's level of exposure to a variety of risk and protective factors, such as family acceptance, homelessness, violence, and economic opportunity.[58] The survey explored patterns in respondents' substance use with questions informed by the National Survey on Drug Use and Health[59] to allow for comparison to substance use trends in the U.S. population. Respondents were asked whether they had ever consumed certain substances, including alcohol, tobacco, marijuana, and other drugs, such as cocaine, heroin, and methamphetamine. Respondents who reported using such substances received a series of follow-up questions about the frequency and quantity of their substance use.

**KEY FINDINGS**

▶ One-quarter (25%) of respondents used marijuana within the past month, compared to 8% of the U.S. population.

▶ Seven percent (7%) of respondents used prescription drugs that were not prescribed to them or used them not as prescribed ("nonmedical prescription drug use") in the past month, compared to 2% of the U.S. population.

▶ Four percent (4%) of respondents used illicit drugs (not including marijuana and nonmedical use of prescription drugs) in the past month, and 29% have used them in their lifetime.

▶ Overall, 29% of respondents reported illicit drug use, marijuana consumption, and/or nonmedical prescription drug use in the past month, nearly three times the rate in the U.S. population (10%).

HEALTH

# I. Alcohol Consumption

Ninety percent (90%) of respondents reported having a drink of alcohol, such as beer, wine, or hard liquor, at any point in their lives, compared to 86% in the U.S. adult population.[60] Sixty-three percent (63%) of respondents were currently using alcohol, meaning that they had consumed at least one alcoholic beverage within the 30 days prior to taking the survey, compared with 56% of the U.S. adult population.[61]

## a. Frequency of Current Alcohol Use

Respondents who were currently using alcohol were asked how many days they had used alcohol in the past month. Twenty-nine percent (29%) used alcohol on 1 or 2 days, and 28% had used alcohol on 3–5 days during the prior month. Nineteen percent (19%) used alcohol on 6–10 of the past 30 days, and 23% consumed alcohol on 11 or more days.

## b. Binge and Heavy Drinking

Current alcohol users were also asked for the number of days in the month when they consumed 5 or more drinks on the same occasion, meaning at the same time or within a couple of hours of each other ("binge drinking").[62] Twenty-seven percent (27%) of the sample reported binge drinking in the past month, slightly higher than the rate in the U.S. adult population in 2014 (25%).[63]

Respondents who were currently working in the underground economy, such as sex work, drug sales, or other criminalized work, were nearly twice as likely to engage in binge drinking as those in the overall sample, with nearly half (49%) reporting binge drinking at least one time in the past month.

Latino/a (32%), Middle Eastern (30%), and Black (30%) respondents were more likely to report binge drinking, while white (25%) and Asian (19%) respondents reported lower levels (Figure 7.34).



**Figure 7.34: Reported binge drinking in the past month**
**RACE/ETHNICITY (%)**

Nine percent (9%) of respondents reported binge drinking on one day during the month and 10% on 2–4 days. Seven percent (7%) of respondents reported binge drinking on 5 more days that month ("heavy drinking"), the same rate as the U.S. population (7%).[64] Respondents who were currently working in the underground economy (19%) were more than twice as likely to report heavy drinking in the past month as those in the overall sample.

# II. Tobacco Use

## a. Lifetime and Current Tobacco Use

Fifty-seven percent (57%) of respondents reported that they had smoked all or part of a cigarette at any point in their lives, lower than the rate in the U.S. population (63%).[65] Twenty-two percent (22%) were current smokers, meaning that they smoked at least one cigarette or part of a cigarette within thirty days of taking the survey, which compares to 21% of the U.S. population.[66]

Respondents who were currently working in the underground economy were more than twice as likely as the overall sample to have smoked tobacco within the past month, with 51% reporting current tobacco use.

AR.10275

## b. Frequency of Tobacco Use Among Current Users

Current smokers were also asked the number of days on which they had smoked tobacco in the past month. Twenty-nine percent (29%) of current users smoked tobacco on 4 days or fewer in the past month, and one-quarter (24%) smoked tobacco on 5–20 days. More than one-third (38%) of current smokers smoked tobacco daily during the past month, compared to 59% of current smokers in the U.S. population.[67]

Among daily smokers, nearly one-third (32%) smoked one or more packs each day. Smoking more than one pack a day was more likely to be reported by daily smokers aged 45–64 (54%) and 65 and over (50%) (Figure 7.35), as well as American Indian (44%) and white (40%) respondents (Figure 7.36).

**Figure 7.35: Daily smokers consuming one or more packs a day in the past month**
CURRENT AGE (%)



**Figure 7.36: Daily smokers consuming one or more pack a day in the past month**
RACE/ETHNICITY (%)



*Sample size too low to report

# III. E-Cigarettes or Vaping Products

More than one-third (36%) of respondents had used e-cigarettes or vaping products at some point in their lives. Lifetime use of these products was elevated among respondents who have worked in the underground economy, with 57% reporting past use. Thirty percent (30%) of respondents who had ever used e-cigarettes or vaping products used them within 30 days of taking the survey. An additional 40% used them more than 30 days prior but less than a year before taking the survey, and 29% had used them more than 12 months before taking the survey.

# IV. Marijuana Use

Nearly two-thirds (64%) of respondents reported having ever used marijuana,[68] compared with 47% of the general population.[69]

## a. Current Marijuana Use

One-quarter (25%) of the sample reported current use, meaning that they used marijuana within 30 days of taking the survey, compared to 8% of the U.S. general population.[70] Current marijuana use was elevated among those who were currently working in the underground economy (60%) and those who were living with HIV (48%).

## b. Frequency of Marijuana Use

Respondents who had used marijuana in the month before taking the survey were asked for the number of days in which they smoked marijuana during that period. More than one in five (22%) smoked marijuana on 1–2 days that month. Thirty percent (30%) smoked marijuana on 3–12 days, 26% on 13–28 days, and nearly one-quarter (23%) smoked marijuana on 29 or on all 30 of the past 30 days.

Among those who were currently working in the underground economy, approximately one-third (34%) reported using marijuana on 29–30 days in

the past month. Respondents who were living with HIV (34%) were also more likely to use marijuana on 29–30 days within that month.

# V. Illicit Drugs

Nearly one-third (29%) of respondents reported ever using illegal or illicit drugs, such as cocaine, crack, heroin, LSD, methamphetamine, or inhalants like poppers or whippits (but not including marijuana).[71] Prior use of illicit drugs was particularly high among respondents who have done sex work (56%) and those who have done underground economy work other than sex work (such as drug sales) (75%). Past illicit drug use was also higher among those who have lost a job because of being transgender (43%) or who have ever experienced homelessness (42%).

## a. Current Illicit Drug Use

Four percent (4%) of respondents in the sample reported current use of illicit drugs (not including marijuana), meaning they had consumed them within 30 days of taking the survey.

Respondents who were currently working in the underground economy (26%) were nearly nine times as likely as those who were not currently working in the underground economy (3%) to have used illicit drugs within the past month.

# VI. Nonmedical Prescription Drug Use

Approximately one-third (34%) of respondents have taken prescription drugs, such as Oxycontin, Xanax, Adderall, or Ambien, for "nonmedical use," meaning that the drugs were not prescribed to them or that they were not being taken as prescribed.

Among respondents who have worked in the underground economy, almost two-thirds (63%) reported nonmedical prescription drug use, compared with 26% of those who had no experience in the underground economy. Rates of nonmedical

*Almost one-third (29%) of respondents reported illicit drug use, marijuana consumption, and/or nonmedical prescription drug use in the past month, compared with 10% of the U.S. population.*

prescription drug use were particularly high among those who had done underground economy work other than sex work, such as drug sales, with 75% reporting nonmedical prescription drug use.

Younger respondents were more likely to report nonmedical prescription drug use, with those aged 25–44 (39%) being most likely, and those aged 65 and older (18%) being the least likely to report such prescription drug use (Figure 7.37).

**Figure 7.37: Nonmedical use of prescription drugs**
CURRENT AGE (%)



## a. Current Nonmedical Prescription Drug Use

Of respondents who reported nonmedical use of prescription drugs, over half (51%) had last engaged in such use more than a year before taking the survey, and 28% had done so within that year but more than a month earlier. More than one in five (21%) reported nonmedical prescription drug use within 30 days of taking the survey. This represents 7% of the overall sample, compared to 2% of the U.S. population.[72]

# VI. Overall Current Drug Use

Almost one-third (29%) of respondents in the overall sample were currently using illicit drugs, marijuana, and/or prescription drugs not prescribed to them or not as prescribed, meaning they consumed them within 30 days of taking the survey. This was nearly three times higher than usage in the U.S. general population (10%).[73]

More than two-thirds (68%) of those currently working in the underground economy reported illicit drug use (including marijuana and prescription drug use) in the past month (Figure 7.38).

**Figure 7:38: Substance use in the past month among respondents currently working in the underground economy**



# F. HIV TESTING AND CARE

The prevalence of HIV and AIDS has been found in prior research to be higher among transgender people than in the U.S. general population.[74] The Centers for Disease Prevention and Control found that a number of factors increase transgender people's vulnerability to HIV, including social rejection and stigma, inadequate access to transgender-competent care, barriers to accessing education, employment, and housing, and high rates of intimate partner violence.[75] Respondents received a series of questions to examine experiences related to HIV testing, HIV care, and living with HIV. Several of the questions in this section of the survey were patterned on national surveys, including the National Health Interview Survey (NHIS)[76] and Behavioral Risk Factor Surveillance System (BRFSS),[77] so that answers could be compared to the U.S. population.

**KEY FINDINGS**

▶ More than half (55%) of the sample has been tested for HIV, compared to 34% of the U.S. adult population.

▶ Respondents reported that they were diagnosed with HIV at a rate of 1.4%, a substantially higher rate than in the U.S. population (0.3%).

▶ Transgender women were more than twice as likely to be living with HIV (3.4%) as the overall sample.

▶ Nearly one in five (19.0%) Black transgender women were living with HIV, and American Indian (4.6%) and Latina (4.4%) transgender women were more than three times as likely to be living with HIV as the overall sample.

# I. HIV Testing

Respondents were asked whether they had ever been tested for HIV, aside from testing obtained through the blood donation process. More than half (55%) of respondents had been tested for HIV, in comparison to 34% of the U.S. adult population.[78] This varied by gender identity, with transgender women (62%) and transgender men (58%) being more likely to be tested, compared to non-binary people (45%). Black respondents (70%) and American Indian (65%) respondents were more likely to have been tested than other people of color and white respondents (Figure 7.39).



Figure 7.39: Ever been tested for HIV RACE/ETHNICITY (%)

| | |
|---|---|
| Overall | 55% |
| American Indian | 65% |
| Asian | 49% |
| Black | 70% |
| Latino/a | 54% |
| Middle Eastern | 53% |
| Multiracial | 59% |
| White | 52% |

2015 U.S. TRANSGENDER SURVEY

AR.10279

People who were currently working in the underground economy, including sex work and drug sales, were also more likely to have been tested (78%).

## a. Test Location

Those who were tested for HIV received tests in a wide range of locations, with nearly one-half (45%) being tested at their private doctor's or HMO office, more than one-quarter (26%) at a clinic, and 11% in a counseling or testing site. Testing locations followed a similar pattern in the U.S. general population, with a few exceptions. USTS respondents were almost three times as likely to have been tested at a counseling or testing site (11%) than those in the U.S. general population (4%),[79] and three times less likely to be tested as a hospital inpatient (Table 7.7).

**Table 7.7: Locations where last tested for HIV**

| Location | % in USTS | % in U.S. population (BRFSS) |
|---|---|---|
| Private doctor or HMO office | 45% | 47% |
| Clinic | 26% | 23% |
| Counseling or testing site | 11% | 4% |
| Hospital inpatient | 3% | 9% |
| Emergency room | 1% | 2% |
| Home | 1% | 2% |
| Jail, prison, or other correctional facility | <1% | 1% |
| Drug treatment facility | <1% | <1% |
| Somewhere else | 9% | 11% |
| Military (write-in response) | 2% | --- |
| Mobile clinic or testing site (write-in response) | 2% | --- |
| Do not know or not sure | --- | 1% |

## b. Year of Last Test

Thirty-eight percent (38%) of respondents who have ever been tested for HIV had most recently been tested in 2015 (the year the survey was conducted), and more than two-thirds (71%) had last been tested in 2013 or later (Figure 7.40).

**Figure 7:40: Year of last HIV test**



% of those who have been tested for HIV

38% 2015
22% 2014
11% 2013
6% 2012
3% 2011
20% 2010 or earlier

## c. Reason For Not Being Tested

Forty-five (45%) percent of respondents reported that they had not been tested for HIV. Of those who had not been tested, 86% reported that the main reason for not being tested was that exposure to HIV was unlikely, similarly to the rate in the U.S. general population (86%).[80] Respondents also reported a variety of additional reasons for not being tested (Table 7.8).

**Table 7.8: Main reason for not being tested for HIV**

| Reason | % of those who have not been tested in USTS | % of those who have not been tested in U.S. population (NHIS) |
|---|---|---|
| Unlikely they have been exposed to HIV | 86% | 86% |
| Their doctor/health care provider never mentioned getting an HIV test | 3% | --- |
| They did not know where to get tested | 1% | 0% |
| They did not want to think about HIV or being HIV-positive | 1% | 0% |
| They did not like needles | 1% | 0% |
| They were afraid to find out if they were HIV-positive | 1% | 0% |
| They were worried their name would be sent to the government if they tested positive | <1% | <1% |
| They were afraid of losing their job, insurance, home, friends, or family if people knew they were tested | <1% | <1% |
| Some other reason | 2% | 1% |
| No particular reason | 6% | 12% |

## II. HIV Status

The rate of respondents who were living with HIV (1.4%)[81,82] was more than four times as high as that in the U.S. general population (0.3%).[83] More than half (53%) were HIV negative,[84] and 46% had not been tested or did not know the results of their HIV test. This included 1% of those who were tested but did not know their status because they never received the results and less than 1% who received results that were unclear, which meant the test did not determine if they had HIV.

HIV status varied by gender identity, with transgender women being most likely to report they were living with HIV (3.4%), in contrast to transgender men (0.3%) and non-binary people (0.4%) (Figure 7.41).

**Figure 7.41: Living with HIV**
GENDER IDENTITY (%)



The rate of HIV differed by race and ethnicity, with Black respondents being almost five times as likely to be HIV positive or reactive (6.7%). American Indian (2.0%) and Latino/a (1.6%) participants also had higher rates of HIV compared to the sample and in contrast to Asian (0.5%) and white (0.4%) respondents (Figure 7.42).

# In Our Own Voices

"I have consulted with surgeons [for gender transition] only to be told they would charge me 50–100% more for the surgery because I am HIV positive. Every day is a double coming out process as transgender and being undetectably HIV positive."

.......................................................

"The nurse refused to give me HIV testing because she said those funds were reserved for men who have sex with men and I'm 'not a real man.' She told me I was born female and just needed to accept reality."

.......................................................

"I am a trans man who has been living with HIV for 25 years. I have good health insurance and get excellent trans-related and HIV-related health care. I have access to a great therapist who is an expert in gender issues and transitioning. All these factors contribute to my survival and my success."

.......................................................

"My first time in jail, and possibly the time I became infected with HIV, was the scariest of all. There were so many times I was in jail and participated in unprotected sex out of fear and necessity. This is just one of the harsh realities for young vulnerable trans women like myself. It is truly bewildering that this reality was so commonly accepted among trans women of color."

.......................................................

AR.10281

*The rate of respondents living with HIV (1.4%) was nearly five times higher than in the U.S. population (0.3%).*

**Figure 7.42: Living with HIV**
RACE/ETHNICITY (%)



Nearly one in five (19.0%) Black transgender women reported living with HIV, a rate that is more than thirteen times higher than that in the overall sample. American Indian (4.6%) and Latina (4.4%) transgender women also reported substantially higher rates of HIV (Figure 7.43).

**Figure 7.43: Living with HIV among transgender women**
RACE/ETHNICITY (%)



The rate of HIV also differed by current age, with it being highest among those aged 45–64 (3.3%) and also higher for the 25–44 age group (2.0%) (Figure 7.44).

**Figure 7.44: Living with HIV**
AGE (%)



Undocumented residents (15.0%) were more than ten times as likely to report that they were living with HIV as the overall sample, and documented non-citizens (3.6%) were also more likely. There were also substantial differences when examining rates of HIV by educational attainment. Those who did not complete high school (7.2%) were more than five times as likely to be living with HIV as those in the overall sample, in contrast to the lower rates for those with a bachelor's degree (0.7%) or a graduate or professional degree (0.8%) (Figure 7.45).

**Figure 7.45: Living with HIV**
EDUCATIONAL ATTAINMENT (%)



The rate of HIV was more than ten times higher for respondents whose current sole source of income was from underground economy work (15.0%), five times higher among those who have participated in sex work at any point in their lifetime (7.9%), and almost twice as high for those who have experienced homelessness (2.7%).

# III. HIV Health Care

Medical providers and HIV health care advocates often describe effective treatment and management of HIV in terms of the HIV care continuum or the HIV treatment cascade. The HIV care continuum describes stages of HIV medical care, including "diagnosis of HIV infection, linkage to care, retention in care, receipt of antiretroviral therapy, and achievement of viral suppression."[85] Respondents were asked whether they had received HIV-related health care in the year prior to the survey, and were also asked about other aspects of the HIV care continuum.

Most of the respondents who were living with HIV had received HIV-specific health care within the past year, not including care received during an emergency room visit or during a hospital stay. Eighty-nine percent (89%) of respondents living with HIV had seen a doctor or health care provider for HIV care in the past 12 months, and 87% received HIV care in the past 6 months.

Respondents who had not seen a doctor for HIV care *in the past 6 months* offered a range of reasons, including not being ready to find health care for HIV, not being able to afford HIV care, not feeling sick enough to look for health care, and their HIV is well controlled enough to only see a doctor once per year.[86] Similarly, those who had not seen a doctor for HIV care *in the past 12 months* offered a variety of reasons, including not having health insurance, not being able to afford HIV care, not knowing where to go for HIV care, not feeling sick enough to look for health care, relying on a higher power or God to help with their HIV, only recently finding out about their HIV status, and other unspecified reasons.[87]

Of respondents who were living with HIV, 82% reported that they had their blood tested to determine their viral load and CD4 counts in the past 6 months. Five percent (5%) had most recently received such testing between 6 and 12 months ago, 6% were last tested more than a year ago, and 7% had never had a blood test for their viral load and CD4 counts.

Eighty-seven percent (87%) of respondents living with HIV have been prescribed anti-retroviral therapy (ART), which are medications that can reduce the amount of HIV in the body.[88] This is compared to 94% of those living with HIV in the general population.[89] Eighty-one percent (81%) of people living with HIV reported that they were currently taking their ART medications. Of those who had been prescribed ART, almost two-thirds (64%) reported taking it regularly and as prescribed all of the time, one-third (33%) took it most of the time, 2% rarely took it, and 1% never took it regularly and as prescribed. Approximately half (45%) of respondents who were not taking their ART medication all of the time—including those who took it most of the time, rarely, or never—reported that the main reason for not taking it as they were supposed to was that they forgot to take it. The remaining respondents (n=23, unweighted) reported several reasons why that they did not take their medication as prescribed, including not being able to afford the medication, not having health insurance, concerns about conflicts with other medications, concerns about weight gain, not wanting to take ART, and other reasons not listed in the question.

AR.10283

# Conclusion

Findings throughout the chapter indicated that respondents were impacted by substantial health-related disparities, including access to quality care and health outcomes. Respondents reported substantial barriers to receiving the care that they need, such as financial constraints, lack of health insurance or insurance that does not adequately address their health needs, and lack of access to health care providers who can administer health care respectfully and with a sufficient knowledge of transgender patients' needs. Furthermore, although some respondents were able to access health care related to gender transition, such as counseling, hormone therapy, or a variety of surgical procedures, a large number have not received such health care despite wanting to do so, often due to income and economic instability and lack of access to adequate health insurance insurance.

Results also suggest that insufficient access to quality care and coverage contributed to poor health outcomes among respondents. Respondents were substantially more likely to be living with HIV than the general population, with much higher rates among transgender women of color. Respondents were also more likely to report poor mental health outcomes, including higher rates of substance use, serious psychological distress, and suicide attempts. Findings demonstrated an association between poor health outcomes and a number of risk factors, such as economic instability, housing instability, lower educational attainment, and lack of family support.

**ENDNOTES** | CHAPTER 7: HEALTH

1   Bockting, W. O., Miner, M. H., Swinburne Romine, R. E., Hamilton, A., & Coleman, E. (2013). Stigma, mental health, and resilience in an online sample of the US transgender population. *American Journal of Public Health, 103(5),* 943–951; Grant, J. M., Mottet, L. A., Tanis, J., Harrison, J., Herman, J. L., & Keisling, M. (2011). I*njustice at Every Turn: A Report of the National Transgender Discrimination Survey. (pp. 72–87).* DC: National Center for Transgender Equality & National Gay and Lesbian Task Force; Institute of Medicine. (2011). *The Health of Lesbian, Gay, Bisexual, and Transgender People: Building a Foundation for Better Understanding.* DC: National Academy of Sciences.

2   Kosenko, K., Rintamaki, L., Raney, S., Maness, K. (2013). Transgender patient perceptions of stigma in health care contexts. *Medical Care, 51(9),* 819–822; Poteat, T., German, D., & Kerrigan, D. (2013). Managing uncertainty: A grounded theory of stigma in transgender health encounters. *Social Science & Medicine, 84(1),* 22–29; Grant, et al. (2011). pp. 72–87; Lambda Legal. (2010). *When Health Care Isn't Caring: Lambda Legal's Survey of Discrimination Against LGBT People and People with HIV.* New York, NY: Lambda Legal.

3   U.S. Census Bureau. (2015). 2015 American Community Survey 1-Year Estimates. Available at: https://factfinder. census.gov/faces/tableservices/jsf/pages/productview. xhtml?pid=ACS_15_1YR_S2701&prodType=table.

4   U.S. Census Bureau. (2015). *2015 American Community Survey 1-Year Estimates: Private Health Insurance Coverage By Type.* Available at: https://factfinder.census.gov/faces/ tableservices/jsf/pages/productview.xhtml?pid=ACS_15_1YR_ S2703&prodType=table; U.S. Census Bureau. (2015). *2015 American Community Survey 1-Year Estimates: Public Health Insurance Coverage by Type.* Available at: https://factfinder. census.gov/faces/tableservices/jsf/pages/productview. xhtml?pid=ACS_15_1YR_S2704&prodType=table.

5   The estimate for the percentage of people who receive coverage through the Indian Health Service was calculated based on a 2015 statement that approximately 2.2 million American Indian and Alaska Native people were served by the Indian Health Service. https://www.ihs.gov/newsroom/ factsheets/quicklook/.

6   Q. 11.9 specified that "[h]ealth insurance marketplaces are part of the new health care law, sometimes called 'Obamacare' or the 'Affordable Care Act,' where people can get insurance online, such as through healthcare.gov, over the phone, or in person."

7   "Insurer" here refers to insurers providing coverage under both private insurance plans (such as those purchased through an employer) and public plans (such as through Medicaid or Medicare).

HEALTH

8   The "other insurance" category includes TRICARE or other military coverage, VA, Indian Health Service, and other types of insurance not listed. See Table 7.1.

9   Respondents were asked if they had "experienced unwanted sexual contact (such as fondling, sexual assault, or rape) in a health care setting (such as a hospital, office, clinic)" in Q.12.7.

10  "People with disabilities" here refers to respondents who identified as a person with a disability in Q. 2.20.

11  Respondents on active duty in military service were asked separately about where they received transition-related health care. These results are reported in the *Military Service* chapter.

12  Although 1.5% of respondents in the sample reported having taken puberty-blocking medication, the percentage reported here reflects a reduction in the reported value based on respondents' reported ages at the time of taking this medication. While puberty-blocking medications are usually used to delay physical changes associated with puberty in youth ages 9—16 prior to hormone replacement therapy, a large majority (73%) of respondents who reported having taken puberty blockers in Q.12.9 reported doing so after age 18 in Q.12.11. This indicates that the question may have been misinterpreted by some respondents who confused puberty blockers with the hormone therapy given to adults and older adolescents. Therefore, the percentage reported here (0.3% or "less than 1%") represents only the 27% of respondents who reported taking puberty-blocking medication before the age of 18.

13  "Transition-related surgery" here includes all procedures listed in Table 7.4 and 7.5, with the exception of electrolysis and non-surgical voice therapy.

14  Respondents who are "living in poverty" represent those who are living at or near the poverty line. See the *Income and Employment Status* chapter for more information about the poverty line calculation.

15  The "other insurance" category in Figure 7.11 includes TRICARE or other military coverage, VA, Indian Health Service, and other types of insurance not listed. See Table 7.1.

16  Since the available surgical procedures related to transition generally vary based on individuals' sex assigned at birth (the gender they were thought to be when they were born), respondents received different questions about surgical procedures based on their response to Q. 2.1, which asked about the sex listed on respondents' original birth certificate. Respondents who said that they had female on their original birth certificate received Q. 12.15, and respondents who said they had male on their original birth certificate received Q. 12.18. Although the vast majority of respondents received only questions about medical procedures available to them, 2.7% of respondents indicated that they were intersex, and a portion of them may not have received questions about all the surgical procedures that best fit their health care needs.

17  Respondents were asked about having "top/chest surgery reduction or reconstruction" in Q. 12.15.

18  Respondents were asked about having a "hysterectomy/'hysto' (removal of the uterus, ovaries, fallopian tubes, and/or cervix)" in Q. 12.15.

19  Respondents were asked about having a "clitoral release/ metoidioplasty/centurion procedure" in Q. 12.15. These are genital procedures that separate the clitoris from the labia.

20  Respondents were asked about having a "phalloplasty (creation of a penis)" in Q. 12.15. This is a genital procedure involving the construction of a larger phallus.

21  The U.S. Preventive Services Task Force currently recommends Pap smears every three years for adults who have a cervix and are between the ages 21 and 65. U.S. Preventive Services Task Force. (2012). *Cervical Cancer: Screening.* Available at: http://www. uspreventiveservicestaskforce.org/Page/Document/ UpdateSummaryFinal/cervical-cancer-screening.

22  Centers for Disease Prevention and Control. (2016). *2015 National Health Interview Survey: Sample Adult File.* Available at: ftp://ftp.cdc.gov/pub/Health_Statistics/NCHS/ Dataset_Documentation/NHIS/2015/samadult_freq.pdf

23  Respondents were asked about having a "vaginoplasty/ labiaplasty/SRS/GRS/GCS" in Q. 12.18. A vaginoplasty is a surgical creation of a vagina. A labiaplasty is a surgical modification or construction of the labia.

24  Respondents were asked about having an "orchidectomy/'orchy'/removal of the testes" in Q. 12.18.

25  Respondents were asked about having "facial feminization surgery (such as nose, brow, chin, cheek)" in Q.12.18.

26  Respondents were asked about having "breast augmentation/top surgery" in Q. 12.18. This refers to an augmentation mammoplasty, which reshapes or increases the size of the breast.

27  Respondents were asked about having a "tracheal shave (Adam's apple or thyroid cartilage reduction)" in Q. 12.18.

28  Although silicone injections are sometimes used to modify one's appearance, they are often risky and can lead to disfigurement, injury, and even death. Such injections are illegal in the United States. However, due to barriers to affordable care, some transgender people turn to silicone injections as a less expensive or more easily accessible substitute for safer treatments.

29  See e.g., Pascoe, E. A. & Richman, L. S. (2009). Perceived discrimination and health: A meta-analytic review. *Psychological Bulletin, 135*(4), 531–554.

30  See e.g., Bariola, E. Lyons, A., Leonard, W., Pitts, M., Badcock, P., Couch, M. (2015). Demographic and psychosocial factors associated with psychological distress and resilience among transgender individuals. *American Journal of Public Health, 105*(10), 2108—2116; Nuttbrock, L., Brockting, W., Rosenblum, A., Hwahng, S., Mason, M., Macri, M., & Becker, J. (2014). Gender abuse and major depression among transgender women: A prospective study of vulnerability and resilience.

*American Journal of Public Health, 104*(11), 2191, 2198; Bockting, W. O., Miner, M. H., Swinburne Romine, R. E., Hamilton, A., & Coleman, E. (2013). Stigma, mental health, and resilience in an online sample of the US transgender population. *American Journal of Public Health, 103*(5), 943–951; Institute of Medicine. (2011). *The Health of Lesbian, Gay, Bisexual, and Transgender People: Building a Foundation for Better Understanding.* DC: National Academy of Sciences.

31   The general health rating among adults in the U.S. population was calculated by the research team using data from the Behavioral Risk Factor Surveillance System (BRFSS). Centers for Disease Control and Prevention. (2015). *BRFSS Prevalence & Trends Data.* Available at: http://www.cdc.gov/brfss/brfssprevalence.

32   The Kessler Psychological Distress Scale, or K6, assesses psychological distress based on how often in the past 30 days respondents felt: so sad that nothing could cheer them up, nervous, restless or fidgety, hopeless, that everything was an effort, or worthless. See Q. 12.2. See the National Health Interview Survey for additional information about the K6 mental health screening instrument and measure of serious psychological distress in adults (available at: http://www.healthindicators.gov/Indicators/Serious-psychological-distress-adults-percent_50055/Profile).

33   The K6 scale rates how often feelings are experienced on the following scale: (0) none of the time, (1) a little of the time, (2) some of the time, (3) most of the time, and (4) all of the time. See Q. 12.2. A total score of 13 or above across all six measures indicates serious psychological distress.

34   Centers for Disease Prevention and Control. (2016). *2015 National Health Interview Survey: Sample Adult File.* Available at: ftp://ftp.cdc.gov/pub/Health_Statistics/NCHS/Dataset_Documentation/NHIS/2015/samadult_freq.pdf.

35   See note 33 for an explanation of how "serious psychological distress" is calculated based on the K6 scale.

36   Center for Behavioral Health Statistics and Quality. (2016). *Results from the 2015 National Survey on Drug Use and Health: Detailed Tables.* Table 8.86B. Rockville, MD: Substance Abuse and Mental Health Services Administration. Available at: http://www.samhsa.gov/data/sites/default/files/NSDUH-DetTabs-2015/NSDUH-DetTabs-2015/NSDUH-DetTabs-2015.pdf.

37   Serious psychological distress is related to age and educational attainment in the U.S. general population. (see note 33; http://www.cdc.gov/mmwr/preview/mmwrhtml/mm6340a13.htm). Those who are younger and have lower educational attainment have a higher prevalence of serious psychological distress. When the "supplemental weight" is applied to the USTS sample's prevalence of serious psychological distress to adjust the sample to reflect the age and educational attainment of the U.S. adult population, the prevalence is reduced to 30%, six times the national prevalence for U.S. adults. Based on

studies using population-based samples of transgender adults, it is estimated that the transgender population is younger and has lower educational attainment than the U.S. adult population. Flores, A. R., Brown, T. N. T., & Herman, J. L. (2016). Race and Ethnicity of Adults who Identify as Transgender in the United States. Los Angeles, CA: Williams Institute; Conron, K. J., Scott, G., Stowell, G. S., & Landers, S. J. (2012). Transgender health in Massachusetts: Results from a household probability sample of adults. American Journal of Public Health, 102(1), 118–122. Therefore, the finding of 39% for prevalence of serious psychological distress is reported here using the standard weight only.

38   *Results from the 2015 National Survey on Drug Use and Health: Detailed Tables.* Table 8.86B. See note 36.

39   Results for respondents who were sexually assaulted here reflect those who reported that they had "experienced unwanted sexual contact (such as oral, genital, or anal contact or penetration, forced fondling, rape)" in the past year (see Q. 18.3).

40   Substance Abuse and Mental Health Services Administration. (2015). *Ending Conversion Therapy: Supporting and Affirming LGBTQ Youth.* Available at: http://store.samhsa.gov/shin/content//SMA15-4928/SMA15-4928.pdf.

41   Additionally, eleven percent (11%) of respondents in the sample said they were sent to a therapist, counselor, or religious advisor by immediate family members to stop them from being transgender. See the "Sent to a Professional for Being Transgender" section of the *Family Life and Faith Communities* chapter for a discussion about respondents who were sent to a professional by their family.

42   Although 0.4% of the overall sample reported that gender transition was not for them, these respondents did identify as transgender, meeting all criteria for inclusion in the survey (see Q. 1.10–1.18).

43   Haas, A. P., Rodgers, P. L., & Herman, J. L. (2014). *Suicide Attempts Among Transgender and Gender Non-Conforming Adults.* New York, NY & Los Angeles, CA; American Foundation for Suicide Prevention & Williams Institute; Moody, C. & Smith, N. G. (2013). Suicide protective factors among trans adults. *Archives of Sexual Behavior 42*(5), 739–752; Grant, J. M., Mottet, L. A., Tanis, J., Harrison, J., Herman, J. L., & Keisling, M. (2011). *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey.* (p. 82). DC: National Center for Transgender Equality & National Gay and Lesbian Task Force.

44   Lipari, R., Piscopo, K., Kroutil, L. A., & Miller, G. K. (2015). *Suicidal Thoughts and Behaviors Among Adults: Results from the 2014 National Survey on Drug Use and Health.* Rockville, MD: Substance Abuse and Mental Health Services Administration.

45   Kessler, R. C., Berglund, P., Chiu, W. T., Demler, O., Heeringa, S., Hiripi, E., . . . Zheng, H. (2004). The US National Comorbidity Survey Replication (NCS-R): design and field procedures. *International Journal of Methods in Psychiatric Research, 13*(2), 69–92.

46  *Results from the 2015 National Survey on Drug Use and Health: Detailed Tables.* Table 8.70B. See note 36.

47  *Results from the 2015 National Survey on Drug Use and Health: Detailed Tables.* Table 8.69B. See note 36.

48  *Results from the 2015 National Survey on Drug Use and Health: Detailed Tables.* Table 8.70B. See note 36.

49  *Results from the 2015 National Survey on Drug Use and Health: Detailed Tables.* Table 8.70B. See note 36.

50  *Results from the 2015 National Survey on Drug Use and Health: Detailed Tables.* Table 8.70B. See note 36.

51  Whether or not a person receives medical attention following a suicide attempt is often used as a measure of the severity of the attempt. However, because many transgender people report avoiding medical professionals because of fear of mistreatment (see, for example, the previous section on "Experiences with Health Care Providers"), it may be difficult to use this measure to gauge the severity of the attempt among USTS respondents.

52  *Results from the 2015 National Survey on Drug Use and Health: Detailed Tables.* Table 8.77B. See note 36.

53  *Results from the 2015 National Survey on Drug Use and Health: Detailed Tables.* Table 8.77B. See note 36.

54  Kessler, R. C., Borges, G., & Walters, E. E. (1999). Prevalence of and risk factors for lifetime suicide attempts in the National Comorbidity Survey. *Archives of General Psychiatry, 56*(7), 617–626. See also Nock, M. K., Hwang, I., Sampson, N. A., & Kessler, R. C. (2010). Mental disorders, comorbidity and suicidal behavior: Results from the National Comorbidity Survey Replication. *Molecular Psychiatry, 15*(8), 868–876; Nock, M. K., Borges, G., Bromet, E. J., Cha, C. B., Kessler, R. C., & Lee, S. (2008). Suicide and suicidal behavior. *Epidemiologic Reviews, 30*(1), 133–154 (finding a lifetime prevalence of suicide ideation of 5.6–14.3%, a lifetime prevalence for suicide plans of 3.9%, a lifetime prevalence for suicide attempts of 1.9–8.7%).

55  Respondents who reported that they were out to all, most, or some of the immediate family they grew up with were asked to assess how supportive their family was using a five-point scale from "very supportive" to "very unsupportive". The categories were collapsed to create a new variable reflecting a supportive, neutral, or unsupportive family.

56  Results for respondents who were sexually assaulted here reflect those who reported that they had "experienced unwanted sexual contact (such as oral, genital, or anal contact or penetration, forced fondling, rape)" in their lifetime (see Q.18.1).

57  The age of the most recent suicide attempt reported here includes responses from both respondents who reported a single attempt and those who reported multiple attempts. For respondents who reported a single suicide attempt, the age of the most recent suicide attempt is also the age of their first suicide attempt as reported in the previous section.

58  See e.g., Cleveland, M. J., Feinberg, M. E., Bontempo, D. E., & Greenberg, M. T. (2008). The role of risk and protective factors in substance use across adolescence. *Journal of Adolescent Health, 43*(2), 157–164; Kilpatrick, D. G., Ruggiero, K. J., Acierno, R., Saunders, B. E., Resnick, H. S., & Best, C. L. (2003). Violence and risk of PTSD, major depression, substance abuse/dependence, and comorbidity: Results from the National Survey of Adolescents. *Journal of Consulting and Clinical Psychology, 71*(4), 692–700.

59  Center for Behavioral Health Statistics and Quality. (2015). *2015 National Survey on Drug Use and Health Questionnaire.* Available at: http://www.samhsa.gov/data/population-data-nsduh/reports?tab=39.

60  Center for Behavioral Health Statistics and Quality. (2015). *Results from the 2014 National Survey on Drug Use and Health: Detailed Tables.* Table 2.6B. Rockville, MD: Substance Abuse and Mental Health Services Administration. Available at: http://www.samhsa.gov/data/sites/default/files/NSDUH-DetTabs-2015/NSDUH-DetTabs-2015/NSDUH-DetTabs-2015.pdf.

61  *Results from the 2014 National Survey on Drug Use and Health: Detailed Tables.* Table 2.6B. See note 60.

62  This report follows the 2014 National Survey on Drug Use and Health (NSDUH) definition for binge drinking, which is defined as "drinking five or more drinks on the same occasion on at least 1 day in the past 30 days." As this definition differs from the 2015 NSDUH definition, general population comparisons for binge and heavy drinking in this report will be drawn from the 2014 NSDUH data. Hedden, S. L., Kennet, J., Lipari, R., Medley, G., Tice, P., Copello, E. A. P., & Kroutil, L. A. (2015). *Behavioral Health Trends in the United States: Results from the 2014 National Survey on Drug Use and Health.* Rockville, MD: Substance Abuse and Mental Health Services Administration. Available at: http://www.samhsa.gov/data/sites/default/files/NSDUH-FRR1-2014/NSDUH-FRR1-2014.pdf.

63  *Results from the 2014 National Survey on Drug Use and Health: Detailed Tables.* Table 2.46B. See note 60.

64  *Results from the 2014 National Survey on Drug Use and Health: Detailed Tables.* Table 2.46B. See note 60.

65  *Results from the 2015 National Survey on Drug Use and Health: Detailed Tables.* Table 2.28B. See note 36.

66  *Results from the 2015 National Survey on Drug Use and Health: Detailed Tables.* Table 2.16B. See note 36.

67  *Results from the 2015 National Survey on Drug Use and Health: Detailed Tables.* Table 6.7B. See note 36.

68  Respondents were instructed to include products such as "weed, joints, hashish, hash, or hash oil" when reporting on marijuana use. See Q. 15.1.

69  *Results from the 2015 National Survey on Drug Use and Health: Detailed Tables.* Table 1.35B. See note 36.

70  *Results from the 2015 National Survey on Drug Use and Health: Detailed Tables.* Table 1.35B. See note 36.

AR.10287

71   For the purposes of this report, "illicit drugs" include those such as cocaine, crack, heroin, LSD, methamphetamine, and inhalants, but does not include marijuana or nonmedical use of prescription drugs. See Q. 15.1. This differs from illicit drugs as reported in the NSDUH, which includes "the misuse of prescription psychotherapeutics or the use of marijuana, cocaine (including crack), heroin, hallucinogens, inhalants, or methamphetamine." *Results from the 2015 National Survey on Drug Use and Health: Detailed Tables.* Table 1.30B. See note 36. Due to the difference between the two definitions, a comparison to the U.S. general population for the overall use of illicit drugs (not including marijuana or nonmedical use of prescription drugs) is not possible.

72   *Results from the 2015 National Survey on Drug Use and Health: Detailed Tables.* Table 1.22B. See note 36.

73   *Results from the 2015 National Survey on Drug Use and Health: Detailed Tables.* Table 1.30B. See note 36.

74   Centers for Disease Control and Prevention. (2016). *HIV and Transgender Communities.* Available at: http://www.cdc.gov/hiv/pdf/policies/cdc-hiv-transgender-brief.pdf; Baral, S. D., Poteat, T., Strömdahl, S., Wirtz, A. L., Guadamuz, T. E., & Beyrer, C. (2013). Worldwide burden of HIV in transgender women: a systematic review and meta-analysis. *The Lancet Infectious Diseases, 13*(3), 214–222; Grant, J. M., Mottet, L. A., Tanis, J., Harrison, J., Herman, J. L., & Keisling, M. (2011). *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey.* (p. 80). DC: National Center for Transgender Equality & National Gay and Lesbian Task Force; Reisner, S. L., Poteat, T., Keatley, J., Cabral, M. Mothopeng, T., Dunham, E., Holland, C. E., Max, R., Baral, S. D. (2016). Global health burden and needs of transgender populations: a review. *The Lancet Infectious Diseases, 388*(10042), 412–436.

75   Centers for Disease Control and Prevention. (2016). *HIV and Transgender Communities.* Available at: http://www.cdc.gov/hiv/pdf/policies/cdc-hiv-transgender-brief.pdf.

76   Centers for Disease Control and Prevention (2015). *National Health Interview Survey: Survey Description.* Available at: ftp://ftp.cdc.gov/pub/Health_Statistics/NCHS/Dataset_Documentation/NHIS/2014/srvydesc.pdf .

77   Centers for Disease Control and Prevention (2014). *2015 Behavioral Risk Factor Surveillance System Questionnaire.* Available at: http://www.cdc.gov/brfss/questionnaires/pdf-ques/2015-brfss-questionnaire-12-29-14.pdf.

78   Centers for Disease Control and Prevention. (2015). *BRFSS Prevalence & Trends Data.* Available at: http://www.cdc.gov/brfss/brfssprevalence.

79   Centers for Disease Control and Prevention. (2016). *Behavioral Risk Factor Surveillance System: 2015 Codebook Report.* Available at: http://www.cdc.gov/brfss/annual_data/2015/pdf/codebook15_llcp.pdf.

80   Centers for Disease Prevention and Control. (2016). *2015 National Health Interview Survey: Sample Adult File.* Available at: https://www.cdc.gov/nchs/nhis/nhis_2015_data_release.htm.

81   Percentages related to HIV status are presented with one decimal place throughout the section for more accurate comparison with general population figures.

82   The rate of respondents living with HIV includes those who were HIV-positive or reactive. Among respondents who had been tested, the rate of those who tested positive for HIV was 2.6%.

83   Centers for Disease Control and Prevention. (2015). HIV Surveillance Report, 2014; vol. 26. Table 18a. Available at: http://www.cdc.gov/hiv/library/reports/surveillance/. The HIV Surveillance Report provides data for those who were living with diagnosed HIV infection in the U.S. population in 2013. The U.S. population data includes those who are 15 years of age and older and does not include rate for those who are under 18, so it was not possible to exactly match the USTS sample with the U.S. population data. However, when estimating the impact of including 15–17 year olds in the U.S. population rate of those living with HIV, research team calculations estimated a difference of approximately 0.002% in the rate, which would not impact the rate of those living with HIV in the U.S. population as reported here.

84   Ninety-seven percent (97%) of those who were tested for HIV were HIV negative.

85   AIDS.Gov. (2015). *HIV Care Continuum.* Available at: https://www.aids.gov/federal-resources/policies/care-continuum.

86   Due to a low sample size, response figures could not be reported for those who had not seen a doctor for HIV care in the past 6 months.

87   Due to a low sample size, response figures could not be reported for those who had not seen a doctor for HIV care in the past 12 months.

88   See AIDS.Gov. (2015). *Overview of HIV Treatments.* Available at: https://www.aids.gov/hiv-aids-basics/just-diagnosed-with-hiv-aids/treatment-options/overview-of-hiv-treatments.

89   Centers for Disease Control and Prevention. (2016). Behavioral and Clinical Characteristics of Persons Receiving Medical Care for HIV Infection—Medical Monitoring Project, United States, 2013 Cycle (June 2013-May 2014). HIV Surveillance Special Report 16. Available at: http://www.cdc.gov/hiv/pdf/statistics/systems/mmp/cdc-hiv-hssr-mmp-2013.pdf.



# CHAPTER 8

# Experiences at School

**M**any schools provide supportive environments that promote learning and growth, while some schools can be unwelcoming and unsupportive for transgender students, whether in Kindergarten through 12th grade (K–12), or in technical or higher education institutions (such as a college or university). Other studies have shown that many students feel unsafe and have been verbally harassed or physically attacked because of their transgender identity.[1,2]

Survey respondents were asked whether they were out or perceived as transgender in K–12 and in higher education institutions. Those who said that they were out as transgender or that others thought they were transgender were asked additional questions about negative experiences based on their transgender status, including verbal harassment, physical and sexual assault, leaving school because of mistreatment, and expulsion. Throughout the chapter, notable differences in respondents' experiences based on demographic and other characteristics are reported.

AR.10289

KEY FINDINGS

▶ Twelve percent (12%) of respondents were out as transgender at some point from Kindergarten through the 12th grade.

▶ More than three-quarters (77%) of respondents who were out or perceived as transgender in K–12 had one or more negative experiences, such as being verbally harassed, prohibited from dressing according to their gender identity, or physically or sexually assaulted.

▶ Fifty-four percent (54%) of people who were out or perceived as transgender in K–12 were verbally harassed, and 24% were physically attacked.

▶ Seventeen percent (17%) of people who were out or perceived as transgender left a K–12 school because the mistreatment was so bad, and 6% were expelled.

▶ Twenty-four percent (24%) of people who were out or perceived as transgender in college or vocational school were verbally, physically, or sexually harassed.

# I. Outness in K–12

Twelve percent (12%) of respondents reported that they were out as transgender at some point between Kindergarten and the 12th grade (K–12). Of those who were not out as transgender, 28% said that they believed classmates, teachers, or school staff thought they were transgender.

All respondents, including those who were out or perceived as transgender in K–12, were also asked whether classmates, teachers, or school staff thought or knew that they were lesbian, gay, bisexual, or queer (LGBQ) in K–12. Three-quarters (75%) believed that classmates, teachers, or school staff thought or knew they were LGBQ. Younger respondents were much more likely to report that classmates, teachers, or staff in K–12 thought or knew they were LGBQ than older respondents,

such as 18- to 24-year-olds (85%) in contrast to 45- to 64-year-olds (51%) (Figure 8.1).

**Figure 8.1: Perceived as LGBQ in K–12**
**CURRENT AGE (%)**



| | |
|---|---|
| Overall | 75% |
| 18 to 24 | 85% |
| 25 to 44 | 76% |
| 45 to 64 | 51% |
| 65 and over | 24% |

*More than three-quarters (77%) of those who were out or perceived as transgender had one or more negative experiences at school because they were transgender, such as being verbally harassed or physically attacked.*

## II. Treatment in K–12

Respondents who were out as transgender in K–12 or who said that others thought that they were transgender received additional questions about negative experiences in K–12, such as verbally harassed, physically attacked, or expelled. Overall, 77% of those who were out or perceived as transgender had one or more of these negative experiences, while only 23% did not have any of these experiences (Table 8.1). American Indian (92%), Middle Eastern (84%), and multiracial (81%) respondents (Figure 8.2) and people with disabilities[3] (82%) were more likely to have one or more negative experiences.

*Poor treatment in school was associated with a variety of negative experiences. Respondents who were out or perceived as transgender in K–12 and had one or more negative experiences outlined in this chapter were:*

- *More likely to have attempted suicide (52%) than those who were out or perceived as transgender and did not have any of these negative experiences (37%).*

- *More likely to have experienced homelessness (40%) than those who were out or perceived as transgender and did not have any of the negative experiences (22%).*

- *More likely to currently be experiencing serious psychological distress (47%) than those who were out or perceived as transgender and did not have any of the negative experiences (37%).*

- *More likely to have ever worked in the underground economy, such as in sex work or drug sales (28%), compared with those who were out or perceived as transgender and did not have any of the negative experiences (18%).*

**Table 8.1: Experiences of people who were out as transgender in K–12 or believed classmates, teachers, or school staff thought they were transgender**

| Experiences | % of those who were out or perceived as transgender |
|---|---|
| Verbally harassed because people thought they were transgender | 54% |
| Not allowed to dress in a way that fit their gender identity or expression | 52% |
| Disciplined for fighting back against bullies | 36% |
| Physically attacked because people thought they were transgender | 24% |
| Believe they were disciplined more harshly because teachers or staff thought they were transgender | 20% |
| Left a school because the mistreatment was so bad | 17% |
| Sexually assaulted because people thought they were transgender | 13% |
| Expelled from school | 6% |
| **One or more experiences listed** | **77%** |

**Figure 8.2: Had one or more negative experiences in K–12 (of those who were out or perceived as transgender)**
**RACE/ETHNICITY (%)**



## a. Verbal Harassment

More than half (54%) of people who were out or perceived as transgender in K–12 were verbally harassed because they were transgender. Verbal harassment differed among people of color, with American Indian (69%) and Middle Eastern (61%) respondents being more likely to have this experience, and Latino/a (52%) and Black (51%) respondents being less likely (Figure 8.3).

**Figure 8.3: Verbally harassed in K–12 because people they thought they were transgender**
RACE/ETHNICITY (%)



### *Nearly one-quarter (24%) of those who were out or perceived as transgender in school were physically attacked because of being transgender.*

**Figure 8.4: Physically attacked in K–12 because people thought they were transgender**
GENDER IDENTITY (%)



## b. Physical Attack

Nearly one-quarter (24%) were physically attacked because of being transgender. Transgender women (38%) were more likely to have been physically attacked than transgender men (20%) and non-binary people (16%) (Figure 8.4). American Indian respondents (49%) were more than twice as likely to have been physically attacked, and Middle Eastern (36%), multiracial (31%), and Black (28%) respondents were also more likely to have had this experience, in contrast to Latino/a (24%), white (23%), and Asian (17%) respondents (Figure 8.5).

**Figure 8.5: Physically attacked in K–12 because people thought they were transgender**
RACE/ETHNICITY (%)



EXPERIENCES AT SCHOOL

AR.10292

## c. Sexual Assault

Thirteen percent (13%) of people who were out or perceived as transgender in K–12 were sexually assaulted in school because they were transgender.[4] Transgender women (21%) and crossdressers (18%) were more likely to have been sexually assaulted than transgender men (9%) and non-binary people (10%) (Figure 8.6).

**Figure 8.6: Sexually assaulted in K–12 because people thought they were transgender**
GENDER IDENTITY (%)



Whether a respondent was sexually assaulted in K–12 varied by age, with older respondents such as 45- to 64-year-olds being more likely to have been sexually assaulted (22%) than younger respondents such as 25- to 44-year-olds (16%) (Figure 8.7).

**Figure 8.7: Sexually assaulted in K–12 because people thought they were transgender**
CURRENT AGE (%)



# In Our Own Voices

"I was constantly bullied and physically assaulted by my classmates. Teachers would often see it happen and make no move to intervene. The harassment continued, and I eventually had to change high schools three times, each time just as bad as the last, until I finally gave up on public schools."

......................................................

"I'd get hit by soda cans, spit balls, and paper airplanes of hate mail. Teachers weren't there or didn't care. I had to avoid social interactions like buses and school bathrooms because I didn't feel safe."

......................................................

"Every single day at college, I was harassed for being a visibly trans woman. People slowed their cars down to stare at me, they shouted slurs at me from their dorm windows, insulted me in class, and a lot more I'd rather not think about. It got so bad that I tried to kill myself twice over the course of three months. Getting out of that school has been the best thing to have happened to me."

......................................................

"In high school, the staff told me I could not use the men's bathroom because I'd make other students uncomfortable, even though I was out to everyone and none of the students were bothered by my gender."

......................................................

AR.10293

## d. Left School Due to Harassment

Seventeen percent (17%) of those who were out or perceived as transgender left a school because the mistreatment was so bad. Transgender women (22%) were more likely to have left a school because of mistreatment, in contrast to transgender men (15%) and non-binary people (15%) (Figure 8.8).

**Figure 8.8: Left school due to mistreatment in K–12**
GENDER IDENTITY (%)



American Indian (39%) and Middle Eastern (36%) respondents were more than twice as likely to have left a school because the mistreatment was so bad, and Black (22%) and multiracial (21%) respondents were also more likely to have left a school for this reason (Figure 8.9).

**Figure 8.9: Left school due to mistreatment in K–12**
RACE/ETHNICITY (%)



*Seventeen percent (17%) of people who were out or perceived as transgender in K–12 left a school because the mistreatment was so bad.*

## e. Expelled from School

Six percent (6%) of people who were out or perceived as transgender were expelled from school. Transgender women were nearly twice as likely to have been expelled, with one in ten (10%) reporting that experience (Figure 8.10). Further, respondents who were currently working in the underground economy (18%) were three times as likely to have been expelled from school.

**Figure 8.10: Expelled from school in K–12**
GENDER IDENTITY (%)



EXPERIENCES AT SCHOOL

# III. Outness and Treatment in College or Vocational School

Of respondents who had attended college or vocational school, 46% said their classmates, professors, or staff at college or vocational school thought or knew they were transgender. Nearly one-quarter (24%) of respondents who indicated that classmates, professors, or staff at college or vocational school thought or knew they were transgender were verbally, physically, or sexually harassed. American Indian (37%), Black (28%), and Middle Eastern (27%) respondents were more likely to have had these experiences, while white (23%), Latino/a (23%), and Asian (22%) respondents were less likely (Figure 8.11).

**Figure 8.11: Verbally, physically, or sexually harassed in college or vocational school**
**RACE/ETHNICITY (%)**



Of respondents who were out or perceived as transgender and who experienced some form of harassment, 16% left college or vocational school because the harassment was so bad. This represents 2% of all respondents who attended a higher education institution. Of those who experienced some form of harassment, transgender women (21%) were more likely to

have left college or vocational school for this reason than transgender men (16%) and non-binary people (12%) (Figure 8.12). Respondents currently working in the underground economy were almost twice as likely (31%) to have left college because of harassment than other respondents. American Indian (23%), Latino/a (23%), Black (21%), and multiracial (20%) respondents were more likely to report leaving school for that reason (Figure 8.13).

**Figure 8.12: Left college or vocational school because harassment was so bad (of those who were harassed)**
**GENDER IDENTITY (%)**



**Figure 8.13: Left college or vocational school because harassment was so bad (of those who were harassed)**
**RACE/ETHNICITY (%)**



*Sample size too low to report

In addition to the 2% who left because the harassment was so bad, 1% of respondents who attended college or vocational school were expelled or forced out, and 5% left because of other reasons related to being transgender.

# IV. Current Outness and Support of Classmates

In addition to questions about being out to classmates at any time while they were in school, respondents were asked whether they currently had classmates, and whether those classmates knew that they were transgender. Of respondents who currently had classmates, only 15% said that all of their classmates knew that they were transgender, 10% said that most of them knew, 28% said that some of them knew, and nearly half (47%) said that none of their classmates knew that they were transgender.

Respondents who currently had classmates and reported that all, most, or some of their classmates knew that they were transgender were asked how supportive their classmates generally were of them as a transgender person. Responses were given on a five-point scale from "very supportive" to "very unsupportive." The categories were collapsed to create a new variable reflecting supportive, neutral, or unsupportive classmates.[5] More than half (56%) reported that their classmates were supportive, 39% had classmates that were neither supportive nor unsupportive, and only 5% reported that their classmates were unsupportive (Table 8.2).

**Table 8.2: Classmates' level of support of them as a transgender person**

| Level of support | % of those who reported that all, most, or some of their classmates knew they were transgender |
| --- | --- |
| Very supportive | 21% |
| Supportive | 35% |
| Neither supportive nor unsupportive | 39% |
| Unsupportive | 4% |
| Very unsupportive | 1% |

*More than half (56%) of those who had at least some classmates who knew they were transgender reported that their classmates were supportive.*

# Conclusion

Results indicated that the majority of those who were out or perceived as transgender in K–12 had one or more negative experiences, and that such experiences were correlated with a variety of poor outcomes, such as higher rates of attempted suicide, homelessness, and serious psychological distress. Although negative experiences were reported at all age groups, results found that older individuals were less likely to have been out as transgender in K–12 than younger respondents, but when out, they were more likely to have experienced negative treatment in schools. This indicates that school environments have improved for transgender people over the years, though high rates of mistreatment were reported even among younger respondents.

Additionally, results indicated that those who attended college or another higher education institution were out or perceived as transgender at high rates. However, they also suggest that transgender students in such institutions are subject to harmful experiences that lead to negative outcomes, such as having to leave school to avoid being harassed because of being transgender.

**ENDNOTES**  |  CHAPTER 8: EXPERIENCES AT SCHOOL

1   Kosciw, J. G., Greytak, E. A., Palmer, N. A., & Boesen, M. J. (2014). *The 2013 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual and Transgender Youth in Our Nation's Schools.* New York, NY: Gay, Lesbian & Straight Education Network; Kosciw, J. G., Palmer, N. A., Kull, R. M., & Greytak, E. A. (2013). The effect of negative school climate on academic outcomes for LGBT youth and the role of in-school supports. *Journal of School Violence, 12*(1), 45–63.

2   Rankin, S. & Beemyn, G. (2012). Beyond a binary: The lives of gender-nonconforming youth. *About Campus, 17*(4), 2–10; Rankin, S., Weber, G., Blumenfeld, W., & Frazer, S. (2010). *2010 State of Higher Education for LGBT People.* Charlotte, NC: Campus Pride.

3   "People with disabilities" here refers to respondents who identified as a person with a disability in Q. 2.20.

4   This data is derived from responses to Q. 26.4, where respondents were asked if they had "experienced unwanted sexual contact because people thought [they were] trans."

5   "Very supportive" and "supportive" categories were collapsed into a single "supportive" category. "Very unsupportive" and "unsupportive" categories were collapsed into a single "unsupportive" category. See Q. 4.12.

AR.10297



# CHAPTER 9

# Income and Employment Status

**H**igh rates of poverty, unemployment, and economic vulnerability among transgender people have been documented in prior research.[1] These disparities can lead to numerous negative outcomes in housing, health, and many other aspects of life. The survey explored respondents' employment status and income sources with questions that were patterned on the Current Population Survey (CPS), a survey used by the Bureau of Labor Statistics to assess economic indicators and the state of the labor force in the United States.[2,3] The questions were used to compare the income and employment experiences of the USTS sample with those in the U.S. population.[4] Notable differences in respondents' experiences based on demographic and other characteristics are reported throughout the chapter.

AR.10298

KEY FINDINGS

▶ The unemployment rate among respondents was 15%, three times higher than the U.S. unemployment rate at the time of the survey (5%).

..............................................................................................................................

▶ Nearly one-third (29%) of respondents were living in poverty, more than twice the rate in the U.S. adult population (12%).

..............................................................................................................................

▶ One in eight (12%) respondents reported an annual household income between $1 and $9,999, three times higher than the U.S. adult population in this income bracket (4%).

# I. Employment Status

Respondents were asked a series of questions about their current employment status. More than one-third (35%) currently had a full-time job, 15% had at least one part-time job, 15% were self-employed, and 11% were students (Table 9.1). Nine percent (9%) of those who were employed were working more than one full-time or part-time job, which represents 4% of the whole sample.

Two percent (2%) of respondents were currently employed doing sex work, selling drugs, or doing other work in the underground economy for income. Of these, 60% indicated that they were currently looking for work that is not criminalized.[5]

Of those who were working either full time or part time for an employer, 13% were members of a labor union or an employee association similar to a union (representing 6% of the full sample), while another 2% of those who were working for an employer were not union members but were covered by a union or employee association contract. This compares to 12% of wage and salary workers in the U.S. population who were members of a union or were not union members but were covered by a union or employee association contract.[6]

**Table 9.1: Current employment status**

| Employment status | % of respondents (supplemental weight) |
|---|---|
| Work full time for an employer | 35% |
| Work part time for an employer | 15% |
| Self-employed in own business, profession or trade, or operate a farm (not including underground economy) | 15% |
| Retired | 14% |
| Not employed due to disability | 13% |
| Student | 11% |
| Unemployed but looking for work | 11% |
| Unemployed and have stopped looking for work | 5% |
| Homemaker or full-time parent | 3% |
| Work for pay from sex work, selling drugs, or other work currently criminalized | 2% |
| Not listed above | 4% |

The national unemployment rate, as reported by the Bureau of Labor Statistics, is calculated out of only those who are currently "in the labor force." This includes people who are employed and those who are unemployed but looking for work. It does not include those who are unemployed but not looking for work, since they are considered to be out of the labor force. For the purposes of comparison, the unemployment rate for USTS respondents reported here was calculated in the same manner. The unemployment rate for

AR.10299

*The unemployment rate for USTS respondents was 15%, three times the unemployment rate in the U.S. population.*

USTS respondents was 15%, three times the U.S. unemployment rate at the time of the survey (5%).[7] Nearly one-half (49%) of undocumented residents were unemployed. The unemployment rate was also higher among people with disabilities[8] (24%) and people of color, with Middle Eastern (35%), American Indian (23%), multiracial (22%), Latino/a (21%), and Black (20%) respondents being more likely to be unemployed. Unemployment rates among Asian, multiracial, Latino/a, and Black USTS respondents were between two and three times higher than Asian, Latino/a, multiracial, and Black people in the U.S. population (Figure 9.1).[9]

**Figure 9.1: Unemployment rate**
RACE/ETHNICITY (%)



■ % in USTS (supplemental survey weight applied)
☐ % in U.S. population (ACS)

*U.S. population data for Middle Eastern people alone is not available. See note 10.*

# II. Sources of Income and Assistance

Respondents were asked about their income sources, and they reported a wide range of sources. In order to compare the USTS sample to the U.S. population in the CPS, the USTS data presented in Table 9.2 is limited to respondents ages 25 and older only. Compared to findings from the CPS, respondents' sources of income differed from the U.S. population in several categories. For instance, 57% of USTS respondents aged 25 and older had income from their own and/or their spouse's employment, compared to 67% of adults aged 25 and older in the U.S. population (Table 9.2).

**Table 9.2: Current sources of income (ages 25 and older only)**

| Income source | % in USTS (supplemental weight) | % in U.S. adult population (CPS) |
|---|---|---|
| Pay from respondent's and/or partner's full-time or part-time job | 57% | 67% |
| Self-employment income from own business, profession or trade, or farm (not including underground economy) | 18% | 7% |
| Social Security retirement, railroad retirement income, or Social Security disability benefits (SSDI) | 25% | 25% |
| Private pension, government employee pension, or other retirement income | 13% | 13% |
| Income from dividends, estates or trusts, royalties, rental income, savings, or bonds | 12% | 61% |
| Supplemental Security Income (SSI) | 7% | 3% |
| Regular contributions from people not living in household | 4% | 1% |
| Veterans disability benefits and other veterans benefits | 4% | 2% |
| Pay from sex work, selling drugs, or other work currently criminalized | 3% | -- |
| Cash assistance from welfare (such as TANF) or other public cash assistance program (not including SNAP or WIC) | 2% | 1% |
| Unemployment benefits | 2% | 2% |
| Child support or alimony | 1% | 2% |
| Workers' compensation or other disability | 1% | 1% |
| Income not listed above | 9% | -- |

INCOME AND EMPLOYMENT STATUS

Responses were examined to determine whether respondents had one source of income or multiple sources. Nearly one-half (45%) of all respondents reported having multiple sources of income. Thirty-seven percent (37%) reported that their sole source of income was from their own employment or their partner's employment. Nearly one in ten (9%) reported that their sole source of income was Supplemental Security Income (SSI) or disability, 1% received their only income from unemployment benefits or cash assistance programs, and 1% reported that their sole source of income was from underground economy work, including sex work, drug sales, or other work that is currently criminalized (Table 9.3).

**Table 9.3: Current sources of income by single and multiple sources**

| Income source | % of respondents (supplemental weight) |
|---|---|
| Employment only (from their own employment, partner/spouse's employment, or self-employment) | 37% |
| SSI/disability only | 9% |
| Pension/retirement only | 3% |
| Other sources only | 3% |
| Pay from sex work, selling drugs, or other work that is currently criminalized only | 1% |
| Unemployment benefits/cash assistance only | 1% |
| Multiple sources | 45% |

Fifteen percent (15%) of respondents reported receiving assistance through food stamps (SNAP)[11] and/or WIC.[12] Forty-one percent (41%) of respondents living with HIV received SNAP and/or WIC assistance. People with disabilities (29%), and Black (23%), American Indian (19%), and Latino/a (18%) respondents were also more likely to receive SNAP and/or WIC assistance (Figure 9.2).

**Figure 9.2: Currently receive SNAP or WIC assistance RACE/ETHNICITY (%)**



## III. Individual and Household Income and Poverty

Respondents also received questions about their individual[13] and household[14] incomes from the year 2014, which was the last full year prior to the survey for which they could provide annual income figures. They reported lower incomes overall than the U.S. population as a whole, as well as higher poverty rates. Most of the analysis and reporting in this chapter focuses on household income.

### a. Individual Income

When asked about their *individual* income, 8% of respondents reported that they had no individual income, compared to 10% in the U.S. adult population.[15,16] Nearly one-quarter (22%) of respondents reported that they had an income between $1 and $9,999 per year, compared to 15% in the U.S. adult population (Figure 9.3).[17]

*One in eight (12%) respondents reported that they had a household income between $1 and $9,999 per year, three times the rate in the U.S. population (4%).*

AR.10301

*Nearly one-third (29%) of respondents were living in poverty, more than twice the rate in the U.S. population (12%).*



Figure 9.3: Individual income in 2014

■ % in USTS (supplemental weight)

□ % in U.S. adult population (CPS)

## b. Household Income

Turning to household income, 4% of respondents reported that they had no *household* income, which was four times higher than the rate of those with no income in the U.S. adult population (12%).[18] Additionally, one in eight (12%) respondents reported earning an annual household income between $1 and $9,999, which was three times as many when compared to the U.S. adult population (4%) (Figure 9.4).[19] Respondents were nearly twice as likely to have a household income of only $10,000 to $24,999 (22%) as those in the U.S. adult population (12%). Furthermore, respondents were less likely to have household incomes of $50,000 to $100,000 (23%) than those in the U.S. adult population (31%).

# In Our Own Voices

"The day I came out as transgender at work, I was let go. Since transitioning, employment has been difficult, with a 95% reduction in earnings."

.........................................................

"I quit after seven months of unbearable working conditions. I have been struggling to keep afloat financially. I'm afraid of going to apply for unemployment or SNAP benefits because I know that I will be discriminated against. I'm on the brink of being homeless and my own family hasn't even reached out to help me."

.........................................................

"I have had to live my life with no safety net or resources, and it's hard. I'm constantly battling homelessness, I rarely get hired because I'm mixed and visibly queer, and I end up having to rely on government assistance and friends with available couches."

.........................................................

"In the nearly seven years since I transitioned, I have been unemployed, surviving off the charity of friends and family, and government assistance when I could get it. I have over 20 years of experience in my field, yet I cannot even land a part-time retail position."

.........................................................

**Figure 9.4: Household income in 2014**



- ■ % in USTS (supplemental weight)
- □ % in U.S. adult population (CPS)

**Figure 9.5: Household income from $1 to $9,999**
RACE/ETHNICITY (%)



More than half (53%) of respondents whose sole source of income was from the underground economy had a household income between $1 and $9,999 per year, more than four times the rate in the overall sample. Nearly one-third (31%) of those who were currently working in the underground economy and also had additional sources of income reported this low household income, nearly three times the rate of the overall sample. People with disabilities (21%) were nearly twice as likely as the overall sample, and those living with HIV (19%) and people of color, including Black (19%), Latino/a (18%), and American Indian (16%) respondents, were also more likely to have a household income between $1 and $9,999 (Figure 9.5).

## c. Poverty

Nearly one-third (29%) of respondents were living in poverty,[20] more than twice the rate of people living in poverty in the U.S. adult population at the time of the survey (12%).[21]

More than two-thirds (69%) of undocumented residents and nearly two-thirds (62%) of those currently working in the underground economy were living in poverty. Respondents living with HIV (51%) and people with disabilities (45%) were also more likely to be living in poverty. Among people of color, Latino/a (43%), American Indian (41%), multiracial (40%), and Black (38%) respondents were most likely to be living in poverty (Figure 9.6).

**Figure 9.6: Living in poverty**
RACE/ETHNICITY (%)



# Conclusion

The results indicate that respondents faced higher levels of unemployment and poverty compared to the U.S. adult population. They were three times more likely than the U.S. adult population to be unemployed, more than twice as likely to be living in poverty, and more than three times as likely to have an annual household income below $10,000. People of color, undocumented residents, people with disabilities, and respondents living with HIV were more likely to report being unemployed, living in poverty, and having low incomes, which indicate that these respondents have experienced substantial economic instability.

**ENDNOTES** | CHAPTER 9: INCOME AND EMPLOYMENT STATUS

1   Grant, J. M., Mottet, L. A., Tanis, J., Harrison, J., Herman, J. L., & Keisling, M. (2011). *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey.* (p. 22). DC: National Center for Transgender Equality & National Gay and Lesbian Task Force; Center for American Progress & Movement Advancement Project. (2015). *Paying an Unfair Price: The Financial Penalty for Being Transgender in America.* Available at: http://www.lgbtmap. org/file/paying-an-unfair-price-transgender.pdf.

2   U.S Census Bureau & Bureau of Labor Statistics. (2015). *Current Population Survey (CPS).*

3   This chapter provides an overview of respondents' income and employment status. Experiences in specific fields of work are discussed further in the *Sex Work and Other Underground Economy Work* and *Military Service* chapters. Experiences in employment settings, such being fired or harassed in the workplace, are discussed in more detail in the *Employment and the Workplace* chapter.

4   Throughout this chapter, findings regarding respondents' income and employment have been weighted with a supplemental survey weight to reflect the age and educational attainment of the U.S. population in addition to the standard survey weight. The USTS sample differs substantially from the U.S. population in regard to age and educational attainment. Therefore, this additional weight is applied to all percentages reported in this chapter in

order to provide a more accurate comparison to the U.S. general population. See the *Methodology* and *Portrait of USTS Respondents* chapters for more information about the supplemental survey weight.

5   Experiences of respondents with sex work and other underground economy work are discussed further in the *Sex Work and Other Underground Economy Work* chapter.

6   Bureau of Labor Statistics. (2016). *Union Affiliation of Employed Wage and Salary Workers by Selected Characteristics, 2014–2015 Annual Averages.* Available at: http://www.bls.gov/news.release/union2.t01.htm#union_ a01.f1. The percentage of people in the U.S. who are members of a union or covered by a union or employee association contract includes those in the U.S. population who are 16 years of age and older, in contrast to the USTS sample, which includes respondents who are 18 and older. Therefore, the comparison to the USTS sample should be interpreted with caution.

7   Bureau of Labor Statistics. (2015). *The Employment Situation—August 2015.* Available at: http://www.bls.gov/ news.release/archives/empsit_09042015.pdf; Bureau of Labor Statistics. (2015). *The Employment Situation— September 2015.* Available at: http://www.bls.gov/news. release/archives/empsit_10022015.pdf. The national unemployment rate for August and September 2015, as published by the Bureau of Labor Statistics, includes those

in the U.S. population who are 16 years of age and older. The USTS sample includes respondents who are 18 and older. Therefore, the comparison between the national unemployment rate and the USTS unemployment rate sample should be interpreted with caution.

8    "People with disabilities" here refers to respondents who identified as a person with a disability in Q. 2.20.

9    The unemployment rate by race and ethnicity among adults in the U.S. population was calculated by the research team using CPS data available via the CPS Table Creator (http://www.census.gov/cps/data/cpstablecreator.html). CPS Table Creator data utilizes data from the March 2015 Current Population Survey Annual Social and Economic Supplement, in which the overall U.S. unemployment rate was 5.5%. This March 2015 national unemployment rate was higher than the national rate at the time of the survey (5.1% in August and September 2015), as outlined in this report (see the unemployment rate time series table available through the Bureau of Labor Statistics, available at http://data.bls.gov/timeseries/LNS14000000). Given the higher national unemployment rate in March 2015, the comparison of the national unemployment rate by race and ethnicity to the unemployment rate for USTS respondents by race and ethnicity as reported here likely reflects smaller differences in the unemployment rate than would have existed at the time of the survey. Therefore, these comparisons should be interpreted accordingly.

10   CPS data combines people of Middle Eastern descent and white people in a single "white/Caucasian" category, therefore Middle Eastern respondents in the U.S. population are included in the CPS percentage for this category.

11   See Q. 7.10. Respondents received the following definition for SNAP: "The Supplemental Nutrition Assistance Program (SNAP) is sometimes called the Food Stamp program. It helps people who have low or no income to buy food, usually with an EBT card." SNAP benefits are not considered income.

12   See Q. 7.10. Respondents received the following definition for WIC: "'WIC' stands for 'Women, Infants, and Children.' It's the short name for the Special Supplemental Nutrition Program for Women, Infants, and Children. WIC is a federal program to help women who are pregnant or breastfeeding and children less than five years old get health care and healthy food." WIC benefits are not considered income.

13   See Q. 7.12. Respondents received the following note describing individual income: "'Individual income' includes money from jobs, employment, net income from business, income from farms or rentals, income from self-employment, pensions, dividends, interest, social security payments, and other money income that you personally received in 2014. Do not include assistance from food stamps (SNAP) or WIC as income."

14   See Q. 7.14. Respondents received the following note describing household income: "'Household income' includes you and all members of your household who have lived with you during the past 12 months and includes money from jobs, employment, net income from business, income from farms or rentals, income from self-employment, pensions, dividends, interest, social security payments, and any other money income received by you and members of your household who are 15 years of age or older in 2014. Do not include assistance from food stamps (SNAP) or WIC as income."

15   *Current Population Survey (CPS)*. See note 2.

16   Those who report having "no income" in the USTS and CPS are a group with characteristics that are distinct from low-income earners, such as those who earn an income between $1 and $9,999. For example, they are more likely to be out of the labor force. Therefore, when differences in experiences by income level are highlighted in this report, the experiences of those who report no household income are generally presented separately from those of low-income earners.

17   *Current Population Survey (CPS)*. See note 2.

18   *Current Population Survey (CPS)*. See note 2.

19   *Current Population Survey (CPS)*. See note 2.

20   The research team calculated the USTS poverty measure using the official poverty measure, as defined by the U.S. Census Bureau, which can be found at: https://www.census.gov/hhes/www/poverty/about/overview/measure.html. The income ranges in the USTS allowed for designation of respondents as in or near poverty if their total family income fell below 125% of the official poverty measure for purposes of comparison to the U.S. adult population. Respondents who are "living in poverty" represent those who are living at or near the poverty line.

21   Proctor, B. D., Semega, J. L., & Kollar, M. A. (2016). *Income and Poverty in the United States: 2015*. (p. 13). DC: U.S. Census Bureau. Available at: https://www.census.gov/content/dam/Census/library/publications/2016/demo/p60-256.pdf. Calculations were completed by the research team.

2015 U.S. TRANSGENDER SURVEY



# CHAPTER 10

# Employment and the Workplace

**A**ccess to employment is critical to people's ability to support themselves and their families. Prior research has shown that transgender people face pervasive mistreatment, harassment, and discrimination in the workplace and during the hiring process.[1] In addition to being fired, forced out of their jobs, or not hired for jobs because of their gender identity or expression, transgender people are also often subject to additional forms of mistreatment at work, such as being verbally harassed, being forced to present as the wrong gender in order to keep their jobs, or being physically attacked at work.[2]

Respondents were asked about being out in the workplace and the level of support they received from coworkers. They were also asked how they were treated in the workplace as a transgender person, including whether they had been fired, denied a promotion, or not hired because of being transgender, whether they had been harassed or faced other forms of mistreatment, and whether they had to take actions to avoid mistreatment, such as quitting their job or delaying their transition. Throughout the chapter, notable differences in respondents' experiences based on demographic and other characteristics are reported.

AR.10306

KEY FINDINGS

▶ Sixteen percent (16%) of respondents who have ever been employed reported losing at least one job because of their gender identity or expression.

▶ Thirty percent (30%) of respondents who had a job in the past year reported being fired, denied a promotion, or experiencing some other form of mistreatment in the workplace related to their gender identity or expression, such as being harassed or attacked.

▶ In the past year, 27% of those who held or applied for a job reported being fired, denied a promotion, or not hired for a job they applied for because of their gender identity or expression.

▶ Fifteen percent (15%) of respondents who had a job in the past year were verbally harassed, physically attacked, and/or sexually assaulted at work because of their gender identity or expression.

▶ Nearly one-quarter (23%) of those who had a job in the past year reported other forms of mistreatment based on their gender identity or expression during that year, such as being told by their employer to present as the wrong gender in order to keep their job or having employers or coworkers share private information about their transgender status with others without permission.

▶ More than three-quarters (77%) of respondents who had a job in the past year took steps to avoid mistreatment in the workplace, such as hiding or delaying their gender transition or quitting their job.

# I. Outness and Support in the Workplace

Respondents were asked whether their current bosses or supervisors and their current coworkers knew they were transgender. Of respondents who currently had bosses or supervisors, 35% said that all of their current bosses or supervisors knew they were transgender, 6% reported that most knew, and 10% indicated that some knew that they were transgender. Nearly half (49%) reported that none of their bosses or supervisors knew that they were transgender. Of respondents who currently had coworkers, less than one-quarter (23%) reported that all of their coworkers knew they were transgender, 11% reported that most of their coworkers knew, and 24% said that some of their coworkers knew they were transgender. Forty-two percent (42%) indicated that none of their coworkers knew that they were transgender.

Respondents who currently had coworkers and reported that all, most, or some of their coworkers knew that they were transgender were asked how supportive their coworkers generally were of them as a transgender person.[3] Responses were provided on a five-point scale from "very

supportive" to "very unsupportive." More than two-thirds (68%) of these respondents reported that their coworkers were supportive, 29% had coworkers who were neither supportive nor unsupportive, and only 3% had unsupportive coworkers (Figure 10.1).

**Figure 10.1: Level of support**



## II. Loss of Employment During Lifetime

Eighty-one percent (81%) of respondents had worked at a job or business at some point in their lifetime.[4] Those respondents were asked whether they had ever experienced a loss of employment, including losing a job, being laid off, being fired, or being forced to resign, and the reasons they believed this happened.

Overall, more than half (53%) of respondents who had ever held a job experienced a loss of employment for any reason. Respondents who were living with HIV (78%) and those who have done sex work (73%) were more likely to have lost a job at some point in their lifetime. American

Indian (66%) and Black (60%) respondents (Figure 10.2), transgender women (66%), and people with disabilities[5] (59%) were also more likely to have ever lost a job.

**Figure 10.2: Ever lost job for any reason**
**RACE/ETHNICITY (%)**



Respondents who had lost a job at some point in their lifetime were asked what they believed the reasons were for that treatment, and they selected one or more reasons from a list, such as age, race or ethnicity, and gender identity or expression (Table 10.1).

**Table 10.1: Reported reasons for losing a job**

| Reason for losing job | % of those who have ever lost job | % of those who have been employed |
|---|---|---|
| Age | 7% | 4% |
| Disability | 13% | 7% |
| Income level or education | 5% | 2% |
| **Gender identity or expression** | **30%** | **16%** |
| Race or ethnicity | 5% | 3% |
| Religion or spirituality | 2% | 1% |
| Sexual orientation | 13% | 7% |
| None of the above | 61% | 32% |

One in six (16%) respondents who have been employed reported that they had lost a job because of their gender identity or expression.[6] This represents 13% of the overall sample.

American Indian (21%), multiracial (18%), and Black (17%) respondents were more likely than the overall sample to have lost a job because of their gender identity or expression (Figure 10.3). More than one-quarter of respondents who have done sex work (27%) and respondents living with HIV (26%) have lost a job because of being transgender. Transgender women (18%) were more likely than transgender men (14%) and non-binary people (7%) to have lost a job because of their gender identity or expression (Figure 10.4).

**Figure 10.3: Ever lost job because of being transgender RACE/ETHNICITY (%)**



**Figure 10.4: Ever lost job because of being transgender GENDER IDENTITY (%)**



# III. Firing, Hiring, and Promotions in the Past Year

Seventy percent (70%) of respondents had held and/or applied for a job in the past year. Those respondents were asked if they had negative experiences related to firing, hiring, and promotions in the past year.

Overall, approximately two-thirds (67%) of respondents who held or applied for a job in the past year reported that they were fired or forced to resign from a job, not hired for a job that they applied for, and/or denied a promotion (Table 10.2). Respondents currently working in the underground economy, such as sex work, drug sales, or other work that is currently criminalized (78%), and people with disabilities (75%) were more likely to have had one or more of these experiences in the past year. Black (75%) and Middle Eastern (74%) respondents were also more likely to have had one or more of these experiences in the past year, in contrast to white (63%) and American Indian (64%) respondents (Figure 10.5).

**Table 10.2: Fired, not hired, or denied a promotion for any reason in the past year**

| Occurrence in the past year | % of those who held or applied for job |
|---|---|
| Not hired for a job they applied for | 61% |
| Denied a promotion | 13% |
| Fired or forced to resign | 12% |
| **One or more experiences listed** | **67%** |

*More than one-quarter (27%) of those who held or applied for a job in the past year reported not being hired, being denied a promotion, or being fired during that year because of their gender identity or expression.*

**Figure 10.5: Fired, not hired, or denied a promotion for any reason in the past year**
RACE/ETHNICITY (%)



# In Our Own Voices

Respondents who reported these experiences were asked what they believed the reasons were for that treatment. Forty-one percent (41%) of respondents who were fired or forced to resign from a job, not hired for a job that they applied for, or were denied a promotion believed that it was due to their gender identity or expression (Table 10.3). This means that 27% of all of those who held or applied for a job in the past year (or 19% of the overall sample) reported not being hired for a job they applied for, being denied a promotion, or being fired from a job in the past year because of their gender identity or expression.

**Table 10.3: Reported reasons for not being hired, being denied a promotion, or being fired in the past year**

| Reported reasons for negative experience in the past year | Reasons for not being hired (% of those not hired) | Reasons for being denied promotion (% of those denied promotion) | Reasons for being fired (% of those fired) |
|---|---|---|---|
| Age | 21% | 16% | 6% |
| Disability | 7% | 9% | 15% |
| Income level or education | 21% | 13% | 6% |
| **Gender identity or expression** | **39%** | **49%** | **43%** |
| Race or ethnicity | 11% | 14% | 10% |
| Religion or spirituality | 1% | 3% | 2% |
| Sexual orientation | 10% | 16% | 14% |
| None of the above | 41% | 33% | 40% |

"Coworkers would gossip about me as news about my trans status spread through the workplace. I was treated significantly differently once people heard about me being trans. Coworkers felt they had the right to disrespect me because the owners set the tone. I became a spectacle in my own workplace."

..................................................

"The day before I started work, HR sent a mass email to everyone in the office 'warning' them about my trans status. I used the women's bathroom since starting, but a month in to the job, I was called to my manager's office and told that I could not use the women's bathroom. I did not feel safe in the men's bathroom, so I told the HR manager that due to city law, I could not be denied access to the bathroom matching my gender identity. I was fired the next day for no given reason."

..................................................

"I changed jobs from a high-paying one where I was not comfortable being out as a trans person to a much lower-paying one where I felt that my identity would be respected. Having a job where my gender identity is respected consistently, where I don't have to constantly fight for myself or hide myself, has improved my quality of life more than any other aspect of my transition."

..................................................

# IV. Responses to Firing Due to Transgender Status

Respondents who reported that they had been fired in the past year because of their gender identity or expression were asked how they responded. While more than two-thirds (69%) of these respondents did not take any formal action in response, 14% filed an official complaint (Table 10.4). Respondents who filed a complaint were asked where they filed it. More than half (53%) reported that they filed a complaint with their employer's human resources or personnel department. One-third (33%) of respondents who filed complaints did so with the federal Equal Employment Opportunity Commission (EEOC), the agency that enforces federal employment nondiscrimination laws (Table 10.5).

**Table 10.4: Response to being fired in the past year because of their gender identity or expression**

| Response to being fired | % of those fired because of their gender identity or expression |
|---|---|
| They did nothing | 69% |
| They contacted a lawyer (see Table 10.6) | 15% |
| They made an official complaint (see Table 10.5) | 14% |
| They contacted a transgender, LGBT, or other group | 10% |
| They contacted their union representative | 2% |
| Not listed above | 7% |

**Table 10.5: Location where respondent made an official complaint**

| Place complaint was filed | % of those who filed an official complaint |
|---|---|
| Employer's human resources or personnel department | 53% |
| Equal Employment Opportunity Commission (EEOC) | 33% |
| Employer's Equal Employment Opportunity (EEO) office | 18% |
| Local or state human rights commission | 17% |
| Supervisor or manager | 9% |
| Not listed above | 26% |

Fifteen percent (15%) of those who were fired in the past year because of their gender identity or expression responded by contacting a lawyer. These respondents were asked what happened after they contacted the lawyer. Nearly one-third (29%) reported that they were not able to hire the lawyer. Other respondents reported that the lawyer filed a lawsuit (21%), helped them file an official complaint (14%), called or wrote a letter to their employer (10%), or advised them not to take any action (10%) (Table 10.6).

**Table 10.6: Assistance provided to those who contacted a lawyer**

| Outcome of contacting lawyer | % of those who contacted a lawyer |
|---|---|
| They were not able to hire the lawyer | 29% |
| Lawyer filed a lawsuit | 21% |
| Lawyer helped them to file an official complaint | 14% |
| Lawyer called or wrote a letter to employer | 10% |
| Lawyer advised them to take no action (write-in response) | 10% |
| Lawyer did nothing or did not follow up (write-in response) | 7% |
| Not listed above | 9% |

# V. Other Forms of Mistreatment in the Past Year

Respondents who held a job in the past year were asked a series of questions about other forms of mistreatment in the workplace that happened because they were transgender.

## a. Verbal Harassment, Physical Attack, and Sexual Assault

In the past year, 15% of respondents who had held a job during that year were verbally harassed, physically attacked, and/or sexually assaulted at work because of their transgender status.[7] Respondents currently working in the underground economy (34%), American Indian respondents (28%), and Middle Eastern respondents (26%) were more likely to report one or more of those experiences in the past year (Figure 10.6).

**Figure 10.6: Verbally harassed, physically attacked, or sexually assaulted at work in the past year**
**RACE/ETHNICITY (%)**



Fourteen percent (14%) of those who held a job in the past year were verbally harassed at work because they were transgender. Respondents who said that others can always or usually tell that they are transgender (23%) were more likely

to be verbally harassed at work in the past year, compared with those who said that others can sometimes (19%) and rarely or never (10%) tell they are transgender.

One percent (1%) of respondents were physically attacked at work in the past year because they were transgender, with higher numbers among respondents who were currently working in the underground economy (4%).

One percent (1%) reported that they were sexually assaulted at work in the past year because they were transgender. Asian (4%) and American Indian (2%) respondents and transgender women (2%) were more likely report this experience.

## b. Other Mistreatment in the Past Year

Respondents were asked if their employer, boss, or coworkers took other negative actions in the past year because of their transgender status, such as telling them to present as the wrong gender in order to keep their jobs, removing them from direct contact with clients, or sharing private information.

Nearly one-quarter (23%) of respondents who held a job in the past year reported that they experienced one or more of those actions in the past year because of their transgender status. One in six (16%) said that, because they were transgender, a boss or coworker shared personal information about them that should not have been shared. Six percent (6%) said that their boss gave them a negative review because they were transgender, 4% were told to present in the wrong gender in order to keep their job, and 4% said that they were not allowed to use the restroom consistent with their gender identity (Table 10.7).

**Table 10.7: Mistreatment at work due to being transgender in the past year**

| Mistreatment at work due to being transgender in the past year | % of those who had a job |
|---|---|
| Employer/boss or coworkers shared information about them they should not have | 16% |
| Employer/boss gave them a negative job review | 6% |
| Employer/boss forced them to resign | 4% |
| Employer/boss did not allow them to use the restroom they should be using based on their gender identity | 4% |
| Employer/boss told them to present in the wrong gender to keep their job | 4% |
| Employer/boss removed them from direct contact with clients, customers, or patients | 3% |
| Employer/boss could not work out an acceptable restroom situation with them | 3% |
| Employer/boss forced them to transfer to a different position or department at their job | 2% |
| **One or more experiences listed** | **23%** |

## c. Efforts to Avoid Discrimination

Respondents who held a job in the past year were also asked a series of questions about actions they took in order to avoid discrimination at work in the past year, including hiding their gender identity, delaying their transition, and quitting their job. More than three-quarters (77%) took one or more actions to avoid discrimination (Table 10.8).

**More than three-quarters (77%) of respondents who had a job in the past year hid their gender identity at work, quit their job, or took other actions to avoid discrimination.**

**Table 10.8: Actions taken to avoid anti-transgender discrimination at work in the past year**

| Actions taken to avoid anti-transgender discrimination at work in the past year | % of those who had a job |
|---|---|
| They had to hide their gender identity | 53% |
| They did not ask employer to use pronouns they prefer (such as he, she, or they) | 47% |
| They delayed their gender transition | 26% |
| They stayed in a job they would have preferred to leave | 26% |
| They hid the fact that they had already transitioned gender | 25% |
| They kept a job for which they were overqualified | 24% |
| They quit their job | 15% |
| They did not seek promotion or raise | 13% |
| They requested transfer to a different position or department | 6% |
| **One or more experiences listed** | **77%** |

Respondents who were living in poverty[8] (82%), non-binary respondents (81%), and people with disabilities (81%) were more likely to take one or more of these steps to avoid discrimination.

More than half (53%) reported having to hide their gender identity at work.[9] Nearly half (47%) said they did not ask their employer to refer to them with correct pronouns (such as he, she, or they) out of fear of discrimination. Non-binary respondents (66%) were nearly twice as likely to avoid asking to be referred to by their correct pronouns compared to transgender men and women (34%).

More than one-quarter (26%) said that they stayed at a job that they would have preferred to leave for fear of encountering discrimination elsewhere. American Indian (40%), Black (31%), and Latino/a (28%) respondents and respondents with disabilities (30%) were more likely to stay at a job that they would have preferred to leave in order to avoid discrimination.

One-quarter (25%) of respondents reported that they hid the fact that they had already transitioned. In the past year, more than one-third (36%) of transgender men hid their past gender transition in the workplace in order to avoid discrimination (Figure 10.7).

**Figure 10.7: Hid past transition to avoid discrimination in the past year**
GENDER IDENTITY (%)



Fifteen percent (15%) of respondents who held a job in the past year reported that they quit their job in order to avoid workplace discrimination. Those currently working in the underground economy (28%), American Indian respondents (23%), Black respondents (19%), and people with disabilities (21%) were more likely to quit their job to avoid discrimination (Figure 10.8).

**Figure 10.8: Quit job to avoid discrimination in the past year**
RACE/ETHNICITY (%)



# VI. Overall Negative Experiences in the Workplace

Overall, 30% of all respondents who held a job in the past year experienced some form of workplace discrimination during that year, including being fired or being denied a promotion because of their gender identity or expression, being harassed or assaulted at work, or experiencing one or more of the other forms of mistreatment discussed in section V of this chapter.[12] This represents 16% of all respondents. Further, 80% of respondents who held a job in the past year reported either experiencing some form of discrimination and/or taking steps to avoid discrimination at work, representing 41% of all respondents.

# Conclusion

Respondents reported high levels of workplace discrimination based on their gender identity or expression, including losing employment opportunities, being harassed, being assaulted, and facing other forms of mistreatment because of being transgender. Many reported losing their job due to anti-transgender bias, with the experience being more likely to occur among people of color, people with underground economy experience, and people with disabilities. Many respondents who applied for or held a job in the past year reported that they were fired, denied a promotion, or not hired for a job they applied for because of their gender identity or expression. Respondents also faced substantial levels of harassment and mistreatment on the job because of their gender identity or expression, including verbal harassment, physical and sexual assault, and breaches of confidentiality. A large number of respondents felt they had to take actions to avoid discrimination, such as quitting a job or hiding their transition, despite the potential impact on their wellbeing or financial stability.

**ENDNOTES** | CHAPTER 10: EMPLOYMENT AND THE WORKPLACE

1  Grant, J. M., Mottet, L. A., Tanis, J., Harrison, J., Herman, J. L., & Keisling, M. (2011). *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey.* (pp. 50–71). DC: National Center for Transgender Equality & National Gay and Lesbian Task Force; Sears, B. & Mallory, C. (2011). *Documented Evidence of Employment Discrimination & Its Effect on LGBT People.* Los Angeles, CA: Williams Institute. Available at: http://williamsinstitute.law.ucla.edu/wp-content/uploads/Sears-Mallory-Discrimination-July-20111.pdf; Rainey, T. & Imse, E. E. (2015). *Qualified and Transgender: A Report on Results of Resume Testing for Employment Discrimination Based on Gender Identity.* DC: DC Office of Human Rights. Available at: http://ohr.dc.gov/sites/default/files/dc/sites/ohr/publication/attachments/QualifiedAndTransgender_FullReport_1.pdf.

2  Grant, et al.; Sears, et al.

3  Respondents were not asked about the level of support from their current boss or supervisor.

4  Q. 21.1 and other questions in this chapter asked only about jobs doing legal work and excluded underground economy work, such as sex work, drug sales, and other work that is currently illegal.

5  "People with disabilities" here refers to respondents who identified as a person with a disability in Q. 2.20.

6  The survey included both "transgender status/gender identity" and "gender expression/appearance" as answer choices so that respondents could select what they felt best represented their experience. Because there was a substantial overlap of respondents who selected both reasons, and because these terms are commonly used interchangeably or with very similar meanings, responses of those who selected one or both of these reasons are collapsed for reporting as "gender identity or expression."

7  Respondents were asked whether they had "experienced unwanted sexual contact (such as fondling, sexual assault, or rape)" at work because they were transgender in Q. 22.3.

8  Respondents who are "living in poverty" represent those who are living at or near the poverty line. See the *Income and Employment* chapter for more information about the poverty line calculation.

9  Respondents were asked if they "had to be in the closet about [their] gender identity in the past year" in order to avoid discrimination.

10  This figure does not include the experience of not being hired for a job in the past year, since this figure represents adverse actions in the workplace experienced by those who had a job only. It also does not include experiences of those who applied for a job but did not work a job in the past year.



## CHAPTER 11

# Sex Work and Other Underground Economy Work

**M**any people participate in sex work, drug sales, and other activities that are currently criminalized ("underground economy") to earn an income, or in exchange for food, a place to sleep, or other goods or services. The commercial sex trade exists in a variety of forms, including street-based sex work, pornography, and escort services.[1] Participation in the sex trade is often higher among those who have faced family rejection, poverty, or unequal opportunities in employment, housing, and education.[2] Previous studies have documented higher levels of participation in sex work among transgender people, and in particular people of color and those facing homelessness or poverty.[3] They have also found high rates of negative mental and physical health outcomes, police abuse, and experiences of violence among transgender people who have done sex work.[4]

Respondents were asked a series of questions about their participation in sex work and other underground economy work, and their interactions with law enforcement officers when they were doing sex work or when police thought that they were doing sex work. Notable differences in respondents' experiences based on demographic and other characteristics are reported throughout the chapter.

AR.10316

▶ One in five (20%) respondents have participated in the underground economy for income at some point in their lives, including in sex work, drug sales, and other currently criminalized work, and 9% did so in the past year.

▶ One in eight (12%) respondents have participated in sex work for income. Six percent (6%) have engaged in sexual activity for food, and 8% have done so for a place to sleep. Overall, nearly one in five (19%) respondents reported doing some type of sex work, such as for money, food, or a place to sleep.

▶ Three percent (3%) of all respondents have interacted with the police either while they were doing sex work or while police thought that they were doing sex work.

  • Of those who interacted with the police while doing or thought to be doing sex work, 86% reported some form of police harassment, abuse, or mistreatment, including being verbally harassed, physically attacked, or sexually assaulted by police.

  • Of those who interacted with the police while doing or thought to be doing sex work, 32% said that at least one of those interactions led to an arrest. Nearly half (44%) of respondents who were arrested said that police used condoms in their possession as evidence of sex work.

▶ One in eight (12%) respondents have earned income by selling drugs (11%) or by doing other work that is currently criminalized (2%), other than sex work.

# I. Overall Underground Economy Participation

Respondents were asked about their participation in sex work, drug sales, and other forms of work in areas that are currently criminalized, referred to throughout this report as underground economy work.

Overall, one in five (20%) respondents had participated in the underground economy for income at some point in their lives. Undocumented residents (38%) and respondents who have lost a job because of their gender identity or expression (37%) were more likely to have participated in the underground economy. Transgender women of color were also more likely to participate in the underground economy for income, including Black (44%), American Indian (41%), multiracial (38%), and Latina (30%) respondents (Figure 11.1).

**Figure 11.1: Underground economy experience among transgender women**
**RACE/ETHNICITY (%)**



AR.10317

*One in five (20%) respondents have participated in the underground economy at some point in their lives and 9% participated in the past year.*

Nearly one in ten (9%) respondents have participated in the underground economy for income in the past year (Table 11.1). Undocumented residents (29%) were more than three times as likely to have worked in the underground economy in the past year. Further, respondents who have been homeless in the past year (23%) were nearly three times as likely to have worked in the underground economy during that year.

**Table 11.1: Income-based underground economy experiences**

| Type of work | % of respondents (past year) | % of respondents (in lifetime) |
|---|---|---|
| Income-based sex work | 5% | 12% |
| Drug sales | 4% | 11% |
| Other criminalized work | 1% | 2% |
| Any underground economy work | 9% | 20% |

## II. Sex Work

### a. Income-Based Sex Work

One in eight (12%) respondents have done sex work for income at some point in their lifetime, meaning that they have exchanged sex or sexual activity for money or worked in the sex industry, such as in erotic dancing, webcam work, or pornography.

Of respondents who have done sex work for money in their lifetime, transgender women represent one-half (50%), non-binary people with female on their original birth certificates represent nearly one-quarter (23%), and transgender men represent 19% (Figure 11.2). While this chapter primarily highlights the experiences of transgender women of color due to their disproportionately high representation among those who have done sex work, it is also important to recognize that non-binary people with female on their original birth certificates and transgender men account for a large proportion of those in the sample who have done sex work.

**Figure 11.2: Income-based sex work in lifetime**
GENDER IDENTITY (%)



% of those who have ever done sex work

- 1% Crossdressers
- 23% Non-binary respondents with female on their original birth certificate
- 19% Trans men
- 7% Non-binary respondents with male on their original birth certificate
- 50% Trans women

Transgender women of color, including Black (42%), American Indian (28%), multiracial (27%), Latina (23%), and Asian (22%) women (Figure 11.3), were more likely to have participated in sex work than the overall sample. Undocumented residents (36%), those who have lost a job because of their gender identity or expression (25%), and those who have ever experienced homelessness (23%) were also more likely to have participated in sex work.

**Figure 11.3: Income-based sex work among transgender women**
RACE/ETHNICITY (%)



| | |
|---|---|
| Overall (all respondents) | 12% |
| American Indian | 28% |
| Asian | 22% |
| Black | 42% |
| Latina | 23% |
| Middle Eastern | 9% |
| Multiracial | 27% |
| White | 11% |

# One in eight (12%) respondents have done sex work for income, and 5% of respondents did so in the past year.

*Respondents who have done income-based sex work during their lifetime were more likely to have experienced a number of challenges:*

- *Nearly half (45%) of respondents who have done income-based sex work were currently living in poverty, in contrast to 26% of those who have not done sex work.*

- *Nearly three-quarters (72%) of respondents who have done income-based sex work have been sexually assaulted in their lifetime, in contrast to those who have not done sex work (44%).*

- *More than three-quarters (77%) of respondents who have done income-based sex work have experienced some form of intimate partner violence, compared with 51% of those who have not done sex work.*

- *Respondents with sex work experience were nearly sixteen times as likely to be living with HIV (7.9%) as those who have never done sex work (0.5%), and nearly six times more likely than those in the overall sample (1.4%).*

Five percent (5%) of all respondents did sex work for income in the past year. More than half (55%) of those who did income-based sex work in the past year were transgender women, 22% were non-binary people with female on their original birth certificate, and 14% were transgender men (Figure 11.4).

**Figure 11.4: Income-based sex work in past year GENDER IDENTITY (%)**



1% Crossdressers

22% Non-binary respondents with female on their original birth certificate

55% Trans women

% of those who did sex work in the past year

14% Trans men

8% Non-binary respondents with male on their original birth certificate

Respondents who experienced homelessness in the past year (17%) were more than three times as likely to have participated in sex work during that year compared to the overall sample. Respondents who were living with HIV (32%) and undocumented residents (29%) were substantially more likely to have participated in sex work in the past year. Additionally, transgender women of color reported higher rates of sex work participation in the past year, particularly Black transgender women (24%), who were almost five times as likely to have done sex work for income in the past year (Figure 11.5).

**Figure 11.5: Income-based sex work in past year among transgender women RACE/ETHNICITY (%)**



2015 U.S. TRANSGENDER SURVEY

# In Our Own Voices

Respondents who have done sex work for income reported working in a wide range of settings, including sex work advertised online (36%), webcam work (35%), and street-based sex work (21%) (Table 11.2). Among those who have done some type of sex work, transgender women (30%) were more likely than others with sex work experience to have done street-based sex work, with women of color, including American Indian (50%), Black (48%), and Latina (31%) women, being substantially more likely to participate in street-based sex work (Figure 11.6).

**Table 11.2: Type of income-based sex work**

| Type of sex work | % of those who have ever done sex work |
|---|---|
| Informal sex work through word of mouth, occasional hook ups with dates in my networks, or things like that | 38% |
| Sex work advertised online | 36% |
| Webcam work | 35% |
| Pornography (picture or video) | 28% |
| Fetish work | 24% |
| Street-based sex work | 21% |
| Phone sex | 14% |
| Escort, call girl, or rent boy with an agency | 12% |
| Erotic dancer or stripper | 11% |
| Sex work advertised in magazines or newspapers | 7% |
| Not listed above | 9% |

**Figure 11.6: Participation in street-based sex work among transgender women who have done sex work**
RACE/ETHNICITY (%)



* Sample size too low to report

"At 17, I ran away with no way of supporting myself. I turned to Internet prostitution, which allowed me to do things for myself that I couldn't [before], like buy girl clothes, pay out of pocket for my doctor to prescribe HRT, and put a roof over my head."

"Sometimes I slept in my truck when friends couldn't put me up at their house, and sometimes I would meet people at a bar and have sex with them to really just sleep over and shower."

"I couldn't find work. I watched one guy throw away my application literally 30 seconds after turning it in. I resorted to escorting. It's the only way to keep food in my belly and a roof over my head."

"I became a sex worker to support myself and pay for my transition. I did not want to do sex work, but I have had worse jobs that paid less."

"An officer attempted to arrest me on prostitution charges because I was at a street corner. It was roughly noon, I was holding a bag of food in my hand, and I was clearly waiting for the street light to change so I could cross the street."

SEX WORK AND OTHER UNDERGROUND ECONOMY WORK

*Nearly one in five (19%) respondents participated in sex work, such as for money, food, a place to sleep, or other goods or services.*

## b. Sex Work for Goods or Services

All survey respondents, including those who did not report doing sex work for income, were asked whether they had sex or engaged in sexual activity for food, for a place to sleep, for drugs, or in exchange for something else (Table 11.3).

**Table 11.3: Engaged in sexual activity in exchange for goods or services**

| Type of activity | % of respondents (past year) | % of respondents (in lifetime) |
|---|---|---|
| Engaged in sexual activity for food | 2% | 6% |
| Engaged in sexual activity for a place to sleep (in someone's bed, at their home, or in their hotel room) | 2% | 8% |
| Engaged in sexual activity for drugs | 1% | 5% |
| Engaged in sexual activity in exchange for something not listed above | 3% | 7% |

Six percent (6%) of respondents have ever engaged in sexual activity for food. Respondents living with HIV (32%) were more than five times as likely to have engaged in sexual activity for food. Undocumented residents (17%) and American Indian (15%), Black (12%), and multiracial (10%) respondents were also more likely to have engaged in sexual activity for food.

One in twelve (8%) respondents engaged in sexual activity for a place to sleep. Respondents who were living with HIV (28%), who have ever experienced homelessness (20%), or who were undocumented residents (17%) were more likely to have engaged in sexual activity for a place to sleep.

Overall, 19% participated in sex work, such as for money, food, a place to sleep, or other goods or services.

## c. Police Interactions

All survey respondents were asked if they had ever interacted with police either while doing sex work, or when police thought they were doing sex work. One percent (1%) of respondents said that they interacted with police while participating in sex work, and an additional 2% said they did so when police thought they were doing sex work. Overall, 3% of respondents have interacted with police while doing sex work or when police thought they were doing sex work.

Transgender women of color, including Black (15%), Middle Eastern (13%), American Indian (12%), multiracial (8%), and Latina (7%) women, were more likely than the overall sample to interact with police who *thought* they were doing sex work (Figure 11.7).

**Figure 11.7: Interacted with police who thought they were doing sex work among transgender women RACE/ETHNICITY (%)**



| | % |
|---|---|
| Overall (all respondents) | 2% |
| American Indian | 12% |
| Asian | 4% |
| Black | 15% |
| Latina | 7% |
| Middle Eastern | 13% |
| Multiracial | 8% |
| White | 3% |

Respondents who interacted with the police while doing sex work or when police thought they were doing sex work were asked about specific experiences they had with police. Eighty-six percent (86%) reported at least one negative experience during the interaction (Table 11.4).

**Table 11.4: Interactions with police while doing or when police thought they were doing sex work**

| Type of interaction | % of those who interacted with police who thought they were doing sex work, or while doing sex work |
|---|---|
| Officers kept using the wrong gender pronouns (such as he, she, or they) or the wrong title (such as Mr. or Ms.) | 69% |
| Officers verbally harassed them | 65% |
| Officers asked questions about their gender transition (such as hormones and surgical status) | 41% |
| Officers sexually assaulted them | 27% |
| Officers physically attacked them | 18% |
| Officers forced them to have sex or engage in sexual activity to avoid arrest | 14% |
| Arrested for drugs in their possession when police stopped them for doing sex work | 11% |
| One or more experiences listed | 86% |

More than two-thirds (69%) said that officers repeatedly referred to them as the wrong gender. This experience was more likely among transgender women (74%). Nearly two-thirds (65%) were verbally harassed by police.

More than one-quarter (27%) of respondents who had interacted with police in this context were sexually assaulted by an officer, including being fondled, raped, or experiencing another form of sexual assault.[6] Respondents who have ever experienced homelessness (34%) were more likely to be sexually assaulted by an officer. Fourteen percent (14%) also reported that they were forced to have sex or engage in sexual activity to avoid arrest.

## d. Arrest

Respondents who interacted with police while engaging in sex work or when police thought they were engaging in sex work were also asked if they were arrested during any of those interactions. Almost one-third (32%) reported being arrested during at least one interaction. Black respondents (50%) and transgender women (40%) were more likely to report that their interaction with the police led to an arrest.

Respondents who reported being arrested were asked how many times they were arrested while they were doing sex work or when police thought they were doing sex work. Approximately one-third (34%) were arrested once, 32% were arrested two or three times, and 35% were arrested four or more times (Figure 11.8).

**Figure 11.8: Number of times arrested while doing or when police thought they were doing sex work**



Respondents who were arrested while doing or while police thought they were doing sex work were also asked whether police considered items in their possession, such as condoms, as "evidence of prostitution." Forty-four percent (44%) said that the police considered condoms in their possession to be evidence of prostitution (Figure 11.9).

**Figure 11.9: Items in possession considered as evidence when arrested (% of those arrested while doing or suspected of doing sex work)**



Respondents were asked about the outcomes of their arrests. More than half (55%) of the respondents who were arrested pleaded guilty in connection to one or more of their arrests, while nearly half (48%) reported that the charges were dropped on at least one occasion (Figure 11.10).

**Figure 11.10: Outcome of arrest (% of those arrested while doing or suspected of doing sex work)**



# III. Drug Sales and Other Underground Economy Work

One in eight (12%) respondents have done work in the underground economy other than sex work at some point in their lifetime. This included those who had participated in drug sales (11%) and/or other work that is currently criminalized (2%).[7] Respondents who were living with HIV (27%), who have lost a job because of their gender identity or expression (22%), or have ever experienced homelessness (21%) were more likely to have been paid for underground economy work apart from sex work during their lifetime.

In the past year, 4% of all respondents have participated in drug sales, and 1% have participated in other underground economy work (other than drug sales or sex work) (see Table 11.1).

# Conclusion

Respondents reported substantial levels of involvement in sex work and other underground economy work, particularly people of color, those living with HIV, undocumented residents, and those who have experienced homelessness. Many respondents, especially transgender women of color, also reported that police often assumed they were doing sex work, even when they were not. The vast majority of those who interacted with the police while doing sex work or while suspected of doing sex work reported being mistreated by police, including being verbally harassed, physically attacked, or sexually assaulted by law enforcement officers.

AR.10323

1    See Ditmore, M. & Thukral, J. (2011). *Behind Closed Doors: An Analysis of Indoor Sex Work in New York City.* New York, NY: Sex Workers Project at the Urban Justice Center). Available at: http://sexworkersproject.org/downloads/BehindClosedDoors.pdf; Ditmore, M. & Thukral, J. (2003). *Revolving Door: An Analysis of Street-Based Prostitution in New York.* NY, New York: Sex Workers Project at the Urban Justice Center. Available at: http://sexworkersproject.org/downloads/RevolvingDoor.pdf.

2    Amnesty International. (2016). *Amnesty International Policy on State Obligations to Respect, Protect and Fulfill the Human Rights of Sex Workers.* Available at: https://www.amnesty.org/en/documents/pol30/4062/2016/en.

3    Fitzgerald, E., Elspeth, S., & Hicky, D. *Meaningful Work: Transgender Experiences in the Sex Trade.* DC & NY, New York: Best Practices Policy, National Center for Transgender Equality, & Red Umbrella Project. Available at: http://www.transequality.org/sites/default/files/Meaningful%20Work-Full%20Report_FINAL_3.pdf; Amnesty International. (2016). *Amnesty International Policy on State Obligations to Respect, Protect and Fulfill the Human Rights of Sex Workers.* Available at: https://www.amnesty.org/en/documents/pol30/4062/2016/en.

4    Fitzgerald, et al. See note 3.

5    Respondents were asked whether they had "ever engaged in sex or sexual activity for money (sex work) or worked in the sex industry (such as erotic dancing, webcam work, or porn films)" in Q. 6.1 and whether they had done such work in the past year in Q. 6.2. This report uses the term "sex work" to refer to all work in the sex industry or involving the exchange of sexual activity for income, food, a place to sleep, or other goods or services. While many of forms of sex work are currently criminalized in the United States, some of them are not.

6    Respondents were asked whether they had "experienced unwanted sexual contact from an officer (such as fondling, sexual assault, or rape)" in Q. 6.6.

7    Respondents were asked in Q. 6.11 if they had "ever been paid for selling drugs or other work that is currently considered illegal."



# CHAPTER 12
# Military Service

**P**rior research suggests that transgender people serve in the military at a higher rate than the U.S. general population.[1] USTS respondents with military experience were asked a series of questions about their service, their treatment as transgender service members, and their separation from the military. They were also asked about health care that they received through military providers and the Veterans Health Administration.

At the time that survey data was collected in 2015, the military still barred transgender people from serving openly in the military, and service members could be discharged simply for being transgender.[2] The Department of Defense announced that it was lifting the ban on June 30, 2016, with full implementation of specific policies related to transgender service members expected to be completed in 2017.[3] Despite the long-standing ban, thousands of transgender people have served and continue to serve in the military, many of them openly and with the support of their colleagues and commanders.

This chapter examines the experiences of current and former service members, including their interactions with leadership and health care providers as transgender people. It also explores veterans' unique experiences of separating from the military and accessing health care. Notable differences in respondents' experiences based on demographic and other characteristics are reported throughout the chapter.

AR.10325

KEY FINDINGS

▶ Nearly one in five (18%) respondents have served in the military, including veterans and those currently on active duty.

..............................................................................................................................

▶ Of current service members whose leadership or commanding officers knew or thought they were transgender, nearly one-quarter (23%) said that actions were taken to discharge them.

..............................................................................................................................

▶ Sixty percent (60%) of service members who separated from the military within the past ten years said that they might or would return to the military if the ban on transgender service members were lifted.

..............................................................................................................................

▶ Nearly one in five (19%) respondents who separated from the military more than ten years ago said they were discharged partly or completely because of their transgender status, and 19% left the military to avoid being mistreated or harassed as a transgender person.

# I. Current and Past Military Service

Nearly one in five (18%) respondents in the sample have served in the military, including respondents who were currently serving in the military on active duty (0.5%), and those who were currently on active duty for training in the Reserves or National Guard (2%).[4] Fifteen percent (15%) of respondents were veterans, compared with 8% in the U.S. population.[5]

Respondents in every age group were more likely to be veterans than their counterparts in the U.S. population. More than half (52%) of respondents over the age of 75 and 40% of respondents between the ages of 65 and 74 were veterans, compared with 22% and 18% of those age groups in the U.S. population, respectively.[6] One-quarter (25%) of respondents between the ages of 55 and 64 were veterans, more than three times higher than that age group in the U.S. population (8%).[7]

Fifteen percent (15%) of respondents between the ages of 35 and 54 were veterans, which was three times higher than the same age group in the U.S. population (5%)[8] (Figure 12.1).

**Figure 12.1: Veteran status**
**AGE (%)**



■ % in USTS (supplemental survey weight applied)
□ % in U.S. general population (ACS)

MILITARY SERVICE

AR.10326

Among those with past or current military service, crossdressers (33%), transgender women (23%), and non-binary people with male on their original birth certificate (22%) were more likely to have served, compared with transgender men (8%) and non-binary people with female on their original birth certificate (2%) (Figure 12.2). White (21%), American Indian (20%), and Middle Eastern (20%) respondents were more likely to have served in the military, while Asian (7%) and Latino/a (7%) respondents were less likely (Figure 12.3). Multiracial respondents were ten times as likely as the overall sample to currently be on active duty, with 5% on active duty at the time they took the survey.

**Figure 12.2: Past or current military service GENDER IDENTITY (%)**



**Figure 12.3: Past or current military service RACE/ETHNICITY (%)**



*Fifteen percent (15%) of respondents were veterans, compared with 8% in the U.S. population.*

Of those who reported military service, 2% were still serving. Nearly one-third (31%) of those who were no longer serving separated from military service within the past ten years, and 69% separated from military service more than ten years ago.

# II. Branch of Service

Current and former service members were asked to identify their current or most recent branch of service. Twenty-eight percent (28%) of these respondents currently or most recently served in the Army, 22% in the Navy, 18% in the Air Force, 7% in the Marine Corps, and 1% served in the Coast Guard. Nearly one-quarter (24%) served in the Reserves or the National Guard (Table 12.1).

**Table 12.1: Current or most recent branch of service**

| Branch of service | % of current or former service members |
| --- | --- |
| Air Force | 18% |
| Air Force Reserve | 2% |
| Air National Guard | 2% |
| Army | 28% |
| Army Reserve | 8% |
| Army National Guard | 8% |
| Coast Guard | 1% |
| Coast Guard Reserve | <1% |
| Marine Corps | 7% |
| Marine Corps Reserve | 1% |
| Navy | 22% |
| Navy Reserve | 3% |

# III. Outness or Being Perceived as Transgender

Current service members[9] were asked how many people in the military (with the exception of other transgender people) thought or knew that they were transgender.[10]

More than half (52%) of current service members said that, as far as they knew, no one else thought or knew that they were transgender. Approximately one-third (34%) of current service members indicated that a few or some people in the military thought or knew that they were transgender, and 13% indicated that most or all people in the military thought or knew that they were transgender (Figure 12.4).[11]

**Figure 12.4: Number of people in the military who thought or knew that respondent was transgender**



*More than half (52%) of current service members said that, as far as they knew, no one else thought or knew that they were transgender.*

# IV. Leadership Response to Transgender Status

Among current service members who said that a few, some, most, or all others in the military thought or knew they were transgender, 48% indicated that their leadership or commanding officer thought or knew that they were transgender.

These respondents were asked about the ways in which their leadership or commanding officer responded to them being transgender, and they selected one or more response. Many reported that their leadership or commanding officer responded to their transgender status in a variety of positive ways, including supporting their name change (47%) and supporting their transition-related medical treatment (36%). Thirty percent (30%) reported that their leadership or commanding officer ignored their transgender status or looked the other way. Approximately one-quarter (23%) reported that their leadership or commanding officer had taken actions to discharge them (Table 12.2).

One-third (33%) of these respondents wrote in responses describing additional actions their leadership or commanding officers took because they thought or knew the respondent was transgender. Their write-in responses included several positive actions, such as supporting their social transition or their use of pronouns and uniforms that were consistent with their gender identity. These respondents also offered several additional negative actions, such as forcing respondents to present in a way that was inconsistent with their gender identity, forbidding them from discussing their transgender status with anyone else, passing them over for awards and duties, and subjecting them to administrative discipline.

MILITARY SERVICE

AR.10328

**Table 12.2: Response of leadership and/or commanding officer to being transgender**

| Leadership or commanding officers' response | % of current service members whose commanding officer thought/knew they were transgender |
|---|---|
| Supported name change | 47% |
| Supported medical treatment | 36% |
| Ignored or looked the other way | 30% |
| Took actions to discharge them | 23% |
| Not listed above | 33% |

# V. Separation from Military Service

Veterans were divided into two groups for the purposes of analysis: those who separated within the past ten years and those who separated more than ten years prior to taking the survey. The two groups were given distinct questions based on a consideration of the types of experiences a service member may have encountered during their service and the changing nature of the military.[12]

## a. Type of Discharge

Respondents who separated from military service more than ten years ago[13] were asked about the reasons for their separation from service, including the type of discharge they received. More than three-quarters (79%) of these respondents reported being honorably discharged, and the remaining 21% reported a variety of other types of discharges (Table 12.3).

**Table 12.3: Type of discharge**

| Discharge | % of veterans who separated more than 10 years ago |
|---|---|
| Honorable | 79% |
| General | 7% |
| Medical | 6% |
| Other-than-honorable | 3% |
| Entry level separation | 2% |
| Bad conduct | 1% |
| Retired | 1% |
| Dishonorable | <1% |
| Not listed above | 2% |

# In Our Own Voices

"I began to accept myself as a woman. I was happier than I ever had been before. But the army didn't share my enthusiasm. A year after returning from deployment, I was kept in under penal conditions. I was demoted from a sergeant to a private, the lowest rank in the army."

...........................................................

"I am repeatedly harassed in my workplace, and am continually required to conceal my transgender status. When I sought assistance from the Equal Opportunity Office, I was told that they were unable to help because transgender individuals are not protected against harassment in the military."

...........................................................

## b. Discharged Because of Transgender Status

While 81% of respondents who had separated from service more than ten years prior reported that they did not believe their discharge was related to being transgender, 19% believed their discharge was either partially related (14%) or completely related (5%) to being transgender.

Respondents who indicated that their discharge was related to being transgender were less likely to have been honorably discharged. Eighty-six percent (86%) of those who said their discharge was not related to their transgender status were honorably discharged, while only 45% of those who

AR.10329

said their discharge was partially related to being transgender and 51% of those who indicated that it was completely related were honorably discharged.

Respondents with female on their original birth certificate (24%) were more likely to say that their discharge was partially or completely related to being transgender than those with male on their original birth certificate (17%). Latino/a (28%) and Black (24%) respondents were also more likely to report that their transgender status was a factor in their discharge, compared with white (16%) respondents.

Even though these discharges took place more than ten years ago, the experience of being discharged partly or completely because of one's transgender status was associated with a variety of negative outcomes affecting respondents at the time they took the survey. Respondents who were currently living in poverty (29%) or currently working in the underground economy (34%) were more likely to say that their discharge was completely or partially connected to their transgender status, as were respondents who were currently experiencing serious psychological distress (28%).

### c. Separated to Transition or Avoid Harassment

Nearly one in ten (9%) respondents who separated from military service more than ten years ago left the service in order to transition, and an additional 19% said they left the service to avoid being mistreated or harassed as a transgender person.

Differences emerged by race, where Latino/a (28%) and Black respondents (26%) were more likely to have left to avoid mistreatment or harassment.

Approximately one-third (32%) of those who were currently living in poverty and more than one-third of those who have done sex work (38%) also left the military to avoid mistreatment or harassment.

# VI. Name Change on Discharge Papers

Respondents who separated from military service more than ten years earlier were also asked if they had changed their name on their military discharge papers, known as the DD 214. Two percent (2%) applied for and received an updated DD 214 with a new name, or they received a DD 215 (an alternative form used to correct errors in a DD 214) with their new name. Six percent (6%) applied for a name change on their military discharge papers, but their request was denied. The remaining 92% had not tried to change their name on their military discharge papers.

# VII. Health Care Treatment from Military Providers

Current service members and veterans who separated from military service within the ten years prior to taking the survey were asked whether they had received health care related to gender transition from a military provider, not including the Veterans Health Administration. Twelve percent (12%) had received mental health treatment related to gender transition from a military provider, and 4% had received medical treatment related to gender transition other than mental health treatment, such as hormone therapy or surgical care, from a military provider.

Even though this survey was conducted prior to the Department of Defense's announcement of plans to allow transgender people to serve openly, more than one-quarter (28%) of all current service members reported taking hormones for their gender identity or gender transition at the time they participated in the survey. Among these

current service members, 28% reported getting their hormones from an on-post medical doctor and/or pharmacy. Nearly three-quarters (74%) received their hormones through an off-post medical doctor, and 57% received them through an off-post pharmacy (Table 12.4).

**Table 12.4: Source of hormones**

| Source of hormones | % of current service members who take hormones |
|---|---|
| Off-post medical doctor | 74% |
| Off-post pharmacy | 57% |
| On-post pharmacy | 15% |
| Friends, online, or other non-licensed sources | 15% |
| On-post medical doctor | 13% |

Current services members were asked whether a military medical provider, including any mental health provider, had reported to their commanding officer that they were transgender or recommended them for discharge. Of current service members whose providers knew they were transgender,[14] 86% reported no action being taken by military medical or mental health providers. However, 8% said that their provider reported their transgender status to their commander, and 12% said that their provider recommended them for discharge.

# VIII. Veterans Health Care

Veterans who separated from the military more than ten years ago were asked about their experiences receiving health care through the Veterans Health Administration (VA).[15]

Forty percent (40%) of former service members have received health care through the VA, 75% of whom were currently receiving care through the VA. Of those who received health care through the

VA at any point, more than half (56%) received care related to gender transition.

Nearly three-quarters (72%) indicated that they were out to their VA providers as transgender. Of those who were out to their VA providers as transgender, almost half (47%) reported that they were always treated respectfully as a transgender person, and 40% said that they received mostly respectful care. Eleven percent (11%) reported that they were sometimes treated respectfully, and 3% said that they were never treated respectfully (Figure 12.5).

**Figure 12.5: Frequency of respectful treatment at the VA**



3%
Never

11%
Sometimes

% of veterans who were out as transgender to their VA provider

47%
Always

40%
Mostly

# IX. Impact of Repealing Ban on Transgender Service

At the time the survey was taken, the military had not yet announced it would let transgender people serve openly. Current military service members were asked what they would do if the military allowed transgender people to serve openly. Nearly one-quarter (24%) said that they would start to transition while still serving, and 18% said that they would finish the transition that they

AR.10331

had already started while continuing to serve. Additionally, 21% reported that they had already transitioned (Table 12.5).

**Table 12.5:  What respondent would do if open service in the military was allowed for transgender people**

| What they would do if allowed to serve openly | % of current service members |
|---|---|
| They would start to transition while still serving | 24% |
| They have already transitioned | 21% |
| They would finish the transition they already started and continue to serve | 18% |
| They would leave the military to transition and not return | 6% |
| They do not want to transition | 6% |
| They would leave the military to transition and then return to service | 3% |
| They would not finish the transition they already started and continue to serve | 1% |
| Not listed above | 21% |

Veterans who separated from the military within the past ten years were asked whether they would return to military service if transgender people were allowed to serve. Nearly one-third (30%) of these respondents indicated that they would return, 30% said that they might return, and the remaining 39% reported that they would not return to military service. Transgender men (42%) were more likely than transgender women (25%) and non-binary people (18%) to say that they would return to service.

# Conclusion

Despite a ban on transgender service members at the time the survey was administered, nearly one in five respondents reported having served in the military, and respondents were nearly twice as likely to be veterans as the general U.S. population. The findings indicated that a majority of current service members were interested in serving openly as transgender people, including those who would transition during their military service. Responses also indicated diverse experiences of acceptance and rejection of transgender people in military and veteran settings by military officials, direct superiors, and health care providers. The results suggest that lifting the ban on transgender service members and implementing new policies could lead to a substantial number of current and former service members continuing or resuming their military service.

**ENDNOTES** | CHAPTER 12: MILITARY SERVICE

1   Gates, G. J. & Herman, J. L. (2014). *Transgender Military Service in the United States.* Los Angeles, CA: Williams Institute. Available at: http://williamsinstitute.law.ucla.edu/wp-content/uploads/Transgender-Military-Service-May-2014.pdf; Blosnich, J. R., Brown, G. R., Shipherd, J. C., Kauth, M., Piegari, R. I., & Bossarte, R. M. (2013). Prevalence of gender identity disorder and suicide risk among transgender veterans utilizing Veterans Health Administration care. *American Journal of Public Health, 103*(10), e27–e32; Shipherd, J. C., Mizock, L., Maguen, S., & Green, K. E. (2012). Male-to-female transgender veterans and VA health care utilization. *International Journal of Sexual Health, 24*(1), 78–87.

2   Although the ban is described in this chapter as being one that prevented "transgender people from serving openly in the military," in actuality, the ban categorically barred transgender people from serving, regardless of whether or not they were open about being transgender. However, it is clear that tens of thousands of transgender people chose to serve in the military despite the ban, and many had to hide their identity to do so. Therefore, the ban is being described here as relating to open service as a transgender person.

3   See e.g., Rosenberg, M. (2016, June 30). Transgender people will be allowed to serve openly in military. *The New York Times.* Available at: http://www.nytimes.com/2016/07/01/us/transgender-military.html.

4   In this section of this chapter, the percentages of respondents who have served or are currently serving in the U.S. Armed Forces have been weighted to reflect the age and educational attainment of the U.S. population in addition to the standard survey weight. The USTS sample differs substantially from the U.S. population in regard to age and educational attainment, and therefore, this additional weight is applied in order to provide a more accurate comparison to the percentage of U.S. adults who have served in the armed forces, as reported in the American Community Survey. See the *Methodology* and *Portrait of USTS Respondents* chapters for more information about the application of the supplemental survey weight.

5   U.S. Census Bureau. (2015). *American Community Survey 1-Year Estimates: Veteran status.* Available at: https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_15_1YR_S2101&prodType=table.

6   U.S. Census Bureau. See note 5.

7   U.S. Census Bureau. See note 5.

8   U.S. Census Bureau. See note 5.

9   "Current service members" includes individuals who were (1) currently serving on active duty, (2) only on active duty for training in the Reserves or National Guard, or (3) no longer on active duty but had been in the past and were still serving in the military. See Q. 2.17.

10  Q. 8.9 asked, "How many people in the military (who aren't trans) believe you are trans?" In the context of the questions in this section, this question was intended to assess how many people were out as transgender in the military by determining if other non-transgender people thought or knew that they were transgender.

11  This question (Q. 8.9) did not distinguish between service members who were not out or perceived as transgender because they were not living according to their gender identity, and those who were already living full time according to their gender identity but did not disclose the fact that they had previously transitioned. However, 47% of service members who said that no one in the military thought or knew they were transgender also reported that they were living full-time in Q. 1.12, suggesting that a substantial number of respondents who were not out to others in the military were living according to their gender identity without disclosing their past transition.

12  During the development of the survey questionnaire, the research team consulted with individuals and groups with subject-matter expertise in LGBT military service in general, and transgender military service in particular. After consultation, the research team chose to divide those who had separated from service into two groups to evaluate the experiences that each group might have had based on their time of service and separation. It was determined that those who had separated from service within the past ten years were serving in a time of changing societal and military culture and policies—including the repeal of "Don't Ask, Don't Tell," permitting lesbian, gay, and bisexual (but not transgender) service members to serve openly—and may have had different experiences as a result. This group may have also had different experiences with transitioning, receiving medical care for transition- and non-transition-related health care, and eligibility to return to service. The two groups were directed to specific questions accordingly.

13  Those who separated within the past ten years should have received questions 8.12–8.21 (which covered the reasons for separation and the nature of their discharge, VA health care, and military discharge papers) to evaluate the differences in experiences between them and those who separated more than ten years prior to participating in the survey. However, due to a programming error, respondents who separated within the past ten years did not receive these questions. Therefore, results of questions that addressed veterans' issues only reflected the experiences of those who separated more than ten years prior and likely underestimated certain experiences reported in this section.

14  Thirty-seven percent (37%) of current service members said that the question did not apply to them, as none of their military health providers knew that they were transgender, while 63% indicated that at least one military health provider knew they were transgender.

15  Veterans who separated from the military within the past ten years did not receive this question due to a programming error. See note 13.



# CHAPTER 13

# Housing, Homelessness, and Shelter Access

Housing is one of the most vital needs all people share. However, many transgender people have faced discrimination when seeking housing, and are vulnerable to actions such as eviction because of their transgender status. Such discrimination, in addition to family rejection and other risk factors, can lead to housing instability and higher rates of homelessness.[1] For transgender people who experience homelessness, shelters present additional problems and often are unsafe environments. Previous studies have found that shelters frequently turn transgender people away because of their gender identity, or require them to stay in facilities that are inappropriate for their gender, often putting them at further risk of violence and harassment.[2]

This chapter explores respondents' current living arrangements and their experiences with homelessness, as well as with specific forms of housing discrimination and instability occurring in the past year because of their transgender status. It also examines respondents' experiences with homelessness in the past year, including access to shelters and the treatment they received in those shelters as transgender people. Notable differences in respondents' experiences based on demographic and other characteristics are reported throughout the chapter.

AR.10334

**KEY FINDINGS**

▶ Only 16% of respondents owned their homes, in contrast to 63% in the U.S. population.

▶ Nearly one-third (30%) of respondents have experienced homelessness at some point in their lives. One in eight (12%) experienced homelessness in the past year because of being transgender.

▶ Nearly one-quarter (23%) of respondents experienced some form of housing discrimination in the past year, such as being evicted from their home or denied a home or apartment because of being transgender.

▶ More than one-quarter (26%) of respondents who were homeless in the past year avoided staying in homeless shelters because they feared they would be mistreated as a transgender person. Additionally, six percent (6%) were denied access to a shelter, including 4% who were denied access due to being transgender.

▶ Seventy percent (70%) of those who stayed in a shelter in the past year reported some form of mistreatment because of being transgender.

- More than half (52%) of those who stayed at a shelter in the past year were verbally harassed, physically attacked, and/or sexually assaulted because of being transgender.

- Nearly one in ten (9%) respondents were thrown out once the shelter staff found out that they were transgender, and 44% decided to leave the shelter because of poor treatment or unsafe conditions.

- One-quarter (25%) decided to dress or present as the wrong gender in order to feel safe in a shelter, and 14% said that the shelter staff forced them to dress or present as the wrong gender in order to stay at the shelter.

AR.10335

# I. Current Living Arrangements

Respondents were asked what their current living arrangements were at the time they participated in the survey. Nearly half (44%) of respondents were living in a house, apartment, or condo they rented, either alone or with others, which was the most commonly reported living arrangement. Seventeen percent (17%) had not yet left home and were living with their parents or the family they grew up with (Table 13.1).

**Table 13.1: Current living arrangements**

| Current living arrangements | % of respondents |
|---|---|
| Living in house, apartment, or condo they rent (alone or with others) | 44% |
| Living with parents or family they grew up with because they have not yet left home | 17% |
| Living in house, apartment, or condo they own (alone or with others) | 16% |
| Living temporarily with friends or family because they cannot afford their own housing | 9% |
| Living in campus or university housing | 7% |
| Living with a partner, spouse, or other person who pays for the housing | 5% |
| Living on the street, in a car, in an abandoned building, in a park, or a place that is NOT a house, apartment, shelter, or other housing | <1% |
| Living in a shelter (including homeless, domestic violence, or other type of emergency shelter) or in a hotel or motel with an emergency shelter voucher | <1% |
| Living in transitional housing or a halfway house | <1% |
| Living in a hotel or motel that they pay for | <1% |
| Living in military barracks | <1% |
| Living in a nursing home or other adult care facility | <1% |
| Living in a foster group home or other foster care | <1% |
| Living in a hospital | <1% |
| Not listed above | 2% |

In contrast to the 63% homeownership rate in the U.S. at the time of the survey,[3] USTS respondents were nearly four times less likely to own a home, with only 16% reporting that they were living in a house, apartment, or condo that they owned. A large difference in the rate of homeownership was consistent across age groups (Figure 13.1).[4]



**Figure 13.1: Homeownership rate**
CURRENT AGE (%)

- ■ % in USTS
- □ % in U.S. population (ACS)

Respondents also reported substantial housing instability. Nearly one in ten (9%) respondents were living temporarily with friends or family because they could not afford their own housing. Approximately half of one percent (0.53%) of respondents were homeless at the time they participated in the survey, including those who were living in a shelter (other than a domestic violence shelter), or on the street. This was three times the rate of current homelessness among adults in the U.S. population (0.18%), as reported by the Department of Housing and Urban Development.[5]

# II. Homelessness During One's Lifetime

Nearly one-third (30%) of respondents have experienced homelessness during their lifetime, including those who have stayed in a shelter, lived on the street, lived out of a car, or stayed temporarily with family or friends because they could not afford housing. The homelessness rate was substantially higher among respondents whose immediate family had kicked them out of the house, with nearly three-quarters (74%) of these respondents experiencing homelessness. The homelessness rate was also nearly twice as high among respondents who have done sex work (59%) and those living with HIV (59%), as well as respondents who have lost their job because of their gender identity or expression (55%). Transgender women of color, including American Indian (59%), Black (51%), multiracial (51%), and Middle Eastern (49%) women, also experienced especially high rates of homelessness (Figure 13.2).

**Figure 13.2: Lifetime homelessness rate among transgender women**
RACE/ETHNICITY (%)



# III. Housing Discrimination and Homelessness in the Past Year

Respondents were asked about specific experiences with housing discrimination and instability in the past year, such as being evicted or being homeless, because they were transgender (Table 13.2).[6]

**Table 13.2: Housing situations that occurred in the past year because of being transgender**

| Housing situation | % of people to whom situation applied |
|---|---|
| They had to move back in with family members or friends | 20% |
| They slept in different places for short periods of time (such as on a friend's couch) | 15% |
| They had to move into a less expensive home or apartment | 13% |
| They experienced homelessness | 12% |
| They were denied a home or apartment | 6% |
| They were evicted from a home or apartment | 5% |
| **One or more experiences listed** | **30%** |

One in eight (12%) respondents reported experiencing homelessness in the past year as a result of anti-transgender bias. Those currently working in the underground economy (such as sex work, drug sales, and other work that is currently criminalized) (37%), undocumented residents (32%), and those living with HIV (27%) were more likely to report experiencing homelessness in the past year because they were transgender. Transgender women of color, including Black (31%), American Indian (27%), multiracial (18%), and Latina (18%) women, were substantially more likely to report being homeless in the past year because of being transgender (Figure 13.3).

AR.10337

**Figure 13.3: Homelessness in the past year because of being transgender among transgender women**
RACE/ETHNICITY (%)



*Sample size too low to report

Six percent (6%) of respondents were denied a home or apartment in the past year because they were transgender, with transgender women of color, including Black (17%), multiracial (15%), and Latina (11%) women, being more likely to have this experience (Figure 13.4).

**Figure 13.4: Denial of home/apartment in the past year due to being transgender among transgender women**
RACE/ETHNICITY (%)



*Sample size too low to report

# In Our Own Voices

"I was ejected from my apartment while I was out of town after my landlord discovered I was trans. The apartment was empty when I returned home."

...................................................

"I lost my job after I came out as transgender. I became homeless for about year. I never stayed in a shelter because I feared harassment."

...................................................

"When I was 18, I ran away from my abusive parents who had been violent toward me because of my sexuality and gender expression. I became homeless for several years, traveling all over the country, stealing food and sleeping in abandoned buildings."

...................................................

"When I go to shelters, I am admonished and told that I should return to 'being a woman' in order to use the shelter system."

...................................................

"I've tried shelters. The men's ones aren't safe for trans men: if those men find out who you are, you're opening yourself up to physical and sexual violence. And when I turned to the women's shelters, I was too masculine to make the women comfortable."

...................................................

## *Five percent (5%) of respondents were evicted from their home in the past year because of anti-transgender bias.*

Five percent (5%) of respondents were evicted from their home or apartment in the past year because of anti-transgender bias. Differences emerged by demographic characteristics, where undocumented residents (18%), people with disabilities[7] (8%), and people of color, including American Indian (9%) and Black (9%) respondents, were more likely to report this experience.

Overall, nearly one-third (30%) of respondents to whom these housing situations applied—23% of all respondents—experienced one or more forms of housing discrimination or instability in the past year because they were transgender. Respondents who were currently working in the underground economy (59%) and those who had been kicked out of the house by their family at some point in their lives because they were transgender (59%) were nearly twice as likely to report one or more of these experiences. Undocumented residents (50%) and transgender women of color were also more likely to have had one or more of these experiences, including Black (49%), multiracial (39%), American Indian (39%), and Latina (37%) women (Figure 13.5).

**Figure 13.5: Any housing discrimination and/or instability in past year due to being transgender among transgender women**
RACE/ETHNICITY (%)



*Sample size too low to report

# IV. Shelters

## *a. Access to Shelters*

Respondents who experienced homelessness in the past year because of their transgender status were asked whether they had gone to a homeless shelter during that year (Table 13.3).

**Table 13.3: Experiences with homeless shelters in the past year**

| Experiences with homeless shelters | % of people who were homeless |
|---|---|
| They sought shelter and stayed at one or more shelters | 10% |
| They sought shelter and were denied access to one or more shelters | 6% |
| They did not seek shelter, because they feared mistreatment as a transgender person | 26% |
| They did not seek shelter for other reasons | 59% |

One in ten (10%) respondents sought shelter and stayed at one or more shelters in the past year. Higher percentages were noted among respondents living with HIV (22%) and American Indian (23%) and Black (15%) respondents.

More than one-quarter (26%) did not seek shelter because they feared being mistreated as a transgender person in the past year. Asian (43%) and American Indian (37%) respondents were more likely to report avoiding a shelter for this reason, in contrast to other people of color, such as Black (25%) and Latino/a (22%) respondents (Figure 13.6). Respondents currently working in the underground economy (36%), and respondents whose families had kicked them out of the house for being transgender (35%) were more likely to avoid seeking shelter for fear of being mistreated.

Figure 13.6: Did not seek shelter for fear of mistreatment as a transgender person in the past year RACE/ETHNICITY (%)



*Sample size too low to report

Six percent (6%) of respondents were denied access to a shelter in the past year. Transgender women of color were more likely to be denied access to a shelter, with multiracial women (30%) being five times as likely, and Black women (13%) being more than twice as likely. Those who were currently working in the underground economy (13%) were also more likely to be denied access to a shelter.

Respondents who were denied access to one or more shelters in the past year were asked what they believed the reasons were for that treatment, and they selected one or more reasons from a list, such as age, race or ethnicity, and gender identity. Nearly three-quarters (74%) believed that they were denied access to a shelter because of their gender identity or expression.[8] This represents 4% of those who were homeless in the past year (Table 13.4).

*Seven out of ten (70%) respondents who stayed at a shelter in the past year faced some form of mistreatment, such as being forced out, harassed, or attacked because of being transgender.*

Table 13.4: Reported reasons for being denied access to one or more shelters

| Reason for denial | % of those denied access to shelter |
|---|---|
| Age | 7% |
| Disability | 8% |
| Income level or education | 5% |
| Gender identity or expression | 74% |
| Race or ethnicity | 4% |
| Religion or spirituality | 4% |
| Sexual orientation | 17% |
| None of the above | 19% |

## b. Treatment in Shelters

Respondents who stayed at one or more shelters in the past year received questions about how they were treated at the shelter(s) as a transgender person. Seventy percent (70%) encountered at least one negative experience based on their transgender status in the past year, such as being forced out, harassed, or attacked because they were transgender.

Nearly one in ten (9%) respondents who stayed at a shelter in the past year were thrown out after the shelter staff found out that they were transgender. Forty-four percent (44%) decided to leave the shelter because of poor treatment or unsafe conditions, even though they had no other place to go. One-quarter (25%) of respondents decided to dress or present as the wrong gender in order to feel safe in a shelter, and 14% said that the shelter staff forced them to dress or present as the wrong gender in order to stay at the shelter (Table 13.5).

HOUSING, HOMELESSNESS, AND SHELTER ACCESS

**Table 13.5: Experiences while staying in homeless shelters in the past year**

| Experiences while staying in homeless shelters | % of people who stayed in a shelter |
|---|---|
| They left because of poor treatment or unsafe conditions, even though they had nowhere else to go | 44% |
| They decided to dress or present as the wrong gender to feel safe in shelter | 25% |
| The shelter required them to dress or present as the wrong gender | 14% |
| They were thrown out after shelter staff learned they were transgender | 9% |
| **One or more experiences listed** | **58%** |

Respondents who stayed at a homeless shelter in the past year were also asked whether they were verbally harassed, physically attacked, or sexually assaulted[9] at the shelter because they were transgender. Nearly half (49%) reported that they were verbally harassed because they were transgender. Nearly one-fifth (19%) were physically attacked, and 17% were sexually assaulted at the shelter because they were transgender (Table 13.6).

**Table 13.6: Verbal harassment, physical attack, and sexual assault in homeless shelters in the past year because they were transgender**

| Experiences while staying in homeless shelters | % of people who stayed in a shelter |
|---|---|
| Verbally harassed | 49% |
| Physically attacked | 19% |
| Sexually assaulted | 17% |
| **One or more experiences listed** | **52%** |

# Conclusion

Respondents reported high rates of homelessness both in their lifetime and the past year. The results also indicated that a substantial number of respondents experienced housing discrimination and housing instability in the past year based on their transgender status, with higher rates among transgender women of color, people living with HIV, people who have been kicked out of their homes by their families, and respondents currently working in the underground economy. Many of those who experienced homelessness in the past year reported that they avoided using a shelter because they feared being mistreated as a transgender person, and those who did use a shelter in the past year faced high rates of mistreatment based on their transgender status, such as being kicked out of the shelter, being verbally harassed, physically attacked, or sexually assaulted.

AR.10341

**ENDNOTES** | CHAPTER 13: HOUSING, HOMELESSNESS, AND SHELTER ACCESS

1    See e.g., Davidson, C. (2014). Gender minority and homelessness. *In Focus: A Quarterly Research Review of the National Health Care for the Homeless Council, 3*(1). Available at: http://www.nhchc.org/wp-content/uploads/2014/10/in-focus_transgender_sep2014_final.pdf; Durso, L. E. & Gates, G. J. (2012). *Serving Our Youth: Findings from a National Survey of Service Providers Working with Lesbian, Gay, Bisexual, and Transgender Youth who are Homeless or at Risk of Becoming Homeless.* Los Angeles, CA: Williams Institute. Available at: http://williamsinstitute.law.ucla.edu/wp-content/uploads/Durso-Gates-LGBT-Homeless-Youth-Survey-July-2012.pdf; Grant, J. M., Mottet, L. A., Tanis, J., Harrison, J., Herman, J. L., & Keisling, M. (2011). *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey.* (p. 112). DC: National Center for Transgender Equality & National Gay and Lesbian Task Force.

2    Grant, et al.; Rooney, C., Durso, L. E., & Gruberg, S. (2016). *Discrimination Against Transgender Women Seeking Access to Homeless Shelters.* DC: Center for American Progress. Available at: https://www.americanprogress.org/issues/lgbt/report/2016/01/07/128323/discrimination-against-transgender-women-seeking-access-to-homeless-shelters/.

3    U.S. Census Bureau. (2015). *American Community Survey 1-Year Estimates: Homeownership Rate by Age of Householder.* The ACS homeownership rate include ages 15 and older, in contrast to the USTS rate, which includes respondents who are 18 and older. Because the ACS includes people under 18 years of age, an exact comparison to the USTS sample could not be made. Therefore, this comparison should be interpreted with caution.

4    U.S. Census Bureau. (2015). *American Community Survey 1-Year Estimates: Homeownership Rate by Age of Householder.* The ACS homeownership rate for the "under 25" age group includes those who are 15–24 years of age, in contrast to the USTS rate, which includes respondents who are 18–24 years of age. See note 3.

5    The homelessness point-in-time estimate is based on January 2015 data. Department of Housing and Urban Development. (2015). *2015 Annual Homelessness Assessment Report (AHAR) to Congress.* Available at: https://www.hudexchange.info/resources/documents/2015-AHAR-Part-1.pdf. Calculation is based on the 436,921 people over the age of 18 who were homeless on a given night in 2015 and the January 2015 estimated adult population (247,492,492).

6    Respondents were given the choice of answering "yes," "no," or "does not apply to me" for each housing scenario listed in Q. 23.2. They were instructed to select "does not apply to me" if the housing situation could not have happened to them in the past year. For example, those who did not rent a home in the past year could not have been evicted, and were instructed to select "does not apply to me" for that question. The results reported in this section do not include those who answered "does not apply to me" for each of the housing situations.

7    "People with disabilities" here refers to respondents who identified as a person with a disability in Q. 2.20.

8    The survey included both "transgender status/gender identity" and "gender expression/appearance" as answer choices so that respondents could select what they felt best represented their experience. Because there was a substantial overlap of respondents who selected both reasons, and because these terms are commonly used interchangeably or with very similar meanings, responses of those who selected one or both of these reasons are collapsed for reporting as "gender identity or expression."

9    Respondents were asked if they had experienced "unwanted sexual contact (such as fondling, sexual assault, or rape)" in Q. 24.4.



# CHAPTER 14
# Police, Prisons, and Immigration Detention

Transgender people, particularly transgender people of color, face elevated levels of negative interactions with law enforcement officers and the criminal justice system. This includes higher rates of police mistreatment,[1] incarceration,[2] and physical and sexual assault in jails and prisons.[3] Furthermore, when navigating the United States immigration system, many transgender people, including those who are seeking asylum based on their gender identity, face the prospect of being placed into unsafe immigration detention centers. While in immigration detention, transgender people are often placed in facilities that do not match their gender identity or face extended periods of solitary confinement, leaving them vulnerable to physical and sexual abuse, denial of medical treatment, and other dangerous conditions.[4]

This chapter explores respondents' experiences with police and other law enforcement officers, in jail, prison, or juvenile detention centers, and in immigration detention, including experiences of physical and sexual assault during interactions with law enforcement and while incarcerated. Many of the questions in this section were modeled on the Bureau of Justice Statistics' National Inmate Survey. Results in this chapter are presented in three sections: (A) Interactions with Law Enforcement Officers, (B) Incarceration in Jail, Prison, or Juvenile Detention, and (C) Experiences in Immigration Detention. Notable differences in respondents' experiences based on demographic and other characteristics are reported throughout the chapter.

AR.10343

# A. INTERACTIONS WITH LAW ENFORCEMENT OFFICERS

**KEY FINDINGS**

▶ Of respondents who interacted with police or law enforcement officers who thought or knew they were transgender in the past year, 57% said they were never or only sometimes treated respectfully. Further, 58% reported some form of mistreatment, such as being repeatedly referred to as the wrong gender, verbally harassed, or physical or sexually assaulted.

▶ More than half (57%) of respondents said they were either somewhat or very uncomfortable asking the police for help.

▶ Two percent (2%) of respondents were arrested in the past year, and of those arrested, 22% believed they were arrested because they were transgender.

## I. Law Enforcement Interactions in the Past Year

Forty percent (40%) of respondents said that they interacted with the police or other law enforcement officers in the past year. Of those, 65% said that they believed none of the officers thought or knew they were transgender, and 35% said that some or all of the officers thought or knew they were transgender (Figure 14.1).

Respondents who said that some or all of the law enforcement officers thought or knew they were transgender were then asked whether they were treated with respect during the interactions. More than half of these respondents (57%) said that they were never or only sometimes treated with respect, and 43% reported that they were always treated with respect (Figure 14.2).

**Figure 14.2: Frequency of respectful treatment by police or other law enforcement officers in the past year**



14%
Never treated with respect

43%
Always treated with respect

43%
Sometimes treated with respect

% of those who interacted with officers who thought or knew they were transgender in the past year

**Figure 14.1: Interaction with officers who thought or knew respondents were transgender**



12%
All

23%
Some

65%
None

% of respondents who interacted with police in the past year

Respondents who were currently working in the underground economy (80%) were more likely to

POLICE, PRISONS, AND IMMIGRATION DETENTION

report never or only sometimes being treated with respect, as were those who were currently living in poverty[5] (69%). Non-binary respondents (70%) and transgender men (62%) were more likely to report having never or only sometimes been treated with respect than transgender women (51%) (Figure 14.3). People of color were also more likely to report never or only sometimes being treated with respect, particularly American Indian (72%) and Black (70%) respondents (Figure 14.4).

**Figure 14.3: Never or only sometimes treated with respect by law enforcement officers in the past year**
GENDER IDENTITY (%)



**Figure 14.4: Never or only sometimes treated with respect by law enforcement officers in the past year**
RACE/ETHNICITY (%)



*Sample size too low to report

Respondents who said that some or all of the officers they interacted with thought or knew they were transgender were also asked whether they experienced specific forms of mistreatment in their interactions with law enforcement officers in the past year, such as being repeatedly referred to as the wrong gender, verbally harassed, or physically attacked. More than half (58%) of these respondents reported having experienced one or more forms of mistreatment (Table 14.1).

**Table 14.1: Mistreatment by police or other law enforcement officers in the past year**

| Experiences of mistreatment in the past year | % of those who interacted with officers who thought or knew they were transgender in the past year |
|---|---|
| Officers kept using the wrong gender pronouns (such as he/him or she/her) or wrong title (such as Mr. or Ms.) | 49% |
| Verbally harassed by officers | 20% |
| Officers asked questions about gender transition (such as about hormones or surgical status) | 19% |
| Officers assumed they were sex workers | 11% |
| Physically attacked by officers | 4% |
| Sexually assaulted by officers | 3% |
| Forced by officers to engage in sexual activity to avoid arrest | 1% |
| **One or more experiences listed** | **58%** |

People of color, including American Indian (74%), multiracial (71%), Latino/a (66%), and Black (61%) respondents, were more likely to have experienced one or more forms of mistreatment (Figure 14.5). Respondents who were homeless in the past year (78%), those who were currently unemployed (75%), and people with disabilities[6] (68%) were also more likely to report one or more of these experiences.

AR.10345

*More than half (58%) of respondents who interacted with a law enforcement officer who thought or knew that they were transgender were verbally harassed, physically or sexually assaulted, or mistreated in another way in the past year.*

be verbally harassed by an officer (40%), and those who were currently working in the underground economy were more than twice as likely to be verbally harassed (51%).

In the past year, more than one in ten (11%) respondents who interacted with law enforcement officers who thought or knew they were transgender reported that an officer assumed that they were sex workers. Transgender women of color were more likely to report that an officer assumed they were sex workers, including Black (33%), multiracial (30%), Latina (25%), American Indian (23%), and Asian (20%) women (Figure 14.6).

**Figure 14.5: Experienced one or more forms of mistreatment by law enforcement officers in the past year**
RACE/ETHNICITY (%)



*Sample size too low to report

**Figure 14.6: Law enforcement officer assumed they were a sex worker in the past year among transgender women**
RACE/ETHNICITY (%)



*Sample size too low to report

Verbal harassment was frequently reported by respondents who interacted with police or other law enforcement officers who thought or knew they were transgender. In the past year, one in five (20%) of these respondents reported verbal harassment by an officer. Those who had been homeless in the past year were twice as likely to

Respondents who interacted with law enforcement officers who thought or knew they were transgender in the past year also reported being physically or sexually assaulted. Six percent (6%) of these respondents were physically attacked, sexually assaulted,[7] and/or forced to engage in sexual activity to avoid arrest by an officer. Respondents who were currently working in the underground economy (27%) and those who were homeless in the past year (17%) were more

POLICE, PRISONS, AND IMMIGRATION DETENTION

likely to report one or more of these experiences. Transgender women of color, including American Indian (20%), Black (17%), and multiracial (16%) women, were also more likely to report one or more of these experiences (Figure 14.7).

**Figure 14.7: Physically attacked, sexually assaulted, and/or forced to engage in sexual activity to avoid arrest in the past year among transgender women RACE/ETHNICITY (%)**



*Sample size too low to report

# II. Comfort Interacting with Law Enforcement Officers

All respondents were asked how comfortable they would feel asking for help from the police if they needed it. Twenty-nine percent (29%) reported that they would either be very comfortable or somewhat comfortable asking for help from the police, and 15% said they were neutral. A majority (57%) of the sample said that they were somewhat uncomfortable or very uncomfortable asking for help from the police (Figure 14.8).

# In Our Own Voices

"When I began to live in my correct gender, I was stopped by police and forced to strip in public in front of them as well as being verbally harassed, threatened with arrest, and accused of being a sex worker."

.................................................................

"While I was in solitary, a cop asked me about my gender. I told him I was male, and he told me I sounded female. Next thing I knew, I was being taken to the jail doctor to spread my legs and have him confirm my gender. It was humiliating."

.................................................................

"I was in [jail] for 12 days housed with male detainees. Upon being booked, I was escorted to the shower area where I was forced to strip down and shower with male inmates who made sexual advances towards me while mocking me for being different. I feared for my life and the guards were of no help because they mocked me for being transgender."

.................................................................

"When I was booked, the officers asked very intrusive questions about my genitalia in a very nonprofessional manner and laughed about it. They ended up booking me into an all-female solitary confinement cell, kept calling me 'miss,' and gave me female colors even though I pass full time as male."

.................................................................

AR.10347

**Figure 14.8: Comfort asking the police for help**



*A majority (57%) of respondents said they would be somewhat or very uncomfortable asking for help from the police if they needed it.*

## III. Arrest

Two percent (2%) of all respondents reported having been arrested in the past year. Almost one-quarter (22%) of those who were arrested believed that they were arrested because they were transgender.

Respondents who were homeless in the past year (6%) were more likely to be arrested during that year. Transgender women of color, including Black (6%), American Indian (6%), and multiracial (3%) women, were also more likely to be arrested in the past year (Figure 14.10).

Middle Eastern (70%), Black (67%), and multiracial (67%) respondents were more likely to say that they were either somewhat or very uncomfortable asking for help from the police (Figure 14.9). Respondents with disabilities (70%) and those who were living in poverty (67%) were also more likely to be somewhat or very uncomfortable asking for help from the police.

**Figure 14.9: Somewhat or very uncomfortable asking the police for help**
**RACE/ETHNICITY (%)**



**Figure 14.10: Arrested in the past year for any reason among transgender women**
**RACE/ETHNICITY (%)**



# B. INCARCERATION IN JAIL, PRISON, OR JUVENILE DETENTION

KEY FINDINGS

▶ Two percent (2%) of respondents were held in jail, prison, or juvenile detention in the past year.

▶ Nearly one-third (30%) of respondents who were incarcerated were physically and/or sexually assaulted by facility staff and/or another inmate in the past year.

▶ During the past year, more than one-third (37%) of respondents who were taking hormones before their incarceration were prevented from taking their hormones while incarcerated.

## I. Overall Incarceration Rates

Two percent (2%) of respondents were incarcerated (held in jail, prison, or juvenile detention) in the past year. Twelve percent (12%) of undocumented respondents were incarcerated in the past year. Transgender women of color, including Black (9%) and American Indian (6%) women, were more likely to have been incarcerated in the past year (Figure 14.11), as were respondents who had been homeless in the past year (7%).

Respondents who were incarcerated in the past year were asked what type of jail, prison, or juvenile detention facility they were in, and they made one or more selections. Most of these respondents were incarcerated in a local jail (64%) and/or held in a holding cell (58%) (Figure 14.12).

**Figure 14.12: Types of incarceration facilities**



**Figure 14.11: Incarcerated in the past year among transgender women**
RACE/ETHNICITY (%)



2015 U.S. TRANSGENDER SURVEY

# II. Physical and Sexual Assault During Incarceration

Respondents who were incarcerated in jail, prison, or juvenile detention in the past year were asked whether they had been physically or sexually assaulted[8] by facility staff or other inmates during that time period. One in five (20%) respondents reported being sexually assaulted by facility staff or other inmates. This rate was five to six times higher than the rates of sexual assault by facility staff or other inmates reported by the U.S. incarcerated population in prisons (4%) and in jails (3.2%).[9] Nearly one-quarter (23%) were physically assaulted.[10] Overall, 30% were physically and/or sexually assaulted in the past year while incarcerated (Figure 14.13). Physical and sexual assault by staff or other inmates is explored separately in the following sections.

**Figure 14.13: Physical and sexual assault by staff or inmates in the past year during incarceration**



## a. Physical and Sexual Assault by Facility Staff

One in five (20%) respondents who were incarcerated in jail, prison, or juvenile detention in the past year were physically and/or sexually assaulted by facility staff during that time (Figure 14.14).

**Figure 14.14: Physical and sexual assault by facility staff during the past year**



Almost one in five (18%) respondents who were incarcerated in the past year were physically assaulted by facility staff during their time in jail, prison, or juvenile detention. Respondents who were physically assaulted by facility staff in the past year were asked how many times it happened. More than half (53%) reported that they had been physically assaulted once, 12% reported that it happened twice, 16% said that it happened between three and seven times, and nearly one in five (19%) reported that it happened eight or more times (Figure 14.15).

**Figure 14.15: Number of physical assaults by facility staff**



Eleven percent (11%) were sexually assaulted by facility staff in the past year during their time in jail, prison, or juvenile detention. The rate among USTS respondents was five to six times higher than the rates of sexual assault by facility staff reported by the U.S. incarcerated population in prisons (2.4%) and in jails (1.8%).[11] Respondents who were sexually assaulted by facility staff in the past year were asked how many times it happened. Nearly half (49%) said that it happened once, 9% reported that it happened twice, 19% said it happened between three and seven times, and almost one-quarter (23%) said that it happened eight or more times (Figure 14.16).

**Figure 14.16: Number of sexual assaults by facility staff**



## b. Physical and Sexual Assault by Other Inmates

Twenty-two percent (22%) of respondents who were incarcerated in jail, prison, or juvenile detention in the past year reported that they were physically and/or sexually assaulted by other inmates during that time (Figure 14.17).

**Figure 14.17: Physical and sexual assault by other inmates during the past year**



One in six (16%) respondents who were incarcerated in the past year were physically assaulted by another inmate during their time in jail, prison, or juvenile detention. Respondents who were physically assaulted by another inmate in the past year were asked how many times it happened. Fewer than half (43%) of those respondents were physically assaulted once, 13% were physically assaulted twice, 34% said that it happened between three and seven times, and one in ten (10%) said that it happened eight or more times (Figure 14.18).

*Respondents who were incarcerated were five to six times more likely than the general incarcerated population to be sexually assaulted by facility staff, and nine to ten times more likely to be sexually assaulted by another inmate.*

**Figure 14.18: Number of physical assaults by another inmate**



**Figure 14.19: Number of sexual assaults by another inmate**



Seventeen percent (17%) of respondents who were incarcerated in the past year reported that they were sexually assaulted by another inmate during their time in jail, prison, or juvenile detention. The rate among USTS respondents was nine to ten times higher than the rates of sexual assault by other inmates reported by the U.S. incarcerated population in prisons (2%) and in jails (1.6%).[12]

Respondents who were sexually assaulted by another inmate in the past year were asked how many times it happened. Forty-three percent (43%) of those respondents were sexually assaulted once, and 16% were sexually assaulted twice. Nearly one in five (18%) said it happened between three and seven times, and nearly one-quarter (23%) said that it happened eight or more times (Figure 14.19).

# III. Hormone Therapy During Incarceration

Over half (58%) of respondents who were incarcerated in the past year had been taking hormones before their time in jail, prison, or juvenile detention. Of those, 82% had a prescription for those hormones. More than one-third (37%) of respondents who had been taking hormones before their incarceration were prohibited from taking their hormones in the past year while in jail, prison, or juvenile detention.

*In the past year, more than one-third (37%) of respondents who had been taking hormones before being incarcerated were prohibited from taking those hormones while in jail, prison, or juvenile detention.*

POLICE, PRISONS, AND IMMIGRATION DETENTION

AR.10352

# C. EXPERIENCES IN IMMIGRATION DETENTION

KEY FINDINGS

▶ Four percent (4%) of respondents who were not U.S. citizens by birth had been held in immigration detention at some point in their lives.

▶ More than half (52%) of respondents who were held in immigration detention were segregated from other people in detention, including 42% who were held in solitary confinement.

▶ Forty-five percent (45%) of respondents who were in immigration detention experienced some form of mistreatment, such as being physically or sexually assaulted or being denied access to hormones.

## I. Placement in Immigration Detention

Respondents who were not U.S. citizens by birth were asked if they had ever been held in immigration detention, such as being held in an Immigration and Customs Enforcement (ICE) detention center or a local jail just for immigration court proceedings.[13] Four percent (4%) (n=30, unweighted)[14] had been held in immigration detention. More than two-thirds (69%) of those who were held in immigration detention said that staff, guards, or others thought or knew that they were transgender or lesbian, gay, or bisexual (LGB).

## II. Isolation and Solitary Confinement

Respondents who were detained were asked whether they had been segregated from others who were also in detention. Of the thirty respondents who answered this question, more than half (52%) reported being isolated in one or more ways. Seventeen percent (17%) were held in a separate area for transgender and/or LGB people, such as a pod, unit, tank, or other housing area. Forty-two percent (42%) were held in solitary confinement.

Those who were held in solitary confinement were asked how long they were held in confinement. Of the nine respondents who had been in solitary confinement, forty percent (40%) were held for 14 days or less (up to two weeks). More than one-quarter (28%) were held for 1–3 months, while 14% were held in solitary confinement for over six months (Figure 14.20).

AR.10353

**Figure 14.20: Duration of solitary confinement (n=9, unweighted)**



% of those held in solitary confinement

- 14% Six months to a year
- 14% 3–6 months
- 40% 14 days or less
- 28% 1–3 months
- 3% 15–30 days

*\* Due to the small sample size, these findings should be interpreted with caution.*

# III. Mistreatment and Assault in Immigration Detention

Those who were placed in immigration detention were asked about any mistreatment they faced while they were there, such as being physically or sexually assaulted, threatened with sexual assault, or denied access to hormones or gender-appropriate clothing. Of the twenty-nine respondents who answered these questions, 45% reported one or more of these experiences from their time in immigration detention.

Approximately one-quarter (23%) were physically assaulted and 15% were sexually assaulted by staff or detention officers or by other detainees or inmates, while 19% were threatened with sexual assault. Nearly one-third (29%) were denied access to hormone treatment (Table 14.2).

**Table 14.2: Mistreatment and assault in immigration detention**

| Form of mistreatment or assault (n=29, unweighted) | % of those detained |
|---|---|
| Denied access to hormones | 29% |
| Physically assaulted | 23% |
| Denied gender-appropriate clothing | 22% |
| Threatened with sexual assault | 19% |
| Sexually assaulted | 15% |
| **One or more experiences listed** | **45%** |

*\* Due to the small sample size, these findings should be interpreted with caution.*

# Conclusion

Respondents reported frequent contact with the law enforcement and criminal justice systems, as well as high rates of mistreatment by police, physical and sexual abuse in jails and prisons, and denial of medical treatment while incarcerated. Experiences with law enforcement varied by demographic groups, with transgender people of color, those who have experienced homelessness, people with disabilities, and low-income transgender people reporting higher rates of discomfort with and mistreatment by police and other law enforcement officers. Results also indicated substantial levels of mistreatment and abuse in jail, prisons, and juvenile detention centers. Additionally, the experiences of respondents who were placed in immigration detention included harmful conditions and mistreatment, such as lengthy periods of solitary confinement and physical and sexual assault by detention staff and other detainees.

POLICE, PRISONS, AND IMMIGRATION DETENTION

AR.10354

**ENDNOTES**  |  CHAPTER 14: POLICE, PRISONS, AND IMMIGRATION DETENTION

1    Center for American Progress & Movement Advancement Project. (2016). *Unjust: How the Broken Criminal Justice System Fails LGBT People.* Available at: http://www.lgbtmap.org/file/lgbt-criminal-justice.pdf.

2    Center for American Progress & Movement Advancement Project. (2016). *Unjust: How the Broken Criminal Justice System Fails LGBT People.* Available at: http://www.lgbtmap.org/file/lgbt-criminal-justice.pdf; Lydon, J. (2015). *Coming out of Concrete Closets: A Report on Black & Pink's National LGBTQ Survey.* Available at: http://www.blackandpink.org/wp-content/upLoads/Coming-Out-of-Concrete-Closets.-Black-and-Pink.-October-21-2015..pdf.

3    Beck, A. J. (2014). *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011–12: Supplemental Tables: Prevalence of Sexual Victimization Among Transgender Adult Inmates.* DC: Bureau of Justice Statistics. Available at: https://www.bjs.gov/content/pub/pdf/svpjri1112_st.pdf.

4    Human Rights Watch. (2016). *"Do You See How Much I'm Suffering Here?": Abuse Against Transgender Women in US Immigration Detention.* NY, New York: Human Rights Watch. Available at: https://www.hrw.org/sites/default/files/report_pdf/us0316_web.pdf; Jeanty, J. & Tobin, H. J. (2013) *Our Moment for Reform: Immigration and Transgender People.* DC: National Center for Transgender Equality. Available at: http://www.transequality.org/sites/default/files/docs/resources/OurMoment_CIR_en.pdf.

5    Respondents who are "living in poverty" represent those who are living at or near the poverty line. See the *Income and Employment Status* chapter for more information about the poverty line calculation.

6    "Respondents with disabilities" here refers to respondents who identified as a person with a disability in Q. 2.20.

7    Respondents received the following answer choice in Q. 28.5: "I experienced unwanted sexual contact from an officer (such as fondling, sexual assault, or rape)."

8    Respondents were asked in Q. 28.10 and Q. 28.12 whether they were "physically forced, pressured, or made to feel that [they] had to have sex or sexual contact" with facility staff or with another inmate. This question was based on the language used by the Bureau of Justice's National Inmate Survey to allow for comparison with the general incarcerated population. Beck, A. J., Berzofsky, M., Caspar, R., & Krebs, C. (2013). *Sexual Victimization in Prisons and Jails Reported by Inmates 2011–12.* DC: Bureau of Justice Statistics. Available at: https://www.bjs.gov/content/pub/pdf/svpjri1112.pdf.

9    Beck et al. See note 8. The Bureau of Justice Statistics (BJS) presents data separately for people incarcerated in state and federal prisons and people incarcerated in jails, but they do not present data for those held in juvenile detention facilities. USTS data includes the experiences of those who were incarcerated in jail, prison, and juvenile detention. Therefore, data from the U.S. incarcerated population in this section is provided as a benchmark for experiences among USTS respondents and should be interpreted with caution.

10    The National Inmate Survey does not ask about physical assault that does not involve sexual violence.

11    Beck et al. See note 8.

12    Beck et al. See note 8.

13    This section discusses the specific experiences of those held in immigration detention. General information about citizenship and immigration status, including experiences with applications for asylum, is provided in the *Portrait of USTS Respondents* chapter.

14    Although a small number of respondents in the sample (n=30, unweighted) had been held in an immigration detention facility, it was important to highlight their experiences in this report. Due to the small sample size, unweighted frequencies are presented alongside weighted percentages in this section to be clear that the percentages reflect the experiences of a small number of respondents. While it is important to present these experiences in this report, the findings presented in this section should be interpreted with caution due to the small sample size.



## CHAPTER 15

# Harassment and Violence

**T**he freedom to participate in public life without fear of discrimination, harassment, and violence has been shown to have wide-ranging impacts on health, economic stability, and other key aspects of life.[1] Transgender people, however, are often vulnerable to mistreatment in public spaces, resulting in barriers to civic and economic participation.[2] Transgender people also face high rates of violence, including physical attacks, sexual assault, and intimate partner violence.[3]

Respondents were asked about their experiences in the past year with unequal treatment or service[4] in businesses, government agencies, and other public places (more broadly than just in public accommodations, which are covered in the *Places of Public Accommodation and Airport Security* chapter), as well their experiences with verbal harassment.[5] They also received questions about experiences with being physically attacked or sexually assaulted in a variety of settings. Finally, they were asked about experiences with intimate partner violence. Questions were informed by several national surveys, including the National Crime Victimization Survey and the National Intimate Partner and Sexual Violence Survey.[6] Notable differences in respondents' experiences based on demographic and other characteristics are reported throughout the chapter.

HARASSMENT AND VIOLENCE

KEY FINDINGS

▶ Nearly half (48%) of all respondents in the sample reported being denied equal treatment, verbally harassed, and/or physically attacked in the past year because of being transgender.

  • One in seven (14%) respondents reported that they were denied equal treatment or service in a public place in the past year because of being transgender.

  • Nearly half (46%) of respondents reported that they were verbally harassed in the past year because of being transgender.

  • Nearly one in ten (9%) respondents reported that they were physically attacked in the past year because of being transgender.

..................................................................................................................

▶ Nearly half (47%) of respondents have been sexually assaulted at some point in their lifetime.

..................................................................................................................

▶ One in ten (10%) respondents in the survey were sexually assaulted in the past year.

..................................................................................................................

▶ More than half (54%) of respondents experienced some form of intimate partner violence.

  • More than one-third (35%) experienced physical violence by an intimate partner, compared to 30% of the U.S. adult population. Nearly one-quarter (24%) experienced severe physical violence by a current or former partner, compared with 18% of the U.S. population.

# I. Overall Experiences of Unequal Treatment, Harassment, and Physical Attack

Respondents were asked if they had been denied equal treatment or service, verbally harassed, or physically attacked in the past year for any reason, regardless of whether it happened because they were transgender. This section of the chapter will examine respondents' overall experiences in the past year, and is followed by separate sections examining denial of equal treatment, verbal harassment, and physical attacks in greater detail.

Fifty-eight percent (58%) of respondents said that they were denied equal treatment or service, verbally harassed, and/or physically attacked in the past year for any reason. Respondents who were currently working in the underground economy, such as sex work, drug sales, or other work that is currently criminalized (82%), and people with disabilities[7] (69%) were more likely to report one or more of these experiences. Middle Eastern (70%), multiracial (70%), and American Indian (69%) respondents were also more likely to report one or more of these experiences (Figure 15.1).

AR.10357



**Figure 15.1: Unequal treatment, verbal harassment, and/or physical attack for any reason in the past year**
RACE/ETHNICITY (%)

Respondents who had one or more of these experiences were then asked what they believed the reasons were for that treatment. Eighty-four percent (84%) believed that it happened because of their gender identity or expression. This means that 48% of all respondents in the survey reported that they were denied equal treatment or service, verbally harassed, and/or physically attacked because of being transgender in the past year (Table 15.1).

**Table 15.1: Denial of equal treatment, verbal harassment, and physical attack in the past year**

| Experience | Had experience for any reason (% of respondents) | Had experience because of being transgender (% of respondents) |
|---|---|---|
| Denied equal treatment | 16% | 14% |
| Verbally harassed | 54% | 46% |
| Physically attacked | 13% | 9% |
| **One or more experiences listed** | **58**% | **48**% |

*Nearly half (48%) of respondents reported that they were denied equal treatment or service, verbally harassed, and/or physically attacked because of being transgender in the past year.*

Those who said that others could usually or always tell that they were transgender (66%) were more likely to report having one or more of these experiences because of being transgender, in contrast to those who said that others could rarely or never tell that they were transgender (39%) (Figure 15.2).

**Figure 15.2: Denial of equal treatment, verbal harassment, and physical attack in the past year**
OTHERS' PERCEPTION OF TRANSGENDER STATUS (%)



- % of those who said others could *always or usually* tell they were transgender
- % of those who said others could *sometimes* tell they were transgender
- % of those who said others could *rarely or never* tell they were transgender

Almost three-quarters (73%) of respondents who were currently working in the underground economy reported being denied equal treatment, verbally harassed, and/or physically attacked in the past year because of being transgender (Figure 15.3).

**Figure 15.3: Unequal treatment, harassment, and physical attack in the past year**
CURRENT PARTICIPATION IN THE UNDERGROUND ECONOMY (%)



% of those who are currently working in the underground economy

% of those who are not currently working in the underground economy

# II. Unequal Treatment or Service

Sixteen percent (16%) of respondents were denied equal treatment or service in the year before taking the survey, such as at a place of business, government agency, or other public place, for any reason, regardless of whether it was related to being transgender.

People of color were more likely to have experienced unequal treatment or service. Almost one-third (30%) of American Indian respondents reported being denied equal treatment or service at a public place in the past year. Middle Eastern (23%), multiracial (22%), and Black (20%) respondents also reported higher rates (Figure 15.4). Undocumented residents (39%) were more than twice as likely to have been denied equal treatment or service as those in the overall sample, in contrast to documented non-citizens (20%) and citizens (16%).

**Figure 15.4: Denial of equal treatment or service for any reason in the past year**
RACE/ETHNICITY (%)



Respondents who were denied equal treatment or service were asked what they believed the reasons were for that treatment, and they selected one or more reasons from a list, such as age, race or ethnicity, and gender identity or expression (Table 15.2).

**Table 15.2: Reported reasons for denial of equal treatment or service**

| Reason for experience[8] | % of those denied equal treatment | % of whole sample |
|---|---|---|
| Age | 14% | 2% |
| Disability | 14% | 2% |
| Income level or education | 13% | 2% |
| **Gender identity or expression** | **88%** | **14%** |
| Race or ethnicity | 24% | 4% |
| Religion or spirituality | 5% | 1% |
| Sexual orientation | 36% | 6% |
| None of the above | 2% | <1% |

Fourteen percent (14%) of all respondents said they had been denied equal treatment or service in the past year because of their gender identity or expression.[9]

Respondents also reported that they had been denied equal treatment or service because of their race or ethnicity. Among people of color, Black (15%), Asian (9%), and multiracial (8%) respondents were

most likely to report being denied equal treatment or service because of their race or ethnicity (Figure 15.5).

**Figure 15.5: Denial of equal treatment or service in the past year because of race or ethnicity**
RACE/ETHNICITY (%)



## III. Verbal Harassment

Respondents were asked if anyone had verbally harassed them in the past year for any reason, regardless of whether it was related to being transgender. More than half (54%) reported that they had experienced verbal harassment. Those who were currently working in the underground economy (77%) were more likely to experience verbal harassment. Among people of color, Middle Eastern (67%), multiracial (66%), and American Indian (65%) respondents were more likely to have been verbally harassed in the past year (Figure 15.6).

**Figure 15.6: Verbal harassment for any reason in the past year**
RACE/ETHNICITY (%)



# In Our Own Voices

"When people have tried to grope me in the street or have verbally harassed me, it's usually either because they see me as a sexual target or because they can't figure out whether I am a 'man' or a 'woman' and they think they have the right to demand an explanation."

..............................................................

"I was sexually assaulted at my university. I was also attacked and stalked. The university didn't do anything to help me. Instead, it threatened to punish me. I lived in terror the entire time I was on campus. I was denied a rape kit because I was transgender and the police were completely uninterested."

..............................................................

"I was found in a ditch after being brutally raped for three days. I was taken to an ER. There I met an officer who told me I deserved it for attempting to be a woman and should have died. He also refused to take a report."

..............................................................

"I was a victim of spousal abuse for over ten years. This grew worse when I transitioned, as [my transition] became an easy justification for verbally, emotionally and physically abusing me."

..............................................................

"My trans status was used as a tool to [make me] stay with my former partner. She would say things such as 'no one else would ever love you.'"

..............................................................

Respondents who were verbally harassed were asked what they believed the reasons were for that treatment (Table 15.3).

**Table 15.3: Reported reasons for verbal harassment**

| Reason for experience | % of those verbally harassed | % of whole sample |
|---|---|---|
| Age | 10% | 5% |
| Disability | 10% | 5% |
| Income level or education | 7% | 4% |
| **Gender identity or expression** | **84%** | **46%** |
| Race or ethnicity | 16% | 9% |
| Religion or spirituality | 5% | 3% |
| Sexual orientation | 42% | 23% |
| None of the above | 8% | 4% |

Nearly half (46%) of respondents in the overall sample reported they were verbally harassed in the past year because of being transgender.

Among people of color, Black (29%), Asian (27%), Middle Eastern (25%), and multiracial (18%) respondents were most likely to report being verbally harassed because of their race or ethnicity (Figure 15.7).

**Figure 15.7: Verbal harassment in the past year because of race or ethnicity**
RACE/ETHNICITY (%)



Respondents were asked if they had been verbally harassed in public *by strangers* because of being transgender in the past year.[10] One-third (33%) of all respondents reported having this experience in

the past year. Transgender women of color were more likely to be harassed by strangers because of their gender identity or expression, particularly multiracial (51%) and American Indian (47%) women (Figure 15.8). Those who said that others could always or usually tell that they were transgender, even without being told (55%), were substantially more likely to have been verbally harassed by strangers, in contrast to those who said that people could rarely or never tell that they were transgender (22%).

**Figure 15.8: Verbal harassment in public by strangers in the past year among transgender women**
RACE/ETHNICITY (%)



# IV. Physical Attack

Thirteen percent (13%) of respondents said that someone had physically attacked them in the past year, such as by grabbing them, throwing something at them, punching them, or using a weapon against them for any reason.

Those who were currently working in the underground economy (41%) were more than three times as likely to report being physically attacked in the past year. Undocumented residents (24%) were almost twice as likely to report being physically attacked. Experiences of physical attack also varied by race and ethnicity, with American Indian (25%), Middle Eastern (25%), and multiracial

(19%) respondents being more likely to report a physically attack in the past year (Figure 15.9).

**Figure 15.9: Physical attack for any reason in the past year**
RACE/ETHNICITY (%)



Those who had been physically attacked in the past year were asked what they believed the reasons were for that attack (Table 15.4).

**Table 15.4: Reported reasons for physical attack**

| Reason for experience | % of those physically attacked | % of whole sample |
|---|---|---|
| Age | 7% | 1% |
| Disability | 8% | 1% |
| Income level or education | 5% | 1% |
| **Gender identity or expression** | **66%** | **9%** |
| Race or ethnicity | 11% | 1% |
| Religion or spirituality | 3% | <1% |
| Sexual orientation | 32% | 4% |
| None of the above | 25% | 3% |

Nearly one in ten (9%) respondents in the overall sample reported being physically attacked in the past year because of being transgender. American Indian (19%), Middle Eastern (14%), multiracial respondents (12%), and Asian respondents (11%) were more likely to report being attacked because of being transgender (Figure 15.10), as were undocumented residents (23%).

**Figure 15.10: Physical attack in the past year because of being transgender**
RACE/ETHNICITY (%)



Respondents also reported that they had been physically attacked because of their race or ethnicity. Among people of color, Middle Eastern (6%), American Indian (4%), Black (4%), and Asian (4%) respondents were most likely to report being physically attacked because of their race or ethnicity (Figure 15.11).

**Figure 15.11: Physical attack in the past year because of race or ethnicity**
RACE/ETHNICITY (%)

Five percent (5%) of respondents in the overall sample were physically attacked in public *by strangers* because of being transgender.[11] Undocumented residents (20%) and respondents currently working in the underground economy (20%) were four times more likely to report this experience than the overall sample. Transgender women of color were also more likely to report this experience, particularly American Indian (19%), Middle Eastern (12%), and multiracial (11%) women

**Figure 15.12: Physical attack in public by strangers in the past year among transgender women**
RACE/ETHNICITY (%)



Respondents who were physically attacked for any reason in the past year were asked how many times they had been attacked. Forty-five percent (45%) were attacked once that year, and 25% were attacked twice. Thirteen percent (13%) were attacked three times, and 16% were attacked four or more times that year (Figure 15.13).

**Figure 15.13: Number of physical attacks in the past year**



These respondents were also asked to specify how they were attacked. Nearly three-quarters (73%) of those who were physically attacked in the past year reported that someone had grabbed, punched, or choked them. Twenty-nine percent (29%) reported that someone threw an object at them, like a rock or a bottle. Nearly one-third (29%)

of those who reported being physically attacked were sexually assaulted.[12] (Table 15.5).

**Table 15.5: Means of physical attack in the past year**

| Type of physical attack | % of those physically attacked |
|---|---|
| By being grabbed, punched, or choked | 73% |
| By having something thrown at them (such as a rock or bottle) | 29% |
| By being sexually assaulted | 29% |
| With another weapon (like a baseball bat, frying pan, scissors, or stick) | 7% |
| With a knife | 5% |
| With a gun | 3% |
| Not listed above | 9% |

Three percent (3%) of respondents who were physically attacked reported being attacked with a gun in the past year. Transgender women of color, particularly Black (11%) and Latina (11%) women, were nearly four times as likely to report that they were attacked with a gun (Figure 15.14). Respondents currently working in the underground economy (10%) were more than three times as likely to have been attacked with a gun, and those whose only source of income was from underground economy work (16%) were more than five times as likely to have been attacked with a gun.

**Figure 15.14: Attacked with a gun among transgender women who were physically attacked in the past year**
RACE/ETHNICITY (%)



*Sample size too low to report

2015 U.S. TRANSGENDER SURVEY

*Nearly half (47%) of respondents have been sexually assaulted at some point in their lifetime.*

# V. Sexual Assault

In addition to questions about being physically attacked in the past year, respondents were asked questions about their experiences with sexual assault during their lifetime and in the past year,[13] informed by questions from the National Intimate Partner and Sexual Violence Survey (NISVS).[14]

Nearly half (47%) of respondents have been sexually assaulted at some point in their lifetime. This included any experiences with "unwanted sexual contact, such as oral, genital, or anal contact, penetration, forced fondling, or rape."[15,16]

Respondents who have participated in sex work (72%), those who have experienced homelessness (65%), and people with disabilities (61%) were more likely to have been sexually assaulted in their lifetime. Among people of color, American Indian (65%), multiracial (59%), Middle Eastern (58%), and Black (53%) respondents were most likely to have been sexually assaulted in their lifetime (Figure 15.15). Experiences also varied across gender, with transgender men (51%) and non-binary people with female on their original birth certificate (58%) being more likely to have been sexually assaulted, in contrast to transgender women (37%) and non-binary people with male on their original birth certificate (41%) (Figure 15.16). Among transgender men and non-binary people with female on their original birth certificates, rates of sexual assault were higher among people of color, particularly American Indian, Middle Eastern, and multiracial people (Figure 15.17 & Figure 15.18).



**Figure 15.15: Lifetime sexual assault RACE/ETHNICITY (%)**



**Figure 15.16: Lifetime sexual assault GENDER IDENTITY (%)**



**Figure 15.17: Lifetime sexual assault among transgender men RACE/ETHNICITY (%)**

AR.10364

**Figure 15.18: Lifetime sexual assault among non-binary people with female on their original birth certificate RACE/ETHNICITY (%)**



*One in ten (10%) respondents in the survey were sexually assaulted in the past year.*

One in ten (10%) respondents in the survey were sexually assaulted in the past year.[17,18] Respondents who were currently working in the underground economy (36%) were more than three times as likely to have been sexually assaulted in the past year.

Respondents who reported this experience were then asked who had committed the sexual assault. Approximately one-third (34%) of those who were sexually assaulted said that a current or former partner had sexually assaulted them. One-quarter (25%) of sexual assault survivors reported that a relative was the perpetrator. Nearly one-third (30%) of sexual assault survivors reported that a stranger committed the assault (Table 15.6).

# VI. Intimate Partner Violence

## a. Overall Intimate Partner Violence

Respondents who reported ever having had a romantic or sexual partner received questions about their experiences with harm involving a current or former intimate partner, including physical, emotional, or financial harm, many of which were based on questions in the National Intimate Partner and Sexual Violence Survey (NISVS).[19] Such acts of harm as described in the survey are defined as "intimate partner violence."[20]

**Table 15.6: Person who committed sexual assault**

| Person who committed sexual assault | % of respondents who have been sexually assaulted |
|---|---|
| A friend or acquaintance | 47% |
| A partner or ex-partner | 34% |
| A stranger | 30% |
| A relative | 25% |
| A coworker | 5% |
| A health care provider or doctor | 4% |
| A teacher or school staff member | 3% |
| A law enforcement officer | 2% |
| A boss or supervisor | 2% |
| A person not listed above | 12% |

Overall, more than half (54%) of all respondents experienced some form of intimate partner violence in their lifetime. Over three-quarters (77%) of respondents who have done sex work and nearly three-quarters (72%) of those who have been homeless experienced intimate partner violence. Undocumented residents (68%), people with disabilities (61%), and people of color, including American Indian (73%), multiracial (62%), and Middle Eastern (62%) respondents, were also more likely to report this experience (Figure 15.19).

AR.10365

**Figure 15.19: Intimate partner violence RACE/ETHNICITY (%)**



**Table 15.7: Intimate partner violence involving coercive control, including intimidation, emotional and financial harm, and physical harm to others**

| Type of intimate partner violence involving coercive control | % of respondents |
|---|---|
| Told them that they were not a "real" woman or man | 25% |
| Tried to keep them from seeing or talking to family or friends | 23% |
| Stalked | 16% |
| Kept them from leaving the house when they wanted to go | 15% |
| Threatened to call the police on them | 11% |
| Threatened to "out" them | 11% |
| Kept them from having money for their own use | 9% |
| Hurt someone they love | 9% |
| Threatened to hurt a pet or threatened to take a pet away | 6% |
| Would not let them have their hormones | 3% |
| Would not let them have other medications | 3% |
| Threatened to use their immigration status against them | 1% |
| **One or more experiences listed** | **44%** |
| **One or more experiences related to being transgender listed** | **27%** |

## b. Intimidation, Emotional, and Financial Harm

Respondents received two sets of questions covering a range of experiences with intimate partner violence. The first set of questions involved experiences with coercive control, including intimidation, emotional and financial harm, and physical harm to others who were important to respondents. Sixteen percent (16%) of respondents reported that they had been stalked, compared to 6% in the U.S. population.[21] One in four (25%) respondents were told that they were not a "real" woman or man by a partner, 23% were kept from seeing or talking to family or friends, and 15% were kept from leaving the house when they wanted to go (Table 15.7).

**More than half (54%) of all respondents experienced some form of intimate partner violence in their lifetime.**

Overall, nearly half (44%) of respondents in the sample experienced some form of intimate partner violence involving coercive control, including intimidation, emotional, and financial harm. Experience with this type of intimate partner violence differed by race, with American Indian (66%), Middle Eastern (56%), and multiracial (51%) respondents reporting higher rates of these experiences (Figure 15.20). Respondents who have done sex work (66%), have experienced homelessness (62%), or were undocumented (60%) were also more likely to have experienced intimate partner violence of this form.

HARASSMENT AND VIOLENCE

AR.10366

**Figure 15.20: Intimate partner violence involving intimidation, emotional, and financial harm RACE/ETHNICITY (%)**



## c. Intimate Partner Violence Involving Physical Harm

Respondents received additional questions about experiences of intimate partner violence involving physical harm inflicted on them (Table 15.8).

**Table 15.8: Intimate partner violence involving physical harm**

| Type of intimate partner violence | % of USTS respondents | % in U.S. population (NISVS) |
|---|---|---|
| Pushed or shoved | 30% | 23% |
| Slapped | 24% | 19% |
| Made threats to physically harm them | 20% | -- |
| Forced them to engage in sexual activity | 19% | -- |
| Hit them with a fist or something hard | 16% | 12% |
| Slammed them against something | 14% | 9% |
| Hurt them by pulling their hair | 11% | 6% |
| Kicked | 10% | 6% |
| Tried to hurt them by choking or suffocating them | 7% | 9% |
| Beat them | 6% | 6% |
| Used a knife or gun against them | 3% | 3% |
| Burned them on purpose | 2% | 1% |
| **Any physical violence** | **35%** | **30%** |
| **Any severe physical violence** | **24%** | **18%** |
| **One or more experiences listed** | **42%** | **---** |

Furthermore, more than a quarter (27%) of survey respondents reported acts of coercive control related to their transgender status, including being told that they were not a "real" woman or man, threatened with being "outed" by revealing their transgender status, or prevented from taking their hormones. Transgender women of color, including American Indian (57%) and multiracial (39%) women, were more likely to report acts of harm related to their transgender status (Figure 15.21).

Overall, 42% of all survey respondents reported experiencing some form of intimate partner violence involving physical harm, including the threat of physical violence, over their lifetime. Respondents who have done sex work (67%) or who have experienced homelessness (61%) were more likely to report intimate partner violence involving physical harm, as were undocumented (59%), American Indian (61%), multiracial (54%), and Middle Eastern (49%) respondents (Figure 15.22).

**Figure 15.21: Intimate partner violence related to transgender status among transgender women RACE/ETHNICITY (%)**



**Figure 15.22: Intimate partner violence involving physical harm**
RACE/ETHNICITY (%)



# Conclusion

The findings indicated that respondents faced high levels of unequal treatment, harassment, and physical attacks in the past year, with higher rates of these experiences reported among people of color, respondents currently working in the underground economy, and those who reported that others can tell that they are transgender. Respondents also experienced high rates of sexual assault in their lifetime and in the past year, and were more likely than the U.S. population to experience physical intimate partner violence. People of color and undocumented residents were more likely to report experiences of sexual assault and intimate partner violence, as were respondents who have worked in the underground economy or who have experienced homelessness.

More than one-third (35%) experienced some form of physical violence by an intimate partner, as defined by the National Intimate Partner and Sexual Violence Survey,[22] compared to 30% of the U.S. adult population.[23] Moreover, nearly one-quarter (24%) of respondents reported having experienced severe physical violence from a partner, compared to 18% in the U.S. population.[24]

---

**ENDNOTES** | CHAPTER 15: HARASSMENT AND VIOLENCE

1   Langton, L. & Truman, J. (2014). *Socio-Emotional Impact of Violent Crime.* DC: Bureau of Justice Statistics. Available at: http://www.bjs.gov/content/pub/pdf/sivc.pdf; Lick, D. J., Durso, L. E., & Johnson, K. L. (2013). Minority stress and physical health among sexual minorities. *Perspectives on Psychological Science, (8)*521. Available at: http://pps.sagepub.com/content/8/5/521.full.pdf+html.

2   See e.g., Grant, J. M., Mottet, L. A., Tanis, J., Harrison, J., Herman, J. L., & Keisling, M. (2011). *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey.* (pp. 124–135). DC: National Center for Transgender Equality & National Gay and Lesbian Task Force.

3   See e.g., Grant et al., 100, 127; Beemyn, G. & Rankin, S. (2011). *The Lives of Transgender People.* New York, NY: Columbia University Press.

4   This chapter discusses general experiences with unequal treatment in public places in the past year, which includes both public accommodations as well as other public spaces. For findings related to unequal treatment in specific public places, such as stores, restaurants, and government agencies, see the *Places of Public Accommodation and Airport Security* chapter.

5   This chapter discusses overall experiences with verbal harassment in the past year. Findings related to verbal harassment in specific settings are discussed in other chapters, such as the *Experiences at School*, *Employment and the Workplace*, and *Health* chapters.

6    Truman, J. L. & Morgan, R. E. (2016). *Criminal Victimization, 2015.* DC: Bureau of Justice Statistics; Breiding, M. J., Smith, S. G., Basile, K. C., Walters, M. L., Chen, J., & Merrick, M. T. (2014). Prevalence and characteristics of sexual violence, stalking, and intimate partner violence victimization—National Intimate Partner and Sexual Violence Survey, United States, 2011. *MMWR, 63*(8). Available at: http://www.cdc.gov/mmwr/pdf/ss/ss6308.pdf.

7    "People with disabilities" here refers to respondents who identified as a person with a disability in Q. 2.20.

8    Respondents were asked to select all the reasons that applied to their experience.

9    The survey included both "transgender status/gender identity" and "gender expression/appearance" as answer choices so that respondents could select what they felt best represented their experience. Because there was a substantial overlap of respondents who selected both reasons, and because these terms are commonly used interchangeably or with very similar meanings, responses of those who selected one or both of these reasons are collapsed for reporting as "gender identity or expression."

10   Only respondents who reported that they were verbally harassed because of their transgender status, gender identity, gender expression, or appearance received this question (Q. 17.6), which asked: "In the past year, did strangers verbally harass you in public because of your trans status, gender identity, or gender expression?" Results are reported out of the full sample.

11   Only respondents who reported that they were physically attacked because of their transgender status, gender identity, gender expression, or appearance received this question (Q. 17.10), which asked: "In the past year, did strangers physically attack you in public because of your trans status, gender identity, or gender expression?" Results are reported out of the full sample.

12   In Q. 17.8, respondents were asked if they were physically attacked with "unwanted sexual contact (such as rape, attempted rape, being forced to penetrate)."

13   Q.18.1 asked if respondents had ever "experienced unwanted sexual contact, such as oral, genital, or anal contact, penetration, forced fondling, or rape."

14   Breiding et al. See note 6.

15   Respondents were asked if they had ever "experienced unwanted sexual contact, such as oral, genital, or anal contact, penetration, forced fondling, or rape" in Q. 18.1. This definition of sexual assault encompassed several categories of sexual violence as outlined in the National Intimate Partner and Sexual Violence Survey (NISVS). See note 16.

16   Due to differences between Q. 18.1 and the NISVS questions about sexual violence, a direct comparison to the U.S. population was not feasible for this report. However, as context for USTS respondents' experience with sexual assault, NISVS findings indicate that an estimated 11% of adults in the U.S. population have been raped in their lifetime, 19% have experienced unwanted sexual contact, 10% have experienced sexual coercion, and 4% were forced to penetrate someone. Breiding et al. See note 6. The figures for the prevalence of sexual violence during one's lifetime in the U.S. population were calculated by the research team to present a combined percentage for the experiences of men and women using 2011 data from the NISVS, as reported by the Centers for Disease Control. Since NISVS respondents could report experiences with multiple forms of sexual violence, an NISVS respondent's experiences could be reflected in several categories of sexual violence. The research team was unable to avoid double counting respondents who reported more than one experience in the NISVS, and therefore, were unable to combine the percentages of NISVS respondents who experienced *any* form of sexual violence to match the broader USTS category of "unwanted sexual contact," and make a direct comparison. Therefore, findings for the U.S. population in regard to rape, unwanted sexual contact, sexual coercion, and being forced to penetrate are presented separately, and comparisons between the NISVS and USTS findings should be interpreted with caution.

17   The 10% rate of sexual assault in the past year reported in this section was based on Q. 18.3. This differs from the rate of sexual assault in the past year reported in the "Physical Attack" section of this chapter (4%), which was based on Q. 17.8. This difference is likely due to the number of respondents in the sample who received each question based on skip-logic patterns. While all respondents in the sample received Q. 18.3, a limited number of respondents received Q. 17.8 based on their answer to Q. 17.3. Respondents who indicated that they had been physically attacked in Q. 17.3, received a follow-up question asking how they were physically attacked (Q. 17.8), which included an answer choice of "unwanted sexual contact." Those respondents who did not identify their experience of unwanted sexual contact as a form of physical attack would not have received the follow-up question regarding the method of the attack, if they had not reported another form of physical attack. Additionally, the difference in reporting may partly result from the more inclusive examples of unwanted sexual contact provided in Q. 18.3 ("such as oral, genital, or anal contact, penetration, forced fondling, or rape"), in contrast to the definition of unwanted sexual contact in Q. 17.8 ("such as rape, attempted rape, being forced to penetrate").

18   Due to differences between Q. 18.3 (sexual assault in the past year) and the NISVS questions about sexual violence, a direct comparison to the U.S. population was not feasible for this report. However, as context for USTS respondents' experience with sexual assault, NISVS findings indicate that an estimated 1.9% of adults in the U.S. population experienced unwanted sexual contact in the past year and an estimated 1.7% experienced sexual coercion in the past year. These figures were calculated by the research team to present a combined percentage for the experiences of men and women using 2011 data from the NISVS. Additionally, an estimated 1.6% of women were raped in the past year. Due to the small number of men who reported being raped in the past year, a reliable estimate was not available for men. An estimated 1.7% of men were forced to penetrate a perpetrator in the past year, while the number of women who were forced to penetrate a perpetrator was too low to produce a reliable estimate. Breiding et al. See note 6. Since NISVS respondents could report experiences with multiple forms of sexual violence, an NISVS respondent's experiences could be reflected in several categories of sexual violence. The research team was unable to avoid double counting respondents who reported more than one experience in the NISVS, and therefore, were unable to combine the percentages of NISVS respondents who experienced *any* form of sexual violence to match the broader USTS category of "unwanted sexual contact," and make a direct comparison. Therefore, findings for the U.S. population in regard to rape, unwanted sexual contact, sexual coercion, and being forced to penetrate are presented separately, and comparisons between the NISVS and USTS findings should be interpreted with caution.

19   Breiding et al. See note 6.

20   See Q. 19.2 and Q. 19.3 for a list of acts described as forms of intimate partner violence.

21   Breiding et al. See note 6.

22   The NISVS measure for "any physical violence" includes all of the actions listed in Table 15.8, except for forced sexual activity and threats of physical violence.

23   The figures for the prevalence of intimate partner violence involving physical violence and/or severe physical violence in the U.S. population was calculated by the research team to present a combined percentage for the experiences of men and women using 2011 data from the NISVS, as reported by the Centers for Disease Control and Prevention. See Breiding et al. See note 6.

24   According to the NISVS, "severe physical violence" includes being hurt by having one's hair pulled, being hit with a fist or something hard, kicked, slammed against something, choked or suffocated, beaten, burned, or attacked with a knife or gun.

HARASSMENT AND VIOLENCE

AR.10370



# CHAPTER 16

# Places of Public Accommodation and Airport Security

**P**ublic accommodations are places of business or other locations generally open to the public, which provide essential services that allow people to meet basic needs and participate in civic life, including government agencies, retail stores, and restaurants.[1] For transgender people, places of public accommodation are potentially unwelcoming or unsafe. Prior research has found that transgender people may face unequal treatment or harassment in public settings such as retail stores.[2] The survey explored respondents' experiences in specific types of public accommodations in the past year and found that respondents were denied equal treatment, verbally harassed, and physically attacked in several of these locations.

Respondents were also asked questions about their experiences in airports related to their gender identity or expression in the past year, given numerous reports of transgender people being subjected to excessive scrutiny and searches by Transportation Security Administration (TSA) officers when going through airport security screening.[3] Widely used body scanners often flag transgender people's bodies and gender-related clothing or items for additional screening, which can lead to unnecessary searches and make them vulnerable to harassment and discriminatory treatment by TSA officers and bystanders.[4]

Notable differences in respondents' experiences based on demographic and other characteristics are reported throughout the chapter.

AR.10371

**KEY FINDINGS**

▶ Of respondents who said that staff or employees at a place of public accommodation they visited thought or knew that they were transgender, nearly one-third (31%) experienced at least one type of negative experience, including being denied equal treatment or service (14%), verbally harassed (24%), and/or physically attacked (2%) in the past year.

- Among those who visited a retail store, restaurant, hotel, or theater and said that staff or employees thought or knew that they were transgender, 31% were denied equal treatment, verbally harassed, and/or physically attacked there.

- Approximately one-third (34%) of respondents had one or more of these negative experiences in the past year when using public transportation where employees thought or knew they were transgender.

- Nearly one-quarter (22%) of respondents had one or more of these experiences in the past year when visiting a domestic violence shelter or program or a rape crisis center where employees thought or knew they were transgender.

..................................................................................................................................

▶ One in five (20%) respondents did not use one or more places of public accommodation in the past year because they thought they would be mistreated as a transgender person.

..................................................................................................................................

▶ Additionally, 43% of respondents who went through airport security in the past year experienced a problem related to being transgender, such as being patted down or searched because of a gender-related item, having the name or gender on their ID questioned, or being detained.

# I. Overall Experiences in Places of Public Accommodation

Respondents received questions about their experiences in places of public accommodation, such as hotels, restaurants, or government agencies in the past year. They were first asked whether they had visited or used services in specific kinds of public accommodations, and they then received follow-up questions based on their responses. For each type of location that they had visited in the past year, respondents were asked whether they thought that staff or employees at the location knew or thought they were transgender. They were also asked whether

they had been denied equal treatment, verbally harassed, or physically attacked at the selected type of location because they were transgender.

Nearly all respondents in the sample (96%) had visited or used services in at least one of the places of public accommodation outlined in this chapter in the past year. Of those who had visited or used services, 50% reported that they thought the staff or employees knew or thought they were transgender at one or more of the locations. Nearly one-third (31%) of those who said that staff or employees knew or thought they were transgender experienced negative treatment in at least one of the locations, including being denied equal treatment or service, verbally harassed, or physically attacked (Table 16.1).

**Table 16.1: Overall experiences in any place of public accommodation in the past year because of being transgender**

| Experience at a place of public accommodation | % of those who believe staff knew or thought they were transgender |
| --- | --- |
| Denied equal treatment or service | 14% |
| Verbally harassed | 24% |
| Physically attacked | 2% |
| **One or more experiences listed** | **31%** |

Respondents' experiences in each type of public accommodation visited or used in the past year are described in detail throughout the chapter (Table 16.2). Those who had not visited a specific type of public accommodation were asked whether they did not visit or use services at that place because they were afraid of being mistreated as a transgender person. Overall, one in five (20%) reported that they did not visit or use services at one or more of these locations because they thought they would be mistreated as a transgender person.

**Table 16.2: Negative experiences in places of public accommodation in the past year because of being transgender**

| Location visited | % of those who believe staff knew or thought they were transgender |
| --- | --- |
| Public transportation | 34% |
| Retail store, restaurant, hotel, or theater | 31% |
| Drug or alcohol treatment program | 22% |
| Domestic violence shelter or program or rape crisis center | 22% |
| Gym or health club | 18% |
| Public assistance or government benefit office | 17% |
| DMV (Department of Motor Vehicles) | 14% |
| Nursing home or extended care facility | 14% |
| Court or courthouse | 13% |
| Social Security office | 11% |
| Legal services from an attorney, clinic, or legal professional | 6% |

# II. Public Transportation

Two-thirds (66%) of the sample used public transportation services in the past year, such as a bus, train, subway, or taxi. Two percent (2%) of respondents did not use public transportation in the past year for fear of mistreatment as a transgender person. Twenty-four percent (24%) of those who used public transportation believed that the employees knew or thought they were transgender. Of those, 34% reported being denied equal treatment or service, verbally harassed, or physically attacked because of being transgender while using public transportation (Table 16.3).

**Table 16.3: Experiences on public transportation in the past year because of being transgender**

| Experience in location | % of those who believe staff knew or thought they were transgender |
| --- | --- |
| Denied equal treatment or service | 4% |
| Verbally harassed | 32% |
| Physically attacked | 3% |
| **One or more experiences listed** | **34%** |

Non-binary people (39%) were more likely to have experienced negative treatment than transgender men and women (32%) when using public transportation (Figure 16.1). These experiences also varied by race and ethnicity, with American Indian (48%), multiracial (45%), and Asian (39%) respondents being more likely to have a negative experience (Figure 16.2). Those who were currently working in the underground economy (such as sex work, drug sales, or other work that is currently criminalized) (49%) and those who were living in poverty (39%) were also more likely to report such an experience.

**Figure 16.1: Negative experiences on public transportation in the past year**
GENDER IDENTITY (%)

**Figure 16.2: Negative experience on public transportation in the past year**
RACE/ETHNICITY (%)

**Sample size too low to report*

***Nearly one-third (31%) of respondents who visited a store, restaurant, hotel, or theater where the staff knew or thought they were transgender were mistreated because of their gender identity or expression.***

# III. Retail Store, Restaurant, Hotel, or Theater

Ninety-one percent (91%) of respondents visited or used services in a retail store, restaurant, hotel, or theater in the past year. One percent (1%) of respondents reported not visiting a retail store, restaurant, hotel, or theater in the past year because they were afraid of mistreatment as a transgender person. Approximately one-third (34%) of those who visited or used services at these locations believed that the staff or employees knew or thought they were transgender. Of those, 31% reported being denied equal treatment or service, verbally harassed, or physically attacked because of being transgender (Table 16.4).

**Table 16.4: Experiences in a retail store, restaurant, hotel, or theater in the past year because of being transgender**

| Experience in location | % of those who believe staff knew or thought they were transgender |
|---|---|
| Denied equal treatment or service | 11% |
| Verbally harassed | 24% |
| Physically attacked | 1% |
| **One or more experiences listed** | **31%** |

American Indian (49%), multiracial (41%), Black (36%), and Asian (36%) respondents were more likely to have a negative experience (Figure 16.3). Those who were currently working in the underground economy (52%), those who were living in poverty level (37%), and people with disabilities[5] (39%) were also more likely to have such experiences in these locations.

**Figure 16.3: Experiences in a retail store, restaurant, hotel, or theater in the past year because of being transgender**
RACE/ETHNICITY (%)



# IV. Drug or Alcohol Treatment Program

Two percent (2%) of the sample visited or used services at a drug or alcohol treatment program in the past year. One percent (1%) of respondents did not go to a treatment center in the past year because of fear of mistreatment as a transgender person. Of those who visited or used services at a treatment program, 58% believed that the staff or employees knew or thought they were transgender. Of those, 22% reported being denied equal treatment or service, verbally harassed, or physically attacked because of being transgender (Table 16.5).

**Table 16.5: Experiences in a drug or alcohol treatment program in the past year because of being transgender**

| Experience in location | % of those who believe staff knew or thought they were transgender |
|---|---|
| Denied equal treatment or service | 11% |
| Verbally harassed | 13% |
| Physically attacked | 1% |
| **One or more experiences listed** | **22%** |

# In Our Own Voices

"When I attempted to change my gender marker on my state ID, I was denied three times. All three times I was harassed. In one incident, the manager of the DMV location made fun of me and started laughing and talked so loud that other patrons at the DMV also began to laugh."

..................................................................

"A year ago I had my Social Security updated to reflect my new name and gender. I was treated with respect at all times. The woman working in the Social Security office wrote 'congratulations' and drew a heart on my copy of the documentation."

..................................................................

"A TSA officer referred to me as 'it' when I couldn't walk through their security screen following top surgery. I had to argue with TSA that a male employee needed to do the pat down and I was informed that a woman would be more appropriate. I stood my ground after repeatedly being told that I was not a man."

..................................................................

"I was subjected to a longer TSA screening while they searched my bag, pulled out my intimate items, and called over friends to look and laugh. I had to remove my wig to prove I was the same person. I was humiliated."

..................................................................

AR.10375

Those who were currently working in the underground economy (34%) and those who were living in poverty (27%) were more likely to report having a negative experience in a drug or alcohol treatment program.

# V. Domestic Violence Shelter, Domestic Violence Program, or Rape Crisis Center

One percent (1%) of the sample visited or used services at a domestic violence (DV) shelter, DV program, or rape crisis center in the past year. Two percent (2%) of respondents did not go to a DV shelter or program or rape crisis center in the past year because they were afraid they would be mistreated as a transgender person. Of those who went to one of these locations, more than half (59%) believed that the staff or employees knew or thought they were transgender. Of those, nearly one-quarter (22%) reported being denied equal treatment or service, verbally harassed, or physically attacked because of being transgender (Table 16.6).

**Table 16.6: Experiences in a DV shelter, DV program, or rape crisis center in the past year because of being transgender**

| Experience in location | % of those who believe staff knew or thought they were transgender |
|---|---|
| Denied equal treatment or service | 16% |
| Verbally harassed | 11% |
| Physically attacked | 2% |
| **One or more experiences listed** | **22%** |

Transgender women (28%) were more likely to report having a negative experience at a DV shelter, DV program, or rape crisis center (Figure 16.4).

*Nearly one in four (22%) respondents who went to a domestic violence shelter or program or rape crisis center where staff knew or thought they were transgender experienced mistreatment of some kind.*



Figure 16.4: Negative experiences in domestic violence shelter in the past year
GENDER IDENTITY (%)

Overall: 22%
Crossdressers*: 
Non-binary: 19%
Trans women: 28%
Trans men: 21%
Trans women and men: 24%

*Sample size too low to report

# VI. Gym or Health Club

More than one-third (35%) of the sample had visited or used services at a gym or health club in the past year. Fourteen percent (14%) of respondents did not go to a gym or health club in the past year because they were afraid of mistreatment as a transgender person. Of those respondents who had visited a gym or health club, 28% believed that the staff or employees knew or thought they were transgender. Of those, 18% reported being denied equal treatment or service, verbally harassed, or physically attacked because of being transgender (Table 16.7).

**Table 16.7: Experiences in a gym or health club in the past year because of being transgender**

| Experience in location | % of those who believe staff knew or thought they were transgender |
|---|---|
| Denied equal treatment or service | 7% |
| Verbally harassed | 13% |
| Physically attacked | 1% |
| **One or more experiences listed** | **18%** |

Respondents who were currently working in the underground economy were nearly twice as likely to report having a negative experience in a gym or health club (35%).

# VII. Public Assistance or Government Benefits Office

Twelve percent (12%) of the sample had visited or used services at a public assistance or government benefits office in the past year, such as for receiving Supplemental Nutrition Assistance Program (SNAP or food stamps) or Women, Infants, and Children (WIC) benefits. Two percent (2%) of respondents did not go to such an agency in the past year because they feared mistreatment as a transgender person. Over one-third (36%) of those who visited or used services at these locations believed that the staff or employees knew or thought they were transgender. Of those, 17% reported being denied equal treatment or service or being verbally harassed because of being transgender (Table 16.8).

**Table 16.8: Experiences in a public assistance or government benefits office in the past year because or being transgender**

| Experience in location | % of those who believe staff knew or thought they were transgender |
|---|---|
| Denied equal treatment or service | 11% |
| Verbally harassed | 9% |
| **One or more experiences listed** | **17%** |

American Indian (25%), multiracial (22%), Black (20%), and Latino/a (20%) respondents reported higher rates of mistreatment, in contrast to 15% of white respondents (Figure 16.5). People with disabilities (21%) and those who were currently working in the underground economy (24%) were also more likely to report having a negative experience in a public assistance or government benefits office.

**Figure 16.5: Negative experiences in a public assistance or government benefits office in the past year**
RACE/ETHNICITY (%)

*Sample size too low to report*

# VIII. DMV

Nearly half (44%) of the sample visited or used services at a DMV (Department of Motor Vehicles) in the past year. Three percent (3%) of respondents did not go to a DMV in the past year because of fear of mistreatment as a transgender person. More than one-third (36%) of those who visited this location believed that the staff or employees knew or thought they were transgender. Of those, 14% reported being denied equal treatment or service or being verbally harassed because of being transgender (Table 16.9).

**Table 16.9: Experiences in a DMV in the past year because of being transgender**

| Experience in location | % of those who believe staff knew or thought they were transgender |
|---|---|
| Denied equal treatment or service | 9% |
| Verbally harassed | 7% |
| **One or more experiences listed** | **14%** |

# IX. Nursing Home or Extended Care Facility

Four percent (4%) of the sample visited or used services at a nursing home or extended care facility in the past year. One percent (1%) of respondents did not go to a nursing home or extended care facility in the past year because they were afraid of mistreatment as a transgender person. Twenty-two percent (22%) of those who visited or used services in this location believed that the staff or employees knew or thought they were transgender. Of those, 14% reported being denied equal treatment or service, verbally harassed, or physically attacked because of being transgender (Table 16.10).

*Nearly one in five (18%) respondents who went to a gym or health club where staff knew or thought they were transgender experienced mistreatment of some kind.*

**Table 16.10: Experiences in a nursing home or extended care facility in the past year because of being transgender**

| Experience in location | % of those who believe staff knew or thought they were transgender |
|---|---|
| Denied equal treatment or service | 6% |
| Verbally harassed | 11% |
| Physically attacked | 1% |
| **One or more experiences listed** | **14%** |

# X. Court or Courthouse

Approximately one in four (22%) respondents in the sample visited or used services at a court or courthouse in the past year. Two percent (2%) of respondents did not go to a court or courthouse in the past year because they were afraid of mistreatment as a transgender person. One-half (50%) of those who visited or used services there believed that court staff or employees knew or thought they were transgender. Of those, 13% reported being denied equal treatment or service, verbally harassed, or physically attacked because of being transgender (Table 16.11).

PLACES OF PUBLIC ACCOMMODATION AND AIRPORT SECURITY

**Table 16.11: Experiences in court or a courthouse in the past year because of being transgender**

| Experience in location | % of those who believe staff knew or thought they were transgender |
|---|---|
| Denied equal treatment or service | 8% |
| Verbally harassed | 8% |
| Physically attacked | <1% |
| **One or more experiences listed** | **13%** |

Those who were currently working in the underground economy (37%) were substantially more likely to report having a negative experience in court or a courthouse, and the rate was also higher among people with disabilities (19%).

# XI. Social Security Office

Nearly one in four respondents (19%) visited or used services at a Social Security office in the past year, such as for updating the name or gender on their records, receiving or changing a Social Security card, or accessing public benefits. Four percent (4%) of respondents did not go to a Social Security office in the past year for fear of mistreatment as a transgender person. Fifty-seven percent (57%) of those who went to a Social Security office believed that the staff or employees knew or thought they were transgender. Of those, 11% reported being denied equal treatment or service, verbally harassed, or physically attacked because of being transgender (Table 16.12).

**Table 16.12: Experiences in a Social Security office in the past year because of being transgender**

| Experience in location | % of those who believe staff knew or thought they were transgender |
|---|---|
| Denied equal treatment or service | 8% |
| Verbally harassed | 5% |
| Physically attacked | <1% |
| **One or more experiences listed** | **11%** |

Asian (15%), Black (15%), and Latino/a (14%) respondents were more likely to report having a negative experience in a Social Security office (Figure 16.6). Respondents who were currently working in the underground economy (36%) and people with disabilities (16%) were also more likely to have such an experience.

**Figure 16.6: Negative experience in a Social Security office in the past year**
**RACE/ETHNICITY (%)**



*Sample size too low to report

AR.10379

# XII. Legal Services from an Attorney, Clinic, or Legal Professional

Twelve percent (12%) of the sample visited or used legal services from an attorney, clinic, or legal professional in the past year. Two percent (2%) of respondents did not visit or use such services in the past year due to fear of mistreatment as a transgender person. Fifty-seven percent (57%) of those who sought services from an attorney, legal clinic, or legal professional believed that the staff or employees knew or thought they were transgender. Of those respondents, 6% reported being denied equal treatment or service, verbally harassed, or physically attacked because of being transgender (Table 16.13).

**Table 16.13: Experiences with legal services from an attorney, clinic, or legal professional in the past year because of being transgender**

| Experience in location | % of those who believe staff knew or thought they were transgender |
| --- | --- |
| Denied equal treatment or service | 4% |
| Verbally harassed | 3% |
| **One or more experiences listed** | **6%** |

Non-binary respondents (12%) were more than twice as likely to report having a negative experience when seeking legal services, in contrast to transgender men and women (5%) (Figure 16.7). Those who were currently working in the underground economy (23%) were almost four times as likely to report a negative experience as the overall sample.



**Figure 16.7: Negative experiences with legal services from an attorney, clinic, or legal professional in the past year**
GENDER IDENTITY (%)

*Sample size too low to report

# XIV. Experiences with Airport Security

In addition to the questions regarding mistreatment in and avoidance of public accommodations, respondents were asked about their experiences traveling through airport security in the United States in the past year. More than half (53%) of respondents reported having gone through airport security during that time period. These respondents were asked about specific experiences and interactions with Transportation Security Administration (TSA) officers during the security screening process.

*Forty-three percent (43%) of those who went through airport security in the past year experienced at least one problem related to their gender identity or expression.*

PLACES OF PUBLIC ACCOMMODATION AND AIRPORT SECURITY

Forty-three percent (43%) of those who went through airport security in the past year experienced at least one issue related to their gender identity or expression, such as TSA officers using the wrong pronoun or title to refer to them, searching their bodies or belongings because of a gender-related item, or detaining them (Table 16.14).

**Table 16.14: Issues when going through airport security in the past year**

| Airport security issue | % of those who had gone through airport security |
|---|---|
| TSA officers used the wrong pronouns (such as he, she, or they) or title (such as Mr. or Ms.) | 29% |
| They were patted down due to gender-related clothing/items (such as a binder or packer) | 17% |
| They were patted down by TSA officers of the wrong gender | 14% |
| TSA officers questioned the name or gender on ID | 11% |
| TSA officers loudly announced or questioned their gender, body parts, or sensitive items (e.g., binder, packer) | 6% |
| Their bag was searched due to a gender-related item (such as a binder or packer) | 5% |
| They were asked to remove or lift clothing to show binder, undergarment, or other sensitive area | 4% |
| They were taken to a separate room for questioning or examination | 4% |
| They were verbally harassed by TSA officers | 2% |
| They experienced unwanted sexual contact (beyond typical pat down by TSA officers) | 1% |
| They were detained for over an hour | 1% |
| They missed their flight due to screening | 1% |
| TSA officers called the police about them | <1% |
| They were physically attacked attacked by TSA officers | <1% |
| They were not allowed to fly | <1% |
| **One or more experiences listed** | **43%** |

More than half (56%) of Middle Eastern and 50% of multiracial respondents who went through airport security in the past year reported one or more of these experiences (Figure 16.8). Respondents who said that others can always or usually (61%) or sometimes (53%) tell that they are transgender were more likely to report one or more of these experiences, in comparison to those who said that others can rarely or never tell that they are transgender without being told (35%). Experiences also differed by gender, with transgender men (52%) being more likely to report one or more of these experiences than transgender women (31%). Respondents who said that none of their IDs reflect the name and/or gender they prefer (51%) were also more likely to report negative experiences in airport security related to their gender identity.

**Figure 16.8: Negative experience in airport security in the past year**
**RACE/ETHNICITY (%)**



# Conclusion

Responses indicated that many respondents faced mistreatment in places of public accommodation, including being denied equal treatment or service, verbally harassed, and/or physically attacked in one or more of the locations. People of color and respondents currently working in the underground economy were more likely to report mistreatment. A substantial number of respondents also did

AR.10381

not visit or use services in places of public accommodation altogether because of fear of being mistreated as a transgender person. Additionally, findings demonstrated that many transgender people experienced mistreatment related to their gender identity when passing through airport security and, as a result, were at risk of potential harm while traveling through airports.

---

**ENDNOTES** | CHAPTER 16: PLACES OF PUBLIC ACCOMMODATION AND AIRPORT SECURITY

1    The legal definitions of public accommodations vary according to local, state, and federal laws, but frequently include places open to the public, such as restaurants, stores, hotels, places of public transportation, and government agencies.

2    See e.g., Equal Rights Center. (2016). *Room for Change*. DC: Equal Rights Center. Available at: http://www.equalrightscenter.org/site/DocServer/Contents.pdf?docID=2681.

3    See e.g., Charles, C. (2015, October 1). Dear TSA, my body is not an anomaly. *The Advocate.* Available at: http://www.advocate.com/commentary/2015/10/01/dear-tsa-my-body-not-anomaly; Ennis, D. (2015, October 21). Traveling while trans: Women share their stories. *The Advocate.* Available at: http://www.advocate.com/transgender/2015/10/21/traveling-while-trans-women-share-their-stories; Rogers, K. (2015, September 22). T.S.A. defends treatment of transgender air traveler. *New York Times.* Available at: http://www.nytimes.com/2015/09/23/us/shadi-petosky-tsa-transgender.html.

4    TSA body scanners examine each passenger's body based on the gender the officer perceives the passenger to be. As a result, transgender people's body parts, or items such as chest binders (compression garments) and prosthetics (such as packers and breast forms), may get flagged. This often causes transgender passengers to be outed or to face additional searches and scrutiny. See note 3.

5    "People with disabilities" here refers to respondents who identified as a person with a disability in Q. 2.20.



# CHAPTER 17

# Experiences in Restrooms

**S**afe access to public restrooms is a basic necessity and essential for most people's participation in civic life, the workplace, and school.[1] Many transgender people, however, face harassment and violence when seeking to use public restrooms, or they are excluded from restrooms by policies or staff.[2] Lack of safe restroom access has been linked to medical problems such as kidney infections, urinary tract infections, and stress-related conditions.[3] Transgender people who are denied equal access to restrooms consistent with their gender identity are vulnerable to harassment, violence, and poor mental health, including higher levels of suicidal thoughts and behaviors.[4]

This chapter explores respondents' experiences in restrooms in public places, at work, and at school, including experiences with denial of access, harassment, and violence, as well as avoidance of public restrooms. Notable differences in respondents' experiences based on demographic and other characteristics are reported throughout the chapter.

It is important to note that the survey was conducted between August and September 2015, more than six months before the state of North Carolina passed a law in March 2016 restricting transgender people's restroom access, and before similar legislation was introduced in at least 23 other states in 2016.[5] This legislation prompted substantial media coverage and public scrutiny of transgender people's restroom access. Widespread anecdotal evidence suggests that this climate had an adverse effect on the experiences of transgender people in restrooms and their perceptions of safety when accessing and using public restrooms. As a result, data collected after March 2016 would likely differ from USTS survey results, with potentially higher numbers of respondents reporting negative experiences in public restrooms.

AR.10383

KEY FINDINGS

▶ Nearly one-quarter (24%) of respondents said that someone had questioned or challenged their presence in a restroom in the past year.

▶ Nearly one in ten (9%) respondents reported that someone denied them access to a restroom in the past year.

▶ One in eight (12%) respondents were verbally harassed, physically attacked, or sexually assaulted when accessing or using a restroom in the past year.

▶ More than half (59%) avoided using a public restroom in the past year because they were afraid of having problems.

▶ Nearly one-third (32%) limited the amount they ate or drank to avoid using the restroom in the past year.

▶ Eight percent (8%) reported having a urinary tract infection, kidney infection, or another kidney-related problem in the past year as a result of avoiding restrooms.

# I. Access to Restrooms

Nearly one-quarter (24%) of respondents said that someone told them or asked them if they were using the wrong restroom in the past year, and nearly one in ten (9%) said that someone stopped them from entering or denied them access to a restroom in the past year. American Indian (18%), Asian (13%), and Middle Eastern (12%) respondents were more likely to report that someone stopped them from entering or denied them access to a restroom in the past year (Figure 17.1). Undocumented residents (23%) and respondents currently working in the underground economy, such as sex work, drug sales, and other work that is currently criminalized (20%), were more than twice as likely to be denied access to restrooms than those in the overall sample.

**Figure 17.1: Denied access to a restroom in the past year**
**RACE/ETHNICITY (%)**



EXPERIENCES IN RESTROOMS

AR.10384

*Nearly one in ten (9%) respondents said that someone stopped them from entering or denied them access to a restroom in the past year.*

# II. Verbal Harassment, Physical Attack, and Sexual Assault

Twelve percent (12%) of respondents reported being verbally harassed, physically attacked, and/or sexual assaulted[6] when accessing or while using a restroom in the past year. These experiences were more frequently reported by undocumented residents (34%), respondents currently working in the underground economy (25%), and American Indian (24%) and multiracial (16%) respondents (Figure 17.2).

**Figure 17.2: Verbal harassment, physical attack, and/or sexual assault in a restroom in the past year RACE/ETHNICITY (%)**



## a. Verbal Harassment

One out of eight (12%) respondents were verbally harassed in a restroom in the past year.

Respondents who were verbally harassed in restrooms were asked for the places where the harassment had occurred. Eighty-nine percent (89%) were verbally harassed in a restroom at a public place, such as a restaurant, shopping mall, or movie theater, and 20% were verbally harassed in a school restroom (Table 17.1).

**Table 17.1: Location of verbal harassment in restroom in past year**

| Restroom location | % of respondents who were verbally harassed |
|---|---|
| Public place (such as a restaurant, shopping mall, or movie theater) | 89% |
| School | 20% |
| Workplace | 14% |
| Another location | 5% |

## b. Physical Attack

One percent (1%) of the sample (228 respondents, unweighted) was physically attacked in a restroom in the past year. Undocumented residents (4%) and American Indian respondents (3%) were more likely to be physically attacked in a restroom.

Respondents who were physically attacked were asked where they had experienced the physical attack. Eighty-six percent (86%) were physically attacked in a restroom at a public place, such as a restaurant, shopping mall, or movie theater, and over one-quarter (27%) said they were physically attacked in a restroom at school (Table 17.2).

**Table 17.2: Location of physical attack in restroom in past year**

| Restroom location | % of respondents who were physically attacked |
|---|---|
| Public place (such as a restaurant, shopping mall, or movie theater) | 86% |
| School | 27% |
| Workplace | 14% |
| Another location | 9% |

## c. Sexual Assault

Approximately one percent (0.6%) of the sample (139 respondents, unweighted) reported being sexually assaulted in a restroom in the past year. Those currently working in the underground economy were more likely to have had this experience (4%). Additionally, transgender women of color, including Asian (3.2%), Middle Eastern (3.2%), American Indian (2.8%), and multiracial (2.4%) women were more likely to have been sexually assaulted in a restroom in the past year (Figure 17.3).

**Figure 17.3: Sexual assault in a restroom in the past year among transgender women**
RACE/ETHNICITY (%)



More than three-quarters (78%) of respondents who were sexually assaulted reported that the sexual assault occurred in a restroom at a public place, and 19% were sexually assaulted at a school restroom (Table 17.3).

**Table 17.3: Location of sexual assault in restroom in past year**

| Restroom location | % of respondents who were sexually assaulted |
|---|---|
| Public place (such as a restaurant, shopping mall, or movie theater) | 78% |
| School | 19% |
| Workplace | 14% |
| Another location | 18% |

# III. Overall Access to and Treatment in Restrooms

Overall, in the year prior to taking the survey, 26% of all respondents were denied access to restrooms, had their presence in a restroom questioned, and/or were verbally harassed, physically attacked, or sexually assaulted in a restroom. This was nearly twice as high for undocumented residents (50%) and was also higher for respondents currently working in the underground economy (39%). It was also higher among American Indian (36%) and multiracial (32%) respondents (Figure 17.4). Respondents who said that others could always or usually tell they were transgender without being told (45%) or sometimes tell they were transgender (38%) were more likely to report one or more of these experiences, in contrast to those who said that others could rarely or never tell that they were transgender (16%).

**Figure 17.4: Any reported problem in a restroom in the past year**
RACE/ETHNICITY (%)



# IV. Avoidance of Public Restrooms

Even prior to the increased public scrutiny and conversations in North Carolina and across the country about anti-transgender bathroom legislation in 2016, 59% of respondents reported that in the past year they had either sometimes (48%) or always (11%) avoided using a restroom, such as in public, at work, or at school, because they were afraid of confrontations or other problems.

Transgender men (75%) were far more likely to report sometimes or always avoiding using a public restroom, in contrast to transgender women (53%) and non-binary respondents (53%) (Figure 17.5). Undocumented residents were also more likely to report sometimes or always avoiding using a public restroom in the past year (72%). Eighty percent (80%) of respondents who said that others could always or usually tell that they were transgender and 72% of those who said that others can sometimes tell they are transgender reported avoiding using public restroom, in contrast to 48% of those who said that others can rarely or never tell that they are transgender.

**Figure 17.5: Sometimes or always avoided bathrooms in the past year**
**GENDER IDENTITY (%)**



# In Our Own Voices

"I either have to 'hold it' or break down and use a male restroom in a public place. I'm not allowed to use the female restroom and have been confronted multiple times when attempting to."

⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯

"I went into the men's bathroom, being a man and all. I was using a stall, and I came out only to find one person who apparently thought it was okay to go after me. I was just washing my hands when he first punched me in the back and then went for my vagina. I nearly passed out due to the blow."

⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯

"I walked into a stall to do my business like I had done so many times before. This time, though, someone recognized me. He and his buddies circled around me as I tried to exit the restroom and pushed me around between them. A police officer walked into the restroom and tried to protest their harassment. The men responded by ripping my pants down. The officer shot me a disgusted look and left the room."

⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯

"I spent high school having to use the nurse's bathroom, because if I used the boys' bathroom, I would get reprimanded, and the same would happen if I went into the girls' bathroom since I was living as a boy. Going to the nurse's office always felt like a walk of shame, like there was no dignified place for me simply because I'm transgender."

⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯

AR.10387

*Nearly one-third (32%) of the sample avoided drinking or eating so that they would not need to use the restroom, and 8% reported having a urinary tract infection or kidney-related medical problem as a result of avoiding restrooms in the past year.*

Respondents were also asked if they had experienced any physical problems as a result of avoiding restrooms in public places, at work, or at school. Nearly one-third (32%) of the sample avoided drinking or eating so that they would not need to use the restroom, and 8% reported having a urinary tract infection or kidney-related medical problem as a result of avoiding restrooms in the past year (Table 17.4).

**Table 17.4: Physical problems due to avoiding public restrooms in the past year**

| Physical problem | % of respondents who avoided using restrooms | % of all respondents |
|---|---|---|
| Did not use the restroom when needed to ("held it") | 89% | 55% |
| Avoided drinking or eating | 52% | 32% |
| Urinary tract infection | 12% | 8% |
| Kidney infection | 2% | 1% |
| Other kidney-related problems | 2% | 1% |
| Kidney-related problem and/or a urinary tract infection | 13% | 8% |
| A problem not listed | 2% | 1% |

## Conclusion

Responses suggest that using restrooms in public places, at work, or at school presents serious challenges for transgender people. Respondents faced numerous barriers and problems when attempting to use a public restroom, including being verbally harassed, physically attacked, sexually assaulted, or denied access to the restroom altogether. In many instances, these experiences were more frequently reported by people of color. A majority of people had avoided using public restrooms in the past year due to fear of encountering confrontations and other problems, which led to a range of health issues, including urinary tract infections and kidney-related problems.

EXPERIENCES IN RESTROOMS

**ENDNOTES** | CHAPTER 17: EXPERIENCES IN RESTROOMS

1  Department of Labor & Occupational Safety and Health Administration. (2015). *Best Practices: A Guide to Restroom Access for Transgender Workers.* Available at: https://www.osha.gov/Publications/OSHA3795.pdf.

2  Herman, J. L. (2013). Gendered restrooms and minority stress: The public regulation of gender and its impact on transgender people's lives. *Journal of Public Management & Social Policy, 19*(1), 65–85.

3  Herman, J. L. See note 2.

4  Seelman, K. L. (2016). Transgender adults' access to college bathrooms and housing and the relationship to suicidality. *Journal of Homosexuality, 63*(10), 1378–1399.

5  Movement Advancement Project, Equality Federation Institute, Freedom for All Americans, & National Center for Transgender Equality. (2016). *The Facts: Bathroom Safety, Nondiscrimination Laws, and Bathroom Ban Laws.* Available at: http://www.lgbtmap.org/file/bathroom-ban-laws.pdf.

6  Respondents were asked if they had experienced "unwanted sexual contact" when accessing or while using a bathroom in Q. 20.3 and Q. 20.6.

7  Movement Advancement Project et al. See note 5.



## CHAPTER 18

# Civic Participation and Policy Priorities

**V**oting and other forms of participation in the political process are important methods by which people involve themselves in their communities and can have a voice in governance at the local, state, and federal levels. They are also significant avenues by which individuals and groups can affect change and influence the policies and procedures that impact their lives.

Respondents received questions about voting in the previous national election (November 2014)[1] to assess levels of voting and determine reasons for not participating, including potential barriers to voting such as voter identification laws. Relevant questions were patterned on the November 2014 Voting and Registration Supplement of the Current Population Survey (CPS). Additionally, respondents were asked questions about their political engagement, political party affiliation, and policy priorities as they relate to issues that impact transgender people, some of which were patterned on the Gallup U.S. Daily Tracking Poll. Notable differences in respondents' experiences based on demographic and other characteristics are reported throughout the chapter.

<div style="text-align: right">CIVIC PARTICIPATION AND POLICY PRIORITIES</div>

AR.10390

▶ More than three-quarters (76%) of U.S. citizens of voting age in the sample reported that they were registered to vote in the November 2014 midterm election, compared to 65% of individuals in the U.S. population who reported that they were registered.

▶ More than half (54%) of U.S. citizens of voting age in the sample reported that they had voted in the election, compared to 42% of those who reported they had voted in the U.S. population.

▶ Over one-quarter (27%) of those who said they had not been registered to vote said that the main reason was that they were not interested in the election or not involved in politics.

▶ Three percent (3%) of those who said they were *not registered to vote* reported that the main reason was that they wanted to avoid harassment by election officials because they were transgender.

▶ Nineteen percent (19%) of those who reported they were registered but did not vote said that they thought their vote would not make a difference or they were not interested in the election, compared to 16% of those in the U.S. population.

▶ Three percent (3%) of those who reported *being registered to vote but not voting* said that the main reason was that they wanted to avoid harassment by election officials because they were transgender.

▶ When asked about what they believed the most important policy priorities were for transgender people, respondents most often identified addressing violence against transgender people (25%), health insurance coverage (15%), and racism (11%) as their top priorities.

# I. Voter Registration and Voting

## a. Voter Registration

Survey respondents were asked about voting in relation to the November 4, 2014 midterm election, which was the national election held in closest proximity to the survey. More than three-quarters (76%) of U.S. citizens in the survey sample who were of voting age at the time of the election[2] reported that they were registered to vote, compared to 65% of those individuals in the U.S. population.[3] The number of reported registered voters differed by race or ethnicity, with Middle Eastern (71%), Latino/a (70%), and Asian (65%) respondents being less likely to be registered than American Indian (77%), white (78%), and Black (79%) respondents (Figure 18.1).

**Figure 18.1: Registered to vote
RACE/ETHNICITY (%)**



Naturalized citizens (69%) were less likely to report being registered than citizens who were born in the United States (76%). There were also differences in voting registration based on respondents' sources of income, with only 48% of those whose sole source of income was from the underground economy—including sex work, drug sales, and other work that is currently criminalized—reporting being registered. Respondents whose only source of income was from unemployment benefits or other cash assistance programs such as TANF[4] (65%) were also less likely to be registered (Figure 18.2).

**Figure 18.2: Registered to vote
SOURCES OF INCOME (%)**



## b. Reasons for Not Registering to Vote

Respondents who said they were not registered to vote in the November 4, 2014 election were asked to identify the main reason why they were not registered based on categories outlined in the Current Population Survey (CPS) and additional experiences they might have had as a transgender person. More than one-quarter (27%) of those in the sample who reported that they were not registered to vote said that they were not interested in the election or not involved in politics, which was the most frequently selected reason for not being registered. Sixteen percent (16%) did not know where or how to register, and 15% indicated that they did not meet registration deadlines. One in eight (12%) felt that their vote would not make a difference and therefore did not register (Table 18.1).[5]

Additionally, respondents reported not being registered to vote because they wanted to avoid anti-transgender harassment by election officials (3%), because they did not have their current name updated on their Social Security card (2%), and because they thought their state's voter identification law would stop them from voting (1%). Avoiding anti-transgender harassment by election officials was a more common reason for transgender men and women (5%) than for crossdressers (2%) and non-binary respondents

*Three percent (3%) of respondents who were citizens and of voting age at the time of the 2014 midterm election were not registered to vote because they wanted to avoid anti-transgender harassment by election officials.*

CIVIC PARTICIPATION AND POLICY PRIORITIES

(1%) (Figure 18.3). Those who reported that people could always or usually tell they were transgender even without being told were more than twice as likely to report this reason (8%), in contrast to those who said people could rarely or never tell they were transgender without being told (3%). Black respondents (7%) were also more likely to report that they did not register to vote in order to avoid harassment by election officials (Figure 18.4).

**Table 18.1: Main reason for not being registered to vote on November 4, 2014**

| Reasons for not being registered to vote | % of USTS citizens not registered to vote |
|---|---|
| They were not interested in the election or not involved in politics | 27% |
| They did not know where or how to register | 16% |
| They did not meet registration deadlines | 15% |
| They felt their vote would not make a difference | 12% |
| They did not live in place long enough or meet residency requirements | 5% |
| They were not eligible to vote (due to criminal/felony conviction or other reason) | 3% |
| Permanent illness or disability | 2% |
| Difficulty with English | <1% |
| Other reasons (including): | 19% |
| They wanted to avoid harassment by election officials because they were transgender | 3% |
| They did not have an identity document (ID) and thought they needed one to register | 2% |
| Their current name did not match the name on their Social Security card | 2% |
| They thought their state's voter ID law would stop them from voting | 1% |
| Protest or philosophical reasons (write-in response) | 1% |

**Figure 18.3: Not registered due to avoiding anti-transgender harassment**
GENDER IDENTITY (%)



**Figure 18.4: Not registered due to avoiding anti-transgender harassment**
RACE/ETHNICITY (%)



## c. Voting in the 2014 Election

More than half (54%) of U.S. citizens in the sample who were of voting age at the time of the election reported that they voted in the election, compared to 42% of those in the U.S. population.[6] Among people of color, Asian respondents (44%) were least likely to report having voted, and Latino/a (48%) and Black (50%) respondents were also less likely to report voting (Figure 18.5).

*More than half (54%) of respondents who were citizens and of voting age at the time of the 2014 midterm election reported that they voted in the election, compared to 42% in the U.S. population.*

**Figure 18.5: Voted in election**
**RACE/ETHNICITY (%)**



# In Our Own Voices

Respondents who were living in poverty[7] (41%) were also less likely to say they had voted, as were those who were currently working in the underground economy (40%), unemployed (42%), or out of the labor force (50%).

## d. Reasons for Not Voting

Respondents who reported being registered but did not vote in the November 4, 2014 election were asked to identify the main reason why they did not vote, based on categories outlined in the CPS and additional experiences they might have had as a transgender person. Nearly one in five (19%) respondents who reported they were registered but did not vote reported that they were not interested or felt their vote would not make a difference, compared to 16% of such voters in the U.S. population.[8] Respondents were also more than twice as likely to report not voting due to registration problems, such as not receiving an absentee ballot or not being registered in the current location (5%), than registered voters in the U.S. general population (2%) (Table 18.2).

Among those who provided additional reasons for not voting that were not included in the CPS, 3% of respondents reported that they wanted to avoid harassment by election officials because they were transgender. Transgender men and women

"Lawmakers pushed through voter ID reforms in my state, requiring every voter to present a photo ID with a gender marker. Since I was unable to do so, I was a victim of 'de facto' disenfranchisement and voter intimidation tactics that are now, unfortunately, all too common."

.......................................................

"When changing my name on my voter registration, the DMV put in the wrong name. I don't know how to fix it and I'm scared that if I try to vote (something I really want to do!) I won't be able to because the voter registration has the wrong name."

.......................................................

"I had to try twice to get my county to change my name in the voter registration, which is extremely embarrassing as people are essentially shouting that you're trans in a public place. Some accused me of attempting voter fraud when all I wanted to do was try to make sure I had the best candidates who would protect my rights."

.......................................................

CIVIC PARTICIPATION AND POLICY PRIORITIES

AR.10394

(4%) were more likely to report that they did not vote because they wanted to avoid harassment by an election official than non-binary respondents (<1%) (Figure 18.6). Two percent (2%) of those who did not vote said that the main reason was that their ID did not match their current name or gender or that their photo did not match their appearance, and 1% said that the main reason was that their current name or gender that did not match their voter registration.

**Table 18.2: Main reason for not voting on November 4, 2014**

| Reasons included in the Current Population Survey (CPS): | % of USTS respondents who were registered but did not vote | % in U.S. population who were registered but did not vote (CPS) |
|---|---|---|
| They were not interested or felt their vote would not make a difference | 19% | 16% |
| They forgot to vote or send in an absentee ballot | 19% | 8% |
| They were too busy or had a conflicting work or school schedule | 16% | 28% |
| They were out of town or away from home | 12% | 10% |
| They did not like the candidates or campaign issues | 8% | 8% |
| Registration problems (e.g., they did not receive an absentee ballot or they were not registered in their current location) | 5% | 2% |
| Illness or disability (own or family's) | 5% | 11% |
| Inconvenient hours, polling place, or hours or lines too long | 3% | 2% |
| Transportation problems | 3% | 2% |
| Bad weather conditions | <1% | <1% |
| Other reasons | 10% | 9% |
| **Additional reasons not included in the CPS:** | | |
| They wanted to avoid harassment by election officials because they were transgender | 3% | --- |
| Their ID did not match their current name or gender, or they had an old photo | 2% | --- |
| Name or gender on ID did not match voter registration | 1% | --- |
| They did not have the ID they needed to vote | 1% | --- |
| They did not know the process for voting or did not know about the candidates (write-in response) | 1% | --- |
| Protest or philosophical reasons (write-in response) | 1% | --- |
| They were not allowed by a poll worker or election official because they were transgender | <1% | --- |

AR.10395

**Figure 18.6: Did not vote due to avoiding anti-transgender harassment**
GENDER IDENTITY (%)



have some influence on government decisions than those who believed they could not influence government decisions.

**Figure 18.7: Perception of ability to influence government decisions**



# II. Political Engagement and Party Affiliation

Respondents received a question about political affairs to examine how much of an influence they believed they could have on government decisions. Specifically, they were asked to rate on five-point scale from "strongly agree" to "strong disagree" what they thought about the following statement: "Someone like me can't really influence government decisions." Nearly half (44%) of respondents disagreed or strongly disagreed with the statement, and approximately one-third (32%) agreed or strongly agreed with the statement (Figure 18.7). This means that there were more respondents who thought that they could

*Half (50%) of respondents identified as Democrats, 48% identified as Independents, and 2% identified as Republicans, compared to 27%, 43%, and 27% in the U.S. general population, respectively.*

Respondents were also asked about their political party affiliation with questions that were patterned on the Gallup U.S. Daily Tracking Poll, including whether they consider themselves a Republican, Democrat, or Independent. Half (50%) of respondents identified as Democrats, 48% identified as Independents, and 2% identified as Republicans, compared to 27%, 43%, and 27% in the U.S general population, respectively (Figure 18.8).[9] Respondents who did not identify as Democrats or Republicans wrote in several political parties and political movements, including socialist or democratic socialist (4%), Green Party (2%), Libertarian (1%), and anarchist (1%). For comparison with the Gallup Daily Tracking Poll, these respondents are included as Independents in Figure 18.8.

Those who identified as Independents were also asked whether they lean more to the Democratic Party or the Republican Party. Overall, 79% in the sample reported that they were Democrats or lean towards the Democratic Party, 4% were Republicans or lean towards the Republican Party,

CIVIC PARTICIPATION AND POLICY PRIORITIES

AR.10396

and 17% were Independents who do not lean towards the Democratic or Republican parties. This compares to 44% in the U.S. population who are Democrats or lean towards the Democratic Party, 45% who are Republicans or lean towards the Republican Party, and 11% who are Independents and do not lean towards either party (Figure 18.9).[10]

When asked about their political views, more than half (55%) of the sample described themselves as "very liberal," 27% selected "liberal," 15% selected "moderate," 2% selected "conservative," and only 1% described themselves as "very conservative."

**Figure 18.8: Consider themselves a Republican, Democrat, or Independent**



**Figure 18.9: Democratic or Republican party affiliation and leaning**



# III. Policy Priorities

The survey explored respondents' opinions on the most important policy priorities for transgender people in the U.S. and asked for those issues to be ranked from "very important" to "not very important." Violence against transgender people was most widely selected as being a very important issue (94%). Insurance coverage for transgender-related health care (90%), police mistreatment of transgender people (88%), and

employment (87%) were also commonly selected as very important priorities (Table 18.3).

**Table 18.3: Respondents' policy priorities**

| Issue | Very important | Important | Not very important |
|-------|----------------|-----------|--------------------|
| Violence against transgender people | 94% | 5% | 1% |
| Insurance coverage for transgender-related health care | 90% | 9% | 1% |
| Police mistreatment of transgender people | 88% | 11% | 1% |
| Employment | 87% | 13% | 1% |
| Training health care providers about transgender health | 86% | 13% | 1% |
| Housing and homelessness | 85% | 14% | 1% |
| Poverty | 84% | 15% | 1% |
| Bullying and discrimination in schools | 84% | 15% | 1% |
| Racism | 83% | 15% | 3% |
| Mistreatment in prisons or jails | 82% | 16% | 2% |
| Identity documents | 79% | 20% | 1% |
| HIV/AIDS | 68% | 29% | 3% |
| Parenting and adoption rights | 68% | 28% | 4% |
| Conversion therapy | 68% | 22% | 10% |
| Immigration reform | 60% | 30% | 10% |
| Marriage recognition | 55% | 32% | 13% |
| Military (open service for transgender people) | 49% | 33% | 18% |

Respondents were also asked for their top three policy priorities. One-quarter (25%) reported that violence against transgender people was the top policy priority for them, and more than half (54%) reported that it was one of their top three priorities. Fifteen percent (15%) reported that health insurance coverage was the most important priority for them, and 11% reported that racism was the most important policy priority for them (Table 18.4).

**Table 18.4: Top policy priorities**

| Respondents' most important priority | % of respondents |
|--------------------------------------|------------------|
| Violence against transgender people | 25% |
| Insurance coverage for transgender-related health care | 15% |
| Racism | 11% |
| Employment | 7% |
| Identity documents | 7% |
| Poverty | 6% |
| Bullying and discrimination in schools | 5% |
| Training health care providers about transgender health | 5% |
| Police mistreatment of transgender people | 5% |
| Housing and homelessness | 4% |
| Mistreatment in prisons or jails | 2% |
| HIV/AIDS | 1% |
| Conversion therapy | 1% |
| Military (open service for transgender people) | 1% |
| Immigration reform | 1% |
| Parenting and adoption rights | 1% |
| Marriage recognition | 1% |

# Conclusion

Participation in the political process through activities such as voting is a vital component of influencing policies that impact lives and communities at the local, state, and national levels throughout the U.S. However, the process may be inaccessible at times or may otherwise present a difficult avenue through which policy priorities and day-to-day needs can be expressed. The results indicate that while a majority of eligible respondents had registered to vote in the most recent national election, only half had engaged in the process by voting, providing reasons such as not believing their vote would make a difference or

wanting to avoid potential harassment by election officials as a transgender person. Respondents were substantially more likely to identify with the Democratic Party or lean towards the Democratic Party than other political parties. Policy priorities that respondents identified as most important are those directly related to the safety and wellbeing of transgender people, including violence against transgender people, health insurance and health care, police treatment of transgender people, racism, employment, and housing.

**ENDNOTES** | CHAPTER 18: CIVIC PARTICIPATION AND POLICY PRIORITIES

1    Questions referred to the midterm elections held on Tuesday, November 4, 2014, and respondents received the explanation that "[t]his was the election in November 2014 to elect members of the U.S. Congress and state-level offices." See Q. 29.1 and 29.2.

2    Voter registration and voting results reported in this chapter are based on the responses of U.S. citizens in the sample who were aged 18 or older at the time of the election to provide the most appropriate comparison to Current Population Survey data on registration and voting in the U.S. population.

3    Reported voter registration in the U.S. is among U.S. citizens aged 18 and over. U.S. Census Bureau, (2014, November). *Current Population Survey: Reported Voting and Registration, by Sex and Single Years of Age: November 2014*. Available at: https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-577.html.

4    TANF (the Temporary Assistance for Needy Families program) is a federal cash assistance program.

5    Although the Current Population Survey asked about the main reason for not registering to vote on November 4, 2014, U.S. population data for that question was not available at the time of this report.

6    The number of USTS respondents who voted represents 70% of those in the sample who were registered to vote in the election. According to the CPS, 42% of citizen voters aged 18 and older voted in the 2014 election, which represents 65% of registered voters. U.S. Census Bureau. (2014, November). *Current Population Survey. Reported Voting and Registration, by Sex and Single Years of Age: November 2014*. Available at: https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-577.html. See also File, T. (2015). *Who Votes? Congressional Elections and the American Electorate: 1978-2014*. (p. 2). DC: U.S. Census Bureau. Available at: https://www.census.gov/content/dam/Census/library/publications/2015/demo/p20-577.pdf.

7    Respondents who are "living in poverty" represent those who are living at or near the poverty line. See the *Income and Employment Status* chapter for more information about the poverty line calculation.

8    U.S. Census Bureau. (2014, November). *Current Population Survey. Voting and Registration in the Election of November 2014*. Available at: https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-577.html.

9    This data is based on Gallup Poll results from September 9–13, 2015, the poll in closest proximity to when the survey was in the field. Gallup Poll. (2015, September 9–13). *Party Affiliation*. Available at: http://www.gallup.com/poll/15370/party-affiliation.aspx.

10   Gallup Poll. (2015, September 9–13). *Party Affiliation*. Available at: http://www.gallup.com/poll/15370/party-affiliation.aspx.

# About the Authors

## Sandy E. James

As Survey Project Manager at the National Center for Transgender Equality, Sandy led the research team in developing, fielding, analyzing, and presenting the 2015 U.S. Transgender Survey. After a decade-long career as a forensic toxicologist, Sandy launched a new career as a civil rights advocate focused on law, research, and policy to advance transgender rights. He has worked on numerous projects involving trans-related legislation, policy, and research, including extensive work with data from the 2008–09 National Transgender Discrimination Survey. Sandy has been published in *The Georgetown Journal of Gender and the Law* and the *LGBTQ Policy Journal at the Harvard Kennedy School.* Sandy received a J.D and M.A in American Government from Georgetown University, where he is also currently pursuing his Ph.D.

## Jody L. Herman

Jody L. Herman is a Scholar of Public Policy at the Williams Institute at the UCLA School of Law. She holds a Ph.D. in Public Policy and Public Administration in the field of Gender and Social Policy from the George Washington University, where she also earned her M.A. in Public Policy with a concentration in Women's Studies. Her doctoral dissertation focused on the problems transgender and gender non-conforming people face when using public restrooms and the development of anti-discrimination protections in public accommodations based on gender identity and expression. She has worked on issues of poverty, women's rights, voting rights, and anti-discrimination policy development with non-profit research, advocacy, and direct-service organizations in the United States and Mexico. She served as a co-author on the groundbreaking report *Injustice at Every Turn*, based on the National Transgender Discrimination Survey conducted by the National Gay and Lesbian Task Force and the National Center for Transgender Equality. Her research at the Williams Institute focuses on the prevalence and impact of interpersonal and structural discrimination based on gender identity or expression.

## Sue Rankin

Sue Rankin is the principal of Rankin & Associates Consulting. She retired from the Pennsylvania State University in 2013 after 36 years, where she most recently served as an Associate Professor of Education, and Associate in the Center for the Study of Higher Education. Sue earned her B.S. from Montclair State University in 1978, and an M.S. and Ph.D. from the Pennsylvania State University. She has presented and published widely on the impact of sexism, racism, and heterosexism in the academy and in intercollegiate athletics. Her current research focuses on the assessment of institutional climate and providing program planners and policymakers with recommended strategies to improve the campus climate for under-served communities. Her recent publications include *The State of Higher Education for LGBT People* and *The Lives of Transgender People* in 2010 and an *NCAA Student-Athlete Climate Study* in 2011. In addition to serving as a consultant for the National Transgender Discrimination Survey in 2011, she has collaborated with over 170 institutions in implementing assessments and developing strategic plans regarding social justice issues.

## Mara Keisling

Mara Keisling is the founding Executive Director of the National Center for Transgender Equality, one of the nation's leading social justice organizations winning life-saving change for transgender people. After a 25-year career in survey research, Mara helped found NCTE and quickly became one of the nation's foremost authorities on transgender issues. Mara has led organizational and coalition efforts that have won significant advances in transgender equality throughout the country, especially in federal law and policy. Under her leadership, NCTE has won well over 100 federal policy changes that have improved the lives of transgender people. Mara was a co-author of *Injustice at Every Turn: The Report of the National Transgender Discrimination Survey*. A native of Pennsylvania and a transgender woman, Mara holds a B.A. from Pennsylvania State University and conducted her graduate studies in American Government at Harvard University.

## Lisa Mottet

Lisa Mottet joined the National Center for Transgender Equality as the Deputy Executive Director in 2013, helping to grow NCTE from 5 staff to now 15 staff. She helps guide the organization's local, state, and federal policy advocacy, while also helping to oversee communications and development. In her previous position as Director of the Transgender Civil Rights Project at the National LGBTQ Task Force (formerly the National Gay and Lesbian Task Force), where she served for 12 years, she was a member of the research team for the National Transgender Discrimination Survey, and co-authored the report of its findings, *Injustice at Every Turn* (2011). As a long-time ally to the transgender community, Lisa was a major figure in promoting trans-inclusion in the LGBT movement and, while at the Task Force, she helped engineer the addition of "gender identity" to the Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act, which became law in 2009, and to the Employment Non-Discrimination Act. Her thoughts and guidance on trans-inclusion were recorded in the 2008 publication, *Opening the Door to Transgender Inclusion: The Nine Keys to Making LGBT Organizations Fully Transgender-Inclusive*. Also while at the Task Force, Lisa co-authored *Transitioning Our Shelters: A Guide to Making Homeless Shelters Safe for Transgender People*. Lisa graduated from the University of Washington in 1998 and received her J.D. from the Georgetown University Law Center in 2001.

## Ma'ayan Anafi

Ma'ayan Anafi is a Policy Counsel at the National Center for Transgender Equality. As part of the NCTE team, Ma'ayan has worked to strengthen and preserve nondiscrimination protections for transgender communities, with a focus on efforts to defeat anti-transgender state legislation and the implementation of federal nondiscrimination laws in health care, employment, education, and housing. Ma'ayan obtained a J.D. from Harvard Law School and a B.A. from the University of Toronto. An Autistic and non-binary transgender person, Ma'ayan is the co-leader of the DC chapter of the Autistic Self-Advocacy Network.



# Appendix A

## Demographic Description and Other Characteristics of the Sample

**T**hroughout the report, findings were presented with the standard or supplemental survey weight applied. These weights adjusted the sample to reflect the U.S. population in regard to age, race, and educational attainment and also adjusted for disproportionate representation of 18-year-olds in the sample. In this appendix, unweighted tabulations of selected demographic and other variables are presented to provide a description of the sample before weights were applied. This includes recoded variables, which are indicated as such. See the *Methodology* chapter and *Appendix C: Detailed Methodology* for a description of the weights used in this report.

APPENDIX A

| Q1.4. What U.S. state or territory do you currently live in? | Unweighted frequency | Unweighted % |
|---|---|---|
| U.S. military base outside of the U.S. | 32 | 0.1% |
| Alabama | 228 | 0.8% |
| Alaska | 84 | 0.3% |
| American Samoa | 2 | 0.0% |
| Arizona | 537 | 1.9% |
| Arkansas | 222 | 0.8% |
| California | 3453 | 12.5% |
| Colorado | 669 | 2.4% |
| Connecticut | 319 | 1.2% |
| Delaware | 84 | 0.3% |
| District of Columbia | 214 | 0.8% |
| Florida | 1099 | 4.0% |
| Georgia | 614 | 2.2% |
| Guam | 2 | 0.0% |
| Hawai'i | 69 | 0.3% |
| Idaho | 155 | 0.6% |
| Illinois | 1082 | 3.9% |
| Indiana | 452 | 1.6% |
| Iowa | 219 | 0.8% |
| Kansas | 197 | 0.7% |
| Kentucky | 274 | 1.0% |
| Louisiana | 274 | 1.0% |
| Maine | 182 | 0.7% |
| Maryland | 662 | 2.4% |
| Massachusetts | 1195 | 4.3% |
| Michigan | 894 | 3.2% |
| Minnesota | 670 | 2.4% |
| Mississippi | 82 | 0.3% |
| Missouri | 509 | 1.8% |
| Montana | 72 | 0.3% |
| Nebraska | 165 | 0.6% |
| Nevada | 206 | 0.7% |
| New Hampshire | 225 | 0.8% |
| New Jersey | 550 | 2.0% |
| New Mexico | 213 | 0.8% |
| New York | 1779 | 6.4% |
| North Carolina | 686 | 2.5% |
| North Dakota | 46 | 0.2% |
| Ohio | 941 | 3.4% |
| Oklahoma | 215 | 0.8% |

| Q1.4. What U.S. state or territory do you currently live in? (continued) | Unweighted frequency | Unweighted % |
|---|---|---|
| Oregon | 1152 | 4.2% |
| Pennsylvania | 1171 | 4.2% |
| Puerto Rico | 27 | 0.1% |
| Rhode Island | 119 | 0.4% |
| South Carolina | 233 | 0.8% |
| South Dakota | 43 | 0.2% |
| Tennessee | 416 | 1.5% |
| Texas | 1490 | 5.4% |
| Utah | 270 | 1.0% |
| Vermont | 163 | 0.6% |
| Virginia | 723 | 2.6% |
| Washington | 1667 | 6.0% |
| West Virginia | 83 | 0.3% |
| Wisconsin | 541 | 2.0% |
| Wyoming | 44 | 0.2% |
| **Total** | **27715** | **100%** |

| Q1.4. U.S. region of current residence (recode based on Census regions) | Unweighted frequency | Unweighted % |
|---|---|---|
| Northeast | 5703 | 21% |
| Midwest | 5759 | 21% |
| South | 7599 | 27% |
| West | 8591 | 31% |
| **Total** | **27652** | **100%** |

| Q1.10. Do you think of yourself as transgender? | Unweighted frequency | Unweighted % |
|---|---|---|
| No | 3270 | 12% |
| Yes | 24445 | 88% |
| **Total** | **27715** | **100%** |

| Q1.11. Do you identify as more than one gender or as no gender? | Unweighted frequency | Unweighted % |
|---|---|---|
| No | 14362 | 52% |
| Yes | 13353 | 48% |
| **Total** | **27715** | **100%** |

| Q1.12. Do you currently live full-time in a gender that is different from the one assigned to you at birth? | Unweighted frequency | Unweighted % |
|---|---|---|
| No | 11135 | 40% |
| Yes | 16580 | 60% |
| **Total** | **27715** | **100%** |

**Q1.14. Someday do you want to live full time in a gender that is different from the one assigned to you at birth?***

| | Unweighted frequency | Unweighted % |
|---|---|---|
| No | 770 | 7% |
| Yes | 6497 | 58% |
| Not sure | 3862 | 35% |
| **Total** | **11129** | **100%** |

*Asked of those who responded "No" to Q1.12.*

**Q1.16. Have you seriously thought about living in a gender that is different from the one assigned to you at birth (transitioning gender)?***

| | Unweighted frequency | Unweighted % |
|---|---|---|
| No | 251 | 33% |
| Yes | 519 | 67% |
| **Total** | **770** | **100%** |

*Asked of those who responded "No" to Q1.12 and Q1.14.*

**Q1.17. Do you consider yourself to be a cross-dresser?**

| | Unweighted frequency | Unweighted % |
|---|---|---|
| No | 25225 | 91% |
| Yes | 2490 | 9% |
| **Total** | **27715** | **100%** |

**Q1.18. Do you live part of the time in one gender and part of the time in another gender?**

| | Unweighted frequency | Unweighted % |
|---|---|---|
| No | 19063 | 69% |
| Yes | 8652 | 31% |
| **Total** | **27715** | **100%** |

**Q2.1. What sex were you assigned at birth, on your original birth certificate?**

| | Unweighted frequency | Unweighted % |
|---|---|---|
| Female | 15858 | 57% |
| Male | 11857 | 43% |
| **Total** | **27715** | **100%** |

**Q2.1 & Q2.3. Gender categories used for analysis (recode)**

| | Unweighted frequency | Unweighted % |
|---|---|---|
| Crossdressers | 758 | 3% |
| Transgender women | 9238 | 33% |
| Transgender men | 7950 | 29% |
| Non-binary people, assigned female at birth | 7844 | 28% |
| Non-binary people, assigned male at birth | 1925 | 7% |
| **Total** | **27715** | **100%** |

**Q2.1 & Q2.3. Gender categories (collapsed recode)**

| | Unweighted frequency | Unweighted % |
|---|---|---|
| Transgender men and women | 17188 | 64% |
| Non-binary people | 9769 | 36% |
| **Total** | **26957** | **100%** |

**Q2.4. How comfortable are you with the word "transgender" being used to describe you?**

| | Unweighted frequency | Unweighted % |
|---|---|---|
| Very comfortable | 12189 | 44% |
| Somewhat comfortable | 7413 | 27% |
| Neutral | 4129 | 15% |
| Somewhat uncomfortable | 3116 | 11% |
| Very uncomfortable | 830 | 3% |
| **Total** | **27677** | **100%** |

**Q2.5. What gender pronouns do you ask people to use to refer to you?**

| | Unweighted frequency | Unweighted %* |
|---|---|---|
| He, his | 9981 | 36% |
| She, hers | 10138 | 37% |
| They, their | 8026 | 29% |
| Ze, hir | 466 | 2% |
| No pronouns. I ask people only to use my name. | 1095 | 4% |
| I don't ask people to use specific pronouns. | 5619 | 20% |
| Pronouns not listed above | 1162 | 4% |

*Multiple choices were allowed, so percentages do not add to 100%.*

**Q2.6. What gender do you currently live in on a day-to-day basis?**

| | Unweighted frequency | Unweighted % |
|---|---|---|
| Man | 9418 | 34% |
| Woman | 8271 | 30% |
| Neither man nor woman/Genderqueer/Non-binary | 5721 | 21% |
| Part time one gender/part time another gender | 4305 | 16% |
| **Total** | **27715** | **100%** |

**Q2.7. People can tell I am trans even if I don't tell them.**

| | Unweighted frequency | Unweighted % |
|---|---|---|
| Always | 549 | 2% |
| Most of the time | 2629 | 10% |
| Sometimes | 9139 | 33% |
| Rarely | 8986 | 33% |
| Never | 6346 | 23% |
| **Total** | **27649** | **100%** |

| Q2.8. What best describes your current sexual orientation? | Unweighted frequency | Unweighted % |
|---|---|---|
| Asexual | 2984 | 11% |
| Bisexual | 4129 | 15% |
| Gay | 1316 | 5% |
| Heterosexual/Straight | 3363 | 12% |
| Lesbian | 3037 | 11% |
| Same-gender loving | 264 | 1% |
| Pansexual | 5056 | 18% |
| Queer | 5706 | 21% |
| Demisexual* | 287 | 1% |
| A sexual orientation not listed above | 1573 | 6% |
| **Total** | **27715** | **100%** |

*Added to the response list from write-in responses.

| Q2.9-Q2.11. Race/ethnicity (recode) | Unweighted frequency | Unweighted % |
|---|---|---|
| Alaska Native alone | 17 | 0.1% |
| American Indian alone | 302 | 1.1% |
| Asian/Asian American alone | 721 | 2.6% |
| Biracial/Multiracial | 1513 | 5.5% |
| Black/African American alone | 796 | 2.9% |
| Latino/a/Hispanic alone | 1473 | 5.3% |
| Middle Eastern/North African alone | 132 | 0.5% |
| Native Hawaiian/Pacific Islander alone | 62 | 0.2% |
| White/European American alone | 22658 | 81.8% |
| A racial/ethnic identity not listed above | 41 | 0.2% |
| **Total** | **27715** | **100%** |

| Q2.12. Religious/spiritual identity (recode) | Unweighted frequency | Unweighted % |
|---|---|---|
| Not religious/spiritual | 10460 | 38% |
| Religious/spiritual | 17195 | 62% |
| **Total** | **27655** | **100%** |

| Q2.13. Age ranges (recode) | Unweighted frequency | Unweighted % |
|---|---|---|
| 18 to 24 | 11840 | 43% |
| 25 to 44 | 10987 | 40% |
| 45 to 64 | 4085 | 15% |
| 65 and over | 803 | 3% |
| **Total** | **27715** | **100%** |

| Q2.15. What is your current relationship status? | Unweighted frequency | Unweighted % |
|---|---|---|
| Partnered, living together | 8762 | 31.6% |
| Partnered, not living together | 4630 | 16.7% |
| Single | 13219 | 47.7% |
| Not listed above | 404 | 1.5% |
| Aromantic/not active/platonic* | 67 | 0.2% |
| Open relationship* | 53 | 0.2% |
| Poly* | 535 | 1.9% |
| Single, divorced* | 11 | 0.0% |
| Single, widowed* | 28 | 0.1% |
| **Total** | **27709** | **100%** |

*Added to the response list from write-in responses.

| Q2.16. What is your current legal marital status? | Unweighted frequency | Unweighted % |
|---|---|---|
| Married | 4671 | 16.9% |
| Legally recognized civil union | 67 | 0.2% |
| Registered domestic partnership | 238 | 0.9% |
| Widowed | 216 | 0.8% |
| Divorced | 2538 | 9.2% |
| Separated | 456 | 1.7% |
| Single, never married | 19463 | 70.4% |
| **Total** | **27649** | **100%** |

| Q2.17. Have you ever served on active duty in the U.S. Armed Forces, Reserves, or National Guard? | Unweighted frequency | Unweighted % |
|---|---|---|
| Never served in the military | 25263 | 91.3% |
| Only active duty for training in the Reserves or National Guard | 298 | 1.1% |
| Now on active duty | 129 | 0.5% |
| On active duty in the past, but not now | 1976 | 7.1% |
| **Total** | **27666** | **100%** |

| Q2.18. What is your citizenship or immigration status in the U.S.? | Unweighted frequency | Unweighted % |
|---|---|---|
| U.S. citizen, birth | 26684 | 96.3% |
| U.S. citizen, naturalized | 555 | 2.0% |
| Permanent Resident | 249 | 0.9% |
| A visa holder (such as F-1, J-1, H1-B, and U) | 115 | 0.4% |
| DACA (Deferred Action for Childhood Arrival) | 16 | 0.1% |
| DAPA (Deferred Action for Parental Accountability) | 1 | 0.0% |
| Refugee status | 6 | 0.0% |
| Other documented status not mentioned above | 40 | 0.1% |
| Currently under a withholding of removal status | 3 | 0.0% |
| Undocumented resident | 46 | 0.2% |
| **Total** | **27715** | **100%** |

AR 10405

| Q2.20. Disability (questions based on American Community Survey, with the exception of the last question) | Unweighted frequency | Unweighted %* |
|---|---|---|
| Are you deaf or have serious difficulty hearing? | 1072 | 4% |
| Are you blind or have serious difficulty seeing even when wearing glasses? | 679 | 2% |
| Because of a physical mental or emotional condition, do you have serious difficulty concentrating, remembering, or making decisions? | 8471 | 31% |
| Do you have serious difficulty walking or climbing stairs? | 1729 | 6% |
| Do you have difficulty dressing or bathing? | 924 | 3% |
| Because of a physical, mental, or emotional condition, do you have difficulty doing errands alone, such as visiting a doctor's office or shopping? | 6200 | 23% |
| Do YOU identify as a person with a disability? | 7764 | 28% |

*Multiple choices were allowed, so percentages do not add to 100%.*

| Q2.20. Any disability (recode) (based on American Community Survey questions only, not including self-identification) | Unweighted frequency | Unweighted % |
|---|---|---|
| No | 16305 | 60% |
| Yes | 10913 | 40% |
| **Total** | **27218** | **100** |

| Q2.21. What is the main language that people speak in your home? | Unweighted frequency | Unweighted % |
|---|---|---|
| English only | 24958 | 90.1% |
| Language(s) other than English | 285 | 1.0% |
| English and other language(s) | 2461 | 8.9% |
| Total | 27704 | 100% |

| Q2.22. What is the highest level of school or degree you have completed? | Unweighted frequency | Unweighted % |
|---|---|---|
| Less than 8th grade | 48 | 0.2% |
| 8th grade | 54 | 0.2% |
| Some high school, no diploma or GED | 804 | 2.9% |
| GED | 661 | 2.4% |
| High school graduate | 2806 | 10.1% |
| Some college, no degree (including currently in college) | 10486 | 37.8% |
| Associate degree in college—Occupational/vocational program | 858 | 3.1% |
| Associate degree in college—Academic program | 1475 | 5.3% |
| Bachelor's degree | 5291 | 19.1% |
| Some graduate work, no graduate degree | 1652 | 6.0% |
| Master's degree (M.A, M.S., MBA) | 2562 | 9.2% |
| Doctoral degree (e.g., Ph.D., Ed.D.) | 504 | 1.8% |
| Professional degree (e.g., MD, JD) | 514 | 1.9% |
| **Total** | **27715** | **100%** |

| Q2.23. What are your current living arrangements? | Unweighted frequency | Unweighted % |
|---|---|---|
| Living in house/apartment/condo I OWN alone or with others (with a mortgage or that you own free and clear) | 4697 | 17.0% |
| Living in house/apartment/condo I RENT alone or with others | 11507 | 41.5% |
| Living with a partner, spouse, or other person who pays for the housing | 1443 | 5.2% |
| Living temporarily with friends or family because I can't afford my own housing | 2229 | 8.0% |
| Living with parents or family I grew up with because I have not yet left home | 5149 | 18.6% |
| Living in a foster group home or other foster care | 10 | 0.0% |
| Living in campus/university housing | 1821 | 6.65% |
| Living in a nursing home or other adult care facility | 9 | 0.0% |
| Living in a hospital | 2 | 0.0% |
| Living in military barracks | 31 | 0.1% |
| Living in a hotel or motel that I pay for myself | 37 | 0.1% |
| Living in a hotel or motel with an emergency shelter voucher | 6 | 0.0% |

| Q2.23. What are your current living arrangements? (continued) | Unweighted frequency | Unweighted % |
|---|---|---|
| Living in transitional housing/halfway house | 48 | 0.2% |
| Living on the street, in a car, in an abandoned building, in a park, or a place that is NOT a house, apartment, shelter, or other housing | 91 | 0.3% |
| Living in a homeless shelter | 36 | 0.1% |
| Living in a domestic violence shelter | 6 | 0.0% |
| Living in a shelter that is not a homeless shelter or domestic violence shelter | 3 | 0.0% |
| A living arrangement not listed above | 126 | 0.5% |
| Mobile housing (RV, camper, etc.)* | 40 | 0.1% |
| A place owned/rented by someone else* | 176 | 0.6% |
| A group home or treatment facility* | 13 | 0.1% |
| At home/with family for other reasons* | 186 | 0.7% |
| Nomadic* | 16 | 0.1% |
| Commune/co-op/collective* | 28 | 0.1% |
| **Total** | **27710** | **100%** |

*Added to the response list from write-in responses.

| Q2.24. Is there at least one telephone INSIDE your home that is currently working and is not a cell phone? | Unweighted frequency | Unweighted % |
|---|---|---|
| No | 18255 | 66% |
| Yes | 9313 | 34% |
| **Total** | **27568** | **100%** |

| Q2.24. Do you have a cell phone? | Unweighted frequency | Unweighted % |
|---|---|---|
| No | 882 | 3% |
| Yes | 26744 | 97% |
| **Total** | **27626** | **100%** |

| Q14.1 & Q14.2 HIV status (recode) | Unweighted frequency | Unweighted % |
|---|---|---|
| HIV positive | 179 | 0.7% |
| HIV negative | 13869 | 50.2% |
| Don't know/not tested | 13606 | 49.2% |
| **Total** | **27654** | **100%** |

| Q7.7 Employment status | Unweighted frequency | Unweighted %* |
|---|---|---|
| Work for pay from sex work, selling drugs, or other work that is currently considered illegal | 516 | 1.9% |
| Work full-time for an employer | 9560 | 34.5% |
| Work part-time for an employer | 6735 | 24.3% |
| Self-employed in your own business, profession or trade, or operate a farm (not including sex work, selling drugs, or other work that is currently considered illegal) | 3868 | 14.0% |
| Unemployed but looking for work | 3991 | 14.4% |
| Unemployed and have stopped looking for work | 1247 | 4.5% |
| Not employed due to disability | 2255 | 8.1% |
| Student | 8639 | 31.2% |
| Retired | 1107 | 4.0% |
| Homemaker or full-time parent | 549 | 2.0% |
| Not listed above | 1240 | 4.5% |
| Seasonal work/odd jobs/other part-time work* | 136 | 0.5% |
| Volunteer* | 76 | 0.3% |
| Internship* | 66 | 0.2% |

*Multiple choices were allowed, so percentages do not add to 100%.

| Q7.8. Respondent is member of a union (recode) | Unweighted frequency | Unweighted % |
|---|---|---|
| No | 25997 | 94% |
| Yes | 1691 | 6% |
| **Total** | **27688** | **100%** |

| Q7.8 & Q7.9. Respondent is a union member or under a union contract (recode) | Unweighted frequency | Unweighted % |
|---|---|---|
| No | 25623 | 92% |
| Yes | 2082 | 8% |
| **Total** | **27705** | **100%** |

| Q7.10. Do you currently receive assistance from food stamps (SNAP) or WIC? | Unweighted frequency | Unweighted % |
|---|---|---|
| No | 25060 | 91% |
| Yes | 2606 | 9% |
| **Total** | **27666** | **100%** |

| Q7.11. Current sources of income (recode) | Unweighted frequency | Unweighted % |
|---|---|---|
| Pay from sex work, selling drugs, or other work that is currently considered illegal only | 143 | 0.6% |
| Pay from employment only | 10519 | 40.4% |
| Pay from pension or retirement only | 227 | 0.9% |
| SSI or disability income only | 903 | 3.5% |
| Unemployment benefits or cash assistance only | 207 | 0.8% |
| Other income source only | 1165 | 4.5% |
| Multiple income sources | 12183 | 46.8% |
| No income | 664 | 2.6% |
| **Total** | **26011** | **100%** |

| Q7.12. Individual income in 2014 (includes all income sources except food stamps (SNAP) or WIC) | Unweighted frequency | Unweighted % |
|---|---|---|
| No income | 3913 | 14.4% |
| $1 to $5,000 | 4647 | 17.1% |
| $5,000 to $7,499 | 1665 | 6.1% |
| $7,500 to $9,999 | 1444 | 5.3% |
| $10,000 to $12,499 | 1743 | 6.4% |
| $12,500 to $14,999 | 1184 | 4.4% |
| $15,000 to $17,499 | 843 | 3.1% |
| $17,500 to $19,999 | 772 | 2.9% |
| $20,000 to $24,999 | 1568 | 5.8% |
| $25,000 to $29,999 | 1071 | 4.0% |
| $30,000 to $34,999 | 1163 | 4.3% |
| $35,000 to $39,999 | 888 | 3.3% |
| $40,000 to $49,999 | 1355 | 5.0% |
| $50,000 to $59,999 | 1049 | 3.9% |
| $60,000 to $74,999 | 1070 | 3.9% |
| $75,000 to $99,999 | 1118 | 4.1% |
| $100,000 to $149,999 | 998 | 3.7% |
| $150,000 or more | 636 | 2.3% |
| **Total** | **27127** | **100%** |

| Q7.12 - Q7.14 Household income in 2014 (recode) | Unweighted frequency | Unweighted % |
|---|---|---|
| No income | 996 | 3.9% |
| $1 to $5,000 | 1433 | 5.7% |
| $5,000 to $7,499 | 811 | 3.2% |
| $7,500 to $9,999 | 869 | 3.4% |
| $10,000 to $12,499 | 1109 | 4.4% |
| $12,500 to $14,999 | 897 | 3.6% |
| $15,000 to $17,499 | 725 | 2.9% |
| $17,500 to $19,999 | 725 | 2.9% |
| $20,000 to $24,999 | 1571 | 6.2% |
| $25,000 to $29,999 | 1220 | 4.8% |
| $30,000 to $34,999 | 1367 | 5.4% |
| $35,000 to $39,999 | 1224 | 4.8% |
| $40,000 to $49,999 | 1872 | 7.4% |
| $50,000 to $59,999 | 1806 | 7.1% |
| $60,000 to $74,999 | 2096 | 8.3% |
| $75,000 to $99,999 | 2360 | 9.3% |
| $100,000 to $149,999 | 2418 | 9.6% |
| $150,000 or more | 1797 | 7.1% |
| **Total** | **25296** | **100%** |

| Q29.1 & Q29.2 Registered to vote on November 4, 2014 (recode) | Unweighted frequency | Unweighted % |
|---|---|---|
| No | 8468 | 31% |
| Yes | 19215 | 69% |
| **Total** | **27683** | **100%** |

| Q29.1. Did you vote in the election held on Tuesday, November 4, 2014? | Unweighted frequency | Unweighted % |
|---|---|---|
| No | 13846 | 50% |
| Yes | 13805 | 50% |
| **Total** | **27651** | **100%** |



# Appendix B

Survey Instrument (Questionnaire)

AR.10409

*The survey was offered online only. The questionnaire has been reproduced here to best reflect what respondents saw when completing the survey. Programming notes are indicated in italics.*

## QUESTIONNAIRE:

The National Center for Transgender Equality welcomes you to the 2015 U.S. Trans Survey, the follow up to the National Transgender Discrimination Survey: Injustice At Every Turn. We thank you for participating in this survey. Every voice counts in documenting and better understanding the lives and experiences of trans people in the United States, and we appreciate yours.

Sincerely,

The National Center for Transgender Equality Survey Team



## UNIVERSITY OF CALIFORNIA LOS ANGELES

### Study information sheet

### 2015 U.S. Trans Survey

This study has been commissioned by the National Center for Transgender Equality (NCTE). A research team made up of Jody L. Herman, Ph.D. and Susan Rankin, Ph.D. are conducting this study. Your participation in this study is voluntary.

### WHY IS THIS STUDY BEING DONE?

This study is being conducted to better understand the demographics, health, and experiences of trans people in the United States. The findings of this study will be used for the benefit of the trans community and the research community.

### WHAT WILL HAPPEN IF I TAKE PART IN THIS RESEARCH STUDY?

If you volunteer to participate in this study, the researchers ask that you participate in an online survey. The purpose of the survey is to gather information about you and your experiences as a trans person in the United States. You will be one of over 700,000 possible participants who may take part in this survey, which is the current best estimate of the total number of trans-identified adults in the United States.

### HOW LONG WILL I BE IN THE RESEARCH STUDY?

Participation in the study will take between 30 and 60 minutes.

### ARE THERE ANY RISKS OR DISCOMFORTS THAT I CAN EXPECT FROM THIS STUDY?

Participating in this study poses no risks that are not ordinarily encountered in daily life. Any information you provide in the survey will be confidential. Some of the questions asked of you as part of this survey may make you feel uncomfortable. You may refuse to answer questions posed to you by skipping the question. You may stop your participation in this study at any time by exiting the survey. Should you need them, there will be a list of resources, including hotlines, provided at the end of the survey.

### ARE THERE ANY BENEFITS IF I PARTICIPATE?

The results of the research will be used for the benefit of the trans community in the United States and the research community. You will not directly benefit from your participation in the research.

### WILL I BE PAID FOR MY PARTICIPATION?

You will receive no payment for your participation. You will have the option to voluntarily enter a drawing to win one of three cash prizes: one prize of $500 and two prizes of $250.

### HOW WILL INFORMATION ABOUT ME AND MY PARTICIPATION BE KEPT CONFIDENTIAL?

Your survey response will be anonymous, so no information that can be used to identify you will be collected unless you voluntarily provide it. Any information that is obtained in connection with this study and that can identify you will remain confidential. If you do voluntarily provide any information that could be used to identify you, the research team will maintain your confidentiality by taking precautions to minimize any risk to your privacy from participating in this survey.

You will be given the option at the end of the survey to be directed to a separate page on a secure website if you wish to provide your contact information to receive survey results from NCTE, be entered into the drawing for one of three cash prizes, or share your personal story with NCTE. NCTE will NOT be provided with any responses from your survey in connection with your contact information. NCTE will only know that you have participated in the survey. NCTE will not provide to the research team any information that could be used to identify you, such as your name. Therefore, you will remain anonymous to the research team.

Results of this research study that are reported in published form will not name you or identify you as a participant. If you choose to self-identify anywhere on the survey and provide a written response, a different name will be created and used instead of your name if quoting you directly in any publication and any content of quotes that could be used to identify you will be removed.

**CAN THE RESEARCHERS REMOVE ME FROM THIS STUDY?**

The researchers will not remove you from the study. You may remove yourself from the study by exiting the survey. If you exit the survey, your responses will not be recorded or used in the study.

**WHAT ARE MY RIGHTS IF I TAKE PART IN THIS STUDY?**

Taking part in this study is your choice. You can choose whether or not you want to participate. Whatever decision you make, there will be no penalty to you.

- You have a right to have all of your questions answered before deciding whether to take part in the study.

- If you decide to take part in the study, you have the right to exit the study at anytime by exiting the survey.

- If you decide at any point to stop participating in this study, you have the right to exit the study at any time by exiting the survey.

**WHO CAN I CONTACT IF I HAVE QUESTIONS ABOUT THIS STUDY?**

The Research Team:

You may contact Jody L. Herman at (310) 267-4382 or Susan Rankin at (814) 625-2780 with any questions or concerns about the research or your participation in this study.

UCLA Office of the Human Research Protection Program (OHRPP):

If you have questions about your rights while taking part in this study, or you have concerns or suggestions and you want to talk to someone other than the researchers about the study, you may contact the UCLA OHRPP by phone: (310) 825-7122 or U.S. mail: UCLA OHRPP, 11000 Kinross Ave., Suite 102, Box 951694, Los Angeles, CA 90095-1694.

If you agree to take part in this study, as described in detail above, please click on the "**I AGREE**" button below. By clicking on the "**I AGREE**" button, you will indicate your consent to participate in this study.

If you do not agree to take part in this study, as described above, please click on the "**I DO NOT AGREE**" button below.

☐ **I AGREE**
I agree and give my consent to participate in this study.

☐ **I DO NOT AGREE**
I do not agree to participate in this study.

*Respondents who selected "do not agree" were sent a disqualification page #2.[1]*

## Survey Instructions

Please read and answer each question carefully. For each answer, click on the appropriate oval and/or fill in the appropriate blank. If you want to change an answer, click on the oval of your new answer and/or edit the appropriate blank, and your previous response will be erased.

You may decline to answer specific questions. The survey will take between 30-60 minutes to complete.

There will be several places in the survey where you will see a word or phrase that is underlined and bolded. You can click on those words or phrases and a definition or additional information will be offered.

In order to clear a response choice, please use the back button on your browser.

**WARNING: If you use the back button on your browser to return to a previous question, the responses you have entered for each page you clicked back on will be erased. For instance, if you click back three pages in the survey, your answers on those three pages will be erased. Responses before those three pages would stay the same.**

In the survey, please do not provide any information that could be used to identify you, such as your name or contact information. All of your answers are confidential and cannot be used against you.

**You must hit the "submit" button on the last page of the survey for your responses to be included in the final analyses.**

## Section 1

**1.1** Please make an ID in question 1.1. The research team will use the ID for their analysis. It will not be used to identify you.

Enter the first and last letter of your preferred first name. For example, if your first name is "Robert", enter "RT".

*[Text box]*

Enter the first letter of your preferred last name. For example, if your last name is "Smith", enter "S".

*[Text box]*

**1.2** It is important that people only complete this survey one time so that we can gather accurate information. You will only be entered into the prize drawing once, even if you complete this survey more than once. Have you already completed this survey before? *[Must answer to continue.]*

No

Yes *[Sent to disqualification page #1][2]*

**1.3** Are you 18 years of age or older? *[Must answer to continue.]*

No *[Sent to disqualification page #2][3]*

Yes

**1.4** What U.S. state or territory do you currently live in? *[Must answer to continue.]*

> *[Drop-down list of all U.S. states and territories.]*

> I do not live in a U.S. state or territory. *[Sent to disqualification page #1]*[4]

**1.5** How did you hear about this survey? **(Mark all that apply.)**

> Email from an organization (listserv, e-newsletter)

> Social networking site (such as Facebook)

> Organization website (such as NCTE)

> I was told about it in person (at an organization, event, or support group)

> Flier or print advertisement

> Word of mouth (e-mail from a friend, a friend told you about it)

> Not listed above (please specify) _____

**1.6** Are you taking this survey at a survey event or meeting, such as one hosted by an LGBTQ or Trans organization or meeting?

> No

> Yes

**1.7** How are you taking this survey?

> On my home computer/laptop

> On my work computer

> On a public computer (such as in a computer lab or library)

> On my mobile phone or tablet

> On a friend's or family member's mobile phone, tablet, or computer

> Not listed above (please specify) _____

**1.8** Not including for this survey, do you use the internet or email, at least occasionally? **(Mark all that apply.)**

> No *[Respondents could not select "No" in combination with any other option.]*

> Yes, the internet

> Yes, email

**1.9** If a national survey company, like Gallup, asked you the following question: "We are asking only for statistical purposes: Do you, personally, identify as lesbian, gay, bisexual, or transgender?" How would you answer?

> I would answer No

> I would answer Yes

> I would not answer the question

**PLEASE READ AND RESPOND CAREFULLY TO THE FOLLOWING QUESTIONS.**

This is a survey for people who are transgender, trans, or non-binary. It doesn't matter if you have transitioned gender or if you plan to. To see if this survey is for you, please answer the following questions.

**1.10** Do you think of yourself as transgender? *[Must answer to continue.]*

> No

> Yes

**1.11** Do you identify as more than one gender or as no gender (such as genderqueer or non-binary)? *[Must answer to continue.]*

> No

> Yes

**1.12** Do you currently live full-time in a gender that is different from the one assigned to you at birth? *[Must answer to continue.]*

> No *[Skip to 1.14]*

> Yes

**1.13** How old were you when you started to live full-time in a gender that is different from the one assigned to you at birth? *[Only respondents who selected "Yes" in response to 1.12 received this question.]*

> *[Drop-down list of all ages from "1" through "99," and "100 and above" as final response choice]*

**1.14** Someday do you want to live full-time in a gender that is different from the one assigned to you at birth? *[Respondents who selected "No" in response to 1.12 must answer to continue.]*

> No *[Skip to 1.16]*

> Yes

> Not sure

**1.15** What are the main reasons that you don't live full-time in a gender that is different from the one assigned to you at birth? **(Mark all that apply.)** *[Only respondents who selected "Yes" or "Not sure" in response to 1.14 received this question.]*

> My spouse and/or kids might reject me.

> My parents might reject me.

> I might lose my job or not be able to get a job.

> I might face mistreatment at school.

> My friends might reject me.

> I might not get the medical care I need.

> I might be hurt financially.

> I might become homeless.

> My church or faith community might reject me.

I might face violence.

I am not ready to transition.

A reason not listed above
(please specify) _____

**1.16** Have you seriously thought about living in a gender that is different from the one assigned to you at birth (transitioning gender)? *[Respondents who selected "No" in response to 1.13 must answer to continue.]*

No

Yes

**1.17** Do you consider yourself to be a cross-dresser? *[Must answer to continue.]*

No

Yes

**1.18** Do you live part of the time in one gender and part of the time in another gender? *[Must answer to continue.]*

No

Yes

*[Respondents who answered "No" to 1.10, 1.11, 1.12, 1.14, 1.16, 1.17, and 1.18 were sent to disqualification page #1.]*[5]

## Section 2

**2.1** What sex were you assigned at birth, on your original birth certificate? *[Must answer to continue.]*

Female

Male

**2.2** Which of these terms do you identify with? **(Mark all that apply.)**

A.G. or aggressive

Agender

Androgynous

Bi-gender

Butch

Bulldagger

Cross dresser

Drag performer (king/queen)

Fa'afafine

Gender non-conforming or gender variant

Genderqueer

Gender fluid/fluid

Intersex

Mahu

Multi-gender

Non-binary

Third gender

Stud

Transgender

Trans

Trans man (FTM, female to male)

Transsexual

Trans woman (MTF, male to female)

Travesti

Two-spirit

A gender not listed above
(please specify)_____

**2.3** If you had to choose only one of the following terms, which best describes your current gender identity? **(Please choose only one answer.)**

Cross-dresser

Woman

Man

Trans woman (MTF)

Trans man (FTM)

Non-binary/Genderqueer *[Respondents who selected this answer received questions 2.3_1, 2.3_2, and 2.3_3.]*

**2.3_1** For people in your life who don't know that you're non-binary/genderqueer, what gender do they usually think you are? *[Only respondents who selected "Non-binary/Genderqueer" in response to 2.3 received this question.]*

Man

Woman

Trans Man

Trans Woman

Non-Binary/Genderqueer

They can't tell

It varies

**2.3_2** When people in your life assume you are something other than non-binary/genderqueer (such as a man or a woman), how do you respond? *[Only respondents who selected "Non-binary/Genderqueer" in response to 2.3 received this question.]*

I **usually** let them assume I am a man or a woman

I **sometimes** tell them I identify as non-binary/genderqueer (or whatever words I use)

I **always** tell them I identify as non-binary/genderqueer (or whatever words I use) *[Skip to 2.4.]*

**2.3_3** What are the main reasons that you don't tell people you identify as non-binary/genderqueer? **(Mark all that apply.)** *[Only respondents who selected "Non-binary/Genderqueer" in response to 2.3 and either selected "I usually let them assume I am a man or a woman" or "I sometimes tell them I identify as non/binary genderqueer" in response to 2.3_2 received this question.]*

Most people don't understand so I don't try to explain it.

Most people dismiss it as not being a real identity or a "phase."

It is just easier not to say anything.

I am not ready to tell people I identify as non-binary/genderqueer.

I might lose my job or not be able to get a job.

I might face mistreatment at school.

My friends might reject me.

I might not get the medical care I need.

I might be hurt financially.

I might become homeless.

My church or faith community might reject me.

I might face violence.

A reason not listed above (please specify) _____

**2.4** How comfortable are you with the word "transgender" being used to describe you?

Very comfortable

Somewhat comfortable

Neutral

Somewhat uncomfortable

Very uncomfortable

*[All respondents received the following message.]* **We know that not everyone is comfortable with the word "transgender," but for this survey, we must use one word to refer to all trans and non-binary identities. Because of this we will use the word "trans" in this survey to refer to all trans and non-binary identities.**

**2.5** What gender pronouns do you ask people to use to refer to you? *[Respondents could mark all answers that applied.]*

He, his

She, hers

They, their

Ze, hir

No pronouns. I ask people only to use my name.

I don't ask people to use specific pronouns.

Pronouns not listed above (please specify) _____

**2.6** What gender do you currently live in on a day-to-day basis?

Man

Woman

Neither man nor woman/Genderqueer/Non-binary

Part time one gender/part time another gender

**2.7** People can tell I am trans even if I don't tell them.

Always

Most of the time

Sometimes

Rarely

Never

**2.8** What best describes your current sexual orientation?

Asexual

Bisexual

Gay

Heterosexual/Straight

Lesbian

Same-gender loving

Pansexual

Queer

A sexual orientation not listed above (please specify)_____

**2.9** Although the choices listed below may not represent your full identity or use the language you prefer, for this survey please select the choice that most accurately describes your racial/ethnic identity. **(Please choose only one answer.)**

Alaska Native

Enter your enrolled or principal corporation: _____ *[required]*

American Indian

Enter your enrolled or principal tribe: _____ *[required]*

Asian/Asian American

Biracial/Multiracial *[respondents received follow-up question 2.10]*

Black/African American

Latino/a/Hispanic

Middle Eastern/North African

Native Hawaiian/Pacific Islander

White/European American

A racial/ethnic identity not listed above (please specify) _____ *[respondents received follow-up question 2.11]*

**2.10** You said that you are biracial or multiracial. Please choose the racial/ethnic identities that best describe you. **(Mark all that apply.)**

*[Only respondents who selected "Biracial/Multiracial" in 2.9 received this question.]*

    Alaska Native

        Enter your enrolled or principal corporation: _____ *[required]*

    American Indian

        Enter your enrolled or principal tribe: _____ *[required]*

    Asian/Asian American

    Black/African American

    Latino/a/Hispanic

    Middle Eastern/North African

    Native Hawaiian/ Pacific Islander

    White/European American

    A racial/ethnic identity not listed above (please specify) _____

**2.11** You said that you had a racial/ethnic identity that was not listed above. Please choose the racial/ethnic identities that best describe you. **(Mark all that apply.)**

*[Only respondents who selected "A racial/ethnic identity not listed above" in 2.9 received this question.]*

    Alaska Native

        Enter your enrolled or principal corporation: _____ *[required]*

    American Indian

        Enter your enrolled or principal tribe: _____ *[required]*

    Asian/Asian American

    Black/African American

    Latino/a/Hispanic

    Middle Eastern/North African

    Native Hawaiian/ Pacific Islander

    White/European American

**2.12** What is your current religious or spiritual identity? **(Mark all that apply.)**

    Agnostic

    Atheist

    Baha'i

    Buddhist

    Christian (Please click here to specify) *[Respondents received the following drop-down list.]*

        African Methodist Episcopal

        African Methodist Episcopal Zion

        Assembly of God

        Baptist

        Catholic/Roman Catholic

        Church of Christ

        Church of God in Christ

        Christian Orthodox

        Christian Methodist Episcopal

        Christian Reformed Church (CRC)

        Episcopalian

        Evangelical

        Greek Orthodox

        Lutheran

        Mennonite

        Moravian

        Nondenominational Christian

        Pentecostal

        Presbyterian

        Protestant

        Protestant Reformed Church (PR)

        Quaker

        Reformed Church of America (RCA)

        Russian Orthodox

        Seventh Day Adventist

        The Church of Jesus Christ of Latter-day Saints

        United Methodist

        Unitarian Universalist

        United Church of Christ

        A Christian affiliation not listed above (please specify) _____

    Confucianist

    Druid

    Hindu

    Jain

    Jehovah's Witness

    Jewish (Please click here to specify) *[Respondents received the following drop-down list.]*

        Conservative

        Orthodox

        Reform

    Muslim (Please click here to specify) *[Respondents received the following drop-down list.]*

        Ahmadi

        Shi'ite

        Sufi

        Sunni

    Native American Traditional Practitioner or Ceremonial

    Pagan

Rastafarian

Scientologist

Secular Humanist

Shinto

Sikh

Taoist

Tenrikyo

Wiccan

Spiritual, but no religious affiliation

No affiliation

A religious affiliation or spiritual identity not listed above (please specify) _____

**2.13** What is your current age?

*[Drop-down list of all ages from "18" through "99," and "100 and above" as final response choice]*

**2.14** What month and year were you born?

Month *[Drop-down list of all months]*

Year *[Drop-down list with years 1997–1915, and earlier as final response choice]*

**2.15** What is your current relationship status?

Partnered, living together

Partnered, not living together

Single

Not listed above (please specify) _____

**2.16** What is your current legal marital status?

Married

Legally recognized civil union

Registered domestic partnership

Widowed

Divorced

Separated

Single, never married

**2.17** Have you ever served on active duty in the U.S. Armed Forces, Reserves, or National Guard? *As a reminder, your answers are confidential and cannot be used against you.*

Never served in the military

Only on active duty for training in the Reserves or National Guard

Now on active duty[6]

On active duty in the past, but not now

**2.18** What is your citizenship or immigration status in the U.S.? *As a reminder, your answers are confidential and cannot be used against you.*

U.S. citizen, birth *[Respondents directed to 2.19]*

U.S. citizen, naturalized

Permanent Resident

A visa holder (such as F-1, J-1, H1-B, and U)

DACA (Deferred Action for Childhood Arrival)

DAPA (Deferred Action for Parental Accountability)

Refugee status

Other documented status not mentioned above

Currently under a withholding of removal status

Undocumented resident

**2.19** In what U.S. state or territory were you born? *[Only respondents who selected "U.S. citizen, birth" in 2.18 received this question.]*

I was not born in a U.S. state or territory.

*[Drop-down list for all U.S. states and territories for other response choices. Respondents who selected "New York" received an additional drop-down choice for "New York City."]*

**2.20** Please answer each question below. (**Please provide an answer in each row.**)

| | No | Yes |
|---|---|---|
| Are you deaf or have serious difficulty hearing? | O | O |
| Are you blind or have serious difficulty seeing even when wearing glasses? | O | O |
| Because of a physical mental or emotional condition, do you have serious difficulty concentrating, remembering, or making decisions? | O | O |
| Do you have serious difficulty walking or climbing stairs? | O | O |
| Do you have difficulty dressing or bathing? | O | O |
| Because of a physical, mental, or emotional condition, do you have difficulty doing errands alone, such as visiting a doctor's office or shopping? | O | O |
| Do **YOU** identify as a person with a disability? | O | O |

**2.21** What is the main language that people speak in your home?

English only

Language(s) other than English

Armenian

Chinese

French

German

Greek

Italian

Japanese

Korean

Persian

Polish

Portuguese or Portuguese Creole

Russian

Serbo-Croatian

Spanish or Spanish Creole

Tagalog

Vietnamese

Yiddish

A language not listed above
(_____)

English and other language(s)

Armenian

Chinese

French

German

Greek

Italian

Japanese

Korean

Persian

Polish

Portuguese or Portuguese Creole

Russian

Serbo-Croatian

Spanish or Spanish Creole

Tagalog

Vietnamese

Yiddish

A language not listed above
(_____)

**2.22** What is the highest level of school or degree you have completed?

Less than 8th grade

8th grade

Some high school, no diploma or GED

GED

High school graduate

Some college, no degree (including currently in college)

Associate degree in college – Occupational/vocational program

Associate degree in college – Academic program

Bachelor's degree

Some graduate work, no graduate degree

Master's degree (M.A, M.S., MBA)

Doctoral degree (e.g., Ph.D., Ed.D.)

Professional degree (e.g., MD, JD)

**2.23** What are your current living arrangements?

Living in house/apartment/condo I OWN alone or with others (with a mortgage or that you own free and clear)

Living in house/apartment/condo I RENT alone or with others

Living with a partner, spouse, or other person who pays for the housing

Living temporarily with friends or family because I can't afford my own housing

Living with parents or family I grew up with because I have not yet left home

Living in a foster group home or other foster care

Living in campus/university housing

Living in a nursing home or other adult care facility

Living in a hospital

Living in military barracks

Living in a hotel or motel that I pay for myself

Living in a hotel or motel with an emergency shelter voucher

Living in transitional housing/halfway house

Living on the street, in a car, in an abandoned building, in a park, or a place that is NOT a house, apartment, shelter, or other housing *[Skip to 2.25]*

Living in a homeless shelter *[Skip to 2.25]*

Living in a domestic violence shelter *[Skip to 2.25]*

Living in a shelter that is not a homeless shelter or domestic violence shelter *[Skip to 2.25]*

A living arrangement not listed above
(please specify) _____

**2.24** Is there at least one telephone INSIDE your home that is currently working and is not a cell phone?

No

Yes

**2.25** Do you have a cell phone?

No

Yes

**2.26** What is the zip code where you currently live? _____

AR.10417

## Section 3

**3.1** At about what age did you begin to feel that your gender was "different" from your assigned birth sex?

*[Drop-down list of ages]*

**3.2** At about what age did you start to think you were trans (even if you did not know the word for it)?

*[Drop-down list of ages]*

**3.3** At about what age did you first start to tell others that you were trans (even if you did not use that word)?

I have not told others that I am trans.

*[Drop-down list of ages for other responses]*

**3.4** How do you socialize with other trans people? **(Mark all that apply.)**

In political activism

Socializing in person

Socializing on-line (such as Facebook or Twitter)

In support groups

I don't socialize with other trans people *[Respondents could not select this answer in combination with any other option.]*

Not listed above (please specify) _____

## Section 4

**These are questions about the people in your life and whether they know you are trans.**

**4.1** Have any of your spouses/partners known that you are trans during your relationship with them? **(Mark all that apply.)**

I have never had a spouse/partner *[Respondents could not select this answer in combination with any other option. Skip to 4.3 if selected.]*

No *[Respondents could not select this answer in combination with any other option. Skip to 4.3 if selected.]*

Yes, my current spouse/partner knows I am trans

Yes, at least one of my former spouses or partners knew I was trans

**4.2** Have any of your spouses/partners ended your relationship because you are trans? *[Only respondents who indicated that at least one of their past or current spouses knew they were trans in 4.1 received this question.]*

No

Yes, only because I was trans.

Yes, because I was trans and other reasons.

**4.3** Do any of your children know you are trans?

I do not have any children *[Skip to 4.5]*

No *[Skip to 4.5]*

Yes

**4.4** Have any of your children ever stopped speaking to you or spending time with you because you are trans?

No

Yes

**4.5** How many people in each group below currently know you are trans? **(Please provide an answer in each row.)**

| | I currently have no people like this in my life | All know that I am trans | Most know that I am trans | Some know that I am trans | None know that I am trans |
|---|---|---|---|---|---|
| Immediate family you grew up with (mother, father, sisters, brothers, etc.) | O | O | O | O | O |
| Extended family (aunts, uncles, cousins, etc.) | O | O | O | O | O |
| Lesbian, gay, bisexual, or trans (LGBT) friends | O | O | O | O | O |
| Straight, non-trans (non-LGBT) friends | O | O | O | O | O |
| Current boss/manager/supervisor | O | O | O | O | O |
| Current coworkers | O | O | O | O | O |
| Current classmates | O | O | O | O | O |
| Current health care providers | O | O | O | O | O |

**4.6** You said some or all of your immediate family you grew up with (mother, father, sisters, brothers, etc.) know that you are trans. On average, how supportive are they of you being trans? *[Only respondents who said in response to 4.5 that some, most, or all of their immediate family members knew they were trans received this question.]*

Very supportive

Supportive

Neither supportive nor unsupportive

Unsupportive

Very unsupportive

**4.7** Did any of your immediate family members you grew up with (mother, father, sisters, brothers, etc.) do any of these things to you because you are trans? **(Mark all that apply.)** *[Only respondents who said in response to 4.5 that some, most, or all of their immediate family members knew they were trans received this question.]*

Stopped speaking to you for a long time or ended your relationship

Were violent towards you

Kicked you out of the house

Did not allow you to wear the clothes that matched your gender

Sent you to a therapist, counselor, or religious advisor to stop you from being trans

None of the above *[Respondents could not select this answer in combination with any other option.]*

**4.8** Did any of your immediate family members you grew up with (mother, father, sisters, brothers, etc.) do any of these things to **support** you? **(Mark all that apply.)** *[Only respondents who said in response to 4.5 that some, most, or all of their immediate family members knew they were trans received this question.]*

Told you that they respect and/or support you

Used your preferred name

Used your correct pronouns (such as he/she/they)

Gave you money to help with any part of your gender transition

Helped you change your name and/or gender on your identity documents (ID), like your driver's license (such as doing things like filling out papers or going with you to court)

Did research to learn how to best support you (such as reading books, using online information, or attending a conference)

Stood up for me with family, friends, or others

Supported you in another way not listed above (please specify)_____

None of the above *[Respondents could not select this answer in combination with any other option.]*

**4.9** Did you ever run away from home because you are trans? *[Only respondents who said in response to 4.5 that some, most, or all of their immediate family members knew they were trans received this question.]*

No *[Skip to 4.11]*

Yes

**4.10** At what age did you run away from home because you are trans? *[Only respondents who selected "Yes" in 4.9 received this question.]*

[Drop-down list of ages]

**4.11** On average, how supportive are your co-workers with you being trans? *[Only respondents who said in response to 4.5 that some, most, or all of their coworkers knew they were trans received this question.]*

Very supportive

Supportive

Neither supportive nor unsupportive

Unsupportive

Very unsupportive

**4.12** On average, how supportive are your classmates with you being trans? *[Only respondents who said in response to 4.5 that some, most, or all of their classmates knew they were trans received this question.]*

Very supportive

Supportive

Neither supportive nor unsupportive

Unsupportive

Very unsupportive

## Section 5

**These questions are about your experiences with your church, synagogue, mosque, or other faith community.**

**5.1** Have you ever been part of a spiritual/religious community (such as a church, synagogue, mosque, or other faith community)?

No *[Skip to 6.1]*

Yes

**5.2** Have you ever left your spiritual/religious community because you **were afraid** they might reject you because you are a trans person?

No

Yes

**5.3** Have you ever left your spiritual/religious community because they **did reject** you because you are a trans person?

No *[Skip to 5.5]*

Yes

**5.4** After you stopped attending, did you find a spiritual/religious community that welcomed you as a trans person? *[Only respondents who selected "Yes" in 5.4 received this question.]*

No

Yes

**5.5 Now just thinking about the past year,** have you been part of a spiritual/religious community?

No *[Skip to 6.1]*

Yes

**5.6 In the past year**, did any leaders or other members of your spiritual/religious community think or know you were trans?

No *[Skip to 6.1]*

Yes

**5.7 In the past year**, how often did leaders or other members of your spiritual/religious community… **(Please provide an answer in each row.)**

| In the past year... | Never | Once or twice | A few times | Many times |
|---|---|---|---|---|
| Make you feel welcome as a trans person attending services/ faith community functions? | O | O | O | O |
| Accept you for who you are as a trans person? | O | O | O | O |
| Tell you that your religion/faith accepts you as a trans person? | O | O | O | O |
| Tell you that your being trans is a sin or that your religion does not approve of your being trans? | O | O | O | O |
| Ask you to meet with spiritual/ religious leaders to stop you from being trans? | O | O | O | O |
| Ask you to seek medical/psychological help to stop you from being trans? | O | O | O | O |
| Ask you to stop coming to services or faith community functions? | O | O | O | O |

## Section 6

**These are questions about work for pay in the sex industry and sex work. As a reminder, your answers are confidential and cannot be used against you.**

**6.1** Have you ever engaged in sex or sexual activity **for money** (sex work) or worked in the sex industry (such as erotic dancing, webcam work, or porn films)?

    No *[Skip to 6.4]*

    Yes

**6.2 Now just thinking about the past year**, have you engaged in sex or sexual activity for money (sex work) or worked in the sex industry (such as erotic dancing, webcam work, or porn films) in the past year? *[Only respondents who selected "Yes" in 6.1 received this question.]*

    No

    Yes

**6.3** What type of sex work or work in the sex industry have you **ever** done**? (Mark all that apply).** *[Only respondents who selected "Yes" in 6.1 received this question.]*

    Street-based sex work

    Sex work advertised online

    Sex work advertised in magazines or newspapers

    Informal sex work through word of mouth, occasional hook ups with dates in my networks, or things like that

    Escort/call girl/rent boy with an agency

    Pornography/picture or video

    Phone sex

    Webcam work

    Erotic dancer/stripper

    Fetish work (Domme, sub, switch)

    Not listed above (please specify) _____

**6.4** Have you engaged in sex or sexual activity for any of the following? **(Please mark all that apply in each row.)** *[Respondents could not select "No" in combination with any other option.]*

| | No | Yes, within the past year | Yes, but more than a year ago |
|---|---|---|---|
| I engaged in sex or sexual activity for food | O | O | O |
| I engaged in sex or sexual activity for a place to sleep in someone's bed, at their home, or in their hotel room | O | O | O |
| I engaged in sex or sexual activity for drugs | O | O | O |
| For something not listed above (please specify) _____ *[Response recorded as "No" if text left blank.]* | O | O | O |

**6.5** Did you ever interact with the police while doing sex work or **when police thought** you were doing sex work? *[Respondents could select multiple answer choices, but could not select "No" in combination with any other option.]*

    No *[Skip to 6.11]*

    Yes, while I was doing sex work.

    Yes, when police thought I was doing sex work.

**6.6** When you interacted with police while doing sex work or when police thought you were doing sex work, did you experience any of the following? **(Please provide an answer in each row.)**

| | No | Yes |
|---|---|---|
| Officers kept calling me by the wrong gender pronouns (such as he/him or she/her) or the wrong gender title (such as Mr. or Ms.). | O | O |
| Officers asked me questions about my gender transition (such as hormones and surgical status). | O | O |
| Officers verbally harassed me. | O | O |
| Officers physically attacked me. | O | O |
| Officers forced me to have sex or sexual activity to avoid arrest. | O | O |
| I experienced unwanted sexual contact from an officer (such as fondling, sexual assault, or rape). | O | O |
| I was arrested for drugs in my possession when police stopped me for doing sex work. | O | O |

**6.7** Have you ever been arrested for doing sex work or **when police thought** you were doing sex work? *[Only respondents who selected "Yes, while I was doing sex work" and/or "Yes, when police thought I was doing sex work" in 6.5 received this*

*question. Respondents could select multiple answer choices but could not select "No" in combination with any other option.]*

No *[Skip to 6.11]*

Yes, while I was doing sex work

Yes, when the police thought I was doing sex work

**6.8** How many times have you been arrested for doing sex work or when police thought you were doing sex work?

*[Drop-down list of 1–10 and "11 or more"]*

**6.9** When police arrested you, did they consider things in your possession such as condoms or sex toys as "evidence of prostitution"? *[Respondents could select multiple answer choices.]*

No

Yes, condoms

Yes, sex toys

Yes, items not listed above (please specify)

_____

I don't know

**6.10** Did any of these things happen when you were arrested? **(Mark all that apply.)**

The charges were dropped.

I pled guilty.

I went to trial and was found not guilty.

I went to trial and was found guilty.

Something not listed above (please specify) _____

**6.11** Have you ever been paid for selling drugs or other work that is currently considered illegal? **(Mark all that apply.)** *[Respondents could not select "No" in combination with any other option.]*

No *[Skip to 7.1]*

Yes, selling drugs

Yes, other work (please specify) _____

**6.12 Now just thinking about the past year,** were you paid for selling drugs or other work that is currently considered illegal in the past year? **(Mark all that apply.)** *[Only respondents who selected an answer choice other than "No" received this question. Respondents could not select "No" in combination with any other option.]*

No

Yes, selling drugs

Yes, other work (please specify) _____

## Section 7

**These questions are about your household, your income, and your current job. As a reminder, your answers are confidential and cannot be used against you. These questions are based on national surveys that we will use to compare with the U.S. population.**

**7.1** How many adults (age 18 or older) live in your <u>household</u>,[7] including yourself? (Do not include neighbors or others who do not live with you in your house, apartment, or single housing unit.) For more information, click on **household** above.

1 *[Skip to 7.5]*

2

3

4

5

6

7

8

9 or more

**7.2** How are the other adults (age 18 or older) who live in your household related to you? **(Mark all that apply.)**

Spouse (legally married)

Partner (not legally married)

Child or children

Grandchild or grandchildren

Parent(s) (Mother/Father/Step-Parent(s))

Brother(s)/Sister(s)/Step-Brother(s)/Step-Sister(s)

Other relative(s) (Aunt, Cousin, Nephew, Mother-in-law, etc.)

Foster child or foster children

Housemate(s)/Roommate(s)

Roomer(s)/Boarder(s)

Other non-relative(s)

Not listed above (please specify) _____

**7.3** How many adults in your household are <u>related to you</u>[8] by birth (blood relatives), adoption, or legal marriage? Don't include partners who aren't legally married to you or adults who aren't related to you. We will ask about them later.

0 *[Skip to 7.5]*

1

2

3

4

5

6

7

8

9 or more

**7.4** Is any person aged 65 or older <u>named on the lease, mortgage, or deed</u>[9] for your household?

No

Yes

**7.5** How many babies and other children under age 18 live in your household?

0 *[Skip to 7.7]*

1

2

3

4

5

6

7

8

9 or more

**7.6** How many of the children under age 18 who live in your household are <u>related to you</u>[10] by birth (blood relatives) or adoption? Don't include children who aren't related to you by birth or legal adoption. We will ask about them later.

0

1

2

3

4

5

6

7

8

9 or more

**7.7** What is your current employment status? **(Mark all that apply.)**

Work for pay from sex work, selling drugs, or other work that is currently considered illegal

*[Respondents who selected this answer choice received the following question.] Are you actively looking for legal work outside sex work, selling drugs , or other work that is currently considered illegal*

No

Yes

Work full-time for an employer

*[Respondents who selected this answer choice received the following question.] Do you have more than one full-time job?*

No

Yes

Work part-time for an employer

*[Respondents who selected this answer choice received the following question.] Do you have more than one part-time job?*

No

Yes

Self-employed in your own business, profession or trade, or operate a farm (not including sex work, selling drugs, or other work that is currently considered illegal)

Unemployed but looking for work

Unemployed and have stopped looking for work

Not employed due to disability

Student

Retired

Homemaker or full-time parent

Not listed above (please specify) _____

**7.8** On any of your full-time or part-time jobs, are you a member of a labor union or of an employee association similar to a union? *[Only respondents who selected "Work full-time for an employer" and/or "Work part-time for an employer" in 7.7 received this question. Respondents could select multiple answer choices but could not select "No" in combination with any other option.]*

No

Yes in a part-time job *[Skip to 7.10]*

Yes in a full-time job *[Skip to 7.10]*

**7.9** On any of your full-time or part-time jobs, are you covered by a union or employee association contract? *[Only respondents who selected "Work full-time for an employer" and/or "Work part-time for an employer" in 7.7 AND selected "No" in 7.8 received this question. Respondents could select multiple answer choices but could not select "No" in combination with any other option.]*

No

Yes in a part-time job

Yes in a full-time job

**7.10** Do you currently receive assistance from FOOD STAMPS (<u>SNAP</u>)[11] or <u>WIC</u>[12]? **(Mark all that apply.)** *[Respondents could not select "No" in combination with any other option.]*

No

Yes, assistance from food stamps (SNAP)[13]

Yes, assistance from WIC[14,15]

**7.11** What are your current sources of income? (**Mark all that apply.**)

Pay from sex work, selling drugs, or other work that is currently considered illegal

Pay from your full-time or part-time job

Pay from your partner's/spouse's full-time or part-time job

Self-employment income from your own business, profession or trade, or farm (not including underground economy)

Income from dividends, estates or trusts, royalties, or rental income

Interest income (on savings or bonds)

Cash assistance from welfare (such as TANF) or other public cash assistance program (DO NOT include food stamps (SNAP) or WIC)

Unemployment benefits

Child support or alimony

Social security retirement or railroad retirement income

Private pension or government employee pension

Other retirement income

Social security disability benefits (SSDI)

Supplemental security income (SSI)

Workers' comp or other disability

Veteran's disability benefits and other Veteran's benefits

Regular contributions from people who don't live in the household

Income not listed above,
(please specify) _____

**7.12** What was your total combined **Individual Income**[16] (before taxes) **in 2014**? This includes all income sources **except** food stamps (SNAP) or WIC.

No income

1 to 5,000

5,000 to 7,499

7,500 to 9,999

10,000 to 12,499

12,500 to 14,999

15,000 to 17,499

17,500 to 19,999

20,000 to 24,999

25,000 to 29,999

30,000 to 34,999

35,000 to 39,999

40,000 to 49,999

50,000 to 59,999

60,000 to 74,999

75,000 to 99,999

100,000 to 149,999

150,000 or more

**7.13** What was your total combined **Family Income**[17] (before taxes) **in 2014**? This includes all income from all family members who are related to you by legal marriage, birth, or adoption and who have lived with you during the last 12

months. **Don't include** food stamps (SNAP) or WIC. *[Only respondents who selected an answer choice other than "0" in 7.3 (related adults in household) and/or selected an answer choice other than "0" in 7.6 (related children in household) received this question.]*

No income

1 to 5,000

5,000 to 7,499

7,500 to 9,999

10,000 to 12,499

12,500 to 14,999

15,000 to 17,499

17,500 to 19,999

20,000 to 24,999

25,000 to 29,999

30,000 to 34,999

35,000 to 39,999

40,000 to 49,999

50,000 to 59,999

60,000 to 74,999

75,000 to 99,999

100,000 to 149,999

150,000 or more

**7.14** How much was your total combined **HOUSEHOLD INCOME**[18] (before taxes) **in 2014**? This includes income from all members of your household from all sources **except** food stamps (SNAP) or WIC. *[Only respondents with non-related adults and/or non-related children in their household received this question. Respondents received this question if they indicated that they had non-related adults in their household (they selected "2" or more in 7.1 and selected a higher number in response to 7.3 than in response to 7.1) and/or they indicated that they had non-related children in the household (they selected "1" or more in 7.5 and selected a higher number in response to 7.6 than in response to 7.5).]*

No income

1 to 5,000

5,000 to 7,499

7,500 to 9,999

10,000 to 12,499

12,500 to 14,999

15,000 to 17,499

17,500 to 19,999

20,000 to 24,999

25,000 to 29,999

30,000 to 34,999

35,000 to 39,999

40,000 to 49,999

50,000 to 59,999

60,000 to 74,999

75,000 to 99,999

100,000 to 149,999

150,000 or more

## Section 8

*[Only respondents who selected an answer choice other than "never served in the military" in 2.17 received question in this section.]*

**You said earlier that you currently serve or have served on active duty in U.S. Armed Forces, Reserves, or National Guard. These are questions about your military service. As a reminder, your answers are confidential and cannot be used against you.**

**8.1** What is your current or most recent branch of service?

Air Force

Air Force Reserve

Air National Guard

Army

Army Reserve

Army National Guard

Coast Guard

Coast Guard Reserve

Marine Corps

Marine Corps Reserve

Navy

Navy Reserve

**8.2** Are you still serving in the military? *[Only respondents who selected "on active duty in the past, but now not" in 2.17 received this question.]*

No

Yes *[Skip to 8.4]*

**8.3** Did you separate from military service within the last 10 years? *[Only respondents who selected "on active duty in the past, but now not" in 2.17 received this question.]*

Yes

No *[Skip to 8.12]*

**8.4** While serving in the military, have you ever received **mental health** treatment related to a gender transition from a military provider (do not include VA)? *[Only respondents who selected "Yes" in 8.2 or selected "Yes" in 8.3 received this question.]*

No

Yes

**8.5** While serving in the military, have you ever received **medical** treatment related to a gender transition from a military provider (do not include VA)? *[Only respondents who selected "Yes" in 8.2 or selected "Yes" in 8.3 received this question.]*

No

Yes

**8.6** Has any military medical or mental health provider reported to your commanding officer that you are trans or recommended you for discharge? **(Mark all that apply.)** *[Only respondents who selected "Yes" in 8.2 received this question. Respondents could not select "No" in combination with any other option.]*

No

Yes, reported that I was trans

Yes, recommended me for discharge

Does not apply to me, none of these providers knew that I was trans

**8.7** If trans people were allowed to serve openly, which of these would apply to you? *[Only respondents who selected "Yes" in 8.2 received this question.]*

I would start to transition while still serving

I would finish the transition that I have already started while still serving

I would not finish the transition that I have already started while still serving

I would leave military service so that I could transition, and not return.

I would leave military service so that I could transition, then return to service after transition

I do not want to transition

I have already transitioned

None of the options listed above

**8.8** If trans people were allowed to serve openly, I would return to service: *[Only respondents who selected "Yes" in 8.3 received this question.]*

Yes

No

Maybe

**8.9** How many people in the military (who aren't trans) believe you are trans? *[Only respondents would selected "Yes" in 8.2 received this question.]*

None *[Skip to 9.1]*

A few

Some

Most

All

**8.10** Does your leadership or commanding officer (or both) think or know you are trans? *[Only respondents who selected "Yes" in 8.2 and an answer choice other than "None" in 8.9 received this question.]*

    No *[Skip to 9.1]*

    Yes

**8.11** How has your leadership or commanding officer (or both) reacted to you being trans? **(Mark all that apply.)** *[Only respondents who selected "Yes" in 8.10 received this question.]*

    Supported my name change

    Supported my medical treatment

    Ignored it or looked the other way

    Took actions to discharge me

    Not listed above (please specify) _____

    *[Only respondents who selected "No" in 8.2 and "No" in 8.3 received questions 8.12–8.21]*

**8.12** What was your character of discharge?

    Entry Level Separation

    Honorable

    General

    Medical

    Other-than-honorable

    Bad Conduct

    Dishonorable

    None of the options listed above (please specify) _____

**8.13** Do you believe your discharge was related to being trans?

    No

    Yes, partially

    Yes, completely

**8.14** Did you leave the service in order to transition?

    No

    Yes

**8.15** Did you leave the service to avoid mistreatment/harassment?

    No

    Yes

**8.16** Did any military medical or mental health provider tell your commander that you are trans or recommend you for discharge? **(Mark all that apply.)** *[Respondents could not select "No" in combination with any other option.]*

    No

    Yes, reported that I was trans.

    Yes, recommended me for discharge.

    Does not apply to me, none of these providers knew that I was trans.

**8.17** Did you ever get any type of health care through the VA?

    No *[Skip to 8.21]*

    Yes

**8.18** Did you ever get health care related to a gender transition through the VA?

    No

    Yes

**8.19** Do you currently get any type of health care through the VA?

    No

    Yes

**8.20** As a trans person, have you received respectful care at the VA?

    Never

    Sometimes

    Mostly

    Always

    Does not apply to me, the VA staff do not know I'm trans

**8.21** Have you changed your name on your DD214 military discharge papers?

    Yes, I received an updated DD214 with new name.

    Yes, I received a DD215 (amended) with new name.

    No, I was denied.

    No, I never tried.

## Section 9

*[Only respondents who selected any answer choice other than "U.S. citizen, birth" in 2.18 received questions in this section.]*

**You said earlier that you are not a U.S. citizen by birth. These are questions about immigration experiences you may have had. As a reminder, your answers are confidential and cannot be used against you.**

**9.1** Have you ever been held in immigration detention (such as being held in an Immigration and Customs Enforcement (ICE) detention center or local jail just for immigration court proceedings)?

    No *[Skip to 9.6]*

    Yes

**9.2** While you were in immigration detention, do you believe staff, guards, or others thought or knew you were trans or lesbian, gay, or bisexual (LGB)?

No

Yes

**9.3** When you were in immigration detention, separated from others who were also in detention? **(Mark all that apply.)** *[Respondents could not choose "No" in combination with any other option.]*

No *[Skip to 9.5]*

Yes, in solitary confinement

Yes, in a separate area for trans or LGB people (such as a pod, unit, tank, or other housing area) *[Skip to 9.5]*

Not listed above (please specify) _____ *[Skip to 9.5]*

**9.4** In total, how long were you held in solitary confinement? *[Only respondents who selected "Yes, in solitary confinement" received this question.]*

Up to 14 days (up to two weeks)

15 days to 30 days (three or four weeks)

31 days to 90 days (1-3 months)

91 days to 180 days (3-6 months)

181 days to one year (more than 6 months up to a year)

More than 1 year

**9.5** When you were in immigration detention, did any of these things happen to you. **(Mark all that apply.)** *[Respondents could not select "None of these things happened to me" in combination with any other option.]*

I was physically assaulted.

  *[Respondents who selected this answer choice received the following question.]* Were you physically assaulted by:

  Staff or detention officers

  Other detainees or inmates

I was sexually assaulted.

  *[Respondents who selected this answer choice received the following question.]* Were you sexually assaulted by:

  Staff or detention officers

  Other detainees or inmates

I was threatened with sexual assault

  *[Respondents who selected this answer choice received the following question.]* Were you threatened with sexual assault by:

  Staff or detention officers

  Other detainees or inmates

I was denied access to hormones that I use.

I was denied gender-appropriate clothing.

None of these things happened to me.

**9.6** Have you ever applied for asylum in the United States? *[Respondents could select multiple answer choices but could not select "No" in combination with any other answer choice.]*

No *[Skip to 9.8]*

Yes, because I am trans or LGB

Yes, for another reason

**9.7** Did you receive asylum in the United States? *[Only respondents who selected "Yes, because I am trans or LGB" or "Yes, for another reason" received this question.]*

Yes *[Skip to 10.1]*

No *[Skip to 9.9]*

No, but I received a "withholding of removal" status. *[Skip to 10.1]*

**9.8** Why didn't you apply for asylum? *[Only respondents who selected "No" in 9.6 received this question.]*

I didn't know how to apply.

I have access to other legal statuses.

I didn't want to apply.

I was afraid to apply.

I believed I was past the 1 year deadline.

A reason not listed above (please specify) _____

**9.9** Why didn't you receive asylum? *[Only respondents who selected "No" in 9.7 received this question.]*

I was past the 1 year deadline.

The immigration official decided that I didn't face danger in my country.

A reason not listed above (please specify) _____

## Section 10

**These are questions about legal name change and your current identification documents, such as your birth certificate or driver's license.**

**10.1** Did you ever try **OR** complete the process to get a legal name change to match your gender identity?

No *[Skip to 10.12]*

Yes

**10.2** How did you try to change your name?

With a court order

During the immigration/naturalization process *[Skip to 10.13]*

By another method (Please tell us what method) _____ *[Skip to 10.13]*

**10.3** For your legal name change, did you interact with judges or court staff? *[Only respondents who selected "With a court order" in 10.2 received this question.]*

No *[Skip to 10.7]*

Yes

**10.4** Do you believe the judges or court staff you interacted with thought or knew you were trans? *[Only respondents who selected "Yes" in 10.3 received this question.]*

No *[Skip to 10.7]*

Yes

**10.5** When you interacted with judges or court staff, were you treated with respect? *[Only respondents who selected "Yes" in 10.4 received this question.]*

I was never treated with respect

I was sometimes treated with respect

I was always treated with respect

**10.6** When you interacted with judges or court staff, did you experience any of the following? (**Please provide an answer in each row.**) *[Only respondents who selected "Yes" in 10.4 received this question.]*

|  | No | Yes |
|---|---|---|
| I was verbally harassed. | O | O |
| I received unequal treatment/service. | O | O |
| They kept calling me by the wrong gender pronouns (such as he/him or she/her) or a wrong title (Mr. or Ms.). | O | O |
| I was asked questions about my gender transition (such as hormones and surgical status). | O | O |

**10.7** Did the court grant your name change? *[Only respondents who selected "With a court order" in 10.2 received this question.]*

Yes, the court granted my name change. *[Skip to 10.9]*

No, the court denied my name change.

No, I ran out of money to complete the process. *[Skip to 10.9]*

No, I gave up. *[Skip to 10.9]*

Not sure yet. I am still in the process of getting my court ordered name change. *[Skip to 10.9]*

Not listed above (please specify) _____ *[Skip to 10.9]*

**10.8** Why did the court deny your name change? *[Only respondents who selected "No, the court denied my name change" in 10.7 received this question.]*

*[Text box]*

**10.9** How old were you when you went to court to get your legal name change? *[Only respondents who selected "With a court order" in 10.2 received this question.]*

*[Drop-down list of ages]*

**10.10** Did you get legal help to change your name? *[Only respondents who selected "With a court order" in 10.2 received this question.]*

No

Yes, I got legal help from a paid attorney.

Yes, I got help for free from a legal clinic or non-profit organization.

Yes, I got help from a friend.

Yes, I got help from some other source.

**10.11** How much did your legal name change cost? Please include the cost of legal help, court fees, newspaper publication, etc. *[Only respondents who selected "Yes, the court granted my name change" in 10.7 received this question.]*

$0

$1 - $99

$100 - $249

$250 - $499

$500 - $749

$750 - $999

$1,000 - $2,000

More than $2,000

I do not remember the cost of my legal name change.

**10.12** Why you have not tried to legally change your name? (**Mark all that apply.**) *[Only those who selected "No" in 10.1 received this question.]*

I feel like my name doesn't conflict with my gender identity or expression.

I am not ready.

I cannot afford it.

I don't know how.

I believe I am not allowed (for example, because of my criminal record, immigration status, or residency).

I am worried that changing my name would out me.

A reason not listed above (please specify) _____

**10.13** Thinking about how your **NAME** is listed on all of your IDs and records that list your name, such as your birth certificate, driver's license, passport, etc. Which of the statements below is most true? *[All respondents received this question.]*

All of my IDs and records list the name I prefer.

Some of my IDs and records list the name I prefer.

None of my IDs and records list the name I prefer. *[Skip to 10.15]*

**10.14** Which of these IDs/records have you changed to list your preferred **NAME**? (**Please provide an answer in each row.**) *[Only respondents who selected "All of my IDs and records list the name I prefer" or "Some of my IDs and records list the name I prefer" in 10.13 received this question.]*

| | I do not have this ID/record | I changed my NAME on this ID/record | I was denied a NAME change on this ID/record | I am in the process of changing my NAME on this ID/record | I have not tried to change my NAME on this ID/record but I want to | I do not want to change my NAME on this ID/record |
|---|---|---|---|---|---|---|
| Birth certificate | O | O | O | O | O | O |
| Driver's license and/or state issued non-driver ID | O | O | O | O | O | O |
| Social Security records | O | O | O | O | O | O |
| Passport | O | O | O | O | O | O |
| Student records (current or last school attended) | O | O | O | O | O | O |
| Work ID | O | O | O | O | O | O |

**10.15** Thinking about how your **GENDER** is listed on all of your IDs and records that list your gender, such as your birth certificate, driver's license, passport, etc. Which of the statements below is most true? *[All respondents received this question.]*

All of my IDs and records list the gender I prefer.

Some of my IDs and records list the gender I prefer.

None of my IDs and records list the gender I prefer. *[Skip to 10.17]*

**10.16** Which of these IDs/records have you changed to list your preferred **GENDER**? (**Please provide an answer in each row.**) *[Only respondents who selected "All of my IDs and records list the gender I prefer" or "Some of my IDs and records list the gender I prefer" in 10.15 received this question.]*

| | I do not have this ID/record | I changed my GENDER on this ID/record | I was denied a GENDER change on this ID/record | I am in the process of changing my GENDER on this ID/record | I have not tried to change my GENDER on this ID/record but I want to | I do not want to change my GENDER on this ID/record |
|---|---|---|---|---|---|---|
| Birth certificate | O | O | O | O | O | O |
| Driver's license and/or state issued non-driver ID | O | O | O | O | O | O |
| Social Security records | O | O | O | O | O | O |
| Passport | O | O | O | O | O | O |
| Student records (current or last school attended) | O | O | O | O | O | O |

**10.17** You said that none of your IDs or records list the gender you prefer. Why haven't you changed your gender on your IDs or records? (**Mark all that apply.**) *[Only respondents who selected "None of my IDs and records list the gender I prefer" in 10.15 received this question.]*

The gender options that are available (male or female) do not fit my gender identity.

I have not tried yet.

My request was denied.

I am not ready.

I cannot afford it.

I do not know how.

I believe I am not allowed. (For example, I have not had the medical treatment needed to change my gender on ID. Or I can't get a doctor's letter or other letter that is needed to update the gender.)

I am worried that if I change my gender, I might not be able to get some benefits or services. These might include medical, insurance, employment, etc.

I am worried that changing my gender would out me.

A reason not listed above (please specify)_____

**10.18** When I have shown IDs with my name or gender that do not match the gender I present as... (**Mark all that apply.**) *[All respondents received this question. Respondents could not select "I have had none of the above problems" or "This does not apply to me. I have only shown IDs that match" in combination with any other option.]*

I have been verbally harassed.

I have been assaulted/attacked.

I have been asked to leave.

I have been denied services or benefits.

I have had none of the above problems.

This does not apply to me. I have only shown IDs that match.

# Section 11

**These are questions about your current health insurance coverage, your health care providers, and the health insurance marketplace (such as healthcare.gov).**

**11.1** Are you currently covered by any health insurance or health coverage plan?

No *[Skip to 11.4]*

Yes

**11.2** What type of health insurance or health coverage plan do you have? (**Mark all that apply.**)

Insurance through my current or former employer or union

Insurance through someone else's current or former employer or union

Insurance I or someone else purchased through

HealthCare.Gov or a Health Insurance Marketplace (sometimes called "Obamacare")

Insurance I or someone else purchased directly from an insurance company

Medicare (for people 65 and older, or people with certain disabilities)

Medicaid (government-assistance plan for those with low incomes or a disability)

TRICARE or other military health care

VA (including those who have ever used or enrolled for VA health care)

Indian Health Service

Any other type of health insurance or health coverage plan (please specify) _____

**11.3 In the past year,** did any of these things happen with your health insurance company? **(Please provide an answer in each row.** If you didn't try to get the kind of care listed or if you never tried to change your records, choose "I have not asked for this.")

| In the past year... | Yes | No | I have not asked for this |
|---|---|---|---|
| My health insurance company wouldn't change my records to list my current name or gender. | O | O | O |
| My health insurance company denied me hormone therapy for transition. | O | O | O |
| My health insurance company denied me surgery for transition. | O | O | O |
| My health insurance company covers only some of the surgical care I need for my transition. | O | O | O |
| My health insurance company covers surgery for transition, but has no surgery providers in their network. | O | O | O |
| My health insurance company denied me gender-specific health care (such as Pap smears, prostate exams, mammogram, etc.) because I am trans. | O | O | O |
| My health insurance company denied me other routine health care because I am trans. | O | O | O |

**11.4** Thinking about the doctor or provider you go to for your **trans-related** health care (such as hormone treatment), how much do they know about providing health care for trans people?

I don't have a trans-related doctor or health care provider right now *[Skip to 11.7]*

They know almost everything about trans healthcare

They know most things about trans healthcare

They know some things about trans healthcare

They know almost nothing about trans healthcare

I am not sure

**11.5** How far do you travel to see your trans-related health care provider?

Less than 10 miles

10-25 miles

25-50 miles

50-75 miles

75-100 miles

Over 100 miles

**11.6** Do you also go to your **trans-related** health care provider for your routine health care, like physicals, flu, diabetes, etc.?

Yes, I see my trans health care provider for my routine health care *[Skip to 11.9]*

No, I see a different doctor or health care provider for my routine healthcare

No, I do not get any routine health care *[Skip to 11.9]*

**11.7** How much does your *routine health care* provider (who you see for physicals, flu, diabetes, etc.) know about health care for trans people? *[Only respondents who selected "No, I see a different doctor or health care provider for my routine healthcare" received this question.]*

I don't have a routine health care provider *[Skip to 11.9]*

They know almost everything about trans health care

They know most things

They know some things

They know almost nothing

I am not sure

**11.8** How far do you travel to see your routine health care provider? *[Only respondents who selected "No, I see a different doctor or health care provider for my routine healthcare" received this question.]*

Less than 10 miles

10-25 miles

25-50 miles

50-75 miles

75-100 miles

Over 100 miles

**11.9 In the past year,** did you look for health insurance from a state or federal health insurance marketplace? (Health insurance marketplaces are part of the new health care law, sometimes called "Obamacare" or the "Affordable Care Act," where people can get insurance online, such as through healthcare.gov, over the phone, or in person.)

No *[Skip to 12.1]*

Yes

**11.10** Did you buy insurance or enroll in a state Medicaid program through a health insurance marketplace? *[Only respondents who selected "Yes" in 11.9 received this question.]*

No *[Skip to 12.1]*

Yes

AR.10429

**11.11** What type of insurance coverage did you buy? *[Only respondents who selected "Yes" in 11.10 received this question.]*

Coverage through a state Medicaid program

Coverage through a private plan with a subsidy, so I pay a lower price because of my income

Coverage through a private plan without a subsidy

Not listed above (please specify) _____

## Section 12

**These are questions about your health, experiences with doctors or health care providers, and health care.**

**12.1** Would you say that in general your health is…

Excellent

Very good

Good

Fair

Poor

**12.2** The following questions ask about how you have been feeling **during the past 30 days**. For each row, please select the column that best describes how often you had this feeling. **(Please provide an answer in each row.)**

| During the past 30 days, how often did you feel… | All of the time | Most of the time | Some of the time | A little of the time | None of the time |
|---|---|---|---|---|---|
| …so sad that nothing could cheer you up? | O | O | O | O | O |
| …nervous? | O | O | O | O | O |
| …restless or fidgety? | O | O | O | O | O |
| …hopeless? | O | O | O | O | O |
| …that everything was an effort? | O | O | O | O | O |
| …worthless? | O | O | O | O | O |

**12.3** We just asked about a number of feelings you had **during the past 30 days**. Altogether, how MUCH did these feelings interfere with your life or activities? *[Only respondents who selected an answer choice other than "None of the time" in 12.2 received this question.]*

A lot

Some

A little

Not at all

**12.4** Was there a time **in the past 12 months** when you needed to see a doctor but could not because of cost?

No

Yes

**12.5** Was there a time in the **past 12 months** when you needed to see a doctor but did not because you thought you would be disrespected or mistreated as a trans person?

No

Yes

**12.6 In the past year**, have you seen a doctor or health care provider?

No *[Skip to 12.8]*

Yes

**12.7 In the past year**, did you have any of these things happen to you, as a trans person, when you went to see a doctor or health care provider? **(Please provide an answer in each row.)** *[Only respondents who selected "Yes" in 12.6 received this question.]*

| In the past year… | No | Yes |
|---|---|---|
| My doctor knew I was trans and treated me with respect. | O | O |
| I had to teach my doctor or other health care provider about trans people so that I could get appropriate care. | O | O |
| A doctor or other health care provider refused to give me trans-related care. | O | O |
| A doctor or other health care provider refused to give me other health care (such as for like physicals, flu, diabetes). | O | O |
| My doctor asked me unnecessary/invasive questions about my trans status that were not related to the reason for my visit. | | |
| A doctor or other health care provider used harsh or abusive language when treating me. | O | O |
| A doctor or other health care provider was physically rough or abusive when treating me. | O | O |
| I was verbally harassed in a health care setting (such as a hospital, office, clinic). | O | O |
| I was physically attacked by someone during my visit in a health care setting (such as a hospital, office, clinic). | O | O |
| I experienced unwanted sexual contact (such as fondling, sexual assault, or rape) in a health care setting (such as a hospital, office, clinic). | O | O |

**12.8** Have you **ever wanted** any of the health care listed below for your gender identity or gender transition? **(Mark all that apply.)** *[Respondents could not select "None of the above" in combination with any other option.]*

Counseling/Therapy

Hormone Treatment/HRT

Puberty Blocking Hormones (usually used by youth ages 9-16)

None of the above

**12.9** Have you **ever had** any of the health care listed below for your gender identity or gender transition? **(Mark all that apply.)** *[Respondents could not select "None of the above" in combination with any other option.]*

Counseling/Therapy

Hormone Treatment/HRT

Puberty Blocking Hormones (usually used by youth ages 9-16)

None of the above

**12.10** At what age did you begin hormone treatment/HRT treatment? *[Only respondents who selected "Hormone Therapy/HRT" in 12.9 received this question.]*

   *[Drop-down list of ages]*

**12.11** At what age did you begin taking Puberty Blocking Hormones? *[Only respondents who selected "Puberty Blocking Hormones" in 12.9 received this question.]*

   *[Drop-down list of ages]*

**12.12** Are you currently taking hormones for your gender identity or gender transition?

   No *[Skip to 12.15]*

   Yes

**12.13** Where do you currently get your hormones? *[Only respondents who selected "Yes" in 12.12 and did not select "Now on active duty" in 2.17 received this question.]*

   I only go to licensed professionals (like a doctor) for hormones

   In addition to licensed professionals, I also get hormones from friends, online, or other non-licensed sources

   I ONLY get hormones from friends, online, or other non-licensed sources

**12.14** Where do you currently get your hormones? **(Mark all that apply.)** *[Only respondents who selected "Yes" in 12.12 and selected "Now on active duty" in 2.17 received this question.]*

   On-post medical doctor

   Off-post medical doctor

   On-post pharmacy

   Off-post pharmacy

   Through friends, online, or other non-licensed sources (not through a doctor or medical provider)

   Another source not listed above (please specify) _____

**12.15** Have you had or do you want any of the health care listed below for gender transition? **(Please give an answer in each row.)** *[Only respondents who selected "Female" in 2.1 received this question.]*

| | Have had it | Want it some day | Not sure if I want this | Do not want this |
|---|---|---|---|---|
| Top/chest surgery reduction or reconstruction | O | O | O | O |
| Hysterectomy/"hysto" (removal of the uterus, ovaries, fallopian tubes, and/or cervix) | O | O | O | O |
| Clitoral release/metoidioplasty/ centurion procedure | O | O | O | O |
| Phalloplasty (creation of a penis) | O | O | O | O |
| Other procedure not listed: _____ | O | O | O | O |

**12.16** You said that you had at least one procedure for your gender transition. At what age did you have your first procedure (other than hormones)? *[Only respondents who selected "Have had it" at least once in 12.15 received this question.]*

   *[Drop-down list of ages]*

**12.17** Have you had a Pap smear or Pap test in the past year? *[Only respondents who selected "Female" in 2.1 received this question.]*

   No

   Yes

**12.18** Have you had or do you want any of the health care listed below for gender transition? **(Please provide an answer in each row.)** *[Only respondents who selected "Male" in 2.1 received this question.]*

| | Have had it | Want it some day | Not sure if I want this | Do not want this |
|---|---|---|---|---|
| Hair removal/electrolysis | O | O | O | O |
| Breast augmentation / top surgery | O | O | O | O |
| Silicone injections | O | O | O | O |
| Orchidectomy / "orchy" / removal of testes | O | O | O | O |
| Vaginoplasty/labiaplasty/SRS/GRS/GCS | O | O | O | O |
| Trachea shave (Adam's apple or thyroid cartilage reduction) | O | O | O | O |
| Facial feminization surgery (such as nose, brow, chin, cheek) | O | O | O | O |
| Voice therapy (non-surgical) | O | O | O | O |
| Voice surgery | O | O | O | O |
| Other procedure not listed: _____ | O | O | O | O |

**12.19** You said that you had at least one procedure for your gender transition. At what age did you have your first procedure (other than hormones)? *[Only respondents who selected "Have had it" at least once for a procedure other than "voice therapy (non-surgical)" in 12.15 received this question.]*

   *[Drop-down list of ages]*

**12.20** Have you ever de-transitioned? In other words, have you ever gone back to living as your sex assigned at birth, at least for a while?

   I have never transitioned. *[Skip to 13.1]*

   No *[Skip to 13.1]*

   Yes

**12.21** Why did you de-transition? In other words, why did you go back to living as your sex assigned at birth? **(Mark all that apply.)**

   Pressure from spouse or partner

   Pressure from a parent

Pressure from other family members

Pressure from friends

Pressure from my employer

Pressure from a religious counselor

Pressure from a mental health professional

I had trouble getting a job.

I realized that gender transition was not for me.

I faced too much harassment/discrimination.

It was just too hard for me.

Not listed above (please specify)_____

## Section 13

These are questions about experiences you may have had with some professionals, such as psychologists, counselors, religious advisors.

**13.1** Did you ever discuss your gender identity or trans identity with a professional (such as a psychologist, counselor, religious advisor)?

No *[Skip to 13.5]*

Yes

**13.2** Did any professional (such as a psychologist, counselor, religious advisor) try to make you identify only with your sex assigned at birth (in other words, try to stop you being trans)?

No *[Skip to 13.5]*

Yes

**13.3** How old were you the first time a professional tried to make you identify only with your sex assigned at birth (in other words, try to stop you being trans)? *[Only respondents who selected "Yes" in 13.2 received this question.]*

*[Drop-down list of ages]*

**13.4** Was this person a religious or spiritual counselor/advisor? *[Only respondents who selected "Yes" in 13.2 received this question.]*

No

Yes

**13.5** Did you ever discuss your **sexual orientation** with any professional (such as a psychologist, counselor, religious advisor)?

No *[Skip to 14.1]*

Yes

**13.6** Did any professional (such as a psychologist, counselor, religious advisor) ever try to change your **sexual orientation**

or who you are attracted to (such as try to make you straight/heterosexual)? *[Only respondents who selected "Yes" in 13.5 received this question.]*

No

Yes

## Section 14

These are questions about HIV testing and care.

**14.1** This question is about the test for HIV, the virus that causes AIDS. Except for tests you may have had as part of blood donations, have you ever been tested for HIV?

No *[Skip to 14.3]*

Yes

**14.2** What was the result of your most recent HIV test? *[Only those who selected "Yes" in 14.1 received this question.]*

HIV positive or reactive, meaning I have HIV. *[Skip to 14.4]*

HIV negative, meaning I do not have HIV. *[Skip to 14.4]*

HIV test results were unclear, meaning the test could not determine if I have HIV. *[Skip to 14.4]*

I don't know. I never received the results. *[Skip to 14.4]*

**14.3** Here is a list of reasons why some people have not been tested for HIV (the virus that causes AIDS). Which one of these would you say is the MAIN reason why you have not been tested? *[Only respondents who selected "No" in 14.1 received this question.]*

It's unlikely I've been exposed to HIV.

I was afraid to find out if I was HIV positive (that you had HIV).

I didn't want to think about HIV or about being HIV positive.

I was worried my name would be sent to the government if I tested positive.

I didn't know where to get tested.

I don't like needles.

I was afraid of losing my job, insurance, home, friends, or family if people knew I was tested for AIDS infection.

My doctor/health care provider never mentioned getting an HIV test.

Some other reason

No particular reason

**14.4_1** Where were you last tested? *[Only respondents who selected "Yes" in 14.1 received this question.]*

Private doctor or HMO office

Counseling and testing site

Emergency room

Hospital inpatient

Clinic

Jail or prison (or other correctional facility)

Drug treatment facility

At home

Somewhere else

A place not listed above
(please specify) _____

**14.4_2** Not including blood donations, in what month and year was your last HIV test? *[Only respondents who selected "Yes" in 14.1 received this question.]*

Month *[Drop-down list of all months]*

Year *[Drop-down list with years 2015–1984 and "before 1984" as a final option]*

*[Only respondents who selected "HIV positive or reactive, meaning I have HIV" in 14.2 received questions 14.5–14.13.]*

**14.5** In the past 12 MONTHS, have you seen a doctor or health care provider for HIV care? Don't include care you received during emergency room visits or while staying in the hospital.

No

Yes *[Skip to 14.7]*

**14.6** What is the main reason you haven't seen a doctor or health care provider for HIV care in the past 12 months? *[Only respondents who selected "No" in 14.5 received this question.]*

I couldn't afford it.

I have no health insurance.

I only recently found out I have HIV.

I have needed other types of medical or mental health care.

I didn't know where to go for HIV care.

I wasn't ready to look for health care for HIV.

I didn't feel sick enough to look for health care.

My family or partner would find out I have HIV.

I believed that I would be mistreated because I am trans.

I rely on a higher power/God to help my HIV.

A reason not listed above
(please specify) _____

**14.7** In the past 6 MONTHS, have you seen a doctor or health care provider for HIV care? Don't include care you received during emergency room visits or while staying in the hospital. *[Only respondents who selected "Yes" in 14.5 received this question.]*

No

Yes *[Skip to 14.9]*

**14.8** What is the main reason that you haven't seen a doctor or health care provider for HIV care in the past 6 months? *[Only*

*respondents who selected "No" in 14.7 received this question.]*

I couldn't afford it.

I have no health insurance.

I have needed other types of medical or mental health care.

I didn't know where to go for HIV care.

I wasn't ready to look for health care for HIV.

I didn't feel sick enough to look for health care.

My family or partner would find out I have HIV.

I believed that I would be mistreated because I am trans.

I rely on a higher power/God to help my HIV.

A reason not listed above
(please specify) _____

**14.9** When was your last blood test to determine your viral load and CD4 counts?

Within the past 6 months

Within the past year

More than a year ago

I have never had a blood test for my viral load and CD4 count.

**14.10** Have you ever been prescribed anti-retroviral therapy, which are the pills that reduce the amount of HIV in your body (often called ART)?

No

Yes

**14.11** Are you currently taking anti-retroviral therapy (ART)?

No *[Skip to 14.13]*

Yes

**14.12** Do you take your anti-retroviral therapy (ART) like you're supposed to (regularly and as prescribed)?

Never

Rarely

Most of the time

All of the time *[Skip to 15.1]*

**14.13** What is the main reason that are you not taking or not regularly taking anti-retroviral therapy (ART) all of the time? *[Only respondents who selected "No" in 14.11 or "Never," "Rarely," or "Most of the time" in 14.12 received this question.]*

I can't afford it.

I have no health insurance.

I only recently found out I have HIV.

My doctor or health care provider said I didn't need it.

I am afraid it would conflict with my hormones.

I am afraid it would conflict with my other medications.

I would gain weight.

I don't know where to get it.

I don't want to take anti-retroviral therapy (ART).

I don't feel sick enough to take anti-retroviral therapy (ART).

My family, partner, or friends would find out I have HIV.

I rely on a higher power/God to help my HIV.

A reason not listed above
(please specify) _____

## Section 15

**These are questions about your use of alcohol, tobacco, marijuana, or other drugs.**

**15.1** Have you **ever** had a drink[19] of any type of alcoholic beverage, smoked part or all of a cigarette, or used any of the other following substances? **(Please provide an answer in each row.)**

| | No | Yes |
|---|---|---|
| Alcohol[20] (such as beer, wine, or hard liquor) | O | O |
| Cigarettes[21] (tobacco only) | O | O |
| E-Cigarettes or vaping products[22] | O | O |
| Marijuana or hashish[23] (such as weed, joints, hash, hash oil) | O | O |
| Illegal or illicit drugs[24] (such as cocaine, crack, heroin, LSD, meth, inhalants like poppers or whippits) | O | O |
| Prescription drugs[25] (such as Oxycontin, Xanax, Adderall, Ambien) that **weren't prescribed to you, or that you didn't take as prescribed**. | O | O |

*[Only respondents who selected "Yes" under "Alcohol (such as beer, wine, or hard liquor)" in 15.1 received questions 15.2–15.4]*

**15.2** How long has it been since you **last** drank an alcoholic beverage[26]?

    Within the past 30 days

    More than 30 days ago but within the past 12 months

    More than 12 months ago

**15.3** During the past 30 days, on how many days did you drink one or more drinks[27] of an alcoholic beverage? *[Only respondents who selected "Within the past 30 days" in 15.2 received this question.]*

    *[Drop-down list of numbers 1–30]*

**15.4** During the past 30 days, on how many days did you have 5 or more drinks[28] on the same occasion? By 'occasion,' we mean at the same time or within a couple of hours of each other. *[Only respondents who selected "Within the past 30 days" in 15.2 received this question.]*

    *[Drop-down list of numbers 1–30]*

*[Only respondents who selected "Yes" under "Cigarettes (tobacco only)" in 15.1 received questions 15.5–15.7]*

**15.5** How long has it been since you last smoked part or all of a cigarette?

    Within the past 30 days

    More than 30 days ago but within the past 12 months

    More than 12 months ago

**15.6** During the past 30 days, on how many days did you smoke part or all of a cigarette? *[Only respondents who selected "Within the past 30 days" in 15.5 received this question.]*

    *[Drop-down list of numbers 1–30]*

**15.7** On the days you smoked cigarettes during the past 30 days, how many cigarettes did you smoke per day, on average? *[Only respondents who selected "Within the past 30 days" in 15.5 received this question.]*

    Less than one cigarette per day

    1 cigarette per day

    2 to 5 cigarettes per day

    6 to 15 cigarettes per day (about ½ pack)

    16 to 25 cigarettes per day (about 1 pack)

    26 to 35 cigarettes per day (about 1 ½ packs)

    More than 35 cigarettes per day (about 2 packs or more)

**15.8** How long has it been since you last used E-Cigarettes or vaping products? *[Only respondents who selected "Yes" under "E-cigarettes or vaping products" in 15.1 received this question.]*

    Within the past 30 days

    More than 30 days ago but within the past 12 months

    More than 12 months ago

**15.9** How long has it been since you **last** used marijuana or hashish? *[Only respondents who selected "Yes" under "Marijuana or hashish (such as weed, joints, hash, hash oil)" in 15.1 received this question.]*

    Within the past 30 days

    More than 30 days ago but within the past 12 months

    More than 12 months ago

**15.10** During the past 30 days, on how many days did you use marijuana or hashish? *[Only respondents who selected "Within the past 30 days" in 15.9 received this question.]*

    *[Drop-down list of numbers 1–30]*

**15.11** How long has it been since you last used any illegal/illicit drug (such as cocaine, crack, heroin, LSD, meth, inhalants like poppers or whippits)? *[Only respondents who selected "Yes" under "Illegal or illicit drugs (such as cocaine, crack, heroin, LSD, meth, inhalants like poppers or whippits)" in 15.1 received this question.]*

    Within the past 30 days

    More than 30 days ago but within the past 12 months

    More than 12 months ago

**15.12** How long has it been since you last used any prescription drugs not as prescribed or not prescribed to you? *[Only respondents who selected "Yes" under "Prescription drugs (such as Oxycontin, Xanax, Adderall, Ambien) that weren't prescribed to you, or that you didn't take as prescribed" in 15.1 received this question.]*

    Within the past 30 days

    More than 30 days ago but within the past 12 months

    More than 12 months ago

## Section 16

**These are questions about suicidal thoughts and behaviors. Talking about suicidal thoughts or behaviors sometimes brings up difficult emotions. If you experience any difficult emotions because of these questions we encourage you to get help from someone you trust or call one of the anonymous helplines listed at the end of the section.**

**16.1** The next few questions are about thoughts of suicide. **At any time in the past 12 months** did you **seriously think about trying to kill yourself**?

    No *[Skip to 16.6]*

    Yes

**16.2** During the past 12 months, did you **make any plans** to kill yourself? *[Only respondents who selected "Yes" in 16.1 received this question.]*

    No

    Yes

**16.3** During the past 12 months, did you **try** to kill yourself? *[Only respondents who selected "Yes" in 16.1 received this question.]*

    No *[Skip to 16.8]*

    Yes

**16.4** During the past 12 months, did you get medical attention from a doctor or other health professional as a result of an attempt to kill yourself? *[Only respondents who selected "Yes" in 16.3 received this question.]*

    No *[Skip to 16.9]*

    Yes

**16.5** Did you stay in a hospital overnight or longer because you tried to kill yourself? *[Only respondents who selected "Yes" in 16.4 received this question.]*

    No *[Skip to 16.9]*

    Yes *[Skip to 16.9]*

**16.6 At any time in your life**, have you **seriously thought** about trying to kill yourself? *[Only respondents who selected "No" in 16.1 received this question.]*

    No *[Skip to 17.1]*

    Yes

**16.7** At any time in your life, did you **make any plans** to kill yourself? *[Only respondents who selected "Yes" in 16.6 received this question.]*

    No

    Yes

**16.8** At any time in your life, did you **try** to kill yourself? *[Only respondents who said "Yes" in 16.6 received this question.]*

    No *[Skip to 17.1]*

    Yes

**16.9** How many times have you tried to kill yourself in your lifetime? *[Only respondents who selected "Yes" in 16.3 or "Yes" to 16.8 received this question.]*

    *[Drop-down list of numbers 1–25 and "more than 25" as last option]*

**16.10** How old were you when you tried to kill yourself? *[Only respondents who selected "1" in 16.9 received this question.]*

    *[Drop-down list of ages]*

**16.11** How old were you the **first time** you tried to kill yourself? *[Only respondents who selected a value other than "1" in 16.9 received this question.]*

    *[Drop-down list of ages]*

**16.12** How old were you the **last time** you tried to kill yourself?

    *[Drop-down list of ages]*

If you are experiencing any difficult emotions after answering these questions and would like to talk to someone, please contact one of the anonymous resources below:

**National Suicide Prevention Helpline**
1-800-273-8255
http://www.suicidepreventionlifeline.org/

**Veterans Crisis Line** (for veterans, military personnel, and their families)
1-800-273-8255 and Press 1
http://veteranscrisisline.net/

**The Trevor Project**
The Trevor Project is a phone and internet chat hotline for LGBTQ people. For those participating in this survey, The Trevor Project will speak or chat with people of all ages.
1-866-488-7386
http://www.thetrevorproject.org/section/get-help

## Section 17

**These are questions about being treated unequally, harassed, or physically attacked.**

**17.1 In the past year,** have you been denied equal treatment or service, such as at a place of business, government agency, or public place for any reason?

No

Yes

**17.2 In the past year,** did anyone verbally harass you for any reason?

No

Yes

**17.3 In the past year,** did anyone physically attack you (such as grab you, throw something at you, punch you, use a weapon) for any reason?

No

Yes

**17.4** You said that you were denied equal treatment or service **in the past year.** Do you believe any of those experiences were because of your... **(Mark all that apply.)** *[Only respondents who selected "Yes" in 17.1 received this question. Respondents could not select "None of the above" in combination with any other option.]*

Age

Disability

Income level or education

Trans status/gender identity

Gender expression/appearance

Race/ethnicity

Religion/spirituality

Sexual orientation

None of the above

**17.5** You said that you have been verbally harassed **in the past year.** Do you believe any of those experiences were because of your... **(Mark all that apply.)** *[Only respondents who selected "Yes" in 17.2 received this question. Respondents could not select "None of the above" in combination with any other option.]*

Age

Disability

Income level or education

Trans status/gender identity

Gender expression/appearance

Race/ethnicity

Religion/spirituality

Sexual orientation

None of the above

**17.6 In the past year,** did strangers verbally harass you in public because of your trans status, gender identity, or gender expression? *[Only respondents who selected "Trans status/gender identity" or "Gender expression/appearance" in 17.5 received this question.]*

No

Yes

*[Only respondents who selected "Yes" in 17.3 received questions 17.7–17.10.]*

**17.7 In the past year,** how many times were you physically attacked? _____

   *[Drop-down list of numbers]*

**17.8** How were you physically attacked? **(Mark all that apply.)**

With a gun

With a knife

With another weapon (like a baseball bat, frying pan, scissors, or stick)

By something thrown (such as a rock or bottle)

By someone grabbing, punching, or choking you

Unwanted sexual contact (such as rape, attempted rape, being forced to penetrate)

Not listed above

**17.9** When you were physically attacked **in the past year,** do you believe any of those experiences were because of your... **(Mark all that apply).** *[Respondents could not select "None of the above" in combination with any other option.]*

Age

Disability

Income level or education

Trans status/gender identity

Gender expression/appearance

Race/ethnicity

Religion/spirituality

Sexual orientation

None of the above

**17.10** In the past year, did strangers physically attack you in public because of your trans status, gender identity, or gender expression? *[Only respondents who selected "Trans status/gender identity" or "Gender expression/appearance" in 17.9 received this question.]*

No

Yes

## Section 18

These are questions about unwanted sexual contact. Some people get sexual attention that they don't want and don't ask for. It could come from someone they know well - a romantic or sexual partner, a friend, a teacher, a coworker, a supervisor, or a family member. These questions are based on national surveys that we will use to compare with the U.S. population. If you experience any difficult emotions because of these questions we encourage you to get help from someone you trust or call one of the anonymous helplines listed at the end of the section.

**18.1** Have you ever experienced unwanted sexual contact (such as oral, genital, or anal contact or penetration, forced fondling, rape)?

No *[Skip to 19.1]*

Yes

**18.2** Who did this to you? **(Mark all that apply.)**

A partner/ex-partner

A relative

A friend/acquaintance

A law enforcement officer

A health care provider/doctor

A stranger

A boss or supervisor

A co-worker

A teacher or school staff member

A person not listed above

**18.3** Now just thinking about **the past year**, have you experienced unwanted sexual contact (such as oral, genital, or anal contact or penetration, forced fondling, rape)?

No

Yes

If you are experiencing any difficult emotions after answering these questions and would like to talk to someone, please contact one of the anonymous resources below:

**Veterans Crisis Line** (for veterans, military personnel, and their families)
1-800-273-8255 and Press 1
http://veteranscrisisline.net/

**FORGE Transgender Sexual Violence Project**
414-559-2123
http://forge-forward.org/anti-violence/for-survivors/ to list of resources

**National Sexual Assault Hotline**
800-656-HOPE (4673)
https://ohl.rainn.org/online/

## Section 19

These are questions about any harm caused by a current or former romantic or sexual partner. This could include physical, emotional, or financial harm.

**19.1** Have you ever had a romantic or sexual partner?

No *[Skip to 20.1]*

Yes

**19.2** Have any of your romantic or sexual partners ever...?
**(Please provide an answer in each row.)**

|  | No | Yes |
|---|---|---|
| Tried to keep you from seeing or talking to your family or friends | O | O |
| Kept you from having money for your own use | O | O |
| Kept you from leaving the house when you wanted to go | O | O |
| Hurt someone you love | O | O |
| Threatened to hurt a pet or threatened to take a pet away from you | O | O |
| Wouldn't let you have your hormones | O | O |
| Wouldn't let you have other medications | O | O |
| Threatened to call the police on you | O | O |
| Threatened to "out" you | O | O |
| Told you that you weren't a "real" woman or man | O | O |
| Stalked you | O | O |
| Threatened to use your immigration status against you | O | O |

**19.3** Have any of your romantic or sexual partners ever...?
**(Please provide an answer in each row.)**

|  | No | Yes |
|---|---|---|
| Made threats to physically harm you | O | O |
| Slapped you | O | O |
| Pushed or shoved you | O | O |
| Hit you with a fist or something hard | O | O |
| Kicked you | O | O |
| Hurt you by pulling your hair | O | O |
| Slammed you against something | O | O |
| Forced you to engage in sexual activity | O | O |
| Tried to hurt you by choking or suffocating you | O | O |
| Beaten you | O | O |
| Burned you on purpose | O | O |
| Used a knife or gun on you | O | O |

## Section 20

**These are questions about your experiences with bathrooms while in public places, at work, or at school.**

**20.1 In the past year,** did anyone tell or ask you if you were using the wrong bathroom?

No

Yes

**20.2 In the past year**, did anyone stop you from entering or deny you access to a bathroom?

No

Yes

**20.3 In the past year**, were you verbally harassed, physically attacked, or experience unwanted sexual contact when accessing or while using a bathroom? **(Mark all that apply.)** *[Respondents could not select "No" in combination with any other option.]*

No *[Skip to 20.7]*

Yes, verbally harassed

Yes, physically attacked

Yes, experienced unwanted sexual contact

**20.4** You said that you were **verbally harassed** in a bathroom in the past year. Where did this happen? **(Mark all that apply.)** *[Only respondents who selected "Yes, verbally harassed" in 20.3 received this question.]*

A bathroom in a public place (such as a restaurant, shopping mall, movie theater, etc.)

A bathroom at my workplace

A bathroom at my school

A bathroom at another location (please specify) _____

**20.5** You said that you were **physically attacked** in a bathroom in the past year. Where did this happen? **(Mark all that apply.)** *[Only respondents who selected "Yes, physically attacked" in 20.3 received this question.]*

A bathroom in a public place (such as a restaurant, shopping mall, movie theater, etc.)

A bathroom at my workplace

A bathroom at my school

A bathroom at another location (please specify) _____

**20.6** You said that you **experienced unwanted sexual contact** in a bathroom in the past year. Where did this happen? **(Mark all that apply.)** *[Only respondents who selected "Yes, experienced unwanted sexual contact" in 20.3 received this question.]*

A bathroom in a public place (such as a restaurant, shopping mall, movie theater, etc.)

A bathroom at my workplace

A bathroom at my school

A bathroom at another location (please specify) _____

**20.7 In the past year**, did you avoid going to the bathroom because you were afraid of having problems using them? This would include bathrooms in public, at work, or at school.

I have never avoided them *[Skip to 21.1]*

I have sometimes avoided them

I have always avoided them

Not listed above (please specify) _____

**20.8** Did you experience any of the following because you avoided using bathrooms in public places, at work, or at school? **(Mark all that apply.)** *[Only respondents who selected an answer choice other than "I have never avoided them" in 20.8 received this question.]*

Not going when needed ("holding it")

I avoided drinking or eating

Urinary tract infection

Kidney infection

Other kidney-related problems

I have never had physical problems from avoiding bathrooms

Not listed above (please specify) _____

## Section 21

**These are questions about things that might have happened to you at your job or business, or while you were looking for work.**

**21.1** Have you ever worked at a job or business? Do not include sex work, selling drugs, or other work that is currently considered illegal.

No *[Skip to 21.6]*

Yes

**21.2** Have you ever lost a job or been laid off?

No *[Skip to 21.4]*

Yes

**21.3** Do you believe that you were ever laid off or lost a job because of your... **(Mark all that apply.)** *[Only respondents who selected "Yes" in 21.2 received this question. Respondents could not select "None of the above" in combination with any other option.]*

Age

Disability

Income level or education

Trans status/gender identity

Gender expression/appearance

Race/ethnicity

Religion/spirituality

Sexual orientation

None of the above

**21.4** Have you ever been fired or forced to resign from a job?

No *[Skip to 21.6]*

Yes

**21.5** Do you believe that you were ever fired or forced to resign because of your... **(Mark all that apply.)** *[Only respondents who selected "Yes" in 21.4 received this question. Respondents could not select "None of the above" in combination with any other option.]*

Age

Disability

Income level or education

Trans status/gender identity

Gender expression/appearance

Race/ethnicity

Religion/spirituality

Sexual orientation

None of the above

**21.6 Now just thinking about the past year,** did you apply for a job and/or work at a job or business? Do not include sex work, selling drugs, or other work that is currently considered illegal. **(Mark all that apply.)** *[Respondents could not select "No" in combination with any other option.]*

No *[Skip to 22.1]*

Yes, I applied for a job

Yes, I worked at job or business

**21.7 In the past year,** how many times have you been... **(Please provide an answer in each row.)**

| In the past year... | 0 times | 1 time | 2 times | 3 times | 4 times | 5 or more times |
|---|---|---|---|---|---|---|
| Denied a promotion at a job | O | O | O | O | O | O |
| Not hired for a job you applied for | O | O | O | O | O | O |
| Fired or forced to resign from a job | O | O | O | O | O | O |

**21.8_1** Do you believe that any of the times that you were **denied a promotion at a job** in the past year were because of your... **(Mark all that apply.)** *[Only respondents who selected a value other than "0" under "Denied a promotion at a job" in 21.7 received this question. Respondents could not select "None of the above" in combination with any other option.]*

Age

Disability

Income level or education

Trans status/gender identity

Gender expression/appearance

Race/ethnicity

Religion/spirituality

Sexual orientation

None of the above

**21.8_2** Do you believe that any of the times that you were **not hired for a job you applied for** in the past year were because of your... **(Mark all that apply.)** *[Only respondents who selected a value other than "0" under "Not hired for a job you applied for" in 21.7 received this question. Respondents could not select "None of the above" in combination with any other option.]*

Age

Disability

Income level or education

Trans status/gender identity

Gender expression/appearance

Race/ethnicity

Religion/spirituality

Sexual orientation

None of the above

**21.8_3** Do you believe that any of the times that you were **fired or forced to resign from a job** in the past year were because of your... **(Mark all that apply.)** *[Only respondents who selected a value other than "0" under "Fired or forced to resign from a job" in 21.7 received this question. Respondents could not select "None of the above" in combination with any other option.]*

Age

Disability

Income level or education

Trans status/gender identity

Gender expression/appearance

Race/ethnicity

Religion/spirituality

Sexual orientation

None of the above

*[Only respondents who selected "Trans status/gender identity" or "gender expression/appearance" in 21.8_3 received questions 21.9–21.11.]*

**21.9** Now just thinking about when you were **fired or forced to resign from a job** because of your gender identity, trans status, and/or gender expression in the past year, please describe your response. **(Mark all that apply.)**

I did nothing *[Skip to 22.1]*

I contacted a lawyer.

I contacted a trans, LGBT, or other non-profit group. *[Skip to 22.1]*

I contacted my union representative. *[Skip to 22.1]*

I made an official complaint.

Not listed above (please specify) _____ *[Skip to 22.1]*

**21.10** You said that you contacted a lawyer in response to being **fired or forced to resign from a job** in the past year. What did the lawyer do to help you? *[Only respondents who selected "I contacted a lawyer" in 21.9 received this question.]*

I was not able to hire the lawyer.

The lawyer called or wrote a letter to my employer.

The lawyer helped me file an official complaint.

The lawyer filed a lawsuit for me.

Not listed above (please specify) _____

**21.11** You said that you made an official complaint in response to being **fired or forced to resign from a job** in the past year. Where did you make the official complaint? **(Mark all that apply.)** *[Only respondents who selected "I made an official complaint" in 21.9 received this question.]*

EEOC (Equal Employment Opportunity Commission

Local/State Human Rights Commission

The Human Resources or Personnel department of the employer

Equal Employment Opportunity (EEO) office of the employer

Not listed above (please specify) _____

## Section 22

*[Only respondents who selected "Yes, I worked at a job or business" in 21.6 received questions 22.1–22.3.]*

**22.1 In the past year**, to **avoid** trans discrimination at work… **(Please provide an answer in each row.)**

|  | No | Yes |
|---|---|---|
| I asked for a transfer to a different position/department at my job in the past year | O | O |
| I stayed in a job I'd prefer to leave in the past year | O | O |
| I didn't seek a promotion or a raise in the past year | O | O |
| I quit my job in the past year | O | O |
| I had/have a job for which I am over-qualified (in the past year) | O | O |
| I had to be in the closet about my gender identity in the past year | O | O |
| I delayed my gender transition in the past year | O | O |
| I did not ask my employer to use the pronouns I prefer in the past year (such as he, she, or they) | O | O |
| I hid the fact that I have transitioned gender already in the past year | O | O |

**22.2 In the past year**, did any of these things happen to you because of trans discrimination at work? **(Please provide an answer in each row.)**

|  | No | Yes |
|---|---|---|
| My employer/boss forced me to resign in the past year. | O | O |
| My employer/boss forced me to transfer to a different position/department at my job in the past year. | O | O |
| My employer/boss removed me from direct contact with clients, customers, or patients in the past year. | O | O |
| My employer/boss told me to present in the wrong gender in order to keep my job in the past year. | O | O |
| My employer/boss gave me a negative job review in the past year. | O | O |
| My employer/boss and I could not work out an acceptable bathroom situation in the past year. | O | O |
| My employer/boss did not let me use the bathroom I should be using based on my gender identity in the past year. | O | O |
| My employer/boss or coworkers shared information about me that they should not have in the past year. | O | O |

**22.3 In the past year**, did any of these things happen to you at work because you are trans? **(Mark all that apply.)** *[Respondents could not select "None of the above" in combination with any other option.]*

I was verbally harassed

I was physically attacked

I experienced unwanted sexual contact (such as fondling, sexual assault, or rape)

None of the above

## Section 23

**These are questions about experiences you may have had with housing.**

**23.1** Have you ever experienced homelessness? Experiencing homelessness includes such things as staying in a shelter, living on the street, living out of a car, or staying temporarily with family or friends because you can't afford housing.

No

Yes

**23.2 Now just thinking about the past year**, have you had any of these housing situations **because you are trans? (Please provide an answer in each row.)**

Please choose "Does not apply to me" if you could not have had that housing situation in the past year. For example, if you didn't rent a home in the past year, you would answer "Does not apply to me" to the first question because you could not have been evicted.

| In the past year... | Yes | No | Does not apply to me |
|---|---|---|---|
| I was evicted from my home/apartment. | O | O | O |
| I was denied a home/apartment. | O | O | O |
| I experienced <u>homelessness</u>.[29] | O | O | O |
| I had to move back in with family members or friends. | O | O | O |
| I had to move into a less expensive home/apartment. | O | O | O |
| I slept in different places for short periods of time, such as on a friend's couch. | O | O | O |

## Section 24

*[Only respondents who selected "I experienced homelessness" in 23.2 received questions 24.1–24.4.]*

**24.1** When you experienced homelessness **this past year**, did you seek shelter in a homeless shelter? **(Mark all that apply.)** *[Respondents could not select a "No" answer in combination with a "Yes" answer.]*

Yes, and I stayed at one or more shelters. *[Skip to 24.3]*

Yes, but I was denied access to one or more shelters.

No, because I feared I would be mistreated as a trans person *[Skip to 25.1]*

No, for other reasons *[Skip to 25.2]*

**24.2** Do you believe that you were denied access to a homeless shelter in the past year because of your ... **(Mark all that apply.)** *[Only respondents who selected "Yes, but I was denied access to one or more shelters" in 24.1 received this question. Respondents could not select "None of the above" in combination with any other option.]*

Age

Disability

Income level or education

Trans status/gender identity

Gender expression/appearance

Race/ethnicity

Religion/spirituality

Sexual orientation

None of the above

**24.3 In the past year,** did any of these things happen to you in the homeless shelter? (**Please provide an answer in each row.**) *[Only respondents who selected "Yes, and I stayed at one or more shelters" in 24.1 received this question.]*

| | No | Yes |
|---|---|---|
| I was thrown out after they learned I was trans. | O | O |
| I decided to dress/present as the wrong gender to feel safe in a shelter. | O | O |
| They required me to dress/present as the wrong gender in the shelter. | O | O |
| I decided to leave a shelter because of poor treatment or unsafe conditions, even though I had no place to go. | O | O |

**24.4 In the past year,** did any of these things happen to you in a homeless shelter because you are trans? **(Mark all that apply.)** *[Only respondents who selected "Yes, and I stayed at one or more shelters" in 24.1 received this question. Respondents could not select "None of the above" in combination with any other option.]*

I was verbally harassed

I was physically attacked

I experienced unwanted sexual contact (such as fondling, sexual assault, or rape)

None of the above

## Section 25

**These are questions about your experiences in places of public accommodations, such as hotels, restaurants, or government agencies.**

**25.1 In the past year,** have you visited or used services in any of these places? **(Mark all that apply.)** *[Respondents could not select "I have not visited or used services in any of these places" in combination with any other option.]*

Domestic violence shelter/DV program/Rape crisis center

Drug/alcohol treatment program

DMV or RMV (Department or Registry of Motor Vehicles)

Social Security office (such as for name or gender change, Social Security card, public benefits)

Public assistance/government benefits office (such as SNAP, WIC)

Gym/health club

Legal services from an attorney, clinic, or legal professional

Court/court house

Nursing home/extended care facility

Public transportation (such as bus, train, subway, taxi)

Retail store, restaurant, hotel, theater

I have not visited or used services in any of these places.

**25.2 In the past year**, did you **NOT** visit or use services at these places because you thought you would be mistreated as a trans person? **(Please give an answer for each place.)** *[Respondents received this question for each of the locations that they did not select in 25.1.]*

| | No | Yes (I did NOT visit because I thought I would be mistreated) |
|---|---|---|
| *[Location not selected in 25.1]* | O | O |

**25.3 In the past year**, when you visited or used services at these places, do you think the staff or employees knew or thought you were trans? **(Please give an answer for each place.)** *[Respondents received this question for each of the locations that they selected in 25.1.]*

| | No | Yes |
|---|---|---|
| *[Location selected in 25.1]* | O | O |

**25.4 In the past year**, when you visited or used services at these places, did any of these things happen to you because you are trans? **(Please provide an answer for each location.)** *[Respondents received this question for each of the locations that they selected in 25.1.]*

| | Denied equal treatment or service | Verbally harassed | Physically attacked | None of these things happened to me at this place |
|---|---|---|---|---|
| *[Location selected in 25.1]* | O | O | O | O |

## Section 26

These are questions about experiences you may have had in school.

**26.1** Were you out as trans in school at any time between Kindergarten and 12th grade?

No

Yes *[Skip to 26.3]*

**26.2** Do you believe that any of your classmates, teachers, or school staff in Kindergarten through 12th grade (K-12) **thought** you were trans? *[Only respondents who selected "No" in 26.1 received this question.]*

No

Yes

**26.3** Do you believe that any of your classmates, teachers or school staff in K-12 thought or knew you were lesbian, gay, bisexual, or queer (LGBQ)?

No

Yes

**26.4** Did any of these happen to you while in K-12? (If any of these things were done to you in K-12 by classmates, teachers, or school staff, please answer "yes.") **(Please provide an answer in each row.)** *[Only respondents who selected "Yes" in 26.1 or "Yes" in 26.2 received this question.]*

| | NO | YES |
|---|---|---|
| I was verbally harassed because people thought I was trans. | O | O |
| I was physically attacked because people thought I was trans. | O | O |
| I experienced unwanted sexual contact because people thought I was trans | O | O |
| I wasn't allowed to dress in the way that fit my gender identity/expression. | O | O |
| I was disciplined for fighting back against bullies. | O | O |
| I believe I was disciplined more harshly because teachers/staff thought I was trans. | O | O |
| I left a school because the mistreatment was so bad. | O | O |
| I was expelled from school. | O | O |

**26.5** Did any of these happen to you while in K-12? (If any of these things were done to you in K-12 by classmates, teachers, or school staff, please answer "yes.") **(Please provide an answer in each row.)** *[Only respondents who selected "No" in 26.1, AND "No" in 26.2, AND "Yes" in 26.3 received this question.]*

| | YES | NO |
|---|---|---|
| I was verbally harassed because people thought I was LGBQ. | O | O |
| I was physically attacked because people thought I was LGBQ. | O | O |
| I experienced unwanted sexual contact because people thought I was LGBQ. | O | O |
| I wasn't allowed to dress in the way that fit my gender identity/expression. | O | O |
| I was disciplined for fighting back against bullies. | O | O |
| I left a school because the mistreatment was so bad. | O | O |
| I was expelled from school. | O | O |

*[Only respondents who selected a level of educational attainment higher than "high school graduate" in 2.22 received questions 26.6–26.9.]*

**26.6** Now just thinking about classmates, professors, or staff at your college or vocational school, did they think or know you were trans?

No *[Skip to 26.9]*

Yes

**26.7** Were you harassed (verbally, physically, or sexually) at college or vocational school because people thought or knew you were trans? *[Only respondents who selected "Yes" in 26.6 received this question.]*

No *[Skip to 26.9]*

Yes

**26.8** Did you have to leave your college or vocational school because the harassment was so bad? *[Only respondents who selected "Yes" in 26.7 received this question.]*

No

Yes

**26.9** Did you leave or were you forced to leave a college or vocational school because you are trans? **(Mark all that apply.)** *[Respondents could not select "No" in combination with any other option.]*

No

Yes, I left school because the mistreatment was so bad.

Yes, I was expelled or forced out.

Yes, I left for other trans-related reasons.

## Section 27

**These are questions about things that may have happened to you when going through airport security.**

**27.1 In the past year**, have you gone through airport security in the United States?

No *[Skip to 28.1]*

Yes

**27.2** When you went through airport security in the past year, did a TSA officer do any of these things to you? **(Mark all that apply.)** *[List was randomized for each respondent. Respondents could not select "None of the above" in combination with any other option.]*

They questioned the name or gender on my ID.

They used the wrong pronouns with me (he/him or she/her) or wrong title (Mr. or Ms.)

They patted me down due to gender-related clothing or items (such as a binder, packer).

I was patted down by a TSA officer of the wrong gender.

They searched my bag due to a gender-related item (such as binder, packer).

They asked me to remove or lift clothing to show a binder, undergarment, or other sensitive area.

They took me to a separate room for questioning/examination.

They announced or questioned loudly my gender, body parts, or sensitive items (such as a binder, packer).

They called the police about me.

I missed my flight due to screening.

I was not allowed to fly.

They detained me for over an hour.

They verbally harassed me.

They physically attacked me.

I experienced unwanted sexual contact (beyond a typical pat down by a TSA officer)

None of the above

## Section 28

**These are questions about things that happened to you with police, in jail, in prison, or in a juvenile detention center.**

**28.1** If you needed help from the police, how comfortable would you feel asking them for help?

Very comfortable

Somewhat comfortable

Neutral

Somewhat uncomfortable

Very uncomfortable

**28.2 In the past year**, did you interact with the police or other law enforcement officers?

No *[Skip to 28.8]*

Yes

**28.3 In the past year**, do you believe the police or other law enforcement officers you interacted with thought or knew you were trans?

None of the officers thought or knew I was trans. *[Skip to 28.6]*

Some officers thought or knew I was trans, some did not.

All officers thought or knew I was trans.

**28.4 In the past year**, when you interacted with police or other law enforcement officers, were you treated with respect?

I was never treated with respect.

I was sometimes treated with respect.

I was always treated with respect.

**28.5 In the past year**, when you interacted with police or other law enforcement officers, did any of these things happen to you? **(Please give an answer in each row.)**

| In the past year... | No | Yes |
|---|---|---|
| Officers kept called me by the wrong gender pronouns (such as he/him or she/her) or wrong title (Mr. or Ms.) | O | O |
| Officers asked me questions about my gender transition (such as hormones and surgical status). | O | O |
| Officers assumed I was a sex worker. | O | O |
| Officers verbally harassed me. | O | O |
| Officers physically attacked me. | O | O |
| Officers forced me to engage in sexual activity to avoid arrest | O | O |
| I experienced unwanted sexual contact from an officer (such as fondling, sexual assault, or rape). | O | O |

**28.6 In the past year**, were you arrested for any reason?

No *[Skip to 28.8]*

Yes

**28.7 In the past year**, do you believe that you were arrested because you were trans?

No

Yes

**28.8 In the past year**, at any time were you held in jail, prison, or juvenile detention?

No *[Skip to 29.1]*

Yes

*[Only respondents who selected "Yes" in 28.8 received questions 28.9–28.20.]*

**28.9 In the past year**, what types of jail, prison or juvenile detention facility were you in? **(Mark all that apply.)**

Federal prison

State prison

Local jail

Holding cell

State juvenile system

Locally or privately-operated juvenile facilities

Other correctional facility
(please specify) _____

**28.10 In the past year**, during your time in jail, prison or juvenile detention facility were you physically forced, pressured, or made to feel that you had to have sex or sexual contact with any **facility staff**?

No *[Skip to 28.12]*

Yes

**28.11 In the past year**, how many times did this happen to you? *[Only respondents who selected "Yes" in 28.10 received this question.]*

[Drop-down list of numbers 1–10 and "11 or more"]

**28.12 In the past year**, during your time in jail, prison or juvenile detention facility, were you physically forced, pressured, or made to feel that you had to have sex or sexual contact with **another inmate**?

No *[Skip to 28.14]*

Yes

**28.13 In the past year**, how many times did this happen to you? *[Only respondents who selected "Yes" in 28.12 received this question.]*

[Drop-down list of numbers 1–10 and "11 or more"]

**28.14 In the past year**, during your time in jail, prison or juvenile detention facility were you **physically** assaulted or attacked by **facility staff**?

No *[Skip to 28.16]*

Yes

**28.15 In the past year**, how many times did this happen to you? *[Only respondents who selected "Yes" in 28.14 received this question.]*

[Drop-down list of numbers 1–10 and "11 or more"]

**28.16 In the past year**, during your time in jail, prison or juvenile detention facility were you **physically** assaulted or attacked by **another inmate**?

No *[Skip to 28.18]*

Yes

**28.17 In the past year**, how many times did this happen to you? *[Only respondents who selected "Yes" in 28.16 received this question.]*

[Drop-down list of numbers 1–10 and "11 or more"]

**28.18** Before your time in jail, prison, or juvenile detention, were you taking hormones?

No *[Skip to 29.1]*

Yes

**28.19** Did you have a prescription for the hormones you were taking?

No

Yes

APPENDIX B

**28.20 In the past year**, during your time in jail, prison, or juvenile detention, were you not allowed to take your hormones?

No

Yes

## Section 29

**Now we have some questions about voting and registration.**

**29.1** In any election, some people are not able to vote because they are sick or busy or have some other reason, and others do not want to vote. Did you vote in the election held on <u>Tuesday, November 4, 2014</u>[30]?

No

Yes *[Skip to 30.1]*

**29.2** Were you registered to vote in the <u>November 4, 2014 election</u>[31]? *[Only respondents who selected "No" in 29.1 received this question.]*

No

Yes *[Skip to 29.4]*

**29.3** Which of the following was the MAIN reason you were not registered to vote? **(Please choose only one response.)** *[Only respondents who selected "No" in 29.2 received this question.]*

Not eligible to vote because I am not a U.S. citizen.

I wanted to avoid being harassed by election officials because I am trans.

My current name does not match social security card.

I thought my state's voter ID law could stop me from voting.

I don't have ID and thought I would need one to register.

Did not meet registration deadlines.

Did not know where or how to register

Did not live here long enough/did not meet residency requirements.

Permanent illness or disability

Difficulty with English

Not interested in the election or not involved in politics.

My vote would not make a difference.

Not eligible to vote because of a criminal/felony conviction.

Not eligible to vote for a reason other than a criminal/felony conviction.

A reason not listed above
(please specify) _____

**29.4** What was the MAIN reason you did not vote? **(Please choose only one response.)** *[Only respondents who selected "Yes" in 29.2 received this question.]*

I wanted to avoid being harassed by election officials because I am trans.

Illness or disability (own or family's)

Out of town or away from home

Forgot to vote (or send in absentee ballot)

Not interested, felt my vote wouldn't make a difference

Too busy, conflicting work or school schedule

Transportation problems

Didn't like candidates or campaign issues.

Registration problems (for example, I didn't receive an absentee ballot or wasn't registered in current location)

Bad weather conditions

Inconvenient hours, polling place, or hours or lines too long

I didn't have the identification documents (ID) I needed to vote.

My identification documents (ID) do not match my current name, gender, or have an old photo.

My gender/name on my identification document (ID) does not match my voter registration.

I was not allowed to vote by a poll worker or election official because I am trans.

A reason not listed above
(please specify) _____

## Section 30

**These are questions about civic and political activities.**

**30.1** Do you agree or disagree with the following statement about political affairs in this country?

Someone like me can't really influence government decisions.

Strongly agree

Agree

Neither agree nor disagree

Disagree

Strongly disagree

**30.2** People may be involved in civic and political activities. In the last <u>Presidential election in 2012</u>[32] did you... **(Please provide an answer in each row.)** *[Response choices were randomized, keeping the first two and last two grouped together in the following order.]*

| In the last Presidential election in 2012 did you ... | No | Yes |
|---|---|---|
| Volunteer or work for a Presidential campaign | | |
| Volunteer or work for another political candidate, issue, or cause | | |
| Give money to a Presidential campaign | | |
| Give money to another political candidate, issue, or cause | | |

AR.10445

**30.3 In the past 12 months** have you... (**Please provide an answer in each row.**) *[Response choices were randomized.]*

| In the past 12 months, have you... | No | Yes |
|---|---|---|
| Attended a political protest or rally | | |
| Contacted a government official | | |
| Worked with others in your community to solve a problem | | |
| Served on a community board | | |
| Written a "letter to the editor" | | |
| Commented about politics on a message board or Internet site | | |
| Held a publicly elected office | | |

**30.4** In politics, as of today, do you consider yourself a Republican, a Democrat, or an Independent?

Republican *[Skip to 30.6]*

Democrat *[Skip to 30.6]*

Independent

Other party (please specify) _____

**30.5** As of today, do you lean more to the Democratic Party or the Republican Party? *[Only respondents who selected "Independent" or "Other party" in 30.4 received this question.]*

Democratic

Republican

Neither/Other

**30.6** How would you describe your political views?

Very conservative

Conservative

Moderate

Liberal

Very liberal

## Section 31

This question asks for your opinion on the most important policy priorities for trans people in the United States.

**This is a two-part question:**

**31.1** For each issue below that affects trans people in the U.S., please mark how important it is. (**Please provide an answer in each row.**) *[Response choices were randomized. Respondents could select up to 3 response choices in the last column.]*

| | Very important | Important | Not very important |
|---|---|---|---|
| HIV/AIDS | O | O | O |
| Identity documents (ID) (updating name and gender) | O | O | O |
| Bullying/discrimination in schools | O | O | O |
| Police mistreatment of trans people | O | O | O |
| Mistreatment in prisons/jails | O | O | O |
| Immigration reform | O | O | O |
| Military (ability to be openly trans) | O | O | O |
| Training health care providers about trans health | O | O | O |
| Insurance coverage for trans-related health care | O | O | O |
| Employment | O | O | O |
| Housing and homelessness | O | O | O |
| Violence against trans people | O | O | O |
| Parenting and adoption rights | O | O | O |
| Marriage recognition | O | O | O |
| Conversion Therapy | O | O | O |
| Racism | O | O | O |
| Poverty | O | O | O |

**31.2** Of these issues, please select your top 3 most important issues.

Issue#1 *[Drop-down list of issues listed in 31.1]*

Issue#2 *[Drop-down list of issues listed in 31.1]*

Issue#3 *[Drop-down list of issues listed in 31.1]*

## Section 32

**32.1** Is there anything else that you would like to tell us about your experiences of acceptance or discrimination so we can better understand your experiences?

No *[Responses were submitted and respondents were directed to the Thank You Page hosted by NCTE.]*

Yes

**32.2** Please tell us anything else that you would like to tell us about your experiences of acceptance or discrimination so we can better understand your experiences. Please do not provide any information that could be used to identify you, such as your name or contact information. Your response will be anonymous. *[Only respondents who selected "Yes" in 32.1 received this question.]*

[Text box]

Please enter your survey responses by clicking on the submit button below:

SUBMIT

*[Once completed, responses were submitted and respondents were directed to the Thank You Page hosted by NCTE.]*

## Thank You Page

THANK YOU FOR MAKING YOUR VOICE HEARD

YOUR SURVEY HAS BEEN SUBMITTED

Want to be one of the first to get the survey results?

Want to win one of the cash prizes?

Give us your info here.

This information will not be connected to your survey responses.

    Preferred name

    Email address

    Zip Code (required)

    Phone (optional)

    [ ] Send me the results of the survey when you release them!

    [ ] Enter me in the drawing for one of three cash prizes: one prize of $500 and two prizes of $250!

SUBMIT

## RESOURCES

We recognize that answering some of the questions on this survey may have been hard. If you are experiencing any difficult emotions after answering the questions and would like to talk to someone, please contact one of the anonymous resources below:

**National Suicide Prevention Helpline**
1-800-273-8255
http://www.suicidepreventionlifeline.org/

**FORGE Transgender Sexual Violence Project**
414-559-2123
http://forge-forward.org/anti-violence/for-survivors/ to list of resources

**Veterans Crisis Line** (for veterans, military personnel, and their families)
1-800-273-8255 and Press 1
http://veteranscrisisline.net/

**The Trevor Project**
The Trevor Project is a phone and internet chat hotline for LGBTQ people. For those participating in this survey, The Trevor Project will speak or chat with people of all ages.
1-866-488-7386
http://www.thetrevorproject.org/section/get-help

**National Sexual Assault Hotline**
800-656-HOPE (4673)
https://ohl.rainn.org/online/

---

**ENDNOTES** | APPENDIX B

1    Respondents who were sent to disqualification page #2 received the following message: "Based on your answers, you are not eligible to complete this survey. Thank you for your interest in participating in this study. For more information about this project please visit the NCTE website: http://www.ustranssruvey.org."

2    Respondents who were sent to disqualification page #1 received the following message: "Thank you for your survey responses. We're interested to learn more about your identity and experiences. If you would like to tell us more, please respond to the following questions. Please **do not** provide any information that could be used to identify you, such as your name or contact information.

    Tell us about your gender identity or expression. *[Text box.]*

    Tell us about your experiences related to your gender identity or expression. *[Text box.]*"

3    See note 1.

4    See note 2.

5    See note 2.

6    Respondents received the following hyperlinked definition for "active duty": "Active duty means full-time service, other than active duty for training as a member of the Army, Navy, Air Force, Marine Corps, Coast Guard, or as a commissioned officer of the Public Health Service or the National Oceanic and Atmospheric Administration, or its predecessors, the Coast and Geodetic Survey or Environmental Science Service Administration. Active duty also applies to a person who is a cadet attending one of the five United States Military Service Academies. For a person with service in the military Reserves or National Guard, mark the "Only on active duty for training in the Reserves or National Guard" box if the person has never been called up for active duty, mobilized, or deployed. For

a person whose only service was as a civilian employee or civilian volunteer for the Red Cross, USO, Public Health Service, or War or Defense Department, mark the 'Never served in the military' box. For Merchant Marine service, count only the service during World War II as active duty and no other period of service."

7    Respondents received the following hyperlinked definition for "household": "A household includes all the adults who live with you in the same house, apartment, group of rooms, or room that is used as one home. If you live in group housing, such as a dormitory, only include yourself and your adult family members who live with you.

8    Respondents received the following hyperlinked note regarding the term "related to you": "Include only adults you're related to by blood, legal adoption, or legal marriage that is recognized by the U.S. government. Do not include your unmarried partner or unrelated adults. Later we will ask about the people not included here."

9    Respondents received the following hyperlinked note regarding the term "named on the lease, mortgage, or deed": "This includes people who are listed on the lease, mortgage, or deed for your home. If your home is not owned or rented by anyone who lives with you, include any adult in the home except roomers, boarders, or paid employees."

10    Respondents received the following hyperlinked note regarding the term "related to you": "Do not include children that are not related to you by birth or by legal adoption. For instance, your unmarried partner's children would not be included here unless you have legally adopted them. We ask about these members of your household elsewhere in the survey."

11    Respondents received the following hyperlinked definition for "SNAP": "The Supplemental Nutrition Assistance Program (SNAP) is sometimes called the Food Stamp program. It helps people who have low or no income to buy food, usually with an EBT card."

12    Respondents received the following hyperlinked definition for "WIC": "'WIC' stands for 'Women, Infants, and Children.' It's the short name for the Special Supplemental Nutrition Program for Women, Infants, and Children. WIC is a federal program to help women who are pregnant or breastfeeding and children less than five years old get health care and healthy food."

13    Respondents who selected this answer choice received the message and clicked "OK" to proceed: "Please note that for upcoming questions about income, don't include food stamps (SNAP) as income."

14    Respondents who selected this answer choice received the message and clicked "OK" to proceed: "For upcoming questions about income, don't include assistance from WIC as income."

15    Respondents who selected multiple answer choices in this question received the following message and clicked "OK" to proceed: "Please note that for upcoming questions

16    Respondents received the following hyperlinked definition for "Individual Income": "Individual income" includes money from jobs, employment, net income from business, income from farms or rentals, income from self-employment, pensions, dividends, interest, social security payments, and other money income that you personally received in 2014. Do not include assistance from food stamps (SNAP) or WIC as income."

17    Respondents received the following hyperlinked definition for "Family Income": "'Family income' includes you and members of your family related by legally-recognized marriage, by birth, or by adoption who have lived with you during the last 12 months and includes money from jobs, employment, net income from business, income from farms or rentals, income from self-employment, pensions, dividends, interest, social security payments, and any other money income received by you and family members in your household who are 15 years of age or older in 2014. Do not include assistance from food stamps (SNAP) or WIC as income."

18    Respondents received the following hyperlinked definition for "Household Income": "'Household income' includes you and all members of your household who have lived with you during the past 12 months and includes money from jobs, employment, net income from business, income from farms or rentals, income from self-employment, pensions, dividends, interest, social security payments, and any other money income received by you and members of your household who are 15 years of age or older in 2014. Do not include assistance from food stamps (SNAP) or WIC as income."

19    Respondents received the following hyperlinked note regarding the term "had a drink": "Please do not include any time when you only had a sip or two from a drink."

20    Respondents received the following hyperlinked definition for "alcohol": "Alcoholic beverages, such as beer, wine, brandy, and mixed drinks."

21    Respondents received the following hyperlinked definition for "cigarettes": "Cigarettes made of tobacco. Do not include electronic cigarettes (E-cigs)."

22    Respondents received the following hyperlinked definition for "e-cigarettes or vaping products": "This includes electronic cigarettes (e-cigs or e-cigarettes), personal vaporizer (PV), or electronic nicotine delivery system (ENDS), all of which are battery-powered vaporizers that feel similar to tobacco smoking."

23    Respondents received the following hyperlinked definition for "marijuana or hashish": "Marijuana is also called pot or grass. Marijuana is usually smoked, either in cigarettes, called joints, or in a pipe. It is sometimes cooked in food. Hashish is a form of marijuana that is also called 'hash.' It is usually smoked in a pipe. Another form of hashish is hash oil."

24   Respondents received the following hyperlinked definition for "illegal or illicit drugs": "Drugs like cocaine, crack, heroin, LSD, and meth that are considered to be illegal. Inhalants are liquids, sprays, and gases that people sniff or inhale to get high or to make them feel good, like poppers or whippits. We are not interested in times when you inhaled a substance accidentally— such as when painting, cleaning an oven, or filling a car with gasoline."

25   Respondents received the following hyperlinked definition for "prescription drugs": "Use of prescription drugs in any way a doctor did not direct you to use them. When you answer this question, please think only about your use of the prescription drug in any way a doctor did not direct you to use it, including:

   • Using it without a prescription of your own

   • Using it in greater amounts, more often, or longer than you were told to take it

   • Using it in any other way a doctor did not direct you to use it"

29   Respondents received the following hyperlinked definition for "homelessness": "Experiencing homelessness includes such things as staying in a shelter, living on the street, living out of a car, or staying temporarily with family or friends because you can't afford housing."

26   Respondents received the following note regarding the term "drank an alcoholic beverage": "A can or bottle of beer, a glass of wine or a wine cooler, a shot of liquor, or a mixed drink with liquor in it. We are not asking about times when you only had a sip or two from a drink."

27   Respondents received the following note regarding the term "drink one or more drinks": "A can or bottle of beer, a glass of wine or a wine cooler, a shot of liquor, or a mixed drink with liquor in it. We are not asking about times when you only had a sip or two from a drink."

28   Respondents received the following note regarding the term "drinks": "A can or bottle of beer, a glass of wine or a wine cooler, a shot of liquor, or a mixed drink with liquor in it. We are not asking about times when you only had a sip or two from a drink."

30   Respondents received the following hyperlinked note: "This was the election in November 2014 to elect members of the U.S. Congress and state-level offices."

31   Respondents received the following hyperlinked note: "This was the election in November 2014 to elect members of the U.S. Congress and state-level offices."

32   Respondents received the following hyperlinked note regarding this term: "This was the presidential election in 2012 between Mitt Romney and Barack Obama."



# Appendix C

## Detailed Methodology

### Survey Sources

When developing the survey instrument, the research team focused on creating a questionnaire that could provide data to address both current and emerging needs of transgender people while gathering information about disparities that often exist between transgender people and non-transgender people throughout the United States. To achieve this, questions were included that would allow comparisons between the U.S. Transgender Survey (USTS) sample and known benchmarks for the U.S. population as a whole or populations within the U.S. Consequently, questions were selected to best match those previously asked in federal government or other national surveys on a number of measures, such as measures related to income and health. Questions in the USTS survey instrument were drawn from federally administered national population-based surveys, either exactly as they appeared in the source survey or with modifications, as follows:

| USTS Questions | Source Survey |
|---|---|
| 2.16–2.22; 11.1 & 11.2 | American Community Survey (ACS) |
| 2.24 & 2.25; 15.1–15.12; 16.1–16.5 | National Survey on Drug Use and Health (NSDUH) |
| 7.1–7.14 | Current Population Survey (CPS) |
| 12.1; 12.4; 12.6; 12.17; 14.4 | CDC's Behavioral Risk Factor Surveillance System (BRFSS) |
| 12.2 & 12.3; 14.1; 14.3 | National Health Interview Survey (NHIS) |
| 16.6–16.12 | National Comorbidity Survey Replication (NCS-R) |
| 17.7 & 17.8 | National Crime Victimization Survey (NCVS) |
| 18.1–18.3; 19.2 & 19.3 | National Intimate Partner and Sexual Violence Survey (NISVS) |
| 28.10–28.17 | National Inmate Survey (NIS) |
| 29.1–29.4 | Current Population Survey (CPS) 2014 November Supplement |
| 30.4–30.6 | Gallup Daily Tracking Poll (U.S. Political and Economic Daily Tracking) |

# Data Cleaning

Data cleaning is the process of detecting and removing some survey responses (e.g., duplicate responses, incomplete responses, illogical responses) in order to improve the quality of the sample. Cleaning of the USTS data proceeded in the following steps: (1) flagging and removal of respondents not eligible to take the survey, (2) flagging and removal of incomplete responses, (3) flagging and removal of duplicate responses, and (4) flagging and removal of illogical responses.

The first step was to remove survey responses from individuals who did not meet basic eligibility criteria for the survey. Respondents had to consent to take the survey, be at least 18 years of age, and reside in the U.S., a U.S. territory, or on a U.S. military base. Additionally, respondents needed to identify as transgender—including non-binary identities—or meet other criteria related to their gender identity or expression. Additionally, respondents were asked if they had already completed this survey before. Respondents who indicated that they had completed the survey before were also ineligible to take the survey. Skip logic was added to the survey to send respondents who did not meet these basic eligibility criteria to a disqualification page, but their responses were included in the initial dataset and had to be removed. Additional analyses of the dataset were completed to remove ineligible respondents. Respondents who provided a month and year of birth that indicated they were under 18 at the time they took the survey were flagged and removed from the dataset. Additional analyses of responses related to gender identity and transition status in Sections 1 and 2 of the survey were completed to flag additional ineligible respondents, which included those who did not identify as transgender or with a range of other gender-related experiences associated with transgender communities. Please see the "Variable Recoding Process" section below for a more detailed description of this process. In all, 10,304 responses were removed from the initial dataset due to being ineligible to take the survey.

Incomplete responses were then removed from the sample based on a requirement that respondents minimally complete Section 1 and specific demographic questions in Section 2 of the questionnaire. Missing data was otherwise allowed provided respondents completed these questions. The required Section 2 questions were as follows: 2.1, 2.3, 2.6, 2.8, 2.9, either 2.13 or 2.14, 2.15, 2.18, 2.19, 2.22, 2.23, and 2.26. It was determined that these questions would provide key information about respondents, including questions used to determine eligibility, and these questions were used to set a minimal level of survey "completeness" the research team was willing to accept for a respondent to remain in the dataset. In all 515 respondents were removed for incomplete survey responses.

Duplicate survey responses were then flagged and removed. Duplicates were determined based on all quantitative responses in the survey. Qualitative ("write-in") responses were not considered when determining whether a response was a duplicate. In all, 329 responses were considered duplicates and were removed from the final dataset.

Finally, respondents who provided more than one illogical response were flagged and removed from the final dataset. An illogical response is one that provides information that contradicts other information provided by a respondent. For instance, the USTS survey included 16 questions related to respondents' age, including current age, age they first disclosed to others they are transgender, age of suicide attempts, and ages of other milestones or experiences. An example of an illogical response would be a respondent who reported they attempted suicide at an age older than their current age. An illogical response could be due to an accidental miscode on the part of the respondent, meaning they accidentally filled out a question incorrectly, or could be evidence that a respondent is not taking the survey in earnest. The research team considered a respondent having more than one illogical response as evidence that the respondent may not have been taking the survey in earnest. In all, 53 respondents had more than one illogical response and were removed from the final dataset.[1]

| | |
|---|---|
| Total initial sample: | 38,916 |
| Total cases removed: | 11,201 |
| Did not consent to take survey | 223 |
| Not eligible: under 18 years of age | 6,168 |
| Not eligible: had already taken survey | 1,072 |
| Not eligible: did not live in U.S., territory, or military base | 1,052 |
| Not eligible: gender identity or expression did not meet minimum criteria | 1,789 |
| Duplicate responses | 329 |
| Incomplete responses | 515 |
| Illogical responses | 53 |
| Final sample: | 27,715 |

# Missing Data and Imputation

When a dataset has substantial amounts of missing data, such as over 5% missing data, researchers should consider techniques to impute the missing data.[2] The research team conducted an analysis to determine whether missing data should be imputed in the USTS dataset. The percentage of missing data due to item non-response (not including intentionally missing data due to skip logic) on any original quantitative variable (not including recoded variables or "write-in" variables) was less than 5%, with the exception of two variables. Question 14.4 regarding the month of respondents' last HIV test had 5.9% missing data (Q. 14.4: "Not including blood donations, in what month was your last HIV test?"). This item may have had relatively higher item non-response because respondents may have been more likely to recall the year of their last HIV test, which was also requested in Q. 14.4, than the month. Question 7.11 regarding respondents' sources of income had 6.2% missing data (Q. 7.11: "What are your current sources of income?"). This may reflect a general reluctance to provide financial information that is routinely found in item non-response to income-related questions in population-based surveys. The research team determined that due to the low amount of missing data, including minimal missing data on questions that routinely have high item non-response in population-based surveys (e.g., individual and household income), missing data imputation was not necessary for this report. Future researchers are encouraged to investigate the impact of data imputation when using this dataset.

# Variable Recoding Process

The initial final dataset contained 1,140 unique variables based on 324 items respondents could have received in the survey. Most of these variables required quantitative or qualitative recoding for use in the study. Quantitative recodes, such as for creating variables to reflect how "out" a respondent was about their transgender identity, were completed by one primary researcher and the syntax for that recode was reviewed by another researcher. Any errors in the syntax that were found in the review were submitted to the primary researcher in order to make corrections. The primary researcher completed any corrections and the variable was then considered a final recode. In all, the research team produced over 2,000 recodes used to generate the findings presented in this report.

Respondents to the survey had many opportunities to write in responses to questions by selecting an answer such as "none of the above" and writing in a unique response or responding to an open-ended question. The research team reviewed approximately 80,000 write-in responses for recoding. The recoding process included two coding teams that conducted initial coding, which was reviewed by another coding team and areas of disagreement were flagged. A simple percent agreement score was calculated to assess inter-rater reliability. For nearly all variables that were recoded, the coding team and the review team had 90% or higher agreement, two variables had agreement between 80% and 90%, and three fell below 80% agreement (Q. 1.7 (79%), Q. 9.3 (67%), and Q. 21.11 (70%)).

In the case of a question with write-in responses where only one answer option was allowed, write-in responses were reviewed to see if they could be recoded into existing answer options. If substantial numbers of respondents wrote in the same response, a new answer option could be added to the question to reflect those responses. If it was not feasible for a response to be recoded into an existing answer option or to be combined with others to create a new answer option, the response remained in the "none of the above" category as a unique response. In the case of a question that allowed multiple choices, a similar process took place. However, if a substantial number of responses could be grouped into a new answer option and a new variable was created to describe those responses, those respondents also remained in the "none of the above" category. Therefore, new answer options based on write-in questions that allowed multiple answer choices should be viewed as a subset of the "none of the above" category.

A different recoding process was established in order to recode respondents into four gender identity categories: transgender women, transgender men, non-binary people, and crossdressers. To categorize respondents based on gender identity, the research team relied on respondents' self-selected gender category in Q. 2.3, which was cross-tabulated with Q. 2.1 to identify transgender men and transgender women. For instance, the researchers would categorize someone assigned female at birth in Q. 2.1 who identifies as a man in Q. 2.3 as a transgender man and would categorize someone assigned male at birth in Q. 2.1 who identifies as a woman in Q. 2.3 as a transgender woman. In a few cases (n=439), a respondent selected female in Q. 2.1 and woman in Q. 2.3 or selected male in Q. 2.1 and man in Q. 2.3. These respondents required additional analysis of their survey responses in order to determine if they met the eligibility criteria for the survey, and if so, to categorize them as transgender men, transgender women, non-binary people, or crossdressers. The research team relied on questions in Sections 1, 2, and 12 to help make these determinations. Members

of the research team completed initial recoding of these respondents to indicate whether they were eligible for the survey, and if so, in which of these categories they should be included. These initial recodes were reviewed by other members of the research team. When initial recoders and reviewers were not in agreement on a recode, the team met to discuss the disagreements and made a final decision on the recode as a group. In all, 250 respondents were determined to be ineligible for the survey based on this recoding and review process and were removed from the final dataset.

# Weights

The USTS sample was a purposive sample that was created using direct outreach, modified venue-based sampling, and "snowball" sampling. As a non-probability sample, generalizability is limited, meaning it is unclear whether the findings presented in this report would hold true for the transgender population of the U.S. as a whole. In addition, prior research has found that online surveys have a known bias, particularly in regard to demographic representation. Online samples tend to over-represent those who are white, young, more highly educated, and with higher incomes.[3] In order to address these biases, at least in part, the research team created and utilized weights to adjust the USTS sample in certain ways in order to better represent what is believed to be the actual population characteristics of transgender people in the U.S. and in order to make more accurate comparisons with population-based samples of the U.S. population.

Prior research using probability samples of transgender adults have found that transgender adults differ from the general population in regard to race and ethnicity and age, with those that identify as transgender being more likely to be people of color and younger than the general population.[4] Studies have found no difference in educational attainment or lower educational attainment and have found lower incomes among transgender people as compared to non-transgender people.[5] The USTS sample has a higher percentage of white, young, and more highly educated respondents than the U.S. general population, which may be due, at least in part, to internet survey bias. However, the younger age is also likely due to the transgender population being younger overall. The USTS sample also has higher incidence of low incomes as compared to the U.S. population, which goes against the typical internet survey bias. Based on the existing research about the transgender population, there is not adequate information available to attempt to correct for bias in the sample based on age, educational attainment, or income. However, there is sufficient evidence to indicate that the race and ethnicity of the USTS sample does not reflect the racial and ethnic makeup of the U.S. transgender population as a whole.

"Weighting" is a common statistical technique used to adjust data drawn from a sample of a population to be more representative of the population from which the sample was drawn. For example, in a survey sample of the U.S. population, the proportion of respondents aged 18–24 may differ from the proportion of that age group in the U.S. population as a whole, in which case weights are commonly applied to adjust the sample to be more representative of the U.S. population. To help correct for sampling bias in the USTS sample in regard to race and ethnicity, U.S. population weights based on the American Community Survey for race and ethnicity were created as part of the standard weight applied to all findings in this report. While this may still over-represent white respondents relative to the makeup of the transgender adult population, this weighting procedure brings the sample closer to what is believed to be the true population distribution for race and ethnicity for

transgender people in the U.S. The standard weight also includes an adjustment to the 18-year-old category, described in more detail below. Additional survey weights were created for the purposes of comparability with federal government and national data sources, including weights for age and educational attainment.[6] These weights were applied in addition to the standard weight when comparing the USTS sample to the U.S. population for items that are sensitive to age and educational attainment, such as individual and household income, and are noted accordingly as the "supplemental weight." Weighted percentages for these and other variables can be found in the *Portrait of USTS Respondents* chapter. Unweighted frequencies and percentages for these and other variables can be found in *Appendix A (Characteristics of the Sample).*

In addition to the potential biases described above, the USTS had a high volume of respondents who indicated that their age was 18 years old, and respondents who, based on their birth date, were 17 years old.[7] It was suspected that the increased binning of 18-year-olds may be attributable to multiple factors, including a higher prevalence of respondents who were younger than 18 at the time of the survey. This resulted in 18-year-olds comprising 9% of the sample, compared to 19-year-olds comprising 6% of the sample. It is impossible to determine the source of this binning entirely, but in order to correct for it, the research team created a weight to adjust the 18-year-olds in the sample so that respondents reporting that age appeared more like the 19-year-old respondents in both sample size and other demographics. The rationale behind this adjustment is that a person's year of birth is likely randomly distributed around the date in which they took the survey. This would imply that the composition of 18-year-olds should strongly match the composition of 19-year-olds.

A sample matching and weighting procedure was used to balance the composition of 18-year-old respondents to 19-year-old respondents. This process is done by using the Covariate Balance Propensity Score (CBPS), which treats the 18-year-olds as a "treatment group" and 19-year-olds as a baseline "control group."[8] The estimation procedure then tries to achieve balance on covariates used in the model while simultaneously accounting for the conditional probability of being in one group over the other. The former process reduces observable differences among 18-year-olds to make their demographic composition reflect 19-year-olds.[9] The latter process weights the data such that the two groups are of equivalent size. After weighting, the size of the 18-year-old sample comprises 6%, which is the same as the 19-year-old sample. Any observed demographic differences between 18- and 19-year-olds were minimized, and many failed to reach statistical significance.

The goal of this weighting process is to up-weight respondents who are most likely 18 years old by making them observationally equivalent to the age cohort closest to them (i.e., 19-year-olds) and to down-weight respondents who are less likely to actually be 18 years old. This way, if respondents who were binned at 18 years of age are really younger than 18 years of age, it would be expected that their responses would diverge from 19-year-olds as that age gap increases.[10] The weighting process down-weights 18-year-old respondents as they diverge from 19-year-olds, minimizing the influence of that group on findings. This adjustment for 18-year-olds was included in the standard survey weight applied to all findings in this report.

**ENDNOTES**  |  APPENDIX C

1   Respondents sometimes provided responses that seemed unlikely, for instance running away from home at a very young age, such as two years old. These types of responses were only considered to be illogical responses if they contradicted other responses. In the case of responses that were considered unlikely, they were allowed to remain in the dataset. These outliers were negligible in the overall findings in that only a handful of outliers are found in any given variable and, therefore, they do not skew the findings. Findings based on age and other variables are often presented in ranges, which also helps to mitigate any influence of outliers.

2   Dong, Y. & Pang, C. Y. J. (2013). Principled missing data methods for researchers. *SpringerPlus*, *2*, 222.

3   Online survey bias is related to demographic differences in internet access. See e.g., Dillman, D. A., Smyth, J. D., & Christian, L. M. (2014). *Internet, Phone, Mail, and Mixed-Mode Surveys: The Tailored Design Method* (4th ed.). Hoboken, NJ: John Wiley & Sons; Smith, A. (2014). *African Americans and Technology Use: A Demographic Portrait*. DC: The Pew Research Center; Herman, J. L. & Hess, D. R. (2009). *Internet Access and Voter Registration*. DC: Project Vote.

4   See e.g., Flores, A. R., Brown, T. N. T., & Herman, J. L. (2016). *Race and Ethnicity of Adults who Identify as Transgender in the United States*. Los Angeles, CA: Williams Institute; Conron, K. J., Scott, G., Stowell, G. S., & Landers, S. J. (2012). Transgender health in Massachusetts: Results from a household probability sample of adults. *American Journal of Public Health*, *102*(1), 118–122; Meyer, I. H., Brown, T. N. T., Herman, J. L., Reisner, S. L., & Bockting, W. O. (in press). Demographic characteristics and health outcomes among transgender adults in select regions in the Behavioral Risk Factor Surveillance System. *American Journal of Public Health*. (accepted); Harris, B.C. (2015). *Likely Transgender Individuals in U.S. Federal Administrative Records and the 2010 Census*, Working Paper #2015-03. DC: Center for Administrative Records Research and Applications Working Papers. Available at: https://www.census.gov/srd/carra/15_03_Likely_Transgender_Individuals_in_ARs_and_2010Census.pdf.

5   See note 4.

6   The weights for race, age, and educational attainment were created based on the Census Bureau's 2014 American Community Survey (ACS).

7   Respondents who are younger than 18 were removed from the final dataset and, therefore, are excluded from all reporting because they were not eligible to participate in the study.

8   Imai, K. & Ratkovic, M. (2014). Covariate balancing propensity score. *Journal of the Royal Statistical Society, Series B, 76*(1), 243–263.

9   Variables used for covariate balance were based on the following questions: Q. 1.4; Q. 1.10; Q. 1.11; Q. 1.12; Q. 1.14; Q. 1.16; Q. 1.17; Q. 1.18; Q. 2.1; Q. 2.3; Q. 2.4; Q. 2.5; Q. 2.6; Q. 2.7; Q. 2.9; Q. 2.16; Q. 2.17; Q. 2.18; Q. 2.19; Q. 2.22; Q. 2.23; Q. 3.1; Q. 3.2; Q. 3.3; Q. 4.1; Q. 4.3; Q. 4.5; Q. 6.1; Q. 7.7; Q. 7.12; Q. 7.13; Q. 7.14; Q. 10.1; Q. 11.1; Q. 11.2; Q. 12.1; Q. 12.8; Q. 12.12; Q. 12.20; Q. 13.1; Q. 14.1; Q. 15.2; Q. 15.9; Q. 16.3; Q. 16.8; Q. 17.1; Q. 17.2; Q. 17.4; Q. 17.5; Q. 17.6; Q. 17.3; Q. 17.9; Q. 18.1; Q. 18.3; Q. 19.1; Q. 20.1; Q. 20.2; Q. 20.7; Q. 21.1; Q. 21.2; Q. 21.7; Q. 23.1; Q. 23.2; Q. 26.1; Q. 26.6; Q. 27.1; Q. 28.1; Q. 28.2; Q. 29.1; Q. 29.2; Q. 30.4; and Q. 30.6.

10   Prior to weighing, the demographic characteristics of 18-year-olds were more similar to respondents who were identified as being 17 years of age and had less similarity to 19-year-olds. After weighting, there are many more similarities between 18- and 19-year-olds and far less commonality with 17-year-olds.

Updated December 2017

**THE REPORT OF THE**



2015 U.S. TRANSGENDER SURVEY



National Center for TRANSGENDER EQUALITY

ustranssurvey.org | transequality.org

AR.10457

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekp-g8lg
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0525
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Betsy Jenson

---

## General Comment

In two significant ways, the Proposed Rules require immigration adjudicators to engage in decision-making to determine whether an asylum applicant's conductconsidered independently of any criminal court adjudicationtriggers a categorical bar to asylum eligibility. First, the agencies propose that immigration adjudicators be allowed to consider "all reliable evidence" to determine whether there is "reason to believe" an offense was "committed for or related to criminal gang evidence," or "in furtherance of gang-related activity, triggering ineligibility for asylum in either case. Second, the Proposed Rules permit immigration adjudicators to "assess all reliable evidence in order to determine whether [a] conviction amounts to a domestic violence offense;" and to go even further by considering whether non-adjudicated conduct "amounts to a covered act of battery or extreme cruelty."

Requiring adjudicators to make complex determinations regarding the nature and scope of a particular conviction or, in the case of the domestic violence bar, conduct, will lead to massive judicial inefficiencies and slanted "mini-trials" within the asylum adjudication process. The scope of the "reliable evidence" available to adjudicators in asylum cases is potentially limitless; advocates on both sides would be obligated to present fulsome arguments to make their cases about gang connections to the underlying activity or the relationship of the asylum applicant to the alleged victim. Because of the lack of robust evidentiary rules in immigration proceedings, it will be difficult if not impossible for many applicants to rebut negative evidence marshaled against them, even if false; and in other cases, asylum applicants will struggle to find evidence connected to events that may have happened years prior (especially for those detained). Asylum trials, which are typically three or fewer hours under current policies, would provide insufficient time to fully present arguments on both sides of these unwieldy issues.

Particularly in the context of the new proposed bar related to alleged gang affiliation, I am concerned that creating a blanket exclusion for anyone who is convicted of a crime - including a misdemeanor - that an immigration adjudicator deems linked to gang activity will erroneously prevent bona fide asylum seekers from receiving protection. This rule confers on immigration adjudicatorswho generally are not criminologists, sociologists, or criminal law expertsthe responsibility to determine if there is "reason to believe" any conviction

AR.10458

flows from activity taken in furtherance of gang activity. This rule will necessarily ensnare asylum seekers of color who have experienced racial profiling and a criminal legal system fraught with structural challenges and incentives to plead guilty to some crimes, particularly misdemeanors. These same individuals are vulnerable to being erroneously entered into gang databases. Such databases are notoriously inaccurate, outdated, and infected by racial bias.

Indeed, asylum applicants are already frequently subjected to wrongful denials of protection because of allegations of gang activity made by the Department of Homeland Security on the basis of information found in notoriously unreliable foreign databases and "fusion" intelligence-gathering centers outside the United States. Empowering immigration adjudicators to render asylum applicants categorically excluded from protection on the basis of such spurious allegations will inevitably result in the return of many refugees back to harm.

The Departments asks for comments on: (1) what should be considered a sufficient link between an asylum seeker's underlying conviction and the gang related activity in order to trigger the application of the proposed bar, and (2) any other regulatory approaches to defining the type of gang-related activities that should render individuals ineligible for asylum. The premise of these questions is wrong: a vague "gang related" bar should not be introduced at all. The Immigration and Nationality Act and existing regulations already provide overly broad bars to asylum where criminal behavior by an asylum seeker causes concern by an adjudicator. Adding this additional, superfluous layer of complication risks erroneously excluding bona fide asylum seekers from protection without adding any useful adjudicatory tool to the process.

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekp-hb6u
**Comments Due:** January 21, 2020
**Submission Type:** API

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0526
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Jordan Cunnings
**Address:**
    PO Box 8382
    Portland,  OR,  97207
**Email:** jordan@innovationlawlab.org
**Organization:** Innovation Law Lab

---

## General Comment

Please see the attached comment on behalf of Innovation Law Lab.

---

## Attachments

Innovation Law Lab Comment- USCIS RIN 1615-AC41; EOIR Docket No. 18-0002; A.G. Order No. 4592-2019

AR.10460



*Submitted via www.regulations.gov*

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41; Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility

January 21, 2020

**RE:    RDHS and DOJ Joint Notice of Proposed Rulemaking--USCIS RIN 1615-AC41; EOIR Docket No. 18-0002; A.G. Order No. 4592-2019**

Innovation Law Lab respectfully submits this comment on the proposed amendments to the regulations governing asylum eligibility, published on December 19, 2019.  The implementation of these amendments would wreak unnecessary havoc on our nation's asylum system, and severely punish many individuals who face danger, violence, and death in their home countries absent the protection that asylum promises.  We urge the agencies to reject the proposed changes in their entirety.

Innovation Law Lab is a nonprofit organization dedicated to upholding the rights of immigrants and refugees.  Founded in 2014 in response to the mass detention and deportation of asylum-seeking immigrant families, Innovation Law Lab specializes in the creation of scalable, highly replicable, and connected sites of resistance that create paradigm shifts in immigration representation, litigation, and advocacy.  By bringing technology to the fight for immigrant justice, Innovation Law Lab empowers advocates to scale their impact and provide effective representation to immigrants in detention and in hostile immigration courts across the country.  Innovation Law Lab works directly with low-income immigrants and the pro bono attorneys who

AR.10461

serve them, providing legal services, direct representation, and tactical support before USCIS and the Executive Office for Immigration Review (EOIR).

We describe below how the proposed amendments to the asylum eligibility regulations will impact our organization and our clients, and the reasons for our opposition. Omission of any proposed change from this comment should not be interpreted as tacit approval. We oppose all aspects of the proposed implementation.

## I.   The Proposed Rules unnecessarily and cruelly eliminate asylum eligibility for bona fide refugees

The proposed rules would cruelly expand the already-broad criminal eligibility grounds for asylum, punishing many immigrants with minor criminal histories by sending them back to countries where they face significant harm and possible death.

Our immigration laws already contain sweeping- and harsh- provisions that exclude immigrants with criminal justice involvement from the protection of our asylum laws. For example, anyone convicted of an aggravated felony- an extraordinarily vague term that encompasses a broad range of petty offenses[1]- is per se ineligible for asylum. Additionally, convictions deemed to be, on a case-by-case basis, "particularly serious crimes" will bar asylum eligibility.[2] Apart from the outright bars, a grant of asylum remains ultimately discretionary-meaning that USCIS or EOIR may, and do, deny cases based on even the most minor criminal histories.[3]

In light of these existing restrictions- which Innovation Law Lab believes should be narrowed, not expanded- there is no need for the proposed rule, which would apply a staggering *seven* new grounds of criminal ineligibility to asylum seekers. The particularly serious crime bar, which was statutorily enacted, would be rendered virtually meaningless if all of the minor crimes listed in the proposed rules become additional ineligibility grounds. Moreover, the proposed rules are arbitrary and capricious, as the agency has offered no convincing evidence that the expanded ineligibility grounds are needed.

The expanded criminal bars are especially troubling in light of the purpose of our nation's asylum laws- to protect persons fleeing persecution and death on account of a protected ground. Though lesser forms of humanitarian protection, like the Convention Against Torture, remain available to individuals regardless of criminal history, as described in section three below, the standard of proof for these forms of relief is much higher than that of asylum, and the protections

---

[1] 8 U.S.C. §§ 1158(b)(2)(A)(ii) and (B)(i).

[2] *See* 8 U.S.C. § 1158(b)(2)(A)(ii); *see also Kankamalage v. INS*, 335 F.3d 858, 864 (9th Cir. 2003)

[3] *See Matter of Pula*, 19 I.&N. Dec. 467 (BIA 1987).

offered are far less generous.[4] Asylum remains the paramount protection available to persons fleeing harm worldwide, and was enacted as part of Congressional efforts to create a protective framework that conforms to the United Nations' Protocols.[5] Indeed, the consequence of denying asylum to an applicant not based on the facts of their asylum case can often be the equivalent of a death sentence.[6]

## II.    The Proposed Rules violate the letter and spirit of United States international treaty obligations, as incorporated in U.S. law

Under the 1967 Protocol Relating to the Status of Refugees,[7] which binds parties to the United Nations Convention Relating to the Status of Refugees,[8] the United States is obligated to develop and interpret United States refugee law in a manner that complies with the Protocol's principle of non-refoulement (the commitment not to return refugees to a country where they will face persecution on protected grounds), even where potential refugees have allegedly committed criminal offenses. Instead of working towards greater congruence with the terms of the Convention, the Proposed Rules carve out categorical bars from protection that violate both the language and spirit of the treaty.

While the Convention allows states to exclude and/or expel potential refugees from protection, the circumstances in which this can occur are limited. In particular, the Convention allows states to exclude and/or expel individuals from refugee protection if the individual "having been convicted by a final judgement of a particularly serious crime, constitutes a danger to the community of that country."[9] However, this clause is intended for "extreme cases," in which the particularly serious crime at issue is a "capital crime or a very grave punishable act."[10] The United Nations High Commissioner for Refugees (UNHCR) has clarified that to constitute a "particularly serious crime," the crime "must belong to the gravest category" and be limited "to refugees who become an extremely serious threat to the country of asylum due to the severity of

---

[4] *See generally* Human Rights First, *Withholding of Removal and the U.N. Convention Against Torture—No Substitute for Asylum, Putting Refugees at Risk* (Nov. 2018), https://www.humanrightsfirst.org/sites/default/files/CAT_Withholding.pdf (describing the inadequacies of withholding of removal and protections under the Convention Against Torture, including the absence of rights to family reunification, prohibition on international travel, and enduring instability of legal status).

[5] *INS v. Cardoza-Fonseca*, 480 U.S. 421, 432-33 (1987).

[6] *See, e.g.*, Sarah Stillman, "When deportation is a death sentence," *The New Yorker*, January 8, 2018, https://www.newyorker.com/magazine/2018/01/15/when-deportation-is-a-death-sentence.

[7] United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268.

[8] Convention Relating to the Statute of Refugees, July 28, 1951, 140 U.N.T.S. 1954 (hereinafter "Refugee Convention").

[9] *Id.* at art. 33(2).

[10] U.N. High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees* 2, U.N. Doc. HCR/IP/Eng/REV. ¶ 154-55, (1979, reissued 2019).

crimes perpetrated by them in the country of asylum."[11] Moreover, the UNHCR has specifically noted that the particularly serious crime bar does not encompass less extreme crimes; "[c]rimes such as petty theft or the possession for personal use of illicit narcotic substances would not meet the threshold of seriousness."[12] Finally, under the Convention, when determining whether an individual should be barred from protection for having been convicted of a particularly serious crime, the adjudicator must conduct an individualized analysis and consider any mitigating factors.[13]

Innovation Law Lab works with asylum-seekers all across the country and has seen the importance of an individualized analysis and consideration of mitigating factors when adjudicating claims for asylum seekers who have a criminal history. Expanding the mandatory bars to asylum to include DUIs, convictions for simple drug possession, and convictions for minor felony offenses would penalize asylum-seekers for the past trauma they have experienced. Virtually all of the asylum seekers the Innovation Law Lab serves have suffered some form of severe past trauma, such as childhood physical or sexual abuse, long-term physical, sexual, and psychological abuse at the hands of their partners, torture by government officials, or witnessing extraordinary violence such as the rape or murder of family members. Research shows that mental health disorders, substance use, and other risky behaviors are linked with traumatic experiences.[14] Innovation Law Lab has observed this link firsthand through its work with asylum seekers. Many of the asylum seekers we help suffer from mental health disorders (diagnosed and undiagnosed), such as major depressive disorders, anxiety disorders, post-traumatic stress disorder (PTSD), and other serious mental health conditions as a result of their past traumatic experiences. Many of these individuals are therefore predisposed to substance use and risky behaviors associated with criminality because of the past trauma they have experienced.[15] Their underlying trauma and access to treatment is an important mitigating factor that an adjudicator should be permitted to consider when determining whether they are a danger to the community. However, under the Proposed Rules, and adjudicator would be prevented from considering an individual's underlying trauma and mental health condition in determining whether they are a danger to the community. This would directly violate the Protocol and the U.S.'s obligations under international law.

Innovation Law Lab is also gravely concerned with the proposed expansion of the asylum bar to include individuals who have been convicted of reentering the United States without

---

[11] U.N. High Comm'r for Refugees (UNHCR), *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 7 (July 2007), http://www.unhcr.org/enus/576d237f7.pdf.

[12] *Id.* at ¶ 10.

[13] *Id.* at ¶ 10-11; U.N. High Commissioner for Refugees, *The Nationality, Immigration and Asylum Act 2002: UNHCR Comments on the Nationality, Immigration and Asylum Act 2002 (Specification of Particularly Serious Crimes) Order 2004*, 4 (2004).

[14] https://www.samhsa.gov/trauma-violence

[15] *See id.*