EXHIBIT A

# WITHHOLDING PROTECTION

Lindsay M. Harris[*]

## ABSTRACT

*In June 2018, President Trump wrote a pair of tweets en route to his golf course, calling for "no Judges or Court Cases" at our border and swift deportation of immigrants, essentially without due process. While immigrant advocates were quick to explain the myriad constitutional problems with this proposal, elements of Trump's dream are already a reality. This Article reveals how a single Customs and Border Protection officer can short-circuit the checks and balances prescribed by U.S. and international law to protect refugees from being returned to harm, and cast a long shadow over a future, meritorious asylum claim.*

*In light of the growing attention to the plight of those fleeing persecution and seeking asylum at our borders, this Article examines shortcomings in both law and practice, illuminating the long-lasting ramifications of erroneously issued expedited removal orders for asylum seekers and their families. Congress designed the expedited removal system to expedite deportations and circumvent due process before an immigration judge. Certain humanitarian protections are built into the system to ensure that the United States meets its international and domestic legal obligations not to return refugees to a place where they*

    *    Assistant professor of law & Co-Director of the Immigration and Human Rights Clinic at the University of the District of Columbia – David A. Clarke School of Law. LL.M, Georgetown University Law Center, J.D. University of California Berkeley School of Law, B.A. University of California – San Diego. With thanks to Sabi Ardalan, B. Shaw Drake, Attenas Burrola, Kate Evans, Andrew Guthrie Ferguson, Denise Gilman, Laila L. Hlass, Jennifer Lee Koh, Estefania McCarroll, Karen Musalo, Michele Pistone, Trina Realmulto, Shoba Wadhia Sivaprasad, Elissa Steglich, and Sarah Sherman Stokes for their insight at various stages in the editing process. I am grateful to participants of the 2018 NYU Clinical Writers' Workshop and to the participants of the October 2018 mid-Atlantic Clinicians workshop. The editing staff members of the *Columbia Human Rights Law Review*, Nicholas Narbutas in particular, have been fantastic. All errors and omissions are my own. Sincere thanks to my ever-supportive institution, UDC Law, for funding to support this article.

AR.10943

*would face persecution or torture. In practice, these humanitarian protections are too often improperly implemented and front-line border enforcement officials, whether manifesting bias against asylum seekers or lacking proper training and expertise, routinely ignore U.S. law and the Department of Homeland Security's own regulations. This results in the wrongful deportation of asylum seekers and, as revealed in the Article, in permanent negative ramifications for those lucky enough to make it back over the border to in an attempt to re-apply for asylum.*

*The Article examines the disastrous interplay between two of the "speed deportation" processes of expedited removal and reinstatement of removal, the lack of sufficient safeguards that leave refugee screening at our borders in the shadows, and the absence of judicial review. The Article seeks not only to expose and analyze this problem, but also to improve the situation by considering a suite of pragmatic, actionable solutions to close the gap between the humanitarian protections prescribed by law and the reality faced by asylum seekers at the U.S. border. As an immediate first step to implement the humanitarian protections enshrined in law, the Article explores the merits and risks of using readily available technology: the use of Body-Worn Cameras by Customs and Border Protection officers conducting screenings of potential refugees at the border to fill the protection gap.*

AR.10944

TABLE OF CONTENTS

Introduction ................................................................... 5

I. Expedited Removal in Theory vs. Expedited Removal in
Practice ...................................................................... 19
   A. The Legal Framework for Expedited Removal and
   Mandatory Protections for Asylum Seekers ................ 20
      1. First-Time Asylum Seekers at the Border:
      Expedited Removal and the Credible Fear Interview
      ................................................................ 22
      2. Asylum Seekers Entering a Second or Subsequent
      Time, Reinstatement of Removal, and the Reasonable
      Fear Interview .......................................... 28
   B. How the Expedited Removal System Functions in
   Reality: Rampant Abuse of Expedited Removal at the
   Border .................................................................. 32
   C. Grave Consequences of the Interplay Between
   Reinstatement and the Expedited Removal System .... 37

II. Lack of Accountability Mechanisms for Abuse of
Expedited Removal ....................................................... 41
   A. Asking CBP to Reopen and Rescind Underlying
   Expedited Removal Orders ....................................... 42
   B. Asking the Office of Chief Counsel to Exercise
   Prosecutorial Discretion to Issue an NTA and Not to
   Accept CBP's Reinstatement of the Prior Expedited
   Removal Order ....................................................... 43
   C. Appellate Dreams Dashed: Limited Judicial Review
   of Expedited Removal Orders ................................... 45

III. Solutions to Stop Depriving Asylum Seekers of
Meaningful Protection .................................................. 50
   A. Congressional Action ........................................... 51
   B. Prosecutorial Discretion in Expedited Removal and
   Reinstatement of Removal ....................................... 53
   C. Increasing Access to Counsel ................................ 55

    D. Enhanced Training for CBP Officers .......................58

IV. Lifting Asylum Seeker Screening at the Border out of
the Shadows: Body-Worn Cameras?...........................................61
    A. Advantages of Body-Worn Cameras.........................63
        1. Transparency.........................................63
        2. Efficiency, Training, and Supervision ..................65
    B. Concerns Regarding the use of Body-Worn Cameras
    .................................................................................67
        1. Privacy ...............................................67
        2. Stifling Disclosure and Increasing Fear in Asylum
        Seekers.................................................69
        3. Acceptance by Border Officials ............................70
        4. Discretion for Border Officials operating Body-
        Worn Cameras...........................................................71
        5. The Necessary Reliance on Immigration Officials
        Exercising Prosecutorial Discretion, even with Video
        Evidence..................................................................73
        6. Reliability of Video Evidence .................................73
        7. Logistical and Financial Costs of Body-Worn
        Cameras at the Border...............................................74

Conclusion ..........................................................................76

AR.10946

INTRODUCTION

In June 2018, President Trump wrote a pair of tweets en route to his golf course, calling for "no Judges or Court Cases" at our border and swift deportation of immigrants, essentially without due process.[1] While immigrant advocates were quick to explain the myriad constitutional problems with this proposal,[2] elements of Trump's dream were already a reality.[3] This Article reveals how a single Customs and Border Protection (CBP) officer can short-circuit the checks and balances prescribed by U.S. and international law to protect refugees from being returned to harm, and cast a long shadow over a future, meritorious asylum claim.[4] The Article proposes a technology-based solution to this problem: the use of Body-Worn Cameras by CBP officers.

The Article examines the expedited removal system, as well as the consequences of an expedited removal order on asylum seekers and their families, and makes clear the need for reform. Congress designed this system to expedite deportations and circumvent due process before

---

1. Philip Rucker & David Weigel, *Trump Advocates Depriving Undocumented Immigrants of Due Process Rights*, WASH. POST (June 25, 2018), https://www.washingtonpost.com/powerpost/trump-advocates-depriving-undocum ented-immigrants-of-due-process-rights/2018/06/24/dfa45d36-77bd-11e8-93cc-6d3 beccdd7a3_story.html?utm_term=.b948fe35c3ec (on file with the Columbia Human Rights Law Review).

2. Doina Chiacu & Sarah N. Lynch, *Trump Says Illegal Immigrants Should Be Deported with 'No Judges or Court Cases'*, REUTERS (June 24, 2018), https://www.reuters.com/article/us-usa-immigration-trump/trump-says-illegal-immigrants-should-be-deported-with-no-judges-or-court-cases-idUSKBN1JK0OL [https://perma.cc/5BXM-JHBQ].

3. Jennifer Lee Koh & Shoba Sivaprasad Wadhia, *Deport, Not Court? The U.S. Is Already Doing That*, L.A. TIMES (June 30, 2018), http://www.latimes.com/opinion/op-ed/la-oe-koh-wadhia-deportations-20180630-story.html [https://perma.cc/F7MZ-HJY6] (explaining that the majority of removals from the United States are already carried out through speed deportation programs rather than fully litigated court cases).

4. As this article goes to print, the Trump Administration is experimenting with giving CBP officers even more authority and discretion—by allowing them to conduct credible fear interviews. *See* Stephen Dinan, *Border Patrol Officers to Double as Asylum Officers for Credible Fear Cases*, WASH. TIMES (Apr. 1, 2019), https://www.washingtontimes.com/news/2019/apr/1/border-patrol-agents-double-asylum-officers-credib/?utm_campaign=shareaholic&utm_medium=twitter&utm_source=socialnetwork [https://perma.cc/8URA-3V8G] (discussing a pilot program deputizing CBP officers to conduct credible fear interviews). The credible fear interview, currently conducted by United States Citizenship and Immigration Services trained asylum officers, is discussed in Part I.A. 1 of this article, *infra* p. 22–28.

an immigration judge in limited situations. Certain humanitarian protections are built into the system in an attempt to ensure that the United States meets its international and domestic legal obligations not to return refugees to a place where they would face persecution or torture. In reality, humanitarian protections are not properly implemented and front-line border enforcement officials, who often manifest bias against asylum seekers and lack proper training and expertise, routinely ignore U.S. law and the Department of Homeland Security's (DHS) own regulations. This results in both the wrongful deportation of asylum seekers and, as will be explained, permanent negative ramifications for those lucky enough to make it back over the border to seek asylum in the future.

      Though the failures of the expedited removal system existed prior to 2017, the Trump Administration has exacerbated the problem through anti-immigrant rhetoric, policies, and actions.[5] An expedited

---

      5.    Indeed, under the Trump Administration, turnbacks of asylum seekers at the border have increased. A high-profile and recent example of these problems was the refugee caravan in April and May of 2018, where border officials denied entry to a caravan of asylum seekers, forcing them to wait outside the United States' port of entry. Kirk Semple & Miriam Jordan, *Migrant Caravan of Asylum Seekers Reaches the U.S. Border*, N.Y. TIMES (Apr. 29, 2018), https://www.nytimes.com/2018/04/29/world/americas/mexico-caravan-trump.html?rref=collection%2Fsection collection%2Fworld&action=click&contentCollection=world&region=rank&module=package&version=highlights&contentPlacement=2&pgtype=sectionfront (on file with the Columbia Human Rights Law Review). Eventually, perhaps due to the media coverage the caravan received, the asylum-seeking caravan members were allowed into the United States and their quest for protection deferred, rather than denied entirely. In the summer of 2018, with the public's interest in asylum seekers piqued by the Administration's family separation policy, mainstream media started to cover the issue of asylum seekers being turned back at ports of entry in Texas and California. Neena Satija, *The Trump Administration Is Not Keeping Its Promises to Asylum Seekers Who Come to Ports of Entry*, TEX. TRIB. & REVEAL (July 5, 2018), https://www.texastribune.org/2018/07/05/migrants-seeking-asylum-legally-ports-entry-turned-away-separated-fami/ [https://perma.cc/NW94-YQHA]; John Burnett, *After Traveling 2,000 Miles for Asylum, This Family's Journey Halts at a Bridge*, NPR (June 15, 2018), https://www.npr.org/2018/06/15/620310589/after-a-2-000-mile-asylum-journey-family-is-turned-away-before-reaching-u-s-soil [https://perma.cc/ACC9-8HCN]. As of July 2018, the Administration is apparently considering an official policy blocking asylum seekers from claiming protection at ports of entry. Caitlin Dickerson, *Trump Administration Considers Unprecedented Curbs on Asylum for Migrants*, N.Y. TIMES (July 18, 2018), https://www.nytimes.com/2018/07/18/us/immigration-asylum-children.html (on file with the Columbia Human Rights Law Review). As this article goes to print, the Trump Administration introduced the "Remain in Mexico" policy, which requires asylum seekers to await adjudication of their claims in Mexico. This policy has been challenged in federal court because it violates the Immigration and Nationality Act,

AR.10948

removal order is one issued by a low-level border official, usually within a matter of days, without an individual ever going before an immigration judge. For an asylum seeker who is successful in entering the asylum process upon a second or third attempt, a prior expedited removal order—even if issued in violation of government regulations—nonetheless has lasting adverse ramifications. An individual with one or more removal orders, who has actually been removed, and who re-enters the United States without permission[6] is

---

the Administrative Procedure Act, and constitutional protections. *See* Complaint at 3, Innovation Law Lab v. Nielsen, No. 3:19-cv-0080Y7 (N.D. Cal Feb. 14, 2019). For an overview of the dire consequences of this policy, see HUMAN RIGHTS FIRST, BARRED AT THE BORDER, WAIT "LISTS" LEAVE ASYLUM SEEKERS IN PERIL AT TEXAS PORTS OF ENTRY (Apr. 2019), https://www.humanrightsfirst.org/sites/default/files/BARRED_AT_THE_BORDER.pdf [https://perma.cc/Y6XB-RNGX].

6.      Conversely, if an individual has a prior removal order and does *not* enter without permission, instead seeking admission at a port of entry, that individual is *not* subjected to reinstatement of removal or withholding-only proceedings, and is instead referred for a credible fear interview. In the last couple of years, however, increasingly CBP officers are illegally turning away asylum seekers across the Southern Border at both major and minor ports of entry following the November 2016 election of Donald Trump as U.S. President. *See* B. SHAW DRAKE, ELEANOR ACER & OLGA BYRNE, HUMAN RIGHTS FIRST, CROSSING THE LINE: U.S. BORDER AGENTS ILLEGALLY REJECT ASYLUM SEEKERS 3, 5 (2017), http://www.humanrightsfirst.org/sites/default/files/hrf-crossing-the-line-report.pdf [https://perma.cc/FUL9-4CDX] [hereinafter HRF, CROSSING THE LINE]; Letter from Am. Immigration Council et al. to Megan Mack, Officer for Civil Rights & Civil Liberties, U.S. Dep't of Homeland Sec., & John Roth, Inspector Gen., U.S. Dep't of Homeland Sec. 1 (Jan. 23, 2017), https://www.americanimmigrationcouncil.org/sites/default/files/general_litigation/cbp_systemic_denial_of_entry_to_asylum_seekers_advocacy_document.pdf [https://perma.cc/YZQ8-3LE2]; *see also* Michael Garcia Bochenek, *US Turning Away Asylum Seekers at Mexican Border: Central Americans Who Flee for Their Lives Denied Entry by US Border Guards*, HUMAN RIGHTS WATCH (May 3, 2017), https://www.hrw.org/news/2017/05/03/us-turning-away-asylum-seekers-mexican-border [https://perma.cc/Q8KV-9BE3]; Vivian Yee, *'They Treated Us Like Criminals': U.S. Border Crossers Report Severe Reception*, N.Y. TIMES (May 1, 2017), https://www.nytimes.com/2017/05/01/us/customs-airports-trump.html (on file with the Columbia Human Rights Law Review). Indeed, there is a class action lawsuit pending in California on this very issue. Complaint for Declaratory and Injunctive Relief at 1–3, Al Otro Lado, Inc. v. Kelly, No. 2:17-cv-5111 (C.D. Cal. July 12, 2017), https://americanimmigrationcouncil.org/sites/default/files/litigation_documents/challenging_custom_and_border_protections_unlawful_practice_of_turning_away_asylum_seekers_complaint.pdf [https://perma.cc/K6F6-EL42] [hereinafter *Al Otro Lado* Complaint]. Reports in 2018 have also highlighted turnbacks of asylum seekers before they reach the port of entry. One family was turned back nine times before being allowed to proceed with their claim for asylum inside the United States. Robert Moore, *At the U.S. Border, Asylum Seekers Fleeing Violence Are Told to Come Back Later*, WASH. POST (June 13, 2018), https://www.washingtonpost.com/world/national-security/at-the-us-border-asylum-seekers-fleeing-violence

at risk of having those orders "reinstated" at the discretion of a CBP border official, which then precludes that individual from later being granted asylum protection.[7] Instead, she is eligible only for a lesser form of protection called "withholding of removal."[8]

Take Cecilia's case,[9] for example: Cecilia, the mother of two young children, fled to the United States three times to escape persecution at the hands of her children's father, who had repeatedly attacked her since she was thirteen years old. Before seeking protection in the United States, Cecilia had made eight attempts to flee locally in Honduras and even El Salvador, but her persecutor found her each time.

Cecilia first sought protection in the United States in May 2014, when border officials arrested her near McAllen, Texas. While holding Cecilia in immigration custody, border officials asked why she came to the United States. Cecilia told officials she was afraid the father of her children would kill her, but the officials failed to record her fear or ask her the mandatory questions about that fear, in violation of their own regulations.

Under U.S. law, border agents must refer anyone who expresses a fear of persecution to the asylum office for a fear interview.[10] After Cecilia expressed her fear, instead of referring her to the asylum office, the border agent promptly processed her for deportation. Without an officer reading Cecilia's statement back to her

---

-are-told-to-come-back-later/2018/06/12/79a12718-6e4d-11e8-afd5-778aca903bbe_s tory.html?utm_term=.aa145fd06921 (on file with the Columbia Human Rights Law Review). Notably, the right of an individual to seek asylum and not be returned to danger attaches prior to a potential refugee's arrival at the border and the State's duty not to *refoule* prohibits any measure resulting in refugees being "pushed back into the arms of their persecutors." *See* B. Shaw Drake & Elizabeth Gibson, *Vanishing Protection: Access to Asylum at the Border*, 21 CUNY L. REV. 91, 99–100 (2017) [hereinafter Drake & Gibson, *Vanishing Protection*] (citing JAMES C. HATHAWAY, THE RIGHTS OF REFUGEES UNDER INTERNATIONAL LAW 301 (2005)).

    7.    *See infra* Section II.C. (discussing the valiant attempts by advocates to fight, in Courts of Appeals, for asylum seekers with prior removal orders subject to reinstatement of removal).

    8.    8 C.F.R. § 241.8 (2018).

    9.    The client's name has been changed to protect her identity, but her story is used with her permission. Cecilia is a client of the University of the District of Columbia David A. Clarke School of Law Immigration and Human Rights Clinic. All facts are from the client file, which is on file with the author.

    10.    Immigration and Nationality Act (INA) § 235(b)(1)(A), 8 U.S.C. § 1225(b)(1)(A) (2012).

AR.10950

or informing her of her rights—both procedures required by regulation[11]—immigration officials deported her to Honduras.

Cecilia was only in Honduras for a few weeks before fleeing for her life again. In June 2014, border officials arrested her in Rio Grande City, Texas. Once again, they violated the law by refusing to ask Cecilia any questions regarding her fear of returning to Honduras, and instead quickly deported her a second time.

Cecilia entered the United States a third time in October 2015, making one last desperate attempt to survive, this time fleeing with her five-year-old daughter. Again, border officials apprehended and detained her. Unlike in her previous two attempts to seek protection, immigration officials listened to Cecilia's fear that she would be killed by the father of her children and properly referred the matter to the Asylum Office. Cecilia underwent a reasonable fear interview, after which the Asylum Office issued a positive fear determination. Cecilia was then released to pursue her claim for protection in immigration court.

Two and a half years later, in April of 2018, an immigration judge heard Cecilia's case in Arlington, Virginia. Cecilia was in "withholding only" proceedings, because her prior removal order had been "reinstated." By contrast, her daughter, whose claim was largely the same as Cecilia's, was in asylum proceedings, having never been previously deported. Before the trial, with the help of her lawyer, Cecilia asked Customs and Border Protection to rescind the two erroneously issued removal orders and received a negative response several months later. Cecilia also asked the government trial attorney to exercise prosecutorial discretion to allow her to pursue a claim for asylum. Without any documented statements of Cecilia's fear during her interactions with CBP at the border in 2014, the trial attorney declined to exercise discretion in this way. Lacking the authority to remedy the situation, the immigration judge granted Cecilia "withholding" protection and her daughter asylum in court on the day of the hearing. The government waived appeal.

Cecilia's eleven-year-old son remained in Honduras, at risk of violent abuse by his father. As a withholding grantee, Cecilia is unable to travel outside the United States. She is also unable to petition for her son to join her in the United States and faced the difficult choice of whether to send her son on the treacherous journey that she knows so well, alone, as an unaccompanied minor. Cecilia is barred from asylum

---

11.     8 C.F.R. § 235.3(b)(2)(i) (2018).

because of the overbroad provisions allowing for reinstatement of removal and because courts have interpreted the law to say that those with reinstated removal orders cannot apply for asylum. Cecilia's case may have worked out very differently, as will be discussed in this Article, if there were an actual record of the two times she expressed her fear to border agents and it was ignored.

Cecilia's case makes clear how problematic implementation of expedited removal, coupled with reinstatement of removal, is for asylum seekers. Both asylum and withholding are forms of protection, along with relief under the Convention Against Torture, for individuals fleeing persecution. There are, however, substantial differences between the three forms of relief and who, in general, is entitled to receive each form of protection.

First, asylum is discretionary and affords the most robust protection for those fleeing persecution.[12] To be granted asylum, an individual must meet the refugee definition, which includes:

> [A]ny person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unwilling or unable to avail himself or herself or the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.[13]

Once an asylum seeker is granted asylum and becomes an "asylee," she has a path to U.S. citizenship and certain benefits along the way.[14] An asylee is also permitted to travel overseas and, often most importantly, to apply for family reunification.[15]

---

12.     *See* OFFICE FOR IMMIGRATION REV., U.S. DEP'T OF JUSTICE, ASYLUM AND WITHHOLDING OF REMOVAL RELIEF CONVENTION AGAINST TORTURE PROTECTIONS (2009), https://www.justice.gov/sites/default/files/eoir/legacy/2009/01/23/Asylum WithholdingCATProtections.pdf [https://perma.cc/N2K5-84ST]; *see* INA § 101(a)(42), 8 U.S.C. § 1101(A)(42) (defining refugee status); INA § 208(b)(1)(A), 8 U.S.C. § 1158(b)(1)(A) (providing that "the Secretary of Homeland Security or the Attorney General *may* grant asylum" to an eligible applicant) (emphasis added).

13.     INA § 101(a)(42).

14.     *See, e.g.*, Lindsay M. Harris, *From Surviving to Thriving: An Investigation of Asylee Integration in the United States*, 40 N.Y.U. REV. L. & SOC. CHANGE 29, 40–49 (2016) [hereinafter Harris, *From Surviving to Thriving*] (discussing the benefits that asylees are eligible for as long as they meet state requirements).

15.     For more detail on the benefits for "asylees," *see* Section I.C, *infra*.

Certain individuals are barred from asylum protection, including those who: have filed their application for asylum more than one year after their arrival in the United States;[16] have previously been denied asylum;[17] or have been "firmly resettled" in another country prior to arriving in the United States.[18] The merits of these bars can be debated, though they rest on discernable principles. For example, individuals who have previously applied for asylum and been denied by a judge are assumed not to have a valid claim; asylum seekers who delay their filing for more than a year are thought to have potentially fraudulent claims;[19] and those who have already gained protection in another country should not be able to access our limited protection resources.[20] For all of these bars to asylum, however, the asylum seeker has the right to present evidence, to argue certain exceptions apply, and to have the potential bar subjected to the scrutiny of an immigration judge, who has the ultimate decision-making authority regarding whether an individual is barred from asylum.[21]

Second, withholding of removal ("withholding") is a mandatory form of relief—if an individual meets the eligibility requirements, that relief must be granted.[22] This is tied to the United States' international treaty obligation not to *refoule*, or return, an individual to a country where his or her "life or freedom would be threatened."[23] To obtain this relief, individuals must meet a higher legal standard and burden of

---

16.     INA § 208(a)(2)(B), (d); *see generally* Lindsay M. Harris, *The One-Year Bar to Asylum in the Age of the Immigration Court Backlog*, 2016 WIS. L. REV. 1185, 1213–24 (2016) [hereinafter Harris, *The One-Year Bar*] (examining the one-year bar to asylum and how flaws in the immigration system impede compliance).

17.     INA § 208(a)(2)(C)–(D). An application is deemed denied only if denied by an immigration judge or the Board of Immigration Appeals, not the Asylum Office. *See* 8 C.F.R. § 208.4(a)(3) (2018).

18.     8 C.F.R. §§ 208.13(c)(2)(i)(B), 208.15 (2018).

