EXHIBIT B

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ekk-cec7
**Comments Due:** January 21, 2020
**Submission Type:** API

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0434
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Sabrineh Ardalan
**Address:**
    HIRC, Harvard Law School
    6 Everett Street, Suite 3106
    Cambridge,  MA,  02138
**Email:** sardalan@law.harvard.edu
**Phone:** 6173847504
**Fax:** 6174958595
**Organization:** Harvard Immigration and Refugee Clinical Program

---

## General Comment

The Harvard Immigration & Refugee Clinical Program (HIRC) writes to express our strong opposition to the above-referenced Proposed Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019.

HIRC is one of the oldest clinical programs in the country that focuses on the advancement of immigrants rights while teaching students important lawyering skills. HIRC includes two distinct clinics that represent individuals seeking asylum and other humanitarian protections, some of whom have criminal convictions. The flagship clinic of the program, the Immigration & Refugee Advocacy Clinic, represents clients seeking humanitarian protections in a range of different fora, including administrative tribunals and federal appellate courts. HIRCs second clinic, the Crimmigration Clinic, is the first and only clinic of its kind that focuses on the growing intersection of criminal law and immigration law. HIRC faculty and staff also teach a range of courses concerning immigration policy, refugees and trauma, the intersection of immigration law and labor law, and the intersection of criminal law and immigration law. They also regularly publish scholarship concerning asylum adjudication, due process protections in removal proceedings, working with traumatized refugees, crimmigration, and immigration detention.

HIRC has worked with hundreds of immigrants and refugees since its founding in 1984. HIRCs advocacy includes representation of individual applicants for asylum and related relief and the development of theories and policy relating to asylum law, crimmigration, and immigrants rights. HIRC has an interest in the proper

AR.09480

application and development of U.S. asylum law to ensure that the claims of individuals seeking asylum and related relief receive fair and proper consideration under standards consisted with U.S. law and treaties.

HIRC regards the Proposed Rules as especially problematic, because, if implemented, they would severely undermine the protections of the United States domestic asylum and international treaty obligations and of fundamental criminal procedures. Stated plainly, the Proposed Rules could jeopardize the lives and safety of countless refugees.

For the reasons detailed in the comments that are attached, the Department of Homeland Security (DHS) and the Department of Justice ("DOJ") should immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

Thank you for the opportunity to submit comments on the Proposed Rules. Please do not hesitate to contact us via email (hirc@law.harvard.edu) to provide further information.

Sincerely,

Harvard Immigration & Refugee Clinical Program

---

# Attachments

HIRC Comment to Asylum Bars Final

AR.09481



**6 Everett St., Suite 3103**
**Cambridge, MA 02138**
**hirc@law.harvard.edu**
**(617) 384-8165**

January 21, 2020

*Submitted via [https://www.regulations.gov/document?D=EOIR-2019-0005-0001]*

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

> Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-
> AA87, 1615-AC41; Comments in Opposition to Proposed Rulemaking: Procedures
> for Asylum and Bars to Asylum Eligibility

To Whom It May Concern:

The Harvard Immigration & Refugee Clinical Program ("HIRC") writes to express our strong opposition to the above-referenced Proposed Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019.

HIRC is one of the oldest clinical programs in the country that focuses on the advancement of immigrants' rights while teaching students important lawyering skills. HIRC includes two distinct clinics that represent individuals seeking asylum and other humanitarian protections, some of whom have criminal convictions. The flagship clinic of the program, the Immigration & Refugee Advocacy Clinic, represents clients seeking humanitarian protections in a range of different fora, including administrative tribunals and federal appellate courts. HIRC's second clinic, the Crimmigration Clinic, is the first and only clinic of its kind that focuses on the growing intersection of criminal law and immigration law. HIRC faculty and staff also teach a range of courses concerning immigration policy, refugees and trauma, the intersection of immigration law and labor law, and the intersection of criminal law and immigration law. They also regularly publish scholarship concerning asylum adjudication, due process protections in removal proceedings, working with traumatized refugees, crimmigration, and immigration detention.

AR.09482

HIRC has worked with hundreds of immigrants and refugees since its founding in 1984. HIRC's advocacy includes representation of individual applicants for asylum and related relief and the development of theories and policy relating to asylum law, crimmigration, and immigrants' rights. HIRC has an interest in the proper application and development of United States asylum law to ensure that the claims of individuals seeking asylum and related relief receive fair and proper consideration under standards consisted with U.S. law and treaties.

HIRC regards the Proposed Rules as especially problematic, because, if implemented, they would severely undermine the protections of the United States' domestic asylum and international treaty obligations and of fundamental criminal procedures. Stated plainly, the Proposed Rules could jeopardize the lives and safety of countless refugees.

For the reasons detailed in the comments that follow, the Department of Homeland Security ("DHS") and the Department of Justice ("DOJ") should immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

Thank you for the opportunity to submit comments on the Proposed Rules. Please do not hesitate to contact us via email (hirc@law.harvard.edu) to provide further information.

Sincerely,

Harvard Immigration & Refugee Clinical Program

AR.09483

**DETAILED COMMENTS in opposition to the Proposed Rules re: Procedures for Asylum and Bars to Asylum Eligibility, 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41**

## INTRODUCTION

On December 19, 2019, DHS and DOJ issued a joint set of Proposed Rules that would make three primary changes to the rules governing asylum adjudications. The first proposed set of changes adds the following seven *categorical* bars to asylum eligibility: (1) any conviction of a felony offense; (2) any conviction for "smuggling or harboring" under 8 U.S.C. § 1324(a), even if the asylum seeker committed the offense for the purpose of bringing her own spouse, child or parent to safety; (3) any conviction for illegal reentry under 8 U.S.C. § 1326; (4) any conviction for an offense "involving criminal street gangs," with the adjudicator empowered to look to any evidence to determine applicability; (5) any second conviction for an offense involving driving while intoxicated or impaired; (6) any conviction or accusation of conduct for acts of battery involving a domestic relationship; (7) and any conviction for several newly defined categories of misdemeanor offenses, including any drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits.

