# EXHIBIT C

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ekj-ogn2
**Comments Due:** January 21, 2020
**Submission Type:** Web

# PUBLIC SUBMISSION

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0366
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Jill Bussey
**Address:**
8757 Georgia Avenue
Suite 850
Silver Spring, MD, 20910
**Email:** jbussey@cliniclegal.org
**Phone:** 3015654833

---

## General Comment

The Catholic Legal Immigration Network, Inc. submits these comments in response and opposition to the Department of Justice and Department of Homeland Security's joint Notice of Proposed Rulemaking entitled "Procedures for Asylum and Bars to Asylum Eligibility" published on December 19, 2019. As detailed in our attached letter, CLINIC urges the withdrawal of these proposed regulations, as they are contrary to our treaty obligations and to the congressional intent behind our domestic asylum law. Please see our full comment attached.

---

## Attachments

FINAL CLINIC Comment Criminal Bars to Asylum

8757 Georgia Avenue • Suite 850 • Silver Spring, MD 20910• Tel: 301.565.4800• Fax: 301.565.4824 • Website: www.cliniclegal.org

*Submitted via www.regulations.gov*

January 21, 2020

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041 Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

**Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41; Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility**[1]

Dear Ms. Alder Reid and Ms. Dunn:

The Catholic Legal Immigration Network, Inc. (CLINIC) submits these comments in response and opposition to the Department of Justice (DOJ) and Department of Homeland Security's (DHS) joint Notice of Proposed Rulemaking (NPRM) entitled "Procedures for Asylum and Bars to Asylum Eligibility" published on December 19, 2019. CLINIC urges the withdrawal of these proposed regulations, as they are contrary to our treaty obligations and to the congressional intent behind our domestic asylum law.

CLINIC embraces the core Gospel value of welcoming the stranger. CLINIC promotes the dignity and protects the rights of immigrants in partnership with a dedicated network of Catholic and community legal immigration programs. CLINIC is the largest nationwide network of nonprofit immigration programs, with approximately 375 affiliates in 49 states and the District of Columbia. With its affiliates, CLINIC advocates for the just and humane treatment of asylum seekers through direct representation, federal litigation, and engagement with policy makers.

[1] These comments were primarily drafted by Rachel Naggar, manager of the BIA Pro Bono Project and staff attorney with the Defending Vulnerable Populations program. Significant support was provided by Victoria Neilson, managing attorney of the Defending Vulnerable Populations program.

The implementation of these proposed regulations would result in the wrongful return of refugees to countries where their lives and safety are threatened. The regulations violate our international commitments in acceding to the United Nations Refugee Convention and Protocol, the plain language of the Immigration and Nationality Act (INA), and congressional intent in enacting the Refugee Act of 1980. CLINIC believes that U.S. asylum policies should reflect the country's core moral values and historical practice of providing refuge to those fleeing persecution. Therefore, we urge DOJ and DHS to immediately withdraw the NPRM "Procedures for Asylum and Bars to Asylum Eligibility."

## I. Background

The United Nations Convention Pertaining to the Status of Refugees ("Refugee Convention") was written to address the needs of the large number of European refugees after World War II.[2] In 1967, the Protocol Relating to the Status of Refugees ("Refugee Protocol") was enacted, applying the principles of the Convention to refugees worldwide.[3] As a signatory to the Refugee Protocol (and, by extension, the Refugee Convention), the United States is prohibited from returning a person to a country where their life or liberty would be threatened on account of race, religion, nationality, political opinion, or membership in a particular social group.[4]

Recognizing that states were concerned with admitting refugees who presented a danger to their security, certain exclusions were included in the Refugee Convention.[5] Article 1F of the Refugee Convention provides that:

> The provisions of this Convention shall not apply to any person with respect to whom there are serious reasons for considering that: (a) he has committed a crime against peace, a war crime, or a crime against humanity, as defined in the inter- national instruments drawn up to make provision in respect of such crimes; (b) he has committed a serious non-political crime outside the country of refuge prior to his admission to that country as a refugee; (c) he has been guilty of acts contrary to the purposes and principles of the United Nations.

The United Nations High Commissioner for Refugees (UNHCR), the agency with supervisory responsibility over the administration of the Refugee Convention, cautions that, "[c]onsidering the serious consequences of exclusion for the person concerned, however, the interpretation of these exclusion clauses must be restrictive."[6] The UNHCR further advises that, in considering what is a serious non-political crime, it must be "a capital crime or very grave punishable act. Minor offenses punishable by moderate sentences are not grounds for exclusion…."[7]

---

[2] U.N. High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees*, U.N. Doc. HCR/IP/Eng/REV. ¶ 5, (1979, reissued 2019), found at www.unhcr.org/en-us/publications/legal/5ddfcdc47/handbook-procedures-criteria-determining-refugee-status-under-1951-convention.html (hereinafter "UNHRC Handbook").
[3] *Id*. at ¶ 8.
[4] *Id*. at ¶ 9; Convention Relating to the Statute of Refugees, July 28, 1951, 140 U.N.T.S. 1954 (hereinafter "Refugee Convention") at article 33(1).
[5] Refugee Convention, *supra*, at article 1F; UNHCR Handbook, *supra*, at ¶148.
[6] UNHCR Handbook, *supra*, at ¶148.
[7] UNHCR Handbook, *supra*, at ¶155.

