# EXHIBIT D

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekq-363e
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0536
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Jean Bruggeman
**Organization:** Freedom Network USA

## General Comment

FNUSA opposes these rule changes as they would cause harm to survivors of human trafficking. Please see attached comments.

## Attachments

FNUSAAsylumCrimBarCommentsFINAL



Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

*Submitted via* https://www.regulations.gov/document?D=EOIR-2019-0005-0001

January 21, 2020

**RE: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41; Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility**

To Whom it May Concern:

On behalf of Freedom Network USA (FNUSA), I submit these comments in response to the above-referenced Proposed Rules to express our strong opposition to the Proposed Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019, and to request that the Department of Homeland Security and the Department of Justice immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

FNUSA, established in 2001, is a coalition of 68 non-governmental organizations and individuals that provide services to, and advocate for the rights of, trafficking survivors in the United States. Our members include survivors themselves as well as former prosecutors, civil attorneys, criminal attorneys, immigration attorneys, and social service providers who have assisted thousands of trafficking survivors. Together, our members provide services to over 2,000 trafficking survivors each year.

These proposed changes constitute an unnecessary, harsh, and unlawful gutting of the asylum protections enshrined in United States and international law. FNUSA is especially

concerned about the extraordinary impact and harm that would befall human trafficking survivors, including those who were trafficked outside of the US and have fled to the US seeking safety and protection, and those who entered the US for any reason and were trafficked inside the borders of the US. These changes would preclude many trafficking survivors from the protection and support that the US Government has promised in domestic and international law.

### I. Human Trafficking Survivors as Asylum-Seekers

Trafficking victims are often left unprotected or even trafficked by their own governments. Justice is often denied trafficking survivors, leaving them with no option but to seek safety in the US. Others respond to what they believe to be legitimate employment or travel offers, only to find themselves exploited and abused in the US. The proposed rule would bar many of these vulnerable and traumatized survivors from qualifying for asylum. According to DHS, the top countries for affirmative asylum filings in 2018[1] have all the US Department of State has identified as failing below Minimum Standards for the Elimination of Trafficking in Persons.[2] Both Venezuela and China, the number 1 and 4 source countries for affirmative asylum, have been found to neither meet the minimum standards, not even attempt to meet the standards. As a result, they are subject to restrictions on funding from the US Government. Guatemala, El Salvador, Mexico, and Honduras all received Tier 2 rankings, indicating that they do not meet the minimum standards, although there is some evidence of efforts to meet the standards.[3]

Trafficking victims may have been forced to commit crimes by their traffickers in their home country, on the journey to the US, or once they arrive in the US. Traffickers use forced criminality as a tactic to entrap their victims, causing them to fear reporting to law enforcement or seek social services. Once the trafficking victim has a criminal record, they feel trapped by the trafficker. Legal schemes that feed into this control tactic assist traffickers in isolating and abusing their victims. Instead, it is critical to remove barriers to services and support for trafficking survivors.

While many trafficking survivors present in the US apply for the T Visa[4], a visa specifically created for trafficking survivors, not all do. Those who experienced trafficking outside of the US are unlikely to qualify for a T Visa, but may be eligible for asylum. Unfortunately, some who are likely eligible for a T Visa may not apply for one because they are unaware that it exists. Few T Visas are approved annually[5], and far fewer immigration practitioners

---

[1] DHS Annual Flow Report: Asylees and Refugees 2018, available at: https://www.dhs.gov/sites/default/files/publications/immigration-statistics/yearbook/2018/refugees_asylees_2018.pdf
[2] Department of State, Trafficking in Persons Report, June 2019, available at: https://www.state.gov/wp-content/uploads/2019/06/2019-Trafficking-in-Persons-Report.pdf.
[3] Id.
[4] *See* 8 USC 1101 (15)(T).
[5] T Visa applications reached an all-time high of 1,613 in FY2018, but have fallen to 1,214 for FY2019. *See* USCIS, Form I-914 Data, available at: https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20

are experienced with T Visas than asylum applications. Therefore, those who have been trafficked both outside and inside of the US may be applying for, and qualified for, asylum in the US.

## II. The Proposed Rule Will Unfairly Prevent Trafficking Survivors from Obtaining Asylum

The proposed rule seeks to add seven new criminal bars to asylum eligibility.[6] These new bars are extremely broad in scope, and several will particularly impact trafficking survivors who are in desperate need of protection and who would otherwise be eligible for asylum protections.

