# EXHIBIT E

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekq-pnpr
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0541
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Olga Byrne
**Organization:** International Rescue Committee

## General Comment

See attached file(s)

## Attachments

IRC_Public Comment Opposing Proposed Asylum Rules

Olga Byrne, Director, Immigration
International Rescue Committee
1730 M St NW #505
Washington, DC 20036

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41; Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility

January 20, 2020

To Whom It May Concern:

I am writing on behalf of the International Rescue Committee in response to the above-referenced Proposed Rules amending eligibility for asylum, as published in the Federal Register on December 19, 2019. The International Rescue Committee (IRC) would like to express its strong opposition to these amendments, which unnecessarily expands the barriers to asylum to the detriment of the most vulnerable who have sought protection in the United States.

Established in 1933, the IRC provides relief, protection, resettlement, and integration services to refugees and other vulnerable immigrants. It is one of nine U.S. agencies sponsored by the State Department's Bureau of Population, Refugees and Migration (PRM) to provide reception and placement services to refugees arriving in the United States. The IRC provides resettlement and integration assistance to thousands of refugees who have been lawfully admitted to the United States as well as Iraqi and Afghan special immigrants, asylum-seekers, asylees, victims of human trafficking, humanitarian parolees, Temporary Protected Status (TPS) holders, lawful permanent residents and others.

The IRC works with asylum seekers from around the world. Since the beginning of 2019, over 6,000 parents and children seeking asylum have received emergency humanitarian assistance from the IRC in Phoenix. At IRC's Welcome Center, the IRC provides critical, immediate services to those being released from detention en route to their final destinations where they can pursue legal protections under asylum. We also provide comprehensive case management and other social support services to over 300 asylum seeking families in key destinations in the U.S. Many of the asylum seeking families arrive in the U.S. with little to no resources, and have already experienced extreme difficulty in accessing the asylum system.

As an organization, the IRC responds to the world's worst humanitarian crises and helps people whose lives and livelihoods are shattered by conflict and disaster to survive, recover, and gain control of their future. People fleeing persecution who fear for their lives, safety, and well-being due to the hostile environments from which they flee deserve fair access to safety and protection through the U.S. asylum system. The IRC strongly objects to the Proposed Rules as they violate statutory law on asylum, expand the criminal bars to asylum to cover almost all conceivable crime (including non-violent misdemeanors), promote a reprehensible policy of family separation, and deny clearly articulated non-refoulement provisions from a variety of different domestic and international legal documents. Although the reasoning in this comment highlights some of the key problems of the Proposed Rules, for the sake of space and time, the comment

AR.10569

herein is limited in scope and should not be taken as an indication that the issues raised within the comment are exhaustive.

For the reasons detailed in the comments that follow, the Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

Thank you for the opportunity to submit comments on the Proposed Rules. Please do not hesitate to contact Olga Byrne, [Olga.Byrne@Rescue.org](mailto:Olga.Byrne@Rescue.org), to provide further information.

Sincerely,
Olga Byrne, Director, Immigration

**DETAILED COMMENTS in opposition to the Proposed Rules re Procedures for Asylum and Bars to Asylum Eligibility, 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41**

**I.      Introduction**

On December 19th, the Department of Homeland Security (DHS) and the Department of Justice (DOJ) issued a joint set of Proposed Rules that would make three primary changes to the rules governing asylum adjudications.

The first proposed set of changes adds the following seven *categorical* bars to asylum eligibility: (1) any conviction of a felony offense; (2) any conviction for "smuggling or harboring" under 8 U.S.C. § 1324(a), even if the asylum seeker committed the offense for the purpose of bringing her own spouse, child or parent to safety; (3) any conviction for illegal reentry under 8 U.S.C. § 1326; (4) any conviction for an offense "involving criminal street gangs," with the adjudicator empowered to look to any evidence to determine applicability; (5) any second conviction for an offense involving driving while intoxicated or impaired; (6) any conviction *or accusation of conduct* for acts of battery involving a domestic relationship; (7) and any conviction for several newly defined categories of misdemeanor offenses, including *any* drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits.

