EXHIBIT F

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekq-w1s8
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0542
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Laura St. John
**Organization:** The Florence Immigrant & Refugee Rights Project

---

## General Comment

On behalf of The Florence Immigrant & Refugee Rights Project ("The Florence Project"), I am writing in response to the above-referenced Proposed Rules to express our vehement opposition to the Proposed Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019.

The Florence Project is a non-profit organization that provides free legal and social services to the over 7,000 men, women, and children who are detained in immigration custody on any given day in Arizona. The Florence Project was founded in 1989 when Immigration Judge John J. McCarrick publicly urged Arizona lawyers to support immigrants, largely asylum seekers, being held in the remote detention center in Florence, Arizona. Judge McCarrick issued his call to action because then, as now, the U.S. was seeing an unprecedented number of people fleeing extreme violence and insecurity in Central America and many of those individuals were forced to plead their case for asylum while detained in remote immigration jails with little to no meaningful access to counsel. Judge McCarrick was deeply concerned about the due process implications of people going before the Court without adequate information or understanding of the law and being potentially wrongfully denied asylum or other forms of relief. The Florence Project was born out of this call to action and has worked extensively with asylum seekers for the past 30 years.

Many of the people we serve come to the U.S. fleeing horrible violence and untenable conditions in their home countries. The majority of such clients have experienced profound trauma in their home countries and in the course of their journey towards safety. Additionally, once here in the U.S., the people we serve face discrimination and criminalization such that they are repeatedly retraumatized within our communities and, particularly, in our legal systems. The proposed regulations are most likely to harm those who are the most traumatized, most vulnerable, and most abandoned by society. The significant expansion of mandatory bars to relief will inevitably result in people being unfairly denied access to asylum without ever having their cases meaningfully reviewed. It also violates both the letter and the spirit of the United States' obligations under international treaties designed to ensure fundamental humanitarian protections to people facing persecution.

AR.10579

Thus, for the many reasons explained in our detailed comment below, the Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal in its entirety, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

# Attachments

2020.01.21 - FIRRP Comment Asylum EOIR 2019-005 - Criminal Bars to Asylum NPRM - FINAL



*Submitted via https://www.regulations.gov/document?D=EOIR-2019-0005-0001*



Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-
AA87, 1615-AC41; Comments in Opposition to Proposed Rulemaking: Procedures for
Asylum and Bars to Asylum Eligibility

January 21, 2020

To Whom it May Concern:

On behalf of The Florence Immigrant & Refugee Rights Project ("The Florence
Project"), I am writing in response to the above-referenced Proposed Rules to express
our vehement opposition to the Proposed Rules to amend regulations relating to
eligibility for asylum published in the Federal Register on December 19, 2019.

The Florence Project is a non-profit organization that provides free legal and social
services to the over 7,000 men, women, and children who are detained in immigration
custody on any given day in Arizona. The Florence Project was founded in 1989 when
Immigration Judge John J. McCarrick publicly urged Arizona lawyers to support
immigrants, largely asylum seekers, being held in the remote detention center in
Florence, Arizona. Judge McCarrick issued his call to action because then, as now, the
U.S. was seeing an unprecedented number of people fleeing extreme violence and
insecurity in Central America and many of those individuals were forced to plead their
case for asylum while detained in remote immigration jails with little to no meaningful
access to counsel. Judge McCarrick was deeply concerned about the due process
implications of people going before the Court without adequate information or
understanding of the law and being potentially wrongfully denied asylum or other forms
of relief. The Florence Project was born out of this call to action and has worked
extensively with asylum seekers for the past 30 years.

Many of the people we serve come to the U.S. fleeing horrible violence and untenable
conditions in their home countries. The majority of such clients have experienced
profound trauma in their home countries and in the course of their journey towards
safety. Additionally, once here in the U.S., the people we serve face discrimination and
criminalization such that they are repeatedly retraumatized within our communities and,
particularly, in our legal systems. The proposed regulations are most likely to harm

**PHOENIX OFFICE**
P.O. Box 32670
Phoenix, AZ 85064
Tel: 602-307-1008
Fax: 602-340-0596

**TUCSON OFFICE**
P.O. Box 86299
Tucson, AZ 85754
Tel: 520-777-5600
Fax: 520-829-4154

www.firrp.org

AR.10581

those who are the most traumatized, most vulnerable, and most abandoned by society. The significant expansion of mandatory bars to relief will inevitably result in people being unfairly denied access to asylum without ever having their cases meaningfully reviewed. It also violates both the letter and the spirit of the United States' obligations under international treaties designed to ensure fundamental humanitarian protections to people facing persecution.

Thus, for the many reasons explained in our detailed comment below, the Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal in its entirety, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

Please do not hesitate to contact Laura St. John, lstjohn@firrp.org to provide further information.

Sincerely,

s/ Laura St. John

Laura St. John
Legal Director
The Florence Immigrant & Refugee Rights Project

_____
_____

**DETAILED COMMENTS in opposition to the Proposed Rules re Procedures for Asylum and Bars to Asylum Eligibility, 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41**

## I.        Introduction

On December 19th, the Department of Homeland Security (DHS) and the Department of Justice (DOJ) issued a joint set of Proposed Rules that would make three primary changes to the rules governing asylum adjudications. The proposal includes a sweeping expansion of the types of criminal offenses that will categorically bar people from being eligible to seek asylum. By barring individuals from asylum based on immigration offenses like unlawful re-entry, misdemeanor drug possession for personal use, or any felony regardless of specific findings of danger the Proposed Rules cast an unjustifiably broad net that will inevitably result in people being unfairly denied access to asylum with no meaningful consideration of the dangers that they face. Such an expansion is at direct odds with the United States' obligations under the United Nations Convention on Refugees that allows states to exclude people from refugee protection **only** in "extreme cases" in which a person has been convicted of a particularly serious crime or constitutes a danger to the community.

