1
2
3
4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6
7

PANGEA LEGAL SERVICES, *et al.*,

Case No. 20-cv-07721-SI

8

Plaintiffs,

9

v.

10

U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,

11
12

Defendants.

**ORDER GRANTING PLAINTIFFS'
MOTION FOR TEMPORARY
RESTRAINING ORDER; ORDER TO
SHOW CAUSE REGARDING
PRELIMINARY INJUNCTION**

Re: Dkt. No. 21

13
14

When Congress passed the Refugee Act of 1980, it "declare[d] that it is the historic policy

15

of the United States to respond to the urgent needs of persons subject to persecution in their

16

homelands[.]" Pub. L. No. 96-212, § 101(a), 94 Stat. 102.  As part of the law, Congress incorporated

17

the internationally accepted definition of "refugee."  H.R. Rep. No. 96-781 at 19 (1980).  The Act

18

also codified this country's procedures for determining eligibility for asylum.  In doing so, Congress

19

stated, "The objectives of this Act are to provide a permanent and systematic procedure for the

20

admission to this country of refugees of special humanitarian concern to the United States, and to

21

provide comprehensive and uniform provisions for the effective resettlement and absorption of those

22

refugees who are admitted." *Id.* § 101(b), 94 Stat. 102.  The Act also codified exceptions to asylum

23

eligibility that "paralleled" the exceptions to removal relief contained in our international treaties.

24

*E. Bay Sanctuary Covenant v. Barr*, 964 F.3d 832, 840 (9th Cir. 2020).

25

Last month, the Department of Justice and the Department of Homeland Security jointly

26

issued a final rule: Procedures for Asylum and Bars to Asylum Eligibility, 85 Fed. Reg. 67202 (Oct.

27

21, 2020) (amending 8 C.F.R. §§ 208.13, 208.16, 1208.13, and 1208.16) ("the Rule").  The Rule

28

creates new categories that would bar individuals from being eligible for asylum.  Congress has

United States District Court
Northern District of California

already written a long list of crimes that render one, if convicted, ineligible for asylum—drug trafficking, sex trafficking, money laundering, counterfeiting, and many more.  The Rule adds new crimes to that list, with the stated goals of promoting the efficiency of asylum proceedings, discouraging lawless behavior, and protecting the community from danger.  These goals, of course, are not problematic in and of themselves, and in any event, it is not this Court's role to pass judgment on the *wisdom* of the policies that executive agencies may craft in the administration of their duties.

The problem is that the Rule sweeps too broadly.  In doing so, it both contradicts Congress's intent and exceeds the authority Congress gave to the executive agencies.  It does so without sufficient explanation from the agencies for their reasoning and without adequate notice and opportunity for the public to comment on these changes.  "Defendants have not shown that the Rule actually addresses" the problems that the Rule purports to fix.  *E. Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1094, 1118 (N.D. Cal. 2018) ("*EBSC I*"), *aff'd*, 950 F.3d 1242 (9th Cir. 2020). "And even if it did so in some small measure, that would not justify the usurpation of Congressional authority.  As the Ninth Circuit noted: 'There surely are enforcement measures that . . . the Attorney General can take to ameliorate the [immigration] crisis, but continued inaction by Congress is not a sufficient basis under our Constitution for the Executive to rewrite our immigration laws.'"  *Id.* (citation omitted).

Plaintiffs in this case are non-profit immigration services organizations seeking a temporary restraining order ("TRO") to stay and enjoin the Rule from taking effect nationwide.  The Rule is set to take effect November 20, 2020.

For the reasons that follow, the Court will GRANT plaintiffs' motion for a TRO enjoining defendants from implementing and enforcing the Rule.

# BACKGROUND

## I.      Relevant Legal Framework

To understand how the Rule would change asylum law, a brief overview of the history and current legal framework of the law is in order.  "Our asylum law has its roots in the 1951 Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 150 ('Convention'), and the 1967

Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267 ('Protocol')." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 757 (9th Cir. 2018) ("*EBSC II*"). "The United States was an original signatory to both treaties and promptly ratified both." *Id.*  In 1980, Congress passed the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102.  That Act brought U.S. law into conformity with its international obligations under the Convention and Protocol.  *See id.*; *INS v. Cardoza-Fonseca*, 480 U.S. 421, 427, 436-37 (1987).  "The Refugee Act of 1980 established a new statutory procedure for granting asylum to refugees[,]" by commanding that the Attorney General shall establish procedures for noncitizens to apply for asylum, thus codifying this country's international obligation to accept asylees.  *Cardoza-Fonseca*, 480 U.S. at 427 (citing 94 Stat. 105, then codified at 8 U.S.C. § 1158(a)); *EBSC II*, 932 F.3d at 754.

At present, the statute states that "[t]he Secretary of Homeland Security or the Attorney General may grant asylum to an alien who has applied for asylum in accordance with the requirements and procedures established by the Secretary of Homeland Security or the Attorney General under this section if the Secretary of Homeland Security or the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) of this title."  8 U.S.C. § 1158(b)(1)(A).  Section 1101(a)(42)(A), in turn, defines "refugee" as follows:

> any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion[.]

8 U.S.C. § 1101(a)(42)(A).  With certain exceptions, "Section 1158(a) makes three classes of aliens categorically ineligible to apply for asylum: those who may be removed to a 'safe third country' in which their 'life or freedom would not be threatened' and where they would have access to equivalent asylum proceedings; those who fail to file an application within one year of arriving in the United States; and those who have previously applied for asylum and been denied." *EBSC II*, 932 F.3d at 758 (quoting 8 U.S.C. § 1158(a)(2)(A)-(C)).  "The INA [Immigration and Nationality Act] further directs the Attorney General to 'establish a procedure for the consideration of asylum applications filed under subsection (a).' *Id.* § 1158(d)(1). The Attorney General's discretion in

3

establishing such procedures is limited by the specifications of § 1158(b) and (d)." *Id.*

Broadly speaking, the asylum application process is as follows:

To obtain asylum status, applicants must clear three hurdles. First, applicants must establish that they qualify as refugees who have left their country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion," *id.* § 1101(a)(42)(A), and that their status in one of those groups "was or will be at least one central reason" for the persecution, *id*. § 1158(b)(1)(A); *see also id.* § 1158(b)(1)(B).

Second, Congress has established a series of statutory bars to eligibility for asylum, such as an applicant's role in persecuting members of protected groups or "reasonable grounds for regarding the alien as a danger to the security of the United States." *Id.* § 1158(b)(2)(A). In addition, Congress authorized the Attorney General to "by regulation establish additional limitations and conditions, consistent with [8 U.S.C. § 1158], under which an alien shall be ineligible for asylum under [*id.* § 1158(b)(1)]." *Id.* § 1158(b)(2)(C). If "the evidence indicates" that one of these statutory or regulatory bars applies, the applicant bears the burden of proving that it does not. 8 C.F.R. § 1240.8(d).

Finally, even if an applicant satisfies those two requirements, the decision to grant asylum relief is ultimately left to the Attorney General's discretion, *see I.N.S. v. Aguirre-Aguirre*, 526 U.S. 415, 420, 119 S. Ct. 1439, 143 L.Ed.2d 590 (1999); *Delgado v. Holder*, 648 F.3d 1095, 1101 (9th Cir. 2011), subject to the court of appeals' review for whether the Attorney General's decision was "manifestly contrary to the law and an abuse of discretion," 8 U.S.C. § 1252(b)(4)(D).

If an alien is granted asylum status, the Attorney General must refrain from removing the alien and must grant the alien authorization to work in the United States. *Id.* § 1158(c)(1)(A)-(B). The alien's spouse and children may also "be granted the same status as the alien if accompanying, or following to join, such alien." *Id.* § 1158(b)(3)(A). Asylum status also provides a path to citizenship.[] Still, asylum is not irrevocable. The Attorney General may terminate an alien's asylum status based on changed circumstances, a subsequent determination that a statutory bar applies, or under various other conditions. *Id.* § 1158(c)(2).

In addition to asylum, two other forms of relief from removal are generally available under U.S. immigration law. With some exceptions,[] an alien is entitled to withholding of removal if "the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." *Id.* § 1231(b)(3)(A). However, "[t]he bar for withholding of removal is higher; an applicant must demonstrate that it is more likely than not that he would be subject to persecution on one of the [protected] grounds." *Ling Huang v. Holder*, 744 F.3d 1149, 1152 (9th Cir. 2014).

An alien may also seek protection under the Convention Against Torture ("CAT"), which requires the alien to prove that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal," 8 C.F.R. § 1208.16(c)(2), and that the torture would be "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity," *id.* § 1208.18(a)(1). Though these latter two forms of relief require the applicant to meet

a higher bar, they are mandatory rather than discretionary. *See Nuru v. Gonzales*, 404 F.3d 1207, 1216 (9th Cir. 2005).

*E. Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d 838, 844-46 (N.D. Cal. 2018), *aff'd*, 950 F.3d 1242 (9th Cir. 2020).

"Where § 1158(a) governs who may *apply* for asylum, the remainder of § 1158 delineates the process by which applicants may be granted asylum." *EBSC II*, 932 F.3d at 758. Subsection (b) of the statute delineates six categories of noncitizens who are excluded from receiving asylum:

**(A) In General**

Paragraph (1) shall not apply to an alien if the Attorney General determines that—

 **(i)** the alien ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion;

 **(ii)** the alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States;

 **(iii)** there are serious reasons for believing that the alien has committed a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States;

 **(iv)** there are reasonable grounds for regarding the alien as a danger to the security of the United States;

 **(v)** the alien is described in subclause (I), (II), (III), (IV), or (VI) of section 1182(a)(3)(B)(i) of this title or section 1227(a)(4)(B) of this title (relating to terrorist activity), unless, in the case only of an alien described in subclause (IV) of section 1182(a)(3)(B)(i) of this title, the Attorney General determines, in the Attorney General's discretion, that there are not reasonable grounds for regarding the alien as a danger to the security of the United States; or

 **(vi)** the alien was firmly resettled in another country prior to arriving in the United States.

8 U.S.C. § 1158(b)(2). The statute goes on to state:

**(B) Special rules**

 **(i) Conviction of aggravated felony**
For purposes of clause (ii) of subparagraph (A), an alien who has been convicted of an aggravated felony shall be considered to have been convicted of a particularly serious crime.[1]

 **(ii) Offenses**
The Attorney General may designate by regulation offenses that will be

---

 [1] The Immigration and Nationality Act defines "aggravated felony" at 8 U.S.C. § 1101(a)(43).

United States District Court
Northern District of California

considered to be a crime described in clause (ii) or (iii) of subparagraph (A).

**(C) Additional limitations**

The Attorney General may by regulation establish additional limitations and conditions, consistent with this section, under which an alien shall be ineligible for asylum under paragraph (1).

**(D) No judicial review**

There shall be no judicial review of a determination of the Attorney General under subparagraph (A)(v).

*Id.*

"If an applicant successfully establishes refugee status and is not excluded from relief by § 1158(b)(2), the Attorney General '*may* grant asylum,' but is not required to do so.  *See* 8 U.S.C. § 1158(b)(1)(A) (emphasis added).   Asylum is a form of 'discretionary relief.'"  *EBSC II*, 932 F.3d at 759 (quoting *Moncrieffe v. Holder*, 569 U.S. 184, 187 (2013)).

Agency regulations also provide for automatic review where an applicant receives a discretionary denial of asylum but subsequently receives withholding of deportation or removal. Those regulations state:

> **Reconsideration of discretionary denial of asylum.** In the event that an applicant is denied asylum solely in the exercise of discretion, and the applicant is subsequently granted withholding of deportation or removal under this section, thereby effectively precluding admission of the applicant's spouse or minor children following to join him or her, the denial of asylum shall be reconsidered. Factors to be considered will include the reasons for the denial and reasonable alternatives available to the applicant such as reunification with his or her spouse or minor children in a third country.

8 C.F.R. §§ 208.16(e), 1208.16(e).

## II.     The Rule

On December 19, 2019, the Department of Justice ("DOJ") and the Department of Homeland Security ("DHS") (collectively, "the Departments") began the rulemaking process by publishing a joint notice of proposed rulemaking.  *See* Procedures for Asylum and Bars to Asylum Eligibility, 84 Fed. Reg. 69640 (Dec. 19, 2019) ("NPRM" or "the Proposed Rule").  The comment period on the Proposed Rule closed January 21, 2020.  *Id.*  The NPRM was jointly signed by defendants Chad F. Wolf, as Acting Secretary of Homeland Security, and William P. Barr, Attorney General.  *Id.* at

United States District Court
Northern District of California

6

69661.

On October 21, 2020, DHS and DOJ published the Rule in the Federal Register, with an effective date of November 20, 2020.  *See* Procedures for Asylum and Bars to Asylum Eligibility, 85 Fed. Reg. 67202 (Oct. 21, 2020).  The Rule "adopt[ed] the provisions of the NPRM with technical corrections to ensure clarity and internal consistency."  *Id.*  The Rule was signed by Chad R. Mizelle, Senior Official Performing the Duties of the General Counsel, U.S. Department of Homeland Security, to whom defendant Wolf delegated the authority to electronically sign the document; and by defendant Barr.  *Id.* at 67257, 67260.

