# EXHIBIT 2

JENNIFER C. PIZER (SBN 152327)
*jpizer@lambdalegal.org*
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
4221 Wilshire Boulevard, Suite 280
Los Angeles, California 90010
Telephone: (213) 590-5903

OMAR GONZALEZ-PAGAN*
*ogonzalez-pagan@lambdalegal.org*
RICHARD SAENZ*
*rsaenz@lambdalegal.org*
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, New York 10005
Telephone: (212) 809-8585

BRIDGET CRAWFORD*
*bcrawford@immigrationequality.org*
IMMIGRATION EQUALITY
594 Dean Street
Brooklyn, New York 11238
Telephone: (212) 714-2904

JEFFREY S. TRACHTMAN*
*jtrachtman@kramerlevin.com*
AARON M. FRANKEL*
*afrankel@kramerlevin.com*
JASON M. MOFF*
*jmoff@kramerlevin.com*
CHASE MECHANICK*
*cmechanick@kramerlevin.com*
KRAMER LEVIN NAFTALIS &
    FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100

AUSTIN MANES (SBN 284065)
*amanes@kramerlevin.com*
KRAMER LEVIN NAFTALIS &
    FRANKEL LLP
990 Marsh Road
Menlo Park, California 94025
Telephone: (650) 752-1718

* Application for admission *pro hac vice*
forthcoming.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IMMIGRATION EQUALITY; OASIS LEGAL SERVICES; THE TRANSLATIN@ COALITION; BLACK LGBTQIA+ MIGRANT PROJECT; TRANSGENDER LAW CENTER,<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY; PETE GAYNOR, in his official capacity, if any, as Acting Secretary of the Department of Homeland Security; CHAD F. WOLF, in his official capacity, if any, as Acting Secretary of the Department of Homeland Security; U.S. DEPARTMENT OF JUSTICE; WILLIAM P. BARR, in his official capacity as United States Attorney General; EXECUTIVE OFFICE FOR IMMIGRATION REVIEW; JAMES MCHENRY, in his official | Case No.<br><br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

capacity as Director of the Executive Office for Immigration Review; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; KENNETH T. CUCCINELLI, in his official capacity as an Agent of the Department of Homeland Security,

*Defendants*.

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................. 1

JURISDICTION AND VENUE ............................................................................................ 9

INTRADISTRICT ASSIGNMENT ...................................................................................... 10

THE PARTIES ...................................................................................................................... 10

    A.    Plaintiffs Provide Services to LGBTQ/H Refugees ................................................. 10

          i.    Plaintiff Immigration Equality ..................................................................... 11

          ii.    Plaintiff Oasis Legal Services ...................................................................... 12

          iii.    Plaintiff The TransLatin@ Coalition ............................................................ 13

          iv.    Plaintiff Black LGBTQIA+ Migrant Project ............................................... 15

          v.    Plaintiff Transgender Law Center ................................................................ 16

    B.    Defendants ............................................................................................................... 18

FACTUAL ALLEGATIONS ................................................................................................ 19

    I.    Background ...................................................................................................................... 19

        A.    The United States Asylum System Protects Refugees From Persecution. ............... 19

        B.    Asylum is Critical to LGBTQ/H Refugees. ............................................................ 22

        C.    Defendants Rushed the Final Rule to Publication. .................................................. 24

    II.    The Final Rule Is Invalid Because It Is Contrary To Law And Arbitrary And

        Capricious .................................................................................................................... 25

        A.    The Final Rule Alters Long-Standing Law, Policy, and Practice with Respect

              to the INA's "Nexus" Requirement. ....................................................................... 25

          i.    The Exclusion of Gender Imperils the Availability of Asylum for All

                 LGBTQ Refugees. ....................................................................................... 27

          ii.    The Final Rule Impermissibly Limits Asylum and Withholding-of-

                 Removal Claims Based on "Interpersonal Animus." ................................... 32

              a.    The "Interpersonal Animus or Retribution" Exclusion is Arbitrary

                   and Capricious and Contrary to Law. ..................................................... 32

              b.    The "Additional Target" Exclusion is Arbitrary and Capricious

                   and Contrary to Law. .............................................................................. 35

        B.    The Final Rule Arbitrarily Narrows the Definition of "Persecution." ..................... 37

        C.    The Final Rule Mandates the Denial of Bona Fide Asylum Claims under the

COMPLAINT FOR DECLARATORY AND                Case No.
INJUNCTIVE RELIEF

Guise of Discretion. .................................................................... 43

    i.    The Final Rule Unlawfully Erases Statutory Exceptions to the One-Year Filing Deadline. ........................................................ 45

    ii.    The Final Rule Arbitrarily, Capriciously, and Unlawfully Restricts Asylum for Refugees Who Transit Through Third Countries. ....................... 50

        a.    Summary of the Transit Rules. ............................................... 51

        b.    The Departments' Previous, Unsuccessful Attempt to Implement a Transit Ban. ...................................................... 54

        c.    The Transit Rules Are Contrary to Law and Exceed the Departments' Statutory Authority Because They Lack an Exception Where the Transit Country Is Not Safe. ................................ 55

        d.    The 14-Day Rule and Multiple Country Rule Are Contrary to Law and Exceed the Departments' Statutory Authority Because They Make the Statutory Firm Resettlement Rule Superfluous. ..................... 56

        e.    The Transit Rules Arbitrarily and Capriciously Penalize Asylum Seekers Even If They Do Not Have Reasonable Access to Asylum in Their Transit Country. .............................................. 57

        f.    The Transit Rules Arbitrarily and Capriciously Penalize Asylum Seekers Who Entered the United States Unlawfully. ............................... 59

        g.    The Transit Rules Arbitrarily and Capriciously Penalize Asylum Seekers Who Are Present in a Transit Country For More Than 14 Days. ........................................................................ 61

        h.    The Transit Rules Arbitrarily and Capriciously Penalize Asylum Seekers Who Transit Through More Than One Country. ....................... 63

D.    The Final Rule Is Unlawful Because It Redefines "Firm Resettlement" in a Manner Inconsistent with the Plain Text of the INA. ................................ 64

E.    The Final Rule Unlawfully Precludes Consideration of "Particular Social Group" Claims Advanced in Motions to Reopen or Reconsider. ............................. 68

F.    The Final Rule Unlawfully Requires Pretermission of Certain Claims. ................... 73

G.    The Final Rule Impermissibly Restricts the Discretion of Adjudicators to Consider Cultural Evidence. ......................................................... 75

H.    The Final Rule Arbitrarily Modifies the Burden of Proof and Factors to Be

Considered with Respect to Whether Internal Relocation Would Be Reasonable. ........................................................................... 78

    i.    The Final Rule Arbitrarily Shifts the Burden of Proof to Applicants Who Have Previously Experienced Persecution by Private Actors. ............. 78

    ii.    The Final Rule Requires Adjudicators to Consider Irrelevant Factors When Determining Whether Internal Relocation is Reasonable. ................... 80

I.    The Final Rule Impermissibly Limits Relief Under the Convention Against Torture. ........................................................................................ 82

    i.    The Final Rule Unlawfully Excludes Acts of Torture by Officials Not Acting "Under Color of Law" ........................................................ 83

    ii.    The Final Rule Adopts an Unworkably Narrow Definition of Acquiescence. .......................................................................... 85

J.    The Final Rule Unfairly Diminishes Confidentiality Protections for Asylum-Seekers. ................................................................................... 88

III.    The Final Rule Is Invalid Because Wolf Is Not Lawfully Serving as Acting Secretary of Homeland Security. ....................................................... 91

    A.    EO 13753 and the DHS Orders of Succession. ........................................ 95

    B.    Wolf Is Not Lawfully Serving as Acting Secretary of Homeland Security. ............. 99

    C.    The DOJ Regulations Must Be Vacated Along with the DHS Regulations. .......... 100

IV.    The Notice of Proposed Rulemaking and 30-Day Comment Period Did Not Provide Adequate Time For Public Comment and Thus Rendered The Final Rule Invalid From The Start. ............................................................... 102

V.    The Final Rule Is Impermissible Because of Its Potentially Retroactive Effect. ............ 104

VI.    The Final Rule Harms Plaintiffs by Frustrating Their Missions and Necessitating the Diversion of Resources. ......................................................... 107

    A.    The Final Rule Frustrates Plaintiffs' Missions. ...................................... 108

    i.    The Final Rule Frustrates the Legal Services Plaintiffs' Missions .............. 108

    ii.    The Final Rule Frustrates the Community Services Plaintiffs' Missions ..... 111

    B.    The Final Rule Forces Plaintiffs to Divert Resources from Core Programs and Services. ......................................................................... 112

    i.    The Final Rule Diverts the Legal Services Plaintiffs' Resources ................ 112

    ii.    The Final Rule Diverts the Community Services Plaintiffs' Resources ....... 114

iii

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

Case No.

C.    The Final Rule Jeopardizes Plaintiffs' Funding.............................................. 116

CLAIMS FOR RELIEF .............................................................................................. 117

PRAYER FOR RELIEF .............................................................................................. 123

COMPLAINT FOR DECLARATORY AND                    Case No.
INJUNCTIVE RELIEF

Plaintiffs Immigration Equality, Oasis Legal Services, The TransLatin@ Coalition, Black LGBTQIA+ Migrant Project ("BLMP"), and Transgender Law Center (collectively, "Plaintiffs"), by and through their attorneys, hereby file this complaint for declaratory and injunctive relief against defendants United States Department of Homeland Security; Pete Gaynor, in his official capacity, if any, as Acting Secretary of the Department of Homeland Security; Chad F. Wolf, in his official capacity as purported Acting Secretary of Homeland Security; United States Department of Justice; William P. Barr, in his official capacity as Attorney General; Executive Office for Immigration Review; James McHenry, in his official capacity as Director of the Executive Office for Immigration Review; U.S. Citizenship and Immigration Services; and Kenneth T. Cuccinelli, in his official capacity as purported Acting Director of U.S. Citizenship and Immigration Services (collectively, "Defendants"), and allege as follows:

## INTRODUCTION

1.     *"Give me your tired, your poor, your huddled masses yearning to breathe free, The wretched refuse of your teeming shore.  Send these, the homeless, tempest-tost to me, I lift my lamp beside the golden door!"*  Those are the words indelibly inscribed on the pedestal of the Statue of Liberty that embody core values of our country.  They are emblematic of the United States' historic and longstanding commitment to serve as a beacon of liberty, where those who are persecuted across the world are welcome to build a home and aspire for greater opportunity, free from abuse, violence, and torture.

2.     Yet, even as the sun sets on this administration, Defendants seek to burn the safe house down by promulgating a series of regulations that drastically change the asylum system in our country and make it virtually impossible for those who seek asylum within our shores to obtain it.

3.     Plaintiffs are nonprofit organizations who serve LGBTQ/H[1] immigrants from across the world seeking asylum or other forms of relief in the United States because they fear that, if deported,

---

[1] LGBT is the abbreviation for lesbian, gay, bisexual, and transgender.  "Q" recognizes those who identify as queer or questioning.  "I" refers to those who identify as intersex, and "A" refers to those who identify as asexual or agender.  "+" is used to recognize those whom the other letters do not necessarily describe, such as nonbinary or gender nonconforming individuals but who nonetheless are sexual or gender diverse individuals.  Throughout this Complaint, Plaintiffs use "LGBTQ" as an

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                              Case No.

they will be persecuted, tortured, or killed on account of their sexual orientation, gender identity, gender expression, or HIV-positive status. These LGBTQ/H asylum seekers have different backgrounds; are Latinx or Black, or of other ethnic or racial backgrounds; and are of different religions, if any. As organizations committed to serving LGBTQ/H asylum seekers, Plaintiffs' very missions and existence are threatened by this administration's discriminatorily motivated regulations, forcing Plaintiffs to fight back. In bringing this action, Plaintiffs seek to enjoin Defendants from enforcing an infirm regulatory scheme that will have a devastating impact on their ability to obtain asylum for their clients who fear life-threatening persecution.

4.     For decades, the asylum laws of the United States have promised "a fair and workable asylum policy which is consistent with this country's tradition of welcoming the oppressed of other nations and with our obligations under international law." H.R. Rep. No. 96-608, at 17-18 (1979). Congress codified this promise in the Refugee Act of 1980, implementing the United States' responsibilities under the 1967 United Nations Protocol Relating to the Status of Refugees ("1967 Protocol") and 1951 Convention Relating to the Status of Refugees ("1951 Convention") and proclaiming a "historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands, including, where appropriate, . . . admission to this country of refugees." Pub. L. No. 96-212, § 101(a), 94 Stat 102 (1980). Each year, the United States grants tens of thousands of asylum applications, necessarily finding that these applications have merit and that the applicants' fears of persecution are genuine. *See* U.S. Department of Homeland Security, *2019 Yearbook of Immigration Statistics*, Table 16. Individuals Granted Asylum Affirmatively or Defensively: Fiscal Years 1990 to 2019, https://www.dhs.gov/immigration-statistics/yearbook/2019/table16. The stakes could not be higher for those seeking refuge from persecution and torture in the United States.

5.     The question in this case is whether the outgoing administration, without adequate public notice or comment, should now be permitted to upend this basic promise, contrary to congressional intent and this Nation's fundamental values. As a new administration prepares to take the reins in only a few weeks, the Defendants, all agencies and sub-agencies of the federal government and their

---

umbrella term to be read as inclusive of all people with these sexual or gender identities, and use LGBTQ/H to refer to LGBTQ people together with people who are living with HIV.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                                    Case No.

purported principal officers, evidently are determined to rush through a suite of ill-conceived regulations designed to choke off access to asylum for most applicants. *See Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review*, 85 Fed. Reg. 80,274 et seq. (Dec. 11, 2020) (the "Final Rule").  Taken individually, the Final Rule's provisions and sub-provisions variously contravene the Immigration and Nationality Act, fail to pass the Administrative Procedure Act's minimum threshold for reasoned decision-making, and violate multiple guarantees of the United States Constitution.  That alone is grounds for this Court to grant the relief requested by Plaintiffs here.  But when these provisions are examined together, their overall design becomes clear: to inflict maximum violence on the United States asylum system in a death by a thousand cuts.

6.      From the very first paragraphs of their joint notice of proposed rulemaking, the Departments of Homeland Security and Justice (together, the "Departments") set an agenda of exclusion.  They declare "the laws and policies surrounding asylum" to be "an assertion of a government's right and duty to protect its *own resources and citizens*, while aiding those in true need of protection from harm."  85 Fed. Reg. at 36,265 (emphasis added); *see also* 85 Fed. Reg. 80,274.  They go on to invoke "ancient principles" of "nation-states" that "the power to exclude aliens is inherent in sovereignty" and "necessary for . . . defending the country against foreign encroachments and dangers." 85 Fed. Reg. at 36,265 (cleaned up).  These sentiments echo those expressed elsewhere by the current administration, which since its earliest days has viewed asylum as "a ruse to enter the country illegally." U.S. Dep't of Justice, *Attorney General Jeff Sessions Delivers Remarks to the Executive Office for Immigration Review* (Oct. 12, 2017), https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-executive-office-immigration-review/.  True to this worldview, the sprawling Final Rule treats migrants as "foreign encroachments," erecting onerous new obstacles to asylum at every stage of the process.

7.      Plaintiffs typically serve thousands of clients each year, whose individual cases each demand significant time, attention, and expertise.

8.      The Final Rule would have a particularly devastating impact on Plaintiffs' clients and members, as well as other LGBTQ/H claimants seeking asylum in the United States.  For example, the

3

COMPLAINT FOR DECLARATORY AND                                    Case No.
INJUNCTIVE RELIEF

Final Rule apparently excludes gender as a basis for asylum relief, which has the potential for altogether eliminating asylum relief for LGBTQ/H applicants. The Final Rule additionally eliminates asylum relief for many individuals who are targets of individualized personal animus. This measure will devastate the many LGBTQ/H asylum applicants who have faced persecution at the hands of people who act on societally and governmentally sanctioned animosities against LGBTQ/H people. The Final Rule further harms LGBTQ/H asylum seekers by sharply limiting the circumstances in which applicants may claim asylum after passing through third countries (many of which are as persecutory of LGBTQ/H individuals as claimants' home countries) or after being in the United States for more than one year (even though many LGBTQ/H claimants experience circumstances that render their claims timely).

9.      The Final Rule will also preclude Plaintiffs from even reaching many of the LGBTQ/H individuals they would otherwise serve by leading to pretermission of their claims before they can obtain Plaintiffs' assistance. Furthermore, the Final Rule has forced, and, if allowed to take effect, will continue to force, Plaintiffs to divert their already stretched resources away from their core mission in order to adapt to the Final Rule's requirements and mitigate its drastic and deleterious impact on LGBTQ/H asylum seekers.

10.     The Final Rule and the individual provisions challenged here should be stricken as unlawful in numerous respects.

11.     *First*, multiple provisions of the Final Rule directly contradict or exceed Defendants' statutory authority under the Immigration and Nationality Act of 1952, as amended, 8 U.S.C. §§ 1101 *et seq.* (the "INA"), or are otherwise not in accordance with law in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), (C). In the INA, Congress set forth comprehensive standards governing eligibility for, and grants and denials of, asylum and withholding of removal. *See* 8 U.S.C. §§ 1158, 1231(b)(3). Similarly, Congress has directed "the appropriate agencies" to "prescribe regulations to implement the obligations of the United States under Article 3 of the United Nations Convention Against Torture," ("CAT") thereby requiring that such regulations at least satisfy the minimum thresholds prescribed under CAT. *See* Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, Div. G, Title XXII, § 2242(b), 112 Stat. 2681-822 (1998) (codified as a note to 8

4

U.S.C. § 1231 (1999)). The Final Rule cavalierly ignores many of these carefully drafted provisions and renders others superfluous, all to the detriment of those fleeing persecution and torture, including because of their sexual orientation, gender identity, gender expression, or HIV status. Among other things, the Final Rule:

- All but erases the ability of adjudicators to grant asylum or withholding of removal because of an applicant's gender, which may be interpreted by authorities as including LGBTQ asylum seekers;

- Generally precludes asylum or withholding of removal where the applicant's claim of persecution is based on "interpersonal animus," even though virtually all instances of persecution, particularly against LGBTQ/H refugees, involve some form of interpersonal animus, 8 C.F.R. §§ 208.1(f)(1)(i)-(ii), 1208.1(f)(1)(i)-(ii) (proposed);

- Effectively requires adjudicators to deny asylum if the applicant accrued one year or more of unlawful presence, ignoring congressionally enacted exceptions to the one-year filing deadline, 8 C.F.R. §§ 208.13(d)(2)(D), 1208.13(d)(2)(D) (proposed);

- Generally eliminates adjudicators' discretion to grant asylum if an applicant traveled through more than one third country, or was present in any third country for more than 14 days, contrary to the more narrowly drawn firm resettlement bars found in the INA, 8 C.F.R. §§ 208.13(d)(2)(A), (B), 1208.13(d)(2)(A), (B) (proposed);

- Bars asylum seekers under the firm resettlement doctrine based on a definition of "firm resettlement" that does not comport with the statute's plain language, 8 C.F.R. §§ 208.15(a), 1208.15(a) (proposed);

- Eliminates in most cases the discretion of immigration judges or the Board of Immigration Appeals ("BIA") to consider certain arguments on a motion to reopen or reconsider—for example, newly articulated "particular social group" claims based on "changed country conditions," contrary to Congress's dictate that a motion to reopen may be filed based on changed country conditions, and even though country conditions for LGBTQ/H refugees are

COMPLAINT FOR DECLARATORY AND                          Case No.
INJUNCTIVE RELIEF

subject to change in today's ever-shifting human rights regimes, 8 C.F.R. §§ 208.1(c), 1208.1(c) (proposed);

- Authorizes immigration judges to deny certain asylum applications without a hearing, with little or no notice or opportunity for applicants to cure any defects in their application, 8 C.F.R. § 1208.13(e) (proposed);

- Overrides the statutory authority of adjudicators to consider all record evidence, including cultural evidence pertaining to the treatment of LGBTQ/H people in the applicant's country of origin, 8 C.F.R. §§ 208.1(g), 1208.1(g) (proposed); and

- Promulgates regulations under the CAT that contradict its plain text and undermine its fundamental objectives, 8 C.F.R. §§ 208.18, 1208.18 (proposed).

12.    *Second*, the Final Rule's provisions are arbitrary and capricious in violation of the APA. It is a foundational principle of administrative law that an agency must articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made. The Departments' published rulemaking for the Final Rule, however, falls woefully short of this standard: most of the provisions of the Final Rule challenged here do not even attempt to specify what problem they are attempting to solve, what facts or data support the actions taken, or how the new regulations adhere to congressional intent and comport with the structure and purposes of the INA. Defendants' Final Rule would repeal longstanding policies, some decades old, while Defendants have utterly failed to display the necessary awareness that they are changing these policies, let alone provided a reasoned explanation for doing so.

13.    Defendants also thoroughly violated the APA by failing to respond to the public comments they received, including the many submitted by legal assistance organizations with expertise in this area of law expressing serious concerns about how the Final Rule will impact the most vulnerable refugees, including LGBTQ/H refugees. Despite the ad hoc justifications that Defendants have offered for the provisions of this colossal rule, it is apparent that every aspect of the Final Rule has a single principal purpose: to deny asylum as much as possible, regardless of the underlying merits of an application or any other public policy considerations.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                                    Case No.

14. For example, in addition to the actions already enumerated above (which are themselves arbitrary and capricious), the Final Rule arbitrarily and capriciously:

- Eliminates the discretion of adjudicators to hold that laws such as those making it a crime to be gay, Christian, or Jewish are inherently persecutory even if not consistently enforced, 8 C.F.R. §§ 208.1(e), 1208.1(e) (proposed);

- Shifts the burden onto many applicants to prove that internal relocation in their home country would not have been reasonable, and requires adjudicators to consider factors that are outright irrational in determining whether internal relocation would have been reasonable, 8 C.F.R. §§ 208.13(b)(3), 1208.13(b)(3), 208.16(b)(3), 1208.13(b)(3) (proposed);

- Harshly penalizes applicants who traveled through a third country without applying for protection there, even if the applicants would have been at risk of persecution or torture in the third country, 8 C.F.R. §§ 208.13(d)(1), 1208.13(d)(1) (proposed); and

- Reduces confidentiality protections, potentially discouraging meritorious applicants or their supporting witnesses from coming forward, particularly for LGBTQ/H applicants, 8 C.F.R. §§ 208.6, 1208.6 (proposed).

15. *Third*, the Final Rule violates the Due Process Clause of the Fifth Amendment of the United States Constitution. It is well-established that the Due Process Clause's guarantees of effective assistance of counsel and procedural due process apply to asylum seekers in removal proceedings.

16. The Final Rule abridges these constitutional guarantees by (a) authorizing immigration judges to pretermit asylum applications without a hearing and without affording applicants a reasonable opportunity to cure, and (b) preventing applicants from asserting new arguments related to their particular social group membership in a motion to reopen, motion to reconsider, or on appeal, even if their failure to do so in their initial application was due to counsel's ineffectiveness, with some limited exceptions. These abridgements of rights uniquely devastate Plaintiffs because, among other reasons, LGBTQ/H claimants frequently fear identifying with their particular social group in their initial public filings.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                                    Case No.

17.     *Fourth*, Defendants have acted improperly by muddling their responses as to whether the Final Rule's multitude of provisions are retroactive and have created confusion by refusing to state whether particular regulatory changes are retroactive or not.  Moreover, insofar as the Final Rule may be applied retroactively, such retroactive application will deprive applicants of full and fair notice of the procedures and standards used in evaluating their claims and will thereby result in a manifest injustice offensive to the Due Process Clause.

18.     *Fifth*, under the APA, when undertaking agency action like promulgating the Final Rule, the agencies must: (1) assess whether there are reliance interests; (2) determine whether they are significant; (3) weigh any such interests against competing policy concerns; and (4) consider whether it has flexibility in addressing such reliance interests.  Defendants have not done so here and therefore have violated their APA obligations.  The Final Rule upsets well-founded expectations.  Rather than balance these reliance interests against any competing alternatives, the Departments ignored them.

19.     *Sixth*, the Final Rule was promulgated in violation of the Appointments Clause of the United States Constitution, the Homeland Security Act of 2002 ("HSA"), and the Federal Vacancies Reform Act of 1998 ("FVRA").  Chad Wolf, who purported to issue the proposed rule (through a delegation to Chad Mizelle, Senior Official Performing the Duties of the General Counsel, U.S. Department of Homeland Security) and the Final Rule, has not been confirmed by the United States Senate to the position of Secretary of Homeland Security and is not lawfully serving as Acting Secretary of Homeland Security.  Consequently, all provisions of the Final Rule that purport to be promulgated by DHS are null and void.

20.     In addition, because the DHS regulations are non-severable from the Final Rule as a whole, and because the Final Rule would itself be arbitrary and capricious if it established two incompatible standards for asylum between the DOJ and DHS, the remaining DOJ regulations must be held invalid under the APA as well.

21.     *Seventh*, Defendants steamrolled the Final Rule to publication without permitting sufficient time for public comment.  The Final Rule is therefore invalid as having issued "without observance of procedure required by law" under the APA.  5 U.S.C. § 706(2)(D).  The 30 days provided

COMPLAINT FOR DECLARATORY AND                    Case No.
INJUNCTIVE RELIEF

by Defendants would be considered the minimum amount of time necessary for any proposed rule in ordinary circumstances. However, the notice of proposed rulemaking in this case was anything but ordinary; spanning approximately 51,000 words of the Federal Register, it is a remarkably lengthy and complicated document, touching nearly every aspect of the nation's asylum system and overruling decades of agency policy and established precedent. Moreover, Defendants promulgated the notice of proposed rulemaking amidst a global pandemic with countless people working from home, many of whom have no childcare, some of whom became ill with COVID-19, and others whose family members became ill with COVID-19. Given these factors, as well as the size and complexity of the proposed rule, a 30-day period for public comment was insufficient as a matter of law.

22.     In sum, the Final Rule is inconsistent with the INA; is arbitrary and capricious under the APA; contravenes the Fifth Amendment's guarantees of procedural due process and effective assistance of counsel; is unlawful insofar as it applies retroactively to pending applications, under both the principles of due process and the APA; violates the Appointments Clause, FVRA, and HSA; and was promulgated without observance of the procedures required by the APA. The Final Rule jeopardizes Plaintiffs' ability to carry out their missions and places their clients and members, and countless others who have filed or have yet to file, at grave risk of persecution, torture, or death if their applications are denied and they are removed. This Court should hold the Final Rule unlawful, set it aside, and enjoin its enforcement and implementation.

## JURISDICTION AND VENUE

23.     This case arises under the APA, 5 U.S.C. § 701 *et seq.*, the INA, 8 U.S.C. § 1101 *et seq.*, the FVRA, 5 U.S.C. § 3345 *et seq.*, the HSA, 6 U.S.C. § 101 *et seq.*, and the Fifth Amendment to the United States Constitution.

24.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises under the laws of the United States and United States Constitution; 28 U.S.C. § 1346, as a civil action against the United States founded upon the Constitution, an Act of Congress, or an executive regulation; and 28 U.S.C. § 1361, as an action to compel an officer or agency to perform a duty owed to plaintiffs.

9

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Case No.

25. Jurisdiction is also conferred on this Court pursuant to 5 U.S.C. §§ 701-706. Defendants' issuance of the Final Rule on December 11, 2020, constitutes a final agency action that is subject to judicial review under 5 U.S.C. §§ 702, 704, and 706, and Plaintiffs are aggrieved by adverse agency action which this Court is authorized to remedy under the APA, 5 U.S.C. §§ 702 *et seq.*

26. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory, injunctive, and other relief pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 705-706.

27. Plaintiffs seek costs and fees pursuant to the Equal Access to Justice Act, 5 U.S.C. § 504 and 28 U.S.C. §§ 2412(2) *et seq.*

28. Venue is proper under 28 U.S.C. § 1391(e)(1) because Defendants are agencies of the United States and officers of the United States acting in their official capacity and because Plaintiffs Oasis Legal Services, BLMP, and the Transgender Law Center have their principal place of business and reside within this judicial district under 28 U.S.C. § 1391(c)(2); and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within this District under 28 U.S.C. § 1391(b)(2).

## INTRADISTRICT ASSIGNMENT

29. This is an Administrative Procedures Act and constitutional action subject to district-wide assignment pursuant to Local Rules 3-2(c) and 3-5(b).

## THE PARTIES

### A. Plaintiffs Provide Services to LGBTQ/H Refugees

30. Plaintiffs include three legal services organizations (Immigration Equality, Oasis Legal Services, and the Transgender Law Center) that provide direct legal services and representation to LGBTQ/H immigrants seeking asylum or other forms of relief in the United States. Their clients fear that, if deported, they will be persecuted or tortured on account of their sexual orientation, gender identity, gender expression, or HIV status. Plaintiffs also include two nonprofit membership organizations (the TransLatin@ Coalition and BLMP) that provide a wide range of services to LGBTQ Latinx and Black migrants, including asylum seekers. The TransLatin@ Coalition also provides direct

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF          Case No.

legal services and representation to transgender Latinx immigrants seeking asylum or other forms of relief in the United States.

31. Plaintiffs Immigration Equality, Oasis Legal Services, the TransLatin@ Coalition, and the Transgender Law Center (together, "Legal Services Plaintiffs") assert claims on their own behalf and also on behalf of their clients and recipients of legal services, who face barriers to asserting their own claims and protecting their own interests.

32. Plaintiffs the TransLatin@ Coalition and BLMP (together, "Community Services Plaintiffs") assert claims on their own behalf, on behalf of their individual members, and on behalf of their clients and recipients of community services, who face barriers to asserting their own claims and protecting their own interests.

33. Plaintiffs assert varied but complementary interests and share the common objective of maintaining an effective, functioning asylum system that protects LGBTQ/H migrants' ability to obtain asylum or other forms of relief.

### i. Plaintiff Immigration Equality

34. Plaintiff Immigration Equality is a nonprofit national legal organization based in Brooklyn, New York, whose mission is to promote equality and justice for LGBTQ/H immigrants and families through direct legal services, policy advocacy, and impact litigation. For more than 26 years, Immigration Equality has worked to secure safety and freedom for LGBTQ/H individuals fleeing persecution, as well as to reunite LGBTQ bi-national couples and families. In order to effectuate its mission, Immigration Equality runs a pro bono asylum project, provides technical assistance to attorneys, maintains an informational website, and fields questions from LGBTQ/H individuals from around the world. Additionally, through education, outreach and advocacy, Immigration Equality works to change the laws that unfairly impact LGBTQ/H immigrants. Immigration Equality regularly represents and provides mentoring to pro bono attorneys representing detained asylum seekers. Immigration Equality's client population is uniquely vulnerable, as they live under the threat of deportation, poverty, and homelessness, and many suffer from trauma-related mental health issues. Ninety-nine percent (99%) of Immigration Equality's clients live at or below 250% of the federal

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                                    Case No.

poverty level and approximately 44% are under the age of 30. Its clients reside throughout the United States and come from all parts of the world with current clients primarily originating from the following countries: Jamaica, Russia, Nigeria, Honduras, Venezuela, Mexico, El Salvador, Uganda, Guyana, Ecuador, and Georgia.

35. Legal services are the foundation of Immigration Equality's programming, and since 1994, Immigration Equality has provided advice and legal assistance to thousands of LGBTQ/H immigrants, binational couples, and families. Immigration Equality currently has a nine-person legal team consisting of: one part-time and three full-time staff attorneys, three paralegals, one BIA accredited representative, and a Legal Director. Through its programming, Immigration Equality has helped over 1,200 LGBTQ/H asylum seekers win asylum, withholding of removal, or CAT relief. Immigration Equality clients have maintained a remarkable success rate, prevailing on adjudicated cases approximately 99% of the time.

36. As of November 23, 2020, Immigration Equality had 639 open matters comprised of 21 in-house cases being handled entirely by Immigration Equality staff (the "In-House Program") and 618 cases placed with volunteer attorneys (the "Pro Bono Program"). Of these matters, close to 520 are asylum, withholding of removal, or CAT cases. Around 420 are affirmative proceedings before USCIS and approximately 100 cases are defensive proceedings before the Executive Office for Immigration Review ("EOIR"). Over the last twelve months, Immigration Equality has provided representation to a total of 793 individuals across 28 states through its In-House Program and Pro Bono Program. In addition, Immigration Equality has accepted an additional 31 asylum seekers into its Pro Bono Program and is in the process of placing these cases with pro bono counsel. Around 15 clients in the Pro Bono Program have not yet filed their I-589, Applications for Asylum and Withholding of Removal ("Asylum Application").

### ii. Plaintiff Oasis Legal Services

37. Plaintiff Oasis Legal Services ("Oasis") is nonprofit legal organization headquartered in Berkeley, California. Oasis's mission is to provide direct legal services and holistic case management to LGBTQ+ asylum seekers living within the jurisdiction of the USCIS San Francisco Asylum Office.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

Case No.

Given California's proximity to Mexico and Central America, over 95% of Oasis's clients are Latinx. Oasis also serves clients from Asia, Africa, the Middle East, and the Caribbean. Oasis's clients are undocumented immigrants, low-income people of color, and victims of hate crimes. All of Oasis's clients have endured horrific violence in their countries of origin because of their sexual orientation, gender identity, gender expression, or HIV-positive status.

38. During the past three years, Oasis has represented over 900 LGBTQ+ asylum seekers. Oasis also collaborates with dozens of organizations and provides case management and wrap-around services to meet the needs of its clients holistically. In addition to direct representation, Oasis provides training, sample documentation and briefs, and direct mentorship to lawyers locally and nationally representing LGBTQ+ asylum seekers.