19.     For an overview of the origins of the one-year filing deadline, connected to fears about asylum fraud, along with a detailed critique of the one-year filing deadline and the ways in which it does not take into account that genuine asylum seekers have valid reasons for missing the deadline that are not covered by the current extraordinary or changed circumstances exceptions, *see* Harris, *The One Year Bar*, *supra* note 16.

20.     *See, e.g.*, Matter of A-G-G-, 25 I. & N. Dec. 486, 489–503 (B.I.A. 2011) (discussing the origins and implementation of policies against firm resettlement and the evolution of the firm resettlement bar over the years).

21.     *See* 8 C.F.R. § 208.2(b) (2018).

22.     INA § 241(b)(3), 8 U.S.C. § 1231(b)(3) (2012).

23.     Protocol Relating to the Status of Refugees art. 33, Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267 (entered into force Oct. 4, 1967).

proof.[24] Although withholding protection is harder to obtain, the benefits are far inferior to asylum—unlike asylum seekers, withholding recipients cannot travel overseas with the certainty that they can return to the United States, cannot petition for family members, and have no pathway to citizenship.[25] Essentially, they live in limbo, having to continually renew their work permits and check in regularly with deportation officers.[26] Further, individuals eligible only for withholding are more likely to be detained during the adjudication of their claim for protection.[27]

Third, applicants for whom criminal bars defeat both asylum and withholding eligibility and who fear government-sanctioned torture in their home country may be eligible for relief under the Convention Against Torture ("CAT").[28]

---

24.     To obtain withholding, an applicant must show a "clear probability" of persecution, meaning that the applicant is more likely than not to be persecuted, while asylum only requires a "well-founded fear" of persecution, meaning the applicant faces at least a one-in-ten chance of persecution. *See generally* INS v. Cardoza-Fonseca, 480 U.S. 421 (1987) (deciding that the standard for asylum is less stringent than that for withholding).

25.     *Withholding of Removal and CAT*, IMMIGR. EQUALITY, https://www.immigrationequality.org/get-legal-help/our-legal-resources/asylum/withholding-of-removal-and-cat/#.W8uQ1RNKjq0 [https://perma.cc/GS8B-XK9K].

26.     *Id.*

27.     *See, e.g.*, DAVID HAUSMAN, AM. CIVIL LIBERTIES UNION, FACT SHEET: WITHHOLDING-ONLY CASES AND DETENTION AN ANALYSIS BASED ON DATA OBTAINED THROUGH THE FREEDOM OF INFORMATION ACT (Apr. 19, 2015) [hereinafter ACLU FACT SHEET: WITHHOLDING-ONLY CASES AND DETENTION], https://www.aclu.org/sites/default/files/field_document/withholding_only_fact_sheet_-_final.pdf [https://perma.cc/35PC-GBH6] (reporting that in over 85% of withholding-only cases, respondents remained detained throughout the adjudication of their claims); Pet. for Writ of Habeas Corpus and Class Action Complaint, Martinez-Banos v. Asher, No. 2:16-cv-01454 (W.D. Wash. 2016), https://www.nwirp.org/wp-content/uploads/2018/04/Martinez-Banos-et-al.-v.-Asher-Complaint2.pdf [https://perma.cc/5KNM-PXDL] (challenging ICE's practice of refusing to allow bond hearings for individuals in withholding-only proceedings); YALE LAW SCH. LOWENSTEIN INT'L HUMAN RIGHTS CLINIC, U.S. DETENTION AND REMOVAL OF ASYLUM SEEKERS: AN INTERNATIONAL HUMAN RIGHTS LAW ANALYSIS 39–40, 40 n.273 (2016), https://law.yale.edu/system/files/area/center/schell/human_rights_first_-_immigration_detention_-_final_-_20160620_for_publication.pdf [https://perma.cc/Z6KZ-367G] ("DHS arrests people who are subject to reinstatement of removal and keeps them in custody throughout the reinstatement proceedings, without the opportunity to seek bond.").

28.     This includes individuals who have been convicted of a particularly serious crime in the United States, have committed a serious non-political crime outside the United States, or pose a threat to U.S. national security. INA § 208(b)(2)(A)(ii)–(iv), 8 U.S.C. § 1158(b)(2)(A)(ii)–(iv) (2012). It also includes those

Federal circuit courts have found, however, that there is another way in which individuals are categorically barred from asylum: a reinstated removal order. Such an order precludes the right to any review of an applicant's asylum eligibility by an immigration judge.[29] Any removal order can be reinstated, but this Article focuses specifically on the situation where an individual receives an expedited removal order, and a border official later decides to subject that individual to reinstatement of removal after the individual re-enters without inspection. In this situation, as with those barred by failure to file within one year or because they were "firmly resettled" in another country, the applicant is only eligible for withholding of removal.[30] Unlike the one-year or firm resettlement bars, however, in this situation the immigration judge has no jurisdiction over whether the individual is in fact subject to a bar from asylum and can only grant withholding protection.[31] In other words, the individual has no way to argue to an immigration judge that the reinstated removal order is the result of an erroneous or illegal action by immigration officials.

EXPEDITED REMOVAL AND REINSTATEMENT OF REMOVAL

This Article builds upon prior scholarship, which has broadly examined the "shadow" deportation system, including the expedited removal and reinstatement of removal processes.[32] This Article is the

who are members of a terrorist organization, have participated in terrorist activity, or have given material support to a terrorist organization, INA §§ 212(a)(3)(B)(i)(I)–(IV), (VI), 237(a)(4)(B), or who have persecuted others, INA §§ 101(a)(42)(B), 208(b)(2)(A)(i).

29.     8 C.F.R. § 241.8 (2018). This is discussed in depth in Section II.C, *infra*.

30.     *See id.* § 241.8(e) (providing an exception to reinstatement of removal for an individual expressing fear to be referred for a reasonable, rather than credible, fear interview, leading to potential withholding, rather than asylum eligibility).

31.     *See id.* § 241.8(a) ("The alien has no right to a hearing before an immigration judge in such circumstances.").

32.     INA § 235(b)(1)(A)(i), 8 U.S.C. § 1225(b)(1)(A)(i) (2012); *see, e.g.*, Jennifer Lee Koh, *Removal in the Shadows of Immigration Court*, 90 S. CAL. L. REV. 181, 187 (2017) [hereinafter Koh, *Removal in the Shadows*] (examining five types of removal orders: expedited removal, reinstatement of removal, administrative removal of non-lawful permanent residents with aggravated felony convictions, in absentia orders for failure to appear in immigration court, and stipulated removal orders following waivers of the right to a court hearing). Professor Wadhia refers to expedited removal and reinstatement along with administrative removals as "speed deportations." Shoba Sivaprasad Wadhia, *The Rise of Speed Deportations and the Role of Discretion*, 5 COLUM. J. RACE & L. 1, 6 (2015) [hereinafter Wadhia, *Speed Deportations*]; Jill Family refers to some of these procedures, outside immigration courts, as "diversions." Jill E. Family, *Beyond Decisional Independence: Uncovering*

first, however, to fully explore how the interaction of expedited removal and reinstatement of removal blocks asylum seekers from meaningful protection, relegating them to withholding protection only.

Expedited removal and reinstatement of removal are important areas for examination. [33] The use of these summary deportation systems is on the rise.[34] Indeed, expedited removals and reinstatement represent the majority of all removals in the United States. In 2016, the most recent year for which statistics were available at the time of writing, 83% of removals took place through reinstatement of prior removal orders or expedited removal of individuals seeking admission at the border.[35]

In addition to the alarming frequency of its use of expedited removal and reinstatement, the Trump Administration has also referred to plans to expand the Department of Homeland Security's authority to use expedited removal to the full extent permitted by statute.[36] This would allow the government to issue expedited removal

---

*Contributors to the Immigration Adjudication Crisis*, 59 U. KAN. L. REV. 541, 542 (2011). Stephen Manning and Kari Hong refer to expedited removal as "rapid removals." *See* Stephen Manning & Kari Hong, *Getting It Righted: Access to Counsel in Rapid Removals*, 101 MARQ. L. REV. 673, 676–79 (2018) [hereinafter Manning & Hong, *Access to Counsel*]; *see also* Jennifer Lee Koh, *When Shadow Removals Collide: Searching for Solutions to the Legal Black Holes Created by Expedited Removal and Reinstatement*, 96 WASH. U. L. REV. 337, 340–41 (2018) [hereinafter Koh, *Searching for Solutions*] (examining two forms of "shadow removals," categorized as expedited removal and reinstatement of removal).

33.    Koh, *Searching for Solutions*, *supra* note 32, at 343 (referring to the intersection of expedited removal and reinstatement of removal as "legal black holes—spaces in which executive power is particularly high but where accountability and review are almost nonexistent") (citing Ralph Wilde, *Legal "Black Holes?" Extraterritorial State Action and International Treaty Law on Civil and Political Rights*, 26 MICH. J. INT'L L. 739, 775 (2005)).

34.    *See generally* AM. IMMIGRATION COUNCIL, IMMIGRATION POLICY CTR., REMOVAL WITHOUT RECOURSE: THE GROWTH OF SUMMARY DEPORTATIONS FROM THE UNITED STATES (2014), https://www.americanimmigrationcouncil.org/research/removal-without-recourse-growth-summary-deportations-united-states [https://perma.cc/5YHD-5J6P] (analyzing the dramatic increase in the number of deportations carried out through summary removal procedures, including expedited removal and reinstatement of removal, since 1996).

35.    OFFICE OF IMMIGRATION STATISTICS, U.S. DEP'T OF HOMELAND SEC., ANNUAL REPORT, IMMIGRATION ENFORCEMENT ACTIONS: 2016, at 8 (2017), https://www.dhs.gov/sites/default/files/publications/Enforcement_Actions_2016.pdf [https://perma.cc/VS94-FN23] (reporting that of 340,056 removals in 2016, 141,518 were expedited removal orders and 143,003 were reinstatements, totaling 284,521, or 83.6%).

36.    Memorandum from John Kelly, Sec'y, Dep't of Homeland Security, to Kevin McAleenan, et al, Acting Comm'r, U.S. Customs & Border Prot., at 6 (Feb.

orders throughout the United States against any individual who had not previously been admitted or paroled and is unable to show that he or she has been continuously physically present within the United States for at least two years.[37]

The shortcomings of regular immigration court removal proceedings are even starker in the context of shadow removals.[38] Indeed, procedural due process rights only apply in immigration court.[39] Outside of immigration court, in the expedited removal and reinstatement context, Customs and Border Protection officers "act as investigator, judge, and jury, with the immigration courts completely uninvolved in the removability determination."[40] Unlike immigration judges and asylum officers, CBP officers must meet only minimal eligibility requirements for the job and are not required to have legal training.[41] As will be explained in Section I.C below, the actions of these officers have profound and prolonged consequences for asylum seekers.

Between 1996 and 2016, scholars estimate that rapid removals have accounted for the removal of more than 4.2 million people, all without any review or oversight by the immigration court system.[42]

---

20, 2017); Exec. Order No. 13,767, 83 Fed. Reg. 8793, 8786 (Jan. 15, 2017), § 11(c). For an explanation of the origins and makeup of the Department of Homeland Security, see Wadhia, *Speed Deportations, supra* note 32, at 5–6. For an exploration of the expansion of expedited removals, including implementation of the "contiguous territories" provision, *see* Geoffrey Hoffman, *Contiguous Territories: The Expanded Use of "Expedited Removal" in the Trump Era*, 33 MD. J. INT'L L. 268, 269–73 (2018).

37.     *See* INA § 235(b)(1)(A)(iii)(II) (2012).

38.     Koh, *Removal in the Shadows*, *supra* note 32, at 222–32 (highlighting how the problems posed by detention, lack of appointed counsel, limits on judicial review, and restrictions on relief and meaningful discretion are exacerbated in the context of shadow removals).

39.     *Id.* at 192.

40.     *Id.* at 193. This is not the only area of law in which low level officials must administer complex immigration laws. *See* Amanda Frost, *Learning from Our Mistakes: Using Immigration Enforcement Errors to Guide Reform*, 92 DENV. U. L. REV. 769, 773 (2015) [hereinafter Frost, *Learning from our Mistakes*].

41.     These requirements include being a U.S. citizen, holding a valid driver's license, being eligible to carry a firearm, being under the age of 40 at the time of referral, and residing in the United States for three of the past five years. CBP officers must go through the hiring process, which includes a basic medical exam, fitness test, background investigation, interview, drug test, and polygraph test. *See CBPO Application Process*, U.S. CUSTOMS & BORDER PROTECTION, https://www.cbp.gov/careers/frontline-careers/cbpo/app-proc [https://perma.cc/XW5C-L59R].

42.     Manning & Hong, *Access to Counsel*, *supra* note 32, at 680 (calculating that number based on data from 2010–2016, where rapid removals accounted for

Unlike previous scholarship, which has addressed the effects of these processes on individuals in the United States with existing ties to the community,[43] this Article focuses on asylum seekers arriving at the border and the consequences of erroneously issued expedited removal orders for those asylum seekers.

As a further sign of the increasing importance of the interplay between expedited removal and reinstatement of removal, according to the EOIR Statistical Yearbook for 2016, the immigration courts saw a dramatic rise in withholding-only proceedings from fiscal years 2012 to 2016. In FY 2012, immigration courts held 1,091 withholding-only proceedings, but in 2016, this number was 3,249.[44]

This threefold increase in just four years is likely explained by the rising numbers of expedited removal orders issued against arriving asylum seekers who, like Cecilia, are not properly referred to credible fear interviews (CFI). This forces those with a genuine fear of persecution to make the dangerous journey again. When those asylum seekers enter a second or third time, their prior expedited removal order and reinstatement of removal render them ineligible for asylum protection.[45] Because of the prior order of removal, they are eligible only for a reasonable fear interview (RFI), which, if positive, puts them into withholding-only proceedings in immigration court.[46]

The number of individuals in withholding-only proceedings is relatively low compared to the number removed via expedited removal at the border. But those with reinstated removal orders upon entering a second or third time are subjected to a higher standard within the RFI than would be applied in a CFI,[47] and thus may not pass that threshold test despite having an otherwise potentially valid asylum claim.[48]

---

76% of all removals, and extrapolating that same percentage rate to all reported removals between 1996–2016).

43.     Koh, *Searching for Solutions*, *supra* note 32 (focusing particularly on individuals with existing ties to the United States and how they are affected by the interplay between reinstatement and expedited removal).

44.     EXEC. OFFICE FOR IMMIGRATION REVIEW, U.S. DEP'T OF JUSTICE, FY 2016 STATISTICS YEARBOOK, B1 (2017), https://www.justice.gov/eoir/page/file/fysb16/download [https://perma.cc/2CBR-HLVL] [hereinafter EOIR FY 16 STATISTICS YEARBOOK]; *see also* Wadhia, *The Rise of Speed Deportation*, *supra* note 32, at 5–6 (citing the 2013 yearbook).

45.     *See infra* text accompanying notes 160–76.

46.     8 C.F.R. § 208.31 (2018).

47.     *See infra* text accompanying notes 89–92.

48.     Other possible explanations for the increase in withholding proceedings could be that DHS has improved its screening of individuals with a reasonable fear

This Article examines the profound and very human consequences of the interaction between expedited removal and reinstatement of removal. The piece then introduces solutions and examines how the use of readily available technology may safeguard the humanitarian protections for asylum seekers at our borders—protections which, while guaranteed by our laws, are too easily denied in practice.

The Article will examine the expedited removal system and contrast the intended system with its reality. The Article will then make clear the ramifications of a split-second decision made by border enforcement officials to ignore an articulated fear of return and issue an expedited removal order. Part I examines the intersection of expedited removal and reinstatement of removal and how their interplay affects asylum seekers specifically.

Part II examines discretionary remedies for asylum seekers along with a lack of meaningful appellate review and largely unsuccessful challenges in the Federal Circuit Courts of Appeals. The first discretionary remedy is to ask CBP border officials to rescind the underlying removal order and to rescind reinstatement of removal orders. Second, an asylum seeker can ask the government trial attorney assigned to the case to exercise discretion to issue a new Notice to Appear, rather than accepting the Notice of Referral from CBP to withholding-only proceedings. Next, this Part discusses relief through the appellate courts and explains how this avenue is insufficient.

In Part III, the Article proposes solutions to remedy the denial of meaningful protection for asylum seekers. This Part considers a broad range of solutions, including statutory overhaul and increasing Congressional oversight, encouraging prosecutorial discretion, increasing access to counsel, and enhancing training of border officials administering the expedited removal system.

Part IV proposes that, in the absence of larger statutory reform dismantling or dramatically overhauling the expedited removal and reinstatement of removal processes, the government should institute

---

of return or simply that more individuals who are ineligible for asylum have a fear of return. *See* Wadhia, *Speed Deportations*, *supra* note 32, at 13–14. Indeed, the number of reasonable fear interviews has also increased during this time period. *See* EOIR FY16 STATISTICS YEARBOOK, *supra* note 44, at B1 (815 in 2012 and 2,552 in 2016). Alternatively, the increase in withholding-only proceedings may be simply tied to the growth in reinstatements and administrative removals by DHS. Wadhia, *Speed Deportations*, *supra* note 32, at 14.

the use of Body-Worn Cameras (BWCs), a practical and expedient solution which follows the lead of law enforcement agencies across the country. This would require all CBP officials, who are empowered to issue the initial expedited removal orders and ask the screening questions around fear to identify asylum seekers, to wear and use body cameras in those interactions. The body cameras would create a permanent record of the initial screening interview, taking expedited removal out of the shadows. Knowing that their actions are being recorded would hopefully encourage officers to follow the law and procedures for properly screening potential asylum seekers in expedited removal. Failing that, complete video footage of the entire screening interaction would give supervising border officials and trial attorneys the information they need to rescind the underlying expedited removal order and to exercise prosecutorial discretion to decline to reinstate the underlying removal order. Finally, implementation of BWCs also gives Congress a mechanism to ensure that the law is implemented as intended.

As will be discussed, video or even audio footage of Cecilia's interactions with border officials would have preserved her articulated fear claim and perhaps persuaded CBP to rescind their erroneously issued removal orders, or the Immigration and Customs Enforcement (ICE) trial attorney to exercise his discretion and allow her to pursue asylum relief.[49] In the absence of more dramatic reform that overhauls

---

49.     It should be noted, however, that in many ways things would have been worse for Cecilia arriving at the border today. For a period of time in 2018, border officials would have taken her five-year-old daughter away and she could have spent months separated from her child. Further, former Attorney General Jefferson B. Sessions' decision issued in June 2018 attempts to undo asylum and withholding protection for those fleeing domestic violence or gang violence at the hands of non-state actors, so Cecilia may have never received a positive decision in her fear interview with asylum officers. *See* Matter of A-B-, 27 I. & N. Dec. 316 (A.G. 2018) (overruling the BIA decision, *Matter of A-R-C-G-*, which recognized domestic violence as a potential ground for asylum). Further, Cecilia may have also faced prosecution for "illegal entry" under 8 U.S.C. § 1326 (2012), or even for "illegal reentry" under § 1327, despite the fact that under Article 31 of the Refugee Convention, asylum seekers should not be penalized for irregular entry. *Compare Attorney General Announces Zero-Tolerance for Criminal Illegal Entry*, U.S. DEP'T JUST. (Apr. 6, 2018) [hereinafter *Attorney General Announces Zero-Tolerance*], https://www.justice.gov/opa/pr/attorney-general-announces-zero-tolerance-policy-criminal-illegal-entry [https://perma.cc/6RNG-QKNN], *with* Convention Relating to the Status of Refugees art. 31, Jul. 28, 1951, 189 U.N.T.S. 137. *Matter of A-B-* is just the latest in what Professor Sarah Sherman-Stokes argues is a decades-long series of government actions aimed at undermining recognition of refugee status for Central Americans, *see* Sarah Sherman-Stokes, *Refugees of the Northern Triangle: Legacies of Discrimination and Denial* 2–3 (July 24, 2018) (unpublished

or eliminates the use of expedited removal, this Article proposes that CBP officials be required to wear body cameras as a short-term solution to prevent erroneous deportations with potentially deadly consequences, preserve due process, and increase transparency. The Article explores the proposed implementation of this solution, drawing from the literature in the criminal context, post-Ferguson in particular, to explore the costs, efficiencies, concerns, and dynamics of BWCs.

## I. EXPEDITED REMOVAL IN THEORY VS. EXPEDITED REMOVAL IN PRACTICE

This Part will present the legal framework for expedited removal and the built-in mandatory protections for asylum seekers. It contrasts the way the system was envisioned with the well-documented reality of expedited removal's rampant abuse. Finally, this Part explains the consequences of that abuse—the erroneous issuance of removal orders for asylum seekers that subjects them to deportation. Not only that, but if an asylum seeker makes it back to the United States to seek protection on subsequent occasions, and if she then enters without inspection, she is at serious risk of being subjected to reinstatement of removal, which would render her no longer eligible for asylum protection.[50]

First, the two discretionary "speed deportation" procedures central to this Article are expedited removal and reinstatement of removal. Expedited removal is a process where certain noncitizens can be removed from the United States without appearing before an immigration judge.[51] Expedited removal can apply to (1) individuals arriving at a port of entry without proper documentation,[52] and (2)

---

manuscript) (on file with the Columbia Human Rights Law Review). The implementation of *Matter of A-B-* was challenged in federal district court and the Court enjoined key portions of the decision and implementing policy memorandum from USCIS. *See* AM. CIVIL LIBERTIES UNION & CTR. FOR GENDER & REFUGEE STUDIES, PRACTICE ADVISORY: *GRACE V. WHITAKER* (Mar. 7, 2019), https://www.aclu.org/legal-document/grace-v-whitaker-practice-advisory [https://perma.cc/2B9C-HUF6].

50.    8 C.F.R. § 241.8 (2018). Many asylum seekers enter without inspection, rather than seeking asylum at a port of entry. This is increasingly understandable given the alarming rates at which CBP is unlawfully turning back those who seek asylum at ports of entry. *See supra* notes 5 and 6.

51.    INA § 235(b)(1)(A)(i), 8 U.S.C. § 1225(b)(1)(A)(i) (2012).

52.    *Id.*

individuals apprehended between ports of entry, [53] among others. Reinstatement of removal refers to the process by which DHS can reinstate final removal orders, including expedited removal orders, without any hearing or review, for noncitizens ordered removed who were in fact removed and then subsequently reentered the United States without inspection. [54] Congress created both expedited removal and reinstatement of removal, but did not mandate their blanket use in all individual cases or categories of cases. [55]

## A. The Legal Framework for Expedited Removal and Mandatory Protections for Asylum Seekers

Before 1996, any person arriving in the United States had the right to seek asylum before an immigration court without passing any initial screening test, and could then appeal that decision to the Board of Immigration Appeals, the federal circuit courts, and potentially even to the Supreme Court. [56] Congress dramatically changed that system when they created the expedited removal system in 1996 [57] to more quickly deport recent inadmissible non-asylum seeking migrants found

---

53.     *Id.* § 235(b)(1)(A)(iii). The INA allows DHS to use expedited removal for any noncitizen who cannot prove that she has been physically present in the United States continuously for the two-year period immediately prior to apprehension, but this authority is currently limited to individuals apprehended within one hundred miles of the southwest border and within fourteen days of unlawfully entering the United States. Notice Designating Aliens for Expedited Removal, 69 Fed. Reg. 48,877, 48,879 (Aug. 11, 2004). Regulations also permit DHS to use expedited removal for aliens apprehended within two years after arriving by sea without being admitted or paroled. Notice Designating Aliens Subject to Expedited Removal Under § 235(b)(1)(A)(iii) of the Immigration and Nationality Act, 67 Fed. Reg. 68,924, 68,926 (Nov. 13, 2002).

54.     INA § 241(a)(5), 8 U.S.C. § 1231(a)(5) (2012).

55.     *See infra* note 151; *see also* AM. IMMIGRATION COUNCIL ET AL., THE FLORES LITIGATION AND THE IMPACT ON FAMILY DETENTION, AILA DOC. 15504332 at 2 (2015), https://www.aila.org/advo-media/press-releases/2015/fact-sheet-flores-litigation-family-detention [https://perma.cc/AQS8-AZTB] ("DHS has taken the position that individuals in 'expedited' removal proceedings—rather than ordinary removal proceedings before an immigration judge—are subject to mandatory detention prior to receiving positive credible fear determinations. But the type of removal proceeding DHS chooses to initiate is completely within its own discretion.").