The second section of the Proposed Rules provides a multi-factor test for immigration adjudicators to determine whether a criminal conviction or sentence is valid for the purpose of determining asylum eligibility. The third section would unlawfully permit the executive branch to deny asylum to otherwise-qualifying refugees based on the adjudicator's independent moral calculus in direct contravention of U.S. obligations under the 1951 Convention Relating to the Status of Refugees ("Refugee Convention" or "Convention") and the 1967 U.N. Protocol Relating the Status of Refugees ("1967 Protocol"), which the U.S. ratified and incorporated into U.S. law.

The Proposed Rules constitute an unnecessary, harsh, and unlawful gutting of the asylum system enshrined in both U.S. and international law. HIRC submits these comments to express its opposition to the entirety of the Proposed Rules and its grave concerns about the Administration's continued efforts to exclude refugees from obtaining the protection required under U.S. and international law. We urge that the Proposed Rules be rescinded in their entirety.

I.   **The Proposed Rules exacerbate the United States' ongoing violations of its international treaty obligations.**

By acceding to the 1967 Protocol,[1] the United States bound itself to the protection imperatives guaranteed by the Refugee Convention.[2] In *INS v. Cardoza-Fonseca*, the Supreme Court recognized that Congress enacted the Refugee Act of 1980 in order "to bring United States

---

[1] United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268.

[2] 1951 Convention Relating to the Statute of Refugees, July 28, 1951, 140 U.N.T.S. 1954.

.

AR.09484

refugee law into conformance with the 1967 Protocol" and therefore the Refugee Convention.[3] U.S. refugee law thus directly incorporates international treaty obligations.[4] When interpreting the Immigration & Nationality Act of 1952 ("INA"), DOJ has cited legislative history that demonstrates Congress aimed to "give statutory meaning to our national commitment to human rights and humanitarian concerns" precisely by "enacting the Refugee Act of 1980," which purposefully embraced the Convention and Protocol's definition of "refugee."[5] In passing the Refugee Act, Congress sought to excise the ideological maneuvering that had characterized U.S. refugee determinations to that point.[6] As such, inconsistencies between U.S. law and its international obligations must be avoided.

Under Article 33 of the Refugee Convention, when someone meets the Convention's definition of a refugee, a state party is forbidden from returning the person "in any manner whatsoever to the" country where she fears persecution. The Convention permits of extremely narrow "exclusions" to this non-refoulement guarantee, with "great caution and only after a full assessment of the individual circumstances of the case," and specifies that "inclusion should generally be considered before exclusion."[7] The U.S.'s already expansive *per se* criminal bars violate the Convention's requirements,[8] and the Proposed Rules threaten to make this problem even worse.

Specifically, the Refugee Convention allows states to exclude and/or expel individuals from refugee protection if the individual "having been convicted by a final judgement of a particularly serious crime, constitutes a danger to the community of that country."[9] However, this clause is intended for "extreme cases," in which the particularly serious crime at issue is a "capital crime or a very grave punishable act."[10] The United Nations High Commissioner for

---

[3] *INS v. Cardoza-Fonseca*, 480 U.S. 421, 436–37 (1987)

[4] Deborah E. Anker, LAW OF ASYLUM IN THE UNITED STATES 22–23 (2019 ed.)

[5] *Matter of S-P-*, 21 I.&N. Dec. 486, 492 (BIA 1996) (quoting S. Rep. No. 256, 96th Cong., 2d Sess. 1, 4, reprinted in 1980 U.S.C.C.A.N. 141, 144); *see also* H.R. Rep. No. 96-781, at 1 (1980) (Conf. Rep.) (noting that the Refugee Act aimed to "establish a more uniform basis for the provision of assistance to refugees"); S. Rep. No. 96-590, at 1 (1980) (Conf. Rep.) (same).

[6] *See* Deborah Anker, *The Refugee Act of 1980: An Historical Perspective*, 5 IN DEFENSE OF THE ALIEN 77–78 (1982); *see also American Baptist Churches v. Thornburgh*, 760 F. Supp. 796, 799 (N.D. Cal. 1991) (stipulating that "foreign policy and border enforcement considerations are not relevant to the determination of whether an applicant for asylum has a well-founded fear of persecution."); Jimmy Carter, "Refugee Act of 1980 Statement on Signing S. 643 into Law" (Mar. 18, 1980) (stating that the "new admissions policy . . . will permit fair and equitable treatment of refugees in the United States, regardless of their country of origin"),
http://www.presidency.ucsb.edu/ws/?pid=33154 [https://perma.cc/ZY68- H7L7].

[7] UNHCR, *Guidelines On International Protection: Application of the Exclusion Clauses: Article 1F of the 1951 Convention relating to the Status of Refugees*, HCR/GIP/03/054 (Sept. 2003).

[8] *See* Harvard Immigration & Refugee Program, Crimmigration Clinic & Immigrant Defense Project, "'Particularly Serious Crime' Bars on Asylum and Withholding of Removal: Legal Standards and Sample Case Law Determinations" 1 (Sept. 2018), http://harvardimmigrationclinic.org/hirc/files/2018/09/IDP_Chart_v3_2-1.pdf.

[9] *See* United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] at art. 33(2).

[10] *See* Harvard Immigration & Refugee Program Crimmigration Clinic & Immigrant Defense Project, "'Particularly Serious Crime' Bars on Asylum and Withholding of Removal: Legal Standards and Sample Case Law Determinations" 1 (Sept. 2018), http://harvardimmigrationclinic.org/hirc/files/2018/09/IDP_Chart_v3_2-1.pdf; U.N. High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees* 2, U.N. Doc. HCR/IP/Eng/REV. ¶¶ 154–55 (1979, reissued 2019).