In 1980, Congress passed the Refugee Act, for the purpose of bringing U.S. refugee law into conformance with the Refugee Convention and Protocol.[8] In adopting the Refugee Act, Congress intended that "the language in the Act should be read consistently with the United Nations' interpretation of the refugee standards."[9]

It was not until the Immigration Act of 1990 that Congress introduced the first statutory bars to asylum based on criminal grounds.[10] Drawing from the language of Article 33 of the Refugee Convention, which provides for the expulsion of certain refugees from their receiving country, the Immigration Act barred asylum for anyone who, "having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States."[11] It further defined all aggravated felonies as particularly serious crimes.[12]

In 1996, as part of the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), Congress authorized the attorney general to "designate by regulation offenses that will be considered to be [particularly serious crimes]" for purposes of asylum.[13] IIRIRA further provided the attorney general with the authority to establish by regulation "any other conditions or limitations on the consideration of an application for asylum," so long as those limitations are "not inconsistent with this chapter."[14]

It has generally been well understood by the Board of Immigration Appeals (BIA) and the Courts of Appeals that low-level, "run-of-the-mill" offenses such as simple possession of drug paraphernalia do not constitute particularly serious crimes and should not be bars to asylum.[15] As Judge Reinhardt explained in a concurring opinion in *Delgado v. Holder*, run-of-the-mill crimes like driving under the influence have "little in common" with other crimes the BIA has deemed particularly serious—e.g., felony menacing with a deadly weapon, armed robbery, and burglary of a dwelling in which the offender is armed or causes injury.[16]

Although asylum is a discretionary benefit, it was not the intent of Congress that the attorney general implement regulations categorically barring large swaths of asylum seekers from protection, thus rendering the provisions of the Act meaningless and undermining the goal of bringing the United States in line with international law. As Pope Francis has said, we must "view [migrants] as persons, seeing their faces and listening to their stories, trying to respond as best we can to their situation. To respond in a way which is always humane, just and fraternal."[17]

---

[8] *INS v. Cardoza-Fonseca*, 480 U.S. 421 at 436-37 (1987); *Grace v. Whitaker*, 344 F. Supp. 3d 96 (D.D.C. 2018).
[9] *Grace v. Whitaker*, 344 F. Supp. at 124.
[10] Immigration Act of 1990, Public Law 101-649, sec. 515, 104 Stat. 4987.
[11] INA § 208(b)(2)(A)(ii).
[12] INA § 208(b)(2)(B)(i).
[13] INA § 208(b)(2)(B)(ii).
[14] INA § 208(d)(5)(B); *see also* INA § 208(b)(2)(C).
[15] *Delgado v. Holder*, 648 F.3d 1095, 1110 (9th Cir. 2011) (en banc) (J. Reinhardt, concurring).
[16] *Id*. at 1110.
[17] Address of Pope Francis to a joint meeting of the United States Congress, September 24, 2015.

## II. General Comments

CLINIC urges the withdrawal of these unlawful and unduly harsh regulations. These regulations would unnecessarily exclude refugees and their family members who are deserving of safety and stability in the United States.

The regulations propose to severely limit the discretion of asylum adjudicators by creating numerous new categorical bars to asylum eligibility. The proposed bars include any conviction of a felony offense, any conviction for "smuggling or harboring" under 8 U.S.C. § 1324(a), even if the asylum seeker committed the offense for the purpose of bringing their own spouse, child or parent to safety, any conviction for unlawful reentry under 8 U.S.C. § 1326, any conviction for an offense where the adjudicator has reason to believe it was in furtherance of criminal street gang activity, more than one conviction for an offense involving driving while intoxicated, any conviction *or accusation of conduct* for acts of battery involving a domestic relationship, any conviction for a drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and any conviction for fraud in public benefits.

The proposed regulations are unnecessary and contrary to the principles established by the United Nations, with which Congress intended U.S. law to comply. The drafters of the Refugee Convention and Protocol considered whether receiving countries should afford protection to individuals who have committed criminal acts. They made the conscious decision to balance the safety concerns of the receiving country with the need to protect refugees.[18]

DOJ and DHS, through their adjudicators, already have broad authority to deny asylum to any individual whom they determine to be a danger to the community or otherwise not deserving of a favorable exercise of discretion.[19] The implementation of the proposed strict categorical bars will result in the wrongful removal of individuals who do not present a danger to the community and who are deserving - and in need - of protection in the United States, without an individualized determination of whether they merit a favorable exercise of discretion. There is no justifiable reason for departing from the prior practice of determining on a case-by-case basis whether an individual is deserving of asylum. In fact, this individualized assessment is the procedure dictated by the UNHCR.[20]

Considering the grave consequences of expelling or excluding a refugee, the UNHCR reminds adjudicators that, before excluding a refugee who has committed a serious non-political crime, adjudicators must consider "all relevant factors, including mitigating circumstances."[21] The UNHCR Handbook further states that in "applying this exclusion clause, it is also necessary to strike a balance between the nature of the offense presumed to have been committed by the applicant and the degree of persecution feared. If a person has a well-founded fear of very severe

[18] UNHCR Handbook, *supra*, at ¶ 151 ("The aim of this exclusion clause is to protect the community of a receiving country from the danger of admitting a refugee who has committed a serious common crime. It also seeks to render due justice to a refugee who has committed a common crime (or crimes) of a less serious nature or has committed a political offence.").
[19] *See Matter of Pula*, 19 I.&N. Dec. 467 (BIA 1987).
[20] UNHCR Handbook, *supra*, at ¶¶ 156, 157.
[21] UNHCR Handbook, *supra*, at ¶157.

persecution, e.g., persecution endangering his life or freedom, a crime must be very grave in order to exclude him."[22]

The Board of Immigration Appeals has historically followed this case-by-case approach to the particularly serious crime determination that would bar an immigrant from receiving asylum.[23] The proposed regulations would tie the hands of adjudicators and prevent them from considering mitigating circumstances, such as the age of the individual at the time the offense was committed, the length of time that has passed since the offense, the individual's rehabilitation efforts, and the severity of persecution faced.