### A. The Smuggling or Harboring Bar Will Harm Trafficking Survivors and Their Families

This expansion would make trafficking survivors who are convicted of helping their spouses and children escape the trafficker and enter the US ineligible for asylum. Traffickers often use violence or threats of violence against family members in the home country to entrap their victims and force them to continue working under exploitive conditions. As with survivors of domestic violence, many trafficking survivors continue to endure abuse in order to protect their family members. Those trafficked close to home, may take their family members with them when they escape to the US. Others may send money to connections in the home country to help their family members escape the traffickers. These actions demonstrate an admirable commitment, not a dangerous intent. The US government should not refuse to protect refugees simply because they love their family members and are desperate to protect them.

### B. The Illegal Reentry Bar Harms Trafficking Survivors Seeking Safety

Barring all applicants convicted of illegal reentry from being eligible for asylum wholly ignores the reality that trafficking victims are often forced to travel, within and between countries, by their traffickers. Therefore, trafficking survivors may have reentered the US without authorization either because they were smuggled by the trafficker, or because they were removed by the US, and then returned to find safety.

---

Forms%20Data/Victims/I914t_visastatistics_fy2019_qtr4.pdf. By contrast, 105,472 affirmative asylum applications were filed in FY 2018. *See* https://www.dhs.gov/sites/default/files/publications/immigration-statistics/yearbook/2018/refugees_asylees_2018.pdf.

[6] Individuals would be ineligible to seek asylum if they are convicted of 1) a felony offense; 2) "smuggling or harboring" under 8 U.S.C. § 1324(a); 3) illegal reentry under 8 U.S.C. § 1326; 4) an offense involving "criminal street gangs"; 5) a second offense of driving while intoxicated or impaired; 6) conviction or *accusation of conduct* of acts of battery or extreme cruelty in the domestic context; 7) certain newly defined misdemeanor offenses.

### C. The Conviction or Accusation of Battery or Extreme Cruelty Bar Harms Survivors Trafficked by Family Members

The proposed rule seeks to make ineligible for asylum not only all applicants who have been convicted of domestic assault or battery, stalking, or child abuse in the domestic context, but also those who are simply accused of engaging in battery and extreme cruelty. This proposed rule creates the *only* crime-related bar for which a conviction is not required. DHS and DOJ paint this proposal as a way to protect survivors; however, it will cause immense harm to immigrant survivors of violence.

First, it is important to note that trafficking can, and often does, happen within families. Traffickers can be parents, spouses, siblings, grandparents, aunts/uncles, or any other relative. However, these family members use force, fraud, or coercion to extract labor or services or commercial sex acts from the survivor. Traffickers often use physical and sexual violence as part of their abuse and exploitation scheme.

Second, in many cases immigrant survivors, not their abusive traffickers, are arrested and prosecuted for domestic violence offenses. Immigrant survivors who have limited English proficiency (LEP) may not be able to fully describe the situation and the abuse they experienced to police officers. They have also been threatened with retaliation if they report the abuse and exploitation to law enforcement. All too often, police officers turn to the *perpetrators* to interpret or rely more heavily on their explanations because they are more fluent in English or act less fearful of law enforcement. In other cases, survivors are arrested and face charges for domestic violence arising from acts of self-defense or because abusive partners or perpetrators manipulate the legal system by filing false claims of abuse. Service providers report that it is common to see abusers make false allegations to police and the courts to have immigrant survivors arrested. The proposed rule's lack of requirement of a conviction increases that likelihood, given the lack of completion of a fact-finding.

Although there is a proposed waiver for survivors who are deemed to not be the primary aggressor, it is wholly insufficient. Many survivors will believe that they are ineligible, or be too fearful to attempt to explain the situation. Survivors who are still fearful of the trafficker will be unwilling to accuse them of abuse and exploitation. Other survivors will be unable to articulate the details clearly, due to ongoing trauma from the trafficking experience.

### D. The Document Fraud Bar Ignores Trafficking-related Circumstances

There are many ways in which trafficking victims may end up with document fraud convictions as a result of their trafficking experience. This bar will enable the force, fraud, and coercion used by traffickers, and punish immigrant survivors instead.

First, traffickers routinely provide their victims with fraudulent documents for use in crossing borders. When survivors are caught by law enforcement while they are still under the control of the trafficker, they are unlikely to explain the circumstances fully. Traffickers

often provide legal representation for the victims, or have threatened the victims so thoroughly with retaliation that they do not disclose the circumstances to the court. Trauma can also make it difficult for trafficking survivors to explain the circumstances of their exploitation without appropriate supportive services. Thus, trafficking survivors are left with document fraud convictions for documents they were forced to use as part of the trafficking scheme.