The second section of the Proposed Rules provides a multi-factor test for immigration adjudicators to determine whether a criminal conviction or sentence that has been vacated, expunged, or modified should be recognized for the purpose of determining asylum eligibility. The third section rescinds a provision in the current rules regarding the reconsideration of discretionary asylum.

Taken together, these proposed changes constitute an unnecessary and punitive overhaul of the asylum protections enshrined in U.S. and international law. The IRC submits these comments to express strong opposition to the entirety of the Proposed Rules and grave concerns

1

with the administration's continued efforts to exclude refugees[1] from obtaining the security and stability the U.S. asylum system has long promised. We urge that the Proposed Rules be rescinded in their entirety.

## II. The current barriers to asylum for people involved in the criminal justice system are already sweeping in scope; adding more barriers is cruel and unnecessary.

The laws, regulations, and processes governing asylum adjudications are already adequately addressing criminal history and are incredibly difficult to navigate. Asylum seekers bear the evidentiary burden of establishing their eligibility for asylum in the face of a complex web of laws and regulations, without the benefit of appointed counsel, and often from a remote, secure detention facility. The obstacles to winning asylum are exceedingly high, and in some jurisdictions, almost no one succeeds.[2]

Specifically, the bars to asylum based on allegations of criminal conduct are *already* sweeping and overly broad in nature and scope. Any conviction for an offense determined to be an "aggravated felony" is considered a *per se* "particularly serious crime" and therefore a mandatory bar to asylum. "Aggravated felony" is a notoriously vague term, which exists only in immigration law. Originally limited to murder, weapons trafficking and drug trafficking, it has expanded exponentially to encompass hundreds of offenses, many of them neither a felony nor aggravated in the U.S. criminal justice system. These include petty offenses such as misdemeanor shoplifting, simple misdemeanor battery, or sale of counterfeit DVDs. The existing crime bars should be narrowed, not expanded.

The 1951 Convention Relating ot the Status of Refugees clearly contemplates excluding individuals who have engaged in serious criminal acts from asylum protections. Refugee protections under the Convention do not apply to persons who have "committed a crime against peace, a war crime, or a crime against humanity" as defined in international law, or have "committed a serious non-political crime outside the country of refuge prior to admission." U.S. laws and regulations already exceeded this narrow exception to refugee protection. As a signatory to the 1967 Protocol, the United States is bound by provisions of the 1951 Convention.

---

[1] A "refugee" is defined under international law in article 1 of the 1951 Convention Relating to the Status of Refugees as a person who is outside his or her country of nationality and, owing to a well-founded fear of persecution on account of race, religion, nationality, membership of a particular social group, or political opinion, is unwilling to avail him/herself of the protection of that country. Under international law, asylum seekers who meet the definition of a refugee must be afforded the protection of the 1951 Convention and benefit from certain provision of the Convention (such as article 31 on non-penalization and article 33 on non-refoulement) even before they are recognized as refugees by states party to the Convention. *See eg*, Dr. Cathryn Costello, "Legal and Protection Policy Research Series: Article 31 of the 1951 Convention Relating to the Status of Refugees," UNHCR, July 2017.

[2] Although there is clear disparity from judge to judge and jurisdiction to jurisdiction, one thing that is common across the country is the backlog of cases. The worse the backlog in the jurisdiction, the worse the experience will be for immigrants who have waited years for a hearing. When their case is finally heard, they may be one of 90 cases heard by the judge that day, and they may not have access to a translator. In many hearings, a continuance is issued and the immigrant is sent back to detention to wait for their next hearing – which is often scheduled several years in the future. Under these conditions, successful outcomes are far and few between, and when they do come, it is after several years of limbo within the complex immigration system. See Kate Brumback, "AP Visits Immigration Courts Across US, Finds Non-Stop Chaos." Jan. 17, 2020. https://apnews.com/7851364613cf0afbf67cf7930949f7d3

The agencies' efforts to add *seven* new sweeping categories of barred conduct to the asylum eligibility criteria are unnecessary and cruel. There is a difference in-kind between the aggravated felonies contemplated by the Refugee Act and the vast extensions in the Proposed Rules. Barring individuals from asylum based on relatively minor offenses renders the "particularly serious" part of the "particularly serious crime" bar meaningless, and places the United States in violation of treaty obligations.