The first proposed set of changes adds the following seven *categorical* bars to asylum eligibility:
(1) Any conviction of a felony offense, without any individualized investigation into danger, as is required under the Convention;
(2) Any conviction for "smuggling or harboring" under 8 U.S.C. § 1324(a), even if the asylum seeker committed the offense for the purpose of bringing her own spouse, child or parent to safety or to provide humanitarian aid;
(3) Any conviction for illegal reentry under 8 U.S.C. § 1326, regardless of whether the person ever had a meaningful opportunity to seek asylum in the past;
(4) Any conviction for an offense "involving criminal street gangs," with the adjudicator empowered to look to any evidence to determine applicability, regardless of the fact that many of the databases and information around such gang involvement are rife with errors;
(5) Any second conviction for an offense involving driving while intoxicated or impaired, without regard for the circumstances or trauma that an individual may have suffered that led to such convictions or their rehabilitation;
(6) Any conviction *or accusation of conduct* for acts of battery involving a domestic relationship, again without regard for the circumstances of the accusation or the reality that many cases of domestic violence are handled by police at the outset as potential situations of mutual combat

AR.10583

even if ultimately the evidence demonstrates that one party is the primary abuser; and

(7) Any conviction for several newly defined categories of misdemeanor offenses, including *any* drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits.

The second section of the Proposed Rules provides a multi-factor test for immigration adjudicators to determine whether a criminal conviction or sentence is valid for the purpose of determining asylum eligibility.

The third section rescinds a provision in the current rules regarding the reconsideration of discretionary asylum.

Taken together, these proposed changes are unnecessary, harsh, and unlawfully gut the asylum protections enshrined in United States and international law. The Florence Project submits these comments to express our vehement opposition to the entirety of the Proposed Rules and grave concerns with the administration's continued efforts to exclude refugees from obtaining the security and stability the United States asylum system has long promised. We urge that the Proposed Rules be rescinded in their entirety.

## II.    The Proposed Rules unjustly and cruelly exclude bona fide refugees from asylum eligibility

*The barriers to asylum for those previously involved in the criminal legal system are already sweeping in scope; adding more barriers is cruel and unnecessary.*

U.S. asylum law, first codified in the Refugee Act of 1980, was a bipartisan attempt to reconcile rhetoric of the United States as a nation with a strong humanitarian tradition and a unique role as a haven for persons fleeing oppression with our law. The Act sought to bring the United States domestic laws into compliance with the provisions of the United Nations Protocol Relating to the Status of Refugees, creating a "broad class" of refugees eligible for a discretionary grant of asylum. Implementation of these Proposed Rules would be a significant betrayal of the laudable goals espoused in the adoption of the Act.

The asylum protections provided by United States law are sacred. Asylum provides those fleeing violence and persecution with physical safety, a path to citizenship and security, and the opportunity to reunite with immediate family members who may remain abroad in danger. The domestic asylum system arose in the wake of the horrors of the Holocaust and, for many, it is a symbol of the United States' commitment never to repeat its failure to save thousands of Jewish refugees refused entry to the United States. For people seeking asylum in the United States, the stakes could not be higher—a claim denied often means return to death or brutal persecution.

The laws, regulations, and process governing asylum adjudications are already overly harsh and complex. Asylum seekers bear the burden of establishing eligibility for

asylum in the face of a convoluted web of laws and regulations, without the benefit of appointed counsel. Our clients face these hurdles from remote immigration jails which further exacerbate the difficulty in obtaining evidence and the assistance of counsel. The obstacles to winning asylum are exceedingly high. Indeed, here in Arizona several judges grant less than 10% of all asylum claims that come before them, with one judge only granting 3% of cases. On average, across all of our detained judges, less than 15% of the thousands of asylum claims that came before them were granted between FY2014 and FY2019.[1]

The criminal bars to asylum are *already* sweeping and over-broad in nature and scope. By adding seven new, broad categories of offenses that would categorically bar individuals from being eligible for asylum, the Proposed Rules drain the phrase "*particularly serious* crime," 8 U.S.C. § 1158, of any sensible meaning, contravening our international treaty obligations. Even under current law, any conviction for an offense determined to be an "aggravated felony" is considered a *per se* "particularly serious crime" and therefore a mandatory bar to asylum. However, "aggravated felony" is a notoriously vague term and though originally limited to murder, weapons trafficking and drug trafficking, it now encompasses hundreds of offenses, many of which are neither felonies nor particularly aggravated under state laws, including petty offenses such as misdemeanor shoplifting, simple misdemeanor battery, or sale of counterfeit DVDs. The existing crime bars should be narrowed, not expanded.

Even for those not categorically barred from relief under the current system the immigration adjudicator maintains full discretion to deny asylum based on criminal conduct to a person otherwise deemed a refugee. It is in the interest of justice to allow adjudicators to exercise this discretion rather than implement new categorical bars to relief because many asylum seekers have experienced significant trauma that may have directly led to certain types of criminal offenses. Discretion allows an adjudicator to consider a person's entire experience, including those factors that led to criminal behavior as well as the steps towards rehabilitation that individuals have taken. Additional categorical bars are not needed. The agencies' efforts to add *seven* new sweeping categories of barred conduct to the asylum eligibility criteria is unnecessary and cruel.

The Proposed Rules are also arbitrary and capricious. They would constitute a marked departure from past practice. The agencies putting forward the Proposed Rules have proffered no evidence or data to sufficiently justify these sweeping changes. Indeed, the Proposed Rules appear to rely on the presumption that every noncitizen convicted of any offense punishable by more than a year in prison necessarily constitutes a danger to the community. However, no evidence is provided to support that assumption, and a criminal record, particularly a non-violent criminal record, does not, in fact, reliably predict future dangerousness.  The Proposed Rules are so capricious, they peremptorily assume a noncitizen's supposed danger to the community even in the face of direct evidence demonstrating that the criminal judge concluded that no danger exists by, for example, imposing a noncustodial sentence. Mere conviction for a crime does not make one a present or future danger—which is

---

[1] These figures are based on the averages found in the latest TRAC data from FY2014 to FY2019.

why the Refugee Convention's particularly serious crime bar, made part of United States law through 8 U.S.C. § 1158, should only properly apply if both (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows that she is a present or future danger.