The Rule amends current DHS and DOJ regulations governing asylum law in three ways.  **First,** it adds new categorical bars to asylum eligibility.  These include bars for: (i) a conviction under the statutes governing smuggling or harboring a noncitizen and illegal reentry; (ii) a conviction that the asylum officer "knows or has reason to believe was committed in support, promotion, or furtherance of the activity of a criminal street gang[;]" (iii) a conviction for driving while intoxicated causing serious bodily injury or death of another; (iv) a second or subsequent conviction for driving while intoxicated; (v) a conviction for "a crime that involves conduct amounting to a crime of stalking; or a crime of child abuse, child neglect, or child abandonment; or that involves conduct amounting to a domestic assault or battery offense," with certain exceptions[2]; (vi) a felony conviction; or a conviction for specified misdemeanor offenses, including crimes related to possession or use of a false identification document, receipt of public benefits without lawful authority, and drug possession or trafficking except for a single offense for marijuana possession for personal use; and (vii) acts of domestic violence, with certain exceptions,[3] even if those acts did not result in conviction, so long as the "asylum officer knows or has reason to believe" that the asylum applicant engaged in such acts.  85 Fed. Reg. at 67202-03, 67258-60.

**Second,** it changes the effect of criminal convictions by defining the terms "felony" and

---

[2] The Rule provides exceptions for a noncitizen who "has been battered or subjected to extreme cruelty and who is not and was not the primary perpetrator of violence in the relationship," upon certain additional findings. *See* 85 Fed. Reg. at 67258-60 (citing section 237(a)(7)(A), codified at 8 U.S.C. § 1227(a)(7)(A)).

[3] *See* n. 2, *supra.*

United States District Court
Northern District of California

"misdemeanor" for purposes of the new categorical bars.  *Id.* at 67259-60.  It states that prior convictions "that have been modified, vacated, clarified, or otherwise altered . . . do not have any effect on the alien's eligibility for asylum unless the court . . . did not do so for rehabilitative purposes or to alleviate possible immigration-related consequences of the conviction." *Id.* at 67203. The Rule creates a presumption that any "modification, vacatur, clarification or other alteration is presumed to be for the purpose of ameliorating the immigration consequences of a conviction if it was entered subsequent to the initiation of removal proceedings or if the alien moved for the order more than one year following the original order of conviction or sentencing." *Id.* at 67203-04.

**Third,** it eliminates the provision in the regulations that provides for automatic review where an individual is denied asylum but subsequently receives withholding of removal.  *Id.* at 67259-60 (removing and reserving 8 C.F.R. §§ 208.16(e), 1208.16(e)).

Specifically, the Rule amends the regulations as follows.

**New Bars to Asylum Eligibility**

The Rule creates new bars to asylum eligibility through the addition of the following language:

(c) . . .

(6) Additional limitations on eligibility for asylum. For applications filed on or after November 20, 2020, an alien shall be found ineligible for asylum if:

(i) The alien has been convicted on or after such date of an offense arising under sections 274(a)(1)(A), 274(a)(2), or 276 of the Act;

(ii) The alien has been convicted on or after such date of a Federal, State, tribal, or local crime that the asylum officer knows or has reason to believe was committed in support, promotion, or furtherance of the activity of a criminal street gang as that term is defined either under the jurisdiction where the conviction occurred or in section 521(a) of title 18;

(iii) The alien has been convicted on or after such date of an offense for driving while intoxicated or impaired as those terms are defined under the jurisdiction where the conviction occurred (including a conviction for driving while under the influence of or impaired by alcohol or drugs) without regard to whether the conviction is classified as a misdemeanor or felony under Federal, State, tribal, or local law, in which such impaired driving was a cause of serious bodily injury or death of another person;

(iv)(A) The alien has been convicted on or after such date of a second or subsequent offense for driving while intoxicated or impaired as those terms are defined under the jurisdiction where the conviction occurred (including a conviction for driving while under the influence of or impaired by alcohol or drugs) without regard to whether the conviction is classified as a misdemeanor or felony under Federal, State, tribal, or local law;

(B) A finding under paragraph (c)(6)(iv)(A) of this section does not require the asylum officer to find the first conviction for driving while intoxicated or impaired (including a conviction for driving while under the influence of or impaired by alcohol or drugs) as a predicate offense. The asylum officer need only make a factual determination that the alien was previously convicted for driving while intoxicated or impaired as those terms are defined under the jurisdiction where the convictions occurred (including a conviction for driving while under the influence of or impaired by alcohol or drugs).

(v)(A) The alien has been convicted on or after such date of a crime that involves conduct amounting to a crime of stalking; or a crime of child abuse, child neglect, or child abandonment; or that involves conduct amounting to a domestic assault or battery offense, including a misdemeanor crime of domestic violence, as described in section 922(g)(9) of title 18, a misdemeanor crime of domestic violence as described in section 921(a)(33) of title 18, a crime of domestic violence as described in section 12291(a)(8) of title 34, or any crime based on conduct in which the alien harassed, coerced, intimidated, voluntarily or recklessly used (or threatened to use) force or violence against, or inflicted physical injury or physical pain, however slight, upon a person, and committed by:

(1) An alien who is a current or former spouse of the person;

(2) An alien with whom the person shares a child in common;

(3) An alien who is cohabiting with or has cohabited with the person as a spouse;

(4) An alien similarly situated to a spouse of the person under the domestic or family violence laws of the jurisdiction where the offense occurs; or

(5) Any other alien against a person who is protected from that alien's acts under the domestic or family violence laws of the United States or any State, tribal government, or unit of local government.

(B) In making a determination under paragraph (c)(6)(v)(A) of this section, including in determining the existence of a domestic relationship between the alien and the victim, the underlying conduct of the crime may be considered and the asylum officer is not limited to facts found by the criminal court or provided in the underlying record of conviction.

(C) An alien who was convicted of offenses described in paragraph (c)(6)(v)(A) of this section is not subject to ineligibility for asylum on that basis if the alien would be described in section 237(a)(7)(A) of the Act were the crimes or conduct considered grounds for deportability under section 237(a)(2)(E)(i) through (ii) of the Act.

(vi) The alien has been convicted on or after such date of—

(A) Any felony under Federal, State, tribal, or local law;

9

(B) Any misdemeanor offense under Federal, State, tribal, or local law involving:

(1) The possession or use of an identification document, authentication feature, or false identification document without lawful authority, unless the alien can establish that the conviction resulted from circumstances showing that the document was presented before boarding a common carrier, that the document related to the alien's eligibility to enter the United States, that the alien used the document to depart a country in which the alien has claimed a fear of persecution, and that the alien claimed a fear of persecution without delay upon presenting himself or herself to an immigration officer upon arrival at a United States port of entry;

(2) The receipt of Federal public benefits, as defined in 8 U.S.C. 1611(c), from a Federal entity, or the receipt of similar public benefits from a State, tribal, or local entity, without lawful authority; or

(3) Possession or trafficking of a controlled substance or controlled-substance paraphernalia, other than a single offense involving possession for one's own use of 30 grams or less of marijuana.

(vii) The asylum officer knows or has reason to believe that the alien has engaged on or after such date in acts of battery or extreme cruelty as defined in 8 CFR 204.2(c)(1)(vi), upon a person, and committed by:

(A) An alien who is a current or former spouse of the person;

(B) An alien with whom the person shares a child in common;

(C) An alien who is cohabiting with or has cohabited with the person as a spouse;

(D) An alien similarly situated to a spouse of the person under the domestic or family violence laws of the jurisdiction where the offense occurs; or

(E) Any other alien against a person who is protected from that alien's acts under the domestic or family violence laws of the United States or any State, tribal government, or unit of local government, even if the acts did not result in a criminal conviction;

(F) Except that an alien who was convicted of offenses or engaged in conduct described in paragraph (c)(6)(vii) of this section is not subject to ineligibility for asylum on that basis if the alien would be described in section 237(a)(7)(A) of the Act were the crimes or conduct considered grounds for deportability under section 237(a)(2)(E)(i)-(ii) of the Act.

85 Fed. Reg. at 67258-60 (amending 8 C.F.R. §§ 208.13, 1208.13).

**Additional Instructions and Definitions for New Bars**

The Rule further defines "felony," which the Rule makes a categorical bar to asylum eligibility in paragraph (c)(6), *supra*, and it clarifies the effect of an order vacating a conviction, modifying a sentence, clarifying a sentence, or otherwise altering a conviction or sentence. Specifically, the Rule, adds several new subsections to the regulations, stating:

(7) For purposes of paragraph (c)(6) of this section:

(i) The term "felony" means any crime defined as a felony by the relevant jurisdiction (Federal, State, tribal, or local) of conviction, or any crime punishable by more than one year of imprisonment.

(ii) The term "misdemeanor" means any crime defined as a misdemeanor by the relevant jurisdiction (Federal, State, tribal, or local) of conviction, or any crime not punishable by more than one year of imprisonment.

(iii) Whether any activity or conviction also may constitute a basis for removability under the Act is immaterial to a determination of asylum eligibility.

(iv) All references to a criminal offense or criminal conviction shall be deemed to include any attempt, conspiracy, or solicitation to commit the offense or any other inchoate form of the offense.

(v) No order vacating a conviction, modifying a sentence, clarifying a sentence, or otherwise altering a conviction or sentence, shall have any effect unless the asylum officer determines that—

(A) The court issuing the order had jurisdiction and authority to do so; and

(B) The order was not entered for rehabilitative purposes or for purposes of ameliorating the immigration consequences of the conviction or sentence.

(8) For purposes of paragraph (c)(7)(v)(B) of this section, the order shall be presumed to be for the purpose of ameliorating immigration consequences if:

(i) The order was entered after the initiation of any proceeding to remove the alien from the United States; or

(ii) The alien moved for the order more than one year after the date of the original order of conviction or sentencing.

(9) An asylum officer is authorized to look beyond the face of any order purporting to vacate a conviction, modify a sentence, or clarify a sentence to determine whether the requirements of paragraph (c)(7)(v) of this section have been met in order to determine whether such order should be given any effect under this section.

85 Fed. Reg. at 67259-60 (amending 8 C.F.R. §§ 208.13, 1208.13).


**Automatic Review of Discretionary Asylum Denials**

Finally, the Rule eliminates and reserves 8 C.F.R. §§ 208.16(e), 1208.16(e), the regulations that provide for automatic review where an applicant receives a discretionary denial of asylum but is subsequently granted withholding of deportation or removal. *See* 85 Fed. Reg. at 67259-60.

***

Although the notice of proposed rulemaking ("NPRM") referred to the Attorney General's

authority to designate by regulation offenses that will be considered to be a particularly serious crime, under 8 U.S.C. § 1158(b)(2)(B)(ii),[4] the final Rule relied only on § 1158(b)(2)(C).[5]  *See* 85 Fed. Reg. at 67207.  The Departments stated,

> Based on the comments received, the Departments realize that the preamble to the NPRM resulted in confusion regarding which authority the Departments relied on in promulgating this rule. Specifically, commenters raised concerns regarding the Departments' reliance on section 208(b)(2)(B)(ii) of the Act (8 U.S.C. 1158(b)(2)(B)(ii)) in support of some of the new bars to asylum eligibility. In response to these concerns and confusion, the Departments emphasize that, as in the proposed rule, the regulatory text itself does not designate any offenses covered in 8 CFR 208.13(c)(6) or 1208.13(c)(6) as specific particularly serious crimes.[footnote] Instead, this rule, like the proposed rule, sets out seven new 'additional limitations,' consistent with the Departments' authority at INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)) to establish 'additional limitations and conditions' on asylum.

*Id.*

The Rule also contained a determination, pursuant to the Regulatory Flexibility Act, 5 U.S.C. §§ 601 et seq., that the Rule "will not have a significant economic impact on a substantial number of small entities.  The rule would not regulate 'small entities' as that term is defined in 5 U.S.C. 601(6).  Only individuals, rather than entities, are eligible to apply for asylum, and only individuals are eligible to apply for asylum or are otherwise placed in immigration proceedings."  85 Fed. Reg. at 67255.  The Departments also determined that the Rule "will not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government.  Therefore, in accordance with section 6 of Executive Order 13132, this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement."  *Id.* at 67257.

---

[4] 8 U.S.C. § 1158(b)(2)(B)(ii) states, "The Attorney General may designate by regulation offenses that will be considered to be a crime described in clause (ii) or (iii) of subparagraph (A)[,]" i.e., a "particularly serious crime" or a "serious nonpolitical crime outside the United States."

[5] 8 U.S.C. § 1158(b)(2)(C) states, "The Attorney General may by regulation establish additional limitations and conditions, consistent with this section, under which an alien shall be ineligible for asylum under paragraph (1)."