### iii. Plaintiff The TransLatin@ Coalition

39. Plaintiff The TransLatin@ Coalition ("the Coalition") is a nationwide nonprofit membership organization that advocates for the interests of transgender and gender nonconforming individuals, particularly Latinx immigrants, and provides direct services to the transgender community, including leadership development, legal services, educational services, and employment services. The Coalition currently has a presence in Los Angeles, California; Washington, D.C.; Chicago, Illinois; New York, New York; Atlanta, Georgia; Houston, Texas; and Tucson, Arizona. The Coalition and its members advocate for policy changes at the local, state, and federal levels, and conduct research regarding homelessness, health and healthcare, and employment in the transgender Latinx immigrant community.

40. The Coalition has thousands of individual members across the United States, including transgender and gender nonconforming Latinx immigrants who have or are seeking asylum or other forms of relief due to the persecution they have experienced in their countries of origin. This includes individual transgender and gender nonconforming Latinx members such as Bamby Salcedo, who resides in California, and Arianna Lint, who resides in Florida. Ms. Salcedo immigrated to the United States from Mexico and was granted statutory withholding of removal based on the persecution she faced in Mexico due to her being transgender and failure to conform with gender stereotypes prevalent in her

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    Case No.

country of origin.  Ms. Lint immigrated to the United States from Peru and was granted relief based on the persecution she encountered as a result of her being transgender and failing to conform to gender stereotypes prevalent in her country of origin.  The Coalition's membership also includes leaders of affiliated community organizations that serve Latinx transgender and gender nonconforming people across the country, such as Arianna's Center headquartered in Florida and with offices in Puerto Rico.

41.     Through its Center for Violence Prevention & Transgender Wellness located in Los Angeles, California, the Coalition also provides direct services to transgender, gender nonconforming, and intersex people, including: community drop-in spaces; daily food distribution; re-entry services to people recently released from incarceration and immigration detention, including rental assistance, transportation and food vouchers; English as a Second Language (ESL) classes; leadership and workforce development education and training programs; emergency and transitional housing; case management; referrals to health care providers and organizations that provide competent and affirming health care services to its members and patrons, including gender affirming care; and, most notably, immigration-focused legal services.

42.     The Coalition's Legal Services Project serves community members who are transgender, nonbinary, and gender nonconforming, with a focus on undocumented immigrants, who tend to be low-income people of color and victims of human rights violations.  Many of its clients have survived years of trauma in their country of origin as a result of their gender identity or gender expression.  The Coalition's Legal Services Project also works hand in hand with a team of case workers at the Coalition to help its clients navigate life and succeed in the United States.  For example, the Coalition has an Anti-Violence Program, Reentry Program, Workforce Development and Emergency Housing (H.O.P.E House) and assists clients with applying for Refugee Cash Assistance, Refugee Medical Assistance or Medi-Cal, Refugee Support Services, CalWORKs, CalFresh, Supplemental Security Income/State Supplemental Payment, Social Security Cards, and California Identification/California Drivers Licenses.  The Coalition's Legal Services Project is composed of one legal director and a staff attorney. It also refers cases to a few pro bono attorneys from those that it has screened.  As of the final quarter of 2020, the Coalition's Legal Services Project has several affirmative asylum cases and is preparing a

14

COMPLAINT FOR DECLARATORY AND                    Case No.
INJUNCTIVE RELIEF

number of defensive asylum cases for hearings in 2021. The Coalition's Legal Services Project is also working to obtain green cards for a few recipients of asylum and U-Visas (which are given to victims of crimes involving physical or mental abuse who are cooperating with law enforcement).

### iv. Plaintiff Black LGBTQIA+ Migrant Project

43. The Black LGBTQIA+ Migrant Project ("BLMP") was formed in response to the invisibilization of Black LGBTQIA+ migrants' experiences of being undocumented, queer, and Black within migrant narratives, immigration justice, and racial justice movements. BLMP works at the local, regional, and national level to face multifaceted and intensifying attacks on their communities, they organize community and movement building events around the country to reduce isolation, create support systems for trans and queer Black migrants, provide support and resources for detained Black migrants, and build leadership and local power to defend Black LGBTQIA+ communities. BLMP engages hundreds of LGBTQIA+ Black migrants across the United States and has local/regional networks centered in Oakland, California; New York, New York; the Upper Midwest (Minneapolis-Saint Paul, Minnesota, Chicago, Illinois, and Detroit, Michigan); Washington D.C., Maryland, and Virginia (DMV), and the South. BLMP has a full-time staff of 4 plus 2 part-time staff members, and also employs 5 consultants. BLMP also has a steering committee of 11 members, who have been directly impacted by the immigration system and includes current asylum seekers. It has also launched the *Queer Black Migrant Survey*, a research project to collect qualitative and quantitative data on Black LGBTQIA+ migrants' experiences. Its policy work includes congressional briefings on LGBTQIA+ migrants in detention and Black migrant experiences during the COVID-19 pandemic.

44. Since 2019, BLMP has provided services and assistance to more than 400 individuals. 100% of BLMP's members identify as LGBTQIA+ and 60% are asylum seekers or have been granted asylum. BLMP provides services to community members who are seeking asylum or other forms of immigration relief in the United States because they fear that, if deported, they will be persecuted or tortured because of their sexual orientation, gender identity, gender expression, or HIV status.

45. BLMP has over 250 members who are located across the United States. BLMP's membership is comprised of directly impacted individuals who are disproportionately low-income, have

---

15

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                                    Case No.

experienced homelessness and unstable housing, trauma history, and discrimination and stigmatization because of their race, immigration status, sexual orientation, gender identity, gender expression, or HIV status. BLMP's membership includes asylum seekers who have either received asylum or have filed applications for asylum or other immigration relief, and individuals who are in immigration detention facilities. Many of BLMP's members have been detained in detention facilities or are currently in detention facilities. BLMP's members have access to its programs and for those in need, they also receive financial assistance.

46. BLMP leads trainings and community gatherings throughout the United States focused on transformative community organizing, healing practices to address trauma, and know your rights trainings for when dealing with police and the immigration system, the asylum system, and working with traumatized populations. Its services include organizing campaigns in support of detained community members for their release and to help them connect with local support when they are released, and cash assistance and mutual aid for necessities such as housing, food, medical care, and clothing. BLMP provides direct support to detained members such as: connecting them with immigration legal services; cash assistance for commissary; interpretation support by connecting their attorneys to interpreters; and expert witnesses for their asylum cases by connecting their attorneys to advocates who have expertise in different countries of origin. BLMP also provides information to its detained members on what they can do *pro se* by facilitating conversations between the detained person and a competent attorney who can offer legal advice. BLMP provides to its non-detained members additional resources, such as webinars and trainings regarding policies that impact their lives and immigration cases, connecting them to legal consultations for their cases, mutual aid assistance via its intake process, access to wellness services, and connecting them to mental health professionals.

### v. Plaintiff Transgender Law Center

47. The Transgender Law Center ("the Center") is a national trans-led nonprofit legal organization founded in 2002 and headquartered in Oakland, California. The Center has satellite offices in Tijuana, Mexico, Atlanta, Georgia, and New York, New York. Grounded in legal expertise and committed to racial justice, the Center employs a variety of community-driven strategies to keep

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    Case No.

transgender and gender nonconforming ("TGNC") people alive, thriving, and fighting for liberation. The Center builds power within TGNC communities, particularly communities of color and those most marginalized, and lays the groundwork for a society in which all people can live safely, freely, and authentically regardless of gender identity or expression. The Center works to achieve this goal through leadership development and by connecting TGNC people to legal resources. It also pursues impact litigation and policy advocacy to defend and advance the rights of TGNC people, transform the legal system, minimize immediate threats and harms, and educate the public about issues impacting its communities.

48. The Center also participates in a Border Project to assist TGNC refugees. The Border Project's mission is to nurture and participate in a network of organizations who provide case management, humanitarian aid, direct legal services, and holistic case management to LGBTQ asylum seekers. The Center's main role in the Border Project is to provide legal information and representation to clients in Tijuana, Mexico, through their arrival and processing in the United States, and then their application for asylum or other forms of relief in the United States. The Center's Border Project participants come from numerous countries and speak many languages. Despite the many differences that exist, they have the unfortunate commonality of having endured violence and systemic discrimination due to their sexual orientation, gender identity, gender expression, or HIV-positive status in their countries of origin.

49. Beyond Tijuana, Mexico, the Center often receives calls for assistance from LGBTQ+ identified individuals who are in U.S. detention facilities. These have included Imperial Valley Detention Center and Otay Mesa Detention Center. In those instances, the Center sometimes provides *pro se* support or limited representation. The Center regularly provides technical assistance in other locations along the border and throughout Mexico and the United States on border policies, LGBTQ+ immigration issues, and human trafficking.

50. Since the start of its work with the Border Project in November 2019, the Center has represented approximately 150 people. In 2020, the Center engaged with LGBTQ refugees from

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                                     Case No.

Russian-speaking nations, Mexico, South American countries, African nations, Iran, Jamaica, Cuba, and Central American nations

### B. Defendants

51.     Defendant United States Department of Homeland Security ("DHS") is a cabinet-level department of the United States federal government.

52.     Defendant Pete Gaynor ("Gaynor") is the Administrator of the Federal Emergency Management Administration ("FEMA"), a sub-agency of DHS, serving since January 16, 2020. According to an order of succession established by then-Secretary of Homeland Security Kirstjen Nielsen on April 9, 2019 and Executive Order 13753 issued on December 9, 2016, Administrator Gaynor would have been third in the line of succession to assume the role of Acting Secretary in the event of the Secretary's resignation, behind the Deputy Secretary of Homeland Security and the Under Secretary for Management. Following Secretary Nielsen's resignation, the offices of Secretary, Deputy Secretary, and Under Secretary of Management have remained vacant. Administrator Gaynor is currently the highest-ranking official designated as Acting Secretary of Homeland Security under the April 9, 2019 order of succession and E.O. 13753. He is sued in his official capacity, if any, as Acting Secretary of Homeland Security.

53.     Defendant Chad F. Wolf ("Wolf") is Under Secretary for Strategy, Policy, and Plans at DHS. Since November 13, 2019, Under Secretary Wolf has purported to serve as Acting Secretary of Homeland Security. The Secretary of Homeland Security directs each of the component agencies within DHS, is responsible for the administration of immigration laws pursuant to 8 U.S.C. § 1103, and is empowered to grant asylum and other immigration benefits. In his purported capacity as Acting Secretary of Homeland Security, Wolf, through a purported delegation of authority, issued the Proposed Rule and Final Rule on behalf of DHS. He is sued in his official capacity, if any, as Acting Secretary of Homeland Security.

54.     Defendant United States Department of Justice ("DOJ") is a cabinet-level department of the United States federal government.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                                            Case No.

55. Defendant William P. Barr ("Barr") is the Attorney General of the United States. He is sued in his official capacity. The Attorney General directs each of the component agencies within the DOJ, is responsible for the administration of immigration laws pursuant to 8 U.S.C. § 1103, and is empowered to grant asylum or other relief. In his official capacity, Barr issued the Proposed Rule and the Final Rule on behalf of the DOJ.

56. Defendant Executive Office for Immigration Review ("EOIR") is a sub-agency of the DOJ and is one of the two agencies responsible for implementing the final rule challenged in this suit.

57. Defendant James McHenry is the Director of the EOIR. He is sued in his official capacity.

58. Defendant U.S. Citizenship and Immigration Services ("USCIS") is a sub-agency of DHS and is one of the two agencies responsible for implementing the final rule challenged in this suit.

59. Defendant Kenneth T. Cuccinelli ("Cuccinelli") has purported to serve as Acting Director of USCIS since June 10, 2019. He is sued in his official capacity, if any, as Acting Director of USCIS.

## FACTUAL ALLEGATIONS

I. **Background**

A. **The United States Asylum System Protects Refugees From Persecution.**

60. For generations, the United States has been a haven for immigrants seeking opportunity and upward mobility. *See, e.g.,* John F. Kennedy, *Nation of Immigrants* (1958); Emma Lazarus, *The New Colossus* (1883) (welcoming "your tired, your poor, your huddled masses"). After the failures of the global community to protect refugees during World War II and the Holocaust, the United States and the international community recognized that "[a]ll human beings are born free and equal in dignity and rights" and that "[e]veryone has the right to seek and to enjoy in other countries asylum from persecution." The Universal Declaration of Human Rights (Dec. 10, 1948), Art. 1, 14.

61. Tracing at least as far back as 1947, the United States has had a "congressionally enacted immigration and naturalization policy which granted immigration preferences to 'displaced persons,' 'refugees,' or persons who fled certain areas of the world because of 'persecution or fear of persecution

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    Case No.

on account of race, religion, or political opinion.'" *Rosenberg v. Yee Chien Woo*, 402 U.S. 49, 52 (1971). "[T]he basic policy has remained constant—to provide a haven for homeless refugees." *Id.*

62. The foundational documents for the protection of refugees under international law are the 1951 Convention and the 1967 Protocol. The 1951 Convention endorsed the principle of *non-refoulement*: that "no one shall expel or return ('*refouler*') a refugee against his or her will, in any manner whatsoever, to a territory where he or she fears threats to life or freedom." United Nations High Commissioner for Refugees, *Convention and Protocol Relating to the Status of Refugees,* at 3 (2010), https://www.unhcr.org/en-us/3b66c2aa10. The principle of *non-refoulement* is so fundamental that no reservations or derogations may be made to it; the 1951 Convention forbids states from returning refugees "in any manner whatsoever" to a place where they may face persecution. *Id.* § 33(1).

63. The 1967 Protocol reincorporated the substantive terms of the 1951 Convention, without its geographic and temporal limitations. The United States ratified the 1967 Protocol in 1968.

64. The United States implements its obligations under the 1967 Protocol through the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102. Under the INA, as amended by the 1980 Act, two related but distinct forms of relief are available: asylum, *see* 8 U.S.C. § 1158, and statutory withholding of removal, *see id.* § 1231(b)(3).

65. The Attorney General or Secretary of Homeland Security may grant asylum to a person who qualifies as a "refugee" under the INA. *See* 8 U.S.C. § 1158(b)(1)(A). A "refugee" is defined, in relevant part, as "any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* § 1101(a)(42). A person's fear of persecution is "well-founded" if persecution is a reasonable possibility. Asylum seekers need not show that it is more likely than not that they would suffer persecution; even a 10% chance of persecution may suffice to establish eligibility.

66. The asylum statute incorporates careful legislative judgments as to who should and should not be granted asylum. For example, an asylum seeker may apply for asylum regardless of

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    Case No.

whether they "arrive[d] in the United States . . . at a designated port of arrival" and "irrespective of such alien's status." 8 U.S.C. § 1158(a)(1). And although an asylum seeker must generally apply within one year of entry in the United States (the "One-Year Bar"), Congress specifically waived this filing deadline where "the alien demonstrates . . . either the existence of changed circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay in filing an application." *Id.* § 1158(a)(2)(B), (D). The Departments may promulgate additional limitations and conditions on eligibility for asylum, but only if they are "consistent with" 8 U.S.C. § 1158. *See id.* § 1158(a)(2)(C).

67. Asylum is a benefit that may be granted or denied in the Departments' discretion. *See I.N.S. v. Cardoza-Fonseca,* 480 U.S. 421, 441 (1987). Decades of precedent, however, teach that the danger of persecution should generally outweigh all but the most egregious of adverse factors. *In re Pula*, 19 I&N Dec. 467, 473-74 (BIA 1987). As the Ninth Circuit remarked, "[i]t is rare to find a case where an IJ finds a petitioner statutorily eligible for asylum and credible, yet exercises his discretion to deny relief." *Gulla v. Gonzales*, 498 F.3d 911, 916 (9th Cir. 2007).

68. In addition to asylum, withholding of removal is available under 8 U.S.C. § 1231(b)(3), which provides that a refugee may not be removed to a country if "the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." The requirements to succeed on a withholding-of-removal claim largely overlap with those required for an asylum claim, except that the burden of proof for a withholding-of-removal claim is a clear probability, *i.e.*, more-likely-than-not. Unlike an asylum claim, a withholding-of-removal claim is not discretionary; it must be granted to applicants who show that they are eligible and it is not subject to the One-Year Bar. 8 CFR § 208.16.

69. Finally, the United States is a party to the United Nations CAT. Article 3 of CAT provides that states may not "expel, return ('refouler') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture."

70. Congress has provided that "it shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Case No.

substantial grounds for believing that the person would be in danger of being subjected to torture" and directed "the appropriate agencies" to "prescribe regulations to implement the obligations of the United States under Article 3 of [CAT]." Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, Div. G, Title XXII, § 2242(a), (b), 112 Stat. 2681-822 (1998) (codified as a note to 8 U.S.C. § 1231 (1999)). The regulations implementing the United States' obligations under CAT are codified at 8 C.F.R. §§ 208.16-208.18. Like withholding of removal, a claim for CAT relief must be proven under a more-likely-than-not standard and is not discretionary. 8 C.F.R. §§ 208.16, 1208.16(c)(4) (2006).

## B. Asylum is Critical to LGBTQ/H Refugees.

71. For years, the Departments and the courts have recognized that persecution based on sexual orientation, gender identity, or HIV status is persecution based on "membership in a particular social group," qualifying such person as a refugee under the INA. *See, e.g.*, *Avendano-Hernandez v. Lynch*, 800 F.3d 1072, 1082 (9th Cir. 2015); *Karouni v. Gonzales*, 399 F.3d 1163, 1172 (9th Cir. 2005); *Matter of Toboso-Alfonso*, 20 I&N Dec. 819, 822 (BIA 1990); U.S. Citizenship and Immigration Services, *Guidance for Adjudicating Lesbian, Gay, Bisexual, Transgender, and Intersex (LGBTI) Refugee and Asylum Claims Training Module* (Dec. 28, 2011), https://www.uscis.gov/sites/default/files/document/guides/RAIO-Training-March-2012.pdf.

72. This recognition has opened the United States asylum system to thousands of LGBTQ/H refugees faced with violence, torture, and even death in their countries of origin. In 69 countries, same-sex relations are illegal, punishable in many locations by imprisonment, corporal punishment, or death. *See* International Lesbian, Gay, Bisexual, Trans and Intersex Ass'n, *State-Sponsored Homophobia: Global Legislation Overview Update* 113-42 (Dec. 2020), https://ilga.org/downloads/ILGA_World_State_Sponsored_Homophobia_report_global_legislation_overview_update_December_2020.pdf. Other countries impose severe restrictions on freedom of expression in relation to sexual orientation. *See id.* at 145-63.

73. Even in countries without laws formally criminalizing LGBTQ/H identity, expression, or status, individuals in these groups face widespread persecution in the form of arbitrary arrests and detentions, beatings, rape, and murder, both at the hands of law enforcement officials and by private

22

actors—often relatives of the victim or members of their community—whom law enforcement is unable or unwilling to stop or punish. The United States Department of State, NGOs, and organs of the United Nations have widely documented persecutory conditions in these and other countries. *See generally* U.N. Human Rights Council, *Report of the United Nations High Commissioner for Human Rights on Discriminatory Laws and Practices and Acts of Violence against Individuals based on their Sexual Orientation and Gender Identity* (Nov. 17, 2011), https://www.ohchr.org/Documents/Issues/Discrimination/A.HRC.19.41_English.pdf (finding worldwide violations against LGBTQ/H individuals including "killings, rape and physical attacks, torture, arbitrary detention, the denial of rights to assembly, expression and information, and discrimination in employment, health and education.").

74.     For example, the U.S. Department of State reports that in Iran, same-sex consensual sexual activity is punishable by death or flogging. Iranian security forces detain people suspected of being LGBTQ, and people accused of sodomy face summary trials, where evidentiary standards are not always met. According to an Iranian NGO, the number of clinics engaging in "corrective treatment" of LGBTQ people is on the rise. These clinics use "electric shock therapy to the hands and genitals of LGBTI persons," psychoactive medication, and other abusive tactics. U.S. Dep't of State, *Country Reports on Human Rights Practices for 2019:* Iran, 49-51 (Mar. 11, 2020), https://www.state.gov/wp-content/uploads/2020/03/IRAN-2019-HUMAN-RIGHTS-REPORT.pdf. In Honduras, 264 murders of LGBTQ people were reported between 2009 and 2017. *See* Amnesty Int'l, *No Safe Place: Salvadorans, Guatemalans, And Hondurans Seeking Asylum In Mexico Based On Their Sexual Orientation And/Or Gender Identity* 9 (Nov. 2017), https://www.amnestyusa.org/wp-content/uploads/2017/11/No-Safe-Place-Briefing-ENG-1.pdf. The Russian Republic of Chechnya has unleashed a reign of terror against LGBTQ people, including "extrajudicial killings and mass torture of LGBTI persons," as "authorities failed to investigate" and "continue[] to deny that there were any LGBTI persons in Chechnya." U.S. Dep't of State, *2019 Country Reports on Human Rights Practices: Russia* 2 (Mar. 11, 2020), https://www.state.gov/wp-content/uploads/2020/03/RUSSIA-2019-HUMAN-RIGHTS-REPORT.pdf. *See also* Article, "Chechnya accused of 'gay genocide' in ICC complaint," BBC News (May 16, 2017), https://www.bbc.com/news/world-europe-39937107.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                                    Case No.

**C. Defendants Rushed the Final Rule to Publication.**

75. On June 15, 2020, the Departments published a joint notice of proposed rulemaking (the "NPRM"), proposing: (i) "changes to the regulations regarding asylum, statutory withholding of removal, and withholding and deferral of removal under the CAT regulations;" (ii) "amendments related to the standards for adjudication of applications for asylum and statutory withholding;" and (iii) certain amendments to the regulations governing credible fear determinations. *Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review*, 85 Fed. Reg. 36,264 (June 15, 2020). The NPRM was unusually voluminous and touched on nearly every aspect of the asylum system, yet only provided 30 days for public comments, in the midst of an international pandemic no less. *See id.* at 36,264.

76. The NPRM was signed by (a) Defendant Barr; and (b) Chad R. Mizelle under the title "Senior Official Performing the Duties of the General Counsel, U.S. Department of Homeland Security," pursuant to a purported delegation of authority by Defendant Wolf under the title "Acting Secretary of Homeland Security." 85 Fed. Reg. at 36,290, 36,306.

77. Notwithstanding the very short comment period, over 88,000 interested members of the public, including Plaintiffs, submitted comments, almost all of whom criticized the NPRM for its myriad defects. Many commenters, including Plaintiffs Immigration Equality and Oasis, noted that given the limited time period, their comments were incomplete and did not address all the proposed rule's flaws and deleterious effects. *See* Public Comment of Immigration Equality (July 15, 2020), at 8, https://beta.regulations.gov/comment/EOIR-2020-0003-85541; Public Comment of Oasis Legal Services (July 15, 2020), at 2-3, https://beta.regulations.gov/comment/EOIR-2020-0003-78374; *see also*, *e.g.*, Public Comment of Lambda Legal (July 15, 2020), at 29-30, https://beta.regulations.gov/comment/EOIR-2020-0003-5999.

78. On December 11, 2020, the Departments published the Final Rule in the Federal Register, less than five months after it received over 88,000 comments on it, the vast majority opposing the rule.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.

**II.    The Final Rule Is Invalid Because It Is Contrary To Law And Arbitrary And Capricious**

79.    The Final Rule is contrary to law and arbitrary and capricious because it includes numerous infirm provisions that variously (1) are contrary to the statutes applicable to asylum applications, (2) serve no rational purpose, (3) fail to consider the real-world circumstance to which they apply, (4) are internally inconsistent with other asylum rules, (5) deny due process rights to asylum applicants, and (6) upend decades of established asylum practice without due consideration or explanation.

**A.    The Final Rule Alters Long-Standing Law, Policy, and Practice with Respect to the INA's "Nexus" Requirement.**

80.    One of the most destructive changes wrought by the Final Rule is a perversion of a key step in the asylum analysis, the requirement that an asylum seeker establish that they have suffered or fear persecution "*on account of* race, religion, nationality, membership in a particular social group, or political opinion" (8 U.S.C. § 1101(a)(42)(A) (emphasis added))—the so-called "nexus" requirement. While a persecutor may have mixed motives, the protected ground must be "at least one central reason" for the applicant's persecution or well-founded fear of persecution.  8 U.S.C. § 1158(b)(1)(B)(i). Further, under longstanding precedent, an applicant need not prove the precise motivation of the persecutor; rather the applicant must merely establish "facts on which a reasonable person would fear that the danger arises on account of" a protected ground.  *E.g., Matter of J-B-N- & S-M-*, 24 I&N Dec. 208, 211 (BIA 2007); *Matter of Fuentes*, 19 I&N Dec. 658, 662 (BIA 1988).

81.    Under a heading entitled "Nexus," the Final Rule radically alters the nexus analysis by listing eight blanket circumstances that adjudicators must now "generally" find insufficient for asylum or withholding of removal relief.  85 Fed. Reg. 80,386 (to be codified as 8 C.F.R. §§ 208.1(f), 1208(f)(1)) ("For purposes of adjudicating an application for asylum . . . or withholding of removal . . . the Secretary, in general, will not favorably adjudicate the claims of aliens who claim persecution based on the following list of nonexhaustive circumstances").  These circumstances include, "gender" and "interpersonal animus or retribution," among others.

82.    Mandating blanket denials for certain circumstances under the auspices of nexus is arbitrary and nonsensical.  Under this approach, an adjudicator is not required to address whether a

25

COMPLAINT FOR DECLARATORY AND                          Case No.
INJUNCTIVE RELIEF

nexus between persecution and a protected ground actually exists. Determining nexus is a classic factual question requiring the adjudicator to consider facts specific to each case, such as direct or indirect evidence of the persecutor's motivation for harming or attempting to harm the applicant. The Final Rule subverts this fact analysis, replacing it with the Departments' general disapproval of certain categories of claims. In short, none of the items on the list meaningfully address whether harm occurred on "account of" a protected ground and thus none have any bearing on whether the nexus requirement is met in a particular case. The intent of the provision is clear: provide adjudicators with a laundry list of categorical denials to swiftly dispense with claims the Departments find undesirable, without the required analysis.

83.     The Departments dismiss commenters' concerns that the rule will result in due process violations and categorical denials of claims, stating that "the rule implicitly allows for those rare circumstances in which the specified circumstances could in fact be the basis for finding nexus," and that "adjudicators should continue to engage in individualized, fact-based adjudications as the rule provides only a list of circumstances that do not constitute harm on account of a protected ground in most, but not all, cases." 85 Fed. Reg. at 80,329. The Departments' statements are disingenuous at best. If adjudicators are to continue conducting individualized determinations, then the list of blanket exclusions serves no purpose and is arbitrary for that reason alone. In reality, setting forth exemptions in this way will lead adjudicators to categorically deny the claims on the list, without taking into account the "fact specific nature" in each case as the law requires.

84.     The proffered rationale for the new nexus requirement is to provide clarity and efficiency for adjudicators. However, the Departments do not actually point to any real lack of clarity in the existing law. Moreover, efficiency does not justify a complete departure from prior practice and law. In essence, in the name of expediency, the Departments are eliminating the individualized analysis required under the INA as a technique to swiftly deny applications.

85.     The new nexus rule also functions as a backdoor method to curtail the scope of disfavored particular social group ("PSG") claims. For example, although claims based on gender meet the definition of a PSG under current law and under the standard codified under the Final Rule itself, *see* 85

COMPLAINT FOR DECLARATORY AND                    Case No.
INJUNCTIVE RELIEF

Fed. Reg. 30,894 (to be codified as 8 C.F.R. §§ 208.1(c), 1208.1(c)), the categorical nexus bar will enable adjudicators to dispense with these claims without delving into the fact-specific inquiry necessary to analyze PSGs. This bait and switch is inconsistent with the INA and contrary to the intent of Congress.

86. For these reasons, the recasting of nexus as a self-executing list is arbitrary and capricious and contrary to law. More specifically, the three items on that list discussed below, which are particularly harmful to LGBTQ/H claimants, are also arbitrary and capricious and contrary to law.

### i. The Exclusion of Gender Imperils the Availability of Asylum for All LGBTQ Refugees.

87. A prime example of the confusion of PSG and nexus requirements is the Final Rule's mandate that adjudicators "in general, will not favorably adjudicate the claims of aliens who claim persecution based on . . . Gender." 85 Fed. Reg. 80,395 (to be codified as 8 C.F.R. §§ 208.1(f)(8), 1208.1(f)(8)). As noted above, injecting a gender bar into the nexus analysis is impermissible and makes no sense. Disturbingly, the regulations do not provide any direction whether this "gender-based" exclusion is intended to preclude claims by LGBTQ refugees. Simply put, the Departments have created a confusing mess that leaves Plaintiffs and LGBTQ refugees uncertain how LGBTQ asylum claims will be treated going forward.

88. The Final Rule omits any meaningful discussion of whether and how the "gender-based" nexus exclusion will affect LGBTQ refugees, despite numerous public comments flagging this important issue and requesting clarification. Commenters expressed concerns about how "gender-based" nexus exclusion would affect LGBTQ asylum seekers given that while sexual orientation and transgender status are not necessarily coterminous with gender, case law recognizes that discrimination based sexual orientation or transgender status are forms of sex discrimination. Moreover, for LGBTQ refugees, their applications nearly always are peppered with language relating to gender.

89. For example, numerous LGBTQ-allied organizations, including Plaintiffs Immigration Equality, Oasis Legal Services, and the Transgender Law Center, submitted comments noting that the Final Rule had the potential to be misconstrued to eliminate asylum claims for LGBTQ refugees, despite a well-settled body of caselaw firmly establishing LGBTQ asylum claims. *See* Public Comment of

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF
Case No.

Immigration Equality (July 15, 2020), at 14-15, https://beta.regulations.gov/comment/EOIR-2020-0003-85541. ("[W]hile the Proposed Rule certainly does not deny that LGBTQ people constitute protected PSGs, there is a real risk that adjudicators will misconstrue the gender bar to preclude gender identity and sexual orientation claims"); Public Comment of Oasis, at 15, https://beta.regulations.gov/comment/EOIR-2020-0003-78374, at 15 ("Oasis has assisted hundreds of applicants who have been persecuted by individuals centrally motivated to commit persecutory acts on account of perceived gender violations—that is, on account of their membership in a cognizable particular social group relating to their sexual minority status"); Public Comment of Transgender Law Center (July 15, 2020), https://beta.regulations.gov/comment/EOIR-2020-0003-6058.[2]

90.     In the Final Rule, the Departments ignored these comments.  Nowhere does the Final Rule analyze or discuss whether claims based on one's status as LGBTQ will be denied under the "gender-based" nexus rule.  Indeed, the Final Rule's analysis of proposed §§ 208.1(f)(8), 1208.1(f)(8)

---

[2] *See also* Public Comment of Los Angeles LGBT Center (July 9, 2020), at 3, https://www.regulations.gov/contentStreamer?documentId=EOIR-2020-0003-4736&attachmentNumber=1&contentType=pdf, ("[I]n eliminating gender-based violence claims . . . , this proposed rule eliminates all LGBTQ asylum claims as well"); Public Comment of Indiana Legal Services (July 15, 2020), at 11-12, https://www.regulations.gov/contentStreamer?documentId=EOIR-2020-0003-6028&attachmentNumber=1&contentType=pdf, ("The elimination of consideration of gender as a nexus of harm or persecution . . . impairs the ability of LGBTQ+ people to claim harm based on their LGBTQ+ identity"); Public Comment of National LGBTQ Task Force (July 15, 2020), at 11, https://www.regulations.gov/contentStreamer?documentId=EOIR-2020-0003-75155&attachmentNumber=1&contentType=pdf, ("[T]he National LGBTQ Task Force is concerned that asylum officers will misconstrue the gender exclusion to preclude gender identity and sexual orientation claims"); Public Comment of American Gateways (July 15, 2020), at 47, https://www.regulations.gov/contentStreamer?documentId=EOIR-2020-0003-5991&attachmentNumber=1&contentType=pdf, ("[G]iven the Departments' curious silence regarding female genital mutilation (FGM) claims and LGBTQ claims throughout the Proposed Rule, this provision risks being weaponized by adjudicators to deny all claims *relating to* gender, including claims based on FGM and claims based on an applicant's sexual orientation and gender identity") (emphasis in the original); Public Comment of Women's Refugee Commission (July 15, 2020), at 7, https://www.regulations.gov/contentStreamer?documentId=EOIR-2020-0003-6061&attachmentNumber=1&contentType=pdf, ("[I]n light of the Supreme Court's recent holding in *Bostock* . . . the Proposed Rule could also be used by the Departments as a basis for a blanket denial of eligibility for all applicants fleeing persecution on account of sexual orientation or gender identity"); Public Comment of National LGBT Bar Association (July 15, 2020), at 7-8, https://www.regulations.gov/contentStreamer?documentId=EOIR-2020-0003-6025&attachmentNumber=1&contentType=pdf,

("In addition to being wrong, immoral, and harmful to women, this change could also be misconstrued to bar claims based on gender identity and sexual orientation, thus denying LGBTQ+ individuals any ability to successfully seek asylum in this country").

28

COMPLAINT FOR DECLARATORY AND          Case No.
INJUNCTIVE RELIEF

makes almost no mention of LGBTQ people whatsoever. The Departments acknowledged one commenter's argument that "the UNHCR . . . has confirmed that people fleeing persecution based on gender, gender-identity and sexual orientation do qualify for asylum under the Convention's definition of a refugee," 85 Fed. Reg. at 80,333, but respond only that "they are not bound by the UNHCR," *id.* at 80,334, suggesting a potential intent to depart from the UNHCR's approach in this regard. The Departments acknowledge commenters' concerns that the "rule will categorically deny asylum to . . . LGBTQ asylum-seekers," but waves away these concerns as "unsupported" and "speculative" without any substantive effort to engage with the issue or provide assurance that the Final Rule will not work a radical change in asylum practice by excluding such claims. *Id.* at 80,287.