56.     *See* Bo Cooper, *Procedures for Expedited Removal and Asylum Screening Under the Illegal Immigration Reform and Immigrant Responsibility Act of 1996*, 29 CONN. L. REV. 1501, 1502 (1997) [hereinafter Cooper, *Procedures of Expedited Removal*] (describing expedited removal as a "colossal change from prior law").

57.     INA § 235(b)(1)(A)(i), (b)(1)(B)(iii)(I) (setting up the expedited removal system).

at or near the border.[58] At the same time, Congress created safeguards to ensure that asylum seekers would be protected and allowed to exercise their Refugee Convention rights to seek asylum protection. In theory, immigrant families seeking protection at the border should benefit from the humanitarian safeguards built into the expedited removal system to prevent those who may be persecuted or tortured from being deported, which would be contrary to our international[59] and domestic legal obligations to protect those individuals.

---

58.    The use of expedited removal has rapidly expanded since its initial implementation. Originally, expedited removal was only implemented at ports of entry, but it was expanded beyond the border in 2004, when Congress passed the Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108–458 § 7210(d)(1), 118 Stat. 3638, 3825 (codified as amended at 8 U.S.C. § 1225a(a)(4)). Now, expedited removal proceedings may be applied to individuals who are apprehended within one hundred miles of the border and are unable to establish that they have been continuously physically present in the United States for the preceding fourteen-day period. *See* Designating Aliens for Expedited Removal, 69 Fed. Reg. 48,877, 48,879 (Aug. 11, 2004). The statute permits the use of expedited removal anywhere in the United States within two years of entry, and the Trump Administration has indicated intent to use the statute as broadly as possible moving forward. *See* INA § 235(b)(1)(A)(iii)(II) (limiting expedited removal to those who cannot establish two years of continuous physical presence); Exec. Order No. 13,767, 82 Fed. Reg. 8,793 (Jan. 25, 2017). For background on the creation of expedited removal, *see generally* Cooper, *Procedures of Expedited Removal*, *supra* note 56 (discussing the creation and controversy of expedited removal).

59.    In addition to the laws of the United States, CBP officials are also obligated to properly conduct a fear screening under international law. The doctrine of *non-refoulement* obligates countries to not return individuals to a country where they would be persecuted or tortured. As a signatory to the 1967 Protocol Relating to the Status of Refugees, the United States is obligated to comply with procedures that ensure that, "No Contracting State shall expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." United Nations High Comm'r for Refugees (UNHCR), Executive Comm., Note on Non-Refoulement (Submitted by the High Commissioner), U.N. Doc EC/SCP/2 (Aug. 23, 1977). This duty also includes individuals "who present themselves at [ports of entry] along the U.S. border" and mandates U.S. officials to not deny the claims of individuals seeking to cross the border "access to a lawful process to present a claim for asylum." Complaint for Declaratory and Injunctive Relief at 40, Al Otro Lado v. Kelly, 3:17-cv-02366-BAS-KSC (S.D. Cal. 2017).

### 1. First-Time Asylum Seekers at the Border: Expedited Removal and the Credible Fear Interview

According to regulations, CBP officers must conduct a screening interview with all border arrivals.[60] To protect asylum seekers and guard against the deportation of individuals with a fear of return to their country of origin, form I-867A&B, Record of Sworn Statement in Proceedings, requires officers to ask these four questions:

> *Why did you leave your home country or country of last residence?*
>
> *Do you have any fear or concern about being returned to your home country or being removed from the United States?*
>
> *Would you be harmed if you are returned to your home country or country of last residence?*
>
> *Do you have any questions or is there anything you would like to add?*

The law requires CBP officers to refer any individual who "indicates either an intention to apply for asylum . . . or a fear of persecution" to the Asylum Office for a credible fear interview.[61] If a CBP officer fails to refer an asylum seeker for a fear interview, that individual's expedited removal order will be executed and she will be returned to her country of origin.

Currently, the training that CBP officers receive regarding the screening of asylum seekers at the border lacks transparency. The Field Officer's Manual, a previous source of guidance to border officials, was publicly available. Around 2013, however, the Field Officer's Manual was rescinded and replaced by the Officer's Reference Tool, which has not been made publicly available, despite litigation over its release and the lack of CBP transparency.[62] Relying on the most recent

---

60.    8 C.F.R. § 235.3(b)(2) (2018).

61.    INA § 235(b)(1)(A)(ii).

62.    *See* Am. Immigration Lawyers Ass'n v. Dep't of Homeland Sec., 306 F. Supp. 3d 162, 165 (D.D.C. 2018). On March 30, 2018, the court denied DHS's motion for summary judgment and ordered the agency to produce the documents referenced in Chapter 11 of the CBP Officer's Reference Tool during the summer of 2018. In March 2019, "the Court ordered Defendants to produce a Vaughn index and additional information about its search for responsive records." *See FOIA Lawsuit Seeking Disclosure of the CBP Officer's Reference Tool*, AM. IMMIGR. COUNCIL,        https://www.americanimmigrationcouncil.org/litigation/foia-lawsuit-

publicly available guidance, CBP's field manual instructs officers to refer individuals for a credible fear interview whenever the above four questions elicit an expression of fear.[63] The field manual also instructs that an officer must refer an individual to an asylum office for a credible fear interview "if the alien indicates in any fashion or at any time during the inspections process, that he or she has a fear of persecution, or that he or she has suffered or may suffer torture."[64]

Border officials are specifically asked to consider "verbal as well as non-verbal cues" regarding fear in their interactions with potential asylum seekers.[65] Further, border officials are instructed to "err on the side of caution, apply the criteria generously, and refer to the asylum officer any questionable cases."[66]

CBP officials are required to document interactions with border arrivals, recording the question-and-answer format of the interview on the required form I-867A&B.[67] This should result in an accurate, sworn record of any statements made by an individual during

---

seeking-disclosure-cbp-officers-reference-tool [https://perma.cc/F9ML-CV58]. As this article went to print, a number of documents were produced in response to the lawsuit, including one October 2, 2014 memo directing CBP officers to refer asylum seekers for credible fear interviews. These documents are on file with author and the *Columbia Human Rights Law Review*.

63.    CUSTOMS & BORDER PROT., U.S. DEP'T OF HOMELAND SEC., INSPECTOR'S FIELD MANUAL ch. 17.15(b)(1) (2006) [hereinafter INSPECTOR'S FIELD MANUAL], https://www.aila.org/File/Related/11120959F.pdf [https://perma.cc/5UAN-DFQH]; *see also* INA § 235(b)(1)(A)(ii) (discussing when an individual should be referred for a credible fear interview).

64.    INSPECTOR'S FIELD MANUAL, *supra* note 63.

65.    *Id.*

66.    *Id. But see* Michele R. Pistone & John J. Hoeffner, *Rules Are Made to Be Broken: How the Process of Expedited Removal Fails Asylum Seekers*, 20 GEO. IMMIGR. L.J. 167, 187–90 (2006) [hereinafter Pistone & Hoeffner, *Rules are Made to Be Broken*] (critiquing CBP's Field Office Manual for giving conflicting guidance to officers and encouraging them to consult with the asylum office on "questionable cases" despite clear guidance elsewhere in the manual requiring them to simply make the referral for a fear interview if a fear is expressed).

67.    *See* INSPECTOR'S FIELD MANUAL, *supra* note 63 (instructing officers that they must take a sworn statement using form I-867A&B in all expedited removal cases); *see also* INA § 235(b)(1)(B)(iii)(II), 8 U.S.C. § 1225(b)(1)(B)(iii)(ii) (2012) ("The officer *shall* prepare a written record of a determination . . . .") (emphasis added); 8 C.F.R. § 235.3(b)(2)(i) (2018) (requiring officers to create a record of the "facts of the case and statements made by the alien" and to read the statement to the alien, who must "sign and initial each page of the statement and each correction").

an initial screening interview.[68] This record is supposed to be read and initialed by the CBP officer and the individual at the border and should be subject to review by a supervisor.[69]

Once an individual expresses a fear, the statute and regulations require that CBP automatically refer her to the U.S. Citizenship and Immigration Services (USCIS) Asylum Office for a credible fear interview (CFI).[70] Where fear is expressed, Immigration and Customs Enforcement (ICE) detains asylum seekers, transporting them from CBP holding facilities[71] to ICE detention centers, where they await and undergo the CFI with an asylum officer, who, unlike a border official, has undergone extensive training in asylum law and interviewing survivors of trauma. During the CFI, an asylum seeker must demonstrate a "significant possibility" that she will ultimately establish eligibility for asylum at a full hearing.[72]

As stated by the former Chief of the Asylum and Refugee Law Division of the Office of the General Counsel and former General Counsel for the Immigration and Naturalization Service, Owen ("Bo") Cooper, "the act of deciding whether a person is a refugee . . . is more

---

68.     These records may be later used by an immigration judge making a credibility determination. *See* Matter of J-C-H-F-, 27 I. & N. Dec. 211, 211 (B.I.A. 2018) ("When deciding whether to consider a border or airport interview in making a credibility determination, an Immigration Judge should assess the accuracy and reliability of the interview based on the totality of the circumstances, rather than relying on any one factor among a list or mandated set of inquiries.").

69.     INSPECTOR'S FIELD MANUAL, *supra* note 63, ch. 17.15(b).

70.     INA § 235(b)(1)(A)(ii).

71.     Conditions within these CBP holding facilities have been challenged in both Arizona and Texas. *See* Doe v. Kelly, 878 F.3d 710, 725 (9th Cir. 2017) (deciding a class action lawsuit challenging Tucson Sector Border Patrol treatment of immigrants within CBP holding facilities in violation of the U.S. Constitution and CBP policy); *see also* Guillermo Cantor, Am. Immigration Council, Hieleras (Iceboxes) in the Rio Grande Valley Sector: Lengthy Detention, Deplorable Conditions, and Abuse in CBP Holding Cells 9–13 (2015), https://www. americanimmigrationcouncil.org/sites/default/files/research/hieleras_iceboxes_in_t he_rio_grande_valley_sector.pdf [https://perma.cc/VP7B-3QT6] (discussing at length the reports of poor living conditions in CBP holding cells); GUILLERMO CANTOR & WALTER EWING, AM. IMMIGRATION COUNCIL, STILL NO ACTION TAKEN: COMPLAINTS AGAINST BORDER PATROL AGENTS CONTINUE TO GO UNANSWERED 3– 6 (2017), https://www.americanimmigrationcouncil.org/sites/default/files/research/ still_no_action_taken_complaints_against_border_patrol_agents_continue_to_go_ unanswered.pdf [https://perma.cc/WDV6-9M3J] (discussing systemic failure to address poor living conditions in CBP holding cells).

72.     INA § 235(b)(1)(B)(v).

art than science." [73] USCIS amended the credible fear lesson plan, which provides guidance for asylum officers conducting credible fear interviews, in February 2014, [74] tightening the standard for the credible fear interview, [75] and again in 2017. [76] The idea behind the CFI, though, is that it is simply a threshold eligibility test and should be applied generously to identify potential refugees for more in-depth adjudication. [77]

The CFI itself ranges in length and is often conducted by phone. [78] Although counsel is permitted at the interview, immigrants are not entitled to government-paid counsel and when lawyers do appear on behalf of immigrants, they do not play a robust role. [79]

---

73.   *See* Cooper, *Procedures of Expedited Removal*, *supra* note 56, at 1503 ("It is a predictive exercise demanding hairbreadth judgments about the motivations of a persecutor, the seriousness of the harm an applicant has suffered or might face, the likelihood that such harm could take place, the truthfulness of the asylum seeker, the conditions prevailing in distant countries, and so forth.").

74.   U.S. CITIZENSHIP & IMMIGRATION SERVS., RAIO ASYLUM DIVISION OFFICER TRAINING COURSE: CREDIBLE FEAR 1 (2014), https://www.aila.org/infonet/ uscis-asylum-division-officer-training-course [https://perma.cc/WKJ2-NKFK].

75.   ELIZABETH CASSIDY & TIFFANY LYNCH, U.S. COMM'N ON INT'L RELIGIOUS FREEDOM, BARRIERS TO PROTECTION: THE TREATMENT OF ASYLUM SEEKERS IN EXPEDITED REMOVAL 35–36 (2016) [hereinafter 2016 USCIRF REPORT], https://www.uscirf.gov/sites/default/files/Barriers%20To%20Protection.pdf [https://perma.cc/Z93Y-F32N].

76.   U.S. CITIZENSHIP & IMMIGRATION SERVS., RAIO ASYLUM DIVISION OFFICER TRAINING COURSE: CREDIBLE FEAR OF PERSECUTION AND TORTURE DETERMINATIONS 1, 18–20 (2017), https://www.aila.org/infonet/raio-and-asylum-division-officer-training-course [https://perma.cc/X5A6-BEAJ] (seemingly elevating the credibility threshold required in credible fear determinations); *see also* Drake & Gibson, *Vanishing Protection*, *supra* note 6, at 128 (explaining how the credible fear standard is vague and ambiguous and the new memo no longer urges asylum officers to err on the side of issuing a positive determination if in doubt).

77.   *See* Martin, *Expedited Removal*, *infra* note 108, at 681–82; *see* Pistone & Hoeffner, *Rules are Made to Be Broken*, *supra* note 66, at 190; *see* Cooper, *Procedures of Expedited Removal*, *supra* note 56, at 1503 ("Essentially, the asylum officer is applying a threshold screening standard to decide whether an asylum claim holds enough promise that it should be heard through the regular, full process or whether, instead, the person's removal should be effected through the expedited process.").

78.   The fact that these interviews are often conducted by phone undermines an asylum officer's ability to assess tone, demeanor, facial expressions, and other non-verbal cues that can be so essential to determining credibility and in discussing sensitive and difficult topics. *See* 2016 USCIRF REPORT, *supra* note 75, at 36–37 (raising concerns about quality of telephonic interviews). The regulations governing the conduct of a CFI can be found at 8 C.F.R. § 208.30 (2018).

79.   INA § 235(b)(1)(B)(iv), 8 U.S.C. § 1225(b)(1)(B)(iv) (2012) ("An alien who is eligible for such interview may consult with a person or persons of the alien's

Indeed, many asylum officers do not permit counsel to interject to clarify or correct the record, although most do allow the attorney or representative to make a brief statement at the end of the interview.[80]

If the asylum officer determines that the asylum seeker meets this threshold "credible fear test," and therefore the asylum seeker has demonstrated a significant possibility of establishing eligibility for asylum, the officer issues charging documents in the form of a "Notice to Appear" (NTA).[81] The NTA lays out the factual and legal allegations against the asylum seeker and places her in immigration court removal proceedings, where she may apply for asylum as a defense to removal.[82] That asylum application must be filed in immigration court within one year of the date of the asylum seeker's arrival into the United States.[83]

---

choosing prior to the interview or any review thereof . . . ."); *see also* ASYLUM SEEKER ADVOCACY PROJECT, VINDICATING THE RIGHTS OF ASYLUM SEEKERS AT THE BORDER AND BEYOND 26–32 (2018), https://asylumadvocacy.org/wp-content/uploads/2018/06/ASAP-Expedited-Removal-Guide.pdf) [https://perma.cc/224C-M9HV] (describing the attorney's role in a credible fear interview).

80.     *See* 8 C.F.R. § 208.30(d)(4) ("Any person or persons with whom the alien chooses to consult may be present at the interview and may be permitted, in the discretion of the asylum officer, to present a statement at the end of the interview.").

81.     Notably, even if the asylum officer believes that the individual is subject to one or more of the mandatory bars to applying for or being granted asylum under INA § 208(a)(2) and (b)(2), he should still place the individual in removal proceedings under § 240 for "full consideration of the alien's claim." 8 C.F.R. § 208.30(e)(5). An individual subject to reinstatement does not get this chance.

82.     Many of these Notices to Appear are issued without a specific date and time to appear in immigration court. The Supreme Court has recently found such NTAs insufficient and may call into question immigration court jurisdiction. *See* Pereira v. Sessions, 138 S. Ct. 2105 (2018). For asylum applicants, this could arguably mean they can seek to have their claims adjudicated before the asylum office with USCIS rather than the immigration courts through the Executive Office of Immigration Review.

83.     8 C.F.R. § 1208.4(a)(2)(A) (2018). Although the asylum seeker is not informed of the one-year filing deadline for asylum, she is obligated to submit an I-589 Application for Asylum within one year of her most recent entry into the United States in immigration court. *See* Harris, *The One-Year Bar*, *supra* note 16 at 1213–24 (describing the 2016 policy change regarding filing an asylum application in immigration court and providing two examples of the difficulties facing asylum seekers in meeting this deadline operationally); *see also* Mendez-Rojas v. Johnson, No. 2:16-cv-01024-RSM (W.D. Wash. June 30, 2016) (granting summary judgment in class action litigation to asylum-seeking plaintiffs, requiring the government to provide notice to all asylum seekers of the one-year filing deadline and to adopt uniform procedural mechanisms to permit class members to timely file their applications). It is also important to note that even where an individual has received a positive CFI, she may decide, based on various factors (including, in some cases, the prospect of prolonged detention) to accept a removal order. *See, e.g.*, Mejia v. Sessions, 866 F.3d 573, 577 (4th Cir. 2017) (explaining how an asylum seeker's

One hundred fifty days after the asylum application is filed, asylum seekers may apply for a work permit, which can be granted when the asylum application has been pending for at least 180 days, but USCIS typically takes several months to issue employment authorization documents.[84]

If the asylum-seeking individual does *not* receive a positive result following a CFI, she has the opportunity to go before an immigration judge for a negative credible fear review, which must take place within seven days of the initial CFI decision.[85] The asylum seeker remains detained during this time period.[86] Counsel may be present, but may not actually enter an appearance for a negative credible fear review,[87] and some judges do not allow any attorney participation. The immigration judge reviews the decision of the asylum officer *de novo* and decides whether to affirm or vacate the decision. If the decision is affirmed, no additional judicial review of an expedited removal order is permitted, and the asylum seeker is typically quickly removed from the United States.[88] If the judge decides that the applicant has a credible fear of persecution, they are placed in removal proceedings before an

---

prior removal order came after the immigration judge warned her that she had a "serious" credibility problem which would be "extremely difficult to overcome," so that she declined to apply for relief and accepted her removal order).

84.    EXEC. OFFICE FOR IMMIGRATION REVIEW & U.S. CITIZENSHIP & IMMIGRATION SERVS., THE 180-DAY ASYLUM EAD CLOCK NOTICE (2017), https://www.uscis.gov/sites/default/files/USCIS/Humanitarian/Refugees%20%26% 20Asylum/Asylum/Asylum_Clock_Joint_Notice_-_revised_05-10-2017.pdf [https://perma.cc/7SWM-W7XY].

85.    INA § 235(b)(1)(B)(iii)(III), 8 U.S.C. § 1225(b)(1)(B)(iii)(III) (2012); 8 C.F.R § 1003.42(e) (2018).

86.    INA § 235(b)(1)(B)(iii)(IV).

87.    The Executive Office for Immigration Review provides that, while the non-citizen is entitled to consult with a person of their choosing before the credible fear review and that person may also be present during the review, the non-citizen "is not represented at the credible fear review. Accordingly, persons acting on the alien's behalf are not entitled to make opening statements, call and question witnesses, conduct cross examinations, object to evidence, or make closing arguments." U.S. DEP'T OF JUSTICE., EXEC. OFFICE FOR IMMIGRATION REVIEW, IMMIGRATION COURT PRACTICE MANUAL ch. 7.4(d)(iv)(c) (2017) [hereinafter IMMIGRATION COURT MANUAL].

88.    However, at various stages in the history of family detention, advocates have had some success filing a request for reconsideration (RFR) with the asylum office following a judge's affirming of a negative CFI or RFI. This is based on the asylum office's regulatory authority to reconsider. 8 C.F.R. § 1208.30(g)(2)(iv)(A) (2018). In response to this filing, the asylum office has, somewhat inconsistently, asked ICE to effectuate a stay while the RFR has been considered, and at times has granted an RFR and given a new interview to the asylum seeker, which can result in a positive credible fear finding.

immigration judge, where the applicant can apply for asylum as a defense to removal.

All of the above describes how the expedited removal system is *supposed* to work.[89] However, much of this process takes place behind closed doors with no internal or external oversight. When researchers *have* been allowed access to the process, they have found that expedited removal operates much differently in practice. This Article focuses on what happens when the system does not function as it should and asylum seekers are *not* referred for a credible fear interview and are instead issued an expedited removal order. This is discussed in Part B below, after a discussion of what happens to an asylum seeker entering *after* a first attempt to seek asylum has resulted in an expedited removal order. Upon attempted reentry, these individuals are at serious risk of being subjected to reinstatement of removal, thus losing their ability to apply for asylum.

### 2. Asylum Seekers Entering a Second or Subsequent Time, Reinstatement of Removal, and the Reasonable Fear Interview

The process is quite different for someone entering the United States who already has a removal order and is attempting to reenter without inspection. Such an individual is subject to detention and "reinstatement" of the original removal order.[90] These individuals are provided with a reasonable—rather than credible—fear interview, and if successful, they are referred to "withholding only" proceedings.[91]

There are significant differences between credible and reasonable fear interviews (RFIs). Those subject to reinstatement of removal because of a prior removal order must meet a higher burden of proof, establishing a "reasonable possibility" of eligibility for withholding protection, to receive a positive determination following an RFI.[92] Specifically, the applicant must establish that she has a "reasonable possibility" that she would be persecuted on account of

---

89.     For more details on how the phases of expedited removal work, including credible or reasonable fear interviews and review of negative determinations in immigration court, *see* Manning & Hong, *Access to Counsel*, *supra* note 32, at 684–87.

90.     *See* INA § 241(a)(5), 8 U.S.C. § 1231(a)(5) (2012). Prosecution of that individual for illegal re-entry is also increasingly likely under 8 U.S.C. § 1326 (2012).

91.     *See* INA § 241(b)(3).

92.     *See* 8 C.F.R. § 208.31(c), (g) (2018).

AR.10970

race, religion, nationality, membership in a particular social group, or political opinion, or that she would be tortured in the country of removal.[93]

If the asylum-seeking individual does *not* receive a positive result following the reasonable fear interview, she has the opportunity to go before an immigration judge for a negative reasonable fear review, which must take place within ten days.[94] Unlike credible fear reviews, representation of counsel is actually permitted for reasonable fear review.[95] Just like a credible fear review, the immigration judge reviews the negative decision of the asylum officer *de novo* and decides whether to affirm or vacate the decision.[96] If the decision is affirmed, no additional judicial review is permitted, and the asylum seeker is typically quickly removed again from the United States.[97]

If the judge vacates the negative reasonable fear decision, or if the asylum officer's initial decision is positive, immigration officials issue a Form I-863 Notice of Referral into withholding-only proceedings with the pre-existing removal order attached. Typically, individuals in reinstatement and withholding-only proceedings are not released from detention to pursue their claims.[98] Historically, those who pass a CFI have had more success securing parole and release to pursue an asylum claim outside of detention.[99]

---

93. *Id.* at § 208.31(c). In the author's experience, with a CFI, USCIS will permit a law student or other non-attorney consultant to be present within the interview, but with an RFI, if an attorney is on record with a Notice of Appearance, USCIS requires the attorney to be present at the interview, rather than a law student or non-attorney supervised by that attorney.

94. *Id.* at § 208.31(g).

95. *See* IMMIGRATION COURT MANUAL, *supra* note 87, ch. 7.4(e)(iv)(c) ("Subject to the Immigration Judge's discretion, the alien may be represented during the reasonable fear review at no expense to the government.").