4

Refugees ("UNHCR") has explained that to constitute a "particularly serious crime," the crime "must belong to the gravest category" and be limited "to refugees who become an extremely serious threat to the country of asylum due to the severity of crimes perpetrated by them in the country of asylum."[11] Moreover, the UNHCR has emphasized that the particularly serious crime bar does not encompass less extreme crimes: "[c]rimes such as petty theft or the possession for personal use of illicit narcotic substances would not meet the threshold of seriousness."[12] Critically, when determining whether an individual should be barred from protection for having been convicted of a particularly serious crime, the adjudicator must conduct an individualized analysis and consider any mitigating factors.[13]

Thus, even under current statutes and regulations the bars to asylum based on allegations of criminal conduct are *already* overbroad in nature and scope.[14] Any conviction for an offense determined to be an "aggravated felony" is considered a *per se* "particularly serious crime" and therefore a mandatory bar to asylum.[15] "Aggravated felony" is a notoriously vague term, which exists only in immigration law. Originally limited to murder, weapons trafficking and drug trafficking,[16] it has metastasized to encompass thousands of offenses, many of them neither a felony nor aggravated, including petty offenses such as misdemeanor shoplifting, simple misdemeanor battery, or sale of counterfeit DVDs.[17]

The Proposed Rules represent an even greater departure from the Refugee Convention. Because of the categorical nature of the seven news bars proposed here, asylum seekers will be precluded from obtaining protection on the basis of a vast array of conduct. In the case of the domestic violence related ground, for example, the categorical bar will be imposed on the basis of *mere allegations* of conduct without any adjudication of guilt.[18]

Instead of working towards greater congruence with the terms of the Refugee Convention, in line with Congress's clear intention as recognized in *Cardoza-Fonseca*, the Proposed Rules violate both the language and spirit of the treaty. For example, at p. 69659, the Proposed Rules first exclude from protection anyone who was convicted of a felony and then at p. 69660, define "felony" as "any crime punishable by more than one of imprisonment" without any reference to other factors, including dangerousness. The Proposed Rules described the

---

[11] U.N. High Comm'r for Refugees (UNHCR), *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 7 (July 2007), http://www.unhcr.org/enus/576d237f7.pdf.

[12] *Id.* ¶ 10.

[13] *Id.* ¶¶10–11; U.N. High Commissioner for Refugees, *The Nationality, Immigration and Asylum Act 2002: UNHCR Comments on the Nationality, Immigration and Asylum Act 2002 (Specification of Particularly Serious Crimes) Order 2004*, 4 (2004).

[14] The existing categorical bars to asylum eligibility are discussed in detail on p. 69641 of the Proposed Rules.

[15] 8 U.S.C. §§ 1158(b)(2)(A)(ii) and (B)(i).

[16] Pub. L. No. 100-690, § 7342, 102 Stat. 4181, 4469–70.

[17] 8 U.S.C. § 1101(a)(43). *See also* Nancy Morawetz, *Understanding the Impact of the 1996 Deportation Laws and the Limited Scope of Proposed Reforms*, 113 HARVARD L. REV. 1939–40 (2000) (criticizing the "'Alice-in-Wonderland-like definition of the term 'aggravated felony'"); Melissa Cook, *Banished for Minor Crimes: The Aggravated Felony Provisions of the Immigration and Nationality Act as a Human Rights Violation*, BOSTON COLLEGE THIRD WORLD L. J. 293 (2003).

[18] The Proposed Rules at p. 69651 explain that the regulations will "render ineligible [non-citizens] who engaged in acts of battery and extreme cruelty in a domestic context in the United States, regardless of whether such conduct resulted in a criminal conviction."

AR.09486

increased categorization of the particularly serious crime bar as necessary because the case-by-case adjudication previously used for non-aggravated felony offenses was "inefficient."[19] But an individualized analysis is exactly what the Convention requires to ensure only those individuals who have been convicted of crimes that are truly serious and therefore present a future danger are placed at risk of refoulement.

Additionally, outside of the aggravated felony context, the Board of Immigration Appeals ("BIA" or "Board") and the Courts of Appeals have repeatedly found that low-level, "run-of-the-mill" offenses do not constitute particularly serious crimes.[20] Under this long-standing interpretation of the particularly serious crime bar in the INA, there is simply no scenario in which low-level offenses like misdemeanor driving under the influence where no injury is caused to another or simple possession of a controlled substance or paraphernalia would constitute a particularly serious crime. The reason for this is common sense. As Judge Reinhardt explained in his concurring opinion in *Delgado v. Holder*,[21] a decision the Proposed Rules cite in support of the expanded bars, run-of-the-mill crimes like driving under the influence have "little in common" with other crimes the BIA has deemed particularly serious—e.g., felony menacing with a deadly weapon, armed robbery, and burglary of a dwelling in which the offender is armed or causes injury.[22] The BIA has cautioned that, "in light of the unusually harsh consequences which may befall a [noncitizen] who has established a well-founded fear of persecution; the danger of persecution should generally outweigh all but the most egregious of adverse factors."[23]

The expansion of the asylum bar to include individuals who have been convicted of reentering the United States without inspection pursuant to INA § 276[24] is also unlike any of the other bars previously recognized by the BIA or the circuit courts. It is an offense with no element of danger or violence to others, and has no victim. Most significantly, and more so than other bars contained in the Proposed Rules, barring asylum based on the manner of entry directly violates the Convention's Article 31 prohibition on imposing penalties based on a refugee's manner of entry or presence in the country.[25] This prohibition is a critical part of the Convention because it recognizes that refugees often have little control over the place and manner in which they enter the country where they are seeking refuge.

The existing crime bars should thus be narrowed, not expanded. Further categorical bars are in direct contravention of U.S. obligations under both domestic and international law to safeguard refugees from return to persecution. The agencies' efforts to add *seven* new sweeping categories of barred conduct to the asylum eligibility criteria drains the phrase "*particularly serious* crime," 8 U.S.C. § 1158 (emphasis added), of any sensible meaning.

---

[19] Proposed Rules at 69646.
[20] *Delgado v. Holder*, 648 F.3d 1095, 1110 (9th Cir. 2011) (en banc) (J. Reinhardt, concurring).
[21] 648 F.3d at 1110 (J. Reinhardt, concurring).
[22] *Id*. at 1110.
[23] *Matter of Pula*, 19 I.&N. Dec. 467, 474 (BIA 1987).
[24] Proposed Rules at 69659, 69660.
[25] Refugee Convention, *supra*, art 31.

6

AR.09487

## II.   The Proposed Rules cruelly disregard the effects of trauma on asylum seekers and will have disparate impact on vulnerable asylum seekers.