Pope Frances has said that, "The exercise of the right to asylum . . . should be recognized everywhere and not obstructed with deterrent and punitive measures."[24] and "No person must be sent back to a country where he or she fears discriminatory action or serious life-threatening situations."[25] The implementation of the proposed bars would unjustly punish refugees facing serious persecution in their home countries.

## III. The Proposed Regulations are inconsistent with congressional intent and the plain language of the INA, and therefore are an impermissible exercise of DOJ and DHS authority under INA § 208(b)(2)(C) and INA § 208 (b)(2)(B)(ii).

Congress explicitly made the commission of a particularly serious crime a bar to asylum. The canon of interpretation known as *expressio unius est exclusio alterius* instructs that, "expressing one item of [an] associated group or series excludes another left unmentioned."[26] The proposed regulations attempt to create numerous additional categories of crimes that bar asylum, even if those offenses are not particularly serious. Such an effort violates this canon of interpretation, and places the proposed regulations *ultra vires* to the statute.

Congress delegated to the attorney general the authority to designate additional offenses as particularly serious crimes, by reason of which the offender "constitutes a danger to the community."[27] Congress also delegated to the attorney general the authority to establish by regulation "other conditions or limitations on the consideration of an application for asylum" as long as those limitations are not inconsistent with the other provisions of the INA.[28] By designating

[22] UNHCR Handbook, *supra*, at ¶156.
[23] *See e.g., Matter of Juarez*, 19 I.&N. Dec. 664 (BIA 1988) (ordinarily a single misdemeanor that is not an aggravated felony will not be a particularly serious crime); *Matter of Frentescu,* 18 I.&N. Dec. 244 (BIA 1982), *modified* (setting forth several factors to be considered before imposing the particular serious crime bar, including: (i) the nature of the conviction, (ii) the circumstances and underlying facts for the conviction, (iii) the type of sentence imposed, and (iv) whether the type and circumstances of the crime indicate that the individual will be a danger to the community); *Matter of Y-L-, A-G-, R-S-R-,* 23 I.&N. Dec. 270 (A.G. 2002) (setting forth a multi-factor test to determine the dangerousness of a respondent convicted of a drug-trafficking offense who is otherwise barred from asylum as an aggravated felon, but seeking withholding of removal).
[24] Pontifical Council "Cor Unum" and Pontifical Council for the Pastoral Care of Migrants and Itinerant People, "Refugees: A Challenge to Solidarity" (1992).
[25] *Id.*
[26] *United States v. Vonn*, 535 U.S. 55, 65 (2002).
[27] INA §§ 208(b)(2)(A)(ii) & (B)(ii).
[28] INA §§ 208(d)(5)(B) & (b)(2)(C).

as categorical bars to asylum numerous offenses that would not be considered "particularly serious," the proposed regulations are inconsistent with the plain meaning of the statute.

The proposed vast expansion of criminal bars to asylum is also inconsistent with congressional intent to comply with the Refugee Convention and Protocol. When Congress first enacted the aggravated felony bar to withholding of removal in the Immigration Act of 1990, Senator Edward Kennedy, who introduced the legislation in the Senate, wrote to the Immigration and Naturalization Service ("INS") that Congress "contemplated that a showing of dangerousness to the community would be necessary in addition to proof of conviction of an aggravated felony."[29] The proposed bars, which exclude asylum seekers based on minor crimes, without a showing of dangerousness to the community, are a clear contradiction of congressional intent. Moreover, the UNHCR has explicitly found that the Refugee Convention does not permit the exclusion of refugees based on minor criminal offenses.[30] It is the intent of Congress that U.S. asylum law should be in line with the Refugee Convention.[31]

## IV. The availability of withholding of removal for individuals subject to these additional bars is insufficient to meet our obligations under the Refugee Convention.

It is not an adequate remedy that individuals barred from seeking asylum by these new regulations may apply for withholding of removal. An applicant for withholding of removal must show that it is more likely than not that they would be persecuted if returned to their country of origin, meaning they must show a more than 50% chance of being persecuted if returned.[32] Asylum only requires a showing of at least a ten percent chance of being persecuted if returned.[33] The Supreme Court has found that, in enacting the Refugee Act of 1980, Congress could have restricted asylum by holding asylees to the higher standard of showing it is more likely than not that they would be persecuted.[34] But the Court, noting the harshness of forcing an individual to return to a country where they will be subject to death or persecution, found that, "it is clear that Congress did not intend to restrict eligibility for that relief . . . ."[35] Subjecting individuals convicted of minor crimes to the higher withholding of removal standard would result in the return of individuals to countries where they will be persecuted, contrary to the intent of congress.

Even for those who meet the higher standard, withholding recipients are still subject to significant prejudice. For example, they have no ability to travel internationally. The Refugee Convention affords refugees the right to travel in mandatory terms.[36] Article 28 states, "Contracting States shall issue to refugees lawfully staying in their territory travel documents for the purpose of travel outside their territory." Recipients of withholding of removal do not have access to a travel

---

[29] *Mosquera-Perez v. INS*, 3 F.3d 553, 556 (1st Cir. 1993).
[30] UNHCR Handbook, *supra*, at ¶¶155-156.
[31] *Grace v. Whitaker*, 344 F. Supp. at 124.
[32] 8 C.F.R. § 208.16(b)(2); *INS v. Stevic*, 467 U.S. 407, 411 (1984) (explaining that petitioner must show a "clear probability" of the threat to life or freedom if deported, and that this standard is more stringent than the well-founded fear standard for asylum; *see also Cardoza-Fonseca*, 480 U.S. at 431 (describing the difference between a well-founded fear of persecution and a clear probability of persecution).
[33] *Cardoza-Fonseca*, 480 U.S. at 440.
[34] *Id.* at 449.
[35] *Id*.
[36] Refugee Convention at article 28.

document as contemplated by Article 28. By regulation, refugee travel documents are available only to asylees.[37] Additionally, the Board of Immigration Appeals requires that an individual granted withholding—unlike an individual granted asylum—must simultaneously be ordered removed, making any international travel a "self-deportation."[38] Thus, individuals granted withholding of removal often miss their last chance to visit with a dying relative or to attend the funeral of an immediate family member.