Second, traffickers routinely confiscate, hide, or destroy survivors' documents in order to exert dominance and prevent survivors from being able to escape or seek assistance. Immigrant survivors who do, amazingly, escape from trafficking are, therefore, often left without documentation. This leaves survivors highly vulnerable to individuals who falsely claim to have the ability to prepare legal documentation for them.

Finally, trafficking is a financial crime, leaving the survivors without financial resources and dependent on the trafficker for housing, food, health care, and other basic needs. Many foreign national trafficking survivors have debts in their home country, created as part of the trafficking scheme to keep the survivor compliant. Survivors who escape from traffickers therefore risk falling into poverty and homelessness and may resort to any measure to work. Barring immigrant survivors from asylum for taking measures to ensure that they could feed, clothe, and house themselves and their children is cruel and will only serve to render them even more vulnerable to exploitation.

### E. The 'Gang Affiliation' Bar Harms Survivors Trafficked by Gangs

Gangs are engaged in trafficking for both labor and sex. They recruit and groom their victims, force them to engage in unlawful activity, and then entrap them in the ongoing labor or sex trafficking scheme. Survivors often believe that they are to blame for their failure to avoid the gang, their willingness to engage in initial activities, or because of their shame and trauma. The vague, and yet overly broad, language of the proposed rule would bar all victims of gang-based trafficking from being granted the very protection they need to escape the trafficking. There is no version of this analysis that can protect victims who have experienced the trauma and shame of gang-related trafficking victimization.

## III. The Proposed Definitions of "Conviction" and "Sentence" Particularly Harm Trafficking Survivors

The Proposed Rule includes a rebuttable presumption "against the effectiveness" of an order vacating, expunging, or modifying a conviction or sentence if the order was entered into after the asylum seeker was placed in removal proceedings or if the asylum seeker moved for the order more than one year after the date the original conviction or sentence was entered.[7] This flies in the face of the understanding that trafficking victims are routinely forced to commit crimes as part of the trafficking scheme, rarely raise this defense at the time of the arrest or prosecution, and justice can only be served through extensive post-conviction relief remedies including vacating, expunging, and modifying

---

[7] Proposed Rules at 69655.

convictions.[8] Conviction records leave survivors unable to access safe housing, employment, education, federal loans, and professional credentialing.[9]

As a general matter, trafficking survivors are not aware of the defects in their underlying criminal proceedings until they consult with an immigration attorney, a trafficking attorney, or until they are placed into removal proceedings, which may happen several years after a conviction. While states are increasingly offering criminal record relief for trafficking survivors, few offer an affirmative defense.[10] Imposing a presumption *against* the validity of a plea withdrawal or vacatur in these cases will particularly harm trafficking survivors who may have multiple convictions from multiple jurisdictions, all due to the trafficking scheme.

## IV. Withholding of Removal or Protection Under the Convention Against Torture Are Not Sufficient Alternatives to Asylum for Trafficking Survivors

Throughout the Proposed Rules, the agencies defend the harsh and broad nature of their proposal by pointing to the continued availability of alternative forms of relief for those precluded from asylum eligibility under the new rules.[11] The availability of these alternatives forms of relief, however—known as withholding of removal (Withholding) and protection under the Convention Against Torture (CAT)—are not sufficient alternatives to asylum. The protections afforded by Withholding and CAT are limited in scope and duration, and they are harder to obtain. As a result, a Rule that limits *bona fide* refugees fleeing human trafficking to Withholding and CAT would impose a very real harm to these survivors.

First, Withholding and CAT protections demand a higher level of proof than asylum claims: a clear probability of persecution or torture.[12] Thus, an individual could have a valid asylum claim but be unable to meet the standard under the other forms of relief and

---

[8] American Bar Association, Workable Solutions for Criminal Record Relief: Recommendations for Prosecutors Serving Victims of Human Trafficking, 2019, available at https://www.americanbar.org/content/dam/aba/administrative/domestic_violence1/SRP/aba-cdsv-workable-solutions.pdf

[9] National Survivor Network, National Survivor Network Members Survey: Impact of Criminal Arrest and Detention on Survivors of Human Trafficking, August 2016, available at https://mvlslaw.org/wp-content/uploads/2017/06/NSN-Survey-on-Impact-of-Criminalization-2017-Update.pdf

[10] Polaris Project, Grading Criminal Record Relief Laws for Survivors of Human Trafficking, 2019, available at https://polarisproject.org/resources/state-report-cards-grading-criminal-record-relief-laws-for-survivors-of-human-trafficking/

[11] *See, e.g.,* Proposed Rules at 69644.