The Proposed Rules are also arbitrary and capricious and constitute a marked departure from past practice. The agencies have offered no evidence to support these changes. One assumption fundamentally underlying the Proposed Rules, for example, is that every noncitizen convicted of any offense punishable by more than a year in prison necessarily constitutes a danger to the community. But no evidence is provided to support that assumption, and a criminal record, does not, in fact, reliably predict future dangerousness.[3] Similarly, the Proposed Rules fail to address or account for the fact that a significant number of people may agree to plead to a crime to avoid the threat of a severe sentence. IRC has seen this happen innumerable times through our immigration legal service programs. Even where proper advisals were not provided according to *Padilla v. Kentucky*, the practical and procedural barriers to obtaining post-conviction relief are often more than vulnerable immigrants can overcome.

### III. The Proposed Rules violate the letter and spirit of U.S. treaty obligations.

The United States acceded to the 1967 Protocol Relating to the Status of Refugees, thereby binding it to the United Nations Convention Relating to the Status of Refugees. As such, the United States is obligated to develop and interpret U.S. refugee law in a manner that complies with the Protocol's principle of non-refoulement (the commitment not to return refugees to a country where they will face persecution on protected grounds), even where refugees have allegedly committed criminal offenses. As noted above, adjudicators already have overly broad authority to deny asylum based on allegations of criminal activity, which vastly exceeds the categories for exclusion and expulsion set out in the Convention. Instead of working towards greater congruence with the terms of the Convention, the Proposed Rules carve out categorical bars from protection that violate both the language and spirit of the treaty.

The provision which most notably violates this principle is the expansion of the asylum bar to include individuals who have been convicted of reentering or attempting to reenter the United States pursuant to 8 U.S.C. § 1326. This is an offense with no element of danger or violence to others. Barring asylum based on the manner of entry directly violates the prohibition in article 31 of the Convention on imposing penalties based on a refugee's manner of entry or

---

[3] Today, over 97% of criminal cases are resolved through plea deals instead of criminal trials. This is a result of a phenomenon known as the "trial penalty." The 'trial penalty' refers to the substantial difference between the sentence offered in a plea deal prior to trial versus the sentence a defendant could potentially receive at trial. An alarming outcome of the trial penalty is the prevalence of innocent people who, instead of going to trial and risking hefty jail sentences, plead guilty to crimes they did not commit. As a result, innocent people with no violent or criminal tendencies have criminal records that can later count against them. See "Report: Guilty Pleas on the Rise, Criminal Trials on the Decline." August 7, 2018. https://www.innocenceproject.org/guilty-pleas-on-the-rise-criminal-trials-on-the-decline/

unlawful presence. This prohibition is a critical part of the Convention because it recognizes that refugees often have little control over the place and manner in which they enter the country where they are seeking refuge.

Furthermore, the U.S. asylum system is failing to offer access at Ports of Entry for those seeking to claim asylum at the border. The Proposed Rules indicate that an individual seeking asylum can proclaim this at entry, so there should be no reason for entry without inspection. However, the administration's informal policy of "metering," which limits the number of asylum seekers it will accept at ports of entry, has caused many asylum seekers—who would have presented at official ports of entry—to attempt entry between ports out of desperation as they face months-long waiting lists in northern Mexico. The administration's "metering" policy has been documented by numerous non-governmental organizations, as well as the U.S. Department of Homeland Security Office of Inspector General.[4]

### IV. Those precluded from asylum eligibility will be gravely impacted even if granted withholding of removal or protection under the Convention Against Torture.

Throughout the Proposed Rules, the agencies defend the harsh and broad nature of their proposal by pointing to the continued availability of alternative forms of relief for those precluded from asylum eligibility under the new rules. The availability of these alternative forms of relief, however - known as withholding of removal and protection under the Convention Against Torture (CAT) - does not nullify the harm created by the Proposed Rule's new limits on asylum. The protections afforded by CAT and by statutory withholding of removal are limited in scope and duration, and are harder to obtain. As a result, a Rule that limits *bona fide* refugees to withholding of removal and CAT protection would impose a very real harm on individuals who have come to the United States in search of protection.