The Board of Immigration Appeals has cautioned that, "in light of the unusually harsh consequences which may befall a [noncitizen] who has established a well-founded fear of persecution; the danger of persecution should generally outweigh all but the most egregious of adverse factors." Yet because of the categorical nature of the seven news bars proposed here, asylum seekers will be precluded from obtaining protection on the basis of a vast array of conduct, without any discretion left to the immigration adjudicator to determine whether the circumstances merit such a harsh penalty. Indeed, in the case of the domestic-violence related ground, the categorical bar will be imposed on the basis of *mere allegations* of conduct without any adjudication of guilt.

Those unjustly precluded from even seeking a discretionary grant of asylum by the Proposed Rules will include: individuals struggling with addiction with one drug-related conviction, regardless of the circumstances of the offense; asylum seekers with two convictions for driving under the influence, regardless of whether the applicant has sought treatment for alcohol addiction or the circumstances of the convictions; community members seeking asylum defensively who have been convicted of a document fraud offense related to their immigration status; and asylum-seeking mothers who have been convicted of their own children across the southern border in an effort to find safety.

One example of how the implementation of the Proposed Rules will disproportionately harm the most vulnerable asylum seekers for minor criminal conduct is our client "Mariam" (names have been changed to protect privacy). Mariam was born and raised in Eritrea and her father was a well-connected politician in the government. When Mariam was about ten years old, soldiers ransacked her home and imprisoned and later killed her father. Mariam fled to the U.S. as a refugee in her teens. Despite showing enormous academic potential in science, Mariam dropped out of college and became homeless. She did not understand that she was showing the first signs of schizophrenia. She hated the medication that doctors provided because it made her feel lethargic and slow. She turned to street drugs to self-medicate for the frightening hallucinations she was experiencing. She later received two convictions for possession of methamphetamine as well as assault. After being placed in removal proceedings, she applied for asylum and cancellation of removal. She demonstrated that employees of the mental health system in Eritrea routinely relied on physical restraints, beatings, and other forms of physical harm to control people who have been diagnosed with mental health disabilities. Eventually the BIA affirmed that the case presented a strong record in favor of humanitarian asylum and the IJ granted Miriam protection. Were this rule to pass, people like Mariam whose convictions stem from a mental health disability and would suffer serious harm in their home countries would not be eligible for asylum.

*The Proposed Rules cruelly disregard the connections between trauma and involvement in the criminal legal system.*

The harsh nature of the Proposed Rules is especially evident when viewed through a trauma-informed lens. Asylum seekers are an inherently vulnerable population because of the trauma they have experienced in their countries of origin and, often, along the journey to find safety. Existing literature suggests that at least one out of every three asylum seekers struggles with depression, anxiety, and/or post-traumatic stress disorder (PTSD). One recent study found the mental health problems facing refugees and asylum seekers so acute that more than a third of the study's sample admitted having suicidal thoughts in the preceding two weeks.

Studies also consistently reveal a high prevalence of comorbidity of PTSD and substance use disorders, with individuals with PTSD *up to 14 times more likely* to struggle with a substance use disorder. Asylum seekers in the United States are often unable to access affordable medical care and treatments for complex trauma; some turn to drugs and alcohol in an effort to self-medicate. The proposed new bars to asylum include *any* drug-related conviction (with one exception for a first minor marijuana possessory offense) and any second conviction for driving under the influence. This approach is not only cruel but also ignores the evidence. *Particularly* given the vulnerabilities of asylum-seeking populations, prior struggles with addiction should be addressed with treatment and compassion, not a closed door and deportation order.

One example of how trauma and substance use disorders can come together to unjustly bar people under the Proposed Rule is the case of "Mateo" (name changed to protect privacy). Mateo is an older indigenous man who experienced extreme violence and genocidal attacks in his community during the Guatemalan Civil War. As a result of his trauma, Mateo turned to alcohol as a coping mechanism and eventually developed a serious mental health condition. In the U.S. this led to several convictions for DUI, although at least one court found him mentally incompetent to stand trial. Despite his convictions, Mateo eventually won Humanitarian Asylum based on the severity of the harm he'd previously suffered and the likelihood he would face other serious harm in light of his mental health condition should he be forcibly returned to Guatemala. Had the Proposed Rules been in effect, Mateo would have been categorically ineligible to seek asylum and likely would not have qualified for any other form of protection.

The Proposed Rules will also exclude from asylum protection countless members of other vulnerable communities who have experienced trauma, abuse, coercion, and trafficking. For example, many LGBTQ immigrants have already experienced a high degree of violence and disenfranchisement from economic and political life in their home countries and hate violence towards undocumented LGBTQ immigrants in the U.S. is already disproportionately high when compared to other members of the LGBTQ community. The isolation many such LGBTQ immigrants face from both their kinship and national networks renders this population uniquely vulnerable to trafficking, domestic violence, and substance abuse, in addition to discriminatory policing practices. Thus, the Proposed Rule will have a disparate impact on LBGTQ individuals whose involvement in the criminal legal system is often connected to past trauma and/or the result of biased policing.