United States District Court
Northern District of California

1    **III.**     **Procedural Background**

2        Plaintiffs filed this action on November 2, 2020, and the following day plaintiffs filed an ex

3 parte motion for a TRO.[6]   Dkt. Nos. 1 ("Compl."), 21 ("Mot.").   Plaintiffs are four non-profit

4 organizations serving immigrants.  Compl. ¶¶ 15-18.  Two of the plaintiff groups are based in the

5 San Francisco Bay Area, one "has staff in a dozen states around the country" with affiliates in 48

6 states, and the other is based in the Washington, D.C. region.  *Id.*

7        Plaintiffs bring seven claims for relief, asserting: (1) that the Rule is not in accordance with

8 law, or is in excess of statutory jurisdiction, authority, or limitations, or short of statutory right under

9 the INA and the Administrative Procedure Act ("APA"); (2) that the Rule is arbitrary and capricious

10 or an abuse of discretion under the APA; (3) that defendants failed to provide adequate notice and

11 opportunity to comment under the APA; (4) that defendant Wolf lacked the authority to issue the

12 Rule under the Appointments Clause of the U.S. Constitution, the Homeland Security Act, and the

13 Federal Vacancies Reform Act; (5) violation of the Regulatory Flexibility Act; (6) violation of the

14 Fifth Amendment Due Process Clause; and (7) violation of the Fifth Amendment Equal Protection

15 Component.  *Id.* at 36-44.

16        On November 4, 2020, the case was reassigned to the undersigned Judge, who ordered that

17 plaintiffs effect service of process and provide defendants with notice of the motion for a TRO.  Dkt.

18 Nos. 22, 24.  Defendants filed an opposition, Dkt. No. 57 ("Opp'n"), and plaintiffs filed a reply

19 brief, Dkt. No. 68 ("Reply").  The Court also received and granted two motions for leave to file

20 amicus curiae briefs—by immigration legal services organizations, and by immigration law

21

22        [6] Plaintiffs are Pangea Legal Services ("Pangea"); Dolores Street Community Services, Inc.

23 ("DSCS"); Catholic Legal Immigration Network, Inc. ("CLINIC"); and Capital Area Immigrants' Rights Coalition ("CAIR Coalition").

24        Defendants are the U.S. Department of Homeland Security; Chad F. Wolf, Acting Secretary of Homeland Security; Kenneth T. Cuccinelli, Senior Official Performing the Duties of the Deputy

25 Secretary for the Department of Homeland Security; U.S. Citizenship and Immigration Services; U.S. Immigration and Customs Enforcement; Tony H. Pham, Senior Official Performing the Duties

26 of the Director of U.S. Immigration and Customs Enforcement; U.S. Customs and Border Protection; Mark A. Morgan, Senior Official Performing the Duties of the Commissioner of U.S.

27 Customs and Border Protection; U.S. Department of Justice; William P. Barr, U.S. Attorney General; Executive Office for Immigration Review; and James McHenry, Director of the Executive

28 Office for Immigration Review.

United States District Court
Northern District of California

professors—in support of plaintiffs' motion; defendants accordingly received leave to file a sur-reply to address amici's arguments.[7]  *See* Dkt. Nos. 53, 56, 62.

On November 18, 2020, the Court held a hearing via videoconference at which both sides appeared.  Plaintiffs' motion for a TRO is now ripe for review.

## LEGAL STANDARDS

### I.     Injunctive Relief

"[I]njunctive relief [is] an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008).  In order to obtain a temporary restraining order or a preliminary injunction, the plaintiff "must make a 'threshold showing' of four factors."  *E. Bay Sanctuary Covenant v. Barr*, 964 F.3d 832, 844 (9th Cir. 2020) ("*EBSC IV*") (quoting *Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011) (per curiam)); *see also Jones v. H.S.B.C. (USA)*, 844 F. Supp. 2d 1099, 1099 (S.D. Cal. 2012) (standard for granting a temporary restraining order is similar to standard for granting a preliminary injunction).  The plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter*, 555 U.S. at 20 (citations omitted). Alternatively, the plaintiff may demonstrate "that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor," so long as the other two *Winter* factors are also met.  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011). "These factors are evaluated on a sliding scale."  *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1271 (9th Cir. 2020) ("*EBSC III*") (citing *All. for the Wild Rockies*, 632 F.3d at 1131-34).

### II.     Administrative Procedure Act

The APA provides, in relevant part, that

The reviewing court shall--

_____

[7] Defendants subsequently filed a notice stating, "Having now had the opportunity to review both amicus briefs, Defendants do not believe a response is necessary."  Dkt. No. 66.

**. . . (2)** hold unlawful and set aside agency action, findings, and conclusions found to be--
**(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
**. . .**
**(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
**(D)** without observance of procedure required by law; . . . .

5 U.S.C. § 706(2); *see also EBSC III*, 950 F.3d at 1271.

## DISCUSSION

Plaintiffs' arguments are numerous. Plaintiffs challenge the Rule on substantive and procedural grounds. They argue that the Rule—particularly the new categorical asylum bars and the treatment of court orders that vacated or modified criminal convictions or sentences—is inconsistent with the INA. They argue that some of the Rule's new categorical bars are unconstitutionally vague. They argue the Rule is arbitrary and capricious as well as procedurally invalid. Plaintiffs seek a TRO to enjoin the Rule's implementation nationwide.

Defendants oppose the motion, arguing that the INA "confers broad discretionary authority on the Attorney General and Secretary of Homeland Security over asylum," and that this authority encompasses adopting categorical "limitations and conditions" on asylum eligibility so long as they are "consistent with" the statute. Opp'n at 1. Defendants reject plaintiffs' due process allegations, arguing the Due Process Clause does not protect plaintiffs' "hypothetical claims of harm on behalf of third-party aliens[,]" particularly where "the Rule calls for application of standards on a case-by-case basis." *Id.* at 2. Defendants state that the agencies "explained the basis for the Rule and supported its judgments with a robust administrative record" and so the Rule is not arbitrary and capricious. *Id.* Defendants also disclaim any allegation that the Rule suffers from procedural deficiency. *Id.* at 2-3. According to defendants, the *Winter* test favors defendants and so a TRO should not issue. *See id.* at 3. Defendants urge that "if the Court grants any relief, it must be limited to those portions of the Rule found unlawful, as applied to Plaintiffs or their bona fide clients." *Id.* at 3.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

## I.      Likelihood of Success on the Merits

### A.      Not In Accordance with Law under the INA and APA

Plaintiffs' first claim for relief, and truly the heart of plaintiffs' substantive challenge to the Rule, alleges that the Rule is not in accordance with law, or is in excess of statutory jurisdiction, authority, or limitations, or short of statutory right under the INA and the APA, in violation of 5 U.S.C. § 706(A) and (C).

This year, the Ninth Circuit has had several occasions to analyze whether new agency rules exceeded the scope of authority conferred by the asylum statute.  Those cases are instructive and are worth summarizing here.  In *East Bay Sanctuary Covenant v. Trump* ("*EBSC III*"), the Ninth Circuit reviewed the district court's grant of a TRO and preliminary injunction enjoining a rule jointly promulgated by the Departments that, in conjunction with a Presidential proclamation, operated to make migrants ineligible for asylum if they entered the United States other than at a port of entry.  950 F.3d 1242 (9th Cir. 2020).  The Departments adopted the rule under 8 U.S.C. § 1158(b)(2)(C).[8]  *Id.* at 1272.  On reviewing whether this executive action violated the APA, the court explained,

> To determine whether the Rule is 'not in accordance with law,' [*see* 5 U.S.C. § 706(2)(A),] we apply the framework established in *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984).  Under *Chevron*, we first consider "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter." *Campos-Hernandez v. Sessions*, 889 F.3d 564, 568 (9th Cir. 2018) (quoting *Chevron*, 467 U.S. at 842, 104 S. Ct. 2778).  Federal courts are "the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." *Chevron*, 467 U.S. at 843 n.9, 104 S. Ct. 2778.

*Id.* at 1271-72.  The court proceeded, "We consider, then, whether the Rule conflicts with Congress's intent.  The only section of the INA implicated by the Rule is section 1158 ('Asylum')." *Id.* at 1272.

---

[8] This was apparently the first time the Attorney General had used § 1158(b)(2)(C) to "exercise[] the authority to establish additional 'limitations or conditions' beyond those Congress enumerated in § 1158(a)(2) and (b)(2)." *EBSC II*, 932 F.3d at 759.

United States District Court
Northern District of California

The *EBSC III* court looked to section 1158(a), governing asylum applications. That subsection "provides that migrants arriving anywhere along the United States' borders may apply for asylum." *Id.* (citing 8 U.S.C. § 1158(a)). The agency rule being challenged, by contrast, "require[d] migrants to enter the United States at ports of entry to preserve their eligibility for asylum." *Id.* In that way, it was "effectively a categorical ban on migrants who use a method of entry explicitly authorized by Congress in section 1158(a)." *Id.* Quoting the district court's language that "'[i]t would be hard to imagine a more direct conflict' than the one presented here[,]" the appeals court found the agency action was "not in accordance with law." *Id.* (quoting 5 U.S.C. § 706(2)(A); *EBSC I*, 354 F. Supp. 3d at 1112). And even if the statutory language was not clear, the court found the rule failed at the second step of *Chevron* because it was arbitrary and capricious. *Id.* at 1273. By conditioning asylum eligibility on a migrant's manner of entry, "a factor that has long been understood as worth little if any weight," the court found the rule "flouts this court's and the [Board of Immigration Appeals'] discretionary, individualized treatment of refugees' methods of entry, and infringes upon treaty commitments we have stood by for over fifty years." *Id.* at 1273-77 (internal quotation marks and citations omitted). After finding the remaining *Winter* factors met, the court affirmed the granting of the TRO and the preliminary injunction that enjoined the rule from going into effect nationwide.

Months later, the Ninth Circuit again affirmed a district court's decision to grant a preliminary injunction preventing the Departments from enforcing a rule that would, "[w]ith limited exceptions, . . . categorically den[y] asylum to aliens arriving at our border with Mexico unless they have first applied for, and have been denied, asylum in Mexico or another country through which they have traveled." *EBSC IV*, 964 F.3d at 838. As with *EBSC III*, the court found the rule was not "consistent with" the Immigration and Nationality Act and was arbitrary and capricious. As with the rule at issue in *EBSC III*, and as is the case here, the Departments relied on § 1158(b)(2)(C) for the authority to promulgate the rule.[9] *See id.* at 845.

---

[9] In their briefing, the defendants in *EBSC IV* expressly did not rely on *Chevron* for the authority to promulgate the rule. *EBSC IV*, 964 F.3d at 845-46. The Ninth Circuit found that it would reach the same conclusion under *Chevron* or otherwise because the challenged rule was "contrary to the unambiguous language of § 1158." *Id.* Likewise, defendants in this case do not

17

In *EBSC IV*, the court explained that

> [a]sylum bars under § 1158 fall into two broad categories.  As relevant here, the first category covers aliens who may otherwise be entitled to asylum but who pose a threat to society—aliens who have persecuted others, aliens who have been convicted of particularly serious crimes, aliens who may have committed serious non-political crimes outside the United States, and aliens who may be terrorists or a danger to the security of the United States.  *See* 8 U.S.C. § 1158(b)(2)(A)(i)-(iv).  The second category covers aliens who do not need the protection of asylum in the United States—aliens who may be removed to a safe third country, and aliens who have firmly resettled in another country.  *See id.* § 1158(a)(2)(A) and (b)(2)(A)(vi).

*Id.* at 846.  The court rejected the challenged rule as inconsistent with the statute because, in contrast to the safe-third-country and firm-settlement bars laid out in the statute, the rule "does virtually nothing to ensure that a third country is a 'safe option.'"[10]  *Id.* at 847 (citations omitted).  The *EBSC IV* court also rejected the government's suggestion "that the Attorney General has equivalent discretion to establish criteria for asylum eligibility" as the Attorney General has discretion to deny asylum to a noncitizen.  *Id.* at 849.  The court noted that "the discretion to prescribe criteria for eligibility is constrained by § 1158(b)(2)(C)[,]" emphasizing that to take the government's view would be to read the "consistent with" language out of the statute.  *Id.* ("When enacting the [Illegal Immigration Reform and Immigrant Responsibility Act of 1996], Congress went out of its way to insert the 'consistent with' language into § 1158(b)(2)(C), adding it to an earlier draft of IIRIRA that had not contained that language.").  The court additionally found the rule arbitrary and capricious.  *Id.* at 849-50.  It accordingly affirmed the injunction "covering the four states along our border with Mexico."  *Id.* at 857-58.

With this background in mind, the Court examines the Rule in the context of the statutory language and concludes that the Rule is contrary to the unambiguous language of the statute.  Here, the sections of the INA implicated by the Rule are 8 U.S.C. sections 1101, defining the terms "refugee" and "aggravated felony," and 1158, governing asylum.