91.     The Departments' failure to clarify the scope of the Final Rule's "gender-based" nexus exclusion has created alarm and leaves significant confusion about whether and how the Final Rule might affect LGBTQ refugees' claims. The confusion around this point highlights the infirmity of the Final Rule and its arbitrary creation of presumptively ineligible categories of "circumstances" rather than conducting the analysis required under the INA and decades of precedent.

92.     The Final Rule also engenders confusion through its bizarre citation in a footnote to a dissenting opinion in *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731 (2020), in support of the misguided, scientifically inaccurate belief that the gender identity of transgender and nonbinary people "'changes over time'" and therefore may not be an "immutable characteristic" for the purpose of defining a particular social group. 85 Fed. Reg. at 80,335 n.56 (citing *Bostock*, 140 S. Ct. at 1779) (Alito, J., dissenting). This statement suggests that the Departments lack understanding of the experiences of transgender people, whose gender identity does not "change[]" when they transition, but rather becomes visible to others. This inaccurate statement also ignores well-settled case law holding that sexual orientation and gender identity are immutable characteristics (*see*, *e.g.*, *Hernandez-Montiel v. I.N.S.*, 225 F.3d 1084, 1093 (9th Cir. 2000))—which poses an apparent threat to the long-settled practice of recognizing LGBTQ people as constituting a PSG for asylum purposes.

93.     To be sure, for decades, the BIA, the Attorney General, USCIS, and the courts have recognized that persecution on account of LGBTQ status qualifies as persecution on account of

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                              Case No.

"membership in a particular social group" under the INA.  8 U.S.C. § 1101(a)(42).  *See, e.g.*, *Avendano-Hernandez v. Lynch*, 800 F.3d 1072, 1082 (9th Cir. 2015) ("The unique identities and vulnerabilities of transgender individuals must be considered in evaluating a transgender applicant's asylum, withholding of removal, or CAT claim."); *Karouni v. Gonzales*, 399 F.3d 1163, 1173 (9th Cir. 2005) ("homosexuals" are a PSG); *Pitcherskaia v. I.N.S.*, 118 F.3d 641, 645 n.5 (9th Cir. 1997) (lesbians are a PSG); *Matter of Toboso-Alfonso*, 20 I&N Dec. 819, 822-23 (BIA 1990) (Cuban gay asylum applicant established membership in PSG); Att'y Gen. Order No. 1895-94 (June 19, 1994) (designating *Toboso* "as precedent in all proceedings involving the same or similar issues"); USCIS, *Guidance for Adjudicating Lesbian, Gay, Bisexual, Transgender, and Intersex (LGBTI) Refugee and Asylum Claims* Training Module (Dec. 28, 2011), AILA Doc. No. 120424 https://www.uscis.gov/sites/default/files/document/guides/RAIO-Training-March-2012.pdf.  Moreover, LGBTQ claims clearly meet the PSG standard codified in the Final Rule. 8 C.F.R. §§ 208.1(c), 1208.1(c) ("a particular social group is one that is based on an immutable or fundamental characteristic, is defined with particularity, and is recognized as socially distinct in the society at question.  Such a particular social group cannot be defined exclusively by the alleged persecutory acts or harm and must also have existed independently of the alleged persecutory acts or harm that forms the basis of the claim.").

94.     If the Departments intended to upset decades of settled law and presumptively preclude some or all LGBTQ claims, they should have raised the possibility in the NPRM.  Effectuating such a drastic change through obfuscation would be procedurally improper and a violation of the APA.

95.     Moreover, the experiences of LGBTQ refugees show that they would be deeply harmed by a rule that excludes gender-based persecution, whether interposed under the nexus or PSG rubric.

96.     For example, Immigration Equality client Alexandra[3], a trans woman from Mexico, was kidnapped and repeatedly raped and tortured by gang members because of her gender identity after they spotted her wearing women's clothing at a fundraiser she was organizing for children with leukemia. The gang members abused her so severely that she had to undergo two rectal surgeries to repair her

---

[3] Plaintiffs' individual clients are referred to in this Complaint using pseudonyms and minor identifying details have been changed to protect their safety and preserve confidentiality.  The facts demonstrating the impact of the Final Rule are unaltered.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                              Case No.

injuries. The Transgender Law Center's client French, a transgender woman from Jamaica, faced a neighborhood mob led by a cousin to her family home, with the intent to kill her, after the cousin saw online a photograph of her from an event for transgender people that showed French dressed in women's clothes. And finally, the Center's client John, a gay man from Jamaica, was constantly referred to with anti-gay slurs, such as "battyman," at school. While John is gay, much of the persecution he endured was focused on his gender presentation, appearance, and mannerisms, which were considered effeminate and outside local gender norms—treatment that blurs the lines between homophobia and gender stereotyping because, in Jamaica, to be effeminate is to be gay whether one's sexual orientation is known or not.

97. As these narratives illustrate, LGBTQ asylum seekers face grave harm if they are returned to countries where they will likely suffer further violence, sexual assault, and even death. Under the Final Rule, however, claims such as these very well may be denied.

98. Purposefully, accidentally, or ambiguously eliminating asylum claims for LGBTQ people under the guise of "gender" would violate the APA in multiple ways. Under the INA, individuals qualify as "refugees" if they have suffered persecution or have a well-founded fear of persecution "on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). LGBTQ status has long been held to be protected in asylum law. Accordingly, the Final Rule is contrary to law because it appears to call into question the refugee status of those who claim persecution, or a well-founded fear of persecution based on their membership in a firmly established particular social group.

99. In the alternative, the Final Rule is arbitrary and capricious because the Departments have failed to acknowledge or analyze how the "gender-based" nexus exclusion would affect LGBTQ populations and failed to acknowledge or justify their departure from longstanding precedent.

100. Additionally, the Final Rule is arbitrary and capricious because it causes confusion, is likely to lead adjudicators to inappropriately misconstrue it as barring claims based on LGBTQ status, and the Department not only has failed to address these concerns but introduced further uncertainty by

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF        Case No.

raising questions about long-settled treatment of LGBTQ claims under PSG standards only in a footnote to the preamble of the Final Rule.

### ii. The Final Rule Impermissibly Limits Asylum and Withholding-of-Removal Claims Based on "Interpersonal Animus."

101. The Final Rule impermissibly bars asylum or withholding of removal for persecution based on (i) "interpersonal animus or retribution," 85 Fed. Reg. at 80,386 (to be codified as 8 C.F.R. §§ 208.1(f)(1), 1208(f)(1)); or (ii) "interpersonal animus in which the alleged prosecutor has not targeted, or manifested an animus against, other members of an alleged particular social group in addition to the member who has raised the claim at issue," 85 Fed. Reg. at 80,386 (to be codified as 8 C.F.R §§ 208.1(f)(2), 1208(f)(2)). These overly broad exclusions are arbitrary and capricious and contrary to law because, at least in part for prohibited reasons, they engraft requirements inconsistent with Congress' intent to make asylum available to individuals subjected to persecution. These changes will inflict particular harm on LGBTQ/H claimants, whose persecution often arises in circumstances that may be labeled as "interpersonal," such as violence at the hands of family members and personal acquaintances that law enforcement officials are unwilling or unable to prevent.

### a. _The "Interpersonal Animus or Retribution" Exclusion is Arbitrary and Capricious and Contrary to Law._

102. The Final Rule's bar on claims based on "interpersonal animus or retribution" is arbitrary and capricious and contrary to law for several reasons. First, the broad language of the exclusion could arguably be read to require denial of nearly _any_ asylum case, because the plain meanings of those terms may be read to embrace any spiteful or malevolent persecution.

103. Further, the new exclusion bars the granting of asylum applications where persecution is based on "interpersonal animus or retribution" even if the persecution was also based on a protected ground, such as membership in a social group. The exclusion of this type of "mixed motive" persecution is arbitrary and capricious because there is no clear distinction between "interpersonal animus" and hostility towards a protected status. This is especially true in cases where persecution is inflicted by family members or close acquaintances, as is often the case with LGBTQ/H asylum applicants. Such abuse can easily be understood as "interpersonal" due to the relationship between the victim and the persecutor, even though the persecution is ultimately motivated by the victim's LGBTQ/H status.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF           Case No.

104. Barring asylum in "mixed motive" cases is also contrary to law because it violates the clear language of the INA, which provides that "race, religion, nationality, membership in a particular group, or political opinion" need only be "*at least one central reason*"—but not necessarily the *only* reason—for persecution. 8 U.S.C. § 1158(b)(1)(B)(i) (emphasis added). Congress thus mandated that asylum be available in mixed-motive cases, even when one motive would not be a proper basis for asylum, so long as a statutorily protected ground is at least "one central reason" for the persecution. The exclusion of an asylum application based on "interpersonal animus or retribution," without regard for whether the persecution was also based on a protected ground, directly violates the statutory "one central reason" standard.

105. The Departments have offered no rational basis for the proposed "interpersonal animus or retribution" exclusion, initially basing it on a single case, *Zoarab v. Mukasey*, 524 F.3d 777 (6th Cir. 2008), in which persecution was based on business dealings rather than political opinion or any other protected ground. 85 Fed. Reg. at 80330. In response to numerous comments noting the lack of support for the rule change, the Departments now cite a handful of additional fact-specific cases standing only for the proposition that certain types of *purely* personal motivation do not trigger eligibility for asylum. *See id*. The Departments also state that it does not intend for the Final Rule to preclude the granting of asylum or withholding of removal based on "mixed motive" persecution, but it did not revise the Final Rule to clarify this point. *See id*.

106. The exclusion will inflict particular harm on LGBTQ/H claimants. As noted above, it is quite common for LGBTQ/H asylum seekers to suffer persecution at the hands of family members and other personal acquaintances, in circumstances where protected status and "interpersonal animus" will be nearly impossible to disentangle.

107. Many LGBTQ/H asylum applicants who have been targeted for persecution by family members or personal acquaintances because of their sexual orientation or gender identity were not targeted out of hostility for the individual *per se*. Some LGBTQ individuals are targeted because of their persecutors' purportedly benign intentions to "save" their LGBTQ relatives or acquaintances from their sexual orientation or gender identity.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                 Case No.

108.    For example, in *Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1056, 1073 (9th Cir. 2017) (en banc), a gay man was sexually and physically assaulted by his uncle, cousins, and neighbors as a child.  Although the immigration judge viewed the attacks as motivated by interpersonal animus, the Court of Appeals recognized that the claimant's LGBTQ/H status was a central reason for the assault, because the abusers focused on the victim's perceived effeminate characteristics and called him a "fag, fucking faggot, queer."  In another example, a gay refugee from Ghana was beaten, doused in kerosene, and almost lit on fire by his father and a mob of neighbors after being discovered with another man. *Doe v. Att'y Gen. of the U.S.*, 956 F.3d 135, 152 (3d Cir. 2020).

109.    This provision of the Final Rule will likely foreclose many of Plaintiffs' clients from obtaining asylum, even though they endured horrific persecution because of their LGBTQ or HIV-positive status and have meritorious claims.  For example, the following Immigration Equality clients would likely no longer qualify for asylum or relief under the Final Rule, despite the severe persecution they experienced:

- Mikhail, a gay man from Russia, used an online dating app to meet another man for a date. Despite taking precautions to ensure the date was legitimate, several men kidnapped Mikhail, and took him back to his own apartment where they stripped him naked, beat him, and tied him to a radiator.  While he was restrained, the perpetrators continued to physically assault him while they ransacked his apartment and robbed him.  Then, they forced him to transfer money to them via online banking.  While Mikhail was still naked, bleeding from the physical assault, and tied to his radiator, the perpetrators took video footage of him where they forced him to state his full name, street address, and admit that he was "a faggot."  They took screenshots of his contacts and threatened to send the video to all of his contacts, including his employer, and post it online if he went to the police.  When Mikhail later went to the hospital, and tried to report the incident to the police, the police mocked him.  They also told him that it was his fault that he was assaulted and said that Russia would be better without people like him.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                                          Case No.

- Nakiesha, an engineer from Guinea, was 33 years old when she gave birth to her firstborn child, an intersex baby. She believed her child was a son and tried to raise him away from her extended family because she knew they would not accept him. One day, one of Nakiesha's female relatives changed the baby's diaper and discovered his intersex identity. News spread quickly, and Nakiesha's family declared the baby to be satanic and demanded that he be killed. They also informed Nakiesha that they would forcibly abort any new pregnancies she might have. When Nakiesha refused to murder her own son, her family deemed her to be satanic too and demanded her death as well. She fled to the United States where she applied for, and was granted, asylum.

- Tariq is a transgender man from Egypt. In his twenties, he fell in love with a young woman named Najila, and the two developed a romantic and intimate relationship that lasted several years. Then, Najila's family discovered that the two were more than just friends, and beat Najila severely. Next, her male relatives locked Najila into the basement of their home. Tariq tried several times to help free her, including by calling the police, but the police told him "this is a family matter."

- Eventually, Tariq fled for his own life to the United States, where he was granted asylum. Months later, Najila's mother snuck a phone into the basement so her daughter could have some communication with the outside world. Tariq and Najila reconnected and said goodbye. Because Najila is not allowed out of her home without a male escort at all times, she has never been able to leave Egypt.

b. *The "Additional Target" Exclusion is Arbitrary and Capricious and Contrary to Law.*

110. The Final Rule further requires that asylum applicants whose claims are based on "interpersonal animus" to provide evidence that their persecutors also targeted other members of the same PSG or else have their claim denied ("additional target" exclusion). That requirement is arbitrary and capricious and contrary to law—most fundamentally because such evidence often simply does not exist. For example, a claimant may be persecuted based on LGBTQ/H status by a family member or others in the community who have never had the occasion to express animus against other LGBTQ/H

35

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    Case No.

1    people (because, for example, they are not aware of any other LGBTQ/H persons in the community).

2    Further, even if the persecutor *has* targeted other LGBTQ/H individuals, the victims may be too

3    traumatized or fearful of retribution to discuss how they were treated.  Anti-LGBTQ/H abuse is often

4    violent and horrific, and it may be impossible for an applicant to locate another victim willing to go on

5    the record in the applicant's asylum case.[4]  There is no rational basis for imposing this added evidentiary

6    hurdle on asylum applicants, and an application should not fail simply because an applicant is justifiably

7    unable to produce evidence of a persecutor's animus towards similarly situated people.

8         111.    This limitation is also contrary to law because it rests on an impermissible construction

9    of 8 U.S.C. § 1101(a)(42).  The definition of "refugee" focuses solely on the applicant; it is irrelevant

10   whether the persecutor has engaged in a similar pattern against other individuals.  Even applicants who

11   are the only individuals abused by their particular persecutors may meet the statutory criteria for a

12   "refugee."   The Final Rule is thus unlawful because it injects this additional requirement.   The

13   Departments have failed to respond to comments raising this issue.

14        112.    The Final Rule is also arbitrary and capricious and contrary to law because the

15   "additional target" exclusion applies only to claims based on membership in a particular social group,

16   rather than the other statutory categories of "race, religion, nationality, or political opinion."  8 U.S.C.

17   § 1101(a)(42).  This unfairly and without statutory justification puts a harsher burden on asylum seekers

18   alleging persecution based on membership in a particular social group (such as LGBTQ/H status), as

19   compared to other types of asylum claims.  For example, under the Final Rule, an LGBTQ/H applicant

20   who was persecuted because of the persecutor's "interpersonal animus" would have to prove that the

21   persecutor harbored animus toward other LGBTQ/H individuals, but a Christian applicant persecuted

22   because of "interpersonal animus" would not have to prove the persecutor's animus toward other

23   Christians.  Nothing in the statute supports this type of discrimination among groups of persons sharing

24   immutable characteristics that may serve as a basis for persecution.

25   _____

26   [4] The Final Rule compounds this issue through its amendments to 8 C.F.R. §§208.6, 1208.6, which
     allow information submitted in an asylum application to be used against applicants or others in virtually
27   any law enforcement investigation or proceeding.  Witnesses will be even less willing to come forward
     to aid an asylum application if they know the information they provide can be used against them or
28   someone else.

COMPLAINT FOR DECLARATORY AND                          Case No.
INJUNCTIVE RELIEF

113.    The Departments have failed to adequately respond to these issues.  The Government maintains that the Final Rule "does not hold aliens relying on membership in a particular social group to a higher evidentiary standard," but merely provides greater "definitional clarity" because "PSG is a more amorphous category."  85 Fed. Reg. 80,331.  However, applicants must already prove that their persecutors were motivated at least in part by their membership in a PSG.  Requiring them to demonstrate persecution of *other* people adds no clarity to the definition of PSG and violates Congress' sole focus on persecution of *individuals*.

114.    As noted, this change will inflict particular harm on LGBTQ/H asylum seekers, who will often be unable to prove that a persecutor has harmed, or threatened to harm, another LGBTQ/H person.

115.    For example, one of Oasis' clients, Jaqueline, a lesbian asylee from Uganda, was hung by her legs from a tree and beaten by her parents with tree branches because they believed she had a demon in her that was causing her to be attracted to women.  Jacqueline's parents were not intending to punish her but instead believed they were doing something necessary to help Jaqueline be safe from what they perceived to be a real threat.  Jaqueline lawfully won asylum because the protected ground of her sexual orientation was one central reason for the harm she experienced.  Jacqueline did not need to prove that her parents had similarly targeted other LGBTQ/H individuals, nor could she have.

**B.    The Final Rule Arbitrarily Narrows the Definition of "Persecution."**

116.    The Final Rule arbitrarily narrows the definition of "persecution," excluding a range of common scenarios in which the lives and safety of asylum seekers are threatened.  This change is arbitrary and capricious because it abandons without adequate explanation or analysis a longstanding policy of permitting adjudicators to determine on a case-by-case basis whether harm rises to the level of persecution.  These categorical exclusions will have a particular impact on LGBTQ/H applicants, for example, in situations where laws are infrequently enforced on a formal basis but nevertheless create a pervasively dangerous and threatening environment.

117.    The word "persecution" is not defined in the INA; its meaning derives from case law, which for decades has provided that whether harm rises to the level of persecution must be resolved on a case-by-case basis.  The Third Circuit recently stressed that persecution is not to be analyzed through

COMPLAINT FOR DECLARATORY AND                    Case No.
INJUNCTIVE RELIEF

a "checklist," rejecting the notion that "physical violence—or any other single type of mistreatment— is a required element of the past persecution determination." *Herrera-Reyes v. Att'y Gen. of U.S.*, 952 F.3d 101, 110 (3d Cir. 2020). Rather, asylum claims are to be analyzed "on a case-by-case basis" with "fact-specific analysis to determine whether a petitioner's cumulative experience amounts to a severe affront to that petitioner's life or freedom." *Id.* The UNHCR Handbook similarly states that whether "prejudicial actions or threats would amount to persecution will depend on the circumstances of each case." UNHCR, The UN Refugee Agency, *Handbook on Procedures and Criteria for Determining Refugee Status and Guidelines on International Protection* (2019), https://www.unhcr.org/en-us/publications/legal/5ddfcdc47/handbook-procedures-criteria-determining-refugee-status-under-1951-convention.html ..

118. The Final Rule disrupts this longstanding and settled practice by enumerating a checklist of harms categorically excluded from the meaning of persecution:

> For purposes of evaluating the severity of the level of harm, persecution is an extreme concept involving a severe level of harm that includes actions so severe that they constitute an exigent threat. . . . [Persecution] does not include intermittent harassment, including brief detentions [or] threats with no actual effort to carry out the threats, except that particularized threats of severe harm of an immediate nature made by an identified entity may constitute persecution . . . . The existence of laws or government policies that are unenforced or infrequently enforced do not, by themselves, constitute persecution, unless there is credible evidence that those laws or policies have been or would be applied to an applicant personally.

85 Fed. Reg. 80,386 (to be codified at 8 C.F.R. §§ 208.1(e), 1208.1(e)).

119. This redefinition, by its plain language, removes the individualized analysis previously accorded to the adjudicator to determine, on a case-by-case basis, whether certain types of harm— specifically, "brief detentions," "threats with no actual effort to carry out the threats," and "laws . . . that are unenforced or infrequently enforced"—constitute persecution. The NPRM did not provide any reasoned analysis supporting these exclusions or the sudden departure from years of contrary practice, and the Final Rule does not adequately answer the many comments objecting to these exclusions. Each of the specific exclusions is arbitrary and capricious.

120. To examine multiple occurrences of "detention[]" or "harassment" *seriatim* without regard to the cumulative effect of such treatment is illogical and a significant departure from current

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    Case No.

doctrine.  As one policy memorandum observed, "though discriminatory practices and experiences are not generally regarded by themselves as persecution, they 'can accumulate over time or increase in intensity so that they may rise to the level of persecution.'" U.S. DOJ, Immigration and Naturalization Service, *Guidelines for Children's Asylum Claims,* 19 (Dec. 10, 1998).

121.    The requirement that persecution involve an "exigent threat" and the categorical exclusion of "threats with no . . . effort to carry out the threats" is similarly arbitrary.  Asylum seekers often suffer threats of violence that are severe and genuine, even if it may be unclear *when*, precisely, such violence will materialize.  *See, e.g.*, Public Comment of Los Angeles LGBT Center, at 2 (discussing client who "found her husband's body chopped into pieces on the side of the road and was warned she would suffer the same fate if she reported his murder to the police").

122.    By eliminating past persecution for anyone who has not suffered an "exigent" threat of harm, the Final Rule places refugees in an impossible position.  If they flee and seek asylum, before an "actual effort to carry out the threats" has been made, then their claim of past persecution will be rejected.  But if they wait for the threats to materialize, they may be physically harmed or worse.

123.    LGBTQ/H refugees should not have to expose themselves to risk of violence and physical harm in order to show they have experienced past persecution.  After being threatened, an asylum seeker should not be forced to wait until someone tries to beat, hang, or rape, let alone kill, them to prove that they have been persecuted.

124.    The following Immigration Equality clients illustrate this point:

- Leila is a bisexual woman from Bangladesh who was kicked out of school when her sexual orientation was discovered.  Shortly thereafter, she spoke out against conservative Islamist groups who were gaining power in Bangladesh.  In retaliation for speaking out, she was publicly outed as bisexual.  She and her parents immediately began receiving death threats. She could not go to the police because same-sex relations are illegal in Bangladesh and she might be arrested.  She knew of other gay Bangladeshis who were outed on Facebook by conservative Islamist groups and subsequently brutally murdered.  Accordingly, she fled

COMPLAINT FOR DECLARATORY AND                                    Case No.
INJUNCTIVE RELIEF

Bangladesh and sought asylum in the United States. The threats against Leila may not have met "identified entity" or immediacy in order to qualify as persecution under the Final Rule.

- Yasir is a gay man from Yemen. While he tried to live his life deeply in the closet, he was nevertheless very publicly outed. Because Yemeni officials sentence gay men to death, he fled to the United States immediately under threat of arrest. As he had feared, the police then issued a warrant for Yasir's arrest. When he could not be found, he was tried for homosexuality in absentia and found to be guilty. Accordingly, the authorities issued a formal death sentence against Yasir. The death sentence was issued after Yasir fled. However, under the Final Rule, the threat of harm to Yasir would likely not have been enough to constitute persecution until *after* he was tried in absentia and issued the death sentence.

Notably, these threats that LGBTQ/H claimants regularly face amount to persistent and conscious terror campaigns, which alone rise to the level of persecution.

125. Finally, the categorical exclusion of "infrequently enforced" laws is arbitrary and capricious. The very existence of persecutory laws is a threat to liberty and forces individuals to live in secrecy and fear, which itself is a form of harm so severe that it rises to the level of persecution. For example, the Final Rule would foreclose asylum relief for religious minorities fleeing countries that make certain belief systems or expressions of faith unlawful. Even if such laws are not often enforced in practice, the "aim of persecuting a religion is to drive its adherents undergrounds in the hope that their beliefs will not infect the remaining population." *Muhur v. Ashcroft*, 355 F.3d 958, 960-61 (7th Cir. 2004) (Posner, J.). There is no reason why an adjudicator should be precluded from finding, on a case-by-case basis, that such laws are inherently persecutory.

126. Indeed, whether the applicant can prove that the government is likely to enforce the law is beside the point, as applicants would not be able to avail themselves of their country's protection if they fear their own arrest in going to the police. Plaintiffs see the chilling effect such laws have on LGBTQ/H refugees' ability to seek protection. Take for example:

- Iskandar is a gay man who worked for the Lebanese government. In Lebanon, it is a crime to be gay. Iskander's ex-partner threatened to out him to his family and to the government

---

40

if Iskander did not pay him hush money.  Iskander was unable to make the payments and decided that he could not risk being outed in Lebanon.  Due to his position in the government, he would be tortured and imprisoned if he were discovered to be gay.  Additionally, given that his family is extremely religious, Iskander would likely be harmed, and even killed, by his own family.  Because LGBTQ conduct is criminalized, he could not seek help.

- Tushar is a gay man from India who was extremely closeted for fear of persecution at the hands of the police and community members.  When Tushar mustered the courage to come out to his friends, they turned on him and raped him, while calling him homophobic slurs and telling him "since you are gay, you should enjoy this."  Tushar was unable to report this to the police at the time, because if he did, Tushar could have been subjected to 10 years of imprisonment.

-  Soraya is a lesbian from Iran who was extremely closeted.  Soraya was sexually and physically abused by an ex-partner.  The ex-partner also set Soraya's car on fire.  However, given that her ex-partner was a woman, Soraya could not report the abuse to the police.  Had Soraya reported the abuse, she would have been outed, and would have been subjected to the death penalty.

- Joseph is gay man from Nigeria where being gay is a crime, and in some states punishable by death.  Joseph was outed at his workplace after he lost his phone and the security police who found it discovered intimate photos of Joseph and a partner.  The police made copies of the photos and used them to extort money from Joseph in exchange for not arresting and outing him.  They also made him sign a statement acknowledging that he was gay and had committed a crime.  The demands for money kept increasing until Joseph could no longer meet the bribes to assure his safety.  He then fled to the United States.

127. Each of the Final Rule's exclusions from the meaning of persecution discussed herein will have a particular impact on LGBTQ/H claimants.  The exclusion of "intermittent harassment" and "brief detentions" overlooks the widespread targeting of LGBTQ/H individuals by law enforcement.  *See, e.g.,* Public Comment of Lambda Legal, at 3 (discussing a gay asylum seeker from Kenya who "had been

41

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    Case No.

imprisoned three times for being gay"); Human Rights Watch, *"Not Safe at Home: Violence and Discrimination against LGBT people in Jamaica"*, at 34 (Oct. 2014), https://www.hrw.org/sites/default/files/reports/jamaica1014_ForUpload_1.pdf (recounting "abuse at the hands of the police" as a "regular occurrence").

128.    LGBTQ/H claimants are also frequently subjected to ongoing threats and intimidation that may or may not materialize but nevertheless can rise to the level of persecution.  *See Tairou v. Whitaker*, 909 F.3d 702 (4th Cir. 2018) (LGBTQ asylum applicant from Benin harassed by crowd of "approximately 40 men" who "threatened to cut off his penis," and received subsequent death threats and menacing phone calls).  For LGBTQ/H victims in particular, persecution often consists of fear-driven pressure to stay closeted or risk retaliation, imprisonment, and abuse, including homicide or "corrective" rape.

129.    The Departments purported to address certain public comments concerning the exclusion of ongoing threats and intimidation from the definition of persecution by adding an exception to that exclusion in the Final Rule for "particularized threats of severe harm of an immediate and menacing nature made by an identified entity."  85 Fed. Reg. 80,386 (to be codified as 8 C.F.R. §§ 208.1(e), 1208.1(e)).  Yet the Departments state that this exception will be "rare."  85 Fed. Reg. 80,276.  The Departments are wrong, for a pattern of imminent threats is just the kind of persecution that LGBTQ/H asylum applicants frequently have faced in their home countries.  Moreover, the parameters of the exception nullify it.  For example, the Departments have limited the exception to persecution at the hands of an "identified entity"—not individuals, families, or entities without a concrete moniker or identity.  That eliminates many kinds of people that persecute LGBTQ/H asylum applicants.

130.    Finally, LGBTQ/H individuals are often subject to infrequently enforced laws that nevertheless create a menacing environment.  According to Human Rights Watch, approximately 70 countries around the world have national laws criminalizing same-sex relations between consenting adults, and at least nine countries have national laws criminalizing forms of gender expression that target transgender and gender nonconforming people.  *See* Human Rights Watch, *#Outlawed: "The Love That Dare Not Speak Its Name"*, http://internap.hrw.org/features/features/lgbt_laws/.  In the majority of these

COMPLAINT FOR DECLARATORY AND                              Case No.
INJUNCTIVE RELIEF

countries, the punishment is imprisonment; in some, same-sex intimacy is punishable by death. In addition, many countries have laws prohibiting public support of LGBTQ/H rights in an effort to silence activists. The persecutory effect of such laws consists not just in the actual enforcement of the law, but also in the chilling effect that the law has on a person's ability to live openly as LGBTQ/H. The criminalization of LGBTQ intimacy or expression, even if such laws are not regularly enforced, increases the risks that LGBTQ/H individuals will be subject to extortion, prevents such refugees from seeking the protection of police, and disincentivizes police from investigating, punishing and preventing crimes against LGBTQ/H people. Furthermore, if a person is a criminal because of their sexual orientation or gender identity, that fact also has seriously detrimental implications for their access to healthcare, education, employment, and for their parental rights.

131. In short, by abandoning without adequate explanation the longstanding policy of allowing adjudicators to determine on a case-by-case basis what harm amounts to persecution, the Final Rule is arbitrary and capricious and therefore unlawful.

### C. The Final Rule Mandates the Denial of *Bona Fide* Asylum Claims under the Guise of Discretion.

132. The Final Rule is arbitrary and capricious because it makes Draconian changes to the Departments' application of discretion to asylum claims. As noted above, asylum is a form of discretionary relief that allows the Secretary of Homeland Security or the Attorney General to grant asylum to anyone who meets the definition of refugee. *See* 8 U.S.C. § 1158(b)(1)(A); *INS v. Cardoza-Fonseca*, 480 U.S. 421, 423 (1987). After first establishing statutory eligibility for asylum, an applicant must then merit a favorable exercise of discretion. *Id.* The discretionary determination requires the balancing of positive and negative factors under a totality of the circumstances test. *In re Pula*, 19 I&N Dec. 467, 473-74 (BIA 1987). The BIA has long held that given the grave humanitarian concerns, "the danger of persecution should generally outweigh all but the most egregious of adverse factors." *Id.* Thus, once applicants demonstrate eligibility, there is a strong presumption that asylum should be granted, which is only overcome if there are very substantial factors weighing against doing so.

133. The Final Rule breaks with over thirty years of precedent on how discretion should be applied, rejecting long-established discretionary factors such as ties to the United States, living

43

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                                    Case No.

conditions, safety, potential for long-term residency in a third country, and general humanitarian considerations, and reversing the heavy presumption that eligible applicants should be granted asylum. Instead, the Final Rule establishes nine "adverse discretionary factors" and three "significant adverse discretionary factors" that essentially eliminate the discretion of adjudicators altogether. 85 Fed. Reg. 80,387-88 (to be codified as 8 C.F.R. §§ 208.13(d), 1208.13(d)). Despite their name, the "adverse discretionary factors" are mandatory in character: subject to extremely limited exceptions, a favorable exercise of discretion *must* be denied if they are present. *See id.* § 208.13(d)(2)(i) ("The Secretary, except as provided in paragraph (d)(2)(ii) of this section, *will not* favorably exercise discretion under section 208 of the Act . . . ."), § 1208.13(d)(2)(i). An "adverse discretionary factor" may be overcome *only*:

> . . . in extraordinary circumstances, such as those involving national security or foreign policy considerations, or cases in which an alien, by clear and convincing evidence, demonstrates that the denial or referral (which may result in the denial by an immigration judge) of the application for asylum would result in exceptional and extremely unusual hardship to the alien[.]

*Id.* §§ 208.13(d)(2)(ii), 1208.13(d)(2)(ii). "Depending on the gravity of the circumstances underlying the [adverse discretionary factor], a showing of extraordinary circumstances might still be insufficient to warrant a favorable exercise of discretion." *Id.*

134. The Final Rule does not provide clear guidance as to how the three "significantly adverse discretionary factors" will affect an application, other than that they "shall" be considered, *id.* §§ 208.13(d)(1), 1208.13(d)(1), but their designation as "significantly adverse" indicates that they carry even more negative consequences than factors that are merely "adverse." The Final Rule's plain text and structure thus indicates that, to overcome a "significant adverse discretionary factor," the applicant must show something more than the "extraordinary circumstances" or "exceptional and extremely unusual hardship" that would suffice for factors that are merely "adverse." *Id.* §§ 208.13(d)(2)(ii), 1208.13(d)(2)(ii).

135. In short, although these factors are framed as discretionary, the Final Rule effectively strips adjudicators of their discretionary authority, forcing them to deny meritorious asylum claims (except in "extraordinary" or "extremely unusual" cases) based on factors that have nothing to do with

COMPLAINT FOR DECLARATORY AND                    Case No.
INJUNCTIVE RELIEF

the underlying claim. The Departments' repeated mischaracterizations of these factors as "discretionary," both in the Final Rule's Preamble and the text of the rule itself, show that the Departments have not adequately analyzed—or do not understand—the implications of their own rule, rendering these "discretionary" factors arbitrary and capricious. Two aspects of the list of "discretionary factors" raise particular concerns under the APA: the factor related to one year of unlawful presence, and those related to third country transit. These factors are arbitrary, capricious, and contrary to law for the additional reasons discussed below.