96. 8 C.F.R. § 1003.42(d) (2018); *see also* Office of the Chief Immigration Judge, U.S. Dep't of Justice, OPERATING POLICIES AND PROCEDURES MEMORANDUM NO. 99-5 IMPLEMENTATION OF ARTICLE 3 OF THE UN CONVENTION AGAINST TORTURE 6–7, 8 (1999), https://www.justice.gov/sites/default/files/eoir/legacy/1999/06/01/99_5.pdf [https://perma.cc/DCS5-P5DW] (explaining that in both credible and reasonable fear review, immigration judges must make *de novo* fear determinations).

97. 8 C.F.R. § 208.31(g)(1).

98. *See supra* note 27.

99. This is not, however, consistent, and recent actions by the Attorney General and the Administration make it clear that the government seeks to detain asylum seekers for the pendency of their asylum proceedings. As this article went to print the Attorney General issued Matter of M-S-, 27 I. & N. Dec. 509 (A.G. 2019) (holding that an individual who passed a credible fear interview is ineligible for

This means that a withholding-only applicant bears several disadvantages. First, she has to meet a higher burden of proof, to show that it is more likely than not that she would face a threat to her life or freedom if removed to the country of feared harm.[100] Second, she will have to make this claim from a detained setting. Aside from the physical and psychological disadvantages of detention, particularly for individuals fleeing persecution,[101] detention poses practical barriers to finding and obtaining supporting evidence.[102] Furthermore, access to counsel is dramatically diminished in detention.[103]

---

release on bond). This decision is being challenged in litigation in the Western District of Washington. *See* Padilla v. ICE, No. 2:18-cv-928 MJP (W.D. Wash. filed June 25, 2018). The Administration has also proposed regulations to hold children seeking asylum indefinitely. *See* Apprehension, Care, and Custody of Alien Minors and Unaccompanied Alien Children, 83 Fed. Reg. 45486 (Sept. 7, 2018) (to be codified at 45 C.F.R. pt. 410, 8 C.F.R. pts. 212, 236) (overriding the *Flores* settlement to allow children to remain detained with their parents for the duration of removal proceedings).

100.   INA §241(b)(3), 8 U.S.C. § 1231(b)(3) (2012) ("[T]he Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, nationality, membership in a particular social group, or political opinion.").

101.   *See generally*, G.J. Coffey et al., *The Meaning and Mental Health Consequences of Long-Term Immigration Detention for People Seeking Asylum*, 70 SOC. SCI. & MED. 2070 (2010) (examining the psychological consequences of immigration detention); Allen S. Keller et al., *Mental Health of Detained Asylum Seekers*, 362 THE LANCET 1721 (2003) (assessing symptoms of anxiety, depression, and PTSD in detained asylum seekers); PHYSICIANS FOR HUMAN RIGHTS & BELLEVUE/NYU PROGRAM FOR SURVIVORS OF TORTURE, FROM PERSECUTION TO PRISON: THE HEALTH CONSEQUENCES OF DETENTION FOR ASYLUM SEEKERS (2003), https://phr.org/wp-content/uploads/2003/06/persecution-to-prison-US-2003.pdf [https://perma.cc/34MK-3ZRU] (describing the traumatic effects of detention on adults); CTR. FOR VICTIMS OF TORTURE ET AL., TORTURED AND DETAINED: SURVIVOR STORIES OF U.S. IMMIGRATION DET. 10 (2013), https://www.cvt.org/sites/default/files/Report_TorturedAndDetained_Nov2013.pdf [https://perma.cc/K668-LMC9] (reporting on personal and psychological impact of detention experience); *accord US: Trauma in Family Immigration Detention,* HUMAN RIGHTS WATCH (May 15, 2015), http://www.hrw.org/news/2015/05/15/us-trauma-family-immigration-detention [https://perma.cc/DC2Q-F3EJ] (same).

102.   *See, e.g.*, Barbara Hines, *An Overview of U.S. Immigration Law and Policy Since 9/11*, 12 TEX. HISP. J. L. & POL'Y 9, 20 (2006) ("It is much harder to represent a detained client in immigration court than one who has been released on bond because of issues such as jail access and the client's ability to obtain necessary evidence and witnesses to support his or her claims.").

103.   *See* Ingrid V. Eagly & Steven Shafer, *A National Study of Access to Counsel in Immigration Court*, 164 U. PA. L. REV. 1, 42 (2015) [hereinafter Eagly & Shafer, *Access to Counsel in Immigration Court*]; *see also* Lindsay M. Harris, *Contemporary Family Detention and Legal Advocacy*, 21 HARV. LATINX L. REV. 135,

Even if a withholding-only applicant is fortunate enough to be released from detention, she will have difficulty supporting herself while she awaits adjudication of her claim. Unlike asylum applicants, who are able to apply for employment authorization after their applications have been pending for 150 days, withholding applicants do not technically have this right until after they are granted protection.[104] Given the immigration court backlogs, adjudication of a non-detained withholding-only claim may take several years.[105] During this time, a withholding-only applicant without work authorization will struggle to support herself, living in the shadows, and, like asylum seekers, will be ineligible for any public assistance.

All of this—the increased difficulty of winning withholding protection, the increased likelihood of detention, and the ultimate insufficiency of the protection awarded[106] if successful—stems from the initial expedited removal order and the subsequent reinstatement of removal. As discussed in the next section, the issuance of many of the underlying expedited removal orders that lead to reinstatement, and thus ineligibility for asylum, is highly problematic.

---

160–63 (2018) (explaining the consequences arising from lack of access to legal counsel for detained clients).

104.    The instructions of the I-765 Application for Employment Authorization form do provide a category for "applicants for asylum and withholding of removal." Similarly, the form upon which one applies for withholding, I-589, is the same form as used for asylum applicants. As such, many attorneys, including the author, have successfully obtained work permits for withholding-only applicants while they are awaiting adjudication of their claims in immigration court. However, this is not consistent. According to the Operating Policies and Procedures Memorandum for immigration courts, there is no asylum clock for applications for withholding or CAT. *See* Memorandum from the Office of the Chief Immigration Judge, U.S. Dep't of Justice on Operating Policies and Procedures Memorandum 13-02: The Asylum Clock (2013), https://www.justice.gov/sites/default/files/eoir/legacy/2013/12/03/13-02.pdf [https://perma.cc/T94K-ZGBA]. Thus, some court administrators never start the "clock," so that when withholding-only grantees apply for work authorization, USCIS denies their applications.

105.    *See Immigration Court Backlog Tool*, TRAC IMMIGRATION, http://trac.syr.edu/phptools/immigration/court_backlog/ [https://perma.cc/8WV5-W9FA] (reflecting an average of more than 750 days for adjudication of immigration court cases nationwide); *see also* Harris, *The One Year Bar*, *supra* note 16, at 1205 n.94 (pointing out that TRAC's numbers only reflect average, not total wait times for adjudication, and that in September 2015 actual full adjudication of backlogged cases would take "between 659 and 2,401 days").

106.    *See infra* notes 140–48 and accompanying text.

AR.10973

### B. How the Expedited Removal System Functions in Reality: Rampant Abuse of Expedited Removal at the Border

The statutorily mandated credible fear process does not always operate according to law, and some asylum-seeking families and individuals, like Cecilia, are wrongfully removed without a credible or reasonable fear interview. Indeed, problems with the expedited removal system have been clear from the very beginning.[107] The architects of the expedited removal system, and those who initially applauded its creation, assumed that where fear was expressed, CBP officers would refer asylum seekers for the appropriate fear-based interview.[108] This assumption was woefully unfounded.

Numerous reports from governmental and non-governmental bodies have sounded the alarm on U.S. failures to meet the international obligation to protect refugees and adhere to the principle of *non-refoulement*.[109] As discussed below, in practice, the expedited

---

107.     Karen Musalo et al., *The Expedited Removal Study: Report on the First Three Years of Implementation of Expedited Removal*, 15 NOTRE DAME J. L., ETHICS & PUB. POL'Y. 1, 1 (2001); Michele R. Pistone & Philip G. Schrag, *The New Asylum Rule: Improved But Still Unfair*, 16 GEO. IMMIGR. L.J. 1, 2–4, 32–62 (2001); Pistone & Hoeffner, *Rules are Made to Be Broken*, *supra* note 66, at 175–84 (2006) (outlining seven key errors and problems with the expedited removal system as applied to asylum seekers from more than a decade ago).

108.     *See* Cooper, *Procedures of Expedited Removal*, *supra* note 56, at 1514, 1516, 1523 (describing expedited removal procedures in detail with the assumption that all the required steps will be undertaken and fear will be recorded accurately, and discussing the credible fear standard with an assumption that all genuine asylum seekers would get to that step in the process). David Martin, who was heavily involved in the establishment of the expedited removal system, assumes throughout his article that officers consistently ask the fear-based questions and accurately record an individual's responses. *See* David Martin, *Two Cheers for Expedited Removal in the New Immigration Laws*, 40 VA. J. INT'L L. 672, 691 (2000) [hereinafter Martin, *Expedited Removal*] ("Someone who simply mentions a fear of return or the wish for asylum is handed over for the credible fear interview and given at least 48 hours to prepare."); RANDY CAPPS, FAYE HIPSMAN & DORIS MEISSNER, MIGRATION POL'Y INST., ADVANCES IN U.S.-MEXICO BORDER ENFORCEMENT: A REVIEW OF THE CONSEQUENCE DELIVERY SYSTEM 5 (2017), https://www.migrationpolicy.org/research/advances-us-mexico-border-enforcement-review-consequence-delivery-system [https://perma.cc/M74L-79KD] (explaining that the "assumptions of effectiveness and deterrence" consequence delivery system, which includes expedited removal and reinstatement of removal, "may be less applicable" since "new and diverse migrant populations, particularly women and children fleeing violence in Central America, have begun to emerge alongside the traditional group of economic migrants . . . .").

109.     *See* ACLU, AMERICAN EXILE: RAPID DEPORTATIONS THAT BYPASS THE COURTROOM 4, 99–100 (2014) [hereinafter ACLU, AMERICAN EXILE],

removal system tramples intended safeguards for asylum seekers as large numbers of applicants are improperly placed in expedited removal without being told of their right to seek fear-based relief, without being able to read and review essential forms, and even in spite of expressing fear of return.

For example, at the behest of Congress, the U.S. Commission on International Religious Freedom (USCIRF) issued three reports on the expedited removal system, the first of which was written after USCIRF was given unprecedented access to border patrol interviews and documents. The first groundbreaking report, released in 2005, raised serious concerns about the integrity of the expedited removal system and the protection of asylum seekers.[110] In particular, following actual observation of border officials on the job, the study found that in 50% of the expedited removal interviews USCIRF observed, border officials failed to inform individuals that they could ask for protection if they feared return.[111] In 72% of cases, individuals were not given the opportunity to read and review forms before they were signed.[112] Finally, in 15% of the interviews observed, asylum seekers who expressed fear were deported without a fear interview, despite the fact that half of those files actually reflected the expression of fear.[113] Since the 2005 release of the first USCIRF report, no organization has been given access to border patrol practices or been allowed to observe credible fear interviews.

The 2005 report made several recommendations to improve expedited removal, all designed to ensure that victims of human rights abuses would have access to asylum protection. However, two years

---

https://www.aclu.org/report/american-exile-rapid-deportations-bypass-courtroom [https://perma.cc/R8UR-5BAP] (explaining the right to apply for asylum and for protection from persecution under international law and norms); CLARA LONG, HUMAN RIGHTS WATCH, "YOU DON'T HAVE RIGHTS HERE:" US BORDER SCREENING AND RETURNS OF CENTRAL AMERICANS TO RISK OF SERIOUS HARM 6, 8 (2014) [hereinafter HRW, YOU DON'T HAVE RIGHTS HERE], http://www.hrw.org/sites/default/files/reports/us1014_web_0.pdf [https://perma.cc/LMB6-T9G2].

110.   MARK HETFIELD ET AL., U.S. COMM'N ON INT'L RELIGIOUS FREEDOM, REPORT ON ASYLUM SEEKERS IN EXPEDITED REMOVAL: VOL. I: FINDINGS AND RECOMMENDATIONS 50–62 (2005); MARK HETFIELD ET AL., U.S. COMM'N ON INT'L RELIGIOUS FREEDOM, REPORT ON ASYLUM SEEKERS IN EXPEDITED REMOVAL: VOL. II: EXPERT REPORTS 33 (2005). For detailed summaries of these three reports, see Manning & Hong, *Access to Counsel*, *supra* note 32, at 689–91; *see also* Frost, *Learning from our Mistakes*, *supra* note 40, at 781–82 (describing the disparity in outcomes between individuals who receive legal assistance and those who do not).

111.   ACLU, AMERICAN EXILE, *supra* note 109, at 43.

112.   *Id.*

113.   *Id.*

later, USCIRF's 2007 annual report gave CBP an "F" because of a total lack of response to USCIRF's 2005 recommendations.[114]

In 2014, several NGOs released reports on expedited removal, all based on interviews with individuals who had gone through the process. A 2014 report from Human Rights Watch (HRW) shared the findings of interviews with Hondurans who were subjected to expedited removal and deported:

> Many said that they had expressed their fears to US Border Patrol officers charged with screening for fear of return before being deported, but fewer than half of these were referred by US Border Patrol for a further assessment of whether they had a 'credible' or 'reasonable' fear of returning to Honduras.[115]

Indeed, HRW reports that "the migrants we interviewed said that the CBP officers whom they encountered seemed singularly focused on removing them from the United States, which impeded their ability to make their fears known."[116] A 2014 report from the ACLU, based on interviews with 89 individuals who had received summary removal orders, reported that 55% were never asked about their fear of persecution.[117] Similarly, a 2014 report from the American Immigration Council details problems with CBP failing to ask the required questions about fear, ignoring fear when expressed, and rapidly conducting interviews without confidentiality and without proper interpretation.[118]

The most recent USCIRF report from 2016 was the result of field research and a review of public information.[119] The report

---

114.    U.S. COMM'N ON INT'L RELIGIOUS FREEDOM, ANNUAL REPORT 59 (2007), http://www.uscirf.gov/sites/default/files/resources/AR_2007/annualreport2007.pdf [https://perma.cc/M7QU-4DHH].

115.    *See* HRW, YOU DON'T HAVE RIGHTS HERE, *supra* note 109, at 8.

116.    *Id.* at 8.

117.    *See* ACLU, AMERICAN EXILE, *supra* note 109, at 4.

118.    SARA CAMPOS & JOAN FRIEDLAND, AM. IMMIGRATION COUNCIL, MEXICAN AND CENTRAL AMERICAN ASYLUM AND CREDIBLE FEAR CLAIMS 9–11 (2014), https://www.americanimmigrationcouncil.org/research/mexican-and-central-american-asylum-and-credible-fear-claims-background-and-context [https://perma.cc/YF6N-VDQM].

119.    This included primary observations of individuals subject to the expedited removal process, interviews with asylum seekers, meetings with government officials and advocates, and meetings with officials at five ports of entry, four border patrol stations, and five asylum offices, along with inspections of 15 detention centers around the United States between 2012 and 2015. *See* 2016

highlighted instances where CBP officers neglected to read back answers to the individual or permit the individual to correct errors on the forms.[120] Further, CBP officers failed to record articulated fear and had pre-populated responses to questions on the forms by copying and pasting from prepared text.[121] USCIRF reports that a key finding was:

> [C]ontinuing and new concerns about CBP officers' interviewing practices and the reliability of the records they create, including: flawed Border Patrol internal guidance that conflates CBP's role with that of USCIS; certain CBP officers' outright skepticism, if not hostility, toward asylum claims; and inadequate quality assurance procedures.[122]

USCIRF expressed concern about "virtual processing" of individuals in expedited removal. This refers to interviews conducted via videoconference by agents located at a different facility, which raises concerns about privacy and the ability to communicate. Also distressing is the use of interviewing "templates" from which officers copy and paste answers.[123]

Existing scholarship has examined some failures of the expedited removal system, including touching on how the system fails asylum seekers,[124] but this Article is the first to fully explore the interaction between expedited removal and reinstatement of removal to block asylum seekers from meaningful protection, relegating them to withholding protection only. Other scholars have highlighted the problems surrounding the screening of asylum seekers in expedited

---

USCIRF REPORT, *supra* note 75, at 9 (describing the methodology informing the report's findings).

120.    *Id.* at 19.
121.    *Id.* at 24–25.
122.    *Id.* at 2.
123.    *Id.* at 24–25.
124.    *See, e.g.*, Manning & Hong, *Access to Counsel*, *supra* note 32, at 680–82, 690; Frost, *Learning From Our Mistakes*, *supra* note 40, at 775 (giving the example of a Mexican asylum seeker whose fear was articulated, but the CBP officer erroneously determined he was ineligible for asylum because he feared harm from private actors and he was prosecuted for illegal entry and removed). Even David Martin, whose 2000 article applauds the expedited removal system, recognized back then some of the problems involved. Martin, *Expedited Removal*, *supra* note 108, at 696–97 ("[T]here have been claims that abusive, ill-trained, or ill-motivated inspectors or interpreters have sometimes deliberately ignored or blown past an assertion of feared persecution, and then issued an expedited removal order without referral to an asylum officer.").

removal.[125] The decisions are made by border officials, who are "generally not lawyers and who (unlike [immigration judges]) do not take oaths to do justice or maintain impartiality."[126] Further, these officers "typically operate within agency cultures that prioritize enforcement," rather than protection.[127]

The full scope of this problem is not exactly clear. As one scholar has explained, this is because, conveniently, "the government does not keep records of its mistakes."[128]

The problems for asylum seekers, however, continue beyond simply being turned back at the border.

Expedited removal can mean serious and even deadly consequences for any deported migrant, and particularly so for a wrongfully removed asylum seeker.[129] As the 2014 HRW report details, several of the Hondurans interviewed had been subjected to further violence after their expressed fear was ignored and they were expeditiously removed from the United States.[130] Additional problems are present when asylum seekers are turned away from the Mexican border and urged to seek asylum in Mexico. As the American Immigration Lawyers Association (AILA) has explained, "in Mexico, asylum seekers and other migrants face the threat of kidnapping, sexual assault, and other harm and are consistently targeted on the basis of race, nationality, sexual orientation, and other protected grounds."[131]

---

125.    Koh, *Removal in the Shadows*, *supra* note 32, at 198–200; *see also* Koh, *Searching for Solutions*, *supra* note 32, at 349–56.

126.    *See* Koh, *Removal in the Shadows*, *supra* note 32, at 230.

127.    *See id.* at 231 (citing Nina Rabin, *Victims or Criminals? Discretion, Sorting, and Bureaucratic Culture in the U.S. Immigration System*, 23 S. CAL. REV. L & SOC. JUST. 195, 199 (2014)); *see also* Pistone & Hoeffner, *Rules are Made to Be Broken*, *supra* note 66, at 196 (recognizing that "the culture in which expedited removal occurs is an enforcement culture").

128.    Frost, *Learning from Our Mistakes*, *supra* note 40, at 782.

129.    HRF, CROSSING THE LINE, *supra* note 6, at 6 (reporting that the MS gang murdered a Honduran man two weeks after his deportation); *see* ACLU, AMERICAN EXILE, *supra* note 109, at 4 (detailing several gang rapes, shootings, kidnapping, sex trafficking, and murders following deportation).

130.    HRW, YOU DON'T HAVE RIGHTS HERE, *supra* note 109, at 15–19.

131.    AM. IMMIGRATION LAWYERS ASS'N., AILA POLICY BRIEF: NEW BARRIERS AT THE BORDER IMPEDE DUE PROCESS AND ACCESS TO ASYLUM, Doc. No. 18060102 3   (2018),   https://www.aila.org/infonet/policy-brief-new-barriers-at-the-border [https://perma.cc/TL2P-L6Z9]; *see also* HRF, CROSSING THE LINE, *supra* note 6, at 16–18 (detailing the danger asylum seekers face along with a lack of protection in Mexico); *see also* AMNESTY INT'L., FACING WALLS: USA AND MEXICO'S VIOLATIONS OF THE RIGHTS OF ASYLUM SEEKERS 19–22 (2017), https://www.amnestyusa.org/

Asylum seekers like Cecilia who make a repeat attempt to seek protection in the United States are forever marked with the stain of a removal order. This renders the asylum seeker ineligible for asylum protection and eligible only for withholding of removal or relief under the Convention Against Torture. The next section discusses how these forms of relief fail to meet the needs of asylum seekers and do not provide meaningful protection.

## C. Grave Consequences of the Interplay Between Reinstatement and the Expedited Removal System

Having examined the failures of the expedited removal system for asylum seekers, it is critical to understand the consequences of those erroneously issued removal orders. To this date, federal circuit courts have universally found that asylum seekers with prior removal orders, expedited or otherwise, and who have been subject to reinstatement after entering again without inspection are categorically ineligible for asylum protection.[132]

This leaves asylum seekers like Cecilia with the inferior protection options of withholding of removal and relief under the Convention Against Torture. These forms of protection require the individual to meet a higher burden of proof while offering fewer benefits. For an asylum claimant, the Supreme Court has recognized that a chance of future persecution as low as 10% would constitute a

---

wp-content/uploads/2017/06/USA-Mexico-Facing-Walls-REPORT-ENG.pdf [https://perma.cc/8NSJ-FKPY] (describing the devastating impact of new policies and practices leading to asylum seekers "pursuing increasingly more desperate and dangerous means of crossing the border"); HUMAN RIGHTS FIRST, DANGEROUS TERRITORY: MEXICO STILL NOT SAFE FOR REFUGEES (2017), http://www.humanrightsfirst.org/sites/default/files/HRF-Mexico-Asylum-System-rep.pdf [https://perma.cc/ER9J-X227]. Problematic conditions for asylum seekers in Mexico have been further highlighted in the litigation challenging the "Remain in Mexico" policy. *See* Complaint, *supra* note 5, at 2. Indeed, in December 2018, two Honduran teens were killed in Tijuana. *See* Mary Beth Sheridan & Kevin Shief, *Two Honduran Teens from Caravan Killed in Tijuana,* WASH. POST (Dec. 19, 2018), https://www.washingtonpost.com/world/two-honduran-teens-from-migrant-caravan-are-killed-in-tijuana/2018/12/19/5ba8f824-03aa-11e9-958c-0a601226ff6b_story.html (on file with the Columbia Human Rights Law Review).

132.    *See* Wadhia, *Speed Deportations*, *supra* note 32, at 11–12 (discussing withholding-only proceedings). This Article focuses on the interplay between reinstatement and asylum protection, but it should be noted that those subject to reinstatement are also subject to potential prosecution for illegal re-entry, particularly under the current administration's "zero tolerance" policy and to other bars to admission. *See Attorney General Announces Zero-Tolerance*, *supra* note 49.

well-founded fear to satisfy that element of the asylum definition.[133] For an individual who is ineligible for asylum and seeking withholding, however, the likelihood of harm (a threat to the individual's life or freedom) must be more likely than not—a 51% probability threshold.[134] Cecilia, for example, had to show in her withholding-only proceedings that the father of her children was more likely than not going to kill or harm her again, rather than there being just a "reasonable possibility" (10% or greater chance) of that harm.

This heightened burden of proof means that one who would have otherwise been eligible for asylum may be returned to face danger. Further, the likelihood of detention for withholding-only applicants dramatically reduces their chances of success on the merits, again increasing the chances that an individual who faces persecution will be returned to danger.[135] Detention decreases access to counsel, in a situation in which access to counsel overwhelmingly improves an individual's chances of obtaining relief and release from detention.[136] For detained immigrants specifically, a national study showed that "the odds were almost eleven times greater than those with counsel (as compared to those without) sought relief, three times greater that they successfully obtained relief, and a little over four times greater that they had their case terminated."[137] Even where an individual is granted withholding of removal in a detained setting, she may be detained for several months following the grant while ICE tries to see whether another country would be willing to accept her for admission.[138]

Aside from the heightened burden of proof and the increased likelihood of detention during the adjudication of the protection claim, an individual is substantively far worse off than an individual granted asylum, when she is granted withholding.