The harsh nature of the Proposed Rules is especially evident when viewed through a trauma-informed lens, as the categorical character of the Proposed Rules precludes asylum adjudicators from conducting a trauma-centered approach. Asylum seekers are an inherently vulnerable population because of the trauma they have often experienced in their countries of origin as well as along the journey to find safety.[26] Existing literature suggests that at least one out of every three asylum seekers struggles with depression, anxiety, and/or post-traumatic stress disorder ("PTSD").[27] One recent study found the mental health problems facing refugees and asylum seekers so acute that more than a third of the study's sample admitted having suicidal thoughts in the preceding two weeks.[28]

Studies also consistently reveal a high prevalence of comorbidity of PTSD and substance use disorders, with individuals with PTSD *up to 14 times more likely* to struggle with a substance use disorder.[29] Asylum seekers in the United States are often unable to access affordable medical care and treatments for complex trauma.[30] Some, like a HIRC attorney's prior client who had been kidnapped and forced to take cocaine and other addictive substances by a rebel group recruiting child soldiers or a HIRC client who was tortured for more than a year as a child, turn to drugs and alcohol in an effort to self-medicate.[31]

The proposed new bars to asylum include *any* drug-related conviction (with one exception for a first minor marijuana possessory offense) and any second conviction for driving under the influence. Particularly given the vulnerabilities of asylum seeking populations, prior struggles with addiction should be addressed with treatment and compassion, not a closed door and deportation order. To fairly decide asylum applications of this nature, an adjudicator has to take into account the applicant's history, the underlying cause of the criminal record, and the

---

[26] *See, e.g.*, Sabrineh Ardalan, *Access to Justice for Asylum Seekers: Developing an Effective Model of Holistic Asylum Representation*, 48 UNIV. MICH. J. OF LAW REF. 1001, 1020–23 (2015) (discussing examples of the challenges the asylum adjudication system foists upon trauma survivors); Sabrineh Ardalan, *Constructive or Counterproductive? Benefits and Challenges of Integrating Mental Health Professionals into Asylum Representation*, 30 GEORGETOWN IMMIGR. L.J. 1, 11–16 (2015) (same).

[27] Giulia Turrini et al., *Common mental disorders in asylum seekers and refugees: umbrella review of prevalence and intervention studies*, 11 INTERNATIONAL JOURNAL OF MENTAL HEALTH SYSTEMS 51 (August 2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5571637/.

[28] Megan Brooks, "Refugees have high burden of mental health problems," *Psychiatry and Behavioral Health Learning Network*, June 2019, https://www.psychcongress.com/article/refugees-have-high-burden-mental-health-problems.

[29] Jenna L. McCauley et al., "Posttraumatic Stress Disorder and Co-Occurring Substance Use Disorders: Advances in Assessment and Treatment," *Clinical Psychology Science and Practice* 19, 3 (October 2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3811127/.

[30] For more information on immigrant eligibility for federal benefits, *see* https://www.nilc.org/issues/health-care/.

[31] Carrier Clinic, *Trauma and Addiction* (2019), https://carrierclinic.org/2019/08/06/trauma-and-addiction/ ("[S]ome people struggling to manage the effects of trauma in their lives may turn to drugs and alcohol to self-medicate. PTSD symptoms like agitation, hypersensitivity to loud noises or sudden movements, depression, social withdrawal and insomnia may seem more manageable through the use of sedating or stimulating drugs depending on the symptom. However, addiction soon becomes yet another problem in the trauma survivor's life. Before long, the 'cure' no longer works and causes far more pain to an already suffering person.").

AR.09488

efforts towards rehabilitation. Unfortunately, the proposed rule eliminates all of these considerations by creating a de facto bar for the trauma survivor to be granted the precise protection needed to overcome the substance abuse disorder.

A case-by-case approach is not only justified but necessary to disentangle *possibly or even allegedly* criminal behavior from conduct fueled by trauma-related mental health disorders. When evaluating whether a criminal offense should bar a grant of asylum, it is critical for an adjudicator to take into account whether the criminal offense was related in some way to the past persecution suffered.

Take for example, Carl,[32] a young man and the son of a political dissident in a war-torn nation, who had been kidnapped and tortured by government security forces. This persecution caused him brain damage and further left him with significant depression and PTSD. Just a few years after his harrowing experience at the hands of state authorities, Carl was confronted and questioned by U.S. police officers following an argument at a waterpark. Carl misidentified himself and indicated that a friend's ID that he had been temporarily holding on to was his own. Carl was a prototypical refugee under the Refugee Act and Convention—but the Proposed Rules' categorical "documentation" bar, if then applied, could have jeopardized his protection without any consideration of the individualized harms he had suffered at the hands of his country's government.

Allowing adjudicators to consider even allegations of domestic violence in full context can be critical to protecting the wellbeing of entire refugee families. For example, HIRC represented a Central American woman named Isabel, who fled to the United States after suffering a decade of brutal violence, including rape and armed death threats by an abuser who after her flight continued to terrorize her young son and other close family members. In the United States, Isabel continued to suffer from severe clinical PTSD and depression and experienced suicidal ideations. She also slowly built a life with, and then married, another immigrant named Juan, who provided her and their children with emotional as well as financial support. Amidst an argument with Juan, Isabel began to have flashbacks to her abuser and called the police—who took Juan into custody. During his detention by the police and subsequently by ICE, Isabel—who had included Juan in her asylum application—did everything in her power to have him released. Indeed, Isabel's psychologist documented that Juan's detention caused her ongoing psychological harms to take a turn for the worse, and likewise the children's pediatrician testified his absence was damaging their wellbeing. Juan was ultimately granted derivative asylum through Isabel—but under the Proposed Rules, it may have been denied. His ineligibility (and their subsequent family separation) would have also greatly harmed Isabel and their young U.S. citizen children.

In addition, the Proposed Rules pose a unique threat to LGBTQ immigrants, many of whom are trauma survivors who have experienced a high degree of violence in their home countries.[33] LGBTQ immigrants often experience isolation following migration, and this

---

[32] The clients described throughout this comment are composites, based on the experiences of various HIRC clients, with names and identifying details altered to protect confidentiality.

[33] *See* Aengus Carroll and Lucas Ramon Mendos, *State Sponsored Homophobia: A World Survey of Sexual Orientation Laws: Criminalisation, Protection and Recognition* (International Lesbian, Gay, Bisexual, Transgender,

AR.09489

isolation frequently leaves them vulnerable to trafficking, domestic violence, and substance abuse. Discriminatory policing practices, along with the expansion of criminal enforcement and prosecution also disproportionately harm LGBTQ immigrants.[34] The Proposed Rules will therefore likely have a disparate impact on trauma survivors, including LGBTQ immigrants, whose involvement in the criminal legal system is often connected to their past trauma and/or the result of biased policing.