An individual granted withholding of removal also cannot petition to bring their spouse or children to safety in the United States.[39] By limiting refugees to the status of withholding of removal, more families will be permanently, unnecessarily separated. In other cases, individual family members will be forced to travel to the United States on their own, without the benefit of an I-730 petition. This will likely endanger children, forced to make the journey by themselves as unaccompanied minors. It will also result in the separation and deportation of spouses and minor children who traveled with the primary asylum-seeker, if they do not independently meet the definition of a refugee or cannot independently qualify for withholding of removal.[40] The Refugee Convention states that governments should take the necessary measures for protecting a refugee's family, "Ensuring that the unity of the refugee's family is maintained particularly in cases where the head of the family has fulfilled the necessary conditions for admission to a particular country."[41] Denying the full benefits of asylum to refugees who have committed minor crimes is a direct violation of this principle of the Refugee Convention.

The Refugee Convention further provides that, "The Contracting States shall as far as possible facilitate the assimilation and naturalization of refugees."[42] Recipients of withholding of removal are not eligible to apply for lawful permanent residence or to become citizens of the United States. They can be removed at any time to a third country.[43] Their status can be terminated at any time if it is determined that there has been a change in the conditions of their home country.[44] Thus, refugees granted only withholding of removal are living a life of uncertainty, in long-term limbo, instead of being fully integrated into the United States. It is the position of the U.S. Conference of Catholic Bishops that, "immigration policy that allows people to live here and contribute to society for years but refuses to offer them the opportunity to achieve legal status does not serve the common good."[45]

---

[37] 8 C.F.R. § 223.1.

[38] *See Matter of I-S- & C-S-*, 24 I.&N. Dec. 432, 434 n.3 (BIA 2008); 8 C.F.R. § 241.7.

[39] 8 C.F.R. § 208.21(a).

[40] Adolfo Flores, *An Immigrant Woman Was Allowed to Stay in the US — But Her Three Children Have a Deportation Order*, BUZZFEED NEWS, Dec. 21, 2019, www.buzzfeednews.com/article/adolfoflores/an-immigrant-woman-was-allowed-to-stay-in-the-us-but-not?fbclid=IwAR0GO6j-Oh5n4vH11SxhYx71fBXXAY7nd-4m4kzRTL7PAoKfUuP2EhTZJeE.

[41] Refugee Convention at section IV.B.

[42] Refugee Convention at article 34.

[43] 8 C.F.R. § 208(16)(f).

[44] 8 C.F.R. § 208.24(b)(1).

[45] *Catholic Social Teaching on Immigration and the Movement of Peoples*, U.S. Conf. of Cath. Bishops, www.usccb.org/issues-and-action/human-life-and-dignity/immigration/catholic-teaching-on-immigration-and-the-movement-of-peoples.cfm (last visited Jan. 17, 2020).

### V. Barring individuals convicted of a felony, as defined in the proposed rule, will result in the denial of asylum for minor conduct in violation of the Refugee Convention.

CLINIC urges the withdrawal of the proposed rule barring asylum for individuals convicted of any felony, defined as "crimes designated as felonies by the relevant jurisdiction or crimes punishable by more than one year's imprisonment." Enacting the regulation as proposed would result in the denial of asylum for individuals who have committed minor crimes and who may never have served any time in jail, and therefore cannot reasonably be considered a danger to the community.

As evidenced by the numerous questions raised in the NPRM, it is difficult to state a single felony definition that would result in the consistent, just, and lawful treatment of asylum applicants across jurisdictions. For example, in Virginia, a second offense for tampering with or stealing change from a parking meter or vending machine is punishable as a felony.[46] UNHCR has specifically noted that, "[c]rimes such as petty theft or the possession for personal use of illicit narcotic substances would not meet the threshold of [a particularly serious crime]."[47]

Yet, under the proposed rule, an individual could be barred from seeking asylum for having committed a petty theft crime, even if they were not ordered to serve any time in jail and the offense took place many years ago. For this reason, the UNHCR recommends that countries conduct a case-by-case determination that takes into account all mitigating factors and the circumstances surrounding the offense.[48] The strict bar proposed by the rule is overbroad and would result in the exclusion of legitimate asylum seekers based on minor crimes, in contrast to the principles outlined by the Refugee Convention, which intended to only preclude asylum where the person presents a serious danger to the receiving country.

The NPRM admits that defining a felony based on a potential sentence only "tends to indicate" that the individual is a danger to the community, but does not necessarily indicate it. Immigration adjudicators already have broad authority to deny asylum if they determine that an individual is a danger to the community or otherwise does not merit asylum as a matter of discretion. Creating a sweeping categorical bar, such as the one proposed, will only serve to endanger legitimate asylum seekers who have been convicted of minor crimes, or who may be rehabilitated and no longer present a danger to the community.