[12] Withholding of removal requires the petitioner to demonstrate his or her "life or freedom would be threatened in that country because of the petitioner's race, religion, nationality, membership in a particular social group, or political opinion." *INS v. Stevic*, 467 U.S. 407, 411 (1984) (quoting 8 U.S.C. § 1231(b)(3)). Unlike asylum, however, the petitioner must show a "clear probability" of the threat to life or freedom if deported to his or her country of nationality. The clear probability standard is more stringent than the well-founded fear standard for asylum. *Id; see also Cardoza-Fonseca*, 480 U.S. at 431 (describing the difference between a well-founded fear of persecution and a clear probability of persecution). For CAT relief, an applicant must show it is more likely than not that he or she will be tortured or killed by or at the government's acquiescence if removed to the home country. 8 C.F.R. § 1208.16(c)(2).

therefore would be removed to their country of origin, where they would face persecution or even death at the hands of the traffickers.

Even if they are successful, Withholding and CAT recipients are not as protected as those granted asylum. For example, they have no ability to travel internationally. Withholding and CAT recipients do not have access to a travel document. By regulation, refugee travel documents are available only to asylees.[13] And the Board of Immigration Appeals requires that an individual granted Withholding or CAT—unlike an individual granted asylum—must simultaneously be ordered removed, making any international travel a "self-deportation."[14] Trafficking survivors granted only Withholding or CAT protection are thus effectively trapped within the United States in long-term limbo.

Withholding and CAT recipients also face permanent separation from their spouses and children. Because international travel is prohibited, they cannot reconnect with their families in a third country. And they also cannot reunite with family in the United States because only asylees and refugees are eligible to petition for a spouse and children to join them as derivatives.[15]

Withholding recipients also face hurdles in access to employment. They must apply for work authorization, and they face frequent delays in the adjudication of these applications, which often result in the loss of legal authorization to work.[16] After escaping the trauma and financial ruin of human trafficking, they will be forced to face long-term uncertainty for their financial future.

Perhaps most fundamentally, there is continuing jeopardy for Withholding and CAT recipients that does not exist for asylum recipients. When a noncitizen is granted asylum, the person receives a legal status.[17] Asylum, once granted, protects an asylee against removal unless and until that status is revoked.[18] None of these protections exists for Withholding and CAT recipients. They have no access to permanent residency or citizenship.[19] Instead, they are subject to a removal order and vulnerable to the permanent prospect of deportation to a third country and subject to potential check ins with immigration officials where they can be made to pursue removal to third countries to which they have no connection.[20]

---

[13] 8 C.F.R. § 223.1.
[14] *See Matter of I-S- & C-S-*, 24 I.&N. Dec. 432, 434 n.3 (BIA 2008); 8 C.F.R. § 241.7.
[15] 8 C.F.R. § 208.21(a).
[16] 8 C.F.R. § 274a.12(a)(10); *Northwest Immigrant Rights Project, et al. v. USCIS, et al.*, No. 2:15-cv-00813-JLR (W.D. Wash., filed May 22, 2015) (class action regarding delays in adjudication of work authorization).
[17] *See, e.g.*, 8 C.F.R. 245.1(d)(1) (defining "lawful immigration status" to include asylees).
[18] *See* 8 U.S.C. § 1158(c)(1)(A).
[19] *Matter of Lam*, 18 I.&N. Dec. 15, 18 (BIA 1981); 8 C.F.R. § 245.1(d)(1) (explaining that only those in "lawful immigration status" can seek permanent residency and excluding withholding recipients from such status); 8 C.F.R. § 209.2(a)(1) (authorizing adjustment of status to permanent residence for asylees); 8 C.F.R. § 316.2 (naturalization available only to permanent residents).
[20] *See R–S–C v. Sessions*, 869 F.3d 1176, 1180 (10th Cir. 2017).

## V. Conclusion

In summary, these proposed revisions would put severe restrictions on access to asylum protections that would very specifically harm survivors of human trafficking seeking protection in the US. These harms cannot be mitigated with small edits or by providing exemptions for trafficking survivors. The existence of these barriers will deter survivors from even coming forward for protection and support, leaving them in continued abuse and exploitation. The US Government must act to protect survivors, not embolden traffickers. Therefore, Freedom Network USA urges the Departments to discard these proposed changes and to, instead, stand in solidarity with human trafficking survivors.

Thank you for the opportunity to submit comments on the Proposed Rules. Please do not hesitate to contact me at jean@freedomnetworkusa.org to provide further information.

Sincerely,

Jean Bruggeman
Executive Director
Freedom Network USA