CAT and withholding protections demand a higher level of proof than asylum claims: a clear probability of persecution or torture. Thus, an individual could have a valid asylum claim but be unable to meet the standard under the other forms of relief and therefore would be removed to their country of origin, where they would face persecution, torture, and possible death. The existence of withholding of removal does not mitigate or address the risk imposed by these Proposed Rules.

Additional harms are incurred, even for those who meet the higher standard. For example, they have no ability to travel internationally and attempting to do so may result in removal. This means that refugees granted only withholding of removal or CAT protection are effectively trapped within the United States, often separated from their families because they cannot travel to reconnect in a third country. Further, they cannot reunite with family in the United States because only asylees and refugees are eligible to petition for a spouse and children to join them as derivatives on that status. Neither withholding of removal nor CAT protection allow family members who are in the United States together and pursuing protection on the same

---

[4] U.S. Department of Homeland Security Office of Inspector General, Special Review – Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy, OIG-18-84, Sept. 27, 2018.

4

basis to apply as derivatives on a principal application. For many, this will mean that the Proposed Rules institute yet another formal policy of family separation.

And perhaps most fundamentally, there is continuing jeopardy for withholding and CAT recipients that does not exist for asylum recipients. When a noncitizen is granted asylum, the person receives a legal status. Asylum, once granted, protects an asylee against removal unless and until that status is revoked. None of these protections exists for withholding and CAT recipients. They have no access to permanent residency or citizenship. Instead, they are subject to a removal order and vulnerable to the permanent prospect of deportation to a third country.

**V. The Proposed Rules require immigration judges to make criminal justice determinations, which are outside the expertise and scope of the immigration court system and will undermine judicial efficiency.**

In two significant ways, the Proposed Rules require immigration adjudicators to engage in decision-making to determine whether an asylum applicant's conduct—considered independently of any criminal court adjudication—triggers a categorical bar to asylum eligibility. First, the agencies propose that immigration adjudicators be allowed to consider "all reliable evidence" to determine whether there is "reason to believe" an offense was "committed for or related to criminal gang evidence." Second, the Proposed Rules permit immigration adjudicators to "assess all reliable evidence in order to determine whether [a] conviction amounts to a domestic violence offense;" and to go even further by considering whether non-adjudicated *conduct* "amounts to a covered act of battery or extreme cruelty."

Requiring adjudicators to make complex determinations regarding the nature and scope of a particular conviction or, in the case of the domestic violence bar, *conduct* even where it has not been prosecuted by a competent state authority, will lead to massive judicial inefficiencies and slanted "mini-trials" within the asylum adjudication process. The scope of the "reliable evidence" available to adjudicators in asylum cases is potentially limitless. Because of the lack of strong evidentiary rules in immigration proceedings, it will be nearly impossible for many applicants to rebut negative evidence marshaled against them, even if false. In other cases, asylum applicants will struggle to find evidence in support of their case (especially for those detained). Individual hearings in immigration court, which are typically three or fewer hours under current policies, would provide insufficient time to fully present arguments on both sides of these unwieldy issues. As the immigration courts contend with backlogs that now exceed one million cases, tasking adjudicators with a highly nuanced, resource-intensive assessment of the connection of a conviction to gang activity and/or the domestic nature of alleged criminal conduct—assessments far outside their areas of expertise—will prolong asylum proceedings and invariably lead to erroneous determinations that will give rise to an increase in appeals.

**VI. The Proposed Rules undermine Sixth Amendment protections and harm immigrants unfamiliar with the complex criminal and immigration framework.**

The Proposed Rules outline a new multi-factor process asylum adjudicators must use to determine whether a conviction or sentence remains valid for the purpose of determining asylum eligibility. The proposal includes a rebuttable presumption "against the effectiveness" of an order

5

vacating, expunging, or modifying a conviction or sentence if the order was entered into after the asylum seeker was placed in removal proceedings or if the asylum seeker moved for the order more than one year after the date the original conviction or sentence was entered.