AR.10587

*Barring asylum for immigrants convicted of or accused of conduct involving acts of battery in a domestic relationship is likely to punish victims of domestic violence and does not make communities safer.*

The Proposed Rules too broadly categorize domestic violence offenses as particularly serious and sweep both offenders and survivors into their dragnet. The immigration laws extend protections to domestic violence survivors outside of the asylum context, recognizing the complex dynamics surrounding intimate partner violence. Provisions in the Violence Against Women Act allow adjudicators evaluating claims for relief arising thereunder to exercise discretion based on a number of factors and circumstances. The blunt approach adopted by the Proposed Rules, allowing disqualification based on any conviction or *accusation*, is inconsistent with the approach taken towards survivors elsewhere in the federal immigration statute and does not rely on any evidence-based justification for treating asylum seekers differently.

Moreover, the domestic violence sections of the Proposed Rules include the only categorical bar to asylum for which a conviction is not required. Domestic violence incidents all too often involve the arrest of both the primary perpetrator of abuse and the survivor. These "cross-arrests" do not always yield clear determinations of victim and perpetrator. Authorizing asylum adjudicators to determine the primary perpetrator of domestic assault, in the absence of a judicial determination, unfairly prejudices survivors who are wrongly arrested in the course of police intervention to domestic disturbances.

Finally, the exemption for asylum applicants who can demonstrate their eligibility for a waiver under INA § 237(a)(7)(A) does not cure the harm to asylum seekers caused by imposition of a categorical domestic violence related bar. Rather, it converts a non-adversarial asylum proceeding into a multi-factor, highly specific inquiry into culpability based on circumstances that may be very difficult for an asylum seeker to prove—especially if proceeding without counsel, with limited English proficiency, and from a detention center.

For example, imposition of the Proposed Rule would place people like Juan's family (names have been changed to protect privacy) in an impossible situation. Juan was an adult suffered from schizoaffective disorder. However, because he lacked legal status in the U.S., he was not able to receive regular treatment. While his family paid for what they could out of pocket, when Juan was not taking medication, he behaved unpredictably and, at times, violently. His parents and siblings tried to restrain him, but Juan could overpower them when he experienced hallucinations. The family's only option was to call the police, who would then transport Juan either to jail or to a mental health crisis center, where he would receive treatment for 24 hours before being discharged home. After one such incident, Juan was detained by immigration where he applied for and won asylum in removal proceedings, showing numerous reports demonstrating that Mexican mental health system is characterized by severe abuse and neglect. Were the Rule to pass and bar applicants from asylum for "any conviction or *accusation of conduct f*or acts of battery involving a domestic relationship," Juan would not have been able to seek asylum, even though those acts were the result of

symptoms of his mental health disability. Nor would he have been able to qualify for the waiver under section 237(a)(7)(A).

> *Barring asylum for immigrants convicted of migration-related offenses punishes them for fleeing persecution and does not make communities safer.*

The expansion of the criminal bars to asylum to include offenses related to harboring, smuggling of noncitizens by parents and family members and those previously removed further criminalizes vulnerable populations fleeing persecution. The vast expansion of migrant prosecutions at the border during the current administration has created administrative chaos and separated families that do not pose a threat to the safety of communities in the United States. The Proposed Rules threaten to magnify the harm caused by these reckless policies by further compromising the ability of those seeking safety on the southern border to access the asylum system.

The Proposed Rules expand the asylum bar to parents or other caregivers who are convicted of smuggling or harboring offenses after taking steps to help minor children enter the United States in order to flee persecution. This proposed bar is particularly insidious in light of now-public documents revealing this administration's explicit efforts to utilize smuggling prosecutions against parents and caregivers as part of its strategy of deterring families from seeking asylum in the United States. The Proposed Rules seek to take this widely condemned strategy one step further, by additionally barring those parents *already prosecuted* from obtaining asylum protections for themselves and their children. The Proposed Rules multiply the harms parents and caregivers have experienced in their treacherous journeys to safety and callously penalize parents for doing what is only human—taking all necessary steps to protect their children.

Moreover, here in Arizona, this administration also has aggressively utilized this same harboring statute to prosecute individuals seeking to provide basic humanitarian aid to migrants in the brutal Arizona deserts.[2] Thus, the Proposed Rule not only potentially harms parents seeking to protect their families, but also Samaritans seeking to protect human lives.

The Proposed Rules also expand the asylum bar to those who have fled persecution multiple times and therefore been convicted of illegal reentry. Their inclusion is premised on conclusory statements regarding the dangerousness of recidivist offenders, without consideration of the seriousness of prior convictions. Rather, the Proposed Rules treat all immigration violations as similar in seriousness to those previously warranting inclusion in the particularly serious crime bar, without any independent evidence to justify the expansion. Such an approach renders meaningless the limiting language of "particularly serious" in the statute.

At the Arizona border, we regularly encounter individuals who were wrongfully returned through expedited removal proceedings without being questioned as to their fear of return as required under law. Our experience is not unusual. In three separate

---

[2] *See U.S.A. v. Warren*, 4:18-cr-00223-RCC-DTF-1 (Dist. Az. 2019).

reports the U.S. Commission on International Religious Freedom, an independent, bipartisan commission, has found that despite established procedures requiring officers to screen for fear during expedited removal, in practice these regulations are frequently flouted in a significant and ongoing pattern of noncompliance that means asylum seekers are removed without ever getting an opportunity to seek relief.[3] Despite the fact that such people have never received any opportunity to present their case for asylum, the Proposed Rules would create categorical barriers for these individuals to have an opportunity to seek asylum if they re-enter and are prosecuted under 8 U.S.C. § 1326.

The Proposed Rules conflates multiple entries by noncitizens having prior removal orders with those who have entered multiple times without ever having their asylum claims heard in other ways as well. Many immigrants who attempted entry to the United States to flee persecution are not aware of the complex statutory regime that governs asylum claims and would not have knowingly abandoned their right to apply for asylum. Some asylum seekers have also been wrongly assessed in prior credible fear interviews. And others yet may have previously entered or attempted to enter the United States before the onset of circumstances giving rise to their fear. Preserving discretion to grant asylum in these circumstances allows meritorious asylum seekers to be heard and corrects errors that might have previously occurred.