---

cite *Chevron* in their brief.  *See generally* Opp'n.

[10] In *EBSC IV* the government did not argue, as it does here, that the rule was "consistent with" the statutory provisions barring noncitizens who "are persecutors, criminals, or a threat to national security."  *See EBSC IV*, 964 F.3d at 846.

United States District Court
Northern District of California

### 1.     New Bars to Asylum Eligibility

The Court is persuaded by plaintiffs' arguments that the new categorical bars to asylum eligibility are contrary to the statutory language and exceed the authority conferred on the Attorney General under 8 U.S.C. § 1158(b)(2)(C), for several reasons.  As explained by the Ninth Circuit, and as relevant here, one of the two statutory categories of asylum bars is the bar "cover[ing] aliens who may otherwise be entitled to asylum but who pose a threat to society."  *EBSC IV*, 964 F.3d at 846 (citing 8 U.S.C. § 1158(b)(2)(A)(i)-(iv)).  Congress gave the Attorney General the power to "designate by regulation offenses that will be considered to be a crime described in" the "particularly serious crime" bar of § 1158(b)(2)(A)(ii).[11]  8 U.S.C. § 1158(b)(2)(B)(ii).  Yet this is not the authority on which the Departments rely in adding new categorical bars in the Rule.  *See* 85 Fed. Reg. at 67207.  The Departments describe the new bars created in the Rule as "*similar to* 'particularly serious crimes'" *see id.* (emphasis added), and they rely on § 1158(b)(2)(C) for their authority.[12]  *See id.*

The Court concludes that the Departments' use of § 1158(b)(2)(C) to designate new categories of crimes that will bar asylum eligibility, in the manner the Rule has done here, is contrary to statute.  Section 1158(b)(2)(B)(ii) uses the term "offenses."  It gives the Attorney General

---

[11] The clause also gives the Attorney General authority to "designate by regulation offenses that will be considered to be a crime described in" the "serious nonpolitical crime outside the United States" bar in section 1158(b)(2)(A)(iii).  *See* 8 U.S.C. § 1158(b)(2)(A)(ii).  However, that bar is not at issue in this case.

[12] The Departments stated,

. . . although the Departments are not specifically designating any categories of offenses as ''particularly serious crimes,'' the authority of the Attorney General and the Secretary to deny eligibility to aliens convicted of such offenses helps demonstrate that the new bars are ''consistent with'' the INA because the offenses to which the new bars apply—*similar to* ''particularly serious crimes''—indicate that the aliens who commit them may be dangerous to the community of the United States or otherwise may not merit eligibility for asylum. As a result, the Departments need not address in detail commenters' concerns about whether discrete categories of offenses should constitute ''particularly serious crimes'' because (1) the new rule does not actually designate any specific offense as such crimes; and (2) section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)), as already discussed and as recognized by the Departments, independently authorizes the Attorney General and the Secretary to establish additional limitations and conditions on asylum eligibility. 85 Fed. Reg. at 67207 (emphasis added).

authority to "designate by regulation *offenses*" that will be considered to be a "particularly serious crime." 8 U.S.C. § 1158(b)(2)(B)(ii) (emphasis added). Section 1158(b)(2)(C), by contrast, gives the Attorney General authority to "by regulation establish *additional limitations and conditions*, consistent with this section, under which an alien shall be ineligible for asylum under paragraph (1)." *See id.* §1158(b)(2)(C) (emphasis added). To read subsection (b)(2)(C) as allowing the Attorney General to designate additional offenses as categorical bars to asylum would render subsection (b)(2)(B)(ii) entirely superfluous. "A statute should be construed so that . . . no part will be inoperative or superfluous, void or insignificant." *EBSC IV*, 964 F.3d at 848 (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)). Had Congress intended to given the Attorney General authority to designate offenses that would render a noncitizen ineligible for asylum, outside of the "particularly serious crime" bar, then it either would have added that language into the power to designate offenses in subsection (b)(2)(B)(ii), or it would have used the term "offenses" in subsection (b)(2)(C), as it did in the subsection immediately preceding it. Subsection (b)(2)(C) simply does not give the Attorney General the authority to designate additional *offenses* that will render someone ineligible for asylum.

Defendants rely heavily on the fact that an award of asylum is within the Attorney General's discretion. But as the Ninth Circuit has already explained, "Discretion to deny asylum to eligible aliens . . . is different from discretion to prescribe criteria for asylum eligibility." *EBSC IV*, 964 F.3d at 849. Tellingly, defendants ignore § 1158(b)(2)(B)(ii) in their brief. Instead, they conflate this provision with § 1158(b)(2)(C), arguing that the latter subsection "permitted the Departments to specify 'additional' *crimes* as disqualifying[.]" *See* Opp'n at 10 (emphasis added); *see also id.* at 8 (arguing that § 1158(b)(2)(C) "expressly authorized the Executive Branch to issue bars to cover additional categories of" criminal aliens). When questioned at the hearing, defendants took the view that § 1158(b)(2)(C) allows for additional "bars" to asylum eligibility, and that the reference to "additional limitations and conditions" in that subsection allows for new "bars" on top of those imposed in § 1158(b)(2)(A), arguing that § 1158(b)(2)(C) modifies the limitations and conditions already laid out in § 1158(b)(2)(A). That is flatly contradicted by the statute. Section 1158(b)(2)(C) allows the Attorney General to establish "additional limitations and conditions, consistent with this

20

United States District Court
Northern District of California

section, under which an alien shall be ineligible for asylum *under paragraph (1)*."[13]   8 U.S.C. § 1158(b)(2)(C) (emphasis added).  Essentially, defendants' position is that, with § 1158(b)(2)(C), Congress has given them complete power to designate *any* offense conduct as an asylum bar.  *See* Opp'n at 2 ("Congress never said that new bars can apply only to conduct that reaches some qualitative level of seriousness.").[14]  If Congress indeed gave the executive branch the authority to bar asylum eligibility irrespective of a crime's seriousness, then defendants apparently could bar asylum eligibility based on a traffic ticket.  The Court cannot read this congressional intent into the asylum statute.

Amici immigration law professors argue, and this Court agrees, that "[b]y including minor offenses, Defendants render the language of § 1158(b)(2)(A)(ii) superfluous by adding minor offenses that do not match the nature or impact of a 'particularly serious crime.'"  Dkt. No. 56-1 at 7-8.  Amici further argue that "Congress expressly states that the particularly serious crime bar applies only where the person (i) is 'convicted by final judgment' (ii) of a 'particularly serious crime' and (iii) 'constitutes a danger to the community of the United States.'"  *Id.* at 8 (citing 8 U.S.C. § 1158(b)(2)(A)(ii)).  But the Rule would render someone categorically ineligible for asylum based on criminal history even where there is no conviction by final judgment and even where the crime cannot arguably be either particularly serious or constitute a danger to the community.  For instance, as plaintiffs note, the addition of misdemeanor drug possession to the list would mean that a second misdemeanor conviction for possessing a small amount of marijuana for personal use[15] now makes the applicant ineligible for asylum.  It is hard to conceive of how such a misdemeanor

---

[13] Paragraph (1) addresses "Conditions for granting asylum[,]" "[i]n general[,]" which encompasses eligibility (including whether someone is a "refugee" within the meaning of § 1101(a)(42)(A)) and burden of proof.  8 U.S.C. § 1158(b)(1).

[14] The Departments echo this position in the preamble to the Rule, stating, "even assuming, arguendo, that the offenses designated by the final rule do not necessarily reflect an alien's dangerousness, the Attorney General and the Secretary retain the authority to promulgate the new bar.  Accordingly, the Departments are unpersuaded by commenters' concerns regarding whether these offenses may not pose a danger to the community because such a finding is not required under section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C))."  85 Fed. Reg. at 67222.

[15] The Rule exempts a single misdemeanor conviction for possession of a small amount of marijuana for personal use.

would rise to the level of "particularly serious" or how it would constitute a danger to the broader community. Additionally, the Rule bars asylum where the "asylum officer knows or has reason to believe that the alien has engaged . . . in acts of" domestic battery or extreme cruelty, regardless of whether or not there is a criminal conviction. *See* 85 Fed. Reg. at 67256 n.44 (noting that this new bar "does not necessarily require a criminal conviction or criminal conduct"), 67258-60 (adding 8 C.F.R. §§ 208.13(c)(6)(vii), 1208.13(c)(6)(vii)).

Moreover, and relatedly, certain of the Rule's new categories of offenses, in and of themselves, conflict directly with the asylum statute. For instance, the Rule would render someone ineligible for asylum if he or she "has been convicted . . . of an offense arising under sections 274(a)(1)(A), 274(a)(2), or 276 of the Act[.]" 85 Fed. Reg. at 67258-60 (adding 8 C.F.R. §§ 208.13(c)(6)(i), 1208.13(c)(6)(i)). Section 274 governs "bringing in and harboring certain aliens," while section 276 governs illegal reentry. *See* 8 U.S.C. §§ 1324, 1326. But Congress has already spoken on this issue, and it created a carve-out for would-be asylees who have prior convictions under section 274 if the person had a one-time offense for assisting his or her own spouse, child, or parent. *See* 8 U.S.C. § 1101(a)(43)(N) (defining "aggravated felony" to include an offense under 8 U.S.C. § 1324(a), "except in the case of a first offense for which the alien has affirmatively shown that the alien committed the offense for the purpose of assisting, abetting, or aiding only the alien's spouse, child, or parent (and no other individual) to violate a provision of this chapter"); *see also* 8 U.S.C. § 1101(a)(43)(O) (making illegal reentry an aggravated felony, thus barring asylum eligibility, only if the individual was previously deported on the basis of a conviction for another aggravated felony). The Rule contains no similar carve-out. In other words, while Congress determined that a first-time offense for bringing one's own child into this country should not be an "aggravated felony" that would bar asylum eligibility, the Rule has the opposite effect.

For all these reasons, the Court concludes plaintiffs are likely to succeed on the merits of their claim that the Rule's new categorical offenses barring asylum eligibility, adding paragraph (c)(6) to the regulations at 8 C.F.R. §§ 208.13 and 1208.13, are contrary to statute and in excess of the Departments' authority and therefore violate the APA.

United States District Court
Northern District of California

### 2.     Additional Instructions and Definitions for New Bars

The second component of the Rule elaborates on the effect of how the new categories of crimes in paragraph (c)(6) are to apply.  That is, the Rule adds paragraphs (c)(7)-(9) to provide "additional instruction and definitions for analyzing the new bars to eligibility" listed in paragraph (c)(6).  *See* 85 Fed. Reg. at 67203, 67259-60.  Paragraph (c)(7) defines the terms "felony" and "misdemeanor" "[f]or purposes of paragraph (c)(6) of this section[.]"  *Id.* at 67259 (adding 8 C.F.R. §§ 208.13(c)(7), 1208.13(c)(7)).  Additionally, for purposes of paragraph (c)(6), paragraph (c)(7) states that, "[n]o order vacating a conviction, modifying a sentence, clarifying a sentence, or otherwise altering a conviction or sentence, shall have any effect unless the asylum officer determines that . . . [t]he order was not entered for rehabilitative purposes or for purposes of ameliorating the immigration consequences of the conviction or sentence."  *Id.* (adding 8 C.F.R. §§ 208.13(c)(7)(v), 1208.13(c)(7)(v)).  The Rule also creates a presumption that the order was for impermissible rehabilitative purposes or for purposes of ameliorating the immigration consequences if: (i) the order was entered after removal proceedings began; or (ii) the order was entered more than one year after the underlying conviction or sentencing.  *Id.* (adding 8 C.F.R. §§ 208.13(c)(8), 1208.13(c)(8)).  Paragraph (c)(9) of the Rule states, "An asylum officer is authorized to look beyond the face of any order purporting to vacate a conviction, modify a sentence, or clarify a sentence to determine whether the requirements of paragraph (c)(7)(v) of this section have been met in order to determine whether such order should be given any effect under this section."  *Id.* (adding 8 C.F.R. §§ 208.13(c)(9), 1208.13(c)(9)).  In other words, revisiting our above example of an asylum seeker with a second-time misdemeanor conviction for possession of a small amount of marijuana for personal use: *even if* the court that sentenced her later determined that her constitutional rights were violated in the process and vacates the conviction, if the court does that more than a year after the conviction, then under the Rule the asylum officer will presume that the conviction was improperly vacated and will find her ineligible for asylum unless she can show otherwise.

Having already found plaintiffs likely to succeed on the merits of their claim of violation of the APA because paragraph (c)(6) is contrary to the INA and exceeds statutory authority, the Court accordingly finds paragraphs (c)(7) through (9) likewise violate the APA in a similar manner.  These

1    paragraphs depend on paragraph (c)(6) and so they have no force if paragraph (c)(6) is not valid.