### i.    The Final Rule Unlawfully Erases Statutory Exceptions to the One-Year Filing Deadline.

136.    The Final Rule effectively erases the INA's statutory exceptions to the one-year filing deadline, abandoning decades of settled precedent and policy with no rational explanation and denying relief to applicants who have legitimate reasons to wait more than one year after their arrival before applying for asylum. The Final Rule is therefore both contrary to law and arbitrary and capricious.

137.    The Final Rule's changes will have devastating consequences for LGBTQ/H refugees, who are often unable to apply for asylum within the first year of their arrival in the United States. The Final Rule arbitrarily bars asylum for LGBTQ/H applicants who, among other things, were not able to immediately understand their LGBTQ identity, did not feel safe disclosing their sexual orientation or gender identity, developed a well-founded fear of persecution based on anti-LGBTQ developments in their country of origin, discover that they are HIV-positive, or other developments more than one year after their last arrival in the United States.

138.    Under the INA, an asylum applicant must "demonstrat[e] that the application has been filed within 1 year after the date of the alien's arrival in the United States." 8 U.S.C. § 1158(a)(2)(B). However, Congress mandated that the one-year filing deadline does not apply "if the alien demonstrates to the satisfaction of the Attorney General" either (1) "the existence of changed circumstances which materially affect the applicant's eligibility," or (2) "extraordinary circumstances relating to the delay in filing an application within the period specified in subparagraph (B)." 8 U.S.C. § 1158(a)(2)(D).

139.    The Final Rule effectively eliminates both of these statutory exceptions and mandates denial of asylum where the applicant misses the one-year filing deadline without regard to changed or

COMPLAINT FOR DECLARATORY AND                    Case No.
INJUNCTIVE RELIEF

extraordinary circumstances. Under the Final Rule, the Secretary or Attorney General (as applicable) "will not favorably exercise discretion under section 208 of the Act for an alien who: . . . Accrued more than one year of unlawful presence in the United States, as defined in sections 212(a)(9)(B)(ii) and (iii) of the Act, prior to filing an application for asylum." 85 Fed. Reg. 80,387-88, 80,396-97 (to be codified as 8 C.F.R. §§ 208.13(d)(2)(i)(D); 1208.13(d)(2)(i)(D)).

140. The only exceptions to this mandatory denial of asylum under the Final Rule are significantly narrower than the statutory exceptions Congress set forth in the INA. 8 U.S.C. § 1158(a)(2)(D). Under the Final Rule, where an applicant seeks asylum beyond the one-year filing deadline, the Secretary "may" (but need not) exercise discretion to grant asylum (1) "in extraordinary circumstances, such as those involving national security or foreign policy considerations," or (2) where the "alien, by clear and convincing evidence, demonstrates that the denial or referral (which may result in the denial by an immigration judge) of the application for asylum would result in exceptional and extremely unusual hardship to the alien." 85 Fed. Reg. 80,387-88, 80,396-97 (to be codified as 8 C.F.R. §§ 208.13(d)(2)(ii), 1208.13(d)(2)(ii)). Notably, contrary to the plain language of the INA, a change in circumstances that materially affects the applicant's eligibility is no longer sufficient for an exemption from the one-year filing deadline under the Final Rule.

141. Additionally, the Final Rule eliminates the longstanding recognition of a variety of extraordinary circumstances that justified failures to file for asylum within one year, such as if the applicant suffered from Post-Traumatic Stress Disorder or other significant health problems, or had diminished mental capacity. The Final Rule narrows extraordinary circumstances to national security or foreign policy considerations.

142. Moreover, the Final Rule purports to impose a burden of proof on asylum applicants inconsistent with the INA. Under the INA, an applicant seeking an exemption from the one-year filing deadline need demonstrate only changed or extraordinary circumstances "to the satisfaction of the Attorney General." 8 U.S.C. § 1158(a)(2)(D). The Final Rule, by requiring the applicant to demonstrate "exceptional and extremely unusual hardship" by "clear and convincing evidence," unlawfully imposes a heightened burden of proof on asylum applicants which is inconsistent with the congressional

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

Case No.

1   framework for asylum.  85 Fed. Reg. 80,388, 80397 (to be codified as 8 C.F.R. §§ 208.13(d)(2)(ii),

2   1208.13(d)(2)(ii)).  *See Singh v. Holder*, 656 F.3d 1047, 1052 (9th Cir. 2011) ("Changes circumstances

3   . . . are not evaluated under a 'clear and convincing' standard").

4       143.   A large number of Plaintiffs' members and clients who file for asylum entered the United

5   States between ports of entry and lacked lawful status when they entered.  Many others had lawful status

6   when they entered, but nevertheless accrued more than one year of unlawful status prior to filing.  For

7   these applicants, the Final Rule's "one year of unlawful presence" rule is effectively a substitute for the

8   statutory one-year filing deadline.  However, to overcome this new standard, the applicants must now

9   satisfy the exacting threshold and burden of proof set forth in proposed 8 C.F.R. §§ 208.13(d)(2)(ii),

10  1208.13(d)(2)(ii) rather than the comparatively more lenient exceptions to the one-year filing deadline

11  that Congress enacted in 8 U.S.C. § 1158(a)(2)(D).  Thus, in the vast majority of cases, the Final Rule

12  would render § 1158(a)(2)(D) obsolete.  Because it renders this carefully draft statute superfluous, the

13  Final Rule is contrary to law.

14      144.   The Departments also fail to meaningfully address relevant comments or offer any

15  rationale for changing this longstanding asylum practice.  The Departments acknowledge that

16  commenters expressed concerns that LGBTQ individuals may require more than one year to recognize

17  and understand their identities, and that this process often necessitates safety, security, and a support

18  system that is frequently unavailable during flight from their home countries.  85 Fed. Reg. 80,354.

19  Rather than substantively responding to these serious concerns, the Departments attempt to ignore them,

20  claiming that "[t]his factor, like the other factors, is not a bar to asylum," and suggesting that "[f]or the

21  discrete populations referenced by the commenters who file outside the one-year deadline, adjudicators

22  may consider those circumstances in accordance with the rule," but that is not what the Final Rule says.

23  *Id.* at 80,355.  These cursory and conclusory responses do not adequately address commenters' concerns,

24  and serve only to highlight the arbitrary and capricious nature of the Departments' rulemaking.  *A*

25  *fortiori*, the Departments have not justified ignoring Congress' definition and level of proof for

26  exceptions to the One-Year Bar.

27

28

COMPLAINT FOR DECLARATORY AND        Case No.
INJUNCTIVE RELIEF

145.    The Final Rule's unlawful erasure of statutory exceptions to the one-year filing deadline is particularly devastating to LGBTQ/H asylum seekers, who often have compelling reasons for waiting more than one year before applying for asylum.  Many LGBTQ asylum seekers struggle for years after arriving in the United States to understand and accept their sexual orientations and gender identities.  The Final Rule nevertheless arbitrarily mandates denial of asylum for LGBTQ/H applicants who fail immediately to seek asylum based on an LGBTQ/H identity that they did not understand or were incapable of expressing during their first year in the United States.

146.    Moreover, the Final Rule would in many cases foreclose asylum relief for transgender applicants who filed after transitioning more than one year after entering the country.  And LGBTQ/H individuals may not feel safe immediately disclosing their sexual orientation or gender identity once in the United States, especially in light of the Final Rule's change regarding disclosure of asylum application information.  85 Fed. Reg. 80,386-87, 80,395-96 (to be codified as 8 C.F.R. §§ 208.6, 1208.6).

147.    In addition, the Final Rule would result in the denial of asylum for LGBTQ/H applicants who develop a well-founded fear of persecution after more than one year in the United States due to anti-LGBTQ/H political or legal changes in their country of origin.  Whereas the INA provides an exemption from the one-year filing deadline in such circumstances (8 U.S.C. § 1158(a)(2)(D)), the Final Rule impermissibly eliminates exemptions based on a change in circumstances materially affecting an applicant's eligibility for asylum.

148.    As such, the Final Rule would have a deleterious impact on the prospect for asylum for Plaintiffs' clients.  One need only look to a few of Immigration Equality's clients for whom the Final Rule would dictate denial of their claims due to the elimination of the previously recognized changed and extraordinary circumstances exceptions to the One-Year Bar:

- Orlando is a genderqueer person from Honduras who came to the United States when they were around 8 years old.  In Honduras, and as a child, Orlando was raped on account of their perceived sexual orientation.  On their way to the United States, Orlando was raped again by someone in Mexico.  In the United States, Orlando lived in a very homophobic household.

48

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                                    Case No.

Their stepfather regularly beat them because of their sexual orientation. Because of the constant abuse, Orlando lived with severe mental health issues. Orlando was finally able to leave their house when they started going to college. In college, Orlando began receiving therapy to manage their mental health conditions and was eventually able to come to terms with their LGBTQ identity and ultimately file for asylum. Under the Final Rule, they would be denied asylum as a matter of discretion despite the fact that Orlando's mental health conditions prevented them from filing an application for asylum until after they turned eighteen.

- Anita is a transgender woman from Syria who came to the United States when she was a child. In the United States, growing up in a very traditional family, Anita was not allowed to explore her gender identity. Stereotypical views and roles of gender were imposed upon her. She suppressed her gender identity and as a result lived with depression. When Anita was in her mid-thirties, she finally felt free to explore her gender identity and started to transition. Under the Final Rule, Anita would not be able to apply for asylum despite the fact that she had very recently discovered her gender identity and was finally able to express it. This would have been recognized as a changed circumstances exception to the One-Year Bar.

- Martin is a gay man from Ecuador who came to the United States in 2009. Martin had suffered horrific persecution on account of his sexual orientation in Ecuador. Because of the persecution, Martin lived with depression. In the United States, Martin was diagnosed with HIV in 2016. Because of the diagnosis, Martin experienced a serious depressive episode. He was unable to even get out of bed. Under the Final Rule, Martin would not be able to apply for asylum even though he had recently been diagnosed with HIV and even though his depression prevented him from filing an application for asylum soon after his diagnosis, comprising both changed and extraordinary circumstances under longstanding interpretation of the statutory exceptions to the One-Year Bar.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF        Case No.

149.     Thus, the Final Rule is arbitrary and capricious and contrary to law because it unlawfully erases the INA's statutory exceptions to the one-year filing deadline, abandons decades of settled policy with no rational explanation, offers no explanation for why being unlawfully present in the United States for more than one year before filing for asylum should be a ground for denial, and denies relief to applicants who have legitimate reasons to wait more than one year after their arrival before applying for asylum.

### ii.     The Final Rule Arbitrarily, Capriciously, and Unlawfully Restricts Asylum for Refugees Who Transit Through Third Countries.

150.     Under the new adverse and significantly adverse discretionary factors, the Final Rule contains multiple arbitrary, capricious, and otherwise unlawful limitations on the availability of asylum for applicants who transit through a third country before arriving in the United States. *See* 85 Fed. Reg. 80,387-88 (to be codified as 8 C.F.R. §§ 208.13(d)(1), (2)(i)(A), (B), 1208.13(d)(1), (2)(i)(A), (B)) (collectively, the "Transit Rules"). The Transit Rules are contrary to and undermine the structure and objectives of 8 U.S.C. § 1158 by penalizing applicants regardless of whether they would have been safe from persecution in the transit country, whether asylum was reasonably available in such country, or whether their underlying claims of asylum have merit.

151.     The Transit Rules likely will eliminate asylum for a significant number, if not the majority, of asylum seekers. Most asylum seekers are from countries that are non-contiguous with the United States, *i.e.,* other than Mexico or Canada. Many if not most asylum seekers must reach the United States by crossing the southern border by land, requiring passage through Mexico and, frequently, Guatemala as well. Additionally, many countries, including those with well-documented histories of persecution against LGBTQ/H individuals and other vulnerable sub-groups, do not have non-stop commercial flights into the United States, requiring refugees to pass through at least one other country. Moreover, in some cases a refugee will flee to a neighboring country, discover that they are still in danger, and then press onwards to the United States.

152.     The Transit Rules will have particularly devastating consequences for LGBTQ/H refugees, including Plaintiffs' current and future clients fleeing persecution in Guatemala, El Salvador, Honduras, and other countries where violence against the LGBTQ/H community is widespread, because

50

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    Case No.

of the inability of many of these refugees to directly transit to the United States and because of the risk such refugees often face in neighboring countries through which they transited, when there is regional persecution of LGBTQ/H people.

### a. *Summary of the Transit Rules*

153. The Final Rule specifies two circumstances relating to third-country transit under which the Secretary or Attorney General, as applicable, "will not favorably exercise discretion under [8 U.S.C. § 1158]" for the applicant. Specifically, proposed 8 C.F.R. § 208.13(d)(2)(i), 1208.13(d)(2)(i) sets forth the following:

- *First*, the Final Rule provides (subject to limited exceptions) that the Secretary or Attorney General "will not favorably exercise discretion" if an applicant "[t]ransits through more than one country between his country of citizenship, nationality, or last habitual residence and the United States." 85 Fed. Reg. 80,387 (to be codified as 8 C.F.R. §§ 208.13(d)(2)(i)(B), 1208.13(d)(2)(i)(B)) (the "Multiple Third Country Rule").

- *Second*, the Final Rule provides (subject to limited exceptions) that the Secretary or Attorney General "will not favorably exercise discretion" if an applicant, "[i]mmediately prior to his arrival in the United States or en route to the United States from the alien's country of citizenship, nationality, or last lawful habitual residence, spent more than 14 days in any one country." 85 Fed. Reg. 80,387 (to be codified as 8 C.F.R. §§ 208.13(d)(2)(i)(A), 1208.13(d)(2)(i)(A)) (the "14-Day Rule").

154. The Final Rule erroneously characterizes these rules as "discretionary considerations." 85 Fed. Reg. at 36,284. However, this characterization is belied by the plain text of the regulation, which states that the adjudicator "*will* not favorably exercise discretion"—*i.e.*, must deny the application—if the rule is triggered. 8 C.F.R. § 208.13(d)(2)(i) (proposed) (emphasis added). The Multiple Third Country Rule and 14-Day Rule are therefore *per se* limitations on eligibility, rather than mere discretionary factors, as they eliminate the discretion of the adjudicator to grant asylum if the rule applies.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF
Case No.

155.    The Final Rule penalizes asylum applicants in other ways for transit through third countries, setting forth three common scenarios that the adjudicator must consider as "significant adverse discretionary factors" in determining whether to grant asylum in the exercise of discretion. Specifically, proposed 8 C.F.R. § 208.13(d)(1), 1208.1 set forth the following:

- *First*, it is a "significant adverse discretionary factor" if the applicant transited through a third country and "fail[ed] . . . to apply for protection from persecution or torture" in such country (subject to narrow exceptions).  85 Fed. Reg. 80387 (to be codified as 8 C.F.R. §§ 208.13(d)(1)(ii), 1208.13(d)(1)(ii)) (the "Failure-To-Apply Factor").

- *Second*, it is a "significant adverse discretionary factor" if the applicant transited through a third country and then entered or attempted to enter the United States unlawfully, unless the applicant was under 18 at the time of such entry or attempted entry.  85 Fed. Reg. 80,387 (to be codified as 8 C.F.R. §§ 208.13(d)(1)(i), 1208.13(d)(1)(i)) (the "Unlawful Entry Factor").

- *Third*, it is a "significant adverse discretionary factor" if the applicant transited through a third country and then "use[d] . . . fraudulent documents to enter the United States." ."  85 Fed. Reg. 80,387 (to be codified as 8 C.F.R. §§ 208.13(d)(1)(iii), 1208.13(d)(1)(iii)) (the "Fraudulent Entry Factor").

156.    An adjudicator is not required to deny an application solely because of the existence of a "significant adverse discretionary factor."  However, the plain meaning of "significant" will require adjudicators to apply a strong presumption against asylum which, in practice, upon information and belief, will result in denial in a majority of cases.  Furthermore, if a "regular" adverse discretionary factor may be overcome only by a demonstration of "extraordinary circumstances or "exceptional and extremely unusual hardship," it is difficult to imagine how an applicant might ever overcome a "significant" discretionary factor.  Even worse, the plain text of the regulation indicates that these "adverse" and "significant adverse" factors apply cumulatively, so that they are harder to overcome if multiple such factors apply.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    Case No.

157. There are three narrow exemptions to the Multiple Third Country Rule, 14-Day Rule, and Failure-To-Apply Factor where: (i) the applicant received a final judgment denying protection in the third country (the "Judgment Exception"); (ii) the applicant was a "victim of a severe form of trafficking in persons" as defined under 8 C.F.R. § 214.11 (the "Trafficking Exception"); or (iii) the transit country was not party to the 1951 Convention, 1967 Protocol, or CAT (the "Nonparty Exception"). 85 Fed. Reg. 80,387-88 (to be codified as 8 C.F.R. §§ 208.13(d)(1)(ii)(A)-(C), (2)(i)(A)(1)-(3), (B)(1)-(3), 1208.13(d)(1)(ii)(A)-(C), (2)(i)(A)(1)-(3), (B)(1)-(3)). These narrow exceptions do not apply to the Unlawful Entry Factor or Fraudulent Entry Factor and in any event to the vast majority of Plaintiffs' LGBTQ/H clients.

158. The Transit Rules do not take into account whether an applicant feared persecution or torture in the transit country itself, such as where refugees escaping persecution on account of their sexual orientation, gender identity, gender expression, or HIV-positive status must travel through a country that is equally hostile to LGBTQ/H people. Nor do the Transit Rules take into account if asylum or other forms of protection were reasonably available in the third country, if the applicant was an unaccompanied minor (except in the context of the Unlawful Entry Factor), or if the transit country had a grossly underfunded asylum system, removing asylum as a viable option in that country.

159. To the extent that the Departments allege that the transit bans are necessary to increase efficiency of adjudicating cases, this rings hollow. First, by that logic, any absolute bar to asylum would increase "efficiency" because every asylum seeker subject to it would lose before they even applied. What makes an asylum system "efficient" is not denying the maximum number of cases possible, but effectively sorting meritorious from non-meritorious cases. By blanketly penalizing applicants for criteria that have nothing to do with whether they qualify as refugees entitled to asylum, the Transit Rules do not strengthen, but weaken, the efficiency of the system.

160. Second, to the extent that a case involving one of the Transit Rules may be subject to an exception, analyzing whether the exception applies (such as whether the applicant's hardship qualifies as "exceptional and extremely unusual") would require more factfinding, not less.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Case No.

161.    Finally, in promulgating the Transit Rules, the Departments utterly fail to explain why they warrant such striking negative discretion.  Mandating the denial of otherwise meritorious asylum claims on such flimsy and unjustifiable discretionary grounds is arbitrary and capricious.

b.    _The Departments' Previous, Unsuccessful Attempt to Implement a Transit Ban._

162.    This is not the first time the Departments have sought to eliminate asylum for refugees who transit through a third country before arriving in the United States.  The Defendants' previous unsuccessful attempt further demonstrates the arbitrary and capricious nature of the Transit Rules.

163.    On July 16, 2019, the Departments promulgated an interim final rule that similarly restricted asylum for applicants who "enter[ed], attempt[ed] to enter, or arrive[d] in the United States across the southern land border . . . after transiting through at least one country outside the alien's country of citizenship, nationality, or last lawful habitual residence en route to the United States." Asylum Eligibility and Procedural Modifications, 84 Fed. Reg. 33,829, 33,830 (Jul. 16, 2019) (codified at 8 C.F.R. § 208.13(c)(4), 1208.13(c)(4)) (the "2019 Transit Ban").  The 2019 Transit Ban contained three exceptions, identical to the Judgment Exception, Trafficking Exception, and Nonparty Exception under the current Transit Rules.

164.    The 2019 Transit Ban was enjoined by a court in this District.  *See E. Bay Sanctuary Covenant v. Barr*, 385 F. Supp. 3d 922 (N.D. Cal. 2019), *stay granted in part and denied in part*, 934 F.3d 1026 (9th Cir. 2019), *injunction restored*, 391 F. Supp. 3d 974 (N.D. Cal. 2019).  On July 6, 2020, the Ninth Circuit affirmed the injunction of the 2019 Transit Ban, holding that the ban was arbitrary, capricious, contrary to law, and in excess of the Departments' statutory authority.  964 F.3d 832 (9th Cir. 2020).

165.    Critical to the Ninth Circuit's holding was its conclusion that "the [2019 Transit Ban] does virtually nothing to ensure that a third country is a 'safe option'" for the applicant.  *Id.* at 847 (cleaned up).  The lack of such exception, the Ninth Circuit held, was inconsistent with the INA's safe third country and firm resettlement bars, which require that "an otherwise qualified alien can be denied asylum only if there is a 'safe option' in another country.'"  *Id.* at 848; *see* 8 U.S.C. § 1158(a)(2)(A), (b)(2)(A)(vi).  Furthermore, the Ninth Circuit found that the limited exceptions under the 2019 Transit

COMPLAINT FOR DECLARATORY AND                                        Case No.
INJUNCTIVE RELIEF

1  Ban did "not remotely resemble the assurances of safety built into" the safe country and firm

2  resettlement bars. *E. Bay Sanctuary Covenant*, 964 F.3d at 847.

3             c.  *The Transit Rules Are Contrary to Law and Exceed the Departments'*
                 *Statutory Authority Because They Lack an Exception Where the Transit*
4                *Country Is Not Safe.*

5     166.   Like the 2019 Transit Ban, the Transit Rules included in the Final Rule violate the INA.

6  As noted by the Ninth Circuit in *E. Bay Sanctuary Covenant* and discussed above, the INA contains two

7  provisions—the safe third country bar and the firm resettlement bar—that preclude eligibility for

8  asylum.  8 U.S.C. § 1158(a)(2)(A), (b)(2)(A)(vi).

9     167.   The safe third country bar states that refugees are ineligible for asylum where the asylum

10 seekers may be safely removed to a third country in which they would not face persecution and would

11 have access to "a full and fair procedure for determining a claim to asylum or equivalent temporary

12 protection, unless the Attorney General finds that it is in the public interest for the alien to receive asylum

13 in the United States."  8 U.S.C. § 1158(a)(2)(A).  The firm resettlement bar provides that applicants are

14 ineligible for asylum if they were "firmly resettled in another country prior to arriving in the United

15 States."  8 U.S.C. § 1158(b)(2)(A)(vi).

16    168.   In enacting 8 U.S.C. §§ 1158(a)(2)(A) and (b)(2)(A)(vi), Congress required that no

17 asylum seekers should be denied relief on account of their transit through a third country unless, at

18 minimum, the asylum seekers were or would be safe from persecution in such country.

19    169.   Like the 2019 Transit Ban, the Transit Rules, collectively and individually, are contrary

20 to law and exceed the Departments' statutory authority because they permit or require the adjudicator

21 to deny an asylum application based on the fact of transit through a third country, even if the third

22 country was or would not have been a safe option for the applicant.  Commenters noted that the

23 elimination from the Final Rule of third country safety considerations would be devastating for many

24 asylum applicants.  The Departments nonetheless refused to reincorporate the safety of third countries

25 as a consideration in this provision of the Final Rule and instead responded that third country safety may

26 be considered only in "extraordinary circumstances" where there is "exceptional or extremely unusual

27

28

COMPLAINT FOR DECLARATORY AND                              Case No.
INJUNCTIVE RELIEF

hardship." 85 Fed. Reg. 80,348.  These vague qualifiers will make the safety consideration rare or non-existent.

170.     The limited Judgment, Trafficking, and Nonparty Exceptions, like their equivalent counterparts under the 2019 Transit Ban, do not cure this defect.  The Judgment Exception is relevant only where the transit country (1) is a safe place for the applicant to reside while their asylum application is pending and (2) has a functional asylum system in the first place, which frequently will not be the case.  The Trafficking Exception is likely to apply only to a small subset of asylum claims.  And the Nonparty Exception is irrelevant; most countries in the world, including many with deplorable human rights records, are nominally party to the anti-torture conventions and protocols.  That includes Mexico and every country in Central America, most of which the U.S. Department of State has concluded persecute LGBTQ/H people.

        d.  *The 14-Day Rule and Multiple Country Rule Are Contrary to Law and Exceed the Departments' Statutory Authority Because They Make the Statutory Firm Resettlement Rule Superfluous.*

171.     Although the term "firmly resettled" is not defined in the INA, the plain meaning of this phrase denotes secure, fixed residence.[5]  Moreover, under long-standing precedent, firm resettlement is construed to mean an offer of permanent resident status, citizenship, or some other form of permanent resettlement.  Congress thus unambiguously expressed its intent that adjudicators should not find asylum seekers ineligible solely on account of supposed resettlement in a transit country absent evidence that the applicant has an invitation by a safe country to establish a fixed and secure residence there.  Inconsistent with this intent, the 14-Day Rule and Multiple Third Country Rule require that asylum be denied, absent rare, extraordinary circumstances, regardless of whether the nature and duration of such presence amounted to firm resettlement within the meaning of 8 U.S.C. § 1158(b)(2)(A)(vi).  The 14-Day Rule and Multiple Third Country Rule negate the firm resettlement rule in the overwhelming majority of cases in which it would otherwise apply.  Accordingly, these rules are contrary to law and exceed the Departments' statutory authority.

---

[5] The Departments recognize that "[t]he dictionary definition of 'firm' is 'securely or solidly fixed in place,' not 'uncertain,' and 'not subject to change or revision.'  Firm, Merriam Webster, https://www.merriamwebster.com/dictionary/firm."

COMPLAINT FOR DECLARATORY AND                    Case No.
INJUNCTIVE RELIEF

e. *The Transit Rules Arbitrarily and Capriciously Penalize Asylum Seekers Even If They Do Not Have Reasonable Access to Asylum in Their Transit Country.*

172.    The Transit Rules are arbitrary and capricious, among other reasons, because they are based on the false assumption that "there is a higher likelihood that aliens who fail to apply for protection in a country through which they transit en route to the United States are misusing the system." 85 Fed. Reg. at 80,346. In support of that erroneous statement, the Departments provide no evidence, but only a cursory citation to the now-enjoined 2019 Transit Ban. *See id.* The fact that the Ninth Circuit struck down the sole proffered basis for the Transit Rules confirms that there is none and that it is arbitrary and capricious.

173.    The Transit Rules do not rationally address this purported concern because they penalize applicants regardless of whether it would have been safe and feasible to seek protection in the transit country. The Final Rule's failure to acknowledge this glaring disconnect between the effect of the Transit Rules and their proffered justifications in and of itself renders the Transit Rules arbitrary and capricious. The Departments responded to the public comments on this subject matter by noting only that asylum availability may be considered in "exceptional" or "extremely unusual" circumstances— effectively nullifying the consideration, given the very narrow scope of grounds the Final Rule recognizes as exception or extremely unusual, as discussed in connection with the One-Year Bar. 85 Fed. Reg. 80348.

174.    Furthermore, there are compelling reasons why individuals may fail to apply for asylum in transit countries. Refugees fleeing persecution are often subject to immense cultural hostility that transcends national borders. In Mexico, for example, "68.3 percent of people from the [Northern Triangle][6] reported that they were victims of violence," and "31.4 percent of women and 17.2 percent of men had been sexually abused."[7] The peril is particularly great for LGBTQ refugees: according to Amnesty International, two-thirds of LGBTQ asylum seekers from the Northern Triangle reported

---

[6] The Northern Triangle refers to the three Central American countries of Guatemala, Honduras, and El Salvador.

[7] Médecins Sans Frontières, *Forced To Flee Central America's Northern Triangle: A Neglected Humanitarian Crisis* 11-12 (May 2017), http://urbanspaces.msf.org/wp-content/uploads/2019/03/forced-to-flee-central-americas-northern-triangle_-a-neglected-humanitarian-crisis.pdf.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                                  Case No.

suffering sexual and gender-based violence in Mexico, augmenting the high levels of crime and human rights violations reported against migrants generally.[8] "Trans women in particular encounter persistent abuse and harassment in Mexico at the hands of drug traffickers, rogue immigration agents and other migrants."[9]

175. Applicants may also be unable to apply for asylum when transit countries lack an efficient, well-funded asylum system capable of processing claims. The asylum system in Mexico, for instance, has been characterized as "restrictive, severely underfunded and underdeveloped," and it "faces significant staffing and infrastructure limitations."[10] The UNHCR has observed that "[t]he absence of proper protection screening protocols for families and adults, the lack of a systematic implementation of existing best interest determination procedures for unaccompanied children and detention of asylum-seekers submitting their claim at border entry points" are all "strong obstacles to accessing the asylum procedure" in Mexico.[11] Consequently, "the Mexican government is routinely failing in its obligations under international law to protect those who are in need of international protection."[12] The asylum system is similarly dysfunctional in neighboring Guatemala, where the government office that specializes in processing asylum claims had "a staff of three caseworkers, three investigators, and one supervisor."[13]

---

[8] *See* Amnesty International, *No Safe Place: Salvadorans, Guatemalans and Hondurans Seeking Asylum In Mexico Based On Their Sexual Orientation And/Or Gender Identity* 20 (Nov. 2017), https://www.amnestyusa.org/wp-content/uploads/2017/11/No-Safe-Place-Briefing-ENG-1.pdf (citing UNHCR, *Población LGBTI en México y Centroamérica* (2017), www.acnur.org/donde-trabaja/america/mexico/poblacion-lgbti-en-mexico-ycentroamerica/).

[9] Jose A. Del Real, "'They Were Abusing Us the Whole Way': A Tough Path for Gay and Trans Migrants," *The New York Times* (July 11, 2018), https://www.nytimes.com/2018/07/11/us/lgbt-migrants-abuse.html.

[10] *See* Dan Kosten, "Mexico's Asylum System Is Inadequate," *National Immigration Forum* (Oct. 28, 2019), https://immigrationforum.org/article/mexicos-asylum-system-is-inadequate/.

[11] UNHCR, *Fact Sheet: Mexico* 2 (Apr. 2019), https://reporting.unhcr.org/sites/default/files/UNHCR%20Factsheet%20Mexico%20-%20April%202019.pdf.

[12] Amnesty International, *Overlooked, Under-Protected: Mexico's Deadly* Refoulement *Of Central Americans Seeking Asylum* 5 (2018), https://www.amnestyusa.org/wp-content/uploads/2018/01/AMR4176022018-ENGLISH-05.pdf.

[13] Human Rights Watch, *Deportation with a Layover: Failure of Protection under the US-Guatemala*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    Case No.

176.    The Final Rule's Failure-to-Apply Factor would have a disproportionate impact on Plaintiffs' LGBTQ/H clients.  Take for example, Gogol and Daniel.  They are a gay couple who fled Georgia for the United States after experiencing persecution on account of their sexual orientation.  In route to the United States, they flew through Kiev, Ukraine.  Under the Final Rule, since Gogol and Daniel did not apply for asylum protection in Ukraine, they would likely be denied asylum in the United States as a matter of "discretion."  But Ukraine is a country where homophobia is rampant, and where they would be subjected to persecution similar to what they faced in Georgia.  Moreover, the United States routinely grants asylum to LGBTQ/H refugees from Ukraine.

177.    The same holds true for Carmen, another Immigration Equality client.  Carmen is a transgender woman from Jamaica who fled severe persecution on account of her gender identity.  In coming to the United States, she took a flight from Jamaica to Mexico City and then travelled by bus from Mexico City to Tijuana, where she presented herself at the U.S. Port of Entry.  In Mexico, Carmen was physically assaulted on account of her gender identity.  The police who came to the scene sided with the attackers.  Luckily, Carmen was able to escape.  Under the Final Rule, Carmen would likely be denied asylum because she did not apply for asylum in Mexico before she requested asylum in the United States.  This would have been futile in Mexico where she was persecuted because of her gender identity, and the United States often grants asylum to LGBTQ/H refugees from Mexico.

178.    Due to these dangers and obstacles, many asylum seekers will not find long-term safety in Mexico or other transit countries before arriving in the United States.  The Departments' failure to address or even acknowledge this defect further renders the Transit Rules arbitrary and capricious.

       f.    *The Transit Rules Arbitrarily and Capriciously Penalize Asylum Seekers Who Entered the United States Unlawfully.*

179.    The Unlawful Entry and Fraudulent Entry Factors violate the congressional scheme for asylum by penalizing asylum seekers who enter the United States without permission, a classification that applies to a large percentage of asylum seekers.  As the Second Circuit has observed, "if illegal manner of flight and entry were enough independently to support a denial of asylum, we can readily

---

*Asylum Cooperative Agreement* (May 19, 2020), https://www.hrw.org/report/2020/05/19/deportation-layover/failure-protection-under-us-guatemala-asylum-cooperative.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF               Case No.

take notice, from the facts in numerous asylum cases that come before us, that virtually no persecuted refugee would obtain asylum." *Huang v. INS*, 436 F.3d 89, 100 (2d Cir. 2006); *accord E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 773 (9th Cir. 2018). Recognizing this reality, Congress expressly provided that unlawful entry should not preclude eligibility for asylum. *See* 8 U.S.C. § 1158(a)(1) ("Any alien who is physically present in the United States or who arrives in the United States (*whether or not at a designated port of arrival . . .* ), *irrespective of such alien's status*, may apply for asylum . . . .") (emphasis added).

180. Because refugees are, by definition, fleeing a severe threat to their life or liberty, they have no realistic choice but to escape their persecutors by whatever means they can, enter the United States, and apply for asylum once they have safely relocated. Furthermore, it can be difficult if not impossible to secure avenues for lawful entry. Given these facts, applying a significant adverse discretionary factor against asylum seekers who enter unlawfully or by means of fraudulent documentation is arbitrary and capricious. Although numerous comments raised this concern, the Departments declined to address the concern directly other than to derogate applicants for not entering the country through legal and deliberate means and claiming, without support, that this Final Rule provision would have little impact because it does not pertain to the majority of asylum applicants in any event.