---

133.     INS v. Cardoza-Fonseca, 480 U.S. 421, 440 (1987).

134.     INS v. Stevic, 467 U.S. 407, 424 (1984).

135.     *See* ACLU FACT SHEET: WITHHOLDING ONLY CASES AND DETENTION, *supra* note 27 (reporting that in 95% of withholding-only cases, the individual is detained throughout the adjudication of his claim).

136.     Eagly & Shafer, *Access to Counsel in Immigration Court*, *supra* note 103, at 35, 42 (finding that only 14% of detained immigrants are represented, according to data from 2007–2012).

137.     *Id.* at 57.

138.     *See, e.g.*, PA. STATE UNIV. DICKINSON SCH. OF LAW CTR. FOR IMMIGRANTS' RIGHTS, WITHHOLDING-ONLY PROCEEDINGS TOOLKIT 33–35 (2014), https://pennstatelaw.psu.edu/sites/default/files/documents/pdfs/Immigrants/Withholding-Only-Toolkit.pdf [https://perma.cc/NDD6-A62L] (discussing the ongoing detention of individuals granted withholding of removal).

AR.10980

First, unlike asylees, who can petition for spouses and unmarried children under the age of twenty-one, withholding grantees do not benefit from family reunification. This leaves Cecilia permanently separated from her young son. Further, withholding grantees are unable to travel outside the United States, which can undermine not only personal freedom of movement but also professional opportunities. If Cecilia had been granted asylum, she could have applied immediately for her young son to join her in the United States as a derivative, and, while she waited for his petition to be processed (potentially for months or years), [139] she could have applied for a refugee travel document to visit him overseas. [140]

Second, withholding grantees are not eligible for some of the benefits available to asylees, including refugee medical assistance (a form of temporary insurance), refugee cash assistance, and services such as case management that may be available through voluntary agencies contracted with the Office of Refugee Resettlement within the Department of Health and Human Services. [141]

Third, withholding grantees live in limbo. Asylees are eligible to apply for permanent residence (often colloquially referred to as a "green card") one year after the asylum grant. [142] Four years after receiving permanent residence, asylees can apply for U.S. citizenship. In contrast, withholding grantees will never become permanent residents or citizens. [143] Permanent residence comes with various

---

139.     Harris, *From Surviving to Thriving*, *supra* note 14, at 76–78.

140.     An asylee (an individual who has been granted asylum) would be able to travel overseas to any country (subject, potentially, to visa requirements) other than their country of origin. Returning to the country of feared persecution could constitute "reavailment" under the statute. Reavailment means that an asylee has availed herself of the protection of the country of feared persecution, such as by traveling to the country of origin, renewing a passport, or other similar actions. *See* INA § 208(c)(2)(D), 8 U.S.C. § 1158(c)(2)(D) (2012).

141.     For a full discussion of the benefits for which asylees are eligible, and some of the struggles asylees face after the asylum grant, see Harris, *From Surviving to Thriving*, *supra* note 14; *see also* Wadhia, *Speed Deportations*, *supra* note 32, at 13 (discussing some differences in benefits between asylees and persons granted withholding of removal).

142.     8 C.F.R. § 209.2(a) (2018); *Eligibility Requirements*, USCIS POLICY MANUAL (Feb. 12, 2019), https://www.uscis.gov/policymanual/Print/PolicyManual-Volume7-PartM-Chapter2.html [https://perma.cc/PPB4-B2YD].

143.     *See generally* CHERI ATTIX, AM. IMMIGR. LAW. ASS'N, PRACTICE POINTER: UNDERSTANDING WITHHOLDING OF REMOVAL, AILA DOC. 14021344 at 2 (Apr. 2, 2014), https://www.aila.org/infonet/uscis-understanding-withholding-of-removal (on file with the Columbia Human Rights Law Review) (explaining the

rights, including, critically, the rights to petition for other family members and to become eligible for federal financial aid for education.[144] When permanent residents become U.S. citizens, they gain the right to vote and hold office.[145]

Further, withholding grantees are often ordered to continue to attend mandatory check-ins with a deportation officer, which vary in frequency from weekly to annually.[146] These check-ins, requiring the individual to physically appear at an ICE office, can be burdensome as they require travel, sometimes to faraway locations, and taking time off work. For someone granted withholding because they fear a threat to their life or freedom, it may also be anxiety-provoking to periodically appear at an ICE office. Withholding grantees must renew their work authorization cards every single year.[147] This temporary work permit may undermine an individual's ability to gain employment as employers may be nervous about the temporary nature of the authorization to work. Further, withholding of removal simply means that the individual's removal is withheld from the specific country of feared persecution; should conditions in that country change or ICE find another country to accept the withholding grantee, she may be deported elsewhere.[148]

---

limitations of withholding of removal); *Withholding of Removal and CAT*, *supra* note 25.

144.    *See Welcome to the United States: A Guide for New Immigrants*, U.S. CITIZENSHIP & IMMIGR. SERVS. 14, 66 (2015), https://www.uscis.gov/sites/default/files/files/nativedocuments/M-618.pdf [https://perma.cc/P5RN-AVBD] (providing information on settling in the United States including information on available benefits).

145.    *Id.* at 98–99.

146.    A judge must first issue a removal order before granting withholding of removal. *See, e.g.*, Matter of I-S- & C-S-, 24 I & N Dec. 432, 434 (B.I.A. 2008). Thus, just like any other immigrant subject to a removal order, a withholding applicant must continue to report to ICE Enforcement and Removal Operations for check-in appointments.

147.    *See* 8 C.F.R. § 274a.12(a)(10) (2018) (deeming withholding of deportation grantees eligible for work authorization). The regulation provides that "USCIS may, in its discretion, determine the validity period assigned to any document issued evidencing an alien's authorization to work in the United States." *Id.* § 274a.12(a). That period for withholding grantees is currently one year. *See Withholding of Removal and CAT*, *supra* note 25 ("A person granted withholding of removal is required to pay a yearly renewal fee for an employment authorization document in order to maintain the legal right to work in the United States.").

148.    "An alien . . . granted withholding of removal or deportation . . . may not be deported or removed to the country to which his or her deportation or removal is ordered withheld . . . unless the withholding order is terminated . . . ." 8 C.F.R. § 208.22 (2018). It is current ICE practice to require withholding grantees to apply

The differences in protection, opportunity, and the potential for integration and stability for asylees versus those granted withholding or CAT protection are profound. And that fork in the road comes most often during the very first interaction an asylum seeker has with the U.S. immigration system, the result of a split-second decision made by a low-level border official. If the CBP officer encounters an asylum seeker and follows the law correctly, the asylum seeker should be referred for a credible fear interview and end up in asylum proceedings. If that officer fails to follow the law correctly, the asylum seeker will be quickly removed and then subject to reinstatement of removal and ineligible for asylum if she tries to illegally enter again. While it seems that an erroneous removal order should be easy to remedy, in reality it is a permanent stain on the asylum seeker's record, incredibly unlikely ever to be removed despite various efforts and tactics undertaken by creative attorneys, as discussed below.

## II. LACK OF ACCOUNTABILITY MECHANISMS FOR ABUSE OF EXPEDITED REMOVAL

Given the already widespread use of expedited removal and its anticipated expansion, the problematic ways in which it affects asylum seekers must be addressed. Immigration judges lack the authority to consider an individual eligible for asylum without a Notice to Appear in INA Section 240 proceedings, which, as explained above, is not given to those in withholding-only proceedings.[149] Thus, immigration judges lack the power to remedy the injustice caused by an erroneously issued expedited removal order that has been subsequently reinstated. The avenues for relief lie with immigration officials, who have discretionary power to remedy the situation.

The existing methods of discretionary relief through one of two immigration agencies are discussed below. Prosecutorial discretion is the power that an agency or individual officer has to decide which

---

to at least three other countries for residence or admission. In Cecilia's case, for example, after her withholding grant in April 2018, ICE ordered her to apply to three consulates for admission to their countries. *See* INA § 241(b)(1)(C), 8 U.S.C. § 1231(b)(1)(C) (2012) (laying out alternate countries to which an individual may be removed). Withholding may also be revoked if the grantee's life or freedom would no longer be threatened because country conditions have changed. 8 C.F.R. § 208.24(b)(1) (2018).

149.    8 C.F.R. § 208.2(b), (c)(2) (2018); *see also id.* § 208.31(g)(2)(i) ("The immigration judge shall consider only the alien's application for withholding of removal . . . .").

charges to bring and how to pursue a particular case. [150] In the immigration context, prosecutorial discretion exists at many levels throughout the system. This Part outlines two existing strategies to challenge an erroneously issued expedited removal order, including (1) asking CBP to reopen and rescind the removal order, and (2) asking the ICE trial attorney with the Office of Chief Counsel to exercise discretion to issue a Notice to Appear, rather than accepting CBP's reinstatement of the removal order and issuing a Notice of Referral to withholding-only proceedings. In the current political climate, neither remedy is effective. Federal court challenges are also limited due to strict jurisdictional provisions, and these are discussed below in Part C.

## A. Asking CBP to Reopen and Rescind Underlying Expedited Removal Orders

A logical first step in challenging an erroneously issued removal order is contacting the agency responsible for issuing that order. CBP officers are not required by law to reinstate prior removal orders against individuals who enter without inspection. [151] Similarly, they have the power to rescind a reinstated removal order or expedited removal order.

Under 8 C.F.R. § 103.5, an individual may ask CBP to reopen and rescind a removal order. The Ninth Circuit has explained that the agency must consider all favorable and unfavorable factors relevant to the exercise of its discretion in considering whether to reinstate a removal order, and that failure to do so would constitute an abuse of discretion. [152] Indeed, some attorneys have managed to get a reinstatement of removal order reversed or an expedited removal order rescinded, but with limited success, and primarily under previous

---

150.    *See* Wadhia, *The Rise of Speed Deportations*, *supra* note 32, at 22 ("'Prosecutorial discretion' refers to a decision by the immigration agency about whether, and to what extent, DHS should enforce immigration laws against a person or group.").

151.    Villa-Anguiano v. Holder, 727 F.3d 873, 878 (9th Cir. 2013) (noting that DHS may "decide to forgo reinstatement of a prior order of removal in favor of initiating new removal proceedings, with the accompanying procedural rights to counsel and a hearing in immigration court"); *see also* Alcala v. Holder, 563 F.3d 1009, 1013–14 (9th Cir. 2009) (noting that the government is not required by law to issue a reinstatement of removal order).

152.    *See Villa-Anguiano*, 727 F.3d at 878 (citing 8 U.S.C. § 1231(a)(5); 8 C.F.R. § 241.8(a)–(b)).

administrations.[153] In a 2014 report, the ACLU interviewed sixty-nine advocates and concluded that "it is incredibly rare to get an order rescinded by border officials."[154] According to a panel discussion at the Federal Bar Association conference in May 2018, a CBP attorney in San Francisco shared that the Port directors determine whether or not to grant such motions, but they are entirely discretionary.[155]

## B. Asking the Office of Chief Counsel to Exercise Prosecutorial Discretion to Issue an NTA and Not to Accept CBP's Reinstatement of the Prior Expedited Removal Order

When CBP will not reopen and rescind the expedited removal order, a second strategy is to ask the prosecuting official to decline to

---

153.    Koh, *Removal in the Shadows*, *supra* note 32, at 201–03, has had some success with this. In following up with Professor Koh, she shared the compelling motion filed on behalf of her client, which resulted in the reopening and rescission of the expedited removal order, although this was in 2016 and prior to the Trump Administration. *See also* Koh, *Searching for Solutions*, *supra* note 32, at 360 n.137 (noting reports of some success with motions to reopen and rescind expedited removal orders). Trina Realmulto of the American Immigration Council shared seven decisions issued by CBP granting a request to rescind a removal order, which included three positive decisions from Los Angeles, CA from 2015 and 2016; one positive decision from Nogales, AZ, in 2016, from Hidalgo, TX, in 2016, from Boston, MA in 2015; and most recently from Laredo, TX, in November 2017. She also shared one decision granting attorney Stacy Tolchin's request to rescind a reinstatement of removal order from Los Angeles, issued in 2015. All of these decisions and motions are on file with the author.

154.    ACLU, AMERICAN EXILE, *supra* note 109, at 18, 80.

155.    Telephone Interview with Trina Realmuto, Directing Attorney, American Immigration Council (Aug. 15, 2018). Indeed, in Cecilia's case, counsel filed such a request with CBP's Rio Grande Valley sector in January 2018, where both of Cecilia's prior expedited removal orders were issued, and received no response before Cecilia's April 2018 trial. Cecilia was granted withholding of removal. Later, in August 2018, CBP responded and denied the request to reopen and rescind the removal orders, stating that there is "no prescribed mechanism for U.S. Border Patrol to reopen, reconsider, or vacate an expedited removal order." This request should have been styled instead as a request to reopen and rescind the reinstatement of the removal orders on June 9, 2014 and October 23, 2015. Regardless, unfortunately this would not make a difference for Cecilia. Her withholding grant was largely based on the 2014 *Matter of A-R-C-G-* decision, which was overruled by former Attorney General Sessions' decision in *Matter of A-B-* in June 2018. Even if Cecilia's removal orders could vanish and she could file a motion to reopen and file for asylum today in immigration court, her chances of success are somewhat diminished. Although asylum cases for domestic violence survivors have been granted in the wake of *Matter of A-B-* and Cecilia may prevail on the merits, this is very dependent on the individual judge and DHS trial attorney involved in the case.

place the asylum seeker into withholding-only proceedings based on CBP's reinstatement of the prior order. The prosecuting official within ICE can instead issue a Notice to Appear, placing the individual into full removal proceedings and allowing an asylum seeker to pursue asylum.

The decision to place an individual into withholding-only proceedings, as opposed to regular removal proceedings, lies in the hands of a charging officer or with an attorney from the ICE Office of Chief Counsel.[156] "'Prosecutorial discretion' refers to a decision by the immigration agency about whether, and to what extent, DHS should enforce immigration laws against a person or group."[157] At least in the past, ICE trial attorneys have had broad prosecutorial discretion and, as one scholar has cogently argued, "certain concrete responsibilities—expressed in statutory provisions, case law, and agency guidance—to seek legitimate objectives, take steps to ensure procedural justice, and exercise equitable discretion in appropriate cases."[158] In this case, specifically, under Section 1231(a)(5) of the INA, ICE agents have the power to reinstate a prior removal order but "may exercise their discretion not to pursue streamlined reinstatement procedures."[159]

In Cecilia's case, counsel submitted such a request to the Office of Chief Counsel a few months before Cecilia's withholding-only hearing. In phone conversations with the original ICE trial attorney

---

156. Matter of E-R-M- & L-R-M-, 25 I. & N. Dec. 520, 523 (B.I.A. 2011) ("[W]e find that the statutory scheme itself supports our reading that the DHS has discretion to put aliens in section 240 removal proceedings even though they may also be subject to expedited removal under section 235(b)(1)(A)(i) of the Act."); *see also* ACLU, AMERICAN EXILE, *supra* note 109, at 14 ("[A]n immigration enforcement officer does have the option to refer a non-citizen to a full hearing in an immigration court even where the non-citizen is eligible for a summary removal procedure."); Wadhia, *Speed Deportations*, *supra* note 32, at 22 (citing memoranda issued in 2011 by then–ICE Director, John Morton).

157. *See* Wadhia, *Speed Deportations*, *supra* note 32, at 22.

158. *See* Jason A. Cade, *The Challenge of Seeing Justice Done in Removal Proceedings*, 89 TUL. L. REV. 1, 6 (2014) [hereinafter Cade, *The Challenge of Seeing Justice Done*].

159. *See* Villa-Anguiano v. Holder, 727 F.3d 873, 878 (9th Cir. 2013) ("[A]n ICE officer may decide to forgo reinstatement of a prior order of removal in favor of initiating new removal proceedings . . . ."). Under 8 C.F.R. § 239.2(b) (2018), where it is "impracticable" for the original officer issuing the NTA to cancel the notice, another officer may do so. Although the BIA has said that trial attorneys do not have the authority to withdraw NTAs that have been filed with the court, the trial attorneys can still file a motion for administrative closure or termination of proceedings, and re-issue a new NTA, or issue a new NTA with the judge's permission.

AR.10986

assigned to the case, that attorney indicated that it was office policy to reinstate all prior removal orders unless there was a clear expression of fear in the record by Cecilia in her interactions with CBP. This is the precise issue—Cecilia expressed her fear and the CBP officers with whom she interacted on two occasions ignored that fear, failed to record it, and deported her.

On the day of her trial, a new trial attorney was assigned to Cecilia's case. He echoed the same policy as his colleague and emphasized a need for "something" in the record indicating a fear expressed at an earlier stage. Ultimately, within the same conversation where he declined to exercise discretion not to reinstate the prior removal orders, he exercised his discretion positively and spontaneously to stipulate to a grant of withholding of removal for Cecilia and asylum for her daughter. This stipulation came solely based on the record before the court, without even hearing testimony from Cecilia, highlighting the strength of the case.

The absurdity and injustice of this decision is paramount. The trial attorney in 2018 recognized how strong Cecilia's case was, so much so that he believed her solely based on the record evidence, without even needing to hear her speak a word or recount her traumatic experiences herself. Regardless, based on her alleged failure to articulate that fear when apprehended by border officials in 2014, he made the decision to preclude her from obtaining durable relief and being reunited with her son.

Ironically, Cecilia's daughter was granted asylum protection, despite having a weaker case than her mother and having endured far less past persecution at the hands of her father, while her mother, the direct victim of the persecution, was only granted withholding protection. It was Cecilia's word against official records from CBP, and in spite of the compelling record evidence, in the absence of concrete, contemporaneous evidence in Cecilia's favor, the ICE attorney chose to side with his immigration agency colleagues.

## C. Appellate Dreams Dashed: Limited Judicial Review of Expedited Removal Orders

With such limited ability to eliminate the underlying removal order, as discussed above, advocates have tried over the years to seek

appellate review of the decision not to allow individuals subject to reinstatement of removal to seek asylum.[160]

      Strict limits on judicial review of the expedited removal system make this very difficult.[161] Habeas review, by which an individual can challenge government detention before a judge, is similarly limited and only available in three narrow situations, where there is a need to determine (1) whether the individual is an "alien," (2) whether a removal order was issued, and (3) whether the individual can demonstrate that he or she is a lawful permanent resident, a refugee, or an asylee.[162] Challenges to the expedited removal system as a whole must be brought within sixty days of a written policy change.[163] All of this means that an asylum seeker wrongfully issued an expedited removal order has little recourse through our federal appellate court

---

    160.    The litigation is discussed below. In one law review article, Hillary Gaston Walsh argues that the reinstatement of prior orders of removal should not bar asylum seekers from accessing asylum protection. *See* Hillary Gaston Walsh, *Forever Barred: Reinstated Removal Orders and the Right to Seek Asylum*, 66 CATH. U. L. REV. 613, 666 (2017).

    161.    *See* INA § 242(a)(2)(A), 8 U.S.C. § 1252(a)(2)(A) (2012). For more on the strict limits to challenging expedited removal orders, see ACLU, AMERICAN EXILE, *supra* note 109, at 3 ("These summary procedures invite, and guarantee, error. And yet erroneous—even illegal—summary removal orders are difficult to challenge because of the speed of the process, the limited 'evidence' required, and the absence of a complete record of the proceeding. These procedures might need more review, as they lack many courtroom safeguards; instead, most summary procedures are subject to strict jurisdictional limits that severely limit the possibility of any judicial review.").

    162.    These limitations on habeas review for expedited removal orders are called into question by the Constitution's Suspension Clause. U.S. CONST. art. I, § 9, cl. 2. The Third Circuit addressed this in *Castro v. DHS*, a case brought by 28 women and their children asylum seekers from Central America who challenged the expedited removal orders issued against them. 835 F.3d 422, 445 (3d Cir. 2016). The court found that the asylum seekers did not benefit from the Suspension Clause given their limited contacts and ties in the United States and apprehension within hours of arrival in the United States. *But see* Osorio-Martinez v. U.S. Att'y Gen., 893 F.3d 153, 167 (3d Cir. 2018) (holding that the Suspension Clause did apply to four children granted Special Immigrant Juvenile status while held in immigration detention). As this article went to print, the Ninth Circuit created a circuit split on this issue, finding that asylum seekers are entitled to federal court review of expedited removal orders. *See* Thuraissigiam v. U.S. Dep't of Homeland Sec., 917 F.3d 1097, 1100, 1116–1119 (9th Cir. 2019).

    163.    *See* INA § 242(e)(3); *see also* Oluwadamilola E. Obaro, *Expedited Removal and Statutory Time Limits on Judicial Review of Agency Rules*, 92 N.Y.U. L. REV. 2132, 2132 (2017) (arguing that "courts should not read the expedited removal time-limit to bar constitutional challenges to expedited removal that could not have been raised within the prescribed time limit").

AR.10988

system. Perversely, "[t]hose with the least amount of process at the front end also receive virtually no avenue to seek accountability by way of federal court review at the back end."[164]

Advocates have brought challenges to the reinstatement of a prior removal order as a bar to asylum in almost every jurisdiction throughout the United States. Specifically, advocates have argued that conflicting sections of the Immigration and Nationality Act should mean that, under the plain language of the statute, an individual with a reinstated removal order is asylum-eligible.[165] Unfortunately, these challenges have been unsuccessful. Courts have found, in various ways, that those subject to reinstatement of removal after re-entering without inspection may not seek asylum.[166] In April 2018, the Board of Immigration Appeals weighed in definitively on this issue, finding that

---

164.    *See* Koh, *Searching for Solutions*, *supra* note 32, at 372. The ACLU notes that "[t]he reinstatement process is particularly harsh when applied to people who previously were deported in summary proceedings where they did not have a hearing before an immigration judge, and thus, had no opportunity to present evidence, receive legal assistance, or have a meaningful opportunity to appeal the prior removal order." ACLU, AMERICAN EXILE, *supra* note 109, at 21.

165.    *Compare* INA § 208(a)(1), 8 U.S.C. § 1158(a)(1) (2012) ("Any alien who is physically present in the United States or who arrives in the United States . . . irrespective of such alien's status, may apply for asylum . . . .") *with id.* § 241(a)(5), 8 U.S.C. § 1231(a)(5) (2012) (providing that the previous removal order is "reinstated from its original date and is not subject to being reopened or reviewed, the alien is not eligible and *may not apply for any relief* under this chapter, and the alien shall be removed under the prior order at any time . . . .") (emphasis added).

166.    *See, e.g.*, Garcia v. Sessions, 856 F.3d 27, 31 (1st Cir. 2017), *cert. denied*, 138 S.Ct. 2652 (2018) (according *Chevron* deference to the BIA's interpretation of the statute and finding those subject to reinstatement ineligible for asylum, but the dissent questions underlying validity of the initial removal proceedings); Herrera-Molina v. Holder, 597 F.3d 128, 139 (2d Cir. 2010) (examining the plain language of § 1231(a)(5) and DHS regulations and holding that "relief other than withholding of removal . . . is not available to this petitioner"); Cazun v. U.S. Attorney Gen., 856 F.3d 249, 251 (3d Cir. 2017), *cert. denied*, 138 S.Ct. 2648 (2018); Calla-Mejia v. Sessions, 866 F.3d 573, 587 (4th Cir. 2017); Lara-Aguilar v. Sessions, 889 F.3d 134, 140–43 (4th Cir. 2018); Ramirez-Mejia v. Lynch, 794 F.3d 485, 490–91 (5th Cir. 2015) (considering § 1158's "discretionary nature" and concluding that "[a]ffording asylum relief to aliens whose removal orders are reinstated would be inconsistent with [§ 1231(a)(5)]"); Ochoa-Carillo v. Gonzales, 437 F.3d 842, 847 (8th Cir. 2006); Perez-Guzman v. Lynch, 835 F.3d 1066, 1070 (9th Cir. 2016); Moralez-Izquierdo v. Gonzales, 486 F.3d 484, 506 (9th Cir. 2007); Ayala v. Sessions, 855 F.3d 1012, 1016 (9th Cir. 2017); Jimenez-Morales v. U.S. Attorney Gen., 821 F.3d 1307, 1310 (11th Cir. 2016) (cert. denied) (examining § 1231(a)(5) and § 1158 and concluding that "[a]s asylum is a form of relief from removal" contained in Chapter 12 of Title 8 of the U.S. Code, an individual subject to a reinstated removal order "is not eligible for and cannot seek asylum").