The expansion of the criminal bars to asylum to include offenses related to harboring and smuggling of noncitizens by parents and family members further criminalizes vulnerable populations fleeing persecution.[35] The Proposed Rules expand the asylum bar to parents or other caregivers who are convicted of smuggling or harboring offenses after taking steps to help minor children enter the United States in order to flee persecution. This proposed bar is particularly insidious in light of this administration's explicit efforts to utilize smuggling prosecutions against parents and caregivers as part of its strategy of deterring families from seeking asylum in the United States.[36] The Proposed Rules seek to take this widely condemned strategy one step further, by additionally barring those parents *already prosecuted* from obtaining asylum protections for themselves and their children.

The Proposed Rules also expand the asylum bar to those who have fled persecution multiple times and therefore been convicted of illegal reentry. It does so based on conclusory statements regarding the dangerousness of recidivist offenders, without consideration of the seriousness of prior convictions.[37] Rather, the Proposed Rules treat all immigration violations as similar in seriousness to those previously warranting inclusion in the particularly serious crime bar, without any independent evidence to justify the expansion of the bar. Such an approach renders meaningless the limiting language of "particularly serious" in the statute and places vulnerable refugees at risk.

III.    **Those precluded from asylum eligibility will be gravely harmed even if granted withholding of removal or protection under the Convention Against Torture.**

Throughout the Proposed Rules, the agencies defend the harsh and broad nature of their proposal by pointing to the availability of alternative forms of relief for those precluded from

---

and Intersex Association, 12th ed. 2017),
https://ilga.org/downloads/2017/ILGA_State_Sponsored_Homophobia_2017_WEB.pdf.
[34] *See, e.g.*, Sharita Gruberg, "How Police Entanglement with Immigration Enforcement Puts LGBTQ Lives at Risk," *Center for American Progress*, Apr. 12, 2017, https://www.americanprogress.org/issues/lgbtq-rights/reports/2017/04/12/430325/police-entanglement-immigration-enforcement-puts-lgbtq-lives-risk/.
[35] On April 11, 2017, then-Attorney General Sessions instructed all federal prosecutors to increase their prioritization of immigration offenses for prosecution, including misdemeanor offenses committed by first time entrants. *See* Memorandum from the Attorney General: Renewed Commitment to Criminal Immigration Enforcement (Apr. 11, 2017), https://www.justice.gov/opa/press-release/file/956841/download.
[36] Ryan Devereaux, "Documents Detail ICE Campaign to Prosecute Migrant Parents as Smugglers," *The Intercept*, Apr. 29, 2019, https://theintercept.com/2019/04/29/ice-documents-prosecute-migrant-parents-smugglers/ (describing how in May 2017, the Department of Homeland Security set out to target parents and family members of unaccompanied minors for prosecution).
[37] Proposed Rules at 69648.

AR.09490

asylum.[38] The existence of these lesser forms of relief—known as withholding of removal and protection under the Convention Against Torture ("CAT")—do not nullify the harm created by the Proposed Rules' new limits on asylum. The protections afforded by CAT and by statutory withholding of removal are limited in scope and duration, and they are harder to obtain. As a result, a rule that limits *bona fide* refugees to withholding of removal and CAT protection would impose a very real harm on individuals who have come to the United States in search of protection.

First, the most serious harm that can befall an individual as a result of these Proposed Rules is removal to persecution and torture. CAT and withholding protections demand a higher level of proof than asylum claims: a clear probability of persecution or torture.[39] Thus, an individual could have a valid asylum claim but be unable to meet the standard for these other forms of relief and therefore be removed to a country in which she has a well-founded fear of persecution.

Even for those who meet the higher standard, withholding and CAT recipients are still subject to significant prejudice. For example, withholding and CAT recipients may face permanent separation from their spouses and children. These individuals have no recourse to reunite with their families. Only asylees and refugees are eligible to petition for a spouse and children to join them as derivatives.[40] For many, this will mean that the Proposed Rules institute yet another formal policy of family separation.

Withholding recipients likewise face hurdles in access to employment. Article 17 of the Refugee Convention states that a contracting state "shall accord to refugees lawfully staying in their territory the most favorable treatment accorded to nationals of a foreign country in the same circumstances, as regards the right to wage-earning employment." Yet recipients of withholding face frequent delays in and obstacles to the adjudication of their applications for work authorization.[41]

Most fundamentally, withholding and CAT recipients face ongoing risks of removal and live in a limbo that does not exist for asylum recipients. When a noncitizen is granted asylum, the person receives a legal status that provides a path to permanent residency and citizenship.[42] Asylum, once granted, protects an asylee against removal unless and until that status is

---

[38] *See, e.g.*, Proposed Rules at 69644.

[39] Withholding of removal requires the petitioner to demonstrate his or her "life or freedom would be threatened in that country because of the petitioner's race, religion, nationality, membership in a particular social group, or political opinion." *INS v. Stevic*, 467 U.S. 407, 411 (1984) (quoting 8 U.S.C. § 1231(b)(3)). Unlike asylum, however, the petitioner must show a "clear probability" of the threat to life or freedom if deported to his or her country of nationality. The clear probability standard is more stringent than the well-founded fear standard for asylum. *Id; see also Cardoza-Fonseca*, 480 U.S. at 431 (describing the difference between a well-founded fear of persecution and a clear probability of persecution). For CAT relief, an applicant must show it is more likely than not that he or she will be tortured or killed by or at the government's acquiescence if removed to the home country. 8 C.F.R. § 1208.16(c)(2).

[40] 8 C.F.R. § 208.21(a).

[41] 8 C.F.R. § 274a.12(a)(10); *Northwest Immigrant Rights Project, et al. v. USCIS, et al.*, No. 2:15-cv-00813-JLR (W.D. Wash., filed May 22, 2015) (class action regarding delays in adjudication of work authorization).

[42] *See, e.g.*, 8 C.F.R. 245.1(d)(1) (defining "lawful immigration status" to include asylees).