This bar fails to account for the potential rehabilitation of juvenile offenders, who the Supreme Court has said, "have a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment" and "a greater possibility exists that a minor's character deficiencies will be reformed."[49] It also fails to consider that in the United States, people of color are disproportionately arrested, convicted, and ordered to serve time in jail, particularly for minor

[46] Va. Code Ann. Section 18.2-152.
[47] U.N. High Comm'r for Refugees (UNHCR), *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 10 (July 2007), www.unhcr.org/enus/576d237f7.pdf.
[48] UNHCR Handbook, *supra*, at ¶ 157.
[49] *Roper v. Simmons*, 543 U.S. 551, 570 (2005); N.Y.U. Review of Law and Social Change, *Starting Over: The Immigration Consequences of Juvenile Delinquency and Rehabilitation*, Volume 40:515, 2016.

crimes.[50] This bar to asylum thus compounds the well-documented racial disparities in our criminal justice system and imports them into our immigration system.

## VI. Denying asylum to individuals who have assisted their immediate family members in fleeing persecution is contrary to our international obligations under the Refugee Convention and congressional intent.

CLINIC strongly opposes broadening the asylum bar for smuggling or harboring to include individuals who have helped bring their immediate family members to safety in the United States. The rationale, that these individuals are displaying, "a serious disregard for U.S. immigration law and pose a potential hazard to smuggled family members" is misguided. By definition, these individuals are entering the United States out of desperation and necessity, not with malicious intent to violate U.S. immigration law or put their family members in danger. The principles of Catholic social teaching provide that, "[p]eople have the right to migrate to sustain their lives and the lives of their family."[51]

If Congress expressly made asylum available to anyone physically present in the United States without regard to how they entered,[52] it follows that Congress did not intend for those same individuals to be barred merely because they aided their family members in similarly escaping persecution. The UNHCR also recognizes that refugees are often forced to commit crimes "as a means of, or concomitant with, escape from the country where persecution was feared."[53] The UNHCR advises that this need to escape should be considered a mitigating circumstance, not a bar to admission.[54]

## VII. Illegal reentry to seek asylum is not a dangerous criminal offense and should not be a categorical bar to asylum.

The proposed rule to bar individuals from seeking asylum merely for having illegally reentered the country is unlawful and immoral. This bar directly violates the Refugee Convention's prohibition on imposing penalties based on a refugee's manner of entry or presence.[55] That prohibition is a critical part of the Refugee Convention because it recognizes that asylum seekers often have little control over the place and manner in which they enter the country where they are seeking protection. The BIA has agreed, finding that "circumvention of orderly refugee procedures…should not be considered [so serious an adverse factor] that the practical effect is to

---

[50] The Sentencing Project, *Report to the United Nations on Racial Disparities in the U.S. Criminal Justice System*, Apr.2018, www.sentencingproject.org/publications/un-report-on-racial-disparities/.

[51] *Catholic Social Teaching on Immigration and the Movement of Peoples,* U.S. Conf. of Cath. Bishops, www.usccb.org/issues-and-action/human-life-and-dignity/immigration/catholic-teaching-on-immigration-and-the-movement-of-peoples.cfm (last visited Jan. 17, 2020).

[52] 8 U.S.C. § 1158(a)(1).

[53] UNHCR Handbook, *supra*, at ¶ 158.

[54] *Id.* at ¶ 157.

[55] Refugee Convention, *supra*, at Art. 31; *See also East Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1249 (9th Cir. 2018) (upholding a temporary restraining order prohibiting the enforcement of an immigration rule and proclamation barring immigrants crossing the U.S.-Mexico border at non-ports of entry because "the rule of decision enforced by the Government—that illegal entry, through Mexico specifically, will always be disqualifying—is inconsistent with the treaty obligations that the United States has assumed and that Congress has enforced" as well as U.S. case law).

deny relief in virtually all cases."[56] Instead, the Board has rightly found that an individual's manner of entry should be considered on a case-by-case basis in the exercise of discretion.[57] Congress has also addressed the issue of whether asylum should be available to individuals who have been previously removed.[58] Congress chose to only exclude from asylum those whose removal orders have been reinstated.[59] DOJ and DHS cannot now, by regulation, additionally exclude those who have been convicted of unlawfully reentering the United States.[60]

Moreover, the assertion in the proposed rule that an individual who has been previously removed can lawfully present themselves at a port of entry to seek asylum ignores the reality of the situation at our southern border. Individuals fleeing persecution are currently being made to wait outside the U.S., in dangerous border towns for months or longer before being allowed to present themselves at a port of entry.[61] Even once allowed to present themselves for inspection, asylum-seekers are being turned back to await adjudication of their claims in Mexico, or being sent to pursue asylum in other dangerous countries such as Guatemala, pursuant to so-called asylum cooperative agreements.[62]

## VIII. Allowing adjudicators to deny asylum to individuals based on potentially vague, unsubstantiated allegations of gang membership will result in the unfair and inconsistent treatment of asylum-seekers.

The proposed rule allowing adjudicators to deny asylum to someone based on having a "reason to believe" the individual committed a crime in furtherance of criminal street gang activity is dangerous and will create considerable judicial inefficiencies. This new rule would give adjudicators discretion to deny the vital protection of asylum on the basis of unverified suspicions, hearsay, or circumstantial evidence. The regulation will force individuals to counter potentially vague accusations by proving a negative—the lack of gang affiliation. This is a violation of due process.[63]