This newly created presumption unfairly penalizes asylum applicants, many of whom may not have the opportunity to seek review of their prior criminal proceedings until applying for asylum. In *Padilla v. Kentucky*, the Supreme Court recognized that the immigration consequences of a conviction are sufficiently serious to invoke Sixth Amendment rights, and to require that a noncitizen defendant be competently advised of them before agreeing to a guilty plea. By imposing a presumption against the validity of a withdrawal or vacatur of a plea (setting aside the plea), the Proposed Rules hold asylum seekers whose rights were violated under *Padilla* to a different standard. Even though they too were denied effective assistance of counsel in the course of their underlying criminal proceedings, asylum seekers will be forced to rebut a presumption that their court-ordered withdrawal or vacatur is invalid. The Proposed Rules therefore compound the harm to immigrants who, in addition to facing persecution in their home countries, have been denied constitutionally compliant process in the U.S. legal system.

The Proposed Rules further improperly authorize immigration adjudicators to second-guess the decision of a state court. The proffered justification for this broad presumption against post-conviction relief is to ensure persons seeking protection "do not have their convictions vacated or modified *for purported rehabilitative purposes that are, in fact, for immigration purposes*." The agencies misread the applicable law, however, by authorizing adjudicators to disregard otherwise valid state orders. Immigration law only requires that orders vacating or modifying convictions be based on substantive or procedural error. The Proposed Rule goes well beyond that requirement.

VII. **The Proposed Rules will disparately impact vulnerable populations already routinely criminalized, including LGBTQ immigrants, survivors of trafficking and domestic violence, and immigrant youth of color.**

The expanded criminal bars exclude from safety and a pathway to citizenship those convicted of offenses that are coincident to their flight from persecution, and do not accomplish the stated goal of making communities safer. They will disparately impact vulnerable populations, who comprise asylum seekers hailing primarily from Central America and the Global South, and those routinely criminalized because of their identities, racially disparate policing practices, or in connection with experiences of trafficking and domestic violence. For these populations especially, the discretion currently delegated to asylum adjudicators is crucial for them to become fully integrated in the larger community. The imposition of additional categorical bars to asylum will further marginalize asylum seekers already struggling with trauma and discrimination.

> *Barring asylum for immigrants convicted of migration-related offenses punishes them for fleeing persecution and seeking safety for minors, and does not make communities safer.*

The expansion of the criminal bars to asylum to include offenses related to the smuggling of noncitizens by parents and family members and those previously removed, further

6

criminalizes vulnerable populations fleeing persecution. The vast expansion of migrant prosecutions at the border during the current administration has created administrative chaos and separated families that do not pose a threat to the safety of our communities. The Proposed Rules expand the asylum bar to parents convicted of smuggling or harboring offenses after taking steps to help their children enter the United States in order to flee persecution. This penalizes parents for doing what is only human—taking all necessary steps to protect their children.

The Proposed Rules also expand the asylum bar to those who have fled persecution multiple times and therefore been convicted of illegal reentry. Their inclusion is premised on conclusory statements regarding the dangerousness of recidivist offenders, without consideration of the seriousness of prior convictions. Rather, the Proposed Rules treat all immigration violations as similar in seriousness to those previously warranting inclusion in the particularly serious crime bar, without any independent evidence to justify the expansion. Such an approach renders meaningless the limiting language of "particularly serious" in the statute. Many immigrants who have previously attempted entry to the United States to flee persecution could not have been aware of the complex statutory regime that governs asylum claims and would not have knowingly abandoned their right to apply for asylum. Some asylum seekers have also been wrongly assessed in prior credible fear interviews. Preserving discretion to grant asylum in these circumstances allows meritorious asylum seekers to be heard and corrects errors in the process.

*Extending the criminal bars to immigrants convicted of misdemeanor document fraud unfairly punishes low-wage immigrant workers and does not make communities safer.*

The Proposed Rules expand the asylum bar to include any asylum seeker who has been convicted of a misdemeanor offense for use of a fraudulent document. In so doing, the Rule entirely ignores the migration-related circumstances that often give rise to convictions involving document fraud. Migrants fleeing persecution often leave their home countries with nothing and must rely on informal networks to navigate their new circumstances. Extension of a blanket bar to asylum seekers who are compelled to resort to fraudulent means to enter the United States, or to remain safely during their applications for asylum, upends decades of settled law directing that violations of law arising from an asylum applicant's manner of flight should constitute only one of many factors to be consulted in the exercise of discretion. Moreover, Congress specifically omitted unlawful employment as a ground of inadmissibility for asylee adjustment—indicating its intent to not punish legitimate refugees for seeking to support themselves out of desperation after fleeing persecution.