> *Extending the criminal bars to immigrants convicted of misdemeanor document fraud unfairly punishes low-wage immigrant workers and does not make communities safer.*

The Proposed Rules expand the asylum bar to include any asylum seeker who has been convicted of a misdemeanor offense for use of a fraudulent document. In so doing, the Proposed Rule fails to provide any rational for why use of fraudulent documents renders an individual a danger to the community. Nor does it explain why a categorical bar is necessary when asylum adjudicators are already required to make explicit credibility findings in asylum cases. Moreover, the Rule entirely ignores the migration-related circumstances that often give rise to convictions involving document fraud. Migrants fleeing persecution often leave their home countries with nothing but the clothes on their backs and must rely on informal networks to navigate their new

---

[3] *See Report on Asylum Seekers in Expedited Removal,* U.S. Commission on International Religious Freedom, 2005, available at http://www.uscirf.gov/sites/default/files/resources/stories/pdf/asylum_seekers/Volume_I.pdf (finding significant failure by border patrol to follow procedural safeguards for asylum seekers); *Expedited Removal Study Report Card: 2 Years Later*, USCIRF, 2007, available at http://www.uscirf.gov/sites/default/files/resources/stories/pdf/scorecard_final.pdf  (CBP failed to implement any recommendations for improvement from USCIRF 2005 report); *Barriers to Protection: The Treatment of Asylum Seekers in Expedited Removal*, USCIRF, August 2016, available at http://www.uscirf.gov/sites/default/files/Barriers%20To%20Protection.pdf. (finding continuing and new concerns about asylum seekers' treatment, USCIRF's 2005 recommendations were mostly not implemented, and, flaws now affect more asylum seekers given expansion of expedited removal); *See also* Human Rights Watch, *You Don't Have Rights Here: US Border Screening and Returns of Central Americans to Risk of Serious Harm* (October 16, 2014), at 3-4, https://www.hrw.org/report/2014/10/16/you-dont-have-rights-here/us-border-screening-and-returns-central-americans-risk (finding that many asylum seekers are turned away through expedited removal).

circumstances. Extension of a blanket bar to asylum seekers who are compelled to resort to fraudulent means to enter the United States, or to remain safely during their applications for asylum, upends decades of settled law directing that violations of law arising from an asylum applicant's manner of flight should constitute only one of many factors to be consulted in the exercise of discretion.

Moreover, migrants in vulnerable communities who are struggling to survive during the pendency of their asylum proceedings are often exploited by unscrupulous intermediaries who offer assurances and documentation that turn out to be fraudulent. Many noncitizens working in the low-wage economy face egregious workplace dangers and discrimination and suffer retaliation for asserting their rights. The continued availability of asylum to low-wage immigrant workers can encourage them to step out of the shadows. The expansion of criminal asylum bars to sweep in all document fraud offenses, on the other hand, would unfairly prejudice immigrants with meritorious asylum claims and force them deeper into the dangerous informal economy.

**III.     The Proposed Rules violate the letter and spirit of United States international treaty obligations**

By acceding to the 1967 Protocol Relating to the Status of Refugees, which binds parties to the United Nations Convention Relating to the Status of Refugees, the United States obligated itself to develop and interpret United States refugee law in a manner that complies with the Protocol's principle of non-refoulement (the commitment not to return refugees to a country where they will face persecution on protected grounds), even where potential refugees have allegedly committed criminal offenses. Instead of working towards greater congruence with the terms of the Convention, the Proposed Rules carve out categorical bars from protection that violate both the language and spirit of the treaty.

While the Convention allows states to exclude potential refugees from protection, a state may only do so in limited circumstances. Specifically, the Convention allows states to exclude a person from refugee protection if the individual "having been convicted by a final judgement of a particularly serious crime, constitutes a danger to the community of that country." However, this clause is meant to be limited to only "extreme cases," in which the particularly serious crime at issue is a "capital crime or a very grave punishable act." The United Nations High Commissioner for Refugees (UNHCR) has explained that to constitute a "particularly serious crime," the crime "must belong to the gravest category" and be limited to those who pose "an extremely serious threat to the country of asylum due to the severity of crimes perpetrated." Moreover, the UNHCR has also specifically clarified that the particularly serious crime bar should not encompass less extreme crimes; "[c]rimes such as petty theft or the possession for personal use of illicit narcotic substances would **not** meet the threshold of seriousness." Despite this guidance, the Proposed Rules would categorically bar people from asylum for exactly these types of minor offenses. Finally, when determining whether an individual should be barred from protection for having been convicted of a particularly serious crime, the adjudicator must conduct an individualized analysis and consider any mitigating factors, a requirement that again the Proposed Rule would eliminate for a broad swath of convictions.

As noted above, legislation and agency interpretation of the Immigration and Nationality Act have already expanded the particularly serious crime bar far beyond what was contemplated in the Convention. The Proposed Rules would amplify the dissonance between U.S. refugee law and the Convention, as well as the violation of U.S. obligations under the Convention, by creating categorical bars within categorical bars. For example, at p. 69659, the Proposed Rules first exclude from protection anyone who was convicted of a felony and then at p. 69660, define "felony" as "any crime punishable by more than one year of imprisonment" without any reference to other factors, including dangerousness. The Proposed Rules described the increased categorization of the particularly serious crime bar as necessary because the case-by-case adjudication previously used for non-aggravated felony offenses was "inefficient," but an individualized analysis is exactly what the Convention requires to ensure only those individuals who have been convicted of crimes that are truly serious and therefore present a future danger are placed at risk of refoulement.