2                                                    ***

3            In sum, for the reasons stated above, the Court finds plaintiffs have shown a likelihood of

4    success on the merits of their claim that the Rule, and specifically those paragraphs that amend 8

5    C.F.R. §§ 208.13 and 1208.13, is contrary to the INA and is in excess of statutory authority under

6    the INA, in violation of the APA, 5 U.S.C. § 706(A) and (C).

7

8            **B.      Arbitrary and Capricious, or Abuse of Discretion under the APA**

9            Plaintiffs' second claim for relief alleges that the Rule is arbitrary and capricious, or is an

10    abuse of discretion, under the APA.   "[T]he touchstone of arbitrary and capricious review . . . is

11    reasoned decisionmaking."   *EBSC IV*, 964 F.3d at 849 (internal quotation marks and citations

12    omitted).   "Normally, an agency rule would be arbitrary and capricious if the agency has relied on

13    factors which Congress has not intended it to consider, entirely failed to consider an important aspect

14    of the problem, offered an explanation for its decision that runs counter to the evidence before the

15    agency, or is so implausible that it could not be ascribed to a difference in view or the product of

16    agency expertise."   *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463

17    U.S. 29, 43 (1983); *see also Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S.

18    Ct. 1891, 1913 (2020).   Agency action is also arbitrary and capricious if, "[w]hen an agency changes

19    course," it fails to take into account "that longstanding policies may have engendered serious

20    reliance interests[.]"   *Regents of the Univ. of California*, 140 S. Ct. at 1913 (internal quotation marks

21    and citations omitted).   Although an agency is not required to "consider all policy alternatives in

22    reaching [its] decision[,]" where the agency is "not writing on a blank slate, . . . it [is] required to

23    assess whether there were reliance interests, determine whether they were significant, and weigh

24    any such interests against competing policy concerns."   *Id.* at 1914-15 (internal quotation marks and

25    citations omitted).

26            For over thirty years, asylum review has taken a "totality of the circumstances" approach, in

27    which the adjudicator evaluates "'the totality of the circumstances and actions of an alien in his

28    flight from the country where he fears persecution,' rather than deny asylum outright because of a

single procedural flaw in the migrant's application." *EBSC III*, 950 F.3d at 1274 (quoting *Matter of Pula*, 19 I. & N. Dec. 467, 473-74 (B.I.A. 1987)).  As stated in *EBSC III*,

> Especially where a migrant may be eligible only for asylum and cannot establish the more stringent criteria for withholding-of-removal, the discretionary factors . . . should be "carefully evaluated in light of the unusually harsh consequences which may befall an alien[.]" [*Matter of Pula*, 19 I. & N. Dec.] at 474. Indeed, "the danger of persecution should generally outweigh all but the most egregious of adverse factors." *Id.*

*Id.*  In the context presented here, this means that for several decades, any criminal history outside of the statutory eligibility bars did not preclude asylum outright but was rather for the asylum adjudicator to weigh on a case by case basis.

### 1.     Failure to Provide Adequate Explanation

Plaintiffs argue that the Rule upends decades of precedent, without satisfactory explanation. The Court agrees.  The explanations the Departments provide for this change of course are somewhat difficult to parse, but they appear to boil down to: adjudicative efficiency, the promotion of lawfulness, and protection of the community from dangerous individuals.  These rationales are insufficient here because they contradict the text of the Rule itself and are inconsistent with other reasons that the Departments provided when issuing the Rule.

With regard to efficiency, the Departments state that adding new categorical bars to asylum will increase "adjudicative efficiency." 85 Fed. Reg. at 67220, 67254.  Yet parts of the Rule would do the opposite, either by requiring or allowing the asylum officer or immigration judge to make findings beyond what is apparent from the face of the criminal history.  Rather than the adjudicator accepting a court's order vacating or modifying a conviction or sentence, the Rule now authorizes the adjudicator to "'look beyond the face of any order purporting to vacate a conviction, modify a sentence, or clarify a sentence' to determine what effect such order should be given[.]" *Id.* at 67204. So while the Departments state they are providing categorical bars to give adjudicators clear bright-line rules, they simultaneously tell adjudicators to disregard criminal court orders and to "look

United States District Court
Northern District of California

beyond" those orders to discern their true intent.[16]   Additionally, several of the categorical bars do not use convictions as the measure of whether the bar applies.   The bar regarding criminal gang activity applies if the asylum seeker has been convicted of a crime "that the asylum officer knows or has reason to believe was committed in support, promotion, or furtherance of the activity of a criminal street gang[.]"   85 Fed. Reg. at 67258-59 (adding 8 C.F.R. §§ 208.13(c)(6)(ii), 1208.13(c)(6)(ii)).   This could conceivably include conduct such as jaywalking (if the asylum officer has reason to believe the person was jaywalking in order to meet up with a gang member) or receiving a speeding ticket (if the asylum officer has reason to believe the person was speeding on his way to commit gang activity).   And the domestic violence bar requires no conviction.   It applies if the "immigration judge knows or has reason to believe that the alien has engaged . . . in acts of battery or extreme cruelty" as defined in the regulations.[17]   *Id.* at 67258-60 (adding 8 C.F.R. §§ 208.13(c)(6)(vii), 1208.13(c)(6)(vii)).   The Departments' reasoning that certain parts of the Rule will foster adjudicative efficiency rings hollow when compared against other parts of the Rule, such as those described here, that seemingly strip away bright line standards.

With regard to the promotion of lawfulness, the Court cannot discern any concrete reasoning to support this goal.   The Departments neither clearly articulate what the problem is that they are

---

[16] Contrast this, also, with the Departments' reasoning for making all alien smuggling or harboring offenses a categorical asylum bar, regardless of any mitigating circumstances, such as for family members or good Samaritans:

> . . . the Departments find that in the context of asylum eligibility, *adjudicators should not look behind a conviction to readjudicate an alien's criminal culpability.* Although the individual circumstances behind an alien's prosecution may vary, the Departments have concluded that, to promote adjudicative efficiency, it is appropriate to provide a clear standard that defers to the original prosecutor's determination to pursue a conviction of the alien for his or her conduct, as well as the criminal court's existing determination of proof beyond a reasonable doubt that the alien engaged in the conduct.

85 Fed. Reg. at 67220 (emphasis added).

[17] The gang activity bar and the domestic violence bar are also the subject of plaintiffs' due process claim, which argues that certain of the categorical bars are unconstitutionally vague.   In light of the Rule's other deficiencies, the Court does not reach the due process claim today.   The Court similarly does not reach plaintiffs' equal protection claim, which the parties do not address in their briefing on the TRO.

trying to solve around general "lawless behavior," nor do they present any data or other facts to draw a "rational connection between the facts found and the choice made." *See State Farm*, 463 U.S. 29 at 43.[18]  For instance, in response to commenters' concerns that the new bar for those with convictions for illegal reentry may sweep in victims of trafficking or smuggling, the Departments responded that they "believe that evaluations of mitigating factors or criminal culpability based on motives are more appropriately reserved for criminal proceedings" and will assume that anyone with a conviction for illegal reentry "has repeatedly flouted the immigration laws."  85 Fed. Reg. at 67222.  In other words, the Departments are ready to defer to state court convictions and not look behind those convictions to determine whether any mitigating factors existed.  Yet elsewhere, the Rule specifically calls on asylum officers to "look beyond the face of" state court vacaturs of convictions to determine whether those were entered for rehabilitative or immigration purposes.[19]

Defendants argue that the Rule will protect this country from those who would disregard the law and hurt our communities.  Yet the Rule the Departments have crafted does not do this.  *See, e.g., EBSC III*, 950 F.3d at 1276 (finding the challenged rule arbitrary and capricious because "[i]llegal entry is not ordinarily considered a 'serious crime.' . . .  Nor does a migrant's method of entry per se create a danger to the United States, serve as a useful proxy for terrorist activity, or suggest the persecution of another.").  As explained elsewhere in this Order, the Rule encompasses conduct that cannot arguably show the individual poses a danger as well as conduct that Congress expressly kept in the asylum laws.  The Rule will deprive some people who would otherwise be valid asylees of ever obtaining asylum, regardless of whether they have rehabilitated themselves, regardless of whether their criminal conduct occurred many years earlier, or regardless of whether they have committed acts that Congress has said should not render one ineligible for asylum, such

---

[18] Equally nebulous are the Departments' references to conduct that shows a "disregard for the societal values of the United States[.]"  *See* 85 Fed. Reg. at 67242, 67249.

[19] The Departments also state that the new presumptions around vacaturs and modifications of criminal convictions is necessary to dissuade "gamesmanship and manipulation in the drafting of orders vacating a conviction or modifying a criminal sentence[,]" but they provide no evidence that this problem actually exists.  *See* 84 Fed. Reg. at 69655.

United States District Court
Northern District of California

as harboring their own children if their children too fled to this country.  *See id.* at 1277 ("The Rule, then, risks the removal of individuals with meritorious asylum claims who cannot petition for withholding of removal or CAT relief.  By doing so, it is inconsistent with our treaty commitment to non-refoulement.").

In the Rule, the Departments deflect commenters' concerns that the Rule "would result in denial of meritorious claims," arguing that "those with a legitimate fear of persecution or torture may still apply for statutory withholding of removal or CAT withholding and deferral[.]"  *See, e.g.,* 85 Fed. Reg. at 67222.  This rationale is directly at odds with the subsequent rationale the Departments provide for why the individuals described in the Rule should not receive asylum— because, according to the Departments, granting them asylum would "encourage lawless behavior and subject the United States and its communities to the dangers associated with the crimes or conduct in which such persons have engaged."  85 Fed. Reg. at 67222.  If individuals who truly pose a danger are able to obtain withholding of removal after a failed asylum application, then the danger to the community is the same, regardless of how they were able to remain in the country.[20]

For these reasons, the Court finds plaintiffs likely to succeed on the merits of their challenge that the rule is arbitrary and capricious because the Departments "offered an explanation for its decision that runs counter to the evidence before the agency, [and] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *See State Farm*, 463 U.S. at 4.

### 2.    Failure to Address Comments that the Rule Encompasses Minor Conduct

When commenters pointed out that the new bars would include minor conduct and conduct that cannot be categorized as particularly serious or even dangerous, the Departments either declined to respond or else relied on their authority under § 1158(b)(2)(C).  *See, e.g.*, 85 Fed. Reg. at 67215-

---

[20] The Departments' proffered rationale also fails to recognize that "[t]he standards for granting withholding or CAT relief are higher than those governing a grant of asylum. . . .  Further, relief under withholding of removal and under CAT is less advantageous than asylum relief."  *See EBSC IV*, 964 F.3d at 843.

16, 67224, 67242.  The Departments "decline[d] to respond" to comments that the new bars are inconsistent with the "particularly serious crime" bar, explaining that the Rule does not "actually designate" particularly serious crimes.[21]  *See* 85 Fed. Reg. at 67207, 67238.  But, as plaintiffs note, in promulgating the Rule, the Departments justified the designation of these new categories of crimes based on their assertion that they are "similar to" particularly serious crimes.  *See id.* at 67207.  The Court agrees with plaintiffs' critique: "Defendants cannot justify the new bars as 'similar' while refusing to engage with comments explaining that they are not, in fact, similar."  *See* Mot. at 18.

Moreover, the Departments' statement they are not relying on their authority to designate additional offenses as "particularly serious crimes" directly conflicts with what they stated in the NPRM.  The NPRM, for instance, states that the reason the Departments are now making *all* felonies categorical bars to asylum is because the historical approach "of case-by-case adjudication and per se rules is an inefficient means of identifying categories of offenses that should constitute *particularly serious crimes*."  84 Fed. Reg. at 69646 (emphasis added).  The NPRM goes on to state, "The proposed rule would eliminate the inefficiencies described above *by providing that all felonies would constitute particularly serious crimes*."  *Id.* (emphasis added).  And the preamble repeatedly invokes the Departments' authority under § 1158(b)(2)(B)(ii).  *See, e.g., id.* at 69645, 69647 ("In addition to their authority under section 208(b)(2)(B)(ii) of the INA, 8 U.S.C. 1158(b)(2)(B)(ii), the Attorney General and the Secretary further propose relying on their respective authorities under section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C) . . ."), 69648 ("The Attorney General and the Secretary further propose to exercise their authority under sections 208(b)(2)(B)(ii) and

---

[21] In the Rule, the Departments stated,

As explained in section II.C.2.a.i, the rule establishes limits and conditions on asylum eligibility; it does not add offenses to the ''particularly serious crime'' bar. *See* 8 CFR 208.13(c)(6), 1208.13(c)(6) (both using prefatory language that reads ''[a]dditional limitations on eligibility for asylum''). To the extent that commenters' concerns relate specifically to the ''particularly serious crime'' bar, the Departments decline to respond because those concerns are outside the scope of this rulemaking.

85 Fed. Reg. at 67238.

1  208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(B)(ii) and (C), . . .”), 69650 (“The Attorney General

2  and Secretary further propose that, pursuant to their authorities under 8 U.S.C. 1158(b)(2)(B)(ii) and

3  (C) . . .”).