181. The Unlawful Entry and Fraudulent Entry Factors are particularly irrational in light of other aspects of the Final Rule. As discussed further below, the Final Rule redefines "persecution" to require an "exigent threat" and categorically excludes threats that are seen as less-than-exigent, such as "threats with no actual effort to carry out the threats" and "[t]he existence of government laws or policies that are unenforced or infrequently enforced." 8 C.F.R. §§ 208.1(e), 1208.1(e) (proposed). In other words, the Final Rule already restricts asylum to those who suffered forms of persecution creating an *immediate* threat of death or harm. Waiting in one's country of origin while attempting to navigate the United States immigration or visa process is not an option for refugees facing an immediate threat of death or severe harm.

COMPLAINT FOR DECLARATORY AND                    Case No.
INJUNCTIVE RELIEF

182.    Finally, even if the Government has a legitimate interest that justifies weighing unlawful entry against an applicant as an adverse factor, the Unlawful Entry and Fraudulent Entry Factors apply this discretion in an irrational way.  There is no reason why the penalty for unlawful entry should be different as between Mexican refugees and refugees from non-contiguous countries.  The Departments' appeal to generalized policy interests in curtailing illegal immigration do not adequately justify this line-drawing.

183.    These provisions negatively affect Plaintiffs' clients.  Take Lili, who Immigration Equality assisted.  Lili is a transgender woman from Central America.  Throughout her life, Lili was severely abused and mistreated because of her gender identity and sexual orientation.  Lili was ganged raped on two separate occasions simply for being transgender.  Lili fled her country of origin to find safety in the United States.  She entered without inspection and was placed in immigration detention. Lili represented herself in Immigration Court and was granted asylum.  The Final Rule would deprive Lili of relief despite her otherwise meritorious claim simply because she did not enter the United States at a designated port of entry even as she was fleeing for her life and was likely to be further harmed in Mexico.

g.    *The Transit Rules Arbitrarily and Capriciously Penalize Asylum Seekers Who Are Present in a Transit Country For More Than 14 Days.*

184.    The 14-Day Ban is arbitrary and capricious because, in addition to illogically punishing asylum seekers for the mere fact that they transited through a third country, the Final Rule will result in denial for thousands of asylum applications simply because United States policy required them to remain in Mexico for extended periods of time.

185.    Since at least 2016, U.S. Customs and Border Protection has "metered" asylum seekers attempting to enter the United States, limiting the number of individuals permitted to seek asylum at ports of entry and requiring the remainder to remain in queue in Mexico.

186.    It is patently unfair to deny an asylum application for reasons that are beyond the applicants' control and that are instead imposed by United States policy itself.  The fact that an applicant was forced to remain in Mexico due to metering therefore cannot rationally support an unfavorable

COMPLAINT FOR DECLARATORY AND                          Case No.
INJUNCTIVE RELIEF

exercise of discretion.  The Final Rule fails to meaningfully address concerns about the impact of metering on the 14-Day Ban.

187.    When responding to public comments raising this concern, the Departments suggest that applicants who are metered for more than 14 days in Mexico can seek asylum there, 85 Fed. Reg. at 80,351, but this ignores the reality that Mexico is dangerous for LGBTQ/H individuals and Mexico's asylum system is rife with insurmountable obstacles and inefficiencies.  The Departments also suggest that such applicants could introduce evidence that they were metered as an "extraordinary circumstance," *id.*, but provide no assurance that applicants subject to this common practice will be able to satisfy adjudicators that it qualifies as "extraordinary" or an "exceptional and extremely unusual" form of hardship.

188.    Similarly, the Departments state that applicants subject to the MPP will not be affected by the 14-Day Ban because they "have entered the United States and were processed under MPP" and "are no longer en route to the United States," whereas the 14-Day Ban only applies where an applicant stays in a country for 14 days "[i]mmediately prior to [their] arrival in the United States or en route to the United States."  *Id.*  However, the Departments did not add any regulatory language to clarify that applicants subject to the MPP will not be excluded under the 14-Day Ban.  Indeed, the Departments felt the need to add a clarification to the Final Rule's new definition of firm resettlement, explicitly stating that one of the definitions would not apply to applicants subject to the MPP.  *See* 8 C.F.R. §§ 208.15(a)(2), 1208.15(a)(2) ("The alien physically resided voluntarily, and without continuing to suffer persecution in any one country for one year or more after departing his country of nationality or last habitual residence and *prior to arrival in or entry into the United States*, *provided that time spent in Mexico by an alien who is not a native or citizen of Mexico solely as a direct result of being returned to Mexico pursuant to section 235(b)(2)(C) of the Act* or being subject to metering would not be counted for purposes of this paragraph") (emphasis added).  This indicates that the Departments believe that an applicant's stay in Mexico under the MPP may, in the absence of clarifying language, be deemed to occur prior to their entry into the United States.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                                   Case No.

h. *The Transit Rules Arbitrarily and Capriciously Penalize Asylum Seekers Who Transit Through More Than One Country.*

189. Finally, the Multiple Third-Country Rule is arbitrary and capricious because there are no rational grounds for treating asylum seekers who pass through multiple countries differently from those who pass through a single country (or who arrive directly from their countries of origin).

190. For example, the Multiple Third-Country Rule would create an arbitrary distinction between asylum seekers from Honduras (who must travel through Guatemala and Mexico to reach the United States southern border) and those from Guatemala (who must travel only through Mexico to reach the border). No rationale for this distinction is discernible from the Final Rule. The Departments' response to public comments that raised this concern was simply to remark that other countries should do their "fair share" of providing asylum, effectively shifting the United States' asylum obligations to other countries. 85 Fed. Reg. 80352. That shift in responsibility is contrary to this country's obligations to asylum seekers who are not present in the *United States*—and contrary to law.

191. The Multiple Third-Country Rule would negatively impact Plaintiffs' clients. For example, the Transgender Law Center's client Kennedy, a Ghanaian man, would be barred under this provision because he hid briefly in Togo, and then fled to the Americas, making his way from Ecuador, through Colombia, Panama, Costa Rica, Nicaragua, Honduras, and Guatemala before reaching Mexico, where he now waits for permission to enter the United States. One night, Kennedy and his same-sex partner were caught together with one sitting on the other's lap. As a result, a group of people from the town attacked them. His partner went one way and Kennedy ran the other. Kennedy was beaten, hanged from a tree, and left for dead. He managed to survive because the rope used to hang him did not break his neck. He hung there all night, but eventually was able to get free. He left immediately after being told by a sympathetic friend that he would have no safe place in Ghana. To this day he does not know what happened to his partner. In Togo, he briefly hid with a cousin, but another cousin conveyed to him that he was in danger and should leave immediately if he wanted to survive. It was impossible for Kennedy to get a visa and money to fly directly to the United States from Ghana. The Multiple Third-Country Rule would mean that he would not be eligible for asylum because he transited through multiple countries in order to reach the United States.

63

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

Case No.

192.    In sum, the Transit Rules draw an arbitrary distinction between refugees who pass through multiple third countries and those who arrive directly from their country of origin or only transit through one third country, even though there is no rational basis for such distinction.  All else being equal, refugees from non-contiguous countries who enter the United States by way of Mexico or other transit countries should be treated no differently than Mexican asylum seekers entering the United States directly.  The only apparent reason for the Transit Rules is a naked desire by the Departments to reduce the total number of asylum applications granted in the United States, an agenda that permeates the entire Final Rule and other recent rulemaking by the Department but flies in the face of Congress' intent in enacting the INA as well as decades of policy and precedent providing a reasonable path to asylum for meritorious applicants regardless of country of origin.

### D.    The Final Rule Is Unlawful Because It Redefines "Firm Resettlement" in a Manner Inconsistent with the Plain Text of the INA.

193.    The Final Rule is contrary to law because it sharply limits eligibility for asylum by categorically deeming many refugees who reside briefly in third countries before arriving in the United States as "firmly resettled" in such countries and thus barred from seeking asylum.  Congress placed statutory limits on the definition of "firm resettlement."  The Final Rule's redefinition of the term vitiates the plain language of the INA because (1) it circumvents other statutory language governing the determination when a claimant may be remitted to a safe third country, and (2) it is inconsistent with the plain meaning of "firm resettlement."  This change is especially harmful to LGBTQ/H asylum seekers, because many of them will temporarily reside in third countries—in particular Mexico, Russia, or Middle Eastern countries—where they may be deemed "resettled" under the new definition but will still be exposed to persecution on account of their LGBTQ/H status.

194.    Prior to the Final Rule, it was the Government's burden to prove that applicants were considered "firmly resettled," and they could do so only by showing that the applicant had received an offer of permanent residence from a third country prior to entering the United States. 8 C.F.R. §§ 208.15, 1208.15 (current).  This regulatory interpretation was adhered to consistently for "nearly 30 years." 85 Fed. Reg. at 36,285.  Even if the applicants had received such an offer, they could still be eligible if they transited the third country only during their travel to the United States, or if conditions in the third

64

COMPLAINT FOR DECLARATORY AND                          Case No.
INJUNCTIVE RELIEF

country were so restrictive that the applicant could not be considered resettled there.  8 C.F.R. §§ 208.15(a) and (b), 1208.15 (a) and (b) (current).

195.    The Final Rule broadens the definition of "firmly resettled" beyond any fair reading of the statutory language.  An applicant will now be considered "firmly resettled" under the Final Rule if any of three separate circumstances exist:

> (1)    The alien resided in a country through which the alien transited prior to arriving in or entering the United States and—
>
> (i) Received or was eligible for any permanent legal immigration status in that country;
>
> (ii) Resided in such a country with any non-permanent but indefinitely renewable legal immigration status (including asylee, refugee, or similar status but excluding status such as of a tourist); or
>
> (iii) Resided in such a country and could have applied for and obtained any non-permanent but indefinitely renewable legal immigration status in that country;
>
> (2)    The alien physically resided voluntarily, and without continuing to suffer persecution or torture, in any one country for one year or more after departing his country of nationality or last habitual residence and prior to arrival in or entry into the United States, provided that time spent in Mexico by an alien who is not a native or citizen of Mexico solely as a direct result of being returned to Mexico pursuant to section 235(b)(2)(C) of the Act or of being subject to metering would not be counted for purposes of this paragraph; or
>
> (3)    (i) The alien is a citizen of a country other than the one where the alien alleges a fear of persecution and the alien was present in that country after departing his country of nationality or last habitual residence and prior to arrival in or entry into the United States; or
>
> (ii) The alien was a citizen of a country other than the one where the alien alleges a fear of persecution, the alien was present in that country after departing his country of nationality or last habitual residence and prior to arrival in or entry into the United States, and the alien renounced that citizenship after arriving in the United States.

85 Fed. Reg. 80,388, 80,397 (to be codified as 8 C.F.R. §§ 208.15(a)(1)-(3), 1208.15(a)(1)-(3)).

196.    The definition of "firm resettlement" set forth in proposed 8 C.F.R. §§ 208.15(a)(1) is contrary to law for several reasons.  First, rather than focusing on whether the applicant was, in fact, firmly resettled, as Congress dictated, the new definition applies even if the applicant was "eligible" for

65

COMPLAINT FOR DECLARATORY AND                    Case No.
INJUNCTIVE RELIEF

or "could have applied for" legal status in that country. *See* 85 Fed. Reg. 80,388 (to be codified as 8 C.F.R. § 208.15(a)(1)). But the fact that a person *could* firmly resettle in a country does not mean they *have* "firmly resettled." Second, the definition set forth in proposed 8 C.F.R. §§ 208.15(a)(2) focuses on whether the applicant resided for one year in the country without suffering persecution. But in view of the text and structure of 8 U.S.C. § 1158(a) and (b), including the limitations on the safe third country bar, the mere fact that an alien would not suffer persecution in a third country does not mean the alien has "firmly resettled" there. Third, the definition set forth in 85 Fed. Reg. 80,388 (to be codified as 8 C.F.R. §§ 208.15(a)(3), 1208.15 (a)(3)) would deem an applicant "firmly resettled" in any third country where they had citizenship and were physically present, no matter how brief or transitory such presence is.

197.    Even more fundamentally, the Final Rule's redefinition of "firm resettlement" is at odds with the plain meaning of the phrase "firmly resettled" itself, which is to be a "fixed, stable resident of that country." Public Comment of the Tahirih Justice Center (July 15, 2020), at 43, https://downloads.regulations.gov/EOIR-2020-0003-4756/attachment_1.pdf. Under the Final Rule, however, none of the three new definitions of "firmly resettled" (reproduced above) requires any showing that the applicant was a "fixed, stable resident" of a third country. *See* 85 Fed. Reg. 80,388 (to be codified as 8 C.F.R. § 208.15(a)(1), (a)(2), and (a)(3)). Rather, the use of the phrase "habitual residence" as a substitute for "country of nationality" in subsections (2) and (3) infers that the use of the plain word "resides" in subsection (1) by contrast means something more fleeting, and not "firm." Because the Final Rule redefines "firmly resettled" to embrace meanings inconsistent with the plain meaning of the statutory language, it is invalid as contrary to law.

198.    The Final Rule will have the effect of barring large numbers of asylum claimants who are not, by any stretch of the imagination, "firmly resettled" in a third country.

199.    The changed definition will have a particularly harsh impact on LGBTQ/H claimants, who often briefly reside in countries (including Mexico and other Latin American countries) in which they may suffer persecution. LGBTQ/H claimants may briefly reside in countries in which they have citizenship but that have become unsafe for LGBTQ/H individuals due to regime change. LGBTQ/H

COMPLAINT FOR DECLARATORY AND                  Case No.
INJUNCTIVE RELIEF

claimants may also briefly reside in transit countries due to economic necessity, for example to earn enough money for transportation to continue their flight to the United States, but they may still be subject to persecution on account of their LGBTQ/H status while doing so.

200. The Departments' responses to comments noting these defects fail to cure the fatal flaw that this provision ignores the plain meaning of the term "firmly resettled" as used in the INA. The Departments suggest that the term is "ambiguous," 85 Fed. Reg. 80,363, but this is belied by the Departments' admission that the term "firmly resettled" has been interpreted the same way for the past thirty years. 85 Fed. Reg. at 36,285 ("the definition of firm resettlement has remained the same for nearly 30 years"). Indeed, the Departments recognize that "[t]he dictionary definition of 'firm' is 'securely or solidly fixed in place,' not 'uncertain,' and 'not subject to change or revision.' Firm, Merriam Webster, https://www.merriamwebster.com/dictionary/firm," 85 Fed. Reg. 80,364, but at the same time defend including in their expanded definition of refugees who only "could have" obtained legal status in a third country, *id.* at 80,388 (to be codified as 8 C.F.R. § 208.15(a)(1), (a)(2), and (a)(3)). This explanation not only fails to cure the facial legal defect, it is also arbitrary and capricious, because it fails to provide any reasoned explanation for departing from decades of settled interpretation and from Congress's express intent.

201. The Departments' responses also fail to articulate a rational basis for the Final Rule in light of factual realities that the Departments themselves acknowledge, including that there are an estimated "16 million refugees [who] have spent five years in countries where they could not be considered firmly resettled," but would be barred under the new definition, and that the Final Rule "does not include exceptions for individuals who are victims of trafficking, lack the financial means to leave a third country, or fear persecution in the third country." 85 Fed. Reg. 80,362. The Departments' responses fail to explain how a definition of "firmly resettled" that bars such refugees can possibly comport with the INA or constitute rational policy.

202. Take for example Immigration Equality's client, Mia. Mia is an HIV-positive, transgender person from Jamaica. At 16, Mia was gang raped. When Mia told their family what had happened, Mia was accused of "being gay" as a result of the rape and thrown out of the family home.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF
                                        Case No.

Without a place to live, Mia was forced to live on the street in a storm drain with a group of homeless LGBTQ/H youth where they all were routinely harassed, threatened, and beaten by homophobic community members and by the police. Mia witnessed one of their friends being brutally stabbed to death and three others being shot. Mia discovered they were HIV-positive when they were 18 years old. On one occasion when they went to seek treatment at a clinic, Mia was viciously attacked by a group of men who shouted homophobic slurs at them. Mia was seriously injured in the attack and needed stitches on their face and leg. Four of their fingers were left permanently disfigured. Mia eventually fled Jamaica and after an arduous journey arrived at the U.S./Mexico border. At the border, Mia was given a number and forced to wait in Mexico for over three months to request asylum. In Mexico, Mia was homeless for some time and suffered further persecution (including being attacked and robbed) on account of their gender identity. Mia eventually made it to the United States and was granted asylum. Given that she resided in Mexico after she fled Jamaica, Mia's application would likely have been denied under the Final Rule.

### E. The Final Rule Unlawfully Precludes Consideration of "Particular Social Group" Claims Advanced in Motions to Reopen or Reconsider.

203. The Final Rule precludes applicants from seeking asylum based on membership in a PSG if they did not immediately raise and adequately define the boundaries of that PSG in their initial application. 85 Fed. Reg. 80,394 (to be codified as 8 C.F.R. § 1208.1(c). This change is arbitrary and capricious because it serves no rational purpose and fails to consider the wide range of real-world circumstances—many of which disproportionately affect LGBTQ/H applicants—that may prevent claimants from identifying as members of a PSG upon first applying for asylum. These changes are also contrary to law because they violate the INA and applicants' due process rights.

204. The Final Rule is drastically overbroad and fails to consider the myriad reasons an asylum applicant may not be able to articulate the basis for their membership in a PSG in their initial application, including: (1) the applicant's lack of proficiency in English; (2) the fact that the applicant is not being represented by counsel; (3) the fact that counsel was ineffective (recognized under the Final Rule only if "egregious"); (4) the fact that the applicant is a minor; (5) the stress and trauma of the

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                                    Case No.

1  applicant's experiences and of the removal proceedings themselves; or (6) changed circumstances or a

2  changed awareness of such circumstances.

3      205.    The Final Rule is arbitrary and capricious because it fails to consider and properly

4  balance these critical factors and fails to explain why the new restriction is necessitated by the reason

5  given for this and other restrictions on the analysis of PSG claims: the desire to "avoid gamesmanship

6  and piecemeal litigation." 85 Fed. Reg. 80,280. The Final Rule is much more extreme than necessary

7  to serve this efficiency goal and instead will wholly preclude many meritorious, good-faith asylum

8  claims.

9      206.    The Departments' desire to broadly preclude claims rather than simply guard against

10  gamesmanship is confirmed by the Final Rule's failure to grant any discretion for the immigration judge

11  or the BIA to consider a "waived" PSG claim later in the proceedings, even when the claimant has good

12  reason for moving for reopening or reconsidering. Furthermore, both the immigration courts and the

13  BIA already can, and do, regularly exercise discretion to deny cases in which they suspect

14  gamesmanship to be present. In the very rare instances when they reopen cases, they do so only when

15  good cause for reopening is shown. The lack of any rational explanation for this punitive and over-

16  inclusive bar, other than a generalized preference for uniformity and efficiency, renders the Final Rule

17  arbitrary and capricious.

18      207.    Moreover, the Departments fail to adequately respond to issues raised in a wide range of

19  filed comments, including comments pointing out that the harsh waiver rule will unfairly penalize many

20  LGBTQ/H claimants who are unable to raise their status in the initial application. While acknowledging

21  these comments, the Departments completely fail to grapple with them—pointing out that applicants

22  have always had to prove their membership in a PSG and defending the waiver rule merely as a

23  codification of the normal litigation rule that issues not raised are waived. 85 Fed. Reg. 80,311, 80,315,

24  80,316. These statements miss the point and ignore the realities lived by many LGBTQ/H individuals,

25  including the persecution and social stigmas they face and the fact that they may not even be aware of

26  their own status at the time of the initial application. The Final Rule is arbitrary and capricious because

27  the Departments fail to provide a reasoned basis for imposing a harsh rule robbing adjudicators of

28

COMPLAINT FOR DECLARATORY AND           Case No.
INJUNCTIVE RELIEF

ordinary discretion and to delineate a rational connection between the Final Rule and the underlying problem being addressed.

208. The Final Rule is also contrary to law because it violates the plain language of the INA. Congress explicitly acknowledged that a motion to reopen an application may be filed on the basis of changed country conditions. 8 U.S.C. § 1229a(c)(7)(C)(ii). However, the Final Rule bars claimants from demonstrating membership in PSG on appeal even when political or social changes in their home countries become known only after initial applications are denied, for example, emergence of a new government that heightens persecution of particular groups. The flat prohibition on considering such changed circumstances violates both the letter and spirit of the INA.

209. The Final Rule is also contrary to law because it denies due process rights to applicants. It is well-established that the Fifth Amendment entitles asylum seekers to due process in removal proceedings. All three factors analyzed in connection with assessing whether procedural due process has been violated—the private interest affected, the risk of deprivation of that interest, and the government interest—weigh in favor of finding that the Final Rule is unlawful: (1) asylum seekers possess strong interests in avoiding refoulement to a country where they may be persecuted or tortured; (2) the risk of erroneous deprivation of those interests is high, since there are a variety of reasons why applicants may fail to properly articulate their PSG in an initial application, as described above; and (3) the government's interests do not weigh in favor of a Final Rule that will prevent many applicants from seeking asylum as members of LGBTQ/H social groups, especially where the only government interest identified by the Departments was procedural efficiency, and the Final Rule is far more Draconian than necessary to serve that minor interest.

210. LGBTQ/H asylum seekers face a particularly high risk of erroneous deprivation because many LGBTQ/H applicants are often unwilling to identify openly as LGBTQ/H in a credible fear interview, based on their experience with past persecution in their home country, or because they are uncertain about their sexual orientation or gender identity at the time they file their application. It can take years for an LGBTQ/H person to come to terms with their identity or free themselves from the shame instilled by severe social stigma. Often the realization of identity and membership in a PSG is

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                                    Case No.

1   possible only after time spent in a non-condemning environment, in which a person has opportunities to

2   form social and romantic relationships

3       211.    The case of *Y.S. v. Gonzales*, No. 05-5242ag (2d Cir.), illustrates this challenge.[14]  Y.S.,

4   a gay Palestinian man, had filed an asylum application seeking to avoid persecution in his native country

5   because of his sexual orientation.  He was denied asylum initially because the immigration judge decided

6   Y.S. had not come out of the closet quickly enough and should have informed the court earlier of his

7   sexual orientation.  However, during his hearing, Y.S. explained: "I was in denial—right now, I'm a

8   man, gay man.  I have a lover.  I have a gay life, an open gay life . . . It wasn't easy for me.  It was really

9   hard to accept I'm gay."   The court of appeals ultimately remanded the case to the BIA for

10  reconsideration of applicant's credibility due to sexual orientation-specific concerns during the hearings

11  process.  Under the Final Rule, an asylum applicant like Y.S. would not be able to have his case reopened

12  or reconsidered.

13      212.    Take also, for example, Immigration Equality's client Jeffery.  Jeffery was a minor when

14  he and his mother applied for asylum based on alleged religious persecution in Indonesia.  Their case

15  was denied and they appealed.  When the family lived in Indonesia, Jeffery's father beat him so severely

16  because he perceived his son to be gay that Jeffery went partially deaf.  In the United States, his family

17  continued to severely mistreat him, and subjected him to an exorcism to expunge his homosexuality.  At

18  age 19, Jeffery moved to reopen his removal proceedings and asserted a new claim based on his sexual

19  orientation.  The BIA granted his motion and remanded his case for further proceedings.  Eventually,

20  Jeffery was granted asylum.

21      213.    And as noted, given the trauma and shame associated with persecution on account of

22  sexual orientation or gender identity, many LGBTQ/H refugees are unable or unwilling to immediately

23  reveal their LGBTQ/H status.  Take for example the following Immigration Equality clients:

24      •   Isis is from Honduras.  She always knew that she was a lesbian, however, due to the

25          persecution she suffered at the hands of her family and community members because of her

26  _____

27  [14] *Y.S.* proceeded under seal. Counsel from Lambda Legal Defense and Education Fund, Inc. participated as *amicus* and a copy of the *amicus brief* is publicly available at: https://www.lambdalegal.org/in-court/legal-docs/in-re-ys_us_20060831_amicus-lambda-legal.

28

COMPLAINT FOR DECLARATORY AND                    Case No.
INJUNCTIVE RELIEF

perceived sexual orientation, she was deeply closeted when she came to the United States. She also suffered from Post-Traumatic Stress Disorder because of the persecution she endured. In Honduras, Isis was well aware of how LGBTQ people were persecuted by the police. Thus, when she arrived in the United States, she was terrified to let immigration officials know about her sexual orientation. This Final Rule would penalize traumatized refugees, like Isis, who are unable to immediately disclose their sexual orientation for fear of abuse.

- Henry is an HIV-positive man from Ghana. When he was in his late teens, his older brother began to die of AIDS. It was readily apparent that his brother was very ill because he was emaciated and had developed skin lesions. Henry's family felt shame and anger at the stigma their household experienced because of his older brother's illness. One day, Henry went to his brother's bedroom to check on him and found that his family had poisoned him to death. It was the same poison they used on feral dogs. They then buried his brother that same day with no funeral, and no one discussed the death. When Henry discovered that he was also HIV-positive, he fled to the United States. He lived here for many years before he could come to terms with his HIV status. Only after extensive therapy and self-acceptance was he able to disclose his HIV status to an immigration official.

214. LGBTQ/H asylum seekers also face a grave risk of erroneous deprivation because they are particularly vulnerable to the Final Rule's bar on motions to reopen based on changed circumstances. In addition to changed circumstances in their own lives—such as commencement of gender confirmation procedures—changes in country conditions may provide a new or strengthened basis for a PSG claim. For example, the governments in Brazil and Russia have recently considered or passed legislation aimed directly at causing harm to LGBTQ individuals and depriving them of basic human rights—considerably increasing the likelihood of persecution based on membership in LGBTQ/H-related PSGs. *See, e.g.*, Human Rights Watch, *Russia: Reject Anti-LGBT 'Traditional Values' Bill*, (Aug. 6, 2020), https://www.hrw.org/news/2020/08/06/russia-reject-anti-lgbt-traditional-values-bill; Anthony Faiola & Marina Lopes, *LGBT rights threatened in Brazil under new far-right president*,

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF        Case No.

Washington Post (Feb. 18, 2019), https://www.washingtonpost.com/world/the_americas/lgbt-rights-under-attack-in-brazil-under-new-far-right-president/2019/02/17/b24e1dcc-1b28-11e9-b8e6-567190c2fd08_story.html.

215.     The Final Rule further denies due process rights to applicants by preventing them from arguing ineffective assistance of counsel.  The Final Rule explicitly prohibits applicants from raising new PSG claims in a motion to reopen even if the motion is based on their prior counsel's ineffectiveness in articulating their PSG in the first place, except in the most egregious cases of attorney misconduct, which the Final Rule describes as "rare."  85 Fed. Reg. 80,317.  But asylum seekers have a due process right to effective assistance of counsel.  Therefore, because the Final Rule forecloses relief for applicants who failed to properly articulate their PSG claim due to their counsel's ineffectiveness, the Final Rule is contrary to the Fifth Amendment.  Furthermore, the burden of proving ineffective assistance of counsel in a motion to reopen is already quite high, including the filing of a disciplinary complaint against a former attorney with the state bar having jurisdiction over the attorney.

216.     The Final Rule is especially punitive when applied retroactively to pending applications, as the applicants may have relied on the fact that a new PSG could be asserted at a later stage in the proceedings.  The failure by the Departments to consider these reliance interests renders the Final Rule arbitrary and capricious and further violates due process for these individuals who relied on the previous law in filing their initial applications.

**F.     The Final Rule Unlawfully Requires Pretermission of Certain Claims.**

217.     The Final Rule requires Immigration Courts to irrevocably "pretermit and deny" all requests for relief from deportation if the refugee fails to establish a "prima facie claim for relief" in the initial application.  85 Fed. Reg. 80,397 (to be codified as 8 C.F.R. § 1208.13(e)).  Thus, applicants who present themselves at the border seeking refuge from torture or persecution but are unable at that time to provide sufficient facts to establish a claim under United States law (which is likely unknown to them), will be summarily returned to the country from which they fled, effectively denying them any recourse.  No hearing is required, and the Immigration Court has no case-by-case discretion because it *must* deny any such application "if warranted by the record."  *Id.*  This change is contrary to law because

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

Case No.

it violates the due process rights of applicants and contravenes the plain language of the INA, which requires a hearing and opportunity for applicants to examine the evidence against them. The Final Rule is also arbitrary and capricious because there is no rational basis for it and the Departments identify no factors that support it.

218. The Final Rule will disproportionately affect LGBTQ/H people because they often do not (1) immediately identify as LGBTQ/H, (2) feel safe disclosing that they are LGBTQ/H, or (3) understand that their LGBTQ/H status (and the related persecution that they are trying to escape) provides a basis for seeking asylum. For many LGBTQ/H refugees, it is only after learning more about both themselves and our legal system that they understand they have a claim.

219. Pretermission without a hearing is contrary to law because it violates the INA, which expressly contemplates a hearing. *See* 8 U.S.C. § 1229a(b)(1)-(4) (stating, *e.g.*, "the alien shall have a reasonable opportunity to examine the evidence against the alien, to present evidence on the alien's own behalf, and to cross-examine witnesses . . . ."). Ignoring these statutory provisions, the Final Rule requires pretermission "if warranted by the record," including where the applicant "has not established a prima facie claim for relief." 85 Fed. Reg. 80,897 (to be codified as 8 C.F.R. §§ 1208.13(e)). Applicants may fail to make a prima facie claim on either legal, factual, or mixed grounds, such as by failing to carry their burden of proof with respect to the facts demonstrating their eligibility. In such circumstances, the Final Rule authorizes pretermission without a hearing, contrary to 8 U.S.C. § 1229a.

220. The Final Rule is also contrary to law because it violates due process. As with the Final Rule's bar on new PSG arguments advanced on appeal, all three factors for procedural due process weigh in favor of finding that the Final Rule is unlawful in connection with the pretermission requirement (particularly with respect to LGBTQ/H claimants): (1) asylum seekers possess strong interests in avoiding refoulement to a country where they may be persecuted or tortured; (2) the risk of erroneous deprivation of those interests is high where denial is based on facts presented in the initial application, including, *inter alia*, because many asylum seekers are unrepresented, refugees fleeing persecution are often unable to bring documentation to immediately substantiate their claims, and many

LGBTQ/H refugees do not know they have a claim at the time; and (3) the government's interests do not weigh in favor of the Final Rule and the NPRM identified no government interest to support it.

221. The Final Rule also presents a particular due process violation should it be applied retroactively to pending applications, because applicants may have already submitted relatively sparse applications in reliance on their right to supplement the record with evidence at a hearing, for example to ensure compliance with the One-Year Bar.

222. The Final Rule is also arbitrary and capricious because the only reason that the Departments give for this harsh new procedure is efficiency. 85 Fed. Reg. 80,303. However, no amount of efficiency can justify a Final Rule that denies due process or removes the right to a hearing and the opportunity to cross-examine witnesses granted by the statute. 8 U.S.C. § 1229a(b)(1)-(4) and (c)(4)(B). Violating these rights is also contrary to the spirit and purpose of the asylum statutes. The Departments' assertions that only *legally* insufficient applications will be subject to pretermission is misleading because applicants may be unable to state a prima facie case purely on *factual* grounds. 85 Fed. Reg. 80,371. The harsh and overbroad elimination of potentially meritorious claims is not rationally related to any need to limit consideration of claims that do not have a *legal* basis.

223. The new pretermission requirement will have a severe and unfair impact on refugees fleeing violence who may not be in a position to set forth a prima facie claim in their initial application. This is particularly true for LGBTQ/H claimants, who may not have sufficient understanding of their own identities—or their ability to make a claim under United States law—when they submit their initial application.

224. Thus, because the pretermission requirement violates the plain language of the INA, denies due process, and is not rationally supported or explained in the Final Rule, it is contrary to law and arbitrary and capricious.

G. **The Final Rule Impermissibly Restricts the Discretion of Adjudicators to Consider Cultural Evidence.**

225. The Final Rule is contrary to law and arbitrary and capricious because its prohibition on the consideration of "cultural stereotypes" may be read to unlawfully restrict the statutory discretion of adjudicators to consider relevant cultural evidence. This change would upend decades of established

75

asylum practice and prevent LGBTQ/H asylum seekers from corroborating their well-founded fears of persecution with indispensable cultural evidence of anti-LGBTQ/H animus.

226. The INA provides that "In determining whether the applicant has met the applicant's burden, the trier of fact may weigh the credible testimony *along with other evidence of record.*" 8 U.S.C. § 1158(b)(1)(B)(ii) (emphasis added). The statute thus clearly gives the "trier of fact" discretion to consider "other evidence of record." The INA, for example, explicitly lists Department of State country reports as a form of evidence that may be considered in making credibility determinations. 8 U.S.C. § 1158(b)(1)(B)(iii).

227. The Final Rule may be read as unlawfully restricting the trier of fact's discretion to consider cultural evidence. Under the Final Rule, "evidence . . . which promotes cultural stereotypes about a country, its inhabitants, or an alleged persecutor, including stereotypes based on . . . gender, shall not be admissible." 85 Fed. Reg. 80,386, 80,395 (to be codified as 8 C.F.R. §§ 208.1(g), 1208.1(g)). If read, as it may well be, to exclude factually accurate information about cultural attitudes, this categorical exclusion would be contrary to the plain language of the INA, which assigns to the trier of fact the discretion to consider "other evidence of record."

228. Such a reading would also render the Final Rule arbitrary and capricious because it would exclude legitimate country condition evidence. Evidence of cultural attitudes toward persecuted groups has for decades been an important part of the asylum application process, particularly where such evidence is grounded in rigorous scholarship and based on reports by the U.S. Department State, non-profit/non-governmental organizations, or reputable news organizations.