"[a]n applicant in withholding of removal only proceedings who is subject to a reinstated order of removal . . . is ineligible for asylum."[167]

In rejecting advocates' plain language argument—that the statute itself makes clear that any person is eligible to apply for asylum—courts seem to assume that asylum seekers are able to challenge the initial expedited removal order itself. [168] This is an unrealistic expectation for several reasons.

First, beyond review by an immigration judge, the federal appellate courts lack jurisdiction to review expedited removal orders.[169]

Second, even if there were a mechanism by which an asylum seeker could challenge the expedited removal order, many asylum seekers subjected to expedited removal do not even understand that they have acquired a removal order.[170] Further, most asylum seekers are unaware of the process to actually seek asylum. Complicating matters, all of the documents prepared are in English, and although Spanish speakers are often spoken to in some version of their native language, language access for speakers of rare or indigenous languages is poor.

Third, the deadline to petition for reopening such an order is within thirty days of its issuance.[171] It would likely take days or weeks for an asylum seeker to file such a court motion, while deportation after an expedited removal order would be swift.

Fourth, most asylum seekers are fleeing for their lives and thus their immediate safety is the priority. This is especially so for those who have been returned to the place from which they fled persecution.

---

167.     Matter of L-M-P-, 27 I. & N. Dec. 265, 265 (B.I.A. 2018).

168.     *See, e.g.*, *Mejia*, 866 F.3d at 590 ("Rather, we think it more than feasible that an individual removed to her home country could illegally re-enter the United States, have the original removal order reinstated by DHS, and petition for review—all within a month's time.").

169.     INA § 235(b)(1)(A)(i), 8 U.S.C. § 1225(b)(1)(A)(i) (2012) (providing for expedited removal "without further hearing or review" of the officer's determination); 8 C.F.R. § 1003.42(f) (2018).

170.     Immigration clinicians train students and new immigration attorneys to ask whether an individual has ever had any contact with border officials or had their photograph taken or been fingerprinted, to try to assess whether a prior removal order exists. Sometimes, the only way to definitively know is to file a Freedom of Information Act (FOIA) request.

171.     INA § 242(b)(1), 8 U.S.C. § 1252(b)(1) (2012).

*Withholding Protection*

Finally, asylum seekers often lack the resources to access counsel, along with the language skills or even literacy to navigate the U.S. court system.[172]

Professor Koh asserts that "the courts might exercise jurisdiction over expedited removal orders issued in error—for instance, because an officer failed to adequately inquire or assess fear."[173] However, most courts have rejected this.[174] Koh has also suggested a different argument, using the Administrative Procedure Act (APA) to challenge placing individuals in reinstatement proceedings following a prior expedited removal order.[175] Specifically, under the APA, agencies must avoid "arbitrary and capricious" action and demonstrate reasoned decision-making.[176] Using the reasoning of the Supreme Court's decision in *Judulang v. Holder*, Koh argues that review of an immigration agency's exercise of discretion should consider various factors including worthiness, merit, an individual's "attributes and circumstance," and whether the individual is "deserving."[177]

---

172. These concerns about practical barriers facing asylum seekers have been identified in the author's experience representing asylum seekers as Professor and Co-Director of the Immigration and Human Rights Clinic at the University of the District of Columbia David A. Clarke School of Law, and in her previous work with the American Immigration Council, the Georgetown Center for Applied Legal Studies, Tahirih Justice Center, and through law school clinical experiences.

173. Koh, *Searching for Solutions*, *supra* note 32, at 374. *See also* Am.-Arab Anti-Discrimination Comm. v. Ashcroft, 272 F. Supp. 2d 650, 663 (E.D. Mich. 2003) (asserting habeas jurisdiction "to determine whether the expedited removal statute was *lawfully applied*"); Dugdale v. U.S. Customs & Border Prot., 88 F. Supp. 3d 1, 2 (D.D.C. 2015) (asserting jurisdiction over the applicant's claim that "his removal order was procedurally defective"); Ramirez-Molina v. Ziglar, 436 F.3d 508, 515 (5th Cir. 2006) (finding jurisdiction to review petitioner's underlying removal order but finding no gross miscarriage of justice in underlying proceedings because petitioner failed to challenge his removability).

174. Koh, *Searching for Solutions*, *supra* note 32, at 374; *see also* Villegas de la Paz v. Holder, 614 F.3d 605, 610 (6th Cir. 2010) (concluding that the court has "jurisdiction over constitutional claims or questions of law raised in the context of reinstatement proceedings," but ultimately finding that it lacks "jurisdiction to review the underlying deportation order"); Lorenzo v. Mukasey, 508 F.3d 1278, 1281 (10th Cir. 2007) (holding that the court lacks "jurisdiction to review any constitutional or statutory claims related to the underlying removal order").

175. *See id.* at 382 (explaining that arbitrary and capricious review requires courts to "hold unlawful and set aside agency action . . . [that is] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law") (citing 5 U.S.C. § 706(2)).

176. *Id.*

177. Judulang v. Holder, 565 U.S. 42, 55–57 (2011). Others have also made arguments that *Judulang* weighs in favor of an exercise of prosecutorial discretion

This is a creative idea that merits exploration by advocates and litigants. However, any daylight on this issue for asylum seekers will take years to come by in the circuit courts. This Article instead considers more immediate solutions to the problematic interplay of expedited removal and reinstatement of removal as it pertains to those seeking protection in the United States.

## III. SOLUTIONS TO STOP DEPRIVING ASYLUM SEEKERS OF MEANINGFUL PROTECTION

Pending legal challenges to CBP's implementation of the expedited removal system for asylum seekers do not specifically address the problematic interplay between reinstatement of removal and expedited removal. For example, a lawsuit pending in the Southern District of California alleges that CBP and DHS are violating domestic and international law, along with asylum seekers' Fifth Amendment due process rights.[178] This lawsuit specifically focuses on the illegal turnbacks of individuals who express a fear of return at our border. It does not address the issue of CBP officers failing to refer asylum seekers for credible fear interviews and issuing expedited removal orders that are later reinstated following a subsequent entry without inspection.

In June 2018, a lawsuit was filed under the Federal Torts Claims Act against CBP on behalf of an individual fleeing Mexico and seeking asylum based on his sexual orientation.[179] In addition to numerous other failings in the interview process, CBP failed to ask about the asylum seeker's fear of persecution and deported him to Mexico.[180] When the asylum seeker entered the United States again and expressed his fear of return, his fear was ignored, his removal order was reinstated, and he was again deported to Mexico.[181]

---

taking into account the equities of an individual situation. *See* Jason A. Cade, *Judging Immigration Equity: Deportation and Proportionality in the Supreme Court*, 50 U.C. DAVIS L. REV. 1029, 1071–75 (2017); Shoba Sivaprasad Wadhia, *The Immigration Prosecutor and the Judge: Examining the Role of the Judiciary in Prosecutorial Discretion Decisions*, 16 HARV. LATINO L. REV. 39, 53 (2013).

178.    *See Al Otro Lado* Complaint, *supra* note 6, at 2.

179.    Complaint, *Crespo Cagnant v. United States*, No. 1:18-cv-22267-FAM (S.D. Fla. June 7, 2018), https://cbpabusestest2.files.wordpress.com/2018/08/crespo_complaint.pdf [https://perma.cc/3YHK-YWS6].

180.    *Id.* at 10–12.

181.    *Id.* at 12–15.

While these lawsuits are in the works, they may not ultimately be successful and may not have remedies that address the depth of the problem. Consequently, we must consider more systemic reforms. Ideally, given all of the challenges with expedited removal highlighted in this Article, the system should be scrapped and we would return to full due process and judicial review for asylum seekers, eliminating reinstatement of removal altogether. In the current political climate, however, this seems unrealistic.

Thus, this Part considers a number of potential reforms—including congressional action to increase oversight and transparency of the expedited removal system, which in some ways may gain some traction in the current political environment. Next, this Part considers encouraging the exercise of prosecutorial discretion, which, although certainly appropriate, seems unlikely in the current climate. Other solutions include increasing access to counsel, which seems both realistic, considering increased attention and funding for immigration advocacy work, and simultaneously challenging given the government's extreme resistance to allowing attorneys to be more involved in the process. Finally, this Part considers reforms within the Customs and Border Protection agency itself. Broadly, one reform would be enhanced training for CBP officers, which may only go so far in the current environment of extreme animus and anti–asylum seeker rhetoric from the highest levels of our government.

A final, and perhaps the most practical and realistic, proposal will be discussed in Part IV, which is to follow the lead of law enforcement agencies throughout the country in their attempts to counter rampant abuse and a lack of public trust and transparency through the introduction of body-worn cameras. This Article proposes that all CBP officers conducting screening interviews wear these devices to create a permanent and accessible record of asylum seekers expressing their fear and to definitively understand whether required laws and protocols are being followed.

## A. Congressional Action

In the current political climate, statutory overhaul favorable to asylum seekers seems unrealistic.[182] There are, however, actions Congress could take to increase oversight and accountability of CBP given the severity of the failures of the expedited removal system. CBP itself recognizes the stakes of the system and explains them within the

---

182.    *See* Koh, *Searching for Solutions*, *supra* note 32, at 394.

Field Officer's Manual: "The expedited removal proceedings give officers a great deal of authority over aliens and will remain subject to serious scrutiny by the public, advocacy groups, and Congress."[183]

The political will may exist to create such transparency in light of the extreme public engagement after recent actions by the Departments of Homeland Security and Justice to prosecute individuals at the border and separate children from their parents.[184] Indeed, public outrage is at a peak and a campaign to #AbolishICE has gained some traction.[185] Congress could mandate this oversight through the U.S. Commission on International Religious Freedom or another body.[186] Calls for such oversight are not new and the importance of external scrutiny cannot be overstated.[187] Scholars Pistone and Hoeffner have also suggested testers—actors who would go through the expedited removal process to assess whether CBP officers are following the rules.[188]

Comprehensive immigration reform is, of course, always up for debate, but ultimately this Article concludes that such reform is

---

183. INSPECTOR'S FIELD MANUAL, *supra* note 63, § 17.15(b)(1).

184. *See, e.g.*, Phil McCausland, Patricia Guadalupe & Kalhan Rosenblatt, *Thousands Across U.S. Join 'Keep Families Together' March to Protest Family Separation*, NBC NEWS (June 30, 2018), https://www.nbcnews.com/news/us-news/thousands-across-u-s-join-keep-families-together-march-protest-n888006 [https://perma.cc/35WQ-7R4A] (reporting on the six hundred marches that occurred throughout the country demanding the Trump administration reunite separated families).

185. *See, e.g.*, Ron Nixon & Linda Qui, *What is ICE and Why Do Critics Want to Abolish It?*, N.Y. TIMES (July 3, 2018), https://www.nytimes.com/2018/07/03/us/politics/fact-check-ice-immigration-abolish.html (on file with Columbia Human Rights Law Review) (explaining the call to abolish ICE); Eliza Relman, *The First Signs Are Emerging That the Progressive Campaign to Abolish ICE Is Working*, BUS. INSIDER (July 24, 2018), https://www.businessinsider.com/abolish-ice-campaign-democrats-progress-updates-2018-7 [https://perma.cc/YG6G-JH5R] ("72% of Democrats now support eliminating the agency, according to new polling.").

186. *See, e.g.*, BORDER ENFORCEMENT ACCOUNTABILITY, OVERSIGHT, AND COMMUNITY ENGAGEMENT ACT OF 2017, H.R. 3020, 115TH CONG. (2017) (proposing legislation establishing a DHS border oversight commission and expanding the USCIS Ombudsman's Office created by the Homeland Security Act in 2002 to make it the Ombudsman for Border and Immigration Related Concerns).

187. *See* Pistone & Hoeffner, *Rules are Made to Be Broken*, *supra* note 66, at 201–02 (arguing that "Congress should authorize a regular schedule of studies with the idea of continuing them until substantial improvement is shown" and the agency should be required to *respond* to those studies).

188. *Id.* at 202–03.

AR.10994

*Withholding Protection*

unlikely and sets up a more focused solution to address this particular problem, below in Part IV.

### B. Prosecutorial Discretion in Expedited Removal and Reinstatement of Removal

Another solution to the problematic interplay between expedited removal and reinstatement of removal may be to expand the use of prosecutorial discretion. Scholars have long called for the expansion of prosecutorial discretion in the "speed deportation" realm[189] and in immigration more broadly.[190] Similarly, Human Rights Watch's 2014 report called for CBP to "apply a presumption of fear of return for migrants in expedited removal" who are from particular countries.[191]

DHS has discretion regarding whether and when to subject an individual to expedited removal or reinstatement of removal.[192] The BIA recognizes that DHS can place individuals who have expedited removal orders into regular removal proceedings, where they could apply for asylum relief.[193] In issuing a Notice to Appear, ICE should "consider humanitarian factors and the possibility for other relief when deciding to place a person who legally qualifies for speed deportation in removal proceedings instead."[194]

As the BIA has recognized, DHS trial attorneys have:

---

189.  *Id.* at 22–25.
190.  *See* Cade, *The Challenge of Seeing Justice Done*, *supra* note 158, at 13 ("This sweeping, categorical, and unforgiving approach thus elevates the role of enforcement discretion, which must compensate for the statute's lack of nuance."); Frost, *Learning from Our Mistakes*, *supra* note 40, at 786 (suggesting that to guard against mistakes in immigration enforcement, immigration officers should "err on the side of interpreting the law expansively," and arguing in favor of a "rule of lenity" to minimize errors leading to the "wrongful exclusion and deportation of those entitled to remain in the United States").
191.  HRW, You Don't Have Rights Here, *supra* note 109, at 41.
192.  *See* Wadhia, *Speed Deportations*, *supra* note 32, at 22 (citing a pair of memos issued by then–ICE Director John Morton in 2011).
193.  Matter of E-R-M- & L-R-M-, 25 I. & N. Dec. 520, 520 (B.I.A. 2011); *see also* Matter of S-M-J-, 21 I. & N. Dec. 722, 726 (B.I.A. 1997) (discussing the immigration judge and trial attorney's responsibilities to ensure that refugee protection is provided where warranted, including introducing evidence favorable to the respondent).
194.  *See* Wadhia, *Speed Deportations*, *supra* note 32, at 24 (citing the Morton Memo).

> [A]n obligation to uphold international refugee law, including the United States' obligation to extend refuge where such refuge is warranted. That is, immigration enforcement obligations do not consist only of initiating and conducting prompt proceedings that lead to removals at any cost. Rather, as has been said, the government wins when justice is done.[195]

In Cecilia's case, and in line with the obligations of DHS trial attorneys, prosecutorial discretion should have been exercised. Cecilia's case presented a clear example of where the equities and the compelling humanitarian case for family reunification, along with Cecilia's eligibility for asylum, merited discretion.[196] Indeed, as made clear from the record in the case, Cecilia's partner, the father of her child, had abused his young son, stuck in Honduras, from the age of three; had served jail time for slashing Cecilia's sister's shoulder with a machete; had set alight two inmates while incarcerated, killing one of them; and yet had been released from custody by the time of Cecilia's asylum hearing. The equities clearly weighed in favor of reunifying this traumatized young boy with his mother.

Unfortunately, in the current era of hyper-aggressive immigration enforcement and directives from on high *not* to exercise prosecutorial discretion, calls for the exercise of prosecutorial discretion seem perhaps unrealistic.[197] In order to more effectively

---

195.     *See S-M-J-*, 21 I. & N. Dec. at 727; *see also* Erin B. Corcoran, *Seek Justice, Not Just Deportation: How to Improve Prosecutorial Discretion in Immigration Law*, 48 LOY. L.A. L. REV. 119, 131 (2014) (arguing that ICE attorneys have ethical duties to pursue justice and that prosecutorial discretion should be formalized through an attorney's manual clearly setting out ICE policies, practices, and priorities for use of prosecutorial discretion).

196.     *See* Cade, *The Challenge of Seeing Justice Done*, *supra* note 158, at 25 ("The other objective [of prosecutorial discretion agency memoranda] is to ensure that ICE attorneys take special account of situations in which noncitizens are technically in violation of civil immigration laws but have strong humanitarian factors militating in favor of discretion."). This case is not unique. The author has handled other cases where withholding grantees are permanently separated from their children with no possibility of reunification because of an erroneously issued expedited removal order. *See also* ACLU, AMERICAN EXILE, *supra* note 109, at 21–22 (giving the example of an indigenous Guatemalan woman who received an expedited removal order because her fear was ignored and now, even if she wins her withholding case, she will not be reunited with her child).

197.     Indeed, much of the positive Obama-era guidance on prosecutorial discretion has implicitly, if not explicitly, been overridden by the Trump executive orders, the end of the Priority Enforcement Program (PEP), etc. *See* Cade, *The Challenge of Seeing Justice Done*, *supra* note 158, at 28–35 (discussing the Morton

persuade trial attorneys and CBP officers to exercise discretion to rescind or amend an erroneously issued expedited removal order, something more is needed to lift the expedited removal process out of the shadows. This will be discussed in Part IV.

## C. Increasing Access to Counsel

One solution to the problem posed here—wrongful deportations of asylum seekers resulting in expedited removal orders that forever stain their quest for meaningful protection—is improved access to counsel. Specifically, within the context of initial screening at the border, access to counsel does not exist.[198] Secondary inspection with a CBP officer is usually a no-go zone for attorneys with zero access and transparency.[199] However, the involvement of attorneys in other pieces of the process, from avoiding an illegal turnback at the border to navigating a credible fear interview and beyond, suggests that involvement of counsel would be highly beneficial in safeguarding the rights of asylum seekers navigating the expedited removal process.

In a 2014 report, the ACLU recommended access to counsel for all individuals facing removal through a summary procedure.[200] Stephen Manning and Kari Hong explore this question and ask whether adequate access to counsel would "mitigate against erroneous removals without undermining the statute's goal of speed."[201] Their resounding answer, drawing on voluminous data from the CARA Pro Bono Project (now the Dilley Pro Bono Project), which operates in Dilley, Texas at the largest family detention center in the country, is

---

Memos in detail). Indeed, even where the directives or, as Pistone and Hoeffner term them, "diktats from above," do mandate prosecutorial discretion, this has little effect on officer behavior in reality. Pistone & Hoeffner, *Rules Are Made to Be Broken*, *supra* note 66, at 197; *see also* Rabin, *supra* note 127, at 200 (2014) (using political scientist James Wilson's analytical framework to understand bureaucratic behavior as applied to ICE—focused on culture, historical formation, and critical tasks).

198.     8 CFR § 292.5(b) (2018).

199.     *See generally* LEGAL ACTION CTR., AM. IMMIGRATION COUNCIL, BEHIND CLOSED DOORS: AN OVERVIEW OF DHS RESTRICTIONS ON ACCESS TO COUNSEL 7–9 (2012), https://elibrary.law.psu.edu/cgi/viewcontent.cgi?article=1006&context=irc_pubs [https://perma.cc/6M3J-3X99].

200.     ACLU, AMERICAN EXILE, *supra* note 109, at 8; *see also* Drake & Gibson, *Vanishing Protection*, *supra* note 6, at 92 (calling for increased attorney involvement and advocacy at earlier stages in the asylum process, including "ensuring that those traveling to the U.S. border have access to the asylum adjudication system").

201.     Manning & Hong, *Access to Counsel*, *supra* note 32, at 678.

yes, access to counsel fundamentally changes the asymmetrical power dynamic surrounding rapid removals. [202] They do not examine, however, the question of intervention of counsel at the border—in the initial screening interaction with the CBP officer who makes a determination of removability and supposedly administers the statutorily required screening for asylum seekers. [203]

Lawyers can indeed make a tremendous difference, even in this early stage of the asylum-seeking process. Human Rights First's 2017 report details numerous instances where advocacy by an attorney prevented CBP's wrongful deportation of an asylum seeker. [204] Around the Spring 2018 refugee caravan, for example, Nicole Ramos, a lawyer with Al Otro Lado, a non-profit organization which operates on the California-Mexico border:

> Would tell officers that every single person in the crowd was afraid of persecution. Every asylum-seeker would carry a Notice of Representation listing Ramos or another volunteer lawyer as his attorney of record. This would allow Al Otro Lado to visit them in detention, document their treatment by Customs and

---

202.    *Id.* at 703–04; *see also* Ingrid Eagly, Steven Shafer, & Jana Whalley, *Detaining Families: A Study of Asylum Adjudication in Family Detention*, 106 CAL. L. REV. 785, 845–47 (2018) (discussing challenges for access to counsel in family detention centers, but also noting the enormous difference legal representation makes in the credible and reasonable fear process).

203.    Manning and Hong outline three distinct moments in which adjudications take place within expedited removal—the first being the "adjudication of removability and the entry of an expedited removal order." Manning & Hong, *Access to Counsel*, *supra* note 32, at 682.

204.    HRF, CROSSING THE LINE, *supra* note 6, at 7, 13. Examples include an attorney who successfully requested that CBP process a Honduran family with bullet wounds as asylum seekers after they had been turned away once by CBP; a Turkish opposition group member who was successfully processed as an asylum seeker only after attorney intervention; and a Mexican family who was turned away twice by CBP before lawyers intervened and CBP processed them on their third attempt, after which an immigration judge granted asylum. *Id.* The report also details attorneys accompanying asylum seekers to border crossings and assisting in the preparation of asylum applications and the presentation of evidence to support the claim at the border; a Mexican journalist who accessed processing as an asylum seeker only with attorney intervention; and a Mexican family stuck on a bridge in Hidalgo until an attorney intervened at the port of entry. *Id. See also* ACLU, AMERICAN EXILE, *supra* note 109, at 40 (recounting an instance where a Honduran asylum seeker eventually secured a credible fear interview due to attorney intervention).

Border Protection, and represent everyone in immigration hearings.[205]

Al Otro Lado's work in Tijuana is gaining attention[206] and, thankfully, funding.[207]

In the current political climate, however, it may be a fool's errand to suggest heightened access to counsel during the critical stage of the CBP interview that determines whether a person will receive a credible fear interview or will instead be deported through expedited removal. Former Attorney General Jefferson Beauregard Sessions III labeled those who assist asylum seekers "dirty immigration lawyers"[208] and former DHS Secretary Kirstjen Nielsen has threatened to prosecute those who "coach" asylum seekers on false claims.[209] For now, while attorneys certainly can and should push within the existing framework on behalf of asylum-seeking clients to access protection, it seems very unlikely that there will be any improvements in access to counsel within the expedited removal process.

At the same time, to the extent that the access to counsel crisis results from a lack of pro bono or low-cost lawyers for asylum seekers in expedited removal proceedings, the current political climate and outrage over family separation has created an, at least temporarily, deep pool of funding to support this work. For example, a Texas-based organization working with detained families and individuals raised more than twenty million dollars in just a few days.[210] Other

---

205.    Daniel Duane, *City of Exiles: Every Month, Thousands of Deportees from the United States and Hundreds of Asylum-Seekers from around the World Arrive in Tijuana. Many Never Leave*, CAL. SUNDAY MAG. (May 30, 2018), https://story.californiasunday.com/tijuana-city-of-exiles [https://perma.cc/2RDN-6D95].

206.    *Id.*

207.    *See also* Drake & Gibson, *Vanishing Protection*, *supra* note 6, at 121–22 (calling on advocates to think beyond the U.S. border and engage asylum seekers in transit through Mexico).

208.    Jefferson Sessions, Attorney Gen., Remarks to the Executive Office for Immigration Review (Oct. 12, 2017), https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-executive-office-immigration-review [https://perma.cc/PLN9-D6U3].

209.    Press Release, Dep't of Homeland Sec., Sec'y Nielsen, Statement on the Arrival of the Central American "Caravan" (Apr. 25, 2018), https://www.dhs.gov/news/2018/04/25/secretary-nielsen-statement-arrival-central-american-caravan [https://perma.cc/DBW9-Y9ED].