AR.09491

revoked.[43] None of these protections exists for withholding and CAT recipients. They have no access to permanent residency or citizenship.[44] Instead, they are subject to a removal order and vulnerable to the permanent prospect of deportation to a third country and subject to potential check ins with immigration officials, who can pursue removal to third countries to which the withholding and CAT recipients have no connection.[45]

## IV.    The Proposed Rules will undermine adjudications, violate due process, and result in racially-biased decision-making.

The Proposed Rules require immigration adjudicators to engage in decision-making to determine whether an asylum applicant's conduct—considered independently of any criminal court adjudication—triggers a categorical bar to asylum eligibility. First, the agencies propose that immigration adjudicators are allowed to consider "all reliable evidence" to determine whether there is "reason to believe" an offense was "committed for or related to criminal gang evidence," or "in furtherance of gang-related activity, triggering ineligibility for asylum in either case.[46] Second, the Proposed Rules permit immigration adjudicators to "assess all reliable evidence in order to determine whether [a] conviction amounts to a domestic violence offense;" and to go even further by considering whether non-adjudicated *conduct* "amounts to a covered act of battery or extreme cruelty."[47]

The Proposed Rules repeatedly cite increased efficiency as justification for many of the proposed changes.[48] Yet requiring adjudicators to engage in mini-trials into issues already adjudicated by the criminal law system based on evidence that may not have been properly tested for its veracity in the criminal process. Such mini-trials will dramatically *decrease* efficiency in the asylum adjudication process. Moreover, the Proposed Rules invite reliance on any type of evidence, including police reports with unsubstantiated or subsequently recanted hearsay statements. However, police reports are inherently unreliable in the absence of the protection of the Confrontation Clause of the Sixth Amendment and Federal Rules of Evidence, neither of which apply in immigration court.[49] For example, in the context of an alleged incident of domestic violence, neither police officers nor alleged victims are required to submit to cross examination in immigration proceedings. The Proposed Rules thus create a categorical bar ("*shall* be found ineligible for asylum") based on evidence, the reliability of which has not been tested, or which has been tested and has not been credited by a judicial court. In doing so, the proposed rule violates basic notions of fairness and due process.

---

[43] *See* 8 U.S.C. § 1158(c)(1)(A).
[44] *Matter of Lam*, 18 I.&N. Dec. 15, 18 (BIA 1981); 8 C.F.R. § 245.1(d)(1) (explaining that only those in "lawful immigration status" can seek permanent residency and excluding withholding recipients from such status); 8 C.F.R. § 209.2(a)(1) (authorizing adjustment of status to permanent residence for asylees); 8 C.F.R. § 316.2 (naturalization available only to permanent residents).
[45] *See R-S-C- v. Sessions*, 869 F.3d 1176, 1180 (10th Cir. 2017).
[46] *See* Proposed Rules at 69649.
[47] *See* Proposed Rules at 69652.
[48] *See* Proposed Rules at 69646, 69656-58.
[49] Mary Holper, *Confronting Cops in Immigration Court*, 23 WM. & MARY BILL RTS. J. 675 (2015), https://scholarship.law.wm.edu/cgi/viewcontent.cgi?article=1730&context=wmborj.

AR.09492

Particularly in the context of the new proposed bar related to alleged gang affiliation, HIRC is concerned that creating a blanket exclusion for anyone who is convicted of a crime—including a misdemeanor—that an immigration adjudicator deems linked to gang activity will erroneously prevent bona fide asylum seekers from receiving protection. Past legislative efforts to expand the grounds of removal and inadmissibility in the INA to include gang membership have failed to pass both houses of Congress.[50] Scores of alleged gang members have already been deported on grounds related to immigration violations or criminal convictions for which no relief is available.[51] Creating a "gang-related crime" bar will only exacerbate the due process violations already occurring as the result of unsubstantiated information about supposed gang ties.[52] It would also result in the unfair targeting of young men of color because gang databases are notoriously infected by racial bias.[53]

The Proposed Rule confers on immigration adjudicators—who generally are not criminologists, sociologists, or criminal law experts—the responsibility to determine if there is "reason to believe" any conviction flows from activity taken in furtherance of gang activity. This rule will necessarily ensnare asylum seekers of color who have experienced racial profiling and a criminal legal system fraught with structural challenges and incentives to plead guilty to some crimes, particularly misdemeanors. These same individuals are vulnerable to being erroneously entered into gang databases. Such databases are notoriously inaccurate, outdated, and infected by racial bias.[54]

Empowering immigration adjudicators to render asylum applicants *categorically* excluded from protection on the basis of such spurious allegations will inevitably result in the

---

[50] *See* Jennifer Chacon, *Whose Community Shield?: Examining the Removal of the 'Criminal Street Gang Member*,' UNIV. OF CHICAGO LEGAL FORUM 317, 333-36 (2007) (reviewing legislative history of failed efforts to expand removability of those accused of gang related offenses and noting criticism that "[t]he only legal effect of the proposed legislation would be to increase the number of noncitizens lawfully present who would be subject to removal on the basis of their purported associations with individuals involved in group criminal activity.").

[51] For an illustration of Immigration and Customs Enforcement's propensity to make gang allegations on the basis of questionable if not fabricated evidence, and the deference to which the evidence is often granted by immigration adjudicators, *see* Mark Joseph Stern, "Bad Liars," *Slate*, May 16, 2018, https://slate.com/news-and-politics/2018/05/federal-judge-accused-ice-of-making-up-evidence-to-prove-that-dreamer-was-gang-affiliated.html.

[52] *See* Yvette Cabrera, "New ICE Tactic Raises Questions About Due Process," *ThinkProgress*, Oct. 6, 2017, https://thinkprogress.org/ice-targets-gangs-6775356473a8/; Rebecca Hufstader, *Immigration Reliance On Gang Databases: Unchecked Discretion And Undesirable Consequences*, 90 NEW YORK UNIVERSITY LAW REV. 671 (2015).

[53] Annie Sweeney and Madeline Buckley, "Chicago police gang data collection faulted by city's inspector general as unreliable," *Chicago Tribune*, Apr. 11, 2019, https://www.chicagotribune.com/news/breaking/ct-met-chicago-police-gang-data-04112019-story.html; Anita Chabria, "A routine police stop landed him on California's gang database. Is it racial profiling?," *Los Angeles Times*, May 9, 2019, https://www.latimes.com/politics/la-pol-ca-california-gang-database-calgang-criminal-justice-reform-20190509-story.html.