---

[56] *Matter of Pula*, 19 I&N Dec. 467 at 473 (BIA 1987).
[57] *Id.*
[58] INA § 241(a)(5).
[59] *Id*.
[60] *Zheng v. Gonzales*, 422 F.3d 98, 116-20 (3d Cir. 2005) (invalidating regulation precluding category of people from applying to adjust status "[g]iven Congress's intent as expressed in the language, structure, and legislative history of INA section 245 [8 U.S.C. § 1255]").
[61] Camila DeChalus, *'Metered' Immigrants Face Long Waits at the Border*, ROLL CALL, Oct. 4, 2019; www.rollcall.com/news/congress/metered-immigrants-face-long-waits-border; Jason Kao and Denise Lu, *How Trump's Policies Are Leaving Thousands of Asylum Seekers Waiting in Mexico*, THE NEW YORKER, Aug. 18, 2019, www.nytimes.com/interactive/2019/08/18/us/mexico-immigration-asylum.html.
[62] Jonathan Blitzer, *How the U.S. Asylum System Is Keeping Migrants at Risk in Mexico*, THE NEW YORKER, Oct. 1, 2019, www.newyorker.com/news/dispatch/how-the-us-asylum-system-is-keeping-migrants-at-risk-in-mexico; Adriana Beltrán, *Guatemala Is No Safe Third Country*, FOREIGN AFFAIRS MAGAZINE, Sep. 25, 2019, www.foreignaffairs.com/articles/guatemala/2019-09-25/guatemala-no-safe-third-country.
[63] *Brito v. Barr*, 2019 U.S. Dist. __ F. Supp. 3d __ | WL 6333093, LEXIS 206578 (finding that it violates the Due Process Clause to require noncitizens to prove that they are not a danger and not a flight risk in bond hearings).

Accusations of gang membership and inclusion in gang databases are "notoriously flawed", according to a report by the New York Immigration Coalition (NYIC) and CUNY School of Law.[64] Gang databases are unregulated and the criteria for being included in the database could be as minimal as "living in a building or even neighborhood where there are gang members, wearing certain colors or articles of clothing, or speaking to people law enforcement believe to be gang members."[65] These databases disparately affect young people of color,[66] so relying on information contained in a gang database to bar asylum seekers would further multiply the harm caused by racially disparate policing as well as racially disparate rates of guilty pleas to minor offenses.[67] Additionally, "these databases have created a wide dragnet [catching] innocent individuals, erroneously labeled, many fleeing persecution from the same gangs in their own countries."[68]

Requiring adjudicators to make complex determinations regarding the nature of a particular conviction will lead to massive judicial inefficiencies and slanted "mini-trials" within the asylum adjudication process. Because of the lack of robust evidentiary rules in immigration proceedings, it will be difficult if not impossible for many applicants to rebut negative evidence marshaled against them.[69] Asylum trials, which are typically three or fewer hours, would provide insufficient time to fully present arguments on both sides of these complex issues. Tasking adjudicators with a highly nuanced, resource-intensive assessment of the connection of a conviction to possible gang activity—assessments far outside their areas of expertise—will prolong asylum proceedings and invariably lead to erroneous determinations that will give rise to an increase in appeals. The INA and existing regulations already provide broad authority for the denial of asylum in the exercise of discretion if an individual's prior criminal history causes concern to the adjudicator. Adding this additional, superfluous layer of complication risks erroneously excluding bona fide asylum seekers from protection.

By barring asylum even without a conviction, the asylum-seeker would not have had the opportunity to be confronted with the evidence against them and to thoroughly contest that evidence in the proper venue—a criminal court. In criminal court, defendants are afforded due process protections including the right to counsel, the right to discovery of the evidence that will be presented, and robust evidentiary rules protecting against the use of evidence that is unreliable

---

[64] Nermeen Arastu *et al.*, New York Immigration Coalition and CUNY School of Law, *Swept Up in the Sweep: The Impact of Gang Allegations on Immigrant New Yorkers*, May 2018, at 7, http://thenyic.pi.bypronto.com/wp-content/uploads/sites/2/2018/06/SweptUp_Report_Final-1.pdf [hereinafter "*Swept Up in the Sweep*"].

[65] *Id*; *see also* Annie Sweeney and Madeline Buckley, *Chicago Police Gang Data Collection Faulted by City's Inspector General as Unchecked and Unreliable*, CHICAGO TRIBUNE, Apr. 11, 2019, www.chicagotribune.com/news/breaking/ct-met-chicago-police-gang-data-04112019-story.html; Anita Chabria, *A Routine Police Stop Landed Him on California's Gang Database. Is It Racial Profiling*?, LOS ANGELES TIMES, May 9, 2019, www.latimes.com/politics/la-pol-ca-california-gang-database-calgang-criminal-justice-reform-20190509-story.html.

[66] *Id*.

[67] *Id*.

[68] *Swept Up in the Sweep*, *supra* note 60, at 19; *see also* Jonathan Blitzer, *How Gang Victims Are Labeled as Gang Suspects*, THE NEW YORKER, Jan. 23, 2018, www.newyorker.com/news/news-desk/how-gang-victims-are-labelled-as-gang-suspects.

[69] CLINIC and the University of Maryland Carey School of Law, Gabriela Kahrl *et al.*, *Presumed Dangerous: Bond, Representation, and Detention in the Baltimore Immigration Court*, 2019, https://cliniclegal.org/resources/enforcement-and-detention/presumed-dangerous-bond-representation-and-detention-baltimore (finding that *pro se* individuals faced insurmountable hurdles in presenting evidence and legal arguments to counter accusations of gang affiliation).

or was unlawfully obtained. Considering the harsh and sometimes deadly consequences of denying protection from persecution, the lack of due process in applying this bar would be a grave injustice.

**IX. Barring asylum based on any conviction for domestic assault, battery, or stalking, or mere allegations of domestic assault or battery is a sweeping departure from prior precedent, a violation of our obligations under the Refugee Convention, and will force civil adjudicators to retry criminal cases.**

CLINIC opposes broadening the asylum bars to include any offense relating to domestic assault or battery, stalking, or child abuse, including where the individual has merely allegedly "engaged in acts of battery and extreme cruelty in a domestic context in the United States, regardless of whether such conduct resulted in a criminal conviction."[70] This rule would dramatically expand the number of minor, misdemeanor crimes that would bar asylum, in direct contradiction of the UNHCR guidelines.