*The Proposed Rules will harm communities with overlapping vulnerabilities, including LGBTQ asylum seekers, survivors of trafficking, and survivors of domestic violence.*

Survivors of domestic violence include trafficking survivors and the LGBTQ community members, such that inclusion of offenses related to domestic violence in the expanded asylum bars affects populations with overlapping vulnerabilities. The Proposed Rules too broadly categorize domestic violence offenses as particularly serious and sweep both offenders and survivors into their dragnet. Domestic violence incidents often involve the arrest of both the primary perpetrator and the survivor and do not always yield clear determinations of victim and perpetrator. Authorizing asylum adjudicators to determine the primary perpetrator of domestic

7

assault, in the absence of a judicial determination, unfairly prejudices survivors who are wrongly arrested in the course of police intervention to domestic disturbances.

## VIII. DHS and DOJ have not fulfilled regulatory requirements to adequately and appropriately assess impact of the Proposed Rules.

The Office of Information and Regulatory Affairs, Office of Management and Budget (OMB), has designated this rule a "significant regulatory action" under section 3(f)(4) of Executive Order 12866. The Departments are under obligation to adhere to Executive Order 12866, section 1(b), Executive Order 13563, and Executive Order 13771 in drafting these comments. However, the agencies have failed to include information on the impact the proposed changes would have on the target population or the general population, and do not provide any evidence or indication that an attempt at quantifying this impact, as required in Executive Order 13563, was made.

The agencies admit that the proposed expansion will likely result in fewer asylum grants annually, but fail to attempt to quantify or evaluate the impact of the decrease. In saying that these individuals would possibly qualify for withholding does not detract from the agencies' responsibility to assess the impact in a decrease of asylees. As expounded upon above, withholding and asylum offer vastly different protections and greatly impact the asylum-seeking population. Because of the vast differential in ability to integrate into U.S. society, withholding and asylum also impact the general population and American communities, a fact which is not even mentioned or explored in the Proposed Rules.

Furthermore, the statement that "there is no precise quantification available for the impact, if any, of this rule beyond the general notion that it will likely result in fewer grants of asylum on the whole" is exceedingly misleading. The agencies' off-hand dismissal to account for or consider the impact of the access to lawful permanent residency and citizenship that asylum affords is unjustified and unrealistic. The IRC assists over 3,000 asylees, refugees, and immigrants annually to adjust status to lawful permanent residency, and around 7,000 to apply for citizenship. We work on a daily basis with asylees who are eager and grateful to pursue lawful permanent status in safety and freedom in the U.S. after experiences of torture and other persecution, and often after years of instability regarding status. Asylees often face barriers to continuing on their path to residency and citizenship, including inadequate knowledge and education around their immigration options, insufficient financial means to pay for the high USCIS fees associated with the applications, language barriers, and lack of access to high quality legal assistance. The IRC provides Know Your Rights information sessions to asylees, working with USCIS in some locations to provide information on support services and immigration paths after asylum is granted. We see first-hand that asylees face barriers to lawful permanent status that cannot be easily dismissed, and that despite this, asylees often do become lawful permanent residents and U.S. citizens.

The Departments indicate that they "do not expect the proposed additional mandatory bars to increase the adjudication time for immigration court proceedings involving asylum applications." The reasoning included is that immigration judges already consider the documentation of the

8

applicant's criminal record in proceedings. However, there is no evidence or analysis to support this statement. In fact, the introduction of seven new bars includes a large expansion to not only criminal convictions but also much more nuanced assessments of criminal conduct and charges that have not been deemed convictions in the criminal justice system. Claiming that this additional type of assessment will not take more time is counter-intuitive and illogical, assuming that each case receives due diligence and a fair hearing.

## IX. Conclusion

For the reasons detailed above, the Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.