Additionally, outside of the aggravated felony context, it has generally been well understood by the Board of Immigration Appeals and the Courts of Appeals that low-level, "run-of-the-mill" offenses do not constitute particularly serious crimes. Under this long-standing interpretation of the particularly serious crime bar in the INA, there is simply no scenario in which low-level offenses like driving under the influence where no injury is caused to another or simple possession of a controlled substance or paraphernalia would constitute a particularly serious crime. The reason for this is common sense. As Judge Reinhardt explained in a concurring opinion in *Delgado v. Holder*, a decision the Proposed Rules cite in support of the expanded bars, run-of-the-mill crimes like driving under the influence have "little in common" with other crimes the Board of Immigration Appeals has deemed particularly serious—e.g., felony menacing with a deadly weapon, armed robbery, and burglary of a dwelling in which the offender is armed or causes injury. Barring individuals from asylum based on these relatively minor offenses renders the "particularly serious" part of the "particularly serious crime" bar meaningless.

As addressed above, the expansion of the asylum bar to include individuals who have been convicted of reentering the United States without inspection pursuant to INA § 276 is also unlike any of the other bars previously established or as interpreted by the Board of Immigration Appeals or Circuit Courts of Appeals. It is an offense with no element of danger or violence to others, and has no victim. Most significantly, and more so than other bars contained in the Proposed Rules, barring asylum based on the manner of entry directly violates the Convention's prohibition on imposing penalties based on a refugee's manner of entry or presence. This prohibition is a critical part of the Convention because it recognizes that refugees often have little control over the place and manner in which they enter the country where they are seeking refuge.

Additionally, as noted above, a significant number of people who have been convicted for reentering the U.S. without inspection pursuant to INA §276 (8 U.S.C. §1326) have never been afforded a meaningful chance to seek asylum in the first instance because the Customs and Border Patrol are engaged in a pattern and practice of

failing to properly conduct regulatorily mandated fear screenings for people placed in expedited removal proceedings.[4]

## IV.  The possibility of relief under withholding of removal or protection under the Convention Against Torture is an inadequate substitute for asylum protection

Throughout the Proposed Rules, the agencies defend the harsh and broad nature of their proposal by pointing to the continued availability of alternative forms of relief – withholding of removal and protection under the Convention Against Torture – for those precluded from asylum eligibility under the new rules. The availability of these alternative forms of relief, however, does not nullify the harm created by the Proposed Rule's new limits on asylum. The protections afforded by CAT and by statutory withholding of removal are limited in scope and duration, and they are significantly harder to obtain. As a result, a Rule that limits *bona fide* refugees to withholding of removal and CAT protection would impose a very real harm on individuals who have come to the United States in search of protection.

First, the most serious harm that can befall an individual as a result of these Proposed Rules is removal to persecution and torture, and the existence of withholding of removal does not account for that risk. CAT and withholding protections demand a higher level of proof than asylum claims: a clear probability of persecution or torture. Thus, an individual could have a valid asylum claim but be unable to meet the standard under the other forms of relief and therefore would be removed to their country of origin, where they would face persecution or even death.

This is equally true for those who are eligible for humanitarian asylum under 8 C.F.R. § 1208.13(b)(1)(iii) based on the severity of past harm or the reasonable possibility that they will suffer other serious harm if returned to their country of origin, as these individuals are unlikely to meet the heightened threshold requirements to establish eligibility for withholding of removal or protection under the CAT.

Even for those who meet the higher standard, withholding and CAT recipients are still prejudiced as the level of protection provided for by either of those forms of relief are significantly less than those available under asylum. For example, they have no ability to travel internationally, which is contrary to the United Nations Convention Relating to the Status of Refugees which affords refugees the right to travel in mandatory terms. Because regulations only provide for travel documents for asylees, refugees granted only withholding of removal or CAT protection are effectively trapped within the United States in long-term limbo and in direct contravention of provisions of the Convention.

Withholding and CAT recipients also face permanent separation from their spouses and children. They can neither reunite with them in a third country, as international travel is prohibited, nor can they petition for their family to join them in the United States. Thus, the Proposed Rules will institute yet another formal policy of

---

[4] *See infra* FN 3.

family separation. To the extent families seek to reunite, family members will have to independently seek asylum in the U.S. which is not only inefficient for the impacted families and back-logged asylum adjudication systems, but also invites inconsistent rulings as different adjudicators assess essentially the same case in various forums.

Withholding and CAT recipients likewise face hurdles in access to employment. Article 17 of the Refugee Convention states that a contracting state "shall accord to refugees lawfully staying in their territory the most favorable treatment accorded to nationals of a foreign country in the same circumstances, as regards the right to wage-earning employment." However, recipients of withholding and CAT enjoy no such right. They must apply for work authorization, and they face frequent delays in the adjudication of these applications, which often result in the loss of legal authorization to work.

And perhaps most fundamentally, there is continuing jeopardy of potential future removal for withholding and CAT recipients that does not exist for asylum recipients. While asylum, once granted, protects an asylee against removal unless and until that status is revoked, no such protection exists for withholding and CAT recipients. They have no access to permanent residency or citizenship. Instead, they are subject to a removal order, vulnerable to the permanent prospect of deportation to a third country, and subject to potential check ins with immigration officials where they can be made to pursue removal to third countries to which they have no connection.

**V.      The Proposed Rules will result in "mini-trials" in immigration court, undermine judicial efficiency and result in racially-biased decision-making**

In two significant ways, the Proposed Rules require immigration adjudicators to engage in decision-making to determine whether an asylum applicant's conduct—considered independently of any criminal court adjudication—triggers a categorical bar to asylum eligibility. First, the agencies propose that immigration adjudicators be allowed to consider "all reliable evidence" to determine whether there is "reason to believe" an offense was "committed for or related to criminal gang activity," or "in furtherance of gang-related activity," triggering ineligibility for asylum in either case. Second, the Proposed Rules permit immigration adjudicators to "assess all reliable evidence in order to determine whether [a] conviction amounts to a domestic violence offense;" and to go even further by considering whether non-adjudicated *conduct* "amounts to a covered act of battery or extreme cruelty."