4  In sum, the Departments initially stated they were relying in part on their authority to

5  designate new offenses as particularly serious crimes.  They then disclaimed reliance on that

6  authority but said the new offenses were “similar to” particularly serious crimes.  *See* 85 Fed. Reg.

7  at 67207.  And they declined to address commenters’ concerns that the Rule now bars crimes that

8  do not rise to the level of particularly serious because, according to the Departments, they are not,

9  in fact, designating new particularly serious crimes and any comments to that point “are outside the

10  scope of this rulemaking.”  *See id.* at 67238.

11  Plaintiffs have shown a likelihood of success on their argument that the Departments

12  “entirely failed to consider an important aspect of the problem,” namely that the Rule sweeps in

13  minor conduct that does not rise to the level of a particularly serious crime.  *See State Farm*, 463

14  U.S. at 43.

15  ***

16  Plaintiffs have shown a likelihood of success on their claim that the Rule is arbitrary and

17  capricious under the APA.

18

19  **C.    Procedural Validity**

20  Having found plaintiffs likely to succeed on the merits of several of their substantive claims,

21  the Court need not reach the procedural claims.  *See EBSC III*, 950 F.3d at 1271 (to obtain

22  preliminary injunction, plaintiffs “must establish a likelihood that the Rule is either substantively or

23  procedurally invalid”).  Nevertheless, for the sake of completeness, the Court proceeds to analyze

24  the procedural claims and finds plaintiffs have shown serious questions going to the merits of those

25  claims.

26  Plaintiffs argue that the Rule is procedurally invalid for three reasons: (1) the notice and

27  comment period was insufficient, (2) the Rule does not comply with the Regulatory Flexibility Act’s

28  requirement that agencies must analyze the impact on “small entities,” and (3) the Rule does not

United States District Court
Northern District of California

properly analyze its impacts on federalism.  These are plaintiffs' third and fifth claims for relief in the Complaint.[22]

### 1.    Notice and Opportunity to Comment under the APA

Defendants issued the NPRM on December 19, 2019.  84 Fed. Reg. 69640.  The comment period closed roughly 30 days later, on January 21, 2020.[23]  *Id.*  The Departments received 581 comments, including 503 comments from individuals and 78 comments from organizations.  85 Fed. Reg. at 67204.  The Departments also received requests to extend the comment period, including requests from commenters who believed a minimum 60-day period was needed for a rule of this type, but the Departments declined to extend the comment period.  They stated, "The Departments believe the 30-day comment period was sufficient to allow for a meaningful public input, as evidenced by the significant number of public comments received, including almost 80 detailed comments from interested organizations."  *Id.* at 67252.  They further stated, "The Departments also believe that the 30-day comment period was preferable to a longer comment period since this rule involves public safety concerns."  *Id.* at 67253 (citation omitted).

Plaintiffs argue that 30 days was insufficient for a Rule of this magnitude.[24]  They also argue

---

[22] Plaintiffs' fourth claim for relief in the Complaint challenges the authority of defendant Wolf as Acting Secretary of Homeland Security, under the Appointments Clause of the U.S. Constitution, the Homeland Security Act, and the Federal Vacancies Reform Act.  Plaintiffs indicated at the hearing that they are not pursuing this issue for purposes of the TRO; however, the Court notes that there is a growing body of case law at the district court level finding defendant Wolf is not lawfully serving in his role.  *See Batalla Vidal v. Wolf*, --- F. Supp. 3d ----, Nos. 16-CV-4756 (NGG) (VMS), 17-CV-5528 (NGG) (RER), 2020 WL 6695076 (E.D.N.Y. Nov. 14, 2020); *Immigrant Legal Res. Ctr. v. Wolf*, --- F. Supp. 3d ----, No. 20-cv-05883-JSW, 2020 WL 5798269 (N.D. Cal. Sept. 29, 2020); *Casa de Md., Inc. v. Wolf*, --- F. Supp. 3d ----, No. 20-cv-02118-PX, 2020 WL 5500165 (D. Md. Sept. 11, 2020); *Nw. Immigrant Rights Project v. United States Citizenship & Immigration Servs.*, No. 19-3283 (RDM), 2020 WL 5995206 (D.D.C. Oct. 9, 2020).

[23] Thirty days after December 19, 2019, would have been a Saturday, and the following Monday was a federal holiday.  The comment period thus closed the first business day following thirty days after the NPRM was issued.

[24] Plaintiffs also state that, due to the year-end holidays, the notice period "included only 15 business days."  Mot. at 21.  Based on official federal holidays, this is a mis-count.  There were three federal holidays during the notice period, *see* https://www.opm.gov/policy-data-oversight/pay-leave/federal-holidays/#url=2019, though the Court recognizes that many businesses

that defendants engaged in an improperly staggered rulemaking process because the Rule was one of three interrelated rules impacting asylum that were announced at different times and, according to plaintiffs, "[t]he full picture, depicting just how drastically asylum-seekers were impacted, only became visible months after the comment period on this Rule closed."  Mot. at 22.

The APA states, in relevant part,

(b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include--

(1) a statement of the time, place, and nature of public rule making proceedings;

(2) reference to the legal authority under which the rule is proposed; and

(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

5 U.S.C. § 553.

"After providing the required notice, the agency must provide for a comment process." *California ex rel. Becerra v. United States Dep't of the Interior*, 381 F. Supp. 3d 1153, 1172 (N.D. Cal. 2019).  "Specifically, 'the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation.'" *Id.* (quoting 5 U.S.C. § 553(c)).  "Among the purposes of the APA's notice and comment requirements are '(1) to ensure that agency regulations are tested via exposure to diverse public comment, (2) to ensure fairness to affected parties, and (3) to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review.'" *Id.* (citations omitted.)  "It does not matter that notice and comment could have changed the substantive result; the public interest is served from proper process itself." *California v. Azar*, 911 F.3d 558, 581-82 (9th Cir. 2018), *cert. denied sub nom. Little Sisters of the Poor Jeanne Jugan Residence v. California*, 139 S. Ct. 2716 (2019).

The Court is troubled by the notice procedures used here for a number of reasons.  First, thirty days for a rule of this magnitude, both in terms of the changes proposed and the importance

may close entirely for the week between Christmas and New Year's Day.

of the subject matter, is already short.  That the comment period spanned the year-end holidays shortened the period further still and undercut the purpose of the notice process to invite broad public comment.  *See Becerra*, 381 F. Supp. 3d at 1172.  "While there is no bright-line test for the minimum amount of time allotted for the comment period, *North Carolina Growers' Ass'n* [*v. United Farm Workers*], 702 F.3d [755,] 770 [4th Cir. 2012], at least one circuit has recognized that 90 days is the 'usual' amount of time allotted for a comment period[.]"  *Id.* at 1177 (quoting *Prometheus Radio Project v. F.C.C.*, 652 F.3d 431, 453 (3d Cir. 2011)).  While not binding, the government's own internal orders state that "a comment period . . . should generally be at least 60 days."  Exec. Order No. 13563, 76 Fed. Reg. 3821, 3821-22 (Jan. 18, 2011); *see also* Exec. Order 12866, 58 Fed. Reg. 51735 § 6(a)(1) (Oct. 4, 1993).

Several other rules that DHS proposed around the same time as this Rule, impacting work authorization for asylum applicants, received 60-day comment periods.  *See* Asylum Application, Interview, and Employment Authorization for Applicants, 85 Fed. Reg. 38532 (June 26, 2020) (final rule) (60-day comment period); Removal of 30-Day Processing Provision for Asylum Applicant-Related Form I-765 Employment Authorization Applications, 84 Fed. Reg. 47148 (Sept. 9, 2019) (NPRM) (60-day comment period).  Notably, in the publication of one of the employment authorization rules, DHS rejected a complaint about the separate publication of these interrelated rules by erroneously stating that the comment period for *this* Rule was 60 days.  *See* 85 Fed. Reg. at 38553 & n.90 ("DHS believes that the 60-day comment period for this rule and the 60-day comment periods provided for the other rules referenced by the commenter provided more than an adequate opportunity for public input, and declines to extend the comment period.").

The number of comments received on the NPRM also shows the comment period was inadequate.  Other rules proposed around the same time, with longer comment periods and/or periods that did not straddle the holidays, received many more comments, some an order of magnitude more.  A rule modifying DHS regulations governing asylum applications, interviews, and eligibility for employment authorization, received a 60-day comment period, spanning the year-end holidays, and received 1074 public comments.  *See* 85 Fed. Reg. at 38553 (NPRM published Nov. 14, 2019).  A rule removing the provision that gives the agency 30 days to grant or deny an

33

asylum applicant's initial employment authorization application, with a 60-day comment period that did not span the holidays, received over 3200 comments. *See* 84 Fed. Reg. 47148; Removal of 30-Day Processing Provision for Asylum Applicant-Related Form I-765 Employment Authorization Applications, 85 Fed. Reg. 37502, 37510 (June 22, 2020) (final rule). And in fall 2018, DHS published a proposed rule amending the regulations governing how DHS determines whether a noncitizen applying for admission or adjustment of status is inadmissible because he or she is likely to become a public charge. That proposed rule had a 60-day comment period and received 266,077 public comments. Inadmissibility on Public Charge Grounds, 84 Fed. Reg. 41292, 41304 (Aug. 14, 2019) (final rule). In declining requests to extend the comment period there, DHS noted that the comment period was in line with the 60-day guidance provided in Executive Order 12866, that the number of comments received showed the comment period was sufficient, and that the proposed rule had been publicly listed since fall 2017 (a year before publication of the proposed rule). *Id.* at 41304-05.

The Rule here contained no similar safeguards to assure the public's participation. The Rule received only a 30-day comment period, spanning the holidays, and defendants do not argue that the proposed rule was previously published in any form. The insufficiency of the notice process is borne out by the fact that the NPRM received far fewer comments than other rules, including ones related to work authorization for asylum applicants, promulgated around the same time but with longer comment periods. In this context, the Court disagrees with the Departments that the receipt of 581 comments on a rule of this scope shows that the 30-day comment period was sufficient. *See* 85 Fed. Reg. at 67252-53; c*f. N. Carolina Growers' Ass'n*, 702 F.3d at 770 (noting that where an earlier rule-making received about 11,000 comments over a 60-day comment period, "[i]n this context, the 800 comments received over the 10-day comment period allowed here do not support the . . . argument that the Department provided adequate opportunity for comment").

Finally, plaintiffs also argue that the "staggered" method in which the Departments published this NPRM and several other related proposed rules deprived the public of meaningful opportunity to participate in the rulemaking process because the full impact of the Rule was not clear until after the comment period on the Rule closed. Mot. at 19-22. Plaintiffs point to: (1) the

34

rule governing employment authorization for asylum seekers, first proposed in November 2019 and finalized in June 2020;[25] and (2) a rule that would apply this Rule's criminal bars to initial credible fear interviews and reasonable fear interviews, first proposed in June 2020.[26]  *See id.* at 19; 85 Fed. Reg. at 36272, 36284 & n.36; 85 Fed. Reg. 38532, 38537.  Although this "staggered" rulemaking process is perhaps not dispositive on its own, the Court agrees that this adds to the overall context in which the notice provided here failed to give the public a meaningful opportunity to comment.

Defendants argue that because most of the plaintiffs here commented on the NPRM, plaintiffs cannot show they were harmed by the length of the notice period.  Yet in *Riverbend Farms*, on which defendants rely, the Ninth Circuit cautioned that

> we must exercise great caution in applying the harmless error rule in the administrative rulemaking context. . . .  An agency is not required to adopt a rule that conforms in any way to the comments presented to it. . . .  Thus, if the harmless error rule were to look solely to result, an agency could always claim that it would have adopted the same rule even if it had complied with the APA procedures.  To avoid gutting the APA's procedural requirements, harmless error analysis in administrative rulemaking must therefore focus on the process as well as the result.  We have held that the failure to provide notice and comment is harmless only where the agency's mistake "clearly had no bearing on the procedure used or the substance of decision reached."

*Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1487 (9th Cir. 1992) (citations omitted).  The Court cannot say any error from the short notice period here was harmless, especially in light of the longer notice periods and greater number of comments received on recent rules involving similar subject matter, as described above.  Moreover, as explained above, the Departments "entirely failed to consider an important aspect of the problem," *see State Farm,* 463 U.S. at 43, when they declined to respond to comments challenging whether the new categorical crime bars meet a sufficient threshold of seriousness.  Rather than address those comments, the Departments changed course and stated in the final rule that that they were not designating new particularly serious crimes, *see* 85 Fed. Reg. at 67207.  *See N. Carolina Growers' Ass'n*, 702 F.3d at 770 (explaining, "because the Department did not provide a meaningful opportunity for comment, and did not solicit or receive

---

[25] The final rule, unlike its NRPM, incorporated this Rule's criminal bars in full.  *See* 85 Fed. Reg. at 38537 & n.9.