229. The Final Rule is unsupported by the only authority cited to justify its "cultural stereotype" exclusion, further confirming that it is arbitrary and capricious. Specifically, the Departments cite to *Matter of A-B-*, 27 I&N Dec. 316 (A.G. 2018), in which the Attorney General stated that "conclusory assertions of countrywide negative cultural stereotypes . . . based on an unsourced partial quotation from a news article eight years earlier, neither contribute to an analysis of the particularity requirement nor constitute appropriate evidence to support such asylum determinations."

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Case No.

1    *Id.* at 346 n.9.  This decision merely casts doubt on the quality of the particular evidence at issue in that
2    matter; it did not categorically reject the use of social or cultural evidence in all cases.

3         230.    With no further support or reasoning, the Final Rule arbitrarily mandates that
4    adjudicators disregard any evidence deemed to "promote[ ] cultural stereotypes."  However, the Final
5    Rule fails to define the term "cultural stereotypes" or explain what constitutes "evidence promoting
6    cultural stereotypes."  There is therefore a serious risk that the Final Rule's arbitrarily broad language
7    will prompt adjudicators to reject entirely legitimate evidence of social or cultural attitudes toward
8    persecuted groups, even if the evidence is derived from official country condition reports or is otherwise
9    grounded in reliable scholarship or journalism.  Moreover, there is a strong likelihood that adjudicators
10   will apply this unclear standard in confusing, unpredictable, and inconsistent ways.

11        231.    The Departments fail to adequately address comments pointing out the considerable
12   negative effect the Final Rule poses to asylum applicants seeking to use legitimate cultural evidence to
13   support their claims.  *See* Public Comment of Tahirih Justice Center, at 33-35; Public Comment of
14   Human Rights Watch, at 6-8; Public Comment of Catholic Legal Immigration Network, Inc., at 44-45;
15   85 Fed. Reg. 80,335-36.  The Departments' response to these comments relies heavily on an unfounded
16   generalization based on the fact-specific ruling in *Matter of A-B-*.  85 Fed. Reg. 80,376-77.  The
17   Departments inexplicably assert that "[t]he definition of 'cultural stereotypes' is straightforward," *id.* at
18   80,337, but still fail to offer any definition of that term, presenting a serious risk that this provision of
19   the Final Rule will be applied inconsistently and will result in the exclusion of relevant, reliable, and
20   probative cultural evidence.

21        232.    The Final Rule inflicts particular harm on LGBTQ/H asylum seekers, who frequently
22   rely on country condition evidence to demonstrate their well-founded fear of persecution.  Evidence
23   demonstrating that anti-LGBTQ/H animus is widely held in a community may be a relevant country
24   condition, but could also be seen as "promoting" the "stereotype" that persons from that country are
25   anti-LGBTQ/H.  If the Final Rule resulted in the exclusion of such evidence, that would depart
26   drastically from current practice.  However, the Departments do not even acknowledge that such
27   exclusion would represent a drastic change from current policy.  *See* 85 Fed. Reg. at 36,282 ("Finally,

28

77

COMPLAINT FOR DECLARATORY AND                                    Case No.
INJUNCTIVE RELIEF

1  the Departments propose to *make clear* that pernicious cultural stereotypes have no place in the

2  adjudication of applications for asylum and statutory withholding of removal") (emphasis added).

3  Moreover, the Final Rule does not state that it is limited to only "pernicious" cultural stereotypes.

4  233.    The Final Rule violates the INA and is contrary to law because it may be read to restrict

5  the statutory discretion of adjudicators to consider relevant cultural evidence.  Moreover, while the Final

6  Rule purports to serve the seemingly salutary purpose of excluding "pernicious cultural stereotypes," it

7  fails to define the term "cultural stereotype" or to distinguish between baseless stereotypes on the one

8  hand and well-founded country condition evidence on the other.  The Final Rule is therefore both

9  contrary to law and arbitrary and capricious.

## H.    The Final Rule Arbitrarily Modifies the Burden of Proof and Factors to Be Considered with Respect to Whether Internal Relocation Would Be Reasonable.

234.    The Final Rule reverses established policies, regulations and legal precedent regarding the reasonableness of applicants relocating within their home countries in two ways: first, by shifting the burden of proof to applicants in cases where past persecution was inflicted by private actors, and second, by abandoning well-established precedent governing reasonableness determinations and instead requiring adjudicators to consider irrelevant factors, such as size of the home country, when determining whether relocation is reasonable.  These changes create internal inconsistencies in the regulations and will lead to the unreasonable exclusion of applicants fleeing extreme violence and persecution, particularly LGBTQ/H claimants who frequently are persecuted by private actors and cannot safely locate within large countries with pervasive anti-LGBTQ/H animus.  Because the Departments fail to provide a rational basis for either of these changes, the Final Rule is arbitrary and capricious.

### i.    The Final Rule Arbitrarily Shifts the Burden of Proof to Applicants Who Have Previously Experienced Persecution by Private Actors.

235.    Under current regulations, an application for asylum or withholding-of-removal may be denied if it is established that "[t]he applicant could avoid future persecution by relocating to another part of the applicant's country of nationality . . . and under all the circumstances, it would be reasonable to expect the applicant to do so." 8 C.F.R. §§ 208.13(b)(1)(i)(B), (2)(ii), 1208.13(b)(1)(i)(B), (2)(ii)) (current) (asylum); 8 C.F.R. §§ 208.16(b)(1)(i)(B), (2), 1208.16(b)(1)(i)(B), (2) (current) (withholding

COMPLAINT FOR DECLARATORY AND                    Case No.
INJUNCTIVE RELIEF

of removal).  The Government bears the burden of proving that internal relocation would be reasonable if the applicant suffered past persecution *or* if a claimant faces future government-sponsored persecution.  8 C.F.R. §§ 208.13(b)(1)(ii), (3)(ii), 208.16(b)(1)(ii), (3)(ii), 1208.13(b)(1)(ii), (3)(ii), 1208.16(b)(1)(ii), (3)(ii) (current).  The applicant bears the burden of proof only if the applicant both did not suffer past persecution *and* now fears persecution from private actors.  *See* 8 C.F.R. §§ 208.13(b)(3)(i), 208.16(b)(3)(i), 1208.13(b)(3)(i), 1208.16(b)(3)(i) (current).

236.    The Final Rule shifts the burden of proof to claimants in situations involving past persecution by private actors.  This has the effect of rendering it irrelevant whether or not the applicant suffered past persecution—the only factor affecting burden of proof is whether past or current persecutors are governmental or private.  This change is irrational, not adequately explained, and creates a number of unnecessary problems.

237.    First, the revised standard creates internal inconsistencies within the Departments' own regulations.  The Final Rule leaves unchanged language providing that "in cases in which an applicant has demonstrated past persecution . . . the *Service* shall bear the burden" of proving the reasonableness of relocation, 8 C.F.R. § 208.13(b)(1)(ii) (proposed) (emphasis added), but then adds directly contradictory language in subsection (b)(3)(iii) placing the burden on the *applicant* where persecution is inflicted by private actors, even where there has been past persecution.  Thus, under the Final Rule, if an applicant has suffered past persecution at the hands of a private actor, the burden of proof confusingly rests on *both* the Government and the applicant.  The Final Rule contains no language indicating which provision takes precedence, rendering it impossible for adjudicators to comply with all provisions, and ensuring inconsistent applications of these rules.

238.    Second, even assuming that the new burden-shifting language controls, the Final Rule fails because it renders obsolete entire paragraphs of regulatory text related to the prior rule that, in cases of past persecution, the Government bears the burden of showing that relocation would be reasonable, including proposed 8 C.F.R. §§ 208.13(b)(1)(i)(B), (3)(i), 208.16(b)(1)(i)(B), (3)(i), 1208.13(b)(1)(i)(B), (3)(i), and 1208.16(b)(1)(i)(B), (3)(i).  It is arbitrary and capricious to promulgate, without adequate explanation, regulations that render other regulations (not being rescinded) superfluous.

239.     Further, the Final Rule provides no rational basis for abandoning the long-settled policy putting the burden on the Government to prove the reasonableness of internal relocation where a claimant has demonstrated past persecution.  The Departments fail to clarify or explain the internal inconsistencies created by the Final Rule.  The Departments' sole justification for shifting the burden of proof is that a "private individual or organization would not ordinarily . . . be expected to have nationwide influence."  85 Fed. Reg. at 80,340.  The Departments cite no support for this proposition, which directly contradicts the Departments' own regular assertion that private organizations have cross-border influence.  *See* Tahirih Justice Center Comment at 41.   Because the Departments' explanation runs counter to the evidence before the agency, it renders the change arbitrary and capricious.

240.     The shift of burden under the Final Rule will have a particularly negative impact on LGBTQ/H claimants, who are frequently persecuted by private actors and may have difficulty proving that they will not be safe in other parts of their country—especially since the Final Rule also may be read as excluding crucial country condition information establishing pervasive cultural hostility to LGBTQ/H individuals, as discussed with respect to the inadmissibility of so-called "cultural stereotype" evidence.   Absent any rational explanation, heightening an applicant's burden of proof while simultaneously restricting the type of evidence an applicant can provide to satisfy such burden is inherently arbitrary and capricious.

### ii. The Final Rule Requires Adjudicators to Consider Irrelevant Factors When Determining Whether Internal Relocation is Reasonable.

241.     The Final Rule is further arbitrary and capricious in directing adjudicators to abandon the factors set forth in current regulations in favor of new, irrelevant considerations such as (i) the applicant's demonstrated ability to relocate to the United States and (ii) the size of the applicant's home country.  Neither of these factors have any significance in establishing whether internal relocation within the applicant's home country is reasonable.

242.     An applicant's "demonstrated ability to relocate to the United States" has no logical relationship to their ability to relocate internally within their home country.  Internal relocation has to do with whether applicants will be safe elsewhere in their home countries, not their physical ability to travel.  And since asylum applicants are by definition refugees who have escaped their home countries

80

1   and traveled to the United States in order to file for asylum, this factor is meaningless in distinguishing

2   between those applicants who can and cannot safely relocate, and in fact just amounts to a built-in strike

3   against every applicant being evaluated under this rule.

4        243.    Similarly, the size of applicants' home countries does not relate to their ability to safely

5   relocate, particularly where persecution is state-sponsored.  The presumption apparently created by the

6   Final Rule that claimants may more safely relocate in large countries will be especially harmful for

7   LGBTQ/H applicants, as some of the worst violence, discrimination, and animus towards LGBTQ/H

8   individuals occur in large countries.  For example, Mexico, Russia, and Nigeria are all large, multi-

9   ethnic countries with populations in excess of 100,000,000—and are all confirmed by the U.S.

10  Department of State to have widespread anti-LGBTQ/H discrimination and violence.

11       244.    The Final Rule contains no explanation as to why either of these factors rationally should

12  weigh in favor of a finding that a claimant may safely relocate, nor any response to comments pointing

13  out the negative impact of these changes.

14       245.    Further, without justification, the Final Rule upends current regulation and precedent

15  governing the reasonableness determination.  These Rules consider the potential harm, both persecutory

16  and otherwise, that relocation might inflict upon an applicant.  Under current regulations, in order to

17  determine whether internal relocation is reasonable for a particular applicant, adjudicators must consider

18  a variety of factors that take into account the overall context of the applicant's safety and ability to

19  relocate including factors that may not be related to the applicant's asylum claim.  Namely, adjudicators

20  must consider factors such as, "whether the applicant would face other serious harm in the place of

21  suggested relocation; any ongoing civil strife within the country; administrative, economic, or judicial

22  infrastructure; geographical limitations; and social and cultural constraints, such as age, gender, health,

23  and social and familial ties." 8 C.F.R. §§ 208.13(b)(1)(ii), (3), 1208.13(b)(1)(ii), (3); 8 C.F.R. §§

24  208.16(b)(1)(ii), (3), 1208.16(b)(i)(ii), (3) (current).   The Departments found such considerations

25  "unhelpful" and specifically found "administrative, economic, or judicial infrastructure" and

26  "geographic limitations" irrelevant to the reasonableness of relocation.  85 Fed. Reg. 36,282.  However,

27  the Departments fail to explain why administrative, economic, and judicial infrastructure is irrelevant to

28

COMPLAINT FOR DECLARATORY AND         Case No.
INJUNCTIVE RELIEF

survivors of persecution who have limited means to safely relocate. Moreover, the Departments fail to point to any examples or cases where courts or the BIA have held the regulatory text setting forth these factors to be irrelevant or unhelpful. In short, the Departments fail to provide any legitimate rationale for rejecting the current reasonableness analysis.

246.   As such, the Final Rule's changes to the "safe relocation" rule are irrational, arbitrary, and capricious, both in raising the burden of proof for claimants who have experienced past persecution by private actors and by departing from established precedent and requiring adjudicators to consider factors irrelevant to claimants' ability to relocate safely within their home countries.

### I.   The Final Rule Impermissibly Limits Relief Under the Convention Against Torture.

247.   The United States entered into the United Nations CAT (Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment) on December 10, 1984, joining 169 other countries in committing that no person should be returned to a country where they will face likely torture. The Final Rule unlawfully limits relief under CAT on two grounds: by narrowing the definition of official acts of torture in ways inconsistent with the treaty, and by establishing a nearly impossible standard for finding that an official acquiesced to torture. The Final Rule is therefore contrary to the plain language of CAT and the United States laws implementing it. The Final Rule is also arbitrary and capricious because the Attorney General admits that these changes do nothing to clarify the existing regulations, despite clarification being the purported reason for the change, and therefore there is no rational connection between the Final Rule's changes and any factor enumerated in the NPRM. Additionally, the Final Rule is an unjustified departure from the longstanding contrary interpretation of CAT.

248.   Article 3 of CAT prohibits countries from expelling or returning any person to a foreign state where there are substantial grounds to believe that person would be in danger of being tortured. U.N. Human Rights, Office of the High Commission, *Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (*Dec. 10, 1984), https://www.ohchr.org/en/professionalinterest/pages/cat.aspx. Congress embraced CAT, declaring that "it shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a

COMPLAINT FOR DECLARATORY AND                    Case No.
INJUNCTIVE RELIEF

country in which there are substantial grounds for believing that the person would be in danger of being subjected to torture" and directing "the appropriate agencies" to "prescribe regulations to implement the obligations of the United States under Article 3 of [CAT]." Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, Div. G, Title XXII, § 2242(a), (b), 112 Stat. 2681-822 (1998) (codified as a note to 8 U.S.C. § 1231 (1999)).

249. Rather than clarify the United States' obligations under CAT, as it purports to do, the Final Rule will improperly deny relief to the vast majority of CAT claimants. The Final Rule's changes to the regulations implementing CAT will inflict particularly grave harm on LGBTQ/H refugees, as many countries have "high rates of impunity" when police commit violence against LGBTQ/H people, "even when this violence occurs outside of an official's job description." Public Comment of Williams Institute ( July 15, 2020), at 15.

250. CAT and the U.S. regulations implementing it contain nearly identical definitions of torture, both requiring, in the disjunctive, that torture be "inflicted by or at the instigation of or with the consent or acquiescence of *a public official or other person acting in an official capacity*." *See* Article 1(1) of CAT (emphasis added). Under both definitions, torture that triggers Article 3 protection may be committed by *either* a "public official" *or* someone who is not a public official but who is "acting in an official capacity." *Barajas-Romero v. Lynch*, 846 F.3d 351, 361 (9th Cir. 2017). Individuals may also obtain Article 3 protection by showing the danger of a public official acquiescing in their torture by another.

#### i. The Final Rule Unlawfully Excludes Acts of Torture by Officials Not Acting "Under Color of Law"

251. The Final Rule unlawfully excludes from the definition of torture all pain and suffering inflicted by a public official who is "not acting under color of law" by requiring that torturers be *both* "public officials" *and* "person[s] acting in an official capacity." The Final Rule is contrary to the plain language of CAT, which uses the disjunctive word "or" to include acts that were committed by either a public official *or* another person acting in an official capacity. The Final Rule is also contrary to the United States law directing agencies to implement regulations ensuring the United States complies with Article 3 (as written, in the disjunctive).

83

252.     The Final Rule is also arbitrary and capricious because it applies a vague, unworkable, and incorrect standard for "acting under color of law," and there is no rational basis for adding this language in the Final Rule that can be tied to any factor listed in the NPRM or responses to comments.

253.     The Final Rule does not define "acting under color of law," and confusion over how to define it exposes the fundamental flaw and arbitrariness of the Final Rule.  No country officially sanctions torture.  Torture is often carried out by public or law enforcement officers without official direction from a state, even if it constitutes a de facto policy of the state or if it is the torturers' official status that enables them to carry out the mistreatment.  While it would be possible to read "under color of law" as including such de facto sanctioned torture, the Final Rule embraces a broader definition that excludes from CAT protection anyone tortured by an official acting without express government direction.  *See* 85 Fed. Reg. 80,368. (explaining that torture by someone not acting in official capacity will not be subject to CAT protection: "the actions of such an official are not a basis for CAT protection because the individual is not acting in an official capacity").

254.     This will dramatically contract the application of CAT to exclude, among other things, a type of torture often inflicted, in particular, on LGBTQ/H people: assaults by police or military personnel not resulting in formal arrests or legal process.  By creating a broad exception to CAT that sharply narrows its protections in a manner inconsistent with its plain language and purpose, the Final Rule is arbitrary and capricious and contrary to law.  And because the Final Rule departs from years of agency policy and interpretation (which adopted the disjunctive "or" language of CAT), a greater degree of scrutiny is required when reviewing this departure.

255.     The Final Rule does not attempt to explain why it ignores the disjunctive *or* used in the CAT to now require that torturers be *both* "public officials" *and* "person[s] acting in an official capacity."  Instead, the Final Rule claims to be merely clarifying what "'acting in an official capacity' means."  85 Fed. Reg. 80,368.  By not even acknowledging that requiring "public officials" to also be "acting in their official capacity" is a major change in interpretation, the Departments fail to establish that the Final Rule is the result of rational decision making.  For this reason as well, the Final Rule is arbitrary and capricious under the APA.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

Case No.

### ii. The Final Rule Adopts an Unworkably Narrow Definition of Acquiescence.

256. The Final Rule also changes the definition of torture by heightening the standard for showing that a public official acquiesced in the torturous acts of another. This was previously broadly defined as "prior to the activity constituting torture, [the public official] hav[ing] awareness of such activity and thereafter breach[ing] his or her legal responsibility to intervene to prevent such activity." 8 C.F.R. § 208.18(a)(7) (existing regulation); 85 Fed. Reg. 36,286-87 (NPRM discussing proposed changes).

257. The Final Rule sharply narrows the definition by adding the following exceptions, which threaten to swallow the rule:

> Such awareness requires a finding of either actual knowledge or willful blindness. Willful blindness means that the public official acting in an official capacity or other person acting in an official capacity was aware of a high probability of activity constituting torture and deliberately avoided learning the truth; it is not enough that such public official acting in an official capacity or other person acting in an official capacity was mistaken, recklessly disregarded the truth, or negligently failed to inquire. In order for a public official to breach his or her legal responsibility to intervene to prevent activity constituting torture, the official must have been charged with preventing the activity as part of his or her duties and have failed to intervene. No person will be deemed to have breached a legal responsibility to intervene if such person is unable to intervene, or if the person intervenes but is unable to prevent the activity that constitutes torture.

85 Fed. Reg. 80,389 (to be codified as 8 C.F.R. § 208.18(a)(7)).

258. These changes require applicants who seek to avoid returning to a country where the government acquiesced in their torture to show specific evidence regarding a public official's subjective state of mind and level of intention; their awareness of the "probability" of the claimant's torture; and the official's actions, inactions, abilities, and efforts to intervene in preventing the torture. Such evidence will rarely, if ever, be available to one who has fled torture in their own country. Torture is committed by those in power, and those subjected to it almost always lack the power to gather evidence regarding a public official's subjective state of mind (especially to the level of detail required to prove willfulness or the absence of a mistake) or gather evidence regarding the official's duties, inactions, abilities, or efforts. Such evidence is almost never available.

259. By requiring proof of matters that virtually no claimant will have access to, the Final Rule violates the language and purpose of CAT and Congress' implementing legislation, 8 U.S.C. §

85

1231 (1999), which require only substantial grounds for believing that an individual is in danger of being tortured, and further require taking into account all relevant considerations when making that determination.  CAT art. 3(2).

260.    The Final Rule offers no rational reason for so drastically increasing the factual burden to show acquiescence, which the NPRM had linked to a concern for giving public officials "due process notice of what conduct was criminal," 85 Fed. Reg. 36,287; and the Final Rule continues to link to the need to prove "both an actus reus and a mens rea," 80,369. However, the United States' obligations under Article 3 of CAT have nothing to do with the prosecution or punishment of torturers, and thus the importation of criminal law concepts and the supposed due process rights of alleged torturers are irrelevant.  The focus under CAT is exclusively on the victims, rather than the perpetrators, of torture.

261.    The Final Rule also sidesteps the question of how victims fleeing torture by public officials in their home countries could possibly obtain evidence to prove that the torturer either (1) had the requisite specific mens rea or (2) was officially "charged with preventing the activity as part of his or her duties."  The Departments merely state that applicants previously had the burden of proof to make the more general showing of awareness and legal responsibility, and then state without support that the Departments "believe" that the much more specific information required by the Final Rule "would be known by the alien, who could at least provide evidence in the form of his or her personal testimony." 85 Fed. Reg. 80,369.  The assumption that torture victims would have access to such information is arbitrary and capricious because it (1) runs counter to the evidence before the agency, and (2) is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.  This proposition is simply ludicrous.

262.    Together, the elimination of CAT relief for torture not officially sanctioned under color of law and an impossibly high standard of proof for acquiescence will preclude the vast majority of claims for CAT relief.  And this impact will fall particularly harshly on LGBTQ/H survivors of torture, who are often subject to torture that is unofficial in nature or perpetrated by private actors with government acquiescence.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                                   Case No.

263.    For example, as recently as April 2020, the Inter-American Court of Human Rights found the state of Peru responsible for acts of torture against Azul Rojas Marín, a transgender woman who at the time identified as a gay man, and who was "forcibly stripped naked, beaten on several occasions, tortured, [and] raped" with a truncheon by three officers while in police custody.  Article, *Azul Rojas Marín: Peru found responsible for torture of LGBT person*, BBC News (Apr. 7, 2020), https://www.bbc.com/news/world-latin-america-52204222.  Under the Final Rule, such actions by police may not trigger protection as official acts of torture under Article 3 of CAT because adjudicators may likely claim that the police were acting outside of their official duties, even though it is their official status that enables them to carry out the persecution.

264.    The Final Rule thus creates insurmountable obstacles for Plaintiffs' CAT clients, as many LGBTQ/H people who have been granted relief under CAT likely would not meet the new standard despite having meritorious claims.  The following Immigration Equality clients illustrate this point:

- Sergio is a gay man from Cuba.  The Cuban police frequently detain LGBTQ people solely because of their LGBTQ status.  Typically, the person is not charged with or accused of any crimes.  The only purpose of these detentions is to abuse LGBTQ individuals.  Sergio was subjected to such detentions on multiple occasions.  During one of the detentions, the Cuban police sexually assaulted Sergio.  He was released shortly after.  He was never charged with any crime or presented with any documents explaining the reason for his detention.  It appears that the Final Rule would make Sergio ineligible for CAT relief.

- Miremba is a lesbian from Uganda.  In Uganda, Miremba was arrested for being a lesbian and raped by the police twice while she was in custody.  Miremba was able to escape from prison and flee to the United States.  It would not be possible for Miremba to obtain the proof required by the Final Rule.  Therefore, she would be disqualified from CAT relief, despite being tortured by the Ugandan police.

- Jaffar is a gay man from Uganda who suffered horrific torture at the hands of the police.  The police came to his house, arrested him and his partner, and imprisoned them naked.  In prison, Jaffar was forced to have sex with his partner in front of the other detained individuals and

COMPLAINT FOR DECLARATORY AND                          Case No.
INJUNCTIVE RELIEF

in front of the police, and the police poured urine on him. He was then taken to a different cell where he was repeatedly injected with some unknown drugs. Jaffar spent four months in this cell, where he was constantly beaten, without ever seeing a judge. Several years later, Jaffar was arrested again and was sexually assaulted by the police and tortured. Under the Final Rule, in order to qualify for CAT relief, Jaffar would have to prove that the officer was acting under the "color of law," which likely would be an impossible task under the circumstances.

265. Many of the Community Services Plaintiffs' members have experienced similar violence at the hands of public officials, who under the Final Rule would be unable to obtain CAT relief. For example, at the age of 15, Ms. Salcedo, member and co-founder of the Coalition, was detained by police in Guadalajara, Mexico who then took her outside of Guadalajara, held her down as they cut her hair, and then proceeded to beat her and rape her. Ms. Salcedo also suffered similar experiences at the hands of Mexican police in other parts of Mexico. The same holds true for Ms. Lint, an individual member of the Coalition. Once, when she was leaving a nightclub in Peru, a policeman stopped her and took her to a parking lot far away on the beach. The policeman put a gun to Ms. Lint's head and sexually abused her, leaving her on the beach. These are plainly acts of torture perpetuated by police empowered by their official status, yet may be excluded under the Final Rule as grounds for relief.

## J. The Final Rule Unfairly Diminishes Confidentiality Protections for Asylum-Seekers.

266. The Final Rule impermissibly dismantles confidentiality protections for the sensitive, personal, and often dangerous information that refugees must disclose in applications for admission, asylum, withholding of removal, or protection from torture. The Final Rule allows the Government to disclose any of this information to any person, so long as the disclosure relates to *any* law enforcement investigation or proceeding. This change is arbitrary and capricious because it is based on general law enforcement objectives, a factor Congress did not intend the Departments to consider under the asylum statutes.

267. The elimination of confidentiality protections will cause significant harm. Not only will this change discourage many individuals from seeking protection under the law, but it also will force

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

Case No.

those who do apply to choose between omitting critical information from their application or risking having it used against them or their loved ones. Worse, many applicants will face a heightened risk of persecution and retaliation when the disclosed details of their applications become known to their prior governments or to individuals, whether in the United States or abroad, who know them or their family members.

268. This impact will be particularly devastating for LGBTQ/H refugees, whose claims often require them to disclose deeply personal and private facts—including, for example, their sexual orientation, gender identity, HIV status, or accounts of sexual abuse and persecution.

269. Specifically, the Final Rule expands the circumstances in which the contents of an asylum application and records relating to the application may be disclosed. The Final Rule permits disclosure of any such information:

> (i) As part of an investigation or adjudication of the merits of . . . any . . . application under the immigration laws,
>
> (ii) As part of any State or Federal criminal investigation, proceeding, or prosecution; [ . . . ]
>
> (v) As part of any proceeding arising under the immigration laws, including proceedings arising under the Act; and
>
> (vi) As part of the Government's defense of any legal action relating to the alien's immigration or custody status including petitions for review filed in accordance with 8 U.S.C. 1252.

85 Fed. Reg. 80386-87, 80,395-96 (to be codified as 8 C.F.R. §§ 208.6(d)(1), 1208.6(d)(1)). There is no limit as to whom the information may be disclosed to, so long as it is disclosed in connection with the circumstances described above. Prior to the Final Rule, most such information remained confidential.

270. Thus, by its terms, the elimination of confidentiality in the Final Rule is designed to support generalized law enforcement purposes. But in crafting United States asylum law, Congress did not intend for the Departments to consider immigration enforcement, let alone generalized state or federal law enforcement. Rather, the purpose of the asylum statutes is to give refugees safe harbor from persecution and comply with the United States' international humanitarian obligations.

89

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    Case No.

271. The Final Rule acknowledges comments identifying the "grave risk of harm" and increased violence that LGBTQ individuals would face if their private information became public, 85 Fed. Reg. 80,369, and gives lip service to "the need to protect asylum seekers, as well as their relatives and associates in their home countries, by preventing the disclosure of information contained in or pertaining to their applications." But the Departments fail to rationally justify the extent to which the Final Rule grossly exacerbates the risk of such harm.

272. The Departments' response to comments focus on the perceived need to assure that "fraudulent" asylum claims and other unlawful behavior are not "needlessly protected," 85 Fed. Reg. 80,369, and suggests that the new disclosure provisions are "limited to specific circumstances in which the disclosure of such information is necessary and the need for disclosure outweighs countervailing concerns," 85 Fed. Reg. 80,370. But the text of the Final Rule itself contains no such balancing or mitigating language—rather, it imposes a new, wholesale waiver of confidentiality as necessary to serve general law enforcement goals. The Final Rule is arbitrary and capricious because it disregards the "grave risk of harm" that it admits the new disclosures may cause and offers an explanation for the rule inconsistent with the real-world effect of the rule itself.

273. The Final Rule is also arbitrary and capricious because it elevates general law enforcement considerations over the humanitarian objectives of the asylum statutes contrary to congressional intent—and does so in a manner that will chill and discourage otherwise eligible applicants from seeking protection.

274. There can be no doubt that even under the prior confidentiality protections, applicants have been subject to heightened danger and harm as a result of the details of their asylum claims becoming known to individuals in their home countries. The Final Rule would greatly exacerbate those harms.

275. Applicants are also likely to be subject to harm within the United States as a result of the details of their application becoming known.

276. LGBTQ applicants are especially harmed by this change because the information that forms the basis for their application including potential persecution on account of their gender identity

90

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

Case No.

or sexual orientation, which must be disclosed in the application, is the same information that could harm them or their families if it were disclosed outside of the confidential asylum process. For example, Immigration Equality had a client from a former Soviet state who refused to disclose the name of the high-ranking government intelligence official who had kidnapped him and held him as a sex slave because even the smallest possibility of that information being leaked was so disturbing to the client that he preferred to risk a potential denial of his claim over the risk that his persecutor might learn of the disclosure. In addition, many Immigration Equality clients have been outed on social media by friends and family who discovered the contents of their applications for asylum. That exposure has often resulted in threats of physical violence, and sometimes, in death threats.

277. The Final Rule is also especially harmful and unfair to the extent it is applied retroactively to pending applicants, who filed their claims with an expectation that the information could be disclosed only under the more limited circumstances provided under current regulations. Pending LGBTQ/H applicants may be unexpectedly and cruelly "outed" as a result of this sudden change in the disclosure policy—exposing them to a grave risk of harm.

## III. The Final Rule Is Invalid Because Wolf Is Not Lawfully Serving as Acting Secretary of Homeland Security.

278. The Final Rule is invalid because Defendant Wolf is not lawfully serving as Acting Secretary of Homeland Security and, therefore, lacked the authority to cause it to be promulgated. Wolf is the Department's Under Secretary for Strategy, Policy, and Plans. He was not confirmed by the Senate to the position of Secretary, and his claim to the title of Acting Secretary is invalid as a matter of law. Specifically, Wolf's appointment was not valid under either of the potentially applicable statutes: the FVRA and HAS.

279. Under the APA, the Court shall hold unlawful any agency action made "in excess of statutory jurisdiction, authority, or limitations" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(C), (D). Here, Wolf lacked authority to cause the DHS to promulgate the Final Rule. Accordingly, all provisions of the Final Rule that purport to amend Chapter I (Parts 208 and 235) of Part 8 of the Code of Federal Regulations (the "DHS Regulations") must be set aside and vacated under the APA.

---

91

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Case No.

280.    Furthermore, the provisions of the Final Rule that purport to amend Chapter V (Parts 1003, 1208, 1235, and 1244) of Part 8 of the Code of Federal Regulations (the "DOJ Regulations") are non-severable from, and would be arbitrary and capricious without, the DHS Regulations.  Accordingly, the DOJ Regulations, and thus the Final Rule in its entirety, must be set aside and vacated.

281.    The Appointments Clause of the United States Constitution provides that "Officers of the United States" shall be nominated by the President and appointed with the "Advice and Consent of the Senate."  U.S. Const. art. II, § 2, cl. 2.  An office for which presidential appointment and Senate confirmation are required is referred to as a "PAS Office."

282.    The FVRA establishes a framework for the appointment of temporary, acting officials when a vacancy occurs in a PAS Office.  "Congress enacted the FVRA to protect the Senate's Advice and Consent power and to prevent the President from engaging in . . . evasive temporary appointment practices . . . ." *See Bullock v. U.S. Bureau of Land Mgmt.*, --- F.Supp.3d ---, No. 4:20-cv-00062-BMM, 2020 WL 574836, at *7 (D. Mt. Sept. 25, 2020).  Under the FVRA, "[i]f an officer of an Executive agency . . . dies, resigns, or is otherwise unable to perform the functions and duties of the office," then the "President (and only the President) may direct" certain officers "to perform the functions and duties of the vacant office temporarily in an acting capacity." 5 U.S.C. § 3345(a)(2)-(3).  If the President does not appoint someone to fill the vacancy, then, by default, the "first assistant" to the office in which the vacancy arose" shall perform the functions and duties of the office temporarily in an acting capacity." *Id.* § 3345(a)(1).  The period of time in which an acting official may serve under the FVRA is generally 210 days after the vacancy arose, but "the person serving as an acting officer as described under section 3345 may serve in the office . . . once a . . . nomination for the office is submitted to the Senate, from the date of such nomination for the period that the nomination is pending[.] *Id.* § 3346(a).  Importantly, the FVRA states that it is the "exclusive means for temporarily authorizing an acting official to perform the functions and duties." *Id.* § 3347(a).  However, this exclusivity provision does not apply if "a statutory provision expressly-- (A) authorizes the President, a court, or the head of an Executive department to designate an officer or employee to perform the functions and duties of [the] specified office temporarily in an acting capacity; or (B) designates an officer or employee to perform the

COMPLAINT FOR DECLARATORY AND                        Case No.
INJUNCTIVE RELIEF

functions and duties of [the] specified office temporarily in an acting capacity[.]" *Id.* § 3347(a)(1)(A)-(B).