210.    Annie Correal, *Women Ask 'What if it Were Me?' And Rush to Aid Separated Families*, N.Y. TIMES (July 20, 2018), https://www.nytimes.com/2018/07/20/nyregion/crowdfunding-immigrant-children-separated.html (on file with Columbia Human Rights Law Review) (mentioning the $20 million that RAICES

organizations on the frontlines of this work, including Southern Poverty Law Center, Northwest Immigrants' Rights Project, Innovation Law Lab, Florence Project, and Al Otro Lado, have all been able to create new, if temporary, positions to increase access to counsel for detained immigrants in light of the current influx of funding. States have also stepped into the fray in the last few years to provide access to counsel for immigrants where the federal government has failed.[211] Thus, despite the absence of formal access to attorneys for secondary screening, as well as a lack of commitment from the federal government to provide or enhance access to counsel for asylum seekers in expedited removal, there is some hope for this solution.

### D. Enhanced Training for CBP Officers

As mentioned above in Part I.A, currently the training that CBP officers receive regarding the screening of asylum seekers at the border lacks transparency. The Officer's Reference Tool, which replaced the Inspector's Field Manual sometime around 2013, is not publicly available. Nonetheless, "if change is going to occur in how DHS processes deportation cases, it is most likely to come from within the agency."[212] Thus, reformed and enhanced training for CBP officers is

---

raised and also a more recent crowdfunding campaign in New York that quickly raised $300,000).

211.     For example, since 2013, the New York Immigrant Family Unity Project, a collaboration of several organizations, has worked to provide universal representation for respondents appearing before the New York City Varick Street Immigration Court without an attorney who meet income threshold criteria. *See* NAT'L IMMIGRATION LAW CTR., BLAZING A TRAIL: THE FIGHT FOR RIGHT TO COUNSEL IN DETENTION AND BEYOND 14 (2016), https://www.nilc.org/wp-content/uploads/2016/04/Right-to-Counsel-Blazing-a-Trail-2016-03.pdf [https://perma.cc/D3MZ-23NS] [hereinafter NILC, BLAZING A TRAIL]. The Project has been expanded to representation in a detention center in Buffalo, New York. *Id.* at 18; *see also* JENNIFER STAVE ET AL., VERA INST. OF JUST., EVALUATION OF THE NEW YORK IMMIGRANT FAMILY UNITY PROJECT: ASSESSING THE IMPACT OF LEGAL REPRESENTATION OF FAMILY AND COMMUNITY UNITY (2017), https://www.vera.org/publications/new-york-immigrant-family-unity-project- [https://perma.cc/9Q53-7EHQ] [hereinafter VERA INST., NYIFUP] (evaluating the impact of the New York Immigrant Family Unity Project on immigrants facing deportation). Also, in the Northeast, in New Jersey the American Friends Service Committee (AFSC) launched the Friends Representation Initiative of New Jersey (FRINJ), a pilot project offering representation, twice a week, to all detained immigrants who appear before the Elizabeth, NJ Immigration Court. *See* NILC, BLAZING A TRAIL, *supra*, at 211.

212.     *See* Cade, *The Challenge of Seeing Justice Done*, *supra* note 158, at 61 (proposing four modest solutions, including introducing discovery obligations, using

one way to fundamentally shift organizational culture in favor of actually following the law and regulations.

Legal scholarship has long highlighted the problems and internal conflicts with the guidance that CBP did make available in the past.[213] As Pistone and Hoeffner explain, CBP's Inspector's Field Manual authorized officers to deport an individual without referring for credible fear when the fear "clearly would not qualify that individual for asylum."[214] This guidance invites the officer to make a complex legal determination and adjudication regarding asylum eligibility that she is not authorized or trained to make. Although it is unclear what the current Officer's Reference Tool advises on this topic, it is very likely that the internal training guidance for CBP needs revision.[215] The advocate community agrees that training of CBP officers is critically important.[216] Legislation to improve CBP training

---

vertical prosecution, increasing responsibility and authority for screening and declining cases, and conducting prehearing conferences).

213.    Pistone & Hoeffner, *Rules Are Made to Be Broken*, *supra* note 66, at 188.

214.    *Id.* (citing Section 17.15(b) of the Immigration Court Practice Manual, *supra* note 87).

215.    *See* Koh, *Removal in the Shadows*, *supra* note 32, at 233 (suggesting that additional information on the training and oversight of individual front-line immigration officials issuing expedited removal and reinstatement orders is essential); Frost, *Learning from Our Mistakes*, *supra* note 40, at 788 (arguing for improved training of CBP officers but basing this suggestion on the premise that failures to recognize valid asylum claims stem from a lack of knowledge of asylum law, rather than a CBP officer's willful disregard of the law); *see also* Drake & Gibson, *Vanishing Protection*, *supra* note 6, at 130 (advocating training for CBP officers on the "importance of protecting potential asylum seekers and the breadth of conduct that is sufficient for a referral").

216.    HRW, YOU DON'T HAVE RIGHTS HERE, *supra* note 109, at 41 (recommending improved training for CBP officers, including "modification of oversight mechanisms; accountability measures, including better quality assurance supervision; and any and all other appropriate measures that initial interviews conducted by CBP properly identify individuals who express fear of return so that they are afforded 'credible' or 'reasonable' fear assessments"); HRF, CROSSING THE LINE, *supra* note 6, at 3 (explaining that training needs to be enhanced for CBP officers to "comply with U.S. domestic law and treaty commitments"); ACLU, AMERICAN EXILE, *supra* note 109, at 8 (recommending that DHS "continuously train and retrain immigration enforcement officers not to use coercion, threats, or misinformation to convince individuals to give up the right to see a judge and accept deportation"); 2016 USCIRF REPORT, *supra* note 75, at 4 (emphasizing a need to retrain all officers on their role in the expedited removal process).

was introduced in the House in 2017, but never advanced further in the Congressional process.[217]

In the current climate, however, training for CBP officers may have only a negligible effect in the wake of former Attorney General Sessions' suggestion that "dirty immigration lawyers" feed magic words to asylum seekers, a message that has only been amplified by President Trump.[218] The administration is working very hard to perpetuate the myth that asylum seekers are gaming the system and falsely claiming a fear of return. As this narrative becomes more deeply entrenched in the public and border enforcement psyche, it will become more difficult to counter.

Prior to the extremely troubling decision issued by former Attorney General Sessions on June 11, 2018, in which he overruled the BIA's precedential decision recognizing asylum claims for survivors of domestic violence,[219] CBP officers were already misapplying asylum law. The regulations CBP must follow require them simply to refer an individual to USCIS for a fear interview if they express fear of return or an intention to apply for protection. Nonetheless, in the twenty-two years since expedited removal was implemented, border officials have taken it upon themselves to deport asylum seekers.[220] The 2018 *Matter of A-B-* decision will only further compound this problem as border officials may be further emboldened by that decision to reject claims related to domestic or gang violence as a threshold matter.[221]

---

217.    *See* Border Enforcement Accountability, Oversight, and Community Engagement Act of 2017, *supra* note 186, § 4 (outlining enhanced training for CBP officers).

218.    Sessions, *supra* note 208; *see also* Donica Phifer, *Donald Trump Calls Asylum Claims a 'Big Fat Con Job,' Says Mexico Should Stop Migrant Caravans Traveling to U.S. Border*, NEWSWEEK (Mar. 29, 2019), https://www.newsweek.com/donald-trump-calls-asylum-claims-big-fat-con-job-says-mexico-should-stop-13 79453 [https://perma.cc/47PG-8VBY] (citing Trump's remarks at a Michigan rally stating that asylum seekers were met by lawyers telling them to say that they are afraid).

219.    Matter of A-B-, 27 I. & N. Dec. 316 (A.G. 2018).

220.    *See* ACLU, AMERICAN EXILE, *supra* note 109, at 37, 104–05.

221.    *Matter of A-B-*, 27 I. & N. Dec. at 320 ("Generally, claims by aliens pertaining to domestic violence or gang violence perpetrated by non-governmental actors will not qualify for asylum . . . ."); *id.* at 320 n.1 ("Accordingly, few such claims would satisfy the legal standard to determine whether an alien has a credible fear of persecution."); *see also* U.S. Citizenship & Immigration Servs., Guidance for Processing Reasonable Fear, Credible Fear, Asylum, and Refugee Claims in Accordance with Matter of A-B- (July 11, 2018), https://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/2018/2018-06-18-PM-602-0162-USCIS-Me morandum-Matter-of-A-B.pdf [https://perma.cc/89R3-8D34] (providing direction for

## IV. Lifting Asylum Seeker Screening at the Border out of the Shadows: Body-Worn Cameras?

The proposals discussed in Part III all have clear shortcomings and lack immediate political willpower. In contrast, this Part proposes the use of Body-Worn Cameras (BWCs) as a way to more immediately improve the situation on the border for asylum seekers and prevent the erroneous issuance of expedited removal orders that put asylum seekers at risk of being subjected to reinstatement of removal upon attempted reentry.

As discussed above, remedies are few and far between for an asylum seeker with an erroneously issued prior removal order. Providing a record of the initial interaction with CBP would equip an asylum seeker with evidence to support her assertion that she did in fact express a fear of return, proving that it was erroneous for CBP to issue an expedited removal order without referring the asylum seeker to a CFI.

A byproduct of recording CBP secondary screening interactions could be that officers would be more likely to follow their own procedures and fewer erroneous removal orders would be issued. While the implementation of Body-Worn Cameras (BWCs), or simply recording technology more broadly,[222] has a number of advantages, this section will also discuss the challenges to this solution.

---

USCIS officers regarding asylum and refugee eligibility in light of the decision in *Matter of A-B-*). Notably, the ACLU and the Center for Gender and Refugee Studies mounted a successful legal challenge to these new policies. *See* Complaint, Grace v. Whitaker, No. 1:18-cv-01853 (D.D.C. 2018), https://www.aclu.org/legal-document/grace-v-sessions-complaint [https://perma.cc/QE7T-ZZ8V]. Implementation of many of the key provisions of *Matter of A-B-* has been enjoined. *See* Practice Advisory: *Grace v. Whitaker, supra* note 49.

222.    I focus here on Body-Worn Cameras, but concede that the use of simple audio recordings or of cameras inside an interviewing room might also mitigate problems I have outlined. In reality, however, the screening interviews take place in a variety of locations and so BWCs may be the most reliable way to ensure that each and every screening interview is captured. *See, e.g.* 2016 USCIRF Report, *supra* note 75, at 24–26 (detailing how interviews actually take place, including through banks of computers and virtually conducted interviews with officers in remote locations, sometimes in groups, rather than in an individual setting, and quite rarely in private interview rooms). Another promising solution, brought to the author's attention as this article went to print, is the use of some kind of electronic application, more commonly known as an "app," similar to that proposed by Professors Ferguson and Leo for use to administer *Miranda* warnings. *See* Andrew Guthrie Ferguson & Richard A. Leo, *The Miranda App: Metaphor and Machine*, 97

This is a not a new recommendation,[223] but it has not been thoroughly explored in the legal scholarship and merits further scrutiny in the wake of increased use of and attention towards BWCs since 2014. Literature from the criminal context, where BWCs have been on the rise since the watershed moment of Ferguson,[224] is instructive in thinking through how to implement BWCs at the border. BWCs are used by police officers nationwide.[225] Indeed, as the nation's largest law enforcement agency, CBP is an outlier in the absence of its use of BWCs.[226]

---

B.U. L. REV. 935 (2017). This app could be administered by CBP officials, recorded, and used with any language and with visuals for illiterate individuals.

223.   *See id.* at 4, 7 (repeating USCIRF's recommendation dating back as early as 2005 of videotaping processing interviews as well as supervisory and headquarters review of a sample of interviews for quality assurance); ACLU, AMERICAN EXILE, *supra* note 109, at 105 (recommending that DHS video-record all summary removal proceedings and keep a copy of the recording in the individual's "A-File."). More broadly, the National Immigration Forum has recommended the use of body cameras for all CBP agents in all interactions with the public. JAMES R. LOPEZ ET AL., NAT'L IMMIGRATION FORUM, BODY CAMERAS AND CBP: PROMOTING SECURITY, TRANSPARENCY, AND ACCOUNTABILITY AT OUR NATION'S BORDERS 9 (2015), https://immigrationforum.org/wp-content/uploads/2015/11/Body-Cameras-and-CBP-Report-11062015.pdf [https://perma.cc/5ZZQ-K6XM] [hereinafter BODY CAMERAS AND CBP] (recommending the use of BWCs for all CBP agents in *all* interactions with the public). U.S. lawmakers have also called on ICE to use body-cameras. *See* Rafi Schwartz, *Some Lawmakers Want Immigration Enforcement Officers to Wear Body Cameras*, BUS. INSIDER (Mar. 13, 2017), http://www.businessinsider.com/some-lawmakers-want-immigration-enforcement-officers-to-wear-body-cameras-2017-3?r=UK&IR=T [https://perma.cc/9J6A-EMTF] (discussing the ICE Body Camera Act of 2017, H.R. 1497, introduced by Democratic Brooklyn Congresswoman Yvette Clarke); *see also* Pistone & Hoeffner, *Rules Are Made to Be Broken*, *supra* note 66, at 203–07 (supporting the use of videotaping of secondary inspection interviews as a counterbalance to "the dominant enforcement culture" and also advocating for the appointment of a senior asylum advocate within DHS, along with requiring border officials to confirm in writing that they read required information to applicants and forbidding telephonic review by supervisory officers).

224.   Mary D. Fan, *Privacy, Public Disclosure, Police Body Cameras: Policy Splits*, 68 ALA. L. REV. 395, 408–09 (2016) [hereinafter Fan, *Policy Splits*]; Kami Chavis Simmons, *Body-Mounted Police Cameras: A Primer on Police Accountability vs. Privacy*, 58 HOW. L.J. 881, 882–83 (2015); Seth W. Stoughton, *Police Body-Worn Cameras*, 96 N.C. L. REV. 1363, 1364–66 (2018).

225.   Fan, *Policy Splits*, *supra* note 224, at 409 ("According to a recent survey . . . 95% of seventy law enforcement agencies surveyed have either committed to putting body cameras on officers or have already done so."); Laurent Sacharoff & Sarah Lustbader, *Who Should Own Police Body Camera Videos?*, 95 WASH. U. L. REV. 269, 283 (2017).

226.   BODY CAMERAS AND CBP, *supra* note 223, at 20 ("If CBP does not continue with implementation of body-worn cameras, it risks being the only large

In thinking through the implementation of BWCs at the border in the expedited removal screening process below, the potential advantages and challenges are considered. Although BWCs have arguably not been the panacea for police accountability that was hoped for in the criminal justice context, [227] the goals in utilizing this technology on the border differ and are perhaps less ambitious. Ultimately, this Article concludes that the use of BWCs would be a politically expedient, feasible solution to partially remedy the injustices currently occurring at our border and to protect future asylum seekers from being permanently barred from meaningful protection by a border official's failure to properly do her job.

BWCs should be worn by all CBP officers at all times in all interactions with potential asylum seekers—which means in all screening interviews at the border, throughout the entirety of the interaction. Absent a recording of the interaction, a presumption should operate in the asylum seeker's favor by accepting her version of events rather than the border official's explanation.

## A. Advantages of Body-Worn Cameras

The introduction of BWCs for officials at the border conducting screening interviews poses a number of advantages, including: increased transparency and efficiency; potential reduction in abuses, including the use of physical force; and enhanced possibilities for training and supervision.

### 1. Transparency

Body-Worn Cameras could increase transparency to take expedited removal out of the darkness and put an end to the legal black hole produced by the combination of expedited removal and

---

and most notable law enforcement agency that does not have such a program in place.").

227. *See, e.g.*, Eric Miller, *Do Body Cameras Improve Police Conduct?*, PRAWFSBLOG (Oct. 18, 2018, 1:08 PM), https://prawfsblawg.blogs.com/prawfsblawg /2018/10/do-body-cameras-improve-police-conduct-.html [https://perma.cc/AF3K-XSLA]. While the author lacks expertise in the criminal justice field, the literature available seems primarily focused on the initial question regarding whether or not BWCs should be used. Hopefully, we will begin to see deeper analysis of their implementation and success in achieving the purported goals of their introduction in the coming years.

reinstatement.[228] Currently, "no clear mechanism for correction for CBP officers that fail to even ask about fear—in violation of the agency's own regulations—exists."[229] But the creation of such a mechanism is possible. Requiring the use of BWCs by all CBP officers conducting screening interviews would create a contemporaneous record of the border interview, with the potential to ensure the protection of many more asylum seekers.

The goals of BWCs in the criminal context are similar to the concerns we are aiming to address in the immigration arena. Given the intense distrust of police by communities,[230] BWCs aim to increase transparency, as well as to guard against police violence and improve professionalism.[231] Seth Stoughton discusses the Hawthorne Effect, or "bystander effect," as the "intuitive phenomenon that people behave differently when they know they are being observed."[232] This combined with deterrence theory suggests that officers "may adapt their behaviors because they know their actions are being scrutinized."[233] From the officer's perspective, BWCs may increase good behavior on both sides and enhance officer safety.[234]

---

228.     *See* Koh, *Searching for Solutions*, *supra* note 32, at 361 ("The layering of one shadow removal upon another thus creates an even darker space in immigration law than the operation of each process on its own.").

229.     *See id.* at 392.

230.     Following Ferguson and the death of Michael Brown, President Obama established the President's Task Force on 21st Century Policing to examine ways to improve community distrust of police. Establishment of the President's Task Force on 21st Century Policing, 79 Fed. Reg. 76,865 (Dec. 23, 2014); Stoughton, *supra* note 224, at 1381 ("Police executives, politicians, and policing scholars have expressed their hope that body cams would increase public trust or explicitly asserted that the technology can or is doing so.").

231.     David A. Harris, *Picture This: Body-Worn Video Devices (Head Cams) As Tools for Ensuring Fourth Amendment Compliance by Police*, 43 TEX. TECH. L. REV. 357, 360 (2010) [hereinafter David A. Harris, *Ensuring Fourth Amendment Compliance*].

232.     Stoughton, *supra* note 224, at 1386.

233.     *Id.* at 1389–90 (noting, however, that "cameras may deter misconduct, but only if officers are sufficiently deterred from misusing (or not using) the cameras themselves").

234.     BODY CAMERAS AND CBP, *supra* note 223, at 12 ("[I]n fiscal year 2015 there were still 390 assaults on border patrol agents. Body-worn cameras could help further reduce the number of assaults."). *But see* Nell Greenfieldboyce, *Body Cam Study Shows No Effect on Police Use of Force or Citizen Complaints*, NPR (Oct. 20, 2017), https://www.npr.org/sections/the two-way/2017/10/20/558832090/body-cam-study-shows-no-effect-on-police-use-of-force-or-citizen-complaints [https://perma.cc/9NEX-HEYM] (discussing a study of the DC metropolitan police department's

Importantly, some studies have shown that BWCs may lead to a significant reduction in use-of-force incidents.[235] Video recording all CBP interactions would be beneficial because there are numerous reports of physical abuse perpetrated by CBP officers.[236] Indeed, between 2005 and 2015, CBP agents killed at least forty-five people, and between 2005 and 2012, 2,170 incidents of misconduct by agents were reported.[237] In the summer of 2018, for example, Claudia Gonzalez, a CBP officer, shot a twenty-year-old indigenous woman from Guatemala in the head.[238] With calls to #AbolishICE and public criticism of immigration agencies at an all-time high, it is an appropriate moment for CBP to take steps to improve transparency and their public image.[239]

### 2. Efficiency, Training, and Supervision

Another advantage may be increased efficiency for CBP officers—BWCs would enable recording in real time, resulting in increased accuracy regarding what was said in secondary screening

---

use of BWCs that had not made much of a difference, but recognizing that the department was already in decent shape).

235. Simmons, *supra* note 224, at 886 (citing one study showing a 60% reduction in use of force incidents by police officers in 2012 in Rialto, California).

236. *See* HRF, CROSSING THE LINE, *supra* note 6, at 6 (recounting an incident where CBP officers knocked a Salvadoran transgender woman to the ground and put their boots on her neck and groin area); ACLU, AMERICAN EXILE, *supra* note 109, at 36 (recounting an officer slapping an asylum seeker across the face with forms when he refused to sign forms he did not understand).

237. BODY CAMERAS AND CBP, *supra* note 223, at 10.

238. Molly Hennessy-Fiske, *Witness Recounts Fatal Border Patrol Shooting of Young Guatemalan Woman in Texas*, L.A. TIMES (May 26, 2018), http://www.latimes.com/nation/la-na-border-shooting-20180526-story.html [https://perma.cc/6UY4-D43W]; *see also* Gus Bova, *The Border Patrol Serial Killer is Part of a Long, Troubled History*, TEX. OBSERVER (Sept. 19, 2018) https://www.texasobserver.org/the-border-patrol-serial-killer-is-part-of-a-long-troubled-history/ [https://perma.cc/6D7Q-BDT5] (describing the history of violent crimes, including murder, committed by CBP agents); Manny Fernandez, *They Were Stopped at the Border. Their Nightmare Had Only Just Begun*, N.Y. TIMES (Nov. 12, 2018), https://www.nytimes.com/2018/11/12/us/rape-texas-border-immigrants-esteban-manzanares.html (on file with the Columbia Human Rights Law Review) (describing incidents of violence and sexual assault committed by CBP agents against women detained while crossing the Rio Grande border).

239. Legislation introduced in 2017 not only required CBP reporting on the use of force and migrant deaths, but also required reporting to Congress on the use of body-worn cameras. *See* Border Enforcement Accountability, Oversight, and Community Engagement Act of 2017, *supra* note 186, § 6(d).

interviews.[240] Another advantage is that supervision of officer conduct may be more effective—body camera recordings allow a supervisor to "see for himself what really happened."[241] Currently, supervisors rely on a conversation with the screening officer, often telephonic, to review a decision to issue an expedited removal order. The existence of video footage would allow a supervisor, who is required to review each expedited removal order regardless, to view the actual interaction leading to the expedited removal order himself.

In addition, BWCs can improve training by allowing supervisors to use recordings for "assessment, training, and disciplinary decisions."[242] Assistance with training in the CBP context is especially important. Up to thirty percent of border officials leave the job within the first year and a half, but Congress requires that the agency employ more than forty thousand agents and officers, creating a "constant pressure to train and deploy new agents."[243]

Improvements in efficiency will not only be seen at the border with CBP. Implementing BWCs would also lead to efficiencies for ICE Office of Chief Counsel trial attorneys and for our immigration courts. In the case of an alleged erroneously issued removal order, trial attorneys assigned to the case, classified as withholding-only, could readily review the videos of the secondary screening interview, determine whether a fear was in fact articulated, and, if so, exercise their discretion not to reinstate the prior removal order. This would save court time and attorneys' attempts to zealously advocate for their clients on this issue—time that is precious, given our extremely backlogged immigration court system.

The immigration system is desperately in need of efficiencies and reform. Currently, 855,807 cases are pending in the immigration

---

240.     David A. Harris, *Ensuring Fourth Amendment Compliance*, *supra* note 231, at 361.

241.     *Id.* at 363; *see also* Stoughton, *supra* note 224, at 1417 (discussing the parameters around when a supervisor should review an officer's BWC recordings).

242.     David A. Harris, *Ensuring Fourth Amendment Compliance*, *supra* note 231, at 364–65; *see also* Simmons, *supra* note 224, at 887 (discussing how body cameras can be a powerful training tool to correct structural problems within a police department); Mary D. Fan, *Democratizing Proof: Pooling Public and Police Body-Camera Videos*, 96 N.C. L. REV. 1639, 1654–55 (2018) [hereinafter "Fan, *Democratizing Policing*"] ("The crisis in public confidence [following Ferguson] also showed police chiefs the value of body cameras to supply evidence, rebuild trust, reduce unfounded complaints, and potentially exonerate officers.").