[54] Annie Sweeney and Madeline Buckley, "Chicago police gang data collection faulted by city's inspector general as unreliable," *Chicago Tribune*, Apr. 11, 2019, https://www.chicagotribune.com/news/breaking/ct-met-chicago-police-gang-data-04112019-story.html; Anita Chabria, "A routine police stop landed him on California's gang database. Is it racial profiling?," *Los Angeles Times*, May 9, 2019, https://www.latimes.com/politics/la-pol-ca-california-gang-database-calgang-criminal-justice-reform-20190509-story.html.

AR.09493

return of many refugees to persecution,[55] yet the Proposed Rule encourages immigration adjudicators to rely on evidence from fusion centers and "gang databases" that judicial courts have rejected wholesale as unreliable. For example, in *Commonwealth v. Wardsworth*, the Supreme Judicial Court of Massachusetts vacated convictions for first degree murder, armed assault with intent to murder, and firearm offenses, and remanded for a new trial in part due to the introduction of an expert opinion regarding gang-affiliation that was based on information from the Boston Regional Intelligence Center "gang database."[56] The Court concluded that, to the extent the database contains opinions about which individuals are gang members, these are hearsay, are not independently admissible, and raised serious Confrontation Clause concerns.[57] The Court went further to warn that the fact that "the defendant was observed in the presence of a suspected or actual gang member, even on more than one occasion, does not suffice to support the conclusion that the defendant was, himself, a member of a gang," and that no meaningful information could be gleaned from the fact that shootings had occurred in the defendant's neighborhood.[58]

Unsurprisingly, the expansion of gang databases for use in the apprehension and removal of foreign nationals—including children—has generated tremendous concern among advocates and the communities they serve.[59] The use of gang databases by local law enforcement and DHS has been widely criticized as an overbroad, unreliable and often biased measure of gang membership and involvement.[60] For example, HIRC represents a twenty-year-old young man who has been held in immigration custody for nearly two years on nothing more than unreliable gang affiliation allegations. The young man fled his home country as a child to seek refuge from targeted gang recruitment and persecution. He has no criminal record, yet he has been denied the ability to get out of detention.

## V.  The proposed definition of "conviction" and "sentence" for the purposes of the new bars further excludes those in need of protection.

The section of the Proposed Rules that outlines a new set of criteria for determining whether a conviction or sentence is valid for the purpose of determining asylum eligibility is an *ultra vires* exercise of authority that is not authorized by the INA or the Constitution. The Proposed Rules impose an unlawful presumption against asylum eligibility for applicants who

[55] Melissa del Bosque, "Immigration Officials Use Secretive Gang Databases to Deny Migrant Asylum Claims," *Pro Publica*, July 8, 2019, https://www.propublica.org/article/immigration-officials-use-secretive-gang-databases-to-deny-migrant-asylum-claims.
[56] 482 Mass. 454, 470 (2019).
[57] *Commonwealth v. Wardsworth*, 482 Mass. 454, 468 and n. 27 (2019).
[58] *Id.* at 469; *see also Commonwealth v. Wolcott*, 28 Mass. App. Ct. 200, 208 (1990) (opinion that defendant was member of gang constituted "unacceptable conjecture" where membership "was supported by little more than [the defendant's] use of a street name and his association with [a member of the gang]").
[59] *See* Nermeen Arastu, et al., "Swept Up In The Sweep: The Impact of Gang Allegations on Immigrant New Yorkers," *New York Immigration Coalition (NYIC) and CUNY School of Law's Immigrant and Non-citizen Rights Clinic*, May 2018, https://www.law.cuny.edu/wp-content/uploads/page-assets/academics/clinics/immigration/SweptUp_Report_Final-1.pdf.
[60] Ali Winston, "Marked for Life: U.S. Government Using Gang Databases to Deport Undocumented Immigrants," *The Intercept*, Aug. 11, 2016, https://theintercept.com/2016/08/11/u-s-government-using-gang-databases-to-deport-undocumented-immigrants/.

AR.09494

seek post-conviction relief while in removal proceedings or longer than one year after their initial convictions.

The Proposed Rules outline a new multi-factor process asylum adjudicators must use to determine whether a conviction or sentence remains valid for the purpose of determining asylum eligibility; the proposal includes a rebuttable presumption "against the effectiveness" of an order vacating, expunging, or modifying a conviction or sentence if the order was entered into after the asylum seeker was placed in removal proceedings or if the asylum seeker moved for the order more than one year after the date the original conviction or sentence was entered.[61]

This newly created presumption unfairly penalizes asylum applicants, many of whom may not have the opportunity to seek review of their prior criminal proceedings until applying for asylum.[62] In *Padilla v. Kentucky*, the Supreme Court recognized that the immigration consequences of a conviction are sufficiently serious for the Sixth Amendment to require a noncitizen defendant to be competently advised of them before agreeing to a guilty plea.[63] By imposing a presumption against the validity of a withdrawal or vacatur of a plea, the Proposed Rules hold asylum seekers whose rights were violated under *Padilla* to a different standard; even though they too were denied effective assistance of counsel in the course of their underlying criminal proceedings, asylum seekers will be forced to rebut a presumption that their court-ordered withdrawal or vacatur is invalid. The Proposed Rules therefore compound the harm to immigrants who, in addition to facing persecution in their home countries, have been denied constitutionally compliant process in the United States criminal legal system.

Many asylum applicants, especially those isolated from resources and unfamiliar with the due process protections available to them in the United States, may not have discovered the defects in their underlying criminal proceedings until their consultation with an immigration attorney, or until they are placed into removal proceedings, which may happen several years after a conviction. Imposing a presumption *against* the validity of a plea withdrawal or vacatur in these cases will undoubtedly lead to the wrongful exclusion of countless immigrants from asylum simply because they were unable to adequately rebut the presumption, particularly in a complex immigration court setting without the benefit of appointed counsel.