This rule would also force asylum officers and immigration judges to conduct mini-trials to determine whether alleged conduct actually occurred and, if so, whether it constitutes battery or extreme cruelty, or whether it was done in a domestic context. In many cases, asylum applicants will struggle to find evidence connected to events that may have happened years prior, especially for those detained. Moreover, asylum adjudicators should not be forced to evaluate such evidence; that should be left to the criminal legal system.

For more than a century the federal courts have consistently embraced the "categorical approach" to determine the immigration consequence(s) of a criminal offense, wherein the immigration adjudicator relies on the statute of conviction as adjudicated by the criminal court system, without relitigating the nature or circumstances of the offense in immigration court.[71] As the Supreme Court has explained, this approach "promotes judicial and administrative efficiency by precluding the relitigation of past convictions in minitrials conducted long after the fact."[72]

Additionally, domestic violence incidents all too often involve the arrest of both the primary perpetrator of abuse and the survivor.[73] These "cross-arrests" do not always yield clear determinations of victim and perpetrator. Authorizing asylum adjudicators to determine the primary perpetrator of domestic assault, in the absence of a judicial determination, unfairly prejudices survivors who are wrongly arrested in the course of police intervention to domestic disturbances.

---

[70] 84 Fed. Reg. 69651 (Dec. 19, 2019).

[71] *Moncrieffe v. Holder*, 569 U.S. 184, 191 (2013).

[72] *Id.* at 200-201.

[73] David Hirschel, *et al.*, *Domestic Violence and Mandatory Arrest Laws: To What Extent Do They Influence Police Arrest Decisions*, JOURNAL OF CRIMINAL LAW & CRIMINOLOGY 98, no. 1 (2007-2008): 255, https://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?article=7284&context=jclc (noting that "[i]n some cases, dual arrests may be the result of legislation, department policies, or both failing to require officers to identify the primary aggressor. In addition, when such provisions are present, police may lack the training or information needed to identify the primary aggressor when responding to a domestic violence assault. This situation may be compounded by batterers who have become increasingly adept at manipulating the criminal justice system, and may make efforts to 'pre-empt' victims from notifying police in order to further control or retaliate against them.").

**X. The proposed regulations barring asylum for individuals convicted of two DUIs and certain minor misdemeanor crimes is a direct violation of UNHCR guidelines, the INA, and the spirit of our asylum laws.**

As previously noted, the UNHCR has instructed that refugees should not be excluded from a receiving country merely because the refugee has committed "minor offenses punishable by moderate sentences."[74] Sections five and seven of the proposed regulations will do just that.

The broad regulation barring asylum for anyone convicted of more than one offense for driving while intoxicated should be withdrawn. In a concurring opinion in *Delgado v. Holder*, Judge Reinhardt noted that both the courts and the public have generally not viewed offenses for driving while intoxicated as particularly serious. [75] "American voters would be unlikely to elect a president or vice president who had committed a particularly serious crime, yet they had no difficulty in recently electing to each office a candidate with a DUI record."[76]

Moreover, multiple DUI convictions are not even an absolute bar to cancellation of removal under INA § 240A(b).[77] The attorney general stated that these offenses are not "conclusive evidence" of an individual's character; a noncitizen can rebut the presumption with a strong showing of evidence of good character and rehabilitation.[78] If individuals seeking discretionary cancellation of removal are afforded the opportunity to show that they merit permanent residence in spite of their prior convictions for driving under the influence, it is nonsensical to promulgate a rule denying asylum seekers that same opportunity. Authority should remain with the adjudicators to balance the seriousness of the offenses against mitigating factors such as the length of time that has passed, evidence of rehabilitation, the potential danger to the community, and the risk of persecution faced by the individual if returned to their home country.

CLINIC also opposes the proposed rule barring asylum for individuals who have been convicted of a misdemeanor offense for use of a fraudulent document. Creating such a blanket bar for asylum seekers, who are often compelled to resort to irregular means to enter the United States, or to remain safely while their applications for asylum are pending, upends decades of settled law directing that violations arising from an asylum applicant's manner of flight should constitute only one of many factors to be considered in the exercise of discretion.[79] Migrants fleeing persecution often leave their home countries with nothing but the clothes on their backs and must rely on informal networks to navigate their new circumstances.[80] Asylum-seekers in the United States are not eligible for any public benefits while their applications are pending and it can take over a year

---

[74] UNHCR Handbook, *supra*, at ¶155.
[75] *Delgado v. Holder*, 648 F.3d 1095, 1110 (9th Cir. 2011) (en banc) (J. Reinhardt, concurring).
[76] *Id*.
[77] *See Matter of Castillo-Perez*, 27 I&N Dec. 664 (A.G. 2019).
[78] *Id*. at 671.
[79] *See Matter of Pula*, 19 I.&N. Dec. at 474; *Matter of. Kasinga*, 21 I&N Dec. 357 (BIA 1996) (granting asylum despite applicant's purchase and use of a fraudulent passport to enter the United States); *Dong v. Gonzales*, 421 F.3d 573, 579 (7th Cir. 2005) ("use of false documents to facilitate travel or gain entry does not serve to impute a lack of credibility to the petitioner." citing *In re O-D-*, 21 I. N. Dec. 1079, 1081 (BIA 1998)).
[80] *See Matter of Pula*, 19 I.&N. Dec. at 474.

to obtain work authorization.[81] As a result, "[m]any become homeless, live in overcrowded or unsafe conditions, and lack basic needs like food and clothing. Without work authorization, asylum seekers cannot purchase health insurance under the Affordable Care Act or obtain a social security number, and often cannot apply for a state issued identification card or driver's license, which further limits access to transportation, banking, and private support services." [82]