Requiring adjudicators to make complex determinations regarding the nature and scope of a particular conviction or, in the case of the domestic violence bar, *conduct*, will lead to massive judicial inefficiencies and slanted "mini-trials" within the asylum adjudication process. The scope of the "reliable evidence" available to adjudicators in asylum cases is potentially limitless. Because of the lack of robust evidentiary rules in immigration proceedings, it will be difficult if not impossible for many applicants to rebut negative evidence marshaled against them, even if false; and in other cases, asylum applicants will struggle to find evidence connected to events that may have happened years prior. These mini-trials are particularly burdensome and

unfair to the approximately 86% of all detained respondents who lack access to counsel to assist them with the type of evidence gathering and arguments necessary to refute these extremely broad grounds. Asylum merits hearings, which are typically three or fewer hours under current policies, would provide insufficient time to fully present arguments on both sides of these unwieldy issues and, thus, the implementation of the Proposed Rules would run a very real risk of creating conditions in which asylum-seekers' due process rights are routinely violated.

As the immigration courts contend with backlogs that now exceed one million cases, tasking adjudicators with a highly nuanced, resource-intensive assessment of the connection of a conviction to gang activity and/or the domestic nature of alleged criminal conduct—assessments far outside their areas of expertise—will prolong asylum proceedings and invariably lead to erroneous determinations that will give rise to an increase in appeals. The Proposed Rules repeatedly cite increased efficiency as justification for many of the proposed changes. Yet requiring adjudicators to engage in mini-trials to determine the applicability of categorical criminal bars, rather than relying on adjudications obtained through the criminal legal system, will dramatically *decrease* efficiency in the asylum adjudication process and undermine faith in the fairness of immigration adjudication institutions.

Particularly in the context of the new proposed bar related to alleged gang affiliation, the Florence Project is concerned about the due process implications and potential for erroneous deprivation of asylum for people based on a blanket exclusion for anyone convicted of a crime that an adjudicator deems linked to gang activity. Gang databases are notoriously inaccurate, outdated, and infected by racial bias. By conferring on immigration adjudicators—who generally are not criminologists, sociologists, or criminal law experts—the responsibility to determine if there is "reason to believe" any conviction flows from activity taken in furtherance of gang activity, this rule will necessarily ensnare asylum seekers of color who are tainted by these databases because of the neighborhood where they live and the color of their skin.

Indeed, asylum applicants are *already* frequently subjected to wrongful denials of protection because of allegations of gang activity made by the Department of Homeland Security on the basis of information found in notoriously unreliable foreign databases and "fusion" intelligence-gathering centers outside the United States. Empowering immigration adjudicators to render asylum applicants *categorically* excluded from protection on the basis of such spurious allegations will inevitably result in the wrongful return of many refugees back to harm. The attempt to shoehorn even minor property related offenses into the particularly serious crime category by virtue of a "reason to believe" that an offense is gang-related will inevitably result in the exclusion from protection of asylum seekers of color who live in economically distressed communities. Relying on the definition of "particularly serious crime" to prevent asylum seekers convicted of even minor crimes construed as gang-related from accessing asylum protection is disingenuous at best, and tinged with racial animus at worst.

While the Departments asks for comments to identify what types of links should be sufficient or how else to otherwise define what gang-related activity should bar

asylum, those questions are misguided and based on the wrong premise. A vague "gang related" bar should not be introduced at all. The INA and existing regulations already provide broad bars to asylum for criminal behavior as well as discretion to asylum adjudicators where criminal behavior by an asylum seeker causes concern. Adding this additional, superfluous layer of complication risks erroneously excluding bona fide asylum seekers from protection without adding any useful adjudicatory tool to the process.

**VI.    The proposed definition of "conviction" and "sentence" for the purposes of the new bars further excludes those in need of protection**

The section of the Proposed Rules that outlines a new set of criteria for determining whether a conviction or sentence is valid for the purpose of determining asylum eligibility is ultra vires and is not authorized by the INA. The Proposed Rules impose an unlawful presumption against asylum eligibility for applicants who seek post-conviction relief while in removal proceedings or longer than one year after their initial convictions. They also deny full faith and credit to state court proceedings by attributing improper motives to state court actors.

*The Proposed Rules undermine Sixth Amendment protections and harms those unfamiliar with the complex criminal and immigration framework governing prior convictions.*

In *Padilla v. Kentucky*, the Supreme Court recognized that the immigration consequences of a conviction are sufficiently serious for the Sixth Amendment to require a noncitizen defendant to be competently advised of them before agreeing to a guilty plea. By imposing a presumption against the validity of a withdrawal or vacatur of a plea, the Proposed Rules hold asylum seekers whose rights were violated under *Padilla* to a different standard. Although they too were denied effective assistance of counsel in the course of their underlying criminal proceedings, asylum seekers will be forced to rebut a presumption that their court-ordered withdrawal or vacatur is invalid. The Proposed Rules therefore compound the harm to immigrants who, in addition to facing persecution in their home countries, have been denied constitutionally compliant process in the United States criminal legal system.

Many asylum applicants, especially those in vulnerable populations isolated from resources and unfamiliar with the due process protections available to them in the United States, may not have discovered the defects in their underlying criminal proceedings until their consultation with an immigration attorney, or until they are placed into removal proceedings, which may happen several years after a conviction. Imposing a presumption *against* the validity of a plea withdrawal or vacatur in these cases will undoubtedly lead to the wrongful exclusion of countless immigrants from asylum simply because they were unable to adequately rebut the presumption, particularly in a complex immigration court setting without the benefit of appointed counsel.