[26] This rule has not yet been finalized and the NPRM provided for a 30-day comment period.

relevant comments regarding the substance or merits of either set of regulations, we have no difficulty in concluding that the Department 'ignored important aspects of the problem[,]'" and finding rule was arbitrary and capricious under the APA).

The Court also questions whether the Departments complied with the APA's requirement that the notice of proposed rulemaking "shall include . . . reference to the legal authority under which the rule is proposed[.]" *See* 5 U.S.C. § 553(b)(2). As the Court noted above, the NPRM cited the Departments' authority under § 1158(b)(2)(B)(ii) and § 1158(b)(2)(C). *See, e.g.,* 84 Fed. Reg. at 69645, 69647, 69648, 69650. However, in issuing the Rule, the Departments acknowledged the "confusion" this reference created and "emphasize[d]" that they were relying only on § 1158(b)(2)(C). *See* 85 Fed. Reg. at 67207. In this way they deprived commenters of the ability to comment on whether § 1158(b)(2)(C) standing alone gave the Departments the authority to promulgate these changes.

In sum, under the facts presented here, the Court concludes that plaintiffs have at minimum shown "serious questions going to the merits" of their claim that the notice process defendants used to promulgate the Rule was deficient under the APA. *See All. for the Wild Rockies*, 632 F.3d at 1134-35.

### 2.     Regulatory Flexibility Act

The parties also dispute whether the Departments violated the Regulatory Flexibility Act ("RFA") by failing to perform an analysis of the Rule's potential impact on "small entities." *See* 5 U.S.C. §§ 603-604.

The RFA requires that, when going through the proposed rulemaking process, an

> agency shall prepare and make available for public comment an initial regulatory flexibility analysis. Such analysis shall describe the impact of the proposed rule on small entities. The initial regulatory flexibility analysis or a summary shall be published in the Federal Register at the time of the publication of general notice of proposed rulemaking for the rule.

*Id.* § 603(a). The analysis shall contain:

> (1) a description of the reasons why action by the agency is being considered;
>
> (2) a succinct statement of the objectives of, and legal basis for, the proposed rule;

(3) a description of and, where feasible, an estimate of the number of small entities to which the proposed rule will apply;

(4) a description of the projected reporting, recordkeeping and other compliance requirements of the proposed rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record;

(5) an identification, to the extent practicable, of all relevant Federal rules which may duplicate, overlap or conflict with the proposed rule.

*Id.* § 603(b).  "Each initial regulatory flexibility analysis shall also contain a description of any significant alternatives to the proposed rule which accomplish the stated objectives of applicable statutes and which minimize any significant economic impact of the proposed rule on small entities." *Id.* § 603(c).  At the final rulemaking stage, the agency shall prepare a final regulatory flexibility analysis.  *Id.* § 604.  The RFA contains an exception: the requirement to prepare an initial and final regulatory flexibility analysis shall not apply "if the head of the agency certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities. If the head of the agency makes a certification under the preceding sentence, the agency shall publish such certification in the Federal Register at the time of publication of general notice of proposed rulemaking for the rule or at the time of publication of the final rule, along with a statement providing the factual basis for such certification."  *Id.* § 605.

Here, the Rule states as follows:

**IV. Regulatory Requirements**

*A. Regulatory Flexibility Act*

The Departments have reviewed this proposed rule in accordance with the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*) and have determined that this rule will not have a significant economic impact on a substantial number of small entities. The rule would not regulate "small entities" as that term is defined in 5 U.S.C. 601(6). Only individuals, rather than entities, are eligible to apply for asylum, and only individuals are eligible to apply for asylum or are otherwise placed in immigration proceedings.

85 Fed. Reg. at 67255; *see also* 84 Fed. Reg. at 69657 (same in NPRM).

Plaintiffs state that they are "small entities" within the meaning of the RFA.  *See* Mot. at 23 (citing 5 U.S.C. § 601(4)).  In their opposition, defendants argue that "Plaintiffs lack a cause of action to enforce the RFA, 5 U.S.C. § 604, because Plaintiffs are not 'small entities' that are 'directly regulated by' the Rule, and, thus, Plaintiffs 'do not have an injury contemplated within the zone of

1    interest of the RFA.'"  *See* Opp'n at 22 (citations omitted).  Defendants also argue that "'[t]he RFA

2    imposes no substantive requirements on an agency' and that defendants fulfilled their procedural

3    requirements when they certified that the Rule will not have a significant economic impact on a

4    substantial number of small entities[.]"  *Id.* (citations omitted).

5         Given the other grounds on which plaintiffs have shown a likelihood of success on the

6    merits, the Court reserves ruling on this issue today and may revisit the Regulatory Flexibility Act

7    question at the preliminary injunction stage.  The parties may wish to augment the record in this

8    regard, including to establish any factual predicate needed to show that plaintiffs are "small entities"

9    within the meaning of the statute and any applicable regulations.

10        Similarly, the Court reserves ruling on the question of whether the Rule improperly fails to

11   include a federalism impact statement or certification.  *See* Mot. at 22-23.

12

13   **II.      Irreparable Harm**

14        Turning now to the second factor of the *Winter* test, the Court considers whether plaintiffs

15   "have established that, in the absence of a [TRO], they are likely to suffer irreparable harm."  *EBSC*

16   *III*, 950 F.3d at 1280 (citation omitted).  Although economic harm is not generally considered

17   "irreparable harm" for purposes of this test, "where parties cannot typically recover monetary

18   damages flowing from their injury—as is often the case in APA cases—economic harm can be

19   considered irreparable."  *Id.*  The *EBSC III* court agreed with the district court that the plaintiff legal

20   services organizations had adequately demonstrated irreparable harm when they showed that the

21   challenged rule would cause them to "suffer a significant change in their programs and a

22   concomitant loss of funding" for which they would "have no vehicle for recovery."  *Id.*  In *EBSC*

23   *IV*, the Ninth Circuit also found that plaintiff immigration organizations had shown irreparable harm

24   by "establish[ing] that the Rule harms their mission of representing and assisting asylum seekers

25   and results in a substantial loss of organizational funding."  *EBSC IV*, 964 F.3d at 854 (citation

26   omitted).

27        Plaintiffs have made a similar showing here.  Each plaintiff organization has filed a

28   declaration attesting that the Rule will lead to a significant change in their programs.  A significant

United States District Court
Northern District of California

38

portion of plaintiffs' clients are potentially impacted by the Rule's categorical bars.  *See, e.g.,* Mahoney Decl. ¶ 9 (approximately 45% of Dolores Street Community Services Inc.'s clients have had some contact with criminal justice system); Cubas Decl. ¶ 11 (approximately 75% of adults and 5% of children CAIR Coalition connected with a lawyer had some criminal justice involvement). Under the Rule, asylum cases will be more time consuming, particularly at the outset of the case, when staff will need "to determine whether any of the asylum bars could be triggered and assess the potential impact of any prior convictions[.]"  Newman Decl. ¶ 13; *see also* Mahoney Decl. ¶ 13; Mendez Decl. ¶ 25.  CAIR Coalition sometimes uses legal assistants and law students to conduct intake screenings but anticipates it will not be able to do this in light of the added complexities of the Rule, causing diversion of resources and increasing the costs to the organization.  Cubas Decl. ¶¶ 23-24.  CAIR Coalition also provides asylum consultations to adults in jail and estimates that the additional complexities of the new Rule "would likely cut by a third the number of adults CAIR Coalition could prepare during each jail visit."  *Id.* ¶ 21.

Several of the organizations "serve individuals seeking asylum as a family unit."  *See* Newman Decl. ¶ 16.  Under the Rule, if a parent is subject to the asylum bar, he or she will instead need to seek withholding of removal, which does not provide relief for eligible family members.  *Id.* The organizations will thus need to serve each family member individually rather than serving them as a family unit (with the child/ren having a claim derivative to the parent's).  *Id.*; Mahoney Decl. ¶ 18; Mendez Decl. ¶ 26.  Plaintiffs will have to divert staff resources as a result and will be able to serve fewer clients.  Newman Decl. ¶ 16.

Additionally, plaintiff Catholic Legal Immigration Network, Inc. ("CLINIC") states that it will need to train more than 2000 affiliate legal staff and their volunteers on the Rule's impact. Mendez Decl. ¶ 18.  Indeed, plaintiffs have already begun diverting staff time and resources to review the Rule and train staff on its requirements, and CLINIC has hired a consulting attorney specializing in the intersection of criminal and immigration law to respond to inquiries it has already begun receiving from its affiliates.  *Id.* ¶ 20; Mahoney Decl. ¶ 22.

Portions of the organizations' funding depend on meeting certain target goals for the number of clients served. By causing each asylum case to take longer, the Rule will jeopardize those targets,

and accordingly plaintiffs' funding.  Newman Decl. ¶ 20 (65% of Pangea's 2020 funding required some form of deliverable); Mahoney Decl. ¶ 24 (95% of DSCS's legal team's 2019 funding required some form of deliverable); Cubas Decl. ¶ 28.  Plaintiffs will therefore either lose out on funding or will need to divert even more resources toward fundraising to make up for the budget loss.  Newman Decl. ¶ 12; Mahoney Decl. ¶ 12.

Plaintiffs also have shown that the Rule would harm their organizational missions of serving asylum seekers.  *Id*. ¶ 11; Mahoney Decl. ¶ 12.  All four plaintiffs uniformly declared that they would be able to serve fewer clients due to the added complexities of the Rule, thereby frustrating their missions of providing assistance to immigrants and to other immigrant-serving groups and lawyers.

Nor are plaintiffs asserting "third-party harms to non-party aliens," as defendants argue.  *See* Opp'n at 23.  As described above, plaintiffs have each submitted detailed declarations outlining the staffing, resources, funding, and mission-related harms they have suffered and will suffer if the Rule goes into effect on November 20.  Further, the Court does not disagree with defendants' underlying premise that an organization's general dissatisfaction with public laws or need to reorder their priorities to accommodate a change in law are not in and of themselves reasons to suspend a law's enactment.  *See id.*  The crux of the matter presented today is that plaintiffs here have shown that the Rule is likely both substantively and procedurally invalid.  The test that courts are to apply in deciding whether to grant a TRO does not ask solely whether a plaintiff has suffered irreparable harm.  *See Winter*, 555 U.S. at 20 (plaintiff must show four factors, including likelihood of success on the merits *and* likelihood of irreparable harm absent preliminary relief); *All. for the Wild Rockies*, 632 F.3d at 1134-35 (plaintiff must show four factors, including "serious questions going to the merits . . . *and* the balance of hardships tips sharply in the plaintiff's favor") (emphasis added).  The Court only reaches the irreparable harm question if plaintiffs have first shown a likelihood of success or serious questions on the merits of their claim.  Plaintiffs have done so here.

The Court concludes that plaintiffs have "demonstrated a sufficient likelihood of irreparable injury to warrant injunctive relief."  *See EBSC III*, 950 F.3d at 1280 (citation omitted).

### III.     Balance of Equities and Public Interest

"When the government is a party, the last two factors (equities and public interest) merge."

*EBSC III*, 950 F.3d at 1271 (citing *Nikn v. Holder*, 556 U.S. 418, 435 (2009)).

Defendants argue that these factors favor defendants rather than plaintiffs, asserting,

> A TRO would irreparably harm the United States and the public. *Contra* Mot. 24-25. It is always in the public interest to protect the country's borders and enforce its immigration laws. *See Landon v. Plasencia*, 459 U.S. 21, 34 (1982). The Executive Branch issued the Rule after notice and comment to ensure that dangerous criminal aliens and threats to public safety do not receive asylum. 85 Fed. Reg. at 67,225; 67,242-43, 67,249, 67,252. Preventing such criminals from endangering our national community is "an urgent objective of the highest order." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2088 (2017). . . . Against this, Plaintiffs fail to show any "immediate threatened injury." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). They do not identify a single alien who would be affected by the Rule. Mot. 24. Even if they had, aliens ineligible for asylum lose only a discretionary benefit to which they are never entitled. And the rule does not "return people to persecution," Mot. 13, as aliens remain eligible for mandatory protections from removal, including withholding of removal and CAT protection.

Opp'n at 23.  As noted elsewhere in this Order, these two statements are in tension.  Defendants argue that the Rule is urgently needed to protect the community from "dangerous criminal aliens," *see id.*, while simultaneously deflecting critiques that the Rule could subject people to persecution if they are wrongly deported by stating that these same supposedly dangerous criminals can still remain in the country through withholding of removal and CAT protection.