283. Congress enacted the HSA in 2002. Under the HSA, the Deputy Secretary of Homeland Security is designated "the Secretary's first assistance for purposes of the [FVRA]," and is therefore the default successor to the Secretary under the FVRA. *See* 6 U.S.C. § 113(a)(1)(A). On December 23, 2016, Congress amended the HSA to designate further acting successors in the event of a vacancy in the office of Secretary of Homeland Security. *See* Pub. L. 114-328, Div. A, Title XIX, § 1903(a), 130 Stat. 2665, 2672 (Dec. 23, 2016). First, consistent with EO 13753 and the then-existing DHS Orders of Succession, the HSA was amended to designate the Under Secretary for Management as the "Acting Secretary" if the Secretary and Deputy Secretary were both unavailable. 6 U.S.C. § 113(g)(1). Second, Congress enacted 6 U.S.C. § 113(g)(2), which provides that, "[n]otwithstanding [the FVRA], the Secretary may designate such other officers of the Department in further order of succession to serve as Acting Secretary."

284. At least four District Courts have already held that Wolf is (or is likely) not lawfully serving as the Acting Secretary of Homeland Security and on that basis vacated or preliminarily enjoined actions taken under his unlawful tenure. *See Immigrant Legal Res. Ctr. v. Wolf*, --- F. Supp. 3d ---, Case No. 20-cv-05883-JSW, 2020 WL 5798269 (N.D. Cal. Sept. 29, 2020); *Batalla Vidal v. Wolf*, --- F. Supp. 3d ---, 16-CV-4756 (NGG) (VMS), 17-CV-5228 (NGG) (RER), 2020 WL 6695076 (E.D.N.Y. Nov. 14, 2020), *vacatur granted*, 2020 WL 7121849 (E.D.N.Y. Dec. 4, 2020); *Nw. Immigrant Rights Project v. United States Citizenship and Immigration Services*, Civil Action No. 19-3283 (RDM), 2020 WL 5995206 (D.D.C. Oct. 8, 2020); *Casa de Maryland, Inc. v. Wolf*, --- F. Supp. 3d ---, Civil Action No. 8:20-cv-02118-PX, 2020 WL 5500165 (D. Md. Sept. 11, 2020).

285. The U.S. Government Accountability Office similarly concluded that Wolf has not properly been elevated to the role of Acting Secretary. *See* U.S. Government Accountability Office, *Matter of: Department of Homeland Security—Legality of Service of Acting Secretary of Homeland Security and Service of Senior Official Performing the Duties of Deputy Secretary of Homeland Security*, File No. B-331650 (Aug. 14, 2020) https://www.gao.gov/assets/710/708830.pdf [hereinafter "GAO

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    Case No.

1  Opinion"] (concluding that "Wolf [was] named to [his] position[] of Acting Secretary . . . by reference

2  to an invalid order of succession"), *reconsideration denied*, File No. B-332451 (Aug. 21, 2020),

3  https://www.gao.gov/assets/710/708944.pdf.

4      286.    When Wolf promulgated the Final Rule on behalf of DHS, he had no authority to serve

5  as Acting Secretary under the FVRA.  Subject to exceptions not relevant here, "a person may not serve

6  as an acting officer for an office" under the FVRA if such person "did not serve in the position of first

7  assistant to the office"—which, in the case of the Secretary of Homeland Security, is the Deputy

8  Secretary—and "the President submits a nomination of such person to the Senate for appointment to

9  such office."  5 U.S.C. § 3345(b)(1); *see* 6 U.S.C. § 113(a)(1)(A).  Wolf has never served as Deputy

10 Secretary, and President Trump nominated him to serve as Secretary of Homeland Security on

11 September 10, 2020.  Thus, Wolf is ineligible to serve as Acting Secretary under the FVRA.  *See Nw.*

12 *Immigrant Rights Project*, 2020 WL 5995206, at *15 n.2 ("The President could not have directly

13 designated Wolf to serve as the Acting Secretary pursuant to the FVRA . . . .").

14     287.    For multiple reasons, Wolf also lacks authority to serve as Acting Secretary under the

15 HSA.  The HSA provides that "the Secretary may designate such other officers of the Department in

16 further order of succession to serve as Acting Secretary."  6 U.S.C. § 113(g)(2).  Wolf was purportedly

17 elevated to the role of Acting Secretary under a November 8, 2019 order of succession issued by Kevin

18 McAleenan, the former Commissioner of U.S. Customs and Border Protection, who was himself

19 purportedly elevated to the role of Acting Secretary under an April 9, 2019 order of succession issued

20 by then-Secretary Kirstjen Nielsen.  However, the order of succession issued by Secretary Nielsen could

21 have delegated authority to Commissioner McAleenan only in the event of a disaster or catastrophic

22 emergency.  In the event of the Secretary's resignation, the order of succession was governed by

23 Executive Order 13,753 (Dec. 9, 2016), under which the proper individual to succeed Nielsen was

24 Christopher Krebs, the Senate-confirmed Director of the Cybersecurity and Infrastructure Security

25 Agency, not Commissioner McAleenan.

26

27

28

COMPLAINT FOR DECLARATORY AND                    Case No.
INJUNCTIVE RELIEF

288.   Wolf lacks authority to serve as Acting Secretary of Homeland Security for the additional reason that, as an *acting* Secretary, McAleenan did not have authority to issue orders of succession under 6 U.S.C. § 113(g)(2).

289.   On November 14, 2020, after the GAO and several courts had already determined that Wolf was acting without authority, Defendant Gaynor purported to use any authority he had as Acting Secretary of Homeland Security to issue an order of succession allowing Wolf to become Acting Secretary.  This order, too, was plagued by statutory and constitutional infirmities.  Specifically, as Acting Secretary, Gaynor could not have issued an order of succession under § 113(g)(2).  Furthermore, Administrator Gaynor's order conflicted with a governing presidential Executive Order. Finally, Gaynor had not validly assumed the role of Acting Secretary, as confirmed by the Department's failure to give notice of his designation as Acting Secretary under 5 U.S.C. § 3349.

## A.   EO 13753 and the DHS Orders of Succession.

290.   On December 9, 2016, pursuant to his authority to appoint successors under the FVRA, 5 U.S.C. § 3345(a), President Obama issued Executive Order 13753, 81 Fed. Reg. 90,667 (Dec. 9, 2016) ("EO 13,753"), which established an order of succession in the event the Secretary of Homeland Security "has died, resigned, or otherwise become unable to perform the functions and duties of the office of Secretary."  The first four individuals named in the line of succession were (i) the Deputy Secretary of Homeland Security; (ii) the Under Secretary for Management; (iii) the Administrator of the Federal Emergency Management Agency ("FEMA Administrator"); and (iv) the Under Secretary for National Protection and Programs, a position that was later renamed Director of the Cybersecurity and Infrastructure Agency ("CISA Director").

291.   On December 15, 2016, then-Secretary of Homeland Security Jeh Johnson implemented EO 13,753 by issuing Revision No. 8 to DHS Delegation No. 00106, titled "DHS Orders of Succession and Delegations of Authorities for Named Positions" (the "DHS Orders of Succession"). *Batalla Vidal*, 2020 WL 6995076, at *2. The DHS Orders of Succession took a bifurcated approach depending on the circumstances that caused the Secretary's vacancy.  Section II(A) provides:  "In case of the Secretary's death, resignation, or inability to perform the functions of the Office, the orderly succession of officials

95

is governed by Executive Order 13753, amended on December 9, 2016." *Id.* at *8. Section II(B), in turn, applies "in the event [the Secretary] is unavailable to act during a disaster or catastrophic emergency" and provides that the order of succession would be governed by an Annex A attached to the order. *Id.* At the time, Annex A provided an order of succession identical to that of EO 13,753.

292.    On February 15, 2019, Secretary Kirstjen Nielsen further amended the DHS Orders of Succession, but the language in sections II(A) and II(B) and the line of succession set out in Annex A were not changed. *Id.* at *2.

293.    Subsequently, in a letter to President Trump, Secretary Nielsen resigned "effective April 7, 2019." *Id.* at *3. In a tweet that day, President Trump announced that Kevin McAleenan, the Commissioner of U.S. Customs and Border Protection ("CPB Commissioner") would become the Acting Secretary of Homeland Security.   *Id.* At that time, the position of CPB Commissioner was seventh in the line of succession in the event of the Secretary's resignation under section II(A) of the DHS Orders of Succession, since the CPB Commissioner was seventh under EO 13,753.

294.    Secretary Nielsen then announced that she would stay on as Secretary until April 10. On April 9, Secretary Nielsen issued Revision No. 8.5 to the DHS Orders of Succession by signing a memorandum affirming her "approval of the attached document."   The "attached document" to the memorandum, titled "Amending the Order of Succession in the Department of Homeland Security," stated, in relevant part: "By the authority vested in me as Secretary of Homeland Security, including the Homeland Security Act of 2002, 6 U.S.C. § 113(g)(2), I hereby designate the order of succession for the Secretary of Homeland Security as follows:  *Annex A* of DHS Orders of Succession and Delegations of Authorities for Named Positions, Delegation No. 00106, is hereby amended by striking the text *of such Annex* in its entirety and inserting the following *in lieu thereof* . . . ." (emphasis added).  What followed was a new version of Annex A in which the CPB Commissioner had been elevated in the line of succession above the FEMA Administrator and CISA Director, just below the Under Secretary for Management.  As the emphasized language make clear, however, this amendment only affected Annex A, which, per section II(B) of the DHS Orders of Succession, applied only "in the event [the Secretary is] unavailable to act *during a disaster or catastrophic emergency.*"  (emphasis added).  In the event of

COMPLAINT FOR DECLARATORY AND                              Case No.
INJUNCTIVE RELIEF

a vacancy due to "death, resignation, or inability to perform the functions of the Office," however, the line of succession remained governed by section II(A), which incorporated EO 13,753.

295. Thus, when Secretary Nielsen's resignation became effective, the appropriate line of succession under section II(A) was: (i) Deputy Secretary, (ii) Under Secretary for Management, (iii) FEMA Administrator, and (iv) CISA Director. At that time, the offices of Deputy Secretary, Under Secretary for Management, and FEMA Administrator were vacant, and Christopher Krebs was serving as the Senate-confirmed CISA Director. Accordingly, the only person who could have validly succeeded Secretary Nielsen upon her resignation was Director Krebs.

296. On January 16, 2020, Defendant Pete Gaynor began serving as Senate-confirmed FEMA Administrator. Accordingly, on and after January 16, 2020, the only person who could have served as Acting Secretary under the applicable DHS Orders of Succession was Administrator Gaynor.

297. On November 8, 2019, McAleenan issued Revision No. 08.6 to the DHS Orders of Succession. *Batalla Vidal,* 2020 WL 6995076 at *3. The line of succession was revised as follows: (i) Deputy Secretary, (ii) Under Secretary for Management, (iii) CPB Commissioner, (iv) Under Secretary for Strategy, Policy, and Plans ("Under Secretary SPP"), (v) Administrator and Assistant Secretary of the Transportation Security Administration; and (vi) FEMA Administrator. At the time of the McAleenan Order, the Acting Under Secretary SPP was Defendant Wolf.

298. Five days later, on November 13, 2019, the Senate confirmed Wolf to the position of Under Secretary for Strategy, Policy, and Plans. McAleenan resigned on the same day and Under Secretary Wolf assumed the title of Acting Secretary of Homeland Security. *Id.* at *3.

299. In August 2020, the Government Accountability Office concluded that Wolf was not lawfully appointed Acting Secretary under the HSA because McAleenan, who issued the order purportedly elevating him to that role, was himself not properly appointed. *See* GAO Opinion 1, *supra*.

300. On September 10, 2020, President Trump nominated Wolf to serve as Secretary of Homeland Security. As of the present date, his nomination remains pending. *Batalla Vidal*, 2020 WL 6995076 at *14 n.6.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF        Case No.

301.    On September 17, 2020, Wolf signed a document titled "Ratification of Actions Taken by the Acting Secretary of Homeland Security." 85 Fed. Reg. 59,651 (Sept. 23, 2020).  The Ratification recites that, on September 10, 2020 (the same day as Wolf's nomination), Administrator Gaynor issued an order "exercis[ing] any authority of the position of Acting Secretary that he had to designate an order of succession under 6 U.S.C. § 113(g)(2) . . . re-issu[ing] the order of succession established by former Acting Secretary McAleenan on November 8, 2019, and plac[ing] the Under Secretary for Strategy, Policy, and Plans above the FEMA Administrator in the order of succession."  However, the Department subsequently disclosed that Gaynor's September 10 order may have been issued before Wolf's nomination was formally submitted to the Senate.  *See* Letter by Dep't of Homeland Sec. at 1, *Batalla Vidal v. Nielsen*, No. 1:16-cv-04756-NGG-VMS (E.D.N.Y. Nov. 13, 2020), ECF No. 341 ("[T]he Department of Homeland Security (DHS) conveyed to the Department of Justice that it had learned that Mr. Gaynor's September 10, 2020 succession order may have been signed approximately one hour before Wolf's nomination was formally submitted to the Senate").  If so, this would have rendered Gaynor's September 10 order invalid because he would have been ineligible to serve as Acting Secretary under 5 U.S.C. § 3346(a), since more than 210 days had elapsed since the office of Secretary became vacant and no nomination for the role was pending.

302.    In an apparent effort to correct this, Administrator Gaynor purported to issue another order on November 14, 2020, again invoking 6 U.S.C. § 113(g)(2) and placing the Under Secretary for Strategy, Policy, and Plans ahead of the FEMA Administrator.  *See* Pete T. Gaynor, "Order Designating the Order of Succession for the Secretary of Homeland Security" (Nov. 14, 2020), https://www.dhs.gov/sites/default/files/publications/20_1114_gaynor-order.pdf.  On November 16, 2020, Under Secretary Wolf signed a document "affirm[ing] and ratify[ing] any and all actions involving delegable duties that I have taken from November 13, 2019 through November 14, 2020, the date of the execution of the Gaynor Order . . . ."  *See* Chad F. Wolf, "Ratification of Actions Taken by the Acting Secretary of Homeland Security" (Nov. 16, 2020), https://www.dhs.gov/sites/default/files/publications/20_1116_as1-global-ratification.pdf.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                                    Case No.

303.     The Final Rule is signed by Chad R. Mizelle under the title "Senior Official Performing the Duties of the General Counsel, U.S. Department of Homeland Security," under a purported delegation of authority from Wolf in his capacity as "Acting Secretary of Homeland Security," and by soon-to-be-former Attorney General Barr.  85 Fed. Reg. at 80,385, 80,401.

**B.     Wolf Is Not Lawfully Serving as Acting Secretary of Homeland Security.**

304.     Defendant Wolf is not lawfully serving as Acting Secretary of Homeland Security because McAleenan did not have authority as Acting Secretary to issue the November 8, 2019 order of succession purporting to elevate Wolf to that position.  Under EO 13753 and the then-governing DHS Orders of Succession, as amended by Secretary Nielsen on April 9, 2019, the Acting Secretary of Homeland Security upon Nielsen's resignation was Director Krebs, not Commissioner McAleenan.  *See Batalla Vidal*, 2020 WL 6695076, at *9 ("Based on the plain text of the operative order of succession, neither Mr. McAleenan nor, in turn, Mr. Wolf, possessed statutory authority to serve as Acting Secretary"); *Immigrant Legal Res. Ctr.*, 2020 WL 5798269, at *8 ("[T]he court could not help but conclude [McAleenan] assumed the role of Acting Secretary without lawful authority") (cleaned up); *Casa de Maryland*, 2020 WL 5500165, at *21 ("[T]he Court cannot help but conclude that McAleenan assumed the role of Acting Secretary without lawful authority"); GAO Opinion, *supra*, at 11 ("Wolf [was] named to [his] position[] of Acting Secretary . . . by reference to an invalid order of succession").

305.     Additionally, and in the alternative, McAleenan did not have statutory or constitutional authority to issue the November 8, 2019 order of succession because only a presidentially appointed and Senate-confirmed "Secretary" of Homeland Security may issue orders of succession under 6 U.S.C. § 113(g)(2).  *See Nw. Immigrant Rights Project*, 2020 WL 5995206, at *17-*24.

306.     Administrator Gaynor's November 14, 2020 order re-issuing the November 8, 2019 order of succession was invalid because only a presidentially appointed and Senate-confirmed "Secretary" of Homeland Security may issue orders of succession under 6 U.S.C. § 113(g)(2).  *See Nw. Immigrant Rights Project*, 2020 WL 5995206, at *17-*24.

307.     Additionally, and in the alternative, Administrator Gaynor's order conflicted with EO 13753 and is therefore unlawful and without effect.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF
       Case No.

308.     Additionally, and in the alternative, Administrator Gaynor was not empowered to exercise the powers of Acting Secretary because he never properly assumed that role and notification of his designation to that role was not submitted to the Comptroller General of the United States and to each House of Congress "immediately upon the designation" as required by 5 U.S.C. § 3349(a)(2).

309.     Because Wolf was not serving as Acting Secretary of Homeland Security when he promulgated the DHS Rules on behalf of DHS, the DHS Rules were made "in excess of statutory jurisdiction, authority, or limitations," or "without observance of procedure required by law" and must be held unlawful and set aside under 5 U.S.C. § 706.

### C.     The DOJ Regulations Must Be Vacated Along with the DHS Regulations.

310.     Excised of the DHS Regulations, the only remaining provisions of the Final Rule are those that amend Chapter V (Parts 1003, 1208 and 1235) of Part 8 of the Code of Federal Regulations (the "DOJ Regulations").  The DOJ Regulations should be vacated because they are arbitrary and capricious as non-severable from the infirm DHS Regulations.

311.     The Final Rule expresses a clear and unambiguous intent that standards for asylum, withholding of removal and relief under the CAT be uniform between affirmative proceedings (which fall under the purview of DHS) and defensive proceedings (which fall under the purview DOJ).  Having one set of standards and definitions for affirmative proceedings and another for defensive proceedings would sow massive confusion and embody the very definition of arbitrary.

312.     For that reason, the DOJ Regulations largely correspond, and in most cases are identical, to the DHS Regulations.  For example, the two Departments adopt matching definitions of "particular social group," 85 Fed. Reg. 80,385, 80,394 (to be codified as 8 C.F.R. §§ 208.1(c), 1208.1(c)); "political opinion," *id.* §§ 208.1(d), 1208.1(d); "persecution," 85 Fed. Reg. 80,386, 80,395 (to be codified as 8 C.F.R. §§ 208.1(e), 1208.1(e)); "nexus," *id.* §§ 208.1(f), 1208.1(f); "firm resettlement,"  85 Fed. Reg. 80,388, 80,397-98 (to be codified as 8 C.F.R §§ 208.15, 1208.15). The Departments also adopted identical standards for, *e.g.*, the exclusion of certain cultural evidence, *see*  85 Fed. Reg. 80,386, 80,395 (to be codified as 8 C.F.R §§ 208.1(g), 1208.1(g)), the disclosure of information contained in an application, *see* 85 Fed. Reg. 80,386-87, 80,395-96 (to be codified as 8 C.F.R.§§ 208.6, 1208.6), the internal relocation bar, *see id.* §§  208.13(b), 1208.13(b), 208.16(b), 1208.16(b); the so-called

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    Case No.

"discretionary" factors including the Transit Rules and the bar on accruing more than one year of unlawful presence, *see* 85 Fed. Reg. 80,387-88, 80,396-97 (to be codified as 8 C.F.R §§ 208.13(d), 1208.13(d)); and the CAT, *see* 85 Fed. Reg. 80,389, 80,398 (to be codified as 8 C.F.R. §§ 208.18, 1208.18). This structure makes clear that the Departments would not have promulgated the Final Rule unless regulations for *both* Departments could be enacted. Otherwise, the Final Rule would implement starkly inconsistent asylum protocols as between DHS and DOJ—in direct contravention of the Final Rule's clear and unambiguous intent to promote uniformity.[15]

313. The Departments' own words in the preamble to the Final Rule cement their own view that the "DHS and DOJ regulations are inextricably intertwined" and cannot be segregated from each other:

> The DHS and DOJ regulations are inextricably intertwined, and the Departments' roles are often complementary . . . . Because officials in both DHS and DOJ make determinations involving the same provisions of the INA, including those related to asylum, it is appropriate for the Departments to coordinate on regulations like the proposed rule that affect both agencies' equities in order to ensure consistent application of the immigration laws.

85 Fed. Reg. 80,286.

314. Because the Final Rule would be arbitrary and capricious if the DOJ Regulations were to stand alone without their corresponding DHS counterparts, because the Final Rule would eschew uniformity in contravention of its clear and unambiguous intent otherwise, and because the DHS Regulations must be vacated for the reasons stated above, the Final Rule must be set aside in its entirety under 5 U.S.C. § 706.

---

[15] The Final Rule does not contain a severability clause that requires saving the DOJ regulations in the event the DHS regulations are set aside. The Final Rule does contain *intra-part* severability clauses, which state that the provisions of particular parts of Title 8 of the Code of Regulations shall be severable from other provisions *within the same part*. *See, e.g.*, 85 Fed. Reg. 80,394 (to be codified as 8 C.F.R. § 1003.42(i) ("The provisions of this part are separate and severable *from one another*. In the event that any provision in [this part] is stayed, enjoined, not implemented, or otherwise held invalid, the remaining provisions shall nevertheless be implemented as an independent rule and continue in effect")) (emphasis added); *see also id.* §§ 208.25, 235.6(c), 1003.42(*i*), 1208.25, 1212.13, 1235.6(c). But these clauses do not link the provisions of any part of the Final Rule to those *outside* of such part, and the Final Rule does not contain any *inter-part* severability clauses stating that different parts of the Final Rule are themselves severable from each other.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF    Case No.

**IV.** **The Notice of Proposed Rulemaking and 30-Day Comment Period Did Not Provide Adequate Time For Public Comment and Thus Rendered The Final Rule Invalid From The Start.**

315. The NPRM and 30-day comment period did not satisfy Defendants' obligation to provide adequate time for public comment and review, rendering the Final Rule invalid. Under the APA, an agency must publish a notice of proposed rulemaking in the Federal Register and "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments," and "incorporate in the rules adopted a concise general statement of their basis and purpose" following review. 5 U.S.C. § 553(b), (c). The APA's requirement of notice and comment is designed to assure due deliberation of agency regulations and foster the fairness and deliberation of a pronouncement of such force.

316. An agency complies with 5 U.S.C. § 553 only where it affords the public a meaningful opportunity to comment. For complex rules like the Final Rule, the time period for comment typically lasts sixty days at minimum. The Administrative Conference of the United States has opined that 60 days is "a more reasonable minimum time for comment." Jeffrey S. Lubbers, *Guide To Federal Agency Rulemaking* 124. Similarly, Executive Order Nos. 13,653, § 2(b) and 12,866, § 6(a) instruct agencies that the "comment period . . . should generally be at least 60 days." *Improving Regulation and Regulatory Review*, 76 Fed. Reg. 3,821, 3,821-22 (Jan. 18, 2011); *Regulatory Planning and Review*, 58 Fed. Reg. 51,735 (Sept. 30, 1993).

317. The NPRM for the Final Rule provided only half this time—a mere 30 days for the public to submit comments. *See* 85 Fed. Reg. at 36,264. Given the length, complexity, subject matter, and dramatic impact of the Final Rule, 30 days was an inherently unreasonable period of time for public comment under the APA.

318. Additional factors limited the public's ability to provide meaningful comment. On July 9, 2020, the Departments published a rule that would have created new security bars for those seeking asylum based on potential exposure to communicable diseases. *See Security Bars and Processing*, 85 Fed. Reg. 41,201 (Jul. 9, 2020). The two rules had overlapping notice-and-comment periods and governed similar subject matter, requiring individuals and organizations preparing comments on the NPRM to divert some of their attention to the July 9 Rule. Similarly, the Departments announced several

102

other interrelated rules at different times that were not finalized before the comment period for the Final Rule closed, or were not introduced until after the comment period for the Final Rule was over. This staggered rulemaking prevented stakeholders from meaningfully commenting on and understanding the full picture of how these interrelated rules would impact asylum seekers. In addition, the ongoing COVID-19 pandemic has greatly disrupted operations for many commenting organizations, including Plaintiffs.

319. The Departments lacked good cause to impose only a 30-day comment period. Defendants have not, for example, cited any exigent circumstances that would have required the Final Rule to be implemented as early as possible and which therefore might have precluded a notice-and-comment period beyond 30 days.

320. On information and belief, the Departments rushed the notice and comment period to enable the Trump Administration to cram the Final Rule through protocols before a transition of presidential power took place. The NPRM was published less than five months before a presidential election; by curtailing public comment, Defendants sacrificed robust policy analysis in order to ensure that the Final Rule would be codified as quickly as possible. *See generally* Eric Lipton, "A Regulatory Rush by Federal Agencies to Secure Trump's Legacy," *New York Times* (Oct. 16, 2020), https://www.nytimes.com/2020/10/16/us/politics/regulatory-rush-federal-agencies-trump.html ("Facing the prospect that President Trump could lose his re-election bid, his cabinet is scrambling to enact regulatory changes," including with respect to immigration; "In the bid to lock in new rules before Jan. 20, Mr. Trump's team is limiting or sidestepping requirements for public comment on some of the changes and swatting aside critics who say the administration has failed to carry out sufficiently rigorous analysis").

321. By depriving the public of a meaningful opportunity to submit informed comments, the Final Rule was promulgated "without observance of procedure required by law." Defendants sacrificed the "due deliberation" and fairness that notice and comment periods ensure and the Final Rule must therefore be vacated under 5 U.S.C. § 706(2)(D).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                                    Case No.

**V.** **The Final Rule Is Impermissible Because of Its Potentially Retroactive Effect.**

322.   With the exception of amendments to 8 C.F.R. §§ 208.20, 1208.20 (standards for determining whether an asylum application is "frivolous"), none of the regulations enacted in the Final Rule specify that they apply only to applications filed on or after the Final Rule's effective date.  As the Departments have acknowledged, the plain text of the Final Rule is ambiguous as to the extent it applies retroactively to the over *350,000* currently pending affirmative asylum applications and hundreds of thousands of defensive asylum cases.  This ambiguity and the Departments' failure to adequately consider, address, and specify the potential retroactive impact of the Final Rule renders the Final Rule arbitrary and capricious.  Moreover, to the extent any of the provisions of the Final Rule are applied retroactively, that would implicate a host of statutory and constitutional problems and further require vacatur of the Final Rule.

323.   A rule is retroactive if it attaches new legal consequences to events completed before its enactment. As the Departments concede, applying the Final Rule to applicants who filed before its effective date would constitute retroactive application of the rule.  *See* 85 Fed. Reg. at 80,380-81.  When applicants file for asylum, withholding of removal or relief under CAT, they do so in reliance on the legal regime then in place and the protections afforded thereunder, identifying themselves to the Departments, disclosing highly sensitive information that can place their life and the safety of others in jeopardy if disclosed to would be persecutors, and often forgoing alternative forms of relief for which they may also be eligible.  To the extent any of the Final Rule's provisions are retroactively applied to those who filed before its effective date, that would greatly upset these reliance interests, attaching severe consequences (including deportation) to conduct that the applicants undertook without any notice of how their applications would be affected.

324.   The Departments now concede that "the potential retroactivity of the rule was not clear in the NPRM." *Id.* at 80,380.  This is attested by numerous public comments received by the Departments drawing attention to the Final Rule's troubling ambiguity, noting that any retroactivity would unfairly penalize asylum-seekers whose cases would have had merit under the prior regulatory scheme.  *See id.* at 80,380; *see, e.g.,* Public Comment of Tahirih Justice Center, at 12 ("The natural inference is . . . that the agencies intend all of the NPRM's remaining provisions to apply to applications

104

for asylum and related relief that are pending at the time the rule becomes effective"),; Public Comment of Catholic Legal Immigration Network, Inc. at 10 ("At a bare minimum, if any of these proposed rules are finalized, the departments must clarify that they will not be applied retroactively"),.

325.    Rather than take these comments into serious consideration, the Departments added no language whatsoever to the relevant regulatory provisions to clarify whether they applied retroactively. Instead, they addressed the issue in a single paragraph in the Preamble, declaring that:

> . . . *to the extent that the rule changes any existing law*, the Departments are electing to make the rule prospective to apply to all asylum applications—including applications for statutory withholding of removal and protection under the CAT regulations—filed on or after its effective date . . . . Nevertheless, *to the extent that the rule merely codifies existing law or authority*, nothing in the rule precludes adjudicators from applying that existing authority to pending cases independently of the prospective application of the rule.

85 Fed. Reg. at 80,380-81 (emphasis added).

326.    This explanation only muddies the waters and exacerbates concerns about the Final Rule's retroactive effect.  To begin with, this workaround only appears in the Final Rule's Preamble, not in the regulatory text itself.  Furthermore, the Departments do not suggest that this purported bifurcation of the Final Rule between portions that "change" the law and those that merely "codif[y] existing law" was proposed by any of the commenters.  *See id.* at 80,380.

327.    But the deeper concern with this standard lies in its vagueness and unworkability, as it will thrust on individual adjudicators (asylum officers and immigration judges) the task of figuring out not just what the law *is*, but also whether, on a provision-by-provision basis, the Final Rule truly constitutes a "change" from prior laws.  The Departments themselves characterize numerous changes as mere codifications of existing law, even though they substantially expand prior law by adding new, harsh grounds upon which an application may be denied.  For instance, the Departments assert that the new rules governing pretermission are "consistent with existing law," 85 Fed. Reg. at 80,302, even though the pretermission rule dramatically alters existing law to the detriment of asylum applicants by, among other things, making pretermission mandatory and providing little or no opportunity for the applicant to cure a deficient application, *see id.* at 80,397 (to be codified as 8 C.F.R. § 1208.13(e)).  Imposing mandatory pretermission on already-filed applicants is extremely unjust, as it would punish

105

them with automatic denial based on a filing which, under the prior rules, could have entitled the applicant to proceed to a hearing. Yet immigration judges may rely on the Departments' statements and conclude that pretermission is not a change in the law, and therefore the pretermission rule must be applied to already-filed applicants.

328. Additionally, the Departments have acknowledged that Circuits have split with respect to some of the matters addressed in the Final Rule. *See* 85 Fed. Reg. at 80,313 (noting "significant conflicts" among Circuits with respect to interpretation of the phrase "particular social group"); *id.* at 80,319 (noting Circuit split "on the issue of whether former gang membership is cognizable as a particular social group"); 85 Fed. Reg. 36,281 n.32 (noting inconsistencies between Circuits with respect to whether threats constitute persecution). No guidance is provided as to whether the Final Rule, by choosing to side with some Circuits over others, has effected a "change" in the law, or a "codification" of it, for retroactivity purposes, or if the retroactive effect would vary across the Circuits.

329. These questions should not be thrust upon counsel and adjudicators in individual asylum cases. As requested by numerous commenters, the Departments should have either clarified the non-retroactive effect of the Final Rule on a global basis, or specifically identified the retroactive effect of the Final Rule's individual provisions so that it can be objectively, and predictably applied and understood. That the Departments only proposed this standard for retroactivity in the Final Rule, without giving the public any opportunity to comment on it, shows further that the Departments failed to give adequate consideration to the issue.

330. Adding insult to injury, the Departments failed to comply with Executive Orders requiring that regulations state clearly their retroactive effect. Executive Order No. 12,988, § 3(b) provides that "each agency formulating proposed legislation and regulations shall make every reasonable effort to ensure . . . (2) that the regulation, as appropriate— . . . (D) specifies in clear language the retroactive effect, if any, to be given to the regulation." *Civil Justice Reform,* 61 Fed. Reg. 4,729, 4,731-32 (Feb. 5, 1996). When the Departments published the NPRM, they certified that "[t]his rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988." 85 Fed. Reg. 36,290. The Departments now concede that certification was incorrect. *See* 85 Fed. Reg. 80,380

("[T]he Departments . . . recognize that the potential retroactivity of the rule *was not clear* in the NPRM") (emphasis added).  In the Final Rule, the Departments omit *any* certification under EO 12,988.  Rather, the purported certification under "Executive Order 12988: Criminal [*sic*] Justice Reform" erroneously contains a certification related to federalism.  *See* 85 Fed. Reg. 80,384; *cf. Federalism*, EO 12,132, 1999 WL 33943706 (Aug. 4, 1999).  Nevertheless, the Final Rule falls short of EO 12,988's standard for "clear language" with respect to retroactive effect.

331.    The Final Rule is arbitrary and capricious in creating ambiguity as to the rules that apply to more than 350,000 currently pending affirmative asylum applications and hundreds of thousands of defensive cases.  It is further arbitrary and capricious to the extent it is, or will be construed by adjudicators to operate as, a retroactive change in the law.  The Departments failed to comply with the requirement to assess and consider retroactivity.  When promulgating a rule in which serious reliance interests may be affected, such as the Final Rule here, an agency must "assess whether there [are] reliance interests, determine whether they [are] significant, . . . weigh any such interests against competing policy concerns," and "consider[] whether [it] ha[s] . . . flexibility in addressing [such] reliance interests."  *Dept. of Homeland Security v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1914, 1915 (2020).  The Departments failed to undertake this analysis here; to the contrary, they expressly "*decline*[*d*] to respond to commenters' assertions about potential implications that the rule's application to pending cases may have, such as 'mass denials' of asylum applications," simply characterizing these concerns as "unmoored from a reasonable basis in fact and wholly speculative due to the case-by-case and fact-intensive nature of many asylum-application adjudications."  85 Fed. Reg. at 80,381.  The Departments' failure to substantively address applicants' reliance interests was arbitrary and capricious and requires the Final Rule to be set aside under 5 U.S.C. § 706.