243.     BODY CAMERAS AND CBP, *supra* note 223, at 13 (citing H.R. 240, 114th Cong. (1st Sess. 2015)).

court backlog,[244] which will likely increase to over one million, given policies recently instituted by former Attorney General Sessions.[245] The cases already in the backlog take several years to resolve, and all expedited removal cases which receive a credible fear finding are referred to court, joining that long queue. Any reforms to this system to save on trial attorney and judge time should be welcome.

## B. Concerns Regarding the Use of Body-Worn Cameras

Despite the advantages, there are serious concerns regarding the use of BWCs at the border. These include: the protection of asylum seekers' privacy and, relatedly, the risks of stifling disclosure and increasing asylum seekers' fear; officer buy-in and the need to renegotiate union contracts with CBP; challenges regarding how much discretion to give officers with regards to when to use the device; the necessary reliance on the prosecutorial discretion of immigration agents, even with video evidence; and the financial cost of widespread use of BWCs at the border.

### 1. Privacy

One of the most frequently voiced concerns in the criminal context is whether the "possible benefit of these cameras could outweigh the substantial privacy concerns."[246] Indeed, in the criminal context, these are serious concerns, as scholar Mary Fan suggests, because through FOIA public disclosure requests intimate details and private moments can end up in the public sphere.[247] Other scholars

---

244. *Immigration Court Backlog Tool*, TRAC IMMIGRATION, *supra* note 105. For an in-depth discussion of the backlog, see Harris, *The One-Year Bar*, *supra* note 16, at 1204–08.

245. *See, e.g.*, Jason Boyd, *8000 New Ways the Trump Administration is Undermining Immigration Court Independence*, HILL (Aug. 19, 2018), http://thehill. com/opinion/immigration/402542-8000-new-ways-the-trump-administration-is-un dermining-immigration-court [https://perma.cc/4TNR-4A2S] (discussing decisions in 2018 issued by the Attorney General limiting an immigration judge's ability to manage her own docket, including administratively closing cases or granting motions to continue); *see also Immigration Court Backlog Surpasses One Million Cases*, TRAC IMMIGRATION, https://trac.syr.edu/immigration/reports/536/ [https:// perma.cc/U4Zj-DMRX] (explaining how the then–Attorney General's decision to reopen 330,211 previously administratively closed cases brought the total backlog to over one million cases).

246. Simmons, *supra* note 224, at 884; *see generally* I. B. Capers, *Race, Policing, and Technology*, 95 N.C. L. REV. 1241, 1244–45 (2017) (arguing that giving up some privacy is the price we must pay for reducing racialized policing).

247. Fan, *Policy Splits*, *supra* note 224, at 397.

suggest that the ownership and control of police body camera videos should be shifted to a neutral police accountability agency.[248]

Privacy concerns are of critical importance in the asylum context. The stakes may potentially be higher than many situations in the criminal context. If a persecutor, whether a governmental or non-governmental actor, obtained access to information disclosed regarding an asylum case, an asylum seeker's family, friends, or associates may be in danger. Further, an asylum seeker herself may face heightened danger if information revealed during her border screening is shared and she is returned to face her persecutors. Asylum seekers are often understandably anxious to begin with about disclosing information about their fear of persecution to anyone, let alone uniformed border agents.

However, current procedures for screening asylum seekers at the border do not prioritize privacy. USCIRF reported that between mid-2013 and February 2015, CBP agents had "virtually processed" more than one hundred thousand people in McAllen, Texas.[249] These individuals were assigned to CBP officers in other stations in Texas or California who completed the fear screening and I-867 form remotely through Skype technology and a bank of computers, not even separated by screens.[250] Private rooms for screening typically are not available in CBP processing facilities, although in one location that has new private rooms with acoustic padding for interviewing, a CBP supervising officer acknowledged to USCIRF that people have been more forthcoming about expressing their fear since the private rooms have been in place.[251] The reality is that in most places, the fear screening interviews lack privacy and so the addition of a video camera may not be as much of an impediment to disclosure, or at least would not be the only impediment.

Regarding the existence of a video or audio recording later down the line for an asylum seeker in the adjudication process, privacy protections already exist. The contents of asylum applications are not publicly available and hearings can be closed to the public upon the asylum seeker's request.[252] In this context, the BWC video recording of

248. Sacharoff & Lustbader, *supra* note 225, at 269, 270, 294–97.
249. 2016 USCIRF REPORT, *supra* note 75, at 24.
250. *Id.* at 24.
251. *Id.* at 26.
252. *See* IMMIGRATION COURT MANUAL, *supra* note 87, § 4.9(a)(i) (allowing asylum hearings to be closed to the public upon request and specifying that the immigration judge will expressly ask the asylum seeker whether they want the hearing to be closed); *see also* 8 C.F.R. § 208.6 (2018) (preventing disclosure of

a particular interaction between a border official and an asylum seeker would simply become part of the asylum seeker's Alien file, subject to the usual privacy exemptions under FOIA disclosure. Although the asylum seeker would not have "symmetrical" access to the video recording, as would be ideal,[253] she would have the same access to it as to the rest of her A-file through filing a FOIA request.

### 2. Stifling Disclosure and Increasing Fear in Asylum Seekers

Another serious concern in the criminal context, potentially heightened in the immigration context, is the fear that recording interactions may make individuals reluctant to speak with law enforcement officials.[254] Serious concerns exist with regards to privacy and confidentiality when interacting with survivors of torture and trauma.[255] Indeed, CBP's own field office manual recognizes that screening interviews should be conducted in "an area that affords sufficient privacy, whenever feasible."[256] Psychologist and trauma expert Stuart Lustig has explained the difficulties that already exist for trauma survivors seeking asylum when disclosing aspects of their trauma at border screenings and in border interviews in the credible fear context.[257]

In the criminal context, Professor Fan has suggested that concerns about reluctance of victims and domestic violence survivors to speak with police officers can be met by police officers affirmatively asking for permission to record.[258] In the immigration context, however, would it make sense to give CBP officers the power to ask

---

information "contained in or pertaining to any asylum application, records pertaining to any credible fear determination . . . without the written consent of the applicant").

    253.    Sacharoff & Lustbader, *supra* note 225, at 308–14 (arguing for timely access to video evidence for defendants in the criminal context).

    254.    David A. Harris, *Ensuring Fourth Amendment Compliance*, *supra* note 231, at 363, 367; *see also* Simmons, *supra* note 224, at 889.

    255.    In the author's immigration clinic at UDC Law and in her previous teaching at Georgetown Law, for example, student attorneys routinely ask asylum-seeking clients if they are comfortable recording interview sessions. This is to facilitate feedback and take some pressure off of student notetaking. Even in this non-adversarial setting, a very small minority of clients express hesitation or decline consent to record their interviews.

    256.    INSPECTOR'S FIELD MANUAL, *supra* note 63, at 17.15(b).

    257.    Declaration of Dr. Stuart L. Lustig, M.D., M.P.H., Expert on Trauma and Asylum Seekers ¶¶ 3–8 (2017) (on file with author).

    258.    Fan, *Policy Splits*, *supra* note 224, at 404, 437–43.

asylum seekers whether or not they wanted recording? Given the long and documented history of CBP abuses of the system in not accurately recording fear statements, the concern is that the officer could just claim an asylum seeker refused video recording to excuse the lack of a video.[259]

In this instance, despite the real concerns about silencing or frightening an already traumatized asylum seeker, the addition of an unobtrusive video camera, potentially affixed within the officer's badge, has the potential to do more good than harm.[260] If a body camera can document the fear and perhaps prevent an asylum seeker being unlawfully returned to potential death, this could be a life-saving technological innovation in the asylum context and would be worth the risk of a silencing effect—already a real concern given that CBP officers are usually armed and uniformed. Given the pre-existing systemic failures and the fact that silencing is a risk whether or not CBP officers wear BWCs, the decrease in erroneously issued expedited removal orders for asylum seekers who express fear most likely outweighs any potential increase in asylum seekers who fail to express fear.

### 3. Acceptance by Border Officials

One concern in the criminal context was officer "buy-in," i.e., would police officers accept the BWCs and use them as instructed? Over time, however, officer buy-in improves and police officers recognize cameras may enhance officer safety[261] and guard against illegitimate complaints.[262] As law enforcement agents, police officers

---

259.    *See also* Sacharoff & Lustbader, *supra* note 225, at 322 ("Studies have shown that the more discretion police have to stop filming, or to never start filming, the less that program deters misconduct.") (citations omitted).

260.    *But see* Bryce Clayton Newell et al., *Sensors, Cameras, and the New 'Normal' in Clandestine Migration: How Undocumented Migrants Experience Surveillance at the U.S.-Mexico Border*, 15 SURVEILLANCE & SOC'Y 21, 21, 34–37 (2017) (disclosing the findings from a qualitative empirical study of a small group of deported migrants in Mexico, only the minority of whom were asylum seekers, expressing some hesitance regarding the use of BWCs by CBP officers).

261.    David A. Harris, *Ensuring Fourth Amendment Compliance, supra* note 231, at 360; *see also* Simmons, *Police Accountability vs. Privacy*, *supra* note 224, at 886 (explaining that body mounted cameras may serve a deterrent effect and promote officer safety by holding officers accountable for their actions).

262.    Fan, *Policy Splits*, *supra* note 224, at 410; *see also* Bryce Clayton Newell & Ruben Greidanus, *Officer Discretion and the Choice to Record: Officer Attitudes Towards Body-Worn Camera Activation*, 96 N.C. L. REV. 1525, 1549–50 (2018) [hereinafter *Officer Discretion*] (examining police officer attitudes towards BWCs

have supported the use of BWCs.[263] There are concerns, however, that CBP agency culture is different.[264] In the CBP context, officer buy-in will be especially important given the strength of CBP's union and collective bargaining agreements that may consider BWCs a "change in working conditions" necessitating negotiations between the Border Protection union and the agency.[265] To ensure officer support for the initiative and due to the sheer size of the agency, BWC use should be piloted and phased in over time.[266]

### 4. Discretion for Border Officials Operating Body-Worn Cameras

Another challenge to address in implementing BWCs in the immigration context is when precisely the devices would be used. In the criminal context, rules vary on how much discretion to give officers regarding when to use BWCs.[267] In understanding how best to implement BWCs, CBP has a number of jurisdictions to draw on throughout the United States and could also look to the U.K., which has long implemented BWCs in its police force.[268]

---

based on a four-year study in two municipal police departments in the Pacific Northwest).

263.        David A. Harris, *Ensuring Fourth Amendment Compliance*, *supra* note 231, at 362–63.

264.        *See, e.g.*, Francisco Cantu, Opinion, *Cages are Cruel. The Desert is, Too*, N.Y. TIMES (June 30, 2018), https://www.nytimes.com/2018/06/30/opinion/sunday/cages-are-cruel-the-desert-is-too.html        [https://perma.cc/9X5B-LNMU] (recounting CBP officer's observations of cruel behavior by fellow agents who "refer to migrants as 'criminals,' 'aliens,' 'illegals,' 'bodies' or 'toncs' (possibly an acronym for 'temporarily out of native country' or 'territory of origin not known'—or a reference to the sound of a Maglite hitting a migrant's skull")); John Washington, *Why We Need a WhistleBlower in U.S. Customs and Border Protection*, NATION (Apr. 25, 2017), https://www.thenation.com/article/why-we-need-a-whistleblower-in-us-customs-and-border-protection/  [https://perma.cc/2G8U-L9EG]  (recounting CBP culture as one lacking transparency and embracing impunity for abuses).

265.        BODY CAMERAS AND CBP, *supra* note 223, at 19.

266.        *Id.* ("Because CBP is the largest law enforcement agency in the country, body-worn cameras may need to be phased in over a multiyear time frame; it would be difficult to train more than 40,000 agents and officers all at once.").

267.        *See* Fan, *Policy Splits*, *supra* note 224, at 412–19 (categorizing various states' approaches to disclosure into three groups: nondisclosure, filtered disclosure, and camera turn-off and turn-on legislation).

268.        *Id.* at 419–22. It appears that the U.K. has also used Body-Worn Cameras within Immigration Removal Centers. *See* NAT'L OFFENDER MGMT. SERVS., PRISON SERVICE INSTRUCTIONS, SECURITY MANAGEMENT: BODY WORN VIDEO CAMERAS (2017) https://www.justice.gov.uk/downloads/offenders/psipso/psi-2017/PSI-2017-04-Body-Worn-Video-Cameras.pdf [https://perma.cc/E3L8-39AT].

In the CBP context, BWCs should be used uniformly and without exception.[269] Further, the absence of a recording[270] should operate to create a presumption in favor of the intending immigrant. For example, in a situation where CBP lacked a recording of a screening interview with an immigrant like Cecilia, Cecilia's own account would be taken as the truth. She would be presumed to be an asylum seeker and her erroneously-issued expedited removal order should automatically be rescinded. While there may be valid reasons why a recording does not exist—technology can malfunction, for example[271]—given the high stakes for asylum seekers as outlined in Part I.C, guarding against abuse in the immigration context requires that the presumption in the absence of a recording should be in the asylum seeker's favor.[272]

It is entirely possible, however, that requiring video recordings could also lead to abuse of that process. Human Rights First details one instance where a Mexican asylum seeker was forced to recant her

---

269.    BODY CAMERAS AND CBP, *supra* note 223, at 17 ("CBP should have the clearest and strictest policy possible—one that at least requires body-worn cameras be on for all encounters with the public."); *see also* Officer Discretion, *supra* note 262, at 1528 ("Research suggests that strict (mandatory) activation policies may increase activation rates . . . .").

270.    In the criminal context, the absence of a recording could potentially give "rise to a presumption that the defendant's version of events should be accepted, absent (1) a compelling reason explaining the failure to record, and (2) a finding that the defendant's version of events could not be believed by a reasonable person." David A. Harris, *Ensuring Fourth Amendment Compliance*, *supra* note 231, at 365; Mary D. Fan, *Justice Visualized: Courts and the Body Camera Revolution*, 50 U.C. DAVIS L. REV. 897, 944 (2017) [hereinafter Fan, *Justice Visualized*] ("In jurisdictions that require video recording, where video is missing or part of an event is unrecorded, judges should inquire into the reasons for the gaps and omissions.").

271.    *See* Fan, *Democratizing Policing*, *supra* note 242, at 1661 (arguing that despite "legitimate reasons for not recording, such as the exigencies and stress of the moment, technological malfunction, inexperience, the transition to new technology and mandates, and other mistakes," there are "potentially problematic reasons for failure to record, such as refusal to comply with rules, concealment, or subversion").

272.    This is contrary to suggestions from scholars in the criminal context that "[c]ourts should accept reasonable explanations without penalty lest other departments considering adopting body cameras be deterred from voluntarily undertaking reform." Fan, *Justice Visualized*, *supra* note 270, at 956. In this context, there is only one department at the federal level who would be implementing BWCs, and, once implemented, the absence of footage should be taken seriously and should operate to benefit the asylum seeker.

fear of return on video.[273] This is why the presumption in favor of an asylum seeker in the absence of a recording is so important.

### 5. The Necessary Reliance on Immigration Officials Exercising Prosecutorial Discretion, Even With Video Evidence

One major concern with the implementation of BWCs at the border is whether—even if ICE trial attorneys and CBP agents and supervisors have video evidence of the screening interview with an asylum seeker—they will exercise discretion favorably. In Cecilia's case, if a video existed of her first interaction with a border official where she explained that she was fleeing for her life, would CBP have later rescinded that removal order? Or, would the ICE trial attorney have actually exercised his discretion in a positive way to preserve her asylum claim? These questions cannot be answered, but of course clear video evidence makes it more likely that an agency employee would admit the mistake and remedy the situation, correcting the injustice.

Ultimately, though, under current law there is no effective mechanism for correcting an unjustifiably issued expedited removal order, even if the errors are obvious and documented. This would require a change in the law and in the jurisdiction awarded to immigration judges, who currently have no authority to grant asylum where a removal order has been reinstated. This change in the law may be more likely to occur, however, if a repository of neutral evidence existed, such as recordings of individual screenings at the border. Such data could be combed to make the case for more comprehensive statutory or regulatory reform, which may include empowering immigration judges with the jurisdiction to determine whether a particular prior removal order should bar an individual from asylum protection.

### 6. Reliability of Video Evidence

Finally, video evidence is not perfect, and although there is the temptation to assume that a video presents a neutral account of what has transpired, the perspective and angle of the camera will actually lead to varying interpretations of what has occurred, as does the bias

---

273.    HRF, CROSSING THE LINE, *supra* note 6, at 12 (detailing CBP officer manipulation of the interview and the video recording).

with which an audience views a video.[274] This is clearly a concern in the criminal context as juries and judges try to understand what exactly transpired and who is at fault. In credible fear screenings, however, video evidence may be more straightforward. Given the way the statute and regulations are written, the screening interview is intended to function, as David Martin describes it, as a "beep test."[275] This means that if an immigrant indicates she has a fear of return or is seeking asylum, this triggers an automatic referral from CBP to USCIS for a fear interview. The video should reliably reveal whether or not such a fear was expressed and thus whether or not the CBP officer took the appropriate, lawfully-mandated action.

Particular populations are especially at risk in the expedited removal process. Indigenous or rare language speakers, for example, are disadvantaged. Those who do not speak common languages like Spanish are often unable to communicate with border officials.[276] In this instance, even a video of the interaction could be inadequate. However, recording the interaction that did occur, even when interpretation was wrong or missing, would surely be better than failing to have any record of the interaction at all.

### 7. Logistical and Financial Costs of Body-Worn Cameras at the Border

Implementing BWCs for CBP will come with costs and challenges. Because CBP operates across state borders and even within Indian reservations, it may have to contend with various state laws regarding privacy and consent to video recording.[277] Further, the data for secondary screening interviews will need to be stored for long periods of time. It may take months or even years for a wrongfully deported asylum seeker to re-enter the United States and pursue her claim for protection. Even if she is admitted the first time and needs

---

274.    Fan, *Justice Visualized*, *supra* note 270, at 947–53; *see also* Fan, *Democratizing Policing*, *supra* note 242, at 1658–64 ("Video is no magic bullet to end fierce conflicts in interpretation . . . ."); Stoughton, *supra* note 224, at 1405–13 (discussing the limits of human interpretation and cognitive bias).

275.    *See* Martin, *Expedited Removal*, *supra* note 108, at 68.

276.    This problem remains, even in immigration court. *See* Jennifer Medina, *Anyone Speak K'iche' or Mam? Immigration Courts Overwhelmed by Indigenous Languages*, N.Y. TIMES (Mar. 19, 2019), https://www.nytimes.com/2019/03/19/us/translators-border-wall-immigration.html [https://perma.cc/UB9B-HGXT] (explaining a shortage of interpreters, particularly for indigenous languages spoken in Guatemala, in the immigration court system).

277.    BODY CAMERAS AND CBP, *supra* note 223, at 14–16.

evidence involving her interaction with CBP, she will typically wait for several years for her case to be adjudicated in immigration court. As such, a FOIA request for the A-file containing the video recording may be submitted years after the original interaction with CBP.

The cost of implementing BWCs throughout CBP may be substantial. This may be mitigated, however, by the fact that CBP has also launched virtual processing en masse in certain locations, like McAllen, Texas. Where fear screenings are already being conducted by officers stationed in remote locations using video technology, it does not seem that simply recording those screening interview would add much or even any financial burden.[278] Further, CBP has not struggled in recent years with Congressional appropriations, currently having a budget of over sixteen billion dollars per year.[279] Further, it may be more politically feasible for Congress to vote to ensure that border officials follow existing law, rather than voting to change the law itself to improve the treatment of asylum seekers and migrants.

Ultimately, the implementation of BWCs is the most practical and politically feasible solution as a step to remedy the injustice perpetrated by the interplay of the expedited removal and reinstatement of removal processes.[280] It is, however, an imperfect solution that still relies on the exercise of discretion by a government official. Even with incontestable evidence that an asylum seeker articulated her fear in the first instance during a screening interview with a border agent, nothing in the law mandates that a trial attorney or border supervisory agent exercise their discretion to rescind the erroneously issued removal order.

Further, there will undoubtedly be instances where the asylum seeker, although genuinely afraid and with a legitimate claim, does fail

---

278. 2016 USCIRF REPORT, *supra* note 75, at 24 (detailing how CBP virtually processed 100,000 individuals in McAllen, Texas using video technology in less than 2 years).

279. U.S. DEP'T OF HOMELAND SEC., BUDGET-IN-BRIEF FISCAL YEAR 2018, at 11 (2018), https://www.dhs.gov/sites/default/files/publications/DHS%20FY18%20BIB%20Fin al.pdf [https://perma.cc/9VWU-TMZ8] (reporting that CBP's budget is around $16 billion, with an almost $3 billion increase between 2017 and 2018).

280. Instituting BWCs for CBP officers is a forward-looking solution—meaning that it will not benefit those asylum seekers who have already been unlawfully turned back by CBP officers and did not receive their credible fear interview the first time they articulated a fear. Indeed, there are thousands of erroneously issued expedited removal orders working their way through the courts. For these cases, advocates should continue to build the record and document the widespread abuse of the expedited removal system.

to articulate her fear in the first instance, and the existence of video footage capturing this may serve to further undermine her credibility and claim for even withholding protection. Even then, however, one advantage of the existence of video footage is that it could be used to show patterns of abuse and to highlight bad actors.

Finally, it is entirely possible that an individual who otherwise would have disclosed her fear during the screening process will be deterred from doing so because of the presence of a video camera or the knowledge that what she says is being recorded. In sum, however, given the current chaotic state of affairs at the border and the daily injustices within the expedited removal system, the careful and complete implementation of BWCs will likely save more lives than it will harm. Until more systemic reform is feasible, BWCs should be introduced and implemented at the border.

## CONCLUSION

Oversight and reform is needed now more than ever. Asylum seekers will not stop coming to our borders, even if we turn them away. Cecilia did not stop fighting to save her life when she was erroneously denied access to the asylum process in 2014 and sought help again the very next month, and again a year later.

Asylum seekers like Cecilia are not going to stop seeking protection in the United States, because they have nowhere else to go.[281] We must meet international and domestic obligations to protect them. This Article exposes the highly problematic interplay of expedited removal and reinstatement of removal. These two systems interact to create an almost always permanent barrier to meaningful protection for asylum seekers.

---

281.    *See* Drake & Gibson, *Vanishing Protection*, *supra* note 6, at 119 ("Essentially, people are trapped in a burning house, and the United States is hoping that locking the front door will discourage them from trying to escape the flames. Until the root humanitarian crises are addressed, forced migration will continue."). Indeed, despite the Trump Administration's targeted focus on vilifying and attempting to prevent asylum seekers from seeking protection in the United States, high numbers of women and children fleeing violence in Central America continue to arrive at the U.S. southern border. *See* Cristobal Ramón, *New Border Apprehensions Data Shows More Families and Children Arriving at the U.S. Border*, BIPARTISAN POLICY CTR. (Mar. 18, 2019), https://bipartisanpolicy.org/blog/new-border-apprehensions-data-shows-more-families-and-children-arriving-at-the-u-s-border/ [https://perma.cc/Y29N-VBK2].

For a mother like Cecilia who is permanently separated from her young son, withholding protection is not meaningful protection at all. While Cecilia can live and work in the United States and raise her daughter, she is not who Congress intended to be barred from asylum protection. The other bars to asylum protection, which render an individual eligible only for withholding, contemplate an individual's delay in filing for asylum or the fact that she may have already received protection in another country. Further, an immigration judge has no power to consider whether or not these factors should operate to bar an asylum seeker from the most meaningful form of protection. For Cecilia, the only difference between her and an individual granted asylum and able to fully integrate and pursue family reunification is that the officers she encountered at the border in 2014 failed to follow the law. They failed to properly screen her for asylum eligibility and issued two erroneous expedited removal orders that have forever changed the course of her life.

We can and must do better. Of the solutions proposed in this Article, the implementation of body-worn cameras for CBP officers interacting with individuals crossing the border is the most practical and politically feasible strategy while additional structural solutions are developed and litigation-based strategies play out. We must seize the opportunity to take advantage of technology, which was not contemplated in 1996 when the expedited removal system was created, but can be harnessed today to remedy some of the shortcomings of the system and increase protection for asylum seekers.

***