Furthermore, the Proposed Rule undermines the authority of a state or federal criminal tribunal to ensure that convictions are constitutionally sound. An immigration adjudicator cannot overlook a substantive or procedural constitutional deficiency that has been corrected by a post-conviction court. To do so would violate the principles of federalism upon which our system of dual sovereignty is based.[64]

---

[61] Proposed Rules at 69655.
[62] On page 69656 of the Proposed Rules, DHS and DOJ urge that "[i]t is reasonable to conclude that an alien who has a meritorious challenge to a criminal conviction based on a procedural or substantive defect is more likely to seek post-conviction relief sooner than an alien who is seeking relief on rehabilitative grounds…"
[63] *Padilla v. Kentucky*, 559 U.S. 356 (2010).
[64] *See* Philip L. Torrey, *Principles of Federalism and Convictions for Immigration Purposes*, 36 IMMIGR. & NAT'L L. REV. 3, 41–44 (2016).

14

## VI.   The Proposed Rules are *ultra vires* to the federal immigration statute to the extent they purport to bar eligibility through a categorical exercise of discretion.

When Congress speaks clearly through a statute, the plain meaning of that statute governs.[65] Congress by statute permits the Attorney General to designate certain categories of offenses as "particularly serious crimes."[66] As such, Congress *explicitly* permitted the Attorney General to designate a non-aggravated felony to be a particularly serious crime and thus to disqualify a person from asylum. In the context of asylum, all aggravated felonies are *per se* particularly serious crimes and the Attorney General "may designate by regulation [other] offenses that will be considered to be" a particularly serious crime for purposes of asylum.[67]

Here, however—seemingly in an attempt to insulate the Proposed Rules from review, the agencies attempt to designate new bars to asylum both by designating them as "particularly serious crimes" pursuant to 8 U.S.C. § 1158(b)(2)(B)(ii) and rendering them categorically exempt from a positive discretionary adjudication of asylum pursuant to 8 U.S.C. § 1158(b)(2)(C). This effort is unlawful. Section 1158(b)(2)(B)(ii) does permit the Attorney General to, if he wishes, attempt to designate some classes of offenses as particularly serious crimes; such designations are reviewable for legal error (and as explained above, the commenters believe these expansions are unlawful).[68] But if the offense is not a particularly serious crime, then a discretionary decision must be rendered on the application. It is true that the Attorney General may also provide for "additional limitations and conditions" on asylum applications so long as they are "consistent" with the with the asylum statute.[69] However, the Proposed Rules add sweeping categories of offenses that automatically remove an applicant from the consideration of discretion—a regulatory proposal that is ultra vires to the plain text of the statute.

To the extent that the proposed rules would adopt a bar to asylum based on a categorical discretionary bar, rather than a particularly serious crime designation, they are similar to the rules struck down by numerous Circuit Courts of Appeal in the context of adjustment of status for those considered by law to be "arriving aliens." Purporting to exercise discretion categorically, then-Attorney General Reno putatively rendered that class of noncitizens ineligible for adjustment of status, a determination that is ordinarily discretionary, even though the statute seemed to allow eligibility. Multiple Circuit Courts of Appeal struck down the proposed regulations, finding them to reflect an impermissible reading of the statute in light of the fact that Congress carefully defined in the statute the categories of people eligible to apply for adjustment of status.[70]

---

[65] See, *e.g.*, *Robinson* v. *Shell Oil Co.*, 519 U.S. 337, 340 (1997).

[66] 8 U.S.C. § 1158(b)(2)(B)(ii).

[67] *Id.* The Attorney General has not designated "substantial battery" to be a particularly serious crime for any purpose, including for purposes of ineligibility to seek asylum.

[68] 8 U.S.C. § 1252(a)(2)(D).

[69] 8 U.S.C. § 1158(b)(2)(C); *see also* 8 U.S.C. § 1158(d)(5)(B).

[70] The First and Ninth Circuits found the regulations contrary to clear statutory command. *Succar v. Ashcroft*, 394 F.3d 8, 29 (1st Cir. 2005); *Bona v. Gonzales*, 425 F.3d 663, 668–71 (9th Cir. 2005). Other courts invalidated the adjustment regulations under "Step Two" of *Chevron*. Those courts found some ambiguity in the statute, but found a per se discretionary bar not based on a permissible construction of the eligibility standards set forth in the governing statute in light of the statutory scheme and congressional intent. *Zheng v. Gonzales*, 422 F.3d 98, 116–20 (3d Cir.

AR.09496

The same logic applies here. In the asylum statute, Congress explicitly made the commission of a particularly serious crime a bar to asylum. The canon of interpretation known as *expressio unius est exclusio alterius* instructs that, "expressing one item of [an] associated group or series excludes another left unmentioned."[71] The Proposed Rules attempt to create numerous categories of discretionary "pseudo-particularly serious crimes," barring asylum through a categorical exercise of discretion even if those offenses are ultimately found not to be particularly serious crimes. Such an effort violates this canon of interpretation, and makes the Proposed Rules ultra vires to the statute.

**CONCLUSION**

The Proposed Rules present copious legal and practical problems that threaten the integrity of the U.S. asylum system in critical ways. Chief among these issues, the Proposed Rules would violate Congress's express aim of bringing the United States into compliance with its international obligations with the Refugee Act of 1980 by enumerating new categorical exclusions to asylum that have no home in the Refugee Convention, or indeed, the INA. The Proposed Rules also encourage asylum adjudicators to engage with "evidence," that courts with competent criminal jurisdiction, such as the Massachusetts Supreme Judicial Court, have rejected as inherently unfair and unreliable. These new categorical exclusions would thus fly in the face of U.S. obligations under domestic and international law to provide protection to refugees and their families and would undermine U.S. commitments to refugees, putting countless bona fide refugees at risk of serious harm or even death.

---

2005) (invalidating regulation precluding category of people from applying to adjust status "[g]iven Congress's intent as expressed in the language, structure, and legislative history of INA section 245 [8 U.S.C. § 1255]"); *Scheerer v. United States Attorney General*, 445 F.3d 1311, 1321–22 (11th Cir. 2006). This reasoning would likewise be applicable to the proposed rule. Where Congress went through the trouble to create a comprehensive statutory scheme to define asylum eligibility, the agency cannot preempt that in the guise of discretion by creating out of whole cloth a separate set of eligibility criteria.
[71] *United States* v. *Vonn*, 535 U.S. 55, 65 (2002).

AR.09497