Furthermore, asylum seekers who are struggling to survive are vulnerable to exploitation by unscrupulous individuals or *notarios*, who claim to offer legitimate assistance in providing documentation that turns out to be fraudulent.[83] Asylum seekers are also at risk of being exploited by employers. Many noncitizens working in the low-wage economy face egregious workplace dangers and discrimination and suffer retaliation for asserting their rights.[84] The expansion of the criminal asylum bars to sweep in all document fraud offenses would unfairly prejudice immigrants with meritorious asylum claims and force them deeper into the dangerous informal economy. The NPRM states that the use of fraudulent documents "so strongly undermines government integrity that it would be inappropriate to allow an individual convicted of such an offense to obtain the discretionary benefit of asylum."[85] Yet, an individual not facing persecution could be granted the discretionary benefit of adjustment of status if their offense qualified as a petty offense or if they received a waiver of inadmissibility.[86]

Similarly, a blanket bar on asylum for individuals who have unlawfully received public benefits will unfairly prejudice the most vulnerable and impoverished asylum seekers. As evidenced by the small number of prosecutions each year, fraudulent receipt of public benefits by immigrants is low.[87] There is no justifiable reason to create this additional categorical bar to asylum. In order to maintain our obligations under the Refugee Convention, discretion should remain with adjudicators to balance the severity of the offense against any mitigating factors, particularly the risk of persecution faced by the asylum seeker.

Finally, categorically barring asylum for individuals convicted of misdemeanor offenses relating to controlled substances, particularly possession of marijuana or prescriptions drugs for personal use, is wildly disproportionate to the severity of these offenses. These offenses do not have an element of violence or dangerousness. The only victims are the offenders themselves, who are typically suffering from addiction, a medical condition that can be difficult to treat.[88] This new bar ignores the fact that asylum seekers have experienced tremendous trauma in their home countries

---

[81] 8 U.S.C. § 1611; Human Rights First, *Callous and Calculated: Longer Work Authorization Bar Endangers Lives of Asylum Seekers and Their Families*, Apr. 2019, www.humanrightsfirst.org/sites/default/files/Work_Authorization.pdf. [hereinafter "*Callous and Calculated.*"].

[82] *Callous and Calculated.*

[83] *See* American Bar Association, *About Notario Fraud*, July 19, 2018, www.americanbar.org/groups/public_interest/immigration/projects_initiatives/fight-notario-fraud/about_notario_fraud/.

[84] Paul Harris, *Undocumented Workers' Grim Reality: Speak Out on Abuse and Risk Deportation*, THE GUARDIAN, March 28, 2013, www.theguardian.com/world/2013/mar/28/undocumented-migrants-worker-abuse-deportation.

[85] 84 Fed. Reg. 69653 (Dec. 19, 2019).

[86] INA § 212(a)(2)(A)(ii)(II); INA § 212(h).

[87] Kristie De Peña, Niskanen Center, *Do Immigrants Fraudulently Use Public Benefits?*, Sep. 25, 2018, www.niskanencenter.org/do-immigrants-fraudulently-use-public-benefits/.

[88] National Institute on Drug Abuse, *Drugs, Brains, and Behavior: The Science of Addiction*, July 2018, www.drugabuse.gov/publications/drugs-brains-behavior-science-addiction; American Society of Addiction Medicine, *Definition of Addiction*, Sep. 15, 2019, www.asam.org/resources/definition-of-addiction.

and often during their journeys to safety, including violence, torture and sexual assault.[89] As a result, many suffer from post-traumatic stress disorder, which can lead them to self-medicate with controlled substances.[90] These individuals need compassion and treatment, not to be denied their asylum claims and returned to their countries of persecution.

## XI. Conclusion

The criminal bars to asylum under current United States law and regulations are already far more restrictive than what was contemplated by drafters of the Refugee Convention and the guidelines set forth by UNHCR. The proposed new rules, which are lacking in any requirement of proportionality, will further weaken our commitment to protecting refugees. They are contrary to this country's values as a nation of immigrants, and to CLINIC's values as a faith-based organization. As Pope Francis recently reminded us, "It is injustice that forces [refugees] to endure unspeakable forms of abuse, enslavement of every kind and torture in inhumane detention camps. It is injustice that turns them away from places where they might have hope for a dignified life, but instead find themselves before walls of indifference."[91] The United States has always been a world leader in protecting refugees and asylum seekers; the U.S. government should be tearing down walls for those fleeing harm rather than erecting them.

For the foregoing reasons, DHS and DOJ should immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

Thank you for the opportunity to submit comments on the Proposed Rules. Please contact Jill Marie Bussey, Director of Advocacy, at jbussey@cliniclegal.org for further information.

Sincerely,

Anna Marie Gallagher
Executive Director

[89] Rocío Naranjo Sandalio, Migration Policy Institute, *Life After Trauma: The Mental-Health Needs of Asylum Seekers in Europe*, Jan. 30, 2018, www.migrationpolicy.org/article/life-after-trauma-mental-health-needs-asylum-seekers-europe.

[90] Danielle Horyniak *et al*., *Epidemiology of Substance Use Among Forced Migrants: A Global Systematic Review*. PLOS ONE 11(7): Jul. 13, 2016, www.ncbi.nlm.nih.gov/pmc/articles/PMC4943736/.

[91] *Pope Decries 'Walls Of Indifference' Migrants Face in New Lands*, WINK NEWS, Dec. 25, 2019, www.winknews.com/2019/12/25/pope-decries-walls-of-indifference-migrants-face-in-new-lands/.