*The Proposed Rules violate the full faith, and credit to which state court decisions are entitled.*

AR.10596

The Proposed Rules also improperly allows immigration adjudicators to second-guess state court decisions, even where the order on its face cites substantive and procedural defects in the underlying proceeding. While the Government claims that such a rule is justified in order to "ensure that aliens do not have their convictions vacated or modified for purported rehabilitative purposes that are, in fact, for immigration purposes," the immigration law already requires that orders vacating or modifying convictions must be based on substantive or procedural infirmities in the underlying proceedings to be effective for immigration purposes. The Proposed Rule goes well beyond that requirement, however, by authorizing immigration adjudicators to ignore otherwise valid state court orders.

The Proposed Rules abandon the presumption of regularity that should accompany state court orders, thus upending settled principles of law. The Proposed Rules cite a misleading quote from *Matter of F-* in support of allowing asylum adjudicators to look beyond the face of a state court order. Had the Rules' authors looked to the full case, they would have read the following: "Not only the full faith and credit clause of the Federal Constitution, but familiar principles of law require the acceptance at face value of a judgment regularly granted by a competent court, unless a fatal defect is evident upon the judgment's face. However, the presumption of regularity and of jurisdiction may be overcome by extrinsic evidence or by the record itself." In *Matter of F-*, the Board of Immigration Appeals offers support for the proposition that an adjudicator should presume the validity of a state court order unless there is a reason to doubt it, contrary to the *presumption of irregularity* put forward in the Proposed Rules.

The authority extended to adjudicators by the Proposed Rules also violates the law of multiple circuits. In *Pickering v. Gonzales*, the same *Pickering* on which the Government relies, the Sixth Circuit Court of Appeals held that despite the petitioner's stated motive of avoiding negative immigration consequences, the BIA was limited to reviewing the court order as to the basis for his vacatur. Similarly, in *Reyes-Torres* the Ninth Circuit Court of Appeals held that the motive of the respondent was not the relevant inquiry. Rather, "the inquiry must focus on the state court's rationale for vacating the conviction." Likewise, the Third Circuit Court of Appeals in *Rodriguez v. U.S. Att'y Gen.*, which the Proposed Rules cite as "existing precedent," held that the adjudicator must look only to the "reasons explicitly stated in the record and may not impute an unexpressed motive for vacating a conviction." Moreover, the *Rodriguez* court stated that to determine the purpose of a vacatur, the adjudicator must first look to the face of the order vacating the conviction, and "if the order explains the courts reasons … the [adjudicator's] inquiry must end there." The Proposed Rules contain no such limiting language to guide the adjudicator's inquiry. Instead, the Rules grant adjudicators vague and indefinite authority to look beyond even a facially valid vacatur. Such breadth of authority undermines asylum seekers' rights to a full and fair proceeding.

**VIII.    The Proposed Rules are ultra vires to the federal immigration statute to the extent they purport to bar eligibility through a categorical exercise of discretion**

When Congress speaks clearly through a statute, the plain meaning of that statute governs. Congress by statute permits the Attorney General to designate certain categories of offenses as "particularly serious crimes." As such, Congress *explicitly* permitted the Attorney General to designate a non-aggravated felony to be a particularly serious crime and thus to disqualify a person from asylum. In the context of asylum, all aggravated felonies are *per se* particularly serious crimes and the Attorney General "may designate by regulation [other] offenses that will be considered to be" a particularly serious crime for purposes of asylum.

Here, however—seemingly in an attempt to insulate the Proposed Rules from review, the agencies attempt to designate new bars to asylum both by designating them as "particularly serious crimes" pursuant to 8 U.S.C. § 1158(b)(2)(B)(ii) and rendering them categorically exempt from a positive discretionary adjudication of asylum pursuant to 8 U.S.C. § 1158(b)(2)(C). This effort is unlawful. Section 1158(b)(2)(B)(ii) does permit the Attorney General to, if he wishes, attempt to designate some classes of offenses as particularly serious crimes; such designations are reviewable for legal error (and as explained above, we believe these proposed expansions are unlawful). However, if the offense is not a particularly serious crime, then a discretionary decision must be rendered on the application. It is true that the Attorney General may also provide for "additional limitations and conditions" on asylum applications so long as they are "consistent" with the with the asylum statute. In this case, however, the Proposed Rules add sweeping categories of offenses that automatically remove an applicant from the consideration of discretion—a regulatory proposal that is ultra vires to the plain text of the statute.

To the extent that the proposed rules would adopt a bar to asylum based on a categorical discretionary bar, rather than a particularly serious crime designation, they are similar to the rules struck down by numerous Circuit Courts of Appeal in the context of adjustment of status for those considered by law to be "arriving aliens." Purporting to exercise discretion categorically, then-Attorney General Reno putatively rendered that class of noncitizens ineligible for adjustment of status, a determination that is ordinarily discretionary, even though the statute seemed to allow eligibility. Multiple Circuit Courts of Appeal struck down the proposed regulations, finding them to reflect an impermissible reading of the statute in light of the fact that Congress carefully defined in the statute the categories of people eligible to apply for adjustment of status.

The same logic applies here. In the asylum statute, Congress explicitly made the commission of a particularly serious crime a bar to asylum. The canon of interpretation known as *expressio unius est exclusio alterius* instructs that, "expressing one item of [an] associated group or series excludes another left unmentioned." The Proposed Rules attempt to create numerous categories of discretionary "pseudo-particularly serious crimes," barring asylum through a categorical exercise of discretion even if those offenses are ultimately found not to be particularly serious crimes. Such an effort

violates this canon of interpretation, and places the Proposes Rules ultra vires to the statute.

## IX.    Conclusion

For all of the reasons states above, the Florence Project firmly opposes the Proposed Rules. They are contrary to U.S. asylum law and both the spirit and letter of our international treaty obligations. They will profoundly harm the most vulnerable asylum-seekers and will inevitably result in people with valid claims being wrongfully returned to countries where they face persecution or death. The administration should immediately withdraw their current proposal in its entirety, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.