The Court finds that the public interest would be served by an injunction in several ways. First, "[t]he public interest is served by compliance with the APA: 'The APA creates a statutory scheme for informal or notice-and-comment rulemaking reflecting a judgment by Congress that the public interest is served by a careful and open review of proposed administrative rules and regulations.'  [Citation.]  It does not matter that notice and comment could have changed the substantive result; the public interest is served from proper process itself."  *Azar*, 911 F.3d at 581-82 (finding district court did not abuse its discretion in finding public interest and equities favored plaintiffs challenging interim rules that exempted certain entities from contraceptive coverage mandate of the Affordable Care Act).  Here, even if plaintiffs themselves were not deprived of the opportunity to comment on the NPRM, the public more broadly was deprived of this opportunity by the too-short notice period that straddled the year-end holidays, as evidenced by the number of

comments received on this Rule versus similar rules with longer notice periods.[27]

The public also "has an interest in ensuring that the statutes enacted by [their] representatives are not imperiled by executive fiat." *Id.* (internal quotation marks and citation omitted). This Rule would reverse decades of precedent that criminal conduct outside of the statutory eligibility bars is to be weighed based on the circumstances of each individual asylum applicant's case. Defendants have articulated no specific harms they would suffer if this status quo is allowed to stay in place pending resolution of a preliminary injunction motion.

As the Ninth Circuit has explained, "the public has an interest in ensuring that we do not deliver aliens into the hands of their persecutors . . . and preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *EBSC III*, 950 F.3d at 1281 (internal quotation marks and citations omitted). As with the asylum rule at issue in *EBSC III*, this Rule "will likely result in some migrants being wrongfully denied refugee status in this country" because the only available alternatives, withholding of removal and CAT relief, have higher burdens of proof. *See id.*

Defendants argue that enjoining the Rule would undermine the "efficient administration of the immigration laws." Opp'n at 23-24 (citing *Innovation Law Lab v. McAleenan*, 924 F.3d 503, 510 (9th Cir. 2019)).[28] In *EBSC III*, the Ninth Circuit addressed this very argument in a similar context and acknowledged that "[t]he government has a compelling interest in ensuring that injunctions—such as the one granted here—do not undermine separation of powers by blocking the Executive's lawful ability to regulate immigration and rely on its rulemaking to aid diplomacy."

---

[27] There is also the question, as the Court previously noted, of whether the public received proper notice of what authority the Departments were relying on to promulgate the Rule, in contravention of 5 U.S.C. § 553(b)(2).

[28] The *Innovation Law Lab* order cited by defendants was a decision by the motions panel granting the government's emergency motion for a stay of the injunction. When the Ninth Circuit subsequently revisited the injunction on the merits, it found that the balance of equities and public interest favored the plaintiffs, and that the government's interest was "diminished by the likelihood . . . that the [challenged rule] is inconsistent with" the statute. *Innovation Law Lab v. Wolf*, 951 F.3d 1073, 1093-94 (9th Cir. 2020) ("*Innovation Law Lab II*"), *stay granted sub nom. Wolf v. Innovation Law Lab*, 140 S. Ct. 1564 (2020), *cert. granted sub nom., Wolf v. Innovation Law Lab*, --- S. Ct. ----, 2020 WL 6121563 (Oct. 19, 2020).

*EBSC III*, 950 F.3d at 1281-82.  However, "this executive deference . . . is closely linked with our determination on the substantive validity of the Rule.  Essentially, the weight we ascribe to this factor depends on the extent to which we agree that the Rule overrides plain congressional intent." *Id.* at 1282.  Having found that the rule in that case was contrary to congressional intent, the Ninth Circuit found this factor weighed "sharply" in the plaintiffs' favor.  *Id.* (citation omitted).  So too here.

***

The Court finds plaintiffs have met all four factors of the *Winter* test and a TRO should therefore issue.

## IV.    Scope of Relief

Plaintiffs request the Court enjoin the Rule's implementation nationally.  Mot. at 25. Defendants urge that any injunction must be "limited to those portions of the Rule found unlawful, as applied to Plaintiffs or their bona fide clients."  Opp'n at 3, 25.

The Ninth Circuit has cautioned prudence in issuing nationwide injunctions and recently has narrowed the scope of several district court orders after finding that nationwide relief was not appropriate.  *See, e.g., Azar*, 911 F.3d at 584 (upholding injunction regarding contraceptive mandate but limiting its scope to the plaintiff states because "[o]n the present record, an injunction that applies only to the plaintiff states would provide complete relief to them" and the record was insufficiently developed on the harm to other states); *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1244-45 (9th Cir. 2018) ("*San Francisco I*") (agreeing with district court that injunction was appropriate to enjoin executive order that would withhold federal grants from "sanctuary jurisdictions" but finding record insufficiently developed on the harm outside California and remanding question to district court).  Some of the many problems with nationwide injunctions include foreclosing adjudication of the issue by a number of different courts and judges, depriving non-parties of the right to litigate in other forums, and forum shopping.[29]  *Azar*, 911 F.3d at 583.

_____

[29] The Court requested that defendants notify the Court "of any other cases in which courts have already ruled on the issues raised in this TRO, and of any other cases in which challenges to

The Court also evaluates today's question mindful that "the proper scope of injunctions against agency action is a matter of intense and active controversy." *Innovation Law Lab II*, 951 F.3d at 990 (citations omitted).

Under the particular circumstances presented here, the Court finds that nationwide relief is appropriate. First, 5 U.S.C. § 705 states, in part, ". . . On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court . . . may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." When a court holds a rule invalid under the APA, "the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *EBSC III*, 950 F.3d at 1283. "Because of the broad equitable relief available in APA challenges, a successful APA claim by a single individual can affect an 'entire' regulatory program." *Id.* (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 n.2 (1990)). Nor will it work for the Court to strike certain portions of the Rule while letting other parts stand. "Our typical response is to vacate the rule and remand to the agency; we ordinarily do not attempt, even with the assistance of agency counsel, to fashion a valid regulation from the remnants of the old rule." *Id.* (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 494 (D.C. Cir. 1989) (internal quotation marks omitted)).[30]

Moreover, the Ninth Circuit has explained that relief may look different in the immigration context because "there is an important need for uniformity in immigration policy." *EBSC III*, 950 F.3d at 1283 (internal quotation marks and citations omitted). "Different interpretations of executive policy across circuit or state lines will needlessly complicate agency and individual action in

---

the same Final Rule at issue here are currently pending." Dkt. No. 24 at 2. As of November 11, 2020, defendants reported that they are "not aware" of any such cases.

[30] Most of the parties' arguments, and accordingly of this Court's order, focus on the new eligibility bars and not on the provision of the Rule that removes automatic review where asylum is denied but withholding of removal granted. Nevertheless, plaintiffs' procedural challenges, which the Court sustains for purposes of this TRO, affect *all* of the Rule. Therefore, allowing just that part of the Rule eliminating automatic review to go into effect would be inappropriate at this time. *See Immigrant Legal Res. Ctr.*, 2020 WL 5798269, at *19-20 (enjoining entire challenged rule rather than just those portions of the rule most impacting plaintiffs' clients, because "plaintiffs are likely to show that Mr. McAleenan's and Mr. Wolf's appointments impact the validity of the Final Rule in its entirety").

United States District Court
Northern District of California

response to the United States's changing immigration requirements.  For these reasons, in immigration cases, we consistently recognize the authority of district courts to enjoin unlawful policies on a universal basis."  *EBSC III*, 950 F.3d at 1284 (internal quotation marks, alterations, and citations omitted).

In a number of the recent cases in which the Ninth Circuit limited the scope of nationwide injunctions, the plaintiffs were cities, counties, or states whose operation "permits neat geographic boundaries," *see City & County of San Francisco v. Barr*, 965 F.3d 753, 766 (9th Cir. 2020) ("*San Francisco II*"), and where the record had not been developed as to the rule's impact outside those jurisdictions.  Based on those records, the appellate court limited the injunctions to application within the plaintiffs' boundaries.  *Azar*, 911 F.3d at 584; *San Francisco I*, 897 F.3d at 1244-45. Subsequent Ninth Circuit decisions have distinguished those cases from ones "involving plaintiffs that operate and suffer harm in a number of jurisdictions, where the process of tailoring an injunction may be more complex."  *See San Francisco II*, 965 F.3d at 766 (citing *EBSC III*, 950 F.3d at 1282-83).

Defendants' proposition that the Rule be suspended only as to plaintiffs and their "bona fide clients" borders on absurd.  Allowing plaintiffs to serve clients under the former asylum regime but applying the Rule to everyone else would not only create a bizarre and confusing multi-tiered immigration law system, but it would likely mean that plaintiffs would be inundated with asylum requests from individuals seeking to take advantage of the pre-Rule criteria, thereby creating an entirely new set of resource problems for plaintiffs.  This proposal would also not afford complete relief to plaintiffs, where, for instance, plaintiff CLINIC, which describes itself as "the hub of the largest network of immigration legal service providers in the United States, . . . is tasked with analyzing every significant change to immigration law and policy and creating digestible information to hundreds of organizations and thousands of practitioners nationwide."  *See* Mendez Decl. ¶ 16.  "The scope of the remedy must be no broader and no narrower than necessary to redress the injury shown by the plaintiff[.]"  *Azar*, 911 F.3d at 584.

Plaintiffs here operate across the country.  CLINIC has offices in Maryland and California. Mendez Decl. ¶ 3.  Pangea and DSCS have offices in the San Francisco Bay Area.  Newman Decl.

¶ 3; Mahoney Decl. ¶ 4.  CAIR Coalition has offices in Washington, D.C., and Maryland.  Cubas Decl. ¶ 4.  And CLINIC's network of affiliates "includes almost 400 affiliated immigration programs, which operate in 48 states and the District of Columbia."  Mendez Decl. ¶ 5.  All of the plaintiff groups serve immigrants, including immigrants seeking asylum, and all have at least a portion of their funding (sometimes a large portion) tied to how many immigrants they serve or how much training and technical assistance they can provide to the community.  *Id.* ¶¶ 28-29; Newman Decl. ¶ 20; Mahoney Decl. ¶ 24; Cubas Decl. ¶ 28.  In other words, plaintiffs "represent 'asylum seekers' broadly. . . .  One fewer asylum client . . . results in a frustration of purpose (by preventing the organization from continuing to aid asylum applicants who seek relief), and a loss of funding (by decreasing the money it receives for completed cases)."  *See EBSC III*, 950 F.3d at 1282-83.

In sum, there are a number of reasons why under the facts of this case, nationwide relief is warranted.  First, because plaintiffs have shown a likelihood of success that the Rule is invalid under the APA, the proper remedy is to enjoin the Rule.  Second, because of the need for uniformity in immigration policies.  Finally, and perhaps most importantly to the scope of the injunction, because nationwide relief is needed to remedy the irreparable harm that plaintiffs, who operate throughout the country and who serve immigrants throughout the country, have shown they will suffer if the Rule is not enjoined, and where defendants have not proposed a workable alternative.  The Court will grant the motion for a TRO and will enjoin implementation and enforcement of the Rule nationwide, pending a decision on a preliminary injunction.

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby GRANTS plaintiffs' motion for a temporary restraining order.  Dkt. No. 21.  The Court hereby ENJOINS Defendants and their officers, agents, servants, employees, and attorneys, and any other person or entity subject to their control or acting directly or indirectly in concert or participation with Defendants, from implementing or enforcing the rule titled Procedures for Asylum and Bars to Asylum Eligibility, 85 Fed. Reg. 67202 (Oct. 21, 2020) ("the Rule").  This TRO is effective immediately and shall remain in effect until further order of this Court.

United States District Court
Northern District of California

## ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION

Defendants, and each of them, is hereby ORDERED TO SHOW CAUSE on **December 9, 2020, at 2:00 p.m.,** before the Honorable Susan Illston, why they, and each of them, and their officers, agents, servants, employees, and attorneys, and any other person or entity subject to their control or acting directly or indirectly in concert or participation with Defendants, should not be enjoined from implementing or enforcing the Rule, pending the final disposition of this action.[31]

Rule 65(c) of the Federal Rules of Civil Procedure provides that a district court may grant a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The district court retains discretion "as to the amount of security required, *if any*." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (internal quotation marks and citations omitted). Here, defendants have not requested a bond, and the Court find the balance of equities weighs in favor of plaintiffs. Further, there is a significant public interest underlying this action. Accordingly, the Court finds it appropriate to waive a bond. *See E. Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d 838, 868-69 (N.D. Cal. 2018) (citations omitted).

**By November 23, 2020,** the parties must submit either a stipulation, or competing proposals, for a briefing schedule in advance of the December 9 hearing. The schedule must contain not only the briefs the parties will file and the due dates for those briefs, but also for any discovery either party may wish to conduct.[32] The parties may also request the Court continue the December 9 hearing to a later date and continue the TRO in effect. Unless they make such a request, however, no briefing deadline in the parties' proposal(s) may occur later than December 4, 2020.

**IT IS SO ORDERED**.

Dated: November 19, 2020

_____
SUSAN ILLSTON
United States District Judge

---

[31] Pursuant to this District's General Order No. 72-6, the hearing shall be conducted by videoconference.

[32] Defendants filed the administrative record on November 10, 2020. Dkt. No. 58.