## VI.    The Final Rule Harms Plaintiffs by Frustrating Their Missions and Necessitating the Diversion of Resources.

332.    The Final Rule's drastic changes to well-established asylum rules and regulations will directly and irreparably harm Plaintiffs, their clients, and members.  These harms will occur nationwide.  Plaintiffs are nonprofit organizations that provide direct legal services to LGBTQ/H migrants, provide training and educational programming to immigration practitioners and immigrant communities, and

COMPLAINT FOR DECLARATORY AND                          Case No.
INJUNCTIVE RELIEF

provide services and support to LGBTQ/H immigrants, including those in detention facilities or facing deportation.

### A. The Final Rule Frustrates Plaintiffs' Missions.

333. Plaintiffs are committed to providing legal services and community services to LGBTQ/H asylum seekers, who if returned to their countries of origin are uniquely vulnerable due to the threat of persecution, trauma, and stigma based on their sexual orientation, gender identity, gender expression, and HIV positive status. Plaintiffs share the common objective of maintaining an effective, functioning asylum system that protects LGBTQ/H migrants' ability to obtain asylum or other forms of relief. The Final Rule frustrates Plaintiffs' missions by making the populations they primarily serve largely ineligible for asylum relief, thus making it more difficult for Plaintiffs to provide services and support to their clients and members. In response to the Final Rule, Plaintiffs will have to make fundamental changes to their programming and services to adjust to the new regulatory landscape.

#### i. The Final Rule Frustrates the Legal Services Plaintiffs' Missions

334. For Legal Services Plaintiffs (Immigration Equality, Oasis Legal Services, the Transgender Law Center, and the TransLatin@ Coalition's Legal Services Project), the Final Rule will frustrate their mission to provide legal services to LGBTQ/H asylum seekers by causing a profound change to existing asylum law and procedures that will impede their ability to successfully advocate for their clients, severely limit their ability to take on new clients, and necessitate equally fundamental changes in how they approach their work.

335. Legal Services Plaintiffs will have to profoundly alter their advocacy strategy in how they present their clients' cases to adjudicators as a result of the Final Rule. For example, Legal Services Plaintiffs will be forced to shift from an affirmative application model to a model in which more cases are presented in a defensive posture, which will take significantly more time and resources for each case.

336. Legal Services Plaintiffs will also have to allocate a significant amount of staff time and resources to learning and understanding the new regulatory scheme and its impact on existing and future clients, a task that is made more difficult by the Final Rule's vagueness around many of its provisions and Defendants' non-responsiveness to comments by Plaintiffs and others. Thereafter, Plaintiffs will

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Case No.

need to convey the new information to their clients and the community members that they serve and support, as well as to immigration practitioners they counsel, and pro bono attorneys they work with and refer matters to.

337.    The Final Rule also will force Legal Services Plaintiffs to alter the way they conduct client representation, as well as the decisions they make as to which cases can be referred to pro bono attorneys for representation or other services, which is a key way in which Legal Services Plaintiffs amplify their resources and reach.  Legal Services Plaintiffs will have to retrain their staff on the Final Rule, as well as how to determine asylum eligibility under it and advise potential clients on the Final Rule's impact on their cases, in order to allow clients to make informed decisions about whether and when to apply for asylum and other forms of relief.  To be sure, Legal Services Plaintiffs are aware the Final Rule will have a chilling effect on LGBTQ/H refugees who would otherwise have filed affirmative applications for asylum.

338.    More specifically, Oasis provides direct legal services and holistic case management to LGBTQ asylum seekers living within the jurisdiction of the USCIS San Francisco Asylum Office.  The Final Rule will result in more of Oasis's clients having their affirmative asylum applications referred to Immigration Court and be put in removal proceedings.  In Oasis's three-year history, it has only had one client referred to Immigration Court and it was able to secure asylum for the client.  Yet, Oasis does not have the capacity to represent clients in defensive asylum proceedings.  It will be forced to change from an affirmative asylum-based model to one where it represents a significant number of clients in Immigration Court, which would be extremely resource intensive and reduce the number of clients it can serve.

339.    Likewise, Immigration Equality provides direct legal services to LGBTQ/H immigrants and families.  Immigration Equality provides representation for LGBTQ asylum seekers through its In-House Program, where matters are handled solely by Immigration Equality staff, and its Pro Bono Program, where matters are placed with volunteer attorneys who are supported throughout the process by Immigration Equality staff.  As a result of the Final Rule, Immigration Equality will have to expend significant resources to reconfigure both its Pro Bono and In-House Programs.  And given that

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

Case No.

affirmative applicants will be chilled from applying due to the Final Rule's drastic limitations on asylum eligibility, the Final Rule will severely limit the number of affirmative asylum seekers Immigration Equality can accept into its program, since many will no longer be eligible for relief.

340.    Under the Final Rule, most of Immigration Equality's clients may now only be eligible for withholding of removal or CAT relief, which have a higher standard of proof than asylum, are more time-consuming cases to handle, and cannot be brought affirmatively.  Immigration Equality will thus be forced to shift resources towards mentoring pro bono attorneys on more difficult defensive proceedings, as well as complicated appeals before the BIA and the circuit courts.  Because defensive cases are far more difficult to place with pro bono counsel, Immigration Equality will have to: take more of these cases in-house, which will reduce its capacity to take on other matters; change the way it cultivates pro bono firms to identify and attract firms interested in defensive cases; and provide more in-depth mentorship and supervision to ensure that pro bono attorneys feel comfortable taking on these more challenging and time-consuming matters.

341.    Through its Border Project, the Transgender Law Center provides humanitarian aid, direct legal services, and holistic case management to LGBTQ asylum seekers.  As a result of the Final Rule, Center staff will need to dedicate more time and resources in preparing clients for credible and reasonable fear interviews.  And while, historically, the Center has not represented clients at such a stage, the Center now must plan to represent all their clients in the credible and reasonable fear interviews ("CFI/RFI") because of the complexity of the Final Rule and the difficulty for asylum seekers to pass the CFI/RFI phase.  The Center anticipates more of their clients not passing the CFI/RFI interview and having their cases referred to an immigration judge for review.  This will also require the Center to provide representation in Immigration Court, further straining its resources and limiting the number of clients that it is able to serve.

342.    The Legal Services Plaintiffs have relied on legal assistants and law students to help prepare asylum cases including client intake interviews.  Due to the complexity of the Final Rule, and the one-year bar to file an asylum application, the Legal Services Plaintiffs anticipate that they will have to rebuild their intake processes to ensure that they are reviewing each new provision of the Final Rule

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                                    Case No.

with the clients and to assess their eligibility for asylum.  Additionally, Legal Services Plaintiffs will have to train and supervise volunteer and pro bono attorneys on the Final Rule before they are able to give cases for representation to pro bono attorneys.  This will significantly reduce Legal Services Plaintiffs' capacity to conduct intake of new clients and their capacity to assist clients throughout the asylum process.

343.    For these reasons, Legal Service Plaintiffs' ability to assist more or the same number of clients will be hampered by the Final Rule. For example, Oasis has made sudden and dramatic shifts in its priorities because of the impending Final Rule. Oasis has stopped accepting and filing new citizenship and family petition cases and has reduced the number of lawful permanent residency cases that it can accept each month by 25%.  For their clients who have won their asylum cases, Oasis no longer has the capacity to assist them to petition for family members who are still out of the United States, thereby extending family separation.  And clients who are eligible to apply for a green card based on their asylum status will now have to wait longer before they are able to travel outside of the United States.

### ii.    The Final Rule Frustrates the Community Services Plaintiffs' Missions

344.    Aside from providing immigration-related legal services, the TransLatin@ Coalition seeks to empower the transgender and gender nonconforming Latinx community in the United States and to improve the quality of life of transgender and gender nonconforming Latinx immigrants through advocacy and an array of community services that help refugees get on their feet, build their new lives, and recover from the traumatic experiences from which they have escaped.  However, as a result of the Final Rule, fewer LGBTQ refugees will be eligible for local, state, and federal governmental programs, thereby creating an increased demand and need for the Coalition's services and gaps the Coalition will need to supplement or supplant.  The Final Rule thus gravely impacts the Coalition's ability to fulfill its mission to ensure the empowerment and inclusion of transgender and gender nonconforming Latinx immigrants in the United States by forcing the Coalition to make impossible choices about the programs and services it will provide.

345.    Similarly, BLMP envisions a world where all Black LGBTQIA+ migrants and their loved ones can thrive in the United States, with dignity and safety.  The Final Rule will frustrate BLMP's

111

COMPLAINT FOR DECLARATORY AND                    Case No.
INJUNCTIVE RELIEF

mission and activities by making it hard to inform Black LGBTQIA+ migrants of their rights.  The Final Rule also increases the likelihood that more Black LGBTQIA+ migrants end up in detention due to their inability to obtain asylum under the Final Rule, which will in turn create a greater demand or need for BLMP's services.

346.    In sum, by making most, if not all, LGBTQ refugees ineligible for asylum and other forms of relief in the United States, the Final Rule largely frustrates the missions of each Plaintiff.  As outlined below, the Final Rule will force Plaintiffs to make sacrifices about which and how many LGBTQ refugees they can serve and to divert resources away from their core projects and services.  The Final Rule directly conflicts with Legal Services Plaintiffs' missions to provide legal services to LGBTQ asylum seekers and Community Services Plaintiffs' missions to support and provide services to improve the lives of LGBTQ migrants.

### B.    The Final Rule Forces Plaintiffs to Divert Resources from Core Programs and Services.

347.    The Final Rule is also causing and will continue to cause Plaintiffs to divert resources from their core programs.

### i.    The Final Rule Diverts the Legal Services Plaintiffs' Resources

348.    The Final Rule's rushed effective date has forced Legal Services Plaintiffs to expend significant resources to analyze and interpret the Final Rule, create new informational materials and resources for clients, members, staff, volunteers, and pro bono attorneys, and provide trainings and webinars to the same.  Plaintiffs have had to prioritize their responses and actions to the Final Rule's impact on their programs and services at the expense of their other core programs and services.

349.    For example, Immigration Equality has assembled a library of materials that it provides to pro bono attorneys in order to facilitate its Pro Bono Program.  These materials include presentations on the state of the law and the asylum process, sample affidavits and briefs, template motions, and other sample and template submissions for both affirmative and defensive proceedings.  In addition, Immigration Equality publishes a comprehensive, 75-page manual on the preparation of asylum claims related to sexual orientation, gender identity, and HIV-status ("Asylum Manual").

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

Case No.

350.    As a result of the Final Rule, which drastically alters the asylum law and processes in the United States, Immigration Equality will have to revise most of written resources and materials, such as: 1) sample and template documents in their Pro Bono Program resource library used by hundreds of volunteer attorneys; 2) materials, including scripts and templates, used to intake clients and respond to online and telephonic inquiries from LGBTQ/H asylum seekers; 3) training materials and presentations for staff, pro bono attorneys, USCIS personnel and judges, and outside attorneys on the LGBTQ/H asylum process; 4) materials for *pro se* applicants; 5) the Asylum Manual and all online content concerning the asylum process; and 6) country conditions materials to the extent they would raise concerns under the Final Rule as comprising "cultural stereotypes" in the way they address cultural attitudes towards LGBTQ/H people.

351.    Oasis will also have to revise the multitude of country condition research, case materials, and guides about asylum law that it provides to its pro bono attorneys and others.

352.    In addition, Legal Service Plaintiffs must update their intake process and forms to add questions and responses based on the Final Rule. Legal Services Plaintiffs have started to spend hours to train their staff on the Final Rule and to provide information to their clients and other community members.

353.    Legal Services Plaintiffs have also had to divert time and staff to educate and answer questions from clients, *pro bono* attorneys, and other stakeholders on the Final Rule. For example, the Transgender Law Center has had to communicate one by one to over 100 clients about the Final Rule, only after devoting significant resources to studying the Final Rule and its impact on the Center's clients. Likewise, Oasis has had to communicate about the Final Rule and its impact to its over 500 pending asylum clients and approximately 45 clients whose cases Oasis has accepted but not yet filed.

354.    The Final Rule has caused and will force Legal Services Plaintiffs to divert resources from other programs and services.  For example, Immigration Equality is currently engaged in litigation and policy advocacy around improving detention conditions and reversing discriminatory policies that impact LGBTQ/H immigration families.  Immigration Equality will have to significantly pull back resources currently devoted to these efforts as well as redirect resources away from Immigration

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                                   Case No.

Equality's Detention Program, online and telephone inquiries, and all non-asylum applications and petitions in order to address the Final Rule and its impact.

355. Similarly, as a result of the Final Rule, Oasis has currently stopped accepting and filing new citizenship and family petition cases and reduced the number of lawful permanent residency cases it can accept each month by 25%. This means Oasis's clients who have won asylum cannot receive its assistance in helping them petition for family members who are still out of the United States thereby extending family separation. And that clients who are eligible to apply for a green card based on their asylum status will now have to wait longer before they are able to travel outside of the United States.

356. The Transgender Law Center has also been forced to divert resources. For example, the Center has had to cut back on the case management services that it had provided to clients due to the dramatic increase of time needed to alter its legal program, to re-assess and advise clients on their legal options under the Final Rule, and to complete necessary case work. Due to the Final Rule, the Center's staff anticipates that it will be unable to accept new clients until they can competently advise clients on it.

### ii. The Final Rule Diverts the Community Services Plaintiffs' Resources

357. The Final Rule will also cause an increased need for community and financial support for LGBTQ refugees, which could exhaust the already limited resources of Community Services Plaintiffs and force Community Services Plaintiffs to make difficult choices about which programs to continue.

358. By making asylum and other forms of relief unattainable for LGBTQ/H refugees, the Final Rule will deprive many LGBTQ/H migrants of the benefit of local, state, and federal programs they could use to get on their feet, build their new lives, and recover from the persecution from which they fled. That is because many local, state, and federal programs require participants to have a legal, documented presence in the United States. Community service organizations serving LGBTQ/H migrants like the Coalition and BLMP will therefore be faced with an increased demand for services, as LGBTQ migrants are unable to gain work, pay rent, access health care, or afford other material necessities. However, these LGBTQ refugees will thus be forced to turn to community services

114

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

Case No.

organizations like the Coalition and BLMP for financial support and assistance for basic needs, such as emergency housing, food, clothing, rental assistance, and health care referrals.

359. The Coalition and its network of affiliated organizations will be forced to divert significant financial resources to emergency support, one of the Coalition's core programs that includes daily food distribution, rental assistance, and transportation and grocery vouchers. The Coalition expects a significant redirection of funds to address the increased need caused by the Final Rule which will impede its ability to perform other programmatic activities like economic and workforce development training programs, coordinated human resources and cultural competency trainings, community research and education programs, and local and state advocacy campaigns for laws protecting the Coalition's members.

360. The Final Rule will also significantly harm the Coalition's ability to conduct its re-entry services program—an important organizational activity that provides support to some of the most vulnerable of the Coalition's members and individuals returning to their communities. These transgender and gender nonconforming people need immediate connections to medical services and other services, which will be delayed by, or in some cases prevented altogether due to the Final Rule, and the diversion of already limited resources overwhelmed by demand.

361. In addition, the COVID-19 pandemic has already put severe strain on the long-term availability of the Coalition's fundamental programmatic services like emergency community support. To accommodate the lack of employment and economic stability facing many members and individuals whom the Coalition and its affiliates serve, the Coalition and its affiliates have been forced to shift resources in a way that would make the programmatic impact of the Final Rule even more detrimental.

362. Similarly, BLMP provides cash assistance (in the amount of $250 and higher) to hundreds of community members especially asylum seekers, asylees and detained members, provides funds for bonds, and works in partnership with other organizations that provide mutual aid for basic needs such as housing, food, and clothing for Black LGBTQIA+ migrants. Since the beginning of the COVID-19 pandemic in 2020, BLMP has given approximately $215,000 in financial support to over 400 LGBTQIA+ migrants who need assistance for housing, food, health care, and other services.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Case No.

Almost all the recipients of mutual aid were ineligible for federal stimulus funds, and over 50% are asylum seekers who would be denied asylum or other forms of relief under the Final Rule. For 2021, BLMP had planned to provide mutual aid at the same levels but because of the Final Rule's impact on LGBTQIA+ migrants, they are now planning to divert and reallocate its resources to address the increase in requests for support.

363. In order to adequately respond to their clients and members' needs, Plaintiffs have had to divert resources from core programs and services to respond to the Final Rule. They have done so by reallocating staffing, devoting less time and money to advocacy projects and community initiatives, and taking on fewer cases. This diversion of resources has and will continue to irreparably harm Plaintiffs unless the Final Rule is prevented from taking effect.

### C. The Final Rule Jeopardizes Plaintiffs' Funding.

364. The Final Rule will also harm Plaintiffs by jeopardizing their funding.

365. Plaintiffs rely on public or foundations grants, government contracts, and individual donors. Such funding streams often have set requirements that Plaintiffs must meet to receive funding or to be eligible for continued funding. Such grants are often conditioned on Plaintiffs' ability to meet certain targets such as number of services provided, clients served, or number of asylum applications filed.

366. For example, BLMP receives more than 90% of its funding through foundation grants. Over 70% of these grants are in support of BLMP's services to migrants in detention centers and at risk of detention or deportation. Most of these grants mandate specific numbers of services provided and people served that BLMP must meet or risk losing funding.

367. Similarly, Oasis receives funding from grants conditioned on filing a certain number of affirmative asylum cases per year or that pay a set amount per case filed. If fewer of the potential clients who come to Oasis have cognizable asylum cases as a result of the Final Rule, Oasis will file fewer affirmative asylum cases and its funding will decrease. Such a decrease in funding may necessitate reducing Oasis's affirmative asylum program and staff in the short term and having less clients to represent in residency and citizenship cases in the long term.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                                    Case No.

368.     As noted above, Immigration Equality has a Pro Bono Program to place asylum cases with volunteer attorneys.  In addition to providing pro bono legal services, the level at which a firm donates is generally based on the level of engagement in Immigration Equality's Pro Bono Program and opportunities to provide direct assistance.  Because fewer of Immigration Equality's clients will be eligible for asylum under the Final Rule, there will be a decrease in the number of clients Immigration Equality may place with volunteer attorneys at partner law firms.  As such, Immigration Equality anticipates that it will see a corresponding dip in donations from these law firms.  Oasis also works with *pro bono* attorneys who work with clients to prepare their asylum applications and represent clients at their asylum interviews.  Oasis anticipates a similar decrease in *pro bono* attorneys because of the impact the Final Rule may have on its volunteers.

369.     Lastly, Oasis functions on a low bono/pro bono model and charges client fees using a sliding scale based on a client's income.  Due to the profound changes brought about by the Final Rule, Oasis anticipates that it will be unable to accept new clients for a period of time after the Final Rule's effective date in order to adequately train its staff and pro bono volunteers on the Final Rule. Because Oasis will be unable to accept new cases, Oasis will lose income and its finances will be negatively impacted.

370.     In sum, the Final Rule will deal a devastating blow to Plaintiffs' finances, including the loss of significant funding streams.

371.     The Final Rule's compounding effects not only diminish the ability of Plaintiffs to fulfill their missions by endangering funding, requiring the diversion of resources, and necessitating wholesale revisions to the way they approach their work, the Final Rule also threatens the very existence of some Plaintiffs, which depends on the ability to represent and assist LGBTQ refugees in their efforts to obtain asylum and other forms of relief.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**Contrary to Law**

372.     Plaintiffs incorporate and reallege the preceding paragraphs as if set forth fully herein.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    Case No.

373. Under the APA, an agency action must be set aside if it is "not in accordance with law." 5 U.S.C. § 706(2)(A). The Final Rule is contrary to law.

374. Multiple provisions of the Final Rule directly contradict or exceed Defendants' statutory authority under federal statutory law, including the INA, 8 U.S.C. §§ 1101 *et seq*., and the Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, Div. G, Title XXII, § 2242(b), 112 Stat. 2681-822 (1998) (codified as a note to 8 U.S.C. § 1231 (1999)), the latter of which obligated the Departments to satisfy the minimum thresholds prescribed under CAT.

375. Among other directives in the Final Rule that are contrary to law, it: (i) generally requires adjudicators to deny asylum if the applicant accrued one year or more of unlawful presence, ignoring congressionally enacted exceptions to the one-year filing deadline, 85 Fed. Reg. 80,387-88, 80,396-97 (to be codified as 8 C.F.R. §§ 208.13(d)(2)(D), 1208.13(d)(2)(D)); (ii) allows adjudicators to deny asylum or withholding of removal where the applicant's claim of persecution is based on "interpersonal animus," even though virtually all instances of persecution, particularly against LGBTQ/H refugees, involve some form of interpersonal animus, 85 Fed. Reg. 80,386, 80,395 (to be codified as 8 C.F.R. §§ 208.1(f)(1)(i)-(ii), 1208.1(f)(1)(i)-(ii)); (iii) generally eliminates the adjudicator's discretion to grant asylum if an applicant traveled through more than one third country, or was present in any third country for more than 14 days, contrary to the more narrowly drawn firm resettlement and safe third country bars found in the INA, 85 Fed. Reg. 80,387-88, 80,396 (to be codified as 8 C.F.R. §§ 208.13(d)(2)(A), (B), 1208.13(d)(2)(A), (B)); (iv) bars asylum seekers under the firm resettlement doctrine based on a definition of "firm resettlement" that does not comport with the INA's plain language, 85 Fed. Reg. 80,388, 80,397 (to be codified as 8 C.F.R. §§ 208.15(a), 1208.15(a)); (v) allows immigration judges to deny certain asylum applications without a hearing, with little or no notice or opportunity for the applicant to cure any defect in the petition, 85 Fed. Reg. 80,397 (to be codified as 8 C.F.R. § 1208.13(e)); (vi) overrides the statutory authority of asylum officers and immigration judges to consider all record evidence, including cultural evidence pertaining to the treatment of LGBTQ/H people in the applicant's country of origin, 85 Fed. Reg. 80,386, 80,395 (to be codified as 8 C.F.R. §§ 208.1(g), 1208.1(g)); (vii) eliminates the discretion of immigration judges or the BIA to consider certain arguments on a motion to

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF           Case No.

reopen or reconsider contrary to Congress' recognition that such motions may be filed based on changed country conditions, 85 Fed. Reg. 80,385, 80,394 (to be codified as 8 C.F.R. §§ 208.1(c), 1208.1(c)); and (viii) promulgates regulations under the CAT that contradict its plain text and undermine its fundamental objectives.

376.     The Final Rule must be set aside in its entirety because it is so rife with provisions like these that are contrary to federal law, as well as other provisions that should be invalidated because they are, among other reasons, arbitrary and capricious, that no part of the Final Rule can be separately salvaged.

## SECOND CLAIM FOR RELIEF
### Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A)
### Arbitrary and Capricious

377.     Plaintiffs incorporate and reallege the preceding paragraphs as if set forth fully herein.

378.     Under the APA, an agency action must be set aside if it is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).  The Final Rule is arbitrary and capricious and an abuse of the Departments' discretion.

379.     In adopting the Final Rule, the Departments failed to consider pertinent data and failed to articulate a reasoned or legally sufficient basis for the Final Rule.  The Final Rule is therefore arbitrary and capricious.  For most of the provisions of the Final Rule addressed in this Complaint, the Departments do not even attempt to specify what problem they are attempting to solve, what facts or data support the actions taken, or how the new regulations adhere to congressional intent and comport with the structure and purposes of the INA.  The Departments repeal longstanding policies, some decades old, utterly failing to display awareness that they are changing position.

380.     In adopting the Final Rule, the Departments also failed to respond adequately to significant comments critical of the Proposed Rule that were submitted during the notice-and-comment period.  Despite the ad hoc justifications that the Departments have offered for the provisions of this sprawling rule, including in their purported responses to Comments promulgated with the Final Rule that are largely boilerplate or rote, it is apparent that the Departments disregarded the underlying merits of the comments and other public policy considerations.

119

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

Case No.

381.    For example, and as set forth in more detail above, the Final Rule arbitrarily and capriciously: (i) eliminates the ability of immigration judges and asylum officers to hold that laws such as those making it a crime to be LGBTQ/H are inherently persecutory even if not consistently enforced, 85 Fed. Reg. 80,386, 80,395 (to be codified as 8 C.F.R. §§ 208.1(e), 1208.1(e)); (ii) shifts the burden for many applicants to prove that internal relocation in their home country would not have been reasonable, and requires adjudicators to consider factors that are outright irrational in determining whether internal relocation would have been reasonable, 85 Fed. Reg. 80,387, 80,396, 98 (to be codified as 8 C.F.R. §§ 208.13(b)(3), 1208.13(b)(3), 208.16(b)(3), 1208.16(b)(3)); (iii) harshly penalizes applicants who traveled through a third country without applying for protection there, even if the applicant would have been at risk of persecution or torture in the third country, 85 Fed. Reg. 80,387, 80,396 (to be codified as 8 C.F.R. §§ 208.13(d)(1), 1208.13(d)(1)); and (iv) reduces confidentiality protections, potentially discouraging meritorious applicants or their supporting witnesses from coming forward, particularly for LGBTQ/H applicants, 85 Fed. Reg. 80,386-87, 80,395-96 (to be codified as 8 C.F.R. §§ 208.6, 1208.6).

382.    The Final Rule is additionally arbitrary and capricious because the Departments neglected their duty under the APA to consider adequately the significant reliance interests of LGBTQ/H asylum seekers, and other asylum seekers, who have already submitted applications.  The Final Rule fails to take into account that in filing for asylum or other forms of relief, pending applicants like the many clients of Plaintiffs and hundreds of thousands of others, relied heavily on the legal regime currently in place, including then-existing rules about what evidence their applications must contain, what elements of their claims must be proven, whether they will be entitled to a hearing, the impact of changed or extraordinary circumstances on the timing of when they filed, and whether the contents of their application will remain confidential.  The Final Rule upsets all of these well-founded expectations and more, for example by potentially treating as retroactive provisions limiting the ability to supplement and reopen claims and permitting broad disclosure of personal information.

383.    In the preamble to the Final Rule, the Departments acknowledge that the potential retroactivity of the Final Rule was not clear in the NPRM.  But the Final Rule's preamble, which itself

COMPLAINT FOR DECLARATORY AND                              Case No.
INJUNCTIVE RELIEF

is not a codified regulation, sows more confusion into the chaos of the Final Rule by asserting that unidentified "substantial portions" of the Final Rule "merely codify existing statutory authority" and that all such portions should apply retroactively. The Final Rule furnishes no guidance concerning which portions the Departments believe "merely codify existing authority," so applicants and their counsel, as well as adjudicators, have no clarity concerning what portions of the Final Rule will apply retroactively. That brazen refusal to account for the reliance interests of LGBTQ/H immigrants like Plaintiffs' clients who have pending applications for asylum is arbitrary and capricious.

384. The Final Rule is so rife with arbitrary and capricious provisions, as well as other provisions that should be invalidated because they are, among other reasons, contrary to law, that no part of the Final Rule can be separately salvaged, and the Final Rule must be set aside in its entirety.

### THIRD CLAIM FOR RELIEF
### Violation of Due Process Clause of the Fifth Amendment and 5 U.S.C. § 706(2)(B)

385. Plaintiffs incorporate and reallege the preceding paragraphs as if set forth fully herein.

386. Under the APA, an agency action must be set aside if it is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

387. The Final Rule violates the Due Process Clause of the Fifth Amendment of the United States Constitution.

388. The Due Process Clause's guarantees of effective assistance of counsel and procedural due process apply in asylum adjudications, as well as in adjudications for withholding of removal and relief under CAT. The Final Rule abridges these constitutional guarantees by: (i) requiring immigration judges to pretermit asylum applications without a hearing and without affording applicants a reasonable opportunity to cure, and (ii) preventing applicants from asserting new arguments related to their PSG membership in a motion to reopen, motion to remand, or motion to reconsider, even if their failure to do so in their initial application was due to counsel's ineffectiveness. While the Final Rule purports to provide an exception for "egregiously" ineffective assistance, "egregious" is not the threshold promised by the Constitution, and the Departments concede in any event that "egregious circumstances" will exist only in "very rare" circumstances.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                                          Case No.

389.     These abridgements of procedural rights that violate the Due Process Clause uniquely devastate Plaintiffs because, among other reasons, LGBTQ/H claimants frequently fear identifying with their PSG in their initial public filings.

390.     The procedures set forth in the Final Rule also further offend the Due Process Clause because, as explained above, the impact of the Final Rule is not clearly limited temporally and Defendants seek to apply it retroactively to those whose applications were already pending as of the Final Rule's effective date.  Applying the Final Rule retroactively to invalidate the settled expectations of LGBTQ/H asylum seekers with pending applications will result in further manifest injustice in violation of the Due Process Clause.

## FOURTH CLAIM FOR RELIEF
### Violation of Appointments Clause of the Constitution, the HSA, the FVRA, and 5 U.S.C. §706(2)(A), (C), (D)
### Lack of Authority of Defendant Wolf

391.     Plaintiffs incorporate and reallege the preceding paragraphs as if set forth fully herein.

392.     Under the Administrative Procedure Act, agency action must be set aside if it is "in excess of statutory jurisdiction, authority, or limitations," or "without observance of procedures required by law." 5 U.S.C. § 706(2)(C), (D).

393.     At the time of publication of the Proposed Rule and Final Rule, Defendant Wolf did not have authority to serve as Acting Secretary of Homeland Security under the Federal Vacancies Reform Act, 5 U.S.C. §§ 3345 *et seq.*

394.     At the time of publication of the Proposed Rule and Final Rule, Defendant Wolf did not have authority to serve as Acting Secretary of Homeland Security under the Homeland Security Act, 6 U.S.C. § 113(g)(2).

395.     At the time of publication of the Proposed Rule and Final Rule, Defendant Wolf did not have constitutional authority to serve as Acting Secretary of Homeland Security under U.S. Const. art. II, § 2, cl. 2.

396.     The Final Rule relies on authority from DHS and Defendant Wolf, and was therefore enacted in excess of statutory authority and without observance of procedures required by law.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                          Case No.

397.    Moreover, the Final Rule would be arbitrary and capricious under the APA if the DOJ Regulations were to stand alone without their corresponding DHS counterparts, because without the DHS Regulations the Final Rule would be devoid of internal logic and eschew uniformity between the DOJ and DHS enforcement practices in contravention of the Final Rule's clear and unambiguous intent otherwise.  Thus, the Final Rule must be set aside in its entirety.

**FIFTH CLAIM FOR RELIEF**
**Violation of 5 U.S.C. §§ 553, 706**
**Insufficient Notice-and-Comment Period**

398.    Plaintiffs incorporate and reallege the preceding paragraphs as if set forth fully herein.

399.    The APA requires an agency proposing a new rule to provide public notice and to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. § 553(c).

400.    The 30-day notice-and-comment period provided was inadequate in light of the proposed rule's hundreds of pages of length, alterations to nearly every aspect of the asylum system, far-reaching impact on hundreds of thousands of refugees, and manifest complexity.  The Final Rule is therefore invalid in its entirety for failure to comply with the notice and comment requirements of the APA.

**<u>PRAYER FOR RELIEF</u>**

**WHEREFORE**, Plaintiffs respectfully pray for the following relief:

i.    That the Court accept jurisdiction and maintain continuing jurisdiction of this action;

ii.    A declaration pursuant to 28 U.S.C. §§ 2201-02 and 5 U.S.C. § 706(2) that the Final Rule is unlawful, unconstitutional, arbitrary and capricious, an abuse of discretion, and invalid in its entirety;

ii.    An order setting aside and vacating the Final Rule;

iii.    A temporary restraining order and preliminary and permanent injunctions enjoining Defendants, their officials, agents, employees, assigns, and all persons acting in concert or participating with them from implementing or enforcing the Final Rule;

iv.    Attorneys' fees, costs, and expenses, and other disbursements for this action under the Equal Access to Justice Act, 5 U.S.C. § 504 and 28 U.S.C. § 2412(2), *et seq.*, and as otherwise authorized; and

COMPLAINT FOR DECLARATORY AND                    Case No.
INJUNCTIVE RELIEF

v.     Such other relief as the Court deems equitable, just, and proper.

Respectfully submitted,

DATED:   December 21, 2020

JENNIFER C. PIZER (SBN 152327)
*jpizer@lambdalegal.org*
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
4221 Wilshire Boulevard, Suite 280
Los Angeles, California 90010
Telephone: (213) 590-5903

OMAR GONZALEZ-PAGAN*
*ogonzalez-pagan@lambdalegal.org*
RICHARD SAENZ*
*rsaenz@lambdalegal.org*
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, New York 10005
Telephone: (212) 809-8585

BRIDGET CRAWFORD*
*bcrawford@immigrationequality.org*
IMMIGRATION EQUALITY
594 Dean Street
Brooklyn, New York 11238
Telephone: (212) 714-2904

By: */s/ Austin Manes*
AUSTIN MANES (SBN 284065)
*amanes@kramerlevin.com*
KRAMER LEVIN NAFTALIS &
    FRANKEL LLP
990 Marsh Road
Menlo Park, California 94025
Telephone: (650) 752-1718

JEFFREY S. TRACHTMAN*
*jtrachtman@kramerlevin.com*
AARON M. FRANKEL*
*afrankel@kramerlevin.com*
JASON M. MOFF*
*jmoff@kramerlevin.com*
CHASE MECHANICK*
*cmechanick@kramerlevin.com*
KRAMER LEVIN NAFTALIS &
    FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100

* Application for admission *pro hac vice*
forthcoming.

*Counsel for Plaintiffs*

124

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

Case No.